# **EXHIBIT 2**

/2007 09:47 FAX

☒001/013

CORRESPONDENT
AGREEMENT
FORM 200

This Correspondent Loan Purchase Agreement ("Agreement"), dated the ___27th___ day of ___January___, 200_5_, by and between CitiMortgage, Inc. ("CMI"), for itself and on behalf of Citibank, FSB, Citibank (West), FSB, and Citibank, N.A., and;

___American Home Mortgage Corp.___ ("Correspondent").

In consideration of the terms contained in this Agreement, CMI and Correspondent agree as follows:

1. **PURCHASE AND SALE OF MORTGAGE LOANS**

   From time to time, Correspondent may sell to CMI and CMI may purchase from Correspondent one or more residential mortgage, home equity or other loans ("Loan(s)") in accordance with the terms, conditions, requirements, procedures, representations and warranties set forth in the "CitiMortgage, Inc. Correspondent Manual" and all amendments, bulletins, program requirements and supplements to such Manual (collectively hereinafter referred to as the "CMI Manual"), and this Agreement. CMI and Correspondent agree that the CMI Manual is incorporated by reference herein and is part of this Agreement. Further, CMI and Correspondent agree that Citibank, FSB; Citibank (West), FSB; and Citibank, N.A. are intended third party beneficiaries of this Agreement.

   For each Loan offered for sale by Correspondent to CMI, Correspondent will deliver Loan documentation to CMI in accordance with the applicable terms, conditions, requirements, procedures, representations and warranties set forth in the CMI Manual. CMI may purchase Loans with or without conducting a complete review of the Loan documentation. CMI's review of, or failure to review, all or any portion of the Loan documentation shall not affect CMI's rights to demand repurchase of a Loan or any other CMI right or remedy provided by this Agreement.

   For each Loan CMI agrees to purchase, CMI shall pay the amount agreed upon by CMI and Correspondent ("Purchase Price") in accordance with the applicable provisions of the CMI Manual. CMI may offset against the Purchase Price any outstanding fees or other amounts owing from Correspondent to CMI in connection with the particular purchase or other transactions.

   As of the date CMI purchases each Loan, Correspondent will (i) transfer to CMI all of its right, title and interest in and to each Loan, including without limitation all documents held or subsequently acquired by Correspondent relating to each Loan and (ii) execute all documents necessary to transfer such right, title and interest to CMI.

2. **REPRESENTATIONS AND WARRANTIES**

   Correspondent represents, warrants and covenants throughout the term of this Agreement as follows:

   (a) That it is duly organized, validly existing, in good standing, qualified and authorized to do business in each jurisdiction where it originate Loans or where a property securing any of its Loans is located; that all corporate or other actions and approvals necessary for the execution and performance of this Agreement have been taken and/or received; and that no consent from any third party is required for the execution and performance of this Agreement.

   (b) That it (i) holds and shall maintain in good standing throughout the term of this Agreement all applicable license(s) and/or registration(s) in each jurisdiction that is/are necessary for Correspondent's Loan origination, purchase and sale activities under this Agreement and (ii) is in full compliance with all laws in each jurisdiction which govern Correspondent's activities under this Agreement. Correspondent agrees to promptly provide CMI with copies of all such license(s) and/or registration(s) upon request by CMI.

   (c) That it will allow CMI to periodically investigate the financial (including but not limited to obtaining corporate and/or individual credit reports) and other status of Correspondent and, if necessary, the financial and other status of Correspondent's directors, officers and/or employees. If necessary, Correspondent shall cooperate with CMI to obtain the written consent of one or more of Correspondent's directors, officers and/or employees to such periodic investigation. Correspondent agrees that the failure to obtain such consent may result in the termination of this Agreement in accordance with the provisions of Sec. 7.

COPY

1 of 7

(03/04)

32493

08/03/2007 09:48 FAX ☒002/013

**CORRESPONDENT**
**AGREEMENT**
**FORM 200**

 (d) That it is thoroughly familiar with and will comply with all applicable federal (including but not limited to the Real Estate Settlement Procedures Act, Truth-In-Lending Act, Equal Credit Opportunity Act and federal fair lending laws), state and, if necessary, local laws and regulations directly or indirectly relating to its activities under this Agreement (including but not limited to involvement in such activities of individuals convicted of crimes involving dishonesty or breach of trust).

 (e) That Correspondent is an approved seller/servicer of conventional residential adjustable and fixed-rate mortgage Loans for Fannie Mae, Freddie Mac, and/or is a FHA-, VA- and/or HUD-approved mortgagee; that Correspondent is duly qualified, licensed, registered and otherwise authorized under all applicable laws and regulations and is in good standing to (i) originate, sell, endorse and assign Loans and, if applicable, the related Loan collateral to CMI, (ii) service Loans in the jurisdiction(s) where, if applicable, the properties securing such Loans are located for Fannie Mae, Freddie Mac, FHA or VA, and (iii) no event has occurred that would make Correspondent unable to comply with Fannie Mae, Freddie Mac, FHA, VA or HUD eligibility requirements or that would require notification to Fannie Mae, Freddie Mac, FHA or VA or HUD.

 (f) That it does not believe, nor does it have any reason or cause to believe, it cannot perform every covenant contained in this Agreement or continue to carry on its business substantially as now conducted; that it is solvent and the sale of Loans will not cause it to become insolvent; that no action, suit, proceeding or investigation pending or threatened against Correspondent, either alone or in the aggregate, may result in its inability to carry on its business substantially as now conducted; and that the sale of Loans under this Agreement is not undertaken with the intent to hinder, delay or defraud any of its creditors.

 (g) That it has obtained and reviewed or will, upon execution of this Agreement, promptly obtain and review the CMI Manual and will fully comply with its terms, conditions, requirements and procedures.

 (h) That it does not currently and will not in the future employ any entity or individual on the Freddie Mac exclusionary list.

 (i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each Loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of fact or omits or will omit to state a fact necessary to make the information not misleading. The provisions of this sub-section shall not apply to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity approved by CMI ("Approved Entity") unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and (ii) the Loan applicant(s) unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.

 (j) That the documentation for each Loan sold to CMI (i) shall be duly executed by the borrower(s), (ii) shall create a valid and legally binding obligation of the borrowers(s) and (iii), if applicable, shall create a fully enforceable first or subordinate lien on the property securing repayment of the Loan.

 (k) That each mortgage, home equity or other Loan (i) shall be fully enforceable and originated in accordance with the terms, conditions, representations, warranties and covenants contained in the CMI Manual and this Agreement which were in effect as of the Loan closing date, (ii), if applicable, was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards, and (iii) is subject to no defects or defenses, including but not limited to damage to the property securing the Loan, lien imperfections or environmental risk.

 (l) That any third-party originators referring, or in any way involved with, any Loan shall be, at a minimum, approved by Correspondent according to Fannie Mae, Freddie Mac, FHA, VA and/or HUD guidelines for approving third-party originators as described in the CMI Manual.

 (m) That it will immediately notify CMI if it (i) fails to maintain any license or registration in violation of Sec. 2(b) above and/or (ii) becomes subject to any enforcement and/or investigative

2 of 7

(03/04)

08/03/2007 09:48 FAX                                                                    ☑003/013

**CORRESPONDENT
AGREEMENT
FORM 200**

proceeding by any licensing or regulatory authority or agency and/or (iii) is named as a party or becomes involved in any material litigation.

(n) That it will immediately notify CMI if (i) Correspondent and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding, (ii) Correspondent and/or any of its principal director(s) or owner(s) requests the appointment of a receiver and/or (iii) Correspondent and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition.

(o) That it will immediately notify CMI of any material change in ownership and/or management.

(p) That it will promptly respond to or otherwise comply with CMI's reasonable request(s) for periodic financial statements of Correspondent and/or any of its principal director(s) or owners and any other documentation required by CMI in connection with the recertification of Correspondent.

(q) That it will fully comply with all additional representations, warranties and covenants contained in the CMI Manual.

(r) That all representations, warranties and covenants contained in this Agreement and the CMI Manual shall survive the expiration and termination of this Agreement.

3. **COSTS**

Correspondent shall pay all costs and expenses incurred in connection with the transfer and delivery of Loans to CMI purchased pursuant to this Agreement, including but not limited to mortgage Loan assignment preparation and recording fees, fees for title policy endorsements and continuations, and Correspondent's attorneys' fees.

4. **CORRESPONDENT ADVERTISING; NON-SOLICITATION AND CUSTOMER PRIVACY**

Correspondent may advertise to the public the availability of various Loan programs, but Correspondent may not, in any way, directly or indirectly identify CMI in all such advertising unless (i) required by applicable law or (ii) CMI has, in advance, approved use of CMI's name in such advertising.

Correspondent agrees that the borrower(s) on all Loans shall, at the time of purchase by CMI, become the exclusive customers of CMI for all Loan-related purposes. During the first twelve (12) months after the date any Loan is purchased by CMI, Correspondent represents and warrants that Correspondent, Correspondent's directors, officers, employees, agents or affiliates will not, without the prior consent of CMI, (i) use targeted advertising, solicit or otherwise directly encourage or incent the Loan borrower(s) to refinance or prepay the Loan that was purchased by CMI, (ii) prepare, sell or distribute any customer list incorporating the names, addresses or any non-public personal information of such borrower(s) or (iii) use any such customer list to solicit, promote, or allow any other entity to solicit or promote, the sale of financial services or products to any such borrower(s). CMI and Correspondent agree that nothing contained herein shall prohibit advertising or solicitation by Correspondent that is directed to the general public in the area where the Loan borrower(s) reside(s).

Correspondent acknowledges that it has received a copy of the Citigroup Privacy Promise and/or Citigroup Privacy Policy and, to the extent necessary, shall comply with all applicable provisions of such Promise and/or Policy. Correspondent also agrees that it shall comply with all applicable federal or state laws related to the use and/or retention of the non-public personal and/or financial information associated with all Loans and the related Loan borrower(s).

5. **TERM**

This Agreement is for an initial one-year term and shall automatically renew for successive one-year terms, unless terminated pursuant to Section 7 of this Agreement.

CORRESPONDENT
AGREEMENT
FORM 200

### 6. RELATIONSHIP BETWEEN CMI AND CORRESPONDENT

This Agreement will not create any agency between Correspondent and CMI. Correspondent shall conduct its business under this Agreement as an independent contractor and shall have the rights and responsibilities of an independent contractor.

CMI shall not be responsible for any actions or omissions by Correspondent. Correspondent agrees it will not represent, orally, in writing, by implication or otherwise, that it can act in any capacity on behalf of CMI.

CMI is prescribing no marketing plan for Correspondent and exercises no control over the methods, operations and practices of Correspondent except as provided in this Agreement and the CMI Manual.

Correspondent acknowledges it is not selling or distributing CMI's services, and CMI has made no promise, representation or warranty regarding the profitability of any arrangement with Correspondent.

Correspondent and CMI acknowledge that each will be providing the other party with valuable proprietary information ("Confidential Information"), including but not limited to information regarding CMI's or Correspondent's products, programs, underwriting policies, procedures and customers. Except as necessary to perform its obligations under this Agreement or as required by law, each party will not disclose any Confidential Information to any person outside that party's organization and will limit access to this information within its organization on a strict "need to know" basis. Each party agrees to notify all of its directors, officers, employees and other agents of its obligations regarding Confidential Information and will cause such directors, officers, employees and other agents to comply with such obligations.

### 7. TERMINATION

CMI may immediately terminate this Agreement without notice and CMI then will have no further obligations under this Agreement upon: (1) the failure of Correspondent to perform or abide by any term, condition, covenant or obligation contained in this Agreement or the CMI Manual; (2) the finding by CMI that any representation or warranty made by Correspondent is false or incorrect in any material respect; (3) commencement by or against Correspondent of any bankruptcy, insolvency or similar proceedings; (4) CMI's determination that Correspondent's actions contravene the terms and conditions of this Agreement or could adversely impact CMI's activities or reputation; or (5) the failure of loans sold by Correspondent to CMI pursuant to this Agreement to satisfy CMI's expectations regarding loan quality and/or performance.

Either party may terminate this Agreement for any other reason upon thirty (30) calendar days prior notice to the other. In the event of termination, Correspondent shall fully cooperate with and assist CMI in obtaining the documentation necessary to complete the processing and full resolution of all matters (including but not limited to the delivery of all application and/or closed loan documents and, if applicable, all Loan insuring documentation) relating to all Loans purchased by CMI.

### 8. ASSIGNMENT

Correspondent may not assign this Agreement or any of its responsibilities under this Agreement. This Agreement and all rights, obligations and responsibilities hereunder may be assigned by CitiMortgage, Inc., without consent of the Correspondent, to any corporation or bank more than 50% of the voting stock of which is, directly or indirectly, owned by Citigroup, Inc.

### 9. NON-EXCLUSIVE AGREEMENT

Correspondent's rights under this Agreement are on a non-exclusive basis. CMI shall be free to market its products and services to, and to contract with, other parties and customers as it deems appropriate.

CORRESPONDENT
AGREEMENT
FORM 200

### 10. INDEMNIFICATION

Correspondent agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) Correspondent's performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual (including but not limited to Correspondent's failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to this Agreement), (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained this Agreement or the CMI Manual and/or (iii) Correspondent's advertisements, promotions or other activities. This indemnification shall extend to any action or inaction by the directors, officers, employees, agents, independent contractors or other representatives of Correspondent and shall survive the expiration and termination of this Agreement.

### 11. CURE OR REPURCHASE

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

(i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

(ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

(iii) was or is capable of being rescinded by the applicable borrower(s) pursuant to the provisions of any applicable federal (including but not limited to the Truth-In-Lending Act) or state law or regulation;

(iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

(v) was subject to an Early Payment Default (as defined in the CMI Manual), an Early Payoff (as defined in the CMI Manual) or any other payment related defect (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

Correspondent agrees and acknowledges that the provisions of this Sec. 11 do not, in any way, eliminate, diminish or impair Correspondent's indemnification obligations contained in Sec. 10.

CORRESPONDENT
AGREEMENT
FORM 200

12. GOVERNING LAW; VENUE

This Agreement shall be governed by the laws of the State of Missouri and applicable federal law.

CMI and Correspondent agree that any action, suit or proceeding to enforce or defend any right or obligation under this Agreement or otherwise arising out of either party's performance under this Agreement shall be brought in St. Louis County Circuit Court or the United States District Court for the Eastern District of Missouri and each party irrevocably submits to the jurisdiction of either forum and waives the defense of an inconvenient forum to the maintenance of any such action, suit or proceeding in such state or federal court and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in either forum.

13. NOTICE

All notices to CMI shall be sent in accordance with the applicable provisions of the CMI Manual and shall be addressed according to such provisions.

Prior to or at the time Correspondent executes this Agreement, it shall provide CMI with one or more procedures and addresses for delivering notices pursuant to this Agreement. In addition to these procedures and addresses, Correspondent agrees and acknowledges that CMI may deliver all notices required by this Agreement in writing to Correspondent at the address listed on the last page of this Agreement.

14. MODIFICATION; MERGER; ENTIRE AGREEMENT; NO WAIVER OF RIGHTS

This Agreement may not be modified except by a document or record signed by both CMI and Correspondent. This Agreement (including the CMI Manual) contains the entire agreement of the parties and supersedes all previous agreements (including all amendments thereto) between the parties hereto. Any representations, promises or agreements not contained in this Agreement or the CMI Manual shall have no force or effect. The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under this Agreement shall not constitute a waiver of any right, including the right to insist on strict compliance in the future.

15. ON-SITE REVIEW AND DOCUMENT COLLECTION

Correspondent shall permit any officer, employee or designated representative of CMI, at any reasonable time during regular business hours and upon reasonable advance notice by CMI, to conduct an examination and audit on Correspondent's premises of any of the processes implemented and documents kept by Correspondent regarding any Loan purchased by CMI pursuant to this Agreement. If Correspondent fails to timely deliver, in accordance with the applicable terms and conditions specified in the CMI Manual, all documents and records associated with or related to any Loan purchased by CMI pursuant to this Agreement, Correspondent shall also give CMI and its officers, employees, or designated representatives reasonable access to Correspondent's premises in order to allow CMI to retrieve, prepare or otherwise obtain all such documents and records. Correspondent shall also make its officers, employees and/or designated representatives available to CMI and shall cooperate with CMI in all such examinations, audits and document and record collection activities.

16. AUTHORITY TO EXECUTE AGREEMENT

Correspondent represents and warrants that it has all requisite power, authority and capacity to enter into this Agreement and to perform all obligations required of it hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action(s). Correspondent shall, upon request by CMI, execute such supplemental resolutions, acknowledgments and/or certifications as may be reasonably necessary to evidence such power, authority and capacity.

CORRESPONDENT
AGREEMENT
FORM 200

17. **CORRESPONDENT GRANT OF LIMITED POWER OF ATTORNEY**

Correspondent hereby appoints CMI and the directors, officers, employees, agents, successors and assigns of CMI as its true and lawful attorney-in-fact without right of revocation and with full power of substitution for and in its place and stead to (i) demand and control all sums due on Loans purchased pursuant to this Agreement and to enforce all rights with respect thereto, (ii) endorse, mark, place or otherwise evidence Correspondent's name as payee on all checks, drafts, acceptances or other form of partial or full Loan payment delivered or tendered to CMI, (iii) endorse, mark, place or otherwise evidence Correspondent's name on all notes, mortgages, deeds of trust, and other forms of security instruments or collateral and all assignments, full or partial releases or satisfactions of said mortgages, deeds of trust, and other forms of security instruments or collateral for all Loans purchased pursuant to this Agreement. Correspondent agrees to execute such other documents as CMI may reasonably request to evidence the appointment of CMI as Correspondent's attorney-in-fact.

18. **MISCELLANEOUS**

All capitalized terms not otherwise defined herein shall have the meanings attributed to them in the CMI Manual. All Section headings are for convenience only and shall not be construed as part of this Agreement. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction and, to accomplish this purpose, the provisions hereof are severable. **This Agreement shall not be effective until signed by both parties.**

IN WITNESS WHEREOF, the duly authorized officers of CMI and Correspondent have executed this Agreement as of the date first above written.

CITIMORTGAGE, INC.  _American Home Mortgage Corp._
(CMI)  (CORRESPONDENT)
By _[signature]_  By _[signature]_

Title _VICE PRESIDENT_  Title _EVP_

Date _2-3-05_  Date _1/28/04_

RICHARD P. McCOPPIN
Manager Eligibility & Wholesale MIS
CitiMortgage Inc.
1000 Technology Drive/MS 111
O'Fallon, MO 63304
(636) 261-0151/GEID #0002093401

Correspondent Notice Address:
_538 Broadhollow Rd._
_Melville, NY 11747_

**NOTE: THE TEXT OF THIS AGREEMENT MAY NOT BE CHANGED IN ANY MANNER WITHOUT THE EXPRESS PERMISSION OF CITIMORTGAGE, INC.**

data/word/citicor.doc (03/01/04)
7 of 7

(03/04)

08/03/2007 09:50 FAX                                                                         008/013



### CMI *Select* Addendum

This Addendum, effective as of August 9, 2004 supplements and amends the CitiMortgage, Inc. ("CMI") Correspondent Loan Purchase Agreement ("Agreement") dated August 9, 2001 by and between CMI and American Home Mortgage Corporation, Incorporated ("Correspondent").

*Whereas*, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to make certain changes to the Agreement in connection with certain Assignment of Trade, Direct Trade and Block Commitments from Correspondent to CMI, as defined in paragraphs 1, 2, 3, and 4 below.

*Now Therefore*, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CMI and Correspondent agree as follows, and the following paragraphs are added to the Agreement:

1. Block Commitments: From time to time Correspondent will negotiate a mandatory sale of whole Eligible Mortgage Loans on an individual note rate of Same Product, and deliver same pursuant to the Agreement to fulfill a Commitment with CMI; and CMI may agree to purchase the mortgage loans and the servicing rights to same under the terms of this Addendum, the Agreement, and the Commitment.

2. Direct Trade Commitments: From time to time Correspondent will negotiate a mandatory sale of Eligible Mortgage Loans pursuant to a Commitment negotiated and executed directly with CMI and CMI will purchase the Eligible Mortgage Loans and the servicing rights to same under the terms of this Addendum, the Agreement and the Commitment.

3. Assignment of Trade Commitments: Under the terms of the Agreement and this Addendum, Correspondent may negotiate a trade with a CMI-approved Securities Dealer ("Dealer"), and then subsequently assign the interest in the trade to CMI. Correspondent shall notify CMI that it desires to assign a trade and sell certain Eligible Mortgage Loans and related servicing rights to CMI and CMI may accept such an offer by a written notice from CMI to Correspondent in the form of the Tri-Party Agreement (the form of which is attached hereto as Exhibit A). The following terms and conditions shall apply to all Assignments of Trade:

    A. CMI shall accept Assignments of Trade of GNMA-I, GNMA-II, Fannie Mae or Freddie Mac "to-be-announced" ("TBA") securities from Seller and shall pay Seller the Purchase Price provided for in paragraph 7 of this Addendum for the Eligible Mortgage Loans intended to fulfill the trades which are delivered to CMI pursuant to the terms and procedures set forth in the Agreement.

    B. CMI will accept TBA trades only, specified trades will not be accepted.

    C. Any Assignment of Trade to be accepted by CMI shall be for available Product windows only.

    D. Trades may only be transacted with CMI approved Dealers.

    E. The minimum amount for any Assignment of Trade to be accepted by CMI for available Product windows shall be $500,000 ($250,000 for GNMA II).

4. Eligible Mortgage Loans are defined as follows:

    A. For Block Commitments:

CitiMortgage, Inc. does business as Citicorp Mortgage in MT and NM.                            A member of citigroup

    (i) Conventional Conforming ARM Loans eligible for pooling in Fannie Mae or Freddie Mac mortgage-backed securities.

    (ii) Conventional Non-Conforming Fixed Rate and ARM Loans eligible for sale to CMI.

    All Products must meet the Product parameters described in the Correspondent Agreement in effect at the time of funding.

  B. For Assignment of Trade and Direct Trade Commitments:

    (i) FHA-insured and/or VA-guaranteed mortgage Loans eligible for pooling in GNMA mortgage-backed securities, and

    (ii) Conventional conforming fixed rate Loans eligible for pooling in Fannie Mae or Freddie Mac mortgage-backed securities.

    All Products must meet the Product parameters described in the Correspondent Agreement in effect at the time of funding. Correspondent shall not deliver to CMI any FHA/VA Loans acquired from a third party customer which is not approved by FHA/VA or not sponsored by Correspondent to originate loans under FHA/VA programs.

5. **Product**: Product is defined as Loans eligible for purchase by CMI, according to the applicable terms, conditions, requirements, procedures, representations and warranties set forth in the Agreement.

6. **Same Product**: Same Product is defined as Loans (eligible as above defined) which share similar characteristics with regard to loan type, term, and note rate.

7. **Purchase Price**:

  A. For Block Commitments, the Purchase Price shall be mutually agreed to by Correspondent and CMI in accordance with the commitment price and any applicable pricing adjusters.

  B. For Assignment of Trade and Direct Trade Commitments, the Purchase Price shall be mutually agreed to by Correspondent and CMI in accordance with the executed trade price and any applicable pricing adjusters.

  C. Upon notification to Correspondent, CMI shall have the right to deduct any fees, penalties, taxes, trade assignment buyout fees, or other charges of any kind owed CMI by Correspondent, from the Purchase Price of any Eligible Mortgage Loans purchased by CMI from Correspondent pursuant to this Addendum or any other agreement between Correspondent and CMI.

8. **Tri-Party Agreement**: For all Assignment of Trade Commitments, CMI and Correspondent will prepare and execute a Tri-Party Agreement (in the form attached hereto as Exhibit A, as amended from time to time by written notice from CMI to Correspondent) in accordance with the procedures contained in this Addendum. The terms and conditions contained in the Tri-Party Agreement shall define the nature of the specific trade and are binding on the parties.

9. **Retention of Risk**: Correspondent agrees that it retains all risks that the Dealer will not perform on the trade. If CMI deems, at its sole option that the Dealer is unable to perform, CMI may immediately take any action it deems necessary and prudent in order to minimize its losses, including pairing off, and Correspondent agrees that it will immediately pay CMI any related loss incurred by CMI pursuant to the terms and procedures described in paragraph 15 of this Addendum.

10. <u>Approved Securities Dealers:</u> For all Assignment of Trade Commitments, CMI will only accept trades from Approved Securities Dealers ("Dealers") listed on the form attached hereto as Exhibit B, as amended from time to time by written notice from CMI to Correspondent. If the Correspondent wishes to assign a trade with a Dealer not listed, approval may be sought from CMI. Approval of Dealers is at the complete and sole discretion of CMI and must be in writing, signed by a duly authorized officer of CMI.

11. <u>Correspondent Authorized Trading Contacts:</u> Correspondent hereby authorizes CMI to accept and communicate pricing information to the representatives indicated on the Secondary Marketing Trading Desk Authorized contact List, attached hereto as Exhibit C. The representatives listed are the sole representatives of Correspondent authorized to conduct mortgage transactions with the CMI-Select Desk of CitiMortgage, Inc. Should this list change, it is the sole responsibility of Correspondent to notify CMI in writing, signed by an authorized signatory from Correspondent.

12. <u>Representations and Warranties</u>:

    A. Correspondent hereby makes all representations, warranties and covenants set forth in the Agreement and this Addendum with respect to each Eligible Mortgage Loan delivered to CMI pursuant to this Addendum, as of the date of delivery of each such Eligible Mortgage Loan.

    B. Correspondent represents that it will not select Eligible Mortgage Loans in a manner materially adverse to CMI when delivering Loans to fulfill a Block Commitment, Assignment of Trade or Direct Trade Commitment. CMI may audit Correspondent's selection procedures during regular business hours to assure itself that the selection procedures are not materially adverse to CMI. In the event CMI reasonably demonstrates that materially adverse selection procedures were used, Correspondent shall within 30 days repurchase and/or replace the affected Loans in accordance with paragraph 11 of the Agreement with Eligible Mortgage Loans selected in a manner which is not materially adverse to CMI. Failure to repurchase or replace any Loan rejected under this subsection may subject Correspondent to those charges, penalties and procedures described in paragraph 7(C) and paragraph 14 of this Addendum.

    C. Correspondent has all requisite corporate power, authority and capacity to enter into this Addendum and to perform the obligation required of it hereunder.

    D. The execution and performance of this Addendum by Correspondent, its compliance with the terms hereof and the consummation of the transactions contemplated herein will not violate any provision of any law applicable to it and will not conflict with any terms or provisions of its certificate of incorporation or by-laws, or any other instrument relating to the conduct of its business or any other agreement to which Correspondent is a party.

    E. No representation, warranty or statement made by Correspondent in this Addendum or other documents prepared by Correspondent contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained in this Addendum or made in any document referred to in the Addendum not misleading.

13. <u>Loan Delivery:</u> CMI will notify Correspondent of the applicable Commitment delivery and funding deadlines for each Commitment obligation. Correspondent agrees to provide CMI with sufficient Eligible Mortgage Loans to fulfill the Commitment by the Commitment delivery deadline as provided at the time of Commitment. Correspondent must deliver Eligible Mortgage Loans with aggregate principal balances within a tolerance of the face amount of the Commitment, as set forth and agreed to by both parties in the Commitment Confirmation (representative samples of which are attached hereto as Exhibit D. Substitutes for rejected Loans will be accepted provided such substitutes are

within tolerance of Commitment and received in sufficient amounts to fulfill the obligations created by an Assignment of Trade, Direct Trade or Block Commitment.

14. <u>Loan Review</u>: CMI will review each Loan for credit quality and documentation prior to purchase of the Loan. At its discretion, CMI may reject any Loan, which it reasonably determines does not meet the terms and parameters of the Agreement. Notwithstanding such prior review, Correspondent agrees to repurchase on CMI's demand any Loan which is unacceptable to CMI, GNMA, Freddie Mac or Fannie Mae as the result of any defects which are not cured by Correspondent within the time period specified by CMI.

15. <u>Failure to deliver</u>: In the event CMI does not receive from Correspondent sufficient Eligible Mortgage Loans to fulfill the obligations created under this addendum, Correspondent shall contact the CMI representative to either arrange for an extension (which extension shall be granted at the sole discretion of CMI) or to pair out of the Commitment. Any and all fees, penalties, taxes, trade assignments, buy-out fees or other charges of any kind, whether incurred and assessed by outside entities or incurred internally by CMI, shall be charged to Correspondent and are due and payable to CMI immediately. CMI shall prepare an itemized statement of such charges and provide same to Correspondent. Failure to remit payment shall constitute an event of default under the Agreement and CMI shall be entitled to all remedies provided by the Agreement and at law. For deliveries which exceed the committed amount, CMI will contact Correspondent to establish the price for excess delivery amount.

16. Correspondent acknowledges that it has received and read the Agreement. All provisions of this Addendum are incorporated by reference into the Agreement, and shall be binding upon Correspondent and CMI. Specific references in this Addendum to particular provisions of the Agreement and not to other provisions do not mean that those provisions of the Agreement not specifically cited in the Addendum are not applicable. All terms used herein shall have the same meaning as the terms have in the Agreement, unless otherwise defined herein, or the context clearly requires otherwise. In the event of any conflict between the provisions of this Addendum and the provisions of the Agreement, the provision of this Addendum shall control.

17. This Addendum may be terminated upon 10 days written notice from either party. Termination shall not affect the sale and purchase of any Eligible Mortgage Loans agreed to between Correspondent and CMI. All representations, warranties and covenants contained in this Addendum and the Agreement shall survive the termination of this Addendum.

| American Home Mortgage Corp. ("Correspondent") | CitiMortgage, Inc. |
|---|---|
| By: _____ | By: _____ |
| Name: Robert F. Johnson | Name: Julie LaBonté |
| Title: EVP, Capital Markets | Title: Director, Correspondent Pricing |

Cc: Richard McCoppin, Intermediary Management

## Delegated Underwriting Addendum

This Delegated Underwriting Addendum ("Delegated U/W Addendum"), effective as of _January 27th_, 20_05_ supplements and amends the CitiMortgage, Inc. ("CMI") Correspondent Loan Purchase Agreement (the "Agreement") dated _January 27_ _TH_ 20 _05_ by and between CMI and _American Home Mortgage Corp._, ("Correspondent")

WHEREAS, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to make certain changes to the Agreement in connection with the delegation of certain underwriting functions to Correspondent,

WHEREAS, Citibank, FSB; Citibank (West), FSB; and Citibank, NA (collectively referred to herein as "The Banks") may, from time to time, purchase from CMI certain Loans which are covered by the provisions of this Delegated U/W Addendum, and the parties hereby expressly acknowledge that The Banks are intended third party beneficiaries of the Agreement and this Addendum, and

WHEREAS, Correspondent desires to originate Loans which comply, in all material respects, with the appropriate underwriting criteria established by CMI for the associated Loan product.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, CMI and Correspondent agree as follows:

1) The following paragraphs are added to Section 11 ("Cure or Repurchase") of the Agreement:

Correspondent expressly agrees that it shall underwrite each Loan in conformity with the applicable underwriting criteria of CMI. If an audit by CMI on any Loan reveals that it was underwritten in violation of the applicable CMI underwriting criteria, Correspondent will, not later than thirty (30) days after receipt of written notice from CMI, repurchase the Loan at the Repurchase Price or provide CMI with written evidence as to why Correspondent believes such underwriting criteria was not violated. If, after reviewing Correspondent's written evidence, CMI, in its sole and independent discretion, determines the Loan was not originated in accordance with the applicable underwriting criteria, Correspondent will, not later than thirty (30) days after receiving further written notice from CMI, repurchase the Loan at the Repurchase Price specified in the Agreement, Manual and/or applicable Bulletin(s).

Correspondent expressly agrees and acknowledges that CMI (i) is entitled to independently exercise and/or receive all benefits and remedies of the Agreement, Manual, and this Delegated U/W Addendum with respect to all Loans purchased by CMI and (ii) may, in its sole and independent discretion, terminate the Correspondent's delegated underwriting privileges with respect to all or a specified number of Loan products at any time upon ten (10) days advance written notice to Correspondent of such full or partial termination.

2) Except as amended herein, all other terms and conditions of the Agreement (including but not limited to the remaining provisions of Section 11) shall remain in full force and effect.

08/03/2007 09:51 FAX                                                                                                    ☒013/013

3) Capitalized terms not defined in this Delegated U/W Addendum shall have the meanings attributed to them in the Agreement.

4) This Delegated U/W Addendum supersedes and replaces all other delegated underwriting Addendum(s) previously executed by Correspondent and CMI.

IN WITNESS WHEREOF, the duly authorized officers of Correspondent and CMI have executed this Delegated U/W Addendum.

American Home Mortgage Corp. ("Correspondent")

By: _____

Name: Robert F Johnson

Title: E V P

CitiMortgage, Inc. ("CMI")

By: _____

Name: _____

Title: Vice President

RICHARD P. McCOPPIN
Manager Eligibility & Wholesale MIS
CitiMortgage Inc.
1000 Technology Drive/MS 111
O'Fallon, MO 63304
(636) 261-0151/GEID #0002093401

delegatedunderwriting (5/13/04)