# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Deadline: January 7, 2008 at 4:00 p.m.** |
| | ) | **Hearing Date: January 14, 2008 at 2:00 p.m.** |
| | ) | |

## NOTICE OF CITIMORTGAGE INC.'S MOTION TO LIFT THE AUTOMATIC STAY AND COMPEL THE DEBTORS TO RELEASE LOAN DOCUMENTS

PLEASE TAKE NOTICE that on December 27, 2007, CitiMortgage, Inc. ("CMI") filed *CitiMortgage Inc.'s Motion To Lift The Automatic Stay And Compel The Debtors To Release Loan Documents* (the "Lift Stay Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801 (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Lift Stay Motion must be in writing, filed with the Clerk of Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, and served upon and received by the undersigned counsel on or before **January 7, 2008 at 4:00 p.m.**

PLEASE TAKE FURTHER NOTICE that a hearing with respect to the Lift Stay Motion will be held on **January 14, 2008 at 2:00 p.m.** before the Honorable Christopher S. Sontchi at the United States Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom #6, Wilmington, Delaware 19801.

IF NO OBJECTIONS TO THE LIFT STAY MOTION ARE TIMELY FILED, SERVED

AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT

THE RELIEF REQUESTED IN THE STAY MOTION WITHOUT FURTHER NOTICE OR

HEARING.

Dated:  December 27, 2007

**MORRIS JAMES LLP**

Brett D. Fallon (DE I.D. #2480)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, Delaware   19899-2306
Telephone:  (302) 888-6888
Facsimile:  (302) 571-1750
Email:  bfallon@morrisjames.com

-and-

Andrew J. Petrie (admitted pro hac vice)
Featherstone Petrie DeSisto LLP
600 17th Street, Suite 2400S
Denver, CO   80202-5424
Telephone:  (303) 626-7139
Facsimile:  (303) 626-7101
Email:  apetrie@featherstonelaw.com

*Attorneys for CitiMortgage, Inc.*

1642205/1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., *et al.,* | ) |
| | ) |
| Debtors. | ) **Objection Deadline: January 7, 2008 at 4:00 p.m. (ET)** |
| | ) **Hearing Date: January 14, 2008 at 2:00 p.m. (ET)** |

### CITIMORTGAGE INC.'S MOTION TO LIFT THE AUTOMATIC STAY AND TO COMPEL DEBTORS TO RELEASE LOAN DOCUMENTS

CitiMortgage, Inc. ("CMI") moves this court to lift the automatic stay pursuant to Sections 362(d) and 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 4001(a)(1) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and to compel American Home Mortgage Corp., American Home Mortgage Servicing, Inc. and certain affiliates (collectively, the "Debtors" or "AHM") to return to CMI all Loan documentation relating to the mortgages Debtors sold to CMI pre-petition under the Correspondent Loan Purchase Agreement and attached addendums dated August 9, 2001 (the "2001 Correspondent Agreement"), the Correspondent Loan Purchase Agreement and attached addendums dated January 27, 2005 (the "2005 Correspondent Agreement"), the Bulk Purchase Amendment dated July 16, 2003 (the "2003 Amendment") and the Citimortage Correspondent Manual, last revised on February 8, 2007 (the "CMI Manual") (collectively, the "Correspondent Loan Agreements").

The Loan documents are, by operation of law and by agreement, CMI's property and are not, therefore, properly included in the Debtors' estates. Indeed, Debtors admit that they have only bare legal title to these documents in their Omnibus Response to Certain Objections to the Sale of Certain Assets and the Assumption and Assignment of Executory Contracts Relating to the Debtors' Loan Servicing Business (the "Omnibus Response"). [Docket No. 1443].

1642113

Moreover, Debtors must immediately hand over the Loan documentation without "payment of reasonable costs and expenses" (payments to which Debtors suggest they are entitled to in their Motion for an Order Pursuant to 11 U.S.C. §§ 105, 363 and 554 Authorizing the (I) Abandonment and Destruction of Certain Duplicate Mortgage Loan Files or (II) Return of Mortgage Loan Files to the Owner of Such Loans Upon Payment of Reasonable Costs and Expenses (the "Abandonment Motion")). [Docket No. 2395].  Debtors have no authority to abandon and destroy or otherwise request a retrieval fee for property Debtors do not own.  (Although, Debtors seem to contradict themselves in their Abandonment Motion, in which they claim the documents are property of the estate. *See infra*.)

Debtors should have already turned over the Loan documents to CMI.  Instead, they have continued to hold on to these documents in breach of the Correspondent Loan Agreements, and now have the temerity to request/require that CMI pay Debtors for the return of its own documents.  If any party should be required to pay a fee, it should be the Debtors, because their failure to turn over these documents has caused CMI to incur additional fees and expenses.

Accordingly, CMI asks this Court to issue an order pursuant to Sections 362(d), 541(d) and its equitable powers under Section 105 lifting the stay and requiring Debtors to return the Loan documents without cost to CMI.

## JURISDICTION

1.      The Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief CMI seeks in this motion are Sections 362(d), 541(d) and 105(a) of the Bankruptcy Code, and Bankruptcy Rules 4001(a)(1) and 9014.

1642113

## **BACKGROUND**

3.      Prior to filing their bankruptcy petitions, Debtors were in the business of originating mortgage loans and selling them in the secondary mortgage market to institutional investors.  Debtors were, therefore, parties to a number of correspondent loan purchase agreements with institutional investors.  Under these agreements, AHM as "correspondent" would sell to an investor mortgage loans on either a "servicing-retained" or "servicing-released" basis.  If an investor bought loans on a "servicing-retained" basis, AHM would act as a servicer of the purchased loans; however, if an investor bought loans on a "servicing-released" basis, the investor maintained the right to service the purchased loans.

4.      On August 9, 2001 and January 27, 2005, AHM entered into the respective 2001 and 2005 Correspondent Agreements with CMI on a servicing-released basis.  Attached as Exhibits 1 and 2 are true and correct copies of these agreements.  For each Loan AHM offered for sale under the 2001 and 2005 Correspondent Agreements, AHM agreed to deliver the related Loan documentation in accordance with the CMI Manual.  [Exhs. 1 and 2 §1].  Section 1 of both the 2001 and 2005 Correspondent Agreements specifically stated that, "[a]s of the date CMI purchase[d] each Loan, Correspondent w[ould] (i) transfer to CMI all of its right, title and interest in and to each Loan, including without limitation all documents held or subsequently acquired by Correspondent relating to each Loan and (ii) execute all documents necessary to transfer such right, title and interest to CMI."  [Exhs. 1 and 2 §1].  Moreover, Section D of the 2003 Amendment to the 2001 Correspondent Agreement made delivery of the Loan documents "mandatory" (attached as Exhibit 3 is a true and correct copy of the 2003 Amendment).  In the event that Loans were to be interim serviced for CMI, AHM was required to transfer the Loans at the Transfer Date defined in the 2003 Amendment.  [Exh. 3 §G].

5.    Section 900 of the CMI Manual set forth the guidelines AHM as Correspondent was to follow when preparing the Loan files for submission to CMI.  Attached as Exhibit 4 is a true and correct copy of the relevant portions of Section 900 of the CMI Manual.  Pursuant to the CMI Manual, AHM was to submit certain Loan documentation prior to purchase, and all other Loan documentation no later than one hundred and twenty (120) days after each Loan purchase.  [Exh. 4 at 1].

6.    As explained by the CMI Manual, the "timely receipt of post purchase documentation [was] critical to minimizing [CMI's] expenses as well as meeting [its] final pool certification deadlines." [Exh. 4 at 3].  It was thus CMI's policy, in its discretion, to require immediate repurchase of all defective Loans at the Repurchase Price specified by CMI if AHM failed to provide all of the documentation required by CMI "and/or fail[ed] to satisfy all other Loan specific or Correspondent Manual document requirements." [Exh. 4 at 3].

7.    Additionally, the 2001 and 2005 Correspondent Agreements stated that, in the event AHM failed to perform "under the terms, conditions or obligations of th[ese] Agreement[s] or the CMI Manual (including but not limited to Correspondent's failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to th[ese] Agreement[s])," AHM was required to indemnify CMI or, at CMI's discretion, cure or repurchase the defective Loan within ten (10) business days of AHM's receipt of CMI's repurchase request.  [Exhs. 1 and 2 §§ 10-11].

8.    Notably, none of the Correspondent Loan Agreements required CMI to pay for the delivery of the documentation underlying each purchased Loan.  To the contrary, Section 3 of both the 2001 and 2005 Correspondent Agreements and Section 900 of the CMI Manual stated that AHM, as Correspondent, was to "pay all costs and expenses incurred in connection with the transfer and delivery of Loans to CMI purchased pursuant to th[ese] Agreement[s], including but not limited to mortgage Loan

4

assignment preparation and recording fees, fees for title policy endorsements and continuations, and Correspondent attorneys' fees." [Exhs. 1 and 2 §3; Exh. 4 at 3].

9.      On August 6, 2007 (the "Petition Date"), and before AHM delivered all Loan documentation to CMI pursuant to the Correspondent Loan Agreements, Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Cases"). This Court is jointly administering the Cases as per this Court's August 7, 2007 order. [Docket No. 60].

10.     Debtors have repeatedly advised that "they filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets" (*see, e.g.,* Abandonment Motion ¶ 10 [Docket No.2395]) – thus confirming that, from the outset, these have been liquidation proceedings.

11.     On August 6, 2007, Debtors filed the Sale Motion so that they could sell the servicing rights retained under servicing-retained loan agreements. [Docket Nos. 11-12].

12.     On August 9, 2007, this Court entered its Order Approving (I) Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof and (IV) Granting Related Relief, which established procedures for the sale of the Debtors' servicing business. [Docket No. 113].

13.     On October 30, 2007, this Court entered an Order Pursuant to Sections 105, 363, 364, 365, and 503(b) of the Bankruptcy Code, and Rules 2002, 4001, 6004, 6006, 7062, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Approving (i) the Sale of the Debtor's Mortgage Servicing Business Free and Clear of Liens, Claims and Interests, (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (B) Granting Certain Related Relief. [Docket No. 1711].

14.     Debtors did not assume the Correspondent Loan Agreements, and thus the Correspondent Loan Agreements were not assumed and assigned and/or purchased in the sale of its servicing business.

1642113

15.    Debtors admitted in their Omnibus Response that the underlying mortgage loans relating to loan agreements[1] with investors were not property of the estate, and that Debtors "*have never asserted more than a possessory interest in this* property." (Omnibus Resp. at 4) (emphasis in original).

16.    To date, AHM is in breach of the Correspondent Loan Agreements because it has failed to deliver a number of Loan documents to CMI. AHM must either deliver these documents immediately, or repurchase or otherwise cure the associated Loans.

17.    CMI brings this motion to lift the stay so that it can recover the Loan documentation currently in Debtors' possession, and which Debtors have retained in breach of the Correspondent Loan Agreements. At a minimum, AHM is required to return the Loan documents listed in Exhibit 5 without any charge to CMI per the Correspondent Loan Agreements because they are not property of the estate pursuant to Section 541(d) of the Bankruptcy Code.

## ARGUMENT

I.    **CMI Is Entitled to Relief from the Automatic Stay Pursuant to Sections 362(d) and 105(a) of the Bankruptcy Code in Order to Recover Loan Documents Debtors Still Owe CMI Because, as Debtors Have Admitted, Debtors Have, If Anything, Only a Mere Possessory Interest in the Documents, and, Therefore, the Documents Are Not Property of the Estate Pursuant to Section 541(d).**

18.    Pursuant to Sections 362 and 541 of the Bankruptcy Code, a Chapter 11 petition serves to "create an estate" comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case" and "automatically stays" actions against the debtor "to obtain possession of property of the estate or of property from the estate . . . ." 11 U.S.C. §§ 362(a)(3) and 541(a)(1).

19.    The automatic stay is not, however, meant to be absolute, and, in appropriate instances, the bankruptcy court may, pursuant to Section 362(d), terminate, annul, modify or condition the stay on

---

[1]    Although Debtors make this comment in reference to the Mortgage Loan Documents underlying its *servicing-retained* loan agreements, this fact applies with even greater force to the Mortgage Loan Documents underlying the servicing-released loan agreements, because Debtors have *no* interest, possessory or otherwise, in Loans (and underlying Loan documents) it sold outright to CMI and is not servicing.

the request of a party in interest and after notice and a hearing. *See* 11 U.S.C. § 362(d). For example, the court can terminate the stay to allow a party in interest to recover its property if "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). A bankruptcy court order terminating the stay is appropriate in this circumstance because property in which a debtor holds bare legal title, but not an equitable interest, is not property of the estate. 11 U.S.C. § 541(d); *see In re Kaiser Aluminum Corp.*, No. 02-10429(JFK), 2004 WL 97658, at *3 (Bankr. D. Del. Jan. 16, 2004) (Exhibit 5) (excluding from property of estate funds in which debtor held legal interest, but no equitable interest, and where agreement with third party showed third party's superior interest in the funds); *In re Edison Bros.*, 243 B.R. 231, 235 (Bankr. D. Del. 2000) ("[C]ourts have concluded that property which a debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy.").

20.    To this end, courts have also used Section 105(a) to provide interested parties appropriate relief from the stay. Under Section 105(a), a court has the power to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of title 11." 11 U.S.C. § 105(a). It "is a powerful, versatile tool . . . [that] empowers bankruptcy courts and district courts sitting in bankruptcy to fashion orders in furtherance of Bankruptcy Code provisions." *In re Joubert*, 411 F.3d 452, 455 (3d Cir. 2005) (affirming district court's finding that Section 105(a) did not grant district court authority to exercise supplemental jurisdiction over debtors' post-confirmation state law claims alleging bankruptcy violations). Thus, a bankruptcy court's equitable powers enable it to "sift the circumstances . . . to see that injustice or unfairness is not done in [the] administration of the bankrupt estate," as "[i]t is not the objective of the bankruptcy laws to confer windfalls on debtors." *Pepper v. Litton*, 308 U.S. 295, 308 (1939) (pre-Code decision affirming district court's use of its equitable powers); *In re Cybridge Corp.*, 312 B.R. 262, 272-73 (D.N.J. 2004) (citations omitted); *see Sears Roebuck & Co. v. Spivey*, 265

7

B.R. 357, 371 (E.D.N.Y. 2001) ("Section 105(a) of the Bankruptcy Code bestows on bankruptcy courts a specific equitable power to act in accordance with principles of justice and fairness ....[and gives] [b]ankruptcy courts [] broad latitude in exercising this power"; finding bankruptcy court had discretion under Section 105 to require judicial approval of redemption agreement, but remanding due to bankruptcy court's mistaken view of law).

21.    Here, the Correspondent Loan Agreements establish that the Loan documents are CMI's property and were never property of the estate.  Indeed, as Debtors admit in their Omnibus Response, AHM had, if anything, a mere possessory interest in these documents.  A mere possessory interest in the Loan documents is not, however, sufficient to place these documents in the Debtors' estates.  Consequently, Debtors, pursuant to Section 541(d), must immediately turn over all Loan documentation to CMI, without cost, or risk having to repurchase or otherwise cure the respective Loans.  *See In re Malmart Mortgage Co.,* No. 87-11681-K, 1988 WL 1004731, at *3 (Bankr. D. Mass. Jan. 25, 1988) (Exhibit 6) (requiring debtor to turn over all notes, mortgages, books and records of mortgage loans not being serviced by debtor); *see also In re Cambridge Mortgage Corp.*, 92 B.R. 145, 152 (Bankr. D.S.C. 1988); *In re Fid. Standard Mortgage Corp.*, 36 B.R. 496, 500-501 (Bankr. S.D. Fla. 1983) ("Plaintiffs' interests in the various mortgages should be protected under 541(d)");  *In re Columbia Pac. Mortgage, Inc.*, 20 B.R. 259, 261-62 (Bankr. W.D. Wash. 1981) (reiterating Advisory Committee Notes discussion of 541(d)).  The legislative history of Section 541(d) not only supports this result; it requires it.  *See* The Advisory Committee Notes to 11 U.S.C. § 541(d) ("The seller of mortgages in the secondary mortgage market will often retain the original mortgage notes and related documents . . . . These facts are irrelevant and the seller's retention of the mortgage documents . . . do[es] not change the trustee's obligation to turn the mortgages or interests in mortgages over to the purchaser . . . .  Under section 541(d), the trustee is

required to recognize the purchaser's title to the mortgages or interests in mortgages and to turn this property over to the purchaser.").

22.    Thus, CMI respectfully requests that this Court issue an order pursuant to Section 362(d) and its equitable powers that lifts the stay and requires Debtors to return CMI's Loan documents. These documents are not property of the estate under Section 541(d) and are obviously not necessary to the Debtors' effective reorganization, as they are currently seeking to abandon the documents (*see infra*).

**II.    Debtors Cannot Abandon and Destroy, or Request a Retrieval Fee For, the Mortgage Loan Files Because, Contrary to Debtors' Abandonment Motion, The Documents Contained Therein are Not Property of the Estate and Debtors Risk Having to Repurchase or Otherwise Cure Relevant Mortgages If Debtors Do Not Return CMI's Documents as the Correspondent Loan Agreements Require.**

23.    In their recent Abandonment Motion, Debtors ask this Court to allow them to abandon and destroy, or require a retrieval fee for, CMI's Mortgage Loan Files currently in the Debtors' possession. First, the premise of the Abandonment Motion is flawed, because Debtors assume the Mortgage Loan Files are property of the estate. But, this is clearly not the case as set forth above.

24.    It follows, then, that Debtors are not entitled to use "reasonable business judgment" to determine the ultimate fate of documents they do not own, and indeed, cannot hold the Mortgage Loan Files hostage by forcing CMI to pay a retrieval fee for its own property.[2]    Rather, Debtors are required, pursuant to the Correspondent Loan Agreements, to return the Mortgage Loan Files and the documents contained therein to CMI or risk having to repurchase or otherwise cure the relevant Loans, which are now defective because CMI does not have these relevant documents.

25.    While Debtors also seek to "abandon" property that is not theirs, even if this were properly considered an abandonment, Section 554 of the Bankruptcy Code does not permit them to, and

---

[2]    A fee Debtors acknowledge is for expenses they will incur in any event, as their proposed course of destroying the files would require Debtors to incur and bear the cost of identifying and retrieving the files for the documents [Abandonment Mtn. ¶¶ 20-21] – both costs they improperly seek to shift to those parties requiring the return of their property.

debtors cite no authority for the proposition that they can properly shift costs of abandonment to third parties. *See* 11 U.S.C. § 554 ("After notice and a hearing, the trustee may abandon any *property of the estate* that is burdensome to the estate or that is of inconsequential value and benefit to the estate.") (emphasis added).

26.    Accordingly, CMI asks this Court to issue an order pursuant to Sections 362(d) and 541(d), and its equitable powers under Section 105, lifting the stay and requiring Debtors to return the Loan documents, without cost, to CMI.

## CONCLUSION

27.    The parties never intended that the Loan documentation would become AHM's property, either in or out of bankruptcy; in fact, they expressly agreed to the contrary per the Correspondent Loan Agreements.  Indeed, this result is mandated not only by the parties' agreements, but also by the clear language of Section 541(d) and its legislative history.  Accordingly, CMI respectfully requests that the Court enter an order:

(a)    lifting the automatic stay;

(b)    directing AHM to return any Loan documents held in its custody, without cost; and

(c)    granting CMI such other and further relief as the Court determines is equitable, just and proper.

10

Dated:  December 27, 2007

**MORRIS JAMES LLP**

*Brett D. Fallon*

Brett D. Fallon (DE Bar No. 2480)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, Delaware  19899-2306
Telephone:  (302) 888-6888
Facsimile:  (302) 571-1750
Email:  bfallon@morrisjames.com

-and-

Andrew J. Petrie *(admitted pro hac vice)*
FEATHERSTONE PETRIE DESISTO LLP
600 17th Street, Suite 2400S
Denver, Colorado  80202-5424
Telephone:  (303) 626-7139
Facsimile:  (303) 626-7101
Email:  apetrie@featherstonelaw.com

*Attorneys for CitiMortgage, Inc.*

11

# **EXHIBIT 1**

CORRESPONDENT
AGREEMENT
FORM 200

# citimortgage

This Correspondent Loan Purchase Agreement ("Agreement"), dated the _____ day of
__March_____, 200_1__, by and between CitiMortgage, Inc. ("CMI"), for itself and on
behalf of Citibank, FSB, Citibank, N.A., Citibank (NYS) and Citibank (Nevada), N.A., and
American Home Mortgage Corp. ("Correspondent").

In consideration of the terms contained in this Agreement, CMI and Correspondent agree as follows:

1.  PURCHASE AND SALE OF MORTGAGE LOANS

From time to time, Correspondent may sell to CMI and CMI may purchase from Correspondent one
or more residential mortgage, home equity or other loans ("Loan(s)") in accordance with the terms,
conditions, requirements, procedures, representations and warranties set forth in the "CitiMortgage,
Inc. Correspondent Manual" and all amendments, bulletins, program requirements and
supplements to such Manual (collectively hereinafter referred to as the "CMI Manual"), and this
Agreement. CMI and Correspondent agree that the CMI Manual is incorporated by reference herein
and is part of this Agreement.

For each Loan offered for sale by Correspondent to CMI, Correspondent will deliver Loan
documentation to CMI in accordance with the applicable terms, conditions, requirements,
procedures, representations and warranties set forth in the CMI Manual. CMI may purchase Loans
with or without conducting a complete review of the Loan documentation. CMI's review of, or failure
to review, all or any portion of the Loan documentation shall not affect CMI's rights to demand
repurchase of a Loan or any other CMI right or remedy provided by this Agreement.

For each Loan CMI agrees to purchase, CMI shall pay the amount agreed upon by CMI and
Correspondent ("Purchase Price") in accordance with the applicable provisions of the CMI Manual.
CMI may offset against the Purchase Price any outstanding fees or other amounts owing from
Correspondent to CMI in connection with the particular purchase or other transactions.

As of the date CMI purchases each Loan, Correspondent will (i) transfer to CMI all of its right, title
and interest in and to each Loan, including without limitation all documents held or subsequently
acquired by Correspondent relating to each Loan and (ii) execute all documents necessary to
transfer such right, title and interest to CMI.

2.  REPRESENTATIONS AND WARRANTIES

Correspondent represents, warrants and covenants throughout the term of this Agreement as
follows:

(a) That it is duly organized, validly existing, in good standing, qualified and authorized to do
business in each jurisdiction where it originate Loans or where a property securing any of its
Loans is located; that all corporate or other actions and approvals necessary for the execution
and performance of this Agreement have been taken and/or received; and that no consent
from any third party is required for the execution and performance of this Agreement.

(b) That it (i) holds and shall maintain in good standing throughout the term of this Agreement all
applicable license(s) and/or registration(s) in each jurisdiction that is/are necessary for
Correspondent's Loan origination, purchase and sale activities under this Agreement and (ii) is
in full compliance with all laws in each jurisdiction which govern Correspondent's activities
under this Agreement. Correspondent agrees to promptly provide CMI with copies of all such
license(s) and/or registration(s) upon request by CMI.

(c) That it will allow CMI to periodically investigate the financial (including but not limited to
obtaining corporate and/or individual credit reports) and other status of Correspondent and, if
necessary, the financial and other status of Correspondent's directors, officers and/or
employees. If necessary, Correspondent shall cooperate with CMI to obtain the written
consent of one or more of Correspondent's directors, officers and/or employees to such
periodic investigation. Correspondent agrees that the failure to obtain such consent may result
in the termination of this Agreement in accordance with the provisions of Sec. 7.

CORRESPONDENT
AGREEMENT
FORM 200

(d) That it is thoroughly familiar with and will comply with all applicable federal (including but not limited to the Real Estate Settlement Procedures Act, Truth-In-Lending Act, Equal Credit Opportunity Act and federal fair lending laws), state and, if necessary, local laws and regulations directly or indirectly relating to its activities under this Agreement (including but not limited to involvement in such activities of individuals convicted of crimes involving dishonesty or breach of trust).

(e) That Correspondent is an approved seller/servicer of conventional residential adjustable and fixed-rate mortgage Loans for Fannie Mae, Freddie Mac, and/or is a FHA-, VA- and/or HUD-approved mortgagee ; that Correspondent is duly qualified, licensed, registered and otherwise authorized under all applicable laws and regulations and is in good standing to (i) originate, sell, endorse and assign Loans and, if applicable, the related Loan collateral to CMI, (ii) service Loans in the jurisdiction(s) where, if applicable, the properties securing such Loans are located for Fannie Mae, Freddie Mac, FHA or VA, and (iii) no event has occurred that would make Correspondent unable to comply with Fannie Mae, Freddie Mac, FHA, VA or HUD eligibility requirements or that would require notification to Fannie Mae, Freddie Mac, FHA or VA or HUD.

(f) That it does not believe, nor does it have any reason or cause to believe, it cannot perform every covenant contained in this Agreement or continue to carry on its business substantially as now conducted; that it is solvent and the sale of Loans will not cause it to become insolvent; that no action, suit, proceeding or investigation pending or threatened against Correspondent, either alone or in the aggregate, may result in its inability to carry on its business substantially as now conducted; and that the sale of Loans under this Agreement is not undertaken with the intent to hinder, delay or defraud any of its creditors.

(g) That it has obtained and reviewed or will, upon execution of this Agreement, promptly obtain and review the CMI Manual and will fully comply with its terms, conditions, requirements and procedures.

(h) That it does not currently and will not in the future employ any entity or individual on the Freddie Mac exclusionary list.

(i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each Loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of fact or omits or will omit to state a fact necessary to make the information not misleading. The provisions of this sub-section shall not apply to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity approved by CMI ("Approved Entity") unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and (ii) the Loan applicant(s) unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.

(j) That the documentation for each Loan sold to CMI (i) shall be duly executed by the borrower(s), (ii) shall create a valid and legally binding obligation of the borrowers(s) and (iii), if applicable, shall create a fully enforceable first or subordinate lien on the property securing repayment of the Loan.

(k) That each mortgage, home equity or other Loan (i) shall be fully enforceable and originated in accordance with the terms, conditions, representations, warranties and covenants contained in the CMI Manual and this Agreement which were in effect as of the Loan closing date, (ii), if applicable, was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards, and (iii) is subject to no defects or defenses, including but not limited to damage to the property securing the Loan, lien imperfections or environmental risk.

(l) That any third-party originators referring, or in any way involved with, any Loan shall be, at a minimum, approved by Correspondent according to Fannie Mae, Freddie Mac, FHA, VA and/or HUD guidelines for approving third-party originators as described in the CMI Manual.

(6/00)

CORRESPONDENT
AGREEMENT
FORM 200

(m) That it will immediately notify CMI if it (i) fails to maintain any license or registration in violation of Sec. 2(b) above and/or (ii) becomes subject to any enforcement and/or investigative proceeding by any licensing or regulatory authority or agency and/or (iii) is named as a party or becomes involved in any material litigation.

(n) That it will immediately notify CMI if (i) Correspondent and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding, (ii) Correspondent and/or any of its principal director(s) or owner(s) requests the appointment of a receiver and/or (iii) Correspondent and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition.

(o) That it will immediately notify CMI of any material change in ownership and/or management.

(p) That it will promptly respond to or otherwise comply with CMI's reasonable request(s) for periodic financial statements of Correspondent and/or any of its principal director(s) or owners and any other documentation required by CMI in connection with the recertification of Correspondent.

(q) That it will fully comply with all additional representations, warranties and covenants contained in the CMI Manual.

(r) That all representations, warranties and covenants contained in this Agreement and the CMI Manual shall survive the expiration and termination of this Agreement.

3.  COSTS

Correspondent shall pay all costs and expenses incurred in connection with the transfer and delivery of Loans to CMI purchased pursuant to this Agreement, including but not limited to mortgage Loan assignment preparation and recording fees, fees for title policy endorsements and continuations, and Correspondent's attorneys' fees.

4.  CORRESPONDENT ADVERTISING; NON-SOLICITATION AND CUSTOMER PRIVACY

Correspondent may advertise to the public the availability of various Loan programs, but Correspondent may not, in any way, directly or indirectly identify CMI in all such advertising unless (i) required by applicable law or (ii) CMI has, in advance, approved use of CMI's name in such advertising.

Correspondent agrees that the borrower(s) on all Loans shall, at the time of purchase by CMI, become the exclusive customers of CMI for all Loan-related purposes. During the first twelve (12) months after the date any Loan is purchased by CMI, Correspondent represents and warrants that Correspondent, Correspondent's directors, officers, employees, agents or affiliates will not, without the prior consent of CMI, (i) use targeted advertising, solicit or otherwise directly encourage or incent the Loan borrower(s) to refinance or prepay the Loan that was purchased by CMI, (ii) prepare, sell or distribute any customer list incorporating the names, addresses or any non-public personal information of such borrower(s) or (iii) use any such customer list to solicit, promote, or allow any other entity to solicit or promote, the sale of financial services or products to any such borrower(s). CMI and Correspondent agree that nothing contained herein shall prohibit advertising or solicitation by Correspondent that is directed to the general public in the area where the Loan borrower(s) reside(s).

Correspondent acknowledges that it has received a copy of the Citigroup Privacy Promise and/or Citigroup Privacy Policy and, to the extent necessary, shall comply with all applicable provisions of such Promise and/or Policy. Correspondent also agrees that it shall comply with all applicable federal or state laws related to the use and/or retention of the non-public personal and/or financial information associated with all Loans and the related Loan borrower(s).

5.  TERM

This Agreement is for an initial one-year term and shall automatically renew for successive one-year terms, unless terminated pursuant to Section 7 of this Agreement.

(6/00)

CORRESPONDENT
AGREEMENT
FORM 200

6.  RELATIONSHIP BETWEEN CMI AND CORRESPONDENT

This Agreement will not create any agency between Correspondent and CMI. Correspondent shall conduct its business under this Agreement as an independent contractor and shall have the rights and responsibilities of an independent contractor.

CMI shall not be responsible for any actions or omissions by Correspondent. Correspondent agrees it will not represent, orally, in writing, by implication or otherwise, that it can act in any capacity on behalf of CMI.

CMI is prescribing no marketing plan for Correspondent and exercises no control over the methods, operations and practices of Correspondent except as provided in this Agreement and the CMI Manual.

Correspondent acknowledges it is not selling or distributing CMI's services, and CMI has made no promise, representation or warranty regarding the profitability of any arrangement with Correspondent.

Correspondent and CMI acknowledge that each will be providing the other party with valuable proprietary information ("Confidential Information"), including but not limited to information regarding CMI's or Correspondent's products, programs, underwriting policies, procedures and customers. Except as necessary to perform its obligations under this Agreement or as required by law, each party will not disclose any Confidential Information to any person outside that party's organization and will limit access to this information within its organization on a strict "need to know" basis. Each party agrees to notify all of its directors, officers, employees and other agents of its obligations regarding Confidential Information and will cause such directors, officers, employees and other agents to comply with such obligations.

7.  TERMINATION

CMI may immediately terminate this Agreement without notice and CMI then will have no further obligations under this Agreement upon:  (1) the failure of Correspondent to perform or abide by any term, condition, covenant or obligation contained in this Agreement or the CMI Manual; (2) the finding by CMI that any representation or warranty made by Correspondent is false or incorrect in any material respect; (3) commencement by or against Correspondent of any bankruptcy, insolvency or similar proceedings; (4) CMI's determination that Correspondent's actions contravene the terms and conditions of this Agreement or could adversely impact CMI's activities or reputation; or (5) the failure of loans sold by Correspondent to CMI pursuant to this Agreement to satisfy CMI's expectations regarding loan quality and/or performance.

Either party may terminate this Agreement for any other reason upon thirty (30) calendar days prior notice to the other. In the event of termination, Correspondent shall fully cooperate with and assist CMI in obtaining the documentation necessary to complete the processing and full resolution of all matters (including but not limited to the delivery of all application and/or closed loan documents and, if applicable, all Loan insuring documentation) relating to all Loans purchased by CMI.

8.  ASSIGNMENT

Correspondent may not assign this Agreement or any of its responsibilities under this Agreement. CMI reserves the right, upon notice to Correspondent, to assign or delegate in whole or in part its obligations and responsibilities under this Agreement to any affiliated entity engaged in the business of residential financing.

9.  NON-EXCLUSIVE AGREEMENT

Correspondent's rights under this Agreement are on a non-exclusive basis. CMI shall be free to market its products and services to, and to contract with, other parties and customers as it deems appropriate.

CORRESPONDENT
AGREEMENT
**FORM 200**

10.  **INDEMNIFICATION**

Correspondent agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) Correspondent's performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual (including but not limited to Correspondent's failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to this Agreement), (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained this Agreement or the CMI Manual and/or (iii) Correspondent's advertisements, promotions or other activities. This indemnification shall extend to any action or inaction by the directors, officers, employees, agents, independent contractors or other representatives of Correspondent and shall survive the expiration and termination of this Agreement.

11.  **CURE OR REPURCHASE**

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

(i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

(ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

(iii) was or is capable of being rescinded by the applicable borrower(s) pursuant to the provisions of any applicable federal (including but not limited to the Truth-in-Lending Act) or state law or regulation;

(iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

(v) was subject to an Early Payment Default (as defined in the CMI Manual), an Early Payoff (as defined in the CMI Manual) or any other payment related defect (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

Correspondent agrees and acknowledges that the provisions of this Sec. 11 do not, in any way, eliminate, diminish or impair Correspondent's indemnification obligations contained in Sec. 10.

08/20/2007 10:46 FAX              ☑006/010

CORRESPONDENT
AGREEMENT
FORM 200

12.   GOVERNING LAW; VENUE

This Agreement shall be governed by the laws of the State of Missouri and applicable federal law.

CMI and Correspondent agree that any action, suit or proceeding to enforce or defend any right or obligation under this Agreement or otherwise arising out of either party's performance under this Agreement shall be brought in St. Louis County Circuit Court or the United States District Court for the Eastern District of Missouri and each party irrevocably submits to the jurisdiction of either forum and waives the defense of an inconvenient forum to the maintenance of any such action, suit or proceeding in such state or federal court and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in either forum.

13.   NOTICE

All notices to CMI shall be sent in accordance with the applicable provisions of the CMI Manual and shall be addressed according to such provisions.

Prior to or at the time Correspondent executes this Agreement, it shall provide CMI with one or more procedures and addresses for delivering notices pursuant to this Agreement. In addition to these procedures and addresses, Correspondent agrees and acknowledges that CMI may deliver all notices required by this Agreement in writing to Correspondent at the address listed on the last page of this Agreement.

14.   MODIFICATION; MERGER; ENTIRE AGREEMENT; NO WAIVER OF RIGHTS

This Agreement may not be modified except by a document or record signed by both CMI and Correspondent. This Agreement (including the CMI Manual) contains the entire agreement of the parties and supersedes all previous agreements (including all amendments thereto) between the parties hereto. Any representations, promises or agreements not contained in this Agreement or the CMI Manual shall have no force or effect. The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under this Agreement shall not constitute a waiver of any right, including the right to insist on strict compliance in the future.

15.   ON-SITE REVIEW AND DOCUMENT COLLECTION

Correspondent shall permit any officer, employee or designated representative of CMI, at any reasonable time during regular business hours and upon reasonable advance notice by CMI, to conduct an examination and audit on Correspondent's premises of any of the processes implemented and documents kept by Correspondent regarding any Loan purchased by CMI pursuant to this Agreement. If Correspondent fails to timely deliver, in accordance with the applicable terms and conditions specified in the CMI Manual, all documents and records associated with or related to any Loan purchased by CMI pursuant to this Agreement, Correspondent shall also give CMI and its officers, employees, or designated representatives reasonable access to Correspondent's premises in order to allow CMI to retrieve, prepare or otherwise obtain all such documents and records. Correspondent shall also make its officers, employees and/or designated representatives available to CMI and shall cooperate with CMI in all such examinations, audits and document and record collection activities.

16.   AUTHORITY TO EXECUTE AGREEMENT

Correspondent represents and warrants that it has all requisite power, authority and capacity to enter into this Agreement and to perform all obligations required of it hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action(s). Correspondent shall, upon request by CMI, execute such supplemental resolutions, acknowledgments and/or certifications as may be reasonably necessary to evidence such power, authority and capacity.

CORRESPONDENT
AGREEMENT
FORM 200

17.  CORRESPONDENT GRANT OF LIMITED POWER OF ATTORNEY

Correspondent hereby appoints CMI and the directors, officers, employees, agents, successors and assigns of CMI as its true and lawful attorney-in-fact without right of revocation and with full power of substitution for and in its place and stead to (i) demand and control all sums due on Loans purchased pursuant to this Agreement and to enforce all rights with respect thereto, (ii) endorse, mark, place or otherwise evidence Correspondent's name as payee on all checks, drafts, acceptances or other form of partial or full Loan payment delivered or tendered to CMI, (iii) endorse, mark, place or otherwise evidence Correspondent's name on all notes, mortgages, deeds of trust, and other forms of security instruments or collateral and all assignments, full or partial releases or satisfactions of said mortgages, deeds of trust, and other forms of security instruments or collateral for all Loans purchased pursuant to this Agreement.  Correspondent agrees to execute such other documents as CMI may reasonably request to evidence the appointment of CMI as Correspondent's attorney-in-fact.

18.  MISCELLANEOUS

All capitalized terms not otherwise defined herein shall have the meanings attributed to them in the CMI Manual.  All Section headings are for convenience only and shall not be construed as part of this Agreement.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction and, to accomplish this purpose, the provisions hereof are severable. **This Agreement shall not be effective until signed by both parties.**

(6/00)

09/20/2007 10:46 FAX                                                    ☒008/010
CORRESPONDENT
AGREEMENT
FORM 200

IN WITNESS WHEREOF, the duly authorized officers of CMI and Correspondent have executed
this Agreement as of the date first above written..

CITIMORTGAGE, INC.                          American Home Mortgage Corp
        (CMI)                               (CORRESPONDENT)

By _____            By _____
                                           Andrew Valentine

ROBERT WETHERELL
Vice President
Title CitiMortgage, Inc./Intermediary Management    Title Sr. V.P./Corp. Counsel
780 Washington Blvd., 9th FL
Stamford, CT 06901
203-975-6800
Date _____0286005_____ 8/8/01     Date March 21, 2001

                                    Correspondent Notice Address:

                                    520 Broadhollow Road
                                    Melville, NY 11747

                                    Att: Andrew Valentine

APPROVED BY CITIBANK, FSB FOR UNDERWRITING AND CREDIT POLICY COMPLIANCE:

By _____

Citibank, FSB Title ___VP___          JOHN B. MARCH, VP
                                      Fair Lending Director
                                      CitiMortgage, Inc./National Sales Administration
Date _____8/9/01_____                CT13/9/1
                                      Tel: (203) 975-6384
                                      ID# 1256391
                                      #324

*NOTE: THE TEXT OF THIS AGREEMENT MAY NOT BE CHANGED IN ANY MANNER WITHOUT THE
EXPRESS PERMISSION OF CITIMORTGAGE, INC.*

data/word/citicor.doc (6/22/2000)

8 of 8                                                              (6/00)

08/20/2007 10:46 FAX                                                                     @008/010

**Delegated Underwriting Addendum**          citimortgage

This Delegated Underwriting Addendum ("Delegated U/W Addendum"), effective as of
____March____ , 20 01  supplements and amends the CitiMortgage, Inc. ("CMI")
Correspondent Agreement (the "Agreement") dated __March__ _____ , 2001  by
and between CMI and __American Home Mortgage Corp__, ("Correspondent")

WHEREAS, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to
make certain changes to the Agreement in connection with the delegation of certain underwriting
functions to Correspondent,

WHEREAS, Citibank, FSB ("Citibank, FSB"), a federal savings bank with offices
located in San Francisco, CA, may, from time to time, purchase certain mortgage loans which are
covered by the provisions of this Delegated U/W Addendum, and

WHEREAS, Correspondent desires to originate mortgage loans which comply, in all
material respects, with the appropriate underwriting criteria established by CMI and Citibank,
FSB for the associated mortgage loan product.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for
other good and valuable consideration, CMI, Citibank, FSB and Correspondent agree as follows:

1) The following paragraphs are added to Section 11 ("Cure or Repurchase") of the Agreement:

Correspondent expressly agrees that it shall underwrite each mortgage loan in conformity with
the applicable underwriting criteria of CMI and Citibank, FSB. If an audit by CMI and/or
Citibank, FSB on any mortgage loan reveals that it was underwritten in violation of the
applicable CMI and/or Citibank, FSB underwriting criteria, Correspondent will, not later than
thirty (30) days after receipt of written notice from CMI and/or Citibank, FSB, repurchase the
mortgage loan at the Repurchase Price or provide CMI and/or Citibank, FSB with written
evidence as to why Correspondent believes such underwriting criteria was not violated. If, after
reviewing Correspondent's written evidence, CMI and/or Citibank, FSB, in their sole and
independent discretion, believe the mortgage loan was not originated in accordance with the
applicable underwriting criteria, Correspondent will, not later than thirty (30) days after receiving
further written notice from CMI and/or Citibank, FSB, repurchase the mortgage loan at the
Repurchase Price specified in the Manual and/or Bulletin.

Correspondent expressly agrees and acknowledges that all mortgage loans which become 60
days or more delinquent during the first six months after origination ("Early Default Loan(s)")
will be fully audited by CMI and/or Citibank, FSB. Should such an audit reveal that one or more
Early Default Loans do not, in the sole and independent discretion of CMI and/or Citibank, FSB,
conform to the applicable CMI or Citibank, FSB underwriting criteria, Correspondent will, not
later than thirty (30) days after receipt of written notice from CMI and/or Citibank, FSB,
repurchase all such Early Default Loans at the Repurchase Price. Notwithstanding the provisions
of the previous paragraph, Correspondent expressly agrees and acknowledges that it shall not be
permitted to submit any written evidence on any Early Default Loan(s).

**citi**mortgage®

Correspondent expressly agrees and acknowledges that both CMI and Citibank, FSB (i) are entitled to independently exercise and/or receive all benefits and remedies of the Agreement and this Delegated U/W Addendum with respect to all mortgage loans purchased by CMI and Citibank, FSB and (ii) may, in their sole and independent discretion, terminate the Correspondent's delegated underwriting privileges with respect to all or a specified number of mortgage loan products at any time upon ten (10) days advance written notice to Correspondent of such full or partial termination.

2) Except as amended herein, all other terms and conditions of the Agreement (including but not limited to the remaining provisions of Section 11) shall remain in full force and effect.

3) Capitalized terms not defined in this Delegated U/W Addendum shall have the meanings attributed to them in the Agreement.

4) This Delegated U/W Addendum supersedes and replaces all other delegated underwriting Addendum(s) previously executed by Correspondent and CMI.

IN WITNESS WHEREOF, the duly authorized officers of Correspondent, CMI and Citibank, FSB have executed this Delegated U/W Addendum.

American Home Mortgage  ("Correspondent")
                        Corp.

By: _____

Name: Andrew Valentine

Title: Sr. V.P./ Corp. Counsel

CitiMortgage, Inc. ("CMI")

By: _____                    ROBERT WETHERELL
                                                Vice President
                                                CitiMortgage, Inc./Intermediary Management
                                                50 Washington Blvd., 9th Fl.
                                                Stamford, CT 06901
                                                203-975-6800
Name: Robert Wetherell                          0286005

Title:   Vice President

Citibank, Federal Savings Bank ("Citibank, FSB")

By: _____

Name: John March                                JOHN D. MARCH, VP
                                                Fair Lending Director
                                                CitiMortgage, Inc./National Sales Administration
                                                CT13/9/1
Title:   Credit Specialist                      Tel: (203) 975-6884
                                                ID# 1258391
                                                #324

corduadd.doc (8/24/00)

# **EXHIBIT 2**

/2007 09:47 FAX                                                                          ☑001/013

CORRESPONDENT
AGREEMENT
FORM 200

This Correspondent Loan Purchase Agreement ("Agreement"), dated the ___27th___ day of
___January___, 200_5_, by and between CitiMortgage, Inc. ("CMI"), for itself and on
behalf of Citibank, FSB, Citibank (West), FSB, and Citibank, N.A., and;

_American Home Mortgage Corp._____ ("Correspondent").

In consideration of the terms contained in this Agreement, CMI and Correspondent agree as follows:

## 1.    PURCHASE AND SALE OF MORTGAGE LOANS

From time to time, Correspondent may sell to CMI and CMI may purchase from Correspondent one
or more residential mortgage, home equity or other loans ("Loan(s)") in accordance with the terms,
conditions, requirements, procedures, representations and warranties set forth in the "CitiMortgage,
Inc. Correspondent Manual" and all amendments, bulletins, program requirements and
supplements to such Manual (collectively hereinafter referred to as the "CMI Manual"), and this
Agreement. CMI and Correspondent agree that the CMI Manual is incorporated by reference herein
and is part of this Agreement. Further, CMI and Correspondent agree that Citibank, FSB; Citibank
(West), FSB; and Citibank, N.A. are intended third party beneficiaries of this Agreement.

For each Loan offered for sale by Correspondent to CMI, Correspondent will deliver Loan
documentation to CMI in accordance with the applicable terms, conditions, requirements,
procedures, representations and warranties set forth in the CMI Manual. CMI may purchase Loans
with or without conducting a complete review of the Loan documentation. CMI's review of, or failure
to review, all or any portion of the Loan documentation shall not affect CMI's rights to demand
repurchase of a Loan or any other CMI right or remedy provided by this Agreement.

For each Loan CMI agrees to purchase, CMI shall pay the amount agreed upon by CMI and
Correspondent ("Purchase Price") in accordance with the applicable provisions of the CMI Manual.
CMI may offset against the Purchase Price any outstanding fees or other amounts owing from
Correspondent to CMI in connection with the particular purchase or other transactions.

As of the date CMI purchases each Loan, Correspondent will (i) transfer to CMI all of its right, title
and interest in and to each Loan, including without limitation all documents held or subsequently
acquired by Correspondent relating to each Loan and (ii) execute all documents necessary to
transfer such right, title and interest to CMI.

## 2.    REPRESENTATIONS AND WARRANTIES

Correspondent represents, warrants and covenants throughout the term of this Agreement as
follows:

(a)    That it is duly organized, validly existing, in good standing, qualified and authorized to do
business in each jurisdiction where it originate Loans or where a property securing any of its
Loans is located; that all corporate or other actions and approvals necessary for the execution
and performance of this Agreement have been taken and/or received; and that no consent
from any third party is required for the execution and performance of this Agreement.

(b)    That it (i) holds and shall maintain in good standing throughout the term of this Agreement all
applicable license(s) and/or registration(s) in each jurisdiction that is/are necessary for
Correspondent's Loan origination, purchase and sale activities under this Agreement and (ii) is
in full compliance with all laws in each jurisdiction which govern Correspondent's activities
under this Agreement.  Correspondent agrees to promptly provide CMI with copies of all such
license(s) and/or registration(s) upon request by CMI.

(c)    That it will allow CMI to periodically investigate the financial (including but not limited to
obtaining corporate and/or individual credit reports) and other status of Correspondent and, if
necessary, the financial and other status of Correspondent's directors, officers and/or
employees.  If necessary, Correspondent shall cooperate with CMI to obtain the written
consent of one or more of Correspondent's directors, officers and/or employees to such
periodic investigation.  Correspondent agrees that the failure to obtain such consent may result
in the termination of this Agreement in accordance with the provisions of Sec. 7.

COPY

(03/04)

32493

CORRESPONDENT
AGREEMENT
FORM 200

(d) That it is thoroughly familiar with and will comply with all applicable federal (including but not limited to the Real Estate Settlement Procedures Act, Truth-In-Lending Act, Equal Credit Opportunity Act and federal fair lending laws), state and, if necessary, local laws and regulations directly or indirectly relating to its activities under this Agreement (including but not limited to involvement in such activities of individuals convicted of crimes involving dishonesty or breach of trust).

(e) That Correspondent is an approved seller/servicer of conventional residential adjustable and fixed-rate mortgage Loans for Fannie Mae, Freddie Mac, and/or is a FHA-, VA- and/or HUD-approved mortgagee; that Correspondent is duly qualified, licensed, registered and otherwise authorized under all applicable laws and regulations and is in good standing to (i) originate, sell, endorse and assign Loans and, if applicable, the related Loan collateral to CMI, (ii) service Loans in the jurisdiction(s) where, if applicable, the properties securing such Loans are located for Fannie Mae, Freddie Mac, FHA or VA, and (iii) no event has occurred that would make Correspondent unable to comply with Fannie Mae, Freddie Mac, FHA, VA or HUD eligibility requirements or that would require notification to Fannie Mae, Freddie Mac, FHA or VA or HUD.

(f) That it does not believe, nor does it have any reason or cause to believe, it cannot perform every covenant contained in this Agreement or continue to carry on its business substantially as now conducted; that it is solvent and the sale of Loans will not cause it to become insolvent; that no action, suit, proceeding or investigation pending or threatened against Correspondent, either alone or in the aggregate, may result in its inability to carry on its business substantially as now conducted; and that the sale of Loans under this Agreement is not undertaken with the intent to hinder, delay or defraud any of its creditors.

(g) That it has obtained and reviewed or will, upon execution of this Agreement, promptly obtain and review the CMI Manual and will fully comply with its terms, conditions, requirements and procedures.

(h) That it does not currently and will not in the future employ any entity or individual on the Freddie Mac exclusionary list.

(i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each Loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of fact or omits or will omit to state a fact necessary to make the information not misleading. The provisions of this sub-section shall not apply to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity or approved by CMI ("Approved Entity") unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and (ii) the Loan applicant(s) unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.

(j) That the documentation for each Loan sold to CMI (i) shall be duly executed by the borrower(s), (ii) shall create a valid and legally binding obligation of the borrowers(s) and (iii), if applicable, shall create a fully enforceable first or subordinate lien on the property securing repayment of the Loan.

(k) That each mortgage, home equity or other Loan (i) shall be fully enforceable and originated in accordance with the terms, conditions, representations, warranties and covenants contained in the CMI Manual and this Agreement which were in effect as of the Loan closing date, (ii), if applicable, was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards, and (iii) is subject to no defects or defenses, including but not limited to damage to the property securing the Loan, lien imperfections or environmental risk.

(l) That any third-party originators referring, or in any way involved with, any Loan shall be, at a minimum, approved by Correspondent according to Fannie Mae, Freddie Mac, FHA, VA and/or HUD guidelines for approving third-party originators as described in the CMI Manual.

(m) That it will immediately notify CMI if it (i) fails to maintain any license or registration in violation of Sec. 2(b) above and/or (ii) becomes subject to any enforcement and/or investigative

(03/04)

CORRESPONDENT
AGREEMENT
FORM 200

proceeding by any licensing or regulatory authority or agency and/or (iii) is named as a party or becomes involved in any material litigation.

(n) That it will immediately notify CMI if (i) Correspondent and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding, (ii) Correspondent and/or any of its principal director(s) or owner(s) requests the appointment of a receiver and/or (iii) Correspondent and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition.

(o) That it will immediately notify CMI of any material change in ownership and/or management.

(p) That it will promptly respond to or otherwise comply with CMI's reasonable request(s) for periodic financial statements of Correspondent and/or any of its principal director(s) or owners and any other documentation required by CMI in connection with the recertification of Correspondent.

(q) That it will fully comply with all additional representations, warranties and covenants contained in the CMI Manual.

(r) That all representations, warranties and covenants contained in this Agreement and the CMI Manual shall survive the expiration and termination of this Agreement.

3.  COSTS

Correspondent shall pay all costs and expenses incurred in connection with the transfer and delivery of Loans to CMI purchased pursuant to this Agreement, including but not limited to mortgage Loan assignment preparation and recording fees, fees for title policy endorsements and continuations, and Correspondent's attorneys' fees.

4.  CORRESPONDENT ADVERTISING; NON-SOLICITATION AND CUSTOMER PRIVACY

Correspondent may advertise to the public the availability of various Loan programs, but Correspondent may not, in any way, directly or indirectly identify CMI in all such advertising unless (i) required by applicable law or (ii) CMI has, in advance, approved use of CMI's name in such advertising.

Correspondent agrees that the borrower(s) on all Loans shall, at the time of purchase by CMI, become the exclusive customers of CMI for all Loan-related purposes. During the first twelve (12) months after the date any Loan is purchased by CMI, Correspondent represents and warrants that Correspondent, Correspondent's directors, officers, employees, agents or affiliates will not, without the prior consent of CMI, (i) use targeted advertising, solicit or otherwise directly encourage or incent the Loan borrower(s) to refinance or prepay the Loan that was purchased by CMI, (ii) prepare, sell or distribute any customer list incorporating the names, addresses or any non-public personal information of such borrower(s) or (iii) use any such customer list to solicit, promote, or allow any other entity to solicit or promote, the sale of financial services or products to any such borrower(s). CMI and Correspondent agree that nothing contained herein shall prohibit advertising or solicitation by Correspondent that is directed to the general public in the area where the Loan borrower(s) reside(s).

Correspondent acknowledges that it has received a copy of the Citigroup Privacy Promise and/or Citigroup Privacy Policy and, to the extent necessary, shall comply with all applicable provisions of such Promise and/or Policy. Correspondent also agrees that it shall comply with all applicable federal or state laws related to the use and/or retention of the non-public personal and/or financial information associated with all Loans and the related Loan borrower(s).

5.  TERM

This Agreement is for an initial one-year term and shall automatically renew for successive one-year terms, unless terminated pursuant to Section 7 of this Agreement.

{03/04)

08/03/2007 09:48 FAX                                                      @004/013

CORRESPONDENT
AGREEMENT
FORM 200

6.   RELATIONSHIP BETWEEN CMI AND CORRESPONDENT

This Agreement will not create any agency between Correspondent and CMI. Correspondent shall conduct its business under this Agreement as an independent contractor and shall have the rights and responsibilities of an independent contractor.

CMI shall not be responsible for any actions or omissions by Correspondent. Correspondent agrees it will not represent, orally, in writing, by implication or otherwise, that it can act in any capacity on behalf of CMI.

CMI is prescribing no marketing plan for Correspondent and exercises no control over the methods, operations and practices of Correspondent except as provided in this Agreement and the CMI Manual.

Correspondent acknowledges it is not selling or distributing CMI's services, and CMI has made no promise, representation or warranty regarding the profitability of any arrangement with Correspondent.

Correspondent and CMI acknowledge that each will be providing the other party with valuable proprietary information ("Confidential Information"), including but not limited to information regarding CMI's or Correspondent's products, programs, underwriting policies, procedures and customers. Except as necessary to perform its obligations under this Agreement or as required by law, each party will not disclose any Confidential Information to any person outside that party's organization and will limit access to this information within its organization on a strict "need to know" basis. Each party agrees to notify all of its directors, officers, employees and other agents of its obligations regarding Confidential Information and will cause such directors, officers, employees and other agents to comply with such obligations.

7.   TERMINATION

CMI may immediately terminate this Agreement without notice and CMI then will have no further obligations under this Agreement upon: (1) the failure of Correspondent to perform or abide by any term, condition, covenant or obligation contained in this Agreement or the CMI Manual; (2) the finding by CMI that any representation or warranty made by Correspondent is false or incorrect in any material respect; (3) commencement by or against Correspondent of any bankruptcy, insolvency or similar proceedings; (4) CMI's determination that Correspondent's actions contravene the terms and conditions of this Agreement or could adversely impact CMI's activities or reputation; or (5) the failure of loans sold by Correspondent to CMI pursuant to this Agreement to satisfy CMI's expectations regarding loan quality and/or performance.

Either party may terminate this Agreement for any other reason upon thirty (30) calendar days prior notice to the other. In the event of termination, Correspondent shall fully cooperate with and assist CMI in obtaining the documentation necessary to complete the processing and full resolution of all matters (including but not limited to the delivery of all application and/or closed loan documents and, if applicable, all Loan insuring documentation) relating to all Loans purchased by CMI.

8.  ASSIGNMENT

Correspondent may not assign this Agreement or any of its responsibilities under this Agreement. This Agreement and all rights, obligations and responsibilities hereunder may be assigned by CitiMortgage, Inc., without consent of the Correspondent, to any corporation or bank more than 50% of the voting stock of which is, directly or indirectly, owned by Citigroup, Inc.

9.   NON-EXCLUSIVE AGREEMENT

Correspondent's rights under this Agreement are on a non-exclusive basis. CMI shall be free to market its products and services to, and to contract with, other parties and customers as it deems appropriate.

4 of 7

(03/04)

08/03/2007 09:49 FAX                                                                    ☒005/013

CORRESPONDENT
AGREEMENT
FORM 200

10.  INDEMNIFICATION

Correspondent agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) Correspondent's performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual (including but not limited to Correspondent's failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to this Agreement), (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained this Agreement or the CMI Manual and/or (iii) Correspondent's advertisements, promotions or other activities. This indemnification shall extend to any action or inaction by the directors, officers, employees, agents, independent contractors or other representatives of Correspondent and shall survive the expiration and termination of this Agreement.

11.  CURE OR REPURCHASE

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

(i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

(ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

(iii) was or is capable of being rescinded by the applicable borrower(s) pursuant to the provisions of any applicable federal (including but not limited to the Truth-In-Lending Act) or state law or regulation;

(iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

(v) was subject to an Early Payment Default (as defined in the CMI Manual), an Early Payoff (as defined in the CMI Manual) or any other payment related defect (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

Correspondent agrees and acknowledges that the provisions of this Sec. 11 do not, in any way, eliminate, diminish or impair Correspondent's indemnification obligations contained in Sec. 10.

{03/04)

CORRESPONDENT
AGREEMENT
FORM 200

12.  GOVERNING LAW; VENUE

This Agreement shall be governed by the laws of the State of Missouri and applicable federal law.

CMI and Correspondent agree that any action, suit or proceeding to enforce or defend any right or obligation under this Agreement or otherwise arising out of either party's performance under this Agreement shall be brought in St. Louis County Circuit Court or the United States District Court for the Eastern District of Missouri and each party irrevocably submits to the jurisdiction of either forum and waives the defense of an inconvenient forum to the maintenance of any such action, suit or proceeding in such state or federal court and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in either forum.

13.  NOTICE

All notices to CMI shall be sent in accordance with the applicable provisions of the CMI Manual and shall be addressed according to such provisions.

Prior to or at the time Correspondent executes this Agreement, it shall provide CMI with one or more procedures and addresses for delivering notices pursuant to this Agreement.  In addition to these procedures and addresses, Correspondent agrees and acknowledges that CMI may deliver all notices required by this Agreement in writing to Correspondent at the address listed on the last page of this Agreement.

14.  MODIFICATION; MERGER; ENTIRE AGREEMENT; NO WAIVER OF RIGHTS

This Agreement may not be modified except by a document or record signed by both CMI and Correspondent. This Agreement (including the CMI Manual) contains the entire agreement of the parties and supersedes all previous agreements (including all amendments thereto) between the parties hereto.  Any representations, promises or agreements not contained in this Agreement or the CMI Manual shall have no force or effect. The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under this Agreement shall not constitute a waiver of any right, including the right to insist on strict compliance in the future.

15.  ON-SITE REVIEW AND DOCUMENT COLLECTION

Correspondent shall permit any officer, employee or designated representative of CMI, at any reasonable time during regular business hours and upon reasonable advance notice by CMI, to conduct an examination and audit on Correspondent's premises of any of the processes implemented and documents kept by Correspondent regarding any Loan purchased by CMI pursuant to this Agreement.  If Correspondent fails to timely deliver, in accordance with the applicable terms and conditions specified in the CMI Manual, all documents and records associated with or related to any Loan purchased by CMI pursuant to this Agreement, Correspondent shall also give CMI and its officers, employees, or designated representatives reasonable access to Correspondent's premises in order to allow CMI to retrieve, prepare or otherwise obtain all such documents and records. Correspondent shall also make its officers, employees and/or designated representatives available to CMI and shall cooperate with CMI in all such examinations, audits and document and record collection activities.

16.  AUTHORITY TO EXECUTE AGREEMENT

Correspondent represents and warrants that it has all requisite power, authority and capacity to enter into this Agreement and to perform all obligations required of it hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action(s).  Correspondent shall, upon request by CMI, execute such supplemental resolutions, acknowledgments and/or certifications as may be reasonably necessary to evidence such power, authority and capacity.

(03/04)

08/03/2007 09:49 FAX                                                                     ☒ 007/013

CORRESPONDENT
AGREEMENT
FORM 200

17.  CORRESPONDENT GRANT OF LIMITED POWER OF ATTORNEY

Correspondent hereby appoints CMI and the directors, officers, employees, agents, successors and
assigns of CMI as its true and lawful attorney-in-fact without right of revocation and with full power
of substitution for and in its place and stead to (i) demand and control all sums due on Loans
purchased pursuant to this Agreement and to enforce all rights with respect thereto, (ii) endorse,
mark, place or otherwise evidence Correspondent's name as payee on all checks, drafts,
acceptances or other form of partial or full Loan payment delivered or tendered to CMI, (iii) endorse,
mark, place or otherwise evidence Correspondent's name on all notes, mortgages, deeds of trust,
and other forms of security instruments or collateral and all assignments, full or partial releases or
satisfactions of said mortgages, deeds of trust, and other forms of security instruments or collateral
for all Loans purchased pursuant to this Agreement.  Correspondent agrees to execute such other
documents as CMI may reasonably request to evidence the appointment of CMI as
Correspondent's attorney-in-fact.

18.  MISCELLANEOUS

All capitalized terms not otherwise defined herein shall have the meanings attributed to them in the
CMI Manual.  All Section headings are for convenience only and shall not be construed as part of
this Agreement.  Any provision of this Agreement that is prohibited or unenforceable in any
jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or
unenforceability without invalidating the remaining portions hereof or affecting the validity or
enforceability of such provision in any other jurisdiction and, to accomplish this purpose, the
provisions hereof are severable. **This Agreement shall not be effective until signed by both
parties.**

IN WITNESS WHEREOF, the duly authorized officers of CMI and Correspondent have executed
this Agreement as of the date first above written.

CITIMORTGAGE, INC.                            American Home Mortgage Corp.
(CMI)                                         (CORRESPONDENT)

By _____                      By _____

Title  VICE PRESIDENT                         Title  E VP

Date  2-3-05                                  Date  1/28/04

RICHARD P. McCOPPIN                           Correspondent Notice Address:
Manager Eligibility & Wholesale MIS           ____538 Broadhollow Rd.
CitiMortgage Inc.
1000 Technology Drive/MS 111                  Melville, NY 11747
O'Fallon, MO 63304
(636) 261-0151/GEID #0002093401

**NOTE:  THE TEXT OF THIS AGREEMENT MAY NOT BE CHANGED IN ANY MANNER WITHOUT THE
EXPRESS PERMISSION OF CITIMORTGAGE, INC.**

data/word/citicor.doc (03/01/04)
7 of 7

                                                                              (03/04)

08/03/2007 09:50 FAX                                                                    ☒008/013



### CMI *Select* Addendum

This Addendum, effective as of August 9, 2004  supplements and amends the CitiMortgage, Inc. ("CMI") Correspondent Loan Purchase Agreement ("Agreement") dated August 9, 2001  by and between CMI and American Home Mortgage Corporation, Incorporated ("Correspondent").

*Whereas*, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to make certain changes to the Agreement in connection with certain Assignment of Trade, Direct Trade and Block Commitments from Correspondent to CMI, as defined in paragraphs 1, 2, 3, and 4 below.

*Now Therefore*, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CMI and Correspondent agree as follows, and the following paragraphs are added to the Agreement:

1.  Block Commitments: From time to time Correspondent will negotiate a mandatory sale of whole Eligible Mortgage Loans  on an individual note rate of Same Product, and deliver same pursuant to the Agreement to fulfill a Commitment with CMI; and CMI may agree to purchase the mortgage loans and the servicing rights to same under the terms of this Addendum, the Agreement, and the Commitment.

2.  Direct Trade Commitments: From time to time Correspondent will negotiate a mandatory sale of Eligible Mortgage Loans pursuant to a Commitment negotiated and executed directly with CMI and CMI will purchase the Eligible Mortgage Loans and the servicing rights to same under the terms of this Addendum, the Agreement and the Commitment.

3.  Assignment of Trade Commitments: Under the terms of the Agreement and this Addendum, Correspondent may negotiate a trade with a CMI-approved Securities Dealer ("Dealer"), and then subsequently assign the interest in the trade to CMI.  Correspondent shall notify CMI that it desires to assign a trade and sell certain Eligible Mortgage Loans and related servicing rights to CMI and CMI may accept such an offer by a written notice from CMI to Correspondent in the form of the Tri-Party Agreement (the form of which is attached hereto as Exhibit A).  The following terms and conditions shall apply to all Assignments of Trade:

    A.  CMI shall accept Assignments of Trade of GNMA-I, GNMA-II, Fannie Mae or Freddie Mac "to-be-announced" ("TBA") securities from Seller and shall pay Seller the Purchase Price provided for in paragraph 7 of this Addendum for the Eligible Mortgage Loans intended to fulfill the trades which are delivered to CMI pursuant to the terms and procedures set forth in the Agreement.

    B.  CMI will accept TBA trades only, specified trades will not be accepted.

    C.  Any Assignment of Trade to be accepted by CMI shall be for available Product windows only.

    D.  Trades may only be transacted with CMI approved Dealers.

    E.  The minimum amount for any Assignment of Trade to be accepted by CMI for available Product windows shall be $500,000 ($250,000 for GNMA II).

4.  Eligible Mortgage Loans are defined as follows:

    A.  For Block Commitments:

    (i)   Conventional Conforming ARM Loans eligible for pooling in Fannie Mae or Freddie Mac mortgage-backed securities.

    (ii)  Conventional Non-Conforming Fixed Rate and ARM Loans eligible for sale to CMI.

All Products must meet the Product parameters described in the Correspondent Agreement in effect at the time of funding.

B.  For Assignment of Trade and Direct Trade Commitments:

    (i)   FHA–insured and/or VA-guaranteed mortgage Loans eligible for pooling in GNMA mortgage-backed securities, and

    (ii)  Conventional conforming fixed rate Loans eligible for pooling in Fannie Mae or Freddie Mac mortgage-backed securities.

All Products must meet the Product parameters described in the Correspondent Agreement in effect at the time of funding. Correspondent shall not deliver to CMI any FHA/VA Loans acquired from a third party customer which is not approved by FHA/VA or not sponsored by Correspondent to originate loans under FHA/VA programs.

5.   <u>Product</u>: Product is defined as Loans eligible for purchase by CMI, according to the applicable terms, conditions, requirements, procedures, representations and warranties set forth in the Agreement.

6.   <u>Same Product</u>: Same Product is defined as Loans (eligible as above defined) which share similar characteristics with regard to loan type, term, and note rate.

7.   <u>Purchase Price</u>:

A.  For Block Commitments, the Purchase Price shall be mutually agreed to by Correspondent and CMI in accordance with the commitment price and any applicable pricing adjusters.

B.  For Assignment of Trade and Direct Trade Commitments, the Purchase Price shall be mutually agreed to by Correspondent and CMI in accordance with the executed trade price and any applicable pricing adjusters.

C.  Upon notification to Correspondent, CMI shall have the right to deduct any fees, penalties, taxes, trade assignment buyout fees, or other charges of any kind owed CMI by Correspondent; from the Purchase Price of any Eligible Mortgage Loans purchased by CMI from Correspondent pursuant to this Addendum or any other agreement between Correspondent and CMI.

8.   <u>Tri-Party Agreement</u>: For all Assignment of Trade Commitments, CMI and Correspondent will prepare and execute a Tri-Party Agreement (in the form attached hereto as Exhibit A, as amended from time to time by written notice from CMI to Correspondent) in accordance with the procedures contained in this Addendum. The terms and conditions contained in the Tri-Party Agreement shall define the nature of the specific trade and are binding on the parties.

9.   <u>Retention of Risk</u>: Correspondent agrees that it retains all risks that the Dealer will not perform on the trade. If CMI deems, at its sole option that the Dealer is unable to perform, CMI may immediately take any action it deems necessary and prudent in order to minimize its losses, including pairing off, and Correspondent agrees that it will immediately pay CMI any related loss incurred by CMI pursuant to the terms and procedures described in paragraph 15 of this Addendum.

10. **Approved Securities Dealers:** For all Assignment of Trade Commitments, CMI will only accept trades from Approved Securities Dealers ("Dealers") listed on the form attached hereto as Exhibit B, as amended from time to time by written notice from CMI to Correspondent. If the Correspondent wishes to assign a trade with a Dealer not listed, approval may be sought from CMI. Approval of Dealers is at the complete and sole discretion of CMI and must be in writing, signed by a duly authorized officer of CMI.

11. **Correspondent Authorized Trading Contacts:** Correspondent hereby authorizes CMI to accept and communicate pricing information to the representatives indicated on the Secondary Marketing Trading Desk Authorized contact List, attached hereto as Exhibit C. The representatives listed are the sole representatives of Correspondent authorized to conduct mortgage transactions with the CMI-Select Desk of CitiMortgage, Inc. Should this list change, it is the sole responsibility of Correspondent to notify CMI in writing, signed by an authorized signatory from Correspondent.

12. **Representations and Warranties:**

   A. Correspondent hereby makes all representations, warranties and covenants set forth in the Agreement and this Addendum with respect to each Eligible Mortgage Loan delivered to CMI pursuant to this Addendum, as of the date of delivery of each such Eligible Mortgage Loan.

   B. Correspondent represents that it will not select Eligible Mortgage Loans in a manner materially adverse to CMI when delivering Loans to fulfill a Block Commitment, Assignment of Trade or Direct Trade Commitment. CMI may audit Correspondent's selection procedures during regular business hours to assure itself that the selection procedures are not materially adverse to CMI. In the event CMI reasonably demonstrates that materially adverse selection procedures were used, Correspondent shall within 30 days repurchase and/or replace the affected Loans in accordance with paragraph 11 of the Agreement with Eligible Mortgage Loans selected in a manner which is not materially adverse to CMI. Failure to repurchase or replace any Loan rejected under this subsection may subject Correspondent to those charges, penalties and procedures described in paragraph 7(C) and paragraph 14 of this Addendum.

   C. Correspondent has all requisite corporate power, authority and capacity to enter into this Addendum and to perform the obligation required of it hereunder.

   D. The execution and performance of this Addendum by Correspondent, its compliance with the terms hereof and the consummation of the transactions contemplated herein will not violate any provision of any law applicable to it and will not conflict with any terms or provisions of its certificate of incorporation or by-laws, or any other instrument relating to the conduct of its business or any other agreement to which Correspondent is a party.

   E. No representation, warranty or statement made by Correspondent in this Addendum or other documents prepared by Correspondent contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained in this Addendum or made in any document referred to in the Addendum not misleading.

13. **Loan Delivery:** CMI will notify Correspondent of the applicable Commitment delivery and funding deadlines for each Commitment obligation. Correspondent agrees to provide CMI with sufficient Eligible Mortgage Loans to fulfill the Commitment by the Commitment delivery deadline as provided at the time of Commitment. Correspondent must deliver Eligible Mortgage Loans with aggregate principal balances within a tolerance of the face amount of the Commitment, as set forth and agreed to by both parties in the Commitment Confirmation (representative samples of which are attached hereto as Exhibit D. Substitutes for rejected Loans will be accepted provided such substitutes are

within tolerance of Commitment and received in sufficient amounts to fulfill the obligations created by an Assignment of Trade, Direct Trade or Block Commitment.

14. <u>Loan Review:</u> CMI will review each Loan for credit quality and documentation prior to purchase of the Loan. At its discretion, CMI may reject any Loan, which it reasonably determines does not meet the terms and parameters of the Agreement. Notwithstanding such prior review, Correspondent agrees to repurchase on CMI's demand any Loan which is unacceptable to CMI, GNMA, Freddie Mac or Fannie Mae as the result of any defects which are not cured by Correspondent within the time period specified by CMI.

15. <u>Failure to deliver:</u> In the event CMI does not receive from Correspondent sufficient Eligible Mortgage Loans to fulfill the obligations created under this addendum, Correspondent shall contact the CMI representative to either arrange for an extension (which extension shall be granted at the sole discretion of CMI) or to pair out of the Commitment. Any and all fees, penalties, taxes, trade assignments, buy-out fees or other charges of any kind, whether incurred and assessed by outside entities or incurred internally by CMI, shall be charged to Correspondent and are due and payable to CMI immediately. CMI shall prepare an itemized statement of such charges and provide same to Correspondent. Failure to remit payment shall constitute an event of default under the Agreement and CMI shall be entitled to all remedies provided by the Agreement and at law. For deliveries which exceed the committed amount, CMI will contact Correspondent to establish the price for excess delivery amount.

16. Correspondent acknowledges that it has received and read the Agreement. All provisions of this Addendum are incorporated by reference into the Agreement, and shall be binding upon Correspondent and CMI. Specific references in this Addendum to particular provisions of the Agreement and not to other provisions do not mean that those provisions of the Agreement not specifically cited in the Addendum are not applicable. All terms used herein shall have the same meaning as the terms have in the Agreement, unless otherwise defined herein, or the context clearly requires otherwise. In the event of any conflict between the provisions of this Addendum and the provisions of the Agreement, the provision of this Addendum shall control.

17. This Addendum may be terminated upon 10 days written notice from either party. Termination shall not affect the sale and purchase of any Eligible Mortgage Loans agreed to between Correspondent and CMI. All representations, warranties and covenants contained in this Addendum and the Agreement shall survive the termination of this Addendum.

American Home Mortgage Corp.
("Correspondent")

By: _____

Name: _____ Robert F. Johnson

Title: EVP, Capital Markets

Cc: Richard McCoppin, Intermediary Management

CitiMortgage, Inc.

By: _____

Name: Julie LaBonté

Title: Director, Correspondent Pricing

## Delegated Underwriting Addendum

This Delegated Underwriting Addendum ("Delegated U/W Addendum"), effective as of _January 27th_, 20 _05_ supplements and amends the CitiMortgage, Inc. ("CMI") Correspondent Loan Purchase Agreement (the "Agreement") dated _January 27     The_ 20 _05_ by and between CMI and _American Home Mortgage Corp._, ("Correspondent")

WHEREAS, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to make certain changes to the Agreement in connection with the delegation of certain underwriting functions to Correspondent,

WHEREAS, Citibank, FSB; Citibank (West), FSB; and Citibank, NA (collectively referred to herein as "The Banks") may, from time to time, purchase from CMI certain Loans which are covered by the provisions of this Delegated U/W Addendum, and the parties hereby expressly acknowledge that The Banks are intended third party beneficiaries of the Agreement and this Addendum, and

WHEREAS, Correspondent desires to originate Loans which comply, in all material respects, with the appropriate underwriting criteria established by CMI for the associated Loan product.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, CMI and Correspondent agree as follows:

1) The following paragraphs are added to Section 11 ("Cure or Repurchase") of the Agreement:

Correspondent expressly agrees that it shall underwrite each Loan in conformity with the applicable underwriting criteria of CMI. If an audit by CMI on any Loan reveals that it was underwritten in violation of the applicable CMI underwriting criteria, Correspondent will, not later than thirty (30) days after receipt of written notice from CMI, repurchase the Loan at the Repurchase Price or provide CMI with written evidence as to why Correspondent believes such underwriting criteria was not violated. If, after reviewing Correspondent's written evidence, CMI, in its sole and independent discretion, determines the Loan was not originated in accordance with the applicable underwriting criteria, Correspondent will, not later than thirty (30) days after receiving further written notice from CMI, repurchase the Loan at the Repurchase Price specified in the Agreement, Manual and/or applicable Bulletin(s).

Correspondent expressly agrees and acknowledges that CMI (i) is entitled to independently exercise and/or receive all benefits and remedies of the Agreement, Manual, and this Delegated U/W Addendum with respect to all Loans purchased by CMI and (ii) may, in its sole and independent discretion, terminate the Correspondent's delegated underwriting privileges with respect to all or a specified number of Loan products at any time upon ten (10) days advance written notice to Correspondent of such full or partial termination.

2) Except as amended herein, all other terms and conditions of the Agreement (including but not limited to the remaining provisions of Section 11) shall remain in full force and effect.

3) Capitalized terms not defined in this Delegated U/W Addendum shall have the meanings attributed to them in the Agreement.

4) This Delegated U/W Addendum supersedes and replaces all other delegated underwriting Addendum(s) previously executed by Correspondent and CMI.

IN WITNESS WHEREOF, the duly authorized officers of Correspondent and CMI have executed this Delegated U/W Addendum.

*American Home Mortgage Corp.* ("Correspondent")

By: _____

Name: *Robert F Johnson*

Title: *E V P*

CitiMortgage, Inc. ("CMI")

By: _____

Name: _____

Title: Vice President

> RICHARD P. McCOPPIN
> Manager Eligibility & Wholesale MIS
> CitiMortgage Inc.
> 1000 Technology Drive/MS 111
> O'Fallon, MO 63304
> (636) 261-0151/GEID #0002093401

delegatedunderwriting (5/13/04)

# EXHIBIT 3



**CitiMortgage, Inc.**
*Correspondent Lending*

## BULK PURCHASE AMENDMENT

This Bulk Purchase Amendment ("Amendment") is entered into this _ll_ day of _JULY_, 200~3~ by and between _American Home Mortgage_ (hereinafter "Seller") and CitiMortgage, Inc. (hereinafter "Buyer").

WHEREAS, Seller and Buyer have entered into a Correspondent Agreement (hereinafter the "Agreement") dated _August 9, 2001_ ; and

WHEREAS, Buyer and Seller wish to amend the Agreement to buy and sell Loans in accordance with the Agreement, this Amendment, and the Buyer's Correspondent Manual (hereinafter "Manual") and agree this Amendment shall supercede the Manual only as to items specifically addressed herein.

NOW THEREFORE, in consideration of the mutual promises, covenants, representations and warranties herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

I.   **BULK PURCHASE PROGRAM**

Seller has been approved to sell and deliver Loans under Buyer's Bulk Purchase Program. Buyer and Seller have agreed to the following terms and conditions regarding Seller's participation in Buyer's Bulk Purchase Program.

A.   Buyer may purchase and Seller may sell pools of Loans on a bulk basis from time to time, pursuant to the terms of the Agreement, the Manual and this Amendment.

B.   With respect to each pool of Loans, a Commitment Letter, substantially in the form of Exhibit 1 (the "Commitment") will be prepared by the Buyer and delivered to the Seller within three (3) Business Days. Seller must review the Commitment and must contact Buyer within two (2) business days of Buyer's transmission of the Commitment and either execute the Commitment or further negotiate terms.

C.   No later than 11:00 a.m. Central Time on the Delivery Date specified on the Commitment, Seller shall make the complete Loan file, the contents of which are defined in Exhibit 5 ("Contents of Each Mortgage File") for each Loan available for review by Buyer (or Buyer's designee) at Buyer's office or other location agreed upon by Buyer and Seller. At Buyer's option, Buyer (or Buyer's designee) shall review any or all such Loan files to determine whether the corresponding Loan(s) are acceptable for purchase by Buyer. Whether or not Buyer chooses to review the Loan files before or after Closing Date or includes a Loan for purchase after review shall have no effect on the representations and warranties given by Seller or Buyer's right to demand repurchase or other relief as provided in the Agreement, the Manual or this Amendment. Promptly after any review, Buyer will inform Seller of any Loans that are not acceptable for purchase. Buyer shall have the option of allowing the Seller to cure the deficiency (ies) or may allow Seller to substitute one or more Loans subject to Buyer's approval.

Revised 6/16/03

1 of 3

D. Seller agrees that delivery to Buyer is mandatory.  Furthermore, Seller acknowledges its obligation to deliver Loans acceptable for purchase by Buyer in an aggregate principal amount at least equal to the amount specified in the Commitment.  To the extent Seller fails to deliver such amount by such time, Seller must pay Buyer a Pair Off amount as calculated below.  The Pair Off amount is equal to (a) the difference between the interpolated dollar price of current coupon FNMA Securities in effect on the Commitment date and the date of the Pair Off, including any mutually agreed upon non-conforming spread tightening as determined by the Buyer and Seller, multiplied by (b) any deficiency of the aggregate principal amount delivered pursuant to the applicable Commitment.  If there is no loss due to spread or price differential, Buyer will not assess a Pair Off fee.

E. On the Closing Date as defined in the Commitment, Buyer shall purchase the Loans that are acceptable for purchase as determined by Buyer.  The Purchase Price shall be calculated as set forth in the Commitment.  If Seller substitutes Loans prior to Closing Date, Buyer may adjust the aggregate Purchase Price to reflect substitute Loans.  Buyer shall prepare and forward a mutually agreeable Term Sheet to Seller, in a form substantially similar to Exhibit 2 ("Term Sheet"), prior to Closing Date reflecting the terms of the funding schedule.

F. In the event the Transfer date is on the Closing Date, the Loans shall be transferred in accordance with Exhibit 3 ("Transfer Procedures").

G. In the event the Loans will be interim serviced for Buyer, Seller shall service the Loans in accordance with Exhibit 4 ("Interim Servicing"), and shall transfer the Loans at the Transfer Date as defined in and in accordance with Section F, above.

H. The parties agree that all terms and conditions negotiated for each pool of loans purchased on a bulk basis pursuant to this Amendment shall be kept confidential and shall not be released or revealed to any third party without the prior express written consent of the other party.

I. Seller represents and warrants that the Loans were originated by the Seller or by a savings and loan association, a savings bank, a commercial bank or similar banking institution which is supervised and examined by a federal or state authority, or by a mortgagee approved as such by the Secretary of HUD;

J. Seller represents and warrants that none of the Loans are classified as (a) "high cost" loans under the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), or (b) "high cost," "threshold," or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws, and no Loan is in violation of any state law or ordinance similar to HOEPA; and

K. Seller represents and warrants that it has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable borrower and the origin of the assets used by the said borrower to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable borrower for purposes of the Anti-Money Laundering Laws.

L. Seller has completed the attached Exhibit 6 ("Seller's Authorized Employees") and represents and warrants that the employees of Seller identified therein are authorized to sign all necessary documents and negotiate the terms of the transactions contemplated pursuant to this Amendment.  Further, Seller represents and warrants that it will promptly

Revised 6/16/03

notify Buyer of any changes, additions or deletions of names from Exhibit 6.  Under no circumstances shall Seller assert that a sale of Loans under this agreement is invalid for any reason on account of it having been negotiated and consummated by an unauthorized employee of Seller.

Except as modified by this Amendment, all terms, conditions, representations and warranties of the Agreement, Manual, and any previously executed Amendments shall remain in full force and effect.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement, Manual or, if appropriate, other executed Amendment(s).

IN WITNESS WHEREOF, Buyer and Seller have executed this Bulk Purchase Amendment by their duly authorized officers as of the date first written above.

CitiMortgage, Inc.
(Buyer)

By: _____

Title: _____

By: _____

MIKE BOLAND
Credit Analyst
CitiMortgage, Inc./Intermediary Management

(Seller)

By: _____ Andrew Valentine

Title: SR. Vice President

Revised 6/16/03

3 of 3

# **EXHIBIT 4**

citimortgage

# Guide/Manuals: Correspondent Manual Table of Contents

Section Number:
» 100 - INTRODUCTION - Revised Friday December 15 2006

Section Number:
» 200 - PROGRAM DESCRIPTIONS - Agency Products - Revised Wednesday January 31 2007
» 200 - PROGRAM DESCRIPTIONS - Community Lending Products - Revised Thursday February 08 2007
» 200 - PROGRAM DESCRIPTIONS - Non-Agency Products - Revised Thursday February 08 2007
» 200 - PROGRAM DESCRIPTIONS - Expanded Products - Revised Wednesday January 31 2007
» 200 - PROGRAM DESCRIPTIONS - Government Products - Revised Tuesday February 06 2007
» 200 - PROGRAM DESCRIPTIONS - Second Lien Products - Revised Monday February 05 2007

Section Number:
» 300 - REGISTRATION - Revised Wednesday October 25 2006

Section Number:
» 400 - DOCUMENTATION PROCESSES - Revised Wednesday January 31 2007

Section Number:
» 500 - APPRAISAL - Revised Wednesday January 31 2007

Section Number:
» 600 - CONDOMINIUM, CO-OPS & PUD PROJECTS - Revised Wednesday January 31 2007

Section Number:
» 700 - UNDERWRITING OPTIONS - Revised Wednesday January 31 2007

Section Number:
» 800 - UNDERWRITING - Revised Monday February 05 2007

Section Number:
» 900 - PRE-PURCHASE REVIEW - Revised Wednesday January 31 2007

Section Number:
» 1000 - PURCHASING - Revised Wednesday January 31 2007

Section Number:
» 1100 - CMI SELECT - Revised Tuesday September 26 2006

Section Number
» 1800 ELECTRONIC DELIVERY - Revised Tuesday September 26 2006

Section Number

ndent Bulletins

» ..00 - IMAGE ACCEPTANCE - Revised Tuesday September 26 2006

Section Number:
» 2100 - NEW LOAN RESEARCH - Revised Saturday August 05 2006

Section Number:
» 2200 - LEGAL - Revised Wednesday January 31 2007

Section Number:
» 2300 - GLOSSARY - Revised Saturday August 05 2006

Section Number:
» 2400 - EXHIBITS - Forms - Revised Wednesday January 31 2007
» 2400 - EXHIBITS - Quick References - Revised Friday September 15 2006
» 2400 - EXHIBITS - Miscellaneious Loan Documents - Revised Wednesday January 31 2007
» 2400 - EXHIBITS - Expanded product Loan Documents - Revised Thursday November 09 2006

citigroup.
http://mortgageweb.citicorp.com/departments/channel/cor/cormanuals.shtm

Terms and Condition
Copyright © 2004 Citigrou

# citimortgage

**CORRESPONDENT MANUAL**                                             **TABLE OF CONTENTS**

**_900 - PRE-PURCHASE REVIEW_**                                              **_REVISED_**

901 - PRE-PURCHASE REVIEW _____ AUGUST 2006

902 - DOCUMENTATION REQUIREMENTS _____ JANUARY 2007

903 - GOVERNMENT CLOSING PACKAGES _____ AUGUST 2006

904 - MORTGAGE INSURANCE_____ JANUARY 2007

905 - LIVING TRUST/INTER VIVOS REVOCABLE TRUST _____ AUGUST 2006

906 – CEMA/MECA _____ AUGUST 2006

907 - COOPERATIVES_____ AUGUST 2006

908 - ESCROWS _____ DECEMBER 2006



PRE-PURCHASE REVIEW

**CORRESPONDENT MANUAL**                                    PRE-PURCHASE REVIEW 901

This chapter outlines the guidelines Correspondents should follow when preparing the loan file for submission to CitiMortgage. Specific requirements relating to the purchase of government loans are in a separate section.

**Note:** This does not cover all of the documents required to originate a loan by the applicable legal entity in the state in which such loan is originated. All required documents must be included in the loan package to comply with the legal and regulatory warranties set forth in the Correspondent Loan Purchase Agreement.

### LOAN FILE SUBMISSION

CitiMortgage accepts copies of all closing files - with some important exceptions. Exceptions include: the original Note (and all applicable riders/addendums), an original Allonge, original co-op documents, and CEMA documents. With the exception of these named documents, CitiMortgage accepts copies of closing documents in lieu of the original documents.

The following address is used to submit files and documents **before your loan is purchased by CMI:**

> **CitiMortgage, Inc.**
> **Attn: Correspondent Operations**
> **1000 Technology Drive,**
> **Mail Station 904**
> **O'Fallon, MO 63368-2240**

**Note: Final recorded documents and final title policies are not submitted to the above address.** After CitiMortgage has purchased a loan from the Correspondent all final recorded documents and final title policies must be sent, as they are received but no later than 120 days after purchase to:

| First Class Mail: | Express Mail: |
|---|---|
| CitiMortgage, Inc. | CitiMortgage, Inc. |
| Attn: Document Processing, MS 321 | Attn: Document Processing, MS 321 |
| P.O. Box 790021 | 1000 Technology Drive |
| St. Louis, MO 63179-0021 | O'Fallon, MO 63368-2240 |

An Outstanding Document Report is generated on a monthly basis. This report will keep you updated on final documents still outstanding.

Correspondents must clearly write the borrower's name, loan type (Conventional or FHA/VA), CMI's loan number, and the Correspondent's loan number on the front of the file for each loan submitted. A copy of CMI's Rate Lock Confirmation should be in every file submitted to CMI for purchase.

### SUSPENSE REPORT

Documents that are missing and/or incorrect are identified during the Pre-Purchase Review process. CitiMortgage sends a Suspense Report to advise Correspondents of the outcome. Correspondents are notified via the Web site, facsimile and/or phone regarding the deficiency. If a Correspondent has any questions or does not receive a Suspense Report within 72 hours of delivering the closed loan to CitiMortgage, he/she should check CitiMortgage's Correspondent Web site correspondent.citimortgage.com. or call the Client Relations Team at 800-967-2205, Option 1.

CitiMortgage lists all conditions, including documents that are missing, incomplete, or in need of correction, on the Suspense Report. Any unsatisfied underwriting conditions (CitiMortgage or Contract) are listed as well. All


**citi**mortgage

CORRESPONDENT MANUAL

PRE-PURCHASE REVIEW

PRE-PURCHASE REVIEW 901

conditions must be satisfied before CitiMortgage purchases the loan. The Suspense Report also lists the final/follow-up documents that must be forwarded to CitiMortgage after the loan is purchased.

Refer to Section 102 for addresses and fax numbers for document submission to CitiMortgage.

<u>DEFICIENCY CURE DEADLINE</u>

Suspense deficiencies must be cured by the Deficiency Cure Deadline Date (latter of expiration date or 4 business days from notification) to avoid pricing adjustments as stated below.

| Days in Deficiency Status | Pricing Adjustment (Based off of calendar days) |
|---|---|
| 1 – 10 days | (.125%) |
| 11 – 20 days | (.250%) |
| 21 – 30 days | (.375%) |
| 31 – 40 days | (.500%) |
| 41 – 50 days | (.625%) |
| 51 – 60 days | (.750%) |

Loans in suspense greater than 60 days will be cancelled, returned to the Correspondent, and assessed a pair off fee. Questions may be directed to Client Relations.

For Single Loan Mandatory Locks:

The Deficiency Cure Deadline Date is the Rate-Lock Expiration Date. Single Loan Mandatory Locks not purchasable by the Rate-Lock Expiration Date will be extended based on the pricing adjustment schedule above. Standard CitiMortgage turn times require complete loan files to be received in purchasable condition 2 business days prior to the rate-lock expiration date in order for the loan to be reviewed.

<u>CLEARING SUSPENSE CONDITIONS</u>

Before CitiMortgage clears the loan for purchase all items listed under Suspense Detail on the Suspense Report must be corrected, and/or missing documents must be received. If an original document, or a document with an original signature, is required per the guidelines, a facsimile is not acceptable to clear the suspense condition.

<u>BORROWER BLANKET CHANGE AUTHORIZATION</u>

For any document requiring changes pursuant to CitiMortgage's document review, the Correspondent must obtain the borrower's initials acknowledging the changes.

Blanket change authorizations given by borrowers for the purpose of correcting errors discovered after closing (i.e., limited power of attorney, blanket authorization letter, etc.) are not acceptable. If a CitiMortgage Reviewer indicates on the Suspense Report a Correction to Mortgage form may be used to correct errors on the security instrument or rider(s), the Correspondent must have it signed by and notarized by the borrowers and the lender, if applicable, and recorded in the appropriate county recorder's office.



**PRE-PURCHASE REVIEW**

**CORRESPONDENT MANUAL**                                    **PRE-PURCHASE REVIEW 901**

## ALTERATIONS TO STANDARD FANNIE MAE/FREDDIE MAC CLOSING DOCUMENTS

The Correspondent must not alter, or add additional language to, the standard Fannie Mae/Freddie Mac closing documents, other than changing the conversion margin from five-eighths to seven-eighths for non-conforming convertible ARM loans, or to comply with local jurisdictional requirements. The Correspondent should refrain from making any other additions or alterations without prior consent from CitiMortgage.

## OUTSTANDING/FOLLOW UP DOCUMENTATION

The timely receipt of post purchase documentation is critical to minimizing expenses as well as meeting our final pool certification deadlines. CitiMortgage looks to its Correspondents to manage outstanding documentation issues in a timely manner.

CitiMortgage's policy regarding outstanding documentation is that upon the occurrence of any one of the following events, the Correspondent shall, upon notice from CitiMortgage, immediately repurchase all affected Loan(s) from CitiMortgage at the Repurchase Price(s) specified in said notice:

- The Correspondent fails to provide all of the documentation required by CitiMortgage and/or fails to satisfy all other Loan specific or Correspondent Manual document requirements At CitiMortgage's sole discretion, the Correspondent's obligation to repurchase any Loan with missing documentation may be postponed pending the return of documents sent for recordation provided any such recordation delay is caused solely by the applicable recorder's office.
- For FHA or VA loans, the Correspondent fails to submit an FHA Mortgage Insurance Certificate (MIC), or a VA Loan Guaranty Certificate (LGC) within ninety (90) days following the CitiMortgage purchase date.

The Correspondent is responsible for the payment of all costs and expenses incurred in connection with the transfer and delivery of Loans to CitiMortgage, including but not limited to mortgage loan assignment preparation and recording fees, fees for title policy endorsements and continuations, and the Correspondent's attorney's fees.

In situations where document delivery deadlines are not met, and because of secondary market investor requirements (e.g., GNMA), if CitiMortgage cannot require the Correspondent to repurchase a loan, CitiMortgage reserves the right to bill the Correspondent for all CitiMortgage expenses incurred in obtaining the required outstanding documentation, including late delivery fees.

## QUALITY CONTROL REVIEW REQUESTS

The Quality Control Department performs a random audit on a percentage of all loans originated and purchased through the Correspondent Program.

If during our review it is discovered that documentation or explanations are missing from the file, or a discrepancy is discovered during re-verification, the Correspondent is notified and given a reasonable time frame in which to respond and supply the item(s) or explanation(s) to satisfy the audit. A prompt response is imperative. Failure to respond, or an unsatisfactory response, may result in a request for continued indemnification or repurchase.

Occasionally, CitiMortgage receives a similar request from FHA or VA resulting from their own audit of a file. Since these contain a very short time frame for responses, CitiMortgage identifies them as Agency Reviews with only a five day response period.

# EXHIBIT 5

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 97658 (Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115
(Cite as: Not Reported in B.R.)

Page 1

**H**In re Kaiser Aluminum Corp., Inc.
Bkrtcy.D.Del.,2004.

United States Bankruptcy Court,D. Delaware.
In re: KAISER ALUMINUM CORPORATION,
INC., et al., Debtor(s)
KAISER ALUMINUM & CHEMICAL
CORPORATION, Plaintiff,
v.
TRANSCONTINENTAL INSURANCE COMPANY
and National Union Fire Insurance Company of
Pittsburgh, PA Defendants.
No. 02-10429(JFK), 02-6531(JKF).

Jan. 16, 2004.

Daniel J. DeFranceschi, Gregory M. Gordon, Daniel
M. Winnika, and David G. Adams, for Plaintiff.
Kevin Gross, David C. Christian, II, Mohsin H.
Khambat, and Stephanie A. Weber, for Defendant
Transcontinental Insurance Company.
Frederick B. Rosner, and Michael S. Davis, for
Defendant National Union Fire Insurance Company
of Pittsburgh, PA.
William P. Bowden, Rafael X. Zahralddin-Aravena,
Lisa Beckerman, H. Rey Stroube, and Brian A.
Kilmer, for the Official Committee of Unsecured
Creditors.Related to Dkt. No. 18 Motion for Partial
Summary Judgment and Dkt. No. 28 Response to
Motion for Partial Summary Judgment and Cross-
Motion for Partial Summary
JudgmentFITZGERALD, Bankruptcy J.

MEMORANDUM OPINION [FN1]

> FN1. The Court's jurisdiction was not at
> issue. This Memorandum Opinion
> constitutes our findings of fact and
> conclusions of law.

*1 Before the Court is Plaintiff Kaiser Aluminum &
Chemical Corporation's ("KACC") Motion for Partial
Summary Judgment on Counts I through VI of the
Complaint in this Adversary Proceeding and
Defendant Transcontinental Insurance Company's
("CNA") Cross-Motion for Partial Summary
Judgment on Counts I and III through VI.

Summary judgment is proper if there is no genuine
issue of material fact and if, viewing the facts in the
light most favorable to the non-moving party, the
moving party is entitled to judgment as a matter of
law. Carter v. McGrady, 292 F.3d 152, 157 (3rd
Cir.2002); seeFED. R. CIV. PRO. 56(c); Celotex
Corp. v. Carett, 477 U.S. 317 (1986). As noted by the
Third Circuit in Carter,"The judge's function at the
summary judgment stage is not to weigh the evidence
and determine the truth of the matter, but to
determine whether there is a genuine issue for trial.
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
249 (1986)."Carter, 292 F.3d at 157.

Based on a review of the pleadings and
representations of counsel, the Court finds that the
disputes in the Complaint and Counter-Motion are
straightforward issues of contract interpretation, that
these contracts are clear on their respective faces and
that there are no genuine issues of material fact in
dispute. Consequently, summary judgment pursuant
to Fed. R. Civ. Pro. 56(c) is appropriate.

For the reasons given below, the Court grants
KACC's motion for partial summary judgment as to
Count II and denies KACC's motion as to Counts I
and III through VI. The Court grants CNA's counter-
motion for partial summary judgment as to Counts I
and III through VI in part and defers in part for
further consideration.

On July 5, 1999, KACC's facility in Gramercy,
Louisiana, exploded (the "Plant Accident"). The
Plant Accident destroyed a substantial part of the
Gramercy plant and resulted in claims brought
against KACC and other parties potentially
responsible for the explosion (the "Third Party
Defendants") by individuals who were on the plant
site at the time of the Plant Accident (the "Inside-the-
Gate Claimants") or outside the plant site (the
"Outside-the-Gate Claimants").

At the time of the Plant Accident, KACC was insured
under third party liability policies issued by CNA and
National Union Fire Insurance Company of
Pittsburgh, PA ("National Union"and together with
CNA, "the Insurers").[FN2] All monies expended to pay
claims and settlements on account of losses incurred
by the Inside- and Outside-the-Gate Claimants were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                    Page 2
Not Reported in B.R., 2004 WL 97658 (Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115
(Cite as: Not Reported in B.R.)

provided by the Insurers. The Insurers agree, and Plaintiff does not contest, that CNA was the last insurer to pay out funds. No money of KACC was used to fund settlements with these claimants.

> FN2. A third insurer of KACC at the time of the Plant Accident, Old Republic Insurance Company, is not a party to this Adversary Proceeding.

KACC entered into settlement agreements with the following Inside- and Outside-the-Gate Claimants: (i) the Preliminary Settlement Agreement ("PSA") of November, 2000, entered into with a class of plaintiffs comprised of Outside-the-Gate claimants; (ii) three "Receipt, Partial Release, Indemnity and Contractual Reimbursement Agreements" with persons who were most seriously injured in the Plant Accident, Gary Guy and family (the "Guy Agreement"), Terrence Hayes and family (the "Hayes Agreement") and Todd Landry and family (the "Landry Agreement"); (iii) thirteen "Receipt, Partial Release, Indemnity and Contractual Reimbursement Agreements" with Inside-the-Gate Claimants other than Guy, Hayes and Landry ("Other Inside-the-Gate Agreements" and, collectively with all the above agreements, the "Settlement Agreements").

**\*2** Each Settlement Agreement includes language requiring KACC and the individual claimants to prosecute claims against Third Party Defendants. A certain percentage of any recoveries from Third Party Defendants are to be paid to "Released Parties" as directed by KACC (the "Third Party Recoveries"). The term "Released Parties" is defined in each of the Settlement Agreements to include KACC and its insurers.

#### The Complaint and Cross-Motion

In Count I of the Complaint, KACC seeks a declaratory judgment that the Third Party Recovery Funds from the Outside-the-Gate Claimants are property of, and belong to, KACC's bankruptcy estate. The value of these recovery funds as of the filing date of the Complaint was $3,825,000 and they are held in a trust account by KACC's insurance counsel, Heller Ehrman White & McAuliffe, LLP ("HEWM").[FN3]

> FN3. The values of the Recovery Funds given in this Memorandum Order are taken

from the Debtors' Complaint dated November 12, 2002, and do not include any settlements paid out or other additional deposits to the Recovery Funds after November 12, 2002, nor do they include interest since that date.

In Count II, KACC seeks a declaratory judgment that monies remaining in the Inside-the-Gate Settlement Fund are property of, and belong to, KACC's bankruptcy estate. The value of these recovery funds as of the filing date of the Complaint was $1,034,533.31 and they are held in a trust account by HEWM.

In Count III, KACC seeks a declaratory judgment that the Third Party Recovery Funds from the Other Inside-the-Gate Claimants are property of, and belong to, KACC's bankruptcy estate. The value of these recovery funds as of the filing date of the Complaint was $1,187,094.58 and they are held in a trust account by HEWM.

In Count IV, KACC seeks a declaratory judgment that the Guy Third Party Recovery Funds are property of, and belong to, KACC's bankruptcy estate. The value of these recovery funds as of the filing date of the Complaint was $2,477,270 and they are held in a trust account by HEWM.

In Count V, KACC seeks a declaratory judgment that the Hayes Third Party Recovery Funds are property of, and belong to, KACC's bankruptcy estate. The value of these recovery funds as of the filing date of the Complaint was $2,419,820 and they are held in a trust account by HEWM.

In Count VI, KACC seeks a declaratory judgment that the Landry Third Party Recovery Funds are property of, and belong to, KACC's bankruptcy estate. The value of these recovery funds as of the filing date of the Complaint was $2,740,000 and they are held in the registry of the United States District Court for the Eastern District of Louisiana.

Count VII of the Complaint seeks a money judgment in favor of KACC from CNA alleging wrongful withholding of proceeds to pay KACC's costs of defense. Neither KACC's Motion nor CNA's Cross-Motion addresses Count VII.

CNA's Cross-Motion asks the Court to deny KACC's

Not Reported in B.R.                                                                                          Page 3
Not Reported in B.R., 2004 WL 97658 (Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115
(Cite as: Not Reported in B.R.)

motion, recognize CNA's right, title and interest in the Third Party Recoveries, authorize the immediate transfer of all of the Third Party Recovery Funds to CNA and to allow discovery to determine rights to any remaining funds in the Inside-the-Gate Settlement Fund

Counts I and III through VI of the Complaint

In Counts I and III through VI of its Complaint, KACC seeks a declaratory judgement that the Third Party Recoveries are property of the bankruptcy estate and that KACC has both legal and equitable title to the Third Party Recoveries. KACC argues that the Third Party Recoveries must be paid to the Released Parties, that the Released Parties include KACC and that KACC has the right to direct payment, including to itself. Since the plain language of the Settlement Agreements, in KACC's interpretation, gives KACC a right to receive the Third Party Recoveries and the exclusive right to direct the disbursement, including the discretion to direct payment to itself, it follows that KACC has both a legal and equitable title to the Third Party Recoveries. This Court disagrees.

*3 In our Memorandum Opinion and Order denying CNA's motion to dismiss this adversary proceeding, this Court wrote that "KACC, a released party and THE party charged with directing the disposition of the funds, has a property interest in the proceeds [the Third Party Recoveries]." Memorandum Opinion and Order Denying Motion to Dismiss dated February 13, 2003, Adversary No. 02-6531 (JKF), Dkt. No. 13.This statement follows from 11 U.S.C. § 541(a)(1) that provides that "all legal *or* equitable interests of the debtor become the property of the bankruptcy estate."[Emphasis added.] This expansive definition of property of the estate, however, is limited by Bankruptcy Code section 541(d) which provides:
Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest .... becomes property of the estate .... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

Although we found that KACC had demonstrated a legal interest in the Third Party Recoveries sufficient to deny dismissal of this action, KACC has not established that it has an equitable interest in the recoveries. Indeed, it is evident from the pleadings

and arguments of counsel that KACC was under a preexisting duty at the time it entered into the Settlement Agreements to direct payments to the Insurers. Because, as will be seen, CNA is the entity with the first priority under the relevant insurance policies to recover certain funds, we look to the language of the CNA insurance policies. Article IV, § ff(1) of KACC's Insurance Policy with CNA states:
If [CNA] makes any payment, we are entitled to recover what we paid from other parties. Any person to or for whom we make payment must transfer to us their rights of recovery against any other party. This person must do everything necessary to secure these rights and must do nothing that would jeopardize such rights.[FN4]

> FN4. Section (N) of KACC's National Union Policy No. BE-357-07-17 contains nearly identical language:
> If an Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair those rights and must help us enforce them.
> Although National Union has deferred to CNA's right to the Third Party Recoveries on the grounds that CNA was the last insurer to pay the proceeds, this language from the National Union policy demonstrates that KACC was on notice and under contract with both of its insurers at the time that it executed the Settlement Agreements that recoveries were to be transferred to the appropriate insurer.

The CNA Policy further states that if more than one insurer or other person makes a payment to or for the benefit of a claimant against the insured, any amounts recovered shall be distributed in the following order:
(a) any party including [KACC] who has paid an amount above payment by this policy shall be reimbursed up to the amount they have paid.
(b) from any remaining balance, [CNA] will then be reimbursed up to the amount [CNA has] paid.
(c) from any remaining balance, amounts paid by any of [KACC's] underlying policies shall be reimbursed.

CNA Policy, Article IV, § f(2) [FN5]

> FN5. Section (N) of KACC's National Union Policy again contains nearly identical language.

Not Reported in B.R.                                                                                                  Page 4
Not Reported in B.R., 2004 WL 97658 (Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115
(Cite as: Not Reported in B.R.)

"An insured has a duty to read his insurance policy and he is bound by the provisions thereof if they are clear and unequivocal."*Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 928 (Del.1982).*See also, Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 745 (Del.1997)* ("When the language of an insurance contract is clear and unequivocal, a party will be bound by the plain meaning").

**\*4** Article IV of the CNA Policy is clear and unequivocal. At the time KACC entered into the Settlement Agreements, KACC knew that the Insurers would fund the Settlement Agreements, that KACC would not contribute any funds and, thus, KACC could not qualify under priority (a) of the CNA policy for a right to recovery higher than its insurers. Consequently, KACC was under a preexisting duty at the time it executed the Settlement Agreements to transfer any Third Party Recoveries generated by the Settlement Agreements to the appropriate insurer.[FN6]

> **FN6.** The Court takes note of KACC's objection to the relevance of the two insurance policy provisions. Both CNA and National Union in their pleadings describe these provisions as "subrogation" provisions. KACC argues that subrogation rules do not apply to the Settlement Agreements because subrogation refers to the entry of the insurer into the rights of the insured to recover against third party tortfeasors and the recovery here is from the claimants. The Court find this analysis unduly restrictive of the meaning of subrogation. Courts have found that subrogation and reimbursement are often interchangeably used and the Court must look to the language in the insurance policy and the rights granted to the insurer to determine the parties' intent. *A. Copeland Enterprises, Inc., et al., v. Slidell Memorial Hospital, et al.,* 657 So.2d 1292, 1298-1299 (La.1995); accord *Barreca v. Cobb, et al.,* 668 So.2d 1129 (La.1996). Here it is clear that KACC, CNA and National Union intended that if the insurer paid funds and KACC later recovered from any other party, the insurer was to be reimbursed.

The filing of the bankruptcy petition did not alter or modify this preexisting duty. "Federal courts are not licensed to disregard interests created by state law when that course is not clearly required to effectuate federal interests."*Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487, 492-93 (3rd Cir.1997), citing in support *Butner v. United States,* 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of the bankrupt's estate to state law").

The phrase in the Settlement Agreements providing that KACC had the power to direct the disposition of the funds cannot be interpreted to confer equitable ownership of the Third Party Receivables on KACC. When examining the Settlement Agreements, the Court is required to look to controlling Louisiana law.[FN7]

> **FN7.** Each of the Settlement Agreements was executed in Louisiana and each agreement contains a clause stipulating the substantive law of Louisiana as governing law, excluding choice of law rules.

Under Louisiana law, interpretation of contracts is a legal question.*Willard v. R & B Falcon Drilling USA, Inc.,* 836 So.2d 424, 428 (La. Ct.App. 1st Cir.2002). According to Louisiana rules of contract construction, the Court must give "contractual words their generally prevailing meaning unless the words have acquired a technical meaning."*Campbell v. Melton,* 817 So.2d 69, 74-75 (La.2002).

"As directed by" is commonly used in legal parlance to indicate control without ownership. For example, settlement funds are often to be disbursed "as directed by" the court, yet no one considers the court the owner of the funds. Similarly, trust funds are often to be disbursed "as directed by" the Trustee, but it is well established that a trustee does not hold equitable title to trust funds.

In applying Louisiana law to the interpretation of the "as directed by" phrase in the Settlement Agreements, the Court finds that the phrase gives KACC a legal interest in the Third Party Recoveries but only insofar as KACC functions as the equivalent of a trustee of a constructive trust for the benefit of the Insurers. When an insured receives money on account of loss reimbursement which should be paid to its insurer, the insured holds such money in trust.*Audubon Ins. Co. V. Farr,* 453 So.2d 232, 235 (La.1984).*See also Southern Pacific Transportation*

_Co. v. Chabert,_ 973 F.2d 441 (5th Cir.1992), _cert. denied_507 U.S. 987 (1993) ("[W]hen the insured recovers from the tortfeasor an amount which, with the amount already received from his insurer, exceeds the loss actually sustained by him, he holds the excess as trustee for his insurer for whom it belongs); _Voss v. Mike & Tony's Steak House,_ 230 So.2d 470, 472 (La.App. 1st Cir.1969) ("[s]ince [the insured] has received amounts in excess of his total loss, he holds the excess in trust for his insurer, which has previously reimbursed him for his loss"); _Penn Fire Ins. Co. v. Harrison,_ 94 So.2d 92 (La.App. 1st Cir.1957) ("When the insured recovers from the tortfeasor an amount which, with the amount already received from his insurer, exceeds the loss actually sustained by him, he holds the excess as trustee for his insurer to whom it belongs").

**\*5** The insurance companies alone paid the third parties' claims against KACC, and each of the Settlement Agreements released KACC from the claims and from any further liability for those claims. Thus, it follows that as a result of the Settlement Agreements, KACC had no actual losses attributable to those claims. Therefore, the Third Party Recovery Funds were funds received in excess of KACC's losses and KACC holds these Third Party Recovery Funds in trust for the Insurers.

Inasmuch as we have determined that KACC is a trustee for its Insurers' equitable rights to the Third Party Recoveries, we must deny KACC's motion for partial summary judgment as to Counts I and III through VI of the Complaint.

Having determined that the Insurers have an equitable interest in the Third Party Recovery Funds, it is necessary to determine the priority of each of the Insurers' rights to these funds. The Court takes note of the following statement in National Union's Memorandum of Points and Authorities in Opposition to Plaintiff Kaiser Aluminum and Chemical Corporation's Motion for Partial Summary Judgment ("National Union Memorandum"):
The subrogation clause in the National Union policy clarifies that any Third-Party Recoveries are payable to Transcontinental [CNA] first, until such time as the limits of the Transcontinental Policy are restored. Thereafter, the funds are to be reimbursed to National Union.

National Union Memorandum, Dkt. No. 25 at 12.The Court finds this statement supporting CNA's claim to

first priority, which is an admission against the interests of National Union, to be consistent with CNA's representation of its rights under the policies and uncontradicted by KACC.[FN8] Therefore, the Court finds that CNA has first priority equitable interest in the Third Party Recovery Funds until such time as the amounts CNA paid are reimbursed.[FN9]On the record before us, it follows that National Union has second priority equitable interest thereafter.

> FN8. The statement was affirmed on the record by National Union's counsel. Appendices to Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 19, Exh. 20, p. 87, lines 17-20.

> FN9. The Court also notes that restoration will increase the amount of insurance available for future claims under the CNA policy.

We grant in part CNA's Cross-Motion for Partial Summary Judgment insofar as it seeks a declaration of CNA's right, title and interest in the Third Party Recoveries. The Court will not take action on that part of CNA's Cross-Motion that seeks transfer of the Third Party Recovery Funds to CNA until the Court has current information on the funds in the Third Party Recovery accounts.

Therefore, within thirty days of entry of the Order accompanying this Memorandum Opinion, HEWM shall file an affidavit with supporting bank documentation listing all funds, including interest, in all Third Party Recovery Funds as of the date of this Order. Further, KACC shall request from the Clerk of the United States District Court for the Eastern District of Louisiana a statement of account of all funds held in the Landry Third Party Recovery Fund and submit this statement of account within thirty days of entry of this Order.

Neither KACC's Motion nor CNA's Cross-Motion addresses Count VII of the Complaint, in which KACC seeks recovery of defense expenses that have allegedly been withheld by CNA. Since KACC was a principal actor in negotiating all the Settlement Agreements and, but for its efforts, there may have been no Third Party Recovery Funds, it would be fundamentally unfair for the Court to allow transfer of the Third Party Recovery Funds to CNA without

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 6
Not Reported in B.R., 2004 WL 97658 (Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115
(Cite as: Not Reported in B.R.)

determining what rights, if any, KACC has to recovery of its alleged defense costs under Count VII. Therefore, before the Court authorizes the transfer of any of the Third Party Recovery Funds to CNA, it will require that funds be deposited in the Clerk's Registry Account of the United States Bankruptcy Court for the District of Delaware in an amount sufficient to cover KACC's claim pending determination of the rights of all parties under Count VII of the Complaint (the "Reserve Amount"). Within 30 days hereof, the parties shall meet and confer to attempt to achieve consent as to the amount of the reserve and shall submit a proposed order establishing the amounts to be distributed and the Reserve Amount.

Count II of the Complaint

*6 In Count II of its Complaint, KACC seeks a declaratory judgment that monies in the Inside-the-Gate Settlement Fund are property of the estate and that KACC has both legal and equitable title to these funds.

KACC, CNA and National Union set up the Inside-the-Gate Settlement Fund (the "Buy-Out Agreement") for claims by individuals other than Guy, Landry and Hayes who may have been present at the Gramercy plant and/or within the fence that surrounds the plant at the time of the Plant Accident. Unlike the other groups of claimants whose Settlement Agreements were funded by the Insurers on an individual basis, the Buy-Out Agreement provided $2.5 million "for the sole purpose of addressing Inside-the-Gate claims through a mediation process."Buy-Out Agreement ¶ 1.

The Buy-Out Agreement provided discretion to KACC in the use of any remaining funds after completion of the mediation effort:
If this fund is not completely exhausted by mediated settlements, the remainder may be used by [KACC] to defend and/or settle any claim brought by any individual listed in Exhibit 1 and/or any claims brought by any [KACC] employee, regardless of whether they were made while the mediation process was open or afterwards.

Buy-Out Agreement ¶ 2.

The Court finds that, in exchange for the funding and discretion granted to KACC in the use of any

remaining funds, CNA and National Union received valuable consideration in KACC's agreement
... not to make any further demands on CNA or National Union to defend or indemnify against any claims brought by individuals listed on Exhibit 1 or claims brought by any [KACC] employee. Claims by "unknown" non-employees can still be presented to CNA for defense and indemnity under CNA's policy, should any be made.

Buy-Out Agreement ¶ 3.

The Buy-Out Agreement also contains a warranty by KACC that it had made a good faith effort to identify "presently known" non-employees that were on the plant premises at the time of the Plant Accident and KACC's recognition that the $2.5 million payment into the fund eroded the limits of National Union's policy.

The Court finds that, in exchange for the funding of the Inside-the-Gate Settlement Fund and broad releases for CNA and National Union with respect to existing and future claims from Other Inside-the-Gate Claimants, KACC was given unfettered use of monies remaining in the fund after the mediation process to defend and/or settle any claims asserted by existing, future, identified or unidentified Other Inside-the-Gate Claimants.

National Union argues that extrinsic evidence should be used to interpret this agreement and that the parties "understood" that the Insurers were entitled to a return of any funds not used for settlement. Besides the general abhorrence with which black letter contract law holds parol evidence, the law of Louisiana specifically rejects the use of extrinsic evidence where, as here, the words of the contract are clear and explicit.[FN10]

> FN10. Although Louisiana is clearly the governing law for the Settlement Agreements, further analysis is required to determine the governing law for the Buy-Out Agreement. The Buy-Out Agreement was signed in counterparts and was thus not signed in a particular place. This agreement does not contain a choice of law clause. KACC, CNA and National Union are headquartered in different states and have different states of incorporation. Louisiana is the jurisdiction of greatest contact for this

Not Reported in B.R.                                                                                      Page 7
Not Reported in B.R., 2004 WL 97658 (Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115
(Cite as: Not Reported in B.R.)

agreement because all the Inside-the-Gate Claims to be paid arose from injuries to residents of that state and the public policy and interests of Louisiana are thus most directly affected by the Buy-Out Agreement. It should also be noted that the case law regarding parol evidence in the Third Circuit is not inconsistent with Louisiana law.

*7 The meaning and intent of the parties to a written instrument, including a compromise, is ordinarily determined from the four corners of the instrument, and extrinsic (parol) evidence is inadmissible to either explain or to contradict the terms of the instrument. *Willard*, 836 So.2d at 428;*Gaubert v. Toyota Motor Sales, USA, Inc.*, 770 So.2d 879, 881 (La. Ct.App. 1st Cir.2000).*See also Am. Totalisator Co., Inc. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir.1993) ("Under Louisiana law, where the words of a contract are clear and explicit and lead to no absurd consequences, the contract's meaning and the intent of its parties must be sought within the four corners of the documents and cannot be explained or contradicted by extrinsic evidence") (citing LA. CIV.CODE ANN. art.2046). This contract is clear on its face and Kaiser retains both the legal and equitable interest in the remaining Settlement Fund proceeds.

Therefore, the Court concludes that when KACC filed its bankruptcy petition, all remaining monies in the Inside-the-Gate Settlement Fund became property of the estate. At the time of the bankruptcy filing, Kaiser enjoyed unfettered use of the fund, was under a continuing obligation to defend or settle claims with use of this fund and had released National Union and CNA from their obligations to defend these claims. Thus, KACC has both legal and equitable title to funds remaining in the Inside-the-Gate Settlement Fund.

An appropriate order will be entered.

INTERIM ORDER

AND NOW, this 16th day of January, 2004, for the reasons expressed in the foregoing Memorandum Opinion, it is ORDERED, ADJUDGED, and DECREED that Plaintiff's Motion for Partial Summary Judgment is granted in part as to Count II only and denied in all other respects. Defendant

CNA's Cross-Motion for Partial Summary Judgment is granted in part as to Counts I, III, IV, V and VI and deferred in part for further proceedings.

IT IS FURTHER ORDERED that within thirty days of entry of this Order, Heller, Ehrman, White & McAuliffe, LLP, special counsel to the Debtors, shall file an affidavit with supporting bank documentation listing all funds on hand, including interest, in all Third Party Recovery Funds [FN11] as of the date of this Order (the "Third Party Recovery Affidavits").

> FN11. Unless explicitly defined in this Order, capitalized terms in this Order have the meaning attributed to them in the attached Memorandum Opinion.

IT IS FURTHER ORDERED that the Debtors shall obtain from the Clerk of the United States District Court for the Eastern District of Louisiana a statement of account for all funds held in the Landry Third Party Recovery Fund (the "Landry Account Statement") and shall submit the Landry Account Statement within thirty days of entry of this Order.

IT IS FURTHER ORDERED that within thirty days hereof Plaintiff and the Defendants shall meet and confer to attempt to achieve consent as to the amount of funds to be deposited in the Clerk's Registry Account of the United States Bankruptcy Court for the District of Delaware to cover the full amount of Debtors' defense costs under Count VII of the Complaint (the "Reserve Amount") and shall submit a proposed order establishing the amounts to be distributed to defendant Transcontinental Insurance Company and the Reserve Amount (the "Proposed Order").

*8 IT IS FURTHER ORDERED that an appealable Final Judgment will be entered on all six Counts after the parties submit the Third Party Recovery Affidavits, the Landry Account Statement and the Proposed Order.

This Adversary Proceeding shall remain open to address Count VII of the Complaint and the remaining issues in Counts I and III through VI.

Plaintiff shall immediately serve a copy of this Memorandum Opinion and Order on all parties in interest and shall file an affidavit of service forthwith.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 8
Not Reported in B.R., 2004 WL 97658 (Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115
**(Cite as: Not Reported in B.R.)**


Bkrtcy.D.Del.,2004.
In re Kaiser Aluminum Corp., Inc.
Not Reported in B.R., 2004 WL 97658
(Bkrtcy.D.Del.), 42 Bankr.Ct.Dec. 115

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 1988 WL 1004731 (Bkrtcy.D.Mass.)
(Cite as: Not Reported in B.R.)

Page 1

**H**In re Malmart Mortg. Co.
Bkrtcy.D.Mass.,1988.
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Massachusetts.
In re MALMART MORTGAGE COMPANY, INC.
Debtor
No. 87-11681-K.

Jan. 25, 1988.

MEMORANDUM OF DECISION ON MOTIONS
OF FEDERAL NATIONAL MORTGAGE
ASSOCIATION FOR RELIEF FROM STAY AND
FOR ORDER COMPELLING TRUSTEE TO
ASSUME OR REJECT EXECUTORY CONTRACT
KENNER, Bankruptcy J.

**\*1** The Federal National Mortgage Association
("FNMA") has filed motions for relief from the
automatic stay and for an order compelling the
Trustee to assume or reject the executory mortgage
servicing contract between FNMA and the Debtor.
Over the Trustee's opposition, the Court issued an
order on January 14, 1988 allowing FNMA's motion
for relief from stay. The Court's decision was based
on 11 U.S.C. § 362(d)(2). Specifically, the Court
found that the Debtor had no equity in the mortgage
servicing contracts or in the underlying notes,
mortgages, and related books and records, and that
such property (the contracts, notes, mortgages, books
and records) was not necessary to an effective
reorganization. 11 U.S.C. § 362(d)(2).

The second of these findings-that the property was
not necessary to an effective reorganization-was not
much contested. In order to prove that property is
necessary to an effective reorganization, the Trustee
most prove that there exists "a reasonable likelihood
of a successful reorganization within a reasonable
period of time."*In re Jug End in the Berkshires, Inc.,
46 B.R. 892, 902 (Bankr.D.Mass.1985).* Here, the
Trustee not only did not attempt to establish the
likelihood of a successful reorganization; he made
clear his opinion that no reorganization was possible
and that the only realistic course was to operate the
Debtor's business long enough to find buyers for the
Debtor's mortgage servicing agreements and then to
liquidate. The Court finds it unlikely that the Debtor
will reorganize. Accordingly, the Court finds that the
mortgage servicing contracts and the related notes,

mortgages, books and records are not necessary to an
effective reorganization.

The second issue-whether the Debtor had any equity
in the notes, mortgages, books and records-was the
parties' primary focus of contention. The parties seem
to agree on at least some of the issues involved.
Specifically, the Trustee does not challenge the well-
established proposition that under § 541(d) and the
case law interpreting it, standard secondary mortgage
market transactions are purchases and sales of assets,
not merely unsecured financing contracts. *In re
Lemons & Associates, Inc.,* 67 B.R. 198, 208
(Bankr.D.Nev.1986); *In re Fidelity Standard
Mortgage Corp.,* 36 B.R. 496, 499
(Bankr.S.D.Fla.1983); *In re Mortgage Funding, Inc.,*
48 B.R. 152, 154-155 (Bankr.D.Nev.1985); *In re
Columbia Pacific Mortgage, Inc.,* 20 B.R. 259, 261-
263 (Bankr.W.D. Washington 1981). The Court
agrees with this proposition. Therefore, at least with
respect to those mortgages the Debtor is servicing
under "standard" secondary mortgage market
arrangements-that is, all mortgages in the Debtor's
FNMA portfolio except for those being serviced
under FNMA's MBS regular servicing option and the
MRS program-the question of equity is clear. The
mortgages belong to the investor, FNMA. The Debtor
has no equity in any of those loans and mortgages
and related books and records.

**\*2** The MBS and MRS mortgage servicing
arrangements differ from the standard arrangements
in that under these servicing programs, the Debtor,
not FNMA, bears the risk of loss on foreclosure. This
is not a normal incident of investor ownership, but
typically a feature of financing arrangements.

The Court concludes that, in view of all the
circumstances, FNMA is more properly be treated as
an owner than as a lender under the MBS and MRS
servicing agreements. This conclusion stems from
two primary considerations: the parties' description of
the agreement and the contractual and transitory
nature of the Debtor's risk of loss.

First, the parties' own characterization of their
agreement, set forth in express contractual language,
is relevant, though not conclusive and binding, as to
the nature of their arrangement. Contractual language

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is evidence of the parties' intent, and manifest intent is the central issue. The documents governing the relationship between the Debtor and FNMA consistently and unambiguously characterize the relationship as that of seller and purchaser.

Second, the fact that the Debtor bears the risk of loss appears to indicate, not that the Debtor has any equity in the notes and mortgages, but that the Debtor has a bargained for, contractual obligation to indemnify FNMA for foreclosure losses. I base this conclusion on the observation that the life of the Debtor's risk of loss is coterminous with the life of the servicing contract. The servicing agreement is structured such that, if either party were to cancel the agreement, the Debtor would bear no risk on any losses incurred after the cancellation. The risk would shift back to FNMA. If the Debtor's risk of loss were an indication that it held an equity interest in the notes and mortgages, the Debtor could not so easily rid itself of the risk of loss; to do so would require the execution of a purchase and sale agreement, not the mere termination of a servicing contract. Therefore, the risk of loss involved here is more properly characterized not as an incident of ownership, but as a bargained for, contractual obligation.

Furthermore, not all of the risk of loss falls on the Debtor. FNMA bears all the risk arising from fluctuations in the market sale of interest over the terms of the serviced mortgages. Therefore, even if allocation of risk were the sole indicator of ownership, ownership would remain an ambiguous issue.

As in *In re Lemon & Associates, Inc.*, 67 B.R. 198, 209-210 (Bankr.D.Nev.1986), this Court finds that the objective indications of the parties' intent outweigh the ambiguous counter-indications relating to risk of loss. Unlike the agreements in *In re Woodson Co.*, 813 F.2d 266, 272 (9th Cir.1987) and *In re S.O.A.W. Enterprises, Inc.*, 32 B.R. 279, 282-283 (Bankr.W.D. Texas 1983), which the courts found bore none of the indicia of purchase and sale agreements, the MBS and MRS servicing agreements are not as easily classified. They are neither standard purchase and sale agreements nor standard investor financing agreements. The MBS and MRS provisions are unique. The parties were free to structure the agreement as they saw fit and they chose to structure it as a purchase and sale agreement. Their intentional designation of the agreement as a purchase and sale was not a mere act of labeling that the Court is free to

disregard in favor of the "substance" of the agreement. Rather, the parties' intentional and deliberate use of the words "purchase" and "sale" in itself made the agreement into a purchase and sale. Where the label and words used by the parties are the product of duress, misunderstanding, or inequity, or where they do not accurately reflect the parties' manifest intent, the Court may disregard the label; but no duress, misunderstanding, or inequity has been alleged here. The equities do not justify overriding the parties' express intent. Therefore, the Court concludes that the Debtor has no equity in the MBS and MRS mortgages.

*3 Nor does the Debtor have equity in the FNMA servicing contract itself. Normally, a servicing agreement would be deemed an asset of the estate. In this case, however, the Debtor would have to cure deficiencies of at least $2.5 million in its obligation to FNMA before assuming the agreement. 11 U.S.C. § 365(b)(1). The Debtor does not have the resources to cure the deficiency, so assumption and assignment of the agreement would be impossible.

In sum, the Debtor has no equity in the FNMA servicing agreement or in the underlying notes, mortgages, and related books and records. The Debtor should turnover to FNMA all of the notes, mortgages, books and records, including those related to the MBS and MRS servicing programs. FNMA's motion for an order compelling the assumption or rejection of the servicing agreement is rendered moot by the Court's having allowed FNMA's motion for relief from stay.

Bkrtcy.D.Mass.,1988.
In re Malmart Mortg. Co.
Not Reported in B.R., 1988 WL 1004731 (Bkrtcy.D.Mass.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### ORDER

Upon consideration of the Motion of CitiMortgage, Inc. ("CMI") to Lift the Automatic Stay and to Compel Debtors to Release Loan Documents (the "Motion To Lift Stay")[1] pursuant to Sections 362(d), 541(d) and 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, and Rules 4001(a)(1) and 9014 of the Federal Rules of Bankruptcy Procedure; and sufficient notice of the Motion To Lift Stay having been given to parties in interest as required under the circumstances; and it appearing that no other or further notice of the Motion To Lift Stay need be given; and the Court having determined that good cause exists for granting the relief requested in the Motion To Lift Stay; and objections to the Motion To Lift Stay, if any, having been withdrawn or overruled; and after due deliberation and sufficient cause appearing therefore; it is hereby so

**ORDERED** that the Motion To Lift Stay is granted; and it is further

**ORDERED** that the automatic stay is hereby lifted so that CMI can recover its Loan documentation from Debtors; and it is further

**ORDERED** that Debtors are required to deliver to CMI, free of charge, all Loan documentation relating to the mortgages Debtors sold to CMI pre-petition under the Correspondent Loan Agreements; and it is further

**ORDERED** that Debtors and CMI are authorized to take all necessary steps to

---

[1] All undefined capitalized terms herein shall have the meanings ascribed to them in the Motion To Lift Stay.

implement the terms of this Order; and it is further

ORDERED that the relief set forth in this Order is without prejudice to CMI to pursue

other relief relating to the Loans pursuant to the Bankruptcy Code; and it is further

ORDERED that this Court shall retain jurisdiction regarding the implementation of this

Order.

Dated: January ___, 2008
        Wilmington, Delaware

                                        _____
                                        Christopher S. Sontchi
                                        UNITED STATES BANKRUPTCY JUDGE

2

1642231