## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x   Chapter 11

In re:                                                 :

                                                       :   Case No. 07-11047 (CSS)

AMERICAN HOME MORTGAGE                                 :
HOLDINGS, INC., a Delaware corporation, et al.,[1]  :   Jointly Administered

                                                       :
        Debtors.                                       :   **Proposed Hearing Date:  January 4, 2008 at 11:00 a.m.**
                                                       :   **Proposed Objection Deadline:  January 3, 2008 at 12:00 p.m.**

------------------------------------------------------- x

### NOTICE OF MOTION

TO:    The Office of the United States Trustee for the District of Delaware; counsel to the
       Committee; counsel to Bank of America, N.A., as Administrative Agent for the lenders
       under that certain Second Amended and Restated Credit Agreement dated August 10,
       2006; counsel to agent for the Debtors' postpetition lenders; and all parties entitled to
       notice under Local Rule 2002-1(b).

        **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in
possession (collectively, the "Debtors") have filed the **Debtors' Motion for an Order
Authorizing Amendment to Post-Petition Debtor-In-Possession Financing Facility** (the
"Motion").

        **PLEASE TAKE FURTHER NOTICE** that the Debtors have requested that
objections to the attached Motion be filed with the United States Bankruptcy Court for the
District of Delaware, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before
**January 3, 2008 at 12:00 p.m.**.  At the same time, you must also serve a copy of the objection
upon the undersigned counsel to the Debtors.

        **PLEASE TAKE FURTHER NOTICE** THAT THE DEBTORS HAVE
REQUESTED THAT A HEARING ON THIS MATTER BE HELD ON **JANUARY 4, 2008
AT 11:00 A.M. (ET)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI IN THE
UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 N.
MARKET STREET, 5TH FLOOR, COURTROOM #6, WILMINGTON, DELAWARE 19801.

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp.
("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM
Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a
Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558);
American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407);
Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp.
("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road,
Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving,
Texas 75063.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OF HEARING

Dated: Wilmington, Delaware
      December 27, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors-in-Possession

DB02:6456302.1                                        066585.1001

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------- x
In re:                                               :    Chapter 11
                                                     :
AMERICAN HOME MORTGAGE                               :    Case No.  07-11047 (CSS)
HOLDINGS, INC., et al., [1]                          :
                                                     :    Jointly Administered
                               Debtors.              :
                                                     :    **Hearing Date: January 4, 2008 at 11:00 a.m.**
                                                     :    **Objection Deadline: January 3, 2008 at 12:00 p.m.**
---------------------------------------------------- x

## DEBTORS' MOTION FOR AN ORDER AUTHORIZING AMENDMENT TO POST-PETITION DEBTOR-IN-POSSESSION FINANCING FACILITY

American Home Mortgage Investment Corp. American Home Mortgage

Holdings, Inc., American Home Mortgage Corp., American Home Mortgage Acceptance, Inc.,

American Home Mortgage Ventures LLC, Homegate Settlement Services, Inc., and Great Oak

Abstract Corp., each a debtor and debtor in possession (collectively, the "Borrowers"),[2] hereby

move this Court (the "Motion") for entry of an order pursuant to sections 105, 363 and 364 of the

United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), authorizing

and approving that certain *First Amendment Agreement* (the "First DIP Facility Amendment"),

by and among the Borrowers, the Borrowers' post-petition lenders (the "Lenders") and WLR

Recovery Fund, III, L.P., as administrative agent for the Lenders (the "Administrative Agent"),

---

[1]    The Debtors (as defined below) in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303) ("AHM Holding"); American Home Mortgage Investment Corp. ("AHM Investment" or "Administrative Borrower"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580) (collectively, "AHM" or the "Debtors"). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2]    AHM Servicing is not a Borrower under the DIP Facility.

substantially in the form annexed hereto as Exhibit A, to the previously-approved DIP Facility

(as defined below).  In support of this Motion, the Borrowers respectfully represent as follows:

## JURISDICTION

1.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases

and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory

predicates for the relief requested herein are sections 105, 363 and 364 of the Bankruptcy Code.

## GENERAL BACKGROUND[3]

2.        On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor

is continuing to operate its business and manage its properties as a debtor in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        The Debtors' cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to an order of this Court.

4.        On August 14, 2007, the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been

appointed.

5.        By Order dated October 30, 2007 [Docket No. 1711] (the "Sale Order"),

the Court approved the sale (the "Sale") of the Debtors' mortgage loan servicing business (the

"Servicing Business") to AH Mortgage Acquisition Co., Inc. (the "Purchaser") pursuant to the

terms of that certain Asset Purchase Agreement dated September 25, 2007 (as amended and

---

[3]        The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors'
Chapter 11 Petitions and First Day Relief [Docket No. 2], which is incorporated by reference as if fully set forth
herein at length.

together with all exhibits and schedules thereto, the "APA"). The APA provides for the Sale to be closed in two steps; an initial (or economic) closing (the "Initial Closing"), which occurred on November 16, 2007, and a final closing anticipated to occur as early as within the next few months, but in no event later than September 30, 2008 (the "Final Closing").

<div align="center">

**THE DEBTORS' DIP FACILITY**

</div>

6.      On the Petition Date, the Borrowers filed a motion seeking approval of and authority to enter into a post-petition debtor-in-possession credit facility in the principal amount of $50 million pursuant to that certain *Debtor-in-Possession Loan and Security Agreement*, dated as of August 6, 2007, by and among the Borrowers, the Lenders and the Administrative Agent (together with any and all exhibits and schedules annexed thereto, and as may be modified or amended from time-to-time, the "DIP Facility").[4] By Order dated August 7, 2007 [Docket No. 67], the Court approved the DIP Facility on an interim basis and by Order dated September 4, 2007, the Court approved the DIP Facility on a final basis (together with the exhibits thereto, the "Final DIP Order") [Docket No. 555].

7.      The DIP Facility, however, does not permit the Borrowers to utilize the borrowings to fund the operations or expenses associated with the Servicing Business. Accordingly, by Order dated August 7, 2007 [Docket No. 68] (the "Interim Cash Collateral Order") and by Order dated September 4, 2007 [Docket No. 554] (the "Final Cash Collateral Order"), the Court approved the Debtors' use of Cash Collateral (as defined in the Final Cash Collateral Order) through October 31, 2007. The Debtors' ability to use Cash Collateral was

---

[4]      The terms and conditions of the DIP Facility are described in greater detail in the *Emergency Motion for Interim and Final Orders (I) Authorizing Certain Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364(c); (II) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c); and (III) Granting Related Relief* filed by the Debtors on the Petition Date [Docket No. 17] as well as the DIP Facility, a copy of which was annexed to the Interim DIP Order (as defined below), each of which are incorporated herein by reference.

extended to November 16, 2007 through interim and final stipulated cash collateral orders
[Docket Nos. 1731 & 2002, respectively] (the "Stipulated Cash Collateral Orders" and together
with the Interim Cash Collateral Order and the Final Cash Collateral Order, the "Cash Collateral
Orders"). On November 16, 2007, the date of the Initial Closing, the Debtors use of Cash
Collateral pursuant to the Cash Collateral Orders terminated.

8.    As was contemplated by the APA, in order to fund the operations of the
Servicing Business from the Initial Closing through the Final Closing, certain of the Debtors on
November 12, 2007, filed a motion requesting approval and authorization to obtain limited
recourse postpetition financing in the principal amount of $50 million pursuant to that certain
*Debtor-in-Possession Loan and Security Agreement (Limited Recourse)* dated as of November
16, 2007 (the "Limited Recourse DIP Facility"). By Order dated November 14, 2007, the Court
approved the Limited Recourse DIP Facility on an interim basis [Docket No. 1999]. By Order
dated November 28, 2007, the Court approved the Limited Recourse DIP Facility on a final basis
(together with the exhibits thereto, the "Final Limited Recourse DIP Order") [Docket No. 2205]

## THE FIRST DIP FACILITY AMENDMENT[5]

9.    The Debtors recently reached significant milestones in these cases in
connection with the approval of the Sale of the Servicing Business to the Purchaser and the
occurrence of the Initial Closing. The Sale, the Initial Closing and other events since the Petition
Date have resulted in the Borrowers' need to modify certain terms of the DIP Facility and to
obtain the Lenders consent/waiver to the Borrowers' use of cash on which the Lenders have a

---

[5] The summary of the terms of the First DIP Facility Amendment herein is for descriptive purposes only. To the
extent this description and the terms of the First DIP Facility vary, the First DIP Facility Amendment shall control.
Unless otherwise defined, capitalized terms shall have the meanings ascribed to them in the First DIP Facility
Amendment.

lien. As a result, the Borrowers, the Lenders and the Administrative Agent have agreed to

amend the DIP Facility through the terms and conditions of the First DIP Facility Amendment.

The material terms of the First DIP Facility Amendment are as follows:

(a)  Reduce the Total Commitment under the DIP Facility from $50,000,000 to $35,000,000.

(b)  Amend the definition of "Maturity Date" in section 1.01 of the DIP Facility to include reference to the sale of all or substantially all of the equity interest or all or substantially all of the assets of the Specified Banking Subsidiary.

(c)  Amend section 2.01 of the DIP Facility to provide for the reduction of the borrowing availability under the DIP Facility in the amount of the LPMI Reserve Amount.

(d)  Amend section 6.18 of the DIP Facility to permit the Borrowers to utilize borrowings under the DIP Facility to fund the making or purchasing of Advances pursuant to section 6.17 of the APA.

(e)  Provide for the consent of the Lenders to the Borrowers to use the Borrowers' cash on which the Lenders have a lien to obtain the release of BofA's liens on the BofA Construction Loans.

(f)  Grant a first priority lien on the BofA Construction Loans upon the payment of the Construction Loan Advances, which lien shall be released when the Borrowers have recovered an amount equal to the Construction Loan Advance through the collection, payoff, compromise, sale or other disposition of the BofA Construction Loans.

(g)  Provide for the Lenders consent to the Borrowers' collection, compromise, sale or otherwise disposition of the BofA Construction Loans in any manner the Borrowers deem appropriate.

(h)  Waive any default that may have occurred in connection with the Borrower's payment of the LPMI Advances from Borrowers' cash.

(i)  Agreement by the Borrowers to pay the Administrative Agent $100,000 as an amendment fee.

066585.1001

**RELIEF REQUESTED**

10.     By this Motion, the Borrowers request entry of an order authorizing and

approving the First DIP Facility Amendment pursuant to sections 105, 363 and 364 of the

Bankruptcy Code.

**BASIS FOR RELIEF REQUESTED**

11.     The DIP Facility was approved by this Court in the Final DIP Order

pursuant to the provisions of, *inter alia*, section 364 of the Bankruptcy Code, which Final DIP

Order contemplates amendments and/or modifications to the DIP Facility which, if material, are

subject to the approval of the Bankruptcy Court. See Final DIP Order, at ¶ 36.  Except as

modified by the First DIP Facility Amendment, the DIP Facility and Final DIP Order shall

remain in full force and effect in accordance with their terms.

12.     Bankruptcy courts consistently defer to a debtor's business judgment on

most business decisions, including the decision to borrow money, unless such decision is

arbitrary and capricious.  See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del.

1994) (noting that an interim loan, receivables facility and asset-based facility were approved

because they "reflect[ed] sound and prudent business judgment...[were] reasonable under the

circumstances and in the best interest of [the debtor] and its creditors").  In fact, "[m]ore exacting

scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate

and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  When

scrutinizing a debtor's business decision, such as the type and scope of a debtor-in-possession

credit facility, bankruptcy courts routinely defer to the debtor's judgment, including the decision

- 6 -

to borrow money on certain terms, so long as the decision at issue "involve[d] a business judgment made in good faith, upon a reasonable basis, and within the scope of [such debtor's] authority under the [Bankruptcy] Code." In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981). For the reasons set forth below, the decision to amend the DIP Facility through the First DIP Facility Amendment is supported by the sound and reasonable business judgment of the Borrowers. Accordingly, consistent with the foregoing authority, the amendment of the DIP Facility by the First DIP Facility Amendment should be approved.

13.    Amending the DIP Facility through the terms and conditions of the First DIP Facility Amendment is supported by the sound business judgment of the Borrowers for several reasons. The approval of the Sale of the Servicing Business, the occurrence of the Initial Closing and other developments in these cases since the Petition Date necessitated that the Borrowers, the Administrative and the Lenders review the terms of the DIP Facility and make certain modifications to the DIP Facility. First, the Borrowers, in consultation with their professionals, and the Administrative Agent, have determined that they do not now need, and do not expect to need in the future, access to the full $50 million contemplated by the DIP Facility. Indeed, any borrowings under the current DIP Facility in excess of $40 million were in the sole and complete discretion of the Lenders. Pursuant to the First DIP Facility Amendment, the Borrowers and Lenders have agreed to reduce the DIP Facility by $15 million to $35 million (including elimination of the $10 million discretionary component), which the Borrowers believe will more than accommodate their borrowing needs as these cases progress. Because $10 million of the original $50 million commitment was discretionary to the Lenders, the reduction of the total commitment to $35 million does not represent a material departure from the amounts expected to be borrowed under the DIP Facility as of commencement of these chapter 11 cases.

066585.1001

Moreover, reduction of the availability of borrowings under the DIP Facility as contemplated by the First DIP Facility Amendment will result in a reduction of the interest escrow required under the DIP Facility by approximately $1.2 million and thus, interest payment savings to the Borrowers and their estates.

14.     Amending the DIP Facility is also required because of the approval of the Sale and the occurrence of the Initial Closing. Under the DIP Facility, the Borrowers are not permitted to use the proceeds of the DIP Facility in connection with the Servicing Business. Instead, the funds necessary to operate the Servicing Business were limited to the use of Cash Collateral pursuant to the terms of the Cash Collateral Orders. As of the Initial Closing the Debtors' ability to use Cash Collateral terminated. Under the APA, following the Initial Closing, the Debtors are required to purchase or fund certain servicing advances pursuant to section 6.17 of the APA. Absent the First DIP Facility Amendment, the Debtors may not have access to the working capital necessary to fund the servicing advances as required by section 6.17 of the APA. The First DIP Facility Amendment permits the Borrowers to utilize borrowings under the DIP Facility to fund such servicing advances. Therefore, the First DIP Facility Amendment is necessary to ensure compliance with the APA and the uninterrupted servicing of the loans not purchased by the Purchaser. In fact, the APA contemplates that the Debtors would use funds borrowed under the DIP Facility to fund the servicing advances required to be made by the Debtors pursuant to section 6.17 of the APA.

15.     Additionally, the First DIP Facility Amendment is necessary because of certain advances made by the Borrowers from Borrowers' cash to fund premiums on lender purchased mortgage insurance ("LPMI") and to fund an escrow held by BofA (the "LPMI Escrow") pending resolution of disputes between the Debtors and BofA regarding responsibility

- 8 -

for LPMI premium obligations. While the Administrative Agent has not declared an event of

default as a result of the Borrowers use of the Borrowers' cash for the LPMI payments and the

LPMI Escrow, the Administrative Agent has expressed its view that it believes such payments

were not permitted under the DIP Facility. While the Borrowers do not agree that the use of

their cash to fund the LPMI payments and the LPMI Escrow is prohibited by the DIP Facility,

they wish to obtain resolution of the issue with the Lenders. Accordingly, in connection with the

other modifications provided for in the First DIP Facility Amendment, the First DIP Facility

Amendment provides for the creation of a LPMI Reserve against availability (in the initial

amount of $12 million, subject to being reduced) and confirms that any event of default that may

have occurred in connection with the use of Borrowers' cash to fund LPMI payments or the

LPMI Escrow is waived by the Lenders.

      16.     Amending the DIP Facility through the terms of the First DIP Facility

Amendment is further necessitated by a proposed settlement between the Debtors and BofA

regarding the pending relief from stay motion filed by BofA [Docket No. 2255] (the "Stay Relief

Motion"). On December 4, 2007, BofA filed the Stay Relief Motion requesting that the

automatic stay be modified to permit BofA to sell certain construction-to-perm loans that are

secured by liens held by BofA (the "BofA Construction Loans"). The Debtors and BofA have

reached an agreement whereby the Debtors will use their cash to pay BofA a sum of money for

the release of liens on the BofA Construction Loans such that the Debtors may collect,

compromise, sell or otherwise dispose of the BofA Construction Loans. The Administrative

Agent has a lien on the Borrowers' cash that will be used to pay BofA for the release of the lien

on the BofA Construction Loans. To avoid any potential default under the DIP Facility from

such payment, the Borrowers have obtained the Lenders' consent to use the Borrowers' cash up

- 9 -

to $7 million for such purpose. The First DIP Facility Amendment further provides for the Lenders to obtain a first priority lien on the BofA Constructions Loans upon the payment of the Construction Loan Advance and release of BofA's lien on the BofA Construction Loans; provided that the Lenders' lien on the BofA Construction Loans and proceeds thereof will be released once the amount of the Construction Loan Advance is recovered by the Borrowers. Further, the Lenders have agreed that the Debtors may collect, compromise, sell or otherwise dispose of the BofA Construction Loans in any manner the Debtors deem appropriate, without obtaining any further consent from Lenders.

17.     In exchange for the agreement to amend the DIP Facility through the terms of the First DIP Facility Amendment, the Borrowers have agreed to pay the Administrative Agent a fee of $100,000. The Debtors believe that the payment of the fee is reasonable under the circumstances.

18.     Moreover, the terms and conditions of the First DIP Facility Amendment are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Accordingly, the Administrative Agent and the Lenders should be afforded the benefits of Bankruptcy Code section 364(e) with respect to the postpetition financing under the First DIP Facility Amendment.

## NOTICE

19.     Notice of this Motion has been given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Committee; (c) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Second Amended and Restated Credit Agreement dated August 10, 2006; (d) counsel to the Purchaser and

- 10 -

Administrative Agent; and (e) all parties entitled to notice under Local Rule 2002-1(b).  The

Borrowers submit that, under the circumstances, no further notice of the hearing is necessary.

## CONCLUSION

WHEREFORE, the Borrowers respectfully request that the Court enter an order,

substantially in the form annexed hereto as Exhibit B, (i) granting the relief requested herein, and

(ii) granting such other relief as is just and proper.

Dated: Wilmington, Delaware
       December 27, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

066585.1001

# EXHIBIT A

FIRST AMENDMENT AGREEMENT dated as of December __, 2007 (this "Amendment Agreement"), by and among American Home Mortgage Investment Corp., as a debtor and a debtor-in-possession, a Maryland corporation (the "Parent"), the affiliates of the Parent set forth in the Loan Agreement referred to below, each as a debtor and a debtor-in-possession (together with the Parent, individually a "Borrower" and, collectively, the "Borrowers"), the lenders party hereto (each individually a "Lender" and, collectively, the "Lenders") and WLR Recovery Fund III, L.P., a Delaware limited partnership, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") under the Debtor-in-Possession Loan and Security Agreement August 6, 2007 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among the Borrowers, the Lenders and the Administrative Agent, as in effect on the date hereof.

WHEREAS, AH Mortgage Acquisition Co., Inc. ("Purchaser"), a Delaware corporation, is acquiring certain assets related to the loan mortgage servicing businesses (the "Servicing Business") of the Parent, American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing Inc., a Maryland corporation, as a debtor and debtor-in-possession (collectively, the "Sellers") pursuant to an Asset Purchase Agreement (the "Purchase Agreement") dated as of September 25, 2007, by and among Purchaser and Sellers, which Purchase Agreement was approved by order of the Bankruptcy Court dated October 30, 2007;

WHEREAS, the Borrowers have determined that they will not need the full amount of the $50 million Total Commitment provided for in the Loan Agreement and in discussions with the Administrative Agent have agreed to reduce the Total Commitment under the Loan agreement to $35 million, which will result in a corresponding reduction in the amount of the Interest Escrow Subaccount.

WHEREAS, certain other issues under the Loan Agreement have arisen in connection with the operation of the Borrowers' Chapter 11 cases that require certain waivers and modifications of the Loan Agreement;

NOW, THEREFORE, each Borrower, each of the undersigned Lenders and the Administrative Agent hereby agree as follows:

SECTION 1.    Defined Terms.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Loan Agreement, as amended hereby.

SECTION 2.    Amendments to Loan Agreement.  On the First Amendment Effective Date:

(a)    Each of (x) the third paragraph of the recitals to the Loan Agreement, (y) the third sentence of Section 2.01 of the Loan Agreement and (z) Schedule B to the Loan Agreement, shall be amended by replacing each reference therein to "$50,000,000" with a reference to "$35,000,000".

(b)    Section 1.01 of the Loan Agreement shall be amended by inserting the following definitions:

"Acquisition Agreement" means the Asset Purchase Agreement dated as of September 25, 2007, by and among AH Mortgage Acquisition Co., Inc., the Parent and the other Borrowers party thereto, as amended, supplemented or otherwise modified from time to time.

"Advances" has the meaning ascribed thereto in Section 1.1 of the Acquisition Agreement.

"BofA Construction Loans" means the construction to permanent loans in which BofA, as administrative agent under the B of A Credit Agreement, holds security interests and liens.

"Initial Closing" has the meaning ascribed thereto in Section 2.7 of the Acquisition Agreement.

"LPMI" means lender purchased mortgage insurance.

"LPMI Advances" means the sum of (i) the unreimbursed LPMI premium payments made by Borrowers from Borrowers' cash between August 6, 2007 and November 16, 2007 in the amount of approximately $7,007,612 and (ii) the $5,457,055 payment made from Borrowers' cash on or about November 15, 2007 to fund an escrow with BofA, pending a resolution of disputes between the Debtors and BofA related to LPMI payment obligations.

"LPMI Reserve Amount" means, at any time on and after November 16, 2007, an amount equal to (i) $12,000,000 minus (ii) the aggregate amount of funds recovered from the LPMI Advances in an amount not to exceed $12,000,000.

(c)     Section 1.01 of the Loan Agreement is hereby amended to replace the following definition in its entirety:

"'Maturity Date" means the date which is the earliest of (a) the effective date of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (b) the first anniversary of the Closing Date, (c) the sale of all or substantially all of the Borrowers' assets, whether under Section 363 of the Bankruptcy Code, a confirmed plan of reorganization or otherwise; (d) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (e) the dismissal of any of the Chapter 11 Cases; (f) September 7, 2007, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (g) such earlier date on which either (A) all Loans shall become due and payable, in whole, in accordance with the terms of this Loan Agreement and the other Loan Documents or (B) all Loans and all other Obligations for the payment of money shall be paid in full and the Commitments and this Loan Agreement are terminated, and (h) the date of consummation of a sale of all or substantially all of the equity interest or all or substantially all of the assets of the Specified Banking Subsidiary.'

(d)     Section 2.01 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"2.01    Loans. Subject to fulfillment of the conditions precedent set forth in Sections 5.01 and 5.02 hereof, and provided that no Default or Event of Default shall have occurred and be continuing hereunder, each Lender hereby severally agrees, from time to time, on the terms and conditions of this Loan Agreement and the other Loan Documents, to make loans (individually, a

"Loan"; collectively, the "Loans") to the Borrowers in Dollars, on any Business Day (but the Borrowers will endeavor to limit requests for Loans to not more frequently than once weekly) from and including the Closing Date to but excluding the Maturity Date in an aggregate principal amount at any one time outstanding not to exceed such Lender's Pro Rata Share of the Total Commitment as in effect from time to time. Subject to the terms and conditions of this Loan Agreement, during such period the Borrowers may borrow, repay and reborrow Loans hereunder. In no event shall the Lenders be obligated to make a Loan when any Default or Event of Default has occurred and is continuing, and in no event shall the aggregate principal amount of all Loans outstanding at any time exceed an amount equal to (i) $35,000,000 minus (ii) the LPMI Reserve Amount in effect at such time, as reduced from time to time in accordance with Section 2.06 (the amount maximum amount available to be borrowed pursuant to this Section 2.01 shall be referred to herein as the "Maximum Credit"); provided, further, that at all times prior to the Final Order, the Maximum Credit shall equal the Interim Amount."

(e)    Section 6.18 of the Loan Agreement shall be amended and restated in its entirety as follows:

"6.18    Use of Proceeds. The Borrowers will use the proceeds of the Loans (i) to finance working capital, (ii) for other general corporate purposes of the Borrowers in accordance with the Budget and (iii) to fund (A) Lender Expenses and fees pursuant to Section 3.07, (B) the repayment of any other Obligations and (C) to fund the making or purchasing of Advances pursuant to the Acquisition Agreement after the Initial Closing pursuant to Section 6.17 of the Acquisition Agreement."

SECTION 3.    Consent. Section 6.18 of the Loan Agreement requires the Borrowers to use the proceeds of the Loans solely for the purposes set forth in Section 6.18, including, among other things, in accordance with the Budget. In addition, Section 7.16 does not permit the Borrowers to make any loan, advance or other investment to any other Person. To the extent the Lenders' consent is required, the Borrowers have requested that the Lenders consent to a use of the Borrowers cash that is not presently provided for in the Budget so that the Borrowers can use an amount of Borrowers' cash in an aggregate amount not to exceed $7,000,000 to obtain the release of BofA's liens on the BofA Construction Loans (the "Construction Loan Advance"). On the First Amendment Effective Date, the Lenders consent to the Construction Loan Advance in an amount not to exceed $7,000,000 notwithstanding any limitation or prohibition set forth in the Loan Agreement.

SECTION 4.    Limited Lien on the BofA Construction Loans. Upon the Borrowers' payment of the Construction Loan Advance, the Lenders shall have a first priority lien on the BofA Construction Loans, which lien shall be released when the Borrowers have recovered from the collection, payoff, compromise, sale or other disposition of the BofA Construction Loans, an amount equal to the Construction Loan Advance. The Lenders acknowledge that any amounts recovered by Borrowers from the collection, payoff, compromise, sale or other disposition of the BofA Construction Loans in excess of the Construction Loan Advance will be free and clear of its liens and will be placed in escrow by the Borrowers to be used for the benefit of general unsecured creditors or as otherwise permitted by the Bankruptcy Court.

SECTION 5.    Consent to Disposition of BofA Construction Loans. Notwithstanding anything in the Loan Agreement to the contrary, upon and following the attachment of Lenders' lien to the BofA Construction Loans pursuant to Section 4 of this Amendment, the Lenders agree that the

Borrowers may collect, compromise, sell or otherwise dispose of the BofA Construction Loans in any manner that the Borrowers deem appropriate, subject to obtaining any necessary Bankruptcy Court approval, and that no consent of the Lenders to any such collection, compromise, sale or other disposition shall be required.

SECTION 6.    Waiver as to LPMI Advances.    In connection with the establishment of the LPMI Reserve pursuant to this Amendment, the Lenders waive any default that might have occurred under the Loan Agreement as a result of Borrowers having made the LPMI Advances.

SECTION 7.    Fees.    On the First Amendment Effective Date, the Parent shall pay to the Administrative Agent, for its own account, an amendment fee in the amount of $100,000.

SECTION 8.    Conditions.    This Amendment Agreement shall become effective as of the date set forth above on the date (the "First Amendment Effective Date") that the following conditions precedent have been satisfied:

(a)    Amendment Agreement.    This Agreement shall have been executed by each Borrower, the Administrative Agent and each Lender.

(b)    Payment of Fees.    The Administrative Agent shall have received the fee required to be paid pursuant to Section 4 hereof.

(c)    Court Order.    The Bankruptcy Court shall have entered an order approving this Amendment Agreement.

SECTION 9.    Effectiveness; Counterparts.    This Amendment Agreement shall become effective when counterparts hereof which, when taken together, bear the signatures of each of the Borrowers, the Administrative Agent and the Lenders shall have been received by the Administrative Agent.    This Amendment Agreement may not be amended nor may any provision hereof be waived except pursuant to a writing signed by each of the Borrowers, the Administrative Agent and the Lenders. This Amendment Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract. Delivery of an executed counterpart of a signature page of this Amendment Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Amendment Agreement.

SECTION 10.    Representations.    Each Borrower represents and warrants to the Administrative Agent and each Lender that, after giving effect to this Amendment Agreement, (a) the representations and warranties set forth in Section 6 of the Loan Agreement are true and correct in all material respects on and as of the First Amendment Effective Date, except to the extent such representations and warranties expressly relate to an earlier date, and (b) no Default or Event of Default has occurred and is continuing.

SECTION 11.    Effect of Amendment.    Except as expressly set forth herein, this Amendment Agreement shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lenders or the Administrative Agent under the Loan Agreement, and shall not alter, modify or in any way affect any of the terms, conditions, obligations, covenants, guarantees, pledges, grants of security or other agreements contained in the Loan Agreement,

all of which are ratified and affirmed in all respects and continue in full force and effect. Nothing herein shall be deemed to entitle any Borrower to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants, guarantees, pledges, grants of security or other agreements contained in the Loan Agreement in similar or different circumstances. This Amendment Agreement shall apply and be effective only with respect to the provisions of the Loan Agreement specifically referred to herein. Each Borrower hereby acknowledges receipt of and consents to the terms of this Amendment Agreement.

SECTION 12.  Notices.  All notices hereunder shall be given in accordance with the provisions of Section 11.03 of the Loan Agreement.

SECTION 13.  Applicable Law; Waiver of Jury Trial.  (A)  THIS AMENDMENT AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

(B)    EACH PARTY HERETO HEREBY AGREES AS SET FORTH IN SECTIONS 11.10 AND 11.11 OF THE LOAN AGREEMENT AS IF EACH SUCH SECTION WERE SET FORTH IN FULL HEREIN.

[Remainder of page intentionally left blank.]

       IN WITNESS WHEREOF, the parties hereto have caused this Amendment Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

<div style="margin-left: 40%;">

WLR RECOVERY FUND III, L.P.,
  as a Lender and as the Administrative Agent

By:    WLR Recovery Associates III LLC,
        its General Partner


By: _____
    Name:
    Title:


AMERICAN HOME MORTGAGE
INVESTMENT CORP.


By: _____
    Name:
    Title:


AMERICAN HOME MORTGAGE
HOLDINGS, INC.


By: _____
    Name:
    Title:

</div>

AMERICAN HOME MORTGAGE CORP.


By: _____
    Name:
    Title:


AMERICAN HOME MORTGAGE
ACCEPTANCE, INC.


By: _____
    Name:
    Title:


AMERICAN HOME MORTGAGE
VENTURES LLC


By: _____
    Name:
    Title:


HOMEGATE SETTLEMENT SERVICES,
INC.


By: _____
    Name:
    Title:


GREAT OAK ABSTRACT CORP.


By: _____
    Name:
    Title:

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------- x
In re:                                             :     Chapter 11
                                                   :
AMERICAN HOME MORTGAGE                             :     Case No.  07-11047 (CSS)
HOLDINGS, INC., et al.,¹                           :
                                                   :     Jointly Administered
                         Debtors.                  :
                                                   :     Ref. Docket No. _____
-------------------------------------------------- x
```

## ORDER APPROVING AND AUTHORIZING THE AMENDMENT TO POST-PETITION DEBTOR-IN-POSSESSION FINANCING FACILITY

Upon consideration of the motion (the "Motion")² of American Home Mortgage

Investment Corp. American Home Mortgage Holdings, Inc., American Home Mortgage Corp.,

American Home Mortgage Acceptance, Inc., American Home Mortgage Ventures LLC,

Homegate Settlement Services, Inc., and Great Oak Abstract Corp., each a debtor and debtor in

possession (collectively, the "Borrowers"), for entry of an order pursuant to sections 105, 363

and 364 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy

Code"), authorizing and approving the First DIP Facility Amendment, a copy of which is

annexed hereto as Exhibit A; and upon all of the pleadings filed with the Court and upon the

---

¹        The Debtors (as defined below) in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303) ("AHM Holding"); American Home Mortgage Investment Corp. ("AHM Investment" or "Administrative Borrower"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580) (collectively, "AHM" or the "Debtors").  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

²        Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Motion.

record of the hearing on the Motion, and after due deliberation and consideration, and sufficient

cause appearing therefor;

      **IT IS HEREBY ORDERED** that the Motion is granted.  Any objections to the

Motion with respect to entry of this Order that have not been withdrawn, waived, or settled, and

all reservations of rights included therein, are hereby denied and overruled.

      **IT IS FURTHER ORDERED** that the Borrowers are authorized to enter into

and perform all of their obligations under the First DIP Facility Amendment annexed hereto as

<u>Exhibit A</u>, and that all such obligations shall constitute legal, valid and binding obligations of the

Borrowers enforceable in accordance with their respective terms;

      **IT IS FURTHER ORDERED** that except to the limited extent modified by the

First DIP Facility Amendment and this Order, all terms and provisions of the DIP Facility and

the Final DIP Order, shall remain unaltered and in full force and effect in accordance with their

terms;

      **IT IS FURTHER ORDERED** that the Lenders' liens on the BofA Construction

Loans and proceeds thereof shall be released once the amount of the Construction Loan Advance

is recovered by the Borrowers.  Amounts received by the Borrowers in excess of the

Construction Loan Advance on account of payoffs, refinancings, or pay-downs of the BofA

Construction Loans shall be held by the Debtors in a segregated account for the benefit of

general unsecured creditors (the "<u>GUC Fund</u>") for eventual distribution pursuant to the terms of

a confirmed chapter 11 plan, unless the Committee agrees or the Court orders that all or a portion

of the GUC Fund may be used for other purposes;

      **IT IS FURTHER ORDERED** that in the event that this Order is hereafter

reversed, stayed, modified or vacated by a subsequent order of this Court or any other court of

DB02:6162914.13

066585.1001

competent jurisdiction, such reversal, stay, modification or vacatur shall not impair, release or affect the validity of any rights granted to the parties to the First DIP Facility Amendment hereunder or the validity of any transaction consummated pursuant to and in reliance on the foregoing paragraphs of this Order prior to the effective date of such reversal, stay, modification or vacatur;

IT IS FURTHER ORDERED that notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order; and

IT IS FURTHER ORDERED that the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  Wilmington, Delaware
      January \_\_\_, 2008

_____
Christopher S. Sontchi
United States Bankruptcy Judge

