IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x  Chapter 11
In re:                                                          :
                                                                :  Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                          :
HOLDINGS, INC., a Delaware corporation, et al.,[1] :  Jointly Administered
                                                                :
        Debtors.                                                :  Hearing Date: February 1, 2008 at 11:00 a.m. (ET)
                                                                :  Objection Deadline: January 25, 2008 at 4:00 p.m. (ET)
---------------------------------------------------------------- x

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE
9019(b) AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN
CONSTRUCTION LOANS WITHOUT FURTHER HEARING OR NOTICE**

The above-captioned debtors and debtors in possession (collectively, "AHM" or the "Debtors") hereby move this Court (this "Motion"), pursuant to sections 363(b)(1) and 105(a) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 9019(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the Debtors to compromise certain construction loans without further hearing or notice. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## SUMMARY OF RELIEF REQUESTED[2]

1.    Due to, among other reasons, the unavailability of borrowing under the Debtors' Warehouse Facilities and the resulting cessation of loan origination operations prepetition, the unavailability of borrowing under the debtor-in-possession credit facility to resume such operations post-petition, and the limitations placed upon the Debtors' use of cash collateral in these bankruptcy cases, the Debtors have not funded advances for certain construction loans. This has put the borrowers to those construction loans in a precarious situation, with partially-completed homes but without the means to finish construction, and with interest continuing to accrue on outstanding balances.

2.    The Debtors attempted to remedy that situation by marketing the Construction Loan Business to potential purchasers who would be willing to continue funding advances under the construction loans, through the procedures established in the Construction Sale Procedures Order. Unfortunately, none of the bids received by the Debtors for the Construction Loan Business, in the Debtors' business judgment, would have provided sufficient value to the Debtors' estates to justify a sale. Accordingly, the Debtors and their financial advisors have considered and evaluated non-sale alternatives for realizing value from the construction loans.

3.    Bank of America, N.A. (the "<u>Administrative Agent</u>"), as administrative agent for itself and certain other banking and financial institutions (the "<u>Prepetition Lenders</u>"), sought relief from the automatic stay to sell the construction loans in which it had a security interest to the then-highest bidder. The Debtors opposed such relief, having determined that working with borrowers and third-party lenders to facilitate refinancing of the construction loans

---

[2] Capitalized terms not defined in this summary shall have the meanings hereinafter ascribed to them in the Motion.

would provide more value for the estates than the sale the Administrative Agent referenced in the Stay Relief Motion. After extensive negotiations, the Administrative Agent and the Debtors entered into the Stipulation whereby the Administrative Agent agreed to release its liens on the Construction Loans upon payment from the Debtors of the Payment Amount. The Official Committee of Unsecured Creditors (the "Committee") consented to the Stipulation, provided that any amounts realized from refinancing over and above the Payment Amount would be placed in an account for the benefit of unsecured creditors. The Stipulation was approved by the Court on January 4, 2008 [D.I. 2593].

4. The Debtors and their financial advisors have determined that, to ensure orderly liquidation of the Construction Loans, and to maximize the realizable value of such loans, the Debtors may need to offer borrowers and third-party lenders incentives to refinancing such as principal reduction (which creates "instant equity" in the underlying real property) or other compromises of the Debtors' rights under the Construction Loan Agreements, Notes, or Mortgages. Accordingly, by this Motion, the Debtors seek an order authorizing them to compromise the Construction Loans, including, without limitation, by offering principal reduction, without further hearing or notice.

## STATUS OF THE CASE AND JURISDICTION

5. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1005(b). Each Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3

6. On August 14, 2007, the United States Trustee for the District of Delaware (the "UST") appointed the Committee. No trustee or examiner has been appointed in these chapter 11 cases.

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and procedural predicates for the relief requested are Bankruptcy Code sections 363(b)(1) and 105(a), and Bankruptcy Rule 9019(b).

## BACKGROUND

### A. The Debtors' Business

8. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate-A quality.

9. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan-production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain AHM entities originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal

amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

### *The Construction Loan Business*

10. In July of 2004, AHM assembled a team of experienced construction lending and mortgage banking professionals to establish a residential construction-to-permanent mortgage loan business (the "Construction Loan Business"). The Construction Loan Business was a full-service construction and renovation lending operation, beginning from the point of closing on the construction loan through draw administration and to a final, permanent mortgage loan. In the first full year of originating construction-to-permanent mortgage loans, annual closing volume for the Construction Loan Business was approximately $113 million, which was followed by approximately $300 million in the second year. Through July 31, 2007, the construction loan closing volume was approximately $201 million.

11. In a construction loan transaction, a borrower submits a plan and budget for home construction or renovation to AHM, upon approval of which AHM and the borrower execute a Construction Loan Agreement. Under the Construction Loan Agreement, AHM commits to lend up to 95% of the projected value of the finished construction. At closing, in exchange for such commitment, the borrower executes a promissory note (the "Note") and open-ended mortgage securing future advances (the "Mortgage") in favor of AHM.

12. The Construction Loan Agreement requires the borrower to pay all the costs of acquiring, constructing and equipping the project (the "Project Costs") up to a pre-determined amount (the "Borrower's Equity"). After the Borrower's Equity threshold is met, AHM is required, upon receipt of proper requests by the borrower, to make periodic advances of

DB02:6449248.5                                                                                                                                    066585.1001

loan proceeds to pay necessary Project Costs in accordance with the agreed-upon budget. AHM holds back 10% of the total committed loan proceeds until final completion of the project.

13. AHM financed the Construction Loan Business with short-term credit facilities (the "Warehouse Facilities") from third-party lenders and lender syndicates (collectively with their respective Administrative Agents, the "Warehouse Lenders"), which were secured by liens in the construction loans funded by such Warehouse Facilities (all loans originated under a given Warehouse Facility, a "Loan Portfolio"). AHM generally provided a percentage of each required advance under a given construction loan using its own funds, and funded the remainder of the advance with a draw on the respective Warehouse Facility.

14. AHM offered construction loans on either a "one-time-close" or "two-time-close" basis. One-time-close construction loans, which represent approximately eighty-nine percent (89%) of the total construction loan portfolio, were designed to provide a single closing for the construction- and permanent-financing phases. During the construction phase of 6, 9, 12 or 18 months, the borrower typically makes interest-only payments on actual principal advances made in accordance with the Construction Loan Agreement. Upon completion of construction and satisfaction of certain other conditions, the loan "converts" to a standard-term, permanent mortgage loan governed by the terms of the Note and the Mortgage.

15. Two-time-close construction loans, which represent approximately eleven percent (11%) of the Debtors' total construction loan portfolio, provide short-term construction financing for a period of 6 to 20 months, after which the borrowers have more options for permanent financing.

**B.     Events Leading to the Chapter 11 Filing**

16.     Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

17.     In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of AHM's loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to AHM's loans. During this time, certain of the Warehouse Lenders began to exercise remedies against AHM, thereby restricting its ability to originate loans and threatening its continued viability.

18.     Unfortunately, in the short time available and given the severe financial pressures facing it, AHM was unsuccessful in its efforts to resolve its liquidity crisis outside the bankruptcy forum and, accordingly, filed for chapter 11 protection to preserve and maximize the value of its business through orderly sales of its assets.

**C.     The Construction Sale**

19.     As of the Petition Date, the Debtors held approximately 575 construction loans with approximately $341 million in committed balances and approximately $217 million in unpaid principal balances ("UPBs").

20.     The unavailability of borrowing under the Warehouse Facilities or the debtor-in-possession credit facility to finance the Construction Loan Business, along with the limitations imposed upon the Debtors' use of cash collateral in these cases, have made it impossible for the Debtors to fund certain construction loans.[3] As noted above, this has put

---

[3] Certain of the Warehouse Lenders funded postpetition advances under the construction loans, either directly or indirectly by authorizing the Debtors' use of cash collateral for that purpose.

DB02:6449248.5                                                                                                                      066585.1001

borrowers in the precarious position of having partially-completed homes but no means to finish construction, while at the same time being required to make interest payments to the Debtors.[4]

21. On September 21, 2007, the Debtors filed a motion [D.I. 900] (the "Construction Sale Motion") to authorize the sale of the Construction Loan Business, as a whole or in parts, and to establish procedures with respect to the same. On October 4, 2007, the Court entered an Order [D.I. 1175] (the "Construction Sale Procedures Order") approving sale procedures and scheduling a hearing to consider the sale.

22. The Debtors believe the construction loans are fairly valued at no less than their UPBs because, among other reasons, the borrowers are generally very creditworthy and the vast majority of the construction loans will automatically convert to permanent loans upon completion of the construction.

23. Unfortunately, despite extension of the bid deadline and adjournment of the sale hearing, very few bids materialized for the Construction Loan Business or the individual Loan Portfolios, and none that approached the aggregate UPB of the construction loans. In the exercise of their business judgment and in light of their fiduciary duties to creditors, the Debtors decided not to accept any of these bids and, instead, to explore non-sale alternatives for realizing value from the construction loans.

### D. The Stay Relief Motion and Stipulation

24. On December 4, 2007, the Administrative Agent filed a motion [D.I. 2255] (the "Stay Relief Motion") seeking relief from the automatic stay to sell the construction loans in which it had a security interest for the then-highest bid (the "Proposed Bid"). The Debtors opposed such relief because, among other reasons, they had already determined that the

---

[4] Despite the Debtors' inability to continue funding as required by the Construction Loan Agreements, the Notes are valid and enforceable to the extent of the advances previously made.

Proposed Bid would not provide sufficient value to the bankruptcy estates and that facilitating the borrowers' refinancing of the construction loans would be more prudent under the circumstances. Indeed, since the Petition Date, several borrowers have refinanced their construction loans, resulting in payment of 100% of the UPBs, plus accrued interest and fees.

25. Given the low prevailing interest rates, and the creditworthiness of the borrowers under the construction loans, the Debtors believe most of the remaining borrowers would be willing and able to refinance. However, given the unusual circumstances surrounding these construction loans—i.e., the original lender's bankruptcy, construction that is half-completed and/or behind schedule, depressed real property values, and the financial markets' recent mortgage-related losses—the Debtors anticipate that borrowers may need assistance and that potential refinancing lenders may need incentives to lend into this situation. One such incentive may be to offer principal reduction to the borrowers, which creates "instant equity" in the real property by reducing the amount of the original mortgage that must be paid off in the refinancing.

26. The Debtors and their financial advisors determined that if even a moderate number of the construction loans constituting the Administrative Agent's collateral were refinanced (even with moderate principal reduction), the Debtors could potentially realize more value for their estates than they would have realized from the Proposed Bid. Indeed, from November 28, 2007, to January 4, 2008, a number of the approximately eighty-five construction loans in which the Administrative Agent had a security interest refinanced, providing the Debtors with $4,846,723.70.

27. The Debtors discussed the compromise/refinancing option with the Committee and discussed with the Administrative Agent a potential purchase of the construction

loans free of its security interest. As a result of those discussions, and after extensive negotiations, the parties agreed upon a stipulation resolving the Stay Relief Motion (the "Stipulation"), which was approved by the Court on January 4, 2008 [D.I. 2593].

28. Pursuant to the Stipulation,[5] the Administrative Agent agreed to release its liens on the construction loans identified on Exhibit A to the Stipulation (collectively, the "Construction Loans") in exchange for a payment in an amount (the "Payment Amount") equal to $9,143,406, less any amounts received by the Administrative Agent from November 28, 2007, until the date of such payment with respect to the construction loans in which it had a security interest.

29. To fund the payment to the Administrative Agent, certain of the Debtors and WLR Recovery Fund III, L.P. (the "DIP Agent"), as administrative agent for the lenders (the "DIP Lenders") pursuant to that certain Debtor-in-Possession Loan and Security Agreement dated as of August 6, 2007 (the "DIP Facility"), agreed to amend the DIP Facility to, among other things, provide for the consent of the DIP Lenders to the Debtors' use of cash collateral to pay the Payment Amount to the Administrative Agent the Debtors (the "First DIP Facility Amendment"). The Court approved the First DIP Facility Amendment on January 4, 2008 [D.I. 2594].

## RELIEF REQUESTED

30. By this Motion, the Debtors seek an order authorizing the Debtors, in their business judgment and without further hearing or notice, to compromise the Construction Loans

---

[5] The following is by way of summary only. To the extent there is any inconsistency between this Motion and the Stipulation, the latter controls.

to the extent necessary to facilitate refinancing thereof pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

## BASIS FOR RELIEF REQUESTED

31. Section 363 of the Bankruptcy Code provides, in pertinent part, that the debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

32. Section 102(1) of the Bankruptcy Code provides that the phrase "after notice and a hearing"

> (A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but
>
> (B) authorizes an act without an actual hearing if such notice is given properly and if—
>
> > (i) such a hearing is not timely requested by a party in interest; or
> > (ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act.

11 U.S.C. § 102(1) (emphasis added).

33. Though not a "use, sale or lease" of estate property strictly speaking, compromise of the Construction Loans with the borrowers implicates section 363(b)(1) of the Bankruptcy Code because it is the functional equivalent of a "sale" of the Construction Loans. See Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 350 (3d Cir. 1999) (citing In re Telesphere Communications, Inc., 179 B.R. 544, 552 n.7 (Bankr. N.D. Ill. 1994) ("There is no difference in the effect on the estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with the adverse party.")).

34. However, unlike approval of a "use, sale or lease" of estate property, which is governed by Bankruptcy Rule 6004, approval of the compromise of the estate's right to

11

payment from a third party is governed by Bankruptcy Rule 9019. Compare Fed. R. Bankr. P. 6004 ("Use, Sale, or Lease of Property") with Fed. R. Bankr. P. 9019 ("Compromise and Arbitration"); see Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 351 n.4 (3d Cir. 1999) ("Bankruptcy Rule 9019 provides the procedure for the required court approval.").

35.  Bankruptcy Rule 9019 provides, in relevant part, that, "[a]fter notice and such hearing as the court may direct, the court may fix a class or classes of controversies and authorize the [debtor in possession] to compromise or settle controversies within such class or classes *without further hearing or notice*." Fed. R. Bankr. P. 9019(b) (emphasis added). This is consistent with the provisions of sections 363(b)(1) and 102(1) of the Bankruptcy Code which, taken together, require court approval of non-ordinary course transactions but permit flexibility in determining when, and under what circumstances, an actual hearing will be required. See 11 U.S.C. §§ 363(b)(1) and 102(1); Telesphere, 179 B.R. at 552 n.8. Thus, pursuant to Bankruptcy Rule 9019(b), a bankruptcy court may authorize the settlement of certain classes of claims without further notice or hearing, where such settlement will produce a minimum threshold of value for the estate. See, e.g., Boyd v. North End Auto Sales, Inc. (In re Check Reporting Serv., Inc.), 137 B.R. 653, (Bankr. W.D. Mich. 1992) (discussing prior order authorizing chapter 7 trustee, without further order of the court, to settle pending preference actions for at least 25% of the amount of judgment demanded).

36.  Compromises are favored in bankruptcy to minimize litigation and expedite administration of the bankruptcy estate. In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). Pursuant to Bankruptcy Rule 9019, however, the Court must determine whether a proposed settlement is in the best interest of the bankruptcy estate. See Law Debenture Trust Co. v. Kaiser

Aluminum Corp. (In re Kaiser Aluminum Corp.), 339 B.R. 91, 96 (D. Del. 2006) (citing Martin, 91 F.3d at 394).[6] In making this determination, the Court must

> assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal in light of four factors: (1) the probability of success in the litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interests of the creditors.

Id. (quotations omitted, citing Martin, 91 F.3d at 393); see In re RNI Wind Down Corp., 348 B.R. 286, 297 (Bankr. D. Del. 2006) (Sontchi, J.). Although the particular Martin factors are somewhat difficult to apply given the nature of the Construction Loans and the non-litigation posture of this Motion, the Debtors submit that the broader Martin analysis supports the relief requested.

37.    The "claims being compromised" for purposes of the Martin analysis are, of course, the Construction Loans—i.e., the Debtors' rights under the Construction Loan Agreements, the Notes, and the Mortgages. As discussed above, the Debtors believe the intrinsic value of the Construction Loans (i.e., if they were funded out and converted to permanent loans) is no less than 100% of their UPBs. However, because the Debtors are unable to continue funding the Construction Loans, and were unable to find a serious buyer willing to do so, the

---

[6] The Kaiser Aluminum and Martin opinions concerned the approval of a settlement under Bankruptcy Rule 9019(a), which is admittedly different from fixing a class of claims and authorizing future settlements thereof pursuant to Bankruptcy Rule 9019(b). However, because the substantive requirements for approval of any settlement derive from section 363(b)(1) of the Bankruptcy Code, case law decided under Bankruptcy Rule 9019(a) should be equally applicable to Bankruptcy Rule 9019. See Martin, 91 F.3d at 395 n.2 ("Section 363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a controversy."); Northview Motors, 186 F.3d at 351 n.4 ("Bankruptcy Rule 9019(a), a rule of procedure, cannot, by itself, create a substantive requirement of judicial approval of the Trustee's settlement of Northview's claims against Chrysler. However, we adhere to our ruling in Martin that Section 363 of the Code is the substantive provision requiring court approval."). Accord Telesphere, 179 B.R. at 551-53 (tracing origin of "best interest of the estate" standard for approval of settlement to case law construing section 363(b) of the Bankruptcy Code).

Debtors must now liquidate the loans in order to maximize the realizable value for the benefit of the Debtors' estates.

38. As discussed above, the Debtors and their financial advisors have determined that offering incentives to borrowers and third-party lenders to refinance the Construction Loans is likely the most expedient method of liquidating them while also maximizing their value for the benefit of the Debtors' estates. Because the loans will be refinanced in the open market, the Debtors submit that the amount of the UPB a lender would be willing to refinance for a borrower with respect to a given property is a fair approximation of the "value" (i.e., the orderly liquidation value) of the Construction Loan secured by that property.[7] Accordingly, with respect to each settlement of a Construction Loan leading to refinancing by a third-party lender, the Debtors will be receiving equivalent value for the Construction Loan. Put another way, the "value to the estate of the acceptance of the compromise" under the Martin analysis will be equal to the "value of the claim that is being compromised."

39. To the extent consideration of the specific Martin factors is relevant to the Court's determination, the Debtors submit that:

    a) In the event they were forced to sue borrowers for payment of the Construction Loans, they would have a high probability of success on the merits of such litigation because the Notes are valid and enforceable as to advances previously made.

    b) The Debtors' ability to collect on resulting judgments against the borrowers would depend on (i) the value of the underlying real property (which will itself depend on the real estate market in the particular location as well as the stage of construction at each site) and (ii) the availability of other assets of the borrowers from which to collect the judgment (which will vary from borrower

---

[7] By way of comparison, in a typical Bankruptcy Rule 9019 motion concerning a litigation claim, the amount of the settlement is determined by the litigants themselves without "market testing" of any kind. In such circumstances, the Debtors submit that closer scrutiny by the bankruptcy court is warranted and the four Martin factors are more clearly relevant.

      to borrower).  As a general matter, proceeding against either the real property or the borrower would take significantly more time than refinancing.

   c) While mortgage foreclosures are generally routine, litigation involving the Construction Loans may become complicated by defenses and/or counter-claims premised upon the Debtors' inability to fund advances under the Construction Loan Agreements.[8]  This would necessarily increase the expense, inconvenience and delay of proceeding via litigation rather than refinancing.

   d) The interests of creditors are best served by refinancing, because it will result in more value for the Debtors' estates than either a sale of the Construction Loans or piecemeal litigation with borrowers to recover the UPBs plus accrued interest and fees.

See Kaiser Aluminum, 339 B.R. at 96 (citing Martin, 91 F.3d at 393); RNI Wind Down, 348 B.R. at 297.

      40.    The Debtors submit that the authority to compromise claims related to the Construction Loans without further notice or hearing is appropriate under the circumstances.  All parties in interest have been on notice of the Debtors' intention and efforts to liquidate the Construction Loans since at least September 21, 2007, when the Debtors filed the Construction Sale Motion.  Moreover, in the Stay Relief Motion, the Administrative Agent sought to sell the Construction Loans.  Accordingly, any party in interest concerned with the liquidation of the Construction Loans would have had ample notice and opportunity to be heard in connection with both the Construction Sale Motion and the Stay Relief Motion, and would have had a sufficient motive to object to either one.  Finally, any party in interest concerned with the specific relief sought in this Motion will have notice and an opportunity to be heard in connection herewith.

      41.    Furthermore, prior to agreeing to compromise a Construction Loan, the Debtors will advise counsel for the Committee of the terms of such compromise.  The

---

[8] The Debtors do not acknowledge or admit the validity of any such defense or counterclaim, and hereby reserve all their rights under the Construction Loan Agreements, the Notes, the Mortgages, and applicable law.

Committee shall have five (5) business days (unless extended by the Debtors) to object to the proposed compromise (the "Objection Deadline"). In the absence of an objection by the Committee on or before the Objection Deadline, the Debtors will proceed with the proposed compromise. In the event the Committee objects to the proposed compromise on or before the Objection Deadline, the Debtors will not compromise that Construction Loan on those terms absent a motion and further order of the Court.

42.    Designating the Construction Loans as a "class of controversies" the Debtors may settle without further order of the Court will result in cost savings to the Debtors' estates by obviating dozens of motions to compromise individual Construction Loans.

43.    In light of the foregoing, the Debtors respectfully request that the Court authorize the Debtors to compromise the Construction Loans in the exercise of their business judgment without further hearing or notice.

## NOTICE

44.    Notice of this Motion will be provided to: (i) the UST; (ii) counsel to the Committee; (iii) counsel to the Administrative Agent; (iv) counsel to the DIP Agent; and (v) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the Proposed Order attached hereto as <u>Exhibit A</u> and grant the Debtors such other and further relief as is just and proper.

Dated:   Wilmington, Delaware
         January _11_, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession