## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                              : Chapter 11

                                                    : Case No. 07-11047 (CSS)

AMERICAN HOME MORTGAGE HOLDINGS,    :
INC., a Delaware corporation, et al.,[1]            : Jointly Administered

                                                    :
    Debtors.                                        : **Objection Deadline: January 25, 2008 at 4:00 p.m. (ET)**
                                                    : **Hearing Date: February 1, 2008 at 11:00 a.m. (ET)**
                                                    :
------------------------------------------------------------- x

## DEBTORS' APPLICATION PURSUANT TO SECTION 327(a) AND 328(a) OF THE BANKRUPTCY CODE FOR ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF CB RICHARD ELLIS, INC. AS A REAL ESTATE BROKER, *NUNC PRO TUNC* TO JANUARY 10, 2008

The above-captioned debtors and debtors in possession in these chapter 11 cases

(the "Debtors"), by this application (the "Application"), seek entry of an order, pursuant to

sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing

and approving the retention and employment of CB Richard Ellis ("CBRE") as a real estate

broker for the Debtors, *nunc pro tunc* to January 10, 2008, in connection with the Debtors' sale

of certain real property located at 538 Broadhollow Road, Melville, New York (the

"Broadhollow Property"). In support of this Application, the Debtors respectfully represent as

follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc., a Delaware corporation (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); American Home Mortgage Servicing, Inc., a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

## BACKGROUND

2.      On the August 6, 2007, (the "Petition Date") each of the Debtors filed with the Bankruptcy Court for the District of Delaware (the "Court") a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

5.      Prior to the filing of these bankruptcy cases, the Debtors' business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans.  The Debtors also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors.  The Debtors offered an array

---

[2]  The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief [D.I. 2], which is incorporated by reference as if fully set forth herein at length.

of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.      As of December 31, 2006, the Debtors held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, the Debtors operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, the Debtors originated loans obtained from mortgage brokers and purchased loans from correspondents. The Debtors originated approximately $58.9 billion in aggregate principal amount of loans in 2006. For the third quarter of 2006, the Debtors were ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.      In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

8.      The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August

3

3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination

of over 6,500 employees.

9.    Unfortunately, in the short time available and given the severe financial

pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity

crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and

maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

10.    AHM SPV II, LLC ("AHM SPV") is a limited liability company non-

debtor entity which is wholly owned by AHM Corp.  In November of 2003, AHM SPV

undertook a series of transactions to acquire ownership of the Broadhollow Property.  Pursuant

to a certain Lease Agreement between Suffolk County Industrial Development Agency ("IDA")

and AHM SPV, dated November 1, 2003 (the "Lease Agreement"), AHM SPV sold the

Broadhollow Property to IDA who contemporaneously leased the Broadhollow Property to

AHM SPV for a period ending on January 31, 2015.  Pursuant to the Lease Agreement, however,

AHM SPV retained the ability to repurchase the Broadhollow Property under certain conditions.

11.    AHM SPV subleased the Broadhollow Property to AHM Corp. who has

since used it as its headquarters.  Although the Debtors continue to use the Broadhollow Property,

the Debtors are now winding down their business affairs, liquidating their assets and will soon no

longer have a use for the Broadhollow Property.  In order to maximize the value of their estates, the

Debtors wish to dispose of its interest, distribute the proceeds to their creditors, and relieve

themselves of the burdens associated with the Broadhollow Property.

12.    To that end, the Debtors initiated a post-petition search for a real estate

broker to assist in the disposition of the Broadhollow Property.  In connection therewith, the

Debtors contacted CBRE to assist in their efforts. The Debtors and CBRE reached an agreement regarding CBRE's retention and employment by the Debtors on or about January 10, 2008, the terms of which are set forth in the Exclusive Sales Listing and Commission Agreement (the "Engagement Agreement"), attached hereto as Exhibit A.

## RELIEF REQUESTED

13.    By this Application, the Debtors seek entry of an order, pursuant to sections 327(a) and 328(a) the Bankruptcy Code and Bankruptcy Rule 2014 authorizing and approving the retention and employment of CBRE as the Debtors' real estate broker, *nunc pro tunc* to January 10, 2008, pursuant to the terms of the Engagement Agreement.

14.    The Debtors also request that the information requirements of Local Rule 2016-2(d) be modified and waived to the extent necessary to permit CBRE to submit time records in summary format which shall set forth a description of the services rendered by each of its professionals and the amount of time spent by each such individual in rendering services on behalf of the Debtors.

## BASIS FOR RELIEF REQUESTED

15.    Bankruptcy Code section 327(a) provides, in relevant part, as follows:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

16.    Bankruptcy Code section 328(a) provides, in relevant part, as follows:

The trustee . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . of this title . . . on any reasonable terms and conditions of

5

employment, including on a retainer, on an hourly basis, on a fixed
or percentage fee basis, or on a contingent fee basis.
Notwithstanding such terms and conditions, the court may allow
compensation different from the compensation provided under
such terms and conditions after the conclusion of such
employment, if such terms and conditions prove to have been
improvident in light of developments not capable of being
anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

17.    Bankruptcy Rule 2014 provides, in relevant part, as follows: "An order

approving the employment of attorneys, accountants, appraisers, auctioneers, agents or other

professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee

or committee." Fed R. Bankr. P. 2014.

A.    **CBRE's Qualifications**

18.    The Debtors have selected CBRE based on its experience and expertise in

providing corporate real estate services. CBRE is a real estate brokerage and consulting firm and

an S&P 500 company headquartered in Los Angeles, California. With over 24,000 employees

and more than 300 offices worldwide, CBRE has extensive experience in representing

corporations with respect to their respective real estate issues, including, but not limited to,

acquisition, sales, dispositions, and leases. Moreover, CBRE's professionals have extensive

experience in consulting and strategic planning in connection with real estate brokerage, and its

professionals have consummated hundreds of commercial real estate sale transactions involving

a wide range of industries. In addition, in anticipation of its retention, CBRE has become

familiar with the Broadhollow Property and the issues related thereto, including, but not limited

to, the relevant agreements with respect to the Broadhollow Property.

19.    The Debtors require qualified professionals to render essential services in

connection with the sale of the Broadhollow Property. Based on CBRE's experience and the

Debtors' business judgment, the Debtors believe that the employment of CBRE is in the best interest of the Debtors' estates, their creditors, and other parties in interest.

**B.    Terms of the Engagement Agreement[3]**

        20.    As more fully set forth in the Engagement Agreement, the terms of the Engagement Agreement include the following:

    a.    The Debtors shall grant CBRE the exclusive right to sell or otherwise dispose of the Broadhollow Property for a period commencing January 10, 2008 and ending midnight July 31, 2008 (the "Term"), which Term may be terminated by either party with or without cause upon thirty (30) days written notice.

    b.    CBRE agrees to use commercially reasonable efforts to effect a sale or transfer of the Broadhollow Property during the Term. The Broadhollow Property will be marketed without a formal asking price.

    c.    The Debtors agree to pay CBRE, together with any co-broker, cooperating builder or outside broker, an aggregate sales commission equal to 1.5% of the gross sales price for the Broadhollow Property up to $35 million and 5.0% of the gross sales price for the Broadhollow Property that exceeds $35 million (which shall include any existing mortgage that is assumed) (the "Commission"). This Commission shall be earned and payable at the time of the closing for services rendered if, during the Term: (a) the Broadhollow Property is sold to a purchaser procured by CBRE, the Debtors or anyone else; and (b) the Debtors contribute or convey the Broadhollow Property to a partnership, joint venture or other business entity or pursuant to a stock sale, or other disposition of the Broadhollow Property.

    d.    The Debtors further agree that they shall pay CBRE a commission in accordance with paragraph c. above, if, within ninety (90) calendar days after the expiration or termination of the Term the Broadhollow Property is sold to, or the Debtors enter into a contract of sale of the Broadhollow Property with, or negotiations continue, resume or commence and thereafter continue leading to a sale of the

---

[3] The services to be provided by CBRE and the compensation structure are explained in their entireties in the Engagement Agreement. If there are any inconsistencies between the summary contained herein and the Engagement Agreement, the Engagement Agreement shall govern. Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Engagement Agreement.

                                 

Broadhollow Property to any person or entity (including his/her/its successors, assigns or affiliates) with whom CBRE has negotiated (either directly or through another broker or agent) or to whom the Broadhollow Property has been submitted prior to the expiration or termination of the Term.

e.  Any and all fees and commissions are subject to the approval of the Court and shall be paid in accordance with sections 328, 330 and 331 of the Bankruptcy Code, such Bankruptcy Rules as may be applicable from time to time, and rules or procedures fixed by the Court.

f.  The Debtors agree to cooperate with CBRE by referring to CBRE all inquiries of anyone interested in the Broadhollow Property.

g.  The Debtors agree to provide reimbursement to CBRE for all reasonable out-of-pocket expenses incurred during the preparation of the offering packages and the actual marketing of the Broadhollow Property up to a maximum of $7,500. These expenses may include, but are not limited to, cost of graphics, photographs, printing, lease summaries, financial analysis and advertising costs directly relating to the marketing of the Broadhollow Property. When requesting reimbursement, CBRE will provide the Debtors with copies of actual receipts as verification of all individual expenses. Payment shall be made upon approval of the Court.

h.  The Debtors agree to indemnify and hold CBRE harmless, solely based on the willful misconduct or gross negligence of the Debtors, from and against all claims, costs, liabilities, settlements and judgments and all costs of defense against such claims (including attorney's fees and disbursements), suffered or incurred by CBRE which arise out of or relate to the physical condition of the Broadhollow Property, the Debtors' title and/or the marketability thereof (the "Indemnification Provision").

## C.  Approval of Fee Structure Pursuant to Section 328(a) of the Bankruptcy Code and Indemnification Provision

21.  In accordance with the terms of the Engagement Agreement, the Debtors

seek approval of the fee structure pursuant to section 328(a) of the Bankruptcy Code. Section

328(a) provides, in relevant part, that a debtor "with the court's approval, may employ or

authorize the employment of a professional person under section 327 . . . on any reasonable

8

terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Section 328(a), therefore, permits the Court to approve the fee structure proposed in the Engagement Agreement.

22. The Debtors believe that the fee structure is fair and reasonable in light of (a) industry practice and prior precedent, (b) market rates charged for comparable services both in and out of the chapter 11 context, (c) CBRE's extensive experience with respect to real estate services, and (d) the nature and scope of work to be performed by CBRE.

23. The Debtors also believe that the Indemnification Provision is customary and reasonable for real estate broker engagements, both out-of-court and in chapter 11 proceedings and should be approved by the Court.

**D.    Disclosures and Disinterestedness**

24. Section 327(a) of the Bankruptcy Code provides that a trustee or debtor in possession is authorized to employ professional persons who do not hold or represent an interest adverse to the estate and who are "disinterested persons" to represent or assist the trustee in carrying out the trustee's duties under the Bankruptcy Code. 11 U.S.C. § 327(a).

25. As more fully set forth in the declaration of Phillip Heilpern (the "Heilpern Declaration"), attached hereto as Exhibit B, CBRE is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, and does not hold an interest adverse to the Debtors. Moreover, to the best of the Debtors' knowledge, information and belief, other than in connection with these cases, CBRE does not have any connection with the Debtors, their creditors, the U.S. Trustee or any other party with an actual or potential interest in these chapter 11 cases or its respective attorneys or accountants, except as set forth in the Heilpern Declaration.

26.    Because of the substantial number of brokers and salespersons employed by CBRE, the Debtors are aware that one of CBRE's brokers or brokerage teams may, on occasion, represent a prospective purchaser seeking to acquire either the Broadhollow Property or, as the case may be, the Debtors' interest in the Broadhollow Property, which representation is independent of the CBRE's selling agency team's representation of the Debtors.  In such cases, CBRE has agreed to disclose its dual role in the potential transaction to the Debtors, the prospective purchaser and the Court and will implement its usual internal safeguards to assure complete confidentiality to both the Debtors and the prospective purchaser in their respective dealings with and through CBRE.  The Debtors agree that such occasional dual representation may occur, subject to appropriate disclosure and consents to payment of CBRE's commissions as provided for hereinabove or where a prospective purchaser has agreed to pay its own broker, as may be called for not only by the Engagement Agreement but also by CBRE's separate commission agreement with that prospective purchaser.

27.    Based on the foregoing, the Debtors believe that the services of a real estate broker, and CBRE in particular, under the terms and conditions set forth in this Application and the Engagement Agreement are necessary to maximize the value of the Debtors' interest in the Broadhollow Property and is in the best interest of the Debtors, their estates, their creditors and all parties in interest.

## NOTICE

28.    Notice of this Motion will be given to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iv) counsel to the DIP Lender; and (v) all parties entitled to notice under Delaware Bankruptcy

10

Local Rule 2002-1(B). The Debtors submit that, under the circumstances, no further notice is required.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form annexed hereto, approving the retention and employment of CBRE as the Debtors' Real Estate Broker, and grant such other and further relief as the Court deems just and proper.

Dated: January 14, 2008
      Wilmington, Delaware

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Donald J. Bowman, Jr. (No. 4383)
The Brandywine Building
1000 West Street - 17th Floor
P.O. Box 391
Wilmington, Delaware 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to Debtors and Debtors in Possession

11

066585.1001