UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                          . Case No. 07-11047(CSS)
                                .
  AMERICAN HOME MORTGAGE        .
  HOLDINGS, INC., a Delaware    .
  Corporation, et. al.,         . 824 Market Street
                                . Wilmington, Delaware  19801
                 Debtors.       .
                                . January 4, 2008
. . . . . . . . . . . . . . . . . 11:00 a.m.
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                Young Conaway Stargatt &
                                Taylor, LLP
                                By:  PAULINE K. MORGAN, ESQ.
                                     ROBERT BRADY, ESQ.
                                     JOHN T. DORSEY, ESQ.
                                     SEAN BEACH, ESQ.
                                     BLAKE CLEARY, ESQ.
                                The Brandywine Building
                                1000 West Street, 17th Floor
                                P.O. Box 391
                                Wilmington, DE  19899

For Unsecured Creditors Comm.:  Hahn & Hessen LLP
                                By:  MARK S. INDELICATO, ESQ.
                                488 Madison Avenue
                                14th and 15th Floor
                                New York, NY  10022


Audio Operator:                 Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

**APPEARANCES CONTINUED:**


For Dept. of Justice:                Office of the U.S. Trustee
                                     By:  JOSEPH McMAHON, ESQ.
                                     844 King Street
                                     Suite 2313, Lockbox 35
                                     Wilmington, DE 19801

For JP Morgan Chase:                 Landis Rath & Cobb, LLP
                                     By:  ADAM G. LANDIS, ESQ.
                                     919 Market Street
                                     Wilmington, DE  19801

For FLSA Plaintiffs:                 Margolis Edelstein
                                     By:  JAMES HUGGETT, ESQ.
                                     1500 Grant Building
                                     Pittsburgh, PA  15219

                                     Outten & Golden
                                     By:  JACK RAISNER, ESQ.
                                     New York, NY

For AH Mortgage Acquisition:         Greenberg Traurig , LLP
                                     By: VICTORIA COUNIHAN, ESQ.
                                     The Brandywine Building
                                     1000 West Street
                                     Suite 1540
                                     Wilmington, DE  19801

For GMAC Mortgage:                   Reed Smith, LLP
                                     By: CLAUDIA Z. SPRINGER, ESQ.
                                         KIMBERLY CLAWSON, ESQ.
                                     2500 One Liberty Place
                                     Philadelphia, PA  19103

For MBIA Insurance Corp.:            Kutak Rock LLP
                                     By:  BRUCE WILSON, ESQ.
                                     Omaha, NE
                                     (telephonic appearance)

For Iron Mountain:                   Archer & Greiner
                                     By:  CHARLES BROWN, ESQ.
                                     One Centennial Square
                                     Haddonfield, NJ 08033

For Bank of America:                 Kaye Scholer LLP
                                     By:  ANA M. ALFONSO, ESQ.
                                     425 Park Avenue
                                     New York, NY  10022

**APPEARANCES (Continued):**

| | |
|---|---|
| For Bank of New York: | Pillsbury, Winthrop, Shaw & Pittman, LLP<br>By:  MARGOT ERLICH, ESQ.<br>New York, NY |
| For FGIC & Assured Guaranty: | Morris, Nichols, Arsht & Tunnell<br>By:  DONNA CULVER, ESQ.<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE  19899 |
| For CitiMortgage, Inc.: | Morris, James, Hitchens & Williams, LLP<br>By:  BRETT D. FALLON, ESQ.<br>PNC Bank Center<br>222 Delaware Avenue<br>10th Floor<br>P.O. Box 2306<br>Wilmington, DE  19899 |
| For CIFG Assurance: | King & Spalding<br>By: STEFANIE GREER, ESQ.<br>New York, NY |

4

1          COURT CLERK:  All rise.

2          THE COURT:  Please be seated.

3          MS. MORGAN:  Good morning, Your Honor.

4          THE COURT:  God morning.

5          MS. MORGAN:  Pauline Morgan from Young, Conaway,

6  Stargatt & Taylor on behalf of the Debtors.

7          Your Honor, proceeding with the agenda, as indicated

8  item one has been adjourned by agreement of the parties.  Item

9  two is the motion of Bank of America for relief, which we've

10 resolved and is the subject of agenda item number 16.  Item

11 three, Your Honor, as indicated is being adjourned so that we

12 can try to work out some agreements with the many objectors

13 that we received.  Item four, I understand the Court has signed

14 the order, I thank the Court for that and item five, Your

15 Honor, is the Debtors motion for an order authorizing a

16 amendment to the limited recourse Debtor-in-Possession

17 facility.

18         As Your Honor will probably recall, on November 14th,

19 the Court approved on an interim basis limited recourse DIP

20 facility in the amount of $50 million dollars in furtherance of

21 the two step closing process of our APA, authorizing the sale

22 of the servicing to AH Mortgage Acquisition.  The final order

23 was entered on November 28th.

24         Since that time, Your Honor, the servicing personnel

25 have determined that they under estimated the working capital

1  that was necessary to fund primarily advances, but also other

2  servicing needs and have determined that it's necessary to

3  increase the amount of the borrowings, potential borrowings,

4  from $5 to $100 million dollars.   Again, Your Honor, there is

5  no change to any other part of the DIP structure, the remainder

6  of it remains as was indicated earlier.   The Debtors liability

7  is limited solely to the purchase -- I'm sorry, the Debtors

8  liability is limited solely to the purchased assets and if

9  there is a default the secured parties can only look to those

10 proceeds of those servicing business for its collateral and

11 recovery.   So, there's no negative effect on the estate,

12 notwithstanding the increase from 50 million to 100 million in

13 the potential DIP borrowings.

14          THE COURT:  Okay.

15          MS. MORGAN:  There have been no objections, Your

16 Honor.  We did file this, not on shortened notice, on December

17 19th, and objections were due on the 4th.

18          THE COURT:  All right.   Does anyone wish to be heard

19 in connection with this matter?  I did see that you had filed a

20 certification of counsel but I felt it more prudent, given the

21 size of the lendings being authorized, to make sure we went to

22 a hearing on it.  If no one has any comments, I'll approve it

23 as submitted.

24          MS. MORGAN:  Thank you, Your Honor.  Do you need

25 another copy of the order?

1            THE COURT:  No, I have it, thank you.

2            MS. MORGAN:  Thank you, Your Honor.  Your Honor, item

3   six is JP Morgan Chase Bank's motion for relief from the stay

4   and I'm pleased to report that this matter is resolved,

5   however, not without a couple short speeches, starting with one

6   from the moving party, Your Honor, and I will cede the podium.

7            THE COURT:  All right.

8            MR. LANDIS:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10           MR. LANDIS:  Happy New Year.  Adam Landis from

11  Landis, Rath, and Cobb for the record, on behalf of JP Morgan

12  Chase Bank.

13           Your Honor, this matter has been resolved at least

14  conceptually by the Debtors consent to the lifting of the

15  automatic stay so JP Morgan can foreclose and otherwise act

16  appropriately with respect to its construction loan assets.  We

17  had hoped, Your Honor, instead of just having a bare consent,

18  that we'd be approaching the Court with a full stipulation so

19  we could do our best to work together on a cooperative basis

20  with the Debtors to have these assets liquidated, minimize

21  claims but as it stands, what I have for the Court today is a

22  very bare bones order that just provides for relief from the

23  automatic stay, a modicum of cooperation from the Debtors and

24  rights reserved with respect to all matters, all other

25  collateral, all claims, collateral valuation, et cetera.

7

1           JP Morgan Chase is happy go forward on that basis,

2  although a little disappointed that we couldn't get to a full

3  blown stipulation.  Reasons for that, really, aren't germane to

4  today's proceedings, but we did want to let the Court know a

5  couple of things in connection with the entry of this order.

6           The first is that we have, at the Debtors request,

7  excised from our proposed form of order, all sorts of findings

8  with respect to 362(d) and the appropriateness of the relief.

9  Your Honor, JP Morgan Chase stands here today believing that

10 based on the circumstances in the case, based on the

11 allegations set forth in the motion which we no longer have to

12 go forward and prove up, given the Debtors consent, but based

13 on them nonetheless, there could be no argument made that

14 there's cause to lift the stay, that the Debtor doesn't have

15 equity in these properties and that these properties aren't

16 necessary for an effective reorganization.

17          In fact, JP Morgan Chase filed the motion only after

18 the Debtors had filed their own  motion and obtained an order

19 seeking to sell these properties.  Unfortunately, the auction

20 for these properties that was supposed to be held, was not held

21 because the only bidder for any of these properties, was JP

22 Morgan Chase.

23          Based on that, Your Honor, we believe that lifting

24 the stay is appropriate.  We're pleased that the Debtors have

25 agreed and consented to the relief.  We're also pleased we

**J&J COURT TRANSCRIBERS, INC.**

1 don't have to take up a lot of time putting on an evidentiary

2 hearing, but we are, again, as I mentioned, disappointed that

3 we don't have a full blown stipulation for Your Honor to

4 provide for some other types of cooperation that we were

5 looking for.

6        However, with that, I know the Debtors have a speech

7 to make on their own and I don't want to stand in the way of

8 that.  I do want to approach, however, with a proposed form of

9 order which has ben blacklined for you convenience.  The

10 Debtors have looked at it, I understand that they are fine with

11 it.  Creditors Committee, I believe, is held up on a train.

12 It's been read to them, I don't think they've seen it and held

13 it physically.  So, I'm sure they're going to want to take a

14 look at it, but we have a blackline for them.  But I would

15 approach with a blackline and a clean version for Your Honor.

16        THE COURT:  Okay.  Thank you.

17        MR. LANDIS: With that, Your Honor, I'll yield the

18 podium to Mr. Brady who has already advised that he has a

19 little speech --

20        THE COURT:  All right.

21        MR. BRADY:   Good morning, Your Honor.

22        THE COURT:  Good morning.

23        MR. BRADY:  Robert Brady on behalf of the Debtors.

24 Your Honor, in this instance, this motion involves about 17

25 construction loans.  It was actually the subject of an earlier

1  stipulation Your Honor signed where JP Morgan Chase was

2  actually funding these loans, post petition.

3          In this case, it's 17 loans, it's not a big issue,

4  but it is a larger issue in the case because the return of

5  rights, the return of loan files can be very expensive.  In

6  other instances in the case as Your Honor will recall, we've

7  done stipulations where people -- where they've picked up the

8  costs, the out of pocket costs, either on a flat fee or a per

9  loan file for the Debtors pulling these files, shipping them to

10 the location, et cetera.  Here what we've agreed to do is

11 cooperate to return the servicing files and the servicing

12 information on the loan files to JP Morgan Chase, but as is

13 commercially practicable and given the Debtors status as a

14 Debtor-In-Possession.

15         We liken this, Your Honor, to leases, retail leases

16 that often require the Debtor to return the premises in broom

17 clean condition.  In many instances, it's economically

18 infeasible for the debtor to do out and spend administrative

19 dollars to clean out a store whereas the landlord will clean it

20 out and include it as part of their claim.  Here, many of these

21 documents requires the Debtor to return a laundry list of

22 information, some of which the Debtor may have or may not have.

23 We're going to give  JP Morgan Chase everything we have.  But

24 to the extent the documents require us to return something we

25 don't have, we don't intend to go incur the cost to get it.  If

1  JPMC needs to go get it, we would expect them to include that

2  as part of their claim. But the parties have reserved all

3  rights in that respect.  But that is why it is a larger issue

4  than this, perhaps, this very small 17 loan portfolio may

5  indicate.

6       Now, I did promise Mr. Indelicato, I spoke to him

7  this morning, he indicated the train was running late, that

8  before the order was entered, he would get a look at it and I

9  think he's doing that now and we'll give him some time if

10 that's acceptable to the Court.  But, otherwise, Your Honor,

11 the consensual form of order is satisfactory to the Debtor.

12      THE COURT:  All right.  Well, let me look at it.  We

13 can look at it together.  Mr. Indelicato, good morning.

14      MR. INDELICATO:  Good morning, Your Honor, Mark

15 Indelicato from Hahn & Hessen on behalf of the Committee.  Your

16 Honor we have no problem with the entry of the order.  As

17 indicated, we've been working with the Debtor to try and

18 resolve this on a consensual basis and we approve the entry of

19 this order.

20      THE COURT:  All right.  Anyone else wish to be heard

21 in connection with this matter?  All right, I'll approve the

22 order as submitted.  Sorry, Mr. Indelicato, I didn't realize

23 you weren't here.  We could have waited  for you, but I'm glad

24 you made it.

25      MR. INDELICATO:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  The trains run late when it's too hot,

2 they run late when it's too cold, they run late when it's too

3 dry, they run late when it's too wet.

4          MR. INDELICATO:  It's a book in the making.

5          THE COURT:  Yes.  All right, item seven.

6          MS. MORGAN:  Your Honor, we are prepared to go

7 forward with item seven, but we had a request from the moving

8 parties in item eight.  I believe one of the counsel involved

9 is strictly observant of the Sabbath and was concerned about

10 waiting until after seven.  So, if it is acceptable to the

11 Court, it's acceptable to the Debtors to bump eight up ahead.

12          THE COURT:  Fine.

13          MS. MORGAN:  And I will cede the podium to the moving

14 parties, Your Honor.

15          THE COURT:  All right.

16          MR. HUGGETT:  Your Honor, Jim Huggett for the movant

17 in the matter from Margolis Edelstein.  Jack Raisner from the

18 firm Outten and Golden in New York City is here.  Mr. Raisner

19 is counsel to the movants in the underlying action.  He's been

20 admitted pro hac in this case already.  I want to thank the

21 Court for the accommodation, as well as Mr. McMahon who I know

22 has busy schedule today, for agreeing to bump us up ahead and,

23 again, it is because of the Sabbath.

24          THE COURT:  Very well.

25          MR. HUGGETT:  With that, Mr Raisner.

1          MR. RAISNER:  Thank you, Your Honor.  The movants are

2   plaintiff in a wage and hour claim against American Home

3   Mortgage.  This is a discrete class of employees known as loan

4   officers.  These are the ones who originated and sold the

5   mortgage loans for the company in the retail level for the most

6   part.  The claim in federal and state laws are that these

7   individuals worked extreme numbers of hours and were not paid

8   overtime and both federal and state laws require overtime to be

9   paid for individuals in this class because there's no exemption

10  which would preclude their earning overtime.

11         We are concerned that these putative class members

12  are going to be barred from this action unless their proof of

13  claim will be honored as good and free of objection, and

14  timely, when we file them now.  If we do not have that type of

15  order in place, then we would ask for an extension of the bar

16  date so that we are able to collect these individuals as it

17  were, by having them get a notice that there is this action and

18  giving them an opportunity under federal law, to send in what

19  is called an opt in notice that will preserve their rights

20  before the bar date expires.

21         Under federal law, unless one does have an opt in

22  notice filed in the case, they are barred through the statute

23  of limitations from ever bringing their claim and so, their

24  statute of limitations are running until an opt in notice is

25  filed.  Obviously, if it's filed after the bar date, it's too

1  late for them to enjoy relief of the claim.

2          THE COURT:  Well, you have to explain that more to me

3  because the statute of limitations against the Debtor isn't

4  running.

5          MR. RAISNER:  Correct, but the bar date would

6  preclude the individual from being part of the bankruptcy

7  proceeding unless their opt in form is received by the Court

8  before the bar date.  So, as a matter of bankruptcy law, the

9  bar date will preclude them from being party to the action.

10          THE COURT:  The bar date doesn't preclude them from

11  being a party to the action, it precludes them from asserting a

12  claim unless they file it prior to the bankruptcy.

13          MR. RAISNER  They have not filed a -- under the

14  federal statute, Fair State Labor Standards Act, the opt ins

15  are not parties to this action.  The filing of the action did

16  nothing to --

17          THE COURT:  I understand, but they still have claims.

18          MR. RAISNER;  They have claims, but unless they are

19  able to assert the claim prior to the bar date, they will not

20  be able to be part of the bankruptcy proceeding.

21          THE COURT:  So, I guess the missing step of what I'm

22  missing in your analysis is, these people have claims against

23  the Debtors, they received the bar date notice presumably.

24          MR. RAISNER:  No, they haven't.

25          THE COURT:  If they haven't, the bar date doesn't

1  apply to them.

2       MR. RAISNER:  Well -- we don't know who has and who

3  has not.

4       THE COURT:  If they're known -- well, if they're

5  known creditors and they don't get a bar date notice, there's

6  no bar date against them.  If they're unknown creditors,

7  publication notice would suffice.  I would assume that the

8  filing of the lawsuit asserting a putative class that would

9  include these employees, puts the Debtor on notice that these

10 employees are known creditors.  So, if they didn't send the bar

11 date notice, then the bar date won't apply.  If they sent a bar

12 date notice, then these people have to file a claim like

13 anybody else.

14      MR. RAISNER:   At this point we don't know who the

15 bar list includes -- the notice list has 10,000 people, we

16 don't know to whom -- who has been sent notice.

17      THE COURT:  Well, my point is -- so, you want stay

18 relief to allow you to go to federal court to get the class

19 certified.

20      MR. RAISNER:  There are two -- on the federal level

21 we would like to have a notice, what's called conditional class

22 certification which allows us to send the notice and to have

23 those who wish to participate do so, and be secured that they

24 are --

25      THE COURT:  How is that any different from the notice

1 they've already received, which is, if you have a claim file

2 it?

3         MR. RAISNER:  Most of these people don't know that

4 there is a federal overtime action that was filed in the

5 summer.

6         THE COURT:  They don't know they have a claim against

7 the Debtor.

8         MR. RAISNER:  They don't know that they have an

9 overtime claim, correct.

10         THE COURT:  All right.  So, and the case was filed,

11 obviously, prepetition.

12         MR. RAISNER:  Correct.

13         THE COURT:  When is the bar date?

14         MR. RAISNER:  The 11th.

15         THE COURT:  Of January?

16         MR. RAISNER:  Correct.

17         THE COURT:  All right.  Well, let me hear the Debtors

18 response.

19         MR. DORSEY:  Good morning, Your Honor, John Dorsey on

20 behalf of the Debtors.  Excuse me, I'm still recovering from a

21 cold.  Going to the issue that the Court raised first, which is

22 the bar date notice, all employees who were employees of the

23 company immediately prior to the filing of the bankruptcy have

24 received actual notice of the bar date.

25         Those who could possibly be a part of this class, who

1 were employees and this is part of the issue that the Court

2 needs to consider, under New York law which is one of the

3 claims that they've raised in this case pending out in

4 California, the statute of limitations is six years.  There

5 could be somebody who worked as a loan officer in New York for

6 the Debtors five, six years ago, that may or may not have a

7 claim based on this purported class action.  Those persons who

8 we wouldn't know, they're unknown creditors because they don't

9 know that they have a claim, they received notice by

10 publication.  It's not the Debtors obligation to go out to

11 potential creditors and say, oh, by the way, you may have a

12 claim under the FLSA so, you should file your proof of claim.

13 They're charged with knowing that they have a claim against the

14 Debtors and bringing that claim.

15          The other thing that the movants brought up in their

16 papers is, well, we could file, or they ask permission from the

17 Court to file a class action class claim.  They're certainly

18 free to do that, it may not be effective until a class is

19 actually certified, but they could bring a class action claim,

20 file it here in this court, and we could litigate the issue

21 about whether or not there is a class action or not here, which

22 would be more effective for the Debtors and for the other

23 creditors in this case because and we have Mr. Wenger here who

24 could testify, he submitted an affidavit, but he would testify

25 that this process for obtaining class certification, even

1  interim class certification, is not a simple, file a motion,

2  file a response and have a hearing.  This entails hours, months

3  and months of discovery, requires depositions, it requires the

4  Debtors to investigate who the potential class members are.

5        In this case, looking back to the six years and

6  giving -- thus is just a guesstimate at this point as to the

7  potential number of purported class members, is up to 10,000

8  people.  And, the Debtors haven't even answered the complaint

9  yet in California.  So, the first step, even if the stay gets

10 lifted and we go back to California, the Debtors are going to

11 have to do an analysis of who is or is not a part of this

12 class, they're going to have to take discovery about who is or

13 is not a part of this class.  They have to respond to the

14 complaint, either answering it or moving to dismiss, which are

15 both options.  A third option which we were not aware of at the

16 time we filed our papers, but there's another class action

17 pending in Oregon.  It was pending a year before this class

18 action was filed in California.  Discovery had started to

19 proceed in that action, in Oregon.  They didn't even get notice

20 of this motion to lift the stay, to allow the Abrams class

21 action to go forward.

22       One of the options that the Debtors have would be to

23 ask the court in California to change venue to Oregon, where

24 there's already been a prefiled class action, where discovery

25 has already gone forward and that plaintiff isn't even here to

1  protect his interests.  So, I think on that basis alone, the

2  Court can't grant the relief at this time.

3        But our suggestion, Your Honor, would be to allow the

4  plaintiffs, the movants, to file their purported class claim

5  here and we'll litigate it here and have this Court supervise

6  that process.  We can move it forward in a more timely,

7  efficient manner than would happen in California and we can get

8  this resolved without having to wait, you know, months down the

9  road before we even start the process.

10       THE COURT:  Well, even if I take your suggestion

11  correctly, you'd like to A) allow them to file, in effect, a

12  class action proof of claim and then have me decide whether the

13  class should be certified?

14       MR. DORSEY:  Correct.

15       THE COURT:  All right.  Well, doesn't that -- to do

16  that, I'd have to -- you'd still have to go through all the

17  discovery and issues that you say you don't want to go through

18  in California.  Why would that be more efficient here than in

19  California?

20       MR. DORSEY:  Well, it would be more efficient here,

21  Your Honor, because Your Honor is aware of what's happening in

22  this case and the Court can regulate the schedule without --

23  the court in California is not going to know what's going on in

24  the bankruptcy case.  He's not going to know what the officers

25  and directors are engaged in at the time.  At this point, right

1 now, today, and for the next several months, it might be

2 difficult for the Debtors to engage in that process, given the

3 amount of time and effort it takes to investigate the potential

4 class.

5        If we're here, in front of this Court, Your Honor is

6 fully aware of what's going on in the case, you can regulate

7 the schedule on discovery, you can regulate the schedule on the

8 filing of the motion for class certification and we can go

9 forward in a more efficient manner here than I think we could

10 out in California where we're subject to the vagaries of that

11 court's schedule, which we don't know what it's going to be.

12 Mr. Wenger would testify going forward in San Francisco could

13 take three years to get this thing resolved.  We certainly

14 can't wait three years in this case.  I don't think the

15 Creditors Committee wants to wait three years.

16        THE COURT:  I apologize.  I mean, I frankly did not

17 have an opportunity to review these papers before the hearing,

18 so I'm asking a lot of questions that would probably be -- it's

19 probably painfully obvious I did not read the papers prior to

20 the hearing, but is the lawsuit pending in federal court or

21 state court?

22        MR. DORSEY:  It's pending in federal court in San

23 Francisco, Your Honor.

24        THE COURT:  All right.  It's assigned a judge in that

25 case?

1          MR. DORSEY:  It is assigned a judge, Your Honor.

2          THE COURT:  All right.

3          MR. DORSEY:  But no answer has been filed, no motion

4    for certification of class has been filed.  It's just the

5    complaint that has been filed.

6          THE COURT:  Well, it's been stayed since the filing

7    of the bankruptcy.

8          MR. DORSEY:  Been stayed since the filing of the

9    bankruptcy.  Which and again the Oregon matter has been going

10   forward for over a year and that discovery process on who is

11   included in that class has been going forward.  So, there's

12   already been some discovery done.  Not complete, but there's

13   been some discovery done.

14         I believe, Your Honor, the amended complaint in the

15   Abrams action was filed at the end of July.  So, the time for

16   the Debtors to answer had not even run before they filed for

17   bankruptcy.

18         THE COURT:  Give me just a moment, please.  Well, the

19   issue that's sort of pushing the movants to really seek some

20   sort of relief from the Court is the upcoming bar date.  And I

21   don't -- let me sort of ask you, Mr. Dorsey, can the Court

22   allow the filing of the proof fo claim on behalf of the

23   putative class without at the same time  committing itself to

24   exercise jurisdiction over whether or not that class should be

25   certified?

1          MR. DORSEY:  Well, I think --

2          THE COURT:  I  know you want me to --

3          MR. DORSEY:  I think what would happen, Your Honor,

4    is if the issue did not come up, if the movants didn't file a

5    motion to have the class certified under class claim, it would

6    be as if the claim was never filed.  It would have been

7    ineffective.

8          THE COURT:  Right.

9          MR. DORSEY:  However, I think a prudent individual

10   who is a putative class member, would not just rely upon the

11   filing of the purported class action claim, they would also

12   file an individual claim, if they believed they had one.  For

13   those who actually received notice, either actual notice or

14   constructive notice, through publication and to the extent they

15   didn't and they don't -- to the extent they did receive notice

16   and they don't file an individual claim and the Court

17   subsequently does not certify the class, then those people are

18   out of luck.  They've lost their claim.  And that's the way it

19   works in bankruptcy, every day, Your Honor.

20         THE COURT:  Well, that's right, I mean, but that --

21   counsel says, you know, most of these people don't even realize

22   they have a claim.  So, even if they were go to down the road,

23   in federal court in California, of trying to get the class

24   certified, and for whatever reason the California court didn't

25   classify or certify the class, the vast majority of those

1  potential class members would never assert those claims against

2  the Debtors in any event.  I mean, if they don't proceed -- the

3  practical reality is, if they don't proceed by class in the

4  lawsuit, in all likelihood, they won't proceed at all, and

5  that's nothing different from the proof of claim situation

6  where the vast majority of the people don't realize they have a

7  claim under this statute, and if I allow a class filing,

8  subject to a later determination, either by this Court or some

9  other court of appropriate jurisdiction as to whether the class

10 is, in fact, certified, and I ultimately disallow it, or it's

11 disallowed, excuse me, the class is not certified by whatever

12 judge is given the power to do that, okay, 95 percent of the

13 class members didn't file individual proofs of claim and they

14 have no claim.  But that really hasn't changed the world as it

15 would haves existed if the bankruptcy hadn't been filed.

16          MR. DORSEY:  I'm not an expert on class action labor

17 law issues, Your Honor, but --

18          THE COURT:  I certainly am not either, although

19 you're trying to make me one.  So, that's a little disturbing.

20          MR. DORSEY:  From my understanding, that's the way it

21 works outside of the context of bankruptcy.  I mean, a class

22 action get filed, the purported class either gets certified or

23 does not get certified.  If it gets an interim certification

24 which is what the plaintiffs are purportedly seeking here, that

25 can be turned around later.  So, they could get an interim

1  class certification, send out the notices, hundreds of people

2  could opt in, the Court could subsequently determine after full

3  discovery and a full hearing on the issues that, no, there

4  shouldn't have been a class, I'm going to decertify it, and now

5  all those individuals have to come back and file an individual

6  claim against the company, if they believe that they that

7  claim.  So, there would be no difference between what happens

8  outside of bankruptcy and what happens inside bankruptcy.

9        THE COURT:  I guess that's my point.  All right, let

10  me hear from the movant.

11        MR. HUGGETT:  Your Honor, Jim Huggett for the

12  movants.  I apologize for the tag teaming, but if I may just

13  point out one or two things.  We're seeking to fashion some

14  form of effective relief that solves what we perceive, and I

15  think is clearly a conflict, between the pending bar date

16  notice or the pending bar date, and the problem that these

17  people don't realize that they have FLSA claims, as co-counsel

18  indicated.

19        I understand there's a whole bunch of theoretical

20  things indicated in the movants papers and some of them were

21  mentioned by Mr. Dorsey, if you grant relief from stay, they

22  may wish to do this and they may wish to do that and they may

23  wish to do the other, but I need to respectfully suggest that

24  that's not saying a lot more than saying that the federal

25  courts are always open and will accept any pleading that's

1  filed.  I don't think preparing an answer to an eight or nine

2  page complaint is something that is beyond the scope of an

3  organization of this size and --

4          THE COURT:  No, but you have the automatic -- they

5  don't -- there's a reason for the automatic stay.

6          MR. HUGGETT: Yes, Your Honor.

7          THE COURT:  And that reason is to allow them a

8  breathing spell from this type of litigation to try to figure

9  out how to liquidate and reorganize their assets.  And there's

10 a reason for a bar date, which is to centralize claims against

11 the Debtor to figure out what they're owed, what they're not

12 owed, figure out how claims will get paid and to discharge the

13 Debtors from its claims.  I mean, there's a process for a

14 reason.

15          MR. HUGGETT:  All that is absolutely true, Your

16 Honor, but the problem is that we need to get class

17 certification and the class definition out of the way one way

18 or the other and I would respectfully submit that it's better

19 to do it sooner rather than later, so we know in one way shape

20 or form --

21          THE COURT:  Well, it'll get done when it gets done.

22 I mean, it may be appropriate -- it may be that they have no

23 objection, like they had no objection in the Warren Act matter

24 that you brought on behalf of different plaintiffs.

25          MR. HUGGETT:  I was just going to point that out.

1        THE COURT:  Or it may be that they do and it needs to

2   go through the discovery processes, I don't know.  And, I don't

3   think we need to lock them in on that.

4        MR. HUGGETT:  Here's what we're trying to prevent, to

5   sort of nail it down to more specifics.  Most -- as I

6   understand it, just about every jurisdiction that has

7   considered the issue or every court of appeals that has

8   considered the issue, though not this one, has decided that

9   class proofs of claim are allowed and appropriate in the

10  bankruptcy context.  And so, we're going to file a class proof

11  of claim if it hasn't been filed this morning.  You'll see one

12  anyway.

13       But the worse case scenario is that ultimately a year

14  down the road, Your Honor asked about the timing and the

15  procedure, how this is going to work interacting with that

16  court, the worse case scenario is that nothing goes forward in

17  the California litigation, two years from now Your Honor enters

18  an order on briefing from the parties that says I don't believe

19  class proofs of claim are appropriate or allowed in bankruptcy,

20  and so this class proof of claim is denied and then we're left

21  with the situation where parties who may have received bar date

22  notice, either actual notice or through the publication that

23  Mr. Dorsey indicates, had no idea, whatsoever, that they had

24  FLSA claims or that they had -- I know you didn't get to read

25  the papers carefully, but it's no just FLSA, it's also

1  analogous wage and hour laws of the various states.

2          THE COURT:  Understood.  But my understanding is and

3  maybe I'm incorrect, that the Debtors are not saying that

4  they're reserving their right to say that the filing of a class

5  proof of claim is inappropriate or disallowed, they're

6  reserving their right to contest whether or not the class

7  should be certified.  If the class is ultimately not certified

8  by an appropriate judge, the filing of the class proof of claim

9  is a nullity, but it has nothing to do with whether or not the

10 filing of a class proof of claim is allowed or not allowed, it

11 has to do with the fact that the premise, the factual premise

12 doesn't exit any more.

13         MR. HUGGETT:  May I respond to those two things?

14         THE COURT:  Yes.

15         MR. HUGGETT:  If it's the former, that if they're

16 waiving the right to argue that class proofs of claim are

17 inappropriate or inapplicable in bankruptcy, that's fantastic,

18 that would be a great result and I would love to get that on

19 the record, so hopefully, we could follow up on that.  I note

20 we haven't heard anything from the Committee either, in this

21 particular one, and the Committee may wish to sound off on that

22 point.

23         If it's the latter, which is a circumstance that some

24 court, either this one or the Northern District of California

25 declines to certify the class, then I certainly agree with you,

1    that's the end of the matter, but our position is that we may

2    as well get that out of the way sooner rather than later and --

3    THE COURT:  Well, why?  Because the rest of the

4    lawsuit is not going to go forward.

5    MR. HUGGETT:  Well, but that's our point, is that all

6    we want to do is file a motion for a conditional certification

7    of a class that sends notice to these people and gives them a

8    limited extension of time, be it 60 days or 90 days, to get out

9    -- excuse me, to return an opt in form.  And so that's --

10    THE COURT:  That's my question, what does that

11    accomplish?

12    MR. HUGGETT:  It helps us to identify the number of

13    claimants. I think it helps the Debtors, frankly, because it

14    sets -- the size of the class is a critical issue here.  I

15    believe we have 58 to 60 plaintiffs that have so far returned

16    opt in forms.  Counsel indicated to me that he thinks there

17    could be as many as several thousand class members.  At the

18    podium, counsel indicated that number could rise as high as

19    10,000 and could even potentially be consolidated with another

20    lawsuit, with another putative class.

21    So, when we're talking about 58 to 10,000 or

22    somewhere in between, I think it's in everybody's best interest

23    to get this resolved, if we can do it in a manner that is

24    efficient and we think we can in the Northern District of

25    California court.  I don't think Your Honor needs to take --

1  I'm not sure I would refer to it as a jurisdictional matter or

2  not, I don't think Your Honor needs to "yank" this into this

3  court and make a decision.

4          If you force us to do so, you know, we would --

5          THE COURT:  Well, I agree with you, I don't think

6  it's jurisdictional, I think it would be question of whether I

7  would abstain, frankly.

8          MR. HUGGETT:  Yes, and I know Your Honor realizes

9  that in this case, and  in multiple others that we have, as you

10 indicated what we have done is filed an adversary proceeding

11 here, you know, and that may be the solution.  But, again, I

12 want to point out that, I know you didn't get a chance to look

13 at these papers, but if you look at the first amended complaint

14 that we filed and you see what we're asserting, it's not just

15 FLSA claims.  From time to time you have looked over this

16 podium and said to me, well Mr. Huggett, I can apply federal

17 law, you know, non-bankruptcy law and state law and I do it all

18 the time, and asked me to respond to that.  So, before you say

19 that, I want to point out that it's not just FLSA issues in the

20 first amended complaint, it's multiple state wage and hour

21 laws, issues such as whether California employees got

22 appropriate mealtime, whether they got paid for mealtime,

23 whether they got paid for breaks and things of that sort.

24         So, when you're looking at this issue from the

25 perspective of the bankruptcy judge, I need to submit that

1 those are really California issues , they're matters that

2 should be decided in the California court.  This is why we seek

3 relief from stay, to have the California court do this.

4 They're really just unconnected in any way with liquidation or

5 with the restructuring of the balance sheet that's going on

6 here.

7        And I did note that Mr. Dorsey made the point, which

8 is obviously a correct one, you know, you might have your

9 finger a little better on the pulse of what are the Debtors,

10 officers and directors doing at a particular time and so on and

11 so forth, but other than that, the argument that you should

12 take this and either not let us go forward in California or

13 take this adversary proceeding and turn it into an adversary

14 proceeding here, because you're more familiar with the hot

15 button issues in the case, I just don't think that could be

16 squared with the amended complaint.

17        Whether California loan officers did or did not get

18 appropriate mealtime under the FLSA, or under California state

19 law or New York state law, these issues have nothing to do with

20 the hot button issues in this bankruptcy case and they're

21 irrelevant to the restructuring of the balance sheet.

22        The last thing, I'm absolutely sensitive to the

23 concerns Mr. Dorsey raises, which is, you know, we don't want

24 directors and officers spending a tremendous amount of time on

25 this and so on and so forth.  Again, to get back to what I said

1  at the beginning, that's why we seek a limited form of stay

2  relief.  We're not looking to have any authority, other than to

3  file a conditional class cert. motion.   And, how much time

4  that's going to take for the directors and officers is a matter

5  that Mr. Wenger who, I believe, submitted an affidavit, can

6  advise you on.  Mr. Raisner can certainly advise you on it.

7  But I think if the Debtor comes to you, as I said in the

8  beginning, and asserts that you shouldn't grant relief from

9  stay, they'll be substantially prejudiced because there are a

10  number of motions that they may consider filing at some point,

11  that simply doesn't rise to the level of prejudice that is

12  necessary to block the relief.

13          Again, I don't know if the Court had additional --

14          THE COURT:  Well, he doesn't need to show prejudice

15  to block your relief.  You need to show cause to get relief.

16          MR. HUGGETT:  Yes, Your Honor.

17          THE COURT:  So, we can't flip it.

18          MR. HUGGETT:  Understood.

19          THE COURT:  All right.  Well, let me just see, Mr.

20  Dorsey, am I correct that the Debtors position, in my

21  recitation of the Debtors position, at least for the purposes

22  of this motion in connection with the filing of a class proof

23  of claim.

24          MR. DORSEY:  Well, I think, Your Honor, the Debtors

25  first position is that they don't meet the burden to show that

1 the stay needs to be lifted at this time and that there would

2 be prejudiced to the defendants in having -- the Debtors, in

3 having to go forward with this class certification.  Again,

4 it's not a simple filing a motion, response.  It, in and of

5 itself, requires a great deal of work, a great deal of

6 discovery, a great deal of time and effort on behalf of the

7 Debtors officers.

8        What our position is, is they can file their class

9 proof of claim and I will state on the record we will not

10 object on the grounds that a class proof of claim is not an

11 appropriate vehicle in the context of a bankruptcy proceeding,

12 and we can have this Court decide whether or not there is or is

13 not a class claim in this context.

14        It doesn't require the filing of an adversary

15 proceeding.  Once they file their class proof of claim, they

16 file their -- we object to it, we have a contested matter and

17 we can go forward on that basis, we don't need to have -- and

18 this is really a core proceeding, Your Honor.  I mean, we're

19 talking about potentially thousands of class members, and some

20 of those may have priority claims, some may have just regular

21 old prepetition unsecured claims.  Those are core issues that

22 this Court would have to decide.  And it's going to affect the

23 distribution to the unsecured creditors.

24        If there are 5,000 just pulling numbers out of thin

25 air, 5,000 members of this class, all of them entitled to a

1 priority claim of 10,000 whatever the number is at this point,

2 for capping prepetition wage claims, we're talking millions and

3 millions of dollars, which is going to affect the distribution

4 to the unsecured creditors.

5        THE COURT:  Let me hear from Mr. Indelicato on the

6 class issue.  Filing of a class proof of claim, and anything

7 else you want to be heard on.

8        MR. INDELICATO:  Thank you, Your Honor.  Since I've

9 been invited to sound off, I think I will.  Your Honor, there

10 are several issues that I think we should look at when you

11 analyze this motion.  I think Mr. Dorsey is correct, I think

12 plaintiffs' have not met their burden to get relief from the

13 stay in this action.

14        This is one of those issues where the Committee looks

15 very closely at, particularly the potential legal fees

16 associated with any discovery and analysis of who the class is

17 with respect to what the ultimate beneficiaries may be

18 receiving, or what the lawyers may be receiving.

19        We think, Your Honor, as happens a lot of times in

20 these cases and it's happened in other cases and it will happen

21 in this case as it relates to this and Warren, really when you

22 look at the nature of the actions, you've got to consider them

23 in a couple of different areas.

24        First, as Mr. Dorsey pointed out, I think there are

25 unique issues which this court is equipped to address and that

1  is the distinction is whether or not the class should be

2  certified.  There may be people who have $10,950 priority

3  claims and then there may be people who had claims that are

4  pure unsecured claims that were incurred five years ago.  Are

5  those parties, should they be in the same class, should they be

6  -- should ceratin parties be saddled with the discovery of

7  states in which it has a six year statute of limitations as

8  opposed to easier discovery where they have two year statute of

9  limitations?  The defenses in all of the states may be

10 different. Is this appropriate to have sis states consolidated

11 under one class proof of claim?  That's an issue I think this

12 Court is uniquely able to determine as opposed to the state

13 courts.  The state courts will only look at the state court law

14 or the federal law, without the overlay of the bankruptcy.

15 Although they are capable of determining the bankruptcy, they

16 are not fully aware of what's going on in the bankruptcy.  So,

17 I think it's an important fundamental aspect when you look at

18 whether a class action should proceed in state court or federal

19 court, if there's a dichotomy between the priority and the

20 unsecured I think, really, it's appropriate to have at least

21 those issues decided in the bankruptcy court.

22        Your Honor, the other issue that I think we really

23 need to focus on is the nature of the claims, the nature of the

24 parties and I don't believe that there is anything wrong with

25 the Debtors suggestion.  I think class proof of claim, at least

1  initially, is appropriate. I think that gives the plaintiffs

2  what they're looking for. I don't think they need the

3  additional time to file the proofs of claim, if the Court

4  grants them.  They do so by the way, at their own peril, I

5  believe.  I think it would be incumbent upon any of the

6  employee who did get notice to file whatever proofs of claim

7  they think they're entitled to.  But if they have chosen to go

8  in this route and file the class proof of claim and have the

9  Court determine whether class certification is appropriate, I

10  think that's the way to go.

11       I think what we need to be mindful of in this case,

12  Your Honor, is not to let the case take on a life of its own.

13  I think it needs to be dealt with in the bankruptcy, in the

14  context of the nature of the claims.  If we are talking about a

15  majority of unsecured claims, it should be dealt with in a

16  negotiated process and not spending all of the money on the

17  litigation regarding who is in the class, who is not in the

18  class and all those other issues.  It's the way we would intend

19  to deal with the Warren Act claims and the way we intend to

20  deal with employee claims in general.

21       So, I think, Your Honor, they have not met their

22  burden.  I think the Debtors suggestion of a class proof of

23  claim in the interim is the right way to go and I would

24  respectfully request that's the way the Court should rule.

25            THE COURT:  All right.  I'm sorry, yes, sir, do you

1  have anything further?

2         MR. RAISNER:  I just wanted to correct a

3  misconception.   In the overtime context particularly the FLSA,

4  it is almost cost free to the defendant, for us to proceed with

5  conditional class cert.  Normally that motion is made on the

6  basis of several declarations that we will give to the district

7  court on the basis of which we will incur the cost of sending

8  out notice to the list that we are provided.  There is normally

9  not any discovery before conditional class cert. is allowed.

10         All of the facts in this case are on the defendant's

11  records.  Who these people are, what they did, how many hours

12  they worked, whether they worked inside, whether they worked

13  outside.  They don't have to do discovery on that, that's all

14  in their system.  In fact, it was their burden to be able to

15  show that these individuals were exempt, they've kept those

16  records.  So, this is not an extensive process necessarily to

17  figure out who is in this class or not and the conditional

18  class cert. state, which means sending out a notice is cost

19  free to the defendant.  If they just give us the list, we will

20  send it out, we will see who comes back, those people will know

21  that they are locked into the case whether there is going to be

22  certification or not because they have filed a timely proof of

23  claim, and opted in.

24         THE COURT:  All right.  Thank you.  Well, here's what

25  I'm prepared to do today.  It's really up to the Debtor and the

1  Committee, what they're willing to do, because I think that the

2  upcoming bar date really does create a problem that needs to be

3  addressed and may be sufficient, in and of itself, to establish

4  cause to lift the automatic stay to allow the court in

5  California to go forward with deciding whether or not

6  certification of class is appropriate.  If I'm going to allow

7  that, I'm going to have to, at least for purposes of those

8  claims related to that complaint, extend the bar date until

9  such time as that's decided.

10      But what I am willing to do in the alternative, is to

11  enter an order today allowing the plaintiff's counsel to file a

12  class proof of claim on behalf of the putative class, provided

13  that the Debtors and the Committee waive the right to argue

14  that the filing of a class proof of claim is inappropriate.  Of

15  course, subject to a full reservation of their rights to argue

16  that the class itself shouldn't be certified.

17      I am not going to commit today, or decide today,

18  whether I will exercise jurisdiction to determine whether or

19  not the class should be certified.  That's, I think, a decision

20  that can wait another day, either through the filing of an

21  adversary proceeding or a claim objection, or some other

22  vehicle, or perhaps at a later date, a motion for relief from

23  the automatic stay as the case is, perhaps, further developed

24  to allow the California court to go ahead and do that.  But if

25  the Debtors or the Committee don't wish to proceed that way, I

1  think the only other thing to do, frankly, is to provide the

2  relief requested, which is to lift the automatic stay to allow

3  the California court to go forward on the class certification

4  and to extend the bar date pending that decision as it pertains

5  to the asserted claims.

6          So I will enter an order today allowing for lifting

7  the automatic stay to allow for the filing of a class proof of

8  claim by plaintiffs' counsel, on behalf of the putative class

9  provided that the Debtors and the Committee waive the right to

10 argue that filing such a class proof of claim is inappropriate,

11 but subject, however, to their right and anyone else's right,

12 to argue that the class itself should not be certified.  And it

13 will be without prejudice as to whether or not this Court is

14 going to exercise jurisdiction to make that decision.  I hope

15 that's clear.

16         MR. DORSEY:  That's acceptable to the Debtors, Your

17 Honor.  I would ask, though, that we also -- well, one, I think

18 Your Honor misspoke when you said you would lift the stay to

19 allow the filing of the claim.  I don't think the Court needs

20 to lift the stay to file a claim.

21         THE COURT:  All right.

22         MR. DORSEY:  Also, I think the other class action in

23 Oregon needs to have notice of what's going on here.  The

24 purported class in the Oregon action overlaps. or is nearly

25 identical to this class.  And, I think --

1          THE COURT:  Well, all I'm allowing is the filing of a

2     class proof of claim at this point.  I can only bind those that

3     are in court, who are agreeing to it.  I'm not sure they would

4     have standing to oppose a motion for relief from the automatic

5     stay.

6          MR. DORSEY:  Not to oppose the motion, just so that

7     they're aware that the class claim is being filed, Your Honor.

8          THE COURT:  Well, you know, they know the case is

9     going forward, right?  They got notice of the commencement of

10    the Chapter 11.

11         MR. DORSEY:  They did, Your Honor.

12         THE COURT:  Well, you know, counsel has an obligation

13    to follow through and to monitor what's going on.  I don't feel

14    particularly obligated to reach out to them, but you're

15    certainly free to talk to anybody you like and tell them what's

16    going on.  I don't think it affects the issues that are

17    directly in front of me.  So, I'd like -- let me just make sure

18    I hear from Mr. Indelicato, I want to lock him in, too.

19         MR. INDELICATO:  Your Honor, we have no objection to

20    the proposal by the Court entry of an order permitting a class

21    proof of claim.  We will not object to the filing of the class

22    proof of claim, but will reserve our rights as to whether or

23    not the class is appropriate.

24         THE COURT:  All right, fine.  I'd ask counsel to work

25    together and submit an order under certification of counsel.

1          MR. DORSEY:  We'll do that, Your Honor, thank you.

2          THE COURT:  Anything further on that matter?

3          MR. HUGGETT:  Your Honor, I believe that's my only

4    business before you, if we might be excused?

5          THE COURT:  Yes, of course, thank you.

6          MR. HUGGETT:  Thank you.

7          MR. BEACH:  Good morning, Your Honor, may it please

8    the Court, Sean Beach from Young Conaway, on behalf of the

9    Debtors.

10          Your Honor, this brings us back to item number seven

11   on the agenda, which is the Debtors motion to modify the

12   procedures, the ordinary course professional procedures and the

13   interim compensation procedures with respect to, and only with

14   respect to foreclosure professionals.  Nunc pro tunc back to

15   the petition date.

16          Your Honor, this relief that we're requesting is

17   primarily driven by the situation with the servicing sale where

18   the economic close has occurred and we now have a situation

19   where the working capital of the AHM servicing business is to

20   the detriment or the benefit only of the purchaser.  That

21   working capital of the servicing business is solely what pays

22   servicing advances and all of the payments for compensation to

23   foreclosure professionals are servicing advances.  So, we now

24   have several layers of protection with respect to the payments

25   to these foreclosure professionals.

1          One is that it's coming from working capital of the

2   AHM servicing business and two, that these are servicing

3   advances that are going to be reimbursed and, Your Honor, I do

4   have a witness here today, Mr. Jane Larkin, who is the

5   executive vice president of  default management with AHM

6   servicing who can testify that in her experience. these

7   reimbursements for servicing advances happen almost to a level

8   of 100 percent reimbursement of these expenses.

9          And, I will say, Your Honor, that while this motion

10  is only contested by the Office of the U.S. Trustee, every

11  other party with a potential economic interest in the relief

12  requested to the motion, including the Committee has agreed to

13  the relief requested and with respect to the Committee, we have

14  had discussions with them and we have agreed, based on those

15  discussions, to include in the motion a monthly filing or

16  disclosure of any payments that are made to professionals, to

17  foreclosure professionals so that there is some public filing

18  of what payments are being made to those professionals.

19         Your Honor, I submit to you that this relief is

20  appropriate under either 362 or 392, and that 330 is no longer

21  applicable because the payments to these foreclosure

22  professionals are being made by either non-estate sources, or

23  from non-estate assets.

24         Your Honor, in addition to that, the New Century case

25  had similar relief with respect to foreclosure professionals.

1  In fact, in the New Century case, the debtor relied on the cash

2  management order which provided that advances could be made in

3  the  ordinary course and when they filed their ordinary course

4  professionals order they provided a footnote in that motion

5  that indicated that they were relying for the payment of

6  foreclosure professionals on the case management order, except

7  with respect to foreclosure professionals which were to

8  liquidate loans that were actually owned by the Debtors.  I

9  don't think we even have an issue with respect to loans owned

10  by the Debtors in our case because, again, the payments that

11  are being made for servicing advances are being made from the

12  working capital of the AHM servicing entity.  To the extent

13  that there is a netting of the liquidation proceeds or a

14  payment by AHM Corp., or whoever the owner of those loans would

15  be, that would just be an ordinary course payment by the

16  Debtors or an administrative expense payment by the Debtors,

17  but not a payment to the professional itself.

18          So, Your Honor, I'm happy to proceed with a witness.

19  I know you've heard five days of testimony with respect to the

20  servicing business but if you believe it would be helpful to

21  Your Honor to hear testimony with respect to how the servicing

22  advances are reimbursed and confirmation that those advances

23  are made almost, again, at 100 percent of the advances that are

24  put forth by the Debtors, I can put Ms. Larkin on the stand.

25          THE COURT:  Well, let me hear from Mr. McMahon in the

1 nature of opening argument before we do that.

2        MR. McMAHON:  Your Honor, good morning, Joseph

3 McMahon for the United States Trustee.

4        I really don't know what witness testimony is going

5 to do, Your Honor, with respect to this issue, as a preliminary

6 matter.  As we note in our objection, there's a basic issue

7 that's presented here which is, are the ordinary course

8 professionals, which the Debtors retained earlier on in these

9 cases as being in the best interest of these estates, employees

10 of the Debtors or employees of the purchaser, some third party

11 prior to the final close that's contemplated under the asset

12 purchase agreement with the purchaser.

13        Now, the motion seeks relief, nunc pro tunc to the

14 petition date and from the petition date to the initial close,

15 from our perspective, there's no argument that the purchaser is

16 not involved in that picture at all.  So, there's a time period

17 there where the Debtors are undoubtedly legally responsible to

18 pay the OCP's, putting the purchaser out of the picture and

19 notwithstanding the fact that they were being reimbursed for

20 making servicing advances.

21        The Debtors have indicated previously in describing

22 what's going on with the Ross sales, of economic titles passing

23 at the initial close and legal titles passing at the final

24 close and with that in mind, Your Honor, from our perspective,

25 as a legal matter, the Debtors continue to employ the ordinary

1  course professionals.  As a legal matter in the event of

2  nonpayment, the ordinary course professionals will be looking

3  to the Debtors estates, they will have administrative claims

4  against the Debtors estate, not against the purchaser, not

5  against directly, as a matter, against the loan owners, for the

6  unpaid portion of their fees.

7          And as a legal matter, Your Honor, we even have to --

8  even with respect to the funds that the Debtors are using to

9  pay these persons, to the extent that they are taken from

10 financial proceeds from the limited recourse facility which

11 Ross has provided to the Debtors estates, they are the

12 borrowers under that facility and they extend -- I'm sorry,

13 this Court approved 364 protections for that financing.

14         So, we see this issue, generally, Your Honor, as a

15 benefits burden issue.  In other words, we're in this posture

16 up until the point of the final close.  The reason why we're in

17 this posture is because the purchaser cannot assume

18 responsibility for the servicing business.  And until the final

19 close occurs, we should be adhering to what the code obligates

20 the Debtors with respect to Section 327.  It's a very simple

21 issue from our perspective and I don't think that a

22 representative of American Home is going to provide any useful

23 gloss on that point.

24         To the extent that the Debtors argue that Civil Rule

25 60 is incorporated by Federal Rule of Bankruptcy Procedure

44

1  9024, overrides the application of Section 327.  Obviously, we

2  care to disagree.

3          THE COURT:  Okay.

4          MR. BEACH:  Your Honor, I think the issue, I have to

5  respectfully disagree with the Office of the U.S. Trustee, the

6  issue is not a form over substance issue and waiting till the

7  legal close of this sale, the issue is an issue of what impact

8  this has on -- these payments to these professionals have on

9  the estate.  One thing the U.S. Trustee indicated is that from

10 the petition date to the initial close there were foreclosure

11 professional expenses that accrued during that period of time.

12         To the extent that there were expenses that accrued

13 and were not yet paid, those are the responsibility of the

14 purchaser, essentially, based on payments out of the working

15 capital of the AHM servicing business.  And, again, the

16 purchaser takes all of the benefit and all of the risk of the

17 working capital in that business and Your Honor had made a

18 ruling with respect to adequate assurance of future performance

19 in connection with the servicing sale and the assumption of

20 contracts under the sale and found that this purchaser is going

21 to be able to provide appropriate working capital to pay the

22 expenses of the AHM servicing business through the final

23 closing.  And, I think that ruling supports what we're

24 requesting the Court to do today.

25         In addition to that, Your Honor, Section 327, we're

**J&J COURT TRANSCRIBERS, INC.**

1 not suggesting that 327 is completely inapplicable, we're

2 suggesting that we're still going to have these professionals

3 file their affidavit of disinterestedness and anyone can

4 object.  We're saying that 330 is not applicable now, it may

5 never have been applicable, the more appropriate sections may

6 have been 363 like was used in New Century or 329, which

7 provides that the Court has oversight and can exercise some

8 discretion providing disclosure of, you know, fees that are

9 being paid, but more importantly, Your Honor, with the fact

10 that the payments are being made from working capital of the

11 business which is not going to benefit or be a detriment to the

12 Debtors estates and the fact that these servicing advances are

13 going to be reimbursed and, again, Your Honor, I'm happy to put

14 that testimony on, there really is no impact to the estate

15 here.

16        So, Your Honor, I'd respectfully request that you do

17 approve the relief requested in this motion and I'm happy to

18 answer any questions that Your Honor has.

19        THE COURT:  Why the nunc pro tunc to the petition

20 date?  I'm missing that?

21        MR. BEACH:  Well, for several reasons, Your Honor.

22 First of all, all of the -- to the extent there are payments to

23 be made for stuff that accrued prior to the initial closing,

24 again, those are going to be paid out of the working capital of

25 the estate.  We did reference in our motion that we believe

1 that some payments may have been made outside of the ordinary

2 course professional procedures and we don't believe, given the

3 fact that the payments -- that those payments were either

4 reimbursed as servicing advances, or they were bought by Ross

5 in the servicing sale, we don't believe that there is a need,

6 fir the relief requested in this motion is granted, to have to

7 go remedy those deviations from the ordinary course

8 professionals order that happened prior to the initial closing

9 and that's primarily why we're asking for the relief back to

10 the petition date.

11        MR. INDELICATO:  Your Honor, if I may, Mark

12 Indelicato on behalf of the Committee.

13        Your Honor, this is an issue the Committee has

14 struggled with and, quite frankly, I don't think we disagree

15 with any of the statements made by Mr. McMahon up until he did

16 the analysis of the benefits and the burdens.

17        Your Honor, we were very concerned, particularly when

18 we saw the magnitude of some of the ordinary course

19 professionals, excuse me the foreclosure professionals, that we

20 were assured that, in fact, these expenses were being paid out

21 of the servicing business and, in fact, we've been assured on a

22 number of occasions by the Debtor, Debtors professionals that,

23 in fact, these expenses, whether they are outstanding, whether

24 they occurred prior to the initial close or after the initial

25 close, they are being paid from the cash flow of the servicing

1  business.

2          Now, one of the concerns that Mr. McMahon raised was,

3  ultimately, it's going to be an expense of the estate if these

4  things are not paid and as a result, it will be -- they should

5  follow the procedures.  While theoretically that is correct,

6  one must look to the APA and the reconciliation process and the

7  rights of the Debtor under that reconciliation process and the

8  collateral with which -- or the assets which they can look to

9  to satisfy those obligations, to realize that is, again, yet

10  another fiction in the context of this sale, that just doesn't

11  pan out.

12          If you look at the assets and the way the asset

13  purchase agreement works, based on the Debtors'

14  representations, all these expenses are to be paid through the

15  working capital of the servicing business.  To the extent

16  expenses are not paid, that gives the Debtor a claim under the

17  APA.  That claim can be satisfied from the assets which

18  otherwise are to be sold to the purchaser.  So, there will

19  always be assets in which to satisfy these claims.

20          So, when the Committee looked at it, Your Honor, and

21  we were receiving responses and input from all of the ordinary

22  course professionals about the magnitude of the additional

23  expenses associated with tracking in accordance with 327 and

24  330, provides we got the assurances we did from the Debtor, the

25  Committee was comfortable with the entry of this order because

1  it will have a negative -- it will have neutral impact on the

2  estate.   These expenses are being paid and have been

3  represented they are being paid by the servicing business, so

4  requiring these additional burdens we were afraid that, in

5  fact, requiring these additional applications would increase

6  the expenses to the estate because there are arguments that

7  these are not servicing related, these are more bankruptcy

8  related and maybe we should, the estate, should be picking up

9  those expenses for these professionals.

10          So, when the Committee did the analysis, Your Honor,

11  we had a lot of the same concerns the U.S. Trustee had but we

12  got comfortable with the procedures in place, the continuing

13  filing of the affidavits of disinterestedness, filing the

14  monthly notices if we're being paid, that that procedure -- we

15  could live with that procedure.

16          THE COURT:  Well, what happens if the economic --

17  what happens if the final close never occurs?

18          MR. INDELICATO:  Your Honor, if the final close and

19  that was our very question which is why we had to walk

20  ourselves back through the APA as we love to do, if the final

21  close doesn't occur, there is still a reconciliation process in

22  claims that the Debtor will have against the purchaser.

23          If I recall, in the APA, the Debtor will have rights

24  against the assets which we sold in theory, the economic assets

25  that we sold to the purchaser to satisfy any claim we have.

1          As the Court will hear later on, those assets are

2 unencumbered and will remain unencumbered so that to the extent

3 there are hundreds of millions of dollars of servicing rights

4 still in the servicing business, we can look to those rights

5 and when those rights are now then sold to a third party, we

6 will get paid from those proceeds.

7          THE COURT:  And, what if, even if the close doesn't

8 occur, what if for whatever reason these foreclosure

9 professionals aren't paid in full what they think they're owed,

10 do they have -- I mean they're retained by the Debtors at this

11 time.

12          MR. INDELICATO:  That is correct, Your Honor, but

13 again the way the process would work is, I believe they would

14 haves claims against the Debtor and that's where I agree with

15 Mr. McMahon.  They are being retained, if you look at -- even

16 not the ordinary course professionals --

17          THE COURT:  And, I'm writing a blank -- the Debtors

18 are asking me to write a blank check here.

19          MR. INDELICATO:  I think, Your Honor, what the Debtor

20 is asking the Court to do is permit the servicing business to

21 operate the way the servicing business is meant to operate and

22 they raise the issues of how it was dealt with in New Century,

23 it was dealt with New Century in the cash management order.  I

24 think the distinction between New Century and American Home is,

25 New Century had no liens on its servicing business and that's

1    the way it was operating prepetition and it continued to

2    operate that way post petition.   American Home had some lenders

3    and some other issues which is maybe why the difference

4    occurred, but the way it works is that generally these amounts,

5    to the extent the foreclosure professionals receive proceeds,

6    they get paid out of those, otherwise, there are servicing

7    advances, which would be reimbursed back.

8              So, to an extent, Your Honor, they are asking to

9    write a blank check, but the reasons the Committee is

10   comfortable with that is because that blank check is being

11   backstopped by the assets of the servicing business that we

12   have already been paid for, that have been sold to the

13   purchaser.  And it's that backstop which gave us the comfort to

14   sort of agree with the Debtor that this process could be

15   streamlined.

16             THE COURT:  Okay.  Mr. McMahon?

17             MR. McMAHON:  I'll be very brief, Your Honor.  With

18   respect to New Century, and its references, we don't have the

19   papers in front of us, but I do want to note that the servicing

20   business in New Century sold, and closed, I think, probably

21   within 60 to 90 days, which -- I mean, frankly, would have been

22   prior to the time the Debtors would have been obligated to file

23   their first report as to what they paid the ordinary course

24   professionals.  So, putting aside what went on in that case, I

25   think we're kind of like basically in a different posture here.

1          And second, the issues that the Debtors raise with

2     respect to application of the OCP order are essentially

3     mechanical.  We can revisit the order in discussions with the

4     Debtors if the Court believes that's appropriate in terms of

5     working through what reasonable caps would apply going forward

6     and issues like that, without, you know, is guess eviscerating

7     application of the bankruptcy code.

8          I appreciate the fact that -- there's no dispute as

9     to what's doing on here.  We appreciate the fact that the

10    Debtors estates have a true up claim against -- vis-a-vis the

11    purchaser to the extent that the admin. claims of these OCP's

12    are not paid, but that doesn't change the fact that they have

13    admin. claims in the first place.  They're employed by the

14    Debtors, the OCP procedures should remain in place in some

15    form.

16         THE COURT:  Well, I agree.  I agree.  Pay attention,

17    Mr. Beach, I'm ruling.  That's all right.  I agree with Mr.

18    McMahon.  I am not comfortable writing a blank check for

19    professionals that work for the Debtors estate.  And, that's

20    what this is.  I don't care what the asset purchase agreement

21    says.  Somebody at the court has to maintain an eye on what

22    professionals are paid.  And basically what you're saying in

23    here is, whatever the prepetition practices were for

24    foreclosure professionals of the company which ultimately ended

25    up in Chapter 11, for whatever reasons and I know the Debtors

1  would say it had nothing to do with the servicing business,

2  that I should say that's okay to go forward, and these people

3  can get paid whatever they get paid and there's no oversight by

4  the Committee, there's no oversight by the Court, there's no

5  aggregate limit on what can get spent, there's no per person

6  limit on what can get spent and the argument is, it doesn't

7  matter because ultimately it'll get paid.  I don't care if

8  there's money available to pay it and I don't care where the

9  money comes from, I'm not going to allow Bank of America to

10 write checks to Young Conaway, Stargatt & Taylor without me

11 making sure that the fees are appropriate.  It doesn't matter

12 where the money comes from.  What matter is, there's somebody

13 at the court or in the process that's reviewing the claims

14 professionals to make sure that they should get paid what

15 they're getting paid.

16        Now, ordinary course professionals, obviously, are a

17 different matter from professionals under 327(a).  The Court

18 often and routinely enters some sort of procedure that would

19 allow for a more streamline process, but there are limitations

20 on it.  There are limitations on the amounts it can get paid,

21 if they go over a certain threshold, obviously, more detail has

22 to be provided to the Court.  And I'm concerned that what

23 you're proposing here, basically, eviscerates that routine and,

24 I think, normal way of proceeding.  I'm not against modifying

25 it in some way, but I think you've gone too far in this

1  connection and I'm inclined to sustain Mr. McMahon's objection.

2          The second piece of that is, I still don't see why,

3  even if I were inclined to grant some sort of relief, why it

4  would go beyond, or prior to the actual closing date, in

5  connection with the economic close of the transaction on the

6  servicing sale.  And now, Ms. Counihan wants to speak.

7          MS. COUNIHAN:  Your Honor, Victoria Counihan on

8  behalf of the purchaser, AH Mortgage Acquisition Company.

9          I just don't want our silence to be construed as us

10  agreeing with all of the statements that have been made

11  regarding how the mechanics of the asset purchase agreement

12  work.  I think that some of the way things were described is

13  not exactly the accurate way that the asset purchase agreement

14  works, so I just wanted to get up and make it clear that,

15  obviously, the asset purchase agreement controls as to how the

16  mechanics works.

17          THE COURT:  All right.  Well, again, and I appreciate

18  that, that's fine, but I don't really care how the asset

19  purchase agreement works.

20          MS. COUNIHAN:  That's fine, Your Honor.

21          THE COURT:  I don't think it matters, because to me

22  it's simply the source of the -- it's the source of the funds

23  that are available to pay estate professionals. It's nothing

24  more -- it would be like a DIP loan.  You know, I don't care

25  that there's money available, what I care is that there be a

1 | process to make sure that people aren't robbing the estate
2 | blind.
3 |          MS. COUNIHAN:  That's fine, Your Honor, thank you.
4 |          MR. BEACH:  Thank you, Your Honor.  We will likely
5 | be filing some kind of motion to modify the ordinary course
6 | professional procedures, as well as there were some foreclosure
7 | professionals that were retained under 327(a) because they were
8 | exceeding the caps on a regular basis.  So, we'll probably --
9 | that motion we'll probably seek to modify the fee application
10 | procedures with respect to those professionals as well.
11 |          And just so Your Honor understands some of the issues
12 | we have with these professionals, and these payments, is that
13 | in the delay, and that's some of what we would have gotten
14 | through with the testimony, is some of the delay in these
15 | payments could affect our ability to net the servicing advances
16 | from the liquidation proceeds and we're now approaching a point
17 | in the case where foreclosures that occurred early on in the
18 | case, the liquidation proceeds or the liquidations are now
19 | starting to happen and if we cannot pay the professionals
20 | before we need to send the liquidation proceeds over to the
21 | owner of the loan, then we can't -- then there are trailing
22 | expenses and we have to collect that money from the owner of
23 | the loan at a later time.  It creates additional expense and
24 | delay on payment and in addition to that, the way that the
25 | invoices work for these foreclosure professionals is, they bill

1 by foreclosure.  So, any one invoice is going to span over a

2 four or five month period.  So, it's been very difficult to try

3 to streamline those invoices to kind of a monthly system in the

4 bankruptcy context.

5        THE COURT:  Well, look, I understand, and I have

6 experience with the way foreclosure professionals get paid,

7 both in my experience in private practice and on the bench, but

8 bankruptcy requires certain things and the process requires

9 certain things and you can try to streamline it as best you

10 can, but I just -- I can tell you, I'm not authorizing a blank

11 check to professionals that are working on behalf of the

12 estate.

13        MR. BEACH:   I understand that, Your Honor.

14        THE COURT:  So, work with Mr. McMahon, maybe you can

15 come up with something that's more agreeable, but as presented,

16 I think it went to far and I'm sustaining the objection.

17        MR. BEACH:  Thank you, Your Honor.

18        MR. McMAHON:  Your Honor with the Court's permission,

19 I'll work with Mr. Beach to get an agreeable form of order

20 relating to this particular motion to the Court under

21 certification of counsel?

22        THE COURT:  That's fine.

23        MR. McMAHON:  Thank you.

24        THE COURT:  Just so you know, I do have a lunch

25 meeting at 12:30, so we can go a little longer than that, we

1  are going to have to break around 12:30 for about an hour.

2        MR. CLEARY:   May it please the Court, Blake Cleary

3  of Young, Conaway, Stargatt & Taylor on behalf of the Debtors.

4        Your Honor, agenda items number nine, ten and 12 are

5  kind of continuations or new motions with respect to HELOC

6  transactions.

7        By agreement of the parties, agenda item number nine,

8  which is the motion of Assured Guaranty for relief from the

9  stay to return the HELOC or turn over the HELOC transitions to

10 GMAC, we've agreed to kind of take that one out of order and

11 take number ten, in fact, before that one.

12        So, I guess with that, I would turn it over to GMAC,

13 to address their motion and then address any questions or

14 concerns the Court has after that.  I suspect it's going to

15 take more than -- if you said 12:30, it's going to take more

16 than four minutes to get through those, so I don't know if Your

17 Honor wants to proceed with those, or break now, but I leave it

18 to the Court.

19        THE COURT:   Who is the movant, I forget.  We're

20 going to number ten, Ms. Springer?

21        MR. CLEARY:  Correct, and I believe there are, you

22 know credit enhancers, there's trustees, the Debtor and GMAC,

23 they all are going to want to be heard on that pleading.

24        THE COURT:  All right, okay.

25        MS. SPRINGER:  Good afternoon Your Honor, Claudia

1  Springer for GMAC Mortgage Corporation.

2          Your Honor, given the time, if we need to break at

3  12:30, I truly do not believe there's sufficient time to get

4  through this in five minutes,

5          THE COURT:  Okay.

6          MS. SPRINGER:  It might be better to just handle the

7  whole thing after lunch, not to break it up.  It's up to you.

8          THE COURT:  Okay.  That's fine, that makes sense.

9  I've missed the last two of these meetings, I have to go.

10         MS. SPRINGER:  Understood.

11         THE COURT:  I'll only get in trouble with the chief,

12 so everybody's got a boss.   So, we are going to have to break.

13 Is there anything, Ms. Morgan, is there anything we can

14 accomplish in four or five minutes that's otherwise in the

15 agenda?

16         MS. MORGAN:  Yes, I think so, Your Honor.  One is,

17 let me find the right number.

18         UNIDENTIFIED MALE SPEAKER:  Eleven.

19         MS. MORGAN:  Eleven on the agenda which is the Iron

20 Mountain motion to compel payment of administrative expenses.

21         Your Honor, we essentially have an agreement to

22 adjourn until the next omnibus hearing on January 14th.  There

23 are disputes as to these claims, both on the amounts for the

24 claims and as to whether they are pre or post petition claims.

25 We are intending to work with the movant and we tried to see if

1  we could work things out before a response is filed, but the

2  movent requested that this be scheduled as a status conference.

3  So, I will cede the podium.

4           THE COURT:  All right.  Mr. Brown.

5           MR. BROWN:  Thank you, Your Honor, Charles Brown on

6  behalf of Iron Mountain, I also want to thank Debtors counsel

7  for allowing this to be taken up right before lunch.

8           Your Honor, this motion was filed with an objection

9  deadline of December 28th, on a matter that I originally

10 brought to the Debtors attention before Thanksgiving.  Because

11 of the objection deadline, we agreed to move it to the January

12 14th hearing, with an objection deadline of January 7th.

13          Debtors counsel is correct, that we've been

14 exchanging information and will continue to do so.  Iron

15 Mountain is very concerned that it has not received payment for

16 those services which I don't think there's any real dispute

17 about or any question over.  And Iron Mountain did stress to me

18 that they would want to go forward on January 14th unless we

19 can make some real progress in the interim.  So, they did --

20 Iron Mountain didn't want to just push it off entirely, they

21 did want me to make that statement.  So, thank you, Your Honor.

22          THE COURT:  You're welcome.

23          MS. MORGAN:  Your Honor, if I may, I'd like to ask a

24 question about two of the remaining items on the agenda and I

25 don't want to be presumptuous, but items 13 and 14, 13 is the

1  Debtors motion to enter into -- to have AHM Servicing enter

2  into subservicing agreements.  There was an objection by

3  CitiMortgage but as we arrived in the courtroom today, we have

4  resolved it through some changes to the order, to give

5  CitiMortgage notice of the procedures.  We had a witness who

6  was where prepared to testify, and she was also prepared to

7  testify on item 14, which is another motion in aid of the APA,

8  if you will, to allow the servicing entity undertake activities

9  to prepare for consummation.

10         There were two objections to that motion which have

11  also been resolved.  So, I guess my question is, if Your Honor

12  would be inclined, would like to hear testimony anyway,

13  obviously, we'll keep the witness here, but if Your Honor

14  doesn't think it's necessary, we'd like to let her go.

15         THE COURT:  No, if they're uncontested, I didn't

16  have any real substantive issues, independent of what was

17  raised in the objections.  So, if they are resolved, you do not

18  need to have a witness.

19         MS. MORGAN:  Okay, fine, Your Honor.

20         THE COURT:  All right.

21         MS. MORGAN:  Thank you.  And, again, we'll put those

22  settlements on the record after the break.

23         THE COURT:  All right.

24         MS. ALFONSO:  Your Honor?

25         THE COURT:  Yes, ma'am.

1          MS. ALFONSO:  I'm sorry, Anna Alfonso from Kaye

2  Scholer on behalf of the Administrative Agent. I just wanted to

3  clarify with respect to item number 13, we just got a

4  blacklined order, so though we don't have a pending objection,

5  we do need to consult with the home office and review the form

6  of order before we can commit to that having been fully

7  resolved.

8          THE COURT:  All right.  So, maybe you'd better hold

9  your witness for a few more minutes.

10          MS. ALFONSO:  I don't think a witness is going to be

11  necessary, though, Your Honor.

12          THE COURT:  All right.

13          MS. MORGAN:  I think the witness was here to address

14  the objection by CitiMortgage.  I'm confident we'll be able to

15  come to an order or not.  But it will not affect the witness, I

16  agree with Ms. Alfonso.

17          MS. ALFONSO:  Thank you.

18          THE COURT:  All right, fine.  Anything further before

19  we break?   All right, we'll take a recess until 1:30.

20          MS. MORGAN:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22                    (Luncheon recess)

23          COURT CLERK:  All rise.

24          THE COURT:  Please be seated.  All right.  Ms.

25  Springer.

1           MS. SPRINGER:  Good afternoon, Your Honor, and Happy
2  New Year.

3           THE COURT:  Thank you.

4           MS. SPRINGER:  I meant to say that earlier.  Your
5  Honor, we're here today on GMAC Mortgage's motion to compel the
6  Debtors to send notice to the HELOC borrowers regarding what we
7  call the freezing of the HELOC loans.  And, if you recall when
8  we were here before the holidays we talked about this and we
9  field the motion after the discourse regarding our concerns
10 about notice going to the borrowers.

11          I'm pleased to say that I think that all of the
12 parties that are interested in this situation, including the
13 Debtors, have agreed that some form of notice ought to be sent
14 by the Debtors to the HELOC borrowers.  However, the bad news
15 is, that the parties are in disagreement as to what the form of
16 that notice ought to be.

17          And, other parties can certainly speak for
18 themselves, but I think one of the major issues regarding the
19 notice is when the notice will become effective, or when the
20 draw requests of the HELOC borrowers will no longer be honored
21 by the lender.

22          One of the things that I think should be made clear
23 from the beginning here, and we mentioned this at the last
24 hearing, but I just wanted to make sure it's understood, under
25 the HELOC documents, all of them, there is a servicing entity

1 and there is a lending entity, completely separate entities.

2          In the situation with American Home, two American

3 Home entities were typically either the lender or the servicer.

4 The servicer services the loans, makes sure that the payments

5 are made, sends the bills to the HELOC borrowers and keeps

6 records of payments and generally advises the trust and the

7 various parties interested in the trust, as to what the payment

8 status is of the HELOC loans.  That's the job of the servicer,

9 for the most part.  And if there's a default in a HELOC loan,

10 the servicer also takes action to try to collect that loan.

11          The lender, on the other hand, is the party that

12 actually advances funds to HELOC borrowers when they make draw

13 requests and, generally, how that occurs is, that a HELOC

14 borrower will have essentially a checkbook and will write a

15 check, which will be honored by the lender.  And the lender is

16 supposed to honor that check in the ordinary course assuming

17 that there's no reason not to honor it, such as a default under

18 the HELOC loan or the HELOC borrower is already at their credit

19 limit.

20          In the situation we have here, GMAC serves as the

21 backup servicer for the most part, for all of these loans.

22 There's on situation where GMAC is actually the master servicer

23 and American Home entity is the subservicer.  But for most of

24 these situations, GMAC is the backup servicer and stands ready

25 to take over the servicing function if American Home is no

1  longer able to service the loans, or if there is a requirement

2  under the documents for the backup servicer to take over the

3  servicing of the loans.  And, GMAC is prepared to do that.

4          GMAC never signed up and there is nothing in the

5  documents that requires GMAC to take over the lending function

6  of the lender in this situation.  American Home stands in the

7  shoes of the lender and will continue to stand in the shoes of

8  the lender.  However, American Home is not going to be -- is

9  not planning to continue to fund these loans going forward.

10  And, that's the purpose of the notice.

11          Now, the issue with the form of the notice is that if

12  the form that we attached to our motion, as a form to consider,

13  that the Debtor send to the HELOC borrowers is a very simple, I

14  think it's three sentences long, it simply says that there will

15  not be any more funding of the HELOC loans after a certain date

16  and we didn't even fill in the date, because we wanted parties

17  to participate in determining what that date should be.

18          The Debtors, as I understand it, would like the

19  notice to be a much more formal document.  They want to have

20  the notice not only provide that the lender will not be lending

21  after a certain date, but they also want a bar date to be

22  included for the filing of proofs of claim by the HELCO

23  borrowers, and they want to explain that GMAC is taking over as

24  the servicing function, and there are various points of that

25  notice that we think are just very cumbersome and are going to

1  be very difficult for an average consumer to comprehend and

2  we're not so sure that the consumers are even going to take the

3  time to read it.

4          With respect to various other parties, including the

5  various insurers, that insurer the notes that were issued by

6  the trust, their concern is that they do not want trust funds

7  used to fund the loans going forward and their concern is that

8  if the Debtors do not make the notice effective immediately,

9  the Debtors will attempt to utilize trust funds to fund the

10 draws on the HELOC's.  They also have the concern that when

11 receiving the notice borrowers might see a date which is a week

12 or two weeks from the date of the notice and if their HELOC is

13 not fully funded, they might take advantage of that situation

14 to draw the full amount available to be drawn under the HELOC.

15         As far as GMAC is concerned, our main concern is that

16 a simple straightforward form of notice go out that simply

17 tells the HELOC borrowers that there is no more funding

18 available after whatever date the Court deems appropriate and

19 so that we don't have people that are calling us wanting to

20 know why they can't borrow under their HELOC.

21         THE COURT:  Well, let me make some comments, and I

22 certainly understand GMAC's desire to send out the notice and I

23 agree that the notice should be as simple and straightforward

24 as possible.  It seems to me that the objections really,

25 frankly, are a request for additional relief by the Court, that

1  is not subject to the motion that's in front of the Court nor

2  am I probably going to be in a position to grant.

3      Let me ask you this, which is, you just said, this is

4  where the rubber hits the road I think, you want me to fill in

5  a date in this notice that is going to be a ruling that that's

6  the appropriate substantive date that these elaborate

7  procedural mechanisms for lending under the HELOC loans will

8  come to a halt, and I don't see how I'm in a position to make

9  that determination.

10      MS. SPRINGER:  Well, what I was hoping Your Honor

11  would not actually be the one to have to decide that date.  I

12  was hoping that by attaching that exhibit as a form, as a

13  proposed form, that the parties could come to an agreement as

14  to what that date ought to be.  I know that, for example, the

15  Debtors would like that date to be February 1st.  I know that

16  the insurers would like that date to be the date that the

17  notice is sent, so that there is -- it's effective immediately.

18      THE COURT:  Well, and I'm probably asking the wrong

19  person, but as the situation exists now, the Debtors are

20  continuing to honor draw requests on the HELOC's, correct?

21      MS. SPRINGER:  My understanding is, what is happening

22  now, is that the Debtor is utilizing funds that are trust

23  funds, to advance draws under the HELOC's.

24      THE COURT:  All right.  And they have the authority

25  to do that?

1              MS. SPRINGER:  They think they do.  The insurers do

2  not believe they have any authority to do that, and believe

3  they are violating the trust agreement by doing what they're

4  doing.

5              THE COURT:  All right.  And some of the insurers, if

6  not all, have filed motions with the Court or adversary

7  proceedings to stop that?

8              MS. SPRINGER:  One insurer, which is FGIC --

9              THE COURT:  FGIC, right.

10             MS. SPRINGER:  Which I think Mr. Wilson is on the

11  phone, if I'm not mistaken --

12             MR. WILSON:  I am.

13             MS. SPRINGER:  Has filed a complaint to essentially

14  stop that action.  It's a little more involved than that, but

15  it's a complaint to determine that what is called a rapid

16  amortization event has occurred and, therefore, the Debtor has

17  no authority to do what it's been doing.

18             THE COURT:  Right and the Debtors dispute that a

19  rapid amortization event has occurred.

20             MS. SPRINGER:  That's right.

21             THE COURT:  All right.  So, assume that none of this

22  -- assume that the Debtors are going to continue to service and

23  GMAC doesn't sort of get into this situation, and where it's

24  the backup servicer, so it wants to make people aware of what's

25  going on.  What would happen is, that the Debtors would

1  continue to act the way the Debtors are acting, eventually I

2  would hear the FGIC, or whatever the acronym is, motion, which

3  ultimately would get decided one way or the other in the

4  meantime to the extent that the Debtors are proved to be wrong,

5  there would be some sort of claim that the insurance company

6  would have and to the extent that the Debtors are right, there

7  wouldn't be some sort of claim the Debtors would have and

8  nothing would get changed.  So, why should I expand the rights

9  of the insurance companies in a context of this notice?  If

10 there's a run on lending, there could have been a run on

11 lending today.  That's not my problem, that's the insurance

12 company's problem.

13      MS. SPRINGER:  The other thing to be aware of,

14 though, Your Honor, is that the -- it's really not as simple as

15 probably my motion made it out to be, nothing ever is, right?

16 The lender is really responsible for the lending.  One source

17 of funds in a situation where everything is going along

18 normally, and there hasn't been a rapid amortization event, or

19 some other type of situation, is that the trust actually

20 reimburses the lender for the amount that the lender has loaned

21 up to a certain point.  If the trust chooses to do that, which

22 in most instances the trust does.

23      Now, if that lending takes it above that point,

24 whatever it is, it's the lender's responsibility to make up the

25 difference, assuming that the lender has the obligation to lend

1 under the specific HELOC loan.  So, what's really going on here

2 is that the insurers are saying and the Trustee's I believe are

3 in agreement with that, that source of funding, that trust fund

4 source, is not available to you, you don't have any

5 availability to use those funds, if you want to continue to

6 lend from whatever source of funds you have, your DIP loan or

7 whatever source of cash you have, that's up to you.  And, so,

8 if you want to use a date of February 1, you know, use that

9 date, but don't assume that you can use these trust funds or

10 don't assume that we're going to reimburse you from the trust

11 in order to cover the draw request that you are honoring.

12         As far as we're concerned, we're kind of caught in

13 the middle here because we just want to make sure the borrowers

14 know that there will be a deadline by which if they write a

15 check it won't be honored and it will come back.

16         THE COURT:  Okay.  And you don't care when that it

17 is, you just want it to be clear.

18         MS. SPRINGER:  We just want it to be clear.

19         THE COURT:  All right.

20         MS. SPRINGER:  Yes, Your Honor, thank you.

21         THE COURT:  Let me hear from, let's start -- let's

22 hears from the Debtors, I think would be --

23         MR. CLEARY:  Thank you, Your Honor, Blake Cleary on

24 behalf of the Debtors and Young, Conaway, Stargatt & Taylor.

25         I think Your Honor has cut right to the quick of the

1  matter and that is in essence, I think a determination, or a

2  ruling by the Court to issue a notice that has an effective

3  date that there will be no further lending under the HELOC's is

4  going well beyond simply compelling the Debtors to send a

5  notice and I think that Your Honor appreciates that and that's

6  been our issue from the beginning.

7           But stepping back for a second, we embarked on this

8  process to transfer the servicing to GMAC.  We understood

9  servicing and Your Honor is fully aware of the servicing sale

10 and the process and the position the Debtor finds itself in.

11 And so, when we were here before, on CIFG's motion for relief,

12 we told the Court we didn't think a notice was appropriate.

13 And the reason we said that was for some of the reasons you've

14 just identified and that is what do we tell HELOC borrowers,

15 when is there ability to borrow stopped, and how does that all

16 work and so the notice that was proposed at that time we

17 thought was misleading.  We think the notice now is misleading

18 on that issue, too, but what's become clear to the Debtors, and

19 I think is clear from Ms. Springer's presentation and the

20 parade of others that have come forward, is that once the

21 Debtors turn servicing over, the parties do not intend, as the

22 servicing agreement contemplates, turn over those excess

23 collections to allow the Debtors to then turn around and fund

24 draws under the HELOC's.

25           The Court is fully aware that we're a Debtor and

1  Debtor-in-Possession and we don't have the ability to come out

2  of pocket to fund HELOC's but until there is a determination by

3  the Court that there's a rapid amortization event, we believe

4  it's appropriate for us to continue to honor those draws and

5  use those excess collections to the extent they exist, to fund

6  those draws.

7          Now, if Your Honor tells us that we can't because

8  there's a rapid amortization event, then we'll guide ourselves

9  accordingly, but we dispute it, we don't believe that it's been

10  under the documents, and so --

11          THE COURT:  So, servicing gets turned over, I don't

12  remember January 18th.

13          MR. CLEARY:  It was January 11th, Your Honor.

14          THE COURT:  January 11th, all right.  And your

15  position still is that a rapid amortization event has not

16  occurred.  So, on January 12, a consumer writes a check on a

17  HELOC loan, and requests a draw, what will happen?

18          MR. CLEARY:  Well, what we found out is that GMAC

19  does not intend to remit the excess collections to the Debtor.

20          THE COURT:  Well, where are they going to go?

21          MR. CLEARY;  They will all then be siphoned and pay

22  down the trust --

23          THE COURT:  And they have authority to do that?

24          MR. CLEARY:  Well, we don't think they do.  That's

25  what happens if there is a rapid amortization event.  You go

1  from a managed amortization, where the collection are only --

2  the excess collections under the documents go to the lender so

3  to speak and then they can be, and practically speaking, those

4  funds are then recycled, so there's not a bypassing of funds.

5  In essence, they're all recycled funds to be used to fund those

6  draws.

7          So, once you have a transfer of servicing, the Debtor

8  then no longer controls the collections --

9          THE COURT:  If -- if you're right, are the excess

10  draws property of the estate?

11          MR. CLEARY:  Well, there's a provision in the

12  agreement which -- under the servicing agreement, which says

13  the excess collections go to, and I can't remember if it's the

14  servicer or the lender, but I believe the language is that it

15  goes to a Debtor entity.

16          THE COURT:  So, I -- I'm confused.  It sounds to me

17  like if I buy that story, that GMAC is violating the automatic

18  stay and converting property of the estate.  Now, they're

19  standing up because they're going to tell me that's wrong, but

20  is that the Debtors position?

21          MR. CLEARY:  That's my understanding of how the

22  documents work, Your Honor, is with the excess collections they

23  go to the lender or the servicer, whatever it is, the Debtor

24  entity and it's in the servicing agreement, I think it's like

25  3.07, somewhere around in there.

1           THE COURT:  But if you don't get those excess -- if

2   the Debtor's don't receive those excess collections, you don't

3   have any funds available to honor a draw.

4           MR. CLEARY:  Correct.  Because what happens is, there

5   were some --

6           THE COURT:  And the trusts are not required to honor

7   draws?

8           MR. CLEARY:  It's a little bit more subtle than that

9   blanket statement.  I think that -- what I wanted to do was

10  clarify the lending obligation.  What happens is, you have

11  excess collections go to the lender, the servicer entity, then

12  draws are funded and then the trust is obligated to buy those

13  new loans, in essence, those draws.  They are then put into the

14  trust, the principle and interest collections are then -- the

15  borrower pays those and then those go to the trust to cover

16  those payments.  Again, any excess are then available for

17  additional draws.  So, it's cycled.  So, I hope that answers

18  your question.

19          THE COURT:  Well, I'm confused -- yes, it does and it

20  doesn't.  I'm troubled and, again, I reviewed -- I did review

21  these documents and tried to make sense of them.  But I'm

22  troubled by this concept that, and maybe I'm being over

23  simplified, simplifying this situation, that by somehow sending

24  out a notice, all of a sudden substantive relief is granted to

25  allow property of the estate to leave the estate, to allow

1 insurance companies to no longer -- to somehow no longer have

2 to honor their obligations under their insurance arrangements

3 and for consumers, all of a sudden not to have the ability to

4 draw down on these loans.  And, maybe if that's what's going

5 on, that's not going to be what's going on.  So, somebody needs

6 to explain to me why that's not what's going on.

7         MR. CLEARY:  It all comes back to whether there's

8 been a rapid amortization event.

9         THE COURT:  And how is that going to get determined?

10         MR. CLEARY:  Well, we believe the Court should decide

11 that.

12         THE COURT:  But procedurally, how is that getting

13 determined?  I mean, what's the mechanism by which I'm going to

14 decide it?  This motion?

15         MR. CLEARY:  No, no.

16         THE COURT:  Okay.  The lawsuit filed by FGIC?

17         MR. CLEARY:  That's one way.

18         THE COURT:  Are there other insurance companies that

19 are implicated?

20         MR. CLEARY:  Yeah, the other insurance are here, and

21 they haven't moved before the Court to stop what we've been

22 doing.

23         THE COURT:  All right.  How manages the trust?  Who

24 is acting -- who is speaking on their behalf?

25         MR. CLEARY:  There's an indentured trustee for each

1  particular trust, I think.  At least one indentured trustee is

2  here.  I don't know if others are here as well, but there's

3  also credit enhancers and Your Honor is familiar with the role

4  of the credit enhancer in connection with these trusts?

5          THE COURT:  No.

6          MR. CLEARY:  So, you have trust which holds the

7  assets, you have underlying note holders, then you have in

8  order to ensure that the ultimate holders of the -- or

9  recipients of the payments of these mortgages, in order to

10 ensure that they get paid, when these trusts were created,

11 there was a credit enhancement placed upon those payments to

12 ensure and guarantee that if the mortgage payments weren't

13 sufficient to pay these note holders, then you would look to

14 the credit enhancer, the insurance company, to pay those note

15 holders so that the trust participants, beneficiaries, were

16 always in a position to receive their principle and interest,

17 or cash flow payments over time.

18         THE COURT:  All right.

19         MR. CLEARY:  So, what we have and I think Your Honor

20 has correctly identified, what you have is credit enhancers

21 trying to minimize their exposure through this kind of process

22 and the unfortunate reality that the Debtors have to get out of

23 this business and some declarations that there's been rapid

24 amortization events, you know, in one case a rapid amortization

25 event was alleged, based simply on the filing of this

1  bankruptcy case.   So, I think that's --

2         THE COURT:  Are these repurchase agreements, or some

3  other mechanism that exempts them from the automatic stay?

4         MR. CLEARY:  No, no.  These are simple -- loans were

5  created and then they were packaged --

6         THE COURT:  All right.  Now, what is the Debtors

7  proposal -- what's the Debtors, step back a second, what's te

8  Debtors sort of plan, or maybe request for now this should

9  actually occur?  You don't want to service the HELOC's any

10  more, that's clear.  There's already an order entered, I

11  believe, that deals with that issue, at least in part.

12         MR. CLEARY:  Right.  There's six of these HELOC

13  trusts and we have four of them, have orders setting a date

14  whereby we would transfer the servicing.

15         THE COURT:  All right.

16         MR. CLEARY:  So, clearly, one way to avoid it is to

17  delay the transfer of the servicing and when you delay the --

18  when you have the servicing, you have, you know, the draw would

19  be stopped and borrowers would have notice of that.

20         The other way is for those that have already been --

21  a transfer date has already been effected, would be to have

22  GMAC act the same way that the Debtors were acting in terms of

23  funding the draw requests and if the Court were going to say,

24  pick a period of time where those would then be cut off, then

25  we recognize that once we don't have the servicing component,

1  logistically, we can't fund.  So, it's an unfortunate

2  situation, but it would happen, you know, whether or not

3  there's a rapid amortization, it's going to happen because we

4  just don't have access to the funds to recycle it.

5         So, what we are trying to do is ease the pain between

6  the situation, provide notice to these HELOC borrowers that you

7  are going to lose the right to borrow but provide them some

8  ample time because, you know, in the papers GMAC said they

9  wanted to do the right thing, do the right thing means to me to

10  provide some notice period prior to you losing your rights.

11         THE COURT:  So, your issue isn't they shouldn't be

12  allowed to do this at all, i.e., it's not that they shouldn't

13  be allowed to cut the Debtors off, and the consumers off, it's

14  a question of timing.  It's not so much that they're stealing

15  property of the estate, it's that they're doing it now, as

16  opposed to later?

17         MR. CLEARY:  Yeah.  I think the proposal would be

18  that February 1st would be the date that the HELOC borrowers

19  would be noticed that after that date, you no longer are able

20  to draw on your HELOC.  So that we would have some period of

21  time between now and --

22         THE COURT:  And why did the Debtors -- why is that

23  your proposal?

24         MR. CLEARY:  Well, there was -- really the underlying

25  reason because it stemmed from -- that was one of the two days

**J&J COURT TRANSCRIBERS, INC.**

1  that is the easiest date to transfer servicing.  So, with

2  respect to the two that we haven't transferred  -- well, we

3  haven't transferred servicing yet on all of them, but to the

4  extent GMAC didn't want to put itself in a situation where it

5  had to do what we're doing now in terms of the collections and

6  the funding of the draws, that if the proposal would be to

7  delay the transfer of the servicing till February 1st, again

8  February 1st is a nice clean day when we can transfer and they

9  can start servicing and it was --

10        THE COURT:  All right, but it creates this concept

11  that there could be a run on the bank.

12        MR. CLEARY:  It does create the concept that there

13  could be a run on the bank, and I think Your Honor has

14  identified, there could have been a run on the bank yesterday,

15  but I don't know the answer to that question. I mean, it may be

16  true.  There may be a run on the bank, I don't know.

17        THE COURT:  If you're a consumer, look, if you're a

18  consumer who has an American Home Mortgage, Home Equity line, I

19  mean maybe you were concerned, you know, when the filing

20  occurred.  You know, you read something going on in the paper,

21  but if you've been using your home equity line, you know, in

22  the last few months you had no reason to assume anything

23  untoward is going on because draws are continuing to be

24  handled.  So, you know, you could have, to a certain extent,

25  have lulled people into a sense of everything is okay, and then

1 all of sudden, it's not going to be there any more.

2        Are consumer protection laws implicated by what's

3 going on here?  I mean --

4        MR. CLEARY:  I don't know.  I was advised by the

5 company at least with respect to RESPA, that RESPA does not

6 apply to HELOC's and the RESPA, at least part of the papers

7 that were filed with the Court, kind of dictated the hello,

8 good-bye letters.

9        THE COURT:  Right.

10        MR. CLEARY:  But, of course, in part of our notice

11 and part of the process that we had shared with others, we

12 haven't had an opportunity to share it with the Court, we think

13 a simple notice is appropriate and we think the notice should

14 be as simple as, we're the servicer, we're no longer going to

15 be the servicer, GMAC is the servicer, please send your

16 payments to GMAC and I think that's important because the

17 Debtor does have an interest in, a residual interest in the

18 trust, such that we are also interested in the payments

19 continuing to be made, continuing to be made timely and

20 continuing to be made at the proper place.

21        THE COURT:  Yes, well, why are we going further than

22 just simply saying, this is the new servicer?  Ms. Springer,

23 why am I going any further than that?  I don't know if I can

24 solve your problem.

25        MS. SPRINGER:  Because Your Honor, well, first of

1  all, we have to respond to some of the things that Mr. Cleary

2  said because they're simply inaccurate.

3          THE COURT:  All right.

4          MS. SPRINGER:  The way this works, it's truly

5  complicated but the way this works is, money comes in from the

6  HELOC borrowers every month, the way it should work is, the

7  money immediately gets put into a trust account, immediately,

8  without -- there's no lending.  The course of conduct here may

9  have been different than what the documents say, but I'm

10 telling you what the documents say.  So, that money comes in,

11 the servicer puts the money in a trust account.

12         Now, when HELOC draws are -- when there is a HELOC

13 draw request, what happens is, the lender, and there's only one

14 lender here, the lender goes to, is supposed to go to the trust

15 account and essentially purchase the interest, get money out of

16 the trust account, purchase the interest in the trust account

17 to get the money out, to find the draw request.

18         Now, I don't know what the Debtor --

19         THE COURT:  Okay, but then what happens?  So they

20 fund the draw request --

21         MS. SPRINGER:  They fund the draw request --

22         THE COURT:  But the trust is the owner of the line of

23 credit.  So, now the Debtors have, in effect, made an advance

24 on the trust's behalf.

25         MS. SPRINGER:  That's right.

1          THE COURT:  So, what does the trust do, it pays the

2  Debtors back.

3          MS. SPRINGER:  It -- well, yeah, it pays -- it's

4  giving money to the Debtor to reimburse the Debtor.  The trust

5  has done that.  The servicer is completely out of that.

6          THE COURT:  I understand.

7          MS. SPRINGER:  Yes.

8          THE COURT:  All right.  So, I have a home equity line

9  of credit with American Home Mortgage for $100,000, I have

10  availability under it, I write a check for 20 grand, that's

11  funded by American Home Mortgage out of a trust account.

12          MS. SPRINGER:  No.

13          THE COURT:  That's what you just said.

14          MS. SPRINGER:  Well, it's -- if it's a normal

15  situation, what happens is, American Home has -- can either

16  fund it out of their regular -- they don't have to use the

17  trust account, they can -- let's say they have a line of

18  credit, let's say it's a situation where they're flush with

19  cash, American Home takes their money, and the lending entity

20  and they essentially lend the money to the HELOC borrower.

21          THE COURT:  All right, okay.

22          MS. SPRINGER:  Now, if they choose, if they choose

23  and it's not a rapid amortization event, they can go to the

24  trust and they can purchase the interest in the trust.  And the

25  trust will essentially reimburse them for the draw request.

1          THE COURT:  Well, they're not purchasing the interest

2     in the trust, they're putting the loan to the trust, right?

3      And then the trust has to pay for it?

4          MS. SPRINGER:  Well, that's not how it's worded, Your

5     Honor.

6          THE COURT:  Well, I -- some associate drafted that,

7     I'm trying to figure out what's actually going on.  Not at

8     Young, Conaway.  At a law firm that's currently letting a lot

9     of people go in New York.

10          MS. SPRINGER:  Why don't you --

11          THE COURT:  I don't want to lose track, somebody's

12     got to explain to me how this works.  So, don't get up unless

13     that's what you're going to do.

14          MS. ERLICH:  I'm going to try.  Margot Erlich,

15     Pillsbury, Winthrop on behalf of the Bank off New York.  As it

16     was explained to me by the corporate people in my office, the

17     lender funds the draw request.  It then sells that draw request

18     as an additional balance to the trust, the trust then purchases

19     those "additional" balances.  So I don't know what goes on in

20     practice, but --

21          THE COURT:  That's basically what I was saying, but

22     it's in the nature of a put because the trust probably has no

23     choice not to buy.

24          MS. ERLICH:  There are two ways that the trust will

25     buy it.  It's either from excess collections or en increase in

1  the transferor which is the equity.  But yes, it is officially

2  purchased by from the lender.  So, that's how the -- that is

3  the clarification that I wanted to make and I hope that helps

4  you.

5          THE COURT:  Okay, that does help.  That's what I

6  think is happening.  All right.  So, the question then becomes,

7  what funds does the Debtors use to honor the draw request of

8  the HELOC borrower and what I thought you were saying, Ms.

9  Springer, was that they used funds that were present in the

10  trust account but you're saying they don't have to, or they're

11  not even allowed to?

12          MS. SPRINGER:  Well, no, what I'm saying is that I

13  think -- I'm just -- I think what has been happening up until

14  now is, they haven't put it in the trust account before they've

15  actually taken the funds to advance to pay the draw request.  I

16  think the course of conduct here has been, it's been a little

17  bit of an informal situation where they haven't really followed

18  the letter of the documents and what has really happened in

19  reality is when money has come in, they've -- the money comes

20  in, they have the money, the draw request comes in and they

21  take the money before putting it in the account, they honor the

22  draw request and they pay themselves the servicing fee, and

23  whatever other fees are payable to the various parties that get

24  fees and then they put the rest of the money in the collection

25  account and that money then goes to pay down the notes, which

1  if it's in a normal amortization situation, nobody says

2  anything because essentially what's happening is, it's just a

3  timing issue.

4          THE COURT:  Well, but -- all right.  So, normally you

5  get your monthly payment and it's supposed to go into the P&I

6  account.

7          MS. SPRINGER:  Right.

8          THE COURT:  And, there's probably -- because these

9  aren't the actual home mortgages, there's probably not a T&I

10  account, right, just a P&I account, there's not tax and

11  insurance, just principle and interest account.

12          MS. SPRINGER:  Right.

13          THE COURT:  Which my understanding was, the Debtors

14  were at least in connection with the mortgage, they were

15  putting collections in the proper P&I accounts.

16          MS. SPRINGER:  I'm not saying they're ultimately not

17  putting the money in the proper accounts, there is a dispute --

18          THE COURT:  Now, they -- it goes into the P&I

19  account, they take out their, whatever bases points, servicing

20  fee, and then that P&I account ultimately is for the benefit of

21  the trust holders.

22          MS. SPRINGER:  Correct.

23          THE COURT:  So, is that not occurring?  Does that get

24  swept then, does that P&I account then get swept into the --

25  for the benefit of the trust holders?

1          MS. SPRINGER:  I believe so, it's used to pay down --
2   I believe it's used --

3          THE COURT:  So, what are they doing that's not right?
4   What of that is not occurring?

5          MS. SPRINGER:  Your Honor, let me make clear that
6   GMAC is not taking a position that what they're doing is not
7   right if there's no rapid amortization event, and we're not
8   taking a position as to whether there's been a rapid
9   amortization event.

10          THE COURT:  Okay.

11          MS. SPRINGER:  The insurer's position is that there
12  has occurred a rapid amortization event and so instead of using
13  any of those funds for the funding of draw requests, what they
14  should be doing is, they should be putting all the funds in the
15  collection account, net of their fees and they should -- and
16  the notes should be amortizing at a much quicker pace.

17          THE COURT:  All right.

18          MS. SPRINGER:  And that has not been happening, as I
19  understand it.

20          THE COURT:  All right.

21          MS. SPRINGER:  And the problem here simply is this,
22  that unfortunately because of the way these -- the
23  circumstances we're confronted with, we have a lender,
24  obviously, that's in bankruptcy, that only has, presumably, one
25  source of funds to fund the HELOC draws, assuming they don't

1 have a DIP or they can't use any other source of funds, which

2 is I think what Mr. Cleary said, and what's going to happen

3 when GMAC takes back the servicing rights, is that GMAC will

4 receive the funds into GMAC, GMAC has been directed by the

5 various insurers to comply with the documents and has been

6 advised that a rapid amortization event has occurred and under

7 the documents, GMAC is obligated as the new servicer, when it

8 becomes the new servicer, to deposit those funds net of the

9 fees that it gets paid as the new servicer, into that trust

10 account.

11          THE COURT:  All right.  And who controls the trust

12 account?

13          MS. SPRINGER:  The trustee.

14          THE COURT:  The indenture trustee of the trust?

15          MS. SPRINGER:  Right, who will pay the note holders.

16 And the checks, when they get written by the individual HELOC

17 borrowers, GMAC will never even see those checks, they're not

18 on GMAC -- they don't have the GMAC name on them, they have the

19 American Home name on them.

20          THE COURT:  Right.

21          MS. SPRINGER:  So, it's not even something that would

22 ever be within our control.

23          THE COURT:  All right.

24          MS. SPRINGER:  And the problem with just telling

25 people, and Mr. Cleary is right that RESPA does not apply to

1  HELOC's, however, what I'm told by our folks who do this

2  consumer finance type work all the time is that it's customary

3  even in HELOC's to give these notices to give at least a hello

4  and goodbye letters to the HELOC borrowers, even though RESPA

5  really doesn't require it, but the problem with the hello,

6  goodbye letters as prepared under RESPA is that they don't say

7  anything about lending.  It only has to do with servicing and

8  it's just a very simple notice that simply advises the

9  customer, the borrower that instead of paying your loan payment

10  to American Home, from now on you'll be sending your money to

11  GMAC and GMAC will be sending you bills.  That's really the

12  gist of it.  It doesn't have anything to do with the future

13  lending and future draw requests that the borrower may make.

14         THE COURT:  Okay.

15         MS. GREER:  Your Honor, Stefanie Greer from King and

16  Spalding on behalf of CIFG, one of the insurers.

17         I think actually Mr. Wilson from MBIA, who represents

18  -- I'm sorry FGIC, is on the phone, I think he wanted to speak

19  first and then we'll follow him.

20         MR. WILSON:  It sounds great, I appreciate that very

21  much.  Your Honor, I appreciate you allowing me to appear by

22  telephone.  If it thought this would be this complicated, I

23  would have --

24         THE COURT:  Let me just say, you can always ask to

25  participate by phone and the answer is always going to be yes,

1  you can participate, but that doesn't mean you can participate

2  substantively by phone.  The rule is, if you want to make an

3  argument, come to court.  All right.  I'll hear you, but this

4  is way too complicated for me to handle over the telephone and

5  I don't know -- I've said it so many times, you can always be

6  on the phone, that doesn't mean I'm going to let you do

7  anything on the other than listen.  But go ahead.

8          MR. WILSON:  I appreciate that, Your Honor.  I mean

9  this came up really last night and I just couldn't get there

10 from last night, so I apologize for that.

11         We represent FGIC and MBIA Insurance Corporation, I

12 think to make clear we don't object to a notice going out.  We

13 do want to reserve our rights on the rapid amortization issues,

14 but we don't think that needs to be decided today.  I think

15 your summary of the documents and understanding is correct,

16 that when in a managed amortization scenario the Debtors have

17 to fund additional balances, it's their requirement to fund

18 additional balances, regardless of managed amor. or rapid in.

19 But when they fund them, the managed amortization scenario --

20 the transaction buys the additional balance.  I just want to be

21 very clear that the collections and the transaction are not

22 property of the estate and are not owned by the Debtor, but the

23 transactions will purchase the additional balance.

24         And, I just wanted to be clear that we don't view the

25 collections as being property of the estates.

1          THE COURT:  Why not?

2          MR. WILSON:  Because they're collections on the loans

3 that are owned by the estate, I'm sorry, owned by the trust,

4 and either instance, the Debtor has the obligation in the

5 relationship with the HELOC borrowers to fund the HELOC's.  We

6 will, the trust will purchase the additional balance if there

7 is funds available in the managed amortization scenario, with

8 cash and that's a purchase price and when it's paid, it becomes

9 property of the estate when it's paid.  But while it's a trust

10 asset, it's not property of the estate.

11          In a rapid amortization scenario, where there is not

12 sufficient funds available, again, the trust will still buy the

13 additional balance, but the Debtor will get an IOU from the

14 trust on what's called a transferor interest, or a security

15 that's issued out of the trust to the Debtor.  And they will

16 get paid on that IOU over time, as per the trust documents.

17          In the transactions that I'm talking about, the FGIC

18 and MBIA transactions, my information is the Debtor no longer

19 owns the residual interest of the transfer interest.  So,

20 there's really no property of the estate issue we're talking

21 about.

22          But the other concern that we have was eluded to by

23 Mrs. Springer, which is that in a normal situation ordinary

24 course draws in a managed amortization scenario, there may be

25 funds available to reimburse the Debtors effectively.  But if

1  you give advanced notice to the borrowers, they will draw down

2  probably to the full extent of their credit line and there will

3  not be, even in the Debtors interpretation of the documents,

4  there will not be sufficient funds available to fund the draws

5  and the Debtors have not answered the question as to what

6  happens with the deficiency.  Under our documents, under their

7  interpretation, they have to fund the deficiency and they

8  simply won't do it.  And that's why we think it's important

9  that when the notice goes out to the HELOC borrowers, you don't

10 exacerbate the problem by creating a run on the bank, you give

11 them notice immediately that the Debtors will not fund their

12 HELOC.

13       I also want to raise one logistical point and that

14 is, on the CIFG and the FGIC transactions, there has already

15 been an order entered providing for a servicing transfer on

16 January 11th.  So, post January 11th, the Debtors will not be

17 able to fund HELOC's and, therefore, I think we cannot say that

18 the HELOC funding mechanism stops on February 1st, because,

19 again, the Debtors have not given an answer as to how fundings

20 will occur from January 11th to February 1st.

21       MS. CLAWSON:  Your Honor, Kim Clawson from Reed

22 Smith.  If it would help, I have a copy of the -- one of the --

23 actually I have a copy of all of the master loan purchase

24 agreements that are at issue if you would like to read the

25 language.  I'd be more than happy to hand on of them up to you

1  to see.  Everybody's talking about it, you might want to read

2  how it's paid.

3              THE COURT:  All right.  Thank you.

4              MS. GREER:  Your Honor, Stephanie Greer from King and

5  Spalding on behalf of CIFG.

6              THE COURT:  Let me read, hang on, let me read.

7              MS. GREER:  Okay.

8              THE COURT:   All right, yes, ma'am.

9              MS. GREER:  Thank you, Your Honor.  Do you haves any

10  questions with respect to the language or are we clear on how

11  this works?

12              THE COURT:  My reading of the language is entirely

13  consistent with what the Debtors have been doing.

14              MS. GREER:  Which we understand to be -- I mean, my

15  understanding --

16              THE COURT:  Paying themselves out of the principle

17  collections, or funding the draws out of the principle

18  collections.

19              MS. GREER:  But, Your Honor, the way that this is

20  intended to work and we can certainly parse through the

21  language, but the Debtor is supposed to be funding the draws

22  with their own funds and then getting reimbursed, essentially,

23  from the trust assets, from the collections.  It's not that the

24  collections themselves are being used, it's that the

25  collections are being used to reimburse the lender for whatever

1  monies the lender is using to pay down those additional draws.

2          THE COURT:  Draws create additional balances.

3  Additional balances are sold from the seller to the purchaser

4  in exchange for payment out of the principle collections,

5  right?

6          MS. GREER:  Right, that's right.

7          THE COURT:  So --

8          MS. GREER:  So, the draws -- but the draws are --

9  once the additional draws have been paid, and -- the additional

10 draws --

11         THE COURT:  Oh, well, your issue is that it can't be

12 -- that the transaction can't be collapsed.

13         MS. GREER:  Right.

14         THE COURT:  Why not?

15         MS. GREER:  The additional draw is -- there's a

16 request made by the borrower for an additional draw and then

17 the lender is required to pay that draw down and then they get

18 reimbursed from the trust.  So it's --

19         THE COURT:  I don't see reimbursed here.  Where is

20 that language?  In consideration of the sale of additional

21 balances, purchaser agrees to pay seller out of the principle

22 collections.

23         MS. GREER:  Your Honor, I'm using the word reimbursed

24 because essentially that's what happens because the lender is

25 using their own funds first and then getting the money back

1  from the trust.

2          THE COURT:  Yes, but that's not what the language

3  says, and there's nothing in this paragraph that indicates that

4  it has to happen the way you say it has to happen.  I mean, I'm

5  not trying to be difficult.

6          MS. GREER:  No, I understand, Your Honor, and you

7  know we can -- I think that this is, obviously, it's

8  complicated.  My understanding of how the documents work and

9  what the intention of this language was, is as I described and

10  certainly, you know, it's difficult to do this without having

11  the benefit of, you know, whether it's testimony or otherwise

12  as to what this actually means and how this actually operates

13  and I just simply cannot give you more information than my

14  understanding of how this actually works.

15          THE COURT:  I understand.

16          MS. GREER:  So, I do want to, however, address a

17  couple of different points because I do think that because of

18  the way this works, that whether or not a rapid amortization

19  event occurred isn't necessarily relevant, contrary to what I

20  believe Ms. Cleary was saying, as to what exactly should be in

21  the notice and what date that notice should be effective.  And

22  that's for, among other reasons, you know, the reasons that Mr.

23  Wilson described.  Certainly the insurers are not trying to

24  avoid any of their obligations.  What we're just trying to

25  understand and make sure that it's clear is that the

1  collections that are being made on account of the HELOC's are

2  not property of the estate.  So, whatever this question about

3  how this all works, whether GMAC should be ordered to use those

4  collections to allow the Debtors to fund for their draws, those

5  issues, Your Honor, are just simply not for today because none

6  of those monies, none of those collections are property of the

7  estate, they're all owned by the trust and held in trust upon

8  collection for the benefit of the securities holders.  So, I'm

9  just not sure why, you know, Mr. Cleary and the Debtors believe

10 that rapid amortization or a determination of rapid

11 amortization is necessary here.  So, I wanted to first point

12 that out.

13        THE COURT:  Well, you know, again, I'm not so sure I

14 agree with you that it's not property of the estate. The fact

15 that these are revolving lines of credit is what creates the

16 complication and the fact that the borrowers can make

17 additional draws and that -- I understand, I'm getting an idea

18 and I think I understand how it's structured, the complexity

19 for me stems from the fact that the trusts don't own the entire

20 balance of the credit risk.  In other words, it's not like a

21 home mortgage where, you know, I borrow $400,000 to buy my

22 house, okay, and it's put into a securitization vehicle and

23 that trust knows that it owns the balance of the $400,000 owed

24 on the mortgage and is entitled to the principle and interest

25 and there's a servicer and there's a P&I and a T&I account, it

1    all works its way through.  The difficult here, I think, and in

2    that situation I think there's a very strong argument to be

3    made that the servicer is not -- that the funds that are coming

4    into the estate and going out of the estate, really aren't

5    property of the estate, except for the P&I -- well, excuse me,

6    except for whatever money they're owed in connection with doing

7    the servicing.

8            But in this situation it's a little different because

9    the parties have agreed to, in effect, split the exposure if

10   you will or the loan, in other words, the trust only owns the

11   current amount of the draw, whatever that is.  The Debtors are

12   required to fund additional draws and the trust is then

13   required to buy those additional draws and I think that aspect

14   complicates it and the fact that -- the way I read this

15   paragraph, I'll read it again, those draws get funded out of

16   principle collections, it sounds to me like the principle

17   collections are property of the estate.  Because the Debtors

18   are allowed to use it.

19           MS. GREER:  Your Honor, let me just go back because

20   these documents, as you point out, are extraordinarily

21   complicated and it certainly goes much beyond this one

22   paragraph.  The documents which govern this transaction make it

23   absolutely clear, at least in our view, that all of the money

24   coming in, all the principle and interest coming in on account

25   of the HELOC's is put in trust, is put in a collection account

1 which is held in trust for the benefit of the securities

2 holders.  So, these documents, that paragraph and all these

3 other documents, do work together and there are provisions that

4 make it very clear and maybe we can't answer this today, and

5 maybe it is more complicated --

6          THE COURT:  Well, that's -- it's clearly complicated,

7 I don't think there's any question that it's not complicated

8 and I'm not -- I'm trying to understand it as best I can, and I

9 guess I continue to fall back on the fact that if it's this

10 complicated, this notice cannot be the mechanism to resolve it.

11 I just don't see how a motion to compel people to give a notice

12 whatever may be appropriate, can be the mechanism by which I'm

13 going to set a deadline for people to not be able to exercise

14 whatever rights they have under these transactions.  I just

15 don't see it.  I mean, I know GMAC wants it that way, and I

16 know ultimately at some point the Debtor is going to stop

17 funding, I understand that, but I don't see without agreement

18 amongst all the parties in interest as to what that is, I just

19 don't see how I'm in a position to make the determination.

20          MR. INDELICATO:  Your Honor, if I may and, obviously

21 --

22          THE COURT:  I'd love to make a decision for you, you

23 know, what's what I'm here for but --

24          MR. INDELICATO:  -- I agree with the Court and I

25 spent a better part of a weekend trying to understand HELOC's

and I never want to have to do that again, but I think the

simple motion that's before Your Honor, and Ms. Springer made

this point I think at the opening part of her argument and the

objections the Committee had when we discussed this the last

time was there was more in the notice than we thought need be.

She has proposed a very simple notice and the date that would

inserted in that notice would be the date on which the Debtor

is going to stop funding.  And I think we can do that and have

it be the date of the letter, the date of the notice,

everybody's rights will be what they are.  It may give rise to

claims, it may not.  It may give rise to trust fund claims, it

may not.  The Court may have to determine that at a later date,

but in order to sort of, I think, give what GMAC is asking for

is the HELOC borrowers notice that they no longer have a HELOC,

I think that's reasonable.  And, I think the only date you

could put in there that makes some sense is the date by which

the notice is sent and the Debtor has said as of that date, you

will no longer have availability under the HELOC.  That may

create claims or not, but I think that's the only date that

really makes sense in the context of the way this has all be

postured.

          THE COURT:  Well, but I haven't heard the Debtors

agree to that.  I don't know if the Debtors decided what day

they're going to stop lending.  I can't make them stop lending.

Well, I can, I guess but I don't have anything in front of me

1 that would be an appropriate procedural mechanism to require

2 them to stop funding.

3      MR. INDELICATO:  Your Honor, my hope is that that is

4 the Debtors agreement and, if not, I think then the Committee

5 will have to consider filing appropriate pleadings to make sure

6 they stop funding because the way these transactions work, any

7 funding that may continue past the transfer of the servicing

8 may be contributions by this estate, to the trust and we would

9 not permit that.

10      THE COURT:  Yes.  And let me be clear, I mean, I

11 think a notice should go out, I think people should know, I

12 think it's important to protect the consumers and the borrowers

13 and as I think Ms. Springer said, it's the right thing to do,

14 that a notice go out to let these people know.

15      MR. INDELICATO:  We agree with Your Honor.

16      THE COURT:  I can't -- what I guess what I'm

17 ultimately struggling with in trying to understand the

18 transaction and work through the objections, and the comments

19 and I hope I'm not being too difficult in trying to do that, is

20 that I don't think I'm in a position to dictate today what that

21 notice should say, vis-a-vis the date the funding is going to

22 cease.

23      MR. INDELICATO:  I think you're right, Your Honor.

24 All we're suggesting is that it be the date by which the Debtor

25 said they will stop funding.

1          MS. SPRINGER:  Your Honor, as I said earlier, as far

2 as we're concerned, we really don't have an issue with the

3 date.  We're sort of caught between a crossfire here.

4          THE COURT:  But you want a date though.

5          MS. SPRINGER:  We want some date.

6          THE COURT:  Right.

7          MS. SPRINGER:  Only because we believe, what is a

8 notice without a date?

9          THE COURT:  Okay.  Well, it could be accomplishing

10 two things.  I mean, you could be basically putting people on

11 notice that, in effect, inquiry notice, that something bad is

12 about to happen and you'd better think real hard about how

13 you're going to proceed or it can be a notice that says, you

14 know, effective immediately, or effective on February 1, or

15 whatever date it is, you're no longer going to have the

16 financing available for future draw downs.

17          All things in, you know, it's not my money that's

18 going to get spent, it's not necessarily the Debtors money

19 that's going to get spent.  I'm sensitive to the insurance

20 companies not wanting to create a run on the bank, if you will,

21 that will do nothing more than increase their exposure to

22 potentially, you know, people drawing down and not being able

23 to pay them.  I don't think there's any secret that there are

24 issues out there with the liquidity of the market and these

25 types of investments, and the ability of borrowers to pay.

1        So, I guess -- here's where I stand.  I think it's

2   appropriate to have a notice, I think it's appropriate that the

3   notice indicate that GMAC is the new servicer and only the

4   servicer, I think it's appropriate that it indicate that at

5   some date, whatever that date is, there's not going to be any

6   future availability to draw down on the HELOC's.  What I'm just

7   not in a position to do, I don't think, is dictate what that

8   date will be, absent some sort of agreement.

9        MR. CLEARY:  Your Honor, if I may approach, I do have

10  a form of order.  We also, we recognize that -- I'm sorry, form

11  of notice, I misspoke.  If I may approach, I do have a form of

12  notice that we drafted in anticipation of a ruling.  If I may

13  approach, I've shared it with the other parties.

14       THE COURT:  All right.

15       MS. SPRINGER:  But, Your Honor, let me make it clear

16  that we haven't agreed to that form of notice and we're happy

17  to sit down with Mr. Cleary and go over the form and talk about

18  what we would agree to and what we wouldn't, because we just

19  saw it today, this morning.

20       THE COURT:  Well, let me -- I would be very troubled

21  by a notice of this length, font, and complexity.

22       MR. CLEARY: Well, if I could start to explain before

23  everybody starts commenting on it at the moment.  So, let me

24  describe what it is and then I can, obviously, the font and

25  what's highlighted and what's not highlighted, I didn't want to

1  try to get into that and I think that is the appropriate

2  subject of some discussion and whatever the parties believe and

3  the Court, but let me just walk you through what we thought

4  would be appropriate in terms of the notice.

5          And we recognize that this is probably, or this is

6  the first time the borrowers are going to receive notice of

7  this bankruptcy case and so, there is not a bar date that's

8  applicable to them, so if the Debtors are going to be put in a

9  position of spending money to send a notice, we'd like to do it

10  in an efficient manner and have a bar date set at the same

11  time.  We're not tied to what the bar date would be, I picked

12  60 days from the, basically, the date of service, which I

13  thought would be an appropriate date.  If the Court wants 70

14  days then we're not dictating that it has to be 60, 70, we just

15  thought it would be an appropriate time, whatever the parties

16  agreed to.

17          But the notice simply just says that these are

18  Debtors and Debtors-in-Possession, that you're receiving this

19  because you are a borrower, that we're the servicer, that we're

20  no longer going to be the servicer as of a transfer date and

21  there is a date in the one that I've handed to you, but

22  obviously we need to talk with the folks that are in the

23  courtroom today to come up with whatever that date would be, so

24  I'm not asking the Court to rule on that form there.  And then

25  it says that as of the transfer dates GMAC will be the servicer

1  and what we would propose is to put in their address and their

2  toll free number, so if there's any questions or concerns about

3  the servicing, that they would make those phone calls to GMAC

4  who is the new servicer and it also indicates that GMAC is

5  going to be sending them a further notice confirming this

6  notice -- that they will be, so it's kind of the hello,

7  goodbye, even though RESPA doesn't dictate that.  And then

8  we've tracked the language, in essence, from GMAC's notice

9  which says lenders will no longer be able to fund draw requests

10  under the HELOC.  And maybe that needs to be bigger, maybe it

11  needs to be italics, and bold, whatever is appropriate, that

12  was the concept.

13        After that, we've incorporated in the notice and,

14  again, the formatting and the way we present we're not married

15  to, but the concept would be to set a bar date so that we

16  didn't have to go back and then spend additional administrative

17  dollars to send a further notice that said, you have until some

18  date in the future to file a claim to the extent you have a

19  claim.

20        So, that was the Debtors proposal and recommendation,

21  and I would leave it to others and I'm more than willing to

22  take a break and let the other matters go forward and try to

23  talk with the folks in the courtroom to try to work through any

24  particulars, but that was the concept and I hope that comports

25  with what the Court understood.  I understand Your Honor thinks

1 it's --

2        THE COURT:  Well, I -- and I'm not going to give you

3 a bar date in connection with this.  I don't think that's

4 appropriate, you haven't filed a motion for a bar date, in

5 connection with these matters.  I think it unnecessarily

6 complicates the notice.

7        I don't have an issue with, and there may make some

8 sense, frankly, for the notice to be captioned under the

9 bankruptcy court caption and have order of the court at the

10 back.  That may make some sense.

11        Paragraphs 2, 3, 4, 5, 6 and 7 are actually pretty

12 good.  You know, just sort of looking at them quickly.

13 Paragraph 1 is way too complicated, it's going to make --

14 you've defined a lot of terms there that don't need to be

15 defined, I think, and I think it's just going to confuse

16 people.  Again, you know, I'm okay with this concept of a

17 notice and I think there's some provisions of this that make a

18 lot of sense.  But I'm not -- let me just sort of say where --

19 I'm not approving or disapproving the Debtors ceasing to honor,

20 to fund the draws on these loans, that's just not before me.

21 I'm not saying there's a rapid amortization event, I'm not

22 saying there isn't, I'm not saying FGIC and those are giving --

23 I don't want to get into that, it's not properly before me

24 procedurally.  If the parties can agree on a transfer date, or

25 whatever date that this notice is going to be effective, you

1 know, if the parties can agree on that and the Debtors are

2 willing to agree to it, you know, I'm willing to at least

3 entertain a notice that says that.

4          You know, I'm troubled, well, I'm concerned about any

5 notice, if it has the bankruptcy court caption on it, having

6 sort of said that it made some sense I'm now rethinking that

7 issue because I don't want it to imply that the Court has

8 someway approved any of the conduct that's going on.  The only

9 thing the Court has approved is the transfer of servicing,

10 under the documents.  That's all that's been in front of me and

11 the issuance of a notice.  And if we have this under the

12 bankruptcy code caption, we may be running into an issue with,

13 you know, does it somehow imply that by order of the court the

14 Debtors are no longer making any future draws, or honoring any

15 future draws.  If that what the Debtors think is appropriate,

16 and they think they have the authority to make that decision

17 without court approval, so be it.

18          MR. CLEARY:  Okay.

19          MS. SPRINGER:  Your Honor, we did attach, actually we

20 did attach a form of very simple notice.  Now, I realize we had

21 some blank spaces for dates and I realize Your Honor is not

22 comfortable filling in those dates, but you said earlier that

23 you would be comfortable with a form of notice that simply said

24 that at some future time, it could be any time, your draw

25 requests will not be honored and, frankly, I'm comfortable with

1 that, too.   As long as people know that they are at risk and

2 that whatever checks they write on these American Home checks

3 may come back as dishonored, it's fine with me.

4        THE COURT:  All right.  I think we've accomplished --

5 I don't know what else to do.  I'm really at a loss, I can't

6 make you guys agree.  I think we've spent enough time on it, at

7 least for the present purposes.  So, I don't know.  Does

8 anybody have a suggestion?  I mean, do we take a break, do you

9 think you can resolve it?  I'm getting a headache, so that's

10 probably not good for anybody.

11        MR. CLEARY:  Your Honor, we might as well talk in the

12 hall to the extent we can resolve it and maybe the other

13 matters that are scheduled can go forward, if Your Honor

14 doesn't have too bad a headache.

15        THE COURT:  No, it'll go away in a second.  Let's do

16 this.

17        MS. SPRINGER:  If we go away.

18        THE COURT:  As soon as Ms. Springer sits down, I'll

19 be fine.  No, no, I'm kidding.

20        MS. SPRINGER:  I don't want to cause you a headache.

21        THE COURT:  No, no, no, no.  Let's take a short

22 recess and then we'll -- in the meantime, what would be the

23 next agenda item up, Ms. Morgan?  We go back to 9?

24        MR. CLEARY:  Your Honor, I guess we skip over 9 and

25 12.

1          THE COURT:  Because they're all related.

2          MR. CLEARY:  To about 14.

3          MS. MORGAN:  13, 14, 15 and 16 are all, at this

4  point, uncontested motions, Your Honor.

5          THE COURT:  All right.  Well, let's take, say, a five

6  minute recess and then we'll come back, reconvene on 13 and

7  during that time, if you have a chance to try to resolve the

8  issues in connection with 10, I think you have my thoughts.

9  They may be sort of all over the place, but what I'm

10 comfortable doing is approving a very bare bones notice that

11 sets forth -- gives people notice that there's an issue out

12 there.  If the parties can agree on a date, if the parties can

13 agree on some language that deals with a specific date, so be

14 it.  Absent an agreement, I just don't think the notice will

15 have one.  And it will, to a certain extent, not accomplish all

16 of the purposes of the notice, but it will at least put people

17 on inquiry notice, if you will, that there's some bad things

18 that may be happening in connection with their home equity

19 loans.  But I don't think I can do anything more than that.

20 All right, so let's take like a five minute recess.

21         MS. SPRINGER:  Thank you, Your Honor.

22              (Short break in proceedings)

23         COURT CLERK:  All rise.

24         THE COURT:  Please be seated.  How are we doing?

25         MS. MORGAN:  Good afternoon, again, Your Honor.  I

1  understand that they're still not quite ready so if it's okay

2  with the Court we'll move onto item 13.

3          THE COURT:  Okay.

4          MS. MORGAN:  Which is the Debtors motion under

5  Sections 105 and 363 approving procedures for AHM Servicing to

6  enter into subservicing agreements and the entry into one or

7  more specific subservicing agreement.

8          As Your Honor knows, because of the two step closing

9  we had various motions before you today and other days.  Until

10 the legal close the purchaser bears all of the upside benefit

11 and downside risk of the operation of the servicing business,

12 but as you heard at the sale hearing, it was the purchaser's

13 intent to actually expand the business.  Since the Debtors no

14 long originate loans and since there is a normal runoff for

15 these loans, the way to expand the business is to actually

16 purchase additional servicing rights but, again, because the

17 purchaser is not yet licensed, it has to purchase those rights

18 and then ask AHM Servicing to subservice them.  So, that is

19 what this motion is about.  It is requesting authority for AHM

20 to become the subservicer for servicing rights sold by

21 Greenwich Capital Financial Products, Inc., and also request

22 the Court to approve a procedure to enter into these additional

23 subservicing agreements without separate hearing, as long as

24 the noticed parties did not object.

25          Again, the purchaser would be paying the purchase

1 price for these additional service rights, and as set forth in

2 the motion, it's at paragraph 16, the purchaser has agreed to

3 provide the Debtors an indemnity against any losses arising out

4 of or in connection with the provision of these services by AHM

5 Servicing, under these new agreements.  And to be sure that the

6 indemnity was adequate and appropriate, the Debtors and the

7 Committee negotiated, we think, a very good indemnity where the

8 purchaser has agreed that it will not encumber its assets

9 through the occurrence or issuance of debt or withdraw or

10 distribute its capital other than as may be required to provide

11 an adjustment to the purchase price as required by the APA.

12         So, again, Your Honor, there's no economic harm to

13 the estate at all in entering -- if the court were inclined to

14 approve this motion.  The motion is supported by the Creditors

15 Committee and the administrative agent for the prepetition

16 lenders consents to the relief requested in the motion.  We did

17 receive the limited objection from CitiMortgage, which

18 essentially argued that the Debtors should not be undertaking

19 this without providing additional adequate assurance.  The

20 objection also requested that Citi be added as a notice party

21 for the procedures.  We have spoken with Mr. Fallon and we have

22 agreed to add CitiMortgage as a notice party, and based upon

23 that agreement, my understanding is that CitiMortgage's limited

24 objection would be resolved and we have circulated an order to

25 that effect.

1        Your Honor, I am, again, other than that, the matter

2   was uncontested.  I am prepared to go through, we do have a

3   witness in the courtroom, but we do believe that the entry into

4   this agreement is supported by the Debtors business judgment.

5   Again, as indicated, there is no harm to the estate because the

6   servicing business is being run by the purchaser and the new

7   servicing rights are being purchased by the purchaser and we do

8   have an indemnity to protect the estate.

9        I think we can also actually say that this benefits

10  the estate in that the APA requires the Debtor to operate the

11  business in the ordinary course and to exercise commercially

12  reasonable efforts to maintain the business.  And the best way

13  to maintain the business is to actually acquire new servicing

14  rights and have the business be expanding and growing, rather

15  than dissipating through ordinary runoff.  So, we do believe

16  this is in the best interest of the estate and it should be

17  approved under Section 363.

18        THE COURT:  Do anyone wish to be heard in connection

19  with this motion?

20        MR. INDELICATO:  Your Honor, Mark Indelicato from

21  Hahn & Hessen on behalf of the Committee.  We just echo the

22  sentiments made by Ms. Morgan, the Committee does support the

23  motion.  There were long and torturous negotiations with the

24  Debtor and the purchase regarding the terms of the indemnity.

25  The Committee was satisfied at the end product that this was an

1 economically neutral transaction to the Debtor and as Ms.

2 Morgan stated, it does even benefit the estate because it

3 complies with our obligations under the APA.  So, in that

4 regard, Your Honor, we support the motion.

5      MR. FALLON:  Good afternoon, Your Honor, Brett Fallon

6 for CitiMortgage, Inc.  We had filed a limited objection on the

7 grounds that we were concerned what affect this would have on

8 the Debtors ability to service, particularly our loans.  And

9 we've agreed to resolve our objection by being included as a

10 noticed party.  We would certainly hope that in any future

11 servicing agreement, that we wouldn't have any objection to it,

12 and we anticipate that we probably would not, but this does

13 give us the opportunity to take a look at what the servicing

14 agreement would be and then if we had an objection, we would

15 all be in a better position to really determine, in a concrete

16 sense, if it was going to impair the servicing.  And so, I

17 think that this resolution of including us as a noticed party

18 is a good resolution and will give us all something more

19 concrete to focus on if any of the parties have differences in

20 the future.  Thank you.

21      THE COURT:  All right.

22      MS. MORGAN:  Your Honor, we do have pretty

23 significant changes to the order.  We also have an informal

24 objection that I meant to mention, from Fannie Mae, which we

25 resolved through language and then we've had a lot of

1  discussions in the last say or so with the purchaser, which we

2  thought it was important to clarify certain aspects of the

3  language already in the order.  May I approach with a clean and

4  a blackline? Again, it's handwritten, so if Your Honor doesn't

5  think it's legible enough, we can always redo it, but Mr. Lunn

6  did a nice job handwriting it.

7        THE COURT:  I'm sure his third grade teacher would be

8  thrilled.  Thank you.

9        MS. MORGAN:  Your Honor, the first change on Page 2,

10 and this is the clarification that I'm referring to.  Not only

11 should we be permitted to enter into new subservicing

12 agreements, but the purchaser pointed out that it's possible

13 that we would be entering into a new agreement by actually

14 assuming and assigning one that already existed between third

15 parties.  So, that is what this language is meant to capture

16 and you will see that throughout this order.

17        THE COURT:  Okay, I understand.

18        MS. MORGAN:  Yes.  And, obviously, you can see the

19 handwritten change on the bottom to add Mr. Fallon's client as

20 a noticed party.  The change on paragraph 3 is, again, to

21 reflect that there could be an assumption of an existing

22 agreement rather than an entry into a whole new agreement.

23        THE COURT:  What's an unreasonable objection?

24        MS. MORGAN:  Your Honor, I hope you never have to

25 find out.

1              THE COURT:  All right.

2              MS. MORGAN:  You know, again, this is supposed to be

3  neutral to the estate, or beneficial to the estate, so we don't

4  anticipate that we will have objections as long as there isn't

5  something that jumps out at the estate, at the Debtors or the

6  Committee, as being unreasonable.

7              THE COURT:  Okay.

8              MS. MORGAN:  And one of the things, actually, you

9  might as well talk about it now, the changes at the top of Page

10 5, we struggled with the idea that if you're assuming an

11 existing agreement, you could be assuming existing liabilities

12 and they could be significant and that seemed to be odd for us,

13 for a Debtor to do.  The purchaser pointed out that it could be

14 perfectly reasonable under the terms of the particular

15 agreement at hand.  So, we kind of struggled with that a bit,

16 but we framed it, again, to make sure that we, the Committee

17 actually and the administrative agent, could assert an

18 objection based upon the assumption, again, that the assumption

19 of a liability that accrued prior to the date of the assumption

20 of an existing servicing agreement, could be the proper basis

21 for an objection and there would be nothing that would prohibit

22 the Committee and the administrative agent from objecting on

23 that basis.  And, of course, the purchaser would have the

24 ability to oppose that objection, I guess asserting that it was

25 not reasonable or not appropriate.

1           THE COURT:  Okay.

2           MS. MORGAN:  Your Honor, almost all the changes on

3   Page 5 are to reflect, again, the fact that there could be an

4   assumption of an existing agreement in addition to an entry

5   into a brand new agreement.  And at the bottom of Page 5 is the

6   change that Fannie Mae requested.  The original Fannie Mae

7   stipulation provided that the Debtors could not acquire

8   servicing of additional Fannie Mae loans without their consent,

9   and that just carries this provision through into this

10  particular order.

11          THE COURT:  Any other comments in connection with the

12  motion or the order?  All right, hearing, none, I'll approve it

13  as revised.

14          MS. MORGAN:  Thank you, Your Honor.  Your Honor, item

15  14 is another motion to undertake certain activities to help

16  prepare for consummation of the sale.

17          This motion requests the authority to create one or

18  more non-debtor business entities for the purpose of entering

19  into agreements relating to transactions of the purchased

20  assets to the purchaser or relating to the continued operation

21  of the servicing business.  It also seeks authority to fund

22  those entities, to the extent necessary, and to enter into the

23  fourth amendment to the APA which would provide, among other

24  things, that the new transition entities would be deemed to

25  purchase assets under the APA and at final closing would become

1 subsidiaries of the purchaser.

2          Finally, the motion asks for authority for AHM

3 Servicing to enter into an employment agreement with David

4 Friedman.  We had an informal objection for the United States

5 Trustee with respect to that last component, the component of

6 the motion that would seek entry into the David Friedman

7 employment agreement.  So, we have agreed with Mr. McMahon to

8 adjourn just that portion of the motion, along with a motion to

9 place the agreement under seal, to the January 14th omnibus

10 hearing, but we would like to go forward with respect to the

11 rest of the motion today.

12          We did receive two responses from GMAC Mortgage LLC

13 and Residential Funding, LLC.  Both objections expressed

14 concern, or confusion as to whether their servicing agreements

15 were being assigned to a transition entity rather than the

16 purchaser and that was simply not the intent of the motion at

17 all. Perhaps it wasn't drafted as clearly as it could be, but

18 AHM Servicing is not seeking to establish these entities to

19 become servicers under the service agreements.  The sale order

20 already provides that the purchaser will become the servicer

21 upon a final closing.

22          So, I've been asked to represent on the record that

23 the servicing agreements referred to in the GMAC and RFC

24 objections are not being transferred to the transition

25 entities, the sale order continues to govern the transfer of

1  those servicing agreements to the purchaser including among

2  other things, that on a final closing those agreements would be

3  assigned to the purchaser.  And, based upon this clarification,

4  my understanding is that the RFC and GMAC objections would be

5  resolved.

6          Again, Your Honor, the transition entities are

7  intended to be set up as a matter of convenience to enter into

8  third party contracts, such as for telephone services and

9  software services.  Certain third parties have either refused

10 or have not been cooperative in entering into new contracts

11 with the Debtor-in-Possession.  The servicing entity believe it

12 could get better terms and be better able to operate the

13 business if it could have a non-debtor subsidiary that could

14 enter into some of these contact and that would also facility a

15 transition at closing because there would already be contracts

16 in place.

17         Through the fourth amendment to the APA, again, the

18 Debtors interest in these entities would be deemed to purchase

19 assets to be transferred to the purchaser at closing and they

20 would become subsidiaries of the purchaser at that time.

21         The only source of funding, again, would be the

22 working capital of the servicing business which is being run

23 for the benefit of the purchaser.  Again, the Debtors estates

24 would not suffer any negative economic impact if permitted to

25 form and fund these transitions entities and, again, the APA,

1   Section 6.2 provides the purchaser will indemnity the sellers

2   for any losses arising from the seller's ownership of the

3   servicing business, post initial closing.

4         For these reasons, Your Honor, again, we have a

5   witness if Your Honor would like to hear it, but we believe

6   sound business justifications exist for the creating and

7   funding of the transition entities and entry into the fourth

8   amendment.  Again, this is contemplated by the APA, it's in

9   furtherance of the intent of the parties in entering into the

10  APA and since there is no economic risk to the Debtors in

11  undertaking these actions, we do believe it's appropriate under

12  Section 363.

13        THE COURT:  Okay.  Does anyone wish to be heard?

14        MR. INDELICATO:  Your Honor, Mark Indelicato on

15  behalf of the Committee.  As I said before, Your Honor, these

16  are all a bunch of grouped together motions, one complicated

17  transaction.  We do support this motion, we believe it is in

18  the best interest of the estate.

19        THE COURT:  All right, thank you.  Anyone else?  Do

20  you have a revised form of order, Ms. Morgan?

21        MS. MORGAN:  Yes, Your Honor.  A clean and a

22  blackline.

23        THE COURT:   Thank you.

24        MS. MORGAN:  Your Honor, not as many changes to this

25  one.  Primarily, and the begin at Page 3 of the blackline.  We

1  are deleting references to approval of the employment agreement

2  as that is being adjourned.  And that is also the change on

3  Page 4.  And, then attached is the fourth amendment.  The

4  fourth amendment also contains some blacklining, beginning at -

5  - the first substantive comments are at Section 4, and these,

6  again, relate to the motion you just heard regarding entry into

7  subservicing agreements with Greenwich and others, providing

8  for the indemnity that I mentioned.  And I believe those are

9  the only substantive changes to the fourth amendment.

10         And, Mr. McMahon reminded me that, yes, there's also

11  deletions to references to the -- deletion of references to the

12  Friedman employment agreement as that is being adjourned.

13         THE COURT:  All right, any further comments?  I'll

14  approve the order as revised.

15         MS. MORGAN:  Thank you, Your Honor.  Your Honor, item

16  15 is the Debtors motion for an order authorizing an amendment

17  to its post petition Debtor-in-Possession financing facility.

18         The motion was initially approved at the first day

19  hearing, provides for a DIP facility at $50 million dollars and

20  it was approved on a final basis, on September 4.  The Court

21  may or may not recall the DIP facility did not permit the

22  Debtors to use the borrowings to fund operations or expenses of

23  the servicing business.  We had a separate cash collateral

24  arrangement with B of A and its participating banks for that

25  aspect of the business.

1          As the Court probably also remembers, at the initial

2 closing, or right around the initial closing of November 16,

3 our cash collateral arrangement terminated.  Because of the

4 structure of the sale, the initial closing and other events

5 since the petition date, the borrowers determined that they

6 need to amend the DIP financing facility in several respects.

7 And these are all summarized in paragraph 9 of the motion, and

8 I will go through them quickly.

9          First of all the commitment is being reduced form 50

10 million to 35 million.  The original DIP actually had a $50

11 million dollar availability but 10 million of it was completely

12 at the discretion of the DIP lender.  So, it was really 40

13 million, and it is now being reduced to 35 million. It's being

14 reduced, Your Honor, because the Debtors simply don't need that

15 much in the way of DIP financing.  In fact, we have yet to draw

16 on the DIP loan.

17          THE COURT:  All right.

18          MS. MORGAN:  We also are amending the agreement to

19 provide that it would mature upon consummation of the sale of

20 the Debtors thrift, it's banking subsidiary, and that's at

21 paragraph B of paragraph 9.  Your Honor, our banking subsidiary

22 is an unencumbered asset, so at that time we would not need the

23 DIP loan.

24          Item C refers to a reduction in availability in the

25 amount of what's called the LPMI reserve amount.  Your Honor,

1  the Debtors as part of their servicing function were paying

2  lenders purchase mortgage insurance, however, there was an open

3  issue and there still remains an open issue with B of A as to

4  whether funds collected from servicing could be used to make

5  those payments.  B of A took the position that those payments

6  were required to be made to B of A, the Debtors believe they

7  could be used to reimburse the Debtors for LPMI payments that

8  were advanced.  That is still unresolved but the reason it

9  appears in this DIP amendment is that our original DIP order

10 did not contemplate our use of the funds for this purpose.  It

11 was not a part of the DIP budget, so we needed to get a waiver

12 from the DIP lender to allow us to use those funds and which

13 the DIP lender has agreed to do as part of this amendment,

14 However, there will be a reserve against availability of the

15 $12 million dollars in the LPMI payments until we resolve that

16 issue.

17         Item D in paragraph nine indicates that the DIP will

18 be amended to permit use of borrowings to fund advances

19 pursuant to Section 6.17 of the APA.  Again, when we entered

20 into the DIP initially, we did not know that we would have the

21 type of sale that we eventually had.  The APA provides that for

22 those excluded contracts, those servicing agreements that the

23 purchaser did not pick up, the Debtors actually have to make

24 the servicing advances post initial closing.  So we need to be

25 able to do that under our DIP borrowing facility and as

1  initially drafted, it did not permit the use of any funds for

2  the servicing business.  So, that's what that amendment is

3  about.

4          E provides for the DIP lender's consent to use of

5  cash to obtain the release of B of A's liens on the B of A

6  construction loans and that is the subject of the next matter

7  before you, but I'll give you a short preview.  We've agreed to

8  basically pay amounts to B of A, to have B of A's lien released

9  on the construction loan portfolio.  Again, a use of funds that

10  was not contemplated under the original DIP financing

11  agreement, or the original DIP budget, so the lender has

12  authorized our use of the funds for that purpose.  In return, B

13  of A would release it's liens and I'm moving onto now F in

14  paragraph 9.  B of A would release its liens and the DIP lender

15  would obtain a lien in that collateral only until though, the

16  payments that we make to B of A are recovered through ordinary

17  course payments by the borrowers, either through refinancings

18  or through payoffs.

19          And, this, essentially, puts the DIP lender in the

20  position it was before, it was relying on a certain amount of

21  cash being used or being available as collateral. We are using

22  some of that collateral to effectuate the settlement with B of

23  A and once that's recovered, the lien would be released.

24          Item G provides for the DIP lenders consent to our

25  collection compromise sale or other disposition of the B of A

1  construction loans.  Again, that's what's contemplated in the B

2  of A settlement.  H indicates that the lender is waiving any

3  defaults that may have occurred in connection with the Debtors

4  making the LPMI advances.  And for all of its troubles, the

5  administrative agent has requested a fee, an amendment fee of

6  $100,000 which the Debtors consider to be a reasonable fee in

7  light of the waivers provided by the DIP lenders through this

8  amendment and the modifications required.

9         Another feature of this motion and the order

10 approving this motion, really, is that with respect to the B of

11 A construction loan portfolio, once the Debtors have recovered

12 the funds that they use to pay the loan advances, the loan

13 advances is the amount we pay to B of A to basically have the

14 lien released, once we recover that back and recover anything

15 in excess of that, we've agreed with the Creditors Committee

16 that any of those excess funds will be segregated in an escrow

17 account for the benefit of general unsecured creditors, to be

18 distributed pursuant tot a plan, subject to the Debtors right

19 to come back to the Court to ask for another use or the

20 Committee may agree to allow us to use it for other purposes.

21 But basically, the unsecured creditors are hopefully getting

22 the upside of this settlement with B of A.  But because of

23 this, the Committee has agreed to the DIP amendment and

24 supports this motion.

25         And, Your Honor, with that, again, I have a witness

1  in the courtroom who would testify that entry into the DIP

2  facility amendment constitutes an exercise of the Debtors sound

3  business judgment and the payment of the $100,000 fee in light

4  of the concessions and waivers received is reasonable and we

5  would ask that the DIP amendment be approved.

6          THE COURT:  Anyone wish to be heard?

7          MR. INDELICATO:  Your Honor, Mark Indelicato, again.

8  For all of the reasons set forth by Ms. Morgan, the Committee

9  does support the amendment to the DIP.  It ultimately gets us

10 to what we were ultimately looking for and that's what's next

11 on the agenda, the settlement with B of A, so we support the

12 DIP amendment.

13         THE COURT:  Thank you.

14         MS. ALFONSO:  Your  Honor, Ana Alfonso, on behalf of

15 the administrative agent.  I concur with what both counsel have

16 already said and given that this is a condition to the

17 implementation of our stipulation that will be before you in a

18 moment, we request that Your Honor enter it as soon as

19 possible.  Thank you.

20         THE COURT:  Okay.  Do you have a form of order, Ms.

21 Morgan?

22         MS. MORGAN:  Yes, Your Honor.

23         THE COURT:  Thank you.

24         MS. MORGAN:  Your Honor, I believe the only change to

25 this is to indicate that the amendment is substantially the

1  form annexed as Exhibit A.  It's an unsigned version.  The

2  parties have exchanged signatures, they're being held in

3  escrow, they plan to exchange them as soon as the Court

4  approves the motion.

5          THE COURT:  All right.  Anybody have anything

6  further?  I'll approve it as revised.  Oh --

7          MS. MORGAN:  Oh, no, that's it, Your Honor for this

8  one.

9          THE COURT:  All right.  I'll approve it as revised,

10 then.  You want to snatch defeat out of the jaws of victory

11 there.

12         MS. MORGAN:  I can do that sometimes.  Your Honor,

13 item 16 is the Debtors motion under Sections 105 and Bankruptcy

14 Rule 9019 approving authorizing a stipulation between the

15 Debtors and Bank of America, as administrative agent.  This

16 resolves B of A's motion for relief from the stay which was

17 filed on December 4th.

18         Your Honor may recall that motion sought authority to

19 sell the construction loan portfolio, I'm sorry, the

20 construction loans which served as collateral to a potential

21 purchaser which had been identified to the Debtors and B of A.

22 That potential purchaser had expressed, you know, a certain

23 price and a purchase interest in the B of A

24 Construction-to-Perm loan pool but the Debtors believed the

25 price to be inadequate.  In the stay relief motion B of A

1  asserted at that time that the unpaid balance under the loans

2  was 30.478 million.  The Debtors working with the Committee,

3  determined that they could obtain greater value for the B of A

4  Construction-to-Perm loans while still achieving for B of A the

5  result that it seemed to want and that is, it wanted the loans

6  sold quickly and it was pleased with the price that we weren't

7  so pleased with.  So, essentially what this deal does is, is

8  proposes settlement that would provide the B of A $9,143,406

9  which is the value that B of A would have received from that

10 purchase offer that was on the table at the time.

11        I did want to point out for the record that there's

12 an error in the motion at paragraph 29, which indicates that

13 the total payment to B of A under the settlement is 9.3.  Your

14 Honor, we had drafted the motion for approval before the

15 stipulation was finalized and it was in one spot on Page -- I'm

16 sorry, on paragraph 29 where the correction did not get made

17 but the stipulation itself is correct.  It has the right

18 number.

19        The payment would be made in two components, and Your

20 Honor may recall from the motion to shorten hearing, what we

21 were experiencing as borrowers were really attempting to, on

22 their own, refinance these agreements and they were paying them

23 off in full, and as of today there have been additional pay

24 downs of $4,846,723.70.  So that much has already been received

25 by B of A and we have agreed to pay them the balance, again,

1  from the 9.1 figure I mentioned earlier, the balance of

2  $4,296,682.30, which is referred to as the payment amount and

3  we've agreed to pay that within one business day of the Court's

4  approval of the stipulation.

5       As I mentioned on the earlier motion, upon payment of

6  the payment amount and the paid sums, B of A would release its

7  liens and security interests in the B of A Construction-to-Perm

8  loans and the stay relief motion would be deemed withdrawn.

9       Your Honor, there have been no objections filed to

10 this motion.  Again, I do have a witness available if Your

11 Honor would like to hear it.  We do believe the entry into the

12 stipulation and order is in the best interest of the estate and

13 its creditors.  It gives the Debtors the opportunity to explore

14 alternatives, which it thinks is more beneficial to the estate

15 rather than liquidating the B of A Construction-to-Perm loans

16 through a forced sale.

17      As indicated, the pay down of these loans has already

18 exceeded 4.8 million and the Debtors are optimistic that

19 they'll continue to receive pay downs or be able to effectuate

20 resolutions with the borrowers that would affect a greater

21 return for the estate.

22      THE COURT:  All right.

23      MS. MORGAN:  And, also, Your Honor, entry into the

24 settlement avoid the costs and risks of litigation with B of A

25 and we believe that this settlement satisfies the standards of

1  Rule 9019 and should be approved.

2          THE COURT:  Does anyone wish to be heard?

3          MR. INDELICATO:  Your Honor, Mark Indelicato from

4  Hahn & Hessen.  Your Honor, this one, I think needs just from

5  the Committee's perspective, for us to give the Court a little

6  flavor, because I think it's a little unorthodox in a

7  liquidating case for the Committee to agree with the Debtor,

8  for the Debtor to purchase back the very assets which they're

9  seeking to liquidate.

10          But in this case, we had a secured lender who made a

11  motion for relief from the stay seeking to compel a sale of

12  assets at a price which they thought was reasonable in light of

13  the market, but having looked down at the underlying

14  collateral, we just could not get comfortable that we were

15  receiving true value for the value of these assets.

16          So, working with the Debtor, Your Honor, we came up

17  with, or the Debtor came up with, and presented to the

18  Committee some alternatives in which they believe that they

19  could achieve greater value.  The impediment to that, however,

20  was that we were going to have to use otherwise unencumbered

21  estate assets, free assets, to pay off B of A, which is

22  something the Committee was very concerned about, so we had to

23  make sure that there was a quid pro quo for the Committee, for

24  us taking this additional risk of using money that would

25  otherwise be available for creditors and paying off the secured

1  lender.  And the exchange for that, Your Honor, was the

2  agreement of the Debtor that to the extent we have paid off the

3  purchase price, meaning the amount that B of A has already

4  collected, plus the amounts we're paying them back, the balance

5  that we collect from the liquidation of these assets will be

6  put away and used subject to further order of the Court if

7  another need is necessary but really would be put away to start

8  funding a plan and distribution to unsecured creditors.

9          In light of that, Your Honor, once our financial

10 advisors had really drilled down to the underlying collateral

11 and we realized that there was a hope that we could unlock some

12 of the value, that we believe this was truly in the best

13 interest of the estate and as a result of that, we've agreed to

14 a lot of the other motions that have been before Your Honor,

15 the amendment to the DIP, and the like and as a result of that,

16 we strongly support this and urge the Court to approve this

17 settlement with B of A.

18          THE COURT:  Okay.  Anyone else?

19          MS. ALFONSO:  Your Honor, Ana Alfonso on behalf of

20 the Administrative Agent.  Obviously, we support the

21 stipulation, I just wanted to confirm on the record that it

22 will resolve our lift stay motion that's pending.

23          THE COURT:  Okay.

24          MS. ALFONSO:  Thank you.

25          THE COURT:  Thank you.

1          MS. MORGAN:  Your Honor, the only change and it's

2    reflected in the blackline, is at the bottom of Page 7,

3    footnote 3, and it is merely to reflect the updated figure of

4    the amounts paid to B of A between when we filed the motion and

5    today.

6          THE COURT:  Okay.  I'll approve the stipulation.

7          MS. MORGAN:  Thank you, Your Honor.  That takes us

8    back to HELOC's, I'm afraid.

9          MR. CLEARY:  Unfortunately. Your Honor, I think we do

10   have an arrangement by where we would send out a form of

11   notice, I think we do have an agreement amongst the parties of

12   what the notice should look like and an agreement amongst the

13   parties that, basically, the end of the funding under the

14   HELOC's would occur on the transfer date and that we would send

15   a notice out, three days in advance of the transfer date.

16          With that, Your Honor, the notice would take the form

17   of one similar,  I guess partially similar to what I handed up

18   to Your Honor, in the sense that it would have the bankruptcy

19   caption, it would provide notice to borrowers under the

20   HELOC's, it would say, Please take notice and then from there

21   we would certainly clean up the first paragraph and I think

22   what we tried to do is take paragraph 2 through 7 of the form

23   that I handed to you and combine it with, I think the well

24   drafted notice put together by counsel to CIFG which I think

25   eloquently stated what would happen, and if you would prefer, I

1 could read some of that into the record, at least with respect

2 to the CIFG, because I'm not sure that Your Honor has been

3 pointed to that exhibit, but it appears as an exhibit to the

4 CIFG, which is Docket Number 2568, limited objection to the

5 pleading, before the Court.

6       And, in essence, it would say that though home equity

7 draws have been honored since the bankruptcy filing, there is

8 no longer a source to fund any future draws.  Therefore, as of

9 the transfer date, you will no longer be able to borrow any

10 funds that may have otherwise been available under your credit

11 line.  Please be further advised that if you have any pending

12 draw requests under your home equity line of credit, such

13 requests will not be honored.  And it goes further in a new

14 paragraph and says, please remember your existing loan balances

15 remain outstanding and must be repaid in accordance with the

16 terms of the home equity credit line agreement, and ends there.

17       I guess what I propose to do is that we work together

18 to put this form of notice together, submit it to Your Honor

19 under a certificate of counsel for approval.  If the

20 anticipation was we would need to serve it out by Tuesday,

21 because of the transfer date was the 11th with respect to

22 certain of the HELOC's.

23       THE COURT:  Okay.  I'm available Monday, that's fine,

24 or you won't get it done today, I don't expect.

25       MS. SPRINGER:  We would actually try to get it done

1  over the weekend.

2           THE COURT:  All right.

3           MS. SPRINGER:  But it would be our hope to get these

4  out Monday, if possible, because as Mr. Cleary mentioned, we'd

5  like them sent out as much before the 11th as possible.

6           THE COURT:  Okay.

7           MR. CLEARY:  Your Honor, I think the agreement was

8  that it would be three days in advance.

9           MS. SPRINGER:  (Indiscernible).

10          MR. CLEARY:  So, it would be sent out Tuesday, but we

11  would need, obviously, the order and the approval from the

12  Court, so we'll get that to Your Honor first thing Monday

13  morning.

14          THE COURT:  All right.

15          MR. CLEARY:  And we are already making arrangements

16  to execute on that.  That, I believe, brings us back to agenda

17  item, which is the motion of Assured for relief from the stay.

18          We have agreed with Assured with respect to a form of

19  order, which we would present, which is similar to the other

20  forms of order where we transferred the servicing with respect

21  to HELOC's and I believe the servicing transfer date would be

22  February 11th, with respect to the Assured -- I'm sorry,

23  January.  Sorry, January 11th, with respect to those, the

24  transfer date and then it would be similar to the FGIC form

25  that Your Honor heard a couple Fridays ago and similar to the

1  CIFG form.

2          THE COURT:  All right.  Ms. Springer, do you want to

3  take back Ms. Clawson's notebook to her?

4          MS. SPRINGER:  Sure.

5          MR. CLEARY:  If I may approach, Your Honor.

6          THE COURT:  Yes, please.

7          MR. CLEARY:  Thank you.  I can get the notebook as

8  well.

9          THE COURT:  Thank you.  This is the form of agreed

10 order?

11         MR. CLEARY:  Yes, it is, Your Honor.

12         THE COURT:  Does anybody wish to be heard in

13 connection with this?

14         MS. CULVER:  Good afternoon, Your Honor, Donna Culver

15 of Morris, Nichols, Arsht & Tunnell on behalf of Assured

16 Guarantee.  I just wanted to put on the record, consistent with

17 what we did with the FGIC, that there is a paragraph in the

18 order that directs the Debtors, or provides for the Debtors

19 cooperation in connection with the transfer of the loan

20 servicing to GMAC and includes some language respecting what is

21 commercially practicable.  I'm hoping we won't have to trouble

22 the Court for an interpretation of what that means, but we did

23 want to put on the record a reservation of rights in the event

24 that the parties hit any snags in connection with the service

25 transfer.

1           THE COURT:  Okay.  Thank you.  I'll approve the order

2  as submitted.

3           MR. CLEARY:  Thank you, Your Honor.  And, I think Mr.

4  Brady eloquently earlier today advised the Court of our

5  position with respect to the transfer of these loans and we

6  believe that language doesn't require us to spend any

7  administrative dollars doing so.

8           THE COURT:  Understood.

9           MR. CLEARY:  That brings us to, I believe, the final

10  agenda item today.

11           THE COURT:  Item 12?

12           MR. CLEARY:  I've lost my place here.  Which is

13  agenda item number 12.  And, Your Honor, what this motion does

14  is essentially abandons our servicing rights.  We didn't have

15  the luxury of a motion to lift stay pending with respect to

16  this final trust, of which MBIA is the credit enhancer under

17  this trust and recognizing as the Court has already heard,

18  we're not going to be in the position of servicing loans for

19  much longer.  In the papers we did describe the economics of

20  when the servicing becomes expensive to us or we go negative

21  with respect to the servicing.

22           And so, in recognition of that we filed a motion to

23  abandon those servicing rights.  There have been no objections

24  to the motion.  We did have a discussion in this courtroom and

25  I believe Mr. Wilson is on the phone representing MBIA, and

1  what we discussed was modifying the form of order to have the

2  transfer date be February 1.  Other than that, the form of

3  order would take the form similar to what Your Honor just

4  entered with respect to Assured and the other HELOC's, or very

5  similar at least.

6          That is a modification from what we put forth in our

7  papers and, again, there's a hard date that makes it clean to

8  transfer on that date.

9          With that, Your Honor, we would respectfully request

10  that the Court enter that form of order and I do have a

11  modified form of order changing, just simply changing that date

12  in the form of order.

13          THE COURT:  Okay.  Anyone wish -- you may approach.

14  Anyone wish to be heard in connection with this matter?

15          MS. SPRINGER:  Yes, Your Honor.  The only thing that

16  Mr. Cleary didn't say with respect to the MBIA insured

17  portfolio is that the same type of notice to the HELOC

18  borrowers with respect to that portfolio, would go out in

19  advance of the February 1st date.  It would not go out -- it

20  would out like three or four days before the February 1st date

21  as opposed to the January 11th date, which is the transfer date

22  for all the other HELOC's.

23          THE COURT:  All right.  I'll approve the order as

24  submitted.

25          MR. CLEARY:  Thank you, Your Honor.  I guess one

1  other cleanup item, there were some representations on the

2  record probably by all parties, with respect to the complicated

3  HELOC documents and I didn't want any silence on our end

4  because I think there were some descriptions that we don't

5  necessarily agree with, but we'll probably have that fight

6  another day.

7          So, with that, I think that concludes the hearing and

8  thank Your Honor for the time and attention for these complex

9  matters.

10          THE COURT:  All right.   Anything further?  Thank you

11  very much, hearing is adjourned.   Enjoy your weekend.

12          MR. CLEARY:   Thank you, Your Honor.  You too.

13                          * * * * *

14                      **<u>CERTIFICATION</u>**

15

16      I, ELAINE HOWELL, court approved transcriber, certify that

17  the foregoing is a correct transcript from the official

18  electronic sound recording of the proceedings in the

19  above-entitled matter and to the best of my ability.

20

21

22

23  <u>/s/ Elaine Howell</u>              Date:  January 15, 2008

24  ELAINE HOWELL

25  J&J COURT TRANSCRIBERS, INC.