UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
AMERICAN HOME MORTGAGE          .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware      .    (Jointly Administered)
corporation, *et al.*,          .
                                .    Jan. 14, 2008 (2:08 p.m.)
            Debtors.            .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **WITNESS:** | | | | |
| Cutisha Cauthorne | | 16 | | |
| Michele Newsham | 35 | 46 | | |
| Robert Johnson | | 81 | | |

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Good afternoon.

3          MR. BRADY: Good afternoon, Your Honor.  Robert

4    Brady on behalf of American Home Mortgage Holdings, Inc., *et*

5    *al*.  Referring to the amended agenda today, I believe matters

6    1 through 6 are as indicated on the agenda, so that will take

7    us to the first contested matter going forward, that is the

8    emergency motion of Cutisha Cauthorne for relief from stay.

9    Mr. Dorsey and Mr. Enos (phonetical) will be handling that

10   for the debtors, but I yield the podium to the movant.

11         THE COURT: Well, I'll tell you what, we're going to

12   skip out it, let's get the fee applications taken care of

13   because that way a lot of people on the phone can hang up,

14   and we'll save the estate some money.

15         MR. BRADY: Your Honor, I was actually going to joke

16   we should start with the fee applications, but I thought you

17   would say, I was something just a -

18         THE COURT: Well, you certainly are that, but - All

19   right, these are interim fee requests for a variety of

20   professionals.  When it goes to the actual substance of the

21   fee applications my law clerks took on the Herculean task of

22   doing the initial review, and there were some issues, but

23   frankly, given the size and amount at stake in the interim

24   nature of the fee applications requested, I didn't think they

25   were sufficiently troubling in order to sort of nitpick a

1   thousand here, a thousand there on the various professional's

2   fee applications.  I found the - not surprisingly, I found

3   the non-bankruptcy professional fee applications to be a bit

4   spotty on their compliance with our various local rules.  But

5   again, I wasn't - especially given the fact that other

6   professionals, such as the Committee, are keeping an eye on

7   what's going on, I wasn't particularly troubled enough by

8   them, and I do give a bit more lenience, frankly, to non-

9   bankruptcy professionals when it comes to billing in tenths

10  of an hour and complying with our various requirements.  So,

11  subject to whatever outstanding objections there are in

12  connection with funding and where the funding comes from, and

13  I don't know if that's going to have any effect on what type

14  of order I enter, I am prepared to approve the fee

15  applications as submitted.

16          MR. BEACH: Good afternoon, Your Honor.  May it

17  please the Court, Sean Beach from Young, Conaway, Stargatt &

18  Taylor on behalf of the debtors.  Your Honor, with respect

19  to, I believe it was a few objections filed by the Committee

20  and then certain responses filed by the purchaser of the

21  servicing business, those all relate to fee applications with

22  respect to foreclosure professionals in connection with the

23  servicing business.  I believe that the Committee's objection

24  was to make it clear that the payments to those foreclosure

25  professionals were coming out of the working capital of the

1    AHM Servicing business, and the purchaser filed an objection

2    saying that with respect - and I don't mean to describe the

3    full extent of their objection, but I think the gist of it

4    was, with respect to foreclosure professional fees and

5    expenses that accrued prior to the initial closing and with

6    respect to excluded assets that those were not payments that

7    the purchaser felt were to be paid out of the purchasers or

8    out of the AHM Servicing working capital.  Your Honor, we've

9    had discussions with the Committee, with Bank of America,

10   with the purchaser and don't have a full resolution of those

11   issues yet, but for the purposes of today, the purchaser has

12   agreed that with respect to the foreclosure costs related to

13   the purchased assets, that the payments will be made out of

14   the AHM Servicing business, the working capital and the AHM

15   Servicing business, and that the parties all reserve their

16   rights to file pleadings with the Court to have a

17   determination as to whether or not the foreclosure costs

18   related to the period of time prior to the initial closing or

19   that may have accrued or arguably accrued prior to the

20   initial closing, who should bear the cost of those

21   foreclosure costs.  In the debtors' view those are servicing

22   advances, and we believe that the purchaser should be

23   responsible for those out of the working capital of business.

24   The purchaser has a different view of that, but we are trying

25   to work out those issues, and for the purposes of today, the

1   parties agree that that money should come out of the AHM

2   Servicing business, the working capital, and the purchaser

3   reserves its right to file a claim and to reconcile those

4   payments at a later date, and of course, all parties reserve

5   the right to file a pleading with the Court to have this

6   determined if the parties can't resolve the issue.

7          THE COURT: All right.

8          MR. BEACH: There may be other parties that would

9   want to clarify their own reservation of rights, Your Honor.

10         THE COURT: No?  Yes?

11         MR. INDELICATO: Yes.  Good afternoon, Your Honor.

12  Mark Indelicato from Hahn & Hessen on behalf of the

13  Committee.  Your Honor, we filed our limited objection.  Just

14  to make clear on the record, as far as we were concerned,

15  these professional fees either were pre-initial close fees

16  that were incurred by the servicing business, and in our

17  view, should have been paid under the cash collateral order

18  of BofA or they were post-initial close expenses that should

19  have been - will be borne by the purchaser, but what was

20  clear to us, at least in our minds, was that these were not

21  expenses that six months down the line we wanted the debtors'

22  estate to bear and actually coming out of the recovery for

23  unsecured creditors.  We had initially sought assurances from

24  the debtor that that in fact was the case, and we believe

25  that the fact, the way the debtor reviewed the documents and

1  explained it to us, that they believed that that in fact was

2  the case, but we wanted to make sure that nobody was under

3  misapprehension and we weren't before Your Honor six months

4  from now and then everybody saying, Well, why didn't you

5  raise it earlier.  So, as a result of that, we raised it, we

6  wanted all the parties to understand what we believe the

7  issues were, that these weren't expenses that we believe

8  ultimately should be paid by the estate.  They should  have

9  either been paid as they went along prior to the initial

10  close or they should be part of the cashflow paid out of the

11  servicing business going forward.  So, that was our position,

12  and we agree with the debtor that we're happy for everybody

13  to reserve their rights as long as everybody knows that there

14  may be issues going forward.

15        THE COURT: All right.

16        MS. COUNIHAN: Your Honor, Victoria Counihan from

17  Greenberg Traurig on behalf of the purchaser.  We do agree

18  with the reservation of rights that Mr. Beach has put on the

19  record, and we do reserve our rights with respect to these

20  particular fee applications as well as the fee applications

21  that will be filed in the future until we come to an

22  agreement on this issue.

23        MR. TALMADGE (TELEPHONIC): Your Honor, this is

24  Scott Talmadge from Kaye Scholer on behalf of Bank of

25  America.  We also agree with the reservation of rights that

1    as long every party has a reservation to assert whatever

2    arguments they need to in the future as to who's responsible,

3    we're okay with the methodology that the debtors have worked

4    out now.

5         THE COURT: All right.  Do you have a form of order,

6    approving everyone's fees except Hahn & Hessen's.

7         MR. INDELICATO: Then I'll be spending a little more

8    time in Delaware, Your Honor.

9         MR. BRADY: If I may approach, Your Honor?

10         THE COURT: Yes.  Thank you.  All right, I'll

11    approve the fees.  I'm signing the order, and anyone that's

12    on the phone solely for the fee application process, please

13    feel free to hang up.  All right, now let's backtrack to

14    agenda item 7.  That goes for anyone in the courtroom as

15    well.  Obviously, if you're just here for fee apps you don't

16    need to stay.  Good afternoon.

17         MR. HOGAN: Good afternoon, Your Honor.  Daniel

18    Hogan on behalf of Cutisha Cauthorne.  Your Honor, thank you

19    for allowing us to be heard today.  You'll recall that back

20    in November we were before the Court on an emergency motion

21    for relief from the automatic stay in order for Ms. Cauthorne

22    to pursue a multi-faceted lawsuit in the federal court down

23    in Virginia regarding Regulation Z and really relating at its

24    crux to a refinancing transaction that she was involved in,

25    in November of 2006.  Today, Your Honor, pursuant to the

1   hearing that we had back in November, you had required of us

2   that we make this an evidentiary hearing, and based on that,

3   Your Honor, I have produced today and have available for

4   testimony both Cutisha Cauthorne as well as John Worrily

5   (phonetical), her attorney from Virginia, who is looking to

6   prosecute the federal court action.  One of your questions on

7   the 21st of November related to whether or not we were in the

8   Fourth Circuit, in the rocket docket, I think was your

9   characterization, and I've been able to ascertain that in

10  fact to the extent that we get the relief that we request, we

11  would be proceeding on that rocket docket, and I have it from

12  Mr. Worrily that we would be able to get this matter resolved

13  if we're allowed to proceed well before the October deadline

14  that we articulated to the Court.  That being said, Your

15  Honor, I can make a proffer as to what Ms. Cauthorne's

16  testimony would be or we can put her on the stand, and I can

17  walk you through the elements of the factual allegations as

18  we understand them and why it is that we believe that we're

19  entitled to relief from the automatic stay.

20          THE COURT: All right.  Is there any objection to

21  the use of a proffer?

22          MR. DORSEY: No objection, Your Honor.

23          THE COURT: All right, we'll proceed by proffer

24  then.

25          MR. HOGAN: Thank you, Your Honor.  Ms. Cauthorne

1   will testify, Your Honor, that in August of 2006 she acquired

2   her primary residence and obtained a first mortgage with

3   American Home Mortgage.  She was essentially unhappy with the

4   terms of her original mortgage financing and proceeded to

5   contact Aggressive Mortgage Brokers to refinance her loan.

6   She underwent the initial application process with Aggressive

7   and was approved for a loan and proceeded to go, or at least

8   it was represented, that she proceeded to go to settlement on

9   or about November 27th of 2006.  At that time, Your Honor, she

10  reviewed the documents in question.  She determined that

11  there was a discrepancy between that which had been

12  represented to her in terms of a good faith estimate and what

13  the actual terms of her arrangement, the financing agreements

14  were.  She declined to proceed to settlement.  She would

15  testify that she was contacted by representatives of both

16  Aggressive Home Mortgage and First Choice Title that she

17  should, in fact, take the financing in place, that she

18  misunderstood the terms, and that she should go to settlement

19  on November 30th, even though the documents were dated

20  November 27th.  Effectively, they told her that she could back

21  date the documents.  The import of that, she'll testify, if

22  allowed, is that her three-day right of recision which is the

23  essential part of Regulation Z and really her greatest right

24  in a refinance process, is the three-day cooling off period.

25  The three days wherein a consumer can take and review what

1    they've done and ascertain whether or not it's in their best

2    interest to proceed.  Her three-day right of recision was

3    winnowed down from a period of three days to a period of

4    about six hours, and as a result of that, she did attempt to

5    rescind her transaction, as she would testify, but that

6    recision was apparently either faxed to the wrong recipient

7    at the instruction of the closing agent and not of American

8    Home.  So, she'll testify as to her loss of rights with

9    regard to the recision.  More importantly, I think, however,

10   Your Honor, she'll testify as to a discrepancy in the loan

11   documents.  Specifically, the promissory note was a

12   promissory note specifically for an adjustable rate period

13   with the first five years having a fixed payment, and there

14   was also a rider to the promissory note which also

15   articulated a five-year period of fixed payments.  Your

16   Honor, this is one of the typical loans that we've read about

17   in the paper about variable rates, negative amortization,

18   it's got it all.  There's a prepayment penalty.  It's a

19   document that is very sophisticated, and one that if you go

20   through and read all the various elements of, there are

21   discrepancies.  And, at the end of the day, she signed this

22   document, again, with the three-day right of recision

23   redacted down to a period of six hours.  She did sign it.

24   She also signed, which isn't included in our documents

25   because we don't have it, she signed a Federal Truth in

1    Lending Disclosure Statement, and the import of that document

2    is that it corresponded exactly to the terms of this

3    promissory note, and by that I mean, specifically, it

4    articulates a 60-month period of fixed payments, principal

5    and interest.  After closing, after she tried to - attempted

6    to rescind, she then got back the documents that she had

7    purportedly signed at settlement.  Attached to that package

8    of documents was, in fact, the same promissory note, but

9    there was a separate Federal Truth in Lending Disclosure

10   Statement.  That Federal Truth in Lending Disclosure

11   Statement has a 20-month period of fixed payments, and so,

12   we're talking about a 40-month discrepancy and her ability to

13   rely on her documents to say, Well, my payments are fixed for

14   60 months or my payments are fixed for 20 months.  So we have

15   these documents.  We've got the one - and I could present all

16   of the documents.  I have them here.  It's part of my

17   proffer, Your Honor.  But, the point of it is, is that we've

18   enlisted a handwriting expert who is - and I've got the

19   report, represents that the document in question, the Federal

20   Truth in Lending Disclosure with the 20-month fixed payment

21   is in fact a forged document.  So, we've got a situation

22   where we've got a redacted period of recision, we've got -

23   and who's responsible for that remains to be seen, Your

24   Honor, but we have got documents from American Home Mortgage,

25   American Conduit - American Brokers Conduit who's, I

1    understand, a part of American Home Mortgage, which indicate

2    there's some discrepancy in theses loan documents, and the

3    import of all this, Your Honor, is that there's a $250- to

4    $300,000 interest discrepancy, and by that I mean, if Ms.

5    Cauthorne is forced to make the payments according to the

6    Federal Truth in Lending Disclosure that was forged and the

7    promissory note, well, she's going to pay $250,000 more in

8    interest than she would pay if she were to pay according to

9    the understanding in the Federal Truth in Lending Disclosure

10   Statement that she has.  And so there's real harm here, and

11   this harm is going to start to accrue in October of this year

12   because the 20-month period in question ends on the first day

13   of October, 2008, as opposed to 40 months out from that.  And

14   so, there's a real harm there, Your Honor, and if she's

15   allowed to testify, she would testify as to those facts and -

16   let me just check one thing here, Your Honor, I want to make

17   sure I covered all my points.  Oh, yes, Your Honor, also, in

18   an attempt to mitigate and deal with this issue in such a way

19   that we wouldn't have to be before Your Honor with this

20   discrepancy or this issue between the parties, the debtor has

21   a loss mitigation program, and Ms. Cauthorne attempted to

22   avail herself of those rights and wrote to American Home and

23   attempted to enlist their assistance in that program, and one

24   of the exhibits that I would proffer, she was denied any

25   assistance in that regard.

1          THE COURT: All right.  Do you want to move your

2     documents in evidence then?

3          MR. HOGAN: I'd like to, Your Honor, if I could.  I

4     will present a copy, of course, to debtors' counsel, and just

5     for the record, Your Honor, I can go through them quickly.

6     Exhibit A is a HUD-1 settlement sheet.  Exhibit B is the

7     entirety of the adjustable rate mortgage together with all

8     the requisite riders.  Exhibit C is the five-year fixed

9     payment, 12 month MTA index power arm disclosure.  Exhibit D

10    is the forensic document examiner's report regarding the

11    forged document.

12         THE COURT: Uh-huh.

13         MR. HOGAN: Exhibit E's interesting in that it is

14    the actual Federal Truth in Lending Disclosure that was

15    forged and the faxed cover sheet is there, Your Honor, merely

16    to show that when we did get it, it came directly from

17    American Home, it didn't come from the broker.  And then

18    finally, F, Your Honor, is the American Home Mortgage

19    Servicing letter regarding the loss mitigation program and

20    her inability to avail herself of those rights.  And so,

21    unless there's an objection, I'd offer those as evidence.

22         THE COURT: All right, you may approach.  Any

23    objection, Mr. Dorsey?  Thank you.

24         MR. DORSEY: I think I would object to Exhibit D,

25    Your Honor, as hearsay, the forensic expert's report.

1          MR. BRADY: I'll cede the podium at this time, Your

2     Honor.

3          THE COURT: Mr. Hogan, response to the hearsay

4     objection to Exhibit D?

5          MR. HOGAN: Your Honor, I anticipated that objection

6     would be forthcoming.  The expert was not able to avail

7     herself to be here today, and there really isn't any basis

8     for me to override that objection that I'm aware of.  It

9     probably is hearsay, Your Honor.

10         THE COURT: All right, Exhibit D will not be

11    admitted.  Any other objection, Mr. Dorsey?

12         MR. DORSEY: No, Your Honor.

13         THE COURT: All right, Exhibit A, B, C, E, and F are

14    admitted.   Do you wish to cross-examine the witness?

15         MR. DORSEY: Yes, Your Honor.

16         THE COURT: All right.  Ms. Cauthorne, will you take

17    the stand, please.

18                     CUTISHA CAUTHORNE

19    having been duly sworn testifies as follows:

20         THE CLERK: Please state your full name for the

21    record and spell it.

22         THE WITNESS: Cutisha T. Cauthorne, first name is

23    spelled C-u-t-I-s-h-a, middle initial T as in Tom, last name

24    Cauthorne, C-a-u-t-h-o-r-n-e.

25         THE CLERK: Please be seated.

1                    CROSS-EXAMINATION

2  BY MR. DORSEY:

3  Q.  Good afternoon, Ms. Cauthorne.

4  A.  Good afternoon.

5             MR. DORSEY: John Dorsey, Your Honor, for the

6  record, Young, Conaway, Stargatt & Taylor on behalf of the

7  debtors.

8             THE COURT: Ms. Cauthorne, would you please move the

9  microphone a little closer to you.  You can bend it - there

10  you go, that's perfect, thank you so much.

11             THE WITNESS: You're welcome.

12  BY MR. DORSEY:

13  Q.  Ms. Cauthorne, I just want to make sure we understand

14  exactly what the complaint is that you have against the

15  various parties involved with the closing of your loan, and

16  in conjunction with that, you wrote a letter to American Home

17  Mortgage in April of 2007 in which you laid out for American

18  Home what had happened with your mortgage; correct?

19  A.  Correct.

20  Q.  And in that letter you explained that it was your belief

21  that the mortgage broker that you had been working with had

22  misrepresented to you what the terms of the loan actually

23  were.

24  A.  Yes.

25  Q.  And the problem that you have with it was, there was a

1    couple of problems.  One was that the amount of the payments

2    that you were supposed to make under the loan were different

3    than what the broker had told you that they would be.

4    A.   Yes, sir.

5    Q.   And this was a loan where you had several different

6    options for payments; correct?

7    A.   That is correct.

8    Q.   There was a minimum payment that you could make; right?

9    A.   Yes.

10   Q.   And you understood that that minimum payment, which in

11   this case was about $1,462 didn't pay all of the interest

12   that was actually due for a given month; right?

13   A.   Yes, I understood that.

14   Q.   And when you only made the minimum payment, that meant

15   that the additional interest that was charged for that month

16   got added to the principal amount of your mortgage loan.

17   A.   Yes, I understood that.

18   Q.   And then the second option you had was to make the

19   interest only payments; correct?

20   A.   Correct.

21   Q.   And under the terms of the loan that you had, the

22   interest only payment would have been around $3,200; is that

23   right?

24   A.   No, well, what the broker, Kim Garnette (phonetical),

25   what she had advised us that my interest only payment would

1  be approximately 2,575.

2  Q.  But that was different than what actually the loan

3  provided for.

4  A.  Yes.

5  Q.  The loan payments - under the loan documents it was

6  actually more like 3,200/3,300 in that range; correct?

7  A.  When I called American Home Mortgage to find out what the

8  other three options would be, they were actually a $1,000

9  more than what Kim Garnette had told me.  So, the actual, I

10  think the interest only payment was approximately 3,500.

11  Q.  Thirty-five hundred, okay.

12  A.  Uh-huh.

13  Q.  And then there was a full payment that you could have

14  made, which according to you, Ms. Garnette, who was the

15  broker you were working with?

16  A.  Yes, sir.

17  Q.  She told you that that full payment which would include

18  the principal and some - the interest and some principal -

19  A.  Yes.

20  Q.  She told you that would be about $2,957?

21  A.  That is correct.

22  Q.  And it was actually more like $3,900.

23  A.  That's correct.

24  Q.  And you could have made a 15-year payment plan which

25  would require you, according to her, Ms. Garnette, to pay

1  3,968 per month; right?

2  A.  Yes.

3  Q.  But it was actually more like $4,900.

4  A.  Correct, and that - the 15-year payment was never an

5  option for me.

6  Q.  Okay.  Would you have been able to afford the minimum

7  payments under the loan or can you afford the minimum

8  payments?

9  A.  Yes, I can.

10  Q.  The interest only - Can you afford the interest only

11  payments under the loan?

12  A.  I can afford the payments that Ms. Garnette had told me

13  what they would be, the 2,575.  Currently, the interest only

14  payment is about $3,600/$3,700 which, no, I cannot pay that.

15  Q.  You cannot pay that, okay.  But that was the amount that

16  was actually in the loan documents that you signed when you

17  signed your mortgage?

18  A.  That particular amount was not listed anywhere in my

19  documents.  The minimum payment was - I saw the rates for the

20  margin in the index, but what I relied on, again, was the

21  information that Ms. Garnette had provided and then also what

22  was in my Truth in Lending Disclosure, and again, those

23  payments were not listed there.  It only listed 20 payments

24  at the minimum payment and then beginning October 1st, at

25  payment number 21, they were jumping to about $3,800, and I

1    refused to sign that particular Truth in Lending.  I only

2    signed the one that Ms. Garnette had provided which listed 60

3    payments at the minimum amount and at that time I understood

4    with the minimum payment being - I think it was like 1,462 or

5    something similar, that amount would again guarantee that the

6    other options would be 2,575 for the interest only and then

7    the 29, I think, 57 for the full payment.

8    Q.  And that's what Ms. Garnette had told you.

9    A.  Yes.

10   Q.  Did anyone from American Home ever tell you that?

11   A.  No, American Home did not, did not say that.  When I

12   called them after I had gone to closing, they told me what my

13   payments would be and again, they were $1,000 more than what

14   the broker had indicated.

15   Q.  Okay.  And prior to your going to closing, you received a

16   packet of information directly from American Home; is that

17   correct?

18   A.  I'm not certain.

19   Q.  Okay.  Let me show you a document, maybe that will help

20   refresh your recollection.

21           MR. DORSEY: May I approach, Your Honor?

22           THE COURT: Yes.  Thank you.

23   BY MR. DORSEY:

24   Q.  The cover of this document is a transmittal sheet that

25   shows from American Brokers Conduit to you, Cutisha

1   Cauthorne; does this help refresh your recollection about the

2   packet that you received before the closing?

3   A.  I would probably say, yes, if I can recall correctly.

4   Q.  Good.  And if you look at the top of this document it was

5   faxed to our offices on January 11, so you can see the fax

6   line there.

7   A.  Uh-huh, yes.

8   Q.  And if you'd turn to what's marked at the top of that is

9   page 14 on those fax lines, please.  Do you have that in

10  front of you?

11  A.  Yes, I do.

12  Q.  That's a Truth in Lending Disclosure Statement form?

13  A.  That's correct.

14  Q.  And this one is the 20 month with the amount listed at

15  1,342 and then beginning the 21st month they jump to 3,854.

16  A.  That's correct.

17  Q.  And this is the one American Home sent you originally

18  that you talked to the broker about and said this isn't what

19  you thought you were getting.

20  A.  Yes.

21  Q.  Okay.  And then you say that the broker then gave you

22  another Truth in Lending form?

23  A.  Yes, she did.  It had 60 payments at the minimum payment,

24  the 1,342.

25  Q.  Did the broker tell you where she got that Truth in

1   Lending Statement from?

2   A.  No, she actually faxed it to my office because I pointed

3   out to her on this Truth in Lending that this wasn't correct,

4   because 20 payments, of course, isn't five years, and I had

5   email correspondence with her, and she said that it was

6   wrong, and she faxed to my office another Truth in Lending

7   that had the 60 payments outlined.

8   Q.  Okay.  Were you aware that under the terms of your

9   mortgage that you were getting, the note that you signed -

10  A.  Uh-huh.

11  Q.  - there was a provision that talked about what happens if

12  the interest is allowed to accumulate, the reverse

13  amortization, as it's been referred to, where some of the

14  interest is continuing to be added to your principal amount,

15  that at some point it would reach a level where your payments

16  would revert to a standard payment as opposed to the minimum

17  payments?

18  A.  I understood that at some point if my loan got to be

19  about 110 percent of the value, and I think it would have

20  been 465,000, that my payments would adjust at that point.

21  Q.  Okay.  And that was disclosed to you in the adjustable

22  rate note that you signed at closing?

23  A.  Yes.

24  Q.  If you would turn to Exhibit B that was introduced by

25  your counsel.

1   A.  I don't have it.

2   Q.  Oh, you don't have those in front of you?

3          THE COURT: Why don't you give her the whole

4   package, Mr. Hogan, just in case.

5          MR. HOGAN: Sure.

6          THE WITNESS: Thank you.  I'm sorry, what page?

7   BY MR. DORSEY:

8   Q.  I'm sorry.  If you look at the first page of the

9   document, at the very top.

10  A.  Yes.

11  Q.  There's in bold letters, it actually describes for you

12  the - what happens if the principal goes up to 165 or 110

13  percent of what your original loan amount was, that in that

14  case, the amount of the payments would be restated; correct?

15  A.  Right.

16  Q.  Right.  And if you turn to section 4(h) of the agreement,

17  and that's on the third page.

18  A.  Yes, I have it.

19          THE COURT: We're on Exhibit B?

20          MR. DORSEY: Yes, Your Honor.

21          THE COURT: Thank you.

22  BY MR. DORSEY:

23  Q.  4(h), that describes for you what you had described that

24  if your loan reached the maximum 110 percent that your

25  payments would be restated; correct?

1   A.  Yes.

2   Q.  And did you understand that if you made the minimum

3   payments under the mortgage that you had been given, that

4   after 20 months you'd reach that 465 threshold?

5   A.  Yes, I understood that.  At that point I would probably

6   be at 465, but - it's kind of difficult to understand because

7   what Kim Garnette had mentioned is that I have a five-year

8   fixed payment, and it really doesn't quite equal if you do 20

9   payments because then they would change, which would sort of

10  change originally the five-year fixed payments, you know, I

11  wouldn't have that.

12  Q.  Right.  So you understood if you made the minimum

13  payment, you wouldn't actually have five years to be able to

14  make the minimum payment because the interest would continue

15  to amortize and the loan would reach that 110 percent;

16  correct?

17  Q.  Well, when I spoke to Kim, it was never my intention to

18  pay the minimum payment.  My intention was always focused on

19  the other payments, the 2,575 and the 2,957.  What she and I

20  had discussed that that would be a better loan for me and -

21  because I could afford the 2,575, and I also could afford the

22  2,957.  So paying the minimum payment was never an option for

23  me, so I didn't focus on the negative amortization.  That

24  wasn't something - that wasn't a reason I was getting this

25  loan.  I was getting the loan because I wanted the fixed

1  payments of the 2,575 and the 2,957.

2  Q.  Right, but you understood that under the Truth in Lending

3  document that had been sent to you by American Home, which I

4  showed you as -

5  A.  Yes.

6  Q.  - Debtors' Exhibit 1, that if you had paid only the

7  minimum payment for 20 months you would hit that threshold

8  and your payments would go up.

9  A.  Well, I don't know at that time.  What I saw was the 20

10  payments and then payment number 21 was jumping to 3,857.

11  Q.  Okay.

12  A.  So, I didn't say, well, at that point, I must have

13  reached 465, I just knew that at payment 21 it was going to

14  jump to 3,857, and I knew I couldn't afford that.  So I

15  refused to sign that document at closing, and she pulled it.

16  She as Amy Porterfield (phonetical) from First Choice Title,

17  she pulled it to the side, and I didn't sign that.

18  Q.  Okay.  And then she faxed over to you another form?

19  A.  No, she did not.  I called Amy Porterfield from First

20  Choice Title and Settlement after going through my documents,

21  and I realized that my Truth in Lending Disclosure wasn't in

22  there, and she kept putting me off, saying that they couldn't

23  find a copy.  I asked her what happened to the other

24  documents that I signed.  She said they had been sent to

25  American Home Mortgage, and after a couple of days going back

1    with her and she wouldn't return my phone calls, I said,

2    well, I'll just contact American Home Mortgage and have them

3    send over a copy and the young lady, I forget her name, it's

4    on the cover sheet of the fax that she sent, she faxed it to

5    my office, and I immediately noticed that that wasn't my

6    signature.  That wasn't the document I signed at closing.

7    Q.  And you testified through your proffer that you had been

8    given another form to sign at closing that showed 60 payments

9    at the 1,362.

10   A.  Yes, sir.

11   Q.  And did you keep a copy of that document, the closing?

12   A.  I have looked high and low.  I do not have it.  I think

13   what I did is I shredded it because Ms. Garnette had sent

14   over a couple of pages from the note, and I shredded those

15   documents because I knew that they would be at settlement,

16   and when I spoke to Amy Porterfield, she, of course, agreed

17   that I had not signed the 20-payment Truth in Lending

18   Disclosure, that I signed the other one, the 60 payments, but

19   she would never send me a copy, and I assumed that after I

20   had gotten the copy from American Home Mortgage that that's

21   why they couldn't present the document I signed because they

22   had a forged one.

23   Q.  Did you contact Ms. Garnette and ask her to send you a

24   copy of that document?

25   A.  Yes, I have.

1   Q.  And what response did you -

2   A.  Everyone says that they have no idea.  It's as if it

3   never existed.  No one has a copy and she couldn't present

4   another one.

5   Q.  Okay.  Then after the loan closed, that night -

6   A.  Yes, sir.

7   Q.  Well, let me just step back just one moment.

8   A.  Uh-huh.

9   Q.  You also testified in your proffer that you went to the

10  closing on the 30th, after having originally gone on the 27th

11  and thought there was discrepancies in the documents and you

12  didn't want to sign them; correct?

13  A.  Yes.

14  Q.  And you told that to Ms. Porterfield who was coming to do

15  the closing for you.

16  A.  Ms. Porterfield came to my home on the 27th, and we were

17  getting ready to do the closing.  I looked at documents.  I

18  compared them to the loan that I currently have, and I said

19  the rates didn't seem right.  I wasn't very clear on what the

20  margin and the index, what those were, but when you looked at

21  all of the other documents, I said, they just don't seem

22  right, so I apologized to her for wasting her time and having

23  her come all the way to Fredericksburg, but I sent her home,

24  and that next day I spoke to Kim, and she again explained,

25  you know, what my payments would be, which is my main focus,

1   and I agreed to go to closing on the 30th, and both Kim and

2   Amy told me to go ahead and back date documents which would

3   prevent them from having to just redo documents with just the

4   date.  I didn't see any problem with it, so I, you know, did

5   what I was instructed.

6   Q.  The documents that had already had the date typed in

7   ahead of time?

8   A.  Yes, they were typed in November 27th.

9   Q.  And did you ask them why they wanted you to back date the

10  documents?

11  A.  Yeah, she simply provided an explanation that it would

12  prevent them from having just to redo documents, to reprint

13  documents.

14  Q.  Did anyone at American Home ever tell you to go ahead and

15  do the closing on the 30th even though the documents were

16  dated on the 27th?

17  A.  No, they did not.

18  Q.  Now, after the closing, you sent to Ms. Porterfield,

19  faxed her that night, a copy of the recision document;

20  correct?

21  A.  Yes, sir.

22  Q.  And why did you send it to her?

23  A.  That's what she instructed me to do at closing.  She said

24  if I had any issues or was still unclear on the loan to fax

25  it in by midnight that night to her office, and I did.

1   Q.  At the closing you did sign a document that told you how

2   to go ahead and do a recision; correct?

3   A.  That is correct.

4            MR. DORSEY: May I approach, Your Honor?

5            THE COURT: Thank you.

6            THE WITNESS: Thank you.

7   BY MR. DORSEY:

8   Q.  Do you recognize this document?

9   A.  Yes, I do.

10  Q.  This is the notice to you about the required federal law

11  about your right to rescind; correct?

12  A.  Yes.

13  Q.  Is that your signature on this page?

14  A.  Yes, it is.

15  Q.  Okay.  And in the middle it says how to cancel and it

16  gives you instructions there that if you decide to cancel the

17  transaction, you should do it in writing to American Home

18  Mortgage?

19  A.  Yes.

20  Q.  Was there a reason why you didn't follow this document as

21  opposed to what Ms. Porterfield told you?

22  A.  On the 30th, that night, I went to Staples, and I know Ms.

23  Porterfield had said to fax the right to cancel to her if I

24  wanted to - if I changed my mind, and I went to Staples, and

25  I faxed - I also attempted to get a number for American Home

1    Mortgage because I was actually going to fax it there as

2    well.  I didn't think I had enough time to put - to get it

3    there because it was almost 12 o'clock that night.  It was

4    late, and I knew I had to meet that deadline of the 12:01, so

5    I didn't have a number but that was just an extra measure

6    that I was going to take.  I felt that with faxing it to Amy

7    Porterfield, as she had said, that that was enough because at

8    closing she didn't say, you know, this is where you have to

9    send it, this is what you have to do.  She said to fax it to

10   her, and I also called and left a message at her office,

11   everything, that night, letting her know that I had sent the

12   right to cancel.  I did not want to proceed with the loan,

13   you know, to please not send my paperwork in, everything, and

14   I felt at that time that I had done all I could do at that

15   moment to send it in and let them known that I wasn't

16   interested in proceeding with the loan.

17   Q.  Okay, and then the following morning, you received a

18   number of calls from Ms. Garnette, the broker?

19   A.  Yes, I did, ten or more.

20   Q.  And she was - I'm sorry?

21   A.  I'm sorry, ten or more phone calls that morning on my way

22   into work.

23   Q.  And eventually you did talk to her and she convinced you

24   not to rescind the loan?

25   A.  That is correct.  We talked again.  She advised me what

1   my payments would be, and she said that I would have to call

2   the title company and tell them to destroy the right to

3   cancel.  She could not do it, to call them and have them

4   destroy that, and then we could proceed with the loan.

5   Q.  And what did she tell you about - What did she tell you

6   to convince you to withdraw the recision?

7   A.  That my payments were exactly what she said they were.

8   She had - Actually I saved the message on my voice mail that

9   my payments were what she said they would be.  I had nothing

10  to worry about.  She was going to take care of me, everything

11  to convince me that this loan was okay.

12  Q.  And you feel that Ms. Garnette was misrepresenting to you

13  at that point?

14  A.  Very much so.

15  Q.  Okay.  Now soon after you withdrew the recision, you also

16  retained an attorney; correct?

17  A.  That is correct.

18  Q.  And that was a Mr. -

19  A.  Mr. Sean Tulicheck (phonetical).

20  Q.  Tulicheck, I didn't know if I was going to be able to

21  pronounce that.  And Mr. Tulicheck wrote to American Home on

22  your behalf a number of times, but the first one was on

23  January 15th of '07; correct?

24  A.  I'm not certain of the date, but yes, he did write to

25  American Home Mortgage.

1  Q.  And there was actually several letters that went back and

2  forth between your attorney and American Home?

3  A.  Yes.

4  Q.  In his letters he indicated that he was, on your behalf,

5  given permission to file an action in the Eastern District of

6  Virginia under the Truth in Lending Act to seek to rescind

7  the loan; is that correct?

8  A.  Yes.

9  Q.  But that never happened; right?

10  A.  No.

11  Q.  Do you know why that didn't happen?

12  A.  There were letters going back and forth, and I think the

13  last letter from Mr. Tulicheck, he had requested a fixed - in

14  order to remedy the situation, he had requested a fixed loan

15  to reinstate my original loan and some other things, attorney

16  fees, et cetera.  What the letter he received from American

17  Home Mortgage had indicated that the loan had been sold and

18  basically there wasn't anything else that could be done.

19  Q.  But you didn't follow through on your threat at that

20  point to file an action; is that right?

21  A.  No.  At that point, I still talked to Mr. Tulicheck, and

22  I was really actually having a hard - a difficult time trying

23  to get him to do other things, and so I started - I wrote to

24  the Better Business Bureau.  I've written to the State

25  Corporation Commission, any and everyone who would hear

1   anything from me, I either talked to on the phone or I've

2   written to.   I contacted my EAP and explained the situation

3   to them because, again, the only thing I'm trying to do is

4   just to keep my home, and what the EAP, they referred me to

5   Mr. Worrily, and I contacted him, I met with him, told him

6   the situation, told him that I had met with Mr. Tulicheck

7   before, provided all my documents to him, and he agreed to

8   take the case and to proceed further.

9   Q.  Did you instruct Mr. Tulicheck not to file an action

10  against -

11  A.  No, I did not.

12  Q.  Did you fire Mr. Tulicheck?

13  A.  Fire - I wouldn't necessarily say I fired -

14  Q.  Okay.

15  A.  - but I did seek legal counsel elsewhere.

16  Q.  Okay.  And the last letter that he wrote was March 12th,

17  2007; is that correct?

18  A.  Again, I'm not sure of the date.  I would have to

19  probably see the letter in order to -

20          MR. DORSEY: May I approach, Your Honor?  I don't

21  want to introduce these, but I'll just show them to her to

22  refresh her recollection.

23          THE COURT: Yes.

24  BY MR. DORSEY:

25  Q.  Does that help refresh your recollection?

1   A.  Yes, it does.

2   Q.  So the first letter he wrote was on January 15th, '07?

3   A.  Yes.

4   Q.  And then he wrote again on February 15th; correct?

5   A.  It looks like it's the 14th.

6   A.  Fourteenth?

7   A.  The second letter is dated the 14th.

8   Q.  And then the third is dated March 12th.

9   A.  I have one letter on February 14th, the other February

10   15th, and then the last one is March 12th.

11   Q.  March 12th.

12   A.  Uh-huh.

13   Q.  So there were four letters altogether.

14   A.  Yes.

15   Q.  Have you attempted to refinance your mortgage?

16   A.  Yes, I have.  I've gone to a number of different banks.

17   The most recent which was very hopeful was the Virginia

18   Credit Union, and they had actually agreed to refinance, but

19   - and they were doing 103 percent loan to value, but the

20   value of my home has declined to $325,000.  I owe 447, so

21   they're not going to refinance it.

22   Q.  How do you know the value of your home has dropped to

23   325?

24   A.  I went through Virginia Credit Union.  They were actually

25   going to do it.  They had an appraiser come out, but the

1   value wasn't enough to refinance the loan.

2   Q.  Okay.  And that would indicate that you probably aren't

3   going to be able to refinance through anybody else.

4   A.  No.

5   Q.  Okay.

6           MR. DORSEY: Thank you, Your Honor, that's all I

7   have.

8           THE COURT: Any redirect, Mr. Hogan?

9           MR. HOGAN: One minute, Your Honor, thank you.

10          THE COURT: Take your time.

11          MR. HOGAN: I have no redirect, Your Honor.

12          THE COURT: Thank you, ma'am, you may step down.

13          THE WITNESS: Thank you.

14          THE COURT: Did you have another witness, Mr. Hogan?

15          MR. HOGAN: At this time, we do not, Your Honor.

16          THE COURT: All right.  Any other - So that will

17  close your case?

18          MR. HOGAN: That's correct, Your Honor.

19          THE COURT: Okay.  Debtor?

20          MR. NOTICE: Your Honor, Kenny Notice of Young,

21  Conaway, Stargatt & Taylor on behalf of the debtors.  The

22  debtors do have one witness that I'd like to present to the

23  Court today.

24          THE COURT: All right.

25          MR. NOTICE: Ms. Michelle Newsham.

1                    MICHELE NEWSHAM

2    having been duly sworn testifies as follows:

3              THE CLERK: Please state your name for the record

4    and spell it.

5              THE WITNESS: Michele Newsham, N-e-w-s-h-a-m.  First

6    name is Michele with one "l".

7                    DIRECT EXAMINATION

8    BY MR. NOTICE:

9    Q.  Good afternoon, Ms. Newsham.  Could you tell the Court by

10   whom you're employed?

11   A.  American Home Mortgage.

12   Q.  And what is your job title?

13   A.  I'm senior vice president of wholesale operations.

14   Q.  And how long have you been employed by AHM Corp.

15   A.  Five and a half years.

16   Q.  And since these bankruptcy cases were filed, would you

17   say that your job duties and responsibilities have changed?

18   A.  Yes, they have.

19   Q.  So, then, could you please explain to the Court prior to

20   the filing and prior to the shut down of the loan origination

21   business, what were your job duties and responsibilities at

22   AHM?

23   A.  I was basically responsible for all operations within the

24   wholesale division which is a division that originates

25   business through brokers in our industry, and I was

1  responsible for regulatory compliance, process flow, pretty

2  much anything that had to do with getting a loan from in the

3  door and out the door.

4  Q.  And could you describe to the Court what you did prior to

5  joining AHM Corp.?

6  A.  I've basically been in the mortgage industry for 24

7  years, in retail correspond, but primarily the wholesale

8  lending area.

9  Q.  Are you able to explain to the Court the differences

10  between wholesale loan origination and retail loan

11  origination?

12  A.  On the retail side of origination, the employees of any

13  company, including American Home, would deal directly with

14  the consumer, the person buying the home.  The loan officer,

15  the processor, they would talk directly, talk to them about

16  programs, lock loans in.  On the wholesale side, our customer

17  and our relationship is with the broker who pretty much is

18  then the retail entity.  So the broker is the one that works

19  with the consumer, the borrower in terms of what loan product

20  and collecting documentation to verify credit worthiness and

21  so forth.

22  Q.  And prior to the bankruptcy filings, did you ever assist

23  with the defense of any litigation that would be commenced

24  against AHM Corp. in relation to the wholesale loan

25  origination business?

1   A.  Yes.  Pretty much I was the first go-to on the wholesale

2   side if there was an issue with the wholesale loan,

3   questions, research for how the process went, and if there

4   was anything, you know, incorrectly done.

5   Q.  And have you reviewed Ms. Cauthorne's motion to lift the

6   stay that was filed in this Court?

7   A.  Yes, I have.

8   Q.  And have you reviewed the draft complaint that was

9   attached to the motion?

10  A.  Yes, I have.

11  Q.  Prior to the filing of the bankruptcy cases,

12  approximately how many loans would you say were originated in

13  a given year on the wholesale side?

14  A.  Within our channel only for American Home, it probably

15  would average somewhere around 130,000 units, somewhere

16  around 11,000 units per month.

17  Q.  And again, with respect to the wholesale side, could you

18  briefly explain what occurs during the loan origination

19  process?

20  A.  Sure.  Our relationships are with brokers.  When a broker

21  wants to sign up with any lender, they have to fill out a

22  contract, so to speak.  It's called a broker agreement, and

23  in that agreement, the lender will outline what they expect

24  of that broker in terms of how they originate business, the

25  compliance regulations, the lack of fraud within files,

1  pretty much setting out the terms of the relationship in

2  doing business.  When a broker originates a loan, they will

3  look to probably many lenders to see what product is going to

4  work best for their consumer and should be discussing that

5  with the consumer for a joint decision on the product that

6  they will go with.  At that point they select a lender, one

7  of the many that they work with and will submit that loan to

8  the lender for review of the loan file.  So, we as a lender,

9  will look at all the credit docs, the collateral docs,

10  anything in the file to make sure that that information will

11  meet the guidelines that we have set for the program that

12  they chose and they submitted to us, and then in the end, we

13  fund that loan.

14  Q.  Now, does AHM Corp. prepare the documentation that would

15  be signed by the individual borrowers?

16  A.  Yes, we do.   We send those to the designated settlement

17  agent and those are closing instructions that pretty much are

18  telling them how we want them to close the loan.

19  Q.  And the information that AHM used to prepare the loan

20  documentation, where would that come from?

21  A.  That would come in the package that the broker has

22  provided to us through their verification process,

23  information on the property comes from the appraisal, the

24  title company submits the preliminary title work, all that is

25  reviewed by our staff before we prepare the documents.

1   Q.   Now, with respect to your side of the business, the

2   wholesale division, does AHM Corp. - Does a representative of

3   AHM meet with an individual borrower?

4   A.   No.   On the wholesale side, actually, we're not allowed

5   to talk to the borrower.   Our relationship is with the

6   broker, and the broker's relationship is with the customer.

7   So, if we do get any calls from the borrower, we do refer

8   them back to their broker as that is who they initiated the

9   process with.

10          THE COURT: You say you're not allowed to talk to

11   the customer?

12          THE WITNESS: That is correct.   Our relationship per

13   the contract that we have is with the broker.

14          THE COURT: So the contract with your broker

15   prohibits you but not any controlling applicable law, just -

16          THE WITNESS: Not that I know of.   Not that I know

17   of.

18   BY MR. NOTICE:

19   Q.   Now, does AHM Corp., the wholesale side, again, does it

20   employ any mortgage loan brokers at all?

21   A.   No, they're not employees of the lender.

22   Q.   So, as best you can, could you explain the relationship

23   as it exists between AHM Corp. and the mortgage loan brokers.

24   A.   Really, the brokers are - how shall we explain it.   The

25   lenders are entities which brokers can originate and send to

1   more for the financing side of it.  So brokers will operate

2   not necessarily with a lot of cashflow.  So they will

3   originate and they will receive rate sheets from a multitude

4   of lenders out there that they are approved with or choose to

5   do business with because of service or product offerings, and

6   then based on a review of what their borrower is looking for

7   and needs, they typically will review what products are out

8   there and then discuss that with the borrower to determine

9   where the loan is going to go.  There is a disclosure at the

10  very front end of the process that we require that the broker

11  sign along with the borrower, called the mortgage broker fee

12  disclosure, and in that it really talks about the nature of

13  the relationship and how the brokers are compensated.

14  Q.  Now with respect to the settlement agent that's

15  responsible for the closing of a borrower's loan, does AHM

16  Corp. employ that person?

17  A.  No, we do not.

18  Q.  And how would the settlement agent be selected for any

19  given loan closing?

20  A.  It could either be someone either the borrower knows and

21  has selected or if they are not familiar with any settlement

22  agent, then oftentimes the broker will assist them with some

23  choices in settlement agents they can use or they may tell

24  them one that they typically work with, and they'll go in

25  that direction.

1   Q.  Does AHM Corp. have any representatives at all that would

2   show up or attend the loan closing itself?

3   A.  No, we simply send our closing instructions that are

4   detailed as to how that settlement agent, which is acting on

5   our behalf, even though we have not selected them, our

6   instructions are telling them how they are to close that

7   loan, and what the fees are and clearly in the instructions -

8   I need to point out that it states that if there any changes

9   that need to be made or come up at the closing table, it's

10  their responsibility to contact American Home Mortgage

11  Closing Department to discuss them before they move forward.

12  Q.  And you indicated earlier you have approximately 24 years

13  of experience in the mortgage industry.

14  A.  Uh-huh.

15  Q.  With that being said, is the manner in which AHM Corp.

16  handles the loan closing process, is it similar or is it

17  different than the other companies that you've worked for?

18  A.  No.  I've been in wholesale probably in four different

19  companies and large banks as well, and this is a standard

20  operating procedure for all the sale division.

21  Q.  And have you reviewed the documentation that's been

22  supplied to Ms. Cauthorne in connection with the closing of

23  her loan?

24  A.  Yes, I have.

25  Q.  And have you reviewed Ms. Cauthorne's loan file?

1  A.  Yes, I have.

2            MR. NOTICE: Your Honor, may I approach the witness?

3            THE COURT: Yes.

4  BY MR. NOTICE:

5  Q.  This is -

6            THE COURT: I can't hear you if you're not talking

7  in the mike.

8            MR. NOTICE: What I've handed the witness was - what

9  the movant's Exhibit B was which was the note, and I

10 apologize, Your Honor, I also need to give the movant, I

11 believe it was Debtors' Exhibit 2, which was the pre-closing

12 packet.  I need to get a copy from - May I approach, Your

13 Honor?

14           THE COURT: Uh-huh.

15           THE WITNESS: Thank you.

16 BY MR. NOTICE:

17 Q.  I realize Mr. Dorsey and Ms. Cauthorne have kind of

18 touched on this a little bit, but as someone from the

19 industry, could you explain the terms of Ms. Cauthorne's

20 loan?

21 A.  Ms. Cauthorne is in a - what's called an option arm, and

22 the option arm is really just that.  It gives the borrowers

23 an option in terms of what kind of payment they would like to

24 make from month to month.  So, Ms. Cauthorne has a five-year

25 fixed payment, 12 month MTA arm, and with that, the terms are

1    that the loan will be fixed.  The payment will be fixed for

2    the first five years of the loan unless it reaches its max

3    with a negative amortization of 110 percent, at which time it

4    will recalculate to fully amortize out to be paid off in the

5    remainder of the term.  The interest rate on the MTAs changes

6    monthly, however, and that's where the negative amortization

7    comes from.

8    Q.  And from your review of Ms. Cauthorne's loan file,

9    including the note that you have in front of you -

10   A.  Uh-huh.

11   Q.  - as well as pre-closing information, are you aware of

12   any alteration that took place at any stage of the process as

13   to the terms of the loan package that was offered to Ms.

14   Cauthorne?

15   A.  From the standpoint of what American Home provided from

16   the preliminary work, the package that you have talked about

17   previously, the preliminary till and the final till that we

18   sent to the closing table really were virtually the same.

19   Q.  So the final documentation was consistent with the pre-

20   closing packet?

21   A.  That is correct, that American Home sent out, that is

22   correct.

23   Q.  Ms. Newsham, could you explain to the Court what a

24   closing protection letter is?

25   A.  A closing protection letter is something that we require

1   on every transaction, and it comes from a parent title

2   company or title insurance company.  So, any settlement agent

3   that is going to close a loan on our behalf has to provide us

4   this protection letter from their parent company that will

5   protect us if there's any fraud found on behalf of the

6   settlement agent, if they have any wrongdoing or if they

7   closed the loan contrary to what our instructions required.

8            MR. NOTICE: Your Honor, may I approach the witness?

9            THE COURT: Yes.

10           THE WITNESS: Thank you.

11           THE COURT: Thank you.

12  BY MR. NOTICE:

13  Q.  Ms. Newsham, can you identify the document that I've just

14  handed you?

15  A.  This is actually a closing protection letter, and it's

16  from Land America Lawyers Title, which is the parent title

17  insurance company, insuring the settlement agent First Choice

18  Title & Settlement LLC in Virginia.

19  Q.  And what loan is that in reference to?

20  A.  In reference to Cauthorne, borrower Cauthorne.

21  Q.  And has this document been signed?

22  A.  Yes by Lawyers Title Insurance Corporation, a

23  representative.

24  Q.  And could you explain to the Court, as best you can, who

25  is protected by this closing protection letter?

1    A.   This closing protection letter protects us, the lender,

2    as well as the borrower, if there is any wrongdoing, again,

3    on the part of the settlement agent.

4    Q.   Have you reviewed the servicing records that was

5    maintained by HM Servicing in connection - with respect to

6    Ms. Cauthorne's loan?

7    A.   Yes, I have.

8    Q.   And what it the status of Ms. Cauthorne's loan?

9    A.   The loan is current as of the last report I saw, next due

10   for February 1st.

11   Q.   So, Ms. Cauthorne is not currently as risk of

12   foreclosure?

13   A.   No, she's not.

14   Q.   If this Court were to grant the relief that Ms. Cauthorne

15   is seeking in the complaint that was filed, is it safe to say

16   that a substantial and time and resources would be devoted to

17   defending against the complaint?

18   A.   Absolutely?

19   Q.   And why is that?

20   A.   Well, we take any complaint seriously as we always have

21   in terms of insuring for multiple reasons, you know, that our

22   process is being followed and that there has not been any

23   wrongdoing on our part.

24        MR. NOTICE: Your Honor, I have no further questions

25   for this witness.

1              THE COURT: Cross-examination, Mr. Hogan.

2              MR. HOGAN: Yes, Your Honor.

3                       CROSS-EXAMINATION

4    BY MR. HOGAN:

5    Q.   Is it Neusam?  I'm sorry, I -

6    A.   Newsham, you put the s and h together.

7    Q.   Sorry, could you spell it for me?

8    A.   N-e-w-s-h-a-m.

9    Q.   Thank you.

10   A.   Uh-huh.

11   Q.   I'm just going to track through your testimony.

12   A.   All right.

13   Q.   I just have a few questions for you.  You described the

14   general wholesale operation and being responsible for

15   regulation, compliance, and the wholesale side and the broker

16   relationship.  Let me start with a question about

17   underwriting.

18   A.   Uh-huh.

19   Q.   With regard to Ms. Cauthorne's loan, ultimately, who made

20   the underwriting decisions?

21   A.   American Home did.

22   Q.   Okay.  And American Home made those decisions based on

23   the documentation that was submitted by whom?

24   A.   The broker, which should have gotten a lot of the

25   documentation from Ms. Cauthorne directly.

1   Q.   Okay.  But not just the broker; isn't that true?  You

2   also got probably some from the appraiser?

3   A.   That's correct, the collateral comes directly from an

4   appraisal that the broker has ordered.

5   Q.   Okay, and then also probably some from the settlement

6   agent.

7   A.   The title work comes directly from the settlement agent.

8   It may come through the broker to us or directly to us, that

9   is correct.

10  Q.   Okay.  What about employment verifications?

11  A.   The broker - typically, depending - and again, I

12  apologize on this.  I don't know if it was a full income,

13  full asset documented loan or if it was a no doc or as

14  stated, that if it is a full income, full asset, the broker

15  will provide us with bank statements, pay stubs, W-2s, or

16  they could get actual verification from the employer or from

17  the bank, and then we will review them when they come in with

18  the package.

19  Q.   Okay, now, maybe I misunderstood, but I thought I heard

20  earlier testimony from you that indicated that you had

21  reviewed Ms. Cauthorne's file in preparation for today's

22  hearing; is that true?

23  A.   I have.  I have, but I apologize, I did not know in terms

24  of the documentation-type.

25  Q.   Meaning you don't know whether it was a full

1  documentation -

2  A.  That's correct.

3  Q.  - or a low documentation or a no documentation?

4  A.  That is correct.  In some of the research, I know the

5  first loan that she did through our retail was a full doc

6  which would lead me to believe this probably was as well.

7  Q.  Okay.  So, you took a look not only at her mortgage loan

8  for the acquisition of the property, which occurred, I

9  believe, in August of 2006, but you also took a look at her

10 November 2006 re-finance transactions as well?

11 A.  The August one I only wanted to find out what product

12 that was originally done under and had gotten the information

13 just on the product that was done.

14 Q.  Okay.  As to the underwriting process -

15 A.  Uh-huh.

16 Q.  - you testified that in fact American Home Mortgage

17 ultimately made the decision to process and allow this loan

18 to go to settlement.

19 A.  That's correct.

20 Q.  American Home also funded the loan from a warehouse line

21 presumably?

22 A.  That's correct.

23 Q.  Okay.  So, the broker and the settlement agent didn't

24 fund any money for this loan to close.

25 A.  No.

1  Q.  And American Home Mortgage prepared all the documents for

2  this loan to close.

3  A.  That's correct.

4  Q.  The documents were presumably prepared in anticipation of

5  the closing.

6  A.  Uh-huh.

7  Q.  And were reviewed once the documents were executed and

8  returned to American Home Mortgage.

9  A.  The documents come back to us directly from the

10  settlement agent after everything's been signed, it's gone to

11  record, funds have bene disbursed, and then we get the

12  package.

13  Q.  Okay.  But typically, the package is returned to American

14  Home, in this instance, prior to the funding of the loan.

15  A.  No, that is not correct.  We do not do a review prior to

16  funding.

17  Q.  Okay.  Let me make sure I understand clearly then,

18  because as I understand these transactions, this settlement

19  was to have occurred in terms of the execution of the

20  documents on November 27th.

21  A.  Correct, with the three-day right of recision.

22  Q.  That's right.  Does American Home Mortgage get the loan

23  documents, typically, not in this instance because we know

24  what happened here, but typically, does American Home get the

25  loan documents back before the expiration of the three-day

1    right of recision?

2    A.   No.

3    Q.   So what happens to the documents during that window?

4    A.   The settlement agent is responsible for those.

5    Q.   Is any communication made to American Home to indicate to

6    American Home that the loan's closed?

7    A.   What's supposed to happen is, if that loan was to close

8    on the 27th then we would not look for it, it's not disbursing

9    until - I don't have a calendar in front of me but three

10   business days after that date, and then we would start

11   looking for that.  They have to send us that file, complete

12   file, within 24 to 48 hours after they fund, and that's when

13   we would start looking for it.

14   Q.   You'd just have to excuse my ignorance, I'm just trying

15   to make sure I understand -

16   A.   Sure.

17   Q.   - because what I'm hearing you say is that the loan

18   closes -

19   A.   Signed, right.

20   Q.   Right.  It's closed, it's signed.

21   A.   Uh-huh.

22   Q.   And then there's a three-day right of recision and then

23   on the fourth business day, effectively -

24   A.   Right.

25   Q.   - American Home funds the loan.

1   A.  That is correct.

2   Q.  Now, is that an automatic process?  Does American Home -

3   Oh, it's the fourth day, let's get a wire out to XY&Z title

4   company.

5   A.  What happens is, we assume everything has gone as

6   planned.  I think our treasury - and I really probably can't

7   speak to that wholeheartedly in terms of what treasury does

8   because at that point it's in their hands, but what we

9   anticipate and what we instruct the settlement agents in our

10  closing instructions is that if there is any change

11  whatsoever to any of these documents or the date of closing,

12  that they're to contact our Settlement Department, and, you

13  know, plan out when the new closing is going to be or get any

14  new documents that they would need for changes to them, but

15  as far as treasury, do they actually call to insure that it's

16  funded, I want to say that I believe that they do, but again,

17  that would be on the fourth business day after they signed

18  the docs.

19  Q.  But it's ultimately, it's American Home's money or their

20  money that they borrowed that they're actually putting out -

21  A.  That is correct.

22  Q.  - to fund the transaction.

23  A.  Uh-huh.

24  Q.  So it's American Home - It's ultimately their decision as

25  to whether the loan's going to close, and then ultimately, if

1    it does close, and it doesn't rescind, it's American Home

2    Mortgage's decision to fund the loan.

3    A.   That's correct.

4    Q.   And you indicated that at this time in November of 2006,

5    approximately 11,000 loans are closed in that given month?

6    A.   Right.

7    Q.   Ballpark?

8    A.   Uh-huh.

9    Q.   Now, you also testified about the relationship between

10   the broker and American Home.  That's a written document.

11   A.   There's a broker agreement that has to be signed for a

12   broker to do business with us.

13   Q.   And that's a contractual agreement that articulates

14   rights as between the broker and American Home.

15   A.   That's correct.

16   Q.   And duties, responsibilities, rights, obligations as

17   between the two parties?

18   A.   Right.

19   Q.   And is it fair to say that the broker acts as an agent of

20   American Home in the loan closing process?

21   A.   You know, I don't know what the technical term is that's

22   used, but basically they have the relationship.  There are

23   due diligence that we've done with them to go ahead and

24   originate loans and send them to us for us to lend on.  So,

25   you know, again, the term "agent" I'm not really sure what

1   it's actually called.

2   Q.  You testified about the verification of documents.  Does

3   American Home ever verify the documents?

4   A.  We'll do a verbal verification of employment, which

5   pretty much we call the employer, make sure that what's on

6   there is factual, not so much in terms of dollar amount,

7   because again, that typically has to be in writing, but that

8   the person is still there at time of closing, make sure

9   they're still employed.

10  Q.  And ultimately, that's of great import because it's the

11  employability that relates to the ability of the borrower to

12  actually service the loan, meaning pay the loan over the life

13  of the loan?

14  A.  That's definitely one of the key factors, absolutely.

15  Q.  Are any ratios run by American Home as to ascertain

16  whether or not in fact there's an afford-ability index

17  effectively?

18  A.  Depending on the program.  There are products that there

19  are no ration type loans, and then there are products that

20  are full income, full assets where ratios are run.  Again,

21  based on the product itself.  So, whether or not it qualifies

22  at a start rate or at a fully indexed rate or at somewhere in

23  between, those are all part of each product's guidelines.

24  Q.  Now, you can't testify today as to whether that happened

25  in Ms. Cauthorne's specific instance; can you?

1   A.  No, I can't.

2   Q.  Okay.  Can you tell me based on the type of loan that Ms.

3   Cauthorne has whether that sort of verification process would

4   have or should have been undertaken?

5   A.  I really don't know if was a full income/full assets, so

6   I can't speak to that off the top of my head.

7   Q.  Okay, thank you.  You also testified about these rate

8   sheets, and as I understand rate sheets, these are

9   communications made by lenders, like American Home Mortgage,

10  out to the various world of the brokers saying, These are our

11  rates.  Our rates have changed, and this is what we're

12  offering.

13  A.  That's correct.

14  Q.  Does that not also articulate a spread or a compensation

15  component to the broker from American Home?

16  A.  It depends on what rate they decide, and as I talked

17  about in the mortgage broker fee disclosure to the borrower,

18  it actually explains, you know, premium pricing and how that

19  works in there.  So, depending on what's right for the

20  borrower in terms of less cost up front, it tells them

21  directly if you want less cost up front you can pick a higher

22  rate, you know, and then compensation goes to the broker that

23  way.  So there are many different options out there in terms

24  of, you know, how loan programs are set up and priced.

25  Q.  Now, is that a document that's typically either disclosed

1    or shared with the borrower?

2    A.   The mortgage broker fee disclosure?

3    Q.   Yes.

4    A.   We won't set up a loan until we have one that's signed by

5    the loan officer, the broker loan officer, and the borrower.

6    Q.   And have you reviewed one in this instance?

7    A.   Yes, I have.

8    Q.   Okay.  You also testified that the settlement agent's not

9    employed by AHS.

10   A.   AHM, that's correct.

11   Q.   Okay.  You also testified as this insured closing letter

12   or closing protection letter.

13   A.   That's correct.

14   Q.   And in this instance it was issued by Land America, which

15   is, I believe, a subsidiary of Trans America; is that

16   correct?

17   A.   Lawyers Title Insurance Corporation.

18   Q.   Okay.

19   A.   They're a part of.

20   Q.   I believe you testified that this document inures to both

21   the benefit of American Home Mortgage but also to the

22   borrower?

23   A.   That is correct, there's a paragraph that specifically

24   cites that.  If you look at - there's under number (2) -

25   Q.   On the first page.

1   A.   Yes.

2   Q.   Fraud or dishonesty of -

3   A.   Right below that there's a paragraph there.

4   Q.   If you were a lender protected under the foregoing

5   paragraph, your borrower in connection with a loan is -

6   A.   As owned by a mortgage on a one to four family dwelling

7   shall be protected as if the letter were addressed to your

8   borrower.

9   Q.   Okay.

10  A.   So that will protect them the same as it will us.

11  Q.   Okay, now, explain to me the protection then.   I

12  understand the letter.

13  A.   Right.

14  Q.   You've testified that this letter affords American Home

15  and the borrower protection.

16  A.   Right.

17  Q.   What is the protection?

18  A.   Well if American Home were the entity that were wronged,

19  so, if there was something done wrong where there was fraud

20  involved that impacted us and our loan, we would then make a

21  claim to Lawyers Title to recall the note.   We would look for

22  a claim for them to pay the mortgage.   If it's in fact in the

23  terms of the borrower, then Lawyers Title would be contacted

24  as well, and then that would have to - as I've said, I've

25  never been a party to a borrower making a claim, but I

1   imagine it would be very much the same in terms of contacting

2   them, starting the discussions, and moving forward with

3   documentation.

4   Q.  Okay.  And to your understanding, that holds true even

5   though in this instance in particular and in general, only a

6   lender's policy was issued for title insurance; isn't that

7   right?

8   A.  I don't know that - I can't speak to whether this has any

9   thing to do with the difference between the lenders and

10  owners or if there was just wrongdoing.  I couldn't speak to

11  that.

12  Q.  Okay, but you're aware that in the typical refinance

13  transaction, that only the lender is typically afforded title

14  insurance protection?

15  A.  Well, I think that also, again, if the borrower had

16  obtained it through the purchase and it's through the same

17  entity, I think that would carryover, but, again, that's not

18  my expertise.  I can't really speak to that.

19  Q.  Thank you.  You had a chance to review the letters that

20  your attorney proffered earlier regarding Ms. Cauthorne's

21  first attorney and the contacts that he made with American

22  Home Mortgage, you had an opportunity to review those?

23  A.  Actually, I did not see those letters prior to this.  The

24  hearing it today, I mean.

25  Q.  Okay, so did you review them in anticipation of this

1    hearing or you didn't review them at all?

2    A.  No, I did not review them at all.

3         MR. HOGAN: I have no further questions for the

4    witness, Your Honor.  Thank you.

5         THE WITNESS: You're welcome, thank you.

6         THE COURT: I have a few.

7         THE WITNESS: Sure.

8         THE COURT: Before redirect.  On the five-year

9    option arm -

10        THE WITNESS: Uh-huh.

11        THE COURT: - how is the minimum payment calculated,

12   how is that determined?

13        THE WITNESS: It's at the starter rate.

14        THE COURT: Yeah, but how do you - typical 30-year

15   amortization of a loan where you pay principal and interest,

16   you know, you use a table.  You have the interest rate.  It's

17   easy to find out.  How do you figure out what the - How's the

18   minimum payment determined?

19        THE WITNESS: I think it's calculating - and again,

20   I would probably have to defer to - you know, our computer

21   does it for us, I'm sorry to say, but I believe it's

22   calculated the same way, but it's just at 2 3/4 and that rate

23   only stays in place until the last day of the month that you

24   close in.  So, be it that when the adjustment happens the

25   next month, if you're making that minimum payment based on

1    that starter rate -

2              THE COURT: Uh-huh.

3              THE WITNESS: You will go into the negative

4    amortization immediately.

5              THE COURT: All right, and then once you get 110

6    percent of value, initial loan value negatively amortized,

7    the larger payment kicks in.

8              THE WITNESS: That is correct.

9              THE COURT: But does it ever actually go to five

10   years?

11             THE WITNESS: Well, if somebody is not just making

12   that minimum payment, you know, you can move - you can -

13   Well, in answer to your question, if you keep making that

14   minimum payment it won't go to five years because it will go

15   up there, but if you don't make the minimum and will make an

16   interest only or principal and interest, it will not go into

17   negative as quickly -

18             THE COURT: All right.

19             THE WITNESS: - and that was the 20 years on the

20   till.  You know, they took a worst case scenario of making

21   the minimum payment and that's why the Truth in Lending

22   showed the initial payment for just 20 payments.

23             THE COURT: You said "20 years", you meant 20

24   payments.

25             THE WITNESS: Twenty payments, I apologize.

1            THE COURT: That's all right.  Okay, thank you.

2    Redirect?

3            MR. NOTICE: No redirect, Your Honor.

4            THE COURT: Okay.  Thank you, ma'am, you may step

5    down.

6            MR. HOGAN: Your Honor, if I may.  I know there's no

7    redirect, but your question did prompt one area that I wanted

8    to explore.

9            THE COURT: Any objection?

10           MR. NOTICE: No, Your Honor.

11           THE COURT: All right, Mr. Hogan.

12                    FURTHER CROSS-EXAMINATION

13   BY MR. HOGAN:

14   Q.  You testified about the letters that you didn't see.  I

15   understood that you didn't see the letters from Ms.

16   Cauthorne's first attorney, but in essence, my question is

17   this: Do you still have a - Does American Home - I know

18   you're not originating any loans -

19   A.  Right.

20   Q.  - but after the allegations came to light that there was

21   this potential fraud, which American Home presumably learned

22   about in January of 2007 -

23   A.  Uh-huh.

24   Q.  Do you know - Did American Home continue a relationship

25   with Aggressive Mortgage Brokers?

1    A.  I can't speak to that.  I know that through reading some

2    notes from the Servicing Department that that information,

3    once we knew the claim of fraud was passed on for

4    investigation to our Legal Department and whatever came of

5    that, I can't speak to here.  I would have to do more

6    research on that.

7              MR. HOGAN: Thank you, Your Honor.

8              THE COURT: Thank you.  I have no questions.  Any

9    redirect?  No?  Ma'am, you may step down.

10             THE WITNESS: Thank you.

11             THE COURT: Any other witness?  Debtor?  All right.

12   That will close the evidence.  I'll hear argument.

13             MR. HOGAN: Your Honor, Daniel Hogan for Ms.

14   Cauthorne.  With the witness testimony and the proffer and

15   the documentations that we've presented, Your Honor, we

16   believe that it's abundantly clear that there's prejudice,

17   significant prejudice to Ms. Cauthorne if she's not allowed

18   to proceed to prosecute her action in federal court as

19   against the primary players to this transaction.  Those

20   players being: the mortgage broker, the settlement agent, and

21   American Home Mortgage.

22             THE COURT: Well, let me ask you.  The case has been

23   filed?

24             MR. HOGAN: The case has not been filed, Your Honor.

25             THE COURT: It's not been filed.

1          MR. HOGAN: Let me explain the situation.  As I

2    understand it, in November when we were initially before the

3    Court, there was the issue of the applicability of § 108 and

4    how that would impact our filing a suit against American Home

5    but also as it would impact as to the other defendants.  Your

6    Honor, obviously, decided to put that ruling off until today

7    and make that hearing originally a preliminary hearing and

8    that we would proceed today, and that's what we've done.

9    Without the ability to sue American Home within the context

10   of bringing that suit in federal court in Virginia, we had no

11   federal question of jurisdiction.  There was no diversity.

12          THE COURT: Uh-huh.

13          MR. HOGAN:  As to the other counts of our actions

14   against the other players, those are state court counts of

15   fraud, common law fraud, and forgery.  So, without being able

16   to pursue American Home Mortgage and without that - and

17   knowing that 108 provided that our action was stayed, the

18   decision was made not to bring suit until we could bring suit

19   against all the parties.

20          THE COURT: Okay, I understand.

21          MR. HOGAN: So, that essentially is why - we're

22   essentially in the same procedural context with regard to the

23   federal court action.  We haven't brought it.  We need a

24   decision as to whether we can bring all the parties.  We

25   believe that American Home is an indispensable party to that.

1    If we're forced to bring suit against the other players in

2    state court in Virginia, we anticipate that one of the other

3    parties is going to file a motion to dismiss, articulate the

4    fact that we haven't name that indispensable party, American

5    Home, and we're going to be essentially in the same box that

6    we're in now.  So, it's our position that there's serious

7    prejudice.  You've heard the testimony from Ms. Cauthorne

8    about the real world issues, how the payments are going to

9    change in October.  How they're going to significantly impact

10   her financially, and so we believe that we've made a

11   significant case and can show that the prejudice to Ms.

12   Cauthorne significantly outweighs any prejudice, and I

13   haven't hear any testimony today about what the prejudice

14   would be as to American Home Mortgage.  So, that's our

15   position, Your Honor.

16             THE COURT: Thank you.  Mr. Dorsey?

17             MR. DORSEY: I think everyone in the courtroom, Your

18   Honor, can empathize with Ms. Cauthorne's situation.  It's a

19   terrible situation, and it apparently was brought on by an

20   unscrupulous broker, if all of the testimony that's she's

21   given today is correct, and we have no reason to believe that

22   it's not.  But she also testified that there was nothing

23   American Home told her that was inconsistent with what she

24   received in terms of the loan.  All of the allegations of

25   wrongdoing are on the part of the broker and the settlement

1   agent, and there's no indication that the movants would be

2   successful if they were allowed to go forward and the stay

3   was lifted.  The prejudice to Ms. Cauthorne, and this is

4   where it really becomes a terrible situation, is that the

5   value of her home has now dropped significantly, apparently

6   down to 325,000, which means even if this loan gets

7   rescinded, she has no way to refinance it.  And it looks as

8   if she's going to lose this home one way or the other.  On

9   the part of the debtors, Your Honor, the prejudice is that we

10  would be required to defend this suit, hire counsel, do an

11  investigation, engage in litigation that is going to take

12  away the time of the very few people we have left in American

13  Home who are trying to wrap up and get this bankruptcy in

14  final form.  There are - We know that there are at least 41

15  other litigation claims filed against the debtors at this

16  point.  About 20 of them appear to be similar to this one,

17  based on proofs of claim that were filed against the debtor,

18  all over the country.  If we lift this one, we are going to

19  get motions from all the others to lift those, and we don't

20  know yet if that's the entire universe.  According to the

21  claims agent, 700 additional proofs of claim were filed on

22  Friday, and they're still in the process of evaluating those

23  to find out what they are.  I know there are some that are

24  missing, for example, the list I had of the 41 didn't include

25  Ms. Cauthorne's proof of claim, which we know was filed.  So

1    we anticipate that there's going to be a lot more of this

2    kind of litigation, and if we open this up now, it's going to

3    distract from getting this bankruptcy case wrapped up.

4         THE COURT: Well, ultimately the litigation is going

5    to have to proceed.

6         MR. DORSEY: It is going to eventually, Your Honor,

7    yes.

8         THE COURT: And the debtors have had a good period

9    and accomplished a tremendous amount, but ultimately cases

10   like this become in the end about litigation, and I don't

11   know when a plan is going to get filed.  I don't know when a

12   deal is going to get cut, and I'm faced with a situation

13   where, why not allow the litigation to go forward now as

14   opposed to later because Ms. Cauthorne could be prejudiced by

15   delaying it.  As time passes, the people who really know what

16   they're doing and who can actually assist in defending the

17   litigation and assisting whatever fact finder there is in

18   finding out what the truth is will disappear.  At some point,

19   you're going to have to litigate these claims, and if I wait

20   until you've got a plan administrator who's some financial

21   professional that doesn't know anything about the history of

22   the business and all he has is a million case files sitting

23   in Melville, New York but nobody to tell him where to find

24   anything or what happened or to assist him in figuring out

25   who shot John, haven't I prejudiced the claimant?

1          MR. DORSEY: I don't believe so, Your Honor.  I

2   believe - and the burden is on them to show prejudice, and as

3   I said, it's a terrible situation.  I don't think - the

4   prejudice they say is she's going to lose her home in October

5   because the payments are going to escalate, but it appears

6   she's going to lose it regardless.  She won't be able to make

7   the payments.  She won't be able to refinance.

8          THE COURT: Well, we don't know what damages may be

9   awarded in connection with the relief being sought, I mean -

10          MR. DORSEY: Damages under <u>Tiller</u> are pretty

11   limited, Your Honor.

12          THE COURT: Uh-huh.

13          MR. DORSEY: There's statutory caps on the amount of

14   damages.  I believe it's 2,000 for a refinancing.

15          THE COURT: All right.

16          MR. DORSEY: Unless you can set up to show that

17   there should be a recision of the loan, and the recision

18   really doesn't really get her anything because she's still

19   going to be stuck with having to refinance that home.

20          THE COURT: Uh-huh.  All right, I'm going to grant

21   the motion, and I'm not - Let me - 41 claims is a lot of

22   claims.  It's not an avalanche of claims, and I expect you'll

23   get some stay reliefs and you may get - not all of them will

24   be stay reliefs.  Some you'll get stay reliefs.  Not all will

25   present a case, frankly, as articulately and as competently

1   as has been presented today.  I find the witness to be

2   absolutely credible.  I have my own theories, most of which

3   go to, I think, consistently with what Mr. Dorsey said which

4   it sounds to me like everyone was defrauded by someone who's

5   not in this room, but there could be and I think you could

6   articulate a second year - or first year law student could

7   articulate a number of theories based on agency law or agency

8   theories that may implicate the debtors in that fraud.  I

9   don't know if they're going to hold up.  I don't know if

10  they're not going to hold up.  That's for a judge with

11  jurisdiction and experience to determine and that's what the

12  trial judge is for.  I think there's two things on the

13  prejudice side: One, I think we do know to a certain extent

14  the universe of these claims, given the statute of

15  limitations, given the fact that the debtors aren't

16  originating any more loans, given the bar date that's in

17  place, there is a finite universe of these types of claims.

18  So I'm not worried about opening the doors to endless

19  litigation.  At the same time, I think Ms. Cauthorne has

20  demonstrated prejudice, given the ticking time bomb that is

21  her mortgage and note.  Obviously, I'm not surprised that

22  there's testimony that the value of the home has declined.  I

23  think, frankly, it's common knowledge that in most markets

24  we're about nine months into a decline, and I hope it doesn't

25  go further.  It may, but those issues will have to await the

1    movement of the market.  It may very well be that nothing can

2    be done to assist Ms. Cauthorne, but this Court is not going

3    to be the thing that stops her from seeking redress for at

4    least the *prima facie* legal wrongs that she's articulated.

5    The debtor has had six months, and I'm not being at all

6    critical of the debtor.  They've accomplished a tremendous

7    amount in this case, but at some point these cases have to go

8    forward.  This litigation is going to have to go forward, and

9    I think waiting longer, at least with this specific

10   litigation, is more like to prejudice the plaintiff than it

11   is the debtors.  So, I'll grant the motion.  Mr. Hogan, do

12   you have an order?

13         MR. HOGAN: Your Honor, it's about the only thing I

14   didn't bring today, Your Honor, is a - I did attach a form of

15   order to my original motion - however, I neglected to bring

16   that with me.  I can submit one once I get back to the

17   office, Your Honor, if that is helpful.

18         THE COURT: I have the form.

19         MR. HOGAN: Thank you.

20         THE COURT: It's pretty vanilla.

21         MR. HOGAN: It is.

22         THE COURT: Debtors have any objection?  Simply,

23   motion is granted, stay is lifted, and further order the

24   movant may now pursue debtor for any judgment in her favor,

25   et cetera, et cetera, standard litigation stay relief type

1    language.

2            MR. DORSEY: Your Honor, the one problem with the

3    order might be the language about the insurance proceeds,

4    which we don't believe there are any.

5            THE COURT: I'll tell you what, why don't you - Mr.

6    Hogan, why don't you see if you can get a form of order

7    that's acceptable to Mr. Dorsey and submit it under

8    certification of counsel.

9            MR. HOGAN: Yes, sir, be glad to.  Thank you.  Your

10   Honor, permission to retire?

11           THE COURT: Please.

12           MR. HOGAN: Thank you.

13           THE COURT: Retire?  Well, you can leave.  You're

14   too young to retire.  Let me - None of the debtors' exhibits

15   were moved into evidence so let me give those back to the

16   debtor if I may, and I'll keep for our files Exhibits A

17   through F.

18           MR. NOTICE: Your Honor, may our witness have

19   permission to leave?

20           THE COURT: Yes, of course.

21           MR. NOTICE: Thank you.

22           MR. BRADY: Your Honor, that takes us to matter 8 on

23   the agenda, and this was the debtors' motion for authority to

24   destroy certain duplicate loan files or return those to the

25   owners upon payment of costs.  As indicated on the amended

1    agenda, we are seeking to adjourn this with respect to

2    virtually all of the objectors.  I believe the U.S. Trustee

3    may still have some issues, and we've really narrowed the

4    scope of what we seek to do today dramatically, but let me

5    give the Court some background because this has been a very

6    important and really, frankly, complicated issue from the

7    start of the case.  Issues with respect to the return of loan

8    files have arisen in a variety of contexts really from the

9    moment we filed the case.  We dealt with the alleged pre-

10   petition termination of servicing agreements, and CSFB was in

11   the court on the first day hearings seeking a TRO for the

12   return of servicing files.  Calyon and others quickly

13   followed suit.  In those instances, the debtors evaluated the

14   servicing rights and determined there was value and the

15   debtors opposed those TROs and adversary proceedings and the

16   fact the Court in the CSFB case denied injunctive relief for

17   the return of servicing files.  We then dealt with interim

18   servicing relationships and that is where the debtor was

19   serving on a short-term basis to do a transition in

20   connection with a loan sale to serve as interim servicer.  We

21   quickly determined in those instances, Your Honor, there was

22   no long term value to the estate, and so we worked with the

23   other party to those interim servicing agreements to

24   effectuate a consensual transition of servicing including the

25   loan files to those parties.  In each case, the debtors

1   negotiated with those parties for the payment of costs and

2   expenses in connection with the return of the loan files.  We

3   had a Society General stipulation where they paid $150,000.

4   There was a Renage (phonetical) deal, Morgan Stanley, Impact

5   Funding, just to name a few, but in those cases we returned

6   the servicing files for consideration.  We had the

7   governmental entities, Your Honor, Freddie Mac, for example,

8   which sought the return of the servicing files.  We

9   negotiated with them the two-step process where Bank of

10  America became interim servicer and then a sale process was

11  set up so that any proceeds from the sale of the servicing

12  rights of Bank of America, over and above Freddie Mac's

13  claims, would come to the estate, and the same for Ginnie

14  Mae.  We negotiated a marketing period.  We were able to

15  close a deal to an approved Ginnie Mae servicer in that time.

16  The debtors' estate would get the value of the servicing

17  rights over and above Ginnie Mae's claims.  We now turn to

18  the loan files that are stored at a facility managed by ACRC.

19  There are approximately 1.5 million loan files at that

20  facility.  The facility is in Melville, New York, and again,

21  it's operated by a third party, independent third party,

22  ACRC.  It's about an 80,000 square foot warehouse.  I keep

23  picturing that final scene from Raiders of the Lost Ark when

24  they're putting the ark in a government warehouse.  It's a

25  huge warehouse, and it holds really substantially all of the

1   debtors' loan files and other corporate records.  We're not

2   the only customer but by far the largest customer of ACRC.

3   The fact is, Your Honor, and Your Honor just said so in your

4   ruling, the debtors are not going to exist forever, at least

5   not in their present form, and so we must start the process

6   of dealing with this 1.5 million loan files.  Now if you

7   assume it takes three minutes to locate, identify, and pull a

8   servicing file and then sort it for either destruction or

9   return, and you have ten people working on this for eight

10  hours a day, for a business day, it would take 3.6 years to

11  deal with the 1.5 million loan files.  You can put that up to

12  20 people or you may have people work two shifts of 16 hours

13  a day, you're down to 1.8 years.  But this is a substantial

14  project, and so the debtors believe that it's crucial that we

15  get started on the process of dealing with these loans.

16  It's, again, important to remember, we do not control the

17  warehouse.  ACRC is a separate entity, not an affiliate, not

18  a subsidiary of the debtors, and the filing of the bankruptcy

19  put ACRC in significant financial trouble.  At the time of

20  the filing we owed them approximately $276,000.  They

21  asserted a warehouse lien on the files, and they filed a

22  secured claim in the case.  We have recently, after

23  significant negotiation, negotiated an agreement with ACRC.

24  It's the subject of a pending motion under Bankruptcy Rule

25  9019, and it's scheduled for the next omnibus hearing.  Based

1    on that agreement, Your Honor, we believe we should have

2    uninterrupted access to the loan files in that facility.

3    There's really three issues, three primary issues involved in

4    the debtors obtaining these loan files.  The first is cost.

5    The debtors pay a rather modest fee to store the files there.

6    Where ACRC historically has made its money is the pulling of

7    files, the refiling of boxes and files, pulling those for

8    requests, new files coming in as we originated loans.  There

9    hasn't been a lot of that, Your Honor, since the filing.  So,

10   a significant source of their revenue stream has not happened

11   since the filing.  There's confidentiality issues.  Each loan

12   file contains the loan application.  It has date of birth,

13   social security numbers, often has bank statements, tax

14   returns, very sensitive consumer data in these files.  Each

15   loan file in connection with funded loans is intermingled.

16   So you might have a Calyon loan, a CitiMortgage loan, a Bank

17   of New York loan, all in the same box.  And you have the

18   logistics, how to find these loans.  The debtors have a

19   software program that can tell them what box the loan is in,

20   but it's ACRC that has the software program to tell you where

21   the box is.  So you need both.  You need the debtor to tell

22   where the loan is, which box it's in, and you need ACRC to

23   find out where the box is, and only ACRC employees are

24   allowed to go on the warehouse floor and pull boxes.  In

25   connection with a later motion today we have testimony on

1    this, so, this is really more for background of this.  So, we

2    have a complicated issue.  What we've determined today, after

3    seeing the response and the concerns raised by parties, we

4    determined to get out of the box and get the process started,

5    if you will.  So we've continued the objection so that we

6    have time to work with those parties to start attempting to

7    negotiate a resolution or at least addressing their concerns

8    in connection with either the return or the destruction of

9    documents.  What we seek authority today is to destroy

10   approximately 115,000 files for loans that never funded.

11   These are loans that were withdrawn, terminated, canceled, or

12   denied by AHM.  So, the relationship never started.  Someone

13   applied for a loan, they were either denied by AHM as not

14   qualifying for the loan, or they terminated the process for

15   whatever reason.  We have about 115,000 of those files.

16   They're kept in separate boxes.  They're maintained together

17   so a box will only contain these files, and we seek - and we

18   have electronic copies of all of these.  Nothing we're

19   seeking authority to destroy today is not backed up by a full

20   electronic copy that we will keep.

21        THE COURT: How were the electronic copies made?

22   Are these PDF or TIF files or whatever?

23        MR. BRADY: I might have to - I happen to have the

24   chief technology officer here, so I'm sure that he can

25   answer, but I know they're scanned in, and exactly what type

1   of program, I'm not sure.

2          THE COURT: So they're scanned to the hard copies.

3          MR. BRADY: They TIF - yes, and they're TIF files.

4   I only wish I knew what that meant, but -

5          THE COURT: And who did that?  ACRC or -

6          MR. BRADY: No, the debtors.  As files came into

7   Melville, the debtors had a team of people who scanned these,

8   and then once they were scanned, the boxes were sent to ACRC.

9          THE COURT: What's the quality control to make sure

10  that all pages were scanned or any missing pages you didn't -

11  two-side pages actually got both scanned?

12         MR. BRADY: For the files we're talking about today,

13  these are unfunded loans.  As they were scanned, there was a

14  monitor screen, and the person doing the scanning reviewed

15  each page as it went through to confirm legibility and

16  completeness and accuracy, no pages were folded over.  For

17  funded loans, there was a much more significant quality

18  control process, but since these never became funded loans or

19  there was not all the collateral documents, the note, the

20  mortgage, et cetera, so really the applications, the quality

21  control was the AHM employees.  As they were doing it, were

22  monitoring the process as it occurred, and they were then

23  boxed and sent to storage.

24         THE COURT: And how do you know these boxes contain

25  only the unfunded ones?

1          MR. BRADY: If it helps, Your Honor, I have -

2    Freddie Mac had raised some question about being concerned

3    about letting this happen and how can they be sure that no

4    Freddie Mac loan accidentally gets caught up in this.  So, I

5    have a brief proffer of Mr. Johnson, who's in the courtroom

6    today -

7          THE COURT: All right.

8          MR. BRADY: I think it hits at least some of your

9    questions, hopefully, all, Your Honor, and if not we can have

10   Mr. Johnson answer them but if I may proceed by proffer, Mr.

11   Johnson -

12         THE COURT: Any objection?  You may proceed.

13         MR. BRADY: Mr. Robert Johnson is employed by AHM

14   Corporation.  He is the executive vice president of Capital

15   Markets.  He has been with AHM since May of 2001.  Of the

16   many hats that he wears, his responsibilities include being

17   the executive in charge of the Post-Closing Department.  The

18   Post-Closing Department oversees the imaging and storage of

19   all loan files.  The files received in Melville are entered

20   into the debtors' system, which is known as UNIFI.  It's all

21   caps U-N-I-F-I.  Specifically, with respect to the types of

22   documents we seek authority to destroy today, the UNIFI

23   system contains stages where a transaction can be marked as

24   withdrawn, canceled, or denied.  With respect to those marked

25   withdrawn, canceled, or denied, the hard copy files that we

1    seek to destroy today have been subject to an image process

2    imaged by AHM personnel and while the images were created,

3    reviewed by AHM personnel for completeness and accuracy.

4    They were then - these withdraw, canceled, denied files were

5    separately boxed and sent to the ACRC facility.  Again, while

6    funded loans may be intermingled in boxes so the box may

7    contain loans of various investors, these files are

8    maintained in separate boxes.  If the relief is granted

9    today, the debtors will do the following in connection with

10   the destruction of those files: The debtors will run a report

11   from their UNIFI system of all of the imaged canceled,

12   withdrawn, denied files.  So they will confirm that they are

13   only pulling a list of loan files that were canceled,

14   withdrawn, denied and have been imaged.  Those boxes then

15   will be ordered and pulled by ACRC and delivered to the

16   debtors.  Debtor personnel will then review each file within

17   the box and scan the bar code that is on each file to confirm

18   that the file is still listed in the UNIFI system as

19   withdrawn, canceled, or denied.  Debtor personnel will then

20   open each file and confirm that the names of the potential

21   borrowers that are in the file match the names of the

22   potential borrowers in the UNIFI system.  Only at that point

23   will the file be sent for destruction.  If the files is

24   listed as having been subsequently funded or there is any

25   discrepancy between the names of the potential borrowers and

1    the information in the file, it will be sent for additional

2    quality control and checked before any destruction occurs.

3    So, it's my understanding based on that proffer that Freddie

4    Mac's concern - and I know they have counsel in the

5    courtroom, that there could be some risk that a Freddie Mac

6    file could accidentally get put in the process and destroyed

7    -

8            THE COURT: Tell me about the destruction process.

9            MR. BRADY: We're going to shred these, Your Honor.

10           THE COURT: Who's going to do it and -

11           MR. BRADY: I can check with our chief technology

12   officer.  There is the ability to shred the documents right

13   at the ACRC facility, since these are going to be brought

14   back to Melville.  I'm not sure they're going to contract

15   with a third party or use the ACRC facilities, but I can

16   confirm with my witness.

17           THE COURT: Okay.

18           MR. BRADY: Because we are moving these files back

19   to the Melville operations of AHM, AHM intends to contract

20   with a third party to shred the files.

21           THE COURT: All right, and they'll be done in a

22   confidential manner, et cetera, et cetera?  I mean -

23           MR. BRADY: Yes, we're very mindful of the fact that

24   we can't simply throw these in a dumpster because of the

25   sensitive information.

1          THE COURT: Uh-huh.

2          MR. BRADY: To the extent we're authorized to

3    destroy these, it will be shredded, and we believe that

4    complies with the various state and federal requirements -

5          THE COURT: Right.

6          MR. BRADY: - for destruction of this type of

7    information.  Now, with that, Your Honor, as I indicated, I

8    think the U.S. Trustee still has an issue, so it may be time

9    to hear from -

10         THE COURT: All right.

11         MR. McMAHON: Your Honor, Joseph McMahon for the

12   United States Trustee.  Before I begin, I do have a - I guess

13   a question to ask.  I don't care whether it gets clarified

14   through a supplement to the proffer or I get to ask it

15   directly of the witness, but I want to know whether canceled

16   loans include loans that have approved applications but which

17   were not funded through no fault of the applicant borrower.

18         THE COURT: Do you want to put him on the stand.

19         MR. BRADY: Your Honor, we'll put Mr. Johnson on the

20   stand.

21         THE COURT: To explain what canceled/withdrawn/

22   denied means.

23                    ROBERT F. JOHNSON

24   having been duly sworn testifies as follows:

25         THE CLERK: Please state your full name for the

1   record and spell it.

2              THE WITNESS: It's Robert F. Johnson, Jr., J-o-h-n-

3   s-o-n.

4              THE CLERK: Please be seated.

5              THE WITNESS: Thank you.

6                           CROSS-EXAMINATION

7   BY MR. McMAHON:

8   Q.   Mr. Johnson, good afternoon.  With respect to the proffer

9   that Mr. Brady just put on the record, you believe that's

10  accurate?

11  A.   Yes, I do.

12  Q.   And you adopt it as your own.

13  A.   Yes.

14  Q.   Okay.  With respect to the various categories of loans

15  that are the subject of the debtors' request today, you heard

16  the label "canceled" being used; correct?

17  A.   Uh-huh, yes.

18  Q.   What does that mean to you?

19  A.   Canceled, or canceled or withdrawn, they're sometimes

20  used interchangeably but they could be loans that were never

21  approved.  They could be loans that never went actually all

22  the way to application.  It's just that the various stages of

23  the mortgage process up until the point where you actually

24  fund the loan or close the loan, where the borrower would

25  choose to not go forward with the transaction.

1   Q.   American Home was - filed for bankruptcy protection after

2   its warehouse lenders, essentially, cut off its funding; is

3   that correct?

4   A.   That is correct.

5   Q.   All right.  Does the label "canceled" as you use it in

6   your testimony include loans that were in fact approved by

7   American Home but were never funded through no fault of the

8   borrower?

9   A.   Okay, I understand your question.  I'm honestly not sure

10  exactly how those loans that were let's say approved on July

11  31st but never went to funding or it wasn't the borrower's

12  decision, I don't know how they were staged in the system.  I

13  don't know what stage they were given.  So, I don't know if

14  they would be canceled, withdrawn, or denied.

15  Q.   Okay, but, well, can you definitively say whether or not

16  those types of loans are included in the loans that the

17  debtor - for which files the debtors are seeking authority to

18  destroy today?

19  A.   I personally couldn't one way or another know if those

20  loans are definitely in this calculation or not.  They might

21  have been given a separate stage, I just don't know.

22  Q.   Do you know if the applicant borrowers got notice of the

23  debtors' motion that's before the Court?

24  A.   I don't know.

25  Q.   All right.  With respect to the ACRC, are you familiar

1   with the lease terms?

2   A.   Not explicitly, no.

3   Q.   Do you have an understanding as to whether or not the

4   debtors get some type of pro rata reduction in the facility

5   costs if the debtors destroyed a certain percentage of the

6   files that are housed there?

7   A.   Yeah, I believe the monthly bill, aside from work orders

8   that go back and forth, is based upon how much we have in

9   storage.  So if we have less there, the monthly bill would be

10  lower.

11  Q.   So, is it a space or per file cost to your knowledge?

12  A.   It's per file, to my knowledge.

13  Q.   Okay.  So, we're talking about destroying a pool of about

14  - the figure I was quoted, is it a 115,000 files, is that

15  accurate?

16  A.   That is correct.

17  Q.   And you have a total of 1.1 million files in storage at

18  the ACRC; is that correct?

19  A.   I believe it's 1.5.

20  Q.   Excuse me, I stand corrected.  Are you aware of any

21  pending federal or state investigations into American Homes'

22  pre-petition activities?

23  A.   I'm aware the SEC is looking at things, yes.  I'm not

24  sure where they stand on this motion one way or another.

25  Q.   How about any state regulators?

1   A.   I don't know personally if there are or not.

2   Q.   Would you be the best person to ask at American Home that

3   question?

4   A.   No.

5           THE COURT: Mr. McMahon, you're going well beyond

6   the scope of the cross of the proffer.  I mean, I -

7           MR. McMAHON: Your, Honor, I appreciate that, and

8   I'm done my questioning.

9           THE COURT: Okay.

10          MR. McMAHON:  A technical matter, I probably could

11  ask to recall the witness in my case, but -

12          THE COURT: Yes, that's true.

13          MR. McMAHON:  - I understand, thank you.

14          THE COURT: Any redirect, Mr. Brady?

15          MR. BRADY: No, Your Honor.

16          THE COURT: You can step down, sir, thank you.

17          THE WITNESS: Thank you.

18          THE COURT:  Okay, well, let's hear - Mr. McMahon,

19  do you have a - do you want to voice your objection?

20          MR. McMAHON: Your Honor, we initially filed our

21  objection to the motion on the basis of the motion as it was

22  initially filed, and we noted in our objection that we

23  believed that the relief requested in the motion, as it was

24  initially framed, raised a host of issues, and I gather we'll

25  get to the balance of them on February 1st.  The debtors are

1   proceeding today with the destruction of about 115,000 files

2   that were originated but were never funded, and, I mean, I

3   use the term "originated", I guess it's a, you know, a file

4   was opened.  At some point in the process, the application

5   was either denied or approved and ultimately the loan itself

6   was never funded.  We note initially, as we did in our

7   initial objection, that the consumer counter-parties whose

8   rights are arguably affected by the relief presented here

9   today, did not receive notice of the motion.  I'll get to

10  that point in a second, but as a more global matter, Your

11  Honor, we note that, as the Court did, that the cases have

12  been around for a bit, but they're still fairly young.  We're

13  about five months into the cases.  I can't say that we know

14  precisely what the landscape of the federal or state

15  regulatory interest is in American Home's pre-petition

16  origination activities, what it will be, and with respect to

17  the relief requested, Your Honor, we're talking about a cost

18  of approximately, if we were to break down the cost of

19  maintaining those files versus the rent, the $45,000 a month

20  facility rent that was quoted in the motion is simply a *de*

21  *minimis*.  You're talking about less than $5,000 a month, if

22  I'm understanding correctly, the cost of actually housing the

23  files there.  That's with the belief that the debtors are

24  seeking to go forward with it today, and it certainly, I

25  think, is a figure that is a small percentage if a *de minimis*

1   one of the overall administrative expenses in these cases.

2   Then, when we balance that *de minimis* cost against potential

3   competing concerns, including the ones I just articulated

4   about the potential federal or state regulatory interests in

5   those files, it certainly, I think, warrants some

6   consideration of whether it would be possible to delay or

7   simply maintain the status quo pending further development of

8   the cases.  Your Honor mentioned a plan in connection with

9   the last motion.  We should be, hopefully, I guess, moving in

10  that direction, but I don't know necessarily whether a mere

11  five months into the case that we have seen the full

12  development of the federal and state regulatory interest that

13  may be brought to bear.  The third point, Your Honor, is the

14  point I was just trying to make with respect to the witness,

15  is that we should be dividing these loans really into two

16  groups, which is, loans that had approved applications but

17  were not funded through no fault of the borrower, and I guess

18  the second category of loans which were the truly withdrawn

19  or the truly denied applications, and it seems to us that the

20  first class that I am referring to may have potential claims

21  against the debtors' estates, and the second class is, I

22  guess, less likely to have such claims although you could

23  certainly debate whether - you could certainly look at it

24  differently, at least from our perspective, if you have an

25  approved application that there's certain rights to attach to

1    that, and from our perspective, Your Honor, really what's

2    being, I guess, addressed here is the potential application

3    of best evidence rule and the protection that provides, and

4    what happens when we effectively destroy the originals of

5    certain documents and they're not available?  You know, I

6    appreciate that the rules of evidence will govern us going

7    forward.  I certainly think that regardless of what the Court

8    does with respect to authorizing relief today, it should be

9    clear as to what can be done vis-a-vis the debtors' estates

10   in terms of using the absence of the original as an offensive

11   or defensive mechanism in connection with asserting claims

12   against the debtors' estates, and that's particularly with

13   respect to the class of claims that we identified.  So, those

14   are basically our concerns with respect to this limited sub-

15   class, and we reserve our rights with respect to the balance

16   of the relief.

17           THE COURT: All right, thank you.  Mr. Brady, if I

18   were to grant your motion today, could you actually begin the

19   process prior to your stipulation with ACR being approved,

20   assuming it is approved on February 1st?

21           MR. BRADY: It's my understanding we currently have

22   access, Your Honor, based on the deal we've reached.  They

23   are granting us access, but I think we still have to put some

24   ducks in a row to actually get the process started.  So, it's

25   unclear whether any document would actually be destroyed

1   between now and the next hearing, for instance on February

2   1st.

3          THE COURT: What about this concept that canceled or

4   withdrawn loans may include loans that were approved, that

5   were ready to go to closing, I guess, in August, and because

6   of the debtors' cessation of business didn't go to closing,

7   and they may be included in these files, and they may be

8   relevant evidence to some sort of claim under whatever the

9   applicable law would be?

10          MR. BRADY: Well, Your Honor, the key we think is

11   that we're keeping the e-copy of these files.  We're not

12   leaving no documentation on these files available.  We're

13   simply seeking to get rid of the hard copies.  Presumably,

14   the potential borrower may have copies of these papers as

15   well, but we'll have an e-copy of these complete files.

16          THE COURT: All right.  I'm such a lud-ite

17   (phonetical).  I just - I'd be more comfortable if you were

18   destroying the electronic copies than the paper copies.

19          MR. BRADY: I'm told that's very old-school, Your

20   Honor.

21          THE COURT: Yes.  Assume there's no bankruptcy,

22   you're just in a regular - you're still operational and you

23   decide - Was there a pre-petition sort of process in place

24   for culling these files out or - What would the applicable

25   law be?  Would you be able to do this if you weren't in

1     bankruptcy?

2          MR. BRADY: It's interesting, Your Honor, we did

3     take a look, and the company does have access to outside

4     counsel that used to advise them in these areas.  We didn't

5     bring them today.  We could if it's an issue Your Honor

6     really wants to delve into.  There's two points really: One

7     is whether a relatively recent federal law preempts all the

8     state laws on these issues, but looking at the state law,

9     just - this was a survey done by the outside firm.  Twenty-

10    four states expressly allow electronic document retention.

11    Three allow electronic document retention with some

12    limitations on exactly what you can destroy, mostly dealing

13    with original instruments in connection with a loan, and 23

14    states and the District of Columbia are silent, but, Your

15    Honor, in 2000, October 1, 2000, Congress passed and the

16    President signed the Electronic Signatures and Global and

17    National Commerce Act, also known as ESIGN, and it indicates

18    if a statute, regulation, or other rule of law requires that

19    a contract be retained, retaining an electronic copy is

20    sufficient to the extent that the documents in question deal

21    with interstate commerce.  Because AHM was involved in

22    mortgage transactions that involved brokers, lenders,

23    servicers, home sellers, home buyers, et cetera, virtually

24    all of their loans involve interstate commerce, and as a

25    result, the only two exceptions under ESIGN - I do have a

1    copy of the statute if Your Honor would like to look at it,

2    but the only two exceptions when the federal rule that

3    keeping an electronic copy is sufficient, is accepted, is

4    that there's a compelling governmental interest relating to

5    law enforcement or national security or imposing a

6    requirement to maintain originals is critical or essential to

7    attaining such an interest such as law enforcement or

8    national security.  So, we think there's a pretty good case

9    that this federal law preempts the various state laws,

10   notwithstanding, we think other than the very few states that

11   have some hybrid, the states are either silent on it or

12   expressly allow electronic retention.

13            THE COURT: The claims bar date has come and gone.

14            MR. BRADY: It passed on Friday, Your Honor.

15            THE COURT: Right, but you don't yet have a complete

16   claims register from your claims agent I expect?

17            MR. BRADY: No.

18            THE COURT: I think from what Mr. Dorsey said

19   earlier today.

20            MR. BRADY: That is correct.  We would put on the

21   record, we would not destroy any file if a claim has been

22   filed by that borrower or potential borrower.

23            THE COURT: Right.  You have a way to cross index

24   those?

25            MR. BRADY: We would, Your Honor, yes.

1           THE COURT: All right.

2           MR. BRADY: Now, I should note, we did not serve the

3    115,000 potential borrowers with this document.  We did serve

4    the SEC.  We did serve all of the states' attorneys general.

5           THE COURT: Did they get notice of the bar date?

6           MR. BRADY: I don't know whether these 115,000

7    potential borrowers gave - Our position on that, Your Honor,

8    would be no contractual relationship was ever formed.  We

9    have not originated a loan since July.

10          THE COURT: Right.

11          MR. BRADY: There's been substantial publicity about

12   the case as well as publication notice of the bar date.  We

13   believe that any -

14          THE COURT: Right, right.

15          MR. BRADY:  - party that would come forward and

16   argue that AHM -

17          THE COURT: Well, frankly, I think - I don't think

18   serving 1.5 million people with a notice like this makes a

19   lot of sense.  I'm not particularly disturbed about the lack

20   of notice, at least in connection with the actual consumers

21   receiving it.  Did you serve attorneys general in the states?

22          MR. BRADY: We did, Your Honor.  We served attorneys

23   general.  We did have - we actually were contacted by an

24   attorney general that I think serves as a sort of

25   coordinating attorney general.  We did walk through -

1           THE COURT: Like in the tobacco - okay.

2           MR. BRADY:  - the process with that attorney

3    general.  Mr. Beach did, I did not, but we've not heard

4    further from them and they did not file a response.

5           THE COURT: Are there any ongoing investigations of

6    the debtors other than the SEC investigation discussed of

7    which you're aware?

8           MR. BRADY: I know the use of the term

9    "investigation" is somewhat sensitive.  I'm not personally

10   aware.  I know there have been inquiries.  I'm not sure what

11   level any have risen to, but again, we did serve the SEC with

12   this motion, the person at the SEC that's been involved in

13   the case and been monitoring the case, and we've not heard

14   from them.

15          THE COURT: Well, I guess it comes as no surprise,

16   this is an extremely sensitive issue and one to which I am

17   concerned even regardless of the filing of the numerous

18   objections, albeit, I understand most of those aren't

19   implicated by the limited relief the debtors are seeking

20   today.  I'm very concerned in preserving documentation for

21   these loan files, documentation that may or may not be

22   necessary for claims litigation or any other kind of

23   litigation or documentation that's just necessary for the

24   instrument to be of use to the people who are parties to it.

25   No matter how careful you are, mistakes will be made, and

1    something's going to get destroyed that there's not a

2    duplicate for, and that document will be gone forever.  So,

3    the Court is concerned about that and understands that that

4    could raise a potential problem.  I don't know what the

5    evidentiary effect of that will be.  I'm sensitive to Mr.

6    McMahon's comments in connection with it.  I think that my

7    opinion is that, well, I don't think I need to offer it, but

8    I expect people would have some protection in that situation

9    who are making claims.  I'm frankly reluctant to approve it,

10   sort of one off until the rest of the matters are before the

11   Court on February 1st including the settlement with the

12   landlord to see if that actually gets approved and the other

13   pieces of the puzzle.  So, even if I were prepared to approve

14   it, can you articulate for me why today as opposed to two

15   weeks from today?

16         MR. BRADY: Well, the one thing is, Your Honor, I

17   can't guarantee for you that we'll have everything buttoned

18   up for the first or we'll go forward.  In other words, we're

19   starting a dialogue with the various parties -

20         THE COURT: Right.

21         MR. BRADY: - and we think, and it's going to be an

22   issue for the next motion that's up, we think a number of

23   parties for funded loans will ask for the documents back, and

24   then the question becomes who bears the cost to get them

25   back.

1          THE COURT: Uh-huh.

2          MR. BRADY: So, in many instances, we don't

3    anticipate a lot of these will be destroyed.  We think there

4    will be a negotiation over getting files back.  In many

5    instances, there's also custodians, and custodians hold the

6    collateral documents.  They're the true key documents to the

7    loan, the note, the mortgage, often the title insurance

8    policy.  They're not in our possession.  They're in the hands

9    of the various custodians under the agreement.  So, there are

10   a lot of issues that we'll deal with on the funded loans

11   through negotiation, and it may come at some point where we

12   seek to go forward, but the concern we have is we don't start

13   any destruction until we have every issue resolved and all of

14   these either litigated or consented to and it's going to take

15   as long as we anticipate it's going to take, and again, this

16   estate won't last forever.  The post-confirmation estate is

17   going to be burdened with the additional costs for some

18   period of time.  So, we tried to pick a subset where no one

19   could ask for these back.  There is no funded loan, so the

20   owner of the loan isn't here to say, I want my loan files

21   back.  There are no notes, no instruments, no title insurance

22   policies -

23          THE COURT: All right.

24          MR. BRADY:  - and the hope was to get started and

25   get underway and get this process started.

1         THE COURT: Journey of a thousand miles starts with

2    a step?  I don't think it's wise to paraphrase Chairman Mao

3    when you're sitting on the U.S. Bankruptcy Court, but in any

4    event, all right, I'll approve the limited relief requested.

5    That's without prejudice in connection with the balance of

6    the relief being sought.  It obviously raises different

7    issues.  I think the record in front of the Court today is

8    that the debtors are putting in place rigorous controlled

9    processes to insure as best possible that any document that's

10   destroyed, there's a duplicate electronic version in place,

11   that the right documents get destroyed and not the wrong

12   documents, and I think that's critical.  And also, at least I

13   think the evidence in front of me also anticipates that

14   really no one else has any legal right or claim to these hard

15   documents that are being destroyed.  Obviously, I urge the

16   debtors to err on the side of caution, and if there's any

17   doubt whatsoever to not destroy the document pending further

18   order of the Court.  If the debtors ignore that advice, they,

19   to a certain extent, act at their own peril.  If they act,

20   you know, with negligence – I'm not going to enter any order

21   that would for instance so indicate that, you know, if the

22   debtors are negligent in destroying something that they

23   wouldn't necessarily be liable for whatever damages may

24   arise.  Just a little concerned that the language that sort

25   of trumps state and federal law was looking for some sort of

1    limitation of liability, I'm not going to grant that, but I

2    will authorize the limited relief being requested.

3         MR. BRADY: Thank you, Your Honor.  We have a

4    revised form of order -

5         THE COURT: All right.

6         MR. BRADY: - we can hand up.  Also, I should note,

7    we actually have a run of the loan files that we believe

8    comprises 115,000 loans.  It's very long.  We can attach that

9    to the order so there's no debate as to which loan files are

10   covered.

11        THE COURT: Well, is there any personal or

12   identifiable information on that?

13        MR. BRADY: It's simply the loan numbers, I believe.

14        THE COURT: No names or -

15        MR. BRADY: I don't think it even has borrower

16   names.

17        THE COURT: The loan number doesn't bear any

18   resemblance or reference to a social security number or

19   anything like that?

20        MR. BRADY: No, and it's so secretive, Your Honor, I

21   think we forgot to bring it, but - I can say, if Your Honor

22   would like that attached - at one point we were going to have

23   a witness and introduce it through the witness and then with

24   a resolution of the issue, we didn't do that.  I can attach

25   it or we -

1          THE COURT: Let's attach it.

2          MR. BRADY: Then we'll do that.  We'll submit that

3    under certification.

4          UNIDENTIFIED SPEAKER: It's about 500 pages.

5          THE COURT: It's 500 - No, let's not attach it.

6    Look, it won't make any sense to anybody who doesn't know

7    what the code means.  So -

8          MR. BRADY: Your Honor, we will - I will -

9          THE COURT: I don't think that's necessary.

10          MR. BRADY: Okay.

11          THE COURT: Do you have a - Let me see the order.

12    Mr. McMahon's looking at it, I take it?  We're going to need

13    to take a break before the next matter, so why don't we take

14    it now while you're talking about the order.  Does that make

15    sense?

16          MR. BRADY: That would be fine, Your Honor.

17          THE COURT: All right, let's take short recess.

18          (Whereupon at 4:24 p.m., a recess was taken in the

19    hearing in this matter.)

20          (Whereupon at 4:38 p.m., the hearing in this matter

21    reconvened and the following proceedings were had:)

22          THE CLERK: All rise.

23          THE COURT: Please be seated.

24          MR. BRADY: Your Honor, if I may approach with the

25    form of order we would submit.

1          THE COURT: Thank you.  Mr. McMahon, do you have any

2   -

3          MR. McMAHON: Your Honor, we have no comments with

4   respect to the Court's concern with respect to the preemption

5   issue.  I note that's in the second full ordered paragraph,

6   and I don't know what, if any, changes are necessary to

7   address that particular concern.

8          THE COURT: All right.  I'm just going to change it

9   to say that, "The motion is granted to the extent set forth

10  herein and subject to the comments of the Court at the

11  hearing on the motion."  With that change I'll approve it.

12         MR. BRADY: Thank you, Your Honor.  Your Honor, some

13  counsel have to catch a flight this evening, so, if we could

14  jump ahead to matter 11, which I think will be - I'm sorry.

15         THE COURT: Eleven's continued.

16         MR. BRADY: Yeah, this agenda goes on and on.

17  Matter 13, Your Honor.

18         THE COURT: Any objection?  All right.

19         MR. BRADY: Your Honor, we're back on this motion.

20  We were here previously and Your Honor entered an order

21  approving part of the relief sought.  We're back here on the

22  approval of Mr. Freedman's employment agreement.  Your Honor

23  approved the fourth amendment to the APA.  We did remove the

24  references to the Freedman agreement, so we're now back on

25  the fifth amendment to the APA.  Like the relief approved

1  previously, the Freedman employment agreement is designed to

2  facilitate a smooth transition of the servicing business to

3  the purchaser at final closing.  Mr. Freedman is currently

4  the executive vice president of AHM Servicing and runs that

5  business.  The APA contemplates that the debtors will

6  continue to operate the service business and the ordinary

7  course requires that the debtors use commercially reasonable

8  efforts to maintain the servicing business, including keeping

9  available officers and employees.  Entering into the Freedman

10 servicing agreement will further the debtors' efforts.  Mr.

11 Freedman's experience and familiarity with the servicing

12 business is necessary to maintain relationships and the

13 operations during this period between the initial close and

14 the final close.  The debtors bear no economic risk in

15 entering into the Freedman employment agreement, which is

16 confirmed through the fifth amendment.  That is because it's

17 clear in the fifth amendment that the employment agreement is

18 deemed part of the business, that's a capital B as defined in

19 the APA.  It's a purchased asset and an assumed contract, and

20 liabilities under the Freedman employment agreement are

21 deemed to be assumed liabilities.  We've consulted with the

22 Committee, Bank of America, and the United States Trustee,

23 and with certain changes to the form of order, none object to

24 the relief requested.  The U.S. Trustee did raise an informal

25 objection with us regarding the servicing component of the

1   deal.  We have revised the order to make it clear that the

2   severance benefits contemplated by the employment agreement

3   will not be paid by the debtors prior to a final close and

4   assumption of the employment agreement.  Further -

5          THE COURT: Wait a minute, say that again.

6          MR. BRADY: That no severance payments will be made

7   by the debtors prior to a final close.

8          THE COURT: All right.

9          MR. BRADY: And an assumption of the agreement, at

10  which point, it would be the purchaser's obligation.  If the

11  final close does not occur within 364 days of the effected

12  date of the employment agreement - again, the employment

13  agreement, the severance component becomes active after one

14  year of service.  So if we get to the one year mark and a

15  final close hasn't occurred, we've agreed that further order

16  of this Court would be required before making any severance

17  payments.  So we do have a revised form of order that's been

18  reviewed by Mr. McMahon, counsel for Bank of America, counsel

19  to the purchaser, and the Creditors Committee, and with that,

20  it's our understanding that all concerns have been addressed.

21  So if I may hand that up, and I'm available to address any

22  questions Your Honor may have.

23         THE COURT: All right.  Thank you.  Is there a

24  blackline?  Is this black-lined?

25         MR. BRADY: I'm going to hand up a blackline, Your

1    Honor, that -

2            MR. LUNN: Your Honor, Matthew Lunn for the record.

3    This is a separate order.  The initial order was presented to

4    Your Honor on last Friday.

5            THE COURT: All right.

6            MR. LUNN:  So this is a whole new order and there's

7    nothing to blackline against it.

8            THE COURT: All right, thank you.  The fifth

9    amendment just deals with the employment agreement?

10           MR. BRADY: It does, Your Honor.  It simply

11   indicates that it's going to be an assumed agreement, a

12   purchased asset, and an assumed liability.

13           THE COURT: I don't seen anything here about the

14   document remaining under seal.

15           MR. BRADY: I have a separate order on that, Your

16   Honor.

17           THE COURT: All right.

18           MR. BRADY: If I could hand that up.  That is a - I

19   do have a blackline order.  The U.S. Trustee is fine with the

20   form of order.  We've included a provision that says nothing

21   in the order shall prejudice the rights of the U.S. Trustee

22   to seek to unseal the employment agreement on notice and

23   other parties' rights to oppose any such motion.  But we've

24   clarified that the U.S. Trustee would have that right, so I

25   do have a form of order that's on consent of the parties I

1   mentioned before to seal the -

2          THE COURT: Is Mr. Freedman an insider?

3          MR. BRADY: He's a senior vice president and runs

4   the servicing business, so -

5          THE COURT: All right.  Is this a retention payment?

6          MR. BRADY: No, Your Honor, the employment contract

7   is to compensate him for his work.  There is a severance

8   component, but again, that's been carved out, if you will, in

9   the sense that unless it's going to be paid by the purchaser

10  after a final close, we have to come back to court to get

11  that -

12         THE COURT: Right, right.  I understand the service

13  issue.  Is he getting a raise here or -

14         MR. BRADY: I will have to check with somebody as to

15  that he's currently making, although I would imagine we may

16  not want to put that on the record, but we are seeking to

17  seal the terms -

18         THE COURT: I understand, but maybe you can give me

19  an understanding of what kind of increase or decrease is

20  involved.

21         MR. BRADY: Counsel of the purchaser's understanding

22  is this is the same base compensation that Mr. Freedman's

23  currently making.  This is simply the -

24         THE COURT: So why do you need to enter - Was he not

25  subject to an employment agreement before?  I'm just trying

1    to figure out why we're -

2              MR. BRADY: I think this -

3              THE COURT: I may be missing the 800 pound gorilla

4    in the room, but why a separate employment agreement if he's

5    already making -

6              MR. BRADY: I don't believe the debtor's going to

7    assume that particular agreement.  This is a new agreement

8    that -

9              THE COURT: New agreement.

10             MR. BRADY:  - would be entered into post-petition

11   and then become an assumed contract of the purchaser.

12             THE COURT: What if - I know you keep telling me

13   this will never happen, but what if the matter doesn't go to

14   a final close and you end up having to terminate the

15   employment agreement?  Will his damages be limited to one

16   year's pay as it would be in connection with a pre-petition

17   employment agreement that you would reach?

18             MR. BRADY: Your Honor, the agreement does contain a

19   provision of precisely what would be payable if the executive

20   employment is terminated for any reason.  I have that

21   available if Your Honor -

22             THE COURT: If you would give me - reference the

23   section, I've got the agreement.

24             MR. BRADY: It would be section 8.

25             THE COURT: Okay.  Oh, so, he gets the full amount -

1    Oh, I see, I see, I see -  Well, that's the severance amount.

2         MR. BRADY: And again, the severance doesn't become

3    effective until the first anniversary.  Your Honor, without

4    testifying from the stand, Your Honor asked what the goal

5    here is.  It appears that the goal here is the non-compete

6    agreement that's included in this employment agreement.

7         THE COURT: All right, well, my concern - I'm trying

8    to articulate it but I'm not doing a very good job.  My

9    concern is whether somehow we're getting around 502(b)(7)

10   which would limit the claim of an employee for damages

11   resulting from the termination of an employment contract.

12   Are you trying to trump 502(b)(7) or would this contact be

13   subject to 502(b)(7)?  It's post-petition.  It's not a pre-

14   petition contract.

15        MR. BRADY: Your Honor, it's our view on that is, in

16   connection with the severance as the language Mr. McMahon

17   negotiated is, either you'll go to a final close and the

18   severance component will become the obligation of the

19   acquisition company -

20        THE COURT: Uh-huh.

21        MR. BRADY: - or, you won't go to a final close,

22   you'll reach the one-year anniversary of the employment

23   agreement, and the debtor has to come back for court approval

24   before any severance payments can be made.  At that point,

25   presumably, there would be -

1           THE COURT: But what if you reject the - what if you

2    don't go to final close, you reject the contract.  He's going

3    to have a damages claim, regardless of severance; right?

4           MR. BRADY: If we terminate the agreement, he would

5    be entitled to those payments that are under section 8.

6           THE COURT: Right, which I understand to be - Oh,

7    that's accrued but not paid.  Okay, all right.  Wait a

8    minute.  Do you see where I'm coming from, Mr. Indelicato?

9           MR. INDELICATO: Your Honor, we do, and we were very

10   concerned about that initially as well, and the way the

11   document is supposed to work and the parties can confirm our

12   understanding of that, if in fact it is terminated post-

13   petition as the Court pointed out, it's a post-petition

14   agreement.  There will be no limitation on the damages, but

15   this is an ongoing expense of the debtor.  It's after the

16   initial close, so this will be an expense of the purchaser

17   going forward.  So it will not be an obligation of the

18   debtor, and we will have rights under this agreement under

19   the various indemnities and the orders of this Court to look

20   to the assets that we still have to satisfy any indemnity

21   claim we might have, but in the first instance, we believe it

22   would be an obligation of the purchaser to satisfy any claim

23   if this is terminated prior to a final close.

24           THE COURT: Okay.  Well, obviously, the people whose

25   economic ox is going to get gored have looked at this and are

1   comfortable with it.  I'm just - continue to be optimistic

2   that the close will occur, but I'd like to also try to think

3   ahead, what if it doesn't?  And make sure we're not putting

4   insiders of the debtor in a situation where they have vastly

5   improved their position, but what I understand is, if there's

6   a termination with or without cause, it entitles this

7   gentleman to severance, and he only gets severance if it gets

8   paid by the buyer or it gets approved by me at a later time.

9        MR. BRADY: That's correct, Your Honor, and I'm kind

10  of hamstrung on how much I can say given that it's under

11  seal, but I think if you look at section 8 there is no large

12  damages that flow from a termination of the agreement except

13  for perhaps severance, and that's been taken care of.

14       THE COURT: Yeah, part of that - I misread.  I

15  apologize, when I first looked at it, I misread paragraph

16  (8)(a), Romanette (I) to say something it doesn't.  So -

17  Reading what it actually says that greatly alleviates my

18  concern.  All right, I'll approve it as revised.

19       MR. BRADY: Thank you, Your Honor.  I do have a

20  blackline of the order and a clean of the under seal order

21  which includes the provision I indicated requested by the

22  U.S. Trustee.

23       THE COURT: Thank you, Mr. Brady.  All right, I'll

24  approve that as revised.  Mr. Lunn, do you mind taking this

25  back so that if ends up in somebody's trash it's not my

1   fault.  Thank you.  They had a pretty strict rule when I was

2   in private practice about not giving me documents.

3          MR. LUNN: I won't inquire further,

4   Your Honor.

5          THE COURT: It worked our pretty well.

6          MR. LUNN: Your Honor, I think that brings us to

7   agenda item number 10 and this is the debtors' motion to

8   retain DoveBid as auctioneer and also to establish auction

9   procedures related to - essentially miscellaneous assets.  As

10  Your Honor may recall, we were in front of Your Honor with

11  respect to a motion to establish procedures for the sale of

12  miscellaneous assets.  This dovetails into that motion, Your

13  Honor.  Specifically what, Your Honor, we're seeking to do is

14  retain DoveBid as the debtors' auctioneer pursuant to 327 and

15  328 and also establish auction procedures under 363.

16  Generally, Your Honor, the procedures provide for that the

17  debtors will identify specific assets.  These assets are the

18  office furniture, computers, filing cabinets, the like, work

19  with DoveBid on a - what's termed a plan or a plan of sale

20  that will identify which assets are subject to an auction,

21  which of the debtors own those assets, whether those assets

22  will be sold at a public or a private sale, including an

23  auction that's conducted on the website, and the estimated

24  costs of DoveBid that will be incurred in connection with

25  that auction.  Once that plan has been developed by the

1   debtors and DoveBid, it will be filed with the Court and

2   served on the parties listed in the motion, including the

3   U.S. Trustee, parties known to have a lien, the Committee,

4   and also counsel for the DIP lenders.  Those parties will

5   have 10 days to file an objection to the proposed plan.  In

6   the event that no objection is filed, the debtors will

7   proceed and DoveBid will proceed with the auction of those

8   assets.  Assets sold pursuant to these plans of sale will be

9   sold on an as is, whereas basis, and the buyers will be

10  taking these assets free and clear of all liens.  Liens,

11  obviously, will - the proceeds - Liens will attach to the

12  proceeds of the sale to the extent and the validity that they

13  had prior to the sale.  Within 10 days of the conclusion of

14  an auction, DoveBid will send the debtors a settlement check

15  representing 80 percent of the net proceeds realized from the

16  sale.  Thirty days or 45 days, depending on whether or not

17  there are multiple sellers, DoveBid will remit the balance to

18  the debtors.  DoveBid, also under the engagement letter and

19  the procedures, will be required to prepare a settlement

20  report, provided at settlement to report to the debtors.  The

21  debtors will then in turn create a compensation report that

22  will be filed with the Court that will list the assets sold,

23  the price for those assets, the premium that DoveBid

24  receives, and also the expenses that are incurred.  The same

25  parties that receive the plan of sale will receive the

1    compensation report.  Those parties will then have 15 days to

2    file an objection.  Assuming no objection's filed, the

3    settlement and the funds can be released in accordance with

4    the settlement report.  If an objection is filed that can't

5    be resolved, it will be before Your Honor at an omnibus

6    hearing to resolve those objections.  With respect to the

7    premium, under the engagement letter, DoveBid will be

8    entitled to receive a buyer's premium of 16 percent which may

9    be reduced by one percent to 15 percent for cash transactions

10   or wire transfers.  No buyer's premium will be awarded for

11   sales or purchases by the employees.  In addition, Your

12   Honor, I should note that under the engagement letter,

13   DoveBid's agreed to provide a rebate to the debtors that

14   totals anywhere from between 2 percent and 4 percent, and

15   it's a sliding sale.  So as the assets are sold, the debtors

16   will receive 2 percent of the rebate for aggregate sales

17   under a million dollars, 3 percent for sales, the aggregate

18   for all the auctions, between a million and two million, and

19   then 4 percent once we exceed the $2 million threshold.

20   There was one objection that was filed, Your Honor.  This was

21   filed by the County of Maricopa in Arizona, and their concern

22   was that they did not receive - or they would not receive

23   notice of the sales.  I have had conversations with their

24   counsel, and we've resolved the objection based on the

25   representation that the debtors will provide the plan of sale

1    to counsel for Maricopa when the property that's being sold

2    may have been located in Maricopa County.  What the debtors

3    have done in connection with the rejection of leases, was

4    remove office equipment and furniture, bring it to Melville,

5    and thus, we'll have to go through a process determining, you

6    know, if that property was located in Maricopa County.

7    Additionally, I -

8         THE COURT: What's in Maricopa County, I mean, is it

9    - is there a city of any -

10        MR. LUNN: I think it's Phoenix, Your Honor.

11        THE COURT: All right.  I've heard of that, okay.

12        MR. LUNN: Pardon me?

13        THE COURT: I've heard of it, all right.

14        MR. LUNN: You've heard of it?  I'm just trying to

15   think there's maybe 9 or 10 office locations, I was just

16   trying to remember.

17        THE COURT: Okay.  And these weren't main offices.

18   These were small retail operations?  All right.

19        MR. LUNN: These were loan origination offices, Your

20   Honor.

21        THE COURT: Got it.

22        MR. LUNN: The additional representation I said I

23   would make to counsel for Maricopa was that we would work

24   with them to the extent that we can to reasonably identify

25   the property that may be subject to a plan that may have been

1    located in their premises.  Your Honor, with that, the

2    debtors submit that sound business justification supports the

3    entry of this motion.  This is another step in the debtors'

4    efforts to liquidate their assets through orderly sales.

5    Other than the objection from Maricopa County, there were no

6    other objections.  The debtors had worked with the Office of

7    the United States Trustee after the filing of the motion and

8    with counsel for the Committee prior to filing a motion to

9    incorporate their comments.  Unless Your Honor has any

10   questions, I do have a proposed form of order that has not

11   changed.

12           THE COURT: No, all right.  Oh, Ms. Counihan needs

13   to tell us something.  Yes.  She's going to reserve her

14   rights.  Yes, ma'am.

15           MS. COUNIHAN: Your Honor, Victoria Counihan from

16   Greenberg Traurig this time in my capacity as counsel to the

17   DIP lender.  We just want to make it clear that WLR Recovery

18   Fund has not been asked to consent to this motion.  We have

19   not provided consent to the motion, and we do reserve all of

20   our rights under the DIP loan.

21           THE COURT: Is it a default?

22           MS. COUNIHAN: I believe that if the sales need to

23   be - We need to consent to the sales, so before the sales

24   happen we have to provide consent, so it's not a default, I

25   don't think -

1          THE COURT: All right.

2          MS. COUNIHAN: - to have the motion approved, but

3     if the sales go forward, I believe that that's the case.

4          THE COURT: Okay.  Yeah, I mean, if you're saying

5     it's an event of default for me to sign this order, you need

6     to raise that issue.  You can't reserve your rights to later

7     call default.

8          MS. COUNIHAN: I'm not, Your Honor.

9          THE COURT: All right, okay.

10         MR. LUNN: And, Your Honor, we intend to work with

11    counsel for the division to obtain their consent prior to the

12    sales to the extent that we need to under the DIP documents.

13         THE COURT: All right.  I've reviewed the order

14    earlier.  You say there have been no changes.

15         MR. LUNN: There have been no changes, Your Honor.

16         THE COURT: I'll approve it as submitted.

17         MR. LUNN: Thank you.

18         MR. BRADY: As Your Honor indicated earlier, matter

19    11 has been continued to February 1, so that takes us to

20    matter 12, which is CitiMortgage's motion for relief from

21    stay.  If I may have one moment, Your Honor, to talk with

22    counsel.  We had a brief discussion during the break, and we

23    may be able to shorten the hearing a bit on that.

24         THE COURT: Shall we take a brief recess then or -

25    Yes, we'll take a brief recess.

1          (Whereupon at 5:03 p.m., a recess was taken in the

2    hearing in this matter.)

3          (Whereupon at 5:17 p.m., the hearing in this matter

4    reconvened and the following proceedings were had:)

5          THE CLERK: All rise.

6          THE COURT: Please be seated.

7          MR. BRADY: Your Honor, thank you.  Robert Brady for

8    the record.  Thank you for that time, and I think at 5:20

9    tonight I'm pleased to report we have resolved matter 12, at

10    least for today, hopefully for good.  But we've at least come

11    up with a resolution that gets us past -

12          THE COURT: It's the most efficient recess I have

13    approved in a long time.

14          MR. BRADY: Your Honor, the debtors' testimony that

15    we were prepared to put on today is out of the 18,700 loan

16    files we have in the ACRC facility identified as CitiMortgage

17    files, that the debtors have actually shipped 18,630 of those

18    files already to CitiMortgage and that we hold duplicates of

19    those files and that there's actually only approximately 70

20    files that we never shipped.  If that's right, and Citi - We

21    learned about it late, I guess I first had an inkling late

22    Friday, confirmed it this morning, and weren't able to tell

23    CitiMortgage prior to the hearing.  If we're right, there's

24    very little to fight about here.  We're talking about 70 loan

25    files, all collateral documents, our records show all

1  collateral documents went from our custodian to CitiMortgage.

2  The debtors didn't hold those.  Our custodian is Deutsche

3  Bank.  They would have held the collateral docs and on the

4  sale of the loan the collateral docs would have transferred

5  to CitiMortgage.  If those facts are right, there's not much

6  to argue about today.  So what we've agreed to do is to

7  adjourn Citi's motion for relief from stay to the February 1st

8  hearing.  In that time, attempt to get them comfortable that

9  our information is correct.  We've put a collar on this so

10  that we don't have to come back if we're slightly off, and

11  that is if it turns out that there are less than 200 loan

12  files that we haven't shipped, CitiMortgage has agreed that

13  they'll either pay the debtors $3.50 for us to pull the files

14  and make them available to them to pick up or $6.25 per loan

15  file if we're going to ship them to them.  So if it turns out

16  that we have less than 200 loan files, we will make them

17  available to CitiMortgage at its cost, and again it's 3.50

18  per loan file to pick up and 6.25 to have us ship them.  If

19  it turns out our information is wrong, all parties reserve

20  all rights, and we'll come back on February 1 and litigate

21  the matter as we had intended today.  One other aspect of

22  that is, if it turns out that we're right and we're holding

23  18,630 duplicate loan files that we've already sent them, and

24  they hold the original loan files, CitiMortgage agrees not to

25  contest any motion by the debtors to destroy those duplicate

1    loan files.

2              THE COURT: Very good.  Mr. Fallon, good evening.

3              MR. FALLON: Good evening, Your Honor.  Brett Fallon

4    for CitiMortgage.  That's correct, we have agreed as Mr.

5    Brady has stated.  The one clarification I'll state is that

6    it's possible that AHM may have sent partial files, and if

7    the partial files, for example, if they didn't send the deed

8    or promissory note or something to that effect and that

9    amounts to more than 200 then that would count - or that

10   would not count as a file that they sent us, if that's clear.

11             MR. BRADY: Yes, Your Honor.  We recognize there may

12   be some debate as to whether a full loan file is gone or

13   incomplete.  We'll try to work that out.  The real goal -

14             THE COURT: But the deed or a note would have gone

15   to the collateral agent; right?

16             MR. BRADY: The deed, the note, and most likely the

17   title insurance policy, all would have gone to the collateral

18   agent.

19             THE COURT: Okay, thank you.  Is that it?

20             (The remainder of this page is intentionally left

21   blank.)

22

23

24

25

1          MR. BRADY: I believe we have completed this agenda.

2    Thank you, Your Honor.

3          THE COURT: You're welcome.  Everyone have a

4    pleasant evening.  Hearing is adjourned.

5          ALL: Thank you, Your Honor.

6          (Whereupon at 5:21 p.m., the hearing in this matter

7    was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M. Ryan                          January 22, 2008
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221