UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
AMERICAN HOME MORTGAGE             .    Case No. 07-11047(CSS)
HOLDINGS, INC., *et al.*,          .    Jointly Administered
                                    .
     Debtors.                       .
                                    .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                    .
CALYON NEW YORK BRANCH,            .
                                    .
     Plaintiff and                  .
     Counterclaim Defendant,        .
                                    .
v.                                  .
                                    .
AMERICAN HOME MORTGAGE CORP.,      .
AMERICAN HOME MORTGAGE             .
SERVICING, INC., AMERICAN HOME     .
MORTGAGE ACCEPTANCE, INC., and     .    Adv. Proc. No. 07-51704
AMERICAN HOME MORTGAGE             .    Jan. 17, 2008 (3:04 p.m.)
INVESTMENT CORP.,                   .
                                    .
     Defendants and                 .
     Counterclaim Plaintiffs.       .

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Good afternoon.

3          MR. ACKERLY: Good afternoon.

4          THE COURT: The parties, I understand, have

5    requested a status conference and scheduling conference in

6    connection with the Phase II trial?

7          MR. ACKERLY: Yes, Your Honor, Ben Ackerly on behalf

8    of Calyon New York Branch, and I have with me Jason Harbour

9    and Mike Busenkell and Tom Rice are here.  If the Court will

10   recall when the matter was first set for trial, it was

11   consolidated with two other similar matters involving Bear

12   Stearns and Credit Suisse First Boston and those parties

13   settled out and we didn't, and the Court went with the trial

14   and judgment with respect to Phase I, and Phase I involved

15   only what we refer to as the *ipso facto* termination and

16   whether that would trigger the rights under the repurchase

17   agreement, and they would be safe harbored, and in our

18   complaint that we filed in the adversary proceeding, we were

19   basing our rights on our pre-petition termination in

20   connection with the repurchase agreement and the servicing

21   agreement.  So, essentially, Phase II, Your Honor, involves

22   the issue of whether the repurchase agreement and the

23   servicing of the mortgage loans was terminated prior to the

24   petition date, and if so, the rights to service the mortgage

25   loans.  It's not property of the estate, because it would

1    have been terminated pre-petition, and the debtors should be

2    directed to turn over the servicing to Calyon so that Calyon

3    can designate a new servicer.  And so that's essentially

4    what's at issue in Phase II of our adversary proceeding.  Mr.

5    Tecce and I spoke yesterday about the issues, and I think -

6    he can obviously speak for himself, but most of the counts,

7    there were 11 counts in the complaint, in the Calyon

8    complaint, and most of those counts are still ripe in one way

9    or another.  For instance, the first count seeks a

10   declaratory judgment that the repurchase agreement was

11   properly terminated on August 1st.  That's obviously still

12   ripe in our view, and the second count was that the

13   declaratory judgment that new servicers were properly

14   designated, which we purportedly did on August 1st, and the

15   third count is that for declaratory judgment that the

16   defendants are obligated to transition the servicing to the

17   new servicers that were designated on August 1st.  So, those

18   three counts are still in play.  The fourth count was a

19   declaratory judgment that the mortgage funds, the principal

20   and interest payments from the collection of the mortgages

21   were property of Calyon, that they were obligated to be

22   segregated, and then paid over to us.  And the Court may

23   recall that we entered into a stipulation which the Court

24   approved as an order back on September 7th that those mortgage

25   funds be segregated.  They have been segregated in an

1   account, I believe, at JP Morgan, but those funds have been

2   segregated and are set aside, and one of the issues, of

3   course, with respect to Phase II is whether or not those

4   funds will be paid over to us without us having to seek to

5   enforce our rights.  We would interpret - We tried in the

6   order that we submitted to the Court, to clarify the issue

7   with respect to the mortgage funds because the Court didn't

8   directly address our request in Phase I that they be turned

9   over, but we believe that the Court's order which gives us

10  the - which determines that the mortgages have been

11  transferred and sold to Calyon, and includes the mortgage

12  funds because what's the mortgage without the mortgage funds,

13  plus the agreement, repurchase agreement, clearly provided

14  that the proceeds of the mortgage were sold as well as the

15  mortgages.  So, we interpret your order gives us the right,

16  the safe harbored right to liquidate our collateral to not

17  only include the sale of the mortgages but the collection of

18  the proceeds from the mortgages which had been accumulating

19  in this account and will accumulate in the future for as long

20  as the debtor continues to service the mortgages.  But I

21  think we've reached an agreement with the debtor that we can

22  submit an order - the stipulation contemplated that the money

23  would stay in escrow.  The mortgage funds would stay in that

24  segregated account until we reached an agreement or the Court

25  ordered, and I think Mr. Tecce may have to check with his

1    client, but the proposal would be that those funds would be

2    paid over to us, and we would ask that future funds as they

3    come in be paid over to us, but we would agree that an amount

4    can remain segregated until the issue of the servicing fee is

5    resolved, and we suspect that as part of Phase II, the

6    debtors will assert that they are entitled to be paid a

7    servicing fee for the servicing of the mortgage loans.  So we

8    would leave that in the segregated account in an amount

9    sufficient to cover that amount in there.  So we don't think

10   that that's an issue, but obviously, if we are unclear as to

11   our interpretation of the Court's order or the debtor's going

12   to take the position that those funds should not be turned

13   over to us, then the question of the mortgage funds and the

14   obligation to turn those funds over to us, should be part of

15   Phase II.  The fifth cause of action, Your Honor, was a

16   request for injunctive relief.  You remember this was filed

17   as an injunction.  We asked for an emergency hearing on the

18   injunction.  We agreed to the stipulation to avoid the

19   emergency hearing, but the injunction component of this case

20   stays in because we are asking the Court to order the debtor

21   to do certain things, like turn over mortgage files, turn

22   over servicing, and things like that.  So, the injunction

23   component stays in, but I don't see it as a really - It's

24   certainly not a new issue.  The relief from stay, we had a

25   count asking for relief from stay.  We don't believe that

1 relief from stay is necessary although I told Mr. Tecce that

2 if they're going to take the position that since we're asking

3 in Count 2 that they be directed to turn over the servicing

4 of the mortgage loans to us, that that's a violation of the

5 automatic stay, that we'll leave that count in there, and

6 it's kind of up to them, you know, it was in the first count

7 counted as a prophylactic measure in case that was an issue.

8 I don't view it as a violation of the automatic stay because

9 it's before the Court.  It's not like we're trying to do it

10 in state court somewhere.  The seventh and ninth causes of

11 action, Your Honor, the seventh cause of action in the

12 complaint deals with what we refer to as the mortgage files.

13 Now, this is not the servicing.  This is just the mortgage

14 files.  It's out position, and we asked for it in Count 1

15 that the mortgage files be turned over to us because, quite

16 frankly, Your Honor, we need complete mortgage files to

17 properly sell the mortgages when we sell them, and we're not

18 asking for the original files.  We'll take electronic files,

19 whatever.  They can keep the originals, we just need copies.

20 Again, it shouldn't be a big issue.  It will help maximize

21 the value of the estate, value of the mortgages that we're

22 selling, reduce our deficiency claim against the estate, and

23 everything.  So it shouldn't be a big issue on the mortgage

24 files, we hope.  The seventh cause of action, Your Honor,

25 also included a monetary damage claim, and the ninth cause of

1    action, which was a conversion cause of action, also included

2    a damage claim, money damage claim.  We have filed proofs of

3    claim in the case in which we have asserted an unliquidated

4    money damage claim, depending on how all this shakes out, and

5    what we proposed to Mr. Tecce yesterday with respect to

6    Counts 7 and 9 is that we would liquidate the liability issue

7    there, seek the declaration there, but as far as money

8    damages are concerned, we would reserve that till the time we

9    have to resolve the amount of the proof of claim, and it

10   could be dealt with in that context and not dealt with in the

11   adversary proceeding.  The bottom line, Your Honor, is we

12   want to reach in Phase II a final order, not have a Phase III

13   and a Phase IV.  We want to get to finality here.  So, it

14   seems to me, our ultimate damage claim that's not going to

15   get liquidated for awhile, and we're perfectly satisfied as

16   long as it's clear we're not waiving the right to that damage

17   claim by not litigating it here to have that resolved as part

18   of the claims resolution process.  The eighth cause of action

19   was a breach of contract for failure to repurchase the loans

20   as they were obligated to do, and that's not an issue in this

21   proceeding because we filed a proof of claim for that amount,

22   and so that would not be part of the issue.  The tenth cause

23   of action, Your Honor, deals with a claim for an accounting.

24   We believe we're about 99 percent there in terms of resolving

25   the numbers with the debtor.  The debtor's cooperating with

1   us, and we think we will have that resolved so there will not

2   be the necessity ultimately to address that issue as part of

3   Phase II, but at least for the moment, because there's, I

4   think, some 200 loan files that are still in question.  We

5   would like to leave that in there, but we'll probably drop it

6   out once we get that resolved.  We're working with the

7   debtor.  The debtor's cooperating on that.  The last cause of

8   action, Your Honor, was a cause of action that the monies

9   that the debtor was holding, the debtor was holding in

10  constructive trusts, we believe that issue is not - does not

11  need to be involved in connection with Phase III - Phase II

12  because we put the money in a segregated account pursuant to

13  an order of the Court, and if we could work out an agreement

14  with the debtor with respect to the release of those funds

15  subject to leaving a certain amount there for servicing, then

16  there's no reason to deal with a constructive trust.  So,

17  Your Honor, what we would propose to do is do pretty much

18  like we did in Phase I, is present an order to the Court with

19  respect to the issues that would be tried in Phase II, and I

20  think the main dispute that Mr. Tecce and I have with respect

21  to that has to do with the timing.  We believe this adversary

22  proceeding is still and should still be on a fast track.  We

23  do not believe that there's a need for a long and protracted

24  discovery or pleadings or anything in this case.  We may want

25  to amend one of our pleadings in one respect to address the

1   November 20th termination by contract, but we would be

2   prepared to do that by Tuesday, because it really just

3   requires one additional paragraph being added to Count 3, and

4   we contemplate that he will want to file a counterclaim to

5   resolve the issue of how much he's entitled to for servicing.

6   There may be a little bit of discovery with respect to that.

7   I don't know, but we really don't see that there's much time

8   to get to the end of it.  You know, we would like to have

9   this thing tried if it's available to the Court sometime in

10  early March.  We cannot imagine it would take more than half

11  a day to try it.  All the evidence is already in essentially.

12  The repurchase agreement is in.  The termination letters are

13  all in, you know, we will go back and look and see if he

14  wants anymore document discovery, we will see.  We thought we

15  produced everything last go-around, but we should be able to

16  get the matter completely teed up for trial by early March,

17  and so that's - I think that's the main dispute we've got.

18          THE COURT: What's the status of the summary

19  judgment motion that I stayed prior to the Phase I trial?  Is

20  it moot?  I haven't looked back at it.

21          MR. ACKERLY: It's moot.

22          THE COURT: It's moot.

23          MR. ACKERLY: I think that's - because we -

24          THE COURT: All right, now, in connection with going

25  forward and issuing some sort of order, are we going straight

1  to a trial or are you contemplating further case dispositive

2  motions?

3          MR. ACKERLY: We do not believe we need to do any

4  dispositive motions, Your Honor.

5          THE COURT: All right.  So you want trial in early

6  March.

7          MR. ACKERLY: Yes, sir.

8          THE COURT: All right, Mr. Tecce?

9          MR. TECCE: Can I be heard on that, Your Honor?

10         THE COURT: Oh, of course.

11         MR. TECCE: Thank you, Your Honor.  James Tecce of

12  Quinn Emanuel on behalf of the debtors.  I'll get right to

13  the issue.  I would like to respond just very briefly to

14  Calyon's description of the counts that are still alive, but

15  getting, I think, to the more important issue, which is the

16  one of timing, Your Honor, while I think the Court might best

17  understand our position if I go back a little bit in time

18  here to talk about how we got to where we are, which is,

19  starting, I believe, in early August, August 8th, I think it

20  was.  It was Credit Suisse that kicked off this whole

21  adversary proceeding by filing its application for a TRO and

22  requesting emergency injunctive relief, and the Court denied

23  that application I think on the 24th of August, and a couple

24  of day later, Calyon filed a similar application, and ever

25  since that point in time or in response to that, the estates

1    really marshaled their resources, and even though they didn't

2    want to proceed on an expedited basis, they did so anyway,

3    and the result was that we negotiated a stipulation that set

4    forth specifically the issues that would be tried in Phase I,

5    and we rolled up our shirt sleeves and went to work in

6    response to their request for an expedited hearing, and we

7    did a lot in the trials on a very expedited basis.  We had

8    expert reports in, in 30 days.  We had documents produced

9    within 30 days of the complaint being filed, expert reports

10    within 30 days of the complaint being filed.  You know, we

11    packed depositions - 10 or 11 depositions in over a two-week

12    period of time.  We had a trial.  We had briefing in three

13    weeks.  But that required a considerable amount of time and

14    effort on the estates' part, and it required the estates to

15    really focus exclusively on Calyon and getting Calyon the

16    relief that it wanted or at least the ability to pursue the

17    relief that it wanted on an expedited basis, and the

18    culmination of that came on January 4 when Your Honor issued

19    the opinion and a portion of the opinion finds that servicing

20    rights are property of the estate and that the automatic stay

21    applies to them.  Now, with that decision, Your Honor, the

22    issues that will be litigated in Phase II, and again, I'll

23    speak to that in a second, but there will be a large focus on

24    the issue again of servicing, and whether servicing

25    terminated pre-petition or not, and at this point in time,

1    given everything that the estates have done to get to the

2    January 4 decision, I just - we would submit that it's unfair

3    to require us to again proceed on such a short timetable and

4    drop everything that we're doing and allocate all of our

5    resources to having this matter tried and heard immediately

6    when there's really no basis for - there's no showing of harm

7    if the case doesn't go forward on a regular schedule.

8    There's been no showing of exigency in terms of why the case

9    has to be tried on March 1st, and we would submit that it

10   should be tried and that discovery and pleadings and all

11   those matters should go forward on an ordinary schedule,

12   which - Now, I understand the Court's proposed order is not

13   set in stone, but it sets 120 days for fact discovery, and

14   that is the rule of thumb that we've been using for all of

15   our other adversary proceedings.

16           THE COURT: Well, that may be the case if you were

17   starting from scratch, but you don't deny that a good bit of

18   the - at least the paper discovery has already occurred.

19           MR. TECCE: Well, the discovery is going to be a

20   little different, Your Honor.  When we ask them for documents

21   previously we were very focused on the issue of re-

22   characterization.  We were very focused on the provenance of

23   the agreement, drafts of the agreement, et cetera.  We did

24   not ask them for any documents, and we were very specific in

25   our requests, relating to events of default, allegations of

1    default, notices of default, why two notices were issued, you

2    know, any of that kind of termination discovery, we didn't

3    ask them for, so we're going to ask them for that again, and

4    certainly there will be depositions in connection with the

5    declarations of default.  So, admittedly - Well, actually, I

6    wouldn't concede that discovery has been done in any of that

7    yet.

8            THE COURT: Well, there's sort of two issues that

9    effect - I think it's pretty clear that they have the right

10   from my January 4 opinion to the mortgages because of the

11   self-help - excuse me, safe harbor remedies.

12           MR. TECCE: Right.

13           THE COURT: That the *ipso facto* clause isn't

14   actually enforceable, which they declared, and they have the

15   mortgages, but they - Mr. Ackerly makes a good point, what

16   good is that without the actual money, the stream of income

17   that they generate.  So - and I understand your close to a

18   resolution at least of that issue for purposes of -

19           MR. TECCE: We received a proposal when I walked in,

20   I'll take it our clients, and we'll get to them.  On that

21   point though, Your Honor, I'll say that a portion of that -

22           THE COURT: The whole point of a - Here's where I'm

23   coming from.  The whole point of a repurchase agreement is to

24   preserve the liquidity in the investment.

25           MR. TECCE: Right.

```
1              THE COURT: All right?  If there are things left to
2      be done that deal with the liquidity of their ownership of
3      those mortgages, i.e., the ability for them to actually flip
4      them to somebody and get money for them -
5              MR. TECCE: Right.
6              THE COURT:  - they're entitled to an expedited
7      hearing.  If all the issues are the servicing issues, there's
8      no - the servicing is being done.  There's no question the
9      servicing is occurring, that the funds are being properly
10     allocated, et cetera, et cetera, we can deal, I think fairly
11     deal with that on a more normal if not leisurely pace, but if
12     there are items that I still need to decide, and I was under
13     the impression I had decided the issues that I needed to in
14     connection with preserving the liquidity of the repurchase
15     agreement, then we need to have that heard on an expedited
16     basis.
17             MR. TECCE: Right.  Your Honor, in response to that,
18     I would say that there's absolutely nothing stopping them
19     from selling the loans.
20             THE COURT: Well, who's going to buy a loan that the
21     servicer won't forward the proceeds on?
22             MR. TECCE: Because the loan can be sold on a
23     servicing retained or release basis.
24             THE COURT: I understand that.  I mean, we talked
25     about that a lot in the opinion.
```

1          MR. TECCE: Right.

2          THE COURT: But if you're not actually - even if

3     you're the servicer and you're servicing -

4          MR. TECCE: We are.

5          THE COURT: - but you're not forwarding the

6     proceeds, why would anybody buy that.

7          MR. TECCE: Okay, so, if that issue is hived off

8     then, there presumably would be no need for an expedited

9     trial; is that what you're saying?

10         THE COURT: Well, I'm thinking out loud here, but my

11    point is that I view it sort of as two pieces; okay?  I view

12    it as what needs to be decided to preserve the liquidity of

13    the mortgages that were subject to the repurchase agreement.

14         MR. TECCE: Right.

15         THE COURT: If there's still stuff to be done to

16    preserve that liquidity, that needs to be done on an

17    expedited basis.  I view the servicing as a separate issue,

18    obviously, from the opinion.  If all I'm deciding is really,

19    you know, whether the debtors in fact continue to have the

20    right to be a servicer and get paid for it because there may

21    or may not have been a pre-petition default or you may or may

22    not be entitled to payment under some sort of *quantum meruit*

23    theory, post November 20th, frankly I think that can proceed

24    at a fairly normal pace.

25         MR. TECCE: Right.

1      THE COURT: But I'm concerned about the other piece.

2      MR. TECCE: Okay.

3      THE COURT: If there's still stuff that needs to be

4   done other than servicing related decisions that need to be

5   made to preserve the liquidity of their investment, we're

6   going to have that heard as soon as possible.

7      MR. TECCE: Okay, and I think in response to that I

8   would say that the only issue that I'm aware of that falls

9   within that category that you've just described is this issue

10   of entitlement to principal and interest, and I would submit

11   that apart from that, if that issue is resolved, then there's

12   absolutely no need to continue on an expedited basis to

13   determine anything relating to servicing or whether servicing

14   terminated pre-petition, which is really the balance of the

15   complaint and what's been discussed as to the relevant

16   issues.

17      THE COURT: That said, I think that the issues are

18   fairly narrow in connection with whether or not a pre-

19   petition default occurred or didn't occur and whether or not

20   there's facts to support some sort of *quantum meruit* theory.

21   So, I don't think you need nine months of discovery -

22      MR. TECCE: Well, I'm not asking for nine months of

23   discovery, Your Honor.  I'm just submitting that there's no

24   reason why the case should have to proceed any more quickly

25   than any other case that comes in the door, and a trial date

1   of March 1 - I mean -

2           THE COURT: When is the - where are we on the moving

3   towards the actual economic - excuse me, the actual final

4   close in connection with the sale of the servicing agreement

5   business?  Because that could affect it; could it not?  Is

6   the servicing of these mortgages sold to Wilbur Ross's

7   entity?

8           MR. BRADY: No, no, sir.

9           MR. TECCE: Actually, Your Honor, I can answer that.

10          THE COURT: Okay.

11          MR. TECCE: It's a bit of a game show.  I believe

12   that it is not.  In fact, part of our stipulation was that -

13          THE COURT: It couldn't.

14          MR. TECCE:  - is that it couldn't be sold until -

15          THE COURT: All right, so once that moves to final

16   close, the debtors no longer have the ability to service

17   those loans without paying someone to do it for them.

18          MR. TECCE: I've just been advised that under the

19   contract Wilbur Ross continues to service, and he gets paid a

20   fee.  So -

21          THE COURT: Well, that was what I said, yeah.  So,

22   once you go to final close, it could continue to be serviced

23   but the debtors have to pay something.

24          MR. BRADY: Yes.  Robert Brady for the record.  It's

25   relatively a *de minimis* fee, but yes, the debtor has to pay

1    something.

2           THE COURT: Okay.  Do we know where we are on the

3    final close.  I mean, I believe there are members of the

4    press here so if you can't say you can't say.

5           MR. BRADY: There are target dates, Your Honor, but

6    I'm not comfortable putting it on the record at this point.

7           THE COURT: All right.  So, what's your counter-

8    proposal?  You don't like early March.  I'm not going to give

9    you October.

10          MR. TECCE: I'm not asking for October, Your Honor.

11   I think we could complete discovery in this case by the end

12   of May and if it has to go to trial then it could be in trial

13   in June or if the parties decide they want to do summary

14   judgment motions, you know, there would be another 30 days on

15   that, but apart from that, the end of May is 120 days from

16   now.  It's really not that far away.

17          MR. ACKERLY: Your Honor, may I just clarify one

18   thing, and that is, I think that there are two issues that

19   are time sensitive: One is - and I've addressed both of them.

20   One is the money, turning over the money, and the other is

21   making available to us copies of the mortgage files because

22   again, that is important to the ability to be able to sell

23   and maximize the value, and it doesn't affect at all their

24   ability to continue servicing the mortgages.  All we want is

25   copies of them because that's important.  So those are the

1   two things -

2           THE COURT: Yeah, my understanding, if I remember

3   correctly from the trial on the sale of the servicing

4   business - or maybe it was - Well, one of the many hearings

5   you've had in this case, is that in the buying and selling of

6   mortgage loans, there's a tape that needs to be sent with the

7   various information, it's usually a computer tape, but the

8   various information, so that whoever is buying the loan knows

9   that they're buying and can price it accordingly.  Am I

10  remembering that correctly?  There's a bunch of lawyers in

11  the room who may or may not know the answer.

12          MR. ACKERLY: That was not in our case - that was

13  not evidence in our case.

14          THE COURT: It would have been in the - maybe in the

15  Credit Suisse case, but the whole point I'm raising that is,

16  there is - to sort of legitimize Mr. Ackerly's point, which

17  is, there is, if I remember correctly - nobody's going to buy

18  a portfolio of a billion dollars worth of subprime mortgages

19  or Alt A or whatever the heck they are without knowing some

20  rudimentary information, and usually there's like 120 days'

21  settlement look-back period, if I remember correctly, and are

22  the debtors providing that information to Calyon?  I take it

23  from Ackerly's comment, he wants the files but has he gotten

24  the tape?

25          MR. TECCE: I don't know whether he's gotten the

1    tape or not, Your Honor.  I can find that out, but the

2    problem I have with this issue of the quote/unquote "files"

3    is, I don't know what that means exactly, and I think it goes

4    to an area of servicing files, and I would submit that those

5    files are property of the estate.  So -

6            THE COURT: No, I understand the concept of what -

7    Well, the servicing files are not property of the estate.

8    Even if you're servicing the mortgages, the files are not

9    your property.  The files belong to the mortgage, whoever

10   owns the mortgage.  You have a possessory interest in the

11   servicing files; okay?  And you have a right to collect the

12   proceeds from servicing and to do the servicing, but the

13   files, again, if my memory serves, are not your property.

14   They go with the loan.

15           MR. TECCE: Right, they go with the loan if the

16   servicing is sold with the loan.

17           THE COURT: I understand - well -

18           MR. TECCE: And it doesn't have to be sold with the

19   loan, it can be sold on a servicing retained basis.  So, I

20   think what this underscores is an issue for Phase II which is

21   to the extent to which - to the extent to which what it means

22   if the servicing is property of the estate and whether

23   servicing terminated prior to the petition date, and what

24   that means exactly.  And actually just getting back to one

25   thing I wanted to clarify that Mr. Ackerly said.  In terms of

1    the automatic stay, I think we've addressed the issue of

2    mortgage assets but one thing I want to clarify is that I

3    wouldn't want anybody to think that we've conceded that if

4    the servicing did terminate prior to the petition date, that

5    automatically that has to be transferred back to Calyon.  I

6    think the question then becomes, would be Calyon has a pre-

7    petition claim for a breach of a pre-petition agreement for

8    the failure to honor that terms of the pre-petition agreement

9    in transferring servicing?  So this is an issue that we

10   intend to pursue in the second phase.

11        MR. ACKERLY: Your Honor, I would represent to the

12   Court that we're not trying to interfere with the servicing,

13   the mortgage servicing which the Court said they would

14   continue to do and was severable, and all we want are copies

15   of our files so that we can have complete files when we go to

16   sell the mortgages.  So the tape, I believe, that you may

17   refer to from another hearing would be considered to be part

18   of that file, but if that's not clear then just like the cash

19   that's being collected and being collected in the future, we

20   need have an expedited hearing.

21        MR. TECCE: Your Honor, one other point if I could,

22   is that, apart from it being unclear as to what the files

23   are, my understanding is that there is - there could be a

24   considerable cost in getting that information to them, apart

25   from the tape.  It seems to me -

1        THE COURT: Well, look, if they have a right to the

2   information and it affects their ability to transfer what

3   they own, I don't particularly care that it costs money.

4   That's - We'll have to have a trial in short order to see

5   whether they're entitled to it or not.  I mean that's - I'm

6   not trying to be difficult, nor am I impugning whatever the

7   debtors' position might be.  My point simply is that I think

8   they're entitled to decisions from this Court as to what

9   their rights are, that it may affect the liquidity of their

10  investment, in short order.

11       MR. TECCE: Okay.

12       THE COURT: And, I am drawing a distinction between

13  servicing and ownership, and I've said they're severable,

14  I've ruled they're severable, and that the servicing was not

15  terminated by operation of the filing of the bankruptcy.

16  That the *ipso facto* clause was enforceable in connection with

17  ownership, and I made a point in the opinion, which I think

18  is correct, that mortgages can be sold on a servicing

19  released or a servicing retained basis, but - and I hate to

20  speculate because I don't think the evidence was in this

21  particular matter, but I don't think we need to be ignorant

22  of the fact that I've sat through literally weeks of hearings

23  in this matter and I've learned something of this complicated

24  industry, although whatever I learned usually goes right out

25  of my head again as soon as I leave the bench, that there is

1   certain information that they need in order to buy and sell

2   the mortgages, even on a servicing retained basis.  So,

3   anyway - but what I'm hearing is there may be a resolution on

4   these points and there may not be a resolution on these

5   points, and at least on one point in connection with the

6   proceeds, you've received a proposal, Mr. Tecce, that you

7   have to take to your client.  I don't know where you are on

8   the mortgage files.  I think I'd like to give you, say, a

9   week or so to try to resolve those issues because it's - and

10  if they can't get resolved, I think we may have to have a

11  mini-hearing, frankly, Mr. Ackerly, on what you need and how

12  it may affect your ability to sell these loans, to flip these

13  loans, if that's what your client wants to do, to decide

14  whether or not to have a trial in March or on a more normal

15  time frame in May.  For the first time in this case, it's

16  actually two weeks to the next American Home Mortgage

17  hearing, which seems like an unbelievably long amount of

18  time.  I want to continue this hearing until next Friday, the

19  25th of January to give the parties an opportunity to work out

20  these issues, and - if that works for everyone.  If that's a

21  bad date, let me know, and what I would contemplate is, first

22  of all, if everyone's come to an agreement - Let me lay it

23  out: If there are issues that are related to Calyon and the

24  purchaser's ability to sell these loans without the

25  servicing, remaining in this case, we're going to have an

1    expedited trial.  If there are not, if all we're talking

2    about is the servicing, we're not going to have an expedited

3    trial.  We're going to have a trial on a more normal

4    schedule.  So next Friday - I'll give you till next Friday or

5    if that date doesn't work, a date near that time, to work out

6    what's left and what's not left, and if there's a dispute,

7    we'll have a mini-hearing, mini-evidentiary hearing at that

8    time for me to make a decision about what's needed and what

9    isn't needed, and the people to have, you know, the witnesses

10   to have or the business people who know what it takes to buy

11   and sell a mortgage loan, and I know the debtors have some

12   and I'm sure Calyon has some as well.  Does the 25th work for

13   everyone?  Mr. Ackerly?

14           MR. ACKERLY: Yes, sir, the 25th is fine.

15           THE COURT: Ten a.m.?  Then we'll have the balance

16   of the day if we need it.  And again, if everything works

17   out, there's no need to have an in-person hearing.  We can

18   either - you can get me on the phone and we can just set a

19   date or we can either do it on the phone then or we can do it

20   earlier if there are no disputes, but I think - I hope I've

21   made it clear where I'm headed.  Are there any questions?

22           MR. ACKERLY: I have no questions, Your Honor.

23           THE COURT: All right, Mr. Tecce?

24           MR. TECCE: Nothing from the debtors, Your Honor,

25   thank you.

1          THE COURT: Okay.  Thank you.  Thank you all for

2    coming in on a snowy day.  You certainly - I think it was

3    very helpful, actually, to have you all here, which I

4    appreciate, and I understand there may have been some

5    confusion on the scheduling.  I apologize.  I was under the

6    impression everyone had agreed to the time and date.  So if

7    that was a mistake, I apologize.  All right, so, we'll

8    reconvene if necessary January 25th at 10 a.m.

9          MR. ACKERLY: Thank you.

10          THE COURT: Thank you very much.  The hearing is

11    adjourned.

12          MR. TECCE: Thank you for your time, Your Honor.

13          (Whereupon at 3:40 p.m., the hearing in this matter

14    was concluded for this date.)

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M. Ryan                          January 22, 2008
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221