# EXHIBIT A

**Complaint**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GERMAN PENA and GLORIA PENA, on behalf of themselves and the classes defined herein, | ) ) ) ) | |
| Plaintiffs, | ) ) | 07 CV 552 |
| v. | ) ) | Judge Guzman |
| FREEDOM MORTGAGE TEAM, INC.; GRACO FUNES; AMERICAN HOME MORTGAGE CORP., doing business as AMERICAN BROKERS CONDUIT; AMERICAN HOME MORTGAGE SERVICING, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; DOES 1-5, PROBE INTERNATIONAL, INC.; ALBERT V. DI LUIGI; and DOES 6-10 | ) ) ) ) ) ) ) ) ) | Magistrate Judge Keys |
| Defendants. | ) ) ) | **JURY DEMANDED** |

### SECOND AMENDED COMPLAINT -- CLASS ACTION

### INTRODUCTION

1.    Plaintiffs German Pena and Gloria Pena bring this action against a

mortgage lender and its affiliates and assignees to secure redress for discriminatory lending

practices.

### JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction under 28 U.S.C. §§1331

(general federal question), 1337 (interstate commerce), and 1367 (supplementary jurisdiction), 42

U.S.C. §3613 (Fair Housing Act), and 15 U.S.C. §1691e (Equal Credit Opportunity Act).

3.    Defendants all  transact business in the District and are deemed to reside

here.

## PARTIES

4.      Plaintiffs German Pena and Gloria Pena are husband and wife. They own

and reside in a home at 3815 N. Osceola Avenue, Chicago, IL 60634.

5.      Plaintiffs are of Hispanic origin.

6.      Plaintiffs' principal language is Spanish. Mr. Pena speaks and reads

minimal English but is not fluent in English. Mrs. Pena does not speak or read English.

7.      Defendant Freedom Mortgage Team, Inc. ("FMT") is an Illinois

corporation with offices at (a) 2201 West North Avenue, Chicago, IL 60647, (b) 17W110 22nd

Street, Suite 700, Oakbrook Terrace, IL 60181, and (c) 166 E. Highland, Elgin, IL 60120. It is

engaged in the business of a mortgage broker.

8.      Defendant Graco Funes was employed by FMT during July and August,

2006. On information and belief, he may be found at Freedom Mortgage Team, Inc., One

Parkview Plaza 700, Oakbrook Terrace Illinois, 60181.

9.      Defendant American Home Mortgage Corp., doing business as American

Brokers Conduit ("ABC"), is a New York corporation with offices at 538 Broadhollow Rd.,

Melville, NY 11747. It is engaged in the business of originating mortgages. It does business in

Illinois. Its registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson

Drive, Springfield, IL 62703.

10.      Defendant American Home Mortgage Servicing, Inc. ("AHMS") is a

corporation with offices at 538 Broadhollow Road, Melville, NY 11747, and 4600 Regent Blvd.,

Suite 200, Irving, TX 75063. It is an affiliate of ABC and engaged in the business of servicing

loans. It does business in Illinois. Its registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703. Payments on plaintiffs' loan are currently being made to AHMS. AHMS thus claims rights with respect to the transaction at issue herein and is a party necessary to be joined if feasible.

11.     Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a corporation that holds title to mortgages. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604. MERS holds title to the mortgage that resulted from the transaction complained of herein. MERS thus claims rights with respect to the transaction at issue herein and is a party necessary to be joined if feasible.

12.     Does 1-5 are any entities (currently unknown to plaintiffs), other than named defendants, that hold an ownership interest in plaintiffs' loan.

13.     Probe International, Inc., is an Illinois Corporation with offices at 2246 Brookside Lane, Aurora, Illinois, 60502. It is engaged in the business of a private investigator. Its registered agent and office is Thomas Y. Mandler, 222 N. LaSalle Street, Suite 300, Chicago, Illinois, 60601.

14.     Albert Di Luigi is the President and Secretary of Probe International, Inc., as well as a private investigator working under its auspices. He may be found at 411 East Gartner Road, Naperville, Illinois, 60540.

15.     Does 6-10 are any persons (currently unknown to plaintiffs) who acted unlawfully in the course of directing the investigation and/or questioning of plaintiffs' neighbors, relatives and co-workers after this action was filed.

3

## FACTS RELATING TO PLAINTIFFS

16.    Prior to August 10, 2006, plaintiffs were referred to Graco Funes, a Senior Mortgage Consultant with FMT, for the purpose of obtaining refinancing.

17.    Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

18.    Funes asked for and was provided with information concerning plaintiffs' home, income, and other pertinent matters, including supporting documentation, such as recent pay stubs, tax returns and account statements.

19.    Funes arranged for an appraisal of plaintiffs' property. On information and belief, the appraiser who came to plaintiffs' home was a relative of Funes.

20.    Plaintiffs were informed by Funes that they qualified for refinancing at the same rate and terms as their then-current debts to Countrywide.

21.    At the time, plaintiffs had two mortgage loans with Countrywide: (a) a conventional mortgage loan with an amount financed of $294,533.13 and an annual percentage rate of 6.131% (Exhibit H) and (b) a $37,000 home equity line of credit with an initial non-discounted annual percentage rate of 9.125% (Exhibit I).

22.    All of the discussions with Funes and the closing of the loan were conducted in Spanish.

23.    At the closing, plaintiffs were presented with a stack of documents, all exclusively in English, for a $353,000 loan.

24.    The documents were not translated into Spanish.

25.    The resulting mortgage loan transaction was a retail transaction.

26.    No certificate of the sort described in §2N of the Illinois Consumer Fraud

Act, 815 ILCS 505/2N, was executed.  Section 2N provides:

§ 2N. Non-English language transaction.

(a) If (i) a person conducts, in a language other than English, a retail transaction or negotiations related to a retail transaction resulting in a written contract and (ii) the consumer used an interpreter other than the retailer or an employee of the retailer in conducting the transaction or negotiations, the retailer must have the consumer and the interpreter sign the following forms:

I, (name of consumer), used (name of interpreter) to act as my interpreter during this retail transaction or these negotiations. The obligations of the contract or other written agreement were explained to me in my native language by the interpreter. I understand the contract or other written agreement.

(signature of consumer)

(relationship of interpreter to consumer)

I, (name of interpreter), acted as interpreter during this retail transaction or these negotiations. The obligations of the contract or other written agreement were explained to (name of consumer) in the consumer's native language. I understand the contract or other written agreement.

(signature of interpreter)

(relationship of interpreter to consumer)

(b) If (i) a person conducts, in a language other than English, a retail transaction or negotiations related to a retail transaction resulting in a written contract and (ii) the retailer or an employee of the retailer acted as the consumer's interpreter in conducting the transaction or negotiations, the retailer must have the consumer sign the following form in the consumer's native language (except as provided in subsection (c)):

This retail transaction or these negotiations were conducted in (language), which is my native language. I voluntarily choose to have the retailer act as my interpreter during the negotiations. The obligations of the contract or other written agreement were explained to

me in my native language.  I understand the contract or other written agreement.

(signature of consumer) (signature of retailer)

(c) If a language that cannot be written is used in the retail transaction or in negotiations related to a retail transaction, then the form set forth in subsection (b) shall be in the English language.

(d) If a person used forms substantially similar to the forms prescribed in subsections (a) and (b) in the regular course of business before January 1, 2002, the person may continue to use those forms instead of the forms prescribed in subsections (a) and (b).

(e) The terms of this Section do not apply to transactions made pursuant to a credit card issued to the buyer, whether such card is issued by the seller or by a third party.

27.    The following are documents relating to the loan:

a.    A note in favor of ABC, Exhibit A;

b.    A mortgage in favor of MERS, Exhibit B;

c.    A settlement statement, Exhibit C, disclosing disbursements of $304,671.61 to pay off the first mortgage with Countrywide and $37,254.91 to pay off the home equity line of credit.

d.    A Truth in Lending statement, Exhibit D, disclosing an annual percentage rate of 9.249% and an amount financed of $347,299.12;

e.    Loan application, Exhibit E;

f.    The three-day notice of right to cancel required by the Federal Reserve Board, Exhibit F.

28.    During the closing, the person purporting to explain the transaction pointed out the 1.625% "teaser" interest rate, but did not explain how the rate could increase.  The rate

adjusts monthly and increased to over 9%.

29.    On the pre-printed loan application that he prepared and had plaintiffs sign at the closing, which was also in English, Funes intentionally falsified information about plaintiffs' education, income and assets.

30.    In fact, Mr. Pena: does not have 19 years of schooling; earned less than half of the application's stated gross monthly income of $6,500.00; and had only a 1/10 of the application's stated balance of $40,000 in his retirement account.

31.    Funes and FMT falsified the information, making it appear that plaintiffs qualified for a higher loan amount and a higher monthly payment, in order to make the loan, which in turn increased the amount of FMT's and Funes' percentage-based broker fee and commission.

32.    On information and belief, Funes had or has a practice of falsifying borrowers' financial information on the pre-printed application he prepares in order to make it appear that the borrowers qualify for the high-cost loan.  Plaintiffs have reason to believe he has done the same thing in other loan transactions.

33.    Plaintiffs were directed at the closing to make payments to AHMS (Exhibit G).

34.    On information and belief, defendant American Home Mortgage Corp. owns plaintiffs' loan.

35.    In the event American Home Mortgage Corp. does not own plaintiff's loan, the actual owners or holders are named as Does 1-5.

36.    Plaintiffs paid $3,794.00 to FMT for its services in brokering the loan.

37.    The sum of $3,794.00 was more than reasonable compensation for such

services.

38.    In addition, ABC paid a "yield spread premium" of $11,649.00 to FMT.

39.    The total compensation of $15,443.00 received by FMT (4.37% of the loan) was exorbitant and unreasonable.

40.    A "yield spread premium" is a payment by a lender to a broker based on the extent to which the interest rate on the loan exceeds a base or "par" rate. For example, if the interest rate on the loan is .50% above "par," the lender will pay a "yield spread premium" of, e.g., 0.5% of the principal amount of the loan to the broker.

41.    The lender's payment of a YSP to the broker and the broker's imposition of a higher interest rate - and the determination of the amounts of both quantities - are unrelated to the borrower's creditworthiness.

42.    Yield spread premiums disproportionately impact minority borrowers such as plaintiffs. This result is known and intended by defendants.

43.    As a result of defendants' conduct, plaintiffs were induced to sign loan documents providing for a loan that was unnecessarily expensive and which was made on less favorable terms than loans defendants brokered or made to Caucasian individuals.

## COUNT I – FAIR HOUSING ACT

44.    Plaintiffs incorporate paragraphs 1-43.

45.    The Fair Housing Act, 42 U.S.C. §3605, provides:

**Discrimination in residential real estate-related transactions**

**(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or**

8

conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing other financial assistance—

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

(B) secured by residential real estate.

(2) The selling, brokering, or appraising of residential real property.

(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

46.    Defendants ABC and FMT violated the Fair Housing Act by paying and receiving, respectively, higher yield spread premiums with respect to loans made to minority borrowers, which necessarily impacts the rates charged to such borrowers.

47.    The Fair Housing Act, 42 U.S.C. §3613, provides:

§ 3613. Enforcement by private persons

(a) Civil action.

(1) (A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this title, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach. . . .

(c) Relief which may be granted.

9

(1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), m ay grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

(2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person. . . .

## CLASS ALLEGATIONS

48.    Plaintiffs bring this claim on behalf of two classes, FMT and ABC.

49.    The FMT class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from any lender through FMT, (c) and paid FMT direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where FMT also received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, and (e) where the loan was closed on or after a date two years prior to the filing of this action.

50.    The ABC class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from ABC through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where ABC also paid the broker a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, and (e) where the loan was closed on or after a date two years prior to the filing of this action.

10

51.    Each class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of each class.

52.    There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against Hispanic or African-American borrowers.

53.    Plaintiffs' claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

54.    Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in consumer credit cases.

55.    A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.  The nature of the claim is such that proof of the class-wide impact of yield spread premiums is necessary.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

a.    Declaratory relief;

b.    Injunctive relief;

c.    Appropriate damages;

d.    Rescission or reformation of plaintiffs' loan;

e.    Attorney's fees, litigation expenses and costs; and

f.    Such other or further relief as the Court deems appropriate.

## COUNT II – EQUAL CREDIT OPPORTUNITY ACT

56.    Plaintiffs incorporate paragraphs 1-43.

57.    The Equal Credit Opportunity Act, 15 U.S.C. §1691, provides:

**(a) Activities constituting discrimination. It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--**

> **(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . .**

58.    Defendants ABC and FMT violated the ECOA.

59.    The Equal Credit Opportunity Act, 15 U.S.C. §1691e, further provides:

Civil liability

**(a) Individual or class action for actual damages.** Any creditor who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

**(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award.** Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $ 10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $ 500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

**(c) Action for equitable and declaratory relief.** Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief

as is necessary to enforce the requirements imposed under this title.

(d) Recovery of costs and attorney fees. In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection. . . .

(f) Jurisdiction of courts; time for maintenance of action; exceptions. Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation . . . .

## CLASS ALLEGATIONS

60.     Plaintiffs bring this claim on behalf of two classes, FMT and ABC.

61.     The FMT class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from any lender through FMT, (c) and paid FMT direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where FMT also received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, and (e) where the loan was closed on or after a date two years prior to the filing of this action.

62.     The ABC class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from ABC through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where ABC also paid the broker a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, and (e) where the loan was closed on or after a date two years prior to the filing of this action.

63.     Each class is so numerous that joinder is impracticable. On information and

belief, there are more than 50 members of each class.

64.    There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against Hispanic or African-American borrowers.

65.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

66.    Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in consumer credit cases.

67.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. The nature of the claim is such that proof of the class-wide impact of yield spread premiums is necessary.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

a.    Declaratory relief;

b.    Injunctive relief;

c.    Appropriate damages;

d.    Rescission or reformation of plaintiffs' loan;

e.    Attorney's fees, litigation expenses and costs.

f.    Such other or further relief as the Court deems appropriate.

14

## COUNT III - ILLINOIS CONSUMER FRAUD ACT - CLASS CLAIM

68.    Plaintiffs incorporate paragraphs 1-43. This claim is against FMT and American Home Mortgage.

69.    Defendants engaged in unfair practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by engaging in the discriminatory conduct that gives rise to the Fair Housing Act and ECOA violations.

70.    Defendants engaged in such conduct in the course of trade and commerce.

71.    Defendants engaged in such conduct with the intent to injure plaintiffs.

72.    Plaintiffs were damaged as a result.

73.    Defendants' conduct caused plaintiffs' injuries.

### CLASS ALLEGATIONS

74.    Plaintiffs bring this claim on behalf of two classes, FMT classes and ABC.

75.    The FMT class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from any lender through FMT, (c) and paid FMT direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where FMT received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date 3 years prior to the filing of this action.

76.    The American Home Mortgage class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from American Home Mortgage through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where American Home Mortgage paid the broker a

yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date 3 years prior to the filing of this action.

77.    Each class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of each class.

78.    There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against Hispanic or African-American borrowers.

79.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

80.    Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in consumer credit cases.

81.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. The nature of the claim is such that proof of the class-wide impact of yield spread premiums is necessary.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

  a. All appropriate damages;

  b. Attorney's fees, litigation expenses and costs.

  c. Such other or further relief as the Court deems appropriate.

## COUNT IV – ILLINOIS CONSUMER FRAUD ACT - INDIVIDUAL CLAIM

82.     Plaintiffs incorporate paragraphs 1-43.  This claim is against defendants FMT, Funes and ABC.

83.     Defendants engaged in unfair and deceptive practices, in violation of §§2 and 2N of the Illinois Consumer Fraud Act, 815 ILCS 505/2 and 2N, by:

a.     Failing to translate the loan documents;

b.     Failing to comply with § 2N;

c.     Misrepresenting the loan terms;

d.     Falsifying plaintiffs' financial information on their loan application;

e.     Having plaintiffs sign a loan application containing the false information and thereby putting them at risk of prosecution;

f.     Paying (ABC) and receiving (FMT) an excessive and unreasonable yield spread premium; and

84.     Defendants engaged in such conduct in the course of trade and commerce.

85.     Defendants engaged in such conduct with the intent to injure plaintiffs.

86.     Plaintiffs were damaged as a result.

87.     Defendants' conduct caused plaintiffs' injuries.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.     Appropriate damages;

b.     Rescission or reformation of plaintiffs' loan;

c.     Attorney's fees, litigation expenses and costs.

d.    Such other or further relief as the Court deems appropriate.

## COUNT V – TILA - INDIVIDUAL CLAIM

88.    Plaintiffs incorporate paragraphs 1-43.

89.    This claim is against the "American" defendants and MERS.

### RIGHT TO RESCIND

90.    Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a) **Consumer's right to rescind.**

**(1)** In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47

**(2)** To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

**(3)** The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

**(4)** When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to

18

all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

### GROUNDS FOR RESCISSION

91.    In connection with the loan, defendants failed to provide the required disclosures of the plaintiffs' right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for, without limitation, the following reasons.

92.    Defendants provided plaintiffs with only three notices of right to cancel, instead of the four required, i.e., two <u>per</u> mortgagor.

93.    This complaint serves as valid and effective notice of rescission.

94.    Under 15 U.S.C. §1641(c), the right to rescind may be exercised against

any assignee.

95.     15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.     A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b.     Statutory damages for the underlying disclosure violation;

c.     If appropriate, statutory damages for failure to rescind;

d.     Attorney's fees, litigation expenses and costs; and

e.     Such other or further relief as the Court deems appropriate.

## COUNT VI – CREDIT REPAIR ORGANIZATIONS ACT - INDIVIDUAL CLAIM

96.     Plaintiffs incorporate paragraphs 1-43. This claim is against FMT and Funes.

97.     FMT violated the CROA by filling out plaintiffs' loan application to overstate plaintiffs' income and assets.

98.     CROA §1679b provides:

**1679b. Prohibited practices**

**(a) In general. No person may--**

(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization,

20

officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to-- . . .

    (B) any person--

        (i) who has extended credit to the consumer; or

        (ii) to whom the consumer has applied or is applying for an extension of credit . . . .

99.    CROA § 1679g provides:

1679g.  Civil liability

(a) Liability established.  Any person who fails to comply with any provision of this title [15 USC §§1679 et seq.] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

    (1) Actual damages. The greater of--

        (A) the amount of any actual damage sustained by such person as a result of such failure . . . .

    (2) Punitive damages.

        (A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow. . . .

    WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against FMT for:

    a.    Compensatory and punitive damages;

    b.    Attorney's fees, litigation expenses and costs; and

    c.    Such other or further relief as the Court deems appropriate.

## COUNT VII - BREACH OF FIDUCIARY DUTY - INDIVIDUAL CLAIM

100.    Plaintiffs incorporate paragraphs 1-43. This claim is against FMT and Graco

Funes.

101.    One who undertakes to find and arrange financing for another becomes the latter's agent for that purpose and owes a fiduciary duty to act in the interest of the principal and make full disclosure of all material facts.

102.    FMT and Funes undertook to serve as plaintiffs' mortgage broker.

103.    They engaged in conduct that was fraudulent and adverse to the interests of plaintiffs.

104.    In connection with the loan, defendants violated their fiduciary duty as mortgage broker by, among other things:

(A)    deceiving plaintiffs about the terms of the loan and misrepresenting to them that they were getting a loan on fair terms when in fact FMT and Funes gouged plaintiffs for their own financial benefit;

(B)    falsifying plaintiffs' educational, financial and asset information on their loan application; and

(C)    having plaintiffs sign a loan application containing false information and thereby putting them at risk of prosecution.

105.    Plaintiffs were damaged as a result.

106.    The conduct of defendants was deliberately oppressive, corrupt and dishonest.  Substantial punitive damages are warranted.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.    compensatory and punitive damages;

22

b.    costs;

c.    cancellation of plaintiffs' loan; and

d.    such other or further relief as the Court deems appropriate.

## COUNT VIII - FAIR HOUSING ACT RETALIATION - INDIVIDUAL CLAIM

107.    Plaintiffs incorporate paragraphs 1-106.

108.    This claim is against defendants FMT, Probe International, Inc. ("Probe"),

Albert Di Luigi and Does 6-10.

109.    42 U.S.C. § 3617 of the Fair Housing Act states:

**It shall be unlawful to coerce, intimidate, threaten, or interfere with
any person in the exercise or enjoyment of, or on account of his
having exercised or enjoyed . . . any rights granted or protected by §
3603, 3604, 3605 or 3606 of this title.**

110.    After this action was filed, after the parties held a 26(f) conference and

after the Court set a discovery schedule, FMT bypassed the discovery process and had Probe send

private investigators to question: plaintiffs' neighbors and relatives in their homes, Mr. Pena's

co-workers at his place of employment, as well as individuals and businesses with which

plaintiffs have done recent business.

111.    On or about May 2 and 3, 2007, one Probe investigator, a retired Chicago

Police Officer, flashed a badge - on information and belief, a Chicago Police officer's badge -

before proceeding to question plaintiffs' neighbors and did not present his identification as a

private investigator, as required by law.

112.    The investigators posed a number of personal questions about plaintiffs to

which it already had the answers or for which it could easily - and in much less costly manner -

have discovered the answers by simply consulting computerized public records.

113.    Alternatively, since all parties, including FMT, participated in the 26(f) conference held April 25, 2007, and filed an agreed Joint Planning Report of Parties Planning Meeting on April 26, FMT could have simply taken depositions to ask the same questions instead of hiring investigators to subject people close to plaintiffs to personal questioning about plaintiffs and jeopardizing plaintiffs' reputation and livelihood.

114.    In the course of asking questions about plaintiffs, defendants also made certain statements about plaintiffs to others. These statements were false. Defendants made these statements maliciously, recklessly or with knowledge of their falsity. This conduct was defamatory.

115.    Defendants' conduct was designed to intimidate plaintiffs - to suggest to plaintiffs as well as others who know plaintiffs that plaintiffs or Mr. Pena had done something wrong by filing or being involved in this lawsuit, which is untrue.

116.    Probe and Di Luigi were FMT's agent and acted within the scope of that agency at all times.

117.    In the alternative, any unlawful conduct by Probe, Di Luigi and Does 6-10 was their responsibility alone.

118.    Defendants' conduct violated the anti-retaliation provision of the FHA and defamed plaintiffs.

119.    As a result of defendants' conduct, plaintiffs are intimidated, and their

24

reputations have been injured.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of

plaintiffs and against defendant for:

.a.    Declaratory relief;

b.    Injunctive relief;

c.    Appropriate damages;

e.    Attorney's fees, litigation expenses and costs; and

f.    Such other or further relief as the Court deems appropriate.


_____
Al Hofeld, Jr.

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Michelle R. Teggelaar
Al Hofeld, Jr.
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)


**JURY DEMAND**

Plaintiffs demand  trial by jury.

_____

25

Al Hofeld, Jr.

t:\18615\pleading\FirstAmendedComplaint_pleading.wpd

# EXHIBIT A

### ADJUSTABLE RATE NOTE

#### (12-MTA Index - Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ___125.000%___ OF THE ORIGINAL AMOUNT (OR $ _441,250.00_ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

___August 10, 2006___        ___Schaumburg___        ___Illinois___
                                          (City)                                (State)

_3815 N Oscaloa Avenue, Chicago, IL  60634_
                              (Property Address)

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ _353,000.00_____ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ___AMERICAN BROKERS CONDUIT___
_____ . I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

### 2.  INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. I will pay interest at a yearly rate of __1.625 %__ until _August 31, 2006_____, and the initial monthly payment provided for in Section 3(B) of this Note will be based on this rate (the "Initial Rate"). Commencing _September 1, 2006__, I will pay interest at a yearly rate of __9.113 %__ (the "Subsequent Rate"). Thereafter, the interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the interest rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.  PAYMENTS

#### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, unless otherwise specified "payment" refers to the Principal and interest payment only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on _the 1st_ of each month beginning on _October 1, 2006___. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on _September 1, 2046____, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at _PO Box 660029, Dallas, TX  75266-0029_
_____, or at a different place if required by the Note Holder.

Doc # 944746/Image: 944746.pcn                          Appl# 0001390434                          AHM-2030N(MULT) (0105)

(B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __1,000.62__ , unless adjusted at an earlier time under Section 4(H) of this Note.

· (C) Payment Changes

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may further change on the __1st__ day of __October, 2006__ , and on that day every month thereafter. Each such date on which my interest rate could change is called a "Change Date."

(B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as the 15 days before each interest rate Change Date is called the "Current Index." If the Index is no longer available, the Note holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____ __Four and 550 Thousandths__ percentage points __4.550__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

(D) Interest Rate Limit

My interest rate will never be greater than __Ten and 550 Thousandths__ _____ percentage points __10.550__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

(E) Payment Change Dates

Effective every year commencing __October 1, 2007__ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of

my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amounts of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes In My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the Maturity Date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to ____125.000%____ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that ____125.000%____ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the Maturity Date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ____Five____ anniversary of the due date of the first monthly payment, and on that same day every ____Five____ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in an amount permitted and otherwise in accordance with Applicable Law in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _____ 15 _____ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.000__ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once for each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given to Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

8.  GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates

the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Gerardo Pena                    -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                          -Borrower

Loan #: 0001390434

## ADDENDUM TO NOTE
### (Prepayment)

THIS ADDENDUM is made this _____10th_____ day of _August, 2006_____, and is incorporated into and intended to form a part of the Note dated the same date as this Addendum.

1.    The Section in the Note entitled "Borrower's Right to Prepay" is modified to provide that I have the right to make payments of principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any penalty. If within the first _three_ ( 3 ) year(s) after the execution of the Note, I make a Full Prepayment or Partial Prepayment(s) of more than twenty percent (20%) of the original principal amount in a twelve month period immediately preceding the date of prepayment, I will pay a prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original principal amount of the Note in that twelve month period. Interest will be calculated using the rate in effect at the time of prepayment.

If I make a partial prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a partial prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

2.    All other provisions of the Note are unchanged by this Addendum and remain in full force and effect.

NOTICE TO THE BORROWER
Do not sign this Note Addendum before you read it. This Note Addendum provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the Note.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

-Guzman Pena

Multi-State Prepayment Rider
(Rev4-06)
Doc # 945224/Image:945224.prn Appl 0001390434

AHM-2034P(MULTI)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                    German Peña                -Borrower

_____    _____ (Seal)
                                                               -Borrower

_____ (Seal)     _____ (Seal)
                 -Borrower                                     -Borrower

_____ (Seal)     _____ (Seal)
                 -Borrower                                     -Borrower

_____ (Seal)     _____ (Seal)
                 -Borrower                                     -Borrower

DOC  #:323164          APPL #:0001390434

-6A(IL) (0010)        Page 14 of 15          Form 3014  1/01

# EXHIBIT B

Return To:
AMERICAN BROKERS CONDUIT
520 Broadhollow Road
Melville, NY 11747

Prepared By:
Cameron Kosin
4200 Commerce Court
Suite 101
Lisle, IL
60532

————————————— [Space Above This Line For Recording Data] —————————————

## MORTGAGE

MIN  100024200013904343

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated August 10, 2006
together with all Riders to this document.
(B) "Borrower" is German Pena, ~~a married man~~ and Gloria Vilma Pena

G.P.  G.P.

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DOC  #:323151                    APPL #:0001390434

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3014 1/01

-6A(IL) (0010)
Page 1 of 15    VMP1 9905.02    Initials: G.P.  G.P.
VMP MORTGAGE FORMS - (800)521-7291



(D) "Lender" is AMERICAN BROKERS CONDUIT

Lender is a Corporation
organized and existing under the laws of State of New York
Lender's address is 538 Broadhollow Road, Melville, NY  11747

(E) "Note" means the promissory note signed by Borrower and dated August 10, 2006
The Note states that Borrower owes Lender Three Hundred Fifty Three Thousand and
No/100                                                                              Dollars
(U.S. $353,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    September 1, 2046
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

  Prepayment Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a
"federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan"
under RESPA.

DOC  #:323152                          APPL #:0003390434

[Initials] 6 P.  G.P.

-6A(IL) (0010)                         Page 2 of 15                          Form 3014  1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the                County
[Type of Recording Jurisdiction]    of    Cook                [Name of Recording Jurisdiction]:

See attached legal

Parcel ID Number:   12-24-212-022-0000                 which currently has the address of
3815 N Oscelola Avenue                                                      [Street]
Chicago                                            [City], Illinois  60634      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

DOC  #:323153                          APPL #:0003390434

-6A(IL) (0010)                          Page 3 of 15           Initials: 6 P  G.P.              Form 3014  1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of

DOC #:323154                    APPL #:0002390434

⊕-6A(IL) (0010)                 Page 4 of 15        Initials: 6 P GR        Form 3014 1/01

Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

DOC #:323155                    APPL #:0002390434              Initials: G P   G. P.

@@D-6A(TL) (0010)              Page 5 of 15                    Form 3014   1/01

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the

DOC #:323156                      APPL #:0001390434

    -6A(IL) (0010)                      Page 6 of 15              Initials: G P    G.P

                                                                 Form 3014  1/01

excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

DOC #:323159                          APPL #:0001390434                        Initials: _G P_ _G.P._

(logo) -6A(IL) (0010)                 Page 9 of 15                             Form 3014  1/01

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments form third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note), Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall

DOC  #:322160                          APPL #:0001390434

@D-6A(IL) (0010)                       Page 10 of 15        Initials: _G P_  _G.P._

Form 3014  1/01

not affect other provisions of this Security Instrument or the Note which can be given effect without the
conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include
corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and
include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take
any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18,
"Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to,
those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow
agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is
not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written
consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.
However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall
provide a period of not less than 30 days from the date the notice is given in accordance with Section 15
within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these
sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security
Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions,
Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior
to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument;
(b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or
(c) entry of a judgment enforcing this Security Instrument. These conditions are that Borrower: (a) pays
Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration
had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in
enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property
inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the
Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably
require to assure that Lender's interest in the Property and rights under this Security Instrument, and
Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless
as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums
and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)
certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an
institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds
Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall
remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the
case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the
Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.
A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments
due under the Note and this Security Instrument and performs other mortgage loan servicing obligations
under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of
the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be
given written notice of the change which will state the name and address of the new Loan Servicer, the
address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

DOC #:323162                    APPL #:0001390434

MD-6A(IL) (0010)                    Page 12 of 15                    Initials 6 P    G.P.

Form 3014  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. Placement of Collateral Protection Insurance. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

DOC  #:323163

APPL  #:0002390434

Initials  G P   G·P

-6A(IL) (0010)

Page 13 of 15

Form 3014  1/01

STATE OF ILLINOIS,        Cook                                                    County ss:
          I,                                      , a Notary Public in and for said county and
state do hereby certify that    German Pena


personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.
          Given under my hand and official seal, this        10th        day of    August, 2006

My Commission Expires:


                                                _____
                                                Notary Public


DOC  #:323165                    APPL #:0001390434

⊗-6A(IL) (0010)                  Page 15 of 15          Initials  G P   G.P.
                                                                  Form 3014  1/01

ADJUSTABLE RATE RIDER

(12-MTA Index – Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this __10th__ day of __August, 2006__, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to _____ __AMERICAN BROKERS CONDUIT_____

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

__3815 N Osceloa Avenue,. Chicago, IL  60634_____

(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125.000%__ OF THE ORIGINAL AMOUNT (OR $ __441,250.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

Interest will be charged on unpaid Principal until the full amount has been paid. I will pay interest at a yearly rate of __1.625__ % until __August 31, 2006__, and the initial monthly payment provided for in the Note will be based on this rate. Commencing __September 1, 2006__ I will pay interest at a yearly rate of __9.113__ %. Thereafter, the interest rate I will pay may change in accordance with Section 4 of the Note.

AHM2029R(MULT) (0106)

Doc # 944735/Image: 944735.prn App# 0001390434

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may further change on the _____1st_____ day of ___October, 2006_____, and on that day every month thereafter. Each such date on which my interest rate could change is called a "Change Date."

(B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding __Four and 550 Thousandths_____ percentage points __4.550___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

(D) Interest Rate Limit

My interest rate will never be greater than _____10.550 % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

(E) Payment Change Dates

Effective every year commencing _____October 1st, 2007_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly

AHM2029R(MULT) (0106)

payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

(F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated

Amortization

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the maturity date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to ____125.000%____ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that ____125.000%____ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

(I) Required Full Monthly Payment

On the ____Five____ anniversary of the due date of the first monthly payment, and on that same day every ____Five____ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

(K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note

AHM2029R(MULT) (0106)

Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

### B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

Doc # 944738/Image: 944738.prn App# 0002390634

_____ (Seal)          _____ (Seal)
German  Pena          -Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                        -Borrower

Doc # 944739/Image: 944739.prn . App# 0002390434

Loan #:  0001390434

### PREPAYMENT RIDER TO SECURITY INSTRUMENT

THIS PREPAYMENT RIDER is made this __10th__ of __August, 2006__, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to __AMERICAN BROKERS CONDUIT__

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

__3815 N Osceloa Avenue, Chicago, IL 60634__
[Property Address]

PREPAYMENT COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

I have the right to make payments of principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any penalty. If within the first __three__ ( __3__ ) year(s) after the execution of the Note, I make a Full Prepayment or Partial Prepayment(s) of more than twenty percent (20%) of the original principal amount in a twelve month period immediately preceding the date of prepayment, I will pay a prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original principal amount of the Note in that twelve month period. Interest will be calculated using the rate in effect at the time of prepayment.

If I make a partial prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a partial prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

NOTICE TO THE BORROWER
Do not sign this Prepayment Rider before you read it. This Prepayment Rider provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Prepayment Rider.

German Pena

Josie U. Pena

# EXHIBIT C

OMB NO. 2502-0265

| A. | | B. TYPE OF LOAN: |
|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | 1. ☐ FHA  2. ☐ FmHA  3. ☒ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS. |
| **SETTLEMENT STATEMENT** | | 6. FILE NUMBER: 270149F    7. LOAN NUMBER: 0001890434 |
| | | 8. MORTGAGE INS CASE NUMBER: |

C. NOTE:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.
1.0  D98   (270149F.PFD/270149F/9)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| GERMAN PENA GLORIA VILMA PENA 3815 NORTH OSCELDA AVENUE CHICAGO, IL 60634 | | AMERICAN BROKERS CONDUIT 520 BROADHOLLOW RD MELVILLE, NY  11747 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: | I. SETTLEMENT DATE: |
|---|---|---|
| 3815 NORTH OSCELDA AVENUE CHICAGO, IL 60634 COOK County, Illinois 12-24-212-022 | Law Title Insurance Agency, Inc.-Naperville Agent for:  LAW TITLE INSURANCE COMPANY INC. PLACE OF SETTLEMENT 1701 E. Woodfield Road Ste 900 Schaumburg IL, 60173 | August 10, 2006 Disburse:08/16/06 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 8,392.77 | 403. | |
| 104. Payoff first mortgage to COUNTRYWIDE HOME LOANS | 304,671.61 | 404. | |
| 105. Payoff second mortgage to COUNTRYWIDE HOME LOA | 37,254.91 | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes          to | | 407. County Taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 350,319.29 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 353,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes          to | | 511. County Taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 353,000.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 350,319.29 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | (353,000.00) | 602. Less Reductions Due Seller (Line 520) | ( ) |
| **303. CASH ( FROM) ( X TO) BORROWER** | 2,680.71 | **603. CASH ( TO) ( FROM) SELLER** | 0.00 |

Page

| L. SETTLEMENT CHARGES | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. TOTAL COMMISSION Based on Price | $ | @ % | | |
| *Division of Commission (line 700) as Follows:* | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission Paid at Settlement | | | | |
| 704. | to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | |
| 801. Loan Origination Fee | % | to | | |
| 802. Loan Discount | % | to | | |
| 803. Appraisal Fee | to PRECISON APPRAISALS | POC $300.00L | | |
| 804. Credit Report | to | | | |
| 805. Lender's Inspection Fee | to | | | |
| 806. Mortgage Ins. App. Fee | to | | | |
| 807. Assumption Fee | to | | | |
| 808. ADMIN FEE | to AMERICAN BROKERS CONDUIT | | 546.00 | |
| 809. WIRE FEE | to AMERICAN BROKERS CONDUIT | | 25.00 | |
| 810. TAX SERVICE | to AMERICAN BROKERS CONDUIT | | 92.00 | |
| 811. FLOOD HAZARD FEE | to AMERICAN BROKERS CONDUIT | | 19.00 | |
| 812. BROKER FEE | to FREEDOM MORTGAGE TEAM, INC. | | 2,795.00 | |
| 813. PROCESSING FEE | to FREEDOM MORTGAGE TEAM, INC. | | 954.00 | |
| 814. YIELD SPREAD PREMIUM | to FREEDOM MORTGAGE TEAM, INC. | POC $11849.00L | | |
| 815. | | | | |
| 816. | | | | |
| 817. | | | | |
| 818. | | | | |
| 819. | | | | |
| 820. | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | |
| 901. Interest From 08/15/06 to 09/01/06 @ $ /day ( 17 days %) | | | 270.88 | |
| 902. Mortgage Insurance Premium for months to | | | | |
| 903. Hazard Insurance Premium for 1.0 years to | | | | |
| 904. | | | | |
| 905. | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | |
| 1001. Hazard Insurance | 3.000 months @ $ 61.75 per month | | 185.25 | |
| 1002. Mortgage Insurance | months @ $ per month | | | |
| 1003. City/Town Taxes | months @ $ per month | | | |
| 1004. County Taxes | 2.000 months @ $ 305.72 per month | | 611.44 | |
| 1005. Assessments | months @ $ per month | | | |
| 1006. | months @ $ per month | | | |
| 1007. | months @ $ per month | | | |
| 1008. Aggregate Adjustment | months @ $ per month | | -61.71 | |
| **1100. TITLE CHARGES** | | | | |
| 1101. Settlement or Closing Fee | to Law Title Insurance Agency, Inc-Naperville | | 200.00 | |
| 1102. Abstract or Title Search | to Law Title Insurance Agency, Inc-Naperville | | | |
| 1103. Title Examination | to | | | |
| 1104. Title Insurance Binder | to | | | |
| 1105. Document Preparation | to | | | |
| 1106. Notary Fees | to | | | |
| 1107. Attorney's Fees | to | | | |
| *(Includes above item numbers:* | | ) | | |
| 1108. Title Insurance | to LAW TITLE INSURANCE AGENCY INC-NAPERVILLE | | 653.00 | |
| *(Includes above item numbers:* | | ) | | |
| 1109. Lender's Coverage | $ | | | |
| 1110. Owner's Coverage | $ | | | |
| 1111. TAX PAYMENT & HANDLING | to LAW TITLE-TITLE DEPARTMENT | | 30.00 | |
| 1112. PAYOFF/PACKAGE HANDLING FEE | to LAW TITLE INSURANCE AGENCY INC-NAPERVILLE | | 60.00 | |
| 1113. REFINANCE COMMITMENT UPDATE | to LAW TITLE INSURANCE AGENCY - NAPERVILLE | | 25.00 | |
| 1114. Cert. of Release Service Fee | LAW TITLE INSURANCE AGENCY INC-NAPERVILLE | | | |
| 1115. Recording Service Fee | to Law Title Insurance Agency, Inc-Naperville | | 80.00 | |
| 1116. 2ND INSTALL RE 2005 TAXES | to LAW TITLE TAX DEPT | | 1,880.91 | |
| 1117. ESCROW DISBURSEMENT FEE | LAW TITLE INSURANCE AGENCY INC. NAPERVILLE | | | |
| 1118. EMAIL FEE | to Law Title Insurance Agency, Inc-Naperville | | 25.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | |
| 1201. Recording Fees: Deed $ ; Mortgage $ ; Releases $ | | | | |
| 1202. City/County Tax/Stamps: Revenue Stamps ; Mortgage | | | | |
| 1203. State Tax/Stamps: Revenue Stamps ; Mortgage | | | | |
| 1204. City Transfer Tax | Law Title Recording Account | | | |
| 1205. | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | |
| 1301. Survey | to | | | |
| 1302. Pest Inspection | to | | | |
| 1303. STATE OF IL POLICY TAX | to LAW TITLE INSURANCE COMPANY INC. | | 3.00 | |
| 1304. | | | | |
| 1305. | | | | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | 8,392.77 | |

Certified to be a true copy.

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

**Borrower:** GERMAN PENA and GLORIA VILMA PENA
**Lender:** AMERICAN BROKERS CONDUIT
**Settlement Agent:** Law Title Insurance Agency, Inc.-Naperville
(847)605-8698
**Place of Settlement:** 1701 E. Woodfield Road Ste 900
Schaumburg IL 60173
**Settlement Date:** August 10, 2006
**Disbursement Date:** August 15, 2006
**Property Location:** 3815 NORTH OSCELOA AVENUE
CHICAGO, IL 60634
COOK County, Illinois
12-24-212-022

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____
GERMAN PENA

_____
GLORIA VILMA PENA

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
Law Title Insurance Agency, Inc-Naperville
Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

(270149F.PFD/270149F/3)

# EXHIBIT D

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:   AMERICAN BROKERS CONDUIT
4200 Commerce Court Suite 101
Lisle, IL 60532

☐ Preliminary   ☒ Final

DATE: 08/10/06
LOAN NO.:
Type of Loan: Conventional
APP NO.:0001390434

BORROWERS:   German Pena

ADDRESS:     3815 N Osceloa Avenue
CITY/STATE/ZIP:Chicago, IL  60634
PROPERTY:    3815 N Osceloa Avenue
Chicago, IL 60634

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.249       % | $ 1,213,827.03 | $ 347,299.12 | $ 1,561,126.15 |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 12 | $1,000.62 | October 1, 2006 | 12 | $1,075.67 | October 1, 2007 |
| 12 | $1,035.75 | October 1, 2008 | 12 | $3,245.08 | October 1, 2009 |
| 432 | $3,484.19 | September 1, 2010 | 1 | $3,490.51 | September 1, 2046 |

DEMAND FEATURE:  ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been   provided to you earlier.

SECURITY:  You are giving a security interest in the property located at:   3815 N Osceloa Avenue
Chicago, IL 60634

ASSUMPTION:   Someone buying this property   ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under   original mortgage terms.

FILING / RECORDING FEES:   $

PROPERTY INSURANCE:   ☒ Property hazard insurance in the amount of $   353,000.00   with a mortgage clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from   any insurance company acceptable to the lender.
Hazard insurance   ☐ is   ☒ is not available through the lender at an estimated cost of   N/A   for a   year term.

LATE CHARGES:   If your payment is more than   15   days late, you will be charged a late charge of   5.000   % of the
overdue payment.

PREPAYMENT:   If you pay off your loan early, you
☒ may   ☐ will not   have to pay a penalty.
☐ may   ☒ will not   be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding   non-payment, default, required repayment in full before scheduled date,   and prepayment refunds and
penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this   disclosure.

_____   8-10-06        _____   8 10 06
German Pena       BORROWER / DATE                  BORROWER / DATE

BORROWER / DATE                          BORROWER / DATE

DOC #:050401 / rev. 06/2005   APPL #:0001390434   LOAN #:0000000000
-788 (0001)   DOC1 3001.05   VMP MORTGAGE FORMS - (800)721-7291   Page 1 of 2   5/96
© 1999 CAE Systems, Inc.   The contents of this form in whole or in part are protected under the copyright   laws of the United States.

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable) over the life of the loan.

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable) over the life of the loan. These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

# EXHIBIT E

FREEDOM MORTGAGE TEAM INC.

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [X] the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or [ ] the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.
If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

_____    _____
Borrower                   Co-Borrower

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | [ ] VA [ ] FHA | [X] Conventional [ ] USDA/Rural Housing Service | [ ] Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|

| Amount | Interest Rate | No. of Months | Amortization Type: | [ ] Fixed Rate | [ ] Other (explain): |
|---|---|---|---|---|---|
| $ 353000.00 | 1.625 % | 480 | | [ ] GPM [X] ARM (type): | 1 MO MTA |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) | | No. of Units |
|---|---|---|
| 3815 N. OSCELOA AVENUE, CHICAGO, COOK IL 60634 | | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| See Preliminary Title Report | |

| Purpose of Loan: | [ ] Purchase [ ] Construction [ ] Other (explain): | Property will be: |
|---|---|---|
| | [X] Refinance [ ] Construction-Permanent | [X] Primary Residence [ ] Secondary Residence [ ] Investment |

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements [X] made [ ] to be made |
|---|---|---|---|---|
| 2005 | $ 370000.00 | $ 370000.00 | 13 Limited Cash-Out Ra | KIT, FLRS Cost: $ 12000.00 |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| GERMAN PENA, GLORIA PENA | JOINT TENNANTS | [X] Fee Simple |
| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) | | [ ] Leasehold (show expiration date) |
| F4 Equity from Subject Property | | |

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | GERMAN PENA | Co-Borrower's Name (include Jr. or Sr. if applicable) |
| Social Security Number / Home Phone (incl. area code) / DOB (MM/DD/YYYY) / Yrs. School | 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 / 773-589-2995 / 09/27/1957 / 19 | Social Security Number / Home Phone (incl. area code) / DOB (MM/DD/YYYY) / Yrs. School |
| | [X] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated — Dependents (not listed by Co-Borrower) no. ___ ages ___ | [X] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated — Dependents (not listed by Borrower) no. ___ ages ___ |
| Present Address (street, city, state, ZIP) [X] Own [ ] Rent No. Yrs | 3815 N. OSCELOA AVENUE CHICAGO, IL 60634 — 11mos | Present Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs |
| Mailing Address, if different from Present Address | | Mailing Address, if different from Present Address |

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) [X] Own [ ] Rent No. Yrs | 4319 N. SPAULDING CHICAGO, IL 60618 — 9 | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs |
|---|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer [ ] Self Employed / Yrs. on this job | CITY SCENTS 209 E. OHIO STREET CHICAGO, IL 60611 — 15 / Yrs. employed in this line of work/profession 15 | Name & Address of Employer [ ] Self Employed / Yrs. on this job / Yrs. employed in this line of work/profession |
| Position/Title/Type of Business / Business Phone (incl. area code) | TRUCK DRIVER / 312-836-0211 | Position/Title/Type of Business / Business Phone (incl. area code) |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer [ ] Self Employed / Dates (from - to) / Monthly Income $ | | Name & Address of Employer [ ] Self Employed / Dates (from - to) / Monthly Income $ |
|---|---|---|
| Position/Title/Type of Business / Business Phone (incl. area code) | | Position/Title/Type of Business / Business Phone (incl. area code) |
| Name & Address of Employer [ ] Self Employed / Dates (from - to) / Monthly Income $ | | Name & Address of Employer [ ] Self Employed / Dates (from - to) / Monthly Income $ |
| Position/Title/Type of Business / Business Phone (incl. area code) | | Position/Title/Type of Business / Business Phone (incl. area code) |

**FREEDOM MORTGAGE TEAM INC.**

### V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income * | $ 6500.00 | $ | $ 6500.00 | Rent | | |
| Overtime | | | | First Mortgage (P&I) | 1312.00 | 1000.62 |
| Bonuses | | | | Other Financing (P&I) | 331.00 | |
| Commissions | | | | Hazard Insurance | 52.00 | 52.00 |
| Dividends/Interest | | | | Real Estate Taxes | 300.00 | 300.00 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other | | |
| **Total** | $ 6500.00 | $ | $ 6500.00 | **Total** | $ 1995.00 | $ 1352.62 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|---|
| | | | $ |

### VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.   Completed ☑ Jointly ☐ Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | | | | |
| **List checking and savings accounts below** | | LIABILITIES | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | | |
| CHASE | | CHASE | 90.00 50 | 4521.00 |
| | | Acct. no.   4147202015502053 | | |
| Acct. no. 001110011569580 | $ 2100.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | ARONSON FURNITURE | | |
| CHASE | | | 80.00 9 | 693.00 |
| | | Acct. no.   1525086 | | |
| Acct. no. 001110613640898 | $ 300.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | THD/CBUSA | | |
| CHASE | | | 18.00 24 | 425.00 |
| | | Acct. no.   6035320128878210 | | |
| Acct. no. 2043670153 | $ 2000.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | CBUSASEARS | | |
| RETIREMENTS FUNDS | | | 10.00 29 | 294.00 |
| | | Acct. no.   604994813752 | | |
| Acct. no. | $ 40000.00 | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) | $ | HSBC/MENARDS | 10.00 16 | 165.00 |
| | | Acct. no.   6004300909550029 | | |
| | | Name and address of Company | $ Payment/Months | $ |
| | | CBUSASEARS | 44.00 2 | 90.00 |
| Life insurance net cash value | $ | Acct. no.   612107503616 | | |
| Face amount: $ | | Name and address of Company | $ Payment/Months | $ |
| Subtotal Liquid Assets | 44400.00 | See Sch Of Liabilities | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 415000.00 | | 1679.00 | 342153.52 |
| Vested interest in retirement fund | $ | Acct. no. | | |
| Net worth of business(es) owned (attach financial statement) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Automobiles owned (make and year) | $ | | | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | 1931.00 | |
| Total Assets a. | 459400.00 | | $ 111058.48 | Total Liabilities b. | 348341.52 |

Freddie Mac 65 07/05
1003702 1006
GERMAN         PENA
Page 2 of 4
Printed by The Loan Handler from Ellie Mae, Inc. — www.elliemae.com
Fannie Mae Form 1003 07/05

FREEDOM MORTGAGE TEAM INC.

## VI. ASSETS AND LIABILITIES

### Schedule of Real Estate Owned (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 3815 N. OSCELOA AVENUE | SFR | $ 415000.00 | $ *341926.52 | $ | $ *1643.00 | $ 352.00 | $ |
| | | | | | | | |
| Totals | | $ 415000.00 | $ 341926.52 | $ | $ 1643.00 | $ 352.00 | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. Purchase price | $ | |
| b. Alterations, improvements, repairs | | |
| c. Land (if acquired separately) | | |
| d. Refinance (incl. debts to be paid off) | 341926.52 | |
| e. Estimated prepaid items | 2247.01 | |
| f. Estimated closing costs | 7949.00 | |
| g. PMI, MIP, Funding Fee | | |
| h. Discount (if Borrower will pay) | | |
| i. Total costs (add items a through h) | 352122.53 | |
| j. Subordinate financing | | |
| k. Borrower's closing costs paid by Seller | | |
| l. Other Credits (explain) | | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 353000.00 | |
| n. PMI, MIP, Funding Fee financed | | |
| o. Loan amount (add m & n) | 353000.00 | |
| p. Cash from / to Borrower (subtract j, k, l & o from i) | -877.47 | |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | X | | |
| b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. Are you a party to a lawsuit? | | X | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | | X | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | | X | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. Is any part of the down payment borrowed? | | X | | |
| i. Are you a co-maker or endorser on a note? | | X | | |
| j. Are you a U.S. citizen? | X | | | |
| k. Are you a permanent resident alien? | | X | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. Have you had an ownership interest in a property in the last three years? | X | | | |
| (1) What type of property did you own -- principal residence (PR), second home (SH), or investment property (IP)? | | | PR | |
| (2) How did you hold title to the home -- solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | SP | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

Acknowledgement. Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 8-10-06 | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information. | CO-BORROWER | ☐ I do not wish to furnish this information. |
|---|---|---|---|
| Ethnicity | ☐ Hispanic or Latino  ☒ Not Hispanic or Latino | Ethnicity | ☐ Hispanic or Latino  ☐ Not Hispanic or Latino |
| Race | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American  ☐ Native Hawaiian or Other Pacific Islander  ☒ White | Race | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American  ☐ Native Hawaiian or Other Pacific Islander  ☐ White |
| Sex | ☐ Female   ☒ Male | Sex | ☐ Female   ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | graco funes 031.0004217 | FREEDOM MORTGAGE TEAM INC. |
| ☒ Face-to-face interview | Interviewer's Signature | ONE PARKWAY PLAZA 700 |
| ☐ Mail | | OAKBROOK TERRACE, IL 60181 |
| ☐ Telephone | Interviewer's Phone Number (incl. area code) | |
| ☐ Internet | (630) 218-0000 | |

Freddie Mac 65  07/05
1003/POS  10/05

Page 3 of 4
Printed by The Loan Handler from Elle Mae, Inc. - www.ellemae.com

Fannie Mae Form 1003 07/05

GERMAN PENA

EXHIBIT F

NOTICE TO CUSTOMERS REQUIRED BY FEDERAL LAW FEDERAL RESERVE REGULATION Z
NOTICE OF RIGHT TO RESCIND (GENERAL)

### NOTICE OF RIGHT TO CANCEL

<u>Conventional</u>                                    ACCOUNT NO. <u>0001390434</u>
(Identification of Transaction)

**1. Your Right to Cancel**

You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1)    The date of the transaction, which is         August 10, 2006         ; or
(2)    The date you received your Truth in Lending disclosures; or
(3)    The date you received this notice of your right to cancel.

If you cancel the transaction, the (mortgage/lien/security interest) is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the (mortgage/lien/security interest) (on/in) your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

**2. How to Cancel**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:
American Home Mortgage
520 Broadhollow Road
Melville, NY 11747  Attn. Mail Stop 800

You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of August 14, 2006    (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____                    _____
SIGNATURE                                          DATE

The undersigned each acknowledge receipt of two copies of NOTICE of <u>RIGHT TO CANCEL</u> and one copy of the Federal-Truth-in-Lending Disclosure Statement.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective to all borrowers/owners.

_____German Pena_____ 08/10/2006        _____
BORROWER/OWNER          DATE                   BORROWER/OWNER          DATE

_____ 8-10-06                  _____
BORROWER/OWNER          DATE                   BORROWER/OWNER          DATE

DOC 6:942349                    APPL #:0001390434
-68 (0102)        0801 0702.02    12/97
VMP MORTGAGE FORMS (800)521-7291



NOTICE TO CUSTOMERS REQUIRED BY FEDERAL LAW FEDERAL RESERVE REGULATION Z
NOTICE OF RIGHT TO RESCIND (GENERAL)

### NOTICE OF RIGHT TO CANCEL

Conventional _____          ACCOUNT NO. ___0001390434___
(Identification of Transaction)

**1. Your Right to Cancel**

You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1)   The date of the transaction, which is      August 10, 2006          ; or
(2)   The date you received your Truth in Lending disclosures; or
(3)   The date you received this notice of your right to cancel.

If you cancel the transaction, the (mortgage/lien/security interest) is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the (mortgage/lien/security interest) (on/in) your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

**2. How to Cancel**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:
   American Home Mortgage
   520 Broadhollow Road
   Melville, NY 11747  Attn. Mail Stop 800

You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
August 14, 2006      (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____          _____
SIGNATURE                                     DATE

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal-Truth-in-Lending Disclosure Statement.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective to all borrowers/owners.

_____  08/10/2006       _____  8·10·06
BORROWER/OWNER Dorman Pena   DATE            BORROWER/OWNER              DATE

_____  _____       _____  _____
BORROWER/OWNER              DATE            BORROWER/OWNER              DATE

DOC #:942349                    APPL #:0001390434
^~-68 (9712)   VMP9723.02         12/97
VMP MORTGAGE FORMS - (800)521-7291



NOTICE TO CUSTOMERS REQUIRED BY FEDERAL LAW FEDERAL RESERVE REGULATION Z
NOTICE OF RIGHT TO RESCIND (GENERAL)

NOTICE OF RIGHT TO CANCEL

<u>Conventional</u>                                      ACCOUNT NO. __0001390434__
(Identification of Transaction)

### 1. Your Right to Cancel

You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1)    The date of the transaction, which is    **August 10, 2006**    ; or
(2)    The date you received your Truth in Lending disclosures; or
(3)    The date you received this notice of your right to cancel.

If you cancel the transaction, the (mortgage/lien/security interest) is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the (mortgage/lien/security interest) (on/in) your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

### 2. How to Cancel

If you decide to cancel this transaction, you may do so by notifying us in writing, at:
American Home Mortgage
520 Broadhollow Road
Melville, NY 11747 Attn. Mail Stop 800

You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of August 14, 2006    (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____                    _____
SIGNATURE                                                                          DATE

The undersigned each acknowledge receipt of two copies of NOTICE of <u>RIGHT TO CANCEL</u> and one copy of the Federal-Truth-In-Lending Disclosure Statement.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective to all borrowers/owners.

BORROWER/OWNER  _____  08/10/2006         BORROWER/OWNER  _____
                                                    DATE                                                                   DATE

BORROWER/OWNER  _____  8-10-06            BORROWER/OWNER  _____
                                                    DATE                                                                   DATE

DOC #:942349                                    APPL #:0003390434
Λ~-68 (9712)    0933 9732.02                      12/97
VMP MORTGAGE FORMS - (800)521-7291

# EXHIBIT G

AMERICAN BROKERS CONDUIT
538 Broadhollow Road
Melville , NY  11747

MONTHLY PAYMENT INFORMATION LETTER

Application Number:  1001390434


BORROWER(S):
German Pena
PROPERTY ADDRESS:
3815 N Osceloa Avenue
Chicago, IL  60634


Dear Borrower(s):

We wish to congratulate you on the purchase/refinance of your residence and
sincerely hope that you will enjoy the many benefits of home ownership.

In accordance with the terms of the Note and Mortgage, your first monthly
payment is due on the 1st of every month.  Your payments should be mailed to
the Bank at the following address:


    American Home Mortgage Servicing, Inc.
    ATT: Payment Processing
    PO Box 660029
    Dallas, TX 75266-0029

During the term of your loan you may expect the amount of your monthly payment
to fluctuate because of changing requirements for taxes, insurance and
assessments.  Your payment must be received by the Bank prior to the 16th of
each month in order to avoid a late charge.  At present and until further
notice, your monthly payment is as follows:


PRINCIPAL AND INTEREST:        $1,000.62

MONTHLY ESCROW DEPOSITS:
Real Estate Taxes      $305.72
Fire Insurance         $61.75

TOTAL MONTHLY ESCROW:          $367.47

TOTAL MONTHLY PAYMENT:         $1,368.09

In case you do not receive the regular monthly coupons before your first
payment is due, kindly use the enclosed temporary coupon when making that
payment.  Should you have any questions regarding your payment please contact
the Customer Service Department at (877) 304-3100, please reference your loan
number, 1001390434.

Document No. 961101/(02/06)

## TEMPORARY MORTGAGE PAYMENT COUPON

Application Number:  1001390434

Due Date:  October 1, 2006

Amount Due:  $1,368.09

Remit to:

      American Home Mortgage Servicing, Inc.
      ATT: Payment Processing
      PO Box 660029
      Dallas, TX 75266-0029
      Customer Service:    1-877-304-3100

-----------------------------------------------------------------

(Cut along dotted line above)

Document No. 361501/(02/06)

# EXHIBIT H

Prepared by: CONNIE GALLEGOS

# TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Bank, a Division of Treasury Bank, N.A.

☐ Preliminary  ☒ Final
DATE 08/15/2005

1199 North Fairfax St. Ste.500
Alexandria, VA 22314

BORROWERS: GERMAN PENA

LOAN CASE NO.    110456801
Type of Loan CONV UNINSURED
NonConf ARM MTA
PayOption 1mo

ADDRESS        4319 N. SPAULDING
CITY STATE / ZIP CHICAGO, IL 60618
PROPERTY       3815 N OSCEOLA AVE
               CHICAGO, IL 60634-3309

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 6.131 % | $ 404,188.05 | $ 294,533.13 | $ 698,721.18 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 952.05 | MONTHLY BEGINNING 10/01/2005 |
| 12 | 1,023.45 | MONTHLY BEGINNING 10/01/2006 |
| 12 | 1,100.21 | MONTHLY BEGINNING 10/01/2007 |
| 12 | 1,182.73 | MONTHLY BEGINNING 10/01/2008 |
| 12 | 1,271.43 | MONTHLY BEGINNING 10/01/2009 |
| 299 | 2,107.87 | MONTHLY BEGINNING 10/01/2010 |
| 1 | 2,109.61 | LAST PAYMENT DUE 09/01/2035 |
| | | |
| | | |
| | | |
| | | |

DEMAND FEATURE: ☒ This loan does not have a Demand Feature.    ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
3815 N OSCEOLA AVE, CHICAGO, IL 60634-3309

ASSUMPTION: Someone buying this property ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard Insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15    days late, you will be charged a late charge of    5.000 % of the overdue payment

PREPAYMENT: If you pay off your loan early, you
☐ may  ☒ will not    have to pay a penalty.
☐ may  ☒ will not    be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

X _____ BORROWER/DATE        _____ BORROWER/DATE
GERMAN PENA

X _____ BORROWER/DATE        _____ BORROWER/DATE

FHA/VA/CONV
● Truth In Lending Disclosure
'8-US (08/04)(d)                    Page 1 of 2

# EXHIBIT I

Prepared by: CONNIE GALLEGOS

Countrywide Bank, a Division of Treasury
Bank, N.A.

DATE:        08/12/2005
BORROWER: GERMAN PENA
CASE #:
LOAN #:        110456793
PROPERTY ADDRESS: 3815 N OSCEOLA AVE
                CHICAGO, IL 60634-3309

Branch #: 0001109
1601 S. HALSTED
CHICAGO, IL 60608
Phone: (312)421-8739
Br Fax No.: (312)421-9037

### HOME EQUITY CREDIT LINE AGREEMENT AND
### DISCLOSURE STATEMENT
### THIS LOAN IS SECURED BY A JUNIOR MORTGAGE

Date: AUGUST 15, 2005

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you,
Countrywide Bank, a Division of Treasury Bank, N.A.
The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to
Countrywide Bank, a Division of Treasury Bank, N.A.

1. LOANS: DRAW AND REPAYMENT PERIOD. Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period,") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 4 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 11.B, 11.D, 12.B or 15.A below.) You will not make any loan before the fourth business day following the signing of this Agreement, except to the extent of proceeds of this loan that are for the purchase or initial construction of the Property.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 12.B below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

2. MAKING LOANS. You will make loans under this Agreement by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $250; (ii) paying closing costs and finance charges in accordance with paragraph 7.C below; (iii) paying certain other amounts on my behalf in accordance with any disbursement authorization provided to you at or before the time I sign this Agreement; (iv) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Mortgage; or (v) any other method or procedure you establish.

3. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement monthly. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

C. I may pay all or part of my "New Balance" at any time, subject to an Account Termination Fee or Low Balance Fee, as applicable, as described in paragraph 7.D and 6.B(6), respectively (known as a "prepayment penalty" under federal law).

✦ HELOC - IL Agreement & Disclosure
2C653-IL (10/04)(d)

Page 1 of 9

Initials: 



LOAN #: 110456793

D. I may pay all or any part of my "New Balance" using an Equity Credit Line Check ("Check"). If I use a Check to pay all or any part of my New Balance, I understand that:

(1) The amount of the Check will be treated as any other advance is treated under the terms and conditions of my Account. My Check will not be honored if I do not have sufficient availability on my Account.

(2) If I make a payment using a Check, my principal balance will not decrease. The principal balance will increase by the amount of the Check.

(3) Interest will accrue on the total increased principal balance when I use a Check to make a payment on my Account.

(4) I may not use a Check to make a payment once the Draw Period ends; that is, a Check may not be used to make a payment during the Repayment Period.

E. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 12.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

F. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my Account.

G. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

4. CREDIT LIMIT. My Credit Limit under this Agreement is $ 37,000.00    . I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown on my most recent periodic statement. However, I agree that when I make payments on my Account by check or other non-cash method, you reserve the right to make loans based on the "Available Credit Limit" shown on the last periodic statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit. I promise not to request a reduction in my Credit Limit to an amount below $5,000.

5. ANNUAL PERCENTAGE RATE.

[  ] A. The initial Daily Periodic Rate is    N/A % . The initial ANNUAL PERCENTAGE RATE is N/A %. These rates are "discounted" rates. This means that these rates are lower than the rates that would be in effect if the formula set forth in paragraph 5.C below had been used, in which event the initial Daily Periodic Rate would be    N/A % and the initial ANNUAL PERCENTAGE RATE would be    N/A %. These discounted rates will be in effect from the date of this Agreement until N/A    . Thereafter, the Daily Periodic Rate and the Annual Percentage Rate will be determined using the formula set forth in paragraph 5.C below.

[X] B. The initial Daily Periodic Rate is 0.02500 % and the initial ANNUAL PERCENTAGE RATE is 9.125 %. These rates are not discounted.

C. My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (beginning with the first day of the first billing cycle after my "discounted" rate has expired, if applicable) according to the following procedure: The ANNUAL PERCENTAGE RATE shall be the "Index" plus a "Margin." The "Index" will be the highest Prime Rate as published in the "Money Rates" table of The Wall Street Journal as of the first business day of the calendar month. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.D below. Each billing cycle will end on the last day of the calendar month. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value is established.

Upon a change in the Index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the ANNUAL PERCENTAGE RATE divided by 365.

D. The "Margin" to be used under paragraph 5.C above to determine my ANNUAL PERCENTAGE RATE is 2.875 percentage points.

LOAN #: 110456793

E. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and not other costs. The ANNUAL PERCENTAGE RATE will never increase above    18.000 % or the maximum rate permitted by law, whichever is less.

F. If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increases, I will have to pay additional periodic finance charges and, as a result, I will have to pay larger "Minimum Payments."

**6. FINANCE CHARGE.** I agree to pay a finance charge on my Account as explained below.

A. Periodic FINANCE CHARGE.

(1) A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check is presented to you for payment. The periodic finance charge begins to accrue on my Account from the time a loan is posted to my Account. You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the number of days in the billing cycle.

(2) To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

B. Other FINANCE CHARGES.

(1) Points FINANCE CHARGE.

I agree to pay a Points FINANCE CHARGE of $ 0.00          at the time I sign this Agreement.

$_____
$_____
$_____
$_____
$_____

(2) Broker Fee FINANCE CHARGES.

I agree to pay Broker Fee FINANCE CHARGES of $ N/A          at the time I sign this Agreement.

$_____
$_____
$_____
$_____
$_____

(3) Settlement Agent FINANCE CHARGES.

I agree to pay the following Settlement Agent FINANCE CHARGES at the time I sign this Agreement:

| | |
|---|---|
| Closing Fee | $          0.00 |
| Electronic Doc Fee | $         25.00 |
| Closing/Escrow | $         75.00 |
| RECORDING FEE | $         46.50 |
| | $_____ |
| | $_____ |

(4) Miscellaneous FINANCE CHARGES.

I agree to pay the following miscellaneous Finance Charges at the time I sign this Agreement:

$_____
$_____
$_____
$_____

(5) Annual Maintenance Fee FINANCE CHARGE

☐   I agree to pay an annual maintenance fee FINANCE CHARGE of $          which  you  will charge to my Account on the first anniversary of this Agreement and every anniversary date thereafter, whether or not I have used or continue to use my Account; except that such fee shall be waived for the entire term of this Agreement if I meet both of the following conditions: (a) I maintain an average outstanding daily balance which

● HELOC - IL Agreement & Disclosure                          Page 3 of 9                          Initials: 6. P
2C553-IL (10/04)

LOAN #: 110456793

does not fall below $ _____ from the date of this Agreement through the first anniversary of this Agreement; and (b) I make each monthly payment during that period on or before the due date for each such payment. You will not rebate any portion of the annual fee if my Account is terminated or suspended before the end of any annual period.

[X] I will not be charged an annual maintenance fee FINANCE CHARGE on this loan.

### (6) Low Balance Fee FINANCE CHARGE

[ ] In consideration of having an Account with a reduced Margin, I agree to maintain an Average Daily Balance of $40,000 in each monthly billing cycle during the first two years of my Account. I further agree to pay a Low Balance Fee FINANCE CHARGE of $40 for each monthly billing cycle during the first two years of my Account in which I fall to maintain an Average Daily Balance of $40,000. You will not charge me for this fee for the month in which you charge me an Account Termination Fee pursuant to the terms of paragraph 7.D.

### 7. OTHER CHARGES.

A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this Agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:

(1) If I fail to make my "Minimum Payment Due" within ten (10) days of the "Payment Due Date," I agree to pay a late fee of 5% of the late payment.

(2) I agree to pay a Return Item Fee of $15 for each check you receive in payment of my Account which is returned unpaid upon second presentment.

B. I agree to pay you or my broker the following closing costs at or before the time I sign this Agreement:

| | |
|---|---|
| CHL Offset Fee | $ -146.50 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| LESS Amounts Paid by Lender | $ -0.00 |
| Total Paid by Borrower | $ 0.00 |

C. I may elect to pay the closing costs described in paragraph 7.B above and the finance charges described in paragraph 6.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my Account to pay some or all of such costs and finance charges.

D. [ ] I agree to pay an Account Termination Fee of $ _____ if I pay in full and terminate my Account with you and ask you to satisfy my mortgage lien on or before the _____ anniversary of this Agreement.

[X] I will not be charged an Account Termination Fee on this loan.

8. REAL PROPERTY SECURITY. To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Mortgage (the "Mortgage") covering my dwelling located at 3815 N OSCEOLA AVE, CHICAGO, IL 60634-3309 (the "Real Property"). The Mortgage is security for my current and future obligations under this Agreement. I will continue to be obligated to make payment to you under this Agreement even if the Real Property is damaged or destroyed and whether or not any insurance proceeds are available.

9. SECTION INTENTIONALLY OMITTED.

10. PROPERTY INSURANCE. I agree to obtain and maintain property insurance against loss or damage to the Real Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Mortgage or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premiums for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

LOAN #: 110456793

## 11. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.

A. You may take the actions listed in paragraph 11.B below during the period that any of the following events or conditions occur:

(1) the value of the Real Property declines significantly below its appraised value for the purposes of my Account;

(2) you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

(3) I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 13 below;

(4) government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

(5) government action (such as imposition of a tax lien) impairs the priority of the lien of the Mortgage such that the value of the lien of the Mortgage is less than 120% of my Credit Limit;

(6) the maximum Annual Percentage Rate set forth in paragraph 5.E above is reached.

(7) you release the Mortgage at my request because I have paid all amounts outstanding under my Account.

(8) the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

B. During the period in which a condition described in paragraph 11.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 11.A above or 12.A below have occurred.

C. Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Mortgage is not impaired.

D. If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 11.A above or 12.A below has occurred.

E. If an event or condition described in paragraph 11.A above occurs which is also an event or condition described in paragraph 12.A below, your rights and remedies described under paragraph 12.B below apply and supersede your rights described in this paragraph 11.

## 12. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.

A. You may take the actions listed in paragraph 12.B below if any of the following events or conditions occur:

(1) I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

(2) I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Mortgage;

(3) I sell or transfer title to the Real Property without first obtaining your written permission;

(4) I fail to maintain insurance on the Real Property as required under this Agreement or the Mortgage;

(5) I act or fail to act and as a result a lien senior to the lien of the Mortgage is filed against the Real Property;

LOAN #: 110456793

(6) I die and I am not survived by another person obligated as a Borrower under this Agreement;

(7) All or part of the Real Property is taken through eminent domain, condemnation or similar government taking;

(8) A prior lienholder on the Real Property begins foreclosure under its security document;

(9) The Real Property is used for an illegal purpose which could subject the Real Property to seizure;

(10) I fail to pay taxes on the Real Property; or

(11) My action or inaction adversely affects the Real Property or your rights in the Real Property. Such action or inaction could include, for example, the following:

    (a) A judgment is filed against me;

    (b) I commit waste or otherwise destructively use or fail to maintain the Real Property;

    (c) I die and I am survived by another person obligated as a Borrower under this Agreement; or

    (d) I move out of the Real Property.

B. If an event described in paragraph 12.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

(1) you may terminate any of my rights under my Account;

(2) you may temporarily or permanently refuse to make any additional loans;

(3) you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

(4) you may foreclose the Mortgage;

(5) you may reduce my Credit Limit; and

(6) you may take any other action permitted by this Agreement, by law or in equity.

13. MY IMPORTANT OBLIGATIONS. I agree that:

A. I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

B. I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

C. From time to time, if requested, I will supply you with current financial information about me.

D. I have not made and will not make any misrepresentation in connection with my Account, whether in my application, in this Agreement, or in the Mortgage.

E. I will not permit a receiver, sequestrator, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Real Property.

F. I will not use or allow use of the Real Property for any illegal purpose.

G. I will not move out of the Real Property.

H. I will not permit a lien to be filed which takes priority over the Mortgage for future advances made under this Agreement.

I. I will not break any promise made in this Agreement or in the Mortgage of Trust such as:

(1) my promise not to exceed my Credit Limit;

LOAN #: 110456793

   (2)   my "Important Obligations" listed in the Mortgage; and

   (3)   my promise not to request a reduction in my Credit Limit to an amount below $5,000.

**14. COSTS OF COLLECTION.** Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection, or foreclosure such as your court costs and reasonable attorney's or trustee's fees. Periodic finance charges will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me.

**15. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.**

   A.   Termination by Me. I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to this paragraph 15.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 11.D above.

   B.   Termination by You. My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 11.B or 12.B above or my exercise of my suspension or termination rights under paragraphs 11.D or 15.A above.

   C.   Effect of Termination. Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 12.B above. I must return unused Equity Credit Line Checks to you upon termination. I may be required to pay an Account Termination Fee pursuant to paragraph 7.D above.

**16. CHANGES TO AGREEMENT.**

   A. You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

     (1)   if the original Index is no longer available, you may change the Index and Margin;

     (2)   you may make any change I agree to in writing;

     (3)   you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

     (4)   you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

   B. If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

**17. OTHER PROVISIONS.**

   A.   Third Parties. This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me, I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Mortgage at any time without my consent.

   B.   Additional Credit Reports and Appraisals. I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Real Property and the Mortgage as you may deem necessary from time to time. I will cooperate in having the Real Property reappraised.

   C.   Tax Deductibility. I know that I should consult a tax adviser regarding the deductibility of interest and charges.

LOAN #: 110456793

D.  Applicable Law. I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Real Property is located.

E.  Application of Payments. You may apply payments and proceeds of the Real Property in such order as you shall deem advisable or as otherwise required by applicable law.

F.  Failure to Perform. If I violate or fail to perform any term or condition of this Agreement (or the Mortgage), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

G.  Waiver of Jury Trial. I waive my right to a jury trial concerning any enforcement dispute arising under this Agreement.

H.  Complete Understanding of the Parties. There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

I.  Waiver of Notice. I waive presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z or other applicable federal or state statutes or regulations.

J.  Meaning of Words. All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

K.  Payment Marked "Payment in Full." I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. **Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to** Countrywide Bank, a Division of Treasury Bank, N.A.
P.O. Box 5170, Simi Valley, CA 93062-5170

L.  Enforcement. You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

M.  Notices. Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 17.M and (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by certified mail, return receipt requested, at
Countrywide Bank, a Division of Treasury Bank, N.A.
P.O. Box 5170, Simi Valley, CA 93062-5170
or to such other address as you may designate by written notice to me as provided in this paragraph 17.M.

N.  Riders/Addenda. The covenants and agreements of each of the riders/addenda checked below are incorporated into and supplement and amend the terms of this Agreement.

☐ No Cost Addendum                                    ☐ _____ Rider
☐ _____ Addendum             ☐ _____
☒ Billing Rights Statement

LOAN #: 110456793

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT", THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

Borrower: GERMAN PENA                                        08-15-05
                                                              Date

Borrower: _____            _____
                                                              Date

Borrower: _____            _____
                                                              Date

Borrower: _____            _____
                                                              Date

# **EXHIBIT B**

**Settlement Agreement**

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release ("Agreement") is entered into between German Pena and Gloria Pena (collectively, the "Penas") and American Home Mortgage Corp. ("AHMC"), effective as specified below.

## RECITALS

WHEREAS, the Penas are the owners of certain real property located at 3815 North Osceola Avenue, Chicago, Illinois 60634 (the "Property"). In August, 2006, AHMC made a mortgage loan (Loan No. 1390434, the "Loan") to the Penas in the principal sum of $353,000 secured by the Property;

WHEREAS, on January 31, 2007, the Penas filed suit against AHMC, American Home Mortgage Servicing, Inc. ("AHMSI"), Mortgage Electronic Registration Systems, Inc. ("MERS") and others, in an action styled Pena v. Freedom Mortgage Team, Inc., et al., Case No. 07 C 552 (United States District Court for the Northern District of Illinois) (the "Lawsuit"), alleging various claims relating the Loan;

WHEREAS, in August, 2007, AHMC filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (the "AHM Bankruptcy Case");

WHEREAS, the Penas, as unsecured, contingent creditors of AHMC, filed a timely proof of claim (the "Bankruptcy Claim") in the AHM Bankruptcy Case relating to the claims asserted in the Lawsuit; and

WHEREAS, without any admission of fault or liability, the parties to this Agreement desire to fully compromise and settle all claims and disputes between them, on the terms set forth below;

## PROVISIONS

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which from one to the other is hereby acknowledged, the Penas and AHMC hereby agree as follows:

1. _Refinancing of the Loan_. Within fourteen (14) days of the Effective Date (as that term is defined in Paragraph 5 below), the Penas shall pay off the Loan in the amount and pursuant to the terms specified on the payoff statement attached hereto as Exhibit A. AHMC agrees that the Penas will not be assessed any penalties, fees or charges in connection with the payoff of the Loan other than those reflected on Exhibit A.

2. _Withdrawal of the Bankruptcy Claim_. Within fourteen (14) days of the Effective Date, the Penas shall make a filing in the AHM Bankruptcy Case which withdraws with prejudice the Bankruptcy Claim. Further, the Penas agree that in the future they will not assert any additional claims against any of the debtors in the AHM Bankruptcy Case.

3. _General Release_. Upon the Effective Date, the Penas, for themselves and their heirs, successors and assigns, release, acquit and forever discharge AHMC, AHMSI and MERS, as well as any agent, employee, representative, officer, director, attorney, predecessor, successor, affiliate, division, subsidiary, or parent of AHMC, AHMSI or MERS, and the successors and assigns of any of the foregoing (the "Released Parties") from and against any cause of action, suit, damage, attorneys' fees, cost, injury, demand or claim of any kind or nature whatsoever which the Penas had, have, or may in the future have against any of the Release Parties, including, without limitation, those which arise from or relate to the Loan, the Property, or the Lawsuit.

4. _Dismissal of the Lawsuit_. Within fourteen (14) days of the Effective Date, the Penas shall dismiss all claims in the Lawsuit against AHMC, AHMSI and MERS with prejudice, and with all parties to bear their own costs and attorneys' fees.

5. _Effective Date_. This Agreement is conditioned on bankruptcy court approval in the AHMC Bankruptcy Case. This Agreement shall become effective on the day (the "Effective Date") that this Agreement receives bankruptcy court approval in the AHMC Bankruptcy Case, pursuant to the procedures in place in that proceeding for approval of settlements involving AHMC.

2

6.    <u>No Admission</u>. This Agreement is entered into solely for the purpose of settlement. Nothing herein may be cited or construed as, or may be used as, an admission by or against any party of any fault, wrongdoing or liability of any kind whatsoever.

7.    <u>Choice of Law</u>. This Agreement shall be governed by and interpreted according to the laws of the State of Illinois.

8.    <u>Entire Agreement</u>. This Agreement represents the entire agreement between the parties and there are no terms, representations, agreements, understandings, or covenants, oral or otherwise, that are not incorporated into this Agreement.

9.    <u>Terms of Agreement Negotiated</u>. This Agreement has been negotiated and drafted by all parties and their counsel. The parties to this Agreement represent and warrant that they have read and understand this Agreement and have consulted their respective counsel concerning its legal effect. No rule of construction shall apply to this Agreement construing its provisions in favor of or against any party.

10.    <u>Counterparts and Facsimile Execution</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall be deemed sufficient, original signatures.

11.    <u>Non-Assignment of Claims</u>. The Penas, and each of them, warrant and represent that they have neither made nor suffered to be made any assignment or transfer of any right, claim, demand, or cause of action covered by this Agreement and that they are the sole and absolute legal and equitable owners thereof.

12.    <u>Amendment or Modification</u>. This Agreement may only be amended or modified by a written instrument signed by all parties to this Agreement.

3

IN WITNESS WHEREOF, the parties have read and understand the terms of this

Agreement, agree to be bound by all of its provisions, and have executed this Agreement on the date

shown by their signatures below.

AMERICAN HOME MORTGAGE CORP.

GERMAN PENA
Dated: January 28, 2008

By: _____
       Authorized Representative
       Dated: January ____, 2008

GLORIA PENA
Dated: January 28, 2008

4

IN WITNESS WHEREOF, the parties have read and understand the terms of this Agreement, agree to be bound by all of its provisions, and have executed this Agreement on the date shown by their signatures below.

_____
GERMAN PENA
Dated: January ____, 2008

AMERICAN HOME MORTGAGE CORP.

By: _____
Authorized Representative
Dated: January _25_, 2008

_____
GLORIA PENA
Dated: January ____, 2008

4

Payoff Statement
January 25, 2008

Send to:  German Pena

        3815 N Osceloa Avenue
        Chicago, IL  60634

Loan Number-1001390434    State-IL
Loan Type-CONV Insur  0632748
Investor-333  Pool#    2

PLEASE REFER TO OUR LOAN NUMBER ON ALL CORRESPONDENCE.

This statement reflects the amount needed to prepay this mortgage in full.
Only cashiers check or certified funds are acceptable for final payment.
The monthly mortgage payments should be made in the normal manner as the
fact that the loan is in the process of being paid in full does not affect
the responsibility of making scheduled payments.

----------------------------------------------------------------------

Mortgagor Name: German Pena
                                    Next Payment Due Date: 2/01/08
                                    Interest Paid To Date: 1/01/08

Property Addr:  3815 N Osceloa Avenue     Mailing Addr: 3815 N Osceloa Avenue
               Chicago, IL  60634                  Chicago, IL  60634

----------------------------------------------------------------------

                  * Statement of Account *

Interest is collected to the date of the receipt of the payoff funds.
Please allow for mailing time.  Any funds over the payoff amount will
be applied to your escrow account, and be returned when we receive the
cancelled documents from the investor.

| | | | |
|---|---|---|---|
| Unpaid Principal | 381,486.66 | Mortgage Escrow Bal | 1,563.99 |
| Interest Due | 2,930.24 | | |
| (From  1/01/08  at  8.920%) | | | |
| | | Prin and Int | 1,075.67 |
| | | Mthly Escrow Dep | 547.78 |
| ***Mortgage Escrow Bal | 1,563.99 | | |
| Recording Fee | 40.00 | | |
| Balance Due | 382,892.91 | Mortgage Payment | 1,623.45 |
| By  2/01/08 | | | |

If paid after this date please add:
If applicable, a Monthly Late Charge of      53.78
Per Diem Interest of                         93.23

----------------------------------------------------------------------

| Escrow Item Summary: | Due Date | Annual Amt. | Income Tax Information | |
|---|---|---|---|---|
| COUNTY TAXES | 2/01/08 | 2,192.69 | Interest Paid YTD | 1,075.67 |
| HAZARD INS | 8/11/08 | 754.00 | | |
| Coverage Amount | 415,800 | | | |
| Policy Number | 13WC63016 | | | |

The figures provided are based upon information available at the time
of issuance.  Figures may change based upon any payment, disbursement,
loan activity or error.  Your payoff figure is good through the balance
due date; however, if the current payment is not received by the 16th a
late charge may also be due.  American Home Mortgage Servicing will
continue to pay taxes and insurance from your escrow account, unless we
are notified in writing in advance.  Upon payment in full, the escrow
balance will be released to you within thirty (30) days.

Method of Payment - Funds must be in the form of a cashier, certified,
attorney or title company check.  We will not be responsible for any
payoff check sent to an incorrect address, lost in the mail, arriving late
or sent via an Express Service.

Please WIRE the payoff funds to the following directions  :

    Bank Name:  JP Morgan Chase
    City, State:  New York, NY
    ABA No.:  021000021
    Account #:  957114117
    Account Name:  AHMS Loan Payoff Account
    Additional Info:  List Borrower Name and Loan Number



EXHIBIT

A

If funds are to be mailed use the following address:

American Home Mortgage Servicing, Inc.
Attn: Cash Management Department
4600 Regent Blvd.  Suite 200
Irving,  TX.    75063-2250

Short Payments - If the payoff check is less than the total amount due
when received, we will attempt to notify the sender by telephone to discuss
the resolution for the shortage amount.  If we are unable to reach the
customer or come to a resolution, the funds will be returned and interest
will continue to accrue until final payment is received.

Overpayments - After payment in full, and an overage exists, the funds
will be disbursed and mailed within thirty (30) days.

Partial Claims - If there is an adjustment to the payoff for a collection of
a previously paid partial claim on the loan, then a separate check must be
issued for this amount made payable to 1st Madison.

If you have any questions regarding this payoff information, please contact
a Customer Service Representative toll free at (877) 304-3100.