IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re:                                                       :   Chapter 11
                                                             :
AMERICAN HOME MORTGAGE                                       :   Case No. 07-11047 (CSS)
HOLDINGS, INC.,                                              :
a Delaware corporation, et al.,                              :   Jointly Administered
                                                             :
            Debtors.                                         :   Docket Ref. No. 1701
                                                             :
                                                             :   Objection Deadline: February 11, 2008 at 4 p.m. (ET)
                                                             :   Hearing Date: February 14, 2008 at 11 a.m. (ET)
------------------------------------------------------------ x

### DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS AND NATIXIS REAL ESTATE CAPITAL INC. F/K/A/ IXIS REAL ESTATE CAPITAL INC.

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above-captioned cases (collectively, "AHM" or the "Debtors"), by this motion (the "Motion"), seek entry of an order pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving the settlement agreement (the "Settlement Agreement")[1] between the Debtors and Natixis Real Estate Capital Inc. f/k/a IXIS Real Estate Capital Inc. ("Natixis") together with the Debtors, the "Parties") resolving the Stay Relief Motion (defined below), a copy of which is attached hereto as Exhibit 1. In support of the Motion, the Debtors respectfully represent as follows:

---

[1]    All terms not otherwise defined in this Motion shall have the meaning ascribed to such term in the Settlement Agreement.

## STATUS OF THE CASE AND JURISDICTION

1. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered pursuant to Rule 1005(b) of the Federal Rules of Bankruptcy Procedure. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## GENERAL BACKGROUND

### A. The Debtors' Business

4. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

6. A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes an important asset of the Debtors' estates.

**B.    Events Leading to the Chapter 11 Filing**

7. Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for

subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9. In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening AHM's continued viability.

10. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

12. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the

Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and "scratch and dent" loans, to financial and strategic investors.

13. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

### RELEVANT BACKGROUND

14. Prior to the Petition Date, Natixis and certain of the Debtors entered into the Third Amended and Restated Master Repurchase Agreement, dated as of July 15, 2005, among Natixis, American Home Mortgage Corp. ("AHMC"), American Home Mortgage Investment Corporation ("AHMIC"), American Home Mortgage Acceptance, Inc. ("AHMA"), American Home Mortgage Holdings, Inc. ("AHMH"), and American Home Mortgage Servicing, Inc. f/k/a Columbia National, Incorporated ("AHMS") (as amended, "Repurchase Agreement").

15. Prior to the Petition Date, Natixis, the Debtors, and Deutsche Bank National Trust Company, as Custodian and Disbursement Agent, entered into the Third Amended and Restated Custodial and Disbursement Agreement, dated as of January 29, 2007, executed by and among the Debtors, Natixis and Deutsche Bank National Trust Company, as Custodian and Disbursement Agent (as amended, the "Custodial Agreement").

16. On or about August 3, 2007, Natixis allegedly delivered a Notice of Default and Reservation of Rights to the Debtors.

17. On or about October 29, 2007, Natixis filed the *Motion of Natixis Real Estate Capital Inc. F/K/A Ixis Real Estate Capital, Inc. for Relief from the Automatic Stay* ("Stay Relief Motion") [D.I. 1701].

18. Pursuant to the Stay Relief Motion, Natixis requested that the Court grant Natixis relief from the automatic stay to (i) complete the termination and transition of servicing from the Debtors to a new servicer appointed by Natixis; and (ii) recover from the Debtors the mortgage files necessary to effectuate the transfer of servicing to a new servicer to be appointed by Natixis. In addition, Natixis requested that the Debtors transfer to Natixis proceeds in connection with purported purchases by certain investors ("Take-Out Investors") of Mortgage Loans, including the Unreleased Loans identified in Exhibit A to the Settlement Agreement.

19. As of January 31, 2008, the Debtors were holding in a segregated account (the "P&I Account") $36,272.87 in principal and interest payments made by the Mortgagors (as defined in the Repurchase Agreement) to the Debtors relating to the Mortgage Loans, whether collected prior to or after the Petition Date. The Debtors were also holding in a separate account (the "T&I Account") $38,220.20 in tax and insurance payments made by the Mortgagors to the Debtors relating to the Mortgage Loans, whether collected prior to or after the Petition Date.

20. Natixis had consented from time to time to adjourn the Stay Relief Motion pending resolution of the matters contained therein.

21. As a result of extensive negotiations, the Parties reached an agreement as set forth in the Settlement Agreement.

## SETTLEMENT AGREEMENT[2]

22. Pursuant to the Settlement Agreement, the Debtors agreed to transfer to Natixis or its designee the Servicing Rights effective on March 1, 2008, or, if later than that date, the date on which this Court enters an order approving the Settlement Agreement. The Servicing Rights include all rights to collect fees and other payments made on account of the Mortgage Loans, less any unreimbursed advances appropriately made by the Debtors in accordance with those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related mortgaged property is located and any servicing fees, if such servicing fees are paid to the Debtors pursuant to a written agreement between the Parties existing as of the date hereof.

23. The Debtors agreed to transfer the Servicing Rights in accordance with the Servicing Transfer Guidelines annexed to the Settlement Agreement as Exhibit B.

24. The Debtors agreed to use good-faith efforts to ensure that all instruments, agreements, and other books, records, and reports and data with respect to the Mortgage Loans[3] in the Debtors' possession, are in intact and to resolve any document exceptions to the Mortgage Files and servicing files within a reasonable time after the discovery thereof to the extent such documents exist.

25. The Debtors, Natixis and its designee, if any, agreed to cooperate in connection with the transfer of the Servicing Rights and to use good-faith efforts to cause the transfer in an efficient, non-disruptive manner.

---

[2] The terms of the Settlement Agreement set forth herein are a summary only. To the extent of any inconsistency between the summary herein and the Settlement Agreement, the terms of the Settlement Agreement shall govern.

[3] The term "Mortgage Loans" is defined to include the mortgage loans that are subject to the Repurchase Agreement but expressly excludes the Excluded HELOC Loans (identified on Exhibit C to the Settlement Agreement) and the Unreleased Loans (identified on Exhibit A to the Settlement Agreement).

26. In accordance with section 13(a)(4)(B) of the Repurchase Agreement, in lieu of selling the Mortgage Loans, Natixis agreed to give the Debtors credit against the aggregate unpaid Repurchase Price and any other amounts due from the Debtors under the Repurchase Agreement. Natixis also agreed that Proofs of Claim filed on January 11, 2008 against AHMH, AHMIC, AHMA, AHMS, and AHMC [(claim numbers 8918, 1819, 8920, 8921, and 8922, respectively)] solely with respect to the Mortgage Loans shall be reduced to zero. Natixis will maintain a contingent claim for (i) any breach by the Debtors of the Settlement Agreement; (ii) any claims or causes of action that arise out of or are related to any contract between Natixis and the Debtors other than the Repurchase Agreement and the Custodial Agreement, and (iii) any claims that any deficiencies in the Mortgage Files, as required to be transferred to Natixis under the Servicing Transfer Guidelines, that ultimately impacts the value of the underlying Mortgage Loan.

27. The Excluded HELOC Loans are expressly excluded from the Mortgage Loans and are to be retained, abandoned, or disposed of by the Debtors in their discretion. The Debtors agreed to provide notice to borrowers under the Excluded HELOC Loans that neither the Debtors, as lender, nor any other entity will honor draw requests under the Excluded HELOC Loans.

28. The Debtors agreed to transfer, on or within three (3) business days after the Servicing Transfer Date, to Natixis or its designee, by wire transfer, any and all amounts in the T&I Account less any unreimbursed advances appropriately made by the Debtors in accordance with those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related mortgaged property is located. The Debtors also agreed to transfer, on or within three

business days after the Servicing Transfer Date, and on a monthly basis thereafter, to Natixis or its designee, by wire transfer, all amounts in the P&I Account, less any unreimbursed advances appropriately made by the Debtors in accordance with those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related mortgaged property is located and any servicing fees, if such servicing fees are paid to the Debtors pursuant to a written agreement between the Parties existing as of the date hereof.

29. The Debtors agreed to the release provided in section 2.1 of the Settlement Agreement, set forth below:

   a) <u>Release by Debtors</u>. Each of the Debtors and their successors and assigns, hereby waive, release and forever discharge Natixis and each of its past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description, whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Loans that are the subject of this Settlement Agreement (excluding the Unreleased Loans and any claims or causes of action the Debtors may have related to Natixis improperly setting a Purchase Price (as defined in the Repurchase Agreement) or Margin Base under section 4.a. of the Repurchase Agreement within the period that is 120 days prior to the Petition Date) (including, without limitation the Excluded HELOC Loans), and/or the Debtors' assertion that Natixis caused or contributed to the commencement of the Debtors' chapter 11 cases.

30. Natixis agreed to the release provided in section 2.2 of the Settlement Agreement, set forth below:

   a) Natixis and its successors and assigns, hereby waives, releases and forever discharges the Debtors and each of their past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description,

whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Loans that are the subject of this Settlement Agreement (excluding the Unreleased Loans).

31. The releases described in paragraphs 2.1 and 2.2 of the Settlement Agreement are limited by section 2.3, which provides:

　　a) <u>Limitation of Releases</u>. The Parties acknowledge and agree that the releases set forth in Sections 2.1 and 2.2 above shall not include or have any effect upon the following claims and causes of action which are expressly preserved and retained by the respective Party:

　　　　i) Claims or causes of action of Natixis or the Debtors that arise from or are related to any contract between Natixis and Debtors other than the Repurchase Agreement and the Custodial Agreement;

　　　　ii) Waiver, release or discharge from any obligations under, or the breach of, this Settlement Agreement;

　　　　iii) Claims or causes of action of Natixis that arise as a result of any deficiency in the Mortgage Files, as required to be transferred to Natixis under the Servicing Transfer Guidelines, that ultimately impacts the value of the underlying Mortgage Loan; and

　　　　iv) Claims or causes of action that the Parties have related to the Unreleased Loans.

## RELIEF REQUESTED AND BASIS THEREFOR

32. By this Motion, the Debtors are seeking approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019. The Debtors and Natixis have weighed the costs and risks associated with the continued litigation of the Stay Relief Motion against the compromises contained within the Settlement Agreement and have concluded that it is in their respective best interest to compromise and settle the matter pursuant to the terms of the Settlement Agreement without further litigation.

## **STANDARDS FOR SETTLEMENTS**

33. Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir. 1979). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414 (1986).

34. Approval of a proposed settlement is within the "sound discretion" of the bankruptcy court. In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate." See In the Matter of Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989). In determining whether to approve an motion to settle a controversy, a bankruptcy court must determine whether it is fair, reasonable and adequate by examining four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection: (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Official Comm. of Unsec. Cred. Of Penn. Truck Lines, Inc., v. Penn Truck Lines, Inc. (In re Penn Truck Lines, Inc.), 150 B.R. 595, 598 (Bankr. E.D. Pa. 1992). The court should not substitute its judgment for that of a trustee. Neshaminy Office Building Associates, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but

rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

35. In examining those factors, the court should not substitute its judgment for that of a debtor. Neshaminy Office Building Associates, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983). It is important that the bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probability of ultimate success should the claims be litigated, and estimate[] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." In re Penn Cent., 596 F.2d at 1146.

36. As an ancillary matter, "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

37. The factors set forth above are satisfied in the instant case for the following reasons. First, although the Debtors believe that they would ultimately prevail on most

of the issues raised by Natixis in the Stay Relief Motion, the Debtors acknowledge that litigation with Natixis has inherent risks, much like all litigation. That being said, the Debtors anticipate that litigating the claims advanced in the Stay Relief Motion will be time consuming and expensive because of complicated legal and factual disputes. Litigating these complex issues will cause the estate to incur additional administrative fees and expenses. Further, approval of the Settlement Agreement largely resolves deficiency claims asserted by Natixis, except for claims specifically reserved in the Settlement Agreement. Finally, approving the Settlement Agreement will allow the Debtors to focus on prosecuting these bankruptcy cases without burdening the Debtors' estates with additional, unnecessary administrative expenses.

38. In light of the above, the Debtors believe the Settlement Agreement is fair, equitable, and in the best interests of the their creditors and their estates, represents an exercise of the their sound business judgment, and should be approved pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## NOTICE

39. Notice of this Motion will be provided via overnight delivery, fax or email to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; (v) counsel to the Natixis, and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

40. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter an order (i) pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the Settlement Agreement, and (ii) granting such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
February 4, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Sharon M. Zieg

James L. Patton, Jr. (No. 2202)
John T. Dorsey (No. 2988)
Sharon M. Zieg (No. 4196)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession