UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x   Chapter 11
In re:                                                           :
                                                                 :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                           :
HOLDINGS, INC., a Delaware corporation, et al.,[1] :             Jointly Administered
                                                                 :
     Debtors.                                                    :   Hearing Date: February 14, 2008 11:00 a.m. (ET)
                                                                 :   Objection Deadline: February 11, 2008 4:00 p.m. (ET)
---------------------------------------------------------------- x

### DEBTORS' MOTION FOR AN ORDER MODIFYING EXISTING PROCEDURES FOR THE COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN FORECLOSURE PROFESSIONALS AND REAL ESTATE BROKERS UTILIZED IN THE ORDINARY COURSE AND GRANTING LIMITED *NUNC PRO TUNC* RELIEF

The above-captioned debtors and debtors in possession (collectively, "AHM" or the "Debtors") hereby move this Court (the "Motion"), pursuant to §§ 105(a), 327, 328, 330, and 331 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Order"), in the form annexed hereto as Exhibit A, (i) modifying existing procedures for compensation and reimbursement of expenses of certain firms utilized in the ordinary course of business to foreclose and liquidate mortgage loans, and (ii) providing a minimum fee of $2,000 to real estate brokers (the "Brokers") employed by the Debtors who successfully consummate a sale of REO Property, *nunc pro tunc* to the Petition Date (as defined herein). In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving,

## SUMMARY OF RELIEF REQUESTED[2]

1. By this Motion, the Debtors seek to modify the existing procedures for compensating and reimbursing expenses of Foreclosure Professionals to allow for more efficient and expedited payment of the Foreclosure Professionals and to eliminate the Trailing Expenses that may result from the current OCP Order. The proposed modifications will benefit the Debtors' estates by (i) reducing the administrative burden and expenses associated with continued compliance with the existing procedures; (ii) facilitating the prompt repayment of Servicing Advances made to Foreclosure Professionals from the proceeds of mortgage loan and REO Property liquidations (the "Liquidation Proceeds"), to which the Servicing Advances are properly chargeable; and (iii) permitting the payment of the customary, Minimum Broker Fee to the Brokers, which was inadvertently left out of the original procedures.

2. The Debtors previously filed a motion to modify the OCP Procedures with respect to the Foreclosure Professionals and Brokers. Pursuant to the Court's ruling on January 4, 2008, the original motion was denied without prejudice to the Debtors' rights to seek relief that provided for appropriate oversight of the Foreclosure Professionals' fees. The instant Motion is the culmination of numerous discussions with the Committee, the United States Trustee, and AH Mortgage Acquisition Co., Inc., and the Debtors believe that it achieves the goal of proper Court oversight while addressing the issues of concern to the Debtors.

## STATUS OF THE CASE AND JURISDICTION

3. August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors'

---

Texas 75063.

[2] All capitalized terms used, but not defined, within this Summary are defined *infra.*

chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). Each Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4.      On August 14, 2007, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed in these chapter 11 cases.

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and procedural predicates for the relief requested are Bankruptcy Code §§ 105(a), 327, 328, 330 and 331, and Bankruptcy Rule 9024.

## GENERAL BACKGROUND

### A.     The Debtors' Business

6.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate-A quality.

7.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan-production offices located

in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain AHM entities originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.  A large component of AHM's business was the servicing of loans (the "Servicing Business"), which it conducted through AHM Servicing. The Servicing Business entails, among other things, collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

9.  The Debtors continued to operate the Servicing Business after the Petition Date and, as discussed further below, currently operate it for the benefit of the Purchaser (as hereinafter defined).

**B.   The Foreclosure Process**

10.  In the ordinary course of the Servicing Business, AHM Servicing is involved in hundreds of foreclosure-related proceedings throughout the country. To conduct such foreclosures and to perform related services, AHM Servicing regularly calls upon certain professionals, including, but not limited to, attorneys, trustee services and real estate brokers.

11.  Prior to bankruptcy, AHM Servicing advanced funds to its professionals to compensate them and reimburse them for necessary foreclosure-related fees, costs, and expenses (such advances, together with other advances made to preserve or rehabilitate the mortgaged real

property, the "Servicing Advances"). Although AHM Servicing is required to make Servicing Advances per their servicing agreements (the "Servicing Agreements"), such advances are ultimately chargeable to the owners of the mortgage loans. Accordingly, where mortgaged real property is sold to a third party in foreclosure or later liquidated, AHM Servicing is entitled to reimburse itself for any Servicing Advances made with respect to the underlying mortgage loan before remitting the Liquidation Proceeds (net of the applicable servicing fees and Servicing Advances) to the owner.

12. Where foreclosure proceedings are initiated but do not result in a sale of the mortgaged real property, the mortgagor is typically responsible for reimbursing AHM Servicing for any Servicing Advances as a cost of curing/reinstating the mortgage.

13. Where foreclosure proceedings are consummated but it is determined that a foreclosure sale would not generate sufficient proceeds to pay off the underlying mortgage on a given property and that a higher price could be obtained by rehabilitating and/or marketing the property over time, AHM Servicing may acquire the property (property so acquired, "real-estate owned" or "REO Property"). AHM Servicing will typically market REO Property for several months before liquidating it for the best price then available.

C.    **Foreclosure and REO Industry Practices**

14. In the mortgage servicing and loan default industry, a well established practice exists with respect to requests for compensation and reimbursement of expenses for foreclosure-related services.

15. In most instances, the law firms and other professionals who commence and prosecute foreclosure actions on behalf of mortgage servicers (the "Foreclosure Professionals") submit invoices to the mortgage servicer after the occurrence of critical events in

the foreclosure process which may include, but are not limited to, the filing of a foreclosure complaint, the completion of a foreclosure action, the reinstatement of a mortgage or a borrower's bankruptcy filing (each a "Critical Event"). For most foreclosure actions, the closing of a foreclosure sale will constitute the only Critical Event, and the Foreclosure Professional will submit one invoice. However, there may be multiple Critical Events in a particular foreclosure matter depending on the billing practices of the Foreclosure Professional and, therefore, multiple invoices for a particular matter or the events that occur once a matter is referred to a Foreclosure Professional (which may include, but are not limited to, a borrower filing bankruptcy, the reinstatement of a loan or the refinancing of a mortgage). Accordingly, each invoice submitted to the mortgage loan servicer covers the fees earned and the expenses advanced by the Foreclosure Professional for the time period before and up to the occurrence of the Critical Event, which could be several months worth of fees and expenses (this billing process being the "Industry Practice").[3]

16. Additionally, in the mortgage servicing industry, real estate brokers who deal in REO Property are guaranteed a minimum fee per transaction, which is necessary to ensure steady and orderly liquidation of REO Properties. The Brokers were typically entitled to collect at least the Minimum Broker Fee upon the successful consummation of a sale of REO Property, which was shared between the real estate brokers on both sides of the transaction.

17. The practice of guaranteeing a minimum fee to real estate brokers is a result of several factors that are independent of a real estate brokers' ability to market and sell REO Properties. The portfolio of REO Properties includes some properties that are located in

---

[3] AHM Servicing and its professionals have put in place controls to ensure that amounts contained on invoices (i) do not contain amounts incurred pre-petition, and (ii) do not contain amounts previously billed.

run-down or blighted areas. These properties are subject to, among other things, (i) municipal ordinances which allow municipalities to swiftly condemn properties that are vacant, and (ii) vandalism, including, among other things, the looting of the REO Properties to remove valuable copper pipe. Accordingly, these properties have been reduced to a value that is only a fraction of the unpaid loan balance. An expedited liquidation of these properties, rather than the rehabilitation or extensive marketing of the property, is in the best interest of the interested parties, including AHM Servicing, given these adverse effects on the properties' physical structure and sale value. Due to the relatively low sale price of these REO Properties and the difficulties incurred in selling such dilapidated properties, the Debtors determined, in their sound business judgment, that payment of the Minimum Broker Fee would provide Brokers the necessary incentive to efficiently liquidate these properties.[4]

### D.   The OCP Procedures

18.   On August 16, 2007, the Debtors filed a motion [D.I. 192] (the "OCP Motion") for an order authorizing, subject to certain limitations, the employment, compensation, and reimbursement of expenses of certain ordinary-course professionals ("OCPs"), including, but not limited to, Foreclosure Professionals and Brokers. The Committee filed a limited objection to the OCP Motion [D.I. 481], expressing concern that the proposed compensation procedures were "overly unrestrictive and could give rise to excessive waste and expenditure of tremendous sums of money where unnecessary or inappropriate and without adequate oversight." (Committee Objection ¶ 11.).

---

[4] To demonstrate the necessity of the minimum payment, if an REO Property was located in a blighted area and the best price for the property was only $5,000, AHM Servicing's real estate broker would be required to undertake marketing efforts for a commission of $150 (assuming the commission is split with the buyer's agent).

19.     The Court granted the OCP Motion by Order dated September 7, 2007 [D.I. 643] (the "OCP Order"), which established procedures (the "OCP Procedures") governing the retention, compensation, and reimbursement of expenses of the OCPs. The OCP Order represented a compromise between the Debtors and the Committee on key issues such as the amount of the caps on fees and expenses, and the extent of oversight by the Committee.

20.     The OCP Procedures permit the Debtors to retain OCPs without separate retention applications or orders, provided that each OCP files with the Court an affidavit of disinterestedness (a "Retention Affidavit") to ensure that the OCP may be employed under § 327 of the Bankruptcy Code. The Debtors are required to serve the Retention Affidavits on certain notice parties (the "Notice Parties"), who have 20 days to object to the proposed retention. In the absence of any objection, the Debtors are authorized to employ and compensate the OCPs in accordance with the terms of the OCP Order.

21.     The OCP Procedures permit the Debtors to make monthly payments for postpetition compensation and reimbursement of postpetition expenses to each OCP upon presentation by the OCP of a "reasonably detailed" invoice, subject to (i) a per-transaction cap for real estate brokers equal to the lower of 6% of the selling price up to a sale price of $3 million (commission on sales over $3 million must receive court approval); (ii) monthly and quarterly caps (either $35k/$75k or $75k/$185k) for non-broker OCPs; and (iii) the requirement that the Debtors provide copies of all OCP invoices to the Committee, which may dispute or object to the invoices within ten (10) days of receipt thereof, for the fees earned and the expenses advanced in a particular month. For Foreclosure Professionals, this often requires submission of multiple invoices prior to the occurrence of a Critical Event; a billing process wholly inconsistent with the Industry Practice and the Foreclosure Professionals' accounting systems.

22. If the Committee disputes or objects to an invoice, the Debtors may not pay the disputed amount absent agreement from the Committee or further order of this Court.

23. If the total postpetition compensation and reimbursement of postpetition expenses payable to any OCP exceeds the amount of the applicable cap(s), the OCP Procedures require the OCP to file a formal fee application in accordance with the Court's Order [D.I. 547] (the "Interim Compensation Order") establishing procedures for interim compensation and reimbursement of expenses of professionals (such procedures, the "Interim Compensation Procedures"), and the OCP is entitled to payment of fees and expenses in excess of the applicable cap only as provided by such procedures. Pursuant to the Interim Compensation Procedures, an OCP who filed a fee application could receive 80% of the fees requested after its fee application was approved by the Court. The remaining 20% of the OCP's fees could not be paid until after a quarterly fee application was filed and approved by the Court. For AHM Servicing to comply with these procedures and the Servicing Agreements, AHM employees must manually calculate the 20% holdback for each invoice identified within the monthly fee application on a per loan and per transaction basis. Such manual calculation creates an increased, and unnecessary, risk of clerical or mathematical error for payments of, and subsequent reimbursements for, such Servicing Advances.

24. Finally, the OCP Procedures require the Debtors to file and serve on the Notice Parties quarterly statements (i) certifying the Debtors' compliance with the terms of the OCP Order and (ii) naming, and stating the aggregate amount of compensation and expense reimbursement paid to, each OCP during the preceding quarter.

25. Following entry of the OCP Order, the Debtors determined that several OCPs would regularly exceed the applicable cap(s) in the OCP Procedures. The Debtors

9

obtained separate retention orders with respect to such OCPs (the "§ 327 Foreclosure Orders").[5] The OCP's subject to § 327 Foreclosure Orders are required to follow the Interim Compensation Procedures for each month.

### E.     The Debtors' Reimbursement Rights

26.     Prior to the Petition Date, Servicing Advances were timely made and seamlessly reimbursed from Liquidation Proceeds. AHM Servicing has realized that the bankruptcy filing and the imposition of the OCP Procedures and Interim Compensation Procedures, when applicable, have created a disruption of AHM Servicing's timely payment of its Foreclosure Professionals and this disruption could, at a minimum, delay AHM Servicing's recovery of such payments once they are made.

27.     The Servicing Agreements typically require AHM Servicing to remit Liquidation Proceeds to a custodial account (a "Collection Account") within a short time after liquidation of a mortgage loan. "Liquidation" of a mortgage loan occurs when AHM Servicing remits the cash value of the mortgage loan to the loan owner, which usually corresponds to the sale of the mortgaged property to a third party via a foreclosure sale or the closing of a sale of REO Property.

28.     With respect to a sale of REO Property, the Broker's commission is typically paid at the time of closing and, accordingly, is withheld from any Liquidation Proceeds received by AHM Servicing. AHM Servicing then deposits the Liquidation Proceeds into the appropriate Collection Account from which it is contractually permitted to "reimburse" itself for

---

[5] The firms retained under § 327 Foreclosure Orders are: Northwest Trustees [D.I. 713], Codilis & Associates, P.C. [D.I. 1593], Weinreb & Associates, PLLC [D.I. 1594], Adorno & Yoss, LLP [D.I. 1707], Samuel I. White, P.C. [D.I. 1709], Orlans Associates, P.C. [D.I. 1710], Law Office of Daniel C. Consuegra [D.I. 2169], and Weltman, Weinberg & Reis, LPA [D.I. 2170].

any Servicing Advances previously made with respect to the underlying mortgage loan (e.g., payments made to foreclosure attorneys) and unpaid servicing fees. AHM Servicing then remits the net Liquidating Proceeds to the loan owner.

29.  Funds on deposit in a Collection Account are remitted periodically (typically, monthly) to the owner of the underlying mortgage loans, after which point AHM Servicing must request reimbursement from the owner for any trailing expenses (i.e., Servicing Advances that were not reimbursed, or were not yet paid by AHM Servicing when the funds in the Collection Account were remitted to the owner of the mortgage loans) (the "Trailing Expenses").

30.  AHM Servicing has a right to reimbursement of Trailing Expenses from the owners of the mortgage loans (and reserves all rights, at law or in equity, to assert the same). However, given the delay and administrative costs associated with requesting and receiving such reimbursements, it is more efficient and cost-effective for AHM Servicing to avoid Trailing Expenses altogether by making and receiving reimbursement for all Servicing Advances related to a particular loan prior to remitting the Liquidation Proceeds of such loan.

31.  In the ordinary course of the Servicing Business, AHM Servicing has begun to liquidate REO Properties that were acquired via foreclosures occurring on or near the Petition Date. Due to the delays resulting from the compliance with the OCP Procedures and Interim Compensation Procedures, however, AHM Servicing has been unable to pay many Foreclosure Professionals for services performed and expenses incurred in connection with such foreclosures to date. If AHM Servicing is unable to make such payments prior to remitting the related Liquidation Proceeds to the owners of the loans, AHM Servicing may be left with Trailing Expenses for which they must seek reimbursement from the owners of the loans.

11

F.     **The Servicing Sale**

32.    By Order dated October 30, 2007, [D.I. 1711] (the "Sale Order") the Court authorized the sale of the Servicing Business (the "Servicing Sale") to AH Mortgage Acquisition Co., Inc. (the "Purchaser") pursuant to the terms of that certain Asset Purchase Agreement dated as of September 25, 2007 (as subsequently amended, the "APA").

33.    Under the APA, the Servicing Sale will close in two steps.[6] At the "economic" close, which occurred on November 16, 2007 (the "Initial Closing Date"), the Purchaser paid the Purchase Price (as defined in the APA) in the manner and to the parties in interest contemplated by the APA. From the Initial Closing Date until the "legal" close on the Final Closing Date (as defined in the APA), the Debtors will continue to operate the Servicing Business in the Ordinary Course of Business (as defined in the APA), subject to the Bankruptcy Exceptions (as defined in the APA), but for the economic benefit of the Purchaser. Following the Initial Closing Date, the Purchaser (i) bears all of the upside benefit and downside risk of the Servicing Business; and (ii) is responsible for providing the necessary working capital to fund the business.

## RELIEF REQUESTED[7]

34.    By this Motion, the Debtors request entry of an order modifying the OCP Order, the § 327 Foreclosure Orders and the Interim Compensation Order to authorize the

---

[6] Description of the APA in this Motion is by way of summary only. To the extent there is any discrepancy between such description and the actual terms of the APA, the latter are controlling.

[7] The relief requested herein is intended to facilitate the Debtors' payment of fees and reimbursement of expenses of their Foreclosure Professionals (which constitute Servicing Advances). The Court has already granted the Debtors' authorization to fund Servicing Advances in the ordinary course of business pursuant to the terms of the order approving the Debtors' cash management system [D.I. 66] and the order approving the Debtors' use and disposition of REO Property and the funding of Servicing Advances related thereto [D.I. 358]. The relief requested herein is consistent with that relief.

Debtors to pay Foreclosure Professionals for services performed and expenses incurred postpetition in accordance with the procedure set forth in Exhibit 1 attached to the Order (the "Modified Procedures")[8] and allowing the payment of the Minimum Broker Fee, *nunc pro tunc* to the Petition Date.

### A. The Modified Procedures

35. Solely with respect to Foreclosure Professionals, the Debtors propose modifications to the Interim Compensation Order, the OCP Order, and the § 327 Foreclosure Orders, as set forth below:

   a. *Interim Compensation Order.* The Foreclosure Professionals subject to the Interim Compensation Order shall receive a waiver from (i) the 20% holdback on attorneys fees, such that all fees and expenses which were not objected to during the 20-day objection period may be immediately paid, subject to disgorgement, and (ii) the requirement to wait until the 15th day of the following month to submit fee applications, such that any Foreclosure Professional required to file fee applications may file fee applications on the first day immediately following the month for which they are requesting fees.

   b. *OCP Order and the § 327 Foreclosure Orders.* The OCP Order and the § 327 Retention Orders are modified to allow each Foreclosure Professional to submit payment requests/invoices by foreclosure matter. The Foreclosure Professionals will not be required to submit requests for payment of fees and expenses based

---

[8] The Modified Procedures include the modifications requested herein and the previously approved procedures under the OCP Order, the § 327 Foreclosure Orders and the Interim Compensation Order (the "Existing Procedures"), to the extent not inconsistent. To avoid confusion, Exhibit 1 to the Order outlines the procedures to be followed by the Foreclosure Professionals and emphasizes the modifications to the Existing Procedures made by the Motion and the Order.

13

solely on the month in which they were incurred. Instead, the Foreclosure Professionals are permitted to submit invoices/fee statements based on Critical Events. Foreclosure Professionals will continue to submit invoices on a monthly basis, but the requests may be tied to the occurrence of a Critical Event during that month and not necessarily the month in which a fee or expense was incurred. Accordingly, an invoice submitted in a particular month may include fees and expenses incurred in one or more previous months. The monthly cap under the OCP Order will no longer be calculated based on when a particular fee or expenses was incurred; instead, the monthly cap will be calculated based on the invoices submitted for a particular month.[9] The Foreclosure Professionals must submit fee requests with sufficient detail to determine the date of incurrence of each fee and expense, shall not submit any request previously submitted for approval, and shall not be entitled to payment of pre-petition fees or expenses. Foreclosure Professional shall provide a summary indicating each invoice number, the amount of fees and expenses requested for each respective invoice and the total amount of fees and expenses for that month.

36. The Modified Procedures differ from the current practices under the OCP Order and the § 327 Foreclosure Orders and contemplate that the Foreclosure Professionals will provide invoices, at the loan level, based on Critical Events rather than disaggregating, at the loan level, each fee and expense on a monthly basis. This is important because it can take several months to reach Critical Events and piecemeal submission of fees and expenses requires

---

[9] Foreclosure Professionals subject to the OCP Order, who exceed the Monthly Cap, shall continue to file a fee application with the Court consistent with the terms of the Interim Compensation Order, as modified herein.

multiple reviews and data entries for each loan file and deprives the Debtors of the loan level snapshot of the fees and expenses incurred to reach the Critical Event. Accordingly, the Modified Procedures will provide all interested parties a better basis for evaluating the fees and expenses requested because it allows any reviewing party to see the costs incurred in arriving at a Critical Event. Additionally, the proposed revisions bring the current practices under the OCP Order and the § 327 Foreclosure Orders closer in line with the pre-petition billing practices between the Debtors and the Foreclosure Professionals and the Industry Practice.

37. Modifying the Interim Compensation Order to allow for accelerated filing of fee application and payment of 100% of fees and expenses upon approval of each fee application will eliminate potential burdens related to the reimbursement of Servicing Advances. The Debtors risk creating Trailing Expenses with respect to the Foreclosure Professionals subject to the Interim Compensation Order because these Foreclosure Professionals have 20% of their attorney's fees withheld during the Interim Period (as defined in the Interim Compensation Order). If a loan liquidates during the Interim Period, Trailing Expenses are created. As set forth above, this can require substantial time and effort on behalf of the Debtors and creates an unnecessary burden on the Debtors. Additionally, manually calculating the 20% may result in an increased risk of clerical or mathematical error for payments of, and subsequent reimbursements for, such Servicing Advances.

38. The relief requested herein is not intended to relieve the obligation of the Debtors and the Foreclosure Professionals (i) to submit the necessary retention papers under the OCP Order, or (ii) deprive the Court or the Committee, as appropriate, the opportunity to review the compensation and reimbursement requested by any Foreclosure Professional.

39.     Accordingly, the Debtors submit that the Modified Procedures will permit the necessary oversight of the Committee, the Court or any other interested party over the professional fee and expense process, while reducing the burden on the Debtors' estates.

### B.     The Minimum Broker's Fee

40.     In addition to the above modifications for Foreclosure Professionals, the Debtors request a modification of the per-transaction cap for the Brokers to provide for a guaranteed payment of the Minimum Broker Fee, *nunc pro tunc* to the Petition Date. The OCP Order provides that the Brokers are subject to a ceiling on fees of 6% of the purchase price; however, the corresponding floor on fees of $2,000 per transaction was inadvertently omitted from the OCP Order. The Minimum Broker Fee is customary in the mortgage servicing industry and is necessary to ensure steady and orderly liquidation of REO Properties. Accordingly, the Debtors request that the OCP Order be modified to allow for payment of the Minimum Broker Fee.[10]

### BASIS FOR RELIEF REQUESTED

41.     Section 105(a) of the Bankruptcy Code provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

42.     It is well settled that the Court's power under § 105(a) includes "the power to vacate or modify [the Court's] orders, as long as it is equitable to do so." In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 265 n.5 (3d Cir. 1991) (quoting Big Shanty Land Corp. v. Comer

---

[10] In approximately 10 cases, the Liquidation Proceeds were insufficient to pay the Minimum Broker Fee. However, AHM Servicing believes that it is appropriate and necessary to pay such minimum fees in such circumstances to ensure its ability to engage Brokers and to avoid the expense of maintaining burdensome property.

Properties, Inc., 61 B.R. 272, 282 (N.D. Ga. 1985)); see In re Argose, Inc., 372 B.R. 705, 708 (Bankr. D. Del. 2007) ("Under section 105(a), the Court may modify an order if it is equitable to do so."); In re Mariner Post-Acute Network, Inc., 257 B.R. 723 (Bankr. D. Del. 2000) (modifying prior order establishing procedures for compensation of professionals).

43. Similarly, Rule 60 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Bankruptcy Rule 9024, provides, in pertinent part, that "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for mistake, inadvertence, surprise or excusable neglect," Fed. R. Civ. P. 60(b)(1), or for "[any] reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

44. The Debtors submit that the granting the relief requested herein is within the equitable authority of the court under section 105(a) and that the requested relief is justified by the circumstances. Allowing the Foreclosure Professionals to follow the Modified Procedures will allow sufficient Court oversight on the Foreclosure Professionals, and the Foreclosure Professionals' fees remain subject to disgorgement. However, this relief will provide a substantive benefit to the Debtors by reducing the potential for Trailing Expenses and by expediting the payment of the Foreclosure Professionals' Invoices. Further, the Modified Procedures will lessen (i) the burden on the Debtors' employees and resources by significantly limiting the number of invoices that must be processed and the overall time expended reviewing each loan file; and (ii) the risk associated with manual calculation of the 20% holdback of fees relating to individual invoices..

45. Balancing the benefits of the Modified Procedures against the absence of harm if the Modified Procedures are implemented, the Debtors submit that the Court should grant the relief requested herein and allow the Debtors to implement the Modified Procedures.

46. The Debtor's also request that the Court modify the OCP Order to permit the Debtors to pay the Minimum Broker Fee. Granting this relief is appropriate under Fed. R. Civ. P. 60(b)(1) because excluding provision for the Minimum Broker Fee from the OCP Order was inadvertent. In addition, it would be unduly burdensome for the Debtors to file a fee application for each property sold where the OCP Order would require an application to the Court for approval of the payment of the Minimum Broker Fee. In light of the foregoing, modification to the OCP Order to allow for the Minimum Broker Fee is fair and equitable and should also be granted pursuant to Fed. R. Civ. P. 60(b)(6).

## **NOTICE**

47. Notice of this Motion will be provided to: (i) the Office of the UST; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A.; (iv) counsel to the Debtors' postpetition lender; (v) counsel to the Purchaser; (vi) the Securities and Exchange Commission; and (vii) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form of the Order attached hereto as <u>Exhibit A</u> and grant the Debtors such other and further relief as this Court may deem just and proper.

Dated:   Wilmington, Delaware
         February 7, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Ryan M. Bartley*

James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Margaret Whiteman (No. 4652)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession