UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                  .   Case No. 07-11047 (CSS)
                        .   Adv. Nos. 07-51684 (CSS),
                        .            07-51704 (CSS)
                        .
AMERICAN HOME MORTGAGE   .
HOLDINGS, INC., et al., .   824 North Market Street
                        .   Wilmington, Delaware 19801
                        .
                        .
         Debtors.       .   February 1, 2008
. . . . . . . . . . . . ..   11:28 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Young, Conaway, Stargatt & Taylor, LLP
                          By:  DONALD J. BOWMAN, JR., ESQ.
                               SEAN M. BEACH, ESQ.
                               SCOTT A. HOLT, ESQ.
                               MATTHEW B. LUNN, ESQ.
                               SHARON M. ZEIG, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, DE 19801

For Koch/WARN Act:        Margolis Edelstein
                          By:  JAMES E. HUGGETT, ESQ.
                               MEGHAN KELLY, ESQ.
                          750 S. Madison Street
                          Suite 102
                          Wilmington, DE 19801


Audio Operator:           Leslie Murin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont.):

For the Committee:          Hahn & Hessen, LLP
                           By:  MARK S. INDELICATO, ESQ.
                                MARK POWER, ESQ.
                           488 Madison Avenue, 14th & 15th Floor
                           New York, NY 10022


For Kathy Koch, et al.:    Gardner, Middlebrooks, Gibbons,
                             Kittrell & Olsen, P.C.
(via telephone)            By:  MARY OLSEN, ESQ.
                                MICHAEL VANCE McCRARY, ESQ.
                           1119 Government Street
                           Mobile, AL 36652


For the Committee:         Blank Rome LLP
                           By:  BONNIE FATELL, ESQ.
                           Chase Manhattan Centre
                           1201 Market Street
                           Suite 800
                           Wilmington, DE 19801


For Bank of America:       Kaye Scholer, LLP
                           By:   SCOTT D. TALMADGE, ESQ.
(via telephone)                  MARGOT SCHONHOLTZ, ESQ.
                                 425 Park Avenue
                           New York, NY 10022-3598


For Kathy Koch, et al.:    Outten & Golden LLP
                           By:  RENE ROUPINIAN, ESQ.
                           3 Park Avenue
                           29th Floor
                           New York, NY 10016


For the Trustee:           United States Department of Justice
                           Office of the United States Trustee
                           J. Caleb Boggs Federal Building
                           By:  JOSEPH J. McMAHON, JR., ESQ.
                           844 King Street, Suite 2207, Lkbox 35
                           Wilmington, DE 19801:


For Bank of America:       Potter, Anderson & Corroon, LLP
                           By:  LAURIE SILVERSTEIN, ESQ.
                           Hercules Plaza
                           1313 North Market Street, 6th Floor
                           Wilmington, DE 19801


**J&J COURT TRANSCRIBERS, INC.**

```
APPEARANCES (Cont.):

For the Committee:        Hahn & Hessen, LLP
                          By:  MARK S. INDELICATO, ESQ.
                          488 Madison Avenue, 14th & 15th Floor
                          New York, NY 10022


For the Trustee:          United States Department of Justice
                          Office of the United States Trustee
                          J. Caleb Boggs Federal Building
                          By:  JOSEPH J. McMAHON, JR., ESQ.
                          844 King Street, Suite 2207, Lkbox 35
                          Wilmington, DE 19801


For JPMorgan Chase:       Landis Rath & Cobb LLP
                          By:  MATTHEW McGUIRE, ESQ.
                          919 Market Street
                          Suite 600
                          Wilmington, DE 19899


For WLR Recovery Fund:    Greenberg Traurig, LLP
                          By:  VICTORIA W. COUNIHAN, ESQ.
                          The Nemours Building
                          1007 North Orange Street
                          Suite 1200
                          Wilmington, DE 19801


For Northwest Trustee     Connolly Bove Lodge & Hutz LLP
Services:                 By:  CHRISTINA M. THOMPSON, ESQ.
                          The Nemours Building
                          1007 North Orange Street
                          Wilmington, DE 19899-2207


For Wells Fargo Bank:     Wolf, Block, Schorr and
                             Solis-Cohen, LLP
                          By:  TODD C. SCHILTZ, ESQ.
                          Wilmington Trust Center
                          1100 North Market Street
                          Suite 1001
                          Wilmington, DE 19081

                          Bayard
                          By:  ERIC M. SUTTY, ESQ.
                          222 Delaware Avenue
                          Suite 900
                          Wilmington, DE 19899
```

# I N D E X

| | PAGE |
|---|---|
| **WITNESSES** | |
| ROBERT F. JOHNSON | |
| Direct Examination by Mr. Beach | 18 |

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| P-1 | Declarations | 99 | 99 |

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Please be seated.

2              MR. POWER:  Good morning, Your Honor.  Mark Power

3    from Hahn & Hessen and counsel to the -- co-counsel to the

4    Committee.  Your Honor, there is one item that's not on the

5    agenda, but we wanted to see if Your Honor would indulge us.

6    If Your Honor recalls, there was a cash collateral order

7    entered in the case with respect to Bank of America and the

8    syndicate lenders.

9              THE COURT:  Mm-mm.

10             MR. POWER:  There was a deadline for the Committee to

11   basically investigate the claims, liens, and security interests

12   of the banks, and we have done that, and there are a number of

13   potential claims that the Committee has identified that it is

14   seeking to preserve, but it doesn't believe it's appropriate to

15   file a complaint at this point since we're in negotiations to

16   secure parties.

17             So, the secured creditors and the Committee have

18   signed off on a stipulation which, in essence, the Committee

19   acknowledges that these claims that are being reserved are the

20   claims it's identified, and those are being preserved for

21   another 30 days -- I think 31 days for the Committee to file an

22   adversary if it's appropriate, and in the meantime the parties

23   will negotiate.  And then -- so, we're basically asking Your

24   Honor to extend an extension order of that provision which

25   simply preserves the claims that we've identified so that we

6

1  don't have to proceed with an adversary today.  And we ask Your

2  Honor to so order that -- the stipulation.

3            THE COURT:  Okay.

4            MR. POWER:  May I approach?

5            THE COURT:  Yes.  Does anyone else wish to be heard?

6  Mr. Talmadge, you want to tell me that you don't think there

7  are any claims, they're worth anything, but in a spirit of

8  accommodation you're glad to give 30 extra days and you fully

9  reserve your rights to oppose the complaint?

10            MR. TALMADGE:  That's exactly what I would like to

11  say, Your Honor.

12                        (Laughter)

13            THE COURT:  I thought so.  But, you still get a bill

14  for being here, so it's all right.  So, I've signed the

15  stipulation.

16            MR. POWER:  Thank you.

17            MR. LUNN:  Good morning, Your Honor.  Matthew Lunn

18  from Young Conaway on behalf of the debtors.  Referring to the

19  agenda now, Your Honor, Agenda Item Number 1 we're carrying

20  over to the February 14th hearing.  Agenda Item 2; we had

21  indicated that the parties are working to resolve the matter in

22  an attempt to submit a stipulation.  The parties are still

23  working through that stipulation, so what I'd like to do is

24  move this matter to the end of the hearing so that they can

25  work through some of the issues with respect to the provisions

1  of this stipulation.

2          THE COURT:  All right.

3          MR. LUNN:  Agenda Items, then, 3 through 9 are being

4  adjourned.  Agenda Items 10 and 11 were the subjects of

5  certificates of no objection, and the orders were entered, so

6  we appreciate that, Your Honor.  Agenda Items 12 through 29

7  were all Relief From Stay motions where the debtors filed

8  Reservations of Rights.  I did see that orders, likewise, were

9  entered for these items.

10          That, then, carries us to Agenda Item 30, Your Honor,

11  and this is the Motion for Administrative Claim filed by

12  Shoreham Viewridge, LLC.  They are a landlord to one of the

13  leases that the debtors rejected with a rejection effective

14  date as of August 31st, 2007.  The Admin Claim motion requested

15  an administrative claim in the amount of $10,687.14.  Debtors

16  and the landlord entered in negotiations.  We have agreed with

17  Shoreham to pay the stub rent portion and allow that claim, as

18  an administrative expense claim, with that amount being

19  $8,489.60.  Payment of that claim will be upon confirmation of

20  a plan or through the terms of a plan for HM Corp. which is the

21  lessor -- or lessee, excuse me, Your Honor.

22          The stipulation, obviously, further provides that all

23  parties rights with respect to the 502(b)(6) claim of Shoreham

24  are reserved, including the debtors' or the successors' rights

25  to object to that claim.  The stipulation was shared with

1 counsel for the Committee, and also counsel for the DIP

2 lenders.  There are no objections to the stipulation.  If I may

3 approach.  I have a form of order and the stipulation.

4          THE COURT:  Yes, you may.  Thank you.  Does anyone

5 wish to be heard in connection with this matter?  All right.

6 Hearing none, the Court will approve it.

7          MR. LUNN:  Thank you, Your Honor.

8          THE COURT:  As agreed.

9          MR. LUNN:  Agenda Item 31, Your Honor, is the

10 quarterly fee application of Northwest Trustee Services, and I

11 will see the podium for counsel for Northwest Trustee.

12          THE COURT:  Yes.  Hello.

13          MS. THOMPSON:  Hello.  Good afternoon, Your Honor.

14 Christina Thompson of Connolly, Bove, Lodge, & Hutz appearing

15 today on behalf of Northwest Trustee Services, Inc.  Your

16 Honor, we're here today on the quarterly fee application of

17 Northwest Trustee Services, Inc., and also in addition, the

18 monthly fee application that was filed for the month of

19 November.

20          Your Honor, these were filed, and limited objections

21 were filed by the debtors and the creditors committee as well

22 as, I understand, what was a basics Reservation of Rights by AH

23 Mortgage Acquisition Company, Inc.  Your Honor, what we've done

24 is, in the -- we've reached an interim resolution that

25 basically provides for the allowance and payment of the

1  undisputed fees and costs at issue in this case.  And the

2  parties have agreed that we are going to adjourn hearing with

3  respect to the disputed issues which really center around

4  specific foreclosure costs until the next quarterly fee

5  hearing.

6          So, what I have today, and I believe all of the

7  parties with a brief interlineation of a Reservation of Rights

8  which I believe Mr. Beach is going to place on the record, we

9  have agreed to a proposed form of order that basically outlines

10  all of that and sets forth the amount that is not in dispute

11  that will be paid, and the order provides that payment would be

12  made within 20 days from entry of the order, or as reasonably

13  practicable thereafter.

14          THE COURT:  Okay.  Let me see what we have.

15          MS. THOMPSON:  If Your Honor would like, I know that

16  somebody's going to be putting a Reservation of Rights.  I have

17  that interlineated on the order.  I will present it to Your

18  Honor.  If you'd like to enter this order or if you'd like me

19  to submit a clean copy under certification of counsel, I can do

20  that also.

21          THE COURT:  Well, let me see what you have and then

22  everybody can put what they want on the record.  Thank you.

23          MR. BEACH:  Good morning, Your Honor.  May it please

24  the Court.  Sean Beach from Young Conaway on behalf of the

25  debtors.  Your Honor, the interlineation, as well as the

1  Reservation of Rights, relates to the issue that was briefly

2  discussed at the January 14th hearing with respect to whether

3  or not -- well, that, first of all, AH Acquisition was

4  consenting to allowing the payment of the foreclosure

5  professional fees to be made out of the working capital of AHM

6  Servicing, but AH Acquisition, the Committee, and the debtors

7  were all reserving their rights with respect to the ultimate

8  responsibility for that payment and whether there'll have to be

9  some kind of reconciliation or whether AH Acquisition would

10 file some kind of claim for reimbursement of those amounts.

11         MR. INDELICATO:  Your Honor, Mark Indelicato from

12 Hahn & Hessen.  Just reiterating what Mr. Beach said.  In fact,

13 it was not a short colloquy, it was a rather lengthy discussion

14 among -- before the Court on July 14th in which all parties set

15 forth their positions by inter delineating those -- that

16 Reservation of Rights.

17         What we intended to do was incorporate all of the

18 comments that were made by the various party regarding the

19 Reservation of Rights as to who ultimately might be responsible

20 for the payment, and -- but authorizing the payment to

21 Northwest.  So, with that, the Committee was comfortable with

22 letting the payment go forward and the order being entered.

23         THE COURT:  All right.  Thank you.  Ms. Counihan.

24         MS. COUNIHAN:  Victoria Counihan, Your Honor, from

25 Greenberg Traurig on behalf of AH Mortgage Acquisition.  The

1 interlineation that essentially transfers the issues from --

2 that we discussed at the last hearing and deals with them in

3 this order is fine with AH Mortgage Acquisition, as well.

4          THE COURT:  Okay.  What's the disputed amount, Ms.

5 Thompson?

6          MS. THOMPSON:  The disputed amount -- and that's set

7 forth a little bit more clearly on Exhibit A where everything

8 is broken out -- that shows what the total disputed amount is,

9 and essentially it's -- there's a dispute between the party,

10 whether or not certain foreclosure costs are pre-petition or

11 post-petition.  And those are the issues that we've carved out

12 from the expenses that are being approved today, and they will

13 be taken up at the next quarterly fee hearing.

14          THE COURT:  All right.  So, it's not fees, it's

15 costs?

16          MS. THOMPSON:  Correct.  There was no dispute as to

17 the fees.  What this order approves is 100 percent of the fees

18 from the first quarterly application and 80 percent of the fees

19 from the November monthly.

20          THE COURT:  What are the costs in general; filing

21 fees, service fees, shares fees, et cetera?

22          MS. THOMPSON:  Correct.  They're all of the costs

23 associated with foreclosure actions, Your Honor.

24          THE COURT:  Well, this is -- and we've gone through

25 this a little bit before.  I'll approve the order.  The

**J&J COURT TRANSCRIBERS, INC.**

1  application is not generally in the form and substance that a

2  professional fee application would be under the local rules in

3  connection with providing certification and compliance with the

4  local rules, local forms, et cetera.  But, this kind of an

5  outfit is, obviously, a specialty firm and makes its money by

6  standardizing as much as possible working on a straight line

7  basis, and I understand the business reality of this type of

8  practice.  I had some experience in -- at least tangentially --

9  in my time before I took the bench in connection with it.

10         So, notwithstanding some issues, I'm willing to

11  approve it, especially since, obviously, the parties involved

12  in the case are keeping a sharp eye on the matter.  So, I'll

13  approve it with the interlineation and Reservation of Rights.

14         MS. THOMPSON:  Thank you, Your Honor.  Just to point

15  out, Northwest Trustee is fine with the Reservation of Rights

16  as we understand, and it's really just a matter to be worked

17  out as to where the money comes from rather than getting our

18  actual payment made.

19         THE COURT:  I understand.

20         MS. THOMPSON:  Thank you, Your Honor.

21         MR. BEACH:  Your Honor, Sean Beach, for the record.

22  Just one comment with respect to your comment regarding these

23  fee applications.  I just wanted to point out that with respect

24  to the retention applications for these professionals to the

25  extent they weren't included as ordinary course professionals,

1 we did ask for waivers of the local rules, as well.

2         THE COURT:  Okay.  Thank you.

3         MR. BEACH:  Your Honor --

4         THE COURT:  It's always good to remind me of the

5 obvious, which maybe I don't always remember.

6         MR. BEACH:  There are quite a few of these

7 applications, so I can see why not, Your Honor.  Your Honor,

8 that brings us to Item Number 32 on the agenda which is the

9 debtors' motion for -- to approve sale procedures and an

10 expense reimbursement in scheduling a hearing for the sale in

11 connection with the sale of certain non-performing loans in the

12 debtors' portfolio.

13         Your Honor, this motion was originally filed on

14 December 22nd, 2007 with an objection deadline of January 7th.

15 Based on discussions with JPMorgan, Bank of America, and the

16 Committee, we determined to make some changes to the procedures

17 and -- and actually, with the U.S. Trustee, as well -- make

18 some changes to the procedures and then to file a modified

19 version of the procedures.

20         We didn't file a blackline of those modified

21 procedures because it -- while there was one main change to it,

22 and that was to eliminate the auction process and use a final

23 sealed bid process which I'll discuss in a moment, the

24 changes -- a blackline wouldn't have been worthwhile because of

25 shifting around certain things in the procedures.  And then we

1 set a new objection deadline of January 29th.  Objections were

2 received by Bank of America, the United States Trustee, as well

3 as --

(Technical difficulties)

5          THE COURT:  Whoever -- Court Call, can you disconnect

6 that line, please?  Hello?  Is the Court Call operator on the

7 line?  Is anyone on the line?  Oh, so everything's off?  Oh,

8 well.  Okay.  Never mind.  Go ahead.

9          MR. BEACH:  Thank you, Your Honor.  As well as

10 objections from Paula Rush and Laura Beall.  Your Honor, I'm

11 pleased to report that with respect to the objection of the

12 United States Trustee we were able to resolve that pending

13 certain testimony that the U.S. Trustee requested in connection

14 with the expense reimbursement portion of the procedures.  And

15 with respect to Ms. Beall and Ms. Rush, Your Honor, they've

16 been advised that their loans are not included in the portfolio

17 of loans to be sold under this sale, and so I do believe that

18 those objections are moot, but I'm sure we'll hear from them.

19 Your Honor, with respect to the loans in the portfolio to be

20 sold here, there's about 424 delinquent first lien whole loans

21 --

22          THE COURT:  How many?

23          MR. BEACH:  Four hundred and twenty-four, with a

24 total unpaid principle balance of approximately 152 million.

25 And that's broken down with -- in three pools of loans, the

1  first of which is 71 non-performing loans with aggregate UPP of

2  approximately 23 million, and those are -- and the DIP lender

3  has a lien on those -- that pool of loans, and then the next

4  pool is 46 non-performing loans with an aggregate UPP of

5  approximately 14 million, of which Bank of America has a lien

6  with respect to that pool of loans.  And then the final and

7  largest pool is a pool of 307 non-performing loans with an

8  aggregate unpaid principle balance of approximately 115

9  million, where JPMorgan has a lien with respect to those --

10 that pool of loans.

11      Your Honor, these -- Mr. Robert Johnson is here to

12 testify today, but I'll briefly run through some of the

13 components of these procedures.  In particular, the debtors

14 have already established a due diligence room by using an

15 IntraLinks website that is already in place, and that will be

16 in place up until the bid deadline of February 26th.

17      The bid process is working as a final bid process in

18 lieu of an auction, Your Honor.  This is very similar to the

19 procedures that Your Honor approved in the Delta Financial case

20 recently.  And it contemplates an indicative bid deadline of

21 February 8th, and a final bid deadline where all final bids are

22 due, and that is -- and those bids are going to be binding --

23 unconditional bids -- where the parties will need to submit

24 binding asset purchase agreements at the same time.

25      Your Honor, with respect to the indicative bids, the

1  debtors believe that that will assist to get parties into the

2  process.  It'll assist the debtors in determining which parties

3  will be entitled to expense reimbursements, assuming that

4  portion of the procedures is approved, and it will also provide

5  the ability to set, essentially, a soft floor with respect to

6  the bids because we're going to post the highest indicative bid

7  on the IntraLinks website.  Not the bidder, but the highest

8  indicative bid for any potential bidders to review in

9  connection with the sale.

10        And with respect to the disclosure of the successful

11  bidder, Your Honor, we will be filing -- notifying those

12  successful bidders and the second best bidders, and filing with

13  the Court a notice of who the winning bidder is and what the

14  winning bid is on February 27th, the day after the bid

15  deadline.  And we're requesting a hearing on February 28th from

16  Your Honor.

17        Your Honor, we also reserve the right to select a

18  stalking horse, and the secured lenders have the ability to

19  consent to any stalking horse that we pick with respect to

20  their pool of loans, and we'll seek separate applications to

21  the Court to the extent that we do seek -- have a stalking

22  horse in place.

23        In addition, Your Honor, the bid procedures provide

24  for certain consent rights with respect to the secured lenders

25  and consultation rights for the secured lenders and the

**J&J COURT TRANSCRIBERS, INC.**

1  Committee.  In particular, the consent rights with respect to

2  the secured lenders run to the choosing of a stalking horse, as

3  well as approval of the expense reimbursements.  And the

4  Committee has consultation rights throughout the procedures.

5       Your Honor, lastly, and as a critical component of

6  these procedures, is the expense reimbursement.  And the way

7  that the debtors intend to choose the parties entitled to an

8  expense reimbursement is, by pool of loans, the debtors are

9  asking for authority to provide an expense reimbursement for up

10 to three bidders for each pool of loans.

11      The expense reimbursement is essentially capped in

12 three respects.  It's capped because we're only paying up to

13 $150 per loan in that pool as an expense reimbursement.  The

14 aggregate cap for all expense reimbursements is $200,000, and

15 the expense reimbursement cannot be more than one percent of

16 the final bid of that qualified indicative bidder.  In fact, we

17 think it'll be well below one percent, probably closer to

18 one-third of one percent of the final bid submitted by that

19 indicative bidder.

20      In addition, Your Honor, there are other protections.

21 The expense reimbursement will not be paid to JPMorgan or to

22 Bank of America in connection with their particular pools of

23 loans to the extent that they seek to bid on those pool of

24 loans.  And the expense reimbursement is payable only if a

25 qualified indicative bidder submits a qualified final bid.

1          If the qualified final bid submitted is lower than

2    the indicative bid, then the party has to provide a reasonable

3    justification, at which time the secured lender and the

4    Committee -- well, the secured lender has consent rights with

5    respect to that, and the Committee has consultation rights with

6    respect to whether or not a reasonable justification was

7    provided.  And then finally, the qualified indicative bidder,

8    if they're the successful bidder, they're not entitled to the

9    expense reimbursement.

10          All of -- any expense reimbursement payable will be

11   paid solely out of the proceeds for any one of these sales so

12   that the debtors are not coming out of pocket with respect to

13   the payment of these expense reimbursements.  Unless Your Honor

14   has questions for me, what I'd like to do now is call Mr.

15   Johnson to the stand.

16          THE CLERK:  Good afternoon.  Please state your full

17   name and spell your last name for the record.

18          MR. JOHNSON:  Robert F. Johnson, Jr., J-o-h-n-s-o-n.

19            ROBERT F. JOHNSON, JR., WITNESS, SWORN

20          THE CLERK:  Thank you.  You may be seated.

21                      DIRECT EXAMINATION

22   BY MR. BEACH:

23   Q    Good morning, Mr. Johnson.  By whom are you currently

24   employed?

25   A    American Home Mortgage Corp.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And what's your position with American Home?

2  A    Executive Vice President of Capital Markets.

3  Q    Can you please describe briefly your responsibilities

4  within American Home?

5  A    Sure.  Prior to bankruptcy I was responsible for the

6  secondary marketing department, post-closing, and also

7  transaction management.

8  Q    And how long have you worked for American Home?

9  A    Almost seven years.

10 Q    And what is your other relevant employment history in this

11 industry?

12 A    Prior to American Home I worked for ComNet Mortgage

13 Services outside of Philadelphia for about seven years.

14 Q    Are you familiar with the loan sales procedures at issue

15 today?

16 A    Yes, I am.

17 Q    And were you part of developing those procedures?

18 A    Yes, I was.

19 Q    Generally, what are non-performing loans?

20 A    Non-performing loans, especially in this case, are loans

21 that are more than two payments down, meaning the borrower has

22 missed two of their regularly scheduled payments and, you know,

23 is still delinquent.

24 Q    The procedures contemplate a final sealed bid process.

25 Please describe that process.

1 A    The final seal bid process would be where on February 26th

2 when the final bids are due, the potential bidders, or the

3 bidders at that point, I guess, would submit final bids to the

4 debtor along with the signed Asset Purchase Agreement.  Those

5 bids would be binding at that point and we would select from

6 all of the final bids who would be the successful bidder, and

7 the second successful bidder -- the second best bid, I guess.

8 And at that point we would be able to choose who we were going

9 to award that to.  So, if -- the final bid meaning that there's

10 not really an auction process.  They send in a bid and that's

11 it.  It's their -- they get one shot at it.

12 Q    Okay.  And did you consider an auction process here?

13 A    Yes, we did.

14 Q    Why do you believe that the -- do you believe that the

15 sealed bid process is -- will yield a better value for these

16 assets?

17 A    Yes, I do believe that it will produce a higher value.

18 Q    And why is that?

19 A    The reason being is that since these loans are

20 non-performing, the likelihood that the bids are separated by

21 large amounts of price -- the best way I can say that, I

22 guess -- that it won't be within a couple basis points between

23 the bids as you might with a performing loan sale in a

24 normalized process.

25            There's going to be a lot of disagreement between the

1 bidders as to what they think the loans are worth, so the

2 likelihood is, you're going to have a wide spread between

3 multiple bidders, and in an auction process where you can come

4 in and kind of lay low and then increase your bid only in small

5 increments until you can get other folks to drop out, we may

6 miss the opportunity for someone who's willing to pay more.

7 And in a sealed bid process, if they really want to buy the

8 loans, they get one shot.  They put their best foot forward and

9 that's it.

10 Q    Are you familiar with the bid deadlines under the

11 procedures?

12 A    Yes, I am.

13 Q    What is the purpose of the indicative bid?

14 A    The indicative bid deadline of February 8th is, in my

15 mind, for two reasons; one is to kind of set our expectations

16 and the bidders' expectations of where this kind of price talk

17 is -- indicative price of -- that's what it's called -- and

18 it's also for us to determine who, if anyone, would be eligible

19 for expense reimbursement for due diligence costs.

20 Q    Will the debtors disclose the highest indicative bid, if

21 any?

22 A    Yes, we would.  We would post that on the IntraLinks

23 website.  Not the bidder, but just the highest bid.

24 Q    I'd like to move to the expense reimbursement.  The

25 procedures contemplate an expense reimbursement.  Can you

1  explain the mechanics of how that expense reimbursement works?

2  A    Sure.  When we get all the indicative bids on February

3  8th, we have one business day to determine any parties that you

4  want to offer expense reimbursement to, and that would be two

5  or three different parties per pool of loans.  There's three

6  pools of loans, so there could, I guess, technically be up to

7  nine different counter parties that would be offered expense

8  reimbursement.

9        But, we would decide, based upon their indicative

10  bid, who we felt was the best indicative bid and potentially

11  offer them the expense reimbursement of the 150 bucks per loan

12  to go then and do their due diligence to firm up their price

13  and give them comfort that what they are bidding on is -- or

14  what they think they're bidding on is what they're really

15  bidding on.

16  Q    In your opinion, is the expense reimbursement necessary

17  and beneficial to this sale process?

18  A    Yes, it is.  The -- as I said before, these loans are

19  non-performing, so the value of the loans is really more linked

20  to the value of the underlying collateral.  The real estate,

21  then, it would be in a performing loan sale.  So, whoever is

22  buying the loans is going to make extra sure that the value of

23  the real estate is what they think it is.  And the only way to

24  do that is to go spend money to find out what the value of the

25  properties are today versus what they were when we originally

1 appraised the property some, you know, 6, 8, 12 months ago when

2 we originated the loans, or even longer in some cases.

3 Q    And from what sources of funds can the expense

4 reimbursement be paid?

5 A    Either from the proceeds, or if a credit bidder, being one

6 of the secured lenders, it would be out of their pocket.

7 Q    Are there any caps on the expense reimbursement?

8 A    There are.  The caps are -- it's 150 bucks per loan, or

9 the maximum of $200,000 for the whole -- all three pools, or

10 one percent of the gross proceeds.

11 Q    As a result of this -- the caps, what percentage of the

12 anticipated sale price do you believe the expense reimbursement

13 will make up?

14 A    It should be, you know, give or take, around a third of

15 one percent.

16 Q    Can JPMorgan or Bank of America's secured lenders qualify

17 for the expense reimbursement with respect to the bids on their

18 pools of loans?

19 A    No, they cannot.

20 Q    Is the expense reimbursement payable to a qualified

21 indicative bidder that does not submit a qualified final bid?

22 A    No, it is not.

23 Q    Is it payable if the final bid is lower than the

24 indicative bid?

25 A    It would be only if proper justification is given for the

1 reduction of the bid, such as when they do their due diligence,

2 they find that instead of the -- to make up numbers, if the

3 gross value of the properties isn't $2 million, it's $180

4 million, they might reduce their bid accordingly.

5 Q    And is it payable to a qualified indicative bidder that

6 becomes a successful bidder?

7 A    No, it's not.

8 Q    Will the qualified indicative bidder be permitted to

9 credit bid the expense reimbursement?

10 A    No, they will not.

11 Q    In your opinion, will the expense reimbursement enhance

12 the value of the sale of these non-performing loans?

13 A    Yes, I believe it would.

14 Q    Will this enhanced value exceed the cost of the expense

15 reimbursement?

16 A    Yes, I believe that it would.

17 Q    Mr. Johnson, with respect to the objections to the sale

18 procedures filed by Paula Rush and Laura Beall, are you

19 familiar with those?

20 A    Generally.

21 Q    Is Ms. Beall's loan included in this sale?

22 A    No, it is not.

23 Q    Is Ms. Rush's loan included in this sale?

24 A    No, it is not.

25 Q    As a whole, do you believe the procedures to be structured

1  to maximize the value of the sale of these non-performing

2  loans?

3  A    Yes, I do.

4          MR. BEACH:  No further questions, Your Honor.

5          THE COURT:  Do you have to submit an indicative bid

6  in order to qualify to submit a final bid?

7          THE WITNESS:  No, you don't.

8          THE COURT:  Any cross examination of the witness?

9          MR. POWER:  Nothing from the Committee, Your Honor.

10          THE COURT:  All right.  Hearing none, you may step

11  down.

12          THE WITNESS:  Thank you.

13          MR. BEACH:  Your Honor, I believe that brings us to

14  the objections.  With respect to the objection of the United

15  States Trustee, I believe the testimony should satisfy the U.S.

16  Trustee with respect to its concerns on the expense

17  reimbursement, but to the extent the U.S. Trustee wants to put

18  anything else on the record.

19          THE COURT:  Mr. McMahon?

20          MR. McMAHON:  Your Honor, good morning.

21          THE COURT:  Good morning.

22          MR. McMAHON:  Joseph McMahon for the United States

23  Trustee.  Three very quick points.  We filed an objection on

24  two grounds, first with respect to notice.  The continuation

25  from the last omnibus hearing to today combined with the

1 re-notice of the revised procedures providing for the sealed

2 bid process resolved our concern in that regard.

3       Second, with respect to the expense reimbursement,

4 the key concern that we had, Your Honor, was whether after an

5 expense reimbursement was awarded to a successful indicative

6 bidder, whether that bid would be communicated to other

7 potential bidders such that the process would benefit from the

8 awarding of the expense reimbursement.  And Mr. Beach has not

9 handed up the form of order, but specifically at Paragraph 9 of

10 the proposed form of order, it indicates that the highest

11 indicative bid is going to be post on the debtors' IntraLinks

12 website on February 11th which is a quality more than two weeks

13 before the final bid is due.  And, therefore, I believe our

14 interest -- our objection on that point, excuse me, has been

15 resolved.

16       The third point I want to make, Your Honor, is in

17 response to, I guess, an assertion by some of my co-objectors

18 with respect to insertion of 363(o).  And in Paragraph 19 of

19 Ms. Rush's objection, she asserts that the 363(o) language was

20 not included in the Broadhollow and Melville loan sales.

21       A couple of points about that, Your Honor.  As you

22 may recall, the Broadhollow and Melville issues involved the

23 sale of non-estate property.  There was no sale order submitted

24 in connection with those matters.  The reason why it became

25 before this Court was because the debtors were requesting the

1  award of bid protections to be paid from the debtors' estates

2  in accordance with Section 503(b).  Therefore, we didn't get to

3  that issue and, therefore, I think that the Court nor the U.S.

4  Trustee or other parties can make an oversight in that regard.

5          With respect to the 363(o) issue in this case, Your

6  Honor, while we typically require it in the sale order,

7  debtors' counsel has inserted it into the bid procedures orders

8  as well to alleviate any concern.  Thank you, Your Honor.

9  That's all we have unless you have any questions.

10          THE COURT:  No, I do not.  Thank you.

11          MR. BEACH:  Your Honor, the next objection is the

12  objection by Bank of America's administrative agent in

13  connection with its liens on one pool of these loans.  Bank of

14  America objects to the extent that they were given only

15  consultation rights and not consent rights in the procedures.

16          Your Honor, the debtors own these loans and have a

17  fiduciary duty to maximize the value of these loans.  Bank of

18  America does have a lien on these pool of loans, and the

19  debtors have afford them significant rights in these sale

20  procedures; consent rights with respect to the expense

21  reimbursement, a consent right with respect to any stalking

22  horse that the debtors may wish to sign up, and consultation

23  rights with respect to all of the other major portions of these

24  procedures.

25          Nevertheless, Bank of America is seeking more than

**J&J COURT TRANSCRIBERS, INC.**

1  that from the debtors.  They're seeking -- they want,

2  essentially, carte blanche consent rights with respect to these

3  procedures which, frankly, is akin to giving them relief from

4  the stay to take control of this whole process.  The debtors

5  have to maintain control of this process.  We believe that we

6  have included them in the process, and we'll continue to

7  include them in the process going forward.  In fact, we're

8  required to consult with them, if not, give them consent rights

9  in every major thing with these procedures.

10      Since Bank of America will be fully engaged in this

11 process by virtue of their consultation rights and the fact

12 that the debtors have continued to keep them informed

13 throughout this process, we don't believe that they need more

14 than that.  If Bank of America wants more, they'll have the

15 opportunity to challenge the debtors judgment with respect to,

16 you know, their judgment as to what the highest bidder is.

17      If we get a bid in that's, you know, two cents on one

18 pool of loans and the debtors choose not to go forward with

19 that sale and Bank of America wants us to go forward with that

20 sale, they'll have the opportunity to bring that before Your

21 Honor or to seek stay relief in order to get those loans back

22 and make the sale on their own.

23      THE COURT:  Are the bidders required to bid for

24 the -- for instance, I know there were the three categories.

25 Are they required to bid for, you know, all the DIP lender, all

**J&J COURT TRANSCRIBERS, INC.**

1 83 loans, or can they cherry pick, say I only want these 52 or

2 these 13 or this 1.

3        MR. BEACH:  It's contemplated that they'll bid on the

4 whole pool of loans and we expect those are the types of bids

5 we get, Your Honor, where the whole pool --

6        THE COURT:  All three categories?

7        MR. BEACH:  On any one whole pool, or all three

8 pools.

9        THE COURT:  So, there are three sub-pools, if you

10 will.  All right.

11        MR. BEACH:  Your Honor, I don't know that this issue

12 is expressly dealt with as to whether or not a party wants to

13 bid on 15 loans and a pool, but I suppose that we would

14 consider those bids, but I imagine, Your Honor, it would be

15 difficult to qualify that as the highest bid if we have other

16 bids on the pool in the aggregate, but I, you know, that's

17 something that we can consider.

18        THE COURT:  All right.

19        MR. BEACH:  So, Your Honor, we believe that Bank of

20 America has plenty of rights with respect to these procedures

21 and to make sure that the collateral's dealt with in an

22 appropriate way.  But, the debtors do have their obligations to

23 maximize the value, and Bank of America has its rights to come

24 to the Court if they have any concerns about the debtors

25 judgments since they'll be informed throughout the process.

1  And, Your Honor, I would ask that you overrule the objection of

2  Bank of America.

3          THE COURT:  Bank of America can credit bid?  Is that

4  right?

5          MR. BEACH:  Bank of America can credit bid.

6          THE COURT:  But, they can't get paid the expense

7  reimbursement.

8          MR. BEACH:  That's right, Your Honor.  And if they do

9  credit bid, they lose all consent and consultation rights --

10         THE COURT:  Right, because then they're a bidder.

11         MR. BEACH:  -- with respect to that pool of loans.

12         THE COURT:  Right, because they're a bidder.  Okay.

13 Mr. Talmadge?

14         MR. TALMADGE:  I think I can now say good afternoon,

15 Your Honor.

16         THE COURT:  Yes.

17         MR. TALMADGE:  Scott Talmadge from Kaye Scholer for

18 Bank of America who's the administrative agent for a group of

19 21 pre-petition secured lenders.  As Your Honor now well knows,

20 we filed a limited objection to the sale procedures.  And

21 really the gist of what we're trying to do here, Your Honor, is

22 to protect our rights as a secured creditor in the context of a

23 case where all of the assets are being liquidated.  And we are

24 particularly, obviously, interested in the assets that we have

25 a security interest in.

1              And what we're concerned about, Your Honor, is the

2    debtors' unilateral ability to go ahead and change the sale

3    procedures after Your Honor has approved them here today in

4    court, to go ahead and pull assets from the sale process and,

5    obviously, particularly our assets from the sale process.  When

6    I say our assets, obviously, Your Honor, I mean the assets in

7    which the bank has a -- or the administrative agent has a

8    security interest for the benefit of the pre-petition secured

9    lenders -- deciding after they get their sealed bids to go

10   ahead and not sell the assets and/or deciding to pick one

11   highest bid because they've decided that's the highest bid over

12   another highest bid without our consent.

13             And what I want to be very clear about here is, we're

14   not looking for a veto right.  We're not looking for carte

15   blanche here.  What we're looking for is that if the debtors

16   come to us and say we want to change the sale procedures and we

17   don't agree with them, that they need to come back to Your

18   Honor and explain to Your Honor why what you've approved today

19   needs to be modified or changed, or if they want to pull our

20   assets after we embark down this road of getting these sale

21   procedures approved and selling the assets in accordance with

22   these sale procedures they want to pull those assets.  Or if

23   they get -- after they get the bids in, that they decide

24   they're not high enough, that at least we come to Your Honor

25   and Your Honor gets to decide whether or not the debtor is

**J&J COURT TRANSCRIBERS, INC.**

1  right or we're right as to whether or not either the assets

2  should be pulled or whether or not the bid that ultimately is

3  the highest bid which, for whatever reason the debtors decide

4  isn't the "highest bid" or the best bid for the assets.  So --

5          THE COURT:  Wait a minute.  Wait a minute.

6          MR. TALMADGE:  Sure.

7          THE COURT:  You want the ability for me to tell them

8  to sell something that they've decided they don't want to sell?

9          MR. TALMADGE:  Well --

10         THE COURT:  If that's what you want, you need a

11 trustee.

12         MR. TALMADGE:  No, no, no.

13         THE COURT:  That's not what I do.

14         MR. TALMADGE:  No, but -- I'm sorry, Your Honor.  I

15 don't mean to interrupt.

16         THE COURT:  No, no, that's --

17         MR. TALMADGE:  We're not asking you that.  We're

18 asking you that if the debtors who have now decided to sell the

19 assets change their minds after we've consented to this process

20 of selling the assets and we don't agree with them.  They need

21 to come back to the Court to explain why they're pulling the

22 assets.  They need to give a reason for it.

23         THE COURT:  Why?  Why?  Because they are a fiduciary

24 to the estate.  They're a debtor in possession.

25         MR. TALMADGE:  Right.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  They'd get to decide what they do with
2    their assets.  If they want to sell or use those assets outside
3    the ordinary course of business, then they come to me, and I
4    have to approve it.  But, what you want me to do is say all
5    right, you've committed to a process where you've going to
6    sell, and if you change your mind and you exercise your
7    fiduciary duty, you have to come back to the Court and get
8    permission not to sell something.  That seems a little
9    backwards to me.

10          MR. TALMADGE:  It's only in the context where we've
11   embarked on the process.  They go to the secured creditor and
12   say here's why we won't want to sell your assets now.  We've
13   changed our mind.  Weeks have gone by, months have gone by in
14   this process and now we've changed our mind and we say wait a
15   second.  Let the process work its way out with a secured
16   creditor.  These are assets that we're going to get the
17   recovery on as the secured creditor, whatever funds that come
18   in.

19          And all we're saying, Judge, is, if there's a dispute
20   between us, now that you've approved, presumably, the sale
21   procedures, at least let us come state our respective cases to
22   Your Honor as to why they should either continue with the
23   process or not continue with the process or, Your Honor, if
24   they get a bid.  And I don't want to put a dollar amount on --
25   I don't want to say what it is and -- it's a bid from a third

1  party and the debtors decide not to go forward with that bid.

2         We don't get the opportunity, then, to come before

3  Your Honor because they just stop the auction process.  There

4  is no opportunity for Bank of America as the secured creditor

5  to say hey, Judge, guess what?  You should accept this bid and

6  here's the reasons why, and the debtor will present its reasons

7  why you shouldn't accept the bid, and Your Honor will decide

8  whether or not -- whatever the burdens are in that respective

9  hearing, whether it's the right thing to do or the wrong thing

10 to do.

11        All we're saying is, at the very least the debtors

12 should be required to come back to the Court.  And Your Honor

13 may say at that time I agree with the debtors, but that's, at

14 least, the opportunity that we want to have here as opposed to

15 we have no opportunity.  We go by -- weeks go by.  We let the

16 process go, and then, for whatever reason, we have this

17 dispute.

18        And the reason why, again, I think that consultation

19 rights don't really have any real meaning or teeth to it.  And

20 I can give you, again, two examples.  The first is, what

21 actually happened here?  We started down a process at the end

22 of December where the debtors presented us with proposed

23 self-procedures, filed them a day later, and then said you'll

24 have consultation rights.  And in the middle of that process,

25 four days before the original hearing, they informed us they

1 were changing the process.  They didn't ask for our consent to

2 change the process.  We went from an auction process to the

3 sealed bid process.

4        I guess one might say they consulted with us because

5 they called us up and sent us the revised procedures, but

6 that's where we were four days before the hearing.  We don't

7 want that to happen again to us in the middle of this process

8 where we change stream as to what we're doing without our

9 consent when they're liquidating the assets that we have a lien

10 in.

11        Rather, we think it's more appropriate if they want

12 to change the way they're going midstream and we don't agree,

13 that they come before Your Honor.  Now, again, I think it's

14 also indicative to see that, ultimately, we went along with the

15 change in the sealed bid -- from the auction process to a

16 sealed bid process.  So, it's not like anyone can say that, oh,

17 the bank might be unreasonable here.  If we're being

18 unreasonable they'll say that to Your Honor.  The other --

19        THE COURT:  We're getting our phone people back.

20 Sorry.  I know you had a head of steam going.

21        MR. TALMADGE:  I'm sorry?

22        THE COURT:  I'm sorry.  I know you had a head of

23 steam going.

24        MR. TALMADGE:  No, that's --

25        COURT CALL:  May I please have the name of your

1  Court, please?

2        THE CLERK:  Judge Sontchi.

3        COURT CALL:  Judge Sontchi?  All right.  I'll go

4  ahead and get your line in.  Give me just one moment.

5        THE CLERK:  Okay.  Thank you.

6                    (Pause)

7        COURT CALL:  (Indiscernible) I'll be assisting you.

8        THE CLERK:  Yes.  Can you reconnect the parties that

9  we had available?

10        COURT CALL:  Sure.  Counsel's lines are connected.

11        THE CLERK:  Okay.  Thank you.

12        THE COURT:  All right.  We're back on the record and,

13  Mr. Talmadge, you can continue.

14        MR. TALMADGE:  Thank you, Your Honor.  I just have

15  two last points.  One is, again, when I mentioned earlier, the

16  possibility where the debtors get sealed bids and they decide,

17  we don't want to go forward with any of these sealed bids.  We

18  don't have an opportunity, then, the way the procedures are

19  written right now, to come before Your Honor to let Your Honor

20  decide whether or not that is a good bid for these assets.

21  Rather, the process just stops right there.  At least, then, we

22  have the opportunity to come to Your Honor if we don't consent

23  and the debtors have the obligation to come to Your Honor for

24  you to make the determination as to whether or not we're right

25  or they're right, applying whatever standards and burdens are

1  applicable.

2          One minor point, Your Honor, that I'd like to make

3  that deals with the indicative bids and the expense

4  reimbursement.  There is a minor inconsistency in the bid

5  procedures that where we actually do have some consent rights,

6  where -- it's in Footnote 2.

7          THE COURT:  You know what?  I'm at a huge

8  disadvantage because --

9          MR. TALMADGE:  I apologize.

10          THE COURT:  -- nobody's handed me what I'm actually

11  approving.

12          MR. TALMADGE:  I'm sorry, Your Honor.  I thought you

13  had this.

14          THE COURT:  That's -- I can't, you know --

15          MR. TALMADGE:  May I approach, please?

16          THE COURT:  Yes, please.  I've got to be able to see

17  what -- I know you've changed them around.  I haven't seen

18  them.  Thank you.  This is blackline?  So, where are --

19          MR. TALMADGE:  I'm sorry, Your Honor.  I'm on Page 5

20  of the procedures.  It's in Footnote 2 that deals with when the

21  indicative bidder comes in after they've been given expense

22  reimbursement, and then ultimately submits a lower bid --

23          THE COURT:  Mm-mm.

24          MR. TALMADGE:  -- where the debtors need to get the

25  prior written consent of the secured lender.  Unfortunately,

1  and I'm not sure how it work, it says they get the prior

2  written consent and then they determine in their sole

3  discretion.  And I just think that it's just a typo that never

4  got changed.  I think the words "in their sole discretion" need

5  to be stricken there because, otherwise, it acts as an override

6  to the prior written consent or could be construed to act as an

7  override.

8         THE COURT:  Well, I'm not giving them their sole

9  discretion to decide whether or not an expense reimbursement's

10 justified so -- period.

11        MR. TALMADGE:  So, Your Honor, with that we would

12 request that the sale procedures be modified, and we have

13 previously given the debtor comments to this effect.

14        THE COURT:  What would you have changed?

15        MR. TALMADGE:  What I would have changed, Your Honor,

16 is on Page 6 --

17        THE COURT:  Of?

18        MR. TALMADGE:  It really comes in two places.  Let's

19 turn to Page 7 of the last page of the sale procedures.

20 There's a long Reservation of Rights of all the different

21 things the debtors can do to go ahead and change the sale

22 procedures, waive terms and conditions, extend the deadlines,

23 cancel the sale, remove assets from the sale, as opposed to

24 saying in consultation with the applicable secured lender, what

25 we would say is, with the prior written consent of the

1  administrative agent or JPM, which is the defined term for

2  JPMorgan Chase, as applicable and in consultation with the

3  Committee, and then you can do all of these other things.  That

4  would be the first change, Your Honor.

5           THE COURT:  Prior written consent?  I mean --

6           MR. TALMADGE:  Well, I mean, Your Honor, these days

7  prior written consent usually consists of an e-mail.  And I

8  think people would prefer to have it that way so there is no --

9           THE COURT:  Yes.

10          MR. TALMADGE:  -- say, dispute in the future as to

11 what was or wasn't consented.

12          THE COURT:  B of A or JPM is applicable?

13          MR. TALMADGE:  Correct, Your Honor.  And then, so

14 agreed, the debtors deserve the right with the prior written

15 consent of the administrative agent or JPM as applicable and in

16 consultation with the Committee.  And there would be a lot of

17 words stricken in there, I think.  Just because it doesn't --

18 it's superfluous at that point, I think.

19          THE COURT:  Mr. Indelicato, I assume if everyone else

20 is getting prior written consent you'd like to also have prior

21 written consent?

22          MR. INDELICATO:  We would, Your Honor.

23          THE COURT:  Yes.  We can't put the Committee in a

24 worse shape position than you, can we?  It's their -- it may be

25 your collateral, but it's their upside.

1          MR. TALMADGE:  Well --

2          THE COURT:  What, you don't them to veto?  It's okay

3  if you veto, but the Committee can't veto?

4          MR. TALMADGE:  Well, the difference here, Your

5  Honor --

6          THE COURT:  Actually, they're the -- the only people

7  that you don't want to veto are the people who have fiduciary

8  duties and that it gets to veto --

9          MR. TALMADGE:  It's not a veto, Your Honor, though.

10 I want to be clear about that.  We're not vetoing.  The person

11 who has the ultimate say in all of these decisions would be

12 you.  And the reason why --

13         THE COURT:  That's backwards.  I'm struggling with

14 that.  I'm not going to tell them what to sell.  I decide

15 whether what they're doing is appropriate.  I authorize the

16 sale.  But, I don't absent some motion to compel or lift stay

17 motion or a motion to appoint a trustee.  I'm not going to sit

18 here and tell the debtors, you need to sell these loans at that

19 price.

20         MR. TALMADGE:  Well --

21         THE COURT:  I say whether or not the loan they want

22 to sell at that price is a reasonable exercise of their

23 fiduciary duties.

24         MR. TALMADGE:  Well, and I think that's exactly what

25 we'd ultimately be asking you to do if at that point the debtor

1  wasn't going forward with one of the sales after we embark upon

2  a sale process that they're proposing to Your Honor.  This is

3  the procedures that they're saying we want to sell these loans

4  by and we're -- all we're saying is, if they decide after we go

5  through this whole process at the end of February for some

6  reason not to go forward with the sale, and we say, wait a

7  second.  You've got a good there.  You should go forward with

8  it.  We have to come before Your Honor.  And if that's the

9  standard that Your Honor applies, that's the standard of

10 whether or not that's a sound exercise of their fiduciary duty.

11            THE COURT:  What are your other changes?

12            MR. TALMADGE:  The other change, Your Honor, would be

13 on the prior page.

14            THE COURT:  Mm-mm.

15            MR. TALMADGE:  Page 6.  And it deals with the

16 selection of the successful bidder.

17            THE COURT:  Mm-mm.

18            MR. TALMADGE:  And we're -- I believe it's in two

19 places in the first paragraph, Your Honor, where it talks about

20 in consultation with the applicable secured lender in the first

21 sentence, and then later on in the second sentence.  Again, I

22 would put it with the prior written consent of the

23 administrative agent or JPM as applicable.

24            THE COURT:  Okay.

25            MR. TALMADGE:  And also, Your Honor, with that one

1  change to the footnote, too, which I think Your Honor already
2  indicated you were striking the -- in their sole discretion.
3          THE COURT:  Well, I'm going to hear what they have to
4  say about that.
5          MR. TALMADGE:  Oh, I'm sorry.
6          THE COURT:  I may not understand the full affect of
7  your requested change, so I'll allow them to respond.
8          MR. TALMADGE:  Thank you, Your Honor.
9          THE COURT:  Let me hear from the Committee first
10 before I hear from Mr. Beach.
11         MR. POWER:  Thank you, Your Honor.  Mark Power from
12 Hahn & Hessen, counsel to the creditors committee.  Your Honor,
13 first of all, the Committee worked very closely with the debtor
14 to go through the procedures.  They involved us in the process
15 of changing them.  We've been involved in a lot of these
16 auctions in the last 12 months, over a dozen, both in this
17 court and outside of the court.  And there's no perfect way to
18 do this, but we have seen the sealed bid process and we have
19 seen it at a number of significant auctions and we've seen it
20 used successfully, and we're comfortable with that.
21         We're definitely comfortable with expense
22 reimbursement.  In fact, we have found in auctions currently
23 going on that a lot of bidders will not participate, absent the
24 ability to get some expense reimbursement simply because there
25 is a number of opportunities out there in the marketplace, and

1   they're getting expense reimbursements.  We've also seen

2   industry placers provide expense reimbursements to bidders when

3   they're selling these loans.

4           THE COURT:  Yes.

5           MR. POWER:  So, with that, we're happy with the

6   procedures and the process, Your Honor, and we support the

7   debtors' motion.

8           With respect to Bank of America, respectfully, we do

9   not agree with the two changes that were just advocated because

10  those are inconsistent with what the counsel just argued.

11  Counsel just said he wants the ability to come back and plead

12  his case if he doesn't agree with the debtors' judgment.  And

13  his changes, basically, require the consent -- his consent --

14  oh, the debtor can't do these things.  There's a big difference

15  because, basically, the procedures would say, if he doesn't

16  give the consent, then therefore the debtor doesn't have any

17  choice.  The order itself requires the consent.

18          In terms of the ability to go back before Your Honor,

19  we kind of do agree with Your Honor.  It's the debtors' motion,

20  and the debtor has the right to pull the motion and decide,

21  we -- and at least myself in 20 years of practice, I rarely

22  ever have a problem with a debtor, particularly with a firm

23  like Young Conaway where we can't agree as to what's a

24  reasonable exercise of business judgment, and we almost always

25  work it out.  The only time I'm concerned is with is an insider

1  issue, and then you come up with different requirements.

2          Having said that, if Your Honor -- we're not opposed

3  to the notion of coming back to Your Honor if there's a huge

4  disagreement in what's being done.  Our main concern is that if

5  the banks are involved in the bidding process, they do not get

6  any input whatsoever in terms of the way the auctions run,

7  which is now what the procedures say.

8          The second issue is that the burdens have to stay the

9  same.  The fact that we go before Your Honor and ask Your Honor

10 to somehow second guess the debtors' judgment, that will not

11 change that we're before Your Honor.  If the debtor wants to

12 pull it or whatever the standard is, then the debtor -- that

13 burden should stay the same.

14         THE COURT:  All right.

15         MR. POWER:  Thank you.

16         THE COURT:  Mr. Beach, let me hear you.  And why

17 don't you start with this Footnote 2 changes.  Is this a

18 problem?

19         MR. BEACH:  No, Your Honor.

20         THE COURT:  All right.  I don't actually need to hear

21 you on the -- I'm going to overrule the Bank of America

22 objection on the remaining points.  I agree with Mr. Power.  I

23 think it's inappropriate.  Secured creditor has its rights in

24 connection with its collateral, but they are not the owner of

25 that collateral.

1          They're not a -- in a position to control, at least

2  at this instance, the disposition of the collateral.  I think

3  giving them the requested relief here would, in affect, put

4  them in the position of serving as a -- as the debtor in

5  possession in connection with these assets.  That's wholly

6  inappropriate, absent some sort of motion to appoint a trustee

7  which, obviously, I would hear in an appropriate.

8          If the case is made I'd appoint one, but the Court's

9  not going to get involved in telling the debtor how to dispose

10  its assets.  That's overreaching on behalf of the Court, and I

11  think it would be overreaching on behalf of Bank of America to

12  have the power to tell the debtor how to dispose of its assets.

13  So, I think consultation is more than sufficient.  And with the

14  change to Footnote 2, I'll overrule the Bank of America

15  objection.

16          MR. BEACH:  Thank you, Your Honor.  Your Honor, that

17  leaves us with the two remaining objections by Ms. Rush and Ms.

18  Beall.  And, Your Honor, as I indicated, and as the testimony

19  indicated, their loans are not included in the pool of loans in

20  connection with this motion, and I believe they're moot.

21          THE COURT:  Did you inform them of that before the

22  hearing?

23          MR. BEACH:  Yes, Your Honor, we did.

24          THE COURT:  All right.  Well, let me hear from them

25  if they wish to be heard.  Actually, Ms. Rush, I'm sorry.  Can

1 we take like a two-minute recess -- five minute recess?  Very

2 short.

3                          (Recess)

4           THE COURT:  Please be seated.  I apologize for the

5 recess.  Ms. Rush, you may proceed.

6           MS. RUSH:  Good morning.  Paula Rush here once again.

7 I'll start by, I understand that they have advised us that our

8 loans are not being sold in these pools.  I will start by

9 saying that we have been told other things that did not turn

10 out to be the truth by the debtor, so we have a --

11          THE COURT:  Who?

12          MS. RUSH:  Who?

13          THE COURT:  Who told you things that did not turn out

14 to be the truth of the debtor?

15          MS. RUSH:  Lots of different people at this point.

16          THE COURT:  Be specific.  Who, counsel?

17          MS. RUSH:  Well, we have been told, and this Court

18 has been told, that under TILA 1641(f)(2) doesn't exist.  They

19 do not have to tell us who the master servicer of our loans --

20          THE COURT:  So, you have a disagreement about the

21 law.  What, otherwise?

22          MS. RUSH:  They have told Ms. Beall that Wells

23 Fargo's the master servicer.  Wells Fargo gave her a letter

24 they are not the master servicer of her loan.  You know, we

25 have -- I have personally, and for my loan file, found out that

1 Triad is the insurer of my loan file.  They did not communicate

2 to Triad that I had asserted recision against my loan or other

3 issues with my loan, and instead were trying to foreclose on my

4 loan and collect mortgage insurance on my loan.  There's a lot

5 of issues.  I mean, honestly.

6      THE COURT:  In an candor, Ms. Rush, I've yet to hear

7 you tell me something the debtors have told you that was

8 incorrect.  You haven't --

9      MS. RUSH:  Told me?

10      THE COURT:  You just said you've been lied to, but

11 you -- and asked you for specifics and I haven't heard them.

12      MS. RUSH:  Well, they said that they did not have to

13 comply with  TILA 1641 (f)(2) and they do.  It is the law --

14      THE COURT:  All right.

15      MS. RUSH: -- that they have to answer, so -- I'm not

16 even going to go to whether my loan is or isn't in this loan

17 pool.  I would like to reassert.  Obviously, I've petitioned

18 again for the protection of the 363(o).  They have now added

19 it.  They did not add it before I brought it up.  This is,

20 again, you know -- I wish I didn't have to be here trying to

21 protect my rights and the rights of other consumers.

22      I'm very concerned that these loans that they're

23 selling are in their own filing, loans they say have

24 underwriting and compliance issues against them and are 60 days

25 or more in default and they're trying to sell them free and

1   clear of liens and liabilities without any protections.  And,

2   obviously, with the Broadhollow loans, New Century loans, these

3   loans are going for 50 cents, thirty cents on a dollar.  The

4   people that buy these loans are turning around and foreclosing

5   on them and forcing them for 100 cents on a dollar.

6          There are bills right now pending.  One's past the

7   house.  It's heading -- it's in the senate now.  They're trying

8   to address these issues.  Unfortunately, as all these lenders

9   are going bankrupt and all this is unfolding in our country,

10  it's like everybody's trying to play catch up and try to head

11  off all of these things that are going on.

12         I understand what you said about the Bank of America

13  objection in that you don't have the right to tell them how to

14  dispose of their assets.  I don't think it's in the best

15  interest to not let consumers have the same opportunity which

16  is provided for under 363 and 541 of the Bankruptcy Code that

17  if you're going to sell an interest, and any owner that has any

18  interest, it reads, is allowed to bid at the same price at the

19  same auction if they're going to sell loans that way.

20         Frankly, I don't think that it is fair in any way to

21  consumers in this process and how this is going on.  And I do

22  think that the senate and congress is trying to address this

23  issue, but again, it's a catch up game at this point.  This has

24  been the past year that all these lenders have gone under and

25  everybody's trying to catch up and figure out how to fix all of

1  these issues.

2          But, I do think that there are provisions under 363

3  and 541 that would allow for the consumers to have the same

4  opportunity as they're giving their forming financing partners

5  who also, obviously -- many investigations going on where

6  they're looking up that pipeline at those parties, as well, as

7  having involvement in what has gone on in this whole entire

8  industry.

9          THE COURT:  All right.

10          MS. RUSH:  So, I would just appreciate that, first of

11  all, Your Honor consider that.  Secondly, I've put on record

12  about my loan through this Court, so if anyone buys my loan

13  they know that I have asserted my objection to it.  So, I

14  preserve my rights for future against those issues, so that's

15  why I'm here.

16          THE COURT:  Okay.  Thank you, Ms. Rush.

17          MS. RUSH:  Thank you.

18          THE COURT:  Mr. Beach, can you address the argument

19  that the borrowers in connection with the non-performing

20  mortgage loans should be entitled to bid for the loans?

21          MR. BEACH:  Your Honor, any party can bid on the pool

22  of loans.  I did have -- I did consult with counsel for the

23  Committee and my client in the recess and they indicated to me

24  that, you know, really, we do need bids on the whole pool of

25  loans and not just, you know, sub parts of those loans.  A

1 borrower can bid on the whole pool of loans.

2         THE COURT:  But, the information is on the IntraLinks

3 website.  I don't think I can get on that.  I expect you can't

4 get on that.

5         MR. BEACH:  Yes, that's right, Your Honor.  But, you

6 know, to the extent that -- I mean, loans are bought and sold

7 all the time and, you know, it's transparent to borrowers.  I

8 don't know why it needs to be different in bankruptcy court

9 with respect to, you know, who owns their loan and that they

10 should have an opportunity at every, you know, point where a

11 party is going to secure ties or sell a pool of loans that they

12 have the opportunity to purchase those loans.  If a party

13 wants -- if a borrower wants to refinance and go with a

14 different mortgage company they can certainly have the

15 opportunity to do that.

16         THE COURT:  Well, yes, but Ms. Rush's point is that

17 because these are non-performing loans the bidders will

18 probably pay -- she's speculating that the bidders will pay

19 maybe even less than par for these loans since they're

20 non-performing, since the focus is on collateral values, and I

21 think the Court can take judicial notice of the decline in real

22 estate collateral values in the United States in the last six

23 months that the one person who's going to be required to pay

24 full price, including accumulated interest fees, costs, and a

25 full amount of principle, would be the consumer who's

1  refinancing.

2       And to say that a consumer has the ability to

3  refinance, while that's true, it's irrelevant to whether or not

4  a consumer or a borrower should be entitled to bid on par with

5  a bank.  And the fact that home mortgage loans are bought and

6  sold all the time, while that's true, again, I'm not sure if

7  that matters so much.  They're being bought and sold in the

8  context of a bankruptcy, and I do think that changes, to a

9  certain extent, the rules.

10      I want to -- obviously, the Court's concern with the

11 disposition of the property of the estate -- the highest and

12 best price in order to maximize the return to creditors.  So,

13 I'm not sure.  It -- I'm not sure.  I have to consider giving

14 the consumers a fair shake at bidding on their own loans.  And

15 most of them, I'm sure -- I certainly couldn't buy out my home

16 mortgage without financing to do so and couldn't pay cash for

17 even a portion of my home mortgage, unfortunately.  And I think

18 that's the case with most people.

19      But -- so, it may be a non-starter to say they should

20 have the opportunity to bid, you know, 85 percent of par on

21 their unpaid principle because it's going to be subject to a

22 financing contingency in any event.  And I assume that these

23 procedures don't provide for any contingencies in the bids.

24      MR. BEACH:  No, Your Honor.  And --

25      THE COURT:  They have to be cash or the equivalent of

1  cash.

2          MR. BEACH:  That's right.

3          THE COURT:  And there's no due diligence -- well, I

4  guess there is due diligence, but not in the final bids.

5  There's due diligence in connection with the indicative bid,

6  but not in the final bid context.

7          MR. BEACH:  That's right, Your Honor.  And to your

8  point, the administrative costs associated with individual

9  borrowers bidding on individual loans would be extraordinary

10  given the number of loans that we have in these pools, so I

11  don't think it would be a benefit to the estate to allow the

12  parties to do that.

13          THE COURT:  All right.  Does the Committee wish to be

14  heard?

15          MR. POWER:  Just briefly, Your Honor, on the issue

16  of -- the procedures did not permit a, what we call kicks, out

17  of the pools.  To be a qualified bid, each bidder has to bid on

18  the entire pool.

19          THE COURT:  Where is that?

20          MR. POWER:  If you look at the definition of

21  qualified bid, Your Honor, both in the indicative and the final

22  bids we included language that basically requires -- one of the

23  components is that you have to bid for the pool of loans.  If

24  you look at -- on Page 4 --

25          THE COURT:  Mm-mm.

1          MR. POWER:  The final bid requirements --

2          THE COURT:  One or more of the three pools, which --

3 all right.

4          MR. POWER:  Right, Your Honor.  You can bid on a

5 separate pool, but you have to bid on the pool.  You can't bid

6 on individual loans.

7          THE COURT:  All right.

8          MR. POWER:  And there's a reason for that as a

9 business judgment.  The -- as Your Honor might guess, when you

10 have hundreds of loans in a pool, the prices and values of each

11 loan varies depending on what the broker -- the appraised value

12 is the collateral on the non-performing.  If you permit kicks,

13 what happens is, you permit the bidder to cherry pick and

14 choose the assets which the bidder thinks are best and leave

15 the stuff that's worth less.  And what you'll have, then, is a

16 lot of non-conforming bids that the debtor will have a very

17 difficult time trying to compare.  And the debtor, then, makes

18 judgments about what the appraised value is and starts

19 deciding.

20          The other thing I think you should know, Your Honor,

21 these are all non-performing.  These loans are all being

22 serviced by American Home Mortgage, Mr. Wilbur Ross' company

23 now.  In that process in the servicing, you know, my experience

24 is -- I don't have personal knowledge of this, but the servicer

25 is contacting the consumer attempting to work these loans and

1 trying to get them back into a performing pool.  There is a

2 process being followed, if Your Honor recalls, at the sale

3 hearing about what's being done in that process to deal with

4 the faulted parties, what's being offered, what's

5 restructurings.

6          If a consumer or a homeowner wants to work through

7 that loan, they have an opportunity at that time to try to work

8 out a deal and negotiate.  One of the pools here is the

9 debtors' own loans that were either non-performing or were put

10 back to the debtor.  The debtors' services are working to try

11 to, again, maximize that value.  And so, I believe this

12 consumer is protected in the system because they have the

13 ability when negotiating with the service to try to resolve

14 their loan.

15          THE COURT:  No, I wouldn't go too far with that.

16 I -- to say that servicers are protecting the rights of

17 consumers --

18          MR. BEACH:  No, Your Honor.  I'm saying the

19 servicer's rights --

20          THE COURT:  -- I think is overstating it to say the

21 least.

22          MR. BEACH:  I said their rights -- their ability to

23 try to resolve their issues with their mortgage can be dealt

24 with on a servicing level.  Administratively for the debtor to

25 try to basically have hundreds and hundreds of individual

1  negotiations and run a process where every individual person

2  can bid on the loans would be an extremely burdensome and

3  difficult process.  Particularly, then, you have to look back

4  at the other bids and decide whether if they include a pool

5  what happens to those bids.  And so, we think for that reason

6  the process as proposed should be approved.

7           THE COURT:  All right.  Yes, Ms. Rush?

8           MS. RUSH:  Could I just have one second?  First of

9  all, I'd like to clarify a couple of things.  One is, if a

10  person is given a notice, in two weeks they can get a

11  pre-approval letter for a refinance to be able to buy the loan

12  out.  A very quick process.

13          THE COURT:  Well --

14          MS. RUSH:  And the -- at 30 to 50 cents on a dollar,

15  there is almost -- any lender out there, no matter what your

16  credit score is, there are still lenders that will --

17          THE COURT:  Well, you're speculating on a couple of

18  things.  You're speculating that the bids will be for 30 to 50

19  cents on the unpaid principle amount of the loan.  So, I have

20  no idea what the bids will be.

21          MS. RUSH:  Broadhollow's were 50 cents.  New

22  Centuries were 30-some cents.  I mean, I'm going by what has

23  been happening in the marketplace.

24          THE COURT:  I understand.  I don't have any evidence

25  to that affect.  The other thing is that, I think Mr. Power

1   makes a good point in connection with selling these loans in a

2   pooled process is much more likely in my experience to generate

3   the kind of funds that are available to sell these loans in

4   pieces.  Nothing in this is, again, I think, and I appreciate

5   and agree that the 363(o) language is something that should be

6   in the order, and I appreciate that you have raised that issue,

7   at least as I understand it.  And I think you provided some

8   value there.

9         But, I think that there are a couple of things; 1) I

10  think you have a standing issue because your loans aren't being

11  sold.  2) even if you didn't have a standing issue, I think Mr.

12  Power has addressed, and as I've sat up here thinking about it,

13  I think it's the correct way to approach, is that the sale has

14  to be all or nothing because, otherwise, you're going to be in

15  a situation where the loans just can't be sold.  3) I just

16  don't think, frankly -- I find it highly unlikely that a

17  consumer would be in a position to make a bid that would be the

18  highest and best bid with no financing contingencies in the

19  time frame set forth.  So, I am going to overrule your

20  objection.  Okay.  Thank you.

21        Ms. Beall, do you wish to be heard?  Did I pronounce

22  your name correctly?  And again, just to clarify, Ms. Rush, I

23  pushed you -- I'm sorry, Ms. Beall.  I'm just going to say a

24  few more words about Ms. Rush's objections.

25        I pushed you a little bit on your comment about being

1 lied to by the debtors because I take those kind of allegations
2 extremely seriously.  And I don't know what's been said or
3 hasn't been said to you in the context of out of court
4 statements in the servicing, but to be absolutely clear, if the
5 debtors represent to this Court -- the debtors' counsel
6 represents to this Court they're not going to sell your loan
7 and they sell your loan, there's going to be hell to pay by the
8 people that are admitted and are fiduciaries to this Court.
9 And I think they know that.  And I pushed you because I wanted
10 to make sure that you hadn't had any misrepresentations made to
11 you by debtors' counsel and I didn't hear any.  That's why I
12 was pushing you on your specifics.  So, I'll just make that
13 clear.  They say they're not selling you a loan, boy they
14 better not.  Ms. Beall.

15         MS. BEALL:  Thank you, Your Honor.  I think there's
16 going to be hell to pay.  They did tell me something that
17 wasn't true.  I don't want to use the word lie because I think
18 it's rude for me to say it.

19         The only reason I'm here today is, quite frankly, I
20 don't believe that my loan is not in that pool.  I'm not saying
21 it is and I'm saying it isn't.  All I'm saying is -- and I have
22 letters.  When I was here October 31st, you may recall that I
23 was told that my loan -- the master servicer of the pool my
24 loan was in is Wells Fargo.  I was also told that twice on two
25 different occasions when I called the servicing unit.  I spoke

1  to a VP over there.  And in addition to speaking to him, an

2  executive with Wells Fargo, the two of us did a conference call

3  with that VP, we were told the same, that it was Wells Fargo.

4       I have two letters from Wells Fargo's corporate

5  trust.  They are not the master servicer.  The loan pools that

6  they told me my loan was in, AHMIT2004-102, that Wells Fargo

7  was the master servicer of those loan pools.  Standard and Poor

8  confirming that.  So, therefore, I was told that my loan was in

9  the wrong pool.

10      I'm just nervous and that's why I'm here because I

11  think for valid reasons I have concerns to not trust them and I

12  don't want it to be that way.  And I am not here to bother this

13  Court.  It's just that I'm desperate.  The servicing unit is

14  doing what they're doing.  I have nowhere to go.  Wilbur Ross'

15  office cannot help me at this time because he's in between the

16  economic and final close.

17      They've been very gracious and talk to me on the

18  phone and they have my information, but it can't go past that

19  for their records, which I know.  So, here I am.  What can I

20  do, get a lawyer?  And then I have to come in and get a relief

21  from stay?  It's -- all I'm trying to do is get them to do what

22  they're legally obligated to do and play by the rules they're

23  supposed to play under.  That's all I'm asking.

24      And honestly, this is a seven hour trip for me.  I'm

25  an old grandma with bad knees.  I don't want to be here today.

1  So, that's all I'm asking.  And one last thing for the record

2  in case in they do try to sell off my loan without the

3  liabilities like they're doing -- proposing with this other

4  batch.  I have a copy, and I know you're familiar with the

5  standard Freddie/Fannie Mae deeds of trust that they use.

6  American Home uses those.  And these are the clauses that

7  they're basically trying to get left out when these loans are

8  transferred which were things that the borrowers signed and

9  agreed to to have these, you know, to have these rights when

10  they gave the properties up for collateral.

11          So, I don't think they're asking you to take this

12  out.  And just -- I'd like to just leave this with you.  I've

13  highlighted the pages and the clauses --

14          THE COURT:  You may approach.  Thank you.  Thank you,

15  ma'am.  Anything further, Ms. Beall?

16          MS. BEALL:  Excuse me?

17          THE COURT:  Do you have anything further?

18          MS. BEALL:  No.

19          THE COURT:  All right.  Thank you.

20          MS. BEALL:  Yes, thank you.

21          THE COURT:  Mr. Power, do you have any response?

22          MR. POWER:  Your Honor, I'm just -- there may be some

23  confusion, and I'm not sure.  The sales process does not seek

24  the sale of the loans free and clear of any defenses or, you

25  know, claims that the homeowners may have.  It's simply a sale

**J&J COURT TRANSCRIBERS, INC.**

1 free and clear of the debtors' interest in those loans.  In

2 other words, when a purchaser purchases the loans he takes

3 subject to --

4         THE COURT:  And free and clear of the collateral

5 interest of Bank of America or Wells Fargo or --

6         MR. POWER:  Correct.  The homeowners themselves, to

7 the extent they have -- you know, you take as is, where is

8 sales, so you take those loans, as is, where is, and so, if

9 there's miscommunication, I wasn't sure, but I thought I heard

10 her think that the homeowners were losing their rights and

11 that's not what's being proposed.

12         THE COURT:  All right.  Mr. Beach, do you have any

13 response to the -- it's not really on point, but Ms. Beall

14 raises a point which is, why should I -- why should she trust

15 your representations to the Court if you're not selling her

16 loan when, apparently, there has been an inability to

17 accurately pin down who owned her loan and who is servicing her

18 loan?

19         MR. BEACH:  Well, I think there are a couple of

20 reasons with -- in connection with Ms. Beall's case.  First of

21 all, her loan is not a non-performing loan, so it doesn't even

22 fall into the definition of this particular sale.  Second of

23 all, you know, we have told her it is in a securitization.

24 We're not selling loans and any securitization at this point.

25 We are selling loans that are owned by the debtors, subject to

1 the liens of Bank of America and JPM or the DIP lenders or --

2 and I have spoken -- we have spent quite a bit of time, Your

3 Honor, trying to hunt down information with respect to these

4 two loans to make sure that we, you know, put them in a box, at

5 least with respect to this sale, and make sure that they're not

6 included in this sale.  And I've been assured on a number of

7 occasions that they're not going to be included in this sale.

8         Mr. Johnson's testimony was to that affect, as well,

9 so there is evidence on the record that they're not included in

10 this sale.  So, I think Ms. Beall should have, in this

11 circumstance, you know, if not others, that -- the satisfaction

12 that her loan is not going to be sold in connection with the

13 sale.

14         THE COURT:  All right.  Well, I'll accept the

15 debtors' testimony and counsel's representations that Ms.

16 Beall's loan is not in this group of loans.  It's not being

17 sold.  And I agree with Mr. Power.  I think there is a

18 miscommunication.  Nothing in the sale of the loan under

19 Section 363 in any way affects the consumer's rights and

20 obligations under those loans.  The free and clear language is

21 free and clear of liens, claims, and encumbrances of the people

22 who have, for instance, a security interest in the asset that's

23 being sold.

24         One could, I suppose, make an argument that a claim

25 like Ms. Rush's claim that she has in connection with her loan

1  could be washed through the 363 process, but I think the 376(o)

2  language solves that issue in its entirety.  That's what the

3  statute says and, appropriately, it's in the order.  So, based

4  on those clarifications I'll overrule the objection.  Anything

5  further, Mr. Beach?

6         MR. BEACH:  Thank you, Your Honor.  Just if we could

7  just quickly walk through the blackline so I can make sure Your

8  Honor is aware of what changes were made in the order.

9  Paragraph -- most of the changes in the order just make the

10 changes with respect to the new dates for the procedures and

11 the new procedure.  Paragraph C includes the 363(o) language we

12 discussed.

13        THE COURT:  Mm-mm.

14        MR. BEACH:  Paragraph 9, Your Honor, I did

15 interlineate in the clean version of your order --

16        THE COURT:  I saw that.

17        MR. BEACH:  -- one provision which just provides, for

18 the record, the debtor shall post the highest indicative bid,

19 if any, received for each pool of non-performing loans on

20 the -- their IntraLinks website.  And those are the primary

21 changes with respect to the order.  There were only --

22        THE COURT:  I need to strike the language in Footnote

23 2.

24        MR. BEACH:  Yes, Your Honor.  And the only other

25 changes to the bid procedures were, 1) to strike out the

1  reference to the purchase agreement and -- as being an

2  attachment to the sale procedures.  Unfortunately, we don't

3  have full agreement on the form of purchase agreement that will

4  be posted to the website and are going to be in discussions

5  with JPMorgan and Bank of America in connection with those form

6  purchase agreements.

7          THE COURT:  All right.  Do you need to make a change,

8  then?

9          MR. BEACH:  It's already made in the procedures you

10  have, Your Honor.

11          THE COURT:  Oh.  All right.  Now I'm going to sign

12  the order.

13          MR. BEACH:  Thank you, Your Honor.  Your Honor, I'll

14  see the podium to Mr. Lunn to handle the other matters.

15          THE COURT:  Okay.  Thank you.  For the record,

16  Matthew Lunn from Young Conaway.  We are now at Agenda Item 33,

17  Your Honor.  And this is the debtors' motion requesting

18  authority to prospectively compromise the B of A construction

19  loans, essentially to facilitate borrowers and third party

20  lenders to refinance these construction loans.

21          Your Honor may recall, we've been in front of Your

22  Honor with respect to the construction loans a number of times.

23  Back in October Your Honor had entered an order approving sale

24  procedures for the debtors to sell the construction loans and

25  the related construction loan platform.  We went through a

1  marketing process, facilitated due diligence request, however,

2  we were unable to sell the loans at that time.  We did receive

3  a few bids, but those bids were of insufficient value to the

4  debtors.

5          We, as a result, then, adjourned the sale hearing,

6  continued the bid deadline for the construction loans, and then

7  during that time, we received yet another bid for construction

8  loans that again, unfortunately, did not represent sufficient

9  value in the debtors' minds.

10          Shortly after that, Your Honor, B of A had filed a

11  Relief from Stay motion with respect to the construction loans

12  that they had a lienor security interest on.  The debtors in

13  B of A in connection with the Committee -- in consultation with

14  the Committee, rather, then entered into a stipulation whereby

15  the debtors agreed to pay a certain amount to B of A for the

16  release of liens in the security interest on the B of A

17  construction loans so that the debtors could proceed and

18  attempt a non-sale alternative with respect to the construction

19  loans.

20          In connection with that -- and that was approved back

21  on January 4th, Your Honor.  In connection with that, also on

22  January 4th, Your Honor entered an order that approved

23  amendments to the DIP credit agreement whereby the DIP lenders

24  gave their consent to the debtors to use the cash collateral to

25  fund the payment provider for under the B of A stipulation.

1          One aspect of that DIP amendment and the order

2   approving the DIP amendment was the agreement by the debtors to

3   segregate any funds received in excess of the amount paid to

4   B of A for the release of the liens and segregate those amounts

5   for the benefit of the unsecured creditors committee and the

6   unsecured creditors that may be used through a plan.

7          Your Honor, this stipulation and thus, then, the

8   amendment, it paved the way for the debtors to move forward

9   with the comprises that the debtors are seeking authority to do

10  now through this motion.  The debtors submit that prospectively

11  compromising these B of A construction loans is the best

12  alternative given the debtors' efforts to otherwise sell the

13  loans and the fact that we have attempted to sell loans, but

14  have yet to receive any sufficient value.

15         Your Honor, as I stated in connection with the DIP

16  amendment, the Committee does also have a stake in the

17  compromises, and as a result, the debtors have built in a

18  provision whereby the Committee will have a five business day

19  objection period and consultation rights with the debtors with

20  respect to any proposed comprise before the debtors proceed

21  with the compromise.

22         It's also important to note, Your Honor, that there

23  were no objections received, but the U.S. Trustee did raise an

24  issue, and as a result, we have revised the form of order.  If

25  I may approach.  I have a blackline.

**J&J COURT TRANSCRIBERS, INC.**

1             THE COURT:  Yes.  Thank you.

2             MR. LUNN:  The concern that was raised by the Office

3   of the United States Trustee was that they would like, or that

4   they requested some report be filed after the debtors have

5   compromised the B of A construction loans.  The debtors were

6   concerned that filing of a report prematurely could compromise

7   the debtors' ability to maximize the compromises.  I said

8   compromises a few times but, in essence, basically giving

9   someone a roadmap to argue and a hurdle in negotiations.

10            So, ultimately, what we have come up with is a

11  revision to the proposed form of order that will provide that

12  the debtors will file a report.  And in that report we'll

13  identify the construction loan number, the unpaid principle

14  balance as the date of the compromise, and the actual amount of

15  the compromise, the unpaid principle balance.

16            All rights with respect to filing that report under

17  seal are reserved, and the key component of that is that the

18  report doesn't have to be filed until we're done compromising

19  all of the B of A construction loans, or the debtors decide

20  that no other further compromises are necessary.  With that,

21  Your Honor, I don't believe there are any objections.  I'm

22  happy to answer any questions Your Honor may have.

23            THE COURT:  No.  Does anyone wish to be heard?  Mr.

24  Indelicato.

25            MR. INDELICATO:  Yes, Your Honor.  Mark Indelicato on

**J&J COURT TRANSCRIBERS, INC.**

1  behalf of the Committee.  Your Honor, as has been represented,

2  they have worked diligently with the Committee.  This is an

3  instance in which the secured lender wanted to sell the

4  portfolio.  The bids, at least in the debtors' and the

5  Committee's judgment, was not sufficient, and we worked out a

6  solution in which we're hoping that everybody benefits.

7          The estate will receive more than they would've

8  received from the bidding process.  The consumers in this

9  instance, because they are -- these are construction loans and

10 they're need to refinance them in any event, will get some

11 benefit as a result of the restructuring and the sale and they

12 will be able to get -- be able to refinance at lower rates and

13 meeting the -- they will get some relief maybe on the principle

14 or other relief that the debtor will propose.

15         So, we believe this works out for everyone's best

16 interest.  We were all a little concerned about the requirement

17 that a report be filed.  We believed it might be appropriate to

18 file once it's all done.  We're reserving our rights if, in

19 fact, the bankruptcy is still going on and there's still assets

20 being liquidated, to come in and seek that to be filed under

21 seal in an appropriate time.

22         THE COURT:  Right.  And also if there's any consumer

23 or privacy information I want to --

24         MR. INDELICATO:  Yes.  We -- one of the things we

25 were thinking about, Your Honor, although it is going to be as

1 I think -- going to be identified only by loan number, we at

2 least did have a concern about that, as well.  So, we will

3 ultimately see what kind of report is generated that's

4 satisfactory to the U.S. Trustee if that, in fact, does become

5 an issue, as well.  So, with those concessions, Your Honor, we

6 would support the motion.

7         THE COURT:  All right.  Anyone else?  Okay.  I'll

8 sign it as revised.  Mr. Lunn.

9         MR. LUNN:  The next agenda item, Your Honor, is

10 Agenda Item 34, and this is the debtors' mea culpa motion.

11 Your Honor may recall that prior to the petition date the

12 debtors had instituted a massive reduction of workforce

13 resulting in over 6500 employees losing their jobs.  Through

14 the first day employee wage motion debtors had sought an

15 authority to pay pre-petition wages, compensation, benefits,

16 and the ability to pay travel and entertainment expenses.

17 However, due to the definition of employee, terminated

18 employees were not covered under the authority to pay travel

19 and entertainment expenses.

20         Recently the debtors discovered that in addition to

21 paying T and E expenses to current employees, they

22 inadvertently paid T and E expenses to terminated employees;

23 approximately 236 employees and in the aggregate of $190,000.

24 It's important to note, Your Honor, that all but one of the

25 terminated employees received less than $5,000 and that the

1  vast majority of them received far less than $1,000.

2          The debtors determined, Your Honor, that the cost and

3  the effort that would have to be expended to seek repayment of

4  the amounts far outweighs any value that would be received from

5  such efforts.  And then simply put, Your Honor, prosecuting

6  litigation to recover the inadvertent payments.  We're not

7  further to the goal of the debtors to maximize value for the

8  estates.

9          The debtors, however, are mindful, not such that the

10 terminated employees wouldn't receive a windfall.  In other

11 words, that they wouldn't be receiving double distribution.  As

12 a result, the debtors reserve their rights to object any claims

13 that the terminated employees may file.  And to that affect,

14 also, Your Honor, the Committee did file a limited objection.

15 The debtors have worked with the Committee on revising the,

16 what I call the T and E order, and I have a blackline if I may

17 approach.

18          THE COURT:  Thank you.

19          MR. LUNN:  As the Committee put in its limited

20 objection, they were -- there were two conditions that the

21 Committee wanted to see.  One was that the debtors provide a

22 report of the terminated employees.  They identified the names,

23 the amounts, the respective termination dates for the

24 employees, and to the extent that known, the dates that the

25 travel and entertainment expenses were incurred.  We have

1  included that's the second to last ordered paragraph, Your

2  Honor, in the proposed form of order.

3          Secondly, Your Honor, the Committee was concerned,

4  and asked that any -- that the representative authorized to

5  make distributions on account of allowed claims have the

6  ability to offset a recoup when taking into account

7  distributions that would otherwise be made to the terminated

8  employees, such that, again, they would not be receiving double

9  recovery.

10          In other words, what we're trying to avoid, and we're

11  not going -- at the same time not penalize them for receiving

12  the inadvertent payment, but trying to make clear that the

13  person authorized to make distributions takes into account the

14  claim of the terminated employee, if any, and takes also into

15  account the amount of the T and E payment which is what the

16  second ordered paragraph, Your Honor, attempts to get to.

17          THE COURT:  How many of these 236 employees were

18  insiders?

19          MR. LUNN:  I'm not sure.  I don't believe any were,

20  but I --

21          THE COURT:  Were any of them vice presidents?

22          MR. LUNN:  I don't have that information.

23          THE COURT:  Who at the debtors authorized the

24  payments?  Was it the controller or it's done in the ordinary

25  course of business?

1          MR. LUNN:  Your Honor, I believe it was done in the

2   ordinary course of business and it was simply an inadvertent

3   error when they were paying the other travel and entertainment

4   expenses to the current employees.

5          THE COURT:  I've had this arise in other cases and

6   it's a very serious issue and one the Court takes seriously

7   because I've got to know that when I sign these orders the

8   debtors are paying attention to them and not paying whatever

9   claims they feel like paying.

10          Now, previous incidence where it arose fairly

11   recently.  It was more alarming, frankly, because it was a --

12   it was under the direction of a restructuring professional who

13   really should have known better.  And it was much more -- it

14   was a much larger amount of claims.  I'll approve the order,

15   again, because the Committee is watchful of it.  But, you know,

16   this is troubling and I don't think I need to tell you it's

17   troubling.  I'm sure you've had many meetings about it

18   internally at your firm to discuss how it happened and how it

19   wouldn't happen in the future.  But, I'll approve it as

20   modified.

21          MR. LUNN:  Thank you, Your Honor.  May I approach?

22          THE COURT:  You may approach.  Thank you.

23          MR. LUNN:  Your Honor, Agenda Item 35 will be handled

24   by Mr. Bowman.

25          MR. BOWMAN:  Good afternoon, Your Honor.

1              THE COURT:  Good afternoon.

2              MR. BOWMAN:  May it please the Court.  Donald Bowman

3   with Young Conaway on behalf of the debtors.  Agenda Item 35,

4   Your Honor, the debtors' application pursuant to Section 327

5   and 328 of the code seeking authorization to retain CB Richard

6   Ellis as real estate professionals.

7              By his application, Your Honor, the debtors are

8   seeking authority to allow American Home Mortgage Corp. to

9   retain CB Richard Ellis as real estate brokers to, in essence,

10  sell American Home Mortgage SPV ownership interest in the

11  Broadhollow property.  As noted on the agenda, Your Honor, the

12  trustee did file an objection which, in essence, I -- and I'll

13  allow him to characterize it in particular, is questioning the

14  appropriateness of the retention given that this is a

15  disposition, ultimately, of a non-debtor asset.

16             And while we appreciate that position of the trustee,

17  Your Honor, there are some connections with the debtors in this

18  case which I would like to make clear to the Court and so you

19  would understand at least why we filed the application.  Your

20  Honor, it was filed, obviously, in an abundance of caution, and

21  in an effort to be completely transparent with what we were

22  trying to do.

23             In essence, we're selling a debtor's headquarters,

24  and given the impact of the sale that it would have on certain

25  debtors, we thought it would be appropriate.  And if I could,

1 I'd just like to go through some quick background as to that

2 point.

3          THE COURT:  All right.

4          MR. BOWMAN:  Your Honor, AHM SPV is a wholly owned

5 sub of American Home Mortgage Corp., and American Home Mortgage

6 Corp. is a sole member of SPV and it controls its board of

7 directors.  SPV is a special purpose entity.  Its only purpose

8 is to hold this property.  It's only asset is to hold this

9 property, and it has no other assets I should say.

10          SPV obtained its ownership interest via a mortgage

11 and security agreement with Suffolk County Industrial

12 Development Agency in which a mortgage on the Broadhollow

13 property was taken to secure SPV's obligations pursuant to an

14 accompanied note in the approximate amount of $26.5 million.

15 That note, Your Honor, is guaranteed by American Home Mortgage

16 Holdings who is a debtor in this case.

17          Contemporaneously with the mortgage, Your Honor,

18 Suffolk County and SPV entered into a lease agreement whereby

19 IDA or Suffolk County would lease back to SPV the property, and

20 then SPV would then sublet that property to American Home Corp.

21 who used it as its headquarters.

22          And pursuant to this lease agreement, Your Honor,

23 it's through this lease agreement that SPV can repurchase this

24 property and, in essence, sell it and recoup any benefit to

25 that.  And it is based on these facts, Your Honor, that we

1  believe that there is a connection that we at least thought

2  would be appropriate to bring before Your Honor.  First, any

3  sale of SPV's interests under these circumstances would be a

4  benefit to American Home Mortgage Corp., and any maximizing of

5  its assets or of the value of these assets, nor to the benefit

6  of Corp. and its creditors.

7          Second, the engagement agreement itself in Section 13

8  provides that CB Richard Ellis is to be reimbursed upon their

9  demand for any out of pocket expenses associated with marketing

10  this property up to the amount of $7500.  As I said before, SPV

11  doesn't have any assets other than this property itself, and

12  so, ultimately, Corp. would be the one that would fund that

13  reimbursement obligation.

14          As I mentioned earlier, Your Honor, the note itself

15  is guaranteed by American Home Mortgage Holdings, and at the

16  very least, any sale would require release of any obligations

17  under that guarantee agreement.  And finally, we believe that,

18  ultimately, the debtors will likely have to come back to this

19  Court anyway to seek authority for American Home Mortgage Corp.

20  to vote as a sole member to even permit SPV to sell its

21  interest in the Broadhollow property.

22          So, given those facts, Your Honor, we're more than

23  willing to proceed as the Court deems appropriate, but I'll

24  allow the trustee, I guess, to address any other concerns he

25  may have.

1          THE COURT:  Let me -- is a real estate broker a

2  professional under 327?

3          MR. BOWMAN:  We believe so, Your Honor.

4          THE COURT:  Well, 327(a) says attorneys, accountants,

5  appraisers, auctioneers, or other professional persons.  And

6  I'm trying to think back -- I -- whether I've run into this

7  before.  I can tell you that I had a situation many years ago

8  where I took the position that it was a professional and he

9  tried to file a fee application and, at least -- I can't

10  remember who was against me at the time, but they disputed it,

11  and I can't recall ever having had the issue in front of me

12  before.  Isn't it -- don't you usually see brokers retained

13  under 363 or am I mis-remembering?

14          MR. BOWMAN:  I suppose, now that you raise it, Your

15  Honor, you can probably do it under 363.  I think we've

16  typically done it the under 327(e), and we've done it with the

17  foreclosure brokers in this case under 327(e), as well.

18          THE COURT:  All right.  And no one's raised that

19  issue other than me?

20          MR. BOWMAN:  No, Your Honor.

21          THE COURT:  Mr. Bowman, you know, I gave Mr. Beach a

22  hard time and I gave Mr. Lunn a hard time, so I can't let

23  you --

24          MR. BOWMAN:  I understand completely.

25          THE COURT:  -- go unscathed.  I mean, it wouldn't be

1  fair.

2          MR. BOWMAN:  I understand.

3          THE COURT:  All right.  Let me hear from anyone else

4  who wishes to be heard.

5          MR. McMAHON:  Your Honor, good afternoon again.

6  Joseph McMahon for the United States Trustee.  And, Your Honor,

7  before I get to my presentation in response to the points that

8  the Court raises, I'm going by memory here, but I believe that

9  one of the twin Third Circuit cases on nunc pro tunc relief,

10 it's either in re Arkansas or F/S Airlease involved a real

11 estate broker --

12         THE COURT:  Okay.

13         MR. McMAHON:  -- being retained under 327.  So, I

14 believe that one of those two opinions supports the idea that a

15 real estate broker is a professional --

16         THE COURT:  All right.

17         MR. McMAHON:  -- for 327 purposes.  Your Honor, with

18 respect to this particular application, we objected and -- on

19 the threshold grounds of whether the debtors or the entities

20 should -- that should be employing this professional.  And what

21 we're dealing here with is a property that a non-debtor

22 subsidiary has both the conditional right to purchase, and also

23 the obligation to purchase at the end of the lease agreement

24 which presently terminates in 2015.

25         And the debtors are proposing that they incur an

1  administrative obligation for the purpose of selling this

2  property that is not property of the debtors' estates.  We

3  won't be seeing a Section 363 sale motion with respect to this

4  property on, presumably, the promise that we're going to see

5  some future dividend from the sale.

6          And as we cite in our objection, Your Honor, the

7  Mertesan (phonetic) and Soko decisions stand for the basic

8  proposition that SPV's property is now property of the debtors'

9  estates.  And the purpose of Section 327 is to allow the

10  trustee to employ professionals to assist it in administering

11  its cases and its property and not the property of others.

12          A couple of points, Your Honor, four to be exact.

13  First, the debtors note in their presentation that they did

14  this for disclosure and fee review purposes.  And the U.S.

15  Trustee recognizes or understands the motivation as to why the

16  debtor might want to file the application.  Disclosure and fee

17  review are generally good things, but we believe that there's

18  also a countervailing jurisdictional concern that has to be

19  considered by the Court.

20          In other words, if we take Mr. Bowman's analysis that

21  at some point the debtors' estates might receive a dividend

22  from the sale and use that to justify the employment of a

23  professional for bankruptcy estate purposes, even if we're

24  dealing with the direct wholly owned subsidiary, we've

25  effectively eviscerated jurisdictional limits at that point.

1        THE COURT:  Wasn't that related to a jurisdiction?

2  Doesn't it have a hypothetical impact on the debtors' estate?

3  Isn't that all I need for related to a jurisdiction?

4        MR. McMAHON:  Your Honor, we believe that if you take

5  a look at the <u>Mertesan</u> and in <u>Soko</u> decisions, they actually

6  stand for the opposite proposition.

7        THE COURT:  All right.

8        MR. McMAHON:  We note that another function of the

9  trustee is to minimize administrative obligations.

10        THE COURT:  Mm-mm.  Under the cash management order

11  in this case, could the debtors pay the expenses of the wholly

12  owned subsidiary SPV entity, even though it's not in

13  bankruptcy, as the guarantor?  In other words, can it flow

14  down?  I know it can't flow up, but can it flow down, Mr.

15  Power?

16        MR. POWER:  No, Your Honor.  The cash collateral

17  order has a strict budget that the debtor can only spend it

18  pursuant -- cash -- oh, the cash management.  I'm sorry.  Then

19  I will sit down because -- I don't -- the cash --

20        THE COURT:  I mean, usually under a cash management

21  order you can pay certain expenses.  Obviously, they would have

22  to be part of the budget, but I mean I've seen them where

23  the -- a situation where you can pay the expenses of the wholly

24  owned subsidiary even though they're a non-debtor.  But, maybe

25  I'm mistaken.

1          MR. McMAHON:  A couple of things here, Your Honor, on

2   that point.  First, I don't know what the precise answer to the

3   Court's question is, but because of the sublease arrangement

4   between SPV and one of the debtors, effectively they're

5   paying --

6              THE COURT:  The debtor leases.

7          MR. McMAHON:  -- the rent through the sublease.

8              THE COURT:  Right.

9          MR. McMAHON:  Ergo, the obligation would be paid for

10  use of it.

11             THE COURT:  Well, if you want to sell the property,

12  somebody's going to have to retain a broker and somebody's

13  going to have to pay the check.  And I guess Mr. Bowman's

14  argument is that, ultimately the check's going to get paid by

15  the debtor one way or the other.  So, if the debtor's paying

16  the check, why shouldn't the debtor do the retention?

17             MR. McMAHON:  Your Honor, I appreciate the point that

18  debtors' counsel's making, but a couple things here.  In our

19  discussions, Mr. Bowman pointed out that the broker's actually

20  getting paid from the sale proceeds to the extent that there is

21  a sale.

22             THE COURT:  Right.

23             MR. McMAHON:  Our response to that is --

24             THE COURT:  Why are you bothering us?

25             MR. McMAHON:  -- that's great.  Well, it justifies

1  retention by SPV.

2          THE COURT:  Right.

3          MR. McMAHON:  In other words, we can respect the

4  jurisdictional limitation that's put forth in decisions that

5  I've cited and allow the debtors to get from Point A to Point

6  B.  And that's what we're not getting out of here which is, at

7  what point did the debtors need a court order to, you know, to,

8  I guess to protect each and every action that they're taking in

9  connection with the process, even if it involves non-estate

10  property.

11          So, Your Honor, a couple of points to conclude.  With

12  respect to the sublease, it's not a part of the proposed

13  engagement for CB Richard Ellis City Marketing, that sublease

14  for assignment.  The debtors have made it clear to us in our

15  discussions that if they do go in that direction, that they

16  will file an application for that purpose and there's going to

17  be the separate compensation structure.  And at the time that

18  that application will be filed, Your Honor, I think in

19  consistent with what I'm arguing here today, you're not going

20  to be hearing this objection from us.

21          And also, Your Honor, we did raise other concerns

22  with respect to the application.  They're embodied in a

23  proposed form of order to the extent that if the Court were to

24  rule against us on this jurisdictional point, but we can

25  discuss them at that point.  Thank you.

1          THE COURT:  All right.  Anyone else wish to be heard?

2     Mr. Indelicato.

3          MR. INDELICATO:  Your Honor, this is, at least from

4     the Committee's perspective, was a little unique.  We thought,

5     as Mr. Bowman described, this is really a piece of property

6     held by a special purpose vehicle with, the only debt it has

7     relates to the underlying mortgage.  And, in essence, all of

8     the equity belongs to the debtors in the flow through process.

9          From the Committee's perspective, we wanted to make

10    sure there was as much oversight as possible.  This potentially

11    could be tens of millions of dollar benefit to the estate, and

12    we believe, ultimately, as the Court pointed out, that the

13    check will be written by the debtor because the secured party's

14    going to get paid off in full, and the equity, whether it comes

15    out of the special purpose vehicle or the debtor, it's going to

16    reduce the amounts that otherwise would be available to the

17    debtors' creditors for payment.

18         And as Mr. Bowman indicated, there are a lot of

19    procedures that will be going forward to get this property sold

20    that, ultimately, we're going to have to come back to this

21    court anyway.  So, we believe that the full process should be

22    before the Court.  They're going to have to come back to this

23    Court, as he indicated, to get authority to have the debtor

24    authorize a special purpose vehicle to enter into whatever

25    ultimate sale agreement is done.

1          So, we believe that this -- the debtor should retain

2    the professional.  Ultimately, it's going to go down to the

3    debtors' benefit.  And we don't want to get into a situation

4    where we have to then wonder how the expenses are going to be

5    reimbursed and how the broker is going to be retained.  That

6    could be detrimental which, ultimately, would hurt creditors.

7    So, we believe, in this instance, under these facts, it's

8    appropriate.

9          THE COURT:  Okay.

10          MR. BOWMAN:  For the record, Your Honor, Donald

11    Bowman on behalf of the debtors.  I just want to make a couple

12    of quick points.  First of all, the trustee indicated that the

13    only obligation that Corp. would have would be for the

14    commission to CB Richard Ellis.  There is the reimbursement

15    provision that was payable upon demand up to $7500.  So, there

16    is an expenditure that needs to occur prior to the closing.

17          And as I pointed out earlier that we're likely to be

18    back before this Court with respect to at least getting

19    authority to allow SPV to sell this property, not just under a

20    363 sale context.

21          THE COURT:  Okay.  I want to read the cases cited by

22    Mr. McMahon before I rule, so -- and we have, I guess, one more

23    matter that is an evidentiary matter, although, I think,

24    uncontested, if that's what Mr. Huggett uncontested?

25          MR. HUGGETT:  Correct.  I'll be brief.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.  Mr. McMahon, do you have those

2    cases?  Or I could look them up myself.

3          MR. MCMAHON:  I do have them handy, Your Honor.  Can

4    I pass them up?

5          THE COURT:  Yes, you may approach.  Let's take a ten

6    or 15 minute break and let me look at that and then we'll

7    reconvene.  I'll give you my ruling.

8          MR. BEACH:  Your Honor, just one other thing.  We did

9    have a matter that we skipped over -- Item 2 on the agenda --

10   which I believe will be a quick matter to handle.  And those --

11         THE COURT:  Is it ready?

12         MR. BEACH:  We're ready to deal with that.

13         THE COURT:  Let's do that before we take a break,

14   then.  I don't want to keep people here any longer than they

15   have to.  Yes.

16         MR. BEACH:  Thank, Your Honor.  I'll see the podium

17   to Sharon Zeig.

18         THE COURT:  All right.  Yes, Mr. McMahon.  I

19   understand that if I overrule your initial objection we have to

20   go through the blackline.

21         MR. McMAHON:  And, Your Honor, just to note

22   scheduling matters, I have a two o'clock hearing before Judge

23   Walsh that I have to be at.  To the extent that there is

24   someone here from my office after the break that's not me, I

25   would ask the Court to accommodate me in that regard.

1          THE COURT:  All right.  That's fine.  Okay.

2          MR. McMAHON:  Thank you.

3          THE COURT:  There isn't a substitute for you, Mr.

4  McMahon, but --

5                    (Laughter)

6          THE COURT:  -- we'll do the best we can.  Yes, ma'am.

7          MS. ZEIG:  Good afternoon, Your Honor.  Sharon Zeig

8  of Young, Conaway, Stargatt & Taylor on behalf of the debtors.

9  I am dealing with matter Number 2 on the agenda today.  It's a

10 motion by Natixis for relief from the automatic stay.

11          I'm happy to announce after much negotiation that we

12 now have an agreed order granting -- a proposed order --

13 granting the relief sought by Natixis, at least in part.

14 There's, essentially, three portions of the motion for relief

15 from stay.  I'll be very brief in describing that.  There's --

16 the first portion is, they would like for servicing to be

17 transferred to them with respect to all mortgage loans serviced

18 by the debtors, other than certain what we're going to call

19 excluded HELOC loans, which are loans that have remained

20 unfunded, meaning no advances have been made on those loans.

21          The second portion of the relief sought by Natixis is

22 for the debtors to assist Natixis with respect to certain funds

23 that it has not received for loans that have been transferred

24 from the Natixis repurchase facility.

25          That portion of the motion has been adjourned at this

1  point until February 28th or such other time that's agreed to

2  by the parties or by the Court.  The third portion of the

3  relief sought in the motion deals with the return of loans

4  under the REPA (phonetic) facility other than the unreleased

5  loans.

6          So, today we have an agreed order that deals with

7  transferring servicing, returning the mortgage loans other than

8  the unreleased loans, which are the loans that have been

9  transferred out of the facility for which Natixis hasn't

10  received payment for, and returning to Natixis certain HELOC

11  loans, which actually is only two, that have not -- that have

12  had funds advanced on them.

13          So, what we would like to do is hand up to you an

14  order, and attached to the order is the party's settlement

15  agreement.  Attached to the settlement agreement are certain

16  servicing transfer guidelines.  Your Honor, you will notice

17  that in the settlement agreement there are certain sections,

18  actually three, that have been interlinead by the parties

19  today.  I hope that's acceptable to you.  But, all parties have

20  signed off and agreed to the interlineations.  May I approach?

21          THE COURT:  Yes.  Thank you.  The Committee's on

22  board?

23          MR. INDELICATO:  Yes, Your Honor.  We did have some

24  concerns, but those interlineations resolve our concerns.

25          THE COURT:  All right.  Yes?

1        MR. SUTTY:  Good afternoon, Your Honor.  Eric Sutty

2    of Bayard on behalf of Natixis.  We obviously support entry of

3    the order approving the stipulation and we fully reserve our

4    rights with respect to the unreleased loans.

5        THE COURT:  I'm going to have to read this.  I can

6    tell you that right now.

7        MR. TALMADGE:  I haven't seen the order either.  I

8    just want to know if there are any funds flowing as a result of

9    the servicing transfer because those might implicate the rights

10   of Bank of America who has (indiscernible) servicing rights.  I

11   just want to understand and see the order.

12       MS. ZEIG:  There are funds that are going to be

13   flowing to Natixis under this order.  Those are the funds that

14   are in the PNI and TNI accounts, less any amounts that were --

15   are unreimbursed advances to the debtors.

16       THE COURT:  Is this your only copy at this point?

17       MS. ZEIG:  No.

18       THE COURT:  I'm going to give Mr. Talmadge a -- you

19   look at it during the break, I'll look at it during the break.

20   I need to read it before I approve it, all right?  Anything

21   else?

22       MS. ZEIG:  Thank you, Your Honor.

23       THE COURT:  I was hoping to get you out of here.

24   Sorry, Mr. Sutty.  All right.  We'll take a recess -- 15, 20

25   minute recess.

1                          (Recess)

2              THE COURT:  Please be seated.  Last things first.  On

3    this Natixis, I'm not comfortable approving this in the context

4    of settlement of a Stay of Relief motion.  There are mutual

5    releases.  There's a variety of other stuff.  I'm going to make

6    you send that out on notice.  You can shorten time if necessary

7    and have it heard at the February 28th hearing, but I think you

8    need a 9019 motion.

9              MS. ZEIG:  The February 28th or the February 14th?

10             THE COURT:  I meant 28th.  I don't know what I said,

11   but I meant 28th.

12             MS. ZEIG:  Okay.

13             THE COURT:  All right?

14             MS. ZEIG:  Thank you, Your Honor.

15             THE COURT:  Unless that's causing a huge problem.

16             MR. SUTTY:  Yes.  I believe there is a hearing on

17   February 14th.

18             THE COURT:  If you get notice out by tomorrow you can

19   shorten notice and have it heard on the 14th, okay?

20             MR. SUTTY:  We would really like to start

21   transferring servicing now and make it effective March 1st and

22   send out our goodbye letters in accordance with the

23   applicable --

24             THE COURT:  Well,

25             MR. SUTTY:  -- law, which is like --

1        THE COURT:  I'd like to be consistent with the letter

2   and spirit of the law, so it's going in on notice.  February

3   14th is the best I can do, all right?  All right.  Look, you

4   got mutual releases in here.  You've got money going out of the

5   debtors' estate.  It's too much, all right?  I'm going to

6   sustain Mr. McMahon's objection.  I'm not sure the cases are

7   actually directly on point, but I think they stand for the

8   proposition that is correct, which is there is a sharp

9   distinction between the assets of a subsidiary who aren't in

10  bankruptcy and the actual ownership interest in that

11  subsidiary.  And I'm concerned about expanding the scope of the

12  Court's jurisdiction to start authorizing professionals who are

13  acting on or behalf of non-debtor entities.

14        Now, true, in all likelihood the expense and the

15  upside and you're -- ultimately to a debtor entity.  And one

16  could make an argument based on that, that the Court should

17  exercise jurisdiction to start supervising the professionals

18  working for that subsidiary.  I think that's a slippery slope

19  that, notwithstanding the Committee's argument that this is a

20  one off -- or a unique situation I'm concerned about.  So, I'm

21  not going to go there.  And I'll sustain the objection and deny

22  the motion.

23        MR. McMAHON:  Your Honor, I'll prepare proposed form

24  of order and circulate it to Mr. Bowman --

25        THE COURT:  That's fine.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. McMAHON:  -- for review.  And, Your Honor, with

2    that may I be excused?

3          THE COURT:  Yes.

4          MR. McMAHON:  Thank you, Your Honor.

5          THE COURT:  Okay.  Mr. Huggett.

6          MR. HUGGETT:  Thank you, Your Honor.  Fascinating

7    issue to be sure.  Jim Huggett with Margolis Edelstein for the

8    WARN Act plaintiffs in Adversary Proceeding 07-51688.  This is

9    our motion for a class certification.  Just by way of a very

10   brief background.  We did have a stipulated order on that

11   motion.  We submitted it to the Court under certification of

12   counsel with various declarations and sworn statements.  The

13   motion is approved and agreed to by the creditors committee as

14   well as the debtors, and of course us.  We've heard no response

15   from the U.S. Trustee or any other party.  I gathered that the

16   Court, nevertheless, was called for an evidentiary hearing,

17   mindful of that the other two should make some type of a record

18   rather than simply just sign off on an agreement between the

19   parties.  And, of course, we're pleased to do that.

20          THE COURT:  Okay.

21          MR. HUGGETT:  In view of the lateness of the hour and

22   the length of the hearing, I wanted to make a respectful

23   suggestion.  The first is that I be authorized to proffer the

24   testimony of the witness.  Her name is Rene Roupinian and she

25   is here.  She came down from Manhattan to entertain any

1 questions or concerns Your Honor might have.

2          THE COURT:  Yes.  Any objection to the use of a

3 proffer?  All right.  Hearing none, that's fine with me.

4          MR. HUGGETT:  And vis-a-vis that proffer, I have two

5 ways to go.  The first is, I can simply proffer through my

6 bullet point list of the testimony the things that I want you

7 to say to make -- or that I want to say to make an evidentiary

8 record.  But, the second option is to simply proffer and put

9 forward the materials.  There were actually pretty extensive

10 sworn declarations attached to the motions.

11          The people making those declarations are not here in

12 this courtroom now, but they include proposed class counsel.

13 They include myself.  They include, I believe, all of the named

14 plaintiffs in the lawsuit.  If you would give me that

15 indulgence we could simply put that forward as the proffer, and

16 if there are any questions or concerns -- if Your Honor's not

17 comfortable doing that, I'll be very brief going over the

18 actual testimonial proffer.

19          THE COURT:  Do you have them with you?  I don't have

20 the hard copies with me.

21          MR. HUGGETT:  I have copies of the declarations, yes.

22          THE COURT:  And -- I'm confused.  You're going to

23 proffer her testimony.  She's going to -- that the affidavits

24 are true and correct?

25          MR. HUGGETT:  No.  I'll proffer her testimony about

1  the Rule 23 standards and the things that are necessary for you

2  to grant the motion.

3          THE COURT:  And then you --

4          MR. HUGGETT:  But, what I was saying -- forgive me if

5  I wasn't clear.  All of that's already done in the exhibits to

6  our motion, so -- but the people who swore to those

7  declarations are not here.

8          THE COURT:  All right.  Let's just do her proffer.

9  That'll be better.

10          MR. HUGGETT:  Okay, that's fine.  And again, I didn't

11  mean to test your patience, but I know --

12          THE COURT:  No, no, no.

13          MR. HUGGETT:  -- a lot of people here for a long

14  time, so -- Your Honor, this is an adversary -- excuse me --

15  the witness to be proffered is Rene Roupinian.  She is a WARN

16  Act and labor attorney with the firm Outten & Golden in

17  Manhattan.  This is an adversary proceeding with committee

18  intervention that I believe has been approved by the Court or

19  it's on its way to being approved such as the Committee is a

20  party.

21          Before starting the factual proffer I would just

22  observe that Rule 7023 takes Federal -- excuse me -- Bankruptcy

23  Rule 7023 takes Federal Rule 23 and applies it verbatim to

24  adversary proceedings.  So, I think you have full power to

25  certify a class as a matter of law, to appoint us as class

1  counsel, and to enter related orders.

2         We filed a complaint on August 8th of '07 which is

3  not long after the bankruptcy case was filed.  Your Honor may

4  recall from the papers that the -- I believe it's a matter of

5  pretty clear public notice that the terminations in question

6  took place on or about August 3rd of 2007, so five days before

7  the filing.

8         Our complaint seeks Rule 23 certification.  It

9  alleges that the debtors violated the WARN Act, vis-a-vis these

10 terminations, and that the WARN Act covers the debtors.  And be

11 that as it may, we'll rest on what's put in the complaint.

12 Sufficed to say, there has been an answer with affirmative

13 defenses, and again, we have committee participation.  So, a

14 scheduling order was entered by consent and we are proceeding

15 with discovery as things go.

16        I neglected to note because of the confusion with

17 Court Call that co-counsel were on the phone; Mr. McCrary and

18 Ms. Olsen.

19        THE COURT:  They're still there.  Yes.

20        MS. OLSEN:  We're here, Your Honor, yes.  Mary Olsen.

21        MR. McCRARY:  This is Vance McCrary.  I'm here also.

22        THE COURT:  Thank you.  They're back.  All right.

23 Welcome back.

24        MR. McCRARY:  Thank you.

25        MR. HUGGETT:  So, I would also just observe that, as

1  a legal point outside of the context of the proffer, Courts,

2  including this Delaware Bankruptcy Court, have repeatedly

3  granted a class certification in WARN Act cases and stated that

4  class actions are the appropriate vehicle, in fact, a pretty

5  smart vehicle for addressing claims for WARN Act violations.

6  Some, but not all of them, are relatively small claims, and it

7  is difficult for the claimants to prosecute those in addition

8  to the opinions that are cited in our materials.

9          I, myself, can represent as an officer of the Court

10  that I've heard Judge Walsh, who was at that time the Chief

11  Justice, specifically state that -- what I just told you, which

12  is that the class action vehicle is appropriate and really well

13  designed to remedy alleged WARN Act violations.  I would also

14  observe --

15          THE COURT:  He's going to be upset to hear he's been

16  demoted from Chief Justice to bankruptcy judge.  And the

17  commencer at pay reduction is truly damaging.

18          MR. HUGGETT:  I heard you talking about pay before,

19  Your Honor.  I do --

20          THE COURT:  Sorry.

21          MR. HUGGETT:  I believe that was the Inacom

22  bankruptcy cases for the Court reporter, I-n-a-c-o-m.  If I'm

23  incorrect about that I apologize.  Last, I would observe that

24  demerits of an action are utterly irrelevant under the case law

25  to the issue of whether you should certify a class.  So,

1 whatever I'm saying here, and whatever I'm about to say, Mr.

2 Beach deserves every right to fight it, and Mr. Power and Mr.

3 Indelicato and anyone else, again, merits are not relevant to

4 class certification.

5         If called to testify, Ms. Roupinian would testify

6 that she has extensive personal knowledge of, and experience in

7 prosecuting WARN Act claims both in and out of bankruptcy and

8 class actions.  If called to testify, she would testify that

9 she knows proposed class counsel here, collectively, have

10 extensive experience in prosecuting WARN Act violations.  And

11 so, not just her, but all of the people who are purported to be

12 class counsel here have been repeatedly appointed as class

13 action counsel for WARN Act matters in bankruptcy cases.  I'm

14 doing in, what, New Century, Aegis and a couple of other cases

15 like that.  I'm proud to say that in every case we have close

16 involvement with he creditors committee and intervene in those

17 cases, and the witness would so testify that we work with the

18 creditors committee.

19         I won't read it unless you like, but the class

20 definition, Your Honor, is set forth in Page 6 of our motion.

21 Maybe I would read it if you'd like, but I don't know if it's

22 necessary.  And, obviously, that class definition, then, makes

23 its way into the order I'm going to ask you to consider.

24         THE COURT:  All right.  Now, you're not -- that's --

25 well, where the heck is it?

1          MR. HUGGETT:  Your binder should have a certification

2  of counsel.

3          THE COURT:  I'm looking at the wrong thing.

4          MR. HUGGETT:  I could hand if you --

5          THE COURT:  Hang on.  You said Page 6 of the motion?

6          MR. HUGGETT:  Yes.  The bottom.

7          THE COURT:  It's not lengthy.  Why don't you read it

8  for the record?

9          MR. HUGGETT:  The class is defined as follows;

10 persons who worked at or reported to one of the defendant's

11 facilities and were terminated without cause on or about August

12 3rd, 2007, were terminated without cause within 30 days of

13 August 3rd, 2007, or were terminated without cause as the

14 reasonably foreseeable consequence of the mass layoff or plant

15 closing ordered by the defendants on or about August 3rd, 2007,

16 and who are affected employees within the meaning of 29 U.S.

17 Code Section 2101(a)(5).  And that's (a) and (5) in paren.  And

18 that's reflected on 6 through 7 of our motion, and it follows

19 up in Your Honor's order.

20         If called to testify as a witness, Ms. Roupinian

21 would testify that we meet the standards of Rule 23.  The

22 standards generally don't even come into play under the case

23 law once you get beyond 40 or 50 people here.  We have

24 thousands of employees.  If called to testify, Ms. Roupinian

25 would state that we meet the Rule 23 standards with respect to

1 commonality of fact and law questions, and specifically --

2 again, this is not the proceeding for the Court to make any

3 findings about the merits of it, but simply to observe through

4 the proffer that the named plaintiffs and the proposed class

5 members are all basically in the same boat.  Whatever their

6 factual and legal questions are going to be applicable to one

7 will be applicable to others and, indeed, all.

8        If called to testify, Ms. Roupinian would testify

9 that the standard on typicality set forth in Rule 23 is

10 similarly met here and, again, that means that the claims of

11 the named plaintiffs are typical of those people throughout the

12 class.

13        If called to testify, she would testify that the

14 named plaintiffs and class counsel believe that we can provide

15 fair and adequate representation for the class members, which

16 is also a requirement of Rule 23.  Moving back from the

17 proffer, I would observe that the case law indicates class

18 claims are allowed in bankruptcy cases.  You and I have been

19 down that road before, Your Honor, and that the class can cover

20 even those individuals who are not people who file their own

21 proof of claim.

22        So, there may be people out there who have claims

23 under the WARN Act and don't know it.  And so, they have not

24 filed a proof of claim in this bankruptcy case.  Those people

25 are, nonetheless, included in the class definition.  And again,

1  all rights for Mr. Beach and Mr. Indelicato are, of course,

2  reserved with respect to any actual -- the merits of any actual

3  claim.  I note again, the moving papers contain multiple sworn

4  affidavits from both the named plaintiffs and the proposed

5  class counsel in this litigation, and I would ask the Court to

6  take notice of those.

7        Last, I wanted to point out, the WARN Act is opt out

8  litigation.  I've been before you on FLSA matters where the

9  opposite is the case, but it's opt out litigation.  So, a

10 detailed and extensive notice of the class action is provided

11 to the proposed class members.  That notice is in our motion.

12 It is substantially similar to a notice that we've used and has

13 been approved in a number of other cases before this Court and

14 other bankruptcy Courts.

15       If called to testify, Mr. Roupinian would indicate

16 that the notice complies with due process and that it provides

17 fair and adequate information to the recipients.  It gives them

18 the ability to protect their rights and a sufficient amount of

19 time to literally opt out if they don't want to be bound by the

20 resolution.  They want to pursue their own lawsuits and to make

21 an informed decision on that issue.

22       The service and timing and mailing procedures with

23 respect to the notice are set forth in the order.  The long and

24 short of it is that the debtors are going to provide us with

25 the contact information and names of the former employees who

1  might fall within that class definition.  This will be done

2  under the Committee's supervision as always, and we will make

3  sure that that information is kept confidential.

4          Usually in these cases we have entered into

5  confidentiality agreements, and if we filed anything that

6  contains anybody's name or personally identifying information,

7  we file it under seal.  We'll certainly be happy to follow

8  that.  Now -- and again, the process is a collaborative one, so

9  we will not be taking any steps other than that are approved by

10 you or by the debtors with consultation of the Committee.

11         So, with all of that, I would tender to proffer the

12 witness and, unless the Court has additional questions, I

13 respectfully request entry of the order.  And I do have a

14 copy -- forgive me -- I also did not ask whether anybody else

15 here wanted to make a --

16         THE COURT:  Hang on.

17         MR. HUGGETT:  -- statement.

18         THE COURT:  Does anyone have any questions for the

19 witness?

20         MR. POWER:  None from the Committee, Your Honor.

21         THE COURT:  All right.  Debtor?  None?  All right.

22 We'll accept the proffer.

23         MR. HUGGETT:  I do have a form of proposed order if

24 I --

25         THE COURT:  Is there any objection to the admission

1   into evidence of the --

2           MR. HUGGETT:  I'd be glad to say their names if --

3           THE COURT:  I'm sorry.  The declarations in support

4   of the motion which were attached to Docket Item 21 -- 29, I

5   mean?  None?  All right.

6           MR. POWER:  None from the Committee, Your Honor.

7           THE COURT:  All right.  It'll be admitted without

8   objection.  Let's see.  I'll admit them as Plaintiff 1.

9           MR. HUGGETT:  Just one moment, please, Your Honor?

10          THE COURT:  Yes.

11          MR. HUGGETT:  This might be a good time for me to ask

12  whether my co-counsel on the phone or in the courtroom had any

13  changes to the order that was submitted with the motion.  I'm,

14  frankly, unaware of any, but they're in another state and --

15  otherwise --

16          THE COURT:  Any changes to the order or any other

17  comments?

18          MR. SCHONHOLTZ:  No, there weren't.

19          MR. HUGGETT:  Okay.

20          THE COURT:  I'm not picky who comes up.  As long as

21  you went through the magnetometer, you can approach.

22          MR. HUGGETT:  Might I raise the issue there has been

23  a change made?  So, before I approach let me observe that Mr.

24  Holt was kind enough to come and give that to me.

25          THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HUGGETT:  I did want to also just observe Your

2  Honor's certifying the class -- appointing class counsel,

3  things of that sort.  But, in just in terms of logistics, it's

4  my understanding that the arrangement we've worked out here is

5  that the debtor will provide us with the names and contact

6  information for the employees, but it's actually the

7  plaintiff's counsel who's taking it upon themselves to do the

8  mailing and the notice and to receive the notices back and to

9  deal with all the people.  That's customary, I think, and

10  common in WARN Act and any opt out litigation.  But, I did want

11  to observe that, as a result, the actual cost to the debtor

12  should be minimal.  This is not something the debtors are going

13  to have to pay parcels to serve out on 4,000 people.

14          THE COURT:  All right.

15          MR. HUGGETT:  Whatever it is, we're going to do it.

16  If I may approach?

17          THE COURT:  Yes.  Thank you.  Thank you very much.

18  All right.  Based on the evidentiary record before the Court

19  I'll approve the order as submitted and make the findings

20  contained therein which are supported by the testimony and the

21  affidavits admitted into evidence.  Is the notice in exhibit?

22          MR. HUGGETT:  It is, Your Honor.

23          THE COURT:  Okay.

24          MR. HUGGETT:  I guess I should observe at this point,

25  unlike what we would normally do, I have not walked you through

1  a blackline showing how the order that was filed with the

2  motion is changed by the order just handed to you.  The reason

3  is because the last version of it was just handed to me by Mr.

4  Holt.  I just wanted to put that on the record in case it

5  becomes an issue.  I'd be glad to go through the order with you

6  line by line.

7          THE COURT:  I read it.  It's fine.

8          MR. HUGGETT:  Okay.

9          THE COURT:  Anything further?

10          MS. SCHONHOLTZ:  Thank you, Your Honor.

11          THE COURT:  All right.  You're welcome.

12          MR. BEACH:  Nothing further, Your Honor.

13          MR. HUGGETT:  Thank you, Your Honor.

14          THE COURT:  All right.  Hearing is adjourned.

15                      * * * * *

16          **C E R T I F I C A T I O N**

17          I, KATHLEEN BETZ, court approved transcriber,

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter, and to the best of my ability.

21

22  /s/ Kathleen Betz                DATE:  February 10, 2008

23  KATHLEEN BETZ

24  J&J COURT TRANSCRIBERS, INC.
25

**J&J COURT TRANSCRIBERS, INC.**