# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x  Chapter 11

In re:                                                           :
                                                                 :  Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                           :
HOLDINGS, INC., a Delaware corporation, et al.,[1]               :  Jointly Administered
                                                                 :
                            Debtors.                             :  Hearing Date: February 28, 2008, at 11:00 a.m. (ET)
                                                                 :  Objection Deadline: February 25, 2008, at 12:00 p.m. (ET)
                                                                 :
---------------------------------------------------------------- x

## DEBTORS' EMERGENCY MOTION TO ENFORCE THE TERMS OF THE LETTER AGREEMENT AND ORDER, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY LEASES AND THE SALE OF FURNITURE, FIXTURES AND EQUIPMENT LOCATED THEREIN; (II) APPROVING THE TERMS OF THE LETTER AGREEMENT; AND (III) GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, "AHM" or the "Debtors"), by and through their undersigned counsel, request by this emergency motion (the "Motion") the entry of an order pursuant to section 105 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to enforce the terms of the Letter Agreement and Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

Granting Related Relief [Docket No. 357] (the "Indymac Sale Order"), attached hereto as Exhibit A, and the terms of a Letter Agreement (as defined below) approved by the Indymac Sale Order, attached hereto as Exhibit B. In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

1. On the eve of the final deadline to assume non-residential real property leases (March 3, 2008) pursuant to section 365 of the Bankruptcy Code, Indymac continues to take all of the benefits of operating out of ninety-eight (98) of the Debtors' Production Offices without closing the transaction and paying the Debtors.

2. The Debtors filed bankruptcy on August 6, 2007. Indymac seized on the opportunity to take over ninety-eight (98) of the Debtors' Production Offices shortly thereafter by executing a binding Letter Agreement and a binding License Agreement on August 7, 2007. The Letter Agreement, among other things, bound Indymac to take assignment of, and assume the liabilities under, the Office Leases and to purchase the FF&E located therein. Pursuant to the License Agreement, Indymac demanded immediate access (no later than August 8, 2007) to certain Production Offices to enable Indymac to begin profiting from the agreement by conducting business operations from those offices. Indymac also demanded, pursuant to the Letter Agreement and License Agreement, that the Debtors file emergency motions for approval of same by no later than August 10, 2007. Through the Debtors' extraordinary efforts (particularly given the juncture of these cases at the time), and the accommodations of the Court,

---

[2] Terms used, but not defined in the Preliminary Statement, shall have the meaning set forth in the Motion.

the Debtors met Indymac's demands and attained approval of the Letter Agreement and License Agreement on August 24, 2007.

3. The apparent strategy of Indymac was and is to force the Debtors into an expedited process to attain maximum value for Indymac and then to abruptly stall the process and refuse to close or pay. Indymac has now been operating out of the Production Offices for well over six (6) months, reaping all of the benefits and only minimal burdens of the transaction. Indeed, the only burdens taken on by Indymac to date have been to satisfy the landlords so as not to have any disruptions in their business operations. Even these burdens have largely fallen on the Debtors throughout the previous six (6) months, since Indymac has not hesitated to contact the Debtors for assistance with landlords and other issues on numerous occasions. When it comes to closing the transaction and paying the Debtors, however, Indymac has certainly hesitated to the point of inaction and/or orchestrated delay.

4. Indymac, a sophisticated and well counseled company, entered into the Letter Agreement and License Agreement with eyes wide open and with a full understanding that the primary purpose of the Letter Agreement and License Agreement was to consummate the assumption and assignment of the Office Leases by March 3, 2008 pursuant to section 365 of the Bankruptcy Code (the "Closing Deadline"). While it is without question that Indymac entered into the agreements with a clear understanding of the Closing Deadline, this understanding is further evidenced by Indymac's request for confirmation that the first extension of the section 365(d)(4) deadline was in fact approved and applicable to the Office Leases under the Letter Agreement and License Agreement, which confirmation the Debtors provided to Indymac on December 5, 2007. See Email from Sean M. Beach to Frederick D. Holden, Jr. (Dec. 5, 2007, 11:11 a.m. (EST)) (attached hereto as Exhibit C). In addition, through numerous telephone calls

and correspondence, the Debtors have made it abundantly clear that Indymac must close the transaction on or before the Closing Deadline. See e.g., Letter from Craig D. Grear to Frederick D. Holden, Jr. (Feb. 7, 2008) (attached hereto as Exhibit D). Yet, through a series of calculated delays and modification requests, Indymac has stalled the closing and left the Debtors with no choice but to file the instant emergency Motion to enforce the terms of the Letter Agreement and close the Sale.

5.  In summary, the Debtors' respectfully request that the Court enter the attached order: (i) enforcing the terms of the Indymac Sale Order and Letter Agreement and compel Indymac to close by the Closing Deadline; (ii) sanction Indymac to pay the costs and expenses associated with filing and prosecuting this Motion; and (iii) awarding the Debtors' interest from August 24, 2007 until the date the Sale closes.

## JURISDICTION

6.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and pursuant to paragraph 14 of the Indymac Sale Order. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is section 105 of the Bankruptcy Code

## BACKGROUND

### A.  General

7.  On August 6, 2007 (the "Petition Date") each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4

8. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

9. On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "<u>Committee</u>"). No trustee or examiner has been appointed.

10. In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

11. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

**B.  <u>The Indymac Sale Order and Letter Agreement</u>**

12. In the weeks prior to the Petition Date, the Debtors operated hundreds of leased loan production offices at locations in 47 states and the District of Columbia (the "<u>Production Offices</u>"). However, shortly prior to the Petition Date, the Debtors discontinued their loan origination business (the "<u>Origination Business</u>") in their Production Offices. The vast

majority of the Debtors' employees were part of the Origination Business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce.

13. During the days leading up to the Petition Date, the Debtors, aided by their professional advisors, were in contact with certain entities in the mortgage industry that expressed an interest in taking immediate control of the Debtors' Production Offices. In particular, Indymac seized on the opportunity to take over certain of the Debtors' Production Offices and approached the Debtors inquiring as to the assumption and assignment of certain of the Debtors' Production Offices and the potential purchase of the FF&E located therein on an expedited basis. Shortly thereafter, the Debtors and Indymac entered into negotiations concerning the potential sale.

14. As a result of those negotiations, on August 7, 2007, the Debtors and Indymac entered into a letter agreement (the "Letter Agreement"), whereby Indymac agreed and was bound to purchase the Office Assets (the "Sale"). The Letter Agreement binds Indymac to take assignment of, and assume the liabilities under, ninety-eight (98) office leases (collectively, the "Office Leases," a list of the Office Leases is attached hereto as Exhibit E),[3] and to purchase certain furniture, fixtures and equipment located therein (the "FF&E"). The purchase price calculation, attached hereto as Exhibit F, was reviewed and verbally approved by Albert Gomez of Indymac on February 7, 2008.[4]

---

[3] The terms of the Letter Agreement permitted Indymac to add or exclude a certain percentage of Office Leases for a limited period of time. On August 7, 2007, there were approximately 75 Offices Leases and, after certain exclusions and additions by Indymac the Sale was approved with the final total of 98 Office Leases.

[4] Consistent with Indymac's positions throughout this process, Mr. Gomez approved the purchase price calculation and indicated that it was subject to final signoffs by a few other Indymac personnel.

6

15. Also on August 7, 2007, Indymac demanded immediate access to the Office Lease premises and the parties entered into a license agreement (the "License Agreement," a copy is attached to the Letter Agreement), pursuant to which Indymac is granted a license to use the office space, and all furniture, fixtures and equipment located within such office space, including utilities, telephone and Internet service supplied to such office space and all other items owned, rented, leased or otherwise controlled by Debtors at the Office Lease premises, until such time as the Sale closes or until it is terminated by either party upon not less than fifteen (15) business days notice.

16. On August 10, 2007, the Debtors, in accordance with Indymac's demands for expedited relief under the Letter Agreement, filed the Emergency Motion for an Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III) Granting Related Relief [Docket No. 137] (the "Emergency Sale Motion").

17. On August 24, 2007, the Court approved the Emergency Sale Motion by entry of the Indymac Sale Order, and separately granted the Debtors' motion to approve the License Agreement [Docket No. 356]. The Debtors, with the Court's accommodation, were successful in attaining the expedited relief requested by Indymac. Despite these efforts by the Debtors and the fact that the Debtors were largely responsible for the cure obligations under the Letter Agreement, Indymac refused to close the Sale prior to the hearing with respect to the establishment of the cure obligations.

18. The Debtors then embarked on the process of setting the cure amounts, by filing a Notice of (I) Assumption and Assignment of Certain Real Property Leases and Sale of

7

Furniture, Fixtures and Equipment Located Therein; and (II) Proposed Cure Obligations, if Any [Docket No. 425] (the "Original Cure Notice") and a Corrected Notice of (I) Assumption and Assignment of Certain Real Property Leases and Sale of Furniture, Fixtures and Equipment Located Therein; and (II) Proposed Cure Obligations, if Any [Docket No. 541] (the "Corrected Cure Notice," and collectively with the Original Cure Notice, the "Cure Notice"). Pursuant to the Cure Notice, the Debtors listed the proposed amounts necessary to cure any defaults under the Office Leases (collectively, the "Cure Amounts").

19. On September 17, 2007, the Court entered the Order Establishing and Fixing Cure Amounts Related to Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III) Granting Related Relief [Docket No. 778] (the "Cure Order"). Pursuant to the Cure Order, the Court fixed the Cure Amounts for the Office Leases through and including September 30, 2007. Since Indymac was obligated to pay all costs since August 7, 2007, either to the Debtors or directly to the landlords and vendors, the cure amounts were largely limited to accrued, but unpaid pre-petition obligations. Upon information and belief, all obligations under the Office Leases accruing after the Petition Date have been satisfied. The outstanding cure obligations will be satisfied upon closing of the Sale.

20. Since entry of the Cure Order, the Debtors have stood ready to close the Sale since no later than September 30, 2007 and have worked diligently to do so. Despite the Debtors' best efforts, however, even after the cure amounts were established Indymac has repeatedly stalled the closing. For instance, the Debtors again made significant efforts to prepare appropriate documentation to permit the closing on September 30, 2007 and, at the eleventh

8

hour, Indymac insisted that a majority of the purchase price be held back, subject to reconciliation. While the Letter Agreement did not provide for any holdback on the purchase price, the Debtors were willing to work with Indymac and provide for a reasonable holdback. Indymac refused to close under the reasonable terms proposed by the Debtors.

21.     Since then, the Debtors have been continuously led down the garden path by Indymac with suggestions that the closing is imminent only to be derailed at the last minute on multiple occasions with new Indymac demands, requests and roadblocks. For instance, Indymac has insisted on sending out estoppel certificates to each landlord under the Office Leases for the purpose of verifying security deposits, as opposed to paying or escrowing a reasonable estimated amount subject to reconciliation. Additionally, Indymac also sent out estoppel certificates to verify the cure amounts owed to each landlord under the Office Leases, even though the Court previously fixed such cure amounts pursuant to the Cure Order and Indymac was obligated to satisfy all obligations since approximately August 8, 2007. While these estoppel certificates were not contemplated under the Letter Agreement, and in fact are not a necessary component to close the Sale, Indymac continues to delay the closing on the basis that it has not received the estoppel certificates from each and every one of the 98 landlords. Moreover, Indymac has further delayed the closing by insisting on modifications to the Letter Agreement, even after such Letter Agreement was approved by this Court. Specifically, Indymac has stated it will hold back twenty percent (20%) of the value of the security deposits from the cash payment to be made at closing and will only remit such twenty percent (20%) upon receiving the estoppel certificates from each landlord. Again, neither verification of the security deposits nor a holdback were contemplated in the Letter Agreement.

22.     On November 8, 2007, the Debtors filed a motion to extend the deadline under section 365(d)(4) of the Bankruptcy Code, which sought, among other things, the extension of the Debtors' time to assume or reject the Office Leases [Docket No. 1905] (the "Extension Motion"). The Extension Motion was approved by the Court on November 26, 2007 [Docket No. 2168] (the "Extension Order"), and extended the Debtors' time to assume or reject the Office Leases until March 3, 2008. While Indymac had been served with the Extension Motion and Extension Order, on or about December 5, 2007, the Debtors' received a call from Indymac to confirm that the Extension Motion was approved and that it applied to the Office Leases. By email on December 5, 2007, the Debtors provided copies of both the Extension Motion and Extension Order to Indymac and confirmed that it did extend the section 365(d)(4) deadline with respect to the Office Leases. See Email from Sean M. Beach to Frederick D. Holden, Jr. (December 5, 2007, 11:11 a.m. (EST)) (attached hereto as Exhibit C). By return email on that same date, Indymac confirmed its agreement that the Office Leases were covered under the Extension Order. See Email from Frederick D. Holden, Jr. to Sean M. Beach (December 5, 2007, 2:42 p.m. (EST)) (attached hereto as Exhibit C). Indymac was certainly aware of and concerned about the deadline to assume the Office Leases. If follows, of course, that Indymac was clearly aware that March 3, 2008 was the absolute latest Closing Deadline under the terms of the Indymac Sale Order and Letter Agreement.

23.     The Debtors have attempted to work through the above-referenced issues and in fact, on February 7, 2008, as referenced above, Indymac approved the detailed purchase price closing calculation. After the Sale again failed to close, on February 7, 2008, the Debtors notified Indymac, in writing, that the Debtors' deadline under section 365(d)(4) of the Bankruptcy Code is no later than March 3, 2008 (the "February 7 Letter," attached hereto as

10

Exhibit D). Among other things, the February 7 Letter reiterated that the Sale must close by no later than the Closing Deadline, that the License Agreement would terminate no later than the Closing Deadline, that the Debtors' reserve the right to move the Court to compel the closing by the Closing Deadline, and that the Debtors' reserve the right to sue Indymac for damages for failing to close by the Closing Deadline.

24. In true form, Indymac did not receive the February 7 Letter and expedite the process of closing the transaction. Instead, while confirming that it has no independent right to unilaterally modify the Letter Agreement, Indymac requested a material modification to the Letter Agreement. Specifically, Indymac requested that the Debtors remove fifteen (15) of the Office Leases from the list of Office Leases to be assigned under the binding Letter Agreement. While the Debtors engaged in good faith negotiations to comply with yet another Indymac request, which included discussions with the Committee, Indymac did not demonstrate any reasonableness or urgency to finalize the Sale. The Debtors were left with no option but to file the instant Motion.

## RELIEF REQUESTED

25. Since the entry of the Indymac Sale Order, the Debtors have actively tried to close the Sale with Indymac and have endeavored to meet all of Indymac's demands. Despite the Debtors' best efforts, Indymac has repeatedly failed to close the Sale, and the Debtors' March 3, 2008 deadline under section 365(d)(4) of the Bankruptcy Code to assume or reject the Office Leases is less than three (3) weeks away. By this Motion, the Debtors respectfully request an order of this Court that (i) enforces the terms of the Indymac Sale Order and the related Letter Agreement, (ii) requires the Sale to close, at the very least, in advance of the aforementioned deadline under section 365(d)(4), (iii) awards the Debtors their fees and expenses associated with

prosecuting this Motion, and (iv) awards the Debtors interest from August 24, 2007 until the date the Sale closes.

## BASIS FOR RELIEF REQUESTED

26. Pursuant to the Indymac Sale Order, the Court "retain[s] jurisdiction over any and all matters arising from or related to the implementation or interpretation of the Letter Agreement or [the Indymac Sale] Order." Moreover, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code," and the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the Debtors' remaining assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986).

27. Furthermore, it is well-established that bankruptcy courts, based on the reference of the inherent power of the district court contained in section 157(c) of title 28 of the United State Code, and on the broad statutory grant of equitable powers in section 105 of the Bankruptcy Code, have the inherent authority to enforce compliance with their lawful orders, to the extent such power is not restricted by statute. LaTrobe Steel Co. v. United Steel Workers, Etc., 545 F.2d 1336, 1350 (3d Cir. 1976); United States Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus.), 68 B.R. 690, 695-97 (Bankr. S.D.N.Y. 1986); Johns-Manville Sales Corp. v. Doan (In re Johns-Manville Corp.), 26 B.R. 919, 924 (Bankr. S.D.N.Y. 1983).

28. Indymac extensively negotiated the Sale transaction and mandated expedited relief to ensure full access to the Office Lease premises for its business operations. The Debtors, with the Court's accommodation, successfully met these demands by signing the Letter Agreement on the 2nd day of the cases, providing access to Indymac on the 3rd day of the

12

cases or as shortly thereafter as was reasonably practicable, filing emergency motions for the approval of the License Agreement and Letter Agreement on the 5th day of the cases, and attaining Court approval of the motions on the 18th day of the cases. Through the Indymac Sale Order, this Court approved the Letter Agreement, which bound Indymac, among other things, to take assignment of, and assume the liabilities under, the Office Leases and to purchase the FF&E located therein.

29.    As detailed above, since entry of the Indymac Sale order, the Debtors have stood ready and able to close the Sale. Indymac, on the other hand, has refused the close despite numerous indications to the Debtors that closing was imminent. Indymac could have closed after the Indymac Sale Order was approved, but refused until the order setting cure amounts was approved. The Debtors attained approval of the cure order on September 17, 2007. Indymac then refused to close claiming, despite the terms of the Letter Agreement, that a majority of the purchase price must be held back and not paid at closing. Indeed, for the last six (6) months Indymac has continually refused to close based on some additional demand, request or manufactured roadblock. It has become abundantly clear that Indymac wanted to force the process through so as to take all of the benefits of operating and profiting from the use of the Production Offices, but had little interest in paying the Debtors under the bargained for and approved Letter Agreement. Now, on February 7, 2008, 24 days before the Closing Deadline, Indymac has requested that the Debtors remove fifteen (15) Office Leases from the Sale, which is a material modification to the Letter Agreement.

30.    As a result of Indymac's failure to close, and in light of the Closing Deadline, which is the latest date under section 365(d)(4) of the Bankruptcy Code that the Debtors are permitted to assume the Office Leases, the Debtors are relegated to move for the


instant relief, pursuant to section 105, to enforce the terms of the Indymac Sale Order and require Indymac to close before March 3, 2008. The Debtors submit that the Court has inherent authority, pursuant to section 105, to enforce the terms of its earlier order and grant such relief. See Baer v. Bowser (In re Jones), Case No. 97-41205-7, 2003 Bankr. LEXIS 2056, at *15 (Bankr. D. Kan. Nov. 10, 2003) ("[T]he Court can think of no better use of its equity power under § 105 than to issue an order that compels compliance with a previous order."); In re WorldCorp., Inc., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (Walrath, J.) (compelling party to make payment in accordance with agreement that was previously approved by court order); JMF Acquisitions Co. v. Boccella (In re Edgehill Nursing Home, Inc.), 68 B.R. 413, 415-16 (Bankr. E.D. Pa. 1986).

31. In addition to having inherent authority to enforce the terms of its earlier orders, bankruptcy courts have substantial discretion to impose a wide variety of sanctions to compel compliance with their orders and compensate the movant for actual losses suffered. Common sanctions include attorneys' fees, see Thomas v. Resolution Trust Corp. (In re Thomas), 184 B.R. 237, 242 (Bankr. M.D.N.C. 1995); In re Snider Farms, Inc., 125 B.R. 993, 996 (Bankr. N.D. Ind. 1991) (citing cases), coercive fines, see McLean Indus., 68 B.R. at 701 ($5,000 for each day defendant fails to comply); In re Affairs with a Flair, Inc., 123 B.R. 724, 727 (Bankr. E.D. Pa. 1991) (actual damages); Thomas, 184 B.R. at 241-42; Williams v. Clark (In re Milton Clark), 91 B.R. 324, 337 (Bankr. E.D. Pa. 1988), opinion supplemented, 96 B.R. 569 (Bankr. E.D. Pa. 1989); In re Haddad, 68 B.R. 944, 954 (Bankr. D. Mass. 1987), and imprisonment until the contempt is purged. In re Spanish River Plaza Realty Co., 155 B.R. 249, 254-56 (Bankr. S.D. Fla. 1993); In re Crabtree, 39 B.R. 702, 712-13 (Bankr. E.D. Tenn. 1984). In fact, the United States Court of Appeals for the Second Circuit has held that, once a movant

proves damages stemming from the contumacious behavior, a court has no discretion but to issue the appropriate remedial order. See Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979). As a result of that substantial discretion, the Debtors submit that this Court has ample authority to grant the relief requested herein, including awarding the Debtors their fees and expenses in filing and prosecuting this Motion and interest on the purchase price set forth in the Letter Agreement.

32.   A failure to comply with a bankruptcy court order may also result in the issuance of a civil contempt order upon the showing of the following three elements: (i) the existence of a valid, final court order; (ii) contemnor had actual knowledge of the order; and (iii) contemnor disobeyed the order. Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995). The offending party must have had actual knowledge of the order and have willfully violated it. In re Continental Airlines Inc., 236 B.R. 318, 331 (Bankr. D. Del. 1999) (Walrath, J.) (citing authorities).

33.   While the ultimate burden of proof lies with the movant, once a *prima facie* showing has been made, the burden of production shifts to the alleged contemnor to demonstrate an "inability" to comply with the order. Shervin v. Liebersohn (In re Shervin), 200 B.R. 109, 112 (E.D. Pa. 1996); In re Affairs with a Flair, 123 B.R. at 727 (burden on contemnor "strictly construed," and a showing of "substantial" or "good faith" efforts will not suffice). The movant's burden must be established by clear and convincing evidence. In re Shervin, 200 B.R. at 112.

34.   In Edgehill, the bankruptcy court entered an order authorizing a sale of the debtor's assets and approving the related sale agreement. Similar to the instant case, the order did not set forth an express sale date or closing deadline. When nearly a month passed since

15

entry of the sale order and the debtor had yet to sign the agreement, the purchaser filed a motion directing the debtor to comply with the order and the bankruptcy court granted the motion. Specifically, the Court found, in relevant part that:

> In the case at bench, [the debtor] stated that his failure to comply with the order was due to his confusion about certain warranties contained in the sales agreement. However, [the debtor's] intentions, although not made in bad faith, are not valid defenses to civil contempt because willfulness is irrelevant. [The debtor's] conduct is nonetheless contemptuous because it is clear that he knew about the order and what it required, but nevertheless failed to comply with it....
>
> Finally, [the debtor] argues that the order was not specific in that it did not set forth a date upon which the agreement had to be signed. Therefore, he contends that his delay in signing the agreement did not constitute contempt. However, even assuming without conceding that the order was unclear, the absence of a specific date in the order is not sufficient justification for [the debtor's] actions. The language in the order was implicit in directing that the sales agreement be signed forthwith. Furthermore, a party cannot disobey an order and later attempt to assert the invalidity of the order as a defense to contempt.... As such, [the debtor's] argument that the order was silent as to the specific date upon which the contract was to be executed is without merit. Accordingly, we find that [the debtor] was in contempt for his refusal to comply with our order and he will be sanctioned for attorney's fees....

In re Edgehill Nursing Home, Inc., 68 B.R. at 415-16.

      35.    Here, more than six (6) months have passed since Indymac executed the Letter Agreement; and more than five (5) months have gone by since the Court entered the Indymac Sale Order, yet Indymac still refuses to close. As Edgehill demonstrates, the Indymac Sale Order must be read to have a Closing Deadline no later than the March 3, 2008 deadline for the Debtors' to assume the Office Leases. Neither party would have entered into the Letter Agreement were that not the case. In fact, Indymac fully understood the implications of the section 365(d)(4) deadline when it signed the Letter Agreement after the Debtors filed for

bankruptcy and confirmed this understanding by ensuring that the Extension Order covered the Office Leases. To that end, the Debtors are constrained to request this Court, pursuant to its inherent authority under section 105 of the Bankruptcy Code, to enforce the terms of the Indymac Sale Order and the related Letter Agreement and require Indymac to close before March 3, 2008.

36. The Debtors submit that not only does the Court have the inherent authority to grant the relief requested herein pursuant to section 105 of the Bankruptcy Code, but all the elements exist for this Court to enter an order of civil contempt against Indymac, (i) enforcing the terms of the Indymac Sale Order and the related Letter Agreement, (ii) requiring the Sale to close in advance of the Closing Deadline, (iii) awarding the Debtors fees and expenses in filing and prosecuting this Motion, and (iv) awarding interest on the purchase price set forth in the Letter Agreement.

37. As the Court well knows, if the Debtors do not assume or reject the Offices Leases prior to March 3, 2008, the Office Leases will be deemed rejected, at which point the Debtors will lose the opportunity to obtain significant value for their estates and creditors. Any extension of the March 3, 2008 deadline would require this Court's approval <u>and</u> the written consent of <u>each</u> lessor. 11 U.S.C. § 365(d)(4)(B)(ii). Stated differently, an additional extension is simply not feasible and was never contemplated by the parties as an option.
Indymac, a sophisticated and well counseled company, entered into the Letter Agreement fully understanding that the agreement's primary purpose was to consummate the assumption and assignment of the Office Leases by March 3, 2008 pursuant to section 365 of the Bankruptcy Code. If this were not the case, neither the Debtors nor Indymac would have entered into the Letter Agreement because the Office Leases would be deemed rejected before closing, and the

Debtors would have nothing to assume and assign to Indymac. Therefore, the Debtors respectfully request that the Court enforce the terms of the Indymac Sale Order and the Letter Agreement and require the Sale to close before March 3, 2008, either pursuant to the Court's authority to enforce its earlier orders under section 105 of the Bankruptcy Code, or upon a finding that Indymac is in contempt.

## NOTICE

38.     Notice of this Motion will be provided to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Second Amended and Restated Credit Agreement dated August 10, 2006; (iv) counsel to the Debtors' postpetition lender; (v) the landlords to the Office Leases; (vi) the United States Securities and Exchange Commission; (vii) counsel to Indymac; and (viii) all parties that have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as <u>Exhibit G</u>, (i) enforcing the terms of the Indymac Sale Order and the Letter Agreement, (ii) requiring the Sale to close in advance of the Debtors' March 3, 2008 deadline under section 365(d)(4) of the Bankruptcy Code to assume or reject the Office Leases, (iii) awarding the Debtors their fees and expenses associated with preparing and prosecuting this Motion, (iv) awarding the Debtors interest from August 24, 2007 until the date the Sale closes, and (v) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      February 15, 2008

                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

                    */s/ Sean M. Beach*
                    James L. Patton, Jr. (No. 2202)
                    Robert S. Brady (No. 2847)
                    Pauline K. Morgan (No. 3650)
                    Sean M. Beach (No. 4070)
                    Kara Hammond Coyle (No. 4410)
                    Robert F. Poppiti, Jr. (No. 5052)
                    The Brandywine Building
                    1000 West Street, 17th Floor
                    Wilmington, Delaware 19801
                    Telephone: (302) 571-6600
                    Facsimile: (302) 571-1253

                    Counsel for Debtors and Debtors in Possession

DB02:6572227.5                                                           066585.1001