IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------- x
                              :        Chapter 11

In re:                           :

                              :        Case No. 07-11047 (CSS)

AMERICAN HOME MORTGAGE    :

HOLDINGS, INC., et al.,         :        **Objection Deadline: March 6, 2008 at 4:00 p.m.**

                              :        **Hearing Date: March 13, 2008 at 10:00 a.m.**

             Debtors.       :

                              :
----------------------------------------------------- x

**MOTION OF BANK OF AMERICA, N.A., AS ADMINISTRATIVE
AGENT, FOR RELIEF FROM AUTOMATIC STAY, PURSUANT TO
11 U.S.C. § 362(d), ALLOWING THE ADMINISTRATIVE AGENT
TO EXERCISE ITS RIGHTS AS A SECURED CREDITOR**

        Bank of America, N.A., as administrative agent (the "Administrative Agent"), for itself

and the pre-petition secured lenders (collectively with the collateral agent under the Security

Agreement (defined herein), the "Secured Parties") under the Second Amended and Restated

Credit Agreement (the "Credit Agreement"), dated as of August 10, 2006, moves as follows for

relief from the automatic stay:

**NATURE OF THE MOTION**

        1.      The Debtors own approximately 3400 residential mortgages, consisting of fixed

rate, adjustable rate, balloon and interest only loans (the "Mortgage Loans"), with an aggregate

unpaid principal balance of approximately $584 million. The Mortgage Loans are the principal

remaining collateral for the credit extended by the Secured Parties to the Debtors.   Not

surprisingly, given the well-known and well-established negative conditions that have prevailed

for months and continue to prevail in the market for such loans, the value of the Mortgage Loans

has declined precipitously since the Petition Date and will likely continue to decline.  Indeed, the

Debtors have fully conceded that the values of their assets are "extremely volatile." (11/28/07 tr. at p. 76.)[1]

2.    Moreover, the delinquency rates and the loan-to-value ratios for these Mortgage Loans have risen during the pendency of these cases, and further deterioration in these critical metrics is likely to continue for the foreseeable future. In addition, as described below, changes in the eligibility guidelines of certain Government Sponsored Enterprises ("GSEs") have also eroded sale options and, thus, value. The loan servicing arrangements presently in place will also continue to erode the value of the collateral as escalating servicing fees are charged against the Mortgage Loans.

3.    Yet, despite these undisputed facts and the Administrative Agent's repeated requests, the Debtors have refused to take steps either to sell the Mortgage Loans expeditiously in order to protect the Secured Parties from further erosion in the value of their collateral or to provide them with "adequate protection" as required under the Bankruptcy Code. Instead, the Debtors and their advisors are engaged in an apparent strategy of wishful thinking, hoping that the value of these assets will increase, when, in fact, their value continues to decline. At the same time, as more fully set forth below, the Debtors' Chief Restructuring Officer and Director of Restructuring have to a large extent left the Debtors for a new engagement in Hawaii, further weakening the Debtors' ability to protect the value of the Secured Parties' collateral.

4.    The purpose of this Motion is to lift the automatic stay pursuant to section 362(d)(1) in order to give the Administrative Agent the right to protect the Secured Parties'

---

[1]    References to the relevant portions of particular transcripts of hearings held in these cases are referred to herein with the date of the transcript as "Tr." and are collectively annexed as Exhibit D to the Declaration of Laurie Selber Silverstein dated February 22, 2008 (the "Silverstein Declaration"), submitted in support of the Motion.

interests by allowing the Administrative Agent to sell the Mortgage Loans in an orderly fashion and to transfer the servicing of those loans, as appropriate, in order to maximize the value of the Secured Parties' collateral -- or, in other words, to stop the erosion of value as soon as practicable.

**JURISDICTION**

5.      The Administrative Agent brings this Motion under section 362(d) of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2) and 1334.

6.      This matter is a core proceeding under 28 U.S.C. § 157(b).

**BACKGROUND**

7.      On August 6, 2007 (the "Petition Date"), the above-captioned Debtors (collectively, the "Debtors") commenced voluntary cases under Chapter 11 of the Bankruptcy Code in this Court (the "Bankruptcy Cases"). The Debtors remain in possession of their property and are managing their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No Chapter 11 trustee has been appointed in the Bankruptcy Cases as of the date of this Motion. On August 14, 2007, an official committee of unsecured creditors (the "Committee") was appointed to represent the interests of the general unsecured creditors in these Bankruptcy Cases.

A.      **The Pre-Petition Agreements**

8.      Prior to the Petition Date, the Secured Parties extended secured credit to the Debtors pursuant to the Credit Agreement. As of the Petition Date, the Debtors were indebted to the Secured Parties in the aggregate principal amount of approximately $1,077,029,932 (the "Indebtedness"). As a result of the Debtors' ongoing liquidation in these Bankruptcy Cases, the

3

principal amount of the Indebtedness has been reduced to approximately $505 million. Pursuant to a Security Agreement dated as of August 30, 2004, as subsequently modified (the "Security Agreement"), the Administrative Agent, for the benefit of the Secured Parties, holds first priority, perfected security interests in and liens upon certain of the Debtors' assets, including the Mortgage Loans (the "Collateral"). Copies of the Credit Agreement and the Security Agreement are annexed to the Silverstein Declaration as Exhibits A and B.

9.      The Security Agreement sets forth the broad rights of the Administrative Agent, upon the occurrence of a default, to take action to protect the Secured Parties' rights in and to the Collateral.[2] After months of delay by the Debtors, the Administrative Agent now seeks to do so, given the clear danger that the value of the Mortgage Loan Collateral will continue to decline and the total absence of adequate protection against this likely course of events.

**B.      The Cash Collateral Order**

10.     On September 4, 2007, this Court entered the Final Order (i) Authorizing Debtors' Limited Use of Cash Collateral and (ii) Granting Replacement Liens and Adequate

---

[2]      In relevant part, paragraph 16 of the Security Agreement provides the Administrative Agent with the right to:

> (i) foreclose or otherwise enforce the security interest for the benefit of the Secured Parties in the Collateral in any manner permitted by law or provided for hereunder; (ii) sell or otherwise dispose of the Collateral or any part thereof at one or more public or private sales, whether or not such Collateral is present at the place of sale, for cash or credit or future delivery and without assumption of any credit risk, on such terms and in such manner as the Administrative Agent may determine; (iii) require the Borrowers to assemble the Collateral and/or books and records relating thereto and make such available to the Collateral Agent at a place to be designated by the Collateral Agent; (iv) enter onto property where any Collateral or books and records relating thereto are located and take possession thereof with or without judicial process; and (v) prior to the disposition of the Collateral, prepare it for disposition in any manner and to the extent the Administrative Agent deems appropriate.

Protection to Certain Pre-Petition Secured Parties [Docket No. 554] (the "Final Cash Collateral Order," together with the interim order entered in connection therewith and any amendments or extensions thereto, collectively the "Cash Collateral Order"). A copy of the Cash Collateral Order is annexed to the Silverstein Declaration as Exhibit C.

11.     Pursuant to the Cash Collateral Order, the Debtors: (i) admitted that the Indebtedness constitutes valid and binding obligations of the Debtors and that no portion of the Indebtedness or any amounts paid to the Secured Parties prior to the Petition Date is subject to avoidance, subordination, recharacterization, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (ii) acknowledged the Administrative Agent's valid, perfected, enforceable, first priority security interests in and liens upon the Pre-Prepitition Collateral (as defined in the Cash Collateral Order) which includes the Mortgage Loans; and (iii) further admitted that the Administrative Agent's first priority security interests in and liens upon the Pre-Prepitition Collateral and the Collateral (as defined in the Cash Collateral Order), for the ratable benefit of the Secured Parties, are not subject to avoidance, subordination, recharacterization, defense or Claim of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

12.     The Debtors' admissions and acknowledgments in the Cash Collateral Order as they relate to both the Indebtedness and the Mortgage Loans are now binding on all parties in interest, including the Committee. Accordingly, the validity, perfection and priority of the Administrative Agent's security interest in the Mortgage Loans, for the ratable benefit of the Secured Parties, is beyond dispute.

C.      **Liquidation of the Debtors' Assets**

13.     From the inception of these cases, the Debtors have engaged in the systematic liquidation of their assets -- except for the Mortgage Loans. Through a series of Court approved

5

transactions, the Debtors have sold virtually all of their mortgage servicing rights, mortgage servicing platform, and the right to recover mortgage servicing advances. *See, e.g.,* Docket No. 610 (order approving sale of Barclays servicing rights); Docket No. 1619 (order approving sale of EMC servicing rights); Docket No. 1711 (order approving sale of servicing business to AH Mortgage Acquisition Co., Inc. (the "Purchaser")).

14.    In addition to these assets, the Debtors have already liquidated, or are in the process of liquidating: (i) real estate owned by the Debtors as a result of mortgage foreclosures [Docket No. 307]; (ii) furniture, fixtures and equipment owned by the Debtors [Docket No. 2477]; (iii) certain construction loans [Docket Nos. 900, 2588 and 2593]; (iv) the building which served as the Debtors' headquarters in Melville, New York [Docket No. 2720]; and (v) certain non-performing mortgage loans [Docket Nos. 2490 and 2754].[3] The *only* assets that the Debtors are not trying to liquidate are the Mortgage Loans.

## D.    The Mortgage Loan Collateral

15.    The Debtors have acknowledged the uncertainty associated with the value of their loans. Kevin Nystrom, the Director of Restructuring for the Debtors (until he left for another assignment in Hawaii, *see* ¶ 17, *infra*), testified at the November 28, 2007 omnibus hearing concerning other matters in these Bankruptcy Cases:

> Q.    Sure. At the time of the petition in August of 2007, there was an uncertainty as to the valuation of American Home Mortgage's business, specifically with regard to the loans?
>
> A.    The value of many of the assets of American Home are extremely volatile both in August and today.

---

[3]    Recognizing that they are liquidating their remaining assets, the Debtors have sought and obtained approval from this Court to abandon and destroy certain of their duplicate loan files. *See* Docket Nos. 2395 and 3010.

*See* 11/28/07 Tr. at p. 76. Indeed, there can be no dispute that (i) the value of the Mortgage

Loans has diminished during the course of these Bankruptcy Cases and (ii) the value of the

Mortgage Loans may continue to decline. Yet, as set forth below, the Debtors have inexplicably

refused to sell the Mortgage Loans or to provide the Secured Parties with adequate protection

despite the harm to the Secured Parties that will result from the diminution in the value of the

Mortgage Loans.

E.    **The Debtors' Failure to Sell the Mortgage**
      **Loans or to Provide Adequate Protection**

       16.    From the inception of the Debtors' cases more than six months ago, it has been

obvious to all concerned, and acknowledged by the Debtors, that their businesses would not be

reorganized and that their assets, including the Mortgage Loans, would be liquidated. At the

first-day hearings in these Bankruptcy Cases, the Debtors' counsel stated that:

> The goal of this bankruptcy case, if it's not obvious from everything I've
> said so far, is relatively simple. . . . [W]e also have a variety of other
> financial assets, mortgage and mortgage-backed securities that we own,
> some of them free and clear and some of them not. . . . *[W]hat we propose*
> *to do is, as quickly and as efficiently as possible, liquidate our holdings in*
> *each of those categories,* sell our servicing business as quickly and
> efficiently as possible, liquidate our miscellaneous assets, our
> miscellaneous financial assets. . . . *We have one enemy in this case and*
> *that's time. Our principal asset, the servicing business, as well as our*
> *financial assets, are not going to improve in value over time. We believe*
> *they're going to decline, and we have no ongoing business.* So every day
> that we're in operation and every day that we're keeping on our payroll
> employees needed to preserve these assets, we are approving
> administrative expenses that are cannibalizing the assets that we do have.
> *So we are going to be asking the assistance of the Court to enable us to*
> *move as efficiently as possible through this sale process so that we can*
> *manage our enemy here, which is time.*

8/07/2007 Tr. at pp. 12-13 (emphasis added).

       17.    The issue now in this ongoing liquidation is not whether, but rather when and by

whom, the process of liquidating the Mortgage Loans should be undertaken. Despite repeated

requests by the Administrative Agent since commencement of the Bankruptcy Cases as well as the Debtors' admissions at the first day hearings, the Debtors have categorically refused to commit to a process or a time-line for selling the Mortgage Loans. The Administrative Agent tried to move this process forward by drafting proposed sale procedures for the Mortgage Loans, which were provided to the Debtors in the fall of 2007. Following receipt of preliminary comments from the Debtors, the Administrative Agent promptly provided the Debtors with revised sale procedures, a form of asset purchase agreement and form orders approving the sale procedures and the ultimate sale of the Mortgage Loans. Having received no comments from the Debtors on the various documents and having been rebuffed by the Debtors in terms of obtaining a firm timeframe for selling the Mortgage Loans, in late November 2007, the Administrative Agent sent to the Debtors a proposed adequate protection stipulation, which, *inter alia,* contemplated certain sale procedures for the sale of the Mortgage Loans by no later than January 2008 and forms of adequate protection pending the sale of the Mortgage Loans. The Debtors ignored these documents and refused even to discuss the sale of the bulk of the Mortgage Loans.

18.    At the outset of these Bankruptcy Cases, the Debtors articulated a plan to liquidate all of their assets. Their failure to follow through with that plan and promptly liquidate the Mortgage Loans has further impaired the value of the Collateral. Indeed, changes in GSE guidelines since October 2007 have made a significant portion of the Mortgage Loans previously eligible to be sold to one or more of the GSEs now ineligible for such sale.

19.    The Debtors' failure to act is further compounded now that the two senior professionals retained to lead the liquidation efforts, the Chief Restructuring Officer and the Director of Restructuring, have accepted an engagement in Hawaii on another matter that will consume the substantial bulk of their time. *See* Hawaiian Telcom Communications, Inc., Current

Report (Form 8-K), at 2 (Feb. 4, 2008), attached to the Silverstein Declaration as Exhibit E ("Pursuant to the terms of the Services Agreement, Messrs. Cooper and Nystrom have agreed to devote approximately 75% of their working time and efforts to the business and affairs of [Hawaiian Telcom]").  While the Administrative Agent is not aware of the other matters to which Messrs. Cooper and Nystrom may be devoting the remainder of their "working time," they have been substantially unavailable to the Administrative Agent and its advisors since their move to Hawaii.

20.    Given the continuing decline in the value of the Mortgage Loans, the Debtors' unwillingness to liquidate these assets promptly or even to establish a process for doing so, the Debtors' unwillingness or inability to provide the Secured Parties with adequate protection against the loss of value (all of which is exacerbated by the leadership vacuum plaguing the Debtors at this critical juncture), and the Administrative Agent's rights under the Security Agreement to control the process under which the Collateral is liquidated to pay down the debt owed to the Secured Parties, section 362(d) requires that the automatic stay be lifted to enable the Administrative Agent to do just that.

## RELIEF REQUESTED

21.    By this Motion, therefore, the Administrative Agent requests that this Court lift or otherwise modify the automatic stay so that the Administrative Agent may sell or otherwise dispose of the Mortgage Loans in the manner provided in the Credit Agreement, the Security Agreement and applicable law.  Specifically, the Administrative Agent seeks relief from automatic stay (i) to sell the Mortgage Loans in a manner designed to maximize the value of this Collateral and (ii) to transfer the servicing of the Mortgage Loans from the Debtors as the Administrative Agent deems appropriate.  This will entrust the party with the greatest interest in

the value of the loans with the responsibility for realizing that value and will protect the Secured

Parties from further erosion in the value of their Collateral.

## ARGUMENT

### This Court Should Lift the Automatic Stay as to the
### Mortgage Loans under Bankruptcy Code § 362(d)(1)

22.    The Administrative Agent is entitled to relief from the automatic stay with respect

to the Mortgage Loans for "cause" under section 362(d)(1).  Bankruptcy Code section 362(d)(1)

states, in part, that a Court may grant stay relief:

> (1) for cause, including the lack of adequate protection of an interest in
> property of such party in interest[.]

11 U.S.C. § 362(d)(1).  Once the secured creditor has established a *prima facie* basis for cause,

the party opposing stay relief has the burden of proof as to whether the secured creditor's interest

in its collateral is being adequately protected.  *See* 11 U.S.C. §362(g); *In re Gauvin*, 24 B.R. 578,

580 (B.A.P. 9th Cir. 1982); *In re Schaller*, 27 B.R. 959, 961 (W.D. Wis. 1983).  If the debtor

cannot meet its burden of proving that the secured creditor's interests are adequately protected,

the secured creditor must be granted stay relief.  *See* 11 U.S.C. §362(d)(1); *In re Park at Dash

Point L.P.*, 121 B.R. 850, 858 (Bankr. W.D. Wash. 1990), *aff'd*, 152 B.R. 300 (W.D. Wash.

1991), *aff'd*, 985 F.2d 1008 (9th Cir. 1993); *In re Lindbergh Plaza Assocs.*, 115 B.R. 202, 208

(Bankr. E.D. Mo. 1990); *In re Lilyerd*, 49 B.R. 109, 117 (Bankr. D. Minn. 1985).

I.      **The depreciation in the value of the Mortgage Loans is cause for
lifting the stay under § 362(d)(1).**

23.     Courts have recognized that depreciation in the value of the secured party's

collateral is cause for relief from the automatic stay under § 362(d)(1).  As the Supreme Court

stated in *United States Savings  Association v. Timbers of Inwood Forest Associates., Ltd.*, 484

U.S. 365, 370 (1988):

> It is common ground that the "interest in property" referred to by §
> 362(d)(1) includes the right of a secured creditor to have the
> security applied in payment of the debt upon completion of the
> reorganization; and that the interest is not adequately protected if
> the security is depreciating during the term of the stay.

*See In re George*, 315 B.R. 624, 328-29 (Bankr. S.D. Ga. 2004) (granting relief from stay for

"cause" under section 362(d)(1) based on secured creditor's demonstration of diminution of value

of its collateral as a result of imposition of automatic stay); *In re Planned Systems, Inc.*, 78 B.R.

852, 862-63 (Bankr. S.D. Ohio 1987) (finding that secured creditor's showing of likelihood of

diminution of value of collateral sufficient to establish a *prima facie* case for relief from stay); *In

re Bushee*, 319 B.R. 542, 551 (Bankr. E.D. Tenn. 2004) (recognizing that cause exists to lift the

automatic stay when collateral is decreasing in value).

24.     The Debtors cannot dispute that the Mortgage Loans have decreased in value

since the Petition Date and are at significant risk of further loss in value based upon current

market conditions.  Market conditions in the industry in question are highly relevant to the

determination of value.  *See, e.g., Sutton v Bank One (in re Sutton)*, 904 F.2d 327, 330 (5th Cir.

1990)(court considered expert testimony on market conditions relevant for purposes of valuing

property); *In re Fund Raiser Prods. Co., Inc.*, 163 B.R. 744, 750 (Bankr. E.D.Pa. 1994)

(deeming economic outlook of the industry as one of eight relevant factors for determining

value).

25.     In addition to the generally negative conditions prevailing in the market, the value
of these loans has deteriorated and is likely to continue to deteriorate for other reasons as well.
A major negative factor impacting the value of the Mortgage Loans is the increased delinquency
rate on these loans. As of the Petition Date, the delinquency rate for the Mortgage Loans was
approximately eight percent (8%) of the total unpaid principal balance of the Mortgage Loans.
The delinquency rate is now almost fifteen percent (15%). In January 2008, alone, in excess of
three percent (3%) of the unpaid principal balance of the Mortgage Loans became delinquent.
The substantial increase in the delinquency rate for the Mortgage Loans further negatively
impacts their value. The increased delinquency rate is particularly disturbing given the recent
vintage of the Mortgage Loans, the vast majority of which were made in the first seven months
of 2007.

26.     Another major negative factor impacting the value of the Mortgage Loans is the
decrease in the value of the underlying properties that serve as collateral for the Mortgage Loans.
As this Court has recognized, "I'm not surprised that there's testimony that the value of the home
has declined. I think, frankly, it's common knowledge that in most markets we're about nine
months into a decline, and I hope it doesn't go further. It may, but those issues will have to
await the movement of the market." 1/14/08 Tr. at pp. 68-69. When the underlying value of the
property securing the Mortgage Loans decreases, the loan-to-value ratio increases, thus driving
down the value of the Mortgage Loans. In addition, as described above, the tightening of GSE
eligibility requirements since October 2007 has diminished the value of the Mortgage Loans.

27.     Furthermore, to prevent further erosion of the value of the Collateral, relief from
the stay should be granted to transfer the servicing of the Mortgage Loans to the Administrative

Agent's designee.[4] This will, in effect, enable the party with the interest in the Collateral to devote the necessary time and effort to collecting as much as possible on the delinquent loans and to facilitate a sale of those loans. In addition, under the Asset Purchase Agreement for the sale of the Debtors' servicing business to the Purchaser, the servicing fees for the Mortgage Loans have risen and will continue to rise over the next several months from a monthly fee of $15 per Mortgage Loan to $25 per Mortgage Loan.

## II.    The Debtors cannot satisfy their burden of proving adequate protection and, therefore, the stay must be lifted.

28.    In view of the *prima facie* evidence of "cause" for lifting the automatic stay under section 362(d)(1), *i.e.*, depreciation in the value of the collateral, the burden is on the Debtors to prove adequate protection of the Secured Parties' interests. *See, e.g., In re Gauvin, supra*, 29 B.R. at 580. The Debtors cannot satisfy that burden. Indeed, the Debtors have not offered the Secured Parties even a scintilla of adequate protection of their interests in the Mortgage Loans. Thus, the Debtors have left the Administrative Agent and the Secured Parties with no choice other than to move for relief from the stay.

29.    In refusing to liquidate these assets expeditiously or even to articulate a meaningful disposition plan, the Debtors have consistently asserted that the Secured Parties should wait until market conditions improve. Holding the assets in the hope that they will improve with age is not a plan. The Debtors have not provided the Administrative Agent with any basis (or adequate protection) supporting their speculation that the Mortgage Loans can somehow maintain their current value, let alone increase in value over time. All the Debtors have provided up until this point is mere conjecture on the current and future status of the loan

---

[4]    Servicing by the Administrative Agent's designee would be temporary, pending a sale of the Mortgage Loans on a "servicing released" basis.

market. The Secured Parties, which are the ones bearing the risk, should not be required to rely on the Debtors' baseless predictions in a very unpredictable market.

30.     As the courts have held, "there is simply no basis for the debtor to retain control of an orderly liquidation when in reality it is liquidating [the senior secured creditor's] collateral and [the senior secured creditor] wishes to regain its right to possession and sale." *In re Efcor, Inc.*, 74 B.R. 837, 845 (Bankr. M.D. Pa. 1987) (granting relief from stay and ordering that the debtor surrender the collateral to the senior secured creditor, cooperate with the senior secured creditor to accomplish repossession of the collateral, and further granting the senior secured creditor leave to sell or otherwise dispose of the collateral). That is precisely what the Debtors are improperly trying to do in this case and what the Bankruptcy Code and case law are designed to prevent.

31.     The Debtors have the luxury of being recklessly optimistic regarding the Collateral since the Secured Parties bear all the risk of the declining value of the Mortgage Loans. However, gambling with the secured creditors' collateral on the mere hope of a market rebound at some time in the future does not constitute adequate protection. Thus, under section 362(d)(1), relief from the automatic stay is not only appropriate, but required.

## CONCLUSION

32.     Based on the Administrative Agent's *prima facie* showing of cause and the Debtors' refusal to provide adequate protection, the Court should enter an order: (i) lifting or otherwise modifying the automatic stay in these Bankruptcy Cases (a) allowing the Administrative Agent to sell or dispose of the Mortgage Loans in the manner provided in the Credit Agreement, the Security Agreement and applicable law and (b) permitting the transfer of

the servicing of the Mortgage Loans to the Administrative Agent's designee; and (ii) granting the

Administrative Agent such other and further relief as the Court may deem equitable and just.

Dated:   February 22, 2008

POTTER ANDERSON & CORROON LLP

By: _____

Laurie Selber Silverstein (DE Bar 2396)
Gabriel R. MacConaill (No. 4734)
P. O. Box 951
1313 N. Market Street, 6th Floor
Wilmington, Delaware  19899
(302) 984-6000

- and -

KAYE SCHOLER LLP
Margot B. Schonholtz
Myron Kirschbaum
Scott D. Talmadge
425 Park Avenue
New York, NY 10022

*Counsel for Bank of America, N.A. as
Administrative Agent under that certain Second
Amended and Restated Credit Agreement, dated
as of August 10, 2006*

Pac#850408

15