IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                               :    Chapter 11
                                                     :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,               :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                      :
                                                     :    Jointly Administered
        Debtors.                                     :
                                                     :    **Objection Deadline: February 27, 2008 at 12:00 p.m. (ET)**
                                                     :    **Hearing Date:  February 28, 2008 at 11:00 a.m. (ET)**
---------------------------------------------------------------- x

## DEBTORS' MOTION FOR ORDER (A) MODIFYING LETTER AGREEMENT WITH INDYMAC BANK, F.S.B.; (B) MODIFYING ORDER, PURSUANT TO SECTIONS 105(a), 363, 365 AND 554 OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY LEASES AND THE SALE OF FURNITURE, FIXTURES AND EQUIPMENT LOCATED THEREIN; (II) APPROVING THE TERMS OF THE LETTER AGREEMENT; AND (III) GRANTING RELATED RELIEF [DOCKET NO. 357]; AND (C) AUTHORIZING THE DEBTORS TO REJECT CERTAIN UNEXPIRED LEASES OF NON-RESIDENTIAL REAL PROPERTY AND TO ABANDON CERTAIN <u>FURNITURE, FIXTURES, AND EQUIPMENT LOCATED THEREIN</u>

American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "<u>AHM</u>" or the "<u>Debtors</u>"),[1] hereby seek

entry of an order, pursuant to sections 105(a), 363, 365 and 554 of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"<u>Bankruptcy Rules</u>"): (A) modifying the letter agreement dated August 7, 2007 (the "<u>Letter</u>

<u>Agreement</u>") by and between the Debtors and Indymac Bank F.S.B. ("<u>Indymac</u>"); (B) modifying

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("<u>AHM Servicing</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

the Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III) Granting Related Relief [Docket No. 357] (the "Original Sale Order"); and (C) in the event that the Letter Agreement is modified as sought herein, authorizing the Debtors to reject certain unexpired leases of non-residential real property (the "Rejected Office Leases"), effective February 29, 2008 (the "Rejection Date"), and to abandon any property remaining at the Rejected Office Lease premises after the Rejection Date including, but not limited to, furniture, fixtures and equipment (collectively, the "Abandoned FF&E"). In support of this motion (the "Motion"), the Debtors respectfully represent as follows:

## JURISDICTION

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein are sections 105(a), 363, 365 and 554 of the Bankruptcy Code and Bankruptcy Rule 9019(a).

## GENERAL BACKGROUND

2.    On August 6, 2007 (the "Petition Date") each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

DB02:6569186.4

066585.1001

4.     On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

5.     In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

6.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

7.     Prior to the Petition Date, a large component of the Debtors' business was the servicing of mortgage loans (the "Servicing Business"). Commencing on October 2, 2007, this Court held a hearing to consider the Debtors' motion to sell the Servicing Business. By Order dated October 30, 2007 [Docket No. 1711], the Court approved and authorized the sale of the Debtors' Servicing Business (the "Servicing Sale") to AH Mortgage Acquisition Co., Inc. (the "Purchaser"), pursuant to the terms of that certain Asset Purchase Agreement dated as of

066585.1001

September 25, 2007 (as amended and together with all exhibits and schedules thereto, the "Servicing Sale APA").[2]

8.    Pursuant to the Servicing Sale APA, the Servicing Sale will close in two steps. At the "economic" close, which occurred on November 16, 2007 (the "Initial Closing"), the Purchaser paid the Purchase Price in the manner and to the parties as provided in the Servicing Sale APA and related agreements referenced therein. From the Initial Closing Date until the "legal" close (the "Final Closing"), the Debtors agreed to operate the Servicing Business in the Ordinary Course of Business, subject to the Bankruptcy Exceptions, for the economic benefit and risk of the Purchaser. The Final Closing has not yet occurred, but is required to occur no later than September 30, 2008.

## SALE TO INDYMAC

9.    In the weeks prior to the Petition Date, the Debtors operated hundreds of leased loan production offices at locations in 47 states and the District of Columbia (the "Production Offices"). However, shortly prior to the Petition Date, the Debtors discontinued their loan origination business (the "Origination Business") in their Production Offices. The vast majority of the Debtors' employees were part of the Origination Business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce

10.    During the days leading up to the Petition Date, the Debtors, aided by their professional advisors, were in contact with certain entities in the mortgage industry that expressed an interest in taking immediate control of the Debtors' Production Offices. In particular, Indymac approached the Debtors inquiring as to the assumption and assignment of

---

[2]    All capitalized terms used in this section with respect to the Servicing Sale APA, but not defined herein, shall have the meanings set forth in the Servicing Sale APA. The description of the Servicing Sale APA in this section is by way of summary only. To the extent there is any discrepancy between such description and the actual terms of the Servicing Sale APA, the latter are controlling.

066585.1001

certain of the Debtors' Production Offices and the potential purchase of the FF&E located

therein on an expedited basis. Shortly thereafter, the Debtors and Indymac entered into

negotiations concerning the potential sale.

11.     As a result of those negotiations, on August 7, 2007, the Debtors and

Indymac entered into a letter agreement (the "Letter Agreement," a copy of which is attached

hereto as Exhibit A), whereby Indymac agreed and was bound to take assignment of, and assume

the liabilities under, ninety-eight (98) office leases (collectively, the "Assumed Office Leases"),[3]

and to purchase certain furniture, fixtures and equipment (the "FF&E," and together with the

Assumed Office Leases, the "Office Assets") located therein (collectively, the "Sale").

12.     Also on August 7, 2007, Indymac demanded immediate access to the

Assumed Office Lease premises and the parties entered into a license agreement (the "License

Agreement," a copy is attached to the Letter Agreement), pursuant to which Indymac is granted a

license to use the office space, and all furniture, fixtures and equipment located within such

office space, including utilities, telephone and Internet service supplied to such office space and

all other items owned, rented, leased or otherwise controlled by Debtors at the Assumed Office

Lease premises, until such time as the Sale closes or until it is terminated by either party upon

not less than fifteen (15) business days notice.

13.     On August 24, 2007, the Court approved the Letter Agreement pursuant to

the Original Sale Order [Docket No. 357] and entered an order approving the License Agreement

[Docket No. 356]. The Original Sale Order authorized the Debtors to, among other things,

---

[3] The terms of the Letter Agreement permitted Indymac to add or exclude a certain percentage of Office Leases for a limited period of time. On August 7, 2007, there were approximately 75 Assumed Offices Leases and, after certain exclusions and additions by Indymac, the Sale was approved with the final total of 98 Assumed Office Leases.

066585.1001

consummate the Sale by assuming and assigning the Assumed Office Leases and selling the FF&E to Indymac.

14.    Subsequent to the entry of the Original Sale Order, the Debtors filed a Notice of (I) Assumption and Assignment of Certain Real Property Leases and Sale of Furniture, Fixtures and Equipment Located Therein; and (II) Proposed Cure Obligations, if Any [Docket No. 425] (the "Original Cure Notice") and a Corrected Notice of (I) Assumption and Assignment of Certain Real Property Leases and Sale of Furniture, Fixtures and Equipment Located Therein; and (II) Proposed Cure Obligations, if Any [Docket No. 541] (the "Corrected Cure Notice," and collectively with the Original Cure Notice, the "Cure Notice"). Pursuant to the Cure Notice, the Debtors listed the proposed amounts necessary to cure any defaults under the Assumed Office Leases (collectively, the "Cure Amounts").

15.    On September 17, 2007, the Court entered the Order Establishing and Fixing Cure Amounts Related to Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III) Granting Related Relief [Docket No. 778] (the "Cure Order"). Pursuant to the Cure Order, the Court fixed the Cure Amounts for the Assumed Office Leases through and including September 30, 2007.

16.    Since entry of the Cure Order, the Debtors have stood ready to close the Sale since no later than September 30, 2007 and have worked diligently to do so. Upon information and belief, all accrued and payable obligations under the Assumed Office Leases have been satisfied by the Debtors or Indymac since September 30, 2007, except for the cure payments to be paid upon the closing of the Sale. While the Debtors have endeavored to meet all

of Indymac's demands, recently Indymac requested a significant modification to the Letter

Agreement. Specifically, Indymac requested that the Debtors remove fifteen (15) leases (as

defined previously, the "Rejected Office Leases') from the list of Assumed Office Leases to be

assigned.

17.    While the Debtors began negotiating this requested modification with

Indymac, the Debtors were cognizant that their deadline to assume and assign their unexpired

leases of non-residential real property expires on March 3, 2008 [See Docket No. 2168] (the

"365(d)(4) Deadline"). In fact, on February 7, 2008, the Debtors notified Indymac, in writing, of

the 365(d)(4) Deadline (the "February 7 Letter"). Among other things, the February 7 Letter

stated that the Sale must close prior to March 3, 2008 and that the License Agreement would

terminate no later than March 3, 2008.

18.    As a result of the quickly approaching 365(d)(4) Deadline, on February

15, 2008, the Debtors filed the Emergency Motion to Enforce the Terms of the Letter Agreement

and Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the

Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures

and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III)

Granting Related Relief (the "Motion to Enforce") [Docket No. 3006]. The purpose of the

Motion to Enforce was to ensure that, at a minimum, the Sale closed on its original terms prior to

the 365(d)(4) Deadline.

19.    Following the filing of the Motion to Enforce, and after additional

negotiations with Indymac and a full evaluation of Indymac's request, the Debtors agreed to seek

Court authority to modify the terms of the Letter Agreement to remove the Rejected Office

Leases, but only upon the following conditions and terms:[4]

(i) Prior to filing the instant Motion, Indymac must execute the Asset Purchase Agreement by and between American Home Mortgage Corp. and American Home Mortgage Holdings, Inc. and Indymac Bank, F.S.B. (the "APA").[5]

(ii) The sale of the Office Assts and the consummation of the transactions contemplated by the APA shall take place in two phases (each, a "Closing" on the dates set forth in section 3.1 of the APA. The Closing with respect to the Office Leases set forth on Schedule 1.1(a) to the APA (excluding the Expired Leases and the Excluded Leases) and the Office Assets (excluding the Excluded Assets and the FFE with respect to the Excluded Leases (the "Phase I Closing"), shall occur on February 22, 2008 (the "Phase I Closing Date"). The Closing with respect to any and all Office Leases on Schedule 1.6 to the APA that were not removed by the Bankruptcy Court pursuant to this Motion by March 2, 2008 (the "Phase II Closing"), shall occur on March 3, 2008 before 4:00 p.m. Eastern Standard Time (the "Phase II Closing Date"). Indymac agrees that it has the unequivocal obligation to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date, if the Bankruptcy Court does not fully approve the Motion on or before March 2, 2008.

(iii) The Purchase Price shall be indefeasibly paid by Indymac on the date the APA is executed by wire transfer of immediately available funds to the account or accounts designated by the Debtors.

(iv) Upon execution of the APA, Indymac shall deliver to Wilmington Trust Company, as escrow agent (the "Escrow Agent"), a deposit (the "Deposit") in the sum of (a) $168,499.89 (the "Adjustments Deposit") for the estimated post-closing adjustments; and (b) $1,000,000.00 for the estimated indemnification expenses of the Debtors (the "Additional Deposit").

---

[4] The following is a summary of the modifications to the Letter Agreement. As it is only a summary, Parties in interest should review the full terms of the APA and the Escrow Agreement (as such terms are defined herein). Any capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the APA or Escrow Agreement.

[5] Despite this requirement of the APA, in the interest of time in order to meet the FedEx service deadline, attached hereto as Exhibit C is a copy of the APA in substantially final form. To the extent the APA is not finalized and executed by 12:00 Noon (EST) on the date hereof, the Debtors intend to withdraw the Motion and prosecute the Motion to Enforce. The Original Sale Order authorized the parties to execute the appropriate documentation to memorialize the Sale terms under the Letter Agreement. The APA and ancillary documents attached thereto achieve this purpose and identify the modified terms that the parties are seeking to be approved herein.

(v)     The filing of the instant Motion is expressly contingent on the Debtors'
        prior receipt of (i) the indefeasible payment by Indymac of the Purchase
        Price (as defined in Section 2.7(a) of the APA), (ii) the affirmative
        enforceable commitment that Indymac shall be obligated to perform its
        obligations with respect to the Phase II Closing (as defined in Section 3.1
        of the APA) by March 3, 2008, (iii) the payment by Purchaser of the
        Deposit (as defined in Section2.7(b) of the APA) into the Escrow
        Agreement (as defined in Section 2.7(b) of the APA), and (iv) the
        execution by Indymac of the APA, the Escrow Agreement, the assignment
        and assumption agreements for both phases of the close, in substantially
        the form set forth in Exhibit 3.5 to the APA, and a closing statement and
        agreement setting forth the amount of the payments to be made by
        Indymac under enumerated items (i) and (iii).

(vi)    Upon approval of the Motion, the Letter Agreement shall be modified to,
        among other things, provide that: (a) the Debtors immediately receive the
        Additional Deposit; (b) the Rejected Office Leases, which are identified
        on Exhibit C hereto, will be removed from the list of Office Leases to be
        assumed and assigned to Indymac; (c) the Rejected Office Leases are
        deemed rejected effective February 29, 2008; and (d) any FF&E not
        removed by Indymac prior to February 29, 2008 will be deemed
        abandoned.

(vii)   Indymac shall indemnify and hold the Debtors harmless from and against
        any loss, cost, expense, or other damage actually incurred by the Debtors,
        including, without limitation, reasonable attorneys' fees and expenses,
        resulting from, arising out of, or incurred with respect to, or alleged to
        result from, to arise out of, or to have been incurred with respect to:

        (a)     in any of the scenarios provided in subsections (b), (c), and (d),

                (1)     any and all liabilities, claims, and expenses with regard to
                        the Offices that were licensed under the Expired Leases,
                        including, but not limited to, any claim for rent, holdover
                        rent, other obligations provided for under the Expired
                        Leases, and damages and liabilities for which the Indymac
                        is liable, including any costs and expenses of defending
                        such claims; and

                (2)     any obligation of the Indymac under the License
                        Agreement that accrued on or before the Phase II Closing
                        Date and any administrative claim or expenses of the
                        Debtors with respect thereto; and

066585.1001

(b)    <u>if the Motion is not approved by the Bankruptcy Court on or before 12:00 Noon on March 3, 2008, and the underlying transactions herein are closed on or before the Phase II Closing Date,</u>

    (1)    the timely payment of the Cure Amounts in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court; and

    (2)    The Debtors' reasonable attorneys' fees and costs with respect to filing and prosecuting the Modification in the Bankruptcy Court; or

(c)    <u>if the Motion is not approved by the Bankruptcy Court by the Court Deadline, and Indymac fails to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date,</u>

    (1)    The Debtors' filing and prosecuting the Motion in the Bankruptcy Court; and

    (2)    any and all damages resulting directly or indirectly from Indymac's failure to perform its obligations with respect to the Phase II Closing on the Phase II Closing Date, except that Indymac's liability for indemnification under this subsection (2) shall, with respect to the Office Assets, be reduced by the amount of Indymac's indefeasible payment of the adjusted Purchase Price under Section 2.7(a) of the APA and the indefeasible payment out of escrow of the Adjustments and Additional Deposit under Section 3.2 of the APA; or

(d)    <u>if the Motion is approved by the Bankruptcy Court on or before 12:00 Noon on March 3, 2008, and the underlying transactions herein are closed on or before the Phase II Closing Date,</u>

    (1)    the timely payment of the Cure Amounts in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court; and

    (2)    any administrative expenses, and the reasonable costs and expenses to contest such claims for administrative expenses, that are asserted, arise, or accrue after the Phase II Closing Date as a result of Indymac's failure to properly surrender the Excluded Lease Premises.

                                          

(viii)   The parties agree that Indymac's liability for indemnification obligations under the APA (i) shall not be capped at the amount of the Additional Deposit or limited in total amount in any way and (ii) shall exist regardless of whether or not any or all of the Additional Deposit has been disbursed for prior indemnification obligations or as consideration for the Debtors' prosecution and filing of this Motion or returned to Indymac under the terms of the Escrow Agreement.

(ix)   Upon the settlement, compromise, or resolution of any claims under Section 3.3(a) of the APA, if any funds attributable to the Additional Deposit are still held by the Escrow Agreement, the Debtors may provide written instructions to the Escrow Agent to distribute to the Debtors, from the funds attributable to the Additional Deposit, including any income or interest that has accumulated thereon, an amount up to, but not exceeding, the amount of the applicable damages. The Debtors shall deliver a copy of the written instructions to both Indymac and the Escrow Agent. The Escrow Agent shall cause the corresponding amount of funds attributable to the Additional Deposit, including any income or interest that has accumulated thereon, to be paid to the Debtors on the second Business Day following the date on which it receives such instructions from the Debtors.

(x)   If the Bankruptcy Court approves this Motion on or before February 28, 2008, but only approves the removal of some, but not all, of the Office Leases listed in Schedule 1.6 to the APA, Indymac and the Debtors shall deliver joint written instructions to the Escrow Agent to distribute a pro rated amount of the Additional Deposit, as well as any income or interest that has accumulated thereto, to Indymac by wire transfer of immediately available funds to the account or accounts designated by Indymac. The pro rated amount to be distributed shall be equal to (x) One Million Dollars ($1,000,000.00), less the Debtors' reasonable costs and expenses of filing and prosecuting this Motion, (y) multiplied by the total estimated rejection damages attributable to the Office Leases that were not approved for removal by the Bankruptcy Court, and (z) divided by the total estimated rejection damages attributable to all Office Leases that were originally included on Schedule 1.6 to the APA without giving effect to Section 1.6(b)(1) of the APA.

20.   Indymac has agreed to the terms and conditions, as more fully described in the APA and the Escrow Agreement, outlined above. Accordingly, the Debtors hereby seek expedited approval of the modifications to the Letter Agreement, which necessarily includes a modification of the Original Sale Order, as well as approval of the rejection of the Rejected Office Leases and the abandonment of certain FF&E. As detailed below, the Debtors

respectfully submit that the modifications are in the best interests of the Debtors, their estates and creditors.

<strong><u>RELIEF REQUESTED</u></strong>

21.     By this Motion, the Debtors request entry of an order, pursuant to sections 105, 363, 365 and 554 of the Bankruptcy Code and Bankruptcy Rule 9019(a), (i) approving certain modifications to the Letter Agreement; (ii) modifying the Original Sale Order; and (iii) in the event that the Letter Agreement is modified as sought herein, authorizing the Debtors to reject the Rejected Office Leases and abandon any FF&E contained therein.

<strong><u>BASIS FOR RELIEF REQUESTED</u></strong>

**I.      The Modifications to the Letter Agreement are Fair, Reasonable, Adequate and in the Best Interests of the Debtors' Estates and Creditors.**

22.     Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P 9019(a).  The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006); see also In re Penn Central Transportation Co., 596 F.2d 1102 (3d Cir. 1979) ("'administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims . . . .'"), quoting In re Protective Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

23.     In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimated the

Page 12

complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." In re Penn Central Transportation Co., 596 F.2d 1127, 1153 (3d Cir. 1979); see also In re Marvel Entertainment Group, Inc., 222 B.R. 243 (D. Del. 1998) (quoting, In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (describing "the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

24.     The Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a compromise should be approved. The four enumerated factors are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Meyers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); accord Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006).

25.     The decision to approve a compromise "is within the sound discretion of the bankruptcy court." In re World Health Alternatives, Inc., 344 B.R. at 296; see also In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in Meyers v. Martin (In re Martin), 91 F.3d 389. The bankruptcy court should not substitute its judgment for that of the debtor. See In re Neshaminy Office Building Associates, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. See In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); see also In re World Health Alternatives, Inc., 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible

compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

26.     The Debtors respectfully submit that the modifications to the Letter Agreement represent a compromise between the Debtors and Indymac regarding the terms of the Sale. As the modifications represent a compromise, the Debtors submit that Bankruptcy Rule 9019(a) is applicable to the relief requested herein. In the Debtors' judgment, the modifications to the Letter Agreement are reasonable and in the best interest of the Debtors, their estates, their creditors and other parties in interest. Moreover, a review of the above-referenced factors clearly demonstrates that the modifications are reasonable under the circumstances. Under the proposed modifications to the Letter Agreement, Indymac has provided an affirmative enforceable commitment that it will close the Sale prior to February 29, 2008. Moreover, if the Court approves the Motion, the Debtors will receive a guaranteed payment of approximately $3.0 million. This $3.0 million includes the Purchase Price, as well as an additional $1,000,000.00 to cover any damages related to the Debtors' rejection of the Rejected Office Leases. The Debtors anticipate that any rejection damage claims related to the Rejected Office Leases will fall short of $1,000,000.00. Any amount remaining after satisfaction of rejection damages is added value for the Debtors' estates.

27.     Alternatively, if the Court does not approve the Motion, the Debtors will receive a guaranteed payment of approximately $2.0 million, plus the ability to draw on the Additional Deposit in respect of indemnity obligations of Indymac. Under either scenario, the Debtors are receiving a significant cash infusion. This cash infusion will undoubtedly benefit the Debtors, their estates and creditors. For the foregoing reasons, the Debtors respectfully submit

DB02:6569186.4                                                                      066585.1001

that the modifications to the Letter Agreement should be approved pursuant to Bankruptcy Rule 9019(a).

**II.    Modifying the Letter Agreement is Also Within the Sound Business Judgment of the Debtors and Should be Approved**

28.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

29.    To approve the use, sale, or lease of property out of the ordinary course of business under Bankruptcy Code section 363(b), this Court must find "some articulated business justification" for the proposed action. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the "articulated business justification" and good faith tests of Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in Abbotts Dairies); Titusville Country Club v. PennBank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 19 (Bankr. E.D. Pa. 1987).

30.    Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved: (1) whether a sound business reason exists for the proposed transaction; (2) whether fair and reasonable consideration is provided; (3) whether the transaction has been proposed and negotiated in good faith; and (4) whether adequate and reasonable notice is provided. See Lionel, 722 F.2d at 1071 (setting forth the "sound business

purpose" test); <u>Abbotts Dairies</u>, 788 F.2d at 145-57 (implicitly adopting the articulated business

justification test and adding the "good faith" requirement); <u>Delaware & Hudson Ry.</u>, 124 B.R. at

176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying

the pre-confirmation sale the court must also determine that the trustee has provided the

interested parties with adequate and reasonable notice, that the sale price is fair and reasonable

and that the purchaser is proceeding in good faith."). For the reasons outlined below, the

modifications to the Letter Agreement meet these four requirements and should be approved.

    A.    <u>Proceeding with a Sale Pursuant to the Modifications of the Letter Agreement Reflects an Exercise of the Debtors' Sound Business Judgment</u>

        31.    There is a sound business justification for the Debtors' preference to

proceed with a sale to Indymac according to the modified terms of the Letter Agreement. As

stated above, under the proposed modifications to the Letter Agreement, Indymac has provided

an affirmative enforceable commitment that it will close the Sale prior to February 29, 2008.

Furthermore, under the modified terms, the Debtors will remove the Rejected Office Leases from

the list of Office Leases to be assumed and assigned to Indymac and will receive $1.0 million to

(i) cover anticipated damages related to the removal and rejection of the Rejected Office Leases

and the costs and expenses the Debtors will incur in prosecuting this Motion, and (ii) will

provide additional consideration to the Debtors' estates for the Debtors' agreement to modify the

terms of the original agreement. Thus, in their business judgment, the Debtors believe that the

modifications to the Letter Agreement will not negatively impact the estates and, in fact, will

result in the Debtors receiving more value than anticipated in the Letter Agreement.

    B.    <u>The Purchase Price is Fair and Reasonable</u>

        32.    The Debtors further believe that the Purchase Price, plus the $1.0 million

in additional payments, represents a fair and reasonable price for the Office Assets. See <u>Mellon</u>

Bank, N.A., v. Metro Communications, Inc., 945 F.2d 635 (3d Cir. 1991) (price amounted to

reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937 (1992). The

Debtors are no longer using the Office Assets, and, as a result, the carrying costs associated

therewith may be an administrative expensive burden on the Debtors' estates. The sale of the

Office Assets to Indymac will result in an infusion of capital in the amount of approximately

$3.0 million and the elimination of substantial claims resulting from Indymac's assumption of

certain liabilities.

C.    The Sale is Proposed in Good Faith

33.    The sale transaction pursuant to the modified terms of the Letter

Agreement has been proposed in good faith. The modified terms of the sale to Indymac are the

product of arm's length negotiations with Indymac. Indymac is not an affiliate of any of the

Debtors, nor does Indymac have any common officers or directors with any of the Debtors.

Moreover, this transaction is proposed for the sole purpose of maximizing the estates' return on

the Office Assets and minimizing future administrative expenses.

D.    Adequate and Reasonable Notice of the Sale Pursuant to the Modified Terms of
the Letter Agreement Has Been Provided Under the Circumstances

34.    Pursuant to the Original Sale Order, the Debtors provided adequate and

reasonable notice of the proposed sale to all parties in interest, as required by the applicable

procedural rules. See Fed. R. Bankr. P. 2002(c)(1) (notice must contain "the terms and

conditions of any private sale and the time fixed for filing objections."); see also, Delaware &

Hudson Ry., 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include

the terms of the sale and the reasons why such a sale is in the best interests of the estate and do

not need to include the functional equivalent of a disclosure statement).

35.    The Debtors will provide the non-Debtor parties to the Assumed Office Leases and the Rejected Office Leases, as well as the Committee, the United States Trustee, and all parties who have filed a request for notice pursuant to Bankruptcy Rule 2002, with adequate and reasonable notice of this Motion based on the circumstances and the pending 365(d)(4) Deadline. Contemporaneous with the filing of this Motion, the Debtors will file a motion to shorten and approve the form and manner of notice (the "Motion To Shorten"). Under the circumstances, including, *inter alia*, the fact that the 365(d)(4) Deadline is rapidly approaching, the Debtors believe that notice is adequate and sufficient.

36.    To summarize, the Debtors submit that to preserve and maximize the value of their estates, the sale of the Office Assets to Indymac pursuant to the modified terms of the Letter Agreement is an exercise of sound business judgment, is in the best interests of the Debtors and their estates, and should be approved in all respects.

## III.    The Original Sale Order Should Be Modified Solely with Respect to the Modifications Requested Herein

37.    As stated previously, on August 24, 2007, the Court entered the Original Sale Order. Pursuant to the Original Sale Order, the Court found and determined, among other findings, that (i) the Sale is in the best interests of the Debtors, their estates, their creditors and other parties in interest; (ii) the Debtors demonstrated good, sufficient and sound business purposes and justifications for the Sale; and (iii) the Letter Agreement was negotiated and proposed, and has been entered into by the parties, in good faith, from arm's length bargaining positions, and without collusion. By this Motion, the Debtors seek only to modify the Original Sale Order to reflect the modifications to the Letter Agreement.

IV.    **Rejection of the Rejected Office Leases, and Abandonment of any Property Remaining at such Rejected Office Leases after the Rejection Date, Should be Approved**

A.    Rejection of the Rejected Office Leases

38.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject an executory contract or an unexpired lease." 11 U.S.C. § 365(a); see also University Med. Ctr. v. Sullivan (In re University Med. Ctr.), 973 F.2d 1065, 1075 (3d Cir. 1992). The Court may approve a debtor's rejection of an executory contract or unexpired lease if such rejection is made in the exercise of such debtor's sound business judgment, and if such rejection benefits its estate. See, e.g., Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); NLRB v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984); In re Patterson, 119 B.R. 59 (E.D. Pa. 1990). See also, In re Federated Dep't. Stores, Inc., 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"); Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) ("[u]nder the business judgment test, . . . [a court should approve a debtor's proposed rejection] if the debtor can demonstrate that rejection will benefit the estate"). It is enough if a debtor determines in its business judgment that a benefit will be realized. Sharon Steel Corp., 872 F.2d at 39 (citing Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)). The business judgment standard requires that the Court approve the debtor's business decision unless that judgment is the product of bad faith, whim or caprice. Lubrizol Enter., Inc. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

39.     As noted previously, Indymac requested that the Debtors remove the Rejected Office Leases from the list of Assumed Office Leases. The Debtors agreed to such removal in return for certain other commitments and obligations agreed to by Indymac. If the Court does not approve the other commitments and obligations as detailed in the APA, the Debtors will not reject the Rejected Office Leases and Indymac must take assignment of such Rejected Office Leases and assume the liabilities associated with such Rejected Office Leases.

40.     However, if the Court approves the requested modifications to the Letter Agreement, the Debtors will no longer assume and assign the Rejected Office Leases to Indymac, and, as such, the Debtors hereby seek to reject the Rejected Office Leases, pursuant to section 365 of the Bankruptcy Code, effective as of February 29, 2008. The Debtors have reviewed the Rejected Office Leases and determined that they hold no material economic value to the Debtors or their estates and are not essential to the conduct of the Debtors' bankruptcy cases. The rejection of the Rejected Office Leases will eliminate the Debtors' obligation to perform, and the accrual of any further administrative expense obligations under the Rejected Office Leases. Accordingly, the Debtors submit that the rejection of the Rejected Office Leases is within their sound business judgment and is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

B.     Abandonment of Certain FF&E

41.     In the event that the Court approves the modifications to the Letter Agreement and the Debtors reject the Rejected Office Leases, if there is any remaining FF&E left at the premises subject to the Rejected Office Leases after February 29, 2008, the Debtors request authority to abandon such FF&E. Section 554 of the Bankruptcy Code provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is

burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C.

§ 554. See In re New Century TRS Holdings, Case No. 07-10416 (Bankr. D. Del. April 24,

2007) (Carey, J.). The Debtors propose to abandon the FF&E at the premises subject to the

Rejected Office Leases because it would be more cost-effective to do so than to transport, store

and sell the FF&E.

      42.     Based upon the foregoing facts and circumstances, the Debtors submit that

the rejection of the Rejected Office Leases and the abandonment of any FF&E remaining at the

premises subject to such Rejected Office Leases in the manner set forth above is supported by

sound business judgment, and is necessary, prudent and in the best interests of the Debtors, their

estates, creditors and parties in interest.

      43.     In accordance with the Order Pursuant to Bankruptcy Rule 3003(c)(3) and

Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form

and Manner of Notice Thereof [Docket No. 1708], the Debtors respectfully request that the order

authorizing the relief requested herein (the "Order") provide that all claims allegedly arising

from the rejection of the Rejected Office Leases (each, a "Rejection Claim") must be filed on or

before the date which is thirty (30) days from the entry of such Order (the "Rejection Bar Date").

Any holder of a Rejection Claim who fails to timely file a proof of such claim on or before the

Rejection Bar Date shall not be treated as a creditor for purposes of voting upon, or receiving

distributions under, any chapter 11 plan or plans in these chapter 11 cases in respect of that

claim.

      44.     The Debtors also respectfully request that, in accordance with sections

503(b) and 365(d)(3) of the Bankruptcy Code, the Order provide that any administrative expense

claims associated with the Rejected Office Leases (each, an "Administrative Expense Claim")

066585.1001

must be filed on or before the Rejection Bar Date. Any holder of an Administrative Expense

Claim who fails to timely file a proof of such claim on or before the Rejection Bar Date shall be

forever barred, estopped and enjoined from asserting such Administrative Expense Claim against

the Debtors (or filing a request for the allowance thereof), and the Debtors and their property shall

be forever discharged from any and all indebtedness or liability with respect to such

Administrative Expense Claim.

       45.     For the reasons stated throughout this Motion, the Debtors, in exercising

their sound business judgment, believe that the modifications to the Letter Agreement, as well as

the related rejection of the Rejected Office Leases and abandonment of any FF&E remaining at

the premises subject to such Rejected Office Leases, are in the best interests of their estates.

Thus, the Debtors respectfully submit that the Motion should be approved.

**V.      Waiver of Ten-Day Stay Period Under Fed. R. Bankr. P. 6004(g) and 6006(d)**

       46.     Bankruptcy Rule 6004(g) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless

the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the

expiration of 10 days after the entry of the order, unless the court orders otherwise." The

Debtors request that the Order be effective immediately by providing that the ten (10) day stays

under Bankruptcy Rules 6004(g) and 6006(d) are waived.

       47.     The purpose of Bankruptcy Rules 6004(g) and 6006(d) is to provide

sufficient time for an objecting party to appeal before an order can be implemented. See

Advisory Committee Notes to Fed. R. Bankr. P. 6004(g) and 6006(d). Although Bankruptcy

Rules 6004(g) and 6006(d) and the Advisory Committee Notes are silent as to when a court

                                    

should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on

Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or

other transaction to close immediately "where there has been no objection to the procedure." 10

Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore,

Collier's provides that if an objection is filed and overruled, and the objecting party informs the

court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to

file such appeal. Id.

48.     The Debtors hereby request that the Court waive the ten-day stay period

under Bankruptcy Rules 6004(g) and 6006(d).

## NOTICE

49.     Notice of this Motion will be provided to (i) the United States Trustee for

the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A.,

as Administrative Agent for the lenders under that certain Second Amended and Restated Credit

Agreement dated August 10, 2006; (iv) the counterparties to the Assumed Office Leases and

Rejected Office Leases; (v) counsel to the Debtors' postpetition lender; (vi) the Securities and

Exchange Commission; and (vii) all parties that have requested notice pursuant to Bankruptcy

Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other

or further notice is required.

## PRIOR MOTION

50.     As stated previously, on August 24, 2007, the Court approved the Letter

Agreement pursuant to the Original Sale Order [Docket No. 357]. Pursuant to the instant

Motion, the Debtors are seeking to modify the Letter Agreement, which necessarily includes a

modification to the Original Sale Order.

066585.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit D, and grant such other and further relief as is

just and proper.

Dated:    Wilmington, Delaware          YOUNG CONAWAY STARGATT & TAYLOR, LLP
          February 22, 2008

                                        _____
                                        James L. Patton, Jr. (No. 2202)
                                        Joel A. Waite (No. 2925)
                                        Pauline K. Morgan (No. 3650)
                                        Sean M. Beach (No. 4070)
                                        Matthew B. Lunn (No. 4119)
                                        Kara Hammond Coyle (No. 4410)
                                        The Brandywine Building
                                        1000 West Street, 17th Floor
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571-6600
                                        Facsimile: (302) 571-1253

                                        Counsel for Debtors and Debtors in Possession

DB02:6569186.4                                        066585.1001