## Exhibit A

# ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## AMERICAN HOME MORTGAGE CORP. and
## AMERICAN HOME MORTGAGE HOLDINGS, INC. (collectively, "Seller")

## AND

## INDYMAC BANK, F.S.B. ("Purchaser")

## DATED FEBRUARY 22,23, 2008

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") dated as of February 22,23, 2008, is by and between **AMERICAN HOME MORTGAGE CORP.**, a New York corporation, and **AMERICAN HOME MORTGAGE HOLDINGS, INC.**, a Delaware corporation (collectively, "Seller"), and **INDYMAC BANK, F.S.B.**, a federally chartered savings bank ("Purchaser").

WHEREAS, Seller and certain of its Affiliates (as defined herein) filed voluntary petitions for relief pursuant to Section 301 of Title 11 of the United States Code, 11 U.S.C. Section 101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") captioned as *In re: American Home Mortgage Holdings, Inc.*, Chapter 11 Case No. 07-11047 (CSS), jointly administered (the "Bankruptcy Case"); and

WHEREAS, Seller is the lessee of certain premises as listed on Schedule 1.1(a) (collectively, the "Offices") and is the owner of certain furniture, fixtures, and equipment located at the Offices; and

WHEREAS, each Seller, as applicable, desires to sell and assign to Purchaser, and Purchaser desires to purchase and assume from such Seller, the real property leases to the Offices, and Seller, as applicable, desires to sell to Purchaser, and Purchaser desires to purchase from such Seller, all furniture, fixtures, and equipment owned by Seller and located at the Offices, as more fully described herein; and

WHEREAS, on August 7, 2007, Seller and Purchaser entered into a letter agreement setting forth the principal terms of and conditions upon the sale, assignment and assumption of such leases and the sale and purchase of such furniture, fixtures, and equipment (the "Letter Agreement"); and

WHEREAS, on August 7, 2007, Seller and Purchaser entered into a License Agreement (the "License Agreement"), which explained the terms under which Purchaser was permitted to use the Offices and the furniture, fixtures, and equipment located in the Offices pending the closing of the sale and purchase contemplated by the Letter Agreement; and

WHEREAS, on August 24, 2007, in connection with the Bankruptcy Case, the Bankruptcy Court entered an Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III) Granting Related Relief (the "Sale Order"), in which the Bankruptcy Court, *inter alia*, approved the assignment and assumption of the leases and the sale and purchase of the furniture, fixtures, and equipment pursuant to the Letter Agreement; and

WHEREAS, on August 24, 2007, in connection with the Bankruptcy Case, the Bankruptcy Court entered an Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code, Approving Debtor's Entry Into License Agreement With IndyMac Bank, F.S.B. in Connection

With the Bid to Assume Certain Office Leases and Purchase Related Furniture, Fixtures and Equipment *Nunc Pro Tunc* to August 8, 2007 (the "License Order"), in which the Bankruptcy Court approved the License Agreement; and

WHEREAS, on September 17, 2007, in connection with the Bankruptcy Case, the Bankruptcy Court entered an Order Establishing and Fixing Cure Amounts Related to Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture, Fixtures and Equipment Located Therein, (II) Approving the Terms of the Letter Agreement; and (III) Granting Related Relief (the "Cure Order"), in which the Bankruptcy Court fixed the cure amounts (the "Cure Amounts") that Seller must pay to the landlords of the Offices (the "Landlords"); and

WHEREAS, Purchaser has requested that Seller file a motion in the Bankruptcy Court (the "Modification Motion") to approve a modification to the terms of the Letter Agreement, and Seller has agreed to file the Modification Motion on February 22, 2008, and prosecute the Modification Motion in the Bankruptcy Court in exchange for additional consideration offered by Purchaser under the terms and conditions contained herein and in the Escrow Agreement (as defined in Section 2.7(b)); and

WHEREAS, Seller's obligation to file and prosecute the Modification Motion is expressly contingent on its prior receipt of (i) the indefeasible payment by Purchaser of the Purchase Price (as defined in Section 2.7(a)), (ii) the affirmative enforceable commitment that Purchaser shall be obligated to perform its obligations with respect to the Phase II Closing (as defined in Section 3.1) by March 3, 2008, (iii) the payment by Purchaser of the Deposit (as defined in Section 2.7(b)) into the Escrow Agreement (as defined in Section 2.7(b)), and (iv) the execution by Purchaser of this Agreement, the Escrow Agreement, the assignment and assumption agreements for both phases of the close, in substantially the form set forth in Exhibit 3.5, and a closing statement and agreement setting forth the amount of the payments to be made by Purchaser under enumerated items (i) and (iii); and

WHEREAS, Seller and Purchaser wish to more fully state the terms of the assignment and assumption and the sale and purchase, as permitted under the terms of the Sale Order,

NOW, THEREFORE, in consideration of the foregoing, the mutual agreements, covenants, representations, and warranties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereinafter set forth, the parties, intending to be legally bound hereby, agree as follows:

1.      **Sale and Purchase of Certain Assets.**

1.1     The Office Assets.  Subject to the terms and conditions contained in this Agreement and the Sale Order, at the applicable Closing (as defined in Section 3.1), Purchaser shall purchase from each respective Seller, as applicable, and such Seller shall sell, convey,

transfer, assign, and deliver to Purchaser, for the Purchase Price and the Security Deposit Reconciliation set forth in Section 2, all of such Seller's right, title, and interest in and to (a) the real estate lease contracts covering the Offices set forth on Schedule 1.1(a) (the "Office Leases"), except for the real estate lease contracts that have expired prior to the applicable Closing Date (as defined herein), as indicated on Schedule 1.1(a) (such contracts, the "Expired Leases"), and (b) the furniture, equipment, trade fixtures, and all other tangible personal property owned by such Seller located at the Offices set forth on Schedule 1.1(a) as of August 7, 2007 (the "FFE" and, together with the applicable Office Leases, the "Office Assets"), except for (A) those assets listed as Excluded Assets under Section 1.5 and (B) the ~~Offices~~Office Leases that are subject to the Excluded Leases (as defined in Section 1.6(c) below). When conveyed by Seller pursuant to this Agreement, the applicable Office Assets are and shall be conveyed to Purchaser free and clear of all liens, claims, arrearages, interests, encumbrances and any other claims or charges (collectively, the "Liens") pursuant to Section 363 of the Bankruptcy Code and the terms of the Sale Order and the Cure Order. The FFE shall include, without limitation, any service manuals in the applicable Seller's possession and, to the extent transferable or assignable, any service agreements or warranties relating to the FFE.

1.2    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the applicable Closing, Purchaser shall assume and become responsible for all liabilities and obligations under the applicable Office Assets arising from and after the applicable Closing.

1.3    Disclaimer of other Representations and Warranties. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 4, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS OR ITS AFFILIATES' ASSETS, LIABILITIES, OR OPERATIONS, INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. Purchaser hereby acknowledges and agrees that, except to the extent specifically set forth in Section 4, Purchaser is purchasing the applicable Office Assets on an "AS-IS, WHERE-IS" basis and is relying on its own investigation and analysis in entering into this Agreement and consummating the transactions contemplated hereby. Without limiting the generality of the foregoing, Seller makes no representation or warranty, and none shall be implied at law or in equity, regarding any assets other than the Office Assets or the value of any of the Office Assets. A party's "Affiliate" shall be defined as any person or entity that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the party specified, and "control" of a person or entity shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such person or entity, whether by contract or otherwise.

1.4    No Intention to Benefit Third Parties. The provisions of this Agreement are not intended to, and shall not, benefit any person other than Seller and Purchaser and are not intended to, and shall not, create any third party beneficiary right in any person.

1.5    <u>Excluded Assets</u>. The Office Assets shall include all assets of Seller, as applicable, located at the Offices other than (i) any and all improvements to the Offices, to the extent that such improvements are the property of the owner of the applicable Office, (ii) structural systems including, without limitation, electrical, plumbing, and heating, venting, and air conditioning systems, (iii) any and all leased equipment located at the Offices, (iv) any furniture, equipment, trade fixtures, or any other tangible personal property located at the Offices that is not owned by Seller, (v) any and all furniture, equipment, trade fixtures, and all other tangible personal property abandoned by Purchaser or Seller at an Office that was leased by Seller under an Expired Lease; and (vi) all business records of Seller or any of its Affiliates, including, without limitation, Consumer Confidential Information (as defined in Section 3.6(a)), maintained or stored at the Offices (collectively, the "<u>Excluded Assets</u>").

1.6    <u>Modification</u>.

(a)    Upon the Phase I Closing, Seller shall file the Modification Motion (as defined in Section 3.1) and prosecute the Modification Motion in the Bankruptcy Court. If the modification to the terms of the Letter Agreement set forth in Section 1.6(c) hereunder (the "<u>Modification</u>") is not approved by the Bankruptcy Court on or before noon Eastern Standard Time on March 3, 2008 (the "<u>Court Deadline</u>"), the parties agree to close the transactions contemplated herein in accordance with Section 3, giving no effect to any provision of Section 1.6(b) or (c).

(b)    If the Modification is approved by the Bankruptcy Court on or before the Court Deadline,

(i)    the parties agree to close all the transactions contemplated herein in accordance with Section 3, giving full force and effect to all of the terms of Sections 1.6(b) and (c); provided, however, that if the Bankruptcy Court only approves the removal of some, but not all, of the Office Leases listed in <u>Schedule 1.6</u>, then the parties shall proceed with the Phase II Closing with all the terms of Sections 1.6(b) and (c) in full force and effect, for the Office Leases on <u>Schedule 1.6</u> that were not removed by the Bankruptcy Court; and

(ii)    Seller shall provide unilateral written instructions to the Escrow Agent (as defined in Section 2.7(b)) to pay <u>either (A)</u> the Additional Deposit, or <u>(B) if the Bankruptcy Court only approves the removal of some, but not all, of the Office Leases listed in Schedule 1.6,</u> the remaining portion of the Additional Deposit after payment to the Purchaser of the amount calculated under Section 3.3(d)<u>,</u> <s>(as defined in Section 2.7(b)), and</s><u>as applicable, together with</u> any accrued income and interest thereon, to Seller by wire transfer of immediately available funds to an account designated by Seller, as additional consideration for the Modification.

(c)    Upon the Bankruptcy Court's approval of the Modification,

(i)     all references to the "FFE" and the "Office Assets" in this Agreement shall continue to include furniture, equipment, trade fixtures, and all other tangible personal property owned by the applicable Seller located, as of August 7, 2007, in all of the Offices, with the exception of the Excluded Assets;

(ii)     all references to the "Office Leases" in this Agreement with respect to the recovery of security deposits, including, without limitation, such references in Sections 2.2 and 2.6(a), shall refer to the real estate lease contracts covering all of the Offices;

(iii)     Seller shall seek authorization from the Bankruptcy Court to reject the real estate lease contracts for the Offices set forth in Schedule 1.6 that were authorized to be removed from Schedule 1.1(a) by the Bankruptcy Court (the "Excluded Leases") and to deem any FFE remaining at the Offices that were leased under the Excluded Leases (the "Excluded Lease Premises") to have been abandoned effective as of the Phase II Closing Date;

(iv)     Purchaser shall be obligated to turn over the keys to the Excluded Lease Premises to the applicable Landlord and leave the Excluded Lease Premises in broom clean condition by no later than the Phase II Closing Date; and

(v)     Purchaser acknowledges and consents that all FFE located in the Excluded Lease Premises, except for Excluded Assets, shall be deemed abandoned by Purchaser as of the Phase II Closing Date and shall be deemed "Excluded Assets" for all purposes under this Agreement as of the Phase II Closing Date, and Purchaser consents to the Seller's abandonment of, and Seller's ability to seek authority from the Bankruptcy Court to abandon, such FFE as of the Phase II Closing Date.

2.     **Purchase Price.**

2.1     Base Purchase Price for Office Assets.  The base purchase price (the "Base Price") for the Office Assets shall be the sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00).

2.2     Security Deposit Installment.  Purchaser shall pay to Seller Four Hundred Thousand Five Hundred Seventy and 98/100 Dollars ($400,570.98) (the "Security Deposit Installment"), which is equal to approximately eighty-one percent (81%) of the security deposits held by the applicable Landlords with respect to any and all of the Office Leases, as listed on Schedule 2.2.

2.3     Cure Amounts.  Seller shall credit Purchaser in the amount of Two Hundred Seventy-Five Thousand Seventy-One and 64/100 Dollars ($275,071.64) (the "Cure Amount Reimbursement"), which is (x) the full amount of Cure Amounts due pursuant to the Cure Order, as listed on Schedule 2.3, less the sum of (y) Purchaser's assumption of Fifty

Thousand Dollars ($50,000.00) of such liabilities and (z) Forty Thousand Two Hundred Two and 23/100 Dollars ($40,202.23) paid or to be paid directly by Seller to reduce such liabilities.

2.4    Closing True-Up.  Seller shall credit Purchaser in the amount of Five Hundred Ninety-Three Thousand Ninety-Five and 66/100 Dollars ($593,095.66), which is the amount by which the estimated non-rental payments made from Purchaser to Seller for the months of August through December 2007 under the License Agreement exceeded the actual amount of non-rental expenses paid by Seller for such months, less Purchaser's unpaid rental payments under the License Agreement for November 2007 through February 2008, as calculated on Schedule 2.4 (the "Closing True-Up").

2.5    Duplicative Rental Payments.  Purchaser shall pay to Seller Twenty-Two Thousand Three Hundred Eighty-Four and 02/100 Dollars ($22,384.02) as a reimbursement of the duplicative rental payments listed on Schedule 2.5 (the "Duplicative Rental Payments").

2.6    Post-Closing Adjustment.

(a)    Security Deposit Recovery.

(i)    Seller shall use its commercially reasonable efforts to prepare and deliver to Purchaser and the Escrow Agent (as defined in Section 2.7(a)) within forty-five (45) days after the Phase II Closing Date a report setting forth the calculation of the Security Deposit Reconciliation (the "Security Deposit Reconciliation Report"). The "Security Deposit Reconciliation" shall be equal to (A) the estimated amount of security deposits, whether listed on Schedule 2.2 or not, that will be recoverable by Purchaser upon the expiration of the respective terms of the Office Leases and upon the deduction of any charges made or claims retained by any Landlord with regard to its security deposit in connection with the applicable Seller's occupancy of such Office, as confirmed in writing to Purchaser or Seller by the applicable Landlord or an agent for the applicable Landlord (the "Security Deposit Recovery"), minus (B) the Security Deposit Installment; provided, however, that if the Security Deposit Recovery is less than the Security Deposit Installment, the parties agree that the Security Deposit Reconciliation shall equal zero.  The Security Deposit Reconciliation Report shall include instructions to the Escrow Agent to pay the Security Deposit Reconciliation, as well as any income or interest that has accumulated thereon, to Seller 15 days after Seller's delivery of such report.

(ii)    Seller acknowledges that Purchaser has used its reasonable best efforts to acquire the written confirmations from Landlords referenced in Section 2.6(a)(i).

(iii)    Notwithstanding anything in this Agreement, Seller shall maintain the right to receive security deposit recoveries for Offices that were

leased under the Expired Leases and Excluded Leases, as applicable, directly from the applicable Landlords.

(b)    <u>Property Taxes Estimation</u>.    Seller shall use its commercially reasonable efforts to (i) deliver to Purchaser within forty-five (45) days after the Phase II Closing Date all applicable returns, statements, invoices, or bills for Property Taxes (as defined in Section 3.4(b)) assessed against the Office Assets for the 2007 taxable year or, if available for a taxing jurisdiction, for the 2008 taxable year, and (ii) deliver to Purchaser and the Escrow Agent (as defined in Section 2.7(a)) a report estimating the total Property Taxes assessed with respect to the 2008 taxable year, based solely on the 2007 or 2008, as applicable, Property Tax returns, statements, invoices, or bills for each applicable taxing jurisdiction (the "<u>Estimated 2008 Property Taxes</u>"); provided that the Estimated 2008 Property Taxes shall not exceed Ninety Thousand Eight Hundred Eighty-Six and 52/100 Dollars ($90,886.52). The Estimated 2008 Property Taxes report shall include instructions to the Escrow Agent to pay ten-twelfths of the Estimated 2008 Property Taxes, as well as any income or interest that has accumulated thereon, to Seller 15 days after Seller's delivery of such report.

(c)    <u>Purchaser Objection</u>.    Purchaser shall have 15 days from Seller's delivery of each of the Security Deposit Reconciliation and the Estimated 2008 Property Taxes to notify Seller and the Escrow Agent of its objection to the calculation of the respective report.

2.7    <u>Payment of Purchase Price and Post-Closing Adjustments</u>.

(a)    <u>Purchase Price</u>.    The Base Price plus the Security Deposit Installment (collectively, the "<u>Purchase Price</u>"), plus the Duplicative Rental Payments, less the Cure Amount Reimbursement and the Closing True-Up, shall be indefeasibly paid by Purchaser on or before the Phase I Closing Date by wire transfer of immediately available funds to the account or accounts designated by Seller.

(b)    <u>Escrow Account</u>.

(i)    ~~Upon execution of this Agreement~~<u>On or before the Phase I Closing Date</u>, Purchaser shall deliver to Wilmington Trust Company, as escrow agent (the "<u>Escrow Agent</u>"), a deposit (the "<u>Deposit</u>") in the sum of

(A)    One Hundred Sixty-Eight Thousand Four Hundred Ninety-Nine and 89/100 Dollars ($168,499.89) (the "<u>Adjustments Deposit</u>"), for the estimated post-closing adjustments described in Section 2.6; plus

(B)    One Million Dollars ($1,000,000.00) (the "<u>Additional Deposit</u>"), which may constitute (i) a portion of the estimated rejection damages, costs and expenses with respect to the rejection of the Excluded Leases ~~and to the Seller's consideration for~~

~~successfully filing and prosecuting the Modification Motion,~~ or (ii) Seller's consideration for successfully filing and prosecuting the Modification ~~under Section 1.6(b)(ii)~~in accordance with this Agreement, as applicable. The parties acknowledge and agree that the Additional Deposit, as adjusted pursuant to Section 3.3(d), constitutes the maximum, liquidated amount payable by Purchaser to Seller ~~only~~ with respect to the rejection of the applicable Excluded Leases and in no event shall Purchaser be responsible or liable for any amount in excess of the amount of the applicable portion of the Additional Deposit (calculated pursuant to Section 3.3(c)) with respect to the rejection of all or any of the Excluded Leases.

(ii)    The Deposit shall be held by the Escrow Agent and shall be placed in an escrow account in accordance with an escrow agreement substantially in the form set forth in Exhibit 2.7 (the "Escrow Agreement"). All fees related to the Escrow Agent shall be paid entirely by Purchaser from the Deposit.

(c)    Post-Closing Adjustments.

(i)    For each of the Security Deposit Reconciliation Report and the Estimated 2008 Property Taxes report, on the first Business Day at least 15 days after Seller's delivery of the applicable report, the Escrow Agent shall distribute, from the funds attributable to the Adjustments Deposit, including any income or interest that has accumulated thereon, the amount calculated in the applicable report, as well as any income or interest that has accumulated on that portion of the funds attributable to the Adjustments Deposit, to Seller by wire transfer of immediately available funds to the account or accounts designated by Seller. "Business Day" means any day, other than a Saturday, Sunday, or legal holiday on which banks in the City of Wilmington, Delaware, are permitted to be closed, upon which the Escrow Agent conducts business.

(ii)    Upon the payment of both the Security Deposit Reconciliation and the Estimated 2008 Property Taxes to Seller, Purchaser and Seller shall deliver written instructions to the Escrow Agent to release any remaining funds attributable to the Adjustments Deposit, including any income or interest that has accumulated thereon, to Purchaser by wire transfer of immediately available funds to the account or accounts designated by Purchaser. The Escrow Agent shall cause the remaining funds attributable to the Adjustments Deposit, including any income or interest that has accumulated thereon, to be paid to Purchaser on the second Business Day following the date on which it receives such instructions. Except in connection with a breach of this Agreement by Purchaser, the parties acknowledge and agree that in no event shall Purchaser have any liability or obligation to pay Seller any amount after the Phase II Closing in excess of the Deposit.

(d)    Seller shall independently attribute the Purchase Price and the Security Deposit Reconciliation between American Home Mortgage Corp. and American Home Mortgage Holdings, Inc.

2.8    Allocation of Purchase Price. The Purchase Price shall be allocated, in a manner agreed upon by the parties, among the Office Assets as set forth in Schedule 2.8. The parties agree to report this transaction for tax purposes in accordance with the allocations set forth in Schedule 2.8.

3.    **Closing.**

3.1    Closing Date. The sale of the Office Assets and the consummation of the transactions contemplated by this Agreement shall take place in two phases (each a "Closing") on the dates set forth in this Section (each, a "Closing Date") at the offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801. The Closing with respect to the Office Leases set forth on Schedule 1.1(a) (excluding the Expired Leases and the Excluded Leases) and the Office Assets (excluding the Excluded Assets) (the "Phase I Closing"), shall occur on February 22,23, 2008 (the "Phase I Closing Date"). The Closing with respect to any and all Office Leases on Schedule 1.6 that were not removed by the Bankruptcy Court pursuant to the Modification Motion by the Court Deadline (the "Phase II Closing"), shall occur on March 3, 2008 before 4:00 p.m. Eastern Standard Time (the "Phase II Closing Date"), or at such other location as the parties shall mutually agree. Purchaser agrees that it has the unequivocal obligation to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date, if the Bankruptcy Court does not fully approve the Modification with respect to all of the Office Leases listed in Schedule 1.6 on or before the Court Deadline.

3.2    Purchaser's Failure to Perform the Phase II Closing. If Purchaser fails to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date in accordance with the terms of this Agreement, Seller shall be entitled to (i) keep the indefeasible payment of the Purchase Price, as adjusted pursuant to Section 2.7(a), (ii) provide unilateral written instructions to the Escrow Agent to indefeasibly pay the Adjustments Deposit and the Additional Deposit, and any accrued income and interest thereon, to Seller by wire transfer of immediately available funds to an account designated by Seller, (iii) seek recovery for damages or for indemnification obligations of Purchaser pursuant to the terms of this Agreement, and (iv) seek any and all other damages to which it may be entitled to under law or equity as a result of Purchaser's breach of this Agreement, including, without limitation, Purchaser's failure to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date in accordance with the terms of this Agreement. **The parties acknowledge that Purchaser's failure to perform its obligations with respect to the Phase II Closing on the Phase II Closing Date will harm Seller in an amount that cannot be ascertained in advance and that indefeasible payment of the adjusted Purchase Price from Purchaser, and the Adjustments Deposit and Additional Deposit from escrow, to Seller hereunder shall serve as agreed upon partial liquidated damages for Purchaser's failure to perform its obligations with respect to the Phase II Closing on the Phase II Closing Date. In addition, if**

Purchaser fails to perform its obligations with respect to the Phase II Closing on the Phase II Closing Date, Purchaser shall be obligated to indemnify and hold Seller harmless in accordance with the provisions of Section 3.3(a)(iii).

  3.3 Indemnification.

    (a) Purchaser shall indemnify and hold Seller harmless from and against any loss, cost, expense, or other damage actually incurred by Seller, including, without limitation, reasonable attorneys' fees and expenses, resulting from, arising out of, or incurred with respect to, or alleged to result from, to arise out of, or to have been incurred with respect to the following:

      (i) in any of the scenarios provided in subsections (ii), (iii), and (iv) of this Section 3.3(a),

        (A) any and all liabilities, claims, damages and expenses with regard to the Offices that were licensed under the Expired Leases and the Excluded Leases that were licensed to Purchaser pursuant to the License Agreement, including, but not limited to, any claim for rent, holdover rent, other obligations provided for under the Expired Leases, and damages and liabilities for which the Purchaser is liable and the Excluded Leases, including any costs and expenses of defending such claims if Purchaser elects to have Seller defend against such claims; and

        (B) any obligation of the Purchaser under the License Agreement that accrued on or before the Phase II Closing Date and any administrative claim or expenses of Seller with respect thereto; and

      (ii) if the Modification is not approved by the Bankruptcy Court on or before the Court Deadline, and the underlying transactions herein are closedPurchaser performs its obligations with respect to the Phase II Closing on or before the Phase II Closing Date,

        (A) the timely payment of the Cure Amounts in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court; and

        (B) Seller's reasonable attorneys' fees and costs with respect to filing and prosecuting the Modification in the Bankruptcy Court; or

      (iii) if the Modification is not approved by the Bankruptcy Court by the Court Deadline, and Purchaser fails to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date,

(A)    Seller's filing and prosecuting the Modification in the Bankruptcy Court; and

(B)    any and all damages resulting directly or indirectly from Purchaser's failure to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date, except that Purchaser's liability for indemnification under this subsection (B) shall, with respect to the Office Assets, be reduced by the amount of Purchaser's indefeasible payment of the adjusted Purchase Price under Section 2.7(a) and the indefeasible payment out of escrow of the ~~Adjustments and Additional~~ Deposit under Section 3.2; or

(iv)    if the Modification is approved by the Bankruptcy Court on or before the Court Deadline, and ~~the underlying transactions herein are closed~~Purchaser performs its obligations with respect to the Phase II Closing on or before the Phase II Closing Date,

(A)    the timely payment of the Cure Amounts in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court; and

(B)    any administrative expenses, and the reasonable costs and expenses to contest such claims for administrative expenses, that are asserted, arise, or accrue after the Phase II Closing Date as a result of Purchaser's failure to properly surrender the Excluded Lease Premises.

(b)    The parties agree that Purchaser's liability for indemnification obligations under this Agreement (i) shall not be capped at the amount of the Additional Deposit or limited in total amount in any way, except as specifically provided under Section 2.7(b)(i)(B) and (ii) shall exist regardless of whether or not any or all of the Additional Deposit has been disbursed for prior indemnification obligations or damages, or as consideration for Seller's prosecution and filing of the Modification, or returned to Purchaser under the terms of the Escrow Agreement.

(c)    Upon the final settlement~~, compromise, or resolution of or~~ judgment with respect to any claims against Seller under Section 3.3(a) or any damages to Seller as a result of the Purchaser's failure to perform its obligations with respect to the Phase II Closing on or before the Phase II Closing Date, if any funds attributable to the Additional Deposit are still held by the Escrow ~~Agreement~~Agent, Seller may provide written instructions to the Escrow Agent to distribute to Seller, from the funds attributable to the Additional Deposit, including any income or interest that has accumulated thereon, an amount up to, but not exceeding, the amount of the applicable claim, expenses, or damages set forth in the applicable settlement agreement or judgment, as applicable. Seller shall deliver a copy of ~~the~~any such written instructions to both Purchaser and the Escrow Agent. The Escrow Agent shall cause the corresponding

amount of funds attributable to the Additional Deposit, including any income or interest that has accumulated thereon, to be paid to Seller on the second Business Day following the date on which it receives such instructions from Seller.

(d)     If the Bankruptcy Court approves the Modification on or before the Court Deadline, but only approves the removal of some, but not all, of the Office Leases listed in Schedule 1.6, Purchaser and Seller shall deliver joint written instructions to the Escrow Agent to distribute a pro rated amount of the Additional Deposit, as well as any income or interest that has accumulated thereto, to Purchaser by wire transfer of immediately available funds to the account or accounts designated by Purchaser. The pro rated amount to be distributed shall be equal to the product of (x) One Million Dollars ($1,000,000.00), less Seller's reasonable costs and expenses of filing and prosecuting the Modification Motion, multiplied by (y) the quotient obtained by dividing (i) the total estimated rejection damages attributable to the Office Leases on Schedule 1.6 that were not approved for removal by the Bankruptcy Court divided by (ii) the total estimated rejection damages attributable to all Office Leases that were originally included on Schedule 1.6.

3.4     Tax Expenses.

(a)     All liabilities for sales, use, transfer, and other non-income taxes and all fees incurred on account of the purchase and sale of the Office Assets hereunder (collectively, "Transfer Taxes") shall be retained liabilities of Seller.

(b)     Except for Purchaser's obligation to pay Seller the Estimated 2008 Property Taxes and to pay any applicable taxing authorities any Property Taxes (as defined herein) assessed to Purchaser based on its use of the Office Assets, all liabilities for real or personal property taxes assessed against the Office Assets (collectively, "Property Taxes") through the applicable Closing Date shall be retained liabilities of Seller.

(c)     Except for any obligation of Purchaser to file tax returns with the applicable taxing authorities because of Purchaser's use of the Office Assets, Seller shall file, or cause to be filed, all necessary tax returns and other documents required to be filed with respect to all Transfer Taxes and all Property Taxes assessed prior to the applicable Closing Date. Purchaser shall cooperate to the extent reasonably necessary with Seller's filing of returns under this section.

3.5     Assignment and Assumption of Office Leases. On and effective as of the Phase I Closing Date, the parties shall execute an assignment and assumption of the Office Leases set forth on Schedule 1.1(a) (excluding the Expired Leases and the Office Leases listed on Schedule 1.6) in substantially the form attached hereto as Exhibit 3.5. On the Phase I Closing Date and effective as of the Phase II Closing Date, the parties shall execute an assignment and assumption of the Office Leases set forth on Schedule 1.6 which are not removed by the Bankruptcy Court pursuant to the Modification Motion in substantially the form attached hereto as Exhibit 3.5; provided, however, on or before the Phase II Closing Date, the parties shall attach

the list of the Office Leases listed in Schedule 1.6 which are not removed by the Bankruptcy Court pursuant to the Modification Motion to such assignment and assumption agreement.

      3.6    Post-Closing.

      (a)    Consumer Confidential Information. Each Seller, as applicable, hereby acknowledges and agrees that prior to the applicable Closing Date, has removed any and all confidential information, including, without limitation, any and all customer loan profiles and any consumer or business data contained on any computer or any other type of electronic equipment ("Consumer Confidential Information"). Purchaser hereby acknowledges and agrees that, after the applicable Closing Date, it shall use its reasonable best efforts to package and deliver to the applicable Seller any Consumer Confidential Information that Purchaser discovers remaining among the Office Assets on or after the applicable Closing Date.

      (b)    License Agreement. The parties agree that (i) notwithstanding any language therein to the contrary, the License Agreement shall terminate as of the applicable Closing Date (or, if the parties fail to consummate the Phase II Closing on or before the Phase II Closing Date, at 4:00 p.m. Eastern Standard Time on March 3, 2008, as stated in the February 7, 2008, notice letter that was delivered to Purchaser in accordance with the termination provision of the License Agreement), (ii) this Agreement shall serve as adequate notice of termination under the "Term" provision of the License Agreement, and (iii) any other notice requirements for effecting a termination of the License Agreement under the terms thereof, including, without limitation, any requirements dealing with the sufficiency of notice or the amount of advance notice required, are expressly waived.

      (c)    Access to Offices.

      (i)    Purchaser hereby acknowledges and agrees that, if necessary, it shall grant the applicable Seller and/or its agents, who shall include, but who shall not be limited to, Office Furniture Outlet, ABE Office Furniture Superstore, and Bekins Moving Solutions, Inc., access to the applicable Offices and FFE in Purchaser's possession after the applicable Closing Date for the purpose of removing or copying any Consumer Confidential Information.

      (ii)    Purchaser hereby acknowledges and agrees that, if necessary, it shall grant counterparties to the applicable Seller's equipment leases or their agents access to the applicable Offices in Purchaser's possession after the applicable Closing Date for the purpose of removing any property belonging to such counterparties.

      (iii)    Purchaser shall cooperate with Seller's collection, preservation, or reproduction of Consumer Confidential Information, including, without limitation, any such information contained on computers or other electronic equipment at the Offices, provided that a regulatory agency requires

Seller to take such action or Seller otherwise determines that such action is necessary under any applicable law, rule, regulation, or court order. Purchaser agrees to allow Seller access to the Offices under Section 3.6(c)(i) and to any computer or other piece of electronic equipment in Purchaser's possession and formerly belonging to Seller, whether or not such computer or equipment is an Office Asset, as necessitated by this Section 3.6(c)(iii).

(iv)     Access under any of the provisions of this Section 3.6(c) shall be subject to reasonable advance notice to Purchaser, shall occur only during regular business hours and shall be undertaken without undue disruption of Purchaser's use and occupancy of the Offices.

(d)     <u>Cure Amounts</u>. Purchaser shall pay the Cure Amounts remaining unpaid as of the applicable Closing Date, in full in the manner and amount required by the Cure Order.

(e)     <u>Sale Order</u>. The parties agree to comply with the terms of the Sale Order.

(f)     <u>Vendor Invoices</u>. Seller shall deliver to Purchaser all invoices attributable to Purchaser's business activities in any of the Office Leases that Seller receives within ninety (90) days after the applicable Closing Date. Purchaser has, prior to the applicable Closing Date, contacted all applicable vendors to ensure that invoices relating to Purchaser's business activities in the Office Leases are sent to Purchaser's address.

4.     **Seller's Representations and Warranties**. Seller hereby represents and warrants to Purchaser the following, which representations and warranties shall be true and correct on the date of this Agreement and on the applicable Closing Date:

4.1     <u>Organization</u>. American Home Mortgage Corp. is duly incorporated under the laws of the State of New York, and American Home Mortgage Holdings, Inc., is duly incorporated under the laws of the State of Delaware.

4.2     <u>Powers; Consents; Absence of Conflicts</u>. Pursuant to the terms of the Sale Order, the applicable Seller has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution, delivery, and performance by the applicable Seller of this Agreement and the consummation of the transactions contemplated by this Agreement:

(a)     are within the applicable Seller's powers, are not in contravention of the terms of its certificate of incorporation or bylaws, as amended to date, and have been duly authorized by all necessary corporate action; and

(b)    unless otherwise expressly provided in this Agreement or set forth in the Sale Order, do not require any approval or consent of, or filing with, any governmental authority; and

(c)    comply with the terms of the Sale Order.

4.3    <u>Binding Agreement</u>.   Pursuant to the terms of the Sale Order, this Agreement and all instruments and agreements hereunder to which the applicable Seller is or becomes a party are or, upon execution, will be valid and legally binding obligations of the applicable Seller, enforceable against such Seller in accordance with the respective terms hereof or thereof, except as enforceability may be subject to general principles of equity and as may be restricted, limited, or delayed by applicable bankruptcy or other laws effecting creditors' rights generally.

4.4    <u>Office Assets</u>.   The applicable Seller owns and holds good and marketable title to all of the FFE and Seller and its agents have not removed or authorized removal of any FFE from any of the Offices on or after August 1, 2007.

4.5    <u>Brokers and Finders</u>.   Neither Seller nor any member, officer, director, employee, or agent of Seller has engaged any finder or broker in connection with the transactions contemplated by this Agreement except for Milestone Advisors, LLC, whose costs and expenses shall be liabilities of Seller only.

5.    **Purchaser's Representations and Warranties**.   Purchaser hereby represents and warrants to Seller the following, which representations and warranties shall be true and correct on the date of this Agreement and on the applicable Closing Date:

5.1    <u>Organization</u>.   Purchaser is duly organized as a federally chartered savings bank.

5.2    <u>Authorization</u>.   Purchaser has the power and authority necessary to enter into and perform its obligations under this Agreement or assumed under the applicable Office Leases and to consummate the transactions contemplated hereby.   The execution, delivery, and performance by Purchaser of this Agreement and the consummation of the transactions contemplated by this Agreement have been approved by all necessary actions of Purchaser.   This Agreement has been executed and delivered by duly authorized officers of Purchaser.

5.3    <u>Binding Obligation</u>.   This Agreement, when executed and delivered by Purchaser, will constitute the legal, valid, and binding obligations of Purchaser in accordance with its terms, except to the extent that the enforcement thereof may be limited by bankruptcy, reorganization, insolvency, or similar laws of general applicability governing the enforcement of the rights of creditors or by the general principles of equity (regardless of whether considered in a proceeding at law or in equity).

5.4    <u>Validity of Contemplated Transactions, Restrictions</u>.   The execution, delivery, and performance of this Agreement and the consummation of the transactions

contemplated hereby will not (i) violate any provision of the charter or bylaws of Purchaser or (ii) result in a violation by Purchaser of any law or order of any court or governmental unit to which Purchaser is subject or by which its assets are bound.

5.5     Consents and Approvals.    No consent, approval, or authorization or declaration, filing, or registration with any governmental authority or any other person is required to be made or obtained by Purchaser in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby.

5.6     Brokers and Finders.    Purchaser has not incurred any liability to any party for any brokerage fees, agent's commissions, or finder's fees in connection with the purchase of the Office Assets.

5.7     Payment of Purchase Price.    Purchaser has, or has available to it, adequate financial resources to pay the Purchase Price and the Deposit on the date this Agreement is executed and to consummate the transactions contemplated hereby.

6.     **Closing Deliveries**.

6.1     Seller Deliveries.    At or prior to each Closing, Seller shall deliver to Purchaser all documents required to consummate the transactions contemplated by this Agreement, duly executed, and such other items necessary to consummate the applicable Closing, including, but not limited to:

(a)     A bill of sale to transfer to Buyer the applicable Office Assets in the form of Exhibit 6.1;

(b)     An executed assignment and assumption for the applicable Office Leases, in the form of Exhibit 3.5;

(c)     All other title documents, assignments, transfers, and other instruments of conveyance, as appropriate, all in form reasonably satisfactory to Purchaser and its counsel, with respect to all of the applicable Office Assets; and

(d)     Such other documents or instruments as Purchaser may reasonably request in connection with the sale and transfer of the applicable Office Assets.

6.2     Purchaser Deliveries.    Purchaser shall deliver to the applicable Seller all documents required to consummate the transactions contemplated by this Agreement, duly executed, and such other items necessary to consummate the applicable Closing, including, but not limited to:

(a)     The Purchase Price, in accordance with and as adjusted pursuant to Section 2.7(a), which shall be indefeasibly paid by Purchaser to Seller on the Phase I Closing Date;

(b)    An executed assignment and assumption for the applicable Office Leases, in the form of <u>Exhibit 3.5,</u> which shall be executed by Purchaser on the Phase I Closing Date and effective and delivered to Seller on <u>or before </u>the applicable Closing Date; <u>and</u>

(c)    Such other documents or instruments as Seller may reasonably request in connection with the sale and transfer of the applicable Office Assets, ~~by~~on the applicable Closing Date.

7.    **Conditions Precedent to Purchaser's Obligations**.  All of the obligations of Purchaser under this Agreement are subject to the satisfaction of each of the following conditions on or before the applicable Closing any of which may be waived by Purchaser in it sole discretion:

7.1    <u>Compliance by Seller</u>.  Each Seller shall have performed and complied in all material respects with all covenants and obligations to be complied with or performed by the applicable Seller on or prior to the applicable Closing Date.

7.2    <u>Orders</u>.  On or before the Phase I Closing Date, Seller shall have delivered to Purchaser certified copies of the Sale Order, the License Order, the Cure Order, and the docket for the Bankruptcy Case available as of September 26, 2007, which docket shall reflect that, as of that date, the Sale Order, the License Order, and the Cure Order shall have become final, shall have not been modified in any respect, and shall not be subject to any stay or appeal.

8.    **Conditions Precedent to Seller's Obligations**.  All of the obligations of the applicable Seller under this Agreement are subject to the satisfaction of each of the following conditions on or before the applicable Closing any of which may be waived by the applicable Seller in its sole discretion:

8.1    <u>Compliance by Purchaser</u>.  Purchaser shall have performed and complied in all material respects with all covenants and obligations to be complied with or performed by Purchaser on or prior to the applicable Closing Date.

9.    **Expenses**.  Except as specifically provided herein, Purchaser and Seller shall each pay their own expenses incurred in connection with this Agreement and the transactions contemplated herein, whether or not the transactions contemplated herein are consummated.

10.    **Miscellaneous.**

10.1    <u>Governing Law, Venue, and Jurisdiction</u>.    This Agreement shall be governed by the laws of the State of New York without regard to any conflicts of law provisions thereunder.  In the event either party shall institute a legal action as a result of the default in the other party's performance under this Agreement or for any breach of this Agreement, any such action shall be brought exclusively in the Bankruptcy Court.

10.2    Binding.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective representatives, successors, and assigns.

10.3    Entire Agreement.  This Agreement and its accompanying schedules and exhibits, together with the Sale Order, License Order and Cure Order, contain the full and complete understanding of the parties with respect to the acquisition of the Office Assets and all other transactions contemplated herein, and supersedes all prior agreements or understandings among the parties relating to the subject matter hereof.

10.4    Assignment.  Neither party shall be permitted to assign its rights hereunder without the written consent of the other party.

10.5    Amendment; Waiver.  This Agreement may be amended, modified, or supplemented only by a written instrument signed by both Purchaser and Seller.  No supplement, modification, waiver, or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver, unless otherwise expressly provided.

10.6    Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally or by facsimile to the recipient, (b) one business day after the date when sent to the recipient by reputable express courier service (charges prepaid), or (c) seven business days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  Such notices, demands, and other communications shall be sent to Seller and to Purchaser at the addresses indicated below:

|  |  |
|---|---|
| If to Purchaser: | IndyMac Bank, F.S.B.<br>888 East Walnut Street<br>Pasadena, California 91101<br>Attn: Jules Vogel, Esquire<br>Telephone: (626) 535-5525<br>Facsimile: (626) 535-4180 |
| with a copy (that shall not constitute notice) to: | Orrick, Herrington & Sutcliffe LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105<br>Attn: Frederick D. Holden, Jr., Esquire<br>Telephone: (415) 773-5985<br>Facsimile: (415) 773-5759 |

If to Seller:

American Home Mortgage Corp.
American Home Mortgage Holdings, Inc.
538 Broadhollow Road
Melville, NY 11747
Attn: Mr. Stephen A. Hozie
Telephone: (516) 620-1061
Facsimile: (866) 557-1961

with a copy (that shall not
constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Attn: Craig D. Grear, Esquire
Telephone: (302) 571-6612
Facsimile: (302) 576-3296

and

Milestone Advisors, LLC
1775 Eye Street, NW
Suite 800
Washington, DC 20006
Attn: Mr. John Nelligan, Managing Director
Telephone: (202) 367-3005
Facsimile: (202) 367-3001

Any party may change its address for purposes of this Section 10.6 by giving notice to the other party of the new address in the manner set forth herein. Any notice given as set forth herein shall be deemed to be received on the earlier of actual receipt or three (3) business days after being sent.

10.7    Time of Essence. It is agreed that time is of the essence in the performance and satisfaction of this Agreement, and each of the conditions specified in Sections 7 and 8 are material for the purposes of this Agreement.

10.8    No Survival of Representations and Warranties. The parties agree that the representations and warranties contained in this Agreement and in any certificate delivered or ancillary agreement entered into pursuant hereto by any party shall not survive the applicable Closing Date, and none of the parties shall have any liability to each other after the applicable Closing Date for any breach thereof. The parties agree that the covenants contained in this

Agreement to be performed at or after the applicable Closing Date, including, without limitation, all indemnification obligations, shall survive the applicable Closing Date hereunder.

        10.9    Severable.  In the event any one or more of the provisions herein shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions of this Agreement, and any application thereof shall not in any way be affected or impaired thereby.

        10.10   Counterparts and Facsimile Signatures.  This Agreement may be executed in one or more counterparts and by facsimile signatures, each of which shall be deemed to be an original and all of which together shall constitute one and the same agreement.  Any and all facsimile signatures on any counterparts of this Agreement or any document or instrument required to be delivered hereunder shall have the same force and effect as an original signature upon such counterpart of this Agreement or any document or instrument delivered hereunder.

*{Signature Page Follows}*

The parties have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written in the introductory paragraph.

SELLER:
AMERICAN HOME MORTGAGE CORP.


By:_____
      Alan Horn
      Executive Vice President and
      General Counsel

AMERICAN HOME MORTGAGE HOLDINGS, INC.


By:_____
      Alan Horn
      Executive Vice President and
      General Counsel

PURCHASER:
INDYMAC BANK, F.S.B.


By:_____
      Richard H. Wohl
      President

**Schedule 1.1(a) – Office Leases**

**Schedule 1.6 – Excluded Leases**

**Schedule 2.2 – Security Deposits**

**Schedule 2.3 – Cure Amounts**

**Schedule 2.4 – Closing True-Up**

**Schedule 2.5 – Duplicative Rental Payments**

**Exhibit 2.7 – Escrow Agreement**

## Schedule 2.8 – Allocation of Purchase Price

All payments by Purchaser, except for payments attributable to the security deposits, shall be allocated to the FFE.

**Exhibit 3.5 – Assignment and Assumption of Office Lease**

**Exhibit 6.1 – Bill of Sale**

Document comparison done by Workshare DeltaView on Wednesday, February 27, 2008 6:07:28 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://WSDMS/DB02/6211739/16 |
| Document 2 | interwovenSite://WSDMS/DB02/6211739/18 |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |

| | |
|---|---|
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 48 |
| Deletions | 29 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 77 |



## ESCROW AGREEMENT

This ESCROW AGREEMENT (this "Escrow Agreement"), dated February ~~22,~~23, 2008, is made by and among **AMERICAN HOME MORTGAGE CORP.**, a New York corporation, and **AMERICAN HOME MORTGAGE HOLDINGS, INC.**, a Delaware corporation (collectively, "Seller"); **INDYMAC BANK, F.S.B.**, a federally chartered savings bank ("Purchaser"); and **WILMINGTON TRUST COMPANY**, a Delaware banking corporation, as the escrow agent (together with any successor in such capacity, the "Escrow Agent").

WHEREAS, Purchaser and Seller are parties to an Asset Purchase Agreement (as in effect from time to time, the "Purchase Agreement"), dated as of the date of this Escrow Agreement, a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to Section 2.7(a) of the Purchase Agreement, Purchaser and Seller have agreed to enter into this Escrow Agreement, and Purchaser shall deposit with the Escrow Agent the sum of One Million One Hundred Sixty-Eight Thousand Four Hundred Ninety-Nine and 89/100 Dollars ($1,168,499.89) in immediately available funds (the "Deposit") to the deposit account set forth in Exhibit B hereto (the "Deposit Account"), with One Hundred Sixty-Eight Thousand Four Hundred Ninety-Nine and 89/100 Dollars ($168,499.89) of the Deposit constituting the "Adjustments Deposit" and One Million Dollars ($1,000,000.00) of the Deposit constituting the "Additional Deposit~~;~~" and

WHEREAS, the Deposit is to be held and acted upon by the Escrow Agent in accordance with the provisions of this Escrow Agreement,

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed among the parties hereto as follows:

1.    **Definitions.** Each capitalized term that is used and not otherwise defined in this Escrow Agreement has the meaning ascribed thereto in the Purchase Agreement.  As used in this Escrow Agreement:

(a)    "Business Day" means any day, other than a Saturday, Sunday, or legal holiday on which banks in the City of Wilmington, Delaware, are permitted to be closed, upon which the Escrow Agent conducts business.

(b)    "Escrow Fund(s)" means the amount of the Deposit and all Escrow Income, in each case held by the Escrow Agent at such time.  "Adjustments Escrow Fund(s)" shall mean the portion of Escrow Funds that is attributable to the deposit of the Adjustments Deposit, and "Additional Escrow Fund(s)" shall mean the portion of Escrow Funds that is attributable to the deposit of the Additional Deposit.

(c)    "Escrow Income" means all interest or other income directly or indirectly earned and paid to the Escrow Agent on the Deposit and held by the Escrow Agent, together with

all interest and other income accrued but unpaid on such funds as of such date and payable at a later time.

**2.    Appointment of Escrow Agent.**  Seller and Purchaser hereby designate and appoint the Escrow Agent as their joint escrow agent subject to the terms of this Escrow Agreement.  The Escrow Agent agrees to (i) act as escrow agent unless and until a successor escrow agent is appointed pursuant to Section 7.7 hereof, (ii) hold and act upon the Escrow ~~Fund~~Funds, and (iii) upon receipt thereof, deposit and hold all portions of the Deposit in a separate non-interest bearing account maintained by the Escrow Agent, in each case in accordance with the terms and conditions of this Escrow Agreement.

**3.    Escrow ~~Fund~~Funds.**  On ~~the day the Purchase Agreement and this Escrow Agreement are executed (first provided above in the introductory paragraph)~~or before the Phase I Closing Date, Purchaser shall wire transfer the Adjustments Deposit and the Additional Deposit to the Deposit Account to be held and disbursed by the Escrow Agent in accordance with the terms and conditions of this Escrow Agreement.

**4.    Disbursement of Escrow Funds.**

4.1    Payment of Adjustments Escrow Fund and Additional Escrow Fund.  The Escrow Agent shall disburse the escrow funds in accordance with this Section 4.1.

(a)    If the Modification is not approved or only partially approved by the Bankruptcy Court on or before ~~March 2, 2008,~~the Court Deadline, and Seller and Purchaser consummate the Phase II Closing ~~by March 3, 2008,~~on or before the Phase II Closing Date.

(i)    If the Bankruptcy Court approves the removal of some, but not all, of the Office Leases listed in Exhibit 1.6 to the Purchase Agreement, Purchaser and Seller shall provide to the Escrow Agent a copy of the order indicating such approval and joint written instructions to the Escrow Agent to distribute to Purchaser, from the Additional Escrow Funds, an amount calculated under Section 3.3(d) of the Purchase Agreement.  Upon its receipt of such order and joint written instructions, the Escrow Agent shall immediately distribute the amount calculated under Section 3.3(d) of the Purchase Agreement contained in such instructions from the Additional Escrow Funds to Purchaser, by wire transfer of immediately available funds to the account or accounts designated by Purchaser.

(ii)    Seller shall use its commercially reasonable efforts to deliver to the Escrow Agent within forty-five (45) days after the Closing Date each of the Security Deposit Reconciliation Report and the Estimated 2008 Property Taxes report.  On the first Business Day at least 15 days after Seller's delivery of each such report, the Escrow Agent shall distribute the amount contained in such report from the Adjustments Escrow Funds to Seller, by wire

transfer of immediately available funds to the account or accounts designated by Seller.

(iii)    Upon the payment of both the Security Deposit Reconciliation and the Estimated 2008 Property Taxes to Seller under subsection (i) hereof, Purchaser and Seller shall jointly execute and deliver to the Escrow Agent written instructions directing the Escrow Agent to distribute any remaining Adjustments Escrow Funds, if any, to Purchaser, by wire transfer of immediately available funds to the account or accounts designated by Purchaser. The Escrow Agent shall cause the remaining Adjustments Escrow Funds to be paid to Purchaser by wire transfer of immediately available funds to the account or accounts designated by Purchaser on the first Business Day following the date on which it receives such instructions.

(iv)    At any time that there are Additional Escrow Funds remaining in the Deposit Account, upon (A) the final settlement, compromise, or resolution of any claim for which Seller is entitled to be indemnified by Purchaser under Section 3.3(a) of the Purchase Agreement (each, an "Indemnified Claim"), and (B) Purchaser's refusal to pay to Seller the amount of such Indemnified Claim within one Business Day of receiving a written request for such amount, Seller shall provide written instructions to the Escrow Agent to distribute to Seller, from the Additional Escrow Funds, an amount up to, but not exceeding, the amount of the applicable Indemnified Claim. Seller shall deliver a copy of the written instructions to both Purchaser and the Escrow Agent. On the second Business Day after receipt of the Seller's written instructions, the Escrow Agent shall distribute the amount contained in such instructions from the Additional Escrow Funds to Seller, by wire transfer of immediately available funds to the account or accounts designated by Seller.

(v)    On the first Business Day that is at least 30 days after the day it distributes funds to Seller under subsection (iv) hereof with respect to Seller's expenses from filing and prosecuting the Modification in the Bankruptcy Court, the Escrow Agent shall distribute the remaining Additional Escrow Funds to Purchaser, by wire transfer of immediately available funds to the account or accounts designated by Purchaser.

(b)    If the Modification is not approved or only partially approved by the Bankruptcy Court by March 2, 2008, on or before the Court Deadline, and Purchaser and Seller fail to consummate the Phase II Closing on or before March 3, 2008, the Phase II Closing Date.

(i)    If the Bankruptcy Court approves the removal of some, but not all, of the Office Leases listed in Exhibit 1.6 to the Purchase Agreement, Purchaser and Seller shall provide to the Escrow Agent a copy of the order indicating such approval and joint written instructions to the Escrow Agent to distribute to Purchaser, from the Additional Escrow Funds, an amount calculated under Section 3.3(d) of the Purchase Agreement. Upon its receipt of such order

and joint written instructions, the Escrow Agent shall immediately distribute the amount calculated under Section 3.3(d) of the Purchase Agreement contained in such instructions from the Additional Escrow Funds to Purchaser, by wire transfer of immediately available funds to the account or accounts designated by Purchaser.

(ii)     Upon notification from Seller that this scenario (b) applies, the Escrow Agent shall immediately distribute the remaining Adjustments Escrow Funds and Additional Escrow Funds to Seller, by wire transfer of immediately available funds to an account designated by Seller.

(c)     If the Modification is approved by the Bankruptcy Court on or before ~~March 2, 2008,~~the Court Deadline, and Seller and Purchaser consummate the Phase II Closing ~~by March 3, 2008,~~on or before the Phase II Closing Date.

(i)     If the Bankruptcy Court approves the entire Modification, Seller shall provide to the Escrow Agent a copy of the order indicating such approval.  Upon its receipt of such order, the Escrow Agent shall immediately distribute all of the remaining Additional Escrow Funds to Seller, by wire transfer of immediately available funds to the account or accounts designated by Seller.

(ii)     If the Bankruptcy Court only approves the removal of some, but not all, of the Office Leases listed in Exhibit 1.6 to the Purchase Agreement, Purchaser and Seller shall provide to the Escrow Agent a copy of the order indicating such approval and joint written instructions to the Escrow Agent to distribute to Purchaser, from the Additional Escrow Funds, an amount calculated under Section 3.3(d) of the Purchase Agreement.  Upon its receipt of such order and joint written instructions, the Escrow Agent shall immediately (i) distribute the amount calculated under Section 3.3(d) of the Purchase Agreement contained in such instructions from the Additional Escrow Funds to Purchaser, by wire transfer of immediately available funds to the account or accounts designated by Purchaser, and (ii) distribute all of the remaining Additional Escrow Funds to Seller, by wire transfer of immediately available funds to the account or accounts designated by Seller.

(iii)     Seller shall use its commercially reasonable efforts to deliver to the Escrow Agent within forty-five (45) days after the Closing Date each of the Security Deposit Reconciliation Report and the Estimated 2008 Property Taxes report.  On the first Business Day at least 15 days after Seller's delivery of each such report, the Escrow Agent shall distribute the amount contained in such report from the Adjustments Escrow Funds to Seller, by wire transfer of immediately available funds to the account or accounts designated by Seller.

(iv)     Upon the payment of both the Security Deposit Reconciliation and the Estimated 2008 Property Taxes to Seller under subsection (iii) hereof, Purchaser and Seller shall jointly execute and deliver to the Escrow

Agent written instructions directing the Escrow Agent to distribute any remaining Adjustments Escrow Funds, if any, to Purchaser, by wire transfer of immediately available funds to the account or accounts designated by Purchaser. The Escrow Agent shall cause the remaining Adjustments Escrow Funds to be paid to Purchaser by wire transfer of immediately available funds to the account or accounts designated by Purchaser on the first Business Day following the date on which it receives such instructions.

4.2    <u>Disbursement by Escrow Agent.</u>  Except as otherwise provided in Section 4.1, the Escrow Agent shall hold the Escrow Funds and shall not deliver or disburse the Escrow Funds, other than:

(a)    pursuant to written instructions jointly executed by Purchaser and Seller and delivered to the Escrow Agent;

(b)    pursuant to a final order, from which no further appeal may be taken, of a court having jurisdiction in accordance with the provisions of Section 10.2 of this Escrow Agreement;

(c)    by delivering the Escrow Funds into the Bankruptcy Court pursuant to the provisions of Section 5 of this Escrow Agreement; or

(d)    by delivering the Escrow Funds to a successor escrow agent pursuant to the provisions of Section 7.7 of this Escrow Agreement.

4.3    <u>Reliance on Notice</u>.  Upon receipt of written instructions given to the Escrow Agent pursuant to Sections 4.1 or 4.2 of this Escrow Agreement, the Escrow Agent shall deliver the Escrow Funds in accordance with such instructions and this Escrow Agreement, and the Escrow Agent shall not be subject to any liability to any party for doing so, except for its own willful misconduct or gross negligence. Purchaser and Seller each agree not to assert any claim against the Escrow Agent for making a disbursement or payment in accordance with this Section, except to the extent such claim arises out of the Escrow Agent's willful misconduct or gross negligence.

5.    **Dispute Procedures.**  In the event of a dispute between the parties hereto as to the proper disposition of all or a portion of the Escrow Funds, the Escrow Agent shall (i) deliver the Escrow Funds, or the portion of the Escrow Funds involved in the dispute, as applicable, in accordance with joint written instructions of Purchaser and Seller (including, for this purpose, an instruction to the Escrow Agent to retain the Escrow Funds) or a final order or judgment, from which no further appeal may be taken, of a court in each case having jurisdiction pursuant to Section 10.2 of this Escrow Agreement, to the extent provided in such instructions or order or judgment, or, in the absence of the foregoing, (ii) deliver the Escrow Funds, or the portion of the Escrow Funds involved in the dispute, as applicable, into the Bankruptcy Court; and, upon giving notice to Purchaser and Seller of such action, shall thereupon be relieved of all further responsibility with respect to the Escrow Funds or the applicable portion thereof.

**6.    Investment of Escrow Funds.**  Upon the Escrow Agent's receipt of the tax information required by Section 10.1 hereof, the Escrow Agent shall invest and reinvest all of the Escrow Funds in the Service class shares of the U.S. Government Portfolio of the Wilmington family of mutual funds or any other mutual funds for which the Escrow Agent or any affiliate of the Escrow Agent may serve as investment advisor or other service provider.  Each of the Purchaser and Seller acknowledge that shares in this mutual fund are not obligations of the Escrow Agent, are not deposits, and are not insured by the FDIC.  The Escrow Agent or its affiliates are compensated by these mutual funds for services rendered in its capacity as investment advisor, custodian, and/or transfer agent.  The Escrow Agent, or its affiliates, are also compensated by these mutual funds for providing shareholder services, and such compensation is both described in detail in the prospectus for the fund and is in addition to the compensation, if any, paid to the Escrow Agent hereunder.  All amounts earned on the Escrow Amount will be added to and become part of the Escrow Funds which may be disbursed pursuant to the terms hereof.

**7.    Escrow Agent.**

7.1    General.  The Escrow Agent shall act in the fiduciary capacity as escrow agent and hold and disburse the Escrow Funds pursuant to the terms and conditions of this Escrow Agreement.  The Escrow Agent's duties under this Escrow Agreement shall cease upon delivery and receipt of the Escrow Funds in accordance with the terms and conditions of this Escrow Agreement.

7.2    Liquidation of Investments.  When necessary to provide funds in order to make any payments required by this Escrow Agreement, the Escrow Agent shall liquidate its investment held by it as the Escrow Agent.  The Escrow Agent shall have no liability for lost or unaccrued interest upon the liquidation of any such investments.

7.3    Limited Duties.  The Escrow Agent undertakes to perform only such duties as are expressly set forth in this Escrow Agreement.  The Escrow Agent shall incur no liability whatsoever to Seller or Purchaser, except for its own willful misconduct or gross negligence in its capacity as escrow agent hereunder.

7.4    Reliance on Notices.  The Escrow Agent may rely and shall be protected in acting or refraining from acting upon any written notice, instruction, or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties.  The Escrow Agent may conclusively presume that each of the undersigned representatives of Seller and Purchaser have full power and authority to instruct the Escrow Agent on behalf of that party.

7.5    Limited Responsibilities.  The Escrow Agent's sole responsibility upon receipt of any written instructions or notice directing delivery to Seller or Purchaser pursuant to the terms of this Escrow Agreement is to comply with the provisions of this Escrow Agreement.

7.6    Action in Good Faith.  The Escrow Agent shall not be liable for any action taken by it in good faith and believed by it to be authorized or within the rights or powers conferred upon it by this Escrow Agreement, and the Escrow Agent may consult with counsel of

its own choice and shall have full and complete authorization and protection and will be deemed not to have acted with willful misconduct or gross negligence for any action taken or suffered by it hereunder in good faith and in accordance with the opinion of such counsel.

7.7    Resignation.  The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving at least 10 Business Days' notice of such resignation to Seller and Purchaser, specifying a date upon which such resignation shall take effect, whereupon a successor escrow agent, which shall be a bank or trust company, shall be appointed by Purchaser with Seller's prior written consent, such consent not to be unreasonably withheld; provided, however, that the Escrow Agent must continue to serve and act as the Escrow Agent hereunder until such time as a successor agent has been appointed and is acting in such capacity pursuant to this Section 7.7; provided further, however, that if no successor escrow agent is appointed and acting in such capacity pursuant to this Section 7.7 within ten (10) Business Days of the date notice of the Escrow Agent's resignation is given to Seller and Purchaser, the Escrow Agent will be discharged from its duties or obligations hereunder upon delivering the Escrow Funds into the Bankruptcy Court.  The Escrow Agent shall be entitled to deliver the Escrow Funds to any successor escrow agent so appointed upon said successor escrow agent having executed and agreeing to be bound by this Escrow Agreement.

7.8    Indemnification.  Seller and Purchaser hereby jointly and severally agree to indemnify the Escrow Agent for, and to hold it harmless against, any loss, liability, damage, or expense, including the cost and expense (including, but not limited to, reasonable attorneys' fees, which may consist in whole or in part of the time charges at their standard rates of partners and attorneys employed by the Escrow Agent) of defending itself against any claim or liability (collectively, "Loss") incurred by the Escrow Agent arising out of or in connection with entering into or performing under this Escrow Agreement, other than a Loss arising out of, or in connection with, the Escrow Agent's willful misconduct or gross negligence.  To the extent permitted by law, the Escrow Agent shall have a first lien against undisbursed Escrow Funds to secure the obligations of the parties hereunder.  The terms of this Section 7.8 shall survive termination of this Escrow Agreement.

7.9    Compensation of Escrow Agent.  The Escrow Agent will be entitled to a reasonable fee for services rendered and for reimbursement of extraordinary expenses reasonably incurred in the performance of its duties.  Such fee and expenses will be paid entirely by Purchaser.  The fee payable to the Escrow Agent hereunder shall be One Thousand Five Hundred Dollars ($1,500.00).  In the event the Escrow Agent renders any extraordinary services in connection with the Escrow Funds at the request of the parties, the Escrow Agent shall be entitled to additional compensation under this Section 7.9, as reasonably approved by the parties.

8.    **Escrow Agent Not Affected by Other Agreements.**  This Escrow Agreement expressly sets forth all the duties of the Escrow Agent with respect to any and all matters pertinent hereto.  No implied duties or obligations shall be read into this Escrow Agreement against the Escrow Agent.  The Escrow Agent, in its capacity as such, shall not be bound by the provisions of any agreement among the parties hereto other than this Escrow Agreement and shall have no duty to inquire into, or to take into account its knowledge of, the terms and

conditions of any agreement made or entered into in connection with this Escrow Agreement, including, but not limited to, the Purchase Agreement.

       **9.**    **Notices**.  All notices, consents, and other communications under this Escrow Agreement shall be in writing and shall be deemed to have been duly given when received by each party at the following addresses, unless another address is specified in writing to the other parties:

      (a)    If to Purchaser:

> IndyMac Bank, F.S.B.
> 888 East Walnut Street
> Pasadena, California 91101
> Attn:  Jules Vogel, Esquire
> Telephone:  (626) 535-5525
> Facsimile:  (626) 535-4180

with a copy (that will not constitute notice) to:

> Orrick, Herrington & Sutcliffe LLP
> The Orrick Building
> 405 Howard Street
> San Francisco, CA 94105
> Attn:  Frederick D. Holden, Jr., Esquire
> Telephone:  (415) 773-5985
> Facsimile:  (415) 773-5759

      (b)    If to Seller:

> American Home Mortgage Corp.
> American Home Mortgage Holdings, Inc.
> 538 Broadhollow Road
> Melville, NY 11747
> Attn:  Mr. Stephen A. Hozie
> Telephone:  (516) 620-1061
> Facsimile:  (866) 557-1961

with a copy (that will not constitute notice) to:

> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> Attn: Craig D. Grear, Esq.
> Telephone: (302) 571-6612
> Facsimile: (302) 576-3296

and

Milestone Advisors, LLC
1775 Eye Street, NW
Suite 800
Washington, DC 20006
Attn:  Mr. John Nelligan, Managing Director
Telephone:  (202) 367-3005
Facsimile:  (202) 367-3001

(c)    If to the Escrow Agent:

Wilmington Trust Company
1100 North Market Street
Rodney Square North
Mail Drop Code 1605
Wilmington, Delaware 19890-1605
Attn:  Mr. David Young
Telephone:  (302) 636-5216
Facsimile:  (302) 636-4149

## 10.    Miscellaneous.

10.1    Tax Treatment of Escrow Funds.  The Escrow Agent will not have any interest in the Deposit or the Escrow Funds but is serving as escrow holder only and has only possession thereof.  Seller and Purchaser agree that, for purposes of federal and other taxes based on Escrow Income, Purchaser will be treated as the owner of the Escrow Funds until the Escrow Funds are disbursed in accordance with this Escrow Agreement.  Upon execution of this Escrow Agreement, Purchaser shall provide the Escrow Agent with its taxpayer identification number and the appropriate forms for or with respect to the reporting of such Escrow Income for tax purposes.

10.2    Jurisdiction.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Escrow Agreement shall be brought against any of the parties only in the United States Bankruptcy Court for the District of Delaware or any other court of competent jurisdiction located in the State of Delaware, and each of the parties hereby consents to the exclusive jurisdiction of such court(s) (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

10.3    Captions.  The captions in this Escrow Agreement are for convenience of reference only and shall not be given any effect in the interpretation of this Escrow Agreement.

10.4    No Waiver.  The failure of a party to insist upon strict adherence to any term of this Escrow Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this

Escrow Agreement. Any waiver must be in writing and signed by the party against whom it is to be charged.

10.5    Amendment. This Escrow Agreement may be amended, modified, and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify, or supplement this Escrow Agreement.

10.6    Exclusive Agreement; Assignment. This Escrow Agreement supersedes all prior agreements among the parties hereto (except for the Purchase Agreement) with respect to its subject matter, is intended as a complete and exclusive statement of the terms of the Escrow Agreement among the parties with respect thereto, and cannot be changed or terminated orally. No party may assign any rights or delegate any of its duties under this Escrow Agreement without the consent of the other parties to this Escrow Agreement. This Escrow Agreement shall be binding upon and inure to the benefit of the successors, assigns, and legal representatives of Purchaser and Seller and to any successor escrow agent appointed in accordance with Section 7.7 of this Escrow Agreement; provided, however, that no succession to, or assignment of, the interest of Purchaser or Seller will be binding upon the Escrow Agent unless and until written evidence of such succession or assignment, in a form satisfactory to the Escrow Agent, is provided to the Escrow Agent.

10.7    Counterparts. This Escrow Agreement may be executed in one or more counterparts and by facsimile signatures, each of which shall be deemed to be an original, and all of which together shall constitute one and the same agreement. Any and all facsimile signatures on any counterparts of this Escrow Agreement or any document or instrument required to be delivered hereunder shall have the same force and effect as an original signature upon such counterpart of this Escrow Agreement or any document or instrument delivered hereunder.

10.8    Governing Law. This Escrow Agreement and all amendments hereof and waivers and consents hereunder shall be governed by, and all disputes arising hereunder shall be resolved in accordance with, the internal law of the State of Delaware, without giving effect to any choice of law or conflict of law principals under the State of Delaware or any other jurisdiction that would cause the application of the laws of any jurisdiction other than the State of Delaware.

10.9    Waiver of Jury Trial. AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN.

10.10    Anti-Terrorism/Anti-Money Laundering Laws.

(a)    IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT - To help the United States government fight the funding of terrorism or money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens a new

account.  What this means for the parties to this Agreement:  the Escrow Agent will ask for your name, address, date of birth, and other information that will allow the Escrow Agent to identify you (*e.g.*, your social security number or tax identification number). The Escrow Agent may also ask to see your driver's license or other identifying documents (*e.g.,* passport, evidence of formation of corporation, limited liability company, limited partnership, etc., certificate of good standing).

(b)      Each party to this Agreement hereby agrees to provide the Escrow Agent, prior to the establishment of the Deposit Account, with the information identified above pertaining to it by completing the form attached as Exhibit C and returning it to the Escrow Agent.  Exhibit C includes one form for individuals and another form for entities.

*{Signature Page Follows}*

The parties have caused this Escrow Agreement to be signed by their respective duly authorized officers as of the date first above written in the introductory paragraph.

SELLER:
AMERICAN HOME MORTGAGE CORP.


By:_____
     Alan Horn
     Executive Vice President and
     General Counsel

AMERICAN HOME MORTGAGE HOLDINGS, INC.


By:_____
     Alan Horn
     Executive Vice President and
     General Counsel


PURCHASER:
INDYMAC BANK, F.S.B.


By:_____
     Richard H. Wohl
     President


ESCROW AGENT:
WILMINGTON TRUST COMPANY


By:_____
Name:
Title:

## EXHIBIT A

Purchase Agreement

*{Attached}*

## EXHIBIT B

Deposit Account

<u>With Regard to the Additional Deposit:</u>

| | |
|---|---|
| Bank: | Wilmington Trust Company |
| Account Name: | American Home Mtge/Indymac Additional Escrow |
| ABA: | 031100092 |
| Account Number: | 083306-001 |
| Attn.: | David B. Young |

<u>With Regard to the Adjustments Deposit:</u>

| | |
|---|---|
| Bank: | Wilmington Trust Company |
| Account Name: | American Home Mtge/Indymac Adjustments Escrow |
| ABA: | 031100092 |
| Account Number: | 083306-000 |
| Attn.: | David B. Young |

EXHIBIT C

**Due Diligence Questionnaire for Entity Customers**

Dear Customer:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism or money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens a new account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

Please complete the items identified and sign below. In certain circumstances, we may be required to request additional information. Thank you for your cooperation in this matter.

**Company Name:**_____

**SSN/TIN\*:**_____

**Street Address\*\*:**_____

**City:**_____ **State:**_____ **Zip Code:**_____

**Phone (Optional):**_____ **Fax (Optional):**_____ **eMail (Optional):**_____

*\*If SSN/TIN has been applied for please attach copy of filed application*
*\*\* Business street address, address for the principal place of business, local office or other physical location,*
*P.O. Box address is not acceptable*

**Required documents from non-individuals:**

Please provide the following *executed* document:
  Completed IRS Form W-9/W-8 (form attached)

Please provide *at least one* (1) of the following certified documents:
  Certificate or Articles of Incorporation
  Government-issued business license
  Partnership Agreement
  LLC Agreement
  Trust Agreement
  Certificate of Good Standing (issued within the last six months)

_____  _____

**Signature**                **Date**

**EXHIBIT C (Cont'd)**
**Due Diligence Questionnaire for Individual Customers**

Dear Customer:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism or money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens a new account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

Please complete the items identified and sign below. In certain circumstances, we may be required to request additional information. Thank you for your cooperation in this matter.

**Your Name:**_____

**SSN/TIN\*:**_____ **Date of Birth (Individuals):**_____

**Street Address** *(individual's residential address\*\*)*:_____

**City:**_____ **State:**_____ **Zip Code:**_____

**Phone (Optional):**_____ **Fax (Optional):**_____ **eMail (Optional):**_____
\*  *If SSN/TIN has been applied for please attach copy of filed application*
\*\* *P.O. Box address is not acceptable*

### Required documents from individuals:

Please provide the following *executed* document:
    Completed IRS Form W-9/W-8 (form attached)

Copy of *at least one* (1) of the following documents:

**1) Driver License (Photo ID):**               **2) Passport:**
State/Country of Issuance:_____     Country of Issuance:_____
License Number:_____            Issuance Date:_____
Issuance Date:_____            Passport Number:_____
Expiration Date:_____           Expiration Date:_____

**3) Government Issued ID Card (Photo ID):**
State/Country of Issuance:_____
ID Number:_____
Issuance Date:_____
Expiration Date:_____


_____          _____
**Signature**                                 **Date**
Revised: January 9, 2007/Due Diligence Form

Form **W-9**

(Rev. November 2005)
Department of the Treasury Internal Revenue service

11.    **Request for Taxpayer**

**Identification Number and Certification**

**Give form to the requester. Do not send to the IRS.**

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box:
☐ Individual/ Sole Proprietor   ☐ Corporation   ☐ Partnership   ☐ Other   ▶ .......................

☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code.

List account number(s) here (optional)

Print or Type

See Specific Instructions on page 2.

## Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN) **However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 2.** For other entities, it is your employer identification number (EIN). If you do not have a number, see **How to get a TIN on page 2.**

**Note:** If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.

Social Security number

Employer identification number

(a)    Certification

Under penalties of perjury, I certify that:

1.  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**

2.  I am not subject to backup withholding because. **(a)** I am exempt from backup withholding, or **(b)** I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or **(c)** the IRS has notified me that I am no longer subject to backup withholding, **and**

3.  I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here**    Signature of U.S. person ▶                    Date ▶

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

• An individual who is a citizen or resident of the United States,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

• Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

• The U.S. owner of a disregarded entity and not the entity,

---

Cat. No. 10231X Form W-9 (Rev. 11-2005)

Form W-9 (Rev. 11-2005)

Form W-9 (Rev. 11-2005)

Page 2

---

• The U.S. grantor or other owner of a grantor trust and not the trust, and

• The U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments (after December 31, 2002). This is called "backup withholding." Payments that may be

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Also see *Special rules regarding partnerships* on page 1.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment. Misuse of TINs. If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the

3

subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details),

"Business name" line.

**Limited liability company** (LLC). If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line. Check the appropriate box for your filing status (sole proprietor, corporation, etc.), then check the box for "Other" and enter "LLC" in the space provided. **Other entities.** Enter your business name as shown on required federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line. **Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

## Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

Form W-9 (Rev. 11-2005)                                                                                                         Page 3

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

**Exempt payees.** Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| IF the payment is for ... | THEN the payment is exempt for... |
|---|---|
| Interest and dividend payments | All exempt recipients except |

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at *www.socialsecurity.gov.* You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer ID Numbers under Related Topics. You can get Forms W-7 and SS-4 from the IRS by visiting *www.irs.gov* or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

4

066585.1001

for 9

| | |
|---|---|
| Broker transactions | Exempt recipients 1 through 13. |

Also, a person registered under
the Investment Advisers Act of
1940 who regularly acts as a
broker

| | |
|---|---|
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt recipients 1 through 7[2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.
[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a federal executive agency.

**Note.** Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon. **Caution:** A *disregarded domestic entity that* has a *foreign owner must use the appropriate Form W-8.*

Form W-9 (Rev. 11-2005)                                                        Page 4

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see *Exempt From Backup Withholding* on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification. **4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (Joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | |
| 7. A valid trust, estate, or pension trust | |
| 8. Corporate or LLC electing corporate status on Form 8832 | |
| 9. Association, club, religious, | |

5

charitable, educational, or other tax-exempt organization

10. Partnership or multi-member LLC

11. A broker or registered nominee

12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program

The owner [3]

Legal entity [4]
The corporation
The organization
The partnership
The broker or nominee
The public entity

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second line name. You may use either your SSN or EIN (if you have one). If you are a sole proprietor, IRS encourages you to use your SSN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules regarding partnerships* on page 1.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, the District of Columbia, and U.S. possessions to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

DB02:6572006.56572006.7

066585.1001

Document comparison done by Workshare DeltaView on Wednesday, February 27, 2008 6:11:38 PM

| Input: | |
|---|---|
| Document 1 | file://H:/AHM - Motion Escrow Agreement.DOC |
| Document 2 | interwovenSite://WSDMS/DB02/6572006/7 |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |

| | |
|---|---|
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 25 |
| Deletions | 19 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 44 |