UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .     Case No. 07-11047(CSS)
                                .
                                .
AMERICAN HOME MORTGAGE          .
HOLDINGS, INC.,                 .     824 North Market Street
                                .     Wilmington, Delaware 19801
                                .
            Debtor.             .     February 14, 2008
. . . . . . . . . . . . . ..          11:09 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Young Conaway Stargatt & Taylor LLP
                           By:  MARGARET WHITEMAN, ESQ.
                                ROBERT BRADY, ESQ.
                                SEAN BEACH, ESQ.
                                SHARON ZIEG, ESQ.
                           The Brandywine Building
                           1000 West Street, 17th Floor
                           Wilmington, DE  19899


For the U.S. Trustee:      United States Department of Justice
                           By:  JOSEPH McMAHON, AUSA
                           844 King Street
                           Suite 2207
                           Wilmington, DE  19801


For Calyon New York        Eckert Seamans
Branch:                    By:  MIKE BUSENKELL, ESQ.
                           300 Delaware Avenue
                           Suite 1210
                           Wilmington, DE  19801


Audio Operator:            Brandon McCarthy


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

**APPEARANCES (CONT'D):**

For FNC, Inc:                  Elliott Greenleaf
                               By:  RAFAEL X. ZAHRALDDIN, ESQ.
                               1000 West Street, Suite 1440
                               Wilmington, DE  19801

For AH Mortgage               Greenberg Traurig, LLP
Acquisition:                  By:  VICTORIA W. COUNIHAN, ESQ.
                              The Nemours Building
                              1007 North Orange Street
                              Suite 1200
                              Wilmington, DE  19801

For Wells Fargo Funding:      Connolly, Bove, Lodge & Hutz, LLP
                              By:  MARC PHILLIPS, ESQ.
                              The Nemours Building
                              1007 North Orange Street
                              Suite 2207
                              Wilmington, DE  19899

                              Sidley Austin, LLP
                              By:  DAVID HALL, ESQ.
                              One South Dearborn
                              Chicago, IL  60603

For Natixis:                  The Bayard Firm
                              By:  ERIC M. SUTTY, ESQ.
                              222 Delaware Avenue, Suite 900
                              Wilmington, DE  19899

For Morgan Stanley            Ashby & Geddes
Mortgage Capital:             By:  AMANDA M. WINFREE, ESQ.
                              500 Delaware Avenue
                              Wilmington, DE  19899

For Countrywide:              Edwards, Angell, Palmer & Dodge
                              By:  WILLIAM E. CHIPMAN, ESQ.
                              919 North Market Street
                              Wilmington, DE  19801

For Bank of New York:         Richards, Layton & Finger, P.A.
                              By:  CHRISTOPHER M. SAMIS, ESQ.
                              One Rodney Square
                              920 North King Street
                              Wilmington, DE  19801

**APPEARANCES (CONT'D):**

For Wells Fargo Bank:      Chapman & Cutler, LLP
                           By:  FRANKLIN H. TOP III, ESQ.
                           111 West Monroe Street
                           Chicago, IL  60603

For the Creditors'         Blank Rome LLP
Committee:                 By:  DAVID CARICKHOFF, ESQ.
                           Chase Manhattan Centre
                           1201 Market Street, Suite 800
                           Wilmington, DE  19801

                           Hahn & Hessen, LLP
                           By:  MARK T. POWER, ESQ.
                           488 Madison Avenue
                           New York, NY  10022

For Triad Guaranty         Womble Carlyle
Insurance Co.:             By:  KEVIN J. MANGAN, ESQ.
                           222 Delaware Avenue, 15th Floor
                           Wilmington, DE 19801

For Bear Sterns/EMC:       Duane Morris, LLP
                           By:  RICHARD W. RILEY, ESQ.
                           Suite 1200
                           1100 North Market Street
                           Wilmington, DE  19801

For JP Morgan Chase        Landis, Roth & Cobb, LLP
Bank N.A.:                 By:  ADAM G. LANDIS, ESQ.
                                JOHN H. STROCK, ESQ.
                           919 Market Street, Suite 600
                           Wilmington, DE  19899

For Bank of America:       Potter Anderson & Corroon, LLP
                           By:  LAURIE SELBER SILVERSTEIN, ESQ.
                           Hercules Plaza
                           1313 North Market St.
                           Wilmington, DE  19801

For CitiMortgage:          Morris James
                           By:  BRETT D. FALLON, ESQ.
                           500 Delaware Avenue, Suite 1500
                           Wilmington, DE  19801

**APPEARANCES (CONT'D):**

```
For CitiMortgage:         Featherstone, Petrie Desisto, LLP
                          By:  ANDREW PETRIE, ESQ.
                          600 17th Street
                          Suite 2400S
                          Denver, CO  80202


For Freddie Mac:          Reed Smith
                          By:  KURT F. GWYNNE, ESQ.
                          1201 Market Street, Suite 1500
                          Wilmington, DE 19801


ABN AMRO Bank:            Millbank, Tweed, Hadley & McCloy, LLP
                          By:  FRED NEUFELD, ESQ.
                               ROBERT J. MOORE, ESQ.
                          601 South Figueroa Street
                          30th Floor
                          Los Angeles, CA  90017


For Calyon:               Hunton & Williams, LLP
                          By:  JASON HARBOR, ESQ.
                          Riverfront Plaza, East Tower
                          951 East Byrd Street
                          Richmond, VA  23219


For Wells Fargo Funding   Sidley Austin, LLP
and Wells Fargo Bank:     By:  PAUL CARUSO, ESQ.
                               D'LISIA BERGERON, ESQ.
                          One South Dearborn
                          Chicago, IL  60603


For Trenwith Group:       Hahn & Hessen, LLP
                          By:  JEFFREY R. MANNING
                          488 Madison Ave
                          New York, NY  10022


For Sandra Kraege Higby:  Bowditch & Dewey, LLP
                          By:  RICHARD A. SHEILS, ESQ.
                          311 Main Street
                          P.O. Box 15156
                          Worcester, MA


For Bank of America:      Kaye Scholer, LLP
                          By:  SCOTT TALMADGE, ESQ.
                               MARGOT SCHONHOLTZ, ESQ.
                          425 Park Avenue
                          New York, NY  10022
```

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

```
For AH Mortgage        Jones Day
Acquisition:           By:  STEVE STENNETT, ESQ.
                       2727 North Harwood Street
                       Dallas, TX  75201
```

**I N D E X**

**PAGE**

**WITNESSES FOR THE DEBTOR**

ROBERT JOHNSON

  Direct Examination by Mr. Brady                    27

CHRISTOPHER CAVACO

  Direct Examination by Mr. Brady                    34

  Cross Examination by Ms. Silverstein               75

  Redirect Examination by Mr. Brady                  80


| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| D-1 | ACRC pricing | 37 | 84 |
| D-2 | Document Retrieval Costs | 41 | 84 |

1          THE COURT:  Good morning.

2          MR. BEACH:  Good morning, Your Honor.  May it please

3  the Court.  Sean Beach from Young, Conaway, Stark and Taylor on

4  behalf of the debtors.

5          THE COURT:  Good morning.

6          MR. BEACH:  Your Honor, the first --

7          THE COURT:  Hang on.  All right.  Okay.

8          MR. BEACH:  Your Honor, the first ten items on the

9  agenda have either been adjourned, orders have been entered or

10  they've been withdrawn.   So unless Your Honor has any

11  questions on those, I'll go to Item Number 11.

12          THE COURT:  I have no questions.

13          MR. BEACH:  With respect to Item Number 11, Your

14  Honor, that's the motion of FNC for adequate protection and

15  relief from the automatic stay.  The parties are prepared to

16  hand up a consensual form of order, revised order in connection

17  with that motion and I'll cede the podium to counsel for FMC.

18          THE COURT:  All right, thank you.  Good morning.

19          MR. ZAHRALDDIN:  Good morning, Your Honor.  Raphael

20  Zahralddin from the law firm of Elliott Greenleaf for the

21  movant, FNC.   Your Honor, we've decided to -- we've agreed

22  upon a rejection of the contract and set a bar date for

23  rejection of damages for 30 days from the rejection date.   And

24  the debtors have also agreed to pay $3,234 left unbilled

25  post-petition within ten days of the order.  I think this

1  resolves our adequate assurance issues that were originally in

2  the motion in regard to the privacy concerns we expressed

3  within that motion.  So if Your Honor is okay, I'll hand this

4  up so you can review it.

5          THE COURT:  Does anyone wish to be heard in

6  connection with this matter?

7          MR. POWER:  Good morning, Your Honor.  Mark Power

8  from Hahn and Hessen, counsel for the Committee.  Your Honor,

9  we're not signatory to the stipulation, but we have reviewed it

10 and the Committee consents to its entry.

11         THE COURT:  All right.  Thank you.  All right, thank

12 you, I'll sign it as agreed.

13         MR. ZAHRALDDIN:  Thank you, Your Honor.

14         THE COURT:  You're welcome.

15         MR. BEACH:  Your Honor, Sean Beach again for the

16 record.  Item Number 12, Your Honor, is the amended application

17 of the official Committee for an order authorizing the

18 Committee to retain Trenwith Securities, LLC.  A certificate of

19 no objection was filed in connection with that.  So if Your

20 Honor has questions I'll see they're put in to the Committee.

21         THE COURT:  I didn't see the CNO, but if you have a

22 form of order, Mr. Power, you can just approach, that would be

23 fine.  Thank you.  Anyone have any comments?  Hearing none I'll

24 approve it.

25         MR. BEACH:  Your Honor, that brings us to Item Number

1  13 on the agenda, which is the motion of the debtors for an

2  order establishing a bar date to file proofs of claim by

3  construction loan and home equity loan borrowers.  Your Honor,

4  there are no objections to the motion.  The debtors filed a

5  certificate of no objection this morning and I do have a form

6  of order to hand up to Your Honor.

7          THE COURT:  Thank you.   This is the form of order

8  that was attached to the motion?

9          MR. BEACH:  Yes, Your Honor.

10          THE COURT:  Any changes?

11          MR. BEACH:  I don't believe so, Your Honor.

12          THE COURT:  Any comments by anyone?  All right,

13  hearing none the Court will approve it.

14          MR. BEACH:  Your Honor, with respect to Item Number

15  14, I'd like to cede the podium to Sharon Zieg.

16          MS. ZIEG:  Good morning, Your Honor, Sharon Zieg of

17  Young, Conaway, Stargatt and Taylor on behalf of the debtors.

18  Your Honor, with respect to Item Number 14, it's the approval

19  of the settlement motion between the debtors and Natixis.  At

20  your direction this motion was filed after the last hearing for

21  approval of the settlement agreement under Rule 9019.  The

22  objection deadline was February 11th, which didn't give us time

23  to file the CNO prior to this agenda being due.  But a CNO was

24  filed yesterday afternoon after four p.m. at Docket Number

25  2971.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MS. ZIEG:  If I may, Your Honor, I'd like to hand the

3  order up.

4          THE COURT:  Please do.

5          MR. ZIEG:  May I approach?

6          THE COURT:  Yes.

7          MS. ZIEG:  Thank you.

8          THE COURT:  I like your shoes.  All right, does

9  anyone wish to be heard?  The Court will approve the

10 stipulation.

11         MR. BEACH:  Your Honor, that brings us to Item Number

12 15 on the agenda which is the debtor's motion to modify the

13 interim compensation procedures, the ordinary course of

14 professional procedures and certain of the retentions of

15 foreclosure professionals.  Your Honor, this follows on the

16 original motion that the debtors filed which was denied.  We

17 have since had a number of discussions with the Office of the

18 United States Trustee, the Official Committee of Unsecured

19 Creditors and AH Mortgage Acquisition Co., and we have come up

20 with procedures which we think will vastly alleviate some of

21 the problems and administrative issues we had with the numerous

22 foreclosure professionals that we have in these cases.

23         Generally what these procedures request to do is to

24 modify the interim compensation order to waive the 20 percent

25 hold back on fees so that 100 percent of the fees and expenses

1 can be paid after the 20-day objection period runs and only to

2 the extent that there is not an objection filed with respect to

3 those portions of the fees.   And also ask to waive the

4 requirement that the parties wait 15 days after month's end to

5 file those applications.

6          Your Honor, part of the importance of that relief is

7 that the way that these fees are entered into the debtor's

8 system, you'd have to take these invoices and enter in pieces

9 of the invoices --

10          THE COURT:  Right.

11          MR. BEACH:  -- at a time and it's just difficult to

12 do that.

13          THE COURT:  You know, I read this in detail actually,

14 I spent a lot of time with it.  So I don't think I need any

15 further recitation, Mr. Beach.  Does anybody have any comments

16 in connection with it other than the reservation of rights of

17 Bank of America?  All right, Ms. Silverstein?  I took that to

18 be a reservation and not an objection.

19          MS. SILVERSTEIN:  It is, Your Honor, except that I do

20 believe that we need to be included in the form of order.  Your

21 Honor, if you look at the form of order that's been presented

22 -- Your Honor, there may be a modified form of order which I

23 have not seen which would include Bank of America in the second

24 to last ordering paragraph.

25          THE COURT:  Is that the list of noticed parties?

1          MS. SILVERSTEIN:   It is the list of parties that have

2    reserved their rights who have stated such on the record of

3    January 14th.

4          THE COURT:  Right.

5          MS. SILVERSTEIN:   There is another place as well in

6    the procedures themselves and that has been modified as well.

7    So why don't we let Mr. Beach present the modified form of

8    order and that may resolve --

9          THE COURT:  Okay.

10          MS. SILVERSTEIN:   -- our issues.

11          THE COURT:  Thank you.

12          MR. BEACH:  Your Honor, may I approach?

13          THE COURT:  Yes you may.  Thank you, Mr. Beach.

14          MR. BEACH:  Your Honor, there were two modifications

15   to the form of order that were filed.  One is in the second to

16   last so ordered paragraph to add Bank of America N.A. in its

17   capacity as administrative agent to the parties reserving

18   rights based on the reservation of rights in the January 14th

19   hearing.  In the procedures we had included the reservation of

20   rights language which was frankly an error because it doesn't

21   belong there so we struck that out.  It was Section G in the

22   modified procedures.

23          THE COURT:  All right.

24          MR. BEACH:  Your Honor, I did just want to mention

25   one other thing.  There was a -- because it's not completely

1 apparent from the motion, with respect to the minimum broker

2 fees we had a number of discussions with the Committee.  There

3 are -- the minimum broker fees, $2,000 per professional, there

4 are some circumstances where the property that's sold is -- the

5 value, the proceeds that come from that property are actually

6 less than $2,000.  The Committee had concerns about why we were

7 paying brokers a minimum fee of $2,000 if the property was sold

8 for less than that amount.  These are situations where a

9 municipality may have changed an ordinance and the property was

10 left vacant and vandalized, the copper pipes were taken out and

11 the house may have been destroyed completely so there's no

12 value to the house and based on an ordinance change there may

13 be no value to the property either.  It still is a value to the

14 estate to have these brokers get rid of this property because

15 otherwise there are some ongoing costs for the estate.  So I

16 believe the Committee is now comfortable with that relief, but

17 since it wasn't highlighted in the motion I wanted to mention

18 it.

19        MS. SILVERSTEIN:  Your Honor, Laurie Silverstein

20 again.  The revised form of order resolves our concern.

21        THE COURT:  All right, thank you.  I'll approve the

22 order as revised.

23        MR. BEACH:  Thank you, Your Honor.  That brings us to

24 the last item on the agenda, and I'd like to cede the podium to

25 Mr. Brady to handle that.

1          THE COURT:  All right.

2          MR. BRADY:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. BRADY:  Robert Brady on behalf of the debtor.

5   Your Honor, as the Court has heard before, this issue is quite

6   complicated and promises to be a monumental task.  Just briefly

7   again, there are 1.5 million files that cover one million in

8   loans that are sitting in a warehouse operated by a third party

9   in Melville, New York.

10          Now our original motion to try to deal with this

11  issue was really focused on obtaining authority to destroy

12  files where there was an electronic image, so we came before

13  the Court to destroy the hard copies and maintain an electronic

14  image.  There were a number of objections to that and we scaled

15  that down to a category known as withdrawn, denied or cancelled

16  loan and that process is going to be underway starting tomorrow

17  actually, the first of those 115,000 approximately files will

18  start to be destroyed.

19          Our original motion, however, did contain a process

20  whereby investors could request the return of their files.

21  Based on the objections that were filed to the motion and

22  discussions we've had with a number of the investors, it

23  appeared there was significant interest in a process whereby

24  investors could obtain the return of their loan files.  So we

25  filed the supplement to the motion really in an attempt to put

1 more structure in place and to accomplish a few goals.  One, we

2 hope this process, if approved, will help the debtors confirm

3 their records of what loan files are in that warehouse.  Two,

4 we hope that this will assist the debtors in determining

5 whether these are the original loan files, for instance, the

6 original origination portion of the files where the borrower

7 completed an application and supplied financial information, or

8 has that already gone to the investor and we maintain a copy

9 solely for regulatory and licensing purposes.  Three, we hope

10 to determine what loan files in that warehouse are owned by an

11 investor and whether that investor wants the file back.  And

12 then four, after this process is concluded, we hope to have

13 more clarity as to what files may be appropriate to come back

14 to the Court and ask for authority to destroy those files.

15      And I think it's important based on the objections

16 that I go through what we're not trying to do today, because I

17 think it resolves some of the reservations of rights and some

18 of the issues raised.  We're not seeking authority to destroy

19 any files today.  That part of the motion has been continued

20 off until late March.  We're not seeking to modify or amend any

21 prior order of the Court approving a stipulation that addresses

22 the return or transfer of loan files.  We have revised the form

23 of order to make that crystal clear.  If we've agreed in a

24 prior stipulation approved by Your Honor to return files to a

25 party, we're going to honor that commitment obviously.

**J&J COURT TRANSCRIBERS, INC.**

1        We're not seeking to modify or amend any prior sale

2   order, including the APAs that those orders approve.  So if we

3   have sold loans, if we have sold servicing rights

4   post-petition, Your Honor's approved it and the APA requires us

5   to return files or transfer files, we're not seeking to include

6   that as part of the relief today, we're not seeking to modify

7   our obligations in any way.

8        We're not seeking authority to return any files for

9   loans that we still intend to try to sell.  So there are a

10  number of loans that the debtor still holds, some of which

11  liens are asserted against by third parties and the debtors

12  intend to try to sell those, for instance, the non-performing

13  loans which Your Honor approved procedures on at the last

14  hearing I believe.  We're not seeking to return those loan

15  files.  We expect that those loan files will be disposed of as

16  part of the sale process.  In other words, the buyer is likely

17  to want them and will obtain those files as part of the sale.

18       We're not seeking to return any loan file or dispose

19  of any loan file that deals with litigation.  Through a review

20  of the schedules and a review of the claims register, we have

21  identified approximately 71 claims that relate to litigation.

22  Any loan file that would relate to any of those potential

23  litigation claims will not be moved, will not be destroyed.  I

24  should change that.  We probably will move them because our

25  goal is to empty the warehouse, but we'll keep them at a

1  facility owned by the debtor.

2        What we seek today really, two things.  We want to

3  create a date by which investors, or in the securitization

4  world, the indentured trustee and/or master servicer must come

5  forward and say, we believe you have loan files that we own and

6  we would like them back.  Now we expect this to be a

7  collaborative process.  We would like to see information from

8  these third parties as to what they think we're holding.  And

9  we will show these third parties what we believe we have and we

10  hope that the two can work together to reach an agreement on

11  what's in that warehouse and whether they want it back.

12        You'll hear some testimony on this.  But the reason

13  we need a deadline is, back in November the debtor started this

14  process rather informally.  An e-mail was sent out to a number

15  of investors and said, if you want your files back, please let

16  us know and here's what it will cost us to get them out of the

17  warehouse, this is what our third party vendor is going to

18  charge us.  We did get some responses, but we were never able

19  -- and we have been negotiating with certain parties on a

20  process by which they can get their files back -- but that

21  process has been dragging on and we have not been able to reach

22  in an informal way a point where the debtor was comfortable

23  transferring files, or if an investor said you can destroy it,

24  that we were comfortable taking that to the Court with

25  authority to destroy it.

1          The fact is, the debtor as the fiduciary wants to do

2     the right thing, and so far the informal process has not

3     yielded any certainty with the debtors as to how to proceed

4     with respect to these files.  So we're hoping a Court approved

5     process will help bring some of that certainty as to what the

6     debtors should do with these files.

7          Frankly, Your Honor, until we started filing these

8     motions we didn't get a lot of information from parties.  We

9     have now started to receive some information.  In many

10    instances, the documents the parties want are called trailing

11    documents.  These are the recorded mortgages, so after a loan

12    sale is done, the debtors will send out the mortgages to the

13    various jurisdictions so that they can be recorded in the new

14    owner's name.  Jurisdictions vary as to how fast they send

15    those back.  Sometimes it can take up to a year.  So in many

16    instances what the buyer of a loan is looking for are these

17    trailing docs.  That's a completely separate process as you'll

18    hear that's administered out of Irving, Texas, and that is not

19    something that we intend to alter by this motion.  The trailing

20    document process, whereby owners receive these recorded

21    mortgages has been happening, will continue to happen and we're

22    continuing to honor that obligation.

23         Now as we've told the Court, this is going to take a

24    while.  There's 1.5 million files.  We're not in complete

25    control in that ACRC acts at our direction, but how fast they

1  retrieve files for that, the number of personnel they have will

2  largely depend on their cash flow that they receive.  Again,

3  AHM is ACRC's largest customer.  But we need to get the

4  process to move forward, and we think this loan return deadline

5  where we get definitive requests from owners of loans that they

6  want their files back will help us advance this process.

7          Now another key question in all of this that's been

8  through all of the negotiations and really through all of the

9  deals we've done in the past is who pays for this?  This could

10 be an incredibly costly process.  We have a deal with ACRC in

11 place and there's a rate structure.  They charge us to get

12 these files out.  The debtors submit, Your Honor, that the

13 obligation to return loan files to parties all exist in

14 pre-petition agreements.  These were pre-petition documents,

15 agreements, where the debtors agreed to provide loan files to

16 third parties.  The debtors do not intend to honor that

17 obligation.  It's a pre-petition obligation.  What we intend to

18 do is assist, because of our knowledge of where these documents

19 are, to assist because of the confidentiality concerns to get

20 these documents back to the people who want them.  But we don't

21 believe the estate should be burdened, the creditor should be

22 burdened with the administrative claims of conducting that

23 process when the debtor's really honoring a pre-petition

24 obligation.  We think that's a pre-petition claim that these

25 claimants can add to their general unsecured claim in the case

1  and will be paid accordingly under any plan.

2          A few points to clarify.  You'll hear the term

3  collateral documents a lot, original collateral documents.

4  There should be no original collateral documents in the ACRC

5  warehouse.  These are the instruments that form the basis of

6  the loan, that's the note, the mortgage, the deed of trust, the

7  title insurance policy, the title commitment, these key legal

8  documents that form the basis of the loan -- and you'll hear

9  testimony -- they were received in Melville, they were sent to

10 a custodian.  AHM is not the custodian under any of these

11 loans, they are in the hands of a third-party custodian, they

12 are the original collateral documents.  Nothing we intend to do

13 through this process intends to affect that.  Those documents

14 should still be available.

15         This process, as I indicated, shouldn't affect the

16 trailing documents.  There should be no trailing documents in

17 the ACRC warehouse.  When the loans were purchased, those were

18 sent out to be recorded in the various jurisdictions.  Since

19 late 2006, they were instructed to return those documents to

20 Irving, Texas.  There are people at Irving, Texas whose job it

21 is to receive those documents, make sure they know where they

22 go and to send them out.  So they either go to the investor,

23 they go to the investor's servicer, they go as directed, but we

24 don't hold them, and that process is ongoing and should not be

25 impacted by this motion.

1           Now we have carved out two parties who filed

2    responses because of very  unique situations.  One is AHM

3    Mortgage Acquisition, the Ross entity that purchased the

4    servicing business.  They filed a reservation of rights, Your

5    Honor, that's at 16X on the agenda.  Right now, AHM Servicing

6    services approximately 173,000 loans.  It's possible that in

7    the ACRC facility there are loan files that relate to the loans

8    that are being serviced by Servicing.  Under the APA, the buyer

9    has purchased the debtor's interest in servicing files and

10   mortgage loan documents.  Those are both defined terms in the

11   APA.  The final closing of the APA has not happened yet and the

12   buyer and seller have not met to define the scope or to agree

13   on the scope of what the servicing files and mortgage loan

14   documents are.  We expect also that the owner of the loan

15   that's being serviced by AHM Servicing would prefer that the

16   servicer have the file.  The owner wouldn't want it back, they

17   would prefer that the servicer have access to it.  So we think

18   a lot of those issues will get resolved through our discussions

19   with Ross, once a final close occurs and when we determine what

20   if any of the documents at ACRC are going to go to the

21   servicer.  That hasn't happened yet so we thought it was

22   premature to deal with those files as part of this motion.

23          So any loans that are being serviced by Servicing or

24   have recently been serviced by Servicing, we're not seeking to

25   do anything with those by this motion.  We're going to meet

1  with the buyer and we're going to try to work this out and have

2  this in place at the time of final close.

3      The other party we determined it was appropriate to

4  carve out was DBSP, Deutsche Bank Structured Products.  They're

5  at 16V on the agenda.  As Your Honor may know, they have

6  appealed Your Honor's order authorizing the debtor to transfer

7  the servicing rights to the buyer.  So at this point, that

8  contract, the DBSP servicing contract, is on the disputed

9  contract list.  It has not been assumed and assigned to the

10 buyer, it has not been rejected.  If ultimately there's a final

11 close and if ultimately the buyer takes this contract and the

12 appeal is denied, then these files would likely be subsumed in

13 our discussions with the buyer of whether these are "servicing

14 files or mortgage loan documents."

15     If the agreement is rejected by the debtors at the

16 request of the buyer or the appeal is successful, then we have

17 to have another discussion with Deutsche Bank Structured

18 Products to determine what they want us to do with these files.

19 So again, we thought it was premature based on the pending

20 appeal and the fact that they're in limbo under the Ross

21 agreement on the disputed contracts.

22     Now, running through some of the other objections, we

23 hope and in some instances we've spoken to people -- we haven't

24 had a chance to talk to everybody -- but we hope we've been

25 able to resolve some of the objections and reservation of

1  rights by some of the statements I've made and by the revised

2  form of order.  Bear Sterns at 16N on the agenda, filed a

3  reservation of rights.  We believe that our statement on the

4  record as well as the revision to the order that we're not

5  attempting to modify any post-petition stipulation or agreement

6  with Bear Sterns or EMC will satisfy them.  Again, we'll honor

7  our commitments under those agreements.

8         With respect to the objection of the United States

9  Trustee, which is at 16-O on the agenda.  One other request

10 made by the trustee was, if the debtor's records may be wrong

11 as to who the true owners of these loans are, then you should

12 provide publication notice.  We've agreed to do that, Your

13 Honor.  We've provided now that we will put publication notice

14 in of this deadline and publish it in either the national

15 edition of the Wall Street Journal or the New York Times.

16        Also, the trustee indicated that if a borrower, a

17 mortgagor under one of these instruments had a right under

18 applicable law to a copy of their loan file and we had the loan

19 file, are we trying to get out of our obligation to give it to

20 them?  At this point it's unclear whether the debtor has any

21 such obligation, but we can put on the record, if under

22 applicable law the debtor has an obligation to provide a

23 borrower with a copy of their loan file and we have that loan

24 file, we will do so.  Without conceding whether we have such an

25 obligation, if we do, we'll do so.

**J&J COURT TRANSCRIBERS, INC.**

1          Freddie Mac, Your Honor, Mr. Gwynne and I traded some
2     voice mails last night, I'm hoping we resolved them.  Again,
3     two issues they were concerned about, nothing being destroyed
4     today or no authority to destroy documents is being obtained
5     today, and that we're going to honor our obligations with
6     Freddie Mac under our stipulations we entered with them early
7     in the case.  And yes, we're going to honor our obligations
8     with Freddie Mac which requires us to transfer files to Bank of
9     America, who's going to act as interim servicer.  We're not
10    done that process yet, and we're going to honor our agreements
11    under that stipulation.

12          Wells Fargo is a master servicer under certain
13    agreements in the securitization world.  Their objection was at
14    16R.  Their concern was we indicated that the legal owner must
15    come forward and ask for these agreements.  In a
16    securitization, most likely the legal owner is the indentured
17    trustee.  But we can understand why the master servicer, Your
18    Honor, may have an interest in making sure these loan files are
19    maintained.  So we've changed the procedures to include master
20    servicers.  If they come forward by the proposed deadline and
21    say they would like copies of -- they would like the files
22    back, we will allow them to file such.  If we have competing
23    interests there, Your Honor, the indentured trustee says I want
24    it, the master servicer says I want it, we'll try to work it
25    out with those two parties.  If we can't work it out, we'll

1  come back before the Court.  We won't make that decision

2  ourselves.

3         Calyon, Your Honor, objected.  They raised a couple

4  issues, but one they were concerned, we just did a stipulation

5  with Calyon in connection with Phase One of the adversary.

6  Again, we're not in any way attempting to modify our

7  obligations under any stipulations including the one we have

8  with Calyon.

9         Midfirst, Your Honor, had an informal response

10 indicated on the agenda at 16X.  We have been able to answer

11 their questions satisfactorily, I don't believe they have any

12 issues.

13        J.P. Morgan Chase filed an objection to the first

14 motion, didn't actually file a supplement, but wanted to

15 confirm, we're holding JPMC loans for sale so that none of

16 their loan files would be transferred by this or -- where

17 they're not required to come forward and identify their loan

18 files.  Again, anything related to JPM loans that we're holding

19 for sale, that's not covered by this order.  We're going to

20 deal with those files as part of the sale process.

21        So I'm not sure if we've completely resolved the U.S.

22 Trustee's objection or anyone else's that needed to see the

23 order or needed to get clarifications.  But by my count it

24 leaves us now with CitiMortgage at 16Q, Wells Fargo Bank at

25 16R, Wells Fargo Funding at 16T, Bank of American N.A. at 16U,

Johnson - Direct                        26

1  Countrywide at 16W.  And if the U.S. Trustee's not resolved by

2  what we've placed on the record, any remaining objections would

3  be 16 -- it's located at 16-0.

4         Two witnesses, Your Honor, Mr. Johnson and Mr.

5  Kavaco, not extensive testimony, but really verifying a number

6  of the things that I've said in my opening.  Also we walked

7  through how we came up with the reasonable costs that we would

8  seek to require owners of loans to pay to get these back.  So

9  they're available to testify, but perhaps it makes sense to

10  find out if I've been successful in resolving --

11         THE COURT:  Well, no let's -- because that will take

12  an hour.  Let's do the proffer.  Any objection to the use of a

13  proffer?

14         MR. BRADY:  I actually was going to put them on, Your

15  Honor.

16         THE COURT:  Oh that's fine.  However you want to

17  proceed.  Let's get the witnesses in before we start hearing

18  people clarify their positions, because even if everybody's

19  agreeable, that will take 45 minutes.

20         MR. BRADY:  We can only hope, Your Honor.  I will

21  call Mr. Johnson first.

22             ROBERT JOHNSON, WITNESS, SWORN

23         THE CLERK:  State your full name, spell your last.

24         THE WITNESS:  Robert F. Johnson, Jr., J-o-h-n-s-o-n.

25                 DIRECT EXAMINATION

**J&J COURT TRANSCRIBERS, INC.**

1  BY MR. BRADY:

2  Q    Mr. Johnson, by whom are you currently employed?

3  A    American Home Mortgage Corp.

4  Q    And what is your title at American Home Mortgage?

5  A    Executive Vice President of Capital Markets.

6  Q    And can you briefly describe your educational background?

7  A    I have a bachelor of arts in economics and communications

8  from the University of Richmond.

9  Q    And generally what are your responsibilities at the

10  company?

11  A    Prior to the bankruptcy filing, like I said I ran capital

12  markets which included core or secondary marketing which is

13  interstate risk management, selling of loans, hedging a

14  pipeline.  Also the Transaction Management Group, which is the

15  group that facilitates purchases and sales of loans and then

16  post closing, which deals with the back end process of

17  receiving files in our Melville facility, processing them,

18  getting them ready for sale.

19  Q    So under your umbrella of duties, you oversaw the

20  departments that handled the storage and imaging of loan files?

21  A    Yes, that was part of my group.

22  Q    And how long have you been with American Home Mortgage?

23  A    Almost seven years.

24  Q    Can you briefly describe your prior employment history?

25  A    Yeah, I worked for ComNet Mortgage Services, which is a

Johnson - Direct                                   28

1  sub and then a division of Commonwealth Bank outside of

2  Philadelphia for about seven years.

3  Q    And so you're familiar with the process that AHM used for

4  the imaging and storage of loan files?

5  A    Yes, generally familiar.

6  Q    So when I use the term loan file, generally what is your

7  understanding of what comprises a loan file?

8  A    A loan file is, you know, in our world, basically two

9  pieces or two sides of a folder.  One is the credit file, which

10 is the documents that are used to determine the borrower's

11 creditworthiness, whether it's their application or the

12 financial documents that they provided us to determine whether

13 or not they are qualified for the loan or can qualify for the

14 loan.  And then there's another piece called a legal file which

15 is all of the documents that we ask them to sign, such as

16 disclosures, note mortgages, that kind of stuff.  Within the

17 legal file there's a subset which is stuff like the note and

18 mortgage which we call collateral documents which we don't keep

19 on site.  We send those off to a custodian because they're

20 extremely important if you need to foreclose or take actions

21 further down the road, they secure the loan.

22 Q    So what happened in this process when the loan files were

23 received from the branch offices in Melville, what happened,

24 what physically happened to these documents?

25 A    There's two ways in which -- generally two ways I guess in

1    which they came in.  If it was from what's called an escrow

2    state, which a lot of the states out west like California are

3    escrow states, you would get -- both the credit file and the

4    legal file would come in from our branch office, because the

5    borrower/signer documents and then send them back -- they get

6    sent back to our branch office, they verify the signatures,

7    whatever you want to call it, and then they send that file back

8    to us kind of in total and then we would take it in our

9    facility, strip it out, the collateral documents, and then

10   image the collateral documents separately, send them off to the

11   custodian.  The credit file and the remaining legal documents

12   that are not part of the collateral package would then be

13   imaged in a separate process, and then the documents themselves

14   would be sent off to storage, those credit documents and the

15   non-collateral or legal documents.  In either case, the images

16   would be, you know, stored electronically.

17           If it was from what's called a roundtable state or

18   like a lot of the closings out east are, is that the borrowers

19   sign the documents at the table, the legal documents, including

20   collateral are sent directly from the settlement table or the

21   settlement agent to our offices in Melville.  That comes

22   separately from the credit file which comes from our

23   origination branch to Melville.  So they would come in most

24   likely on different days.  We would image the credit file

25   separately, store the credit file separately.  The legal file

1  would come in on a different day, we would strip out the

2  collateral just the same, but the final storage after imaging

3  of the non-collateral legal documents would be separate from

4  the credit file.

5  Q    So is that the reason why there's 1.5 million files, but

6  they only relate to one million loans?

7  A    That's right.  Once we started imaging we used the

8  computer to marry the file together.  Before we were imaging in

9  2005, we actually had what was called a half file room where we

10 would wait for the other half to come in, put them together so

11 that we could find them together.  But since the computer can

12 tell us where they are together, we didn't need that.

13 Q    So I know you briefly covered it, but just because it's

14 important make sure you could describe for the Court again,

15 what do you mean by the term collateral documents?

16 A    Again, collateral documents are the documents to secure

17 the lender's interest in the properties and stuff like the note

18 and the mortgage, the title commitment, those types of things

19 were sent to our off-site third party custodian.

20 Q    And so the original collateral documents are not stored in

21 the ACRC warehouse?

22 A    That's correct.

23         THE COURT:  Is a copy of the collateral documents in

24 the legal file?

25         THE WITNESS:  In the storage facility?

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Correct.

2           THE WITNESS:  It would be separate post the image --

3    once we started imaging, because that would go and get imaged

4    separately, so we would have an imaged copy of it.  Prior to

5    imaging we would have a copy of the collateral documents within

6    the copy of the legal file.  They'd just be photocopies.

7           THE COURT:  Just starting in 2005, only electronic

8    copies or images of the collateral documents are maintained, no

9    hard copies.

10          THE WITNESS:  That's right.  I mean there may be a

11   few strays, but that was the general process.

12   BY MR. BRADY:

13   Q    And AHM is not a custodian for any original collateral

14   documents, is that correct?

15   A    No we are not.

16   Q    Are you familiar with the term "trailing documents" or

17   "final documents"?

18   A    Yes I am.  Those are documents that come in generally well

19   after settlement from the county recording offices or title

20   agents which would be the recorded mortgage or assignment or

21   things like the final title policy, those types of items.

22   Q    And what are the debtor's procedures with respect to these

23   trailing documents?

24   A    We tell the settlement agents and the title companies to

25   send them to our Irving facility -- or what used to be our

1  Irving facility I guess -- and they get processed there,

2  imaged, and then the documents that we received in would be

3  sent out to the applicable investor and we would have an imaged

4  copy of it.

5  Q    Can that process take some time?

6  A    It does take time.  I mean the process in getting them

7  back from the various jurisdictions sometimes takes time.  Like

8  I think places like Washington D.C., it could take a year or

9  so.  And some are quicker, but -- and then we also might have

10 processing time within our facility.  But I think that that has

11 gone down dramatically, obviously as a result of us not putting

12 new loans into the process, any backlog we would have had would

13 have been caught up to.

14 Q    So the processing at the various jurisdictions, AHM, does

15 it have any control over that?

16 A    No it doesn't, you know, you can call them and harass

17 them, but their process takes how long it takes.

18         THE COURT:  I'm sorry, you said the trailing

19 documents, after they're scanned are sent to the investor, are

20 they sent to the investor or to the custodian or does it

21 depend?

22         THE WITNESS:  These are not -- these are copies of

23 documents, like say the original mortgage --

24         THE COURT:  It's a copy of the recorded mortgage --

25         THE WITNESS:  That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1       THE COURT:  -- so it doesn't go the custodian?

2       THE WITNESS:  No.

3       THE COURT:  All right.

4  BY MR. BRADY:

5  Q    Now prior to filing the motion and the supplement, did the

6  debtors attempt to contact owners of loans regarding a

7  potential return of files?

8  A    We did back in November we placed some phone calls, sent

9  e-mails out I believe that said, you know, who wants what we

10 have.  I think we gave them a price schedule for it and we got

11 back, you know, some responses were, give us this, we don't

12 want to pay for it, some responses, we'll give you -- you know,

13 we don't know what you have, but tell us what you have and some

14 didn't respond, it was kind of a hodgepodge of responses and

15 none of us really felt 100 percent sure of what we could do

16 with that information, which is why I think, you know, we've

17 been negotiating with different counter parties since then and

18 we just, you know, kind of wanted to get more, you know,

19 formality around what we were doing, so we didn't do something

20 that was (a), going to cost us too much money that we didn't

21 need to spend, meaning returning something to somebody that

22 they didn't want, or we didn't destroy something that we

23 weren't supposed to.

24      MR. BRADY:  I have nothing further for this witness.

25      THE COURT:  All right.  Let's actually -- I'll have

**J&J COURT TRANSCRIBERS, INC.**

1  him step down.  I'm going to reserve the ability to cross until

2  we actually get to the point where people are presenting their

3  objections.  I don't know if people want to cross, but what I

4  would propose doing is putting the direct in and then once

5  that's all done we'll hear from the parties and we'll see what

6  objections are still open and anyone who still has an open

7  objection is free to recall the witness for cross examination

8  at that time, which means during any breaks or as the hearing

9  progresses, Mr. Johnson, you may not discuss the substance of

10 your testimony with counsel.

11            THE WITNESS:  Understood.

12            THE COURT:  All right, thank you, you may step down.

13            THE WITNESS:  Thank you.

14            MR. BRADY:  Your Honor, then the debtors would call

15 next Mr. Chris Cavaco.

16            THE CLERK:  State your full name, spell your last

17 name for the Court.

18            THE WITNESS:  Christopher J. Cavaco, C-a-v-a-c-o.

19            CHRISTOPHER J. CAVACO, WITNESS, SWORN

20                 DIRECT EXAMINATION

21 BY MR. BRADY:

22 Q    Mr. Cavaco, by whom are you currently employed?

23 A    American Home Mortgage Corp.

24 Q    And what is your title?

25 A    I'm executive vice president and chief information

1  officer.

2  Q    Can you briefly describe your educational background?

3  A    I have a bachelors in business administration from

4  Hofstra University.

5  Q    And generally what are your responsibilities at AHM, and

6  if you could focus on what they may have been pre-petition and

7  if there's been any changes post-petition?.

8  A    Prior to our bankruptcy I was responsible for the

9  Information Technology Group.  Since bankruptcy I've taken on

10 additional responsibilities with both facilities and real

11 estate.

12 Q    And would the ACRC facility be a facility that you've

13 taken on some responsibility with respect to?

14 A    Yes it has.

15 Q    And how long have you worked for American Home Mortgage?

16 A    Just over seven years, since November 2000.

17 Q    And can you briefly describe your work history prior to

18 joining AHM?

19 A    Prior to AHM I was a network manager and application

20 development manager with MCI Worldcom Wireless for three years.

21 Prior to that I was in information technology consulting for

22 seven years.

23 Q    Are you generally familiar with AHM's loan file storage

24 system?

25 A    Yes I am.

1  Q    And where does AHM primarily store its loan files?

2  A    At the ACRC facility in Melville.

3  Q    Is ACRC an affiliate or subsidiary of AHM?

4  A    No it's not.

5  Q    Generally, what types of files are stored at this ACRC

6  facility?

7  A    The majority of the files are loan files.  The credit and

8  legal files Mr. Johnson spoke of.

9  Q    Do you know the total number of AHM files that are stored

10 in this facility?

11 A    It's approximately 1.5 million files.

12 Q    And approximately how many loans do those files cover?

13 A    Just over a million loans.

14 Q    And how many of these loan files are imaged?

15 A    I believe it's just under 500,000, 490 something.

16 Q    And how are these documents stored at ACRC, what does the

17 storage look like?

18 A    The files are stored in bankers' boxes, typically one-foot

19 -- one cubic foot boxes on steel shelves.

20 Q    And approximately how many files are in a box?

21 A    Approximately ten.

22 Q    Mr. Cavaco, are you aware of an agreement that was reached

23 between the debtors and ACRC recently?

24 A    Yes.

25 Q    Can you briefly described your understanding of that

1 agreement?

2 A    We agreed to honor the pre-petition contract rates and set

3 up an escrow account with approximately $1 million to cover

4 costs associated with retrieving files.

5 Q    And when you say pre-petition rates, were you talking

6 about the pricing for services with ACRC?

7 A    For storage and for services.

8         MR. BRADY:  Your Honor, I'd like to show the witness

9 what is Exhibit A to our supplement.  It is the -- what

10 purports to be the pricing sheet from ACRC.  We're marking it

11 for identification as Debtor's Exhibit 1.

12         THE COURT:  Okay.  Thank you.

13 BY MR. BRADY:

14 Q    Mr. Cavaco, what is marked as Debtor's Exhibit 1, are you

15 familiar with the document?

16 A    Yes I am.

17 Q    And could you describe for the Court what this document

18 is?

19 A    This is a rate sheet of what ACRC charges us for services

20 as well as monthly storage charges.

21 Q    So with respect to the agreement that the debtors have

22 with ACRC right now, these rates control?

23 A    Correct.

24         MR. BRADY:  Your Honor, I know we typically do it,

25 Your Honor, after cross, but I'll just note for the record that

**J&J COURT TRANSCRIBERS, INC.**

1  I would seek to move the admission of Debtor's Exhibit 1.

2          THE COURT:  All right, we'll hold that in abeyance

3  pending any cross examination.

4  BY MR. BRADY:

5  Q    Do you know whether the agreement with ACRC has a

6  termination date?

7  A    Yes, I believe it's June 15th, 2008.

8  Q    Approximately what is the size of the ACRC facility?

9  A    I would say it's approximately 80,000 square feet.

10 Q    And of that 80,000 square feet, how much room does AHM

11 Mortgage occupy?

12 A    We have a majority of the space, I would say 80 percent.

13 Q    Now the loan files maintained at this facility, do they

14 contain confidential information?

15 A    Yes they do.  The credit package contains the borrower's

16 application which would include items like social security

17 number, bank account information as well as other documents

18 like bank statements and copies of tax returns, that sort of

19 information.

20 Q    Can you describe for the Court how AHM would go about

21 retrieving a file located at the storage facility?

22 A    Our normal process is to make a request to ACRC personnel

23 to retrieve either a box or a box with a file number and they

24 will deliver the box or file to us.

25 Q    Within a box, does it contain loan files that are just for

1  a specific investor or are there different investor loan files

2  within each box?

3  A    The boxes contained mixed investor files.  There's no --

4  or may contain -- there's no guarantee that any one box is for

5  one investor.

6  Q    So they're intermingled?

7  A    Yes.

8  Q    Now, can AHM just go over to the ACR facility and pull a

9  box when it needs something?

10  A    No, we have to make a request through the warehouse.  They

11  don't allow us in their facility to pull anything off the shelf

12  for insurance reasons.

13  Q    Now if an investor is going to request the return of a

14  loan file as part of this process that we're seeking the Court

15  to approve today, how would that work, how would AHM go about

16  obtaining that file and making it available for the investor?

17  A    We've devised a process where we will recall the boxes

18  from the resource facility and we have a group of people who

19  will sort through them and pull out the files for an investor

20  and sort the files from the box into the different investor

21  categories if you will.  And then as we have full boxes of

22  files for an investor, they have another person recheck that

23  box to verify that all those files are indeed for that investor

24  and then put them in a storage location set aside for a

25  specific investor.

1  Q    So when you pull a box you're going to take it to the

2  debtor's Melville facility?

3  A    Yes.

4  Q    Why aren't you just going to just put it back on the

5  shelves at ACRC?

6  A    There's a cost associated with pulling the file and

7  putting it back in as well as the ongoing storage costs.  We're

8  trying to remove as much as possible from the facility.  ACRC

9  is having financial difficulty as well since we were their

10 largest customer.  A lot of their income was based on the

11 service piece of our business, not just the storage, and since

12 our bankruptcy they are behind in their rent and may be facing

13 bankruptcy as well.

14 Q    So it would be cheaper if you only had to pull a box once?

15 A    Absolutely.

16 Q    Why do you need to know who would want their files back

17 before you start pulling boxes out of the facility?

18 A    With the volume of files that we're looking at, it's very

19 important for us to be as organized up front as possible, so we

20 had built a system to tell us who the investor is in our file

21 so the person scans a barcode on the file it will tell them it

22 goes to Investor X.  So we need to know all the possible sorts

23 of investors that we will have.  We have over 125 investors.

24 So we also are laying out our storage space within the building

25 to be organized by investor as well.

1          We're trying to only handle files once so if we know

2     the investors up front, we can sort the files by all the

3     investors who want them, only touching it once.  Anyone who

4     doesn't want to be -- or doesn't want their file, we can put

5     together in another location.

6     Q    Now will AHM have to hire additional employees to handle

7     these documents and the sorting work you just described?

8     A    Yes, we'll need to bring back additional people to do this

9     function.

10    Q    So these are people who have otherwise been laid off or

11    terminated as a result of the bankruptcy, you'll have to bring

12    them back?

13    A    Either bring them back or hire temp labor.

14    Q    Mr. Cavaco, have you done an analysis of what the cost

15    would be to retrieve files and conduct this sorting process?

16    A    Yes I have.

17          MR. BRADY:  Your Honor, if I may approach, I have

18    what is marked as Debtor's Exhibit 2 for identification.

19          THE COURT:  All right.  Thank you.

20          MR. BRADY:  Your Honor, I believe I have fewer than

21    people want.

22          THE COURT:  Hang on.  We'll get some copies for you,

23    Mr. Brady.  Save one.

24                         (Pause)

25          THE COURT:  Ms. Gasson's (phonetic) going to come in.

Cavaco - Direct                                    42

1  How many do you need?

2         MR. BRADY:  Maybe ten, Your Honor, to be safe.

3         THE COURT:  That's fine.  He needs ten copies.

4  Thanks.  It takes our copier a long time to warm up, so you

5  might as well keep going.

6         MR. BRADY:  You can send the bill to Young Conaway,

7  Your Honor.

8         THE COURT:  I could, but then you'd just bill the

9  estate and there would be like a 50 percent markup.

10                        (Laughter)

11        THE COURT:  Is there any objection to proceeding?

12  Okay, why don't you keep going and we'll get the copies to

13  people as soon as we can?

14  BY MR. BRADY:

15  Q    Mr. Cavaco, are you familiar with the document that's been

16  marked as Debtor's Exhibit 2 for identification?

17  A    Yes I am.  I created it.

18  Q    And just briefly describe for the Court, what is this

19  document?

20  A    It's a listing of the costs associated with retrieving a

21  file, retrieving a file and shipping it to investor and

22  retrieving a file imaging it and shipping a DVD to an investor.

23  Q    And so based on your estimate, what would it cost for AHM

24  to retrieve a file from ACRC, sort it and make it available to

25  an investor for pick up?

1  A    Approximately $2.50 a file.

2  Q    Can we -- let's walk through, if you would, these various

3  categories and explain for the Court and those in the courtroom

4  how you came up with these numbers.  So if you would, just

5  start with the first task, pulling it out of the box and walk

6  through the cost and how you came up with it?

7  A    Sure.  There's a charge of a $1.50 for the vendor to pull

8  the box off the shelf.  Another -- I'm sorry, $1.75 for pulling

9  the box off the shelf -- $1.50 to have it delivered to our

10  facility.  In order to process this volume of files, they're

11  delivering pallets of files to us, and we estimate that we have

12  -- we'll need a full time forklift driver to bring the pallets

13  into the building to be staged for sorting.  That works out to

14  $.80 per box.  They charge us $4.50 to permanently pull the box

15  from storage.  So, anytime we tell them we're pulling a box and

16  not returning it, they charge us 4.50.  They also charge us

17  $1.50 for the record of that carton being in storage for

18  deletion in the computer record as well $1.50 per file that's

19  in the box.  So we end up with approximately $15.00 per box in

20  charges for terminating the computer record associated with the

21  file.

22        And then we move into what's our labor costs.  In

23  order to sort through the box and sort it by investor, it's

24  approximately ten minutes of labor per box at $18 an hour for a

25  total of $3 per box.  As we check the box and seal the boxes

  CAUTION

1 up, that's another eight minutes of work to have somebody

2 recheck the box, verify those are indeed for that investor for

3 $2.40 a box.  And then moving the box from the sorting area to

4 the storage facility is another two people working full days.

5 We estimate we can do about 400 cartons a day, 400 boxes a day,

6 which the math there equals $.72 per box.

7         We have a supervisor monitoring the process, doing --

8 just verifying everybody's doing what they're supposed to be

9 doing, handling any exceptions.  The cost of that is roughly

10 $.60 a box.

11         So a total of all the costs for processing one box is

12 approximately 34.77 with an average of ten files per box, you

13 would arrive at a cost of 3.48 per file, and we round it to

14 3.50 a file.

15 Q   The second category on your spreadsheet says, "Ship to

16 investor," is that would be if we then after retrieving and

17 sorting the file were asked to actually send it to the investor

18 as opposed to having it available for them to pick up?

19 A    Correct.  So it's the additional cost of preparing a UPS

20 label, taping up the box, affixing the label, which is

21 approximately ten minutes per box for someone to do that, for a

22 cost of $3.  The postage charge is $25 a box to ship a box

23 ground shipping, which adds up to $28, plus the -- or 2.80 per

24 file, add the 3.48 from above, we end up with 6.28, we rounded

25 that to 6.25.

1 Q    And the last category on the spreadsheet, image and create

2 a -- and ship a DVD, that is if an investor were to ask for

3 this information not in hard copy but in electronic copy.

4 A    Right.  So here we add on the cost of the labor to scan a

5 file, so there's approximately $2.70 in cost in preparing the

6 document which is removing it from the folder, printing cover

7 pages, removing staples, et cetera.  Then there's $2.40 in cost

8 to actually have somebody run the documents through the

9 scanner.  There's a QC process that verifies that all the pages

10 are readable and there's no folded pages or upside down or

11 backwards pages for another $2.70 per file.

12      And then there's an export process which somebody

13 needs to mark each file to be exported and the computer will

14 export that to a directory.  And then somebody needs to verify

15 that the list of files that we want on a specific DVD is what

16 has been requested by the investor.  That costs about another

17 $.30 per file.  And then there's another $.30 to burn a file to

18 a DVD, it takes about a minute per file to burn to a DVD.  And

19 then it's the destruction of the paper file that won't be going

20 to the investor, about $.30 a file.

21      Another $.07 for shipping a DVD to investor assuming

22 there's 250 files on a DVD.  So the total cost of scanning the

23 documents and preparing the DVD is $9.30 plus the 3.48 cost to

24 retrieve the file from the warehouse equals 12.85, and we round

25 that to $13.00.

1  Q    And again, does AHM currently have the work force in place

2  to do all of this?

3  A    No we don't.

4  Q    And so AHM would have to go out and hire either contract

5  employees or bring back former employees to conduct this work.

6  A    That's correct.

7  Q    For the costs that you've described here in your

8  spreadsheet, do the debtors intend to make a profit or believe

9  they'll make a profit from charging these fees?

10 A    No, the intent was to cover our costs.  In fact, these

11 costs are based on everybody reclaiming all their files.  The

12 cost may actually be much higher if -- say not all investors

13 want the files, an investor has only one loan file in a box, it

14 still costs us $35 to pull that box and sort for that one loan

15 file.  So while the cost is $35, we may only receive 3.50 in

16 payment for that file.

17 Q    But the debtors are prepared to live with these prices

18 under -- as long as the current ACRC prices remain in place as

19 what it intends to seek reimbursement for?

20 A    Yes.

21        MR. BRADY:  Your Honor, again for the record, I know

22 we'll defer it, but just we would move the admission of

23 Debtor's Exhibit 2 in.  And I have nothing further for this

24 witness.

25        THE COURT:  All right.  Mr. Cavaco, you can step

1  down.  We'll make you available for cross examination later if

2  that becomes necessary.  And as a result you may not discuss

3  the substance of your testimony in the meantime.

4          THE WITNESS:  Understood.

5          THE COURT:  Thank you.

6          MR. BRADY:  Your Honor, I've been doing all the

7  talking, I'm sure there are people in the courtroom who might

8  want to be heard.  I would like to get an understanding of if

9  we've been successful in resolving anybody's concerns.

10          THE COURT:  All right, so there's some order, I don't

11  particularly care how we do this, but it may make some sense if

12  you think that your issues have been resolved, let's hear from

13  you first, and if there of course is no rush to the podium we

14  know we have a longer day than one would hope.  But let's hear

15  from those who think their issues are substantially or

16  completely resolved.  Mr. Gwynne, good afternoon.

17          MR. GWYNNE:  Good afternoon, Your Honor.  Kurt Gwynne

18  on behalf of Federal Home Loan Mortgage Company, also known as

19  Freddie Mac.  I believe that our issues have been resolved, but

20  I think I just need Mr. Brady to be a little bit clearer.  He

21  said that the debtor's not intending to modify any stipulations

22  that have previously been entered into in this case.  And we

23  had two stipulations that were approved by orders of the Court,

24  at Docket Numbers 861 and 862 that dealt with the stipulation

25  resolving Freddie Mac's motion for relief from stay and also

**J&J COURT TRANSCRIBERS, INC.**

1  Freddie Mac's objection to the sale.  Those stipulations

2  required the debtor to turn over files to I believe it was Bank

3  of America.

4           The files were supposed to be turned over by November

5  2nd.  Approximately 2,000 files still haven't been turned over.

6  I know that's not the issue for today, but the files that have

7  been turned over, there were no cost charge.  Our stipulation

8  did not provide for paying any fees associated with turning

9  over the files, so when Mr. Brady says that he's not trying to

10 modify the stipulation -- just one of the stipulations, I just

11 want it to be clear that they're not going to try to impose any

12 charges or filling out any of these loan file return

13 declarations or anything like that.  In other words, I think

14 that this order should not apply to Freddie Mac, and that's

15 what I would like, I guess Mr. Brady, to clarify.

16          And if he does, then I think all our issues are

17 resolved.  But I also would want to make clear that since today

18 we're only going forward with respect to this limited relief

19 and not destroying the loan files, that that issue will be

20 carried over into March and if they're going to present

21 testimony at that time, we'll have the opportunity to cross the

22 witness with respect to destroying files.

23          THE COURT:  Well I -- just to be clear, anything --

24 any party's rights in connection with anything that the debtors

25 are not seeking to accomplish today are fully and utterly

1   reserved and no specific reservation is required.  And to be

2   specific, no one need worry about reserving their rights in

3   connection with the debtors seeking relief to destroy files.

4   All those rights are completely reserved.

5           Mr. Brady is -- I took it to mean that -- I took your

6   comments to mean that -- I haven't seen the language, but I

7   take it in effect Freddie Mac's carved out of this order?

8           MR. BRADY:  Yes, Your Honor.  I'll hand you up the

9   black line which I did circulate before the hearing started.

10          THE COURT:  Thank you.

11          MR. BRADY:  Your Honor, I thought I had been very

12  clear, but I may not be able to speak as fluently with respect

13  to every stipulation we've done.  I happen to know the Freddie

14  Mac's very well, both of them, and I can say, yes, we're going

15  to honor our obligations under those stipulations.  Only one of

16  the two actually requires loans to be transferred, and that's

17  the one that requires them to be transferred to Bank of

18  America, but that's at our cost.  Even if it were not at our

19  cost, the second stipulation allows Freddie Mac to recover all

20  of its claims out of any proceeds from sales, so they'd get it

21  that way in any event.  But yes, the debtors will honor their

22  obligations under the Freddie Mac stipulations, including

23  transferring files to Bank of America at the debtor's cost.  I

24  just would note for the record, we think it's a lot less than

25  2,000 that haven't been delivered, but that's an ongoing

1  process.

2          THE COURT:  I have no interest whatsoever in whether

3  it's a million or one.  That is not in front of me today.

4          MR. GWYNNE:  I think that resolves our issues, Your

5  Honor.  Thank you.  And may I be excused?

6          THE COURT:  Yes.

7          MR. GWYNNE:  Thanks.

8          THE COURT:  Is there anyone else who --

9          MR. TOP:  Good afternoon, Your Honor.  Frank Top from

10  Chapman and Cutler on behalf of Wells Fargo Bank as Master

11  Servicer.  And I was hoping just to maybe get a clarification

12  on one of the terms of the proposed -- revised order as that

13  might have a -- might determine, you know, our position on

14  this.  And that relates to the provision that's been added with

15  respect to AH Mortgage Acquisition Company's rights with

16  respect to these files.

17          As you might recall, virtually all the mortgage loans

18  for which we're serving as master servicer have been part of

19  that purchase.  And frankly, I'm not really sure where that --

20  where this particular provision in this revised order puts

21  Wells Fargo as master servicer, and for that matter, all the

22  indentured trustees in connection with this bar date request.

23  And if maybe we can get some clarification as to how that is

24  intended to work.  Because frankly I'm not sure the master

25  servicer and indentured trustee want to spend a lot of time

1   asking for files that they may not be entitled to get because

2   they're being purchased as part of the Wilbur Ross acquisition.

3   So if I might get some clarity on that, that might help me out

4   some.

5           MR. BRADY:  Your Honor, what we'd like to do, we did

6   again modify the order to include master servicer as someone --

7   as a party that can make a request.  We'd like the master

8   servicer to say we think you have these files and we would want

9   them.  But if they go to AH Mortgage Acquisition Co., we're

10  fine with that.  So that we have an understanding from the

11  owners of the loans that they're not going to contest any

12  attempt to transfer these files to the Ross entities on final

13  close.  So we'd like them to still respond, tell us what they

14  think we have, again through hopefully a collaborative process,

15  but then to include if they are fine with the files going to

16  Ross, include that in there a notice so the debtor has a

17  direction there.

18          THE COURT:  Where does it say that?

19          MR. BRADY:  Well, I've just added that, Your Honor,

20  to address -- he asked for clarification and I --

21          THE COURT:  You're modifying on the fly.

22          MR. BRADY:  I would propose to modify that with

23  respect to Wells Fargo Bank as master servicer that they --

24          THE COURT:  Well the language you have in there now

25  says that notwithstanding anything else in the order, you shall

1  not actually return the servicing files to the extent they're

2  service -- or mortgage loan documents pertaining to servicing

3  that you sold to the Wilbur Ross entity.  It doesn't say that

4  the owner isn't required to request it.  So your point is, yes,

5  the owner and to the extent the owner wants to act through the

6  master servicer, they are actually -- you're actually

7  requesting that they return it.  But aren't you asking them to

8  do something that's sort of an empty gesture?  Since one part

9  of the order says request away, they're still not going to

10  actually transfer.

11       MR. BRADY:  Well again, what we would like -- what

12  could happen, Your Honor, it could be that the Ross entities

13  decide not to take all of the files.  They could determine that

14  certain files aren't necessary, for instance, for their

15  operations.  And the master servicer might say, well if they

16  don't want them, I do, but we'd like to clarify that.  We'd

17  like to understand that if Ross -- if the buyer doesn't take

18  them, whether this master servicer or indentured trustee wants

19  them nonetheless.

20       THE COURT:  All right.  So there's your

21  clarification.  The order will apply to Wells Fargo as master

22  servicer.

23       MR. TOP:  Thanks for the clarification.

24       THE COURT:  Does that resolve your objection or not?

25       MR. TOP:  No, not in its entirety.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Fair enough.  Fair enough.  Mr.

2  Busenkell.

3          MR. BUSENKELL:  Good afternoon, Your Honor.  Mike

4  Busenkell on behalf of Calyon New York Branch.  Our objections

5  appear at letter H and letter S.  First, let me say, I just got

6  the revised order this morning.  I do appreciate the debtor's

7  efforts to try to address some of our concerns.  And I think

8  they may be addressed at least in part, and I'll tell Your

9  Honor the issues that we have.  First, we were concerned that

10  the order would affect or modify the stipulation that's been

11  entered into in the adversary proceeding that I know Your Honor

12  has been fully aware of.  I'm advised that it does not, and

13  based on the representations of Mr. Brady, I think we're

14  comfortable that this order doesn't affect the debtor's

15  obligations underneath that --

16          THE COURT:  Well it says it.  It says, "Ordered;

17  nothing herein shall be deemed to be a modification or

18  interpretation of the debtor's obligations under any other

19  order of the Court including orders approving agreements or

20  stipulations."

21          MR. BUSENKELL:  Right.  And we just saw this order

22  this morning.

23          THE COURT:  I understand.

24          MR. BUSENKELL:  So we're comfortable with that.  The

25  second issue that Calyon had was we were concerned that the

**J&J COURT TRANSCRIBERS, INC.**

1  debtors not destroy any original documents and that any

2  original documents that they had be turned over to the

3  respective custodian.  To the extent that any collateral --

4  original collateral documents are found, we believe they should

5  be turned over, and that this order shouldn't affect their

6  obligation to do so.  Now I appreciate again the efforts that

7  the debtors have made to address our concerns with the language

8  that they've added, we would just like a little bit more

9  clarification that --

10         THE COURT:  All right, so your issue is, you

11  understand they're not seeking to destroy anything in this

12  order, but you don't want them to ship back to anybody an

13  original collateral document?

14         MR. BUSENKELL:  We want to make sure that the

15  original collateral --

16         THE COURT:  If they find an original collateral

17  document, it has to go to the custodian.

18         MR. BUSENKELL:  And that their obligation to turn

19  over those original collateral documents to the custodian are

20  not affected by this order.

21         THE COURT:  But I don't understand -- Mr. Brady,

22  you'll have to correct me -- but I didn't understand that your

23  people were actually going to peruse the file.  My

24  understanding was -- I didn't see that on the -- I didn't see

25  anything, sort, rebox, I don't see, you know, anything on your

1  sort of line item of expenses or go through the file and figure

2  out what's there.   Am I wrong?

3         MR. BRADY:   Your Honor, I think based on speaking

4  with the people who are going to do this, there will be some

5  sight -- you know, some viewing of the files on a really high

6  level.   What we've included in the order that if -- we made it

7  clear, this is on Page 3 -- that any collateral documents will

8  remain by the custodian and then if the debtors discover any

9  collateral documents, that we will forward those to the

10 custodian, so --

11        THE COURT:   Where's it say that?

12        MR. BRADY:   This is the next to the last ordered on

13 Page 3.

14        THE COURT:   Okay.   In the event that the debtor

15 discovery any original collateral documents during the review,

16 debtor shall forward them to the custodian.   Okay.

17        MR. BRADY:   Your Honor is correct, we're not going to

18 scrub these files as they would have when they first arrived at

19 Melville.   We think that process has been done.   But if we come

20 across during any of this process what appear to be original

21 collateral documents, we agree we will send those to the

22 custodian.

23        THE COURT:   Okay.

24        MR. BUSENKELL:   And, Your Honor, I think that does

25 address our concerns.   But as I noted at the beginning of my

1  presentation, I just had the first opportunity to look at this

2  order this morning and I need to talk with my co-counsel to see

3  if that in fact addresses our concerns then.  But Your Honor

4  wanted to know what objections were unresolved --

5          THE COURT:  No, I understand, Mr. Busenkell, that's

6  fine.

7          MR. BUSENKELL:  Thank you, Your Honor.

8          THE COURT:  Anyone else?  Mr. Chipman, you have

9  Countrywide, right?

10          MR. CHIPMAN:  Yes, Your Honor.  For the record,

11  William Chipman on behalf of Countrywide.  Your Honor, can I

12  have a minute to just clarify one thing with Mr. Brady?

13          THE COURT:  Yes.

14          MR. CHIPMAN:  Thank you.

15                      (Pause)

16          MR. CHIPMAN:  Thank you, Your Honor.  I believe most

17  of our concerns have been addressed by the representations made

18  by Mr. Brady.  As Your Honor knows, we purchased -- Countrywide

19  purchased servicing rights back -- I think back in December --

20  and this order doesn't affect -- my understanding is this order

21  doesn't affect the obligations under the court order approving

22  that.  In addition, Your Honor, there were prior transactions

23  where the debtors -- between Countrywide and the debtors -- and

24  there are what we call additional documents that may or may not

25  be in the warehouse.  And we're working with the debtors to

1 figure out which documents may or may not be in that warehouse.

2        The only outstanding issue that I can see at this

3 point, Your Honor, from Countrywide's perspective, is Mr. Brady

4 had mentioned that he believes these are all pre-petition

5 obligations subject to a general unsecured claim.  I think it's

6 premature at this time for Your Honor to rule on that.  And I

7 believe Countrywide wants to reserve its rights to in the

8 future assert the right to seek an administrative claim.

9        As Your Honor is aware, there's certain cases in this

10 circuit that allow --

11        THE COURT:  I didn't see anything in here affecting

12 Countrywide's ability to assert an admin claim, or did I miss

13 it?

14        MR. BRADY:  Your Honor, we do request in brief and in

15 the papers that for a party requesting this, we want them to

16 sign up and say they will cover the costs and then we believe

17 those costs are unsecured claims.  I'll tell you why we think

18 it's important to this process to have that --

19        THE COURT:  I'm okay with them covering the costs,

20 but how can you at this time nail down whether they're going to

21 add that to their admin claim or their unsecured claims?

22        MR. BRADY:  Well, we'd like to try because here's

23 why.  Here's why, Your Honor.  Who pays we think will have a

24 material impact on this process.  In other words, if the

25 debtors have to cover these costs, then these investors have no

1  incentive but to ask for everything and decide later what they

2  really wanted.  And if they have to bear the cost, then we

3  think they'll conduct with us a good faith reconciliation of

4  what's in this warehouse and we'll reach agreement on what

5  files belong to them and they want returned.

6      So we think it is important to the extent that Mr.

7  Chipman's client could bring forward facts that would somehow

8  indicate that this is a post-petition obligation of the estate

9  and not based on our pre-petition agreement to provide them

10  files and they were different than that scenario, I understand

11  that we can't really address that today because we don't know

12  what those facts are he would allege.  But under pre-petition

13  agreements that require the debtor to return loan files at the

14  debtor's cost, we're making it very clear, we're breaching

15  those, we're not going to honor that obligation, because we

16  don't want to spend administrative dollars and burden the

17  creditors, the other creditors of this estate, to honor that

18  pre-petition obligation.

19      THE COURT:  I'm just looking -- I'm looking in your

20  order for where you say that and I don't see it.  I see it says

21  sworn -- a list, name, contact info, sworn declaration that

22  it's their property, preferred method, acknowledgment that such

23  costs are subject to increase.  All right, so you want that

24  further ordered -- ordered that the requesting parties shall be

25  responsible for the return costs applicable to the method of

1  delivery.  You view that to be sort of an indefeasible shifting

2  of the burden?

3          MR. BRADY:  Yes.  We're not trying to hide it, Your

4  Honor --

5          THE COURT:  No, no --

6          MR. BRADY:  -- the parties wanted to be clear.  We

7  believe that if our obligation to provide loan files is under a

8  pre-petition agreement, we believe that's a pre-petition claim.

9          THE COURT:  All right.  Okay, Mr. Chipman, I'm sorry,

10 I interrupted you, I was trying to get clarification.

11         MR. CHIPMAN:  That's quite all right, Your Honor.

12 Your Honor, all I'd like to point out to Your Honor is there

13 are certain agreements that are pre-petition agreements that

14 provide obligations post-petition that can give rise to

15 administrative expense claims.  _Montgomery Ward_ is a good

16 example, Your Honor.  I've also cited --

17         THE COURT:  Well that's the bankruptcy code.  That's

18 --

19         MR. CHIPMAN:  Right.

20         THE COURT:  -- 365(d)(3).

21         MR. CHIPMAN:  Your Honor, there's also _Transworld_

22 _Airlines_ case that I cited in my reply that basically you can

23 analogize.  It says, damages flowing from the debtor's failure

24 to return planes in a specified condition gives rise to an

25 administrative expense claim.  I'm not asking Your Honor to

1 decide these issues today, just we have no problem working with

2 the debtors to get the return of our documents, but I think

3 it's premature at this time for Your Honor to make that ruling.

4 And I think parties should have an opportunity to come back

5 later on and assert an administrative expense claim.   We may

6 not, we just think that it's premature, Your Honor.   Other than

7 that, I think all of our issues have been resolved by Mr.

8 Brady.   Thank you.

9         THE COURT:   That's like saying -- well never mind --

10 that's the 800-pound gorilla in this entire process.   So I

11 understand, it's an open issue.   Okay.

12         MR. REILLY:   Good afternoon, Your Honor, Richard

13 Reilly from Duane Morris on behalf of Bear Sterns and EMC.   I

14 thin I'm echoing Kurt Gwynne up here on just needing some

15 clarification that I think Bear Sterns and EMC are parties to

16 two different settlement agreements with the debtor that have

17 been approved by the Court.   And my -- what we had wanted to be

18 is just completely carved out of the agreement, out of this

19 order.   But I would like clarification that we don't have to

20 follow any of the procedures under this order to get our

21 documents back.   I know the parties are in discussions to get

22 their mortgage loan files back.

23         I also don't -- I also want clarification that in

24 connection with not having to submit any of these requests to

25 get our documents back because we're already under other

1  agreements, that we're not agreeing to what is reasonable

2  expenses here.  I heard the testimony today about their

3  retrieval costs and all that, and I think under one of our

4  agreements, the debtor's responsible for the cost.  Under

5  another agreement, we may be responsible for the cost, although

6  we've already paid them I think $100,000 or so in anticipation

7  of those costs.  But I don't want anything in this order to

8  prejudice our rights to come back and fight them later about

9  what the reasonable cost of retrieval of our documents are,

10 because that's under the prior stipulations.  And if that's

11 what Mr. Brady -- that should fall under they're not seeking to

12 modify or interpret our agreements, but if it doesn't, I'd like

13 Mr. Brady to go a little further and tell me it doesn't apply

14 to us.

15        MR. BRADY:  Your Honor, Mr. Gwynne starts this and

16 then he leaves, so I think I'm going to object the next time he

17 asks to be excused.

18                        (Laughter)

19        THE COURT:  Things go so much more smoothly when he's

20 not here, Mr. Brady.

21                        (Laughter)

22        MR. BRADY:  Your Honor, again, I'm not that familiar

23 with the terms of the Bear Sterns, EMC stipulations, but we are

24 not in any way seeking to modify our obligations under that or

25 interpret them.  So to the extent that we put on testimony

1  today that a reasonable cost is 3.50 and a post-petition

2  stipulation with one of these parties says they have to pay

3  reasonable costs, they'll be able if there's a dispute to --

4          THE COURT:  Okay.

5          MR. BRADY:  -- to address that.  And again, we're not

6  sure whether Bear Sterns, EMC have the loan files that are not

7  covered by the stipulations.  That's why we haven't just carved

8  people out.  To the extent they have loan files that they think

9  we have that are not covered by the stipulations, we do want

10 them to come forward and file something by the deadline so

11 we're aware of that.  That's why we just don't completely carve

12 these people out.  We indicate that for the specific loan files

13 that are covered by Court approved stipulations, we're not

14 modifying our obligations or trying to interpret them today.

15         THE COURT:  All right.

16         MR. RILEY:  That's fine, Your Honor.

17         THE COURT:  Okay, thank you, Mr. Riley.

18         MR. MANGAN:  Good afternoon, Your Honor.  Kevin

19 Mangan on behalf of Triad Guaranty Insurance Corporation.  I

20 believe I fit in the category of resolved issues.  I had an

21 opportunity to speak at length with Mr. Beach prior to the

22 hearing.  My client is in a different situation than the other

23 objectors from what I could tell.  We're not a servicer, we're

24 not an owner, we're an insurance company on mortgage insurance.

25 Your Honor might recall that we were before Your Honor on a

1  pretrial conference.  AMH has -- AHM, I'm sorry -- has filed a

2  lawsuit against Triad on breach of contract and declaratory

3  judgment.  It's our position that the various files where Triad

4  may be an insurer are relevant to that litigation.  Our initial

5  objection which is found at 16F on the agenda, Your Honor,

6  related to the destruction of these documents, we have been

7  assured that certainly nothing is being destroyed as a result

8  of the relief sought today.

9       My concern, Your Honor, is tracking these files that

10 may contain Triad Insurance.  That is relevant.  All the files

11 would be relevant that relate to Triad.  My suggestion would be

12 that a notice be provided by loan number of what files are

13 being shipped off to someone else, whether it be the servicer

14 or the owner.  That way we can keep track of them.  We're not

15 saying to hold up the whole process, we just want some sort of

16 notice to us that these documents -- or these files are being

17 -- by file number -- are being processed and transferred.

18      THE COURT:  Well, I assume the debtors are

19 maintaining records of what they're going to be shipping, so

20 they'll be able to provide some tracing for you at some point.

21 So they'll be able to tell you that Box 105293 was shipped to

22 Bear Sterns on February 7th.  Why should they have to do

23 anything more than that?  Why should they have to provide you

24 notice?  Because that notice isn't going to mean anything to

25 you at this time.

1          MR. MANGAN:  Well I think what we would ask, Your

2  Honor, as opposed to box number, is what loan number.  I know

3  that part of the declaration that's being sought --

4          THE COURT:  But why, but why?

5          MR. MANGAN:  Well, by providing us with the loan

6  number, Your Honor, we would be able to determine whether Triad

7  has -- whether there is any insurance involved with that.  That

8  is my understanding.

9          THE COURT:  Again, so why do you care?

10          MR. MANGAN:  Well, Your Honor, as you recall in the

11  litigation, there's claims that we've breached insurance

12  policies and declaratory judgment.  We believe that besides the

13  specific ones that are delineated in the complaint, there are

14  all the policies of our files, containing policies could be

15  relevant to that litigation and to cut off a spoliation issue

16  now, we would like to be able to know which files are being

17  involved in this process, Your Honor.  And to remedy that, and

18  it's my understanding that by providing us with loan numbers,

19  then we can determine whether there was any insurance involved.

20          THE COURT:  Who at Triad's going to look at a million

21  loan numbers?

22          MR. MANGAN:  No, I don't believe that there's a

23  million, we're talking a much shorter and smaller --

24          THE COURT:  Well I've heard there's a million loans

25  and 1.5 million loan files.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MANGAN:  Right.  I believe the relief sought

2   today is south of 490,000, or there the ones that are

3   ultimately to be destroyed I guess.

4          THE COURT:  Well nothing's being destroyed.

5          MR. MANGAN:  Right, correct.  My understanding --

6          THE COURT:  Your argument might -- I mean, it's being

7   shipped off to someone who might destroy it I guess is the risk

8   and you're afraid it may affect your ongoing litigation.

9          MR. MANGAN:  Certainly, and it could affect Triad's

10  -- or, rather the debtor's position as well as the plaintiff in

11  the case.   And we believe that these loan files could be

12  relevant to the case or are in fact relevant to defenses that

13  we have.  We don't know what has actually been copied and we

14  don't know -- and certainly the original file would be best

15  evidence.

16         THE COURT:  Not if it's a photocopy.  And it's

17  scanned electronically, right?  You've got an electronic copy,

18  right?  Don't my e-discovery procedures already require you to

19  --

20         MR. BRADY:  We have --

21         THE COURT:  -- provide him with a list?  Go ahead,

22  I'm sorry.

23         MR. BRADY:  All of the requests for return of files

24  are going to be filed, they're going to be public.  So to the

25  extent -- as they come in, Triad can monitor those and have an

1 understanding.  I'm not sure that the debtor should be burdened

2 -- if these loans -- files are owned by another party and the

3 debtor's simply making them available for that party, they're

4 not being destroyed by the debtor, so, you know, Triad to the

5 extent it wants access to those files would obtain access from

6 the owner of the file through discovery I would suspect.

7           THE COURT:  Well, but if they were to file an

8 interrogatory tomorrow requesting you to identify the loan

9 numbers of all documents that are being transferred from the

10 facility, they'd probably have a pretty good argument.  Maybe

11 unduly burdensome, but you know, it may lead to the, you know,

12 it may lead to discovery of admissible evidence and there's an

13 ongoing litigation then you'd probably have to supply that

14 information.  At least, you know, you'd have to consult about

15 whether you were going to seek some sort of objection or

16 protective order to not do it.  So I guess is your answer

17 they're going to get this information anyway or -- I don't know

18 what you mean by publicly available.

19           MR. BRADY:  Well parties who request the return of

20 documents have to do so under our procedures if approved by a

21 date certain and they have to list AHM loan numbers of the --

22           THE COURT:  Right, that's available to you, that's

23 not available to the general public.

24           MR. BRADY:  No, our procedures contemplated, they are

25 filed with the Court.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Oh, it's filed with the Court?

2          MR. BRADY:  Yes.  And Triad can review those and if

3 they want to put us on notice and say we think the following

4 loan files that have been requested by CitiMortgage, we believe

5 were --

6          THE COURT:  And they have to identify by loan number,

7 is that correct?

8          MR. BRADY:  Our proposed procedures require them to

9 put -- the requestor to put AHM loan number.

10          THE COURT:  All right.  Well you're going to get

11 electronic notice of that anyway, Mr. Mangan, whatever, I'm

12 sure you're getting --

13          MR. MANGAN:  Certainly.

14          THE COURT:  -- e-notice of everything, that's all

15 seven million things that have been filed in this case.

16          MR. MANGAN:  That is true.  And certainly we don't

17 want these procedures to affect their duties in the litigation

18 and the discovery process in our litigation with them.  If

19 that's what they're saying is the notice that they're going to

20 provide us, then I think we'll --

21          THE COURT:  I think that will have to be sufficient.

22 Because otherwise I think you're creating just a giant

23 obligation on their behalf to give you a lot of information I

24 think in all likelihood your client has no interest in

25 receiving. it But --

1          MR. MANGAN:  Well we are interested and correct me if

2    I'm wrong that in these notices there will be specific loan

3    numbers identifying it and it would be --

4          THE COURT:  Well that's what's required.  I mean,

5    you'll get what they get, so you'll have access to what they're

6    getting and if it's insufficient, they're not -- if they don't

7    have loan numbers, they're not going to be able to identify the

8    document in any event to transfer it.

9          MR. MANGAN:  Very good, Your Honor.  Thank you.

10          THE COURT:  You're welcome.

11          MR. MANGAN:  I assume that resolves my issue as far

12    as today is concerned.

13          THE COURT:  Yes.

14          MR. MANGAN:  Thank you.

15          THE COURT:  I'd like to take just a five-minute

16    recess if we may.  I have an appointment at two o'clock, so we

17    are going to have to recess at 1:30 and we can reconvene at

18    3:30 if we're not done.  But I'm sorry, I have an out of office

19    appointment at two o'clock that will last an hour.  So let's

20    just if we may take a short recess and then we'll reconvene

21    until 1:30.

22                          (Recess)

23          THE COURT:  Sorry, that was a lawyer's five minutes,

24    not a real one.  I apologize.

25          MR. BRADY:  Your Honor, I'm sure there are other

1 people who still wish to proceed, but during the break we did

2 talk to a couple people who indicated if I could make a couple

3 additional statements, we may have them resolved.  Calyon

4 indicated, Your Honor, that they were fine with the form of

5 order with the request for one further addition, and this is on

6 Page 3 of the black line where it indicates if we discover

7 collateral documents during our review of files pursuant to

8 this order, they would like it to also say, or other order of

9 the Court, because --

10          THE COURT:  Right.

11          MR. BRADY:  -- under their agreement we're going to

12 be pulling files, and if we find them in that exercise, again,

13 we will send those to the custodian.

14          THE COURT:  Okay.

15          MR. BRADY:  Your Honor, Ms. Rush is in the courtroom

16 and had asked to confirm since she is --

17          THE COURT:  Yeah, I saw her come in -- yeah, okay.

18          MR. BRADY:  -- subject of a pending lawsuit,

19 pre-petition lawsuit, that her file won't be transferred

20 anywhere.  I can confirm that we will -- that is one of the

21 litigation loan files that we will maintain possession of.

22          THE COURT:  Right.

23          MR. BRADY:  JPMC wanted the order revised for the

24 avoidance of doubt that it's not intended to cover any loans

25 that the debtors are holding for sale or intend to sell.  Right

1  now I think it says that have been subject of sale procedures,

2  a sale motion or a sale order.  We are holding some loans that

3  we haven't done any of those steps yet, but we do intend to

4  sell them, JPMC's loans would fall in that.  So we will work

5  with them on language acceptable in the order to confirm that

6  this is not covering loans that are held for sale or intended

7  for sale.

8          THE COURT:  All right.

9          MR. BRADY:  The United States Trustee asked that we

10 add an ordered paragraph that nothing herein shall impair or

11 otherwise affect the rights of mortgagors under applicable law,

12 if any, to obtain copies of their respective hard copy loan

13 files from the debtor.  I thought Your Honor had left for a

14 moment.

15         THE COURT:  Okay.

16         MR. BRADY:  Your Honor, we'll add that with the

17 caveats that I said before.  We're not conceding whether there

18 is such an applicable law so we have the word if any.  And

19 obviously it's implicit that if the debtors have the file, by

20 the time a request comes in from a mortgagor for a file.

21         THE COURT:  Well, except you're going to keep an

22 electronic copy so you can print out a copy of the e-copy,

23 right?

24         MR. BRADY:  For the 490,000 that are imaged, yes.  If

25 it's not been imaged, we're not going to scan.

1          THE COURT:  Understood.

2          MR. BRADY:  Mr. McMahon had a couple of changes to

3 the form of notice, those were fine with us, we'll work with

4 him.

5          THE COURT:  Okay.

6          MR. BRADY:  Because obviously if Your Honor approves

7 this, the order's going to need some reconstructing and we'll

8 do that.  And then Mr. McMahon raised a concern that for

9 instance, Your Honor, the master servicer example, if the

10 master servicer comes forward and files a notice that says they

11 would like the loan files and they'll agree to pay the cost,

12 but if it goes to the servicer, they're fine with that, if it

13 goes to the buyer, they're fine with that.  He wanted to

14 confirm that if the acquisition company, the buyer of the

15 servicing facility takes a servicing contract either under 365

16 or 363, but takes on the obligations under that agreement,

17 nothing in this order would impact acquisition corps'

18 obligations to perform.  So they couldn't piggyback on this

19 order and say well, I can charge you to get your files back

20 even though it says I can't because of this order.  This is not

21 intended to impact a third party's rights, vis-a-vis any party

22 in this bankruptcy who might take on an obligation under an

23 agreement.

24          THE COURT:  All right.  I'm not sure I could do that

25 in any event.

1          MR. BRADY:  One other point, Your Honor, and I don't

2     know if this impacts your schedule.  One of our witnesses had

3     plans for this evening.  It is, I am told, Valentine's Day

4     which for the record I believe is a Hallmark holiday, but he

5     did have plans and I did promise him if we could try to get him

6     out of here.  Mr. Cavaco, if there's any way we could see based

7     on where we've been if anyone's going to need to cross examine

8     him and see if we would have time before the break, that would

9     be greatly appreciated.

10          THE COURT:  All right, well let's see what we can do.

11     He's obviously not been married as long as I have.  Let's see.

12     Bear Sterns, USD, Wells Fargo, DB Structured, Ms. Winfree, are

13     you here?  I understand they've carved you out, is that

14     acceptable?

15          MS. WINFREE:  Yes, Your Honor.

16          THE COURT:  So that leaves CitiMortgage -- just to

17     make sure I've got them all -- that leaves CitiMortgage, Wells

18     Fargo -- I guess all three Wells Fargo entities -- not

19     necessarily entities, but positions -- Bank of America and

20     Countrywide.  Anyone else?  No, no, no?  All right.  All right,

21     let's do this then since I know those are all still contested.

22     Mr. McMahon, do you want to say something?

23          MR. McMAHON:  Your Honor, I may want to be heard

24     about the form of order and comment on it --

25          THE COURT:  Oh, that's fine.  Understood.  All right.

1 Then let's see, since I understand those are outstanding

2 objections and we have at least one witness who would like to

3 leave Delaware, let's see, does anyone wish to cross examine

4 Mr. -- is it Kavorka, I'm sorry, Cavaco, does anyone wish to

5 cross examine Mr. Cavaco?

6        MR. PETRIE:  Good afternoon, Your Honor, Andrew

7 Petrie on behalf of CitiMortgage.  I believe I have a

8 stipulation to offer that Mr. Brady's agreed to that will avoid

9 the need to examine any of the witnesses.

10        THE COURT:  Okay.

11        MR. PETRIE:  And that is simply as to the

12 CitiMortgage files we have as Mr. -- or we are included in

13 among the group that has been trying to work on a collaborative

14 process.  And the stipulation is that of the various

15 CitiMortgage files, the debtors have been able to break those

16 down into three separate categories and provide us with lists

17 of files using the debtor's file numbers.

18        The first category is a group where they have

19 provided us both a file number and a ship date on which the

20 debtors believe they shipped the files, the original files,

21 back to CitiMortgage.  The second category is a list as to

22 which the debtors have only been able to provide file numbers,

23 no ship dates, but they nonetheless believe that they at some

24 point shipped the files back to CitiMortgage.  And the third

25 list is a list of approximately 800 files as to which they are

1  -- to use the debtor's phrase -- still under investigation.

2  And with that stipulation, CitiMortgage won't need to call any

3  of their witnesses.

4          THE COURT:  All right.  Mr. Brady?

5          MR. BRADY:  Just for the clarification of where Mr.

6  Petrie said file number he meant tracking number.  In our

7  system there is something marked tracking number.  So some have

8  a tracking number and a ship date, some have just the tracking

9  number and there's -- the 18,700 files we have, there's 800

10  under further investigation.  Likewise, CitiMortgage has sent

11  us information of what they think we have.  Those relate to

12  trailing docs and that's a separate discussion.

13         THE COURT:  All right.

14         MR. PETRIE:  And I had mis-spoken, Your Honor, that

15  is a tracking number.

16         THE COURT:  Okay, thank you.  All right.  Ms.

17  Silverstein, do you wish to cross examine the witness?

18         MS. SILVERSTEIN:  Your Honor, I would make the

19  argument that there is no authority for you to impose costs

20  upon Bank of America in connection with this proceeding so we

21  don't need to get into what the costs are, but given that we're

22  somewhat out of order, I would question the witness if you want

23  me at this point in time to go through some of these costs.

24         THE COURT:  Well let's do that then to save his

25  schedule.  So, Mr. Cavaco, please take the stand, I'm sorry.

Cavaco - Cross/Silverstein                    75

1  You're still under oath, sir.

2            CHRISTOPHER CAVACO, PREVIOUSLY SWORN

3                    CROSS EXAMINATION

4  BY MS. SILVERSTEIN:

5  Q    Mr. Cavaco, my name is Laurie Silverstein and I represent

6  Bank or America.  Mr. Cavaco, I believe you testified that the

7  banker boxes do not -- contain about ten files each, is that

8  correct?

9  A    That's correct.

10 Q    And the files have been intermingled, so that the boxes

11 are not -- the boxes are not sorted currently by investor,

12 purchaser et cetera, correct?

13 A    That is correct.

14 Q    And I take it American Home is the one who made the

15 decision to intermingle files from various purchasers and

16 investors into a single banker's box which was then stored off

17 site, is that correct?

18 A    Well the files were sent off site most probably before an

19 investor was assigned to a file, as it was originated.

20 Q    So there was no investor who determined how it would be

21 that you would send your documents off site or store them, is

22 that correct?

23 A    That is correct.

24 Q    Now if you want -- is it your understanding that the

25 debtor is going to dispose in some fashion of each and every

                 **J&J COURT TRANSCRIBERS, INC.**

1  storage box that is currently in storage with ACRC?

2  A    That is our intention.

3  Q    And so the debtor is going to have to remove from ACRC

4  each banker's box that is currently stored there?

5  A    Correct.

6  Q    And that is whether or not that box is returned to an

7  investor or perhaps destroyed in connection with some further

8  proceedings before this Court, correct?

9  A    Correct.

10 Q    So let's take a look if we can at Debtor's Exhibit 2, do

11 you have that in front of you still?

12 A    I do.

13 Q    And let's take a look at some of these costs.  The first

14 cost is a box pull cost of $1.75.  Can you explain what that

15 cost is?

16 A    That is a charge from the vendor to -- anytime there's a

17 request to pull a box off the shelf.

18 Q    And that cost is going to be incurred whether or not the

19 files in those boxes are returned to the vendors or ultimately

20 destroyed or otherwise disposed of by American Home, correct?

21 A    Correct.

22 Q    Could we say the same for each and every cost in the first

23 category, retrieval of file; that is, that those costs will be

24 incurred whether or not the files are returned to a vendor or

25 ultimately disposed of in another fashion?

**J&J COURT TRANSCRIBERS, INC.**

1 A    I would not say for every item.  Of the items that involve

2 labor for sorting, rebox and QC, returning to inventory and

3 process supervisor.

4 Q    Okay, which costs are those, sorting costs?

5 A    Sort and below.

6 Q    Sort and below.  So everything above sort is a cost that's

7 going to be incurred by the debtor regardless of how a file is

8 disposed of, correct?

9 A    That is correct.

10 Q    And in fact some of those appear to be costs such as, you

11 know, a termination of a computer record that American Home, I

12 guess, and ACRC have agreed among themselves of a certain cost,

13 correct?

14 A    Those are in our contract, yes.

15 Q    Okay.  And that would actually have little to do with the

16 physical return of a file to a vendor -- investor, correct?

17 A    That is correct.

18 Q    What is the sorting and new box costs?

19 A    The sorting is the labor to go through the files that are

20 in the box, barcode scan, look it up in the system to see who

21 the investor is, who the borrower is, verify that that file is

22 indeed for that borrower by looking in the file.  So, it's the

23 labor costs in analyzing who the investor is in that file.

24 Q    And is that going to be done on site at American Home

25 somewhere?

1  A    Yes.

2  Q    Okay.

3  A    The new box cost is the cost of a physical banker's box as

4  the boxes coming back from storage are not in a condition that

5  can be shipped.  They're up to seven years old and have been

6  moved many times, they're not stable boxes.

7  Q    Won't it be necessary to go through those files in any

8  event to determine which files will need to be transferred, for

9  example, to Mr. Ross in connection with the sale of loans to

10 Mr. Ross?

11 A    Only for files that would be transferred to him.

12 Q    But it's my understanding since they haven't been boxed in

13 any particular fashion by investor, you're going to need to go

14 through every box in any event to pull out files that will need

15 to be transferred to Mr. Ross, is that correct?

16 A    No, we know what loans are in what boxes.  So if we know

17 that there are 163,000 that are being transferred, we can look

18 up the box numbers for those and only go through those boxes.

19 Q    Okay.  And what assurance do you have that you will not be

20 looking in virtually every box that will -- stored currently at

21 ACRC with respect to the Wilbur Ross transaction?

22 A    I have none at this point.

23 Q    The cost under "ship to investor", as I read them, these

24 are physical costs -- these are costs either for mail or for

25 postage or for cost of a box?

1  A    The $3 cost is to the labor involved in packaging and

2  labeling a box for shipment, and $25 is postage.

3  Q    Okay, and what's the cost of a box down here, didn't we

4  pay for that up top?

5  A    The cost for a file to mail is just a formula, cost for a

6  box divided by ten, it's $28 divided by ten is 2.80.

7  Q    What is the one right above that cost/box $28?

8  A    The cost of the box is $28.

9  Q    Oh, I see.

10 A    It's just the sum total of 25 and three.

11 Q    I see, thank you.  Now have you negotiated a price or

12 tried to negotiate a price for shipping with respect -- with

13 any other vendor other than -- with a vendor?

14 A    The shipping charges are a negotiated price with UPS.

15 Q    Have certain parties come and picked up their files

16 themselves?

17 A    Not to my knowledge.

18 Q    Would anything prevent the debtor from sorting out files,

19 boxing them by investor and then putting them in a place on

20 site for American Home where the investor can come pick it up

21 or make arrangements itself to come pick it up?

22 A    Other than space restrictions as to the number of files we

23 can store at one time, there would be no -- that's our plan is

24 to sort and store for pick up.

25 Q    Have you figured out yet what it will cost to destroy a

**J&J COURT TRANSCRIBERS, INC.**

Cavaco - Redirect                                    80

1  file?

2  A    Not specifically.  It will depend on what is required as

3  far as due diligence to destroy the file.

4  Q    So can you tell me today that it will cost more to

5  redeliver a file to an investor than it will to destroy a file?

6  A    Not specifically.

7  Q    Are you aware that Bank of America has sent two requests

8  for return of certain files that have in fact -- and has in

9  fact received no response?

10 A    No I'm not.

11          MS. SILVERSTEIN:  Thank you, Your Honor, I have no

12 further questions.

13          THE COURT:  Any other cross?  No other cross.

14 Redirect, Mr. Brady?

15          MR. BRADY:  One moment, Your Honor.

16          THE COURT:  Yes.

17                    REDIRECT EXAMINATION

18 BY MR. BRADY:

19 Q    Just a few questions, Mr. Cavaco.  If the debtors never

20 requested a box be pulled from ACRC, would it be charged any

21 fees based on your schedule?

22 A    Just the monthly storage fee.

23 Q    So if we didn't request the box, we don't get charged?

24 A    That's correct.

25 Q    If Bank of America, for example, went to ACRC and said, I

                    **J&J COURT TRANSCRIBERS, INC.**

1 want a file, would ACRC charge them?

2 A    I don't believe they would give them, but they would

3 certainly charge them --

4 Q    Do you have any idea what they would charge them?

5         MS. SILVERSTEIN:  Objection, Your Honor.  I don't

6 think there's any foundation for this witness to know what they

7 would charge Bank of America when the witness has stated he

8 doesn't think he'll give them the file.

9         THE COURT:  Why isn't that hearsay, Mr. Brady?

10        MR. BRADY:  I ask for -- Mr. Cavaco's been involved

11 in the discussions with ACRC, I asked him if he had an opinion,

12 but I think I can get to it another way, Your Honor.

13 BY MR. BRADY:

14 Q    Mr. Cavaco, you said you were familiar with the agreement

15 reached between the debtors and ACRC, is that correct?

16 A    Yes.

17 Q    Does that agreement contain any requirements with respect

18 to ACRC charging a third party to get their file back?

19        MR. PETRIE:  Excuse me, Your Honor, I'm going to

20 object to that.  That's a document that is in evidence, this is

21 hearsay, best evidence and what calls for a legal opinion.

22        MR. BRADY:  Your Honor, he's indicated he's familiar

23 with it, it is public document and I'm simply asking this

24 witness if he's familiar with a provision in that agreement.

25        THE COURT:  Yeah, but if you want to talk about

1  what's in a document, show me the document, don't have a

2  witness testify as to his memory of what the provisions provide

3  for.  I think that's a valid objection.  Sustained.

4  BY MR. BRADY:

5  Q    If you know, do you think it's possible Mr. Ross as

6  acquirer might only request e-copies of files?

7  A    Yes, it is possible, that discussion has taken place.

8        MS. SILVERSTEIN:  Objection, Your Honor.  This

9  witness has not even testified he's familiar with the active

10 purchase agreement.  And how can he know what Mr. Ross is going

11 to request?

12       MR. BRADY:  Your Honor, Ms. Silverstein asked him a

13 question, she asked him if he had to go through all the boxes

14 to send files to Mr. Ross.  I'm asking a follow up question if

15 it's possible he'll have to go through no boxes to send files

16 to Mr. Ross.

17       MS. SILVERSTEIN:  That's a different question, Your

18 Honor.

19       MR. BRADY:  She asked the question.

20       THE COURT:  Let's restate -- I'm going to sustain the

21 objection as posited, Mr. Brady, re-ask your question.

22 BY MR. BRADY:

23 Q    Your Honor -- I mean, Mr. Cavaco, is it possible that the

24 purchaser of the servicing business would only request e-copies

25 of the files in the ACRC facility?

1  A    Yes it is possible.   In fact we've had discussions with

2  him where he has stated that may be acceptable.

3  Q    Now if the debtors are requested to pull a file for an

4  investor and they pull the box and in that box of all the

5  investors only one file is requested and it's requested to be

6  made available for pickup, how much will the debtors receive

7  under our proposal?

8  A    Three dollars and 50 cents.

9  Q    Three dollars and 50 cents.  But how much would it cost --

10  is it going to cost the debtor to take the box and sort the

11  files?

12  A    Approximately $35.

13  Q    So we're not asking the investor who asked for their file

14  and we pull the box, pay the $35 to sort it, to pick up the $35

15  for the entire box, we're asking them for how much?

16  A    Three dollars and 50 cents.

17  Q    Have you evaluated what the costs would be for bulk

18  destruction?  In other words, if the debtors were not required

19  to go through any process to sort these files, simply to

20  destroy everything in the warehouse, have you looked at that?

21  A    Yes, it's approximately $9 less per box than the $35.

22  Q    So it would be cheaper under a bulk destruction process

23  than the current plan in process of a retrieval and sorting?

24  A    Yes.

25          MR. BRADY:  Nothing further, Your Honor.

1          THE COURT:  You may step down.  You may step down,

2 sir.

3          THE WITNESS:  Thank you very much, Your Honor.

4          THE COURT:  Enjoy your holiday.  All right, let me

5 just -- is there anyone who anticipates they're going to cross

6 examine Mr. Johnson?  All right, I see no one, so I think we

7 can release Mr. Johnson as well.  Is there any objection to the

8 admission of Debtor's Exhibit 1 or 2?  All right, hearing none,

9 those exhibits are admitted without objection.  So that will

10 release the debtor's witnesses.  We only have about ten minutes

11 before I have to leave the bench, so is there anything we can

12 do in that time frame or should we simply deal with the still

13 open objections and legal argument after the -- when we

14 reconvene at 3:30?  Did I say 3:30?  Yeah, 3:30.  You guys are

15 so quiet.  I apologize.  The other option is to reconvene

16 tomorrow, but I assume you'd rather come back today.  Yes, all

17 right, okay.  All right, we'll reconvene at 3:30.

18                          (Recess)

19          THE COURT:  Nothing like a recess to thin the ranks.

20 All right, where are we?  You resolved all your objections

21 during the break, didn't you, Mr. Brady?

22          MR. BRADY:  No, I think everyone ate lunch actually.

23          THE COURT:  Well, little miracles.

24          MR. BRADY:  Your Honor, we have no further witnesses,

25 so we would close our case in chief and I'm not aware of any

**J&J COURT TRANSCRIBERS, INC.**

1 other witnesses.

2         THE COURT:  All right, well shall we hear from the

3 objectors, I mean, is that how you want to --

4         MR. BRADY:  However Your Honor wishes to proceed?

5         THE COURT:  Let's hear from the objectors.

6         MR. PETRIE:  CitiMortgage has no witnesses, Your

7 Honor.

8         THE COURT:  I want argument.  Does anybody else have

9 any evidence?  No, all right, we're closing the evidentiary

10 record, now I'll hear argument.

11         MR. PETRIE:  Your Honor, I guess I'll start by

12 addressing one of the arguments that Mr. Brady made about if

13 the debtors don't charge a fee, then we're going to ask for all

14 the boxes for free.  And in the case of CitiMortgage, that's

15 the 18,700 -- excuse me I said boxes -- loan files.  That's

16 actually the last thing we want and the entire reason why we're

17 in this exercise, is because if it's paper that's already been

18 provided to us or is just duplicate copies we have no interest

19 in it.  At the same -- and that's part of what drove us to the

20 informal procedure that led to the stipulation trying to

21 identify the various files.

22         I guess where we end up here, Your Honor, is that the

23 debtor is talking about incurring some costs, the bulk of the

24 costs that it's proposed or that it's looked at in terms of its

25 assessment of costs, as the cross examination established, are

1 costs that the debtor's going to incur anyways.  And so really

2 they're trying to foist the costs off on people like

3 CitiMortgage without any basis in the cost structure and

4 without any basis in the code.

5          And as you'll recall from our objection, we focus

6 principally on the fact that there is no authority in the code

7 for this type of cost shifting.  As a matter of fact, to the

8 extent we're able to locate any sort of direct commentary, it

9 was in the advisory committee notes to the code and in

10 particular to Section 541(d) which in at least two places,

11 Congress when looking at the changes it was making to the code

12 at that point in time, talked about the debtor's obligation to

13 turn over this property that doesn't belong to the debtor and

14 give it back to the owner such as CitiMortgage or what's been

15 generically referred to here as the investors.

16          And so we're -- and I'm not going to repeat

17 everything in the papers, I know Your Honor has looked at them

18 -- but where we end up at the close of today's proceedings is

19 with an effort to shift a cost that is not founded anywhere in

20 the code, not founded anywhere in the rules, is contrary to the

21 case authority that we've provided.  The nearest thing that the

22 debtors have sort of latched onto is this possessory interest

23 claim and we've addressed that in the papers and why that's

24 incorrect under the Whiting Pools case to say that that's an

25 interest that bears any moment in this case.

1          And even if Your Honor were to then take the

2    unprecedented step of saying that the debtor can abandon

3    property that doesn't belong to it and pass that cost onto the

4    owners of the property, I think what the evidence and the

5    testimony showed today was that the costs are nowhere near as

6    high as are attempted to be passed through and the bulk of

7    which are costs that they're going to incur anyways.  And I'll

8    let co-counsel explain a little further about why they're going

9    to incur them anyways.  Thank you.

10          THE COURT:  All right.  Let me ask you a question

11   before you sit down.

12          MR. PETRIE:  Yes, sir.

13          THE COURT:  These files -- bottom line, these files

14   are either going to be returned or destroyed.  They cannot stay

15   at this warehouse forever.

16          MR. PETRIE:  That's correct.

17          THE COURT:  The debtor is not going to exist in the

18   coming months and not going to be able to afford to have them

19   maintained.  The owner of the warehouse is on the verge of

20   bankruptcy.  All right?  So we all know that they can't stay

21   there forever.  So the question is, I think the question is who

22   bears the cost and risk of loss of these files?  Why shouldn't

23   it be borne by the people that own the loan?  You own the loan.

24   This documentation exists solely to protect your interest in

25   the loan you own.  Why shouldn't you pay for it?

1          MR. PETRIE:  There is an open question, Your Honor,

2    as to whether this documentation exists solely to protect our

3    interest in the loan.  First of all, just as a factual matter,

4    when we said let's sit down and parse through the loans, that's

5    when we got the division back into the three categories.  And

6    in that particular respect, some of these, frankly if it's a

7    copy of a loan file that's been where the original collateral

8    documents have been provided to us, number one, we don't care.

9    We wouldn't care if they had a giant bonfire up in Melville.

10          Second and what's also important here, Your Honor, is

11   that the reason why the debtor just can't get rid of these

12   documents is because of the regulatory structure in which the

13   debtor operates, not something that we've imposed on the

14   debtor, but rather because of the business into which the

15   debtor has entered, it cannot as a matter under the federal

16   regulations cannot sit there and just abandon these in the

17   traditional sense.  Even if we took away the confidentiality

18   issues, they still have record keeping requirements that they

19   have to keep these records for their purpose wholly independent

20   of our purposes.  So I think there's both a factual question

21   about whether they are in fact being, if they are duplicate

22   files and we're just trying to make sure there aren't these

23   stray original documents in there and can't get the information

24   to do so, whether that then becomes our burden to pick up

25   18,700 files of which --

1          THE COURT:  All right, so your argument is, look, I

2    shouldn't let them off the hook because these files exist

3    because they're required to maintain the files under federal

4    regulations.  But at the same time you say, well wait a minute,

5    we're not sure that's all that's in there.  There may be stuff

6    we need.  So the debtor should bear the costs of parsing

7    through and giving us what we need without us having to pay for

8    it as opposed to simply getting -- if look, any claims against

9    the debtor are unsecured.  So for instance, if there were

10   violations in the originations of these loans, et cetera,

11   they're going to be unsecured claims and I don't know what

12   they're going to parse out in this case, but I'm not going to

13   speculate, but I've seen richer cases.  So, you know, why

14   shouldn't I balance the harms, reduce the administrative claim

15   and just give the debtors carte blanche to destroy everything?

16   Because you'd be in here complaining about that, wouldn't you?

17   If I signed an order today that said the debtor has Court

18   authority to shred 1.5 million files, your client would have a

19   problem.

20          MR. PETRIE:  I think my problem would have a problem

21   certainly as to --

22          THE COURT:  But you don't want to pay to resolve that

23   problem, so you want it both ways, right?

24          MR. PETRIE:  No.  We've agreed, Your Honor, that --

25   if I can go back to my three categories.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Sure.

2          MR. PETRIE:  That as to -- and I'm going to go

3 backwards -- as to the third category, the ones under

4 investigation.  As you may recall from January, we stipulated

5 that.  If that was something, the estimate at the time was on

6 the order of 200 loan files.  Obviously we just pay that and

7 call it a day and walk away.  And what happened was when we got

8 the additional data in these three different categories,

9 instead of being provided information that said all of your

10 documents have been shipped back to you CitiMortgage, we got

11 them the three categories, some with tracking numbers and

12 delivery dates, some with just tracking numbers, nothing that

13 we can put to a delivery date of any sort, and then the third

14 category's still under investigation.

15          One of our problems is that we're kind of caught

16 between a vice here, but the matter's up for consideration,

17 we're being asked to take on faith that all of the original

18 documents have been provided.  Even the witness's testimony was

19 that he couldn't testify that all of the originals were gleaned

20 out of the documents.  And it's the debtor's responsibility,

21 because that is not the debtor's property, to return it to us.

22 And there's nothing in any of the congressional comments about

23 this turnover obligation nor in 541(d) that says that's a

24 turnover obligation that we have to fund to get our own

25 property back.

1           THE COURT:  Well --

2           MR. PETRIE:  And I use turnover not in the code

3   sense.

4           THE COURT:  No, I understand.  But -- so basically

5   it's an unfunded congressional mandate.  They've got to do it,

6   but Congress doesn't care where it comes from.

7           MR. PETRIE:  It wouldn't be the first.

8           THE COURT:  Debtors have to have funds to do

9   something and there are competing interests in the funds.  They

10  have cash collateral, they have debtor in possession financing.

11  That's all they have.

12          MR. PETRIE:  I understand, Your Honor, but these

13  debtors and these particular documents -- let's sort of take

14  your scenario and assume just for the sake of the argument that

15  -- let's make it easy -- say all of the CMI CitiMortgage

16  documents are ones that we wanted back, or then in the

17  alternative say or they're ones that we said destroy them all.

18  If we said destroy them all, we've heard they're still going to

19  incur most of these costs anyways.  And that would then would

20  be, we'd fall into the category of saying, who cares, which as

21  I understand the witness's testimony, they understand that

22  that's a risk the creditors -- or owners -- will come in and

23  say that they don't want to have their property back, in which

24  case --

25          THE COURT:  Why is it of any moment that they're

1 going to incur the cost if they destroy it, but if they return

2 it they should be able to pass that cost onto you, why does

3 that matter?

4        MR. PETRIE:  Well I think that goes to the

5 reasonableness of the cost.  When you look at who's got the

6 responsibilities and you ask me the questions about not being

7 able to walk away from the pile of documents so to speak --

8        THE COURT:  Right.

9        MR. PETRIE:  -- I think you look at this and you also

10 say that well, at the same time the debtors can't walk -- the

11 debtors can't abandon this property.  They don't have the

12 ability under the regulatory structure in which they operate to

13 just say to the warehouse, well you know, we can't pay, go

14 ahead and treat it like an old couch that somebody put at the

15 You Store Em lot and go ahead and have an auction.  They can't

16 do that.  And so they have a set of fixed costs that they're

17 not trying to shift to folks like CitiMortgage.

18        THE COURT:  Okay.  All right.  Thank you.

19 Ms. Silverstein?

20        MS. SILVERSTEIN:  Your Honor, when Mr. Brady made his

21 presentation this morning, he said that there were certain

22 goals that they were trying to achieve by this motion.  And the

23 goals that he listed all had to do with knowing with certainty

24 what documents parties wanted back and what documents parties

25 did not want back.  They wanted to confirm records of what

1  loans were in their warehouse, they wanted to confirm whether

2  original loan files were gone or there were just copies.  They

3  wanted to know what files were owned and people wanted back.

4  They wanted to know what files might be appropriate to destroy.

5       And I think those are good goals, perhaps premature

6  goals as we're hearing today because a lot of people are

7  excepted out.  So that even if Your Honor grants the relief

8  today, I'm not sure they're going to know with certainty all of

9  the things they want to know because in fact as we've heard, a

10  litany of people who do not have to provide them a list.  But

11  we're prepared to do that because we've already provided a list

12  twice of files that we would like back or like to talk to them

13  about whether we need them back.

14       Your Honor, they don't stop there though.  What they

15  further do is they set up a process that says, okay people, if

16  you want to give us that list, you have to pay a price for it.

17  They're going to have the Court order that to even give them a

18  list so that they know what is theirs, what is not theirs, what

19  people are claiming, you have to pay a price and here it is.

20  And they ask Your Honor to order that a certain price is

21  reasonable simply to give them a list in essence of what it is

22  that you want.  You're not entitled to give them a list and not

23  agree to pay the cost, you have to give them a list, and in

24  that declaration you have to agree to pay the cost.

25       So we are not given the opportunity under these

1  procedures to do what we've already done informally, what the

2  debtor has already done on many occasions which is negotiate a

3  resolution of how we're going to get our documents back.   In

4  fact, we are mandated to say in a declaration that we will pick

5  up these expenses.  Now as previous counsel has already

6  indicated, there is absolutely nothing in the bankruptcy code

7  that gives Your Honor the authority to mandate that we pay a

8  certain expense.  This is not the case where we have come in,

9  non-debtor parties have come in for affirmative relief asking

10 you to approve a claim, an administrative claim for return

11 costs.  And Your Honor obviously has the authority to allow or

12 disallow a claim, that's clearly something permitted.  This is

13 a wholly different posture and I do think it makes a

14 difference.  This is the debtor seeking affirmative relief

15 almost in the guise of setting up a process of creating an

16 expense and a mandate that non-debtor parties must pay.

17        And they didn't cite you any case that says that you

18 have the authority to do that.  I certainly know of none, and I

19 think it is -- the return cases are entirely inapposite.  The

20 return cases say -- it could be one of two kinds of situations.

21 The debtor can actually return something to you and you can

22 look at it, such as an airplane and say, oh well, you didn't do

23 a C check, you didn't do a D check, so on and so forth, and you

24 haven't returned the plane in the condition that I -- that

25 you're required to under the contract and so you owe me X

1  dollars.  And then we can fight over whether those are general

2  unsecured claims or administrative claims.

3         Another situation might be where the debtor says, I'm

4  not going to fly your plane back to you, it's sitting in

5  Philadelphia Airport, you come pick it up, here it is, it's

6  available, you come pick it up.  I'm going to breach my

7  contract, I'm not going to return it to you.  And you go pick

8  it up and then you say, okay, not only do I have the cost of

9  the non C check and the non D check, I have the cost of

10 physically returning that airplane to where it was supposed to

11 be put.  And in that instance, the debtor has breached his

12 contract, but the Court has not foisted any cost upon anybody

13 else in connection with that.

14         Mr. Brady stands up and announces, we're going to

15 breach our contract.  Okay, they can do that, but it may have

16 whatever consequences it has.  What I don't think it does --

17         THE COURT:  Your analogy falls apart, because that's

18 not the situation.  The situation is that your airplane is at a

19 hangar in Philadelphia and the Philadelphia Airport Authority

20 won't let you take it out of the hangar unless somebody pays

21 the cost to get it out on the runway so then you can fly it

22 home.  And the problem is, who pays the Philadelphia Airport

23 Authority that money to get the plane out of the hangar?  And I

24 presume if you don't want the plane you let it sit there and if

25 you do want the plane it's no different than the cost that's

**J&J COURT TRANSCRIBERS, INC.**

1  being foisted upon you which is your self help remedy in flying

2  the plane back to Columbus, you know, where your fleet is and

3  you can go through the process of doing the checks you need to

4  do.  It's no different.

5        MS. SILVERSTEIN:  Well it is a little bit different,

6  Your Honor, because here we have an overlay, it's an overlay

7  that previous counsel has alluded to.  It's an overlay of the

8  code of federal regulations.  And the code of federal

9  regulations will not let the debtor just keep the airplane in

10  the hangar.  What the code of federal regulations says -- and

11  they've cited it and I think it's still relevant even though

12  they aren't seeking to destroy documents now -- but it says

13  that the -- any person who maintains or possesses consumer

14  information for a business purpose must properly dispose of

15  such information by taking reasonable measures to protect

16  against unauthorized access to or use of that information in

17  connection with its disposal.

18        And disposal is also defined and it talks about

19  discarding or abandoning the information.  And then it talks

20  about what they can do.  They can't just let it sit in the

21  hangar, they have to under the proper codes, and I would say

22  under 28 U.S.C. 959 which requires a debtor to operate in

23  accordance with federal law and to pick up the costs for

24  operating in accordance with federal law, they have to properly

25  dispose of these assets.

1        They can do it a couple of ways.  They could return

2   it to us or they could perhaps destroy it.  But I also don't

3   think Your Honor's going to enter an order or should enter an

4   order that would permit a debtor post-petition to destroy

5   property it doesn't own.  I would suggest to you that's not

6   breaching a contract.

7        THE COURT:  Look, who -- it can't be that the debtor

8   has to continue to keep the property in place, not be allowed

9   to destroy it and continue to pay the administrative expense

10  claim.

11       THE COURT:  Your Honor, the federal regulations are

12  there.  Perhaps Mr. Chipman had the right idea which is that

13  Your Honor should not enter an order today -- I'll modify his a

14  little bit -- Your Honor shouldn't enter an order today dealing

15  with the costs.  Your Honor should enter an order today dealing

16  with the process.  The only reason we heard from Mr. Brady that

17  he needs Your Honor today to determine that other parties

18  should defray what I will call their organizational cost in

19  getting the documents, files together is -- we'll?ask for too

20  many documents.

21       Well, Your Honor, I think it goes without saying

22  almost, we're going to look at documents, we've already engaged

23  -- we haven't been engaged back -- but we've already engaged on

24  that process, the debtor has already successfully negotiated

25  many of these stipulations.  And if we take every single

1 document back of which we don't need, then we've got to pay for

2 costs of housing and storage et cetera.  So we're not going to

3 take back documents we don't want.  But let me suggest that if

4 you keep the issue open --

5           THE COURT:  But why shouldn't you, because you own

6 the loan.  You own the right to payment.  You are the lender.

7 Why shouldn't you pay the costs associated with protecting your

8 investment and your collateral?

9           MS. SILVERSTEIN:  Well, Your Honor, as previous

10 counsel suggested, we are not the only ones with an interest in

11 those files.  Those debtors also have an interest in those

12 files.  They're required to keep them, they use them for

13 servicing, they're required under the regulations to keep them.

14 So it's not solely for our interest, and we may decide that we

15 did not -- we have the files, we don't need a duplicate file,

16 maybe they kept a duplicate file for their purposes.  I don't

17 know, Your Honor.

18           THE COURT:  It's like the movie "Tin Men" in the

19 beginning where nobody wants to make the first offer.  You

20 know, the guy's trying to buy a Cadillac and he doesn't want to

21 say what he wants to pay and the other guy doesn't say what he

22 wants to sell it for and they have a big fight over who's going

23 to make it first.  Your client doesn't want to do what it has

24 to do to figure out whether it needs this stuff.  Mr. Brady's

25 client doesn't want to do and incur the cost that he has to do

1 to figure out whether or not you need this stuff.  All right.

2 I understand that.

3         Nobody wants -- banks don't make money by employing

4 people to do tasks.  All right?  Everybody wants to minimize

5 the costs associated with borrowing and lending money.  But at

6 some point human beings are going to need to sit down and

7 figure out whether you need the document or not, and I think

8 that it makes perfect sense that the person who bears that cost

9 is the person who's going to have the benefit, that's Bank of

10 America, who is the lender, who is entitled to the payments

11 under the loan and whose collateral it is.

12         MS. SILVERSTEIN:  And, Your Honor, I would say that

13 we did make the first step.  We sent a list of what it is that

14 we wanted, we did it twice to the debtors, and they did not

15 respond.  So this is not a situation where Bank of America has

16 not reached out to the debtor to say, let's try to resolve this

17 situation.  It's a situation where the debtor for whatever

18 reason, whether they're busy with other things or whatever, has

19 not come back to us to say, let's work this out.

20         But, Your Honor, if you look at the costs that they

21 seek to defray, this is the organizational costs if you will of

22 putting the documents back into a place where we can come pick

23 them up.  They decided that they would store the documents a

24 certain way.  They decided that they wouldn't put them by

25 investor, they'd just put them all mix matched in a file.  And

1  what they have to do to be able to say, hey guys, come pick up

2  your files, is they have to organize them.  And they have to

3  figure out what they need, they're going to keep, and the files

4  that they're going to keep, we end up paying those

5  organizational costs for.

6          When you looked at this, some of this is -- some of

7  this is to terminate the storage space, to terminate the

8  computer record, to terminate the computer record file.  Why

9  should we pay for the expenses of their organizational issues

10 or what they agreed to pay to organize files?

11         THE COURT:  You don't have to.  You can simply say

12 you don't want the stuff.

13         MS. SILVERSTEIN:  Well we could if they responded to

14 our request and we could look at it and sit down and say,

15 you're right, we don't need X, Y and Z, you may destroy that or

16 you may do whatever you do with it.  But they cannot just

17 abandon the documents, the code of federal regulations doesn't

18 permit them to.

19         THE COURT:  And I could authorize them to destroy

20 them.

21         MS. SILVERSTEIN:  Your Honor, I would submit you

22 can't or you shouldn't.

23         THE COURT:  But the CFR says they can dispose of them

24 as long as they do so in the right way.

25         MS. SILVERSTEIN:  Actually, it also says however, it

1 doesn't say that they can destroy property that's not theirs,

2 it says also that --

3          THE COURT:  Well, look, if it's not their property,

4 you're just -- that just feeds into my argument that it's your

5 property and as a result you should pay the costs of getting it

6 back.

7          MS. SILVERSTEIN:  Well, Your Honor, they --

8          THE COURT:  If I were to give you stay relief, you

9 would have to pay the costs of getting your property back.  If

10 I were to grant stay relief and say, you know what, it's your

11 property, the stay is lifted, go get it.  You would have to

12 negotiate with this entity that operates the warehouse.  They

13 would charge you a fee, you would have to pay people to do all

14 this, you would have to pay people to ship, you'd be exactly

15 where you are today.

16          MS. SILVERSTEIN:  But I haven't asked for that, Your

17 Honor.  Maybe they're premature in asking for that.

18          THE COURT:  No, because you want it both ways.

19 You're perfectly happy to let the debtor continue to pay the

20 cost of keeping it --

21          MS. SILVERSTEIN:  No, Your Honor --

22          THE COURT:  -- as long as possible until the last

23 possible minute at which point you'll finally agree that you'll

24 take it back.

25          MS. SILVERSTEIN:  Now, again, Your Honor, I would say

1   we've already requested a meeting with them to determine what

2   documents we need.  They are prolonging that for some reason.

3        THE COURT:  Well, the relationship with Bank of

4   America isn't all rosy between the debtors and Bank of America

5   at this point in the case.  I don't know what's going on, I

6   have no way of knowing one way or the other, I'm not going to

7   speculate.

8        MS. SILVERSTEIN:  And I can't dispute that either.

9   All I want to assure Your Honor is that we're not just sitting

10  back, we have been proactive and we have asked for certain

11  documents.  But I would suggest to you that an intentional

12  destruction of property is more than a breach of contract.

13  Debtors can breach their contract.  They can decide to do that,

14  we can't stop them from doing that.  But to ask this Court to

15  bless an intentional destruction of property that is not

16  theirs, I don't think Your Honor can do that, I think it would

17  be an administrative expense of the estate, a post-petition

18  intentional destruction of documents as opposed to a breach.

19       But more important, Your Honor, I think that if we

20  could sit down and talk with them, we might work all of this

21  out.  What I don't see, and again, debtors haven't cited any

22  authority for the fact that at this point in time to require

23  people to proceed in a process, to participate in a process to

24  simply identify documents there has to be an agreement to pay

25  for them, I think is not, is not appropriate.  And seeking to

1  defray the organizational costs, the costs that they say they

2  will incur even if we don't want our documents back, why should

3  we pay for that?  That is not something that benefits totally

4  us.  They have to destroy the documents, and I think that the

5  testimony was that of the $35 per box to sort, only -- they

6  would save $9 if they destroyed everything.  So that's a cost

7  that this debtor will have to incur regardless because of its

8  obligations under the code of federal regulations.  And why

9  should we defer that cost?

10        Your Honor, if they want to pull our documents

11  together and put them on a pallet and say come pick them up or

12  they'll be gone in so many days, I think we would have to make

13  that decision and go pick them up at our expense.  I don't

14  think we have to pay the expense to say, come put it on the

15  pallet.  I think that is part of their obligations so that

16  we're in a position to be able to pick it up.  I don't think

17  that we could go and look through every single box.  I don't

18  know that we'd be permitted to look through every single box

19  and everybody else's documents in order to find ours and call

20  ours and put them together.  So I think that scenario is just

21  not a scenario that can happen.  What the debtor is trying to

22  do is defray that organizational cost if you will of finding

23  out whose documents are whose, and the documents they're

24  keeping or they're selling to Wilbur Ross, why should we defray

25  that cost?  That makes no sense.

1          So this organizational cost of determining -- of

2   putting the documents, here's this Investor A, this Investor B,

3   to me we shouldn't incur that.  Perhaps the cost of picking it

4   up, that's where we have the choice, that's the more

5   traditional, here's your copy machine in the retail space, go

6   pick it up.  Here are your boxes, they're right here in this

7   place, come pick them up or not, it's up to you.  I make a big

8   distinction between those two kinds of costs, and I think that

9   there's no way the first cost gets shifted to us.  I suggest to

10  you the second shouldn't get shifted to us now, we haven't

11  asked for that relief.  I don't think they've teed it up

12  properly in front of you, but I also think there is no

13  authority for saying to participate in a process to identify

14  documents because it is the nice thing for the debtor to have,

15  you have to agree in a declaration to those costs, otherwise

16  you don't participate, you don't have an opportunity to get

17  your documents?  I think this is an unprecedented process and

18  the Court should -- can if it wants to order people to

19  participate in that process and identify their documents.  The

20  cost can be determined at another time when we know in fact

21  what they are, what the debtor's been able to negotiate, who's

22  picked up their documents and leaving it up in the air will

23  give both parties incentive to streamline and make this as

24  seamless as possible.

25          THE COURT:  Thank you.

1          MR. TOP:  Good afternoon, Your Honor, Frank Top on

2     behalf of Wells Fargo Bank as master servicer.  I'm not going

3     to rehash all the arguments that have just been made before

4     you, so I'll be fairly brief.  First of all, I did want to say

5     that I appreciated a lot of the debtor's presentation of their

6     witnesses as it related to how they treated the collateral

7     documents as they called them as well as the trailing

8     documents, because at least as the master servicer is

9     concerned, those are the documents we care most about to make

10    sure that the servicing function works property and that

11    they're able to exercise whatever remedies they need to

12    exercise in order to foreclose upon mortgage, things like that

13    that are in default.

14          Having said that though, the process is not perfect

15    and as I know you will probably see in the near future, our

16    indentured trustee claims and the like, which are all sorts of

17    document exceptions that relate to items that the custodians

18    have not received in their files and they can be anywhere as

19    mundane as title policies and things like that, but from time

20    to time you're missing a mortgage and from time to time you're

21    missing a note, and whether those would be in this mystery bin

22    of files, no one really knows for sure.  And so I still have a

23    little bit of concern that there are some of these original

24    documents that might be contained in that mystery bin.

25          And I do think the process puts the cart a little bit

before the horse in that we're being asked to make a decision

as to whether we want files without really knowing what's in

those files.  Again, that's a discussion you already had with

others before this Court so I'm not going to belabor that as

well.  The two points that I will talk a little bit about

though are this -- the bar date motion as it relates to those

loans that are being serviced by the new Wilbur Ross entity.

Again, I think to the extent that they decide that they want

those particular mortgage files, I think that's great.  And I

don't want on behalf of my client to have to duplicate efforts

to determine whether I want files that they're going to

ultimately want to pick up.  There's over 100,000 loan files

and that's going to be a tall task to determine whether or not

the contents of those files are such that we're going to be

interested in that.  So I would ask that that bar date be

pushed back for some period of time until that entity makes

some kind of a decision as to whether or not they want those

loan files.

         And the second thing I'll talk about is fees real

quick.  I'm not sure frankly whether these are pre-petition

expenses or whether they're administrative expense claims,

particularly as it relates to these servicing -- the ones that

are going to be serviced by Wilbur Ross, because in fact, some

of these servicing agreements have provisions in there which

require that the servicer holds certain documents in trust on

1  behalf of the trust funds and the like.  Those documents that

2  would be held in trust are obviously collateral documents that

3  might be in their possession.  So to the extent that there are

4  documents hanging around in one warehouse or another and they

5  rightfully belong to the trust and this is a servicing

6  agreement that's going to be assumed and sold to somebody else,

7  I would suspect that someone might be able to come up with an

8  argument that that should be an administrative expense claim.

9        So at this point in time I would request that the

10 order not specify whether or not that particular claim that a

11 lender may have for seeking the return of these files be an

12 unsecured claim that they could file or an admin claim.  I

13 think that that should remain up in the air for the time being.

14 Thanks a lot.

15        THE COURT:  Go ahead.

16        MR. SAMUS:  Good afternoon, Your Honor, Chris Samus

17 of Richards, Layton and Finger here today on behalf of Bank of

18 New York.  Your Honor, we did not file a supplemental

19 objection, we filed a joinder to Wells Fargo's original

20 objection to the document destruction motion.  I only rise

21 today to say that we adopt Wells Fargo's position with respect

22 to this matter as well, and to maybe make one -- or maybe one

23 additional point, and that would be to the extent that we're

24 able to maybe get a sample loan file as Wells Fargo suggests in

25 their papers, that might go a long -- that would be very, I

1 think, cost efficient for the debtors and at the same time

2 might go a long way to resolving some of our concerns so we

3 would have a better idea of exactly what's contained in a loan

4 file.

5          THE COURT:  Okay, thank you.

6          MR. SAMUS:  Thank you very much, Your Honor.

7          MR. CHIPMAN:  Good afternoon, Your Honor, William

8 Chipman on behalf of Countrywide.  Your Honor, I do agree with

9 my colleagues here on some of their arguments.  I won't repeat

10 them.  Basically I think it's premature at this time for Your

11 Honor to make a determination whether -- whoever bears the cost

12 -- whether or not the claims are going unsecured or

13 administrative claims I think.  I don't think there's evidence

14 on the record to support that and I think it's premature at

15 this time and I merely rise to request that to the extent we do

16 have to pay costs to get back some of our documents which we're

17 working with the debtors on, that we have the ability, at least

18 the ability in the future to reserve the right to file an

19 administrative expense claim.  Thank you, Your Honor.

20          MR. HALL:  Good afternoon, Your Honor, David Hall on

21 behalf of Wells Fargo Funding.  I also echo many of the points

22 with respect to the law on who should pay the burden of turning

23 over these loan files that are stated today.  I think there's

24 no basis in the law or the statute for defraying the costs onto

25 Wells Fargo Funding to turn over these loan files.

1          And I would also state that as far as on the equities

2   who should bear the burden of paying for the turnover of the

3   loan files, I would say that, Your Honor, the debtors had

4   agreed in our pre-petition transactional documents to act as

5   interim servicer and loan originator.  And as part of those

6   obligations they were to hold as custodian our loan documents.

7   And part of the negotiated purchase price for these loan

8   documents were their costs for holding and turning over our

9   loan files as required underneath the document.  So I think

10  that coming to us on the back end to defray the costs again

11  seem to be a bit of a double dipping.

12          THE COURT:  That's what debtors do.

13          MR. HALL:  Fair enough, Your Honor.

14          THE COURT:  I'm sure they'd much rather be solvent

15  and still in business and have the ability to pay for it.

16          MR. HALL:  That's a fair point, I'd only point it

17  out, Your Honor.  I would also note, though, that a lot of the

18  costs and burdens to the debtor's estates that they point out

19  in their motion are largely their own doing.  It's their cost

20  of doing business and they're seeking to just pass it along to

21  us.  We didn't negotiate or agree to have our documents stored

22  at ACRC, we don't have any control over the terms of the

23  agreement and we don't feel we should be bound by its terms.

24          Like B of A, we also very early on in this case, in

25  September as a matter of fact, gave them a very detailed list

1  of all of our files.  We've been very active in working with

2  the debtors to try to recover these files and we don't feel

3  that legally there's a basis for us to pay anything to get

4  these files returned.  Nevertheless, we have entered into

5  negotiations where there would be some defrayment of the costs

6  onto Wells Fargo and we just haven't gotten there on a deal.

7  With that in mind, if Your Honor was inclined to enter relief

8  today on the debtor's motion, we would respectfully request

9  that there be some limit as to time or cost.  As proposed it's

10 open-ended.  There's no time frame for when these files will be

11 returned to us and six months into the process, when we have

12 literally been engaged from the inception of these cases to try

13 to get our files back, we feel that an open-ended process is

14 inappropriate; and that is, we're very much in the situation

15 where we have mortgage loans that we can unload, but we don't

16 have the supporting documentation because they're holed up at

17 ACRC.

18         We also feel that there's very limited, if any,

19 control over the pricing structures.  You know, these prices

20 that are quoted in the debtor's motion are subject to increase

21 as early as June when the deal with ACRC runs out and is able

22 to renegotiate.  I have no doubt that he will want to

23 renegotiate the pricing structure.  And at that point if Your

24 Honor were to enter the order as proposed by the debtors, we

25 feel there's little incentive by either of the debtors or ACRC

1  to get this done in a time effective or cost-effective manner.

2  ACRC has every economic incentive to let this thing ride and

3  the debtors, so long as they're able to just pass it through to

4  us, don't really have an incentive to speed up the process.  So

5  with that in mind, Your Honor, if you were inclined to enter

6  relief today ordering us to pay anything, we would certainly

7  ask that you place some limitation on the time and the cost.

8  We would also -- if you were inclined to require investors to

9  pay, that we be reserved in our rights to file an

10  administrative expense claim.

11            THE COURT:  Thank you.

12            MR. McMAHON:  Your Honor, good afternoon, Joseph

13  McMahon.  With respect to one of the three points that Mr.

14  Brady addressed with respect to our supplemental objection, Mr.

15  Brady correctly articulated our concerns with respect to

16  the -- you could call it the agreements that would be part of

17  the servicing unit sale clearly to the extent that those

18  agreements are part of that particular sale, the relief that's

19  being sought by the debtor should not impair what is provided

20  in those respective agreements insofar as both cost and

21  transfer.

22            But with respect to agreements that I guess will not

23  be part of that sale, whether they are non-executory contracts

24  under -- or executory contracts that will be rejected,

25  consistent with the position that's been taken by some of the

1  objectors today, our position is that their rights to assert a

2  general unsecured claim or an administrative claim with respect

3  to costs to the extent that they believe that they have the

4  rights under those contracts given the limited record that's

5  before the Court today should be reserved in the form of order.

6          THE COURT:  Okay, thank you.

7          MR. McMAHON:  Thank you.

8          MR. POWER:  Your Honor, Mark Power from Hahn and

9  Hessen, I'll be brief, I promise.  First of all, for the

10  record, the Committee supports the debtor's application

11  wholeheartedly.  This is clearly an instance where the debtor -

12  - this very limited assets should be required to bear a

13  significant expense really for no benefit to the estate

14  whatsoever.

15          And it's kind of funny when I listen to the secured

16  parties here though, the investors.  If you look at an

17  analogous situation that we see in bankruptcy cases every day

18  -- and I bet you most of these counsel represent those parties

19  as secured creditors -- if you have a lender who has an asset

20  based loan and a lien on inventory, which happens every day

21  before this Court, the lenders also cry, wait a minute, my

22  inventory's stuck in a warehouse and how do I know the

23  warehouseman is not going to make me pay to get my stuff if I

24  can't get it out.  And the answer is no, the warehouseman will

25  make you pay, so you better enter into an agreement with that

1  warehouseman, get a waiver from that warehouseman before you do

2  this deal to make sure that your rights are preserved.

3  Otherwise, every counsel in this room tells the lender that

4  you're going to be subject to those claims because the

5  warehouseman has a lien on your goods, a lien on your inventory

6  and he's going to assert a claim that will come ahead of you

7  and you're going to have to deal with him in the process unless

8  you have a waiver.  And in fact, in my experience, even if you

9  have a waiver, you still have to deal with him often because he

10  has physical possession and you've got to get your inventory

11  out of there.

12          What do we have here?  We have a group of lenders

13  which didn't do their homework, didn't do their due diligence,

14  they've let their documents be in the custody and control of

15  this debtor, they never figured out where they were, they never

16  exercised any remedies, they never negotiated any deal with

17  this warehouse lender -- warehouse landlord to say, you have my

18  documents, if this debtor goes under I want to work out an

19  arrangement where I'll get them back.  Now they're coming

20  before this Court crying that, wait a minute, this is our

21  documents, we want them and we shouldn't have to pay anything

22  for them.  Every other bankruptcy proceeding, the Court says,

23  I'll lift stay, I'll give you back your stuff, but you've got

24  to go and get it from the warehouse lender (sic), you don't

25  make the debtor, who has no equity in that, pay for it.  And

1 this is no different than one of those situations.

2       And all the debtor is trying to do is say, we know we

3 have an obligation, we talked to the Committee, we understand

4 we have an obligation to preserve these records because they

5 have confidential information in them.  We know we have to

6 destroy them.  We're giving these parties an opportunity to get

7 their stuff back if they want it.  But in that case, they

8 should pay for it, and if they don't want it and they don't

9 want to pay the price to determine whether they want it or not,

10 then let us destroy it, and that's where we're going, that's

11 this whole process and what we're trying to do here.  And the

12 estate is bearing the burden of complying with the federal

13 regulations by destroying those records if it has to, and the

14 debtor is trying to create a mechanism whereby these parties

15 has an opportunity to retrieve this, and the debtor has spent a

16 lot of time, effort and expense, the estate funds, to work out

17 a deal with this landlord where basically the prices are

18 frozen, the prices are reasonable and to give every lender an

19 opportunity to try to get their collateral back.

20       And so when we look at this process, we say this is

21 an extremely favorable and fair process.  The debtor is bending

22 over backwards to make sure the parties' rights are preserved.

23 And, I mean, I look at Bank of America, for example, they put

24 in a request for 1,000 loan, 2,000 loans, Judge, that's 3500

25 bucks.  We're talking $7,000 to deal with this issue.  Counsel

1 has spent more on this issue than that amount.  So you have to

2 begin to wonder what's really involved here.

3         The debtor's expenses don't have to be -- all they

4 have to do is, they say, give us these files, you pull the

5 files, you pay the vendor, you put them on a flat and they can

6 go pick them up.  The debtor is not saying that it will charge

7 everybody all these expenses, the debtor is saying, if you want

8 this, this is the cost, if you want that, this is the cost.

9 This is a Chinese menu of things you can choose, and these are

10 the reasonable costs to do that.  And it's no different than

11 any secured creditor in any case we see.

12         If they want to get their collateral back and the

13 estate has no interest in it, they should go and work out that

14 arrangement, and they have to go to the warehouse and pay for

15 it.  They have to go to the trucking company and pay for it,

16 you have to go to the contractor and pay to get your goods

17 back.  Here, the debtor has basically given them the ability to

18 pre-negotiate that arrangement and get the stuff from the

19 warehouse in a pre-arranged procedure.

20         We think it's eminently fair and reasonable, we think

21 Your Honor clearly has the ability to do this.  They're not

22 really being fair here.  They can give the debtor a list, they

23 can do one of two things, give us all these documents and you

24 know exactly what the costs are, second of all, we don't care

25 what's in the files, do what you need to do and then the debtor

1  will proceed with its motion to destroy them.  And that's kind

2  of where we're going with this, Your Honor.  What they want to

3  do is say, you pull the file, you pay the warehouseman, you go

4  through it, you analyze it, you come back to us, you tell us

5  what's in it and then we'll decide what we want to do.  And the

6  debtor's saying no, that's too expensive, we shouldn't bear

7  that expense, it's your documents and you should bear that

8  expense.

9          And from the Committee's point of view with the

10 creditors basically bearing this -- I mean, asked to bear this

11 expense, it's not appropriate.  It's not appropriate

12 administrative -- there's no necessary or reasonable benefit

13 for this estate to go through the process that they're

14 mandating.  We think this is eminently reasonable, Your Honor,

15 and we ask you to support it -- to approve it.

16          MR. BRADY:  Your Honor, Robert Brady for the debtors.

17 Needless to say, the debtors agree with the Committee and the

18 fine points made by Mr. Power.  I think one thing's clear from

19 this hearing which started at eleven o'clock today is there's a

20 need for a process.  The debtors tried to go the first route

21 here of seeking authority to destroy the documents, and Your

22 Honor's right, people came forward and said, wait, we might

23 want those.  And so the debtors took a step back and said, all

24 right, let's find out what you want.  The debtors are

25 liquidating.  We're not going to be in business forever.  Our

1  agreement with ACRC expires in June.  We continue to incur

2  storage costs of $45,000.  We already paid ACRC $200,000 on its

3  pre-petition claim to release an asserted lien on these files.

4  That was already benefit that this estate paid to benefit the

5  parties who own these loans to get access back to that

6  warehouse.

7         We've told you the process is going to take a while.

8  We're not in total control of the process, ACRC has to answer

9  our request for documents.  The faster they are, the faster we

10 can do this.  We have space constraints of our own as we sort

11 these, but we're committed to getting this process under way.

12        The confidentiality concerns, the fact that is in a

13 third party's hands all create unique problems and challenges.

14 Ms. Silverstein said something interesting, Your Honor, when

15 she was talking about how B of A has engaged.  She said, we've

16 already told them what we want, then she said, well we've told

17 them what we want to talk about.  And I note that they didn't

18 respond to our November e-mail.  They came forward and raised

19 questions after we filed our motion.  And when we asked them

20 for a list, that's exactly what we want to happen, we want to

21 have that dialogue, we want to determine with B of A what they

22 want.  We didn't have time to do it between the filed motion

23 and dealing with the objections and getting here today, but we

24 want to have that dialogue.

25        You've heard about the dialogue we've had with

1  CitiMortgage.  Out of 18,700 files, we've shown them our

2  records which show them we believe we've shipped them 17,900.

3  There's 800 under review.  We've asked them to tell us what

4  files do you believe you haven't received.  The list we got

5  back from them, all trailing documents, Your Honor.  We haven't

6  seen any evidence on their part that they've checked their

7  files to see if they got what we think we shipped.  But we need

8  that process to happen.  We'll do our part.  We'll provide

9  information, but we need them to come forward, as CMI's

10 objection makes it clear, they believe they own these files,

11 but we have no interest whatsoever in them.  If that's the

12 case, then they need to come forward and tell us that they

13 don't have them.  Counsel said, if they're copies, get rid of

14 them, we don't care, we need to work with them so we can

15 understand that.

16       And then the question is, who pays?  All of the

17 objectors, when they cite the debtor's obligation to turn these

18 documents over, all of the obligations are set forth in

19 pre-petition agreements.  The debtors are in bankruptcy, we're

20 liquidating the estate.  We're not going to honor those

21 pre-petition obligations.  In the normal case as everyone

22 talked about, what would happen, if the debtor wasn't going to

23 pay on a copier, we'd say come pick up your copier, we would

24 wheel it down to the lobby and the creditor would come pick up

25 their copier.  We can't do that here.  The files are in the

1   hands of a third party, they contain confidential information.

2          We need to understand who the owners are, because our

3   records may indicate that we sold a loan to CitiMortgage.

4   Since then, CitiMortgage may have sold it to a third party.  We

5   may not have that information.  Before we hand over files to

6   someone, we need to understand that they're the owner.

7          The parties have said there's no authority to make

8   them pay.  Well there's really no authority to require the

9   debtors to honor a pre-petition obligation.  Our obligation to

10  return documents to them at our costs are in pre-petition

11  agreements, and the debtors aren't going to honor those, we're

12  going to breach those, which means they need to now go and they

13  have options, they could go to ACRC and say, we want our

14  documents back.  Well, in the agreement which is of record,

15  it's publicly filed with ACRC, ACRC has agreed not to charge

16  anyone less than what they're charging us.  We didn't do that

17  to burden the lenders to say, aha, you can't get it cheaper.

18  We did it to make sure we weren't paying more than others.  We

19  negotiated that we would be the lowest price.

20         Again, we also paid $200,000 to release the lien, but

21  ACRC insisted that this Court didn't have authority to require

22  them to release a lien they may have against other people's

23  property, non-debtor property.  So they've reserved in this

24  agreement the right to charge other parties who come to them

25  and want documents, to charge them to release the lien.  We

1   can't do anything about that, Your Honor, but we could get them

2   to release the lien with our payment of $200,000, which we've

3   already done.

4        You know, as with many issues in this case, this is

5   very complicated.  And there's no case law directly on point.

6   But really there's two areas of the case law, I think, that are

7   completely analogous.  One is the return condition cases, where

8   a debtor has an obligation to return to the landlord the leased

9   premises in broom clean condition.  The debtor has done their

10  GOB sales and has racks there and other trash.  The debtors are

11  not going to go spend administrative dollars to clean all that

12  out.  They're going to tell the landlord, clean it out and add

13  it to your claim.

14       The other cases, and Your Honor's heard these through

15  a number of matters in this case, are the specific performance

16  cases.  What these parties are really asking for is the debtor

17  to specifically perform pre-petition obligations.  And we think

18  these can be satisfied by damages.  They have a claim.  They

19  have a claim for any costs they incur in having to get these

20  documents back if they want them.

21       The fact that these are in ACRC is, you know, Your

22  Honor, it is what it is.  They are there.  They were there

23  pre-petition, that's the way the debtor stored them, as Mr.

24  Power indicated, no one took any precautions to prevent that.

25  The parties want us to limit our costs, they want us to agree

1  that we will have this done in three months.  We're not in

2  total control of the process.  ACRC has a role in it and space

3  constraints have a role in it.

4         THE COURT:  Well, I am troubled by two things.  One,

5  I'm troubled by the pig in a poke argument which is you've got

6  them agreeing to pay whatever it's going to cost with no

7  guarantee that the cost structure won't go through the roof.

8  The second thing I'm concerned about is, foregoing their

9  opportunity to assert an administrative expense claim.  I'm not

10 saying I'm going to rule that it's an administrative expense

11 claim, but I'm concerned about foregoing that.

12        Especially -- and I think there's some force behind

13 not requiring it now in Ms. Silverstein's argument and, Mr.

14 Perry is it -- I'm sorry, Petrie --

15        MR. PETRIE:  Petrie.

16        THE COURT:  -- Mr. Petrie.  Mr Petrie's argument that

17 a lot of these costs are going to be borne one way or the

18 other.  So what's your response to that?  The administrative

19 expense issue as well as the -- I'm sorry, the fact that the

20 cost structure may increase dramatically.

21        MR. BRADY:  Your Honor, the fact that these costs

22 would be borne one way or the other, not necessarily, Your

23 Honor.  We believe if we had been authorized by the Court to

24 destroy these in bulk we could have negotiated a very favorable

25 price.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  But the testimony today was $24 a box.

2              MR. BRADY:  The testimony today was if we followed

3    along this pricing scheme with this vendor and pulled each box

4    and then destroyed them, all that you would reduce is the off

5    the shelf costs -- the labor cost would be the one piece

6    missing.  But we would not have proceeded that way, Your Honor,

7    we would not have proceeded with this landlord adhering to this

8    rate schedule.  We would have said -- we would have negotiated

9    a bulk destruction rate.  To simply take boxes off a file and

10   throw them in a shredder, bring the shredder to the landlord

11   and do it that way, we think it would have been significantly

12   cheaper than the rates we were -- we negotiated rates, we

13   negotiated to use the pre-petition rates because the landlord

14   envisioned a process whereby it was going to operate like it

15   did pre-petition, the debtors would be pulling boxes off

16   shelves and sorting them.

17            So clearly the testimony was it would be cheaper, we

18   think it would have been significantly cheaper.  Plus, we pay

19   $45,000 a month.  If the parties are right that these are not

20   our property and that we can't destroy them, and we would

21   submit Your Honor could authorize us to destroy them, and this

22   is going to cost us $5.2 million, that's eight years, Your

23   Honor, of paying $45,000 a month.

24            THE COURT:  There's only so much cost shifting the

25   debtors could do.  You know, outsourcing's a great idea until

1  it bites you in the butt.  And making business decisions two or

2  three years ago that turned out maybe not to be good ones, you

3  know, okay, people make bad decisions, but should I -- can I

4  shift all of that onto the banks?

5         MR. BRADY:  Well, we -- as the testimony evidences,

6  Your Honor, we don't think you are shifting all of it.  The way

7  we did it -- and originally, Your Honor, in our first motion,

8  we simply said parties would ask for these documents back and

9  pay whatever the costs were and we didn't give an estimate.  We

10 felt that would be an accounting nightmare and obviously

11 parties complained, they needed to understand what the costs

12 might be.  So we came up with this per file cost.  As I

13 indicated, this is not going to be cost free by the debtor's

14 perspective.  If Ms. Silverstein requests a file that's in a

15 box and the nine other files aren't requested, we'll pay $35 to

16 get that box and take it back to Melville, and we'll only

17 recover 3.50.  We think that's the protection against the

18 argument that we're going to incur a bunch of costs and we're

19 asking to pass it all along.  We're not.  We're only asking to

20 pass along the cost on the files requested.  We've already

21 incurred $200,000.  We've paid $200,000 to get the landlord to

22 release the lien they were asserting against us for these

23 files.

24        So we could say, pay the reasonable costs whatever

25 they may be and then we could send them an invoice and we could

1 come back and fight before Your Honor as to what the reasonable

2 costs were.  We thought it was more certainty to them if we

3 could give them a cost structure.  We can't do anything about

4 the fact that our deal expires with ACRC in June other than

5 what we already are doing.  We're in discussions with them --

6          THE COURT:  Sure.

7          MR. BRADY:  -- about extending that agreement, and we

8 are hopeful once the money starts to flow again, once this

9 process gets underway and ACRC actually starts seeing some

10 money.  And again, we've put $1 million away so they're

11 protected and sure they're going to get paid.  We think they're

12 going to be willing to talk about an extension.  No promises,

13 but those discussions are already underway.

14          THE COURT:  All right.  Well -- thank you, Mr. Brady.

15          MR. BRADY:  On your one other point, Your Honor, on

16 whether it's an administrative claim.  We believe it's clear

17 that all of these are based on pre-petition agreements.  To the

18 extent that Your Honor require that the parties bear the costs

19 to retrieve their files, but reserve their right to assert an

20 administrative claim and we would come back later and argue

21 about it, the debtors would live with that.  Our strong feeling

22 is that these are clearly pre-petition claims, but if someone

23 wants to litigate that issue at another time and they bear the

24 cost now, we could live with that.

25          THE COURT:  Well I think you could live with whatever

1 I decide.  I hope.   All right, I understand.  It's a difficult

2 situation to say the least.   But I think it's probably fairly

3 clear from my questioning that I view it basically in favor of

4 the debtors and obviously there's a million and a half files,

5 a million loans sitting in the hands of a third party and the

6 debtors are no longer originating loans, it's a liquidating

7 estate.

8 　　　　　I go back to my comment earlier which is, there's no

9 question that these files are either going to be returned or

10 destroyed.  That's got to happen, this debtor cannot live

11 forever, the debtor cannot afford to continue to pay forever to

12 maintain these files.  So the question becomes, do you offer

13 the persons or entities who are the actual owners of the loan,

14 the lenders and their -- to the extent appropriate, their

15 agents, such as master servicers, an opportunity to get the

16 documents back, and if so, who should bear that cost?  And I

17 really think it is analogous to a stay relief situation where

18 the Court would lift the automatic stay and the secured party

19 then has the burden of bearing the cost or recovering their

20 collateral.

21 　　　　　It's complicated in this situation of course by the

22 fact that the collateral -- or it's not really collateral, but

23 that the property is in the hands of a third party warehouse.

24 We see that, I think Mr. Power makes the point, we see that

25 actually quite often.  And it's simply creates a situation

1  where the costs that may be incurred by Bank of America aren't

2  just the internal costs of paying someone to actually do the

3  job, but also include paying that warehouse for access to their

4  collateral.

5          I don't view this as foisting the cost or taxing Bank

6  of America or the other objectors.  It's simply a situation

7  where they're left with a business decision, do they want the

8  documents or not, and if they do, they've got to pay the cost.

9  If they don't want them, it doesn't cost them anything.

10          I know they're frustrated, I understand they're

11 frustrated, this entire industry is frustrated to say the

12 least.  Did American Home Mortgage do everything American Home

13 Mortgage should have done in organizing its files in a way that

14 would make it easy and pain free for the holders of these loans

15 to get their files back?  No.  But -- and not in a pejorative

16 sense really, but I don't also hold the current lenders

17 completely blameless.  I see this type of cost shifting in a

18 lot of my cases, I see it in my consumer cases a lot in that

19 the banks that own the loans are perfectly happy to own the

20 loans, but there's tremendous cost pressure internally at those

21 banks to do as little as possible and to reduce costs as much

22 as possible to increase the returns on those lending

23 investments.  The problem is that when you start to actually

24 get down to it, you've got real loans and real files and you

25 need real people to figure these things out and that costs

1  money.  That's probably an unnecessary aside, but it is what it

2  is.  So I'm prepared to grant the relief.  That said, I'm going

3  to make Mr. Brady -- I was going to make him do it anyway --

4  but since he says he can live with it, I think it is

5  appropriate to have the order specify that it's without

6  prejudice to the rights of the lenders to assert, basically

7  without prejudice, as to the nature of the claim that may arise

8  against the debtors for whatever costs are incurred in

9  connection with getting your files back.  Whether it's an

10 unsecured claim or an administrative claim I think is an issue

11 for another day.  I understand Mr. Brady's argument, I don't

12 think there are any facts in evidence that would preclude Mr.

13 Chipman's argument.  And given that that is the case, I think

14 the order should be without prejudice and we'll decide --

15 hopefully we'll never have to -- I'll never have to decide, but

16 if I do, I do -- but we'll do that at a different day.

17        I'm also concerned about the increase in the cost

18 structure and I don't think it's appropriate to require the

19 lenders to basically say they're going to pay whatever it's

20 going to cost in the future with no control over what that cost

21 will be.  So I'd like the order to basically provide that any

22 change in the cost structure needs to be subject to Court

23 approval with an opportunity to object.  That may arise frankly

24 in the context of whatever second settlement agreement is in

25 front of the Court.  The first settlement agreement was

1 approved by the Court, I assume the second one will be as well

2 and there will be notice and an opportunity for a hearing under

3 either 9019 or I guess possibly 363 if it's a transaction

4 outside the ordinary course of business.

5          But I think the lenders -- you know, to say they have

6 to pay whatever it's going to cost and it turns out it's $100 a

7 file, that's very different than 9.25 a file.  I'm not saying

8 it will be there, but we just don't know at this point.  And I

9 think if I ruled otherwise, frankly, I'd be putting the

10 warehouse landlord in a tremendous bargaining position and I'm

11 not going to do that.

12          So subject to those changes, and obviously you'll

13 have to mark up the order and submit it under certification of

14 counsel, the Court will overrule the remaining objections and

15 approve the motion.

16          MR. BRADY:  Robert Brady, Your Honor.  Just to

17 clarify that last point.  At this point the order will provide

18 that they will have to pay the costs of 3.50, 6.25, $13 based

19 on their election and that cost is static absent further order

20 of the Court on notice?

21          THE COURT:  Correct.

22          MR. BRADY:  Thank you.

23          THE COURT:  You said it much better than I did.

24 Anything else for today?  Thank you very much.  Hearing is

25 adjourned and I'll await that order under certification of

1  counsel.

2                                    * * * * *

3                    **C E R T I F I C A T I O N**

4           I, RITA BERGEN, court approved transcriber, certify

5  that the foregoing is a correct transcript from the official

6  electronic sound recording of the proceedings in the

7  above-entitled matter, and to the best of my ability.

8

9  /s/ Rita Bergen                 DATE:   February 24, 2008

10 RITA BERGEN

11 J&J COURT TRANSCRIBERS, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**