IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------- x | | |
| In re: | : | Chapter 11 |
| | : | |
| AMERICAN HOME MORTGAGE | : | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., | : | |
| a Delaware corporation, et al., [1] | : | Jointly Administered |
| | : | |
| Debtors. | : | **Objection Deadline: March 20, 2008 at 4:00 p.m. (ET)** |
| | : | **Hearing Date: March 27, 2008 at 11:00 a.m. (ET)** |
| ------------------------------------------------- x | | |

## DEBTORS' MOTION FOR AN ORDER FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THERETO PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move this Court (the "Motion"), pursuant to section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9006 the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order further extending the Debtors' exclusive periods to file a chapter 11 plan or plans and to solicit acceptances of such plan(s) through and including June 2, 2008 and July 31, 2008, respectively. In support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

---

[1] The Debtors (as defined below) in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303) ("AHM Holding"); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580) (collectively, "AHM" or the "Debtors"). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The statutory and legal predicate for the relief sought herein is section 1121(d) of the Bankruptcy Code, together with Bankruptcy Rule 9006(b)(1) and Local Rule 9006-2.

## GENERAL BACKGROUND[2]

2.      On August 6, 2007 (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

5.      On December 19, 2007, this Court entered the Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereto Pursuant to Section 1121(d) of the Bankruptcy Code [Docket No. 2245] (the "Exclusivity Extension Order"). Pursuant to the Exclusivity Extension Order, the Debtors' exclusive periods to file a chapter 11 plan or plans and solicit acceptances thereto were extended to March 3, 2008 and May 5, 2008, respectively.

---

[2] Many of the facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief [Docket No. 2], which is incorporated by reference as if fully set forth herein at length.

066585.1001

## POSTPETITION DEVELOPMENTS

6.    The Debtors have made and continue to make significant progress in administering these large and complex cases. Since the entry of the Exclusivity Extension Order, the Debtors have continued to focus much of their attention on maximizing the value of the Debtors' estates through the orderly liquidation of their assets for the benefit of their stakeholders. The following is a non-exhaustive summary of the Debtors' activities since entry of the Exclusivity Extension Order.

**A.    Sale of the Debtors' Servicing Business**

7.    Prior to the Petition Date, a large component of the Debtors' business was the servicing of mortgage loans (the "Servicing Business"). Commencing on October 15, 2007, this Court held a hearing to consider the Debtors' motion to sell the Servicing Business. After a five-day evidentiary hearing, by Order dated October 30, 2007, (the "Sale Order") [Docket No. 1711], the Court approved and authorized the sale of the Debtors' Servicing Business (the "Servicing Sale") to AH Mortgage Acquisition Co., Inc. (the "Purchaser"), pursuant to the terms of that certain Asset Purchase Agreement dated as of September 25, 2007 (as amended and together with all exhibits and schedules thereto, the "APA"). [3]

8.    On November 6, 2007, DB Structured Products, Inc. filed its Notice of Appeal [Docket No. 1799] of the Sale Order. [4] The appeal is currently pending in the United States District Court for the District of Delaware, Case Number 07-773. The Debtors, the

---

[3]  All capitalized terms used in this section with respect to the APA, but not defined herein, shall have the meanings set forth in the APA. The description of the APA in this section is by way of summary only. To the extent there is any discrepancy between such description and the actual terms of the APA, the latter are controlling.
[4]  On November 9, 2007, UBS Real Estate Securities, Inc. ("UBS") also filed a Notice of Appeal [Docket No. 1922]; however, UBS later withdrew the appeal [Docket No. 2089].

Committee and DB Structured Products, Inc. participated in a mediation of the appeal on February 27, 2008.

9.    The appeal of the Sale Order has not impacted the Debtors' ability to close the Servicing Sale. The APA provided for the Servicing Sale to be closed in two steps, comprised of an "economic" close and a "legal" close. The "economic" close of the Servicing Sale occurred on November 16, 2007 (the "Initial Closing"), at which time the Purchaser paid the Purchase Price in the manner and to the parties as provided in the APA and related agreements referenced therein.

10.    The Debtors have been diligently working with the Purchaser to effectuate the "legal" close (the "Final Closing"), while operating the Servicing Business in the Ordinary Course of Business, subject to the Bankruptcy Exceptions, for the economic benefit and risk of the Purchaser. To that end, the Debtors and the Purchaser have spent significant time preparing applications for, and negotiating with, numerous jurisdictions to obtain licensing rights for the Purchaser (which is a condition of the Final Closing). The Final Closing is required to occur no later than September 30, 2008 under the terms of the APA.

11.    In addition, the Debtors, together with the Purchaser in certain instances, have affirmatively undertaken certain activities to prepare for consummation of the Final Closing. On December 27, 2007, the Debtors filed a motion [Docket No. 2527] (the "Transition Motion") seeking authorization to (i) create one or more non-debtor business entities (the "Transition Entities") for the purpose of entering into certain agreements relating to the transition of the assets purchased pursuant to the APA or relating to the operation of the Servicing Business; (ii) fund the Transition Entities with amounts sufficient to perform their respective obligations; (iii) amend the APA to provide that the Debtors' interests in the Transition Entities

- 4 -

will be deemed "Purchased Assets" as defined in the APA; and (iv) enter into an employment

agreement with Mr. David M. Friedman. By orders entered January 4, 2008 [Docket No. 2595]

and January 15, 2008 [Docket No. 2723], the Court granted the relief requested in the Transition

Motion.

12.    In anticipation of the Final Closing, the Purchaser has endeavored, with

the involvement of the Debtors, to increase the volume of the Servicing Business. On December

27, 2007, the Debtors filed a motion for entry of an order approving the procedures for, and

authorization of, AHM Servicing to enter into one or more subservicing agreements [Docket No.

2525] (the "Subservicing Authorization Motion"), pursuant to which AHM Servicing would act

as a subservicer for servicing rights that the Purchaser intends to acquire. By Order dated January

4, 2008 [Docket No. 2597], the Court approved the Subservicing Authorization Motion.

**B.    Closing of Indymac Sale**

13.    In addition to the Initial Closing of the Servicing Sale, the Debtors have

recently closed "Phase I" of the sale with Indymac Bank F.S.B. ("Indymac"). On August 7,

2007, the Debtors and Indymac entered into a letter agreement (the "Letter Agreement"),

whereby Indymac agreed and was bound to take assignment of, and assume the liabilities under,

ninety-eight (98) office leases and to purchase certain furniture, fixtures and equipment located

therein (collectively, the "Indymac Sale"). On August 24, 2007, the Court approved the Letter

Agreement and the terms of the Indymac Sale (the "Indymac Sale Order") [Docket No. 357].

14.    Since entry of the Indymac Sale Order, and particularly following entry of

the Exclusivity Extension Order, the Debtors spent significant time negotiating the closing

economics with Indymac. When it appeared that the Indymac Sale might not close prior to the

Debtors' deadline under section 365(d)(4) of the Bankruptcy Code to assume or reject

-5-

nonresidential real property leases, the Debtors filed a motion to enforce the terms of the

Indymac Sale Order [Docket No. 3006] (the "Motion to Enforce").

15.    Following the filing of the Motion to Enforce and after significant

negotiations, the Debtors reached an agreement with Indymac on the closing of the sale, which

agreement included certain modifications to the Letter Agreement. On February 22, 2008, the

Debtors filed a motion to modify the terms of the Letter Agreement [Docket No. 3059], which

was approved by the Court on February 28, 2008 [Docket No. 3114] (the "Indymac Modification

Order"). Pursuant to the Indymac Modification Order, Phase I of the Indymac Sale closed on

February 23, 2008, and Phase II is scheduled to close by March 3, 2008 at 4:00 p.m.

**C.    Return of Mortgage Loan Files and Destruction of Duplicate Mortgage Files**

16.    On December 14, 2007, the Debtors filed a motion requesting authority to

abandon and destroy certain duplicative copies of their mortgage loan files (the "Duplicate Hard

Copy Loan Files") and to expend funds to complete the disposition of the mortgage loan files or,

alternatively, to return the Duplicate Hard Copy Loan Files to the owner of such loans upon

written request and payment of all reasonable costs and expenses associated with the retrieval,

review and return (the "Returned Loan Files"), in accordance with the federal and state laws

which protect confidential consumer information [Docket No. 2395] (the "Destruction Motion").

The Debtors received twelve objections to the  Destruction Motion and expended significant

time negotiating with the objecting parties. On January 14, 2008, the Court approved the

Destruction Motion in part, authorizing the Debtors to immediately abandon and destroy only

those Duplicate Hard Copy Loan Files for loans the Debtors did not fund [Docket No. 2724] (the

"First Destruction Order").

17. Following entry of the First Destruction Order, the Debtors continued to negotiate with parties in interest regarding the establishment of a document return program (which relief was not approved in the First Destruction Order). Thereafter, on February 5, 2008, the Debtors filed a reply and supplement to the Destruction Motion [Docket No. 2888] (the "Destruction Supplement"), pursuant to which the Debtors sought only approval of a document return program. The Debtors received twenty-five objections to the Destruction Supplement. Again, the Debtors expended substantial time negotiating with the objecting parties, including the Office of the United States Trustee, regarding the document return program. As a result of these significant efforts, the document return program was approved by the Court on February 14, 2008 [Docket No. 3010].

## D.    Compromise of Construction Loans

18. On December 4, 2007, Bank of America, N.A., as administrative agent (the "Administrative Agent") for itself and certain other banking and financial institutions as prepetition secured lenders (the "Prepetition Secured Parties"), filed a motion [Docket No. 2255] (the "Stay Relief Motion") requesting relief from the automatic stay to allow the Administrative Agent to sell certain construction-to-perm loans in which the Administrative Agent held security interests and liens (the "BofA Construction-to-Perm Loans") to a potential purchaser. In the Stay Relief Motion, the Administrative Agent asserted that the amounts outstanding under the BofA Construction-to-Perm Loans as of the date thereof was $30,478,019.73.

19. The Debtors disputed the allegations in the Stay Relief Motion, and asserted that they could obtain greater value for the BofA Construction-to-Perm Loans than the value estimated to be realized from the sale to the potential purchaser proposed by the Administrative Agent through facilitating the borrowers' refinancing of BofA Construction-to-

Perm Loans. In fact, the Debtors and their financial advisors determined that if even a moderate number of BofA Construction-to-Perm Loans were refinanced, the Debtors would realize more value for the Debtors' estates than would be realized from the sale to the potential purchaser.

20.    To achieve this greater value and resolve the Stay Relief Motion, the Debtors engaged in good faith negotiations with the Committee, Administrative Agent and WLR Recovery Fund, III, L.P., as administrative agent for the lenders pursuant to that certain Debtor-in-Possession Loan and Security Agreement, dated as of August 6, 2007 (together with any and all exhibits and schedules annexed thereto, and as may be modified or amended from time-to-time, the "DIP Facility"). As a result of these negotiations, the parties reached an agreement (the "BofA Stipulation") wherein the Debtors would essentially "purchase" the BofA Construction-to-Perm Loans free of the Prepetition Secured Parties' liens by paying the Administrative Agent $9,143,406 (less all amounts received by the Administrative Agent from the Debtors on account of the BofA Construction-to-Perm Loans from November 28, 2007 through the Payment Date (as defined in the BofA Stipulation)) from (i) proceeds from the payoff, refinancing, or pay-downs of BofA Construction-to-Perm Loans and (ii) to the extent necessary, the DIP Lenders' cash collateral as provided by an amendment to the DIP Facility. On December 27, 2007, the Debtors filed a motion [Docket No. 2531] (the "BofA 9019 Motion") for approval of the BofA Stipulation, which was approved by the Court on January 4, 2008 [Docket No. 2593].

21.    The Debtors' projections with respect to the BofA Construction to Perm Loans indicated that the refinancing such loans would result in amounts received by the Debtors significantly in excess of $9,143,406, the amount paid to the Administrative Agent under the BofA Stipulation for the release of the Prepetition Secured Parties' liens on the BofA Construction-to-Perm Loans. As a result, on January 11, 2008, the Debtors filed a motion

- 8 -

[Docket No. 2709] (the "BofA Construction Loan Compromise Motion") seeking authorization for the Debtors, in their business judgment and without further notice or hearing, to compromise the BofA Construction-to-Perm Loans to the extent necessary to effectuate the refinancing of such loans. By order dated February 1, 2008 [Docket No. 2860] (the "BofA Construction Loan Compromise Order"), the Court approved the relief requested in the BofA Construction Loan Compromise Motion.

22.    Shortly after entry of the BofA Construction Loan Compromise Order, ABN AMRO Bank N.V. ("ABN") contacted the Debtors to request that the Debtors continue servicing the construction loans with ABN (the "ABN Construction Loans") through June 30, 2008, and to offer certain refinancing initiatives to borrowers of the ABN Construction Loans, similar to the authority granted to the Debtors by the BofA Construction Loan Compromise Order. In connection with such request, ABN additionally offered to fund all of the Debtors' obligations with respect to a stay and bonus plan for the Debtor's construction loan employees.

23.    The Debtors and ABN entered into good faith negotiations regarding the continued servicing of the ABN Construction Loans and the bonus plan for the Debtors' construction loan employees, which resulted in the Third Post-Petition Advances Stipulation (the "Third ABN Stipulation").[5] Pursuant to the Third ABN Stipulation, the Debtors agreed to use commercially reasonable efforts to keep in place the construction loan servicing group to service the ABN Construction Loans through June 30, 2008. In return, ABN agreed to (i) continue funding its pro rata share of the budget for the servicing of the Debtors' construction loan portfolio to the second quarter of calendar 2008, (ii) fund a $450,000 bonus pool to incentivize the construction loan servicing group to negotiate and effectuate compromises of the ABN

---

[5] The First and Second Post-Petition Advances Stipulations, which related to various funding of construction loans by ABN, were entered into by the Debtors and ABN on August 22, 2007 and December 3, 2007, respectively.

-9-

Construction Loans, and (iii) waive certain claims against the Debtors and their estates. The

Debtors filed a motion [Docket No. 2972] (the "ABN 9019 Motion") seeking approval of the

Third ABN Stipulation, including the authority to compromise the ABN Construction Loans and

establishment of a Bonus Plan for the construction loan employees. By order dated February 28,

2008 [Docket No. 3115], the Court approved the relief requested by the ABN 9019 Motion.

**E.      HELOC and Construction Loan Bar Date**

   24. By order dated February 14, 2008, the Court approved the Debtors'

motion to establish April 30, 2008 (the "Bar Date") as the date by which borrowers under the

Debtors' construction loans and home equity line of credit mortgage loans must file proofs of

claim, substantially conforming to Official Bankruptcy Form No. 10, with the Debtors' court-

appointed claims agent, Epiq Bankruptcy Solutions, LLC.

**F.      Non-Performing Loan Sales**

   25. On December 22, 2007, the Debtors filed the Motion of the Debtors for

Orders:  (a)(i) Approving Sale Procedures; (ii) Approving Payment of the Expense

Reimbursement (iii) Scheduling a Hearing to Consider Sale of Certain Non-Performing Loans

(the "Non-Performing Loans"); (iv) Approving Form and Manner of Notice Thereof; and (v)

Granting Related Relief; and (b)(i) Authorizing the Sale of Non-Performing Loans Free and

Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Sale

Agreement Thereto; (iii) Authorizing the Distribution of the Proceeds; and (iv) Granting Related

Relief [Docket No. 2490] (the "Non-Performing Loan Sale Motion").

   26. By order dated February 1, 2008 [Docket No. 2858], the Court approved

the sale procedures set forth in the Non-Performing Loan Sale Motion, authorizing the Debtors

to sell approximately 424 whole mortgage loans with an aggregate unpaid principal balance of

approximately $152,000,000 pursuant to a sealed, single bid sale process. Final Bids for the Non-Performing Loans are required to be submitted by March 11, 2008, and the sale hearing with respect to the Non-Performing Loans is currently scheduled for March 13, 2008.

**G.    Adversary Proceedings**

27.    The Debtors are also parties to a number of adversary proceedings initiated in this Court, which have occupied a significant portion of the Debtors' time.

28.    On August 8, 2007, two former employees of the Debtors, on their own behalf and on behalf of several similarly situated former employees, filed a complaint for damages on account of alleged violations of the Worker Adjustment Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act"). On February 1, 2008, the Court approved the parties' stipulated order certifying a class and entered a scheduling order. The case will thus proceed as a certified class action. The Debtors have since answered the plaintiffs' complaint and discovery has commenced.

29.    Actions were filed by Credit Suisse First Boston Mortgage Capital LLC ("CSFB"), Bear Stearns Mortgage Capital Corp. and EMC Mortgage Corp. ("BS/EMC"), and Calyon New York Branch ("Calyon")), each of whom similarly asserted that the Debtors' rights under mortgage loan servicing agreements had terminated prepetition, and that the Debtors were obligated to transfer the servicing of certain loans over to CSFB, BS/EMC, and Calyon, respectively. The Debtors asserted certain counterclaims in the answers to these complaints. The adversary proceedings with CSFB and BS/EMC have been settled. The litigation with Calyon continues, however, and the Court held a "Phase I Trial" in connection with that adversary proceeding. The Court entered an order on the Phase I Trial on January 15, 2008, and Calyon filed a motion to alter or amend on January 25, 2008. Briefing related to this matter is

complete and oral argument has been requested. Subsequently, Calyon filed an amended complaint on February 4, 2008, which the Debtors expect to answer no later than March 5, 2008. The Court has currently scheduled a trial for "Phase II" to begin on June 17, 2008.

30.    On August 22, 2007, Waldner's Business Environments Inc. ("Waldner's") filed a complaint against AHM Corp. for reclamation of goods and immediate payment of an administrative expense claim for goods shipped to AHM Corp. prior to the Petition Date. In addition, three other parties have asserted demands for reclamation of goods shipped prior to the Petition Date. After substantial negotiations, the Debtors entered into a stipulation with Waldner's that was approved by order of the Court dated January 11, 2007.

31.    On October 22, 2007, certain of the Debtors filed a complaint against Bank of America, N.A., asserting a breach of payment obligations under certain swap agreements entered into in connection with mortgage loan purchases. Bank of America, N.A. filed a motion to dismiss the amended complaint on grounds of lack of jurisdiction or, in the alternative, abstention. Briefing on this matter is complete; however the matter is still pending before the Court.

32.    On October 24, 2007, AHM Investment filed a complaint against Lehman Brothers Inc. and Lehman Commercial Paper Inc. (collectively, "Lehman"), asserting that Lehman breached its contract with AHM Corp. when it sought to foreclose on certain private-label notes, and seeking the turnover of the notes as well as various declaratory relief. On November 26, 2007, Lehman filed a motion to partially dismiss the complaint. Briefing with respect to this matter is now complete and oral argument has been scheduled for March 13, 2008.

33.    On October 25, 2007, Wells Fargo Bank, N.A., in its capacity as Securities Administrator ("Wells"), filed an interpleader action, seeking a resolution of a dispute between

066585.1001

the Debtors and BS/EMC regarding the rights to mortgage-backed certificates held by BS/EMC,
as well as August 2007 principal and interest payments related to the mortgage-backed
certificates. On November 19, 2007, Wells filed an amended complaint, which the Debtors
answered on December 11, 2007. The parties are currently engaging in discovery.

34.     On November 5, 2007, AHM Investment and AHM Servicing filed a
complaint against Triad Guaranty Insurance Corp. ("Triad"), a private mortgage insurance
company, asserting that Triad breached its insurance agreement by denying coverage for claims
relating to certain defaulted mortgage loans that borrowers procured by fraud. Triad filed its
answer and counterclaim on December 6, 2007, and the Debtors filed an answer to the
counterclaim on December 26, 2007. Currently, fact discovery is scheduled to be completed by
May 4, 2008, and expert discovery is scheduled to be completed by July 3, 2008.

## RELIEF REQUESTED

35.     By this Motion, the Debtors respectfully request, pursuant to section
1121(d) of the Bankruptcy Code, that: (a) the period in which the Debtors have the exclusive
right to file a chapter 11 plan or plans be extended by 90 days through and including June 2,
2008; and (b) the period in which the Debtors have the exclusive right to solicit acceptances of
such plan or plans be extended by approximately 90 days through and including July 31, 2008.
This is the Debtors' second request for an extension of these deadlines.

36.     The Debtors also request that such extensions be without prejudice to their
rights to request further extensions or to seek other appropriate relief. In fact, notwithstanding
their commitment to continue to diligently prosecute these chapter 11 cases, the extensions
sought herein may not provide sufficient time for the Debtors to complete the various sales and
other tasks that must be completed before a plan can be filed and acceptances of such plan can be

- 13 -

solicited. As stated below, more must be done in these cases before any party will be in a position to file a chapter 11 plan and accompanying disclosure statement. However, in consultation with the Committee, the Debtors have determined to seek only 90-day extensions at this time, without prejudice to their rights to seek further extensions. The Committee supports the 90-day extensions of time requested herein.

## BASIS FOR RELIEF

37.    Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a plan (the "Exclusive Filing Period"). Section 1121(c)(3) of the Bankruptcy Code provides that, if a debtor files a plan within the Exclusive Filing Period, then it has an initial period of 180 days after the commencement of its chapter 11 case to solicit acceptances of such plan (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods"). The Debtors' current Exclusive Filing Period will expire on March 3, 2008,[6] and the Debtors' current Exclusive Solicitation Period will expire on May 5, 2008. Section 1121(d) permits the Court to extend the Exclusive Periods for "cause." For the reasons set forth herein, the Debtors believe that "cause" exists to extend the Exclusive Periods.

**A.    Section 1121(d) of the Bankruptcy Code Permits the Court to Extend the Exclusive Periods for "Cause"**

38.    The Exclusive Periods under section 1121(b) of the Bankruptcy Code are intended to afford the Debtors the opportunity to propose a chapter 11 plan and to solicit acceptances of such plan without the deterioration and disruption to the Debtors' business operations that might be caused by the filing of competing plans by non-Debtor parties. In

---

[6]    Pursuant to Local Rule 9006-2, the Debtors' Exclusive Filing Period "shall automatically be extended until the Court acts on the motion, without the necessity for the entry of a bridge order." Del. Bankr. LR 9006-2.

circumstances where, as here, the current Exclusive Periods prove to be an unrealistic time frame

to file and solicit acceptances of a meaningful chapter 11 plan that might garner support from

parties in interest, section 1121(d) of the Bankruptcy Code allows the Court to extend the

Debtors' Exclusive Periods for "cause."  Specifically, section 1121(d) of the Bankruptcy Code

provides:

> (1)    Subject to paragraph (2), on request of a party in interest
> made within the respective periods specified in
> subsections (b) and (c) of this section and after notice and a
> hearing, the court may for cause reduce or increase the 120-
> day period or the 180-day period referred to in this section.

> (2)    (A)    The 120-day period specified in paragraph (1) may
> not be extended beyond a date that is 18 months after the
> date of the order for relief under this chapter.

> (B)    The 180-day period specified in paragraph (1) may
> not be extended beyond a date that is 20 months after the
> date of the order for relief under this chapter.

11 U.S.C. § 1121(d).

39.    It is well established that the decision to extend the Exclusive Periods is

left to the sound discretion of the Bankruptcy Court and should be based upon the facts and

circumstances of a particular case.[7] See First American Bank of New York v. Southwest Gloves

and Safety Equip., Inc., 64 B.R. 963, 965 (D. Del. 1986); In re Reetz, 61 B.R. 412, 414 (Bankr.

W.D. Wis. 1986).  Although the Bankruptcy Code does not define "cause" for the purpose of an

extension of the Exclusive Periods, courts have looked to the legislative history of section

1121(d) of the Bankruptcy Code for guidance.  See In re Gibson & Cushman Dredging Corp.,

101 B.R. 405, 409 (E.D.N.Y. 1989); In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D.

---

[7]    Although the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended
section 1121(d) by prohibiting extensions of the Exclusive Filing Period and Exclusive Solicitation Period
beyond 18 and 20 months, respectively, of the Petition Date, there was no revision to the standards for obtaining
interim extensions.  Accordingly, pre-BAPCPA case law continues to apply and must be examined in the
context of the instant case.

    

Ohio 1996). Indeed, courts have found that Congress did not intend that the 120- and 180-day

periods be a hard and fast rule. See Amko Plastics, 197 B.R. at 77 (noting that Congress

intended courts to have flexibility in dealing with extensions of exclusivity); Gaines v. Perkins

(In re Perkins), 71 B.R. 294, 297 (W.D. Tenn. 1987) ("The hallmark of ... [section 1121(d)] is

flexibility"). Rather, Congress intended that the Exclusive Periods be of an adequate length,

given the circumstances, for a debtor to formulate, negotiate and draft a viable plan of

reorganization, which by definition means one supported by some or all of a debtor's key

constituents, without the disruption to its business that would occur with the filing of competing

plans. See Geriatrics Nursing Home v. First Fidelity Bank, N.A., 187 B.R. 128, 133 (D.N.J.

1995) ("The opportunity to negotiate its plan unimpaired by competition, the court held, is meant

to allow the debtor time to satisfy all creditors and win support for its restructuring scheme and

thus ensure its survival as a business."). Indeed, Congress recognized that often a 120-day

exclusivity period will not afford a debtor sufficient time to formulate and negotiate a plan:

> The court is given the power, though, to increase . . . the 120-day
> period depending on the circumstances of the case. [T]he bill
> allows the flexibility for individual cases that is not available
> today. For example, if an unusually large company were to seek
> reorganization under chapter 11, the Court would probably need to
> extend the time in order to allow the debtor to reach an agreement.

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 232 (1977) (footnotes omitted).

40.     When determining whether cause exists for an extension of the Exclusive

Periods, courts have relied on a variety of factors, each of which may provide sufficient grounds

for extending the periods. Factors considered by the courts in making such a determination have

included: (a) the size and complexity of the case; (b) the necessity of sufficient time to negotiate

and prepare adequate information; (c) the existence of good faith progress toward reorganization;

(d) whether the debtor is paying its debts as they come due; (e) whether the debtor has

demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiating with creditors; (g) the length of time the case has been pending; (h) whether the debtor is seeking the extension to pressure creditors; and (i) whether unresolved contingencies exist. See, e.g., Continental Casualty Co. v. Burns & Roe Enters., Inc., 2005 U.S. Dist. LEXIS 26247, at *11-12 (D.N.J. 2005); In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409-10 (E.D.N.Y. 1989); In re Central Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); In re Express One Int'l Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); In re Grand Traverse Dev. Co. Ltd. P'ship, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992); In re Southwest Oil Co. of Jourdanton, Inc., 84 B.R. 448, 451-54 (Bankr. W.D. Tex. 1987). The application of these factors to the facts and circumstances of these cases demonstrates that the requested extensions are both appropriate and necessary to afford the Debtors with time to adequately evaluate their alternatives for a plan or plans of reorganization in these cases.

**B.      Cause Exists for an Extension of the Debtors' Exclusive Periods in These Cases**

   **(1)      The Size and Complexity of These Cases**

         41.      As with other large and complex cases, the current Exclusive Periods in these cases did not provide the Debtors with an adequate opportunity to develop and negotiate a chapter 11 plan or plans. Particularly with respect to these cases, the contested nature of nearly every facet of these cases to date has prevented the Debtors and their professionals from devoting significant attention to the preparation and negotiation of a chapter 11 plan or plans. Initially upon the filing of these cases, the Debtors were focused on stabilizing the Debtors' operations in the wake of the unprecedented upheaval in the mortgage loan and mortgage-backed securities experienced nationwide. The sudden upheaval in the mortgage industry was caused by, among other factors, falling real estate prices and a spike in consumer defaults on mortgage obligations. The downward pressure on loan and security values accelerated as more and more

- 17 -

borrowers were forced to sell securities and loans in an effort to meet margin calls. Many lenders asserted defaults prior to the Petition Date and sought to, among other things, exercise the right to terminate the Debtors' ability to service mortgage loans. In the two weeks immediately prior to the Petition Date, the markets for these assets were disrupted to the point of dysfunction, leaving the company unable to meet the volume of margin calls and forcing major write-downs of its loan and security portfolios.

42.    In the months following the Petition Date, the Debtors have had to work with –and in some cases, vigorously litigate with – the numerous large financial entities and other parties in interest with whom the Debtors did business, to obtain approval of the sale of the Servicing Business. The Debtors received various notices of purported defaults from parties to the Debtors' master servicing agreements. Certain of these parties also notified the Debtors that such alleged defaults served as the basis for disqualifying AHM Servicing from continuing to act as servicer for their loans. Ultimately, the Debtors either resolved their disputes with these counterparties, or obtained an order from the Court authorizing the transfer of the Servicing Business to the Purchaser.

43.    Completing the sale process for the Servicing Business involved time-consuming litigation and discovery had been the primary focus of senior management and the Debtors' professionals for the first four months of these cases, and was essential to preserving the value of the Servicing Business for the Debtors' estates and creditors. Accordingly, the Debtors did not, and could not reasonably have been expected to, formulate and negotiate a meaningful chapter 11 plan or plans during the sale process.

44.    More recently, and since the entry of the Exclusivity Extension Order, the Debtors have spent time working with the Purchaser to facilitate the effective transition of the

- 18 -

066585.1001

Servicing Business to the Purchaser. The Debtors have additionally been focused on maximizing the value of, and minimizing the administrative burdens related to, the Debtors' other major assets, such as, among other things, marketing and selling loans and analyzing an efficient and appropriate disposition of the 1.5 million mortgage loan files held by the Debtors through a third party vendor.

45.    Further, the sheer size alone of the Debtors' chapter 11 cases supports a finding of cause to extend the Exclusive Periods. The Debtors conducted business in 47 states, and scheduled thousands of creditors in their Schedules. In addition to the complexity of the sale of the Servicing Business, the number of creditors and amount of prepetition liabilities in these cases suggest a chapter 11 plan process will be complex as well.

**(2)    Good Faith Progress Made in These Cases**

46.    The Debtors have made significant and material progress in these chapter 11 cases and do not seek the extension of the Exclusive Periods as a means to exert pressure on the relevant parties in interest. Since the entry of the Exclusivity Extension Order, the Debtors have focused much of their time and resources towards maximizing the value of the Debtors' estates through the disposition of their major assets. For example, during this period, the Debtors sought and obtained, among other things, authorization to create one or more non-debtor business entities for the purpose of transitioning the Servicing Business to the Purchaser upon Final Closing, approval to consummate the Indymac Sale, approval of procedures to return mortgage loan files to owners or master servicers of such loans and to minimize the volume of mortgage loan files held by the Debtors through a third party vendor, authorization to compromise certain loans to obtain a greater value for such assets of the Debtors' estates, and approval of procedures to maximize the sale value for certain non-performing loans. In addition,

- 19 -

066585.1001

during this period of time, the Debtors have expended substantial time and resources addressing
the numerous pending adversary proceedings and the discovery matters relating thereto.

      (3)     **The Necessity of Sufficient Time to Negotiate and Prepare Adequate
Information**

        47.    As set forth more fully above, since the entry of the Exclusivity Extension
Order, the Debtors have focused on maximizing the value of the Debtors' estates through the
orderly liquidation of their assets, minimizing administrative liabilities, and prosecuting and
defending numerous litigation matters. The Debtors have begun, but not yet completed,
negotiations with the Committee regarding the terms of a consensual chapter 11 plan or plans
based on adequate information. The general claims bar date was January 11, 2008 and the
government bar date was February 4, 2008. The Debtors have been engaged in an extensive
review of the nearly 10,000 proofs of claim filed, but that review, given the number of proofs of
claim, remains ongoing.

        48.    Additionally, there are a variety of other tasks that lie ahead of the
Debtors. The Debtors still have numerous assets that may be marketed and sold, including the
Debtors' federally chartered thrift and bank (which will need to be sold in a manner consistent
with strict regulatory guidelines), certain whole loans still owned by the Debtors, and certain
other real estate holdings such as the Debtors' corporate headquarters in Melville, New York.
The resolution of these asset sales and the review and analysis of claims will be determinative of
the value available to the estates' creditors, and must be considered in the formulation of any
plan.

      (4)     **The Debtors are Paying Their Debts as They Come Due**

        49.    The Debtors respectfully submit that, under the relevant facts and
circumstances, the requested extension of the Exclusive Periods will not prejudice the legitimate

- 20 -

interests of creditors, as the Debtors continue to make timely payment on their undisputed

postpetition obligations. As such, the requested extension will afford the parties in interest a

meaningful and reasonable opportunity to formulate and negotiate a chapter 11 plan or plans.

 (5)  **Termination of the Debtors' Exclusive**
    **Periods Would Adversely Impact These Cases**

   50.  Termination of the Debtors' Exclusive Periods would adversely impact the

Debtors' business operations and the progress of these cases. In effect, if this Court were to deny

the Debtors' request for an extension of the Exclusive Periods, any party in interest then would

be free to propose a plan of reorganization for each of the Debtors. Such a ruling would foster a

chaotic environment with no central focus.

   51.  The Debtors also note that relief similar to that requested in this Motion

has been granted to other debtors in this jurisdiction in other chapter 11 cases. See, e.g., In re

New Century TRS Holdings, Inc., No. 07-10416 (Bankr. D. Del. January 22, 2008) (Carey, J.);

In re Nellson Nutraceutical, Inc., No. 06-10072 (Bankr. D. Del. March 12, 2007) (Sontchi, J.); In

re FLYi, Inc., No. 05-20011 (Bankr. D. Del., April 23, 2006) (Walrath, C.J.); In re Meridian

Automotive Systems Composites Operations, Inc., No. 05-11168 (Bankr. D. Del., October 23,

2006) (Walrath, C.J.).

   52.  Finally, the fact that a Debtor may propose a liquidating rather than

reorganizing plan should not negatively impact its ability to retain the exclusive right to file a

plan. Indeed, courts in this District have, on other occasions, granted multiple extensions of

exclusivity in liquidating chapter 11 cases. See In re Cone Mills Corp., et al., No. 03-12944

(Bankr. D. Del., March 8, 2004) (Walrath, C.J.).; In re SFMB Acquisition Corp., Ch. 11 Case

No. 03-11524 (Bankr. D. Del., August 25, 2004) (Walsh, J.); In re SHC, Inc., Ch. 11 Case No.

                         

03-12002 (Bankr. D. Del., April 2, 2004) (Walrath, C.J.); In re Golf America Stores, Inc., Ch. 11

Case No. 02-12313 (Bankr. D. Del., April 11, 2003) (Walsh, J.).

      53.     Based upon the foregoing, the Debtors respectfully submit that cause

exists in these bankruptcy proceedings to extend the Debtors' Exclusive Periods pursuant to

section 1121(d) of the Bankruptcy Code.

### NOTICE

      54.     The Debtors will serve this Motion on (i) the Office of the United States

Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the

Administrative Agent; (iv) counsel to the DIP Lender; and (v) those parties who have requested

notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. LR 2002-1(b). In light

of the nature of the relief requested herein, the Debtors submit that no other or further notice is

necessary.

      55.     No previous motion for the relief requested herein has been made to this

or any other court.

**[Remainder of Page Left Blank By Intention]**

DB02:6582213.5

066585.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto: (a) granting the relief requested herein; and (b) granting to the Debtors such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
          February 29, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_/s/ Margaret B. Whiteman_
James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Margaret B. Whiteman (No. 4652)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors in Possession

DB02:6582213.5                                                              066585.1001