# **EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------x
In re:                                        :  Chapter 11
                                              :
AMERICAN HOME MORTGAGE                        :  Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al :
                                              :  Jointly Administered
            Debtors.                          :
                                              :
---------------------------------------------x

## AFFIDAVIT OF SANDRA KRAEGE HIGBY

Commonwealth of Massachusetts  )
                               ) ss:
County of Worcester            )

Sandra Kraege Higby, being duly sworn, deposes and says:

1. I am an attorney licensed to practice in The Commonwealth of Massachusetts and in good standing. I am a sole practitioner.

2. In 2005 I was retained by Robert Hardman, Vice President ("Robert Hardman") of the Foreclosure Department of American Home Mortgage Servicing, Inc. ("AHM") to represent AHM in foreclosure and bankruptcy matters in the Commonwealth of Massachusetts. I have been representing AHM on such matters continuously since then.

3. On August 6, 2007 I spoke with John Kalas, General Counsel for AHM and he informed me that AHM and other associated entities had filed a Ch. 11 bankruptcy petition that day. Attorney Kalas told me that AHM was still in business and he instructed me to continue to work on the foreclosure and bankruptcy files that had been referred to me by AHM. He assured me that I would continue to be paid.

{Client Files\ban\306637\0001\DOC\01080567.DOC;4}

4. On August 6, 2007 I spoke with Robert Hardman who advised me that AHM's accounts payable person was holding a check payable to me in the amount of $69,578.99, but that he could not release it until the Bankruptcy Court approved the emergency motions filed by AHM.

5. On August 8, 2007, Robert Hardman telephoned me and advised me that the Bankruptcy Court had signed an order authorizing AHM to pay pre-petition obligations to certain critical vendors and service providers as identified by AHM in its discretion. Mr. Hardman advised me also that he had been instructed to release the check in the amount of $69,578.99 to me, and Mr. Hardman told me that all invoices going forward from August 6, 2007 would be paid when submitted by me and that "it was business as usual" and I should keep working on the files.

6. On August 9, 2007, I received a check from AHM in the amount of $69,578.99 as promised by Robert Hardman. It was my understanding that this payment was made pursuant to the court order, and that under the terms of the order I was required to continue to provide legal services to AHM if I accepted the check.

7. On August 12, 2007, Robert Hardman telephoned me to advise me that all of my invoices for pre-August 6, 2007 services and expenses would be paid by AHM, including specifically invoices dated August 1, 2007. He said that none of my invoices would be categorized as "pre-petition" or "post-petition". He said that all of my invoices were charged to individual customer accounts who were liable to pay my fees and costs under their loan documents. He further explained that I was retained under a servicing contract with lenders who were not in bankruptcy and these lenders were also liable for my fees and costs and were required to reimburse AHM for my fees and costs. Robert

Hardman assured me that all of my invoices would be paid, that I should continue to do work, and that it was business as usual. He also instructed me to continue to submit my invoices as I had in the past, and that AHM would process and pay them in a timely manner.

8. In reliance on the foregoing assurances, I continued to work the foreclosure and bankruptcy files sent to me by AHM. Per Mr. Hardman's instructions I continued to submit invoices to AHM daily or weekly. I continued to get paid during August and September 2007 for services rendered and costs incurred on AHM files.

9. I have provided legal services for approximately ten years to various lenders where Robert Hardman was employed as the Vice President in charge of the foreclosure department. During these past ten years, I have had an excellent working relationship with Robert Hardman. I have found him to be fair, honest, and extremely hard working. I consider him a man of strong ethics and integrity. Because of our long standing working relationship, I have no reason to question Robert Hardman's instructions or doubt his assurances. He has always been a man of his word.

10. In late September 2007, I received correspondence and a copy of a court order from the law firm representing AHM in its bankruptcy case that seemed to contradict my prior instructions from Robert Hardman and John Kalas. According to this new paperwork, I needed to file a Retention Affidavit and then I would be employed by AHM nunc pro tunc to August 6, 2007. This paperwork capped my fees and expenses at $75,000.00 per month and a three month aggregate of $185,000.00.

11. On September 25, 2007 I submitted the Retention Affidavit to the law firm representing AHM, and requested that they increase my monthly cap because it was too

low. No one from the law firm responded to my request that they increase my cap. I left a telephone message for Robert Hardman on or about September 25, 2007 seeking clarification, but he did not return my call. In good faith and reliance on prior assurances and directives, I continued to provide legal services to AHM. I continued to submit my invoices daily and weekly to AHM for September, October, and November, 2007.

12. On November 26, 2007, Isabel Rodriguez, the accounts payable person at AHM, forwarded to me a copy of a letter dated November 7, 2007 written on the letterhead of the law firm representing AHM in its bankruptcy case. The November 7, 2007 letter outlined completely new procedures for submitting invoices. I received this letter on November 26, 2007 and this was the first time I learned about these new procedures. According to the letter, I was also required to re-submit all invoices I had previously submitted for the months of August, September, October, and November. I understood this to mean that I needed to re-submit only those invoices which were unpaid for those months.

13. At great administrative cost to me, on December 3, 2007, I did re-submit to AHM's attorneys the unpaid invoices for services rendered and costs incurred for the months of August, September, and October, 2007. On December 12, 2007 I submitted invoices for fees and expenses incurred in November 2007. I received payment for only a *portion* of the re-submitted invoices on December 26, 2007.

14. I am a sole practitioner. I cannot afford to incur the huge expenses associated with foreclosures with no assurances of timely payment. My customary and usual billing practice with AHM was to bill daily or weekly as fees and costs were

incurred so that invoices were continuously being paid and I would maintain a positive cash flow which then allowed me to continue to work the files.

15. Court fees and recording charges must be paid contemporaneously with the filing of foreclosure complaints and recording of documents. Some of my vendors, including some newspapers and the primary auctioneer and primary title examiner I use for AHM foreclosure matters, require payment in advance for their fees and charges. In the past, I have "fronted" those expenses. Given the limitations on the payment of fees and expenses in AHM's bankruptcy case and AHM's failure to promptly pay my invoices for services rendered and expenses incurred on foreclosure and bankruptcy files, I have been placed in a financially disastrous position. I am working without payment for my time, and I have been using my personal funds to pay expenses on behalf of AHM – the foreclosure fees and expenses are incurred for the benefit of AHM.

16. On December 13, 2007, Robert Hardman left me a telephone message advising me that from the moment I submitted the invoices to Young Conaway Stargatt & Taylor, LLP (counsel for AHM), to the time the creditors committee reviews them, to the time AHM pays them, less than 30 days will elapse (this was counting the 20-day committee review period). He assured me that AHM's accounts payable department would process and pay the invoices within 2-3 days (4 at most) after receiving the committee's approval.

17. On December 14, 2007, Ryan Bartley of the law firm of Young Conaway Stargatt & Taylor, LLP, notified me and AHM that the committee had approved the invoices I had submitted for August, October, and November, 2007, which totaled $70,137.42.

18. On December 18, 2007 Isabel Rodriguez, accounts payable at AHM, advised me that she had received the authorization to pay me and that I could expect to see a check in two weeks.

19. On December 26, 2007 I received a check in the amount of $61,888.58. I contacted Isabel to ask about the remaining funds due to me in the amount of $8,248.84. She advised me that those invoices were for accounts where the borrowers had paid off the loans or the loans had been sold or transferred. She advised me that since all loans showed a zero balance, the invoices would be paid from a separate account, and that I could expect a check within two weeks.

20. On January 15, 2008, I spoke with Isabel Rodriguez about two issues: (1) a check that she had voided and never sent to me (as explained below) and (2) the status of the remaining funds for the approved invoices. With regard to the remaining funds (about $8,100.00) owed to me on approved invoices, she said she could not send me this money because it was being "offset" against bills that I had received payments for in August and September that were "unauthorized" because the committee had not had the opportunity to review them. She said this was a problem only for those attorneys who had not submitted revised paid invoices to the committee for those months. She said that some attorneys for AHM had submitted revised invoices to the committee for all prior invoices, even those they had been paid for. The committee approved all of their invoices (including those already paid for), and therefore these attorneys had no "unauthorized" payments on record, and those attorneys were now getting paid on everything with no offset. She said AHM was discussing having my office and other attorneys re-submit revised invoices for August and September that we had already been

paid for so that we would not have any "unauthorized" payments on the book. She said that once that happened, I would get paid the balance of funds being withheld. As I previously stated, I had submitted unpaid invoices for the committee's review – no one instructed me to submit both paid and unpaid invoices.

21. During my conversation with Isabel Rodriquez on January 15, 2008, I also discussed a situation that had just come to my attention with respect to a check cut by AHM, but never delivered to my office. AHM cut check #329819 on or about November 2, 2007 to pay many of my invoices. Once a check has been cut, the fees and expenses are charged to each individual borrower's account. On or about November 2, 2007, Isabel Rodriguez advised me that she would have to void the check and could not send it to me because she had learned that the invoices had not yet been approved by the committee. On January 15, 2008, Isabel had sent me a request to refund money to AHM because it appeared of record that AHM had paid two invoices twice on one account. However, when I discussed this matter with Isabel she confirmed that after Check #329819 was voided, no one went back into the system and reversed the charges to the individual accounts. I requested that she have someone do this immediately so that no more allegations would be made that some of my invoices had been paid twice. She assured me that all of the charges outlined on Check #329819 would be reversed. She confirmed that I had not been paid twice.

22. As of March 5, 2008, I have 183 foreclosure files referred to my office by AHM. Of these, 51 are in Phase I, 95 are in Phase II, and 37 are in Phase III. I am attaching as <u>Exhibit B</u> lists of the files and the phases they are in, as well as the estimated money needed for that phase. My flat fee to AHM for legal services on each foreclosure

proceeding is $1,250.00, generally billed in three phases. Phase I is the initial work, including obtaining the title, sending demand letters, and filing the complaint with Land Court. The Phase I fee per file is $500.00. The average Phase I expenses per file are $600.00. Phase II is receiving the Orders to Foreclose from Land Court, and attending to the publishing, serving and recording of the Orders. The Phase II fee per file is $350.00. The average Phase II expenses per file are $500.00. Phase III is the scheduling of the auction sale, which includes title updates, three week legal advertising, auctioneer fees and advertising, and serving notices of the sale by certified mail. The Phase III fee per file is the balance of the flat fee, $400.00. The average Phase III expenses per file are $5,000.00.

23. Based upon the "phasing reports" at present: Phase I files will result in $22,500.00 in fees and an estimated $30,600.00 in expenses; Phase II files will result in $33,250.00 in fees and an estimated $47,500.00 in expenses; and Phase III files will result in $14,800.00 in fees and an estimated $185,206.00 in expenses.

24. Setting aside my fees, my out of pocket expenses for the 183 files in their current Phase is approximately $263,306.00. (Obviously, if all files go through the entire foreclosure process, these expenses will increase.) Currently, I have about $93,000 in fees and expenses that I have paid on AHM's behalf to prosecute the foreclosure files. I do not have the ability and wherewithal to advance monies on AHM's behalf, particularly where there is so much uncertainty about when and if I will get reimbursed.

25. I have been handling foreclosure matters for almost twenty years. I am experienced, knowledgeable, and enjoy an impeccable record and reputation. I take pride in my work. I consistently meet deadlines. I like the work, and I enjoy working with the

personnel at AHM and would very much like to continue to represent AHM in foreclosure matters. Since it filed its bankruptcy petition, AHM has sent me almost 145 new files. While I am willing to abide by a reasonable procedure for payment of my fees for representing AHM in foreclosure matters, I cannot advance filing fees, title search costs, recording charges, costs of publication of orders of notice and mortgagee's notices of sale, auctioneers fees and charges, and other foreclosure-related expenses on AHM's behalf. I am requesting that the arbitrary fee caps imposed on me be lifted and that AHM or the purchaser of AHM Servicing pay in advance (by way of a retainer or escrow account) for expenses I incur in prosecuting its foreclosure matters.

26. On February 11, 2008, I received an email from Isabel Rodriguez in accounts payable at AHM. She advised me that three of my approved December invoices were for service released loans and so she had forwarded the invoices to the new lenders, Regions Mortgage and Portfolio Services for payment by these companies. These unpaid invoices total $1,938.42. I have no relationship with either of these lenders/servicing companies, and do not know who to call at these companies. I also do not understand how they can be liable for my invoices since AHM retained me, not them.

27. On February 15, 2008, I received a hostile letter from someone at Regions Mortgage requesting additional information on one invoice they had received from AHM, and indicating to me that if they paid the invoice, it would be on their fee schedule (substantially less), not the schedule of AHM.

28. To date I have received none of the outstanding $10,187.26 from AHM, Regions Mortgage, Portfolio Services or any other lenders/servicing companies on any of the alleged "service released", transferred, sold, or paid off loans. I am aware that at least

one of these loans was paid off in full and that the payoff received by AHM last September 2007 included all of my outstanding invoices.

29. On March 4, 2008, I received an email from Isabel Rodriguez in accounts payable at AHM instructing me to contact Thomas Brolan with regard to the outstanding invoices on loans that were "service released, short sale, or third party sale". I have no idea who Thomas Brolan is, who he works for, or how to contact him.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 6, 2008.

_____
Sandra Kraege Higby

HD:Dell

{Client Files\ban\306637\0001\DOC\01080567.DOC;4}