UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .      Case No. 07-11047(CSS)
                          .
                          .
AMERICAN HOME MORTGAGE     .
HOLDINGS, INC.,           .      824 North Market Street
                          .      Wilmington, Delaware 19801
                          .
        Debtor.           .      March 13, 2008
. . . . . . . . . . . . ..      10:10 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:           Young Conaway Stargatt & Taylor LLP
                          By:  JOHN DORSEY, ESQ.
                               ROBERT BRADY, ESQ.
                               SEAN BEACH, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, DE  19899

For the U.S. Trustee:     United States Department of Justice
                          By:  JOSEPH McMAHON, AUSA
                          844 King Street
                          Suite 2207
                          Wilmington, DE  19801




Audio Operator:           Nikita Barksdale


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

**APPEARANCES (CONT'D):**

```
For WLR Recover          Greenberg Traurig, LLP
Fund:                    By:  Sandra Selzer, ESQ.
                         The Nemours Building
                         1007 North Orange Street
                         Suite 1200
                         Wilmington, DE  19801

For the Creditors'       Blank Rome LLP
Committee:               By:  BONNIE FATELL, ESQ.
                         Chase Manhattan Centre
                         1201 Market Street, Suite 800
                         Wilmington, DE  19801

                         Hahn & Hessen, LLP
                         By:  MARK T. POWER, ESQ.
                         488 Madison Avenue
                         New York, NY  10022

                         Hennigan, Bennett & Dorman
                         By:  JOSEPH BODNAR, ESQ.
                              MICHAEL MORRIS, ESQ.
                         245 Park Avenue, 39th Floor
                         New York, NY 10167

For Bank of America:     Potter Anderson & Corroon, LLP
                         By:  LAURIE SELBER SILVERSTEIN, ESQ.
                         Hercules Plaza
                         1313 North Market St.
                         Wilmington, DE  19801

                         Kaye Scholer, LLP
                         By:  SCOTT TALMADGE, ESQ.
                              MARGOT SCHONHOLTZ, ESQ.
                         425 Park Avenue
                         New York, NY  10022

For JP Morgan            Landis, Rath & Cobb
                         By:  MATTHEW MCGUIRE, ESQ.
                         919 Market Street, Suite 600
                         Wilmington, DE 19899
```

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**


For Lehman:                 Latham & Watkins LLP
                            By:  ROBERT ROSENBERG, ESQ.
                                 MICHAEL RIEL, ESQ.
                                 JASON SANJANA, ESQ.
                            885 Third Avenue
                            New York, NY 10022

                            Ashby & Geddes
                            By:  WILLIAM BOWDEN, ESQ.
                            500 Delaware Avenue
                            Wilmington, DE  19899

For American Home:          Quinn, Emanuel, Ruquhart, Oliver
                            and Hedges
                            By:  JAMES TECCE, ESQ.
                            51 Madison Avenue
                            22nd Floor
                            New York, NY 10010

4

**I N D E X**

|          |                            | PAGE | |
|----------|----------------------------|------|------|
| **EXHIBITS** |                        | **ID.** | **EVD.** |
| D-A      | Bank of America sealed bid | 74   | 76   |
| D-B      | JP Morgan sealed bid       | 88   | 88   |

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Please be seated.  Good morning.

2          MR. BRADY:  Good morning, Your Honor.  Robert Brady

3  on behalf of American Home Mortgage Holdings, Inc. et al.  Your

4  Honor, referring to the notice of amended agenda that was filed

5  yesterday, Matters 1 through 7 are all as addressed in the

6  agenda.

7          Turning to Matter 8 which is the hearing to consider

8  the sale of certain non-performing loans, Your Honor we called

9  chambers this morning and there are several loose ends that

10  we're working on both with the purchasers and the secured

11  parties in connection with that sale.  We ask for authority to

12  start that hearing at 11:30 so that we can keep people at their

13  phones and computers to try to wrap up those loose ends and

14  resolve any open issues.

15          So that request was granted so the hearing with

16  respect to the sale of non-performing loans will start I guess

17  at the later of 11:30 or when this hearing concludes.

18          Matter 9, Your Honor, was continued at the request of

19  the movant to March 27th.  Matter 10 is the preliminary hearing

20  on Bank of America's request for relief from stay.  I yield to

21  Bank of America and I am happy to report that pursuant to the

22  local rules we did meet and confer over the last two days and

23  we have reached agreement on a pre-trial and hearing schedule

24  between the parties.  But I'll yield to the Bank of America.

25          THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1            MR. BRADY:  On this motion.

2            THE COURT:  Thank you.

3            MS. SCHONHOLTZ:  Good morning, Judge.  Margot

4   Schonholtz, Kaye Scholer for Bank of America.

5            THE COURT:  Good morning.

6            MS. SCHONHOLTZ:  Good morning.  With the Court's

7   permission I would like to address a related matter prior to

8   moving to the status conference, very briefly.

9            THE COURT:  All right.

10            MS. SCHONHOLTZ:  As the Court will recall pursuant to

11   the cash collateral stipulation the creditor's committee had a

12   right to look at a discreet set of issues with respect to the

13   bank's liens and claims.  I am pleased to report that the banks

14   and the committee have reached a settlement with respect to

15   those issues.  And with respect to the committee's potential

16   objections to the bank's stay relief motion.

17            The stip will be noticed up.  We will ask the Court

18   to put it on for March 27th, but part of that settlement is

19   that the committee will support the bank's stay relief motion.

20   I am also pleased to report as Mr. Brady suggested that we have

21   resolved with the debtor the issues raised in our motion to

22   expedite discovery.  And the Court was kind enough to put it on

23   the agenda for this morning.  We have taken care of that.  We

24   are working backwards from what I understand is an April 16th

25   hearing date that your chambers has cleared and we've

1  agreed on a detailed discovery and briefing schedule that we

2  will reduce to a stip or put on the record today depending on

3  the Court's preference.

4          And I'd just like to note that the pre-trial briefs

5  will be exchanged midday on Friday, April 11th with a hearing

6  to commence the following Wednesday, April 16th.  We expect

7  that one full day will be enough.

8          THE COURT:  Do you have the time on the 16th?

9          MS. SCHONHOLTZ:  The time on the 16th.

10          THE COURT:  Did she give you the time?

11          MS. SCHONHOLTZ:  11:00 a.m. Mr. Brady tells me.

12          THE COURT:  When is your settlement, the 27th?

13          MS. SCHONHOLTZ:  We reached the settlement literally

14  last night and we're going to ask Your Honor to put it on for

15  the 27th which is the next omnibus hearing date.

16          THE COURT:  All right.  Great.  Do you have anything

17  for me to do?

18          MS. SCHONHOLTZ:  Only if you have any questions Your

19  Honor.

20          THE COURT:  I would just be making work for myself if

21  I asked the question.  So, no, I don't have any questions.

22          MS. SCHONHOLTZ:  Works for me Your Honor.  Thank you.

23          THE COURT:  Your welcome.

24          MR. BRADY:  Your Honor, we did learn this morning

25  that they were going to seek shortened notice on the

1  stipulation which resulted the first time last night.  I would

2  just ask that the Court provide the debtors a short period of

3  time to respond to the request for shortened notice.

4          THE COURT:  When I said okay I just meant I

5  understand.  I wasn't saying I was approving the shortened

6  notice.

7          MR. BRADY:  Thank you, Your Honor.

8          THE COURT:  All right, I think that -- hold on, Mr.

9  Dorsey has some questions.

10         MR. DORSEY:  Good morning, Your Honor.  John Dorsey

11 on behalf of the debtors.  One additional issue on the Bank of

12 America motion, Your Honor.  We would ask the Court and I've

13 conferred with Bank of America's counsel and they agreed to

14 institute a -- we anticipate there may be hopefully we will be

15 able to work them out, motions to compel.  Given the shortened

16 period of time that we have that perhaps the parties could

17 submit letter memoranda to the Court of no more than two or

18 three pages if there is a dispute and then have an expedited

19 hearing on that.

20         THE COURT:  That's fine, that's fine.

21         MR. DORSEY:  Thank you.

22         THE COURT:  We can do that by phone.  We don't need

23 to have any hearing on discovery in person unless people really

24 want it.

25         MR. BRADY:  Hopefully we'll work that out, Your

9

1 Honor.  But a phone should suffice and speed the process.

2 Thank you.

3          THE COURT:  That leaves us to the Lehman matter.

4          MR. BRADY:  Correct, Your Honor.

5          THE COURT:  Well let's take just a few minutes recess

6 so we can reshuffle the parties and we'll come back and hear

7 oral argument on the Lehman adversary proceeding.

8                          (Recess)

9          THE COURT:  Please be seated.  Mr. Bowden, good

10 morning.

11          MR. BOWDEN:  Good morning Your Honor.  Bill Bowden of

12 Ashby & Geddes for Lehman Commercial Paper and Lehman Brothers

13 Inc.  Your Honor, I want to introduce Your Honor to Mr.

14 Rosenberg from Latham & Watkins who is here to make the

15 argument in support of motion to dismiss.

16          THE COURT:  All right.  I think I remember Mr.

17 Rosenberg.

18          MR. ROSENBERG:  I think we've met before Your Honor.

19          THE COURT:  Yes.

20          MR. ROSENBERG:  Your Honor as you know this is a

21 motion by Lehman Brothers Inc. and Lehman Commercial Paper Inc.

22 to dismiss most, but not quite all, of the complaints filed

23 against Lehman by the debtor.  Your Honor, when you cut through

24 this complex and convoluted complaint which I hope our papers

25 did and our oral argument will highlight today, really come

1 down to a single legal issue and the factual issues that follow

2 from that legal issue.

3           That legal issue is what is the standard that will

4 apply to the post-petition liquidation of the securities by

5 Lehman Brothers?  Is it the agreement or is it the Article 9 of

6 the UCC?  And of course that is, I believe, the major issue

7 before this Court today because as I suggest I believe the

8 other issues can be relatively easily disposed of.

9           That of course leads to a factual question which is

10 whether or not Lehman properly complied with that standard and

11 that unfortunately, of course, is not an appropriate subject

12 for the 12(b)(6) motion and that is what this case would be

13 left with if Your Honor rules in accordance with our hopes.

14 That of course would probably then be the subject of a motion

15 for summary judgment at some future time.

16           The first issue I would like to address Your Honor to

17 clear the brush here is the Safe Harbors under the Bankruptcy

18 Code.  As Your Honor will recall one of the allegations in the

19 complaint is that the liquidation violated the automatic stay,

20 the post-petition liquidation.

21           Your Honor, I think that Section 555 pretty obviously

22 applies here and based upon your Calyon decision, the basis for

23 the application are all in place.  The only -- it is undisputed

24 that the MRA, the Master Repurchase Agreement, constitutes a

25 security contract.  So the only issue is whether we can

1 properly show at this stage that the relevant Lehman counter-

2 party is either a stockbroker or a financial participant.  And

3 I think it's quite clear, Your Honor, from the public record

4 that was attached and indeed the schedules filed in this Court

5 that the appropriate Lehman Brothers entity is both a

6 stockbroker and a financial participant.

7        THE COURT:  You are being very careful, I note, how

8 you use your terms.  Appropriate Lehman entity, what do you

9 mean by that?

10        MR. ROSENBERG:  I am indeed Your Honor.  And I'm

11 being careful because the complaint attempts to lump them

12 together and say that (a) we only presented evidence on one and

13 (b) they don't know which of the two plaintiffs -- which of the

14 two defendants is the appropriate party.  That, of course, Your

15 Honor, I think we thoroughly demolished in our reply brief.

16 The document itself makes it crystal clear that that

17 information is determined by the confirmation which is part of

18 the agreement by its own terms, by the terms of the agreement,

19 it establishes buyer and seller.

20        The plaintiff chose to attach the MRA but not the

21 confirmations which it of course had.  Those confirmations,

22 part of that document, are attached to my affidavit and show

23 definitively that the proper party for this purpose is Lehman

24 Brothers, Inc.  That of course is not a concession that LCPI

25 could not also meet the standard, but it is simply irrelevant.

1          The proper party as recognized on this motion to

2   dismiss is Lehman Brothers, Inc.  And again the case law in the

3   circuit is clear that this Court can look to public documents

4   and we attached the various SCC filings to show both that

5   Lehman is a registered broker dealer with customers, and

6   therefore a stockbroker, as well as meeting the legal standards

7   of a financial participant in terms of the outstanding amounts

8   of transactions within 15 months of the petition date which is

9   the relevant standard as set forth in the definitions not any

10  particular date thereafter.  So the document clearly

11  establishes that and indeed the financial number is met with

12  this debt pursuant to its own schedules.  So there just can't

13  be any serious doubt about that Your Honor.

14          I submit -- that by the way, disposes, just so Your

15  Honor can keep track, of the declaratory judgment Counts A and

16  C and would render B moot.  But now let me address B because if

17  559 applies and it doesn't have to because one or the other is

18  sufficient, that would render -- that would take care of A and

19  B and render C moot.

20          559 is only slightly more difficult, Your Honor,

21  because it's a matter of first impression.  The issue there

22  would be whether or not the definition of repurchase agreement

23  which includes interest and mortgage loans would cover our

24  repurchase situation.  Again, Your Honor need not reach that

25  question if Your Honor finds that 555 applies.  But it is as a

1 matter of first impression.

2        The only way that Your Honor could find that these

3 are not interest and mortgage securities is to buy the debtor's

4 argument that this is simply surplusage language to be read out

5 of the statute and given no meaning.

6        THE COURT:  I think you just had a slip there.  You

7 said interest and mortgage securities.

8        MR. ROSENBERG:  I'm sorry, Your Honor.  I did indeed.

9 Thank you for catching it.  I meant interest and mortgage

10 loans.  The statute covers mortgage back securities which these

11 clearly are not because of the way that is defined.  It also

12 covers mortgage loans which these are not.  They are securities

13 secured by mortgage loans.

14        But the statute also covers interests in mortgage

15 loans.  Your Honor, if you are going to give independent

16 meaning to the or and the interest in mortgage loans then it

17 must mean something.  And it must mean something different from

18 the other two.  I suggest Your Honor that this is the kind of

19 situation that would squarely fit within that language if Your

20 Honor is not going to leave it out of the statute.  But again,

21 you don't have to reach that question if you find that 555

22 applies.

23        That brings us to what is probably the most peculiar

24 argument that the debtors make.  And that is that

25 notwithstanding the clear language of the MRA, notwithstanding

1 I assume this Court's decision in <u>Calyon</u> that the savings

2 language which says if it's not a purchase and sale then it is

3 deemed to be a security interest, takes priority over the

4 purchase and sale language.

5        Your Honor, there isn't a scintilla of support for

6 that proposition.  It is simply wrong.  What the debtor is

7 asking for here is to overturn the expectations of a $7

8 trillion market to overturn all the New York contract law that

9 intent prevails.  And to ignore the commentary to the 2001 UCC

10 that says very specifically this is a change of language not a

11 change of the law to conclude that parties' expectations should

12 be defeated by a savings clause when the intent of the savings

13 clause is exactly what it says, to save the situation if there

14 is otherwise a problem.

15        First, the argument that the 2001 UCC radically and

16 completely changed the law to make intent irrelevant.  Because

17 the intent of the parties is crystal clear.  The language of

18 the document is crystal clear.  You have to literally go with

19 an argument here that says forget all of that, anything that

20 uses the words security interest in any context however

21 contingently, however much on a savings basis puts you under

22 Article 9.

23        Your Honor, again there isn't a scintilla of evidence

24 to suggest that is correct.   A similar argument was

25 specifically rejected in the <u>WorldCom </u>decision up in New York.

1  The official comments specifically reject it.  The official

2  comment too to revise 9109(a)(1) says the former subsections

3  have been combined and shortened.  No change of meaning is

4  intended.  What was intended here as is clear from the

5  commentary, Your Honor, is to actually enforce what is really

6  going on by saying that you can look beyond the party's intent

7  to other factors.  There isn't a scintilla of evidence to

8  suggest as the plaintiff's argue that the intent was to make

9  intent totally irrelevant.  I suggest to Your Honor that it is

10 clever, it's creative, it's dead wrong.

11          Second -- a second argument is made with respect to

12 the security interest issue in an effort to apply the Article 9

13 commercial reasonable standards which is equally wrong.

14 Plaintiff says, okay, if it's not a security interest,

15 nonetheless sales of promissory notes and payment and tangibles

16 are covered by Article 9.  Therefore the Article 9 default

17 provisions apply.  This, Your Honor, is a completely false

18 syllogism.

19          First of all, it is clear from the definition and the

20 case law, New York Court of Appeals definitive case law, the

21 Highland Capital case, that these securities in question are

22 not promissory notes or payment intangibles because those

23 definitions exclude investment property which includes

24 securities and the Highland Capital decision will tell us

25 pretty clearly that what we're dealing with here are securities

1  as defined in Article 8.  Therefore Article 8, not Article 9

2  applies.  And Article 8 has no similar provisions.

3          Even if that's wrong, however, even if this Court

4  found that, no, they are promissory notes or payment

5  intangibles and therefore Article 9 applies to the sale, that

6  still doesn't get them where they want to go, Your Honor.

7  Because the UCC is crystal clear that this is a convention with

8  respect to the filing requirements with respect to sales, and

9  the default provisions of Article 9 do not apply because it is

10  a sale.

11          It is a sale that has to be reported under Article 9

12  but the seller does not retain any interest that could be

13  foreclosed, if you will, under the default provisions of

14  Article 9.  So even if Your Honor accepted everything to that

15  point they are still wrong in terms of the application of the

16  Article 9 commercially reasonable provisions.

17          To the extent that one or the other of the Safe

18  Harbor Provisions apply, Count 1 the breach of contract point

19  is simply mooted and needs to be dismissed.  If Your Honor

20  reads the allegations in that provision it is crystal clear

21  that notwithstanding allegations of wrongful margin calls pre-

22  petition, the only damage alleged is a breach --damages from

23  breach of contract in terms of either (1) violating the

24  automatic stay or (2) the unreasonable disposition of the

25  securities.

1        If there was a Safe Harbor, there was no violation of

2    the automatic stay.  The event of default that was asserted

3    post-petition --

4        THE COURT:  Well, if there was a breach two weeks

5    pre-petition as alleged, not two weeks whatever it is, if there

6    is a breach of pre-petition and even if I buy the second

7    argument which is once they filed there was -- the Safe Harbor

8    applies and once they filed it was a default and you were free

9    to do whatever you wanted to do, there still could have been

10   damages that arose from the intervening period.

11       MR. ROSENBERG:  There could have been Your Honor

12   theoretically, but none were alleged.

13       THE COURT:  Well they do but the complaint alleges

14   that the damages are not less than $84,125,000.  It's not with

15   any specificity but there is a general allegation of damages.

16       MR. ROSENBERG:  Your Honor, I think you have to look

17   behind that and say what independent damages could there

18   possibly be from a margin call that was -- the first margin

19   call that was made thereby reducing the amount of the debt.  Or

20   the second margin call that wasn't made.

21       THE COURT:  Well I'm not sure I can look behind it in

22   the context of a motion to dismiss.  I mean I agree with you

23   that ultimately the Court is going to have to look very

24   carefully at that.  But can I do that on a motion to dismiss?

25       MR. ROSENBERG:  I don't think you have to accept the

1  face value Your Honor, even on a motion to dismiss a naked

2  unsupported statement that can't be possibly true as a matter

3  of law logic.

4          That leaves, Your Honor, Counts 2, 3 and 4, turnover,

5  conversion, unjust enrichment.  And they are all meritless as a

6  matter of law even again if the claim for wrongful liquidation

7  remains.  There is no allegation in any of those sections that

8  there is any independent obligation outside of the contract.

9          Turnover doesn't work because under bankruptcy

10 principles of turnover, if the right to the property is

11 disputed or if it is just a claim for money it's not a

12 turnover.  We are still dealing with a breach of contract claim

13 and by the way, it's very interesting that they want a turnover

14 of property, but have not tendered payment of the debt that

15 they acknowledge they owe or would owe if they got the property

16 back, 61 million plus dollars.  Nowhere do they say you give us

17 the property, we'll pay the debt.  But again it's in dispute

18 and is not a proper turnover situation.

19         Conversion, again conversion has to be based upon an

20 independent legal duty outside of a contract itself based upon

21 New York law and if there was a Safe Harbor and if the contract

22 therefore that the securities were properly liquidated, they

23 clearly could not have been converted.  Contractual rights were

24 being exercised.

25         THE COURT:  I want to back up.  Sorry, if we could

1  back up to the turnover issue.

2          MR. ROSENBERG:  Yes.

3          THE COURT:  What about the argument that assuming

4  this 555 Safe Harbor applies, they are entitled to the stub,if

5  you will.  To the extent that any funds received from the

6  liquidation over the stated repurchase price and expenses the

7  debtors are entitled to.  Does the turnover action survive at

8  least in connection with that possible claim?

9          MR. ROSENBERG:  I think that's a moot question,Your

10 Honor.  Because even the debtor doesn't claim that there were

11 excess proceeds.  The debtor may argue that there should have

12 been because of wrongful liquidation procedures but that is a

13 breach of contract claim.

14         THE COURT:  Okay.  And if 559 applies there is no

15 requirement to pay the stub back?

16         MR. ROSENBERG:  Correct.  But in fact Your Honor

17 that's not before you at the moment.  There is no stub here.

18 And if --

19         THE COURT:  I'm not surprised.

20         MR. ROSENBERG:  Yes, exactly.  And in the no good

21 deed goes unpunished category, Lehman is being criticized in

22 this complaint for saying since there is literally no market

23 for this stuff that even approaches the amount of the debt,

24 let's take it in at the amount of the debt and waive an

25 unsecured claim.  That's what happened here and we're being

1  sued for that.  But that's the factual development that comes

2  later.

3          THE COURT:  All right.  I'm sorry.  I interrupted

4  you.  You were on conversion.

5          MR. ROSENBERG:  Yes, Your Honor.  Again, it's the

6  same point.  There was no automatic stay.  We clearly didn't

7  convert the securities by liquidating them.  The most that can

8  be argued is that we didn't do it properly and damages arise

9  under the contract.

10          Similarly unjust enrichment, unjust enrichment in New

11 York is a quasi contract remedy for a situation where the

12 contract doesn't apply.  You come back to the same point, there

13 is a contract here, it does apply.  They can argue we breached

14 that contract in the way we liquidated, but there is no

15 independent action called unjust enrichment when there is a

16 contract.

17          Of course, then the logical Lehman point, how could

18 we be unjustly enriched if they want the securities back they

19 haven't offered to pay off the loan.  So it's more than a bit

20 peculiar.

21          So again, Your Honor, I think that covers the

22 highlights of our position.  What we are left with at the end

23 of the day is the argument either that the contract was

24 breached in the manner of the liquidation.  That clearly is not

25 an issue for dismissal, or alternatively, and maybe it's not

1  alternatively, the complaint isn't clear that Section 562

2  should apply to the measure of damages.  Okay, we're not

3  arguing otherwise one way or the other in the context of this

4  motion to dismiss.  That argument would survive.

5          But at the end of the day Your Honor, that is what is

6  left in this case.  This was a Safe Harbor liquidation and what

7  is properly before this Court as a legitimate litigation is

8  whether or not Lehman properly liquidated these securities

9  under the terms of the MRA.

10         Does Your Honor have any questions?

11         THE COURT:  No, thank you Mr. Rosenberg.  Thank you

12 very much.  Mr. Tecce.

13         MR. TECCE:  Good morning, Your Honor.  James Tecce of

14 Quinn Emanuel Urquhart Oliver & Hedges on behalf of American

15 Home Mortgage Investment Corp., a plaintiff in this adversary

16 proceeding.

17         Your Honor, to set the stage, I'd like to briefly

18 mention some of the facts, salient facts, at least, that are

19 alleged in the complaint which I think Rule 12(b) in the

20 applicable case law dictate are accepted as true, at least for

21 purposes of Lehman's motion.

22         The genesis of the dispute, Your Honor, is in a

23 warehouse securitization program that was designed by Lehman

24 and used by American Home to fund a portion of their mortgage

25 origination through two special purpose entities; Broad Hollow

1  Funding and Millville Funding.  Under the structure of Broad

2  Hollow and Millville would acquire mortgage loans from two

3  American Home entities, specifically American Home Mortgage

4  acceptance and American Home Mortgage Corp. and Broad Hollow

5  would finance those acquisitions by issuing commercial paper.

6         In this instance it was two types of commercial

7  paper, highly rated commercial paper and lower rated

8  subordinated notes.  Those lower rated subordinated notes are

9  the notes that are at issue in this particular litigation.  And

10  I'll refer to them this morning, Your Honor, as the Broad

11  Hollow notes, but they are lower rated.  Standard and Poors

12  rated the Broad Hollow notes at BBB and Moody has rated them at

13  BAA2 which will become relevant in a second.  So just to be

14  clear the relationship here Your Honor is that Broad Hollow

15  would acquire mortgage loans.  Broad Hollow would finance that

16  acquisition by issuing the commercial paper.

17         American Home Investment Corp. is a real estate

18  investment trust.  And it invested in the notes that were

19  issued by Broad Hollow.  It bought them for its own account and

20  it financed that acquisition under this particular repurchase

21  agreement with Lehman.  There is one other agreement in this

22  matrix that, and I don't want to complicate it too much but

23  it's relevant, and that's the swap agreements that were entered

24  into by Broad Hollow and Bank of America.  They're under the

25  subject of another litigation and I'm not going to get into

1   that litigation but suffice it to say that we do allege under

2   those swap agreements that money should be coming back to Broad

3   Hollow as a consequence of the sale of those loans and interest

4   rate fluctuations.

5           So the point being that money will -- assuming that

6   we prevail in that litigation, that money --

7           THE COURT:  That litigation has a motion to dismiss

8   pending as well.

9           MR. TECCE:  That's correct, Your Honor.  It does.

10          THE COURT:  That is a subject matter of jurisdiction.

11          MR. TECCE:  It is.  The allegation is that the

12  bankruptcy court does not have jurisdiction to hear the motion.

13  But assuming we prevail in that litigation and I understand

14  that I'm not asking Your Honor to make any decision with

15  respect to that, but money will come back to Broad Hollow and

16  that will increase the value of these notes.  And that's a very

17  important factor because we allege that the notes are money

18  good and that they are valuable notes.

19          And every dollar that comes back will go to repay

20  these notes because the senior secured notes, the higher rated

21  notes will be taken out from the proceeds of the sale.  So that

22  money coming back from Bank of America, it's our position and

23  any other funds that Broad Hollow has, will go to repay these

24  notes.

25          So getting back to the facts, Your Honor, Lehman

1 financed the purchase --

2          THE COURT:  Bank of America doesn't need to get

3 nervous, okay.  This is just facts.

4          MS. SILVERSTEIN:  Thank you, Your Honor.

5          MR. TECCE:  I want to -- I saw Bank of America's --

6          THE COURT:  I could tell they were murmuring over

7 there getting all nervous.  Yes, I could see that.

8          MR. TECCE:  I saw them in court this morning, Your

9 Honor, and I wanted to be very clear that I wasn't try to seek

10 any kind of determination.

11          But American Home Mortgage Investment Corp. invested

12 in the Broad Hollow notes and used funds acquired under this

13 master repurchase agreement, or MRA as I will refer to it this

14 morning.  And there are two provisions in that agreement.  By

15 the way, the agreement is executed by both Lehman Commercial

16 Paper Inc. and Lehman Brothers, Inc.  They are both parties to

17 that agreement.

18          That again is a fact that I will get to later that is

19 extremely relevant.  It is co-signed by both parties but there

20 are two provisions of the master repurchase agreement which we

21 would submit are especially relevant for purposes of this

22 morning's argument.  The first is the market value definition

23 which is Section 2J.  And what market value is, the price of

24 such securities on such a date obtained from a generally

25 recognized source, agreed to by the parties or the most recent

1 closing bid quotation.  And market value is important because

2 it's the basis upon which margin calls are made under the

3 repurchase agreement.  And if the market value falls below a

4 level, then Lehman margins and American Home Mortgage

5 Investment and hence those margin calls as you can see from the

6 complaint are how ultimately a default was declared because of

7 the failure to meet those margin calls.

8        The second provision which we think is relevant is

9 the event of default section, Your Honor, and that is found at

10 Section 11 of the master repurchase agreement.  And what it

11 says and I'm reading 11(d)(1) which is on Page 8 of the master

12 repurchase agreement is that as to transactions in which the

13 defaulting party is acting as the seller, which would be us in

14 this case, we are acting as the seller.

15        THE COURT:  The seller of the notes.

16        MR. TECCE:  That's correct, Your Honor.  The

17 purchaser can immediately sell, "in a recognized market or

18 otherwise in a commercially reasonable manner."  We think that

19 language is very important again for purposes of the

20 application of Article 9 which I will get to in a second.

21        But just very quickly Your Honor, the margin call,

22 the sequence of events relating to the margin calls that led to

23 the defaults from our perspective that as of July 13, 2007 the

24 market value ascribed to the Broad Hollow notes was 97 percent

25 of their face value.  Face value being 100 percent, 97 percent

1  of that was ascribed as the market value.

2          As alleged in the complaint, Your Honor, a series of

3  capricious, what we would view as capricious unjustified margin

4  calls followed after July 13th.  The first I think on July 13th

5  -- or strike that, I'm sorry.  On July 17th Lehman took the

6  position that the market value had fallen, July 17th now from

7  97 percent to 91 percent.  And American Home Mortgage

8  Investment advised Lehman that they didn't agree with that.

9          So it was reset back at 97 percent.  But then on the

10  23rd of July, just a few days later, Lehman returned and said

11  that the market value had fallen to 91 percent and margined us

12  for $3.7 million which we paid.  But then only three days later

13  Lehman returned again and said the market value has now fallen

14  to 80 percent of the face value.  So you are going from 97 on

15  July 13 to 91 on July 23 to 80 percent now, on July 26 and they

16  margined us for $6.9 million.

17          And as alleged in the complaint an allegation Your

18  Honor that Lehman was taking advantage of the liquidity problem

19  facing the debtors at that point in time and manipulated the

20  market values for the purpose of foreclosing on the notes.  So

21  those are the complaints that are -- those are the facts that

22  are alleged with respect to leading up to the default rather.

23  So on July 26th the estate -- or American Home Mortgage

24  Investment Corp. did not make that second margin call and

25  Lehman declared a default.

1          On August 1, Your Honor, four days before the

2 bankruptcy or five days before the bankruptcy they issued a

3 notice declaring us to be in default for the failure to make

4 that margin call.  And, Your Honor, the -- I think a lot of

5 time was dedicated to the recharacterization argument.  I'd

6 like to take that second -- or I'm sorry to the Safe Harbor

7 argument.  I'd like to take that second.

8          I'd like to be heard clear.  This is not a

9 recharacterization case.  We're well aware of the Court's

10 Calyon decision.  We are not trying to recharacterize this

11 repurchase agreement.  But I'll speak to that argument second.

12 But on the basis of those facts the complaint alleges breaches

13 of the express terms of the MRA to the extent that the

14 liquidation of the notes did not comply with the commercially

15 reasonable language that's found in the text of the MRA that it

16 breached modicums of good faith, fair dealing and commercial

17 reasonableness.

18          And you know, some of the background facts on that

19 that Lehman structured -- was the architect of the structure.

20 They had an intimate understanding of the value of those notes.

21 They had an obligation to act in good faith in setting the

22 market values and they didn't satisfy those obligations.

23          But getting, Your Honor, to what we think is the most

24 important argument and that is the application of Article 9

25 because Article 9 applies and I don't believe Lehman disputes

1 this fact, Article 9 applies irrespective of whether this

2 agreement is Safe Harbored or not, if Article 9 does indeed

3 apply and we submit that it does.

4        We submit that it does Your Honor for three reasons.

5 One --

6        THE COURT:  Your point is --

7        MR. TECCE:  My point is --

8        THE COURT:  -- the application of Article 9 is not

9 related to the existence or non-existence of the Safe Harbor.

10        MR. TECCE:  That's correct, Your Honor.

11        THE COURT:  Because I don't think they agree that

12 Article 9 applies.

13        MR. TECCE:  No, I know that they don't agree that

14 Article 9 applies.  But irrespective of whether this is a

15 securities contract, not a securities contract --

16        THE COURT:  It's an independent issue of the

17 repurchase agreement, right?

18        MR. TECCE:  That's correct, your Honor.  It's also I

19 think the more important issue in this case and the one that

20 requires the most discretion at least from our perspective, so

21 I'd like to start with it first.

22        But generally, Your Honor, and I'll get into each one

23 of these in detail, the specific language in the MRA suggests

24 that Article 9 applies.  While it does not say that Article 9

25 applies the use of the commercial reasonableness standard in

1  liquidation suggests that it does apply.

2          Number two, Your Honor, Article 9, as I'll get into,

3  applies to any transaction that involves the creation of a

4  security interest.  And number three, Your Honor, I think that

5  we have very strong responses to Lehman's two arguments with

6  respect to, (1) the statements of intent in the MRA, and (2)

7  the claim that these notes are an investment property.  But we

8  have strong responses to those.  But before getting into

9  specifics I just want to be clear about two points, Your Honor.

10         What Article 9 entails, what its application entails

11 to the repurchase agreement and specifically there are features

12 of Article 9 that the estates would argue govern this contract.

13 Article 9 imposes standards of good faith and fair dealing and

14 commercial reasonableness in the performance of the contract.

15 It's not just the liquidation of the contract, Your Honor.

16 That's Section 1-203.  Every contract or duty within this act,

17 it's not just Article 9.  One, two or three would apply to

18 Article 8 and Article 9, imposes an obligation of good faith in

19 its performance or its enforcement.

20         Then Article 9 itself proceeds to define good faith

21 as honesty in fact and the observance of reasonable commercial

22 standards of fair dealing.  And it's not just Article 9 that

23 imposes that requirement with respect to the contract.  Mere

24 common law recognizes and imposes the very same standards, an

25 implied covenant of good faith and fair dealing in all

1 contracts.  The UCC provides an additional source of authority

2 on this.

3        For post default conduct Article 9 delineates the

4 method and manner of foreclosing against the collateral.

5 Sections such as 9-610 there are cases interpreting those

6 sections that would provide valuable guidance with respect to

7 what conduct parties should undertake with respect to these

8 types of agreements.

9        But moving on as to why we think Article 9 applies

10 first, and I've mentioned this a number of times, the agreement

11 itself, the use of the phrase commercial reasonableness for

12 purposes of event of a default agreed that the contract does

13 not specifically say Article 9 applies but the use of that

14 phrase we think goes a long way to showing that Article 9

15 should apply, or at least the parties contemplated in Article 9

16 should apply.

17        That would be the very standard that governs the

18 liquidation of collateral under Article 9 in any event,

19 commercial reasonableness as dictated by 9-610.  So the use of

20 language that is in Article 9 in the contract we would suggest

21 that it at least was expected that the parties would be

22 governed by those standards.

23        But in terms of the actual text of Article 9 and what

24 brings this agreement within Article 9, 9109(a)(1) Your Honor

25 says that Article 9 applies to a transaction regardless of its

1  form that creates a security interest.  And the official

2  comment clarifies on that.  When a security interest is created

3  this article applies regardless of the form of the transaction

4  or the name the parties give to it.

5          So irrespective of the fact that the parties call the

6  transaction a repurchase agreement, the repurchase agreement

7  itself does provide for the creation of a security interest.

8  It's a contingent security interest, yes.  It's a springing

9  security interest, yes.  It doesn't apply unless -- it does not

10  apply --

11          THE COURT:  What governs the liquidation of leased

12  property under Article 2(a)?  In other words, you have a lease,

13  okay, and it's breached and you return the property to the

14  lessor and the lessor liquidates it.  What governs it, Article

15  9 or Article 2(a)?  I've never seen a lease that didn't include

16  savings language that said if it's not a true lease, it's a

17  secured financing.  And I've represented a lot of lessors and I

18  can tell you that they weren't thinking Article 9 when they got

19  their stuff back and they liquidated it.  But under your

20  argument, Article 9 would be applied.

21          MR. TECCE:  To Article 2(a)?

22          THE COURT:  Yes.

23          MR. TECCE:  To a lease.

24          THE COURT:  Because it's -- there is a springing

25  security interest in the alternative in the event it's not a

1  lease transaction.

2       MR. TECCE:  Your Honor, I must confess, I don't know

3  the question with respect to leases, but I do know that there

4  is a series of cases that have applied Article 9 in

5  transactions that one would not consider to fall within the

6  ambit.  The cases that we cited, the Credit General case

7  applied Article 9 to an insurance agreement which I think

8  nobody ever contemplated that insurance agreement would be

9  covered by Article 9 but it said Article 9 applies because --

10  yes, Article 9 does not apply -- what the case said is, yes,

11  Article 9 does not apply to an insurance agreement.

12       But this particular insurance policy involves the

13  creation of a security interest and pays claims based on the

14  value that's left after you foreclose on an automobile,

15  therefore Article 9 applies to that.  And another circumstance,

16  perhaps the Crass (phonetic) analogy, Your Honor, which is not

17  cited in our papers but which we discovered in preparing for

18  argument is a pawnbroker.

19       There is a case In Re Schwab 347 B.R. 726 and when

20  you read the description of that particular arrangement which

21  is that goods are left with the pawnbroker, the pawnbroker

22  extends the loan and the -- and in the parlance and in the

23  practice of pawnbroking if the money is not returned then there

24  is an automatic or I believe the phrase an agreed strict

25  foreclosure at that point in time.  The Court found that

1 Article 9 applied to that even though that is a springing

2 security interest because Article 9 is to be broadly

3 interpreted and Article 9 applies to the creation of a security

4 interest.

5        So, it doesn't always apply in situations where like

6 the insurance context that I mentioned but if there is the

7 creation of a security interest then we would submit that

8 Article 9 does apply.

9        THE COURT:  Okay.

10       MR. TECCE:  The second argument Your Honor going to

11 Lehman's argument that our position represents a complete

12 misunderstanding of the law and is not consistent.  Actually

13 our conversations with repo participants suggests that Lehman's

14 position is actually in the minority on this point as to

15 whether Article 9 applies.

16       But going to the first counter argument from Lehman

17 which is that Article 9 does not apply to purchases and sales

18 which is what the repurchase agreement was.  Well it does apply

19 to purchases and sales, Your Honor.  In Section 9-109(a)(3)

20 applies to the purchase or sale of promissory notes and payment

21 intangibles.

22       Now I understand that Lehman has an argument as to

23 why the Broad Hollow note is not a promissory note.  But -- and

24 I'll address that in a second.  But it does cover purchases and

25 sales.  In that case promissory notes.  And secondly, Your

1 Honor, even if there are purchases and sales under the

2 repurchase agreement again, we fall back to Article 9 applying

3 to transactions that provide for the creation of a security

4 interest.

5      But I think the thrust of -- or one of Lehman's

6 larger arguments as to why Article 9 does not apply is that the

7 notes are instruments and therefore they are investment

8 property and they are securities and they are not promissory

9 notes and therefore Article 8 applies and Article 9 does not

10 apply.

11      Just to walk you through their argument, Your Honor,

12 is that because a promissory note is defined as an instrument

13 and an instrument includes -- an instrument expressly excludes

14 investment property and investment property is a security.  And

15 since these are securities, they therefore are not instruments

16 and therefore are not promissory notes.

17      If they are not promissory notes, it is hard for us

18 to actually figure out what they really are.  A promissory note

19 is an instrument that evidence a promise to pay a monetary

20 obligation.  It does not evidence an order to pay and does not

21 contain an acknowledgment by a bank but the bank has received

22 for deposit a sum of money or funds.

23      The notes are -- do evidence a promise to pay a

24 monetary obligation.  So if they are not a promissory note,

25 it's not really clear to us.  The same with payment intangible

1  which is a general intangible under which the account debtor's

2  principle obligation is a monetary obligation.  Well that would

3  be the Broad Hollow notes.

4          So if they are not payment intangibles and promissory

5  notes, it's not really clear to us what they are.  But if they

6  are, they are covered expressly by Article 9, by Article

7  9-109(a)(3) which applies to the purchase and sales of

8  promissory notes.  But getting to the argument, Your Honor,

9  that these are securities and they are therefore governed by

10 Article 8 that actually fails for a number of reasons.

11         First, Your Honor, even if they are investment

12 property and they are securities and they are governed by

13 Article 8, Article 8 has its own standards of commercial

14 reasonableness, Your Honor.

15         Number two, Article 9's provisions still apply.

16 Certain provisions of Article 9 still apply even if the

17 underlying race is investment security or investment property

18 or security.  There are four cases Your Honor and I apologize

19 they are not in our papers because this argument about

20 investment property was raised in Lehman's reply and we did not

21 have an opportunity to respond to it.

22         But there are four cases that have a -- that I would

23 cite in favor of this proposition that Article 9 applies even

24 if you are dealing with an investment property that is governed

25 by Article 8.  The first Your Honor is In Re Keane Corp 188

1 B.R. 881.  In that course I'm citing from Page 889 of the

2 decision.  "Article 8 of the Uniform Commercial Code governs

3 the creation, perfection and attachment of security interests

4 in investment securities."

5        In general the Article 8 security interest is subject

6 of the provisions of Article 9 with two important exceptions.

7 First, the secured party need not perfect its interest through

8 filing.  Second a written security agreement signed by the

9 debtor is necessary.  So there are provisions in Article 8.

10 For example, provisions like --

11        THE COURT:  No.  That -- let me just interrupt you

12 for a moment.  That just -- I don't know that case at all but I

13 know the numbers, so 188 B.R., that's an older case right.  So

14 that's pre -- does it matter that it's a pre-changes to Article

15 9?

16        MR. TECCE:  No, I think the change in Article 9 and

17 I'll speak to that in a second actually militates in favor of

18 Article 9 applying here.

19        THE COURT:  All right.

20        MR. TECCE:  The change to Article 9 with respect to

21 the elimination of the intent language from the language in

22 Article 9 that defines the scope of Article 9 is actually

23 better for us.  And I'll explain to that in a second.  That

24 change should not -- the fact that this is a pre-amendment

25 decision should not change that.

1          Your Honor, the other case In Re Domestic Fuel Corp

2 71 B.R. 734, same finding, Your Honor.  Although Article 8 of

3 the New York UCC applies to investment securities for purposes

4 of determining issues involving negotiation and transfer

5 including the creation of security interest and investment

6 securities reference must be made to the agreement itself and

7 to Article 9 of the UCC in order to ascertain a secured party's

8 rights in event of a default under the security agreement.

9          Two other cases, Your Honor, that are not in our

10 brief and I won't tax the Court's time.  Third Circuit case

11 Solfanelli v. Corestates 203 F.3d 197, Your Honor, applied

12 Article 9, specifically then Section 9-504 to the disposition

13 of investment property to the disposition of securities and

14 whether or not the party had complied with the commercial

15 reasonableness standards was determined in that case.  It was

16 actually determined it did not.

17          And one other case, Your Honor, FDIC v. Caliendo 802

18 F. Supp. 575, a district court case from New Hampshire also

19 applied Article 9, commercial reasonableness standards to the

20 disposition of investment property or securities.  So the point

21 again, Your Honor, being that even if Article 8 does apply,

22 Article 9 governs the disposition requirements.

23          And Article 8 itself, Your Honor, has the very same

24 identical if you will commercial reasonableness standard

25 provisions that are found in Article 9.  And by that, Your

1  Honor, first just going back to 1203 which imposes the duty of

2  good faith, that applies to any article under the Uniform

3  Commercial Code.

4          But Article 8 has its own definition of good faith

5  which is the same definition or almost the same definition as

6  that found in Article 9 which is 8-10210 good faith for

7  purposes of the obligations of good faith in the performance or

8  enforcement of contracts or duties within this article means

9  honesty in fact and the observance of reasonable commercial

10 standards of fair dealings.

11         Lastly, Your Honor, if there is any question as to

12 whether or not Article 9 would apply to securities and

13 investment property that are governed by Article 8, Article 9

14 contains provisions that specifically address investment

15 property, 9-106 control of investment property, 9-305 law

16 governing perfection and priority of security interest in

17 investment property.

18         There is no authority for the proposition that

19 Article 8 and Article 9 are mutually exclusive.  Securities

20 that fall within Article 8 can fall within Article 9.  You

21 know, again, Article 9 applies to the creation of security

22 interest in personal property and if you look at the definition

23 of general intangible it means any personal property other than

24 investment property and I would suggest that you can read that

25 definition to stand for the proposition that investment

1  property is a form of personal property.

2          Going -- moreover, Your Honor, or the second point I

3  think here is that the Broad Hollow notes would not fall as

4  squarely within the definition of securities as Lehman suggests

5  because one of the requirements is that the notes are traded on

6  exchange, traded on an exchange or other type trade on

7  exchange.

8          The Highland case which is I think at the centerpiece

9  of the argument in the Lehman papers, first of all the issue in

10 that case was whether or not an oral agreement to sell the

11 notes was enforceable.  And it's an issue because under Article

12 8 such an agreement need not be in writing.  That is the case

13 -- that was the issue in that case and the circuit court, the

14 Second Circuit Court of Appeals certified the question of

15 whether these promissory notes, the promissory notes in that

16 particular case were subject to or were investment property for

17 purposes of Article 8.

18          And it does, I don't dispute that Highland does set

19 the standard of the framework for determining whether or not a

20 promissory note falls -- it is investment property.  But one of

21 the requirements of showing that it is investment property is

22 that it is traded on an exchange.  These, Your Honor, are

23 private label notes.  They were issued by Broad Hollow.  These

24 are not government backed uniform Fannie Mae, Ginny Mae type

25 securities.

1        There may be an argument there is an exchange for

2   those notes, but there is no exchange for these notes.  Given

3   the distinctions between these types of notes and other notes

4   for which there is an exchange.  We submit that they are not

5   other type that is traded on any recognized exchange.  And the

6   fact of the matter is that on August 27th when Lehman advised

7   the debtors that they had tried to sell the notes and they got

8   one bid for them, if there is an exchange we're curious as to

9   what exchange yielded one bid.

10       So there's not an exchange for this note and I guess

11  the last point I would make on this before moving on, Your

12  Honor, is that we think this determination is a question of law

13  as to whether or not Article 9 applies.  The <u>Highland</u> case

14  examined a fully developed record in determining that the notes

15  fell within the investment property definition.

16       It examined the way that investment professionals

17  treated the notes.  It examined the market perception of the

18  notes in that particular instance.  Investment professionals

19  considered them junk bonds.  It looked at evidence.  It looked

20  at a record.  There's no record in this case.  So while we

21  think this is an issue of law that can be decided now, to the

22  extent that you are persuaded by <u>Highland</u>, the adoption of

23  <u>Highland</u> is premature because there's been no discovery.  We

24  are still at the 12(b)(6) phase.

25       The second defense or second counter argument raised

1  by Lehman is that Article 9 provides that when there is a sale,

2  there is a termination or a cutoff of the obligation to comply

3  with Article 9.  They're referring to 9-318(a) and I think

4  9-601(g) of the Article 9.  What 9-318(a) says is that a debtor

5  that has sold an account, chattel paper, payment intangible or

6  promissory note does not retain a legal title or equitable

7  interest in the collateral that is sold.

8          Then they go on to 902 which says that in that

9  instance there are no duties imposed on a secured party after

10 the sale.  It says a consignor or buyer of certain rights to

11 payment except as otherwise provided in 9-607(c) this part

12 imposes no duties upon a secured party that is a consignor or

13 is a buyer of accounts, chattel paper, payment tangibles or

14 promissory notes.

15         Your Honor, neither of these sections apply because

16 -- well for two reasons.  Number one, under the repurchase

17 agreement we were legally obligated to buy the notes back.  We

18 did not sell them and walk away from them.  The agreement

19 imposed an obligation on us to buy the notes back.  It's not

20 just that we could buy the notes back.  It's not a final sale.

21 We were legally obligated to buy them back.  This is not a sale

22 that would cut off our rights under Article 9.

23         You know we can't forget 1-1023 of the Uniform

24 Commercial Code which says that the effect of the provisions of

25 the act can be amended by an agreement.  The agreement in this

42

1  situation is not a sale of accounts or chattel paper.  Sale of

2  an account, our name might still be on the account but there

3  has to be some type of mechanism that cuts off our obligation.

4        Here this is an agreement or repurchase agreement

5  that by definition we were obligated to buy the property that

6  we sold back.  So it's not the final sale I think that is

7  envisioned by 9-318 or 9-601.

8        I think the final argument raised by Lehman is the

9  intent argument as to why Article 9 does not apply, because the

10  contract says that the parties intended it as a repurchase

11  agreement.  Your Honor, in response to this -- my response is

12  two-fold.  Number one, the cases that they cite _Granite_ and

13  _Bevel_ we discussed at length in the _Calyon_ trial.  The _Granite_

14  _Partners_ case discussed the importance of the party's intent to

15  create a security interest in determining whether or not the

16  repurchase agreement was a secured financing governed by

17  Article 9 or repurchase agreement.

18        _Bevel Ressler_, same issue when we walked through

19  these cases before.  And if you look at the text in those cases

20  it's clear in what context the issue of intent arose; _Granite_

21  _Partners_ 17 F.Supp. 2d at Page 299.  The key inquiry as to

22  whether the repos in the case should be characterized as

23  purchase and sale agreements or secured loans lies in the

24  intention of the parties.  Article 9 only applies to

25  transactions in which the parties intend to create a security

1 interest.

2       If you look at <u>Bevel</u> 67 B.R. 94, in the present cases

3 the intent of the parties is a central consideration in

4 determining their property interests and the securities

5 underlying the repo and reverse repo transactions under

6 applicable state law.  The intent of the parties viewed in the

7 context of the entire market in which these transactions take

8 place is controlled.

9       First of all we're not arguing intent controls

10 whether the agreement is a repurchase agreement or a secured

11 financing.  So for starters I would submit respectfully that

12 <u>Granite</u> and <u>Bevel</u> are just in opposite.  But more importantly

13 Your Honor the section of Article 9, 9-109(a)(1) that existed

14 at the time that the <u>Granite</u> and the <u>Bevel</u> cases were decided

15 said that Article 9 applies to transactions where the parties

16 intend to create a security interest.

17       The new Article 9 applies to any transaction

18 regardless of its form that creates a security interest.

19 Intent of the parties is not relevant in determining whether

20 Article 9 applies.  The intention requirement or the word

21 "intended" has been removed from the statute.  That is the

22 point that we're making which is that assuming the parties did

23 put language in their agreement saying that it is their intent

24 this, their intent that Article 9 applies to a transaction that

25 contemplates the creation of a security interest, whether the

1  parties intended it or not.

2        The _Pulitics_ case which we always come back to

3  recognizes the significance of removing the word "intent" from

4  whether a security interest -- whether a transaction creates a

5  lease or security interest and it does so in the context of

6  1-20737.  But the removal of the word "intent" from 9-109 and

7  now the application to any transaction that provides for the

8  creation of the security interest regardless of intent we think

9  undercuts the intent argument.

10        Moving on, Your Honor, and I know I've been here for

11  a while so I will quickly get through, I guess, what I will

12  call the common law counts.  Breach of contract.  Lehman -- I

13  think the argument that Lehman makes here is that assuming that

14  this is a repurchase agreement that falls within the Safe

15  Harbors, the filing of our bankruptcy petition on August 6th,

16  Your Honor, essentially cleansed them of any wrongdoing, of any

17  breach that occurred before.

18        And in support of that they cite the _Sasson_ case 786

19  F. Supp. 349 and in that case there was a promissory note and

20  the obligee under the note didn't pay it back when it was due.

21  And argued instead that they had reached an oral agreement

22  saying that the maturity date had been extended so it really

23  wasn't in breach.  But when he didn't pay it back the obligor

24  said okay, you know what, the contract is terminated.  You

25  didn't pay the note back, I'm terminating the contract.

1           The point that the decision says that when the
2  obligor terminated the contract he didn't violate any breach --
3  they didn't breach any covenants of good faith and fair dealing
4  because there was a simultaneous occurrence.  The obligee
5  didn't pay and the obligor was entitled to default them.  It
6  happened at the same time so therefore when they defaulted them
7  for not paying there was no breach of the implied covenant of
8  good faith and fair dealing.

9           That is not the factual circumstance here.  If you
10 look at the timeline of events, Your Honor, July 26 is the
11 margin call.  The margin call that we argue is not made in good
12 faith.  The margin call that we argue did not reflect the
13 market value of the notes, July 26.  On August 1st before the
14 company filed for bankruptcy Lehman issued a default notice to
15 the debtors.  They did not default us because of the bankruptcy
16 filing and I'm not arguing that on August 7 when they sent us a
17 default notice because of the bankruptcy filing, if this falls
18 within the Safe Harbor, that that was somehow a breach of
19 contract.  That's not our argument.

20          July 26 a margin call that should not have been made
21 that there was no good basis to make.  August 1st a declaration
22 of default, the bankrtupcy is five days later.  That is the
23 default and this is not a simultaneous occurrence of events.
24 So the bankruptcy filing on August 6 can not cleanse their
25 conduct for everything prior to August 6.  I don't know if

1  there is any authority for that proposition.

2           With respect to the allegation that we don't allege

3  damages during this period; one, we were margined when we

4  shouldn't have been margined, two, it's not clear -- we are

5  entitled to --

6           THE COURT:  You didn't pay the margin.

7           MR. TECCE:  I'm sorry?

8           THE COURT:  But you didn't pay the margin that you

9  claim is incorrect.

10          MR. TECCE:  That's correct but we were declared in

11 default of our agreement, Your Honor.  And we're entitled to

12 prove at trial what the damages are during that period.  It's

13 -- the extent to which that triggered cross defaults, the

14 extent to which that led to our bankruptcy, the whole myriad of

15 events could have transpired between the 6th and the day of the

16 bankruptcy where we incur damages during that period.  And

17 we're entitled to prove that.

18          So the filing of the bankruptcy six days later does

19 not give them the convenient excuse that absolves them for what

20 we allege and which must be accepted as true for purposes of a

21 12(b)(6) motion was a breach of the agreement before that.

22          Moving on, Your Honor, to unjust enrichment.  A

23 reading of the complaint shows that we satisfied the elements

24 of the claim under New York law.  It shows -- those elements

25 are that the defendant benefitted at the plaintiff's expense

1 and that equity and good conscience require restitution.  The

2 essence of the claim is that one party has received money or a

3 benefit at the expense of another which in good conscience

4 ought to be returned.

5          It's our argument that number one, these notes are

6 money good.  Number two, they foreclosed against these notes

7 and basically deprived us of what I think Your Honor referred

8 to as the stub which is anything owing in excess of the amounts

9 under the repo.  Once we repay the amounts owing under the

10 repurchase agreement any residual value in the notes is ours.

11 That's now become Lehman's property.

12          And with respect to the claim that the liquidation

13 notice on August 27 indicated that they liquidated at the exact

14 amount of our indebtedness under the MRA, the allegation, Your

15 Honor, is that that price point is the exact price point that

16 cuts off our equity interests in the notes.  Assuming that $68

17 million or let's assume out of $100 --

18          THE COURT:  Why do I need to -- why should I rely on

19 quasi contractual theories when I've got a contractual

20 provision that governs, Section 11(d)(1)?

21          MR. TECCE:  Your Honor, it says in the event of

22 default it addresses their --

23          THE COURT:  Non defaulting party to return any post

24 foreclosure application.  Apply the proceeds thereof to the

25 aggregate unpaid repurchase price.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. TECCE:  Right.  Your Honor, it's implied in that

2    provision.  You are correct.  To the extent that there is a

3    provision that generally addresses this, it's implied.  I don't

4    think it's expressed that to the extent that the notes are sold

5    at a value that exceeds the amounts owed under -- it's implied

6    but it's not express to the extent that the notes are sold in

7    an amount that exceeds the amounts owing under the repurchase

8    agreement.  That money is ours.  That's not -- while I think

9    the agreement can be read that way, it's not as expressed such

10   that it is expressly provided for under the contract.

11        Similar argument, Your Honor, I think on conversion

12   that we had an ownership interest in the balance owing under --

13   in the value of the notes any value that remained after the

14   amounts owing under the repurchase agreement.  We had a limited

15   collateral interest in that.  And that basically has -- our

16   ability to realize on that has been interfered with and that

17   the conversion is a claim that addresses interference with

18   possessory interests.

19        On turnover, Your Honor, I think the argument from

20   Lehman is that if it's not property of the estate or if it is

21   not property of the estate then it's not the proper subject of

22   a turnover motion.  On that I would say that to the extent that

23   amounts are owed -- there is value in the notes after we

24   satisfied our obligations under the repo, that is property of

25   the estate and that's what one of the things that we are

1  requesting.

2         The last argument, Your Honor, is whether the Safe

3  Harbors apply.  And I think our overall response here is that

4  Your Honor has basically a premature summary judgment motion in

5  front of him on this point.  Starting with 559 and whether it's

6  a repurchase agreement or not, the parties agreed Your Honor,

7  the parties agreed expressly in Section 19(a), Page 11 of the

8  master repurchase agreement.  The parties recognize that each

9  transaction is a repurchase agreement as that term is defined

10 in 101 Title 11 of the United States Code, except insofar as

11 the type of security subject to such transaction or the term of

12 such transaction would render the definition inapplicable.

13        So if the securities don't fall within 101-47(a), the

14 parties don't recognize that it is a repurchase agreement.  Our

15 argument here is that the securities don't fall within

16 101-47(a).  They are not the mortgage backed securities that

17 are referred to in 101-47(a) and I don't think Lehman disputes

18 that.  They don't satisfy the 1934 acts definition because they

19 are not "rated in one of the two highest categories by at least

20 one nationally recognized statistical rating organization."

21 Lehman doesn't dispute that.  The notes were BBB by Standard

22 and Poors.

23        I think that the argument is that they are interest

24 in mortgage loans.  And on that score, Your Honor, we would

25 submit that they are not interest in mortgage loans.  They are

1 mortgage backed securities.  And there are basically two prongs

2 of the definition of mortgage backed securities in the 34 Act.

3 The first one deals with the rating of the notes and the second

4 one is basically that they are notes that are backed by

5 mortgages.

6         THE COURT:  All right.  So they are mortgaged back

7 securities that don't -- that aren't properly rated, so they

8 fall out.

9         MR. TECCE:  Correct.  And if you accept the argument

10 that there are interests in mortgage loans well that just reads

11 out the requirement that they satisfy the 34 Act because you

12 could be a note secured by a mortgage that is not highly rated

13 and you wouldn't satisfy the 34 Act definition but somehow you

14 find your way into 101-47(a)(1).  So you are basically reading

15 out the requirement that you look to the 34 Act.

16         THE COURT:  Well there is duplication in the statute.

17 I mean, 555 and 559 have been amended in such a way that they

18 are in effect duplicate, duplicative in many ways.  I mean, I

19 note that in the Calyon decision.

20         MR. TECCE:  Well, Your Honor, I don't think that

21 there is duplication in -- there are no other terms in

22 101-49(a) that can be read in duplication.  For example, if I

23 may.  A certificate -- 101-47(a)(1) says mortgage, interest and

24 mortgage loans, mortgage backed securities, certificates of

25 deposit.  I mean there is no overlap there.  My point being

1 that with respect to the other terms, the other securities or

2 types of securities that are in 101-47(a) these would be the

3 only two where there is overlap.  That can not -- we would

4 submit that that is not how the statute should be read.

5       Certificates of deposit, mortgage related securities

6 as defined in Section 3, mortgage loans.  Again there is no

7 carry over there.  Interest in mortgage related securities or

8 mortgage loans and eligible banker acceptances, qualified

9 foreign government securities.  There's -- the point being that

10 these would be the only two where there is carry over.  These

11 being mortgage related securities and interest in mortgage

12 loans.

13       Secondly, Your Honor, to say that is interest in a

14 mortgage loan.  It's a note, it's a promissory note.  It's an

15 obligation by Broad Hollow to repay money to repay the money on

16 a certain date.  Yes it's backed by a mortgage but it's first

17 and foremost a note.  So to the extent that you consider its

18 relationship with the underlying mortgage, that brings it into

19 the mortgage backed securities -- mortgage related securities

20 definition.

21       Lehman I guess also asserts that they're interest in

22 mortgage loans because their value fluctuates with the value of

23 the underlying mortgage.  You know, on that I would just

24 identify you know rely on the Court or perhaps the Court

25 doesn't know, but the value of the interest rate for example

1  under the notes is tied to LIBOR.  It's not tied to the

2  interest rate on the underlying mortgage.  So there's not a

3  connection between the actual Broad Hollow note and the

4  underlying mortgage for that purpose.

5        Lastly Your Honor, I would just -- I think one final

6  textual argument on this point which is if you look at 101-54

7  the term transfer means, (d) each mode, direct or indirect,

8  absolute or conditional, voluntary or involuntary of disposing

9  of or parting with property or an interest in property.  The

10  1978 legislative notes to 101-54 state with respect to interest

11  in property the following.

12       Under this definition any transfer of an interest in

13  property is a transfer including a transfer of possession,

14  custody or control even if there is no transfer of title

15  because possession, custody and control are interests in

16  property.  In this particular instance you have a note that is

17  secured by a mortgage but you don't have possession, custody or

18  control of the underlying mortgage.  So we would submit that

19  for those reasons, Your Honor, they are not interest in

20  mortgage loans.

21       The last point, Your Honor, going to -- the last

22  point in the argument is whether they are entitled to a

23  stockbroker/financial participant finding at this point in the

24  case and whether or not the 555 Safe Harbor applies.  On that

25  score, Your Honor, I recognize that they have submitted

1 documents in support of their motion that would demonstrate

2 that LCI or as far -- that demonstrate that LCI would satisfy

3 the definitional requirements.  But I just remind the Court

4 that at this point, number one, there are two parties that are

5 contact to this agreement.  Number two, there is no evidence

6 with respect to the second party Lehman Commercial Paper Inc.

7 Number three, Lehman party Commercial Paper, Inc. which signed

8 this agreement, there is a reason they signed the agreement and

9 we are entitled at least to know why they signed the agreement.

10 And number four, there are facts out there that we're entitled

11 to seek discovery of.

12         It's true that the trade confirmations that were

13 attached show that Lehman Brothers, Inc. or LCI rather, not

14 Lehman Commercial Paper but the other entity that satisfies the

15 requirements was the counter party in this transaction.  But

16 what if discovery revealed that the money that was actually

17 used to -- or funded to American Home came from Lehman

18 Commercial, Inc., the counter party to the contract?  Or that

19 it was booked on their books?  Or there were facts or documents

20 in the record that would suggest that it is really Lehman

21 Commercial Paper, Inc. that is the counter party to this

22 transaction?

23         There could be evidence in the record that would

24 demonstrate that and we would basically be foreclosed from

25 pursuing that at this point in time simply because Lehman

1  picked the best documents it could possibly find and let's be

2  clear that I'm sure they picked the best documents for them and

3  attached them to the motion and that we would be shut down on

4  this point at this stage of the case.  So we just respectfully

5  submit, Your Honor, that at this point that is a premature

6  determination.

7          If Your Honor has no further questions that concludes

8  my presentation.

9          THE COURT:  No.  Thank you.  Mr. Rosenberg, do you

10 have a reply?

11         MR. ROSENBERG:  I will be brief.  Just a couple of

12 points.  I would just like to address the last point first or

13 make a general point first.  Mr. Tecce has thrown out a lot of

14 facts in the course of this argument, a lot of speculation.

15 You know none of that is properly before this Court on this

16 motion and I hope that the Court won't consider beyond the

17 appropriate record.

18         On the appropriate record just goes to that last

19 point first.  I would not have otherwise made it.  But I think

20 it's a good indication of how Mr. Tecce reads the agreement

21 when it's to his advantage and speculates that the agreement

22 doesn't mean what it says when it's not to his advantage.  I

23 bring -- call the Court's attention to Paragraph 3(b) that

24 tells you very specifically that you can have as many parties

25 to the master agreement as you want, but it is the confirmation

1  slip that definitely establishes who the buyer and seller are.

2          And I asked this Court to decide this motion based

3  upon the documentary evidence which is properly before the

4  Court.  Similarly, while we're on that subject, I heard a lot

5  of speculation.  It wasn't even speculation that maybe the

6  allegedly wrongful pre-petition calling of an event of default

7  triggered cross defaults and that's the damages.  Where is that

8  in the complaint, Your Honor?  I just looked.  I couldn't find

9  it.

10          Your Honor is to determine this motion based upon

11 those documents as I understand the law, not on what Mr. Tecce

12 speculates in an oral argument that isn't in the complaint at

13 all.  And you would think if that were the case that's a pretty

14 basic point and it would have been there.

15          But, Your Honor, there is one basic point I want to

16 make here and only one; that is this, Mr. Tecce made my head

17 spin and I suspect yours with his quick citations of UCC

18 Article 9 provisions and cases.  Your Honor, we are just off on

19 a totally irrelevant tangent here.  This is very simple.  This

20 document either creates a purchase and a sale and if it does

21 not, then there is a provision that says if it does not it

22 creates a secured loan.  Okay.

23          It is one or the other.  It is not both.  It can't be

24 both.  They are mutually exclusive.  I suggest to Your Honor it

25 is a purchase and a sale.  Your Honor so ruled in <u>Calyon</u>.  If

1  it is a purchase and sale Article 9 is totally irrelevant and I

2  was very happy to hear Mr. Tecce cite many of the relevant

3  provisions of the MRA which does indeed include a commercially

4  reasonableness requirement as the appropriate standard for

5  determining whether or not Lehman properly met its obligations

6  under the contract in the liquidation.

7           If on the other hand this Court contrary to your

8  Calyon decision ruled that this was not a purchase and a sale

9  then it's a secured loan.  And then Mr. Tecce is right.  All of

10 this Article 9 stuff becomes implicated whether -- by which I

11 mean the liquidation provisions.  But as Your Honor suggested

12 it's just like a lease, it's one or the other, it's not both.

13 Talking endlessly about the provisions of the UCC which apply

14 to purchases and sales of certain kinds of stuff which, you

15 know, if it is that kind of stuff you have to comply with the

16 filing provisions.

17          THE COURT:  Mr. Rosenberg, you can't throw around

18 this legal jargon.  I mean, stuff --

19          MR. ROSENBERG:  I'm sorry, Your Honor.  I'll be more

20 technical.  Some of the terms that come to mind would be

21 totally inappropriate.  If it's the kind of property, is that

22 better than stuff, which is covered by the UCC provisions that

23 say purchase and sale still requires filing, that doesn't turn

24 that into anything other than a purchase and sale.

25          So, okay, maybe it fits within the definition, maybe

1  it doesn't.  I don't believe it does.  It can't be both.  That

2  still doesn't mean that the Article 9 provisions apply.  So,

3  Your Honor, I think what you really have here is a very simple

4  construct and it has been grotesquely overblown and confused.

5           Number one, is this a purchase and sale?  Number two,

6  if it is does one or both of the Safe Harbors apply?  If so

7  then what is left of this lawsuit is an argument about whether

8  or not Lehman properly liquidated under the terms of the

9  contract.

10          If the answer to number one is no, then that's

11  because -- then the Article 9 provisions become implicated and

12  then the -- what Lehman's actions would be measured under the

13  standards of Article 9.  I don't believe that's the case but

14  that's the implication and all of these arguments about

15  everything else is simply irrelevant.  And again, Your Honor,

16  one I suggest that it can't be both.  It's either a purchase

17  and sale or it's an Article 9 security interest.  Two, finding

18  that it is anything other than a purchase and sale would of

19  course be, (a) inconsistent with Your Honor's own decision in

20  Calyon, and (b) inconsistent with everything in the market

21  place ever.  Every other court decision, every other

22  commentator and certainly the market expectations and would

23  upset trillions of dollars of transactions.

24          Finally, Your Honor, as I suggested the provisions of

25  at least the 555 Safe Harbor are clearly met here.  Mr. Tecce's

1  speculation is completely inconsistent with the document itself

2  that Your Honor needs to interpret.  The 559, as I suggested,

3  would be a question of first impression.  I don't know why Mr.

4  Tecce is belaboring that which we agree with, that the only

5  relevant provision there would be interest and mortgage loans.

6  But Your Honor doesn't have to get to that question if Your

7  Honor doesn't want to.

8          But again, very simply and forgive me for belaboring

9  it, it's one or the other.  You don't have to look at 82 UCC

10  provisions to decide whether it's a purchase and sale

11  consistent with everything else this Court has done or a

12  security interest.  Thank you.

13          THE COURT:  Thank you very much.  Very briefly, Mr.

14  Tecce.

15          MR. TECCE:  Less than a minute, Your Honor.  First of

16  all to be clear Mr. Rosenberg -- or Lehman rather is correct

17  that the complaint does not allege that the second margin call

18  resulted in cross default.  That's correct.  I don't want there

19  to be any misrepresentation on the record on that point.

20          The point that I was trying to make, Your Honor, was

21  that we are entitled to prove at trial what damages resulted

22  from that second margin call.  What damages, what impact it had

23  with respect to our other financings, whether people were

24  watching us in the market, whether people found out about it,

25  et cetera.  We are entitled to prove that at trial and to take

1  discovery and to build a case around that point.  That was my

2  point there.

3          Secondly, Your Honor, unfortunately there is no

4  wealth of authority on the question as to whether or not

5  Article 9 would apply to this repurchase agreement.  This is an

6  issue of first impression.  We've not uncovered a case on these

7  facts that applied Article 9 to this.  So if you were to find

8  that you are not going against the weight of any authority at

9  all.  So, I don't --

10          THE COURT:  I don't mind bucking authority as long as

11  it is authority that doesn't make sense.

12          MR. TECCE:  Fair enough.  And lastly, Your Honor --

13          THE COURT:  As long as it is not Third Circuit

14  authority.

15          MR. TECCE:  To reiterate, Your Honor, we're not

16  making it --

17          THE COURT:  Regardless of whether it makes sense.

18          MR. TECCE:  We're not making a recharacterization

19  argument, Your Honor.  This is not <u>Calyon,</u> we're not arguing

20  whether there is a true sale here or not.  That's not the

21  point.  And we're not trying to recharacterize it.  We

22  understand a decision of the Court after it's decided.  Our

23  point -- thank you.

24          THE COURT:  You're welcome.  Mr. Rosenberg, anything

25  further?

1          MR. ROSENBERG:  No, Your Honor.

2          THE COURT:  All right.  Thank you.  Well I think it

3 will come as no surprise I'm going to take this matter under

4 advisement and issue a written decision as soon as reasonably

5 possible, as soon as commercially reasonably possible.  Thank

6 you very much for an excellent presentation.

7          Let's take -- Mr. Beech, do you need some time to

8 reshuffle?

9          MR. BEECH:  Your Honor, unfortunately we've been able

10 to finalize one of the two deals that we wanted to go forward

11 with today.  That is with respect to the Bank of America pool

12 of non-performing loans.  I think it is a relatively

13 straightforward deal and I can present that and go forward now

14 or we can take a brief recess.  What I was going to ask from

15 Your Honor is if it is possible to have a couple of hours after

16 the Bank of America sale to work with the committee with JP

17 Morgan and with Lehman to see if we can finalize the remaining

18 issues that we have with the other sale?

19          THE COURT:  All right.  That's going to be fine.

20 Let's take a break in any event so we can reshuffle the parties

21 and give you a few minutes to get organized.  So take say a ten

22 minute recess.  We'll reconvene, we'll deal with Bank of

23 America and then you can certainly have until this afternoon to

24 try to resolve your other issues.

25          MR. BEECH:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  You're welcome.

2                    (Recess)

3          THE COURT:  Please be seated.

4          MR. BEECH:  Good almost afternoon, Your Honor.  May

5  it please the Court Sean Beech from Young Conaway on behalf of

6  the debtors.  Your Honor, as I indicated earlier what we would

7  like to do is to go forward right now with the sale of the Bank

8  of America non performing loans and then request some time in

9  between the going forward on the JPM non-performing loans.

10         THE COURT:  Okay.  This is, let me just, this is

11  consensual at this point for Bank of America?

12         MR. BEECH:  Yes, Your Honor.  It is.  Your Honor, the

13  debtors filed a motion in December to approve bid procedures

14  and the sale of certain non-performing loans.  We've grouped

15  those into three pools.  We've defined them as the Bank of

16  America non-performing loans, the unencumbered non-performing

17  loans and the JP Morgan non-performing loans.

18         With respect to the Bank of America non-performing

19  loans there are -- there were 46 loans in that pool when we

20  filed the motion.  Two of those have since paid off and were

21  removed from the pool.  So now there are 44 loans that we seek

22  to sell today.  When I say loans, we also had a situation

23  where some of these loans have been in foreclosure and turned

24  into real estate owned during that same period of time.  So

25  we're looking to sell either the loans or the REO.  We believe

1  that there are at least three REOs in this portfolio of loans

2  at this point that we're looking to sell as well.

3       Your Honor may recall we do have an order in this

4  case approving our ability to sell free and clear REO property

5  in the ordinary course of business.  Your Honor, we had a

6  bidding process which was a final sealed bidding process which

7  preceding that we had an indicative bid process.  In the

8  indicative bid process we received 19 bids overall and a subset

9  of that was with respect to the Bank of America pool of loans.

10 From that indicative bid pool we chose certain bidders who

11 would be entitled to an expense reimbursement if those bidders

12 met the requirements under the sale procedures, one of those

13 requirements being that they submit a final bid and that if --

14 that that final bid, if it's not above the price that they

15 submitted in the indicative bid, that they provide some

16 reasonable justification for that reduction.

17      Your Honor, we received and approved the bid of

18 Beltway Capital as the successful bidder with respect to the

19 Bank of America pool of loans and after consultation with the

20 committee and Bank of America determined not to choose the

21 second best bidder at the time.  The bidder from -- the bid

22 from Beltway was not only favorable in its -- well, I think

23 what might help, Your Honor, is if I can -- we are asking to

24 seal the purchase price so if I may approach Your Honor and

25 hand up a calculation, a purchase price calculation and some of

1  the -- and the order and APA and blackline form may assist

2  walking through these.

3          THE COURT:  All right.  You are seeking to approve,

4  excuse me, to seal the purchase price until the unencumbered

5  loans are sold on April 14th, is that correct?

6          MR. BEECH:  Yes, Your Honor, that's right.  Yes, it

7  would be -- the hearing currently is set for March 27th, but we

8  provided for April 14th is when we have our next omnibus

9  hearing just in case that that got pushed which is the reason

10 that we put the earlier of when there is a sale order on it or

11 April 14th.  May I approach?

12         THE COURT:  Yes.  The only item you are sealing is

13 the price.

14         MR. BEECH:  That's right, Your Honor.  So the order

15 that we would submit would just redact the purchase price

16 percentage similar to the way we had done it in the servicing

17 sale and what I've just provided to Your Honor is a breakdown

18 of how the purchase price works.  You'll see on the top, Your

19 Honor, there is an unpaid principle balance of $12,682,381 as

20 of February 29, 2008 which is the cutoff date under the

21 agreement.

22         The loan count, as I indicated before, is 44.  Below

23 that, Your Honor, is the percentage of the UPBs that was bid by

24 Beltway Capital and then the full bid amount below that.  The

25 seller administrative fees below that, Your Honor, of $37,804

1  is not in addition to the purchase price.  That is the portion

2  that will go to the estate for the necessary direct costs of

3  filing and selling the collateral, filing the motion and

4  selling the collateral.

5          THE COURT:  That comes out of the bid amount?  It

6  comes out of the bid amount.

7          MR. BEECH:  Yes.  So that $37,804 will be sent to the

8  debtors and the remaining proceeds would be sent to Bank of

9  America's administrative agent.

10          THE COURT:  All right.

11          MR. BEECH:  So the amount for the direct costs is

12  approximately 24,000.  The additional amount is to satisfy the

13  two expense reimbursements under this sale, 6900 per party

14  entitled to that.  And the two parties we believe are entitled

15  to an expense reimbursement under this pool are Lehman and

16  Archbay.

17          THE COURT:  What was the second one?

18          MR. BEECH:  Archbay.

19          THE COURT:  Archbay?

20          MR. BEECH:  Yes.

21          THE COURT:  I just couldn't hear you.  I'm sorry.

22          MR. BEECH:  That's all right, Your Honor.  Your

23  Honor, one change that you will see in the APA that was made

24  was to make it such that the purchaser is not responsible for

25  the payment of accrued interest on the purchase mortgage loans

1  which would have been a possible amount that would increase the

2  purchase price.  But based on some of what we've heard from

3  bidders and in conversations with Bank of America we determined

4  that it was appropriate in order to maximize the bid to take

5  that provision out.

6          The purchaser will be responsible for servicing

7  advances after the cutoff date during the interim servicing

8  period.  And there is also a --

9          THE COURT:  I'm sorry, who is responsible for

10 servicing advances?

11         MR. BEECH:  After the cutoff date of February 29th,

12 the purchaser will be responsible for that.

13         THE COURT:  All right.

14         MR. BEECH:  Your Honor, and to that point we reserved

15 in the form of order our ability to seek payment or

16 reimbursement of the servicing advances from Bank of America as

17 administrative agent.  The paid and accrued advances on this

18 pool were not significant and rather than fight the issue at

19 this hearing we determined to hold that off for another day

20 because the debtors believe that the estate is entitled to the

21 payment of the servicing advances that were paid or accrued on

22 account of these loans.

23         Your Honor, the only other -- under this APA the only

24 other item that could possibly effect the purchase price is

25 there is a period of time between the cutoff date and the

1  closing date which is referred to as the adjustment period.

2  Really what that tries to capture is a situation where a loan

3  pays off in full during that period we would take that loan out

4  of the sales so that the estate or the administrative agent

5  will be -- get full payment with respect to that.

6        If it's acceptable to Your Honor, I would propose to

7  move forward with a proffer of Mr. Robert Johnson who is

8  present in the courtroom today to support the motion and the

9  approval of the agreement with Beltway.  And then we can walk

10  through the asset purchase agreement changes and the order if

11  Your Honor wishes.

12        THE COURT:  Any objection to the use of a proffer?

13  Hearing none, you may proceed.

14        MR. BEECH:  Thank you, Your Honor.  If called to the

15  stand, Mr. Johnson would testify that he is an executive vice

16  president Capital Markets of the American Home Mortgage

17  Investment Corp. and has been with the company since 2001.  Mr.

18  Johnson received a Bachelor of Arts degree from the University

19  of Richmond and has worked in the mortgage lending industry

20  since 1994.

21        Prior to joining American Home Mortgage, Mr. Johnson

22  managed a secondary mortgage division of Comnet Mortgage

23  Services.  In his career in the mortgage industry he has

24  overseen and participated in numerous sales of mortgage loans

25  on a servicing release basis.

1        Mr. Johnson would testify that he has reviewed and is

2   familiar with the sale motion and the sale procedures approved

3   by the Court on February 1, 2008.  The sale procedure

4   specifically provided for one or more sales of certain non-

5   performing loans utilizing a final sealed bid process without

6   an auction through separate sale agreements with purchasers.

7        Mr. Johnson would further testify that he has been

8   responsible for, among other things, overseeing the sale of

9   various facets of the debtor's business.  Mr. Johnson would

10  testify that the debtor's own certain non-performing loans

11  which are defined as first lien loans in which the mortgagors

12  have not fulfilled one or more of the terms, covenants,

13  conditions or obligations and are 60 days or more delinquent.

14       He would further testify that certain of the non-

15  performing loans were paid in full prior to the closing of the

16  sale and thus removed from the sale.  Certain were brought

17  current by homeowners but remain in the sale since such sales

18  would be discounted as a result of the prior delinquencies.

19  And certain of the loans have turned into real estate owned or

20  REO property and remain in the sale.

21       Mr. Johnson would testify that in order to maximize

22  the value of the estates for the benefit of the stakeholders

23  the debtors, with the assistance of their advisors, determine

24  to separate the non-performing loans into three pools including

25  the unencumbered non-performing loans, the Bank of America non-

1  performing loans and the JP Morgan non-performing loans.

2        He would testify that the debtors and their financial

3  advisors believe that separating the non-performing loans into

4  these pools would help maximize value.  Mr. Johnson would

5  testify that in the context of the proposed sales of the non-

6  performing loans and REO properties his duties have included,

7  among other things facilitating due diligence conducted by

8  interested parties both individually and at his direction

9  through the debtor's advisors Milestone Advisors LLC and other

10 AHM employees, overseeing the communications with the

11 interested parties and working on behalf of debtors to

12 encourage competitive bidding through contact with bidders.

13       Mr. Johnson has been personally involved in the

14 debtor's non-performing loan sale and related REO property sale

15 including the proposed sale to Beltway Capital LLC for the Bank

16 of America non-performing loans.  He would testify that in

17 accordance with the sale procedures the debtors designated and

18 posted the debtors -- on the debtor's interlink website the

19 three pools of non-performing loans.  The information relevant

20 to the non-performing loans, including certain books and

21 records, material contracts and other financial information

22 needed for due diligence was posted on the debtor's interlink

23 website for the respective pools.

24       Mr. Johnson would further testify that access to the

25 website was made available within 24 hours of the bidder

1 executing a non-disclosure agreement.  He would testify that

2 the sale procedures were tailored in such a way as to ensure

3 maximum recovery to the debtor's estate.

4       Mr. Johnson would testify that pursuant to the sale

5 procedures and the indicative bid deadline for the non-

6 performing loans on February 8, 2008 and that the debtors

7 received 19 indicative bids.  Mr. Johnson would testify that

8 pursuant to the sale procedures ordered the debtors have

9 selected Archbay Capital, Beltway and Lehman as qualified

10 indicative bidders for the Bank of America non-performing loans

11 in accordance with the sale procedures order.

12       Mr. Johnson would further testify that in accordance

13 with the sale procedures order parties submitted qualified

14 indicative bids are entitled to an expense reimbursement if

15 they meet the criteria under the sale procedures and the

16 debtors have approved Lehman and Archbay for expense

17 reimbursement on the Bank of American non-performing loan pool.

18       Mr. Johnson would further testify that pursuant to

19 the notice of modified bid deadlines and sale related dates

20 filed by the debtors, the final bid deadline with respect to

21 the Bank of America non-performing loans was extended to 4 p.m.

22 on March 11, 2008 at the request of certain bidders and after

23 consultation with certain other parties.

24       During this due diligence period, the debtors

25 received four separate file bids from various potential

1 purchasers with respect to the Bank of America non-performing

2 loans.  Pursuant to the sales procedures order on March 12 the

3 debtors filed a notice of successful bidders with respect to

4 that pool of loans.

5         Mr. Johnson would testify that he has reviewed the

6 qualified final bid of Beltway and that its bid for the Bank of

7 America non-performing loans is in the debtor's best business

8 judgment represents the highest and best value for the debtor's

9 estates in the context of the court approved sales procedures

10 and given the nature of the non-performing loans and that the

11 sale process was fair and conducted in accordance with the sale

12 procedures.

13         Accordingly, Mr. Johnson would testify that based on

14 his experience and knowledge and participation in the marketing

15 and sale process under the sale procedures, the debtor's

16 execution of the proposed sale agreement with Beltway

17 represents an arm's length agreement and was entered into in

18 good faith.  The proposed purchase price of the Bank of

19 American non-performing loans represents a fair and reasonable

20 price under the circumstances.  Entry into the sale agreement

21 with Beltway is an exercise of the debtor's sound business

22 judgment.

23         The sale of the Bank of America non-performing loans,

24 that Beltway is in the best interest of the debtor's estates

25 and creditors, that Beltway is not affiliated with nor owns an

1  interest in any of the debtors or as an insider under the term
2  as defined in the bankruptcy code.  And that the payment of the
3  expense reimbursement to Lehman and Archbay is appropriate
4  pursuant to the sale procedures.
5          Finally, Mr. Johnson would testify with respect to
6  sealing the purchase price with respect to the Beltway pool.
7  He would testify that the debtors have yet to determine a
8  successful bidder for the pool of unencumbered non-performing
9  loans.  He would testify that the debtors are seeking only to
10  seal the purchase price until the sale of the unencumbered non-
11  performing loans is approved.  But the purchase price
12  constitutes confidential commercial information which would
13  provide an unfair advantage to other bidders if disclosed prior
14  to consummating the sale of the unencumbered non-performing
15  loans.
16          And that publicly disclosing the purchase price at
17  this time may have a negative impact on the bidding in that
18  pool of unencumbered non-performing loans.  While sealing the
19  information for a limited time would assist the debtors in
20  maximizing value and not prejudice other parties in interest.
21          Your Honor, that would conclude the proffer of Mr.
22  Johnson.
23          THE COURT:  Any cross examination?  Why is the
24  unencumbered property sale not going forward?
25          MR. BEECH:  Your Honor the primary reason for that is

1  that there was certain collateral documents that we could not

2  get primarily because, we believe, that they had been sent to

3  foreclosure professionals to foreclose on the properties and

4  until we get those, the information on those collateral

5  documents, we don't believe that we would get the best price

6  for the assets.  Out of the 71 loans we are missing

7  approximately 35 of those collateral documents are working to

8  find out which foreclosure professional has those documents so

9  that we can maximize the value of that sale.

10          THE COURT:  And so you have received -- you haven't

11  received final bids I guess.

12          MR. BEECH:  No, we haven't.  We -- pursuant to the

13  sale procedures order we were -- we had the authority to push

14  those dates back and that's what we did with respect to that

15  pool of loans.

16          THE COURT:  All right.

17          MR. BEECH:  Your Honor, if you would like to there

18  are not -- the changes with respect to the order filed with the

19  Court I believe just before the agenda was due, are minor.  In

20  Paragraph E you will see that we simply cut out the concept of

21  approval of a second best bidder in connection with the order.

22          THE COURT:  I've gone through the blackline of the

23  order and I don't have any questions.  Let's just go through

24  the APA.

25          MR. BEECH:  Okay.  One of the primary changes to the

1  APA, Your Honor, that you'll see throughout the document is to

2  include the concept of the REO property --

3           THE COURT:  REO property, yes.

4           MR. BEECH:  -- into that.  Your Honor, really the

5  only other changes that were made to this agreement were

6  clarifications -- well not even -- well, one clarification and

7  that is in Section 7.01 -- bear with me, I'm sorry 5.01(l) and

8  that was just to clarify that the servicing advances made with

9  respect to and related to the mortgage loans were the

10 purchaser's responsibility after the cutoff date.  I think the

11 concept that was in there because we talked about the interim

12 servicer, but we wanted to make that clear.

13          There were some other typographical errors that were

14 changed and we took out the increase of the purchase price

15 based on accrued interest.  Those, Your Honor, were the primary

16 changes to the document.

17          THE COURT:  Okay.

18          MR. BEECH:  The purchaser had no changes to the form

19 APA.

20          Your Honor, with respect to our request to seal the

21 documents, we recognize that we only filed the motion last

22 night.  We wanted to get something on file before we made the

23 request to Your Honor today and would certainly send it out on

24 notice for objections, if Your Honor wishes to do so or if

25 you'll take oral motion for approval, we can go that route as

1 well.

2          THE COURT:  Well, you said you filed a written

3 motion?

4          MR. BEECH:  We did file it.  We put it on the amended

5 agenda.  We only filed it last night.  It didn't have any

6 objection deadline or hearing date because I wanted to talk to

7 Your Honor about what you believed would be appropriate.

8          THE COURT:  Hang on, I'll deal with that in just a

9 second.

10          MR. BEECH:  Sure.

11          THE COURT:  Mr. Bowman sent it over this morning.

12 All right I understand that the seal order is, at least through

13 April 14th, has the support of the committee and the office of

14 the U.S. Trustee.

15          MR. BEECH:  That's my understanding, Your Honor.

16          THE COURT:  Or let's say no objection as opposed to

17 support.

18          MR. MCMAHON:  Support is a strong word to state Your

19 Honor.

20          THE COURT:  Yes.  Right.  You need to denounce and

21 reject the seal motion.  All right.  I don't think any hearing

22 is going to be necessary.  I'll sign the seal order.

23          MR. BEECH:  Thank you, Your Honor.  Unless Your Honor

24 has any other questions we would ask that you approve the sale

25 to Beltway of the Bank of America non-performing loans.  I did

1  provide Your Honor with a clean form of order.

2         THE COURT:  Yes, just give me a second.  Yes, sir,

3  Mr. Power.

4         MR. POWER:  Thank you, good afternoon, Your Honor.

5  Mark Power of Hahn & Hessen, counsel to committee.  Your Honor,

6  there is one factual correction I want to make the Court aware

7  of and first before I do that I'd like to say that I concur

8  with the debtor's motion.  The committee fully supports it.

9  The debtor has been working with the committee and keeping us

10 in the loop on every stage of this auction.  We've been

11 involved in all the decisions and we're very happy with the

12 cooperation.

13        We have -- we've spoken with some of the bidders and

14 we think the process was done in good faith and the bids

15 represent a fair and reasonable price for these assets.  So the

16 committee is fully supportive of the motion.  The one change,

17 the one factual correction on the record, although I don't

18 think it really effects the sale is, as Your Honor heard

19 earlier today the committee had entered into yesterday a

20 stipulation with Bank of America as administrative agent.

21        One of the issues the committee raised with Bank of

22 America was the REO property and we had asserted that the liens

23 did not extend to the REO properties and in fact the Article 9

24 security interest did not -- were not perfected in real

25 property.  And the stipulation that Your Honor will hopefully

1 be hearing at the end of this month provides for a settlement

2 of that issue and basically if that stipulation is approved, I

3 think it's approximately 16.96 UPB of REO will be turned over

4 to the estate for the benefit of the estate and B of A will

5 basically release its lien to those REO properties.

6      Of those 16.96 approximately 1.196 of UPB loans, the

7 three loans in this pool are included in that.  So when Mr.

8 Beech indicated the money would all go to B of A, if our

9 settlement is approved we will basically get a pro rata share

10 of the net purchase price which will reflect the pro rata

11 portion of the REO property versus the entire pool.  So

12 approximately nine percent give or take of the pool.  So in

13 fact the estate does have a direct economic interest in the

14 sale and should get some proceeds of that.

15      THE COURT:  Let's -- one more thing.  I'm going to

16 admit this document that contains the purchase price as

17 Debtor's Exhibit A.  I'll admit it into evidence under seal

18 unless there's any objection.  Hearing none, I grant my own

19 motion.  Any further comments on the form of order?  Based on

20 the undisputed record for the Court and the support of the

21 committee, I'll approve the sale of the Bank of America non-

22 performing loans.

23      MR. BEECH:  Thank you, Your Honor.  And Your Honor,

24 with respect to the sale of the JPM non-performing loans, if

25 it's acceptable to Your Honor and you would indulge us with

1  some time this afternoon, I haven't spoken with the parties

2  about a time but I will propose perhaps three o'clock which

3  might give us enough time to resolve some of these issues.

4        THE COURT:  That's fine.  Three o'clock is fine.  All

5  right.  Thank you.  We'll reconvene at three.

6        MR. BEECH:  Thank you Your Honor.

7                    (Recess)

8        THE COURT:  Please be seated.

9        MR. BEECH:  Good afternoon, Your Honor.  May it

10  please the Court Sean Beech, Young Conaway on behalf of the

11  debtors.

12        Your Honor, I am pleased to report that the time was

13  well spent and we have been able to reach an agreement and I

14  believe we are proceeding with a consensual sale of the JPM

15  non-encumbered -- or non-performing loans.  At this time, I do

16  want to say -- one representation I promised to make for AH

17  Acquisition Co., the Ross Company that bought the servicing

18  business, was that we are not in either of these sales selling

19  any of the assets that we sold to Ross in connection with that

20  sale.  So I wanted to put that representation on the record.

21        THE COURT:  That you are not selling what you already

22  sold?

23        MR. BEECH:  Yes, Your Honor.  I didn't want to.  I

24  was asked to.

25        THE COURT:  All right.

1            MR. BEECH:  Your Honor, if I may approach, I think it

2    may be helpful for you to have some of these documents up

3    front.

4            THE COURT:  Yes.

5            MR. BEECH:  Your Honor, what I've handed you is the

6    purchase price calculation which again we are asking be sealed.

7    I think the order on the seal motion addressed this sale as

8    well.

9            A draft of a form of order which is not in final form

10   and what I propose to do is to walk through these, mark some

11   changes to the version that was filed the other day and I also

12   have some additional changes based on negotiations that we've

13   had over the last couple of hours that I can show Your Honor as

14   well.  And then a blackline version of the APA which should be

15   in final form or is in final form.

16           Your Honor, I'll give a brief summary of what this

17   pool of loans looks like and then maybe it would make sense to

18   walk through the purchase price which has some of the relevant

19   information as well.  But the -- this is a pool which started

20   out at about 307 mortgage loans.  The sale, the loan cap under

21   the sale is 299 mortgage loans.  As of, I believe, at least two

22   weeks ago there were 34 properties that turned into REO and

23   again we're looking to sell the REO in connection with this

24   sale as well.

25           The UPBs in this sale as of February 29, 2008 is

1  113,795,549.  Your Honor, I just wanted to make one

2  clarification, the UPBs are as of 2/29 for the mortgage loans.

3  With respect to the REO the UPBs are from the date just prior

4  to a foreclosure on that property.  But this number, the $113

5  million number does reflect the UPBs that are applicable for

6  the sale.

7          And with respect to this purchase price calculation,

8  Your Honor, Lehman has excluded one loan which is in litigation

9  and is not going to be purchasing that loan.  There are also 11

10 loans that are -- they've been defined as withdrawn loans under

11 the sale.  The UPBs in connection with those loans are

12 $5,533,093.  The story with those loans is that Lehman has

13 indicated that they have not been able to locate the notes in

14 connection with those loans.  So what we've agreed to in this

15 sale is that the -- we'll close on all of the loans including

16 those 11, but the proceeds from those 11 loans will be put into

17 an escrow.  If the debtors can locate the documentation by

18 March 31st, then the debtors will get their proceeds from those

19 loans and if not, and the debtors don't get an extension from

20 Lehman, then those proceeds will go back to Lehman and the

21 mortgage loans will come back to the estate.

22         We already have -- what we've agreed with Lehman is

23 that a Bailey letter stating that the note is with a

24 foreclosure attorney is going to be acceptable to Lehman, and

25 we've already located or actually I think we've already signed

1 two of those Bailey letters already with respect to two of the

2 loans.  So we do expect to get all of our, or almost all of

3 those 11 loans, the documents for all those 11 loans, so they

4 should be included in the sale.

5          Your Honor, this sale, and I think, frankly, it would

6 make most sense to just start walking through the sale order so

7 we can -- I can talk to you about some of the requirements that

8 are under the sale agreement and some of the concessions that

9 we've been able to get from JP Morgan to be able make this sale

10 workable for the estate and the creditor's committee.

11          THE COURT:  Okay.

12          MR. BEECH:  The first change is just the same change

13 in Paragraph E because we're not selecting a second best bidder

14 in connection with this sale.  And then the bulk of the

15 substantive agreements are in Paragraph 10, Your Honor.  The

16 first one is that the proceeds will come initially into the

17 estate and will be distributed in accordance with this

18 paragraph.  They will first be distributed to pay expense

19 reimbursements if any.

20          And in connection with this sale Your Honor the

21 debtors believe it's appropriate to pay an expense

22 reimbursement for Archbay Capital.  The expense reimbursement

23 would be around $46,000.  I just don't have the exact number

24 here.  And there would not be any expense reimbursements for

25 other parties.

1          The second paragraph, Your Honor, deals with paid but

2   unreimbursed servicing advances as of the cutoff date of

3   February 29th.  This provides that $2,787,878 will be escrowed.

4   It actually provides for -- the version you have provides for

5   in excess of three million will be escrowed.  We've determined

6   that we only need the $2.7 million number and have reduced that

7   escrow amount.  These -- so once the debtors provide

8   documentation to JP Morgan that supports the payment of the

9   servicing advances subject to JP Morgan's ability to object, we

10  can release those proceeds to the estate.

11         In Romanette three, that deals with servicing

12  advances as well but it deals with accrued but unpaid servicing

13  advances as of the cutoff date and it provides for an escrow of

14  $740,000 with the same caveats of JP Morgan's ability to

15  object.  What we have agreed to is that we would provide all

16  the documentation to JP Morgan within 90 days subject to a

17  further extension from JP Morgan in that regard.

18         Paragraph 4 deals with the escrow of the REO

19  proceeds.  All of the proceeds from the sale of REO will be

20  escrowed pending an agreement between JP Morgan, the debtors

21  and the committee or a final order of the Court directing the

22  release of those proceeds.  This, Your Honor, gets at the issue

23  of whether or not JP Morgan has a valid and perfected security

24  interest in connection with that REO.

25         There is an addition that you'll see in your version.

1  It relates to a provision, a rep and warranty that is made in

2  the sale agreement by the debtors that the debtors have a title

3  with respect to the REO that's incurable.  There is another

4  provision in the sale agreement that says if the debtors breach

5  that warranty and can't cure it, they may be subject to a

6  repurchase obligation.  The debtors don't believe that this is

7  a big issue but to the extent that there is any repurchase

8  obligation, we've agreed that the money to repurchase these

9  loans can be taken from the escrow of the REO proceeds.

10              THE COURT:  Where is this?

11              MR. BEECH:  It's in the APA sale order.  In the sale

12  order it's Romanette four.  It's the blacklined part on the

13  bottom.

14              THE COURT:  Oh, I see it.  I got it.

15              MR. BEECH:  And I will point to the provisions, the

16  relevant provisions, in the sale order.

17              THE CURT:  I got it.  Go ahead.

18              MR. BEECH:  In Romanette five, Your Honor, it deals

19  with the escrow with respect to the 11 withdrawn loans that I

20  spoke of earlier.  And those proceeds will be released in

21  accordance with the sale agreement.  Romanette six is in

22  connection with an escrow for delinquent tax obligations.  The

23  reason for this escrow is there is a representation and

24  warranty in the sale agreement that provides that there are no

25  delinquent taxes in connection with the mortgage loans and REO

1  property.

2          A corollary provision that essentially provides that

3  the debtors will cure any of those delinquencies.  And just to

4  be clear those are tax delinquencies on mortgage loans and REO

5  property but only to the extent that those delinquencies, that

6  those tax obligations aren't in some grace period.

7          We have agreed with JP Morgan to increase that escrow

8  to 800,000 instead of the 500,000 on the order that Your Honor

9  is looking at.

10          THE COURT:  All right.

11          MR. BEECH:  And JP Morgan will agree that to the

12  extent there are any tax obligations that exceed the 800,000,

13  that's going to be a responsibility of JP Morgan.  The other

14  provision that we're going to add in here is that they'll be

15  some noticing and time frames in connection with our

16  requirement to get them documentation supporting the tax

17  delinquencies within a certain period of time.  And another

18  agreement that we have with them is that once we get them that

19  supporting documentation, JP Morgan will have a five day

20  objection period.  This relates, Your Honor, to a 15 day cure

21  period in the sale agreement.  So we wanted to make sure that

22  we can get them documentation and have their objection or not

23  so that we can use the escrow proceeds to pay any of the tax

24  delinquencies or at least know that they are objecting before

25  that cure period runs.

1              THE COURT:  All right.

2              MR. BEECH:  We're also going to make it clear that

3    these are to -- that this escrow is to satisfy delinquent taxes

4    as of the closing date.

5              Romanette seven, Your Honor, essentially provides

6    that the remainder of the proceeds with respect to the mortgage

7    loans will go to JP Morgan subject to the debtor's rights to

8    seek to surcharge -- well the debtor's rights to seek a 506(c)

9    surcharge or some other surcharge for the cost of disposing of

10   and preserving the collateral.  And that the proceeds can be

11   disgorged from JP Morgan to the extent that there -- that the

12   Court or that there is an agreement -- that there is an

13   agreement between the parties or that the Court rules that a

14   surcharge is appropriate.

15             We also preserve the right for the debtors to

16   challenge JP Morgan's secured claims.  JP Morgan has filed a

17   claim, but there is no agreement yet that the full claim is a

18   valid and perfected claim at this point.  So we've preserved

19   our right to disgorge with respect to those proceeds that are

20   going to JP Morgan.

21             In addition to that, Your Honor, there is one other

22   rep and warranty that is in the sale agreement that says the

23   debtors have secured a first lien mortgage with respect to the

24   mortgage property underlying the mortgage loans.  Again, we

25   don't expect there to be an issue with that rep and warranty

1  but with the corollary provision that would potentially require

2  us to repurchase the loan if we didn't meet that requirement,

3  we have provided in this agreement that JP Morgan will be

4  responsible to pay for the repurchase of any such loans out of

5  the proceeds they received and to the extent of the proceeds

6  they received from this sale of the mortgage loans.

7          Those are the primary changes to the sale order, Your

8  Honor.  If I may, I'd like to turn to the sale agreement.

9          THE COURT:  Okay.

10          MR. BEECH:  The sale agreement, Your Honor, contains

11  the same or similar changes with respect to the addition of the

12  REO property.  It makes some typographical changes and

13  clarifications.  The first page is just cutting out references

14  to Bank of America in connection with this agreement.

15          The definition on Page 4 of escrow payments talks

16  about the exception event which deals with the withdrawn loans,

17  those 11 withdrawn loans.  Page 7 excludes the one loan that

18  had the litigation issue that Lehman has not agreed to

19  purchase.  This agreement also makes it clear in a few

20  additional places that the purchaser is not paying for accrued

21  interest in connection with the mortgage loans.

22          On Page 16, Your Honor, Section 2.04(c) primarily but

23  I think it's also in Romanette five, this is the language that

24  deals with the withdrawn loans and the escrow related to those

25  11 withdrawn loans.  Essentially adjusting the purchase price

1  and giving the loans back to the debtors if we can't provide

2  the documentation by March 31st.

3        Section 3.01(f), Your Honor, is the representations

4  and warranties that I mentioned in connection with the sale

5  order that we have provided for certain provisions to protect

6  ourselves.  Romanette one deals with the REO property and

7  having good and insurable title.  Romanette two deals with the

8  delinquent tax escrow to the extent that the taxes aren't in a

9  grace period.  And Romanette three deals with the confirmation

10  that the mortgage loans secure a first lien on the related

11  mortgage property.

12        THE COURT:  Okay.

13        MR. BEECH:  We made a clarification in Section 5,

14  actually it's more than a clarification, 5.01(l), this was one

15  of the sticking points we had between the parties because

16  previously as this read, it said that the purchaser was only

17  responsible for servicing advances made after the cutoff date.

18  Lehman has agreed that it would be servicing advances made and

19  accrued after the cutoff date.  We added a sentence at their

20  request just saying for the avoidance of doubt that stuff --

21  that servicing advances that accrue or are paid prior to the

22  cutoff date are now the purchaser's responsibility.

23        THE COURT:  Okay.

24        MR. BEECH:  Section 7.01 is the non-recourse section

25  which there's been some additions with some recourse.  Those

1 relate essentially back to the reps and warranties, and some

2 recourse that Lehman would have in that regard and then back to

3 the sale order where we've made those provisions to protect the

4 estate.

5      And then Section 7.03 is -- just talks about the

6 survival of the reps and warranties only for a 90 day period

7 because the recourse obligations are only for a 90 day period

8 after the closing date.  I believe that those are the major

9 changes to the order or to the sale agreement, Your Honor.

10      Your Honor, Mr. Johnson is still in the courtroom

11 today.  I think his proffer would be identical to the proffer

12 with respect to the B of A non-performing loans except with

13 respect to these non-performing loans.  I'm happy to go through

14 that proffer again, Your Honor.

15      THE COURT:  Any objections to incorporation of the

16 previous proffer as soon to be supplemented by Mr. Beech?  All

17 right, hearing none we'll incorporate that and you can just

18 proffer the testimony to the extent it's different in

19 connection with this package.

20      MR. BEECH:  Thank you, Your Honor.  All references in

21 the prior proffer to the B of A non-performing loans will be to

22 the JPM non-performing loans.  Mr. Johnson would testify that

23 with respect to the JPM non-performing loans that he has

24 reviewed the Lehman bid and Lehman's bid for the JP Morgan non-

25 performing loans is in the debtor's business judgment the

88

1 highest and best offer for these assets under the circumstances

2 of these bankruptcy cases and in the context of the sale under

3 the sale procedures.  And that the sale procedures and the sale

4 process was fair and conducted in accordance with the sale

5 procedures.

6          He would testify that under the circumstances of

7 these cases and the sale under the sale procedures, the

8 debtor's execution of the proposed sale agreement with Lehman

9 represents an arm's length agreement and was entered into in

10 good faith.  The proposed sale price for the JP Morgan non-

11 performing loans to Lehman represents a fair and reasonable

12 price under the circumstances.  Entry into the sale agreement

13 with Lehman is the exercise of the debtor's sound business

14 judgment.

15          The sale of the JP Morgan non-performing loans to

16 Lehman is in the best interest of the debtor's estates and

17 creditors.  Lehman is not affiliated with nor owns any interest

18 in or is not related to in any way the debtors.  It's not an

19 insider as defined under the Bankruptcy Code.  And that the

20 payment of the expense reimbursement to Archbay is appropriate

21 pursuant to the sale procedures.

22          Your Honor, the proffer with respect to the sealed

23 request would be the same in connection with this sale as well.

24          THE COURT:  Thank you.  Anyone wish to cross examine

25 the witness?  All right, hearing none I'll accept the testimony

1  and let's move or have admitted into evidence the detail of the

2  JP Morgan bid by Lehman Brothers.  I'll mark it as Debtor's

3  Exhibit B and admit that under sealed.

4      MR. BEECH:  Your Honor, I'm happy to answer any

5  questions you have or try to give you some more --

6      THE COURT:  No, let's just -- what's the process

7  going forward?

8      MR. BEECH:  Well, what we'd like to do is go back

9  tonight and finalize the form of order.  I don't think the

10  changes are going to be significant so we would expect to be

11  able to get it over either -- well, perhaps before five today

12  or first thing tomorrow morning I think would be the intent.

13      THE COURT:  Okay.  That's fine.  I'm here 'til six or

14  so today.  So that's, you can send it over whenever it's ready.

15      MR. BEECH:  Great.  Thank you, your Honor.

16      THE COURT:  Mr. Bowden.  You are here for Lehman I

17  take it?

18      MR. BOWDEN:  Your Honor, I am.  For the record, Bill

19  Bowden of Ashby & Geddes for Lehman Brothers.  First I'd like

20  to apologize that Mr. Aiello had to leave.  He had a 4:40

21  flight to Shreveport, Louisiana for a hearing tomorrow morning.

22      THE COURT:  All right.

23      MR. BOWDEN:  Based upon what I've been made to

24  understand and about the hour that I've been involved in this

25  matter, I believe that everything that was said on the record

1 by Mr. Beech is accurate.  We will need to review the form of

2 order and the APA, the most up to date drafts with Lehman.  I

3 don't know if that's going to happen tonight but we will make

4 every effort to get it done by no later than tomorrow morning.

5          THE COURT:  All right.

6          MR. BOWDEN:  I just wanted to give Your Honor a heads

7 up.

8          THE COURT:  Thank you.  I appreciate that.  Well,

9 send it over when it's ready under certification of counsel and

10 I won't -- I wouldn't anyway but I won't stay waiting for it.

11 If it comes it comes.  Otherwise, I'll look at it tomorrow.

12          MR. MCGUIRE:  Your Honor, Matthew McGuire of Landis

13 Rath & Cobb on behalf of JP Morgan.  Just with respect to the

14 committee objection.  The committee objected to a portion of

15 the motion regarding to the distribution of funds to JP Morgan.

16 In an effort to get this deal done we agreed to escrow that.  I

17 don't think it will come as a surprise to Your Honor that we

18 disagree with the committee's position.

19          That being said, I had the opportunity to speak with

20 committee counsel and we're going to work up informal process

21 moving forward to try and get this resolved.  With that said,

22 Your Honor, we support the sale in its entirety.

23          THE COURT:  All right.  Thank you.  Does anyone wish

24 to be heard from the committee?  Mr. Power.

25          MR. POWER:  Your Honor, I will be very quick.  Mark

1  Power, Hahn & Hessen, counsel for committee.  We're going to

2  tag team very quickly on this issue.  The reason is because my

3  firm has a conflict with the JP Morgan Chase.  When we first

4  discovered the issue of the REO security interests on the Bank

5  of America we immediately turned this over to conflicts counsel

6  who is here to deal with that issue.  So you won't be seeing my

7  face in connection with the Chase issues.

8         With respect to the sale, my firm was involved in

9  that sale and just like the previous representation we were

10  part of that process.  The debtor did keep us informed and the

11  committee fully supports the sale and believes it maximizes

12  value and is in the best interest of the estate.

13         THE COURT:  All right.  Thank you.  Mr. Bodnar, I

14  think you are conflict counsel.

15         MR. BODNAR:  Yes, Your Honor.  If I might, Joe Bodnar

16  on behalf of the committee for those specific conflict issues.

17  Also I'd like to introduce to the Court Mr. Michael Morris of

18  the Hennigan Bennet & Dorman office.

19         THE COURT:  Mr. Morris, hello.

20         MR. MORRIS:  Hello.

21         MR. BODNAR:  I filed a pro hac for him.  It's

22  probably waiting for your signature.

23         THE COURT:  Okay.

24         MR. BODNAR:  Your Honor, at this point I think we're

25  on board with everything that's been said to Your Honor with

1  respect to the changes.  We'd like to take a look at them to

2  confirm that they've been made.

3          THE COURT:  All right.  But do you have an agreement

4  in substance, if you will, in connection with the agreement to

5  escrow the proceeds?

6          MR. BODNAR:  Yes, and the procedure that was

7  described for getting those escrow funds out.

8          MR. MORRIS:  Your Honor.

9          THE COURT:  Mr. Morris.

10         MR. MORRIS:  If I may, there's simply one

11 clarification I wish to make and that is with respect to the

12 change in the order that applies to the reservation of rights

13 under 506(c), on behalf of the debtor we'd like that to include

14 the committee within that reservation of rights section.  Just

15 to --

16         THE COURT:  Why?  You don't have standing in the

17 506(C).

18         MR. MORRIS:  All right, that's fine.  We will work

19 that out with the debtor if we believe that's necessary.  Other

20 than that we do endorse the changes that were made.  Thank you.

21         THE COURT:  Very well.  All right.  So I'll await the

22 order under certification of counsel.

23         MR. BEECH:  Yes, thank you, Your Honor.  We'll work

24 on that with considering everyone's schedules.  We do hope, the

25 closing is scheduled for tomorrow and if everything works out

**J&J COURT TRANSCRIBERS, INC.**

1  and we can get you an order timely then we hope that will

2  occur.

3          THE COURT:  All right.  I'll look at it when it

4  comes.  Thank you.  Anything further for today.

5          MR. BEECH:  No, thank you, Your Honor.

6          THE COURT:  Thank you very much.  Hearing is

7  adjourned.

8                    * * * * *

9              **C E R T I F I C A T I O N**

10         I, LYNN SCHMITZ, court approved transcriber, certify

11  that the foregoing is a correct transcript from the official

12  electronic sound recording of the proceedings in the

13  above-entitled matter, and to the best of my ability.

14

15  /s/ Lynn Schmitz              DATE:  March 17, 2008

16  LYNN SCHMITZ

17  J&J COURT TRANSCRIBERS, INC.

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**