UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .        Case No. 07-11047(CSS)
                              .        Chapter 11
AMERICAN HOME MORTGAGE        .
HOLDINGS, INC.,               .
a Delaware corporation,       .
et al.,                       .        824 North Market Street
                              .        Wilmington, DE 19801
                              .
           Debtors.           .        February 28, 2008
. . . . . . . . . . . . . ..           11:05 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:              Young Conaway Stargatt & Taylor,
                               LLP
                              By:  SEAN M. BEACH, ESQ.
                                   MATTHEW B. LUNN, ESQ.
                              The Brandywine Building
                              1000 West Street
                              17th Floor
                              P.O. Box 391
                              Wilmington, DE  19899


For AH Mortgage              Greenberg Traurig, LLP
Acquisition Company:         By:  VICTORIA W. COUNIHAN, ESQ.
                             The Nemours Building
                             1007 North Orange Street
                             Suite 1200
                             Wilmington, DE  19801


Audio Operator:              Nicole Schaefer


Proceedings recorded by electronic sound recording, transcript
               produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For Bank of America:        Kaye Scholer LLP
                           By:  MARGOT B. SCHONHOLTZ, ESQ.
                           425 Park Avenue
                           New York, NY  10022
                           (Telephonic Appearance)

For ABN AMRO Bank, N.V.:   Milbank, Tweed, Hadley &
                            McCloy LLP
                           By:  FRED NEUFELD, ESQ.
                                ROBERT JAY MOORE, ESQ.
                           601 South Figueroa Street
                           30th Floor
                           Los Angeles, CA 90017
                           (Telephonic Appearance by Mr. Moore)

For JPMorgan Chase:        Landis Rath & Cobb, LLP
                           By:  MATTHEW B. McGUIRE, ESQ.
                           919 Market Street
                           Wilmington, DE  19801

For Indymac Bank:          Pachulski, Stang, Ziehl & Jones,
                            LLP
                           By:  CURTIS A. HEHN, ESQ.
                           919 North Market Street
                           17th Floor
                           P.O. Box 8705
                           Wilmington, DE  19899

For Indymac Bank:          Orrick, Herrington & Sutcliffe, LLP
                           By:  FREDERICK D. HOLDEN, JR., ESQ.
                           Old Federal Reserve Bank Building
                           400 Sansome Street
                           San Francisco, CA  94111

For the Creditors'         Blank Rome, LLP
Committee:                 By:  DAVID W. CARICKHOFF, JR., ESQ.
                           Chase Manhattan Centre
                           1201 Market Street
                           Suite 800
                           Wilmington, DE 19801

For Bank of America,       Potter Anderson & Corroon, LLP
N.A.:                      By:  LAURIE SELBER SILVERSTEIN, ESQ.
                           Hercules Plaza
                           1313 North Market Street
                           Wilmington, DE 19801

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  JOSEPH McMAHON, ESQ.
                               844 King Street
                               Suite 2313
                               Lockbox 35
                               Wilmington, DE 19801

For AHM Holdings:              Kroll Zolfo Cooper
                               By:  ROBERT J. SEMPLE
                               101 Eisenhower Parkway
                               Third Floor
                               Roseland, NJ  07068

**J&J COURT TRANSCRIBERS, INC.**

1        THE CLERK:  All rise.

2        THE COURT:  Please be seated.  Good morning.

3        MR. LUNN:  Good morning, Your Honor.  May it please

4   the Court, Matthew Lunn from Young Conaway on behalf of the

5   debtors.  Referring to the amended agenda that was filed

6   yesterday afternoon, Your Honor, agenda Item 1, the debtors and

7   Vicom are still documenting the settlement agreement, which

8   will be submitted either under certification of counsel or an

9   appropriate 9019 motion upon appropriate notice.

10       Agenda Items 2 through 4 are being adjourned.  Agenda

11  item Number 5, this relates to agenda item Number 16, and that

12  was withdrawn as a result of the filing of agenda item Number

13  16.

14       THE COURT:  Okay.

15       MR. LUNN:  Agenda Items 6 through 10 were the subject

16  of the certificates of no objection, and Your Honor had entered

17  orders on those matters, and we appreciate that.  Agenda item

18  Number 11 through 14 are foreclosure relief from stay related

19  motions.  They are either all the subject of certifications of

20  counsel or an order was entered.  Specifically, I don't believe

21  an order was entered yet with respect to Item 12.

22       THE COURT:  I received that this morning, and I

23  signed the order.

24       MR. LUNN:  All right.  Thank you very much, Your

25  Honor.  That then carries us to agenda item Number 15.  This is

1  the debtors' motion for approval of a settlement agreement by

2  and between the debtors, or certain of the debtors, and ABN

3  AMRO Bank, NV, whereby the debtors are requesting approval of

4  that third post-petition advances stipulation, approval of the

5  authority to compromise the ABN mortgage loans and approval of

6  a bonus plan for the construction loan employees.  A brief

7  background probably will give some context to this, Your Honor.

8            THE COURT:  All right.

9            MR. LUNN:  Certain of the debtors and ABNs -- and ABN

10  are parties to a master repurchase agreement dated as of

11  February 28th, 2007.  Pursuant to that agreement, certain of

12  the debtors made residential construction loans to individuals

13  constructing or renovating single-family residential homes.

14  Currently there are 285 ABN mortgage loans under the master

15  repurchase agreement with an aggregate UPB, or unpaid principal

16  balance, of approximately 142 million.

17            During the course of the cases, ABN and certain of

18  the debtors have entered into numerous stipulations.  The first

19  was approved by Your Honor on August 22nd, 2007, and is

20  referred to as the "first post-petition advances stipulation."

21  Pursuant to that stipulation, ABN was permitted to fund certain

22  additional mortgage advances as defined in that stipulation and

23  authorized ABN to make servicing payments for the debtors to

24  continue servicing the ABN construction or mortgage loans.

25            Your Honor may recall also that in September and

1 through October we attempted to sell the construction loan

2 portfolios, as well as the construction loan platform, but

3 ultimately were unsuccessful in doing so and, as a result,

4 adjourned -- or canceled the auction and adjourned the sale

5 hearing.  That sale was separate and apart of the -- from the

6 servicing sale to Wilbur Ross, and I spoke with counsel for

7 Wilbur Ross's -- for Wilbur Ross this morning who wanted me to

8 make clear that the construction loan servicing group is

9 separate and distinct from the servicing group that is in

10 Irving.

11          In connection with the attempt to sell the

12 construction loan portfolios and the platform, ABN and the

13 debtors again entered into a further stipulation, and this one

14 is referred to as the "sale procedure stipulation," which

15 provided for, among other things, an agreed sale and marketing

16 process with respect to the ABN mortgage loans, the obligation

17 of ABN to pay the debtor $700,000 for that marketing process,

18 an agreement by ABN that upon the turn over of the mortgage

19 loans upon their request in the event that we could not sell

20 those loans, that they would not assert a claim in essentially

21 a claim waiver provision that's referred to in the motion.

22          Pursuant to the construction loan procedures, as I

23 said, there was an auction that was scheduled for October 29th

24 that ultimately was cancelled, and then the sale hearing was

25 adjourned because no bids were received that would have

1  resulted in a significant value to the debtors' estates.   On

2  November 8, 2007, under the sale procedure stipulation, ABN did

3  pay the debtors the $700,000.   Shortly thereafter on December

4  3rd, the debtors and ABN entered into yet a further

5  stipulation, this referred to as the "second post-petition

6  advances stipulation," whereby the debtors agreed to maintain

7  the construction loan servicing group through March 31, 2008.

8  ABN agreed to continue to pay the mortgage advances and also

9  servicing payments in accordance with the budget that was

10 attached to it.

11         Recently, due to regulatory issues that delayed the

12 turnover of the ABN mortgage loans by the debtors to ABN as

13 contemplated under the sale stipulation, ABN contacted the

14 debtors and requested that we maintain the construction loan

15 servicing group through June of 2008.   In connection with that

16 request, and as ABN saw in connection with the debtors' efforts

17 to compromise the construction loans which Your Honor approved

18 at the beginning of this month, which were previously subject

19 to liens and security interests of B of A, they additionally

20 requested that the debtors go out and attempt to compromise and

21 refinance those loans as they see that it's also an expedient

22 and efficient manner to liquidate those loans.

23         As further incentive for the debtors to undertake

24 these obligations, ABN has agreed to fund a bonus plan in the

25 amount not to exceed $450,000, while the debtors continue to

8

1  operate the servicing -- construction loan servicing business

2  and work to refinance the construction loans.

3        As a result, the debtors then have entered into the

4  third post-petition advances stipulation.  The significant

5  terms, Your Honor, as laid out in the motion and in the

6  stipulation, are that ABN shall continue to fund the additional

7  mortgage advances and servicing payments as provided in the

8  first post-petition advances stip and the second post-petition

9  advances stipulation.  ABN has further agreed that it's going

10 to continue to pay the 2008 budgeted amounts related to the

11 servicing of construction loans and that the debtors would

12 agree to use their commercially reasonable best efforts to keep

13 the construction loan servicing group in place through June

14 30th of '08.  If, however, we cannot, the debtors cannot keep

15 that construction loan servicing group in place through June

16 30th, the debtors still have the ability to give ABN notice of

17 its inability to maintain the group in place and turn over the

18 loans as contemplated under the sale stipulation.

19       The stipulation further provides and reaffirms the

20 waiver of claims by ABN.  It authorizes the debtors to offer

21 principal reductions on the ABN mortgage loans.  All costs

22 associated with the refinancings and the compromises undertaken

23 by the debtors are borne by ABN.  Additionally, upon closing of

24 refinancing of the loan and the distribution of the net

25 proceeds, ABN will further release and waive claims against

1  AHM.

2        As was done in connection with the construction loans

3  pursuant to which B of A had previously had a lien and security

4  interest in, the debtors will file a report upon the completion

5  of the compromises of the ABN mortgage loans and the

6  construction loans.  Similar to that report as I referred to,

7  ABN consents to the filing of that report and will support the

8  debtors if -- in the event the debtors have determined to file

9  that report under seal.

10        As I alluded to in the beginning, Your Honor, ABN has

11  also agreed to fund the entire cost of a bonus plan in an

12  amount not to exceed $450,000.  That bonus plan, Your Honor,

13  has two components, as laid out in the stipulation.  There's a

14  stay component and there's also an incentive component.

15        With respect to the stay component, the construction

16  loan employees, other than Karen Gowins, will be entitled to

17  receive their allocated portion of the bonus pool for the stay

18  component if they are employed or remain employed through June

19  30th or the date that the ABN mortgage loans and the

20  construction loans are fully compromised or that the debtors

21  determine that no further loans can be compromised.  Of the

22  $450,000, $175,000 has been designated for the stay component

23  of the bonus plan.

24        The second component, which is the incentive

25  component, is directly tied to performance and the reduction of

1  UPBs achieved by the construction loan servicing group.

2  Specifically, there are three measures.  There's a 60 percent

3  aggregate reduction of the UPBs, and the aggregate reduction --

4  or the aggregate UPBs are the ABN mortgage loans combined with

5  the construction loans that were subject to the liens of B of A

6  previously.  There is also an 80 percent milestone and a 90.

7  Upon achieving a 60 percent reduction of the UPBs, the

8  construction loan employees other than Karen Gowins will be

9  entitled to receive ten percent of their allocated portion of

10 the bonus pool.  Karen Gowins will be entitled to receive 20

11 percent.  Upon achieving the 80 percent milestone, construction

12 loan employees will then be entitled to receive 15 percent,

13 while Ms. Gowins 30 percent of her allocated portion of the

14 bonus pool.  Upon the 90 percent, the remaining portion of the

15 bonus pool allocated for incentives will be paid to the

16 construction loan employees.  In other words, 25 percent to

17 those construction loan employees other than Karen Gowins and

18 50 percent to Karen Gowins of her allocated portion of the

19 bonus pool.

20        If the construction loan group is not kept in place,

21 the stipulation further provides that ABN shall be obligated to

22 fund a hundred percent of the stay bonus in a pro rata share,

23 or portion, of whatever milestone that is or is not reached.

24 As put in an example in the stipulation, if only a 30 percent

25 reduction is achieved before the turnover or June 30th, then

1  ABN will fund a hundred percent of the stay bonus and 50

2  percent of the allocated portion for the 60 percent milestone.

3       In support of the motion, Your Honor, we filed the

4  declaration of Robert J. Semple, who is an employee of Kroll

5  Zolfo Cooper, who is working with the debtors.  Mr. Semple is

6  appearing telephonically and is available to answer any

7  questions Your Honor may have, but if I -- if you wish, I could

8  walk through the salient points of his declaration.

9       THE COURT:  I don't think that's necessary.

10       MR. LUNN:  All right.

11       THE COURT:  Is there any opposition to reliance on

12  the declaration in support of the motion?  All right.  The

13  Court will accept it as evidence in support of the motion.

14       MR. LUNN:  Thank you, Your Honor.  Your Honor, the

15  debtors believe that approval of the stipulation under 9019 is

16  in the best interest of the debtors' estates.  As under the

17  third post-petition advances stipulation ABN is committed to

18  continue funding its pro rata share of the budget for the

19  servicing portfolios.  ABN is funding the entire obligations of

20  the bonus plan, and ABN has reaffirmed the waiver of claims.

21  The added incentive further of the bonus plan, which is tied

22  not only to the compromise of the ABN mortgage loans, but

23  includes now the construction loans directly, does benefit the

24  debtors' estates.  Further, the compromise of the ABN loans is

25  supported by the sound business judgment of the debtors.  The

1 ability to compromise the ABN mortgage loans is effectively no

2 different than the authority that Your Honor granted in

3 connection with the B of A construction loans that were subject

4 to a prior order of the Court, as the debtors have attempted to

5 sell these construction loans, the construction platform, but

6 yet were unsuccessful.

7       Your Honor, additionally, the debtors submit that the

8 bonus plan is justified by the facts and circumstances of the

9 debtors' cases as required under Section 503(c) of the

10 Bankruptcy Code.  The bonus plan is not an insider retention

11 plan that would implicate the provisions of Section 503(c)(1).

12 Namely, there are only two construction employees with titles

13 that may suggest they are insiders of the debtors.  The other

14 titles of the construction loan employees under the bonus plan

15 are construction loan lending specialists.  However, the one --

16 to address the 503(c)(1), Ms. Gowins is specifically not

17 eligible to receive payments under the stay component of the

18 bonus plan.

19       There is one additional individual, Mr. David Hall,

20 who has the title of vice president, but, as set forth in the

21 declaration as well as the record Your Honor had for him in

22 connection with the approval of the non-insider KERP plan and

23 the testimony of Mr. Allen Horn, who is present in the

24 courtroom today, vice presidents are essentially managerial

25 employees of the debtors.  They do not control the operations

1 or policy decisions of the debtors.  Their compensation is not

2 set by the board and they cannot hire employees.

3        Your Honor, the debtors further submit that there is

4 a reasonable relationship between the bonus plan and the

5 proposed results, as the bonus payments are tied directly to a

6 threshold of a reduction of UPBs.  The cost of the bonus plan

7 is neutral to the debtors because ABN has agreed to fund the

8 entire obligations in the maximum amount of $450,000.  Further,

9 the bonus plan does not unfairly discriminate, as it includes

10 all the current construction loan employees.

11        Prior to the filing of the stipulation and the

12 motion, Your Honor, the debtors did work with the committee to

13 address any concerns that it may have, as there was a perceived

14 -- and the debtors have perceived this initially -- of taking

15 the construction loan employees folks away from compromising

16 those other construction loans in favor of the ABN construction

17 loans.  That was resolved by aggregating the UPBs.  Therefore,

18 there is no direct incentive for only compromising the ABN

19 mortgage loans.

20        Additionally, prior to the hearing and after the

21 filing of the motion, the Office of the United States Trustee

22 requested a schedule of the employees and the amounts to be

23 paid pursuant to the plan, their allocated portions.  That was

24 provided to the U.S. Trustee.  And then recently the United

25 States Trustee did raise an informal concern with respect to

1 the motion.  Specifically, they were concerned with the

2 potential creation of administrative expense liability in the

3 event that ABN didn't fund the bonus pool amounts.  As a

4 result, ABN and the debtors have agreed to a revision to the

5 order that provides that the $450,000 that's allocated for the

6 bonus pool will be pulled from the control account, which is a

7 "for benefit" account, with a -- excuse me AHM and ABN,

8 transfer that $450,000 to a new debtor-in-possession account

9 for the sole purpose of holding those funds and then disbursing

10 those funds upon the reaching of the milestones of the stay

11 bonus.  I believe with that revision, Your Honor, that the

12 Trustee's objection is resolved.  And then there were no other

13 objections to the motion, Your Honor.

14          THE COURT:  Does anyone wish to be heard?

15          MS. COUNIHAN:  Good morning, Your Honor.  Victoria

16 Counihan from Greenberg Traurig on behalf of AH Mortgage

17 Acquisition Company.  Based on the debtors' representations to

18 us that the construction loans don't relate to the assets that

19 are being purchased by my client under their asset purchase

20 agreement, we don't have a position on the motion.

21          THE COURT:  All right.  Thank you.  Mr. McMahon?

22          MR. McMAHON:  Your Honor, good morning.  Joseph

23 McMahon for the United States Trustee.  Mr. Lunn has accurately

24 stated our office's position.  I would just note that in the

25 discussion of the relief sought in the motion, there is some

1  reference to the standard under 503(c)(3) and whether or not

2  it's a business judgment standard or something else.  Our

3  office has a defined view on that that justified by the facts

4  and circumstances of the case means something different than

5  business judgment, but we're happy to address that issue

6  another day.

7           THE COURT:  All right.  I have an undefined view on

8  that, but it's still an open issue as far as I'm concerned, as

9  well, but I understand your reservation.  Yes, sir?

10          MR. CARICKHOFF:  Good morning, Your Honor.  May it

11 please the Court, David Carickhoff of Blank Rome on behalf of

12 the creditors' committee.  Based upon the agreement in its

13 present form, the committee supports it.

14          THE COURT:  All right.  Mr. Lunn, do you have an

15 order?

16          MR. LUNN:  I have a black line and a proposed form of

17 order, if I may approach.

18          THE COURT:  Yes.  Thank you.

19          MR. LUNN:  Your Honor, the revisions, to address the

20 U.S. Trustee's concern, are in the third "Ordered" paragraph on

21 the second page.  Unfortunately -- I apologize, Your Honor.

22 There is no page numbers on this black line.

23          THE COURT:  All right.  I'll sign the order as

24 revised.

25          MR. LUNN:  Thank you, Your Honor.  Agenda Item 16,

1  which is the remaining agenda item, will be handled by Mr.

2  Beach.

3          THE COURT:  All right.

4          MR. BEACH:  Good morning, Your Honor.  May it please

5  the Court, Sean Beach from Young Conaway Stargatt & Taylor on

6  behalf of the debtors.  Your Honor, first of all, I'd like to

7  thank Your Honor for hearing this matter on shortened notice

8  and assure Your Honor that the parties have been working

9  diligently to come up with a modification to the original

10  letter agreement and sale order that not only is acceptable to

11  both parties, but inures to the benefit of the debtors, and we

12  think with some modifications which I'll highlight for Your

13  Honor today, that we certainly achieved that goal, and we do

14  believe that the modification is in the best interests of the

15  estate and its creditors.

16          Your Honor, just a brief history.  In -- on August

17  7th, 2007, the debtors and Indymac executed a letter agreement

18  and license agreement whereby Indymac agreed to take the

19  assignment of and assume the liabilities in connection with

20  approximately 98 office leases and to purchase the FF&E in

21  connection with those office leases.  On August 10th, 2007, the

22  debtors filed an emergency motion to seek approval of those

23  agreements, and on August 24th, 2007, the Court approved the

24  letter agreement and the license agreement.

25          Since that time, Indymac has been working out of

1 those offices pursuant to the terms of the license agreement

2 and paying the obligations in connection with those office

3 leases.  On September 17th, 2007, the Court entered an order

4 establishing the cure amounts and setting those cure amounts

5 through September 30th, 2007.  Since that time, by information

6 and belief, all the administrative costs in connection with

7 these office leases have been paid either by the debtors or

8 Indymac in connection with the license agreement.

9         While the debtors were authorized to assume and

10 assign these office leases, the office leases were never, in

11 fact, assumed and assigned because the sale never closed, and

12 in early February 2008, the debtors sent a letter to Indymac

13 notifying them of the 365(d)(4) deadline which was quickly

14 approaching on March 3rd.  The debtors and Indymac began some

15 discussions but with no resolution.  On March 15th, the debtors

16 filed a motion to enforce the terms --

17         THE COURT:  February --

18         MR. BEACH:  I'm sorry.

19         THE COURT:  You said March 15th.  February 15th.

20         MR. BEACH:  I'm sorry, February 15th, Your Honor, the

21 debtors filed a motion to enforce the terms of the letter

22 agreement and continued discussions with Indymac to try to come

23 up with an acceptable form of asset purchase agreement to fully

24 document the letter agreement and certain modifications

25 requested by Indymac.  Your Honor may recall the letter

1  agreement was simply a three-page agreement so it required some

2  additional documentation in the form of an APA, and it did take

3  some time to get an agreement on that form.

4          Your Honor, with the -- the debtors did agree to file

5  motion to modify the letter agreement and request a

6  modification of the original sale order after, you know,

7  numerous discussions with Indymac and an agreement on a

8  modification which would result in the rejection, if approved,

9  of 15 of the approximately 98 office leases.  Based on a

10 request by the debtors we've now reduced that number to 13

11 office leases and Indymac has agreed to take the assumption of

12 two of those 15 offices leases, so today, Your Honor, we are

13 asking to have the rejection effective with respect to 13 of

14 those office leases, which significantly reduces the rejection

15 damages, and as a result of Indymac taking the assumption and

16 assignment of those two additional office leases, there will be

17 a reduction of the additional escrow deposit that was described

18 in the motion.  That additional escrow deposit was as filed

19 with the motion and as funded by Indymac in the amount of $1

20 million.

21         The parties agreed since the filing of the motion to

22 -- at the request of the debtors, to modify that so that

23 Indymac would take the assumption and assignment of these two

24 leases, and we would use the calculation set forth in the APA

25 to reduce the amount of that escrow deposit.  So, the way that

1  the deal would currently work is that the -- if the Court does

2  approve the modification today, the debtors would reject 13 of

3  these leases and immediately be -- be authorized from the

4  escrow agreement to get $393,593 from that escrow.  And

5  assuming that Indymac closes on the Phase II closing by March

6  3rd at four o'clock before the 365(d)(4) deadline, Indymac

7  would then be authorized to take the additional 606,000 and

8  change from that additional escrow deposit.

9       So that's a modification from the filed version,

10 which the debtors believe certainly inures to our benefit

11 because it significantly reduces the potential rejection

12 damages and it reduces the rejection damages more specifically

13 with respect to an estate that the debtors think they may have

14 a high recovery with respect to unsecured claims, and so the

15 debtors believe that this $393,000 that they would receive with

16 approval of the modification would not only satisfy the

17 anticipated distributions for the rejection damages, it would

18 also satisfy the costs of the debtors bringing the modification

19 motion and give the debtors additional consideration on top of

20 that probably to the tune of $200,000.

21      Your Honor, prior to filing the motion or prior to

22 agreeing to file the motion to modify the letter agreement, the

23 debtors did require certain things from Indymac, and one

24 important thing that the debtors required was that Indymac pay

25 the purchase price under the original letter agreement.  Under

1  this modification, there's no reduction in that original

2  purchase price, and on February 22nd Indymac did, in fact, pay

3  that amount, that indefeasible amount, and did close on 73 of

4  the 98 leases.  There was an additional seven or so leases that

5  had expired by their own terms in between having been approved

6  early on in these cases and now, and then the additional 13

7  leases we're asking -- well, an additional 13 leases we're

8  asking be rejected, and then the additional two leases will be

9  added to the list of leases to be assumed and assigned, which

10  will be assumed and assigned in connection with, as we describe

11  it, the Phase II closing under the letter agreement.

12         And in connection the filing of the motion, in

13  addition to paying the purchase price, we did require that we

14  close on a portion of those leases and, like I said, Your

15  Honor, we did close on 73 of those leases and received the

16  purchase price.  On February 22nd, Indymac also paid the one

17  million -- well, actually, $1,168,000 into an escrow.  The one

18  million is this additional escrow amount that I discussed

19  earlier which relates to the additional consideration paid to

20  the estate for rejecting the 13 leases, and, as I've described

21  with our modified agreement, the debtors would get a portion of

22  that if approved, and Indymac would get the remainder if the

23  Phase II closing occurs.  In addition, there's $168,000 in the

24  escrow account that relates to certain reconciliations on

25  security deposits and tax payments that are due, or will become

1  due.

2          In addition, Your Honor, the asset purchase agreement

3  provides for a number of indemnification obligations by Indymac

4  to cover any costs related to leases that expired by their

5  terms prior to the closing, any administrative costs associated

6  with the rejected leases, obligations under the license

7  agreement, the payment of cure amounts which are held back from

8  the purchase price and to be paid by Indymac and other costs as

9  set forth in Section 3.3 of the asset purchase agreement,

10 including the estates' costs for defending against any asserted

11 administrative claims.

12          Last, Your Honor, the lease parties were provided

13 with notice of which leases were to be assumed and which were

14 proposed to be rejected under Schedule 1.1(a) of the APA, which

15 included footnotes identifying certain leases to be excluded

16 and others that were expired.  While these leases were properly

17 identified on 1.1(a), there was one lease incorrectly

18 identified on Schedule 1.6 as an excluded lease.  That is the

19 property at 3053 Center Point, which will be assumed under the

20 revised schedules that are attached to the sale order, again if

21 approved, and one lease that has been added to Schedule 1.6 as

22 an excluded lease, the 2829 West Town Parkway lease, which will

23 be rejected.  Again, those were properly identified in Schedule

24 1.1(a), but due to a clerical error they were -- they were

25 switched on Schedule 1.6.

1          Your Honor, Mr. Allen Horn is here today.  There were

2    no objections to the motion, but we did prepare a brief proffer

3    of the testimony of Mr. Allen Horn, and if it's acceptable to

4    Your Honor I'd like to put that testimony on the record.

5          THE COURT:  Any objection to the use of a proffer?

6    You may proceed.

7          MR. BEACH:  Thank you, Your Honor.  Mr. Allen Horn,

8    who is present in the courtroom today, is secretary, executive

9    vice president and general counsel of American Home Mortgage

10   Investment Corp., one of the debtors and the ultimate parent of

11   each of the other debtors.  If Mr. Horn were called to testify,

12   he would state that he has been employed by the debtor since

13   January 2003.  He would also state that after graduating from

14   Temple University Law School, he was admitted to practice law

15   in the State of New York in 1977 and remains in good standing.

16   He would further state that he is familiar with the debtors'

17   motion to modify the Indymac letter agreement and that he is

18   qualified to testify to the merits of necessity for the relief

19   sought in the motion.

20         In support of the motion, Mr. Horn would testify as

21   follows.  The modifications to the letter agreement represent a

22   compromise between the debtors and Indymac with respect to the

23   terms of the sale.  Mr. Horn would also testify that the

24   debtors engaged in good faith and arm's length negotiations

25   with Indymac to modify the terms of the letter agreement and

1  the original sale order.  Mr. Horn would testify that in his

2  business judgment the modifications are fair and reasonable,

3  adequate and in the best interest of the debtors, their estates

4  and creditors.

5          Mr. Horn would testify that the debtors have reviewed

6  the office leases sought to be rejected and have determined in

7  their business judgment that such leases hold no material

8  economic value to the debtors or their estates and are not

9  essential to conducting these bankruptcy cases, particularly in

10 light of the fact that there is no reduction in the original

11 purchase price for the assets, and Indymac is providing

12 additional adequate consideration to the estate to reject the

13 13 leases.

14         Mr. Horn would further testify that it would be more

15 cost effective for the debtors to abandon the FF&E remaining in

16 the premises, subject to those leases than to transport and

17 store that FF&E.

18         Ultimately, Mr. Horn would testify that under the

19 circumstances the modified APA provides the debtors with

20 additional indemnification rights, additional certainty of

21 closing prior to the March 3rd 365(d)(4) deadline and

22 consideration, which is anticipated to be in an amount

23 sufficient to cover rejection damages for the rejected leases,

24 costs associated with filing and prosecuting the modification

25 motion and additional consideration to the estate.  As such, he

1  would testify that there is sound business justification to

2  approve the modifications and for the debtors to reject the 13

3  office leases and to abandon any FF&E remaining therein as of

4  February 29th, 2008 and that doing so is in the best interest

5  of the debtors, their estates and creditors.  And that would

6  conclude Mr. Horn's testimony.

7          THE COURT:  All right.  Does anyone wish to cross

8  examine the witness?  Hearing none, the Court will accept the

9  testimony.

10          MR. BEACH:  Your Honor, I do have a revised form of

11  order in black line and clean form which may aid Your Honor to

12  see some of the modifications that we've made.  If I may

13  approach?

14          THE COURT:  Yes.  Thank you.

15          MR. BEACH:  Your Honor, the changes to the order

16  reflect essentially what I suggested before, which was

17  primarily a request by the debtors to make certain

18  modifications so that Indymac would assume two of the 15 leases

19  listed as leases that we sought to reject in the original

20  motion and a -- a calculation of how the escrow deposit would

21  be handled, the additional escrow deposit would be handled and

22  the actual amounts that would go to the parties if certain

23  events occur.

24          Your Honor, when we filed the motion, as the parties

25  were working very hard to finalize the APA, we couldn't

1  finalize it before the FedEx deadline on Friday.  We did file

2  an executed version of the APA at approximately noon on

3  Saturday.  We filed yesterday with the Court a black-line

4  version showing the changes from the original filed version to

5  the executed version, which was also filed and served on all

6  parties.  Your Honor, the -- I can walk through the changes to

7  the APA unless Your Honor has already had the opportunity to

8  take a look at --

9         THE COURT:  No, I saw it this morning.  That's fine.

10        MR. BEACH:  Thank you, Your Honor.  With that, Your

11 Honor, I would ask that Your Honor approve this modification.

12 The debtors and Indymac worked very hard to come up with a

13 mechanism to get this -- to get the leases -- or as many of the

14 leases assumed and assigned as possible to provide

15 consideration for the estate for the modification, and we do

16 believe that it is in the best interest of the estate to

17 approve this modification.

18        Your Honor, I do want to note that Mr. Fred Holden

19 and Mr. Curtis Hehn from -- counsel for Indymac are in the

20 courtroom today to the extent Your Honor has any questions for

21 them.

22        THE COURT:  All right.  Does anyone wish to be heard

23 in connection with this matter?

24        MR. HOLDEN:  Good morning, Your Honor.  Frederick

25 Holden for Indymac Bank.  I just want to make just a very brief

1 couple of comments.  Mr. Beach's presentation seemed entirely

2 accurate.  I would just note that, in fact, there is a piece of

3 the history that goes back even farther.  When we first signed

4 the letter agreement in the first -- around the first -- 7th of

5 August, there were only 75 leases that were anticipated to be

6 assumed and assigned.  By the time we got to court it was up to

7 98, and now we're back to about 75, and it seems like a moving

8 target.  Among other things, seven of the leases have run their

9 full term, and all of these landlords -- Mr. Beach has stated,

10 all of these landlords have been paid in full, all of their

11 rent up through tomorrow.  So I think -- you know, that's why I

12 think you're not seeing much opposition to this, in addition to

13 other reasons.

14        Also, I just wanted to make a very brief comment

15 about the motion that has been withdrawn.  There is -- this has

16 been a difficult matter for all sides, and Indymac included,

17 but one would see from looking at the schedules to the revised

18 asset purchase agreement, which has a so-called license

19 true-up, that all along not only has Indymac been paying rent

20 to the landlords, but it's also been making payments to the

21 debtor that in every month exceeded the amount that was

22 actually turned out to be owing.  So, I think there's been a

23 lot of good faith all around on all sides, and we would urge

24 the Court to approve the order.  Thank you.

25        THE COURT:  All right, thank you.  Anyone else?  Mr.

1 Carickhoff?

2          MR. CARICKHOFF:  Thank you, Your Honor.  Again, David

3 Carickhoff for the record.  Based upon the fact that there will

4 be additional monies provided to cover the anticipated

5 rejection damages, the committee supports this compromise.

6          THE COURT:  Okay.  Thank you.  Anyone else?  I'll

7 sign the order as revised.

8          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.  I

9 believe that concludes our agenda today, probably in record

10 time for these cases.

11          THE COURT:  All right.  When is the Bank of America

12 stay relief motion scheduled for, March 15th?

13          MS. SILVERSTEIN:  Yes, Your Honor, the next hearing

14 date.

15          THE COURT:  All right.  Okay.  That's it.  Thank you.

16 Hearing is adjourned.

17                              *  *  *  *  *

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, DENISE M. O'DONNELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Denise M. O'Donnell              DATE:  March 18, 2008

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.