IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE | ) |
| HOLDINGS, INC., a Delaware corporation, | ) Case No. 07-11047 (CSS) |
| et al.[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Ref. Docket No. 3318** |

**DEBTORS' OBJECTION TO JOINT MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS AND BANK OF AMERICA, N.A., AS
ADMINISTRATIVE AGENT, FOR ENTRY OF FINAL STIPULATION AND ORDER
RESOLVING ALL REMAINING ISSUES WITH RESPECT TO THE
FINAL ORDER (I) AUTHORIZING DEBTORS' LIMITED USE OF CASH
COLLATERAL AND (II) GRANTING REPLACEMENT LIENS AND ADEQUATE
PROTECTION TO CERTAIN PRE-PETITION SECURED PARTIES**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") hereby object (the "Objection") to the Joint Motion of the Official Committee of

Unsecured Creditors (the "Committee") and Bank of America, N.A., as Administrative Agent

(the "Administrative Agent"), for Entry of a Final Stipulation and Order (the "Settlement

Stipulation")[2] Resolving all Remaining Issues with Respect to the Final Order (I) Authorizing

Debtors' Limited Use of Cash Collateral and (II) Granting Replacement Liens and Adequate

Protection to Certain Pre-Petition Secured Parties [D.I. 3318] (the "Motion") and request that the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2]     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Settlement Stipulation.

Court deny approval of the Settlement Stipulation. In support of this Objection, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT[3]

1.    Although the standards for approval of a compromise under Bankruptcy Rule 9019 are not particularly stringent, regrettably, the Settlement Stipulation cannot clear those low hurdles. The Settlement Stipulation purportedly offers value to general unsecured creditors through essentially two forms of consideration: (i) the value from the release of the Administrative Agent's claims and liens on the Designated REO Properties, and (ii) the sharing arrangement provided in paragraph 3 of the Settlement Stipulation. The Debtors support the spirit of the notion of the release of claims and liens on the Designated REO Properties and the Administrative Agent agreeing to share a portion of its recovery with general unsecured creditors, but not its form. The terms of the Settlement Stipulation are skewed heavily in favor of the Administrative Agent to the detriment of the Debtors' estates, and the Debtors therefore cannot support the Settlement Stipulation.

2.    Analyzing the consideration offered by the Administrative Agent against the price agreed to by the Committee, the price being paid by the Debtors' estates is simply too high and not in the best interests of the Debtors' estates. In return for the meager and potentially illusory consideration, the Committee has agreed to (i) submit itself to the control of the Administrative Agent for the duration of these complex chapter 11 cases; (ii) relegate itself to bystander status in connection with several, critical matters yet-to-be decided by the Court related to the Collateral and the Administrative Agent's asserted rights; (iii) allow and immunize from objection the amount and treatment of any Deficiency Claim in contravention of the

---

[3]    Capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms in the Objection.

Debtors' and other creditors' rights and the Bankruptcy Code; and (iv) support the Stay Relief Motion despite the adverse implications that allowing the Administrative Agent to control the disposition of the Collateral will on the value of the Collateral.

3.     With the Committee's capitulation on these other points, the Settlement Stipulation goes far beyond resolving only the issues delegated to the Committee. For example, this Court's approval of the Settlement Stipulation would result in the allowance of the amount, and would dictate the treatment of the Deficiency Claim. The Committee, as a result, has exceeded its authority and standing conferred under the Cash Collateral Order and the Bankruptcy Code. Therefore, the Settlement Stipulation cannot be approved over the objection of the Debtors.

4.     Simply put, the Settlement Stipulation is not in the best interests of the Debtors' estates and should be rejected.

## BACKGROUND

### A.     The Chapter 11 Cases

5.     On August 6, 2007 (the "Petition Date") each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"). Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

6.     On August 14, 2007, the United States Trustee for the District of Delaware appointed the Committee comprised of the following seven (7) members: Wilmington Trust Company; United Parcel Service, c/o The Receivable Management Services Corporation, Its

3

Agent; The Bank of New York Trust Company, N.A.;[4] Deutsche Bank National Trust Co., as

Trustee; Norma Credit & Capital, Inc.; Impac Funding Corporation; and Waldners Business

Environments, Inc.[5]

       7.     By Order dated October 30, 2007, (the "Sale Order") [D.I. 1711], the

Court approved and authorized the sale (the "Servicing Sale") of the Debtors' mortgage loan

servicing business to AH Mortgage Acquisition Co., Inc., an affiliate of W.L. Ross & Co., LLC.

pursuant to the terms of an Asset Purchase Agreement dated as of September 25, 2007 (the

"APA").[6] Pursuant to the APA, the servicing sale will close in two steps. At the "economic"

close, which occurred on November 16, 2007 (the "Initial Closing"), the Purchaser paid the

purchase price, the vast majority of which went to the Administrative Agent. From the Initial

Closing Date until the "legal" close (the "Final Closing"), the Debtors agreed to operate the

servicing business in the ordinary course of business for the economic benefit and risk of the

Purchaser. The Final Closing has not yet occurred, but is imminent.

**B.**      **The Indebtedness and Cash Collateral Orders**

       8.     Prior to the Petition Date and pursuant to that certain Second Amended

and Restated Credit Agreement dated as of August 10, 2006 (the "Loan Agreement") by and

between certain of the Debtors (the "Borrowers and Guarantors")[7] and the Administrative Agent

for itself and certain other banking and financial institutions as prepetition secured lenders (the

"Prepetition Secured Parties"), the Prepetition Secured Parties made various loans, advances and

---

[4]      The Bank of New York Trust Company resigned from the Committee and was replaced with Law Debenture Trust Company of New York pursuant to notice of the Office of the United States Trustee dated December 7, 2007.

[5]      Waldners Business Environments, Inc. subsequently resigned from the Committee.

[6]      All capitalized terms used in this paragraph with respect to the APA, but not defined herein, shall have the meanings set forth in the APA. The description of the APA in this paragraph is by way of summary only. To the extent there is any discrepancy between such description and the actual terms of the APA, the latter are controlling.

[7]      The Borrowers are AHM Investment, AHM Acceptance, AHM Servicing, and AHM Corp. Additionally, AHM Holdings and AHM Investment are guarantors under the Loan Agreement.

extensions of credit to or for the benefit of the Borrowers. As set forth in the Cash Collateral

Orders (as hereafter defined), and subject to the rights of the Committee as provided therein, the

Debtors admitted that, as of the Petition Date, the Borrowers and Guarantors were justly indebted

to the Prepetition Secured Parties in the aggregate principal amount of approximately

$1,104,550,000 in respect of loans and other advances made, together with accrued and unpaid

interest, costs and expenses. (D.I. 554 at ¶ C.).

       9.      On the Petition Date, the Debtors sought authority to use cash (the "Cash

Collateral") upon which the Administrative Agent held security interests and liens [D.I. 16] (the

"Cash Collateral Motion"). On August 7, 2007, the Court entered an interim order [D.I. 68]

approving the Cash Collateral Motion. On September 4, 2007, the Court entered a final order

[D.I. 554] (the "Final Order"), pursuant to which the Court authorized the Debtors to use Cash

Collateral in accordance with a budget through October 31, 2007.

       10.     Through an interim stipulation and order [D.I. 1731] and final stipulation

and order [D.I. 2002] (together with the Final Order, the "Cash Collateral Orders"), the Debtors'

authorized use of Cash Collateral was extended from October 31, 2007 through November 16,

2007.

       11.     As set forth in the Cash Collateral Orders, and subject to the rights of the

Committee as provided therein, the Debtors admitted that to secure the amounts due under the

Loan Agreement, pursuant to a certain Security and Collateral Agency Agreement dated as of

August 30, 2004 (the "Security Agreement"), they granted valid, perfected, enforceable, first

priority liens upon and security interests to the Administrative Agent (for the ratable benefit of

the Prepetition Secured Parties) in the property described in the Collateral Documents (as

defined in the Final Order). (D.I. 554 at ¶ D.).

12.     The claim of the Administrative Agent and Prepetition Secured Parties was secured by essentially three types of collateral: (i) the assets of the Debtors' mortgage loan servicing business (collectively, the "Servicing Assets"); (ii) certain construction-to-permanent mortgage loans originated and serviced by the Debtors (collectively, the "Construction Loans"); and (iii) certain mortgage loans originated and serviced by the Debtors (collectively, the "Mortgage Loans"), along with any proceeds thereof such as, e.g., real estate owned as a result of foreclosures (the "REO Property" and, together with the Servicing Assets, Construction Loans, and Mortgage Loans, the "Pre-Petition Collateral").

13.     "[A]s adequate protection for, and to secure payment of an amount equal to the Collateral Diminution" (defined as "the aggregate diminution of the value of the Pre-Petition Collateral . . . from and after the Petition Date"), the Final Order granted the Administrative Agent a post-petition security interest in the Pre-Petition Collateral and any proceeds thereof (collectively, the "Collateral"). (D.I. 554 at ¶¶ 3-4). As "additional adequate protection," the Cash Collateral Orders required the Debtors to make periodic cash payments in certain amounts (including the payment of the Administrative Agent's postpetition attorneys' fees and expenses until expiration of the Cash Collateral Orders), and to remit all proceeds of the Pre-Petition Collateral and Collateral into collateral accounts to be swept by the Administrative Agent on a weekly basis. (D.I. 554 at ¶¶ 5-6, *as amended by* D.I. 2002 at ¶ 2.). The Final Order contained specific provisions and deadlines concerning the sale of the Servicing Assets, but did not prescribe the method or timing of the sale of any other Collateral. (D.I. 554 at ¶¶ 5-6, *as amended by* D.I. 2002 at ¶ 3.).

14.    To date, there has been no assertion by the Administrative Agent that the Debtors have failed to provide the adequate protection required under the terms of the Cash Collateral Orders.

### C.    The Committee's Review Rights and the Remaining Issues

15.    Pursuant to paragraph 20 of the Final Order, the Committee had until December 4, 2007, which was extended to February 1, 2008, by further stipulation [D.I. 2284], to file an adversary proceeding or contested matter "(x) challenging the amount, validity, enforceability, priority or extent of the Indebtedness or the Pre-Petition Secured Parties' security interests in and liens upon the Pre-Petition Collateral, or (y) otherwise asserting any claims or causes of action against the Pre-Petition Secured Parties on behalf of the Debtors' estates." (D.I. 554 at ¶ 20.).

16.    As the February 1, 2008 deadline approached, the Committee and the Administrative Agent negotiated and ultimately entered into a second stipulation [D.I. 2855] (the "Second Committee Stipulation"), granting the Committee a further extension of its review period until March 3, 2008, but solely with respect to three limited matters (the "Remaining Issues"):  (i) whether the Prepetition Secured Parties interests are perfected with respect to REO Property and the proceeds thereof; (ii) whether all or any portion of the funds either received by the Administrative Agent from or after August 1, 2007 or currently held in specified bank accounts are Pre-Petition Collateral; and (iii) whether, in the event the value of the Pre-Petition Collateral and Collateral is determined to be less than the amount of the Prepetition Secured Parties' allowed secured claims, any amounts paid by the Debtors pursuant to the Cash Collateral Orders on account of fees and/or expenses incurred by the Administrative Agent should be applied to reduce principal.  (D.I. 2855 at ¶ 1.)

17.    Through subsequent stipulations, the Committee's review period with regard to the Remaining Issues was extended to March 31, 2008 (D.I. 3142; D.I. 3172; and D.I. 3264) and then further extended to April 18, 2008.  (D.I. 3505).

D.    **Liquidation of the Collateral by the Debtors**

18.    Since the commencement of the Debtors' chapter 11 cases, the Debtors have been engaged in the orderly and systematic liquidation of their assets.  The Debtors' primary focus was the sale of the Servicing Assets, which the Debtors successfully accomplished between the Petition Date and October 30, 2007, in several discrete transactions for certain Servicing Assets – *see, e.g.,* D.I. 610 (order approving sale of Barclays servicing rights), and D.I. 1619 (order approving sale of EMC mortgage rights) – and a single transaction for substantially all of the remaining Servicing Assets, *see* D.I. 1711 (the sale of the Servicing Business).

19.    On August 24, 2007 [D.I. 358], the Debtors obtained authority to sell REO Property in the ordinary course of business with proceeds of such sales to be remitted to the Administrative Agent in accordance with the Cash Collateral Orders.  On October 4, 2007 [D.I. 1175], the Debtors obtained authority to sell the Construction Loans.  Despite the Debtors' marketing efforts, adjournment of the auction and extension of the bid deadline, the Debtors did not receive a bid for the Construction Loans that would have resulted in sufficient value to the Debtors' estates.

20.    On December 4, 2007, the Administrative Agent filed a motion for relief from the automatic stay [D.I. 2255] (the "Construction Loan Stay Relief Motion") seeking to compel the sale of the Construction Loans to a potential bidder for a price the Debtors had already determined was insufficient, complaining that the Debtors were "holding the Administrative Agent's collateral hostage."  To the contrary, the Debtors were exploring non-

sale alternatives to maximize the value of the Construction Loans, including, offering the borrowers incentives to refinance or otherwise prepay the loans, which would result in the immediate realization of outstanding principal balances.

21.    With the approval of the Committee, the Debtors and the Administrative Agent resolved the motion by the Debtors "purchasing" the Construction Loans free of the Administrative Agent's liens for approximately $9.1 million – the amount offered by the potential bidder and representing only 30% of the unpaid principal balance ("UPB") of the Construction Loans. (*See* D.I. 2593). The Debtors subsequently obtained authority (D.I. 2860) to compromise the Construction Loans in order to facilitate refinancing or other prepayment thereof. As the Debtors and the Committee correctly anticipated, the Debtors' estates will achieve significantly higher value for the Construction Loans than the paltry purchase price offered by the Administrative Agent's bidder – an offer the Administrative Agent relentlessly insisted that the Debtors should have accepted. In fact, as of April 4, 2008, the Debtors have received approximately $10.3 million, $1.8 million more than the "purchase price paid to the Administrative Agent, through routine interest payments, fees and the compromise of the Construction Loans. The remaining UPB of the Construction Loans is approximately $20.3 million. The Debtors estimate that the final recovery to be realized through holding and compromising the Construction Loans will be between $19 million and $27.3 million, equating to a benefit to general unsecured creditors of approximately $10 million to $18.3 million.[8] Thus, had the Administrative Agent allowed the Debtors to "hold the Administrative Agent's Collateral

---

[8]    Pursuant to an agreement between the Debtors and the Committee, which was approved pursuant to the Order amending the Debtors' postpetition debtor in possession financing facility dated January 4, 2008 [D.I. 2594], the amounts in excess of the "purchase price" for the Construction Loans are required to be held by the Debtors in a segregated account for the benefit of general unsecured creditors, unless the Committee agrees or the Court orders otherwise.

hostage" the Administrative Agent would have enjoyed the benefit now available to the general

unsecured creditors demands that the Construction Loans be quickly was the right decision.

      22.     By motion dated December 22, 2007 [D.I. 2409], the Debtors sought

authority to sell certain non-performing Mortgage Loans (the "Non-Performing Loans").  After

employing a marketing process and in consultation with the Administrative Agent and the

Committee, the Debtors consummated the Sale of the Non-Performing Loans to Beltway Capital,

LLC for a purchase price of 44.37% of UPB.

    **E.**      **The Stay Relief Motion**

      23.     On February 22, 2008, the Administrative Agent filed the Motion for

Relief From Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing the Administrative Agent

to Exercise its Rights as a Secured Creditor [D.I. 3054] (the "Stay Relief Motion").  Through the

Stay Relief Motion, the Administrative Agent seeks authority to "exercise its rights as a secured

creditor" to take possession of and sell the Mortgage Loans, on the basis that its security interest

in the Mortgage Loans is not "adequately protected."  If approved, the Stay Relief Motion will

have severe repercussions and effectively negate the purported value of the Settlement

Stipulation.

      24.     The Administrative Agent asserts in the Stay Relief Motion that, as a

result of the Debtors' liquidation of Collateral and other postpetition payments to the

Administrative Agent, the indebtedness under the Loan Agreement has been reduced to

approximately $505 million.[9]  The Administrative Agent also asserts that the UPB of the

Mortgage Loans subject to the Stay Relief Motion is approximately $584 million.

---

[9]     The Debtors reserve all rights with respect to determining the actual amount of the indebtedness under the Loan Agreement, but accept the Administrative Agent's estimate for purposes of this Objection.

25.     The Stay Relief Motion is currently scheduled for consideration on April

16, 2008, and the Debtors and Administrative Agent, as of the filing of the Objection, are

engaged in extensive discovery.  The Debtors have filed a preliminary objection and will

supplement the objection on or before April 11, 2008 after the completion of discovery.

## OBJECTION

I.     **THE SETTLEMENT STIPULATION GOES FAR BEYOND WHAT THE COMMITTEE HAS THE AUTHORITY TO SETTLE AND THEREFORE CANNOT BE APPROVED**

26.     The Cash Collateral Orders, as further limited by the Second Committee

Stipulation, granted the Committee authority to resolve only the Remaining Issues.[10]  However,

the Settlement Stipulation goes well beyond those Remaining Issues.  Specifically, approval of

the Settlement Stipulation, among other things, (i) binds the Debtors, their estates and creditors

to allowance of the amount of any Deficiency Claim;[11] (ii) provides for the treatment of any

Deficiency Claim *pari passu* with the claims of general unsecured creditors; and (iii) permits the

Administrative Agent to receive attorneys' fees and expenses in certain circumstances even if

under-secured[12] (collectively, the "Additional Issues").

---

[10]     The Remaining Issues relate to (i) whether the Prepetition Secured Parties interests are perfected with respect to REO Property and the proceeds thereof; (ii) whether all or any portion of the funds either received by the Administrative Agent from or after August 1, 2007 or currently held in specified bank accounts are Pre-Petition Collateral; and (iii) whether, in the event the value of the Pre-Petition Collateral and Collateral is determined to be less than the amount of the Prepetition Secured Parties' allowed secured claims, any amounts paid by the Debtors pursuant to the Cash Collateral Orders on account of fees and/or expenses incurred by the Administrative Agent should be applied to reduce principal.  *See* Second Committee Stipulation at ¶ 1.

[11]     Deficiency Claim is defined in paragraph 3(g) of the Settlement Stipulation to mean "[i]f, after of all Cash Receipts, there remains any unsatisfied obligations arising prior to the Petition Date asserted in the proof of claim filed in these cases by the Administrative Agent on behalf of the Pre-Petition Secured Parties on January 10, 2008 (Claim No. 8165) ... the Pre-Petition Secured Parties shall have an allowed unsecured claim against the Applicable Debtors in the amount of such deficiency...."  Settlement Stipulation at ¶ 3(g).

[12]     Paragraph 3(f) of the Settlement Stipulation provides "[f]rom and after the later of (x) the date this Stipulation and Order is so ordered by the Court and (y) the date that the Stay Relief Motion has been decided by the Court (the "Expense Shift Date"), all reasonable fees and expenses incurred by the Administrative Agent shall be paid from the Pre-Petition Secured Parties' Share."  Settlement Stipulation at ¶ 3(f).  Paragraph 3(i) further provides, that "[s]ubject to the payment of reasonable fees and expenses incurred by the Administrative Agent prior to the Expense Shift Date, the Administrative Agent shall apply all of the Cash Receipts as follows ...."  Settlement Stipulation at ¶ 3(i).

27.     Pursuant to the ruling of the United States Court of Appeals for the Third

Circuit in *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics*

*Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003), the Committee only has standing to settle those

matters that the Debtors have either delinquently chosen not to prosecute, *see Cybergenics*, 330

F.3d at 563, 568-69, or, which were conferred to it pursuant to previous Orders of the Court or

agreements with the Debtors.  With respect to the Additional Issues, the Debtors have been and

remain vigilant and no Order or agreement delegating authority to the Committee has been

entered or reached.  Therefore, the Committee has no standing to compromise these issues.  *Id.*;

*see also Smart World Techs. LLC v. Juno Online Servs. Inc. (In re Smart World Techs. LLC)*,

423 F.3d 166 (2d Cir. 2005).

28.     Furthermore, Rule 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") provides that "[o]n a motion by the trustee[13] and after notice and a

hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  By the

plain language of Bankruptcy Rule 9019, only a debtor in possession may move for approval of a

settlement or compromise, not a committee or other party in interest.

29.     In *Smart World*, the United States Court of Appeals for the Second Circuit

considered whether a settlement agreement could be approved pursuant to Bankruptcy Rule

9019, when approval of the settlement agreement was sought by two of the debtor's creditors

over the objection of the debtor.  The Second Circuit explained that there are important

differences between pursuing an otherwise neglected claim, like in *Cybergenics*, and settling a

claim that the debtor in possession is pursuing, and concluded that a party who seeks to displace

the debtor faces a "heav[y] burden" *id.* at 177, because "other parties to a bankruptcy proceeding

---

[13]     Section 1107 of the Bankruptcy Code gives a debtor in possession the rights, functions and duties of a
trustee. 11 U.S.C. § 1107(a) ("a debtor in possession shall have all of the rights ... and shall perform all the
functions and duties ... of a trustee serving in a case under [chapter 11]").

have interests that differ from those of the estate and are not suited to act as the estate's legal

representative." *Id.* at 180.  The Second Circuit noted that in "rare circumstances derivative

standing might be appropriate in the Rule 9019 context." *Id.*

30.     Here, the Committee is compromising claims over the objection of the

Debtors and no "rare circumstances" have been proven or even asserted to justify granting it

derivative standing with respect to the Additional Issues.  Simply stated, the Committee and the

Administrative Agent are advancing a settlement that is <u>not</u> in the best interests of the Debtors'

estates, and, as such, no grounds exist to grant derivative standing to proceed under Bankruptcy

Rule 9019.

**II.     ASSUMING THEY HAVE STANDING AND AUTHORITY TO SEEK
APPROVAL OF THE SETTLEMENT STIPULATION, THE COMMITTEE AND
ADMINISTRATIVE AGENT HAVE NOT MET AND CANNOT MEET THEIR
BURDEN OF SHOWING THAT THE SETTLEMENT STIPULATION IS IN THE
BEST INTERESTS OF THE ESTATES**

**A.     The Committee and Administrative Agent Bear the Burden of Proof**

31.     Deciding whether to approve a settlement is within the discretion of the

bankruptcy court.  *Key3 Media Group, Inc. v. Pulver.com, Inc. (In re Key3 Media Group, Inc.)*,

336 B.R. 87, 92 (Bankr. D. Del. 2005).  When exercising such discretion, the bankruptcy court

must "assess and balance the value of the claim that is being compromised against the value to

the estate of the acceptance of the compromise proposal." *Myers v. Martin (In re Martin)*, 91

F.3d 389, 393 (3d Cir. 1996); *see also In re Marvel Entertainment Group, Inc.*, 222 B.R. 243,

249 (D. Del. 1998) (describing the "ultimate inquiry to be whether the compromise is fair,

reasonable, and in the best interest of the estate").  Significantly, it is well-settled that the

proponent of a settlement bears the burden of persuasion that the settlement is in the best

interests of the estate.  *In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 463 (Bankr.

E.D. Pa 1998); *In re Eastwind Group, Inc.*, 303 B.R. 743, 750 (Bankr. E.D. Pa 2004)

("proponent of a settlement bears the burden of proof").

      32.    As the Debtors demonstrate below, the Committee and the Administrative

Agent have not and cannot meet their burden.

**B.    The Committee and Administrative Agent Have Not and Cannot Satisfy the Four Martin Factors**

      33.    In determining whether to approve a settlement under Bankruptcy Rule

9019, the court must assess and balance the value of the claim being compromised against the

value to the estate of the acceptance of such proposed compromise by examining four factors: (i)

the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity

of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(iv) the paramount interests of creditors. *In re Martin*, 91 F.3d at 393; *In re World Health

Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *In re RNI Wind Down Corp.*, 348

B.R. 286, 297 (Bankr. D. Del. 2006).

      34.    The Committee and Administrative Agent, in the Motion, assert that a

settlement should be approved "unless it falls below 'the lowest point in the range of

reasonableness.'" (D.I. 3318 at ¶ 15.). However, when the consideration received by the estates

from the Administrative Agent is compared to the concessions given up by the Committee, the

Settlement Stipulation falls well below the lowest point in the range of reasonableness. *See In re

Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) (recognizing that "a one-

sided settlement would be cheered by the side it favors even though it is a terrible deal for the

side it disfavors"); *see also In re Hydronic Enterprise, Inc.* 58 B.R. 363, 366 (Bankr. D.R.I.

1986) ("even if it is concluded that the settlement is above the lowest level of reasonableness, in

our discretion we may still deny approval, if not in the best interest of the estate").

(i)    Matters Resolved Under the Settlement Stipulation and Consideration
       Received by the Debtors' Estates

35.    The Settlement Stipulation does resolve certain matters in favor of the

Debtors' estates.  Specifically, the Administrative Agent has agreed to (i) waive and release its

claims and liens on the Designated REO Properties, which are those listed on Exhibit B to the

Settlement Stipulation (*see* Settlement Stipulation at ¶ 2), and (ii) share a portion of its recovery

with general unsecured creditors under certain circumstances (*see* Settlement Stipulation at ¶ 3(a)

– (d)).

(a)    The REO Property Consideration

36.    The aggregate amount of the UPB for the Designated REO Properties is

approximately $17 million, and the Debtors estimate that the sale value of the Designated REO

Properties is between $7 million and $11 million.  The Administrative Agent's agreement to

waive and release the claims and liens on the Designated REO Properties is nothing more than a

"throw-away".  In any litigation with respect to the Designated REO Properties, especially the

approximately $13.1 million in prepetition REO Property, the issues and facts before the Court

will be simple and straightforward and the costs will be modest.  The Committee is almost

certain to prevail and there will be no risk of collection.  The litigation will turn on whether the

Administrative Agent holds a perfected lien against the REO Property.  Prepetition, the

Administrative Agent perfected its lien in the collateral by filing financing statements under

Article 9 of the Uniform Commercial Code.  To remain perfected in the proceeds of its collateral

that became real estate (the REO Property) the Administrative Agent would have had to record a

mortgage on the REO Property within twenty (20) days of the Debtors taking title.  The

Administrative Agent failed to do so.[14]  Indeed, the risk of an unfavorable result – the liens and

---

[14]    Article 9 of the Uniform Commercial Code is not applicable to security interests in real property and

security interests of the Administrative Agent are avoided – falls squarely on the Administrative

Agent.

> (b)    Consideration in the Form of The Sharing of Applicable Cash Receipts

37.    Paragraph 3 of the Settlement Stipulation sets forth the consideration

related to the agreement by the Administrative Agent to share a portion of its recovery with

general unsecured creditors.[15] This sharing arrangement is touted as aligning the interests of the

Administrative Agent and other creditors.    However, the Administrative Agent's responses to the

Debtors' interrogatories (the "Interrogatories") served in connection with the Stay Relief Motion

and the Administrative Agent's behavior in the past, particularly with respect to the sale of the

Construction Loans, casts serious doubt as to the value of the sharing arrangement and the

proposition that the Administrative Agent's interests can be aligned with the interests of the

Debtors' estates.

---

therefore, in order to perfect a security interest in a mortgage, the party is required to file or record the mortgage in accordance with applicable state law.

[15]    Paragraph 3 of the Settlement Stipulation provides, in relevant part, that "(a) After cash receipts from (i) the Collateral, (ii) a trustee or liquidating trustee appointed by the Court or (iii) any Debtor (which is a party to any of the Loan Documents) on account of the Collateral or otherwise (… such cash receipts, the "Cash Receipts") have, from and after the Petition Date, been indefeasibly paid to the Pre-Petition Secured Parties and irrevocably applied to the permanent reduction of the Indebtedness in an amount equal to 94% of the Benchmark Pre-Petition Claim, i.e., $1,017,895,163.07, 90% of the next $31,857.72 of Cash Receipts shall be paid to the Administrative Agent and the remaining 10% shall be paid to the Debtors' estates. (b) After Cash Receipts have, from and after the Petition Date, been indefeasibly paid to the Pre-Petition Secured Parties and irrevocably applied to the permanent reduction of the Indebtedness in an amount equal to 95% of the Benchmark Pre-Petition Claim, i.e., $1,028,723,835.02, 75% of the next $36,095,573.16 of Cash Receipts shall be paid to the Administrative Agent, and the remaining 25% shall be paid to the Debtors' estates. (c) After Cash Receipts have, from and after the Petition Date, been indefeasibly paid to the Pre-Petition Secured Parties and irrevocably applied to the permanent reduction of the Indebtedness in an amount equal to 97.5% of the Benchmark Pre-Petition Claim, i.e., $1,055,795,514.89, 50% of the next $54,143,359.74 of Cash Receipts shall be paid to the Administrative Agent, and the remaining 50% shall be paid to the Debtors' estates. (d) After Cash Receipts have, from and after the Petition Date, been indefeasibly paid to the Pre-Petition Secured Parties and irrevocably applied to the permanent reduction of the Indebtedness in an amount equal to 100% of the Benchmark Pre-Petition Claim, i.e., $1,082,867,194.76, 50% of all additional proceeds of Collateral shall be paid to the Administrative Agent (until 100% of the Total Lender Obligations … have been indefeasibly paid in cash in full), and 50% shall be paid to the Debtors' estates. Settlement Stipulation at ¶ 3(a) – (d).

38.     The Mortgage Loans are effectively the last of the Collateral to be
liquidated. In the Stay Relief Motion, the Administrative Agent asserts that the value of the
Mortgage Loans has declined from the Petition Date and continues to decline. (D.I. 3054 at ¶ 1).
In response to Interrogatory Nos. 1 and 6 propounded by the Debtors in connection with the Stay
Relief Motion,[16] the Administrative Agent stated that in November 2007 an expression of
interest in purchasing the Mortgage Loans was received for a "firm bid of between 55% to 60%
of the unpaid principal balance of such loans." The Administrative Agent asserts in the Stay
Relief Motion that the UPB of the Mortgage Loans is approximately $584 million. (D.I. 3054 at
¶1). The Administrative Agent also asserts that value of the Mortgage Loans is declining. *Id.*
By implication, therefore, based on the firm bid received in November 2007, the proceeds from
the sale of the Mortgage Loans at this time would be less than 55% of the UPB or approximately
$321 million.

39.     Over the course of the chapter 11 cases, the Debtors have paid down the
Indebtedness to approximately $486 million. After taking into account a sale value of the
Mortgage Loans of $321 million, the Deficiency Claim would be approximately $165 million.[17]
However, the Administrative Agent has only agreed to start sharing "after cash receipts from (i)
the Collateral, (ii) a trustee or liquidating trustee appointed by the Court or (iii) any Debtor
(which is a party to any of the Loan Documents) on account of the Collateral or otherwise …
indefeasibly paid to the Pre-Petition Secured Parties" reduces the Indebtedness to "an amount
equal to 94% of the Benchmark Pre-Petition Claim, i.e., $1,017,895,163.07." Settlement

---

[16]     Interrogatory No. 1 asked "[d]escribe all communications regarding Your efforts to market, sell or
otherwise dispose of all or any portion of the Mortgage Loans from the Petition Date to the present. Interrogatory
No. 6 asked "[i]dentify all communications between You and any third parties … relating to the Mortgage Loans,
and describe the general nature of those communications."
[17]     The Debtors offer the calculation of the Deficiency Claim by way of example only and reserve all rights to
challenge any deficiency claim asserted by the Administrative Agent or the Pre-Petition Secured Parties.

Stipulation at ¶3(a).  Under the foregoing scenario (i.e., the Cash Receipts only totaling $918 million), the sharing arrangement would not even come close to kicking in, meaning the unsecured creditors will receiving nothing whatsoever under the sharing agreement.[18]

40.    Indeed, if the sharing arrangement were to kick in, the Deficiency Claim would be increased by the amount of the sharing.[19]  AHM Holdings is a guarantor under the Loan Agreement and therefore, falls within the definition of "Applicable Debtors" under the Settlement Stipulation.  The Debtors currently project that the recovery for creditors of AHM Holdings under a chapter 11 plan is likely near 100%.  Thus, the Administrative Agent likely will recover on its Deficiency Claim any value it gives up through the sharing arrangement.

41.    Moreover, the majority of the Mortgage Loans are performing loans.  The Debtors continue to collect and realize the cash value generated from the Mortgage Loans in the form of principal and interest payments from the borrowers.  The amounts received through the continued collection of principal and interest payments from the borrowers will ultimately be applied to reduce the Indebtedness.  Assuming the market for the sale of the Mortgage Loans improves and the Debtors determine, in the exercise of their business judgment, to sell the Mortgage Loans, the recovery on account of the Indebtedness may reach the 94% sharing threshold in the Settlement Stipulation.  That result, however, likely cannot occur if the

---

[18]    The risk of not reaching the 94% sharing threshold is especially high if the Administrative Agent, which has no fiduciary duty to the Debtors' estates and creditors, is granted relief from the automatic stay to sell the Mortgage Loans as it sees fit.

[19]    Paragraph 3(g) of the Settlement Stipulation provides that "[i]f, after of all Cash Receipts, there remains any unsatisfied obligations arising prior to the Petition Date asserted in the proof of claim filed in these cases by the Administrative Agent on behalf of the Pre-Petition Secured Parties on January 10, 2008 (Claim No. 8165) ... the Pre-Petition Secured Parties shall have an allowed unsecured claim against the Applicable Debtors in the amount of such deficiency (the "Deficiency Claim").  The Deficiency Claim shall be *pari passu* with all other allowed unsecured claims against the Applicable Debtors' estates...."  Settlement Stipulation at ¶ 3(g).  Paragraph 3(a) of the Settlement Stipulation, for example, provides, in relevant part, that after the Cash Receipts "have, from and after the Petition Date, been indefeasibly paid to the Pre-Petition Secured Parties and irrevocably applied to the permanent reduction of the Indebtedness in an amount equal to 94% of the Benchmark Pre-Petition Claim, i.e., $1,017,895,163.07, 90% of the next $12,031,857.72 of Cash Receipts shall be paid to the Administrative Agent, and the remaining 10% shall be paid to the Debtors' estates."  Settlement Stipulation at ¶ 3(a).

Administrative Agent, with no fiduciary duty to the Debtors' estates or creditors, is granted relief from the automatic stay to control the disposition of the Mortgage Loans. The folly of granting stay relief and the liquidation of the Mortgage Loans will be explained in greater detail in connection with the Debtors' further response to the Stay Relief Motion.

(ii)     Consideration Paid for Resolving the Remaining Issues by the Debtors' Estates and the Committee

42.     The consideration the Committee has agreed to give to the Administrative Agent significantly outweighs the purported consideration received in exchange.

(a)     The Deficiency Claim is Allowed and Insulated from Review and Objection

43.     Paragraph (3)(g) of the Settlement Stipulation allows the amount and treatment of the Deficiency Claim by impermissibly insulating it from review and objection by the Debtors and creditors of the Debtors. Paragraph 3(g) provides, in relevant part, that "after application of all Cash Receipts, there remains any unsatisfied obligations arising prior to the Petition Date asserted in the proof of claim filed by the Administrative Agent on behalf of the Prepetition Secured Parties (Claim No. 8165) ... the Pre-Petition Secured Parties shall have an allowed unsecured claim against the Applicable Debtors in the amount of such deficiency" and that "[t]he Deficiency Claim shall be *pari passu* with all other allowed unsecured claims against the Debtors' estates...." Settlement Stipulation at ¶ 3(g).

44.     The amount of the Deficiency Claim is unknown. Yet, the Committee has agreed to bind the Debtors, itself, the Debtors' estates and creditors from challenging the amount and treatment of the Deficiency Claim.

45.     The Administrative Agent does not owe a fiduciary duty to the Debtors' estates or creditors and thus, its actions and motives are not aligned with the Debtors which are to maximize the value of these estates for the benefit of all creditors. The Administrative Agent,

19

as made clear by the filing of the Stay Relief Motion and other actions throughout these chapter 11 cases, wants out of these chapter 11 cases by whatever means necessary, even through a "fire sale" of the Mortgage Loans. This was made abundantly clear from the absurd position taken by the Administrative Agent with respect to the Construction Loans. Fortunately for the Debtors' creditors, the Debtors did not succumb to the Administrative Agent's pressure to sell the Construction Loans at a severely discounted price. The Debtors' judgment with respect to how to maximize the value of the Construction Loans has proven to be correct and resulting in significantly more value to the Debtors' estates than the sale the Administrative Agent attempted to foist upon the Debtors. Given the Administrative Agent's track record on this point, the creditors cannot reasonably expect better (or different) behavior from the Administrative Agent with respect to the Mortgage Loans.

46.     Moreover, the majority of the Mortgage Loans are performing loans. The Debtors continue to collect and realize the cash value generated from the Mortgage Loans in the form of principal and interest payments from the borrowers. The amounts received through the continued collection of principal and interest payments from the borrowers is being applied to reduce the Indebtedness. Assuming the market for the sale of the Mortgage Loans improves and the Debtors determine, in the exercise of their business judgment, to sell the Mortgage Loans, the recovery on account of the Indebtedness may reach the 94% sharing threshold in the Settlement Stipulation. That is far less likely to occur if the Administrative Agent, with no fiduciary duty to the Debtors' estates or creditors, is permitted to control the disposition of the Mortgage Loans.

47.     The Debtors admitted under the Final Order that the Indebtedness was approximately $1,104,550,000 and agreed to waive and release "any and all Claims (as such term is defined in the Bankruptcy Code) against each of the Pre-Petition Secured Parities...."

(D.I. 554 at ¶¶ C,G). However, the Debtors did not agree, and cannot be bound by the Committee through the Settlement Stipulation to agree, not to contest the amount or validity of any Deficiency Claim, especially if the Deficiency Claim is the direct result of unreasoned, ill-advised actions by the Administrative Agent (e.g., selling the Mortgage Loans in the current depressed market).

48.     The Committee furthermore cannot prevent creditors of the Debtors from objecting to the Deficiency Claim. Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest ... is deemed allowed, unless a *party in interest* ... objects." 11 U.S.C. § 502(a) (emphasis added). Creditors of the Debtors are without question parties in interest and cannot be forced to waive rights to object to the Deficiency Claim. *See* 4 Collier on Bankruptcy ¶ 502.02[2][d] (15th ed. Rev. 1996) ("the right of a creditor to object to the allowance of another creditor's claim should be undisputed on principle" but recognizing that such right should not be unfettered due to the necessity of an orderly and expeditious administration of the case). And neither the Debtors nor other creditors can be precluded from challenging the Deficiency Claim on the basis that the Deficiency Claim should be subordinated under section 510(c) of the Bankruptcy Code.

(b)     The Committee is Neutralized for the Remainder of these Chapter 11 Cases

49.     The Settlement Stipulation neutralizes the Committee for the remainder of these complex chapter 11 cases to such an extreme degree that it constitutes an overall detriment to the Debtors' estates. *See In re National Health & Safety Corp.*, No. 99-183393DWS, 2000 Bankr. LEXIS 745, at *18 (Bankr. E.D. Pa July 5, 2000) (denying approval of a settlement under Bankruptcy Rule 9019 concluding that "it provide[d] no benefit to creditors and indeed by neutralizing the one constituent voice, constitutes an overall detriment to [the] estate").

50.     Paragraph 5 of the Settlement Stipulation provides that "[w]ith respect to all motions, contested matters or adversary proceedings in these chapter 11 cases *concerning or affecting the Collateral or claims or rights* of the Pre-Petition Secured Parties in and to the Collateral or validly arising under the Loan Documents, the Committee shall either *remain neutral*, or in its discretion, support the Administrative Agent and the Pre-Petition Secured Parties, *but under no circumstances shall the Committee oppose the Administrative Agent or the Pre-Petition Secured Parties*. Nothing contained [in the Settlement Stipulation] shall restrict the Committee's right to (i) enforce the terms of this Settlement Stipulation and Order or (ii) act as a fiduciary on behalf of general unsecured creditors, including supporting or proposing a plan which the Committee believes is in the best interests of general unsecured creditors...." Settlement Stipulation at ¶ 5. (emphasis added). The implications and effect of paragraph 5 of the Settlement Stipulation are particularly troubling considering the significant pending issues between the Debtors and the Administrative Agent that must be adjudicated or resolved prior to making distributions to creditors.

51.     Pursuant to section 1102 of the Bankruptcy Code, a committee represents "creditors holding unsecured claims." 11 U.S.C. § 1102(a)(1). As such, the Committee owes a fiduciary duty to all general unsecured creditors of the Debtors. *In re SPM Mfg.*, 984 F.2d 1305, 1315 (1st Cir. 1993) (stating that a committee is "a fiduciary for those whom it represents"). Paragraph 5 of the Settlement Stipulation effectively requires the Committee to abrogate those fiduciary duties, by prospectively agreeing to remain silent or support the Administrative Agent on any issues affecting the Collateral or the Administrative Agent's rights and there are many such issues on the horizon.

52.    For example, there is a significant dispute between the Debtors and the Administrative Agent with respect to (i) the propriety of prepetition sweeps by the Administrative Agent from certain bank accounts totaling approximately $3,568,920.59; (ii) the refusal of the Administrative Agent to return certain amounts related to postpetition transfers from certain bank accounts to the Administrative Agent totaling approximately $2,599,619.00; (iii) whether the Administrative Agent had a lien on funds of other financial institutions held in account number 435450 at Deutsche Bank National Trust Company (the "FBO Account") totaling approximately $265,128.03; and (iv) whether the Administrative Agent had a lien on funds currently in certain "frozen" bank accounts totaling approximately $10,217,148.67. The Administrative Agent has asserted, in support of its actions and position, that it has a lien on the funds and the bank accounts at issue (collectively, the "Frozen Accounts"), but the Debtors disagree. Pursuant to the Final Order, only the Committee can challenge perfection. Through the Settlement Stipulation, however, the Committee has waived its rights to challenge whether the Administrative Agent has a lien or perfected security interest on those accounts.

53.    The Debtors anticipate that the Committee will argue that the Settlement Stipulation does not make the Committee a slave to the Administrative Agent because it does not restrict the Committee's right "to act as a fiduciary on behalf of general unsecured creditors, including supporting or proposing a plan which the Committee believes is in the best interest of general unsecured creditors ...." Settlement Stipulation at ¶ 5. The reservation does not work. By seeking the Court's approval of the Settlement Stipulation the Committee and Administrative Agent are requesting the Court to find that agreeing to remain neutral with respect to anything affecting the Collateral and "under no circumstances oppose the Administrative Agent or the Prepetition Secured Parties" is a proper exercise of the Committee's fiduciary duty.   Settlement

Stipulation at ¶ 5. Henceforth, it will be a tautology to say that the Committee is properly exercising its fiduciary duties every time it refuses to oppose or challenge the will of the Administrative Agent.

54.     Assume for illustrative purposes only, that the Debtors propose a chapter 11 plan containing similar provisions to those jointly proposed by the debtors and the official committee of unsecured creditors in *In re New Century Mortgage Corp.* Case No. 07-10419 (Bankr. D. Del.) (Carey, J.), such as a mechanism for determining claims related to breach of warranty or early payment defaults under loan agreements between the Debtors and certain counterparties. Such a provision and the resulting sharing mechanism could affect the Collateral and a distribution on account of any Deficiency Claim. If that is the result, the Committee would be required to remain neutral and not support such a chapter 11 plan if it is opposed by the Administrative Agent or Prepetition Secured Parties, even though it may be in the best interests of all general unsecured creditors.

55.     Likewise, assume that the Debtors propose a chapter 11 plan that treats the claim of the Administrative Agent and Prepetition Secured Parties in a manner that they oppose in any way, for any reason. Even if such treatment would enhance the recovery for other general unsecured creditors, the Settlement Stipulation would preclude the Committee from supporting it.

(c)     Supporting the Stay Relief Motion

56.     As further consideration for the Administrative Agent's waiver and release claims and liens on the Designated REO Properties and the sharing arrangement provided in paragraph 3 of the Settlement Stipulation, the Committee has agreed to support the Stay Relief Motion. As the Debtors' objection to the Stay Relief Motion will detail more fully, there is no

24

basis for approval of the Stay Relief Motion.[20] The Debtors are well positioned to manage and

maximize the value of the Mortgage Loans as previously proven in connection with the

Construction Loans[21] and there is no basis to substitute the Administrative Agent's business

judgment for that of the Debtors, especially based on the judgment exercised to date by the

Administrative Agent. Finally, the Administrative Agent's lien in the Mortgage Loans is not

declining in value for purposes of adequate protection and therefore, the Administrative Agent is

adequately protected.

> (d)    Administrative Agent Receives Postpetition Attorneys' Fees
>        Whether or Not It Is Over-Secured

57.    Paragraph 3(f) of the Settlement Stipulation provides that the

Administrative Agent's reasonable fees and expenses "shall be paid from the Pre-Petition

Secured Parties' share" after the "Expense Shift Date", which is defined as the later of approval

of the Settlement Stipulation and adjudication of the Stay Relief Motion. Settlement Stipulation

at ¶ 3(f). Paragraph 3(i) of the Settlement Stipulation outlines how the Cash Receipts are to be

applied and provides that such application is [s]ubject to payment of reasonable fees and

expenses incurred by the Administrative Agent prior to the Expense Shift Date." Settlement

Stipulation at ¶ 3(i). Under the Cash Collateral Orders, the Debtors, as adequate protection for

the use of Cash Collateral, agreed to pay reasonable postpetition professional fees and expenses

incurred by the Administrative Agent. (D.I. 554 at ¶6.). The Debtors' use of Cash Collateral,

however, expired on November 16, 2007, the date of the Initial Closing of the Servicing Sale.

---

[20]    The Debtors intend to demonstrate that the value ascribed by the Administrative Agent to the Mortgage
Loans is less than the Debtors' current projections.

[21]    Indeed, if the Settlement Stipulation is ultimately approved, the Debtors are in a better position to manage
the disposition of the Mortgage Loans to achieve the 94% recovery sharing threshold in paragraph 5 of the
Settlement Stipulation, and approving the Settlement Stipulation enhances the case for denying the Stay Relief
Motion. The Debtors' estates' upside from the Mortgage Loans at 94% of the principal rather than 100% of the
principal, interest and costs.

As a result, there is no continuing obligation to pay such fees and expenses to the Administrative

Agent absent a finding by the Court that it is over-secured.

58.    As suggested by the arguments and positions asserted by the

Administrative Agent in connection with the Stay Relief Motion, the Administrative Agent

appears to believe it is under-secured. Yet, the provisions of the sharing arrangement in

paragraph 3 of the Settlement Stipulation suggest that the Administrative Agent nevertheless will

receive postpetition attorneys' fees and expenses. Such a result directly contradicts the

provisions of the section 506(b) of the Bankruptcy Code. 11 U.S.C. § 506(b); *see also United*

*Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372-73 (1988)

(concluding section 506(b) "permits postpetition interest to be paid only out of the 'security

cushion,' the undersecured creditor, who has no such cushion, falls within the general rule

disallowing post-petition interest"). The same rationale applies to postpetition claims for fees

and costs. *In re Loewen Group Int'l., Inc.*, 274 B.R. 427, 444-45 (Bankr. D. Del. 2002) (holding

that because the claims were not oversecured, the claimant was not entitled to postpetition fees

and charges).

        (e)    The Breadth and Scope of the Consideration Given by The
            Committee Dictates the Terms of a Future Chapter 11 Plan

59.    The concept of a plan *sub rosa* was enunciated in the landmark case *In re*

*Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983). *Braniff* recognized that a bankruptcy court

should not authorize certain transactions proposed by a debtor that would in effect establish a

plan *sub rosa* without abiding by the requirements for confirmation of a chapter 11 plan. *Id.* at

940. The underlying rationale behind denying transactions as effecting a plan *sub rosa* is that a

transaction might improperly and indirectly lock an estate into a particular chapter 11 plan of

reorganization without the protection afforded by the procedures surrounding a disclosure

statement and confirmation under chapter 11. *Id.* ("the debtor and the Bankruptcy Court should

not be able to short circuit requirements of Chapter 11 for confirmation of a reorganization plan

by establishing the terms of a plan sub rosa in connection with a sale of assets."); *In re*

*Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (S.D.N.Y. 1990) ("A transaction which

would effect a lock-up of the terms of a plan will not be permitted"). A bankruptcy court may

not approve a compromise or settlement which lays the groundwork for a creeping plan. *See*

*Crowthers McCall Pattern, Inc.*, 114 B.R. at 885.

60.     Chapter 11 rights circumvented by *sub rosa* plans include being deprived

of the statutory safeguards of the chapter 11 requirements to confirm a plan of reorganization.

*Quality Beverage*, 181 B.R. 887, 895 (S.D. Tex. 1995) ("Neither the Committee, nor the Chapter

11 Trustee should be permitted to bind [other] creditors without the disclosure, claims allowance,

and voting safeguards of plan confirmation in Chapter 11"); *Crowthers McCall*, 114 B.R. at 885

(recognizing that a transaction circumvents a chapter 11 right if the transaction either in fact or

effect encroaches on a right afforded creditors or equity holders in the chapter 11 plan process);

*In re DRW Property Co.*, 54 B.R. 489, 498 (N.D. Tex. 1985) ("The Court refuses to invoke its

equity jurisdiction so as to accomplish outside the framework of creditor suffrage what should

not be done without full disclosure and opportunity to vote"). The Fifth Circuit implied that a

bankruptcy court should not be able to approve a transaction outside of a plan if a transaction

would not be able to be approved as part of a plan of reorganization. *See Institutional Creditors*

*of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*,

780 F.2d 1223, 1228 (5th Cir. 1986) (recognizing that because certain creditors could have

defeated a plan of reorganization containing such a required transaction, the bankruptcy court

may have lacked statutory authority to authorize the proposed transaction).

61.     A common characteristic of a plan *sub rosa* is that the proposed transaction effectively dictates the terms of a future chapter 11 plan that might not otherwise be approved by the estate's creditors through the voting process. The Settlement Stipulation does just that; it dictates significant terms of a future chapter 11 plan in violation of the usual protections afforded under the Bankruptcy Code and during the Debtors' exclusive period under section 1121 of the Bankruptcy Code to file and solicit a chapter 11 plan or plans.

62.     In *In re Louise*, the United States District Court for the District of Delaware found a proposed settlement agreement exceeded the boundaries of a compromise under Bankruptcy Rule 9019 and was really a proposed plan of reorganization disguised as a compromise under Bankruptcy Rule 9019. *In re Louise*, 211 B.R. 798, 802 (D. Del. 1997). The district court held that the settlement agreement would ultimately lead to a proposed plan of reorganization, with the terms pre-determined by certain provisions dictating control of the debtor, "thereby circumventing a meaningful consideration of the requirement of Chapter 11 regarding confirmation of a reorganization plan." *Id.*; *see also Braniff*, 700 F.2d at 940 (a provision of the proposed sale agreement "had the practical effect of dictating some of the terms of any future reorganization plan"); *Quality Beverage*, 181 B.R. at 887 (proposed settlement agreement terms, such as dictating priority status of certain claims and requiring creditors to assign their claims to the bank as a condition of receiving distribution of certain escrowed funds, in effect bound creditors without the protections of the chapter 11 process).

63.     As stated by this Court in connection with consideration of a settlement under Bankruptcy Rule 9019 in *In re Nellson Nutraceutical, Inc.*, "at some point, you go so far, you throw in so many provisions that you … start to add provisions that, for instance, bind third parties or dictate how the reorganization is going to take place or provide releases. And you get

28

so large that you start to become either beyond the scope of what you're settling or you get into the area of calling something a sub-rosa plan." *In re Nellson Nutraceutical, Inc.*, Case No. 06-10072 (CSS), 3/12/07 Tr. at p. 197 (a copy of the relevant pages from the March 12, 2007 transcript are attached hereto as Exhibit A.). The Settlement Stipulation here goes well beyond the scope of resolving the Remaining Issues and dictates several substantive provisions of any future chapter 11 plan. Specifically, the Settlement Stipulation (i) allows the Deficiency Claim in an unknown amount; (ii) requires that the Deficiency Claim be treated *pari passu* with general unsecured creditors and forecloses the rights of the Debtors and creditors to object to such claim; and (iii) allows for the Administrative Agent postpetition attorneys' fees and expenses absent a finding that the Administrative Agent is over-secured.

(f)    Significant Issues Remain Unresolved

64.    There remain significant unresolved issues between the Administrative Agent and the Debtors that will have a direct effect on the ultimate distribution to creditors in these chapter 11 cases. Many of these issues relate to the servicing sale, such as (i) purchase price adjustments by the Purchaser; (ii) reimbursement of the Debtors' costs for litigating cure claims; (iii) the Debtors' alleged obligation to repurchase certain servicing advances; (iv) disposition of "disputed servicing agreements"; (v) reimbursement of professional fees from the proceeds of the Servicing Sale; and (vi) other reconciliations contemplated by the servicing sale APA. The amounts at issue related to the foregoing exceed the purported value under the Settlement Stipulation. Yet, the Committee is prohibited from supporting the Debtors or taking an adverse position to the Administrative Agent, the Prepetition Secured Parties or the Collateral.

65.    Another significant open issue between the Debtors and the Administrative Agent is the entitlement of the Debtors to approximately $12.5 million related to advances made by AHM Corp. on account of loan purchase mortgage insurance payments. The

29

Administrative Agent has refused to reimburse the estate for these servicing advances

notwithstanding they were made to protect the Mortgage Loans.  Again, the Committee cannot

support the Debtors' efforts to recover those amounts if it means that the Committee has to take

an adverse position to the Administrative Agent, the Prepetition Secured Parties or the Collateral.

       66.    When these known unresolved issues, and there will be others that the

Debtors have not yet discovered, are compared with the consideration being provided to the

Debtors' estates by the Administrative Agent, the consideration paid by the Debtors' estates to

the Administrative Agent significantly outweighs the consideration received under the

Settlement Stipulation.

## CONCLUSION

WHEREFORE, the Debtors assert that the Settlement Stipulation is woefully deficient and not in the best interests of the estate and should be denied.

Dated:  Wilmington, Delaware
        April 7, 2008

                 YOUNG CONAWAY STARGATT & TAYLOR, LLP

                 James L. Patton, Jr. (No. 2202)
                 Robert S. Brady (No. 2847)
                 Pauline K. Morgan (No. 3650)
                 Sean M. Beach (No. 4070)
                 Matthew B. Lunn (No. 4119)
                 The Brandywine Building
                 1000 West Street, 17th Floor
                 Wilmington, Delaware 19801
                 Telephone: (302) 571-6600
                 Facsimile: (302) 571-1253

                 Counsel for the Debtors and Debtors in Possession

# EXHIBIT A

1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  Case No. 06-10072

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  NELLSON NUTRACEUTICAL, INC.,

9

10        Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. BANKRUPTCY COURT

15              824 North Market Street

16              Wilmington, Delaware

17

18              March 12, 2007

19              10:13 a.m.

20

21  B E F O R E:

22  HON. CHRISTOPHER S. SONTCHI

23  U.S. BANKRUPTCY JUDGE

24

25

1  even in a world where the agreement doesn't specifically say

2  there will be no appeals in the motion for reconsideration,

3  will be withdrawn.  Those decisions would rest in the hands of

4  Mr. Meyercord.  We're comfortable with those decisions resting

5  there.  So is it perfect, does it button everything up, no.

6  But it's a step -- it's the next step, we believe.  And it's an

7  important step that we think is in the best interest of the

8  estate.

9          THE COURT:  Thank you.  Mr. Hodara, do you have any

10  comments?

11          MR. HODARA:  I don't, Your Honor.  Thank you.

12          THE COURT:  Okay.  Before I rule, I'd like -- I'd

13  like to see in chambers -- I'd like to see counsel for the

14  debtor, the committees, UBS and the U.S. Trustee and Fremont.

15  All right, you can come around this side.

16      (Recess from 4:16 p.m. until 4:38 p.m.)

17          THE COURT:  Please be seated.  All right.  I'm

18  prepared to provide my ruling in connection with debtor's

19  motion for order approving compromise and settlement agreement

20  with Fremont investors and the second lien lenders.  Excuse me.

21  As a preliminary matter, I think it's important to note, Mr.

22  Godshall made this point several times, what's in front of the

23  Court and what's not in front of the Court.  The deal between

24  Fremont and the second lien lenders is not before me.  The

25  Fremont decision about who to appoint to the board of directors

196

1   pursuant to the exercise of its controlling interest in the

2   debtor is not before me.  And the plan support agreement

3   between Fremont and the second lien lenders is not in front of

4   me.  Of course, it's all part of an integrated settlement

5   agreement.  And whatever ruling I make in connection with the

6   issues that is before me -- that are before me, excuse me, may

7   have the effect of rendering the entire agreement either void

8   or -- or of no moment.

9          The issues that I consider before me are the debtor's

10  releases of Fremont, the debtor's releases of the second lien

11  lenders, the debtor's payment of directors and then the

12  miscellaneous provisions, most important of which are 7.5 and

13  its effect on the debtors.  Several objections have been

14  raised.  The U.S. Trustee and the informal committee raised

15  that this is not a proper 9019 motion because there's nothing

16  to settle.  And they cite the Louise's case to that effect.  I

17  don't think that's the case here.  Clearly, word, from the very

18  beginning of this case -- that I've had this case.  So since at

19  least April of last year, there's been an ongoing dispute as to

20  who would control the debtor.  Whether that control would

21  happen pursuant to a plan or in the interim has not been -- has

22  never been concrete.  But the entire valuation trial, the whole

23  point of the valuation trial was to resolve who was in the

24  money and who was not in the money on the -- and whether equity

25  was in the money.  So I think that while it's not -- while

1   there's not specific provisions at the settlement agreement

2   that say the appeal is going to be resolved or the motion for

3   reconsideration is going to be resolved, there's no question

4   that the provisions, especially the control provisions, who's

5   going to be the board of directors, deal very specifically with

6   the issue that's been in front of the Court since April as well

7   as the issue of the releases, the mutual releases.

8          There's also an argument -- so I -- I -- I overrule

9   that objection, at least, on that basis.  There has also been

10  the review, or the argument, that this is a sub-rosa plan.  I

11  don't know what -- you know -- part of the problem is I don't

12  know what a sub-rosa plan is.  So it's hard to -- it's hard to

13  figure out whether this is a sub-rosa plan.  I think, as I

14  articulated during argument, the Louise's decision in the sub-

15  rosa plan case sort of melt together in my mind.  There's a

16  dispute.  You can resolve that dispute.  You don't have to

17  resolve it with just the issues that are in the dispute; you

18  can go further.  But at some point, you go so far, you throw in

19  so many provisions that you start to add provisions that, for

20  instance, bind third parties or dictate how the reorganization

21  is going to take place or provide releases.  And you get so

22  large that you start to become either beyond the scope of

23  whatever you're settling or you get into the area of calling

24  something a sub-rosa plan.

25          I don't think I have to reach that issue here.  This

198
1  may be a sub-rosa plan. But I don't think I have to reach that

2  issue here because I'm going to -- I'm not trying to hide the

3  ball -- I'm going to deny the motion. At least I'm going to

4  deny the motion as it affects the releases. And I think that

5  sort of moots the sub-rosa objection, if you will.

6       The release -- the debtor's release of Fremont and

7  the debtor's release of the second lien lenders are very

8  troubling here. And the reason they're troubling is twofold.

9  One, I think as a matter of policy, as a matter of Chapter 11

10  policy, as a matter of this case, I think that they're

11  premature. I think that those releases have to occur, if

12  they're going to occur, in the context of a plan of

13  reorganization.

14       As to what standard to apply, I don't think that the

15  9019 Martin factors can trump the Zenith factors. If you have

16  to meet a more stringent requirement in order to do an -- to do

17  something pursuant to a plan, I can't see how doing it prior to

18  the plan should somehow lower the bar. So I would apply the

19  Zenith factors generally speaking. But I have to say that I

20  think we go beyond that because it's clear to me from the

21  evidence that the releases were negotiated by Mr. Lenihan on

22  behalf of the debtors. The debtor's release of Fremont was

23  negotiated by a Fremont representative. I think the board, I

24  won't say they abdicated their responsibility, but I think the

25  board clearly deferred to Mr. Lenihan to make that decision.