## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re: : Chapter 11

:

AMERICAN HOME MORTGAGE : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1] :

: Jointly Administered

Debtors. :

: **Hearing Date: 04/14/08 at 11:00 a.m. (Requested)[2]**
: **Objection Deadline: 04/11/08 at 4:00 p.m.**
: **(Requested)**
: **Related Document No. 1711**

------------------------------------------------------- x

## EMERGENCY MOTION OF AH MORTGAGE ACQUISITION CO., INC. TO COMPEL DEBTORS TO EFFECTUATE THE FINAL CLOSING UNDER THE ASSET PURCHASE AGREEMENT FOR THE SALE OF THE DEBTORS' MORTGAGE SERVICING BUSINESS

AH Mortgage Acquisition Co., Inc. (the "Purchaser") hereby moves the Court for

an order directing American Home Mortgage Investment Corp. ("AHM Investment"), American

Home Mortgage Corp. ("AHM Corp."), and American Home Mortgage Servicing, Inc. ("AHM

Servicing," and collectively with AHM Investment and AHM Corp., the "Sellers"), three of the

debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); AHM Investment, a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); American Servicing, a Maryland corporation (7267); AHM Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Concurrently with the filing of this Emergency Motion, AH Mortgage Acquisition Co., Inc. has filed a motion to shorten notice requesting that the Court schedule this Emergency Motion for hearing on April 14, 2008 at 11:00 a.m. and set a response deadline of April 11, 2008 or such other date as the Court may determine.

effectuate the Final Closing[3] under the Asset Purchase Agreement dated as of September 25, 2007 (as subsequently amended, the "APA") as approved by this Court's *Order Pursuant to Sections 105, 363, 364, 365, and 503(B) of the Bankruptcy Code, and Rules 2002, 4001, 6004, 6006, 7062, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Approving (i) the Sale of the Debtors' Mortgage Servicing Business Free and Clear of Liens, Claims and Interests, (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (B) Granting Certain Related Relief* [Docket No. 1711] (the "Servicing Sale Order"). In support of this Motion, the Purchaser submits the Declaration of Josh R. Seegopaul (the "Seegopaul Declaration"), which is attached hereto as Exhibit A and incorporated herein by reference, and respectfully represents as follows:

## JURISDICTION AND STATUS OF THE CASE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 363(b).

2.      On August 6, 2007, each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

---

[3]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the APA, a copy of which is attached hereto as Exhibit B and incorporated herein by reference.

4.    On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors.  No trustee or examiner has been appointed.

## BACKGROUND

### The Debtors' Mortgage Servicing Business

5.    Prior to the filing of these bankruptcy cases, the Debtors' businesses primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans.  The Debtors also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors.  The Debtors offered an array of mortgage products and primarily made loans to borrowers with good credit profiles.  Most of the Debtors' loan portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate-A quality.

6.    A large component of the Debtors' businesses was the servicing of loans (the "Servicing Business"), which the Debtors conducted primarily through AHM Servicing. The Servicing Business entails, among other things, collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over collection and default mitigation processes.  Many of the loans the Debtors originated were to be serviced by the Servicing Business, thus assuring that the Servicing Business would obtain additional servicing rights as existing mortgage loans were repaid in whole or in part.

7.    As well documented in these cases, unprecedented disruptions in the credit markets in 2006 and 2007 undermined the value of the Debtors' loan portfolio, thereby causing significant write-downs in the Debtors' loan and security portfolios.  This decrease in the

Debtors' loan portfolio resulted in margin calls for hundreds of millions of dollars, which in turn resulted in defaults under the Debtors' various credit facilities thus severing the Debtors' access to credit and impairing their ability to originate loans. The Debtors' deteriorating financial condition also served as grounds for counterparties to the Debtors' master servicing agreements to seek termination of those agreements.

**The Debtors' Emergency Sale Motion**

8.      Although the Debtors' Servicing Business remained viable, without the ability to originate new loans that the Debtors would service, and given the threat of termination of master service agreements, the Debtors faced the prospect of a total loss of value of their Servicing Business. Accordingly, to preserve the value of their assets, the Debtors initiated these proceedings and immediately began to market the Servicing Business by filing their *Emergency Motion of the Debtors for Orders:  (A)(i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of Certain Assets Used In the Debtors' Loan Servicing Business; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief; and (B)(i) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related Relief* [Docket No. 11] (the "Initial Servicing Sale Motion"). By Order dated August 9, 2007 [Docket No. 113], the Court granted the Initial Servicing Sale Motion.

9.      Thereafter, the Debtors concluded, in the exercise of their business judgment, that having a stalking horse bidder for the sale would be in the best interests of their estates, and commenced good faith arm's length negotiations with the Purchaser with respect to a transaction whereby the Purchaser would agree to purchase the Servicing Business and become the stalking horse for the sale process. Accordingly, on September 21, 2007, the Debtors filed

- 4 -

their *Motion of the Debtors for Order Pursuant to Sections 105(a), 363, 364, 365, and 503(b) of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006, 7062, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Approving Revised Procedures for the Sale of the Debtors' Mortgage Servicing Business; (B) Approving Certain Protections for the Stalking Horse Bidder in Such Sale; (c) Directing that Certain Notices of Such Sale and Deadline be Given; and (D) Authorizing, on an Interim Basis, the Debtors to Grant Certain Liens and Other Protections for the Purchaser's Collateral Effective After the Initial Closing* [Docket No. 865]. The Court approved the revised motion by order dated September 25, 2007, [Docket No. 937].

10.    No other qualified bids were received for the Servicing Business, and on October 15, 2007, the Court conducted a sale hearing. Thereafter, on October 30, 2007, the Court entered the Servicing Sale Order authorizing the sale of the Servicing Business to the Purchaser.

**The Need for Regulatory Approval and the Two-Step Closing Process**

11.    Because the Purchaser was not yet licensed to service mortgage loans in the various jurisdictions necessary to operate the Servicing Business, the APA and the Servicing Sale Order provide for a two-step closing process designed so that the sale could close from an "economic" perspective while the Purchaser obtained the necessary regulatory approvals and licensing.[4] (Seegopaul Decl. ¶ 2.) At the "economic" close, which occurred on November 16, 2007 (the "Initial Closing"), the Purchaser paid the Purchase Price in the manner and to the parties in interest as contemplated by the APA, but the Sellers, with AHM Servicing as the licensed servicing entity, retained ownership of the Servicing Business. (Seegopaul Decl. ¶ 2.)

---

[4]    The description of the APA in this Motion is by way of summary only. To the extent there is any discrepancy between descriptions herein and the actual terms of the APA, the latter are controlling.

From the Initial Closing until the Final Closing, the Sellers are required to operate the Servicing

Business in the ordinary course of business for the economic benefit (and risk) of the Purchaser,

but the Purchaser is required to provide such liquidity and working capital as may be necessary

to enable the Sellers to operate the business from the Initial Closing to the Final Closing.

Additionally, because the Debtors will no longer have the necessary platform to service loans

after the Final Closing, the APA also contemplated that the parties would enter into either a sub-

servicing agreement or an interim service agreement, whereby the Purchaser would service for

the benefit of the Debtors any mortgage loans under servicing agreements not included in the

Purchased Assets under the APA.

        12.     Following the Initial Closing, the only condition to the Purchaser's

obligation to effectuate the Final Closing under the APA is the condition that the Purchaser has

obtained the necessary regulatory approvals and licenses (the "Regulatory Approval Condition"),

a condition the Purchaser may waive.[5]  (APA § 8.4.)  Following the Initial Closing, there is no

condition to the Sellers' obligation to effectuate the Final Closing under the APA.  The APA

further provides that the Final Closing, and the transfer of title to the Servicing Business,

including the Purchased Assets, Assumed Liabilities and Assumed Contracts, shall take place on

the first business day following the date on which the Purchaser has satisfied or waived the

Regulatory Approval Condition.  (APA § 2.7(b).)

**The Debtors' Refusal to Close and Breach of the APA**

        13.     On March 16, 2008, the Purchaser, pursuant to paragraph 58 of the

Servicing Sale Order, notified the Sellers that of the 44 licenses the Purchaser needed to obtain,

---

[5]     In accordance with paragraph 58 of the Servicing Sale Order, the Purchaser submitted
monthly reports to the Debtors regarding the status of the Purchaser's regulatory approval.

40 had either been issued or regulatory approval to proceed to closing had been obtained. (Seegopaul Decl. ¶ 3.) A copy of the March 16, 2008 status report is attached hereto as Exhibit C and incorporated herein by reference. Shortly thereafter, the Debtors and the Purchaser began conducting daily conference calls in anticipation of the Final Closing and worked toward finalizing various agreements such as the Transition Services Agreement and the post-Final Closing servicing agreements. (Seegopaul Decl. ¶ 3.) The parties thereafter set March 31, 2008 as the Final Closing Date. (Id.)

14.     Although the Purchaser had satisfied the Regulatory Approval Condition by that date, the Debtors failed to effectuate the Final Closing on that date because of a regulatory issue associated with two mortgage servicing agreements that are not included in the Purchased Assets. (Seegopaul Decl. ¶ 4.) As noted above, the APA contemplates that the Purchaser will enter into a sub-servicing arrangement with the Debtors to service mortgage loans under servicing agreements that are not included in the sale. (Id.) A problem arose, however, relating to the need for both the Debtors and the Purchaser to be licensed to service those mortgage loans. (Id.) Additionally, the Debtors indicated that one of the servicing agreements, a repurchase agreement with Calyon New York Branch ("Calyon"), required Calyon's consent for the Purchaser to act as subservicer. (Id.) On April 3, 2008, the parties resolved the regulatory issues associated with the sub-servicing arrangements. (Id.)

15.     On April 4, 2008, the Purchaser sent a letter (the "Demand Letter") to the Debtors (a) formally notifying the Debtors that the Purchaser has satisfied the Regulatory Approval Condition and that, to the extent there is any doubt that the condition has been satisfied, the Purchaser waives the condition; and (b) demanding that the Debtors comply with the APA and effectuate the Final Closing no later than April 7, 2008. (Seegopaul Decl. ¶ 5.) A

power under § 105 than to issue an order that compels compliance with a previous order."); In re

WorldCorp., Inc., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (compelling party to make payment

as required under court approved postpetition agreement); JMF Acquisitions Co. v. Boccella (In

re Edgehill Nursing Home, Inc.), 68 B.R. 413, 415-16 (Bankr. E.D. Pa. 1986) (noting that court

directed debtor to comply with court order and execute postpetition agreement).

18.    As discussed in the Initial Servicing Sale Motion, a fundamental element

of these cases was the rapid sale of the Servicing Business to "realize value for their

stakeholders." (Initial Servicing Sale Motion at ¶ 27.) The complexity of the Servicing Business

and the related loans and securitizations, combined with the Debtors' severe financial condition,

necessitated a unique transaction structure that would provide the Debtors with an infusion of

cash, while allowing for the Purchaser to obtain the necessary regulatory approvals and licenses

to operate the Servicing Business. With these goals accomplished, the final transfer of the

Servicing Business to the Purchaser must now be expeditiously effectuated. There can be no

question that the Regulatory Approval Condition has been satisfied or waived, and unless

otherwise agreed by the parties, the APA provides that the Final Closing "shall take place . . . on

the Business Day following the date on which the [Regulatory Approval Condition] has been

satisfied or waived." (APA § 2.7(b).) Moreover, recognizing that the parties could indeed suffer

substantial and irreparable harm in this type of circumstance, the APA expressly provides that

the parties are entitled to specific enforcement of the agreement in addition to other remedies.

(APA § 11.15.)

19.    Although the Debtors have no legal basis to delay the Final Closing

because of the long-standing dispute between the Debtors and Calyon, the Debtors are holding

the Purchaser hostage because of this purported need for a consent and the Debtors' apparent

copy of the Demand Letter is attached hereto as Exhibit D and incorporated herein by reference. Although the Debtors initially agreed to close on April 7, the Debtors informed the Purchaser on April 7 that they were not willing to close because they had not yet obtained Calyon's consent.[6] (Id.)

### RELIEF REQUESTED

16.     Pursuant to sections 105 and 363 of the Bankruptcy Code, the Purchaser respectfully requests entry of an order directing the Debtors to effectuate the Final Closing as required pursuant to the terms of the APA and the Servicing Sale Order.

### BASIS FOR RELIEF REQUESTED

17.     "It is axiomatic that a court possesses the inherent authority to enforce its own orders." Protarga, Inc. v. Webb (In re Protarga, Inc.), 329 B.R. 451, 479 (Bankr. D. Del. 2005 (citing In re Cont'l Airlines, Inc., 236 B.R. 318, 325-26 (Bankr. D. Del. 1999), aff'd, 279 F.3d 226 (3d Cir. 2002)). Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out" the Bankruptcy Code's provisions and "gives the bankruptcy court the power and the jurisdiction to enforce its valid orders." Protarga, 329 B.R. at 479 (internal quotations and citations omitted); 11 U.S.C. § 105(a). Moreover, courts have often applied their equitable powers to compel parties debtors to perform under postpetition agreements or otherwise comply with postpetition obligations. See Baer v. Bowser (In re Jones), Case No. 97-41205-7, 2003 Bankr. LEXIS 2056 at *15 (Bankr. D. Kan. Nov. 10, 2003) ("[T]he Court can think of no better use of its equity

---

[6]     It is the Purchaser's understanding that the Debtors are attempting to obtain this consent as part of some global settlement with Calyon and that the Debtors' prepetition lenders may be insisting that the Debtors not effectuate the Final Closing without a global Calyon settlement.

insistence, perhaps at the behest of their prepetition lenders, in reaching a global settlement with
Calyon before effectuating the Final Closing.  Obtaining Calyon's consent, however, is not a
condition to the Debtors' obligation to effectuate the Final Closing.  Furthermore, the Debtors
refusal to effectuate the Final Closing is exposing the Debtors' estates to the continuing accrual
of administrative claims of the Purchaser.  Indeed, each day the Final Closing is delayed causes
the Purchaser to suffer damages under the APA.  In particular, the APA allocates certain
overhead costs of the loan servicing business, totaling $350,000 per month, to the Purchaser
during the period between the Initial Closing Date and the Final Closing Date.  (APA § 6.2(b);
Ex. G to APA.)  The Purchaser's responsibility for such overhead costs, however, will be
substantially reduced after the Final Closing Date, pursuant to the Transition Services
Agreement.  (Seegopaul Decl. ¶ 6.)  In addition, under section 6.2(f) of the APA, the Debtors
agreed to remit certain fees to the Purchaser for servicing certain mortgage loans during the
period from the Initial Closing through the Final Closing.  The amount of such fees following the
Final Closing, however, is expected to be substantially more than the amount of the current fees.
(Id.)  Thus, the longer the Final Closing is delayed, the more overhead costs the Purchaser will
incur and the more fees the Purchaser will forego.  (Id.)

      20.     Furthermore, the Purchaser cannot wait for an extended period while the
Debtors seek to obtain Calyon's consent because the Purchaser has entered into other significant
transactions that are dependent upon the Final Closing under the APA.  (Seegopaul Decl. ¶ 7.)
The most significant of those transactions is the Purchaser's agreement to acquire the mortgage
servicing rights of Option One Mortgage Corporation (the "Option One Sale") pursuant to that
certain Purchase Agreement by and among Option One Mortgage Corporation, the Purchaser and
certain other entities, dated March 17, 2008 (the "Option One Agreement").  (Id.)  Because,

among other reasons, the regulatory approvals and licensing obtained to operate the Servicing Business to be acquired at the Final Closing under the APA will serve as the necessary licensing for the Option One servicing platform, one of the financing conditions that must be satisfied to close under the Option One Agreement is that the Final Closing has occurred on the Purchaser's acquisition of the Debtors' Servicing Business. (Id.) The Option One Sale is targeted to close on April 30, 2008 and, because of certain purchase price adjustments and other factors, the Purchaser will incur substantial damages if the Option One Sale fails to close on or before April 30. (Id.) The various parties involved in the Option One Sale, however, are unlikely to devote the substantial resources necessary to prepare for closing that sale until the necessary Final Closing under the APA has occurred. (Id.) As a result, if the Final Closing remains uncertain for another couple of weeks, it will seriously jeopardize the ability of the Purchaser to close the Option One Sale on or before April 30. (Id.) To the extent that the Debtors' failure to effectuate the Final Closing causes the Purchaser to miss the targeted April 30, 2008 closing date for the Option One Sale, the Purchaser intends to hold the Debtors' estates, as well as the Debtors' prepetition lenders to the extent they have been the cause of the delay, liable for all damages incurred.

21.    Additionally, as the Debtors well recognize, it is imperative that the Purchaser maintains the confidence of the Servicing Business employees, the counterparties to the servicing agreements, as well as state regulators. (Seegopaul Decl. ¶ 8.) Any prolonged delay of the Final Closing could raise concerns among the Servicing Business employees, the Federal Home Loan Mortgage Corporation (Freddie Mac), the Federal National Mortgage Association (Fannie Mae), and the credit rating agencies, all of whom were already notified that the Purchaser expected the Final Closing to occur on March 31. (Id.) It is critical to the success

of the Purchaser's business that these parties have confidence in the Purchaser, and the Final Closing under the APA must occur as quickly as reasonably possible to avoid damage to the Purchaser's reputation and business prospects. (Id.) Indeed, it is exactly because of the possibility of all of the foregoing sorts of difficult-to-measure damages and potentially irreparable harms, that the parties expressly agreed in the APA that the parties would be entitled to specific performance.

## NOTICE

22.     Purchaser will serve the Motion to Compel by overnight delivery or hand delivery on counsel to the Debtors, counsel to the Committee, counsel to the prepetition lenders, the Office of the United States Trustee and counsel to Calyon New York Branch; and by hand delivery to all local counsel and first class mail to all other parties requesting notices in these cases. No prior request for the relief requested herein has been made to this or any other court.

WHEREFORE, for all the foregoing reasons, the Purchaser respectfully requests entry of an order, substantially in the form attached hereto as Exhibit E, (i) directing the Debtors to comply with the terms of the APA and effectuate the Final Closing, and (ii) granting the Purchaser such other and further relief as is just and appropriate.

Dated: April 8, 2008
       Wilmington, Delaware

GREENBERG TRAURIG, LLP

Victoria W. Counihan (BAR #3488)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000

and

JONES DAY
Daniel P. Winikka
Daniel B. Prieto
Eric N. McKay
2727 North Harwood Street
Dallas, Texas  75201-1515
(214) 220-3939

Counsel for AH Mortgage Acquisition Co., Inc.