## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., et al., | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | Related Docket Nos. 554, 2002, 2284, |
|  | ) | 2855, 3142, 3172, 3264, 3318, 3533, |
|  | ) | 3541, 3542, 3546 and 3552 |
|  | ) |  |

Hearing Date: April 14, 2008 at 10:00 a.m.

**REPLY OF BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT
(i) IN FURTHER SUPPORT OF THE JOINT MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS AND THE ADMINISTRATIVE AGENT
FOR ENTRY OF FINAL STIPULATION AND ORDER RESOLVING ALL
REMAINING ISSUES WITH RESPECT TO THE FINAL ORDER (I) AUTHORIZING
DEBTORS' LIMITED USE OF CASH COLLATERAL AND (II) GRANTING
REPLACEMENT LIENS AND ADEQUATE PROTECTION TO CERTAIN PRE-
PETITION SECURED PARTIES AND (ii) IN RESPONSE TO OBJECTIONS**

Bank of America, N.A., as Administrative Agent[1] for itself and the other Pre-

Petition Secured Parties, by and through its undersigned counsel, submits this reply ("Reply") in

further support of the *Joint Motion of the Official Committee of Unsecured Creditors and Bank*

*of America, N.A., as Administrative Agent, For Entry of Final Stipulation and Order Resolving*

*All Remaining Issues With Respect To The Final Order (I) Authorizing Debtors' Limited Use Of*

*Cash Collateral and (II) Granting Replacement Liens and Adequate Protection To Certain Pre-*

*Petition Secured Parties* ("Approval Motion") and in response to the objections ("Objections")

filed by (i) the Debtors, (ii) AH Mortgage Acquisition Co., Inc. and WLR Recovery Fund, III,

L.P. (collectively, "WLR") and (iii) the Office of the United States Trustee (the "U.S. Trustee").

---

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the
Approval Motion.

## **INTRODUCTION**

Though the Debtors would have the Court believe otherwise, the Stipulation will achieve a beneficial result for unsecured creditors, is structured on terms similar to those contained in many other settlements that have been approved by this Court and other bankruptcy courts, and fairly compromises the Remaining Issues. The Debtors' Objection mischaracterizes clear provisions of the Stipulation and virtually ignores the relevant provisions of the Cash Collateral Order (of which the Debtors were the proponents and beneficiaries).

It is obvious from the Debtors' Objection that their motivation for opposing the Stipulation has nothing to do with the reasonableness of the settlement or the value it will afford to the Debtors' unsecured creditors. The Debtors merely wish to derail the settlement so they can try to dissuade the Committee from supporting the Stay Relief Motion (which the Committee should support on the merits even without this Stipulation) and enlist the Committee as an ally in their threatened litigation against the Pre-Petition Secured Parties (which the Committee has already considered and rejected). The Debtors' blatant disregard for their binding commitments under the Cash Collateral Order and criticism of the Committee's judgment do not change the fact that the Stipulation is an appropriate compromise worthy of the Court's approval.

WLR and the U.S. Trustee object to the Stipulation because the Estate Share and the proceeds of the Designated REO Properties will be placed in a fund for the benefit of unsecured creditors, without necessarily ensuring that priority and administrative expense claims are paid in full. These objections should be overruled because the Stipulation provides that the Court can order different treatment for the trust funds, and because, as Bankruptcy Judge Walsh ruled in a recent case with facts strikingly similar to those at bar, the establishment of such a fund does not violate the absolute priority rule. *In re World Health Alternatives, Inc.*, 344 B.R.

291, 298-99 (Bankr. D. Del. 2006). It is appropriate, and fairly common, for secured creditors to share collateral with unsecured creditors in the context of pre-plan settlements. Moreover, there is no basis for WLR's concern that funds potentially subject to WLR's postpetition liens will be used to pay unsecured creditors before WLR's as yet non-existent claims as postpetition lender have been repaid in full. The Stipulation does not address liens of creditors other than the Pre-Petition Secured Parties and will not prejudice WLR's ability to assert liens if it so chooses. All of the Objections should be overruled, and the Stipulation should be approved.

## RELEVANT FACTS[2]

### I.      The Cash Collateral Order and the Committee's Investigation

Pursuant to the Cash Collateral Order, the Court authorized the Debtors' use of the Pre-Petition Collateral, subject to certain terms and conditions. Among other things, the Debtors:

- *admitted* that the Pre-Petition Secured Parties' claims for the Indebtedness are valid, binding obligations of the Debtors;

- *admitted* that no portion of the Indebtedness is subject to avoidance, subordination, recharacterization, offset, counterclaim, defense or claim of any kind;

- *agreed* not to contest that the Pre-Petition Secured Parties' claims are oversecured;

---

[2]     The Debtors' rambling Objection is premised on their hope that the Court will deny the Stay Relief Motion. In an obvious attempt to color the Court's views before the hearing on that motion, the Debtors devote a large portion of their Objection to baseless assertions and arguments, such as (i) their misleading account of the construction loan sale process and the results thereof and (ii) their assertion that the Administrative Agent will conduct a fire sale of the Mortgage Loans. The Administrative Agent disagrees with virtually all of the Debtors' assertions but will not burden the Court with a point by point response. The Debtors will be held to their burden at the hearing on the Stay Relief Motion.

- *admitted* that the liens and security interests of the Pre-Petition Secured Parties are valid, enforceable, perfected and not subject to avoidance, subordination or recharacterization; and

- *waived and released* all claims against the Pre-Petition Secured Parties.

*See* Cash Collateral Order at ¶¶ C, D, E, G.  The agreements, admissions and releases contained in the Cash Collateral Order are binding upon the Debtors "*for all purposes*." *Id.* at ¶ 20.

At the same time, the Cash Collateral Order granted the Committee standing, on behalf of the Debtors' estates, to: (i) challenge the amount, validity, enforceability, priority or extent of the Indebtedness or the Pre-Petition Secured Parties' security interests in and liens upon the Pre-Petition Collateral or (ii) otherwise assert any claims or causes of action against the Pre-Petition Secured Parties.  *Id.* at ¶ 20.  Thus, as is often the practice in chapter 11 cases, once the Debtors released estate claims against the Pre-Petition Secured Parties in exchange for the right to use a substantial amount of Cash Collateral and other benefits, the Committee was the only party with the right and authority to evaluate the estates' claims and decide whether or not to proceed with respect to those claims.[3]

Consistent with its fiduciary duties, the Committee undertook its analysis, and by February 1, 2008, had narrowed the universe of potential claims against the Pre-Petition Secured Parties to the Remaining Issues.[4]  The Administrative Agent strongly disputed (and continues to

---

[3]    The Debtors' agreements, admissions and releases also became binding upon all parties in interest other than the Committee as of October 22, 2007.  *See* Cash Collateral Order at ¶ 20.

[4]    The Debtors' Objection carefully paraphrases the Remaining Issues and in doing so distorts the clear articulation of those issues.  *See* Debtors' Objection at ¶ 16.  The Court is respectfully referred to the Second Stipulation and Order [D.I. 2855] for an accurate and complete description of the Remaining Issues.

dispute) the merits of any claims based on the Remaining Issues but agreed to extend the

Committee's time to pursue those claims so that the parties could work toward a consensual

resolution that would avoid the expense of protracted litigation.

**II.      The Stay Relief Motion and Negotiation of the Stipulation**

On February 22, 2008, while those negotiations were underway, the

Administrative Agent filed the Stay Relief Motion, which seeks modification of the automatic

stay to allow the Administrative Agent to sell the Pre-Petition Secured Parties' primary

remaining collateral, approximately 3,400 Mortgage Loans, in an orderly fashion to maximize

their value. As set forth in the Stay Relief Motion, the Administrative Agent has urged that sale

options and processes be explored from the outset of the case, and has watched values decline

and options disappear while the Debtors wait for a "market rebound" to sell the Mortgage Loans.

The Administrative Agent and the Committee agree that, for many reasons, the

Administrative Agent is far better equipped than the Debtors to obtain the best value for this

Collateral and has the economic incentive to do so. In exploring settlement alternatives, the

Committee and the Administrative Agent determined that it was worthwhile to consider options

that would align the parties' economic interests. Those efforts culminated in the settlement

embodied in the Stipulation.

**III.     Key Compromises in the Stipulation**

The Stipulation sets forth several major concessions by the Pre-Petition Secured

Parties that clearly benefit the Debtors' estates. The Pre-Petition Secured Parties will relinquish

all of their rights and claims against the Designated REO Properties, including any distribution to

which the Pre-Petition Secured Parties would otherwise be entitled on account of their potential

Deficiency Claim. This resolution gives unsecured creditors a better result than the Committee

5

could have obtained through a litigated result, without requiring the Committee to incur any litigation expenses.

Twenty-three of the fifty-nine Designated REO Properties became REO Properties after the Petition Date as a result of foreclosures on Mortgage Loans having an unpaid principal balance of approximately $3.9 million. Pursuant to the Cash Collateral Order, the Pre-Petition Secured Parties have perfected first priority security interests on these Designated REO Properties, which would be immune from any lien challenge. *See* Cash Collateral Order at ¶ 9. In addition, the Debtors failed to take title to many of the other Designated REO Properties, which renders them outside the scope of the Remaining Issues and therefore immune from any challenge by the Committee. *See* Second Stipulation and Order [D.I. 2855] at ¶ 1(a).

The Pre-Petition Secured Parties have also voluntarily subordinated their Deficiency Claim, if any, against the Designated REO Properties by agreeing to forego any distribution from the proceeds thereof. The other claims the Committee has the right to pursue in relation to REO Property or proceeds thereof would be costly, time-consuming and unlikely to yield greater value than what the Committee has bargained for in the Stipulation.[5] Three of the Designated REO Properties were sold as part of a Court-approved auction of non-performing loans, which generated approximately $500,000 that the Administrative Agent will release upon approval of the Stipulation.

---

[5]    The Committee is releasing claims to recover REO Property proceeds paid to the Administrative Agent within 90 days prior to the Petition Date or paid after the Petition Date on account of prepetition REO Property. The litigation of those claims would involve a tracing analysis that the Debtors (which released those claims) have never been willing or able to produce, presumably because it is either too complicated or because it would not support a claim justifying the expense that would be incurred by the Committee in litigation.

In addition to the Designated REO Property, the Pre-Petition Secured Parties will begin sharing proceeds of Collateral with unsecured creditors before the Pre-Petition Secured Parties' prepetition claims have been paid in full, beginning after 94% of the Benchmark Pre-Petition Claim has been satisfied. This aspect of the Stipulation is essentially a gift that aligns the interests of the Administrative Agent and the Committee in maximizing the value of the Collateral. As with the proceeds of Designated REO Properties, the Pre-Petition Secured Parties have agreed to forego the right to distributions from the Estate Share on account of any Deficiency Claim, which further enhances the value of this concession to the estates.[6]

Contrary to what the Debtors suggest, and as the Debtors know, the Administrative Agent's fees and expenses have not been paid by the Debtors' estates since the November 16, 2007 termination date under the Cash Collateral Order. Since that date, the Administrative Agent's fees and expenses have been paid from the proceeds of Collateral pursuant to the waterfall provisions in the Loan Documents. Once the sharing of Collateral proceeds begins under the Stipulation, the Administrative Agent's fees will only be paid from the Pre-Petition Secured Parties' Share and not the Estate Share.

In exchange for this consideration, the Pre-Petition Secured Parties will receive releases of the Remaining Issues, the Committee's support for the Stay Relief Motion, and the Committee's agreement to remain neutral or support the Administrative Agent with respect to matters concerning the Pre-Petition Secured Parties' claims, security interests and collateral.

---

[6]    The Debtors mischaracterize an interrogatory response given in connection with the Stay Relief Motion as a representation by the Administrative Agent that the Pre-Petition Parties' claims are so undersecured as to render this sharing provision worthless. That is a gross distortion of the interrogatory response and is pure *ipse dixit*. The Administrative Agent believes it is far better positioned than the Debtors to maximize value from the Mortgage Loans.

This provision ensures that the estates and the Committee do not reap the benefits of the Stipulation and then challenge through the back door what is being settled, which is particularly important to the Administrative Agent given the Debtors' propensity to walk away from the Cash Collateral Order when convenient.

## REPLY

The proposed Stipulation and the circumstances surrounding it are not unusual. Like many cash collateral orders and debtor-in-possession financing orders entered in chapter 11 cases, the Cash Collateral Order contained releases and admissions by the Debtors and gave the Committee standing to challenge the claims and security interests of the Pre-Petition Secured Parties. As in many other cases, the Committee analyzed the potential estate claims, identified those which it considered litigating, and reached a compromise to avoid litigation expense and to maximize the value it could recover for unsecured creditors. This sort of compromise is often done at various points in the case, such as pursuant to a pre-plan settlement near the expiration of the committee's time to assert claims, in connection with a pre-plan sale of assets pursuant to section 363 of the Bankruptcy Code, or pursuant to a settlement set forth in a plan of reorganization.

The only unusual circumstance before the Court in connection with the Stipulation is the Debtors' objection to it. After having released their right to challenge the Pre-Petition Secured Parties' claims and security interests, and after having received the benefit of the use of more than $100 million of Cash Collateral over a 15 week period, the Debtors have decided to ignore their own releases and attack the Committee's judgment in compromising claims that the Debtors previously saw fit to release when doing so suited their purposes. The Debtors' disregard for the Cash Collateral Order is disturbingly consistent with their objection to

the Stipulation, since they essentially want the Administrative Agent to provide all the

concessions it offers under the Stipulation without getting anything in return.

      The Debtors' Objection complains that the Stipulation (i) allows the amount of

the Pre-Petition Secured Parties' claims, (ii) does not preserve equitable subordination claims,

(iii) improperly compromises issues that the Committee has no standing to compromise, and (iv)

prevents the Committee from opposing the Pre-Petition Secured Parties on any matter

whatsoever.[7] These objections are unfounded and should be overruled.

## I.    The Debtors' opposition ignores the Cash Collateral Order and their agreements from the outset of the case.

      As noted above, the Cash Collateral Order sets forth the Debtors' agreements,

admissions and releases with respect to the Pre-Petition Secured Parties' claims and security

interests, which are binding for *all purposes*. Now, under the guise of opposing the Committee's

decision to settle, the Debtors propose that the Court reject the Stipulation based on arguments

that directly violate those binding commitments.

      The Debtors should be barred under the doctrine of judicial estoppel from taking

positions that run afoul of their binding admissions, agreements and releases in the Cash

Collateral Order. *In re Armstrong World Indus.*, 432 F.3d 507, 517 (3d Cir. 2005) (judicial

estoppel prevents parties from "deliberately changing positions according to the exigencies of the

moment"); *Krystal Cadillac-Oldsmobile GMC Truck, Inc., v. General Motors Corp.*, 337 F.3d

314, 324-25 (3d Cir. 2003) (judicial estoppel precludes a litigant from asserting a position

---

[7]    For example, the Debtors state that they intend to challenge prepetition sweeps by the Pre-Petition Secured Parties, even though they *admitted* in the Cash Collateral Order that any amounts applied toward obligations owing under the Loan Documents prior to the Petition Date are not subject to avoidance, subordination, recharacterization, offset, counterclaim, defense or claim of any kind. *See* Cash Collateral Order at ¶ C.

inconsistent with that asserted in the same or in a previous proceeding) (internal citation omitted)).

Bankruptcy courts in this Circuit have applied judicial estoppel to deny relief sought by debtors based on positions inconsistent with those taken to obtain prior relief. *Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.)*, 327 B.R. 719, 723-724 (Bankr. D. Del. 2005) (precluding debtors from seeking to void assumed agreement after convincing bankruptcy court that assumption was in the estates' best interests); *Chrysler Corp. v. Monroeville Dodge, Ltd. (In re Monroeville Dodge, Ltd.)*, 166 B.R. 264, 269 (Bankr. W.D. Pa. 1994) (debtor estopped from arguing that its previously assumed contract was burdensome to the estate; debtor "previously said one thing in persuading th[e] court to grant its motion to assume" and could not "have it both ways").

The fundamental unfairness of the Debtors' reversal of its position could not be more evident here. After having received the benefit of the use of Cash Collateral, the Debtors have disregarded their binding admissions simply because doing so suits the exigencies of the moment. After agreeing to the Committee's standing to pursue the estates' claims and watching silently as the Court approved several stipulations extending the Committee's time to pursue those claims, the Debtors now complain that the Committee cannot compromise estate claims over the Debtors' objection. This is precisely the type of conduct that judicial estoppel is designed to prevent. The Court can and should hold the Debtors to the terms of the Cash Collateral Order.

## II.    The Committee Has Authority to Enter Into the Stipulation.

As discussed above, the Cash Collateral Order gave the Committee standing to pursue claims and challenges against the Pre-Petition Secured Parties that the Debtors waived the

right to pursue. Nevertheless, the Debtors now claim that the Committee has exceeded its

authority by compromising these issues, either because committees cannot compromise claims

generally or because the claims being compromised belong to the Debtors. These arguments are

meritless.

There is nothing novel about a creditors' committee seeking court approval for a

settlement. *See, e.g., World Health*, 344 B.R. at 295 (approving settlement among debtor,

creditors' committee and secured creditor pursuant to Bankruptcy Rule 9019 and finding the

debtor's release of estate claims "somewhat puzzling" since the debtors had already granted the

secured creditor a release under a prior order); *see also In re SPM Mfg. Corp.*, 984 F.2d 1305,

1315-16 (1st Cir. 1993) (creditors' committee had the right to enter into a settlement with secured

party not submitted to the bankruptcy court for approval, pursuant to §1103(c)(5)).[8]

Citing to *In re Smart World Technologies, LLC,* the Debtors suggest that the

Committee cannot compromise estate claims over the objection of the Debtors as a matter of law.

*Smart World Techs., LLC v. Juno Online Services, Inc. (In re Smart World Techs., LLC)*, 423

F.3d 166 (2d Cir. 2005). That is an absurd proposition given that the Committee was given

standing under the Cash Collateral Order to pursue the claims and lien challenges, and the

Debtors released the Pre-Petition Secured Parties and waived the right to pursue those claims.

*Smart World* involved a case in which a creditor and a committee that had *not* been granted

---

[8]     The Debtors' suggestion that the Committee cannot compromise claims under
        Bankruptcy Rule 9019 would turn the Committee's prudent exercise of complying with
        the applicable notice requirement on its head. As the Court observed during a telephonic
        hearing with the Court on March 24, 2008 to discuss notice of the Approval Motion
        under Bankruptcy Rule 9019 and Del. Bankr. L. R. 2002(b), it is not clear that
        Bankruptcy Rule 9019 is applicable to this settlement. Nevertheless, out of an abundance
        of caution, the Committee and the Administrative Agent voluntarily followed those
        notice requirements to give parties notice that estate claims are being settled.

11

derivative standing to pursue estate claims were trying to settle those claims while the debtor was still trying to litigate them. *Id.* at 177. Those circumstances are not present here, since the Committee is only compromising estate claims it has been given standing to pursue, with the Debtors' consent, pursuant to the Cash Collateral Order. *Id.* at 176, n.15 (noting courts' recognition of derivative standing when the debtor consents).

### III.    The Stipulation is Not a *Sub Rosa* Plan

Since they have no justification for challenging the Stipulation, the Debtors resort to misreading terms and then objecting to them as tantamount to a *sub rosa* plan. Specifically, the Debtors state that the Stipulation: (i) allows the Deficiency Claim in an unknown amount and waives the estates' subordination claims, (ii) requires that the Deficiency Claim be *pari passu* with general unsecured creditors, and (iii) allows for the Administrative Agent's postpetition attorneys' fees and expenses absent a finding that the Administrative Agent is oversecured. None of these are accurate descriptions of the Stipulation's terms, and each is a red herring.

The Pre-Petition Secured Parties' claims are not being allowed pursuant to the Stipulation; they were allowed pursuant to the Cash Collateral Order. Cash Collateral Order at ¶¶ C, 20. The Administrative Agent filed a proof of claim. The Committee has reviewed it and has found no obvious issues, but the Committee will continue to have the right to determine whether claims *validly* arise pursuant to the Loan Documents. If the Committee does not believe so, it can assert that. *See* Stipulation at ¶ 5.

The Pre-Petition Secured Parties' Deficiency Claim, if any, is by law *pari passu* with other unsecured creditors, since the Cash Collateral Order already immunized the Pre-Petition Secured Parties' claims from subordination. Therefore, it makes no sense to suggest the Stipulation is causing the release of such a claim. But pursuant to the Stipulation, the Deficiency

Claim is being voluntarily subordinated with respect to distributions otherwise available from the Estate Share and proceeds of the Designated REO Properties.

The Debtors' estates have not paid the Administrative Agent's postpetition attorneys fees (other than those paid prior to November 16, 2007 pursuant to the Cash Collateral Order) and will not do so as a result of the Stipulation. The Administrative Agent's fees have been and will continue to be paid from proceeds of the Collateral.

There is nothing in the Stipulation to suggest that it is a *sub rosa* plan. It provides that the Committee is free to propose or support a plan, with one reasonable condition: that the Committee live by the compromises set forth in the Stipulation and the agreements, admissions and releases set forth in the Cash Collateral Order. *See* Stipulation at ¶ 5.

## IV.    The Committee Is Not Abdicating Its Fiduciary Obligations.

The Debtors' Objection grossly mischaracterizes paragraph 5 of the Stipulation as a complete waiver of the Committee's right to oppose the Administrative Agent on any matter whatsoever. As noted above, paragraph 5 is merely an agreement that the Committee will not directly or indirectly undermine the benefits the Pre-Petition Secured Parties have bargained for in the Stipulation. This provision is particularly important since the Debtors clearly feel free to ignore their prior binding agreements, admissions and releases embodied in the Cash Collateral Order, have threatened litigation against the Pre-Petition Secured Parties and want the Committee to join them.[9] It is not an unreasonable burden for the Committee to refrain from supporting the Debtors in such wasteful, ill-conceived pursuits against the Administrative Agent.

---

[9]     The Administrative Agent is at a loss as to the relevance of the "significant issues" discussed in paragraphs 64 and 65 of the Debtors' objection. Each of those issues has a mechanism in place for resolution of disputes, and those mechanisms will be

(continued...)

13

Building on their misinterpretation of paragraph 5 and unhappiness with the
Committee's willingness to support the Stay Relief Motion, the Debtors urge the Court to defer
to their judgment and deny the Approval Motion (as well as the Stay Relief Motion, even though
it is not yet before the Court). The Debtors' logic is that the Stipulation is an abdication of the
Committee's fiduciary duties, and the Administrative Agent, which has no fiduciary duty to
creditors, will not behave like a rational economic actor if given authority to sell the Mortgage
Loans. Thus, the Debtors maintain that by default, they should retain control of all decisions that
effect the estates, even those that the Debtors ceded to the Committee in the Cash Collateral
Order.

The Debtors owe fiduciary duties to *all* creditors and have lost the support of their
constituents by failing to propose any plan whatsoever to realize, let alone maximize value for
the Mortgage Loans. Instead of addressing that problem, the Debtors have chosen to waste an
incredible amount of money fighting this Approval Motion and the Stay Relief Motion. Thus,
the Debtors' touting of its judgment as superior to that of all other parties in interest should be
viewed with great skepticism.

## V.    The Objections of WLR and the Trustee Should Be Overruled

WLR opposes the Stipulation on two grounds: (i) that it potentially gives
unsecured creditors property otherwise subject to liens of the DIP Lender before the DIP Lender
has been repaid in full (assuming there are outstanding borrowings under the DIP Facility, which
there have not been to date), and (ii) that the fund to be established for the benefit of unsecured

---

implemented if necessary. If the Stipulation is approved, the Committee will benefit
from the resolution of these disputes, regardless of which party prevails.

14

creditors is an impermissible class-skipping gift. The U.S. Trustee joins in opposing the
Stipulation on the second ground. Neither objection has merit.

Contrary to what these objections suggest, no one has never suggested that the
Estate Share is not Collateral, nor has anyone ever proven that the Designated REO Properties
are not subject to the valid, perfected, first priority liens of the Pre-Petition Secured Parties. The
purpose of depositing those proceeds into a trust is to ensure that they are only used or
distributed pursuant to a plan or other Order of the Court and not spent on needless litigation or
other purposes of the Debtors' choosing without the input of the Committee or approval by the
Court. To the extent WLR has unpaid claims as a postpetition lender (which it currently does
not) and wishes to assert liens on funds in the trust, the Stipulation does not prejudice WLR's
ability to do so.

This Court and others have held that secured creditors are free to share their
collateral proceeds with unsecured creditors, both in the context of plans and pre-plan
settlements, without providing for payment of other creditors. *See, e.g., World Health,* 344 B.R.
at 298-99 (pre-plan settlement of estate claims against secured party in exchange for carve-out of
collateral proceeds for benefit of unsecured creditors did not implicate the absolute priority and
would not violate the absolute priority rule even if it were implicated); *In re Genesis Health
Ventures, Inc.,* 266 B.R. 591, 602 (Bankr. D. Del. 2001), *appeal dismissed,* 280 B.R. 339 (D.
Del. 2002) (confirming chapter 11 plan providing for senior lenders' agreement to share
distribution otherwise available to them with some unsecured creditors but not others); *SPM,* 984
F.2d at 1312 (upholding over debtor's objection settlement between secured creditor and
creditors' committee providing for carve-out of collateral proceeds for unsecured creditors'
benefit, even if priority creditors would not receive payment); *In re MCorp. Fin., Inc.,* 160 B.R.

941, 960 (S.D. Tex. 1993) (plan may provide for senior creditors to share their proceeds with a junior creditor, even if intermediate creditor is left out, so long as intermediate creditor does not receive less than it would have without the sharing).

World Health is particularly instructive since the facts and the settlement in that case closely parallel those at issue here. The debtors in World Health filed chapter 11 petitions with the intention of liquidating their assets. The debtors' first day motions sought orders authorizing the sale of substantially all of the debtors' assets and approving a debtor in possession financing agreement with the debtor's pre-petition lender, which had a first lien on all of the debtors' assets. World Health, 344 B.R. at 293. The final debtor in possession financing order (like the Cash Collateral Order in this case) contained acknowledgements and agreements by the debtors regarding the validity of the lender's claims and liens and provided a waiver of the debtor's right to challenge them. Id. The creditors' committee and other parties in interest were given a limited period of time to investigate and challenge the lender's claims and liens, which eventually expired as to all parties in interest other than the committee. The committee, the debtors and the lender then reached an agreement providing for (i) a cap of the lender's prepetition claim, (ii) the committee's support for the sale motion, (iii) the committee's release of estate claims and agreement not to pursue claims against the lender, and (iv) a carveout of a portion of the lender's collateral proceeds, to be distributed to unsecured creditors or used to fund litigation against other parties for the benefit of unsecured creditors. Id. at 294-295.

The U.S. Trustee objected to the proposed settlement because it compromised estate causes of action for the benefit of unsecured creditors without providing for payment of priority creditors. Judge Walsh overruled the U.S. Trustee's objection, citing the line of authority allowing "a senior creditor to agree to give up part of its collateral to another class,

16

skipping other classes in between." *Id.* at 298. Relying on that authority, Judge Walsh noted

that "[s]eemingly, even if the absolute priority applied, which it does not, an ordinary carve out

such as here would not offend the rule." *Id.* Moreover, Judge Walsh noted that settlements

between official committees of unsecured creditors and secured creditors involving a carveouts

of collateral proceeds had become commonplace in liquidating chapter 11 cases. *Id.* at 297 n.3.

For all of the same reasons Judge Walsh overruled the U.S. Trustee's objection in that case, the

Court should overrule the Objections of WLR and the Trustee here.[10]

---

[10]    WLR recognizes the holding in *SPM* that a secured creditor can share its collateral with whomever it chooses but argues that such holding is limited to the chapter 7 context. However, *World Health* relied heavily on *SPM* in applying the same principle to the pre-plan chapter 11 liquidation context. Thus, *SPM* supports approval of the Stipulation.

## CONCLUSION

For all of the reasons set fort in this Reply and in the Approval Motion, the

Administrative Agent requests that the Court overrule the Objections, approve and "so order" the

Stipulation and Order and grant such other further relief the Court deems just and proper.

Dated:  April 10, 2008
       Wilmington, Delaware

 

POTTER ANDERSON & CORROON LLP

Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConail (No. 4734)
P.O. Box 951
1313 N. Market Street, 6th Floor
Wilmington, Delaware  19899
Telephone:  (302) 984-6000

-and-

KAYE SCHOLER LLP
Margot B. Schonholtz
Ana M. Alfonso
425 Park Avenue
New York, NY  10022
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8689

*Counsel for Bank of America, N.A. as
Administrative Agent under that
certain Second Amended and Restated
Credit Agreement, dated as of August 10, 2006*

Pac#859717