## IN THE UNITED STATES BANKRUTPCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, INC.,
a Delaware corporation, *et al.*,[1]

                                        Debtors.

-------------------------------------------------------------------x

Chapter 11

Case No. 07-11047 (CSS)
Jointly Administered

Re: Docket Nos. 3318, 3541, 3542, 3552, and 3546

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF THE JOINT MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT, FOR ENTRY OF FINAL STIPULATION AND ORDER RESOLVING ALL REMAINING ISSUES WITH RESPECT TO THE FINAL ORDER (I) AUTHORIZING DEBTORS' LIMITED USE OF CASH COLLATERAL AND (II) GRANTING REPLACEMENT LIENS AND ADEQUATE PROTECTION TO CERTAIN PRE-PETITION SECURED PARTIES**

The Official Committee of Unsecured Creditors (the "*Committee*") of the above-captioned debtors and debtors-in-possession (the "*Debtors*"), by its undersigned co-counsel, hereby files this reply in further support of the *Joint Motion of the Official Committee of Unsecured Creditors and Bank of America, N.A., as Administrative Agent, for Entry of Final Stipulation and Order Resolving All Remaining Issues with Respect to the Final Order (i) Authorizing Debtors' Limited Use of Cash Collateral and (ii) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Parties* [Docket No. 3318] (the "*Motion*")[2] and in response to the objections ("*Objections*") filed by (i) the Debtors, (ii) AH Mortgage Acquisition Co., Inc. ("*AHMAC*") and WLR Recovery Fund, III, L.P. ("*WLRRF*", and together with AHMAC, "*WLR*") and (iii) the Office of the United States Trustee (the "*UST*", and together

---

[1]    The Debtors in these cases are: AHM Holdings; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; American Home Mortgage Servicing, Inc.; American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

with the Debtors and WLR, the "*Objectors*"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    The settlement encompassed in the Motion (the "*Settlement*") is the product of protracted and arduous arm's length negotiations over several months between the two constituencies that actually have an economic stake in the matters being settled, the Committee, as representative of all general unsecured creditors, and the Administrative Agent, as agent for the secured creditors.  In contrast, the Objectors have no current economic stake in the matters being settled.[3]  None of the Objectors object to the economic merits of the Settlement. Indeed, even the Debtors acknowledge, as they must, that the Settlement is good for the estates if they prevail on their opposition to the Administrative Agent's Stay Relief Motion as the estates' other creditors start sharing in recoveries realized on the Administrative Agent's collateral much sooner than if no settlement had been reached.[4]

2.    The economic benefits of the Settlement are readily apparent when a comparison is made of the potential benefits to the Debtors' estates with and without the Settlement.  For example, under the Settlement, if the total Cash Receipts equal the Benchmark Pre-Petition Claim, the Debtors' estates will receive ~$30 million under the Settlement.  Without the Settlement, the Debtors' estates would receive nothing.  The Settlement is not conditioned on this Court's granting of the Stay Relief Motion so it is beneficial regardless of how that motion is

---

[3]    Since the first day hearing, the Debtors have acknowledged that these are liquidating cases with no value for equity holders.  Upon information and belief, as of the date hereof, the Debtors have not borrowed from WLRRF under the DIP Loan and AHMAC has not asserted any alleged administrative claim.

[4]    *See* Debtors' Objection, p. 25, n.21 ("Indeed, if the Settlement Stipulation is ultimately approved, the Debtors are in a better position to manage the disposition of the Mortgage Loans to achieve the 94% recovery sharing threshold … [t]he Debtors' estates' upside from the Mortgage Loans at 94% of the principal rather than 100% of the principal, interest and costs [which is what would be required without the Settlement before any sharing begins].").

decided.  The inescapable conclusion is that the Settlement provides a substantial economic benefit to the estates.

3.    Rather than object to the merits of the underlying settlement (*i.e.*, whether or not the Committee received fair value for its settlement of the Remaining Issues under the Cash Collateral Order), the Objectors raise issues that they perceive exist in the ancillary provisions contained in the Settlement Stipulation.  In so doing, the Objectors either misinterpret the intent of those provisions or are simply mistaken.  To the extent that an Objector misinterprets a certain provision of the Settlement Stipulation, such as WLR's and the UST's concern that the Settlement Stipulation attempts to earmark funds for general unsecured creditors of a specific Debtor ahead of allowed unpaid administrative and priority claims against that Debtor, the Committee will propose clarifying language in the approval order to resolve those objections as that was not the intent of the provision.

4.    The Debtors' Objection, however, presents a more fundamental issue regarding the future of these cases.  The Debtors interpret certain provisions contained in the Settlement Stipulation as tantamount to the Committee somehow abdicating its role as a fiduciary for unsecured creditors in these cases.  Nothing could be further from the truth.  The Settlement Stipulation does not impair the Committee's ability to fulfill its fiduciary obligations by continuing to represent the interests of unsecured creditors in these proceedings.  To the extent the Pre-Petition Secured Parties have taken a position or action or asserted a claim that is violative of the terms of its loan documents, the Settlement, prior orders of this Court or applicable law, the Committee has reserved the right to object.  What the Committee has agreed not to do is assert, in the future, claims against the Pre-Petition Secured Parties that were settled by the Settlement or were previously waived by the Debtors on behalf of all other parties.

3

5.      In discharging its fiduciary duty, the Committee has done what it was charged to do -- evaluate the relative merits of various potential prepetition claims that it had standing to commence against the Pre-Petition Secured Parties (claims that the Debtors previously decided to relinquish under the Cash Collateral Order), and either pursue those claims or settle them.  The Committee has elected to settle those claims in exchange for significant, in-hand and future potential consideration to its constituency at a substantial cost savings to the Debtors' estates.  The Committee is unwilling to gamble on a speculative recovery based on the Debtors' hypothetical account of how this portfolio may perform over the next 30 years.  The Committee has not only evaluated the relative merits of the various claims against the Pre-Petition Secured Parties, it has also considered the continuing administrative burden being placed by these Debtors on these liquidating estates in order to maintain the *status quo*.  The average monthly burn being incurred by these non-operating Debtors exceeds $2 million.  The Committee believes the estates may be able to save as much as $750,000 of this expense if the Mortgage Loans are moved to a different platform.  The Committee also took into account the possibility that this Court may grant the Stay Relief Motion over the Debtors' objection.  The Debtors fail to take these factors into account when considering the merits of the Settlement.

6.      Over the past nine months, the Debtors and the Committee have worked well together in an effort to maximize potential values realized by these estates.  The Committee believes that it will be able to continue to work productively with the Debtors towards this common goal and a successful conclusion of these cases.  At this point in these cases, however, the Committee and Debtors simply disagree on the best approach to take with respect to the Pre-Petition Secured Parties' collateral and how to mitigate the potential risks to the estates.  The Committee submits that when the Court takes into consideration all of the relevant factors

considered by the Committee in deciding to enter into the Settlement, the Court will find that the Settlement is a fair and reasonable compromise of the issues embodied therein and should be approved.

## RELEVENT BACKGROUND

7.      On August 6, 2007 (the "*Petition Date*"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*").

8.      On August 14, 2007, the UST formed the Committee.

9.      On September 4, 2007, the Court entered its *Final Order (i) Authorizing Debtors' Limited Use of Cash Collateral and (ii) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Parties* [Docket No. 554] (as amended, the "*Cash Collateral Order*").

10.     Pursuant to the Cash Collateral Order, the Debtors gave broad releases to each of the Pre-Petition Secured Parties and acknowledged the validity and perfection of all of the Pre-Petition Secured Parties' liens upon and security interests in the Pre-Petition Collateral. *See* Cash Collateral Order, ¶¶ C and 20.  No exception was made for real estate owned ("*REO*") properties.  The Debtors also agreed that the total amount of Indebtedness owed to the Pre-Petition Secured Parties was approximately $1,104,550,000, exclusive of certain accrued and unpaid interest, fees, costs and expense.[5]  *See* Cash Collateral Order, ¶ C.  The Debtors further admitted that the "Indebtedness constitutes valid and binding obligations of the Debtors and that no portion of the Indebtedness is … subject to avoidance, subordination, recharacterization,

---

[5]      The Committee's professionals conducted due diligence on the amount of the Indebtedness that the Debtors admitted to in the Cash Collateral Order.  It was ultimately determined that this amount was overstated, and the correct amount was $1,082,867,194.76.  The correct amount is reflected in the Settlement Stipulation.  Pursuant to the terms of the Settlement Stipulation, the Committee has maintained the right to complete its review of the unliquidated amounts asserted Administrative Agent's proof of claim and, if appropriate, contest such amounts.

offset, counterclaim, defense or Claim of any kind …." *Id*. The Debtors' releases and admissions became binding on all parties, except the Committee, on October 22, 2007. *See* Cash Collateral Order, ¶ 20. Pursuant to various extensions, the Committee has until April 18, 2008 to bring certain causes of action against the Pre-Petition Secured Parties.

11.    As is typical in chapter 11 cases involving secured parties, subsequent to the entry of the original Cash Collateral Order, the Committee's professionals engaged in a review and analysis of the estates' potential claims and causes of action against the Pre-Petition Secured Parties. After completing its review, the Committee narrowed the list of potential claims and issues it believed it had against the Pre-Petition Secured Parties to a few remaining issues (the "*Remaining Issues*") which the Committee reserved the right to pursue in an extension to the Cash Collateral Order. The Remaining Issues concerned (i) whether the Pre-Petition Secured Parties' interests were properly perfected in the REO Properties and proceeds related thereto; (ii) whether certain funds swept by the Administrative Agent or held in designated bank accounts constituted Pre-Petition Collateral, subject to an aggregate cap of $11,297,750; and (iii) whether, in the event the Pre-Petition Secured Parties' claims were determined to be undersecured, certain fees and expenses paid post-petition to the Administrative Agent should be applied to reduce the principal amount of the Indebtedness.

12.    On February 22, 2008, the Administrative Agent filed the Stay Relief Motion seeking modification of the automatic stay to allow the Administrative Agent to sell or dispose of its principal remaining Collateral, consisting of approximately 3,400 residential mortgage loans (the "*Mortgage Loans*") in accordance with the terms of its loan documents and applicable law.

13.    After extensive negotiations, the Committee and the Administrative Agent entered into the Settlement resolving all of the Remaining Issues between the Committee and the Pre-Petition Secured Parties.  During these negotiations, the parties also negotiated a compromise of the Committee's potential opposition to the Stay Relief Motion.

## THE TERMS OF THE SETTLEMENT

14.    The terms of the Settlement provide the respective Debtors' estates with significant tangible present value and potential future value in exchange for the settlement of the Remaining Issues and the Committee's agreement to support the Stay Relief Motion, all at minimum administrative cost to the Debtors' estates.  Annexed hereto as *Exhibit A* is a chart which shows the upside and potential upside to be realized as a result of the Settlement (the "*Settlement Chart*").  The salient terms of the Settlement are as follows:

●    Creditors receive title to 59 REO Properties with a total UPB of approximately $17 million, free and clear of the Administrative Agent's liens.  These properties are projected to realize between $8.5 million and $12 million in cash proceeds for the benefit of the Debtors' estates without the Committee's professionals having incurred any litigation costs or expenses.

●    The REO Properties include approximately $4 million in properties that converted from mortgages to REO post-petition.  The Administrative Agent has asserted that post-petition REO Properties constitute proceeds of its prepetition collateral in which the Cash Collateral Order automatically extended its lien without the need to record separate mortgages.

●    The Debtors' estates start sharing in an increasing amount with the Pre-Petition Secured Parties in the recoveries it realizes from any source once the Pre-Petition Secured Parties have received and applied collections equal to 94% of the Benchmark Prepetition Claim (*i.e.*, the Indebtedness).  The sharing formula starts at 10% and increases to 25% and then 50% when the Pre-Petition Secured Parties recover 95% and 97.5% of the Benchmark Prepetition Claim, respectively.  As shown on the Settlement Chart, assuming Pre-Petition Secured Parties realize no recoveries from any other source, collections equaling 94% of the Benchmark Prepetition Claim would occur, and hence sharing would commence, if recoveries from the Mortgage Loans equal

7

79.6% of the UPB of the Loans.  The Committee, however, fully expects that the Pre-Petition Secured Parties will realize recoveries from sources other than the Mortgage Loans, which will lower the sharing threshold needed to be realized from the Mortgage Loans.

● Sharing will be in all sources of recovery realized by the Pre-Petition Secured Parties, including distributions on their unsecured deficiency claim, if any.

● The Pre-Petition Secured Parties will not be entitled to share in any distribution of the proceeds realized from the REO Properties or Estate Share, thus further materially enhancing the potential value of the Settlement to other creditors.  The Estate Share will be used only as a last resort to satisfy any unpaid administrative or priority claims against the Debtors' estates, which are determined by a confirmed plan or further order of the Court to be entitled to such proceeds.

● In exchange for these material concessions, the Committee has agreed to release the Remaining Issues and support the Stay Relief Motion.

15.    The Committee fully recognizes that there are risks associated with the Settlement and, as the Debtors point out, if the recoveries realized on the Mortgage Loans are lower than anticipated, then the sharing formula under the Settlement will never kick in.  But in such a circumstance, the Pre-Petition Secured Parties will have realized a significant loss after the disposition of their collateral and, absent contested circumstances, would otherwise be entitled to assert a large deficiency claim.  If those facts are realized, the result will be the same even if the Debtors prevail on their opposition to the Stay Relief Motion.  However, to the extent, for example, that the Pre-Petition Secured Parties failed to liquidate their collateral in a commercially reasonable manner as required under Article 9 of the Uniform Commercial Code or have otherwise failed to comply with the term of their loan agreements, the Committee has reserved the right to object to the Pre-Petition Secured Parties' actions or the amount of their deficiency claim.  Nothing contained in the Settlement releases those rights.

## LEGAL STANDARD

16.    Whether to approve a compromise and settlement lies "within the sound discretion of the bankruptcy court." *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005); *see In Re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).  When exercising such discretion, a bankruptcy court must determine whether the compromise is "fair, reasonable, and in the best interests of the estate." *In re Key3Media Group*, 336 B.R. at 92; *see In re RFE Industries, Inc.*, 283 F.3d 159, 165 (3d Cir. 2002).  In doing so, a bankruptcy court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

17.    In striking this balance, a bankruptcy court should consider the following factors:  (1) the probability of success in the litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant thereto; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable opinions. *See, e.g., Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Martin*, 91 F.3d at 393.

18.    A bankruptcy court, however, is not required to determine that the proposed settlement is the best possible compromise. *See In re Key3Media Group*, 336 B.R. at 93-94.  Rather, the settlement should be approved unless it falls below "the lowest point in the range of reasonableness." *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) (quoting *Official Unsecured Creditors' Comm. v. Penn. Truck Lines, Inc. (In re Penn. Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D. Pa. 1992)); *see Cosoff v. Rodman (In re W.T. Grant*

*Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (same).  In order to minimize litigation and expedite the administration of a bankruptcy estate, "compromises are favored in bankruptcy." *In re Martin*, 91 F.3d at 393; *see also In re Coram Healthcare*, 315 B.R. at 329-30.

## ARGUMENT

I.    **The Settlement Falls Well Within the Range
of Reasonableness and Should be Approved**

19.    The Settlement is the product of extensive arm's length negotiations between the parties and provides significant benefits and substantial value to the Debtors' estates.  The application of the *Martin* factors to the instant facts in balancing the benefits the Debtors' estates derive from the Settlement against the concessions made by the Committee weighs strongly in favor of approving the Settlement.

A.    **The REO Properties**

20.    The Settlement provides for the receipt by the Debtors' estates of $17 million in REO Properties and related proceeds without the incurrence of any substantial litigation costs or attendant delay.

21.    Contrary to the Debtors' assertion, any litigation to recover the REO Properties from the Pre-Petition Secured Parties would involve highly complex legal and factual issues and the Pre-Petition Secured Parties could be expected to vigorously defend against the Committee's efforts to avoid its liens on the REO Properties.  While the Committee believes it is has strong arguments, the outcome of any litigation can never be certain.

22.    In addition, the Pre-Petition Secured Parties have argued that the Cash Collateral Order insulates from challenge a substantial portion of the properties transferred into REO Properties.  According to the Debtors, $3.9 million of the REO Properties relates to Mortgage Loans that converted to REO Properties post-petition.  With respect to those

10

properties, the Pre-Petition Secured Parties have argued that the Cash Collateral Order provides for the Pre-Petition Secured Parties' automatic perfection of their security interests and liens in the proceeds of their collateral, which they argue includes the REO Properties. The Committee disputes the Pre-Petition Secured Parties' position but recognizes that the answer is far from certain. As such, the receipt of $3.9 million in post-petition REO Properties over and above the $13.1 million in pre-petition REO Properties without *any* costs or attendant delay offers additional substantial consideration to the estates.

23.    Additionally, under the terms of the Settlement, the Pre-Petition Secured Parties' deficiency claim, if any, would not share in recoveries on this $17 million in REO Properties and related proceeds, thereby increasing the value of the Settlement to other creditors.

24.    Despite being confronted with the obvious benefits of this portion of the Settlement, the Debtors challenge it nonetheless, claiming that it was a "throw away." As a threshold issue, the Committee notes that the Debtors conveniently neglect to advise this Court that the Debtors waived early on in these cases their right to challenge the perfection of the Pre-Petition Secured Parties' security interests with respect to the REO Properties. Hence, if any challenge to the Pre-Petition Secured Parties' liens with respect to the REO Properties is so "simple and straightforward" and a relinquishment of such properties is just a "throw away" as the Debtors alleged (Debtors' Objection, ¶ 36), it begs the question as to why the Debtors walked away from these very claims without receiving anything in return. Regardless, it cannot reasonably be disputed that a settlement where the Committee recovers that to which it claims it is entitled, if not more, without incurring any attendant costs, is somehow unreasonable.

B.        **Sharing in the Pre-Petition Secured Parties' Cash Receipts**

25.        In addition to the $17 million REO Properties and related proceeds gained by the Committee for the benefit of the Debtors' estates (other than the Pre-Petition Secured Parties), the Settlement also provides for the Debtors' estates to share in post-petition cash receipts applied to the Indebtedness of the Pre-Petition Secured Parties.  Pursuant to the Settlement, the Debtors' estates will share (the "*Estate Share*") in the cash receipts payable to the Pre-Petition Secured Parties commencing at the point where 94% of the Indebtedness has been recovered.  As shown on the Settlement Chart, based on current outstanding balance on the Indebtedness, the first sharing level will commence, assuming no other sources of recovery, if the Mortgage Loans sell for 79.6% or more of their unpaid principal balance.

26.        This is a significant benefit to the Debtors' estates as, without the Settlement, the estates would receive nothing until such time as the Pre-Petition Secured Parties recover 100% on their outstanding Indebtedness, or significantly more, to the extent that they are determined to be oversecured.[6]  Moreover, similar to the treatment of the REO Properties, the Settlement insulates the Estate Share from any deficiency claim that the Pre-Petition Secured Lenders would be entitled to assert on the account of a recovery shortfall, further enhancing other creditor recoveries.

27.        In an attempt to attack the sharing protocol, the Debtors point out the obvious, that if the Prepetition Secured Parties recover less on their Indebtedness than the sharing triggering percentage, the Debtors' estates will receive nothing under the sharing arrangement. *See* Debtors' Objection, ¶¶ 38-39.  However, the Debtors completely miss the point because if that is the best that the Mortgage Loans can generate, then it is clear that the Debtors'

---

[6]        The Committee notes that the Debtors agreed not to challenge the status of the Pre-Petition Secured Parties' Claims as being oversecured. *See* Cash Collateral Order, ¶ E.

estates do not have any equity in such loans and would not have received any portion of those proceeds with or without the sharing arrangement.  What the Debtors fail to recognize is the potential upside other creditors can receive if the loans are sold for in excess of certain percentages of UPB.  For instance, if the Mortgage Loans are sold for 85% of UPB, and even assuming there are no other distributions made to the Pre-Petition Secured Parties, the sharing arrangement would engage and the Debtors' estates would share in a portion of the recoveries received by the Pre-Petition Secured Parties.  In that case, although the unsecured creditors would still not have any equity in the Mortgage Loans, and thus be entitled to nothing absent a sharing arrangement, the Settlement would bring ~$5.5 million to the Debtors' estates from encumbered assets.

28.     Further, the Debtors have given no consideration to the fact that sharing is based on any cash receipts, not just the receipts from the sale of the Mortgage Loans. *See* Settlement, ¶ 3(a).  Thus, even if the sale of the Mortgage Loans does not generate enough proceeds to trigger the first sharing level, that level could be reached by the Pre-Petition Secured Parties' receipt of other proceeds, including distribution on their deficiency claim, thereby entitling the Debtors' estates to receive cash that it otherwise would not be entitled to.

**C.     The Releases Provided to the Pre-Petition Secured Parties Are Appropriate**

29.     The Pre-Petition Secured Parties are not being released by the Committee from any claim in the Cash Collateral Order that the Debtors have not already released.  Putting aside for the moment the Debtors' hyperbole and misstatement of fact, the Committee, in exchange for the consideration received by the Debtors' estates, agreed to (i) provide the Pre-Petition Secured Lenders with the same releases that the Debtors provided to the Pre-Petition Secured Lenders at the onset of these cases (nothing more, nothing less) and (ii) support the Stay

13

Relief Motion. As to the former, it is inconceivable that the Debtors could find fault in those releases when they willing bound themselves and all other parties-in-interest to these same releases within the first month of these cases in the Cash Collateral Order.[7] Accordingly, the releases from the Committee contained within the Settlement are well within the Committee's authority granted by the Cash Collateral Order.

30.     As to the latter, the Debtors have no standing to oppose the Committee's decision to support the Stay Relief Motion. What the Committee decides to advocate to this Court is solely up to the Committee, not the Debtors. Moreover, the Committee believes that in light of the Settlement, its decision is the correct one. The Committee's choice in entrusting the disposition of the Mortgage Loans, in which it now has a potential upside, to one of the largest financial institutions in the United States with significant expertise, connections and resources in monetizing these types of assets rather than to liquidating debtors with no origination or servicing platform and diminished staff, was not driven by compulsion but rather by a desire to see the Mortgage Loans bring maximum value to the Debtors' estates.

## II.    The Settlement Does Not Impair the Committee's Exercise of its Fiduciary Duty

31.     The Settlement is nothing more than a settlement of the Remaining Issues. The Debtors completely misread paragraph 5 of the Settlement which serves solely to provide the Pre-Petition Secured Parties with finality on the issues that have been settled and comfort that the Committee will not seek to do indirectly what it has agreed not to do directly, i.e., commence any actions on the issues that have been settled. Furthermore, paragraph 5 of the Settlement

---

[7]     As the releases being given are the claims that the Committee was authorized to bring under the Cash Collateral Order, there are no standing issues and thus *Cybergenics v. Chiney* and *Smart World Techs v. Juno* are not implicated. Even assuming *arguendo* that a claim being released was not a claim reserved to the Committee under the Cash Collateral Order, the Committee questions how the Debtors "have been and remain vigilant" with respect to those issues given the Debtors' broad waivers in the Cash Collateral Order.

specifically permits the Committee to challenge "claims or rights … [not] validly arising under the Loan Documents."  Settlement, ¶ 5.

32.    By way of example, the Debtors argue that the Settlement prevents the Committee from challenging the propriety of certain of the Pre-Petition Secured Parties pre-petition sweeps, post-petition receipts, and liens on monies held in certain bank accounts totaling approximately $16 million dollars.  First, the Committee must point out that the Debtors waived their right to challenge the Pre-Petition Secured Parties' pre-petition liens with respect to funds collected prior to the commencement of these cases.  The Settlement merely provides for the very same releases granted by the Debtors with the difference being that the Committee, not the Debtors, received value in return for such releases.  Second, the Committee evaluated the claims related to these funds (which are capped at $11,297,750 in the aggregate) and, given that other parties also asserted claims to these funds[8] and the Committee was concerned about the viability of these claims with respect to the pre-petition matters, it determined that obtaining the $17 million in REO Properties and a potential recovery of $40 million through a sharing arrangement warranted not pursuing those claims.

33.    The Debtors' argument regarding the Committee's inability to champion a chapter 11 plan is similarly unavailing particularly since it is contradicted by the actual words of the Settlement.  The relevant portion of the Settlement provides that "[n]othing contained herein shall restrict the Committee's right to … (ii) act as a fiduciary on behalf of general unsecured creditors, including supporting or proposing a plan which the Committee believes is in the best interest of general unsecured creditors." Settlement, ¶ 5.

---

[8]    For example, the Debtors have recently acknowledged that at least $1.1 million received prepetition by the Administrative Agent constituted funds owed by Calyon, not the Debtors.

**III.    The Settlement Does Not Function as a *Sub Rosa* Plan,
Nor Does it Create a "Class-Skipping" Gift**

34.    All of the Objectors have raised concerns about the language in the
Settlement Stipulation that requires that the money received under the Settlement be "held in
trust for the benefit of general unsecured creditors of the Debtors to be distributed pursuant to a
confirmed chapter 11 plan or further order of the Court."  Settlement, ¶ 3(e).  The intent of this
provision is to ensure that the Debtors do not have unfettered access to the funds but their use
will be subject to strict court supervision.  The provision was also intended to provide a
marshalling function in order to ensure that other estate funds are applied first to satisfy unpaid
administrative and priority claims, in an effort to preserve the benefits of the Pre-Petition
Secured Parties' waiver of their right to receive a distribution from the Estate Share.  The
Settlement was not intended to remove the Court's discretion either to direct the use of these
funds in a chapter 11 plan or otherwise.[9]

35.    As a threshold matter, it should be noted that a senior creditor is permitted
to share its collateral proceeds with junior creditors and such arrangements have not been
deemed to violate the absolute priority rule. *See, e.g.*, *In re World Health Alternatives, Inc.*, 344
B.R. 291 (Bankr. D. Del. 2006); *In re Genesis Health Ventures*, 266 B.R. 591 (Bankr. D. Del.
2001); *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993).  Although the First Circuit's
decision in *In re SPM Mfg.* and Judge Walsh's decision in *World Health* decision provide ample
authority for the Committee to seek that the Estate Share be segregated solely for the benefit of
the unsecured creditors, that was not the intent here.  To the extent that the funds are necessary to
pay administrative or priority claimants of the Debtor who is allocated those funds, this

---

[9]    Interestingly, these Settlement funds are treated no differently than the funds received from the disposition
of the Construction Loans and no party, including the Debtors, objected to such treatment.

Settlement does not prohibit such use.  The Committee will propose language to the order that it believes will clarify this issue.[10]

36.     This Settlement also does not address the potentially complicated analysis that may be required to determine to which Debtor or Debtors the Estate Share belongs.  The appropriate allocation of the funds among the various Debtors' estates and related negotiations will be addressed in connection with the negotiation of a plan or plans of reorganization.  No determination has been made in the Settlement as to whether one plan or several will be filed in these cases or how the assets or liabilities will be allocated.  All rights with respect to these issues are specifically reserved.[11]

## IV.    The Settlement Does Not Fix the Amount of the Prepetition Secured Parties' Deficiency Claim, Nor Insulate It From Review or Objection

37.     The Settlement neither fixes the amount of the Deficiency Claim nor insulates the ultimate amount asserted by the Administrative Agent from review or objection.

38.     While the Debtors' memory may be short (or simply selective), they (and all other parties-in-interest) admitted the amount of the Pre-Petition Secured Parties' Indebtedness at the onset of these cases in the Cash Collateral Order.[12]  The Settlement merely

---

[10]     In order to avoid any doubt as to the operation of the Settlement, the Committee proposes to add the following language to the order approving the settlement:

> Notwithstanding anything contained in the Settlement, in the event other available funds are insufficient to pay all allowed administrative and priority claims of a particular Debtor, any funds received from the Settlement which have been allocated to that Debtor either pursuant to a confirmed plan or further Court order, can be used to pay such claims.

[11]     WLR also asserts that the Settlement potentially provides unsecured creditors with property otherwise subject to the DIP Lenders liens prior to their payment in full. *See* Ross' Objection, ¶ 5. This objection should be dismissed because the Settlement was, *inter alia*, a settlement of potential avoidance actions against the Pre-Petition Secured Parties and the DIP Lenders were not granted a lien on such actions. *See* Final DIP Order, ¶ 9.

[12]     Although the Debtors allowed the Pre-Petition Secured Parties' full claim at the commencement of these cases, the Committee conducted its own independent examination of the claim and determined that the amount listed

provides the standard mathematical formula for calculating a deficiency claim:  The amount of the allowed prepetition indebtedness less the amount paid from collateral and/or other sources equals the "deficiency claim."  Nothing precludes the Debtors from arguing that the Administrative Agent failed to properly apply any receipts.  Furthermore, the Debtors' Objection to such claim being treated *pari passu* with other general unsecured claims simply makes no sense since the Debtors also waived their right to re-characterize, subordinate or avoid the claims of the Pre-Petition Secured Parties (*see* Cash Collateral Order, ¶ C).

39.    Moreover, the Committee, unlike the Debtors, has not waived their right to challenge any Deficiency Claim as such right exists via paragraphs 5 and 6 of the Settlement.[13] The Settlement merely provides that to the extent that the Pre-Petition Secured Parties have a *valid* right or entitlement under the Loan Documents or Court Order, they are entitled to such a deficiency claim.  The Settlement does not waive any rights to challenge the calculation of any such deficiency claim.

40.    The fundamental flaw underlying the Debtors' Objection is the assumption that Committee has consented to the Pre-Petition Secured Parties disposing of the Mortgage Loans at a "fire sale."  Pursuant to the terms of the Settlement, the Committee retains the right to enforce the provisions of the Settlement including the requirement that the Pre-Petition Secured Lenders "dispose of the Mortgage Loans in the manner provided by the Credit Agreement, Security Agreement and applicable law." Settlement, ¶ 6.  As such, the Committee did not give the Pre-Petition Secured Parties free reign to dispose of their Collateral in any

on their filed proof claim (as opposed to the amount specified in the Cash Collateral Order) was appropriate.

[13]    In footnote 17 of the Debtors' Objection, the Debtors reserve the right to challenge any deficiency claim. While we leave any dispute between the Debtors and the Administrative Agent to be handled among those parties, we do not see how the Debtors have the ability to challenge any deficiency claim in light of the multitude of the waivers they granted the Pre-Petition Secured Parties in the Cash Collateral Order at the commencement of these cases.  However, to the extent that such rights were not waived in the Cash Collateral Order, such rights were not waived in the Settlement.

manner they want.  They must comply with the Credit Agreement, the Security Agreement and applicable law (including a disposition of the collateral in a commercially reasonable manner). *See* Settlement, ¶ 6.  Should they fail to do so, the Committee has preserved the right to challenge the disposition and the resulting deficiency claim.  *See* Settlement, ¶ 6.

**V.      The Debtors Incorrectly Link the Settlement to
            the Stay Relief Motion**

41.      As previously noted, this Court's decision on the Stay Relief Motion is not linked to the Settlement.  The Settlement is good for creditors regardless of the outcome of the Stay Relief Motion.  Any argument by the Debtors to the contrary is simply wrong.

**VI.    The Administrative Agent is Not Entitled to *Carte
            Blanche* Post-Petition Attorneys' Fees and Expenses**

42.      The Settlement does *not* entitle the Pre-Petition Secured Parties to the payment of post-petition fees and expenses on top of its Indebtedness without the Pre-Petition Secured Parties being over-secured.  The Settlement merely provides for (a) the Administrative Agent's internal allocation of cash receipts to post-petition fees and expenses, as permitted under the applicable loan agreements and (b) a mechanism for calculating when the Debtors' estates are entitled to share in the proceeds from the Cash Receipts based on the meeting of certain recovery thresholds set forth under the Settlement.  That calculation does not serve to increase the amounts to which to the Pre-Petition Secured Parties are entitled under the Bankruptcy Code.

**WHEREFORE**, the Committee respectfully requests that the Court (i) overrule the

Objections, (ii) approve the Motion, and (iii) grant such other and further relief as the Court may

deem just and proper.

Dated:  Wilmington, Delaware
        April 10, 2008

<div style="margin-left:40%">

BLANK ROME LLP

/s/ *David W. Carickhoff*
Bonnie Glantz Fatell (No. 3809)
David W. Carickhoff (No. 3715)
1201 Market Street, Suite 800
Wilmington, Delaware  19801
(302) 425-6400 - Telephone
(302) 425-6464 - Facsimile

- and -

HAHN & HESSEN LLP
Mark S. Indelicato
Mark T. Power
Edward L. Schnitzer
Jeffrey Zawadzki 488 Madison Avenue
New York, New York 10022
(212) 478-7200 - Telephone
(212) 478-7400 - Facsimile

*Co-Counsel to the Official Committee*
*of Unsecured Creditors of American Home*
*Mortgage Holdings, Inc., et al.*

</div>