IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------- x
                                :     Chapter 11
                                :
In re:                              :
                                :     Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE        :     Jointly Administered
HOLDINGS, INC., et al.,            :
                                :     **Hearing Date:  April 16, 2008 at 11 a.m.**
               Debtors.         :
                                :     **Re:  D.I. 3054, 3056, 3175**
-------------------------------------------------- x

**PRE-TRIAL MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT, FOR RELIEF FROM
AUTOMATIC STAY, PURSUANT TO 11 U.S.C. § 362(d), ALLOWING THE
<u>ADMINISTRATIVE AGENT TO EXERCISE ITS RIGHTS AS SECURED CREDITOR</u>**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL FRAMEWORK ...................................................................................... 4

        A.      Evidence Showing A Decline In The Value Of The Mortgage Loans Is
                Sufficient to Establish The Administrative Agent's *Prima Facie* Case For
                Relief From The Automatic Stay Under Section 362(d)(1)................................... 4

        B.      The Debtors Have The Burden To Rebut The Administrative Agent's
                Showing That The Value Of The Mortgage Loans Has And Likely Will
                Continue To Decline Or That The Administrative Agent Is Adequately
                Protected .......................................................................................................... 6

        C.      The Value Of The Mortgage Loans Is The Amount That An Investor
                Currently Would Be Willing To Pay For Them Taking Into Account The
                Risks Associated With Them.............................................................................. 9

III.    EVIDENCE TO BE PRESENTED .................................................................... 11

        A.      The Evidence Will Show That The Value Of The Mortgage Loans Is
                Declining And Likely Will Continue To Decline Precipitously, Thereby
                Establishing The Administrative Agent's Prima Facie Case for Relief from
                the Automatic Stay............................................................................................ 11

        B.      The Debtors Will Be Unable To Come Forward With Evidence To Rebut
                The Administrative Agent's Showing That The Value Of The Mortgage
                Loans Has Been Declining And Likely Will Continue To Decline..................... 17

        C.      The Debtors Will Be Unable To Come Forward With Evidence To Satisfy
                Their Burden To Prove That The Administrative Agent's Interest In The
                Mortgage Loans Is Adequately Protected.......................................................... 21

CONCLUSION .................................................................................................................. 24

Bank of America, N.A., as administrative agent (the "Administrative Agent"), for

itself and the pre-petition secured lenders (collectively with the collateral agent under the

Security Agreement, the "Secured Parties") under the Second Amended and Restated Credit

Agreement (the "Credit Agreement"), dated as of August 10, 2006, submits this pre-trial

memorandum of law in support of its motion for relief from the automatic stay, pursuant to 11

U.S.C. § 362(d)(1), to allow the Administrative Agent to exercise its rights as a secured creditor

(the "Motion").[1] The Official Committee of Unsecured Creditors supports this Motion, and not a

single creditor has objected. The only opposition to the Motion comes from the Debtors, which

are in the process of liquidation.

## I.    INTRODUCTION

The Secured Parties extended credit to the Debtors pursuant to the Credit

Agreement. As of August 6, 2007 (the "Petition Date") when the Debtors commenced these

voluntary cases under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases"), the Debtors

were indebted to the Secured Parties in the aggregate principal amount of approximately

$1,077,029,932 (the "Indebtedness"). On August 9, 2007, the full amount of the Indebtedness

matured and was fully due and payable under the express terms of the Credit Agreement. As of

the date the Motion was filed, the Indebtedness had been reduced to a principal amount of

approximately $505 million as a result of the Debtors' ongoing liquidation in these Bankruptcy

Cases.

Pursuant to a Security Agreement dated as of August 30, 2004, as subsequently

modified (the "Security Agreement"), the Administrative Agent holds first priority, perfected

---

[1]     The Administrative Agent reserves the right to file a short supplement to this pre-trial
memorandum of law with information obtained through discovery completed on or after
April 11, 2008.

security interests in and liens upon certain of the Debtors' assets, including its portfolio of

residential mortgage loans (the "Mortgage Loans") consisting of approximately 3,400 loans with

an unpaid principal balance as of the date the Motion was filed of approximately $584 million.[2]

The Mortgage Loans are the Debtors' most substantial remaining asset and the only asset that

they have refused to liquidate even though, upon commencement of these Bankruptcy Cases,

Debtors' counsel stated that "what we propose to do is, as quickly and as efficiently as possible,

liquidate our holdings" because "[w]e have one enemy in this case and that's time" in light of the

fact that "our financial assets are not going to improve in value over time. We believe they're

going to decline, and we have no ongoing business." 8/07/2007 Tr. at 12-13.

       The Administrative Agent seeks to lift the automatic stay pursuant to 11 U.S.C.

§ 362(d)(1) so that it can exercise its rights on behalf of itself and the Secured Parties under the

Security Agreement.[3]  The evidence will show that cause exists to lift the automatic stay

---

[2]    The Debtors have conceded their Indebtedness to the Secured Parties and the existence
and validity of the Administrative Agent's liens in the Final Order (I) Authorizing
Debtors' Limited Use of Cash Collateral and (II) Granting Replacement Liens and
Adequate Protection to Certain Pre-Petition Secured Parties (the "Cash Collateral
Order"). *See* Cash Collateral Order ¶¶ C, D.

[3]    The Administrative Agent's rights under the Security Agreement include the right to

    (i) foreclose or otherwise enforce the security interest for the benefit of the
Secured Parties in the Collateral in any manner permitted by law or
provided for hereunder; (ii) sell or otherwise dispose of the Collateral or
any part thereof at one or more public or private sales, whether or not such
Collateral is present at the place of sale, for cash or credit or future
delivery and without assumption of any credit risk, on such terms and in
such manner as the Administrative Agent may determine; (iii) require the
Borrowers to assemble the Collateral and/or books and records relating
thereto and make such available to the Collateral Agent at a place to be
designated by the Collateral Agent; (iv) enter onto property where any
Collateral or books and records relating thereto are located and take
possession thereof with or without judicial process; and (v) prior to the

                                                                      (continued...)

pursuant to section 362(d)(1) because the value of the Mortgage Loans has been declining precipitously since the Petition Date and likely will continue to decline for the foreseeable future in light of (a) negative conditions prevailing in the market generally for such loans, and (b) the steadily rising delinquency rates and loan-to-value ratios for the Mortgage Loans, and other characteristics particular to the Mortgage Loans, which are causing a further deterioration in their value.

The evidence will further show that the Debtors opposition to this motion and desire to maintain the stay and retain control over the Mortgage Loans indefinitely is based on their speculation that, at some unspecified point in the future, the value of the Mortgage Loans will begin to increase from some floor to which it is now falling. In essence, the Debtors wish to retain sole discretion to sell the Mortgage Loans when and if the Debtors deem it prudent to do so even though the Debtors are liquidating (and have no prospects for reorganization) and the Official Committee of Unsecured Creditors, the only other constituency with a pecuniary interest in the Mortgage Loans, has supported the Administrative Agent's request for relief from the automatic stay.

Under the applicable legal principles, once the Administrative Agent establishes a *prima facie* case for cause, the burden shifts to the Debtors to show that the value of the Mortgage Loans is not declining or that the Administrative Agent is adequately protected. The Debtors' speculation falls far short of satisfying that burden, and is plainly an insufficient basis upon which to maintain the automatic stay.

---

disposition of the Collateral, prepare it for disposition in any manner and to the extent the Administrative Agent deems appropriate.

3

This Court should lift the automatic stay and restore to the Administrative Agent its right to exercise its judgment on behalf of itself and the Secured Parties to secure the value of the Mortgage Loans, which has been and likely will continue to decline dramatically, in satisfaction of the fully matured Indebtedness. There is no basis in law or the evidence that will be submitted to leave those critical judgments in the sole discretion of the liquidating Debtors.

## II.    LEGAL FRAMEWORK

### A.    Evidence Showing A Decline In The Value Of The Mortgage Loans Is Sufficient to Establish The Administrative Agent's *Prima Facie* Case For Relief From The Automatic Stay Under Section 362(d)(1)

Section 362(d)(1) provides for relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). In the first instance, the moving party must present evidence sufficient to make out a *prima facie* case for relief from the automatic stay. *See Matter of Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992) (granting relief from the automatic stay under section 362(d)(1)).

The Administrative Agent will satisfy its burden to make out a *prima facie* case by establishing cause to lift the automatic stay. Because "[s]ection 362(d)(1) does not define cause," courts must "consider what constitutes cause based on the totality of the circumstances in each particular case." *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997) (granting relief from the automatic stay under section 362(d)(1)). As the United States Supreme Court has stated:

> It is common ground that the "interest in property" referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that the interest is not adequately protected if the security is depreciating during the term of the stay.

*United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988).

It follows that one circumstance in which a party satisfies its *prima facie* case to establish cause to lift the automatic stay is where, as the evidence here will demonstrate, there

4

has been a "decline in value -- or the threat of a decline" in value of the collateral securing the fully matured Indebtedness. *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994); *accord In re Worldcom, Inc.*, 2003 WL 22025051, *6 (Bankr. S.D.N.Y. Jan. 30, 2003) ("As part of the prima facie case, secured creditors must prove a decline in value -- or the threat of a decline -- during the term of the automatic stay"); *LNC Investments, Inc. v. First Fidelity Bank*, 1995 WL 231322, *5 (S.D.N.Y. Apr. 19, 1995) ("it is enough for the secured creditor to prove an actual or threatened decline in the value of its collateral" to establish a *prima facie* case under section 362(d)(1)); *In re Whitney*, 1988 WL 141523, *4 (Bankr. D. Minn. Dec. 20, 1988) ("The interest in property that is protected is the value of the collateral" and "[t]hat interest is not adequately protected if the security is depreciating during the term of the stay"); *In re Planned Sys., Inc.*, 78 B.R. 852, 862-63 (Bankr. S.D. Ohio 1987) ("'Once the likelihood of a diminution in value has been credibly raised, a prima facie case for lifting the stay for lack of adequate protection has been made until and unless [the debtor] effectively negate[s] this showing by competent evidence"); 3 Collier on Bankruptcy ¶ 362.10 (15th ed. 2007) ("if a movant relies on a lack of adequate protection as grounds for relief, the movant must demonstrate a decline or a threatened decline in the value of the collateral").

The Administrative Agent can satisfy its burden to establish a *prima facie* case for cause for relief from the stay by submitting "proof of declining value . . . from appraisal or similar evidence showing that the collateral at the beginning of the case was worth more than at the date of the hearing, or more generally, that it was worth more at an earlier date than it is or will be worth at some future date." *Elmira Litho*, 174 B.R. at 903. As the evidence will demonstrate, that is precisely the case here.

5

**B.**     **The Debtors Have The Burden To Rebut The Administrative Agent's Showing That The Value Of The Mortgage Loans Has And Likely Will Continue To Decline Or That The Administrative Agent Is Adequately Protected**

Once the Administrative Agent establishes its *prima facie* case, the "burden shifts to the debtor to go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected . . . ." *Elmira Litho*, 174 B.R. at 902; *accord In re Worldcom, Inc.*, 2003 WL 22025051 at *6 (same); 3 Collier on Bankruptcy ¶ 362.10 (15th ed. 2007) ("Once the moving party makes this showing, the burden of going forward and the ultimate burden of persuasion shift to the party opposing the relief to show that the collateral is not declining in value, [or] the movant is adequately protected"); *see also In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) (citing *Elmira Litho* in context of motion for relief from stay under section 362(d)(1)).

The Debtors contend that, as part of its *prima facie* case, the Administrative Agent must prove either that it is undersecured or, alternatively, if the Administrative Agent is oversecured, that any resulting equity cushion -- the value of the Mortgage Loans above the amount owed to the Secured Parties -- is insufficient to provide adequate protection. *See* Debtors' Preliminary Objection to the Motion of Bank of America, N.A., as Administrative Agent, for Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing the Administrative Agent to Exercise its Rights as a Secured Creditor ("Preliminary Objection") at 9-13. The Debtors' argument confuses the requirements for relief from the automatic stay under Section 362(d)(1) and those required under Section 362(d)(2).

Proof that the debtor lacks equity in the property (in which case the Administrative Agent would be undersecured) is required to establish relief from the automatic stay under Section 362(d)(2). *See* 11 U.S.C. § 362(d)(2)(A). But the Administrative Agent has

6

not sought relief under that Section and such proof is not required to establish cause for relief

from the automatic stay under Section 362(d)(1). Thus, the Administrative Agent is not required

to demonstrate that it is undersecured to establish its *prima facie* case under Section 362(d)(1).

For example, in *In re Bushee*, 319 B.R. 542, 545 (Bankr. E.D. Tenn. 2004), the

court granted relief under Section 362(d)(1) where the value of the collateral exceeded the

amount of the indebtedness. In that case, the court held that a creditor establishes its *prima facie*

case by showing that it "has a valid security interest that it seeks to protect, and that cause exists

justifying relief, such as the Debtors' failure to make payments or that the collateral is decreasing

in value." *Id.* at 551. Similarly, in *Ukranian Savings & Loan Ass'n v. Trident Corp.*, 22 B.R.

491, 493, 496 (E.D. Pa. 1982), the court affirmed the grant of relief under Section 362(d)(1)

where "the fair market value of the property [was] $280,000" and the debtor "owe[d]

approximately $250,000 to its secured creditors" and held that the burden of establishing that the

secured creditor's interest in the property is protected is on the *debtor*." (Emphasis added.)

Thus, the question of whether a creditor is undersecured or oversecured is irrelevant to the

creditor's *prima facie* case under Section 362(d)(1).[4]

Nor is it incumbent on the Administrative Agent to establish that an equity

cushion, if one exists, is inadequate to protect it from the precipitous decline in the value of the

Mortgage Loans. Rather, it is the Debtors' burden to make that showing.

Although the existence of an equity cushion might provide adequate protection

under circumstances not present here, "[i]t does not follow . . . that the existence or absence of an

---

[4]     The fact that some cases addressing relief from the automatic stay under Section
362(d)(1) involve creditors that were undersecured (Preliminary Objection at 11-12) in
no way establishes that as an element of a creditor's *prima facie* case. None of those
cases so hold.

7

equity cushion is material to the secured creditor's *prima facie* case" because "the existence or

absence of an equity cushion does not support the inference that the collateral is declining in

value," which remains "[t]he relevant inquiry" with respect to the creditor's *prima facie* case.

*Elmira Litho*, 174 B.R. at 904; *accord Worldcom*, 2003 WL 22025051 at *6 ("The existence of

an equity cushion is not part of the secured creditor's *prima facie* case"); *LNC Investments*, 1995

WL 231322 at *5 ("[T]he existence or absence of an equity cushion does not decide whether or

not there is a *prima facie* case under section 362(d)(1)").

　　　　　Furthermore Section 362(g) does not alter that result.  Section 362(g)(1) states,

"[i]n any hearing under subsection (d) . . . of this section concerning relief from the stay . . . the

party requesting such relief has the burden of proof on the issue of the debtor's equity in

property[.]"  11 U.S.C. § 362(g)(1).  Because Section 362(d)(1) (as opposed to Section

362(d)(2)) does not require that the Administrative Agent show that the Debtors lack equity in

the Mortgage Loans, Section 362(g)(1) does not impose that substantive burden on the

Administrative Agent.  As the court in *Elmira Litho* explained:

> The debtor's lack of equity is immaterial to the secured creditor's
> case under § 362(d)(1), and if the debtor raises the existence of an
> equity cushion to demonstrate adequate protection, the debtor --
> not the secured creditor -- must prove it notwithstanding the
> provisions of § 362(g).

*Elmira Litho*, 174 B.R. at 904; *accord In re Gauvin*, 24 B.R. 578, 580 (9th Cir. B.A.P. 1982)

("we read the reference in section 362(g) to be limited to the issue of equity expressed in section

362(d)(2)(B) and conclude that the debtor retains the burden of proving lack of cause under

section 362(d)(1) even where the debtor asserts that equity furnishes adequate protection"); 3

Collier on Bankruptcy ¶ 362.10 (quoting *Elmira Litho* with approval).

　　　　　Accordingly, once the Administrative Agent has established its *prima facie* case

by showing that the Mortgage Loans have been declining and likely will continue to decline in

8

value, the burden is on the Debtors to establish either that the Mortgage Loans are not declining

in value or that the Administrative Agent is adequately protected against such decline.

C.    **The Value Of The Mortgage Loans Is The Amount That An Investor Currently Would Be Willing To Pay For Them Taking Into Account The Risks Associated With Them**

For purposes of considering the value of the Administrative Agent's interest in the

Mortgage Loans, this Court must consider the "purpose of the valuation." *In re Craddock-Terry*

*Shoe Corp.*, 98 B.R. 250, 253 (Bankr. W.D. Va. 1988) (citing 11 U.S.C. § 506(a)). In particular,

where, as here, a secured creditor seeks relief from the automatic stay, "the creditor must receive

the same *measure* of protection in bankruptcy that he could have had outside of bankruptcy . . . ."

*Id.* (emphasis in original). Thus, "the value of the interest of [the Administrative Agent] in the

[Mortgage Loans] is equivalent to what [it] could have recovered through foreclosure, had the

[Debtors] defaulted but not filed [their] petition[s] for Chapter 11 relief" because the "benefit

initially bargained for, and to be protected under sections 361 and 362, was the value obtainable

from the most commercially reasonable disposition of the collateral within the context of

foreclosure proceedings." *Id.* at 253-54; *see Resolution Trust Corp. v. Swedeland Dev. Group,*

*Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[t]he whole purpose

of adequate protection for a creditor is to insure that the creditor receives the value for which [it]

bargained pre-bankruptcy"); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003)

("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in

value essentially what he bargained for").

Moreover, where, as here, the value of the Mortgage Loans is based on their

ability to generate future cash flows, it is necessary to determine "how much money an investor

would be willing to pay on that given day in order to obtain the right to receive the [property's]

cash flows in the future." *In re Prince*, 85 F.3d 314, 319 (7th Cir.), *cert. denied*, 519 U.S. 1040

(1996). To make that determination, the "projected stream of income" must "be 'discounted' back to the present day (i.e., reduced to the value that someone would be willing to pay today for the expected cash flows in the future), using a discount factor that accounts for (1) the uncertainty (or riskiness) of the future cash flow projections and (2) the purchaser's opportunity cost of investing money in the [property] rather than in some other available wealth-producing asset." *Id.*, *see In re Nelson Nutraceutical, Inc.*, 2007 WL 201134, *27 (Bankr. D. Del. Jan. 18, 2007) (when valuing entity based on cash flow analysis, it is appropriate to apply "a higher discount rate to reflect risky revenue projections"); *In re Haskell Dawes, Inc.*, 199 B.R. 867, 878 (Bankr. E.D. Pa. 1996) ("A projected stream of income in the future has a discounted present value based upon an interest factor, to account for the time value of money, and a risk factor, to account for the possibility that the projected stream of income may never be realized" (citation omitted)). One measure of what a buyer would pay for the Mortgage Loans is what buyers recently have paid for comparable loan portfolios. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses"); *In re Monica Board Assocs.*, 147 B.R. 385, 392 (Bankr. E.D. Va. 1992) ("Fair value of assets shall be measured by their market value if an active market for them exists. If no active market exists for the assets transferred but exists for similar assets, the selling prices in that market may be helpful in estimating the fair value of the assets transferred.").

In light of these principles, the Court should consider the declining value of the Mortgage Loans from the standpoint of what the Administrative Agent bargained for and obtained in the Security Agreement -- the right to sell the Mortgage Loans in satisfaction of the Indebtedness, which is fully matured and past due. In addition, any assessment of the Mortgage

Loans' value must take into account the risk at any point in time to an investor purchasing the

Mortgage Loans that the future anticipated income from the Mortgage Loans will not

materialize.

Thus, there is no basis for the Debtors' contention that "the value of the Mortgage

Loans has remained essentially static since the Petition Date" because "as of the Petition Date,

the actual future income potential for the Mortgage Loans was fixed." Objections, Responses

and Answers of the Debtors to the First Set of Interrogatories and Requests for Production of

Documents of Bank of America, N.A., as Administrative Agent, Directed to the Debtors in

Connection with the Motion of Bank of America, N.A., as Administrative Agent, for Relief from

Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing the Administrate Agent to Exercise its

Rights as a Secured Creditor ("Debtors' Interrogatory Responses") at 8. That simplistic notion

fails to account for the increasing risk that the future income potential of the Mortgage Loans

will not be realized.

## III.    EVIDENCE TO BE PRESENTED

### A.    The Evidence Will Show That The Value Of The Mortgage Loans Is Declining And Likely Will Continue To Decline Precipitously, Thereby Establishing The Administrative Agent's Prima Facie Case for Relief from the Automatic Stay

Consistent with the principles set forth above, residential mortgage loans are

valued by calculating the anticipated cash flow and applying a market discount rate, which takes

into account the perceived risks related to residential mortgage loans generally and related to the

specific Mortgage Loans at issue. Expert Report of Robert R. Branthover ("Branthover Report")

at 8. Applying such method of valuation, the value of the Mortgage Loans has been falling

dramatically since the Petition Date and likely will continue to fall for the foreseeable future in

light of both risks associated with residential mortgage loans generally and the risks specifically

11

associated with the Mortgage Loans.  As Robert Branthover, an expert witness who will appear

on behalf of the Administrative Agent, testified at his deposition, "all risk associated with the

[the Mortgage Loans] has been moving up because the perceived risk and the realized risk

associated with them has been increased."  Deposition or Robert R. Branthover, dated April 9,

2008 ("Branthover Dep.") at 116.[5]

        The value of residential market loans generally has been declining and likely will

continue to decline for the foreseeable future.  For much of this decade, increasing real property

values and decreasing credit and documentation standards led many people to purchase homes

that they could afford only if property values continued to increase.  Branthover Report at 4,

Expert Witness Report of Maureen Bolton ("Bolton Report") at 10.  But, more recently, property

values have been falling, which has resulted in a wave of defaults on mortgage loans and

foreclosures on the underlying real property held as collateral.  Consequently, prices for all types

of residential mortgage loans have fallen dramatically.  Currently, the yield spread for

"conventional" loans, which are backed by Government Sponsored Entities ("GSEs"), such as

Fannie Mae and Freddie Mac and which are perceived to be the least risky type of residential

mortgage loan, are at a 20 year low when compared with 5 and 10 year U.S. Treasury Securities.

*Id.* at 5; Bolton Report at 10-11 ("all residential mortgages and [residential mortgage backed

securities], even those issued by the Federal Housing Administration or guaranteed by Fannie

Mae or Freddie Mac were adversely impacted" by the "decrease in home price appreciation in

most housing markets and the surrounding uncertainty").

---

[5]     Mr. Branthover is a Co-Head of the Secondary Solutions department at the Mortgage
Industry Advisory Corporation with responsibility for, among other things, valuations of
residential loan portfolios.  *See* Branthover Report at 1-2.

Moreover, the precipitous and continuing decline in the residential loan market is exacerbated by the prevalence of a relatively new type of instrument called the Payment Option Adjustable Rate Mortgage ("Payment Option ARM"). These loans are structured to encourage borrowers to pay an amount that is insufficient to cover their monthly interest for an initial five year period after which the loans reset at higher interest rates. Branthover Report at 7. During the period that borrowers pay less than the full amount of interest on these loans, the principal balance of the loans rises, which causes the loan to value ratio to rise, and depresses the value of the loans. *Id.* at 9. In addition, in the current environment where underlying property values are falling, these loans are particularly prone to defaults after rates reset when it is likely that many borrowers will be unable to satisfy their payment obligations. *Id.* at 10; Branthover Dep. at 60-61, 108-09. In light of the prevalence of Payment Option ARM loans, the current decline in the residential real estate and mortgage markets is likely to be more pronounced and of greater duration than past downturns in those markets, which typically have lasted five or six years. Branthover Dep. at 59-60, 62.

As a result, there has been and likely will continue to be significant declines in the value of residential mortgage loans generally. In addition to the factors that have contributed and likely will continue to contribute to the significant decline in the value of residential mortgage loans generally, the Mortgage Loans have declined in value and are at particular risk of further decline due to risks specific to them.

First, approximately 71% consisting of $415 million of the outstanding principal balance of the Mortgage Loans are comprised of loans in the product sectors that have faced the largest declines in value. Branthover Report at 5; Branthover Dep. at 48, 52. In particular, approximately 39% consisting of $227 million of the unpaid principal balance of the Mortgage

13

Loans are Payment Option ARM loans. Branthover Report at 9. As set forth above, these loans are at particular risk of future default when rates are reset and subject to further decline in value. Moreover, because Payment Option ARM loans are especially prone to default, it is important to try to restructure them to avoid that result and preserve the value of the loans. The Debtors are not in a position to do that because they are liquidating and not originating new loans. For that reason, the Payment Option ARM loans accounting for 39% of the unpaid principal balance on the mortgage loans are even less valuable under the control of the Debtors than they would be under the control of an active mortgage originator, such as the Administrative Agent. *Id.* at 10.

Second, a significant percentage of the Mortgage Loans are delinquent, and that percentage has nearly doubled since the Petition Date. Thus, at the end of August 2007, 8.481% of the unpaid principal balance of the Mortgage Loans was in default. *Id.* at 10. By the end of February 2008, that percentage had increased to 16.387%, which is "unheard of in the industry" and "four times" the "national average [which] is a low single digit." *Id.*; Branthover Dep. at 57. Given this trend, it is likely that the Mortgage Loans will continue to "decrease in value materially going forward." Branthover Dep. at 96. This is particularly true in light of the fact that approximately 39% of the Mortgage Loans consist of Payment Option ARM loans, which are especially susceptible to future defaults. Branthover Dep. at 58. The rising delinquency rate of the Mortgage Loans has substantially decreased their value by decreasing cash flow, increasing recovery costs, and decreasing investor confidence in the future performance of the Mortgage Loans. Branthover Dep. at 95-96; Branthover Report at 11.

Third, a substantial percentage of the real property collateral underlying the Mortgage Loans is located in states with some of the highest and fastest growing foreclosure rates in the country. In particular, the real property collateral for 57% consisting of $330 million

14

of the unpaid principal balance of the Mortgage Loans, are located in the states with the ten

highest residential mortgage foreclosure rates. *Id.* at 11. And, 49% consisting of $284 million of

the unpaid principal balance of the Mortgage Loans, are located in the states with the five highest

residential mortgage foreclosure rates. *Id.* Increasing foreclosure rates result in a decrease in the

value of the Mortgage Loans because the underlying property values will decrease, thus

increasing the actual loan to value ratios. *Id.*

Finally, the Mortgage Loans are subject to further decline in value because many

of the loans in the portfolio are misidentified as "Conventional" loans that are eligible for

purchase by GSEs, such as Fannie Mae or Freddie Mac. *Id.* at 12. Typically, Conventional

loans that meet GSE underwriting standards are sold to GSEs within 90 days of their origination

because the return on those types of loans is lower than for other fixed income instruments.

Branthover Dep. at 77, 87. The inability to sell such loans indicates that there are problems with

them that impair their value. Branthover Dep. at 78. Although the Debtors identify

approximately $118 million of "Conventional" loans that are eligible for purchase by

government sponsored entities on their February 29, 2008 data tape, up to $47 million of those

loans may no longer be eligible. Branthover Report at 12.[6] Thus, an internal electronic mail

message dated February 11, 2008, indicates that Fannie Mae rejected $47 million out of $105

---

[6]    The Debtors' expert states that "67.84% of the AHM Portfolio aggregate UPB are
conforming (loan balances qualify for potential purchase and guarantee by the
Government National Mortgage Association or by Government Sponsored Entities such
as Fannie Mae and Freddie Mac)." Expert Witness Report of Maureen Bolton, dated
April 2, 2008 ("Bolton Report"). But that is misleading because loan balances are only
one of the criteria necessary to establish eligibility for purchase and guarantee by GSEs.
Branthover Dep. at 140 ("just because the loan size is less than the perceived Agency
eligibility does not necessarily mean they will ever be able to be purchased by one of the
government Agencies"). As the evidence will show, other eligibility requirements relate
to loan to value ratios and borrowers' FICO scores.

million of "Conventional" loans that the Debtors had submitted for purchase due to updated

FICO scores and loan to value ratios and heightened standards since the loans were originated

that rendered those loans ineligible for purchase by Fannie Mae. *See* AHM2BOA0208311-13.

The fact that a significant number of the Mortgage Loans identified by the Debtors as

"Conventional" loans were rejected by Fannie Mae and remain in the Debtors' portfolio suggests

that there are significant problems with those loans negatively impacting their value. Branthover

Dep. at 78, 87.

 In sum, for all these reasons related to the market for residential mortgage loans

generally and related specifically to the Mortgage Loans at issue, the value of the Mortgage

Loans has decreased since the Petition Date and likely will continue to decrease for the

foreseeable future.[7] Valuations performed for and by the Administrative Agent from the period

just prior to the Petition Date through early February 2008 have shown a substantial decline in

the value of the Mortgage Loans.[8]

---

[7]    The Debtors contend that the diminution in value from the Petition Date to the date of
this Motion is irrelevant. Preliminary Objection at 13-15. The Debtors rely for that
proposition on cases addressing motions for adequate protection. *Id.* at 14 (citing *In re
Continental Airlines*, 146 B.R. 536, 539-40 (Bankr. D. Del. 1992); *In re Wilson*, 70 B.R.
46, 48 (Bankr. N.D. Ill. 1987)). But the Administrative Agent has not moved for
adequate protection. No such limitation applies to its motion for relief from the
automatic stay. In any event, the Debtors' contention is a red herring because the
Administrative Agent will demonstrate that the value of the Mortgage Loans has declined
steadily from the Petition Date and will continue to decline in the future.

[8]    The Administrative Agent has not published the specific results of these valuations to
avoid placing an artificial value on the Mortgage Loans in the event they are sold in the
future.

**B.      The Debtors Will Be Unable To Come Forward With Evidence To Rebut The Administrative Agent's Showing That The Value Of The Mortgage Loans Has Been Declining And Likely Will Continue To Decline**

As set forth above, once the Administrative Agent establishes its *prima facie* case, the "burden shifts to the debtor to go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected . . . ." *Elmira Litho*, 174 B.R. at 902. There is no evidence from which the Debtors can satisfy their burden. They have not even attempted to do so.

Indeed, the Debtors' expert, Maureen Bolton, concurs with the conclusion that the value of the Mortgage Loans (what an investor would pay for them today in light of the risks associated with them) has declined. Thus, she admits that "[d]ue to marked increases in the number of home foreclosures, decreases in home sales and home price appreciation and the consequent decline of the ABX index, lenders have stopped funding residential mortgage originations, purchases of residential mortgage portfolios and mortgage-backed securities." Bolton Report at 9. As a result, the "few residential mortgage portfolios or [Residential Mortgage Backed Securities], which have been sold in recent weeks, are reported to have been priced at large discounts." *Id.*

Moreover, Ms. Bolton effectively concedes that the market for the Mortgage Loans likely will continue to decline for the foreseeable future. Thus, according to Ms. Bolton, the "Case-Shiller index of home prices in 10 major metropolitan areas showed an 11.4 percent decline in home prices over the 12 months ending in January, and the futures market is predicting that the index will decline another 13 percent in 2008." *Id.* at 11. Declining home prices, which Ms. Bolton concedes are likely to continue through at least the end of the year, lead to increases in loan to value ratios, which further depress the value of residential home mortgages, including the Mortgage Loans.

17

Indeed, the Debtors conclude that this is a bad time to sell the Mortgage Loans precisely because their value has declined and likely will continue to decline. Based primarily on recent government efforts to stem the crisis in the residential housing and mortgage markets, the Debtors speculate that the market will improve at some unspecified point in the future and propose to retain control over the Mortgage Loans until such time as they deem it appropriate in the exercise of their business judgment to sell them. Preliminary Opposition at 4; Bolton Report at 10, 12-14.[9]  In short, the Debtors want to gamble with the Administrative Agents' collateral, which is a tactic that does not satisfy their burden to avoid relief from the automatic stay.

Indeed, the Mortgage Loans already have incurred a significant decline in value due to the Debtors' decision to hold them, rather than sell them shortly after their origination as companies such as the Debtors do in the "normal course of business," and "[t]ime is working against the value of this portfolio" of Mortgage Loans. Branthover Dep. at 93, 120, 156; *see* Wampler Dep. at 47-48 ("I'm concerned at the divergence from the initial game plan when the

---

[9]     It goes without saying that government efforts no matter how well-intentioned do not come with a guarantee of success. Suffice it to say that some commentators are less optimistic than Ms. Bolton in that regard:

> Efforts by Congress to stem the tide of foreclosures are likely to be modestly successful at best. A very large proportion of foreclosures, which we estimate to be around 40 percent, are on homes purchased by investors and speculators. There is little Congress or the lending community can do to prevent these borrowers from going under, which will result in sharply higher foreclosures and price declines in investor-laden markets, such as Florida, Arizona, Nevada and California's Central Valley.

Wachovia Economics Group Special Commentary, Housing Chartbook: April 2008 at 1-2.; *see* Branthover Dep. at 65-66 (the impact of recent government efforts is likely to be "[m]odest at best"); *id.* at 161-64. In any event, unlike the Administrative Agent, the Debtors are not in a position to take advantage of many of the measures enacted by the government in an effort to stem the crisis in the residential housing and mortgage markets.

18

company went into bankruptcy and the values that could be achieved at that point in time, and where we find ourselves today"). Debtors' counsel admitted as much when these Bankruptcy Cases were commenced. 8/07/2007 Tr. at 12-13 ("We have one enemy in this case and that's time"). In light of the increasing rate of delinquencies and other factors discussed above, it will be "a worse time" to sell the Mortgage Loans "if you come into the market a month from or two months from now." Branthover Dep. at 156.

Moreover, the Administrative Agent has not proposed to liquidate all the Mortgage Loans immediately or engage in a "fire sale." As a result of the Debtors' failure to liquidate the Mortgage Loans when they might have achieved greater value, immediate liquidation of the entire portfolio of Mortgage Loans is no longer feasible. Branthover Dep. at 123-24; Branthover Report at 13. Rather, if the Administrative Agent is permitted to exercise its rights under the Security Agreement and obtains control over disposition of the Mortgage Loans, it would explore "different avenues to achieve maximum value for different product types within the [Mortgage Loans] portfolio. Some of the [Mortgage Loans] have characteristics that permit them to be sold quickly and achieve good value. Some of the [Mortgage Loans] require additional strategies to maximize value," including "strategies involving renegotiation and rework[ing] of loans to make them into conforming product that becomes GSE eligible," offering "incentives to borrowers to refinance with third parties," and establishing and financing programs to allow mortgagors to roll their loans over into new products. Wampler Dep. at 44-45. The Administrative Agent has the financial and other resources and economic incentive to take those necessary steps to achieve maximum value to satisfy the fully matured Indebtedness.

On the other hand, the Debtors are not in a position to take those necessary steps because "[i]t is tough for a bankrupt institution to get a whole lot of credibility when they come

19

into the market to sell anything, particularly when they didn't have a great reputation when they sold to begin with." Branthover Dep. at 110-11. In addition, the Debtors are constrained in terms of "personal resources as well as financial resources" and lack the financial incentive to achieve the maximum value for the Mortgage Loans. Wampler Dep. at 46; *see* Wampler Dep. at 208-09 ("There are a lot of things that we can do that bankrupt Debtor that is out of money can't do").

But, more importantly, how the Debtors would exercise their business judgment is beside the point. The issue raised by this motion is whether the automatic stay should be lifted so that the Administrative Agent can exercise its independent business judgment with regard to the Mortgage Loans on behalf of itself and the Secured Parties whose financial interests are at stake, as provided in the Security Agreement. As the Official Committee of Unsecured Creditors has stated, "the Administrative Agent, and not the Debtors, should be the party that controls the disposition process for the Mortgage Loans" because "the Administrative Agent, one of the largest financial institutions in the United States with significant connections, access and experience in monetizing these types of assets, is the party best situated, and has the best incentive to maximize the recovery from the disposition of the Mortgage Loans." The Official Committee of Unsecured Creditors' Support of the Motion of Bank of America, N.A., as Administrative Agent, for Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(D), Allowing the Administrative Agent to Exercise its Rights as a Secured Creditor, dated April 9, 2008 ¶ 8.

As one court has put it, "there is simply no basis for the debtor to retain control of any orderly liquidation when in reality it is liquidating [the creditor's] collateral and [the creditor] wishes to regain its right to possession and sale." *In re Efcor, Inc.*, 74 B.R. 837, 845

(Bankr. M.D. Pa. 1987) (granting relief from automatic stay); *see In re 160 Bleecker Street Assocs.*, 156 B.R. 405, 411-12 (S.D.N.Y. 1993) (reversing denial of motion to lift stay where maintaining the stay "merely permits the debtor to speculate with the creditor's interests" in the "hope of recouping equity if the market rises significantly in the years to come").

In any event, courts have held that speculation, such as that offered by Debtors, that the declining value of collateral will eventually "bottom out" and appreciate over time, is insufficient to sustain the Debtors' burden under Section 362(d)(1). *See, e.g., In re Grant Assocs.*, 1991 WL 21228, *7 (S.D.N.Y. Feb. 5, 1991) (affirming grant of relief from stay where evidence showed that value of collateral "had been declining 'precipitously' over the past three to four years" notwithstanding Debtors' testimony "that the market had 'bottomed out'").

## C. The Debtors Will Be Unable To Come Forward With Evidence To Satisfy Their Burden To Prove That The Administrative Agent's Interest In The Mortgage Loans Is Adequately Protected

In response to Interrogatories, the Debtors contended "that the Secured Parties are adequately protected by (1) the protections set forth in the Cash Collateral Order, and (ii) the amount, if any, by which the value of the Mortgage Loans, the Other Collateral, and any other collateral securing the Indebtedness, collectively, exceeds the amount of the outstanding Indebtedness." Debtors' Interrogatory Responses at 11. There is no evidence to support either theory.

First, there is nothing in the Cash Collateral Order that purports to adequately protect the Administrative Agent against the precipitous and continuing decline in the value of the Mortgage Loans since the time that Order was entered. The Debtors rely on the provisions of the Cash Collateral Order granting the Administrative Agent a post-petition security interest in certain of the Debtors' assets, including the Mortgage Loans, and requiring the Debtors to make certain payments, including proceeds from the Mortgage Loans, to the Administrative Agent.

*See* Preliminary Objection at 5, 17.  But those provisions merely maintain the Administrative

Agent's lien in a rapidly declining asset.

Second, the Debtors have not come forward with any evidence to satisfy their

burden to demonstrate an equity cushion, much less the size of such equity cushion.  But even

assuming that the Debtors do come forward with some evidence of an equity cushion, that would

not debar the Administrative Agent from obtaining relief from the stay, especially where, as

here, the Debtors are liquidating rather than reorganizing.  Courts have held that even a

substantial equity cushion is insufficient to establish adequate protection where lifting the stay

will not prejudice other creditors and maintaining the stay will not serve any purpose of the

Bankruptcy Code.

For example, in *In re Bouquet Investments*, 32 B.R. 988, 989-90 (Bankr. C.D. Cal.

1983), the court granted relief from the automatic stay under Section 362(d)(1) even though the

court found that the debtor had "substantial equity in the property" because the chapter 11 case

was not "the sort of case where important going-concern value would be lost if the secured

creditor were permitted to defeat the reorganization."  As the court explained, the debtor "should

not be permitted to speculate at the [creditors'] expense."  *Id.* at 989.

Similarly, in *In re Certified Mortgage Corp.*, 19 B.R. 369 (Bankr. M.D. Fla.

1982), the court granted relief from the stay even though there existed a large equity cushion

because that case, like these Bankruptcy Cases, was a liquidating chapter 11 case.  As the court

explained, an equity cushion is insufficient to provide adequate protection, where as here, "a plan

is a liquidation plan and where the sole hope of the Debtor to effectuate the reorganization is to

salvage the equities in its properties, the success of which depends on economic factors over

which the Debtor has no control."  *Id.* at 370-71.

22

Here too, the only purpose that maintaining the stay would serve is to permit the Debtors to speculate that the value of the Mortgage Loans will increase at some unspecified future date at great risk to the Administrative Agent, the Secured Parties, and the unsecured creditors, which are the only parties with a pecuniary interest in the Mortgage Loans. That would not serve any legitimate purposes of the Bankruptcy Code and its automatic stay provisions.

The "purpose [of the automatic stay] is three-fold:  'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'"  *In re Rexene Prods.*, 141 B.R. at 576 (quoting *Borman v. Raymark Ind., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991)). None of those purposes would be served by leaving the automatic stay in place.

First, all the parties with a pecuniary interest in the Mortgage Loans, including the Administrative Agent, the Secured Parties and the unsecured creditors all support lifting the stay and placing control over disposition of the Mortgage Loans in the Administrative Agent. Thus, lifting the automatic stay would not permit any creditor to gain a preference over another or over the Debtors, which are the only parties opposing the Motion engaged in the process of liquidation.

Second, lifting the automatic stay in these Bankruptcy Cases will not result in the Debtors' incurring legal costs to defend proceedings in other courts, which would deplete the assets available to satisfy creditors' claims. No such proceedings are at issue.

Third, lifting the automatic stay will not interfere with the orderly liquidation or rehabilitation of the Debtors. To the contrary, lifting the automatic stay would facilitate the

quick and efficient liquidation of the Debtors' assets and resolution of these Bankruptcy Cases, which is precisely what Debtors' counsel said was the goal of these Bankruptcy Cases when they were commenced. As Debtors' counsel stated at that time, "what we propose to do is, as quickly and as efficiently as possible, liquidate our holdings. . . . We have one enemy in this case and that's time. Our principal asset, the servicing business, as well as our financial assets, *are not going to improve in value over time. We believe they're going to decline, and we have no ongoing business.*" 8/07/2007 Tr. at 12-13 (emphasis added). As the Debtors' counsel candidly admitted at that time, in the absence of a quick and efficient liquidation of the Debtors' assets, "we're keeping on our payroll employees needed to preserve these assets, [and] approving administrative expenses that are cannibalizing the assets that we do have." *Id.*

## CONCLUSION

For the reasons set forth above, and based on the evidence that will be submitted at the hearing scheduled for April 16, 2007, this Court should (i) grant the Administrative Agent's motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1), allowing the Administrative Agent to exercise its rights in the Mortgage Loans as a secured creditor under the Security Agreement, or (ii) order such other further or different relief as the Court may deem equitable and just.

Dated: April 11, 2008

POTTER ANDERSON & CORROON LLP

By: _____
Laurie Selber Silverstein (DE Bar 2396)
Gabriel R. MacConaill (DE Bar 4734)
P.O. Box 951
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19899
(302) 984-6000

- and -

KAYE SCHOLER LLP
Margot B. Schonholtz
Myron Kirschbaum
Scott D. Talmadge
425 Park Avenue
New York, New York 10022

*Counsel for Bank of America, N.A. as*
*Administrative Agent under that certain*
*Second Amended and Restated Credit*
*Agreement, dated as of August 10, 2006*

Pac#859841