IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------------- x
In re:                                              :   Chapter 11
                                                    :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,              :   Case No. 07-11047 (CSS)
a Delaware corporation, et al.,*                    :
                                                    :   Jointly Administered
                                                    :
          Debtors.                                  :   Ref. Dkt. Nos. 3054, 3175, 3618
                                                    :   Hrg. Date: April 16, 2008 at 11:00 a.m.
-------------------------------------------------------------------- x
```

**DEBTORS' PRETRIAL BRIEF IN OPPOSITION TO THE
MOTION OF BANK OF AMERICA, N.A., AS ADMINISTRATIVE
AGENT, FOR RELIEF FROM THE AUTOMATIC STAY**

---

\*      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## **TABLE OF CONTENTS**

Page

## TABLE OF AUTHORITIES

**Page**

**Cases**

Bluebird Partners, L.P. v. First Fid. Bank, N.A.,
 85 F.3d 970 (2d Cir. 1996) ......................................................................... 24

Grella v. Salem Five Cent Savings Bank,
 42 F.3d 26 (1st Cir. 1994)........................................................................... 40

Grimes v. Munoz (In re Munoz),
 83 B.R. 334 (Bankr. E.D. Pa. 1988) ........................................................... 40

In re Beaver Valley Builder's Supply, Inc.,
 177 B.R. 507 (Bankr. W.D. Pa. 1995)......................................................... 30

In re Best Prods. Co.,
 138 B.R. 155 (Bankr. S.D.N.Y. 1992)......................................................... 23

In re Cason,
 190 B.R. 917 (Bankr. N.D. Ala. 1995) ........................................................ 33

In re Continental Airlines,
 146 B.R. 536 (Bankr. D. Del. 1992)............................................................ 23

In re Efcor, Inc.,
 74 B.R. 837 (Bankr. E.D. Pa. 1987) ........................................................... 20

In re Global Home Prods., LLC,
 369 B.R. 778 (Bankr. D. Del. 2007)............................................................ 21

In re James Wilson Assoc.,
 965 F.2d 160 (7th Cir. 1992) ...................................................................... 28

In re Jug End in Berkshires, Inc.,
 46 B.R. 892 (Bankr. D. Mass. 1985) .......................................................... 29

In re Kane,
 27 B.R. 902 (Bankr. M.D. Pa. 1983) .......................................................... 29

In re Lane,
 108 B.R. 6 (Bankr. D. Mass. 1989) ............................................................ 28

In re Lehigh Valley Prof'l Sports Clubs, Inc.,
 Case No. 00-11296DWS, 2001 Bankr. LEXIS 1245,
 *23 (Bankr. E.D. Pa. Sept. 7, 2001)........................................................... 19

In re Marvel Ent'mt Group,
   140 F.3d 463 (3d Cir. 1998) ....................................................................... 20

In re Mattera,
   Case No. 05-39171 (DHS), 2006 Bankr. LEXIS 4083,
   *11 (Bankr. D.N.J. Feb. 6, 2006) (unpub. letter op.)............................... 19

In re Morysville Body Works, Inc.,
   86 B.R. 51 (Bankr. E.D. Pa. 1988) ........................................................... 29

In re Murel Holding Corp.,
   75 F.2d 941 (2d Cir. 1935) ....................................................................... 38

In re Opelika Mfg. Corp.,
   66 B.R. 444 (Bankr. N.D. Ill. 1986) ......................................................... 31

In re Reice,
   88 B.R. 676 (Bankr. E.D. Pa. 1988) ......................................................... 30

In re RNI Wind Down Corp.,
   348 B.R. 286 (Bankr. D. Del. 2006) ......................................................... 27

In re Sharon Steel Corp.,
   871 F.2d 1217 (3d Cir. 1989) ................................................................... 20

In re The Score Board, Inc.,
   238 B.R. 585 (D.N.J. 1999) ...................................................................... 19

In re Timbers of Inwood Forest Assocs., Ltd.,
   793 F.2d 1380 (5th Cir. 1986) ................................................................. 33

In re V. Savino Oil & Heating Co.,
   99 B.R. 518 (Bankr. E.D.N.Y. 1989)........................................................ 20

In re Wilson,
   70 B.R. 46 (Bankr. N.D. Ill. 1987) ........................................................... 23

Johnson v. Righetti (In re Johnson),
   756 F.2d 738 (9th Cir. 1985) ................................................................... 40

Mazzeo v. Lenhart (In re Mazzeo),
   167 F.3d 139 (2d Cir. 1999) ..................................................................... 19

Petit v. New England Mortgage Servs., 182 B.R. 64 (D. Me. 1995)........................... 20

Sonnax Indus. v. Tri Component Prods. Corp. (In re Sonnax Indus.),
   907 F.2d 1280 (2d Cir. 1990) .............................................................. 19, 27

Till v. SCS Credit Corp.,
    541 U.S. 465 (2004)........................................................................................ 14, 15, 16, 34

Timbers U.S., 484 U.S. at 370-371 ................................................................................. 33, 39

United Sav. Ass'n v. Timbers of Inwood Forest Assocs.,
    484 U.S. 365 (1988)........................................................................................................ 33

United States Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,
    484 U.S. 365 (1988)........................................................................................................ 28

United States v. Whiting Pools, Inc.,
    462 U.S. 198 (1983)........................................................................................................ 33

**Statutes**

11 U.S.C. § 1101 ........................................................................................................... 12

11 U.S.C. § 1106(a) ....................................................................................................... 13

11 U.S.C. § 1107 ....................................................................................................... 12, 13

11 U.S.C. § 1121(b) ....................................................................................................... 13

11 U.S.C. § 1123(a)(5)(B) ............................................................................................. 13

11 U.S.C. § 1123(a)(5)(D) ............................................................................................. 13

11 U.S.C. § 1325(a)(5)(ii) ............................................................................................... 7

11 U.S.C. § 361 ...................................................................................................... passim

11 U.S.C. § 361(3) ......................................................................................................... 30

11 U.S.C. § 362 ....................................................................................................... 14, 32

11 U.S.C. § 362(d) ........................................................................................................... 1

11 U.S.C. § 362(d)(1) ............................................................................................... passim

11 U.S.C. § 362(d)(2) ......................................................................................... 12, 21, 22

11 U.S.C. § 362(g) ......................................................................................................... 19

11 U.S.C. § 363 ....................................................................................................... 13, 14

11 U.S.C. § 363(c)(2) ..................................................................................................... 14

11 U.S.C. § 363(e) ................................................................................................... 14, 15

11 U.S.C. § 364 ................................................................................................................ 14

11 U.S.C. § 364(d) .......................................................................................................... 14

11 U.S.C. § 507(b) .......................................................................................................... 27

11 U.S.C. § 704(a)(1) ...................................................................................................... 13

**Other Authorities**

H.R. Rep. No. 95-595,
   95th Cong., 1st Sess. 338-40 (1977) ......................................................................... 24

H.R. Rep. No. 95-595, at 343-44 (1977),
   reprinted in 1978 U.S.C.C.A.N. 6300 ...................................................................... 11

AHM Holdings and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"), submit this pretrial brief (the "Pretrial Brief") (i) in opposition to the Motion of Bank of America, N.A., as Administrative Agent (the "Administrative Agent") for Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing the Administrative Agent to Exercise its Rights as a Secured Creditor, D.I. 3054 (the "Stay Relief Motion"), filed February 22, 2008, and the Official Committee of Unsecured Creditors' Support of the Stay Relief Motion, D.I. 3618 (the "Committee Statement"), filed April 9, 2008, and (ii) in further support of the Debtors' Preliminary Objection to the Motion, D.I. 3175 (the "Preliminary Objection"), filed March 6, 2008.  In support of this Pretrial Brief, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

Before the Court is the rather unusual Motion filed by the Administrative Agent (albeit the second of its kind thus far in these chapter 11 cases), seeking to compel the turnover and/or sale of Mortgage Loans[1] constituting property of the Debtors' bankruptcy estates.  The ostensible basis for such relief is the Debtors' alleged "failure" and "inexplicable refusal" to expeditiously sell the Mortgage Loans or, alternatively, to capitulate to the Administrative Agent's informal adequate protection demands.

Of course, words like "failure" and "inexplicable refusal" suggest that the Debtors are in dereliction of some duty under the Bankruptcy Code.  But so far as the Debtors are aware:

(i)     The Bankruptcy Code merely *permits* a chapter 11 debtor in possession to sell property of the estate—it nowhere *requires* it; and

(ii)    Except in limited circumstances not present here, the Bankruptcy Code places the burden squarely on the secured creditor to *formally request*

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Preliminary Objection and the Stay Relief Motion, as applicable.

adequate protection if it believes its lien is declining in value and is not adequately protected.

Nevertheless, based on the Debtors' "failure" and "inexplicable refusal" to do things the Bankruptcy Code does not require them to do, the Administrative Agent postulates that the Debtors are "plagued" with a "leadership vacuum" that renders them incapable of managing the Mortgage Loans.

Luckily for the estates and creditors, the Administrative Agent—ever altruistic—is ready and willing to step in and fill this "leadership vacuum," and filed the Stay Relief Motion with a view toward liquidating the Mortgage Loans in accordance with applicable nonbankruptcy law, a result it touts as "entrust[ing] the party with the greatest interest in the value of the loans with the responsibility for realizing that value". Under the circumstances, however, there is little reason to believe the Administrative Agent has *any* interest—much less "the greatest" interest—in realizing value from the Mortgage Loans above and beyond what an immediate "fire sale" would yield. The Administrative Agent's promise to conduct this fire sale "in accordance with applicable nonbankruptcy law" does not change the fact that *it is a fire sale*, motivated more by the Administrative Agent's desire to extricate itself from these chapter 11 cases than by any concern about realizing the intrinsic value of the Mortgage Loans.[2] Furthermore, the Administrative Agent's promise rings hollow in light of the proposed Settlement Stipulation (as hereinafter defined) between the Administrative Agent and the Committee, which, if approved in its current form, would insulate the Administrative Agent's deficiency claim from review, thus depriving the estates of their only meaningful remedy under Article 9 of the Uniform

---

[2]     The Debtors have learned through discovery that the Administrative Agent may now be moving toward a "hold" strategy with respect to the Mortgage Loans. However, the Stay Relief Motion is premised entirely upon a proposed sale of the Mortgage Loans, and there is nothing in that motion or in the Settlement Stipulation that would preclude a fire sale, should the Administrative Agent's constituency decide it would be better to cash out their positions and reinvest the proceeds elsewhere rather than maximizing their recovery through P&I payments (as hereinafter defined) from the Mortgage Loans over time.

Commercial Code in the event the Administrative Agent fails to dispose of the Mortgage Loans in a commercially reasonable manner.

Approval of the Settlement Stipulation would also undercut the Administrative Agent's assertion that it has "the greatest interest" in realizing the value of the Mortgage Loans in light of the sharing arrangement between the Administrative Agent and the bankruptcy estates. Under this sharing arrangement, the marginal utility of additional cash receipts after the sharing threshold is met (i.e., after 94% of the Administrative Agent's benchmark prepetition claim is paid) would *decrease* from the Administrative Agent's perspective, while at the same time *increasing* from the estates' perspective.  In other words, given the choice between (i) liquidating the Mortgage Loans in a severely depressed market and realizing 100% of the sale proceeds immediately, for cash and (ii) holding the Mortgage Loans and collecting payment over time, with the bankruptcy estates taking progressively larger shares of the cash receipts (10%, 25%, and 50% after the respective thresholds are met), the Administrative Agent will likely choose the former.[3]  And given the same choice, the Debtors, acting on behalf of the bankruptcy estates, would obviously choose the latter.  Thus, approval of the Settlement Stipulation would bring into sharp focus precisely what is at stake in the Stay Relief Motion—i.e., *control*—and would all but mandate denial of the Stay Relief Motion, if the bankruptcy estates are to receive any benefit from the sharing arrangement.

Beyond the Administrative Agent's questionable motives, the Administrative Agent's track record thus far in these chapter 11 cases—in particular, its willingness to accept approximately $9.1 million exchange for a release of its lien on approximately $30.5 million in unpaid principal balance ("UPB") of Construction Loans (as hereinafter defined) from which the

---

[3]     The Administrative Agent's constituency may well be willing to recover less on their claim if it meant freeing up capital to be put to other uses.

Debtors have since collected approximately $10.3 million, in cash, *with over $20 million in UPB of loans remaining*—counsels against "entrusting" it with the disposition of approximately $584 million in UPB of Mortgage Loans.  Indeed, one might think the Administrative Agent would have learned from the bad deal it struck on the Construction Loans that there are perfectly viable non-"fire sale" alternatives for realizing value from mortgage loans.  But apparently it did not, because it now seeks to force yet another sale of loans into a downward-spiraling secondary mortgage market dislocated by a glut of supply, on the one hand, and significantly weakened demand, on the other, for a price that bears little relation to the Cash-Flow Value (as hereinafter defined) of the Mortgage Loans.  There is simply no reason to believe that the Administrative Agent will exercise better judgment with respect to the Mortgage Loans than it did with the Construction Loans.  And given that the UPB at stake with the Mortgage Loans is some nineteen times greater than the UPB at stake with the Construction Loans, "entrusting" the Administrative Agent with the task of liquidating these loans is a risk the bankruptcy estates should not be forced to take.

Innuendo and empty rhetoric aside, the Stay Relief Motion does assert an ostensible legal basis for relief from the stay, namely that the Administrative Agent's lien in the Mortgage Loans is not adequately protected.  However, this adequate protection theory does not withstand closer scrutiny.  First and foremost, in light of the Administrative Agent's undisputed assertion that the "value" of its collateral exceeds the amount of Indebtedness it secures—an assertion that was renewed recently during discovery on the Stay Relief Motion—it bears at least some explanation how the "value" of the Mortgage Loans is now in such peril as to require immediate stay relief.  By what twisted logic can the Administrative Agent's equity cushion both *exist* for purposes of permitting the Administrative Agent to collect post-petition attorneys' fees

from the proceeds of its collateral and, simultaneously, *not exist* for purposes of adequate protection?  The only explanation is that the Administrative Agent is using the term "value" mean different things at the same time.  But now that the Administrative Agent has placed "value" squarely at issue by raising adequate protection in its Stay Relief Motion, and now that the Debtors have called the Administrative Agent's bluff, it is time for the Administrative Agent to put its cards on the table.

Whether or not the Administrative Agent has an equity cushion, it still needs to prove that its lien in the Mortgage Loans is not adequately protected against decline in "value" within the meaning of § 361 of the Bankruptcy Code.  But this is simply not the case.  The Mortgage Loans are not like used cars or warehouses full of soon-to-be obsolete inventory, for which Market Value (as hereinafter defined) might be a sensible metric of "value" for adequate protection purposes.  Nor are the Mortgage Loans like hotels, drill presses, or other going-concern capital assets for which Projected Cash-Flow Value (as hereinafter defined), though a sensible metric of "value" for adequate protection purposes, would nonetheless be highly dependent on the business acumen and management skill of whomever holds the assets.  Rather, the Mortgage Loans are *purely financial assets*, for which Actual Cash-Flow Value (as hereinafter defined) is the only sensible metric of "value" for adequate protection purposes.  Like any debt instrument, the Actual Cash-Flow Value of a Mortgage Loan—for better or for worse— is "baked in" at the moment of origination, at which point the extension of credit to the borrower is a *fait accompli*.  Thereafter, assuming the loan is serviced properly such that every dollar that can be collected is in fact collected, the Actual Cash-Flow Value of the loan "is what it is" and neither increases nor decreases, no matter who happens to be holding the loan.

Because every dollar that is generated from the Mortgage Loans is already being paid into a collateral account for the benefit of the Administrative Agent, it is already receiving the "indubitable equivalent" of the Actual Cash-Flow Value of the Mortgage Loans.  As such, the Administrative Agent's request for additional "adequate protection" is essentially a cleverly-disguised "mark-to-market" margin call, designed to *improve* the Administrative Agent's collateral position post-petition at the expense of general creditors of the estate.  *A fortiori*, the Stay Relief Motion should be denied.

## **BACKGROUND**

As of the Petition Date, the approximately $1.077 billion Indebtedness to the Administrative Agent[4] was secured by essentially three types of collateral: (i) the Servicing Assets; (ii) the Construction Loans; and (iii) the Whole Loans (along with REO resulting from foreclosure) (collectively, the "Pre-Petition Collateral").

## I.      The Cash Collateral Order

In the Cash Collateral Order, the Administrative Agent consented to the Debtors' use of the Pre-Petition Collateral, including the limited use of cash collateral, "upon the protections, terms and conditions provided for" therein.  (D.I. 554 at ¶ J.)  *In addition, the Administrative Agent asserted, and the Debtors agreed not to contest, "that the value of the Pre-Petition Collateral exceeds the amount of the Indebtedness."*  (Id. at ¶ E.)  Subject to certain rights of the Committee, the Debtors' agreement not to challenge that the Administrative Agent is oversecured is currently "binding on the Debtors and all other parties in interest . . . *for all purposes*".  (D.I. 554 at ¶ 20 (emphasis added).)

---

[4]        The term Administrative Agent encompasses the Pre-Petition Secured Parties as the context requires.

"[A]s adequate protection for, and to secure payment of an amount equal to the Collateral Diminution" (defined as "the aggregate diminution of the value of the Pre-Petition Collateral . . . from and after the Petition Date"), the Cash Collateral Order granted the Administrative Agent a post-petition security interest in the Pre-Petition Collateral and any proceeds thereof (collectively, the "Collateral").  (D.I. 554 at ¶¶ 3-4.)  As "additional adequate protection," the Cash Collateral Order required the Debtors to make periodic cash payments in certain amounts (including the payment of the Administrative Agent's post-petition attorneys' fees and expenses until expiration of the Cash Collateral Order), and to remit all proceeds of the Pre-Petition Collateral and Collateral into collateral accounts to be swept by the Administrative Agent on a weekly basis.  (D.I. 554 at ¶¶ 5-6, *as amended by* D.I. 2002 at ¶ 2.)  The Cash Collateral Order contained specific provisions and deadlines concerning the Debtors' sale of the Servicing Assets, but did not prescribe the method or timing of the sale of any other Collateral.  (*See* D.I. 554 at ¶¶ 5-6, *as amended by* D.I. 2002 at ¶ 3.).

The Cash Collateral Order expired by its terms on November 16, 2007.  (D.I. 554 at ¶ 11, *as amended by* D.I. 2002 at ¶ 3.)  Following such expiration, the Cash Collateral Order provides that, "until the Indebtedness has been indefeasibly paid in full in cash, the Administrative Agent shall be entitled to receive all proceeds from the collection, sale, disposition or liquidation of the Collateral", including principal and interest ("P&I") received from borrowers on the Construction Loans and Whole Loans (net of applicable servicing fees).  (*See* D.I. 2002 at ¶ 3.)  The Administrative Agent does not assert that the Debtors are in violation of any payment provisions of the Cash Collateral Order.

## II.    Post-Petition Dispositions of the Collateral

As noted in the Stay Relief Motion, from the beginning of these bankruptcy cases the Debtors have been engaged in the systematic liquidation of their assets, including (but by no means limited to) the Collateral.  The primary concern was the sale of the Servicing Assets, which was mandated by the Administrative Agent and which the Debtors accomplished between the Petition Date and October 30, 2007, in several discrete transactions, including a sale of the vast majority of the Servicing Assets to AH Mortgage Acquisition Co., Inc. ("Wilbur Ross"), which currently services the Mortgage Loans on behalf of the Debtors.  The Debtors subsequently obtained authority to sell (i) REO in the ordinary course of business, with proceeds of such sales to be remitted to the Administrative Agent in accordance with the Cash Collateral Order, and (ii) the Construction Loans.

Despite the Debtors' marketing efforts and several extensions of the bid deadline, however, the Debtors did not receive a bid for the Construction Loans that they believed, in their business judgment, was acceptable.  On December 4, 2007, the Administrative Agent filed its Construction Loan Stay Relief Motion (D.I. 2255), seeking to compel the sale of the Construction Loans to a potential bidder for approximately 30% of UPB, a price the Debtors had already determined was insufficient.  The Administrative Agent complained in its motion that the Debtors had "inexplicably refused" to provide the potential bidder with reasonable due diligence and were "holding the Administrative Agent's collateral hostage."  In point of fact, the Debtors were exploring non-sale alternatives to realizing value from the Construction Loans (including, e.g., offering the borrowers incentives to refinance or otherwise prepay the loans, which would result in the immediate realization of outstanding principal balances).

The Administrative Agent's insistence on selling the Construction Loans provided an opportunity for a consensual resolution of the Construction Stay Relief Motion.  With the approval of the Committee, the Debtors "purchased" the Construction Loans free of the Administrative Agent's liens, and subsequently obtained authority to compromise the Construction Loans in order to facilitate refinancing or other prepayment thereof.  As of April 4, 2008, the Debtors have received approximately $10.3 million—$1.8 million more than the "purchase price" paid to the Administrative Agent—and have approximately $20.3 million more in UPB of Construction Loans to work with.  The Debtors estimate that the final recovery to be realized through holding and compromising the Construction Loans will be $19-$27.3 million, resulting in a net benefit to creditors of approximately $10-$18.3 million.

The Debtors subsequently sold certain non-performing Whole Loans (the "Non-Performing Loans") for a purchase price of 44.37% of UPB, a price that was within the Debtors' target price range.  The remaining Whole Loans, i.e., the "Mortgage Loans" at issue in the Motion, consist generally of *performing* loans.  Given the Projected Cash-Flow Value (as hereinafter defined) of these loans and the depressed state of the secondary mortgage market, the Debtors have concluded that a sale of the Mortgage Loans at this time would not be prudent.  However, consistent with their fiduciary duties to creditors, and notwithstanding the Administrative Agent's bald assertions to the contrary, the Debtors are constantly evaluating the market conditions and all available sale and non-sale alternatives for maximizing the value of the Mortgage Loans.

On February 22, 2008, the Administrative Agent filed the Stay Relief Motion.  The Debtors filed their Preliminary Objection on March 6, 2008.  Thereafter, the parties commenced discovery, and the Administrative Agent and Committee agreed upon and sought

approval of a global settlement stipulation (the "Settlement Stipulation"), to which the Debtors

and others have objected.  The Settlement Stipulation is currently scheduled for April 14, 2008,

two days before the hearing on the Stay Relief Motion.

### PROPOSED DEFINITIONS REGARDING "VALUE"

The term "value" has both a legal sense (i.e, as a term of art under § 361 of the

Bankruptcy Code) and a practical economic sense (i.e., "value" from a business standpoint).  The

essential question presented by the Stay Relief Motion is whether the "value" that is entitled to

adequate protection under § 361 of the Bankruptcy Code more closely resembles the practical

economic "value" assigned by the Administrative Agent or by the Debtors.  Lest the parties

succumb to the logical fallacy of equivocation—i.e., using the same term to mean different

things in the same argument[5]—the Debtors propose abandoning the generic term "value" used in

the Stay Relief Motion and the Preliminary Objection, to the extent possible, in favor of more

analytically precise terms, which have the benefit of crystallizing the parties' respective legal

positions.

### A.    "Cash-Flow Value"

For the purposes of the following discussion, the "Cash-Flow Value" of the

Mortgage Loans (or any subset of Mortgage Loans, including an individual loan) as of a given

moment in time is the net present value ("NPV"), as of such time, of the future income stream

attributable to such Mortgage Loan(s).[6]  Under basic financial valuation principles, it is

---

[5]    The problem of equivocation is particularly evident from the interrogatories exchanged by the parties.  In compromise of objections (from both sides) to certain interrogatories concerning the "value" of the Mortgage Loans, the parties agreed that such interrogatories could be interpreted and answered in light of the answering party's understanding of the term "value."  The result, of course, was that the question posed by one party was not the same question answered by the other party.

[6]    The NPV calculation and the concept of Cash-Flow Value should be non-controversial.  In Till v. SCS Credit Corp., 541 U.S. 465, 474-475 (2004), a plurality of the United States Supreme Court found that the NPV calculation was "familiar in the financial community" and, therefore, was an appropriate metric for determining the

axiomatic that the NPV of a future income stream and the income stream itself are *economic equivalents*—that is, all things held equal, at any given moment a rational investor should be indifferent to receiving the Cash-Flow Value of the future income stream immediately versus receiving the actual income stream over time (and vice-versa).[7]

To arrive at the NPV of a future income stream one would "discount" the future payments by a rate that reflects both (i) lost opportunity cost (i.e., the time value of money) and (ii) the risk of non-payment.[8]

### 1.    "Actual Cash-Flow Value"

For purposes of the following discussion, the "<u>Actual Cash-Flow Value</u>" of the Mortgage Loans (or any subset of Mortgage Loans, including an individual loan) as of a given moment in time is the NPV of the future income stream that *actually will be received* on account of such Mortgage Loans, whether from regular principal and interest payments, refinancings or other prepayments, foreclosure proceeds, REO sale proceeds, or otherwise.  Put another way, Actual Cash-Flow Value (as distinct from *Projected* Cash-Flow Value discussed below) is the Cash-Flow Value one would assign if one had perfect knowledge of the future and could predict with 100% accuracy the amount and timing of all payments.  Because there is no "risk" of

---

"value" of property to be distributed under a chapter 13 plan (i.e., the stream of payments due from the chapter 13 debtor over the life of the plan) for purposes of the § 1325(a)(5)(ii) cramdown provision.  (The remaining members of the Court did not disagree with NPV as the proper metric of "value" for cramdown purposes—they disagreed only as to the appropriate discount rate to use in the NPV calculation.)  Chapter 13 plan payments and residential mortgage loans are analogous insofar as they are both consumer debt obligations susceptible to the same (or at least, *very* similar) valuation methodologies.

[7]    <u>See</u> <u>Till</u>, 541 U.S. at 487 n.1 (Thomas, J., concurring) ("[I]f the relevant interest rate is 10%, receiving $4,000 one year from now is the equivalent to receiving $3,636.36 today.  In other words, an investor would be indifferent to receiving $3,636.36 today and receiving $4,000 one year from now because each will equal $4,000 one year from now.").

[8]    <u>See</u> <u>Till</u>, 541 U.S. at 477 (finding that the discount rate used in the NPV calculation compensates creditors "for the time value of their money and the risk of default").

nonpayment as to amounts absolutely certain to be received, the discount rate used for the NPV

calculation would reflect only opportunity cost and, accordingly, would equal the risk-free rate.[9]

In the absence of perfect knowledge, of course, it is impossible to predict with

100% certainty the amount and timing of future payments.  It is therefore impossible to quantify

Actual Cash-Flow Value unless and until the income stream is completely exhausted, at which

point the amount and timing of the payments is known in hindsight, and one can reconstruct the

Actual Cash-Flow Value historically as of a given moment.  However, because the NPV of an

income stream and the income stream itself are economic equivalents, it follows that the Actual

Cash-Flow Value of the Mortgage Loans and the actual income stream generated by such

Mortgage Loans are, likewise, *economic equivalents*.  Thus, while it may not be possible to

*quantify* the Actual Cash-Flow Value of the Mortgage Loan(s), it is nonetheless possible to

*provide* it (or at least, to provide its "indubitable equivalent"), by ensuring that every payment

that *can* be collected under the circumstances *is in fact* collected (i.e., by ensuring that the loans

are *properly serviced*).

**As discussed below, the Debtors contend that, with respect to the Mortgage**

**Loans, *Actual Cash-Flow Value* is the "value" that is entitled to adequate protection for**

**purposes of § 361 of the Bankruptcy Code.**

### 2.    "Projected Cash-Flow Value"

For purposes of the following discussion, the "Projected Cash-Flow Value" of the

Mortgage Loans (or any subset of the Mortgage Loans, including an individual loan) as of a

given moment in time is the NPV of the future income stream that is *anticipated will be received*

on account of such Mortgage Loans, whether from regular principal and interest payments,

---

[9]    Accord <u>Till</u>, 541 U.S. at 479 n. 18 (noting that "if the court could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cram down loans").

refinancings or other prepayments, foreclosure proceeds, REO sale proceeds, or otherwise. Put another way, Projected Cash-Flow Value represents one's best guess as to Actual Cash-Flow Value at any given moment in time.

Because it is not possible to know exactly when and in what amount payments will in fact be received, the discount rate used for the NPV calculation consists of the risk-free rate plus a "risk premium" which is proportional to the uncertainty of payment. The applicable discount rate, and therefore Projected Cash-Flow Value, fluctuates regularly as investors react to new information that leads them to re-price the risk premium associated with the Mortgage Loans.[10]

### B.    "Market Value"

For purposes of the following discussion, the "<u>Market Value</u>" of the Mortgage Loans at a given moment in time is the price that would be obtained in a well-run auction of such loans at that time. Market Value is in large part a function of Projected Cash-Flow Value as determined by the potential bidders.[11] However, Market Value is also a function of supply and demand. Thus, for example, motivated sellers unloading mortgage loans onto the secondary market in order to preserve liquidity (leading to a glut of supply) and/or a general perception among investors that mortgage assets are more risky than comparable non-mortgage assets

---

[10]    (Expert Report of Robert R. Branthover (the "<u>Branthover Report</u>") p. 8 ("The discount rate must take into account market perceived risks with respect to residential mortgage loans and will change over time as the marketplace perceives changes in the degree of risk associated with residential mortgage loans, both generally and directly related to specific portfolios of mortgage loans.").)

[11]    (Branthover Report p. 8 ("Residential mortgage loans are generally valued in a few ways, depending on the age of the loan, but ultimately the expected cash flow discounted at a market discount rate will provide pricing for the value of a pool of mortgages.").)

(leading to weakened demand) can exert downward pressure on prices such that the Market

Value for a given portfolio of loans is less than its Projected Cash-Flow Value.[12]

**The Administrative Agent contends that, with respect to the Mortgage**

**Loans, *Market Value* is the "value" that is entitled to adequate protection for purposes of**

**§ 361 of the Bankruptcy Code.[13]**

## ARGUMENT

I.    **The Debtors are the Presumptive and Proper Custodians of Property of the Bankruptcy Estates and Have Discharged their Statutory Duties Throughout these Chapter 11 Cases; There is No Basis for Installing the Administrative Agent as Custodian of the Mortgage Loans**

Section 362(d)(1) of the Bankruptcy Code requires the Court to grant relief from

the automatic stay "for cause".  11 U.S.C. § 362(d)(1).  Neither the statute nor the legislative

history define the term "cause," and the legislative history gives only minimal guidance.  Sonnax

Indus. v. Tri Component Prods. Corp. (In re Sonnax Indus.), 907 F.2d 1280, 1285-1286 (2d Cir.

---

[12]    (Expert Report of Maureen Bolton (the "Bolton Report") pp. 9-10 ("Due to volatile mark-to-market pricing, heightened concerns of regulators, board members and shareholders regarding residential mortgages and RMBS, investors that otherwise would be interested in purchasing high quality residential mortgage portfolios such as AHM's are no longer participating in portfolio auctions or negotiated sales of whole loan mortgage pools. . . . The few residential mortgage portfolios or RMBS, which have been sold in recent weeks, are reported to have been priced at large discounts.  Not surprisingly, such sales are involuntary, *i.e.*, forced or motivated by warehouse or other secured lenders calling loans secured by residential mortgages or RMBS due to substantial declines in the market values of such assets, regardless of their cashflow or potential appreciation.  Regulated financial institutions have also sold residential mortgage and RMBS portfolios at sizeable losses in order to quickly eliminate their exposure to mortgages in order to appease shareholders and regulators.  Hedge funds seeking to appease investors demanding fund redemptions have also been forced to sell mortgages and related assets prematurely.").)

[13]    (See Stay Relief Motion ¶ 1 ("[G]iven the well-known and well-established negative conditions that have prevailed for months and continue to prevail in the market for such loans, the value of the Mortgage Loans has declined precipitously since the Petition Date and will likely continue to decline.") and ¶ 31 ("[G]ambling with the secured creditors' collateral on the mere hopes of a market rebound at some time in the future does not constitute adequate protection."); Response to Debtors' Interrogatory No. 2 ("[Q:] Describe all of Your communications regarding how to value the Mortgage Loans, including discussions of various methodologies to be used to determine or estimate the current and/or future value of the Mortgage Loans.  [A:]  . . . [T]he Administrative Agent . . . has had communications with employees of Banc of America Securities LLC regarding obtaining pricing estimates for the Mortgage Loans under then current market conditions assuming a well run auction were conducted.") and No. 4 ([Q]: Describe all methodologies You . . . have used since the Petition Date to value the Mortgage Loans.  [A:] . . . [T]he methodology used concerning pricing estimates to value the Mortgage Loans . . . was based upon then current market conditions if a well run auction were conducted.").)

1990).  Thus, the "facts of each request will determine whether relief is appropriate under the circumstances."  Id. at 1286 (quoting H.R. Rep. No. 95-595, at 343-44 (1977), reprinted in 1978 U.S.C.C.A.N. 6300); Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999).  "Cause" under § 362(d)(1) is "viewed as a broad and flexible concept," In re The Score Board, Inc., 238 B.R. 585, 593 (D.N.J. 1999), and the Court has "the flexibility and the discretion to fashion the relief to the circumstances of the particular matter," In re Mattera, Case No. 05-39171 (DHS), 2006 Bankr. LEXIS 4083, *13 (Bankr. D.N.J. Feb. 6, 2006) (unpub. letter op.).

To the extent the Administrative Agent's generalized complaints about the Debtors' conduct in the management of their bankruptcy estates are aimed at establishing some generic form of "cause" for stay relief separate and independent from the adequate protection argument discussed below, the Court should disregard them.  The Debtors have done nothing wrong, and there is simply no basis—statutory or otherwise—for putting the Administrative Agent in charge of disposing of the Mortgage Loans.  See In re Lehigh Valley Prof'l Sports Clubs, Inc., Case No. 00-11296DWS, 2001 Bankr. LEXIS 1245, *23 (Bankr. E.D. Pa. Sept. 7, 2001) ("On what basis should I allow the [movant] to take possession of estate assets? . . . . [T]he [movant] cites no case nor does my research reveal one that has found, in the absence of some demonstrated contractual right, 'cause' to allow a third party to take control of a debtor's property because it decides that everyone will be better off with its plan for the use of it.").  Indeed, the Administrative Agent had no complaint with the Debtors when they successfully sold their Servicing Assets for in excess of $500 million, paid the Administrative Agent its asking price for the Construction Loans, or achieved a satisfactory result in a very difficult market in the sale of the Non-Performing Loans.

A.    **The Bankruptcy Code Places the Chapter 11 DIP at the Helm
of its Bankruptcy Case, and Makes no Distinction Between
Liquidating and Non-Liquidating Cases**

The Administrative Agent glibly states that the "Bankruptcy Code and the case

law are designed to prevent" the Debtor from retaining control over the orderly liquidation of its

bankruptcy estates, citing for this novel proposition a case decided under § 362(d)(2) of the

Bankruptcy Code, which the Administrative Agent has *not* asserted as a basis for relief from the

stay.  See In re Efcor, Inc., 74 B.R. 837, 845 (Bankr. E.D. Pa. 1987).

To the contrary, the Bankruptcy Code expressly provides for the DIP to retain

control over its bankruptcy case, and makes no distinction between "liquidation" and

"reorganization."  See 11 U.S.C. § 1101 (installing debtor as DIP) and § 1107 (rights, powers,

and duties of DIP).  In the usual chapter 11 proceeding, the debtor remains in possession

throughout the case because "current management is generally best suited to orchestrate the

process of rehabilitation for the benefit of creditors and other interests of the estate."  In re

Marvel Ent'mt Group, 140 F.3d 463, 471 (3d Cir. 1998) (quoting In re V. Savino Oil & Heating

Co., 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989)).  Furthermore, the DIP "is a fiduciary of the

creditors and, as a result, has an obligation to refrain from acting in a manner which could

damage the estate, or hinder a successful reorganization."  Id. (quoting Petit v. New England

Mortgage Servs., 182 B.R. 64, 69 (D. Me. 1995) (internal quotations omitted)).  The strong

presumption in favor of permitting the DIP to control the bankruptcy case "also finds its basis in

the [DIP]'s usual familiarity with the business it had already been managing at the time of the

bankruptcy filing, often making it the best party to conduct operations during the

reorganization."  Id. (citing In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989)).

Consistent with their rights and responsibilities as estate representative and

fiduciary for all creditors, the Debtors in these cases, unremarkably, have exercised their

20

business judgment not to sell the Mortgage Loans because they believe there are better value-maximizing alternatives.  To suggest that this is somehow contrary to the Bankruptcy Code and against the weight of established case law simply because the Debtors no longer operate as a going concern is, in a word, absurd.

> **B.**     **The Bankruptcy Code Permits the Debtors to Sell (or not to Sell) Property of the Estate; It Does Not Impose an Affirmative Duty to Liquidate, Whether Expeditiously or Otherwise**

The Administrative Agent references in the Stay Relief Motion the Debtors' alleged "failure" to expeditiously liquidate the Mortgage Loans.  But the Debtors are under no such obligation.  Compare 11 U.S.C. § 1107 (duties of debtor in possession include certain duties of chapter 11 trustee) and § 1106(a) (duties of chapter 11 trustee include certain duties of chapter 7 trustee) with § 704(a)(1) (duty of chapter 7 trustee to expeditiously "collect and reduce to money the property of the estate"; *not* incorporated by § 1106(a)).  The Bankruptcy Code *permits* the Debtors to use, sell, or lease property of the estate (and, presumably, *not to* use, sell, or lease), 11 U.S.C. § 363, and, so long as the Debtors have a sound business purpose in so doing (or not doing), they generally should not be second-guessed, see In re Global Home Prods., LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (holding that the use of property under § 363 is governed by a liberal "business judgment" standard).  The Bankruptcy Code also *permits* the Debtors to transfer or sell property of the estate pursuant to a plan of reorganization, 11 U.S.C. § 1123(a)(5)(B) & (D), and provides the Debtors a period within which it has the exclusive right to propose such a plan, 11 U.S.C. § 1121(b).  Nothing in the Bankruptcy Code *requires* the Debtors to sell property of the estate, *much less* to sell it within the exclusivity period prior to disclosure of the Debtors' plan of reorganization.  Put simply, it is the Debtors' prerogative whether to hold or sell the Mortgage Loans (or, conceivably, transfer them into a post-

confirmation trust pursuant to a plan of reorganization), subject to the Administrative Agent's right to seek adequate protection if it believes it is entitled to it.  However, the Debtors' exercise of their statutory discretion alone cannot constitute "cause" for relief from the automatic stay.

### C.    Except in Limited Circumstances not Present Here, There is No Duty to Provide Adequate Protection to a Secured Creditor Absent a Formal Request

The Administrative Agent complains throughout the Stay Relief Motion of the Debtors' "failure" to provide adequate protection in response to its informal overtures, which obviously implies that the Debtors were under some affirmative duty to provide the Administrative Agent adequate protection prior to the formal request embodied in the Stay Relief Motion.  However, this is simply not the case.  As § 361 of the Bankruptcy Code makes clear, adequate protection is required only under §§ 362, 363, or 364.  11 U.S.C. § 361.  The obligation to provide adequate protection arises automatically whenever the debtor in possession (i) uses cash collateral pursuant to § 363(c)(2) or (ii) grants a priming or *pari passu* lien on encumbered property pursuant to § 364(d).  Otherwise, the obligation to provide adequate protection arises only "on request of a party in interest" under § 362(d)(1) (for relief from the automatic stay for lack of adequate protection) or § 363(e) (to prohibit or condition proposed use, sale, or lease of estate property).  Because the Mortgage Loans are not cash collateral and the Debtors have not purported to grant a lien in them pursuant to § 364, any obligation of the Debtors to provide adequate protection to the Administrative Agent with respect to the Mortgage Loans could have arisen only under § 362(d)(1) or § 363(e), either of which would have required a formal "request" from the Administrative Agent.

In light of the structure of the Bankruptcy Code's adequate protection provisions, it is well-established that "adequate protection may only be awarded from the date movants seek

relief" under § 362(d)(1) and/or § 363(e).  In re Continental Airlines, 146 B.R. 536, 539-540

(Bankr. D. Del. 1992) (citing In re Best Prods. Co., 138 B.R. 155 (Bankr. S.D.N.Y. 1992)); *see*

In re Wilson, 70 B.R. 46, 48 (Bankr. N.D. Ill. 1987).  Accordingly, for adequate protection

purposes, a secured creditor's lien in collateral is appropriately valued as of the date of the

adequate protection request (as opposed to the bankruptcy filing date), and the creditor is only

entitled to receive adequate protection of its lien against subsequent decline in value (as opposed

to all post-petition decline in value).  Id.  The benefits of this bright-line rule are twofold: "First,

the rule does not reward the creditor for inaction . . . .  Second, th[e] rule puts the debtor on

notice at the time the creditor's motion is filed that at a future point in time the collateral will

have to be relinquished or payments will have to be made."  Wilson, 70 B.R. at 48.

           In the Cash Collateral Order, the Administrative Agent explicitly consented to the

Debtors' "use" of the Mortgage Loans, subject to certain bargained-for protections such as the

grant of a post-petition lien in the Mortgage Loans and proceeds thereof, remittance of all

collections from such loans to collateral accounts for the benefit of the Administrative Agent,

and certain periodic cash payments.  The Cash Collateral Order expired on November 16, 2007.

Between that date and February 22, 2008, the Administrative Agent made no formal request

under § 362(d)(1) or § 363(e) for additional adequate protection of its lien in the Mortgage

Loans.  And now, several months after the Debtors rejected the Administrative Agent's proposed

adequate protection stipulation and rebuffed the Administrative Agent's proposed time frame for

the sale of the Mortgage Loans, the Administrative Agent cries foul and asserts what appears to

be a wholly inappropriate demand for adequate protection retroactive to the Petition Date.

           Ultimately the Administrative Agent's adequate protection demand (whether

retroactive or prospective) is of no consequence, because, as discussed below, (i) the Actual

Cash-Flow Value of the Mortgage Loans has remained (and will remain) essentially static during

these bankruptcy cases, and (ii) at any rate, the Administrative Agent has been (and will be)

adequately protected at all times.  However, even if the Court were to conclude that Market

Value is the appropriate measure of "value" for adequate protection purposes, any diminution in

Market Value between the Petition Date and the filing of the Stay Relief Motion is *irrelevant*.

The Administrative Agent delayed formally requesting adequate protection at its own peril,[14] and

any harm resulting from such delay is the Administrative Agent's own fault.

> **D.    The Debtors are More Than Capable of "Managing" the Mortgage Loans, and Their Business Judgment is Demonstrably Superior to that of the Administrative Agent**

The Administrative Agent would have this Court believe that the "management"

of the Mortgage Loans requires the full resources, expertise, and industry presence of an

institution such as Bank of America, N.A.  Of course, for practical purposes the Mortgage Loans

are simply numbers on a servicing tape, which generate a stream of income that is channeled

directly into the Administrative Agent's collateral accounts.  All of the heavy lifting is done by

Wilbur Ross, which currently acts as servicer for the Mortgage Loans.[15]  Watching the secondary

mortgage markets for opportunities to sell the Mortgage Loans is not particularly difficult, and at

any rate does not require the kind of manpower the Administrative Agent will claim it does.  The

Debtors can (and do) prepare internal estimates of Projected Cash-Flow Value, which they can

(and do) measure against estimates of current Market Value.  If at any time the Market Value for

a given pool of Mortgage Loans is higher than the Projected Cash-Flow Value, then the Debtors

---

[14]    See, e.g., Bluebird Partners, L.P. v. First Fid. Bank, N.A., 85 F.3d 970, 972 (2d Cir. 1996) (lawsuit against indenture trustee alleging breach of fiduciary duty on account of (i) trustee's failure to make formal adequate protection demand and (ii) subsequent decline in value of collateral; suit dismissed for lack of standing).

[15]    Indeed, the Administrative Agent fully supported the sale to Wilbur Ross and consented to its servicing of the Mortgage Loans.

will obviously sell the loans.  If not, then the Debtors will hold the Mortgage Loans, collect the

P&I and use it to pay down the Indebtedness.  It is a rather simple process.

       The Administrative Agent, despite having a considerable manpower advantage

over the Debtors, does not consider (or at least, has not yet considered) the Projected Cash-Flow

Value of the Mortgage Loans when deciding how best to "maximize" their value.  This myopic

focus on Market Value has already led the Administrative Agent to forego more than$10 million

in value in connection with settlement of the Construction Loan Stay Relief Motion, all in the

name of liberating its Construction Loan collateral from the clutches of the Debtors, who were

"holding it hostage" at the time.

       The Construction Loans are obviously not the only success the Debtors have had

thus far in these chapter 11 cases.  Indeed, as the Stay Relief Motion points out, the Debtors have

liquidated substantially all of the Administrative Agent's collateral—including the Servicing

Assets, through a very complex, yet expedited sale process—resulting in the paydown of the

Indebtedness by approximately $600 million postpetition.  In light of the Debtors' track record, it

is unlikely that the Debtors would somehow stop seeking to maximize the value of estate assets

at this crucial stage in these chapter 11 cases, or that the Debtors would arbitrarily discriminate

against the Administrative Agent or the Mortgage Loans as the Stay Relief Motion suggests.

     **E.**    **If Anything, the Impending "Battle of the Experts" Will
Establish that Reasonable Minds Can Differ as to the Proper
Course of Action with Respect to the Mortgage Loans; Under
Such Circumstances, the Bankruptcy Code Mandates
Deference to the Debtors' Business Judgment**

       At trial the Court will hear from two experts whose views as to the proper

disposition of the Mortgage Loans are diametrically opposed.  Mr. Branthover, the

Administrative Agent's expert witness, believes the Mortgage Loans should have been sold

several months ago for a small loss, and should be sold immediately for a bigger loss, so as to prevent an even bigger loss upon a sale in the future.  Ms. Bolton, the Debtors' witness, believes that the secondary mortgage market is operating inefficiently such that Market Value is significantly less than Cash-Flow Value, and that those who have the luxury of holding mortgage loan assets (e.g., the Debtors), should hold them because to sell them now would be akin to selling cash at a discount.  Ms. Bolton believes that recent governmental responses to the illiquidity in the secondary mortgage market will have a positive effect on Market Value going forward.  Mr. Branthover, for his part, is skeptical of the government's ability to stimulate the market.

While the Debtors ultimately place more credence in Ms. Bolton's position than Mr. Branthover's position, the Court may well find some truth in both.  If so, then the "battle of the experts" will have established merely that, in these trying times of historic turmoil in the mortgage industry, reasonable minds can differ as to how to proceed with respect to the Mortgage Loans.  Where reasonable minds can differ, however, the Bankruptcy Code requires deference to the Debtors' business judgment.

## II.    The Administrative Agent Has Not Alleged, and Cannot Establish, a *Prima Facie* case for "Cause" for Relief from the Automatic Stay for Lack of Adequate Protection

Section 362(d)(1) of the Bankruptcy Code provides for modification of the automatic stay on request of a party in interest "for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).  Under § 362(g), the moving party has the burden of proof as to the debtor's lack of equity in the property at issue, and the party opposing relief from the stay has the burden on all other issues. 11 U.S.C. § 362(g).  "Nonetheless, the moving party first must establish its *prima facie* case.

Failure to prove a *prima facie* case requires denial of the requested relief."  In re RNI Wind Down Corp., 348 B.R. 286, 299 (Bankr. D. Del. 2006) (Sontchi, J.) (citing Sonnax Indus. v. Tri Component Prods. Corp. (In re Sonnax Indus.), 907 F.2d 1280, 1285 (2d Cir. 1990) ("If the movant fails to make an initial showing of cause, . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.")).

As discussed in the Preliminary Objection, the Stay Relief Motion, though rich in hyperbole and irrelevant factual allegations, is silent on most of the necessary elements of the Administrative Agent's *prima facie* case.  The essential factual allegations in the Stay Relief Motion are as follows: (i) the Mortgage Loans, which have an aggregate UPB of approximately $584 million, are the "principal" remaining collateral securing a claim of approximately $505 million; and (ii) the Market Value of the Mortgage Loans has decreased by some amount since the Petition Date, and there is a "significant risk" of decrease in the Market Value of the Mortgage Loans by some amount going forward.  Relying solely on a line of cases involving *under*secured creditors, the Administrative Agent argues that depreciation in the Market Value of the Mortgage Loans, by itself, constitutes *prima facie* "cause" for relief from the automatic stay pursuant to § 362(d)(1).

In the Preliminary Objection, the Debtors seriously questioned whether the factual allegations in the Stay Relief Motion, *even if taken as true*, would be sufficient to make a *prima facie* showing of "cause" for relief from the automatic stay for lack of adequate protection, especially in light of the Administrative Agent's assertion in the Cash Collateral Order that its claim was *over*-secured.  The Debtors assumed that discovery would clarify the Administrative Agent's position and put some flesh on the bones of the Stay Relief Motion.  For the most part, however, it did not.

Accordingly, the Debtors hereby incorporate by reference and renew the arguments raised in the Preliminary Objection, certain of which are summarized and/or developed further below in light of information obtained during discovery.

A. **Diminution in the value of *collateral*, without more, does not establish "cause" for relief from the stay; to make its *prima facie* case, the Administrative Agent must allege diminution in the value of its *lien***

The Administrative Agent is not entitled to adequate protection of the value of *the Mortgage Loans* as such. Rather, the Administrative Agent is entitled to adequate protection of the value of its *interest in* the Mortgage Loans, i.e., its *lien*.

> A security interest is—a security interest. It is not a fee simple. [The Administrative Agent] does not *own* [$584 million in UPB of Mortgage Loans] or the [cash proceeds they] throw[] off month after month, year after year. It is just a creditor with a *claim* currently worth about $[505] million that it has secured with liens against the [Mortgage Loans] and [their proceeds], to assure repayment. It has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest. It has every right to complain if the [Debtors] monkey[] with the security in a way that endangers its claim, but it does not argue that its *claim* is endangered by any of the steps of which it so bitterly complains.

In re James Wilson Assoc., 965 F.2d 160, 171 (7th Cir. 1992) (emphasis added) (citations omitted); see In re Lane, 108 B.R. 6, 8 (Bankr. D. Mass. 1989). In other words, an equity cushion *is* adequate protection—it is not *entitled* to adequate protection. See id.

B. **Because the Administrative Agent has an Equity Cushion, it Must Expand its *Prima Facie* Case to Include Some Explanation of Why its Equity Cushion is Inadequate Protection**

If a lien is undersecured (or exactly secured) then a decline in the value of the collateral results in a concomitant decline in the value of the lien. See, e.g., United States Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370 (1988). However, if a lien is oversecured, and thus protected by an equity cushion, it does not necessarily follow

that a decline in the value of the collateral corresponds to a decline in the value of the lien. Thus, mere allegations of diminishing collateral value are insufficient for an oversecured creditor to make its threshold showing of a "lack of adequate protection" under § 362(d)(1)—it must expand its *prima facie* case to include some explanation as to why its equity cushion is inadequate. See In re Morysville Body Works, Inc., 86 B.R. 51, 57 (Bankr. E.D. Pa. 1988) (no *prima facie* cause where creditor failed to establish insufficiency of equity cushion); In re Jug End in Berkshires, Inc., 46 B.R. 892, 900 (Bankr. D. Mass. 1985) (burden shifts to debtor where creditor establishes "*prima facie* case under § 362(d)(1) of an inadequate equity cushion"); In re Kane, 27 B.R. 902, 905 (Bankr. M.D. Pa. 1983) (*prima facie* cause requires showing the equity cushion is inadequate).

In the Cash Collateral Order, the Administrative Agent asserted that its claim is oversecured, and the Debtors agreed not to deny this assertion. In the Construction Loan Stay Relief Motion, the Administrative Agent sought relief from the stay under § 362(d)(2), alleging that the Debtors lacked equity in the Construction Loans, which obviously suggested that the Administrative Agent's claim was undersecured at that time. The Administrative Agent apparently reconsidered its legal strategy for purposes of the Stay Relief Motion, seeking relief under § 362(d)(1) only. However, based on the Administrative Agent's assertion in the Stay Relief Motion that diminution in the value of the Mortgage Loans was sufficient to establish *prima facie* "cause" under § 362(d)(1), it appeared the Administrative Agent, though it had not moved under § 362(d)(2), nevertheless believed it was undersecured. Naturally, the Debtors sought clarification from the Administrative Agent during discovery, at which point they learned that the Administrative Agent "has not contended that the Indebtedness is under-collateralized." (Resp. to Debtors' Interrogatory No. 17.) Thus, as it stands now, the Administrative Agent has

previously asserted that it is oversecured, and does not now contend it is undersecured.  By

process of elimination, the Administrative Agent is either *exactly* secured, or oversecured.

However, since the Debtors may not deny that the Administrative Agent is oversecured, they

must assume that the Administrative Agent's lien in the Mortgage Loans is protected by an

equity cushion in some amount.  If this is the case, then the Administrative Agent must explain

why this equity cushion is inadequate protection.

    **C.**      **To establish the inadequacy of its equity cushion, the Administrative Agent must quantify: (i) the aggregate value of the collateral securing the Indebtedness and (ii) the rate at which the Mortgage Loans are declining in value**

To establish the inadequacy of its equity cushion the Administrative Agent must

quantify both the amount of the equity cushion and the rate of decline in value of the Mortgage

Loans.  See In re Reice, 88 B.R. 676, 684 (Bankr. E.D. Pa. 1988) (finding that "vague,

undocumented allegations that the [collateral] is depreciating by an unspecified dollar amount"

were insufficient to establish "cause" for relief from the stay).  To quantify the amount of the

equity cushion, the Administrative Agent must quantify the aggregate value of the Mortgage

Loans and all other collateral securing the Administrative Agent's claim.  In re Beaver Valley

Builder's Supply, Inc., 177 B.R. 507, 515-16 (Bankr. W.D. Pa. 1995);[16] see In re Opelika Mfg.

---

[16]    The court explained that, were this otherwise, "an overzealous lienholder might under certain circumstances obtain relief from the automatic stay where it would be inappropriate."  Beaver Valley, 177 B.R. at 515-16.

    Assume, for instance, that A, B, and C all are in bankruptcy; that the value of the assets of A, B, and C is less taken individually than the amount of D's lien; and that the value of their assets taken collectively exceeds the amount of D's lien.

    If the value of A's, B's, and C's assets are considered in isolation; and if D were to proceed against only A's assets, and then against only B's assets, and finally against C's assets, D would be entitled to relief from the automatic stay with respect to all three debtors even though the combined value of their assets exceeds the amount of D's lien.

    Under this scenario, D would be able to take action against the assets of all three debtors even though they collectively have equity therein. Any equity that exists may not be available for distribution to other creditors. Such an outcome is not in keeping with one of the fundamental tenets of bankruptcy.

Corp., 66 B.R. 444, 448 (Bankr. N.D. Ill. 1986) (determining amount of equity in property requires consideration of secured creditor's "entire security package, not just a portion thereof"). The Administrative Agent cannot meet this burden, however, because it "has not quantified the extent of the decrease in the value of the Mortgage Loans."  (Resp. to Debtors' Interrogatory No. 9.)  Accordingly, the Administrative Agent cannot establish its *prima facie* case for "cause" for relief from the stay.

**III.    Even if the Administrative Agent Makes a *Prima Facie* Showing of "Cause" For Relief from the Automatic Stay, the Debtors will Meet their Burden of Establishing their Entitlement to the Continued Protection of the Stay**

Should the Administrative Agent clear the significant hurdles it has placed in front of itself in connection with its *prima facie* showing of lack of adequate protection, the Debtors are prepared to satisfy their burden of establishing entitlement to the continued protection of the automatic stay on two independent bases: first, that the Actual Cash-Flow Value of the Mortgage Loans, which is the proper metric of "value" for adequate protection purposes, has remained essentially static during these chapter 11 cases and is not declining; second, that the Administrative Agent, by receiving the actual income stream generated by the Mortgage Loans, is receiving the "indubitable equivalent" of its lien in the Mortgage Loans and is therefore adequately protected.

**A.    The Mortgage Loans are not Declining in "Value" for Adequate Protection Purposes**

As it had in the Construction Loan Stay Relief Motion, the Administrative Agent in the Stay Relief Motion presupposes that "value" of the Mortgage Loans for adequate protection purposes is their Market Value.  However, "value" under § 361 of the Bankruptcy Code is not a "one-size-fits-all" concept.  As noted in the legislative history to § 361:

Id.

The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. *It is expected that the courts will apply the concept in light of facts of each case and general equitable principles.* It is not intended that the courts will develop a hard and fast rule that will apply in every case. The time and method of valuation is not specified precisely, in order to avoid that result. There are an infinite number of variations possible in dealings between debtors and creditors, the law is continually developing, and new ideas are continually being implemented in this field. *The flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.*

Neither is it expected that the courts will construe the term value to mean, in every case, forced liquidation value or full going concern value. There is wide latitude between those two extremes.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 338-40 (1977) (emphasis added).

If the Stay Relief Motion is any indication, the Administrative Agent will likely cite any number of cases where relief from the automatic stay was granted with respect to collateral that does not at all resemble the Mortgage Loans—e.g., a consumer debtor's automobile[17] or residence;[18] single-asset real estate (e.g., a hotel);[19] or the plant, equipment, and/or inventory of a going-concern business.[20] This is not surprising, insofar as the adequate protection of a security interest in residential mortgage loans is (at least, so far as the Debtors are aware) uncharted territory in the reported case law. In the absence of guidance from cases involving assets similar to the Mortgage Loans, however, the Court should resist the urge to

---

[17]    A consumer debtor's automobile is a rapidly depreciating, non-income producing asset, for which Market Value is the only metric of "value" for adequate protection purposes.

[18]    A residence, of course, is an entirely different animal than a residential mortgage loan—the former is a fixed, non-income generating real property asset, while the latter is an income-producing debt instrument that is *secured* by a fixed real property asset.

[19]    While Cash-Flow Value of income-producing real property may be an appropriate metric of "value" for adequate protection purposes, this value (unlike the Cash-Flow Value of a residential mortgage loan) will be heavily dependent on the debtor's management acumen and prospects for reorganization, which often drive the outcome in single-asset real estate cases. The Mortgage Loans, by way of contrast, are "managed" by a third-party servicer completely independent of who owns them.

[20]    Like income-producing real property, the Cash-Flow Value of plant and equipment depends heavily on who owns and manages them. In addition, under certain circumstances, Market Value may be a better metric of the "value" of plant and equipment for adequate protection purposes. Inventory is generally valued at Market Value, and may be subject to risks of seasonality, obsolescence, and/or deterioration that have little in common with the risks inherent in Mortgage Loans.

employ rules of law developed to deal with other, dissimilar forms of collateral and should instead retreat to first principles.

The concept of "adequate protection" is rooted both in the Fifth Amendment's Due Process Clause (protecting property interests) as well as a bankruptcy policy favoring preserving the essential benefit of a secured creditor's bargain under state law. See generally In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1389-1401 (5th Cir. 1986) ("Timbers Cir."), aff'd sub nom. United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988) ("Timbers U.S."); see also In re Cason, 190 B.R. 917, 928 (Bankr. N.D. Ala. 1995) ("Adequate protection protects Fifth Amendment property rights and replaces the secured creditor's right of possession." (citing United States v. Whiting Pools, Inc., 462 U.S. 198, 207 (1983)). Adequate protection is not intended to compensate a secured creditor for lost opportunity costs resulting from its inability to foreclose upon and liquidate its collateral. Timbers U.S., 484 U.S. at 370-371 (rejecting argument that the "interest in property" entitled to adequate protection "also includes the secured party's right (suspended by the stay) to take immediate possession of the defaulted security, and apply it in payment of the debt"). Rather, the purpose of adequate protection is to *preserve* the secured creditor's collateral position against diminution during the pendency of the automatic stay. Timbers Cir., 793 F.2d at 1389 (5th Cir. 1986) ("Our examination of the language of the adequate protection provisions suggests that they were intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay.")

Evaluating the nature and characteristics of the Mortgage Loans in light of the purposes of adequate protection, it is clear that the Mortgage Loans' Actual Cash-Flow Value is the "value" entitled to adequate protection under § 362(d)(1) of the Bankruptcy Code.

**1.    The Actual Cash-Flow Value of the Mortgage Loans was fixed upon their origination and neither increases nor decreases over time**

By definition, the Actual Cash-Flow Value of a Mortgage Loan—i.e., the Cash-Flow Value one would assign to the loan given perfect knowledge of the amount and timing of the future payments—is fixed as of the moment the loan is originated and neither increases nor decreases over time (except insofar as it decreases in proportion to the income thrown off).  That is to say, once the extension of credit is made to the borrower, the loan is a *fait accompli*, and all future risks of nonpayment are built into the loan.  As with any true "debt" instrument, the lender's potential upside benefit is capped at the amount of the interest borne by the loan.  In practice, this interest rate may or may not be sufficient to compensate the lender for the "true" risk of nonpayment embedded in the loan.[21]  In any event, once the loan is originated, it cannot be un-originated, and all the lender and any subsequent holder of the loan can really do to maximize the return on their investment is to engage a servicer (or perform servicing itself) who will ensure that every payment that can be collected from the borrower under the circumstances (such as they may be at any given time) is in fact collected.

Beyond servicing, there is nothing a holder of a loan can do or not do that will affect the Actual Cash-Flow Value of the loan.[22]  And while the market's *perception of the risk* associated with the loan will change over time in response to changing conditions, which will have an obvious effect on the Projected Cash-Flow Value and the Market Value of the loan, the *actual risk* associated with the loan (and thus, its Actual Cash-Flow Value), is what it is.  It is therefore somewhat misleading to characterize the volatility in the Projected Cash-Flow Values

---

[21]    Till v. SCS Credit Corp., 541 U.S. 465, 488 n.3 (Thomas, J., concurring) (2004) (noting that, "in an efficient market, th[e true] risk [of default] has been (or will be) built into the interest rate of the original loan").

[22]    An element of servicing, of course, is the pursuit and/or facilitation of refinancing when appropriate, whether through the servicer's own loan origination platform or by a third-party lender.  In a competitive lending market, the fact that a servicer lacks its own loan origination platform (e.g., AH Acquisition Co., Inc.) is of little consequence in terms of its ability to get loans refinanced.

and Market Values of residential mortgage loans as increasing or decreasing the "value" of the loans in some absolute sense of the word. In reality, the market is simply "re-pricing" the risk premium previously assigned to those loans to more closely approximate the risk premium that, in a perfectly efficient market, would have been assigned to the loans (and reflected in their interest rate) when they were originated.

> 2.    **The Actual Cash-Flow Value of the Mortgage Loans is the appropriate metric of "value" for adequate protection purposes**

Insofar as the purpose of adequate protection is to preserve—and not to improve—the secured creditor's collateral position during the pendency of the bankruptcy case, it follows that the Actual Cash-Flow Value of the Mortgage Loans is the "value" protected by § 362(d)(1) of the Bankruptcy Code. That the Actual Cash-Flow Value is discernible only in hindsight is perfectly consistent with § 507(b) of the Bankruptcy Code, which employs a backward-looking test for determining the amount (if any) of a secured creditor's super-priority claim resulting from adequate protection that turned out to be inadequate. Moreover, as discussed below, the ability to provide the "indubitable equivalent" of the Actual Cash-Flow Value of residential mortgage loans—i.e., by ensuring the loans are properly serviced and remitting the income stream generated from the loans into a collateral account for the benefit of the secured creditor—makes it possible to grant adequate protection prospectively without having to engage the services of an omniscient appraiser to establish the Actual Cash-Flow Value as of the date of the adequate protection demand. That the Actual Cash-Flow Value of the Mortgage Loans is the appropriate metric of "value" for adequate protection purposes is further demonstrated in light of the consequences of tying adequate protection to Projected Cash-Flow Value and Market Value.

Adopting Projected Cash-Flow Value would impose significant evidentiary burdens on the parties and the Court, as it would require consideration of expert valuation testimony in order to establish a baseline for determining whether, and to what extent, the "value" of the Mortgage Loans would decline in the future.  After hearing this evidence, the Court could establish a baseline "value" and, perhaps, an amount of any periodic cash payments the Debtors would be required to make in order to continue to hold the Mortgage Loans. However, if the Actual Cash-Flow Value going forward turned out to be higher than the Projected Cash-Flow Value established at the valuation hearing, the Administrative Agent's collateral position would have actually *improved* as a result of the putative "adequate protection" payments.  And if the Actual Cash-Flow Value going forward turned out to be *lower* than the Projected Cash-Flow Value, the Administrative Agent would no doubt be back in Court demanding additional cash to cover this shortfall.  However, this would essentially reward under-pricing the risk associated with the Mortgage Loans, insofar as a *better*, *more accurate valuation* at the initial hearing would have foreseen the amount of this additional decline, and therefore would have produced a lower Projected Cash-Flow Value.  The result, again, is that the Administrative Agent's collateral position is *improved* by the amount of any putative "adequate protection" payments that were keyed to the overly inflated Projected Cash-Flow Value.

Tying adequate protection to Projected Cash-Flow Value would similarly reward the Administrative Agent's under-pricing of its own collateral risk (in the warehouse credit agreement) by forcing the Debtors' bankruptcy estates to act as *de facto* mortgage insurers for the benefit of the Administrative Agent.  In an efficient market, the "true" risk of default would have been built into the interest rate charged to the borrower under each of the Mortgage Loans constituting the Administrative Agent's collateral, and the Projected Cash-Flow Value and

Actual Cash-Flow Value would be one in the same.  The thrust of the Administrative Agent's argument regarding declining value appears to be that the levels of default and foreclosure among the Mortgage Loans *exceed* the assumptions that went into pricing the interest rates charged to borrowers, which has led to a decline in the Projected Cash-Flow Value (and thus the Market Value).  In other words, the Administrative Agent realizes now it made a bad deal, lent against some underperforming collateral, and now it wants the bankruptcy estate to make up the difference between the deal it wanted and the deal it actually got, in the form of putative "adequate protection" payments that, again, would in fact *improve* the Administrative Agent's collateral position.

Because Market Value is in part a function of Projected Cash-Flow Value, keying adequate protection to Market Value would present many of the same problems.  In addition, the secondary mortgage market is operating inefficiently at the moment, due to supply- *and* demand-side shocks that have driven market prices down below Projected Cash-Flow Values for many types of mortgage assets.  In light of the market's inefficiency, tying adequate protection to Market Value as opposed to Cash-Flow Value would lead to anomalous results.  For example, with respect to the Construction Loans, had the parties not resolved the Construction Loan Stay Relief Motion, and had the Court determined that the Market Value of the Construction Loans as alleged by the Administrative Agent (approximately 30% of UPB) was their "value" for adequate protection purposes and was declining, the Court could have conceivably ordered the Debtors to make periodic cash payments to the Administrative Agent to "compensate" it for this decline, notwithstanding the fact that the Debtors' *actual recovery* on those loans over the next several months (i.e., the Actual Cash-Flow Value) proved to be significantly greater than their Market Value.  Indeed, it was precisely this sort of unilateral, "mark-to-market" margin call—

conducted *en masse* by the Debtors' secured lenders and various repo participants prepetition—
that stripped the Debtors of valuable assets and landed them in bankruptcy.

> **B.    By receiving all income generated by the Mortgage Loans the Administrative Agent is realizing the "indubitable equivalent" of its lien**

Under Section 361(3) of the Bankruptcy Code, the Court may provide the Administrative Agent adequate protection by "granting such other relief . . . as will result in the realization by [the Administrative Agent] of the indubitable equivalent of [its lien] in [the Mortgage Loans]."  11 U.S.C. § 361(3).  The term "indubitable equivalent" derives from Judge Learned Hand's observation, in In re Murel Holding Corp., 75 F.2d 941 (2d Cir. 1935), that

> [i]t is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; *he wishes to get his money or at least the property*. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by *a substitute of the most indubitable equivalence*.

Id. at 942.  There is precious little case law construing the "indubitable equivalence" standard. However, in the case of the Mortgage Loans, it is possible to give the Administrative Agent *both* "its money" (i.e., payment up to the amount of its allowed secured claim) *and* "the property" (i.e., the cash flow from the Mortgage Loans), so long as the proceeds of the Mortgage Loans continue to be deposited into the Administrative Agent's collateral accounts pursuant to the Cash Collateral Order.  Indeed, in the Construction Loan Stay Relief Motion, the Administrative Agent acknowledged that "the ultimate form of adequate protection" would be to receive "the value" of its collateral (which the Administrative Agent then believed, erroneously, was the Market Value).  Because the Actual Cash-Flow Value of the Mortgage Loans is their "value" for adequate protection purposes, and because the Actual Cash-Flow Value of the Mortgage Loans

and the future income stream from those loans are economic equivalents, the Debtors submit that the Administrative Agent is already receiving, in its own words, the "ultimate form of adequate protection" insofar as it is receiving "the value" of the Mortgage Loans—in other words, it is already receiving the "indubitable equivalent" of its lien.

It is obvious from the Stay Relief Motion that the Administrative Agent wishes to (or at least, to have the right to) sell its right to the future income stream from the Mortgage Loans at a discount, no doubt so it can distribute the proceeds ratably among the Pre-Petition Secured Parties, who can then utilize the proceeds for other purposes.  However, the a secured creditor's interest in liquidating its collateral and reinvesting the proceeds elsewhere (i.e., making up for lost opportunity cost), while understandable, is not entitled to adequate protection under §§ 362(d)(1) and 361 of the Bankruptcy Code.  Timbers U.S., 484 U.S. at 370-371 (rejecting argument that the "interest in property" entitled to adequate protection "also includes the secured party's right (suspended by the stay) to take immediate possession of the defaulted security, and apply it in payment of the debt").  Because the Administrative Agent is currently realizing the indubitable equivalent of its lien in the Mortgage Loans, the Debtors should be permitted to sell or hold the Mortgage Loans as they see fit, in the exercise of their business judgment and in accordance with their fiduciary obligations to creditors, both of which require the Debtors to try and pay off as much of the Administrative Agent's claim as possible.

## IV.    Relief from the Automatic Stay, if Granted, Would not Entitle the Administrative Agent to Affirmative, Substantive Relief

The specific relief requested in the Stay Relief Motion is an order "allowing the Administrative Agent to sell or dispose of the Mortgage Loans" and "permitting the transfer of the servicing of the Mortgage Loans to the Administrative Agent's designee."  (Motion ¶ 32.) As in the Construction Loan Stay Relief Motion, it appears the Administrative Agent is seeking

this Court's assistance (or at the very least, its blessing) in carrying out the sale of the Mortgage Loans.  However, a stay relief motion "is not designed to short circuit non-bankruptcy substantive and procedural requirements."  Grimes v. Munoz (In re Munoz), 83 B.R. 334, 338 (Bankr. E.D. Pa. 1988).  Rather, "the effect of granting relief from the stay is to allow a creditor to proceed and assert non-bankruptcy created rights (e.g. state law rights)" in the proper forum.  Id.  A motion for relief from the stay is not the appropriate procedural vehicle for obtaining affirmative substantive relief.  See Grella v. Salem Five Cent Savings Bank, 42 F.3d 26, 32 (1st Cir. 1994) ("The limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings, have led most courts to find that such hearings do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate."); Johnson v. Righetti (In re Johnson), 756 F.2d 738, 740 (9th Cir. 1985) (relief from stay hearings are limited in scope to adequacy of protection, equity, and necessity to an effective reorganization, and validity of underlying claims is not litigated).

If the Court is inclined to lift the automatic stay as to the Mortgage Loans, it should nevertheless decline the Administrative Agent's invitation to endorse its proposed plan of liquidation for such loans.  What the Administrative Agent does after receiving relief from the stay is governed exclusively by non-bankruptcy law and is not a matter for this Court.  If the Administrative Agent wishes to wrest the servicing of the Mortgage Loans from AH Mortgage Acquisition Co., Inc. and transfer servicing to its own designee pending a sale of the Mortgage Loans for an unreasonably low price in a depressed market, it must proceed at its own peril and at its own expense.

## RESERVATION OF RIGHTS

The Debtors reserve the right to amend, modify, or supplement this Pretrial Brief based upon information obtained from the Administrative Agent in discovery or otherwise, or as a result of subsequent developments.  If the Court is inclined to grant the Stay Relief Motion, the Debtors reserve the right to request that the Court condition any stay relief on the Administrative Agent providing the estate with information and certain other protections.

## CONCLUSION

For the reasons set forth above, the Debtors respectfully request that this Court deny the Stay Relief Motion and grant the Debtors such other and further relief as is just and proper.

Dated:     Wilmington, Delaware
           April 11, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Patrick A. Jackson

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession