UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In the Matter of:          :     Case No, 07-11047
                           :
AMERICAN HOME MORTGAGE     :     Wilmington, Delaware
HOLDINGS, INC., a Delaware :     October 17, 2007
corporation, et al.,       :     10:14 a.m.
          Debtors.         :
---------------------------

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:              KENNETH J. ENOS, ESQ.
                          JOHN DORSEY, ESQ.
                          ROBERT BRADY, ESQ.
                          JAMES L. PATTON, JR., ESQ.
                          BLAKE CLEARY, ESQ.
                          PAULINE K. MORGAN, ESQ.
                          Young, Conaway, Stargatt & Taylor
                          1000 West Street, 17th Floor
                          Wilmington, Delaware  19801

For Bank of America:      LAURIE SELBER SILVERSTEIN, ESQ.
                          Potter, Anderson & Corroon
                          1313 North Market Street
                          Wilmington, Delaware  19801

For DB Structured:        ANDREW GALLO, ESQ.
                          Bingham, McCutchon
                          150 Federal Street
                          Boston, Massachusetts  02110

For Bear Stearns:         DAVID KUNEY, ESQ.
                          Sidley, Austin
                          1501 K Street NW
                          Washington, D.C.  20005

APPEARANCES:   (Continued)


For Countrywide:              WILLIAM E. CHIPMAN, JR., ESQ.
                              Edwards, Angell, Palmer & Dodge
                              919 North Market Street, Suite 1500
                              Wilmington, Delaware  19801


For U.S. Bank:                ERIC LOPEZ SCHNABEL, ESQ.
                              Dorsey & Whitney
                              1105 North Market Street, Suite 1600
                              Wilmington, Delaware  19801


For Vantage Pointe:           BRADFORD J. SANDLER, ESQ.
                              Benesch, Friedlander, Coplan & Aronoff
                              222 Delaware Avenue, Suite 801
                              Wilmington, Delaware  19801


For CitiMortgage:             BRETT D. FALLON, ESQ.
                              Morris, James
                              500 Delaware Avenue, Suite 1500
                              Wilmington, Delaware  19899


For Creditors Committee: BONNIE FATELL, ESQ.
                              Blank, Rome
                              1201 Market Street, Suite 800
                              Wilmington, Delaware  19801


                              MARK POWER, ESQ.
                              Hahn & Hessen
                              488 Madison Avenue
                              New York, New York  10022


For U.S. Trustee:             JOSEPH McMAHON, ESQ.
                              Office of the U.S. Trustee
                              844 King Street
                              Wilmington, Delaware  19801


Audio Operator:               Nickita Barksdale

Transcribed by:               DIANA DOMAN TRANSCRIBING
                              P.O. Box 129
                              Gibbsboro, New Jersey  08026-0129
                              (856) 435-7172
                              FAX:  (856)  435-7124
                              EMAIL:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

I N D E X

| WITNESSES | VOIR DIRE | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|---|
| FOR THE DEBTOR | | | | | |
| ROBERT JOHNSON | | 29(Dor) | 45(Kun) | 106(Dor) | |
| | | | 55(Gal) | | |
| | | | 89(Fal) | | |
| | | | 92(Chi) | | |

| EXHIBITS | | IDENT. | EVID. |
|---|---|---|---|
| DB-5 | Two AAR's | | 89 |
| DB-9 | EMC agreement | | 89 |
| DB-10 | Grenich agreement | | 89 |
| CW-1 | Letter | 97 | 106 |
| CW-2 | Letter | 97 | 106 |

Colloquy                                          4

1          THE COURT:  Please be seated.  We have a new face.

2   Good morning.

3          MR. ENOS:  The big guns for the omnibus hearing,

4   Your Honor.

5          Good morning, Your Honor.  Ken Enos, Conaway,

6   Stargatt & Taylor on behalf of the debtors.  Your Honor, I'll

7   be proceeding through the agenda that our office filed on

8   Monday.

9          The first three matters on the agenda, Your Honor,

10  are adjourned at the consent of the parties.  So with the

11  Court's permission I would ask that we proceed to matter

12  number 4.

13         THE COURT:  All right, I signed 4, 5, 6, and 7 this

14  morning.

15         MR. ENOS:  Well, then.  Your Honor, then number 8 on

16  the agenda is actually the Committee's application, so I will

17  cede the podium at this time to counsel for the Committee.

18         THE COURT:  Thank you.

19         And I would have signed 8, 9, 10 and 11 if somebody

20  filed a CNO.

21         MS. FATELL:  We did not, Your Honor.  Bonnie Fatell

22  for the Committee.

23         We have had some discussions with the U.S. Trustee

24  and we have agreed that we will file supplemental affidavits

25  as will Hahn & Hessen.

1          With respect to BDO there will be a revision to that

2     application to carve out Trenwid (phonetic) and they will file

3     a separate application for them, and then we will be filing a

4     certification of counsel with revised orders and the

5     supplemental affidavits, and ask that the Court consider that,

6     and there are no other objections to the application.

7          THE COURT:  All right, so for Hahn & Hessen you're

8     going to file a supplemental affidavit.

9          MS. FATELL:  Right.

10          THE COURT:  And then a certification of counsel.

11          MS. FATELL:  Correct.  And --

12          THE COURT:  And what about for --

13          MS. FATELL:  Same for Blank, Rome.

14          THE COURT:  Same for Blank, Rome, okay.

15          MS. FATELL:  And then for BDO -- bear with me one

16     second -- sorry -- Trenwid will file a separate application

17     and we will also file a --

18          THE COURT:  You say Pennwick (phonetic)?

19          MR. POWER:  Your Honor, Mark Power from Hahn &

20     Hessen.

21          Trenwid is the investment banking arm of BDO.  While

22     they're not being hired as investment bankers, they have

23     provided some advisory services in connection with the sales

24     on an hourly basis.  And BDO originally proposed to include

25     that time in their applications.

1        However, the U.S. Trustee wants a separate

2    application for them.

3        THE COURT:  All right.

4        MR. POWER:  And so basically we've agreed to do

5    that, and they'll file a separate application and then they'll

6    do a separate fee request.

7        THE COURT:  All right.  And how are we dealing with

8    the BDO retention then?

9        MR. POWER:  We proposed to modify the order to take

10   Trenwid out, and then I think the U.S. Trustee doesn't have

11   any objection beyond that.

12       THE COURT:  All right, so you'll modify the order

13   and submit it under certification of counsel?

14       MS. FATELL:  That's correct.

15       THE COURT:  Mr. McMahon, yes?

16       MR. McMAHON:  Your Honor, good morning.  Joseph

17   McMahon for the U.S. Trustee.  Provided that the supplemental

18   affidavits and forms of order are acceptable to us, what

19   counsel proposed is agreeable.

20       THE COURT:  All right, so they need to run the

21   supplemental application by you before they submit the

22   certification of counsel?

23       MS. FATELL:  Supplemental affidavit, yes,

24   supplemental affidavit.

25       THE COURT:  All right.  Very well.

Colloquy                                               7

1              MS. FATELL:  And forms of order.

2              THE COURT:  All right, let's --

3              MR. McMAHON:  Your Honor --

4              THE COURT:  -- let's continue it to a set date

5    though just in case the wheels come off the bus.  So, we

6    continue it to the 31st hearing, and if it's all resolved in

7    the meantime, submit it under certification of counsel and

8    I'll sign the orders and it will not be on the hearing but --

9              MS. FATELL:  That's perfect.

10             THE COURT:  -- that way it doesn't fall between the

11   cracks.

12             MS. FATELL:  Okay, thank you.

13             MR. McMAHON:  Thank you.

14             THE COURT:  Item number 11.

15             MR. SCHNABEL:  Your Honor, good morning.  Eric Lopez

16   Schnabel of Dorsey & Whitney on behalf of United Health Group.

17             Your Honor, I don't believe there were any

18   objections filed, at least I'm not aware of any and I don't

19   have a copy of the agenda so I didn't know whether crept on,

20   but we did receive comments from the debtors on a reformed --

21   on some minor revisions to the order.  This is just a setoff

22   on a real property lease.

23             And I've handed a red line to the Committee and it's

24   pretty innocuous so if we can hand up a clean and red line,

25   unless Your Honor has any questions, we'd ask --

Colloquy                                                                           8

1              THE COURT:  Let me see the order.

2              MR. SCHNABEL:  -- that they be entered.

3              THE COURT:  Thank you.

4                          (Pause)

5              MR. SCHNABEL:  Your Honor, the revisions are simply

6    to apply the setoff first to any administrative expense claim

7    and then a reservation of rights for the debtors to object to

8    any claim that we might file.

9              THE COURT:  Any comments by the Committee?

10             MS. FATELL:  We're fine with the order, thank you.

11             THE COURT:  All right.  I'll sign the revised order.

12             MR. SCHNABEL:  Thank you, Your Honor.

13                          (Pause)

14             THE COURT:  Okay.

15             MR. ENOS:  Your Honor, the next matter on the agenda

16   is the Milestone Advisors's retention application.  The

17   debtors did receive informal objections from the Committee and

18   the Office of the United States Trustee.  However, the parties

19   have resolved their issues and a proposed form of order was

20   filed under certification of counsel.

21             THE COURT:  All right, I signed it this morning.

22             MR. ENOS:  Thank you, Your Honor.

23             Your Honor, the next item on the agenda is Vantage

24   Pointe Capital's motion for an order under Rule 2004.  At this

25   time I'll cede the podium to counsel for Vantage Pointe.

Colloquy                                                          9

1              THE COURT:  All right.

2              MR. SANDLER:  Good morning, Your Honor, Brad Sandler

3    of Benesch Friedlander on behalf of Vantage Pointe Capital.

4              Your Honor, Vantage Pointe Capital is a substantial

5    preferred equity holder in this case, and has filed a motion

6    seeking a 2004 exam because it believes that there is value

7    for the preferred equity holders.

8              Vantage Pointe Capital, its principal, Daniel

9    Osborne (phonetic) is in the courtroom with me today, and he

10   has substantial experience in the mortgage industry.

11             Shortly after the petition date, roughly one week

12   after the petition date, Your Honor, we requested the

13   appointment of an equity committee in this case and that

14   request was denied.

15             We then approached debtor's counsel and made an

16   informal request for documents so that we would be able to

17   determine if there was value for the preferred equity holders

18   in this case, and we were basically told go pound sand.

19             And the reason for that was that they said they were

20   too busy with the sale process, which of course we acknowledge

21   that all debtors are busy and that this is a very fast moving

22   case.

23             Vantage Pointe is seeking a very limited document

24   request.  It's not a typical litigation where we are asking

25   for any and all documents under the sun.  It's a simplified

1  list of documents that would enable Vantage Pointe to

2  determine on behalf of all of the equity holders if there was

3  value for equity holders.

4          What's the rationale?  I guess that's the question.

5  What's the rationale?  The debtors have come out and they've

6  made the assertion that there's no value here for equity.

7          So why is it that Vantage Pointe believes that there

8  might be equity?  The reason is that because back in March of

9  this year, American Home had 1.2 billion dollars of

10 stockholders equity.  In May 4th of this year they raised

11 another 92 million dollars from the sale of common stock.  In

12 June, towards the end of June of this year, an institutional

13 investor agreed to invest 125 million dollars in the form of a

14 convertible trust preferred security that was convertible into

15 common at $25 a share.

16         So somewhere in roughly the 40-day period before the

17 petition date the debtors are saying that there was a

18 tremendous loss of value, perhaps in excess of a billion

19 dollars.

20         We find this to be incredible.  Is it impossible?

21         THE COURT:  Really?

22         MR. SANDLER:  No.

23         THE COURT:  You find it to be incredible?

24         MR. SANDLER:  Do I find it to be incredible?  I

25 think --

1           THE COURT:  Have you been reading the Wall Street

2    Journal?

3           MR. SANDLER:  Well, Your Honor, with all due

4    respect, the credit markets back in the summer absolutely,

5    they were unstable.  They are stabilizing.  The fed has cut

6    interest rates by half a point --

7           THE COURT:  This company is not originating loans

8    anymore.

9           MR. SANDLER:  Well, I understand that, Your Honor.

10          THE COURT:  All right.

11          MR. SANDLER:  But they also -- their loans were

12   performing.  They didn't have non -- many non-performing

13   loans.

14          The only way to know if there is equity is to get

15   the documents that we requested.  And again, we've asked for a

16   limited document request.  In fact, we have even offered to

17   sit down with their business people and just go through the

18   documents with them and see if we could come up with some sort

19   of resolution, and we were turned away.

20          My understanding is that the debtors have actually

21   put together some documents, it's just my understanding, that

22   they have put together some documents, although they're not

23   willing to release those documents to us.

24          The bottom line is that we have a substantial

25   investor who is willing to spend his own time, his own money -

1    - he's a sophisticated investor -- to analyze documents to

2    determine if there's value for the equity holders in this --

3    in this case.

4              Your Honor, to me it seems to be a no-brainer.

5    There's no risk to the debtors, there's no risk to the

6    creditors in this case to grant the motion.

7              MR. CLEARY:  Your Honor, Blake Cleary of the Young,

8    Conaway, Stargatt & Taylor on behalf of the debtors in this

9    case.

10             I don't think I could disagree more wholeheartedly

11   with the fact that it won't affect or cost this estate any

12   money.  But I think we need to back up to analyze the stated

13   purpose, to understand what's being asked of the Court here.

14   And we would submit quite simply that this is an end run

15   around discovery that should be in private litigation not

16   involving this company.

17             And what do I mean by that?  Well, who is the movant

18   here?  The movant is a shareholder, a preferred shareholder.

19   They've sought an equity committee that was denied.  And then

20   the stated purpose, Mr. Sandler said, was to determine the

21   value of equity.

22             Well, if that was the stated purpose, it seems to me

23   you would ask information relevant to the schedules, the --

24   the current asset value.  Obviously, Your Honor is embroiled

25   in the midst of a sale to determine whether the sale is

Colloquy                          13

1    servicing businesses appropriate.  We have -- the market has

2    spoken with respect to that asset.  And other asset sales will

3    come before Your Honor, including a construction loan sale at

4    the end of the month.

5             So, we will be able to determine value.  We will be

6    able to determine value in an organized fashion.

7             So, the stated -- the stated purpose is to determine

8    value.  Well, if you look at Schedule G of their pleading,

9    what you'll find --

10             THE COURT:  Is that their document request?

11             MR. CLEARY:  That's correct, Your Honor.

12             THE COURT:  All right.

13             MR. CLEARY:  Sorry, I should have flagged it so I

14   had it handy.

15             THE COURT:  I have it.

16             MR. CLEARY:  Simply look at request number 1.  And

17   what it says is, "Provide such documents as the debtors

18   customarily utilize or refer to in valuing the purposes of SEC

19   filings".  Well, the last SEC filing by these debtors, my

20   understanding was March of this year.

21             It seems to me that if you're trying to determine

22   the value, and Your Honor has done evaluation trial which

23   spent over 20 days trying to determine value, I don't know

24   that the appropriate starting point is to look to the SEC

25   documents from early March.  It seems to me the appropriate

1  place would be to look at the asset values and the assets held

2  for sale.

3          THE COURT:  Well, they're not asking for the SEC

4  filings.  They're asking for the documents you generally rely

5  upon in making SEC filings, which is a distinction.

6          MR. CLEARY:  Correct.  But again, what's the stated

7  purpose?  The stated purpose is to determine value.

8  Presumably they want to determine value today because that's

9  all that matters, because they are seeking the appointment of

10 an equity committee  and if there's equity value, there

11 certainly would presumably then be cause to appoint an equity

12 committee.

13         So if you look closely at the request for

14 production, they don't match up with the stated purpose.

15         Your Honor, there is securities litigation that's

16 pending.  We believe this, this request really goes to, again,

17 private litigation --

18         THE COURT:  Is the movant a party to that

19 litigation?

20         MR. CLEARY:  I'm not sure, Your Honor.

21         THE COURT:  Mr. Friedlander?

22         MR. SANDLER:  Your Honor, may I speak with my

23 client?

24         THE COURT:  Mr. Sandler, I'm sorry.

25         MR. SANDLER:  That's right.  May I speak with my

1  client for a second, Your Honor?

2            THE COURT:  Yes.

3            MR. SANDLER:  Thank you.

4                    (Pause)

5       MR. SANDLER:  Your Honor, fortunately I am in much

6  better health than Mr. Friedlander.

7       Your Honor, my client is not involved in the

8  litigation.

9            THE COURT:  Thank you.

10       MR. CLEARY:  That's certainly helpful to know but I

11  don't think that obviates the argument or limits the argument

12  in any way because this really is about -- it's not

13  determining a claim which they haven't said they did, it's

14  determining value, then again, the point of their document

15  requests don't go to that.

16       So if the point was to determine value, we should be

17  here on a much different scope of their request, one that we

18  probably could accomplish.  But that's not what this is.  This

19  is -- we believe again, looking closely at their document

20  request, it is information that will be used in private

21  litigation and should not be money expended by this estate for

22  a claimant --

23            THE COURT:  Well --

24            MR. SANDLER:  -- who if they had a claim would be a

25  5(10)B claim.

1          THE COURT:  I'm not sure -- I'm not sure that that's

2     the test under Rule 2004.  That if there's potential

3     litigation, that people aren't entitled to the information.  I

4     mean, Rule 2004 says for any purpose, "on motion of any party

5     in interest the Court may order the examination of any entity"

6     and then it goes, "relating to the acts, conduct or property

7     or to the liabilities and financial condition of the debtor".

8     It's pretty broad.

9          MR. CLEARY:  Yes.

10         THE COURT:  And certainly if there is ongoing

11    litigation, the case law is clear that you're limited to your

12    discovery rights in your ongoing litigation.  But if there's

13    not an ongoing litigation, even if there's potential

14    litigation, isn't that what Rule 2004 is designed to allow

15    parties to do?

16         MR. CLEARY:  I agree, Your Honor.  But I'm not

17    arguing that the purpose of determining value is not

18    appropriate. What I'm arguing before Your Honor is that what

19    they've requested and what they're asking this Court to enter

20    an order approving doesn't match up with that stated purpose.

21         And what we would respectfully request is that they

22    come back with a list of documents that relate to their stated

23    purpose.

24         THE COURT:  Well, now I'm struggling a little bit,

25    because request number 1 says they want the documents that the

1   debtors customarily use, utilize in valuing certain assets,

2   documents the debtor customarily uses in valuing other --

3   first three requests here are -- deal with documents that

4   debtors utilize in valuing their assets.  How does that not

5   relate to the valuation of the debtor's assets?

6          MR. CLEARY:  Well, then at best it's vague and

7   ambiguous because we were under the assumption that what

8   they're asking for is documents relating to the last SEC

9   filing used to prepare those documents.

10          Again, Your Honor, we think that the scope of what

11  they're asking for should be narrowed.   But remember the

12  other test is, does the harm to this creditor outweigh the

13  harm to the estate in forcing the debtor to create documents,

14  gather documents, some of which are potentially available.

15  For example, in connection with the construction loan, we do

16  have a list of loans that are for sale.  They are matched up

17  by warehouse line.  We can work with them on that.  But this

18  is not -- this scope of what they've requested is not

19  consistent with their stated purpose.

20          THE COURT:  Well, there are a couple -- there are a

21  couple of points I guess.  One would be to the extent they're

22  asking you to go above and beyond just producing documents,

23  but to organize the documents in a way that the debtors

24  wouldn't ordinarily organize the documents, that's not going

25  to happen.  That's not your -- that's not your responsibility,

1    and if the person -- the movant is willing to expend the funds

2    to go through the documents, that's their job.  I'm not going

3    to make the debtors organize the documents in any way that

4    they wouldn't otherwise be organized -- organized by the

5    debtors.

6         But let me ask you this question which is in

7    connection with the asset sale that's going on.  I heard

8    yesterday from Mr. Brady that there is a discovery website,

9    documents available on a website, is that correct?

10         MR. CLEARY:  Yes, Your Honor, I was going to address

11   that point too, because there are, there are documents that

12   are responsive to their requests, and what we put in our

13   papers, and I'm sure Your Honor probably hasn't had a chance

14   to read them, given the status of the trial, but we said, and

15   it's true, is that there are documents that are responsive to

16   this that are readily available, documents that are already

17   public information.

18         THE COURT:  Well, that's the SEC documents.  I took

19   that to mean your SEC filings.

20         MR. CLEARY:  But also --

21         THE COURT:  Are you saying that it would also

22   include what you otherwise made available to the parties --

23   the objectors in connection with this sale?

24         MR. CLEARY:  Well, yes, more to the point to that is

25   we filed an asset purchase agreement and one of the schedules

1   list -- listed the unpaid principal balances with respect to

2   the servicing rights that we're selling.  That's embodied in

3   this document request as well.

4            THE COURT:  All right.

5            MR. CLEARY:  Again, I think the more appropriate

6   document request would be backup information relevant to the

7   schedules that were filed with the Court on October 5th and

8   the statement of financial affairs that were filed in these

9   cases.  Those document --

10            THE COURT:  Are the debtors willing to allow Mr.

11  Sandler's client access to the document website that they've

12  set up in connection with the asset purchase sale that's

13  before the Court?

14            MR. CLEARY:  I think it would be -- you would need

15  to have them -- they would need to execute a confidentiality

16  agreement before any access would be provided.  But --

17            THE COURT:  Mr. Sandler, is your client willing to

18  execute a confidentiality agreement?

19            MR. SANDLER:  Your Honor, let me, if I may, have a

20  moment to speak with my client --

21            THE COURT:  Yes.

22            MR. SANDLER:  -- although I just want to address

23  very briefly the issue of organizing the documents and

24  compiling them.  We don't care about that.  Provide us the raw

25  documents and we'll do all the leg work with that.

1           (Pause)

2           MR. SANDLER:  Your Honor, my client is willing to

3  sign a confidentiality agreement, assuming that the

4  information -- and I only say this -- he'll sign a

5  confidentiality agreement, but I assume we're talking about

6  current information that's on the website.

7           THE COURT:  Yes.  All right, here's what we're going

8  to do.

9           MR. POWER:  Your Honor, may I be heard on one issue

10 before we go --

11          THE COURT:  Yes.

12          MR. POWER:  Mark Power from Hahn, Hessen, counsel to

13 Committee.

14          I can see where Your Honor is going.  I want to

15 mention that a lot of the securities lawsuits that are filed

16 are class action suits.  And so, therefore, everybody is

17 included to the extent they don't opt out.  They haven't yet

18 been certified for class.  There's an application for the

19 debtor to retain counsel to deal with those lawsuits.

20          If this party is intending to seek discovery

21 separate and above from that, then he should basically come on

22 the record and say he'll opt out of that class.  Because

23 otherwise what we're doing is two tiers of litigation.

24          THE COURT:  But it doesn't matter because he's not

25 currently -- the deadline hasn't occurred.  Even if he were

1   getting ready to file the mother of all class action lawsuits

2   against the debtor, I still don't see why he still would be

3   entitled as a creditor or interest holder to 2004 rights until

4   he's actually filed that lawsuit.

5           MR. POWER:  The lawsuits are filed on his behalf by

6   several firms against the debtor seeking to include him within

7   a class.  So he is technically a punitive claimant right now

8   in an adversary -- in a lawsuit pending in State Court.   In

9   fact, there's various ones pending.  So, he is a punitive

10  claimant.

11          THE COURT:  But the opt out time hasn't occurred.

12          MR. POWER:  That is -- I don't -- I believe that is

13  correct, Your Honor, that has not happened yet.  But I mean

14  what we're doing is we're --

15          THE COURT:  He may or may not be acting in concert

16  with the plaintiff's attorneys but you know, just because

17  someone's filed a class action lawsuit that you aren't

18  actively participating in, doesn't foreclose your rights to

19  discovery.

20          MR. POWER:  Your Honor, if you were being

21  represented by counsel as a class action claimant in a

22  lawsuit, then 2004 should not apply because then there is a

23  pending litigation, and right now there are lawsuits pending

24  and this gentleman is a -- or Vantage is a punitive plaintiff

25  in that action.

Colloquy                                      22

1          THE COURT:  Well, so is every other shareholder of

2     the debtors.

3          MR. POWER:  That is correct, Your Honor, except to

4     the extent they opt out.

5          So, I think when Your Honor is making the judgment

6     of whether to seek discovery or not, I think we first have to

7     determine whether he actually is a plaintiff in that action,

8     or if he doesn't want to be a plaintiff, that's fine, then he

9     can proceed on his own, but --

10          THE COURT:  Well, what I'm going to order isn't

11     going to prejudice the debtors in any way, and it's not going

12     to cost them a dime of money.

13          MR. POWER:  Okay.

14          THE COURT:  So I don't see the harm.  And frankly, I

15     suspect everything that's on that website is something that --

16     or documents that -- and information that ultimately will be

17     discoverable in a class action lawsuit in any event.

18          MR. POWER:  Yes, Your Honor.  My -- I've seen the

19     website.  My understanding is that information primarily

20     relates to the servicing -- it relates to the assets that are

21     sold.  But the debtor is subject to confidentiality provisions

22     with third parties, which is why there has to be a

23     confidentiality agreement.

24          THE COURT:  I understand.

25          MR. POWER:  Okay.

Colloquy                                    23

1          THE COURT:  Let me just give preliminary comments.

2    The debtors -- this is an unusual case.  It's unusual -- well,

3    it's a sale case and that doesn't necessarily make it unusual

4    anymore but it's an unusual case I think in that the volume of

5    what needs to be done, the time frame that the debtors are

6    operating under, the limited resources that any debtor has to

7    deal with responding to the various motions that are in front

8    of the Court.

9          That said, I think that the Rule 2004 is clearly

10   broadly written and broadly interpreted to provide access to

11   information relating to the debtors that interest holders and

12   creditors are entitled to receive, balanced against the

13   various common sense harms of expense, burden, et cetera on

14   the debtor's estate.

15         So, this is what I'm going to order, taking those

16   things into account.  I'm going to actually continue the

17   hearing for a time period.  I'm going to order that, subject

18   to the entry of a suitable confidentiality agreement agreeable

19   to the debtors and the Committee, and obviously the movant,

20   that the movant be provided access to the discovery website

21   that the debtors have established and the information

22   contained therein in connection with this sale that the

23   Court's currently holding hearing on.

24         Then if there are additional documents -- this is

25   why I'm not -- that's why I'm continuing the hearing -- if

1   there are additional documents -- or let me put it this way --

2   documents encompassed in the Rule 2004 request, that you're

3   unable to fairly locate on that discovery website, you can

4   come back into Court at the continued hearing and renew your

5   request on a more narrow basis hopefully, and I'll decide at

6   that time as to whether additional documents will be made

7   available to the movant.

8          But as those documents are in effect already been

9   compiled and made available, I don't think it's particularly

10  onerous to the debtors to make them available to the movant

11  subject to the entry of a confidentiality agreement.  And even

12  though there have been some class action lawsuits filed, this

13  -- at least at this time, the representation is that the

14  movant isn't actively participating, so I don't think that

15  those issues come into play.

16         And I think it's important in that it allows us some

17  access to the movant but it's not going to be an additional

18  burden, or hopefully not overly burdensome to the movant -- or

19  to the debtor.

20         The time that I'm continuing the hearing to is --

21  well, let's -- we'll continue this till October 31.  That will

22  give you a week and a half to look for the documents.  If you

23  have any issues in connection with being able to agree on a

24  confidentiality agreement, give me a call, I'll get on the

25  phone, we'll figure it out.

Colloquy                                    25

1       But as of now it's attorney's eyes only under our

2   District Court local rules until the -- until the

3   confidentiality agreement is finalized.  So there should be no

4   reason that Mr. Sandler can't have access to that information

5   right away on an attorney eyes only basis.

6           MR. POWER:  Understood, and thank you, Your Honor.

7           THE COURT:  All right.  And I don't think we need a

8   formal order.  I think we can rely on my statements on the

9   record and we'll otherwise continue the hearing until the 31st

10  of October.

11          All right, any questions?

12          MR. POWER:  No, Your Honor, thank you.

13          THE COURT:  You're welcome.

14          Item 14.

15          MR. ENOS:  Ken Enos again for the debtors, Your

16  Honor.

17          Item number 14 on the agenda is the debtor's fourth

18  rejection motion.  We did file a supplement to the motion on

19  September 28th, just to add a couple of copier leases, the

20  debtor's headquarters. There were no objections received.

21  However, we did receive a reservation of rights that was filed

22  by Bank of America, one of the debtor's equipment lessors.

23  The debtors take no issues with statements included in the

24  reservation of rights.  I don't believe Bank of America's

25  lease counsel is here today.

1        And we also received two informal responses to the

2    motion and as to those parties, we've just adjourned the

3    motion with respect to two real property leases.

4             THE COURT:  Okay.

5             MR. ENOS:  Can I approach with a form of order, Your

6    Honor?

7             THE COURT:  Yes.

8                        (Pause)

9             THE COURT:  Is there anyone here on behalf of the

10   Bank of America leasing arm who wishes to be heard?  I

11   reviewed the reservation of rights.  It's not an injunction.

12   It's merely sort of a statement of the rights and reservation.

13   I don't consider it something that needs to be addressed in

14   connection with the motion.  So I'll sign the motion as

15   revised -- or the order as revised.

16            MR. ENOS:  Thank you, Your Honor.

17            Your Honor, that's the final item on the agenda for

18   the day, unless the Court has any questions.

19            THE COURT:  No, I have no questions.  We'll

20   reconvene the sale hearing at 11.

21            MR. ENOS:  Thank you, Your Honor.

22                  (Off the record at 10:44 a.m.)

23                  (On the record at 11:07 a.m.)

24            THE CLERK:  All rise.

25            THE COURT:  Please be seated.

1        I think we'll go till -- shoot to go till about

2   1:30, 1:45, somewhere in that time frame straight through and

3   then break for the day to allow time to prepare for the

4   consumer cases at 2.

5            MR. DORSEY:  Thank you, Your Honor.

6            John Dorsey on behalf of the debtors, Your Honor.

7            Before we call our next witness, I did want to

8   address one housekeeping matter with the Court --

9            THE COURT:  All right.

10           MR. DORSEY:  -- for scheduling purposes for the rest

11  of the hearing.  Yesterday Your Honor had directed the

12  objecting parties to identify any witnesses that they were

13  going to be calling in their cases in chief to the debtors by

14  this morning.  As of now, I have three of the objecting

15  parties who have identified witnesses.

16           EMC Bear Stearns has indicated that they are going

17  to call a witness to discuss their EPD claim, what they claim

18  is their EPD claim.  The debtors have agreed to stipulate for

19  the purposes of this hearing only what that EPD would be but

20  they prefer to bring a witness to do that.

21           THE COURT:  All right.

22           MR. DORSEY:  GMAC has identified two witnesses.  I

23  do not know what topics they are going to testify about.  And

24  Deutsche Bank has identified two witnesses; one, a business

25  person to discuss the negotiations of the deal, and we may

1   have an attorney from Thacher, Proffitt coming to testify

2   about the agreement as well.

3            THE COURT:  All right.

4            MR. DORSEY:  So just so Your Honor knows what's

5   coming down the road.  And as far as I know there are no other

6   witnesses from any objecting party.

7            MR. KUNEY:  Your Honor, may I -- excuse me -- may I

8   be heard?

9            THE COURT:  Yes, sir.

10           MR. KUNEY:  Sorry to interrupt, Your Honor.  Just to

11  clarify I did not tell Mr. Dorsey but the witnesses are going

12  to testify to one or two additional topics.  It wasn't that we

13  were unwilling to go along with the stipulation, so I didn't

14  want to mislead anybody.  There are some additional topics as

15  well.

16           THE COURT:  All right.

17           MR. DORSEY:  Could we identify what those additional

18  topics are, Your Honor?

19           MR. KUNEY:  Well, Your Honor, you haven't imposed a

20  duty on any of the parties to do so, so unless the Court is

21  directing me --

22           THE COURT:  No, see if you can work that out.  If

23  you can't work that out, Mr. Dorsey can always take those

24  witnesses' depositions before they appear, if you like.  If

25  anyone wants to depose any of the objector's witnesses before

Colloquy                                29

1   they appear in Court, they may do so.

2            MR. DORSEY:  Thank you, Your Honor.

3            THE COURT:  Or they can tell you what they're going

4   to testify about.

5            MR. DORSEY:  I appreciate that, Your Honor.

6            Our next witness, Your Honor, is Robert Johnson.

7            THE CLERK:  Please state your full name and spell

8   your last name for the record.

9            THE WITNESS:  Robert Johnson Jr., J-O-H-N-S-O-N.

10                    ROBERT JOHNSON, SWORN

11                     DIRECT EXAMINATION

12   BY MR. DORSEY:

13   Q.   Good morning, Mr. Johnson.

14   A.   Good morning, Mr. Dorsey.

15   Q.   Could you please tell the Court by whom you're employed?

16   A.   Sure.  I'm employed by American Home Mortgage Corp.

17   Q.   What is your current position at American Home Mortgage

18   Corp?

19   A.   My position there is Executive Vice President of Capital

20   Markets.

21   Q.   How long have you been in that position?

22   A.   For approximately three and a half years, since October

23   of 2003.

24   Q.   Would you describe for the Court please what your

25   responsibilities are in that position?

1  A.   Sure.  I am responsible for the Capital Markets function

2  which at American Home includes secondary marketing, post

3  closing and transaction management.  And I'll describe those

4  three different functional groups.

5      Secondary marketing is responsible for the interest rate

6  risk management, and hedging of the at risk pipeline for

7  buying and selling loans, or trading as we would call it,

8  responsible for pricing, for product development, for lock in

9  functions or interest rate commitments.

10     The post closing function would be responsible for once

11 loans are closed at the settlement agents or title agents,

12 that the loans are sent to -- the packages are sent back to

13 our corporate office.  That group processes the files once

14 they come in, sends our collateral out to our document

15 custodian out in California, images the files, prepares them

16 for delivery to investors, that type of thing.  And then once

17 we trade loans with investors, they would be responsible for

18 delivering the loans to investors, clearing up any document

19 issues, whatever may arise, to help settle the trade.

20     And then also the transaction management function would

21 be responsible for facilitating transactions where we are

22 either buying pools of loans or selling pools of loans.  When

23 I say facilitate, they would kind of be a, like a hub in the,

24 amongst a number of parties, whether it be the trading group

25 in Capital Markets, the post closing group, our internal

1   counsel, legal counsel, the investors, due diligence team, the

2   investors, legal counsel, however -- you know, kind of just to

3   make sure that the process goes smooth.

4   Q.   Yesterday Mr. Love (phonetic) testified about four

5   different buckets in which servicing rights arise.  Could you

6   describe for the Court the buckets in which the AHM

7   Corporation sells loans?

8   A.   Sure.  There'd be -- from my side there's three buckets.

9   One of the buckets becomes different down in servicing but

10  what my side does, we would -- first we could securitize the

11  loans with one of the agencies, Fannie or Freddie or Ginnie

12  Mae, create servicing rights as a result of that.  We could

13  sell loans to private investors like we talked about where we

14  would sell loans under an MLPSA, and servicing rights would be

15  created as a result of that.

16       We also could securitize loans on one of our shelves and

17  servicing rights would be then created at that point also.

18       The reason that Mr. Love (phonetic) testified there's a

19  fourth category is that sometimes when we sell loans to

20  private investors under an MLPSA, they would at their decision

21  further securitize those loans at some point after our sale

22  transaction is closed, and then that's when -- I think he

23  referred to it as third party securitizations would be

24  created.

25  Q.   When you sell to private investors are there two

1    different ways that you could sell loans in that situation?

2    A.    Yes, there are.    There are -- we have completed

3    transactions on both the servicing retained and the servicing

4    released basis.

5    Q.    Before we get into the process of selling these loans,

6    could you just tell us why it is the debtors filed for Chapter

7    11 bankruptcy protection?

8    A.    Yes, sure.    It was to maximize the value of our assets

9    through allowing orderly disposition of those assets.

10   Q.    I'd like to turn now to the negotiation of the sale of

11   loans to private investors and just focus on that for a moment

12   if we could.

13        How is the sale to a private investor initiated?

14   A.    First we would identify internally which loans we would

15   like to sell, whether they be actual loans that have already

16   been closed with consumers or that we already purchased from

17   somebody else, or loans that we believe that we are going to

18   close or purchase in the near future.    That would be what I

19   would call our inventory or our expected to be inventory.    We

20   would take those loans or the characteristics of those loans

21   and create what we call the bid tape which would -- maybe

22   let's say there's a thousand loans in the bid tape, it would

23   say you have a thousand lines of data which would be

24   representative of what we're trying to sell.    We might provide

25   some summary data or some bid stipulations and we would take

1    that information, email it out to potential loan buyers,

2    typically we'd ask them to bid at a certain date and a certain

3    time sometime in the near future from when we sent the email

4    out.  We would ask for bids on a, quite often on both a

5    retained and a released basis.

6         Then at some time in the future, whatever that date and

7    time we specified was, the potential loan buyers would call us

8    back and say here's our price for the pool of loans that you

9    have offered for sale, and it would be -- they could give us

10   prices, sometimes both retained and released.  Sometimes they

11   would say well, we only have a released price, sometimes we

12   only have retained, or sometimes they may opt out completely

13   saying they have no appetite for this pool of loans.

14   Q.   Once you received the bids from the potential investors,

15   what factors did AHM consider in deciding which one to accept?

16   A.   What we would do is we would kind of take all of the

17   released bids and all of the retained bids and separate those

18   first because we want to make sure that we're comparing you

19   know, like, like type sales to each other.  So we would take

20   all of the released sales for -- or released bids for example

21   and we would kind order them from the highest price to lowest

22   price and look at the highest price and try to determine if it

23   was the highest and best by not only looking at its price, by

24   saying okay, what is the friction that might be caused by

25   closing this transaction with this counter party. Is it

1   someone that we dealt with quite often in the past or we had

2   problems with them in settling transactions, whatever types of

3   things beyond the headline dollar price would cause us to

4   think that it would not be the best bid because whatever

5   friction we might have with closing that transaction would eat

6   up any benefit to what the second highest dollar price was.

7       Same process would occur on the retained side.  It just —

8   it would not include the value of the servicing because

9   they're not paying us for the servicing.

10  Q.   How did AHM Corporate decide what was the best bid?

11  A.   Okay, so we would take those two -- let's assume that I

12  have a highest and best released and a highest and best

13  retained. We would take those two numbers, compare them.  The

14  difference between those two numbers would be the number that

15  I would compare against our internal assumption of what the

16  value of servicing was.

17      So if the spread between those two numbers was let's say

18  a hundred basis points, and we thought that the value of the

19  servicing was 90 basis points, we would sell the servicing --

20  or sell the trade, the loans released.  If the spread between

21  the two was still a hundred and we thought that the servicing

22  was valued at 110 basis points so that's what we thought it

23  was worth, we would most likely go retained at that point

24  because we would have higher total proceeds or higher total

25  value.

Johnson - Direct (Dor)                                    35

1    Q.    Yesterday Mr. Love testified about the role that AHM

2    Servicing played in negotiations of MLPSA's.  Did they have

3    any role in the negotiation -- let me strike that.  I'll come

4    back to that in a moment.

5         Who typically would draft -- or once you've accepted a

6    bid, what would be the next process?

7    A.    There's a number of things that go on, but one of the

8    early things that we try to do is make sure that we've got the

9    legal documents in place, because it seems as much process as

10   there is on the business side, that waiting till the end to

11   get our legal documents, that tends to cause problems with

12   trade, so we worked as hard as we can to try and get those

13   things dealt with early.

14        One of the things is if we have got an MLPSA or an MLPA

15   in place with the winning bidder, we would work on any

16   amendments or changes that need to be made.  But if there

17   isn't one, we would come up with a brand new one, and that

18   would typically come from -- the purchasing entity would

19   either draft it themselves or they would have a law firm that

20   they hired draft it.

21   Q.    And were you involved in the negotiation of the MLPSA's?

22   A.    Yeah, I was involved to the extent that if there were

23   business terms that needed to be discussed, our legal group

24   who did most of the back and forth negotiation with the

25   counter party, if they had business questions related to, you

1   know, what did we agree to when we did the trade, if it was

2   how much the time period for EPD we agreed to or the time

3   period for prime rate recapture or what the servicing fee was

4   gonna be, those types of things, they would come to me or my

5   group to clarify or to talk through with them.

6   Q.   Skipping to third party securitizations just for one

7   second, what role did you play in negotiating of any third

8   party securitization deals after you've already entered into

9   the MLPSA?

10  A.   I would have limited negotiations.  There wasn't, I

11  think, I wouldn't say there's a lot to negotiate at that

12  point.  It's the purchaser owns the loans.  We might be the

13  servicer.  What terms related to -- you know, how the loans

14  are gonna be serviced and the securitization would be dealt

15  with by the servicing group and the legal group, we might

16  provide some information or additional information that the

17  securitizing party might need is -- like pursuant to our

18  underwriting guidelines and stuff like that, stuff that they

19  have to bolt into their prospective supplement for the

20  securitization.

21  Q.   Are you familiar with the term loan funding schedule?

22  A.   Yes, I am.

23  Q.   Can you tell the Court what that is?

24  A.   A funding schedule is one of the documents that gets

25  produced just prior to closing of a sale, where it's a,

Johnson - Direct (Dor)                              37

1  basically it's a manifest of the loans that are being

2  purchased.  So if there's, again like I said, a thousand loans

3  on the bid tape, there might be a thousand loans in this loan

4  funding schedule and it would just detail characteristics of

5  those loans whether, you know, like our loan number,

6  borrower's name, unpaid principal balance, interest rate.  If

7  it were a retained type transaction it would identify the loan

8  level, what the service fee is for each of those loans, and it

9  would further identify what the net interest rate or what we

10 would pass through to the loan buyer would be.

11       So it would be if the note rate were 7, service fee were

12 .25, the net rate would be 6.75.  And then it would also have

13 things like the dollar price for the loans on the retained

14 transaction.  And a couple other items like accrued interest

15 and that type of thing.

16       But if it were a released transaction it would have all

17 those things except it wouldn't typically identify a separate

18 servicing fee as what percentage of the coupon is going to be

19 remitted because there's nothing to remit, because we're

20 releasing, but it might sometimes have two separate purchase

21 prices, one for the loan assets and one for the servicing

22 rates.

23 Q.   Where does that come from in terms of the deal, who

24 provides that document?

25 A.   The purchaser typically provides the funding schedule.

1    Q.    That would be the investor?

2    A.    Yes.

3    Q.    What goes into valuing the servicing rights in one of

4    these transactions?

5    A.    What we look at internally is the expected future cash

6    flow of the servicing asset against the burdens that we have

7    as far as servicing expense, the risk of early payoff, the

8    risk of the interest rates going up or down, that type of

9    thing, to kind of project out what we believe over time the

10   present value of the cash flows will be net of expenses.  We

11   look at things like how we can possibly gather information as

12   a result of servicing and whether or not that's beneficial to

13   us as an originator, that type of thing.

14   Q.    Yesterday there was a lot of testimony about what are

15   called early payment defaults or EPD's.  Are you familiar with

16   that term?

17   A.    Yes, I am.

18   Q.    Could you briefly remind the Court what an EPD is?

19   A.    Sure.  An EPD is where a loan -- typically it would be

20   missing one of its first three payments after a loan is sold

21   to an investor.  So one of the first three payments due to end

22   investor or purchaser if the borrower goes more than 30 days

23   delinquent on that loan, that would be an early payment

24   default.  And that's a typical clause.  There's other types of

25   early payment defaults but that's the most common.

1    Q.   Prior to the filing of the bankruptcy petition, how did

2    the company become aware of an EPD claim by one of the

3    investors?

4    A.   The purchasing party would send notice to American Home

5    Corp as you know, either in a Fed-Ex or an email.  Sometimes

6    emails came directly to me, sometimes they went to our

7    counsel.  The Fed-Ex's would come to me sometimes, whatever.

8    That was the most common way they would notify us of a early

9    payment default breach.

10   Q.   And once you received the notice from one of the

11   investors of an EPD claim, how would that be handled at AHM

12   Corporate?

13   A.   We had a group or we have a group within my division that

14   handles those claims.  So they would be sent onto this little

15   department within my group that would catalog the claim in the

16   database so we could track all of our outstanding repurchase

17   claims and what's been dealt with, what hasn't been dealt with

18   yet and the like.

19   Q.   That was something you would have handled yourself, or

20   had been involved with?

21   A.   I would have been involved with, yes.  It was a

22   department that worked for me.  That function moved, I can't

23   remember the exact time but it was either sometime in early

24   '07 or late '06 that it moved into my group.  But I would get

25   involved in that.  Once that group, you know, they would take

1   a look at the repurchase claims and try and determine the

2   validity of the repurchase claim.  They would -- and then if

3   they believed it were valid, they would come to me.

4   Q.   How would you determine whether an EPD claim was valid or

5   not?

6   A.   What they would do is they would first go to the servicer

7   of the loan and determine -- try and get as much information

8   as possible from the servicer.  So whether it's a pay history

9   or collection note from the servicer, everything that they can

10  gather to understand the borrower's intent and if the borrower

11  actually is delinquent or did miss a payment, that type of

12  thing, they would gather from the servicer.

13       They would also gather information from the contract that

14  the loan was sold under to determine if -- what the actual

15  clause is that the default came up under and try and test that

16  for validity.  Then if they believed that -- if this group

17  believed that the claim was true, that it was something that

18  was an obligation of American Home or it was a breach, they

19  would bring it to my attention through their manager.  I would

20  sit down with him and we would go through the different claims

21  that they thought were good, and I would either agree or

22  disagree with some of them based upon my review.  If I agreed

23  that they were good, we would -- I would then take it to our

24  CEO and he would have to further sign off on those repurchase

25  claims at that point.

1    If the group that does the evaluation doesn't believe

2    that it's a valid repurchase claim, or somewhere up the line

3    from them we don't believe it's a valid repurchase claim, then

4    that group would go back and negotiate or talk with the

5    investor about why we didn't believe it was a valid repurchase

6    claim.

7    Q.   Once a claim was determined to be valid, what would

8    happen next?

9    A.   So once I signed off and our CEO signed off, we would

10   then -- I would instruct the group that prepared all this

11   information to go ahead and create a wire authorization form

12   and a schedule of the loans that we're gonna repurchase much

13   like a funding schedule.  When we're selling loans that we

14   want to re-grade to purchase loans it would be an internal

15   schedule. Then we would -- if it was retained, we would -- I'm

16   sorry, if it was released, we would have to notify our

17   servicing group that eventually they're gonna get servicing

18   transferred back.  We would notify our document custodian that

19   they're gonna get collateral in from whoever the investor

20   might have been.  And then American Home Mortgage Corp would

21   send a wire -- the wire would get signed off by myself and

22   Mike again, but we would, from our Treasury Department,

23   American Home Mortgage Corp would send a wire to the investor.

24   Q.   So the funds to pay EPD's would come from American Home

25   Mortgage Corporation?

Johnson - Direct (Dor)                                    42

1    A.    Yeah.  If there were certain situations where if it was

2    in a, in a securitization, we may -- like I think Mr. Love

3    testified to yesterday, the money would come from Corp to be

4    sent to servicing since they have the wiring account set up or

5    whatever with the investor, so that it would just be passed

6    right through, but the money would start from the Corp.

7    Q.    Did AHM Corporation view its obligations differently with

8    regard to EPD's where there was a MLPSA with servicing

9    released versus a deal where servicing was retained?

10   A.    The only difference would be where we would get the

11   information from.  If it was retained, we'd be talking to our

12   own, you know, servicing group.  If it was released, we'd be

13   trying to get information from an outside servicer, but our

14   obligations to repurchase loans were generally the same

15   whether it was a released or retained transaction.

16   Q.    And would the funds to pay those EPD's come from the same

17   AHM Corporate regardless whether it was a released transaction

18   or a retained transaction?

19   A.    That's correct.

20   Q.    Are you familiar with a term that was discussed yesterday

21   as well, premium recapture?

22   A.    Yes, I am.

23   Q.    Again, could you briefly remind the Court what a premium

24   recapture is?

25   A.    Sure.  Premium recapture is when -- it occurs in two

1    different ways.  On a retained transaction it's if we sold the

2    loans for above par or above a hundred percent of the unpaid

3    principal balance, if that loan is paid off by the consumer,

4    whether by a refinance or they move where they pay off with

5    cash, within a specified time period, we would have to remit

6    anything that was above that par price back to the loan

7    purchaser.  So if they paid us 101 percent of the EPD, that

8    one percent would have to be sent back to them and we would

9    send that back from Mortgage Corp also.

10        If it were released, it's a little bit different in that

11   it's sometimes still called premium recapture, sometimes it's

12   a -- sometimes it's identified as servicing or release premium

13   recapture.  It depends but there could be instances where they

14   just want the money that they paid for the servicing back

15   versus any above par on the loan.  Or even if the loan was

16   sold below par and the servicing was still of value, they

17   would want us to send that back.

18   Q.   Where would the funds to pay the premium recapture claims

19   come from, regardless -- in a context of both a servicing

20   released and a servicing retained?

21   A.   Either way, my group in Capital Markets would do the work

22   to figure out who we owed what to, and then we would send a

23   wire authorization form signed off on by myself to Treasury

24   and the money would come from Mortgage Corp.

25   Q.   In those situations where AHM has retained the servicing

1    rights, does AHM -- do the debtors consider that to be an

2    asset of the company?

3    A.    Yes, we would.

4    Q.    Why?

5    A.    Well, as I said before, we do this analysis to determine

6    it has value, and something of value to the estate or to

7    American Home is something we would consider to be an asset.

8    Q.    Did AHM Corp consider servicing rights to be something

9    that were freely tradable prior to filing bankruptcy?

10   A.    Yeah.  I mean that was only our expectation, or my

11   expectation at least is that there are servicing transactions

12   that take place in the marketplace quite often. There are

13   brokers like Phoenix Capital that their -- one of their

14   primary functions is to find buyers and sellers of servicing

15   and bring them together.

16   Q.    Did AHM actually trade in its servicing rights pre-

17   petition?

18   A.    We did not trade specifically in our servicing rights.

19   We had talked about doing it but it's just something that we

20   had -- you know, stand alone rights we had not sold.

21   Q.    Did AHM take any steps to borrow money against the

22   servicing rights?

23   A.    Yes, we did.  We pledged the servicing rights that we,

24   that we owned to a syndicate led by Bank of America and they

25   advanced us money against the servicing rights.

Johnson - Direct (Dor)                              45

1   Q.   And did AHM view the tradability of the servicing rights

2   differently in the context of a servicing released versus a

3   servicing retained transaction?

4   A.   I'm sorry, can you --

5   Q.   I guess --

6   A.   Yeah.

7   Q.   -- that's not a good question because servicing released,

8   there are no servicing rights --

9   A.   Right.

10  Q.   -- maintained at AHM.  But in the context of an MLPSA,

11  did American Home consider when the servicing rights were

12  contained within an MLPSA that they somehow were precluded

13  from being able to trade those rights if they chose to do so?

14  A.   No, that was not a consideration.

15  Q.   Thank you.

16          MR. DORSEY:  That's all I have, Your Honor.  Thank

17  you.

18          THE COURT:  All right.  Cross-examination of anyone

19  in favor of the motion?  All right, hearing none, I'll hear

20  from objectors, if any.  Mr. Kuney?

21          MR. KUNEY:  Good morning, Your Honor.  David Kuney

22  for EMC.

23                      CROSS-EXAMINATION

24  BY MR. KUNEY:

25  Q.   Good morning, Mr. Johnson.

1  A.   Good morning.

2  Q.   Mr. Johnson, let me direct your attention please back to

3  March of 2006.  That's the date that the EMC contract, which

4  is the subject of this motion, was entered into.  It's EMC

5  Exhibit 1.  If you need to look at it, it's next to you, but I

6  don't think my question necessarily requires that.

7  A.   It's good.

8  Q.   But I want to direct your attention to that time period

9  because you were employed by what I'm going to call American

10  Home Corp, correct, at that time?

11  A.   Yes, I was.

12  Q.   And that's, if I'm correct, the seller of the loans,

13  correct?

14  A.   Without looking at it that would be what I would assume,

15  yes.

16  Q.   Now, you were not in March of 2006 then at that time

17  aware of any special provisions in the Bankruptcy Code that

18  gave protection to what are called securities contracts, isn't

19  that correct?

20  A.   That is correct, I was not.

21  Q.   And you've -- and you're not -- well, are you familiar

22  even today with the provisions of Section 555 of the

23  Bankruptcy Code?

24  A.   Not with the specific provisions.  I've heard the term

25  555 thrown around.

1   Q.   So when you consulted, or when you answered inquiries

2   about the contract, if you did in March of 2006, you were not

3   then aware that a mortgage whole loan sale was a protected

4   contract under Section 555 of the Code?

5         MR. DORSEY:  Objection.  That assumes, Your Honor,

6   that their agreement is actually a protected contract under

7   Section 555.

8         THE COURT:  I think the question was more broadly

9   worded than that, so overruled.

10  A.   I would not have been aware of that at that time.

11  Q.   And I take it that neither -- that you have not had any

12  discussions with anyone from EMC, my client, about whether or

13  not the contract, the March 2006 contract would be viewed as a

14  single contract or two separate documents?

15  A.   There may have been -- I can't remember if I spoke to

16  anyone at EMC or Bear Stearns about the fact that it was a

17  single contract versus two or not.  I think we may have talked

18  about it during my deposition with your colleague, but --

19  Q.   All right.  Well, let me ask you and your counsel to

20  refer to page 194 of your deposition that was taken last week.

21        THE COURT:  You're going to need to give him a copy.

22        MR. KUNEY:  We will.

23        THE COURT:  Or you can read it, however you want to

24  proceed, but he doesn't have it up there.

25  BY MR. KUNEY:

1   Q.   It's a short read.  Let me read you the following

2   question and answer.

3   A.   Yes, sir.

4           MR. KUNEY:  Is that okay, Your Honor?

5           THE COURT:  Give Mr. Dorsey a moment.

6           MR. DORSEY:  Thank you, Your Honor, I'm ready.

7           THE COURT:  Okay, proceed.

8           MR. KUNEY:  Okay?

9   BY MR. KUNEY:

10  Q.   All right, Mr. Johnson, line 20.

11          THE COURT:  Go ahead.

12          MR. KUNEY:  Sorry, Your Honor.

13          THE COURT:  What page?

14          MR. KUNEY:  194.

15  BY MR. KUNEY:

16  Q.   Question was, "Did you have any discussions with anyone

17  from EMC about whether or not the contract for the purchase

18  and servicing would be a single contract or two separate

19  contracts?"

20       The witness, "I don't believe that I did, no."

21       Now, is that the testimony you gave at your deposition?

22  A.   I'm sure it is.  I think that's what I just said too, is

23  I don't believe that I did.

24  Q.   Okay, perhaps I misunderstood your answer then.

25  A.   Okay.

1   Q.   Now, Mr. Johnson, you testified with respect to the

2   calculation of the early payment default a few moments ago, do

3   you recall that?

4   A.   Yes, I do.

5   Q.   And that it sounded like from your testimony that you

6   would be familiar with the amount of repurchase obligations

7   that Corp has incurred during calendar year 2006 and calendar

8   year 2007, is that correct?

9   A.   I would be -- I don't know sitting here.  I could figure

10  it out if I went and I had, you know, information that was in

11  front of me, but.

12  Q.   Well, to assist me and the Court, can you give the Court

13  an estimate of the total amount of repurchase obligations that

14  Corp incurred during calendar year of 2006?

15  A.   You know, I could, it would be -- it's just a reasonable

16  guess that it was somewheres around, you know, five or six

17  hundred million dollars worth of claims in '06.  It could be

18  completely wrong, I apologize.

19  Q.   You didn't check that in order to testify today?

20  A.   No, absolutely not.

21  Q.   Did you -- when the debtor was preparing -- and I'll show

22  you the exhibit in a moment -- what had been called a schedule

23  of the cure amounts, did anyone consult with you as to the

24  repurchase obligation?

25  A.   Not as it relates exactly to creating a schedule.  I was

1  asked at some point to provide a list of outstanding

2  repurchase claims, which I did.

3  Q.   All right.  Do you know if those -- did you -- well, did

4  you look at the potential claims from EMC for repurchase

5  obligations?

6  A.   I didn't look at them specifically, no.

7  Q.   Have you heard some discussion or testimony during these

8  proceedings that EMC contends that because of the early

9  payment defaults there is an approximate claim of 24 million,

10 have you heard that before?

11 A.   I have heard that number before, yes.

12 Q.   Have you gone back to check or confirm or refute that

13 number in any way?

14 A.   No, I have not.

15 Q.   And when the cure amount was being calculated, did you

16 suggest or recommend that that amount be included in the cure

17 schedule?

18 A.   I didn't make recommendations as to what should or should

19 not be on the cure schedule.

20 Q.   Now, do you know -- well, are you aware that the cure

21 amount for EMC is currently shown as zero on the debtor's

22 schedules?

23 A.   I've heard that mentioned over the past couple of days.

24 Q.   Do you know if the debtor in fact pays zero as the cure

25 amount for the repurchase obligation?  What is your

1   understanding of how or if that obligation ever gets paid?

2              MR. DORSEY:  Objection, Your Honor.  I think that's

3   -- the question is vague.  I'm not sure he's talking about

4   from a legal perspective or from a monetary perspective.

5              THE COURT:  I have to admit I didn't follow it

6   either --

7              MR. KUNEY:  All right.

8              THE COURT:  -- so you better rephrase the question.

9   BY MR. KUNEY:

10  Q.   If the -- well, are you familiar that under this

11  transaction as I understand it, I think this is what the

12  witnesses have said, if the cure amount as shown is zero, that

13  means the purchaser is going to pay zero with respect to that

14  specific claim, is that your understanding?

15  A.   Yeah, I think that's right.  I'm not even sure that the

16  purchaser is -- this is, well, basically from what I've been

17  listening to.  I'm not sure if the purchaser pays the cure

18  amount or if it comes out of the cure escrow agreement which

19  might just be part of the proceeds that gets --

20  Q.   Right, well, let me suggest to you that it is.

21  A.   Okay, it's zero either way.

22  Q.   Okay, it's zero either way?

23  A.   Correct.

24  Q.   So we agree on that?

25  A.   Yes.

1   Q.   So that's my question.   If there's a 24 million dollar

2   liability, and if the purchaser is not going to escrow 24

3   million to pay it, what is your understanding as to how that

4   obligation will be paid?

5   A.   My under --

6            MR. DORSEY:   Objection, Your Honor.   It calls for a

7   legal conclusion.

8            MR. KUNEY:   I'm asking for a funding question, Your

9   Honor.

10           THE COURT:   Overruled.

11  A.   My business understanding would be that that 24 million

12  dollar claim or whatever claim EMC Bear Stearns may have would

13  remain with the debtor.

14  Q.   Does the debtor -- is it your understanding the debtor

15  intends to honor that claim?   Assuming it's established

16  properly as required.

17  A.   We have not determined whether or not that claim is

18  valid, if that's --

19  Q.   Well, do you know, would you take a look, please, at

20  what's been marked as EMC exhibit number 7.   It's modified

21  notice of possible assumption and assignment of certain

22  leases.

23           THE COURT:   Mr. Patton, could you have someone

24  assist the witness find the correct notebook.   EMC Exhibit 7.

25  Is it in binder 1 or 2?

1          MR. KUNEY:  1, Your Honor.

2          THE COURT:  All right, that's fine, ma'am, you can

3    do it.  EMC binder 1.  It should be up there somewhere.

4                         (Pause)

5    A.    Which page or tab?

6    Q.    It should be Exhibit 7, tab 7.

7    A.    Tab 7 is not -- oh, I'm sorry, what were you saying I was

8    looking for exactly?

9    Q.    Modified notice of possible assumption.

10   A.    Yes, that I found, correct.

11   Q.    Good, thank you.

12   A.    Go ahead.

13   Q.    Would you look at page 3, down at the very bottom, it

14   says, "Please take further notice".

15   A.    Yeah.

16   Q.    Now it says there that, and I'm going to abbreviate a

17   little bit, "any person receiving notice of the sale hearing

18   shall be" -- I'm going to A now -- "shall be forever barred

19   from objecting to the proposed cure obligations and from

20   asserting any additional cure or other amounts with respect to

21   the assumption and assignment of such potential executory

22   contracts".

23         So I guess my question is, as a business matter, is it

24   the debtor's intention then that if the purchaser puts zero

25   into the escrow, the cure escrow, and there's a repurchase

1    obligation determined, is it the intention of the debtor as a

2    business matter to bar all parties from ever recovering that

3    purchase obligation?

4              MR. DORSEY:  Objection, Your Honor.  It calls for a

5    legal conclusion.  He's asking this witness to interpret a

6    pleading.

7              THE COURT:  I agree.  Sustained.

8    BY MR. KUNEY:

9    Q.    Do you know approximately the amount of purchase

10   obligations that are going to be accruing between the initial

11   closing date and the final closing date?

12   A.    The repurchase obligation?

13   Q.    Yes.

14   A.    I would have no idea of that number.

15   Q.    Do you know whether or not the debtor, whether Corp

16   currently has sufficient capital to pay the repurchase

17   obligations?

18   A.    It would depend what the obligations were, I guess.

19   Q.    If the obligations are in the approximate range of 500

20   million dollars, on a calendar basis, and let's assume the

21   period between initial close and final close is three-quarters

22   of a year, eight months, is there sufficient capital to pay

23   the repurchase obligations?

24   A.    Well, it would seem to me first that the next three-

25   quarters of a year we would have less claims just as a result

1    of us not continuing to sell loans and incur early payment

2    defaults, but whether or not we would have sufficient capital

3    to pay those claims in full, it's just not, it depends on what

4    we sell our assets for, I guess.

5            MR. KUNEY:  All right, thank you, Your Honor,  I

6    have nothing further.

7            THE WITNESS:  Thank you.

8            THE COURT:  All right.  Mr. Gallo.

9            MR. GALLO:  Good morning, Your Honor.  Andrew Gallo

10   from Bingham, McCutchon for DB Structured Products, Inc.

11           THE COURT:  Good morning.

12                   CROSS-EXAMINATION

13   BY MR. GALLO:

14   Q.   Good morning, Mr. Johnson.

15   A.   Good morning, Mr. Gallo.

16   Q.   Mr. Johnson, you're an officer of both American Home

17   Mortgage Corp and American Home Servicing, correct?

18   A.   I know I'm an officer of American Home Mortgage Corp and

19   I know I'm an authorized signer for American Home Mortgage

20   Servicing, so whether that makes me a true officer in the

21   legal sense, I'm not sure, but I have signing powers.

22   Q.   Do you have a position with American Home Servicing?

23   A.   I know we talked about that the other day and again, my

24   title of EPD of Capital Markets is at Corp, whether that's the

25   same at Servicing or not, I guess I'm not a hundred percent

1  sure, but it seems to make sense if I can sign for servicing,

2  it would be, but I don't know.

3  Q.   Have you ever seen your name in print anywhere with a

4  title that was VP or another title associated with Servicing?

5  A.   No.

6  Q.   Do you know if the other members of senior management of

7  Corp also hold positions or have titles with respect to

8  servicing?

9  A.   Some may.  I think the reason that especially myself was

10 designated to be able to sign was more of a matter of

11 convenience than anything else.  I'm in the corporate office

12 and sometimes things need to be signed for servicing, and

13 they're not.

14 Q.   My question though was, whether or not you know whether

15 other members of senior member for corporation, other than

16 yourself, also have titles with respect to servicing?

17 A.   I'm not specifically aware if they do or not.

18 Q.   I want to talk a little bit about the process or the

19 analysis that American Home Corp undergoes with respect to

20 entering into servicing retained versus servicing released

21 transactions, okay?

22 A.   Sure.

23 Q.   And you talked a little bit about that with Mr. Dorsey on

24 direct, correct?

25 A.   Yes, I did.

1  Q.   And one of the things you testified went into that

2  decision-making process was pricing, correct?

3  A.   Yes, of course.

4  Q.   And so there -- if you put out a pool of loans to sell

5  servicing retained versus servicing released, there will be a

6  price that the market will pay for the servicing released

7  loans that will usually be in excess of servicing retained

8  because the buyer is also getting the servicing rights, is

9  that right?

10 A.   Yes, they're buying more stuff.

11 Q.   And I think the shorthand we used at your deposition was

12 there's a delta between the price for the servicing released

13 transaction versus the price for the servicing retained

14 transaction, is that right?

15 A.   That is typically correct, yes.

16 Q.   And if American Home Corp is to sell the loan servicing

17 retained, it obviously retains the servicing rights, correct?

18 A.   Yes.

19 Q.   And those servicing rights will produce an income stream

20 for American Home going forward if it performs the rights and

21 obligations under the servicing agreement, correct?

22 A.   Assuming that the borrowers don't pay off, yes.

23 Q.   And so one of the -- part of the analysis that you do for

24 American Home Corp is to look at the delta between the price

25 that buyers are willing to pay for servicing released loans

1    versus the price that the buyers are willing to pay for

2    servicing retained loans, and compare that against the income

3    stream you would expect to get going forward if you were to

4    retain the servicing rights, right?

5    A.   The present value of the cash flow net of the expenses

6    plus some other ancillary type things that might come into as

7    to what we thought were value, yes.

8    Q.   Yes.  So on the Corp level, when you're considering

9    entering into these transactions, you are concerned with what

10   the value will be for the actions that the servicer will

11   perform going forward on these loans, right?

12   A.   I'm just concerned that they service the loans, if that's

13   what you mean.

14   Q.   But what you're looking at is you're looking at what are

15   the servicing fees going to be for the next X amount of years

16   that we will have these loans, right?

17   A.   Yeah.

18   Q.   What are the other ancillary fees that we might get under

19   these servicing agreements, right?

20   A.   Yes, but those would all be actions that would happen in

21   servicing regardless of whether I cared about it or not.  It's

22   just -- and regardless of who the servicer was.  The service

23   fee is whoever owns the rights is gonna get them.

24   Q.   Right.  But when you were making the decision do I sell

25   these loans servicing released or do I sell these loans

1  servicing retained, you care about those fees and those

2  advances and those other things that are going to be attendant

3  with the servicing if you're going to retain it, right?

4  A.   Yes.

5  Q.   And it's particularly important to you, if I heard you

6  correctly on your direct, because it was not part of American

7  Home's regular business to ever sell servicing rights once it

8  retained it, isn't that right?

9  A.   Yeah, we have not done that.

10 Q.   You've never done that.  So you've never had a

11 transaction where you -- strike it.

12 A.   Okay.

13 Q.   Now, in addition to the economic benefit or the economic,

14 the pricing of difference between retaining servicing and

15 releasing servicing, there are other benefits that accrue to

16 American Home by virtue of the fact that it retains servicing

17 on pools of loans, is that correct?

18 A.   Yeah, they're indirect economics.  I mean, any benefits I

19 think of are economic benefits are not, but.

20 Q.   They're indirect economic benefits that aren't

21 necessarily associated with that price delta that we

22 discussed, right?

23 A.   They would be associated with that in that those are the

24 types of things that I consider in deciding whether or not to

25 retain rights or not.  If something has value, no matter how

1    small that value might be, it's got to be something I look at

2    as far as the value of the servicing rights.

3    Q.    And I think we're agreeing with each other.  The only

4    point I was trying to make is that the value with respect to

5    these other items is not in the actual monetary consideration

6    that is being provided to you from the counter party, right?

7    A.    Yes, these items are not part of the servicing fees if

8    that's what you mean, or ancillary fees that you would get as

9    a result of servicing.

10   Q.    And maybe it would be easier if we just kind of walk

11   through some examples of these.

12         So for example, and again we're looking at servicing

13   released versus servicing retained.  Now in both of those

14   transactions, in a servicing released transaction and a

15   servicing retained transaction, I believe you testified that

16   there are going to be EPD obligations, correct?

17   A.    Typically that's correct.

18   Q.    However, in the servicing retained transaction, if you

19   retain the servicing rights, it's easier for American Home to

20   verify claims by the purchaser for EPD's, right?

21   A.    It's easier for us to defend ourselves.

22   Q.    It's easy for you to verify whether or not the EPD claim

23   is a valid claim, right?

24   A.    Yes, it's easier for us to prove to the purchaser that is

25   coming back to us that it is not a valid EPD claim.

Johnson - Cross (Gal)                              61

1   Q.   And that's because American Home has retained the

2   servicing rights, and therefore American Home has certain of

3   the records that are necessary in order to verify the claim in

4   house, right?

5   A.   That is correct.

6   Q.   You don't have to go to a third party servicer like

7   Countrywide or Ocwen and try to get the records from them,

8   right?

9   A.   That is correct.

10  Q.   And this is a benefit that accrues to American Home in a

11  servicing retained transaction that would not be there in a

12  servicing released transaction, right?

13  A.   Yeah, it makes it easier for us.

14  Q.   The other thing is that a servicing retained transaction

15  is beneficial to American Home from an informational

16  perspective, right?

17  A.   That's correct.  We would have better information about

18  our credit performance and stuff like that.

19  Q.   So this is important when you're trying to underwrite --

20  when you were trying to underwrite your originating business.

21  In other words you would have that information as to how the

22  loans are performing or under -- how the loans -- strike that,

23  excuse me.  This is important in your origination business

24  because you'll have information as to how the loans you are

25  originating are performing and you have that information in

1  house because servicing is performing the servicing function,

2  right?

3  A.    Correct.

4  Q.    And again, that's another benefit that would accrue to

5  American Home when it sells loan servicing retained versus

6  servicing released, right?

7  A.    Correct.

8  Q.    And finally there are also competitive advantages that

9  accrue to American Home when it sells loan servicing retained

10  versus servicing released, isn't that correct?

11  A.    Yeah, there are some we retain the customer so that the

12  knowledge of the loan existing, I mean I guess the public

13  records have the fact that the loan exists, but if we sell the

14  servicing released there might be somebody else who now is

15  another mortgage company that now knows this borrower and

16  might be a competitor when they go to get a mortgage loan

17  sometime down the road.

18  Q.    Right.  So if you -- American Home has gone out and

19  originated this loan, and then it sells that loan servicing

20  released, and the person who buys the loan decides that they

21  want to use -- I'm sorry, say Countrywide to service the loan,

22  Countrywide now has a direct monthly contact with that

23  borrower and can solicit that borrower for a refinancing or

24  something else, right?

25  A.    I don't know for sure but if they don't own the loan

1    asset they may be not able to solicit the borrower directly.

2    They would certainly be allowed to have their company's name

3    on the monthly statement but I don't know if they can direct -

4    - there's a lot of no solicit clauses within different

5    contracts, so.

6    Q.   But in any event, when you're saying that there's

7    competitive reasons as to why you might prefer to retain

8    servicing, it would be so that one of your competitors like

9    Countrywide or somebody else would not be servicing loans that

10   you originated, right?  That's fair, isn't it?

11   A.   That is fair.

12   Q.   And when you have -- you add up all these factors, the

13   pricing and these other factors that are benefits to American

14   Home, it's true, is it not, that if those factors weigh in

15   favor of keeping or retaining the servicing rights, American

16   Home is going to be more likely to make concessions in its

17   MLPA's in order to retain those rights?

18   A.   We talked about this a little bit during my deposition

19   too and I was a little bit, I guess, unresolved on what you

20   were driving at.  But these concessions that you mention, I

21   don't know what they might be.  I guess you're gonna tell me

22   what they are.  But I think any concession that I would make,

23   again, my thought process, as far as my role in American Home

24   is I'm economics.  So, if a concession could cost money, I

25   would be cognizant of that, or I would try and be cognizant of

1  that.  So anything that someone might ask me should we do

2  this, I would have to think well, what could that cost me.

3  So, I know, if it was a -- I can't think of a non-monetary

4  concession.

5          MR. GALLO:  Your Honor, do you have a copy of Mr.

6  Johnson's deposition?

7          THE COURT:  If it's the one that was handed to me

8  earlier, yes.  Was he only deposed once?

9          MR. GALLO:  He was only --

10         THE WITNESS:  It seemed like more than once.

11         MR. GALLO:  Yes, it seemed like more than once but

12  no, it was only once.

13         THE COURT:  All right, I have it.

14         MR. GALLO:  I'm looking at page --

15         THE COURT:  He does not, however.

16         MR. GALLO:  Amanda, can you provide Mr. Johnson with

17  a copy of his deposition.  And I don't know if you have a mini

18  of what you're looking at, Your Honor, but we have a full copy

19  if that's easier for you.

20         THE COURT:  That's what I have.

21  BY MR. GALLO:

22  Q.   I'm looking at page 51 of your deposition, Mr. Johnson.

23  Let me know when you're there.

24  A.   Isn't that right at the top, right?

25  Q.   Yes.

1   A.   Got it.

2   Q.   And I don't know if you've seen a transcript before, but

3   down the left hand side there are numbers, those are line

4   designations.

5   A.   Yes.

6   Q.   So I'm looking at line 9, and I asked you, "Right,

7   obviously you wouldn't want to give the store away but you

8   might be willing to make more concessions to a buyer in a

9   transaction where you value that delta", and we were talking

10  about the delta between the benefits of a servicing retained

11  versus a servicing released transaction, "higher than any

12  transaction where that delta is smaller, is that fair to say?"

13  And your answer was, "As long as the value of the concessions

14  didn't chew up all the delta."  And then I questioned,

15  "Right?"  And you said, "That's possible."

16      That's consistent I think with what you testified here

17  today, right?

18  A.   Yes, that the economic value of those concessions would

19  be taken into account.

20          MR. DORSEY:  I'm going to object, Your Honor, to

21  using a deposition to confirm the testimony of the witness.

22          THE COURT:  Agreed and stricken.  That's not what a

23  deposition is for.  If you want to impeach him, impeach him.

24  He's under oath here today.  You can ask him the questions

25  today.  I don't want you using depositions to confirm what he

1    just said.  It's improper.  Those questions and answers are

2    stricken from the record.

3         MR. GALLO:  Mr. -- Your Honor, do I need to read the

4    deposition back in again if I want to use it again?

5         THE COURT:  To impeach him?

6         MR. GALLO:  Or to -- I believe I'm allowed to ask

7    him if that is correct, if he agrees with what he's testified

8    to.

9         THE COURT:  You already did.  You asked him a series

10   of questions.  You then read a deposition where you in effect

11   re-asked him all the same questions.  That's not proper use of

12   the deposition.  And now if you're going to ask him again, I

13   suspect Mr. Dorsey is going to say asked and answered, which I

14   would uphold that objection.  I think you've established --

15   I'm not trying to be difficult but --

16        MR. GALLO:  I understand, Your Honor.

17        THE COURT:  -- but I think you covered the ground.

18        MR. GALLO:  It's my fault.  I didn't -- I wasn't

19   aware that what Mr. Johnson testified was the same, but in any

20   event.

21   BY MR. GALLO:

22   Q.   Now, Mr. Johnson, all MLPA's are not created equally,

23   right?

24        MR. DORSEY:  Objection, vague, Your Honor.  I don't

25   know what that means.

1          THE COURT:  Overruled.  I understand.

2     A.   Yeah, they might have differences.

3     Q.   Each individual agreement isn't identical to the next

4     one, right?

5     A.   No.

6     Q.   You need to look at the individual terms of each contract

7     to understand what the terms of the deal are, right?

8     A.   That would seem to make sense to me.

9     Q.   And terms can differ in significant ways from deal to

10    deal, isn't that correct?

11    A.   Yeah, that's possible.

12    Q.   I want to first --

13         MR. GALLO:  Your Honor, do you have the Deutsche

14    Bank binder available?  The rest of the exhibits I'm going to

15    refer to are in there.

16         And Amanda, if you could find the Deutsche Bank

17    binder for the witness, Amanda.

18                         (Pause)

19         THE COURT:  You're fine.  Ms. Winfrey (phonetic) is

20    going to take care of you.

21    BY MR. GALLO:

22    Q.   I'd like you to -- I think what's been placed in front of

23    you, and correct me if I'm wrong, Mr. Johnson, is the MLPA for

24    my client that's dated as of May 1st, 2006, right?

25    A.   MLPSA, but yes.

1  Q.    MLPSA, correct?

2  A.    Yes.

3  Q.    And you've seen this agreement at least once before I

4  showed it to you at your deposition, right?

5  A.    That's correct.

6  Q.    And I want you to turn to -- by the way, you've been

7  present in the courtroom for all the testimony in this hearing

8  so far, right?

9  A.    I'd say substantially all, yes.

10  Q.    I'm going to -- we're going to turn to page 55 which is

11  the, contains Section 13.01 which is the indemnity provision

12  in this agreement.  And I've now probably read this into the

13  record two or three times so I'm going to spare the Court

14  doing that again, but if you could just turn to that.

15  A.    I'm there.

16  Q.    And I think you read -- you read this provision before at

17  least once because I asked you to read it at your deposition,

18  right?

19  A.    Yeah, I believe so.

20  Q.    Now, from a business standpoint, it wouldn't be unusual

21  to you for an agreement like this one to bind the servicer to

22  pay the reps and warranties relating to the sale, correct?

23  A.    If I remember correctly from the deposition, I believe

24  that I said that I hadn't -- that I hadn't seen a clause like

25  this before.  I didn't say whether it would be usual or

1   unusual because I was unfamiliar with it.

2        For the servicer you said, right?

3   Q.   Yes, let me just re-ask my question.

4   A.   Sure.

5   Q.   Because I wasn't asking you about what you testified to

6   at your deposition.  I was asking for your understanding as

7   you sit here today.

8        From a business standpoint, it wouldn't surprise you,

9   would it --

10  A.   Would not you're saying?

11  Q.    It would not surprise you if there was a provision of

12  this agreement, my client's MLPA that binds the servicer to

13  pay claims relating to reps and warranties surrounding the

14  sale, correct?

15  A.    From a business standpoint, prior to what I've, you know,

16  been a party to over the past couple days, I would have been

17  surprised.

18  Q.    That would have been surprising?

19  A.    I would have -- you know, I guess I would have -- I would

20  have known either way, so maybe whether I was surprised or

21  not, I guess, I don't know.

22  Q.    If we could turn to page 68 of your deposition.

23  A.    Sure.

24            MR. DORSEY:  I'm sorry, which page?

25            MR. GALLO:  68, John.

1              THE COURT:  I have a question before we get there.

2       When Mr. Johnson was deposed, was he deposed as a designated

3       representative under Rule 30(b)6?

4              MR. DORSEY:  Yes, Your Honor.

5              THE COURT:  All right.  I'm going to overrule my

6       previous evidentiary finding.  Use of a deposition by an

7       adverse party of an officer or director or someone who's been

8       deposed under Rule 30(b)6 may be used for any purpose, not

9       just for impeachment.  So I say it now in anticipation of any

10      further objections.  And Mr. Gallo, if at the end of your

11      testimony or at any time you want to go back to the testimony

12      that I precluded you from putting in the record, I'll allow

13      you to do that.

14              MR. GALLO:  Thank you, Your Honor.  I appreciate

15      that.

16      BY MR. GALLO:

17      Q.   I'm on page 68, Mr. Johnson, and I'm specifically at line

18      7.  And I asked you, question, "Would it surprise you to

19      understand that this agreement" -- and we were referring to

20      the MLPA that's DB-1 -- "from a business standpoint, would it

21      surprise you to understand that the agreement allows Deutsche

22      Bank to terminate servicing if there is a failure to make

23      those payments?"  And by those payments, we were talking about

24      reps and warranties relating to the sale, EPD's or premium

25      recapture.

1    A.    Yeah.

2    Q.    Mr. Dorsey objected to the form of my question, and you

3    answered, "From a business standpoint, it doesn't completely

4    surprise me.  But also from a business standpoint, prior to us

5    filing bankruptcy, we were working with Deutsche Bank, as we

6    were working with many other investors on repurchase claims

7    and premium recapture.  So there was never a point where they

8    might have said to us, quote, by the way, you are in default,

9    you know, a convention, a conversation I would have with

10   them."

11        Did I read that correctly?

12   A.    You did read it correctly.

13   Q.    And so is it correct that it wouldn't surprise you if

14   there was a provision of this agreement that would allow my

15   client to terminate servicing rights if the seller or the

16   servicer failed to pay EPD or premium recapture claims?

17   A.    I said it wouldn't completely surprise me.  I may have

18   been partially surprised, I guess.  Or if I look at the -- if

19   I'm allowed to look at the next page, I'm not sure, but it

20   says --

21             THE COURT:  Mr. Dorsey will take care of that.

22             THE WITNESS:  Okay.

23   BY MR. GALLO:

24   Q.    Well, let's read that in.  "But it wouldn't be an unusual

25   term for an agreement like this."

1          "Objection."   The witness, "I don't know if it would be

2     unusual or not.   I was unaware of it in this agreement."

3          Right?

4     A.   Right, which is what I think I said before we brought

5     this back out.

6     Q.   And the reason why you're unaware of it is because of the

7     answer to your previous question, is it not, in that

8     throughout the relationship that you had with Deutsche Bank

9     under this agreement, up until very near the bankruptcy, you

10    were successful in working with them to resolve EPD claims or

11    premium recapture claims before they rise to the level of

12    Deutsche Bank declaring a default, isn't that correct?

13    A.   That's probably right, yeah.   That we were working

14    together as business partners or whatever you want to call it.

15         I don't think I knew I was avoiding default though.   I

16    think it was just default under a servicing agreement.   I

17    think I was working together to avoid litigation or whether or

18    not I'm gonna repurchase loans or not.

19              MR. GALLO:  Move to strike the last part of the

20    answer, Your Honor.

21              THE WITNESS:  Sorry.

22              THE COURT:  Overruled.

23    BY MR. GALLO:

24    Q.   The -- when you perform obligations under contracts, you

25    do so, so that you don't end up in breach of the contract,

1  right?

2  A.   I perform obligations under contracts because of what I'm

3  told to do I guess by internal parties, I guess.  If that

4  happens to be an obligation of the contract, it's --

5  Q.   As a business person you understand how a contract works,

6  right?

7  A.   Yes.

8  Q.   You have certain rights and obligations under the

9  agreement, correct?

10  A.   Yes.

11  Q.   And if you don't perform your obligations under that

12  agreement, you may not receive the rights or benefits of that

13  agreement that you have previously negotiated, right?

14  A.   Sure, that seems to make sense to me.

15  Q.   All right.  Now, we were -- we spoke a little bit about

16  not all MLPA's being the same, and I just want to illustrate

17  that very briefly.

18      If you'll -- again, we've looked at the indemnification

19  provision in my client's agreement which is Section 13.01.  If

20  you'll turn to Exhibit 9 in the -- I'm sorry --

21            MR. GALLO:  9 in the binder, Your Honor.  John, 9.

22            THE COURT:  Exhibit 9?

23            MR. GALLO:  No, Mr. Johnson -- Amanda's going to --

24  my co-counsel, Ms. Winfrey is going to provide you with

25  Exhibit 9.  And I believe this is -- I'm just using my binder

1  for ease of reference, Your Honor.  I believe this exhibit is

2  already in evidence somewhere else.

3          THE COURT:  Exhibit 9?

4          MR. GALLO:  No, this is my, the Deutsche Bank

5  binder.  All the exhibits I'm using are in the Deutsche Bank

6  binder.  But this agreement is the EMC agreement which I

7  believe Mr. Kuney has entered as a separate agreement, but

8  just for ease of reference.

9          THE WITNESS:  Am I gonna need your 1301 still, I

10  assume?

11          MR. GALLO:  We'll see, but you can leave it there.

12          THE WITNESS:  Okay.

13  BY MR. GALLO:

14  Q.   And specifically I want to turn to page 65 of this EMC

15  agreement and this was negotiated on March 1st, 2006, so

16  approximately -- I'm sorry, this was dated as of March 1st,

17  2006, which is two months prior to my client's, the date of my

18  client's agreement, right?

19  A.   Yes.

20          MR. GALLO:  I think Mr. Dorsey will stipulate to

21  that.

22  Q.   The -- and I want to -- page 65 is the indemnification

23  provision for this agreement.  And that indemnification

24  provision contains two separate paragraphs, one that relates

25  to an indemnification provided by the company, who in this

1    agreement is equivalent to the seller in my agreement, is that

2    your understanding?

3    A.    Yes.

4    Q.    And there's a separate and distinct paragraph that deals

5    with the indemnification obligations of the servicer, right?

6    A.    Yeah.

7    Q.    And that's different than the indemnification -- reads

8    differently than the indemnification provision in my

9    agreement, right?

10   A.    More words.  Yes, it's separate.

11   Q.    And then if you'll turn to --

12           MR. GALLO:  Exhibit 10, Your Honor, in the binder.

13   And Ms. Winfrey, if you could provide the witness with the

14   Grenich (phonetic) agreement.

15   Q.    This Exhibit 10 is actually dated the same day as my

16   client's agreement, it's dated as of May 1st, 2006, right?

17   A.    Yes, it is.

18   Q.    And if you'll turn to the indemnification provision in

19   this agreement --

20   A.    Is it gonna be in 13?

21   Q.    It's actually Section 14, subsection 14.01 which is on

22   page 55.  This provision reads --

23   A.    Hold on a second.

24   Q.    I'm sorry.

25   A.    I'm there.

Johnson - Cross (Gal)                                76

1    Q.    This provision reads, "In addition to the indemnification

2    provided in Subsection 7.03, the seller or servicer as

3    applicable shall indemnify the initial purchaser and any

4    subsequent purchaser."

5          Do you see that?

6    A.    Yes, I do.

7    Q.    And then again, that wording is different than the

8    wording in the indemnification provision that appears in my

9    client's agreement, right?

10   A.    Yes, it's different.

11   Q.    The words "as applicable" don't appear in 13.01 of my

12   client's agreement, right?

13   A.    That is correct, at least not in that sentence.

14   Q.    Right.  You can put that away.  I'm done with that, Mr.

15   Johnson.

16         I just want to address as one final topic point,

17   assignment, assumption and recognition agreements.  Are you

18   familiar with those, Mr. Johnson?

19   A.    I'm familiar with the term, and the document that was

20   used in conjunction with -- taking the MLPSA and then using

21   those -- when you securitize those loans, that document is

22   sometimes executed.

23   Q.    And if I refer to it as an AAR, is that okay?  Would you

24   know I'm referring to the assignment, assumption and

25   recognition agreement?

1    A.    That works for me.

2    Q.    Okay.  And the way that -- and again, not all AAR's are

3    the same, but typically the way that this agreement is

4    utilized is that you will have a master loan purchase and

5    servicing agreement that is entered between your client and my

6    client say that sells loans on a servicing released basis.

7    Are you with me?

8    A.    No, say that again, I'm sorry?  You said servicing

9    released.

10   Q.    Servicing retained, excuse me.

11   A.    Yes.

12   Q.    And if my client -- often times what my client will do is

13   it will take the loans that it owns and it will transfer them

14   to a secure -- it will securitize those loans, correct?

15   A.    That is correct.

16   Q.    And as part of the securitization process, the loans, the

17   ownership interest in the loans will be transferred to a trust

18   or some other entity that's associated with the security,

19   right?

20   A.    That's my understanding.

21   Q.    And as part of that process, what will often times happen

22   is the -- my client will assign its rights to receive the

23   servicing from American Home to the entity that is, that is

24   part of the securitization, for shorthand we'll call it the

25   trust, okay?

1    A.    Okay.

2    Q.    Is that correct?

3    A.    I'm not sure.  I'm not sure exactly what the document

4    was.

5              MR. DORSEY:  I'm not sure what the question is, Your

6    Honor.  Is he asking him if it's okay to refer to it as the

7    trust or is there another question?

8              THE COURT:  It was a poorly worded question.

9              THE WITNESS:  That's what I was asking too.

10             MR. GALLO:  I apologize.

11   BY MR. GALLO:

12   Q.    Going forward, if I -- I'm going to refer to the entity

13   that -- do you understand when I refer to the trust, I'm

14   referring to the entity to whom my client would transfer loans

15   if it was going to securitize loans?  Can we use that as

16   shorthand?

17   A.    That's fine with me.

18   Q.    Okay.  So in a securitization transaction, often times

19   what will happen is the servicing rights that my client has

20   under the master loan purchase and servicing agreement will be

21   assigned to the trust, correct?

22   A.    Can you repeat the question?  I just want to make sure I

23   hear it right.

24   Q.    Yes.  The servicing rights that my client has under the

25   master loan purchase and servicing agreement, my client will

1  assign those rights to the trust?

2  A.    I thought under a retained transaction I have the

3  servicing rights.

4  Q.    Well, my client has a right to receive the servicing,

5  right?

6  A.    To receive the servicing, I'm not sure I follow that.

7  You have the right to receive principal and interest payments.

8  Q.    When I own the loans, when American Home services the

9  loans, they are servicing the loans for my client's benefit,

10  right?

11  A.    Yes.

12  Q.    You're collecting principal and interest for Deutsche

13  Bank, right?

14  A.    Yes.

15  Q.    And when my client assigns or sells the loans or places

16  the loans in a trust, it is now the trust that owns the income

17  stream, the principal and interest that's arising out of these

18  loans, right?

19  A.    Yes.

20  Q.    And the rights and obligations you have, American Home

21  has, as a servicer to service the loans are performed for the

22  trust, right?

23  A.    Yes.  I'm not sure if they're exactly the same from in

24  the MLPSA to what had to do with the trust, but generally we

25  would then be servicing for the benefit of the trust.

1   Q.   And that's what I'm getting to. The document that

2   transfers those servicing rights, or the right to receive the

3   servicing from my client to the trust, that's the AAR, right?

4              MR. DORSEY:  Objection, Your Honor.  This witness

5   testified on direct that he is not involved in the

6   transactions involving the AAR's except to provide information

7   to counsel. And we had extensive testimony about this

8   yesterday from Mr. Love.  I think we're spinning our wheels

9   here and wasting a lot of time.  It's outside the scope of

10  this witness's direct testimony.

11             THE COURT:  Response to whether it's outside the

12  scope of direct.

13             MR. GALLO:  Well, if it's outside the scope of

14  direct, if the -- if Mr. Dorsey will promise that he will keep

15  Mr. Johnson around till my case in chief, I'll call him on

16  this point then or I can call Mr. Love.  I think Mr. Johnson

17  testified earlier on my cross-examination that he has an

18  understanding of what AAR's do and what they are.

19             THE COURT:  I believe he testified that he

20  understood the term.  I'm not sure he testified as to the

21  mechanism.  Also I don't -- I'm not going to require Mr.

22  Dorsey to promise you anything.  If you wanted this witness as

23  part of your case, you had subpoena powers.  All right?  But

24  I'll give you some latitude on this to the extent the witness

25  can answer -- understands and answers the questions he can.

1          THE WITNESS:  You're going to need to repeat the

2     question.  I'm sorry.

3     BY MR. GALLO:

4     Q.   My question was do you understand that when -- that when

5     my client does a securitization, one of the documents that is

6     executed, and the purpose of the document is an AAR, which

7     transfers the right that my client has to receive the

8     servicing to the trust.  Now the trust has the right to

9     receive the servicing.  Do you understand that?

10    A.   I understand that -- I guess I don't know exactly that

11    that's what that document does.  I understand that often times

12    when third party securitizations as we call them are done,

13    that the securitizing entity or the owner of the loans asks to

14    have that document executed I guess is the best way to put it.

15    Q.   Let me approach this from a different angle, okay?

16    A.   Sure.

17    Q.   Under an MLPA, Corp has -- under your opinion -- strike

18    that.  Under an MLPA there are obligations for EPD's and

19    premium recapture claims, right?

20          MR. DORSEY:  Objection, Your Honor.  He's using the

21    term MLPA.  It's MLPSA.

22          THE COURT:  MLPSA.  Well, it makes a difference.

23    The S is servicing.  MLPSA.

24          MR. GALLO:  I'm sorry, Your Honor.  The term that we

25    used throughout the deposition was MLPA so that's why I'm

1  confused, but I will use MLPSA from now on.

2            THE WITNESS:  There are MLPA's also.

3            MR. GALLO:  My apology.  Let me restate the

4  question.

5  BY MR. GALLO:

6  Q.   Under -- and let's talk specifically about my client's

7  agreements.  Under the Deutsche Bank agreement, the Deutsche

8  Bank MLPSA, there are -- my client has rights for EPD claims

9  and for premium recapture claims, right?

10  A.   There are provisions I believe within that contract

11  related to those items.

12  Q.   And when my client sells or transfers loans into a

13  securitization, those claims remain, right?  We still have the

14  EPD rights and we still have the premium recapture rights,

15  correct?

16  A.   I'm not sure if whatever documents that transfers loans

17  into the trusts somehow change the relationship between

18  American Home Mortgage Corp and DB Structured Products or not.

19  Sometimes I -- I know that we have repurchased loans that have

20  been securitized, and I know that other times we have not had

21  to I guess, because once they're securitized, there's

22  different, I think, different reasons why you can and can't

23  buy loans out of a trust, so that will cause a problem I

24  think.

25  Q.   I think you anticipated my question is that, there have

1   been points in time where after investors such as my client

2   has placed loans in a securitization, you have had to satisfy

3   EPD claims that were made by someone like my client, right?

4   A.   Yes, I believe that's been the case.

5   Q.   And if you'll --

6        MR. GALLO:   Let's take a look at tab 5 in the

7   binder, Your Honor.   And can you, Ms. Winfrey, can you provide

8   the witness with the agreements behind tab 5.

9        And Your Honor, we -- there -- and I've gone through

10  this with the debtors.   There are actually two different

11  assignment, assumption and recognition agreements behind this

12  tab.   But they're kind of clipped together but they're two

13  different agreements.   But I'm just going to ask about the

14  first one.   I believe they're both in evidence, John?   You put

15  all the AAR's in?

16        MR. DORSEY:   I believe that's correct, yes.

17  BY MR. GALLO:

18  Q.   And so, and I just want to understand if this is

19  consistent with your business understanding.   With respect to

20  -- this is an AAR, and if you'll look in the first couple of

21  paragraphs, the second paragraph, it references the May 1st,

22  2006 agreement that is Deutsche Bank's MIMLPSA, right?

23  A.   In Exhibit AB, right?

24  Q.   Yes.

25  A.   Second paragraph?

Johnson - Cross (Gal)                                    84

1    Q.    Yes.

2    A.    It references that agreement, yes.

3    Q.    And if you look at the paragraph under assignment and

4    assumption, what's being assigned -- that paragraph, just read

5    that for me.

6    A.    You want me to read it out loud?

7    Q.    No, you can just read it to yourself.

8                MR. DORSEY:  I'm sorry, which paragraph are we

9    looking at?

10               MR. GALLO:  Paragraph 1, John.

11               MR. DORSEY:  Under assumption and assignment

12   agreement?

13               MR. GALLO:  Yes.  Assumption and assignment --

14               MR. DORSEY:  Or assignment and assumption.

15               MR. GALLO:  I'm sorry, assignment and assumption,

16   paragraph 1.

17                            (Pause)

18   A.    Okay.

19   Q.    Now, the -- I should have made this clear before you read

20   it and I apologize, but the -- in this agreement, the MLPSA

21   with my client is defined as the servicing agreement, do you

22   see that?  That's in the second paragraph or the full

23   paragraph of the agreement.

24   A.    Let me read that for a second.

25                            (Pause)

1  A.   Yeah, it seems to -- yes, it says it.

2  Q.   And what that paragraph 1 says is that the servicing

3  agreement is being assigned but what's being reserved and not

4  being assigned are all the rights and obligations under

5  Section 7 of that agreement, isn't that right?

6  A.   That's what it seems to say.  I'm not --

7  Q.   And Section 7 of my client's agreement is the section

8  that contains the reps and warranties relating to the sale.

9  So the way that this agreement is set up is that the --

10  there's a specific agreement executed --

11       MR. DORSEY:  I think counsel may have misspoke.  I

12  don't believe it's Section 7 in that paragraph.  It's Section

13  7.03 which refers to.  Unless I'm looking in the wrong place.

14       THE COURT:  Mr. Dorsey is correct.

15  BY MR. GALLO:

16  Q.   It says, "Under the representations and warranties

17  contained in Section 7.03 of the servicing agreement and the

18  signer is retaining the right to enforce the representations

19  and warranties set forth in Section 7 of the servicing

20  agreement against the company."

21       Did I read that correctly?

22  A.   No.

23  Q.   I did not read that correctly?

24  A.   Section 7.03 of the servicing agreement.

25  Q.   And then if you go on to read further.

1   A.   Oh, the Roman numeral 7.

2   Q.   Section Roman numeral 7, right.  Correct?  I read that

3   correctly, right?

4   A.   Yes.

5   Q.   And so pursuant to this agreement which is signed by my

6   client and signed by American Home Servicing, what occurs is

7   that the servicing rights are specifically transferred, and

8   the reps and warranties relating to the sale that would appear

9   in Section 7 are specifically retained by my client, isn't

10  that right?

11          MR. DORSEY:  Objection.  Calls for a legal

12  conclusion.

13          THE COURT:  Sustained.  You're asking him to read

14  the contract to me, and then tell me what it means.  All

15  right?  Mr. Johnson is clearly an intelligent person.  I don't

16  care what his legal interpretation of this contract is.

17          MR. GALLO:  I understand, Your Honor.

18  BY MR. GALLO:

19  Q.   From a business standpoint -- and I think I already

20  established this, but just to clean it up, from a business

21  standpoint, it would be consistent with your understanding

22  that in some circumstances after loans are securitized, the

23  sale reps and warranties will remain with the initial

24  purchaser of the loans, right?

25  A.   Yes, that does happen from time to time.

1    Q.    Okay.  And do you also have an understanding that often

2    times when servicing rights or obligations are transferred

3    pursuant to an AAR, that there will be modifications of those

4    obligations?

5    A.    I think I've heard that that there are.  I don't know

6    directly that there are modifications.

7    Q.    And if you'll turn to page 5 of this AAR agreement,

8    there's a section of the agreement which is Section 7 that's

9    entitled modification of servicing agreement, do you see that?

10   A.    Which page, I'm sorry?

11   Q.    I'm sorry, this agreement is AB  is numbered 1 of 17, 2

12   of 17, you see at the top?

13   A.    Yes.

14   Q.    I'm on page 5 of 17.

15   A.    And -- okay, I'm there.

16   Q.    And you see there's a section that's labeled modification

17   of the servicing agreement?

18   A.    I do.

19   Q.    And am I correct that that section goes on for the next

20   two pages and finishes at the end of page 7?

21   A.    Yeah, that's what it seems to do.

22            MR. GALLO:  Your Honor, I don't have anything more

23   for this witness.  My only -- I just want to -- I think all

24   exhibits that I used are in.  I'm just not sure. But I'd like

25   to offer into admission -- I know the EMC agreement is in, I'm

1  assuming the Grenich exhibit is part of the debtor's binders.

2  If not, I'd move that into admission.  And I would move the

3  AAR's into admission as well.

4           MR. DORSEY:  Could we just have a moment, Your

5  Honor?

6           MR. GALLO:  Or we could resolve this on a break.

7           THE COURT:  Yes, as a matter of fact we're going to

8  take one, so let's take a five or ten-minute break before we

9  reconvene and you can work out the documents during the break.

10  During the break, sir, you can't discuss the substance of your

11  testimony with counsel.

12           THE WITNESS:  Understood.

13                (Off the record at 12:27 p.m.)

14                (On the record at 12:38 p.m.)

15           THE CLERK:  All rise.

16           THE COURT:  Please be seated.

17           MR. GALLO:  Your Honor, I believe that the issues

18  have been resolved and the debtors agree that those exhibits

19  that I used can be admitted.  Is that correct, Mr. Dorsey?

20           MR. DORSEY:  That's correct, Your Honor.

21           THE COURT:  All right, so just so the record's

22  clear, DB Exhibits --

23           MR. GALLO:  5, which is the 2 AAR's.

24           THE COURT:  Okay.

25           MR. GALLO:  And then Exhibit 9 is the EMC agreement

1   which is already in evidence, and Exhibit 10 is the Grenich

2   agreement, which is not otherwise in evidence.

3           THE COURT:  All right.  So, DB Exhibits 5, 9 and 10

4   are admitted without objection.

5           (DB Exhibits 5, 9 and 10 admitted into evidence)

6           MR. GALLO:  Thank you, Your Honor.

7           THE COURT:  Thank you.  Your master mortgage loan

8   purchasing and servicing agreement was previously admitted.

9           MR. GALLO:  If not, I'm not doing my job.

10          THE COURT:  All right, who's next?  Mr. Fallon.

11              CROSS-EXAMINATION BY MR. FALLON:

12  BY MR. FALLON:

13  Q.   Good morning, Mr. Johnson.  I'm sorry, good afternoon,

14  Mr. Johnson.  Brett Fallon for CitiMortage as master servicer.

15  A.   Good afternoon.

16  Q.   You had testified that you had negotiated several of the

17  purchasing and servicing agreements?

18  A.   I testified that I -- I believe what I testified was I

19  was involved in negotiations surrounding those types of

20  transactions.  Whether or not I was the one who dealt directly

21  with the counter party, it was more of our legal counsel

22  internally.

23  Q.   Okay.  And in those agreements they had -- they set up --

24  they provided for the servicer to set up custodial accounts,

25  are you familiar with that?

1    A.    Yeah, I believe that would be the case.

2    Q.    And the -- at least as contemplated by the agreement, the

3    servicer would withdraw funds from those custodial accounts,

4    either to pay the purchaser or pay itself fees, is that fair?

5    A.    Yeah, I think that's how it works.

6    Q.    Now in any of those purchase and sale agreements -- or

7    I'm sorry, purchase and servicing agreements that you are

8    familiar with, did they ever prohibit the servicer from

9    withdrawing amounts from those custodial accounts where the

10   purchaser had a right to have the mortgage repurchased?

11   A.    The first time that that kind of came to my attention was

12   over the past few days starting with my deposition the other

13   day.

14   Q.    So you weren't familiar with that at all before?

15   A.    No.

16   Q.    And that had not been the subject of any discussion that

17   you were aware of?

18   A.    Not that I recall, no.

19   Q.    Are you familiar with any time where a purchaser had a

20   right to repurchase and had not had that mortgage repurchased?

21   A.    The purchaser had a right to repurchase or they had a

22   right to ask the seller to repurchase?

23   Q.    They had a right to have the seller repurchase that

24   mortgage loan and that repurchase right had not been honored?

25   A.    I guess --

1          MR. DORSEY:  I couldn't follow the question.  Is he

2     asking whether there was a valid EPD recognized by AHM that

3     was not paid or is he talking about whether there were

4     negotiations that were disputed EPD's?

5          THE COURT:  I don't think he was that specific.

6     Maybe you could restate the question, Mr. Fallon.

7     BY MR. FALLON:

8     Q.   Let me ask first, are you aware of a circumstance where

9     AHM had recognized that there is a right of repurchase,

10    whether it's for an EPD or for whatever reason, and AHM had

11    not honored that?

12    A.   I mean to me AHM would recognize that by actually sending

13    the money and repurchasing the loan but were there times where

14    we may have agreed yeah, you're right, we should repurchase a

15    loan either telephonically or by email and then subsequently

16    we went and filed for bankruptcy and didn't do it, that's

17    possible, yeah.

18    Q.   Okay.  Had a servicer sought to enforce any provision

19    prohibiting AHM from withdrawing money from the custodial

20    accounts on account of what they thought was a valid right of

21    repurchase?

22    A.   I would have no idea.

23    Q.   Okay.

24          MS. FALLON:  No further questions.

25          THE COURT:  Thank you.

Johnson - Cross (Chi)                                92

1          THE WITNESS:  Thank you.

2          THE COURT:  Mr. Chipman.

3                    CROSS-EXAMINATION

4    BY MR. CHIPMAN:

5    Q.    Good afternoon, Mr. Johnson.

6    A.    Good afternoon.

7    Q.    My name is Wayne Chipman, I represent Countrywide.

8    A.    Mmhmm.

9    Q.    Are you familiar with Country-Wide's mortgage loan

10   purchase and servicing agreement?

11   A.    Not specifically.  We may have a number of them, I don't

12   know.

13   Q.    Okay.

14   A.    If you want to refer me to one I'll --

15   Q.    I'll refer you to, I believe it's -- I don't think these

16   are in evidence, but Exhibit 33 of the debtor's exhibits.

17   A.    Excuse me.

18          THE COURT:  The ones to the right there, are those

19   the ones from Deutsche Bank?

20          THE WITNESS:  Some of them are, I believe some of

21   them actually are marked exhibit and some are --

22          THE COURT:  Ms. Winfrey, can you take those back, if

23   you don't mind.  It's getting awfully crowded up there.

24          MS. WINFREY:  Sorry.

25          THE COURT:  Thank you.  We're not going to be able

1  to see the witness pretty soon.

2           THE WITNESS:  That's fine with the witness.

3           THE COURT:  Thank you, Ms. Winfrey.

4  A.   That was 33, right?

5  Q.   I believe it's 33.

6  A.   Hang on a second.

7                        (Pause)

8  A.   I'm on 33.

9  Q.   Do you recall having any participation in negotiating

10  this particular agreement?

11  A.   Again, I don't think that I negotiated back and forth

12  with Country-Wide's counsel.  Specifically I know that I would

13  have spoken with business folks at Countrywide relating to

14  this -- maybe not the actually MLPSA but the -- any

15  transactions that would have occurred underneath -- if that's

16  the right legal way to say that.

17  Q.   Fair enough.  I'm going to ask you basically general

18  questions so hopefully, hopefully you can answer them, and if

19  you can't, you can let me know.

20       This agreement is listed on the debtor's schedule 1.1J.

21  A.   Okay.

22  Q.   If -- in a typical mortgage loan purchase and servicing

23  agreement such as this, are the servicing rights embedded

24  within this agreement?

25  A.   If it's a purchase and servicing agreement, I would

1  assume that the servicing rights would be somehow embedded in

2  there, yeah.

3  Q.    Okay.  If I could direct your attention to page 28,

4  article 4.  It's entitled "servicing of the mortgage loans".

5  A.    I'm there.

6  Q.    That section would generally deal with servicing rights

7  and obligations under this agreement, correct?

8  A.    Without reading the whole document, it seems to be about

9  right, but I don't know.

10 Q.    Do you -- do you know today whether, which obligation --

11 rights and obligations under this agreement are being sold and

12 which rights and obligations under this agreement are being

13 retained by the debtors?

14         MR. DORSEY:  Objection.  Calls for legal conclusion.

15         THE COURT:  No, not the way it was asked, I don't

16 think.  He can answer whether or not he knows.  Overruled.

17 A.    The way I understand it is that the administrative right

18 or the administrative requirements of servicing a loan and

19 then the right to receive the servicing fee and all the other

20 ancillary fees that kind of go along with servicing is what we

21 are trying to sell to the purchaser.

22 Q.    Let me ask another question.  You can't -- sitting here

23 today you can't tell me which sections of this agreement are

24 being sold and which sections of this agreement are being

25 retained by the debtor?

1   A.   No, I couldn't.  As a section by section review, I would

2   need help from an attorney to do that.

3   Q.   O.  And you were here in the courtroom yesterday when Mr.

4   Love testified basically the same thing.  He couldn't tell me

5   which sections of this agreement were being sold and which

6   sections of this agreement were being retained by the debtors?

7           MR. DORSEY:  Objection.  Mischaracterizes Mr. Love's

8   testimony.  I believe he stated that he could go through the

9   agreement but the Court ordered Mr. Chipman not to do that

10  with the witness.

11          THE COURT:  Sustained.

12  BY MR. CHIPMAN:

13  Q.   Is there anyone at the debtor's that could tell me which

14  specific sections of this agreement, to your knowledge, are

15  being sold sitting today, and which sections of this agreement

16  are being retained by the debtors?

17  A.   I wouldn't be able to answer that.  I wasn't involved in

18  that.

19  Q.   You don't know?

20  A.   No, I don't know.

21  Q.   Do you know whether or not there's premium recapture

22  obligations contained within this agreement?

23  A.   You'd make it easier for me if you told me where it was.

24  Q.   Why don't I direct you to Sections 3.3 and 3.5.

25  A.   Yes, there appears to be premium recapture.  Not exactly

1  those words in this contract but the same principle.

2  Q.   So generally the premium recapture obligations your --

3  I'm sorry?

4  A.   No, it does say premium recapture here on the next page.

5  Q.   Okay.  So generally premium recapture obligations are

6  contained within this agreement?

7  A.   They're inside the agreement, yes.

8  Q.   And repurchase obligations, are they also contained

9  within this agreement?

10  A.   That appears to be the case, yes.

11  Q.   Thank you.  There was testimony yesterday that AHM is

12  fully complying with all the servicing terms under this

13  agreement, is that your understanding or do you have an

14  understanding otherwise?

15  A.   Complying with the servicing terms?  I'm not -- I believe

16  what we are -- whether AHM is today or -- maybe you should ask

17  the question again, sir.

18  Q.   Let me -- are you aware of any deficiencies in any of the

19  servicing obligations under this particular agreement?

20  A.   As far as I know, American Home Mortgage Servicing is

21  doing what it's always done and has continued to do so, if

22  that's what you mean.

23  Q.   Have you received any correspondence from Countrywide at

24  all related to the servicing under this agreement?

25  A.   Yes, I have.

1    Q.    Okay.  And do you recall what the subject of that

2    correspondence was?

3    A.    Sure, it was a termination letter.

4    Q.    Was there any other correspondence received?

5    A.    Not that I can recall.  There may very well have been.

6              MR. CHIPMAN:  Your Honor, may I approach the

7    witness?

8              THE COURT:  Yes.

9    A.    Can I put your agreement away or do we still need this

10   out?

11             MR. CHIPMAN:  If it pleases the Court, can I mark

12   this as Countrywide 1, Your Honor?  I believe it was attached

13   to one of our objections.

14             THE COURT:  Yes.

15             (Countrywide 1 marked for identification)

16   BY MR. CHIPMAN:

17   Q.    Mr. Johnson, why don't you take a minute and familiarize

18   yourself with what I've handed you and marked as Countrywide

19   1.

20                        (Pause)

21   A.    Okay, I'm familiar now.

22   Q.    Do you recall receiving this letter from Countrywide?

23   A.    Honestly I don't.  I mean, I know it has my name on it

24   and I'm sure it got sent to me, but at that time, September

25   18th, it was right before our Broad Hollow auction and I was

1    kind of focusing on that, and I've got a lot of documents that

2    come to me and I think most of them I just kind of hand over

3    to our counsel and don't --

4    Q.    Okay.  And I noticed Alan B. Horn (phonetic) has been

5    copied on this.  Who is Alan B. Horn?

6    A.    He's American Home's general counsel.

7    Q.    So if he had gotten this letter would he have -- is it

8    ordinary business practice for him to contact someone?

9              MR. DORSEY:  Objection, lack of foundation.

10             THE COURT:  Sustained.

11   BY MR. CHIPMAN:

12   Q.    After reading the letter -- strike that.

13         I'd like to turn to Sections 5.8 and 5.9 of the

14   agreement.

15   A.    Got it.

16   Q.    I believe they're on page 45.

17   A.    Yeah, I'm there, I'm sorry.

18   Q.    Would Sections 5.8 "purchaser's right to examine seller's

19   records", and 5.9 "seller shall provide information as

20   reasonably required", in your business view, your

21   understanding as a business person, would that be something

22   that Countrywide would be entitled to under this agreement?

23             MR. DORSEY:  Objection.  Calls for legal conclusion.

24             MR. CHIPMAN:  Your Honor, I think I'm just --

25             THE COURT:  I don't understand the question

1  actually.  Countrywide would be entitled to sections of the

2  agreement?  I don't know what you mean.

3        MR. CHIPMAN:  Your Honor, I'll rephrase the

4  question.

5  BY MR. CHIPMAN:

6  Q.  Does Countrywide under this -- do you understand whether

7  or not Countrywide has a right under this agreement to examine

8  the seller's, AHM's books and records?

9  A.   To me it seems like what Countrywide would be trying to

10  do is review the servicing I guess -- or the seller's records

11  -- let me read them before I --

12  Q.  Why don't you take a minute and familiarize yourself with

13  the provisions of the agreement.

14                     (Pause)

15  A.   Okay, I'm more -- do you want to answer your question

16  again -- ask your question again?

17  Q.   If Countrywide were trying to verify the amounts

18  contained in its custodial accounts, and they requested

19  information from AHM, would AHM generally be obligated to

20  provide such information?

21        MR. DORSEY:  Objection.  Calls for a legal

22  conclusion.  He asked the witness to read a provision and

23  respond to what it means.

24        THE COURT:  Mr. Chipman, I agree.  You can't ask a

25  lay person to read contract provisions and then tell you what

1   they think they mean or what the entitlements are under those

2   contract provisions.  That's a legal question.

3            MR. CHIPMAN:  I'll ask general questions, Your

4   Honor, on his business knowledge.

5   BY MR. CHIPMAN:

6   Q.   In your experience at AHM, if a purchaser of loans

7   request information relating to custodial accounts, generally,

8   would AHM normally provide that type of information?

9   A.   I don't know what they would do.  I believe that they'd

10  provide remittance reports and whether or not that shows

11  balances and custodial accounts or not, I don't know.

12  Q.   If remittance reports were provided to Countrywide, is

13  there any way -- that's just information that's provided by

14  AHM to Countrywide, correct?

15  A.   That's right.  Well, it's provided to -- yeah, to

16  Countrywide and the master servicer, whoever the master is.

17  Maybe Countrywide is in this agreement, I don't know.

18  Q.   And what do these remittance reports generally entail,

19  what kind of information?

20  A.   I believe they would have loan level information about

21  the loans that are being serviced.  I haven't looked at one,

22  so.

23  Q.   Would those be helpful to a loan purchaser to establish

24  or to figure out what's owed under these types of agreements?

25            MR. DORSEY:  Objection, Your Honor.  He just said

Johnson - Cross (Chi)                                    101

1   he's never seen one of these agreements.  How could he

2   possibly testify as to whether it would be helpful to an

3   investor.

4           THE COURT:  Response, Mr. Chipman.

5           MR. CHIPMAN:  Your Honor, I'm just trying to

6   establish whether -- how we can establish our cure amount

7   under this particular agreement given the records that are

8   being provided, that's all.

9           MR. DORSEY:  Well, Mr. Love was on the stand for

10  eight hours yesterday, Your Honor, from AHM Servicing, and he

11  could have answered those questions but he didn't ask them of

12  that witness.

13          MR. CHIPMAN:  I -- Your Honor, I'll move on.  If he

14  doesn't know, he doesn't know.  If he's not dealing with the

15  servicing aspect of it --

16          THE COURT:  All right.

17          MR. CHIPMAN:  -- I understand that.

18          Can I have a minute, Your Honor?

19          THE COURT:  Mmhmm.

20                          (Pause)

21  BY MR. CHIPMAN:

22  Q.   We had talked a little bit earlier about you acknowledged

23  receipt of a termination letter from Countrywide, is that

24  correct?

25  A.   Have I seen a copy of it, yeah.

1    Q.    Okay.

2              MR. CHIPMAN:  Your Honor, may I approach the

3    witness?

4              THE COURT:  Yes.

5    A.    Thank you.

6              THE COURT:  Thank you.

7              MR. CHIPMAN:  If it pleases the Court, can I mark

8    this as Countrywide 2?

9              THE COURT:  Yes.

10             MR. CHIPMAN:  Thank you.

11        (Exhibit Countrywide 2 marked for identification)

12   BY MR. CHIPMAN:

13   Q.   Mr. Johnson, I've just handed you what's been marked

14   Countrywide 2.  Have you seen this letter before?

15   A.   Yes, I have.

16   Q.   Is this the letter sent by Countrywide to American Home

17   Mortgage Corp on August 3rd, 2007 purporting to terminate the

18   agreement?

19   A.   Yes, it is.  I mean I -- this was an interesting one in

20   that when I received it it was actually -- I mean it's dated

21   August 3rd and I could tell that Countrywide tried to send it

22   on August 3rd I guess but for some reason UPS or Fed-Ex didn't

23   deliver it till like August 7th, but I think it also came to

24   me by email, but I could be wrong about that.

25   Q.    Okay.  This letter purports to terminate the agreement

1   without cause.  Are you familiar without cause termination

2   provision?

3   A.    I understand what it means, I think.

4   Q.    Can you explain to the Court what that means in your

5   business understanding?

6   A.    Sure.  It means that they can terminate without having a

7   good reason to do so, I guess, without cause.

8   Q.    If you could turn to Section 7.2 of the agreement.

9   A.    I'm there.

10  Q.    Can you tell me your general understanding of Section 7.2

11  of the agreement from a business perspective, what it means to

12  you when you're negotiating these types of agreements?

13  A.    That generally, my thought would be that if the purchaser

14  wants to terminate the servicing without cause, that they

15  would have to fairly compensate us for that.

16  Q.    Okay.  When you say fairly compensate, what does that

17  mean in your understanding?

18  A.    Come to an agreement as to what the market price were of

19  those assets.

20  Q.    So if Countrywide were to terminate this agreement

21  pursuant to Section 7.2, it would have to pay you something

22  for the servicing rights?

23  A.    That is my understanding of this section or clause,

24  whatever.

25  Q.    And doesn't this agreement provide that the parties are

1  to sit down and figure out what that value is?

2  A.   It does.

3  Q.   Okay.  In the context of the sale to the purchaser, is it

4  -- are the loans that are being serviced for Countrywide, are

5  they a necessary component of the minimum value, the 38

6  billion (sic) dollars that's been testified to?

7  A.   It would be if I didn't have 38 billion otherwise.

8  Q.   So if you had 38 billion, would it -- could you sell the

9  servicing rights back to Countrywide for fair market value?

10        MR. DORSEY:  Objection.  It calls for speculation.

11        THE COURT:  Overruled.

12 A.   If we were able to meet the minimum 38 million, I think

13 the only issue is, and I'm not a hundred percent familiar, is

14 that there were a number of specific servicing rights that

15 were listed in somewhere of the APA that said that the debtor,

16 American Home, has the right to sell those prior to the

17 initial close.  I don't know that your particular servicing

18 rights were on that list, so I don't know if I can or I can't.

19 Q.   Okay.  I don't believe they were, but I can tell you that

20 because of the termination, this was listed on Schedule 1.1K.

21 A.   That I know.

22 Q.   If this was listed on 1.1K, do you know whether or not

23 the unpaid principal balance is included or excluded in the 38

24 billion dollar minimum?

25 A.   The 38 billion dollar minimum doesn't -- to me it's just

1    -- it's the deliverable amount.  It doesn't include or exclude

2    any particular rights.  It's just to close we need to deliver

3    38 billion.  I don't know if -- let's just assume there were

4    40 billion of total servicing rights that we thought we could

5    sell and there were five billion on a disputed list, and we

6    lost all the disputes, I don't know if that gives the

7    purchaser an opt out because we can only deliver 35 if only

8    the reason was that everything else was disputed and

9    ultimately got terminated.  I don't know the answer to that.

10   Q.   So you don't know whether the purchaser can walk, if the

11   terminated amounts aren't -- if you lose on the termination

12   issues, if you drop below the 38 billion, you're not certain

13   what happens?

14   A.   That's correct, I don't know.

15            MR. CHIPMAN:  Your Honor, I have no further

16   questions.

17            THE COURT:  Thank you.

18            THE WITNESS:  Thank you.

19            THE COURT:  Any other cross-examination?

20            MR. CHIPMAN:  Your Honor, I don't know if anyone has

21   an objection.  Can I move C -- Countrywide 1 and 2 into

22   evidence?  They're attached to our objection.

23            THE COURT:  Any objection?

24            MR. DORSEY:  No objection, Your Honor.

25            MR. CHIPMAN:  Thank you, Your Honor.

Johnson - Redirect (Dor)                    106

1          THE COURT:  Admitted without objection.

2      (Countrywide Exhibit 1 and 2 admitted into evidence)

3          THE COURT:  All right, I see no further cross-

4  examination, so redirect, Mr. Dorsey.

5          MR. DORSEY:  Can I just have five minutes, Your

6  Honor, to consult with my colleagues?

7          THE COURT:  Yes, you may.  Yes, we'll take a brief

8  recess.

9                  (Off the record at 1:05 p.m.)

10                  (On the record at 1:17 p.m.)

11          THE CLERK:  All rise.

12          THE COURT:  Please be seated.

13          Any redirect, Mr. Dorsey?

14          MR. DORSEY:  Very brief, Your Honor.

15                  REDIRECT EXAMINATION

16  BY MR. DORSEY:

17  Q.   Mr. Johnson, you were asked on cross-examination by Mr.

18  Gallo for Deutsche Bank about how you determine the value of

19  the servicing rights; do you recall that?

20  A.   Yes, I do.

21  Q.   If there was a particular agreement that required the

22  servicer to pay for EPD and premium recapture claims, would

23  that affect the value of those servicing rights?

24  A.   It would affect the value of those rights if you weren't

25  -- let me think -- who's the owner of the rights?  If the

Colloquy                                   107

1    servicer is the owner of the rights and they are on the hook

2    for EPD and premium recapture, would that affect the

3    valuation?  Yes, I would think -- yes, it would.

4    Q.    How would it affect it?

5    A.    It would reduce it.

6    Q.    Thank you.

7              MR. DORSEY:  That's all I have, Your Honor.

8              THE COURT:  All right, thank you.  You may step

9    down.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Okay, wow, finished on time.

12             MR. DORSEY:  The only open issue at this point, Your

13   Honor, from the debtor's perspective, we still have our expert

14   witnesses to testify tomorrow.  I've had some conversations

15   with counsel for the objectors who have indicated they are

16   going to bring witnesses but I'd like to get a little more

17   clarification on whether the debtors can have an opportunity

18   to depose those witnesses versus just having a statement of

19   what they're going to testify about.

20             THE COURT:  Well, let's deal with the easy issue

21   first, which is tomorrow.  I would -- I have all day tomorrow.

22   I was going to propose starting at nine a.m. tomorrow.  To the

23   extent we need to go on till Friday, I have some matters in

24   the morning and a meeting, but we can start at 11:30 on

25   Friday.  So with any luck we'll finish the last witness on

Colloquy                                    108

1    Thursday, last debtor witness.

2              So it was my anticipation that we would then turn --

3    probably basically reserve tomorrow for the expert witness,

4    unless it's -- I'm assuming he's going to last about as long

5    as Mr. Love lasted, but maybe I'm wrong.

6              MR. DORSEY:  I'm hoping it's more like along the

7    lines of Mr. Johnson, Your Honor.

8              THE COURT:  Okay, all right, so that becomes the --

9    the issue then becomes when do you take these depositions of

10   these people in anticipation of their testimony?  We have how

11   many witnesses -- we have two Deutsche Bank witnesses, two

12   GMAC witnesses and one EMC witness.

13             MR. DORSEY:  Correct, Your Honor.  Although they've

14   all fudged a little bit by saying we may call but we're not

15   entitled -- entirely sure yet, so --

16             THE COURT:  Well, they're not going to call any more

17   than that.

18             MR. DORSEY:  That's correct, Your Honor.

19             THE COURT:  Well, it really becomes a debtor

20   question, Mr. Dorsey, and I think it would be fair to give the

21   debtors an opportunity to depose these witnesses prior to

22   having to hear them for the first time in trial.  But to give

23   you the time to do that would require putting those witnesses

24   off until next week.  So, you have the Hobson's choice of

25   deposing them on the stand in Court for the first time and

1   keeping the sale hearing moving, or having the weekend or

2   Thursday or Friday or what have you to get ready and then to

3   have the hearing last that much longer.   I'm not asking you

4   to answer that right now.  I don't think there's any other way

5   to do it.

6          Mr. Kuney and Mr. Gallo have risen, so I assume they

7   have some comment.

8          MR. KUNEY:  May I, Your Honor?

9          THE COURT:  Yes, please.

10         MR. KUNEY:  Your Honor, I just want to point out I

11  don't think it's necessarily a Hobson's choice for the

12  following reason.

13         On September 28th I sent to Mr. Brady and Mr.

14  Dorsey, with whom we have I think very good relationships, an

15  email, it's actually Exhibit A, and I proposed that they

16  identify all their witnesses, that we'd get together, we'd

17  work all this out, we'd come up with a cooperative way of

18  resolving how the hearing would proceed.

19         I mean regrettably I didn't even get a no; I got

20  nothing, and that was September 28th.  I told them at the end

21  of the email that I reserve my right to ask the Court for some

22  assistance on how we ought to structure the discovery and the

23  hearing and I'm sure for a good reason, but the Court was not

24  inclined to grant my motion for a status conference and the

25  debtor didn't consent to it.

1        But the short of it is I think the administrative

2    point is I've been trying to get the parties to organize the

3    hearing and come together before and set up discovery

4    schedules and whatnot.  The only reason I got to take

5    depositions at all, when we saw other parties had noted

6    depositions, we filed our own quickly and then had to invite

7    ourselves to a conference call, when we finally learned you

8    know, Monday of last week who they were going to be.

9        It need not have been this way.  I don't think it's

10   particularly fair to our side to now say we're going to have

11   depositions, certainly not during the hearing, which I think

12   Mr. Dorsey may have been proposing --

13            THE COURT:  Well, we're not going to do that.

14            MR. KUNEY:  All right.

15            THE COURT:  I don't think it's -- clearly, Mr.

16   Kuney, you're the lead counsel for your client in this matter

17   and it's a matter of some import, to say the least.  I'm not

18   going to require you to bifurcate your case, or Mr. Gallo,

19   your case and be in two places at the same time.  And that's

20   why I'm sort of laying it out like I am in connection with we

21   either sort of go forward, or continue to go forward with the

22   hearing or we take a break to allow Mr. Dorsey an opportunity

23   to depose your witnesses.

24            Now, to quote my colleague, Judge Shannon, we are

25   where we are, and then he would usually say "let's eat lunch"

Colloquy                                          111

1   -- (laughter)-- but we don't have to do that quite yet.  Could

2   it have been done a different way?  Well, you know, I'm sure

3   it could have been done a different way.  And all things being

4   equal, maybe it would have been preferable but I'm sure there

5   are good reasons why it wasn't done another way.

6        So I'm focused more on figuring out how to solve the

7   problem and have a hearing that makes some sense and give the

8   debtors an opportunity to be prepared.  I don't know if Mr.

9   Gallo, you had any comments other than you didn't want to --

10  you probably were going to say the same thing, you didn't want

11  to be in two places at the same time.

12       MR. GALLO:  That's it, Your Honor, and I think Mr.

13  Dorsey had proposed doing the depositions tomorrow and I was

14  just going to say that I didn't want to do it that way.  But I

15  think your Hobson's choice resolves that issue.

16       THE COURT:  Now if he chooses to continue the

17  hearing for some time, to allow him to depose those witnesses,

18  you're going to need to work with him to make those people

19  available reasonably and it may be that there is some

20  appropriate dual tracking of depositions going on.  I'm not

21  necessarily sure Mr. Gallo needs to be at EMC's deposition and

22  vice versa for Mr. Kuney, but --

23       MR. DORSEY:  I can cut this short, Your Honor,

24  because I think given the Hobson's choice, the debtors would

25  prefer to complete the hearing in order to get this sale done.

1          THE COURT:  And I'll give you wide latitude on

2    cross-examination, Mr. Dorsey, not having had an opportunity

3    to depose these witnesses.

4          MR. DORSEY:  Thank you, Your Honor.

5          THE COURT:  All right, so we'll continue on.

6          So then the issue will be, we're going to start with

7    the fifth witness tomorrow morning and go hopefully to the

8    end.  If we finish with that witness tomorrow, does it make

9    sense to have, to move directly to objector witnesses or would

10   you like -- would the objectors like more concrete idea of

11   when they're going to begin?

12         MR. KUNEY:  Your Honor, I think if we do finish in

13   time, I think we'll be prepared to start.  I mean, I'll do

14   what the Court would like to do, to accommodate Your Honor's

15   schedule, so if it works out that it's better to continue,

16   we're happy to do so.  If the Court would rather start the

17   next day, that's fine too.  But we'll be ready to do what the

18   Court would like us to do.

19         THE COURT:  All right, well, to a certain extent

20   we'll just have to play it by ear.  Is your witness going to

21   be here one way or the other, sir?

22         MR. KUNEY:  Yes, Your Honor.

23         THE COURT:  All right.  Why don't we say we'll start

24   with Mr. Kenney's witness, EMC's witness, and to the extent

25   that we -- if time permits, we'll move right into that, and to

1    the extent it doesn't, we should certainly be in a position by

2    Friday I would hope to move on to the objectors' evidence.

3              MR. DORSEY:  Your Honor, can I still get the

4    objecting parties to identify the subject matters that their

5    witnesses are going to testify to?

6              MR. GALLO:  I've already done that.

7              THE COURT:  I think that would be fair.  I think you

8    can do that offline but I think that would be fair for Mr.

9    Dorsey.

10             Ms. Lawson, did you have something to say?

11             MS. LAWSON:  No, not now.

12             THE COURT:  Not now.  When things are going your

13   way, don't speak, right?

14             MS. LAWSON:  Right.

15             MR. SCHNABEL:  Your Honor, Eric Lopez Schnabel on

16   behalf of U.S. Bank.

17             Just a question in terms of scheduling --

18             THE COURT:  Which bank, I'm sorry?

19             MR. SCHNABEL:  U.S. Bank.

20             THE COURT:  Okay.

21             MR. SCHNABEL:  In its capacity as a trustee.  Judge,

22   just in terms of scheduling, just being the pessimist, if

23   we're not done on Friday, just --

24             THE COURT:  Oh, I don't think we'll be done on

25   Friday.

Colloquy                                    114

1          MR. SCHNABEL:  Well, then can you give us a hint

2    just so people can coordinate travel schedules?  Mine is easy

3    but others in my firm are not, you know, as to next week, that

4    would be most helpful.

5          Unless we go straight through Saturday which would

6    mean that I would need a family lawyer -- (laughter).

7          MR. DORSEY:  Your Honor, John Dorsey again for the

8    debtors.

9          I was a little concerned with Your Honor's comment

10   that we won't be done on Friday.  I'm hoping that we will be

11   done on Friday.  I have a family obligation on Monday and

12   Tuesday of next week and will be out of town which would make

13   it difficult for me to cross-examine the witnesses.

14         THE COURT:  Well, we'll play it by ear.  I'm hoping

15   we're finished too but I'm not overly optimistic because --

16   well, it depends on what you mean by finished.  You mean

17   finished evidence, maybe.  Finished argument, I mean argument

18   is going to take some time.

19         MR. DORSEY:  As long as we're done with the

20   witnesses, Your Honor, Mr. Patton is going to do the

21   arguments.

22         THE COURT:  All right, you don't care about his

23   schedule, I understand.

24         MR. KUNEY:  Your Honor --

25         THE COURT:  I have availability next week and I will

Colloquy                                    115

1    -- not as much as I had this week but I will work you in to

2    the best of my ability.  Mr. Kuney, yes, sir?

3         MR. KUNEY:  Your Honor, I know this sounds fanciful

4    but I did not expect this hearing to last through beyond

5    Friday, maybe not even beyond Monday, but in any event, I have

6    a fairly significant unbreakable lead speaking engagement in

7    San Diego on Wednesday and Thursday, so I would not be able to

8    be here, so I'm hopeful if the Court would consider that

9    scheduling matter --

10        THE COURT:  We're not going to get that far.  Let's

11   -- notwithstanding Mr. Schnabel's request, I think we'll deal

12   with -- we're going to have to deal with this as we see how

13   the next two days go.  We've accomplished quite a bit in

14   really not even a half day, a full day and a quarter day.

15        So maybe I'm overly pessimistic because we have all

16   day tomorrow and we can go late tomorrow.  And once we start

17   on Friday we have all day Friday and we can go late Friday.

18   So, maybe we'll finish.  Maybe we won't.

19        Anything else for today?  I can keep you here all

20   day chatting but I assume you don't want to sit through

21   consumer Chapter 7 calendar.

22        So the hearing is adjourned until tomorrow at --

23   what did I say, nine a.m.  Tomorrow at nine a.m., and I would

24   ask you to -- you don't need to clear everything but if you

25   could pack up as much as possible there, we will have a dozen

1    or so people in here at two o'clock.  All right?

2            Thank you.  Hearing is adjourned until tomorrow at

3    nine.

4            COUNSEL:  Thank you, Your Honor.

5                (Matter adjourned at 1:30 p.m.)

6                    *  *  *  *

7

8

9            **C E R T I F I C A T I O N**

10

11        I, Sandra Carbonaro, court approved transcriber,

12   certify that the foregoing is a correct transcript from the

13   official electronic sound recording of the proceedings in the

14   above-entitled matter.

15

16

17   _____

18   SANDRA CARBONARO

19

20   <u>Doman Transcribing & Recording Svcs.</u>     _____

21   AGENCY                              DATE

22

23

24