UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                      .  Case No.  07-11047 (CSS)
                            .  Adv. Nos. 07-51684 (CSS)
                            .            07-51704 (CSS)
                            .
AMERICAN HOME MORTGAGE      .
HOLDINGS, INC., et al.,     .  824 North Market Street
                            .  Wilmington, Delaware 19801
                            .
                            .
          Debtors.          .  April 14, 2008
. . . . . . . . . . . . . .  10:17 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Young, Conaway, Stargatt & Taylor, LLP
                            By: DONALD J. BOWMAN, JR., ESQ.
                                SEAN M. BEACH, ESQ.
                                SCOTT A. HOLT, ESQ.
                                MATTHEW B. LUNN, ESQ.
                                SHARON M. ZEIG, ESQ.
                                EDWARD J. KOSMOWSKI, ESQ.
                                JAMES L. PATTON, JR., ESQ.
                            The Brandywine Building
                            1000 West Street, 17th Floor
                            Wilmington, DE 19801

For Koch/WARN Act:          Margolis Edelstein
                            By: JAMES E. HUGGETT, ESQ.
                                MEGHAN KELLY, ESQ.
                            750 S. Madison Street
                            Suite 102
                            Wilmington, DE 19801


Audio Operator:             Leslie Murin

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont.):

For the Committee:          Hahn & Hessen, LLP
                            By:  MARK S. INDELICATO, ESQ.
                                 MARK POWER, ESQ.
                            488 Madison Avenue, 14th & 15th Floor
                            New York, NY 10022

For Kathy Koch, et al.:     Gardner, Middlebrooks, Gibbons,
                               Kittrell & Olsen, P.C.
(via telephone)             By:  MARY OLSEN, ESQ.
                                 MICHAEL McCrary, ESQ.
                            1119 Government Street
                            Mobile, AL 36652

For the Committee:          Blank Rome LLP
                            By:  BONNIE FATELL, ESQ.
                                 DAVID W. CARICKHOFF, JR., ESQ.
                            Chase Manhattan Centre
                            1201 Market Street
                            Suite 800
                            Wilmington, DE 19801

For Bank of America:        Kaye Scholer, LLP
                            By:  SCOTT D. TALMADGE, ESQ.
(via telephone)                  MARGOT SCHONHOLTZ, ESQ.
                                 425 Park Avenue
                            New York, NY 10022-3598

For Kathy Koch, et al.:     Outten & Golden LLP
                            By:  RENE ROUPINIAN, ESQ.
                            3 Park Avenue
                            29th Floor
                            New York, NY 10016

For the Trustee:            United States Department of Justice
                            Office of the United States Trustee
                            J. Caleb Boggs Federal Building
                            By:  JOSEPH J. McMAHON, JR., ESQ.
                            844 King Street, Suite 2207, Lkbox 35
                            Wilmington, DE 19801:

For Bank of America:        Potter, Anderson & Corroon, LLP
                            By:  LAURIE SILVERSTEIN, ESQ.
                            Hercules Plaza
                            1313 North Market Street, 6th Floor
                            Wilmington, DE 19801

APPEARANCES (Cont.):

For the Trustee:            United States Department of Justice
                           Office of the United States Trustee
                           J. Caleb Boggs Federal Building
                           By:  JOSEPH J. McMAHON, JR., ESQ.
                           844 King Street, Suite 2207, Lkbox 35
                           Wilmington, DE 19801

For JPMorgan Chase:        Landis Rath & Cobb LLP
                           By:  MATTHEW McGUIRE, ESQ.
                           919 Market Street
                           Suite 600
                           Wilmington, DE 19899

For WLR Recovery Fund:     Greenberg Traurig, LLP
                           By:  VICTORIA W. COUNIHAN, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Suite 1200
                           Wilmington, DE 19801

For Northwest Trustee      Connolly Bove Lodge & Hutz LLP
Services:                  By:  CHRISTINA M. THOMPSON, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Wilmington, DE 19899-2207

For Wells Fargo Bank:      Wolf, Block, Schorr and
                             Solis-Cohen, LLP
                           By:  TODD C. SCHILTZ, ESQ.
                           Wilmington Trust Center
                           1100 North Market Street
                           Suite 1001
                           Wilmington, DE 19081

                           Bayard
                           By:  ERIC M. SUTTY, ESQ.
                           222 Delaware Avenue
                           Suite 900
                           Wilmington, DE 19899

                           Chapman and Cutler
                           By:  FRANKLIN H. TOP III, ESQ.
                           111 West Monroe Street
                           Chicago, IL  60603

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (Cont'd.):

For Alan Weinreb:        Law Office of Alan Weinreb
                         By:  ALAN WEINREB, ESQ.
                         Syosset, NY

For Allen & Overy:       Allen & Overy, LLP
                         By:  PAMELA CHEPIGA, ESQ.
                              NATHAN REILLY, ESQ.
                         1221 Avenue of the Americas
                         New York, NY  10020

For Calyon:              Hunton & Williams
                         By:  JASON HARBOUR, ESQ.
                         Riverfront Plaza, East Tower
                         951 East Byrd Street
                         Richmond, VA 23219-4074

**J&J COURT TRANSCRIBERS, INC.**

5

## INDEX

| **WITNESSES** | **PAGE** |
|---|---|
| DAVID BERLINER | |
| Direct Examination by Mr. Power | 37 |
| | |
| WILLIAM FAY | |
| Testimony Read Into The Record | 120 |
| | |
| SIMON SAKAMOTO | |
| Direct Examination by Mr. Beach | 126 |
| Cross Examination by Mr. Top | 138 |
| Redirect Examination by Mr. Beach | 143 |
| | |
| WILLIAM FAY | |
| Direct Examination by Mr. Top | 145 |
| Cross Examination by Mr. Beach | 147 |
| | |
| DAVID E. FENNELL | |
| Direct Examination by Mr. Wisler | 161 |
| Cross Examination by Mr. Lunn | 184 |
| Cross Examination by Mr. Power | 191 |
| Redirect Examination by Mr. Wisler | 194 |
| Recross Examination by Mr. Lunn | 196 |

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| Committee Exhibit 1 Chart | 41 | 53 |
| Debtors' Exhibit 1  e-mail | 133 | 144 |
| Debtors' Exhibit 2  document | 134 | 144 |
| NWTS-1 E-mail, Cole to Olsen, 8/7/07 | 261 | 184 |
| NWTS-2 Application for Order | 169 | 184 |
| NWTS-3 Affidavit of Todd Hendricks | 171 | 184 |
| NWTS-4 Retention Order | 172 | 184 |
| NWTS-5 Letter from Young Conaway | 174 | 184 |
| NWTS-6 First Quarterly Application | 176 | 184 |
| NWTS-7 Second Quarterly Application | 176 | 184 |

1    COURT CLERK:  All rise.

2    THE COURT:  Please be seated.

3    MR. LUNN:  Good morning, Your Honor.

4    THE COURT:  Good morning, Mr. Lunn.

5    MR. LUNN:  May it please the Court.  Matthew Lunn

6 from Young Conaway on behalf of the debtors.  Referring to the

7 amended agenda that was filed last Friday, April 11th, you can

8 quickly dispose of agenda Items 1 through 25 as Items 1 through

9 9 are either being adjourned or have been withdrawn.  Agenda

10 items then 10 through 25 were the subject of certificates of no

11 objection under certifications of counsel, and orders have been

12 entered with respect to those matters, and we appreciate Your

13 Honor's consideration of those.

14    THE COURT:  All right.

15    MR. LUNN:  I would also like to note for the record

16 that agenda Item 30, which was the motion to compel filed by AH

17 Mortgage Acquisition Co. has been withdrawn.  I'm pleased to

18 report that the final closing of the servicing sale occurred on

19 Friday, April 11th after extreme efforts on behalf of all

20 parties involved.  So AH Acquisition had withdrawn that motion

21 late on Friday, Your Honor.

22    THE COURT:  All right.

23    MR. LUNN:  That then carries us to agenda Item 26,

24 and I don't know if Your Honor wishes to proceed with --

25    THE COURT:  Let's do the fee apps first --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LUNN:  Okay.

2          THE COURT:  -- because I assume there are people on

3  the phone that can deal with this who don't need to stick

4  around, if that's acceptable.

5          MR. LUNN:  It is, Your Honor.

6          THE COURT:  Just globally, I have -- we have reviewed

7  them all, which was fun.  I only have questions in connection

8  with five applications, so that's -- and I don't have a lot,

9  but I have issues with Young Conaway, Cadwalader, Allen and

10  Overy, Alan Weinreb, who's a foreclosure professional, and

11  Blank Rome.  I didn't have any issues with any others, so I'll

12  approve those, and we can just address the one's I have

13  questions with, if that's okay.

14          Let's start with Young Conaway.  And, of course, you

15  know, your firm's applications are generally fine.  Basically,

16  I had some issues with the vagueness of some entries for one

17  specific associate, E. Kostoulas -- Kostoulas.

18          MR. LUNN:  Andy, yes --

19          THE COURT:  All right.

20          MR. LUNN:  -- Kostoulas.

21          THE COURT:  Andy?

22          MR. LUNN:  Andy, yes.

23          THE COURT:  That's easier.

24          MR. LUNN:  I figured it would be, Your Honor.

25          THE COURT:  Okay.  Basically, vagueness.  December

1  20th, 6.9 hours, research state and local taxes.  I don't know

2  what that is, why he's doing it.  You go into January, and

3  maybe you can just tell me what this was.  He spent a lot of

4  time working on a memo re LPMI Obligations.

5           MR. LUNN:  That relates to lender purchaser or lender

6  mortgage -- mortgage insurance, Your Honor, and there is an

7  issue that is addressed actually in the objection to the

8  settlement between the Committee and B of A related to one of

9  these remaining issues.  LPMI is a remaining issue between the

10 debtors and B of A as to who's responsibility it is.  H Corp.

11 -- American Home Mortgage Corp. had paid those amounts on

12 behalf of the servicer, so there is an issue going through the

13 underlying documents to determine who ultimately is the party

14 responsible.

15          THE COURT:  All right, so when I -- when he's doing

16 -- when it says memo re, I assume he's researching and drafting

17 it?

18          MR. LUNN:  Yes, Your Honor.

19          THE COURT:  All right.  And that's -- is that what

20 the research he was doing in December was as well?  Do we know?

21          MR. LUNN:  I believe it's --

22          MR. BEACH:  Your Honor, may it please the Court.

23 Sean Beach on behalf of the debtors.  The December research in

24 connection with the taxes I believe relates to the IndyMac

25 transaction.  There was --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. BEACH:  -- an issue as to who was to pay the

3  taxes in connection with that deal, and he was doing research

4  on that.  I'll -- we'll certainly go back and talk to Mr.

5  Kostoulas about having more detailed time entries.  For the

6  record, he is a corporate attorney, and we probably didn't make

7  it clear to him as to what the requirements were.

8          THE COURT:  Those corporate guys, they're trouble.

9                    (Laughter)

10         THE COURT:  Yes, let's -- okay.  Given the

11  explanation, I'll approve the fees for today's purposes, but

12  please reiterate with your -- even your corporate associates

13  that we need a little more detail in the fee applications.

14  Those are the only issues I had in connection with Young

15  Conaway, so based on that clarification, I'll approve it in

16  full.

17         MR. LUNN:  Thank you, Your Honor.

18         THE COURT:  Is there anyone here for Cadwalader?

19                   (No verbal response)

20         THE COURT:  Anyone on the phone?

21                   (No verbal response)

22         UNIDENTIFIED SPEAKER:  No, Your Honor, I don't see

23  anyone for that firm.

24         THE COURT:  All right.  Thank you.  Yes, I was just

25  checking myself.  Thank you.  Well, Mr. Lunn, I'll let you pass

1  it on, and we'll have to either pass them to the next hearing

2  or just reduce their hours accordingly, because I had some

3  questions.  Again, some vagueness issues.  October 10th, I

4  assume it's Mr. Bevilacqua, 1.3 hours for attention to e-mail

5  research issues.  I don't know what that means.

6          On January 9th, P. Williams, an associate, six and a

7  half hours for contract diligence.  And then there's some

8  lumping issues on January 22nd with J. Perez, an associate, and

9  G. Zimmer, eight and a half and 6.8 hours, respectively,

10  multiple tasks, no breakdown.  And January 28th, again

11  vagueness, J. Perez, an associate, 13 and a half hours for

12  attention to motion to strike reply and motion to dismiss

13  reply.  I don't know what attention to means.  So we need to

14  either carve them out or just --

15          MR. LUNN:  We'll carve them out, Your Honor --

16          THE COURT:  All right.

17          MR. LUNN:  -- and continue their interim fee

18  application to the next omnibus, if that's acceptable?

19          THE COURT:  The whole fee application?

20          MR. LUNN:  The whole fee app.

21          THE COURT:  Fine with me.  That'll teach them not to

22  come.

23          MR. LUNN:  Oh, boy.

24          THE COURT:  If you want to get paid, at least get on

25  the phone.

1           MR. LUNN:  Your Honor, we'll try to strike those

2    amounts submitted in the interim.

3           THE COURT:  Mr. Beach is reminding you that you need

4    to preserve the source of business, that is New York counsel.

5    Whatever you want to do, again, it's Bevilacqua 1.3 on October

6    10th, P. Williams six and a half on January 9th -- I don't have

7    the rates in front of me, so you'll have to do them at -- J.

8    Perez was eight and a half hours on January 22nd, and G. Zimmer

9    was six and a -- 6.8 hours on the same day, and then Perez

10   again for 13 and a half hours.  That's actually two days,

11   January 28th and 29th.  All right?

12          Allen and Overy.  Anyone here for Allen and Overy?

13          MS. CHEPIGA:  Yes, Judge, it's Pamela Chepiga and

14   Nathan Reilly.

15          THE COURT:  Okay.  Again, it's a vagueness issue.

16   There are some hour -- 5.4 hours on November 19th by N.

17   Mitchell.

18          MS. CHEPIGA:  November 19th, N. Mitchell.

19          THE COURT:  Yes, 5.4 hours, conducted research on a

20   legal issue in connection with DOJ/SEC investigation.  Can you

21   provide me with a little more detail on that?

22          MS. CHEPIGA:  I can go back and let you know, Judge,

23   what that is.  Occasionally, the entries may be a little bit

24   vaguer, because --

25          THE COURT:  I understand.  If you need to let me

**J&J COURT TRANSCRIBERS, INC.**

1  know --

2         MS. CHEPIGA:  But I don't necessarily want to

3  highlight what an issue is.

4         THE COURT:  Yes.  If you need to let me know in

5  camera, that's fine.

6         MS. CHEPIGA:  Okay, so it's November 19th --

7         THE COURT:  Yes.

8         MS. CHEPIGA:  -- Nick Mitchell.  Let me just check if

9  Mr. Reilly might remember what Mr. Mitchell was researching,

10 but, otherwise, I can send you a letter, Judge.

11        THE COURT:  That's fine.  All right.  Let's just

12 carve that out for today's purposes, and when I get the letter,

13 I assume it'll satisfy me in which case we'll approve the

14 balance of the fees.

15        MS. CHEPIGA:  Okay.

16        THE COURT:  So that's --

17        MS. CHEPIGA:  Thanks, Judge.

18        THE COURT:  I don't know what his rate is, but that's

19 5.4 hours.

20        MS. CHEPIGA:  Five point hours.  We'll do it.

21        THE COURT:  All right.  Thank you.  That was it for

22 you.

23        MS. CHEPIGA:  Thank you, Judge.

24        THE COURT:  Let's skip ahead to Blank Rome, if I can

25 find it.  Just one entry, January 16th, one of your partners,

**J&J COURT TRANSCRIBERS, INC.**

13

1  Storero?

2           MR. CARICKHOFF:  Yes.

3           THE COURT:  Six point eight hours, research legal

4  issues, prepare memo re same.

5           MR. CARICKHOFF:  Okay.

6           THE COURT:  I think that pretty much defines what

7  research is and what drafting a memo is, but it doesn't tell me

8  anything else.

9           MR. CARICKHOFF:  Sure.  Your Honor, Ms. Storero,

10 again we have problems similar to debtors' counsel with respect

11 to our corporate partners.  She was involved primarily with

12 reviewing a potential transaction regarding the sale of the

13 debtors' thrift, so it was an agreement to sell that, and she

14 had spent time analyzing that, and I would assume preparing a

15 memo with respect to issues related to that.

16          THE COURT:  All right.  All right.  Well, I'll

17 approve it for today's purposes based on your clarification,

18 but if you could reiterate the need for more detail, I'd

19 appreciate it.

20          MR. CARICKHOFF:  Your Honor, I'd be happy to do that.

21          THE COURT:  All right.

22          MR. CARICKHOFF:  Thank you.

23          THE COURT:  You're welcome.  Let's backtrack, Alan

24 Weinreb.  That's one of the foreclosure professionals.

25          MR. WEINREB:  I'm here, Judge.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  All right.  Thank you.  I understand we

2   have -- and I know it's difficult for the type of legal

3   practice.  The -- generally speaking our rules require a lot of

4   specificity with a description, as you probably heard as we've

5   gone through it, the description of what was occur -- what the

6   -- what's being billed for on an hourly basis.  Now, I

7   understand that the -- and I raised this concern at the last

8   fee application that there was a lot of specificity, and

9   debtors' counsel reminded me or stated that Local Rule 2016-2,

10  which sort of sets forth the procedures and rules in connection

11  with hourly, had been waived in the order approving the

12  retention of Alan Weinreb.

13        When I went -- we went back and looked, and that's

14  true in connection with the fixed rate services but not

15  actually with the hourly rate services, and my understanding is

16  you're being paid both on a fixed rate and an hourly rate.

17        MR. WEINREB:  Correct, on the non -- well, not non-

18  litigated but on a basic case fixed rate, on a contested matter

19  on an hourly rate, and I have corrected that in my subsequent

20  fee applications.

21        THE COURT:  Okay.

22        MR. WEINREB:  Because Young Conaway advised me of the

23  specificity requirements, and it's all been amended for

24  subsequent ones.

25        THE COURT:  And when you say subsequent, what --

**J&J COURT TRANSCRIBERS, INC.**

1  starting when?

2          MR. WEINREB:  Starting with the February application.

3          THE COURT:  All right.  Starting with February.

4  Okay.  So you fixed -- you're going to be more specific --

5          MR. WEINREB:  I fixed it all just as they told me,

6  and we sat down, and we went over it.

7          THE COURT:  All right.

8          MR. WEINREB:  Because sometimes it's hard to

9  differentiate.

10         THE COURT:  I understood.  All right.  We'll -- given

11  the difficulty there, and I -- and the acknowledged issues with

12  regard to people who aren't frankly used to this type of

13  reporting --

14         MR. WEINREB:  Okay.

15         THE COURT:  -- and the fact that it's been fixed

16  going forward, I'll approve it.  I'll approve the interim

17  application, and --

18         MR. WEINREB:  Thank you so much, Judge.

19         THE COURT:  You bet.  And then we'll look to the

20  future ones with a little more rigor.

21         MR. WEINREB:  Okay, and they will be to your

22  specification.

23         THE COURT:  All right.  Thank you.  All right.

24         MR. WEINREB:  Thank you so much.  I'm going to drop

25  off.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That's fine.  That's it for my rulings,

2  so if you have an order?

3          MR. LUNN:  I do have an order, Your Honor.  I've

4  removed Cadwalader's and also Allen and Overy's.  They're

5  separate exhibits for each professional.  We'll submit a

6  further order with respect to those --

7          THE COURT:  That's fine.

8          MR. LUNN:  -- professionals?

9          THE COURT:  Yes.

10          MR. LUNN:  May I approach?

11          THE COURT:  Yes.  Thank you.  All right.  Anyone

12  who's on the phone or present in court simply for the fee

13  applications is -- please feel free to hang up or leave if you

14  wish.

15          MS. CHEPIGA:  Thank you, Judge.

16          THE COURT:  You're welcome.  Okay.

17          MR. LUNN:  Your Honor, there is also the interim fee

18  applications of Northwest Trustee that have been objected to by

19  the debtors.  I don't know if you want to proceed with it,

20  since we're doing fee applications now, or if you want to hold

21  that over towards the end.

22          THE COURT:  Let's save that for the end, because I

23  need to look at that.  I didn't focus on that, frankly, so I'll

24  need to look at that before -- before we have a hearing on it.

25  So we'll have to take a recess is all I'm saying --

1          MR. LUNN:  Okay.

2          THE COURT:  -- before we go to that part, unless it's

3 resolved.

4          MR. LUNN:  A portion of it is resolved, Your Honor.

5 The debtors' limited objection to the second interim fee

6 application, there are two exhibits.  One, Exhibit B, which was

7 an unidentified loan.  The Northwest Trustee provided the

8 debtors with the documentation.  We were able to identify that

9 loan, and we have withdrawn the objection with respect to

10 Exhibit B.

11          With respect to Exhibit C, there is an agreement

12 between Northwest Trustee and the debtors to adjourn that

13 matter, those loans and the fees requested, with respect to

14 those, to the next omnibus hearing.  These are loans related to

15 sold servicing, re-leased, or otherwise sold, and the debtors

16 no longer servicing those loans and, therefore, wouldn't be

17 required to pay those fees and expenses.  But we're tabling

18 that -- the consideration of that until the next omnibus.

19          The issue before Your Honor with respect to Northwest

20 Trustee is essentially costs -- foreclosure costs that the

21 debtors assert are pre-petition costs regardless of when the

22 debtors were billed for them.

23          THE COURT:  Okay.

24          MR. LUNN:  So it's a fairly limited scope, Your

25 Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  And that's for me to decide today?

2          MR. LUNN:  Yes, Your Honor.

3          THE COURT:  All right.  Well, I'm not prepared to do

4    that at this moment.  I'll address it today, but we're going to

5    need to take a break before I do that.

6          MR. LUNN:  Very well, Your Honor.  I believe that

7    carries us then to agenda item --

8          THE COURT:  I -- let me just -- I'm sorry.  We did

9    review their fee application for the sort of general, normal

10   issues and didn't have any, so that -- as far as I'm concerned,

11   that narrow issue is the only issue.

12         MR. LUNN:  Okay.  Very well, Your Honor.  Your Honor,

13   then we are to agenda Item 26, and this is the motion for

14   relief from stay filed by Gloria Kirk (phonetic).  The debtors

15   did file a response, but I will cede the podium to counsel for

16   Ms. Kirk.

17         THE COURT:  All right.  Good morning, Mr. Bailey.

18         MR. BAILEY:  Thank you.  Is Your Honor generally

19   familiar with the papers?

20         THE COURT:  Yes.

21         MR. BAILEY:  I don't want to repeat something that's

22   already well known to you.  The three key elements that I

23   wanted to briefly discuss would be a prejudice to debtor,

24   balance of hardships, and probability of success, concepts well

25   known to you.  On each of those three elements or items, Ms.

1  Kirk will prevail, and let me briefly explain over the next two

2  or three or four minutes, if you don't kind, why that's so.

3          First, briefly put, the facts of the case need to be

4  stated, because they do reflect on prejudice to debtor, balance

5  of hardships, and probability of success.  In September, 2006

6  this lawsuit started in Federal District Court in Tennessee.

7  The essential allegation was an improper firing.  The case

8  proceeded along prior to the bankruptcy here in this court.  A

9  scheduling order was entered.  Discovery took place.  Many

10 depositions occurred.  The case was set for trial November,

11 2007, last year.

12         The discovery is completed.  Depositions are

13 complete.  The case is ready to go to trial, and that includes

14 all the key witnesses, the management personnel that are

15 referred in debtors' moving papers, all of them.  They don't

16 have to appear if they don't choose to in the action in

17 Tennessee.  Their depositions can be used in lieu of live

18 testimony.

19         The brief facts that show probability of success on

20 the merits.  Ms. Kirk was an experienced mortgage lender and a

21 manager.  She worked at a branch office having been hired in

22 2004.  In December, 2005 there was a surprise, unannounced

23 audit by the bank regulators in Tennessee who showed up one

24 morning at 9:00 a.m. and said we're here for the audit.  Let us

25 in.  We want to go through books and records.

**J&J COURT TRANSCRIBERS, INC.**

1           Based on her experience, she let them in but felt

2    uncomfortable.  She could think of no reason why she shouldn't

3    or wouldn't let them in to do this.  They are regulators from a

4    state agency.  But, nonetheless, she consulted with three or

5    four of her contemporaries and colleagues there in the office

6    and in the region.  She consulted with home office in Melville,

7    New York  and received permission to allow the audit to proceed

8    later that morning, and it did.  There was no policy preventing

9    her from letting these regulators into the office to do the

10   audit.

11          About six months later, in June of the following

12   year, she was invited to dinner with the Regional Manager, and

13   after a nice, pleasant dinner, she was fired.  And the reason

14   given to her at that time by the Regional Manager was that she

15   had, in violation of company policy, let the regulators in, and

16   the audit was performed.  The audit results, by the way, were

17   not favorable to the debtor.  She was given no other reason.

18          A policy was put out months later, in the middle of

19   the year 2006, by debtor, which for the first time to the

20   knowledge of Mrs. Kirk, evidenced what the policy was, and it

21   stated that no regulator was to be let in to do an audit

22   essentially regardless of what the laws of the State of

23   Tennessee said.  I'm paraphrasing.  I'm a lawyer.  I'm an

24   advocate, but that is more or less what it says.

25          Her claim is one not premised or one that can be

1  defended by the at will statute.  Tennessee, like Delaware, has

2  an at will employment law, so they can fire her, because it's

3  Tuesday, or she has blue eyes, or whatever.  But Tennessee does

4  have a retaliatory statute barring retaliation by an employee

5  -- to an employee who acts as Ms. Kirk did under the facts of

6  this case.  Now, I can supply a lot more detail, but I don't

7  think you want me to do that just now.  I can supplement the

8  record to the extent necessary.  But Tennessee does have a

9  Public Policy Protection Act and a common law right barring

10 retaliatory discharge, which is what happened here.

11        So I'm bringing this up on the topic of whether or

12 not there's probability of success on the merits.  The chance

13 of a jury hearing the facts that I've just related, which are

14 going to be tough, if not impossible, to dispute, would

15 strongly suggest probability of success on the merits.

16        Hardship to the debtor.  Everyone's been deposed.

17 The debtor spends a lot of time articulating the points that

18 their key personnel are going to be tied up.  They're not.

19 They've been deposed.  There's nothing else to do.  All the key

20 players are on Tennessee.  There's no one here.  Those at the

21 home office in New York have been deposed.  There are 16

22 witnesses to testify in the trial.  Twelve are in Tennessee.

23 The rest are in New York.

24        It's inconceivable that this could have any impact on

25 these bankruptcy proceedings here in this Court.  The debtor

1   admits in its own moving papers that discovery is complete if
2   you look at Paragraph 16 and 17 in their response.

3         And so looking at the three factors this Court has to
4   consider, there's simply no question that we're entitled to
5   have the automatic stay lifted.  If there could be no lifting
6   of an automatic stay, the case law and this Court wouldn't take
7   the time to go through these factors, as it must, in making a
8   decision.  Thank you.

9         THE COURT:  You're welcome.  Mr. Lunn.

10        MR. LUNN:  Thank you, Your Honor.  Your Honor, with
11  all due respect, the motion was two pages long.  For now for
12  the first time counsel is trying to move into evidence I guess
13  certain facts.  We haven't heard a witness.  There's no
14  declaration.

15        THE COURT:  Well, the amended complaint was attached
16  to the motion.

17        MR. LUNN:  Which hasn't been filed, Your Honor.
18  Regardless, Your Honor, Ms. Kirk is required to demonstrate,
19  before the burden shifts to the debtor, that sufficient cause
20  does exist.  As outlined, the Court looks at three factors,
21  prejudice that would be suffered by the debtors, the balance of
22  the hardships, and probability of success.

23        Your Honor, the debtors submit that Ms. Kirk has not
24  met this initial burden, and, as I stated, there's no evidence
25  before Your Honor with respect to these matters.  All there is

1  is a two-page motion, and, as Your Honor did note, there is an

2  amended complaint that has not been filed.  Therefore, on this

3  basis the debtors would request that the Court deny the motion.

4         Even if Your Honor moves on and considers those three

5  factors and also the policy underlying the automatic stay under

6  362, which provides for breedings of all the debtors such that

7  they can focus on a reorganization, the debtors filed these

8  Chapter 11 cases in order to liquidate their remaining assets

9  to maximize the value for the remaining creditors and their

10  stakeholders.  Moreover, Ms. Kirk has filed a proof of claim.

11  There have been 76 similar proofs of claim filed.  This type of

12  claim can be adjudicated through the claims reconciliation

13  process, Your Honor.

14         Moving on to the three factors, the debtors actually

15  will be significantly prejudiced if the stay is lifted.  There

16  are only a few key employees that remain.  The debtors are

17  continuing to reduce their workforce.  Focusing the attention

18  of just these few key employees away from the administration of

19  these -- the estates does pose a significant burden and

20  severely prejudices the debtors.

21         Ms. Kirk will not be prejudiced or suffer irreparable

22  injury.  The debtors have shut down their businesses.  There's

23  no prospects of being rehired by the debtor, and this is

24  different than the type of relief from stay motion Your Honor's

25  heard in connection with Cawthorne.  She's not a borrower.

**J&J COURT TRANSCRIBERS, INC.**

1  She's not about to lose her house as Ms. Cawthorne was.

2           Additionally, moving on to the merits of the

3  underlying litigation, as noted, Ms. Kirk was an at will

4  employee, Your Honor.  The debtors terminated her for just

5  cause.  This was a sound business decision by the debtors, and,

6  as a result, the debtors submit that it would be extremely

7  unlikely that Ms. Kirk would succeed in the underlying

8  litigation, Your Honor.  For these reasons, the debtors submit

9  that Your Honor deny the underlying motion.

10          THE COURT:  All right.

11          MR. INDELICATO:  Good morning, Your Honor.  Mark

12  Indelicato from Hahn and Hessen on behalf of the Committee.

13  Your Honor, for many of the reasons stated by Mr. Lunn, we

14  supported the debtors' objection to the motion for relief from

15  the stay.  Your Honor, I think as Mr. Lunn artfully set forth,

16  this is really a claims resolution issue, and, unfortunately,

17  that to the extent they want the claim decided in Tennessee, it

18  still is going to await confirmation of a plan and distribution

19  to creditors before its paid.  So when the Court weighs the

20  balancing, it could be substantial prejudice to the debtor.

21  We're talking, if I heard correctly, Your Honor, substantial

22  legal fees, and proceeding there are going to be 12 witnesses,

23  four of them which may be from Melville.  And to say that the

24  people from Melville are not going to be involved, because the

25  deposition's already been taken, are really not analyzing the

1  true -- the trial preparation time and costs that would go into

2  it.

3         We believe that, as Mr. Lunn said, there are 76 other

4  similarly situated creditors that may need to be resolved.  I

5  think the Court should deny the motion without prejudice at

6  this time and maybe give the parties an opportunity to try and

7  resolve it without extensive litigation and costs.  But I think

8  at this point the balance of the -- tips in favor of the

9  debtor, and the motion should be denied.

10         THE COURT:  All right.  Thank you.  Mr. Bailey,

11 anything further?

12         MR. BAILEY:  Yes, Your Honor.  The amended complaint

13 is essentially the same as the original.  It simply conforms to

14 the evidence.  It doesn't really change the core allegations,

15 which were just as I described them for you a few minutes ago.

16         I haven't heard anything here that suggests I was

17 wrong in what I said in each of the three factors this Court

18 has to consider.  This is not a complicated case.  This is not

19 a case involving teams of lawyers at all.  This is not that

20 case.  This is a very simple case of someone getting fired,

21 because she did something that the bosses didn't like.  It's

22 not something that's going to tie up legions and floors of

23 corporate offices or even more than just a few people for a

24 brief period of time at some point in the future.

25         There was reference to at will, but, as I said, the

1    concept of at will law simply has nothing to do with this.

2    It's not about that.  In fact, the phrase probably won't even

3    come up in Tennessee.  There really isn't anything to do except

4    go try it.  There just isn't.  It's been done.  And so we'd

5    submit that you can talk about how the debtor is prejudiced,

6    how the scales tip in favor of the debtor and so forth, but

7    they don't.  It's easy to say it.  It's another thing to back

8    it up.  If there's a question about whether the record is fully

9    supplemented, I'm happy to supplement the record and come back

10   at the Court's pleasure to do whatever else is necessary.

11           THE COURT:  All right.  Thank you.  Well, I am a

12   little -- I am concerned about the state of the record, and I'm

13   going to be flexible, and I need to be flexible in context of

14   ongoing litigation in a jurisdiction that's well outside the

15   confines of the State of Delaware and his representation of an

16   individual.  There's not a bottomless pit of fees or

17   availability for normal working people to travel to be present

18   to a hearing.  So I look at that with some flexibility.

19           So I am prepared, at least for purposes of figuring

20   out what the case is about and where the case is, to rely on

21   the allegations in the complaint and the representations of

22   counsel as to what the status of the case is.  So I don't think

23   we need to worry about supplementing the record, because in a

24   case like this, frankly, I don't think it would be just or fair

25   to hold a claimant such as this to, frankly, probably the

1 burden that's technically required under the statute,

2 especially in a case here where it's so close to trial.

3        That said, I don't think that's the end of the

4 analysis, although that goes to likelihood of success on the

5 merits perhaps.  It doesn't cut to the issue of prejudice,

6 which I think in this case still weighs against granting this

7 motion, and I am going to deny the motion without prejudice.

8        I think at heart this is a claims reconciliation

9 issue.  Now, whether this Court will ultimately decide that

10 claim or whether that claim, once the process is instigated,

11 will be -- I'll either abstain or transfer or what have you to

12 Tennessee to allow judges with certainly more familiarity with

13 the substantive state law of Tennessee to decide the issue or a

14 jury, if that's what ultimately occurs.

15       But we don't even know if that's frankly going to be

16 necessary in this case.  We don't know where this case is in

17 connection with what the distribution on the plan will be, how

18 quickly the claims reconciliation process is going to occur.

19 It's somewhat counterintuitive, but I think liquidating cases

20 like this actually require a little more time to work through

21 these issues than cases where there's a rehabilitating

22 business, because there are way fewer employees.  The focus is

23 on different issues, and there's not going to be sort of a

24 permanent group of people in place.  We're going to continue to

25 deal with these issues on a going forward basis.

1        So I think the debtor would be prejudiced.  This case
2  is -- albeit it's been here since August, it's still early in
3  the process.  It's still trying to work through the issues of
4  liquidating its assets, which is incomplete, dealing with
5  issues as to where that asset disposition goes and how the
6  estate's going to be divvied up before it can move on to the
7  next issue, which is actually reconciling the claims to pay out
8  on liabilities.  So, in other words, this is still a case where
9  we're trying to figure out what the assets are, and it's a
10  little early to try to figure out how you're going to
11  distribute the liabilities, especially those to general
12  unsecured creditors.

13        So for those reasons, I am going to deny the motion.
14  It is without prejudice obviously to changes at a later date.
15  You know, the case can't go on forever.  If six months from now
16  we're still right where we are, at some point the movant is
17  going to be allowed to go forward, either in this court
18  consensually on the claims reconciliation process or maybe in
19  another court.  We'll decide that for a later date.  So I am
20  going to deny the motion without prejudice.  Do you have a form
21  of order, Mr. Lunn or --

22        MR. LUNN:  I don't, Your Honor.

23        THE COURT:  That's all right.  We'll jimmy one up.
24  That's fine.

25        MR. LUNN:  Thank you, Your Honor.  Your Honor, the

1  next agenda item is the debtors' first omnibus objection to

2  claims, and I will cede the podium to my colleague Mr.

3  Kosmowski.

4          THE COURT:  All right.

5          MR. KOSMOWSKI:  Good morning, Your Honor.  For the

6  record, may it please the Court, Ed Kosmowski of Young,

7  Conaway, Stargatt, and Taylor here on behalf of the debtors.

8  Your Honor, before the Court is the debtors' first omnibus

9  objection, which is a non-substantive objection.  There were

10 three responses filed to the objection, one by the United

11 States.  The United States had filed a amended proof of claim,

12 and what they advised us in their response is that in a sense

13 they've amended the amended proof of claim.  So what we'll do,

14 Your Honor, is we'll file another objection to object to that

15 claim and leave as a remaining claim their last filed claim.

16         With respect to MDIA Insurance Company, Your Honor,

17 they filed three proofs of claims.  On their proof of claim

18 forms, Your Honor, they had put the case number of the jointly

19 administered case as that of Holdings, which is 07-11047, but

20 in the name of the debtor they had put three separate entities,

21 which were Servicing, Investment, and Acceptance.  We had

22 listed those as duplicates, since we were looking at the

23 number.  When we realized that, we realized that there aren't,

24 in fact, amended claims.  What we're going to do is fix the

25 case numbers, and then we're also going to go back and review

1  our records and make sure there aren't other claims who -- or

2  claimants who put the jointly administered case number and

3  another debtor entity in the case name, so that we made sure

4  that our records are all correct.  That the case number and the

5  case name match up.  So what we're going to do, we're going to

6  withdraw that proof of claim, Your Honor, since it's obviously

7  not a duplicate claim.

8         THE COURT:  Withdraw the objection.

9         MR. KOSMOWSKI:  Yes, with respect to that claimant.

10 The last claim, Your Honor, was a claim of Rachel Maseva

11 (phonetic).  This is an individual, Your Honor.  She wrote a

12 handwritten letter, and pretty much she agreed with us that

13 said, you know, I didn't mean to file two claims.  I only meant

14 to file one, and pretty much that's what it said, and that's

15 what our objection states.  So it's really -- it's a response,

16 but it's not an objection.  And with that, Your Honor, there

17 were no other responses received.  Unless Your Honor has any

18 questions --

19        THE COURT:  No, I didn't have any questions.

20        MR. KOSMOWSKI:  -- I have a revised form of order.

21 May I approach --

22        THE COURT:  Yes.

23        MR. KOSMOWSKI:  -- with the revised form of order?

24        THE COURT:  Yes.  This is routine obviously dealing

25 with amended superseded type of claims -- duplicate claims, and

1  the Court will approve the relief as revised.

2         MR. KOSMOWSKI:  All right.  Thank you, Your Honor.

3  May I be adjourned or --

4         THE COURT:  No.

5         MR. KOSMOWSKI:  May I leave?

6         THE COURT:  I think the Committee and the Bank of

7  America would object to your motion to adjourn.

8                    (Laughter)

9         THE COURT:  So that's denied.  You can leave though.

10                   (Laughter)

11        THE COURT:  Get out while you can.

12        MR. LUNN:  Your Honor, that brings us to agenda Item

13 28, and this is the motion of the Committee and Bank of America

14 to -- for approval of the underlying stipulation.

15        MR. INDELICATO:  Good morning, Your Honor, again.

16 Mark Indelicato from Hahn and Hessen on behalf of the

17 Committee.  Your Honor, before you is the motion of the

18 Committee and the Bank of America to approve a settlement that

19 I will tell Your Honor was a settlement that was negotiated

20 over many weeks, many long hours, and many late-night calls,

21 and to believe that it was anything other than hard fought

22 would be a mistake.

23        But what we have, Your Honor, is a situation where we

24 have a 9019 motion where we must demonstrate to the Court that

25 this is a settlement that makes sense based on the Martin

1  factors, a showing that there's going to be a probability of

2  success, the difficulties in issues and collection and related

3  items, the complexity and the costs associated with litigating

4  these issues, and, most important to us, Your Honor, that it's

5  in the paramount interest of creditors.  And, Your Honor, as we

6  will demonstrate to Your Honor -- and we want to emphasize this

7  at the beginning, we will emphasize it in the middle, and we

8  will emphasize it at the end -- we took that very seriously.

9  Any indication that the Committee or its counsel or its

10 professionals abdicated their fiduciary duties we hope to

11 eliminate from the Court's concern.

12        The way we would like to handle this, Your Honor, is

13 I'm making a short opening, and then I think B of A would like

14 to make a short opening.  We have a witness that we would like

15 to put on to demonstrate to the Court why we believe this

16 settlement makes sense, and then we would -- if the Court

17 accepts this procedure, then we would proceed, subject to

18 whatever evidence the debtor wants to put in, at the close of

19 evidence proceed to argument.

20        THE COURT:  All right.

21        MR. INDELICATO:  Thank you, Your Honor.

22        MS. SCHONHOLTZ:  Good morning, Your Honor.  Margot

23 Schonholtz of Kaye Scholer for Bank of America.  Contrary to

24 what the debtors would have Your Honor believe, this

25 stipulation is a bankruptcy primer on how a case is supposed to

1   work when it's working.  We had a consensual cash collateral

2   order.  The debtor gave the lenders waivers and releases and

3   got the right to use over $100 million of cash collateral in

4   return.  The Committee's rights were all reserved.  We have a

5   Committee with sophisticated members represented by

6   sophisticated counsel and financial advisors who are very

7   experienced in mortgage-related bankruptcy cases.

8           The Committee and its advisors analyzed the lenders'

9   claims, identified some potential issues, sat down with the

10  administrative agent and its counsel and worked out a

11  resolution before spending time and money on litigation.

12  That's exactly what's supposed to happen.

13          The debtors are fighting this stipulation on two

14  premises, neither of which is true.  The first is that the

15  Committee can never look at the administrative agent's master

16  proof of claim filed on behalf of the lender group.  That is

17  not what the stipulation says, and that's not what's required.

18          The second false premise is that if the stay relief

19  motion is granted on Wednesday, the lender will act

20  irrationally and dump the mortgage loans in a fire sale.  B of

21  A and the other 20 lenders have fiduciary duties to their

22  shareholders, so the notion that they will act in a

23  commercially unreasonable manner just because they have no duty

24  to unsecured creditors is absolutely absurd.

25          The debtors' objection is really a disguised attempt

1  to have a hearing on stay relief two days before the hearing on

2  stay relief.  It has nothing to do with the reasonableness of

3  the stipulation, and we respectfully request that the objection

4  should be overruled.

5          THE COURT:  All right.  Does the debtor wish to make

6  an opening or any of the other objectors as well?  Go ahead,

7  Mr. Patton.

8          MR. PATTON:  Just very briefly, Your Honor, Ms.

9  Schonholtz on behalf of B of A -- her premise about our false

10  premise is false.  She seems to misunderstand exactly what our

11  issues are with respect to this settlement.  Our issues do not

12  spring from the notion that B of A will act in a way that is

13  irrational, or that there will be a fire sale.  With respect to

14  that point, our view is simply that B of A's actions will be

15  actions taken for the good of B of A.

16          I don't believe it has the duty or even the ability

17  to take actions that are otherwise without running into foul

18  territory with respect to its bank group.  Those duties,

19  however, are not duties that run to the larger constituency of

20  this estate.  That does, in fact, form part of the premise of

21  our objection.

22          The second point with respect to the proof of claim,

23  I'll come back to that at the -- or the first point that she

24  made, I'll come back to that in my closing remarks, but our

25  concern has nothing to do with the proof of claim as filed.

1 Our concern has everything to do with how we treat and deal

2 with the deficiency claim that ultimately is presented by B of

3 A, if any, at the end of the disposition of these assets either

4 by the debtor or by B of A if stay relief is granted. Thank

5 you, Your Honor.

6         THE COURT:  Okay.  Any other objectors who wish to

7 make an opening before we proceed to evidence?

8         MR. POWER:  Your Honor, Mark Power from Hahn and

9 Hessen.  I think what we should do is inform Your Honor that we

10 have resolved all the other objections.  We -- the other

11 objections really related to two things.  One was in connection

12 whether -- there was language in the stipulation which said

13 that the funds -- the settlement funds would be held in trust

14 for the benefit of unsecured creditors to be distributed

15 pursuant to a confirmed plan or a further order of this Court.

16 It was never Committee counsel's intent to do what we call an

17 SPM, a class skipping arrangement where the unsecureds got

18 money ahead of unpaid priority and admin claims.

19         The objections -- most of the objectors objected on

20 that ground.  They viewed it as language could be viewed as a

21 SPM issue.  That was not our intent.  Our intent was to do two

22 things, to preserve the funds to make sure that they're

23 available and the Committee has input in terms of how they're

24 spent.  The other is, and one of the principal reasons is,

25 we've negotiated with Bank of America that Bank of America does

1  not share in any of the funds we get under this settlement in

2  any distribution on its deficiency claim.  In order to make

3  that have teeth, what you have to do is keep those funds being

4  used to pay admin claims, so that other funds then go to

5  unsecured creditors which Bank of America would share in.  In

6  other words, it's a -- it was a mechanism to try to make those

7  funds the last resort funds.

8  So what we've done is we've put in the proposed order

9  that hopefully Your Honor will approve simply stating that.

10  That (1) first of all, that this -- the settlement funds are

11  not allocated to any specific debtor.  That will be for a later

12  day to decide where those funds should go.  Second, that these

13  funds will be held in reserve.  To the extent a certain debtor

14  that is allocated those funds has unpaid admin or priority

15  claims and does not have the sufficient funds to satisfy those

16  claims, then these funds -- these settlement funds will be

17  available to satisfy those claims.

18  With those two resolutions, we resolved a third one.

19  The U.S. Trustee raised an issue to make sure that these are

20  deemed to be estate funds regardless to avoid the lender

21  collateral SPM issue.  We've consented to all of those, and we

22  have language that we put in the order, and I think with that

23  we've solved all those objections.

24  THE COURT:  All right.  Thank you.

25  MR. POWER:  So with that, Your Honor,  I'd like to

Berliner - Direct/Power                              37

1  call a witness, Mr. Berliner.

2           THE COURT:  All right.

3           THE CLERK:  Raise your right hand.  Place your left

4  on the bible.

5           DAVID BERLINER, COMMITTEE'S WITNESS, SWORN

6           THE CLERK:  Please state and spell your name for the

7  record.

8           THE WITNESS:  David Berliner, D-a-v-i-d, last name B-

9  e-r-l-i-n-e-r.

10          THE CLERK:  Thank you.  You may be seated.

11          THE WITNESS:  Thank you.

12                       DIRECT EXAMINATION

13 BY MR. POWER:

14 Q    Mr. Berliner, with whom are you currently employed?

15 A    I'm a partner in BDO Consulting, which is a division of

16 BDO Seidman, LLP.

17 Q    And what is -- what primary role do you serve for BDO?

18 A    I'm in the Business Restructuring Services Group, which is

19 primarily really involved with bankruptcy cases, restructuring,

20 and solvency cases.

21 Q    And what's BDO's relationship with this case?

22 A    We are the financial advisor to the Unsecured Creditors

23 Committee.

24 Q    And are you the head of the engagement on behalf of BDO

25 with this Committee?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I am.

2  Q    Do you have experience in advising committees throughout

3  your professional career?

4  A    Yes.

5  Q    Could you briefly just describe that?

6  A    I've been working for BDO and doing bankruptcy work for

7  over 11 years now and been financial advisor to a number of

8  creditor committees over the years.

9  Q    Are you familiar with the settlement that's the subject of

10  the motion before the Court right now?

11  A    Yes.

12  Q    And is that a settlement that you were involved in

13  negotiations and drafting on?

14  A    Yes.

15  Q    And were you involved in the Committee deliberations and

16  deciding whether to support that settlement or not?

17  A    Yes, I was.

18  Q    Briefly, I want to describe to the Court the basic terms

19  as the Committee views them in terms of the settlement.  Do you

20  understand what the claims that the Committee had remaining

21  under the cash collateral order that it could assert against B

22  of A generally?

23  A    Yes.  Generally, yes.

24  Q    Could you describe that for the Court, please?

25  A    There were claims related to the real estate-owned REOs as

1  we call them.  There were claims related to certain cash that

2  was transferred pre-petition, bank sweeps or other transfers.

3  And then the third had to do with the -- whether the collateral

4  is over or under secured.

5  Q    And is your understanding that those three issues were the

6  only issues the Committee had a right to assert against B of A

7  on the cash collateral when they settled?

8  A    Yes, that was my understanding.

9  Q    Now, the settlement resolves the amount of Bank of

10  America's pre-petition claim.  Is that correct?

11  A    Yes.

12  Q    And are you familiar with that claim?

13  A    Yes.

14  Q    And what is the amount approximately that will be allowed?

15  A    One billion 82 million and change.

16  Q    Is that a number that the debtor consented to and agreed

17  to previously, to your knowledge?

18  A    No, my understanding was the original number was a billion

19  104 -- 104 million, but there were some adjustments that

20  occurred right around the petition date that needed to be

21  adjusted to get to the billion 82 number.

22  Q    Now, when you as financial advisor to the Committee

23  determined that that was an appropriate claim amount, could you

24  briefly describe for the Court what you did to satisfy yourself

25  that that claim was correct?

1 A    It took a little while to -- there was a lot of back and

2 forth on that.  We had spoken to the debtor as well as to FTI,

3 the bank's financial advisor, to try to get a handle on that,

4 and after those discussions the billion 82 number turned out,

5 from what we understood, to be the best number.

6 Q    And as financial advisor to the Committee, you're

7 satisfied that that claim number is accurate and correct?

8 A    Yes.

9 Q    And that's based on the debtors' basically agreement in

10 this Court order plus your discussions with B of A.  Is that --

11 A    Yes, that's fair.

12 Q    Now, let's describe the settlement and the consideration

13 going to the Committee or that could go to the Committee.  The

14 first is related to what we call REO property.

15 A    Yes.

16 Q    All right.  Could you briefly describe the transaction as

17 you understand in that term?

18 A    There is about I believe 59 or 60 REOs out there totally

19 about $17 million in value that would go to the Creditors

20 Committee as part of this deal.

21 Q    And when you say go to the Committee, what does that mean?

22 A    As you described before, go to the creditors for the

23 benefit of creditors to be set aside.

24 Q    Of the 17 million, are you familiar with how much was

25 mortgage loans that turned into property prior to the filing of

1  the bankruptcy petition and how much was related to properties

2  that -- mortgage that turned into properties after the

3  bankruptcy petition?

4  A    In my understanding, it's about 13 million that was pre-

5  and about 3.9 or 4 million that occurred post-petition -- that

6  converted post-petition.

7  Q    So of the 17, roughly 4 million approximately is post-

8  petition real estate?

9  A    Yes, that's my understanding.

10  Q    Now, is your understanding of the settlement that all that

11  -- the interest in all those properties gets turned over to the

12  estate, and B of A has no interest?

13  A    That's right.

14  Q    Have you done an estimate as to what you think that will

15  result in terms of cash proceeds to this estate?

16  A    Yes, the best estimate we have right now, it ranges

17  anywhere between 8 and a half to 12 and a half, so we used

18  about $10 million as a ball park estimate of what that would be

19  worth.

20          MR. POWER:  Okay.  Your Honor, we had a chart

21  attached to our reply memorandum, which I'm going to show the

22  witness, and I have a copy of it.  It's in the last two pages.

23          THE COURT:  Do you have an extra?

24          MR. POWER:  I do, Your Honor.  May I approach?

25          THE COURT:  I read your reply, but I didn't notice

1  the chart.  Sorry.  Thank you.

2  Q    Mr. Berliner, do you have that chart that I just handed

3  you?

4  A    Yes, I do.

5  Q    Okay.  Are you familiar with this?

6  A    Yes.

7  Q    In fact, you prepared this.  Is that correct?  You and

8  your colleagues?

9  A    Yes.

10  Q    Okay.  Would you briefly describe for the Court on the

11  first page what the box in the upper right-hand corner refers

12  to and then the second box in the middle, which says REO

13  recovery?

14  A    The box on the top right called outstanding UPB of pre-

15  petition secured parties portfolio, shows the UPB or unpaid

16  principal balance of the loans at 550 million and change less

17  the UPB of the REOs that are being turned over to the estate to

18  get the net UPB, which from information we were given is as of

19  March 31 of 535 million and change that you see there.

20  Q    Okay.  Now, the second box, that relates to the REOs that

21  we were just discussing.  Is that correct?

22  A    Yes, the next box shows the appraised value of the 17

23  million that we were just discussing, and then the 50, 60, and

24  70 was just to show of that appraised value what potential

25  recoveries could be on those properties.

Berliner - Direct/Power                              43

1  Q    Now, are you familiar with some of the REO properties the

2  debtor has sold during the bankruptcy and the percentage of

3  recovery on those?

4  A    Yes.

5  Q    Isn't it -- wasn't it closer to 80 percent, 78 percent?

6  A    Yes, I believe the loss severity was around 20 -- about 80

7  percent.  Yes.

8  Q    So --

9           THE COURT:  Eighty percent of what?

10          MR. POWER:  Of the --

11          THE WITNESS:  Of the UPB -- for the appraised value.

12  I'm sorry.

13  Q    So just to be clear, those properties that were sold by

14  the debtor post-petition, the debtor had an appraisal in its

15  files, and when the debtor ultimately sold those to a new

16  buyer, recovered close to 80 percent --

17  A    Yes.

18  Q    -- from the appraised value.  So when you have these

19  percentages, 50, 60, 70, those relate to the appraised value.

20  Is that correct?

21  A    Yes.

22  Q    And you're being a little conservative.  If you got 80,

23  obviously, there would be more money there.

24  A    Yes, if I recall, there are only seven or eight properties

25  that have sold up to this point in time, so we thought with

Berliner - Direct/Power                    44

1  what's going on in the market, that may not be as easy to get

2  going forward.

3  Q    Could you explain to the Court what you did with the

4  second liens, because some of these properties are a second

5  lien not first lien?

6  A    The second lien is shown here as the difference between

7  the 15 million that's the top right box and that total UPB of

8  12 million 875 you see in the next box down.  So it's about 2

9  million of second liens.  We didn't think there would be as

10 much recovery on that, so we just pulled that out for the

11 purpose of showing -- of this presentation.

12 Q    Is your understanding that all of the REO property that

13 the Committee could assert against B of A that it -- the

14 estate's entitled to has basically been turned over as part of

15 this settlement?

16 A    Yes, as far as I know.

17 Q    Now, the settlement also has a second component, which is

18 what we call a sharing formula.  Are you familiar with that?

19 A    Yes.

20 Q    Would you briefly describe for the Court what that is?

21 A    Sure, and that's shown in the next set of boxes down in a

22 sense.  The way it works is the sharing formula begins once the

23 recoveries to the secured parties reach 94 percent of any

24 proceeds they receive on their collateral, and at that point in

25 time there's a certain sharing, and then after it goes up to 95

1  percent, there's additional sharing.  So at 94 percent there's

2  10 percent sharing, and then it goes up to 25 percent at 95

3  percent, and then at 97 and a half percent of the UPB there

4  would be a 50/50 sharing at that --

5  Q    Now, when you say sharing -- I'm sorry.  Strike that.

6  When you describe we'll call the benchmark at 94 percent, when

7  the estate starts sharing in those funds, that's 94 percent of

8  what?

9  A    Ninety-four percent of the original billion 82 amount we

10 just discussed before of the collateral.

11 Q    So the parties have agreed as to this is the amount the

12 bank is owed as a secured claim or -- pre-petition claim as of

13 the petition date and then any recoveries from any source, if

14 it hits 94 percent, then the sharing starts.  Is that correct?

15 A    That's correct.

16 Q    Okay.  Have you done an analysis of what the estate would

17 receive if the -- if Bank of America is successful and is able

18 to recover basically the full billion 82 million?

19 A    Yes, that's in the bottom chart on the bottom of this

20 page, and what it shows if the full billion 82 is collected,

21 the recovery on the mortgage loans, as it shows there, would be

22 91.7 percent of the UPB totaling $490,854,934.  That would mean

23 that the creditors' share on that would be 18,649,380.  Add to

24 it whatever the REOs would be.  In ths example we used the 60

25 percent amount, or 10 million, so the creditor recovery would

1 be 28 million 868 and change.

2 Q    So under this settlement if Bank of America gets paid its

3 exact secured claim, the estate will get roughly 28 million to

4 30 million of that -- almost 29 million.

5 A    If the collections are the full billion 82, this is what

6 the estate would get, but there still would be a deficiency

7 claim as shown here, because they're sharing with us.  So that

8 amount goes to the carve out or whatever you're calling that --

9 carve out of the cash.

10 Q    So at that point Bank of America has not got paid in full

11 on its claim, but the estate has gotten $30 million.

12 A    Correct.

13 Q    Is that correct?

14 A    That's right.

15 Q    Would you turn to the second page of that chart?  What

16 does the upper left-hand corner box represent?

17 A    That shows that same billion 82 amount of the pre-petition

18 debt, and then since, as we discussed, the recoveries here are

19 not just on the mortgage loans, the way this settlement works,

20 the recoveries are any other money that comes in.  In this

21 particular case -- well, what this box is showing is the

22 billion 82 plus what we had estimated to be the post-petition

23 interest and fees the lenders would be entitled to if they did

24 receive the full billion 82 and were over secured, which would

25 bring the total that they would be owed to approximately a

Berliner - Direct/Power                                          47

1  billion 122.

2  Q    And does a billion 122 represent the amount that the

3  estate would have to recover in order to start sharing in the

4  collateral before B of A's paid in full including post-petition

5  interest and fees?

6  A    Not under our settlement.  No.

7  Q    But without the settlement --

8  A    Without the settlement, yes, because they --

9  Q    That's preferred, although the estate would have to get to

10  before we got any money.

11  A    Yes.

12  Q    Is that correct?

13  A    Yes, the estate would have to repay the full billion 82

14  plus whatever interest and fees.

15  Q    So could you describe the charts in the middle for the

16  Court as to the comparison between under the settlement and

17  without the settlement?

18  A    Under the settlement what it shows is -- and that's the

19  middle set of boxes there.  The first column under estate

20  recovery on mortgage loans, if you go to the far left where it

21  has recovery under mortgage loans as a percentage of the UPB,

22  you see that at 73 percent of UPB there's no estate recovery.

23  And then estate recovery in the next row actually begins at

24  79.6 percent, but at 81 percent the estate would recovery

25  768,547 plus again whatever the value of the REOs turn out to

1  be.  Without that settlement, the estate would not have any

2  recovery at that level.  And then if it increased to 85 percent

3  of UPB, the recovery on the loans would be 5,469,282 plus the

4  REOs, and again there would be no recovery absent this

5  settlement.

6  Q    Describe the bottom box and exactly what that shows, if

7  you would, please?

8  A    The bottom box is just a summary that again, as we just

9  showed, on the second row here with the settlement the estate

10  begins to recover something on the mortgage loans beginning at

11  79.6 percent.  Without that -- without the settlement the

12  recovery would need to go up to 97.3 percent of the UPB in

13  order for the estate to begin to recover, and you see that on

14  the far right column where the money begins to come in.

15  Q    Now, you mentioned before, and I think we should just

16  briefly touch on it, the sharing formula works not simply with

17  the mortgage loans but any recoveries from any source.  Is that

18  correct?

19  A    That's correct.

20  Q    And that includes money that's currently held in reserve

21  related to the sale of the servicing business.  Is that

22  correct?  If those monies get distributed to B of A --

23  A    Yes, if those monies get distributed as well as other

24  assets that the estate might receive proceeds from.

25  Q    Now what about B of A's deficiency claim, if it ultimately

1  has one, and receives an unsecured distribution, are those

2  monies also counted towards this?

3  A    Yes.

4  Q    So if B of A gets monies from any other source on any part

5  of its debt, it would go to the sharing formula?

6  A    It goes into the sharing formula, yes.

7  Q    To your knowledge, does the B of A get a share in the

8  settlement proceeds that the estate gets as a result of this

9  settlement?

10  A    No, B of A doesn't share in the amount of these funds that

11  are set aside.

12  Q    So what is -- in your view, what does that do for creditor

13  recoveries besides Bank of America in terms of that component

14  of the settlement?  Is it beneficial?

15  A    Yes, it's beneficial.  It provides a source of funds that

16  would be available.

17  Q    In terms of the chart that we just discussed, your firm

18  prepared that.  Has Bank of America had a chance to review that

19  chart, to your knowledge?

20  A    I assume so, but I don't know for sure.

21  Q    Is this chart just the Committee's representation of

22  what --

23  A    Yes, this is just the Committee's.  Yes.

24  Q    One of the components of the settlement is in connection

25  with the Committee's agreement to support Bank of America on

1 its relief from stay motion.  Are you familiar with that

2 component?

3 A    Yes.

4 Q    Would you briefly describe the Committee's decision in

5 terms of why to support that motion in this context -- in the

6 context of this overall settlement?

7 A    Sure.  The Committee evaluated over the course of the

8 eight months that the company has been in bankruptcy what the

9 debtor has done to sell the mortgage loans.  There has been

10 some auctions of certain loan pools, Broad Hollow and Melville,

11 some delinquent loan pools.  The results of those weren't as

12 high as the Committee had thought or the debtor originally

13 represented.  The Committee thought that given where things are

14 today, there's a lot of work that needs to be done to bring

15 these loans -- to recover money on these loans, to work these

16 loans, particularly the large amount of option ARMs that this

17 debtor has, and that evaluating the liquidating debtor who is

18 no longer in the business of originating, no longer in the

19 business of servicing loans, that the secured parties, Bank of

20 America being one of the largest institutions with a large

21 mortgage practice, would be better suited to go out there and

22 work these loans, work with the borrowers to refinance or to

23 work out the option ARM-type loans to get a better recovery for

24 the creditors.

25 Q    Did the Committee have a view when they were analyzing the

1  settlement as to what has happened in the market generally from

2  the day the case was filed until now in terms of these -- the

3  value of these assets?

4  A    Well, generally, I think the view was that the value has

5  gone down not up.  That, you know, for example, one of the

6  components of the loans are what they call agency loans, which

7  are loans that the debtor had hoped to sell to one of the

8  government-sponsored entities and, in fact, had been discussing

9  some deals with another lender to try to do that.  And during

10 the course of the bankruptcy some of the eligibility standards

11 have changed over the last few months given what's going on in

12 the marketplace.  So the ability to sell those loans at close

13 to par or at all has been compromised.  So things have occurred

14 in the marketplace given what's been going on that is certainly

15 putting downward pressure on the value.

16 Q    If the Court decides in a couple days to deny the motion

17 for relief from stay, does that impact at all the settlement

18 that's before the Court today?

19 A    No, this settlement is irrespective of what happens on

20 Wednesday.

21 Q    And if the debtor is correct in the lift stay motion, that

22 the debtor believes it can maximize value better than the

23 administrative agent, is this settlement better if the debtor

24 prevails in that argument?

25 A    Yes, I still think this settlement is better than without

Berliner - Direct/Power                              52

1  it.  Absolutely.

2  Q    So if the Court's decision today really relates to this

3  settlement regardless of the lift stay, they really aren't

4  related at all.  Is that --

5  A    That's -- yes, I would agree with that.

6            MR. POWER:  One moment, Your Honor.

7                           (Pause)

8            MR. POWER:  No further questions, Your Honor.

9            THE COURT:  Bank of America have any questions?

10            MS. SCHONHOLTZ:  Not at this time, Your Honor.

11            THE COURT:  Well, this is your chance.

12            MS. SCHONHOLTZ:  Then I'll take it.

13                      CROSS EXAMINATION

14  BY MS. SCHONHOLTZ:

15  Q    Just real quickly, Mr. Berliner, do you have any knowledge

16  as to how much cash collateral the debtor used in the first 15

17  weeks of the case until November 16th?

18  A    I believe so.  This would be to the closing of the

19  servicing business?

20  Q    Yes, that would be November 16th, the initial close.

21  A    It was approximately 103 million from what I recall.

22            MS. SCHONHOLTZ:  Thank you.  No further questions,

23  Your Honor.

24            THE COURT:  Cross.  Actually, Mr. Patton, can we take

25  -- would you have cross?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PATTON:  A break would be a good idea, Your

2  Honor.

3          THE COURT:  All right.  Let's take a short recess.

4                      (Recess)

5          THE CLERK:  All rise.

6          THE COURT:  Please be seated.

7          MR. PATTON:  No cross examination, Your Honor.

8          THE COURT:  Oh, all right.  Thank you.  You may step

9  down.

10          THE WITNESS:  Thank you.

11          MR. POWER:  Your Honor, I was waiting until the end.

12  I wanted to move for admission the one exhibit -- the

13  Committee's Exhibit 1 if that's --

14          THE COURT:  Any objection, Mr. Patton?

15          MR. PATTON:  (No verbal response).

16          THE COURT:  Submitted without objection.

17          MR. POWER:  Thank you, Your Honor.

18          THE COURT:  Any further witnesses by the movants?

19          MR. POWER:  No, Your Honor.  Nothing

20          THE COURT:  Okay.  Mr. Patton, any witnesses?

21          MR. PATTON:  No, Your Honor.

22          THE COURT:  All right.  That'll close the evidence.

23  I'll hear argument.

24          MR. INDELICATO:  Thank you, Your Honor.  Mark

25  Indelicato from Hahn and Hessen on behalf of the Committee.

**J&J COURT TRANSCRIBERS, INC.**

1 Your Honor, the way I'd like to present this is the way I'd

2 like to think about it, and what we do is first look at where

3 we are with the settlement, then look where we are without the

4 settlement.  And if you look at where we are with the

5 settlement, Your Honor, you've had testimony from Mr. Berliner

6 going through the numbers, but I'd like to start first with a

7 full picture of what the settlement brings us.

8        The first thing the settlement brings us is a

9 resolution of the dispute between B of A and the Committee with

10 respect to the REO properties.  As Mr. Berliner testified,

11 there's approximately $3.1 million of pre-petition REOs and

12 about $4 million in post-petition REOs.  And contrary to what

13 the debtor indicates in their papers, this is not a slam dunk.

14 It's not a slam dunk for a number of reasons.

15        One, there would be significant litigation costs.

16 Even though we believe the Committee has a strong position,

17 there would significant expenses incurred by this estate in

18 achieving that result.

19        We also received, xx, the $4 million in post-petition

20 REOs, and if you take a careful look at the cash collateral

21 order, there is at least an argument that those are protected

22 by the cash collateral order.  So why you may ask did B of A

23 give them up.  Well, Your Honor, that was part of a negotiation

24 related to the total REO issues.  There was also issues that

25 the Committee had regarding the transfers that may have

1  occurred in the 90 days, and it was, Your Honor, in essence an

2  exchange of one for the other.

3          And we went one step further, Your Honor.  B of A

4  agreed to give up any claim to these proceeds which they will

5  not be able to achieve any recovery from that deficiency.  So,

6  Your Honor, in effect we went one step better than total

7  victory.  Not only do we get total victory, but we got B of A

8  to agree to not receive any of the proceeds from this.  So,

9  Your Honor, when you look at that, I beg to differ with the

10 debtors' analysis that this was a slam dunk throw away that the

11 Committee just got because of their good looks.

12          Your Honor, also, you must now look at the sharing

13 that the debtors -- that the Committee received with respect to

14 the rest of the collateral, and before I start that, Your

15 Honor, I must emphasize something that's very important.  This

16 is not just a sharing of the proceeds from the mortgage loans.

17 It's a sharing of every dollar that B of A gets.  This

18 addresses Mr. Patton's argument that he made in the beginning.

19 He was concerned that B of A would just do what was best for B

20 of A and not have any -- and because they have no fiduciary

21 duties to creditors, they only have fiduciary duties to their

22 own constituency.

23          Your Honor, we don't disagree with that, and that's

24 why we structured this settlement in a way to align the

25 interests of B of A with the unsecured creditors to maximize

1  recovery, and we did that, Your Honor, by not limiting it just

2  to the mortgage loans, so that they could pick up the benefits

3  on other assets but to make the requirement that B of A share

4  with us on every dollar that comes in to pay down their

5  indebtedness.  So, Your Honor, that was the first and I think a

6  major thing that we did to align the interests of B of A and

7  the Committee.

8          Your Honor, when you look at the exhibit that Mr.

9  Powers moved into evidence, there are a lot of numbers there,

10 and it's a lot to digest, but I think the telling numbers are

11 the numbers on the back of the -- on Page 2 which talks about

12 without the settlement we need to achieve 97.3 percent of

13 collections on the outstanding amounts of the UPBs in order to

14 share without the settlement.  We need 79.6 percent to start

15 sharing under the terms of this settlement.  A significant

16 difference, particularly given the level of the debt here.

17         So, as we said, Your Honor, the way the settlement

18 breaks down -- and you can look at the numbers specifically,

19 but if we achieve 94 percent of the outstanding UPB, we will

20 share 10 percent.  Between that -- 95 percent to 97.5 percent

21 we share 25 percent, and 97 percent and above we share 50

22 percent.

23         Now, it's a little confusing, Your Honor, when you

24 look at the charts and you listen to the numbers, because

25 there's apples and oranges.  When we're talking about the 94

1  percent, the 95 percent, and the 97 percent, we're talking

2  about recovery based on the outstanding amount of the UPB as of

3  the petition date.  Keep in mind that the 1 billion 82 million

4  has already been reduced to $490 million, so the Committee

5  already got a benefit by the collections that have already

6  collected 100 percent to reduce the percentages that we need

7  going forward on the remaining balance.

8          So what I mean, Your Honor, is based on the

9  information that's available to us, if there are no other

10 collections received by B of A other than from the mortgage

11 portfolio, we need to receive collection -- we need to receive

12 about 79.6 percent of those collections before we'd start to

13 share.  However, there are many other assets out there, and B

14 of A has its deficiency claim.  They have guarantor claims, and

15 so we believe that there will be other collections received by

16 B of A, so that will lower the percentage of recovery we need

17 off of the mortgages before we start sharing.  So we think

18 that's important.

19         Your Honor, you look at the numbers, and you say at

20 the end of the day if B of A were to get just to the benchmark

21 number, which is the pre-petition number that has been agreed

22 to by both the debtor and the Committee, this estate would have

23 received in excess of $28 million.  Your Honor, when you look

24 at the Martin factors and you consider whether or not this

25 settlement is in the best interest of the estate, that's a

1 stark number to realize that this estate may achieve 28.8

2 million based on this settlement without this settlement.  With

3 the same collections they will receive nothing.

4        Your Honor, the debtor says -- and if you look at

5 Footnote 21 in their objection, they don't necessarily agree

6 with the math that I've just put forth before the Court or the

7 methodology, but what they say is what the Committee gives up

8 in this settlement is way more expensive in just in my

9 estimation and $28 million, because, otherwise, it doesn't make

10 sense.  So what we look at, Your Honor, is some of the things

11 they object to.

12        The first thing, or at least in my mind one of the

13 most important things that they object to, is that they believe

14 that the Committee has sold their soul.  They believe that the

15 Committee is just going to stand idly by and take direction

16 from B of A and not exercise their fiduciary duties.  As I said

17 at the inception, Your Honor, there could be nothing further

18 from the truth.  This was a hard-fought negotiation in which

19 there was give and take on both sides, and the objective of the

20 Committee was to optimize the recovery for unsecured creditors,

21 and we did that in a number of ways.

22        As we pointed out to the Committee -- to the Court

23 already, we have negotiated provisions with B of A in which the

24 -- they will not share in either the estate proceeds or in the

25 REO proceeds.  So that in and of itself -- it increases the

1  recovery that creditors will receive from those funds, and I'll

2  get to how that math works later, Your Honor.

3      The next thing we did is we made sure the Committee

4  has the right to propose its own plan or to negotiate and

5  propose a plan that it believes is in the best interest of

6  creditors.  So contrary to the example given by the debtor in

7  its reply, we do have the right to propose our own plan, even

8  if it relates to issues that B of A doesn't agree with as it

9  relates to the deficiency claim.

10      One of the things that's important, Your Honor, is to

11  understand what we can't do and what we can't do is try and go

12  back to do to B of A what we have settled.  And, Your Honor,

13  you must understand that in the inception of these settlement

14  negotiations, because of some of the relationships and

15  discussions between B of A and the debtor, that this was a deal

16  point for B of A.  There had to be a provision in the

17  settlement agreement that made clear that once we agreed to

18  settle, we agreed to settle, and we weren't going to be able to

19  do indirectly that which we had released directly.  So having

20  that as a starting point, Your Honor, we began our settlement

21  discussions.

22      There has been a lot made about Paragraph 5 and what

23  Paragraph 5 does or does not do, and I would state, Your Honor,

24  what that does is exactly what I said it does.  It provides

25  that we cannot do to B of A indirectly that which we have

1  released directly.  And there are a lot of provisions in this

2  settlement, Your Honor, where we have the words validly arising

3  to make clear that the Committee has preserved the right with

4  respect to its deficiency claim -- the B of A deficiency claim

5  to know -- to determine whether or not the claim that they're

6  asserting validly arises under the loan agreement and the proof

7  of claim.

8         Your Honor, there are also protections in Paragraph 6

9  of the stipulation which also address some of the debtors'

10 objections.  The debtor contends that we will allow -- by this

11 settlement B of A has the ability to fire sale these loans and

12 blow them out any way they want.  Your Honor, a careful reading

13 of Paragraph 6 indicates that the Committee addressed that as

14 well.  There's a provision in there that talks about B of A --

15 I don't want to misquote.  It says, "The administrative agent

16 agrees that if request for relief of stay motion is granted,

17 the administrative agent will sell or otherwise dispose of the

18 mortgage loan in a manner provided in the credit agreement, the

19 security agreement, and applicable law."  So we believe we

20 addressed that issue as well, Your Honor.

21        Paragraph 3G also protects the estate --

22        THE COURT:  Well, wait a minute.

23        MR. INDELICATO  Yes.

24        THE COURT:  Okay, but how does that preserve the

25 Committee's right if they don't do it?

1          MR. INDELICATO:  Because, Your Honor, they are

2 agreeing, and if they are breaching their obligations under

3 this agreement, we have the rights to enforce the terms --

4          THE COURT:  All right.

5          MR. INDELICATO:  -- of this settlement agreement, so

6 that's why we would come back to court.

7          THE COURT:  And how would you do that?

8          MR. INDELICATO:  We would come back to this Court,

9 and we would bring a motion.  I don't know exactly what the

10 motion would be yet, because I don't know what the issue would

11 be.  But we would bring a motion before this Court to enforce

12 the terms of this settlement, and if there's a dispute between

13 B of A and the Committee on that issue, it will have to be

14 decided by this Court.

15          THE COURT:  I guess my point would be you say they've

16 agreed -- in effect they've agreed what their obligated to do

17 under the agreements and the law, and if they don't do that,

18 that would be a breach of the agreement, so I'm trying to

19 figure out how that has any teeth.  In other words, does that

20 mean that you would then object to their claim when you've

21 already agreed you can't object to their claim?  Does it mean

22 you can somehow agree or undo the sharing arrangement?  Does it

23 mean you would seek an injunction?  I mean what's the mechanism

24 by which you actually do something that has any positive effect

25 in the event they breach their duties?

1          MR. INDELICATO: Your Honor, we'll start with the last

2     one first.  If, in fact, the committee has advance notice that

3     they think that B of A is going to do something contrary to the

4     terms of the settlement agreement, first and foremost, we would

5     speak to B of A's counsel and I'm sure once we did that, it

6     would be worked out, but if not, we may have to come to this

7     court and seek an injunction.  If that wasn't successful, if

8     that were not the appropriate manner, Your Honor, we would

9     obviously reserve our rights, I can't say here today what the

10    appropriate remedy might be but this, at least, gives the

11    ability to provide, or at least it addressed that issue as far

12    as the committee was concerned in the context of this

13    settlement as B of A was not going to be able to, with

14    impunity, dispose of these loans contrary to any of their

15    obligations under applicable law or the lending arrangements.

16    We were not giving them carte blanche based on this release to

17    do whatever they chose to do.  These are the obligations they

18    had under the terms of the lending arrangement going into the

19    filing, these are the obligations they maintain, they're not

20    being released where people might view it as a complete release

21    going forward, we believe this gives us at least the

22    protections that we had going in and this kept them to the

23    obligations going in, it doesn't relieve them of any.

24          THE COURT:  Okay.

25          MR. INDELICATO:  And, Your Honor, that sort of

1  brought me to my next point.  In looking at what the committee

2  achieved in its settlement, particularly with respect to its

3  fiduciary duties, you must look at where we were.  We were,

4  with a cash collateral order and I believe B of A may go

5  through this in more detail but, in essence, agreed to the

6  amount of the prepetition claim, agreed that they would not

7  subordinate, recharacterize or otherwise reclassify the debt of

8  B of A.  The debtor agreed that the B of A -- they would not

9  contest it if B of A claimed that they were over secured.  They

10  agreed to acknowledge the amount, validity, extent and priority

11  of the B of A loans.

12          So, Your Honor, this is what we came into and the

13  committee was diligent in its examination of the claims of B of

14  A.  We found issues that we had with respect to the REO

15  property, we had some other issues that we discussed and

16  negotiated with B of A and came out with the settlement.

17          THE COURT:  Well, what about the argument that

18  paragraph 3(g) is beyond the scope of the committee's charge

19  and that deals with the deficiency claim?

20          MR. INDELICATO:  Thank you, Your Honor, that's my

21  next point.  The debtor claims also that the committee has

22  exceeded its authority in negotiating a proposed settlement.

23  Your Honor, I would propose that this is a red herring.  These

24  so called additional issues are really not issues at all.

25  Let's look at the first one, the allowance of the deficiency

1 claim.

2         No where in the settlement stipulation does this

3 settlement stipulation allow a deficiency claim in an amount

4 certain.  What we did, Your Honor, is create a methodology for

5 the calculation of the deficiency claim based on the settlement

6 agreement.  And what that means is that the debtor has agreed

7 and the committee has agreed now, once this settlement is

8 approved, as to the amount of the outstanding indebtedness owed

9 to B of A as of the petition date.

10         There were, as Mr. Berliner testified, some

11 adjustments to the amounts contained in the cash collateral

12 order but we believe that the billion eighty-two million dollar

13 number is the right number.

14         What we have said to the debtor, what we have said to

15 B of A is two prongs.  Your deficiency claim will be calculated

16 based on the proceeds that you receive and there is a catch to

17 that.  B of A said, but I might be entitled to indemnification

18 claims under my loan documentation that are not included in the

19 billion eight-two number.  We're not waiving that.  We said in

20 the context of this settlement, okay, we agree that you're not

21 waiving them.  So, to the extent they are validly -- you are

22 validly entitled to assert indemnification claims, under your

23 lending arrangements, that will be part of your deficiency

24 claim but we can't determine as we sit here today, all of the

25 rights and obligations that you might be entitled to

1  indemnification claims for, so we are reserving the right to

2  contest whatever you might add to your deficiency claim to

3  determine whether or not it's proper.

4          So, if you start with the amount of a billion

5  eighty-two, you apply that to the amount that they collect and

6  then they may assert additional claims.  The committee is

7  reserving its right to contest that those amounts are validly

8  chargeable under the loan agreement.

9          So, it just -- it merely set up a process, Your

10  Honor, it did not allow a deficiency claim, other than to say

11  that to the extent the deficiency claim is a billion eighty-two

12  and assume, let's assume they receive a billion dollars, they

13  will have an allowed deficiency claim of $82 million.  So, to

14  that extent, Your Honor, it did set up the math, but it didn't

15  determine the number.

16          THE COURT:  Well, wait a minute.  If after

17  application of all cash receipts there remains outstanding any

18  unsatisfied obligations arising prior to the petition date,

19  asserted in the proof of claim, the prepetition secured parties

20  shall have an allowed unsecured claim against the debtors in

21  the amount of such deficiency.  To me, that allows the claim.

22          MR. INDELICATO:  Your Honor --

23          THE COURT:  And it says, whatever they filed, minus

24  whatever they've received, they shall have an allowed unsecured

25  claim.

J&J COURT TRANSCRIBERS, INC.

1            MR. INDELICATO:  That's correct, Your Honor.  But as

2   I said initially, remember from --

3            THE COURT:  I assume the proof of claim has plus

4   unliquidated amount somewhere written in it.

5            MS. SCHONHOLTZ:  That is correct, Your Honor.

6            THE COURT:  Yes.

7            MR. INDELICATO:  It does, Your Honor, and the

8   committee has reserved the right to challenge those

9   unliquidated amounts.

10           THE COURT:  Where is that?

11           MR. INDELICATO:  Where it talks about -- five, where

12  talks about validly?  Yes.  If you turn to Page 8 of the

13  settlement stip.

14           THE COURT:  Um hum.

15           MR. INDELICATO:  X --

16           THE COURT:  All right, hang on, let me read it.

17                          (Pause)

18           THE COURT:  X, I'm sorry?

19           MR. INDELICATO:  X, the allowance of the prepetition

20  secured lenders claims validly arising, pursuant to the loan

21  documents.  And what that is meant to preserve, Your Honor, is

22  the ability to do exactly what the Court indicated, is to the

23  extent they're unliquidated and disputed amounts, added onto

24  the proof of claim, not in the numbers, the committee reserves

25  the right to examine and challenge those.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  All right.  And the position would be

2    that the debtors have waived the right to make that assertion?

3            MR. INDELICATO:  That's correct, Your Honor.

4            THE COURT:  But the debtor disagrees.

5            MR. INDELICATO:  I believe that's correct, Your

6    Honor.

7            THE COURT:  Okay.  Isn't that where the rubber hits

8    the road, right here?  I mean, what we're fighting about?

9            MR. INDELICATO:  I think that is exactly what, at

10   least the issue as it relates to these additional issues is,

11   Your Honor.

12           THE COURT:  All right.  Can you show me in the cash

13   collateral order why you're right or is that -- B of A is going

14   to do that?

15           MR. INDELICATO:  I think B of A will do that, Your

16   Honor.

17           THE COURT:  All right.  Let's not lose track of that.

18   I want to talk about that.  Okay.

19           MR. INDELICATO:  Your Honor, another point that they

20   raise with respect to these additional issues related to the

21   deficiency claim is the attorneys fee issue.  What they are

22   concerned about is that under the terms of this stipulation,

23   the committee is allowing B of A to receive post petition fees

24   and expenses that they might not otherwise be entitled to if

25   it's not over secured.

1          And, Your Honor, there is, let us just say some

2     confusion on the debtors part between how you calculate the

3     deficiency claim and how you calculate the sharing.  When we

4     negotiated our settlement with B of A, B of A agreed to shared

5     with us, or share with the estate, before they received 100

6     cents on the dollar, but they said, we're doing this, we're

7     continuing to litigate with the debtor and we believe to the

8     extent we are successful, the creditors committee or the

9     creditors of the debtor, will achieve the benefits.

10          So, we're not going to share with you, on our

11     calculation of the thresholds, we're going to take our legal

12     fees away before we get to that level.  It was just another

13     mechanism of achieving the number under which we began sharing.

14     It's not in anyway allowing their post petition fees, that

15     relates to the calculation of their deficiency claim which we

16     believe we have preserved the rights and there may be some

17     discussion or confusion on that, but we believe we have

18     preserved our rights to say --

19          THE COURT:  Except to argue.  Well, you preserved

20     your right to what?

21          MR. INDELICATO:  We believe we have preserved our

22     rights to examine the calculation of the deficiency claim, to

23     determine whether or not it should be adjusted because of the

24     inclusion or exclusion, however you figure it, of post petition

25     legal fees.  In other words, we believe --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Based on the reasonableness of the legal

2    fees or based upon whether they're entitled to them to begin

3    with?

4          MR. INDELICATO:  Whether they're entitled to them to

5    begin with as being over secured creditors.

6          THE COURT:  All right, and that's in 5 as well?

7          MR. INDELICATO:  I believe so, Your Honor.  Your

8    Honor, I think --

9          THE COURT:  Where in 5?

10          MR. INDELICATO:  Okay.

11          THE COURT:  Is that the catchall at the end, I --

12          MR. INDELICATO:  I believe so, Your Honor.

13          THE COURT:  Or zed as my grandmother would say.  Any

14    other rights of the administrative agent or the prepetition

15    secured parties set forth in or arising pursuant to the cash

16    collateral order?  That doesn't sound right.

17          MR. INDELICATO:  Your Honor, I think it may be in 5

18    -- in X again, but we'll -- as I'm going forward, we'll look

19    through it, and come up with the specific provision.  It may be

20    in the context of 3(g) and 5(x) as we discussed before.

21          THE COURT:  All right.  Okay.

22          MR. INDELICATO:  Your Honor, the next issue I think,

23    and I think Mr. Power addressed it when he explained to the

24    Court the settlement that we intend to propose with respect to

25    all of the other objections, that this is not a sub rosa plan,

**J&J COURT TRANSCRIBERS, INC.**

1  it was never intended to be a sub rosa plan.  Really, that

2  language in the stipulation of settlement dealing with the

3  money being held in trust, subject to further order of this

4  Court or of a plan of reorganization, was to do just as Mr.

5  Power had indicated, to preserve for the creditors, the

6  unsecured creditors, the benefits we negotiated with B of A,

7  the concept being that to the extent there are other funds

8  available, those funds should be reused to pay administrative

9  creditors and not these funds because the unsecured creditors

10 get a better bang or an extra bang out of these funds if the

11 settlement funds that we achieve through Bank of America are

12 used to pay admin. claims, then Bank of America would then have

13 a claim to a distribution from the other funds to the extent

14 they're used to pay administrative claims.

15        So, that provision was not meant to skip classes,

16 what it was meant to do was to preserve the exclusion of B of

17 A's deficiency claim from sharing in these proceeds.  So, if

18 you have a pot of proceeds and these settlement proceeds were

19 used first to pay administrative creditors, and not used only

20 as a last resort of pay administrative creditors, B of A might

21 have an argument if our funds were used first, for example, in

22 the administration of the estate and other funds weren't used,

23 that they would now be entitled to receive the benefits of the

24 other funds in their unsecured creditors.

25        I think I should go through that again because I may

1  haves lost you.

2         What it is, Your Honor, is, let's assume, for example

3  --

4         THE COURT:  Let me -- I mean the problem you're going

5  to run into is money is fungible, so you're creating sort of

6  this complete artifice as to -- when you get into this

7  marshaling issue as to --

8         MR. INDELICATO:  Well, I think, Your Honor, that's

9  why we used the phraseology we did, so this is sort of the

10  methodology we tried to use, and hopefully, we're going to use

11  successfully on the settlement that we had with respect to the

12  construction to perm loans.  That we really would like the

13  money not to be fungible, we really would like the money to be

14  held, we really would like this money to be used for unsecured

15  creditors.  We acknowledge that there's a priority in the

16  bankruptcy code, we acknowledge that to the extent we confirm a

17  plan, priority and administrative creditors have to be paid

18  first, and that's why in the language the Court will see if the

19  settlement is ultimately approved, what we state is that these

20  funds are freely available to pay other administrative and

21  priority creditors to the extent there are other assets not

22  otherwise available, otherwise, these funds are to be used to

23  fund the plan and make distributions to unsecured creditors.

24  So, we are trying to address that issue, Your Honor, and we do

25  understand that money is fungible.

1          THE COURT:  Well, let me ask you this, maybe I can

2     restate it.  Is basically what you're saying that B of A

3     doesn't share in the first dollars available for general

4     unsecured creditors, up to the amount of its claim that it's

5     waiving under the sharing formula?

6          MR. INDELICATO:  Your Honor, B of A has agreed to

7     waive their entitlement to share in the proceeds generated from

8     this settlement.  The way the Court articulated it, may have

9     been another way of negotiating our settlement, unfortunately,

10    it's not the one that is in the settlement agreement.  So, the

11    way it's drafted is that B of A has agreed not to participate

12    in the funds generated from the settlement agreement and that's

13    why we have structured the structure we did.  It hopefully will

14    achieve the same objective --

15         THE COURT:  How are you going to tell?  How are you

16    going to tell if --

17         MR. INDELICATO:  Well, Your Honor --

18         THE COURT:  -- if the $15 million left from general

19    unsecured creditors, how are you going to tell where it came

20    from?

21         MR. INDELICATO:  Because, Your Honor, this money is,

22    in theory, supposed to be segregated as it comes in.  Now, if

23    -- and that's the --

24         THE COURT:  Who's going to hold it?

25         MR. INDELICATO:  -- Your Honor, as far as we're

1  concerned, right now it could be held like the construction to

2  permit held by the debtor, which is why we said that the funds

3  would be held either pursuant to a plan or further order of the

4  Court.  If for some reason the debtor believes that they need

5  access to this money, they would have to either get the

6  agreement of the committee and then we'd submit a proposed

7  order to Your Honor, for you consideration or they'd have to

8  make a motion, so that we can keep a check on this funding and

9  we don't have a lot of the issues that the Court is concerned

10 about.

11         We tried to address a lot of those issues as best we

12 could.  We understood it was problematic, but we thought this

13 was the best way to achieve that objective.

14         Your Honor, I think next on the issues that we need

15 to address is the next thing the debtor indicates in their

16 objection that they were concerned about is the significant

17 cause of actions that they think, let us say, are being

18 compromised by the terms of this settlement.  I think Mr.

19 Berliner indicated on the stand that when the committee

20 analyzed this settlement with respect to the returned wire

21 accounts and all of the other account issues that they have

22 raised, to the extent they related to prepetition amounts and

23 sweeps that might be waived, the committee took that into

24 consideration in determining the settlement and we still

25 believe that this settlement, in which we could potentially

1 receive in excess of $28 million, was in the best interest of

2 the estate.

3         There are other significant issues that the debtor

4 indicates in their objection might be compromised, like

5 purchase price adjustments and other issues related to the sale

6 with Wilbur Ross.  We don't believe that in the cash collateral

7 order the debtor released those claims and we don't believe as

8 a result of our settlement we released those claims.  The

9 committee can still be an active participant in those issues.

10         At the end of the day, Your Honor, all the committee

11 did is release the very same causes of action in exchange for

12 potentially $28 million that the debtor released on day one in

13 the cash collateral order.  There's no additional release given

14 to B of A.  There is some concern, I understand, from the Court

15 regarding the establishment of the deficiency claim and

16 believing that the committee may have exceeded its authority

17 but, again, I believe that's a red herring.  All we did was set

18 forth the mathematical methodology and reserved our rights to

19 the extent it's not a mathematical calculation.  To the extent

20 there are any additional issues included in that deficiency

21 claim, regarding their additional language in their proof of

22 claim, the committee reserved its rights to examine and

23 determine whether that's properly asserted against the estate.

24         So, while it appears that we may be allowing a

25 deficiency claim, we're doing nothing more than exactly what

1 the debtor did in its cash collateral order.  So, Your Honor,

2 for all of the reasons, set forth in the testimony of Mr.

3 Berliner and our argument, the committee strongly believes this

4 settlement is well above the lowest level of reasonableness,

5 satisfied the standards in Warren and we believe this

6 settlement should be approved.  Thank you.

7            THE COURT:  Thank you.

8            MS. SCHONHOLTZ:  Your Honor, briefly.  The assumption

9 that the banks will act in a commercially unreasonable manner

10 has no basis in fact.  B of A and the other lenders will live

11 by their obligations, not only in the credit agreement, the

12 security agreement, but under the law, and there's no reason to

13 suggest that otherwise.  We agree with Mr. Indelicato that if

14 such an issue, in terms of how we dispose of the loans if we

15 are fortunate enough to get stay relief, will be a subject of a

16 discussion if there's ever an issue and in all likelihood will

17 be resolved.

18            We also believe that it's totally inappropriate for

19 the debtors to weigh in now on how the estate claims should be

20 compromised, because the debtors released those claims, agreed

21 to the committee's standing to pursue them and then proceeded

22 to use over $100 million in cash collateral, over a 15 week

23 period.

24            THE COURT:  Let me interrupt you for a minute, I want

25 to back up to the commercially reasonable point.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. SCHONHOLTZ:  Sure.

2          THE COURT:  It's true that if your client was in a

3  position to receive 100 percent of the recovery for the

4  disposition of an asset and it was going to -- in other words,

5  at some point the fact that you're receiving less than 100

6  cents on the dollar, on the margin of what you're liquidating,

7  could have the effect of incentivizing or motivating you to not

8  take certain actions that you would otherwise take if you were

9  going to receive 100 cents on the dollar.  So, for example, if

10  another, you know, if it requires 45 percent effort, or if

11  you're in a position where you're going to receive say, 45

12  cents on the dollar, and you're -- but for extra effort you

13  could receive 75 cents on the dollar, if all you're going to

14  get out of, if the extra effort costs more than that margin of

15  5 percent, you're not going to take that action.  In other

16  words, if taking that extra action to liquidate the estate at

17  75 cents on the dollar as opposed to 45 cents is going to cost

18  more than you'll ultimately receive on the back end, you won't

19  take that effort.

20          So, the issue the debtor has isn't necessarily that

21  you're going to act in bad faith in connection, or breach your

22  fiduciary duties in maximizing the recovery of your client, or

23  your client is an agent to other lenders, so on behalf of the

24  principles, but that at some point, because you're sharing in

25  the proceeds, 50/50 with the estate, you may not take certain

1  actions that you otherwise would be motivated to take because

2  you're not going to get all the upside.  And as a result, I

3  can't -- I shouldn't approve the settlement because I'm, in

4  effect, putting you in charge of disposing the collateral where

5  you won't be, your client will not have an incentive to recover

6  for the full amount, you'll only have an incentive and my math

7  probably doesn't make any sense, you actually have to sit down

8  and do a more detailed analysis, but at some point on the

9  margins, if there's certain actions that need to be taken in

10 order to increase the recovery, but all that increase is going

11 to go to the committee, your client is not going to take those

12 actions.  It would be economically unreasonable to expect them

13 to.

14         That's a given in a sharing arrangement, okay, so

15 it's a question of who am I going to put in charge of disposing

16 of the collateral?  The debtors, who have the fiduciary duty to

17 all creditors, or the secured creditor, who has a fiduciary

18 duty to itself, and its principles, who will be acting, to a

19 certain extent, on behalf of people to whom it's not

20 particularly motivated or incentivized to do anything to

21 support, so how do you respond to that rather lengthy,

22 confusing hypothetical?

23         MS. SCHONHOLTZ:  Let me try to respond briefly and

24 tell me if I'm responsive.

25         First of all, this is where we assert that the debtor

J&J COURT TRANSCRIBERS, INC.

1  is trying to confuse the stay relief hearing with today's

2  hearing.  Okay.  We think, and I don't want to be accused of

3  doing the same thing, but in terms of who controls the

4  disposition of those assets, that is for Wednesday and I think

5  you will hear a lot of testimony, evidence, see documents, that

6  Bank of America is in a better position to liquidate them,

7  whatever is recovered.

8          With respect to the settlement itself, unfortunately,

9  as we stand here today, we all have a long way to go before we

10  probably get to this 79 cents and change, where the committee,

11  you know recovery on the UPP where the committee starts sharing

12  and the effort that the organization and the manpower to

13  realize value on these assets is required for the whole pool,

14  so we don't foresee that we'll be in situation of saying, well,

15  let's just liquidate this part for this amount and we don't

16  care about the rest because it's only for the unsecured

17  creditors committee account.

18          The next way I'd respond is, that as we sit here

19  today and as you're going to hear on Wednesday, it is more

20  likely than not that the banks have an unsecured deficiency

21  claim.  So, why would we stop trying to recover on assets when

22  we have the ability to recover on assets because although we

23  won't share in what we are giving them, their percentage

24  recovery, we will share in a deficiency pool.  So, we have

25  every incentive to maximize the value from these assets and

1 they do not lend themselves cleanly, Judge, to just saying,

2 okay, we don't need to spend X dollars, so we'll stop.

3          THE COURT:  Okay.  So, your response is, first of

4 all, my hypothetical is irrelevant, deal with it Wednesday.

5          MS. SCHONHOLTZ:  I was trying to be polite, Your

6 Honor.

7          THE COURT:  And, second, you're going to fight the

8 hypothetical and say that that's not how the assets will be

9 disposed of.  So, I guess I'll have to hear about that on

10 Wednesday, too.  But I'm intrigued by your last point, which is

11 somehow that there's -- what is there left that you don't --

12 you're not giving up that's available for unsecured creditors?

13          MS. SCHONHOLTZ:  Oh, it's my understanding, and I'm

14 going to defer to the committee, my understanding is that

15 there's a thrift to be liquidated, that there is a long term

16 lease of the Melville Building to be liquidated.  There are

17 other assets --

18          THE COURT:  That you don't have a lien on?

19          MS. SCHONHOLTZ:  That we do not have a lien on.  Our

20 lien was on this mortgage loan portfolio, the servicing rights

21 and some other collateral related to those two things, but

22 there are encumbered assets in this estate, Your Honor.

23          THE COURT:  Unencumbered assets.

24          MS. SCHONHOLTZ:  Yes.

25          THE COURT:  All right.  Okay.  So, let's go to the

1   point you were headed to when I backed you up.  Sorry.

2            MS. SCHONHOLTZ:  Okay.  No problem.  In the face of

3   the admissions and releases in the cash collateral order, we

4   think that virtually all of the debtors argument in opposition

5   to the settlement is barred and if I may approach, I'd like to

6   hand up a demonstrative that I think will help us quickly work

7   through the cash collateral order.

8            THE COURT:  Show it to the other side first, make

9   sure it's all right.  Any objection, Mr. Patton?

10            MR. PATTON:  No.

11            THE COURT:  All right.  Yes, you may approach.  Thank

12   you.

13            MS. SCHONHOLTZ:  Let's walk through it quickly.  The

14   debtors cannot now complain about the allowance of our

15   deficiency claim and I think that was a question Your Honor was

16   addressing when Mr. Indelicato was at the podium.

17            I'd ask you, Your Honor, to turn to Tab 3, which is

18   Paragraph C from the final cash collateral order.  This

19   paragraph allows, essentially, the claim in the amount we've

20   been discussing, admits that it constitutes valid, binding

21   obligations of the debtors and if you look, Your Honor, before

22   the definition of the word indebtedness, it is not just the

23   amount of principle or interest, but it is all other

24   obligations owing under the loan documents.

25            It also, in that paragraph, says that that provision,

1 and our claims, prepetition claims, are not subject to

2 avoidance, subordination, recharacterization, offset,

3 counterclaim defense or claim of any kind.

4          THE COURT:  What if -- forget about the settlement,

5 but what if you asserted a claim of $1.2 billion that included

6 various things, would this paragraph because there's a dollar

7 amount in there that the debtor acknowledged, would this

8 paragraph waive the debtors right to dispute the difference

9 between 1.2 billion and 1.1 billion, and if so, is it just as

10 to amount or would it include, okay, you can't include this

11 piece or that piece, even though it's included, we acknowledge

12 -- in other words, we acknowledge interest and attorneys fees

13 and et cetera, are part of your claim, if your claim is 1.1

14 billion, but if your claim is 1.2 billion, we don't acknowledge

15 anything and we can fight you on that $900 million difference.

16          MS. SCHONHOLTZ:  The answer with respect to the

17 debtor is, they gave that right up --

18          THE COURT:  90 million difference.

19          MS. SCHONHOLTZ:  -- on the first day of the case

20 because of the reference to the other obligations.  So, to the

21 extent --

22          THE COURT:  So, why is the 1.1 billion in there, why

23 do I have an amount?

24          MS. SCHONHOLTZ:  Because that is a starting point for

25 the discussion and when we do these, we start with the

1  principle, the prepetition interest and fees, and then any

2  other prepetition obligations.  At the outset of the case, we

3  know there may be other obligations.

4          THE COURT:  All right.  So, your argument would be,

5  all they've acknowledged, the dollar amount is simply an

6  acknowledgment of principle debt of 1.1 billion, plus, so

7  together would mean plus, accrued and unpaid interest in an

8  undefined amount of money and they've waived the right to

9  object to that.

10         MS. SCHONHOLTZ:  Correct, pursuant to other

11  obligations arising under this credit agreement.

12         THE COURT:  Yes.  Limited to -- right.

13         MS. SCHONHOLTZ:  They also can't complain about our

14  deficiency claim not being subject to subordination because of

15  the language in the bottom of Tab C.

16         They have complained, if you direct your attention,

17  Your Honor, to Tab 6.  They are complaining, I believe, now

18  about prepetition setoffs and we believe they waived that right

19  as you can see from the highlighted portions of Paragraph F in

20  the final cash collateral order.

21         THE COURT:  All right, hang on.

22         UNIDENTIFIED MALE SPEAKER:  I apologize which tab?

23         UNIDENTIFIED MALE SPEAKER:  Tab 6.

24         MS. SCHONHOLTZ:  Yes.

25         THE COURT:  Debtors admit as of the petition date

1  funds on deposit were subject to rights of setoff.

2          MS. SCHONHOLTZ:  Um hum, and valid perfected

3  enforceable liens.

4          THE COURT:  All right.

5          MS. SCHONHOLTZ:  Okay.  They also complain about the

6  administrative agent's attorneys fees being paid without a

7  showing the indebtedness is over secured, in Tab 5, Paragraph E

8  of the final cash collateral order.  They agreed not to contest

9  the value of the prepetition collateral exceeding the amount of

10 the indebtedness.  And just for a point of reference, they take

11 two different positions on our attorneys fees.  At some points,

12 they suggest, I believe, that the Bank of America's attorneys

13 fees are being paid by the estate, which they have not been

14 paid since November 16th, which is the initial close.

15         They also complain that the committee does not have

16 standing to release estate claims and if you turn to Tab --

17         THE COURT:  I'm sorry, is there any limit on the

18 amount of the indebtedness in Paragraph E, or is it, again

19 carte blanche?  Whatever claim you have, the debtors have

20 waived their right to assert that the collateral is worth less

21 than the claim.

22         MS. SCHONHOLTZ:  That's correct, Your Honor.

23         THE COURT:  And --

24         MS. SCHONHOLTZ:  The way the indebtedness is defined

25 --

1        THE COURT:  Not defined, as an amount, or a limit.

2        MS. SCHONHOLTZ:  No, it is not.  It is not.

3        THE COURT:  Okay.

4        MS. SCHONHOLTZ:  Tab 10 sets forth the issues

5 reserved, at least at the outset of the case, to the committee,

6 so we are perplexed as to how the debtor could say the

7 committee doesn't have standing to release estate claims.

8        They also challenged the administrative agent's liens

9 on REO property, cash on deposit with prepetition secured

10 parties, or any other collateral, and if you turn to Tab 4, and

11 I'm sorry to go a little bit out of order, I'm trying to

12 address issues you raised.

13        THE COURT:  That's all right.

14        MS. SCHONHOLTZ:  If you turn to Tab 4, you can see

15 that this is an admission of the lien.

16        THE COURT:  Let's back up to the committee's

17 position.  Let me look at this real fast.

18        MS. SCHONHOLTZ:  Sure.

19        THE COURT:  Amount, validity, enforceability,

20 priority or extent of the indebtedness.

21        MS. SCHONHOLTZ:  Which I think is what we've been

22 talking about this settlement would cover.

23        THE COURT:  Okay.

24        MS. SCHONHOLTZ:  Okay, Tab 11 just shows, Your Honor,

25 what the remaining issues were as we note them down with the

1  committee after they did their investigation and those you've

2  heard about today.

3          THE COURT:  Okay.

4          MS. SCHONHOLTZ:  And, then Tab 12 shows you where we

5  ended up, which basically, other than those reserved issues,

6  everything -- the debtors admissions, releases, waivers, are

7  binding on all parties at this point in time.

8          The debtors also somewhat indirectly say that there

9  should be -- and they do this with respect to issues they

10 identify that are left from the Ross closing, in essence, they

11 are asserting that 506(c) charge on our collateral is

12 appropriate and if you look at Tab 9, on the final hearing,

13 Paragraph 13, they waive their right to assert any 506(c)

14 charges.

15         THE COURT:  Okay.

16         MS. SCHONHOLTZ:  Just, in closing, Your Honor,

17 contrary to what the debtors keep saying, Paragraph 5 of the

18 stipulation does not prevent the committee from looking at the

19 master proof of claim, both the components and the amount.  The

20 administrative agent filed a detailed proof of claim in

21 January, asserting liquidated and unliquidated amounts owing to

22 the administrative agent and the lenders, under these loan

23 documents.  My understanding is the committee has already

24 looked at it, nothing jumps off the page as being

25 inappropriate.  We're glad they did that before this hearing,

1  but if we have a deficiency claim, or if there is something in

2  there that they say is not properly arising under our loan

3  documents, there is no doubt that we will sit and talk to them

4  about it and they will have the right to object.  We, under no

5  circumstances, are coming in here and asking --

6          THE COURT:  Regardless of the settlement, your

7  position is, if the debtors tried to do the same, they'd be

8  violating the cash collateral order.

9          MS. SCHONHOLTZ:  Unequivocally.  And for that, they

10  got the use of $100 million  of cash collateral, and a deal is

11  a deal.

12          THE COURT:  All right.  Really?

13          MS. SCHONHOLTZ:  I hope, Your Honor.  I have nothing

14  further.

15          THE COURT:  Maybe not before -- maybe not

16  prepetition, but hopefully post petition, but maybe not, who

17  knows.  All right, thank you.

18          MS. SCHONHOLTZ:  Thank you.

19          THE COURT:  Mr. Patton?

20          MR. PATTON:  Thank you, Your Honor, and good

21  afternoon.  Let me take a minute to talk a little bit about

22  where we were just a minute ago with Ms. Schonholtz and B of A.

23          I'll come back to this in a minute, but just to

24  highlight some of the issues that focusing on the documents,

25  are going to force us to wrestle with.  Let's start, for

1    example, with Tab 3 of the demonstrative.

2              THE COURT:  Okay.

3              MR. PATTON:  Which is Paragraph C of the final cash

4    collateral order.  And, first of all, our view is that in no

5    way does this preclude the estate's ability to challenge a

6    deficiency claim including, by the way, the language later that

7    says we can't challenged whether they're under secured.  By the

8    time we get to a deficiency claim, the question of their value

9    of collateral will have be established, they will be asserting

10   a deficiency claim.  So, clearly, at that point the question of

11   our challenging whether they are under secured is irrelevant,

12   they will be stating that they are themselves.

13             Nevertheless, focusing on this language, what we've

14   agreed to, as part of this order, is that the amount of the

15   indebtedness is approximately, as is the fifth line down, 1.1.

16   We also have agreed that that is the amount that's due and

17   owing and on the next line, if you'll read with me, it says,

18   together with accrued and unpaid interest and costs and

19   expenses, including, without limitation, which is modifying

20   together with accrued and unpaid interest, costs and expenses,

21   and it runs a list.  These are all things that are included in

22   the category of unpaid interest, costs and expenses, accrued

23   unpaid interest, costs and expenses.  No where in here have we

24   agreed to an unliquidated, unaccrued obligation.

25             Additionally, in the next line down, the last yellow

1 highlighted line, we've only agreed with respect to any

2 obligations that are actually owing.  To the extent that we

3 have a dispute with B of A, about whether an amount is, in

4 fact, owing, that issue was preserved.

5          Finally, no where in this Tab 3 of the demonstrative

6 or anywhere in the cash collateral order, have we agreed to the

7 allowance of a proof of claim.

8          One more important --

9          THE COURT:  Well, proofs of claims aren't allowed,

10 claims are allowed.

11         MR. PATTON:  That's true, but the way that it's

12 phrased in the stipulation refers specifically to what's in the

13 proof of claim and as Your Honor pointed out, that brings in

14 the unliquidated component of the proof of claim.  So, you've

15 actually highlighted an additional problem we have with the way

16 the stipulation is worded because you're correct, proofs of

17 claims aren't allowed, claims are allowed but the way the

18 settlement agreement is crafted, it springs back to the proof

19 of claim itself, rather than stating that a claim is allowed in

20 the amount of X.

21         Tab 6, Your Honor, and this is an interesting

22 provision, because -- I believe my history is correct with

23 respect to the evolution of these documents from the interim

24 cash collateral order to the final cash collateral order, but

25 in the fourth line, unhighlighted, is the phrase, for the

1 benefit of the prepetition secured parties.  And, that's an

2 important phrase.  I believe I am correct that that was

3 inserted in the final round of negotiations at the urging of

4 the creditors committee because what this tells you is that

5 only amounts held by other institutions, for the benefit of te

6 prepetition secured parties, are the subject of their lien, not

7 amounts held in other institutions, that are not for the

8 benefit of the prepetition secured parties, which leaves open,

9 of course, the question that must be resolved, were these

10 amounts held for the benefit of the prepetition secured parties

11 which is at the heart of the dispute that would arise with

12 respect to amounts that are currently frozen in the hands of

13 Deutsche Bank, for example, to which Bank of America asserts a

14 lien and to which we believe they do not have a lien.  Not that

15 it wasn't perfected, just simply they don't have one that was

16 granted.

17     One more point that I want to focus Your Honor's

18 attention on before I get into my argument in full, and that

19 is, if you'll turn back to Paragraph 5 of the stipulation.

20 And, you'll remember that Mr. Indelicato directed you to Sub X

21 on Page 8 as providing the leeway for the committee to

22 challenge the prepetition lenders claims.

23     If you turn the page back to 7 and begin at the

24 bottom, this language that includes Paragraph X, is a

25 parenthetical.  It begins, provided, however, that the

1 committee shall not oppose the administrative agent or the

2 prepetition secured parties with respect to any matter

3 concerning the allowance of the prepetition secured parties

4 claims validly arising pursuant to the documents.

5         Now, Mr. Indelicato, I believe, is in effect arguing

6 that the insertion of the word validly creates a double

7 negative, which preserves for the committee the right to

8 challenge the Bank of America's claims, yet I do not believe

9 that that rises to a level that would allow the committee to

10 negate the explicit language that deals with the allowance of

11 the proof of claim embedded in 3(g).

12         And, that really brings me to the heart of my

13 argument, which is that the words matter and they've mattered

14 in all of the documents throughout this case.  And, I'm

15 somewhat conflicted.  I'm certainly pleased that the REO issue

16 is resolved, albeit to be finally resolved, this stipulation,

17 or this settlement agreement would have to be approved, which

18 I'm opposed to.  I'm certainly delighted that the notion of a

19 sharing agreement has surfaced and that there's some potential

20 for a mechanism for there to be a sharing of the potential

21 upside of the disposition of this collateral.  The problem is,

22 of course, to get to these agreements, our view is that the

23 committee has given up estate causes of action that have not

24 been delegated to them and you're absolutely correct where the

25 rubber hits the road is, are there remaining estate causes of

1  action that are being sacrificed or is it as Mr. Indelicato

2  suggests, simply a case of the committee doing nothing more,

3  and nothing less than the debtor had already done.

4       Our view is that we retain the right to challenge

5  Bank of America's deficiency claim.  As you read through the

6  cash collateral order, there's nothing in there that prevents

7  us from, at the end of the day, the day of reckoning, when Bank

8  of America comes and says, all right, we've liquidated all of

9  our collateral, we've collected X, we have the right to

10 challenge whether or not that collection, if it happened after

11 a stay relief was done, in an appropriate manner, whether or

12 not they complied with Article 9, whether or not the math was

13 correct, we also retain the right under the stipulation and

14 cash collateral order, to challenge anything that occurs after

15 the entry of that order.

16      In other words, if Bank of America, and this really

17 goes to the heart of the question of challenging their

18 deficiency claim, if Bank of America behaves in such a way that

19 they create a right, a claim or a cause of action of the

20 estate, back against them, or an argument back against them,

21 there's nothing in the cash collateral order that cuts that

22 off.  And, in fact, the cash collateral order at 13 picks the

23 one area that is most of concern to secured creditors that

24 involves future potential claims.  That's 506(c) and explicitly

25 provides in chapter -- or in Section 13, that the 506(c) rights

92

1  of the estate are cut off absent the consent of Bank of

2  America.  But no where in here do we waive anything with

3  respect to future actions of Bank of America such as

4  inappropriate disposition of collateral.

5          In my thesis that the specific words are going to be

6  important in this case really are highlighted by the reply that

7  Bank of America submitted to the Court and by the argument that

8  you've heard today.  Ms. Schonholtz took you through the words

9  of the cash collateral order and spent some time focusing on

10 exactly what those words say and I took Your Honor through that

11 same document and pointed out other words that are, in our

12 view, important and trump Ms. Schonholtz's interpretation of

13 those documents.

14         And focusing on the funds that are currently held in

15 an account frozen by Deutsche Bank, there is a dispute about

16 those funds, and the dispute involves a question of whether or

17 not they are subject to the lien and security interest of Bank

18 of America.

19         Bank of America would submit to Your Honor that we

20 have given up the ability, through signing the cash collateral

21 agreement and its entry by Your Honor, to attack the very

22 question of whether or not Bank of America's prepetition

23 security interest identified and validly established and

24 created a security interest in those funds, and in those

25 accounts.

**J&J COURT TRANSCRIBERS, INC.**

1         Cut to the bone, the argument that Bank of America is

2   presenting is that if Bank of America stands up today and says

3   we have a lien in the stock of our valuable bank subsidiary,

4   this document prevents us from challenging that.  That's simply

5   not the case.  All that has happened in the cash collateral

6   order and it's very straightforward if you read that document

7   together with the underlying credit agreement, it's we've

8   agreed that their liens and their prepetition collateral,

9   however that might be defined, are valid and that the security

10  interest in their prepetition collateral, however that might be

11  defined, is valid.

12        But the question of how it's defined remains

13  unresolved.  There's nothing in here that precludes us from

14  contesting an assertion by Bank of America, that it has a

15  security interest in and a lien against an asset that we don't

16  think they have a security interest in and a lien against and

17  that is available for other creditors.  Such an order would be

18  an absurd order to present to the Court in the first place.

19        We did not give Bank of America a blank check,

20  either, with respect to the determination of its deficiency

21  claim.  We've preserved our ability and our rights to challenge

22  any of their post petition activities with respect to the

23  disposition of their collateral, if it's turned over to Bank of

24  America and to dispute with Bank of America its ultimate

25  calculation of its deficiency claim.

**J&J COURT TRANSCRIBERS, INC.**

1          And, so, we approached our analysis of this
2   settlement agreement with the assumption that the settlement
3   agreement is going to be analyzed with the same level of
4   scrutiny and careful reading as the cash collateral order
5   signed by Your Honor, and as the credit agreement executed by
6   Bank of America and the debtors.

7          And it's only nature, there's a lot of money at stake
8   and a lot of sophisticated parties involved in these
9   proceedings, but the words matter.  So, let's take a look at
10  the security agreement, sorry, the settlement agreement and
11  analyze what it says.

12         We have, as our primary concern, as I said, the
13  notion that in order to craft this deal, the committee has
14  given away estate assets and has given away estate assets that
15  have not been delegated to the committee for its disposition.
16  And, the core of our concern in this regard arises in
17  Paragraphs, or Sections 3(a) and 3(g) of the security
18  agreement.  3(a) defines the term cash receipts and it says
19  that cash receipts are cash received from any number of sources
20  and includes specifically cash from the collateral, which is a
21  defined term and that term itself takes you back to the cash
22  collateral order and ultimately to the credit agreement.

23         3(g) says, and, Your Honor, I think, read this just a
24  minute ago, and I quote:  "If after application of all cash
25  receipts, there remains outstanding any unsatisfied obligations

1  asserted in the proof of claim -- I'm summarizing in the middle

2  there -- the prepetition secured parties shall have an allowed

3  unsecured claim in the amount of such deficiency."

4         This does a couple of things.  One, it appears to

5  allow everything that's asserted in the proof of claim,

6  including those things that remain yet to be resolved, for

7  example, the question of whether debts are owed.  For example,

8  I submit that we have not agreed to the unliquidated amounts in

9  the proof of claim from a fair reading of Paragraph C of the

10 cash collateral order.

11        And something else that this does is, it says that

12 once the cash is received from these various sources, a

13 deficiency claims springs into being by the simple affect of a

14 mathematical calculation.  And that becomes the deficiency

15 claim and if it's allowed, then there will be no opportunity

16 for any other party to challenge it, including the debtor.

17        Now, the problem is that this formula only -- one of

18 the problems, apart from the fact that it cuts off the

19 opportunity to challenge unliquidated amounts, cuts off the

20 opportunity to test the question of what's owed and what's not

21 owed, is that it also only counts cash.  And we all know that a

22 secured creditors claim can be satisfied by non-cash

23 distributions and yet, what this tells you is that whenever the

24 items of collateral and other assets are turned to cash, then

25 and only then do we know what the allowed claim is.

1          Among the other things that this does is, it quite

2 simply cuts off our right under 1129(b)(2)(a)(3), to provide

3 the indubitable equivalent to Bank of America in a plan of

4 reorganization and distribute property back to them and then

5 determine through a subsequent hearing or contemporaneous

6 hearing what the value of that asset is, and ultimately at that

7 point arrive at their deficiency claim.

8          There is also the opportunity to make a distribution

9 and we may end up making a distribution under this plan of

10 reorganization of both cash and property and yet, for the same

11 logic, property distributed to Bank of America that's non-cash,

12 doesn't count in determining the deficiency claim.  We would

13 have to wait until it's liquidated.

14          This becomes a problem if we end up in what I would

15 call the reverse of today's posture, although it may not be so

16 reversed, but when I say the reverse of today's posture, I mean

17 a posture where today the debtor believes that the correct

18 strategy with respect to the loans that are B of A's

19 collateral, is to hold them and not try to sell them in the

20 present or immediate future, that that strategy will yield the

21 greatest value.  It's not clear to me any more whether B of A

22 actually disputes that that's the strategy.  In fact, it

23 appears to be that they are coming around to agree with us, but

24 that they believe that they are in a better position to do

25 that, execute that whole strategy than we are but,

1  nevertheless, it's entirely possible that we would arrive at a

2  plan confirmation and find that either the committee or some

3  significant constituent of the secured creditors that have a

4  blocking position with the plan or even the estate has

5  concluded that what's in the best interest of all creditors is

6  to, as quickly as possible, distribute all of the assets of

7  this estate, which would require a determination of the

8  deficiency claim of Bank of America.  You could put the loans

9  to Bank of America and have an ordinary context, have a hearing

10 to determine whether or not those loans have value and, if so,

11 how much, to determine what the deficiency claim is and then

12 make your distribution and move on.

13        What this stipulation does, in that specific context

14 is really prevents you from ever determining what that

15 deficiency claim is based on a distribution of property.  You

16 have to wait until those assets are ultimately liquidated, the

17 estate has to stay open until we can determine that deficiency

18 claim to make our final distribution.

19        The other problem apart from eliminating our ability

20 to challenge components of the proof of claim that are

21 unliquidated, our ability to test the question of what's owed

22 under the proof of claim and our inability to use property

23 instead of cash, our functional inability to use property

24 instead of cash to satisfy the Bank of America claim and our

25 inability to do a (b)(2)(a)(3) cram down, is that 3(g) also

1 dictates that this deficiency claim, as we've learned how it's

2 defined in the settlement agreement, is going to be, come hell

3 or high water, treated pari passu with all other unsecured

4 creditors within the relevant estates against which the claim

5 might be lodged.

6           Well, why do I care about that?  Well, as Your Honor

7 pointed out in the context of grilling Mr. Indelicato, it's

8 difficult to see exactly what tools are available to the Court

9 to police the actions of Bank of America if stay relief is

10 granted and Bank of America fails to live up to the obligations

11 under Article 9 or its credit agreement.  There is one very

12 potent tool, though, that's available to the Court, two

13 actually.  One is to allow or not, or modify or not, the

14 deficiency claim.  For example, if Bank of America were to

15 behave in a manner that was ultimately determined to be, and I

16 don't believe Bank of America for a minute is going to behave

17 in a fashion that's not both legal and in its best economic

18 interest, let me make that perfectly clear, I just don't think

19 that their best economic interest is necessarily the estates

20 best economic interest and my belief that they won't behave in

21 a manner that's illegal doesn't mean that it's appropriate for

22 the estate to give up the ability to police them and to make

23 sure that there is a tool for a remedy if they behave in a

24 manner that's illegal.

25           So, in that context, what concerns me is that the

1 dictate in the stipulation that the claim be treated both as an

2 allowed claim and pari passu means that the Court most likely

3 is not going to be able to not allow that deficiency claim

4 because this mathematic formula dictates the outcome, it'll

5 become a part of Your Honor's order, and number two, it cuts

6 off any ability to use 510(c) to subordinate.

7           Now, Bank of America has argued that the right to see

8 subordination has been waived.  Your Honor, the right to seek

9 subordination has been waived as to all events up to the entry

10 of the cash collateral order.  Any action that Bank of America

11 were to take with respect to the disposition of its collateral

12 that would give rise to the kind of concern that Your Honor

13 identified in the context of your questioning of Mr.

14 Indelicato, is an action that occurs post petition.  And Your

15 Honor retains the power and the debtor retains the right to

16 bring to Your Honor's attention, actions that would, post

17 petition actions by Bank of America, that would suggest that an

18 appropriate remedy would be to subordinate its deficiency claim

19 and that would be precisely the kind of context that would

20 arise in a situation where Bank of America failed to comply

21 with the reasonableness requirements of Article 9 in the

22 ultimate disposition of its collateral and came back to the

23 Court with an artificially inflated deficiency claim.

24           This dictate, that that deficiency claim be treated

25 pari passu, cuts off any opportunity of this Court to police

1  the actions of Bank of America in connection with its post

2  petition activity.

3          And, as I said, if there's any doubt about whether or

4  not there's a prospective component to the releases that are

5  granted here, I think you need look no further than to

6  Paragraph 13 which speaks to the 506(c) waiver.  There would be

7  no need to include that if all prospective Chapter 5 actions

8  were cut off and I don't think Your Honor would even

9  contemplate for a day that the provision that says that we

10  waive all Chapter 5 actions waives the ability of the estate to

11  bring a 549 action for an unauthorized, post petition transfer

12  to B of A in the form of a gift, mistaken or otherwise, that

13  delivered assets to them that should not properly have been

14  delivered to them without a court order.

15          So, I don't think anyone can stand before Your Honor

16  and argue with a straight face that if their conduct, post

17  entry of the cash collateral order, was conduct that would give

18  rise to an entitlement to, or a power on the part of Your Honor

19  to equitably subordinate them, to punish them for that conduct,

20  that anything we said in our cash collateral stipulation and

21  order gave them a pass on that sort of behavior.

22          Just the same as my argument that the cash collateral

23  stipulation and order, while we acknowledge their security

24  interest and their liens do not give them a pass and a blank

25  check to allow them to simply assert a claim on any asset that

1  they felt they were entitled to assert an asset on without our

2  having an ability to challenge whether or not that was

3  legitimately an asset within the purview of their security

4  interest.

5        So, Your Honor, what this does, in 3(g), what this

6  settlement agreement does in 3(g) is cuts off two very

7  important tools that would be necessary in the hands of the

8  estate to police Bank of America were stay relief granted and

9  are necessary in the hands of the estate to preserve all of its

10  options with respect to the ultimate crafting of a plan of

11  reorganization and trading those rights in the context of the

12  settlement is an exercise by the committee in trading rights

13  that were not delegated to it and as we argue at length in our

14  papers, they simply don't have the authority to do that.

15        I'm actually wondering if there's even of minds

16  between Bank of America and the committee with respect to this

17  stipulation given Bank of America's view that there are no

18  rights left to the debtor to give up with respect to arguments

19  about the deficiency claim and the pari passu treatment and the

20  argument of the committee that they're giving up nothing other

21  than what the debtor itself gave up at the outset of the case

22  in connection with the cash collateral order.

23        But nevertheless, in addition to exceeding the

24  authority that was delegated to it under the cash collateral

25  order, the committee, I think has, in fact, failed to satisfy

**J&J COURT TRANSCRIBERS, INC.**

1  the test in <u>Martin</u>, and as everybody knows, the test is a four

2  part test, and I'm not even sure <u>Martin</u> applies, but assuming

3  it applies to this situation where there seems to be a mix of

4  delegated assets and non-delegated assets being offered up as

5  part of a settlement, the test is a balancing and an evaluation

6  of the probability of success on the merits, the difficulty of

7  collecting, the complexity of the underlying litigation and the

8  paramount interest of creditors.

9        We heard that there are three assets that are being

10 -- that have been delegated to the committee, in the eyes of

11 the committee, and that are being compromised.  One is the

12 claim to REO, the second is prepetition sweeps and transfers of

13 cash and the third is the question of whether the Bank of

14 America group is over secured or under secured.

15       I think Mr. Indelicato misspoke when he said that the

16 witness testified that the sweeps were evaluated by him and

17 were part of, and as part of that calculus, he concluded that

18 this deal was a fair deal.  My notes indicate that we heard no

19 testimony one way or the other with respect to the prepetition

20 sweeps and so we have not heard whether or not there's any

21 probability of success on the merits or whether the litigation

22 is complex or whether there's any challenge of collectability

23 or anything about the interest of the creditors with respect to

24 that, except to the extent that it's offered up as a -- to the

25 extent the sharing is offered up as being a component of that

1  paramount interest of the committee.

2      With respect to the REO question, we saw some math,

3  but we did not hear any evidence about the complexity of the

4  litigation or about the probability of success or

5  collectability.  And, again, on the element that turns to the

6  paramount interest of the creditors, I believe the suggestion

7  is that the sharing that was negotiated satisfies the question

8  of whether or not the settlement satisfies the paramount

9  interest of creditors test.

10      But on sharing, while we, again, saw some math, we

11  really saw no testimony, no evidence was presented, that

12  addressed the question of whether or not sharing was likely.

13  We did have some discussion from the podium and Ms. Schonholtz

14  on behalf of Bank of America suggested, at least as it stands

15  today, they probably will have a deficiency claim, which casts

16  some doubt on the question of whether they'll be sharing.  Now,

17  it's entirely possible for them to have a deficiency claim and

18  for sharing to be applicable.

19      But we didn't hear anybody in court on behalf of the

20  movants talking about the real economic value of the sharing.

21  The sharing, as I understand the way the settlement agreement

22  works, creates a deficiency claim.  In other words, if Bank of

23  America gives up value under the sharing, then it, by

24  definition under the settlement agreement has not received cash

25  and, therefore, that reduces its indebtedness and, therefore,

1  it's deficiency claim is increased by the amount of the

2  sharing.  And we did not hear from the witness an evaluation of

3  what distribution the deficiency claims are going to receive.

4  Our view, as we've indicated in our papers, is that it's very

5  likely that the deficiency claim that will be created through

6  the sharing will, in turn, earn a distribution of 100 cents on

7  the dollar.

8        So, not only have we heard nothing that satisfies the

9  <u>Martin</u> standards about the REO, and about the sweeps, but the

10  only thing offered, other than testimony about the sharing, the

11  only thing that's offered up about the sharing, really fails to

12  assess whether or not sharing is ever likely or if it were to

13  take place, whether the sharing itself would benefit the

14  estate.

15        So, I conclude with the only possible conclusion that

16  I can reach, that the request for approval of the stipulation

17  must be denied, the committee is giving away live assets of the

18  debtor.  We've not ourselves given those assets away to test

19  and challenge the deficiency claim, to challenge amounts in the

20  claim, in the proof of claim that are unliquidated, the ability

21  to challenge the question of pari passu treatment based on post

22  petition activity of the Bank of America group, and not having

23  the power to give those away, the committee has exceeded its

24  authority and in that regard, is precluded from asking the

25  Court for approval of the stipulation.

1          We also think that with respect to the basic economic

2    merits of the settlement, it's failed to satisfy the <u>Martin</u>

3    standards.  But I'm also torn in the sense that having some

4    sharing as part of a deal is better than none.  Unfortunately,

5    the package that has been wrapped around that notion, and

6    around the notion of resolving the REO, is flawed and, in my

7    view, it's so fundamentally flawed that it can't be approved by

8    the Court.  Thank you.

9          THE COURT:  Any reply?

10          MR. INDELICATO:  Thank you, Your Honor, Mark

11   Indelicato again.  Hopefully, I will not be too long.  I'd like

12   to address some of the issues the Court raised and Mr. Patton

13   raised as well.

14          First, going back to an issue, I think the Court

15   raised with Ms. Schonholtz, you were questioning regarding the

16   sharing at 50 percent and how would, why would B of A, if it

17   would cost them $10 to achieve 5, why would they do it.  And

18   that's a good question, but I just would ask the Court and it

19   may just have been the numbers you picked, to understand that

20   if we were at a point where we're sharing 50 percent, the

21   estate has already received $38 million that they might not

22   otherwise have been entitled to, so we tried to achieve an

23   alignment with B of A in liquidating these assets understanding

24   that we were getting money before we would otherwise be

25   entitled to and we believed that was the way to achieve the

1 greatest objective and although this is not about the hearing

2 that's going to start on Wednesday, our concern was that

3 without a settlement agreement if, in fact, the motion for

4 relief from the stay was granted, that the B of A would have

5 far greater control over these assets with no sharing of the

6 estate and they would not be aligned with the interest of

7 creditors and that so at least this way we're trying to achieve

8 that objective.

9          And, Your Honor we have, and the committee has

10 although, again, not for today's hearing, but it was part and

11 parcel of our deliberations on this settlement regarding the

12 relief stay and as the Court will see when they review the

13 papers for Wednesday, the committee has filed a statement in

14 support of the relief stay motion and I believe the committee

15 would have done that without, given where we are today, with or

16 without this settlement, but we do have the settlement and we

17 do support the relief stay.

18          Your Honor, it seems to me that the crux of Mr.

19 Patton's arguments today and as he started out, I don't think

20 he's unhappy about the REO, I think he was delighted about the

21 sharing, I think what he was concerned about was the issues

22 relating to the deficiency claim and a sense that the committee

23 is giving away, as he called them, live assets that we have no

24 authority to give away.

25          Your Honor, as I said, I think at the conclusion of

1  my presentation, that I do not believe that we are doing

2  anything that the debtor hasn't already done in its cash

3  collateral and we can dispute the language but I don't believe

4  in essence we are.

5          Mr. Patton is concerned about post petition conduct

6  that B of A may have done, that the committee may be absolving

7  them from, I see nothing in the stipulation that does that.  To

8  the extent people view our language as establishing an allowed

9  deficiency claim, Your Honor, I would submit that to the extent

10 B of A has an allowed deficiency claim because of the terms of

11 their debt and they have done something post petition that

12 would justify an extraordinary remedy of equitable

13 subordination under 510, there is nothing in this stipulation

14 that would take that power away from the Court.  I can't

15 imagine it happening, but we are doing nothing in this

16 stipulation, other than, and the title of the stipulation, Your

17 Honor, is final stipulation and order resolving all remaining

18 issues with respect to the final order authorizing debtors

19 limited use of cash collateral.  We are not giving B of A a

20 release going forward, with respect to acts or conduct that

21 they may take.

22          So, I believe those issues that Mr. Patton raises,

23 although theoretical issues, I don't think they're real.  I

24 think the issue that the Court needs to focus on is the fact

25 that what the committee has done is examined the prepetition

1  conduct of B of A, the prepetition lien security interest and

2  we have examined the issues that the debtor has raised with

3  respect to prepetition sweeps and the like and we have

4  determined, based on all of that, that this settlement will

5  garner greater benefit for the estate than not having this

6  settlement, litigating with B of A on those very issues and not

7  sharing in the collateral with them.

8          Your Honor, we do believe that this settlement gives

9  us the right to the extent B of A does not act in accordance

10  with applicable law and that may mean the UCC in disposing of

11  its collateral, we believe we do have rights to come back to

12  this Court.  There may be various forms in which that release

13  can come, but we do believe we have that.  We do not believe

14  that we have waived those rights.

15          We're looking at it, Your Honor, again, as Mr. Patton

16  framed it, 3(g) waives two tools.  He's concerned that there's

17  going to be nobody who is going to be the watchdog.  I can

18  assure Your Honor as we have in the past, the committee will

19  continue to be the watchdog of B of A and, again, I don't

20  believe that we are trading rights that we don't have otherwise

21  the right to trade.  We were given the authority to pursue

22  these actions that were waived by the debtor at the inception

23  of the case.  If they were not waived by the debtor, they're

24  not being waived by the committee.  To the extent causes of

25  action exist post petition, that the debtor has, I believe the

1  committee has them as well.  I don't believe the calculation of

2  the deficiency claim and I truly believe that's what that is,

3  from our perspective, Your Honor, it's a calculation.  We have

4  reserved the rights to determine whether or not any of those

5  unliquidated or disputed amounts that B of A may claim in their

6  proof of claim are not appropriate.

7         The reason that we drafted it the way we did, Your

8  Honor, is that one specific proof of claim deals with the

9  prepetition lending arrangements.  There are other proof of

10 claims that B of A has out there, not related to that

11 specifically, and that's why we isolated that one proof of

12 claim and focused on that.

13        So, Your Honor, we believe at the end of the day,

14 what we've achieved from this settlement is a resolution of the

15 REO property.  We believe we created a sharing arrangement

16 which does a number of things including aligning the interests

17 of B of A with that of the committee to achieve a maximum

18 result for creditors.  We do believe that at this stage in the

19 game, B of A is the proper party to liquidate out this

20 collateral or achieve maximum value through a number of

21 multi-step process.

22        Mr. Patton also said he thinks B of A is now coming

23 along to their way of thinking on the wait and hold

24 methodology.  You'll wait, the Court will until Wednesday to

25 hear the various testimony, but I'm not sure that that wasn't

1  always B of A's analysis to liquidate this in a commercially

2  reasonable manner.

3        So, Your Honor, I believe based on everything we've

4  heard to date, I think that the four <u>Martin</u> standards have been

5  met, I think the paramount interest of creditors are served by

6  approving this settlement agreement. I do not believe the

7  provisions in here dealing with the deficiency claim are going

8  to create the cataclysmic results that Mr. Patton believes they

9  will and I think that this Court should approve the settlement.

10 Thank you.

11       MS. SCHONHOLTZ:  Briefly, Your Honor, suffice it to

12 say, that we're in general disagreement with Mr. Patton's

13 articulation of the debtors remaining rights after the cash

14 collateral orders and the parade of horribles he envisions if

15 we get stay relief, or if we have a deficiency claim to pursue.

16       The debtor should not be permitted to blow up a

17 settlement over far out hypotheticals about what B of A might

18 do, if we get stay relief, and what we might do if we have a

19 deficiency claim to pursue.

20       Mr. Patton should have no fear about the meeting of

21 the minds between us and the committee.  The committee and the

22 Court, if necessary, which we don't expect it would be

23 necessary, can look at our general behavior in liquidating the

24 collateral if we get stay relief.  And the commercial

25 reasonableness, and it's set out in the stip, as to what we're

1 doing.

2          The committee and the Court, if necessary, and again,

3 we don't envision it would be necessary, can look at the

4 components and the amount of our deficiency claim, if any,

5 involving a claim over the admitted billion eighty-two million

6 benchmark amount in Paragraph D of the settlement.  I have

7 nothing further, thank you, Your Honor.

8          THE COURT:  You're welcome.  Mr. McMahon?

9          MR. McMAHON:  Your Honor, good afternoon, Joseph

10 McMahon for the United States Trustee.  I rise just to, I

11 guess, note our office's disagreement with counsel to the

12 committee regarding the mechanics of how the settlement funds

13 may be used to satisfy administrative or priority claims

14 actually operates.

15          I don't know if Your Honor has been handed a copy of

16 the proposed form of order.

17          THE COURT:  No.

18          MR. McMAHON:  Then perhaps, I can just reserve on

19 this point, if we get that far.

20          THE COURT:  Yes.  Let's do that.

21          MR. McMAHON:  Thank you, Your Honor.

22          THE COURT:  Thank you.  Ms. Counihan.  Good

23 afternoon.

24          MS. COUNIHAN:  Good afternoon, Your Honor, Victoria

25 Counihan on behalf of both AH Mortgage Acquisition Company and

**J&J COURT TRANSCRIBERS, INC.**

1  WRL Recovery Fund 3LP.

2        Your Honor, we filed a limited objection.  My

3  understanding is that there is language that's going to be

4  inserted into the form of order that resolves our objection.  I

5  have seen an e-mail of the language, I have not seen the form

6  of order, so presuming that language is added to the order,

7  that does resolve our issues with the settlement stipulation.

8        THE COURT:  All right, thank you.  All right.  I'm

9  going to take some time to review some of the materials before

10  rule on this matter.  And I think I'd like to do that

11  preliminarily before we go through the exercise of walking

12  through the order.

13        In addition, I have a hearing at two o'clock which I

14  understand is mostly resolved, but there are some objections.

15  I think it may be a 7 if I remember correctly, I have to look

16  at the agenda again, which is a long way of saying, we're going

17  to take a recess for me to read those materials, eat my lunch,

18  prepare for two o'clock and have the two o'clock hearing.  So,

19  I think we're going to reconvene, we're going to shoot for 2:30

20  because I don't want to keep you here, and I know we have other

21  matters to turn to, after we reconvene, besides this matter,

22  although -- what do we have left, we have the -- oh, we have

23  the Wells Fargo motion, is that going forward still?  It is?

24        MR. BEACH: Yes, Your Honor, the Wells Fargo motion, I

25  believe there's a contested fee app.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  And we have the Northwest, right.  Okay.

2    So we have two matters to turn to.  2:45, we're going to

3    reconvene at 2:45, all right?  Thank you very much, we're in

4    recess until 2:45.

5                         (Luncheon recess)

6      **(Proceedings from 3:06 to 3:42 previously transcribed)**

7           THE COURT:  I think next on the agenda was the Wells

8    Fargo matter.  Anyone that needs to leave can leave.  Or wants

9    to leave.

10           UNIDENTIFIED ATTORNEY:  Needs to leave.

11           THE COURT:  I guess except me.

12                         (Pause)

13           MR. TOP:  Good afternoon, Your Honor.  My name is

14    Frank Top.  I'm with Chapman and Cutler in Chicago, Illinois.

15    And I'm here representing Wells Fargo Bank, N.A. -- in its

16    capacity as securities administrator.  And this matter is up

17    this afternoon on Wells Fargo motion for relief from the

18    automatic stay to seek approval to exercise a variety of

19    equitable remedies.

20           This matter relates to a payment made to American

21    Home Mortgage Investment Corporation in -- on or about March

22    26, 2007.  And the payment was made to it in error.  It should

23    never have received the funds.  And the debtors had no right or

24    entitlement to any of those proceeds that they received on

25    March 26th in connection with the Class IV-M4 transaction

**J&J COURT TRANSCRIBERS, INC.**

1   -- certificate in the AHMIT 2007 SD1 transaction.  That's a

2   mouthful and I'm sorry.

3         Wells Fargo serves as securities administrator for

4   the AHMIT which stands for American Home Mortgage Investment

5   Trust SD1 transaction as it does for a whole host of other

6   transactions sponsored by American Home Mortgage in their

7   securitization programs.  That would include the AHMIT 2005 SD1

8   transaction; it would include the AHMIT 2006-2 transaction, the

9   AHMIT 2007- -- or the AHMAT, A-H-M-A-T, 2007-3 transaction, and

10  the AHMAT 2007-SD2 transaction.  This -- the payment that was

11  made in error relates to a transaction that flows to on or

12  about March 13th, 2007.

13        And the first distribution date in connection with

14  this particular transaction was March 27th, 2007.  Let me give

15  you a little bit of background in connection, though, with that

16  particular transaction.  It was kind of a Siamese twin with

17  another transaction.  It was issued in connection with also the

18  AHMIT 2007-A transaction.  They both have the same offering

19  circular or offering memorandum in connection with both

20  transactions.  They both are reported on the exact same monthly

21  servicer or distribution report.  So, they're all collected on

22  that particular transaction, as well.  They all have the same

23  accounts.  And this was all done in a way to kind of facilitate

24  the economics of the transaction.

25        Separately, neither probably could have been

1  economically viable to be their own stand alone transaction, so

2  they, you know, combine them together.  But it is true that in

3  each situation, both the AHMIT-S -- 2007-SD1 transaction has

4  it's own -- or that those securities have their own separate

5  indenture, as well, as the 2007-A certificates.  They have

6  their own separate indenture, as well.

7        Basically, what happens in the ordinary course of

8  business is Wells Fargo would get information from the servicer

9  with respect to the mortgage loans and funnel it through a

10  model -- a computer model that determined who should get

11  payments, on what particular date and at what particular time,

12  and then prepares a report with respect to these payments.  And

13  it's sent to the indentured trustees, and it's made available

14  to note holders and the like.

15        And the problem in this circumstance is apparently

16  there was a change in the model sometime after the closing of

17  the transaction, but -- and which Wells did not become aware of

18  until after payments were made, and you know -- if the model

19  had changed prior to that particular point in time, the payment

20  would never have been made on that class for M4 certificate.

21  That particular certificate does not -- was not anticipated

22  that any distributions would be made in connection with that

23  certificate for many, many, many, many years.  And I think in

24  the debtors' pleadings, they say it could be as long as 16

25  years before any particular distribution would have been made

J&J COURT TRANSCRIBERS, INC.

1  on that certificate.

2          So, in any event, the payment, the distribution was

3  made on -- with respect to that certificate.  It was made in

4  error.  Wells Fargo sought the return verbally, at least,

5  originally to try to get that money back into the trust.

6  Thereafter, followed that up with a request in writing and for

7  whatever reason, those funds were not returned to the trust.

8  And so at this point in time, the trust, with respect to that

9  securitization was out $462,000 and some change.  And you know,

10 frankly that's money that does not constitute property of the

11 estate, and money that, you know, rightfully should have been

12 returned near the time it was received by the debtors.  And so

13 this -- we're filing this motion seeking to get that money

14 back.

15         We're seeking basically three different forms of

16 relief, Your Honor.  And I'm sure you've read the papers.

17 We're seeking to try to recoup the money from other payments to

18 be made in the upcoming future that AHMIC owns.  We're seeking

19 to assert a constructive trust over any account that may have

20 received the proceeds of the wrongful payment.  And third,

21 we're seeking to impose an equitable lien against various

22 certificates owned by AHMIC in an effort to try to get this

23 money back into the appropriate trust.

24         As it relates to recoupment, unquestionably, this was

25 -- these were funds that were paid over to the debtors

1    unjustly.  It constitutes an unjust enrichment on -- for the

2    benefit of the estate.  Under applicable case law, recoupment

3    is a viable, equitable theory, although not set forth in the

4    bankruptcy code to try to get those funds back.  In this

5    particular circumstance, given the fact that this was money

6    that should never have gone to the debtors, that should have

7    been returned into the trust immediately, we believe that this

8    ought to empower the Court equitably to view the applicable

9    transaction even more broadly than it might otherwise view the

10   transaction for purposes of recoupment.

11        Obviously, we are aware of the cases that focus on a

12   single integrated transaction approach, such as the University

13   Medical Center's case.  But in this particular case because

14   this wasn't just a over -- a normal overpayment, but just an

15   outright payment that should never have been made, and should

16   have been returned, and probably was kept by the debtors

17   improperly, we believe maybe you ought to be a little more

18   expansive as to what you consider a particular transaction.

19   And so we ask that you enable us to recoup money from all the

20   various securities that AHMIC owns until we get up to $462,000

21   and return that money back into the trust.

22        Alternatively, if you view it a little bit more

23   narrowly than that, we urge you to consider both the 2007-A and

24   2007 SD1 transaction as appropriate certificates to take

25   proceeds from in order for us to recoup those funds, as well.

**J&J COURT TRANSCRIBERS, INC.**

1 And finally, barring that, obviously, we should be able to

2 recoup anything we can get from that particular certificate,

3 although, admittedly, there's nothing expected on that

4 particular certificate for quite some time.

5         Your Honor in connection with the constructive trust

6 theory, again, it's money that the debtors should never have

7 received, and money they are holding unjustly.  And there's

8 applicable case law that provides that a constructive trust may

9 be asserted over any bank account that these proceeds may have

10 found their way into.

11         I am wary of the fact that the debtors have asserted

12 that these are -- were deposited into account with many, many

13 transactions going back and forth.  But the third circuit has

14 applied the lowest intermediate balance test to help solve that

15 particular problem.  It's my understanding that the

16 intermediate -- lowest intermediate balance may have in fact

17 been zero in this case, although I don't know the answer to

18 that.  But to the extent that there was a positive lowest

19 intermediate balance, we should be able to assert a

20 constructive trust over those amounts that may be in that

21 particular account.

22         And then finally, Your Honor, we're seeking to impose

23 an equitable lien on the various certificates held by AHMIC.

24 And in this case, it is a little unusual in that normally

25 equitable liens are asserted against property which is actually

improved using proceeds and the like.  However, in this

particular circumstance, we would be -- we in essence made an

advance in connection with this particular certificate.  We

ought to be able to get the first funds back to replenish the

trust with money that the debtors did not rightfully receive.

And this lien or charge could be used so that the debtors

couldn't go off for example and sell all these certificates

without somehow allowing us to repay the amounts that are

otherwise due and owing the trust.

All in all, Your Honor, it is a very straightforward

simple request in a number of respects.  I mean, again, this is

a payment that was made in error, a payment that should never

have been made to AHMIC in connection with this.  A payment

that was requested back from the debtors.  And we did not

receive those funds back or Wells did not receive those funds

back.

I do want to raise one final thing that was mentioned

in the debtors' papers just so that we're up front about that.

And that is in fact that sometime in November, we became aware

that some of the operational folks at Wells Fargo had withheld

some money from distributions that were otherwise going to go

to AHMIC to try to recover the $462,000.  I believe the

payments were in September and October or maybe it was October

and November.  In any event, after considering the matter and

after receiving a letter from the debtors, we took a look at

1 the applicable law and the like and felt that the decision as

2 to whether or not we were entitled to withhold those monies was

3 better left in your hands.  So, all that money was released in

4 November and returned to the debtors.  So, at this point in

5 time, Wells Fargo is not withholding any funds with respect to

6 any of those certificates.  And that was a cause for filing

7 this particular motion.

8           I have with me today William Fay from our Wells

9 Fargo's default administration department.  To the extent that

10 you believe a factual record is appropriate, I'm more than

11 happy to proffer his testimony here today.

12           THE COURT:  Go ahead.

13           MR. TOP:    I proffer the testimony of William Fay.

14 If called to testify, Mr. Fay would testify as follows:  that

15 he is a default and restructuring account manager at Wells

16 Fargo Bank, N.A. in their corporate trust services asset

17 securitization group and works from their offices in Columbia,

18 Maryland.  He would further testify that in his capacity as

19 default and restructuring account manager, he has oversight

20 over the AHM bankruptcy proceeding as it relates to their

21 securitization transaction.  In such capacity, he has reviewed

22 certain books, records, and materials relating to AHM and the

23 securitizations and in particularly, the AHMIT 2007-A and SD1

24 transactions.

25           He would testify further that Wells Fargo was a party

1 to that certain indenture dated as of March 13th, 2007 along

2 with American Home Mortgage Assets Trust 2007 SD1 as issuing

3 entity and Deutsche Bank National Trust Company as indentured

4 trustee relating to the trust.  A copy of the indenture is

5 attached to the motions Exhibit B and a copy of the relevant

6 definitional appendix also was attached as Exhibit C.

7            The 2007 A and SD1 transactions were apparently too

8 small to issue independently such that it made economic sense

9 to issue the transactions together.  The 2007-SD1 and 2007-A

10 were issued pursuant to an offering memorandum.  Certain of the

11 same accounts are applicable to both the 2007-A and SD1

12 transactions.  And they are generally reported on the same

13 reports to investors.

14            Pursuant to the terms of the indenture, Wells Fargo

15 maintains a custodial account that holds monetary remittances

16 received from the relevant servicer which after the payment of

17 certain fees and expenses are used to make payments to the

18 holders of the notes.  Wells Fargo additionally maintains a

19 reserve fund and there are supplemental reserve fund for the

20 benefit of the holders of the notes.

21            On or about March 26, 2007, Wells Fargo prepared and

22 delivered a statement to the trustee and the holders of the

23 notes that described among other things, the amount of

24 available funds and payments to be made to holders of the

25 notes, and the balances in the reserve fund, and the

1  supplemental reserve fund.  The statement was based on a model

2  that was changed close to the payment dates such that Wells

3  Fargo was unable to make changes to the statement and make

4  payments in accordance with the true waterfall contained in the

5  indenture.

6            Based on the calculations in this statement, on or

7  about March 26, 2007, a payment was made to AHMIC in the total

8  amount of $462,049.83 which recalled the payment.  On account

9  of the Class IV-M4 note held by AHMIC, the March 26, 2007

10 payment date was the first payment date for the securitization

11 transaction.  Based on the trust payment waterfall, and the

12 amount of available funds, the payment should never have been

13 made to AHMIC on account of its Class IV-M4 note because no

14 distributions were owing to any holders of Class IV-M4 notes at

15 the time the payment was made to AHMIC.  Moreover, AHMIC knew

16 or should have known that it was very unlikely that any

17 payments would be distributed to AHMIC for a substantial period

18 of time on its Class IV-M4 note.

19           Once it discovered the error, Wells Fargo immediately

20 notified AHM both prepetition three months -- approximately

21 three months prior to the petition date and post-petition of

22 the error seeking the return of the funds.  But AHM failed to

23 return the payment to Wells Fargo.  As a result, a reserve fund

24 in the trust is short about $462,049.83.  Prior to the petition

25 date and since then --

1          THE COURT:  I'm sorry, how much?  I'm sorry.

2          MR. TOP:  $462,049.83.  Prior to the petition date

3  and since then, AHMIC respectively was and continues to be a

4  holder of a number of different classes of notes in the 2007-A

5  and SD1 transaction, including but not limited to the Class

6  I-M2, the Class I-M3, Class II-M5, Class II-M6, Class IV-M4,

7  Class IV M5, Class IV-M6, the OC-1, OC-2, and OC-3 notes.  In

8  addition, we believe, AHMIC owns securities and other

9  securitizations.

10          Wells Fargo serves as securities administrator in a

11  number of securitizations sponsored by AHM related entities

12  regularly making calculations and preparing reports in support

13  of AHM securitization program.  Wells Fargo serves in some

14  capacity in more than 70 securitizations involving AHM or loans

15  originated by AHM.

16          And that would be the end of his testimony.

17          THE COURT:  All right.  Do you wish to cross examine

18  the witness?

19          MR. BEACH:  No, Your Honor.

20          THE COURT:  Okay.

21          MR. TOP:  Your Honor, I have no further evidence.

22          MR. BEACH:  Good afternoon, Your Honor, may it please

23  the Court, Sean Beach on behalf of the debtors.  Your Honor,

24  this -- while this motion in its general relief is not all that

25  complicated, the breadth in which Wells Fargo is trying to seek

1 this equitable relief is -- goes far beyond what this Court

2 should consider particularly given the fact that despite the

3 fact that Wells Fargo is trying to paint a picture that the

4 debtors had some amount of wrong-doing here, that's clearly not

5 the case as will be evidenced by the debtors' witness that will

6 show the debtors didn't receive any notice in connection with

7 this Class M4 note payment that was made on March 26th until

8 November of 2007.  And we only received notice when we started

9 to inquire about improper post-petition set-offs that were

10 being applied by Wells Fargo, brought that to their attention,

11 and then --

12        THE COURT:  Well, they got -- they had $450,000

13 unaccounted for sitting in their account.  I mean, I know it

14 was a big enterprise, but don't they audit their accounts?

15        MR. BEACH:  Well, Your Honor, as my witness will

16 testify to, there were in the month of March alone about 2,800

17 incoming and outcoming (sic) wires just from that one account

18 alone, a similar inflow and outflow in the months that follow.

19 And more importantly, this is Wells Fargo's obligation to get

20 the distributions right and the statements it makes right.  And

21 it's not the debtors' practice to review everyone of these

22 statements in connection with the securitizations until a

23 problem is identified.

24        So, this is not an obligation that should be put on

25 the debtors to be able to identify funds and give them back to

1  a party.  This is the obligation of Wells Fargo to make the

2  distributions properly.

3          THE COURT:  Well, I know it's a big company and

4  everything, but if you got a check -- if you got a wire into

5  your checking account for $450,000 --

6          MR. BEACH:  I would certainly notice that, Your

7  Honor.  But --

8          THE COURT:  Maybe Mr. Lunn wouldn't but you would

9  notice that.  And aren't you under some obligation, you know,

10  to inquire as to where it came from?  I mean, let's ask it this

11  way.  Wells Fargo clearly has a claim against the debtor for

12  this money.

13          MR. BEACH:  Absolutely.

14          THE COURT:  Okay.

15          MR. BEACH:  And it's a general unsecured claim

16  against the estate, Your Honor.

17          THE COURT:  All right.

18          MR. BEACH:  What may be helpful, Your Honor, is if I

19  do put my witness on.

20          THE COURT:  Yes, why don't we do that?

21          MR. BEACH:  He can clarify some of these facts and

22  then we can have a discussion on the law and the --

23          THE COURT:  You can either put him or proffer, how

24  ever you want.

25          MR. BEACH:  I prefer to put him in, Your Honor,

1  because he can explain the securitizations quite a bit better

2  than me.

3              THE COURT:  Yes.

4              MR. BEACH:  Your Honor, I'd like to call Simon

5  Sakamoto to the stand.

6                  SIMON SAKAMOTO, DEBTORS' WITNESS

7              DEPUTY CLERK:  Can you state and spell your name for

8  the record?

9              THE WITNESS:  Simon Sakamoto, last name is spelled,

10  S-a-k-a-m-o-t-o.

11             DEPUTY CLERK:  Thank you.

12                     DIRECT EXAMINATION

13  BY MR. BEACH:

14  Q    Good afternoon, Mr. Sakamoto.  Would you tell the Court

15  where you're currently employed?

16  A    I'm a senior portfolio manager at American Home Mortgage

17  Investment Corp.

18  Q    And as senior portfolio manager, what are your

19  responsibilities?

20  A    I'm in charge of a team that manages the investment

21  portfolio for American Home.  And we managed a portfolio of

22  about eight billion of highly rated mortgage-backed securities

23  to generate net interest income.

24  Q    How long have you been employed with AHM Investment?

25  A    Since September 2003.

1  Q    Please describe your educational background and relevant

2  work experience.

3  A    I have a MBA from Columbia University and electrical

4  engineering degree from MIT.  And I've worked for Lehman

5  Brothers and First Boston for about 15 years prior to working

6  at American Home in various trading, portfolio management, and

7  structured finance capacities.

8  Q    And are you familiar with the Wells Fargo motion for

9  relief from the automatic stay that's at issue today?

10  A    Yes.

11  Q    In Paragraph 11 of the motion, Wells Fargo defines the

12  term trust securities.  Can you please explain your

13  understanding of that term?

14  A    I believe they created a term to define all the securities

15  that American Home owns in both the 2007-A securitization as

16  well as the 2007-SD1 transaction.

17  Q    And also in the motion, Wells Fargo defines the term

18  securities as all the securities listed on Exhibit A to the

19  motion, can you explain your understanding of that term?

20  A    I believe based on the securities that were listed on

21  Exhibit A, those were all the securities that American Home

22  owns.  And also Wells Fargo is the security administrator for

23  the securities.  So, they would have the knowledge of what we

24  owned.

25  Q    So, there are multiple securitizations and multiple notes

1  under Exhibit A?

2  A    Exhibit A has securities that we own.  Most of the

3  securities are from securitizations different from the

4  2007-SD1 transaction.

5  Q    Are the 2007-SD1 and 2007-A securitizations separate and

6  distinct from one another?

7  A    They are absolutely separate transaction.  The reason is,

8  they have separate indentures and trust agreements.  They have

9  separate agreements for all the securities as to its cash flow

10  rights.  They have unique security identifiers.

11  Q    And from your understanding of the SD1 and 2007-A

12  securitizations, do payment distributions from these

13  securitizations originate from the same payment account?

14  A    According to the indentures for the 2007-A and the

15  2000-SD1, the payment accounts have to be set up separately

16  since they're separate legal entities.  So, they would not

17  share a same payment account.

18  Q    Okay.  Is it common practice for an underwriter to market

19  two securitizations at the same time?

20  A    It's probably not that common, but since this

21  securitization was a private placement, in other words, it

22  wasn't a public offering registered with the SEC that we chose

23  to market several transactions with an underwriter.  But

24  nevertheless, they were two separate transactions, as evidenced

25  by two separate indentures, two separate trust agreements.

1       I think more importantly from an economic point of

2  view, the 2007 transaction is really a securitization of

3  performing loans, whereas the 2007-SD1 is a transaction backed

4  by non-performing loans, primarily.  So, obviously the type of

5  investors that would purchase each side or each transaction

6  would be very different.  One would have higher returns, higher

7  risks.  The others, moderate returns, moderate risk.  And

8  obviously, we had different investors coming into these

9  transactions.

10 Q    So, does the fact that these were marketed together change

11 your testimony as to whether or not they are separate and

12 distinct transactions?

13 A    No.

14 Q    You mentioned the term securities include several

15 securitizations.  Are all of these separate from each other,

16 these securitizations?

17 A    Yes, they are.

18 Q    You also indicated that there are notes in connection with

19 each securitization.  Are all the notes separate and distinct

20 from one another?

21 A    Yes.  First of all, all the securities, for example on

22 Exhibit A -- most of them are from completely separate

23 securitizations, separate indentures, separate trust

24 agreements, separate underwriters, separate closing dates.  So,

25 they're uniquely different.  But there were two securities

1  other than the M4 securities in question that were part of the

2  same securitization.

3          But nevertheless, they're separate transactions then

4  since the Class IV-M notes compared to the Class M6, M5 notes

5  that we also own have different cash flow rights as defined by

6  the indenture.  The M5 and M6 notes have separate QSIPs which

7  identify uniquely the securities.  They can be separately

8  traded to counter-parties.  So, they have unique security

9  rights that are unique to that and they're not part of the M4

10 transaction.

11 Q    Do you have an understanding as to how Wells Fargo would

12 have even known the existence of the securities and the term

13 that they used?

14 A    The -- probably knew that we were the record holder of

15 these securities, and that's probably how they created the

16 list.

17 Q    Which notes do the -- does AHM Investment own an interest

18 in connection with the SD1 securitization?

19 A    We own the Class IV-M4 notes, the IV-M5 notes, and IV-M6

20 notes.

21 Q    And did any other parties own securities under the SD1

22 securitization?

23 A    Yes, we have another institutional investor that owns, I

24 believe, the A Class and the IV-M1, M2, and M3 notes.

25 Q    You mentioned the M4 note, could you please describe the

1  M4 note, please?

2  A    The M4 note is the security that we received an incorrect

3  payment back in March 27, 2007.

4  Q    Are AHM Investment distribution rights separate from those

5  in the M5 and M6 notes?

6  A    Yes, it's clearly defined in the securitization indenture,

7  the 2007-SD1 securitization indenture as to its cash flow

8  rights, the M5 and the M6 are different from the M4 notes.

9  Q    And are the M4 note cash flow rights independent of those

10  in the other securities under the SD1 securitization?

11  A    Yes, they are.

12  Q    Does AHM Investment own the Class I, Class II, or Class

13  III notes which were issued under the SD1 indenture?

14  A    No, they don't.

15  Q    And from your understanding of the SD1 indenture, are

16  there any notice procedures to be followed in the event that

17  there's an overpayment?

18  A    There's no procedures in place.

19  Q    And did you or any employee under your control receive

20  notice of the M4 note payment made on March 26, 2007?

21  A    The first time that we learned about the incorrect payment

22  of 462,000 was on November 6, 2007.  And the way we discovered

23  this incorrect payment is not because we felt that there was a

24  large cash balance in our account.  In fact, I wanted to

25  clarify how -- when we received the 462,000 -- what we normally

1  do is we follow -- we look at the bond holders remittance

2  report which Wells Fargo produced.  So, when we saw that the M4

3  class received 462,000, we thought it was -- that's what it was

4  supposed to get.

5          We manage a portfolio over -- close to 300

6  securities.  So, it would be impractical for us to each time

7  there's a payment to go back and reconcile thinking that

8  perhaps the securities administrator may not do the calculation

9  correctly.

10         If that were the case, I don't think, you know, the

11  securitization business would work properly if every investor

12  had to go back and recalculate what they're owed.  So, I think,

13  Judge, you asked the question before, did we know that the

14  462,000 didn't belong to us?  No, we didn't know because the

15  report that was created by Wells Fargo said that we were

16  supposed to get paid.  And that's what our accountants

17  recorded, that we received the principal paid out.  So nobody

18  in our organization really knew that we weren't really entitled

19  to that payment until November 6, 2007.

20         Now, let me go further.  The way we discovered how we

21  received the mistake in payment was we noticed that back in

22  September 2007 that we didn't receive any payment on securities

23  that were owed to us.  And we asked Wells Fargo to look into

24  it, why we didn't get paid.  And we had several phone calls and

25  conversations.  And we didn't get any answer.  And then, we got

1  to October 25th, and we also didn't receive any payment and

2  still no answer.  And then on November 6, we received an e-mail

3  from a Wells Fargo representative saying that we decided to

4  -- first of all, we made a mistake on the payment of 462,000.

5  And not only that, we're going to offset all the payments on

6  your other securities until we get back the $462,000.  And

7  that's the first time that we discovered that we received an

8  incorrect payment.

9           So, through no fault of our own, we were blamed for

10 holding the money.  We didn't because there was no possible way

11 that we would have discovered this mistake in payment.

12          MR. BEACH:  Your Honor, may I approach?  We've

13 stipulated with Wells Fargo as to two exhibits.  If I may

14 approach the witness, I can hand in those exhibits and copies

15 to Your Honor.

16          THE COURT:  Yes.  Thank you.

17                      (Pause)

18 Q   Mr. Sakamoto, you reference an e-mail earlier as the first

19 time you received notice in connection with the overpayment.

20 One of those documents I -- can you look at those documents I

21 just handed to you and let me know what the e-mail document is?

22 A    Yes, this is the e-mail that we received from Dean

23 Cooperman who sent us a notice that first of all, there was a

24 mistake payment on the M4 note.  So, because we made the

25 mistake payment of 462,000 on March 26, 2007, that we will be

1  withholding payments on your other securities.  In fact, they

2  stated that they already withheld 81,000 on 9/25/07, then again

3  another payment of 188,000 on October 25th, 2007.  And that we

4  need to be paid another 192,000 to be made whole.  And that

5  they requested us to pay it.  And we told them that we couldn't

6  pay it because these are prepetition obligations.

7  Q    Did the distributions Wells Fargo withheld have any

8  relation to the M4 note payment that was made on March 26th,

9  2007?

10  A    Those payments were payments that were owed to us on other

11  securities, securities different from the M4 class.

12  Q    Okay.  Is it possible with respect to the M4 note that

13  there'll never be another distribution?

14  A    Well, I can't really speculate, but when we close the

15  transaction, the two transactions, CSFB was the underwriter.

16  They produced us calculation tables with the expectation that

17  the M4 note's first payment would occur approximately 198

18  months from the closing.  So, it's difficult to say at this

19  point in time what exactly will be paid on that note, whether

20  it'll actually take 16 years or not since there are too many

21  assumptions that go into -- so, you know, I can't say

22  definitively whether they will get paid or not.

23  Q    So, there may or may not be another distribution on the M4

24  note?

25  A    Correct.

1 Q    And if there is a distribution that would be made, where

2 would those funds come from to make that distribution?

3 A    The indenture uniquely defines the payment priorities of

4 the cash flows to fund the note payments.  And the note

5 payments come from the fact that you received the principal and

6 interest payments from underlying borrowers.  So, those cash

7 flows are then used to pay the notes.  And then each note has

8 its unique priorities in the schedule called the waterfall.

9 That's what would be funding those bond payments.

10 Q    And the cash flow that would be used to make any

11 additional distribution which is anticipated to be years from

12 now, would that cash flow be the same cash flow that was used

13 to make the M4 payment that was made in error in March?

14 A    Probably unlikely since over time, these securitization

15 pool -- the number of loans remaining in the pool gets smaller

16 and smaller as borrowers pay off or if borrowers defaulted are

17 liquidated.  So, the cash flows that will be funding the future

18 payments on the M4 class will have a proportionately different

19 allocation from each loan.

20 Q    Okay.  And as to the account the M4 payment went to, did

21 you conduct an investigation regarding that account?

22 A    Yes, I did.

23 Q    When did you conduct that investigation?

24 A    I conducted it last week.

25 Q    Please describe the results of your investigation.

Sakamoto - Direct                    136

1  A    We did a -- we inquired into our primary investment

2  activity account which we hold a prime brokerage account at

3  Citi.  And we received a report of all the transactions that

4  came in and out of the account for the month of July 2007.  And

5  the -- if you go to the -- if you go to Page 13 of that

6  statement --

7           MR. BEACH:  Your Honor, this is the second exhibit I

8  handed both to you and the witness.

9           THE COURT:  I thought the payment was in March.

10          MR. BEACH:  The payment was in March.  This is a --

11          THE COURT:  I'll let the -- go ahead.

12          THE WITNESS:  We're trying to establish --

13  Q    Mr. Sakamoto, would you explain what that exhibit is?

14  A    Yes, it's the cash balance in our prime brokerage account.

15  This is the same account which we received the --

16          THE COURT:  Understood -- I got you.

17  A    So, if you look at the left hand side where it says, SD

18  closing balance, unsettled wires, we actually had a negative $2

19  million balance.  It's because all -- we received a lot of

20  margin calls, and we didn't have enough money to make all our

21  obligations.  So, at the end of July 31st, 2007, our cash

22  balance was negative 2.064 million.  And if you look at the

23  projected balance, we would be -- we would go more negative as

24  time progressed because of the repos were coming due.

25  Q    Okay.  And each month, March, April, June, and July, what

1  would be your estimate as to the inflow and outflow of wires

2  that went through that operating account?

3  A    Well, for the month of July (sic), we had over 2,600

4  incoming and outgoing wires.

5  Q    Is that the month of July or the month of March?

6  A    No, that's the month of March.  And then for April, May,

7  June, I would suspect the number of wires would not be that

8  dissimilar because our portfolio size didn't materially change

9  during that period.

10 Q    Is that general operating account encumbered in any way?

11 A    It's -- Citi is the prime broker.  So, to the extent that

12 the account balances went negative, they would have liens on

13 the net assets of the account.

14 Q    Is the --

15 A    And that's part of the prime brokerage agreement.

16 Q    Okay.  Is the note payment in the debtors' possession?

17 A    Yes.  When you say, do we still have the money, the answer

18 is no, we spent it.  As you can see by the end of July 31st,

19 2007, we had a negative cash balance, so the money is gone.

20 Q    So, you -- can you tell when the money left the debtors'

21 possession after March 26th, 2007?

22 A    It's very -- it's impossible to trace it.  We have 2,600

23 transactions.

24 Q    So, it was either spent or swept at the end of the July?

25 A    I would say it was spent earlier than that since we had

Sakamoto - Cross                      138

1  money coming in and going out.

2  Q    Was AHM Investment under any obligation to keep the M4

3  note payment in the segregated account?

4  A    No.

5  Q    Is it the debtor's common practice to deposit these

6  distributions in the -- general operating account?

7  A    Our business required us to deposit all our investment

8  income into our general investment operating account which is

9  our prime brokerage account at Citi.

10           MR. BEACH:  Okay.  No, further questions, Your Honor.

11           THE COURT:  All right.  Cross?

12           MR. TOP:  Just a couple, Your Honor.

13           THE COURT:  Actually, did the committee have any --

14           UNIDENTIFIED ATTORNEY:  No, Your Honor.

15           THE COURT:  Oh, okay.  It looked like --

16           UNIDENTIFIED ATTORNEY:  No questions.

17           THE COURT:  Okay.  It looked you might.  Okay, yes,

18  cross examination.

19                        CROSS EXAMINATION

20  BY MR. TOP:

21  Q    Good afternoon, Mr. Sakamoto.  Can you, again, describe

22  the collateral for the SD1 trust?

23  A    The SD1 is backed by primarily non-performing mortgage

24  loans.

25  Q    And it's true that you estimate that a payment wasn't

                    **J&J COURT TRANSCRIBERS, INC.**

1  -- wouldn't be due on the Class IV-M4 certificate for 16 years,

2  is that correct?

3  A    This estimate was provided by our underwriter, CSFB.

4  Q    So, notwithstanding the fact that the collateral for the

5  trust wasn't particularly good collateral, and the fact that

6  you weren't expecting the payment for 16 years, it wasn't

7  surprising to you in the least that you got a payment of

8  $462,000 with respect to the Class IV-M4 certificate?

9  A    We don't routinely go back and check the payment from the

10 remittance report.  We assume that Wells Fargo, who is one of

11 the largest securities administrator, is capable of doing a

12 correct job.  I don't think it's that uncommon because we have

13 other securitizations where we have junior rated classes that

14 will have some cash flow payments.  So, you know, we don't

15 devote our time to go back and recalculate based on the

16 assumption that perhaps the securities administrator might make

17 a mistake.

18       Just think about it, we have 300 positions.  If we

19 had to do this annually, that's 300 times 12 inquiries.  So,

20 that's over 3,000 inquiries just to check to see whether it was

21 made properly.  And we just don't have the resources to do

22 that.  And I'm sure a lot of other investors don't have the

23 resources to do that either.

24 Q    Do you have any kind of a program to review the investor

25 reports that you receive on a monthly basis in connection with

1  these transactions?

2  A    We normally look at an aggregate level how much income

3  we're generating.  And if it deviates from an expected level,

4  we would go back and check to see if there's any improper

5  payments made on individual securities.  But generally, no, we

6  rely on the securities administrator's bond remittance report.

7  Q    Now, you mentioned Wells Fargo was a securities

8  administrator.  Are you aware of how many transactions that

9  Wells Fargo serves as security administrator for the AHM

10 trusts?

11 A    Well, I don't know the exact amount, but I know that you

12 -- Wells Fargo is the securities administrator for many of our

13 securitizations.

14 Q    A fair number, is that -- would that be a fair comment?

15 A    Yes.

16 Q    And the rest will serve as -- servicer for a fair number

17 of your other securitization transactions, as well, is that

18 correct?

19 A    Yes.

20 Q    And you've developed a pretty good working relationship

21 with Wells Fargo in connection with their capacities as such?

22 A    I have an idea, yes, as to your capacities.

23 Q    So, would it surprise you to know that -- to find out that

24 they had made an overpayment in connection with one

25 transaction, and you not find out about it until November of

1  2007?

2  A    Well, can you define what surprise means?

3         MR. BEACH:  Objection, Your Honor, I think he's

4  already answered these questions.

5         THE COURT:  Overruled.  You can answer based on your

6  understanding of the definition of the term surprise.

7  A    Well, I'm surprised that you told us November 6th because

8  I noticed that when we were informed of the mistake in payment,

9  we were also pointed out to the revised remittance report which

10 was dated, May 2007.  So, why would it take from May to

11 November to tell us that there was a mistake in payment?

12 Q    Now, you mentioned --

13 A    There's no way for us to know that there was a mistake in

14 payment.

15 Q    Now, you mentioned a revised remittance report, can you

16 describe what you meant by that?

17 A    The -- once we -- once our organization became aware of

18 the mistake in payment on November 6th, 2007, we went back to

19 the Wells Fargo remittance report website, and we downloaded

20 the revised copy.  And we noticed the time stamp on the

21 revision was dated May 2007.

22 Q    So, as you sit here today, your testimony is that you had

23 no idea that that remittance report was restated at the time it

24 was restated in May 2007?

25 A    That's correct.

1  Q    Do you have anyone in your shop that reviews regularly the

2  remittance reports?

3  A    Only to the extent that when we do our aggregate macro net

4  interest income calculation we think there's some inconsistency

5  with what we expect, we would go out and review it.  But the

6  answer's no, we don't review it.  Like I said, if we had to

7  review it, that's 300 bond positions, 12 remittance report a

8  year, that's over 3,000 reviews.  We just don't have the

9  capacity to do that.  I don't think any investor would have the

10 capacity to do that.

11 Q    You don't think any investor would monitor their

12 investments?

13 A    Yes, of course they do.  Of course they do.  Actually, I

14 think you have the obligation to tell us when a mistake is

15 made, not wait until November 6th, 2007.

16 Q    So, as you sit here today, it's your testimony that

17 notwithstanding what the Wells Fargo representative states,

18 that they contacted AHM verbally about the error prior to the

19 petition and wrote letters that you were not informed of any

20 problems there were with respect to that payment until November

21 of 2007?

22 A    Yes, I -- nobody on my staff received any phone calls from

23 Wells Fargo staff indicating there was any payment errors.

24 Q    And you -- as you sit here today, you disagree with the

25 testimony of the Wells Fargo representative with respect to the

1  fact that written communications were made with respect to this

2  overpayment?

3  A    Yes, we never received that letter.  In fact, I notice

4  from reading your motion that you sent the letters on a date

5  that's either a Saturday or a Sunday.  Now, we weren't here on

6  the weekend.  I'm sure your people weren't there on the weekend

7  either, so --

8  Q    Well, they may be hard workers.

9  A    But we didn't get it because we don't have people working

10 on Saturdays and Sundays.  Notwithstanding, we didn't receive

11 the letter.

12            MR. TOP:  No further questions, Your Honor.

13            THE COURT:  Redirect?

14            MR. BEACH:  Just a few questions, Your Honor.

15                    REDIRECT EXAMINATION

16 BY MR. BEACH:

17 Q    Whose obligation is it to make proper payments under the

18 securitizations?

19 A    It's Wells Fargo's.

20 Q    And whose obligation is it to put together the remittance

21 reports which notify note holders as to the distribution?

22 A    It's Wells Fargo's.

23 Q    And the March remittance report, did that have reference

24 to the distribution that was made on March 26th, 2007?

25 A    Yes, it did.

Sakamoto - Redirect                    144

1  Q    And what amount was that?

2  A    It said that the M4 class should receive a payment of

3  462,000.

4           MR. BEACH:  No further questions, Your Honor.

5           THE COURT:  You can step down.

6           THE WITNESS:  Okay.

7           THE COURT:  Any other evidence, Mr. Beach?

8           MR. BEACH:  No further evidence, Your Honor.  I would

9  like to ask that the two exhibits I provided be admitted into

10 evidence.

11          THE COURT:  Any objection?

12          MR. TOP:  No, Your Honor.

13          THE COURT:  All right.  I'm going to mark the e-mail,

14 Debtors' Exhibit 1 and the forward settlement latter report is

15 Debtors' Exhibit 2.  And they'll be admitted without objection.

16          MR. BEACH:  Your Honor, I'd a like to -- a few

17 minutes to make a closing argument.  Would you like to hear

18 from Wells Fargo first or --

19          THE COURT:  It's their motion, so, yes, let me hear

20 from them.

21          MR. TOP:  Your Honor, may I call a quick rebuttal

22 witness?

23          THE COURT:  Any objection?  Any objection?

24          MR. BEACH:  No, Your Honor.

25          THE COURT:  Yes, you may.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. TOP:  Your Honor, I'd like to recall William Fay

2  to the stand.

3          THE COURT:  Very well.  Mr. Fay previously testified

4  by proffer.  So, we need to swear him in.

5      WILLIAM FAY, WELLS FARGO'S REBUTTAL WITNESS, SWORN

6          DEPUTY CLERK:  Please state and spell your name for

7  the record.

8          THE WITNESS:  William Fay, F-a-y.

9          DEPUTY CLERK:  Thank you.

10                    DIRECT EXAMINATION

11  BY MR. TOP:

12  Q    Mr. Fay, I'll be brief.  In your proffer, you advised that

13  you were in the default section of Wells Fargo, is that

14  correct?

15  A    Yes, I'm a default and restructuring account manager.

16  Q    And just to move this along, in connection with this

17  matter, you've reviewed the books and records relating to this

18  particular transaction?

19  A    I have.

20  Q    And in connection with that particular review, did you

21  come across any correspondence relating to the matters at

22  issue?

23  A    I did.

24  Q    And can you describe that correspondence?

25  A    Sure.  I believe there was a series of three letters sent

**J&J COURT TRANSCRIBERS, INC.**

Fay - Direct                                              146

1  from our corporate trust operations group.  Two were sent

2  prepetition, one was sent post-petition.  Obviously, when you

3  have a $462,000 overpayment, your boss isn't going to be very

4  happy.  It gets escalated.  There were a number of reports that

5  were filed.  And our corporate trust operations group took over

6  at that point.  There were some verbal communications.

7           MR. BEACH:  Objection.  He's testifying to letters

8  that we don't have copies of.

9           THE COURT:  Why isn't this hearsay?

10          MR. TOP:  Well, Your Honor, I'm just -- we don't

11  -- I'm not here to necessarily get what the letters say in, but

12  the fact that letters were apparently sent according with their

13  books and records.  That's all.

14          THE COURT:  All right.

15          MR. BEACH:  He already testified to that.

16          THE COURT:  Well, I'll overrule the objection to the

17  extent he's discussing the events surrounding the sending of

18  the letters as opposed to what's contained in the letters.

19          MR. TOP:  That's all I'm asking for, Your Honor.

20          THE COURT:  Sure.

21  A    So, our corporate trust operations group got involved.

22  And the normal procedure at the bank where there is an

23  overpayment and there's no repayment by the party that was

24  paid, a number of letters are sent.  And then at which time if

25  there's still no response -- in this case three letters were

1  sent -- the normal protocol is to withhold future payments to

2  recover that amount.

3              MR. TOP:  No further questions.

4              THE COURT:  Cross, Mr. Beach?

5              MR. BEACH:  Just a few questions.

6              THE COURT:  All right.

7                       CROSS EXAMINATION

8  BY MR. BEACH:

9  Q    Good afternoon, Mr. Fay.  You say that it's your practice

10 to take distribution payments from other -- is it your practice

11 to take distribution payments from other securities, totally

12 separate securities to repay an overpayment?

13 A    In rare cases, it is a policy from the standpoint of money

14 was paid, communications were sent to the party, and they

15 refused to pay.  So, therefore, we have to recoup that -- you

16 know, technically, we have an obligation to the trust to make

17 sure that that money is recovered.

18 Q    So, it's not generally your practice to take distribution

19 payments from wholly separate securities to repay the debt

20 of --

21 A    Well, usually parties pay the money back.  In this case,

22 that did not happen.

23 Q    So, it's not generally your practice to take distributions

24 from separate securities to --

25 A    As I said, in rare cases, that's what we sometimes will

1  do.

2          MR. BEACH:  No further questions, Your Honor.

3          THE COURT:  All right.  You can step down.  Thank

4  you, Mr. Fay.

5          THE WITNESS:  Thank you.

6          THE COURT:  Any other evidence?

7          MR. TOP:  No, Your Honor.

8          MR. BEACH:  No, Your Honor.

9          THE COURT:  Mr. Top, do you have any --

10          MR. TOP:  Just quickly in closing, I know I had a

11  lengthy opening argument, and I'll stick with that.  But again,

12  this is a very unusual circumstance.  A significant amount of

13  money that Wells Fargo was -- that was paid in error with

14  respect to one of the trusts on a security that should not had

15  payments for 16 some years and so, we're trying to get that

16  money back.  And when you take a look at what it means to be

17  part of a transaction, I think in connection with the role of

18  Wells Fargo in these transactions, as well as the role of AHM

19  and their affiliates, you need to take a broader look at what

20  that transaction might be.

21          As you are well aware of now in this particular

22  circumstance, this is almost like a factory.  You know, you

23  originate loans, you package them together, you sell them to

24  somebody else.  And AHM had their roles in their in connection

25  with that process.  And Wells Fargo had their roles in their

1 and worked cooperatively with each other on seventy plus

2 transactions either as master servicer, or securities

3 administrator, or the like.  And when they had business

4 problems -- as I understand it, the way they would have handled

5 it is to get on the phone and try to work those things out.

6        This is not a typical situation where you have an

7 investor with a particular security that's outside of the

8 overall -- well, for lack of a better word -- factory.  I mean,

9 again, I don't think in this circumstance where you have a

10 payment that should never have been made and should never been

11 retained, that a broader view of what a transaction should be

12 for purposes of recoupment should not be entertained.

13        Further, I think to make sure that those funds get

14 returned to the particular trusts, an equitable lien would be

15 appropriate on these securities just to ensure that these

16 securities aren't sold immediately to somebody else and we lose

17 the opportunity to recapture money for the particular trust.

18        Finally, I'll just say a couple of words about

19 constructive trusts.  I mean, again, I think we're certainly

20 entitled to have a sort of a constructive trust to the extent

21 that proceeds can be identified.  I understand the evidence is

22 that in fact the lowest intermediate balance was less than

23 zero, but to the extent that it's ever determined that those

24 funds were swept improperly or those proceeds could be located

25 anywhere else, again, we ought to be able to assert a

1 constructive trust with respect to that, as well.  Thank you,

2 Your Honor.

3          THE COURT:  You're welcome.  Mr. Beach?

4          MR. BEACH:  Thank you, Your Honor.  Your Honor, this

5 is a situation where Wells Fargo unfortunately made a mistake.

6 And they now have a general unsecured claim in a bankruptcy

7 case.  They tried once to improperly set those off

8 post-petition.  That didn't work.  They repaid that amount.

9 And now, they're seeking certain other equitable relief from

10 this Court.

11          The three things that they are asserting are

12 recoupment constructive trust and equitable lien.  I think the

13 case for recoupment in connection with the M4 payment is

14 clearly under the Third Circuit and frankly most other, you

15 know, jurisdictions.  Recoupment has to be very narrowly

16 construed, and it has to be a single integrated transaction.

17 Clearly, the trust securities as Wells Fargo defines them in

18 the motion are -- include two securitizations and numerous

19 different notes.  All of these notes as you've heard the

20 debtors' witness testify to are distinct.  They're freely

21 tradeable separately.  They have separate QSIP numbers.  They

22 have separate maturity dates.  They have separate principal

23 amounts.  They have separate interest amounts.  These are

24 clearly separate securities and should be treated as such in

25 connection with the recoupment argument.

1         I think the <u>University Medical Center</u> case -- the

2 Third Circuit case is on all fours with our situation here.  In

3 that case, they even have a similar fact where the party -- the

4 Department of Human Health -- Health and Human Resources tried

5 to improperly set off overpayments post-petition, then they

6 sought their recoupment.  It rides very similar to the way

7 Wells Fargo is dealing with it here.  In that situation, there

8 are overpayments made in 1985 and in 1988.  Based on their

9 contractual right in that case, they were seeking to be able to

10 essentially set off or recoup those overpayments from other

11 monies owed to the debtors in 1988 after the debtor had filed

12 for bankruptcy.

13         The Court in that case said despite the contractual

14 rights in that case -- and there are none here in the indenture

15 that's relevant or the indentures that Wells Fargo would assert

16 are relevant -- there's no such rights here.  And as you've

17 heard the testimony, not only are the securitizations separate

18 and distinct, the notes are separate and distinct.  And even an

19 M4 note payment or another distribution that would be made may

20 be 16 years from now, if ever, those payments would be separate

21 from the payments made under the M4 note in March 26, 2007.  It

22 would be based on a whole new set of loans.  You'd have more

23 principal than interest at that time.

24         It's -- and I think it's very analogous to the

25 <u>University Medical Center</u> case where the Court said, yes,

1  you've got this contractual right.  Yes, you've got the ability

2  under the contract to essentially set off those overpayments,

3  but you know, it is a different transaction three years later.

4  And you shouldn't be able to recoup under the very narrow Third

5  Circuit law in connection with the recoupment.  So, Your Honor,

6  I would ask that you deny the request for recoupment on all

7  grounds.  I think the only grounds that Wells Fargo could have

8  a colorable claim in connection with recoupment is in

9  connection with the M4 note, recouping future distributions.

10       But, as is evidenced today, there may never be a

11 distribution.  If there is ever, it's probably going to be 16

12 years from now.  This should be dealt within a claims

13 reconciliation process if they want to assert that claim

14 against the M4 note at that time.  But, Your Honor, I would

15 submit, based on the evidence today, that any cash flow related

16 to any future distribution, even on the M4 note, would be

17 wholly separate and should be denied.

18       In connection with the constructive trust argument,

19 Your Honor, it's clear that there was a lower than zero balance

20 in that account from the evidence today and that no

21 constructive trust can be granted on that account.  In addition

22 to that, there's already other liens on that account than would

23 be higher in priority than the liens that Wells Fargo would

24 have you grant today.  I'm sorry.  I think I jumped to the

25 equitable lien argument.  But, in any event, I think the

1 equitable lien argument is similar to the constructive trust

2 argument when there's no money to provide an equitable lien on.

3 That also must be narrowly construed and there should be no

4 equitable lien on the vast number of securities that Wells

5 Fargo would ask that Your Honor provide an equitable lien on

6 today.  And then, certainly, there shouldn't be an equitable

7 lien on the account or the funds in an account that, first of

8 all, has no money in it and, second of all, already has liens

9 on it.

10          So, Your Honor, I would ask that you deny the motion

11 in its entirety today.

12          THE COURT:  Okay.  Mr. Power?

13          MR. POWER:  I will be very quick, Your Honor.  The

14 Committee filed a supporting pleading to support the debtor's

15 position in this case and we do.  Quite frankly, we don't

16 believe the requirements for recoupment are here.  Constructive

17 trusts, in addition to the fact that they're the zero balance

18 account, you require some kind of fiduciary relationship or

19 some relationship between the parties to create a constructive

20 trust in the first place and that just doesn't exist here.

21 There's a contractual relationship straight up.

22          This is just a situation where the debtor didn't do

23 anything wrong, didn't take advantage, didn't do anything.  It

24 just received funds in an extensively operating account that

25 changed funds constantly.  It thought it was entitled to funds

1  it found out months later that it may not have been.  By then,

2  the bankruptcy had filed.  And the equitable lien arm we also

3  believe fails on its all fours, Your Honor.  We see no reason

4  to treat this creditor like any of the other hundreds of

5  millions of dollars of creditors in this case and we would ask

6  that you deny the motion.

7          THE COURT:  Thank you.  I'm going to deny the motion

8  in its entirety for the reasons set forth by the debtor and the

9  Committee.  In connection with the recoupment argument, I

10 decline the invitation to broaden the recoupment law and rather

11 follow the Third Circuit and I think recoupment needs to be

12 narrowly construed.  At best in this case, it would be on the

13 M-4 note and, given the length of time involved and the other

14 facts as they came out and as Mr. Beach put forward, I just

15 think it would inequitable to grant recoupment and somehow

16 impede the distributions on these notes 16 years, well into my

17 second term hopefully, but certainly beyond the reasonable

18 scope, I think, of this Court's at least jurisdiction, I hope,

19 in connection with this case.

20         Constructive trust.  Again, I agree there is no

21 fiduciary relationship and the -- what I would theoretically

22 put a constructive trust on had a negative balance of two

23 million dollars in late July.  That money is gone.  The account

24 was cleaned out in the run up to the bankruptcy.  There is

25 simply nothing left to impose a constructive trust on.

1          And in connection with the lien, again, you have the

2    issue that there is nothing to put a lien on.  And even to the

3    extent there was, there is already a lien that would be in

4    first place.  Also, I think the doctrine of unclean hands comes

5    into play in connection with Wells Fargo seeking equitable

6    relief.  Mistakes were made but the reality is two different

7    post-petition deductions were taken which were violations of

8    the automatic stay.  Now, that money was returned and I applaud

9    Wells Fargo for that and they did obviously the right thing to

10   do.  But I think that puts them in a difficult situation for

11   future collections on that account.

12          Now, certainly, if that were the only thing between

13   them and granting some sort of relief, I would look past it

14   because, again, they did what they were supposed to do.  But

15   given the other factors that are against granting any relief in

16   this case, I just raise it as an additional point.  Clearly,

17   they have an unsecured claim.  Unfortunately, that may or may

18   not be a claim that generates a tremendous return.  But that

19   puts them in the boat with a lot of general unsecured

20   creditors.

21          In connection with the argument about whether notice

22   was went, whether notice was received, I'm really not in a

23   position to make a determination one way or the other.  I have

24   testimony from two very believable, reliable witnesses that go

25   both ways.  You can't make a decision, they taught me in judge

1  school, to go back on the burden of proof.  The burden of proof

2  lies on Wells Fargo and I'm not in a position to make a

3  determination so I have to rule in the debtor's favor in

4  connection with that dispute.

5          So I'm going to deny the motion and the Court will

6  enter an order denying the relief requested for the reasons set

7  forth on the record.

8          MR. BEACH:  Thank you, Your Honor.

9          THE COURT:  You're welcome.  Northwest Trust.  Let's

10  push through here if we can.

11          MR. BEACH:  Your Honor, may we be excused?

12          THE COURT:  Yes.  Please.  We'll take a very short

13  recess, Mr. Wisler, to allow you to get organized.

14                          (Recess)

15          THE COURT:  Please be seated.

16          MR. BEACH:  Your Honor, if I may, I forgot that we

17  did add one item to the agenda, the status conference with

18  respect to Calyon.  I can be very short on that.  We've settled

19  it.  We've signed the documents.  We filed a 9019 motion which

20  is set for May 1st.  Unless Your Honor has any other questions,

21  I think that can be the status.

22          THE COURT:  You filed a motion to shorten?

23          MR. BEACH:  No.  We filed it on Friday.

24          THE COURT:  Oh, all right.

25          MR. BEACH:  So it should be 20 -- if I counted right,

1  it should be 20 days.

2              THE COURT:  Okay.

3              MR. HARBOUR:  Your Honor, Jason Harbour of Hunton &

4  Williams, on behalf of Calyon, if I may?

5              THE COURT:  Yes.

6              MR. HARBOUR:  Mr. Beach is correct.  The parties did

7  work very hard and did get on without needing to file a motion

8  to shorten.  The only other thing with respect to the status

9  conference, I would note that on Friday, as well as the motion,

10  a certification of counsel was filed with respect to the

11  stipulation that we had advised Your Honor about between Calyon

12  and Bank of American.  So I did want to note to the Court that

13  that is in existence and, if you have any questions, please let

14  us know and we can address them at a subsequent hearing or at

15  the Court's convenience.

16              THE COURT:  A certification of counsel in connection

17  with what?

18              MR. HARBOUR:  A stipulation between Bank of American

19  and Calyon.

20              THE COURT:  About what?

21              MR. HARBOUR:  That resolves Bank of America's

22  objection to the motion.  Calyon had filed a motion to --

23              THE COURT:  I thought you filed a 9019.  See, now you

24  got me confused.  Mr. Beach, you promised me you would be

25  short.  Mr. Wisler is sitting here, waiting to go.

1          MR. BEACH:  Well, if Mr. Harbour had just kept quiet

2  --

3          THE COURT:  This was an add on to the agenda.  I

4  mean, gee.

5          MR. BEACH:  Your Honor, we -- the debtors and Calyon

6  entered into a stipulation which was signed and filed under

7  9019.  As part of one of the many Calyon requirements in

8  connection with that settlement was that the Bank of America

9  issues would be resolved.  So Calyon and Bank of America

10  separately entered into a stipulation which essentially

11  resolved the motion to intervene filed by Bank of America and

12  -- I'm not going to characterize what's in the stipulation but

13  it resolves some issues between them in connection with the

14  other motion.  So that wasn't filed under 9019.

15          I believe at one of the prior status conferences, we

16  indicated to Your Honor that we would submit it under -- or

17  that those parties would submit it under certification of

18  counsel and request that Your Honor --

19          THE COURT:  All right.  Did someone send it over?

20          MR. HARBOUR:  That's my understanding, Your Honor.

21          THE COURT:  All right.  Well, I'll look at if and

22  when it hits my desk and I'll let you know if I have any

23  issues.

24          MR. HARBOUR:  Thank you, Your Honor.

25          THE COURT:  All right.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BEACH:  Thank you, Your Honor.

2          THE COURT:  Mr. Wisler.

3          MR. WISLER:  Good afternoon, Your Honor.  Jeffrey

4  Wisler on behalf of Northwest Trustee Services, Inc.  Your

5  Honor, Northwest Trustee is a foreclosure professional hired by

6  the debtor or retained by the debtor with the Court's approval

7  nunc pro tunc to the petition date.  This is a hearing on

8  Northwest Trustee's first and second quarterly fee

9  applications.

10          The first application was resolved in part through an

11  agreed order that Your Honor entered about 75 days ago.  There

12  were objections to both the first and second quarterly

13  applications by the debtors, joined by the Committee, and I

14  believe there was a reservation of rights filed by the buyer.

15  As to the debtor's most recent objection, or the debtor's

16  objection to the second application, as Mr. Lunn stated

17  earlier, there was an Exhibit B that objected to a certain loan

18  because AHM couldn't identify it.  We've resolved that.

19          As to Exhibit C, the debtor asserts that essentially

20  someone else is responsible for paying for these fees and

21  costs.  We think AHM is responsible but if, through

22  communications, somebody else is going to pay them, that's fine

23  and we don't need to litigate that today.  That may come up

24  later.  So we're not litigating that today, although I will ask

25  my witness a limited number of questions about that because

1  he's from Seattle and I don't want to bring him out just for

2  those issues.

3          Today's issue is over what the debtor calls

4  pre-petition foreclosure costs.  There is approximately

5  $430,000 at issue that the debtor considers pre-petition

6  foreclosure costs.  That's what today is about.  Unless Your

7  Honor wants an opening, I will not provide one.  I will call my

8  witness and proceed.

9          THE COURT:  Okay.  Let's get stated.  I'm sorry the

10 hearing has gone so long for your witness but it's only two

11 o'clock in the afternoon so you just got back from lunch and

12 you're ready to go, right?

13         MR. WISLER:  I would like to call David Fennell to

14 the stand, please.

15     DAVID E. FENNELL, NORTHWEST TRUSTEE'S WITNESS, SWORN

16         THE CLERK:  Please state and spell your last name.

17         THE WITNESS:  My name is David, initial E. Fennell,

18 F, like Frank - e-n-n-e-l-l.

19         THE CLERK:  Thank you.  You may be seated.

20         MR. WISLER:  Your Honor, I have an exhibit binder

21 that I would like to hand to the witness and the Court, if

22 that's okay.

23         THE COURT:  Yes, please.

24                     (Pause)

25         THE COURT:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1     MR. WISLER:  Your Honor, the only different between

2  the binder that I've handed Mr. Fennell and the binder that

3  I've handed Your Honor and others is that Mr. Fennell's copies

4  had exhibit stickers on them that say NWTS-1, and so on.

5                    DIRECT EXAMINATION

6  BY MR. WISLER:

7  Q    Mr. Fennell, are you an attorney licensed to practice law?

8  A    Yes, I am.

9  Q    Are you a bankruptcy attorney?

10 A    No.

11 Q    How are you employed?

12 A    I'm employed by Northwest Trustee Services, Inc.

13 Q    And what's your position with Northwest Trustee?

14 A    The title is manager but it functions as, more or less, a

15 COO and in-house counsel.

16 Q    Are you the person at Northwest Trustee most involved with

17 Northwest Trustee's post-petition dealings with the debtor?

18 A    Yes.

19 Q    Can you generally describe the nature of Northwest

20 Trustee's business, please?

21 A    Northwest Trustee Services is a deed of trust trustee

22 which is a statutory position that is observed in a lot of

23 states in the west with -- that use deeds of trust rather than

24 mortgages to secure mortgages and -- or loans against real

25 property.  And the trustee's goal is really twofold.  One is to

**J&J COURT TRANSCRIBERS, INC.**

1  handle and conduct non-judicial deed of trust foreclosures by

2  power of sale and the other is to serve as the entity that

3  signs lien releases to release the liens of deeds of trust

4  against property.

5  Q    In what states does Northwest Trustee perform services?

6  A    Oregon, Washington, Idaho, California, Nevada, Arizona.

7  Q    And do the services that Northwest Trustee provides vary

8  from state to state?

9  A    Yes.

10 Q    Can you explain that briefly, please?

11 A    Yes.  The foreclosure process is completely a creature of

12 statute and each state has its own statutory procedure.

13 Q    To whom does Northwest Trustee provide its services?

14 A    Northwest Trustee's clients are most exclusively

15 institutional mortgage servicing companies and investors.

16 Q    And approximately how many clients does Northwest Trustee

17 have?

18 A    Approximately 100.

19 Q    And of those approximately 100, how many would you say

20 have written agreements with Northwest Trustee Services?

21 A    Approximately one half.

22 Q    And why are there not written agreements with all of your

23 clients?

24 A    The clients are the ones who ask us to enter into

25 contracts and about half of them don't.  We just rely on course

1  of dealing and sort of prevailing custom in our region and in

2  the industry.

3  Q    Well, does that leave the parties with an unpredictable

4  course of dealing?

5  A    Not at all.  It's well established and it's recognized

6  universally.

7  Q    In the context of getting paid for their work, in the

8  context of Northwest getting paid for its work, what are those

9  well established terms?

10  A    Well, Northwest does the foreclosure.  It does it on a

11  flat fee basis plus expenses.  And then, when the foreclosure

12  is resolved, we then invoice our clients.

13  Q    And what is the typical ratio of expenses to the flat fee?

14  A    It's about 2.5 or 3 to one.

15  Q    And when is a foreclosure matter considered resolved?

16  A    For the most part, it's considered resolved when the

17  foreclosure actually occurs or there is a reinstatement by

18  curing of all defaults or a payoff or satisfaction of the

19  mortgage loan.

20  Q    And are both the flat fee and the expenses recaptured by

21  your client at the resolution of the foreclosure?

22  A    Yes.

23  Q    Can you explain that, please?

24  A    Yes.  For instance, in a reinstatement, in order to cure,

25  the borrower has to pay all of the arrearage plus foreclosure

1  fees and expenses.  And so at the time that that amount is

2  tendered, that pays the foreclosure fees and expenses and you

3  recoup that.

4  Q    And how is Northwest Trustee paid at resolution?

5  A    It invoices the lender or the servicer for the fees and

6  expenses and collects.

7  Q    And what are these expenses of a non-judicial foreclosure?

8  A    The foreclosure expenses that we're allowed to bill for

9  are costs of mailing of the notice of trustee sale and the

10 notice of default, the cost of recording the notice of trustee

11 sale, cost of posting the property with foreclosure notices or,

12 in some states, personally serving them.  In all the states,

13 there's a cost of publishing the foreclosure notice.  And then

14 finally, there's a cost of paying the auctioneer to conduct the

15 foreclosure sale.

16 Q    Is a title report required?

17 A    Oh, yes.  The title report is the first thing typically we

18 have to get because we have to know who to serve or who to mail

19 to for due process purposes.

20 Q    Now, does -- you the term, allow to bill for.  Do the

21 statutes tell Northwest Trustee what it can and can't bill for

22 or what it can or most do in terms of pre-foreclosure expenses?

23 A    You made reference earlier to what we're allowed to bill

24 for.  That's more a reference to the course of dealing and the

25 well established practice.  Typically, we're allowed by our

1 clients only to bill them for parts of the foreclosure that are

2 required either by statute or practice, such as the title.  We

3 could actually bill for more under the statute but we don't by

4 agreement.

5 Q    And in a foreclosure conducted by Northwest Trustee, who

6 performs or how does Northwest Trustee obtain things like

7 publication, title report, and that sort of thing, the expenses

8 you talked about?

9 A    Those services are obtained through third party vendors.

10 Q    And when does Northwest Trustee pay those vendors for

11 their work?

12 A    Northwest Trustee pays those vendors upon resolution of

13 the foreclosure.

14 Q    Okay.  Any exceptions to that?

15 A    There's one exception that -- it's the mailing vendors in

16 California, Nevada, Arizona.  They get paid, I think, 30 to 60

17 days after they perform the service.

18 Q    All right.  Let me make sure I understand this right. So

19 if you order a title report from a third party, your

20 arrangement with the title report vendor is that you don't have

21 to pay them until the resolution of the foreclosure?

22 A    Yes.

23 Q    And is that common in the -- is that part of the well

24 established terms of the industry?

25 A    Yes.

1 Q    Prior to the bankruptcy filing, did Northwest Trustee have

2 a business relationship with American Home Mortgage?

3 A    Yes.

4 Q    When did it begin?

5 A    Approximately two years ago.

6 Q    And approximately how many foreclosures has Northwest

7 Trustee performed for the debtor?

8 A    I believe between one and two thousand.

9 Q    And does Northwest Trustee have a written contract with

10 AHM?

11 A    No, not to my knowledge.

12 Q    And what terms control the relationship?

13 A    The well established industry standards and course of

14 dealing.

15 Q    So in your relationship with AHM, Northwest Trustee does

16 not get paid until the foreclosure matter is resolved?

17 A    That's correct.

18 Q    Does that include expenses?

19 A    That's correct.

20 Q    And you said generally before that you -- Northwest

21 Trustee does not mark up its vendor expenses.  Is that true

22 with AHM?

23 A    Correct.  Yes.

24 Q    What's the average time of a non-judicial foreclosure from

25 the time it starts until the time it reaches resolution?

1  A    It varies a little bit state to state because of the

2  different statutory procedures but the typical time frame is

3  about four months.

4  Q    And does Northwest Trustee have any control over how long

5  that takes?

6  A    No.  That time line is set by statute.

7  Q    When AHM filed for bankruptcy, were there any foreclosures

8  in the process with Northwest Trustee?

9  A    Yes.

10  Q    What, if anything, was Northwest Trustee advised at the

11  time by AHM?

12  A    I think the first bit of information we got was that

13  everything would be business as usual.

14  Q    I would like you to please turn to Exhibit 1 in the

15  exhibit binder.  Can you identify that document for me, please?

16  A    Yes.  It's an E-mail communication from Kathy Cole to

17  Lance Olsen and to myself dated August 7, 2007.

18  Q    Do you recall receiving this E-mail?

19  A    Yes.

20  Q    And who is Kathy Cole?

21  A    Kathy Cole is Director of Operations in Northwest

22  Trustee's Santa Anna, California office.

23  Q    The text of this E-mail message refers to Bob.  Can you

24  tell me who that is?

25  A    Yes.  Robert Hardman at AHM.

1  Q    And is Mr. Hardman or was Mr. Hardman the primary AHM

2  contact for Northwest Trustee?

3  A    Yes.

4  Q    What, if anything, does the E-mail say about ongoing

5  business?

6  A    They're stating that we should proceed as business as

7  usual.  Business as usual is in quotes.

8  Q    When AHM filed for bankruptcy, was there any urgency

9  communicated from AHM to Northwest Trustee about this business

10 as usual?

11 A    Oh, yes.  They wanted us to keep things moving as quickly

12 as possible.

13 Q    Were you directly involved in the process of retaining

14 Northwest Trustee as a foreclosure professional for AHM in the

15 bankruptcy case?

16 A    Yes.

17 Q    Was it your understanding -- did you have an understanding

18 about whether Northwest Trustee would need to be retained with

19 court approval?

20 A    Yes.

21 Q    Did you have any understanding about fee applications?

22 A    Not entirely but I had some inclination.

23 Q    Did you understand that, once you are retained as a

24 professional for a debtor in the bankruptcy case, that you

25 would -- there would need to be filed fee applications for you

1  to get paid?

2  A    That's what I was told.  Yes.

3  Q    What, if anything, were you initially told by AHM about

4  payment for outstanding amounts due at the time AHM filed for

5  bankruptcy?

6  A    We would have to file a proof of claim.

7  Q    And what was your understanding of what you would have to

8  file a proof of claim for?

9  A    For invoices that were outstanding as of the date that the

10  bankruptcy was filed.

11  Q    Would you turn to Exhibit 2 in your exhibit booklet,

12  please?  Can you identify that for me?

13  A    Yes.  This is the Application for Order Pursuant to

14  Section 327e of the Bankruptcy Code and Bankruptcy Rule 2014,

15  approving the retention and employment of Northwest Trustee

16  Services, Inc. as foreclosure professionals for the debtors

17  nunc pro tunc to the petition date.

18  Q    Were you involved in the preparation of this document?

19  A    Yes.

20  Q    What was your involvement generally?

21  A    I was asked by debtor's counsel to fill in some background

22  concerning Northwest Trustee Services.

23  Q    And attached to the retention application is an affidavit

24  of Todd Hendricks.  Would you please tell me who Todd Hendricks

25  is?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Todd Hendricks is -- his title is Assistant Vice President

2  of Northwest Trustee Services, Inc.  Functionally, he is what

3  we call a foreclosure analyst who handles -- he's the top

4  echelon of our production teams.

5  Q    Were you involved in the preparation of this affidavit?

6  A    Yes.

7  Q    And what was your involvement?

8  A    Again, I provided background information regarding

9  Northwest Trustee Services.

10  Q    Is there a waiver of claims in this affidavit?

11  A    No.

12  Q    Was one requested at this time?

13  A    No.

14  Q    Who filed the retention application?

15  A    Debtor's counsel.

16  Q    And what, if anything, happened after the retention

17  application was filed?

18  A    I was informed by debtor's counsel that the U.S. Trustee

19  had an informal objection to Northwest Trustee's retention.

20  Q    And do you recall if you were told what would need to be

21  done to resolve that objection?

22  A    Two things.  One was to disclose or further disclose the

23  relationship between Northwest Trustee Services and its vendors

24  and, secondly, to -- that we would have to waive our

25  outstanding invoices that were outstanding and unpaid as of the

1 petition date.

2 Q    Would you turn to Exhibit 3 in the binder, please?  Would

3 you identify that document for me generally, please?

4 A    This is a second affidavit by Todd Hendricks supporting

5 the application for retention.

6 Q    And did you participate in the preparation of this

7 document?

8 A    Yes.

9 Q    Does this affidavit contain a claim waiver?

10 A    Yes, it does.

11 Q    Would you read the waiver language in Paragraph 10,

12 please, on the second to the last page?

13 A    "As of August 6, 2007, the debtors owed Northwest Trustee

14 $92,847.67 for pre-petition services and fees, the pre-petition

15 fees.  Northwest Trustee hereby waives the pre-petition fees

16 against the debtors."

17 Q    And what does the $93,000 figure consist of?

18 A    That was the sum total of the outstanding and unpaid

19 invoices due and owing as of essentially August 6, 2007.

20 Q    And why did Northwest Trustee waive this amount?

21 A    Northwest Trustee basically  made a business decision.  It

22 wasn't clear how much of would be gained from a proof of claim

23 in this bankruptcy and the prospect of getting future business

24 was more important.

25 Q    If the amount had been significantly greater than 93,000,

1  could that have changed Northwest Trustee's decision?

2  A    It very well could have.  It's a lot of money.

3  Q    Mr. Fennell, can you confirm that none of the $93,000

4  referred to in that affidavit are included in the request in

5  the first and second quarterly fee applications of Northwest

6  Trustee Services?

7  A    Yes, I can confirm that.

8  Q    Could you turn to Exhibit 4, please?  Would you identify

9  that generally for me, please?

10  A    Yes.  This is the retention order that was -- that was

11  entered by the Court retaining Northwest Trustee Services.

12  Q    As of when?

13  A    As of the petition date, it says.

14  Q    Did you participate in the preparation of this order?

15  A    No.

16  Q    Mr. Fennell, can you briefly explain to me your

17  understanding of how the fee application process would work,

18  say, back when you first got retained?

19  A    My understanding at the time was that we would do the

20  work, foreclosure would be resolved.  We would submit our

21  invoices to debtor's counsel and then they would put together

22  the fee applications.

23  Q    Did you submit your invoices to debtor's counsel?

24  A    Yes, we did.

25  Q    And when did you first do this?

1  A    I think we first started doing it in early October.

2  Q    What happened after that?

3  A    Nothing happened for about three weeks or so.  And then we

4  got some requests for more information and some requests

5  possibly to change the appearance of the invoices a bit.

6  Q    Did there come a time when you realized that some of your

7  expenses would become an issue?

8  A    Toward the end of October, I received word from debtor's

9  counsel that there might be an issue with our expenses.

10  Q    Can you describe that issue --

11  A    Yes.

12  Q    -- as you understood it?

13  A    The way it was described was that debtor's -- I think

14  debtor's attorneys were taking the position -- it could have

15  been others -- that certain expenses in the foreclosure

16  process, especially on those that were referred for the -- the

17  foreclosure was referred before the petition date, that some of

18  those expenses would be treated not as -- would be treated as

19  pre-petition claims.

20  Q    And would they be paid?

21  A    And would not be paid.

22  Q    Would you turn to Exhibit 5, please, and identify that

23  generally for me, please?

24  A    Yes.  This is a letter from debtor's counsel in early

25  November sort of laying out how professionals would be paid,

1  foreclosure professionals would be paid.

2  Q    Did you receive this letter around the time you were

3  working with debtor's counsel on the expenses issue?

4  A    Yes.  Around that time.

5  Q    Would you please look at Page 2 of that letter and

6  specifically under Paragraph 3, iii, the italicized and bolded

7  language?

8             THE COURT:  What page?

9             MR. WISLER:  Page 2 of the letter, Your Honor.

10            THE COURT:  Thank you.

11 BY MR. WISLER:

12 A    iii?

13 Q    It's the bolded and italicized language toward the middle

14 of the page.

15 A    "Your pre-petition course of dealing with the debtors

16 determines the allocation and accrual of fees."

17 Q    Would you also turn to the second exhibit via the letter

18 which is the third to the last page of the document?

19 A    I'm sorry.  Could you tell me that again?

20 Q    Sure.  The third to the last page of the document is a

21 second exhibit B.

22 A    Oh.

23 Q    It starts with the words, "documenting your fees".

24 A    Oh, I see.

25 Q    Do you have that?

1  A    At the very top?

2  Q    It says "Exhibit B" and the first words --

3  A    I see that.

4  Q    -- and they start documenting your fees.

5  A    Okay.

6  Q    Would you please read what it says after "expenses" in the

7  second section of the document?

8  A    "Dates for expenses should be related to the dates in

9  which your firm is entitled to reimbursement.  Generally, this

10  should be when your firm makes payment to third parties."

11  Q    Mr. Fennell, in Northwest Trustee's arrangement with

12  American Home Mortgage, on what date was your firm entitled to

13  reimbursement?

14  A    Upon resolution of the foreclosure.

15  Q    And under your arrangement with your vendors, other than

16  the mailing vendor, when does your firm make payment to those

17  third parties?

18  A    After resolution of the foreclosure.

19  Q    Mr. Fennell, Northwest Trustee eventually retained

20  counsel.  Why is that?  General?

21  A    Toward the end of October, it was becoming pretty apparent

22  that the whole system of trying to put things together for

23  applications was becoming very complex.  Deadlines were

24  starting to really, really, really come to the for.  I'm not a

25  bankruptcy practitioner.  I was getting a little bit scared

1 about deadlines.  There was so much money involved.  And then

2 we had this disagreement about expenses and I was concerned

3 that we might be out quite a bit of money.  And so I thought if

4 I was going to retain counsel, that was the time.

5 Q    Mr. Fennell, would you look at Exhibits 6 and 7 in your

6 book and just tell me what they are generally, if you can

7 identify them?

8 A    Exhibit 6 is the first quarterly application of Northwest

9 Trustee Services, Inc. for allowance and approval of

10 compensation for services rendered and reimbursement of

11 expenses.  And I believe the second one, Exhibit 7, is for the

12 same purpose but for the second quarterly application.

13 Q    Did you assist in the preparation of these documents?

14 A    Yes.

15 Q    Have you reviewed them?

16 A    Yes.

17 Q    Are both of those applications true and accurate to your

18 knowledge?

19 A    To my knowledge, yes.

20 Q    The expenses for which you seek reimbursement in those

21 applications, are they actual expenses?

22 A    Yes.

23 Q    Were those expenses necessary to resolve the foreclosures

24 for AHM?

25 A    They were absolutely vital, the services, in order for the

1  foreclosure to be valid in the first place.

2  Q    Focusing only on the loans that are subject to the

3  compensation and expenses requested in these applications, can

4  you approximate the aggregate amount of money or the amount of

5  loans that AHM recovered through your efforts to reach

6  foreclosure resolution?

7  A    It's very approximate but it's in the hundreds of millions

8  of dollars.

9  Q    So -- and let me go back and make that clear because it

10 seemed that I did not ask a very good question.  All the fees

11 and expenses that you seek in these applications are for

12 foreclosures that have been resolved, correct?

13 A    Correct.

14 Q    Okay.  And the aggregate amount of loans in those

15 foreclosures that have been resolved are in the hundreds of

16 millions?  Is that your answer?

17 A    I believe so.

18 Q    And were all these resolutions after AHM filed bankruptcy?

19 A    Yes.

20 Q    And did AHM recover all of those amounts after the

21 bankruptcy?

22 A    Yes.

23 Q    Are you familiar with the debtor's objection that they

24 filed two fee applications?

25 A    Yes.

Fennell - Direct//Wisler                    178

1  Q    Let's talk about the waiver issue first.  Did Northwest

2  Trustee Services agree, voluntarily agree, to waive any more

3  than the $93,000 figure in the Todd Hendricks second affidavit?

4  A    No.  Never.

5  Q    Did Northwest Trustee voluntarily agree to waive any of

6  the expenses in the first or second quarterly fee application?

7  A    No.

8  Q    Did Northwest Trustee Services knowingly agree to waive

9  any of the expenses in the first or second quarterly fee

10  application?

11  A    No.

12         MR. POWER:  Your Honor, I'm going to object.  We're

13  getting a little beyond leading here.  The last three have been

14  --

15         THE COURT:  Yes.  I agree.  Sustained.  I mean, I

16  think you're --

17         MR. WISLER:  As to?

18         THE COURT:  As to the use of the adverb knowingly as

19  being leading.

20         MR. WISLER:  So to that last question.

21  BY MR. WISLER:

22  Q    At any time, to your knowledge, did Northwest Trustee

23  agree to waive any of the expenses sought in the first and

24  second quarterly fee application?

25  A    No.

1 Q    To your knowledge, and to the best of your knowledge to

2 Northwest Trustee's knowledge, did it ever agree to waive any

3 of the expenses listed in the first and second quarterly fee

4 applications?

5 A    No.

6 Q    And I think I asked you this previously, but I just want

7 to emphasize, is any of the $93,000 listed in the Hendricks

8 affidavit included in your first and second quarterly fee

9 applications?

10 A    No.

11 Q    As of the petition date, that's the date that AHM filed

12 its bankruptcy petition, did Northwest Trustee have a right to

13 invoice AHM for payment of the disputed expenses?  The disputed

14 expenses I'm going to call the -- what the debtors have

15 referred to as the pre-petition foreclosure costs.  I'm going

16 to call them disputed expenses.  Do you understand?

17 A    I understand but could you repeat the question?

18 Q    Sure.

19            THE COURT:  Yes.  Please do.

20 BY MR. WISLER:

21 Q    As of the petition date, did Northwest Trustee have a

22 right to invoice AHM for payment of any of the disputed

23 expenses?

24            MR. POWER:  Your Honor, I'm going to object.  It

25 seems leading.  They're asking for a legal conclusion as to

1   whether they had legal right.

2           THE COURT:  Well, he is an attorney.

3           MR. POWER:  No, I know that, but I think the question

4   relates more to the practice.

5           THE COURT:  Maybe you could rephrase, Mr. Wisler.

6           MR. WISLER:  Certainly.

7   BY MR. WISLER:

8   Q    Under the terms and conditions of the relationship between

9   AHM and Northwest Trustee, did Northwest Trustee -- was

10  Northwest Trustee able to invoice AHM for the disputed expenses

11  prior to the petition date?

12  A    No.

13  Q    Under those same terms and conditions, did Northwest

14  Trustee have a right to be paid for those disputed expenses

15  prior to the petition date?

16  A    No.

17  Q    As of the petition date, did Northwest Trustee Services

18  have a right to sue AHM for the disputed expenses?

19  A    No.

20          MR. POWER:  I'm going to object, Your Honor.  It's

21  again for a legal conclusion.  I mean, this gentleman is not

22  put on as an expert in law as to whether they have a right to

23  sue or not.

24          THE COURT:  What was the question?  I'm sorry.  I

25  missed it.

1          THE CLERK:  Do you want me to play it back?

2          THE COURT:  Yes.  You get to hear yourself on tape.

3                    (Playback)

4          THE COURT:  Okay.  Thank you.  Okay.  I'm going to

5  sustain the objection.   It asks for -- again, I mean, he is a

6  general counsel to the company but maybe you can rephrase.

7          MR. WISLER:  Understood, Your Honor.

8  BY MR. WISLER:

9  Q    As of the petition date, were the disputed expenses due

10 and owing from AHM to Northwest Trustee Services?

11 A    No.

12 Q    Do you know if AHM itself has received reimbursement for

13 any of the disputed expenses?

14 A    It certainly has in reinstatement and payoff and sales.

15 Q    Let me ask you, how do you know this?  How would you know

16 this?

17 A    When a servicer is -- receives payoff or reinstatement

18 funds, for instance, the foreclosure fees and expenses are

19 included in the tender.  If they're not included, cure is not

20 effected and satisfaction of loan such that you could justify

21 releasing the lien would not be effective.

22 Q    And to your knowledge, did Northwest Trustee -- did any of

23 the foreclosures that Northwest Trustee was handing for AHM

24 reach reinstatement post-petition?

25 A    Yes.

1  Q    And in that circumstance, would AHM have received

2  reimbursement for the expenses and the flat fee that you were

3  to subsequently invoice?

4  A    Yes.

5           MR. WISLER:  May I have a minute, Your Honor?

6           THE COURT:  Mr. Wisler, I have a question for you.

7  You were retained after the retention order was signed, is that

8  correct?

9           MR. WISLER:  That's correct, Your Honor.

10          THE COURT:  All right.

11 BY MR. WISLER:

12 Q    Mr. Fennell, we talked about how Northwest Trustee pays

13 its vendors.  Let me just ask it in a different way.  When

14 Northwest Trustee asks its vendors for things like a title

15 report for a foreclosure it's doing for AHM, does Northwest

16 Trustee advance funds to that title company to perform that

17 title search?

18 A    No.

19 Q    It invoiced -- Northwest Trustee pays that after the

20 resolution of the foreclosure?

21 A    Yes.

22          MR. WISLER:  Your Honor, the next couple of questions

23 are just on that Exhibit C issue which really aren't part of

24 today but I'm just going to ask it and I had talked to Mr. Lunn

25 about that prior to the hearing and he was okay with it.

                    **J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  All right.

2  BY MR. WISLER:

3  Q    Mr. Fennell, are you familiar with Exhibit C to the

4  debtor's objection?

5  A    Yes.

6  Q    Would you like to see a copy of it to --

7  A    I would.

8  Q    -- refresh your recollection?

9  A    Please.

10                      (Pause)

11            MR. WISLER:  May I approach the witness, Your Honor?

12            THE COURT:  Yes.

13            MR. WISLER:  Your Honor, for the record, this is the

14  -- I believe Mr. Lunn can correct me if I'm wrong, but I

15  believe it's the very last page of the debtor's objection to

16  Northwest Trustee's second quarterly fee application.

17  BY MR. WISLER:

18  Q    Mr. Fennell, have you seen this document before?

19  A    Yes.

20  Q    The left hand column, is that a list of loans or loan

21  numbers?

22  A    Yes.

23  Q    To your knowledge, are they all loan numbers -- are they

24  all -- yes -- loan numbers for loans that AHM asked Northwest

25  Trustee to foreclose upon?

Fennell - Cross/Lunn                    184

1  A    To my knowledge.

2  Q    And to your knowledge, are all of these loans, at least to

3  the extent that they were included in your second quarterly fee

4  application -- have they all been resolved successfully?

5  A    Yes.

6  Q    And as of the filing of the second quarterly fee

7  application, to your knowledge had Northwest Trustee received

8  payment for its fees and expenses for any of the loans on

9  Exhibit C, again as of the time you filed the fee application?

10 A    As of the time of the fee application, I don't believe so.

11         MR. WISLER:  That's all I have, Your Honor.

12         THE COURT:  Okay.

13         MR. WISLER:  Oh, excuse me.  I would like to move

14 Exhibits 1 through 7 in the hearing book into evidence as

15 Northwest Trustee's 1 through 7.

16         THE COURT:  Any objection?

17         MR. POWER:  No objection.

18         THE COURT:  All right.  Admitted without objection.

19         MR. WISLER:  I'm not moving the Exhibit C into

20 evidence, Your Honor.

21         THE COURT:  All right.

22                      CROSS EXAMINATION

23 BY MR. LUNN:

24 Q    Good afternoon, Mr. Fennell.

25         MR. LUNN:  I'll be very brief, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

Fennell - Cross/Lunn                    185

1  BY MR. LUNN:

2  Q    Is Northwest Trustee Services a law firm?

3  A    No.

4  Q    And as a result, there was an objection as filed by the

5  Office of the United States Trustee, or an informal objection?

6  I'm sorry.

7  A    I'm not aware of the entire circumstances.

8  Q    Are you aware that, as a result of an informal objection,

9  your retention was switched from a Section 327e retention to a

10 Section 327a retention under the Bankruptcy Code?

11 A    I'm not familiar with the code sections but that sounds

12 familiar.

13 Q    Okay.  Isn't it true that you, on behalf of Northwest

14 Trustee, agreed to waive pre-petition claims against the

15 debtors?

16 A    92,000 approximately.

17 Q    And those related to fees and expenses for pre-petition

18 services?

19 A    Yes.

20 Q    Not just fees, correct?

21 A    Correct.

22 Q    The order which I believe is --

23         MR. LUNN:  I apologize, Your Honor.

24                     (Pause)

25 BY MR. LUNN:

Fennell - Cross/Lunn                    186

1  Q    The order approving the retention of Northwest Trustee, I

2  believe has been marked as Northwest Trustee Exhibit 4.  Do you

3  have that in front of you?

4  A    I do.

5  Q    I would ask you to flip to the second page and the third

6  paragraph from the bottom.

7  A    Yes.

8  Q    Can you please -- is it true that this states that

9  Northwest Trustee is deemed to waive any and all pre-petition

10  amounts due to the debtors?

11  A    Yes, that's what it says.

12  Q    And this form of order was presented to you or at least

13  someone at Northwest Trustee prior to its submission?

14  A    No, not prior to submission.

15        MR. LUNN:  May I approach, Your Honor?

16        THE COURT:  Um-huh.

17  BY MR. LUNN:

18  Q    Mr. Fennell, I have just handed you what's been marked D-

19  1, or Debtor's 1.  Do you recognize this?

20  A    Not this one individually but I recognize the format.

21  Q    Is it true to characterize that this is an invoice that's

22  prepared by Northwest Trustee Services?

23  A    Yes.

24  Q    Would it be fair to characterize this as the one that was

25  the first page -- I understand that you may not understand it,

1 that is the exact one -- but if I were to tell you that this is

2 the first one on Exhibit C to the fourth fee application, would

3 that be correct?  Would you assume that to be correct?

4 A    I'll take your word for it.  Sure.

5 Q    Could you please -- I'll focus your attention to the left

6 hand column on the exhibit.

7 A    Um-huh.

8 Q    Let me back up.

9         THE COURT:  Strike that, Your Honor.

10 BY MR. LUNN:

11 Q    Is this invoice representative of other invoices prepared

12 by Northwest Trustee Services?

13 A    I believe so.

14 Q    What do the dates -- and I'll direct your attention to the

15 column under date.  What do these dates reflect?

16 A    These dates reflect dates on which -- I'm looking through

17 here to make sure there's no exception -- dates on which

18 expense events occurred.

19 Q    And you're aware that the petition date in these cases is

20 August 6, 2007?

21 A    Correct.

22 Q    And that, at least on this exhibit, D-1, there are a

23 number of them that are prior to August 6, 2007?

24 A    The expense events.  Yes.

25 Q    Are these charges indicated on at least this invoice for

1 | outside vendors?

2 |                              (Pause)

3 | A    Yes.

4 | Q    Does Northwest Trustee have a relationship with any

5 | particular vendors?

6 | A    Yes.

7 | Q    Which one is that?

8 | A    FEI, LLC.

9 | Q    And can you explain that relationship?

10 | A    Of course.  FEI is half owned by Stephen Routh who is also

11 | the owner of Northwest Trustee Services.  FEI provides posting

12 | services, provides publication facilitation services, and

13 | provides foreclosure auctioneering services in the foreclosure

14 | process.

15 |            MR. LUNN:  I got one step ahead of myself so excuse

16 | me, Your Honor.  I apologize.

17 | BY MR. LUNN:

18 | Q    I want to go back to what's been marked as D-1.  In the

19 | event that a foreclosure happened prior to August 6, 2007,

20 | would those charges been required to be paid at that time?

21 | A    Yes.

22 | Q    Were these charges incurred on the date that is reflected

23 | on Exhibit D-1?

24 |            MR. WISLER:  Your Honor, along the lines of the

25 | objections raised by Committee counsel, I think incurred is

1  going to need a little more definition.

2              MR. LUNN:  I'll move on.

3  BY MR. LUNN:

4  Q    You had testified that AHM had received reimbursement of

5  expenses to the foreclosures in your direct testimony.  Do you

6  know for a fact the amounts that have been received by AHM?

7  A    I couldn't tell you the amounts.

8  Q    So you were speaking -- I'm sorry.  So you were just

9  speaking in general terms of the standard procedures?

10  A    Correct.

11  Q    You don't know how much AHM has been received or has

12  received for reimbursements of these advances?

13  A    Oh, of course not.

14  Q    Okay.  Just a few questions with respect to Exhibit C.

15  Upon a loan being sold, servicing released, isn't it true that

16  in the ordinary course that, for professionals, foreclosure

17  professionals to seek reimbursement from the new servicers?

18  A    I don't believe it's ordinary course. I believe it's

19  courtesy.

20  Q    In the ordinary course, isn't it true that American Home

21  would notify Northwest Trustee or other foreclosure

22  professionals upon a loan being sold servicing released?

23  A    In theory, yes.

24  Q    Have you contacted the new servicers related to the loans

25  identified on Exhibit C for payment?

Fennell - Cross/Lunn                    190

1  A     To my knowledge, we've contacted those for whom American

2  Home gave us enough information.  We've collected from some.  I

3  don't know about Exhibit C in particular but on others we have.

4  Q     So in the past, North -- or American Home has given you

5  information as to the new servicers in the ordinary course of

6  business?

7  A     Inconsistently.  Yes.

8  Q     But they have done it, nonetheless?

9  A     In some cases.

10 Q     Thank you.

11        MR. LUNN:  No further questions, Your Honor.

12        THE COURT:  Excuse me.  Did -- you said that you did

13 not see the order that the Court entered approving the

14 retention prior to its filing, is that correct?

15        THE WITNESS:  That's correct.  I did not.

16        THE COURT:  Do you know whether anyone at Northwest

17 did receive it?

18        THE WITNESS:  No one else would have, I don't think.

19 I was the first --

20        THE COURT:  You were the contact person?

21        THE WITNESS:  -- contact person.

22        THE COURT:  Do you recall seeing a black line of that

23 order?

24        THE WITNESS:  No.

25        THE COURT:  Okay.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MS. COUNIHAN:  Your Honor, Victoria Counihan on

2    behalf of AH Mortgage Acquisition.  I wasn't aware that there

3    was going to be a discussion as to the issue as to who the

4    appropriate party is to reimburse.  I just continue to reserve

5    our rights and I'm not anticipating asking questions of this

6    witness on that issue because the reservation rights said that

7    we would deal with it later and I wasn't informed it would be

8    dealt with today.

9          THE COURT:  All right.

10         MS. COUNIHAN:  So I reserve questions if that issue

11   comes up and we need the witness.

12         THE COURT:  Okay.

13         MR. POWER:  I just have a few questions.  Mark Power

14   from Hahn & Hessen, Counsel for the Committee.

15                    CROSS EXAMINATION

16   BY MR. POWER:

17   Q    Sir, just going back to D-1, that exhibit and those

18   expenses --

19   A    Yes.

20   Q    -- there were -- now, go to, for example, 4/26/07.  Do you

21   see that expense for date publication commenced?

22   A    Yes.

23   Q    Is that the date that a publication was made about the

24   pending foreclosure?

25   A    I'm not sure.  It could either be the date that the order

**J&J COURT TRANSCRIBERS, INC.**

Fennell - Cross/Power                    192

1  was placed or the date that it actually started publication.

2  Q    So when you say an order was placed, your firm would, I

3  guess, would approach an affiliate who would then state the

4  publication and the publication may be a few weeks later?  Is

5  that probably --

6  A    Assuming, yeah.  I mean, typically, early in the

7  foreclosure process, an order is placed and sort of time lines

8  are set.

9  Q    But at the time the publication actually goes out, the

10 vendor who has made that publication has done everything it

11 needs to do to complete its obligations, isn't that correct?

12 A    I'm sorry.  Repeat that?

13 Q    At the time the publication is made, and publish notice

14 has been given, the vendor who is making that publication

15 notice has done everything it needs to do in order to fulfill

16 its obligation?

17 A    That's correct.

18 Q    So the debt owed to that vendor is owed?  It may not be

19 due but it is owed?  Would you agree with me on that?

20         MR. WISLER:  Objection, Your Honor.

21         THE COURT:  Basis?

22         MR. WISLER:  I think it was the same objection that

23 Committee counsel raised, although you may have ruled it but I

24 don't recall.

25         THE COURT:  Well --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. WISLER:  If it's to his knowledge and not a legal

2    conclusion.

3          THE COURT:  Yes.  I think you're asking a legal

4    conclusion, Mr. Power.

5          MR. POWER:  Your Honor, I guess I respectfully think

6    the term "owed" is a business term as opposed to incurred or

7    legal obligation.

8          THE COURT:  Well, I mean, I think you've established

9    -- I don't think you need the answer.  I think you've

10   established the factual predicate for the argument.

11         THE COURT:  Sounds like you need the answer.  I think

12   you've established the factual predicate for the argument.

13         MR. POWER:  Yes, Your Honor.

14   Q    Have you ever had a situation where a servicer is changed

15   the foreclosure professional in midstream?

16   A    Yes.

17   Q    And in that situation is it -- is the first foreclosure

18   professional who is replaced, are they still owed the expenses

19   that they came out of pocket on?

20   A    Yes.

21   Q    And did they basically to make the servicer pay for those

22   expenses because they've been replaced and they still owe

23   those.  Is that correct?

24   A    I believe so.

25   Q    Would you turn to Exhibit 5 for just one second?  And

1  read, turn to Page 3 of that exhibit.  Would you just briefly

2  read Number 4, the first sentence if you would?

3  A    AHM is authorized to pay only those fees and expenses

4  incurred after the petition date.

5  Q    Did you read this letter when you got it?

6  A    I'm not sure how thoroughly I read it.

7  Q    Did you inquire of the debtor, when you read -- if you did

8  read this letter, did you make any inquiries about what that

9  phrase meant?

10 A    No.

11          MR. POWER:  No further questions, Your Honor.

12          THE COURT:  Redirect.

13          MR. WISLER:  Yes, Your Honor.  Thank you.

14                      REDIRECT EXAMINATION

15 BY MR. WISLER:

16 Q    Mr. Fennell, regardless of your understanding or lack of

17 understanding about Sections 327A and 327E, does that

18 understanding or lack of understanding have any effect or did

19 it have any effect on the intent of Northwest Trustee with

20 regard to what it was waiving?

21 A    no.

22 Q    Or you thought it was waiving?

23 A    No.

24 Q    Look at Exhibit D-1 for me please.  Mr. Lunn represented

25 that this was part of your fee application for one of your --

**J&J COURT TRANSCRIBERS, INC.**

Fennell - Redirect/Wisler                    195

1  one of the fee applications and based on that and based on the

2  invoice date can you tell me whether the foreclosure resolution

3  was pre or post-petition?

4  A     Pretty clearly it was post-petition.

5  Q     Other than the mailing costs, which I believe is the

6  second entry, were any of these charges paid by Northwest

7  Trustee to its vendors prior to the resolution of the

8  foreclosure?

9  A     Not to my knowledge.

10 Q     And based on the terms of the agreement between Northwest

11 Trustee and AHM, were any of these amounts due from AHM to

12 Northwest Trustee prior to the resolution of the foreclosure?

13 A     No.

14 Q     Mr. Lunn brought up the issue of affiliated vendors.  Mr.

15 Fennell does Northwest Trustee's arrangement with regard to how

16 it pays its vendors, and more specifically when it pays its

17 vendors, is that any different between affiliated vendors and

18 non-affiliated vendors?

19 A     No.

20 Q     Is the way you charge your clients generally in AHM

21 specifically does that change -- strike that.  Does the

22 arrangement as to when an amount is due from AHM change

23 depending on whether you use affiliated or unaffiliated

24 vendors?

25 A     No.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You told Mr. Lunn that you could not state the amount that

2  American Home Mortgage has received in terms of reimbursement

3  for some of the disputed expenses and I understand that.  But

4  you do know, in fact, that some have been recovered.  Is that

5  correct because your firm conducted the foreclosures?

6  A    Correct.

7           MR. WISLER:  That's all I have, Your Honor.

8           THE COURT:  You may step down.

9           MR. LUNN:  Your Honor, I just want to ask one

10 clarifying question relating to D-1.

11           THE COURT:  Okay.

12                    RECROSS EXAMINATION

13 BY MR. LUNN:

14 Q    The dates on the lefthand column.

15 A    Yes.

16 Q    These are the dates that the services were rendered,

17 correct?

18 A    Either rendered or ordered.  I'm not sure.

19 Q    Thank you.

20           THE COURT: Anything further, Mr. Wisler?  Okay.  You

21 may step down, sir.

22           MR. LUNN:  One procedural.  May I move Exhibit D-1

23 into evidence, Your Honor?

24           THE COURT:  Any objections?

25           MR. WISLER:  No objection.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Admitted without objection.  Any other

2  evidence?

3          MR. WISLER:  Not from Northwest Trustee, Your Honor.

4          THE COURT:  All right.  Debtor or committee?

5          MR. LUNN:  No, Your Honor.

6          THE COURT:  Okay.

7          MR. WISLER:  Your Honor, the witness's notebook which

8  has the original marked exhibits, where can I place that?

9          THE COURT:  You can give that to the ECRO that would

10  be good. Well what controls Mr. Wisler, this Court's orders and

11  the bankruptcy code or your client's understanding in Ms.

12  Whitman's letters?

13          MR. WISLER:  It doesn't matter, Your Honor.  They are

14  both the same.

15          THE COURT:  Okay.

16          MR. WISLER:  As I said at the beginning, Northwest

17  Trustee is an ordinary, of course, professional chosen,

18  retained and used by the debtor to recover defaulted loans

19  post-petition.  The fee applications are properly and timely

20  filed.  There is no objections to the compensation.  There is

21  no dispute that the expenses were actual.  There is no dispute

22  that the expenses were necessary.

23          THE COURT:  What are we talking about just so I --

24  about the expenses in play for today?  You said $400,000?

25          MR. WISLER:  Yes, Your Honor.  About $430,000.

1          THE COURT:  In expenses?

2          MR. WISLER:  Yes.

3          THE COURT:  Okay.

4          MR. WISLER:  I want to address the waiver issue

5 first.  The supplemental affidavit states a specific amount

6 that Northwest Trustee was willing to waive.  Mr. Fennell's

7 testimony verifies that and verifies further that that was the

8 only amount intended to be waived and it was the only amount

9 knowingly waived.  So there was no voluntary or knowing waiver

10 of the expenses that are requested in these fee applications.

11          I don't think there is really a dispute about that.

12 So the question is really this pre versus post-petition issue

13 and I concede, Your Honor that --

14          THE COURT:  Well.

15          MR. WISLER:  Go ahead.

16          THE COURT:  How do we get it?  Well I guess -- I

17 signed an order submitted under certification of counsel and it

18 has provisions saying that they waived these amounts.

19          MR. WISLER: Yes, Your Honor.  Perhaps we save that

20 for the end because the words of your order sort of beg the

21 question that is presented.  What is the pre-petition amount?

22          THE COURT:  Fair enough, fair enough.

23          MR. WISLER:  I concede that the case law in its

24 surface at first glance appears to be against us, but if you

25 look at the cases, specifically the ones cited by the debtors

1  in their papers, none of them analyze the statutory framework

2  here or the equitable facts here.  Northwest Trustee's

3  applications are under Section 330.  They are not under

4  503(b)(1).  They seek reimbursement of expenses.  They do not

5  seek a claim.

6      The <u>Montgomery Ward</u> case teaches us that when

7  congress uses different words it intended to use different

8  words.  In the <u>Montgomery Ward</u> case the Third Circuit looked at

9  the word obligation in 502 -- 365(d)(3) and said obligation

10  must mean something different that claim.  Section 330 says

11  expenses.  It doesn't say claim.

12      We know those terms are different because the very

13  first line of Section 507 says the following expenses and

14  claims have priority in following order.  Now if they were the

15  same thing, congress wouldn't have used those words.

16  Therefore, arguments and case law talking about what a pre-

17  petition claim is and is not doesn't apply here.

18      Also, Your Honor, if you look at Section 328, 330,

19  331, not one of those sections contains a word about pre-

20  petition or post-petition.  Not one of them and not 330 in

21  particular has the requirement that expenses must be incurred,

22  paid or anything else pre-petition as opposed to post-petition.

23  All Section 330 requires is actual and necessary.  If they are

24  both actual and necessary, the Court may award reimbursement.

25  The undisputed evidence here shows his expenses were actual and

1 they were necessary so the U.S. Trustee is entitled to

2 reimbursement.

3         Just to complete the statutory analysis, Your Honor,

4 you can go to 503(B) or 503(b)(1) allows actual necessary costs

5 and expenses of preserving the estate and when you go to little

6 I it talks about services rendered after the commencement of

7 the case.

8         THE COURT:  Where are you?  I'm sorry.

9         MR. WISLER: I'm under 503(b)(1)(a)(i).

10         THE COURT:  Wages, salaries.

11         MR. WISLER:  And commissions for services rendered

12 after the commencement of the case.  Look at ii.  It talks

13 about wages and benefits, skip some words, attributable to any

14 period of time occurring after the commencement of the case.

15 Neither those words nor those types of words appear in Section

16 330 or 328 or 331.

17         THE COURT:  What about 327?

18         MR. WISLER:  Not at 327 either.

19         THE COURT:  But it requires you to be disinterested.

20         MR. WISLER:  They are.

21         THE COURT:  And if you go to disinterested, it can't

22 be a creditor.

23         MR. WISLER:  And a creditor holds a claim, a right to

24 payment.  So that brings us to the next issue which I don't

25 think Your Honor needs to reach because Section 330 in and of

1  itself has been met here.  But if we need to look at right to

2  payment, we know from the undisputed evidence that Northwest

3  Trustee could not have issued an invoice for payment pre-

4  petition for the dispute of expenses.  They had no ability to

5  manipulate the timing of the foreclosures so that they get to

6  the invoice -- I'm sorry, they get the right to payment before

7  and after bankruptcy.  They couldn't have sued for the recovery

8  of the disputed expenses.  They couldn't have billed them.

9  They weren't due.  So Northwest Trustee services had no right

10  to payment for these disputed expenses pre-petition.

11        Again, I don't think the Court needs to reach that

12  issue because we've met the standards of Section 330.  Well

13  let's look at what AHM is saying in their objection.  They are

14  saying well look at the dates the work was ordered where the

15  vendors did the work or either the date that the vendors did

16  their work is irrelevant.

17        If I bill for my copy costs and I'm an estate

18  professional I don't have to go back to when I got the reams of

19  paper in my copier or when I got them shipped into my firm or

20  when the copier arrived.  This a package deal.  It's a one sold

21  animal.  It's a foreclosure.  All the expenses lead up to that

22  foreclosure event and that's the well established terms and

23  course of dealing in this business.  If you don't get paid

24  until foreclosure is resolved, then there is no right to

25  payment until the foreclosure is resolved.

1          Even further than that I think Section 330 and of

2    course 105 give Your Honor discretion to look at the equities

3    of the situation.  Here we've got a huge benefit to the estate,

4    hundreds of millions of dollars in loans recovered post-

5    petition for the benefit of the post-petition estate all

6    because of the work done by this profession who is currently

7    out $430,000 in expenses.  AHM induced Northwest Trustee to

8    continue work.  Business as usual.  Hurry up.  We have to keep

9    these going.  And that made sense in the context of this case.

10   AHM is certainly couldn't afford --

11          THE COURT:  They haven't -- he hasn't -- your client

12   has relied on the detriment -- his detriment to that because he

13   wouldn't have been paid.  Those obligations were already

14   incurred so he either stops work and doesn't do any more

15   foreclosures and then those people either pays or doesn't pay

16   those people or he keeps doing work and generates new business.

17   But he either pays or he doesn't pay those people regardless of

18   whether he gets reimbursed.  One way or the other he is not

19   incurring any new debt post-petition on reliance of the

20   debtor's hiring him that he's not now getting paid for.

21          MR. WISLER:  What Mr. Fennell would tell you is that

22   some of those costs could be recovered if they did not proceed

23   to foreclosure resolution.  I would have to call him back to

24   proffer his evidence to say that.

25          THE COURT:  They just stopped.  They could have sued

1  the debtor but it would have been a pre-petition claim.

2          MR. WISLER:  No what I'm saying, Your Honor, if they

3  had stopped.  If they had said stop we don't want you to do

4  this foreclosure under the industry standards that Northwest

5  Trustee operates in.  They would not have had to pay for the

6  title report and the title work which is as I recall the most

7  expensive of the work that's done.

8          THE COURT:  So the title report company eats it?

9  Eats the debt?

10         MR. WISLER:  As a courtesy for the work for that.

11         THE COURT:  To use a term of art.

12         MR. WISLER:  Yes.  The November 7 letter to ordinary

13 course professionals including Northwest Trustee Services, if

14 you look at the words it uses.

15         THE COURT:  Well that letter is schizophrenic is what

16 that letter is.  It says two different things.

17         MR. WISLER:  Well actually it doesn't Your Honor.

18 Well although I don't know exactly what Your Honor is referring

19 to but it does say your pre-petition course of dealing with the

20 debtors determines the allegation of approval fees.  Well we

21 know what the organization --

22         THE COURT:  Right, but then it says but you don't get

23 a pay for anything that wasn't incurred.

24         MR. WISLER:  But look at the title of that section,

25 Your honor.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  No pre-petition invoices.

2            MR. WISLER:  Right.  There weren't any.  Those were

3  waived.  Then look at the second Exhibit B.   Then Your Honor

4  look at the modified procedures order that Your Honor entered.

5            MR. LUNN:  Your Honor, I hate to interrupt but they

6  are not an ordinary course professional.  The letters to an

7  ordinary course professional.  They were redeemed under 327(a).

8            THE COURT:  Well we'll get to you.  You'll have a

9  chance.

10            MR. LUNN:  I didn't want to get too astray, too far

11  with procedures.

12            MR. WISLER:  Let me interrupt that for a second.

13  Northwest Trustee is absolutely an ordinary course

14  professional.  It was retained under 327(a).  That doesn't

15  change the characterization of what they were, certainly not in

16  the debtor's eyes since they sent this letter to Northwest

17  Trustee Services after Your Honor's order was entered.

18            THE COURT:  All professionals are retained either

19  through 327(a) or 327(e).  Ordinary course professional

20  programs deal with how we pay for them and how we generate the

21  invoices.   So are they covered under the ordinary course

22  professional motion for the payment and generation of invoices?

23  Mr. Lunn is shaking his head no.

24            MR. WISLER:  They were not retained under the

25  ordinary course professional motion.  That is correct, Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor.

2          THE COURT:  it may not matter but.

3          MR. WISLER:  Right, they were retained under separate

4  application and I think Mr. Lunn will agree with this because

5  the volume of work generated was too high.

6          THE COURT:  Right.

7          MR. WISLER:  In any event just to complete the

8  thought, Your Honor.  The modified foreclosure professional

9  procedures that are attached to Your Honor's order from

10 February 7 prohibit the billing of expenses advanced prior to

11 the petition date.  Evidence shows these expenses were not

12 advanced except with the exception of minimal mailing costs.

13         We're not asking Your Honor to make new law.  I'm

14 asking you to approve the reimbursement of expenses that have

15 been requested in these two applications under Section 330

16 which is the statutory basis of the application.  The expenses

17 are actual and they are necessary.  And just for comparison,

18 Your Honor, even if they were pre-petition expenses under, in

19 the Court's mind, pre-petition expenses were paid under the

20 critical vendors motion under Section 105.  I understand that

21 motion and that order was up to the debtor's discretion and in

22 their discretion they chose not to pay Northwest Trustee but

23 they did pay other foreclosure professionals in the same

24 situation.

25         But importantly, if Your Honor had the discretion to

1  enter that order, then Your Honor has the discretion even if

2  you don't think we fit squarely into Section 330 to award the

3  reimbursement of these expenses.

4        THE COURT:  Well, if it's a claim that all -- your

5  whole argument rests on that, that idea that it's not a claim

6  because that defeats your disinterest in it.

7        MR. WISLER:  Only if it's a pre-petition claim.

8        THE COURT:  Right.  But if it's a claim the case law

9  is pretty clear that it is a pre-petition claim.  You told me

10 to ignore that case law because it doesn't really help because

11 there is a difference between an expense and a claim, but if I

12 consider it a claim they are pre-petition claims.

13       MR. WISLER:  Well Your Honor can rule that way but my

14 argument is different because what case law says is a claim has

15 a right to payment.  I think the evidence is clearly

16 established that there was no right to payment pre-petition so

17 it can not be a pre-petition claim.

18       THE COURT:  Well but it says whether matured or

19 unmatured, liquidated or unliquidated notwithstanding, you

20 know, regardless of whether reduced to judgment.

21       MR. WISLER:  Right, all under circumstances unlike

22 this.

23       THE COURT:  Okay.

24       MR. WISLER:  Your Honor, I just want to --

25       THE COURT:  Your argument is it is nothing, it's not

**J&J COURT TRANSCRIBERS, INC.**

1 a pre-petition claim either.

2          MR. WISLER:  That's correct.

3          THE COURT:  Then I don't need 105.

4          MR. WISLER:  Well I'm arguing the alternative.

5          THE COURT:  I don't need 105 to pay a pre-petition

6 claim under critical trade vendor motion because I can't

7 because it can't be an administrative claim because it's pre-

8 petition claim.

9          MR. WISLER:  Let me clarify, Your Honor.  First Your

10 Honor should award reimbursement of these expenses because they

11 were both actual and necessary and those are the only statutory

12 requirements that I need to meet.  Number two, if the Court

13 deems this to be a claim it's a post-petition claim because we

14 had no right to payment.  Number three, if Your Honor deems

15 that a claim and a pre-petition claim then under Section 105 in

16 the equitable situation -- the equitable facts and

17 circumstances here, Your Honor should award it in Your Honor's

18 equitable discretion.

19          THE COURT:  And that part -- I got the first two

20 arguments.  The third argument is where I put a stop on you

21 because if I decide it's a pre-petition claim you can't assert

22 it because then you are no longer disinterested.  I can't use

23 my equity, equitable powers to overrule the disinterest in it.

24          MR. WISLER:  I understand Your Honor.  Maybe I'll

25 think about that for a minute.

1          THE COURT:  That was the discussion I was trying to

2  have very unartfully so I apologize.

3          MR. WISLER:  I apologize as well Your Honor.

4          THE COURT:  All right.  Then we both apologized.

5          MR. WISLER:  One note that I just want to add at the

6  end.  To the extent that we don't recover these fees, we may

7  seek some remedy under constructive trust because as Mr.

8  Fennell testified AHM has received reimbursement for some of

9  these expenses that it doesn't want to reimburse Northwest

10 Trustee for.  Whether we have a right to make that claim or

11 whether we have such claim is something for a different day but

12 I'm not making that argument today nor am I waiving that

13 argument.

14         THE COURT:  All right.  There was one little bit, you

15 were with your client on and I understand the concept of

16 retention order says what it says and he didn't see it.  In any

17 event it was you asked him whether he had knowingly and then

18 there was an objection, but you asked him whether he had waived

19 in connection with his fee application I think the pre-petition

20 claims or previous hearings.  Is there an argument that I'm

21 missing that the debtors are making that something in the

22 previous order approving the fees was a waiver?

23         MR. WISLER:  My understanding of the debtor's

24 argument is that what I've called the disputed expenses,

25 expenses included in the first and second part of the fee

1  applications were waived.

2       THE COURT:  By the retention order?

3       MR. WISLER: I don't think it was specific.

4       THE COURT:  Oh, all right.

5       MR. WISLER:  But probably.  But I'll let them make

6  their arguments.

7       THE COURT:  The reason I was asking is I understand

8  that's what the retention order -- well it says what it says

9  but the way you were asking the question seemed to imply maybe

10 there was more to the argument.  I was wondering whether there

11 was an argument that something in my previous fee order or

12 something like that had constituted a waiver.

13      MR. WISLER:  No, I'm sorry that they didn't come out

14 clearly.  What I was trying, I was asking the same question two

15 different ways.  I was asking if the waiver was restricted to

16 the 93,000 on the one hand and then I was asking the flip side

17 of that question did your waiver include anything that is in

18 your fee applications.  And the answer was no.

19      THE COURT:   Right.  All right.  That you, Mr.

20 Wisler.  Mr. McMahon.

21      MR. MCMAHON:  Good evening, Your Honor. Joseph

22 McMahon for the United States Trustee.  Your Honor we didn't

23 file papers with respect to this matter although I've given

24 that our office kind of finds itself in the middle of the

25 circumstances that produced potentially the situation that is

1 before Your Honor.  I'd like to be heard.

2         THE COURT:  Yes, please.

3         MR. MCMAHON:  Just to give the Court some background

4 what Your Honor occurred via the record made by both counsel

5 and testimonies essentially accurate.  We received an

6 application to retain Northwest Services under Section 327(e)

7 of the bankruptcy code.  Noted that 327(e) only allows the

8 retention of attorneys.  Attorney is a defined term in the

9 bankruptcy code.

10         Given that we were dealing with an entity with an

11 Inc. at the end of its name our office, specifically me,

12 directed some questions to debtor's counsel as to whether we

13 were dealing with an attorney. The answer was no and that's

14 what led to the switch to an essentially a Section 327(a)

15 application with the supplemental affidavit.  That was

16 submitted and I can tell the Court that if we refer back to

17 Exhibit 3, Paragraph 10 of the supplemental affidavit, I will

18 note that there is no specific reference to invoices issued.

19 It just says approximately $93,000 for pre-petition services

20 and fees and that Northwest Trustee was waiving the pre-

21 petition fee against the debtors.

22         What was also left out of the dialogue on this

23 matter, Your Honor, is if we turn to Paragraph 12 just the very

24 next page Northwest Trustee gives the disinterested person

25 representation that Your Honor referred to that is requisite

1 for Section 327(a) professionals and in 12(a) represents that

2 the company, its officers and employees are not creditors.

3 It's fairly clear.

4        Based on that representation, Your Honor, and the

5 additional language in the order which frankly Your Honor I

6 don't see as being somehow inconsistent with what was

7 represented in the affidavit at the time nor do I today.  We

8 were willing to consent to the retention.  One thing that is

9 important to note here, Your Honor, that even though this isn't

10 a Section 327(e) application, there are a number of foreclosure

11 professionals that are laboring under Section 327(e), either as

12 separately retained via application or as ordinary course

13 professionals.  And presumably if they had pre-petition

14 charges, expenses for foreclosure services the best position

15 that they could be in would be to be left with a pre-petition

16 claim for those amounts that are due and owing as of the

17 petition date.  Meaning that today would be, to the extent

18 that the Court would find that, that claim did not render some

19 type of adversity with respect to the matters upon which they

20 were being retained, would be able to assert that claim as a

21 general unsecured claim against the debtor's estates assuming

22 that they didn't have a retainer or security or something that

23 could be applied with respect to that.

24        So let's go back to the legal argument here.

25 Northwest counsel jumped ahead to Section 503 and 330 and what

1  the payment rights are.  I think the Court had the focus right

2  which is the 327(a) the professional has to be disinterested,

3  consistent with the record that was developed in this case they

4  waived their pre-petition claims and Your Honor is right with

5  respect to the definition of the term claim, as in Section

6  1015(a) the term creditor referring to that from 1010, a right

7  to payment whether such right and it goes on and it says fixed

8  or contingent.  Contingent presumably could refer to upon the

9  submission of an invoice.  Matured or unmatured, again this

10 situation could easily fall into the -- one of those two terms.

11           The bottom line is that it's a broad language that

12 refers to any right to payment.  And sitting behind counsel

13 listening to the arguments I'm a bit confused by Northwest's

14 argument here.  Let me pose a hypothetical.  Let's assume that

15 instead of filing for bankruptcy protection American Home on

16 August 6, 2007 just shut down completely.  No further

17 operations.  I gather that taking Northwest's logic to its

18 conclusion as has been submitted here, they are out of luck

19 with respect to the foreclosures that were pending for which

20 they had not rendered an invoice because they would have no

21 right to payment.  Sorry, in other words, it was a race for the

22 door because the business successfully shut down before

23 Northwest issued an invoice.  There was no right for payment.

24           Presumably Northwest isn't taking that position today

25 and I think that that simple hypothetical crystalizes the

1    problem with what Northwest is arguing.  So what is going on

2    here today?

3          Well in our view Northwest is caught in an

4    unfortunate situation but we have to resort to the maxim that

5    equity follows the law.  The case that we heard put on here is

6    an evidentiary matter here today Your Honor is something that I

7    would consider more akin to the situation where you have a nunc

8    pro tunc retention.  In other words, the professional is trying

9    to identify equitable concerns that were just -- that would

10   identify extraordinary circumstances that would justify

11   retention to a date earlier in the cases.

12         Here we have a strict factual predicate where a

13   professional waived pre-petition claims asserted in an

14   affidavit filed under propoundity of perjury that it had no

15   pre-petition claims and there was a final court order entered

16   that memorialized that fact.  Therefore, with respect to when

17   we get to the 503(b)(1) and (b)(2) issues or anything dealing

18   with 503 that counsel raises, two points.

19         First is that if you are a professional you get to

20   bill for your post-petition bills and expenses under 330 and

21   503(b)(2).  We have to read that in connection with the 327

22   provision which of course requires a professional to waive its

23   pre-petition claims.  Obviously as a matter of statutory

24   interpretation it doesn't make that much sense to read 330 and

25   503 in a way that allows a non-disinterested professional to

1  bootstrap a pre-petition claim into a post-petition claim and

2  seek payment of it post-petition.  So to the extent that that

3  is the argument being advanced by Northwest, it can not

4  succeed.

5       The other source of authority that the Court could

6  look to is the Third Circuit case of FS Air Lease where there

7  was an issue with respect to nunc pro tunc retention of a

8  professional and after the Court said no, you know, you can't

9  come in under Section 327.  The professional said okay well pay

10 me under 503(b)(1)(a).  The bankruptcy court said no you've got

11 to -- you can't meet the structures of professional retention

12 under the bankruptcy code.  We're not going to let you use 503

13 to end run those requirements.

14      Another source of guidance from the Third Circuit

15 that's instructed here is United States Trustee v.

16 PriceWaterhouse which is a Third Circuit case where in fact it

17 dealt with an issue of a pre-petition claim that

18 PriceWaterhouse Cooper was attempting to assert.  And basically

19 the fallback argument that was advanced by PriceWaterhouse

20 Cooper -- PriceWaterhouse, excuse me, in that circumstance in

21 that published Third Circuit case was well notwithstanding the

22 fact that they hold a pre-petition claim we should allow them

23 to be retained because they are necessary for the engagement or

24 they are good professionals.  We know them.  And the Third

25 Circuit said, no equitable concerns don't carry the day here.

1 Following the maxim that equity follows the law, the Third

2 Circuit refused.

3       They told the pre-petition claimant they weren't

4 capable of being retained.  So with respect to that Your Honor

5 the Third Circuit law is pretty clear.  There is one of the

6 Heckinger cases refers to use of Section 105.  It can only be

7 done so in connection with an authorized section of the code

8 which allows the Court to act and without a code section under

9 which to act, to the extent that 327 and 330 in conjunction

10 would prohibit the payment of the expenses that we're talking

11 about here then 105 doesn't authorize the Court to use that

12 section.

13       Your Honor, I have some experience in this line of

14 work prior to coming to the U.S. Trustee's Office.  I have a

15 general understanding of how it works and I can certainly

16 understand the circumstances which led to this situation today.

17 That being said, I think we've gotten some things taken care of

18 but the retention stage and we're attempting to revisit them

19 now.  Even if we were all here and had this debate at the

20 retention end -- I guess the question I am asking is after we

21 put on these arguments where do we end up.  I think it's

22 basically the same stop which is these particular costs of

23 foreclosure are not reimbursable because they were pre-petition

24 claims and in the event that the professional wants to be

25 retained under Section 327(a) would have had to waive those

1  costs.

2           I don't have anything further.  If the Court?

3           THE COURT:  No, thank you Mr. McMahon.

4           MR. MCMAHON:  Thank you, Your Honor.  Thank you.

5           MR. LUNN:  If I may first respond to a few points

6  that Mr. Wisler made.  The waiver language in the underlying

7  order, Your Honor, it's our standard practice meaning Young

8  Conaway's practice to submit that order, to send it to

9  professionals prior to the submission of certification of

10 counsel so I'm 100 percent confident that the order was

11 provided.  Regardless we would have served that order on

12 Northwest Trustee.  They had the ability to file a motion for

13 reconsideration if they did not agree with the underlying

14 order.

15          Point number two, the pre-petition claim aspect and

16 draw upon this paper analogy, these reams of paper, it just

17 doesn't work Your Honor.

18          THE COURT:  Who drafted the order?

19          MR. LUNN:  Young Conaway would have.

20          THE COURT:  I mean you filed this.  The certification

21 was filed by you.

22          MR. LUNN:  Then I would have -- I don't recall Your

23 Honor providing them per se to represent to you 100 percent

24 confidently that I sent it to them, but it's my standard

25 practice Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Can we -- do these numbers help at all or

2    is that just these are just general random numbers generated by

3    your system?

4              MR. LUNN:  Those are just, at the bottom the footers?

5              THE COURT:  Yes, the docket number, document numbers.

6              MR. LUNN:  I'm referring to an email that I would

7    have sent to them with a blackline to show here's the

8    resolution of the informal objection from the United States

9    Trustee's Office.  This is the reason why this is required.  We

10   had to change your retention from 3.78 and attempted to work.

11   And Your Honor Young Conaway --

12             THE COURT:  The order says pre-petition amounts, it

13   doesn't say pre-petition claim.  At least the blackline says

14   pre-petition amounts.

15             MR. WISLER:  That's what it says, Your Honor.

16             THE COURT:  Yes.  I don't now what that --  go ahead.

17             MR. LUNN: I want to kind of take that paper analogy a

18   little bit.  The reams of paper that we may buy pre-petition

19   and then if you take for example -- when you get ready to file

20   cases, Your Honor knows from practice, you prepare reams and

21   reams of paper, copies.  First day binders go to the U.S.

22   Trustee's Office.  They go to the uninterested parties even

23   before you file.  If you take what Northwest Trustee is trying

24   to say is that the copy charges that Young Conaway or any other

25   firm would be charged say by parcels, we don't need to pay that

1  or that doesn't need to be paid and it can be paid after the

2  petition date as opposed to maybe taking it out of the retainer

3  right before you filed to avoid having a claim.  Their analogy

4  just doesn't work, Your Honor.

5          Fourth, or I guess it's my third point, they said

6  that the date --

7          THE COURT:  I'm trying to understand your argument.

8  So your argument is that Mr. Wisler is in effect arguing that

9  you don't need to pay parcels for the pre-petition amounts you

10 owe them before you file a case.  You can pay them one week

11 into the case and still get reimbursed by the estate.

12         MR. LUNN:  That's correct.

13         THE COURT:  That's not the standard practice.

14         MR. LUNN:  That's correct, Your Honor.  Otherwise

15 that is a -- those services were rendered prior to the petition

16 date.  Those copy charges are pre-petition charges.  They have

17 to be paid under the 327(a).  You need to be disinterested.

18 That would be a claim.

19         THE COURT:  Well he would argue it's an expense.  I

20 would apposite and say claim for reimbursement for an expense.

21         MR. LUNN:  Right.

22         THE COURT:  Which makes it a claim.  Just like it's a

23 claim for compensation.  The statute actually, 330 doesn't say

24 claim at all.  It says compensation or reimbursement of

25 expenses.  It's a claim administrative or unsecured or secured,

1  whatever, for compensation and reimbursement of expenses.  If

2  that's the way the statute reads, the way I read the statute,

3  then does that resolve the issue or can I nonetheless pay it

4  even though it's a -- that gets to when it accrued I guess.

5  His argument would be what if your course of dealing with

6  parcels was 30 days.  That usually is the course of dealing

7  with parcels but you alter it to avoid the issue of 327.

8         Now are you doing that because that's the way it's

9  always been done or are you doing that because it's the way the

10 code says it needs to be done?

11        MR. LUNN:  We're doing it to avoid having a claim.

12 Whether or not the whole accounting function and I don't know

13 what these accountants do that are down in the accounting

14 department, but nonetheless that amount is set aside so that

15 that amount is paid prior to the petition date.  So that we are

16 not in a position where we hold a claim against the debtor.  I

17 think what Your Honor is going towards and maybe I'm wrong but

18 a contingent claim on a 1015 is still a claim.  The fact that

19 maybe invoice hadn't been submitted doesn't change the fact

20 that it's been done pre-petition or done at a certain time and

21 ultimately we come payable whether upon presentment of that

22 invoice or not.  It's still a claim.  The date of the services

23 that were rendered here in the instance where the debtors are

24 objecting are all to services rendered, for fees or not fees

25 but costs incurred prior to the petition date.

1       As Exhibit D-1 showed there are numbers, and I only

2  pulled one Your Honor because there are tens of these invoices

3  with dates that are pre-petition dates, it doesn't change the

4  fact that these were --

5       THE COURT:  That's undisputed.  I mean, you don't

6  dispute the fact that -- I don't think anyone disputes the fact

7  that the work was done pre-petition, i.e. the expenses were

8  ordered pre-petition but paid post-petition.  I mean the facts

9  aren't in dispute.

10      MR. LUNN:  I guess that's correct, Your Honor.

11      THE COURT:  You don't dispute the Court dealing

12  either that that's when they get paid.

13      MR. LUNN:  That's correct Your Honor.

14      THE COURT:  This is an issue of bankruptcy code

15  semantics, right?

16      MR. LUNN:  Correct.  Your Honor, to the equities

17  point raised by Northwest Trustee, I would just note that we've

18  taken this position with respect to all the other foreclosure

19  professionals.  To my knowledge, Northwest Trustee is the only

20  one who is objecting to the debtor's position with respect to

21  these types of fees and costs.  Moreover, they could have taken

22  or requested a retainer pre-petition not post-petition but

23  nonetheless they could have insulated themselves from the

24  scenario such as this.

25      Coming full circle, Your Honor, I think this is quite

1  simple.  We boil it all down that these are simply the costs

2  that Northwest Trustee incurred in connection with foreclosures

3  pre-petition under the order and under the supplemental

4  affidavit, those costs have been waived.  The fact that

5  Northwest Trustee did not invoice the debtors for these amounts

6  until after the petition date, again doesn't alter the fact

7  that they were performed pre-petition and are pre-petition fees

8  and expenses.  And if as Mr. McMahon pointed out, if we had

9  shut down as a petition date and we had no longer operated any

10 longer, those fees and expenses would have been due that time.

11         Your Honor, I want to point you to one case in

12 particular and it's been cited in our papers.  This is <u>United</u>

13 <u>States Trustee v. First Jersey Security Inc.</u> and the cite is

14 180 F 3d 504 and the pinpoint is 511.  Specifically I'm just

15 going to read it.  It says we agree with our sister circuits in

16 other courts that legal claims arise when the legal services

17 are performed not when the bill itself is presented to the

18 client.  This falls right in line with that quote, Your Honor.

19 The fact that they are presenting us with a post-petition or an

20 invoice post-petition doesn't alter the fact that the services

21 were rendered pre-petition.

22         THE COURT:  Thank you.

23         MR. POWER:  Your Honor, I promise to be very quick.

24 I don't think I can add much.  I was thinking the analogy which

25 happens rarer and rarer these recent days, but if I take my

1  wife to dinner on the first of the month and I charge it and my

2  credit card isn't billed til the 10th of the following month

3  that doesn't mean that I didn't incur a liability on the first

4  of the month.  I clearly did and I will owe that bill when the

5  time comes for it to be paid.

6        There is no difference whatsoever in this

7  circumstance where unfortunately this vendor basically incurred

8  liabilities on behalf of the debtor.  Those services provided

9  the testimony was very clear that they were completed and done.

10  The vendor had finished all it needed to do to be owed the

11  money.  At that point, it's just a matter of time.  We're just

12  waiting for a time in which that bill will be due.  That is a

13  claim and there's just really no issue as far as I can  see as

14  to whether that's a claim here.

15        The other thing I will mention Your Honor is we were,

16  the committee was a part of this retention process along with

17  the U.S. Trustee.  We looked at every ordinary course

18  professional.  We looked at every party to see where they fell

19  in terms of the dollar numbers and how they stood.  We saw this

20  order.  We read this as a waiver of all claims, pre-petition

21  claims.  It really, it says pre-petition amounts quite frankly

22  but we viewed that as a waiver.

23        We have to rely on the order that is submitted and

24  presented by the Court as do all of the creditors.  This case

25  was very, if Your Honor recalls, we had a lot of issues

1  regarding the service advances here and how the parties were

2  going to be reimbursed, and a lot of decisions were made based

3  on what the amounts were and how much is being incurred.  If

4  the committee had known that this claimant was going to come in

5  and argue three months later that in fact they were owed

6  $400,000 going into the retention before they even got started

7  there would have been a much different issue about whether we

8  would have ever signed off on this firm's retention.

9          There are other firms that do this work that could

10 have taken over and as the witness testified his firm -- the

11 moment he was replaced, those monies were due.  It wasn't a

12 matter of waiting for foreclosure.  There would be other

13 circumstances those monies were due as well and there could

14 have been other foreclosure professionals that could have been

15 put in place here.  But they weren't because our understanding

16 was there was no pre-petition amount so it was just for the

17 going forward work that we were dealing with.

18         So from the committee's point of view we were trying

19 to protect the estate and really trying to preserve that issue.

20 The only other thing I would mention when I look at this issue

21 and I'm very sensitive because I understand that there is a

22 professional that got hurt here as a lot of people did in this

23 case.  But, when they filed their first monthly fee application

24 in November the order was attached, the retention order was

25 attached at that point.  When the witness was saying I reviewed

1 the application and I saw it and I looked over it, they had the

2 order four or five months ago.  I personally, I have no idea

3 Your Honor.  I know the committee would have seen this order

4 because I know Young Conaway gives us a copy of every order

5 before they submit it and makes sure that we sign off.  We're

6 always part of those emails.

7       But I do know this, this applicant has had this order

8 attached to its fee applications over the last six months and

9 we're now coming to the issue where they are claiming they

10 never saw the order.  They didn't realize it was waiver of pre-

11 petition amounts.  I just find that hard -- not really

12 credible.  They may not have realized what it said, they may

13 not have reviewed it, but there is no argument they can make

14 that they never saw it.

15       The committee supports the debtor's objection to the

16 motion and ask it be denied.

17       THE COURT:  Mr. Wisler, reply?

18       MR. WISLER:  Yes, Your Honor.  I'm trying to keep

19 track of all of this. Let me first be clear that the point of

20 the testimony about the order was we had gone through a number

21 of things like a retention application and the affidavit and I

22 asked Mr. Fennell if he had participated in the preparation.

23 He said no.  I was trying to make it clear to the Court that he

24 did not assist in the preparation of the order and he said he

25 did not see it before it was entered.

1          In fact, what the debtor's certification of counsel

2     that went with the order said is the debtors and the trustee

3     had agreed to certain changes in the order, not that Mr.

4     Fennell had, but had Mr. Fennell seen the order eventually

5     absolutely.  Did he attach it to his applications?  Absolutely.

6     Did he waive any -- intend to waive any more than his $93,000

7     worth of claims?  No, the testimony is undisputed. But I'm not

8     claiming that he never saw the order until today, certainly

9     not.

10         One of the problems Mr. McMahon absolutely has a

11    right to stand up here and object to anything he wants, but one

12    of the problems is his points are all new and I think in this

13    case misguided.  The entire first portion of his argument was

14    that we can't make an application for payment under 503(b)(1)

15    because you are retained.  I agree.  It's 503(b)(2).

16         Mr. McMahon's arguments are that no one else was paid

17    like this.  Well that's not true.  Foreclosure professionals

18    just like Northwest Trustee were paid under the critical vendor

19    motion.  In the debtor's application for modified procedures

20    they pointed out to the Court they had paid lots of them this

21    way just because that's the way it's done and that's the way it

22    happens.

23         The difference here is that we're filing an

24    application because we're retained under 327(a) not (e).  Well

25    that's because we're not a law firm.  But that can't make a

1  fundamental difference in what expenses under 330 are allowed

2  and not allowed.  330 says what 330 says.  There was an analogy

3  to parcels about pre-petition work.  Well Young Conaway's deal

4  with parcels isn't that they pay parcels when the bankruptcy is

5  over or concluded or resolved.  Their deal is they get paid in

6  30 days.  They get invoiced right away.  That's not the

7  arrangement that the testimony demonstrated exists between

8  Northwest and its vendors and Northwest and American Home

9  Mortgage.

10      Mr. McMahon analogized to a situation where there was

11  a shut down.  Again, we didn't see this argument coming.  But

12  what Mr. Fennell would testify and I proffer his testimony is

13  that a shut down would be a termination.  There would be a

14  call.  Do you want us to keep doing this?  Well nobody answers

15  the phone so that's probably a no or somebody says yes, stop.

16  That's a resolution.  At the resolution the bill is due.  So at

17  a shut down would the money be due?  Yes.  Was there a shut

18  down here?  No.  What there was here is business as usual.

19  Keep going and please hurry about it.

20      Mr. Lunn talks about how we're the only foreclosure

21  professional coming to the Court with this situation.  Well you

22  know what, Your Honor, there's 26 fee applications on the

23  docket for today.  We're the only one that was objected to.

24  And we have taken a glance at some of them.  And I didn't want

25  to get into this but you can see some of these foreclosure

1 professionals what they do is on the date, the third party

2 vendor date, they put the date they write the check which is

3 typically after the foreclosure.  In this case, post-petition

4 so it slides right by.

5        Young Conaway filed fee applications.  Their first

6 fee application expenses August 1 through 6, third party

7 vendors.  Nobody raises it happens.  There was a motion to

8 compel filed by another foreclosure professional.  That

9 professional talked about in an affidavit being paid under the

10 ordinary course procedures and being paid in full, broad,

11 complete, made whole.

12        We're the ones being treated differently.  The First

13 Jersey case was a 547 issue Your Honor.  Section 330 isn't

14 mentioned once in that case.  And it wasn't about expenses.  It

15 was about fees.  Why?  Because expenses aren't the services we

16 provided.  The vendors provided those services.  That's what

17 makes fees and expenses different.  First Jersey was all about

18 legal fees.  Fees aren't objected to here, only the

19 reimbursement of expenses.

20        Contrary to committee counsel statement there was no

21 evidence at all that the vendors were done and complete all of

22 their work prior to the petition date.  Whether they were or

23 not I don't know, but there wasn't any evidence about that.

24        All right, let's go back to the key point.  Every

25 argument against an award of reimbursement of expenses comes

1 down to it's a pre-petition claim.  It can't be a claim because
2 if claim and expense were the same thing 507 wouldn't use both
3 words.  We don't have a claim until Your Honor gives us the
4 award.  Section 330 says you can award reimbursement of
5 compensation if there are actual and necessary, not one person
6 has disputed that.

7        Then under 503(b)(2) I get an allowance of an
8 administrative expense for compensation and reimbursement
9 awarded under Section 330(a).  Then finally 507 the following
10 expenses and claims.  In this case expenses not claims have
11 priority.  Number two, second, administrative expenses.

12        Every argument against Northwest Trustee's position
13 is it's a claim, it is not a claim.  Remember Mr. Patton saying
14 earlier words matter.  They do.  Especially when congress uses
15 them in some places and not others.  I go back again there is
16 nothing in 330 that says anything about pre-petition versus
17 post-petition before the petition commencement of the case,
18 excuse me, or after the commencement of the case.

19        These expenses were actual and necessary to the post-
20 petition estate.  They brought a benefit to the post-petition
21 estate.  They are actual and necessary.  Northwest Trustee is
22 entitled to the order.

23        THE COURT:  Okay.  I'm going to have to take this
24 matter under advisement.  It's well a couple of things.  It's
25 important to the claimant of it requires more attention for

1  that reason and quite frankly it's more complicated than it

2  appears on it's face.  I don't really have a pleading from

3  Northwest that kind of lays out all these arguments.  It's not

4  really -- it's sort of in the fee application but what I'd like

5  is a short post-argument briefing on the matter and Mr. McMahon

6  if you want to submit something as well.  I'll kind of leave it

7  to the parties to sort of work out a schedule that makes sense.

8          I know I've received the debtor's objection.  If the

9  debtors don't wish to -- well what seems to make sense is to

10 have Mr. Wisler's client file a brief and then if you want to

11 respond let him know and Mr. Wisler I'll give you the last --

12 if you want to file a reply I'll give you the last bit of the

13 apple if you want it.  If you don't want to file one, you don't

14 need to.  Then when it's all done just submit it to me under

15 certification of completion of briefing.

16         We don't need further argument but I think I need

17 further written submissions especially on Mr. Wisler's position

18 and I'll give the committee, the debtor, and the U.S. Trustee

19 an opportunity to respond to whatever you submit.  Whatever is

20 -- I know your client doesn't want to spend any more money than

21 absolutely necessary.  I understand that.  You are already out

22 of pocket but it would be helpful to the Court.

23         MR. WISLER:  So as I understand it, I am filing the

24 next submission.

25         THE COURT:  Yes.

1          MR. WISLER:  Then the parties have the opportunity to

2  respond and I can reply should I choose to.

3          THE COURT:  If you wish, yes.

4          MR. WISLER: Understood, Your Honor.

5          THE COURT:  And that will be the end of it.  If you

6  want to do it by letter brief -- well do it by formal pleading

7  or you know brief.  Doesn't need to be a full blown brief with

8  all the tables and all that other stuff, but a memo of some

9  sort would be helpful and work out a schedule amongst you that

10 works.  I don't want to jam you up but I understand you want

11 the issue resolved and I'm happy to do that.  But I'm going to

12 need some more information.  I don't know how quickly you can

13 get the transcript.  If you can cite -- I don't think you'll

14 need to cite to the transcript.  I think the facts frankly are

15 undisputed 99 percent of them.  So it's a really an issue of

16 question of law.  As soon as I get it, I'll turn to it.

17         MR. WISLER:  Understood, Your Honor.

18         THE COURT:  All right.  Thank you.  Anything further

19 for today?

20         MR. LUNN:  Thank you very much, Your Honor, for a

21 very long day.  We appreciate your attention to all the

22 matters.

23         THE COURT:  You're welcome.  No, you're welcome.

24 Hearing is adjourned.  Thank you.  Have a pleasant evening.

25                    * * * * *


                    **J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

We, Patricia Repko, Elaine Howell, Vidhya Veerapan, Cecilia Ashbock and Lynn Schmitz, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Patricia Repko
PATRICIA REPKO


/s/ Elaine Howell
ELAINE HOWELL


/s/ Vidhya Veerappan
VIDHYA VEERAPPAN


/s/ Cecilia Ashbock
CECILIA ASHBOCK


/s/ Lynn Schmitz
LYNN SCHMITZ

J&J COURT TRANSCRIBERS, INC.          DATE:  April 23, 2008