UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No. 07-11047(CSS)
                              .
                              .
AMERICAN HOME MORTGAGE        .
HOLDINGS, INC.,               .    824 North Market Street
                              .    Wilmington, Delaware 19801
                              .
            Debtor.           .    April 16, 2008
. . . . . . . . . . . . . ..        10:10 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          Young Conaway Stargatt & Taylor LLP
                         By:  JOHN DORSEY, ESQ.
                              ROBERT BRADY, ESQ.
                              ROLIN BISSELL, ESQ. (Telephonic)
                              MATTHEW LUNN, ESQ.  (Telephonic)
                              SEAN BEACH, ESQ.
                         The Brandywine Building
                         1000 West Street, 17th Floor
                         Wilmington, DE  19899

                         Kroll, Zolfo & Cooper
                         By:  MITCHELL TAYLOR, ESQ.
                              (Telephonic)


Audio Operator:          Nikita Barksdale

TRANSCRIBED BY:          **DIANA DOMAN TRANSCRIBING**
                         **P.O. BOX 129**
                         **Gibbsboro, New Jersey 08026-0129**
                         **Office:    (856) 435-7172**
                         **Fax:       (856) 435-7124**
                         **E-Mail:    Dianadoman@comcast.net**


Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

APPEARANCES (cont'd):

For Bank of America:          Potter Anderson & Corroon, LLP
                             By:  LAURIE SELBER SILVERSTEIN, ESQ.
                             Hercules Plaza
                             1313 North Market St.
                             Wilmington, DE  19801

                             Kaye Scholer, LLP
                             By:  MYRON KIRSCHBAUM, ESQ.
                                  MARGOT SCHONHOLTZ, ESQ.
                                  ANA M. ALFONSO, ESQ.
                                  NICHOLAS CREMONA, ESQ.
                                  (Telephonic)
                             425 Park Avenue
                             New York, NY  10022

For WLR Recovery             Greenberg Traurig, LLP
Fund:                        By:  Sandra Selzer, ESQ.
                             The Nemours Building
                             1007 North Orange Street
                             Suite 1200
                             Wilmington, DE  19801

For the Creditors'           Hahn & Hessen, LLP
Committee:                   By:  MARK T. POWER, ESQ.
                                  EDWARD L. SCHNITZER, ESQ.
                             488 Madison Avenue
                             New York, NY  10022

For ABN AMRO Bank:           Milbank, Tweed, Hadley & McCloy, LLP
                             By:  ROBERT J. MOORE, ESQ.
                                  FRED NEUFELD, ESQ.
                             601 South Figueroa Street, 30th Floor
                             Los Angeles, CA 90017

**I N D E X**

                                                              **PAGE**

**WITNESSES:**
J. TODD WAMPLER
    Direct Examination by Ms. Schonholtz                         39
    Direct Examination by Mr. Power                              90
    Cross Examination by Mr. Dorsey                              96
    Redirect Examination by Ms. Schonholtz                     124


ROBERT BRANTHOVER
    Voir Dire by Mr. Kirschbaum                                 127
    Direct Examination by Mr. Kirschbaum                        140
    Cross Examination by Mr. Bissell                            182
    Redirect Examination by Mr. Kirschbaum                      195



**EXHIBITS:**                                           **ID.**     **EVD.**

BOA-2     Credit Agreement, 8-10-06                    --       93
BOA-3     AHM Guarantee                                --       93
BOA-4     Security & Collateral Agency Agreement       43       93
BOA-5     UCC Filings                                  43       93
BOA-30    Final Order                                  43       93
BOA-6     Agenda                                       49       93
BOA-7     Agenda                                       49       93
BOA-8     Draft Sale Procedures                        50       93
BOA-9     Response                                     50       93
BOA-10    E-mail, 11/6/07                              52       93
BOA-11    Detailed Analysis, First Page                54       93
BOA-12    Estimated Recovery Analysis                  58       --
BOA-13    E-Mail, Wampler to Kennedy                   66       93
BOA-14    Schedule Exposure Report                     66       94
BOA-15    E-Mail, Adequate Protection Stip             67       93
BOA-16    Plan by Kroll Zolfo Cooper                   70       93
BOA-17    Print-out with handwritten notes            70       93
BOA-23    FAS-14                                       77       94
BOA-24    Asset Quality Report                         77       95
BOA-25    FAS-114, Quarter Ending 3/31                 78       95
BOA-27    Document                                     80       95
BOA-28    Market Overview and Forecast                 82       95
BOA-39    Document                                     --      181
BOA-40    Document                                     --      181
BOA-41    Document                                     --      181
BOA-42    Document                                     --      181
BOA-43    Document                                     --      181
BOA-44    Document                                     --      181
BOA-47    Document                                     --      181
BOA-48    Document                                     --      181

INDEX (cont'd):

| **EXHIBITS**: | | **ID.** | **EVD.** |
|---|---|---|---|
| BOA-49 | Document | -- | 181 |
| BOA-50 | Document | -- | 181 |
| BOA-51 | Document | -- | 181 |

1          THE COURT:  Good morning.

2          MS. SCHONHOLTZ:  Good morning, Your Honor, Margot

3  Schonholtz on behalf of Bank of America as administrative agent

4  for itself and 20 other lenders under a 364 day revolving

5  credit agreement.  We are here this morning on Bank of

6  America's motion for relief from the automatic stay allowing

7  the administrative agent to exercise its rights as a secured

8  creditor.

9          Unlike many of the previous motions for stay relief

10  or adversaries filed with this Court, this is not a repurchase

11  agreement or a securitization scenario.  Rather, the

12  administrative agent seeks to lift the automatic stay so that

13  it can exercise its rights on behalf of the secured parties

14  under the security agreement to take control of certain

15  mortgage loans.  These loans are being held as collateral for

16  the debtors obligations under a revolving credit agreement, a

17  credit agreement that matured by its terms three days after the

18  debtors commenced these cases.

19          B of A and the lenders have moved for relief from the

20  stay because the debtors have left them no choice.  Although

21  the debtors announced on the first day of these cases that they

22  were liquidating all of their assets and that time was the

23  enemy, the debtors took no actions to liquidate this loan

24  portfolio, nor did they comply with the B of A's repeated

25  request to develop a sale plan or process for these mortgage

1  loans.  Instead, as we found out during discovery on this

2  matter, the debtors decided in late October or early November

3  not to sell these loans.

4         Why?  Because as the testimony will show, at that

5  time, in the debtor's view B of A and the other lenders could

6  have gotten out whole or close to whole, but there would not

7  have been any upside realized from these assets for the estate.

8         The debtors did not tell the secured parties any of

9  this, nor did they apparently tell the committee.  Instead,

10 they acted unilaterally to the detriment of all.  In response

11 to repeated requests to develop a sale process, the debtor

12 stalled and gave excuse after excuse, one of which actually

13 was, Christmas is coming.

14        During the months that B of A tried to work with the

15 debtors, the market value of its whole loan collateral has

16 declined precipitously.  The capital markets have frozen.  And

17 the quality of the loan portfolio has deteriorated.  All of

18 these trends have unfortunately continued unabated.

19        So, here we are almost nine months into this case

20 with virtually none of B of A's whole loan portfolio having

21 been marketed, no less sold.  Given the chaotic capital markets

22 conditions and the characteristics of this portfolio, if these

23 loans were offered for sale today, the banks would not get out

24 whole or even close to whole as they would have in October or

25 November.  Instead if sold today, there would be approximately

1  $150 million less proceeds from these loans.  Although it is

2  not our burden, that's what discovery has shown.

3          Under 362(d)(1) of the Code, the administrative agent

4  is entitled to relief from the automatic stay for cause.  Cause

5  is not defined in 362(d)(1).  The courts consider what

6  constitutes cause based on the totality of the circumstances in

7  each particular case.  The administrative agent has the burden

8  to present evidence sufficient to make out a prima facie case

9  for relief from the automatic stay.

10          To demonstrate cause in this case, the administrative

11  agent will prove that there has been and will continue to be a

12  decline in the value of this collateral securing the fully

13  matured indebtedness.  That issue, Your Honor, can hardly be

14  debated.  It will surprise no one who has read a newspaper

15  since August that the value of a portfolio of residential

16  mortgage loans has headed in one direction since then, and that

17  direction is down.

18          In fact, the debtor's expert admits as much and says,

19  now is not a good time to sell for that very reason.  Once the

20  administrative agent establishes its prima facie case, the

21  burden shifts to the debtors to go forward with evidence and

22  ultimately to prove that the collateral is not declining in

23  value or that the secured party is adequately protected.  We

24  submit that the debtors will be unable to carry their burden on

25  either ground.

1          The debtor's primary contention is that the value of

2     these mortgage loans has remained essentially static since the

3     petition date because as of the date the loan was made, the

4     actual future income potential for each of the mortgage loans

5     was fixed.  Put simply, the debtors argue that the market value

6     of these loans is wholly irrelevant and that the loans are

7     worth the actual cash flow that they generate over time.

8          This is wrong.  The relevant inquiry is what someone

9     will pay for these loans in the market based on accepted market

10    methodology for valuing them.  There is no question that that

11    value has declined.  As set forth in our pretrial memorandum,

12    this Court should consider the declining value of the mortgage

13    loans from the standpoint of what the administrative agent and

14    the lenders bargained for and obtained in their credit and

15    security agreements:  the right to sell, prepare for

16    disposition, or otherwise dispose of the mortgage loans which

17    are collateral for a fully matured and past due obligation.

18         In its case in chief, the administrative agent will

19    present two witnesses.  First, the agent will call J. Wampler,

20    a senior vice president of B of A who has been in charge of

21    B of A's relationship with the debtors since shortly before the

22    bankruptcies commenced.  Mr. Wampler will testify to the value

23    of the mortgage loan portfolio from the bankruptcy filing date

24    and moving forward.  Significantly, you will hear evidence from

25    Mr. Wampler that had the debtors sold the mortgage loans in

1  October or November, the secured parties could have gotten out

2  whole or close to whole.

3          But despite repeated requests by the administrative

4  agent, the debtors chose not to sell the mortgage loans in

5  October, November, or any time thereafter.  And that result,

6  Your Honor, has been nothing short of disastrous.  The banks

7  and the debtors' documents will show that mortgage loans that

8  were worth 95 cents on the dollar in August were worth around

9  85 to 86 cents on the dollar in October and November.  And by

10 the debtors' own admission, are now worth approximately 62

11 cents on the dollar.  Unquestionably, that has been a real and

12 significant decline in value.

13          Mr. Wampler will also testify that contrary to

14 debtors' assertions, the administrative agent does not

15 immediately intend to sell the mortgage loans in a fire sale

16 for any price it can get.  That was not the administrative

17 agent's intention when the lift stay motion was filed, and it

18 is not the administrative agent's intention today.

19          Mr. Wampler will explain how the bank intends to

20 maximize the value of these loans.  And in the process, Mr.

21 Wampler will demonstrate that as compared to the debtors, the

22 administrative agent is in a much better position to maximize

23 the value of this collateral.

24          Not surprisingly, Bank of America has capabilities,

25 resources, and experience, and expertise that are simply not

1  available to a bankrupt debtor which has shed much of its staff

2  and is in the process of liquidating.  The committee recognizes

3  this, and for that and other reasons supports the stay relief

4  motion.

5          The administrative agent's second witness will be

6  presented by my partner, Myron Kirschbaum.  Robert Branthover

7  is co-head of the Secondary Solutions department at the

8  Mortgage Industry Advisory Corporation.  Mr. Branthover has

9  responsibility for, among other things, evaluating residential

10 loan mortgage portfolios.  Mr. Branthover will testify that

11 residential mortgage loans are valued by calculating the

12 anticipated cash flow and applying a market discount rate which

13 takes into account the perceived risk related to the mortgage

14 loans at issue and mortgage loans in general.

15         Mr. Branthover will testify that the value of

16 residential mortgage loans generally has been declining and

17 likely will continue to decline for the foreseeable future.

18 Mr. Branthover will explain to the Court why mortgage loans

19 generally are declining in value and why the mortgage loans

20 held as collateral here are declining in value.

21         The debtors will be unable to rebut the

22 administrative agent's evidence in any meaningful way.  In

23 addition, the debtors will be unable to come forward with

24 evidence to support and satisfy their burden to prove that the

25 administrative agent's interest in these mortgage loans is

1    adequately protected.

2        The debtors will try to argue that a speculative

3    payout over a 14-year period is adequate protection for a fully

4    matured loan.  It isn't.  It's not what the secured parties

5    bargained for.  And it is not in any way equivalent to what

6    they are entitled to under any standard.

7        To prevent further value erosion and destruction, the

8    Court must decide which party is best suited to implement the

9    appropriate strategy to reclaim lost value on these assets if

10   possible.  Is it a liquidating debtor with no access to

11   capital, no economic interest in these assets, and a skeletal

12   staff that will be unemployed if the portfolio is disposed of

13   or is it one of the world's largest, most stable financial

14   institutions which is a major player in the residential

15   mortgage market and has the economic incentive to maximize

16   value?

17       In the end, the automatic stay should be lifted for

18   cause because the collateral is declining in value, is likely

19   to continue to decline, and the secured parties are not

20   adequately protected.  The unsecured creditors committee

21   supports this motion and wants the stay lifted so that it to

22   has an opportunity to see improved value in a reasonable time

23   frame.

24       As the evidence will show, the debtors' desire to

25   maintain control of these assets should not prevail over the

1 will of the only real parties in interest with respect to these

2 assets.  Thank you, Your Honor.

3          THE COURT:  Mr. Power?

4          MR. POWER:  Thank you, Your Honor, I'll be brief.

5 Mark Power from Hahn and Hessen, counsel for the committee.  As

6 Your Honor is well aware, Your Honor a few days ago proved the

7 settlement with the -- between the Bank of America and the

8 committee which under certain circumstances will permit a

9 sharing in the potential proceeds of these loans.

10          The committee recognizes and has always recognized

11 that we may not be in the money, but we do have a sharing

12 arrangement and no matter what, we would do better without

13 -- with that settlement than without depending on how these

14 loans do because we start sharing sooner than if B of A had

15 total control and we didn't have the sharing arrangement.

16          The committee supports the Bank of America's motion.

17 And I just want to briefly explain what the committee's

18 perspective on this is, Your Honor.  We quite frankly believe

19 the debtors' hold strategy was flawed.  We have seen a decline

20 in the market value of these loans since last August.  We've

21 been in this market in a lot of cases professionals in the

22 committee and nobody really argues that the market has

23 deteriorated.

24          The question now for everybody is, what's the best

25 way to maximize the value of the assets?  And I think the

13

1  evidence, Your Honor, will hear -- and at least from the

2  committee's perspective -- is these assets are not a single

3  rock, a single pool; they are a series of separate assets that

4  you have to approach them from different categories.  And the

5  question for the committee is who's the best party able to

6  maximize the value from those slivers of assets?  And Your

7  Honor will hear testimony, I believe, today which demonstrates

8  that in our view, Bank of America is in a better position

9  simply to try to maximize value.

10            And the reason is not because the debtor has done

11  anything wrong, it's simply given who the debtor is -- for

12  example, Bank of America being one of the largest institutions

13  in the mortgage industry has access to the agencies.  One of

14  the fundamental issues in these loans, a large pool could be

15  conventional, could be agency qualified loans.  It's -- they've

16  been kicked out.  Bank of America has the ability to go to the

17  agency, negotiate what can be added to the pool, work out

18  arrangements to make more of those loans conventional.  That

19  offers a tremendous increase in the value, I think Your Honor

20  will hear.

21            The debtor doesn't have access to the agency.  The

22  debtor has to use a middleman at the end of the day because

23  they have no access.  So, the debtor's not in a position to

24  take advantage of that avenue.

25            The other avenue the committee thinks is the best way

1  -- and we have -- you know, our experts think is -- the biggest

2  portfolio here is the optional ARMs, Your Honor.  And those

3  have a lot of issues with them because those loans in many

4  cases are negative amortization, they're not being paid

5  currently.  The principal balance is increasing, and they have

6  to be reworked.

7       In order to do that, the party reworking them has to

8  offer alternative financing.  Has to go to those homeowners and

9  say, I want to put you in a conventional loan that's agency

10  approved, that's going to have this interest rate, and this

11  arrangement.  And you have to do that on a loan by loan basis.

12  And that's the way in the committee's view to maximize those

13  values.

14       And when we look at who the party is who can do that,

15  quite frankly, it's the folks on the left who have the ability

16  to offer that financing arrangements.  The debtor can do it,

17  but it has to link up with the party to assist them in that

18  process.

19       And in our view, for that reason, we support B of A's

20  motion.  The balance of the loans -- there's a lot of different

21  segments.  But when we look at the entire pool, we think that B

22  of A is in a better position to maximize value whether the

23  estate will have equity in that, we don't now.  Whether the

24  deficiency claim will be less, we think it will be if the

25  motion is granted.  Therefore, the committee supports the

1  motion, Your Honor.

2          THE COURT:  Thank you.  Debtor?  Mr. Brady, good

3  morning.

4          MR. BRADY:  Good morning, Your Honor.  Robert Brady

5  on behalf of the debtors.  Your Honor, fundamentally, B of A's

6  motion is about control.  Who will control the disposition of

7  mortgage loans with an unpaid principal balance of

8  approximately $565 million to pay B of A's secured claim of

9  approximately $480 million.  Should it be the debtors who are

10 fiduciaries to all creditors in these cases or should it be

11 Bank of America who serves as an administrative agent for a

12 consortium of banks and whose only duties go to those secured

13 creditors?

14         Let's assume that today the stay is lifted.  And for

15 purposes of today's hearing, let's assume Bank of America will

16 then act in a commercially reasonable manner.  The problem is

17 that even if Bank of America acts in a commercially reasonable

18 manner in the disposition of these assets, those actions may

19 still not be in the best interest of the debtors' estates and

20 their creditors.

21         Their can be no dispute that a large deficiency

22 asserted -- deficiency claims asserted by Bank of America will

23 have a dramatic impact on the outcome and the recoveries in

24 this case.

25         Now, on Monday, the committee was very honest with

1  Your Honor when they told you that the only protections they

2  received in their settlement with B of A is that if B of A is

3  given the right to liquidate these loans, they must do so in

4  accordance with the loan documents, the security agreement and

5  applicable law of the UCC.  All of which Bank of America was

6  already obligated to do.

7        The fact is, as you would expect, the loan documents,

8  the security agreement are extremely broad and basically give

9  Bank of America the right to do whatever is in the bank groups

10 best interest.  And in reality, Bank of America could sell

11 these loans in as little as ten days.  And all the debtors of

12 the committee would have is a potential lawsuit.

13       Your Honor asked on Monday, what teeth are in the

14 settlement so that the committee can be sure it receives the

15 benefit of the bargain they struck with Bank of America?

16 Leaving the debtors in control of the disposition of these

17 assets is really the only effective way for the debtors and the

18 committee to try to realize value for the creditors, the

19 unsecured creditors from these assets, the only effective way

20 to realize value from the sharing arrangements the committee

21 negotiated, and the only effective to manage any potential

22 deficiency claim.

23       Now, the committee acknowledged in its reply on the

24 settlement that it has worked productively with the debtors

25 over the last nine months to maximize value.  And they believe

1  they'll be able to continue to work with the debtors for this

2  common goal and to resolve these cases.

3         We cannot forget, Your Honor, that the debtors, the

4  committee, and Bank of America have worked together in this

5  case with success.  We sold the servicing rights for an excess

6  of $1 billion -- half a billion dollars.  If it was a billion,

7  we wouldn't be here.

8         THE COURT:  Pretty soon it adds up to real money,

9  doesn't it?

10         MR. BRADY:  With the committee's consent, we were

11  able to deliver to Bank of America the price they wanted on the

12  construction loans and build value for the estate.  We were

13  able to sell certain non-performing loans out of the Bank of

14  America portfolio for a price that fell within the targeted

15  range of recoveries.  Have we bickered at times?  Have we

16  disagreed?  Sure. But we ask the Court to keep this dynamic in

17  place to protect the unsecured creditors of the estate.

18         Now, the committee and Bank of America told Your

19  Honor on Monday not to worry because as a result of the

20  settlement, the interest of the secured creditors and the

21  unsecured creditors are now aligned.  But let's explore that a

22  little further.  Exactly, who would the Court be turning

23  control over to if the Bank of America motion is granted?  Bank

24  of America serves as an administrative agent for a group of

25  banks including Calyon, JPMC, Credit Suisse, ABN AMRO, SocGen,

1  Citigroup, and the list goes on.

2       Bank of America itself only holds about 9.3 percent
3  of the debt.  The loan documents are clear that the holders of
4  51 percent of the debt can direct the administrative agent to
5  take actions.  So, Bank of America does not call the shots in
6  connection with this loan facility.

7       You also heard that this is a bank group that put its
8  money at risk on a relatively short term basis with the
9  anticipation that they would be repaid with a certain return,
10  that the banks could then go redeploy that capital in some
11  other wealth producing investment.  They may not have
12  anticipated that they'd be required to hold a long term debt
13  instrument as collateral and wait some portion of time while
14  that debt instrument pays itself off.

15       These banks are not in the storage business, Your
16  Honor.  They're in the recycling business.  Concepts like lost
17  opportunity cost, redeployment of capital, internal rate of
18  return are major factors in their decision making process.  The
19  unsecured creditors in this case hope to receive a recovery on
20  their claims.  We really fail to see how those two goals are
21  aligned.  Also, these banks have another option available.
22  They can sell their debt.

23       The makeup of this bank group could change and
24  therefore their plans could change.  The debt could be acquired
25  perhaps at a discount.  And the new holders could have a very

1   different agenda with very different motivations.  You could

2   have a new control group, new pricing, and a reset on the

3   target internal rate of returns.  So, even if the Court, Bank

4   of America, and the committee all agreed today that this bank

5   group's interests are aligned with the unsecured creditors,

6   there is no assurance that a new control group would have the

7   same interest.  And there's no protection against that.

8        If the Court allows the debtors to continue in

9   possession, there will be transparency.  All creditors will

10  have access to the process of disposing of these assets or

11  their treatment under a Chapter 11 plan.

12       Now, you have heard that Bank of America. I think.

13  now agrees that the debtors -- with the debtors that some of

14  these loans should not be sold immediately.  They agree that

15  there may be other opportunities or strategies to maximize

16  value.  B of A's assertion basically though is that they could

17  do it better, that they have more tools in the tool box than

18  the debtors.  That's a point the debtors don't necessarily

19  concede, but there is no doubt that Bank of America is a

20  powerful financial institution with a great deal of resources.

21       However, as you will hear, the administrative agent

22  does not have to be the owner of these mortgage loans to

23  execute on those strategies.  If it makes economic sense for

24  Bank of America to work out these loans, it doesn't need to be

25  the holder of those loans to work them out.  The debtors and

1  Bank of America could agree on a principal reduction program to

2  encourage refinancing.  Similar to what the debtors did in the

3  construction loans.  Bank of America and the debtors have

4  already agreed to give the servicer certain rights to waive

5  penalties to encourage refinancings under certain products.

6          Bank of America could use its influence that we heard

7  about in Mr. Power's opening to effectuate the transfer of

8  agency loans.  The question the Court should ask is, why is

9  Bank of America only willing to use its resources, only willing

10  to use its power if they're the owner of the loans?

11          Now, as set forth in our pretrial brief -- and we

12  think this is a critical point -- Bank of America has only

13  removed for relief under Section 362(d)(1).  They have not

14  moved for relief under (d)(2).  As such, Bank of America has

15  the burden today to establish cause.  If they fail to establish

16  a prima facie case for cause, their motion must be denied.

17          Now, Bank of America's papers are not exactly clear

18  on what the cause is that justifies relief from stay.  Is it

19  that they wanted the debtors to sell quickly and the debtors

20  have refused?  Yet there's no obligation under the code

21  requiring a quick sale for a poor price.  And Bank of America

22  didn't bargain for that right under the cash collateral order

23  like they did for the servicing sale where there were sale

24  deadlines in the cash collateral order.

25          Is it that they want to hold the mortgage loans and

1   Bank of America can hold them better?  Again, we don't concede

2   that.  But the debtors want to work with Bank of America and

3   the committee to maximize value for all creditors, not just the

4   secured creditor.  Again, it's hard to tell the precise alleged

5   grounds for relief, but Bank of America appears to be loosely

6   asserting that there is a lack of adequate protection here.

7          If that's the case, though, they cannot meet their

8   burden.  The case law is clear that Bank of America is not

9   entitled to adequate protection of the value of the mortgage

10  loans; they're entitled to adequate protection of the value of

11  their interest in the mortgage loans.  And in this case, Your

12  Honor, that's a distinction with a difference.  Because if Bank

13  of America is over secured, an alleged decline in the value of

14  its lien is not sufficient to establish their case for adequate

15  protection because an equity cushion, Your Honor, is adequate

16  protection.  It is not entitled to adequate protection.

17         You'll recall -- and this came up a few times on

18  Monday that the cash collateral order provided that the

19  administrative agent asserted it was over secured.  And the

20  debtors agreed not to contest that assertion.  In the

21  construction loan stay of relief motion that Bank of America

22  filed, it was less clear.  Bank of America sought relief under

23  362(d)(2).  They asserted the debtors had no equity in the

24  construction loans which could have suggested that the

25  administrative agent was taking the position that it was under

22

1  secured.

2        But it wasn't clear because B of A took the position

3  that the debtors had no equity just in the construction loans

4  as opposed to the portfolio as a whole.  So, it was unclear

5  whether they were making an assertion they were under secured.

6        This motion, again, Bank of America has only moved

7  under (d)(1).  Now, as you would have expect, the debtor

8  attempted to clarify Bank of America's position on its secured

9  status.  We asked the question in discovery.  And in response

10 to Interrogatory Number 17, the administrative agent stated it

11 has not contended that the indebtedness in under

12 collateralized.

13       So, since Bank of America previously asserted it was

14 over secured and is not now contending that it's under secured,

15 it means either that they're exactly secured or the debtors

16 have to assume they're over secured.  If they're over secured,

17 there's an equity question.  If there's an equity question, we

18 submit they're adequately protected.

19       If Bank of America were to now assert that they are

20 under secured, their motion still fails.  As we set forth in

21 our papers, Bank of America's only entitled to adequate

22 protection from the date they make a formal request.  That's

23 been the law in this district since Judge Baylick's (phonetic)

24 opinion in Continental.

25       Now, regardless of what valuation one uses -- and we

1   set forth in our papers what we think the appropriate valuation

2   methodology is, specifically for this type of asset.  Bank of

3   America has to establish one, the value of the interest in the

4   mortgage loans on the date of the request.  They also have to

5   show that that benchmark value is less today, and they have to

6   show it will continue to decline in the future.  They must show

7   those three things to establish a prima facie case for adequate

8   protection.

9          Remember these assets are cash flowing.  You'll hear

10  from Mr. Wampler today that Bank of America is receiving

11  somewhere between 10 and $12 million a month just on the cash

12  flow from these assets.

13         We submit that Bank of America must do more than

14  simply state that there's a decline in value of some

15  un-quantified amount over some indeterminate period of time,

16  and that that decline will continue in an un-quantified amount

17  over some future indeterminate period of time.  I think the

18  record will show today that Bank of America's evidence amounts

19  to not much more than asking Your Honor to take judicial notice

20  that the economy is bad.

21         In the answer to the debtors' interrogatories, the

22  administrative agent makes a general statement that the value

23  of the mortgage loans is decreasing due to market factors.  But

24  they admit they have not quantified the extent of the decrease

25  in the value of the mortgage loans.

1        Mr. Wampler who is Bank of America's 30(b)(6) witness

2   confirmed in his deposition they had not quantified the extent

3   of the decrease in the value of the mortgage loans.  If Bank of

4   America's expert -- proposed expert -- is clear in his

5   deposition that he did not conduct any valuation of the

6   mortgage loans even though he could have, Your Honor, for

7   somewhere between $7,500 and $15,000, but he was not asked to

8   perform a valuation.

9        I submit to you, Your Honor, you will hear no

10  evidence or expert testimony from Bank of America today on what

11  the value of the mortgage loans were as of the date of the

12  request, what they are today, and what the value will be in the

13  future under any valuation theory.  This is a point we raised

14  in our preliminary objection, we again raise it in our

15  pretrial.  We believe Bank of America's motion is fatally

16  flawed as a result.  We will ask the Court to deny that motion

17  after they present their case in chief.

18       Bank of America may attempt to establish other cause

19  to obtain relief from the stay, but as Your Honor will hear,

20  those assertions are contradicted and they certainly do not

21  rise to the level necessary to unseat the debtors as the

22  presumptive custodian of these estate assets and really the

23  only party with a fiduciary duty to all creditors.

24       And Your Honor I think we'll move to evidence at this

25  time, but based on counsel's opening, I believe we may have a

1  motion in limine on certain aspects of the evidence and I'll

2  leave it to the Court as to when you would like to address

3  that.

4          THE COURT:  All right.

5          MS. SCHONHOLTZ:  Your Honor, B of A calls J. Wampler

6  to the stand.

7          THE COURT:  Okay.

8          MR. DORSEY:  Your Honor, this is the witness for

9  which the debtors would like to make a motion in limine before

10 his testimony.

11         THE COURT:  All right.  What's the basis of the

12 motion?  Why don't you have a seat, sir?

13         MR. DORSEY:  The failure of Bank of America to

14 provide adequate discovery prior to his testimony today.

15         THE COURT:  Have a seat.  We'll have to deal with

16 this.  Do you have a little more detail, Mr. Dorsey?

17         MR. DORSEY:  I'm sorry, Your Honor?

18         THE COURT:  Could I have a little more detail,

19 please?

20         MR. DORSEY:  Yes, Your Honor.  As Your Honor knows,

21 the discovery process in this case was driven by Bank of

22 America's desire to have this case moved forward as quickly as

23 possible.  During the discovery process, we issued certain

24 interrogatories to Bank of America asking them to identify all

25 methodologies that they used in valuing the mortgage loans.

1  The response that we received was, you'll be able to figure it

2  out from the documents we give you.

3         We then took a 30(b)(6) deposition.  And in our

4  notice of deposition, one of the topics that we asked was

5  someone who could testify regarding the methodologies used by

6  Bank of America in valuing the mortgage loans.  Mr. Wampler was

7  identified as the witness who was going to provide that

8  testimony.  At his deposition, I specifically asked him if he

9  had seen the notice before, he said, he had.  I asked him if he

10 could answer questions about all topics that were listed in it.

11 He said that he could.  When I asked him what methodology was

12 used, he said, he didn't know, that he received the numbers

13 from Bank of America Securities.  They did the analysis.  He

14 admitted that there were numerous methodologies that they could

15 have used.  But he has no idea which one they did.

16        They have effectively, Your Honor, denied the

17 debtors' discovery on the key issue in this case.  What is the

18 methodology you used to determine the value of these loans?

19 And based on that, Your Honor, we believe that the Court should

20 preclude Mr. Wampler from testifying regarding the value of the

21 mortgage loans and preclude Bank of America from introducing

22 any evidence at this hearing regarding the value of the

23 mortgage loans.  Thank you.

24        THE COURT:  Thank you.

25        MS. SCHONHOLTZ:  Your Honor, we have had on a very

1  short time frame extensive discovery in this case.  Mr. Wampler

2  did not testify as Mr. Dorsey suggests.  He is the person at

3  Bank of America who has been responsible for this matter during

4  the entirety of the cases.  He answered questions I believe for

5  about seven or eight hours, answered every question put before

6  him in terms of valuations, in terms of what the books and

7  records of the bank showed with respect to valuations.  He

8  testified about the group at B of A who performed those

9  valuations and discussions with those people.  I don't agree

10 with Mr. Dorsey, he's not a traitor.  But he did testify from

11 the contemporaneous books and records of the bank as to what

12 the banks used -- were with respect to valuation.  He -- there

13 was no question raised at any point during his deposition or

14 after his deposition until we opened up today, Your Honor, as

15 to whether he is qualified or not qualified to testify in any

16 respect.

17           MR. DORSEY:  May I respond, Your Honor?

18           THE COURT:  Yes.

19           MR. DORSEY:  In Mr. Wampler's deposition, Your Honor,

20 I asked him -- and we can provide the Court with a copy if

21 you'd like to see it.

22           THE COURT:  Sure.

23                     (Pause)

24           MR. DORSEY:  At Page 69 of his deposition, Your

25 Honor, beginning at Line 16, I asked Mr. Wampler, "Has Bank of

1  America undertaken to value these mortgage loans based on a

2  discounted cash flow value?"  His response was, "I can't with

3  certainty say how Adam Glassner's team valued the portfolio."

4  And then he goes on to say, I believe FTI may have done one.

5  But he was cut off by counsel.  And that was not provided to

6  the debtors.

7         MS. SCHONHOLTZ:  Your Honor --

8         MR. DORSEY:  I'm not finished yet, Your Honor.

9         THE COURT:  Okay.

10        MR. DORSEY:  At Page 71 beginning at Line 1, "When

11 you received the information back from Mr. Glassner or from the

12 other people in Bank of America Securities, did they tell you

13 how they came up with their valuation?"

14    "A   No.  They provided a very detailed statistical

15 analysis of each of the buckets of loan that include

16 significant amounts of information regarding the portfolio.

17 Each sub-portfolio of the portfolio in each of the buckets,

18 they assigned a weighted average price.  That's what I

19 received.

20    "Q   So, you don't know how they came up with a weighted

21 average price, they just gave you a number?

22    "A   Again, I think it would be speculation on my part to

23 say how they came up with that value."

24        I don't know how clearer I could make it, Your Honor.

25 Mr. Wampler knew nothing about how they came up with these

1  valuations.

2          MS. SCHONHOLTZ:  Your Honor, Mr. Dorsey conveniently

3  skipped over an entry on Page 70 of Mr. Wampler's deposition,

4  "Do you know the various ways to value a loan portfolio?"

5  "Again, you can look at market comps for similar portfolios

6  you've sold."  And it goes on to say there are various ways to

7  do it.

8          We do have and will put into evidence, Mr. Dorsey had

9  the opportunity and in fact did examine Mr. Wampler on all the

10  underlying data that Mr. Glassner's group came up with.  There

11  are no secrets of surprises here, Your Honor.  And in fact --

12          THE COURT:  Well, wait a minute.  Wait a minute.  To

13  say he knows, I mean, I know the various ways you can value an

14  asset, too.  But if I get a document, that doesn't necessarily

15  know how I know.  And all it has is the conclusion, that

16  doesn't mean I know how someone achieved it.

17          MS. SCHONHOLTZ:  No, Your Honor --

18          THE COURT:  Wether it's a weighted cost of capital or

19  it's a discounted cash flow, or, you know, comparable

20  transaction analysis --

21          MS. SCHONHOLTZ:  The underlying data as to how the

22  trading desk at B of A valued it will all be put into evidence.

23  Let me just add, Your Honor, he was called as a 30(b)(6)

24  witness.  And obviously a 30(b)(6) has to be reasonably

25  prepared to testify, but is not necessarily expected to know

1 every detail of every subject.  If they wanted another witness

2 or they had an issue with this, they certainly had the

3 opportunity to ask for another witness, or indeed to ask for

4 Mr. Glassner.  They did not do so.

5         MR. DORSEY:  Given the timing, Your Honor, and Bank

6 of America's desire to move this process forward as quickly as

7 possible, it would have been impossible to get another

8 deposition done in time.  And they produced no documents

9 regarding the methodologies that Mr. Glassner --

10         THE COURT:  Did they produce the report that Mr.

11 Glassner prepared for Mr. Wampler?

12         MR. DORSEY:  They produced what Mr. Wampler testified

13 were the buckets of loans that he put in each of the -- that he

14 broke the portfolio out into.  When I asked Mr. Wampler at Page

15 35 of his deposition whether he looked at those documents and

16 could tell me how they came up with the number, the weighted

17 average number, he said, no, I can't.  He didn't look at them.

18 He didn't even look at the documents produced by Bank of

19 America Securities.

20         And there was another entry, Your Honor, on Page 72,

21 Line 16 when I asked him whether they used other similar

22 portfolios in valuing these loans, and he said, again, I don't

23 know what methodologies they used.

24         MS. SCHONHOLTZ:  Your Honor, just for the record,

25 there is no formal report.  What happened in his case -- and

1 you'll see in the evidence -- that during -- at periodic

2 intervals for bank reporting purposes in part, Mr. Wampler

3 reached out to the trading desk which had all the underlying

4 loan tape and information.  And the desk gave him -- and data

5 will be produced into evidence -- it's views as of that time.

6 There were no formal valuations requested or prepared.  And the

7 results of those -- what we can call quick and dirty valuations

8 -- are in the bank's books and records.

9        THE COURT:  Why is that -- why isn't that hearsay?

10 Are you going to rely on the business records exception?

11        MS. SCHONHOLTZ:  Yes, Your Honor.

12        MR. DORSEY:  We'll obviously oppose that, Your Honor.

13 I don't think there were prepared --

14        THE COURT:  Why isn't that -- yes, I mean, why isn't

15 that -- it's double hearsay.  That may get you past the fact

16 that it's -- Mr. Glassner's not here, but that -- how does that

17 fix the underlying issue of what he's relying on is hearsay?

18        MS. SCHONHOLTZ:  Well, the documents reflect -- were

19 kept in the ordinary course of business, made in the ordinary

20 course of business, and relied on in the ordinary course of

21 business.

22        THE COURT:  What documents?

23        MS. SCHONHOLTZ:  The material -- and it's not a

24 valuation report -- from Mr. Glassner.

25        THE COURT:  Hang on.  We have a problem.

1                          (Recording off)

2              THE COURT:  Sorry, technical difficulties.

3              MS. SCHONHOLTZ:  No problem, Your Honor.

4              THE COURT:  Go ahead.

5              MS. SCHONHOLTZ:  The materials put together

6    periodically by Mr. Glassner's group were documents kept

7    -- made, kept, and relied on in the ordinary course of the

8    bank's business.

9              MR. DORSEY:  Except, Your Honor, that Mr. Wampler who

10   they proposed to introduce this evidence through does not work

11   for Bank of America Securities which was --

12             THE COURT:  And he's not the -- he's not the

13   custodian.  Is he a qualified a witness?

14             MS. SCHONHOLTZ:  He does work for Bank of America

15   which is an affiliate of Bank of America Securities.  And I

16   would suggest, Your Honor, that he certainly can testify as to

17   how the books and records of the bank, Bank of America

18   Securities, are maintained.

19             Suffice it to say, Your Honor, that we believe it's

20   more than competent evidence, and he should be able to testify,

21   and Your Honor can take it for what it's worth.  There is

22   contemporaneous evidence at the same time in the debtors' files

23   that comes out with the same valuations.  And we have not -- we

24   will not take issue with anybody's competence to testify about

25   that.  Those --

1          THE COURT:  All right.  Well, let's -- we don't want

2     to get ahead of ourselves, we start to get into the hearsay

3     issue which is obviously reserved for whenever the evidence

4     comes in.  I have one sort of fundamental issue as to whether

5     the witness should be precluded from at the outset from

6     testifying with regard to value at all based on the fact that

7     the debtors -- or excuse me, the bank did not adequately

8     respond to the discovery.  Do you have the interrogatories and

9     interrogatory responses upon which you rely, Mr. Dorsey?

10          MR. DORSEY:  Yes, Your Honor.

11          MS. SCHONHOLTZ:  Your Honor, those interrogatories

12     were answered before the document production was well underway

13     and the depositions.  So, there is a lot of evidence in this

14     record that would respond to those interrogatories.

15          THE COURT:  All right.

16          MR. DORSEY:  Well, if that were the case, Your Honor,

17     they should have supplemented it because they have an

18     obligation to supplement the responses and they did not do so.

19     The -- Your Honor, I don't know if you have a copy of the

20     -- witness exhibit for the debtors.  I can bring that up to

21     you.  That includes a copy of the interrogatory responses.

22          I'm sorry -- this is your copy, Your Honor, I have

23     it.

24          MR. DORSEY:  The interrogatories, Your Honor, are in

25     this binder as Debtors' Exhibit Number 3.

1          MS. SCHONHOLTZ:  Your Honor, I need a copy of this.

2  Thank you.

3          THE COURT:  What page?

4          MR. DORSEY:  And specifically, Your Honor, it's

5  Interrogatory Number 7 on Page 7.  I'm sorry, that's the wrong

6  one, Your Honor.

7                       (Pause)

8          MR. DORSEY:  I apologize, Your Honor, I just need one

9  minute.

10                      (Pause)

11         MR. DORSEY:  It's Interrogatory Number 3, Your Honor,

12  on Page 5.  We asked them to identify all persons with

13  knowledge of the value of the mortgage loans.  And then in

14  Interrogatory Number 4, we ask them to, "Describe all

15  methodologies you and the parties identified in response to

16  Interrogatory Number 3 above have used since the petition date

17  to value the mortgage loans."

18         And the response was, "The administrative agent

19  states that the methodology used concerning pricing estimates

20  to value the mortgage loans as set forth in documents produced

21  herewith was based upon the then current market if a well run

22  -- if a well run auction were conducted."  That was the

23  entirety of their response, Your Honor.

24         THE COURT:  All right.  And how is that a disconnect

25  with what Mr., is it, Wampler --

1          MR. DORSEY:  Yes, Your Honor.

2          THE COURT:  -- testified to?

3          MR. DORSEY:  I asked Mr. Wampler what was the

4    methodologies used, and he didn't know.

5          THE COURT:  And where's the notice of deposition?

6          MR. DORSEY:  I can hand that up to, Your Honor.

7          THE COURT:  Please do.  Thank you.

8                    (Pause)

9          THE COURT:  "The value of the mortgage loans and the

10   methodologies used to determine or estimate the current or

11   future value of the mortgage loans."

12         MR. DORSEY:  That's correct, Your Honor, Item Number

13   1.

14         MS. SCHONHOLTZ:  Your Honor, I would also direct your

15   attention to Item Number 5, that it's our contention that the

16   mortgage loans have decreased in value since the petition date.

17   That is our contention.  And that is what we are willing to

18   prove and are able to prove through Mr. Wampler's discussion of

19   value.  It is not our burden to do a valuation to establish

20   that we're under secured, although the evidence will

21   demonstrate that.

22         THE COURT:  Well, I don't particularly care whose

23   burden it is.  If the allegation is that you were asked what

24   your position was on something in discovery, and then asked to

25   produce a witness who had knowledge of it, and failed to do so,

1  regardless of whether it's part of your burden or otherwise,

2  the issue is whether I should allow you to introduce evidence

3  as to what the value is.

4        MS. SCHONHOLTZ:  Your Honor, we didn't decline to

5  answer or produce evidence.  And Mr. Wampler testified based on

6  documents what his understanding was as to the valuation.  Mr.

7  Dorsey is focusing on the word methodology.  I will add, Your

8  Honor, that there was an agreement amongst the parties that if

9  there was a discovery dispute or if there was an issue, it

10  would be promptly brought to the Court's attention.  We have

11  not heard about any of this prior to the commencement of the

12  hearing.  So, they did have an opportunity to take Mr.

13  Glassner's deposition or anyone else's they wanted if in fact

14  they were not satisfied or to come to the Court and say, we

15  need more.

16        THE COURT:  When did you take Wampler's deposition,

17  last week?

18        MS. SCHONHOLTZ:  Last Thursday.

19        THE COURT:  Anything further, Mr. Dorsey?

20        MR. DORSEY:  No, Your Honor.  Only to say, the burden

21  was on them to produce somebody who could answer our questions.

22  They told us they did.  And we relied upon that.  And we did

23  not have time to go back and do another deposition, and our

24  discovery period had run under the scheduling order.

25        THE COURT:  Well, I hate to do this because it's

1  -- could be construed somewhat frankly as ducking the question

2  a little bit, but I think it's because -- I think it's -- I

3  simply don't have sufficient record at this time to determine

4  whether or not -- because I haven't heard Mr. Wampler's

5  testimony of course.  This is always an issue with a motion in

6  limine to a certain extent.

7          So, I haven't had an opportunity to hear exactly how

8  the evidence is going to be presented, although I think Mr.

9  Dorsey has raised at least some preliminary concerns with -- in

10  support of his motion in limine.  I'm not sure there's

11  sufficient concrete language that he can really rely on in the

12  interrogatory responses or the deposition notice sufficient to

13  impose a rather Draconian remedy of moving or allowing -- or

14  excuse me -- banning this witness from testifying.

15          Nonetheless -- so, I'm going to deny the motion in

16  limine.  But I'm going to do that without prejudice to see how

17  the record develops.  And I will reconsider it as the record is

18  developed or at the conclusion of the record as the record is

19  developed because I think part of what's going to depend

20  frankly is how much the debtor is prejudiced in their ability

21  to effectively cross examine the witness.  I'm just not going

22  to be able to tell that until I see how the hearing proceeds.

23          The problem of course in any contested matter, and

24  certainly one that's done on an expedited basis is that the

25  mechanisms that would normally -- and time that would normally

1  exist in a more leisurely litigation including the opportunity

2  to take several depositions or, you know, contact the Court is

3  seriously truncated and creates some issues.  Unfortunately,

4  there's not a lot I can do about that given the time frame that

5  all the parties agreed to.

6         So, we go to an evidentiary hearing on contested

7  matters and on this contested matter with an imperfect

8  foundation for the presentation of the evidence to the Court.

9  I think frankly that's a rather standard risk in bankruptcy

10 litigation, although I am sensitive to it.  And I will

11 certainly not allow accountant -- allow parties to not respond

12 to discovery or to take positions inconsistent with discovery

13 responses.

14        All that said, I don't think I have enough here to

15 actually determine that that's what Bank of America has done,

16 at least as of yet.  So, I'm going to deny the motion in limine

17 without prejudice.  I'll allow the presentation of the witness.

18 And I'll reconsider the motion at an appropriate time after

19 direct, and cross examination, and redirect of the witness.

20 This is without prejudice, obviously, to any arguments about

21 hearsay or any other objections in connection with any

22 testimony that's proffered.

23        MR. DORSEY:  Thank you, Your Honor.

24        MS. SCHONHOLTZ:  Thank you, Your Honor.  I call J.

25 Wampler to the stand.

1          DEPUTY CLERK:  Can you state your full name and spell

2   your last name for the Court?

3          THE WITNESS:  J. Todd Wampler, W-a-m-p-l-e-r.

4      JOHN TODD WAMPLER, BANK OF AMERICA'S WITNESS, SWORN

5                   DIRECT EXAMINATION

6   BY MS. SCHONHOLTZ:

7   Q    Good morning Mr. Wampler.  By whom are you employed?

8   A    Bank of America.

9   Q    And what are your current title and day to day duties?

10  A    I'm a senior vice president and I oversee a group charged

11  with workout and rehabilitation activities on large corporate

12  credits.

13  Q    And how long have you been a B of A employee?

14  A    For B of A and its affiliates, since 1988.

15  Q    And during that time, have you worked on troubled credits?

16  A    Yes.

17  Q    For how long?

18  A    Since the spring of 1990.

19  Q    What are your general responsibilities with respect to

20  those credits?

21  A    To look at touch points where the relationship touches the

22  bank, where we may have credit exposure, to look at strategies,

23  to mitigate losses associated with those exposures, and to

24  develop strategies to get repaid.

25  Q    And what is your experience with troubled assets -- strike

1  that.   What is your experience with troubled credits involving

2  mortgage assets?

3  A    I've done my share.   Over the course of the last 18

4  months, I've probably directly looked at or had people in my

5  group work on upwards of a dozen companies.

6  Q    And that's within the last 18-month period, is that

7  correct?

8  A    Correct.

9  Q    On credits involving troubled mortgage assets, what other

10 resources do you have within Bank of America to figure out the

11 best way to maximize value?

12 A    We have vast resources.   We have a servicing platform that

13 can look at the quality of servicing that were being provided

14 by the debtor in possession if that's the case.   Or by a

15 company that's outside of the scope of a Chapter 11, we have a

16 trading desk that can look at current trends in the market,

17 look at the characteristics of the portfolio that are pledged

18 to us as either collateral or purchased by the bank through a

19 repo arrangement.

20      We have hedging departments that, you know, to the

21 extent that we take positions and portfolios, we can hedge that

22 portfolio to mitigate loss because of market movements.   And as

23 part of the servicing, we have loss mitigation areas that look

24 at credits that are in distress, that are past due, and

25 implement mitigation strategies to make those borrowers -- make

1  those borrowers reperform, if you will.

2  Q    Are you the B of A officer primarily responsible for the

3  American Home relationship?

4  A    I am.

5  Q    And when did you take on that responsibility?

6  A    Late July, 2007.

7  Q    And does part of that responsibility include B of A's role

8  as the administrative agent on the American Home Revolving

9  Credit Facility?

10  A    It does.

11  Q    Okay.  And how many lenders to American Home participate

12  in that facility?

13  A    Including Bank of America, there's 21.

14  Q    Okay.  There are notebooks in front of you, Mr. Wampler,

15  if you'd please turn to BOA-1.  Tell me if you recognize that

16  document.

17  A    I do.

18  Q    What is it, please?

19  A    It is an e-mail from our credit services area outlining

20  the pro rata shares of the bank group.

21  Q    And what are your day to day responsibilities as the

22  administrative agent on this facility?

23  A    To work with counsel and consultants to develop repayment

24  strategies together with the debtor and its advisors.  We try

25  to work in a consensual way to reach mutual resolution.  We

1  also communicate those strategies, and seek advice from the

2  bank group, and agreement from the bank group on the

3  implementation of those strategies.

4  Q    Does your responsibility also include looking after B of

5  A's exposure for revolving credit loans it has made to American

6  Home under this revolver?

7  A    It does.

8  Q    Okay.  When did Bank of America and the other lenders

9  enter into the revolving credit agreement?

10 A    I believe it was in August of 2006, August 10,

11 thereabouts.

12 Q    I direct your attention to BOA-2 in your book, can you

13 identify that, please?

14 A    Yes, that is the second amended and restated credit

15 agreement dated August the 10th.

16 Q    Okay.  And what was the state of maturity of that

17 facility?

18 A    I believe it was a 364 day facility, so that would make it

19 August the 9th.

20 Q    And were there any --

21 A    2007, excuse me.

22 Q    Were there any guarantees of this facility?

23 A    Yes.

24 Q    Okay.  Turn your attention, if you would please to BOA-3.

25 And what is that document?

1 A    This is the actual guarantee from American Home Mortgage

2 Investment Corp. and American Home Mortgage Holdings, Inc.

3 Q    What secures this facility, Mr. Wampler?

4 A    There are a number of assets at the time that the loan was

5 made to secure the loan that include but are not limited to the

6 mortgage servicing rights, servicer advances, and the whole

7 loan portfolio.

8 Q    Please turn to BOA-4 in your book.  Can you identify that?

9 A    That is our security and collateral agency agreement.

10 Basically, it describes the collateral that's been pledged to

11 the agent on behalf of the bank group.

12 Q    Okay.  Let me direct your attention to BOA-5.  Can you

13 tell us what that is, please?

14 A    These would be the UCC filings that were made to perfect

15 our security interest in personal property assets.

16 Q    With respect to this revolving credit facility?

17 A    Correct.

18 Q    Okay.  And let me direct your attention to BOA-30 and ask

19 you to tell us what that is, please.

20 A    This looks like the final order approving the use of cash

21 collateral by the debtor.

22 Q    Anything else in there?

23 A    It looks like extensions and modifications to the original

24 cash collateral order together with the final stipulation with

25 the Unsecured Creditors Committee.

1 Q    What was the principle amount of outstanding indebtedness

2 owed to the agent and the lenders as of the petition date?

3 A    A little over $1,077,000,000.

4 Q    And what is the principle amount currently outstanding?

5 A    Approximately $500,000,000.

6 Q    And what accounts for that principle reduction?

7 A    The largest reduction resulted from the sale of about 42

8 billion in MSR's and, I can't recall the exact dollar about,

9 but about a hundred million dollars worth of servicer advances

10 to Wilbur Ross.  That, together with other bilateral MSR sales.

11 I think there were probably half a dozen or more in total,

12 resulting in a little over 500 million and that paid out to the

13 bank group.  There are P&I payments that are received

14 periodically and that accounts for the balance.

15 Q    And what collateral has not yet been liquidated?

16 A    The vast majority of the whole loan portfolio.

17 Q    What is the approximate unpaid principle balance of the

18 loans in that portfolio?

19 A    About 570 million.

20         THE COURT:  Five oh seven or five seven oh?

21         THE COURT:  Five seventy.  Excuse me.

22 BY MS. SCHONHOLTZ:

23 Q    At or around the petition date, Mr. Wampler, what was your

24 understanding as to what the company's plans were with respect

25 to the sale of the whole loan collateral?

1  A    My understanding was, and we talked about it the week

2  leading up to the bankruptcy, that the first order of business

3  was to sell the assets, that this was not going to be a

4  reorganization; that an orderly process would be put in place

5  to sell a lot of the assets of the company.

6  Q    And what did you think of that strategy?

7  A    We agreed with the strategy and we agreed that it was

8  better to sell, particularly our collateral, sooner rather than

9  later.

10 Q    And why was that?

11 A    The mortgage market in general had come under intense

12 scrutiny from liquidity providers.  People were looking at

13 mortgage products that had been, I guess, newly developed

14 within the last couple of years leading up to the bankruptcy.

15 It started out in the subprime market but it became apparent

16 in the latter part of 2007 that the issues attendant to

17 decline in value, default rates, foreclosures related to

18 subprime, were not going to be limited to subprime; that near

19 prime and prime borrowers themselves would begin to feel the

20 impact and the values related to those types of assets would go

21 down.

22 Q    Now, did the debtors pursue that strategy to expeditiously

23 liquidate all their assets after the petition date?

24           MR. DORSEY:  Objection.  Calls for speculation.

25           MS. SCHONHOLTZ:  I'm asking --

1            THE COURT:  No.  I mean, response to Mr. Dorsey's

2   question.

3            MS. SCHONHOLTZ:  Let me rephrase it.

4            THE COURT:  All right.

5   BY MS. SCHONHOLTZ:

6   Q    To your knowledge, did the debtors pursue the strategy of

7   liquidating your loan portfolio after the petition date?

8   A    No.

9   Q    Okay.  And do you know why not?

10           MR. DORSEY:  Objection.  Calls for speculation.

11           THE COURT:  Wait.  Hang on.  Response?

12  BY MS. SCHONHOLTZ:

13  Q    Do you have any knowledge -- do you have any personal

14  knowledge as to why the debtors did not liquidate the assets?

15  A    I do through discovery.

16  Q    What have you --

17  A    That's been produced.

18  Q    What have you learned about why the debtors did not pursue

19  the expeditious liquidation of your loan portfolio?

20           MR. DORSEY:  Objection.  Calls for speculation.

21  Calls for hearsay.

22           THE COURT:  Response?

23           MS. SCHONHOLTZ:  I'm just asking, Your Honor, for

24  what his knowledge is as to why the debtors did not pursue the

25  strategy they had articulated to him and others, including this

1  Court at the outset of the case.

2          THE COURT:  Well, he's said his basis is discovery so

3  I assume that statements of the debtor so, to the extent it's

4  hearsay, I suppose it's a statement against personal interest

5  --

6          MS. SCHONHOLTZ:  It's an admission, Your Honor.

7          THE COURT:  -- so it's an admission.  And it's not

8  speculation because he's parroting what he's already been told

9  so I'll overrule the objection.

10 BY MS. SCHONHOLTZ:

11 A    It was disclosed in the discovery process that the

12 debtors, in November, felt like we would get paid in full and

13 chose to not go through with that sale, hopefully in the hopes

14 of building more equity for the estate, if any.  We were told

15 verbally by Kevin Neistrom in early November that they didn't

16 feel like it was a good time to go to market.  A quick sale, in

17 our view, should have occurred September, October, early

18 November.  And when early November came and Neistrom said, we

19 don't feel like we should sell until after the first of the

20 year, you know, that's not necessarily something that came out

21 of discovery but that's direction Neistrom, we shouldn't sell

22 now.

23 Q    Okay.  Did Mr. Neistrom tell you -- and we'll get back to

24 this in a minute -- when he said in early November that it was

25 not a good time to sell the loans, did he tell you that debtors

1  had decided not to sell the loans at all?

2  A    No, not at that time.

3  Q    Now, from the inception of the case, what inquiries did

4  you make about the development of a sale plan or process?

5  A    We made inquiries every week from the inception of the

6  case.

7  Q    When you say ever week, was there a regularly scheduled

8  call?

9  A    Yes.  There was a Tuesday, Thursday afternoon call and we

10  would -- from before the case until the case started through

11  mid to late January, every Tuesday, Thursday.   More often than

12  not, we would have a call where status update on various issues

13  were discussed and the sale of the whole loan portfolio was

14  always discussed.

15  Q    Who participated in these calls generally from the bank?

16  A    Myself, Tyler Levings (phonetic), counsel, advisors from

17  FTI.

18  Q    And who participated generally in these calls from the

19  American Home side?

20  A    Kevin Neistrom, Mark Limberry, representatives from Young

21  Conaway.  I can't recall if BDO was ever on any of them but

22  most of the time they were not, if at all.  Excuse me.  BDO is

23  the committee representative -- or the committee consultant.

24  Q    Now, I would like you to take a look at what has been

25  marked as BOA Exhibits 6 and 7 in your book, if you would, and

1   just tell the Court what those are.

2   A    These are agendas that were sent to the company and its

3   advisors, basically to go over status updates, both with the

4   lenders as well as for regular Tuesday, Thursday call.

5   Q    Okay.  And does -- were these agenda typical?

6   A    Yes.

7   Q    Okay.  Do they reflect anything about the possible sale of

8   the whole loan portfolio?

9   A    On Exhibit 6, status of the whole loan, the sale is

10  definitely on there, the entire portfolio.  And by the time we

11  get to 7, it's the first issue that we want to talk about.

12  Q    Do you recall any biweekly calls, Mr. Wampler, when the

13  subject of the sale of the whole loan portfolios was not

14  discussed?

15  A    No.

16  Q    What did the administrative agent do to try and move the

17  development of a sales process along in November?

18  A    Well, I think it may have even started in October.  We

19  talked to the debtor and its advisors about running a parallel

20  path, that there were notice requirements and timing around the

21  sale of servicing.  The major agreements around that had been

22  made.  The Court had been noticed.  The procedure was pretty

23  well set.  We wanted to turn our focus towards running a

24  parallel process to get bidders in place and to run a stalking

25  horse bid, if you will, for the whole loan portfolio.

1  Q    Did there come a time when the administrative agent

2  forwarded bid procedures to the debtor --

3  A    Yes.

4  Q    -- to make that happen?

5  A    Yes.  In late October, early November.

6  Q    And do you recall whether the debtors responded to those

7  bid procedures?

8  A    I believe we received one turn of comments on those

9  procedures.

10  Q    Okay.  Let me direct your attention to BOA-8.  Are those

11  the draft sale procedures you've just referred to which reflect

12  the company's comments?

13  A    These do reflect the company's comments.  Yes.

14  Q    And what did your attorneys do after receiving the draft

15  sale procedures that are BOA-8?

16  A    I would have instructed you to turn them as quickly as

17  possible to get them back to the debtors.

18  Q    Okay.  Let me direct your attention to BOA-9 and ask you

19  if you can identify those.

20  A    This looks like the turn that I just referred to of either

21  accepting or rejecting, going back and forth.  But this would

22  have been our response back to their turn of our document.

23  Q    And, to your knowledge, did the debtor or its

24  representatives ever respond to this turn of the draft?

25  A    No.

1  Q    When did you anticipate that the sales covered by these

2  bid procedures would occur?

3  A    Initially, I was hopeful that it would occur in the month

4  of November and, base don this turn, it looks like it was being

5  pushed back to December, but definitely before the end of the

6  year.

7  Q    2007?

8  A    Correct.

9  Q    Did the debtor move forward on these bid procedures or any

10 other sale procedures for the entire loan portfolio?

11 A    No.

12 Q    And did there come a time when the debtors told you that

13 they would not sell most of their loans until the first quarter

14 of 2008?

15 A    Yes.

16 Q    Okay.

17 A    In early November 2007.

18 Q    And who told you that?

19 A    Kevin Neistrom.

20 Q    When did he tell you that?

21 A    On or about November 6th.

22 Q    And what did he say and what did you say?

23 A    He basically said that, given the holiday season, that

24 there wasn't enough time to get an active list of potential

25 bidders together; that by the time that they put the due

1  diligence room together, Thanksgiving would be here and there

2  wasn't enough time in the gap period between Thanksgiving and

3  Christmas to run a process.  So, because of that, he felt it

4  was in everyone's best interest to wait until the first of next

5  year, or this year now.

6  Q    2008?

7  A    Correct.

8  Q    Okay.  And did you respond to Mr. Neistrom?

9  A    I did.

10  Q    How did you respond?

11  A    I told him that, in our view, it was a mistake to wait;

12  that values would more than likely decline and we were

13  concerned about seasonality in a loan portfolio related to the

14  holiday effect.  People, for whatever reason, may chose to

15  over-extend themselves during the holiday season and, at the

16  beginning of the year, in January, delinquencies increase

17  disproportionate as compared to the rest of the year.  And we

18  were concerned that that spike in delinquencies, if we waited,

19  would have a negative impact together with just the general

20  decline in the market.

21  Q    Let me direct your attention to BOA-6.  Can you tell us

22  what that is, please?

23  A    Six?

24  Q    I'm sorry.  Ten.  Forgive me.

25  A    Okay.

1  Q    Can you tell us what that is, please?

2  A    During the call on that Tuesday, November 6, 2007, when

3  Kevin said that we should wait, I expressed my concerns and he

4  suggested that I speak to my trading desk and come back to him.

5  I did so and tried to call him, couldn't get him, so I sent him

6  this E-mail.

7  Q    And the conversation you just testified to between you and

8  Mr. Neistrom happened after this E-mail was sent, correct?

9  A    It happened, to a large extent, before and after.  We

10 expressed our concerns during the call and, after I talked with

11 the trading desk, they confirmed my concerns.

12 Q    Okay.  Now, prior to November 6, 2007, had the Broad

13 Hollow loan portfolio been sold?

14 A    Yes.

15 Q    Okay.  And when was that portfolio sold?

16 A    Mid to maybe the third week in September.

17 Q    Okay.  And what was the average price for the loans in the

18 Broad Hollow portfolio?

19 A    Across the entire $1.6 billion portfolio, I believe they

20 hit the bid at about 88.2 cents on the dollar.

21 Q    Okay.  And in your experience, were the loans in the Broad

22 Hollow pool of the same general type as the loans as this whole

23 loan portfolio that served as collateral?

24 A    That's my --

25          MR. DORSEY:  Objection.  Lack of foundation.

1          THE COURT:  Sustained.  What experience?

2          MS. SCHONHOLTZ:  His experience with liquidating

3   mortgage portfolios and working on -- I believe he testified

4   to about a dozen of these in the last year, Your Honor.  I'm

5   just asking for the type.  I am not asking for him to be an

6   expert on the characteristics of the loans, just the type of

7   product.

8          THE COURT:  I don't think you laid a sufficient -- I

9   mean, I remember that general testimony.  I don't think it was

10  sufficient in detail to put him in a position to testify as to

11  what constitutes the types of the various loan portfolios so

12  I'll sustain the objection for lack of foundation.

13         MS. SCHONHOLTZ:  Okay.

14  BY MS. SCHONHOLTZ:

15  Q    Let me direct your attention, to Mr. Wampler to BOA-11,

16  the first page of that.

17  A    Right.

18  Q    What is that?

19  A    This is some of the detailed analysis that our trading

20  desk would have done on a loan take representing the whole loan

21  portfolio pledged to secure the revolver.  I asked them to

22  split the portfolio up into product types that, to the extent

23  this portfolio was going to put up for auction, divided up into

24  buckets that would attract the most number of buyers because

25  certain types of buyers have targeted product that they like to

1 buy.

2 Q    And what was the basis of your personal knowledge as to

3 how to split these products into categories?

4 A    Bank of America had a wide ranging relationship with

5 American Home and, in the Broad Hollow situation, we were a

6 market value swap provider and I worked closely with Adam

7 Glassner and the market value swap team in the structured

8 finance area to look at the bid procedures in the way that they

9 were looking at the Broad Hollow portfolio as far as breaking

10 it up into a potential bid package.

11 Q    And so --

12        MR. DORSEY:  Objection.  Move to strike.  Hearsay.

13 He's testified his only knowledge is based on his conversations

14 with Mr. Glassner.

15        THE COURT:  Well, based as to what his knowledge --

16 the testimony is to what the knowledge is based on, not as to

17 the specifics of, you know, what it is or isn't.  So I think he

18 can testify as to what forms -- he was describing generally

19 what formed the basis for his knowledge so I'll overrule the

20 hearsay objection.

21 BY MS. SCHONHOLTZ:

22 Q    Now, the first page of BOA-11 sets forth your view as

23 to how to divide the pool here up for analysis, is that

24 correct?

25        MR. DORSEY:  Objection.  Misstates the testimony.

1  The witness testified that Adam Glassner at Bank of America

2  Securities split this up, not him.

3           MS. SCHONHOLTZ:   That's not correct, Your Honor.   He

4  said it was his first cut at how to look at the portfolio.

5           THE COURT:   The objection is overruled.   Is that

6  correct?

7  BY MS. SCHONHOLTZ:

8  A    This -- I asked Adam Glassner and his team to work with

9  the loan take and to bucket the loans in a way that would

10  attract the most bidders and attract the higher value.   We --

11           MR. DORSEY:   Renewing my objection.

12  BY MS. SCHONHOLTZ:

13  A    We consulted with one another on that from time to time.

14  I think that there was an occasion when they came to me with

15  buckets in a certain type and I went back to them and

16  questioned them as to whether or not they should split out

17  first lien loans from second lien loans so I did have input

18  into the bucketing of these loans.   Yes.

19  Q    But this general bucketing was based on what had happened

20  in Broad Hollow, is that correct?

21  A    That's correct.

22  Q    And you were familiar with what had happened in Broad

23  Hollow, is that correct?

24  A    That's correct.

25  Q    Now, did you make the notes on the first page of this

1 exhibit, BOA-11?

2 A    I did.

3 Q    Okay. And what do your notes represent?

4 A    The notes next to each of the buckets represents the

5 unpaid principle balances and outstanding of each of the loan

6 product categories.

7 Q    And when did you make these notes?

8 A    I would have made them on November 6th, the date that the

9 analysis is dated.

10 Q    Okay.  And what do the two notations on the bottom -- the

11 first one five twenty to five hundred, what does that

12 represent?

13 A    Five twenty to five hundred represents an indication of

14 value of the portfolio as it stands here today.

15 Q    And was that indication --

16         MR. DORSEY:  Objection, Your Honor.  Move to strike.

17 Lack of foundation.  He didn't say where that value came from.

18 He just said he wrote it on this page.

19         THE COURT:  Well, he's just explaining what his  note

20 means.  It doesn't -- there's no -- he's not saying that the

21 note is right or wrong.  He's just describing what the note

22 means so overruled.

23 BY MS. SCHONHOLTZ:

24 Q    Okay.  Now, your notation there was based in part on what

25 the Broad Hollow loans fetched, is that correct?

1          MR. DORSEY:  Objection.  Leading.

2          THE COURT:  Sustained.

3          MS. SCHONHOLTZ: Okay.

4  BY MS. SCHONHOLTZ:

5  Q    What was your notation of five twenty to five hundred

6  based on?

7  A    It was based upon the value of the Broad Hollow outcome

8  together with discussions with Adam Glassner.

9  Q    Okay.  And the six forty represents what, Mr. Wampler?

10  A    The approximate UPB of the portfolio.

11  Q    Let's turn to BOA-12 and would you describe what that is?

12  A    This would have been an estimated recovery analysis on the

13  back of the envelope that I would have put together and

14  transmitted to Tyler Levings who works in my group and assists

15  me on this transaction.

16  Q    And what's the purpose of this document?

17  A    The purpose of the document is to, in effect, look at our

18  estimated recoveries in advance of the preparation of a

19  quarterly report that we do called a FASBE-114.

20  A    And what is the date as of which this document was

21  prepared?

22  A    November 15, 2007.

23  Q    And on that date, what was the bank's estimate as to

24  the amount of recovery it might achieve from the whole loan

25  sale?

1          MR. DORSEY:  Objection.  Lack of foundation.

2          THE COURT:  Response?

3          MS. SCHONHOLTZ:  One second.

4          THE COURT:  Well, hang on.

5          MS. SCHONHOLTZ:  One second.  I am not asking him

6   anything other than what his view was in preparing for a formal

7   regulatory report as to what these loans might obtain.

8          THE COURT:  You're asking what's written on the

9   paper?

10         MS. SCHONHOLTZ:  Yes.

11         THE COURT:  Overruled.

12         MR. DORSEY:  Your Honor, I don't think she's asking

13  him what's written on the paper.

14         MS. SCHONHOLTZ:  No. I am, Your Honor.

15         MR. DORSEY:  She asked him what the value the bank

16  put on these loans at the time this document was prepared.  She

17  hasn't established a foundation for where that came from.

18         MS. SCHONHOLTZ:  I --

19         MR. DORSEY:  Ordinarily, Your Honor, a witness cannot

20  testify about the content of a document until it's been

21  admitted into evidence.

22         THE COURT:  Why don't you rephrase.

23  BY MS. SCHONHOLTZ:

24  Q    Did you have any understanding as to -- strike that.  In

25  your view, what could the bank expect as of the time this

1  document was written to receive on account of the whole loan

2  portfolio?

3          MR. DORSEY:  Objection.  Lack of foundation?

4          THE COURT:  Why don't you lay a foundation as to

5  where the data came from that he's relying on in making that?

6          MS. SCHONHOLTZ:  I thought I did, Your Honor.  I

7  think --

8          THE COURT:  Well, if you did, I've forgotten it.

9          MS. SCHONHOLTZ:  I apologize.

10          THE COURT:  So make it again.

11          MS. SCHONHOLTZ:  Okay.

12  BY MS. SCHONHOLTZ:

13  Q    Around this time, you were analyzing the AHM portfolio in

14  part based on the Broad Hollow results, is that correct?

15  A    That's correct.

16  Q    Okay.  And at the time this document was written in

17  mid-November, was there a notation as to what the bank might

18  expect to recover on these loans?

19          MR. DORSEY:  Objection.  She still hasn't established

20  a foundation of where that comes from.

21          MS. SCHONHOLTZ:  He's --

22          MR. DORSEY:  The bank is a big bank.  She needs to

23  tell us where that came from.  She's trying to get around the

24  whole issue of the hearsay.

25  BY MS. SCHONHOLTZ:

1  Q    Do you have personal knowledge of what the results were of

2  the Broad Hollow auction?

3  A    Yes.  I listened to it live on the phone.

4  Q    Okay.  So having participated in that auction, you know

5  that those loans collectively brought about 88.25 cents, is

6  that correct?

7              MR. DORSEY:  Objection.  Leading.

8              THE COURT:  Overruled.

9              MS. SCHONHOLTZ:  Okay.

10 BY MS. SCHONHOLTZ:

11 Q    And when you --

12             THE COURT:  What was the answer?

13             THE WITNESS:  Yes.

14 BY MS. SCHONHOLTZ:

15 Q    And when you put -- and you -- when you put together the

16 analysis and the document we are now looking at, did you use

17 that personal knowledge you obtained from listening in on the

18 Broad Hollow sale to place a possible value on the bank's

19 recovery?

20 A    I used that knowledge together -- if you notice, on Bates

21 6745, the loans are bucketed 1A through 2G.  Those buckets

22 exactly correspond to the previous exhibit that we looked at.

23 Q    And that was, as I believe you've testified, the way that

24 the Broad Hollow loans were bucketed, is that correct?

25 A    That is correct.  And based on that knowledge and the

1  current market value discussions that I had with respect to

2  this portfolio with Adam Glassner, this valuation of our entire

3  portfolio was developed.

4  Q    Okay.  And so you're -- what was the expectation at the

5  time this was written as to how much value the bank might

6  expect from these loan sales?

7           MR. DORSEY:  Objection.  Hearsay.  He said he relied

8  on Adam Glassner's valuation.

9           MS. SCHONHOLTZ:  He relied on two things, Your

10  Honor.  He relied on his personal knowledge of what the loans

11  had fetched and he relied on conversations with Mr. Glassner.

12  And I believe that the -- he's testified that -- well, strike

13  that.

14  BY MS. SCHONHOLTZ:

15  Q    In your experience working out loans, have you -- do you

16  have reason to resort to information provided to you from other

17  parts of the bank in doing your job?

18  A    Yes.

19  Q    Okay.  And would the information that Mr. Glassner

20  provided to you in discussions or otherwise be information you

21  asked for in the ordinary course of doing your job?

22  A    Yes.

23  Q    And would it be information that was kept in the ordinary

24  course of business?

25  A    Yes.

1  Q    And you rely on it in doing the bank's business, is that

2  correct?

3  A    That is correct.

4  Q    And this document reflects a number, does it not?

5  A    It does.

6  Q    And that number is in part based on your personal

7  knowledge of the Broad Hollow sale and in part on conversations

8  you had with Mr. Glassner, is that correct?

9  A    That is correct, together with other mortgage company

10  portfolios that we've seen be sold in the market

11  contemporaneous at this period in time.

12  Q    And did you --

13         MR. DORSEY:  Objection, Your Honor.

14         MS. SCHONHOLTZ:  Let me finish.

15  BY MS. SCHONHOLTZ:

16  Q    Do you have personal knowledge of the prices fetched by

17  those other mortgage portfolios?

18  A    I do.

19  Q    Okay.  And what is  --

20         MR. DORSEY:  Your Honor, I have -- I'm going to move

21  to strike this entire line of testimony, again on discovery

22  grounds.  During the discovery process, we asked Bank of

23  America for information regarding other portfolios that were

24  similar to this one that they had sold.  They refused to answer

25  that question.  We agreed with them we would not ask for that

1   information if they weren't going to put on a witness who was

2   going to testify about other portfolios in connection with

3   valuing these mortgage loans and now that's exactly what

4   they're doing.

5        MS. SCHONHOLTZ:  Your Honor, that's not what we're

6   doing.  There was an agreement to limit discovery because of

7   the far-reaching request as to how every mortgage portfolio

8   ever looked at by any lender was handled.  I am not asking Mr.

9   Wampler what other portfolios were value at.  I'm simply asking

10  him what the basis of his knowledge was with respect to a

11  number he put on a piece of paper.

12       MR. DORSEY:  And if they didn't give me discovery on

13  it, Your Honor, they can't do that.  And I have an E-mail I can

14  show from their counsel, agreeing with our position that they

15  would not put on a witness as an expert or as a fact witness

16  regarding valuation that was based upon other similar mortgage

17  loans.

18       THE COURT:  Well, did you agree to that?

19       MS. SCHONHOLTZ:  No, Your Honor.  We agreed that the

20  discovery would be limited so as not to go on a fishing

21  expedition to look at a lot of other different portfolios that

22  have nothing to do with this one.  They had the right to ask

23  Mr. Wampler any of these questions.  They didn't do so.  We can

24  move on if Your Honor would like.

25       THE COURT:  Well, if you've agreed not to present

1  evidence to something, you can't then say that they're somehow

2  at fault for not deposing the gentleman in connection with what

3  you've -- that posits the assumption that there's some E-mail

4  out there with an agreement about which you and Mr. Dorsey

5  apparently disagree as to what it says and I haven't seen it.

6  So I'm not saying anybody is right or wrong but --

7          MS. SCHONHOLTZ:  If I might cede the podium to my

8  partner, Myron Kirschbaum, who had this exchange, with Your

9  Honor's permission?

10          THE COURT:  All right.  Let's do this.  Let's

11  actually take a short recess.  I've been on the bench for an

12  hour and a half. That's about my limit.  We'll take a short

13  recess.  During the recess, sir, you're under examination and

14  under oath.  You may not discuss the substance of your

15  testimony with your attorneys during the break and that will go

16  for any other breaks we have until your testimony is completed.

17  Do you understand that?

18          THE WITNESS:  I do.

19          THE COURT:  Okay.  Let's take a five minute recess.

20                    (Recess)

21          THE CLERK:  All rise.

22          THE COURT:  Please be seated.

23          MS. SCHONHOLTZ:  Let's try a different approach.

24          THE COURT:  All right.

25  BY MS. SCHONHOLTZ:

1  Q   Mr. Wampler, if you would, please take a look at BOA-13 in

2  your book.  Describe for me, please, what this is?

3  A    It is an E-mail from me to Paul Kennedy who, at the time,

4  was in charge of all the special assets for Bank of America,

5  updating him on the fact that the servicing sale to Wilbur Ross

6  had closed and basically outlining what the primary remaining

7  collateral securing our loan was and basically explaining to

8  him our view -- not our view but what it would take from a

9  market price prospective based on that UBP of 640 to clear our

10 remaining debt from a principle prospective.

11 Q   Okay.  And when you were referring to the price you would

12 have to get to clear the market, what price was that?

13 A    82.8 cents on the dollar.

14 Q   Now, that is not a valuation, is it, Mr. Wampler?

15 A    No, it is not.

16 Q   It's just an estimate as to how much the loans would have

17 to be sold for in order to get you out whole, is that correct?

18 A    That is correct.

19 Q   Turn to Exhibit 14, please?  And what is this document?

20 A    It is a schedule exposure report that we prepare quarterly

21 that goes to credit committee to update them on progress

22 towards repayment of the exposure.

23 Q   Let me direct your attention to the page Bates 4292.  Does

24 this document reflect what the bank thought it would need to

25 have the loans sell for in order to get taken out whole?

1  A    Yes.

2  Q    And what is that price?

3  A    Again, it's 82.8 cents on the dollar.

4  Q    And what is the expectation as reflected in this document

5  as to when that sale would occur?

6  A    At this point in time, it's expected it would occur in the

7  first quarter of 2008.

8  Q    And that is because Mr. Neistrom had told you in early

9  November that that's when the company had decided to market

10 them, is that correct?

11 A    That is correct.

12 Q    Okay.  Now, after Mr. Neistrom told you that, what if

13 anything did you do to try and get that process moving?

14 A    We were concerned about continued further decline in the

15 value of the whole loans and so we suggested that we enter into

16 a stipulation providing adequate protection to the bank.

17 Q    And what would that stipulation provide with respect to

18 these loans?

19 A    The primary reason for the stipulation would be to, in

20 effect, memorialize and put in place the sale procedures that

21 we were trying to negotiate back and forth with the borrower in

22 late October, early November.

23 Q    Okay.  Let me direct your attention to BOA-15.  Can you

24 tell us what that is, please?

25 A    That is an E-mail from your firm to counsel for the debtor

1  transmitting the adequate protection stip that we just spoke

2  about.

3  Q    Okay.  And to your knowledge, did the company or its

4  representatives ever respond to that stipulation?

5  A    No, they did not.

6  Q    Okay.  Now, did there come a time when you learned that

7  American Home had been approached by Bayview Capital with

8  respect to a possible purchase of your whole loan portfolio?

9  A    Yes.

10  Q    Okay.  And when was that?

11  A    In early November.

12  Q    And what did you learn about that?

13  A    I'm sorry?

14  Q    What did you learn about that?

15  A    I learned that they had approached Kevin Neistrom or

16  someone at the debtor, that Kevin introduced to myself and we

17  talked about having them bid on the entire whole loan portfolio

18  in the context of becoming a stalking horse bidder for that

19  portfolio.

20  Q    And to your knowledge, did American Home ever receive an

21  indicative bid from Bayview with respect to that possible

22  stalking horse bid?

23  A    They did.

24  Q    Okay.  And what was the bid range?

25  A    I believe it was 55 to 60 cents on the dollar.

1  Q     And did you discuss that with Mr. Neistrom?

2  A     I did.

3  Q     Okay.  And what did he say and what did you say?

4  A     He indicated his disappointment and didn't really want to

5  pursue it further.  I indicated that, you know, the bid was

6  low.  I thought that we could do better but, in the context of

7  developing a stalking horse process, this was the initial bid

8  and we should let the process run its course.

9  Q     And did -- to your knowledge, did Mr. Neistrom do what you

10 suggested he do?

11 A     No.

12 Q     Do you know why not?

13 A     No.

14 Q     Okay.  Now, other than the Bayview bid, by year end 2007,

15 what other bids did American Home bring to you with respect to

16 the whole loan portfolio?

17 A     There was one minor sale that really wasn't a sale.  They

18 hold an auction for our construction of perm portfolio.  It was

19 a very small portion of the overall portfolio.  The UPB was

20 approximately $30 million.  They had sale procedures, a due

21 diligence room.  They ran the process at the end of which there

22 was zero bid for my portfolio.  Shortly after that failed

23 auction, two potential buyers came to me as directed by Kroll,

24 Zolfo, Cooper expressing interest in our construction of perm

25 portfolio.  One of them ultimately -- well, they both submitted

1  written offers but one of them was more firm than the other at

2  approximately 30 cents on the dollar.

3  Q    And other than those bids, by year end 2007, did the

4  debtor bring you any other bids or interested purchasers with

5  respect to your portfolio?

6  A    No.

7  Q    Did there come a time when you received a response from

8  the company with respect to your request for a sale processor

9  plan?

10  A    Mid-January 2008.

11  Q    Okay.  And what do you recall of that response?

12  A    That it was way past due and it was pretty light on

13  detail.

14  Q    Let me ask you to take a look at BOA Exhibits 16 and 17

15  and if you can tell me what those are, please?

16  A    16 is the plan that was submitted or that was transmitted

17  to us by Kroll, Zolfo, Cooper and 17 is my print-out of that

18  plan that has my handwritten notes in the margin.

19  Q    Okay.  And was there a discussion about this proposal with

20  the company at or around the time it was sent to you?

21  A    It was discussed on that day.

22  Q    And what day would that be?

23  A    January 15, 2008.

24  Q    Okay.  And tell us what was discussed on that call?

25  A    Basically, we let the company and its advisors walk

1  through the proposal.  We listened and asked questions around

2  timing of execution and that's basically specifically on this

3  topic what we talked about.

4  Q    And what was your view of the proposal at the time it was

5  made?

6  A    At the time, we felt like the Page 1 loans, as we tend to

7  call them, that they should be sold as soon as possible.  There

8  was some concern with respect to the option arms and the other

9  loans noted on the second page because it appeared that the

10  debtor's plan of action on that was to wait indefinitely and

11  wait for market conditions to improve and that was not

12  necessarily a strategy that we wanted to employ.

13  Q    Why did you not want to employ that strategy with respect

14  to the loans on Page 2?

15  A    Because of the nature of the product.  The option arms in

16  particular have a high degree of risk.  As we move forward

17  through this cycle and payment shock sets in because of

18  resetting of the payment pattern together with potential

19  negative amortization, those issues combine together with

20  falling real estate values.  If the borrower finds itself in a

21  position where it can't meet the monthly payment, there's

22  little, if any, incentive for them to try to work to stay

23  current.

24  Q    What, if any, thoughts did you have as to whether the Page

25  2 loans could be worked in a different fashion than as you

1 testified held?

2 A    Well, the way that I guess they're currently being

3 serviced, the WLR really -- he doesn't have as part of this

4 servicing agreement necessarily remedial duties that would

5 compare to the effort that Bank of America would put on it or

6 maybe another third party servicer that we would choose.

7          MR. DORSEY:  Objection.  Move to strike.  Lack of

8 foundation about what W. L. Ross's servicing of these loans is

9 at this time.

10          THE COURT:  Sustained.

11 BY MS. SCHONHOLTZ:

12 Q    Was it your view that the Page 2 loans could realize more

13 value if handled in a different way from being held?

14 A    Yes.

15 Q    Okay.  And in your view, what would need to be done --

16 strike that.  In your view, what should be done differently

17 with respect to the Page 2 loans other than what is set forth

18 on this page?

19 A    They should be actively managed.  They should be

20 approached regarding modifications of the underlying terms of

21 the mortgage to try to move them into a more conforming

22 product, if you will; something that would potentially

23 eliminate the future payment shock, something that would give

24 them an incentive to continue to stay current.

25 Q    Okay.  And what, in your view, is the ability of the

1  debtor to effect the plan that you have just articulated?

2            MR. DORSEY:  Objection.  Lack of foundation.

3            THE COURT:  Overruled.

4  BY MS. SCHONHOLTZ:

5  Q    In my view, one, the debtor has limited resources to offer

6  alternatives to the borrowers.  They can encourage, they can

7  ask, they can hope for third party help.  They can try to

8  contact third parties and enlist their help.  But they have no

9  resources from a refinancing prospective or capital prospective

10 to support those types of activities.  They have a skeleton

11 staff as compared to other people that can take on this task.

12 It's not an easy job and I think that we could bring more

13 assets to bear to make this happen.

14 Q    Okay.  And would the ability, in your view, to re-work the

15 loans on Page 2 to make them agency conforming be an

16 alternative to a hold strategy?

17 A    Yes.

18 Q    Okay.  And does the debtor have the ability to do that, to

19 your knowledge?

20 A    No.

21 Q    Okay.  Did you express these views to American Home?

22 A    Yes.

23 Q    Okay.  What, if any, portion of the plan set forth on BOA

24 -- let's look at 17 -- did the debtors accomplish as of today?

25 A    Again, they sold the seriously delinquent first mortgage

1  loans which represent a little over, you know, one percent of

2  our total claim.  As far as UPB, the actual money received is

3  about a half a percent of the total legal claim so that's the

4  only thing that they have accomplished.

5  Q    Okay.  And when you were discussing this proposal with the

6  company on or about January 15th, what was the company -- what

7  did the company state about its timing to try and accomplish

8  the items on Page 1?

9  A    It was noted in the margins.  The -- my understanding from

10 the discussions, the seriously delinquent mortgage loans would

11 be well down the road as far as the second lien mortgage loans,

12 the second category, by mid-March.  The REO properties, there

13 really wasn't necessarily a time line discussed in absolute

14 detail but the general gist was that it took between four and

15 six months for something to turn from REO into cash and that

16 the general realization rate was in the 70 percent UPB range.

17 On the bond loan programs, again there's about 30 million and

18 they believed that they could assemble the bonds and deliver

19 them into the agencies in two to three weeks and, on the agency

20 conforming, there was a program whereby the debtor was going to

21 work through Countrywide and the way it was described to us,

22 Countrywide would look at quote, unquote, "the prompt screen"

23 for agency eligible production and, to the extent the prompt

24 screen on that day was, call it one oh one, two to three points

25 would be backed off of that.  That's what Countrywide would pay

1  for the loans and deliver them into the GSE and they would take

2  the rep and the warranty risk for that two to three percent

3  discount.  And, as noted on this, the time line around that was

4  the end of the week.  We would have a good idea if that's going

5  to happen or not.

6  Q    What was your understanding as to why the debtor had to

7  work through Countrywide for the agency conforming loans?

8  A    As a debtor-in-possession, they could not deliver directly

9  to the agencies.

10 Q    Okay.  Now, did the debtor, to your knowledge, deliver

11 $112 million into the agencies by the end of the week that

12 January 15th appeared in?

13 A    No, they have not.

14 Q    Okay.  And did they do it by the end of February as

15 indicated in that bullet?

16 A    No, they have not.

17 Q    Do you know why not?

18 A    I didn't know until discovery occurred but, in reading

19 some of the documentation that's been produced, as well as

20 updates on the Tuesday, Thursday calls, in mid-February, early

21 February perhaps, on the calls, we were informed that of the

22 112 million, only 58 million of it was at this point eligible

23 and the way that the original transaction was described was now

24 different in that the loan take had been delivered to

25 Countrywide and Countrywide then went to the GSE and said,

1  which loans will you take.  And they didn't pay for it up

2  front.  They didn't take any rep in the warranty risk.  They

3  basically took the take and the GSE said, we've re-FICA'ed the

4  borrowers, we've re-credit scored them, we've re-evaluated the

5  loan to value ratios, and at this point, because of changes in

6  regulations, 54 million of the original pool don't fit.

7  Q     So the company told you, on one of the bi-weekly calls,

8  that approximately how much of the 112 million was no longer

9  GSE eligible?

10 A     54 million.

11 Q     Okay.  And did the company tell you why?

12 A     I can't recall if they told us exactly why on that call.

13 Q     Okay.  What, if anything else, do you recall of the

14 discussion of this subject in terms of -- I believe you said 58

15 million of GSE eligible loans no longer being eligible?

16 A     Well, 54 no longer eligible.

17 Q     I apologize.

18 A     58 are.  Again, because of changes in the GSE eligibility,

19 together with perhaps declines in the loan to value ratios and

20 re-FICA scores on the borrowers, they were no longer eligible

21 to be GSE product.

22 Q     And after the company told you, did they articulate --

23 strike that.  Did they articulate what it planned to do with

24 the remainder of these loans?

25 A     No.

1  Q     Okay.

2                         (Pause)

3              MS. SCHONHOLTZ:   May I have just a moment, Your

4  Honor?

5                         (Pause)

6  BY MS. SCHONHOLTZ:

7  Q     Let me direct your attention, Mr. Wampler, to BOA-23.

8  A     Okay.

9  Q     Can you tell us what that is?

10 A     This is a FAS-114 that the bank prepares on a quarterly

11 basis.  Whenever a loan is on non-accrual, accounting

12 convention requires that we run this analysis to establish loan

13 loss reserves.

14 Q     And what, if anything, does this document say about when

15 the bank expected to have proceeds of the whole loan portfolio?

16 A     We expected, based on the assumption that was in this

17 document, that the sale would occur before the end of the first

18 quarter or at the -- during the first quarter of 2008.

19 Q     Look at the next exhibit -- strike that.  BOA-24.

20 A     Yes.

21 Q     What is this?

22 A     This is an asset quality report that is prepared quarterly

23 that goes to the asset quality committee and the Board of

24 Directors at Bank of America.

25 Q     And did you participate in the preparation of this

1 document?

2 A    I did.

3 Q    Okay.  What, if anything, does this document say about the

4 price that BOA would need for itself and the lender group to

5 get out whole under the revolving credit agreement?

6 A    At this point in time, it estimates that 88 cents on the

7 dollar would be required for the banks to get out whole.

8 Q    And what, if anything, does this document say about the

9 bank's views at or about the time it was written as to what to

10 do with this loan portfolio?

11 A    Well, we did not believe that that price was achievable

12 and, as noted in the next sentence, we went on to estimate a

13 total loss on the entire facility in the neighborhood of

14 between ten and twenty percent and, as a result of that, our

15 options around a sale of the entire portfolio in one felt swoop

16 were being reconsidered and we were going to look at other

17 alternatives around holding and reworking the loans.

18          MR. DORSEY:  Objection.  Move to strike as to the

19 potential loss.  There's no foundation for that.

20          THE COURT:  Overruled.

21 BY MS. SCHONHOLTZ:

22 Q    Could you look at BOA Exhibit 25, please, Mr. Wampler, and

23 tell us what this document is?

24 A    This is another FAS-114 that was prepared for the quarter

25 ended -- or anticipation of the quarter ended March 31st.

1  Q    Okay.  And what, if anything, does this document say about

2  what the bank's expectations were as to when the loans would be

3  repaid?

4  A    Our projection in this indicates a longer term rework

5  strategy and that the loans would not be monetized until June

6  of 2009.

7  Q    And why was that?

8  A    A number of factors that revolve around execution in the

9  market based upon the product types and the portfolio and our

10 concern about selling at -- I don't want to say fire sale

11 prices, but we won't achieve maximum value and we feel like the

12 better, more prudent approach here is to rework these loans and

13 make them more conforming in nature and pursue a loan return

14 strategy.

15 Q    Now, you've mentioned before you -- part of the strategy

16 is to make the loans more conforming.  What does that mean?

17 A    In effect, it means to work with the borrowers on either

18 discounted refinancing or revised terms that would lead them to

19 be able to move into a GSE eligible product.

20 Q    And without stating a price, is your expectation that were

21 or someone else to be able to accomplish that, the price for

22 those loans would then be higher?

23 A    The price for those restructured loans would be par.

24 Q    Par meaning?

25 A    A hundred cents on the dollar.

1  Q    Now, the document we just looked at, BOA-26 (sic) was that

2  prepared at or about the time the banks decided to move for

3  relief from the stay?

4           MS. DORSEY:  I'm sorry, Your Honor.  We're on 25 or

5  26?

6           THE COURT:  I believe we're on 25.

7           THE WITNESS:  I'm on 26.

8           MS. SCHONHOLTZ:  I apologize.

9           THE COURT:  Well, I'm not.

10           MS. SCHONHOLTZ:  I apologize.  25.

11           THE WITNESS:  25.  Okay.

12  BY MS. SCHONHOLTZ:

13  Q    Was that document prepared at or about the time that the

14  banks decided to move for relief from the stay?

15  A    The document was prepared on the 25th of February so, yes.

16  Q    Let me direct your attention to BOA-27.  And I will

17  represent to you that this is a document produced in this

18  litigation by American Home that was prepared approximately two

19  weeks ago.  Let me direct your attention to the top that says

20  "Sell".

21  A    Okay.

22  Q    Does this document estimate proceeds that could be

23  recovered from the sale of your whole loan portfolio, if you

24  know?

25  A    Yes.  It appears to.

1  Q    And what is the amount of those proceeds?

2  A    Approximately $351 million.

3  Q    Okay.  And on the outstanding UBP, of what amount?

4  A    Approximately --

5  Q    Five sixty one?

6  A    Five sixty one.

7  Q    It is an eye chart.  I apologize.  That's how it was

8  produced.  Now, doing the math, Mr. Wampler, what is the

9  percentage sale price set forth in this document according to

10 the debtors?

11 A    Approximately sixty-two and a half cents on the dollar.

12 Q    Okay. And is that number generally consistent with the

13 bank's views as of this time?

14         MR. DORSEY:  Objection.  Lack of foundation.

15         THE COURT:  Response?

16         MS. SCHONHOLTZ:  I'll withdraw the question.

17         THE COURT:  Thank you.

18 BY MS. SCHONHOLTZ:

19 Q    Now, given your general experience in working with

20 troubled credits and working with troubled mortgage assets, do

21 you have any understanding as to why American Home might value

22 these loans at 62 cents on the dollar in this paper at this

23 time?

24 A    Yes.

25 Q    And what is that?

1  A    It's basically based upon where assets such as this are

2  being bid in the market and that is being driven by supply and

3  demand.   It's being driven by the characteristics of the

4  underlying products within the portfolio and anticipated future

5  defaults, delinquencies, foreclosures, et cetera.

6              MR. DORSEY:  Objection.  Move to strike.  The witness

7  still has not established a foundation for his knowledge of the

8  mortgage industry.   We've already determined that he cannot

9  rely on other similar mortgage programs that he's been involved

10  in.  At least they have not taken that -- tried to do that any

11  further.

12              MS. SCHONHOLTZ:  I'm not --

13              MR. DORSEY:  He still hasn't established a

14  foundation.

15              MS. SCHONHOLTZ:  I'm asking for the general state of

16  his knowledge as a person who works in this phase on a lot of

17  credits.  I'm not asking for him to --

18              THE COURT:  How is that proper foundation for why the

19  -- to have an opinion as to why the debtors are valuing

20  something at a certain level?  I mean, isn't the person to ask

21  the debtor?

22              MS. SCHONHOLTZ:  I will, Your Honor.

23              THE COURT:  All right.

24  BY MS. SCHONHOLTZ:

25  Q    Let me direct your attention to BOA-28.

1  A     Okay.

2  Q     Okay.  And I direct your attention to the page ending

3  Bates 4168.  Okay.  Market overview and forecast.  Did you

4  prepare this document?

5  A     It was prepared by my group.  Yes.

6  Q     Okay.  And what, if anything -- strike that.  The purpose

7  of this report was what?

8  A     Basically to give an overview of the current market

9  conditions and the outlook for 2008.

10 Q     Okay. And without being specific to the American Home

11 portfolio, this entry gives your view as to what general market

12 conditions were at the time, correct?

13         MR. DORSEY:  Objection.  Move to strike.  There's

14 still no foundation, Your Honor.

15         MS. SCHONHOLTZ:  I'm just asking his understanding --

16         THE COURT:  Well, wait a minute.

17         MS. SCHONHOLTZ:  -- of the general market conditions.

18         THE COURT:  Two things.  One, when you asked him

19 whether he prepared it, he was very careful to say his group

20 prepared it and he's not testifying as a group; he's a person.

21 Second, I think you need to lay a foundation as to why and on

22 what basis he has an understanding of what the market is.  I

23 mean, we all have a basic understanding but the evidence -- I

24 think, you're going to need to get some evidence in as to what

25 the basis is.  So I sustain the foundation objection.

1  BY MS. SCHONHOLTZ:

2  Q    Was this document prepared at your direction?

3  A    It was prepared at my direction.  It was reviewed and, to

4  the extent needed, it was edited by me.

5  Q    Okay.  So you reviewed and edited this document yourself

6  before it was finalized, is that correct?

7  A    That is correct.

8  Q    Okay.  And what is the basis for your knowledge as to the

9  information set out in market overview and forecasts?

10 A    Again, it's general industry exposure through the mortgage

11 loan companies that I've worked with over the course of the

12 last 12 to 18 months.  It involves direct experience.  It

13 involves experience talking regularly with my trading desk

14 about conditions in the market.  It includes internal calls

15 related to the dislocation of credit markets specifically

16 focused on both mortgage loans and mortgage pack securities.

17         MR. DORSEY:  Objection, Your Honor.  I still don't

18 think he's established his personal knowledge.  He's talking

19 about --

20         THE COURT:  Well --

21         MR. DORSEY:  -- his conversations with other people

22 and, again, we're back to this, his experience with other

23 similar mortgage portfolios which we object to and move to

24 strike.

25         THE COURT:  Well, I think you're anticipating the

1 next question with your objection.  She asked him what the

2 basis of his knowledge was and he answered it.  So I don't

3 think it's a proper objection to the question that was actually

4 asked so it's overruled.

5 BY MS. SCHONHOLTZ:

6 Q    Okay.  Are your views consistent with what's set forth in

7 Exhibit 28?

8           MR. DORSEY:  I'll renew my objection, Your Honor.

9           THE COURT:  Overruled.

10 BY MS. SCHONHOLTZ:

11 A    Yes.

12 Q    Do you have a view, Mr. Wampler, as to what the future

13 state of the residential mortgage market will be in the near

14 term?

15 A    Which part?

16 Q    Any part.

17           MR. DORSEY:  Objection, Your Honor.  This witness was

18 not identified as an expert witness on the market.

19           THE COURT:  And also, frankly, I think it's vague.  I

20 think the question is vague.  I'm not sure I know what it means

21 either.

22           MS. SCHONHOLTZ:  I'll --

23           THE COURT:  I mean, there are plenty of different

24 aspects.  You know, whether someone can get a mortgage, whether

25 someone can give a mortgage, whether someone can sell a

1  mortgage.

2          MS. SCHONHOLTZ:  I'll rephrase it, Your Honor.

3  BY MS. SCHONHOLTZ:

4  Q    What views do you have, Mr. Wampler, if any, with respect

5  to the current condition of the financial markets with respect

6  to the purchase and sale of mortgage related products?

7          MR. DORSEY:  Objection.  It's still vague, Your

8  Honor, and they're still asking for expert testimony.

9          MS. SCHONHOLTZ:  I'm not asking for expert testimony.

10  I'm asking for his experience and knowledge as a banker.

11          THE COURT:  Well --

12          MR. DORSEY:  She's asking the --

13          THE COURT:  You're asking him for -- to speculate --

14  well, you're asking him to use his crystal ball or tell us what

15  his crystal ball is as to what's going to happen.  That's

16  different from saying, what -- based on your experience in the

17  field, what did happen or what the current state of play is.

18  So it's a slightly different issue.  It really starts to get, I

19  think, into the realm of opinion testimony.  So the question

20  is, if it's not expert opinion testimony, is it fact testimony.

21  And if you're going to -- or opinion of the fact witness under

22  702 and there you're going to need to identify -- to the extent

23  that's the way you're going, you're going to have to be more

24  specific about what that fact testimony is based on.

25          MR. DORSEY:  Well, Your Honor, we also had a

1  stipulation with Bank of American that any witness who was

2  going to testify pursuant to R. 701 had to be designated prior

3  to the hearing.

4              MS. SCHONHOLTZ:  I'll move on, Your Honor.

5              MR. DORSEY:  And Mr. Wampler was not designated.

6              MS. SCHONHOLTZ:  I'll move on.

7              THE COURT:  All right.  Move on.

8              MS. SCHONHOLTZ:  Okay.

9  BY MS. SCHONHOLTZ:

10 Q    Did there come a time when Bank of America and the lenders

11 decided to move for relief from the stay?

12 A    Yes.

13 Q    Okay.  And without disclosing legal advise, why did BOA

14 and the lenders make that decision?

15 A    Two parts.  One was the decline in value since the

16 beginning of the case and the whole loan portfolio and the lack

17 of execution against the plan to monetize the portfolio that

18 was enunciated in this court on day one.  And that was a sale

19 process that was conducted sooner rather than later because

20 time was the enemy.  That was not done.  The focus of the

21 debtor and its professionals, for whatever reason -- I don't

22 know if there was not enough focus, not enough staff, but there

23 was an unwillingness to run a parallel path in 2007 with the

24 servicing sale and a whole loan sale.  We felt like the Broad

25 Hollow option was a good proxy for the way, with some

1  modifications, the way the whole loan portfolio could be sold

2  in this instance.  And for whatever reason, we got pushed back.

3  When we received the plan, if you want to call it that, in

4  January regarding what they wanted to do with each of the

5  various buckets of loans, there became a point in time when it

6  was clear that either they weren't going to or they could not

7  execute against even that plan.  So that was more or less a

8  watershed event that led to the discussions around moving for

9  relief from stay.

10 Q    Why did you wait until February?

11 A    Because we believed the debtor.  We believed that they

12 were going to do what they said they were going to do.  And in

13 November, rightly or wrongly, we deferred to their business

14 judgment around the impact and the potential decline in

15 performance rating of the portfolio.  Delinquencies did spike

16 as we thought and values declined even further.

17 Q    What relief is sought here, Mr. Wampler?

18 A    The relief that is sought is that that's provided for in

19 our security agreement more or less and that's to be able to

20 take possession or direct the servicing of our loans and to

21 prepare them as we see fit for sale or to hold.

22 Q    Are you seeking -- strike that.  Are you and the lender

23 group seeking to own these loans?

24 A    No.

25 Q    And if stay relief is granted, what is the general plan

1 for these assets?

2 A    Well, the general plan in total has not been fully

3 developed but I think it's fair to say that certain of the

4 assets lend themselves towards maximum recovery through a sale

5 in short order for delivery into the GSE's.  The other assets,

6 the option arms, et cetera, they're going to require some more.

7 Q    What is your view, sitting here today, as to what the

8 price would need to be to get the bank out whole on these

9 loans?

10 A    In the neighborhood of 88, 89 cents on the dollar.

11          MS. SCHONHOLTZ:  I have no further questions, Your

12 Honor.

13          THE COURT:  Thank you.  Does -- Mr. Power, are you

14 going to have any questions?

15          MR. POWER:  Your Honor, I wasn't but I would like to

16 ask one question just based on that last answer.

17          MS. SCHONHOLTZ:  I apologize.  Would Your Honor like

18 me to move the exhibits in now or wait until the end of the

19 case?

20          THE COURT:  It's up to you.  They're your exhibits.

21          MS. SCHONHOLTZ:  It's -- let me move for admission

22 of, one, BOA-1 through 11, 13 to 17, 23 to 25 --

23          THE COURT:  Wait a minute.  One to 11, 13 to 17.

24          MS. SCHONHOLTZ:  23 to 25 and 27 to 30.   27 and 30.

25          THE COURT:  All right.  So 1 through 11, 13 through

1  17, 23 through 25, 27 and 30?

2              MS. SCHONHOLTZ:  Correct.

3              THE COURT:  Any objection, Mr. Dorsey, or do you need

4  time?

5              MR. DORSEY:  I need time, Your Honor.

6              THE COURT:  All right.  We'll deal with it when Mr.

7  Dorsey has an opportunity.

8              MS. SCHONHOLTZ:  Understood.

9              THE COURT:  Okay.  That could be a while.

10             MR. POWER:  I just have one question.  Mark Power

11 from Hahn & Hessen.

12                      DIRECT EXAMINATION

13 BY MR. POWER:

14 Q    Sir, when you -- your answer to the last question which

15 related to what you thought the bank needed to recover on the

16 loans in order to get paid out in full, are you familiar with

17 the settlement that was approved by the Court on Monday?

18 A    I am.

19 Q    And when you referenced those loan numbers, does that take

20 into account the settlement that you have against --

21 A    It does not.

22 Q    So when you take in the settlement, the numbers change

23 because of the sharing arrangements, is that correct?

24 A    That's correct.

25             MR. POWER:  Thank you.  That's all.

1              THE COURT:  All right.  Would you like to proceed,

2  Mr. Dorsey, or would you like to --

3              MR. DORSEY:  We could proceed or we can break for

4  lunch, Your Honor, whatever the Court would prefer.

5              THE COURT:  Let's take a break.  Two questions before

6  we do that.  How late do you want to go tonight and what's your

7  plan when we don't finish today?

8              MS. SCHONHOLTZ:  We're at your disposal, Your Honor,

9  and we'll work as late as you want.  We're prepared as -- I

10  understand you have time on your docket tomorrow for us.  So

11  whatever works best for Your Honor.

12             THE COURT:  All right.  Let's -- two-thirty all right

13  to reconvene?  And let's try to be prompt.

14             MR. DORSEY:  Thank you.

15             THE COURT:  Okay.  We'll take a recess until

16  two-thirty for lunch.  We'll reconvene at that time with cross

17  examination and you get the lunch break off, sir.  You don't

18  get to talk to your lawyers so you're the happiest man in the

19  room.  We're in recess until two-thirty.

20                       (Luncheon recess)

21             THE COURT:  Please be seated.  Will the witness

22  retake the stand, please.

23             MR. DORSEY:  If Your Honor would like, we can address

24  the exhibits that were moved --

25             THE COURT:  Oh, all right.

1          MR. DORSEY:  -- before we start with the witness.

2          THE COURT:  Very well.  Go ahead, Mr. Dorsey.

3          MR. DORSEY: Do you have any objection to my sitting,

4    Your Honor, so I --

5          THE COURT:  No, not at all.

6          MR. DORSEY:  The debtors have no objection, Your

7    Honor, to Exhibits 1 through 10.  We do object to Exhibit No.

8    11.  It contains valuation information that this witness was

9    unable to establish a foundation for.  We have no objection to

10   Exhibit 13.  We object to Exhibit 14 for the same reason; it

11   contains valuation information the witness was unable to lay a

12   foundation for.  We have no objections to 15, 16 or 17.  We do

13   object to 23 through 25 for those reasons; they contain

14   valuation information the witness was unable to lay a

15   foundation for.  Number 27 we have no objection to.  28, we

16   object to for those same reasons.

17          THE COURT:  I don't think they moved 28.  27 and 30

18   was --

19          MS. SCHONHOLTZ:  Your Honor, when we broke, my

20   partner advised me that 28 was on our list.  We immediately

21   advised Mr. Dorsey.

22          THE COURT:  All right.  Okay.  I'm sorry.  No

23   objection to 28?

24          MR. DORSEY:  No objection to 28, Your Honor.

25          THE COURT:  Okay.

1            MR. DORSEY:  And we do object to -- I'm sorry.  28,

2    we do object to.  Now I'm confused.  28 we do object to for the

3    same reasons; it contains valuation information the witness was

4    unable to lay a foundation for.  And Exhibit 30, we have no

5    objection.

6            THE COURT:  Okay.  So 1 through 10, 13, 15, 16, 17,

7    27 and 30 are admitted without objection and I'll hear response

8    on 11, 14 and 23, 24, 25, and 28.

9            MS. SCHONHOLTZ:  With respect to Exhibit 11, Your

10   Honor, we would like to move only the first page in, not the

11   underlying documentation.  The first page, this witness

12   testified, he -- is his handwriting.  He participated in the

13   bucketing and it is not being offered for valuation.  It's

14   being offered for his state of mind and what he was thinking

15   and doing at the time.

16           THE COURT:  Mr. Dorsey?

17           MR. DORSEY:  Withdraw the objection.

18           THE COURT:  All right.  11 is admitted, just the

19   first page, for the purpose set forth by counsel without

20   objection.

21           MS. SCHONHOLTZ:  Okay.  14, and this goes to others

22   that are also -- we'll just take them one at a time.  This

23   document, the witness testified, was prepared in part and all

24   reviewed by him.  It is a business record kept and -- made,

25   kept and relied on in the ordinary course of business.  We are

1  not offering this for valuation.  We are offering it for the

2  purposes of the questioning in terms of what this witness

3  believed it would take the bank to get out whole at the time

4  and the timing of the liquidation of these assets.

5              THE COURT:  Mr. Dorsey?

6              MR. DORSEY:  As long as it's not being offered for

7  the valuation, Your Honor, I'll withdraw the objection.

8              THE COURT:  All right.  It will be admitted as

9  limited, without objection.

10             MS. SCHONHOLTZ:  Next, I believe, is 23.

11             MR. DORSEY:  Yes.

12             MS. SCHONHOLTZ:  Again, same basis.  We are not

13 offering this for valuation.  It is a business record made,

14 kept and relied on in the ordinary course of business.  It is a

15 quarterly report for regulatory purposes and, again, we are not

16 offering it for valuation.

17             MR. DORSEY:  Based on that representation, Your

18 Honor, with that limitation, I withdraw the objection.

19             THE COURT:  All right.  Based on the limitation, it

20 is admitted without objection.

21             MS. SCHONHOLTZ:  Okay.  Exhibit 24, a business record

22 made, kept and relied on in the ordinary course of business,

23 done quarterly and no -- we are not offering it for the

24 purposes of valuation.

25             MR. DORSEY:  Given the representation and with that

1  limitation, I will withdraw the objection, Your Honor.

2          THE COURT:  All right.  Permitted as limited without

3  objection.

4          MS. SCHONHOLTZ:  The same statement with respect to

5  Exhibit 25, Your Honor, which is a FAS-114, similar to Exhibit

6  23.  The same limitation.  We are not offering it for

7  valuation.  We are offering it for the purposes on which we

8  questioned this witness.

9          MR. DORSEY:  With that, Your Honor, I will withdraw

10  the objection with that limitation.

11          THE COURT:  All right.  So it's admitted as limited

12  without objection.

13          MS. SCHONHOLTZ:  Okay.  The next one was 28, I

14  believe.

15          THE COURT:  Yes.

16          MS. SCHONHOLTZ:  Also, again, another version of the

17  same type of document, not offered for valuation.  Same

18  limitations and a business record.

19          MR. DORSEY: And, again, we'll withdraw based on those

20  limitations, Your Honor.

21          THE COURT:  All right.  28 is admitted as limited

22  without objection.

23          MS. SCHONHOLTZ:  Thank you.

24          THE COURT:  Cross examine the witness.  You're still

25  under oath, sir.

1                     CROSS EXAMINATION

2   BY MR. DORSEY:

3   Q    Good afternoon, Mr. Wampler.  You are here testifying on

4   behalf of Bank of America as the administrative agent for the

5   facility that is at issue in this case, is that correct?

6   A    The revolving credit facility.  Yes.

7   Q    You are not here to testify on behalf of Bank of America

8   itself, is that correct?

9   A    That is not correct.

10  Q    You are testifying as both Bank of America as the

11  administrative agent and Bank of America?  Is that your

12  understanding?

13  A    I would expand it to say three things: administrative

14  agent, Bank of America, and myself individually.

15  Q    Is Bank of America a party to this proceeding, sir?

16  A    We are the agent for the revolving lenders.

17  Q    You're aware that the action was actually filed by Bank of

18  America limited to its capacity as the administrative agent?

19            MS. SCHONHOLTZ:  Objection.

20            THE COURT:  Basis?

21            MS. SCHONHOLTZ:  There's no foundation for that at

22  all and it's not accurate.

23            THE COURT:  All right.  Mr. Dorsey?

24            MR. DORSEY:  Well, we can take a look at the motion,

25  Your Honor.  I believe it was filed as -- by Bank of America as

1 administrative agent.

2          MS. SCHONHOLTZ:  On behalf of the lenders of which

3 BOA is lumped.

4                         (Pause)

5          MR. DORSEY:  I believe the caption of it is, "As

6 administrative agent," Your Honor.  In the preamble, they do

7 indicate that they are bringing it on behalf of Bank of America

8 as administrative agent and the underlying lenders.

9          MS. SCHONHOLTZ:  It would have made for a very long

10 caption, Your Honor.

11         THE COURT:  Well, it's signed in your capacity as

12 administrative agent.

13         MR. DORSEY:  That's correct, Your Honor.

14         MS. SCHONHOLTZ:  But for -- administrative agent for

15 the lenders.

16         THE COURT:  I'm not sure I understand the point of

17 the line of testimony but why is this relevant?

18         MR. DORSEY:  I'll get to that, Your Honor.

19         THE COURT:  Thank you.

20         MR. DORSEY:  I can move on, Your Honor.

21         THE COURT:  Yes, okay.

22 BY MR. DORSEY:

23 Q    You testified, sir, that there were a number of resources

24 that Bank of America could bring to the process, including a

25 servicing platform?  Is that correct?

1  A    That's correct.

2  Q    And a trading desk, is that correct?

3  A    That's correct.

4  Q    The trading desk is Bank of America Securities that you're

5  referring to, is that correct?

6  A    It's an affiliate of Bank of America, yes.  Bank of

7  America Securities.

8  Q    And hedging departments, correct?

9  A    That's correct.

10  Q    And loss mitigation for purposes of servicing the loans,

11  is that right?

12  A    It's part of the servicing department.  Yes.

13  Q    Okay.  So it's your position that Bank of America, if the

14  relief here is granted, would take possession of these loans

15  and service them and do all the work outs that you've testified

16  to in your direct testimony?

17  A    That hasn't been fully developed but it may be Bank of

18  America on certain of the products; it may be other servicers

19  that have greater expertise in certain loan products.

20  Q    Would you have to pay those people to undertake that

21  obligation?

22  A    We would pay an ordinary and customary third party arm's

23  length rate.  Yes.

24  Q    Nobody is going to do that for free, right?

25  A    It's not being done for free now.  No.

1 Q    And you also testified that Bank of America would be able

2 to give reps and warrants, is that correct?

3 A    That's a possibility.

4 Q    Possibility but you haven't decided whether you're going

5 to do that or not?

6 A    That has not yet been decided.

7 Q    If they did give reps and warranties, would Bank of

8 America charge a fee to the other members of the bank group?

9 A    We haven't fully vetted that with the group but, to the

10 extent that that was done, we would look for a ratable share

11 from each of the bank group members for that collective rep and

12 warranty.

13 Q    So there would be a charge associated with that?

14 A    Not necessarily.  If the rep and warranty and

15 indemnification, whatever you want to call it, was never

16 called, there would be no charge.  But we would ask for each of

17 the members of the bank group to step up for their ratable

18 share of whatever that rep and warranty exposure may be.

19 Q    Is that something the bank group could do now with the

20 debtors holding possession of those loans?

21 A    It's something that they could consider but whether they

22 would do it or not is another question.

23 Q    And you talked about a number of other things that you

24 thought might be done but, again, you don't have your plan in

25 place yet for these particular loans.  And that included

1  managing the accounts, is that right?

2  A    Not me personally but we would make sure the resources

3  were allocated to work on accounts that needed more work than

4  others.  If it's not a regular current paying customer, they

5  would require special handling.  Yes.

6  Q    And is that something that Bank of America could assist

7  the debtors with doing now with the debtors still in possession

8  of those loans?

9  A    That's a possibility but it's not necessarily the

10 preferred path.

11 Q    It's not Bank of America's preferred path, correct?

12 A    It's not Bank of America nor the bank group's preferred

13 path.

14 Q    Has the bank group voted on that?

15 A    We discussed this and it was affirmed by -- I don't think

16 anyone in the bank group dissented upon this course of action.

17 Q    And when did that occur, sir?

18 A    Prior to the filing of the motion for relief of stay.

19 Q    You also mentioned that Bank of America, if they were in

20 possession of the loans, could rework them to make the GSE

21 eligible, correct?

22 A    That's correct.

23 Q    Is that something that could be done in conjunction with

24 the debtors holding possession of the loans, rather than

25 transferring them to Bank of America?

1  A    That's something that could possibly be done but it would

2  require Bank of America and the bank group's consent.

3  Q    And I want to go back to some testimony you gave about

4  what was happening in the -- I believe you said the late

5  October, early November time frame when Bank of America sent

6  some bid procedures to the debtors.  Do you remember that

7  testimony?

8  A    I do.

9  Q    Was that the first time that the debtors and Bank of

10 America had had discussions about possible bid procedures in

11 connection with the sale of the whole loans?

12 A    No.

13 Q    When was the first time, sir?

14 A    Probably in August, September, as it related to the Broad

15 Hollow portfolio.

16 Q    As it related to Broad Hollow as opposed to the whole

17 loans involved in the Bank of America suit?

18 A    In that time frame, yes, but the procedures again were

19 talking about on the Tuesday, Thursday call and it was a

20 natural extension to take those procedures and use them as it

21 relates to the mortgage loans under the warehouse loan.  Yes.

22 Q    So there were discussions between Bank of America and the

23 debtors as early as August regarding potential bid procedures,

24 right?

25 A    On Broad Hollow.

1  Q    But not on the whole loans?

2  A    Not specifically as it relates to the revolver whole

3  loans.  No.

4  Q    All right.  But -- so they were discussed in terms of

5  Broad Hollow but with the idea that they could be used for the

6  whole loans as well, is that right?

7          MS. SCHONHOLTZ:  Objection to the form.  He's already

8  answered that question.

9          THE COURT:  Not yet.  Overruled.

10 BY MR. DORSEY:

11 A    The discussions with respect to the bid procedures

12 specifically being used for the whole loans were not discussed

13 as it relates to the discussions on Broad Hollow until after

14 the Broad Hollow option.

15                      (Pause)

16          MR. DORSEY:  May I approach the witness, Your Honor?

17          THE COURT:  (No audible response).

18          MR. DORSEY:  May I approach the witness?

19          THE COURT:  Yes.

20 BY MR. DORSEY:

21 Q    Do you have the binder of materials that was provided to

22 you, sir?

23 A    I do.

24 Q    And if you would open to the first document, or Tab 1,

25 please?  Do you have that open?

1  A    I do.

2  Q    And this is an E-mail from Sean Beach who is an attorney

3  at Young Conaway to your counsel, copied to Mr. Patton dated

4  August 17, 2007 attaching draft loan asset procedures, do you

5  see that, and a motion?

6  A    I do.

7  Q    And if you look at the attached motion, it says "Debtor's

8  Motion for an Order Establishing Procedures for the Sale of

9  Mortgage Loans and the Servicing Rights Related Thereto; (2)

10 Authorizing the Debtors to Sell Mortgage Loans and Related

11 Servicing Rights in the Ordinary Course of Business; and (3)

12 Granting Certain Related Relief".  Do you see that?

13 A    I do.

14 Q    Does this relate only to Broad Hollow or does it relate to

15 all mortgage loans?

16 A    My understanding is this is related to all mortgage loans

17 without distinction as to which facility they were refinanced

18 or repo'ed.  It was every either owned or financed or repo'ed

19 mortgage loan that the company had in its possession.

20 Q    And if you turn to the next tab, sir, there's another

21 E-mail from Mr. Beach, again to Ms. SCHONHOLTZ, your attorney,

22 and it again relates to a motion to approve sales in the

23 ordinary course.  Do you see that?

24 A    I do.

25 Q    And attached to that again is another form of a proposed

1  motion and order to establish procedures for the sale of loans?

2  Do you see that?

3  A    I do.

4  Q    And is that in any way limited to the sale of the Broad

5  Hollow loan, sir?

6  A    I do not know.  I haven't read this motion but --

7  Q    Feel free to take a look.

8                          (Pause)

9  A    It's not that specific.  It just broadly describes the

10  loan assets generally.  Perhaps there's more detail in the

11  definition of loan assets that I've skipped over or haven't

12  gotten to yet.

13                          (Pause)

14  A    Well, it looks to me like it's a motion requesting that

15  the debtor be permitted to sell loans that it owns and is

16  financed by others free and clear of liens using it's own

17  business judgment.  So, yes, I would say that that is broad

18  enough to cover loans beyond the Broad Hollow.

19  Q    And if you turn to the next tab, please, sir, there's

20  another E-mail, stream of E-mails.  If you start at the bottom

21  of the Page 1, there's an E-mail from Mr. Patton -- excuse me

22  -- from Mr. Talmadge to Mr. Patton regarding the draft sale

23  procedure motion, correct?

24  A    That's correct.

25  Q    And Mr. Talmadge, who is an attorney for Bank of America,

1 | correct --

2 | A    Correct.

3 | Q    -- he's giving comments to Mr. Patton about the proposals

4 | that have been made by the debtors, correct?

5 | A    He is.  Well, he's basically saying that he has issues

6 | with it.

7 | Q    And if you look at the attachment to that E-mail, sir,

8 | that again is the same sale -- proposed sale procedures that we

9 | looked at previously?

10 | A    That is correct.  Well, I say that quickly.  Yes, it is.

11 | Q    And, again, that was broad enough to cover all loans, not

12 | just the Broad Hollow loans, correct?

13 | A    In the debtor's sole discretion, it is -- it covers all

14 | loans, yes, but it is in the debtor's discretion without regard

15 | to other peoples' lien rights, et cetera.

16 | Q    And if you look back at the caption of the E-mail that we

17 | were looking at originally on Page 1 from Mr. Talmadge to Mr.

18 | Patton, you're included as a copy on that E-mail, are you not?

19 | A    I am copied.  Yes.

20 | Q    If you turn to the next tab, please, sir, another E-mail

21 | from Mr. Beach to Ms. SCHONHOLTZ and Mr. Talmadge dated

22 | September 7, 2007.  Do you see that?

23 | A    I do.

24 | Q    And this is another E-mail captioned, "Loan Sale Procedure

25 | Motion," correct?

1  A     It is.

2  Q     And in the body of that E-mail, Mr. Beach is telling Mr.

3  Talmadge that he's following up on a conversation they had had

4  about the draft loan sale procedures, correct?

5  A     That's correct.

6  Q     And, again, the attachment to this E-mail is the same sale

7  procedures that we've been looking at in the other E-mails that

8  would relate to all loans held by the debtors, not just Broad

9  Hollow?

10 A     Yes.

11 Q     And if you turn to the next tab, please, sir, this is an

12 E-mail -- E-mail at the bottom from Mr. Beach to Mr. Talmadge

13 dated October 3, 2007 indicating that he understands that we

14 are all focused on the servicing sale but wanted to remind you

15 to get me the loan asset sale procedures with respect to the

16 loans under the BOA facility?  Do you see that?

17 A     I do.

18 Q     And Mr. Talmadge responded to him, saying that he's been

19 working on it, correct?

20 A     That's correct.

21 Q     And the E-mail from Mr. Beach is for the loans under the B

22 of A facility?  That would be the facility at issue here,

23 correct, sir?

24                         (Pause)

25 A     He has limited to the -- limited it to the B of A

1  facility, yes.

2  Q    And if you turn to the next page, sir, Tab No. 6, another

3  E-mail from Mr. Beach to Mr. Talmadge dated October 30, 2007.

4  Do you see that?

5  A    I do.

6  Q    And Mr. Beach is attaching a copy of Mr. Johnson's V-card

7  as he had requested for someone who they could contact in

8  connection with the whole loan sales, correct?

9  A    Yes.

10  Q    And the next page, sir, is another -- excuse me.  The next

11  tab, Tab 7, is another E-mail from Mr. Talmadge to Mr. Beach

12  dated November 2, 2007.  The subject is the whole loan sales

13  procedures.  Do you see that?

14  A    That's correct.

15  Q    And this was the procedures that had been forwarded by Mr.

16  Talmadge to Mr. Beach that we looked at in connection with your

17  direct testimony under Exhibit No. 8 and 9, correct?

18  A    It would appear to be so, yes.  But it's slightly

19  different.

20  Q    Different in what way, sir?

21  A    The dates at the top indicate that it's a draft from April

22  16, 2008 and it's clearly not.

23  Q    I believe that was just a printing when it was printed by

24  the counsel who Mr. Beach had updated the date at the top.

25  A    I understand.

1 Q    Let's go back to Exhibit No. 8 that your counsel walked

2 you through during your direct testimony, please.

3            MS. SCHONHOLTZ:  8?

4            MR. DORSEY:  Yes.

5                        (Pause)

6 BY MR. DORSEY:

7 Q    Do you have that in front of you, sir?

8 A    B of A Exhibit 8.  Yes.

9 Q    And you testified that this was comments made by the

10 debtors to the sale procedures that have been proposed by Bank

11 of America, correct?

12 A    I did.

13 Q    And if you look at No. 9, these were sales procedures, the

14 same sale procedures, with comments back from Bank of America

15 to the debtor, correct?

16 A    That's correct.

17 Q    And if you turn to Page 3 of that document, please --

18            THE COURT:  Which tab?  9?

19            MR. DORSEY:  Yes, Your Honor.

20            THE COURT:  Thank you.

21 BY MR. DORSEY:

22 Q    One of the things that was added to the previous drafts

23 appears as -- towards the bottom of the page, it says "Bank of

24 America, N/A, for its own account and not in its capacity as

25 administrative agent and each of the pre-petition secured

1  lenders for their respective own accounts and not in their

2  respective capacities as pre-petition secured lenders, may

3  submit a bid and may become a qualified bidder in accordance

4  with the provisions of these sales procedures," correct?

5  A    I see that.  Yeah.

6  Q    And that did not appear in the previous version, correct?

7  A    If it's black-lined, I would assume no.

8                    (Pause)

9  A    No, it is not.

10  Q    And if you turn back to Exhibit No. 9, sir, on Page 4,

11  Section No. 6 of those proposed bid procedures, do you have

12  that in front of you, sir?

13  A    Exhibit 8, Page 4, Section 6?

14  Q    No. 9.  Exhibit 9.  I'm sorry.

15  A    I'm sorry.

16                    (Pause)

17  A    Go ahead.  Exhibit 9.  Which page and section?

18  Q    Page 4.

19  A    Go ahead.

20  Q    Section 6.

21  A    Got it.

22  Q    These changes to this version of the bid procedures would

23  have required the debtors to have accepted even one qualifying

24  bid if it had been received within the time allotted, correct?

25  A    That's correct but it doesn't look like it's a change.

1  Q    The debtors would have been forced to have accepted a bid,

2  regardless of how low that bid was, if one qualified bid had

3  been received, correct?

4  A    I think Exhibit 9 includes the debtor's comments, so yes.

5  They accepted that.

6  Q    Well, you don't know that they accepted that, do you, sir?

7  A    They didn't mark it.

8  Q    Okay.  Did they ever have conversations with you that said

9  they didn't like the idea of having to accept a single

10  qualified bid if it had been received?

11  A    I can't recall if they did or not.

12  Q    Let's turn to Exhibit No. 12 that your counsel referred

13  you to.

14  A    In --

15                         (Pause)

16          MS. SCHONHOLTZ:  Your Honor, if we are moving to

17  another subject, I would like to interpose an objection.

18          THE COURT:  Okay.

19          MS. SCHONHOLTZ:  The entire line of questioning I

20  would move to strike except for the portion that asked this

21  witness about BOA Exhibit 8 and 9 because none of the documents

22  that he was shown were produced in discovery of this action and

23  they clearly were within the purview of the request and, if you

24  look at the book, they were printed yesterday.

25          MR. DORSEY:  Your Honor, these were all documents

1   that were in their possession.  They're E-mails between

2   debtor's counsel and Bank of America's counsel.  We did not

3   feel we needed to produce documents that they already had in

4   their possession that would be part of our objections to their

5   request for production of documents.  We're not going to

6   produce stuff you already have.  So they already have this

7   stuff.  And I would note they didn't produce it either, Your

8   Honor, and it was in -- if it's something they thought should

9   have been produced, they should have produced it.

10          MS. SCHONHOLTZ:  Your Honor, we produced all the

11  documents that were requested in the bank's files and, to the

12  extent the documents didn't exist in the bank files, they

13  didn't exist.  But --

14          THE COURT:  What about your files?  You're an agent

15  of the bank.  Did you go through your files?

16          MS. SCHONHOLTZ:  We did not and our understanding was

17  that that was -- let me put it this way.  We looked through --

18          THE COURT:  Well, did you ask for Young Conaway to go

19  through Young Conaway's files?

20          MS. SCHONHOLTZ:  Our understanding was that any

21  documents that were in the debtor's files at any point in time

22  which these, we have to believe were, should be produced from

23  the debtor's files.  It is hard to imagine, Your Honor --

24          THE COURT:  Well, what did your client do with the

25  copy of the E-mail that he's listed on that wasn't produced

1  that he received?

2          MS. SCHONHOLTZ:  We don't know that we didn't produce

3  it.  We might well have produced it but this doesn't --

4          THE COURT:  You just told me none of it was --

5          MS. SCHONHOLTZ:  No, I did not, Your Honor.

6          THE COURT:  Oh, I'm sorry.  Okay.  Mr. Dorsey told me

7  none of it was produced.

8          MS. SCHONHOLTZ:  I'll represent to the Court that the

9  documents that were requested from the bank's files were

10  produced.  Just because he hasn't used a B of A Bates stamp

11  number doesn't mean --

12          THE COURT:  Did Kay Scholer comb Kay Scholer's files,

13  and produced documents that were in Kay Scholer's files?

14          MS. SCHONHOLTZ:  We did to the extent they were not

15  duplicated in B of A's files, only to the extent we knew that B

16  of A got them.  If B of A got them, they were in B of A's

17  files.  The request was not to comb the files for every

18  interchange.  These documents, we must believe, at least some

19  of the sales procedures were also in the debtor's files.  We

20  didn't impose any stronger obligation on Young Conaway than

21  they imposed on us.  But to the extent these documents existed

22  in the debtor's files, they should have been --

23          THE COURT:  We don't know that one way --

24          MS. SCHONHOLTZ:  We are on expedite --

25          THE COURT:  We don't know that one way or the other,

1  do we?  I mean, it's not --

2       MS. SCHONHOLTZ:  We're on a very expedited schedule.

3  We produced everything we could find and we were very careful.

4  We -- I'm going to move to strike and object to these documents

5  to the extent that they were in the debtor's files, were not

6  produced, and are -- or run today.

7       MR. DORSEY:  Two things, Your Honor.  One, if we look

8  through these, we'll see that they were all in Kay Scholer's

9  files.  They had access to all of these.  Whether they were in

10 debtor's production or not, I cannot represent to the Court one

11 way or the other because the debtor's production, unlike the

12 Bank of America production, was a million pages of documents.

13 A million pages of documents, tens of thousands of documents.

14 The production we got from Bank of America was 667 documents.

15 They certainly did not go out of their way to provide us with

16 information.  And I'm not moving these into evidence.  I'm

17 using them for impeachment purposes to show that this witness

18 mis-testified when he said that the November 8th or early

19 November bid procedures were the first time they had any

20 conversations with the debtors about sales procedures in this

21 case.

22       MS. SCHONHOLTZ:  I don't recall him testifying to

23 that but that's besides the point.  If the debtor has intended

24 to use these, we believe that they were under the obligation to

25 produce them.

1          THE COURT:  Not for impeachment purposes.

2          MS. SCHONHOLTZ:  Pardon me?

3          THE COURT:  Not for impeachment purposes.

4          MS. SCHONHOLTZ:  But in discovery, not for -- not

5    today.  They were obligated to produce them in discovery.

6          THE COURT:  Did you object to producing documents

7    that were already in possession of Bank of America?

8          MR. DORSEY:  I believe we did, Your Honor.  Yes.  I

9    can take a look at it.

10                         (Pause)

11         MS. SCHONHOLTZ:  Your Honor, if they're not going to

12   offer them into evidence, we're okay.

13         THE COURT:  All right.  The objection is withdrawn.

14   Or let's say preserved to see -- for purposes of whether or not

15   Mr. Dorsey seeks to move them into evidence.

16         MR. DORSEY:  I'm trying to remember where I left off,

17   Your Honor.

18   BY MR. DORSEY:

19   Q    Let me go back to Exhibit No. 12, please, Mr. Wampler.

20   A    Bank of America or --

21   Q    Bank of America.  Yes.

22         THE COURT:  I believe that's where you were, Mr.

23   Dorsey.

24   BY MR. DORSEY:

25   A    Okay.

1  Q    This was a document that your counsel asked you about on

2  your direct examination, correct?

3  A    Yes.

4  Q    And I believe you testified that the various tranches of

5  debt or -- excuse me -- the tranches of mortgage loans that are

6  listed in this exhibit came from the same type of tranches that

7  were used in the Broad Hollow sale, is that correct?

8  A    It was a similar technique.  I don't know if there's a

9  hundred percent overlap between the product types but the

10  technique is exactly the same.  Yes.

11  Q    Would it surprise you, sir, that there were only three

12  tranches in the Broad Hollow sale?

13  A    No, it would not.  I believe there were six.  There were

14  Melville and Broad Hollow; each had three.  So there were six

15  tranches.

16  Q    And there's seven listed in this, correct?

17  A    That's correct.

18  Q    Looking at Exhibit No. 13, please, sir, this was the

19  E-mail from you to Mr. Kennedy dated November 16, 2007,

20  correct?

21  A    That is correct.

22  Q    And you -- who is Mr. Kennedy, by the way?

23  A    He is retired from the bank but, at the time, he was the

24  head of all the special assets for Bank of America.

25  Q    So he was your boss, is that right?

1  A     He was my boss's boss.  Pete Jost is my boss.

2  Q     Okay.  And you're providing him an update on what is going

3  on with the AHM servicing sale, correct?

4  A     And the collection effort in total.

5  Q     And you indicated in here that it is expected that the

6  whole loan sale would occur in the first quarter of '08,

7  correct?

8  A     That's correct.

9  Q     And this is November 16, when you testified you were

10 pushing the debtors to try and sell the stuff as quickly as

11 possible, correct?

12 A     In talking to the debtor, again, I wanted to beat this

13 target and, in talking to Mr. Kennedy, I wanted to give him my

14 outside expectation of when it would be achieved.  But I always

15 strive to do it earlier.

16 Q     But you didn't seem -- you didn't put in this E-mail to

17 Mr. Kennedy that you disagreed with the debtor's view of

18 selling these in the first quarter of '08, did you, sir?

19 A     This, again, is a very high level of the bank.  I just

20 wanted to shoot him a quick note.  We didn't get into that

21 level of detail.  No.

22 Q     So Mr. Kennedy, reading this, would assume the bank

23 agrees; we'll sell the loans the first quarter of '08?

24         MS. SCHONHOLTZ:  Objection.

25         MR. DORSEY:  Withdrawn.

1  MR. DORSEY:

2  Q    Let's take a look at Exhibit No. 14, Bank of America

3  Exhibit 14.   Now, what was the purpose of preparing this

4  document at the bank, sir?

5  A    Again, as I previously testified, it's a quarterly report

6  that credit risk management looks at where we update the

7  current status and progress on our collection efforts with

8  respect to distressed credits.

9  Q    And in this document, you again referred to the sale

10 occurring in the first -- the sale of the mortgage loans

11 occurring in the first quarter of '08, correct?

12 A    It is currently expected to occur during the first quarter

13 is what I say.   Yes.

14 Q    And this is under Bank of America's plan to get repaid,

15 correct?

16 A    That is correct.

17 Q    And nothing in here says this was the debtor's plan to do

18 it in the first quarter of '08 and we disagree with it but

19 we're going along because that's what the debtors want to do,

20 correct?

21          MS. SCHONHOLTZ:  Objection to the form.

22          MR. DORSEY:  I don't think there's anything

23 objectionable with the form, Your Honor.  Cross examination.

24          MS. SCHONHOLTZ:  He's testifying.

25          THE COURT:  Oh, no.  Overruled.  Do you recall it?

1  If you can, answer.

2  BY MR. DORSEY:

3  A    To read the whole last paragraph, it says, "We will

4  continue to work with counsel, the company, and its advisors."

5  It's not Bank of America's plan.  It is a joint plan.

6  Q    My question was, sir, there's -- no one reading this at

7  the bank would have any understanding that Bank of America

8  disagreed with the concept of selling these loans in the first

9  quarter of '08 by reading this document, correct?

10           MS. SCHONHOLTZ:  Objection, Your Honor?

11           THE COURT:  Basis?

12           MS. SCHONHOLTZ:  No one at the bank.  He's asking

13  this witness to get in the heads of everybody in the bank who

14  might have looked at this document.

15           MR. DORSEY:  No, Your Honor.  I'm asking him to tell

16  me that there's nobody who would look at this -- he told me it

17  was used in the bank for reporting purposes.  Anyone looking at

18  this in the bank would not be able to tell by looking at it --

19           THE COURT:  All right.

20           MR. DORSEY:  -- that they disagree with the debtors.

21           MS. SCHONHOLTZ:  There's no foundation for that.

22           THE COURT:  Well, he doesn't need foundation on cross

23  so overruled.

24  BY MR. DORSEY:

25  A    The presentation of these serves are done in committee.

1 What's written here is not exactly a hundred percent of the

2 total take-away from the document.  There are discussions

3 orally at committee to discuss where we are and those

4 sentiments may be captured in those oral discussions at

5 committee but this document says what it says.

6 Q    Okay.  You mentioned during your direct testimony a bid

7 that was received from Bayview Capital, correct?

8 A    That's correct.

9 Q    And that was received in mid-May, I believe you testified?

10 Or, excuse me, mid-November?

11 A    To the best of my recollection, yes.

12 Q    And that bid was an indicative bid?  It was not a firm

13 bid, correct?

14 A    It was an indicative bid with the anticipation of becoming

15 a stalking horse bidder.  Yes.

16 Q    And that bid was between 55 and 60 cents for the entire

17 portfolio, correct?

18 A    That is correct.

19 Q    Now, under the bid procedures that have been proposed by

20 Bank of America, that if you have one qualifying bid, you would

21 have to accept it?  If they had held an auction in late

22 November, after Bayview Capital had made its bid and no one

23 else bid and Bayview had the 55 to 60 cent bid, the debtors

24 would have been forced to accept that bid, correct?

25 A    If those had become the final sell procedures, that's

1 true.

2 Q    And you also mentioned about other bids that had been

3 received by the debtor with respect to the construction to perm

4 loans, correct?

5 A    I talked about no bids at auction but there were bids that

6 were received after the auction.   Yes.

7 Q    And the construction to perm loans, those are loans that

8 are given to someone who is building a house and they have to

9 be funded over time, correct?

10 A    It's interim financing, yes.

11 Q    And when Bank of America received notice that two people

12 had bid 30 cents on a dollar, they wanted the debtors to take

13 those bids, correct?

14 A    We wanted the debtor to execute against those bids, yes.

15 Q    And instead of taking those bids, the debtors paid to Bank

16 of America what would be the value received from that bid, the

17 30 cents, correct?

18 A    Approximately 9.1 million.   That's correct.

19 Q    And the debtors kept those loans and have been reworking

20 them in an attempt to make money off of them, correct?

21 A    I don't know what the debtor has done with them.

22 Q    So it would surprise you to know that the debtors received

23 -- have made over three and a half million dollars on those

24 loans since they've been reworking them?

25 A    It wouldn't surprise me but in the context of a billion

1  dollar revolver, we're looking at a situation where we're

2  talking about one percent or less of the total expected

3  recovery to the bank group.  And in the context of the

4  construction of perm sale, I was more focused on the larger

5  whole loan portfolio than this particular subset.  It's -- in

6  the grand scheme, the time and effort dedicated to a one

7  percent potential recovery, we were happy to get the nine

8  million.  We were happy to let the homeowners who were stranded

9  hopefully work towards a solution, and we made that deal and we

10 moved on.  I haven't looked back.

11 Q    Let's turn to Exhibit Number 23, please.  This is one of

12 the FAS 114s that your counsel walked you through during your

13 direct testimony, correct?

14          THE COURT:  Which number?  I'm sorry.

15          MR. DORSEY:  Number 23, Your Honor.

16 Q    And these FAS 114s are used for accounting purposes

17 internally at the bank?

18 A    For reserving, yes.

19 Q    And you noticed during your direct testimony that the

20 projected sale of the mortgage loans was to be in May of 2008,

21 correct?

22 A    I believe that's March.

23 Q    Excuse me.  March 2008?

24 A    Yes.

25 Q    And if you turn to Exhibit 25, this is another FAS 114,

1    correct?

2    A     It is.

3    Q     And this one shows the projected sale in June of 2009,

4    correct?

5    A     That's correct.

6    Q     So, for purposes of accounting, the bank doesn't have any

7    problem with indicating that the sale of these loans is going

8    to occur some time much later than what you testified you would

9    want them to occur, correct?

10   A     This is an estimate, again, for reserving purposes.  We

11   plan for the worst and we hope for the best.  This isn't

12   necessarily the exact outcome, but it's a tool that is used to

13   establish reserves.

14   Q     That has an impact on the bank to establish a reserve,

15   correct?

16   A     It does.

17   Q     And you have to report that in your 10-Qs every year,

18   correct?, to the SEC?

19   A     Loan loss reserves are a reportable income statement

20   balance sheet item, yes.

21   Q     And let's take a look at Exhibit Number 24, please.  This

22   was the asset quality reporting that your counsel walked you

23   through again during your direct testimony, correct?

24   A     That is correct.

25   Q     And it's dated December -- or excuse me -- December 31,

1 2007, correct?

2 A    That is correct.

3 Q    And as of the time this document was prepared, the last

4 line in the document says, "Other hold and collect strategies

5 are being considered to avoid selling and to the current market

6 which may result in improved recovery for the banks," correct?

7 A    That's correct.

8 Q    So, as of December 31, 2007, the bank was of the same view

9 as the debtors that now might not be the best time to sell,

10 correct?

11 A    Well, again, this document was prepared some time after

12 December the 31st, so I don't think it's fair to say that

13 that -- that comment reflected the current thinking at the time

14 that this was put together.  The balances up above in the

15 exposure summary are as of December the 31st, but the narrative

16 is realtime based upon when this document is drafted and put

17 together.  There's usually about a one-month to five-week lag

18 between the two.

19 Q    But, the bank is of the same view today that it might be

20 better to hold some of these portfolios -- some of this

21 portfolio rather than selling it and reworking it and trying to

22 increase the value for the banks, correct?

23 A    The bank is of the view that it's better for someone other

24 than the debtor to execute those strategies.

25 Q    And those are for the reasons we discussed earlier,

1  correct?

2  A     Correct.

3          MR. DORSEY:  Nothing further, Your Honor.  Thank you.

4          THE COURT:  Redirect?

5          MS. SCHONHOLTZ:  Quickly, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MS. SCHONHOLTZ:

8  Q     Mr. Dorsey was asking you questions about the bid

9  procedures that we looked at on your direct in November.  Do

10  you recall that?

11  A     In November, yes.

12  Q     Yes.  The BOA exhibits.

13  A     Right.

14  Q     Okay.  And to your knowledge were those the first bid

15  procedures that were specific only to the B of A portfolio?

16  A     To my knowledge, yes.

17  Q     Okay.  And Mr. Dorsey was asking you questions with

18  respect to the requirement that you would take -- or the debtor

19  would have to take a 55 to 60 cent bid from Bayview.  Do you

20  recall that?

21  A     I do.

22  Q     Okay.  Bayview did not ever qualify as even a stalking

23  horse bidder, did they?

24  A     No.

25  Q     Okay.  So, there's no suggestion -- strike that.  Do you

1  have any recollection that a bid at 55 to 60 cent for Bayview

2  would ever be a qualified bid at which you'd recommend a sale?

3  A    No.

4           MR. DORSEY:  Objection.  Calls for speculation.

5           MS. SCHONHOLTZ:  I asked for his recollection.

6           THE COURT:  Overruled.

7           MS. SCHONHOLTZ:  No further questions.

8           THE COURT:  What was the answer?

9           THE WITNESS:  No.

10           MS. SCHONHOLTZ:  No further questions, Your Honor.

11           THE COURT:  You can step down, sir.  Thank you.  The

12  next witness is your expert, is that correct, or proffered

13  expert?

14           MS. SCHONHOLTZ:  Yes, Your Honor.

15           THE COURT:  All right.

16           MS. SCHONHOLTZ:  I will turn the podium over to Mr.

17  Kirschbaum.

18           THE COURT:  Okay.

19           MS. SCHONHOLTZ:  Right?

20           THE COURT:  Yes.  I was -- we're going to take a very

21  short recess before we start.  But, if, Ms. Silverstein, you

22  want to introduce Mr. Kirschbaum, that's fine.  I see you filed

23  a pro hac vice motion, but I haven't signed it yet.

24           MS. SILVERSTEIN:  We did, Your Honor.  And I ask that

25  you permit him to be admitted for purposes of this hearing.

1          THE COURT:  I'd be happy to do so.  And welcome.

2          MS. SILVERSTEIN:  Thank you.

3          MS. SCHONHOLTZ:  Thank you, Your Honor.

4          THE COURT:  We'll take a few minute recess, please.

5                         (Recess)

6          THE CLERK:  All rise.

7          THE COURT:  Please be seated.  A quick scheduling

8   matter.  We can go to about seven-thirty tonight if that's

9   where we need to go.  That's as late as I can go this evening.

10  I have to be somewhere at eight.  Tomorrow I have limited

11  availability, but I can give you between eleven and

12  three-thirty.  And that's a hard stop at three-thirty because I

13  have to be somewhere at four.  At ten I have a confirmation

14  hearing, and there is an objection.  So, hopefully we can start

15  at eleven, but, you know, I don't know.

16         We may get -- it's a small case, but there's an

17  objection of confirmation.  So, if that gets resolved or if it

18  gets resolved quickly we'll be able to start right at eleven.

19  Otherwise, we may get pushed back a little bit.  But, for

20  tomorrow's purposes, let's plan on not taking a break for

21  lunch.  We'll move straight from eleven to three-thirty -- get

22  it over with so we don't lose any time, all right?

23         MR. KIRSCHBAUM:  Your Honor, the administrative agent

24  calls Robert Branthover to the stand, please.

25              ROBERT ROSS BRANTHOVER, WITNESS, SWORN

1          MR. KIRSCHBAUM:  Your Honor, if I may approach the

2  bench?  I have a binder and a Redwell of documents for --

3          THE COURT:  All right.  Thank you.

4          MR. KIRSCHBAUM:  May I begin, Your Honor?

5          THE COURT:  Yes, please.

6                    VOIR DIRE EXAMINATION

7  BY MR. KIRSCHBAUM:

8  Q    Mr. Branthover, have you been retained by Bank of America

9  to testify as an expert in this matter?

10 A    I have.

11 Q    On what subjects have you been retained to provide expert

12 testimony?

13 A    The current state of the mortgage market and how we

14 anticipate that -- how it looks going forward.

15         THE COURT:  I can't hear you.  I'm sorry.  Can you

16 move that microphone a little closer?

17         THE WITNESS:  Certainly, Your Honor.

18         THE COURT:  Thank you.  Can you restate your answer,

19 please?

20 A    I have been to assess the current state of the mortgage

21 market and what the view may be going forward.

22 Q    Have you also been retained to express any opinion with

23 respect to the portfolio of loans that have sometimes been

24 referred to as the AHM Portfolio that is at issue in this

25 proceeding?

1  A    I have not specifically valued that portfolio, but I have

2  looked at the characteristics of that portfolio and compared it

3  to like collateral that's currently trading in the marketplace.

4  Q    Please describe the aspects of your experience and

5  background that you have relied upon in formulating your expert

6  opinions in this matter.

7  A    Well, I've been in the mortgage business for about, or

8  have been related or directly in the mortgage business for

9  approximately 20 years.  So, over that time I've been involved

10 with hedging origination sales, securitization of mortgage

11 collateral in many capacities.  So, that brings me -- and we

12 also as a service in my company, we do a lot of valuation work

13 for various parties, so I think very unduly qualified to value

14 and look at the trends of the overall mortgage market.

15 Q    What do you do currently?

16 A    I am a senior vice president of the Mortgage Industry

17 Advisory Company.  It's a shop in New York City.  It's

18 approximately 50 employees.  We represent --

19 Q    How many employees?

20 A    Fifty.

21 Q    5-0?

22 A    5-0.  We are a software vendor.  We have software --

23 represent companies -- the largest mortgage companies in the

24 country; Chase, Citibank, those type of names.  We also do work

25 with smaller mortgage companies, as well, on the secondary

Branthover - Voir Dire/Kirschbaum                    129

1  marketing side.

2  Q    What do you mean by the secondary marketing side?

3  A    The business that's -- generally, the business line that's

4  charged with originating hedging and selling mortgage product

5  in the secondary market.

6  Q    Mr. Branthover, please describe your educational

7  background.

8  A    I have a B.S. in finance from the University of Maryland.

9  Q    And can you describe your job experience prior to joining

10  your present employer which we'll refer to as MIAC,

11  beginning -- let's begin with the first job you've had that

12  related at all to the residential mortgage business.

13  A    Okay.  In 1989 I joined Chase Manhattan Bank which is now

14  known as JPMorgan Chase.  I was in a treasury capacity there,

15  and we were responsible for aggregating and hedging the entire

16  bank's balance sheet.  At that time, that did include mortgage

17  product, and I had directed interaction with the mortgage

18  company on their hedging strategies and a lot of the risk that

19  they actually would take in the marketplace would be laid off

20  within our position.

21        So, I had direct interaction with the mortgage

22  company and, in fact, in the early 90s, we also were involved

23  with valuing and hedging the servicing position that Chase had

24  which was, at the time, still probably the top ten position in

25  the country.

1  Q    Have you worked for an entity that may be related to

2  JPMorgan Chase known as Chase Home Finance?

3  A    I did.  I spent 13 years -- a little more than 13 years

4  with Chase -- JPMorgan Chase.  I left treasury and joined the

5  mortgage company in early 1998.

6  Q    Is the mortgage company that you're referring to is Chase

7  Home Finance?

8  A    Chase Home Finance.  That's correct.

9  Q    And describe your experience at Chase Home Finance.

10  A    I was, again, involved with the valuation and hedging of

11  the servicing position for approximately a year.  And then in

12  1999 I moved into secondary marketing and became the jumbo

13  trader at Chase Home Finance.  So, I was responsible for

14  hedging and selling all the non-conforming mortgages that Chase

15  originated.

16  Q    So, by jumbo you mean what?

17  A    Any product that fell outside of the conforming arena.

18  Q    Okay.  Were you involved at all in what might have been

19  known at the time as an Alt-A product?

20  A    Yes, I was.

21  Q    Okay.  Explain what that means.

22  A    Alt-A is short for Alternative A, which is generally a

23  product that is -- mostly comes about from a documentation

24  issue.  It's generally not a full documentation loan, but at

25  times can have credit as good as -- as high as a full doc loan.

1  But, the borrower may not produce certain documentation.

2  Q    And do you recall at the time the volume, approximately,

3  of Chase Home Finance's jumbo Alt-A mortgage loan business?

4  A    On a per annum basis it was somewhere between three to

5  five billion dollars.

6  Q    What did you do after you left --

7           THE COURT:  I'm sorry.  A billion?

8           THE WITNESS:  Billion.

9           THE COURT:  Thank you.

10  A    I joined Lehman Brothers.

11  Q    Okay.  And what -- when were you at Lehman Brothers and

12  what did you do there?

13  A    I joined Lehman Brothers in the spring of '03 and left

14  there in the fall of '04.  I was the -- I started a new group

15  there called the Community Banking Group which was charged with

16  bringing in smaller accounts for Lehman to cover, both in the

17  depository arena and in the mortgage space arena.

18  Q    When did you leave Lehman?

19  A    Late August of 2004.

20  Q    And where did you go?

21  A    MIAC.

22  Q    Okay.  And that's your present employer, right?

23  A    Correct.

24  Q    What are your responsibilities at MIAC?

25  A    My present responsibilities are basically four-fold.  I

1 co-head the Secondary Solutions Group with a partner.  We have

2 four major business lines.   Those business lines are developing

3 software for the secondary marketing arena or marketplace.  We

4 do hedge advisory work for smaller mortgage companies, so we

5 would help them do their pricing or do their hedging, sale of

6 loans, all of the accounting, all of the market to market.

7 It's all their reporting to, basically, do a facto third party

8 secondary marketing department for them.  We also do market to

9 market work for various institutions.  Generally, lending

10 institutions that are being pledged mortgage collateral as

11 collateral for that advance.

12 Q    What do you mean by market to market perk?

13 A    If someone who is going to be pledging, say, a billion

14 dollars worth of mortgages in exchange for an advance from its

15 depository, the depository may not have the ability to value

16 that collateral, so they would come to us and we would put a

17 market to market on it for them so the parties or the party

18 would have a comfort level of -- in case of duress, they would

19 know what the value of that collateral would be.

20 Q    What is the fourth area of the group that you are with now

21 in terms of its business line?

22 A    General consulting, and that tends to be, more recently,

23 dealing with institutions on how to sell collateral and how to

24 maximize, you know, value for what they have and what they need

25 to sell.

1  Q     When you say collateral, what are you talking about?

2  A     Mortgage collateral.

3  Q     Mortgage lines?

4  A     Mortgage lines.

5  Q     Please describe for us the client base of MIAC.

6  A     MIAC represents over 200 institutions.  It spans really

7  the gamut from some of the largest banks and holding companies,

8  so, like a Chase Manhattan Bank, a GMAC, a Citibank, down

9  through regional mortgage companies that originate ten to $20

10 million a month in mortgage prime.

11 Q     And you mentioned valuation were -- referred to market to

12 market or valuation work that MIAC does.  Describe that work,

13 please.

14 A     Generally, we would be on a -- either on a regular basis,

15 a monthly, quarterly -- some we do daily -- where we'll receive

16 tapes from our customers.  And those files would represent the

17 mortgage collateral in itself.  We would've, in advance, laid

18 out the collateral or the specifics of the collateral, so

19 therefore we could pull it into our system to market to market

20 effectively.

21        So, there's going to be a process of aggregating the

22 collateral up in the various categories, looking at the risk

23 criterias, auditing the data to confirm, you know, so we can

24 get a better feel for, is this really conforming, is it jumbo,

25 is it a 15-year mortgage, but the amortization's 30 years.

1    So, we do lots of checks and balances to confirm that

2 the data is what has been presented to us, and then we market

3 to market it based upon records that are available in the

4 marketplace.

5 Q    What volume of valuation work did MIAC do in 2007?

6 A    2007 was in excess of a trillion dollars.  One trillion.

7 Q    One trillion?  Okay.  And how much have you done so far in

8 2008?

9 A    You know, we're doing it every week.  We're over 400

10 billion at this point.

11 Q    Okay.  You mentioned some of what goes into a valuation.

12 You mentioned you're looking at various metrics.  Could you

13 describe in detail what is the process that MIAC undertakes

14 what it needs to value a mortgage loan portfolio?

15 A    When you're valuing mortgages the devil is really in the

16 detail.  So, we really need to understand what the data has

17 been presented to us.  And we need to verify and try to rectify

18 that data and make sure it's as accurate as possible.

19    It's not very hard for someone to pass to us a loan

20 that they say is conventional, yet it may not look like it's a

21 conventional loan, meaning the balance is larger than the

22 acceptable conventional balance, or they've borrowed 105

23 percent of the value of the property.  So, we have --

24 Q    Well, stop right there.  If they borrowed 105 percent of

25 the value of the property, what does it have to do with whether

1  it's a conforming loan?

2  A    Well, generally, that wouldn't apply.  It wouldn't be

3  qualified as an agency conforming loan.

4  Q    Despite the fact that it fits within the size limits of

5  the --

6  A    Correct.  There are other criteria that would come into

7  play that'll preclude that loan from being agency eligible.

8  Q    When you do the evaluation work do you consider cash

9  flows?

10  A    We do.

11  Q    Is that important to the valuation work you do?

12  A    It is.  Some more than others.  It depends on the

13  valuation at hand.

14  Q    Do you consider risk?

15  A    Absolutely.

16  Q    What role does risk play in the evaluation work?

17  A    Risk plays a very critical role.  And -- I mean, I do --

18  what we're trying to do is not only we're trying to value the

19  collateral, but generally what we're trying to do is ascertain

20  is how that collateral will behave in various interest rate

21  scenarios.

22          So, for some valuation work that we do, similar

23  applies.  We are actually running various yield purpose

24  scenarios to determine how that collateral will behave given

25  expectations in the yield curb or changes in risk parameters.

1  Q    Do you consider discount rates and market discount rates

2  when you do your evaluation work?

3  A    We do.  I mean, they're kind of the end game of

4  evaluation.  It's seldom that you'll actually see a pool of

5  loans trade based upon what the discount rate is.  At the end

6  of the day mortgage collateral, unlike treasuries, you don't

7  know what your cash flows are going to be.  You can estimate

8  what those cash flows are going to be based upon pre-payment

9  assumptions and various -- in terms of the loans.  So, you have

10 to -- when you're evaluating mortgages, you need to have

11 assumptions about how those loans will pre-pay, and everything

12 that would affect the overall cash flow.  Once you've run all

13 those cash flows, then you can solve -- once you come up with a

14 price you can solve for the discount rate or vice versa.

15 Q    Have you done any work for American Home Mortgage either

16 while you were at MIAC or any of your previous employers?

17 A    I did while at MIAC.

18 Q    What -- describe -- in general terms, describe the work

19 you did for American Home Mortgage.

20 A    I believe, going back to 2004, we were engaged to provide

21 a weekly market to market of the Broadhollow and Melville

22 facilities.

23 Q    Through what period of time did you do that?

24 A    I believe some time in 2004.  I don't recall when we

25 started doing that.  But, up through the bankruptcy

1  proceedings.

2  Q    Does MIAC do any work currently for the Bank of America

3  other than your serving as an expert witness in this matter?

4  A    I don't believe so, no.

5  Q    Has it in the past?

6  A    I believe we have, yes.

7  Q    Were you personally involved in some of that work?

8  A    I performed a, again, I think it was a monthly valuation

9  for Bank of America.  It might've been in 2005, 2006 in regards

10 to a subprime facility where they were lending money.  I know

11 they had pulled out of that facility and we stopped doing the

12 valuation.

13 Q    Did you prepare a report of this matter?

14 A    They got a weekly or --

15 Q    Excuse me.  I'm talking about this matter.

16 A    Oh, yes, I did.

17 Q    I should say this matter.

18 A    Yes, this matter.  I did.

19 Q    You did prepare a report?

20 A    I did.

21 Q    Okay.  You have a binder of documents in front of you.

22 You have a black binder and you also have a Redwell of

23 documents.  I'll tell you when to look at the Redwell.

24 A    Okay.

25 Q    In the meantime, look at the binder, please.  And I

1  believe the first document in the binder should be marked s

2  Bank of America Exhibit 39.  Do you see that?

3  A    It is.

4  Q    Is Bank of America 39 a copy of your report in this

5  matter?

6  A    It is.

7  Q    Okay.  In the course of preparing your report, did you

8  analyze the characteristics of the AHM loan portfolio that is

9  at issue here.  And I'm just -- we refer to that as the AHM

10 Loan Portfolio if that's okay.

11 A    I was provided five data tapes, I believe going back to

12 August of 2007 through February 29th, 2008 which had a loan

13 level record of each type of loan.  And from that, I analyzed

14 that and came up with different types of groupings.  We looked

15 at how the collateral had changed.  We looked at what we would

16 call some frequency reports which would then group the

17 collateral into various groups.  We'd look at the distribution

18 of FICOs and different distributions of L.T.V --

19 Q    FICOs?  What are they?

20 A    Credit scores.  LTV which is loan to value, and combine

21 loan to value statistics, state distribution, no

22 redistribution, product distribution.  Basically some Excel

23 work within those files.

24 Q    Okay.  Now, the Redwell.  In the Redwell contains four

25 jumbo exhibits; Bank of America 40, 41, 42 and 43 if I'm not

1  mistaken.  Do you see those?

2  A     I do.  40, 41, 42 and 43.

3  Q     Could you please describe -- identify each of these

4  documents?

5  A     Yes.  These appear to be the physical hard copies of the

6  Excel files that I was presented.

7  Q     Are these the -- well, is the information contained in

8  these documents the information that you work with, presumably

9  electronically, in developing your report?

10 A     Well, there are a lot of files here, but it appears that

11 it is.

12 Q     Feel free to refer to this at any time during the

13 questioning.

14         MR. KIRSCHBAUM:  Your Honor, at this point the

15 administrative agent offers Mr. Branthover as an expert witness

16 in this matter on the subject of the U.S. Residential Loan

17 Market, Trends and Value, both in the residential loan market

18 in general, and trends and value in the portfolio of loans at

19 issue in this motion in particular.

20         THE COURT:  Mr. Dorsey?

21         MR. BISSEL:  Mr. Bissel, Judge Sontchi.  We have no

22 objection to the witness' qualifications.  We may have some

23 objections later to his methodology in these matters.

24         THE COURT:  All right.  He's admitted as an expert on

25 the proffered testimony -- or proffered areas, then, without

1 objection.

2         MR. KIRSCHBAUM:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4 BY MR. KIRSCHBAUM:

5 Q    Mr. Branthover, what information do you normally rely on

6 to identify existing and future trends in the residential home

7 loan market?

8 A    Well, we're in the market every day, and we represent

9 clients who are selling product almost every day or hedging

10 product every day.  So, we -- and it's a team.  I run a team of

11 ten professionals within the group.  So, we -- obviously we're

12 trying to take in everything that's going on in the world to

13 ascertain what is going on, how best to maximize the value for

14 our clients in a particular portfolio loans or warehouse loans

15 that need to be sold.

16 Q    What kind of information do you typically look at?

17 A    Well, we have access to all the typical market data;

18 Bloomberg, Reuters, Telerate, Trade web, CNBC, you know, as

19 well as all the research from the various dealers that are

20 available.

21 Q    Do you look at current quotes for transactions?

22 A    Absolutely.

23 Q    Do you look at what the large aggregators and the large

24 originators are doing?

25 A    We do.  We --

1    THE COURT:  I'm sorry.  I didn't -- what was the

2  question?

3    MR. KIRSCHBAUM:  Large aggregators and large

4  originators.

5    THE COURT:  Oh.  Thank you.

6  Q    Do you look at what they are doing?

7  A    We do.  Some of our clients sell directly to the larger

8  aggregators which are the larger mortgage companies in the

9  country.  So, we have access to all of their pricing and rate

10  sheets for the products that they offer.

11  Q    Okay.  In the course of your work in the mortgage

12  industry, have you identified any general trends in the current

13  residential mortgage loan market?

14  A    Yes.  There's been quite a few trends that have evolved

15  over the last nine months.

16  Q    Okay.  What are they?

17  A    Well, it -- where do we begin.  It -- going back, probably

18  late 2006, we started to see the credit problems start to

19  surface within the subprime arena with a couple of larger

20  subprime originators failing.  That brought about widespread

21  concern about the overall real estate market and the mortgage

22  market that slowly began to affect lower credit quality

23  mortgage product that was originated by mainstream mortgage

24  companies.  And then early 2007, you know, that product started

25  trade at wider levels at lower price levels than it had

1  previously based upon data that was becoming available to the

2  marketplace because of the performance of that type of

3  collateral.

4  Q    Okay.  And based on the events that you have just

5  described, have you come to any conclusions as to what the

6  current and likely future trends are with respect to the

7  pricing of home loan mortgages in the U.S. market?

8  A    It is -- I do, and I think you really need to look at

9  every group of portfolio.  And it's unique and it's -- it has

10 its uniqueness.  So, certain markets are still trading very

11 poorly and we anticipate that they will continue to trade

12 poorly.  Those markets would be, obviously, subprime loans

13 which basically -- a market that no longer exists.  Alt-A

14 product, payment options arms, seconds, even Jumbo A is also

15 trading pretty poorly, and that situation could -- yes, it

16 could probably go on for quite a while.

17 Q    Okay.  Starting in 2001, can you trace for us what you

18 view as being the source of the problems as they arose and how

19 we got to where we are?

20 A    Sure.  I think, you know, we -- post-2000 we had the stock

21 market deflation.  We had 9/11.  The fed cut rates to historic

22 lows.  The common thought was that real estate will be the next

23 thing to go up, so everyone took their money and started buying

24 real estate.  The fed created very -- created it and fueled a

25 situation that encouraged people to do so by holding rates,

1  probably artificially low for an extended period of time.

2         So, that brought about a massive mortgage refinance
3  boom.  It also brought about a demand for yield in fix income
4  product.  So, that brought about -- it didn't bring about, but
5  it brought to a culmination of the demand for secure ties in
6  mortgage product which trades that had spread higher than other
7  fixed income instruments.

8         So, those three things came together -- created a --
9  I hate to use it, but a perfect storm, which really allowed the
10 mortgage market to take off and to be financed by these
11 securitization -- the originate and securitize model.

12 Q    Okay.  And then what happened?

13 A    Like every good trend it has to come to an end.  The
14 credit problems started, again, at the lowest rung which was
15 subprime and it worked its way up.

16 Q    Have credit standards fluctuated and changed during the
17 period of time that you've been talking about?

18 A    They have.  You know, traditionally, in the early 2000s it
19 was, you know, the ability to finance the entire property value
20 was not as commonplace as it had become in 2007.  So, the
21 leverage -- the amount of leverage involved was significantly
22 raised going into 2007.

23 Q    I'd like you to turn, please, to a document that has been
24 marked as Bank of America Exhibit 44 in your book.

25 A    Okay.

1  Q    Could you identify Bank of America 44?

2  A    I can.

3  Q    What is it?

4  A    It is a -- the 2/29 data file that has been stratified in

5  various groups by products, by pre-paid --

6  Q    What do you mean by the 229 data file?

7  A    The same 2/29 data file that I believe I had that I was

8  presented with the loan level detail.  But, in this form, it's

9  been aggregated into various groups.  Those groups would

10  include product, you know, document type, pre-payment type,

11  property occupancy, purpose, term, all the kind of category

12  that I had described earlier.

13  Q    Okay.  Now, is this a document you prepared?

14  A    It is not.

15  Q    This document, then, in fact, was part of the materials

16  from the expert named in this matter by the debtors, correct?

17  A    Correct.

18  Q    Okay.  But, is it your understanding that it is, in fact,

19  the summary of the data tape for 2/29/08 that is included in

20  the documents that you looked at earlier in the Redwell?

21  A    It is.

22  Q    Okay.  Based on your review of the portfolio in the form

23  of the data tapes that are summarized in the Redwell exhibits

24  and Bank of America 44 as well, what percentage of the

25  portfolio represents the kind of product sectors that you have

Branthover - Direct/Kirschbaum                   145

1  identified as being in the declining sphere?

2  Q    The bulk of this portfolio.

3  Q    Okay.  Let's turn to Page 3 of Bank of America 44.  On

4  second thought, let's turn to Page 2.  Did that contain a

5  product listing?

6  A    Mm-mm.

7  Q    For the benefit of that --

8         THE COURT:  Was that a yes?  I'm sorry.  Was that a

9  yes?

10        THE WITNESS:  Yes, it is.  Sorry.

11        THE COURT:  Thank you.

12 Q    With the benefit of the product listing here, could you

13 identify the products in the product listing in the American

14 Home Loan -- American Home Mortgage portfolio which you viewed

15 to be in the more risky categories?

16 A    Seconds, Elox, Hybrid option arms, payment option arms,

17 Alt-A arms, Alta-fixed, and to a lesser extent, Jumbo fix and

18 Jumbo arms.

19 Q    Okay.  And approximately how much of the portfolio does

20 that account for?

21 A    I believe that makes up about, well, 400 million of the

22 500 and change.

23 Q    What product in AHM's portfolio as listed here gives you

24 the most concern relative to the future value of the portfolio

25 if any one product stands out in your mind?

1  A    Well, there is -- there tends to be a significant

2  concentration in both Hybrid option arm and payment option arms

3  which represents about 200 and, you know, 20 million dollars

4  out of a 500 million collateral.

5              THE COURT:  Where's payment option arm on here?

6              THE WITNESS:  About halfway down there's Hybrid

7  option -- excuse me, Your Honor -- Hybrid option arm.

8              THE COURT:  Yes?

9              THE WITNESS:  And in the last line, option arm for

10  97.9 million.

11             THE COURT:  Oh, that's what you mean by

12  payment option arm?

13             THE WITNESS:  And Hybrid option arm's 127.2 million.

14             THE COURT:  I understand.  I was just trying to -- I

15  didn't see the word payment option arm.  I was just trying to

16  figure out what you were talking about.  So, when -- where it

17  says option arm you mean payment option arm?

18             THE WITNESS:  Yes.

19  Q    And would you combine those two listings, the Hybrid

20  option arm listing of 22.16 percent and the option arm listing

21  of 17.07 percent to arrive at the total proportion of this

22  portfolio which you would characterize as being payment option

23  arms?

24  A    I would.

25  Q    What is a payment option arm?

1  A    It's commonly known as a negative amortization product

2  where you are making a payment based upon a much lower interest

3  rate than the actual amount the debt is accruing at.  So, when

4  you look at these loans and look at the loan tapes, the

5  balance, generally, is increasing on these loans as opposed to

6  most loans where the balance decreases.

7  Q    Why does this product concern you with respect to future

8  values?

9  A    There's a couple things.  Obviously, the market has really

10 soured on this product in general.  For a while there it traded

11 at -- it had significant value, but the concern about the

12 amount of leverage involved, and also the negative amortization

13 characteristics and payment shock have -- and the amount of

14 delinquencies, foreclosures of this product have basically

15 brought the market and this product to very little originations

16 in the current market.

17 Q    Okay.  Does the fact that these loans, these

18 payment option arms, are presently held by American Home

19 Mortgage in its current state?  Does that affect your

20 assessment of their risk?

21 A    It does, and I think previous testimony here today talked

22 about the need to be able to work with these borrowers to find

23 an alternative financing solution for them is, I think, the

24 most prudent way to resolve this problem.

25 Q    And in that context, why does the fact that the loans are

1 held by American Home Mortgage give you concern?

2 A    Well, they're not an ongoing mortgage company.

3 Q    If you were advising the client in your consulting role as

4 to how to maximize the value from these loans, what would you

5 advise?

6 A    These would --

7         MR. BISSEL:  Objection, Your Honor.  I don't think

8 this is part of his opinion as described in his report, and I

9 think it's outside the scope of what he's been designated for.

10         MR. KIRSCHBAUM:  Your Honor, it's a major part of his

11 opinion.  It was also gone into at some length at his

12 deposition.  I would just look -- turn right to the last page

13 of his report, right at the top, "The best method of achieving

14 maximum value for these loans is to have them taken over by a

15 stronger better capitalized institution which could achieve a

16 satisfactory resolution through restructuring and sales before

17 the delinquency rates further increase and market prices fall."

18 And I can go on and read further, but that might, in fact, be

19 depriving the witness of the chance to testify.  I mean --

20         THE COURT:  Mr. Bissel, I'll hear a response.

21         MR. BISSEL:  I think, yes, the report contains that

22 conclusion, but there is no analysis or data or anything else

23 to back it up.

24         THE COURT:  Well, you can get into that in cross

25 examination.  The objection's overruled.

1        MR. KIRSCHBAUM:  Thank you, Your Honor.  Do you have

2  a question in mind or should we restate it?

3        THE COURT:  I've lost it, so why don't you restate

4  it.

5        MR. KIRSCHBAUM:  I will, Your Honor.

6  Q    If you were advising a client with respect to how to

7  maximize the value from these loans, what would you advise?

8  A    Well, this is not a product that you can just service and

9  forget.  So, it's going to require active management to find a

10 long term solution for many of these loans.  Not all.  Many of

11 these will pay off.  Many of these loans may potentially

12 refinance.  But, many of these loans are -- has become very

13 well known, and two of these loans are becoming a problem

14 within the industry, and one of the biggest concerns about this

15 is that the people are making minimum payments.  So, they're

16 really not being forced, so they're not really under duress

17 right now for any rate shocks or resetting currently because

18 these loans are relatively new.

19 Q    You said these loans are relatively new.  You're talking

20 about the AHM portfolio loans?

21 A    The American Home portfolios and the option arms and the

22 Hybrid options arms in question.

23 Q    Okay.  When you say relatively new, what do you mean?

24 A    They originated within the last year and a half or so.

25 Q    Were many of them originated in July of 2007?

Branthover - Direct/Kirschbaum                    150

1   A     Many were.

2   Q     And if you were advising the client with respect to the

3   best way to achieve maximum value from this portfolio of loans,

4   would you also get into the question of what kind of

5   institution would be in the best position to achieve maximum

6   value?

7   A     Well, an institution that would have the ability to offer

8   the customer, or the borrower in this case, another mortgage

9   product that would potentially give them a stable payment plan

10  maybe over a longer term, maybe at a discounted rate, something

11  that would keep them paying.

12  Q     Why would it be important for an institution to be able to

13  offer customers -- and I assume you're talking primarily of the

14  payment option arm customers, right?  Why would it be important

15  for an institution to be able to offer those customers and

16  alternative product?

17  A     Well, in many situations we're finding that the states

18  where these loans were originated were highly leveraged states.

19  A few borrowed a substantial amount of a down payment.  And

20  even if they were only up to 80 percent combined LTVs on these

21  loans, if it's Florida or California the property values may

22  have eaten up that extra 20 percent already anyhow.

23          So, when it comes time to refinance this product they

24  may be unable to because they owe more than the house -- owe

25  more on the property than it's worth.  So, therefore, if you

1  had an ongoing concern that could maybe look beyond that

2  current CLTV or LTV situation to keep them in a paying

3  mortgage, that would be probably the best solution.

4  Q    And is the way to get them to pay to offer them a possible

5  new product or different product?

6  A    Having some solutions would be a good way.

7  Q    It's not just enough to say hey, pay?

8  A    Yeah, we don't think that's going to be the case here.

9  They need to have some kind of solution.

10 Q    How does the percentage of American Home Mortgage's

11 portfolio of payment option arms compare to other portfolios

12 that you're familiar with?

13         MR. BISSEL:  Objection, Your Honor.  This is

14 definitely outside the scope of the report.  There is nothing

15 in the report that compares the percentages of the portfolio of

16 AHM to any other portfolio or to any industry statistic.

17         MR. KIRSCHBAUM:  Your Honor, the witness has been

18 proffered as an expert on the residential mortgage market.  The

19 witness testified.  The witness' report deals with the

20 payment option arm problem.  It deals with the percentages.  I

21 don't believe that every iota of the witness' testimony needs

22 to be specified in his report.  That's what a deposition was

23 for.  Mr. Bissel was free to ask any questions he wanted about

24 the witness' understandings about the market in connection with

25 payment option arms.

1     The report is replete with references to the witness'

2 concerns about payment option arms, and with the 39 percent

3 number that the witness identified in his report of payment

4 option arms in the AHM portfolio.  I don't think that it's

5 beyond the scope of the report to ask the witness based on the

6 experience set forth in the report how that 39 percent compares

7 to other portfolios generally.

8          THE COURT:  Mr. Bissel?

9          MR. BISSEL:  Your Honor, expert must testify on the

10 basis of data.  There's no data in this report.  No data in the

11 materials that were produced in support of this report about

12 how the percentages of loan product compared to the percentages

13 of loan product in other portfolios, similar portfolios, the

14 market generally.  It's simply testimony without any basis and

15 data and, therefore, it's inadmissible expert testimony.

16          MR. KIRSCHBAUM:  I don't believe data is necessary to

17 be able to serve as the basis for a witness who's got this kind

18 of experience on -- hands-on current experience in this area.

19 I don't believe he has to have reported data to be able to

20 testify as to his own experience.

21          THE COURT:  All right.  The objection's overruled.

22 Q    I'll restate the question.  How does the percentage of

23 American Home Mortgage's portfolio of payment option arms

24 compare to other portfolios that you are personally familiar

25 with?

1  A    We have -- again, I've -- my group is valued in excess of

2  $400 billion in mortgage collateral that's generally been newly

3  originated in the last year or so.  Except for one portfolio,

4  I've never seen a higher concentration.

5  Q    So, American Home Mortgage is the second highest

6  concentration you've seen in this area?

7  A    Correct.

8  Q    And have -- and just give us a range of magnitude of how

9  many portfolios you've looked at with lower percentages.

10  A    A dozen or so.

11  Q    In addition to the high percentage of payment option arms

12  in the AHM portfolio relatively speaking, are there any other

13  characteristics of these mortgage loans that, in your opinion,

14  will affect the value of these mortgages going forward?

15  A    Could you rephrase?  I'm sorry.

16  Q    Okay.  Why don't you take a look at Exhibit 45 in your

17  book.  Are you familiar with Exhibit 45?

18  A    I am.

19  Q    What is Exhibit 45?

20  A    Exhibit 45 represents the -- either the amount of loans

21  that have stopped making payments on the aggregate of this

22  portfolio over -- going back from August 31, 2007 through

23  February 29, 2008.

24  Q    Okay.  And is this -- does this exhibit bear any

25  relationship to the data tapes that you examined?

1  A    Yes.  They tie out precisely to the calculations that I

2  made.

3  Q    Okay.  Now, using the -- with the help of this exhibit,

4  can you please trace for us the history of the delinquency

5  rates in the AHM portfolio from the data tapes dated August 31,

6  2007 through and including February 29, 2008?

7  A    Sure.  Going back to August 31 they were approximately

8  eight and a half percent.  And that's total delinquencies

9  and/or foreclosure loans that are in arrears, Your Honor.  And

10 November 30, 2007 it was just shy of 13 percent, 12/31/2007

11 year-end, it was just shy of 14 percent.  January 31, 2008,

12 almost 16 percent, and 2/29, they were, I think, 16 and a half

13 to 16 and three-eighths percent delinquent.

14 Q    Okay.  Have you formed a professional opinion as to the

15 likelihood that the delinquency rates that you have seen and

16 are reserved in the AHM portfolio from August through February

17 as to whether those will or will not increase in the future?

18 A    My best thought and based upon the analysis and the

19 distribution of product and the state distribution is that that

20 rate will continue.  And so, the delinquency rates will

21 continue to increase into the future.

22 Q    And what is the likely affect of the value of this

23 mortgage loan portfolio in the future, taking into account the

24 likelihood of the delinquency rates in the portfolio also

25 continuing to rise?

1  A    Well, as this consumes such a large -- continues to

2  consume such a large piece of the overall portfolio, the value

3  of that piece of portfolio will be marked down to extremely low

4  levels.  So, it has a significant detriment to the value of the

5  collateral.

6  Q    How do the delinquency rates of these loans that you've

7  observed compared to loan portfolios that -- in the marketplace

8  generally that you have had dealings with?

9        MR. BISSEL:  Objection, Your Honor.  Again, this is

10 material that we have not been provided any data about.  He has

11 not told us what these other portfolios are, what the

12 delinquency rates are in them.  He's making comparison to

13 something that's just in his head, and there's no data to

14 support.

15       MR. KIRSCHBAUM:  Your Honor, again --

16       MR. BISSEL:  We believe it's an informous expert

17 testimony since he's obviously relying on this data.

18       MR. KIRSCHBAUM:  Your Honor, I don't believe the

19 objection has anything to do with, therefore, with this not

20 being in the report.  As I understand it, the objection is

21 because the witness is not producing data, and again, the

22 witness is testifying based on his own experience based on

23 portfolios of loans that he has involvement in and delinquency

24 rates that he's seen in this portfolio compared to those.

25       THE COURT:  All right.

1          MR. KIRSCHBAUM:  He does -- he's testified that he

2     does what he has done with the AHM portfolio to many, many

3     other loan portfolios that he works on.

4          THE COURT:  Okay.  I overrule the objection under

5     Federal Rule of Evidence 705.  Expert may testify in terms of

6     opinion or inference and give reasons, therefore, without first

7     testifying to the underlying facts or data.  The expert may, in

8     any event, be required to disclose the data on cross

9     examination.  Get into it on cross examination.  So, the

10    objection's overruled.

11    Q    So, I'll repeat the question.  Based on your experience,

12    how do the delinquency rates of the American Home Mortgage

13    loans that you've observed from the data tapes compared to the

14    delinquency rates of other mortgage loan portfolios that you're

15    familiar with in the marketplace?

16    A    I have seen groups of loans, or loans that have been

17    secure ties with similar delinquencies, but they tend to be of

18    one loan category.  So, let's say an Alt-A securitization that

19    was done a year ago by Country Wide or Washington Mutual, it is

20    not uncommon to see delinquency rates that are not a whole lot

21    different than this.  But, this portfolio's made up of a very

22    broad product mix of products.  A large chunk of it was

23    conforming -- conventional conforming loans.  So, given the

24    fact that it's jumbo A, Alt-A, and a mix of products that

25    should be performing pretty good, it is on a higher side.

1  Q    In your opinion, how high do you think the percentage of

2  delinquencies for this portfolio could reasonably be expected

3  to go?

4  A    I, you know, not only my own opinion, but other opinions

5  of other research that I've read shows this can go into the 30s

6  or 40 percent.

7  Q    In addition to the payment option arms and rising

8  delinquency rates, are there any other factors that you recall

9  identifying in this portfolio that, to your mind, affect its

10 riskiness?

11 A    Well, the payment option arm, you know, potentially is one

12 that I'm very concerned about because the ability to delay, the

13 ability -- the delaying and the low payment that current

14 mortgagees have and, you know, when they get to the point where

15 they actually have to make the full payment or find another

16 alternative product that maybe they can't find, and they owe

17 substantially more on the property than they originally

18 borrowed, and maybe what the house is even worth, the

19 propensity of those individuals to potentially walk away is

20 quite high in my opinion.

21 Q    Does the geographic distribution of the collateral,

22 meaning where the homes are that are being mortgaged in the AHM

23 portfolio, does that give you any cause for concern?

24 A    It does.  It does.  It appears from my analysis when we

25 did a cross referencing of the states -- the highest states of

1 production as well as -- and cross reference of the states with

2 the highest foreclosure amounts, there was a very good

3 correlation there.

4 Q    Okay.  Let's turn, if you will, please, to B of A Exhibit

5 46.  And please explain to us what B of A 46 consists of.

6 A    This is the American Home Mortgage portfolio as of 2/29/08

7 cross referenced with a realty track which is a company that

8 tracks foreclosures nationwide and ranks the states with the

9 highest foreclosure.  And it shows the UPB or current balance

10 of loans in those states within this portfolio.  So, from here

11 we can see that in the top ten states that we've got 57 percent

12 of the collateral is in the top ten foreclosure states in the

13 country.

14 Q    So, that 50 percent -- 57 percent of the AHM collateral is

15 in the top ten foreclosure states of the country?  Is that what

16 you're saying?

17 A    That is correct.

18 Q    Okay.  And the data in terms of foreclosures which are the

19 top ten foreclosure states in the country, you said that comes

20 from something called realty track?

21 A    That is correct.

22 Q    Could you turn, please, to the next exhibit which is

23 B of A 47 and tell us what that is?

24 A    This is a printout from their website which, as of January

25 29th, lists those statistics.

1 Q    Okay.  So, this is the realty track data that you relied

2 on --

3 A    Correct.

4 Q    -- in terms of the ranking of foreclosure states, correct?

5 A    That is correct.

6 Q    Okay.  And the percentages of the AHM portfolio

7 attributable to each such state, where did you get that?

8 A    From the February 29 data file that was brought in to me.

9 Q    In your experience, what are the factors that generally

10 cause increases in foreclosures?

11 A    There's a few that come to mind.  One that we probably all

12 have read about is payment shock for short reset arms like

13 payment option arms.  That in conjunction with falling home

14 values create a, you know, a dangerous situation.

15 Q    Now, going back to B of A 46 for a minute, that's --

16 there's a listing there of the top ten states.  In the context

17 of the AHM portfolio, which, if any, of the top ten states in

18 the concentrations of AHM collateral in those states gives you

19 the most concern?

20 A    There is a substantial allocation of loans to California

21 and Florida which make up about 37 percent of the total

22 portfolio in question.

23 Q    Okay.  In your opinion, what is the likely trend with

24 respect to foreclosures -- home loan foreclosures in the future

25 going forward?

1  A    That will continue to move higher.

2  Q    And going back to the residential market in general, what

3  factors do you see playing the significant role in the trend of

4  the market going forward?

5  A    The overall market value trend in the -- for a mortgage

6  product, every portfolio has its strengths and weaknesses.

7  Clearly, a distribution of product in this case is particularly

8  troublesome since there is such a significant concentration and

9  some of the products that are very much out of favor at the

10 moment and probably will be for an extended period of time

11 given the credit criteria and the makeup and state distribution

12 of this collateral.

13         The conventional product is trading very actively.

14 There should be no problem with originating that product and

15 selling that product into an active secondary market.  It is

16 training at historical wides to the treasury market, but at the

17 same time mortgage rates and conventional fixed rate 30-year

18 product is at historically low rates at the moment.

19 Q    And where are the problems?

20 A    The problems are going to be in payment option arms -- a

21 lot of the products that had low-documentation and high

22 leverage.  And I think most bubbles will boil back down to

23 leverages as the culprit for the problem.

24 Q    Okay.  In terms of documentation levels, particularly,

25 please, at Bank of America Document 44 in your file.  You

1  looked at it earlier.

2  A    Mm-mm.

3  Q    Okay.  On Page 2 there's a heading, "Documentation,"

4  and --

5  A    There is.

6  Q    Do you see that?

7  A    I do.

8  Q    What is -- the first item there under "Documentation" is

9  FIFA.  What does that mean?

10  A    Full Income, Full Assets.

11  Q    Okay.  What does this tell you in terms of the

12  documentation levels that were prevalent in the AHM portfolio?

13  A    That approximately 50 percent of the collateral had full

14  document -- or full document loans.

15  Q    And what about the rest?

16  A    Some form thereof.  So, it could be stated income.  The

17  next biggest line item was state of income, full assets.

18  Q    What does that mean?

19  A    That the borrower did not have to document his current

20  income status, but could show that he had X amount of assets in

21  a bank account or brokerage account or other assets.

22  Q    Okay.  Does the prevalence or at least 50/50 -- more or

23  less 50/50 breakdown in the AHM portfolio between full docs and

24  less than full docs as it's called, does that give you any

25  trouble -- any concern?

1  A    I think what's evolving over the last year is that there

2  was some problems with the product as a whole.  It -- there's

3  lots of issues on how people were gaming the systems to get

4  loans approved.  You know, if you verified smaller assets, it

5  was not uncommon, unfortunately, for many borrowers to inflate

6  their current income, or the brokers would inflate their

7  current income to get a loan approved.

8  Q    Okay.  You haven't come to any conclusion with respect to

9  the AHM portfolio on that particular question, have you?

10  A    I have not.

11  Q    How do you -- how long do you believe the present cycle in

12  terms of the residential home loan market will last?

13  A    Well, I mean, we've -- I lived through the last real

14  estate boom bust, and I think history has to be a guide here,

15  thought we don't have any crystal ball that will tell us

16  exactly how this will play out.  But, the last time this

17  situation played out, it played out over about a five-year

18  period.  I think the markets adapt and react quicker these

19  days, so I think we could have a situation -- it could be a

20  three or four-year scenario with the one caveat being that the

21  payment option arms could be the big ticking time bomb for the

22  industry.

23  Q    What do you mean by a big ticking time bomb?

24  A    Again, there's -- no one's being forced.  Generally, a lot

25  of the collateral -- a lot of those loans were originated in

1  the recent history.  The payments are relatively low for the

2  value of the property in question.  So, they may be able to

3  live in that house for less than they could live in a rental

4  nearby.  You know, the ability for them to be forced out is

5  minimal.

6  Q    If interest rates are reduced or continue to be reduced,

7  do you have a view as to whether or not that will, in and of

8  itself, solve the payment option arm ticking bomb problem?

9  A    I don't think it'll solve it, but it -- I can't say it's

10 not going to help a little.  You know, most of these loans

11 originated at a margin over what's known as the one-year of

12 this -- the MTA or the Moving Treasury Average.  That rate

13 today is at about, you know, one and a half percent.  None of

14 the -- it's not uncommon to have margins of 400 basis points

15 over that index, so we're looking at a rate of about five and a

16 half percent currently.

17         But, I think the bigger issue is the fact that when

18 the loan is forced to reset when it meets its maximum negative

19 amortization, which in many cases is 115 -- anywhere from 110

20 to 125 percent, depending on the particular product, that they

21 now are going to be forced to pay a larger balance over a

22 shorter period of time at a higher interest rate.  So, those

23 three things factored in are basically what's going to create

24 payment shock.

25 Q    So, even if interest rates generally trend down, the

1  payment option arm people, when their initial period is over,

2  will still have to pay a higher rate?

3  A    They're going to pay a higher payment.  It may be a lower

4  rate, but their payment will be higher.

5  Q    Mr. Branthover, are you generally familiar with actions

6  that the Congress, the executive, the federal reserve have

7  taken over the past couple of months to try to ameliorate any

8  of the negative trends in the market that you've identified?

9  A    I am.  And there have been many.

10  Q    Okay.  Could you describe for us some of the executive

11  branch programs that you may be familiar with such as actions

12  by the treasury department, Secretary Paulson, the Federal

13  Housing Agency and -- excuse me -- Federal Housing

14  Administration and why?

15  A    We have the Hope Now program which is, I think, as has

16  been described and has as been portrayed is really going to

17  lead out to and try to reach out to people who have subprime

18  mortgages that are being forced out of their property when

19  those loans reset and they have a payment shock, or are unable

20  to make the payments under the new structured loan.  That --

21  potentially that could help some folks -- some people.  It is

22  still unclear how that will be rolled out.  And there's a piece

23  today that came out from Lehman Brothers that it anticipates

24  that will only affect maybe ten to 20 percent of the total

25  people that have those products.  So, it's still unclear how

Branthover - Direct/Kirschbaum                    165

1  that will shake out.

2  Q    Are you familiar with actions by the Federal Home Loan

3  Finance Board with respect to increasing amounts of permitted

4  MBS -- Mortgage Bet Securities products?

5  A    Well, there's been a few things that have been going on in

6  that regards.  FAO has -- well, the agencies, Fannie, Freddie

7  and Ginnie Mae, now can issue loans in various MSAs, up to 700

8  -- approximately $730,000.  I believe most of those loans can

9  be originated on an ongoing basis as of August of '07, but

10 prior portfolios could be bid on by the -- by the agencies.  So

11 that could alleviate some of the problems that we currently

12 have in the jumbo market, but, again, it's unclear on how that

13 will be -- how that will affect the current state and loans

14 that were originated prior to that.

15 Q    In your opinion, what will the likely effect be of any of

16 these actions on the value of the American Home Mortgage loans

17 that we're dealing with in this proceeding?

18 A    I don't think it'll have a dramatic impact.  It is still

19 unclear on what the overall end gain will be and how much these

20 programs will affect the average home borrower, but it seems to

21 me most of these -- most of these programs are -- tend to be

22 directed towards the subprime borrower, and the bulk of this --

23 it wasn't really a product for American Home subprime, so --

24 but there may be some modest effect.

25 Q    With respect to the increase in the loan limit size that

1  Fannie Mae or Freddie Mac will currently lend against or

2  purchase, does that change the loan origination standards for

3  Fannie Mae and Freddie Mac with respect to other credit

4  requirements?

5  A    No.  They have on three occasions actually tightened or

6  raised the fees to sell them riskier loans going back to last

7  summer.

8  Q    Okay.  When you say -- does that make it more difficult,

9  in effect, to sell loans to the GSEs?

10  A    It does in many regards.  Just because the loan is below

11  the threshold doesn't mean you could actually still sell the

12  loan and/or if you did you would get paid less because the risk

13  -- the risk associated with that and how they've changed their

14  pricing grids.

15  Q    Okay.  So since let's say August of 2007 to the present

16  have there been specific actions taken by the GSEs that

17  regardless of this change in the loan limit have adversely

18  affected the ability to sell product to the GSEs?

19  A    Yes.  They've increased their minimum FICO scores and

20  reduced the LTV/CLTV combos and then the fees charged for

21  anywhere between on those -- on those grids.

22  Q    Okay.  In your opinion, will the decreases in the interest

23  rates that are taking place recently and, for that matter, some

24  that may still yet -- yet be to come, will those substantially

25  alleviate the current negative trends in the market?

1  A    I don't believe so.  I think we have a home value problem,

2  not so much as a refinance ability.  I think if one's able to

3  refinance, I think we'll see that happen, but I think the

4  recent trends over the last six months is that many people who

5  have come to the market have tried to refinance but are unable

6  to because the current value of their product -- value of their

7  home.  Also, you know, underwriting guidelines across the

8  industry have become more stringent, so people are looking at

9  the credit scores more closely, looking at documentation more

10 closely, looking at the home values much more closely and have

11 identified markets that are in duress and then have different

12 pricing adjustments, are -- can't say blocking those markets

13 out altogether, but are requiring more down payments.

14 Q    Is the Fed now allowing certain Triple A related

15 securities to be utilized as collateral?

16 A    They are.  They've opened the gate to nondepository

17 financial institutions to pledge Triple A backed --

18 mortgage-backed security as a form of a loan, or they can

19 pledge that and get cash in exchange.

20 Q    In your opinion, will that increase the value of American

21 Home Mortgage's loan portfolio?

22 A    I think what that's done is, I think ultimately that could

23 have some impact.  I think what we're -- what we're seeing here

24 has really more been a stabilization for dealers that have been

25 playing in this market for many, many years.  For the actual

1  value of Triple A securities to increase, I think there has

2  just been a backup of buyers of that product, both globally

3  because of the losses that people have taken in mortgage

4  product, and it'll be a while before they come back.

5  Q    With regards to the payment option ARMS in the AHM

6  portfolio, with the Fed's lowering interest rates now be

7  relevant to what happens at the time those loans are recast

8  into the new payment mode?

9  A    That's a good question, because no one knows what -- what

10 the Fed will do.  I mean, we've got an inflation concern.  The

11 Fed may not be able to lower rates as low as they would like

12 given what's going on in the -- in the inflation picture, and

13 if the economy does begin to pick up and real estate begins to

14 appreciate in value, generally the Fed will start increasing

15 rates, so --

16 Q    So, what time frame to you have to look at to decide

17 what's the relevant interest rate?  If you're looking at a

18 payment option ARM, is it now or is it at the time of recast?

19 A    Most of these are reset monthly, but not always.  In the

20 case of American Home about half their portfolio have a fixed

21 rate term up-front, but the monthly ones tend to have the

22 higher -- highest risk.

23 Q    And how long is that -- how long is that fixed period of

24 time?

25 A    It is generally based upon the amortization, or the

1 negative amortization capital, but somewhere between three to

2 five years.

3 Q    In your opinion, what is the likelihood that any of these

4 governmental initiatives we've discussed will substantially

5 improve the value of the American Home Mortgage portfolio?

6 A    I don't think it's going to have a dramatic impact anytime

7 soon or merely -- any impact anytime soon.

8 Q    Want to ask you about a couple of terms that appear in the

9 loan data.  What is the difference between LTV and CLTV?

10 A    LTV is the loan value of a mortgage.  So if you bought a

11 hundred thousand dollar house, you put down 50,000, you've got

12 a 50 LTV.

13 Q    And what is CLTV?

14 A    That applies to loans that have a second behind the first.

15 So in that same situation if you borrowed an additional $25,000

16 second, your CLTV will be 75 percent.

17 Q    Have you calculated the LTV for the AHM portfolio as of

18 February 29, 2008?

19 A    I have, and I believe there was a misstatement on the file

20 that was provided, on BOA-44.  The average LTV is I believe 80

21 -- about 86 percent, and then the combined is about 89 percent.

22 Q    Okay.  And the average that you're referring to on BO -- B

23 of A 44 for weighted average LTV is 74.78 percent on the first

24 page, right?

25 A    Correct.

1  Q    What's your understanding as to the reason why the figure

2  74.78 appears there rather than the 86 percent figure that

3  you've calculated?

4  A    When you calculate the LTV for a pool of loans you need to

5  exclude the seconds.  In many situations, the second may show

6  as at a 20 and a hundred, which really means it's at 80 and a

7  hundred.  It's just kind of a market convention that's kind of

8  silly.  So when you look at -- when you have a second, it's

9  best to really only focus on the CLTV of that particular

10  mortgage, and if you include the seconds in your LTV

11  calculation it will skew the numbers generally to the lower

12  side.

13  Q    How do you calculations of 86 percent LTV, 89 -- 80, 89

14  percent CLTV, affect your assessment of the riskiness of the

15  American Home Mortgage portfolio?

16  A    Well, I think leverage is one of the biggest problems that

17  every mortgage portfolio is dealing with in the current

18  marketplace.  So the fact that that now is, you know, closer to

19  90 percent in a real estate market that might be down ten

20  percent already, you know, creates a much more challenging

21  situation for borrowers to resolve.

22  Q    What's the effect of the fact that market may be down ten

23  percent when you consider an LTV let's say of 89 percent?

24  A    Well, the borrower can very easily owe more than the house

25  is worth, and that --

1 Q    Why is that?  Is the LTV calculated as of the time of

2 origination?

3 A    It is.

4 Q    Okay.  So if property values or the value of the house or

5 the home goes down after the mortgage is taken, what does that

6 do to the LTV?

7 A    Well, if they go to try to refinance that loan, that house

8 would be reappraised and they'll look at the current balance

9 that the person's looking to apply, and let's say -- unless

10 they're putting an additional amount down, they may not qualify

11 for the mortgage because they owe more than the house is worth.

12 It was a very common situation in the early 90s.

13 Q    If you were doing -- withdraw it.  If you wanted to see if

14 a company was properly implementing its underwriting

15 guidelines, what would you do to determine that?

16 A    Underwriting, the devil is really in the details.

17 Obviously, you need to review all of the underwriting

18 guidelines that are available for the institution.  It's

19 important to understand how that institution is going to be --

20 or how that institution sells their product.  Many institutions

21 are basically feeders to larger aggregators.  So, therefore,

22 the underwriting guidelines are probably very, very similar to

23 the individuals whom they sell their product to currently.  So,

24 you need to confirm that.  If they're doing their own

25 securitizations, have their own securitizations shelf, they're

1  underwriting guidelines could be substantially broader.  So,

2  you need to see how that product's being sold, how it's -- how

3  it's also being accepted into the marketplace.  But to actually

4  find out if the policies are being followed, you would really

5  need to have an in-depth meeting with compliance to see how

6  those policies are actually being used in the field.  You also

7  would want to -- depending on how they -- how automated the

8  company is, if they have a very good loan origination system,

9  known as an LOS, many of those policies will be replicated

10  within that LOS.  It will allow -- prevent a loan officer from

11  locking a loan or actually booking a loan without passing

12  certain criteria.  So you would need to confirm that as well.

13  Then also I think you really would need to do some samples of

14  actual loan files to verify and re-verify the underwriting

15  guidelines were actually being followed.

16  Q    Why would it be advisable to actually look at the loan

17  files to see whether the underlying -- underwriting guidelines

18  were being followed?

19  A    There's lots of different things that can be overlooked,

20  and mistakes are made.  You know, obviously over the last few

21  years the amount of volume coming through mortgage companies

22  has been extremely high, and there's been lots of situations

23  where things just weren't -- you know, all the Is weren't

24  dotted and the Ts weren't crossed, or signatures were missing

25  and documents prevented the loans from being sold, or things of

Branthover - Direct/Kirschbaum                     173

1  that nature.

2  Q    Did underwriting guidelines generally get stricter in the

3  industry as a whole in 2007?

4  A    Yes.

5  Q    Okay.  How would you go about determining whether American

6  Home Mortgage made its underwriting stricter in 2007?

7  A    It would be nice to see a trend of decreased leverage and

8  higher credit quality.  I think on the surface those are the

9  two trends that are causing most of the problems.  So, lower

10 CLTV and LTVs, higher FICO scores.

11 Q    In your review of the data tapes and the data files, did

12 you see any evidence of that?

13 A    I did not.  It appeared that both FICO scores were

14 trending lower, and CLTV and LTVs were trending higher.

15 Q    And you're talking about in mid-2007?

16 A    In the data tapes that were provided to me as -- in

17 question here.

18        THE COURT:  I'm confused.  The debtors aren't

19 originating any new loans?

20        MR. KIRSCHBAUM:  No.  We're talking about -- Your

21 Honor, this really arises from testimony that came from the

22 other side's expert with respect to whether American Home

23 Mortgage's underwriting would have been expected to become

24 tighter later in -- for it in its later -- latter part of 2007,

25 which, of course, would be July.  So, in other words, whether

Branthover - Direct/Kirschbaum                    174

1    July --

2              THE COURT:   What data -- the data tapes he had were

3    August through February.

4              MR. KIRSCHBAUM:   Yes, but those relate to the loans

5    that were written or originated while American Home Mortgage

6    was originating loans.   So, he looks at the data tape.   That's

7    a slice of time.   As of 8/31/2007, how are the loans in the

8    portfolio doing?   As of November 30, 2007, how are they doing?

9    It's the same loans.   They all originated July 2007 or earlier,

10   but what he's looking at over time is how they've developed

11   over time.

12             THE COURT:   All right.   So, his -- so your -- the

13   point of the testimony is they weren't doing their job in the

14   underwriting because the performances deteriorated.

15             MR. KIRSCHBAUM:   Yes.   The point is that while their

16   expert testified that underwriting guidelines got tighter and,

17   therefore, since most of American Home Mortgage's loans in this

18   portfolio were written in the later part of its existence,

19   therefore you should expect the quality of the portfolio to be

20   better, that, in fact, if you look at the portfolio in any kind

21   of granular way, you see that it isn't true.

22             THE COURT:   All right.   Understood.

23                      CONTINUED DIRECT EXAMINATION

24   BY MR. KIRSCHBAUM:

25   Q    Mr. Branthover, based on your review of the data tapes and

1  Exhibit 44 as well, what percentage of the loans in the

2  American Home Mortgage portfolio were categorized by American

3  Home Mortgage as conforming loans?  And I refer you -- the last

4  page of Bank of America 44 might be helpful.

5  A    Yeah, well, Page 2 of Number 44 has the best breakdown, I

6  think, and they are representing about 717 loans worth $119

7  million, which represents about 21 percent of the total loan --

8  Q    Okay.  Based on your review, would that percentage of

9  American Home's portfolio actually be accepted by -- for

10 purchase by the GSEs?

11 A    Well, I think we had -- we heard early testimony today and

12 read from prior depositions that of the loans that were still

13 performing, which I believe is about 105 or six million, it was

14 presented to Countrywide as the go between to Fannie Mae to see

15 if those loans could be purchased by Fannie Mae.

16 Q    What happened?

17 A    And a substantial amount of those loans were kicked due to

18 re-FICOs, re-underwriting, re-LTV, recalculations of the credit

19 quality of those borrowers --

20 Q    Okay.

21 A    -- exact same things I've talked about here before.

22 Q    Okay.  I'd like you to take a look, please, at exhibit --

23 Bank of America Exhibit 48 and 49, and tell me whether or not

24 in preparing your report in this matter you reviewed those

25 documents, both of which were produced from the files of

1  American Home Mortgage.

2  A    I did.

3  Q    Okay.  And what do those documents -- how do those

4  documents inform your opinion in this matter?

5  A    I think it very clearly and succinctly tells people at

6  American Home that of the 105 million that was submitted 58

7  million was acceptable to the agencies for purchase.

8  Q    And what about the other 47 million?

9  A    It was, as I said here so succinctly, kicked.

10  Q    What does "kicked" mean?

11  A    It was excluded from any purchase currently.

12  Q    In addition to the fact that it appears that, in fact,

13  Fannie Mae was not willing to accept a very substantial

14  percentage of the otherwise -- the loans listed as conforming

15  in AHM's books, what other -- what other loans within the AHM

16  portfolio listed as conforming would not be acceptable by GSEs

17  based on characteristics of the loans such as their current

18  status or delinquent status?

19  A    Yeah, there's -- the only way to really know what the

20  agencies will buy is to run them through their underwriting

21  system, is the best way, and most institutions of this size

22  would have run their loans through DU, in this case Desktop

23  Underwriter, which is Fannie Mae's underwriting engine, to

24  verify if that's the case.  So, it depends, you know, how --

25  how that all would shake out, but there are other

1  characteristics that come into play that would determine if a

2  loan is agency eligible or not.

3  Q    Is a delinquent loan generally agency eligible?

4  A    No.

5  Q    And some -- were some of the $121 million worth of loans

6  listed in the AHM documents as conforming, were some of those

7  delinquent?

8  A    There were -- pretty -- pretty good sizable chunk,

9  actually, for a conventional product.

10 Q    In your experience, does the timing of a mortgage loan's

11 origination have a lingering effect with respect to its value?

12 A    Yeah.  I mean, within the industry, there's vintages and

13 certain vintage year of mortgage product is better than others,

14 and 2007 is going to go down as one of the worst.

15 Q    Okay.  And is 2007 the year in which most of the loans in

16 this portfolio were originated?

17 A    Correct, and -- and surprisingly there is -- I think 15

18 percent of the portfolio was originated in 2006, which

19 astonishes me why that would still be laying around.

20 Q    What do you mean by, "why that would still be laying

21 around?"

22 A    You know, I haven't had conversations with secondary

23 marketing at American Home, but most mortgage companies they'd

24 work with are in the business of originating loans and quickly

25 selling them into the secondary market as quickly as possible.

1  And the only time they would keep loans were because they

2  couldn't sell them or there was some other problem they need to

3  cure, but they didn't have funding facilities to -- from what

4  I'm aware of, to keep loans around indefinitely.

5  Q    Do you have an opinion as to whether or not the vintage of

6  the bulk of the AHM portfolio will have any effect on the

7  ability to realize value from the portfolio going forward?

8  A    Yeah, I think that's going to be hard to get away from the

9  '07 vintage for a lot of its product, primarily with the way

10 it's been performing so far with the delinquencies as high as

11 they are.

12 Q    In your experience, do companies, mortgage companies whose

13 business it is to originate loans and sell them, is there any

14 reason why they would originate loans and hold them?

15 A    Some institutions, as a policy, will originate some loans

16 for portfolio.  That makes perfect sense.

17 Q    What kind of institutions are those?

18 A    Depositories.

19 Q    And what's the difference between a depository institution

20 in that regard and a non-depository institution?

21 A    A depository has -- generally has a substantial amount of

22 liabilities, cheap liabilities, in the form of checking account

23 balances and other deposits from customers that they then can

24 deploy into various assets for balance sheet purposes.

25 Q    And companies that are operating on short-term credit to

1 keep themselves financed, do those companies who are in the

2 mortgage origination business generally originate and sell

3 quickly?

4 A     They do.  I don't know of any other mortgage companies

5 that borrow short-term financing and lend out 30-year product

6 against it for portfolio.

7 Q     In your opinion, what effect will AHM's bankruptcy have on

8 its ability to sell these mortgage loans if the mortgage loans

9 remain with it to sell?

10 A     I think it would be difficult for them, given the -- their

11 current status in bankruptcy, to achieve full value for those

12 -- any loans that they bring to market.

13 Q     Why do you think that?

14 A     They're bankrupt.  They have no alternatives.

15 Q     In your experience, does that affect what a buyer might be

16 willing to pay for a loan, the fact that the sellers are

17 bankrupt?

18 A     I do.

19 Q     Well, how does it affect it?

20 A     I think it would not -- not be a positive effect, just be

21 --

22 Q     What, in your view, would be the best method for achieving

23 maximum value for this loan portfolio that you examined?

24 A     I think for maximum value to be achieved in this portfolio

25 it's going to require significant resources and time to work

1  through these loans to achieve that.  So, I think an

2  institution that has significant resources, both in the

3  servicing platform and as well capital at their disposal, would

4  be a -- would be a better solution.

5  Q    In your opinion, what are the chances that there will be a

6  significant decline in the value of the American Home Mortgage

7  portfolio going forward?

8  A    If the previous history of delinquency and foreclosures,

9  if that trend continues, and I believe it will, that will have

10  a significant increase -- decrease in the value of that

11  portfolio going forward.

12          MR. KIRSCHBAUM:  Should we -- Your Honor, I'm through

13  with my questioning.  The only question is whether I should

14  move the documents into evidence at this point or wait till

15  after cross.  Does the Court or my opponents have any

16  preference?

17          THE COURT:  Why don't you identify what you're going

18  to move into evidence.  So, go ahead and make the motion.

19          MR. KIRSCHBAUM:  Your Honor, we move into -- we would

20  like to move into evidence the following documents:  Bank of

21  America 39, 40, 41, 42, 43, 44, 47, 48 and 49.

22          THE COURT:  Thirty-nine, 40, 41, 42, 43, 44, 47, 48

23  and 49, correct?

24          MR. KIRSCHBAUM:  That's correct, Your Honor.

25          THE COURT:  All right.  I'll allow the debtors an

Branthover - Direct/Kirschbaum                181

1  opportunity, as I did previously, to consider whether they have

2  any objection.

3         UNIDENTIFIED ATTORNEY:  Fifty and 51?

4         MR. KIRSCHBAUM:  Your Honor, in addition, even though

5  I did not show these documents to the witness, we have included

6  in our book Exhibits 50 and 51, which are both Fannie Mae

7  announcements with regards to changes in their guidelines.  If

8  I need to, I suppose I can show them to the witness, but I

9  would -- I would ask for their -- unless the other side will

10 object, I would just ask for those -- admission of those

11 documents.

12        THE COURT:  All right.  Well, we'll consider the --

13 I'm not going to ask them to make a decision on the fly, so

14 move them into evidence and if there's an objection and you

15 need to recall the witness to deal with that, we'll deal with

16 it at that time.   Did you have any further questions?

17        MR. KIRSCHBAUM:  I have no further questions at this

18 time, Your Honor.

19        THE COURT:  All right.  Mr. Power, any questions?

20        MR. POWER:  No, Your Honor.

21        THE COURT:  Okay.  Take a very short recess before we

22 do cross.

23                  (Recess)

24        THE CLERK:  All rise.

25        THE COURT:  Please be seated.  Mr. Bissell.

1          MR. BISSELL:  Thank you, Your Honor.

2                    CROSS EXAMINATION

3  BY MR. BISSELL:

4  Q    Mr. Branthover, I think you testified on direct

5  examination that MIAC and you had done some work for American

6  Home in the past, correct?

7  A    Correct.

8  Q    And that's valuation work that you did in the past for

9  American Home, right?

10 A    That is correct.

11 Q    And in particular I believe you told me in the past that

12 MIAC valued the Broadhollow and Melville loan portfolios every

13 week for the better part of a couple of years, is that right?

14 A    That is correct.

15 Q    And you reviewed those valuation analyses when they were

16 done if you were in the office, correct?

17 A    Generally, yeah.  There's three individuals who could

18 review and approve those, so I -- I'm out of the office a lot,

19 so someone other than myself may have reviewed any particular

20 one.

21 Q    Okay.  And those valuations, they were done with some of

22 the proprietary software that your firm owns and develops, is

23 that correct?

24 A    That is correct.

25 Q    And the name of that software is MarketShield?

Branthover - Cross/Bissell                    183

1  A    MarketShield and WinOAS.

2  Q    Yes, and what is --

3            THE COURT:  And what?  And what?

4            THE WITNESS:  WinOAS, as in Windows Option Adjusted

5  Spread.

6            THE COURT:  All right.  Okay.

7  Q    And you consider that and MIAC considers that to be the

8  market leading program?

9  A    WinOAS is -- has the lion's share of the services and

10 whole loan valuation in the country, absolutely.

11 Q    Yes.  What sort of market share does it have?

12 A    We do work with I think nine of the top 11 servicers,

13 which represents trillions of dollars of mortgage servicing.

14 Q    So, that's the dominate product, is that fair to say?

15 A    It is a dominate product.

16 Q    And you use it part of your -- as part of your

17 professional duties, do you not?

18 A    I do.

19 Q    And you use it every week, correct?

20 A    I depends.  Some weeks I don't use WinOAS.

21 Q    Most weeks if you can?

22 A    I -- you know, I try to have my analysts do it, actually.

23 Q    And that's what you use to value loans for clients in the

24 normal course of your business, correct?

25 A    We need to be specific on a couple topics.  For newly

1 originated loans, we don't need to run cash flows on those

2 loans, and we don't need to run all the -- cash flows that

3 would come out of a more seasoned portfolio or a portfolio in

4 distress, what have you.  So, for a newly originated product,

5 we'll run that through of MarketShield application, which will

6 price those loans based upon current pricing in the

7 marketplace.

8 Q     Okay.  And MarketShield and WinOS (sic), they look at

9 several factors, do they not?

10 A     Yes.

11 Q     And they look at things like loan type, correct?

12 A     They do.

13 Q     Okay.  And I think maybe we were calling that "product

14 type" earlier today, but loan type or product type, we can use

15 those interchangeably?

16 A     Yes.

17 Q     Okay.  And they look at the note rate, do they not?

18 A     They do.

19 Q     And they look at whether the loan -- how the loan was

20 documented, correct?

21 A     They do.

22 Q     FICO score, which I think you talked about earlier today.

23 A     Credit score comes into play, absolutely.

24 Q     LTV and CLTV, correct?

25 A     Correct.

1  Q    Piggy bank loan associated with the major loan?

2  A    Piggyback.

3  Q    Piggyback.  Okay, piggyback.  And whether the loan is an

4  ARM and what the margin of the loan is, if it's an ARM,

5  correct?

6  A    And its resets and -- you know, on ARMs there's -- a few

7  other factors come into play as well.

8  Q    So, if there's caps or resets?

9  A    Absolutely.

10  Q    Okay.  And it looks at prepayment covenants, does it not?

11  A    It does.

12  Q    And it also looks at geographic location, doesn't it?

13  A    It -- it does.

14  Q    Okay.

15  A    Or it can.

16  Q    And to run that analysis on the portfolio at issue here,

17  that would cost between seventy-five hundred and $15,000, is

18  that correct?

19  A    That's a reasonable estimate.

20  Q    And, in fact, you decided not to do any valuation of the

21  current portfolio as part of your expert report, did you?

22  A    I was asked not to do a complete valuation.

23  Q    Okay.  So you were asked not to use the product that you

24  use in your normal course of business, is that correct?

25  A    Yeah.

1  Q    Now, the MarketShield and WinOAS programs, they value the

2  loan portfolio by looking at individual loan performance, isn't

3  that right?

4  A    Again, you've got to separate the newly originated loans

5  from seasoned loans, so --

6  Q    Okay.

7  A    For newly originated loans, you know, we're going to work

8  under the assumption that those are all current and performing.

9  Q    Okay --

10 A    If you have a seasoned loan, then you would have to factor

11 in if they were not -- if there was any delinquency issues and

12 what have you.

13 Q    Here we're talking about seasoned loans, are we not?

14 A    We are.

15 Q    Okay, great.  And it does that because it's interested in

16 terms of coming up with its values at the discounted cash flows

17 that it predicts these loans are going to crank out, is that

18 right?

19 A    At the end of the day, that is correct, but there's many

20 things that need to be laid down in advance to come up with

21 that ultimate discount rate and an ultimate value.

22 Q    Okay.  And the focus on what the future cash flow of the

23 loans, that's how you value loan portfolios in your normal

24 course of business, isn't that right?

25 A    That is correct.

1  Q    Now, your --

2  A    It's one of our businesses.  It's our only business.

3  Q    Okay.  Now, your report does not attempt to put any kind

4  of range of price decline on the portfolio, does it?

5  A    No.

6  Q    And it doesn't set forth the discount rates that you would

7  use if you were to value these loans by looking at their cash

8  flow, does it?

9  A    It does not.

10 Q    And your -- and your non-litigation clients, when you

11 valuing a loan portfolio for --

12 A    Non-litigation clients?

13 Q    Your normal clients.

14 A    Oh, okay.

15 Q    This is a litigation client, bankruptcy litigation --

16 A    Our client.

17 Q    -- but still litigation.  For your --

18 A    Is that a law joke?

19 Q    Some people found it funny.

20         THE COURT:  I think I was just dissed, but go ahead.

21 It's all right.

22         MR. BISSELL:  May not be --

23         THE COURT:  See, when you're an Article I Judge, it's

24 hard to get people to take you seriously.

25         MR. BISSELL:  Oh, boy.

1          THE COURT:  Go ahead, Mr. Bissell.  Keep digging.

2  Q    For your clients, you other clients, when you do the

3  valuation, you do look at the cash flow and you do compute it

4  at some type of discount rate, isn't that right?

5  A    We do.

6  Q    Okay.  Just not here.

7  A    Correct.

8  Q    Now, let's discuss some things that are not in your

9  report.  Now, there's not an analysis of loan by product type

10  in your report, is there?

11  A    No.

12  Q    And there's not -- it doesn't set forth in your report

13  what a standard portfolio looks like, does it?

14  A    No.

15  Q    And you did not try to -- you talked about underwriting

16  guidelines during your direct.  You did not try to determine

17  whether AHM followed its underwriting guidelines as part of

18  your work, did you?

19  A    I have -- I would have no way of doing so.

20  Q    And you're not aware of any instances of borrowers from

21  AHM inflating the values of their property and trying to get

22  loans?

23  A    I do not have any specifics of that whatsoever.

24  Q    And you're not aware of any fraud committed by any

25  borrowers against American Home?

1  A    Don't have knowledge of that at all.

2  Q    And you've not calculated the cash flow that is coming

3  from the loan portfolio over different dates, isn't that

4  correct?

5  A    Correct.

6  Q    And your report doesn't contain analysis of which AHM

7  loans were no-document loans, low-document loans, or fully

8  document loans, isn't that right?

9  A    That -- that information was presented to us as B of A 44.

10 Q    Yes, after you had reached your opinion, correct?

11 A    No.

12 Q    You didn't include B of A 44 as part of your report, did

13 you, sir?

14 A    No, I did not.

15 Q    Now, you understand the distinction between low-document

16 loans and no-document loans, do you not?

17 A    I do.

18 Q    And you would agree with me, wouldn't you, that there are

19 very few no-document loans in the AHM portfolio, correct?

20 A    That's what -- that's what we've been told.

21 Q    Okay.  And that's what Bolton 4, which you were looking at

22 earlier, shows, doesn't it?

23 A    Correct.

24 Q    And your report doesn't set forth --

25         MR. KIRSCHBAUM:  Just for the record, Bolton -- I

1  don't think we referred to a Bolton 4.  We referred to Bank of

2  America 44.

3              UNIDENTIFIED SPEAKER:  Forty-four.

4              MR. KIRSCHBAUM:  I believe Mr. Bissell is referring

5  to that.

6              UNIDENTIFIED SPEAKER:  Yes.

7              MR. KIRSCHBAUM:  Bolton posed the exhibit number for

8  the deposition of Ms. Bolton when this document was first used.

9              MR. BISSELL:  Yes --

10             MR. KIRSCHBAUM:  The direct examination didn't refer

11 to Bolton --

12             MR. BISSELL:  Thank you, Mr. Kirschbaum.  I

13 appreciate the correction.

14             THE COURT:  So, it's Bank of America 44?

15             MR. BISSELL:  Yes, Your Honor.

16             THE COURT:  Thank you.

17             MR. BISSELL:  I apologize.

18 Q    Now, your report doesn't set forth B of A's plan for

19 handling loans post-foreclosure, does it?

20 A    No.

21 Q    And it doesn't make any predictions about how B of A will

22 do with these loans, does it?

23 A    No.

24 Q    And it doesn't have any analysis comparing how B of A

25 might do versus American Home, does it?

1   A     No.

2   Q     Now, you spoke about whether Fannie Mae is willing to

3   accept certain parts of the AHM portfolio as loans for its

4   program.  Do you recall that testimony earlier today, sir?

5   A     I do.

6   Q     Now, you base that testimony entirely on those e-mails

7   that were marked as exhibits during your -- your testimony, do

8   you not?

9   A     I -- I do.  BOA 48.

10  Q     Thank you.  Now, a couple of other things your report

11  doesn't contain, it doesn't have a -- it doesn't have an

12  analysis, does it, of how American Homes' FICO scores -- or,

13  excuse me -- how FICO scores for loans American Home originated

14  has changed over time, does it?

15  A     It does not, but we have tapes over time, so one could

16  follow those, but that is, you know, a static portfolio.  New

17  loans weren't being originated as time went by.

18  Q     But you didn't set forth in your report any sort of data

19  analysis of those FICO scores, did you?

20  A     I don't believe so, no.

21  Q     Now, you talked about your prior experience briefly at the

22  beginning, and I just want to make sure I understand it, sir.

23  Before you were at MIAC, you were at Lehman Brothers, is that

24  correct?

25  A     At Lehman Brothers, that's correct.

1  Q    Yes.  And I believe your position there was fixed income

2  sales?

3  A    Correct.

4  Q    That was a sales or trading position, correct?

5  A    Sales.  Sales.

6  Q    And before that you were at Chase Home Finance for five

7  years, and there you were a jumbo trader?

8  A    That was the last job I held at Chase Home Finance.

9  Q    Yes, and is it fair to call that a sales and trading

10 position?

11 A    A trading position.

12 Q    Okay.  And then before that you were at secondary

13 marketing at JPMorgan Chase.  Is it fair to call that a sales

14 and trading position, sir?

15 A    Yes.

16 Q    Now, you don't have any background working for any

17 regulatory agencies, do you?

18 A    No.

19 Q    And you do not interface with either the Department or

20 Treasury or Fannie Mae or Freddie Mac as part of your everyday

21 duties, do you?

22 A    I represent clients who sell loans to both Fannie Mae and

23 Freddie Mac, so, therefore, I try to stay current on what their

24 guidelines are and --

25 Q    But do you deal with them directly, sir?

1  A    I have a representative that I could call if I need to

2  call them, yes.

3  Q    And how often does that happen, sir?

4  A    Maybe quarterly.

5  Q    And you're not a workout specialist, are you sir?

6  A    No, I'm not.

7  Q    Now, you'd agree right now is a pretty bad time to try to

8  sell or transfer a loan, correct?

9  A    Sell or transfer?

10  Q    Yes.

11  A    Which -- what --

12  Q    Well, let's do -- just do sell.

13  A    Talking about sale or are we talking about transfer of

14  servicing, or what are you --

15  Q    Let's do --

16  A    -- could you clarify the question?

17  Q    Let's do sale first.

18  A    Okay.  The current market for mortgages has been better.

19  Q    Yes, the market's pretty dead right now, isn't it?

20  A    It's been better.

21  Q    Would you agree with me that lower rates now make it

22  easier for someone to refinance now?

23  A    Someone who has equity in their home, potentially yes.

24  Someone who is currently making payments on their mortgages,

25  yes.

1  Q    Someone who has an option ARM that may not reset for

2  several years, it's easier for them to refinance if interest

3  rates are low now?

4  A    Potentially.

5  Q    Now, I think you testified that you don't expect

6  government programs to have much of an effect on the mortgage

7  market, isn't that right?

8  A    That's correct.

9  Q    And --

10 A    As they've been rolled out currently.  Maybe things will

11 change down the road, but the way they've been rolled out so

12 far, it's -- it appears to be mostly window dressing.

13 Q    Okay.  But do you recall when I asked you at your

14 deposition whether you could identify anybody who shared these

15 views with you, whether you could identify anybody who does?

16 A    Well, I read lots of research, and many of those research

17 pieces don't actually list the title -- or list the author.

18 Q    Okay.  Well, you agree you couldn't identify any specific

19 piece of writing by anybody that agreed with you, correct?

20 A    Well, I think we -- there has been commentary on TV where

21 various pundits on TV talked about these programs.

22 Q    We'll get to TV in a second, but in terms of things in

23 writing, you couldn't identify anybody, could you?

24 A    Correct.

25 Q    And then we talked -- we did talk about TV, and you were

Branthover - Redirect/Kirschbaum                195

1  only available (sic) to identify one person you thought agreed

2  with you, correct?

3  A    Correct.

4  Q    And that was Mr. Kudlow on CNBC?

5  A    Correct.

6         MR. BISSELL:  Thank you, Mr. Branthover.  That's it.

7         THE COURT:  Redirect?  Would you like a moment?

8         MR. KIRSCHBAUM:  Your Honor --

9         THE COURT:  That's fine.  I mean, it's fine.

10                    REDIRECT EXAMINATION

11 BY KIRSCHBAUM:

12 Q    Mr. Branthover, the data from Bank of America 44, which

13 Mr. Bissell showed you or referred you to, is that data the

14 same data that is in the data tapes that were marked as B of A

15 40, 41, 42 and 43?

16 A    They are.

17 Q    Okay.

18 A    They are.

19 Q    And was that -- were those data tapes identified in your

20 report as part of the materials you are relying on here?

21 A    Correct.

22 Q    Mr. Bissell also asked you about the e-mails concerning

23 the Countrywide Fannie Mae issue, do you recall that?

24 A    I do.

25 Q    And that e-mail would be exhibit -- Bank of America

Branthover - Redirect/Kirschbaum                196

1  Exhibit 48 and 49, correct?

2  A    Forty-eight, yes, and forty-nine.

3  Q    Are you aware of testimony given by the debtor's corporate

4  representative as well as by Bank of America's witness that

5  corroborates or doesn't corroborate your reading of those

6  emails.

7  A    It appears to corroborate my view on the emails.

8  Q    So, the emails and the testimony are all consistent with

9  your testimony on direct?

10 A    That is correct.

11        MR. KIRSCHBAUM:  Nothing further, Your Honor.

12        THE COURT:  All right.  Thank you.  Have you had an

13 opportunity to consider any objections to the exhibits?

14        MR. BISSEL:  Yes, we've agreed to the admission of

15 all the exhibits subject to them relinquishing an objection

16 that they made at the trial deposition of our expert last

17 Monday on two exhibits, but –

18        MR. KIRSCHBAUM:  There are two exhibits that we

19 objected to that we really should have objection to.  There are

20 others that we, I think strategically object that does need to

21 be dealt with when we do whatever it is we are going to do deal

22 with the other side that --

23        THE COURT:  Based on your withdrawal of two

24 unidentified, but I'm sure you guys know what you're talking

25 about.  You said it's in connection with the debtor's expert

1   witness.   Exhibits, Bank of America 39 through 44, 47, 48, 49,

2   50 and 51 can be admitted without objection.

3              MR. BISSEL:  Yes, Your Honor.

4              THE COURT:  All right.  I think we're finished with

5   you, sir.  You may step down.

6              MS. SCHONHOLTZ:  Your Honor, one small order of

7   business before we rest.  I'd like to move B of A 53 into

8   evidence.  May I approach?

9              THE COURT:  Yes.  What is this?

10             MS. SCHONHOLTZ:  B of A is – 53 is a composite

11  exhibit showing AHM's valuations of the loan portfolio securing

12  the B of A line.  It was produced by the debtors in this

13  litigation.  The document was compiled by the group headed by

14  Mr. Johnson, the 30(b)(6) witness in this case.  And these were

15  prepared between Aug 27th, '07 and January 31st, '08.  They

16  were identified by Mr. Johnson at his deposition on Friday.

17  Pages 133 Line 4, through 136-3 and we offer them into

18  evidence.

19             THE COURT:  Any objection?

20             MR. DORSEY:  May I have a moment to consider it, Your

21  Honor?

22             THE COURT:  That's fine.

23             MR. DORSEY:  Your Honor, we would object because we

24  had an agreement between the parties to identify trial exhibits

25  prior to the hearing and this was not identified as a potential

1  exhibit, which denied me the opportunity to be able to cross

2  examine witnesses about it to –- they waited too long.  Again,

3  a defalcation on their part.  They should have identified this

4  as an exhibit and they didn't do it.

5        MS. SCHONHOLTZ:  Your Honor, our obligation was to,

6  as was theirs, was to exhibit - to identify exhibits we were

7  going to use with our fact witnesses.  This is a document that

8  came out of their files.  They can't cross examine Mr. Wampler

9  on his document.  I do plan to use it on Mr. Johnson's cross

10 examination.  It was discussed at length in his deposition and

11 we were under no obligation to identify every exhibit on the

12 direct case; was exhibits to be used only in fact witness

13 testimony.

14       MR. DORSEY:  I disagree, Your Honor.  We - the

15 agreement that we had was to produce all exhibits that were to

16 be used in a party's case in chief.  And they didn't identify

17 this one.

18       THE COURT:  Let me see the agreement.

19       MR. DORSEY:  May I approach, Your Honor?

20       THE COURT:  Yes.

21       What am I looking at?  Oh, this stipulation. I think

22 I signed this.

23       MR. DORSEY:  If you look at the last - the last entry

24 on the page, Your Honor.

25       THE COURT:  Paragraph 8, on or before April 11, 2008,

1  at 1:00 p.m. the parties will serve - excuse me - will file and

2  serve pretrial briefs and exchange all exhibits that will be

3  presented in each parties case in chief.  That seems pretty

4  clear to me.  Is this part of your case in chief?

5          MR. KIRSCHBAUM:  Your Honor, in light of the case

6  that the debtors have expressed the intention of making a

7  motion to dismiss at the end of our case, we thought that we

8  should be entitled to introduce this document because this will

9  be part of our resistence to that motion.  If that document

10 would - was used with Mr. Johnson at his deposition, that

11 document was known to the other side, they knew it was a

12 critical document, they're not prejudice.  In fact, Your Honor,

13 that day for providing exhibits was postponed until Monday.

14 There have been no depositions since Monday.  So, we think

15 there's no prejudice to them.  This is not a document that was

16 hidden from them in any way, shape or form.  It will be used in

17 any event with Mr. Johnson when Mr. Johnson testifies, under

18 the circumstances, we don't think there's any prejudice to them

19 for allowing us to introduce this.  It's their document

20 identified by their witness at a deposition which took place on

21 Friday, April 11th.

22         MR. DORSEY:  I think they still had an obligation to

23 identify it.  They agreed to the --

24         THE COURT:  To paraphrase Vice President Cheney, so -

25 I mean, that's not the point of this - the fact that they've

1  responded to what they believe are weaknesses, they may or may

2  not be weaknesses on what you plan to present in your case in

3  chief isn't an excuse to not go by the agreed stipulation and

4  order as to what was to be identified or not identified.

5          MR. DORSEY:  Your Honor, the –

6          THE COURT:  Aren't they prejudiced by the fact that

7  they developed a strategy for litigation based on what they

8  think you're going to introduce in evidence and you now changed

9  it.

10          MR. KIRSCHBAUM:  It didn't change the strategy, Your

11  Honor, because there have been no – there were no – the date

12  for production was not the 11th.  We changed that and what we

13  said was we would break our exhibits into two pieces.  One

14  piece would be expert exhibits -- exhibits which would be used

15  by the experts on -- would be identified on Saturday April

16  12th.  Exhibits that would be used with the fact witnesses

17  would be identified and on Monday, April 14th.  That's what

18  happened, Your Honor.  Your Honor is correct that the original

19  stipulation did say case in chief.  This document was not

20  identified.  I don't think it was intentionally withheld.  It

21  wasn't hidden from them, and under the circumstances, Your

22  Honor, I believe it should be considered if they are going to

23  make a motion to dismiss, otherwise we would ask that the

24  motion to be dismissed be deferred until we can introduce the

25  document with Mr. Johnson, which we would be entitled to do.

1  And which we certainly signal to the other side very strongly

2  than we intended to do when we used this exhibit which they

3  produced in that cross examination of Johnson.

4          MR. DORSEY: They used a lot of exhibits in the cross

5  examination -- or in the deposition of Mr. Johnson, Your Honor,

6  that they did not identify as trial exhibits, and --

7          THE COURT:  You're going to call Mr. Johnson as a

8  witness?

9          MR. KIRSCHBAUM:  Assuming their case survives.

10         THE COURT:  All right.

11         MR. KIRSCHBAUM:  We don't think it will.

12         MR. DORSEY:  We don't think that the -- whether our

13 case survives or not, Your Honor should turn on this, because

14 clearly this is a document they knew of and are not being

15 surprised.

16         THE COURT:  I'm going to think about that.  I'm going

17 to think about whether to admit it or not.  While thinking

18 about whether to admit it or not, I'm going to ask a question

19 about it, because it's kind of -- it doesn't make a lot of

20 sense to me.  I take it the -- all these loans aren't your

21 loans.  You're the Bank of America line?

22         MS. SCHONHOLTZ:  Correct, Your Honor.  You'll see on

23 each of these documents the second line says Bank of America.

24 That is the loan portfolio securing the Bank of America

25 revolver.  And it appears on the second line of each of the

1 documents.

2          THE COURT:  All right.  I'm going to think about that

3 one.  Anything further?

4          MS. SCHONHOLTZ:  Nothing further, Your Honor.

5          THE COURT:  So, subject to admission or not admission

6 of this exhibit, you rest?

7          MS. SCHONHOLTZ:  We do, Your Honor.

8          THE COURT:  All right.  And Mr. Brady?

9          MR. BRADY:  Your Honor, Robert Brady on behalf of the

10 debtors.  We would, as we indicated on our openings, we would

11 at this time move under Bankruptcy Rule 7052, which

12 incorporates Federal Rule of Civil Procedure, 52(c) and seek

13 judgment on the partial findings.

14          B of A has failed to meet its burden to present prima

15 facie evidence of cause warranting the lifting of the stay.  As

16 we indicated in the opening, they never answered the question

17 of whether they're over-secured, or under-secured --

18          THE COURT:  I understand.

19          MR. BRADY:  As we predicted, they danced all around

20 the issue of value.  The B of A has not presented any evidence

21 on what the value of the loans were on the petition date, what

22 the value of the loans were on the date of request for stay

23 relief, what they are worth today and what they believe  the

24 value will be in the future.  To meet its burden, Bank of

25 America must establish the value of its lien and the amount

1  and the rate of decline over a specified period.  They have

2  failed to do so.  There is no dispute.  Mr. Wampler did not

3  quantify the amount of any alleged decline in the value of

4  their collateral.  He did not give any testimony on valuation.

5  Mr. Branthover gave a lot of testimony on the nature and the

6  perceived quality of Bank of America's collateral but did not

7  do a valuation.  Was asked not to do a valuation.  He didn't

8  value this portfolio as of the petition date, he did not value

9  this portfolio as to the date of the motion; he did not value

10 the portfolio as of today and did not offer a value of what it

11 would be worth in the future.  What he gave are vague opinions

12 of where he believes the market for mortgage loans has been,

13 where it is today, and where it might go.  No valuation was

14 ever done.  Bank of America's evidence amounts to asking the

15 Court to take judicial notice of a troubled economy and a

16 troubled residential loan market.

17         I belief in opening, counsel for Bank of America told

18 you they would establish that the market value of the loans

19 declined by a 150 million dollars since the fall.  But they

20 presented no evidence whatsoever on that point.  Some of the

21 cases cited by Bank of America support the request, Your Honor.

22 The Elmira Litho case cited by Bank of America often in its

23 brief.  One setting for Bankruptcy Rule Reporter 892 indicates

24 that the benchmark value and the rate of decline must be

25 established from appraisal or other similar evidence.  Indeed

1  in that case which Bank of America relies on, the court granted

2  the debtor's Rule 52(c) motion because the secured creditor

3  failed to present its evidence.

4         The Planned Systems case, also cited by Bank of

5  America at 78BR(852) indicated where the secured creditor has

6  failed to establish the value in the amount and rate of

7  decline, it would have been fatal to their prima facie case.

8  In that case, the debtor admitted a decline in value.  There's

9  been no such admission here.

10         In my opening I indicated that it was not enough for

11  Bank of America to come forward today and make allegations of

12  an unspecified amount of decline over an indeterminate period

13  of time.  I'm not sure they even got there.

14         Your Honor, their failure to do that has also put the

15  Court and the debtors in position we cannot determine what, if

16  any, adequate protection would be necessary because they have

17  failed to quantify what they belief the decline is.  So, the

18  debtor and the Court could not even attempt to fashion adequate

19  protection if the Court were to find they were not adequately

20  protected.  Again, they have failed to produce any evidence in

21  that regard.  We think this motion has to be dismissed.

22         THE COURT:  Mr. Brady, let me ask you a question.  Is

23  there any dispute that the maximum value of the loans is the

24  unpaid principal or is it possible that they're worth more than

25  that?

1              MR. BRADY:  You mean the unpaid principal balance?

2              THE COURT:  Right.  These investments are a string of

3    payments of principal and interest over time -- it's cash flow,

4    so my question is whether there -- it was unclear to me because

5    frankly I think some of your comments indicate -- have some

6    weight because there was precious little discussion in

7    specifics as to valuation of the mortgages.  But my question

8    for you is does the debtor posit a situation where this

9    debtor's dispute that the loans could be worth more than par.

10   Well, par is not right.  The value of the unpaid principal

11   balance.

12             MR. BISSEL:  Just one moment, Your Honor.

13             THE COURT:  That question may not have made any sense

14   because you've got several interpreters trying to tell you what

15   I just asked.

16             MR. BRADY:  Your Honor, we think they could be worth

17   more than the unpaid principal balance because as indicated

18   some are negatively amortizing.  So, the UPBs are not going

19   down at the same level as the --

20             THE COURT:  Actually going up, right.  The unpaid

21   interest is principalizing as principal?

22             MR. BRADY:  Yes.

23             THE COURT:  All right.  To the debtors, the debtors

24   don't dispute that the value of the portfolio -- well, I read

25   your brief.  I mean, you sort of take position that the value

1  is sort of actual value.  You know, the math, but assuming that

2  the Court's going to apply some sort of valuation on the

3  collateral that will give weight to the fact that there's risk

4  in the world.  These aren't treasury securities; these are home

5  mortgages.

6         So, assuming that the Court's going to use the

7  valuation method that implies some sort of risk, you don't

8  dispute the basic parameters that the general market has

9  deteriorated; real estate values are generally held static are

10  declined, and that maybe the market is not functioning, but the

11  price has declined over the life of the case.

12         MR. BRADY:  What's unique about this asset, Your

13  Honor, was any risk was built in the moment it was originated

14  and became Bank of America's collateral.  So, the loans are

15  what they are.  They are Bank of America's collateral, their

16  characteristics, their cash flow, it is what it is.  That was

17  the risk that was built in the moment those loans were

18  originated and the moment Bank of America accepted them as

19  collateral.

20         THE COURT:  Well, yes perhaps, but there was an

21  assumption -- the set of assumptions that went to calculate

22  that risk at the time had changed.  And would always change.  I

23  mean, they could go up, they could go down.  It just so happens

24  that after 15 years they're now going down.  It's been a long

25  time since they went down.

1          MR. BRADY:  Well, there was no evidence put on by

2    Bank of America, but the interest rates were on these loans.

3          THE COURT:  Okay.  Well, let me hear response.

4    please.  Thank you, Mr. Brady.

5          MR. KIRSCHBAUM:  Your Honor, if it please the Court,

6    when the administered agent moved for -- to lift the automatic

7    stay here, obviously there was a choice to be made as to

8    whether or not to move under 362(d)(2) which deals with the

9    issue of whether or not the debtor has equity in the property,

10   or whether to limit ourselves to 362(d)(1), which only requires

11   us to make a showing of cause and then shifts the burden to the

12   debtors on all other issues.  And we made that decision with

13   our eyes open and it was based primarily on the fact that we

14   didn't think it was going to be in the interest of anyone in

15   the estate for us to come in with a motion, guns blazing to try

16   to show how little this collateral really was worth.  We did

17   not hire Mr. Branthover to do a valuation and the reason we

18   didn't hire Mr. Branthover to do a valuation, believe me, Your

19   Honor, was not because we were afraid that he would come in and

20   show that lo and behold, these loans are worth 90 cents.  That

21   wasn't it.  It was quite the opposite, Your Honor.  What we

22   were concerned about was having Mr. Branthover coming into open

23   court and making statements -- having to make statements about

24   valuations that we thought would be at very low levels and

25   would not at all help the sale of this collateral.  The debtors

1  have taken the position thinking directly on the law, and I'll

2  get to that in a second, that even though we proceeded with the

3  362(d)(1), we somehow retained the burden of showing the value

4  of the collateral.  In other words that we would have the worst

5  of both worlds.  That in combination with the fact that the

6  debtors produce from their files valuation documents, which

7  showed valuations in the 62 cent range, led us to believe that

8  in order to do our best for our client under the circumstances,

9  although we had no choice but to, in fact, use that number and

10 use that information, Your Honor.  And we believe that that

11 information coming out of the debtor's own files here, really

12 kinds of put the lie to this whole issue about whether or not

13 we're talking about a fully securitized, fully protected, over-

14 secured creditor.  We're not.  We're clearly not.

15 Nevertheless, we did proceed the way we proceeded, and we

16 believe we proceeded properly under 362(d)(1) because the case

17 law, we've cited the case law in our pretrial memorandum, in

18 some cases four and five, the more recent case law as opposed

19 to the cases that for the most part the debtors are relying on

20 does not require the creditor moving to lift the automatic stay

21 to make any showing whatsoever with respect to adequacy and

22 protection, what is the exact value of the collateral.  That is

23 not our burden.  Our burden is purely to show cause.  Once we

24 establish prima facie cause, one of which has been identified

25 by the cases as showing declines or threatened declines in

1   value, not necessarily quantifying them.  You do not have to

2   quantify the amount of the decline.  you don't have to put a

3   specific number on the amount of the decline and <u>Elmira</u> doesn't

4   say you do, but what our burden is to show declines, or

5   threaten declines -- you don't even have to show the decline.

6   It's sufficient to show a threatened decline under the case law

7   we've cited and quoted, and once we do that, then the burden

8   shifts to the other side, and it shifts to them on every issue

9   including the issue of whether or not there is, in fact, an

10  over-secured situation, including whether or not there is, in

11  fact, adequate protection.  They then have that burden, and we

12  cited case law on Page 8 of our Memorandum, which makes that

13  very clear from <u>Elmira</u> and also from the 9th Circuit in <u>In Re:</u>

14  <u>Garvin</u> which said we read the reference in Section 362(g), to

15  be -- which is the provision that says that the creditor has

16  the burden on the issue of equity in the property.  We read the

17  reference in Section 362(g) to be limited to the issue of

18  equity expressed in Section 362(d)(2)(D) and conclude that the

19  debtor -- the debtor retains the burden of proving lack of

20  cause under Section 362(d)(1), even when the debtor asserts

21  that equity furnishes adequate protection.  So, in fact, no one

22  has done a valuation here.  Ms. Bolton, who's testimony you

23  hopefully will read by transcript, she did that to a valuation.

24  Neither of the experts on either side has done a valuation and

25  the only actual evidence that we believe should be admissible

1  and hopefully we believe will be admissible, is Mr. Johnson's

2  valuation of 62 cents.  But even if that information doesn't

3  come in on our case in chief subject to Your Honor's ruling,

4  the fact of the matter is, is that they had that burden -- not

5  we.  We did not have the burden to show that we were not over

6  secured.  They had the burden in effect of showing that we

7  were.  And they know they can't meet that burden.  They haven't

8  made one iota of effort to try and meet that burden.

9          THE COURT:  All right.  Hang on. Sorry.  He was

10 really on a roll, though.  You're killing --

11                  (Temporarily off the record.)

12         MR. KIRSCHBAUM:  Not that kind of drink, though.

13         THE COURT:  All right.  Did you get all the drink

14 jokes?  Good, good.  The Court of Appeals will like that.  Go

15 ahead.

16         MR. KIRSCHBAUM:  In any event, Your Honor, we believe

17 that both on the facts and the law, this motion has to be

18 denied.  On the facts it has to be denied because the evidence

19 -- there is absolutely no evidence to show that we are over

20 secured.  The notion, I believe, is somewhat absurd and

21 whatever documentation and whatever evidence there is will be

22 this record, will show that we are wilfully under secured, but

23 we don't have that burden.

24         THE COURT:  Holding the Johnson document aside, you

25 do have a little bit of a problem to the extent it's something

1  I require you to show, you've shown -- you've presented

2  evidence of the decline in value based on what's happening in

3  the market, but you haven't given me a starting point.  How do

4  I -- so, for instance, okay, do you have any evidence that the

5  market is generally declining, but if I don't know where we

6  started, how do I know whether that general decline has put you

7  in a situation where you're at risk, or you actually under

8  secured?

9          MR. KIRSCHBAUM:  Two points on that, Your Honor.

10 First of all, we have submitted evidence in the form of the

11 data tapes and Mr. Branthover's analysis to show the

12 deterioration in the quality of this portfolio, not in terms of

13 the loans changing, but in terms of the performance of the

14 portfolio, from August 31, 2007 to date, but the delinquency

15 rates have been steadily rising during that period of time.

16 So, we are dealing with the portfolio that has been declining

17 in value.  His testimony is un-rebutted.  Their expert admits

18 it.  The portfolio has an overwhelming likelihood that it has

19 declined and there's certainly a threat of future decline.  But

20 as far as the other issue, Your Honor, to be able to decide

21 once you decide we've met our prima facie requirement which is

22 just to show what I just said, then the burden to show that we

23 are not adequately protected --

24          THE COURT:  Back up.  Assume I'm going to make you --

25 assume that I'm going to make you show me some decline.  And

1  basically, whether, as part of cause, including lack of

2  adequate protection, that I read cause to include some evidence

3  that you're under secured, okay -- assume that and exclude the

4  Johnson case, or the Johnson document.  Can you point to

5  evidence that proves that in your case?

6          MR. KIRSCHBAUM:  Assuming we have the burden of

7  showing we're under secured?

8          THE COURT:  Right.

9          MR. KIRSCHBAUM:  And assuming that --

10         THE COURT:  Assuming the Johnson document isn't in

11  evidence.

12         MR. KIRSCHBAUM:  Assuming the Johnson document isn't

13  in evidence, I would still ask Your Honor to look at the fact

14  that you're dealing with a portfolio that was in terms of the

15  principal -- unpaid principal balance approximately in

16  equipoise to what the debt is and by virtue of the evidence of

17  substantial decline in the portfolio, Your Honor, I believe,

18  could draw the inference that the portfolio was declined

19  sufficiently.  It doesn't take that much to take us down that

20  the portfolio has, in fact, declined sufficiently for us to

21  meet our burden, but of course --

22         THE COURT:  Still not necessarily the market, the

23  actual quality of the asset has changed --

24         MR. KIRSCHBAUM:  The quality of the asset --

25         THE COURT:  -- the delinquency  rates have gone up -

1        MR. KIRSCHBAUM:  A 16.67 percent delinquency rate,

2  which is what the evidence shows as of February 29.

3        THE COURT:  Declining FICA scores --

4        MR. KIRSCHBAUM:  Declining FICA scores, increasing

5  the LTDs and the fact that in August we were dealing with low -

6  - mid-single digits that went delinquencies, Your Honor.  The

7  fact that Fannie Mae kicked half of the conforming -- what was

8  supposed to be the conforming loans in February of 2008.

9        THE COURT:  Now, the evidence on that was a little

10 unclear to me whether Fannie Mae kicked them, you know, sort of

11 void ab initio kicked them, i.e.; they were never conforming,

12 or whether they kicked them based on Fannie Mae's tightening of

13 the conforming loan standards.

14        MR. KIRSCHBAUM:  The testimony is that the tightening

15 standards is what caused them to kick.  I believe that's what

16 the record will show.

17        THE COURT:  So, an origination they were conforming,

18 but the standards have tightened.

19        MR. KIRSCHBAUM:  Or there was deterioration by virtue

20 of the fact that half of the portfolio of conforming loans

21 became nonconforming as a result of Fannie Mae changes.  That's

22 a deterioration.  That's a decline.  And again, I also

23 emphasized that the caseload does not even really require us to

24 show a decline, a threatened decline is sufficient.  That's

25 what the cases say.  A decline or threatened decline.

214

1          THE COURT:  Okay.

2          MR. KIRSCHBAUM:  But I really, at the end of the day,

3  Your Honor, I would urge the Court to consider the case law

4  we've cited on the fact that it is, indeed their burden, not

5  our burden to show that we are under secured, not over secured,

6  not ever to show that we're under secured.  And they've

7  assiduously avoided getting anywhere near that issue other than

8  to the document produced from Mr. Johnson, which shows of

9  course, they were under secured.

10         THE COURT:  So, it's their burden to show you're over

11  secured?

12         MR. KIRSCHBAUM:  Absolutely, Your Honor.  That's what

13  the cases say.  That's what <u>Gorden</u> says, that's what <u>Elmira</u>

14  says.  That's what <u>Colliers</u> now says.  All of the cases in the

15  last, I would say, 10 or 15 years on the subject have all

16  recognized that despite the fact that 362(g) talks about the

17  burden being on the moving party with respect to equity, that's

18  only a 362(d)(2) issue, not a 362(d)(1) issue and that under

19  362(d)(1) it's the debtor's burden.

20         THE COURT:  Give me a second before I hear from Mr.

21  Brady.  I may have a question.  No, right there.  I see how

22  it's right.  Anything further, Mr. Kirschbaum?

23         MR. KIRSCHBAUM:  Just, Your Honor, the fact that

24  Exhibit 14 is moved into evidence, does make it clear that it

25  was -- that at the time, which was November of 2007, the price

1  to get the banks out whole was expected to be 82.8 cents.

2  That's what it would cost to get the banks out whole and they

3  expected to get out whole, that's what Exhibit 14, which is in

4  evidence shows, and again, the Johnson document shows a current

5  value of 62 cents.

6           One other thing, Your Honor, is that on the

7  evidentiary evidence of Johnson, if the Johnson exhibit is held

8  not to be admissible, we would ask to be able to designate

9  deposition testimony from Mr. Johnson, which we had no -- which

10 we were not barred in any way from doing, we would to designate

11 deposition testimony from Mr. Johnson which establishes the

12 same fact.

13           THE COURT:  All right.  Thank you.

14           MR. BRADY:  Your Honor, once again, Bank of America

15 has prejudiced us with their interrogatory answers.  This is

16 interrogatory answer Number 17.  The question was: "Are you

17 going to assert that you're under-collateralized?"  The answer

18 is:  "The administrative agent states that it has not contended

19 that the indebtedness is under-collateralized."  If at some

20 later date the administrative agent does so contend, the

21 administrative agent will provide information relating

22 thereto."  Counsel just said they're under secured.  This is

23 the first time they put that on the record.  Based on this

24 interrogatory answer if they were going to take the position

25 today they're under secured, they had a duty to provide us with

1  information with respect to that, and we have the right to take

2  depositions in that area.  This is different in a case where

3  the debtor has to prove that they're over secured.  We cannot

4  contest that they're over secured.  They asserted it in the

5  cash collateral order and the debtors agreed not to contest it.

6  We cannot argue that they're not over secured until they argue

7  they're under secured.  And today was the first time anybody

8  from Bank of America put on the record, to my knowledge, they

9  think they may be under secured.

10        Counsel indicated that they didn't want to move under

11  362(d)(2) because they didn't think it was a good idea to put

12  out there what their valuations were on these loans.  Your

13  Honor, they could have moved under seal, they could have -- if

14  they wanted to move under (d)(2), fi they wanted to keep

15  confidential their valuations, they could have done so, they

16  could have asked the Court to put it under seal.  But to use

17  that as the argument as to why they didn't move under (d)(2)

18  and they moved under (d)(1), I think the Court has to disregard

19  that.

20        The fact is, they have the burden to establish that

21  they are not adequately protected, and until they make a prima

22  facie case that they're not adequately protected, the debtor

23  doesn't have a duty to put on any evidence.  The motion must be

24  dismissed.

25        THE COURT:  Well, cause may not be limited to lack of

1  adequate protection.  It says "including lack of adequate

2  protection."  So, they're --

3          MR. BRADY:  So, from their case in chief, Your Honor,

4  what other statements, testimony, allegations have they made

5  that could possibly rise to the level of granting relief from

6  stay, it would be the lightest showing for the biggest

7  collateral pool of any case I've read or any case I've seen.

8          THE COURT:  Anything further?

9          MR. BRADY:  One thing about the Johnson document,

10 Your Honor, because it's become a hot topic, the Johnson

11 document only provides information thru 1/31/08.  It's the

12 debtor's position backed by the Continental Airlines case that

13 Bank of America is not entitled adequate protection until they

14 file a motion for relief from stay and ask.  So, that document,

15 even if it were to come in --

16         THE COURT:  Well, let's keep it -- assuming that

17 document is in evidence and assuming it shows collateral values

18 at 62 percent UPB, evidence is one thing, but are you asking me

19 to make a leap of faith that between January 31 and the date

20 they filed stay relief the value of the valuation went up to 20

21 percent from 62 to 82?

22         MR. BRADY:  I don't think that's our burden.  First,

23 we disagree with what they think the Johnson document says, but

24 it's not in evidence, so we'll address that if it ever comes

25 into evidence, but Your Honor, I think they have to show a

1  decline from the date they asked forward.  It's not that it has

2  to spring back after they ask.  They have to establish that

3  there's been a decline in their collateral value from the date

4  --

5          THE COURT:  Well, but if I put out -- if I allow

6  evidence in the record that arguably indicates that the value

7  of the loans was 62 percent of unpaid principal as of January

8  31 as a hypothetical, and I have the evidence of their witness,

9  expert witness, who testified about the continuing

10  deterioration of the collateral -- the integrity of the

11  collateral pool as well as the market in general, isn't that

12  evidence that it's declining post stay relief?

13          MR. BRADY:  A valuation, Your Honor, would have been

14  evidence.  General assertion of --

15          THE COURT:  Again, I'm assuming that's something

16  that's not in evidence yet which is that:  a) the Johnson

17  document is admitted; and b) that it is evidence of a value as

18  of the date certain.  Then they have their starting point and

19  they have evidence of declining -- I'm not saying I'm going to

20  buy it one way or the other, but isn't that enough to meet the

21  prima facie case?

22          MR. BRADY:  We don't believe so, Your Honor.

23          THE COURT:  Why?

24          MR. BRADY:  We believe they have to show the value of

25  their collateral, of their interest in this property as of the

1   date they asked for relief from stay --

2              THE COURT:  Right.

3              MR. BISSEL:  -- and then it declined subsequent and

4   it has to be quantifiable.

5              THE COURT:  Why does it have to be quantifiable?

6   Isn't it enough to say it's gone down?  If they say the value

7   of the asset was $100 on the day I moved and my evidence by my

8   expert is it's now worth less than $100.  That's cause.

9              MR. BRADY:  Depending on the value.  The valuation

10  methodology that the Court would adopt.  But will --

11             THE COURT:  Stop biting the high hope.  Give me a

12  break.  My point here is they've established a start point and

13  they provided evidence of it that the value is now less than

14  the start point and that start point was on the day they moved.

15  Why does that evidence that it's now less than the start point

16  have to be quantifiable?  Why can't it just be -- it's less.

17             MR. BRADY:  Your Honor, in order for the Court to be

18  able to fashion adequate protection, the Court has to be able

19  to determine what the decline was, because one of the remedies

20  available is to adequately protect the creditor and denies the

21  relief.

22             THE COURT:  But then that's your burden.  Okay, so

23  now I said, okay, there's cause.  Now you need to come back and

24  say, all right, Judge, sure there's cause, but they haven't

25  told you what that decline is, so my -- you know, there is no

1  adequate protection I can provide.  Maybe I provide a dollar's

2  worth of adequate protection.  Maybe I provide something very

3  general.  That actually might make it easier when it flips back

4  to your side where you're actually able to say, all right,

5  fine, there's cause, but one of the things I can do is say

6  they're adequately protected.  And here's what I'm going to

7  give them.  And based on the fact that they don't have any

8  evidence to fight my valuation, which indicates, okay, sure, it

9  declined by a dollar, big deal.

10       MR. BRADY:  Your Honor, that hypothetical stated that

11 way, Your Honor may have created a situation where the burden

12 shifted.  It did not here.

13       THE COURT:  Okay.  Yes, Mr. Kirschbaum?

14       MR. KIRSCHBAUM:  One thing that should be pointed

15 out, and I'm sorry for not raising it earlier, Bank of America

16 Exhibit 27 is in evidence.  Bank of America Exhibit 27 in the

17 upper left hand corner has a calculation of UPB and estimated

18 proceeds, HM document shows that the HM portfolio has UPB in

19 estimated proceeds, 561 million of UPB, 350 million dollars

20 less than the proceeds.  If one performs the division on those

21 two numbers, I am reliably informed that the quotient is 62

22 cents.  The same 62 cents that appears on the document we've

23 been disputing.  So, we do have evidence in the record of a

24 value substantially below what is necessary to adequately

25 secure us in this matter and this document is, I believe it is

221

1 as of April of 2008.

2          THE COURT:  Mr. Brady?

3          MR. BRADY:  One moment, Your Honor.  Your Honor, the

4 document they're referencing was created two weeks ago, I

5 think, by their own statement, but the benchmark they're trying

6 to go back to are Bank of America exhibits where Mr. Wampler

7 indicated what he thought they would take it out --

8          THE COURT:  Right.  Before admitted specifically

9 without --

10          MR. BRADY:  Without valuation.

11          THE COURT:  -- valuation of the evidence.  And is it

12 possible under this scenario that even if they are under

13 secured, if they were under secured for the same precise amount

14 on the date they filed the motion, they haven't shown a

15 decline?

16          MR. BRADY:  That's correct.

17          THE COURT:  All right.  Mr. Kirschbaum, yes?

18          MR. KIRSCHBAUM:  Your Honor, we -- this is not -- the

19 date of the motion to the present date is not relevant for

20 present purposes.  That would only become relevant if the issue

21 was what do they have to do in terms of post and some adequate

22 protection.  In terms of our setting forth our prima facie case

23 of cause, the fact that we show a decline and the threatened

24 decline in the future, doesn't -- it doesn't limit us to the

25 date of the motion.  The Continental case, and all that whole

1  line of cases doesn't strictly apply in this situation.  And as

2  far as this document is concerned,  this document is showing,

3  in effect is valuation is from their files.  It's their

4  document, it's their valuation.

5       THE COURT:  Okay.  I said we were going to go late.

6  We're not because I'm going to -- I'm going to stay late

7  because I'm going to read the cases, and deal with the debtor's

8  motion.  So, I want to look at the cases. I want to re-look at

9  the briefs.  I'm also going to consider whether or not to admit

10  Johnson 23.  And I will give you my answer when we reconvene at

11  11 tomorrow morning and we will proceed accordingly.  All

12  right? Is there anything further for today?

13       MS. SCHONHOLTZ:  No, Your Honor.

14       THE COURT:  All right.  The hearing is recessed until

15  tomorrow at 11 and I'm going to take a few seconds to gather my

16  things, but you can go about your business.  So, thank you very

17  much.

18                    *  *  *  *  *

19

20

21

22

23

24

25

223

1              C E R T I F I C A T I O N

2           We, the court-approved transcribers, certify that the

3    foregoing is a correct transcript to the best of our ability

4    from the official electronic sound recording of the proceedings

5    in the above-entitled matter.

6                            Date: April 20, 2008

7

8    _____        _____

9    VIDHYA VEERAPPAN                       CEIL ASHBOCK

10

11   _____        _____

12   KATHLEEN BETZ                          DENISE O'DONNELL

13

14   _____

15   ANNETTE PAPP

16

17

18

19

20

21

22

23

24

25