1

1    UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF DELAWARE

3    Case No. 07-11047

4    Adv. Case No. 07-51738

5    - - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7    AMERICAN HOME MORTGAGE HOLDINGS, INC., ET AL.,

8                    Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - -x

10   BROADHOLLOW FUNDING, LLC; MELVILLE FUNDING,

11   LLC; and AMERICAN HOME MORTGAGE SERVICING, INC.,

12                   Plaintiffs,

13            v.

14   BANK OF AMERICA, N.A.,

15                   Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - -x

17                    U.S. Bankruptcy Court

18                    824 North Market Street

19                    Wilmington, Delaware

20

21                    May 2, 2008

22                    10:10 a.m.

23   B E F O R E:

24   HON. CHRISTOPHER S. SONTCHI

25   U.S. BANKRUPTCY JUDGE

2

1    Defendant Bank of America, N.A.'s Motion to Dismiss Amended

2    Complaint on Grounds of Lack of Jurisdiction or, in the

3    Alternative, Abstention

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Esther Accardi

25

3

1    A P P E A R A N C E S :

2    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3         Attorneys for Plaintiffs/Debtors

4         51 Madison Avenue

5         New York, New York 10010

6

7    BY:   JAMES C. TECCE, ESQ.

8

9

10   KAYE SCHOLER

11        Attorneys for Bank of America

12        425 Park Avenue

13        New York, New York 10022

14

15   BY:   AARON RUBINSTEIN, ESQ.

16        ANA ALFONSO, ESQ.

17

18

19   POTTER ANDERSON & CORROON, LLP

20        Attorneys for Bank of America

21        1313 N. Market Street

22        Wilmington, Delaware 19899

23

24   BY:   LAURIE SELBER SILVERSTEIN, ESQ.

25

4

1                P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  Good morning, sorry.

4          MR. RUBINSTEIN:  Good morning, Your Honor.

5          THE COURT:  Sorry for the wait.  This is the motion

6    to dismiss in the Broadhollow matter.  I'll hear from the

7    movant.

8          MR. RUBINSTEIN:  Thank you, Your Honor.  Aaron

9    Rubinstein from Kaye Scholer appearing for Bank of America as

10   swap counterparty and defendant in this action.

11         THE COURT:  All right.

12         MR. RUBINSTEIN:  Your Honor, I'd like to first lay

13   out some of the relevant facts.  I believe that the Court is

14   familiar with the relationship between the debtors and the non-

15   debtor special purpose entities involved in this case, so I

16   won't belabor those details, Your Honor.

17              In short, Broadhollow and Melville are special

18   purpose entities that were formed by American Home Mortgage

19   Corporation to facilitate the financing of mortgage loans.

20   Broadhollow and Melville purchased loans from American Home

21   Mortgage under mortgage loan purchasing and servicing

22   agreements, MLPSA as they're commonly referred to.  And under

23   the MLPSAs plaintiff AHMSI contracted to service the loan

24   portfolio for the special purpose entities, the SPEs.  The SPEs

25   purchase of the loans was financed with the proceeds of senior

5

1    and subordinated notices.  In order to hedge certain risks

2    associated with owning the purchased mortgage loans, the SPEs,

3    Broadhollow, and Melville, entered into front swap agreements

4    with various counterparties, including Bank of America.

5    Separately, in order to hedge some of its own risks, Bank of

6    America entered into different swap agreements with American

7    Home, what are called the back swap agreements.  Broadhollow

8    and Melville are not parties to the backstop agreements at all.

9            Now, the mortgage loan --

10           THE COURT:  The counterparty to the back swap

11   agreement is American Home Mortgage Corp.?

12           MR. RUBINSTEIN:  Is one of the American Home

13   entities, yes, Your Honor.

14           THE COURT:  A debtor entity?

15           MR. RUBINSTEIN:  Yes.  The mortgage loan that the

16   SPEs owed were to be sold if there were certain termination

17   events.  And when sold the front swap agreements provided that

18   there be payment of partial termination payments between Bank

19   of America, on the one hand, and Broad Hollow and Melville on

20   the other.  None of the debtors were parties to those

21   agreements, and none of the debtors had any payment obligations

22   or any right to any payment under the front swaps.

23           THE COURT:  Under the NLPSA -- no, not under the

24   NLPSA, excuse me.  Under the servicing agreement, American Home

25   Servicing, Inc. was required to actually do the action required

1    to liquidate the loans in the event of a termination agreement?

2            MR. RUBINSTEIN:  Yes, they had to liquidate the

3    loans, exactly, Your Honor.  And that's what happened.

4    American Home entities filed for Chapter 11, Broadhollow and

5    Melville did not file and are not debtors.  The mortgage loans

6    owned by Broadhollow and Melville were, in fact, sold at

7    auction by American Home Servicing, Inc.  They were sold at

8    less than par value and that triggered certain payment

9    obligations from Bank of American to Broadhollow and Melville

10   under the front swap agreements.  And Bank of America made

11   those payments but Broadhollow and Melville disputed the amount

12   that Bank of America had computed was due under the front stop

13   agreements to be paid.  And this lawsuit followed.

14           By the way, Your Honor, it was not brought by

15   Broadhollow and Melville, the contracting parties, in a New

16   York court which is the jurisdiction in which the front swaps,

17   the contracting parties agreed on a non-exclusive basis that

18   cases or disputes under the front swaps would be brought.  I

19   raise that only because it's relevant, I think, to the

20   abstention argument which I make --

21           THE COURT:  Right.  On the foreign shopping, right?

22           MR. RUBINSTEIN:  Yes.  Instead --

23           THE COURT:  Let me just interrupt for a moment.  The

24   payment by Bank of America, at least the "partial" payment,

25   obviously there's an additional amount in dispute, but the

7

1    payment that was made by Bank of America to the Broadhollow and

2    Melville entities under the front swap agreement, that in turn,

3    triggered an obligation of the debtors to pay Bank of America

4    under the back swap agreement?

5             MR. RUBINSTEIN:  That, in turn, would then allow Bank

6    of America to assert rights under the back swap agreements

7    against the American Home entities.  Of course, that's a

8    separate contract issue there can be disputes on that.  The

9    counterparty to the back swap agreements can challenge, and

10   there would have to be a determination, if there is such a

11   challenge, between Bank of America and the back swap

12   counterparty, the American Home entity in a proceeding that

13   would address any such issue.

14            THE COURT:  I understand that.  But as a factual

15   matter, the obligation, if you will, under the front swap, is

16   what triggers the obligation under the back swap?

17            MR. RUBINSTEIN:  Yes.  Payment under the front swap,

18   yes.

19            THE COURT:  And your client, has, in fact, asserted

20   this claim in the bankruptcy asserting liabilities in

21   connection with the back swap agreement?

22            MR. RUBINSTEIN:  Asserting possible liabilities in

23   the future.  They didn't have to assert because they held

24   various collateral under the back swap agreements.  And so

25   there is nothing due right now, as I understand it, under the

1   back swap agreements.  But as a protection --

2             THE COURT:  Are you still holding the collateral?

3             MR. RUBINSTEIN:  We're holding some balance of

4   collateral that still remains there, Your Honor.  But we filed

5   a proof of claim preserving our right that if something

6   happens.  And if we have to assert a claim under the back swap

7   agreements or otherwise against one of the debtors, that we

8   would then have to go through proof of claim process and

9   establish our claim to this Court and deal with whatever

10  challenge to that claim existed.

11            THE COURT:  Okay.

12            MR. RUBINSTEIN:  This suit, of course, was brought in

13  this Court, that's why we're here today.  No debtor entity is

14  referenced anywhere in the single cause of action that's

15  asserted in the suit, and the relief requested is for Bank of

16  America to pay Broadhollow and Melville something approximating

17  twenty-five million dollars, that's supposedly due under the

18  front swap agreements.

19            Your Honor, respectfully, I want to say that there is

20  really one primary issue before the Court on this motion and it

21  is not, in my view, particularly complicated.  To be sure, if

22  you read plaintiffs' papers and their response to our motion,

23  they try to make a dispute and the complaint complicated, but

24  it is not.  Again, just the three or four basic facts,

25  plaintiffs have pleaded a single private state law cause of

9

1    action for the alleged breach of specific agreements, the front

2    swap agreements.  The only parties to those contracts are the

3    non-debtors, the special purpose entities, Broadhollow and

4    Melville and defendant Bank of America.  No debtor is a party

5    to the contracts, nor is any debtor a third-party beneficiary

6    under those contracts.  And the disputed right to payment in

7    this case is not alleged to be property of any debtor, it is

8    only property of the non-debtor special purpose entities.

9         Those facts, those undisputed facts, establish that

10   the Bankruptcy Court does not have jurisdiction over this case.

11   These facts, and with Your Honor's indulgence, I'll take you

12   through it briefly in a few moments, but those facts are

13   remarkably similar to the facts presented to Chief Judge

14   Walrath in the DVI case that we've cited and discussed at great

15   length in our papers, and which Judge Walrath rejected

16   Bankruptcy Court jurisdiction.  Plaintiffs, of course, try to

17   avoid that consequence.  And how do they do it?  Well, they

18   essentially ignore the agreements that they have pleaded that

19   are at heart -- that are the basis for this suit.  They discuss

20   at length in their papers numerous other agreements in which

21   the debtors are involved.  And they spend virtually all of

22   their time discussing the claims that have not been asserted in

23   this litigation that might be asserted in the future under

24   those other agreements.  Under certain circumstances, the

25   claims that could possibly be asserted in the future.

1          And they go on in a further effort to argue that the
2    Court has jurisdiction.  They add a debtor as a named plaintiff
3    to the suit.  Your Honor will have noticed that not only are
4    the non-debtor counterparties to the contract, Broadhollow and
5    Melville plaintiffs, but AHMSI, American Home Servicing, Inc.,
6    appears as a plaintiff as well, but it is not asserting a claim
7    in its own right.  Rather, in its own words, it asserts a claim
8    "on behalf of Broadhollow and Melville."  And, again, as I'll
9    get into in a few moments, I think the law clearly provides
10   again, Judge Walrath in the DVI addresses this point as well,
11   that that does not create jurisdiction in this Court.  And,
12   when in fact, the smoke clears that results from plaintiffs'
13   reference to all these other agreements on which the complaint
14   is not based, it all comes down to a simple argument,
15   plaintiffs' argument, that the Court has jurisdiction because
16   the debtors allegedly have equity interest in the non-debtor
17   plaintiffs which could possibly result in indirect future
18   recovery or benefit to the debtors.  They hypothesize that they
19   might possibly get some benefit from this suit in the future
20   (1) if Broadhollow and Melville succeed on their claim, (2) if
21   the debtors also succeed in their separate lawsuit before this
22   Court against Lehman Brothers, through which the debtors are
23   trying to challenge Lehman's ownership interest in the
24   Broadhollow subordinated notes, and that's been a subject of
25   motion practice before Your Honor, and (3) if the recovery in

1    this action exceeds the amounts owed to Lehman Brothers under

2    those subordinated notes.  Then they might get a benefit out of

3    whatever happens in this litigation, the benefit that

4    Broadhollow and Melville would get if they succeed in this

5    litigation.  And I submit that under those facts, DVI

6    specifically rejects this Court's jurisdiction.

7              Let me turn to the specific questions of the Court's

8    jurisdiction.  First, and --

9              THE COURT:  Let me just say -- interrupt you there.

10   You've carefully crafted the facts in the other party's

11   position to sort of meet the DVI test.  But is that a fair

12   description of their argument, i.e., is it solely that any

13   benefit will be if there's equity in the Broadhollow and

14   Melville entities, don't they spend a significant amount of

15   time talking about the impact of the back swap agreements --

16             MR. RUBINSTEIN:  Yes, they do.

17             THE COURT:  -- at least in connection with related-to

18   jurisdiction?

19             MR. RUBINSTEIN:  I will address that also, Your

20   Honor.

21             THE COURT:  Okay.

22             MR. RUBINSTEIN:  I intend to address that.  But

23   that's what I call their smokescreen, quite frankly.  The fact

24   that they know that they do not -- they are not a party to this

25   agreement, they concede that it is not -- the recovery in this

12

1   agreement is not property of the estate.  The fact that only

2   Broadhollow and Melville, non-debtors, and Bank of America are

3   parties to this agreement, that all recoveries go directly to

4   Broadhollow and Melville, that fact really, I think, under

5   the -- you don't want it crafted, Your Honor, in the DVI

6   situation destroys their jurisdiction.  So, of course, they

7   have to go and they have to -- how do they deal with the fact

8   that they're not parties to this contract.

9            THE COURT:  Right.

10           MR. RUBINSTEIN:  Well, that's just it.  They really

11   throw up against the wall all these other agreements, other

12   possible future disputes, which we will, at some point, perhaps

13   have to litigate with them before this Court, presumably will

14   have to establish our proof of claim.  The law is quite clear

15   that that also, as I'll demonstrate, does not give them

16   jurisdiction.

17           THE COURT:  Okay.

18           MR. RUBINSTEIN:  I think I can address core

19   jurisdiction very, very briefly, Your Honor.  I'm actually a

20   little surprised that they're asserting core jurisdiction in

21   their response or briefs.  But I believe that the standard for

22   core jurisdiction, particularly in this circuit, is very, very

23   clear.  The Guild and Gallery Plus Third Circuit case, for

24   example, articulates it as "a case can only be core under

25   Section 157 if it invokes a substantive right provided by Title

1    XI.  Or if it is a proceeding that violates nature could arise

2    only in the context of a bankruptcy case."  Plaintiffs' single

3    breach of contract claim is clearly not a right created by

4    bankruptcy law, and it certainly could exist outside of a

5    bankruptcy since it couldn't be filed in a State Court, it is

6    nothing more than a private state law contract dispute among

7    three non-debtor entities.  And, therefore, I think that there

8    is clearly no basis for core jurisdiction.

9         Which really brings us to the issue at the heart of

10   this motion.  And that is whether this Court has related-to

11   jurisdiction over this particular claim.  The cases we've

12   cited, not just DVI, but Sol Ewing, for example, say succinctly

13   that a court "has related-to jurisdiction over property only

14   when the property is part of the bankruptcy estate."  The law,

15   I submit, is clear that we've cited and discussed in our

16   papers, that when a dispute is between non-debtors over

17   property that is not part of the bankruptcy estate, related-to

18   jurisdiction does not attach and that is, I believe, our

19   situation here.

20        And that brings me to how plaintiffs, as Your Honor

21   was questioning before, how they tried to overcome the

22   undisputed facts that no debtor has any rights under the front

23   swap agreements, and that no plaintiff claims, anywhere in its

24   complaint, that any recovery under this case, would be property

25   of the estate.  Well, I alluded to one thing before, Your

1    Honor.  First, the fact that AHMSI brings this action on behalf

2    of Broadhollow and Melville, I can address very briefly.  It

3    does not create related-to jurisdiction.  Chief Judge Walrath

4    rejected exactly that assertion in DVI, and this is the

5    language of that case.  And it is remarkably exactly the

6    situation on this point, "The securitization trust, not DVIFS,"

7    which was the debtors' servicing agent, that's playing the same

8    role as AHMSI in this case, "hold legal and equitable title to

9    the leases and loans.  Moreover, as the servicing agent, DVIFS

10   is asserting claims on behalf of the non-debtor securitization

11   trust, not in its own right.  DVISF has no direct claim against

12   the defendant and jurisdiction, therefore, could not be based

13   on that," according to Judge Walrath, and that is precisely the

14   case here.

15          Okay.  What else do they assert?  Well, as I said

16   before, they assert that related-to jurisdiction exists because

17   debtor, American Home Mortgage acceptance, AHMI, which is not a

18   party to this action -- and this is how they craft their

19   argument, "is entitled to the residual value if the payment of

20   the repurchase price, with respect to approximately eighty-four

21   million dollars of the subordinated notes issued by

22   Broadhollow."  That's paragraph 9 of their complaint.  That is

23   precisely -- I don't have to craft anything, that is precisely

24   the situation that was presented to DVI and I'll go through

25   that in a moment, Your Honor.  But because where AHMA is

1    neither a party nor a third-party beneficiary to the front swap

2    agreements, is not a party to the amended complaint, and is not

3    alleged to be owed money whatsoever by Bank of America.  But,

4    instead, asserts that it could possibly be derived, in affect,

5    some residual or indirect value in the future if non-debtors

6    Broadhollow and Melville succeed there is no jurisdiction.

7         Let me now compare that to DVI, it could not be more

8    on point.  There defendants were lessees of certain equipment.

9    Plaintiff, DVI as AHMSI, was originally the lessor of that

10   equipment but then sold all of its rights and interest to three

11   securitization trusts, just like Broadhollow and Melville.  DVI

12   continued as servicing agent on the leases, just as we have

13   here.  DVI filed for bankruptcy, and then it brought suit in

14   Bankruptcy Court as a result of the defendants, in that case,

15   failure to make payments under their leases.  And it brought

16   that suit on behalf of the three non-debtor securitization

17   trusts.  And as plaintiffs' precisely allege here in paragraph

18   9 I just read from the complaint, DVI alleged there that

19   because it was a debtor jurisdiction was proper because the

20   dispute related to its bankruptcy proceeding because "it holds

21   an equity and debt interest in the securitization trust.  Upon

22   liquidation of the securitization trust and payment to the

23   trust creditors, DVI will be entitled to the remaining assets,

24   which will be available to pay its creditors."  That is the

25   same exact assertion that plaintiffs have made here to justify

1    jurisdiction.  And in dismissing that complaint, Judge Walrath

2    stated "a debtor may not invoke related-to jurisdiction where

3    the action may have only speculative indirect or incidental

4    affect on the estate.  The mere fact that DVI holds an equity

5    interest in the trust is too tenuous and insufficient to confer

6    jurisdiction on this Court."  And, Your Honor, I've made it

7    narrow to come into this case.

8              I submit that the facts in our case are more

9    compelling for no jurisdiction than they were in DVI.  An

10   indirect recovery, possibly benefiting the debtors in this

11   case, is even more speculative.  The debtors here do not even

12   own the subordinated notes by which they speculate they might,

13   in the end, obtain some of the Broadhollow and Melville money

14   if those entities prevail in this suit.  I believe Your Honor

15   is aware, as I mentioned before, that Lehman Brothers owns

16   those notes and the debtors are currently in litigation before

17   this Court against Lehman Brothers regarding those notes.  Even

18   if the debtors win in that litigation, it's partly certain they

19   will, but even if they win its possible that they may only

20   obtain a damage award against Lehman and not return of the

21   notes themselves.  So, Your Honor, in DVI -- in DVI the debtor

22   owned the notes there.  But here the speculator future benefit,

23   if there ultimately is one, will probably or could probably go

24   to Lehman Brothers.  Nor, Your Honor, is there any basis to

25   believe, other than pure speculation, that Broadhollow will

1    ever have enough money to pay off those notes in full and then

2    have additional money for the equity holders.

3            And finally, Your Honor, on this point, I submit

4    that, Your Honor in this Court, has already recognized on this

5    particular issue distinction recognized and relied on by DVI.

6    Just this past February at a hearing, I believe it was dated

7    February 1, at a hearing in this case in which the debtors

8    sought permission from Your Honor to employ a broker to sell

9    property owned by a non-debtor special purpose entity under the

10   argument, and the premise that the debtors residual equity

11   ownership interest in the special purpose entity gave them the

12   standing to do that and the reason to spend the money.  Your

13   Honor said "there is a sharp distinction between the assets of

14   a subsidiary who aren't in bankruptcy, and the actual ownership

15   interest in that subsidiary."  And even when "in all likelihood

16   the expense and upside may be ultimately to a debtor entity,

17   and Your Honor found that jurisdiction was nevertheless not

18   something they could attach, Your Honor straightforwardly

19   declared "I think that's a steeper slope and I'm not going to

20   go there."  And I think that's exactly where we are today.

21           THE COURT:  Wow.  Well, I could have been wrong of

22   course.

23           MR. RUBINSTEIN:  I think Your Honor was dead-on and

24   not wrong.

25           THE COURT:  I like it when people tell me I'm right.

1          MR. RUBINSTEIN:  Let me address some of the other

2     arguments that Your Honor actually raised before that

3     plaintiffs point to.

4          THE COURT:  And, frankly, I think it's the stronger

5     argument, which is the back swap argument.

6          MR. RUBINSTEIN:  Okay.

7          THE COURT:  Unrelated to jurisdiction.

8          MR. RUBINSTEIN:  Let me address their reference to

9     the numerous unrelated contracts and parties that they have

10    made the back swaps and other agreements.  They indeed do that.

11    They brush aside their own complaint, they brush aside the sole

12    contract that their complaint relies on, they brush aside the

13    sole claim that it addresses.  And, in fact, as Your Honor has

14    read and noted, they state that in reality their claim turns on

15    a -- this is their language, "a set of agreements creating a

16    triangular matrix of interconnected obligations, between Bank

17    of America, the non-debtor special purpose entities, and the

18    debtors."  But, as stating the obvious first, the front swap

19    agreements are the only agreements on which the claim before

20    the Court is based.  And only Broadhollow and Melville are

21    pleaded as the real parties-in-interest.  And the point is,

22    that future disputes between debtors and Bank of America

23    arising under this matrix of transactions, other claims, will

24    not be adjudicated in this claim.  Whatever claims Bank of

25    America may have in the future, has set forth this proof of

1    claim regarding Broadhollow are under other agreements, Bank of

2    America will have to prove those claims at the appropriate time

3    in the claims process.  That will be a separate proceeding.

4            And, Your Honor, plaintiffs have cited no law for the

5    proposition that they now assert that claims involving debtors

6    under separate contracts can confer jurisdiction over a lawsuit

7    in which the debtors have no right of recovery.  You know, Your

8    Honor, this is --

9            THE COURT:  Well --

10           MR. RUBINSTEIN:  They rely on cases like CoreStates

11   and Pacor and things like that --

12           THE COURT:  And Federal Mobile.  I mean, the language

13   in Federal Mobile that related to bankruptcy jurisdiction will

14   not extend to a dispute between non-debtors unless that

15   dispute, by itself, creates, at least, a logical possibility

16   that the estate will be affected.

17           MR. RUBINSTEIN:  That dispute, by itself, there is --

18   all those cases are cases -- and by the way, in most of those

19   cases related-to jurisdiction is rejected.

20           THE COURT:  Right.

21           MR. RUBINSTEIN:  Even in Pacor and in CoreStates in

22   those cases.  Why?  It's a narrow exception.  If something --

23   recovery automatically triggers and indemnity without any

24   possible issue, it's a director of a company -- most of those

25   cases are in the asbestos arena, Your Honor.

1           THE COURT:  Right.

2           MR. RUBINSTEIN:  It's a director of a company being

3    sued, there's no question that he, under the bylaws of the

4    company and the charter and everything else, is entitled to

5    have his fees paid immediately then and there going forward.

6    That's the situation where yes, that could affect the estate

7    and therefore there could be related-to jurisdiction.  But,

8    even in those indemnity cases, which should be the most dead-

9    on, you know, for related-to jurisdiction, in those cases if

10   (a) the indemnity isn't automatic as of this moment, but is

11   something that will have to be triggered or come into play

12   later on.  And, in fact, there could be an issue as to whether

13   or not the indemnity is triggered or not, then there is no

14   related-to jurisdiction.  Even the most oft-quoted decision,

15   Pacor, on this particular point, that rejected jurisdiction, by

16   the way, saying "when it rejected jurisdiction that

17   jurisdiction over non-bankruptcy controversies with third-

18   parties, who are otherwise strangers to the civil proceeding

19   and to the apparent bankruptcy, does not exist."  That court

20   rejected an argument analogous to the one Your Honor is asking

21   about here.  That somehow the outcome of this case could

22   trigger claims and obligations that defendant might be able to

23   assert against the debtors in a future proceeding.  And the

24   court said, this is Pacor, "at best the lawsuit is a mere

25   precursor to the potential third-party claim for

1    indemnification by defendants against the debtor."  And it

2    rejected jurisdiction because of that, because it wasn't an

3    automatic right now absolute, without dispute, trigger.  There

4    will be disputes, we have a proof of claim, that claim we'll

5    have to establish, that claim may be disputed, undoubtedly will

6    be disputed.  And we will be in this Court, and the debtors'

7    interest will be protected and will be addressed in this Court

8    because it will be a claim against the debtor, which his an

9    estate issue, an estate claim, it's a claim issue.  And we

10    understand that, if and when, there's a dispute about that we

11    will have to be before this Court.  But we may never, because

12    the back swaps may never be triggered.

13          THE COURT:  Let's talk about that, why wouldn't the

14    back swaps be triggered?

15          MR. RUBINSTEIN:  We could win the case, Your Honor.

16    That's another reason why it's speculative.  The back swaps

17    only come into play here if we lose in Broadhollow and

18    Melville.

19          THE COURT:  Okay.

20          MR. RUBINSTEIN:  In fact, the irony here is,

21    plaintiffs, in theory, have to be rooting for us to win.  It's

22    not that plaintiffs are aligned against us with Broadhollow and

23    Melville, plaintiffs the -- the Broadhollow and Melville

24    interests, quite frankly, Your Honor, are adverse to the

25    debtors in this case.  And they're adverse to the debtors

1   because the plaintiffs are relying on the back swaps, we have

2   to lose our case against Broadhollow and Melville for us, then,

3   to be able to try and prove --

4        THE COURT:  Well, that can't be the determinative --

5   whether you win or lose can't be the determinative aspect for

6   whether or not there's related-to jurisdiction.

7        MR. RUBINSTEIN:  It isn't the determinative but it

8   just adds to the mix of the speculative nature, uncertain

9   nature.

10       THE COURT:  For example, even in Pacor they had to

11  lose -- the defendant had to lose in order to figure the

12  indemnity.  And then there were issues about okay, were there

13  defenses to the indemnity or were there things that had to

14  occur for the indemnity to actually arise.  So win or lose,

15  let's hold that aside.  What is it that would prevent Bank of

16  America, assuming it loses, even if it's a dollar, what would

17  be the impediments between Bank of America losing this case and

18  then asserting its rights under the back swap?

19       MR. RUBINSTEIN:  I can only speculate or predict what

20  the debtors, or in that case, what the defendant-debtors would

21  assert as obstacles.  They have a third obstacle --

22       THE COURT:  You have the collateral, right?  You have

23  the collateral, can you -- if you lose here can you then

24  immediately, without any further court intervention apply the

25  collateral in connection with the back swaps?

1          MR. RUBINSTEIN:  If we lose here we can and then they

2     can challenge us if they want to say it was an improper

3     application of the collateral.  In fact --

4          THE COURT:  This is covered under -- this is -- this

5     would be covered under 555 and 559, right?

6          MR. RUBINSTEIN:  Yes.  But they are -- in fact, they

7     are challenging -- they are challenging our application of the

8     collateral in this case, Your Honor.  And, in fact, this Court

9     may -- if they press that challenge will have to address the

10    application of collateral.  That, however, the determination of

11    that issue, has absolutely no bearing in resolving or

12    determining the dispute between us and Broadhollow and Melville

13    as swap counterparties, as the only parties to that swap

14    agreement.  If we lose in that case, and we turn around, the

15    debtors, unless they participate, the debtors are not

16    necessarily bound by that decision.  The debtors can take the

17    position that they don't care, that under the provisions of the

18    back swap agreements or the front swap agreements, that we

19    shouldn't have had to pay that money.  Even though we lost that

20    issue, as between us and Broadhollow and Melville, they could

21    assert that, they're not bound by collateral estoppel if they

22    don't participate in that dispute, and they shouldn't

23    participate in that dispute.  That gives them the right to have

24    a second bite of the apple.

25         THE COURT:  Is Pacor triggered as not being able to

1   get related-to jurisdiction even under the Pacor holding, does

2   it rely on the fact that there are additional factual issues

3   that need to be decided in the subsequent proceeding, or does

4   it rely on -- or can related-to jurisdiction be defeated merely

5   by legal defenses in the subsequent case?  Do you understand

6   the question?

7          MR. RUBINSTEIN:  I think I do, I think the answer is

8   either.

9          THE COURT:  Okay.

10          MR. RUBINSTEIN:  I think can be either.

11          THE COURT:  Okay.

12          MR. RUBINSTEIN:  I think can be either.

13          THE COURT:  It really has to be your reading of Pacor

14   is in order to initiate -- in order to have related-to

15   jurisdiction on that sort of -- because of that subsequent

16   liability, it really has to be a situation where, you know, you

17   have to write the check, it's that simple?

18          MR. RUBINSTEIN:  Yes.

19          THE COURT:  There's simply no defense?

20          MR. RUBINSTEIN:  Yes, Your Honor.  And even when you

21   look at the line of cases that deal with that issue and the

22   indemnity cases, the obvious ones, in almost every case where

23   there is related-to jurisdiction not only is there an ultimate

24   indemnity obligation but there is an immediate indemnity

25   obligation.  So that, for example, when the executive of a

25

1    company in bankruptcy that's being sued -- you know, an

2    asbestos bankruptcy is being sued in a separate case and the

3    defense costs from day one have to be paid by the debtors,

4    automatically, without any question, that's when usually you

5    find the related-to jurisdiction to exist.  But when it's down

6    the road --

7              THE COURT:  And has the Third Circuit actually found

8    related-to jurisdiction in any of these cases, I know they

9    don't in Pacor but do they find it in Federal Mobile or any of

10   the others?

11             MR. RUBINSTEIN:  I don't think in Federal Mobile.

12   They have found it, and I can't give you the name of the case,

13   Your Honor, they have found it in, at least, one or two of the

14   indemnity cases in, I believe, it's the asbestos context --

15             THE COURT:  Combustion Engineering?

16             MR. RUBINSTEIN:  It might be Combustion Engineering.

17             THE COURT:  Okay.

18             MR. RUBINSTEIN:  And Combustion Engineering is a

19   really good survey, quite frankly, Your Honor, of this whole

20   development line of cases.  And Combustion Engineering I think

21   says that, you know, they found where I've indicated where the

22   indemnity obligation is immediate, unquestionable and

23   automatic.

24             THE COURT:  Right.

25             MR. RUBINSTEIN:  And by the way, that is a real

1   exception to the otherwise applicable principle that if it's

2   not property of the estate --

3           THE COURT:  Right.  I'm going to back you up one more

4   time --

5           MR. RUBINSTEIN:  Sure.

6           THE COURT:  -- because I'm trying to get my head

7   around this.  And I think this is extremely important.  You've

8   got collateral, you've got a back swap agreement, you lose in

9   connection with the debtors, what's the impediment to you

10  applying the collateral immediately?  Would they have to seek

11  an injunction or --

12          MR. RUBINSTEIN:  Well, they -- we've already applied

13  collateral, they would have to come into Court and say that

14  that was a preference or that there was some basis or

15  infirmity, which I believe they are asserting.

16          THE COURT:  All right.

17          MR. RUBINSTEIN:  And have to litigate with us, in

18  this Court, as to whether or not it was appropriate or proper

19  for us to apply the collateral, they would be challenging the

20  collateral.

21          THE COURT:  Understood.  And let me back up again.

22  Is any of this in the complaint?

23          MR. RUBINSTEIN:  None, zero.

24          THE COURT:  Okay.

25          MR. RUBINSTEIN:  The complaint is the shortest,

1    straightforward complaint that you could imagine.  There is a

2    contract, there is a contract called a swap agreement, it's

3    between Broadhollow, Melville and Bank of America.  As a result

4    of the sale of the loans, there were partial termination

5    payments due from Bank of America to Broadhollow and Melville.

6    Bank of America paid only some thirteen or some million

7    dollars.  Twenty-five million dollars was due.  Judgment should

8    be entered against Bank of America to make payment to

9    Broadhollow and Melville, end of discussion, that's this case.

10           There are other arguments that plaintiffs make, I

11   don't really think I need to address them in any great length.

12   They make an estoppel argument that I just want to touch upon,

13   Your Honor.

14           THE COURT:  Is this the letter at issue?

15           MR. RUBINSTEIN:  Yeah, the letter issue.  And I don't

16   know if Your Honor wants me to address it.

17           THE COURT:  Sure.  Yes, please?

18           MR. RUBINSTEIN:  I could do it briefly.  Plaintiffs'

19   claim, and again this is their words, that "Bank of America

20   should be estopped from arguing the lawsuit does not implicate

21   the debtors, because it treated the American Home parties as

22   direct parties to the Bank of America front swap agreements

23   when certain of Bank of America correspondence, explaining its

24   refusal to honor its obligations under those agreements, was

25   addressed to them.  That's what they say is an estoppel

1    argument.  Well, first, Your Honor, I think we can dispose of

2    that in one sentence.  The law is crystal clear that estoppel

3    cannot create jurisdiction where no jurisdiction exists.  You

4    can't be estopped and thereby create jurisdiction.  But even if

5    that were not the law, plaintiffs' argument I submit is based

6    on a mischaracterization of the certain correspondence which

7    they refer, which they did not submit to the Court but which we

8    did attach to our reply brief.  I don't know if Your Honor's

9    had a chance to look at it.  Here are just the basic facts.

10   The correspondence that they're pointing to was initiated, not

11   by us by picking someone to send it to, it was initiated by the

12   debtors, not Bank of America.  And what they were is an e-mail

13   sent to Bank of America dated October 1 and October 3, 2007.

14   Bank of America was asked to make payments allegedly owed to

15   Broadhollow and Melville, that's the language of their e-mails

16   to us.  Referencing that the payments were due under the

17   Broadhollow and Melville swap transactions.  It means

18   absolutely nothing, that an American Home entity, a debtor

19   entity, sent this initial correspondence, since an American

20   Home entity manages the SBEs, that's part of its job.  The

21   correspondence that they're pointing to in response to those

22   two e-mails is an October 4 --

23            THE COURT:  Did the correspondence come from the

24   managing entity or from the home office?

25            MR. RUBINSTEIN:  No.  It came from an e-mail address

1    from American Home.

2                THE COURT:  All right.

3                MR. RUBINSTEIN:  And the correspondence that they

4    point to is the October 4 e-mail responding back to the person

5    who sent us the e-mail, who sent Bank of America the e-mail.

6    And that's what the correspondence was.

7                And by the way, in Bank of America's response back to

8    the person answering the question, to the person who sent it to

9    Bank of America, Bank of America did not mention any American

10   Home party anywhere from that correspondence, but instead, it

11   referenced having received two requests for payments "from

12   Broadhollow and Melville."  And there's one other document that

13   they point to and that's on October 9, 2007 letter from a Bank

14   of America outside lawyer.  And they state that it was

15   addressed "to the AHM parties."  And that's not accurate, Your

16   Honor.  Again, it was written in response to a specific letter

17   that was sent to us and it was written back again to the very

18   same person who sent it to us.  It was an e-mail from an

19   attorney at the Young Conaway firm, the firm that also

20   represents the special purpose entities, Broadhollow and

21   Melville.  And the subject heading of that letter was

22   "Broadhollow's swap payments."  That writer at Young Conaway,

23   asked Bank of America to let him know, this is the language

24   "when Broadhollow can expect to receive payment?"  That was

25   what was asked in that letter.  And the October 9 letter was

1    simply a response from Bank of America's outside counsel to

2    Young Conaway, to the very same person who sent the request to

3    Bank of America and I think that there's absolutely nothing in

4    there that could create an estoppel even if estoppel was

5    relevant.

6           Now, Your Honor, there is an abstention argument that

7    we made in our papers, I won't belabor the Court with that,

8    unless Your Honor wants me to or asks any question.  I think

9    that we laid out the appropriate analysis under the twelve-

10   factor test that's considered in this circuit and elsewhere.

11   And I'll rely on our papers.

12          THE COURT:  Okay.

13          MR. RUBINSTEIN:  There's only one argument that I'd

14   like to briefly address, Your Honor.  And that is we have a

15   separate argument that we have made with respect to plaintiff,

16   AHMSI, that it has no standing to bring this action and be part

17   of this action.  AHMSI is not a party to the front swap

18   agreements.  Plaintiffs have not alleged that any provision of

19   the front swap agreements provides AHMSI with any rights

20   against Bank of America as a swap counterparty.  And the law, I

21   think, is crystal clear that under these circumstances they

22   have no standing to be a party to this case.  And I don't care

23   which law, because originally we cited New York Law, because

24   New York Law is the law that's governed under the agreement.

25   Under New York Law, "as a stranger to the contracts, plaintiff

31

1    lacks standing to sue for the enforcement of their provisions

2    or for a declaration as to their meaning."  And then, Your

3    Honor, in our reply brief we said and cited that Delaware law

4    is identical "a fundamental principle of contract law provides

5    that only those entities that are parties to a contract or

6    conferred rights to or under a contract outstanding to enforce

7    it."  The only answer the plaintiffs have to try and salvage

8    jurisdiction for AHMSI under this law is, once again, to try

9    and deflect attention away from the front swap agreements at

10   issue in this case, and to try and confuse them, once again,

11   with the back swap agreements to which AHMSI and Bank of

12   America are indeed both parties.

13          But, again, Your Honor, to belabor the point, stating

14   the obvious, this proceeding is not a suit by Bank of America

15   against AHMSI under the back swap agreement nor, is it a suit

16   by AHMSI against Bank of America under the back swap agreement.

17   It's not a party to the front swap agreement, it has no rights

18   against Bank of America under the front swap agreements, and

19   therefore, Your Honor, I submit it doesn't have any standing to

20   be a plaintiff in this case.

21          That's all I have Your Honor, unless Your Honor has

22   further questions.

23          THE COURT:  No, thank you.

24          MR. RUBINSTEIN:  Thank you, Your Honor.

25          THE COURT:  Mr. Tecce?

32

1          MR. TECCE:  Good morning, Your Honor.  For the

2     record, James Tecce of Quinn Emanuel on behalf of plaintiff,

3     American Home Mortgage Servicing, Inc. and plaintiffs,

4     Broadhollow Funding, LLC and Melville Funding, LLC.

5          Your Honor, as Bank of America notes, Broadhollow is

6     not a debtor entity, it's managing member is a debtor entity,

7     but it is not a debtor entity.  And similarly, Melville is not

8     a debtor entity, although, it's managing member is a debtor

9     entity as well.  AHMSI is a debtor entity, and it's the

10    servicer under the MLPSAs, as has been noted.   And it's also a

11    counterparty to the B of A swap agreements, the back swap

12    agreements.

13         We've heard this morning, Your Honor, repeatedly how

14    this proceeding is nothing more than a state law contract

15    dispute involving non-debtor entities.  And while I intend to

16    touch on a number of issues, Your Honor, I think that Bank of

17    America's argument that this dispute has no impact on the

18    estates is tellingly undercut by the proofs of claim that it

19    filed in these cases.  Especially, its claim against plaintiff,

20    American Home Mortgage Servicing, Inc. for any amounts that it

21    may be obligated to pay if it adjudged to be liable in this

22    proceeding.  And while that proof of claim strikes me as a

23    tacit admission of core and related-to jurisdiction that should

24    end the discussion, I think a brief review of the agreements

25    and the transactions which we think are relevant to the Court's

1   determination would aid in showing what we consider to be a

2   very clear connection between this lawsuit and the estates and

3   the impact that this lawsuit has on the estates.

4          And the transactions have been discussed already this

5   morning, so I won't go through them in great detail.  But Your

6   Honor will recall, that in the Lehman adversary proceeding,

7   we've discussed previously, the Broadhollow and Melville

8   structure of securitized origination of warehouse -- of

9   mortgage loans.  Specifically, the SPEs would purchase mortgage

10  loans that were originated by American Home Mortgage and they'd

11  finance that acquisition through the issuance of commercial

12  paper, the Broadhollow notes.  And those notes, as Your Honor

13  knows, are the subject of another proceeding involving Lehman

14  Brothers.

15         But that transaction involved three types of

16  agreements.  And yes, the complaint only refers to the front

17  swap agreement, but a consideration of those agreements is

18  important to show the impact that the lawsuit has on the

19  estate.  So while we're not necessarily bringing claims and

20  causes of action under all the agreements, I would like to just

21  discuss them briefly because it shows how this lawsuit impacts

22  the entire estate.

23         The first one is the master loan purchase and

24  servicing agreement of the MLPSA.  And that agreement is the

25  agreement pursuant to which Broadhollow would acquire the

1    mortgage loans from the American Home debtor entities.  And

2    then as has been mentioned to hedge against interest rate risk

3    and also to hedge against certain risks relating to the sale of

4    the mortgage loans that were acquired under the MLPSAs,

5    Broadhollow would enter into the front swap agreement with the

6    highly-rated financial institution like Bank of America.  It

7    actually entered into a number of them, ABN AMRO, Citibank,

8    Calion, etcetera.  But there's also a mirror agreement, a

9    concomitant to the agreement, the back swap agreement.  And the

10   highly-rated financial institution entered into a back swap

11   agreement.  And to the extent that Broadhollow and Melville

12   received payments from Bank of America under the front swap

13   agreement then that financial institution would then be able to

14   assert a claim against the debtor entity that was party to the

15   back swap agreement.  In this particular case, the two back

16   swap agreements that are relevant are the back swap agreement

17   among Bank of America and plaintiff, American Home Mortgage

18   Servicing, Inc.  And the back swap agreement among Bank of

19   America and American Home Mortgage Investment Corp.

20          And, Your Honor, American Home Mortgage Investment

21   Corp. is relevant for one other reason, and I've been through

22   this before in other cases, American Home Mortgage Investment

23   Corp. is and prior to Lehman's alleged foreclosure against the

24   entity, they may argue was, but owned the Broadhollow notes,

25   they were a creditor of Broadhollow.  So to be clear, a debtor

1    and American Home Mortgage Investment Corp. purchased

2    Broadhollow notes and was a creditor of Broadhollow.  And in

3    the Lehman adversary proceeding, American Home Mortgage

4    Investment Corp. argues that that repurchase agreement, the

5    repurchase agreement which it financed the acquisition of those

6    notes.  Meaning American Home Mortgage purchased Broadhollow

7    notes and it financed that acquisition under its repurchase

8    agreement with Lehman.  American Home Mortgaging Corp. argues

9    that Lehman wrongly foreclosed against the notes and

10   extinguished its residual interest in the notes.  But the thing

11   about the notes that's very important is that if Bank of

12   America honors its obligations under the swap agreement, then

13   those Broadhollow notes will be money good.  And it's a very

14   important part of our argument in the Lehman adversary

15   proceeding that we have a residual interest in those notes.

16   That after we repay our obligations under the Lehman repurchase

17   agreement we're entitled to those notes and any stub that

18   remains after our obligations to Lehman have been repaid.

19          Now, admittedly, there's been no conclusive

20   determination in that proceeding.

21          THE COURT:  Isn't that -- even if I take all of that

22   as true --

23          MR. TECCE:  Right.

24          THE COURT:  -- isn't that on really all squares with

25   DVI?

1          MR. TECCE:  No.  Your Honor, I can distinguish DVI

2    and I'd be happy to distinguish that case.  DVI looks like our

3    case and I think it's a very superficial similarity.  In DVI,

4    the debtor was in the business of financing the acquisition of

5    very complex medical equipment.  And it sold those loans that

6    it originated into a special purpose entity and -- now you

7    might think well, that looks just like our case, doesn't it?

8    We have mortgage loans that are originated and they were sold

9    to a special purpose entity.  Isn't that exactly our case?

10   Well, there's a lot more going on in our case than what's going

11   on in DVI.

12          So in DVI, they originated loans really into the

13   complex medical equipment and they sold them to a special

14   purpose entity.  And the cause of action was the special

15   purpose entity suing a lessee of the medical equipment for

16   payments that had not been made.

17          THE COURT:  Okay.

18          MR. TECCE:  Okay?  So if they prevailed in that

19   action, if they prevailed in DVI, then there would be a

20   recovery of lease payments that were in arrears and that

21   recovery would belong to the special purpose entity.

22          THE COURT:  Right.

23          MR. TECCE:  And that would be the end of the

24   analysis.  And what the debtor argued in that case well, Your

25   Honor, Judge Walrath, we have an equitable -- we have a

1    residual interest in that money coming back because we actually

2    own the special purpose entity.  And Judge Walrath said that

3    ownership interest is not sufficient to bring the matter within

4    the Courts related-to jurisdiction.

5            THE COURT:  Okay.

6            MR. TECCE:  Okay?  Now my response to that is three-

7    fold, Your Honor.  The first one is this.  There's no common

8    back swap agreement between the lessee of the medical equipment

9    and the estates.  Meaning, in our case, if we prevail against

10   Broadhollow -- I'm sorry.  If we prevail against Bank of

11   America, the defendant, Bank of America turns around under the

12   back swap agreement and has a claim against a debtor entity.

13   That impacts the estate.  There was no ability for the lessee

14   in DVI to assert a claim against the debtor entity.

15           THE COURT:  All right.  Now --

16           MR. TECCE:  If it lost in that case, it ended.

17           THE COURT:  Okay.  But that related-to jurisdiction

18   issue, if you will, arises as a result of the back swap

19   agreement.  Okay?  What I'm trying to focus on, and I know you

20   don't want to separate it out because it's all part of one big

21   global --

22           MR. TECCE:  Right.

23           THE COURT:  -- three-party transaction, our triangle,

24   per that front swap agreement.  My point is, your argument is

25   that if you prevail against Bank of America on the front swap

38

1    agreement and that makes the subordinated notes, as you said,
2    money good --
3              MR. TECCE:  Right.
4              THE COURT:  -- and there's a debtor entity who gets
5    the benefit of the fact that the subordinated notes are money
6    good --
7              MR. TECCE:  Correct.  Correct.
8              THE COURT:  -- not because the debtors own the SPE --
9              MR. TECCE:  No.  That's right --
10             THE COURT:  -- because the debtors own the notes --
11             MR. TECCE:  Right.
12             THE COURT:  -- that Lehman allegedly improperly
13   exercised its rights under the repurchase agreement.  So it's
14   still --
15             MR. TECCE:  In other words, that's --
16             THE COURT:  It's still benefit that arises as a
17   result of an ownership interest albeit in a secured not and not
18   in a equity stake --
19             MR. TECCE:  Right.
20             THE COURT:  -- but it's still separate from the
21   transaction.
22             MR. TECCE:  Your Honor --
23             THE COURT:  And isn't that DVI?
24             MR. TECCE:  It's --
25             THE COURT:  And your first answer is it's not DVI

1    because of the back swap.  I want you to ignore that and we'll

2    talk about that later.

3              MR. TECCE:  Okay, fine.  In fact, there's two other

4    ways it's not DVI.

5              THE COURT:  Okay.

6              MR. TECCE:  Okay?  The second way it's not DVI is the

7    way you just mentioned, Your Honor, and that, by the way, is

8    not so speculative that it wouldn't satisfy related to a

9    jurisdiction.  Any conceivable impact on the administration of

10   the estate, it need not be certain -- there has -- there need

11   not be a likelihood of it.  That standard is easily satisfied

12   by what I would consider to be the second distinguishing factor

13   of DVI, which is that a debtor entity is a creditor of the

14   special purpose entity.  And that debtor entity and its

15   creditors will receive a distribution if the lawsuit goes

16   forward to a successful conclusion.  There was no creditor of

17   the special purpose entity in DVI that was going to receive a

18   payout on its notes because DVI was successful of its

19   prosecution of the lawsuit.  There was an argument --

20             THE COURT:  But that's really just a question of

21   how -- that's really just a question as to the capital

22   structure, or the SPE, and the priorities scheme.  It doesn't

23   matter.  What you're saying is -- and if I could use the

24   analogy Judge Walrath is saying is, like, look, it can't be

25   that there's related-to jurisdiction to every entity that the

40

1    debtor owns stock in.  That's the same thing as saying it can't

2    be that there's related-to jurisdiction over every dispute that

3    the debtor has a claim against.

4              MR. TECCE:  Well --

5              THE COURT:  It doesn't -- in other words, it doesn't

6    focus necessarily on equity.  It focuses on the fact that there

7    is a claim/interest in this other entity.

8              MR. TECCE:  Right.  But --

9              THE COURT:  Now she may be wrong but --

10             MR. TECCE:  Well, Your Honor, to the extent that --

11             THE COURT:  Just don't tell her I said that.

12             MR. TECCE:  I won't.  To the extent that DVI says

13   that the only connection is the equity ownership between the

14   SPE and the debtor entity --

15             THE COURT:  All right.

16             MR. TECCE:  Okay.  First of all, related-to

17   jurisdiction is found in cases between two non-debtor entities

18   to have absolutely equity association or affiliation.

19             THE COURT:  Right.

20             MR. TECCE:  So if we were to take Judge Walrath's

21   view that a mere equitable ownership is not sufficient to

22   provide a basis related-to jurisdiction, what then of the

23   authority, including the 3rd Circuit authority of CoreStates,

24   which is a dispute between unaffiliated, unowned, unconnected

25   entities, both non-debtors, that was found to constitute

1   related-to jurisdiction.  Equity ownership is not a test for

2   related-to jurisdiction.  It is not in isolation an automatic

3   preclusion to a finding of related-to jurisdiction.

4           THE COURT:  Just to think out loud, in other words,

5   if you focus on the --

6           MR. TECCE:  Let --

7           THE COURT:  If you focus on the basis for the claim

8   against the non-debtor entity that may benefit, that's starts a

9   slippery slope, if you will, because, again as I was saying, is

10  like well, wait a minute, it's not necessarily equity.  I mean,

11  it could be a claim.  And then you're collapsing down to the

12  point where your argument would be -- you're collapsing down to

13  the point where CoreStates doesn't make any sense, the

14  language --

15          MR. TECCE:  Well, how could core estates make any

16  sense because there's no ownership?

17          THE COURT:  ---- combustion engineering doesn't make

18  any sense.

19          MR. TECCE:  Actually, Your Honor.  I don't want to

20  lose focus --

21          THE COURT:  The issue is effect not how the effect

22  gets there.

23          MR. TECCE:  I think the language --

24          THE COURT:  You had a third reason to distinguish

25  DVI --

42

1          MR. TECCE:  Yeah, I --

2          THE COURT:  -- and I interrupted you.  I apologize.

3          MR. TECCE:  Let's go right to the language actually.

4    I mean, let's take it on in DVI.  And what Judge Walrath says

5    is on page -- do you have an extra copy?  If Your Honor doesn't

6    have a copy --

7          THE COURT:  I got it here.

8          MR. TECCE:  Well, it's a bit of a non-event, Your

9    Honor.  It's two sentences so I don't want --

10         THE COURT:  I guess it's --

11         MR. TECCE:  It says "We disagree with DVI's broad

12   assertion.  A debtor may not invoke related-to jurisdiction

13   where the action may have only speculative, indirect or

14   incidental effect on the estate."

15         THE COURT:  What page again?

16         MR. TECCE:  I'm on page 418, Your Honor.  This is

17   where the argument is raised about the equitable ownership.

18         THE COURT:  Right.  Say it again.  I'm sorry.  I

19   wasn't --

20         MR. TECCE:  And what Judge Walrath says on this point

21   is that the argument is look, we have an equitable ownership in

22   the SPE and therefore that should give related-to jurisdiction.

23   And she says you know what?  A debtor may not invoke related-to

24   jurisdiction where the action may have only speculative,

25   indirect or incidental effect on the estate.  That's the reason

43

1    why Judge Walrath says that equitable --

2              THE COURT:  She's studying the In on the Bay case,

3    right?

4              MR. TECCE:  Right.  Okay.  But there's a couple

5    things again that are missing from DVI.  Also, Your Honor, the

6    defendant in DVI didn't file proof of claim in the bankruptcy

7    case of the related entities.  And I think that's actually

8    quite an important fact.  If you look at Best Products, which

9    is a Second Circuit case, it makes heavy mention of the fact

10   that a proof of claim was filed finding core jurisdiction.  It

11   says "The dispute here involves" -- 68 F.3d at 31 -- "involves

12   enforcement of a contractual subordination agreement between

13   parties."  Best Products, by the way, is similar factually to

14   CoreStates.  It's a dispute between two non-debtor parties,

15   again, no equitable ownership between them, no affiliation,

16   still a finding of now core jurisdiction over a dispute between

17   two parties over an intercreditor agreement.  And it says "the

18   dispute involves the enforcement of a contractual subordination

19   agreement between parties that filed proofs of claim against

20   the debtor.  Settlement of this dispute is essential to the

21   administration of the estate."

22             So again, in our case, our defendant has filed a

23   proof of claim, not only for amounts that maybe a judge

24   obligated to pay in this particular case but for amounts that

25   it may be owed under the front swap agreement -- or under the

1    back swap agreements, rather, and it makes mention of amounts

2    that it paid under the front swap agreements.

3          Actually, the proof of claim that was filed is a bit

4    telling.  There's been a lot of discussion this morning about

5    how consideration of the MLPSA and the front and the back swap

6    agreements are unrelated to this litigation.  But what Bank of

7    America's own proof of claim says, and I quote, "The relevant

8    agreements for purposes of this proof of claim include the

9    MLPSAs, the B of A front swap agreements as defined therein as

10   the front swaps and the back swap agreements, defined therein

11   as the back swap agreements."  So when it filed its proof of

12   claim, it considered these agreements relevant.  And in this

13   particular case, our argument is that you have to consider

14   those other agreements because they show the impact of this

15   lawsuit on the estates.

16         The last point I'd make, Your Honor, is that Judge

17   Walrath's language about incidental effect, it's not consistent

18   with or it doesn't square, if you will, with the Third

19   Circuit's own statement of related-to jurisdiction which is any

20   conceivable impact.  Meaning, the language is "the test is

21   conceivable.  Certainty or even likelihood is not a

22   requirement.  Bankruptcy jurisdiction will exist so long as it

23   is possible that a proceeding may impact the debtors' rights,

24   liabilities, options or freedom of action in handling the

25   administration of the bankruptcy estate."  That's the language

1    from CoreStates Bank and I would respectfully submit that that

2    is not consistent with the statements that speculative and --

3    speculative impact is not sufficient to bring related-to

4    jurisdiction into the fold.

5            THE COURT:  What page are you on in CoreStates?

6            MR. TECCE:  CoreStates Bank at page 204, Your Honor.

7    That's citing Guild and Gallery.

8            THE COURT:  Right.

9            MR. TECCE:  Now, actually, there's been -- and this

10   perhaps may be an admission against interest but some of the

11   Third Circuit's authority this morning that we've discussed, we

12   have said that there was a finding of jurisdiction when there

13   actually was not.  So let me correct the record on that.

14   Combustion Engineering, Your Honor, actually found that there

15   was no related-to jurisdiction.

16           THE COURT:  Okay.

17           MR. TECCE:  And it did so -- perhaps Your Honor was

18   confused, it found that there wasn't a sufficient factual

19   record to make a determination as to whether or not there

20   should be related-to jurisdiction.  And it said that absent -

21   you know, typically we would remand the case back but we only

22   have 105(a) left and that's not an independent jurisdictional

23   basis so that was the end of it.

24           Your Honor asked whether any Third Circuit cases have

25   found specifically for related-to jurisdiction and I would say

1   CoreStates is one of them.  The other one is Shoe v. Flattery

2   (sic), another Third Circuit case, that found related-to

3   jurisdiction existed with respect to a former employee's action

4   under the Pennsylvania Wage Payment and Collection Law against

5   officers and directors of the debtor.

6            THE COURT:  Oh, right.

7            MR. TECCE:  Combustion is not a case where --

8            THE COURT:  What about Federal Mogul?

9            MR. TECCE:  Federal Mogul did not find related-to

10  jurisdiction.  But, Your Honor, if you look at Combustion

11  Engineering, on page -- if you look at Combustion

12  Engineering -- do you have a copy of that?  I have a copy of

13  that one as well.  Explains -- there's an issue --

14           THE COURT:  I got it.

15           MR. TECCE:  Okay.  There's an issue in Pacor and

16  Combustion Engineering and I guess what they're talking about

17  here in Federal Mogul -- and I'm on pages -- I'm on page 226.

18           THE COURT:  Um-hmm.

19           MR. TECCE:  What they say is that, look, where

20  there's an indemnification obligation that requires -- that in

21  order for that to be asserted requires the initiation of

22  another lawsuit then it's not related to it.  It doesn't tie

23  sufficiently to the estate.  It says because -- I'm right

24  before the new paragraph (b) starts.  It says "Because the

25  potential indemnification and contribution claims against

1    Federal Mogul had not yet accrued and would require another

2    lawsuit before they could affect Federal Mogul's bankruptcy

3    estate, we concluded the District Court correctly held it

4    lacked subject matter jurisdiction over the third-party

5    dispute."

6              Your Honor, we don't have to initiate another lawsuit

7    here because the proofs of claim have already been filed.  And

8    there's a back swap agreement in place that enables Bank of

9    America to proceed against the debtor entities.  Now the

10   accusation has been made that we didn't mention anything in

11   this case about the margin of cash collateral pre-petition and

12   we didn't mention in this case or in the complaint about the

13   fact that Bank of America was deducting from that cash

14   collateral to satisfy the back stop obligations.  Okay.  That

15   just doesn't work for us on a number of levels.  Their

16   obligations, and that's probably the problem in this lawsuit,

17   is that when Broadhollow has a claim against Bank of America,

18   that's a hundred cent claim 'cause Broadhollow's not a debtor.

19   But when Bank of America wants to assert its concomitant claim

20   under the back swap, that's a pre-petition claim that's payable

21   in bankruptcy dollars.

22             So they've been margining.  Now --

23             THE COURT:  Well, except to the extent that they are

24   holding collateral --

25             MR. TECCE:  Well, it's not --

1      THE COURT:  -- that is not subject to the stay that

2   they can --

3      MR. TECCE:  Well, that's right but to get to this

4   point, Your Honor, is that we never alleged this.  That's

5   actually not true.  In paragraph 38 of our complaint, Your

6   Honor, which was filed --

7      THE COURT:  You mean, the amended complaint?

8      MR. TECCE:  Yes, Your Honor, which was filed --

9      THE COURT:  November, right?

10      MR. TECCE:  -- in November.  I don't have the

11   specific date, I'm sorry.  Paragraph 38 says "Contrary to

12   B of A's reading of the B of A's swap agreements, the partial

13   termination payments owing under the B of A's swap agreements

14   total not less than twenty-three million.  Indeed, at the time,

15   B of A was holding eighteen million dollars of funds posted by

16   plaintiffs in response to a margin call by B of A on July 19th,

17   2007 under the back swap agreement."  Okay.  That's what we

18   knew at the time.  This was November of 2007.  On January 9th,

19   2008, after we filed the complaint, Bank of America filed its

20   proof of claim.  And there it's revealed in paragraph 11, and I

21   have a copy of this as well if Your Honor would like to look at

22   this, it says "Prior to the petition date, in accordance with

23   its rights under the back swaps, the claimant deliver margin

24   calls to AHMIC and AHM Servicing.  AHMIC and AHM Servicing

25   delivered to the claimant a portion of the cash margin it was

1    required to deliver which the claimant held as cash collateral

2    as of the petition date.  Since the petition date, cash

3    collateral has been applied towards satisfaction of (1)the back

4    swap obligations; and (2)cost and expenses including legal fees

5    and expenses incurred by the claimant for which it is entitled

6    to reimbursement from the sellers under the back swaps.  After

7    satisfaction of the back swap obligations and the expense

8    obligations incurred as of the date hereof, the claimant holds

9    cash collateral in the amount of 3.644462 -- 3,644,462 dollars

10   that may be applied towards satisfaction of any additional

11   obligations of the sellers under back swaps including without

12   limitation any additional expense obligations."

13          So we knew that it was eighteen million margin pre-

14   petition and now we learn that it's, I guess, fifteen million

15   that's been applied.  So we could amend the complaint on the

16   basis of the proof of claim but that was not within our

17   knowledge at the time the complaint was filed.

18          Lost track of the outline a little bit, Your Honor,

19   so I --

20          THE COURT:  It's okay.

21          MR. TECCE:  -- just need a second.

22          THE COURT:  I was peppering you with questions.

23          MR. TECCE:  Fair enough.  All right.  So I think I --

24          THE COURT:  You were explaining the transactions.

25          MR. TECCE:  We're way -- I think we're a little past

1    that now, Your Honor.  I guess I'd like to speak to a couple of

2    the cases that were mentioned.  I mentioned Pacor and

3    Combustion.  Guild and Gallery, Your Honor, is a case that

4    involved Prices Art Work.  There's always drama in these cases

5    but that one involved Prices Art Work that was deposited at Art

6    Gallery and because it was a bailment, the art gallery actually

7    never owned the artwork and it was therefore not considered

8    property of the estate.  It's a Third Circuit case, declines to

9    find related-to jurisdiction.  But there's a fact in that case

10   that you won't get from me this morning which is that both the

11   parties -- it was not disputed that the outcome of the case

12   would have no impact on the bankruptcy estate.  That was not a

13   disputed fact of that case.  And I would not concede that for a

14   second in this case.

15          All right.  So I -- the other case that was mentioned

16   was Saul Ewing Remick & Saul.  This is a case where a law firm

17   brought that represented the DIP lender brought a cause of

18   action against the DIP lender arguing that mortgage notes that

19   had been pledged as collateral that then became the DIP

20   lender's mortgage notes were actually the law firm's mortgage

21   notes.  It was a dispute between the two of them.  And the

22   Court declined to find related-to jurisdiction in that case

23   stressing that the property was never part of the bankruptcy

24   estate.  I don't think that that's really factually on all

25   fours with our case here.

1    If I can just have a second.  I think, Your Honor,

2    the proof of claim that was filed by Bank of America is

3    actually quite a telling fact because when you look at the

4    proof of claim and you look at the claims that Bank of America

5    asserts against -- they actually filed a number of proofs of

6    claim.  We attached to our reply brief the proofs of claim that

7    related to Broadhollow and Melville.  And they're actually

8    captioned proofs of claim.  And it says Broadhollow and

9    Melville in parentheses as if they were debtors, but I guess

10   that's just besides the point.  These are not claims, Your

11   Honor, as they've been styled this morning.  These are not

12   claims that may be filed in the future.  I think one of Bank of

13   America's arguments is that this lawsuit is only about the

14   front swap agreement and the controversy under the MLPSAs and

15   back swap agreements without some future controversy that may

16   or may not take place at some point in the future.  But the

17   bottom line is that these claims have been filed against the

18   estate and this lawsuit will fix the amount of those claims and

19   it will adjudicate the rights and responsibilities among Bank

20   of America and the debtor entities relating to those claims,

21   the front swap agreements and the back swap agreements.

22       THE COURT:  Well, can I consider that on a motion to

23   dismiss?  The proofs of claim?

24       MR. TECCE:  Well, actually, you don't have to because

25   it's alleged in the complaint that -- well, yeah.  It's

1    referenced in the complaint, Your Honor, in paragraph 9.  It's

2    not just -- for the record, paragraph 9 is not just us arguing

3    the equitable ownership and the SPE provides the basis for

4    jurisdiction.  We also allege "In addition, B of A has asserted

5    claims against one or more of the American Home parties

6    pursuant to or in connection with its obligations under the B

7    of A swap agreements.

8              THE COURT:  B of A swap agreements, that's a defined

9    term, I take it?

10             MR. TECCE:  It is.  That's the front swap agreements.

11             THE COURT:  Okay.

12             MR. TECCE:  And then -- that's in subparagraph (a).

13   And then in subparagraph (b), it says "Three International Swap

14   Dealers Association master agreements".  Those are the back

15   swap agreements.

16             THE COURT:  Okay.

17             MR. TECCE:  Okay.

18             THE COURT:  So they are referenced?

19             MR. TECCE:  Correct.  So they're both referenced.

20   The fact that they would assert claims against us under those

21   agreements is referenced in paragraph 9.  And then the proofs

22   of claim were subsequently filed so they're, I would argue,

23   incorporated.  Well --

24             THE COURT:  Incorporated?  Well --

25             MR. TECCE:  Well, to be perfectly -- here.  They

53

1    can't be incorporated because they didn't exist at the time

2    that we wrote the complaint but -- they are publicly filed

3    documents as well, Your Honor.  I suppose you could take

4    judicial notice on a motion to dismiss.

5           Just very --

6           THE COURT:  And I guess again we're in a motion to

7    dismiss.  So you get the benefit of the doubt.

8           MR. TECCE:  I do.  And I get -- not to ask for

9    everything but I get to have the complaint construed in a way

10   favorable to us.

11          Just -- Your Honor, we've been through a lot and I

12   don't want to --

13          THE COURT:  Yeah.  If we could, unless you have

14   anything more to say about subject matter jurisdiction, maybe

15   we can back up to standing.

16          MR. TECCE:  Sure.  A couple of their specific

17   arguments that AHMSI is a stranger to the contracts.  I don't

18   think that's really an accurate statement.  It's not a stranger

19   to the back swap agreements.  The back swap agreements are tied

20   to the MLPSAs.  They share definitions.  The occurrence of

21   events under the MLPSAs triggers obligations under the back

22   swap agreements.  And AHMSI is the servicer under the MLPSAs.

23          THE COURT:  Well, is that consistent with the

24   position the debtors have been taking for the last eight months

25   about the MLPSAs?  I mean, we had a pretty lengthy hearing in

1   October where you argued with some force or your client argued

2   with some force that the MLPSAs were stand alone agreements

3   that were -- in fact were severable stand alone agreements.

4         MR. TECCE:  Well, that is true.  I can't speak for

5   what -- but I know what I've said in other proceedings, Your

6   Honor, about severability in certain contexts and I can't speak

7   for what my colleagues may have said.  But the point, I think

8   is that Bank of America argues that we're trying to sort of

9   misuse the MLPSAs which I think is just a little bit

10  incongruent with their position in the proof of claim that

11  they're a third-party beneficiary under the MLPSAs because of

12  the back swap agreement.  So I don't really --

13        THE COURT:  Your position is they take a position

14  that they're third-party beneficiaries under the agreements --

15        MR. TECCE:  That's not my position.

16        THE COURT:  -- but at the same time are going to

17  argue that the debtors aren't.

18        MR. TECCE:  Correct.  And that's actually not my

19  position.  That's specifically what it says in the proof of

20  claim.  It says in footnote 3, "Pursuant to Section 12.15 of

21  each MLPSA, the claimants as swap counterparties under the

22  front swap is an expressed third-party beneficiary under the

23  MLPSA."  So I don't want to prejudice the estate's rights with

24  respect to MLPSAs.  Generally, I just note that point.

25        THE COURT:  All right.

 1         MR. TECCE:  There's also been a lot of discussion
 2    this morning that recovery belongs exclusively to --
 3         THE COURT:  Now do you specifically argue -- I'm
 4    looking here.  Do you specifically argue that Servicing as a
 5    third-party beneficiary is a forward swap?
 6         MR. TECCE:  No, we do not.
 7         THE COURT:  Okay.
 8         MR. TECCE:  We argue that Servicing has a concomitant
 9    obligation under the back swap that arises to amounts that are
10    paid under the forward swaps.
11         THE COURT:  All right.  And while that may be
12    sufficient to invoke subject matter jurisdiction, is it
13    sufficient to revise Servicing with standing to assert claims
14    related to the forward swaps?
15         MR. TECCE:  I'll speak to standing again.  I don't
16    want you to think that we've caved on abstention.  I think that
17    our brief goes through all those points.  I would just note
18    that that's a narrowly invoked exception to federal
19    jurisdiction.
20         And lastly, on the issue of standing --
21         THE COURT:  I can't imagine you caving on abstention.
22         MR. TECCE:  No, I --
23         THE COURT:  Why would be arguing about everything
24    else?  We spent the last hour arguing.
25         MR. TECCE:  I think abstention is -- I would just say

56

1    that we rest on our papers --

2                THE COURT:  All right.  Very well.

3                MR. TECCE:  I have nothing new to add on that.  Your

4    Honor, the argument on standing, right now AHMSI is impacted by

5    the suit in a number of ways.  First of all the collateral that

6    it pledged pre-petition is basically being used to satisfy

7    claims under the back swap agreements.  And those claims under

8    the back swap agreements are a function of Bank of America's

9    claims under the front swap agreements.

10               Secondly, the MLPSAs authorize AHMSI to take any

11   action that -- I believe the word is "undertake any such action

12   which it may deem necessary or desirable with respect to this

13   purchase agreement and the rights and the duties of the parties

14   hereto."

15               THE COURT:  The MLPSAs?

16               MR. TECCE:  That's correct.

17               THE COURT:  But they're not a party, the MLPSAs.  But

18   they're expressed third-party beneficiaries.

19               MR. TECCE:  So they say.  Well, if that's what the

20   agreement says, yes.  But that is their position is that they

21   are an expressed third-party beneficiary.

22               But there's a different point which is that their

23   claims against the estate include claims under the MLPSA.  They

24   include claims for indemnity under the MLPSAs.  And they

25   include claims against AHMSI for negligence and breach of duty

1    under the MLPSAs.  And that actually goes -- that is

2    inextricably tied, and I don't want to use a fancy word like I

3    used in the opening statement of my brief, but because the

4    genesis of this dispute is that with respect to the sale of the

5    Broadhollow loans that the Broadhollow loans did not -- the

6    Broadhollow loans when they were sold, they didn't retrieve par

7    value.  And under the forward swap agreement, Broadhollow and

8    Melville are entitled to seek reimbursement for the deficiency.

9    The way the forward swap works is that if the loans were sold

10   over par then Broadhollow pays that amount to B of A.  And if

11   they're sold below par value, B of A pays that amount back.

12   And while it's not the appropriate forum to discuss whether B

13   of A is entitled to not make payments under the forward swap

14   agreement, it's position is as has been communicated to us that

15   the loans when they were sold -- the loans were not eligible

16   mortgage loans, the loans did not satisfy eligibility criteria

17   and that as a consequence of those events, they're -- at

18   thirteen million, which is what they've paid, that they don't

19   owe any more money under the forward swap agreement.  But

20   American Home Mortgage Servicing, Inc. -- I think the claim

21   they intend to assert against American Home Mortgage Servicing,

22   Inc. is that when it sold the loans, that it was negligent when

23   it sold the loans and that there was a breach of its duties

24   when it sold the loans.  So American Home Mortgage Servicing,

25   Inc. is tied to this dispute.  And it is the sale of those

1  loans for less than par value that triggered the forward

2  obligations.

3         THE COURT:  Weren't those loans sold pursuant to a

4  Court order?

5         MR. TECCE:  They were.  Sold pursuant to a Court

6  order and pursuant to procedures that were reviewed and

7  approved by the Court.

8         THE COURT:  And Bank of America is going to argue

9  that was negligent?  Okay.

10        MR. TECCE:  Your Honor, if I could go back to their

11  proof of claim, just paragraph 14 says that under the MLPSAs,

12  each party -- I'm paraphrasing but that it says in paragraph

13  14, "The seller under each MLPSA agreed to indemnify and hold

14  each claimant harmless against any losses, damages, penalties,

15  fines, forfeitures...resulting from the seller's breach of a

16  representation or warranty under the MLPSA.  To the extent such

17  costs are not attributable to credit losses on the mortgage

18  loans and are not otherwise included in the repurchase price,

19  and AHM Servicing agreed inter alia to indemnify and hold the

20  claimant harmless against any and all claims, losses,

21  penalties, fines, forfeitures...to the extent attributable to

22  the seller's gross negligence, fraudulent conduct or willful

23  misconduct."

24        The complaint alleges that one of the -- that it

25  would be a breach -- to the extent that it is an alleged breach

1    of a representation and warranty regarding the eligibility of

2    the mortgage loans that the MLPSAs limit remedies in that

3    instance.  So I think that would be the genesis of the dispute

4    over whether the amounts ultimately get paid, whether the --

5    assuming that there is a breach of representation and

6    warranties over the eligibility of mortgage loans, which we

7    would not concede, the MLPSA is pretty clear that that's

8    confined to three remedies which are selling the mortgage

9    loans, indemnification and a third which escapes me but --

10           Your Honor, I think, unless Your Honor has any

11   questions, that would conclude my presentation.

12           THE COURT:  Nope.  Thank you.  I've peppered you

13   enough.  Thank you very much.  Reply?

14           MR. TECCE:  Just a minute, Your Honor.

15           THE COURT:  Hang on.

16           MR. TECCE:  My colleague reminds me that just for the

17   record, the Third Circuit case is Stoe, S-T-O-E, and not Shoe

18   against Flaherty.

19           THE COURT:  Oh, okay.  Thank you.  Mr. Rubinstein,

20   reply?

21           MR. RUBINSTEIN:  Yes, Your Honor.  Thank you.  Let me

22   just reply to a couple of particular points that were made.

23   First, with respect to DVI, I think a distinction was tried to

24   be made but that only dealt with having equity interest and

25   didn't involve being a debt holder of the SPE involved here.  I

1    think that's not the case.  The paragraph in DVI right before

2    the sentence that was read by plaintiffs' counsel points out

3    that "DVIFS argues that this adversary proceeding...the Pacor

4    test because the DVIFS holds an equity and debt interest in the

5    securitization trust which it considers to be valuable assets

6    of its estate."  So I think the fact situation that was

7    presented to Judge Walrath in DVI was that the debtor there

8    claimed its residual and potential future benefit both as a

9    result of being the equity holder of the securitization trust

10   but also as holders of debt interest in the securitization

11   trust.  I think Your Honor raised questions as to whether that

12   was a distinction of significance.  I don't think you have to

13   get there because I think the DVI fact pattern by reading the

14   decision said that it was both there.

15           Secondly, there was mention made of CoreStates and

16   Best Products.  Those cases are enormously factually

17   distinguishable from this case and they were actually correctly

18   decided.  CoreStates does not support the existence of related-

19   to jurisdiction or core jurisdiction in this case.  And, in

20   fact, the other case that was discussed, Combustion

21   Engineering, couldn't be clearer in laying out why not.

22   CoreStates actually says that it dealt with a case in which you

23   had -- in that dispute that was being resolved, the Court had

24   to deal with resolving subordination agreements between two

25   creditors so that the estate could be administered properly and

1   so that the Court in that dispute determined the priority among

2   creditors.  I think that Combustion Engineering made it

3   absolutely clear why CoreStates is not something that provides

4   jurisdiction.  In fact, Combustion Engineering basically lays

5   out the high hurdle for related-to jurisdiction that it

6   believes the Third Circuit in CoreStates.  And this is the

7   language of Combustion Engineering.  It pointed out that the

8   Third Circuit held there in CoreStates "did not support

9   extending related-to jurisdiction to non-derivative claims

10  against the non-debtors.  And the reasons that Combustion

11  Engineering gave was, first, "CoreStates involved an

12  intercreditor dispute that directly concerned assets of the

13  debtors' estate."  And this is again Combustion Engineering

14  quoting, "Moreover, the matter at issue in CoreStates purported

15  to alter the priority of creditors in the bankruptcy process

16  which would have had an obvious effect on the administration of

17  the bankruptcy estate."  Clearly not the case that we have

18  here.  An the third distinction that Combustion Engineering

19  made of CoreStates to show how it was limited was -- and this

20  is Combustion Engineering, the Third Circuit "finally and most

21  importantly, CoreStates involved a dispute regarding assets of

22  the debtors' bankruptcy estate."

23          And that's just not our case here.  Plaintiffs' sole

24  claim in our case for breach of contract by non-debtors against

25  non-debtors regarding property and, counsel candidly admitted,

1   regarding property that is not property of the debtors' estate

2   is anything but an intercreditor dispute that has to be

3   resolved to the Court to properly deal with the administration

4   of the estate.

5            So I don't think CoreStates or Combustion Engineering

6   helped at all.  In fact, I think it really assists in

7   dispelling jurisdiction here.

8            Finally, Your Honor, on that particular point, there

9   was reference to the very off-sided general language of Pacor

10  regarding any conceivable impact.  I can't remember how many

11  times I've read "any conceivable impact" as a result of Pacor.

12  But again, in Pacor, there was no jurisdiction found and there

13  was no jurisdiction found, among other things, because, as I

14  said earlier, because the Court there thought it was too

15  speculative that just because a recovery in that particular

16  case might trigger indemnification obligations in the

17  subsequent case.

18           Your Honor, also there was mention of the back swap

19  agreements.  And, by the way, virtually everything I've heard,

20  everything I've heard quoted about the proofs of claim,

21  everything I've heard about why AHMSI has standing, for

22  example, everything we heard had the word "back swap" or

23  "MLPSA", that there are rights, that there are issues, that

24  there are disputes that are going to arise or will arise or do

25  exist under the proof of claims because AHMSI has this

1    particular right or issue or claim under the back swap

2    agreement or something under the MLPSA.  That's the point.  Not

3    under the front swap agreement.  The front swap agreement is

4    what this dispute is about.

5              Your know, Your Honor, it's fortuitous that the back

6    swap protection that Bank of America sought was with a debtor

7    entity, AHMSI.  It's a hedge.  It was a hedge for its exposure.

8    Bank of America could have gone to Citibank and entered into a

9    swap agreement if it wanted to.  If it did that, would there be

10   any issue that Citibank should be a party in this suit between

11   Broadhollow and Melville suing under a contract they have, the

12   front swap agreement against Bank of America because maybe

13   depending on the outcome of that, Citibank would be called upon

14   to make payment unless it disputed it under the back swap

15   agreement.  It wouldn't.  There would have to be a resolution

16   of the confined and narrow issue under the front swap

17   agreements between the contracting parties to that agreement,

18   Broadhollow and Melville and Bank of America, and if there were

19   other contracts, if there were other issues between a back swap

20   party and Bank of America, that would follow thereafter in a

21   separate action or separate proceeding.  That's exactly the

22   case that we are presented with here, Your Honor.

23             You know, the proofs of claim were not filed because

24   that was the time.  They were subject to a bar date and they

25   had to be filed.  And those proofs of claim really address that

1   we will have issues.

2          Counsel today said he's going to have an issue under

3   the -- they'll challenge under the MLPSA Bank of America's use

4   of the collateral.  They're going to maybe challenge that there

5   were limitations under the MLPSA as to what indemnification

6   obligations -- there is going to be a dispute.  That in and of

7   itself is a concession of a distinction between the rare cases

8   where indemnification obligations, which is absolutely iron

9   clad and beyond dispute, might in the rare case give latitude

10  jurisdiction.  And all the other cases where the Courts

11  recognize that the payment obligation that might be triggered

12  by the first dispute will have to be the subject of a separate

13  proceeding, a separate dispute resolution, a separate action in

14  the court.  And that's exactly what's going to happen here.  If

15  we have a basis after the resolution of this dispute to assert

16  claims under the back swap agreements or the MLPSAs, it will be

17  claims that we assert and try and recover under the back swap

18  agreements or the MLPSAs.  And they sure as -- were standing

19  here today and arguing, they will raise all sorts of

20  limitations on liability and indemnification obligations and we

21  will be litigated before Your Honor.  And that will be the

22  right time to do it and the right parties to do it and the

23  right place to do it.  But not this -- I don't want to

24  oversimplify this but it's a simple contract dispute under one

25  agreement.

1            And finally, Your Honor, just two things.  I think

2      reading the proofs of claim just to embellish what I just said

3      only show that there may be dispute under the back swap

4      agreement.  And again, that is the point.  And for them to say

5      that they could amend their complaint to assert a claim, let's

6      say, for the collateral under the -- which he said was under

7      the back swap agreement issue, they could amend the complaint

8      and assert all sorts of claims that are not the first count.

9      They can assert five, six, seven, eight more counts.  We'd be

10     standing here, Your Honor, and saying the first count, which is

11     the dispute between Broadhollow and Melville, non-debtors, and

12     Bank of America, non-debtor, has no place here.  And even if

13     the remaining counts could stay in this court, that count has

14     to be dismissed because there's no jurisdiction over that

15     count.

16            Finally, with respect to the standing issue that was

17     raised, again, what I heard, almost all the justification was

18     that -- and this is counsel's words -- that AHMSI is not a

19     stranger to the back swap agreement.  And everything that I

20     heard after that was respect to the back swap agreement and the

21     MLPSAs.  And that's the point.  That's not what we're here to

22     litigate over.  We're here to litigate over a straightforward

23     payment obligation that is or was not due under a front swap

24     agreement that is solely between non-debtor parties.  Thank

25     you, Your Honor.

1          THE COURT:  You're welcome.

2          MR. TECCE:  Your Honor, may I have ten seconds?  I'd

3    be remiss -- I had one point in distinguishing DVI and I didn't

4    reference it during my argument.  It was the subject of a

5    subsequently filed pleading after our reply brief.  It's the

6    new case by Judge Walsh, Juliano, and it goes to the point --

7    and if counsel would like to respond to this, I don't want it

8    to sandbag and limit, but it goes to the point, Your Honor, it

9    involves a finding of related-to jurisdiction between two

10   entities that are not affiliated, that are not related, that

11   are not debtors.  They're two non-debtors.  It's a Chapter 7

12   trustee initiated, a fraudulent transfer case, against a --

13   this is a newly decided decision.  The day after we filed our

14   papers a Chapter 7 trustee initiated a cause of action against

15   a third-party and the third-party impleaded another non-debtor

16   that had no affiliation, ownership or otherwise to apportion

17   liability.  And what Judge Walsh said was there's a possibility

18   that that would benefit the Chapter 7 estate because if the

19   avoidance action defendant has no money and is found to be

20   judgment proof, it may recover against the third-party non-

21   debtor with whom it has no ownership association and that could

22   benefit the estate.  And that therefore gives rise to related-

23   to jurisdiction.

24          So, I cite that as further limiting the proposition

25   that DVI says that you have to have more than an equity

67

1    ownership -- the debtor has to have more than an equity

2    ownership in the entity to have related-to jurisdiction where

3    it's not a function of ownership between debtor and its --

4    thank you, Your Honor.

5            THE COURT:  You're welcome.  You addressed that in

6    your reply brief.

7            MR. RUBINSTEIN:  I put footnotes that appear in our

8    reply brief, Your Honor, yes.

9            THE COURT:  Yes.  I see it.

10           MR. RUBINSTEIN:  Thank you.

11           THE COURT:  I was double checking and that is in fact

12   the case.  Okay.  Thank you very much.  Thank you for an

13   excellent briefing and argument.  And it probably comes as no

14   surprise, the Court's going to take the matter under advisement

15   and I'll issue my decision as soon as possible.

16           MR. TECCE:  Thank you, Your Honor.

17           MR. RUBINSTEIN:  Thank you, Your Honor.

18           THE COURT:  The hearing is adjourned.

19       (Proceedings concluded at 11:41 a.m.)

20

21

22

23

24

25

68

# C E R T I F I C A T I O N

I, Esther Accardi, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


_____    ___May 15, 2008_____

Signature of Transcriber                     Date


__ESTHER ACCARDI _____

typed or printed name