# EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE, | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., | ) | |
| a Delaware corporation, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| COUNTY OF COOK | : | |
| | : | SS. |
| STATE OF ILLINOIS | : | |

Martin Cohn, Esquire, having been duly sworn, does depose and say as follows:

1.      Unless otherwise noted I have personal knowledge of the matters set forth in this affidavit. I am making this affidavit in connection with the *Debtors' Fifth Omnibus (Non-Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007 and Local Rule 3007-1* (the "Fifth Omnibus Objection) as it relates to the proof of claim I filed on behalf of my client, Sam Hage, II (designated "Claim No. 9641") in the above-captioned bankruptcy case.

2.      I operate a sole proprietorship law firm with one other lawyer that does business as Martin Cohn & Associates, located at 116 South Michigan Avenue, 14th Floor, Chicago, Illinois 60603-6094 (the "Firm"). I am a member in good standing of the Illinois Bar. I am the attorney who is principally responsible for handling Claim No. 9641.

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc., a Delaware corporation (6303); American Home Mortgage Investment Corp, a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Mellville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75036.

3.       The Firm operates a general civil law practice, focusing primarily on estate

planning, estate administration, taxes, and primarily residential (with some commercial) real

estate. I estimate that far less than 1% of the Firm's practice relates to bankruptcy in general.

Accordingly, I would not characterize the Firm's bankruptcy practice as "sophisticated."

4.       I was retained to represent two gentlemen, including Mr. Hage, in connection

with their Employment Agreements, executed approximately October 19, 2006, when they

moved from one company to another.

5.       The new company turned out to be American Home Mortgage Corp., (Case No.

07-110512 (CSS)) (the "Debtor"). During the negotiation of their Employment Agreements, I

had direct contact with an officer of the Debtor and, as memory serves me, its counsel.

6.       In conjunction with the filing of the bankruptcy, the Debtor terminated the

employment of both my clients and went out of business.

7.       These gentlemen were established clients of mine and they asked me to assist

them in connection with the Debtors' bankruptcy case by filing proofs of claim. In roughly

October 2007, I began immediately to draft proof of claim forms on their behalves on standard

blank proof of claim forms.

8.       After my clients informed me of the Debtors' contemplated sale hearing

scheduled for September 2007, I wrote to them on October 25, 2007 advising that it was time to

file claims in the Debtor's bankruptcy. A true and correct redacted copy of that letter is attached

hereto as Exhibit A.

9.       Having not received timely responses, I wrote my clients again on November 9,

2007. A true and correct redacted copy of that letter is attached hereto as Exhibit B.

2

10.     On November 15, 2007, Mr. Hage advised my by electronic mail that he would provide me during the following week with copies of the outstanding documents I had requested in my letter of November 9. A true and correct copy of that electronic mail is attached hereto as Exhibit C.

11.     On December 5, 2007, I wrote Mr. Hage once again requesting documents required in order to complete the official pre-printed proof of claim forms provided by the Debtors' claims agent. A true and correct copy of that letter is attached hereto as Exhibit D.

12.     Early on the morning of December 19, 2007, I send an electronic mail to Mr. Hage asked him to "light a fire" about the documents I needed in order to complete the drafting of the proof of claim forms. True and correct copies that electronic mail and redacted reply are attached hereto as Exhibit E.

13.     Later that same day, I wrote Mr. Hage and requested his review, approval, and signature on the official pre-printed proof of claim I had drafted on his behalf. A true and correct redacted copy of that letter, although unsigned as kept in the normal course of business, is attached hereto as Exhibit F.

14.     Mr. Hage delayed in returning the fully executed copy of his proof of claim form to me.

15.     Although it is standard operating procedure of the Firm that important filings such as a proof of claim form be sent by UPS for tracking purposes, on the afternoon of Wednesday, January 9, 2008, my secretary sent Mr. Hage's claim form via regular mail, postage prepaid, to the Debtors' claims agent in New York City. I am uncertain why Mr. Hage's claim form was sent in this manner, although I note that the Debtors' claims agent uses a post office box rather than a street address, and it is my understanding and belief that UPS does not make deliveries to

3

post office boxes. A true and correct copy of the proof of claim transmittal letter, although unsigned as kept in the normal course of business, is attached hereto as Exhibit G.

16.      I received a time-stamped copy of Mr. Hage's proof of claim dated January 15, 2008. A true and correct redacted copy of the time-stamped proof of claim form is attached hereto as Exhibit H.

17.      Because Mr. Hage had a written Employment Agreement with the Debtor that provided for severance pay in the event of his termination without cause, I would have expected the Debtor to have recognized that Mr. Hage held a potential claim against the Debtor and would have included his claim for severance pay on its official schedules. On information and belief, it appears that this was not done.

18.      I would have expected the Debtor to have provided me with actual notice of the bar date because both (i) an officer of the Debtor and (ii) its counsel knew (or should have known) that I represented Mr. Hage in connection with the negotiation of his Employment Agreement less than one year prior to the petition date. I received no such actual notice of the bar date from any of the Debtors.

*[Remainder of Page Left Blank Intentionally]*

4

FURTHER, AFFIANT SAYETH NAUGHT:

_____
Martin Cohn, Esquire

SWORN AND SUBSCRIBED before me this ___19th___ day of May 2008.

_____
Notary Public

My commission expires ___7-26-10_____.

```
OFFICIAL SEAL
AUDREY E DOMAR
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/26/10
```

# EXHIBIT A

*** TRANSMISSION REPORT ***

PRINT TIME  10/25 '07 11:16 ID:LAW_OFFICES          FAX:3123728681

    TIMER=--:--                                                   U*****2AN 097  L

FILE START      MODE       LOCATION              STORE   TX/RX   TOTAL  CODE
No.  TIME                                         PAGE    PAGE    TIME
421  10/25 11:15 TX        17737707437             1      1/ 0   00'27" OK

    ERROR PAGE=

LAW OFFICES

## MARTIN COHN & ASSOCIATES

116 SOUTH MICHIGAN AVENUE • 14TH FLOOR • CHICAGO, ILLINOIS 60603 • TELEPHONE 312/372-3458 • FAX 312/372-8681 • cohnassociates@aol.com

MARTIN COHN
ALAN G. PALMER

October 25, 2007

VIA FAX (773) 7707437

Mr. Sam M Hage II

Gentlemen:

I suspect it is probably time to file claims in the Delaware hearing. I am not sure that this recent sale or approval of a sale really has any meaning because it is really only one of the corporations involved and not the one you work for, but I guess it doesn't hurt to file a claim.

In order to do so, I need good, clean copies of both of your contracts and I need current addresses for each of you and I need your social security numbers.

I do have a copy of a faxed contract for you,    but it would be better if I had a clean, direct copy rather than a fax, if possible. For you, Sam, I have nothing.

Very truly yours,

Martin Cohn

MC:ad

# **EXHIBIT B**

*** TRANSMISSION REPORT ***

PRINT TIME  11/09 '07 12:39 ID:LAW_OFFICES

TIMER=--:--

FAX:3123728681

U*****2AN 087 L

| FILE START | MODE | LOCATION | STORE PAGE | TX/RX PAGE | TOTAL TIME | CODE |
|---|---|---|---|---|---|---|
| No. TIME | | | | | | |
| 476  11/09 12:39 TX | | 17737707437 | 1 | 1/ 0 | 00'25" | OK |

ERROR PAGE=

LAW OFFICES
## MARTIN COHN & ASSOCIATES
116 SOUTH MICHIGAN AVENUE • 14TH FLOOR • CHICAGO, ILLINOIS 60603 • TELEPHONE 312/372-3458 • FAX 312/372-8681 • cohnassociates@aol.com

MARTIN COHN
ALAN G. PALMER

November 9, 2007

VIA FAX  (773) 770-7437

Mr. Sam M. Hase II

Gentlemen:

I have not received the contracts that you promised me and therefore cannot

complete the claims. I don't think there is any hurry but why not get it done.

Very truly yours,

Martin Cohn

MC:ad

7

# **EXHIBIT C**

FUTURE FAXES                                                    Page 1 of 1

Subj:   **FUTURE FAXES**
Date:   11/15/2007 4:41:41 P.M. Central Standard Time
From:   sam.hage@wamu.net,
To:     CORNASSOCIATES@AOL.COM

Marty,

We will get you what you need next week !! Thanks for the reminder!! I have a new fax number it is 877-209-7776 !! Please use that fax number for all future correspondence !!

Regards,

SAm

Sam Hage II
Senior Loan Consultant
Washington Mutual
2807 N. Ashland Avenue
Chicago, IL 60657
773-209-7776 (Direct)
773-770-7438 (Fax)
sam.hage@wamu.net

# EXHIBIT D

*** TRANSMISSION REPORT ***

PRINT TIME  12/05 '07 15:19 ID:LAW_OFFICES                   FAX:3123728681

    TIMER=—:—                                                            U*****2AN 087  L

FILE START      MODE        LOCATION                 STORE   TX/RX   TOTAL   CODE
No.  TIME                                            PAGE    PAGE    TIME
588  12/05 15:18 TX         18772097776               1      1/ 0    00'22" OK

    ERROR PAGE=

LAW OFFICES
## MARTIN COHN & ASSOCIATES
11e SOUTH MICHIGAN AVENUE • 14TH FLOOR • CHICAGO, ILLINOIS 60603 • TELEPHONE 312/372-3458 • FAX 312/372-8681 • cohnassociates@aol.com

MARTIN COHN
ALAN G. PALMER

December 5, 2007

VIA FAX (877) 209-7776

Mr. Sam Hage II

Dear Sam:

Although I have heard from either you or Lou from time to time, I still do not have

the paperwork to proceed to do the claims in the bankruptcy court.

Very truly yours,

Martin Cohn

MC:ad

# **EXHIBIT E**

Subj:     **RE: information**
Date:     12/19/2007 11:38:18 A.M. Central Standard Time
From:     sam.hage@wamu.net
To:       Cohnassociates@aol.com

                                                        My home e mail is
There you go Marty !! Thanks and Happy holidays

---

From: Cohnassociates@aol.com [mailto:Cohnassociates@aol.com]
Sent: Wed 12/19/2007 7:40 AM
To: Hage II, Sam M.
Subject: information

Dear Sam:

I last wrote to you indicating that I need Lou's telephone number and e-mail address so I can finish the forms. I have not heard back and that seems to be the only thing I am missing so I can finish these things and get them to you guys for signature and filing.

I would appreciate you lighting the fire about it.

                        Very truly yours,

                        Martin Cohn

Martin Cohn, Esq.
Martin Cohn & Associates
116 South Michigan Avenue
Fourteenth Floor
Chicago, Illinois 60603
v. 312.372.3458
f. 312.372.8681

NOTE: This e-mail is from the law firm Martin Cohn & Associates ("MCA") and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of MCA do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to MCA in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of MCA, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

---

See AOL's top rated recipes <http://food.aol.com/top-rated-recipes?NCID=aoltop00030000000004> and easy ways to stay in shape <http://body.aol.com/fitness/winter-exercise?NCID=aoltop00030000000003> for winter.

Wednesday, December 19, 2007 America Online: Cohnassociates

# EXHIBIT F

December 19, 2007

Mr. Sam Hage II
366 West Utley Road
Elmhurst, IL  60126

Dear Sam:

Please review the enclosed and see if everything meets with your approval.  I
believe it directly reflects the claim of monies due you,

                                        If you find that every-
thing is in good order, then please sign two copies and return them to me keeping
one copy for your files.

If you have any questions, thoughts or suggestions, call me right away.

                         Very truly yours,



                         Martin Cohn

MC:ad
Enclosures

# **EXHIBIT G**

January 9, 2008

United States Bankruptcy Court
 for the District of Delaware
American Home Mortgage Claims Processing Center
FDR Station, P. O. Box 5076
New York, NY  10150-5076

Dear Sir or Madam:

I am enclosing herewith duplicate claims on the American Home Mortgage
Corporation matter on behalf of Sam Hage II.  Please stamp one copy and
return it to me in the self-addressed, stamped envelope provided for that purpose.

Your cooperation is appreciated.

Very truly yours,

Martin Cohn

MC:ad
Enclosures

# EXHIBIT H

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE American Home Mortgage Claims Processing Center FDR Station, P.O. Box 5076 New York, NY 10150-5076 | | **PROOF OF CLAIM** |
|---|---|---|

| In Re: American Home Mortgage Holdings, Inc., et al. Debtors. | Chapter 11 Case No. 07-11047 (CSS) Jointly Administered | |
|---|---|---|
| Name of Debtor Against Which Claim is Held | Case No. of Debtor | |
| American Home Mortgage Corp. | 07-11051 | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

    AHM (MERGE2.DBF,SCHED_NO) SCH #: 40481*****
    HAGE II, SAM
    366 W UTLEY ROAD
    ELMHURST IL 60126

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Telephone number:  (773) 209-7776
Email Address:    sam.hage@wamu.net

Account or other number by which creditor identifies debtor:

Check here if this claim:
☐ replaces    ☐ amends a previously filed claim, dated:

1.  **Basis for Claim**
    ☐ Goods sold
    ☐ Services performed
    ☐ Money loaned
    ☐ Personal injury/wrongful death
    ☐ Taxes
    ☒ Other Employment Agreement attached (explain) : from _____ to _____
    par. (a) on page 9 of 11 and "severance" par. (a) page 11 of 11

    ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
    ☒ Wages, salaries, and compensation (fill out below)
    Last Four Digits of your SS#:  1  0  6  0
    Unpaid compensation for services performed from _____ to _____

2.  **Date debt was incurred:**
    first claim - 6-25-07
    second claim - 8-3-07

3.  If court judgment, date obtained:

4.  Total Amount of Claim at Time Case Filed: $146,536.14 + _____ + _____ = $146,536.14
    (unsecured nonpriority)    (secured)    (unsecured priority)    (Total)
    If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
    ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5.  **Secured Claim.**
    ☐ Check this box if your claim is secured by collateral (including a right of setoff).
    Brief Description of Collateral:
    ☐ Real Estate    ☐ Motor Vehicle
    ☐ Other _____
    Value of Collateral: $_____
    Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

6.  Unsecured Nonpriority Claim: $_____
    ☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

7.  **Unsecured Priority Claim.**
    ☐ Check this box if you have an unsecured priority claim
    Amount entitled to priority $_____
    Specify the priority of the claim:
    ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
    ☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
    ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
    ☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
    ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
    ☐ Other -- Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

8.  **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

9.  **Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
    **DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

10  Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

FILED / RECEIVED

JAN 15 2008

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date
12-31-2007

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
Sam M. Hage II

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

09/21/2006    12:55    FIRST HOME → 18667998101                                NO.769    001

## SALES MANAGER EMPLOYMENT AGREEMENT

THIS SALES MANAGER EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of ___Sept. 25___, 2006 ("Effective Date"), by and between AMERICAN HOME MORTGAGE CORP., a New York corporation having a place of business at 538 Broadhollow Road, Melville, NY 11747 (the "Company") and Sam Hage (the "Employee").

1.  **Employment.** The Employee agrees to enter into the employment of the Company as a Sales Manager as of the Effective Date, and the Company agrees to employ and compensate the Employee as a Sales Manager in accordance with the terms and conditions set forth in this Agreement. The Employee understands and agrees that during the term of the Employee's employment with the Company: (a) The Employee may assist only the Company in the performance of activities contemplated by this Agreement; and (b) The Employee may not engage, participate or become interested, either directly or indirectly, in any business in competition with the Company, in any capacity.

The Employee's employment with the Company is contingent upon the satisfactory completion of a background and credit investigation as determined solely in the discretion of the Company. It is understood that any investigation found unsatisfactory to the Company, may result in immediate termination of employment.

2.  **At Will.** The Employee understands and agrees that the Employee's employment with the Company shall be at all times "at will" employment. The Company reserves the right to terminate the Employee's employment with the Company at any time, with or without cause, and with or without notice. Likewise, the Employee may resign from the Company at any time for any reason. The term of this Agreement shall begin on the Effective Date and shall end on the date it is terminated by either the Company or the Employee.

3.  **Duties and Responsibilities.** The Employee understands and acknowledges that, in performing duties on behalf of the Company, the Employee shall work away from the offices of the Company on a regular basis. The Employee's duties and responsibilities shall include, but are not limited to, the following: collecting and analyzing customer financial information; determining which financial products of the Company best meet a customer's needs and financial circumstances; advising customers regarding the advantages and disadvantages of different financial products of the Company; marketing, servicing and promoting the Company's financial products; and such other duties that are assigned to the Employee by management.

4.  **Duty of Loyalty.**

The Employee agrees that, during the term of Employee's employment with the Company, Employee shall devote the Employee's full business time, attention, best efforts, skill and ability exclusively to the business of the Company. The Employee agrees to do the Employee's utmost to further the interests of the Company, and agrees not to take any action intended to harm the Company.

The Employee agrees that, during the term of the Employee's employment with the Company, the Employee shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm, corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company. The Employee expressly agrees that this section is fair and reasonable and that the Employee is being adequately compensated for agreeing to the terms of this section.

Initials _SH_

5.    **Commission.**   The Company will pay the Employee a commission on each loan produced by the Employee that was originated in accordance with the Company's policies.  Generally, a loan will be considered produced by the Employee if 1) the loan disbursed, 2) the loan was based on an application submitted for processing and funding by the Employee and 3) the loan was based on an application that was signed by the Employee.  Except as otherwise agreed in writing between the Company and the Employee, the Company is not obligated to pay commission on the same loan to more than one Employee, and disputes regarding entitlement to commission among Employees will be decided by the Company in its sole discretion.

During the term of this Agreement, the amount of commission the Company will pay the Employee will be determined in accordance with the Commission Plan attached hereto as Exhibit 1, which may be amended by the Company in its sole discretion.  No commission will be due the Employee for loans that fund more than 30 days after the termination of this Agreement.  Notwithstanding anything to the contrary herein, it is hereby understood and agreed that the Company shall not change, modify or amend the terms of the Accelerated Commission and Minimum Compensation sections of the Commission Plan attached hereto, during the first two (2) years of the Employee's employment with the Company.

The Employee acknowledges that the Employee's compensation will be reported to the Internal Revenue Service on a Form W-2, and the Company will withhold taxes from the Employee's pay as required by law.

The Employee acknowledges that the Employee is not entitled to extra pay for absences from work, including holidays and sick days, or for overtime, but will be entirely compensated pursuant to the commission provisions of this section.

6.    **Compliance with Company Policies.**   The Employee agrees to comply with, and be subject to, all Company policies and procedures, including amendments to such policies and procedures adopted by the Company in its sole discretion either prior to, on, or subsequent to the Effective Date of this Agreement.

7.    **Compliance with Manager and Officer Directives.**   The Employee agrees to comply fully with all lawful instructions, directives, and orders given by the Employee's Branch Manager or by an officer of the Company.

8.    **Compliance with Laws & Regulations.**   The Employee agrees to comply fully with all federal, state and local laws and regulations applicable to mortgage lending activities undertaken by the Company and the Employee. This obligation includes, but is not limited to, the Employee complying with any and all applicable individual licensing requirements imposed by the state(s) in which the Employee originates mortgage loans.

9.    **Prohibition against Inaccurate Applications and False Information.**   The Employee agrees not to knowingly submit loan applications to the Company, or to facilitate in any way, the making of loan applications that are inaccurate or misleading.  In addition, the Employee agrees not to knowingly create or assist in the creation or submission to the Company of any false information in connection with loan applicants or in connection with real property, including the ownership and value thereof. The Employee agrees to reimburse the Company for any damages it suffers as a result of the Employee's breach of this section.

10.    **Benefits.**   The Employee is eligible to participate in such benefit programs that the Company may from time to time maintain for employees of the Employee's level. The Company reserves the right to modify, substitute, or eliminate such benefits at any time and in its sole discretion. Benefits available to the Employee will be based on the Employee's tenure at the Company, position at the Company, state and county of

Page 2 of 11

Initials 

residence and other factors determined by the Company. The Employee acknowledges that certain of the Company's optional benefits require the Employee to pay for some or all of the cost of those benefits. The Employee agrees to pay such costs in accordance with the Company's policies.

11.    **Charge-backs; Right of Setoff; Employee's Agreement to Pay Amounts Owed to the Company.** The Employee acknowledges that certain of the Company's policies and procedures, as may from time to time be amended by the Company in its sole discretion, including but not limited to those relating to collection of fees, marketing and other expenses, administrative assistant support, interest rate lock-ins, employee benefits, buy-backs, and other charge-backs to the Employee, may result in the Employee becoming indebted to the Company. The Employee hereby grants the Company an unconditional right of setoff against commissions and all other amounts otherwise due the Employee, for such amounts owed by the Employee to the Company. Notwithstanding the foregoing, the Company reserves the right to demand, for immediate payment, all such sums due and owing to the Company from the Employee. Nothing in this section shall constitute a waiver or limitation of the Company's rights to collect sums due and owing from the Employee through any and all legal means available to the Company. Notwithstanding anything to the contrary herein, the Employee shall not become indebted to the Company for actions or conduct that existed prior to such policy change that becomes effective by the Company at a later date.

12.    **Confidential and Proprietary Information; Company Property.** For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, personal employee information and cost and pricing policies. Notwithstanding anything to the contrary, "Confidential Information" shall exclude the contact information of customers or business referral sources whose contact information the Employee: (i) compiled and maintained in a database prior to the Effective Date; and (ii) adds to, and is stored in, the records of the Company on or within 30 days of the Effective Date. All Confidential Information disclosed or provided to the Employee by the Company, or developed or created by the Employee during the term of the Employee's employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company. The Employee agrees not to disclose Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary for the Employee to perform the Employee's responsibilities as a Sales Manager of the Company. The Employee also agrees not to use Confidential Information for any purpose other than to fulfill the Employee's responsibilities as a Sales Manager of the Company.

The Employee acknowledges, understands, and agrees that Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if Employee breaches or threatens to breach any of the provisions of this Agreement relating to Employee's use or disclosure of any of Confidential Information.

The Employee further acknowledges that the Company may provide the Employee with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Employee agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time in the sole discretion of the Company. The Employee further agrees promptly to return in good working condition all Company Property in the Employee's possession upon termination of the

Page 3 of 11                                    Initials

09/21/2006    12:55    FIRST HOME → 18667998101                          NO.769    P04

Employee's employment with the Company for any reason, and shall be liable for damages, including but not limited to replacement cost, for any financial loss to the Company if Company Property is not returned in such manner.

The Employee agrees that this section shall survive the termination of this Agreement, and that all of the Employee's obligations set forth in this section shall remain in full force and effect after this Agreement is terminated. The Employee further agrees that, upon termination of this Agreement, the Employee will return to the Employee's branch manager, or if no branch manager is available, then to a Company officer, all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Employee's possession or custody.

13.    **Non-Solicitation; Non-Disparagement.**    The Employee agrees that during the term of the Employee's employment with the Company, and for a period of one (1) year after termination of the Employee's employment with the Company, whether such termination is voluntary or involuntary, with or without cause, the Employee shall not, directly or indirectly: (a) attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers and/or potential customers of the Company which have been derived from leads and/or lists developed and provided to the Employee by the Company; (b) influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company; (c) influence or advise any person who is an employee of the Company to leave the employment of the Company; and (d) employ any person who is an employee of the Company.

The Company and the Employee agree that neither will disparage the other, and that their representatives will not disparage either party hereto.

The Employee expressly agrees that this section is fair and reasonable and that Employee is being adequately compensated for agreeing to the terms of this section. The Employee's obligations as set forth in this section shall survive the termination of this Agreement.

14.    **Employee Authority.**    The Employee shall have no authority to bind the Company to the payment of any money or the doing of any action or thing, or incur any debt, obligation, liability, or expense for which the Company is or may become liable without first obtaining the written consent of an appropriate officer of the Company. In the absence of such prior written consent, any debt, obligation, liability or expense incurred by the Employee shall be the sole responsibility of Employee, and the Company shall have no liability for or obligation to Employee regarding such debt, obligation, liability or expense. The Company reserves the right to recover from the Employee all losses to the Company resulting from the Employee exceeding the Employee's authority as limited by this section, through any and all means available by law.

15.    **Power of Attorney.**    The Employee hereby irrevocably appoints the Company, or any of its authorized agents, as Employee's attorney-in-fact to act for the Employee and in the Employee's name (in any way the Employee could act in person) with respect to the following powers: (a) to open and review all any and all correspondence, envelopes or packages addressed to the Employee and delivered via the United States Mail or other means to the Company's offices, and to take for itself any currency, checks, drafts, money orders, or other forms of payment enclosed therein to which the Company is or may be entitled; or (b) to deposit any currency and endorse and negotiate any and all checks, drafts, money orders or other forms of payment made payable to the Employee which are the property of the Company.

16.    **Insurance.**    The Employee agrees that during the term of the Employee's employment with the Company, the Employee will maintain in effect on any and all motor vehicles used by the Employee in the

Page 4 of 11                                    Initials _____

conduct of the Company's business a minimum of $250,000.00 in combined single-limit bodily injury/property damage liability insurance. The Employee further agrees to defend, indemnify, and hold the Company harmless from and against any and all claims against the Company for injuries or damages caused, or alleged to have been caused, by the Employee while operating any motor vehicle in the course and scope of the Employee's employment with the Company.

17.    **Claims or Actions against the Company.**  If any civil or criminal complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance is filed, commenced, asserted, issued to or made against the Company on account of or as a result of any act or omission by the Employee in violation of (a) any of the Company's policies as amended, instructions, directives, or orders, or (b) any of the laws and regulations of any and all government entities with jurisdiction over mortgage lending activities engaged in by the Employee, the Employee agrees to defend, indemnify, and hold the Company harmless from and against any loss, liability, damages, fines, penalties, costs, or expenses (including reasonable attorneys' fees) incurred by the Company in connection with any such lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance, including any settlement thereof, regardless of whether (a) the Employee is named as a party in any such complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance; (b) the Employee is employed by the Company at the time the loss, liability, damages, cost, or expenses (including reasonable attorneys' fees) is incurred by the Company; or (c) the Company ultimately prevails in, or successfully defends against, the complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance. Notwithstanding anything to the contrary herein, this section shall apply only if the Employee is found by a court of competent jurisdiction (or other adjudicative body) to have committed such act or omission resulting in any loss, liability, damages, fines, penalties, costs or expenses (including reasonable attorneys' fees) incurred by the Company.  This section shall survive the termination of this Agreement, and all of the Employee's obligations pursuant to this section shall remain in full force and effect after this Agreement is terminated.

18.    **Acknowledgement.**  The Employee represents and warrants that the Employee is not subject to any agreement, order, judgment, or decree of any kind which would prevent the Employee from entering into this Agreement or performing fully the Employee's obligations hereunder. The Employee acknowledges that: (a) it is the Company's policy not to seek access to or make use of trade secrets or confidential business information belonging to other persons or organizations, including but not limited to, competitors or former employers; and (b) the Employee should not, under any circumstances, reveal to the Company or any of its affiliates or make use of trade secrets or confidential business information belonging to any other person or organization. The Employee represents and warrants that the Employee has not violated and shall not violate such instructions.

19.    **Waiver of Jury Trial.**  The Employee waives any right to a trial by jury in any action to enforce or defend any right under this Agreement or any amendment, instrument, document or agreement delivered or to be delivered in connection with this Agreement or arising from any relationship existing in connection with this Agreement, and agrees that any action shall be tried before a court and not before a jury.

20.    **Construction.**  The titles or headings of the sections of this Agreement are intended for convenience of reference only and are not intended to change, limit or otherwise affect the meaning or construction of the terms of this Agreement. The term "person" shall include an individual, corporation, partnership, association, or other legal entity. The term "Employer" or "the Company" shall include any affiliate, parent, subsidiary or sister company of the Company.

21.    **Governing Law.**  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

Initials _____

22.    **Entire Agreement**.  This Agreement, together with the Commissions Agreement attached hereto as Exhibit 1, as may be amended or modified from time to time in the Company's sole discretion, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements, discussions, negotiations, or understandings, whether oral or written, between the parties relating to the matters addressed herein.  Notwithstanding anything to the contrary herein, it is hereby understood and agreed that the Company shall not change, modify or amend the terms of the Accelerated Commission and Minimum Compensation sections of the Commission Plan attached hereto, during the first two (2) years of the Employee's employment with the Company.

23.    **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law.  If any provision of this Agreement, or any portion of any provision of this Agreement, is found to be unlawful or invalid or otherwise unenforceable, all valid and enforceable provisions of this Agreement shall remain in full force and effect.

24.    **Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto and their respective heirs, estates, legal representatives, executors, successors, and assigns.

25.    **Waiver**.  No waiver, or alleged waiver, by the Company of any term, condition or provision of this Agreement shall be effective for any purpose whatsoever unless such waiver is in writing and signed by a Regional Vice President, Executive Vice President, Division President or the President of the Company.  No express waiver by the Company of a breach of this Agreement by the Employee shall operate or be construed as a waiver of any subsequent breach of this Agreement by the Employee.

26.    **Notices**.  All notices required or permitted under this Agreement shall be sufficient if in writing and mailed through the United States Postal Service to the Employee at such residence address on file with the Company, and to the Company, at 538 Broadhollow Road, Melville, New York 11747, Attn: Senior Vice President, Director of Human Resources.

IN WITNESS WHEREOF, the parties have executed this AGREEMENT as of the Effective Date.

American Home Mortgage Corp.

By: _____

General Counsel

_____

The Employee

_____ 1260 _____

Social Security Number

Initials _____

## American Home Mortgage
## Commission Plan

Exhibit 1 to the Sales Manager Employment Agreement between American Home Mortgage Corp. (the "Company") and Sam Hage (the "Employee") dated as of 9/25, 2006. The Company reserves the right, in its sole discretion, to modify, amend, or terminate any of the terms and conditions of this Commission Plan at any time. All calculations required pursuant to this Commission Plan shall be made in the sole discretion of the Company in accordance with methodologies, policies, and procedures of the Company which may be in effect from time to time.

### Base Commission

The Company will pay the Employee commissions for each month of employment based on one of the two schedules below. The Company will pay the Employee based on the schedule that is more favorable to the Employee for the month being paid:

### Schedule 1

| Aggregate Principal Amount Of Loans Produced By The Employee During A Calendar Month | Percent Of The Cumulative Amount Of Loan Principal For The Month The Company Will Pay Employee |
|---|---|
| $1 - $499,999 | .35% (35 Basis Points) |
| $500,000 - $999,999 | .45% (45 Basis Points) |
| $1,000,000 - $1,499,999 | .50% (50 Basis Points) |
| $1,500,000 - $1,999,999 | .55% (55 Basis Points) |
| $2,000,000 + | .60% (60 Basis Points) |

### Schedule 2

| Number Of Loans Produced By The Employee During A Calendar Month | Percent Of The Cumulative Amount Of Loan Principal For The Month The Company Will Pay Employee |
|---|---|
| 1-3 | .35% (35 Basis Points) |
| 4-7 | .45% (45 Basis Points) |
| 8-11 | .50% (50 Basis Points) |
| 12-15 | .55% (55 Basis Points) |
| 16+ | .60% (60 Basis Points) |

Page 7 of 11

Initials _____

For purposes of Schedule 2, first lien loans, second lien loans, and HELOCS collateralized by the same property shall be credited to the Employee as one loan.

### a) FHA and VA Bonus

For FHA and VA loans produced, the Company will pay the Employee a base commission of 1.2% of the loan principle of the loans instead of the amount set forth in the schedules above.

### b) Home Equity Lines of Credit

The Company will pay the Employee $125.00 or .15% (15 basis points), whichever is greater, for each open-end Home Equity Line of Credit ("HELOC") produced by the Employee. The Company will pay the Employee $250.00 or .30% (30 basis points), whichever is greater, for each closed-end HELOC produced by the Employee.

### c) Early Repayments

If the Employee produces a refinance of a loan secured by a property on which the Company granted a first mortgage loan (the "Refinance Transaction"), the Employee will not receive commission on the Refinance Transaction if the refinance occurs within 180 days of the date of the loan that was on the property prior to the refinance. Notwithstanding anything to the contrary herein, the Employee shall be eligible to receive commissions on Refinance Transactions which are produced by the Employee, not to exceed eight (8) per calendar quarter. Thereafter, the Employee shall be subject to Company Policies and Procedures which may be in effect from time to time with regard to Refinance Transactions.

### d) Overages and Shortages

The company will pay the Employee 50% of the overages charged by the Employee to a borrower on a given loan, and will charge the Employee 50% of a shortage due to a reduction in cost to a borrower allowed by the Employee. All calculations of overages and shortages will be made by the Company using its usual practices as may be amended from time-to-time and the calculations of the Company will be final. All overages charged must be in accordance with the Company's policies and all applicable laws and regulations.

### Accelerated Commission

Notwithstanding the terms of this Base Commission section of the Commission Plan, the Employee shall be eligible to receive accelerated commission of .9% (90 basis points) of the aggregate internal closed loan production originated by the Employee during the first two (2) years of employment ("Accelerated Commission").

In the first two (2) years of employment, the Employee shall be eligible to receive an increased Accelerated Commission for each calendar month in which the Company employs two or more loan officers (hereafter referred to as a "Recruit"), whom the Company hired based on the Employee's personal recruitment efforts, as determined in the Company's discretion. If, in a calendar month, two Recruits are employed with the Company, the Employee shall be eligible to receive Accelerated Commission of .95% (95 basis points) of the aggregate internal closed loan production originated by the Employee. If, in a calendar month, three Recruits are employed with the Company, the Employee shall be eligible to receive Accelerated Commission of 1% (100 basis points) of the aggregate internal closed loan production originated by the Employee.

Initials _____

It is hereby understood and agreed that the Company shall not change, modify or amend the terms of this Accelerated Commission section during the first two (2) years of the Employee's employment with the Company.

## Override Bonus

The Employee shall be eligible to receive a monthly override bonus (the "Override Bonus") in an amount equal to .05% (5 basis points) of the aggregate principal amount of closed loan production originated by loan officers reporting directly to the Employee, as determined by the Company.    The Override Bonus for a given month will be paid when such bonuses are generally paid by the Company in the succeeding month.  The Override Bonus shall not apply to loans originated by the Employee for which the Employee is paid a commission, as set forth above, or loans that are brokered to other lenders.  To earn and receive the Override Bonus, the Employee must be employed on the scheduled payment date.

The Employee shall be eligible to receive an additional override bonus (the "Secondary Override Bonus") in an amount equal to .02% (2 basis points) of the aggregate principal amount of closed loan production originated by Recruits who do not report directly to the Employee.  The Secondary Override Bonus shall be paid to the Employee only with respect to the closed loan production originated by each Recruit within each Recruit's first twelve (12) months of employment.  The Secondary Override Bonus for a given month will be paid when such bonuses are generally paid by the Company in the succeeding month.  The Secondary Override Bonus shall not apply to loans that are brokered to other lenders.  To earn and receive the Secondary Override Bonus, the Employee must be employed on the scheduled payment date.

## Minimum Compensation

The Employee shall be eligible to receive minimum compensation of $30,000.00 per month for the first twenty-four (24) months of employment to be applied against the amounts otherwise due the Employee pursuant to the Base Commission section, Accelerated Commission section, and Override Bonus section above ("Minimum Compensation").  To earn and receive such Minimum Compensation, the Employee must be employed with the Company on the scheduled payment date.  If the Employee earns, pursuant to the Base Commission section, Accelerated Commission section, and Override Bonus section, more than the Minimum Compensation in a given month, the Company will pay the Employee the Minimum Compensation plus such excess. Notwithstanding anything to the contrary herein, the Company agrees to pay the Employee a pro-rata share of either: (i) the Minimum Compensation earned by the Employee as of the date of separation; or (ii) other amounts earned by the Employee that may be in excess of the Minimum Compensation earned by the Employee as of the date of separation.

It is hereby understood and agreed that the Company shall not change, modify or amend the terms of this Minimum Compensation section during the first two (2) years of the Employee's employment with the Company.

## Carry-over Contingent Compensation Bonus

(a)    Subject to the conditions set forth below, the Employee shall be eligible to receive a bonus in an amount equal to that which the Employee would have received if the Employee remained employed at the Employee's immediately prior employer (the "Carry-over Contingent Compensation Bonus"). The Employee shall be eligible to receive a Carry-over Contingent Compensation Bonus of $113,515.30, which shall be payable to the Employee as follows: (i) $56,757.65 shall be paid to the Employee on the first available pay date following the Employee's execution of the Sales Manager

Page 9 of 11                                    Initials

Employment Agreement and commencement of employment hereunder; and (ii) $56,757.65 shall be paid to the Employee on the first available pay date following the Employee's completion of ten (10) months of employment with the Company (the "Second Installment"). To be eligible to receive either installment of the Carry-over Contingent Compensation Bonus, the Employee must be employed on the payment date. SUBJECT TO SECTION (b) BELOW, THE EMPLOYEE AGREES THAT IF THE EMPLOYEE'S EMPLOYMENT WITH THE COMPANY TERMINATES FOR ANY REASON WITHIN TWELVE (12) MONTHS FROM THE COMMENCEMENT OF EMPLOYMENT HEREUNDER, THE EMPLOYEE WILL IMMEDIATELY REPAY TO THE COMPANY THE FULL AMOUNT OF THE CARRY-OVER CONTINGENT COMPENSATION BONUS RECEIVED BY THE EMPLOYEE; AND IF THE EMPLOYEE'S EMPLOYMENT WITH THE COMPANY TERMINATES FOR ANY REASON DURING MONTHS 13 THROUGH 24 OF EMPLOYMENT, THE EMPLOYEE WILL IMMEDIATELY REPAY TO THE COMPANY 50% OF THE AMOUNT OF THE CARRY-OVER CONTINGENT COMPENSATION BONUS RECEIVED BY THE EMPLOYEE (the "Carry-over Contingent Compensation Bonus Repayment Obligation").

(b)    Notwithstanding anything to the contrary in section (a) above, the Employee shall not be subject to the Carry-over Contingent Compensation Bonus Repayment Obligation if the Company terminates the Employee's employment without Cause. For purposes of the Agreement and this Commission Plan, the circumstances under which the Company may terminate the Employee's employment for "Cause" shall include: (i) a default or other breach by the Employee of the Employee's obligations hereunder; (ii) failure by the Employee to perform the Employee's duties hereunder; (iii) misconduct, dishonesty, insubordination, or other act by the Employee detrimental to the Company or its good will or damaging to its relationships with its customers, suppliers, or employees; and (iv) use of alcohol or illegal drugs in such a way as to interfere with the performance of the Employee's obligations hereunder; a conviction of or plea of guilty or no contest to a felony or any crime involving moral turpitude, dishonesty, or theft; and failure by the Employee to comply with applicable laws or governmental regulations with respect to Company operations or the performance of the Employee's duties.

(c)    Notwithstanding anything to the contrary in section (a) above, the Employee shall be eligible to receive the Second Installment of the Carry-over Contingent Compensation Bonus, if the Company terminates the Employee's employment without Cause prior to the scheduled bonus payment date.

### Pipeline Bonus

The Company agrees to pay the Employee a pipeline bonus (the "Pipeline Bonus") which represents amounts that the Employee would have received, but did not receive, from the Employee's immediately prior employer for loans currently within the Employee's pipeline. The Employee shall provide the Company with documentation adequately supporting the amounts that the Employee would have received. It is expressly understood and agreed that the adequacy of such documentation for purposes calculating the Pipeline Bonus shall be made in the Company's sole discretion, and the amount of the Pipeline Bonus, if any, shall be determined by the Company in its sole discretion. To be eligible to receive the Pipeline Bonus, the Employee must be employed on the bonus payment date. THE EMPLOYEE AGREES THAT IF THE EMPLOYEE'S EMPLOYMENT WITH THE COMPANY TERMINATES FOR ANY REASON WITHIN TWELVE (12) MONTHS FROM THE COMMENCEMENT OF EMPLOYMENT HEREUNDER, THE EMPLOYEE WILL IMMEDIATELY REPAY TO THE COMPANY THE FULL AMOUNT OF THE PIPELINE BONUS RECEIVED BY THE EMPLOYEE (the "Pipeline Bonus Repayment Obligation"). Notwithstanding anything

Initials 

to the contrary herein, the Employee shall not be subject to the Pipeline Bonus Repayment Obligation if the Company terminates the Employee's employment without Cause.

### Severance

(a)  The Employee shall be eligible to receive severance in an amount equal to $90,000.00 ("Severance") if: (i) within the first 12 months following the Effective Date, the Company terminates the Employee's employment without Cause, as defined above; and (ii) the Employee executes an Agreement and General Release, the form and content of which shall be determined in the Company's sole discretion.

(b)  The Employee shall be eligible to receive the Severance if: (i) in months thirteen through twenty-four of employment following the Effective Date, the Company terminates the Employee's employment without Cause, as defined above; (ii) the Employee personally originates a minimum of $15 million of aggregate internal closed loan production in months seven through twelve of employment  following the Effective Date; and (iii) the Employee executes an Agreement and General Release, the form and content of which shall be determined in the Company's sole discretion.

### Sales Assistant

The Employee shall be eligible to be assigned one sales assistant (the "Assistant") whose annualized rate of pay shall not exceed $36,000.00.  The Company shall pay the Assistant's monthly compensation for the Assistant's first twelve (12) months of employment.  Beginning with the Assistant's thirteenth month of employment, the Employee must personally originate a minimum of $6 million of aggregate internal closed loan production during each calendar quarter in order for the Company to continue to pay the Assistant's Compensation.

### Sales Achiever and President Club

The Employee shall be eligible to attend both the Sales Achiever and President Club meetings provided the Employee is employed with the Company on such dates.

_____        9-25-06
Employee                                Date

Agreed and Accepted:

American Home Mortgage Corp.

By: _____

Title: EVP+ Secretary

Initials _____