IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :   Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE                                           :   Case No. 07-11047 (CSS)
HOLDINGS, INC.,                                                  :
a Delaware corporation, et al.,                                  :   Jointly Administered
                                                                 :
                                                                 :   Objection Deadline: June 4, 2008 at 4:00 p.m. (ET)
              Debtors.                                           :   Hearing Date: June 11, 2008 at 10:00 a.m. (ET)
                                                                 :
---------------------------------------------------------------- x

### DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS AND FINANCIAL GUARANTY INSURANCE CO. RESOLVING ADVERSARY PROCEEDING (07-51725)

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"), by this motion (the "Motion"), seek entry of an order pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving the settlement agreement between the Debtors and Financial Guaranty Insurance Company ("FGIC" and together with the Debtors, the "Parties") resolving adversary proceeding (07-51725) (the "Settlement Agreement"), a copy of which is attached as Exhibit 1 to the proposed form of Order also attached hereto. In support of the Motion, the Debtors respectfully represent as follows:

### STATUS OF THE CASE AND JURISDICTION

1. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered pursuant to Rule 1005(b) of the Federal Rules of

Bankruptcy Procedure. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## GENERAL BACKGROUND

### A.     The Debtors' Business

4. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination

offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

6. A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes an important asset of the Debtors' estates.

## B. Events Leading to the Chapter 11 Filing

7. Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9. In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the

Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening AHM's continued viability.

10. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

12. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and "scratch and dent" loans, to financial and strategic investors.

13. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity

crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

14. Prior to filing bankruptcy, AHM Servicing ("AHMS") and AHM Acceptance ("AHMA" and, collectively with AHMS, the "Debtor-Defendants") were the contract servicers of certain home equity line of credit mortgage loans (the "HELOC Mortgage Loans") under the following HELOC Servicing Agreements:

> (i) HELOC Servicing Agreement dated as of March 23, 2005 among AHMS, GMAC Mortgage, LLC as successor by merger to GMAC Mortgage Corporation ("GMAC"), as back-up servicer, American Home Mortgage Investment Trust 2005-1 (the "2005-1 Trust"), as issuer, Deutsche Bank National Trust Company as the Indenture Trustee and AHMA, as seller;

> (ii) HELOC Servicing Agreement dated as of June 22, 2005 among AHMS, as servicer, GMAC, as back-up servicer, American Home Mortgage Investment Trust 2005-2 (the "2005-2 Trust"), as issuer, Deutsche Bank National Trust Company, as the Indenture Trustee and AHMA, as seller; and

> (iii) HELOC Servicing Agreement dated as of October 7, 2005 among AHMA, as servicer, GMAC as back-up servicer, American Home Mortgage Investment Trust 2005-4A (the "2005 4A Trust" and, together with the 2005-1 Trust and 2005-2 Trust, the "Trusts), as issuer, U.S. Bank National Association, as the Indenture Trustee and AHMA, as seller,

(collectively, the "HELOC Servicing Agreements"). AHMS and AHMA also entered into a HELOC Subservicing Agreement dated as of October 7, 2005 among the 2005-A4 Trust, AHMS, AHMA and U.S. Bank National Association, as Indenture Trustee (the "HELOC Subservicing Agreement") relating to the HELOC Servicing Agreement described in clause (iii) above.

15. The HELOC Servicing Agreements were entered into by the parties thereto in connection with the following three securitization transactions: American Home

Mortgage Investment Trust 2005-1, American Home Mortgage Investment Trust 2005-2 and American Home Mortgage Investment Trust 2005-4A (collectively, the "FGIC Securitizations").

16. The Trusts established in the FGIC Securitizations acquired and own the HELOC Mortgage Loans and issued securities that are "backed" by, or that rely on, the HELOC Mortgage Loans and related collections owned by the Trusts as the source of payment. In each of the FGIC Securitizations, in connection with an Insurance and Indemnity Agreement, FGIC has insured certain of the securities issued by the Trusts.

17. On October 10, 2007, FGIC filed its Complaint and Request for Declaratory and Damages (the "Complaint") [D.I. 1], thereby initiating an adversary proceeding, Adv. Proc. Case No. 07-51725 (the "Adversary Proceeding"). Pursuant to the Complaint, FGIC (I) requested declaratory judgment that (A) the Defendants' Servicing Rights under the HELOC Servicing Agreements were properly terminated on August 2, 2007, (B) the Defendants' were obligated to transition servicing to GMAC, and (C) a Rapid Amortization Event under the Indentures has occurred; (II) moved for relief from the automatic stay; (III) alleged that the Debtors breached HELOC Servicing Agreements by failing to transfer Servicing Data and Collections on the HELOC Mortgage Loans; (IV) alleged conversion; and (V) requested the imposition of a constructive trust.

18. On December 14, 2007, the Debtor-Defendants filed their Answer to the Complaint (the "Answer") [D.I. 10] opposing the relief sought in the Complaint.

19. On November 29, 2007, FGIC filed the *Motion of Financial Guaranty Insurance Company for Relief From the Automatic Stay* (the "Stay Relief Motion") [D.I. 2224]. In the Stay Relief Motion, FGIC sought an order modifying the automatic stay to allow FGIC and the non-debtor parties to the HELOC Servicing Agreements and HELOC Subservicing

Agreement to take any and all actions necessary to terminate and transfer AHM Servicing's and AHM Acceptance's rights as servicer and subservicer under the HELOC Servicing Agreements. The Debtors consented to termination of the automatic stay on the terms and conditions as set forth in the *Order Granting, in Part, Motion of Financial Guaranty Insurance Company for Relief From the Automatic Stay to Permit Transfer of the Rights and Responsibilities of Debtor as Servicer Under the HELOC Servicing Agreements For Series 2005-1, 2005-2 and 2005-4A* (the "Order") entered by the Court on December 21, 2007 [D.I. 2484]. The Debtors have complied with the Order and servicing of the HELOC Mortgage Loans was transferred to GMAC on January 11, 2008.

20.  As a result of extensive negotiations, the Parties have reached an agreement the terms of which are embodied in the executed Settlement Agreement attached hereto.

## SETTLEMENT AGREEMENT[1]

21.  Pursuant to the Settlement Agreement, the Debtors have agreed not to challenge an assertion by FGIC that a Rapid Amortization Event occurred after January 11, 2008.

22.  The Debtors reserve their right to challenge any assertions by FGIC or any other party as to whether a Rapid Amortization Event occurred prior to January 11, 2008.

23.  Subject to the Settlement Agreement, FGIC has agreed to dismiss the Adversary Proceeding without prejudice.

---

[1] The terms of the Settlement Agreement set forth herein are a summary only. To the extent of any inconsistency between the summary herein and the Settlement Agreement, the terms of the Settlement Agreement shall govern.

**RELIEF REQUESTED AND BASIS THEREFOR**

24.  By this Motion, the Debtors are seeking approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019. The Debtors and FGIC have weighed the costs and risks associated with the continued litigation of the Adversary Proceeding against the compromises contained within the Settlement Agreement and have concluded that it is in their respective best interest to compromise and settle the matter pursuant to the terms of the Settlement Agreement without further litigation.

**STANDARDS FOR SETTLEMENTS**

25.  Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir. 1979). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. V. Anderson, 390 U.S. 414 (1986).

26.  Approval of a proposed settlement is within the "sound discretion" of the Bankruptcy Court. In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate." See In the Matter of Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989). In determining whether to approve an motion to settle a controversy, a Bankruptcy Court must determine whether it is fair, reasonable and adequate by examining four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the

complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Official Comm. of Unsec. Cred. Of Penn. Truck Lines, Inc., v. Penn Truck Lines, Inc. (In re Penn Truck Lines, Inc.), 150 B.R. 595, 598 (Bankr. E.D. Pa. 1992). The Court should not substitute its judgment for that of a trustee. Neshaminy Office Building Associates, 62 B.R. at 803. The Court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

27.     In examining those factors, the court should not substitute its judgment for that of a debtor. Neshaminy Office Building Associates, 62 B.R. at 803. The Court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983). It is important that the Bankruptcy Court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probability of ultimate success should the claims be litigated, and estimate[] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." In re Penn Cent., 596 F.2d at 1146.

28.     As an ancillary matter, "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

29.     The factors set forth above are satisfied in the instant case for the following reasons. First, although the Debtors believe that they would ultimately prevail in the Adversary Proceeding, the Debtors acknowledge that litigation with FGIC has inherent risks, much like all litigation. That being said, the Debtors anticipate that litigating the claims advanced in the Complaint will be time consuming and expensive because of complicated legal and factual disputes. Litigating these issues would require numerous depositions and document requests of several third parties, in addition to the costs of discovery vis-à-vis the parties themselves. Moreover, litigating the Adversary Proceeding to conclusion would take months to complete. Finally, approval of the Settlement Agreement will allow the Debtors to focus on prosecuting these bankruptcy cases without burdening the Debtors' estates with additional, unnecessary administrative expenses.

30.     In light of the above, the Debtors believe the Settlement Agreement is fair, equitable, and in the best interests of the their creditors and their estates, represents an exercise of their sound business judgment, and should be approved pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## NOTICE

31.     Notice of this Motion will be provided via overnight delivery, fax or email to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii)

counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; (v) counsel to the FGIC, and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## **NO PREVIOUS REQUEST**

32. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 (i) approving the Settlement Agreement, and (ii) granting such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
May 20, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Travis Turner (No. 4926)
James L. Patton, Jr. (No. 2202)
John T. Dorsey (No. 2988)
Sharon M. Zieg (No. 4196)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession