# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re:                                                       : Chapter 11
                                                             :
AMERICAN HOME MORTGAGE                                       : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]           :
                                                             : Jointly Administered
              Debtors.                                       :
                                                             : Hearing Date: 06/11/08 at 10:00 a.m.
                                                             : Objection Deadline: 06/04/08 at 4:00 p.m.
                                                             : Related Document No. 1711
                                                             :
------------------------------------------------------------ x

## MOTION OF AMERICAN HOME MORTGAGE SERVICING, INC., FORMERLY KNOWN AS AH MORTGAGE ACQUISITION CO., INC., FOR AN ORDER GRANTING THE ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM FOR BREACHES BY CERTAIN DEBTORS OF THE ASSET PURCHASE AGREEMENT FOR THE SALE OF THE DEBTORS' MORTGAGE SERVICING BUSINESS

American Home Mortgage Servicing, Inc., a Delaware corporation formerly known as AH Mortgage Acquisition Co., Inc. (the "Purchaser"), through its undersigned counsel, hereby moves the Court for the entry of an order granting the allowance and payment of an administrative expense claim for breaches by Debtors American Home Mortgage Investment Corp., American Home Mortgage Corp. and AHM SV, Inc., a Maryland corporation formerly known as American Home Mortgage Servicing, Inc. (collectively, the "Sellers") under the Asset

---

[1] The above-captioned debtors and debtors in possession in these cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc., a Maryland corporation, formerly known as American Home Mortgage Servicing, Inc. (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

Purchase Agreement dated as of September 25, 2007 (as subsequently amended, the "APA") as approved by this Court's *Order Pursuant to Sections 105, 363, 364, 365, and 503(B) of the Bankruptcy Code, and Rules 2002, 4001, 6004, 6006, 7062, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Approving (i) the Sale of the Debtors' Mortgage Servicing Business Free and Clear of Liens, Claims and Interests, (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (B) Granting Certain Related Relief* [Docket No. 1711] (the "Servicing Sale Order"). In support of this Motion, the Purchaser submits (i) the Declaration of Joel Gendron (the "Gendron Decl."), which is attached hereto as Exhibit A and incorporated herein by reference; and (ii) the Declaration of David Friedman (the "Friedman Decl."), which is attached hereto as Exhibit B and incorporated herein by reference; and respectfully represents as follows:

### JURISDICTION AND STATUS OF THE CASE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. On August 6, 2007, each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4. On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors. No trustee or examiner has been appointed.

## PRELIMINARY STATEMENT

5.  Since the initial closing under the APA on November 16, 2007, the Sellers have materially breached the APA in several respects. These breaches, which have all either occurred recently or were recently discovered, include, among other things, refusals to pay certain costs the Sellers are obligated to pay under the APA as well as inappropriate uses of cash from the separate accounts set up for the benefit of Purchaser under the APA. In particular, the Sellers have refused to pay certain deficiencies in the lender paid mortgage insurance and prepayment penalty accounts as required under the APA as well as the cost of delivery of the applicable mortgage loan files to Irving, Texas as expressly required by the APA.

6.  Furthermore, the Purchaser recently discovered that prior to the commencement of these bankruptcy cases, AHM SV, Inc. ("SVI"), which was formerly known as American Home Mortgage Servicing, Inc.,[2] remitted to its parent, American Home Mortgage Investment Corp. ("Parent"), certain funds collected in connection with the servicing of mortgage loans that were required to be held in custodial accounts for the benefit of, or were otherwise required to be remitted to, the applicable holder of certain loans, including securitization investment trusts, under the applicable servicing agreements. These custodial accounts were required to be replenished under the applicable servicing agreements well prior to the initial closing under the APA. Nonetheless, when SVI discovered these problems after the initial closing, SVI utilized cash from the separate accounts set up for the benefit of the Purchaser to make payments to the applicable trust or holder of the loan to rectify the breaches. This use of cash from the Purchaser's accounts clearly breached the APA, which not only prohibits the

---

[2] Following the final closing on the APA, Debtor American Home Mortgage Servicing Inc. changed its name to AHM SV, Inc.

Sellers from using cash in those accounts other than for operation of the servicing business in the ordinary course, but also requires that the Sellers, not the Purchaser, pay to cure pre-initial closing defaults under the mortgage loan servicing agreements assumed and assigned to the Purchaser.

7. As described in detail below, as a result of all of these various breaches the Purchaser has incurred damages, and is entitled to an allowed administrative priority claim, aggregating over $12 million.

## BACKGROUND

### The Debtors' Mortgage Servicing Business

8. Prior to the filing of these bankruptcy cases, the Debtors' businesses primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. The Debtors also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors.

9. A large component of the Debtors' businesses was the servicing of loans (the "Servicing Business"), which the Debtors conducted primarily through SVI. The Servicing Business entails, among other things, collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over collection and default mitigation processes. Many of the loans the Debtors originated were to be serviced by the Servicing Business, thus assuring that the Servicing Business would obtain additional servicing rights as existing mortgage loans were repaid in whole or in part.

10. As well documented in these cases, unprecedented disruptions in the credit markets in 2006 and 2007 undermined the value of the Debtors' loan portfolio, thereby causing significant write-downs in the Debtors' loan and security portfolios. This decrease in the

Debtors' loan portfolio resulted in margin calls for hundreds of millions of dollars, which in turn resulted in defaults under the Debtors' various credit facilities thus severing the Debtors' access to credit and impairing their ability to originate loans. The Debtors' deteriorating financial condition also served as grounds for counterparties to the Debtors' master servicing agreements to seek termination of those agreements.

**The Debtors' Emergency Sale Motion**

11. Although the Debtors' Servicing Business remained viable, without the ability to originate new loans that the Debtors would service, and given the threat of termination of master service agreements, the Debtors faced the prospect of a total loss of value of their Servicing Business. Accordingly, to preserve the value of their assets, the Debtors initiated these proceedings and immediately began to market the Servicing Business by filing their *Emergency Motion of the Debtors for Orders: (A)(i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of Certain Assets Used In the Debtors' Loan Servicing Business; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief; and (B)(i) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related Relief* [Docket No. 11] (the "Initial Servicing Sale Motion"). By Order dated August 9, 2007 [Docket No. 113], the Court granted the Initial Servicing Sale Motion.

12. Thereafter, the Debtors concluded, in the exercise of their business judgment, that having a stalking horse bidder for the sale would be in the best interests of their estates, and commenced good faith arm's length negotiations with the Purchaser with respect to a transaction whereby the Purchaser would agree to purchase the Servicing Business and become the stalking horse for the sale process. Accordingly, on September 21, 2007, the Debtors filed

their *Motion of the Debtors for Order Pursuant to Sections 105(a), 363, 364, 365, and 503(b) of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006, 7062, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Approving Revised Procedures for the Sale of the Debtors' Mortgage Servicing Business; (B) Approving Certain Protections for the Stalking Horse Bidder in Such Sale; (c) Directing that Certain Notices of Such Sale and Deadline be Given; and (D) Authorizing, on an Interim Basis, the Debtors to Grant Certain Liens and Other Protections for the Purchaser's Collateral Effective After the Initial Closing* [Docket No. 865]. The Court approved the revised motion by order dated September 25, 2007, [Docket No. 937].

13. No other qualified bids were received for the Servicing Business, and on October 15, 2007, the Court conducted a sale hearing. Thereafter, on October 30, 2007, the Court entered the Servicing Sale Order authorizing the sale of the Servicing Business to the Purchaser.

**The Need for Regulatory Approval and the Two-Step Closing Process**

14. Because the Purchaser was not yet licensed to service mortgage loans in the various jurisdictions necessary to operate the Servicing Business, the APA and the Servicing Sale Order provide for a two-step closing process designed so that the sale could close from an "economic" perspective while the Purchaser obtained the necessary regulatory approvals and licensing. At the "economic" close, which occurred on November 16, 2007 (the "Initial Closing"), the Purchaser paid the Purchase Price in the manner and to the parties in interest as contemplated by the APA, but the Sellers, with SVI as the licensed servicing entity, retained ownership of the Servicing Business. (Id.) From the Initial Closing until the date upon which the ownership of the Servicing Business was transferred to Purchaser (the "Final Closing"), the Sellers were required to operate the Servicing Business in the ordinary course of business for the economic benefit (and risk) of the Purchaser, but the Purchaser was required to provide such

liquidity and working capital as necessary to enable the Sellers to operate the business from the Initial Closing to the Final Closing. The Final Closing occurred on April 11, 2008.

## RELIEF REQUESTED

15.     Pursuant to sections 503(a) and (b) of the Bankruptcy Code, the Purchaser respectfully requests entry of an order (a) granting the Purchaser an allowed claim against the Sellers' estates, entitled to administrative expense priority, for certain damages arising from the Sellers' breaches of the APA, (b) directing the Sellers to pay that administrative claim as soon as reasonably practicable; and (c) granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

16.     Section 503(a) of the Bankruptcy Code provides that "[a]n entity may timely file a request for payment of an administrative expense," and section 503(b) provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate . . ." 11 U.S.C. §§ 503(a) and (b). It is well-established that obligations under agreements entered into postpetition are actual and necessary costs of preserving the estate and that a claim for damages arising from a debtor's postpetition breach of a postpetition contract is entitled to administrative expense priority. In re Mushroom Transp. Co., Inc., 78 B.R. 754, 761 (Bankr. E.D. Pa. 1987) ("[t]hus, Mushroom's failure to cure would represent, simply, the postpetition breach of a postpetition agreement. This, in turn, would give rise to an administrative claim"); GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.), 761 F.2d 1503, 1509 (11th Cir. 1985) ("[t]he policy behind treating claims arising from post-petition breaches as administrative expenses is clear. The debtor in possession or trustee by assuming or entering into the contract makes a determination that the contract is in the best interest of the estate and its creditors."); In re Chugiak Boat Works, Inc., 18 B.R. 292,

298 (Bankr. D. Alaska 1982) (holding that damages arising from a contract entered into by the debtor after the filing of Chapter 11 petition but prior to conversion to Chapter 7 liquidation are permissible administrative expenses). Additionally, the APA, which was approved by the Court after notice and a hearing pursuant to the Servicing Sale Order, specifically provides that "[a]ny claims arising from breaches by any Sellers of their obligations pursuant to the terms of this Agreement shall constitute allowed administrative expense claims against the Sellers under Sections 503(b)(1) and 507(a)(1), as applicable, of the Bankruptcy Code." (APA at § 11.3(c)). Accordingly, any claim the Purchaser has against the Sellers for any breach of the APA is entitled to administrative expense priority.

## ARGUMENT

17. The Purchaser has a claim against the Sellers in an aggregate amount of approximately $12 million for six separate breaches of various provisions of the APA. As expressly provided for in the APA and under applicable law as noted above, the Purchaser's claim is entitled to administrative expense priority. The particular components of the Purchaser's claim are outlined below.

### Sellers' Refusal to Pay Certain Costs They Are Obligated to Pay Under the APA

18. To date, the Sellers have refused to pay over $1.2 million in costs that, pursuant to the terms of the APA, are obligations of the Sellers.

#### *Lender Paid Mortgage Insurance and Prepayment Penalties*

19. The Purchaser is owed approximately $1.14 million for deficiencies in the lender paid mortgage insurance ("LPMI") and prepayment penalties accounts.

20. Within the mortgage loan servicing business, lenders sometimes purchase LPMI on certain loans. (Gendron Decl. at ¶ 6). For loans on which a lender has procured LPMI, the mortgage loan servicing company normally pays the LPMI premiums to the insurance

company and deducts those payments from principal and interest payments that the servicer receives from the borrower and remits to the owner of the loan. (Id.)

21.     Some mortgage loans provide that the borrower must pay a prepayment penalty if the loan is repaid prior to the end of its term. (Id. at ¶ 7). The mortgage servicing company normally collects the prepayment penalty, which it subsequently forwards to the owner of the loans. (Id.)

22.     Amounts received by the mortgage servicing company for the payment of LPMI premiums and payment of prepayment penalties to the owner of the loan normally are deposited in one or more accounts used to remit LPMI premiums or prepayment penalties. (Gendron Decl. at ¶ 8). In accordance with industry practice, SVI established such accounts for use in paying LPMI premiums and remitting prepayment penalties on loans it was servicing. (Id.) The Purchaser acquired these accounts. (Id.)

23.     On or about November 16, 2007, the date of the Initial Closing, the Sellers notified the Purchaser that there was a deficiency in the accounts established to pay LPMI premiums and to remit prepayment penalties. (Gendron Decl. at ¶ 9). Accordingly, as part of the Third Amendment to the Asset Purchase Agreement dated as of November 16, 2007 (the "Third Amendment"), the purchase price was reduced by $6,061,810 and the parties agreed to work together in good faith to determine whether the $6,061,810 was sufficient to cure the deficiency in the LPMI and Prepayment Penalties accounts. (Id.; Third Amendment at § 4).

24.     Based upon LPMI premiums paid and prepayment penalties remitted to the owners of certain loans, the Purchaser has determined that the LPMI accounts were deficient in the approximate amount of $2.5 million and the prepayment accounts were deficient in the approximate amount of $4.7 million. (Id. at ¶ 10). After reducing the aggregate amount of these

deficiencies ($7.2 million) by the aforesaid purchase price reduction ($6,061,810), there remains a deficiency of approximately $1.14 million. (Id.) The Purchaser has not been reimbursed by any third parties for this deficiency, and it is unlikely that it will ever obtain such reimbursements. (Id.) The Sellers have refused to pay the Purchaser $1.14 million to satisfy this deficiency. (Id.)

### *Document Delivery Costs*

25. The costs of shipping the servicing files and other books and records relating to the servicing business (the "Servicing Documents") from the Sellers' warehouse in New York to the Purchaser's office in Irving, Texas will cost $65,000. (Friedman Decl. at ¶ 9). Pursuant to the terms of the APA, the Sellers are responsible for that cost.

26. Specifically, Section 2.1 of the APA provides that "Sellers shall sell, convey, transfer, assign and *deliver* to Purchaser . . . all of the right, title and interest of all Sellers and their Affiliates as of the Final Closing Date in and to all assets and properties related to the Business, whether tangible or intangible, real, personal or mixed . . . and including . . . all of Sellers' Servicing Rights and rights to receive Servicing Fees . . . ." (APA at § 2.1) (emphasis added). Servicing Rights are defined in the APA to include, among other things, "the right of ownership, possession, control or use of any and all Servicing Files and Mortgage Loan Documents pertaining to the servicing of the Mortgage Loans as provided in the Servicing Agreements." (APA at § 1.1). And Servicing Files are defined in the APA as "copies of the Mortgage Loan Documents and all other documents, files and other items related thereto required to be maintained by the servicer pursuant to the applicable Servicing Agreement." (Id.) Those are precisely the files that are awaiting shipment to the Purchaser's offices.

27. Additionally, Section 6.10(a) of the APA provides that "Sellers shall, in accordance with Purchaser's reasonable instructions, take all steps, and execute and *deliver* all

such agreements, letters or other documents as are reasonably requested by Purchaser to effect the transfer of the Servicing Agreements . . . such that, after the Final Closing Date, Purchaser or its designee *has* all of the Servicing Rights, the Servicing Files and any and all assets and rights necessary to perform its obligations under such Servicing Agreements." (APA at § 6.10) (emphasis added).

28. Despite this unequivocal contractual language and repeated requests, the Sellers have refused to pay the costs of delivery, agreeing only to have the files pulled from the Sellers' warehouse in New York at Sellers' cost and expense for either pick up by the Purchaser at the warehouse or delivery to the Purchaser at Purchaser's expense. Although the parties effectuated the Final Closing notwithstanding the Sellers' position they were not required to deliver the Servicing Documents, the parties entered into a side letter at the time of the Final Closing pursuant to which the Sellers agreed that the Purchaser's rights and claims under the APA relating to the location where the files were to be delivered would be preserved. A copy of that side letter is attached hereto as Exhibit C and incorporated herein by reference.

29. In refusing to honor this obligation, the Sellers rely on the "As Is Where Is" clause of the APA, which provides, in pertinent part, that "*except as expressly set forth in the Agreement*, Purchaser will accept the Purchased Assets on the Final Closing Date "AS IS" and "WHERE IS." (APA at § 2.11) (emphasis added). The Sellers have argued that the files were therefore purchased "Where Is" and the costs of delivery to the Purchaser's office in Irving, Texas should be borne by the Purchaser.

30. The Sellers' argument, however, ignores the fact that the "As Is Where Is" clause, by its own terms, does not supersede the express provisions of the APA. As cited above, the parties expressly agreed in sections 2.1 and 6.10 of the APA that the Sellers would be

responsible for delivery of the Servicing Files. Moreover, the cost of this delivery should be a cost and expense of the Sellers since Section 11.3 of the APA states that "[e]xcept as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the consummation of the Transaction shall be paid by the party incurring such expenses." Accordingly, the Purchaser is entitled to an administrative claim for $65,000 for the costs of delivering the Servicing Agreements to the Purchaser's offices in Irving, Texas.

**Amounts Wrongfully Paid Out of Purchaser's Accounts**

31. Prior to commencement of these cases, SVI transferred to Parent funds that were required to be held for the benefit of, and remitted to, the applicable holder of certain loans, including securitization investment trusts. (Gendron Decl. at ¶ 4). There were three categories of transactions in which monies that should have been held in custodial accounts or otherwise remitted to the holders of the loans were instead transferred to Parent. (Id.)

    a. From time to time, prior to the commencement of these bankruptcy cases, Parent loaned funds to SVI for advances that SVI would make in connection with servicing loans. (Id.) As SVI collected funds relating to those loans, including in respect of mortgage insurance claims, delinquent principal and interest payments or as a result of loan foreclosures or liquidating REO Properties, SVI was required to deposit those collections in custodial accounts for the benefit of the applicable securitization trust or loan owner. (Id.) Under the servicing agreements, however, SVI was entitled to reimburse itself for those advances from the custodial accounts. (Id.) Since SVI had borrowed from Parent for advances, to repay Parent SVI would periodically wire funds to Parent from the custodial accounts in amounts that Servicing was permitted to withdraw for reimbursement of advances. (Id.)

       On July 3, 2007, SVI wired $5,082,009 to Parent from one or more custodial accounts to repay loans for advances. (Id.) This transfer, however, represented an overpayment of $1,496,586. (Id.) Under the applicable servicing agreement or agreements, SVI is only permitted to withdraw amounts from custodial accounts as necessary for reimbursement of advances and not amounts in excess of such amounts and is further obligated to promptly replenish any shortfall. (Id.)

  b. Prior to the commencement of these proceedings, SVI remitted substantial amounts of money to Parent, currently estimated to be about $3 million, which consisted of collections on loans SVI mistakenly believed Parent owned, but which had been sold to third parties. (Id.) These collections should have been remitted to the third party owners of the loans rather than Parent. (Id.)

  c. Prior to commencement of these proceedings, SVI received approximately $5.6 million in payments in connection with (a) loans that it was servicing under servicing agreements eventually acquired by the Purchaser that were in foreclosure or (b) the sale of REO Property performed pursuant to those servicing agreements. (Id.) These amounts included payments from mortgage insurance, partial payments from borrowers and full liquidation proceeds and were supposed to have been held in custodial accounts to be eventually remitted to the owners of the underlying loans pursuant to the terms of their respective servicing agreements. (Id.) However, rather than holding these funds in the appropriate custodial accounts, SVI remitted the $5.6 million to Parent. (Id.)

  32. After the Initial Closing, SVI discovered that it had incorrectly remitted to Parent the funds described above, which should have been maintained in custodial accounts or otherwise remitted to the holders of the loans. (Id.) Rather than using the Debtors' funds to satisfy the foregoing deficiencies, however, the Sellers used funds held in separate accounts established for the benefit of the Purchaser. (Id.)

  33. This use of cash from the Purchaser's accounts unquestionably breached the APA in two respects. First, Section 6.14(d) of the APA prohibits the use of cash in those accounts other than for operation of the Business in the Ordinary Course, as defined in the APA:

> Sellers will deposit all cash and cash equivalents received in connection with the Business and the Purchased Assets during the period from the Initial Closing until the later of the Final Closing and payment of the Reconciliation Payment in cash accounts that are separate from any other accounts maintained or used by Sellers or any of their Affiliates. The cash in such accounts will be used only for the operation of the Business in the Ordinary Course or as required by the agreements for the Financing.

(APA at § 6.14(d)). Making payments out of operating cash to the holder or owner of mortgage loans to cure deficiencies in custodial accounts due to the misdirection of remittances is not

within the ordinary course of business. (Gendron Decl. at ¶ 5). Nor is it in the ordinary course of business, with respect to collections on loans sold by Parent, for SVI to satisfy Parent's obligations to those third parties, particularly when the funds that Parent was obligated to remit to those third parties had already been remitted to Parent.

34. Moreover, the APA also expressly provides that it is the Sellers' obligation, not the Purchaser's, to cure pre-Initial Closing defaults under the mortgage servicing agreements being assumed and assigned to Purchaser. Specifically, Section 2.6 of the APA provides that "Sellers shall retain and be liable and responsible for all Retained Liabilities." (APA at § 2.6). Retained Liabilities is defined to include, among other things, the Initial Cure Amount and Interim Cure Amount, which, in turn, are defined to mean the amount payable to cure all defaults under Assumed Contracts as of the date that the Servicing Sale Order was entered and the amount payable to cure all defaults under Assumed Contracts as of the Initial Closing Date, respectively. (APA at § 1.1).

35. As a result of these breaches of the APA, the Purchaser has incurred aggregate damages of over $10 million.

**The Signature Bank Agreement**

36. On the Initial Closing date, the Purchaser paid the purchase price for the assets to be transferred to it at the Final Closing. (Friedman Decl. at ¶ 3). The purchase price was based, in part, on the outstanding unpaid principal balance of loans serviced pursuant to various mortgage servicing agreements listed on Schedule 1.1(j) of the APA. (Id.) One of those mortgage servicing agreements was an agreement dated as of March 4, 2004 between Signature Bank and the Debtors' predecessor, Columbia National Incorporated (the "Signature Agreement"). (Id.)

37.     The Signature Agreement empowered Signature Bank (a) to terminate the servicing company without cause at any time prior to expiration of the initial term of the Signature Agreement; and (b) to sell the servicing rights at any time pursuant to Section 2.5(d) of the Signature Agreement. (Friedman Decl. at ¶ 4). An agreement with these characteristics that could evaporate at the whim of the counterparty could not have been intended by the parties to have justified a $757,426 purchase price and, accordingly could not have been intended to have been included on Schedule 1.1(j). Moreover, the Signature Agreement did not transfer "mortgage servicing rights" as the term is understood in the industry. (Id.)

38.     Inclusion of the Signature Agreement among the servicing agreements that formed part of the basis for the calculation of the purchase price caused the purchase price to be overstated by $757,426, which represents a price of approximately 0.92% of the amount, as of the Initial Closing, of the unpaid balance of mortgage loans that were being serviced pursuant to the Signature Agreement. (Id. at ¶ 5). Accordingly, the Purchaser is entitled to a return of the $757,426.[3]

---

[3] As required by Sections 4.1(b) and (c) of the APA, by letter dated December 13, 2007, the Purchaser gave notice to the Sellers that it disputed the inclusion of the Signature Agreement among the servicing agreements that formed part of the basis of the calculation of the purchase price paid by the Purchaser as of the Initial Closing and that the Purchaser believed that it was entitled to a reduction in the purchase price in the amount of $757,426. (Friedman Decl. at ¶ 6). By letter dated December 28, 2007, the Sellers advised the Purchaser that it did not agree that the Signature Agreement was erroneously included among the servicing agreements assumed by the Purchaser. (Id. at ¶ 7). The Sellers further stated that the "Signature Agreement is not a dispute that is susceptible to resolution under the dispute resolution procedures set forth in Section 4, i.e., that the dispute relates to a matter that can be resolved by accountants reviewing calculations and determining whether the amounts were properly calculated." (Id. at ¶ 7). Notwithstanding the Purchaser's repeated demands, the Sellers have refused to refund the $757,426 of the purchase price attributable to the Signature Agreement. (Id. at ¶ 8).

## RESERVATION OF RIGHTS

39. Section 6.2(b) of the APA provides that from the Initial Closing until the Final Closing all profits and losses from the Business "shall be solely for the account of Purchaser" and that following the Initial Closing the Sellers and the Purchaser will follow certain procedures set forth in Section 6.2 to reconcile the net cash flow of the Business as contemplated by Exhibit G to the APA. (APA at § 6.2). After the conclusion of the reconciliation process, either the Sellers or the Purchaser, as applicable, is required to "make a reconciliation payment to the other with respect to the net sources and uses of cash for the period from the Initial Closing through the Final Closing (the "Reconciliation Payment") based on the [final reconciliation report] as may be necessary to ensure each party is placed in the same economic position as if the Purchased Assets, Assumed Liabilities and Assumed Contracts had been transferred to the Purchaser on the Initial Closing Date." (Id.)

40. In accordance with the procedures set forth in Section 6.2, the Sellers were required to deliver a Reconciliation Report within 30 days of the Final Closing, or by May 11, 2008. The Sellers delivered a "draft" report on May 12 2008. Although the Purchaser does not believe that this complied with the APA requirements, the Purchaser has been working with the Sellers to resolve several disputed line items in the draft report, and the parties are still working on reconciling certain material discrepancies. On May 22, 2008, the Sellers delivered a final Reconciliation Report. The final report, like the draft report, contains several entries that materially deviate from the Purchaser's numbers, and if the cash inflows and outflows of the Servicing Business are in fact as the Sellers' reports suggest, certain of these cash flows could only be the result of material breaches by the Sellers under the APA.

41. Accordingly, the Purchaser expressly reserves the right to amend this Motion to include additional claims or to file an additional request for allowance and payment of

additional claims, whether based on additional breaches discovered during the reconciliation process or otherwise. Without limiting the generality of the foregoing, the Purchaser specifically reserves the right to modify or amend this Motion, file additional papers in support of this Motion or take other appropriate actions, including to: (a) respond to any allegation, legal theory or defense that may be raised in a response by or on behalf of the Sellers; and (b) raise any additional argument in support of the relief requested herein based on additional information that may be discovered upon further review by the Purchaser or through discovery pursuant to the applicable provisions of the Bankruptcy Rules.

        42.     The Purchaser also reserves the right to object on any grounds that bankruptcy and nonbankruptcy law permit to all, or any part, of the Sellers' Reconciliation Reports, and nothing in this Motion shall be interpreted as agreement with, or waiver of any right to challenge, any of the numbers or conclusions in those reports.

        WHEREFORE, for all the foregoing reasons, the Purchaser respectfully requests entry of an order, substantially in the form attached hereto as Exhibit D, (i) granting the Purchaser an allowed claim entitled to administrative expense priority in the amount of approximately $12 million[4],059,012 (the "Allowed Administrative Claim"), (ii) directing the Sellers to pay the Allowed Administrative Claim as soon as reasonably practicable; and (iii) granting the Purchaser such other and further relief as is just and appropriate.

---

[4]     As noted herein, the amounts for certain components of the Purchaser's claim are approximate and may vary to a small degree from the approximate amounts set forth herein once the amounts are finalized. The Purchaser will supplement this Motion with exact amounts once the Purchaser has confirmed the exact amounts of these components of its claim.

DLI-6189653v5                                 - 17 -

Dated: May 23, 2008
      Wilmington, Delaware

GREENBERG TRAURIG, LLP

*/s/ Victoria W. Counihan*
Victoria W. Counihan (BAR #3488)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000

and

JONES DAY
Keith C. McDole (TX 13533740)
Daniel P. Winikka (TX 00794873)
Robert J. Jud (TX 24041217)
2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939

Counsel for AH Mortgage Acquisition Co., Inc.