## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| | : | |
| **AMERICAN HOME MORTGAGE HOLDINGS,** | : | **Case No. 07-11047 (CSS)** |
| **INC., a Delaware corporation, et al.,** | : | |
| | : | **Jointly Administered** |
| **Debtors,** | : | |
| | : | |
| | : | Docket Ref: 11,674,865 & 937 |
| | : | |

## DECLARATION OF DAVID M. FRIEDMAN

I, David M. Friedman, declare as follows:

1.      I am President of American Home Mortgage Servicing, Inc. ("AHMSI").  During the period between November 16, 2007 (the "Initial Closing") and April 11, 2008 (the "Final Closing") (which period is referred to herein as the "Interim Period"), I was Executive Vice President – Director of Servicing for Debtor AHM SV, Inc. ("SVI"), formerly known as American Home Mortgage Servicing, Inc.

2.      I am over the age of twenty-one and am competent to make this Declaration submitted in support of AHMSI's Motion for Allowance and Payment of Administrative Claims. The facts stated herein are true and correct and, unless otherwise noted below, are based on my personal knowledge and/or the books and records of SVI and AHMSI maintained in the ordinary course of business.

3.      On the Initial Closing date, AHMSI paid the purchase price for the assets to be transferred to it at the Final Closing.  The purchase price was based, in part, on the outstanding unpaid principal balance of loans serviced pursuant to various mortgage servicing agreements listed on Schedule 1.1(j) of the Asset Purchase Agreement among AHMSI, American Home Mortgage Investment Corp., American Home Mortgage Corp. and SVI, dated as of September

25, 2007 (as amended, the "APA"). One of those mortgage servicing agreements was an agreement dated as of March 4, 2004 between Signature Bank and the Debtors' predecessor, Columbia National Incorporated (the "Signature Agreement").

4.      The Signature Agreement, a true copy of which is attached hereto as Exhibit A, empowered Signature Bank (a) to terminate the servicing company without cause at any time prior to expiration of the initial term of the Signature Agreement; and (b) to sell the servicing rights at any time pursuant to Section 2.5(d) of the Signature Agreement. As the term "mortgaging servicing rights" is usually and customarily understood within the mortgage servicing industry, the Signature Agreement did not contain "mortgage servicing rights" to transfer to AHMSI.

5.      Inclusion of the Signature Agreement among the servicing agreements that formed part of the basis for the calculation of the purchase price paid by AHMSI caused the purchase price to be overstated by $757,426, which represents a price of approximately 0.92% of the amount, as of the Initial Closing, of the unpaid balance of mortgage loans that were being serviced pursuant to the Signature Agreement.

6.      By letter dated December 13, 2007, a true copy of which is attached hereto as Exhibit B, AHMSI gave notice to Debtors that it disputed the inclusion of the Signature Agreement among the servicing agreements that formed part of the basis of the calculation of the purchase price paid by AHMSI as of the Initial Closing and that AHMSI believed that it was entitled to a reduction in the purchase price in the amount of $757,426.

7.      By letter dated December 28, 2007, a true copy of which is attached hereto as Exhibit C, Debtors advised AHMSI that it did not agree that the Signature Agreement was erroneously included among the servicing agreements assumed by AHMSI. Debtors further

stated that the "Signature Agreement is not a dispute that is susceptible to resolution under the dispute resolution procedures set forth in Section 4.1(c) of the APA, *i.e.,* that the dispute relates to a matter that can be resolved by accountants reviewing calculations and determining whether the amounts were properly calculated."

8.      Notwithstanding AHMSI's repeated demands, Debtors have refused to refund the $757,426 of the purchase price to AHMSI attributable to the Signature Agreement.

9.      At the time of the Initial Closing, SVI maintained Servicing Files and Mortgage Loan Documents (as those terms are defined in Section 1.1 of the APA) in warehouse facilities located in New York. SVI did not deliver those documents to AHMSI at its principal place of business in Irving, Texas. Based upon an estimate obtained from a third-party cartage company, AHMSI has determined that it will cost $65,000 to ship the Servicing Files and Mortgage Loan Documents from their current location in New York to AHMSI's facilities in Irving, Texas. SVI has refused to pay these costs or to otherwise deliver the documents to AHMSI's facilities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 22, 2008

David M. Friedman

AUG. 26. 2004  1:24AM                                        NO. 8194    P. 1

# SERVICING AGREEMENT
## (Signature Bank)

THIS SERVICING AGREEMENT ("Agreement") is made as of the 4th day of March 2004 by and between Signature Bank, with a principle place of business located at 565 Fifth Avenue, New York, NY 10017 ("Owner"), and Columbia National, Incorporated ("Servicer"), located at 7142 Columbia Gateway Drive Columbia, Columbia, Maryland 21046.

Recitals:

WHEREAS, Servicer is engaged in the business of servicing residential mortgage loans, and cooperative apartment loans evidenced by notes and secured by deeds of trust, mortgages, trust deeds, security agreement or like security instruments; and

WHEREAS, Servicer has the capacity to service for Owner such loans or pools of such loans; and.

WHEREAS, Owner desires that Servicer service said loans and Servicer is agreeable thereto;

NOW, THEREFORE, in consideration of the mutual recitals, promises and covenants set forth herein, and other good and valuable consideration herein received for, but not herein recited, the receipt of which is hereby acknowledged. The parties hereto agree as follows:

## Article I
## Definitions

For purposes of this Agreement, each of the following terms shall have the meaning specified with respect thereto.

1.1    "Agreement" shall mean this Servicing Agreement as the same may be from time to time amended.

1.2    "Ancillary Income" shall mean late charges, optional insurance premiums, and such other fees earned from third party solicitations.

1.3    "Applicable Requirements" shall mean, as of the time of reference and with respect to a party, all of the following: (i) all Mortgage-related obligations, including without limitation those contractual, obligations contained in this Agreement or in the Mortgage documents for which such party is responsible; (ii) all applicable Mortgage related federal, state and local legal and regulatory requirements (including statutes, rules, regulations and ordinances) binding upon such party, (iii) all other applicable Mortgage related requirements and guidelines of (1) each applicable governmental agency, board, commission, instrumentality

**Exhibit A**

and other governmental body or office having jurisdiction, including without limitation those of FHA, FHLMC, FNMA, GNMA, HUD and VA (exclusive of any FHLMC balloon reset obligations), and (2) any private mortgage insurance companies; and (iv) all other applicable judicial and administrative judgments, orders, stipulations, awards, writs and injunctions.

1.4     "Borrower" shall mean each person obligated to pay amounts due and owing under a Mortgage.

**1.5**     "Business Day" means any day other than a Saturday, Sunday, federal holiday or a day on which banks in New York are permitted to be closed.

1.6     "FDIC" shall mean the Federal Deposit Insurance Corporation.

1.7     "FHA" shall mean the Federal Housing Administration.

1.8     "Freddie Mac" or "FHLMC" shall mean the Federal. Home Loan Mortgage Corporation.

1.9      "Fannie Mae" or "FNMA" mean the Federal National Mortgage Association.

1.10    "Ginnie Mae" or "GNMA" shall mean the Government National Mortgage Association.

1.11    "HUD" shall mean the Department of Housing and Urban Development

1.12    "Investor" shall mean the owner and holder of the note.

1.13    "Industry Standards" shall mean applicable Mortgage related requirements and guidelines of FNMA and/or FHLMC.

1.14    "Mortgage", "Mortgages", "loan" or "loans" shall mean fixed or adjustable rate loans, security deeds, trust deeds, deeds of trust, security agreement and related loan documents relating to fixed or adjustable rate loans which comprise residential mortgage loans, cooperative apartment loans, or pools of residential mortgage loans and, cooperative apartment loans transferred to Servicer by Owner from time to time for inclusion under the terms of this Agreement

1.15    "Mortgagor" or "Mortgagors" shall mean the owner or owners of any real or personal property securing a Mortgage.

1.16    "Owner" shall mean Signature Bank, and its successors.

1.17    "P & I" shall mean principal and interest.

1.18    "REO" shall mean real estate owned by Owner.

1.19   "Servicer" shall mean Columbia National, Incorporated.

1.20   T & I" shall mean taxes and insurance.

1.21.   VA shall mean the Veterans Administration.

<u>Article II</u>
<u>Agreements of Servicer</u>

<u>2.1   General:</u> Servicer hereby agrees to assume the responsibility to service the Mortgages on behalf of Owner pursuant and subject to the term of this Agreement.

2.2   <u>Compliance</u>. Servicer will comply with, and Servicer will use commercially reasonable efforts, to cause each Mortgagor to comply with all Applicable Requirements. Owned shall indemnify and hold harmless Servicer from any liability, claim, loss or damages, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of Servicer's compliance with the terms of this Agreement.

2.3   <u>Procedure</u>. Until the principal and interest of each Mortgage is paid in full, unless this Agreement is previously terminated pursuant to the terms hereof, and subject to all Applicable Requirements, Servicer shall:

(a)   Collect from Borrowers or Mortgagors applicable payments of principal and interest, and applicable deposits for taxes, assessments and other public charges that are generally impounded, hazard insurance premiums flood insurance premiums as required, FHA insurance or private mortgage insurance premiums, optional insurance premiums, and all other items, as they become due;

(b)   Accept payments of principal and interest and impound deposits only in accordance with the Mortgage instruments. Deficiencies in or excesses in payments or deposits shall be accepted and applied, or accepted and not applied, or rejected in accordance with the requirements of HUD and VA, with respect to FHA and VA Mortgages, respectively, and in accordance with the provisions of conventional mortgage loan instruments with respect to conventional loans;

(c)   Apply all installment payments and impound deposits collected from the Borrower and Mortgagor, and maintain permanent Mortgage account records capable of producing in chronological order: the date, amount, distribution, installment due date or other transactions affecting the amounts due to Owner or to the Borrower or Mortgagor and indicating the latest outstanding balances of principal, impound deposits, advances, and unapplied payments.

(d)   Pending disbursement segregate and deposit funds collected from Borrowers and Mortgagors in a custodial account or accounts in an insured financial institution in such manner as to show the custodial account number thereof, and so that

the Owner and each separate Borrower or Mortgagor whose funds have been deposited into such account or accounts will be individually insured under the rules of the FDIC. Servicer's records shall show the respective interest of the Owner and each Borrower or Mortgagor in all such custodial accounts. All funds collected for principal and interest shall be maintained by and carried in the records of Servicer as "trustee" for the Owner, except as may otherwise be required by all Applicable Requirements;

(e)    Pay interest on the impound accounts that Servicer maintains or controls pursuant to sub paragraph (d) above, if any Applicable Requirement requires the payment of interest on such deposits—in which case such interest shall be paid to Borrower or Mortgagor in accordance with any Applicable Requirement. As applicable, Servicer will determine the amount of deposits to be made by Borrowers or Mortgagors and will furnish to each Borrower or Mortgagor, at least once a year, an analysis of the impound account in accordance with the Applicable Requirement;

(f)    Maintain accurate records reflecting the status of taxes, ground rents and other recurring similar charges that are maintained by the Servicer under generally accepted practices of the mortgage servicing industry or which would become a lien on the property securing the Mortgage. For all Mortgages providing for the payment to and collection by Owner or its designee of impound deposits for taxes, ground rents or such other recurring charges. Servicer shall remit to the proper recipient payments for such charges before any penalty date. Servicer assumes responsibility for the timely remittance to the proper recipient of all such payments and will hold harmless and indemnify Owner and Mortgagor from all penalties, loss or damage resulting from Servicer's failure to discharge said responsibility subsequent to delivery of the servicing of such Mortgage to Servicer.

(g)    For all Mortgages which have no provisions for the payment to and collection by Owner or its designee of impound deposits for taxes, Servicer shall keep track of the Mortgagor's payment of such taxes to ensure that those taxes have been paid as they become due and shall promptly contact Owner regarding the delinquency of any said tax. Upon Owner's instruction and remittance, Servicer will pay any delinquent taxes. Additionally, Servicer shall not be responsible for payment of ground rents or other charges for any Mortgage for which it is not obligated to collect impound deposits and will pay such charges only upon Owner's instructions and remittances;

(h)    When funds held in any Mortgagor's or Borrower's impound account are insufficient to pay taxes, assessments, mortgage insurance premiums, hazard or flood insurance premiums, or other items due therefrom, Servicer shall advance amount sufficient to pay those items, and Borrower or Mortgagor shall reimburse Servicer for such advances in accordance with Applicable Law.

(i)    Maintain in full force and effect at all times all required, and to the extent applicable, existing FHA mortgage insurance, VA guaranty, private mortgage insurance, or optional insurance, as applicable, in accordance with the type of Mortgage, and will

-4-

assume responsibility for the remittance of the premiums thereon to the proper recipient impound account in accordance with Industry Standards; and

(j)     Assure that all improvements on the property securing each Mortgage are insured by a hazard insurance policy in accordance with Industry Standards and in accordance with the provisions of to be underlying Mortgage documents. In order to effectively service the Mortgages during the servicing period, the mortgagee on the loss payee provision of the hazard insurance policy will read as follows:

> Signature Bank and its Successors and/or Assigns
> c/o Columbia National, Incorporated
> Mail Stop D1-10
> PO Box 3050
> Columbia, Maryland 21045-6050

In accordance with the terms of Servicer's mortgage impairment insurance policy, Servicer shall not maintain the original insurance policy for any Mortgage delivered for servicing.

2.4     Other. Servicer shall be responsible for further safeguarding Owner's interest in the property and rights under the Mortgage by:

(a)     Inspecting the property after the Mortgagor or Borrower is sixty (60) days or more delinquent in the payment of any obligation under the Mortgage, and perform such other inspections as the prudence and sound business judgment based on Industry Standards and advise Owner of the results of such inspections;

(b)     To the extent commercially reasonable, securing any property found to be vacant or abandoned at the property securing the Mortgage, and advising Owner of the status thereof;

(c)     Notifying Owner whenever Servicer receives due notice of any liens, bankruptcy, probate proceeding, tax sale, partition, local ordinance violation, condemnation or proceeding in the nature of eminent domain, or similar event that would, in the prudent and sound business judgment based on Industry Standards, impair Owner's security interest, or the value of such security interest, in a Mortgage; and Servicer shall assist Owner in undertaking appropriate action to preserve its security interest and the value of such security interest;

(d)     Advising Owner, in accordance with Industry Standards, with respect to requests for partial releases, easements, substitutions, division, subordination, alterations, or waivers of security instrument terms and the effect that the Applicable Requirements have on those requests;

(e)     Advising Owner of any change in ownership of the property securing a Mortgage and the effect that the Applicable Requirements have on such change and

comply with all instructions from Owner with respect to the acceleration or modification of the Mortgage indebtedness to the extent permitted under the Applicable Requirements; Servicer will forward to Owner all requests for loan assignments immediately upon receipt together with this advice. Servicer will provide the initial paperwork necessary for Owner to decide how to handle the loan assignment request.  This information will be forwarded to Owner for approval together with all necessary disclosures.  If Owner approves the loan assignment request, then Servicer will prepare the necessary assignment papers and forward them to the Owner for execution;

(f)     Maintaining in force at all times a policy of errors and omissions insurance coverage at Servicer's sole expense. Such insurance shall provide coverage in accordance with Industry Standards. The Servicer shall provide Owner on or before the signing of this Agreement with a certificate of such insurance and provide a replacement certificate each time such insurance is renewed or changed. The purpose of such coverage is to provide Owner protection in liquidating a Mortgage against any loss that can be attributed to damage to the property from a hazard or peril required to be insured by the Owner or Mortgagor and that otherwise would be insured but for the Servicer allowing the Mortgagor's insurance coverage on the property securing the Mortgage to lapse or failing to require that the Mortgagor keep a sufficient amount of insurance on such property in force;

(g)     Disbursing insurance loss settlements, including:

(1)     Receiving reports of hazard insurance losses and assuring that proof of loss statements are properly filed;

(2)     Authorizing the restoration and rehabilitation of the damaged property;

(3)     Collecting, endorsing and disbursing the insurance loss proceeds and arranging for progress inspections and payments, if necessary;

(4)     Complying with all Applicable Requirements pertaining to settlement of insurance losses; and

(5)     In general, complying with Applicable Requirements to assure that the priority of the Mortgage's lien on the property securing that Mortgage is preserved.

(h)     Processing insurance drafts in the following manner:

(1)     Provided that the Mortgage is current in all respects, Servicer may endorse and deliver to Mortgagor without prior inspection of the property and completion of repairs, settlement drafts for losses up to the amount of five thousand dollars ($5,000.00);

(2)    With respect to settlement drafts for losses in excess of five thousand dollars ($5,000.00) and for losses when the Mortgage is not current in all respects, Servicer shall monitor the progress of the repairs to insure that the property is being restored in a satisfactory manner and will release funds in accordance with completed property inspection reports.

(3)    If special disaster procedures are issued by Owner or governmental agencies, Servicer will release funds in accordance with those policies.

2.5    <u>Accounting and Reporting</u>.  Servicer shall:

(a)    Remit to the Owner, on a date and in a manner specified by Owner, all principal and interest paid on the Mortgages.  Servicer will remit any guaranty fees to the guarantor in accordance with Applicable Requirements.  Servicer will remit monthly to Owner on the fifth (5th) Business Day after the 15th of the month, the remaining portion of the gross payment collected, net of the compensation due Servicer as set forth in Section 4.1 hereof.

(b)    Servicer shall deliver to Owner certain reports, the contents, format, and frequency of which shall be agreed to by Owner and Servicer including, but not limited to, reports listed in Exhibit B.

(c)    In the event Owner sells any Mortgage to a third party or parties, including the sale of participating interests therein, and such third parties succeed to all of the rights of Owner hereunder for any portion of such sold Mortgage and this Agreement remains in full force and effect, remit that part of the principal and interest installments collected under such Mortgage (or, if applicable, any portion of such Mortgage) directly to such third party or parties in accordance with the terms of the applicable servicing agreement, after deduction of the servicing fee which is payable to the Servicer.  The obligation to make direct remittances to such third party or parties shall arise upon thirty (30) days written notice of such assignments given by the Owner to Servicer.  Servicer shall be entitled to and shall be paid Owner an additional One Dollar ($1.00) per loan per month, for each such third party remittance.

(d)    In the event the Owner sells a Mortgage with the servicing released to the purchaser, then upon notice from Owner, Servicer shall transfer to the purchaser or that purchaser's servicing agent all of the servicing rights to that Mortgage, including all funds held in an escrow account to pay T&I or any other recurring charge upon the property securing such Mortgage in accordance with the Owner's instructions; provided, however, that Owner pay Servicer a flat fee of $750 per mortgage as compensation for the Servicers loss of servicing revenue for each mortgage sold servicing released to a purchaser.

(e)    Hold any dated escrow demand deposit accounts associated with the receipt, disbursement and accumulation of principal, interest, taxes, hazard insurance, mortgage insurance, etc. as "trustee" for Owner and/or Mortgagors and Borrowers, except

for interest required by Applicable Requirements to be paid to Mortgagors or Borrowers on the funds in such account.

(f)     Intentionally omitted.

(g)     Not accept any prepayment of any Mortgage except as specified or authorized by Applicable Requirements, including, but not limited to, the terms of the Mortgage and all applicable federal and state law and regulations, nor waive, modify, release or consent to postponement on the part of the Mortgagor or Borrower of any term or provision of the Mortgage documents without the written consent of Owner.

(h)     Upon payment of a Mortgage in full, prepare for Owner's execution and upon such execution, file any necessary release or satisfaction documents, and continue servicing that Mortgage pending final settlement, and refund to the Mortgagor or Borrower any funds remaining in the escrow account with respect to such Mortgage.

(i)     Make interest rate adjustments in compliance with Applicable Requirements for adjustable Mortgage loans and the Mortgage documents, which reflect the applicable movements of the applicable loan rate index.  Servicer shall execute and deliver all appropriate notices required by Applicable Requirements for adjustable Mortgage loans and the Mortgage document regarding such interest rate adjustments, including without limitation, timely notification to Owner or to Owner's successors or assigns, of the applicable date and information regarding such interest rate adjustment, the methods of implementation of such interest rate adjustments, new schedules of Owner's program share of collections of principal and interest, and of all prepayments of any loan hereunder by Mortgagor.

(j)     Perform such other usual and customary duties of a servicer, furnish Owner copies of standard reports and prepare for Owner's execution such other documents in connection with its duties hereunder as Owner from time to time reasonably may require.

(k)     Annually provide Owner with a Uniform Single Audit Program letter from its independent auditors.

(l)     In the event Owner requests Servicer to provide special reports or data files or render other related services to either Owner or any third party that are not provided for by this Agreement or which are not in accordance with Industry Standards, Servicer shall use commercially reasonable efforts to provide said reports, data files, or related services.  Servicer shall thereupon bill Owner for the cost to Servicer of such reports, data files, or related services in accordance with a separate fee to be determined in advance by Owner and Servicer and such amount shall be deducted by Servicer from the gross service fee.

(m)     Deliver to Owner such other reports, the content, frequency, and format of which shall be agreed to by Owner and Servicer, in good faith.

-8-

(n)     Deliver to Owner a copy of Servicer's blanket fidelity bond and an errors and omissions policy in accordance with Industry Standards.

(o)     Deliver to Owner copies of most recent FNMA, FHLMC, FHA, GNMA, HUD claims, VA and third party audits for review.

(p)     Deliver to Owner copies of most recent audited financial statements, and annual financial statements thereafter, within ninety (90) days of year-end, throughout the term of this Agreement.

2.6     Delinquency Control.  Servicer shall:

(a)     Maintain a delinquent Mortgage servicing program which shall include an adequate accounting system that indicates the existence of delinquent Mortgages, a procedure that provides for sending delinquent notices, assessing late charges, and returning inadequate payments, and a procedure for the individual analysis of distressed or chronically delinquent Mortgages;

(b)     Maintain a collection department and an on-line automated collection system that substantially complies with established FNMA collection guidelines, industry standards and Applicable Requirements;

(c)     Provide Owner with various reports, the frequency, format, and contents of those reports shall be agreed to by Owner and Servicer in good faith, but at a minimum shall include a month-end collection and delinquency report identifying and describing the status of any delinquent Mortgages and any reports required by Industry Standards or otherwise necessary to comply with Applicable Requirements, or detailing any matters Servicer believes should be brought to the special attention of Owner; and

(d)     Assist in the foreclosure or acquisition of the property securing a Mortgage, the transfer of such property to the Owner, FHA or VA, as and/or if applicable, and the collection of any applicable mortgage insurance, and pending completion of these steps, protect such property from waste and vandalism. At the option of Owner, Owner may assign such Mortgage to Servicer, which will then conduct all such proceedings in its own name, promptly thereafter assigning and conveying to the Owner any title, equity, or other property or right acquired by such proceedings. Servicer will have title to the property conveyed in the name designated by Owner. Owner agrees to reimburse Servicer for all of its actual expense so incurred under this paragraph, including, but not limited to, travel, court costs and attorneys' fees, in accordance with Section 9.1 hereof.

2.7     Real Estate Owned.

(a)     Upon the completion of a foreclosure proceeding and the purchase of such property by the Owner or by the Servicer for the account of the Owner, or in case of a

Mortgagor transferring to Owner or Owner's designee the property securing a Mortgage upon receipt of a voluntary deed in lieu of foreclosure, Servicer will protect the REO while so owned by Owner or Owner's designee. These operations shall be on terms as determined and directed by Owner from time to time and in accordance with Applicable Requirements. Servicer will service the same until the debt of the Mortgage is completely liquidated. Servicer shall be entitled to the Servicing fee with respect to REO as provided for by Exhibit A attached hereto.

(b)     When Servicer advances funds to pay taxes, assessments, hazard or flood insurance premiums, or other items necessary to protect the security of the Owner in the REO, Servicer will bill Owner for any such advances made. Owner agrees to reimburse Servicer for any impound account deficiencies and such advances in accordance with Section 9.1 hereof.

2.8     Books and Records; Audit.

Servicer shall make available to Owner a copy of Servicer's ultimate parent company's most recent consolidated audited financial statement, and Servicer shall deliver to Owner any written notification that Servicer receives from FNMA, FHLMC, FHA, GNMA, HUD, VA. and similar third party, as applicable, stating that Servicer is not eligible to service any Mortgage loans that are subject to such government sponsored entities within 7 Business Days of its receipt of such notification. Servicer shall give Owner, Owner's federal and state supervisory agencies, or Owner's or such supervisory agency's authorized representative the opportunity, upon reasonable advance written notice to examine at Servicer's principal place of business Servicer's books and records strictly relating to Owner's Mortgages; provide that such examination is conducted during Servicer's normal business hours and is conducted in a manner that minimizes disruption to Servicer's normal business operations. Any additional requests for loan audit or confirmations to be performed by Servicer's independent auditing firm on Owner's Mortgages, shall be at Owner's sole expense. Servicer will keep records in microfiche form, electronic image form, and/or otherwise in accordance with Industry Standards pertaining to each Mortgage and the servicing of such Mortgage and such records shall be the property of Owner and upon termination of this Agreement shall be delivered by Servicer to Owner or Owner's designee at Owner's expense.

2.9     Insurance. Servicer will maintain in effect at all times and at Servicer's cost, a blanket fidelity bond and an errors and omissions policy in accordance with Industry Standards. Servicer shall cause, upon written request by Owner, certificates evidencing the existence of such coverage to reflect Owner as an additional named insured to be delivered to Owner.

### Article III
### Agreements of Owner

3.1     Documentation. At its sole cost and expense, Owner shall provide Servicer with the following, solely to the extent applicable:

(a)     Copies of any documents or records, in Owner's possession or control, for each Mortgage that are necessary or appropriate for Servicer to conduct the servicing of the Mortgages.

(b)     Complete and accurate electronic data and/or written documentation for each Mortgage submitted hereunder to enable Servicer to place the Mortgage on its computer system so that Servicer can service that Mortgage.

(c)     Intentionally omitted.

(d)     Before the release of good-bye letters, a complete listing of any Mortgages where the mortgage payment is inclusive of an optional insurance premium. This list will also provide the name of the insurance company; type of insurance coverage; premium amount; and the name and telephone number of the individual at Owner's firm or affiliation knowledgeable as to such coverage. Furthermore, should Owner misrepresent, misinform, provide inadequate information or no information regarding the status of optional insurance coverage's (such as mortgage life insurance) which would cause Servicer to incur a loss or damage, Owner agrees to hold Servicer harmless from any and all claims, liabilities, damages, and loss, including reasonable attorneys' fees, resulting there.

(e)     Physical evidence that a hazard insurance policy is in force for each Mortgage delivered to Servicer for servicing and allow Servicer sufficient time to obtain evidence that all notifications have been forwarded to Servicer. Further, Owner agrees to hold Servicer harmless from any loss or damage caused by insufficient evidence of hazard insurance coverage delivered by Owner to Servicer or for any loss or damage which occurred during a lapsed policy occurring prior to the Owner's delivery of the Mortgage relating to such policy to Servicer for servicing.

(f)     Life-of-loan Tax Service Contracts. In lieu thereof, Owner may provide Servicer with the requisite fee for Servicer to acquire such Contracts.

(g)     Life-of-loan Flood Contracts.  In lieu thereof, Owner may provide Servicer with the requisite fee for Servicer to acquire such Contracts.

(h)     A copy of Owner's blanket fidelity bond and an errors and omissions policy in accordance with Industry Standards;

(i)     Copies of most recent audited financial statements, and annual financial statements thereafter, within ninety (90) days of year-end, throughout the term of this Agreement.

(j)     The name and address of all document custodians. All costs and expenses of said document custodians (including, without limitation, those resulting from a change

of document custodian) shall be the responsibility of Owner, except if document custodian is the Servicer or appointed by Servicer.

3.2    Further Notification. If and solely to the extent applicable, Owner shall advise Servicer upon delivery of each Mortgage submitted for servicing, as to whether the Mortgage is in a sold or pending-sale status. Owner shall provide Servicer with specific information regarding the Investor. If a Mortgage which has been delivered to Servicer in a warehouse (unsold) status is sold, Owner will immediately notify Servicer of the sale by phone and will deliver a written copy of the Investor's purchase advice or funding detailed report immediately thereafter. If the Investor charges a penalty for late reporting, remittances, etc, which were caused by Owner delay in notifying Servicer of the Investor's purchase of the Mortgage(s), Owner shall promptly pay the penalty and Servicer shall have no liability on account thereof.

3.3    Default and Right of Offset. In the event that a Party shall fail to pay to the other Party any sums due and payable to that Party under this Agreement within 30 days of when those sums  shall be due and payable, whether as compensation, reimbursement, or otherwise, such Party shall be deemed in default of its obligations hereunder, and the other Party shall promptly notify that Party in writing of such default. If the breach is not cured, then the unpaid Party shall be entitled to adjust and payment due to the defaulting Party in set-off of the amount of any sum so owing and unpaid. This provision shall not impair a Party's right to be reimbursed in accordance with the terms of this Agreement through offset of amounts due from the other Party.

3.4    Notices. By no later than thirty (30) days prior to the date on which Servicer commences servicing the of Mortgages, Servicer shall deliver or cause to be delivered to Owner for approval a joint form or joint forms of a Mortgagor notification letter in connection with the transfer of the servicing responsibilities for the related Mortgages to Servicer.  Not less than fifteen (15) days prior to the applicable commencement date and otherwise in accordance with Applicable Requirements, Owner shall mail, or cause to be mailed, the approved form of notification to the Mortgagors of the transfer of the servicing responsibilities for the related Mortgages to Servicer. The expense of the preparation, printing and mailing of such notices shall be borne by Owner. Servicer shall on behalf of Owner, at its expense, notify or cause to be notified the applicable tax service with regard to the Mortgages and all insurers that the servicing responsibilities for the related Mortgages are being transferred, and instruct such entities to deliver tax bills, payments, notices and insurance statements, as applicable, to Servicer on and after the applicable commencement date.

3.5    Recourse. Except for matters with regards to which Servicer must indemnify Owner pursuant to this Agreement or costs or expenses that Servicer must bear hereunder, in no event shall Servicer be liable for losses, costs, expenses, damages or claims (including attorneys' fees) incurred by Owner in connection with the Mortgages serviced hereunder, including without limitation losses, costs, expenses, damages or claims (including attorneys' fees) incurred by Owner in connection with the default or foreclosure of such Mortgage Loans unless that loss, cost, expense, damage or claim was

caused by Servicer's willful misfeasance or gross negligence, bad faith, or fraud in connection with the performance of, or failure to perform its obligation under this Agreement.

Article IV
Compensation

4.1    Servicing Fee:

As consideration for servicing the Mortgages, Servicer shall be paid in accordance with the fees established, in Exhibit A, attached hereto. Servicer shall subtract, from the monthly payments remitted to Owner, its servicing fee, guaranty fees (if applicable), REO Servicing fee, Exit Fee and any Ancillary Income (as defined in and in accordance with Exhibit A attached hereto). Servicer shall be entitled to reimbursement of necessary extraordinary fees associated with services which may be proper under this Agreement, including, without limitation, services performed in connection with the foreclosure of mortgages, property maintenance and improvement, property management, the sale of my foreclosed real estate, and similar extraordinary expenses, which shall be contracted or performed by Servicer at its customary, reasonable costs for such services. Servicer shall promptly bill Owner for these expenses, and Owner shall remit the amount billed under the terms of this paragraph to Servicer in accordance with Section 9.1 hereof.

Article V
Term and Termination

5.1    Term and Notice.  The initial term of this Servicing Agreement shall be for a period of three years following the date hereof, and thereafter shall be automatically renewed on an annual basis unless either Party gives no less than one hundred twenty (120) days prior written notice to the other Party of its intention to terminate this Servicing Agreement at the end of the then current term.

5.2    Termination.  In the event of a material breach of this Agreement, which breach is curable by the breaching party, the breaching party shall have thirty (30) days to cure such breach after written notification is given by the non-breaching party.  If the breach is either not cured within the thirty (30) day period, or is a breach of such a type as to be incapable of being cured, the non-breaching party may terminate this Agreement upon thirty (30) Business Days notice, and require the immediate transfer by Servicer to Owner or Owner's designee of all Mortgages, Mortgage documents, all Mortgage custodial account funds and other data and information related to the Mortgage, and Servicer shall provide a "good-bye letter" for each Mortgage and perform all customary tasks necessary to provide for an orderly and efficient transfer of the servicing of the Mortgages to Owner or Owner's designee.

Owner can terminate this Agreement at any time prior to the end of the initial term, or at any time prior to any renewal term, without cause by providing Servicer no less than one hundred twenty (120) days prior written notice. If Owner terminates this Agreement

13

without cause at any time other than the end of the initial term or any renewal term and does not give Servicer at least one hundred twenty (120) days prior written notice, then Owner shall pay Servicer the Exit Fee provided in Exhibit A. If Owner provides more than one hundred twenty (120) days advance written notice of termination, no Exit Fees shall be due.

Should Servicer at any time during the term of this Agreement have its rights to service for FHLMC, FNMA or GNMA suspended or lose any other permits or licenses necessary to carry out its responsibilities under this Agreement, or become insolvent, files for bankruptcy, or is placed under conservatorship or receivership, then, and in any of these events, the Owner may immediately terminate this Agreement for cause, without the payment of an Exit Fee or any other fee and without any further liability to the Owner. Should Owner become insolvent, file for bankruptcy or is placed under consevatorship or receivership, then, in any of these events, the Servicer may immediately terminate this Agreement for cause, without being entitled to the payment of an Exit Fee and without any further liability to the Owner.

Should there be fewer than forty (40) Mortgages serviced for Owner by Servicer on the date which is one (1) year from the effective date of this Agreement, Servicer shall have the right, in its sole discretion, to terminate this Agreement upon one hundred twenty (120) days written notice to Owner.

The rights of termination, as provided herein, are in addition to all other available rights and remedies, including the right to recover damages in respect of any breach.

5.3    <u>Reimbursement</u>. Upon termination of this Agreement the defaulting party, or if the termination is voluntary, the terminating party, shall reimburse the other party for all costs reasonably incurred in connection with Servicer's return or transfer, as applicable, of the Mortgages then serviced to Owner or Owner's designee. In addition, Servicer right to reimbursement for actual expenses and any advances made on behalf of the Owner in accordance with the terms of this Agreement, shall also apply in the event the Investor to which Owner has sold the Mortgages, instructs Servicer in writing to transfer the servicing of any loan(s) to such Investor or its designee.

5.4    <u>Accounting</u>.    Upon termination of this Agreement under this section, Servicer will account for and turn over to Owner or Owner's designee, as applicable, all funds collected hereunder, less the compensation then due to Servicer, and deliver to Owner or Owner's designee, as applicable, all records and documents relating to each Mortgage then serviced and will advise Mortgagors that their mortgages will henceforth be serviced by Owner or Owner's designee, as applicable.

Article VI
<u>Representations, Warranties and Covenants of Owner</u>

6.1    <u>Assistance</u>. Owner warrants and represents to, and covenants and agrees with Servicer that, to the extent that it is  reasonably necessary and Owner has the

14

capability and resources to do so, Owner shall cooperate with and assist Servicer as requested by Servicer, in carrying out Servicer's covenants, agreements, duties and responsibilities under this Agreement and in connection therewith shall execute and deliver all such papers, documents and instruments, including but not limited to Servicing Agreements, as may be necessary and appropriate in furtherance thereof. Such cooperation and assistance by Owner shall in no way alter or diminish Servicer's obligation to comply with such covenants and agreements and to perform such duties and responsibilities and Owner's failure to provide such cooperation and assistance will not waive, relieve or excuse Servicer from such obligation.

6.2    Intentionally omitted.

6.3    Taxes. Real estate taxes due and billed within thirty (30) days of the transfer date of the servicing of a Mortgage to Servicer shall have been paid by the Owner or Owner's designee or agent prior to delivery of such servicing to Servicer. Owner will indemnify and hold Servicer harmless from any tax penalties and interest with respect to a Mortgage covered by this Agreement that arose or accrued prior to delivery of the servicing of that Mortgage to Subservicer.

6.4    Agency Approvals. Solely to the extent applicable or necessary with respect to any Mortgages that are owned, insured or guaranteed by FHLMC, FNMA, GNMA, HUD, VA, Owner is in good standing with such government sponsored entities and shall maintain such approvals and standing throughout the term of this Agreement.

6.5    Authority. Owner is a duly organized and validly existing corporation in good standing under the laws of its state of incorporation and has all requisite powers and authority to enter into this Agreement and the persons executing this Agreement on behalf of Owner are duly authorized to do so.

Article VII
Representations, Warranties and Covenants of Servicer

Servicer warrants and represents to, and covenants and agrees with, Owner as follows:

7.1    Notice of Breach. Servicer shall immediately notify Owner of any failure or anticipated failure on its part to observe and perform any warranty, representation, covenant, obligation or agreement required to be observed and performed by it under this Agreement.

7.2    Agency Approvals. Servicer is an approved servicer for, and in good standing with, FHLMC, FNMA, GNMA, HUD and VA, and shall maintain such approvals and standing throughout the term of this Agreement. Servicer shall service the Mortgage in accordance with Industry Standards and Applicable Requirements.

7.3    Authority; Licenses. Servicer is a duly organized and validly existing corporation in good standing under the laws of its jurisdiction of incorporation, and has all requisite power and authority and has taken all requisite corporate actions to enter into, execute, deliver and perform this Agreement so that it is a legal, valid and binding obligation of Servicer enforceable against Servicer in accordance with its terms, and the persons executing this Agreement on behalf of Subservicer are duly authorized to do so. Servicer is qualified, licensed and in good standing in its state of incorporation and in each state wherein the property securing a Mortgage is located to the extent that such qualification and/or license is required for Servicer to perform this Agreement, maintains all required federal and state government or agency licenses, approvals, authorizations and permits and will maintain such qualifications, approvals, authorizations, permits and licenses during the term of this Agreement.

7.4    Compliance with Applicable Requirements; No Conflicts. Servicer is not in violation of Applicable Requirements that would reasonably have a material adverse effect on the operations of Servicer and its performance of this Agreement will not involve a violation of an Applicable Requirement. The execution, delivery and performance of this Agreement by Servicer will not conflict with or result in the breach or default under the terms of Servicer's charter, by-laws or any legal restriction or agreement that Servicer is a party to or is bound by.

7.5    Disaster Recovery Plan. Servicer has a disaster recovery plan that meets industry standards and provides for the back-up and protection of all documents, records and data related to this Agreement to enable Servicer in the event of a disaster, or anything else that could affect all or part of the documents, records and data, to continue performing this Agreement as promptly as possible, to prevent the loss of all or any part of such documents, records and data and to replace and lost, destroyed or damaged document, record or data with a exact duplicate copy of such records and data. Servicer has delivered to Owner a copy of Servicer's disaster recovery plan.

7.6    Confidential Information. Servicer shall comply with all federal and state privacy and data protection laws, rules, and regulations which are or which may in the future be applicable to the information received by or disclosed to Servicer pursuant to this Agreement or in connection with any transactions or activities covered by this Agreement. In addition, Servicer acknowledges that in performing this Agreement that Servicer will receive from Owner, Mortgagors, Borrowers and other person and entities Confidential Information. Confidential Information means any and all financial, technical, commercial, or other information concerning Owner, Mortgagors, Borrowers or the Mortgages, that may be provided to Servicer, regardless of the form or source of communication, or becomes known to Servicer as a consequence of its performance of this Agreement. Confidential Information shall not include any information (i) known to Servicer on a non-confidential basis either prior to this Agreement or during its performance of this Agreement for a purpose unrelated to this Agreement, (ii) is publicly available provided that Servicer is not aware that the information has become publicly available through a breach of an obligation of confidence or (iii) has been made available to Servicer without a breach of an obligation of confidentiality. Servicer agrees not to use

16

any Confidential Information for any purposes other than in the performance of this Agreement and not to provide such Confidential Information to any officer, director, employee, agent or advisor of Servicer unless such person needs to know that information in order for Servicer to perform this Agreement, such person has been advised of the Servicer's obligation to keep that information confidential and such person has agreed to be bound by the provisions of this Section of this Agreement. Servicer agrees that Confidential Information includes any nonpublic personal information that it receives from or about an Owner, a Mortgagor, a Borrower, or any other person or entity in connection with the activities or transactions covered by this Agreement. For purposes of this provision, the terms "nonpublic personal information" shall have the meanings set forth in Section 509 of the Gramm-Leach-Bliley Act (P.L. 106-102) (15 U.S.C. Section 6801 et seq.) and implementing regulations thereof. Servicer represents and warrants that it has, and will continue to have for so long as it retains Confidential Information, adequate administrative, technical, and physical safeguards (i) to insure the security and confidentiality of Confidential Information, including, but not limited to, customer records and information, (ii) to protect against any anticipated threats or hazards to the security or integrity of such information and records, and (iii) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to an Owner, a Mortgagor, a Borrower or anyone else to whom that information or record relates. Servicer shall immediately notify Owner if Servicer discovers there has been a breach in its security safeguards required by this Section, or if the security of Confidential Information has been or may be compromised for any reason. Owner may take all reasonable and appropriate steps to protect the Confidential Information, including obtaining an injunction or injunctions to prevent the breach of Servicer's obligation of confidentiality contained in this Section by Servicer or any director, officer, employee, agent or advisor of Servicer which shall be in addition to any other remedy Owner may be entitled to under law or equity. Servicer waives any requirement that Owner post a bond when seeking such injunction. Servicer shall at all times during the term of the Agreement, keep proper books and records of account, and shall maintain records and information sufficient to show its compliance with the terms of this Section. Upon reasonable notice to Servicer, Servicer shall provide such information as requested by Owner or permit Owner or Owner's designee the right to audit Servicer at reasonable times to evidence or demonstrate Servicer's compliance with the terms of this Section. Upon the termination of this Agreement, Servicer shall return to Owner, or Owner's designee, at Owner's expense, all of the Confidential Information or if any of such Confidential Information is not in a form that can be returned, the Servicer shall destroy that Confidential Information after obtaining Owner's written permission to do so and providing Owner written certification of its destruction. These obligations shall survive termination or expiration of this Agreement.

## Article VIII
### Independence of Parties; Indemnification; Survival

8.1    Independence of Parties.    The following terms shall govern the relationship between Owner and Servicer:

(a)    Servicer shall have the status of, and act as, an independent contractor. Nothing herein contained shall be connection to create a partnership or joint venture between Owner and Servicer.

(b)    Servicer shall not be responsible for any representations, warranties or contractual obligations in connection with the servicing or transfer of any such Mortgages if it pertains to the period of time that is prior to the assumption of servicing responsibilities for the Mortgages by Servicer pursuant to this Agreement.

(c)    Notwithstanding any contrary provisions in this Agreement, the representations and warranties of Servicer contained in this Agreement shall not be construed as a warranty or guarantee by Servicer as to future payments by any Mortgagor.

(d)    Notwithstanding any contrary provisions in this Agreement, Servicer shall not be responsible under this Agreement for any performance or compliance under any loan agreement to which Owner is a party and Servicer or its Affiliates, is not a party, any indemnification, representation or warranty related to the origination or brokerage of a Mortgage, in each case occurring either before or after the date of this Agreement, or, with respect to the servicing of a Mortgage, occurring prior to that servicing being transferred to Servicer pursuant to this Agreement.

8.2    Indemnification by Servicer.  Except as otherwise stated herein, Servicer indemnifies and holds harmless Owner from any liability, claim, loss, or damage, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of Servicer's failure to observe or perform, or its grossly negligent performance of, any or all of Servicer's covenants, agreements, warranties, or representations contained in this Agreement.

8.3    Indemnification by Owner.  Owner indemnifies and holds harmless Servicer from any liability, claim, loss or damage, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of Owner's failure to observe or perform, or its grossly negligent performance of, any or all of Owner's covenants, agreements, warranties or representations contained in this Agreement. Further, Owner will indemnify Servicer and hold it harmless from any losses which have resulted or may result from the performance of (or failure to perform by) any previous servicer, but only to the extent that Servicer could not have prevented such loss after receiving written notice thereof.

8.4    Survival.  The indemnifications, representations and warranties set forth herein shall survive the termination of this Agreement.

## Article IX
## Miscellaneous

9.1    Due Date of Payments. Unless otherwise stated herein, all fees, payments, charges, expenses, advances and other sums payable to by one party to the other party hereunder, shall be due and payable within thirty (30) Business Days after the date invoice. Thereafter, all unpaid sums shall be subject to a finance charge at an annual rate of 1.5% of such unpaid sums per month in the billing period.

9.2    Changes in Practices. The parties hereto acknowledge and accept the Industry Standards as the standard practices and procedures of the mortgage servicing industry, which change over a period of time. To accommodate these changes, Servicer shall conform to the Industry Standards that are in effect from time to time and shall notify Owner of such changes that materially affect Owner's rights under this Agreement.

9.3    Assignment. This Agreement may be assigned only by written consent of both Owner and Servicer. The sale of all or substantially all of the stock or assets of Owner or Servicer, or the transfer of a controlling interest in Owner or Servicer, shall not be deemed an assignment of this Agreement for purposes of this Section 9.3, provided the other party is notified in writing of such sale or transfer.

9.4    Prior Agreements. If any provision of this Agreement is inconsistent with any prior Agreements between the parties, oral or written, the terms of this Agreement shall prevail, and after the effective date of this Agreement, the relationship and agreements between Owner and Servicer shall be governed in accordance with the terms of this Agreement.

9.5    Entire Agreement. This Agreement contains the entire agreement between the parties hereto and cannot be modified in any respect except by an amendment in writing signed by both parties which amendment specifically refers to this Agreement.

9.6    Invalidity. The invalidity of any portion of this Agreement shall in no way affect the remaining portions hereof.

9.7    Effect. Except as otherwise stated herein, this Agreement shall remain in effect until Owner's interest in all of the Mortgages, including the underlying security, are liquidated completely, unless sooner terminated pursuant to the terms hereof.

9.8    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

9.9    Notices. Any notice or other communication required or which may be given hereunder shall be in writing and either delivered personally to the addressee, or delivered via an overnight courier or the USPS certified or registered mail, postage prepaid, return receipt requested (regardless of whether receipt is acknowledged by the addressee) and shall be deemed effective when so delivered personally , or if delivered

via an overnight courier or the USPS on the date on which USPS or such overnight courier acknowledges that it duly delivered such notice or communication to the addressee as follows:

If to Owner:

    SignatureBank.
    70 West 36th Street, 15th Floor
    New York, NY 10018
    Telephone: (646) 822-1391
    Facsimile: (646) 822-1692
    Attention: Debra M. Eannel

With a copy to:

    Bank Hapoalim BM.
    1177 Avenue of the Avenues
    New York, NY 10036
    Attn: General Counsel

If to Servicer:

    Columbia National, Incorporated
    7142 Columbia Gateway Drive
    Columbia, Maryland 21046
    Telephone: 410-872-2080
    Fax: 410-910-3645
    Attention: Charlie Isenhour

With a copy to:

    American Home Mortgage Corp.
    520 Broadhollow Road
    Melville, NY 11747
    Attention: John Kalas

Or to such other address as Owner or Servicer shall have specified in writing to the other.

9.10    Waivers. Either Owner or Servicer may by written notice to the other:

(a)    Waive compliance by the other party with any of the terms, conditions or covenants required to be complied with by the other party hereunder; and

(b)    Waive or modify performance by the other party of any of the obligations of the other party hereunder.

The waiver by either party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

9.11    Binding; Effect. This Agreement shall insure to the benefit of and be binding upon the parties hereto and their successors and assigns.

9.12    Headings.  Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect

IN WITNESS WHEREOF, each party has caused this instrument to be signed in its corporate name on its behalf by its proper officials duly authorized as of the day, month and year at above written.

Servicer:

COLUMBIA-NATIONAL, INCORPORATED

By:

Name: Baron Wilhelm
Title: Senior Vice President

Owner:

SIGNATURE BANK

By:

Name: John Tamberlane
Title: Vice Chairman

By:

Name: Joseph J. DePaolo
Title: President

## Exhibit A

**Servicing Fees**

For servicing of the Mortgages, Servicer shall receive an annual servicing fee of 25 basis points of the outstanding principal balance of the Mortgages transferred to the Servicer by Owner. The servicing fee shall be paid on a monthly basis and calculated as 0.25% of the outstanding principal balance of the aggregate Mortgages transferred to Servicer by Owner as of the prior month end, divided by 12, with a cap of $100 per month per loan serviced. Servicing fees shall be deducted from the monthly payments collected and remitted to Owner on each Mortgage loan serviced by Servicer.

**REO Servicing Fees**

The REO servicing fee shall be a one-time fee, which shall be $1,500 per REO. The REO servicing fee shall be paid to Servicer by Owner upon assumption of the ownership by Owner (whether by foreclosure and purchase by Owner or by voluntary deed).

**Ancillary Income**

Ancillary Income shall constitute the following:

(1)  All late fees imposed on late payments, insufficient funds fees, and other similar fees on each Mortgage (pursuant to the terms of each Mortgage);

(2)  All other income and fees received related to other services provided by Servicer with respect to each Mortgage to the extent the Servicer is permitted under Applicable Requirements to be paid such income and fees.

Servicer shall keep all Ancillary Income received by it as part of its services provided under the Servicing Agreement to the extent the Servicer is permitted under Applicable Requirements to receive and keep such Ancillary Income.

**Exit Fees**

| Term Residing on Servicer's System | Exit Fee per Mortgage |
|---|---|
| 12 months or less | $125.00 |
| 13-24 months | $115.00 |
| 25 months and greater | $100.00 |

## Exhibit B

Servicing Reports:

Private Mortgage Insurance
interest on escrow
adjustable rate mortgage adjustment tickler
cutoff transaction journal
trial balance
curtailments/prepayments
delinquent loan
single debit reconciliation

**AH MORTGAGE ACQUISITION CO., INC.**
c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 27th Floor
New York, New York 10036

December 13, 2007

VIA FACSIMILE AND
FEDEX

American Home Mortgage Investment Corp.
American Home Mortgage Corp.
American Home Mortgage Services, Inc.
c/o American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, New York 11747
Attention: Mr. Steven Cooper

Re:    Asset Purchase Agreement dated as of September 25, 2007, by and among
AH Mortgage Acquisition Co., Inc. ("Purchaser"), a Delaware
corporation, American Home Mortgage Investment Corp., a Maryland
corporation, as a debtor and debtor-in-possession ("Parent"), American
Home Mortgage Corp., a New York corporation, as a debtor and debtor-
in-possession, and American Home Mortgage Servicing Inc., a Maryland
corporation, as a debtor and debtor-in-possession (the "Company" and
together with American Home Mortgage Corp. and Parent, the "Sellers")
(as amended, the "APA").

Gentlemen:

In accordance with Sections 4.1(b) and (c) of the APA, this letter constitutes notice by
Purchaser of disputes concerning the Initial Closing Date Report provided by Sellers at the Initial
Closing that took place on November 16, 2007.[1]

The Initial Closing Date Report included an agreement, dated as of March 4, 2004,
between Signature Bank and the Company's predecessor, Columbia National Incorporated (the
"Signature Agreement"). The inclusion of the Signature Agreement in the Initial Closing Date
Report was the result of that contract being listed on Schedule 1.1(j) to the APA. The mortgage
servicing rights under the Signature Agreement, however, do not and did not belong to Sellers.
Indeed, the Signature Agreement empowered Signature Bank (i) to terminate the Company
without cause at any time prior to the expiration of the initial term of the Signature Agreement
and (ii) to sell the servicing rights at any time pursuant to Section 2.5(d) of the Signature

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the APA.

DL1-6160056v2

**Exhibit B**

Mr. Steven Cooper
December 13, 2007
Page 2

Agreement. Moreover, the Signature Agreement does not transfer to the Company "mortgage servicing rights" as that term is understood in the mortgage servicing industry and as was intended by the parties to be sold for a price of approximately 0.92% of the amount of the unpaid principal balance of the related mortgage loans. Thus, the inclusion of the Signature Agreement in Schedule 1.1(j) to the APA was clearly erroneous, as the parties could not have intended that mortgage servicing rights of Signature Bank be purchased from Sellers and paid for by Purchaser.

The erroneous inclusion of the Signature Agreement on the Initial Closing Date Report resulted in an error in the Initial Closing Servicing Balance, which resulted in the Purchase Price, as calculated in connection with the Initial Closing, to be overstated by $757,426 (the "Overpayment Amount"). Thus, Purchaser hereby requests that Sellers repay the Overpayment Amount to Purchaser by wire transfer of immediately available funds to the account described on Exhibit A to this letter.

The Initial Closing Date Report also contains an error relating to HELOCs. The Initial Closing Date Report includes sections entitled "Investor Summary--Include" and "Investor Summary--Exclude." While Purchaser was to purchase Advances relating to certain excluded Mortgage Loans and servicing rights, Section 11.3 of the First Amendment to the APA provides that "all advances relating to HELOC Agreements or the Mortgage Loans serviced thereunder are excluded from the definition of Advances and shall be Excluded Assets." The Funds Flow Statement prepared in connection with the Initial Closing shows that the Purchase Price calculation was based on an Advances Amount of $104,630,465. That number is the total of the Total Net Advance Balances shown on the "Investor Summary--Include" and "Investor Summary--Exclude" sections. However, contrary to the First Amendment to the APA, the Total Net Advance Balance on the "Investor Summary--Exclude" section, and therefore the Advances Amount, included advances relating to HELOC Agreements or the Mortgage Loans serviced thereunder. While we do not yet know with certainty the exact amount of such advances relating to HELOC Agreements or the Mortgage Loans serviced thereunder, it appears to be at least $958,246, which means that the Purchase Price as calculated in connection with the Initial Closing was overstated by at least $881,586 (the "HELOC Overpayment Amount"). Thus, Purchaser hereby requests that Sellers repay the HELOC Overpayment Amount, and any other part of the Purchase Price based on advances relating to HELOC Agreements or the Mortgage Loans serviced thereunder, to Purchaser by wire transfer of immediately available funds to the account described on Exhibit A to this letter.

In addition, Purchaser is concerned that, with respect to the Signature Agreement, Sellers are not meeting their contractual obligations under Section 6.1(h) of the APA to "use commercially reasonable efforts to oppose any action by a third party to terminate . . . any Assumed Contract." Although Signature Bank has informed us that they are terminating the Signature Agreement, we are unaware of any steps that Sellers have taken to oppose that termination. We request that Sellers immediately take all commercially reasonable steps to oppose Signature Bank's efforts to terminate the Signature Agreement, which would include, we

Mr. Steven Cooper
December 13, 2007
Page 3

believe, an assertion by Sellers that any such termination would be violative of the automatic stay in the Bankruptcy Cases.

To work through these issues, we should talk as soon as possible. Should other matters arise with respect to the Initial Closing Date Report, we will, of course, provide you with a supplement to this notice; however, we thought it was important to inform you of these items as soon as possible.

Very truly yours,

Josh Seegopaul, Vice President

cc:

Kroll Zolfo Cooper
101 Eisenhower Parkway
Roseland, New Jersey 07068
Facsimile: (973) 618-9430
Attention: Elizabeth S. Kardos, Esq.

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Facsimile: (302) 571-1253
Attention: James L. Patton, Jr., Esq.

Banc of America
Strategic Solutions, Inc.
901 Main Street, 66th Floor
Dallas, TX 75202
Facsimile: (214) 290-9475
Attention: Jay T. Wampler

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Facsimile: (212) 836-6545
Attention: Mark Liscio, Esq.

Mr. Steven Cooper
December 13, 2007
Page 4


Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Facsimile:  (212) 478-7400
Attention: Mark S. Indelicato, Esq.

Robert Profusek, Esq.
Jones Day
222 East 41st Street
New York, New York  10017-6702
Facsimile:  (212) 755-7306

EXHIBIT A

Wire Transfer Instructions

Citibank- New York, New York-ABA 021 000 089

For Bear Stearns a/c 09253186

**Further credit: WLR Recovery Fund IV LP a/c 102-35770-2-4**

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**
**AMERICAN HOME MORTGAGE CORP.**
**AMERICAN HOME MORTGAGE SERVICES, INC.**
**538 Broadhollow Road**
**Melville, New York 11747**

December 28, 2007

**BY FACSIMILE (212)317-4891**
AH Mortgage Acquisition Co., Inc.
c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 27th Floor
New York, New York 10036
Attention: Mr. Wilbur L. Ross

Re:     Asset Purchase Agreement, dated as of September 25, 2007
        by and among AH Mortgage Acquisition Co., Inc. ("Purchaser"), a
        Delaware corporation, American Home Mortgage Investment Corp., a
        Maryland corporation, as a debtor and debtor-in-possession ("Parent"),
        American Home Mortgage Corp., a New York corporation, as a debtor
        and debtor-in-possession, and American Home Mortgage Servicing Inc., a
        Maryland corporation, as debtor and debtor-in-possession (the "Company"
        and together with American Home Mortgage Corp. and Parent, the
        "Sellers"), as amended (the "APA")

Gentlemen:

        We are in receipt of your correspondence of December 13, 2007 (the "Dispute Notice"),
that was delivered with respect to certain items set forth in the Initial Closing Date Report
delivered by Sellers to Purchaser at the Initial Closing that took place on November 16, 2007.[1]
The Dispute Notice alleges that (i) Servicing Rights under an agreement between Columbia
National Incorporated (a predecessor to the Company) and Signature Bank ("Signature"), dated
March 4, 2004 (the "Signature Agreement"), were not owned by the Company, the Signature
Agreement should not have been listed on Schedule 1.1(j) to the APA, and that Purchaser should
not have paid approximately 0.92% of the amount of the unpaid principal balance with respect to
the mortgage loans serviced under the Signature Agreement; and (ii) that Advances relating to
HELOCs were included in the Advances Amount and should not have been. Based on the
claims asserted in the Dispute Notice, Purchaser has asserted that the Purchase Price was
overstated (i) by $757,426 as a result of inclusion of the Signature Agreement and (ii) by at least
$958,246 as a result of the inclusion of Advances relating to HELOCs in the Advances Amount.

---

[1] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the APA.

**Exhibit C**

Sellers respectfully disagree with Purchaser's assertion that Servicing Rights under the Signature Agreement were not properly included on Schedule 1.1(j) of the APA and that the unpaid principal balance of mortgage loans serviced under the Signature Agreement should not have been included in the Initial Closing Date Report. Sellers agree that Advances relating to HELOCs should not have been included in the Advances Amount, but disagree that the inclusion of such Advances in the Advances Amount resulted in a Purchase Price overstatement of at least $958,246.

<u>Signature Agreement</u>

Under Section 2.1(a) of the APA, Purchaser agreed to purchase "all of Seller's Servicing Rights and rights to receive Servicing Fees." The term "Servicing Rights" is specifically defined in Section 1.1 of the APA to include "all right, title and interest of Sellers in and to: (i) the right to service the Mortgage Loans under the Servicing Agreements, including the right to receive the Servicing Fees and Ancillary Income; . . . ." The Signature Agreement clearly grants the Company certain rights with respect to the servicing of Mortgage Loans and such rights granted to the Company under the Signature Agreement fall squarely within the definition of Servicing Rights set forth in the APA. Thus, contrary to the Dispute Notice's assertion, inclusion of the Signature Agreement on Schedule 1.1(j) was appropriate. After the Initial Closing, Purchaser is entitled to all benefits of the Signature Agreement and, upon the Final Closing, Purchaser will be entitled to all "right, title and interest of Sellers" under the Signature Agreement. Moreover, Section 2.11 of the APA provides that the Purchaser would acquire the Purchased Assets (a defined term that includes the Servicing Agreements) on an "as is" and "where is" basis. Thus, Purchaser agreed to purchase whatever rights Sellers had with respect to the Servicing Rights afforded under the Signature Agreement.

Sellers also note that, despite Purchaser's assertions to the contrary, the Signature Agreement does afford the Company with rights and obligations that are typically associated with the duties of a servicer, including, obligations to receive and apply principal and income payments, to receive, escrow, and apply tax and insurance payments, to retain servicing fees out of amounts received, to initiate foreclosures, and to collect and retain "ancillary income" from mortgage borrowers. Thus, the Dispute Notice's assertion that the rights under the Signature Agreement are not typical in the mortgage servicing industry also lacks merit.

Purchaser's contention that Signature's ability to terminate the Signature Agreement without cause indicates that such agreement is not a Servicing Agreement for purposes of the APA is a moot point. As is the case with any Servicing Agreement, Purchaser is not entitled to a refund of any portion of the Purchase Price if a Servicing Agreement is terminated after the Initial Closing. It should also be noted that the initial term of the Signature Agreement was for a period of three years commencing on March 4, 2004 and expiring on March 3, 2007. Thereafter, the Signature Agreement automatically renews for successive annual terms unless one party notifies the other of a termination not less than 120 days prior to the expiration of the then-

current term. The termination right identified by Purchaser that purportedly precluded characterization of the Signature Agreement as a Servicing Agreement had already expired, without exercise, by the Initial Closing and Sellers continued to provide servicing of the underlying Mortgage Loans on the Initial Closing Date.

Sellers also disagree with Purchaser's contention that Signature's ability to terminate the Company's Servicing Rights under the Signature Agreement upon a sale of the underlying mortgage loans pursuant to Section 2.5(d) of the Signature Agreement serves as further evidence that inclusion of the Signature Agreement on Schedule 1.1(j) was inappropriate. Purchaser neglects to mention that if Signature terminates Servicing Rights upon the sale of any underlying mortgage loans, Signature is required to pay a $750 per loan fee to the Company with respect to each loan for which Servicing Rights are transferred. Moreover, where an underlying mortgage loan is sold and servicing remains with the Company, the Company is entitled to receive an additional fee of $1.00 per month with respect to servicing such mortgage loans pursuant to Section 2.5(c) of the Signature Agreement.

Based upon the foregoing, the Sellers believe that the Signature Agreement was properly included on Schedule 1.1(j) to the APA and that the Purchase Price properly included 0.92% of the unpaid principal balance of Mortgage Loans serviced by the Company pursuant to the Signature Agreement. Sellers also believe that any dispute with respect to the inclusion of the 0.92% of unpaid principal balance of the Mortgage Loans serviced under the Signature Agreement is not a dispute that is susceptible to resolution under the dispute resolution procedures set forth in Section 4.1(c) of the APA, *i.e.*, that the dispute relates to a matter that can be resolved by accountants reviewing the calculations and determining whether the amounts were properly calculated. Instead, the dispute raises a matter of contract interpretation. Accordingly, the parties may be better served by attempting to resolve the matter in another manner or in another forum.

HELOC Advances

As previously noted, Sellers do not dispute the Dispute Notice's assertion that Advances relating to HELOCs should not have been included in the Advances Amount. Sellers' review of the Initial Closing Date Report, however, indicates that the inclusion of such Advances in the Advances Amount resulted in an overstatement of the Purchase Price of $386,551. Total Advances set forth in the Initial Closing Date Report for the excluded HELOCs were $420,164. A summary of such Advances is attached hereto. Sellers also note that some Advances for HELOCs may have been repaid after the Initial Closing. As a result, a reconciliation will need to be prepared to ensure that no amounts are refunded with respect to HELOC Advances that have already been paid.

After you have had an opportunity to review the foregoing, we would like to discuss with you how to best proceed to resolve these matters.

Sincerely,

Kevin Nystrom, on behalf of Sellers

cc:   Robert Profusek, Esq. (by facsimile (212)755-7306)
      Elizabeth S. Kardos, Esq. (by facsimile (973)618-9430)
      Mr. Jay T. Wampler (by facsimile (214)290-9475)
      Mark Liscio, Esq. (by facsimile (212)836-6545)
      Mark S. Indelicato, Esq. (by facsimile (212)478-7400)
      James L. Patton, Esq. (by facsimile (302)571-1253)

| Investor Number | Investor Name | Loan Count | UPB | Cumulative Gross P I Advance (11/15/07) | Cumulative Net P I Advance (11/15/07) | Borrowings On Pre Payments (11/15/07) | Escrow Advance Balance | Corporate Advance Balance | Total Gross Advance Balance | Total Net Advance Balance | Cumulative Gross P I Advance (Oct EOM) | Cumulative Net P I Advance (Oct EOM) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 324 | AHMIT 2006-2 | 554 | $35,039,286 | $235,184 | $0 | $235,184 | $2,230 | $13,687 | $251,101 | $15,917 | $261,940 | $0 |
| 598 | AHMIT 2004-4 | 962 | $46,722,372 | $0 | $0 | $0 | $3,833 | $192,864 | $196,697 | $196,697 | $0 | $0 |
| 800 | AHMIT 2005-1 | 932 | $45,010,067 | $145,426 | $0 | $145,426 | $5,780 | $9,037 | $160,242 | $14,817 | $194,507 | $0 |
| 801 | AHMIT 2005-2 | 1,587 | $81,388,352 | $0 | $0 | $0 | $2,895 | $22,292 | $25,187 | $25,187 | $0 | $0 |
| 802 | AHMIT 2007-A | 599 | $34,521,238 | $0 | $116,410 | ($116,410) | $4,398 | $588 | $4,986 | $121,396 | $0 | $0 |
| 803 | AHMIT 2005-4A | 1,515 | $81,562,647 | $0 | $0 | $0 | $5,489 | $40,661 | $46,151 | $46,151 | $0 | $246,410 |
| Total | | 6,149 | $324,243,962 | $380,610 | $116,410 | $264,200 | $24,625 | $279,129 | $684,363 | $420,164 | $456,447 | $246,410 |