# EXHIBIT "A"

01095236 JUL 19 2001

Liber-34314   Page-279
201338155   7/19/2001
Bernard J. Youngblood, Wayne Co. Register of Deeds

—— Do Not Write Above This Line ——

# HOME EQUITY MORTGAGE
## (LINE) 49105437

### THIS IS A FUTURE ADVANCE MORTGAGE

This Home Equity Mortgage (the "Mortgage") is made this __29th__ day of __June__, __2001__ by HICHAM A MAKKI AND AMENA MAKKI HUSBAND AND WIFE

_____ whose address is
__6611 N BEECH DALY   DEARBORN HEIGHTS MI 48127__ ("Mortgagor")
and who mortgages and warrants to Comerica Bank, P.O. Box 75000, One Detroit Center, 500 Woodward Avenue, Detroit, Michigan 48226-7235 ("Mortgagee"), the land and property located in the County of __WAYNE__, State of Michigan, more fully described as:
LAND SITUATED IN THE CITY OF DEARBORN I EIGHTS, WAYNE COUNTY, MICHIGAN, LOTS 129-132, ALSO EAST 1/2 OF ADJACENT VACATED ALLEY, ANNIS HAWTHORNE MANOR SUBDIVISION, AS RECORDED IN LIBER 54, PAGE 61 OF PLATS, WAYNE COUNTY RECORDS.

Commonly known as: __6611 N BEECH DALY DEARBORN HEIGHTS MI 48127__

Parcel identification number: __33 011 01 0129 000__

together with all buildings and fixtures, whether now existing or hereafter placed on the land and property (the "Property"), to secure repayment of the initial sum of __TWENTY SEVEN THOUSAND DOLLARS 00/100__
_____ Dollars ($ __27,000.00__ )
or so much of that sum as may be outstanding from time to time under an Equity Line Account Agreement and Disclosure Statement dated __6-29__, __01__ (the "Agreement"), including interest thereon and any extensions, renewals, modifications, amendments or supplements thereof, given and owing by:

☐ Mortgagor to Mortgagee.

☐ _____ ("Debtor") to Mortgagee

along with the performance and payment required under this Mortgage by Mortgagor; and additional amounts, with interest, Mortgagee, in its sole discretion, may lend to Mortgagor or Debtor, when evidenced by promissory notes or other instruments or agreements stating such promissory notes, instruments or agreements are secured by this Mortgage (collectively, the "Debt").

In addition to the Debt, this Mortgage shall secure "Protective Advances" as that term is defined in MCLA 565.901(c).

**THE MAXIMUM PRINCIPAL AMOUNT SECURED BY THIS MORTGAGE IS $ __54,000.00__**

Mortgagor promises and agrees:

1. To keep the Property insured against fire, windstorm, flood and such other hazards in an amount and manner Mortgagee may require, with companies acceptable to Mortgagee and with the proceeds made payable in the policies to Mortgagee under a standard mortgage clause, and to deliver all policies to Mortgagee. Any insurance proceeds received by Mortgagee may be retained by it and may at any time or from time to time be applied by it against the Debt and shall constitute payment on the Debt and under the Agreement only to the extent so applied.
2. To pay all taxes, assessments and water rates levied on the Property before any interest, collection fee or penalty accrues.
3. To promptly remove any liens or encumbrances from the Property except (a) liens given to Mortgagee and (b) the following liens ("Senior Lien"):
__NATIONAL CITY MORTGAGE__

4. To keep the Property in good repair and in compliance with all applicable laws.

222 (06/00)

Liber-34314 Page-280

5. That if the Property is taken under the powers of eminent domain, or by condemnation, the entire proceeds of the award shall be paid, subject to the rights of the holder of the Senior Lien, if any, directly to the Mortgagee and applied toward reimbursement of all the Mortgagee's costs and expenses incurred by Mortgagee in connection with collecting such award, including without limit reasonable attorney fees, and the balance applied upon the Debt whether or not then due or payable in whatever manner the Mortgagee deems advisable. The Mortgagee or any of its employees is irrevocably appointed attorney-in-fact and is duly authorized and empowered to receive, receipt for, discharge and satisfy any condemnation award and judgment, whether joint or several, on behalf of the Mortgagor, its legal representatives or assigns.

6. That if Mortgagor fails to perform of any of the duties imposed by this Mortgage (which failure, along with Mortgagor's or Debtor's (as applicable) non-payment of the Debt and Mortgagor's failure to comply with the terms of a Senior Lien are referred to collectively as "Events of Default"), Mortgagee may, but is not obligated to, perform those duties and all sums paid by Mortgagee to comply with the terms of this Mortgage shall be due and payable by Mortgagor from the time of their payment by Mortgagee with interest at the highest lawful rate specified in the Agreement and such sums shall be secured by this Mortgage.

7. To reimburse the Mortgagee on demand for the cost of any title search and report made after any Event of Default and for all costs and expenses incurred by Mortgagee in collecting or attempting to collect the Debt or in enforcing or attempting to enforce any of its rights under this Mortgage, including without limit court costs legal expenses and reasonable attorneys' fees (whether inside or outside counsel is used, whether suit is instituted and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy or probate proceeding or otherwise).

8. That upon the occurrence of an Event of Default, in addition to all other available remedies, Mortgagee is authorized and empowered to sell the Property or cause the Property to be sold at public sale by foreclosure of the Mortgage by advertisement pursuant to Michigan Law and out of the proceeds of said sale, to retain the amount of the Debt outstanding, the cost, charges of such sale and reasonable attorney fees provided by Michigan statute, and render the surplus moneys, if any, to the Mortgagor. In the event of any foreclosure or other sale under this Mortgage by virtue of judicial proceedings, advertisement or otherwise, the mortgaged premises may be sold in one parcel and as an entirety, or in such parcels, manner or order as the Mortgagee in its sole discretion may elect. IN THE EVENT OF FORECLOSURE BY ADVERTISEMENT UNDER THIS POWER OF SALE, NO NOTICE OF THE MORTGAGE SALE OTHER THAN PUBLICATION IN A NEWSPAPER AND POSTING OF A COPY OF THE NOTICE OF SALE ON THE MORTGAGED PROPERTY IS REQUIRED BY MICHIGAN LAW. THERE WOULD BE NO ACTION OR HEARING BEFORE ANY COURT OF LAW.

9. That the Debt secured by this Mortgage shall become due and payable without notice, at the option of the Mortgagee, and it shall be deemed an Event of Default, if Mortgagor conveys, assigns, or transfers the Property by deed, land contract, or other instruments, or if the title to the Property shall become vested in any other person or persons in any manner whatsoever, whether voluntary or involuntary, by operation of law or otherwise.

10. That this Mortgage shall be governed by Michigan law.

11. That if any provision of this Mortgage is in conflict with any statute or rule of law or is otherwise unenforceable for any reason, then that provision shall be deemed null and void to the extent of the conflict or unenforceability and shall be deemed severable, but shall not invalidate any other provision of the Mortgage.

12. That the term "Mortgagee" includes Mortgagee's successors and assigns, the term "Debtor" includes Debtor's legal representatives, successors and assigns and the term "Mortgagor" includes and binds Mortgagor's legal representatives, successors and assigns. If this Mortgage is signed by two or more persons, the obligations and security interest granted by this Mortgage shall be joint and several and cumulative. All remedies specified in this Mortgage shall be cumulative and in addition to any other remedies provided by law.

IN WITNESS WHEREOF, the Mortgagor has signed and delivered this Mortgage the day and year first written above.

WITNESSES:

_(Signature)_
Ahmed Siaje
(Type or clearly print name)

_(Signature)_
Frances Palmer
(Type or clearly print name)

MORTGAGOR:

_(Signature)_
HICHAM A MAKKI

_(Signature)_
AMENA MAKKI

State of Michigan ) ss.
County of Wayne

The above instrument was acknowledged before me this 29th day of June, 2007
by HICHAM A MAKKI AND AMENA MAKKI HUSBAND AND WIFE

Drafted by: Rita M. Parraz
and When Recorded Return To:

Comerica Bank
Equity Operations Department
P.O. Box 75000
Detroit, Michigan 48275-7307

Notary Public, Wayne County, Michigan
My commission expires: 07/11/03

AHMED A. SIAJE
Notary Public, Wayne County, MI
ACTING IN Wayne CO
My Commission Expires 07/11/200_

222 (05/00)

Makki, Hicham
4610395149105437

## COMERICA — Credit Agreement and Disclosure Statement

### HOME EQUITY LINE OF CREDIT

In this Credit Agreement and Disclosure Statement (the "Agreement"), "Bank" means Comerica Bank, and "Account" means your home equity line of credit. "You" and "your" means all persons who sign and agree, individually, and jointly and severally, to be bound by this Agreement. "Checks" means checks issued to you by Bank specifically to access the Account. "Card" means the VISA Gold Access Card (whether over the counter or otherwise) to access the Account. "Cash Advance" means cash received from a financial institution accepting the Card (whether over the counter or by automated teller machine), funds transferred from the Account for overdraft protection and funds transferred from the Account using Checks (including checks used to purchase goods or services) or balance transfer forms issued by the Bank. "Purchases" means transactions for goods and services using the Card, whether or not you signed a sales draft. "Credit Limit" means the amount set forth in paragraph 24. "Real Estate" means the owner-occupied property you are pledging, under the terms of a future advance mortgage (the "Mortgage") to secure this Agreement. The minimum

1. Use of Account. You may obtain credit from the Account by using the Checks, the Card and/or through overdraft protection. The Bank shall not be obligated to pay any Checks, honor any use of the Card or permit an overdraft protection transfer that will exceed your available credit limit, or after credit on the Account has been suspended under Paragraph 13 or 14. Cancelled Checks will not be returned, but upon your specific request, the Bank will give you photocopies for the fee in Paragraph 9. You agree not to use the Account in violation of the law or the terms of this Agreement.

2. Finance Charges - (a) You will avoid Finance Charges on Purchases (including fees other than Cash Advance fees) if you pay the New Revolving Balance in full each month by the Due Date. If you do not pay your New Revolving Balance in full, Finance Charges on that month's Purchases will not begin until at least 25 days after the Statement Closing Date, but Finance Charges will begin to accrue as described in paragraph (2b) on Purchases made in the following month. There is no Grace Period for Cash Advances. For any transaction in the current statement cycle not posted
(b) Except as provided in (2c), Finance Charges begin to accrue on the Transaction Date from the first day of the next Statement cycle.
(c) The Finance Charge is computed by multiplying your Account's Average Daily Balance, for Purchases and for Cash Advances, for the monthly statement cycle by applicable Annual Percentage Rate ("APR") divided by 12.
(d) To get your Average Daily Balance for Purchases, take the beginning balance for Purchases each day, less unpaid Finance Charges, credits and adjustments posted that day, and if you did not pay the New Balance in full by the prior month's Due Date, add that day's New Purchases and fees (except for Cash Advance fees) posted to your Account that day. This is your "Daily Balance for Purchases". Add all Daily Balances for Purchases for the monthly Statement cycle and divide by the number of days in that cycle. This is the Average Daily Balance for Purchases. To get your Average Daily Balance for Cash Advances, take the beginning balance for Cash Advances each day, less unpaid Finance Charges, credits and adjustments posted that day, plus that day's Cash Advances and Cash Advance Fees. This is your "Daily Balance for Advances". Add all Daily Balances for Cash Advances for the monthly Statement cycle and divide by the number of days in that cycle. This is the Average Daily Balance for Cash Advances.
(e) Finance Charge on Certain Cash Advances: For all Michigan Home Equity Line of Credit Accounts opened beginning September, 1998: A fee of 2.0% of the Cash Advance with a minimum of $2 and a maximum of $15 is imposed on all Cash Advances from an Automated Teller Machine (ATM). This fee is a Finance Charge and will be included in the APR for Cash Advances on your Statement.

The monthly periodic rate applied to the Average Daily Balance for each billing cycle will be the ANNUAL PERCENTAGE RATE applicable to Your Account divided by 12. The ANNUAL PERCENTAGE RATE applicable to Your Account will be the highest prime rate as published in the Midwest Edition of the Wall Street Journal in effect on the 15th day of each month("PRIME") plus _____0.750_____ percentage points. Interest rate change dates for the ANNUAL PERCENTAGE RATE applicable to Your Account will be the first day of each new billing cycle in each month. For example, if the rate changes on December 15, the new rate will be applicable to any balance outstanding and future balance beginning the first day of Your January billing cycle and will be reflected on Your February statement.

The monthly periodic rate and the corresponding ANNUAL PERCENTAGE RATE applicable to Your Account will vary, increasing or decreasing to reflect changes in the prime rate as published in the Midwest edition of the Wall Street Journal. Any increase in the monthly periodic rate and corresponding ANNUAL PERCENTAGE RATE applicable to Your Account will result in increased FINANCE CHARGES, and may slightly increase the minimum monthly payment. The maximum ANNUAL PERCENTAGE RATE will not exceed 18.00%. The ANNUAL PERCENTAGE RATE will not be less than 3.00%. _____ the current monthly periodic rate is _____0.729%_____ (Corresponding ANNUAL PERCENTAGE Effective 05/28/2001
RATE: 8.750% ).

3. Credit Limit. If the Bank, at its option, extends credit in excess of your credit limit, you agree to pay the excess on receipt of your next Statement or on demand. If, on your request, Bank increases your Credit Limit, you agree to pay reasonable costs for new title work, credit reports and an appraisal, if required. Those three fees are estimated at $300. You also agree to pay a filing fee estimated at $9.

4. Payments. You agree to pay Bank for all credit extended on your Account, plus applicable finance charges, fees and costs of collection, including reasonable attorney fees as permitted by law. The amount of your payment during the Draw Period (as defined in Paragraph 22) will be based, in part, on the amount of your Credit Limit as a percentage of the value of the Real Estate as of the Date of this Agreement. This value is called the "LTV". If your LTV is less than 90%, you must make minimum monthly payments of the greater of $100 or interest only on the balance of the Account not covered under a Term Payment Option described in Paragraph 5 (the "Revolving Balance") or any accrued or unpaid interest. If your LTV is 91% or more, you must make minimum monthly payments of the greater of $75 or 2% of the Revolving Balance. Minimum payment amounts shown on your Statement include all payments calculated on the Revolving Balance and under each Term Payment Option, but do not include amounts you may withhold under your billing rights, as disclosed on your Statement. Any Revolving Balance less than $75 must be paid in full. Payments are due by the due date on your Statement.

5. Term Payment Option. During the Draw Period you have the option(a "Term Payment Option"), subject to certain conditions, to repay all or a portion of the balance of the Account(a)at a fixed rate of finance charge, (b)in equal monthly payments,(c)for a term of 3, 5, 7 or 10 years. The fixed rate of finance charge will be determined at the time you select a Term Payment Option and will be based on Prime in effect on the first day of the Term. If your LTV is 85% or less, the rate will be Prime plus 1.00 percentage points for Term Payment Option amounts of $25,001. or more and Prime plus 2.00% points for amounts up to $25,000.If your LTV is 86% to 90%, the rate will be Prime plus 2.00 percentage points for Term Payment Option amounts up to $25,000.If your LTV is greater than 90%, the rate will be Prime plus 4.00 percentage points.The payments will be in an amount sufficient to amortize the Term Payment Option amount amounts of $25,001. to $50,000. and Prime plus 3.00 percentage points for Term Payment Option over the term you have selected.The following conditions apply to your Term Payment Option:(a)The minimum Term Payment Option amount is $2,500;(b)you may not exercise this option more than twice in any one year period;(c)you may not have more than two(2)Term Payment balances outstanding at any time (d)you may not exercise this option while a default exists in the Account;(e)a fee in the amount of $50 will be due each time you elect the Term Payment Option.

6. Irregular Payments. The Bank's acceptance of late payments or partial payments, or of checks or money orders noted "payment in full" or language to the same effect, will not affect Bank's rights under this Agreement.

7. Prepayments. You may prepay all or a portion of the Account without penalty, except as provided in Paragraph 9. Any prepayments will be applied to the Account in the following order: first to the Revolving Balance and then to the balance of the Term Payment Option with the earliest date. Any prepayment will be applied to the monthly Account payments coming due in the inverse order of their maturities, which means you are not paid ahead and you will be required to make the next scheduled monthly payment.

8. Security Interest. You represent, warrant and agree that the Real Estate is owner occupied and will continue to be as long as any amount remains outstanding on the Account. As security for Cash Advances, Purchases and all other amounts owing under this Agreement you give the Bank a security interest in the Real Estate, which is located at: **6671 N BEECH DALY DEARBORN HEIGHTS MI**
and agree to execute and, if anyone has an interest in the Real Estate, have such joint owner execute, and deliver to the Bank a future advance mortgage (the "Mortgage") in favor of the Bank covering the Real Estate in the amount of the Credit Limit. You also give the Bank a security interest in funds you may have on deposit with Bank and in other money Bank may owe you. You agree by granting security for the Account that the Bank may satisfy all or any part of amounts owing on the Account, by charging your deposit account or any accounts maintained with the Bank if you do not pay the Account balance as required by this Agreement.

In addition, collateral securing other loans with the Bank may also secure credit extended under this Agreement. However, the Bank waives any security interest it may have or acquire in any person's principal dwelling other than the security interest granted under the terms of the Mortgage.

9. Fees and Charges. You agree to pay the following fees and charges: ANNUAL FEE (WAIVED THE FIRST YEAR) $50. and fees specified elsewhere in this Agreement:
(a) Returned Check Charge - $29., for any check or other draft received in payment on the Account which is not paid upon presentment, (b) Late Fee : $29., if you do not make a minimum payment within 3 days of the due date. (c) Stop Payment Fee - $29. for each Check written against the Account upon which you place a stop payment order. (d) Overlimit Fee - $29. (e) When You request an advance for which there are insufficient funds because your Credit Limit is exceeded, or (ii) Your Account privileges have been suspended. (e) Photocopy Fee - $2., for each photocopy unless requested under your billing rights. (f) Early Termination Fee - $250.00, if you pay off and close the Account within 24 months from the date the Account was opened. (g) Property Appraisal Fee     $ 0.00    . Title Examination Fee    $ 0.00    . Filing Fee    $ 0.00    .

_____ and Flood Insurance examination fee. See Paragraph 3 for fees related to an increase in your Credit Limit and Paragraph 5



**Credit Agreement and Disclosure Statement**

## HOME EQUITY LINE OF CREDIT

10. **Property Insurance.** You agree to obtain and maintain, adequate insurance against fire, flood and such other reasonable risks to the Real Estate as Bank may require with Bank as loss payee under a standard mortgagee clause. Any proceeds of insurance required to be obtained hereunder will also be security for all sums due on the Account. You may obtain such insurance from any agent, broker or insurance company of your choice, which is licensed to do business in the state where the Real Estate is located. However, the Bank reserves the right to reject any insurance company or policy for reasonable cause.

If you fail to keep the Real Estate insured, Bank may, but is not required to, purchase and pay for such insurance. Whether paid prior to or after cancellation of the Account, any payment made by Bank for such insurance shall be an extension of credit on the Account and you agree to pay this amount plus finance charges at the rate provided in the Agreement. If Bank exercises its option to purchase such insurance, it may not protect your interest in the Real Estate.

11. **Liability for Unauthorized Use of the Card.** You may be liable for unauthorized use of the Card that occurs before you notify Bank orally (by calling the number shown on your Statement), or in writing, of loss, theft, or possible unauthorized use of the Card. In any case, your liability shall not exceed the lesser of $50 or the amount of the unauthorized use. You agree that you will sign the Card upon receipt. Any merchant presented with an unsigned Card may decline to accept the Card or require proper identification and that you sign the Card in the merchant's presence.

12. **Overdraft Protection.** The Account may be used for overdraft protection for your Comerica Bank checking account. If you choose to link your Account with a Comerica Bank checking account, you authorize us to transfer funds until the entire amount of the overdraft is satisfied up to your available credit. The minimum draw for overdraft protection is $50, and increments of $10. will be added until the overdraft is satisfied. Overdraft transfers will appear as a Cash Advance on your statement.

13. **Default.** Upon the occurrence of any of the following events, the Bank may, at its option, (a) terminate the Account and declare the balance outstanding immediately due and payable, (b) temporarily or permanently prohibit any additional extension of credit or (c) temporarily or permanently reduce the Credit Limit if:

(i) you fail to make any payment on the Account when due; (ii) you fraudulently or materially misrepresent any information in connection with the Account; or (iii) your action or inaction is such that the Bank's security for the Account or any right Bank has in the Real Estate is adversely affected, including, but not limited to, sale or transfer of the security (whether voluntary, involuntary, or by operation of law), failure to maintain property insurance on the Real Estate; commission of waste or other destructive use of the Real Estate; failure to pay taxes on the Real Estate, or failure to prevent the filing of a lien against the Real Estate that is senior to the Mortgage.

If you fail to make a minimum payment by the due date, it is the Bank's option to immediately increase the APR on the Account (including any introductory or promotional APR) to a default APR of four (4) percentage points above the Account APR. The APR applicable to the Account will revert to the standard APR in paragraph 2 if you are not in default for six (6) consecutive monthly billing cycles.

If Bank terminates the Account and declares the entire outstanding balance immediately due and payable, the Bank may foreclose on the Real Estate or take any other legal action deemed necessary by Bank to collect such balance due.

14. **Change in Account Terms/Suspension of Account.** The Bank may, at any time, change the terms of this Agreement as permitted by Michigan and federal law or regulation. The Bank will comply with all applicable notice requirements. In addition, Bank may, at its option, temporarily prohibit additional extensions of credit during any period in which: (a) the value of the Real Estate declines significantly below its determined value at the time your Account is opened; (b) the Bank reasonably believes that you will be unable to fulfill the repayment obligations specified in this Agreement because of a material change in your financial circumstances; (c) the Bank is precluded by government action to the extent that the value of the rate provided for in this Agreement; (d) the priority of the Mortgage is adversely affected by government action having supervisory responsibility that security interest is less than 120% of the Credit Limit; (e) the Bank is notified by any regulatory agency having supervisory responsibility that continued extensions of credit on the Account would be an unsafe and unsound practice; (f) you are in default of any material obligation under this Agreement; or (g) the maximum annual percentage rate stated in Paragraph 2 is reached. Any amendment made shall be applicable to the outstanding balance of the Account on the amendment's effective date as well as to subsequently owed amounts, unless prohibited by law. If the Bank discontinues the home equity line of credit product as to all customers, the Bank may cancel the Account by mailing you notice of such cancellation at the address shown on the Bank's Account files, with reasonable advance notice. In such event the amount owed on the Account shall remain subject to this Agreement and will be secured by the Mortgage, as though the Account has not been cancelled.

15. **Your Right to Cancel.** You may cancel the Account at any time by notifying the Bank in writing. If more than one person has signed this Agreement, cancellation of the Account by any signer shall cancel the Account for all persons on the Account. If you cancel, the Account shall remain subject to this Agreement and, until repaid in full, shall continue to be secured by any security for the Account, including the Mortgage. You may be subject to a fee under Paragraph 9.

16. **Rescission.** Under federal law, you, in connection with the granting of the mortgage on your principal dwelling, are entitled to a three (3) business day period in which to rescind the Account. The Bank will not honor any requests for extensions of credit on the Account until this right of rescission period has expired. After this period expires, advances will be secured by the Mortgage only up to the amount of the Credit Limit. Any amount over the Credit Limit shall be considered unsecured.

17. **Surrender of Checks and/or Card.** In the event the Account is cancelled, whether by Bank or at your request, you agree to promptly surrender to the Bank your unused Checks and/or the Card.

18. **Waiver, Invalidity.** Bank may from time to time elect to enforce its rights under this Agreement or the Mortgage. Partial exercise or delay in exercise of, or any failure to exercise such rights will not result in loss of any of the Bank's rights under this Agreement or the Mortgage. Should any provision of this Agreement be found invalid or unenforceable, the remainder will remain in effect.

19. **Additional Customer Agreements.** You further agree: (a) not to receive any extension of credit secured by the Real Estate which has priority over the Mortgage. (b) not to take an extension of credit on the Account in order to make a payment due on the Account. (c) that your statement is the document which evidences your obligation to pay until you advise the Bank under applicable law of a billing error. (d) to notify Bank immediately of any change in your address or phone number; (e) not to hold the Bank liable if merchants, banks, or any others fail to honor or accept the Card or the Checks. (f) the Bank may make credit inquiries about you and give information about the Account to others in response to credit inquiries, as well as share all information we obtain about you with the Bank's affiliates, subsidiaries, service providers, or parent company; (g) upon opening the Account, all liens on the Real Estate prior to the Mortgage except the current taxes and assessments and the first mortgage or similar lien approved by the Bank, shall be paid in full, if the Bank agrees prior liens may be paid by an advance against the Account; (h) to advise the Bank immediately at the phone number shown on your Statement if the Checks or Cards are lost or stolen; (i) except as otherwise provided in this Agreement, any Check written on the Account is subject to all laws normally applicable to checks and negotiable instruments; (j) to promptly provide the Bank with such current financial information as it may request from time to time; (k) that this Agreement and the Mortgage, set forth the entire agreement between you and Bank regarding the Account.

20. **Tax Deductibility.** You acknowledge that Bank has made no representation or warranty, nor given any advice as to the tax consequences of entering into this Agreement and that you should consult a tax advisor regarding the deductibility of interest and other charges on the Account.

21. **Assignment.** The Bank may assign all or part of the Account, its rights under this Agreement, and the Mortgage to any person or entity without notice to you. You may not transfer your rights under this Agreement or the Mortgage.

22. **Termination.** The Bank will review your account at the end of five (5) years, and at any other time it deems necessary, to confirm that you continue to comply with the default and suspension of account provisions of Paragraph 13 and 14. Unless extended by Bank the obligation of Bank to make advances under this Agreement shall terminate ten (10) years from the date of this Agreement (which time period, including any extensions, is called the "Draw Period"). At end of the Draw Period, the entire Account balance outstanding, including all unpaid finance charges, shall accrue finance charges at a fixed rate to be determined by the Bank based on rates then in effect for new loans of the same type and shall be repaid in equal monthly payments in an amount sufficient to amortize the amounts owing over a period of time (the "Repayment Period") not to exceed ten (10) years.

23. **Governing Law.** This Agreement and the use of the Account are governed by federal and Michigan law.

24. **Acceptance.** You accept the Account in the amount of $ __27,000.00__ . By signing below, you acknowledge receipt of the brochures "What You Should Know About Home Equity Lines of Credit" and "Important Terms About Comerica Bank's Home Equity Line of Credit" and a completed copy of this Credit Agreement and Disclosure Statement and agree to the terms set forth herein.

NAME _____  DATE __6/29/01__

HICHAM A MAKKI

NAME _____  DATE _____



## HOME EQUITY LINE OF CREDIT
## CREDIT AGREEMENT AND DISCLOSURE STATEMENT
## INTRODUCTORY RATE ADDENDUM

The ANNUAL PERCENTAGE RATE applicable to your Account will be an introductory APR of 5.90% (which is a monthly periodic rate of .492%) and applies only to transactions that post to the account during the first three statement cycles after the account open date ("the introductory rate balances"). This rate is effective through the last day of your third statement cycle after your closing date. For all other balances and for introductory rate balances after the last day of your third statement cycle after your closing date, the ANNUAL PERCENTAGE RATE will vary monthly and will be based on the highest Prime rate as published on the 15th day of the preceding month in the Midwest Edition of The Wall Street Journal plus a margin in accordance with the terms of your Agreement.

Your fixed rate Term Payment Option will not be available until after your three-statement-cycle introductory rate of 5.90% APR has ended.

NAME _[signature]_  DATE 6/29/01
HICHAM A MAKKI

NAME _____  DATE _____

603(rev 05/01)

cc type: NP01