IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re:                                                        :   Chapter 11
                                                              :
                                                              :   Case No.  07-11047 (CSS)
AMERICAN HOME MORTGAGE                                        :
HOLDINGS, INC., a Delaware corporation, et al.,[1]           :   Jointly Administered
                                                              :
                Debtors.                                     :   **Objection Deadline:  June 18, 2008 at 4:00 p.m.**
                                                              :   **Hearing Date:  June 25, 2008 at 10:00 a.m.**
------------------------------------------------------------- x

**DEBTORS' MOTION FOR AN ORDER FURTHER EXTENDING
THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN
AND SOLICIT ACCEPTANCES THERETO PURSUANT TO
SECTION 1121(d) OF THE BANKRUPTCY CODE**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") hereby move this Court (the "Motion"), pursuant to section 1121(d) of title 11 of

the United States Code (the "Bankruptcy Code"), Rule 9006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 9006-2 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), for entry of an order further extending the Debtors' exclusive periods to file a chapter

11 plan or plans and to solicit acceptances of such plan(s) through and including September 2,

2008 and October 29, 2008, respectively.  In support of this Motion, the Debtors, by and through

their undersigned counsel, respectfully represent:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation
(3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM
SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM Servicing"), a Maryland corporation (7267);
American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage
Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services,
Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York
corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except
for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION

1.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The statutory and legal predicate for the relief sought herein is section 1121(d) of the Bankruptcy Code, together with Bankruptcy Rule 9006(b)(1) and Local Rule 9006-2.

## GENERAL BACKGROUND

2.    On August 6, 2007 (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.    On August 14, 2007, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed.

5.    On December 19, 2007, this Court entered the Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereto Pursuant to Section 1121(d) of the Bankruptcy Code [Docket No. 2445] (the "First Exclusivity Extension Order").  Pursuant to the First Exclusivity Extension Order, the Debtors' exclusive periods to file a chapter 11 plan or plans and solicit acceptances of such plan(s) were extended to March 3, 2008, and May 5, 2008, respectively.

DB02:6808192.3                                                                                              066585.1001

6.     On March 26, 2008, this Court entered the Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereto Pursuant to Section 1121(d) of the Bankruptcy Code [Docket No. 3415] (the "Second Exclusivity Extension Order," and together with the First Exclusivity Extension Order, the "Exclusivity Extension Orders"). Pursuant to the Second Exclusivity Extension Order, the Debtors' exclusive periods to file a chapter 11 plan or plans and solicit acceptances thereto were extended to June 2, 2008, and July 31, 2008, respectively.

## POSTPETITION DEVELOPMENTS

7.     The Debtors have made and continue to make significant progress in administering these large and complex cases. Since the entry of the Second Exclusivity Extension Order, in addition to their continued focus on maximizing the value of their estates through the orderly liquidation of assets for the benefit of their stakeholders, the Debtors have devoted substantial time to several highly complex litigation matters. The following is a non-exhaustive summary of the Debtors' activities since the entry of the Second Exclusivity Extension Order.

**A.     Closing of the Sale of the Debtors' Servicing Business**

8.     Prior to the Petition Date, a large component of the Debtors' business was the servicing of mortgage loans (the "Servicing Business"). By Order dated October 30, 2007 [Docket No. 1711] (the "Sale Order"), the Court approved and authorized the sale of the Debtors' Servicing Business (the "Servicing Sale") to AH Mortgage Acquisition Co., Inc. (the "Purchaser"), pursuant to the terms of that certain Asset Purchase Agreement dated as of

3

September 25, 2007 (as amended and together with all exhibits and schedules thereto, the "APA").[2]

9.    On November 6, 2007, DB Structured Products, Inc. ("DBSP") filed its Notice of Appeal [Docket No. 1799] of the Sale Order (the "Appeal"). The Appeal is currently pending in the United States District Court for the District of Delaware, Case Number 07-773. The Debtors, the Committee and DBSP participated in a mediation of the Appeal on February 27, 2008. The parties, however, were unable to reach a settlement and are proceeding with the Appeal. On May 7, 2008, DBSP filed its opening brief, and on May 27, 2008, the Debtors filed their answering brief. Pursuant to the scheduling order, DBSP's reply brief is currently due by June 11, 2008.

10.    The Appeal, however, did not impact the Debtors' ability to close the Servicing Sale. The APA provided for the Servicing Sale to be closed in two steps, comprised of an "economic" close and a "legal" close. The "economic" close of the Servicing Sale occurred on November 16, 2007 (the "Initial Closing"), at which time the Purchaser paid the Purchase Price in the manner and to the parties as provided in the APA and related agreements referenced therein.

11.    Since the entry of the Second Exclusivity Extension Order, the Debtors diligently worked with the Purchaser to effectuate the "legal" close (the "Final Closing"), while operating the Servicing Business in the Ordinary Course of Business, subject to the Bankruptcy Exceptions, for the economic benefit and risk of the Purchaser. To that end, the Debtors and the Purchaser spent significant time preparing applications for, and negotiating with, numerous jurisdictions to obtain licensing rights for the Purchaser, which was a condition of the Final

---

[2]  All capitalized terms used in this section with respect to the APA, but not defined herein, shall have the meanings set forth in the APA. The description of the APA in this section is by way of summary only. To the extent there is any discrepancy between such description and the actual terms of the APA, the latter are controlling.

Closing. Additionally, the Debtors worked diligently to resolve and complete the other matters necessary to effectuate the Final Closing. As a result of those efforts, the Final Closing occurred on April 11, 2008.

**B.    Non-Performing Loan Sales**

12.    On December 22, 2007, the Debtors filed the Motion of the Debtors for Orders: (a)(i) Approving Sale Procedures; (ii) Approving Payment of the Expense Reimbursement (iii) Scheduling a Hearing to Consider Sale of Certain Non-Performing Loans (the "Non-Performing Loans"); (iv) Approving Form and Manner of Notice Thereof; and (v) Granting Related Relief; and (b)(i) Authorizing the Sale of Non-Performing Loans Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Sale Agreement Thereto; (iii) Authorizing the Distribution of the Proceeds; and (iv) Granting Related Relief [Docket No. 2490] (the "Non-Performing Loan Sale Motion").[3] The Non-Performing Loans were divided into three separate pools: the Unencumbered Non-Performing Loans; the BofA Non-Performing Loans; and the JPM Non-Performing Loans.

13.    By Order dated February 1, 2008 [Docket No. 2858], the Court approved the sale procedures set forth in the Non-Performing Loan Sale Motion. With respect to the BofA Non-Performing Loans and the JPM Non-Performing Loans, Final Bids were required to be submitted by March 11, 2008. With respect to the Unencumbered Non-Performing Loans, Final Bids were required to be submitted by March 27, 2008.[4]

14.    The Debtors ultimately received four (4) Final Bids with respect to the BofA Non-Performing Loans and three (3) Final Bids on the JPM Non-Performing Loans.

---

[3] All capitalized terms used in this section with respect to the Non-Performing Loan Sale Motion, but not defined herein, shall have the meanings set forth in the Non-Performing Loan Sale Motion.
[4] The Debtors elected to cancel the sale of the Unencumbered Non-Performing Loans because they did not believe that the Final Bids received for the loans were representative of the loans' value.

Based on the Final Bids received, the Debtors identified Beltway Capital, LLC as the Successful Bidder for the BofA Non-Performing Loans and Lehman Capital as the Successful Bidder for the JPM Non-Performing Loans.

15.    By Orders dated March 14, 2008 [Docket Nos. 3283 and 3314], the Court approved the sale of the BofA Non-Performing Loans to Beltway Capital, LLC and the JPM Non-Performing Loans to Lehman Capital, respectively.  Each of these sales closed on March 15, 2008.

C.    **Bank of America Stay Relief Litigation[5]**

16.    On February 22, 2008, Bank of America, N.A., as Administrative Agent (the "Administrative Agent") filed a Motion for Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing the Administrative Agent to Exercise its Rights as a Secured Creditor [Docket No. 3054] (the "BofA Stay Relief Motion"), in which it sought authority to sell approximately $580 million in unpaid principal balance ("UPB") of mortgage loans owned by the Debtors subject to the Administrative Agent's security interest (the "BofA Portfolio"). On March 6, 2008, the Debtors filed their Preliminary Objection to the BofA Stay Relief Motion [Docket No. 3175] (the "Preliminary Objection"), which responded to the allegations made in the BofA Stay Relief Motion concerning the Debtors' management of the BofA Portfolio and, further, argued that (i) the Administrative Agent had failed to allege a *prima facie* case for "cause" under section 362(d)(1) of the Bankruptcy Code, (ii) the Administrative Agent was entitled to adequate protection only from and after the date of the BofA Stay Relief Motion, (iii) the Administrative Agent's interest in the BofA Portfolio was adequately protected, and (iv) the BofA Portfolio should not be sold into a down market.  Thereafter, the

---

[5] All capitalized terms used in this section with respect to the BofA Stay Relief Motion, but not defined herein, shall have the meanings set forth in the BofA Stay Relief Motion.

Debtors and the Administrative Agent engaged in extensive, expedited discovery (including expert witness discovery), and prepared pretrial briefing.

17.    While discovery was underway on the BofA Stay Motion, the Administrative Agent and the Committee negotiated and executed the BofA/Committee Stipulation (as hereinafter defined) resolving issues under the Cash Collateral Order between the Committee and the Administrative Agent. Following approval of the BofA Settlement Stipulation (discussed below), and pursuant thereto, the Committee filed a Statement in Support of the BofA Stay Relief Motion [Docket No. 3175] on April 9, 2008.

18.    The Administrative Agent and the Debtors exchanged pretrial briefs on April 11, 2008 [Docket Nos. 3667 & 3668], and an evidentiary hearing was held on April 16 and 17, 2008. At the conclusion of the Administrative Agent's case in chief, the Debtors moved to dismiss the BofA Stay Relief Motion for failure to establish a *prima facie* case, which dismissal was granted. By Order dated April 25, 2008 [Docket No. 3850], the Court denied the BofA Stay Relief Motion.

**D.    Committee and Bank of America 9019 Motion**[6]

19.    On March 13, 2008, the Administrative Agent and the Committee filed a motion to shorten notice [Docket No. 3279] (the "BofA/Committee Motion to Shorten") with respect to a joint motion, filed subsequently on March 14, 2008 [Docket No. 3318] (the "BofA/Committee 9019 Motion"), to approve a settlement stipulation (the "BofA/Committee Stipulation") resolving all remaining issues under the Cash Collateral Order. On March 17, 2008, the Debtors filed an objection [Docket No. 3322] to the BofA/Committee Motion to Shorten, noting several troubling provisions of the BofA/Committee Stipulation and arguing it

---

[6]  All capitalized terms used in this section with respect to the BofA/Committee 9019 Motion, but not defined herein, shall have the meanings set forth in the BofA/Committee 9019 Motion.

should go out on full notice.  By Order dated March 17, 2008 [Docket No. 3325], the Court

denied the BofA/Committee Motion to Shorten.

        20.    On April 7, 2008, the Debtors filed an objection [Docket No. 3542] to the

BofA/Committee 9019 Motion, arguing, among other things, that the Committee had exceeded

its authority under the Cash Collateral Order, that the BofA/Committee Stipulation provided

illusory value to the Debtors' estates, and that the Committee's concessions to the

Administrative Agent were disproportionate to the value received.  Objections were also filed

by the Purchaser [Docket No. 3541] and the United States Trustee [Docket No. 3552].  At the

conclusion of the April 14, 2008 hearing on the BofA/Committee 9019 Motion, the

BofA/Committee Stipulation was approved by order of this Court [Docket No. 3699].

**E.**      **Wells Fargo Stay Relief Motion**

        21.    On March 24, 2008, Wells Fargo Bank, N.A. ("Wells Fargo") filed the

Motion for Relief From the Automatic Stay to Recover a Payment Made in Error to One of the

Debtors Through Recoupment, Imposition of a Constructive Trust, and/or an Equitable Lien

[Docket No. 3387] (the "Wells Fargo Stay Relief Motion"), by which it sought relief from the

automatic stay to assert the equitable remedies of recoupment, constructive trust and equitable

lien in order to recover a $462,049.83 distribution Wells Fargo made on a certain note to the

Debtors in March 2007.

        22.    On April 8, 2008, the Debtors filed an objection to the Wells Fargo Stay

Relief Motion (the "Wells Fargo Stay Relief Objection") arguing, among other things, that

recoupment must be narrowly construed and that Wells Fargo failed to demonstrate that

imposition of a constructive trust or an equitable lien was justified under the circumstances.  On

April 14, 2008, this Court held an evidentiary hearing on the matter, during which the Debtors

8

presented witness testimony.  On April 15, 2008, this Court enter an order denying the Wells

Fargo Stay Relief Motion [Docket No. 3702] (the "Wells Fargo Stay Relief Order").  On April

25, 2008, Wells Fargo filed its Notice of Appeal of the Wells Fargo Stay Relief Order [Docket

No. 3860], thereby appealing this Court's decision to the United States District Court for the

District of Delaware (the "District Court").

**F.      Omnibus Claims Objections**

        23.     The Debtors have also made substantial progress with respect to the

reviewing, reconciling and objecting to proofs of claim filed in Debtors' chapter 11 cases.  To

date, in excess of 10,000 proofs of claim have been filed.  The Debtors have worked diligently

with their financial advisors to review those proofs of claim.  As a consequence of these efforts,

the Debtors have filed nine (9) omnibus objections to more than 3,400 claims.  As of the date

hereof, the Debtors have prosecuted objections to more than 1,500 of those claims.

## RELIEF REQUESTED

        24.     By this Motion, the Debtors respectfully request, pursuant to section

1121(d) of the Bankruptcy Code, that:  (a) the period in which the Debtors have the exclusive

right to file a chapter 11 plan or plans be extended by 90 days through and including September

2, 2008; and (b) the period in which the Debtors have the exclusive right to solicit acceptances

of such plan or plans be extended by approximately 90 days through and including October 29,

2008.  This is the Debtors' third request for an extension of these deadlines.

        25.     The Debtors also request that such extensions be without prejudice to their

rights to request further extensions or to seek other appropriate relief.  In fact, notwithstanding

their commitment to continue to diligently prosecute these chapter 11 cases, the extensions

sought herein may not provide sufficient time for the Debtors to complete the various sales and

other tasks that may need to be completed before a plan can be filed and acceptances of such

plan can be solicited. As stated below, more must be done in these cases before any party will

be in a position to file a chapter 11 plan and accompanying disclosure statement.

## BASIS FOR RELIEF

26.    Section 1121(b) of the Bankruptcy Code provides for an initial period of

120 days after the commencement of a chapter 11 case during which a debtor has the exclusive

right to file a plan (the "Exclusive Filing Period"). Section 1121(c)(3) of the Bankruptcy Code

provides that, if a debtor files a plan within the Exclusive Filing Period, then it has an initial

period of 180 days after the commencement of its chapter 11 case to solicit acceptances of such

plan (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the

"Exclusive Periods"). The Debtors' current Exclusive Filing Period will expire on June 2,

2008,[7] and the Debtors' current Exclusive Solicitation Period will expire on July 31, 2008.

Section 1121(d) permits the Court to extend the Exclusive Periods for "cause." For the reasons

set forth herein, the Debtors believe that "cause" exists to extend the Exclusive Periods.

**A.      Section 1121(d) of the Bankruptcy Code Permits the Court to Extend the Exclusive
         Periods for "Cause"**

27.    The Exclusive Periods under section 1121(b) of the Bankruptcy Code are

intended to afford the Debtors the opportunity to propose a chapter 11 plan and to solicit

acceptances of such plan without the deterioration and disruption to the Debtors' business

operations that might be caused by the filing of competing plans by non-Debtor parties. In

circumstances where, as here, the current Exclusive Periods prove to be an unrealistic time

frame to file and solicit acceptances of a meaningful chapter 11 plan that might garner support

---

[7] Pursuant to Local Rule 9006-2, the Debtors' Exclusive Filing Period "shall automatically be extended until the
Court acts on the motion, without the necessity for the entry of a bridge order." Del. Bankr. L.R. 9006-2.

from parties in interest, section 1121(d) of the Bankruptcy Code allows the Court to extend the

Debtors' Exclusive Periods for "cause."  Specifically, section 1121(d) of the Bankruptcy Code

provides:

> (1)    Subject to paragraph (2), on request of a party in interest
> made within the respective periods specified in
> subsections (b) and (c) of this section and after notice and a
> hearing, the court may for cause reduce or increase the 120-
> day period or the 180-day period referred to in this section.
>
> (2)    (A)    The 120-day period specified in paragraph (1) may
> not be extended beyond a date that is 18 months after the
> date of the order for relief under this chapter.
>
> (B)    The 180-day period specified in paragraph (1) may
> not be extended beyond a date that is 20 months after the
> date of the order for relief under this chapter.

11 U.S.C. § 1121(d).

28.    It is well established that the decision to extend the Exclusive Periods is

left to the sound discretion of the Bankruptcy Court and should be based upon the facts and

circumstances of a particular case.[8]  See First Am. Bank of N.Y. v. Southwest Gloves and

Safety Equip., Inc., 64 B.R. 963, 965 (D. Del. 1986); In re Reetz, 61 B.R. 412, 414 (Bankr.

W.D. Wis. 1986).  Although the Bankruptcy Code does not define "cause" for the purpose of an

extension of the Exclusive Periods, courts have looked to the legislative history of section

1121(d) of the Bankruptcy Code for guidance.  See In re Gibson & Cushman Dredging Corp.,

101 B.R. 405, 409 (E.D.N.Y. 1989); In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D.

Ohio 1996).  Indeed, courts have found that Congress did not intend that the 120- and 180-day

periods be a hard and fast rule.  See Amko Plastics, 197 B.R. at 77 (noting that Congress

---

[8]  Although the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended section
1121(d) by prohibiting extensions of the Exclusive Filing Period and Exclusive Solicitation Period beyond 18 and
20 months, respectively, of the Petition Date, there was no revision to the standards for obtaining interim extensions.
Accordingly, pre-BAPCPA case law continues to apply and must be examined in the context of the instant case.

066585.1001

intended courts to have flexibility in dealing with extensions of exclusivity); Gaines v. Perkins (In re Perkins), 71 B.R. 294, 297 (W.D. Tenn. 1987) ("The hallmark of ... [section 1121(d)] is flexibility"). Rather, Congress intended that the Exclusive Periods be of an adequate length, given the circumstances, for a debtor to formulate, negotiate and draft a viable plan of reorganization, which by definition means one supported by some or all of a debtor's key constituents, without the disruption to its business that would occur with the filing of competing plans. See Geriatrics Nursing Home v. First Fidelity Bank, N.A., 187 B.R. 128, 133 (D.N.J. 1995) ("The opportunity to negotiate its plan unimpaired by competition, the court held, is meant to allow the debtor time to satisfy all creditors and win support for its restructuring scheme and thus ensure its survival as a business."). Indeed, Congress recognized that often a 120-day exclusivity period will not afford a debtor sufficient time to formulate and negotiate a plan:

> The court is given the power, though, to increase . . . the 120-day
> period depending on the circumstances of the case. [T]he bill
> allows the flexibility for individual cases that is not available
> today. For example, if an unusually large company were to seek
> reorganization under chapter 11, the Court would probably need to
> extend the time in order to allow the debtor to reach an agreement.

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 232 (1977) (footnotes omitted).

29.     When determining whether cause exists for an extension of the Exclusive Periods, courts have relied on a variety of factors, each of which may provide sufficient grounds for extending the periods. Factors considered by the courts in making such a determination have included: (a) the size and complexity of the case; (b) the necessity of sufficient time to negotiate and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) whether the debtor is paying its debts as they come due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether

the debtor has made progress in negotiating with creditors; (g) the length of time the case has been pending; (h) whether the debtor is seeking the extension to pressure creditors; and (i) whether unresolved contingencies exist.  See, e.g., Cont'l Casualty Co. v. Burns & Roe Enters., Inc., 2005 U.S. Dist. LEXIS 26247, at *11-12 (D.N.J. 2005); In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409-10 (E.D.N.Y. 1989); In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); In re Express One Int'l Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); In re Grand Traverse Dev. Co. Ltd. P'ship, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992); In re Sw. Oil Co. of Jourdanton, Inc., 84 B.R. 448, 451-54 (Bankr. W.D. Tex. 1987).  The application of these factors to the facts and circumstances of these cases demonstrates that the requested extensions are both appropriate and necessary to afford the Debtors with time to adequately evaluate their alternatives for a plan or plans in these chapter 11 cases.

**B.      Cause Exists for an Extension of the Debtors' Exclusive Periods in These Cases**

   **(1)      The Size and Complexity of These Cases**

         30.    As with other large and complex cases, the current Exclusive Periods in these cases did not provide the Debtors with an adequate opportunity to develop and negotiate a chapter 11 plan or plans.  Particularly, the contested nature of nearly every facet of these cases to date has prevented the Debtors and their professionals from devoting significant attention to the preparation and negotiation of a chapter 11 plan or plans.

         31.    Initially upon the filing of these cases, the Debtors were focused on stabilizing the Debtors' operations in the wake of the unprecedented upheaval in the mortgage loan and mortgage-backed securities experienced nationwide.  The sudden upheaval in the mortgage industry was caused by, among other factors, falling real estate prices and a spike in consumer defaults on mortgage obligations.  The downward pressure on loan and security

13

values accelerated as more and more borrowers were forced to sell securities and loans in an effort to meet margin calls. Many lenders asserted defaults prior to the Petition Date and sought to, among other things, exercise the right to terminate the Debtors' ability to service mortgage loans. In the two weeks immediately prior to the Petition Date, the markets for these assets were disrupted to the point of dysfunction, leaving the company unable to meet the volume of margin calls and forcing major write-downs of its loan and security portfolios.

32.    In the months following the Petition Date, the Debtors have had to work with – and in some cases, vigorously litigate with – the numerous large financial entities and other parties in interest with whom the Debtors did business, to obtain approval of the sale of the Servicing Business. The Debtors received various notices of purported defaults from parties to the Debtors' master servicing agreements. Certain of these parties also notified the Debtors that such alleged defaults served as the basis for disqualifying AHM Servicing from continuing to act as servicer for their loans. Ultimately, the Debtors either resolved their disputes with these counterparties, or obtained an order from the Court authorizing the transfer of the Servicing Business to the Purchaser. Completing the sale process for the Servicing Business involved time-consuming litigation and discovery and had been the primary focus of senior management and the Debtors' professionals for much of these cases, and was essential to preserving the value of the Servicing Business for the Debtors' estates and creditors.

33.    More recently, and since the entry of the Second Exclusivity Extension Order, the Debtors expended significant time working with the Purchaser to facilitate the effective transition of the Servicing Business to the Purchaser, which transition has recently taken place. The Debtors have additionally continued to focus on maximizing the value of their remaining assets, while at the same time preserving the value of these estates, by, among other

14

things, marketing and selling certain mortgage loans, filing objections to proofs of claim, and litigating complex disputes. Accordingly, the Debtors have not, and could not reasonably have been expected to, formulate and negotiate a meaningful chapter 11 plan or plans at this point in these cases.

34.    Further, the sheer size alone of the Debtors' chapter 11 cases supports a finding of cause to extend the Exclusive Periods. The Debtors conducted business in 47 states, and over 10,000 proofs of claim have been filed against the Debtors. In addition to the complexities of the sale of the Servicing Business and issues created by the breadth and depth of the Debtors' other assets, the number of creditors and amount of prepetition liabilities in these cases have created a chapter 11 plan process that presents significant challenges.

**(2)    Good Faith Progress Made in These Cases**

35.    The Debtors have made significant and material progress in these chapter 11 cases and do not seek the extension of the Exclusive Periods as a means to exert pressure on the relevant parties in interest. Since the entry of the Second Exclusivity Extension Order, the Debtors have focused much of their time and resources towards resolving multiple complex litigation matters and maximizing the value of the Debtors' estates through the orderly disposition of assets.

36.    For example, during this period, not only have the Debtors litigated the Wells Fargo and Bank of America Stay Relief Motions, but also, they have completed the Final Close with respect to the sale of the Servicing Business and liquidated the majority of their non-performing loan portfolio. Further, the Debtors have worked diligently with their financial advisors to preserve the value of the estates by filing omnibus objections to more than 3,400 proofs of claim.

15

**(3)     The Necessity of Sufficient Time to Negotiate and Prepare Adequate Information**

37.     As set forth more fully above, since the entry of the Second Exclusivity Extension Order, the Debtors have continued to focus their attention on maximizing the value of their estates through the orderly liquidation of assets, minimizing administrative liabilities, and prosecuting and defending numerous litigation matters.  The Debtors have begun, but not yet completed, negotiations with the Committee regarding the terms of a consensual chapter 11 plan or plans based on adequate information, and indeed, the plan drafting process is well under way.  The general claims bar date was January 11, 2008, and the government bar date was February 4, 2008.  As set forth above, the Debtors have been engaged in an extensive review of the more than 10,000 proofs of claim that have been filed in these cases, but that review, given the number of claims, remains ongoing.

38.     Additionally, there are a variety of other tasks that lie ahead of the Debtors.  The Debtors still have numerous assets that may be marketed and sold, including the Debtors' federally chartered thrift and bank, certain whole loans still owned by the Debtors, and certain other real estate holdings.  The resolution of these asset sales and the review and analysis of claims will be determinative of the value available to the estates' creditors.

**(4)     The Debtors are Paying Their Debts as They Come Due**

39.     The Debtors respectfully submit that, under the relevant facts and circumstances, the requested extension of the Exclusive Periods will not prejudice the legitimate interests of creditors, as the Debtors continue to make timely payment on their undisputed postpetition obligations.  As such, the requested extension will afford the parties in interest a meaningful and reasonable opportunity to formulate and negotiate a chapter 11 plan or plans.

16

    (5)      **Termination of the Debtors' Exclusive
Periods Would Adversely Impact These Cases**

        40.    Termination of the Debtors' Exclusive Periods would adversely impact the

Debtors efforts to maximize the value of their assets and the progress of these cases.  In effect,

if this Court were to deny the Debtors' request for an extension of the Exclusive Periods, any

party in interest then would be free to propose a plan of reorganization for each of the Debtors.

Such a ruling would foster a chaotic environment with no central focus.

        41. ·   The Debtors also note that relief similar to that requested in this Motion

has been granted to other debtors in this jurisdiction in other chapter 11 cases.  See, e.g., In re

New Century TRS Holdings, Inc., No. 07-10416 (Bankr. D. Del. January 22, 2008) (Carey, J.);

In re Nellson Nutraceutical, Inc., No. 06-10072 (Bankr. D. Del. March 12, 2007) (Sontchi, J.);

In re FLYi, Inc., No. 05-20011 (Bankr. D. Del., April 23, 2006) (Walrath, C.J.); In re Meridian

Automotive Systems Composites Operations, Inc., No. 05-11168 (Bankr. D. Del., October 23,

2006) (Walrath, C.J.).

        42.    Finally, the fact that a Debtor may propose a liquidating rather than a

reorganizing plan should not negatively impact its ability to retain the exclusive right to file a

plan.  Indeed, courts in this District have, on other occasions, granted multiple extensions of

exclusivity in liquidating chapter 11 cases.  See In re Cone Mills Corp., et al., No. 03-12944

(Bankr. D. Del., March 8, 2004) (Walrath, C.J.).; In re SFMB Acquisition Corp., Ch. 11 Case

No. 03-11524 (Bankr. D. Del., August 25, 2004) (Walsh, J.); In re SHC, Inc., Ch. 11 Case No.

03-12002 (Bankr. D. Del., April 2, 2004) (Walrath, C.J.); In re Golf America Stores, Inc., Ch.

11 Case No. 02-12313 (Bankr. D. Del., April 11, 2003) (Walsh, J.).

                                                    

43.     Based upon the foregoing, the Debtors respectfully submit that cause exists in these bankruptcy proceedings to extend the Debtors' Exclusive Periods pursuant to section 1121(d) of the Bankruptcy Code.

## NOTICE

44.     The Debtors will serve this Motion on (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the Administrative Agent; (iv) counsel to the DIP Lender; and (v) those parties who have requested notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

45.     No previous motion for the relief requested herein has been made to this or any other court.

DB02:6808192.3                                                                                   066585.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order

substantially in the form attached hereto:  (i) granting the relief requested herein; and

(ii) granting to the Debtors such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
       May 30, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kenneth J. Enos (No. 4544)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors in Possession

DB02:6808192.3

066585.1001