IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

| | |
|---|---|
| | Chapter 11 |
| In re: | |
| | Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al.,[1] | Jointly Administered |
| Debtors. | **Objection Deadline: June 18, 2008 at 4:00 p.m.** **Hearing Date: June 25, 2008 at 10:00 a.m.** |

---

## DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE DESTRUCTION OF NON-REQUESTED LOAN FILES

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") by and through their counsel, hereby submit this motion (the "Motion"), pursuant to sections 105, 363 and 554 of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order authorizing the Debtors to destroy the Non-Requested Loan Files (as defined below) in accordance with applicable non-bankruptcy law. In support of the Motion, the Debtors respectfully represent as follows:

### JURISDICTION

1.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 363 and 554 of the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road,

066585.1001

Bankruptcy Code, as complimented by Rule 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.    General Background**

2.    On the Petition Date each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.    On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

**B.    Hard Copy Loan Files**

5.    In the ordinary course of the Debtors' pre-petition loan origination business, the Debtors maintained individual loan files, including copies of consumer loan applications, closing documents, titles and home appraisals. The Debtors' loan origination personnel transmitted their mortgage loan files to the Debtors' headquarters in Melville, NY (collectively, the "Hard Copy Loan Files") for central storage in compliance with applicable federal and state laws.

6.    Upon receipt of the Hard Copy Loan Files, the Debtors reviewed such files for any original collateral documents (i.e., original note, mortgage copy (recorded mortgage

---

Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

DB02:6850607.2                                                                            066585.1001

if returned), title insurance (binder or commitment); related addenda to mortgage or note; and paper assignments). Collateral documents were immediately removed from the file, copied, and forwarded to the respective custodian for the underlying loan. Accordingly, all original collateral documents are stored by a third party custodian and, any collateral documents within the Storage Facility (to the extent any exist) are merely photocopies of those held by the custodian.

      7.    The Hard Copy Loan Files may consist of two or more folders (i.e., a credit folder and legal folder) which may have been transmitted to the Debtors' headquarters at different times. Accordingly, each loan may be associated with two or more Hard Copy Loan Files, which are not located in the same storage box.

      8.    The Debtors catalogued each of the Hard Copy Loan Files at the time it was received in their loan database and management system, the UNIFI Loan Origination System ("UNIFI").[2] Through UNIFI, the Debtors can access (i) borrower information on a loan application; (ii) the borrower's credit report/credit score; (iii) underwriting information, including the automated underwriting decision, where applicable; and (iv) a regeneration of disclosures/closing documents.

      9.    The Debtors utilize UNIFI's document storage management barcoding system (the "Barcode System") to coordinate the storage of the Hard Copy Loan Files. Through the Barcode System, the box identification and status of each Hard Copy Loan File is recorded. Depending on the preference of the owner of the underlying loan, the Debtors either (i) stored the files by sending the original Hard Copy Loan File to American Corporate Record Center, Inc. ("ACRC" or the "Storage Facility"), a non-affiliated third party-owned document storage facility

---

[2]    In addition to UNIFI, the Debtors utilize another access database system to track files such that there is a combination of systems used to track and locate stored files.

or (ii) transferred the original Hard Copy Loan File to the owner of the loan and created a photocopy (collectively, the "Copied Loan Files") of the Hard Copy Loan File to be sent to ACRC. As of the Petition Date, ACRC stored approximately 1.5 million Hard Copy Loan Files (including Copied Loan Files).

10.    In September of 2005, the Debtors began imaging the Hard Copy Loan Files and, since that time, have imaged files of approximately 490,000 loans (the "E-Loan Files"). The E-Loan Files are maintained on secure servers, and the Debtors retain two electronic copies of each E-Loan File.

11.    In addition to imaging and maintaining the E-Loan Files, the Debtors continued to store the corresponding Hard Copy Loan Files (the "Duplicate Hard Copy Loan Files") at the ACRC facility. Accordingly, more than one-half of the Debtors' 1.5 million Hard Copy Loan Files are Duplicate Hard Copy Loan Files. Because the Hard Copy Loan Files include the Copied Loan Files, a subset of the Duplicate Hard Copy Loan Files are merely photocopies of the original Hard Copy Loan Files that were previously sent to the owner of the underlying loan.

12.    Given the volume of Hard Copy Loan Files, the continued cost of storage and the cumbersome requirements for disposition of the confidential consumer information, the Debtors have been actively working to obtain Court approval on a disposition program.

C.    **ACRC**

13.    The Debtors and ACRC are parties to a Record and Storage and Service Agreement effective as of November 21, 2005 (the "ACRC Agreement"). Pursuant to the ACRC Agreement, ACRC maintains storage for the Hard Copy Loan Files and various other corporate documents. ACRC currently charges approximately $45,000/month for the storage of the Hard

4

Copy Loan Files.  Additionally, ACRC provides storage-related services such as document retrieval, delivery, photocopying, refiling, archiving, destruction and/or termination of shelf space.

14.    In connection with the storage of the Hard Copy Loan Files, ACRC maintains a proprietary electronic indexing system of the Debtors' (and other customers') files that enables search and retrieval.  Although the Debtors are able to identify in which box a particular Hard Copy Loan File is located through UNIFI, the Debtors must rely on ACRC's indexing system to determine the location of the particular box within ACRC's 80,000-square foot storage facility.

15.    ACRC asserted a prepetition claim in the amount of $276,000 against the Debtors' estates (the "Prepetition Claim") and a warehouseman's lien (collectively, the "Liens") against the files held in storage on account of the Prepetition Claim.  Thereafter, ACRC intermittently denied the Debtors access to the Hard Copy Loan Files.

16.    In an effort to resolve the Liens asserted against the Debtors, and the Prepetition Claim, the Debtors and ACRC negotiated and entered into a Term Sheet, effective as of December 13, 2007 (the "ACRC Term Sheet").[3]  The Court approved the ACRC Term Sheet on January 30, 2008 [Docket No. 2804].

17.    Pursuant to the ACRC Term Sheet, ACRC has, among other things, fixed the rates charged for storage and storage-related services for a period of six (6) months from the date of the ACRC Term Sheet (i.e., June 13, 2008).  ACRC may not charge any other customer or entity lower rates and charges than are charged to AHM for the same or similar services.

---

[3]    Pursuant to the ACRC Term Sheet, ACRC has not released Liens that it may assert in connection with another party that may request files.

066585.1001

18.    The Debtors agreed to, among other things, endeavor to establish a document relocation and/or destruction program within six (6) months of the date of the ACRC Term Sheet.  The Debtors have been removing files daily from the Storage Facility and have reduced the number of cartons of files from approximately 115,000 to approximately 76,000.  The Debtors continue to reduce the number of files in storage consistent with the Term Sheet.

19.    In anticipation of the expiration of the 6-month rate agreement provided for in the Term Sheet, the Debtors have been negotiating with ACRC regarding the Debtors' ongoing storage needs.  However, the Debtors have been informed that ACRC's landlord is desirous of having a complete exit strategy for ACRC from the premises (including the removal of the Debtors' files).  The Debtors and ACRC have commenced and continue negotiations regarding implementing such an exit strategy.

**D.    The Document Destruction/Return Motion**

20.    On December 14, 2007, the Debtors filed their motion [D.I. 2395] (the "Document Destruction/Return Motion") seeking entry of an order, pursuant to sections 105, 363 and 554 of the Bankruptcy Code, authorizing the Debtors to abandon and destroy the Duplicate Hard Copy Loan Files or, alternatively, to return Hard Copy Loan Files (to the extent the request is received prior to destruction of same) to the owner of such loans upon written request and payment of all reasonable costs and expenses associated with the retrieval, review and return.

21.    The Document Destruction/Return Motion also outlined a process, whereby the legal owners of the underlying loans (collectively, the "Owners") could request such Hard Copy Loan Files from the Debtors by sworn, written declaration (the "Loan File Return Declaration").  The Debtors received numerous objections by parties asserting an interest in the Hard Copy Loan Files.

22.    On January 14, 2008, the Court entered an order (the "First Disposition Order") authorizing the immediate abandonment and destruction of only those Duplicate Hard Copy Loan Files for loans that did not close (i.e., files related to withdrawn, cancelled or rejected loans) (the "Imaged Withdrawn/Denied Files") [Docket No. 2724]. Consistent with the First Destruction Order, the Debtors have destroyed approximately 130,945 Imaged Withdrawn/Denied Files.[4]

23.    After the Debtors supplemented the Document Destruction/Return Motion, the Court entered a second order on February 19, 2008 [Docket No. 3010] (the "Second Disposition Order"), which, among other things, authorized the Debtors to return Hard Copy Loan Files to the legal owners and/or Master Servicers (each, a "Requesting Party") of the underlying loans upon request, through filing a Loan File Return Declaration, and upon payment of fixed expenses for the retrieval, shipment and/or imaging as requested. The Court also established a deadline of March 14, 2008 (the "Return Request Deadline") by which a Requesting Party was required to file and serve a completed Loan File Return Declaration.

24.    The Second Disposition Order was served on all known entities holding an interest in the Hard Copy Loan Files (see D.I. 3426), and on February 25, 2008, the Debtors published a notice of the Return Request Deadline in the national edition of *The New York Times*. See D.I. 3287.

25.    The Debtors have received fourteen (14) timely Loan File Return Declarations, requesting approximately 278,995 Hard Copy Loan Files regarding in the

---

[4] The Debtors have identified approximately 69,185 non-imaged files relating to withdrawn, cancelled or rejected loans (the "Withdrawn/Denied Files") that remain in the Storage Facility. Additionally, during the process of reviewing and destroying the Imaged Withdrawn or Denied Loan Files, the Debtors discovered another subset of loans files for mortgages that were approved subject to certain borrower conditions, but not funded because such conditions were never satisfied (the "Suspended Loans"). The Debtors estimate that 4,100 mortgage loan files being maintained by the Debtors relate to Suspended Loans (the "Suspended Files", and together with the

DB02:6850607.2                                                                066585.1001

aggregate. See D.I. 3271, 3275, 3289, 3290, 3291, 3294, 3297, 3300, 3302, 3304, 3305, 3307, 3327, and 3347.[5]  Accordingly, of the 1.5 million Hard Copy Loan Files that were once located in ACRC, approximately 900,000 Hard Copy Loan Files remaining in the Debtors' possession are not subject to a Loan File Return Declaration, postpetition agreement, or order to return (the "Non-Requested Loan Files").[6]

26.    Since the Return Request Deadline, the Debtors have been (i) reconciling the Loan File Return Declarations with not only their books and records, but also the other Loan File Return Declarations and various orders or agreements addressing the transfer of loan files; (ii) establishing protocols for the sorting, retrieval and delivery of the Hard Copy Loan Files to the applicable investor or Master Servicer; (iii) returning Hard Copy Loan Files in the delivery method requested under the applicable Loan File Return Declaration; and (iv) segregating the Non-Requested Loan Files for temporary storage in the Debtors' headquarters in Melville, New York.  At present, the Debtors are working through approximately 2,500 boxes of Hard Copy Loan Files per week.[7]

27.    In connection with their quality control process, the Debtors have entered the loan number (by bar code or manual entry) of each Hard Copy Loan File and catalogued each

_____

Withdrawn/Denied Loan Files, the "Unfunded Loan Files").  The Unfunded Loan Files are included within the definition of Non-Requested Loan Files.

[5]    Of these fourteen Loan File Return Declarations, three do not comply with the Second Order.  Pursuant to their respective Loan File Return Declarations, Deutsche Bank National Trust Company [D.I. 3305] and LaSalle Bank National Association [D.I. 3347] have agreed to pay applicable Return Costs "only to the extent that sufficient funds are made available from the respective Trusts."  In lieu of a Loan File Return Declaration, Wells Fargo Bank, N.A. filed an objection and reservation of rights to the Return Request Deadline established pursuant to the Second Order [D.I. 3307].  The Debtors reserve all of their rights with respect to these Loan File Return Declarations, including, but not limited to, refusal to deliver Hard Copy Loan Files requested pursuant to the non-compliant Loan File Return Declarations.

[6]    To the extent that a request for a Hard Copy Loan File is withdrawn, such file shall be deemed to be a Non-Requested Loan File.

[7]    At the rate of 2,500 boxes per week, the Debtors estimate that it will take approximately 30 weeks to complete this task.  The Debtors have added additional resources, which is anticipated to increase the weekly box rate, so that the Debtors expect to complete the process by year-end.  The rate is dependent upon a myriad of factors

of the loan numbers associated with the Hard Copy Loan Files pulled from ACRC.  As a result, the Debtors are compiling, on a rolling basis, a complete list of all loans underlying the Non-Requested Loan Files.

## RELIEF REQUESTED

28.    By this Motion, the Debtors seek entry of an order authorizing the Debtors, pursuant to sections 105, 363 and 554 of the Bankruptcy Code, to destroy the Non-Requested Loan Files in accordance with applicable non-bankruptcy law.

## BASIS FOR RELIEF REQUESTED

29.    Section 554 of the Bankruptcy Code provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  Additionally, section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  The purpose of section 105(a) of the Bankruptcy Code is "to assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy, ¶ 105.01 at 105-6 (15th ed. rev. 1999).

30.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b)(1) of the Bankruptcy Code, courts should generally approve a non-ordinary course transaction if the proposed use of estate assets is within the debtor's reasonable business judgment. See e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as

---

including, but not limited to, continued access to the Storage Facility, maintaining a full workforce, timely pick-up by Requesting Parties, and sufficient storage space for files removed from the Storage Facility.

there is a legitimate business justification); In re Montgomery Ward Holding Corp., 242 B.R.

147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to

evaluate motions brought pursuant to section 363(b)); In re Delaware & Hudson R.R. Co., 124

B.R. 169, 175-76 (D. Del. 1991) (same).

      31.    The Court should apply the business judgment standard in reviewing the

Debtors' decision to abandon property that is either of inconsequential value or burdensome to

the estate. See In re Slack, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) ("The trustee's power to

abandon property is discretionary. . . . The court only needs to find the trustee made:  1) a

business judgment; 2) in good faith; 3) upon some reasonable basis; and 4) within the trustee's

scope of authority.") (internal citations omitted); Reich v. Burke (In re Reich), 54 B.R. 995, 1004

(Bankr. E.D. Mich. 1985) ("[I]f a trustee feels an asset is of inconsequential value and benefit to

the estate *or* that it is 'burdensome to the estate,' he may abandon it." (emphasis in original)).

      32.    Given that the Debtors have shut down the loan origination business, sold

the servicing business, and are liquidating their remaining assets, the abandonment of the Non-

Requested Loan Files is warranted under section 554(a) of the Bankruptcy Code, and the

destruction, including the incurrence of costs associated with destruction, is permitted under

section 363 of the Bankruptcy Code.  The Debtors no longer need the Non-Requested Loan Files

for their business operations and any continuing expenses relating to the Non-Requested Loan

Files is an unnecessary administrative burden on the estates.  Indeed, the cost of maintaining the

Non-Requested Loan Files is exorbitant and must be reduced and eliminated as quickly as

possible.

      33.    More specifically, the abandonment and destruction of the Non-Requested

Loan Files is necessary because of the administrative costs of maintaining them and the Debtors'

      

need to ultimately destroy or remove all files from ACRC's Storage Facility in an expeditious and efficient manner. As noted above, the ACRC Term Sheet, which stabilizes the monthly rent and the rates charged for storage related services, expires on June 13, 2008. Although the Debtors are in negotiations with ACRC to or enter into a new agreement, the Debtors cannot continue to rely indefinitely on the relationship with, and financial condition of, ACRC. As a result, the Debtors are simultaneously exploring the availability of alternative storage and destruction facilities for their remaining Hard Copy Loan Files.

34.    Moreover, the Debtors believe that destruction or return of the Hard Copy Loan Files in accordance with the federal regulations will take several months to complete. The extensive timeframe necessitates that the Debtors continue taking the necessary steps to complete the destruction or return as efficiently as possible. The Debtors are utilizing the Debtors' headquarters, located in Melville, NY, as temporary space to conduct the sorting, return and destruction of the Hard Copy Loan Files. In furtherance of its liquidation efforts, the Debtors have begun marketing the building and anticipate that a sale of the building will occur before year-end. To the extent that a potential purchaser is unwilling to allow the Debtors to continue to use the facilities for the return and destruction process, the Debtors will be forced to incur additional administrative expenses to transport the Hard Copy Loan Files (including the Non-Requested Loan Files) and necessary equipment to another location. Such transportation expenses could be greatly reduced if the Debtors were authorized to destroy the Non-Requested Loan Files prior to any potential move. The Debtors submit that destruction of the Non-Requested Loan Files is the most appropriate next step in light of the status of negotiations with ACRC and its landlord and the prohibitive costs for any alternatives.

11

35.     The Debtors submit that destruction of the Non-Requested Loan Files will not adversely affect any parties in interest in this case.  The Debtors have provided ample notice and opportunity for parties in interest to request the return of wanted files and submit that the Non-Requested Loan Files are not subject to any of the requests under the Loan File Return Declarations.  The Debtors propose to remove the Non-Requested Loan Files from the Storage Facility, confirm that they were not requested by any party in interest, and then destroy the Non-Requested Loan Files in compliance with applicable regulations.  Given that each loan file has been reviewed to limit the possibility that the Debtors are not destroying files related to the Requested Loan Files, the destruction of the Non-Requested Loan Files at this time is warranted and will not prejudice any parties in interest.

36.     Most significantly, failure to destroy the Non-Requested Loan Files may significantly impair the Debtors ability to return the Requested Loan Files.  Because only approximately 330,000 of the 1.5 million Hard Copy Loan Files were requested (or are otherwise subject to an order or postpetition agreement regarding the return of such files), the Debtors' temporary storage (i.e., the Debtors' headquarters in Melville, NY) is nearing capacity with Non-Requested Loan Files.  The Debtors' ability to continue the retrieval, sorting, and return of the Requested Loan Files is dependent upon having sufficient space to conduct such activities and provide temporary storage for the requesting parties to pick up their requested loan files.  As noted above, the Debtors have analyzed, and continue to analyze, alternatives; however, the cost associated with transferring the equipment and the Hard Copy Loan Files already relocated to the Melville, NY headquarters is cost prohibitive.  As the temporary storage reaches maximum capacity with Non-Requested Loan Files, the Debtors will be forced to halt the process of returning the Requested Loan Files.

12

066585.1001

37.     For the reasons set forth herein and in the Document Destruction/Return Motion, the Debtors submit that destruction of the Non-Requested Loan Files is in the best interests of the Debtors, their estates and creditors.

## NOTICE

38.     Notice of this Motion will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Second Amended and Restated Credit Agreement dated August 10, 2006; (iv) counsel to the Agent for the Debtors' Postpetition Lender; (v) the offices of the attorneys general of the fifty states and the District of Columbia; (vi) the Federal Trade Commission; (vii) all parties that hold an interest in the Hard Copy Loan Files, including those parties who filed Loan File Return Declarations; (viii) the class action plaintiffs; (ix) AH Mortgage Acquisition Co.; (x) the Securities and Exchange Commission; (xi) the Storage Facility; and (xii) all parties entitled to notice under Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## PRIOR REQUEST

39.     As noted above, by the Document Destruction/Return Motion, the Debtors sought entry of an order, pursuant to sections 105, 363 and 554 of the Bankruptcy Code, authorizing the Debtors to abandon and destroy the Duplicate Hard Copy Loan Files or, alternatively, to return Hard Copy Loan Files (to the extent the request is received prior to destruction of same) to the owner of such loans upon written request and payment of all reasonable costs and expenses associated with the retrieval, review and return.  The Court has

13

entered two orders approving various portions of the relief requested in the Document
Destruction/Return Motion.  Consideration of the remaining relief requested has been adjourned.

40.    The relief requested in this Motion expands the request for the
abandonment and destruction of Hard Copy Loan Files to those files which were not imaged by
the Debtors in the ordinary course of their business.  Accordingly, approval of the relief
requested in this Motion would essentially moot the remaining relief requested in the Document
Destruction/Return Motion.

### CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order (i)
authorizing the Debtors, pursuant to sections 105, 363, and 554 of the Bankruptcy Code, to
destroy the Non-Requested Loan Files in accordance with applicable non-bankruptcy law, and
(ii) granting the Debtors any further relief that the Court deems just and proper.

Dated: June 5, 2008          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
       Wilmington, Delaware

                        /s/ Margaret B. Whiteman
                        James Patton (No. 2202)
                        Robert S. Brady (No. 2847)
                        Sean M. Beach (No. 4070)
                        Margaret B. Whiteman (No. 4652)
                        The Brandywine Building
                        1000 West Street - 17th Floor
                        P.O. Box 391
                        Wilmington, Delaware  19899
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Counsel to Debtors and Debtors in Possession

066585.1001