# EXHIBIT A

1  CHARLES D. RICHMOND, ESQ., SBN 95915
2  2357 Via Pisa
   Del Mar, California 92014
3  Tel. (858) 558-4600
   Fax (858) 755-0965

4
   Attorneys for Plaintiffs,
5  THOMAS and SARA CHAVEZ

6
7        SUPERIOR COURT OF THE STATE OF CALIFORNIA
8    IN AND FOR THE COUNTY OF ORANGE, CENTRAL DIVISION

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**DEC 10 2007**

ALAN SLATER, Clerk of the Court

BY:  ENRIQUE VELOZ  ,DEPUTY

9                                              **30-2007**

10  THOMAS CHAVEZ and SARA CHAVEZ,      )     **0 0 1 0 0 0 1 0**
    husband and wife as joint tenants  )     Case Number:
11                                      )
          Plaintiffs,                   )     **COMPLAINT FOR (1)**
12                                      )     **DECLARATORY RELIEF; (2)**
    v.                                  )     **PERMANENT INJUNCTION TO**
13                                      )     **ENJOIN FORECLOSURE ; (3)**
    AMERICAN HOME LOANS, a California   )     **ACCOUNTING; (4) BREACH OF**
14  corporation, Sterling Eagle Investment Company, )  **WRITTEN CONTRACT; (5) BREACH**
    LLC, an unknown entity; Surestep Fulfillment )  **OF FIDUCIARY DUTY; (6)**
15  Services, a New Jersey Limited Liability Company )  **NEGLIGENCE;(7) NEGLIGENT**
    and wholly owned subsidiary of Sterling Eagle )  **SUPERVISION; (8) PROMISSORY**
16  Mortgage Investment Company, LLC; AMERICAN )  **FRAUD; (9) INTENTIONAL**
    HOME MORTGAGE SERVICES, INC., an    )     **MISREPRESENTATION;**
17  unknown entity; AMERICAN HOME       )     **(10) NEGLIGENT**
    MORTGAGE, an unknown entity; THE ESCROW )  **MISREPRESENTATION;**
18  FORUM, a California corporation; DOES 1-20 )  **(11) UNFAIR TRADE PRACTICES**
                                        )     **(B & P § 17200); Exhibits 1-5.**
19          Defendants.                 )
                                        )     **[UNLIMITED CIVIL CASE]**
20                                      )
                                              **JURY TRIAL**
21
                                              **JUDGE FRANZ E. MILLER**
22                __GENERAL ALLEGATIONS__           **DEPT. C4**

23      1.    Plaintiffs THOMAS and SARA CHAVEZ, (hereinafter "Chavez's") are, and at all

24  times relevant herein, were individuals residing in the state of California, County of Orange.

25      2.    Plaintiffs THOMAS and SARA CHAVEZ are and were at all times relevant herein,

26  husband and wife.

27      3.    Plaintiffs THOMAS and SARA CHAVEZ are and were at all times relevant herein,

28  Joint Tenants in the property described as described as "Lot 19 in Block 2 of Tract No. 883, in the city

    of Dana Point, in the County of Orange, State of California, as shown by map on file in book 27,

                              COMPLAINT - 1

1 pages 1 to 10 inclusive of maps, records of Orange County, California" commonly known as 35012

2 Camino Capistrano, (hereinafter the "PROPERTY".)

3    4.    Defendant American Home Loans, is and was at all times relevant a California

4 corporation, doing business in the County of Orange and located at 17991 Cowan Street, Irvine,

5 California.

6    5.    At all times relevant herein Jerry McGarvey was a senior loan officer with American

7 Home Loans and was a loan officer regarding the Chavez's loan which is the subject of this

8 complaint, and was acting in the course and scope of his employment.

9    6.    At all times relevant herein John Barry was a senior loan officer with American Home

10 Loans and was the loan officer regarding the Chavez's loan which is the subject of this complaint, and

11 was acting in the course and scope of his employment.

12    7.    At all times relevant herein Sterling Eagle Mortgage Investment Company, LLC,

13 (hereinafter "EAGLE") was an unknown business entity doing business in the State of California,

14 County of Orange.

15    8.    At all times relevant herein Surestep Fulfillment Services, (hereinafter "SURESTEP")

16 was a New Jersey Limited Liability Company and wholly owned subsidiary of Sterling Eagle

17 Mortgage Investment Company, LLC, an unknown business entity doing business in the State of

18 California, County of Orange.

19    9.    At all times relevant herein Mark N. Arnold was the Senior Vice President and

20 Operations Manager for SURESTEP, and was acting in the course and scope of his employment.

21    10.    At all times relevant herein, Defendant American Home Mortgage (hereinafter

22 "AHM"), is and was at all times relevant herein an unknown business entity, with a principal place of

23 business at 4600 Regent Boulevard, Irving, Texas and doing business in the State of California,

24 County of Orange.

25    11.    At all times relevant herein, Defendant American Home Mortgage Servicing Inc.

26 (hereinafter "AHMS"), is and was at all times relevant herein an unknown business entity with a

27 principal place of business at 4600 Regent Boulevard, Irving, Texas and doing business in the State of

28 California, County of Orange.

   12.    At all times relevant herein, Tammy Dawson was an employee and/or agent of

COMPLAINT - 2

1  American Home Mortgage Servicing Inc., and was acting in the course and scope of her employment.

2      13.    At all times relevant herein, Northwest Trustee Services was an actual agent of
3  Defendant American Home Mortgage with a principal place of business at 505 North Tustin Avenue,
4  Suite 243, Santa Ana, California.

5      14.    At all times relevant herein the Escrow Forum (hereinafter, ESCROW) was an
6  unknown entity with a principal place of business locate at 23161 Lake Center Drive, Suite 120, Lake
7  Forest, California 92630 and the escrow. The Escrow forum is the trustee on the recorded Deed of
8  Trust for the subject property.

9      15.    At all times relevant herein Sara Spangler was the licenced escrow officer for the
10  Escrow Forum (hereinafter, ESCROW) and was the escrow officer regarding the loan which is the
11  subject of this complaint, and was acting in the course and scope of her employment.

12      16.    Defendants DOES 1 through 10, inclusive, are sued herein under fictitious names.
13  Their true names and capacities are unknown to Plaintiff. When the true names and capacities are
14  ascertained, Plaintiff will amend this complaint by inserting their true names and capacities herein.
15  Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants
16  are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as
17  herein alleged were proximately caused by those Defendants. Each reference in this complaint to
18  "Defendant," "Defendants," or a specifically named Defendant refers also to all Defendants sued
19  under fictitious names.

20      17.    Plaintiff is informed and believes and thereon alleges that at all times herein
21  mentioned each of the Defendants, including all Defendants sued under fictitious names, were the
22  agent and employee of each of the remaining Defendants, and in doing the things hereinafter alleged,
was acting within the course and scope of employment.

23      18.    On or about November 22, 2006, Plaintiffs Thomas and Sara Chavez entered into a
24  contract with American Home Loans to refinance their residence located at 35012 Camino
25  Capistrano, Dana Point California. The loan was subject to the Federal Truth in Lending Act,
26  Regulation Z and Real Estate Settlement Procedures Act, inter alia.

27      19.    The Truth in Lending Disclosure statement stated the loan terms of 12 fixed monthly
28  payments of $3,972.25, commencing January 2007 and adjusting to a higher fixed monthly payment

COMPLAINT - 3

1  each year over the next four years resulting in 299 fixed payments of $9,120.40, beginning in 2012.

2  The final payment of $ 9,124.09 being due 12/01/2036. The stated APR was stated as 6.245 % (See,

3  Exhibit "1".)

4      20.     The Adjustable Rate Note rider was explained to the Plaintiffs by the loan officer, as

5  calling for 12 monthly payments of $3,972.25, commencing January 2007 and adjusting to a higher

6  fixed monthly payment each year over the next four years resulting in 299 fixed payments of

7  $9,120.40, beginning in 2012. The final payment of $ 9,124.09 being due 12/01/2036. The stated

8  APR was stated as 6.245 %. (See Exhibit "2", attached hereto.)

9      21.     The Escrow Forum as Trustee opened an Escrow and prepared loan escrow

10  instructions with a loan disbursement date of November 29, 2006.

11      22.     On November 30, 2006, document number 2006000801592 consisting of 24 pages was

12  recorded in Orange County indicating a Deed of Trust in favor of American Home Loans. (See

13  Exhibit "3", attached hereto.) Page 19 of Exhibit "3", "Adjustable Rate Rider" Section 4( c) indicates

14  a Margin of 1.050 % for interest rate change dates.

15      . 23.    On December 05, 2006, the Chavez's received correspondence from loan servicer

16  CBSK Financial Corp. Indicating monthly payments in the amount of $3,972.25 and commencing

17  January 01, 2007, were to be made to a new loan servicer, Sterling Eagle Mortgage Investment

18  Company, LLC.   Further, said correspondence indicated said "transfer of servicing in no way changes

   the terms and conditions of the mortgage contract."

19      24.     On December 18, 2007, Sterling Eagle Investment by and through its subsidiary

20  SURESTEP contacted the Chavez's and requested they sign a "corrected" Adjustable Rate Note,

21  backdated to November 22, 2007. No recession of the recorded loan documents or legally required

22  disclosures were made, in violation of the Truth in Lending Act. (See Exhibit "4")

23      25.     EAGLE and SURESTEP told the Chavez's the material terms of the loan had not

24  changed, and that they needed to sign an "updated" form. In truth and fact. Exhibit "4", the second

25  unrecorded Adjustable Rate Note deleted the date provision under Exhibit "3", section 2, which

26  indicated a 1 % interest Rate for the period of November 22, 2006 to November 30, 2006, with a

27  subsequent rate of 6.37 % for the period of December 01, 2006 to December 31, 2006. Furthermore,

28  the change date of January 1ˢᵗ, 2007, indicated an interest rate margin for change dates of 1.050 %.

26.    Exhibit "4" calculated the interest rate margin for change dates at 3.550 %, resulting in a significant increase in the cost of the mortgage, and all without disclosing the existence or the effect of the changes to the Chavez's. Furthermore, the new note was for a very different and much more expensive loan program than the Plaintiff's bargained for and as explained in the Truth in Lending disclosures.

27.    On January 10, 2007, Sterling Eagle Mortgage Investment Company, LLC, sent correspondence to the Chavez's indicating it had transferred the loan servicing and all monthly payments commencing February 01, 2007 were to be made to American Home Mortgage Servicing Inc.. The document indicated "transfer of servicing in no way changes the terms and conditions of the mortgage contract" and further called for a February 01, 2007 payment due of $3,972.25.

28.    Also on January 10, 2007, American Home Mortgage Servicing Inc., sent correspondence to the Chavez's indicating Sterling had transferred the loan servicing to it and all monthly payments commencing February 01, 2007, were to be made to them. Further, said correspondence indicated said "transfer of servicing in no way changes the terms and conditions of the mortgage contract", and indicated a February 2007 payment due of $1,029.17.

29.    Plaintiff upon information and belief and thereupon alleges, American Home Mortgage purchased the Plaintiff's loan from EAGLE and assigned a reference number of 1001527887.

30.    On January 22, 2007, AHMS sent an ARM Adjustment Notification letter indicating on March 01, 2007, the monthly payment would increase to $8730.42, based on a **3.550** % margin.

31.    Sara Chavez's immediately telephoned American Home Mortgage Inc., and indicated the mortgage contract entered into called for 12 fixed payments of $3,972.25 for the first year of the loan. After speaking to a Customer Care Specialist, Ms. Chavez made a qualified written request for documentation to support the claimed amounts due.

32.    Chavez also contacted AHL, and was assured by Jerry McGarvey the Truth in Lending statement accurately represented the terms of the loan they brokered for the Chavez's and that AHL would contact AHMS to remedy the problem.

33.    AHL instructed Plaintiffs not to pay the increased amount indicated in the ARM Adjustment Notification letters, and to continue to make the 12 fixed payments of $3,972.25 per

1   month, and all subsequent payments as indicated by the TILA disclosure, Exhibit "1". Plaintiffs have

2   continued to make payments as required.

3       34.    Plaintiffs on information and belief, and thereupon allege, from March 2007 to May

4   2007 Jerry McGarvey was in contact with AHMS customer care specialist Tammy Dawson and was

5   promised the situation would be resolved to reflect the loan the Plaintiff's bargained for as stated in

6   the Truth in Lending statement and explained by AHL loan officers prior to escrow closing and

7   recording.

8       35.    On or about May 17, 2007 AHMS collections department sent Plaintiffs a default

9   notice in the amount of $18,393.76 indicating payments for April and May 2007 were not made.

10  Plaintiffs disputed the claims and retained the services of an attorney.

11      36.    On or about June 2007, Plaintiff's attorney, Chris C. Prussak sent letters to AHL,

12  AHMS, SURESTEP and EAGLE indicating Truth in Lending violations, exercising rights of

13  rescission and demanding the loan be reformed to reflect the terms set forth by the Truth in Lending

14  statement as bargained for by the Plaintiffs.

15      37.    On or about July 25, 2007 AHMS sent apologetic correspondence to the plaintiffs

16  indicating correction had been taken regarding the alleged default stated on May 17, 2007 and that it

17  had sent notice to credit bureaus payment for April 2007, May 2007 and June 2007 had been paid as

18  agreed.

19      38.    Despite Plaintiffs payments of $$3,972.25 for July 2007, August 2007, September

20  2007 and October 2007, as agreed to by AHMS, on or about September 26, 2007 American Home

21  Mortgage, by and through Its agent Northwest Trustee Services, Inc., recorded document a Notice of

22  Default, document number 2007000583618, with the Orange County recorders office. (See Exhibit

    "5" attached hereto.)

23      39.    Jurisdiction and venue are proper as the real property is located in the County of

24  Orange and the damages to the plaintiffs exceed $25,000.00.

25  ///

26  ///

27  ///

28  ///

**I.**

**FIRST CAUSE OF ACTION**

**(Declaratory Relief by Plaintiffs Thomas and Sara Chavez against Defendants**

**American Home Mortgage and Does 1-10)**

Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 39.

40.     Plaintiffs Thomas and Sara Chavez are now, and at all times relevant to this complaint were the owners of real property described as described as "Lot 19 in Block 2 of Tract No. 883, in the city of Dana Point, in the County of Orange, State of California, as shown by map on file in book 27, pages 1 to 10 inclusive of maps, records of Orange County, California" commonly known as 35012 Camino Capistrano, Orange County, California

41.     Defendant The Escrow Forum is an unknown entity authorized to engage in, and at all times mentioned in this complaint engaged in escrow services. This defendant was the trustee of the deed of trust attached as Exhibit "2".

42.     Defendant American Home Mortgage is now the beneficiary of the deed of trust.

43.     Plaintiff does not know the true names, capacities, or basis for liability of defendants sued as Doe 1 through Doe 10. Each fictitiously named defendant is in some manner liable to plaintiff, or claims some right, title, or interest in the subject property, or both.

44.     On November 22, 2006 , for valuable consideration, Plaintiffs, as borrower, made, executed and delivered to defendant, American Home Loans, a written promissory note in the amount of $1,235,000.00.

45.     To secure payment of the principal sum and interest as provided in the note and as part of the same transaction, Plaintiffs, as trustor, executed and delivered to defendant, American Home Loans , as beneficiary, a deed of trust dated November 22, 2006, by the terms of which plaintiff, as trustor, conveyed to defendant, The Escrow Forum, as trustee, real property described in paragraph 39.

46.     On November 30, 2007, the deed of trust was recorded against the subject property, in the Official Records of Orange County, California. A copy of the Deed of Trust and promissory note is attached as Exhibit "2" and incorporated here by reference.

47.     On September 26, 2007 American Home Mortgage, by and through its agent

COMPLAINT - 7

1  Northwest Trustee Services caused to be recorded a notice of default and of election to sell, in
2  recorded document a Notice of Default, document number 2007000583618, with the Orange County
3  recorders office, alleging (a) that a breach of the obligation secured by the deed of trust had occurred,
4  consisting of plaintiff's alleged failure to pay certain monthly installments of principal and interest,
5  and (b) that defendant, as beneficiary, elects to sell, or to cause to be sold, the trust property to satisfy
6  that obligation. A copy of the notice of default and election to sell is attached as , Exhibit "5"and
7  incorporated here by reference.

8      48.    A breach of the obligation for which the deed of trust is security has not occurred, as
9  Plaintiffs have made all payments as required under the terms of the loan.  An actual controversy
10 exists between plaintiff and defendant concerning their respective rights and duties pertaining to the
11 subject property and the described transactions in that (a) plaintiff contends that payments are current,
12 the terms of the loan as stated by American Home Mortgage are fraudulent and in violation of TILA
13 and Regulation Z and recession and reformation of the Deed of Trust are required. and (b) defendant
14 disputes this contention and contends that approximately $50,667.00 is past due.

15     49.    Plaintiffs desires a judicial determination and declaration of plaintiff's and defendant's
16 respective rights and duties; specifically, that plaintiff did not breach his or her obligations, and that a
17 rescission of the Deed of Trust and a reformation of the same be ordered according to the clear and
18 unambiguous terms set forth in the Truth in Lending statement attached as Exhibit "1".

19     50.    Furthermore, the Loan documents are ambiguous and conflicting and as such should be
20 interpreted most strongly against the party who caused the uncertainty to exist. (CC § 1624)

21     51.    Such a declaration is appropriate at this time so that plaintiff may determine their
22 rights and duties before the subject property is sold at a foreclosure sale.

/// /// /// /// /// /// ///

## II.

### SECOND CAUSE OF ACTION

**(Permanent Injunction to Enjoin Foreclosure Sale by Plaintiffs Thomas and Sara Chavez**

**against Defendant American Home Mortgage and its agent Northwest Trustee Services, Inc.)**

Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 51.

52.    Defendants American Home Mortgage and Northwest Trustee Services, Inc., as trustee intend to sell, and unless restrained will sell or cause to be sold, the subject property, all to plaintiff's great and irreparable injury in that defendant has given notice that the trustee sale of the property is pending and if the sale takes place as scheduled, plaintiff, having no right to redeem the subject property from the sale, will forfeit it.

53.    The scheduled sale is wrongful and should be enjoined by virtue of the facts alleged in the above paragraphs. Plaintiff has no other plain, speedy, or adequate remedy, and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to plaintiff's interests.

54.    Plaintiff's have sued for breach of contract requested recession and reformation of the loan transaction herein and reserve their right to pursue all legal remedies under the Federal Truth in Lending Act, including the right to rescind the loan and tender the security (15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(a)(3).

## III.

### THIRD CAUSE OF ACTION

**(Accounting by Plaintiffs Thomas and Sara Chavez**

**against Defendant American Home Mortgage.)**

Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 54.

55.    The amount of money defendant American Home Mortgage owes to plaintiff for collecting on requested loan payments, including illegal interest payments and all in violation of the TILA is unknown to plaintiff and cannot be determined without an accounting.

///

///

///

COMPLAINT - 9

**IV.**

**FOURTH CAUSE OF ACTION**

**(Breach of Written Contract against DEFENDANTS AHL, EAGLE, SURESTEP, AHMS, AHM and DOES 1-20)**

Plaintiff incorporates herein the allegations of paragraphs 1 through 55 of the complaint as though fully set forth.

56.    On or about November 22, 2006, Plaintiffs Thomas and Sara Chavez entered into a contract with American Home Loans to refinance their residence located at 35012 Camino Capistrano, Dana Point California. The loan was subject to the Federal Truth in Lending Act, Regulation Z and Real Estate Settlement Procedures Act, *inter alia*.

57.    The Truth in Lending Disclosure statement stated the loan terms of 12 fixed-monthly payments of $3,972.25, commencing January 2007 and adjusting to a higher fixed monthly payment each year over the next four years resulting in 299 fixed payments of $9,120.40, beginning in 2012. The final payment of $ 9,124.09 being due 12/01/2036. The stated APR was stated as 6.245 % (See, Exhibit "1".)

58.    The Adjustable Rate Note rider was explained to the Plaintiffs by the loan officer, as calling for 12 monthly payments of $3,972.25, commencing January 2007 and adjusting to a higher fixed monthly payment each year over the next four years resulting in 299 fixed payments of $9,120.40, beginning in 2012. The final payment of $ 9,124.09 being due 12/01/2036. The stated APR was stated as 6.245 %. (See Exhibit "2", attached hereto.)

59.    The contract was drafted by AHL and the terms of the contract were explained by the AHL loan officer as set forth in Exhibit "1".

60.    On November 30, 2006, document number 2006000801592 consisting of 24 pages was recorded in Orange County indicating a Deed of Trust in favor of American Home Loans. (See Exhibit "3", attached hereto.) Page 19 of Exhibit "3", "Adjustable Rate Rider" Section 4( c) indicates a Margin of 1.050 % for interest rate change dates. The terms of the Deed of Trust and the TILA disclosures are patently in conflict and ambiguous.

61.    Defendant AHL subsequently sold or assigned the servicing of the loan to EAGLE, which in turn sold the loan to AHM and the servicing to AHMS.

62. Plaintiffs performed all of the terms of the loan as required by Defendants and made monthly payments in-full per the terms of the contract.

63. Defendants materially breached the contract by misrepresenting or unilaterally and without notice modifying material terms of the loan.

64. Defendant AHM materially breached the contract by recording a Notice of Default on September 26, 2007 and initiating foreclosure proceedings, without cause or justification and in direct conflict with promises to correct recorded loan documents, reform the deed of trust and acceptance of payments which acted as a waiver of the right to foreclose.

65. Defendants were not excused from performance of any terms of the contract.

66. Plaintiffs seek rescission of the Deed of Trust and reformation and recording of the loan documents to comply with the intent of lender and the borrower at the time of the transaction and in compliance with the TILA disclosure statement. (Exhibit "1".)

67. As a result of Defendants breach of contract Plaintiff's have been damaged in an amount in excess of $25,000.00.

V.

**FIFTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty as to AHL, EAGLE, SURESTEP, AHM, AHMS,**

**The Escrow Forum and DOES 1-20)**

Plaintiff incorporates herein the allegations of paragraphs 1 through 67 of the complaint as though fully set forth.

68. Defendant AHL represented to the Chavez's it was a bona fide lender with licenced loan officers who could use their expertise to secure refinancing of the PROPERTY.

69. Defendant AHL'S loan officers and DOES 1-5 owed the Chavez's a fiduciary duty of the highest level and were required to disclose any form of advantage the relationship created in refinancing the Property.

70. Defendants EAGLE and SURESTEP represented to the Chavez's it was a bona fide lender with licenced loan officers who could use their expertise to secure refinancing of the PROPERTY.

71. Defendant EAGLE and SURESTEP's loan officers and DOES 1-5 owed the Chavez's

COMPLAINT - 11

1 a fiduciary duty of the highest level and were required to disclose any form of advantage the

2 relationship created in refinancing the Property.

3      72.    Defendants The Escrow Forum and DOES 1-5 represented to the Chavez's it was a

4 bona fide escrow company with licenced escrow officers, including Sara Spangler, which could use

5 its expertise to open and close escrow on the refinancing of the PROPERTY.

6      73.    Defendants AHM and AHMS officers and DOES 1-5 owed the Chavez's a fiduciary

7 duty of the highest level and were required to disclose any form of advantage the relationship created

8 in servicing the refinancing loan the Property.

9      74.    Defendants were fiduciaries of Plaintiffs, as set forth above.  As such said Defendants

10 had a special relationship with Plaintiffs, who reposed trust and confidence in the integrity and ability

11 of said Defendants to advise Plaintiffs appropriately and to deal with Plaintiff in Plaintiff's best

12 interests.  As a result of this special relationship, Plaintiffs relied upon said defendants to fully inform

13 them of all matters material to his decision to enter into and complete the refinancing of the subject

14 property, including matters related to payments on Plaintiffs' loan.

15      75.    In doing the said acts as set forth above, in paragraphs 1-74, including DOES 1-5 and

16 (1) AHL's misrepresentations of the terms of the loan, (2) ESCROW and Spangler's failure to act

17 with due care and discover conflicting loan terms during escrow and prior to recordation, (3) EAGLE

18 and SURESTEP's misrepresentations concerning illegal modifications to the loan, and (4) AHMS and

19 AHM false promises to resolve conflicts in the loan terms in favor of the terms of the TILA

20 disclosure, constituted breaches of said fiduciary duties owed by them to Plaintiffs.

21      76.    Said acts were done with the knowledge that said acts were not in the best interests of

22 Plaintiffs and that Plaintiffs could not reasonably discover that said Defendants had failed to disclose

23 such matters or misled Plaintiffs.  Said Defendants did the acts described above and failed to disclose

24 said matters with the intent to induce Plaintiff to enter into the loan transaction all to the detriment of

25 Plaintiff.

26      77.    Plaintiffs reasonably relied on these misrepresentations and/or concealment of material

27 facts and were under the reasonable belief that Defendants were fiduciaries in all matters concerning

28 the refinancing of the property.  Further, the Chavez's expected that their interests would always be

placed above the individual desires of the Defendants when receiving fiduciary services.

78.    Defendants breach of fiduciary duty actually and proximately caused damage to the Plaintiffs, each and every one of them, in an amount to be proven at trial in excess of $25,000.00.

79.    The despicable conduct of the Defendants was done with oppression and fraud, thereby justifying a demand for punitive damages.

## VI.

## SIXTH CAUSE OF ACTION

### (Negligence as to AHL, EAGLE, SURESTEP, AHM, AHMS, ESCROW and DOES 1-20)

80.    Plaintiffs realleges and incorporate paragraphs 1 through 79 into this cause of action as though fully set forth.

81.    As a result of the special relationship described in prior allegations, Defendants AHL, EAGLE, SURESTEP, AHM, AHMS and DOES 1-5 owed a duty owed to Plaintiffs to adhere to all statutes and lending regulations, to prepare loan documents, explain terms of the loan and to ensure proper preparation and recording of accurate loan documents as bargained for by the parties.

82.    As a result of the special relationship described in prior allegations, Defendant ESCROW and DOES 1-5 had owed a duty to Plaintiffs to accurately prepare and carry out consistent escrow instructions, including a closing statement consistent with TILA disclosures and the terms of the loan agreement.

83.    Further, Defendants had a duty to notice and clarify and ambiguous provisions in the loan instructions and inform Plaintiff on a timely basis of any ambiguity, conflict or apparent error in the instructions prior to closing of escrow.  Defendant ESCROW has a duty to act with due care, carefully perform all instructions so as not to cause an unreasonable risk of harm to Plaintiffs and to inform Plaintiffs of any matter which may have a substantial adverse impact on them.

84.    As such, said defendants breached their duties to Plaintiffs, as set forth above, and said acts and failures to act of defendants duties constituted negligence.

85.    As a result of the negligence of said defendants, Plaintiff has been required to retain attorneys and incur attorneys' fees to prosecute an action against other defendants.  Such fees incurred by Plaintiff are a natural and proximate result of the acts of defendants, which may entitle Plaintiff to reimbursement of said fees by said defendants.

86.    As a result of the negligence of said defendants, as set forth above, Plaintiffs have

1  incurred damages in an amount in excess of $25,000.00.

2                                         **VII.**

3                          **SEVENTH CAUSE OF ACTION**

4    (Negligent Supervision as to EAGLE, SURESTEP, AHL, AHM and AHMS, The Escrow

5                             Forum, and DOES 1-20)

6           Plaintiffs reallege and incorporate paragraphs 1 through 86 into this cause of action as though

7    fully set forth.

8           87.    Defendants had a duty to supervise their agents and or employees. Further, said

9    defendants had a duty to ensure that their agents or employees complied with all state and federal

10   laws, were properly licensed to perform the duties requested of them, and to perform those duties

11   competently and in good faith.

12          88.    Defendants knew or should have known that the failure to supervise their employees

13   and agents in conducting exercise their job duties utilizing the appropriate standard of care would

14   cause harm to the Plaintiffs.

15          89.    The acts of defendants, as set forth above, were breaches of their duties owed to

16   Plaintiff and constituted negligence.

17          90.    As an actual and proximate result of the negligence of said defendants, Plaintiffs have

18   been damaged in an amount in excess of $25,000.00.

19                                        **VIII.**

20                           **EIGHTH CAUSE OF ACTION**

21    (Promissory Fraud against EAGLE, SURESTEP, AHL, AHMS, AHMS and DOES 1-20)

22          Plaintiff incorporates herein the allegations of paragraphs 1 through 90 of the complaint as

23   though fully set forth.

24          91.    At all times herein mentioned, brokers knew that Plaintiffs were unsophisticated in

25   finance and loan transactions, and that they relied upon agents to act diligently to discover and inform

26   Plaintiffs of all matters material to Plaintiff's decision to enter into the loan transaction which was

27   secured by the PROPERTY.

28          92.    On or about November 30, 2006, an officer, director, or managing agent of the

     corporation AHL and DOES 1-5, whose true name and identity is unknown at this time to Plaintiffs,

1    and will be ascertained during discovery, made a promise to the Chavez's the terms of their loan were

2    exactly as stated in the TILA disclosure and all supporting loan documents would be consistent

3    therewith.

4        93.    At all times relevant herein AHL ratified the wrongful conduct of the unidentified

5    officer, director, or managing agent.

6        94.    That this promise was important to the transaction.

7        95.    That AHL and DOES 1-5 did not intend to perform this promise when it made it as it

8    intended to sell the loan for a profit to EAGLE.

9        96.    That AHL and DOES 1-5 intended the Chavez's to rely on this promise to

10   consummate the transaction to its financial benefit.

11       97.    The Chavez's reasonably relied on AHL and DOES 1-5's promise.

12       98.    Defendant AHL and DOES 1-5 did not in fact perform the promised act, by drafting

13   loan documents to present to escrow which complied with the terms of the TILA disclosure and

14   which were non-conflicting and unambiguous.

15       99.    That the Chavezs' were harmed by damage to creditworthiness, illegal interest paid

16   and costs and expenses associated with this litigation brought about by an improper Notice of Default

17   and Intent to Sell Under Deed of Trust, cloud on title to the property. Plaintiffs' reliance on AHL and

18   DOES 1-5's promise was a substantial factor in causing their harm.

19       100.   On December 18, 2007, an officer, director, or managing agent of the corporation

20   EAGLE, SURESTEP and DOES 1-5 whose true name and identity is unknown at this time to

21   Plaintiffs, and will be ascertained during discovery, contacted the Chavez's and requested they sign a

22   "corrected" Adjustable Rate Note, backdated to November 22, 2007. No recession of the recorded

23   loan documents or legally required disclosures were made, in violation of the Truth in Lending Act.

24   (See Exhibit "4")

25       101.   EAGLE, SURESTEP and DOES 1-5 made a promise to the Chavez's the material

26   terms of the loan had not changed, and that they needed to sign an "updated" form. In truth and fact.

27   Exhibit "4", the second unrecorded Adjustable Rate Note deleted the date provision under Exhibit

28   "3", section 2, which indicated a 1 % interest Rate for the period of November 22, 2006 to November

30, 2006, with a subsequent rate of 6.37 % for the period of December 01, 2006 to December 31,

1    2006. Furthermore, the change date of January 1st, 2007, indicated an interest rate margin for change

2    dates of 1.050 %.

3        102.    As stated in Exhibit "4", the interest rate margin was calculated for change dates at

4    3.550 %, resulting in a significant increase in the cost of the mortgage, and all without disclosing the

5    existence or the effect of the changes to the Chavez's. Furthermore, the new note was for a very

6    different and much more expensive loan program than the Plaintiff's bargained for with AHL and as

7    explained in the Truth in Lending disclosures.

8        103.    At all times relevant herein EAGLE and SURESTEP ratified the wrongful conduct of

9    DOES 1-5, the unidentified officer, director, or managing agent.

10       104.    That this promise was important to the transaction.

11       105.    That EAGLE and SURESTEP did not intend to perform this promise when it made it

12   as it intended to sell the loan to AHM and AHMS for a profit.

13       106.    That EAGLE and SURESTEP intended the Chavez's to rely on this promise to

14   consummate the transaction to its financial benefit.

15       107.    The Chavez's reasonably relied on EAGLE and SURESTEP's promise.

16       108.    Defendant EAGLE and SURESTEP did not in fact perform the promised act, by

17   drafting loan documents to present to escrow which complied with the terms of the TILA disclosure

18   and which were non-conflicting and unambiguous.

19       109.    The Chavezs' were harmed in excess of $25,000.00 by damage to creditworthiness,

20   illegal interest paid and costs and expenses associated with this litigation brought about by an

21   improper Notice of Default and Intent to Sell Under Deed of Trust, cloud on title to the property.

22   Plaintiffs' reliance on EAGLE, SURESTEP and DOES 1-5's promise was a substantial factor in

23   causing their harm.

24       110.    On or about January 10, 2007, an officer, director, or managing agent of the

25   corporation AHM, American Home Mortgage Servicing Inc., and DOES 1-5, whose true name and

26   identity is unknown at this time to Plaintiffs, and will be ascertained during discovery, contacted the

27   Chavez's and, sent correspondence to the Chavez's indicating Sterling had transferred the loan

28   servicing to it and all monthly payments commencing February 01, 2007, were to be made to them.

     Further, said correspondence indicated said "transfer of servicing in no way changes the terms and

COMPLAINT - 16

1   conditions of the mortgage contract".

2       111.    At all times relevant herein AHM and AHMS ratified the wrongful conduct of the
3   unidentified officer, director, or managing agent.

4       112.    On January 22, 2007, AHMS sent an ARM Adjustment Notification letter indicating
5   on March 01, 2007, the monthly payment would increase to $8730.42, based on a **3.550** % margin.

6       113.    Sara Chavez's telephoned American Home Mortgage Inc., and indicated the mortgage
7   contract entered into called for 12 fixed-payments of $3,972.25 for the first year of the loan.  After
8   speaking to a Customer Care Specialist, AHMS and DOES 1-5 promised Ms. Chavez the Truth in
9   Lending statement accurately represented the terms of the loan and instructed Plaintiffs not to pay the
10  increased amount indicated in the ARM Adjustment Notification letters, and to continue to make the
11  12 fixed-payments of $3,972.25 per month.

12      114.    Plaintiffs on information and belief, and thereupon allege, from March 2007 to May
13  2007 Jerry McGarvey was in contact with DOES 1-5 and AHMS customer care specialist Tammy
14  Dawson who made a promise to AHL, intending or reasonably expecting that it would be repeated to
15  Plaintiffs, the situation would be resolved to reflect the loan the Plaintiff's bargained for as stated in
16  the Truth in Lending statement and explained by AHL loan officers prior to escrow closing and
17  recording.

18      115.    That AHM, AHMS and DOES 1-5 intended the Chavez's to rely on this promise to
19  trick them into defaulting for its financial benefit. The Chavez's did in fact reasonably rely on the
20  false promises made by AHMS and made the fixed payments of $3,972.25 per month, and all
    subsequent payments as indicated by the TILA disclosure.

21      116.    Defendant AHM, AHMS and DOES 1-5 did not in fact intend to or perform the
22  promised acts.

23      117.    On or about July 25, 2007 AHMS sent apologetic correspondence to the plaintiffs
24  promising correction had been taken regarding the alleged default stated on May 17, 2007 and that it
25  had sent notice to credit bureaus payment for April 2007, May 2007 and June 2007 had been paid as
26  agreed.

27      118.    Despite Plaintiffs payments of $$3,972.25 for July 2007, August 2007, September
28  2007 and October 2007, as agreed to by AHMS, on or about September 26, 2007, American Home

1 │ Mortgage, initiated foreclosure proceedings by and through Its agent Northwest Trustee Services, Inc.,

2 │ recorded document a Notice of Default, document number 2007000583618, with the Orange County

3 │ recorders office. (See Exhibit "5" attached hereto.)

4 │     119.   AHM, AHMS and DOES 1-5 did not intend to perform this promise when it made it as

5 │ it intended to demand interest and penalties and foreclose on the property for a profit.

6 │     120.   The Chavez's were harmed in excess of $25,000.00 by damage to creditworthiness,

7 │ illegal interest paid and costs and expenses associated with this litigation brought about by an

8 │ improper Notice of Default and Intent to Sell Under Deed of Trust, cloud on title to the property.

9 │ Plaintiffs' reliance on AHMS and AHMS promise was a substantial factor in causing their harm.

10 │     121.   In doing the acts herein alleged, Defendants acted with oppression, fraud and malice,

11 │ and said acts were despicable and done with the intent to harm and injure Plaintiff. Therefore,

12 │ Plaintiff is entitled to an award of punitive damages in a sum sufficient to make an example of

13 │ Defendants, and each of them, and deter such conduct by Defendants in the future.

14 │

15 │ **IX.**

16 │ **NINTH CAUSE OF ACTION**

17 │ **(Fraud as to AHM, AHMS, EAGLE, SURESTEP and Does 1-20)**

18 │     Plaintiff realleges and incorporates paragraphs 1 through 121 into this cause of action as

19 │ though fully set forth.

20 │     122.   On December 18, 2007, an officer, director, or managing agent of the corporation

21 │ EAGLE, SURESTEP and DOES 1-5 whose true name and identity is unknown at this time to

22 │ Plaintiffs, and will be ascertained during discovery, contacted the Chavez's and requested they sign a

23 │ "corrected" Adjustable Rate Note, backdated to November 22, 2007. No recession of the recorded

24 │ loan documents or legally required disclosures were made, in violation of the Truth in Lending Act.

25 │ (See Exhibit "4")

26 │     123.   EAGLE, SURESTEP and DOES 1-5 made an intentional misrepresentation to the

27 │ Chavez's the material terms of the loan had not changed, and that they needed to sign an "updated"

28 │ form. In truth and fact. Exhibit "4", the second unrecorded Adjustable Rate Note deleted the date

provision under Exhibit "3", section 2, which indicated a 1 % interest Rate for the period of

1   November 22, 2006 to November 30, 2006, with a subsequent rate of 6.37 % for the period of

2   December 01, 2006 to December 31, 2006. Furthermore, the change date of January 1st, 2007,

3   indicated an interest rate margin for change dates of 1.050 %.

4          124.    As stated in Exhibit "4", the interest rate margin was calculated for change dates at

5   3.550 %, resulting in a significant increase in the cost of the mortgage, and all without disclosing the

6   existence or the effect of the changes to the Chavez's. Furthermore, the new note was for a very

7   different and much more expensive loan program than the Plaintiff's bargained for with AHL and as

8   explained in the Truth in Lending disclosures.

9          125.    At all times relevant herein EAGLE, SURESTEP and DOES 1-5 ratified the wrongful

10  conduct of DOES 1-5, the unidentified officer, director, or managing agent.

11         126.    That EAGLE, SURESTEP and DOES 1-5  did not believe the misrepresentation to be

12  true.

13         127.    That EAGLE, SURESTEP and DOES 1-5 intended the Chavez's to rely on the

14  misrepresentation to consummate the transaction to its financial benefit.

15         128.    The Chavez's reasonably relied on EAGLE, SURESTEP and DOES 1-5's

16  misrepresentation.

17         129.    The Chavezs' were harmed in excess of $25,000.00 by damage to creditworthiness,

18  illegal interest paid and costs and expenses associated with this litigation brought about by an

19  improper Notice of Default and Intent to Sell Under Deed of Trust, cloud on title to the property.

20  Plaintiffs' reliance on EAGLE, SURESTEP and DOES 1-5's misrepresentations was a substantial

    factor in causing their harm.

21         130.    On January 22, 2007, AHMS sent an ARM Adjustment Notification letter indicating

22  on March 01, 2007, the monthly payment would increase to $8730.42, based on a 3.550 % margin.

23         131.    On or about March 2007, an officer, director, or managing agent of the corporation

24  American Home Mortgage Servicing Inc., and AHMS whose true name and identity is unknown at

25  this time to Plaintiffs, and will be ascertained during discovery, represented to the Chavez's the Truth

26  in Lending statement (Exhibit "1") accurately represented the terms of the loan and instructed

27  Plaintiffs not to pay the increased amount indicated in the ARM Adjustment Notification letters, and

28  to continue to make the fixed-payments of $3,972.25 per month.

1    132.    Plaintiffs on information and belief, and thereupon allege, from March 2007 to May

2    2007 Jerry McGarvey was in contact with AHMS customer care specialist Tammy Dawson who made

3    representations to AHL , intending or reasonably expecting that it would be repeated to Plaintiffs, the

4    situation would be resolved by reforming the loan documents and Deed of Trust to reflect the loan the

5    Plaintiff's bargained for as stated in the Truth in Lending statement.

6    133.    Defendant AHM and AHMS and DOES 1-5 knew the statements they would accept

7    the payments of $3,972.25 per month as full accord and satisfaction to be false, or made the

8    representation recklessly and without regard for its truth.

9    134.    Defendants intended the Chavez's to rely on this intentional misrepresentation to trick

10   them into defaulting for its financial benefit. The Chavez's did in fact reasonably rely on the

11   misrepresentations and made the fixed payments of $3,972.25 per month, and all subsequent

12   payments as indicated by the TILA disclosure.

13   135.    Despite Plaintiffs payments of $$3,972.25 for July 2007, August 2007, September

14   2007 and October 2007, as agreed to by AHMS and DOES 1-5, on or about September 26, 2007,

15   American Home Mortgage, initiated foreclosure proceedings by and through Its agent Northwest

16   Trustee Services, Inc., and recorded document a Notice of Default, document number

17   2007000583618, with the Orange County recorders office.  (See Exhibit "5" attached hereto.)

18   136.    The Chavez's were harmed in excess of $25,000.00 by damage to creditworthiness,

19   illegal interest paid and costs and expenses associated with this litigation brought about by an

20   improper Notice of Default and Intent to Sell Under Deed of Trust, cloud on title to the property.

21   Plaintiffs' reliance on AHM and AHMS's and DOES 1-5 misrepresentations were a substantial factor

     in causing their harm.

22   137.    In doing the acts herein alleged, Defendants acted with oppression, fraud and malice,

23   and said acts were despicable and done with the intent to harm and injure Plaintiff. Therefore,

24   Plaintiff is entitled to an award of punitive damages in a sum sufficient to make an example of

25   Defendants, and each of them, and deter such conduct by Defendants in the future.

26   ///

27   ///

28   ///

## X.

### TENTH CAUSE OF ACTION

#### (Negligent Misrepresentation as to all Defendants, and DOES 1-10)

Plaintiffs reallege and incorporate paragraphs 1 through 137 into this cause of action as though fully set forth.

138.     In the alternative, if the allegations of paragraphs 121-137, were not done intentionally, recklessly or with gross negligence the Defendants knew or should have known their misrepresentations would cause Plaintiffs harm.

139.     The negligent misrepresentations of Defendants actually and proximately caused the Chavez's harm in excess of $25,000.00 by damage to creditworthiness, illegal interest paid and costs and expenses associated with this litigation brought about by an improper Notice of Default and Intent to Sell Under Deed of Trust and cloud on title to the property.  Plaintiffs' reliance on AHM and AHMS's misrepresentations were a substantial factor in causing their harm.

### XI.

### ELEVENTH CAUSE OF ACTION

#### (Unfair Competition in violation of B & P § 17200 pursuant to § 17500 as against AHL, ESCROW, EAGLE and SURESTEP, AHMS, AHMS and DOES 1-20)

140.     Plaintiff incorporates by reference paragraphs 1 through 139 above, as though the same were set forth in full herein.  All references to Defendants either generically or by name also refer to DOES 1 to 50 inclusive.

141.     Defendants AHL, ESCROW, EAGLE and SURESTEP, AHMS, AHMS and DOES 1-5 are required to comply with B & P § 17200 and thereby must refrain from any business activities which might be construed to be any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising ( B & P § 17500).

142.     Further all Defendants were required to comply with the Federal Truth in Lending Act, Regulation Z and Real Estate Settlement Procedures Act, *inter alia*.

143.     Plaintiff received from lender a loan which qualified under the TILA as a refinance loan, secured by a principle dwelling under 15 U.S.C. § 1635(a); 12 C.F.R. §§ 226.15(a) 226.23(a).

144.     Defendants failed to provide accurate *material disclosures* or *the notice of right to*

1  *cancel* in the prescribed manner, including but not limited to each borrower receiving two notices of

2  right to cancel which clearly and conspicuously disclose: (1) the retention or acquisition of a security

3  interest in the consumer's principal dwelling; (2) the consumer's right to rescind the transaction; (3)

4  how to exercise the right to rescind with a form for that purpose, designating the address of the

5  creditor's place of business; (4) the effects of rescission; and (5) the date the rescission period expires

6  (Regulation Z § 226.23(b)(1)(I-v)).. 12 C.F.R. §§ 226.15(a)(3), 226.23(a)(3).

7       145.   Further, and in violation of Regulation Z, Defendants failed to provide accurate

8  *material disclosures* of the annual percentage rate, the finance charge, the amount financed, the total

9  payments, the payment schedule, and the disclosures and limitations referred to in sections 226.32©

10  and (d) in the ."Truth In Lending Disclosure Statement". (See Exhibit "1" Exhibit "2" and Exhibit

11  "3".)

12       146.   On December 05, 2006, the Chavez's received correspondence from loan servicer

13  CBSK Financial Corp. Indicating monthly payments in the amount of $3,972.25 and commencing

14  January 01, 2007, were to be made to a new loan servicer, Sterling Eagle Mortgage Investment

15  Company, LLC.  Further, said correspondence indicated said "transfer of servicing in no way changes

16  the terms and conditions of the mortgage contract."

17       147.   On December 18, 2007, Sterling Eagle Investment by and through its subsidiary

18  SURESTEP contacted the Chavez's and requested they sign a "corrected" Adjustable Rate Note,

19  backdated to November 22, 2007, which in no way changes the terms and conditions of the mortgage

20  contract. Said statement was knowingly false.  No recession of the recorded loan documents or

21  legally required disclosures were made, in violation of the Truth in Lending Act. (See Exhibit "4")

22       148.   EAGLE and SURESTEP told the Chavez's the material terms of the loan had not

23  changed, and that they needed to sign an "updated" form.  Defendants EAGLE and SURESTEP failed

24  to provide any new disclosures required under TILA (12 C.F.R. §§ 226.1) or Regulation Z, a per se

25  violation of the Federal Truth in Lending Act and a basis for a California state claim under the UCL.

26       WHEREFORE, Plaintiff prays for judgment as follows:

27

28

1 | AS TO THE FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF:

2 |     1.    Plaintiffs seeks a judicial determination (1) the TILA disclosure statement attached

3 | hereto as Exhibit "1" shall be the set forth the controlling terms of the loan at issue and (2) they are

4 | not in default under such terms.

5 |

6 | AS TO THE SECOND CAUSE OF ACTION TO ENJOIN THE FORECLOSURE:

7 |     1.    For issuance of a temporary restraining order, preliminary injunction, and permanent

8 | injunction restraining and enjoining Defendant AHMS and its agent Northwest Trustee Services Inc.

9 | from proceeding with foreclosure;

10 |     2.    For issuance of a temporary restraining order, preliminary injunction, and permanent

11 | injunction restraining and requiring Defendant AHMS to withdraw the recorded Notice of Default,

12 | Rescind the Deed of Trust and reform the Deed to comply with the TILA disclosure terms stated in

13 | Exhibit "1".

14 |

15 | AS TO THE THIRD CAUSE OF ACTION FOR ACCOUNTING:

16 |     1.    Defendants should be ordered to provide all fees, penalties, interest, principal received

17 | from Plaintiffs concerning loan transaction and should be ordered to place the same in a trust account

18 | pending resolution of this lawsuit.

19 |

20 | AS TO THE FOURTH CAUSE OF ACTION FOR BREACH OF CONTRACT:

21 |     1.    Plaintiffs pray the Deed of Trust be rescinded and reformed, and recorded as a Deed of

22 | Trust consistent with the loan terms in the TILA disclosure statement (Exhibit "1".)

23 | AS TO CAUSES OF ACTION FIVE THROUGH TEN:

24 |     1.    For general and special damages in an amount to be shown at the time of trial;

25 |     2.    For reasonable attorney's fees as allowed by contract or statute according to proof;

26 |     3.    For punitive damages in an amount to be shown at trial.

27 |     4.    For all costs of suit herein incurred;

28 |     5.    For such other and further relief as the court may deem just and proper.

COMPLAINT - 23

1   AS TO THE ELEVENTH CAUSE OF ACTION:

2        1.    Disgorgement of all improperly obtained profits from Plaintiffs and Restitution.

3        2.    An injunction against AHM to refrain from all acts which may be deemed in violation

4   of the UCL, including an order staying the foreclosure and rescission and reformation of Deed of

5   Trust and Promissory Note.

6

7   Dated:  December 7, 2007

8

9                                    By:  _____

10                                         Charles D. Richmond, Esq.
                                          Attorney for THOMAS CHAVEZ and SARA CHAVEZ

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 22

EXHIBIT "1"

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: 1095707
Creditor: AMERICAN HOME LOANS                              Date: NOVEMBER 22, 2006
Address: 17991 COWAN STREET, IRVINE, CALIFORNIA 92614

Borrower(s): THOMAS J. CHAVEZ, SARA A. CHAVEZ

Address: 35012 CAMINO CAPISTRANO, DANA POINT, CALIFORNIA 92624

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down payment of $ |
|---|---|---|---|---|
| 6.345 % | $ 1,779,775.05 | $1,233,217.08 | $3,012,992.13 | $ N/A |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning | Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning | Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning |
|---|---|---|---|---|---|---|---|---|
| 12 | 3,972.25 | 01/01/07 | | | | | | |
| 12 | 4,270.17 | 01/01/08 | | | | | | |
| 12 | 4,590.43 | 01/01/09 | | | | | | |
| 12 | 4,934.71 | 01/01/10 | | | | | | |
| 12 | 5,304.81 | 01/01/11 | | | | | | |
| 299 | 9,120.40 | 01/01/12 | | | | | | |
| 1 | 9,124.09 | 12/01/36 | | | | | | |

_____ DEMAND FEATURE: This obligation has a demand feature.

__X__ VARIABLE RATE FEATURE: Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.
THE CURRENT INDEX USED FOR THIS CALCULATION IS 5.320%.

INSURANCE: The following insurance is required to obtain credit:
_____ Credit life insurance and credit disability   __X__ Property insurance   _____ Flood insurance   _____ Mortgage insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.
SECURITY: You are giving a security interest in: 35012 CAMINO CAPISTRANO, DANA POINT, CALIFORNIA
_____ The goods or property being purchased   __X__ Real property you already own.   92624
FILING FEES: $ 60.00
LATE CHARGE: If payment is more than _____15_____ days late, you will be charged _____5.000__ % of the payment. *
PREPAYMENT: If you pay off early, you                       * or $5.00 (whichever is greater)
__X__ may   _____ will not   have to pay a penalty.
_____ may   __X__ will not   be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
_____ may   __X__ may, subject to conditions   _____ may not   assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
__X__ "e" means an estimate   _____ all dates and numerical disclosures except the late payment disclosures are estimates.
Each of the undersigned acknowledge receipt of a complete copy of this disclosure. The disclosure does not constitute a contract or a commitment to lend.

| Applicant THOMAS J. CHAVEZ | Date | Applicant SARA A. CHAVEZ | Date |
|---|---|---|---|
| Applicant | Date | Applicant | Date |
| Applicant | Date | Applicant | Date |

** NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

A+HN: KEM

## DOCUMENT SYS...MS, INC.

*Loan Document Worksheet (continued)*

### MISCELLANEOUS/IMPOUNDS

| | PART/ YEAR | PAYMENT AMOUNT | MONTHLY | DUE . ATE | # MOS | |
|---|---|---|---|---|---|---|
| Property Taxes | $ | $ | | | | 1ST Year PMI Premium $ |
| Hazard Insurance | $ | $ | | | | Renewal Rate % |
| Flood Insurance | $ | $ | | | | (Years 2-10) or Term |
| PMI | $ | $ | | | | PMI 2nd Renewal Rate % |
| | $ | $ | | | | (Years 11-Term) or Term |
| | $ | $ | | | | Aggregate Adjust. |

### CLOSING/TITLE/OTHER SERVICE PROVIDERS

| | | | |
|---|---|---|---|
| CLOSING CO.: | OFFICER: | CLOSING #: | |
| ADDRESS: | | PHONE NUMBER: | |
| TITLE CO.: THE ESCROW FORUM | OFFICER: | ORDER #: | |
| ADDRESS: | | PHONE NUMBER: | |
| REPORT DATE: 10/31/2006 | PARCEL #: 12336219 | | |
| TAX MESSAGE: 12-06 TAXES DUE AT CLOSING | ENDORSEMENTS: | | |
| APPROVED ITEMS: | CLOSING COUNTY: ORANGE | | |
| TYPE: APPRAISAL | COMPANY NAME: AMERICAN HOME LOANS | | |
| ADDRESS: | | | |
| PHONE NUMBER: | CONTACT: | REF. NUMBER | RELATION CODE: |
| TYPE: UNDERWRITING | COMPANY NAME: AMERICAN HOME LOANS | | |
| ADDRESS: | | | |
| PHONE NUMBER: | CONTACT: | REF. NUMBER | RELATION CODE: |
| TYPE: FLOOD CERTIFICATION | COMPANY NAME: AMERICAN HOME LOANS | | |
| ADDRESS: | | | |
| PHONE NUMBER: | CONTACT: | REF. NUMBER | RELATION CODE: |

### CLOSING INSTRUCTIONS

AT CLOSING, INSTRUCTION: REAL ESTATE TAXES WILL NOT BE ESCROWED. MUST BE
CURRENT WITHIN 60 DAYS OF CLOSING.
AT CLOSING, INSTRUCTION: HOMEOWNERS INSURANCE NOT ESCROWED.  MUST BE CURRENT
WITHIN 60 DAYS OF CLOSING
AT CLOSING, SPOUSE MUST EXECUTE: MORTGAGE, TRUTH IN LENDING & ITEMIZATION,
NAME AFFADAVIT, AND RIGHT OF RECISION FORM (REFI ONLY).
AT CLOSING, INSTRUCTION: CLOSING INSTRUCTIONS: ATTACH LEGAL DESCRIPTION TO
SECURITY INSTRUMENT PRIOR TO RECORDING
AT CLOSING, RETURN MARKED UP TITLE OR BINDER WITH SIGNED CLOSING DOCUMENTS.
TITLE COMMITMENT TO SHOW CORRECT VESTING AND LEGAL DESCRIPTION AND TO CLEAR
ALL LIENS AND ENCROACHMENTS THAT WOULD IMPAIR THE PROPER LIEN POSITION OF
THE MORTGAGE/DEED OF TRUST.
AT CLOSING, CLOSED LOAN PACKAGES MUST BE RECEIVED WITHIN 24 HOURS OF CLOSING.
THE PACKAGE MUST BE SENT TO SURESTEP FULFILLMENT SERVICES, 340 SCOTCH ROAD,

### BENEFICIARY/TRUSTEE

BENEFICIARY: AMERICAN HOME LOANS, A CALIFORNIA CORPORATION
17991 COWAN STREET, IRVINE, CALIFORNIA 92614
TRUSTEE: THE ESCROW FORUM

### PAYMENT SCHEDULE

| | | |
|---|---|---|
| 12 | 3,972.25 | 01/01/2007 |
| 12 | 4,270.17 | 01/01/2008 |
| 12 | 4,590.43 | 01/01/2009 |
| 12 | 4,934.71 | 01/01/2010 |
| 12 | 5,304.81 | 01/01/2011 |
| 299 | 9,120.40 | 01/01/2012 |
| 1 | 9,124.09 | 12/01/2036 |

| APR | SECTION 32? | STATE HIGH COST? | LATE DAYS | LATE % |
|---|---|---|---|---|
| 6.345% | NO | N/A | 15 | 5.000% |

IMPORTANT NOTICE - PLEASE READ CAREFULLY: We are proud of our reputation in the mortgage lending industry and make every effort to satisfy the mortgage lending needs of our customers.  However, absent a written agreement to the contrary, we make no warranties, express or implied.  Please note that it is your responsibility to verify the accuracy of this order.  Your responsibilities as a customer include, but are not limited to, verifying the accuracy of all data entered on the loan worksheet, calculating the accuracy of all loan documents, and verifying the accuracy and completeness of all loan documents created after the loan data is processed.  The specified obligations apply whether or not you actually receive the documents after processing.  We are not responsible for errors or omissions discovered after the loan documents have been signed by the borrower.  In any event, our liability is limited to the fee we charged you for processing this order.

DocMagic eXpress 800-649-1362
www.docmagic.com

CHAVEZ
AO4 160152.7857

EXHIBIT "2"

MIN: 100326000010957079                    Loan Number: 1095707

# ADJUSTABLE RATE NOTE
### (12-MTA INDEX - PAYMENT AND RATE CAPS)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE
AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE
FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE
LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY
MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A
RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE
AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN     125.000 % OF
THE ORIGINAL AMOUNT (OR $ 1,543,750.00     ). MY INTEREST RATE CAN
NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A
BALLOON PAYMENT MAY BE DUE AT MATURITY.

NOVEMBER 22, 2006                    IRVINE               CALIFORNIA
[Date]                               [City]               [State]

    35012 CAMINO CAPISTRANO, DANA POINT, CALIFORNIA 92624
                        [Property Address]

### 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,235,000.00     plus any amounts
added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the
Lender. The Lender is AMERICAN HOME LOANS, A CALIFORNIA CORPORATION

I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may
transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments
under this Note is called the "Note Holder."

### 2.    INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. I will pay interest at a yearly
rate of     1.000 % until DECEMBER 1, 2006     , and the initial monthly payment provided
for in Section 3(B) of this Note will be based on this rate (the "Initial Rate"). Commencing DECEMBER 1    ,
2006     , I will pay interest at a yearly rate of     6.3700 % (the "Subsequent Rate"). Thereafter,
the interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this
Section 2 and Section 4 of this Note is the interest rate I will pay both before and after any default described in Section
7(B) of this Note.

### 3.    PAYMENTS

    **(A) Time and Place of Payments**
    I will pay Principal and interest by making payments every month. In this Note, unless otherwise specified
"payment" refers to the Principal and interest payment only, although other charges such as taxes, insurance and/or
late charges may also be payable with the monthly payment.
    I will make my monthly payments on     1st  day of each month beginning on   JANUARY 1    ,
2007     . I will make these payments every month until I have paid all of the principal and interest and
any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest
before Principal. If, on DECEMBER 1, 2036     , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."

---

ADJUSTABLE RATE NOTE (12-MTA INDEX - PAYMENT AND RATE CAPS)          DocMagic ☎ 800-649-1362
AHM-2030N (MULT) 01/01/06                    Page 1 of 6                    www.docmagic.com

I will make my monthly payments at 340 SCOTCH ROAD, WEST TRENTON, NEW
JERSEY 08628
                                    , or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my monthly payments until the first Payment Change Date will be in the amount of U.S.
$3,972.25        , unless adjusted at an earlier time under Section 4(H) of this Note.

(C) Payment Changes
My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect
changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest
rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may further change on the 1st   day of JANUARY, 2007         ,
and on that day every month thereafter. Each such date on which my interest rate could change is called a "Change
Date."

(B) The Index
On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average,
determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to
a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release
entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by
adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
The most recent Index figure available as the 15 days before each interest rate Change Date is called the
"Current Index." If the Index is no longer available, the Note holder will choose a new Index which is based upon
comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
ONE AND 050/1000                        percentage point(s) (         1.050 %)
("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest
one-thousandth of one percentage point (0.001). Subject to the limits stated in Section 4(D) below, this rounded
amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to
paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of
the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin
on the last date the old Index was available and the average of the new Index for the most recent three year period
which ends on that date (or if not available for such three year period, for such time as it is available). This difference
will be rounded to the next higher 1/8 of 1%.

(D) Interest Rate Limit
My interest rate will never be greater than NINE AND 950/1000
                        percentage point(s) (        9.950 %) ("Cap").
except that following any sale or transfer of the property which secures repayment of this Note after the first interest
rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the
interest rate in effect at the time of such sale or transfer.

(E) Payment Change Dates
Effective every year commencing JANUARY 1, 2008        , and on the same date each twelfth
month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that
would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in
full on the Maturity Date at the interest rate that will become effective one month prior to the Payment Change Date
in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to
Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my
payments are changed earlier under Section 4(H) of this Note.

(F) **Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amounts of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

(G) **Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the Maturity Date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H) **Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to        125.000 % of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that      125.000 % limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the Maturity Date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

(I) **Required Full Monthly Payment**

On the     5th     anniversary of the due date of the first monthly payment, and on that same day every   5th   year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J) **Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(K) **Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

5.    **BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

ADJUSTABLE RATE NOTE (12-MTA INDEX - PAYMENT AND RATE CAPS)
AHM-2030N (MULT) 01/01/06                                    Page 3 of 6

6.  **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in an amount permitted and otherwise in accordance with Applicable Law in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

7.  **BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000    % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once for each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given to Borrower).

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

8.  **GIVING OF NOTICES**

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.  **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

---

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial Interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

ADJUSTABLE RATE NOTE (12-MTA INDEX - PAYMENT AND RATE CAPS)
AHM-2030N (MULT)  01/01/06                    Page 5 of 6                    DocMagic eForms 800-649-1362
                                                                            www.docmagic.com

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
THOMAS  J.  CHAVEZ          -Borrower

_____ (Seal)
SARA  A.  CHAVEZ            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

ADJUSTABLE RATE NOTE (12-MTA INDEX - PAYMENT AND RATE CAPS)
AHM-2030N (MULT)  01/01/06          Page 6 of 6

DocMagic €Forms 800-649-1362
www.docmagic.com

EXHIBIT "3"

**Southland Title Corporation**

# 2653766

Recording Requested By:
AMERICAN HOME LOANS

And After Recording Return To:
AMERICAN HOME LOANS
340 SCOTCH ROAD
WEST TRENTON, NEW JERSEY 08628
Loan Number: 1095707

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

75.00

**2006000801592 08:00am 11/30/06**
103 49 D11 24

0.00 0.00 0.00 0.00 0.00 69.00 0.00 0.00 0.00

[Space Above This Line For Recording Data]

## DEED OF TRUST

MIN: 100326000010957079

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   NOVEMBER 22, 2006   , together with all Riders to this document.
(B) "Borrower" is   THOMAS J. CHAVEZ and SARA A. CHAVEZ, HUSBAND AND WIFE AS JOINT TENANTS

Borrower is the trustor under this Security Instrument.
(C) "Lender" is   AMERICAN HOME LOANS

Lender is a   CALIFORNIA CORPORATION                                                        organized and existing under the laws of   CALIFORNIA
Lender's address is   17991 COWAN STREET, IRVINE, CALIFORNIA 92614

(D) "Trustee" is   THE ESCROW FORUM

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated NOVEMBER 22, 2006
The Note states that Borrower owes Lender   ONE MILLION TWO HUNDRED THIRTY-FIVE
THOUSAND AND 00/100                              Dollars (U.S. $ 1,235,000.00   ) plus interest.

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic eForms 800-649-1362
Form 3005 01/01                                     Page 1 of 14                          www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 1 of 24
Order: Richmand Comment:

UGA CUSTMER SERVICE                                    ☒ 004/037

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than DECEMBER 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider       ☐ Planned Unit Development Rider
☐ Balloon Rider               ☐ Biweekly Payment Rider
☐ 1-4 Family Rider            ☐ Second Home Rider
☐ Condominium Rider           ☒ Other(s) [specify]
                                 PREPAYMENT RIDER TO SECURITY INST

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 2 of 24
Order:  Richmand Comment:

UBA CUSTOMER SERVICE    @ 005/037

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
**COUNTY** of **ORANGE**
[Type of Recording Jurisdiction]    [Name of Recording Jurisdiction]
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 12336319

which currently has the address of 35012 CAMINO CAPISTRANO
[Street]

DANA POINT                , California    92624    ("Property Address"):
[City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01    Page 3 of 14
Copyright © 2000-2007
www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 3 of 24
Order: Richmand Comment:

001 COSTNER SERVICE                                                   ☑ 008/037

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS            DocMagic ☎ 800-649-1362
Form 3005 01/01                                            Page 4 of 14                                   www.docmagic.com

U&1 CUSTMER SERVICE    ☒007/037

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the escrow items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT – MERS
Form 3005 01/01                     Page 6 of 14                     DocMagic eForms 800-649-1362
www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 5 of 24
Order: Richmand Comment:

G&I CUSTMER SERVICE @ 008/037

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic eForms 800-649-1362
Form 3005 01/01                                         Page 6 of 14                                        www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 6 of 24
Order: Richmond Comment:

G&T CUSTMER SERVICE                    @009/037

**6.  Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease.  Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.  Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                        Page 7 of 14              DocMagic eForms 800-649-1362
www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 7 of 24
Order: Richmond Comment:

☑010/037

C81 CUSTMER SERVICE

Mortgage Insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 8 of 14
DocMagic EFORMS 800-649-1362
www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 8 of 24
Order: Richmond Comment:

(1/20/2001  11:00 FAX  8083847815          C&1 CUSTMER SERVICE                          011/037

or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  Loan Charges.  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.  Notices.  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      DocMagic eForms 800-649-1362
Form 3005 01/01                                              Page 9 of 14                                www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 9 of 24
Order: Richmond Comment:

CMI CUSTMER SERVICE    ☒012/037

otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic ☎800-649-1362
Form 3005 01/01    Page 10 of 14    www.docmagic.com

U&L CUSTMER SERVICE                                      ☒ 013/037

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                    DocMagic ☎ 800-649-1362
Form 3005 01/01                                            Page 11 of 14                            www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 11 of 24
Order: Richmand Comment:

1:/29/2007  11.31 FAX  8089967815          C&L COSTNER SERVICE                    ☑014/037

required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 12 of 24
Order: Richmond Comment:

· · ·-·/···· ··.·· ··· ··························    ·a· ········· ·······    015/037

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
THOMAS J. CHAVEZ            -Borrower

_____ (Seal)
SARA A. CHAVEZ             -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Witness:

_____

Witness:

_____

CALIFORNIA--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        DocMagic eForms 800-649-1362
Form 3005 01/01                                Page 13 of 14                       www.docmagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 13 of 24
Order: Richmand Comment:

CRI CUSTMER SERVICE    ☑018/037

State of California        )
                           ) ss.
County of ORANGE           )

On November 22, 2006 before me, S. Spangler, Notary Public

personally appeared   THOMAS J. CHAVEZ, SARA A. CHAVEZ

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.



NOTARY SIGNATURE

S. Spangler
(Typed Name of Notary)

NOTARY SEAL

S. SPANGLER
Commission # 1648578
Notary Public - California
Orange County
My Comm. Expires Mar 4, 2010

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic eForms 800-649-1362
Form 3005 01/01                                      Page 14 of 14              www.docmagic.com

┌────────── ·······  ·· ··· ···  ····························   ···· ········ ·······   ☑ 017/037

## ILLEGIBLE NOTARY SEAL DECLARATION
## GOVERNMENT CODE 27361.7

I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY SEAL ON THE
DOCUMENT WHICH THIS STATEMENT IS ATTACHED, READS AS FOLLOWS:

NAME OF NOTARY: _____ *S. Spangler* _____

COUNTY WHERE BOND IS FILED: _____ *Orange* _____

DATE COMMISSION EXPIRES: _____ *Mar 4, 2010* _____

PLACE OF EXECUTION OF THIS DECLARATION: IRVINE, CALIFORNIA

DATE: _____ *11-29-06* _____

COMMISSION NUMBER: _____ *1648378* _____

AUTHORIZED MANUFACTURES CODE: _____ *NNA1* _____


SOUTHLAND TITLE

TITLE OFFICER

GBI CUSTMER SERVICE                                          ☑ 018/037

Loan Number:  1095707

Date:  NOVEMBER 22, 2006

Property Address:  35012 CAMINO CAPISTRANO, DANA POINT, CALIFORNIA
92624

EXHIBIT "A"

LEGAL DESCRIPTION

A.P.N. # : 12336219

DocMagic CDForms 800-649-1341
www.docmagic.com

## Exhibit "A"

Lot 19 in Block 2 of Tract 883, in the City of Dana Point, County of Orange, California as per map recorded in Book 27, Page(s) 1-10, Inclusive of Miscellaneous Maps in the Office of the County Recorder of said County.

*Description: Orange,CA Document-Year.DocID 2006.801592 Page: 17 of 24*
*Order: Richmand Comment:*

`,, ``,` ``,` `,,`` ``` `````````    U&T CUSTMER SERVICE                    ☒020/037

Loan Number: 1095707

## ADJUSTABLE RATE RIDER
### (12-MTA INDEX - PAYMENT AND RATE CAPS)

THIS ADJUSTABLE RATE RIDER is made this 22nd day of NOVEMBER 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to AMERICAN HOME LOANS, A CALIFORNIA CORPORATION

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

35012 CAMINO CAPISTRANO, DANA POINT, CALIFORNIA 92624
[Property Address]

**THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN    125.000 % OF THE ORIGINAL AMOUNT (OR $ 1,543,750.00    ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE AND RIDER.  A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**

Interest will be charged on unpaid Principal until the full amount has been paid.  I will pay interest at a yearly rate of  1.000  % until DECEMBER 1,  2006    , and the initial monthly payment provided for in the Note will be based on this rate.  Commencing  DECEMBER 1 2006    , I will pay interest at a yearly rate of  6.3700  %.  Thereafter, the interest rate I will pay may change in accordance with Section 4 of the Note.

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may further change on the  1st   day of  JANUARY 2007    , and on that day every month thereafter.  Each such date on which my interest rate could change is called a "Change Date."

ADJUSTABLE RATE RIDER (12-MTA INDEX - PAYMENT AND RATE CAPS)                    Docuxlegic Communic 800-649-1362
AHM-2029R (MULT)  01/01/06                        Page 1 of 5                    www.documagic.com

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 18 of 24
Order: Richmond Comment:

**(B)  The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)  Interest Rate Change**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ONE AND 050/1000                 percentage point(s) (   1.050  %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D)  Interest Rate Limit**

My interest rate will never be greater than     9.950 % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E)  Payment Change Dates**

Effective every year commencing            JANUARY  1,  2009  , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F)  Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G)  Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the

ADJUSTABLE RATE RIDER (12-MTA INDEX - PAYMENT AND RATE CAPS)
AHM-2029R (MULT) 01/01/08                          Page 2 of 5

001 CUSTOMER SERVICE                    ☑ 022/037

unpaid Principal I owe in full on the maturity date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H)  Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to    125.000  % of the principal amount originally borrowed.  In the event my unpaid Principal would otherwise exceed that  125.000  % limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation.  The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

(I)  Required Full Monthly Payment

On the      5th         anniversary of the due date of the first monthly payment, and on that same day every      5th         year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

(K)  Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.  If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be

Description: Orange, CA Document-Year.DocID 2006.801592 Page: 20 of 24
Order: Richmond Comment:

☑ 024/037

**BY SIGNING BELOW**, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.  Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

_____ (Seal)
THOMAS J.  CHAVEZ              -Borrower

_____ (Seal)
SARA A.  CHAVEZ                -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

ADJUSTABLE RATE RIDER (12-MTA INDEX - PAYMENT AND RATE CAPS)
AHM-2029R (MULT)  01/01/06                              Page 5 of 5

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 22 of 24
Order: Richmand Comment:

. . . . . . . . .                 UWI CUSTMER SERVICE                                      ☎ 025/037
   . .

Loan Number: 1095707

## PREPAYMENT RIDER TO SECURITY INSTRUMENT

THIS PREPAYMENT RIDER is made this 22nd  of  NOVEMBER, 2006  ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to   AMERICAN HOME LOANS, A CALIFORNIA
CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

   35012 CAMINO CAPISTRANO, DANA POINT, CALIFORNIA 92624

[Property Address]

PREPAYMENT COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

I have the right to make payments of principal at any time before they are due. A prepayment
of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the
unpaid principal is known as a "partial prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time
without paying any penalty. If within the first  THIRTY-SIX ( 36  ) month(s) after the
execution of the Note, I make a Full Prepayment or Partial Prepayment(s) of more than twenty percent
(20%) of the original principal amount in a twelve month period immediately preceding the date of
prepayment, I will pay a prepayment charge in an amount equal to the payment of six (6) months'
advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original
principal amount of the Note in that twelve month period. Interest will be calculated using the rate in
effect at the time of prepayment.

If I make a partial prepayment equal to one or more of my monthly payments, the due date of
my next scheduled monthly payment may be advanced no more than one month. If I make a partial
prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

Description: Orange,CA Document-Year.DocID 2006.801592 Page: 23 of 24
Order: Richmond Comment:

☑ 028/037

**NOTICE TO THE BORROWER**

Do not sign this Prepayment Rider before you read it. This Prepayment Rider provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Prepayment Rider.

_____ (Seal)
THOMAS J. CHAVEZ        -Borrower

_____ (Seal)
SARA A. CHAVEZ          -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

MULTI-STATE PREPAYMENT RIDER
ARM-20245 (MULTI) 04/01/03         Page 2 of 2         DocMagic eForms 800-649-1362
                                                        www.docmagic.com

EXHIBIT "4"

Jun 18 2007 7:05AM   CBSK Financial Group Inc.   9494183250                    p.8

MIN: 100326090010957079                    Loan Number: 1095707

## ADJUSTABLE RATE NOTE
### (12 MONTH TREASURY AVERAGE INDEX - NO PERIODIC RATE CAPS)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE MINIMUM AND MAXIMUM INTEREST RATE I MUST PAY.

NOVEMBER 22, 2006                 IRVINE              CALIFORNIA
[Date]                            [City]              [State]

35012 CAMINO CAPISTRANO, DANA POINT, CALIFORNIA 92624
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $1,235,000.00   (this amount is called "Principal"), plus interest, to the order of Lender. Lender is AMERICAN HOME LOANS, A CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.000 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
(A) Time and Place of Payments
I will make a payment on the  1st  day of every month beginning   JANUARY 1, 2007
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on DECEMBER 1, 2036      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 340 SCOTCH ROAD, WEST TRENTON, NEW JERSEY 08628
                                    or at a different place if required by the Note Holder.

MULTISTATE ADJUSTABLE RATE NOTE (12 MONTH TREASURY AVERAGE INDEX -
NO PERIODIC RATE CAPS) 1 MONTH MTA BOI
AHM-20 MN (MULTI)  06/01/05                    Page 1 of 5

DocMagic eForms 800-649-1362
www.docmagic.com

1044a.bin

(B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $1,029.17    before the First Principal and Interest Payment Due Date, and thereafter will be in amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The adjustable interest rate I will pay may change on the 1st    day of JANUARY, 2007    and on that day every month thereafter. Each date on which my adjustable interest rate could change is called a "Change Date."

(B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as the 15 days before each Interest rate Change Date is called the "Current Index." If the Index is no longer available, the Note holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 550/1000    percentage point(s) (    3.550 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

(D) Limits on Interest Rate Changes

My interest rate will never be less than the Margin nor greater than    9.950 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment due after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my adjustable interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be JANUARY 1, 2017

**5.   BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

MULTISTATE ADJUSTABLE RATE NOTE (12 MONTH TREASURY AVERAGE INDEX -
NO PERIODIC RATE CAPS) 1 MONTH MTA (X)1
AHM-2014N (MULTI) 08/01/05          Page 3 of 9          DocMagic eForms 800-649-1362
www.docmagic.com

Jun 18 2007 7:06AM    CBSK Finanical Group Inc.    9494193250    p.11

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a)Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

MULTISTATE ADJUSTABLE RATE NOTE (12 MONTH TREASURY AVERAGE INDEX -
NO PERIODIC RATE CAPS) 1 MONTH MTA DOI
- AHM-2014N (MULTI) 08/01/06                Page 4 of 5

DocMagic eForms 800-649-1362
www.docmagic.com

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12.  MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____  (Seal)
THOMAS J.  CHAVEZ          -Borrower

_____  (Seal)
SARA A.   CHAVEZ          -Borrower

_____  (Seal)
                          -Borrower

_____  (Seal)
                          -Borrower

_____  (Seal)
                          -Borrower

_____  (Seal)
                          -Borrower

MULTISTATE ADJUSTABLE RATE NOTE (12 MONTH TREASURY AVERAGE INDEX -    DocMagic EForms 800-649-1362
NO PERIODIC RATE CAPS) 1 MONTH MTA (IC)                                www.docmagic.com
AHM-2014N 04/LT8  08/01/05                     Page 5 of 5

EXHIBIT "5"

U&1 CUSTNER SERVICE                                                    027/037

)
Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder
|||||||||||||||||||||    9.00
**2007000583618** 09:42am 09/26/07
100 52 N16 2
0.99 0.00 0.00 0.00 3.00 0.00 0.00 0.00

Recording requested by:

When recorded mail to:
NORTHWEST TRUSTEE SERVICES, INC.
505 N. Tustin Avenue, Suite 243
Santa Ana, CA 92705

Space above this line for Recorder's use

File No. 7983.21518          Loan No.1001527687     MIN No. 100326000010957079

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED
## OF TRUST

### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION.
You may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account (normally five business days prior to the date set for the sale of your property). No sale may be set until three months from the date this notice of default is recorded (which date of recordation appears on this notice). This amount is **$50,857.66** as of 09/25/07, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have the pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**AMERICAN HOME MORTGAGE**
**C/O Northwest Trustee Services, Inc.**
**505 N. Tustin Avenue, Suite 243 Santa Ana, CA 92705**
**Telephone (714) 277-4899**
**Reinstatement and Pay-Off Request Line (866) 387-NWTS**

*Description: Orange,CA Document-Year.DocID 2007.583618 Page: 1 of 2*
*Order: Richmand Comment:*

UPS CUSTMER SERVICE                                     ☑028/037

TS No.: 7983.21818
Loan No. 1001627887
Notice of Default and Election to Sell Under Deed of Trust

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.    Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN:    That the undersigned is either the original Trustee, the duly appointed substituted trustee or acting as agent for the trustee or beneficiary under a Deed of Trust dated 11/22/06, executed by THOMAS J. CHAVEZ AND SARA A. CHAVEZ, HUSBAND AND WIFE AS JOINT TENANTS,   as Trustor(s), to secure certain obligations in favor of Mortgage Electronic Registration Systems, Inc., as Beneficiary, recorded 11/30/06, as Book No. , Page No. , and Instrument No. 2006000801692, of Official Records in the Office of the Recorder of Orange County, California, describing land therein as more fully described in said Deed of Trust.

Said obligations including (1) NOTE(S) FOR THE ORIGINAL sum of  $1,235,000.00, that the beneficial interest under such Deed of trust and the obligation secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:
The monthly installment of principal and interest which became due on 05/01/07, and all subsequent installments, together with late charges as set forth in said Note and Deed of Trust, advances, assessments and attorney fees. Nothing in this notice shall be construed as a waiver of any fees owing to the beneficiary under the deed of trust, pursuant to the terms of the loan documents

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Dated: 09/25/07        Northwest Trustee Services, Inc.
As Agent For Beneficiary
By:  First American Title Insurance Company, as Agent

By:  _____
        Authorized Signatory            DARIEN MCDONALD

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

Description: Orange,CA Document-Year.DocID 2007.583618 Page: 2 of 2
Order: Richmand Comment: