IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x  Chapter 11
In re:                                                          :
                                                                :  Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                          :
HOLDINGS, INC., a Delaware corporation, et al.,[1]              :  Jointly Administered
                                                                :
    Debtors.                                                    :  Hearing Date: July 17, 2008 at 2:00 p.m.
                                                                :  Objection Deadline: July 10, 2008 at 4:00 p.m.
---------------------------------------------------------------- x

### DEBTORS' MOTION FOR ORDER AUTHORIZING THE DEBTORS TO COMPROMISE OR SELL CERTAIN MORTGAGE LOANS IN THE ORDINARY COURSE OF BUSINESS WITHOUT FURTHER HEARING OR NOTICE

The above-captioned debtors and debtors in possession (collectively, "AHM" or the "Debtors") hereby move this Court (the "Motion"), pursuant to sections 363(b)(1), 363(c) and 105(a) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 9019(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the Debtors to compromise or sell certain mortgage loans in the ordinary course of business without further hearing or notice. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## PRELIMINARY STATEMENT[2]

1. Prior to the Petition Date, the Debtors would hold mortgage loans originated by them and others for sale and investment purposes. In the ordinary course, the Debtors conducted auctions, by which they sold these mortgage loans on a servicing released or servicing retained basis in the open market. Collectively, the Debtors held approximately $4.6 billion in mortgage loans for sale and investment purposes as of the Petition Date. Since that time, pursuant to Orders entered by this Court, that amount has been reduced to approximately $900 in mortgage loans.

2. The Debtors continue to evaluate the best manner in which to liquidate the mortgage loans. It is likely that a percentage of these loans will be pooled and sold, either through court-approved auctions or private sales. However, based upon the current market conditions, and the exigency with which the Debtors hope to prosecute a chapter 11 plan and begin making distributions to holders of allowed claims, authorizing the Debtors to offer incentives to borrowers to refinance their respective loans,[3] along with permitting the Debtors to conduct and consummate smaller scale sales of the Mortgage Loans, without further notice or hearing, may be the best vehicles for maximizing the value of the Mortgage Loans.

3. Accordingly, by this Motion, the Debtors seek an order authorizing them to (i) compromise certain Mortgage Loans to aid borrowers in their ability to refinance such loans or (ii) sell Mortgage Loans, either individually or in smaller pools, up to approximately $3.0 million in aggregate unpaid principal balance ("UPB"), pursuant to the procedures described herein.

---

[2] Capitalized terms used in the Preliminary Statement shall have the meanings ascribed to such terms in the Motion.
[3] The Court has already approved the usage of this option with respect to certain loans that were apart of the Debtors' construction loan business (the "Construction Loans"). See Docket Nos. 2593 and 3115.

**JURISDICTION**

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and procedural predicates for the relief requested are sections 363(b)(1), 363(c) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(b).

**GENERAL BACKGROUND**

5. On August 6, 2007 (the "Petition Date") each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

6. On August 14, 2007, the United States Trustee for the District of Delaware appointed the official committee of unsecured creditors (the "Committee"). No trustee or examiner has been appointed.

7. In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

8.  The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.

9.  Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## THE MORTGAGE LOANS

10.  The mortgage loans subject to the relief requested herein are certain first and second lien, performing and non-performing, encumbered and unencumbered loans, which the Debtors own subject to the security interests of other parties. Specifically, the mortgage loans include the following categories:

(a)  First lien and second lien performing loans owned by the Debtors, but subject to the liens of AH Mortgage Acquisition Co., Inc., in its capacity as Lender and Administrative Agent, and the other lenders (the "DIP Lender") under that certain Debtor-in-Possession Loan and Security Agreement (the "DIP Agreement") dated as of November 16, 2007 (collectively, the "Unencumbered Loans"); and

(b)  First lien performing mortgage loans (collectively, the "JPMorgan Loans" and together with the Unencumbered Loans, the "Mortgage Loans") owned by the Debtors pursuant to that certain Senior Secured Credit Agreement, dated January 24, 2006, with JPMorgan Chase Bank, N.A. ("JPMorgan").

11.  As of May 31, 2008, there were approximately 251 first lien performing Unencumbered Loans with an aggregate UPB of approximately $37,923,576 and 293 performing second lien Unencumbered Loans with an aggregate UPB of approximately $13,143,949.

Additionally there were approximately 109 performing first lien JPMorgan Loans with an aggregate UPB of approximately $22,796,655.

**RELIEF REQUESTED**

12. In recent months, the Debtors and their financial advisors have evaluated options with respect to the best, most efficient and profitable manner in which to dispose of the Mortgage Loans. After much consideration, the Debtors have determined obtaining the authority to compromise the Mortgage Loans or sell the Mortgage Loans individually or in smaller loan pools than that which has been utilized thus far in these cases offers a significant benefit to the Debtors' estates, at minimal expense. Specifically, the Debtors have evaluated the current market conditions, the proceeds obtained through prior mortgage loan sales conducted in these cases, the success achieved by the Debtors through offering compromises to holders of the Construction Loans, and the types of assets that are the subject of this Motion, and because of these considerations, in the exercise of their sound business judgment and consistent with their fiduciary duties to these estates, believe that the relief sought by this Motion is reasonable and necessary to maximize value for creditors.

13. Certain of the Mortgage Loans may ultimately be marketed and sold via a more traditional sale process under the supervision of this Court. However, the Debtors believe that the current market conditions require them to act quickly, and as a result, the relief requested herein may provide the estates with a greater return as to certain of the Mortgage Loans than that which could be obtained through the typical marketing and sale process that has been used thus far in these cases.

14. Accordingly, by this Motion, the Debtors seek an order authorizing the Debtors, in their business judgment and without further hearing or notice, to compromise or sell

5

the Mortgage Loans pursuant to Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rule 9019.

## BASIS FOR RELIEF REQUESTED

### A. Compromise of the Mortgage Loans

15. The Debtors have primarily attempted to liquidate their assets through Court-approved sales. However, based upon, among other things, market conditions, the significant costs associated with a traditional sale process and the success the Debtors have achieved through offering compromises to holders of certain Construction Loans, the Debtors submit that authorizing them to offer incentives to borrowers to facilitate the refinancing of their respective loans, without further notice of hearing, but pursuant to the Mortgage Loan Compromise Procedures (as defined and described below) is a favorable and profitable alternative for maximizing the value of certain of the Mortgage Loans.

*i.   Mortgage Loan Compromise Procedures*

16. Prior to agreeing to compromise a Mortgage Loan, the Debtors shall comply with the following procedures (the "Mortgage Loan Compromise Procedures"):

> i. Advise (i) counsel for the Committee and (ii) counsel for (a) the DIP Lender with respect to the Unencumbered Loans or (b) JPMorgan with respect to the JPMorgan Loans (collectively, the "Compromise Notice Parties") of the terms of the proposed compromise. The Compromise Notice Parties shall have three (3) business days (unless extended by the Debtors) to object to the proposed compromise (the "Compromise Objection Deadline").
>
> ii. The Compromise Notice Parties can raise any objection to a proposed compromise informally without the need to file a pleading with the Bankruptcy Court.
>
> iii. In the absence of an objection on or before the Compromise Objection Deadline, the Debtors shall be authorized to proceed with and consummate the proposed compromise without further notice or a hearing and such compromise shall be deemed fully authorized by the Court.

6

    iv. If an objection is raised, the Debtors shall not proceed with the proposed compromise absent reaching a resolution of the objection with the objecting party, but reserve the right to file a motion on notice to the Compromise Notice Parties and those parties that have requested notice pursuant to Bankruptcy Rule 2002 to approve such proposed compromise under Bankruptcy Rule 9019.

  17. Approval of the foregoing Mortgage Loan Compromise Procedures is in the best interests of the Debtors' estates, their creditors and other parties in interest. The Mortgage Loan Compromise Procedures will provide the Compromise Notice Parties with an opportunity to consider the significant terms of each Mortgage Loan compromise prior to the consummation of such compromise. At the same time, absent an objection, the Debtors will be permitted to take all appropriate actions necessary to effectuate such compromise without further notice, hearing or Order of the Court.

  *ii.* *The Compromise of the Mortgage Loans is Permitted Pursuant to Bankruptcy Code Section 363 and Bankruptcy Rule 9019*

  18. Section 363 of the Bankruptcy Code provides, in pertinent part, that the debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

  19. Section 102(1) of the Bankruptcy Code provides that the phrase "after notice and a hearing"

> (A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but
> (B) authorizes an act without an actual hearing if such notice is given properly and if—
>  (i) such a hearing is not timely requested by a party in interest; or
>  (ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act.

11 U.S.C. § 102(1) (emphasis added).

20. Though not a "use, sale or lease" of estate property strictly speaking, compromise of the Mortgage Loans with the borrowers implicates section 363(b)(1) of the Bankruptcy Code because it is the functional equivalent of a "sale" of the Mortgage Loans. See Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 350 (3d Cir. 1999) (citing In re Telesphere Communications, Inc., 179 B.R. 544, 552 n.7 (Bankr. N.D. Ill. 1994) ("There is no difference in the effect on the estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with the adverse party.")).

21. However, unlike approval of a "use, sale or lease" of estate property, which is governed by Bankruptcy Rule 6004, approval of the compromise of the estate's right to payment from a third party is governed by Bankruptcy Rule 9019. Compare Fed. R. Bankr. P. 6004 ("Use, Sale, or Lease of Property") with Fed. R. Bankr. P. 9019 ("Compromise and Arbitration"); see Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 351 n.4 (3d Cir. 1999) ("Bankruptcy Rule 9019 provides the procedure for the required court approval.").

22. Bankruptcy Rule 9019 provides, in relevant part, that, "[a]fter notice and such hearing as the court may direct, the court may fix a class or classes of controversies and authorize the [debtor in possession] to compromise or settle controversies within such class or classes *without further hearing or notice.*" Fed. R. Bankr. P. 9019(b) (emphasis added). This is consistent with the provisions of sections 363(b)(1) and 102(1) of the Bankruptcy Code which, taken together, require court approval of non-ordinary course transactions but permit flexibility in determining when, and under what circumstances, an actual hearing will be required. See 11 U.S.C. §§ 363(b)(1) and 102(1); Telesphere, 179 B.R. at 552 n.8. Thus, pursuant to Bankruptcy Rule 9019(b), a bankruptcy court may authorize the settlement of certain classes of claims without further notice or hearing, where such settlement will produce a minimum threshold of

value for the estate. See, e.g., Boyd v. North End Auto Sales, Inc. (In re Check Reporting Serv., Inc.), 137 B.R. 653, (Bankr. W.D. Mich. 1992) (discussing prior order authorizing chapter 7 trustee, without further order of the court, to settle pending preference actions for at least 25% of the amount of judgment demanded).

23.     Compromises are favored in bankruptcy to minimize litigation and expedite administration of the bankruptcy estate. In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). Pursuant to Bankruptcy Rule 9019, however, the Court must determine whether a proposed settlement is in the best interest of the bankruptcy estate. See Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.), 339 B.R. 91, 96 (D. Del. 2006) (citing Martin, 91 F.3d at 394).[4] In making this determination, the Court must

> assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal in light of four factors: (1) the probability of success in the litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interests of the creditors.

Id. (quotations omitted, citing Martin, 91 F.3d at 393); see In re RNI Wind Down Corp., 348 B.R. 286, 297 (Bankr. D. Del. 2006). Although the particular Martin factors are somewhat difficult to apply given the nature of the Mortgage Loans and the non-litigation posture of this Motion, the Debtors submit that the broader Martin analysis supports the relief requested.

---

[4] The Kaiser Aluminum and Martin opinions concerned the approval of a settlement under Bankruptcy Rule 9019(a), which is admittedly different from fixing a class of claims and authorizing future settlements thereof pursuant to Bankruptcy Rule 9019(b). However, because the substantive requirements for approval of any settlement derive from section 363(b)(1) of the Bankruptcy Code, case law decided under Bankruptcy Rule 9019(a) should be equally applicable to Bankruptcy Rule 9019. See Martin, 91 F.3d at 395 n.2 ("Section 363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a controversy."); Northview Motors, 186 F.3d at 351 n.4 ("Bankruptcy Rule 9019(a), a rule of procedure, cannot, by itself, create a substantive requirement of judicial approval of the Trustee's settlement of Northview's claims against Chrysler. However, we adhere to our ruling in Martin that Section 363 of the Code is the substantive provision requiring court approval."). Accord Telesphere, 179 B.R. at 551-53 (tracing origin of "best interest of the estate" standard for approval of settlement to case law construing section 363(b) of the Bankruptcy Code).

24. The "claims being compromised" for purposes of the <u>Martin</u> analysis are, of course, the Mortgage Loans—i.e., the Debtors' rights under the Mortgage Loan agreements. The Debtors believe the intrinsic value of the Mortgage Loans, because of current market conditions, and with respect to certain of the loans, their non-performing status, is somewhat less than 100% of their UPBs. Therefore, if the Debtors were to dispose of the Mortgage Loans either through a private sale or auction process, the amount received in exchange for the loans could be a fraction of their UPBs. Moreover, disposing of the Mortgage Loans through a private sale or auction process would require that the Debtors devote time and resources in furtherance of a process that may or may not result in locating a qualified purchaser.

25. As discussed above, the Debtors and their financial advisors have determined that offering incentives to borrowers to refinance the Mortgage Loans may, in many instances, provide an alternative that produces a greater benefit for these estates than liquidation of the Mortgage Loans through orderly sales. Because the loans will be refinanced in the open market, the Debtors submit that the amount of the UPB a lender would be willing to refinance for a borrower with respect to a given property is a fair approximation of the "value" (i.e., the orderly liquidation value) of the Mortgage Loan secured by that property.[5] Accordingly, with respect to each settlement of an Mortgage Loan leading to refinancing by a third-party lender, the Debtors will be receiving equivalent value for the Mortgage Loan. Put another way, the "value to the estate of the acceptance of the compromise" under the <u>Martin</u> analysis will be equal to the "value of the claim that is being compromised."

---

[5] By way of comparison, in a typical Bankruptcy Rule 9019 motion concerning a litigation claim, the amount of the settlement is determined by the litigants themselves without "market testing" of any kind. In such circumstances, the Debtors submit that closer scrutiny by the bankruptcy court is warranted and the four <u>Martin</u> factors are more clearly relevant.

26. To the extent consideration of the specific <u>Martin</u> factors is relevant to the Court's determination, the Debtors submit that:

    i. In the event they were forced to sue borrowers for payment of the Mortgage Loans, they would have a high probability of success on the merits of such litigation because the borrowers' obligations are valid and enforceable.

    ii. The Debtors' ability to collect on resulting judgments against a borrower would depend on (i) the value of the underlying real property (which will itself depend on the real estate market in the particular location) and (ii) the availability of other assets of the borrowers from which to collect the judgment (which will vary from borrower to borrower). As a general matter, proceeding against either the real property or the borrower would take significantly more time than refinancing.

    iii. While mortgage foreclosures are generally routine, litigation involving the Mortgage Loans may be complicated by the unique facts and circumstances surrounding each individual Mortgage Loan, which for purposes of this Motion is not an analysis in which the Debtors have engaged.[6] Nonetheless, the Debtors submit that this process would certainly and necessarily increase the expense, inconvenience and delay of proceeding via litigation rather than refinancing.

    iv. The interests of creditors are best served by refinancing, because it will result in greater or comparable value for the Debtors' estates than either a sale of the Mortgage Loans or piecemeal litigation with borrowers to recover the UPBs plus accrued interest and fees.

See <u>Kaiser Aluminum</u>, 339 B.R. at 96 (citing <u>Martin</u>, 91 F.3d at 393); <u>RNI Wind Down</u>, 348 B.R. at 297.

27. In light of the foregoing, the Debtors respectfully request that the Court authorize the Debtors to compromise the Encumbered Mortgage Loans in the exercise of their business judgment without further hearing, notice or Order of the Court.

---

[6] The Debtors do not acknowledge or admit the validity of any such defense or counterclaim, and hereby reserve all their rights under the Mortgage Loan agreements and applicable law.

11

B.   **Sale of Mortgage Loans**

28.   Throughout these cases, the loan sales conducted by the Debtors have involved loan pools of substantial size marketed to large institutional investors. Although the Debtors have liquidated a number of mortgage loans through these sales, the value obtained for such loans has not been overwhelming. Moreover, certain parties have contacted the Debtors inquiring as to the purchase of their own Mortgage Loan or the purchase of a select few loans. As a result of the Debtors' experience in these cases and to take advantage of potentially advantageous sales, the Debtors believe, in certain instances, greater value may be derived from selling a Mortgage Loan or smaller Mortgage Loan pools of less than $3.0 million in aggregate UPB, without further hearing, but pursuant to the Mortgage Loan Sale Procedures (as defined and described below).

i.   *Mortgage Loan Sale Procedures*

29.   Prior to closing the sale of a Mortgage Loan or a pool of Mortgage Loans, the Debtors shall comply with the following procedures (the "Mortgage Loan Sale Procedures"):

  i.   The Debtors shall give written notice (a "Sale Notice") of a proposed sale to: (i) the U.S. Trustee; (ii) counsel to the Committee; and (iii) counsel to (a) the DIP Lender with respect to the sale of an Unencumbered Loan or (b) JPMorgan with respect to the sale of a JPMorgan Loan (collectively, the "Sale Notice Parties") three (3) business days prior to closing such sale (unless extended by the Debtors) (the "Notice Period").

  ii.  The Sale Notice shall consist of (a) a disclosure that the Sale Notice is being provided in accordance with the order approving this Motion, (b) an identification of the Mortgage Loans being sold, (c) a general description of the relationship between the potential purchaser and the Debtors, and (d) the estimated purchase price; *provided, however,* that the Sale Notice shall be deemed fully confidential and shall not be shared with any party other than the Sale Notice Parties absent written consent from the Debtors or further order of this Court.

    iii.    Objections to a proposed sale as set forth in a Sale Notice shall be filed with the Court and served on counsel for the Debtors and the Sale Notice Parties on or before the expiration of the Notice Period.

    iv.    If no written objections are filed and served in accordance with the Mortgage Loan Sale Procedures, the Debtors are authorized by the Court to take any and all actions, and to execute any and all resolutions and other documents necessary to effectuate such sale, without any further need to seek the Court's review or approval of such sale.

    v.    If a written objection is filed and served in accordance with the Mortgage Loan Sale Procedures that cannot be resolved, a hearing on the matter will be scheduled with the Court so as to seek the Court's determination of whether to approve the proposed sale.

30. Approval of the foregoing Mortgage Loan Sale Procedures is in the best interests of the Debtors' estates, their creditors and other parties in interest. The Mortgage Loan Sale Procedures will provide the Sale Notice Parties with an opportunity to consider the significant terms of each Mortgage Loan sale prior to the consummation of such sale. At the same time, absent an objection, the Debtors will be permitted to take all appropriate actions necessary to effectuate such sale with little delay and without any further need to seek the Court's review or approval of such sale. Moreover, the Mortgage Loan Sale Procedures will allow the Debtors to take advantage of an opportunity that has heretofore been missed - smaller sales on an accelerated basis. Absent the Mortgage Loan Sale Procedures, many sales may never be consummated, because in the current market, purchasers desire to act quickly.

    ii.    *Sales of the Mortgage Loans Should Be Permitted in the Ordinary Course of the Debtors' Business*

31. Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to use, sell or lease property of the estate in the ordinary course of its business. 11 U.S.C. § 363(c). Section 363(c)(1) of the Bankruptcy Code, in relevant part, reads:

13

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). The ordinary course standard was intended to allow the debtor in possession the flexibility it needs to run its business and respond quickly to changes in the business environment. In re James A. Phillips, Inc., 29 B.R. 391, 394 (S.D.N.Y. 1983); In re HMH Motor Service., 259 B.R. 440, 448-49 (Bankr. S.D. Ga. 2000). Therefore, a debtor in possession may use, sell or lease property of the estate even without need for prior court approval if the transaction is in the ordinary course. See In re Johns Mansville, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate property do not require a prior hearing); see also In re James A. Phillips, Inc., 29 B.R. at 394 (holding that where a debtor in-possession is merely exercising the privileges of his status, there is no general right to notice and hearing concerning particular transactions conducted in the ordinary course of the business).

32.  Courts broadly interpret the term ordinary course. In re Berkley Multi-Units, Inc., 88 B.R. 394, 396 (Bankr. M.D. Fla. 1988). In determining whether a transaction is in the ordinary course of business under section 363 of the Bankruptcy Code, the courts generally engage in a two step test: (1) the objective horizontal test; and (2) the subjective vertical test. In re Roth American, Inc., 975 F.2d 949, 952 (3d Cir. 1992); In re Vision Metals, Inc., 325 B.R. 138, 143 (Bankr. D. Del. 2005).

33.  The horizontal test is a factual analysis as to whether the transaction in question is of the sort commonly undertaken by companies in that industry. In re Roth American, Inc., 975 F.2d at 952-53. That is, the horizontal test focuses on whether the transaction is usual or abnormal for the industry. In re Dant & Russell, Inc., 853 F.2d 700, 704

14

(9th Cir. 1988). The vertical test is an analysis conducted from the perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor to an economic risk of a nature different from those he accepted when he decided to extend credit. In re Roth American, Inc., 975 F.2d at 952-53; see also United States ex rel. Harrison v. Estate of Deutscher, 115 B.R. 592, 598 (M.D. Tenn. 1990) (holding that the vertical test focuses on debtor's internal operations, comparing the debtor's prepetition business with its postpetition conduct and considers factors such as the size, nature and type of business and the size and nature of the transaction in question in assessing whether the transaction has subjected the creditor to economic risks of nature different from those accepted when credit was extended).

34.   The sale of mortgage loans is an essential element of the residential mortgage loan sale industry, and accordingly, is typical in the industry. Moreover, a hypothetical creditor should expect that the Debtors, who were in the business of selling loans, to sell mortgage loans similar to what is contemplated herein. In addition, granting the relief requested in this Motion would not subject creditors to economic risks which should not have been contemplated by the creditor. Indeed, if the relief requested herein is granted, creditors will be in a similar position as with prepetition sales of mortgage loans. See, e.g. In re WRB West Associates Inc., 106 B.R. 215, 218-20 (Bankr. D. Mont. 1989) (holding that a land developer had the authority to sell developed lots of land in the ordinary course of the debtor's business pursuant to section 363 of the Bankruptcy Code); see also In re Stroud Ford, Inc., 205 B.R. 722, 725-26 (Bankr. M.D. Pa. 1996) (explaining that a debtor's sale of real estate would not require court approval if the debtor's business was residential real estate development).

35.   The Debtors believe that an important component of their efforts to maximize the value of these estates, in addition to the ability to compromise Mortgage Loans, is

the ability to sell individual or to pool and sell smaller groups of Mortgage Loans in the ordinary course of business, without the requirement that court approval be obtained for each and every such sale by separate motion. The Debtors desire to receive the greatest value for the Mortgage Loans, and they submit that the flexibility of selling Mortgage Loans pursuant to the Mortgage Loan Sale Procedures will further their efforts of achieving that goal.

      ii.    *In Addition, the Sale of the Mortgage Loans Should be Approved Even Under the Standards Set Forth In Section 363(b) of the Bankruptcy Code.*

36.    Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if the transaction represents the reasonable business judgment of the debtor. See, e.g., In re Martin, 91 F.3d at 395 (inferring that a sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code where the transaction represents an exercise of the debtor's sound business judgment); Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); Stephens Industries. Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith."); In re Delaware & Hudson Ry. Co., 124 B.R. 169,176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); In re Montgomery Ward Holding Corp., 242 B.R. 147,153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169,176 (D. Del. 1991); In re Trans World Airlines. Inc., 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. 2001).

16

37. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith. See Delaware & Hudson Rv., 124 B.R. at 176; Phoenix Steel, 82 B.R. at 335-36; In re United Healthcare Svs., Inc., 1997 U.S. Dist LEXIS 5090, at * 13-14 and n.2 (D. N.J. 1997).

38. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3d Cir. 1986); Lionel, 722 F.2d 1063. In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores. Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the ... [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Products, Inc., 99 B.R. 124,130 (Bankr. N.D. Ga. 1988)).

39. The Debtors' experiences thus far in these cases demonstrate the need for creative and flexible measures to liquidate the Mortgage Loans to preserve and maximize value for these estates, and the Debtors' efforts are entirely consistent with the longstanding rationale for authorizing a sale outside of a chapter 11 plan. See Lionel, 722 F.2d 1063; Financial. Associates v. Loeffler (In re Equity Funding Corporation, of America), 492 F.2d 793, 794 (9th

Cir. 1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the debtor's property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets." (citations omitted)). Indeed, in view of the Debtors' liquidation efforts and the nature of the assets to be sold, the Debtors believe that the types of sales contemplated by this Motion are an important component of their duty to maximize the value of their assets for the benefit of these estates.

40. Accordingly, the Debtors have articulated a sound business justification for the sales of the Mortgage Loans, and this Court should approve the relief requested pursuant to section 363 of the Bankruptcy Code.

C. **Reporting of Mortgage Loan Compromises and Sales**

41. Upon completion of the compromise or sale of all the Mortgage Loans or determination by the Debtors that no other Mortgage Loans will be compromised or sold pursuant to the authority sought by this Motion, the Debtors shall file a report (the "Report"). The Report shall identify (i) each Mortgage Loan by loan number that has been compromised or sold, (ii) the amount of the UPB as of the date of compromise or sale of each compromised or sold Mortgage Loan, and (iii) the amount received by the estates for each compromised or sold Mortgage Loan. The rights of the Debtors and any other party in interest to seek to file the Report under seal are fully reserved, as are the rights of any party in interest (including the U.S. Trustee) to object to such a request.

**NOTICE**

42. Notice of this Motion will be provided to: (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Administrative Agent under the Second Amended and Restated Credit Agreement dated August 10, 2006; (iv) counsel to the DIP Lender; (v) counsel

for JPMorgan; and (vi) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the Proposed Order attached hereto as <u>Exhibit A</u> and grant the Debtors such other and further relief as is just and proper.

Dated:   Wilmington, Delaware
         June 27, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

DB02:6804815.3                                                                          066585.1001