# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:

AMERICAN HOME MORTGAGE
HOLDINGS, INC.,
a Delaware corporation, et al.,

      Debtors.

------------------------------------------------------- x

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered

**Hearing Date: July 17, 2008 at 2:00 p.m. (ET)
(requested)
Objection Deadline: July 14, 2008 at 4:00 p.m. (ET)
(requested)
Competing Bid Deadline: July 14, 2008 at 4:00 p.m. (ET)
(requested)**

## MOTION OF THE DEBTORS FOR ORDER, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE PRIVATE SALE OF THE UNENCUMBERED NON-PERFORMING LOANS AND REO PROPERTY TO BELTWAY CAPITAL, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) APPROVING THE TERMS OF THE SALE AGREEMENT, AND (III) GRANTING RELATED RELIEF

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors

in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this

motion (the "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code,

11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002 and 6004 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (i) authorizing the private

sale of certain unencumbered non-performing loans and REO Property (as defined in the Sale

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

Agreement) (the "Unencumbered Non-Performing Loans") to Beltway Capital, LLC ("Beltway")

or to another party submitting a higher or better offer free and clear of liens, claims, encumbrances,

and other interests, (ii) approving the terms of the Loan Sale and Interim Servicing Agreement (the

"Sale Agreement"), attached hereto as Exhibit A, and (iii) granting related relief (the "Motion").

In support of this Motion, the Debtors respectfully represent:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District

and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief requested herein are sections 105(a) and 365(a) of the Bankruptcy Code, along with

Bankruptcy Rules 6006 and 9014.

## BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this

Court a voluntary petition for relief under the Bankruptcy Code.  Each Debtor is continuing to

operate its business and manage its properties as a debtor-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and

are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware

appointed an Official Committee of Unsecured Creditors (the "Committee").  No trustee or

examiner has been appointed.

5.      In the weeks prior to the Petition Date, an unprecedented disruption in the

credit markets caused major write-downs of the Debtors' loan and security portfolios and

2

consequently resulted in margin calls for hundreds of millions of dollars with respect to the

Debtors' loans.  During this time, certain of the Debtors' warehouse lenders began to exercise

remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and

threatening the company's continued viability.

6.    The Debtors' inability to originate loans and the exercise of remedies by

certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the

Debtors to discontinue their retail and indirect loan origination business.  Unfortunately, in the

short time available and given the severe financial pressures facing them, the Debtors were

unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and,

accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through

orderly sales of their assets.

7.    Prior to the Petition Date, a large component of the Debtors' business was

the servicing of mortgage loans (the "Servicing Business").  Commencing on October 2, 2007, this

Court held a hearing (the "Sale Hearing") to consider the Debtors' motion to sell the Servicing

Business.  By Order dated October 30, 2007 [Docket No. 1711] (the "Sale Order"), the Court

approved and authorized the sale of the Debtors' Servicing Business (the "Servicing Sale") to AH

Mortgage Acquisition Co., Inc., an affiliate of W.L. Ross & Co., LLC (such affiliate, the

"Purchaser") pursuant to the terms of that certain Asset Purchase Agreement dated as of September

25, 2007 (as amended and together with all exhibits and schedules thereto, the "APA").[2]

Pursuant to the APA, the Servicing Sale closed in two steps.  At the "economic" close, which

occurred on November 16, 2007 (the "Initial Closing"), the Purchaser paid the Purchase Price in

---

[2]  All capitalized terms used in this section with respect to the APA, but not defined herein, shall have the meanings set forth in the APA.  The description of the APA in this section is by way of summary only.  To the extent there is any discrepancy between such description and the actual terms of the APA, the latter are controlling.

066585.1001

the manner and to the parties as provided in the APA and related agreements referenced therein. From the Initial Closing Date until the "legal" close (the "Final Closing"), the Debtors operated the Servicing Business in the Ordinary Course of Business, subject to the Bankruptcy Exceptions, for the economic benefit and risk of the Purchaser. The Final Closing occurred on April 11, 2008.

## RELEVANT BACKGROUND

8.     Prior to filing these bankruptcy cases, the Debtors were owners of certain first lien loans in which the mortgagors had failed to fulfill one or more of the terms, convenants, conditions or obligations required under the mortgage (the "Non-Performing Loans"). To that end, on December 22, 2007, the Debtors filed the *Motion of the Debtors for Orders: (A)(I) Approving the Sale Procedures; (II) Approving Payment of Expense Reimbursement; (III) Scheduling a Hearing to Consider the Sale of Certain Non-Performing Loans; (IV) Approving Form and Manner of Notice Thereof; and (V) Granting Related Relief; and (B)(I) Authorizing the Sale of Non-Performing Loans Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Sale Agreement Thereto; (III) Authorizing the Distribution of the Proceeds; and (IV) Granting Related Relief* (the "Non-Performing Loan Sale Motion") [D.I. 2490].

9.     By the Non-Performing Loan Sale Motion, the Debtors were seeking the authority to Non-Performing Loans pursuant to an open auction type process. In an effort to maximize the value for the Debtors' estates, the Debtors grouped the Non-Performing Loans into three distinct pools:

(a)     Non-Performing Loans owned by the Debtors, but subject to the liens of AH Mortgage Acquisition Co., Inc., in its capacity as Lender and Administrative Agent, and the other lenders (the "DIP Lender")

4

under that certain Debtor-in-Possession Loan and Security Agreement dated as of November 16, 2007.[3]

(b)     Non-Performing Loans owned by the Debtors that constitute a portion of the collateral securing the obligations owing by certain of the Debtors under the terms of that certain Second Amended and Restated Credit Agreement, dated as of August 10, 2006 among certain of the Debtors and Bank of America, N.A. as the Administrative Agent (the "BofA Non-Performing Loans").

(c)     Non-Performing Loans owned by the Debtors pursuant to that certain Senior Secured Credit Agreement, dated as of January 23, 2006 among certain of the Debtors and JPMorgan Chase Bank, N.A. (the "JPMorgan Non-Performing Loans").

10.     On February 1, 2008, the Court entered an order approving the sale procedures set forth in the Non-Performing Loan Sale Motion (the "Non-Performing Loan Sale Procedures Order") [D.I. 2858].  Pursuant to the Non-Performing Loans Sale Procedure Order, the Debtors received bids for the three pools of Non-Performing Loans.  Pursuant to the Non-Performing Loan Sale Procedures Order, the Debtors accepted Beltway's bid as the successful bidder on the BofA Non-Performing Loans and Lehman Capital's bid as the successful bidder on the JPMorgan Non-Performing Loans.  On March 14, 2008, the Court entered orders approving the sale of the BofA Non-Performing Loans and the JPMorgan Non-Performing Loans to Beltway and Lehman Capital, respectively.

11.     In addition, the Debtors received bids on the Unencumbered Non-Performing Loans, including a bid from Beltway.  For various business-related reasons, the Debtors determined not to proceed with the sale of the Unencumbered Non-Performing Loans at that time.  Accordingly, on March 28, 2008, the Debtors, withdrew the Non-Performing Loans Sale Motion solely with respect to the Unencumbered Non-Performing Loans.

---

[3] The pool of unencumbered non-performing loans marketed pursuant to the Non-Performing Loan Sale Procedures Order (as defined below) is included in the Unencumbered Non-Performing Loans under this Motion.  Since additional loans have become non-performing, however, there are certain additional loans included in this Motion.

066585.1001

12.    The Debtors, however, have subsequently determined that selling the Unencumbered Non-Performing Loans to Beltway pursuant to the terms of the Sale Agreement is in the best interest of the Debtor's estates.

**RELIEF REQUESTED**

13.    By this Motion, the Debtors seek the entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, (i) authorizing the private sale of the Unencumbered Non-Performing Loans to Beltway or to another party submitting a higher or better offer free and clear of liens, claims, encumbrances, and other interests, (ii) approving the terms of the Sale Agreement, and (iii) granting related relief.

**THE AHM CORP. AND BELTWAY TRANSACTION**

14.    The Unencumbered Non-Performing Loans are non-performing loans owned by the Debtors in which the mortgagors have not fulfilled one or more of the terms, covenants, conditions or obligations required under the mortgages.  Each of the Unencumbered Non-Performing Loan is greater than thirty days past due.  The Debtors propose to pool and sell approximately 82 Unencumbered Non-Performing Loans with an aggregate unpaid principal balance of $26,860,066 as of May 31, 2008, to Beltway for the Purchase Price (as defined below).

15.    On or about July 3, 2008, the Debtors and Beltway agreed to the terms of the Sale Agreement, attached hereto as Exhibit A, which is contingent upon Court approval of the terms of the sale (the "Beltway Sale").

I.    **Marketing Efforts for Unencumbered Non-Performing Loans**

16.    As stated previously, the Debtors, after significant deliberation, concluded that pooling and selling certain Unencumbered Non-Performing Loans created the greatest likelihood of obtaining the maximum return for these estates.  To that end, the Non-Performing Loan Sales Procedure Order provided for one or more sales of the Non-Performing Loans utilizing

6

a final, sealed bid process without an auction through separate sale agreements with different purchasers. In connection with the Debtors' sale efforts in connection with the Non-Performing Sale Procedures, the Debtors, through certain of the Debtors' employees, their advisors, Milestone Advisors, LLC, and Kroll Zolfo Cooper, contacted parties known to the Debtors to have an interest in purchasing the Non-Performing Loans. In addition and in accordance with the approved sale procedures, Debtors designated and posted to the Debtors' Intralinks website, the three (3) categories of Non-Performing Loans; namely, Unencumbered Non-Performing Loans, BofA Non-Performing Loans, JPM Non-Performing Loans. The information relevant to the Non-Performing Loans (including certain books and records, material contracts, and other financial information needed for due diligence) was posted on the Debtors' Intralinks website for the respective Non-Performing Loans. Access to this website was made available within 24 hours to any potential bidder upon execution of a Non-Disclosure Agreement.

17.    Bids were received for each of the pools of the Non-Performing Loans, including a bid from Beltway which was determined to be the highest and best bid for the Unencumbered Non-Performing Loans. However, the Debtors determined that it was not in the estates' best interest to proceed with the sale of the Unencumbered Non-Performing Loans at that time. Accordingly, the Debtors filed the *Debtors' Notice of Partial Withdrawal of Docket No. 2490* [D.I. 3470] which withdrew the Non-Performing Loan Sale Motion solely as it related to the Unencumbered Non-Performing Loans.

18.    Given the previous extensive marketing efforts to sell the Unencumbered Non-Performing Loan only four (4) months ago, it is the Debtors' judgment that the consideration offered by Beltway through the Sale Agreement exceeds the value that the Debtors could obtain for the for the Unencumbered Non-Performing Loans if the Unencumbered Non-Performing Loans

7

were subjected to an additional marketing process.

**II.     Summary of Proposed Terms of the Sale Agreement**

19.     Pursuant to the terms of the Sale Agreement, the Debtors propose to sell to

Beltway, or such other higher or otherwise better offer, the Unencumbered Non-Performing Loans

(which include any loans that become real estate owned ("REO Property") prior to the Closing

Date) free and clear of liens, claims, encumbrances, and other interests.  The Sale Agreement is

subject to the Court's approval.

20.     As set forth in the Sale Agreement, the material economic terms of the

transaction are as follows: [4]

    a.    Agreement to Purchase; Conveyance of Mortgage Loans and REO Property.
          In exchange for the payment of the Purchase Price on the Closing Date, the
          Sellers agree to sell and the Purchaser agrees to purchase, without recourse,
          but subject to the terms of this Agreement, on a servicing released basis, all
          of the right, title and interest of the Sellers in and to the Mortgage Loans and
          the REO Property in the Mortgage Loan Package having an aggregate Stated
          Principal Balance in an amount as set forth in the Memorandum of Sale.
          The Sellers shall use commercially reasonable efforts to deliver to the
          Purchaser a computer readable file in a format acceptable to the Purchaser
          containing all information in the Sellers' possession or control necessary for
          the Purchaser to board the Mortgage Loans on its servicing system and the
          Mortgage Files.  Pursuant to Section 2.03, the Sellers will deliver the
          Mortgage Loan Documents to the Custodian.

    b.    Purchase Price:  The Purchase Price based on a blended rate for each
          Mortgage Loan and each REO Property listed on the Mortgage Loan
          Schedule shall be forty and 25/100 percent (40.25%) multiplied by its Stated
          Principal Balance (subject to adjustment as provided herein).  The actual
          Purchase Price shall be determined on a loan by loan basis, calculated based
          on the Purchase Price Percentage applicable to each Mortgage Loan as set
          forth on the Mortgage Loan Schedule multiplied by its Stated Principal
          Balance.  To the extent a Mortgage Loan is a Withdrawn Loan (as defined in
          Section 2.04(c)) on the Closing Date, such Withdrawn Loans and the
          Purchase Price paid with respect to such Withdrawn Loans shall be subject
          to the terms and conditions of Section 2.04(c).  The period of time after the

---

[4] Unless otherwise defined, capitalized terms contained in this section shall have the meaning ascribed to them in the
Sale Agreement.

DB02:6873787.6                                                      066585.1001

Cut-Off Date but prior to the Closing Date shall be referred to as the "Adjustment Period." The Purchase Price shall be adjusted (the aggregate total of such adjustments, the "Purchase Price Adjustment") by reducing the Purchase Price by the amount of (i) any principal payments received by a Seller during the Adjustment Period (provided, however, that this clause (i) shall not apply to any Mortgage Loan to which clause (ii) is applicable), (ii) the Purchase Price related to any Mortgage Loans paid off in full during the Adjustment Period, which Mortgage Loans shall be deleted and excluded from the Mortgage Loan Package, and (iii) the Purchase Price related to any REO Property sold during the Adjustment Period, which REO Property shall be deleted and excluded from the Mortgage Loan Package. Subject to the foregoing, with respect to each Mortgage Loan purchased, the Purchaser shall own and be entitled to receive all payments, whether of principal, interest, or otherwise, collected on or after the Closing Date.

c.    <u>Closing Date</u>. The Closing Date shall be July 18, 2008.

d.    <u>Closing Condition</u>. The Purchaser and the Sellers acknowledge that the Sellers have not delivered either the Mortgage Loan Note or a certified copy of the Mortgage Loan Note with a lost note affidavit (the "Required Documents") with respect to each Mortgage Loan set forth on Exhibit G attached hereto (each, a "Withdrawn Loan"). The Sellers acknowledge that the missing Required Documents would be grounds for the Purchaser to refuse to purchase such Mortgage Loans. The Purchaser hereby agrees to purchase each Withdrawn Loan despite the Sellers' failure to provide the Required Documents; provided, however, that the Purchase Price for each Withdrawn Loan, calculated based on the Purchase Price Percentage set forth on the Mortgage Loan Schedule multiplied by the Stated Principal Balance, shall be held in escrow (the "Withdrawn Loan Escrow") by Sellers pending delivery of the Required Documents to Purchaser. Upon delivery to Purchaser of the Required Documents with respect to a Withdrawn Loan, the Purchase Price for such Withdrawn Loan, calculated based on the Purchase Price Percentage set forth on the Mortgage Loan Schedule multiplied by the Stated Principal Balance, shall be released from the Withdrawn Loan Escrow to Sellers. Unless Purchaser elects to accept a Withdrawn Loan without the Required Documents or to allow Sellers additional time to deliver any Required Documents, if the Required Documents with respect to any Withdrawn Loan have not been delivered to the Purchaser on or before September 19, 2008, any amounts then remaining in the Withdrawn Loan Escrow shall be distributed to Purchaser and any Withdrawn Loan for which Required Documents have not been delivered to Purchaser will be retained by Sellers.

e.    <u>Costs</u>. Each Seller shall pay any commissions due to such Seller's salesmen, and the legal fees and expenses of its attorneys. All other costs and expenses specified herein or incurred in connection with the transfer and delivery of the Mortgage Loans or any REO Property, including without

limitation recording fees, realty transfer taxes, all outstanding or assessed property or other taxes with respect to any REO Property, fees for title policy endorsements and continuations, fees for recording Assignments of Mortgage or Quitclaim Deeds, if any, the fees, costs and expenses, including attorneys' fees and expenses, of the Custodian, and the Purchaser's attorney's fees, shall be paid by the Purchaser. Notwithstanding the foregoing, Sellers shall pay or reimburse Purchaser for any Delinquent Taxes to the extent that Purchaser provides reasonable supporting documentation with respect to any Delinquent Taxes, in writing, within thirty (30) days from the Closing Date. For avoidance of doubt, the Sellers shall have no obligation to pay or reimburse Purchaser for any Delinquent Taxes and Purchaser shall be barred from asserting any claim for Delinquent Taxes unless reasonable supporting documentation with respect to any Delinquent Taxes is provided to Sellers, in writing, within thirty (30) days from the Closing Date.

f.     <u>Purchase Price Adjustment</u>. On the Closing Date, the amount payable by Purchaser on the Closing Date shall be reduced by an amount equal to the Purchase Price Adjustment, if any.

g.     <u>"As Is Where Is" Transaction</u>. Purchaser hereby acknowledges and agrees that, notwithstanding anything to the contrary herein, except as expressly set forth in this Agreement, the Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Mortgage Loans or REO Property. Without in any way limiting the foregoing, the Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Mortgage Loans or REO Property. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the Mortgage Loans or REO Property and all such other matters relating to or affecting the Mortgage Loans or REO Property as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Mortgage Loans and REO Property, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, except as expressly set forth in the Agreement, Purchaser will accept the Mortgage Loans and REO Property on the Closing Date "AS IS" and "WHERE IS".

h.     <u>Survival</u>. The respective representations and warranties of the Parties contained herein and in any other agreement, certificate, instrument or other document associated therewith or herewith shall not survive, and shall expire upon, the Closing, unless otherwise expressly set forth therein or herein.

## III.     <u>The Sale of Unencumbered Non-Performing Loans Should Proceed by Private Sale</u>

21.     For the reasons explained below and throughout this Motion, the Debtors

believe that the approval of a private sale of the Unencumbered Non-Performing Loans to Beltway

pursuant to the terms of the Sale Agreement is appropriate.

> i.   *Sale of the Unencumbered Non-Performing Loans Pursuant to the Terms of the Sale Agreement Should be Approved*

22.    Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property

of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides: "The

Court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a). In pertinent part, Bankruptcy Rule 6004 states that,

"all sales not in the ordinary course of business may be by private sale or by public auction."

Fed.R.Bankr.P. 6004(f)(1). With respect to the notice required in connection with a private sale,

Bankruptcy Rule 2002(c)(1) states, in pertinent part, that,

> . . . the notice of a proposed use, sale or lease of property . . . shall
> include . . . the terms and conditions of any private sale and the
> deadline for filing objections. The notice of a proposed use, sale or
> lease of property, including real estate, is sufficient if it generally
> describes the property.

Fed.R.Bankr.P. 2002(c)(1).

23.    To approve the use, sale, or lease of property out of the ordinary course of

business, this Court must find "some articulated business justification" for the proposed action.

See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly

adopting the "articulated business justification" and good faith tests of Committee of Equity Sec.

Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983)); see also In re

Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third

Circuit had adopted a "sound business purpose" test in Abbotts Dairies); Titusville Country Club v.

PennBank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Indus.

11

<u>Valley Refrigeration & Air Conditioning Supplies, Inc.</u>, 77 B.R. 15, 19 (Bankr. E.D. Pa. 1987).

> j.    *Legal Standard for Approval of Private Sale*

24.    Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved:  (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. <u>See</u> <u>Lionel</u>, 722 F.2d at 1071 (setting forth the "sound business purpose" test); <u>Abbotts Dairies</u>, 788 F.2d at 145-57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); <u>Delaware & Hudson Ry.</u>, 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

25.    This fundamental analysis does not change if the proposed sale is private, rather than public.  <u>See</u>, <u>e.g.</u>, <u>In re Ancor Exploration Co.</u>, 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."). The bankruptcy court "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." <u>In re WPRV-TV, Inc.</u>, 143 B.R. 315, 319 (D.P.R. 1991), <u>vacated on other grounds</u>, 165 B.R. 1 (D.P.R. 1992); <u>accord</u>, <u>In re Canyon Partnership</u>, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).  Here, the proposed private sale of the Unencumbered Non-Performing Loans to Beltway meets all of these requirements and should be approved.

k.    *Proceeding by Private Sale Reflects an Exercise of the Debtors' Business Judgment*

26.    There is a sound business justification for the Debtors' preference to proceed with a private sale to the Beltway, rather than conducting a public sale of the Unencumbered Non-Performing Loans.  The Debtors submit that an order granting the relief requested herein is a matter within the discretion of the Court and would be consistent with the provisions of the Bankruptcy Code.  See 11 U.S.C. § 105(a).  As stated previously, the Unencumbered Non-Performing Loans were previously marketed pursuant to the Non-Performing Loan Sale Procedures Order.  Based on that marketing process, the bids received in connection therewith and the composition of the Unencumbered Non-Performing Loans, which is slightly different than before, the Debtors believe that the offer from Beltway embodied in the Sale Agreement is superior to what the Debtors would obtain through a formal auction process.

27.    Accordingly, the Debtors believe that their estates and creditors would benefit from the approval of the Beltway Sale without the added costs associated with a public auction, at which the Debtors are not guaranteed the commitment of Beltway to purchase the Unencumbered Non-Performing Loans at all, much less at the price to be provided through the Sale Agreement.

28.    The Debtors believe that a private sale of the Unencumbered Non-Performing Loans to the Beltway under the terms of the Sale Agreement will be much more likely to close in a timely manner than an auction because, in the Debtors' business judgment, the Sale Agreement with Beltway provides them with strong assurances that Beltway is motivated to close the contemplated transaction in a timely manner.  Further, the Sale Agreement demonstrates Beltway's good faith intent to close the contemplated transaction, subject only to Court approval.

066585.1001

l.    *The Purchase Price is Fair and Reasonable.*

29.    The Purchase Price represents a fair and reasonable price for the Unencumbered Non-Performing Loans.  As explained above, since the Petition Date, the Debtors have been engaged in the orderly liquidation of their assets, including the Non-Performing Loans. In the Debtors' view, the Sale Agreement represents significant value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Unencumbered Non-Performing Loans at a price that represents fair and reasonable consideration.  See Mellon Bank, N.A., v. Metro Communications, Inc., 945 F.2d 635 (3d Cir. 1991) (price amounted to reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937 (1992).

m.    *Adequate and Reasonable Notice of the Sale Has Been Provided.*

30.    The Debtors have provided adequate notice of the proposed sale to all parties-in-interest, as required by the applicable procedural rules.  See Fed.R.Bankr.P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); see also, Delaware & Hudson Ry., 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

31.    The Debtors have also served the Motion and the Sale Agreement on parties that have previously expressed interest in purchasing mortgage loans to the Debtors or the Debtors believe may have an interest in purchasing the Unencumbered Non-Performing Loans.

32.    The parties will have the opportunity to submit competing bids (collectively, the "Competing Bids") during the period prior to the objection deadline noted in the caption of this Motion.  Consistent with their fiduciary duties to their estates, the Debtors will consider all such offers.

14

33.    To summarize, in the Debtors' informed business judgment, there is very

little, if anything, to be gained by conducting a formal auction of the Unencumbered Non-

Performing Loans, and there is a great deal to lose.  Even if there were other entities willing and

able to overbid Beltway for the Unencumbered Non-Performing Loans, which the Debtors believe

to be unlikely, the delay, uncertainty and added administrative expenses attendant to the auction

process would be unfavorable to the Debtors, their estates and creditors.  For these reasons, the

Court should not force the parties to conduct a public sale or to establish bidding procedures

contrary to the Sale Agreement and the Debtors' business judgment, but instead should approve the

private sale of the Unencumbered Non-Performing Loans to Beltway.

**IV.    The Sale Should Be Approved Under 11 U.S.C. § 363(f)**

a.    *The Sale Transfer Should be Free and Clear of Liens, Claims, and Interests*

34.    In accordance with section 363(f) of the Bankruptcy Code, a debtor in

possession may sell property under section 363(b) "free and clear of any interest in such property

of an entity other than the estate" if any one of the following conditions is satisfied:

> (a)    applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (b)    such entity consents;
>
> (c)    such interest is a lien and the price at which such property is
> to be sold is greater than the aggregate value of all liens on
> such property;
>
> (d)    such interest is in bona fide dispute; or
>
> (e)    such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see In re Elliot, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be

approved provided the requirements of at least one subsection are met).

35.    Considering that any objections to this Motion must be resolved by consent

15

of the objecting party or by the Court, the Debtors expect that they can satisfy at least one of the

subsections of section 363(f) of the Bankruptcy Code.  Accordingly, the Debtors request that the

sale of the Unencumbered Non-Performing Loans be approved "free and clear", with any liens,

claims, encumbrances, and interests to attach to proceeds of the sale.

> b.    *The Sale is Proposed in Good Faith Within the Meaning of*
> *11 U.S.C. § 363(m)*

36.    As discussed above, the Sale Agreement was negotiated at arms-length and

in good faith.  Beltway is not affiliated to any of the Debtors or their representatives.  Accordingly,

this Court should find that Beltway has acted in good faith within the meaning of section 363(m) of

the Bankruptcy Code.  See generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.), No. 89

Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y.) (holding that to show lack of good faith, a party

must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other

bidders"); see also generally In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting

In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66

B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity

of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572

F.2d 1195, 1198 (7th Cir. 1978))).

**E.    Procedure for Competing Bids**

37.    The Debtors further propose that the deadline for submitting Competing

Bids shall be July 14, 2008 at 4:00 p.m. (prevailing Eastern Time) (the "Competing Bid

Deadline").  Prior to the Competing Bid Deadline, a bidder that desires to make an offer for the

Unencumbered Non-Performing Loans shall deliver written copies of its bid to:  (i) American

Home Mortgage Holdings, Inc., 538 Broadhollow Road, Melville, New York 11747 (Attn.:  Bret

Fernandes); (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box

DB02:6873787.6                                                                                      066585.1001

391, Wilmington, Delaware 19899-0391 (Attn.: Sean M. Beach and Matthew B. Lunn.), counsel

to the Debtors; (iii) Hahn & Hessen LLP, 448 Madison Avenue, New York, New York 10022

(Attn: Mark S. Indelicato and Mark T. Power), counsel to the Committee; and (iv) Jones Day, 222

East 41st Street, New York, New York 10017 (Attn: Brett Barragate and Scott J. Friedman),

counsel to the DIP Lender.

38.    If a Competing Bid is received by the Competing Bid Deadline, the Debtors

will conduct an auction (the "Auction") on July 16, 2008 at 10:00 a.m. (prevailing Eastern Time) at

the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington,

Delaware 19899, or such other place and time as the Debtors shall notify all bidders, counsel to the

Committee and counsel to the DIP Lender.

39.    The Debtors reserve the right to: (i) determine at their discretion which

Competing Bid or offer, if any, is the highest or best offer; and (ii) reject at any time prior to entry

of an order of the Court approving an offer, any offer that the Debtors, in their discretion and

without liability, deems to be (x) inadequate or insufficient, (y) not in conformity with the

requirements of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules or the terms and

conditions of the Agency Agreement or the bidding procedures set forth therein or herein, or (z)

contrary to the best interests of the Debtors or their estates. The Debtors will have no obligation to

accept or submit for Court approval any bid or offer presented at the Auction.

40.    The selection of a successful bidder, however, shall be within the sole

discretion of the Debtors, subject to this Court's approval. Economic considerations shall not be

the sole criteria upon which the Debtors base their decision.

**F.    Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004(h) is
        Appropriate**

41.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that the order granting the relief requested by this Motion be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) is waived.

42.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

43.    The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h).

**NOTICE**

44.    Notice of this Motion will be provided to: (i) the United States Trustee for the District of Delaware, (ii) counsel to the Committee, (iii) counsel to the Bank of America, N.A., (iv) counsel to the DIP Lender, (v) the Internal Revenue Service, (vi) the U.S. Securities and Exchange Commission, (vii) state and local taxing authorities, (viii) Beltway, (ix) those parties known to the Debtors to have expressed an interest in the Non-Performing Loans, and (x) all

DB02:6873787.6                                                                    066585.1001

parties entitled to notice under Local Rule 2002-1(B).  In light of the nature of the relief requested

herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the proposed order,

substantially in the form attached hereto as <u>Exhibit B</u>, (i) approving the private sale of the

Unencumbered Non-Performing Loans and REO Property to Beltway, (ii) approving the Sale

Agreement and (iii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware          YOUNG CONAWAY STARGATT & TAYLOR, LLP
      July 3, 2008

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Donald J. Bowman, Jr. (No. 4383)
The Brandywine Building
P.O. Box 391
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Counsel for the Debtors and Debtors in Possession

DB02:6873787.6                                                      066585.1001