

7

Re: American Home Mortgage
Case No. 07-11047- (CSS)
Claim Number 291
Claim Amount $5000

US Bankruptcy Court For The District OF Delaware:

I, Audrey M. Andrews have responded previously via e mail to Kevin Hand of American Home Mortgage. Per my employment contract I had a guaranteed minimum of $10,000 per month or $5000 each pay period. This agreement was extended every 6 months and had been extended every 6 months since January 2006. I do not have a copy of the last extension however Kevin Hand of American Home Mortgage should have access to the employment file. I have tried to contact him by phone and e mail without success. Because I was employed with American Home Mortgage in the month of August, I am entitled to the minimum guarantee of $5000 for the first pay period of that month. I have included a copy of the original contract with the extensions that I was given copies of. I was verbally told that it had been extended again past July of 2007 and would be automatically extended every 6 months. I was told this by my manager Rich Kemp who had gotten the approval from the Regional Manager, Chris Dallas. Again, Kevin Hand of American Home Mortgage should be able to confirm this information.

Audrey M Andrews
2829 Oakland Drive
Kalamazoo, MI 49008
269-341-1650

# AMENDMENT OF BRANCH MANAGER EMPLOYMENT AGREEMENT

This Amendment of Branch Manager Employment Agreement ("Amendment"), which is made and entered into as of January 16, 2007, amends Addendum A ("Addendum A") to that certain Branch Manager Employment Agreement, dated as of January 23, 2006 (the "Agreement"), by and between American Home Mortgage Corp. (the "Company") and Audrey Andrews (the "Executive").

Whereas the Company and Executive have agreed to amend Addendum A;

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. Section 7 of Addendum A is hereby deleted in its entirety and shall be replaced with the following:

"7. **Minimum Compensation.** With respect to each month in which the Executive is employed with the Company during the period from January 16, 2007 through July 15, 2007, the Executive shall be eligible to receive minimum compensation of $10,000.00 per month to be applied against amounts otherwise due the Executive pursuant to sections 4, 5, and 6 above ("Minimum Compensation"). To earn and receive payments of Minimum Compensation, the Executive must be employed on the scheduled payment date. If the Executive earns, pursuant to sections 4, 5, and 6 above, more than the Minimum Compensation in a given month, the Company will pay the Executive the Minimum Compensation plus such excess."

2. Except as herein modified, all terms and conditions of the Agreement and Addendum A shall remain in full force and effect, and by executing this Amendment, the parties hereto ratify and confirm the terms of the Agreement and Addendum A, as modified by the terms of this Amendment.

3. This Amendment may be executed in counterparts, each of which shall be deemed an original and each of which shall together constitute one and the same document. Execution of this Amendment may be effected by delivery of facsimiles or electronic copies of signature pages and the parties waive any objection to the use of facsimile or electronic copies of signatures in lieu of their paper equivalents.

4. This Amendment shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

## BRANCH MANAGER EMPLOYMENT AGREEMENT

This **BRANCH MANAGER EMPLOYMENT AGREEMENT** ("Agreement") is made and entered into as of _____, 2006 by and between AMERICAN HOME MORTGAGE CORP., (the "Company") and Audrey Andrews (the "Executive").

THE COMPANY AND EXECUTIVE AGREE AS FOLLOWS:

1. **Employment.** The Executive agrees to enter into the employment of the Company as a Branch Manager, and the Company agrees to employ and compensate the Executive as a Branch Manager in accordance with the terms and conditions set forth in this Agreement. The Executive understands and agrees that during the term of the Executive's employment with the Company: (a) The Executive may assist only the Company in the performance of activities contemplated by this Agreement; and (b) The Executive may not engage, participate or become interested, either directly or indirectly, in any business in competition with the Company, in any capacity.

Notwithstanding anything to the contrary herein, this Agreement and the Executive's employment with the Company is contingent upon, and shall not become effective until, the date (the "Effective Date") on which the Company acquires 100% of the capital stock of Waterfield Financial Corporation ("Waterfield").

2. **At Will.** The Executive understands and agrees that the Executive's employment with the Company shall be at all times "at will" employment. The Company reserves the right to terminate the Executive's employment with the Company at any time for any reason whatsoever, with or without cause. Likewise, the Executive may resign from the Company at any time for any reason. The term of this Agreement shall begin on the Effective Date and shall end on the date it is terminated by either the Company or the Executive.

3. **Duties and Responsibilities.** The Executive's branch is hereby defined as the Company's retail business, principally developed by the Executive subsequent to the Effective Date, located in Kalamazoo, Michigan (Cost Center #1614) (hereinafter referred to as the "Branch"). Without limiting the foregoing, the Executive is responsible for managing the financial performance of the Branch, the personnel working in the Branch, the selling and marketing of the Company's products within the Branch, and profitable growth of the Branch. It is mutually agreed that the Company may, at any time, change the make-up and size of the Branch in its sole discretion, including adding or deleting territory to or from the Branch.

4. **Duty of Loyalty.** The Executive agrees that during the term of Executive's employment with the Company, the Executive shall devote the Executive's full business time, attention, best efforts, skill, and ability exclusively to the business of the Company. The Executive agrees to do the Executive's utmost to further the interests of the Company, and agrees not to take any action intended to harm the Company.

The Executive agrees that, during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm, corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company. The Executive expressly agrees that this section is fair and reasonable and that the Executive is being adequately compensated for agreeing to the terms of this section.

5. **Compensation.** During the term of the Executive's employment hereunder, the Company will pay the Executive compensation, the amount and terms of which are set forth in Addendum A of this Agreement. All computations pursuant to this Agreement and the Addendum A shall be made solely by the Company, in accordance with methodologies, policies and procedures which may be in effect from time to time, and which may be changed by the Company at any time in its sole discretion. The Executive acknowledges that

the Executive's compensation will be reported to the Internal Revenue Service on a Form W-2, and the Company will withhold taxes from the Executive's pay as required by law. The Executive acknowledges that the Executive is not entitled to extra pay for absences from work, including holidays and sick days, or for overtime, but will be entirely compensated pursuant to the provisions of this section. Notwithstanding the terms of this section, the Executive shall not be entitled to any unpaid bonuses if the Executive is no longer employed by the Company as of the payment date.

6. **Compliance with Company Policies.** The Executive agrees to comply fully with, and be subject to, all of the Company's policies and procedures, including amendments to such policies and procedures adopted by the Company in its sole discretion prior to, on, or subsequent to the commencement of the Executive's employment hereunder.

7. **Compliance with Directives.** The Executive agrees to comply fully with all lawful instructions, directives, and orders given by an Executive Vice President of the Company, a Division President of the Company, a Regional Manager of the Company, a District Manager of the Company, or the President of the Company. The Executive further agrees that the Executive will cooperate at all times with other Company personnel.

8. **Compliance with Laws & Regulations.** The Executive agrees to comply fully with all federal, state, and local laws and regulations applicable to mortgage lending and brokering activities undertaken by the Company and the Executive.

9. **Prohibition against Inaccurate Applications and False Information.** The Executive agrees to not submit loan applications to the Company, or to facilitate in any way, the making of loan applications that are inaccurate or misleading. In addition, the Executive agrees not to create or assist in the creation or submission to the Company of any false information in connection with loan applicants or in connection with real property, including the ownership and value thereof. The Executive agrees to reimburse the Company for any damages it suffers as a result of the Executive's breach of this section. The obligations of the Executive and the rights of the Company with respect to the preceding sentence, shall survive the termination of this Agreement.

10. **Benefits**. The Executive is eligible to participate in such benefit programs that the Company may from time to time maintain for employees of the Executive's level. The Company reserves the right to modify, substitute, or eliminate such benefits at any time and in its sole discretion. Benefits available to the Executive will be based on the Executive's tenure at the Company, position at the Company, state and county of residence and other factors determined by the Company. The Executive acknowledges that certain of the Company's optional benefits programs may require the Executive to pay for some or all of the cost of those benefits. The Executive agrees to pay such costs in accordance with the Company's policies.

11. **Right of Setoff; Executive's Agreement to Pay Amounts Owed to the Company.** The Executive hereby grants the Company an unconditional right of setoff and authorizes the Company to deduct any amounts owed by the Executive to the Company from compensation and other amounts due the Executive from the Company. Notwithstanding the foregoing, the Company reserves the right to demand, for immediate payment, any amount due the Company from the Executive. Nothing in this section shall constitute a waiver or limitation of the Company's rights to collect sums due and owing from the Executive through any and all legal means available to the Company. This section shall survive the termination of this Agreement.

12. **Confidential and Proprietary Information; Company Property.** For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information,

2

Initials _____

including names and contact information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, personal employee information, and cost and pricing policies. Notwithstanding the foregoing, Confidential Information shall not include the database of contact information compiled and maintained by the Executive prior to the Effective Date and added to, and stored in, the records of the Company on or after the Effective Date. All Confidential Information disclosed or provided to the Executive by the Company, or developed or created by the Executive during the term of the Executive's employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company. The Executive agrees not to disclose the Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary in order for the Executive to perform the Executive's responsibilities as a Branch Manager of the Company. The Executive also agrees that the Executive will not use the Confidential Information for any purpose other than to fulfill the Executive's responsibilities as a Branch Manager of the Company.

The Executive acknowledges, understands, and agrees that the Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if Executive breaches or threatens to breach any of the provisions of this Agreement relating to Executive's use or disclosure of any of the Confidential Information.

The Executive further acknowledges that the Company may provide the Executive with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Executive agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time at the sole discretion of the Company. The Executive further agrees to promptly return in good working condition all Company Property in the Executive's possession upon termination of the Executive's employment with the Company for any reason, and shall be liable for damages, including but not limited to replacement cost, for any financial loss resulting to the Company if Company Property is not returned in such manner.

The Executive agrees that this section shall survive the termination of this Agreement, and that all of the obligations of the Executive set forth in this section shall remain in full force and effect after this Agreement is terminated. The Executive further agrees that, upon termination of this Agreement, the Executive will return to the Executive's Division President, or if such Division President is not available, to the Company's General Counsel, all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Executive's possession or custody.

13. **Covenants of Executive.** As part of the consideration for the execution of this Agreement, and to induce the Company to employ the Executive, and to continue such employment, subject to the terms hereof, the Executive covenants and agrees that the Executive will not engage in certain activities, as herein set forth. Accordingly, the Executive hereby covenants that during the term of this Agreement and for a period of 24 months after termination of the Executive's employment for any reason, the Executive shall not, either directly or indirectly, on the Executive's behalf or on behalf of others: solicit, encourage, or attempt to persuade any other employee of the Company to leave the employ of the Company; or employ, hire, engage or retain the services of any employee of the Company.

The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section. The Executive's obligations as set forth in this section shall survive the termination of this Agreement.

3

Initials _____

14. **Non-Disparagement.** The Company and the Executive agree that each will not disparage the other, and that their representatives will not disparage either of the parties to this Agreement. The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section. The Executive's obligations as set forth in this section shall survive the termination of this Agreement.

15. **Power of Attorney.** The Executive hereby irrevocably appoints the Company, or any of its authorized agents, as Executive's attorney-in-fact to act for the Executive and in the Executive's name (in any way the Executive could act in person) with respect to the following powers: (a) to open and review all any and all correspondence, envelopes or packages addressed to the Executive and delivered via the United States Mail or other means to the Company's offices, and to take for itself any currency, checks, drafts, money orders, or other forms of payment enclosed therein to which the Company is or may be entitled; or (b) to deposit any currency and endorse and negotiate any and all checks, drafts, money orders or other forms of payment made payable to the Executive which are the property of the Company.

16. **Insurance.** The Executive agrees that during the term of the Executive's employment with the Company, the Executive will maintain in effect on any and all motor vehicles used by the Executive in the conduct of the Company's business a minimum of $250,000.00 in combined single-limit bodily injury/property damage liability insurance. If a court of competent jurisdiction (or other adjudicative body) finds that the Executive, while operating a motor vehicle in the course and scope of the Executive's employment with the Company, has caused injuries or damages to a third party, the Executive agrees to defend, indemnify and hold the Company harmless from and against any and all claims against the Company for such injuries or damages caused by the Executive.

17. **Claims or Actions Against the Company.** In the event any civil or criminal complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance is filed, commenced, asserted, issued to or made against the Company on account of or as a result of any act or omission by the Executive in violation of any of the Company's policies as amended, instructions, directives, or orders, or on account of any act of dishonesty committed by the Executive, the Executive agrees to defend, indemnify and hold the Company harmless from and against any loss, liability, damages, fines, penalties, costs or expenses (including reasonable attorneys' fees) incurred by the Company in connection with any such lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance, including any settlement thereof, regardless of whether (a) the Executive is named as a party in any such complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance; (b) the Executive is employed by the Company at the time the loss, liability, damages, cost, or expenses (including reasonable attorneys' fees) is incurred by the Company; or (c) the Company ultimately prevails in, or successfully defends against, the complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance. Notwithstanding anything to the contrary herein, this section shall apply only if the Executive is found by a court of competent jurisdiction (or other adjudicative body) to have committed such an act or omission resulting in any loss, liability, damages, fines, penalties, costs or expenses (including reasonable attorneys' fees) incurred by the Company. This section shall survive the termination of this Agreement.

18. **Acknowledgement.** The Executive represents and warrants that the Executive is not subject to any agreement, order, judgment, or decree of any kind which would prevent the Executive from entering into this Agreement or performing fully the Executive's obligations hereunder. The Executive acknowledges that: (a) it is the Company's policy not to seek access to or make use of trade secrets or confidential business information belonging to other persons or organizations, including but not limited to, competitors or former employers; and (b) the Executive should not, under any circumstances, reveal to the Company or any of its affiliates or make use of trade secrets or confidential business information belonging to any other person or organization. The Executive represents and warrants that the Executive has not violated and shall not violate such instructions.

Initials _____

19. **Waiver of Jury Trial.** The Executive waives any right to a trial by jury in any action to enforce or defend any right under this Agreement or any amendment, instrument, document or agreement delivered or to be delivered in connection with this Agreement or arising from any relationship existing in connection with this Agreement, and agrees that any action shall be tried before a court and not before a jury.

20. **Construction.** The titles or headings of the paragraphs of this Agreement are intended for convenience of reference only and are not intended to change, limit or otherwise affect the meaning or construction of the terms of this Agreement. The term "person" shall include an individual, corporation, partnership, association, or other legal entity. The term "Employer" or "the Company" shall include any affiliate, parent, subsidiary or related company of the Company, including, but not limited to, Waterfield.

21. **Governing Law.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

22. **Entire Agreement.** This Agreement, together with the any schedules and Addenda attached hereto, as may be amended or modified from time to time in the Company's sole discretion, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements, discussions, negotiations, or understandings, whether oral or written, between the parties relating to the matters addressed herein.

23. **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement, or any portion of any provision of this Agreement, is found to be unlawful or invalid or otherwise unenforceable, all valid and enforceable provisions of this Agreement shall remain in full force and effect.

24. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto and their respective heirs, estates, legal representatives, executors, successors, and assigns.

25. **Attorney Fees.** The Executive agrees to pay the reasonable costs and attorney fees incurred by the Company resulting from the Company's successful enforcement of the terms and provisions of this Agreement.

26. **Waiver.** No waiver, or alleged waiver, by the Company of any term, condition or provision of this Agreement shall be effective for any purpose whatsoever unless such waiver is in writing and signed by a Division President or the President of the Company. No express waiver by the Company of a breach of this Agreement by the Executive shall operate or be construed as a waiver of any subsequent breach of this Agreement by the Executive.

27. **Notices.** All notices required or permitted under this Agreement shall be sufficient if in writing and mailed through the United States Postal Service to the Executive at such residence address on file with the Company, and to the Company, at 538 Broadhollow Road, Melville, New York 11747, Attn: General Counsel.

Initials _____

Initials _____

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**American Home Mortgage Corp.**

By: _____
**General Counsel**

_____
**Executive**

6

Initials _____

## BRANCH MANAGER EMPLOYMENT AGREEMENT
## Addendum A

The following sets forth **ADDENDUM A** to the **BRANCH MANAGER EMPLOYMENT AGREEMENT** by and between AMERICAN HOME MORTGAGE CORP., (the "Company") and Audrey Andrews (the "Executive") dated as of _____, 2006 (the "Agreement").

THE COMPANY AND EXECUTIVE AGREE AS FOLLOWS:

1. **Terms and Conditions.** Terms and conditions herein shall be defined by, and are subject to, the Agreement, unless otherwise specifically set forth in this Addendum A.

2. **Compensation**. Section 5 of the Agreement provides that the Company shall compensate the Executive pursuant to this Addendum A. The Executive's total compensation is set forth in this Addendum A.

3. **Term.** The term of this Addendum A shall begin on the Effective Date and shall end on the date on which the Executive's employment terminates, pursuant to the Agreement.

4. **Override Bonus.** For each month of employment during the term of the Executive's employment, the Executive shall be eligible to receive an override bonus (the "Override Bonus"). The Override Bonus shall be in an amount equal to 10 basis points (.10 %) of the aggregate principal amount of loans closed within the Branch beginning on the Effective Date, as determined by the Company in its sole discretion. The Override Bonus for a given month will be paid when such bonuses are generally paid by the Company in the succeeding month. The Override Bonus shall not apply to loans originated by the Executive for which the Executive is paid a commission, as set forth below, or loans that are brokered to other lenders. To earn and receive the Override Bonus, the Executive must be employed on the scheduled payment date.

5. **NOI Bonus.** The Executive shall be eligible to receive an NOI bonus (the "NOI Bonus"), in an amount equal to ten percent (10%) (hereafter referred to as the "NOI Percentage") of the profit of the Branch, as calculated by the Company. The Company will calculate the Branch's net operating financial results at the end of each calendar quarter, and will maintain an account, referred to hereafter as the "NOI Bonus Account", for the Executive. If the Branch realizes a profit for a calendar quarter, the Executive's NOI Bonus Account will earn a credit in the amount of the NOI Percentage times the profit of the Branch. If the Branch has a loss for a calendar quarter, the Executive's NOI Bonus Account will be charged the NOI Percentage times the loss of the Branch. However, no such loss, if any, in the first and second calendar quarter of 2006 will be carried-over to subsequent calendar quarters. The Executive will be eligible for a draw of 50% of the NOI Bonus Account balance at the end of each of the first three quarters of a calendar year, which, if available to the Executive, shall be advanced within 45 days of the end of the calendar quarter (an "NOI Bonus Draw"). NOI Bonus Draws will be charged to the NOI Bonus Account. Within 90 days of the end of a calendar year, the Company will determine the final balance of the Executive's NOI Bonus Account (the "Final Balance"). If the Executive is determined by the Company to have a positive Final Balance, such positive Final Balance will be paid to the Executive. If the Executive is determined by the Company to have a negative Final Balance, such negative Final Balance will be carried forward by the Company and applied to the Executive's future profit bonus calculations.

7

Initials _____

6. **Personal Production Commission.** The Executive shall be eligible to receive personal production compensation in the form of commissions based upon a percentage of the revenue stream of loans produced and originated personally by the Executive. The Company will pay the Executive for each month of employment a commission equal to 25% of the total revenue stream of loans produced and originated personally by the Executive. Monthly commissions shall be paid only on loans that are closing validated and shall be paid out in accordance with Company policies and procedures which may be in effect from time to time.

7. **Minimum Compensation.**

    (a) For the first through sixth months of the Executive's employment with the Company, the Executive shall be eligible to receive minimum compensation of $20,500.00 per month to be applied against the amounts otherwise due the Executive pursuant to sections 4, 5, and 6 above ("Initial Minimum Compensation"). To earn and receive payments of the Initial Minimum Compensation, the Executive must be employed by the Company on the payment date. If the Executive earns, pursuant to sections 4, 5, and 6 above, more than the Initial Minimum Compensation in a given month, the Company will pay the Executive the Initial Minimum Compensation plus such excess.

    (b) For the seventh through twelfth months of the Executive's employment with the Company, the Executive shall be eligible to receive minimum compensation of $10,000.00 per month to be applied against the amounts otherwise due the Executive pursuant to sections 4 and 5 above ("Secondary Minimum Compensation"). To earn and receive payments of the Secondary Minimum Compensation the Executive must be employed by the Company on the payment date. If the Executive earns, pursuant to sections 4 and 5 above, more than the Secondary Minimum Compensation in a given month, the Company will pay the Executive the Secondary Minimum Compensation plus such excess.

8. **Personal Production Bonus.** The Executive shall be eligible to receive a one-time bonus in an amount equal to 10 basis points (.10 %) of the aggregate principal amount of in-house loans originated by the Executive and closed in the first year of the Executive's employment hereunder (the "Personal Production Bonus"). The Personal Production Bonus shall be payable to the Executive on the first available pay date in March 2007. To earn and be eligible to receive the Personal Production Bonus: (a) the Branch, in the seventh through twelfth months of the Executive's employment with the Company, must be profitable by at least $1.00; and (b) the Executive must be employed on the scheduled payment date.

9. **Welcome Bonus.**

    (a) The Executive shall be eligible to receive a welcome bonus of $46,300.00 (the "Welcome Bonus"), which shall be payable as follows: (i) $11,575.00 payable on the first available pay date following the execution of the Agreement and commencement of employment hereunder; (ii) $11,575.00 payable on the first available pay date following the conclusion of the Executive's first 3 months of employment; (iii) $11,575.00 payable on the first available pay date following the conclusion of the Executive's first 6 months of employment; and (iv) $11,575.00 payable on the first available pay date following the conclusion of the Executive's first 12 months of employment. To be eligible to receive any installment of the Welcome Bonus, the Executive must be employed on the scheduled payment date. **SUBJECT TO SECTION 9(b) BELOW, THE EXECUTIVE AGREES THAT IF THE EXECUTIVE'S EMPLOYMENT WITH THE COMPANY TERMINATES FOR ANY REASON WITHIN TWELVE (12) MONTHS FROM THE COMMENCEMENT OF EMPLOYMENT HEREUNDER, THE EXECUTIVE WILL IMMEDIATELY REPAY TO**

8

Initials _____

**THE COMPANY THE AMOUNT OF THE WECOME BONUS RECEIVED BY THE EXECUTIVE (THE "WELCOME BONUS REPAYMENT OBLIGATION").**

(b) Notwithstanding anything to the contrary in section 9(a) above, the Executive shall not be subject to the Welcome Bonus Repayment Obligation if the Company terminates the Executive's employment without Cause. For purposes of the Agreement and this Addendum A, the circumstances under which the Company may terminate the Executive's employment for "Cause" shall include: (A) a default or other breach by the Executive of the Executive's obligations hereunder; (B) failure by the Executive to perform the duties hereunder; or (C) misconduct, dishonesty, insubordination, or other act by the Executive detrimental to the Company or its good will or damaging to its relationships with its customers, suppliers, or employees (including, without limitation, use of alcohol or illegal drugs such as to interfere with the performance of the Executive's obligations hereunder; conviction of or plea of guilty or no contest to a felony or any crime involving moral turpitude, dishonesty, or theft; and failure by the Executive to comply with applicable laws or governmental regulations with respect to Company operations or the performance of the Executive's duties).

10. **Car Allowance.** For each month of employment during the term of the Executive's employment, the Executive shall be eligible to receive a car allowance in the amount of $425.00 per month (the "Car Allowance"). If the Executive's employment terminates for any reason, the Car Allowance payable to the Executive for the calendar month in which the Executive's employment terminates (the "Final Month") shall be pro rated based on the number of full days worked by the Executive in the Final Month.

11. **Computation of Addendum A Amounts Due.** All calculations required pursuant to this Addendum A shall be made in the sole discretion of the Company in accordance with methodologies, policies and procedures of the Company which may be in effect from time to time, and which may be changed by the Company at any time in its sole discretion.

12. **Non-Payment of Bonuses.** Notwithstanding anything to the contrary in this Addendum A, the Executive shall not earn or be entitled to receive any unpaid bonuses if the Executive is no longer employed by the Company as of the scheduled payment date.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**American Home Mortgage Corp.**

By: _____
**General Counsel**

**EXECUTIVE:** _____

9

Initials _____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| AMERICAN HOME MORTGAGE ) | |
| HOLDINGS, INC., Delaware corporation, et al., ) | Case No. 07-11047 (CSS) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| ) | Objection Deadline: July 10, 2008 at 4:00 p.m. (ET) |
| ) | Hearing Date: July 17, 2008 at 2:00 p.m. (ET) |
| ) | |

AHM OB10 6/17/2008 (merge2.txnum2) 4000000290  BSI Use - 53

ANDREWS, AUDREY M.
2829 OAKLAND DR
KALAMAZOO, MI  49008

## NOTICE OF DEBTORS' TENTH OMNIBUS (NON-SUBSTANTIVE) OBJECTION TO CLAIMS PURSUANT TO SECTION 502(b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 3003 AND 3007 AND LOCAL RULE 3007-1

**TO:** ANDREWS, AUDREY M.
2829 OAKLAND DR
KALAMAZOO, MI  49008

**Basis For Objection:** No supporting documentation

| | Claim Number | Claim Amount |
|---|---|---|
| **Claim to be Expunged** | 291 | $5,000.00 |

Claimant failed to include any documentation to support claim. Claimant has not responded to communications from the Debtors.

The above-captioned debtors and debtors in possession (the "Debtors") have filed the **Debtors' Tenth Omnibus (Non-Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007 and Local Rule 3007-1** (the "Objection"), a copy of which is attached hereto. The Debtors hereby object to the claim listed above in the "Claim to be Expunged" row because this claim was filed without any supporting documentation or facts sufficient to support a legal basis for a claim. The Objection seeks to alter your rights by disallowing the above-listed claim.

Responses to the Objection, if any, must be filed on or before **July 10, 2008 at 4:00 p.m. (ET)** (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.

At the same time, you must also serve a copy of the response upon the counsel to the Debtors listed below so that the response is received on or before the Objection Deadline.

A HEARING ON THE OBJECTION WILL BE HELD ON **JULY 17, 2008 AT 2:00 P.M. (ET)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DE 19801.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: June 17, 2008
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Edward J. Kosmowski (No. 3849)
Kara Hammond Coyle (No. 4410)
Nathan D. Grow (No. 5014)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6756
Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors in Possession