UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .      Case No. 07-11047 (CS)
                            .
                            .
AMERICAN HOME MORTGAGE      .
HOLDINGS, INC.,             .      824 North Market Street
                            .      Wilmington, DE 19801
                            .
          Debtor.           .      June 25, 2008
. . . . . . . . . . . . ..          10:11 a.m.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:             Young, Conaway, Stargatt & Taylor
                            By:  NATHAN GROW, ESQ.
                                 SEAN BEACH, ESQ.
                                 MATTHEW LUNN, ESQ.
                            1000 West Street, 17th Fl.
                            Wilmington, DE 19801


For the Creditors'          Blank, Rome
Committee:                  By:  DAVID CARICKHOFF, ESQ.
                            1201 Market Street, Suite 800
                            Wilmington, DE 19801




Audio Operator:             Ken Brown



Proceedings recorded by electronic sound recording, transcript
                produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (cont'd):

For Wells Fargo                 Connolly, Bove, Lodge & Hutz
Funding:                        By:  MARC J. PHILLIPS, ESQ.
                                1007 North Orange Street
                                Wilmington, DE 19899

                                Sidley, Austin
                                By:  PAUL S. CARUSO, ESQ.
                                One South Dearborn
                                Chicago, IL 60603

For Freddie Mac:                Reed, Smith
                                By:  JUSTIN CORY FALGOWSKI, ESQ.
                                1201 Market Street, Suite 1500
                                Wilmington, DE 19801

For AHM Acquisition:            Greenberg, Traurig
                                By:  VICTORIA W. COUNIHAN, ESQ.
                                1007 North Orange Street, Suite 1200
                                Wilmington, DE 19899

For JP Morgan Chase:            Landis, Rath & Cobb
                                By:  MATTHEW B. McGUIRE, ESQ.
                                919 Market Street, Suite 600
                                Wilmington, DE 19801

For Bank of America:            Potter, Anderson & Corroon
                                By:  LAURIE SELBER SILVERSTEIN, ESQ.
                                1313 N. Market Street
                                Wilmington, DE 19899

TELEPHONIC APPEARANCES:

For Elisabeth Jackson:   By:  ELISABETH J. JACKSON

For Calyon:                     Eckert, Seamans, Cherin & Mellott
                                By:  MARGARET ENGLAND, ESQ.
                                300 Delaware Avenue, Suite 1210
                                Wilmington, DE 19801

For AHM:                        American Home Mortgage
                                By:  MARISSA MORELLE, ESQ.

For Wells Fargo:                Sidley, Austin
                                By:  D'LISIA E. BERGERON, ESQ.
                                One South Dearborn
                                Chicago, IL 60603

**J&J COURT TRANSCRIBERS, INC.**

**I N D E X**

| **WITNESSES FOR THE DEBTOR** | **PAGE** |
|---|---|
| JASON BURZENSKI | |
| Direct Examination by Mr. Beach | 22 |
| Cross Examination by Mr. Falgowski | 33 |
| Cross Examination by Mr. Caruso | 56 |
| Cross Examination by Mr. Carickhoff | 58 |
| Redirect Examination by Mr. Beach | 59 |
| | |
| ROBERT SEMPLE | |
| Direct Examination by Mr. Beach | 62 |
| Cross Examination by Mr. Falgowski | 67 |
| Cross Examination by Mr. Caruso | 72 |

| **EXHIBITS** | **EVD** |
|---|---|
| Freddie Mac-1  Order of the Court | 56 |
| Freddie Mac-6  Transcript dated 1/14/08 | 56 |

**J&J COURT TRANSCRIBERS, INC.**

4

1          THE COURT:  Please be seated.  Good morning.

2          MR. LUNN:  Good morning, Your Honor.  May it please

3  the Court, Matthew Lunn on behalf of the debtors.  Referring to

4  the amended agenda, Your Honor, that was filed yesterday

5  afternoon agenda items 1 through 14 are being adjourned.  A

6  specific note about agenda item number 12 which is the debtors'

7  exclusivity motion which is being adjourned by agreement with

8  the committee and Bank of America.  The debtors are close to

9  finalizing the terms of a plan.  The committee had raised an

10  issue and B of A had filed a limited objection.  Instead of

11  focusing on contesting exclusivity the parties decided it would

12  be best to focus on the terms and trying to finalize the terms

13  of the Chapter 11 plan and hopefully file that prior to the

14  next hearing which is July 17th.  Therefore that's the reason

15  for the adjournment, but it's by agreement of the parties, Your

16  Honor.

17          THE COURT:  Okay.

18          MR. LUNN:  That carries us then to agenda items 15,

19  16 and 17.  These are all matters that were the subject of

20  certificate of no objection.  I didn't know if Your Honor had

21  any questions as of this morning.  When I checked the docket I

22  had not seen the orders entered yet.  I'm happy to address any

23  questions.

24          THE COURT:  I'm 99 percent sure I signed them, but

25  let me just -- I signed about 50 orders yesterday.  It takes a

1  while to get them on the docket.

2           MR. LUNN:  I understand, Your Honor.

3                    (Pause)

4           THE COURT:  Ms. Gadson emails me and tells me yes, I

5  signed them.

6           MR. LUNN:  Thank you, Your Honor.

7           THE COURT:  They're in the process of being docketed.

8           MR. LUNN:  Thank you.  We'll wait for those to hit

9  the docket then.  Agenda items 18 through 56 are the standard

10 first lien foreclosure motions that were the subject of the

11 debtors' reservation of rights that's now become standard and

12 the certifications of counsel.  And I had seen those orders

13 being entered this morning and I'm assuming that you --

14          THE COURT:  I signed them.

15          MR. LUNN:  Those are the 50 that you were referring

16 to earlier.

17          THE COURT:  Correct.  I signed them all, and missed

18 some and they came back and made me sign more, and I think I

19 got them all.

20          MR. LUNN:  Great, Your Honor.  I appreciate it.  We

21 are now on agenda item 57.  And this is the debtors' motion to

22 approve the termination of the 401(k) Plan and the

23 implementation of certain procedures in connection with the

24 termination of the 401(k) Plan.  Your Honor, may recall that

25 prior to the petition date the debtors implemented a

6

1  significant reduction in the work force as a result of shutting

2  down their loan origination business.  Through the subsequent

3  liquidation of the debtors' assets through orderly sales

4  approved by Your Honor and also through the fact that certain

5  employees have found new employment and just the general

6  termination of the employees as we continue to wind down the

7  affairs we're left with less than 20 employees that are under

8  the 401(k) Plan and are participating in the 401(k) Plan.

9  Pursuant to Article 9.3 of the 401(k) Plan the debtors have the

10 ability to terminate the plan in the ordinary course of

11 business, but out of an abundance of caution we have decided to

12 file the motion and request the approval of Your Honor to

13 terminate the plan.  The debtors believe the termination of the

14 plan is justified because one of the minimal number of

15 employees that are participating, the cost associated with

16 maintaining a 401(k) Plan for less than 20 employees, the fact

17 that the debtors' in-house plan administrator will be leaving

18 the debtors' employment as of June 30 and therefore terminating

19 the plan to avoid the accrual of any new or existing

20 obligations.

21        The termination of the 401(k) Plan was approved and

22 adopted by the Board of the debtors.  In addition, as I said at

23 the outset, we're seeking to implement procedures that allow us

24 to terminate 401(k) Plan in accordance with the IRS regulations

25 such as notifying the plan participants, amending the plan such

1  that the participants will be invested in the plan, and

2  preparing the necessary IRS forms.  There were no objections,

3  Your Honor.  I am happy to address any questions Your Honor may

4  have with respect to the motion.

5          THE COURT:  Anyone wish to be heard in connection

6  with this matter?  Hearing none the Court will approve the

7  motion.

8          MR. LUNN:  Thank you.  May I approach with a form of

9  order?

10          THE COURT:  Yes.  Thank you, Mr. Lunn.

11          MR. LUNN:  That carries us to agenda item 58 which is

12  our fifth omnibus nonsubstantive objection and I will cede the

13  podium to Mr. Grow from my office.

14          THE COURT:  All right.

15          MR. GROW:  Good morning, Your Honor.  Nathan Grow,

16  Young, Conaway, Stargatt & Taylor on behalf of the debtors.

17  Before we address the ninth omnibus nonsubstantive objection to

18  claims the debtors have one clean up housekeeping matter.

19  Matter number 10 on the amended agenda is the debtors' eighth

20  substantive objection to claims.  An order was entered on the

21  eighth objection shortly after the last omnibus hearing.  In

22  the debtors' form of order the debtors neglected to indicate

23  their intent to withdraw the eighth omnibus objection with

24  respect to a claim by G. Mello, LLC.  And because of this

25  omission from the form of order the claim was expunged as a

1 multiple debtor claim through the order entered by the Court.

2 The debtors have prepared a second form of order that states

3 that the claim of G. Mello, LLC is not expunged, and that the

4 debtors withdraw their objection as to this claim, and preserve

5 their right to object to the claim in the future on any

6 grounds.  The debtors and G. Mello respectfully request that

7 the Court enter this second order which I can hand up to the

8 Court.

9          THE COURT:  Yes.  Not a problem.  Thank you.

10          MR. GROW:  Does Your Honor have any questions about

11 --

12          THE COURT:  No.  I'll sign the order.

13          MR. GROW:  Okay then matter number 60 on the amended

14 agenda is the debtors' ninth omnibus nonsubstantive objection

15 to claims.  This objection deals solely with approximately 1500

16 claims that were filed on account of claimants' equity interest

17 in the debtors.  The debtors have received 88 responses to this

18 objection from claimants.  I have a revised form of order

19 reflecting some changes made in response to the various

20 responses that the debtors received.  I can hand it up.  May I

21 approach?

22          THE COURT:  Yes.  Thank you.  Go ahead.

23          MR. GROW:  Okay.  Just to address some of the

24 responses that we received.  There were 88 of them.  Eighty out

25 of these 88 responses failed to offer any valid arguments to

9

1  suggest that these claims should not be expunged.  These 80

2  responses are the ones marked, "go forward," on the chart

3  attached to the amended agenda.  Some of these respondents

4  filed the notice -- they simply filed the notice that they

5  received in connection with the ninth omnibus objection.

6  Others merely stated that they oppose the relief requested, and

7  requested that the debtors and the Court recognize their

8  claims.  In summary, these 80 that we wish to go forward on

9  none of them offer any valid arguments to oppose the --

10         THE COURT:  So there's nothing on the claims,

11  attached to the claims, or in the responses that would indicate

12  they had any cause of action for fraud or securities claims or

13  anything along those lines?  Simply equity claims?

14         MR. GROW:  In the 80 out of the 88 that we've marked

15  as go forward that's true.

16         THE COURT:  Okay.

17         MR. GROW:  And the other eight there are some

18  additional allegations.

19         THE COURT:  Very good.

20         MR. GROW:  So these remaining eight responses are

21  items 2, 3, 4, 40, 41, 66, 74, and 75, in the chart attached to

22  the amended agenda.  And these few raise additional

23  allegations.  In light of Your Honor's ruling and the hearing

24  on the fifth omnibus objection with regard to equity claims the

25  debtors have withdrawn their objection to these claims through

1  a separate notice that was filed Monday.  And they reserve the

2  right to object to these proofs of claim on any grounds in a

3  future objection.

4        THE COURT:  All right.  And that's reflected in the

5  --

6        MR. GROW:  Reflected in the order.

7        THE COURT:  -- revised order.

8        MR. GROW:  And then the exhibit is revised from what

9  was filed with the Court to remove these claimants.

10       THE COURT:  I only see -- oh, I see -- I was going to

11 say I only see seven, but --

12       MR. GROW:  One of them is restricted.

13       THE COURT:  Ms. Christman has two.

14       MR. GROW:  That's right.

15       THE COURT:  All right.  Very good.  Does anybody wish

16 to be heard in connection with the ninth omnibus objection the

17 claims would seek solely to expunge equity interest to the

18 extent hey assert proofs of claim as opposed to a proof of

19 interest?  All right.  Hearing none the Court will approve the

20 order as revised.

21       MR. GROW:  Okay, Your Honor, and I don't think we

22 mentioned for the record that items number 58 and 59 on the

23 amended agenda, 58 being the debtors' fifth omnibus objection,

24 59 being the motion of Sam Hage for an order deeming proof of

25 claim to be timely filed.  These were marked on the agenda as

1  going forward.  However, yesterday afternoon we came to an

2  agreement with counsel to Sam Hage to adjourn until the next

3  hearing.  We called and notified your chambers.

4          THE COURT:  Right.  Someone called.  Yes.  I

5  appreciate that very much.

6          MR. GROW:  Okay.  And then moving on item 61 on the

7  amended agenda is motion of Jo Ann Jackson for relief from

8  stay.  Certification of counsel has been filed with respect to

9  that item.

10          THE COURT:  Was that sent over, do you know?

11          MR. GROW:  I believe so.  I think it's a -- cert of

12  counsel was filed by the party asserting the motion.

13          THE COURT:  Oh, Ms. Doubty sent it over.  Let me just

14  double --

15          MR. GROW:  I have a copy of it here, Your Honor.

16          THE COURT:  Yes, I signed this.  Yes.  I did sign

17  this.  This is the judicial lien one.  It may not be on the

18  docket though yet.  Let me -- I'm sure it's not on the docket

19  yet.  You can hand it up if you don't mind, and just in case it

20  gets lost.  Does anyone wish to be heard in connection with

21  this matter?  Ms. Jackson, you're on the telephone.  Are you

22  there?

23          MS. JACKSON:  Hello.  Yes, I'm sorry.  This is Judy

24  -- this is Elisabeth Judith Jackson.

25          THE COURT:  All right, just give me a moment, ma'am.

1          MS. JACKSON:  Uh-huh.

2                          (Pause)

3          MR. GROW:  Your Honor, I think --

4          THE COURT:  Is this -- are you Jo Ann Jackson or are

5  you a different --

6          MS. JACKSON:  I'm not Jo Ann Jackson.

7          THE COURT:  Oh.  Okay.  I'm sorry.  I apologize.

8          MS. JACKSON:  That's okay.

9          THE COURT:  Thank you.  Never mind.  Okay.  I'm 99

10 percent sure I signed the order, but I'll double check when

11 we're back in chambers.

12         MR. GROW:  Okay.  And for the remainder of the agenda

13 I want to cede the podium to my colleague Sean Beach.

14         THE COURT:  All right.  Thank you.  Mr. Beach, good

15 morning.

16         MR. BEACH:  Good morning, Your Honor.  May it please

17 the Court, Sean Beach on behalf of the debtors.  Your Honor,

18 item number 62 on the agenda is the debtors' motion for an

19 order authorizing the destruction of nonrequested mortgage loan

20 files.  As Your Honor is aware determining the appropriate

21 solution for handling the hard copy loan files has been a

22 challenging and contentious issue in these bankruptcy cases.

23 The debtors have worked extremely hard to balance out the many

24 competing issues related to the handling of these files.  Among

25 other things these competing interest include insuring that

1 personal consumer information is not publicly disclosed while

2 allowing parties with an appropriate interest in the mortgage

3 loan files, the ability to get those files returned to them.

4       The debtors have identified approximately 1.5 million

5 loan files at issue.  With respect to each loan the debtors

6 have on average two file folders, a credit folder and a legal

7 folder with respect to these files, but there could be more

8 than a few files.  For instance, in one extreme case we found

9 12 files with respect to one of the loans identified.  The

10 debtors have obtained two prior orders of the Court related to

11 these mortgage loan files.  The first of those orders

12 authorized the debtors to destroy loan files relating to

13 unfunded mortgage loans which were also imaged.  And pursuant

14 to that order the debtors have destroyed approximately 130,000

15 mortgage loan files.

16       The Court also granted a second order with respect to

17 the mortgage loan files.  That second order approved the

18 debtors' procedure to file a notice for a deadline to get loan

19 declaration requests or loan file declaration requests filed.

20 As Your Honor may recall, in that hearing there were, I think,

21 approximately 30 objections.  We did wind up only getting 14

22 loan declarations filed pursuant to that order.  In that order

23 Your Honor also held that those parties are responsible for the

24 costs.

25       And I think 12 out of the 14 parties that filed those

1 loan file declarations complied with the representation in the

2 declaration that they would pay for the costs.  Two, the other

3 parties were parties to securitization and indicated that to

4 the extent that the funds could be taken from the collateral

5 under the securitization that they would pay for it out of

6 that.  So the debtors are reserving their rights with respect

7 to whether or not that declaration complies.  We don't think it

8 complies with the Court's prior order.  But that, Your Honor,

9 is not an issue for today.  With respect to those 14 loan file

10 declarations the request was made for approximately 278,000

11 loan files out of the 1.5 million that the debtors currently

12 hold.

13 Between January and mid-June the estates have

14 incurred approximately 1.5 million in cost to ACRC which is the

15 storage facility.  Those are direct costs that the debtors have

16 paid just over the six month period in connection with storing

17 and some file retrieval in connection with these mortgage loan

18 files.  The debtors have also incurred internal cost of in

19 excess of $100,000 a month during that same period in

20 connection with employees that were tasked to help out with the

21 sorting and reinventorying of these mortgage loan files as well

22 as some temporary staff and other costs.  So the costs to the

23 estate has been significant.

24 In fact, the expenses in connection with these

25 mortgage loan files are one of the larger expenses that the

1  estate is incurring.  And as a result of that, and the fact

2  that this debtor is a liquidating debtor, Your Honor, we do

3  need to bring closure to this issue.  This is an issue that the

4  debtors identified early on in the case, but given the volume

5  of loan files and the numerous objections that we've gotten

6  from parties in connection with prior motions filed it has

7  taken some time to figure out what the appropriate mechanism is

8  and plan to sort inventory, return, retain, and destroy these

9  files.

10         Your Honor, the debtors come here today with a motion

11  to abandon and destroy any files that were not sought to be

12  returned in the declarations or returned under a prior order or

13  agreement of this Court, or, you know, there are a couple other

14  categories of loans that the debtors don't intend to destroy

15  including loans that are owned by the debtors whether they're

16  encumbered by liens from Bank of America or JP Morgan, for

17  instance, or whether they're unencumbered loans.  The debtors

18  have also extracted out of the relief sought in this motion any

19  loan files related to pending and threaten litigation.  And

20  that category includes approximately 39,000 loans that were

21  insured by Triad because there's pending litigation there and

22  possible future litigation in connection with those loan files.

23  And it also excludes out claims or loan files that relate to

24  claims that have been filed in the bankruptcy cases as well.

25         Your Honor, because of ACRC's own internal issues and

1  the debtors' need for closure on this issue there is an

2  agreement that requires all of the loan files to be removed

3  from ACRC by the end of August, and provides that the files

4  will be removed in bulk from the warehouse by ACRC and moved to

5  the debtors' headquarter facilities at 538 Broadhollow.

6         In the Melville facility the debtors will continue

7  sorting and reinventorying each and every one of these mortgage

8  loan files.  And, Your Honor, we have two witnesses here today

9  which will walk through what that process is and the

10  appropriate quality controls that the debtors have put in place

11  to make sure that we segregate out the loan files that are not

12  to be destroyed because they're to be retained or returned to

13  the appropriate parties.  And the debtors' current plan

14  anticipates that this process will be completed by September

15  30th.

16         Given that the 538 Broadhollow building is currently

17  being marketed for sale and that there are severe space

18  constraints within that facility the approval of this motion is

19  critical for the debtors to be able to conduct this plan and to

20  get the documents sorted, inventoried, destroyed and returned

21  by the September 30th date.  The debtors anticipate the cost

22  associated with the plan that we're providing Your Honor with

23  today is approximately 1.2 million.  And the debtors firmly

24  believe that if we don't have the authority to destroy these

25  documents that we're requesting to be destroyed today the cost

1  will be at least a million dollars in excess of that and

2  probably far in excess of the million dollars.  As a result of

3  the fact that we have to get the documents out of the ACRC

4  facility because, again, of their internal problems and the

5  agreement that those will be removed by August.  The fact that

6  they're going to be temporarily just stored in the 538

7  Broadhollow facility, but that we don't really have enough

8  space to continue to sort and inventory all of that stuff

9  unless we're contemporaneously destroying some of the

10 documents.  And the fact that we need to get those loan files

11 out of or a substantial portion of the loan files out of the

12 538 Broadhollow facility before that facility is sold because

13 we are concerned about a problem that it might present with a

14 potential purchaser of that property.

15        Your Honor, the debtors have received six formal

16 objections to the motion.  The objections at 62B and C on the

17 agenda, I believe, have been -- one of them, I believe, has

18 been resolved, and the other one, I believe, is moot.  These

19 are the objections by two individual borrowers.  Ms. Jackson I

20 heard is on the phone.  We did have a conversation with Ms.

21 Jackson, and indicated that we would not be -- that we would

22 separate out her mortgage loan files.  She requested in her

23 objection that those files be returned to her.

24        The debtors are in the process of determining whether

25 or not those mortgage loan files have been requested by the

1 investor under one of the loan file declarations, and if not

2 whether or not the debtors can return a portion or all of that

3 loan file to her whether there are restrictions on it.  I

4 suspect, Your Honor, there are some restrictions in returning

5 the full file to you, Ms. Jackson, or any other borrower.  For

6 instance, one issue I know about is with respect to the credit

7 report.  The credit report that mortgage lender receives is

8 different than what an individual receives.  It's got, you

9 know, industry level information and not as clear and distilled

10 information as a borrower would receive, and the credit bureaus

11 have restricted the AHM from providing that information to the

12 borrowers themselves.  But I believe the objection with Ms.

13 Jackson is resolved by the debtors' representation that we will

14 be separating out and not destroying those files in connection

15 with this motion and reserving rights for dealing with that

16 later.

17        THE COURT:  Ms. Jackson.

18        MS. JACKSON:  Yes.

19        THE COURT:  Is that correct?

20        MS. JACKSON:  Yes.  I have filed a written request

21 under RESPA guidelines to have the file returned to me.

22        THE COURT:  All right.  They're not going to destroy

23 your file, Mr. Beach represents, and he's told you that, and

24 they've taken your request to have the file -- to use lawyers

25 speak -- under advisement, which I always tell my kids means

1  I'll let you know later.  But they're not going to do anything

2  with your file without further notice.  And I expect Mr. Beach

3  will act quickly on your request to have the file returned.

4          MS. JACKSON:  Thank you, Your Honor.

5          THE COURT:  You're welcome.

6          MR. BEACH:  Your Honor, item number, I think it's 62.

7  Well, it's either B or C is the -- it's B, with respect to the

8  other borrower --

9          THE COURT:  Edmund Andrews.

10          MR. BEACH:  -- Edmund Andrews.  Your Honor, we have

11  reached out to Mr. Andrews, but have -- I think we received a

12  return call this morning, but never connected with him.  But

13  propose to resolve that objection in the same manner or moot

14  that objection in the same manner by separating out and not

15  destroying those loan files under this --

16          THE COURT:  And you have the ability to do that.  Is

17  that correct?

18          MR. BEACH:  I'm sorry, Your Honor?

19          THE COURT:  You have the ability to identify the

20  files and pull them out before you destroy the --

21          MR. BEACH:  Yes, Your Honor.  And you'll hear

22  testimony about that later.  And if Your Honor wants to reserve

23  on this objection certainly we can do that until after the

24  testimony.

25          THE COURT:  All right.  Is Mr. Andrews on the phone?

1  Anyone here on his behalf?  All right.  Based on the debtors'

2  representation that his file will not be destroyed the Court

3  will overrule the objection as moot.

4          MR. BEACH:  Thank you, Your Honor.  Item --

5          THE COURT:  I'm sorry.  And subject to the

6  evidentiary record that's going to be put on with regard to the

7  debtors' ability to properly identify the file prior to the

8  destruction of others.

9          MR. BEACH:  Thank you, Your Honor.  Item 62D is the

10  objection by Triad.  As I indicated earlier the debtors are not

11  destroying the approximately 39,000 loan files related to loans

12  that are insured by Triad, and we have communicated with them

13  and haven't -- they've represented that that would resolve

14  their objection.

15          THE COURT:  All right.  I don't see -- is anyone here

16  on behalf of Triad?

17          MR. BEACH:  I believe Mr. Mangan said he wouldn't be

18  present based on the resolution, but.

19          THE COURT:  Okay.  That's fine.  Very good.  I'll

20  consider that objection resolved.

21          MR. BEACH:  Your Honor, item number 62F on the agenda

22  is the objection of Calyon which essentially stated that if the

23  protective language in the proposed order stays in the proposed

24  order then they don't have an objection.  That protective

25  language has been unchanged in the proposed order and so I

1  believe their objection is not an objection or resolved.

2          THE COURT:  I guess they hadn't seen your proposed

3  order.  They objected to the extent the language they wanted

4  was not in it.  But you're saying it's in it?

5          MR. BEACH:  It is in it, and it was in the filed

6  motion.  I believe they filed the objection out of an abundance

7  of caution.  I can point to the language --

8          THE COURT:  That's fine.  Is anyone here on behalf of

9  Calyon?  They're more than capable of defending themselves.

10  All right, I'll consider that objection withdrawn.

11          MR. BEACH:  Thank you, Your Honor.  Item number 62C,

12  Your Honor, is the objection of Wells Fargo.  And just prior to

13  the hearing I had a conversation with Wells Fargo and are

14  working on a representation which I believe will resolve that

15  objection and I'll ask to deal with that at the end of the

16  hearing.

17          THE COURT:  Okay.

18          MR. BEACH:  Item number 62A is the objection by

19  Freddie Mac, and that remains unresolved.

20          THE COURT:  All right.

21          MR. BEACH:  Your Honor, if it pleases the Court I'd

22  like to call my first witness, Jason Burzenski.

23          THE COURT:  Very good.

24          COURT CLERK:  Mr. Burzenski, please state your full

25  name, and spell your last name for the record.

1          MR. BURZENSKI:  Sure.  My full name is Jason

2   Burzenski.  My last name is spelled B-u-r-z-e-n-s-k-i.

3          JASON BURZENSKI, DEBTORS' WITNESS, SWORN

4                  DIRECT EXAMINATION

5   BY MR. BEACH:

6   Q    Good morning, Mr. Burzenski.

7   A    Good morning.

8   Q    By whom are you currently employed?

9   A    American Home Mortgage.

10  Q    And how long have you been employed with American Home?

11  A    About five years.

12  Q    What's your title with American Home?

13  A    The vice-president of information security.

14  Q    And generally what are your responsibilities at American

15  Home and other roles that you may have had at American Home?

16  A    My role at American Home is to manage the information

17  security department which is five separate teams responsible

18  for information security throughout the organization consisting

19  of about 40 individuals in various roles.

20  Q    And briefly describe your prior work history prior to AHM.

21  A    Before American Home I was a security consultant for about

22  two years.  And prior to that I had owned my own business doing

23  some consulting work as well as application development and web

24  hosting.

25  Q    Are you generally familiar with the motion before the

1  Court today?

2  A    Yes.

3  Q    And are you familiar with AHM's loan file storage system?

4  A    Yes.

5  Q    Generally where does AHM store its hard copy loan files?

6  A    The majority of the loans hard copies are stored at ACRC

7  Warehouse.  There are also some loans that were being processed

8  or worked on that were in our facilities that have been

9  returned to headquarters.

10  Q    And what is the approximate number of loan files that are

11  stored by the debtors whether in the ACRC warehouse or return

12  from other locations?

13  A    Approximately 1.5 million loan files.

14  Q    Are there instances where there are more than one loan

15  file associated with any given loan?

16  A    Yes.  There could be two or more files that are associated

17  with a loan that aren't married together that would be in

18  storage.  So if you were to take that aggregate of 1.5 million

19  and correlate them back to individual loan numbers you really

20  only have about 1.1 million loan numbers.

21  Q    How are the loan files generally stored?

22  A    Typically they're stored in a box.  Either a short box or

23  a long box.  The vast majority of them are bar coded in short

24  boxes.

25  Q    And how many loans, approximately, are in each box?

1  A    Typically you're going to get an average of 10 to 20

2  loans.  But depending on what size the pieces are you could

3  have 40 or 50 loans in a box.  But that typically doesn't

4  happen too often.

5  Q    When you say loans you mean loan files?

6  A    Loan files.

7  Q    And how many boxes remain at ACRC today?

8  A    There's approximately 54,000 boxes.

9  Q    And where are the rest?

10  A    They're stored in our headquarters on 538 Broadhollow.

11  Q    And approximately how many are there?

12  A    There's about 25,000 files.  I don't recall the number of

13  boxes that are there.

14  Q    Okay.  Are you generally familiar with AHM's e-file

15  system?

16  A    Yes.

17  Q    Please describe that database system.

18  A    The e-file database system is comprised of about three

19  parts.  There's unify, our origination system where a lot of

20  the loan data is stored in our loan database.  Another part is

21  what we call paper-vision system where the imaged loan files

22  are stored and they can be requested from that system in their

23  entirety.  It's just any paper associated with that loan file.

24  The newest part is what we call the file sort app, that it does

25  the -- has all the loan numbers that we're seeking to sort

1 programmed into it so that when we do look at an individual

2 loan file we can tell which sorting group that that loan would

3 belong to.

4 Q    Is AHM currently able to obtain individual loan files upon

5 request from ACRC?

6 A    No.

7 Q    Are you familiar with the order establishing the loan file

8 declaration requirements?

9 A    Yes.

10 Q    Do you know how many loan file declarations were filed and

11 received?

12 A    Fourteen I'm aware of.

13 Q    And approximately how many loan files were requested in

14 those 14 declarations?

15 A    Approximately 280,000 loan files.

16 Q    What's the status of the retrieval and return of the loan

17 files requested in those declarations?

18 A    At this point we've made significant progress.  For each

19 requesting party we have a large portion loans in our facility

20 that have been pre-sorted and boxed and inventoried.

21 Q    And when do you anticipate this process being completed?

22 A    The projected completion date is September 30th.

23 Q    Are the requested loan files subject to the debtors'

24 current motion to destroy loan files?

25 A    No.

1  Q    So they're to be excluded from the documents to be

2  destroyed?

3  A    That's correct.

4  Q    Are there any other loan files that will not be destroyed?

5  A    Yes, there are other categories of loan files that have

6  been identified.  Any loans related to any litigation, the

7  unencumbered loans or the encumbered loans have been

8  identified, loans requested by the servicing entity, there's a

9  couple others as well.

10  Q    When you say litigations does that include pending and

11  threatened litigation?

12  A    Yes.

13  Q    And does that include claims that were filed in the

14  bankruptcy court that relate to loans.

15  A    Yes.  That includes the loans identified through the claim

16  process.

17  Q    And does that include the loan files for the approximately

18  39,000 loans insured by Triad?

19  A    Yes.

20  Q    And when you refer to loans owned by the debtors does that

21  include any loans owned by the debtors whether or not

22  encumbered or unencumbered?

23  A    Yes.

24  Q    And are the loans that are subject to return or retention

25  under post-petition agreements or orders of this bankruptcy

1  court anticipated to be destroyed?

2  A    No.

3  Q    Are the loans to be delivered to AH Acquisition, the

4  servicing business purchaser, included in the list of loans to

5  be destroyed?

6  A    No.

7  Q    With respect to the loan files requested by AH

8  Acquisition, please describe what that request comprised of.

9  A    They had requested a large number of loans and they

10 requested that we deliver them an image -- digital image of

11 those loans when possible, and if we did not have a digital

12 image to deliver the hard copies.  So what we're looking for

13 for them are the remaining 40 some-odd thousand hard copies

14 that we did not already deliver in image format.

15 Q    And what do you propose to do with the hard copies for the

16 image files that were sent to AH Acquisition?

17 A    For the remaining image -- hard copies of the imaged files

18 we will -- the application will determine if they were

19 requested by another party and sort them appropriately, and if

20 not, if they were unrequested then they will be put with the

21 rest of the unrequested loans.

22 Q    Okay.  I want to talk a little bit about some quality

23 control issues with respect to the proposed process.  Please

24 describe the process and the controls that the debtors intend

25 to employ with respect to sorting the loan files to be

1  returned, retained or destroyed.

2  A    The process for the sort starts when the files are

3  delivered to us.  They were delivered to us by truck, and

4  forklift down into our secure location in the basement or into

5  a secure container.  And from there they're brought manually

6  over to our sorting station where the skid is then broken down

7  and the boxes are placed in front of sorting agents that are

8  sitting in front of computer terminals with bar code readers

9  and they systematically go through the box removing each loan

10 file, scanning the loan file, and sorting the loan file based

11 on whichever requesting party is presented according to the

12 application.  They also label each file with a code that the

13 inventory folks are familiar with that give additional

14 assurance that that loan belongs to whichever party requested

15 it according to the application.

16 Q    Okay.  Now, please describe the process and the controls

17 that the debtors intend to employ with respect to

18 reinventorying the loan files to be returned, retained, or

19 destroyed after the sorting process.

20 A    Sure.  At the -- after the sorting process the sorting

21 agent will place the file in a respective sort location.  So if

22 it's a requested file it'll go in one direction.  If it's an

23 unrequested file it'll go in a completely different direction.

24 And both of those directions lead to an inventory station.

25 There's a different team of people working on the inventory of

1  the requested documents from the nonrequested documents.  And

2  they're set up similarly at a station with a system for storing

3  this information and they will go through each loan file then

4  coming in from the sort piles or the sort bins that they might

5  use and check it into a new box that they'll create and label

6  with a bar code.  The box is labeled with a special code

7  indicating which requesting party that box is affiliated with.

8  And as they check each loan he'll return into the box then

9  creating inventory identifying those files in that box.

10           Then at that same station whether it be the

11  unrequested inventory or the requested inventory they'll take

12  the boxes, pack a skid neatly and create additional inventory

13  identifying the skid with the boxes on it and that skid will be

14  wrapped and stored with that type of loan.  So if it's one

15  particular requester, all of their documents are in boxes for

16  that specific requester, on skids for that specific requester

17  and stored in a location in our facility for that specific

18  requester.

19  Q    So is it your testimony that every one of the loan files

20  in storage will be reviewed twice --

21  A    That is correct.

22  Q    -- during this process?  And for instance if you in the

23  sorting process identify a Freddie Mac loan tell me how that

24  works through the process.

25  A    If it's a Freddie Mac loan that loan will be identified

1  and sorted appropriately.  When it gets into the inventory

2  stage it will be typically with a pile of other Freddie Mac

3  loans and identified as such and inventoried.  Then when that

4  document is stored in a location we're aware of that number of

5  that loan file as associated with that particular requesting

6  party so that before we do anything with that group of files

7  we'll be able to cross reference that against existing records

8  to make sure that it isn't requested by someone or an incorrect

9  party.

10 Q    Okay.  And is there any chance of error in this process?

11 A    Yes.  There's a small chance of error.  I mean, it's

12 possible if the loan file is missed.  But we've put controls in

13 place to minimize that to a point where it'd be difficult for a

14 problem to happen.  So we're fairly confident that we've got

15 the process down very well.

16 Q    And how does an AHM employee know how to sort and to

17 reinventory the loan files?

18 A    They use the application to make the sorting decisions.

19 That application will present to them the sort location for the

20 -- that particular loan file, and then they have as part of the

21 sorting staging area several containers set up for smaller

22 requests.  And for large requests there's typically a rolling

23 bin that they'll use to place the sorted files.

24 Q    Okay.  Are there any other quality control methods used to

25 confirm whether a document is sorted or reinventoried properly?

1  A    Yes.  There's an additional process that we use.  We call

2  it the manifest process where before decision is made with a

3  pallet of files an agent will look at that pallet and do a few

4  quality control checks.  They're aware of how many boxes should

5  be on that pallet.  So if the box count doesn't match the

6  electronic manifest that's generated they'll review that pallet

7  and make sure that the correct boxes are on there.  The

8  manifest will also have the box codes in inventory that we're

9  aware of so if there's an incorrect requester on that

10 particular pallet a box of Freddie got on a box of Wells skid

11 they'll identify that, remove that.

12          Or if there's a human error where someone didn't

13 review the loan files in the box and the box is showing as

14 empty or if there's a problem of that nature they will identify

15 it at that phase and correct it prior to any delivery or

16 decision with that skid.

17 Q    Are you familiar generally with the objection filed by

18 Freddie Mac?

19 A    Yes.

20 Q    Freddie Mac indicates in that objection that approximately

21 535 loan files they requested have not yet been returned by the

22 debtors.  Do you know why that is?

23 A    The post-petition agreement the way we initially handled

24 those types of requests were to obtain a list of loan numbers

25 by the requester and then correlate those records back to our

1  storage records or to internal records identifying where those

2  boxes were stored or which boxes those files were in and then

3  where those boxes were stored.  And that initial process, which

4  is different from our current process, left us to our own

5  records to figure out where stuff was.  So we might recall as

6  many boxes as we could figure out that were associated with

7  those loans and pull those loans out and identify as many as

8  possible.

9          So the probability that we were missing a record or

10 we had incorrect documentation as to where a specific loan file

11 was was possible at that point.  Whereas now our process is

12 more along the lines of to look at every single loan file that

13 we have in our possession.  The original inventory is

14 irrelevant.  And if we are in possession of the file it would

15 be identified through the normal course of the file sort

16 process.

17 Q   So based on your new process to the extent that that file

18 exists in a storage facility of the debtors do you believe that

19 those 535 files or what exist of those files in storage will be

20 found through this process?

21 A   Yes.

22 Q   And returned to Freddie Mac?

23 A   Absolutely.

24          MR. BEACH:  No further questions, Your Honor.

25          THE COURT:  Cross?

1          MR. FALGOWSKI:  Good morning, Your Honor, Cory

2   Falgowski from Reed Smith on behalf of Freddie Mac.

3                      CROSS EXAMINATION

4   BY MR. FALGOWSKI:

5   Q    Mr. Burzenski, am I saying that correctly?

6   A    Uh-huh.

7   Q    You said you are the executive vice-president of

8   information security for American Home Mortgage?

9   A    No.  I'm the vice-president.

10  Q    Okay.  In that capacity was it your job to oversee the

11  storage of loan files including Freddie Mac's loan files?

12  A    No.

13  Q    Is it your job to oversee the management of those loan

14  files in storage?

15  A    No.

16  Q    Could you clarify what your job function is as a director

17  of information security?

18  A    As the vice-president of information security my role was

19  to coordinate the teams that were responsible for the

20  management of information security at American Home.  The

21  responsibilities of the teams was more on the technical side,

22  we who did security control implementation, anti-virus spam

23  blocking.  We did security monitoring, firewall reviews and IDS

24  -- or intrusion detection reviews.  We were responsible for

25  some compliance issues, policy writing.  Those types of things.

Burzenski - Cross/Falgowski                    34

1  Q    Okay.  Are you aware of an agreement that American Home

2  Mortgage reached with Freddie Mac regarding transfer of its

3  loan files to Bank of America as an interim servicer?

4  A    I've heard about it, but I haven't reviewed it.

5         MR. FALGOWSKI:  Permission to approach the witness,

6  Your Honor.

7         THE COURT:  Any objection?  Permission granted.

8  BY MR. FALGOWSKI:

9                     (Pause)

10 Q    Sir, I have handed you a document marked as Freddie Mac

11 Exhibit 1.  Do you recognize this document?

12 A    Honestly, it looks like a lot of other documents I've seen

13 lately.  So none --

14 Q    Understood.  Okay.  This is a copy of the stipulation and

15 order relating to the transfer of the servicing of the Freddie

16 Mac files to Bank of America.  Would you agree with that?

17 A    It looks like that.  Yeah.

18        THE COURT:  Can I have a copy, Mr. Falgowski?  Okay.

19 Thank you.  Whoever is typing on the telephone, please either

20 stop typing or mute your phone.  Go ahead.

21 BY MR. FALGOWSKI:

22 Q    Would you please turn to the second page of the document

23 I've handed you.  What is the date of the order signed by the

24 Court approving this stipulation?

25 A    September 20th, 2007.

1  Q    Would you please now turn to Page 5 of the stipulation

2  document, and please read Paragraph 2 out loud.

3           MR. BEACH:  Objection, Your Honor.  I don't believe

4  that this line of questioning is relevant.  The debtors have

5  already said that we're not destroying documents subject to a

6  prior court order.  If this line of questioning relates to

7  whether we're going to comply with that court order or whether

8  Freddie Mac thinks we haven't complied with it they can file a

9  separate motion.  But that's not the subject of this document

10 destruction motion since we're including out any documents

11 related to prior court order.

12          THE COURT:  All right.  Mr. Falgowski, where are we

13 headed?

14          MR. FALGOWSKI:  Well, the thrust of this objection,

15 Your Honor, is that there's been a pattern here of

16 noncompliance with the previous agreement.  We have been --

17 it's chronicled in our objection, but we have been through

18 numerous different occasions where we were told one thing by

19 American Home.  We were told files were being delivered, they

20 were not delivered.  We were also given different numbers of

21 files.  This line of questioning, Your Honor, is designed to

22 show that there is -- there was an agreement that American Home

23 has not complied with the agreement.  And that is indicative of

24 its inability to comply in the future.

25          THE COURT:  All right.  I'll overrule the objection.

1  BY MR. FALGOWSKI:

2  Q    Would you please read Paragraph 2 out loud, sir?

3  A    Sure.  "Debtor shall turn over the imaged microfiche, hard

4  copies and other forms of the Freddie Mac files in its physical

5  possession in their existing format to B of A which transfer

6  shall begin no later than the date of the order approving this

7  stipulation and be substantially complete on or before November

8  2nd, 2007 provided that debtor shall use their best efforts to

9  make all available image documents available by September 30th,

10 2007 and all available microfiche documents by October 11th,

11 2007."

12 Q    You can stop there.

13 A    Okay.

14 Q    So under this stipulation the debtors agreed to begin

15 their transfer of all the hard copy, microfiche Freddie Mac

16 files no later than September 20th.  Is that correct?

17 A    Yes.

18 Q    And the debtors also agreed, in this same paragraph, that

19 the transfer of the Freddie Mac files would be substantially

20 complete on or before November 2nd, 2007.

21 A    Correct.

22 Q    But the transfer was not complete as of November 2nd.

23 Isn't that correct?

24 A    I'm not aware of when that transaction was completed or

25 not.

1 Q    Well, I believe you testified before that you had been

2 through Freddie Mac's objection and there was an allegation

3 that approximately 535 of the Freddie Mac's files were still in

4 American Home's possession.  Do you remember that

5 representation?

6          MR. BEACH:  Objection, Your Honor.  That wasn't his

7 testimony.  His testimony was that --

8          THE COURT:  Whoa.  If that's not what you remember

9 your testimony to be then you can tell the Court that, you

10 know, what you think your testimony was or simply that's not

11 what you said.

12          THE WITNESS:  I don't recall making a determination

13 of how many loan files were not returned.  I mean, I haven't

14 testified on behalf of this case yet.

15 BY MR. FALGOWSKI:

16 Q    So is it your testimony that you are unaware of whether or

17 not there are any Freddie Mac files which have not been

18 returned to Freddie Mac?

19 A    No.  I am aware that Freddie Mac wants more files, and we

20 have identified some portion or all of those files, and we're

21 currently looking for them, but I'm not aware of the details of

22 the prior attempt to retrieve those files.

23 Q    Okay.  So if you are looking for the files would you agree

24 that it's likely that those files have not been returned to

25 Freddie Mac?

1  A    At this point.  Yes.

2  Q    Okay.  So in some -- if there's still files that are being

3  researched and looked for by American Home then the interim

4  servicing transfer was not complete as of November 2nd, 2007.

5  A    If they're the same loan numbers you were looking for

6  then, then yes, it wouldn't be complete.

7  Q    And isn't it true that as of the beginning of January 2008

8  the transfer was still incomplete?

9  A    I'm not aware if we shipped any files to Freddie after

10  January.

11  Q    Okay.

12         MR. FALGOWSKI:  Your Honor, may I approach the

13  witness again?

14         THE COURT:  Yes.

15                    (Pause)

16         MR. BEACH:  Your Honor, may I have a few minutes to

17  look at these exhibits?

18                    (Pause)

19  BY MR. FALGOWSKI:

20  Q    Sir, I've handed you four documents.

21         MR. BEACH:  May I have a few more minutes?

22         THE COURT:  Yes, please.  Mr. Beach, let us know when

23  you're ready.

24                    (Pause)

25         MR. BEACH:  Your Honor, I would object to the use of

1  any of these exhibits.  They're all emails between Mr.

2  Falgowski and Ed Kosmowski it seems for the most part of our

3  office, none of which this witness was copied on.

4         THE COURT:  Well, let's see how he wants to use them

5  before we worry about whether they can't be used.  Mr.

6  Falgowski.  This is cross.

7  BY MR. FALGOWSKI:

8  Q    Sir, I've handed you four documents marked Freddie Mac

9  Exhibit 2, 3, 4, and 5.  Would you please look first at the

10 document marked as Freddie Mac Exhibit 2.  This document is an

11 email communication.  Correct?

12 A    It looks like it.

13 Q    And what is the date on this email?

14 A    June 24th, 2008.

15 Q    Could you please ignore that and look to the email below

16 it.

17 A    January 3rd, 2008?

18 Q    And who's this email from?

19 A    The original email is from Ed Kosmowski.

20 Q    And do you know who Mr. Kosmowski is?

21 A    I don't think we've met.

22 Q    Do you know in what capacity he -- what role he plays in

23 this bankruptcy case?

24 A    Not specifically.

25 Q    Can you tell from his signature block where he's employed?

1  A    Yes.

2  Q    And where is he employed?

3  A    Young, Conaway, Stargatt & Taylor.

4  Q    And isn't it correct that Young, Conaway, Stargatt &

5  Taylor represents American Home Mortgage in this bankruptcy

6  case?

7  A    Yes.

8  Q    Okay.  So Mr. Kosmowski is counsel for the debtors in

9  American Home's bankruptcy case.

10 A    Okay.

11 Q    Would you please read the text of Mr. Kosmowski's email

12 into the record?

13 A    Sure.  "George, according to my business folks out of the

14 2,058 loans requested AHM has shipped 1,209 with another 220

15 files slated for delivery tomorrow.  That would leave another

16 629 to be shipped.  AHM is attempting to reconcile what files

17 are still outstanding, and is requesting that Freddie Mac

18 forwarded them a list of the files they have received to date.

19 Can you see if your business folks can provide us with such a

20 list?"

21 Q    So this email reflects that prior to January 3rd, 2008

22 Freddie Mac had requested delivery of approximately 2,058 files

23 that were outstanding.

24         MR. BEACH:  Objection, Your Honor.  He can't testify

25 as to what the email reflects.  He read the email.  It speaks

1  for itself.

2           THE COURT:  Sustained.

3  BY MR. FALGOWSKI:

4  Q    After your review of this email do you have any personal

5  knowledge or memory of how many files were outstanding as of

6  approximately January 3rd, 2008?

7  A    You're talking specifically about Freddie Mac files?

8  Q    For Freddie Mac.  Yes.

9  A    No.  I'm not aware of the numbers.

10 Q    Okay.  So you were -- at no point were you generally aware

11 of how many Freddie Mac files remained outstanding.

12 A    I may have looked it up at some point from the data, but

13 we had a lot of different projects underway for loan files.  So

14 that specific request I don't remember the specific numbers.

15 Q    So this email doesn't refresh any recollection that you

16 have about the number of Freddie Mac files that had been

17 requested or outstanding or could not be located?

18 A    No.

19 Q    Would you please turn to the document marked as Freddie

20 Mac Exhibit 3.  And would you please look at the email from Mr.

21 Kosmowski dated January 16th, 2008 and read the text of that

22 email into the record.

23 A    "George, 450 Freddie Mac files are being sent out today.

24 Once this shipment has been received let me know how many files

25 Freddie Mac believes are still outstanding.  Thank you."

Burzenski - Cross/Falgowski                    42

1  Q    So you would agree that the -- or, would you agree that

2  the prior email dated January 3rd, 2008 specified that certain

3  amount of files had been shipped and that 629 files remained to

4  be shipped?

5         MR. BEACH:  Objection, Your Honor.  Again, I don't

6  think he can testify to --

7         THE COURT:  You're trying to end run around what I

8  already ruled on.  Sustained.  You can ask him about his memory

9  or his knowledge, but you can't get the text of the emails in

10 by him reading it and asking him whether what he read is what

11 he read.  It just doesn't work that way.

12 BY MR. FALGOWSKI:

13 Q    Could you please turn to the document marked Freddie Mac

14 Exhibit 4.  This is another email from Mr. Kosmowski.  Correct?

15 A    Yes.

16 Q    And this email is dated January 29th, 2008.  Correct?

17 A    Yes.

18 Q    So that's about two weeks subsequent -- about a month

19 subsequent to the first email we looked at, and then two weeks

20 subsequent to the next email we looked at.

21 A    Right.

22 Q    Could you please read the first portion up until where it

23 says, "in storage 800 files," into the record, please.

24 A    "George, as per our discussion during this afternoon's

25 telephone conference I have attached an Excel spreadsheet that

Burzenski - Cross/Falgowski                    43

1  breaks down the 1,171 Freddie Mac files by the following

2  categories.  Microfiche 6 files, still researching 51 files,

3  shipped 314 files."

4  Q    And then it says, "In storage 800 files."  Correct?

5  A    Yes.  "In storage 800 files."

6  Q    After reviewing these emails do you recall ever

7  experiencing a situation where American Home had believed that

8  it knew how many Freddie Mac files were outstanding, but then

9  subsequently upwardly adjusted those numbers?

10        MR. BEACH:  Objection, Your Honor.  I think the

11  question is vague and it's --

12        THE COURT:  Well, if the objection is vague,

13  overruled.  If you understand the question you can answer it.

14  A    Can you ask the question again?

15  Q    Sure.  I'm asking whether there was -- whether you

16  remember any time where American Home had believed that a

17  certain number of Freddie Mac files remained undelivered, but

18  then subsequent to that discovered that there were actually a

19  certain amount of additional files that remained undelivered

20  and upwardly adjusted its figures as to what remained

21  undelivered to Freddie Mac?

22        MR. BEACH:  Objection, Your Honor.  He can't ask the

23  witness what AHM believed.  He can ask --

24        THE COURT:  No, no, he asked if he recalled.

25        MR. BEACH:  Okay.

Burzenski - Cross/Falgowski                    44

1   A    I don't recall that.  No.

2   Q    Is it possible that American Home made representations to

3   Freddie Mac about the number of files that it believed were

4   outstanding and then upwardly adjusted those numbers at later

5   times?

6   A    You're asking me if it's possible?

7   Q    Yes.

8   A    Not based on any of the data that the systems would have

9   presented.

10  Q    Okay.

11                          (Pause)

12  Q    Were there ever any files that -- any Freddie Mac files

13  that American Home specifically identified as not being able to

14  locate?

15  A    I don't recall specifically, but I believe there would

16  have been at that time when we did the initial request.   In

17  these emails it states somewhere that these were older loans --

18  a mixture of Lakewood and older loans which to us means that

19  they might predate our inventory system which would mean we

20  would have no way to locate a specific box that contained that

21  loan.   There are very few of those loans, but those are the

22  older loans in the system.

23  Q    Okay.  We'll get to that.  I'd like to ask you a few

24  questions now about how the files are stored.  You touched on

25  it briefly in your direct examination.  And you mentioned that

1  the funded loans could be intermingled in boxes together with

2  other loans that don't necessarily correspond to that

3  particular lender.

4  A    Are you referring to prior to being sorted or?

5  Q    As they're stored.  So my question is a Freddie Mac loan

6  could be in a box together with 10 or 20 other loans that

7  aren't Freddie Mac loans.  Correct?

8  A    While they're stored in the warehouse.  Yes.  Typically

9  loans would be intermingled.

10 Q    And then it's likely that many of Freddie Mac's loans are

11 stored in boxes together with non-Freddie Mac loans that the

12 debtor seeks to destroy by its current motion.  Correct?

13 A    No.  The boxes that we would seek to destroy would be

14 boxes that we've already repackaged with loans that we

15 specifically know are unrequested.

16 Q    But as they're stored now in ACRC the Freddie Mac files

17 would be packaged together with other loan files that are non-

18 Freddie Mac loans.  Isn't that correct?

19 A    That's correct.

20 Q    And you also testified during your direct examination that

21 there -- I believe you did -- that a loan file does not

22 necessarily fit into one file.  It could be a credit file and a

23 loan file kept in separate boxes.  Is that correct?

24 A    That's correct.

25 Q    And isn't it true that in some instances there's more than

1  two separate loan files that make up one entire loan?

2  A    Yes.

3  Q    And isn't it true that in at least one instance a loan

4  file was separated into 12 separate folders?

5  A    Yes.

6  Q    So isn't it possible that a Freddie Mac loan as it's

7  stored in ACRC could be co-mingled in 12 different boxes with

8  -- interspersed with other non-Freddie Mac loans?

9  A    Yes.

10  Q    Isn't it true that a number of the Freddie Mac loans were

11  older loan files as -- I'll use the word, "older," to describe

12  certain loan files that were serviced pre-select Columbia

13  National or Lakewood or another predecessor to American Home?

14  A    I know that's stated here, but without looking at the list

15  of loans and qualifying them in the system I really don't know

16  if they truly are older loans.

17  Q    Okay.  So you're not aware of whether any of the Freddie

18  Mac loans are older loans or not.

19  A    No.  Not specifically aware.  I just know what --

20  Q    Is it possible?

21  A    Yes.  Yes.

22  Q    And isn't it true that these older loan files are not

23  catalogued electronically?

24  A    They might not be catalogued from the perspective of

25  having a location in our storage facility.  So they might not

1  have a box number associated with them.

2  Q    So there's -- so your testimony is there's no way for you

3  to, from an electronic standpoint, pinpoint where that file is

4  located in a box in your warehouse.

5  A    That's correct.

6  Q    So the only way to locate that would be through hand

7  sorting.

8  A    Right.  That's correct.

9  Q    And are these loan files stored in boxes together with

10 other loans that don't necessarily correspond to that lender?

11 For example, a Freddie Mac older loan could be in a box with

12 other lenders' loans that are catalogued electronically?

13 A    It's possible, but from my understanding the older loans

14 are typically together, at least in the same box.  But it's

15 possible that if a loan was pulled at some point and a new loan

16 was put in its place you could have some intermingling.

17 Q    So it's possible that you have situations where when you

18 scan a particular box and it tells you that you have 12 loans

19 in that box that there could actually be 13 loans, one of them

20 being an older loan that is not catalogued electronically.

21 A    Well, we wouldn't typically scan a box to have it tell us

22 what loans are in there.  But prior to the current process that

23 we're using we would rely on the box inventory to determine

24 where any particular requesters' loan files were.

25 Q    Would you please take a look at the document that's marked

1 as Freddie Mac Exhibit 5.  You referred to it earlier so I

2 assume that you've taken a look at it.  Does this document

3 refresh your recollection of whether any of the Freddie Mac

4 loans are under this classification as older loans?

5 A    No.

6 Q    Okay.  Isn't it true that as of May 13th, 2008 the debtor

7 has not forwarded any additional loans to Freddie Mac?

8 A    Not that I'm aware of.

9 Q    Are you saying that the debtor has forwarded additional

10 loans to Freddie Mac?

11 A    It's possible.  You know, I don't do the shipping so if it

12 did happen I didn't hear about it.

13 Q    Okay.

14                         (Pause)

15 Q    Let's talk a little bit about the debtors' storage

16 situation.  We referred to ACRC before.  What is that?

17 A    I'm not sure what it stands for, but it's -- ACRC is the

18 warehouse vendor that stores our hard copy loan files.

19 Q    And you were previously under a term sheet with ACRC for

20 the storage of files that expired on June 13th, 2008.  Is that

21 correct?

22 A    I'm not sure about the expiration date, but it sounds

23 right to me.

24 Q    Are you aware of a new arrangement where the debtor would

25 have to get all of its files out of ACRC by the end of August?

1  A    Yes.

2  Q    And are those files that have to come out of ACRC, is the

3  debtor intending to move those to its headquarters?

4  A    Yes.

5  Q    Currently is the debtors' headquarters at capacity with

6  the amount of boxes that are in storage?

7  A    It's close to capacity.

8  Q    So currently there's not enough space at the debtors'

9  headquarters for all of those boxes at ACRC.

10  A    No.

11  Q    So in order to make room to bring new boxes over you need

12  to sort through the boxes that are already there and destroy

13  and ship them out.

14  A    That's correct.

15  Q    Is that correct?  It's approximately five weeks between

16  now -- excuse me.  It's approximately nine weeks between now

17  and the end of August.  Is that correct?

18  A    Yes.

19  Q    And how many boxes are currently at the debtors'

20  headquarters?

21  A    I think it's -- I don't recall specifically how many boxes

22  there are.

23  Q    So in order to make that end of August deadline your --

24  the people that you oversee need to sort through all of those

25  boxes that are at the debtors' headquarters plus some more that

1 will be coming from ACRC in order to make room to get

2 everything out of the ACRC storage facility by that deadline.

3 Right?

4 A    That's right.

5 Q    And that seems like a pretty tight time frame.  Do you

6 agree with that?

7 A    Yes.  But we've staffed and improved process to try to

8 accommodate.

9 Q    So let's talk about that a little bit.  Your staff, are

10 these people that have been brought in to specifically do this

11 task or were they American Home employees prior?

12 A    It's a combination of the two.

13 Q    So some of them have experience doing this type of work

14 and some of them don't.

15 A    That's correct.

16 Q    Are these employees paid contract rate, or are they paid

17 salary?

18 A    I believe it's a combination of both depending on the

19 role.  But I'm not familiar with everyone's arrangements.

20 Q    Do any of the employees get paid on a per box basis?

21 A    No.

22 Q    So it's all hourly or salary based?

23 A    I believe so.

24 Q    Okay.  We previously talked before about how the original

25 deadline on the stipulation for transfer of the Freddie Mac

1  files was November 2nd.  When the debtor entered into that

2  stipulation do you -- was the intent of the debtor to comply

3  with that stipulation?

4          MR. BEACH:  Objection, Your Honor.  I don't believe

5  this witness can testify as to the intent of the debtor in that

6  stipulation.  He didn't sign the stipulation.  I don't believe

7  --

8          THE COURT:  Yes.  You need to lay, Mr. Falgowski.

9  You're going to need to have more foundation before you can ask

10 him what the debtors' intent is on a document he didn't sign.

11 BY MR. FALGOWSKI:

12 Q    Did you take any part in negotiating the stipulation

13 between the debtors and Freddie Mac?

14 A    No.

15 Q    Do you have no knowledge about the -- whether the debtors

16 intended to comply with that stipulation.

17         MR. BEACH:  Objection, Your Honor.

18         THE COURT:  Basis?

19         MR. BEACH:  The same basis as before.  He didn't sign

20 the stipulation, he's testified he has no knowledge of it,

21 didn't negotiate it.

22         THE COURT:  Yes.  I agree.  I think you're going to

23 need -- you haven't even laid a foundation who did, whether he

24 knows these people, you know.  I mean, what's he going to say?

25 Well, generally speaking, yeah, you know, if we signed

1  something we intend to abide by it.  I mean, anybody would say

2  that.  So sustained.

3  BY MR. FALGOWSKI:

4  Q    Do you believe that the debtor has been diligent in

5  abiding by its obligations to complete that servicing transfer?

6  A    Yes.

7  Q    But isn't it also true that as of today's date there are

8  still a number of Freddie Mac files that are outstanding?

9  A    That's what it sounds like.  Yeah.

10 Q    You testified previously that there were files that were

11 being researched and attempting to be located, so --

12 A    Right.

13 Q    -- you would agree that the debtor although you believe

14 it's been diligent has not complied with the stipulation by

15 forwarding all of Freddie Mac's files.  Correct?

16        MR. BEACH:  Objection, Your Honor.  I don't think he

17 can testify as to whether the debtors complied with the

18 stipulation that he doesn't have any knowledge about.  And I

19 don't think it's relevant to these proceedings.

20        THE COURT:  No.  Why don't you restate the question,

21 Mr. Falgowski, to basically reference the deadline that was in

22 the stipulation whether it's been met.  If you understand my

23 point.

24        MR. FALGOWSKI:  Yes.

25 BY MR. FALGOWSKI:

1  Q     You testified before that the debtor is still researching

2  files currently, and attempting to locate files currently.  So

3  the deadline of November 2nd for the final completion of the

4  transfer was not met.  Correct?

5  A     Assuming that's the same files that were in the initial

6  request.

7  Q     Okay.  And you also believe that the debtors' been

8  diligent in attempting to meet its obligations under that

9  stipulation.

10  A     Yes.

11  Q     So if the debtor has been diligent in fulfilling its

12  obligations under the stipulation, but has been unable to do so

13  then isn't the only logical conclusion that there is an

14  organization problem in the debtors' maintenance of its files

15  that is making it impossible to locate certain files?

16  A     No, I don't think it's impossible to locate them.  I think

17  it's just a matter of doing exactly what we're doing which is

18  going through each and every single file we have in our

19  possession until we find what we're looking for.

20  Q     So is your testimony that it's just taking more time?

21  A     More time than what?

22  Q     More time than -- more time passed the November 2nd

23  deadline than had been originally contemplated?

24  A     Yes.

25  Q     So -- okay.  Do you believe there's a risk that files will

1 be inadvertently destroyed?

2 A    If there is potential for that risk we've gone through a

3 lot of different measures to avoid it.  But dealing in this

4 scope of files, you know, upwards of one point five million

5 files, there's always the possibility of some human error,

6 albeit, small.

7          MR. FALGOWSKI:  Permission to approach the witness,

8 Your Honor.

9          THE COURT:  Yes.

10                         (Pause)

11 BY MR. FALGOWSKI:

12 Q    Could you please -- I'm sorry.  Could you please turn to

13 the first page and read the title of this document?

14 A    Sure.  Transcript of proceedings before the Honorable

15 Christopher S. Sontchi, United States Bankruptcy Court Judge.

16 Q    And what's the date of this transcript?

17 A    January 14th, 2008.

18 Q    Could you please turn to Page 92.  And starting at the

19 first complete sentence on Line 20, read that portion into the

20 record up until the sentence ends on Line 2 of the subsequent

21 page.

22 A    Okay.  "I'm very concerned in preserving documentation for

23 these loan files, documentation that may or may not be

24 necessary for claims litigation or any other kind of litigation

25 or documentation that's just necessary for the instrument to be

1 of use to the people who are parties to it.  No matter how

2 carefully you are mistakes will be made and something's going

3 to get destroyed that there's not a duplicate for, and that

4 document will be gone forever."

5 Q    Do you agree with that statement that the Court made at

6 that January 14th hearing?

7 A    I believe it's possible, but unlikely.  And, you know,

8 there's a good portion of these documents that exist elsewhere,

9 potentially.  So while it is possible the potential is very

10 small.

11           MR. FALGOWSKI:  I have no further questions, Your

12 Honor.

13           THE COURT:  Thank you.

14           MR. FALGOWSKI:  Although I'd like to move the

15 admission of Exhibits.  Transcript is marked as Freddie Mac

16 Exhibit 6.  I'd like to move the admission of Freddie Mac

17 Exhibits 1, 2, 3, 4, 5, and 6.

18           THE COURT:  Objection?

19           MR. BEACH:  Your Honor, I don't object to the

20 admission of Exhibit 6.  I do object to the admission of every

21 other --

22           MR. CARICKHOFF:  Your Honor, the committee --

23           MR. BEACH:  -- exhibit.  Well, Exhibit 1 I don't have

24 an objection to since it's an order of the Court.  But I object

25 to the admission of 2, 3, 4, and 5.  They're emails by parties

1  other than Mr. Burzenski.  He wasn't part of these emails, he's

2  not familiar with them, he didn't have knowledge of them.

3           MR. CARICKHOFF:  Your Honor, the committee --

4           MR. BEACH:  There's not a witness here to

5  authenticate these.

6           THE COURT:  You want to call Mr. Kosmowski?  Go

7  ahead.  I'm sorry.

8           MR. CARICKHOFF:  Your Honor, the committee would join

9  the debtors' objection.  I think that counsel is using them to

10  refresh -- potentially refresh the witness' recollection

11  unsuccessfully.  I don't see the purpose for allowing them as

12  evidence.  I don't know how they come in, Your Honor.

13          MR. BEACH:  Your Honor, he used them to impeach the

14  witness.  He's got them read into the record.  I don't think he

15  needs them admitted as exhibits, and I don't think it's

16  appropriate.

17          THE COURT:  Mr. Falgowski, response?

18          MR. FALGOWSKI:  I'll withdraw the request.

19          THE COURT:  All right.  Exhibits 1 and 6 are admitted

20  without objection.  Exhibits 2, 3, 4, and 5 are withdrawn.  Any

21  more cross?

22          MR. CARUSO:  Good morning, Your Honor, Paul Caruso,

23  Sidley, Austin on behalf of Wells Fargo Funding.

24                      CROSS EXAMINATION

25  BY MR. CARUSO:

1  Q    Mr. Burzenski, I just have a couple of questions for you.

2  You indicated that there are about 1.5 million loan files or

3  1.1 million loans.  Are you able to reconcile the discrepancy

4  of the 400,000 based on the American Home loan file number?

5  A    That's correct.

6  Q    Okay.  And for purposes of the present motion, destroying

7  them, is it relevant to how those documents are stored at ACRC?

8  A    No.

9  Q    Okay.  You mentioned the quality control process that you

10 go through currently sorting the files.  Is the criteria that

11 you utilize the American Home loan number?

12 A    Typically, yes.

13 Q    Do you use any other criteria?

14 A    No.  We won't use it for making a decision.

15 Q    So is it possible that to the extent an American Home loan

16 number is incorrect that you could improperly sort a file

17 either for destruction or not or attribute it to an incorrect

18 owner of that file?

19 A    If that were the case.  But we will pre-scrub these lists

20 to make sure they are valid American Home numbers prior to

21 putting them into the system.  If there is an issue with a

22 number we will research it with whoever is involved to

23 determine what the correct loan number is.

24 Q    But you currently don't use any other criteria again,

25 Social Security Number, borrower name to determine if you have

1 the correct loan file.

2 A    No.   Because you don't see that information typically when

3 you're looking at any given piece of the loan.

4 Q    And then the second step you said was the inventory

5 process.   Do you both check the documents for destruction, and

6 the documents that are not to be destroyed at that stage as

7 well?

8 A    Yes.   And they're distributed separately.

9 Q    All right.   And you mentioned that all the documents are

10 going to be removed from ACRC by 8/31.   Has the debtor made

11 arrangements for storage -- any other storage facilities beyond

12 that date or will all the files beyond 8/31 be at the

13 headquarters in Melville?

14 A    I believe they'll be at the headquarters.

15 Q    Okay.   Thank you.

16        MR. CARUSO:   Nothing further.

17        THE COURT:   Any other cross?

18        MR. CARICKHOFF:   May it please the Court, David

19 Carickhoff from Blank, Rome on behalf of the creditors'

20 committee.

21                CROSS EXAMINATION

22 BY MR. CARICKHOFF:

23 Q    Mr. Burzenski, I just want to make sure I'm clear as to

24 the process that the debtors are undertaking in connection with

25 this request to destroy certain loan files.   The way that the

1  process works is that any destruction will be done at the

2  Melville headquarters.  Is that correct?

3  A    I don't know if arrangements have been made specifically

4  for that, but typically that's what we'd probably do.

5  Q    So the determination as to what files will be destroyed,

6  will that take place at the Melville headquarters?

7  A    Yes.

8  Q    Okay.  So in terms of the process of how that works

9  individuals are going through boxes, they're pulling out

10 individual files, they will look up these files on your

11 database to determine whether they've been requested or fall

12 into one of the other excluded categories.  Is that correct?

13 A    That's correct.

14 Q    And once they make that determination that they're not

15 listed there then they go into a separate destroy box?  Is that

16 correct?

17 A    It's an unrequested box that's labeled and inventoried.

18 Yes.

19 Q    Okay.  With respect to --

20        MR. CARICKHOFF:  That's all the questions I have for

21 the witness, Your Honor.

22        THE COURT:  Thank you.  Redirect?

23        MR. BEACH:  For the record, Sean Beach on behalf of

24 the debtors.

25                REDIRECT EXAMINATION

1  BY MR. BEACH:

2  Q    Mr. Burzenski, let's take a -- one of the 535 loans that

3  Freddie Mac alleges still is in storage with the debtors.

4  Let's assume you have one loan number and based on the current

5  process that's in place, please walk us through how that loan

6  will be identified, assuming it is in storage in a facility?

7  A    That loan might exist in a -- in one box that's been

8  returned so it would be somewhere in our facility.  It would

9  travel to our sort station.  It would end up in a box on

10  someone's desk, they would remove that loan file from the box,

11  and scan it.  It would present on the screen as a Freddie loan

12  and then they would add it to the location where the Freddie

13  loans are being sorted and stored.  Typically that would be a

14  box set up in a staging area behind their scanning work

15  station.  That would have been added with other Freddie loans.

16          When that box fills up it'll be moved to the

17  inventory station where another agent will take that box,

18  remove the loans, possibly get a different box if the box is

19  not in good condition, and scan each loan again adding it to

20  the box and correlating it to an inventory associated with

21  Freddie loans.  The box will be labeled with a Freddie tag, and

22  added to an inventory on a skid with other Freddie loans.

23  Q    And then how will that be returned to Freddie?

24  A    Once we have arrangements for how these loans will be

25  shipped, if it's a truckload then typically Freddie would

1 arrange for a truck to come pick up or come load and deliver

2 the files.  If it's a smaller group of files we might arrange

3 something differently, some other shipping arrangement.

4 Q    So whenever Freddie arranges to have that picked up they

5 can come pick up that loan file.

6 A    Right.  They come pick it up.  We would know in advance so

7 we would start the manifest process on that population of loans

8 which would include identifying any, you know, misplaced boxes

9 or issues of that nature.  Once we are satisfied with the

10 manifest and that it contained the appropriate loan numbers we

11 would review those loan numbers against existing populations of

12 requested loans so the output from that type of check would

13 just assure that every single loan in that list was -- should

14 be delivered to Freddie.

15 Q    Okay.  And if there was another loan file related to this

16 particular loan number would it go through that same process?

17 A    Yes.

18          MR. BEACH:  No further question, Your Honor.

19          THE COURT:  Thank you.  You may step down.

20          MR. BEACH:  Your Honor, if it pleases the Court I'd

21 like to call my second witness, Mr. Robert Semple.

22          THE COURT:  All right.  Let's take a five minute

23 recess before we do that.

24          MR. BEACH:  Thank you.

25                    (Recess)

1          COURT CLERK:  All rise.

2          THE COURT:  Be seated.  You may proceed, Mr. Beach.

3          MR. BEACH:  Thank you, Your Honor.  Your Honor, I'd

4  like to call my next witness, Mr. Robert Semple.

5          THE COURT:  Okay.  Please swear the witness.  Please

6  stand, sir.

7          MR. SEMPLE:  Oh.  Sorry.

8          COURT CLERK:  Please state your name, and spell your

9  last name.

10          MR. SEMPLE:  Robert Semple.  S-e-m-p-l-e.

11              ROBERT SEMPLE, DEBTORS' WITNESS, SWORN

12                    DIRECT EXAMINATION

13  BY MR. BEACH:

14  Q    Good afternoon, Mr. Semple.

15  A    Good afternoon.

16  Q    By whom are you currently employed?

17  A    Kroll, Zolfo, Cooper.

18  Q    And how long have you been employed there?

19  A    Ten years.

20  Q    What is your title with Kroll?

21  A    Director.

22  Q    How long have you been working on the AHM matter?

23  A    Since August of '07.

24  Q    And generally what are your responsibilities in connection

25  with the AHM matter?

1  A    The construction loan program, operations and asset sales.

2  Q    What is the operations responsibilities consist of?

3  A    Just the oversight of processing the files, the file

4  retrieval program.

5  Q    Briefly describe for the Court your relevant education and

6  work history prior to the AHM engagement.

7  A    I have a BS in accounting, a MS in operations research, an

8  MBA in finance, and I'm CIRA certified and I've worked

9  bankruptcies and turnarounds for the past ten years.

10  Q    Are you generally familiar with the motion before the

11  Court today?

12  A    Yes, I am.

13  Q    Are you familiar with AHM's loan and file storage system?

14  A    Yes, I am.

15  Q    Generally where does AHM store its hard copy loan files?

16  A    At an offsite facility, American Corporate Records Center,

17  which is an unrelated entity.

18  Q    And could copies or originals of the loan files stored by

19  the debtors be held by document custodian?

20  A    Yes.  The collateral documents as they're called are held

21  by the collateral agent.  The closing agent generally keeps

22  copies of his files.  The borrower walks away with copies of

23  anything he has signed.  So a lot of what's in those files is

24  simply copies.

25  Q    Could they also be with a servicer?

Semple - Direct/Beach                    64

1  A    Yes.

2  Q    And could they also be with the owner of the loan?

3  A    Yes.

4  Q    Since January 2008 how much has the storage sorting and

5  reinventorying cost the estate?

6  A    The cost to -- from ACRC is about a million, eight, and

7  the cost of sorting on a personnel basis is approximately

8  600,000.

9  Q    So in approximately six months the estate has incurred

10 over two million in cost in connection with the storage and

11 sorting.

12 A    Yes.

13 Q    Did the debtors have a plan to return, retain, and destroy

14 all of the remaining loan files?

15 A    Yes.

16 Q    Would you briefly describe that plan.

17 A    Basically ACRC has agreed to deliver all the files to

18 American Home by August 31st.  American Home plans to sort

19 through those files and be done by September 30th.  This is

20 based on a process flow of documents coming in and going out of

21 the building either to the people who requested them, or being

22 destroyed.

23 Q    Were you involved in developing this plan?

24 A    Yes.

25 Q    And how long have you been working to develop this plan?

Semple - Direct/Beach                         65

1  A    We've been trying to get this done since November of '07.

2  Q    What is the estimated time -- I'm sorry.  What is the

3  estimated cost of accomplishing this plan?

4  A    It will be 740,000 for ACRC, and another 400,000 for

5  personnel related cost to do the sorting.  I don't have an

6  estimate for the destruction cost yet.

7  Q    If the debtors are not authorized to destroy loan files

8  how will this affect the plan?

9  A    Well, it will certainly throw a wrench in the works,

10  because the headquarters building is an office building, it's

11  not designed to handle this material.  We're coming in and out

12  of an underground garage and working on the basement level.  In

13  order to take the documents upstairs we have to unpalletize

14  them, put the boxes individually in an elevator which is not a

15  freight elevator, and repeat the process on a higher floor.

16  And I'm not sure of the loading on the floors, how much files

17  we could actually keep there.  Also, the building is for sale,

18  and any buyer is not going to want an office building full of

19  records that they can't get rid of.

20  Q    And with respect to ACRC, what's the reason that the loan

21  files need to be out of ACRC by the end of August?

22  A    They need -- they're relocating their business to a

23  smaller facility, because the facility that they have without

24  the American Home ongoing feed and interplay is too great for

25  their -- you know, it's just too much space and costs too much.

1 So they're moving out, and have wanted to get out.

2 Q    You believe that the debtors need to move these files from

3 the ACRC --

4 A    Oh, yeah.  We can't stay there because they're shutting

5 down.  If we -- the only way they can stay there is if we

6 abandon them there.

7 Q    Okay.  And what would the alternative be if the debtors

8 were required to -- I'm sorry, let me start the question over.

9 If the debtors were not authorized to destroy the documents,

10 and as you testified couldn't conduct a plan because of the

11 issues in the headquarters facility, what would the

12 alternatives for the debtors be?

13 A    We'd have to find a replacement storage facility, and we'd

14 have to reinventory the boxes to the shelves and locations much

15 of which, you know, ACRC had done in the past so that in the

16 future if you wanted to find a box of unrequested loans you

17 knew which box to go to and where it was.  Based on

18 conversations with ACRC it would cost at least a million

19 dollars for us to do that in addition to a new warehouseman

20 wanting escrows and assurances that he's going to be paid in

21 the future.  And then at some point in time what do you do with

22 these files anyway?  So you still face a destruction cost and

23 you have ongoing maintenance and credit issues for the estate.

24         MR. BEACH:  No further questions, Your Honor.

25         THE COURT:  Cross?

1          MR. FALGOWSKI:  Hello, Mr. Semple.

2          THE WITNESS:  How are you?

3                     CROSS EXAMINATION

4  BY MR. FALGOWSKI:

5  Q    Are you aware of the debtors' obligations to return loan

6  files to Freddie Mac?

7  A    Generally speaking, yes.

8  Q    Have you been involved in the debtors' attempts to locate

9  and return the Freddie Mac loan files?

10 A    I've known it's gone on, I've followed up on what some of

11 the issues were.  I think they have it reduced to 56 loans that

12 are unaccounted for.  But this process that we're going through

13 we're going to touch every loan file and sort out every loan

14 file.  So to the extent that there are Freddie Mac loan files

15 in the warehouse by September 30th they'll be found.

16 Q    So September 30th is the deadline that you have projected.

17 A    Yes.

18 Q    You said -- you testified on direct that you had been

19 trying to get this done since November 2007 meaning the --

20 A    Emptying of the warehouse.

21 Q    Has it taken longer than expected?

22 A    Yes.

23 Q    What are the reasons for that?

24 A    Trying to identify which loans people wanted to take back

25 has been a big hurdle, and getting the loans on a box specific

1  basis and then searching through a box for a loan, getting that

2  and then going back to that box at some subsequent point for

3  another loan has been very time consuming.  The process that

4  we're proposing to do is we go to a box one time, empty it out,

5  sort the loans to the appropriate sort bin, and then return

6  them.  I mean, we have sent out already a number of truckloads

7  to one of the requesters.  So that relieves the back end

8  pressure of getting the loan files into the 538 location.

9  Q    Are you familiar with the quote, unquote, older loans that

10 we were referring to earlier which are loans that are not

11 catalogued electronically?

12 A    If they're physically in the warehouse -- yes -- and if

13 they're physically in the warehouse we're going to pick them

14 up, we're going to touch them, and if they don't have a scan

15 band we're going to keypunch the loan number in.  And if that's

16 not a match then we'll open up the loan and open up the file

17 and research it.  So each loan is being touched and processed.

18 Q    You testified before that this process has been more time

19 consuming than originally anticipated.  Is that correct?

20 A    Yes.

21 Q    And now you're faced with a deadline of August 31st to get

22 all of the boxes out of ACRC.  Is that correct?

23 A    Yes.

24 Q    And all those boxes are anticipated to be delivered to the

25 Melville headquarters.  Is that correct?

1 A    Yes.

2 Q    But currently the Melville headquarters is at or near

3 capacity so that there's no room for those boxes at the present

4 time.   Correct?

5 A    All of them right this minute?  No.  But there's a process

6 flow where we have 15,000 boxes as of last Friday at the

7 facility, we have an additional 55 to get from ACRC and we've

8 processed in the neighborhood of 5,000 a week.

9 Q    So to get this done -- for a very time consuming process

10 as it has been to get this done it's going to have to move

11 relatively quickly.  Is that -- would you agree with that?

12 A    We've added extra staff, we've added a night shift and a

13 weekend shift which has compressed the time frame, you know,

14 that gives you more manhours or personhours to get the work

15 done.

16                          (Pause)

17 Q    The people that are employed to do this processing task,

18 are they experienced in doing this type of work?

19 A    Scanning loans and sorting?  I mean, it's not a difficult

20 task to teach.  There's a number of people who are either

21 current or prior American Home employees so they're familiar

22 with the files.  The temps we're getting from the agencies have

23 been relatively good workers and catch on.  I mean, you scan a

24 file, you react to a prompt, you put a code on the binder, file

25 folder, you put it in a box, and then the second guy would

1  recheck that.  I mean, it's not rocket science we're doing

2  here.

3  Q    You testified before that not all the files have a bar

4  code though so you can't scan them all.

5  A    Well, no.  They key punch.  They enter them manually.  And

6  the ones that they have problems with and can't resolve they

7  raise to a supervisor.  The supervisors are either active or

8  prior American Home employees.

9  Q    And then how are those -- those files that don't have bar

10  codes, you said that they would be -- the loan number would be

11  key punched.

12  A    Uh-huh.

13  Q    What steps are then taken to cross reference that against

14  basically all the files that have been requested or --

15  A    Oh, they feed them into the same system, and it's part of

16  -- it's just another input.  It's a matter of -- a scanned bar

17  code it's a key punch input and it goes into the same process

18  flow.

19  Q    Are those loans only catalogued by American Homes loan

20  number for them?

21  A    I don't understand that question.

22  Q    Are they catalogued in any other manner other than

23  American Home's loan number such as lender -- a number the

24  lender may have assigned to them or Social Security Number,

25  property address?

1 A     Those numbers are available and unified.  And those

2 numbers are in the loan documents.  They're not sorted by

3 Social Security Number.  They are placed randomly in the boxes

4 in the warehouse.  And again, they're emptying each box,

5 touching each file and determining the proper sort for each

6 loan file that they have.

7 Q     The previous witness read an excerpt from the record of

8 the January 14th hearing into this record.  Do you remember

9 that statement that was read into the record?

10 A     The quote from Judge Sontchi?  Yes.

11 Q     Do you agree with that quote that documents will -- no

12 matter how careful you are documents will be inadvertently

13 destroyed, and there's not going to be copies and those

14 documents will be gone forever?  That's just an inevitability.

15 And do you agree that there is risk in this case that could

16 occur?

17 A     Minuscule.  Because copies exist along the paper trail to

18 get it to the file.  Most of what's in the file are copies of

19 stuff.  The double sorting and the third check before a box is

20 moved goes against the current database.  So if there's a box

21 that was put in a wrong file it'll pop out.  And if a file is

22 actually destroyed then the -- what's the probability of that

23 file being the one that you need, and not being able to find

24 any of the other documentation surrounding it?  So, yeah, it's

25 possible, but I would bet against it being a very large number.

1          MR. FALGOWSKI:  No further questions.

2          THE COURT:  Any other cross?  Mr. Caruso.

3          MR. CARUSO:  Good afternoon, Mr. Semple.

4                    CROSS EXAMINATION

5    BY MR. CARUSO:

6    Q    I just have one question for you.  Have the debtors

7    explored the potential of subleasing the ACR facility beyond

8    8/31?

9    A    No.

10   Q    Okay.  Thank you.

11   A    This is much too much space for us to keep the files in.

12   We don't need that space, we don't need the files.  There's no

13   real benefit to the estate to keep it.

14   Q    Thank you.

15          THE COURT:  Any other cross?  Redirect?

16          MR. BEACH:  No, Your Honor.

17          THE COURT:  All right.  Thank you, sir, you may step

18   down.  Any other witnesses, Mr. Beach?

19          MR. BEACH:  No, Your Honor.

20          THE COURT:  Any other evidence?

21          MR. BEACH:  No.

22          THE COURT:  Okay.  Anyone else have any evidence to

23   put before the Court?  Hearing none that'll close the

24   evidentiary record.

25          MR. BEACH:  Thank you, Your Honor.

1              THE COURT:  Is the Wells Fargo matter resolved, or?

2              MR. BEACH:  Your Honor, I have a representation I was

3    going to read into the record which I believe will resolve the

4    objection although Wells Fargo may want to make additional

5    statements.

6              THE COURT:  Okay.

7              MR. BEACH:  Your Honor, the debtors and Wells Fargo

8    agreed that to the extent that AHM could not reconcile the loan

9    number provided by Wells Fargo, AHM has received property,

10   addresses and Social Security Numbers from Wells Fargo to cross

11   check and obtain the appropriate AHM loan number.  As an added

12   precaution Wells Fargo will provide property address, borrower

13   name and Social Security Number for all requested loans.

14   Within two weeks AHM will cross reference these search criteria

15   within its electronic database.  And to the extent that

16   additional loan numbers are found AHM will add such file

17   numbers to the Wells Fargo poll list.  The parties agree to use

18   their best commercially reasonably efforts to reconcile any

19   Wells Fargo requested documents with the files in AHM's

20   possession or provide if known the information regarding such

21   loan's disposition.

22             THE COURT:  Okay.

23             MR. BEACH:  Your Honor, I believe that representation

24   should resolve the objection.

25             THE COURT:  Mr. Caruso.

1          MR. CARUSO:  Your Honor, that does resolve our

2    objection.  Wells Fargo is mindful of the fact that there has

3    to be an efficient administration of the estate balanced

4    against our desire to have our property back.  The reason we're

5    concerned, Your Honor, is that the damage that could be caused

6    by the failure to return the documents to us exceeds the cost

7    of the retrieval.  We may not be able to retrieve -- excuse me,

8    transfer these loans and force our rights against them or

9    provide the proper releases upon payoff.  So we're simply

10   seeking, and this representation, I believe, makes clear, an

11   additional reconciliation such that when the debtors are going

12   through this process of identifying files to either provide to

13   us or other parties or are to destroy that there are other

14   criteria that they're searching to ensure that they are not

15   inadvertently destroying them.  And mindful of the fact that

16   out of the 280,000 files that were requested 185,000 of those

17   files are requested by Wells Fargo.

18          THE COURT:  Thank you.

19          MR. BEACH:  Your Honor, I believe that leaves us with

20   only one remaining objection.  That's the objection by Freddie

21   Mac.  Your Honor, --

22          THE COURT:  Let me hear from Mr. Falgowski.  I think

23   that makes the most sense.  I think I know your position.  I

24   heard the evidence so let me hear the objection.

25          MR. FALGOWSKI:  Your Honor, Freddie Mac's objection

1 is premised upon the effect that on September 20th, 2007 this

2 Court approved a stipulation where the debtors agreed to return

3 all of Freddie Mac's files by November 2nd.  That date came and

4 went, and over the course of the next seven months, seven and a

5 half months the parties have been in constant contact.  And

6 we've been told on numerous occasions that files were being

7 sent, and those deliveries were either significantly delayed or

8 never occurred.

9        There were also occasions where the debtors gave us

10 estimates as to how many loan files they believed were

11 outstanding, and those numbers fluctuated.  At one point the

12 number went from less than 200 back up to 1200.  And there are

13 loan files the debtors have admitted that they cannot locate.

14 There are other loan files that are -- they can only be located

15 by hand sorting.  They're in boxes without bar codes.

16        THE COURT:  So why doesn't the procedure that the

17 debtors have established or wish to establish not address every

18 one of your client's concern other than timing which, without a

19 time machine we can't address in any event?

20        MR. FALGOWSKI:  Well, Your Honor, as this Court

21 recognized on January 14th mistakes will be made, and --

22        THE COURT:  Well, frankly I think -- with all due

23 respect I think you're reading my comments into the record out

24 of context, and on a different evidentiary record.  Those

25 comments went to the issue of the fact that there were at that

1  time I think something along the lines of 50 pending

2  objections.  The system had not been fully presented to the

3  Court as it has now, and it's been changed since then.  There

4  was no process in place for people to request to have their

5  documents looked at, and the debtors were seeking expedited

6  relief.  I mean, you know, and I may have just been wrong.

7  There's always that possibility.

8           MR. FALGOWSKI:  Point noted although I think the

9  record here with respect to Freddie Mac, at least, has

10 indicated a pattern of disorganization.  And, you know, until

11 we have some comfort that the files are actually going to be

12 returned the debtor shouldn't be allowed to --

13          THE COURT:  Well, frankly should I hold up the estate

14 to the tune of $2 million for 500 of your files?

15          MR. FALGOWSKI:  Your Honor, we had an agreement under

16 our stipulation.  We don't believe that those rights that we

17 bargained for should be jeopardized for convenience of the

18 debtor.

19          THE COURT:  All right.

20          MR. FALGOWSKI:  But to the extent that Your Honor is

21 inclined to overrule Freddie Mac's objection we'd request that

22 there be a provision added to the order that would provide that

23 the debtors would, to the extent documents are lost, and can't

24 be retrieved that the debtors provide reasonable cooperation

25 with the servicer and the owner of that loan to basically as a

1 remedy to try to remedy as best as possible any effect of that

2 inadvertent destruction.  And that would include executing

3 documents as necessary.  Basically just reasonably cooperating

4 in manner with respect to underlying foreclosure actions and

5 the like.

6           THE COURT:  For how long?  I mean, the debtor is

7 going to cease to exist fairly soon, one can only hope.

8           MR. FALGOWSKI:  Well, once the debtor ceases to exist

9 then.

10          THE COURT:  All right.  Okay.  Thank you.  Any other

11 objection?  I'm going to overrule the objection of Freddie Mac.

12 I understand the concerns.  Ms. Counihan, do you need to be

13 heard before I do that?

14          MS. COUNIHAN:  I do.

15          THE COURT:  All right.

16          MS. COUNIHAN:  Thank you, Your Honor.

17          THE COURT:  Hurry up.

18          MS. COUNIHAN:  Your Honor, Victoria Counihan on

19 behalf of AH Mortgage Acquisition.  Your Honor, at the closing

20 of the sale between my clients and the debtors they entered

21 into a letter agreement which was dated April 11th, 2008

22 whereby the debtors agreed that they would pull certain stored

23 files that belong to my client and would deliver them to my

24 client when we requested them.  Since that time we have

25 actually provided them a request.  The testimony seemed to be

1  clear that the debtors are actually not going to destroy those

2  documents and have segregated them or are in the process of

3  segregating them.  And I did speak to debtors' counsel.  They

4  informed me that nothing in the order that was going to be

5  entered today was meant to alter or override either our asset

6  purchase agreement or that letter agreement.  But I did want to

7  rise, because, Your Honor, I don't think that the order -- the

8  form of order made clear that our files were not going to be

9  destroyed although the testimony seems to make that clear.  So

10 I just wanted to put that reservational right on the record.

11         THE COURT:  Mr. Beach, you're not going to destroy

12 Mr. Ross' files, are you?

13         MR. BEACH:  No, Your Honor, we will not.  I only

14 raise one issue.  The request that they made was that their

15 files be provided by July 7th.  That's not going to be

16 feasible, but Ms. Counihan is right, we are separating them

17 out, we're not destroying them and we will be providing them to

18 the purchaser.

19         THE COURT:  Okay.  Very good.  Mr. Caruso.

20         MR. CARUSO:  Your Honor, one last thing.  I just want

21 to understand that to the extent the debtors' procedures are

22 approved it's without prejudice to any party who has requested

23 a policy return to bring any claims based on their inadvertent

24 destruction to the extent they have been requested to be

25 returned to them.

1          THE COURT:  The order doesn't have a release in it,

2  does it?

3          MR. BEACH:  No, Your Honor, it doesn't.

4          THE COURT:  Claims are claims.

5          MR. CARUSO:  Thank you.

6          THE COURT:  Okay.  I'm going to overrule the

7  objection of Freddie Mac.  I understand Freddie Mac's

8  frustration now we're nine months coming since they entered

9  into their stipulation.  We're well beyond the time period by

10  which the debtors had agreed, and this Court approved it

11  through an order to provide the files to Freddie Mac.  All that

12  said there are some things that we simply can't fix, and the

13  passage of time is one of them.  In addition, this process of

14  destroying files has been in place since January, February at

15  the latest when we had our initial hearing and there were a lot

16  of issues that needed to be worked out including issues with

17  the landlord.

18          I frankly think that other than the passage of time

19  the debtors' proposed procedure is going to address any of the

20  issues that Freddie Mac may have and will result in them

21  receiving at least all files that the debtor currently

22  possesses in hard copy by September 30th or pretty close to

23  that date.  A year late, but nonetheless the documents that

24  were required to be provided.

25          In addition, I'm comforted and I think the evidence

1 clearly establishes that a mechanism has been established to

2 make all reasonable efforts to protect information to make sure

3 information and files are not destroyed inadvertently.

4 Certainly there are no certainties in life and at some point

5 the question is, you know, do you institute a quintuple

6 checking system as opposed to a double checking system

7 increasing your cost by a hundred percent to take care of the

8 .0001 percent change of a mistake with a double system?  And

9 obviously at that point you don't.  It doesn't make any sense.

10 Especially in the context of a debtor in a Chapter 11

11 liquidation mode that's trying to destroy these documents so it

12 can get along with its liquidation and its liquidating plan.

13       So I'm satisfied that Freddie Mac's legitimate

14 concerns are addressed.  I don't think there's any pattern of

15 misfeasance or malfeasance that would require me to hold the

16 debtor to a higher standard than the debtors' already proposed.

17 In addition, I think that the -- with the other resolutions I

18 think that the motion is clearly reasonable exercise of the

19 debtors' business judgment, and is required in order to

20 minimize continued expense to the estate, destroys the

21 documents and takes due care to protect those files that people

22 have requested that they be given.

23       So I will approve the motion.  Has there been any

24 changes to the order?  In connection with Mr. Falgowski's

25 request that the order require reasonable cooperation or

1 whatnot, I don't think at this point that's necessary.  When we

2 know how many documents they don't have if you have a

3 controversy at that time you can bring an appropriate adversary

4 proceeding or motion with the Court.  If the debtors have an

5 obligation under state law, for example, to take certain steps

6 if they lose loan documents, et cetera, those obligations

7 remain in place.  Nothing in bankruptcy forgives the debtors'

8 requirement to continue to operate in compliance with state

9 law.

10          MR. BEACH:  Your Honor, may I approach?

11          THE COURT:  Yes.  Thank you.

12                    (Pause)

13          THE COURT:  I'm going to add a proviso that any

14 objections to the motions have either been overruled or

15 resolved.

16          MR. BEACH:  Thank you, Your Honor.

17                    (Pause)

18          THE COURT:  Okay.

19          MR. LUNN:  For the record, Matthew Lunn.  As a

20 housekeeping matter, Your Honor, agenda item 2 is now able to

21 come off of the agenda.  Agenda item 2 was the previous motion

22 to destroy documents.  So we'll no longer have that on the

23 agenda.  The final item for today's hearing, Your Honor, is

24 agenda item 63.  And this is the debtors' motion to modify the

25 engagement with Kroll, Zolfo, Cooper.  As Your Honor is aware

1  Kroll, Zolfo, Cooper was retained by the debtors to provide
2  restructuring and financial advisory services to the debtors
3  pursuant to an agreement.  In connection with that agreement
4  Mr. Stephen Cooper was appointed as CRO and Mr. Kevin Nystrom
5  as the director of restructuring the debtors.  The engagement
6  agreement was modified in April of 2008 to take the flat fee
7  from Mr. Nystrom and Mr. Cooper and switch it to an hourly fee.
8  Recently there was a special board meeting held, specifically
9  June 2nd, where the debtors accepted the resignation of Mr.
10 Cooper as the debtors' CRO effective as of June 30th.  At that
11 same meeting the Board of Directors authorized to replace Mr.
12 Cooper with Mr. Nystrom who is the director of restructuring
13 and promote a gentleman by the name of Bret Fernandes who is
14 also with Kroll, Zolfo, Cooper to replace Kevin Nystrom as the
15 director of restructuring.
16      The motion was necessitated by the fact that the
17 order required -- the order approving the original retention
18 required that any modifications to the executive officers, Mr.
19 Cooper and Mr. Nystrom, that we had to file a motion.  This is
20 the motion, Your Honor.  The debtors believe that the decision
21 to appoint Mr. Nystrom as the CRO and Mr. Fernandes as the
22 director of restructuring given their active involvement in the
23 cases as provided in the monthly fee statements that have been
24 filed with the Court is a sound business decision.
25      There was an informal issue raised by the Office of

1  the United States Trustee with respect to whether or not we

2  needed to adjust the monthly cap.  That was the subject of the

3  April 2008 readjustment to the engagement letter.  With the

4  agreement of the Office of the United States Trustee we are

5  adjourning whether or not the cap should be adjusted either up

6  or down to the July 17th hearing.  I have a proposed form of

7  order that has not been changed from the filed version.  I

8  don't know if anyone else wishes to be heard or if you have any

9  questions regarding the motion, Your Honor.

10            THE COURT:  No, I don't have any questions.  Mr.

11  McMahon, you're satisfied that the form of order is

12  satisfactory notwithstanding the reservation in connection with

13  the cap?

14            MR. McMAHON:  Your Honor, yes.

15            THE COURT:  Okay.

16            MR. LUNN:  May I approach?

17            THE COURT:  Yes.  Anyone else wish to be heard?  All

18  right.  Hearing none the Court will approve the motion.  All

19  right.  Anything else for today?

20            MR. LUNN:  No, Your Honor.

21            THE COURT:  Okay.  Thank you.  The hearing is

22  adjourned.

23                         * * * * *

24

25

### C E R T I F I C A T I O N

        I, KIMBERLY UPSHUR, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of my ability.


/s/ Kimberly Upshur                DATE:  July 16, 2008
KIMBERLY UPSHUR
J&J COURT TRANSCRIBERS, INC.