## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., | : Case No. 07-11047 (CSS) |
| a Delaware corporation, et al., [1] | : |
|  | : Jointly Administered |
| Debtors. | : |
|  | : **Hearing Date: August 5, 2008 at 3:00 p.m. (ET)** |
|  | **Obj. Deadline: August 1, 2008 at 4:00 p.m. (ET)** |
|  | **(Requested)** |

------------------------------------------------------------- x

**DEBTORS' MOTION PURSUANT TO FEDERAL BANKRUPTCY RULE 9019(a) AND SECTIONS 105(a), 362 AND 363 OF THE BANKRUPTCY CODE FOR AN ORDER APPROVING AND AUTHORIZING THE STIPULATION OF SETTLEMENT AMONG (I) THE DEBTORS, (II) BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT, AND (III) THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively with AHM Holdings, the "Debtors"), by

this motion (the "Motion"), seek entry of an order pursuant to Rule 9019(a) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and sections 105(a), 362 and 363 of title 11

of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving a

stipulation (the "Stipulation") by and among the Debtors, Bank of America, N.A., as

Administrative Agent, and the Official Committee of Unsecured Creditors (collectively, the

"Parties") to settle outstanding issues among them.  A copy of the Stipulation is attached as

---

[1]       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

Exhibit 1 to the form of order attached hereto as Exhibit A.  In support of the Motion, the

Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

The Debtors are pleased to report that after several months of extensive

negotiations, the Parties have finally achieved a consensual resolution of all known outstanding

issues among them.  A major component of the Stipulation is the Parties' agreement to transfer

to the Administrative Agent's designee complete dominion and control over and discretion with

respect to the Mortgage Loans, which are the principal remaining Collateral securing the

Indebtedness.  As the Court is aware, the Parties have engaged in extensive litigation over how

best to maximize the value of the Mortgage Loans.  Absent a consensual resolution of that issue,

the Debtors anticipate that the estates would incur substantial costs as a result of continued

litigation with the Administrative Agent, including with respect to the formulation and

confirmation of a chapter 11 plan.  The Debtors believe that the Stipulation achieves a favorable

result for the estates, not only because it gives the Administrative Agent the ability to control the

Mortgage Loan sale process (thereby ending the threat of continued litigation over this issue),

but it includes protections and incentives that support the Debtors' goal of maximizing value for

the estates and resolves a number of other complicated disputes in a manner that the Debtors

consider fair and reasonable.  The Debtors submit that the Stipulation serves the best interests of

these estates and their creditors and should be approved.

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief requested are sections 105(a), 362 and 363 of the Bankruptcy Code along with Bankruptcy Rule 9019.

## GENERAL BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

5.      In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

6.      These events forced the Debtors to discontinue their retail and indirect loan origination business. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their

liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

7.    Prior to the Petition Date, the Debtors entered into that certain Second Amended and Restated Credit Agreement (as subsequently amended, the "Credit Agreement"), dated as of August 10, 2006, with Bank of America, N.A., as Administrative Agent (in such capacity, the "Administrative Agent") for itself and on behalf of Deutsche Bank National Trust Company, as Collateral Agent (in such capacity, the "Collateral Agent") and certain lenders (in such capacities, the "Pre-Petition Secured Lenders" and, together with the Administrative Agent and the Collateral Agent, the "Pre-Petition Secured Parties"). As of the Petition Date, approximately $1.082 billion dollars was outstanding under the Credit Agreement (the "Indebtedness"). Pursuant to a Security Agreement dated as of August 30, 2004 (as amended, modified and supplemented, the "Security Agreement"), the Administrative Agent, for the benefit of the Pre-Petition Secured Parties, holds a security interest in and liens upon certain of the Debtors' assets.

8.    As of the Petition Date, the collateral securing the Indebtedness essentially consisted of: (i) the assets of the Debtors' mortgage loan servicing business, including servicing rights, the servicing platform, and the right to recover servicing advances (collectively, the "Servicing Assets"); (ii) certain construction-to-permanent mortgage loans originated and serviced by the Debtors (the "Construction Loans"); and (iii) certain mortgage loans originated and serviced by the Debtors (the "Whole Loans"), along with proceeds thereof such as, e.g., real estate owned as a result of foreclosures (the "REO Property" and, collectively with the Servicing Assets, the Construction Loans, and the Whole Loans, the "Pre-Petition Collateral").

A    **Cash Collateral Order**

9.    On September 4, 2008, the Court entered its Final Order (I) Authorizing

Debtors' Limited Use of Cash Collateral and (II) Granting Replacement Liens and Adequate

Protection to Certain Pre-Petition Secured Parties [D.I. 554] (as subsequently amended by D.I.s

2002, 2284, 2855, 3142, 3172 and 3699, the "Cash Collateral Order").  Pursuant to the terms of

the Cash Collateral Order, the Debtors were authorized to use the Pre-Petition Collateral,

including cash collateral, subject to certain terms and conditions set forth in the Cash Collateral

Order.

10.    Additionally, the Cash Collateral Order provided that, (i) the Debtors'

agreements, admissions and releases in Paragraphs C, D, E, F and G of the Cash Collateral Order

are binding upon the Debtors and all other parties in interest for all purposes; (ii) the obligations

of the Debtors under the Loan Documents constitute allowed claims for all purposes; (iii) the

Pre-Petition Secured Parties' security interests in and liens upon the Pre-Petition Collateral are

deemed to have been, as of the Petition Date, legal, valid, binding, perfected, first priority

security interests and liens, not subject to recharacterization, subordination or otherwise

avoidable; and (iv) the Indebtedness and the Pre-Petition Secured Parties' security interests and

liens on the Pre-Petition Collateral are not subject to any other challenge by the Debtors, the

Committee or any other party in interest seeking to exercise the rights of the Debtors' estates,

including, without limitation, any successor thereto (the "Prior Debtor Releases").

11.    The Cash Collateral Order initially provided that the Committee was

deemed to have standing to, among other things:  (i) challenge the amount, validity,

enforceability, priority or extent of the Indebtedness or the Pre-Petition Secured Parties' security

interest in the Pre-Petition Collateral or (ii) otherwise assert any claims or causes of action

against the Pre-Petition Secured Parties (the "Potential Committee Claims").  The Cash

Collateral Order established a deadline by which the Committee was required to assert any of the

Potential Committee Claims.  The Committee reviewed the potential causes of action the

Debtors' estates may have had against the Administrative Agent and narrowed the Potential

Committee Claims to the following:  (i) whether the Administrative Agent's interests are

perfected with respect to the REO Property and certain proceeds thereof; (ii) whether certain

funds received by the Administrative Agent or held in certain specified bank accounts constitute

Pre-Petition Collateral; and (iii) whether, in the event that the Pre-Petition Secured Parties'

claims are determined to be undersecured, certain fees and expenses that the Debtors paid to the

Administrative Agent pursuant to the Cash Collateral Order should be applied to reduce the

principal amount of the Indebtedness (the "Remaining Issues").[2]  Through various stipulated

agreements, the Administrative Agent provided the Committee with an ultimate deadline of

March 12, 2008 to bring an adversary proceeding or contested matter for purposes of seeking a

determination of the Remaining Issues.

**B.      Administrative Agent's Motion for Relief from the**
**         Automatic Stay to Foreclose upon the Mortgage Loans**

                12.     On February 22, 2008, the Administrative Agent filed its Motion for

Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing the Administrative Agent

to Exercise its Rights as a Secured Creditor [Docket No. 3054] (the "Stay Relief Motion"), in

which it sought authority to sell certain of the Mortgage Loans with approximately $580 million

in unpaid principal balance.  On March 6, 2008, the Debtors filed their preliminary objection to

the Stay Relief Motion [Docket No. 3175] (the "Preliminary Objection"), which responded to the

---

[2]        The summary of the Remaining Issues are provided as a convenience only.  The Remaining Issues are set
forth in Second Stipulation and Order regarding the use of Cash Collateral [D.I. 2855] (the "Second Cash Collateral
Stipulation").  The Second Cash Collateral Stipulation shall control in the case of any conflict.

allegations made in the Stay Relief Motion. Subsequent to the filing of the Stay Relief Motion, the Administrative Agent and the Committee negotiated and executed the Committee Settlement (as hereinafter defined), and the Committee ultimately filed a Statement in Support of the Stay Relief Motion [Docket No. 3175].

The BofA-Committee Settlement

13.     On March 14, 2008 (the "Committee Settlement Motion"), the Committee and the Administrative Agent filed a joint motion to approve a settlement stipulation between them (the "Committee Settlement") [Docket No. 3318].

14.     The Debtors, the US Trustee and the Purchaser (as defined below) filed objections to the Committee Settlement Motion.  At the conclusion of the April 14, 2008 hearing on the Committee Settlement Motion, the Committee Settlement was approved by order of the Court [Docket No. 3699].

Denial of the Stay Relief Motion

15.     Interested parties submitted pretrial briefing to the Court related to the Stay Relief Motion.  On April 16 and 17, the Court held an evidentiary hearing on the Stay Relief Motion.  At the conclusion of the Administrative Agent's case in chief, the Debtors moved to dismiss the Stay Relief Motion for failure to establish a *prima facie* case, which dismissal was granted, and, by Order dated April 25, 2008 [Docket No. 3850], the Court denied the Stay Relief Motion.

**C.     Disposition of the Pre-Petition Collateral**

16.     Since the Petition Date, the Debtors have disposed of a portion of the Pre-Petition Collateral through, among other things:  (i) selling the Servicing Assets; (ii) selling certain non-performing Mortgage Loans; and (iii) obtaining authority to purchase and compromise the Construction Loans.  The proceeds from those transactions, along with the

income received by the Debtors in the ordinary course, including the funds received from the

borrowers under the Mortgage Loans and the sale of certain REO Property, have been used to

reduce the Indebtedness. The amount of the outstanding Benchmark Pre-Petition Claim (as

defined in the Stipulation) as of July 2, 2008 is $468,128,691.58.

Sale of the Debtors' Servicing Business

17.    Prior to the Petition Date, a large component of the Debtors' business was

the servicing of mortgage loans (the "Servicing Business"). In addition to the separate sales of

other servicing rights, commencing on October 2, 2007, this Court held a hearing (the "Sale

Hearing") to consider the Debtors' motion to sell the Servicing Business. By Order dated

October 30, 2007 [Docket No. 1711] (the "Sale Order"), the Court approved and authorized the

sale of the Debtors' Servicing Business (the "Servicing Sale") to AH Mortgage Acquisition Co.,

Inc., an affiliate of W.L. Ross & Co., LLC (such affiliate, the "Purchaser") pursuant to the terms

of that certain Asset Purchase Agreement dated as of September 25, 2007 (as amended and

together with all exhibits and schedules thereto, the "APA").

18.    The Sale Order is currently the subject of an appeal pending before the

United States District Court brought by DB Structured Products, Inc. (the "Appeal").

19.    Pursuant to the APA, the Servicing Sale closed in two steps. At the

"economic" close, which occurred on November 16, 2007 (the "Initial Closing"), the Purchaser

paid the Purchase Price in the manner and to the parties as provided in the APA and related

agreements referenced therein. From the Initial Closing Date until the "legal" close (the "Final

Closing"), the Debtors agreed to operate the Servicing Business in the ordinary course of

business, subject to the Bankruptcy Exceptions (as defined in the APA), for the economic benefit

and risk of the Purchaser. The Final Closing occurred on April 11, 2008. The Purchaser is

currently acting as the subservicer of the Mortgage Loans, as well as other loans owned by the

Debtors. The parties to the Servicing Sale are currently resolving certain claims, including, but

not limited to disputed cure claims, that arose from the Servicing Sale.

Purchase and Compromise of the Construction Loans

20.    Following the Petition Date, the Debtors made several attempts to

negotiate a sale of the Construction Loans to third parties. However, the Debtors were unable to

obtain an offer to purchase the loans which, in their sound business judgment, would provide

reasonably sufficient value for the assets. On December 4, 2007, the Administrative Agent filed

a motion for relief from the automatic stay which, *inter alia*, sought to compel the sale of the

Construction Loans. While the Debtors opposed the requested relief, the Debtors and the

Administrative Agent were able to negotiate a compromise whereby the Debtors "purchased" the

Construction Loans free and clear of the Administrative Agent's interest.

Sale of the Non-Performing Loans

21.    By order dated March 14, 2008, the Court approved the sale of certain of

the Mortgage Loans to Beltway Capital, LLC ("Beltway") pursuant to that certain Loan Sale and

Interim Servicing Agreement dated as of March 11, 2008 by and among Beltway and certain of

the Debtors [Docket No. 3283] (the "Beltway Sale"). The Beltway Sale closed on March 15,

2008.

**D.    Other Disputes**

Designated Bank Accounts Dispute

22.    In the days leading up to and following the Petition Date, certain funds

were transferred into the Debtors' bank accounts (the "Bank Accounts") and certain funds were

transferred from the Bank Accounts to the Administrative Agent (collectively, the "Designated

Funds") which funds the Administrative Agent contended were part of its Pre-Petition Collateral. The Debtors disputed this contention.  Following the Petition Date, certain banks froze the Designated Funds pending resolution of certain disputes related to the Designated Funds, among them being whether the Administrative Agent properly received certain of the Designated Funds or whether the Administrative Agent held any interests, liens or encumbrances upon certain of the Designated Funds.

Servicing Advances

23.     In the ordinary course of business, AHM Corp. would make payment for Lender Purchased Mortgage Insurance ("LPMI") to third parties, and AHM SV would subsequently reimburse AHM Corp. for those payments.  Prior to the Initial Closing, AHM Corp. made payments for the purchase of LPMI which amount had not been reimbursed by AHM SV as of the Initial Closing.  AHM Corp. has sought reimbursement of these amounts from the proceeds of the Servicing Sale, and the Administrative Agent has taken the position that AHM SV is not responsible for the amounts paid by AHM Corp. for LPMI and, accordingly, that such amounts are not chargeable against the proceeds of the Servicing Sale (the "LPMI Dispute").

24.     In addition, the Debtors have funded certain servicing advances related to the Mortgage Loans since the Petition Date (the "Servicing Advances").  The Debtors have sought to recover the Servicing Advances from funds received that are related to the Mortgage Loans.  The Administrative Agent has contested the Debtors' ability to net Servicing Advances against funds received by the Debtors related to the Mortgage Loans or otherwise recover the Servicing Advances from the Pre-Petition Collateral (the "Servicing Advances Dispute").

Professional Fees Subject to Reimbursement

25.     Since the Petition Date, the Debtors and their professionals have undertaken to dispose of certain of the Pre-Petition Collateral.  The Debtors have asserted that they are entitled to reimbursement from the Administrative Agent for the professional fees incurred and paid by the Debtors in disposing of the Pre-Petition Collateral.  The Administrative Agent has consented to the reimbursement of certain professional fees and contested others.

The Calyon Servicing Litigation

26.     Following the commencement of these cases, Calyon New York Branch, as Administrative Agent ("Calyon"), brought an adversary proceeding for turnover of certain assets received by the Debtors which Calyon alleged were received in violation of that certain Repurchase Agreement dated November 21, 2006 (the "Calyon Repo"), among certain of the Debtors, Calyon and the lenders thereto (the "Calyon Claims").  In turn, the Debtors counter-claimed against Calyon which requested, among other things, the payment of certain servicing fees alleged due and owing under the Calyon Repo (the "Calyon Servicing Litigation Claims," and with the Calyon Claims, the "Calyon Adversary").  Calyon subsequently filed its motion to compel the turnover of certain monies allegedly due and owing under the Calyon Claims (the "Calyon Motion"), and the Administrative Agent sought to intervene with respect to the Calyon Motion, which intervention the Court subsequently granted.  By stipulation dated April 11, 2008, Calyon and the Debtors resolved a significant number of the issues under the Calyon Motion, which the Court approved on May 1, 2008 [Docket No. 3918] (the "Calyon Order").  The balance of the Calyon Adversary and the Calyon Motion remains before the Court.

E.     **Freddie Mac Servicing Rights**

27.     Prior to the Petition Date, the Debtors served as the servicer of a portfolio of loans (the "Freddie Mac Loans") owned by the Federal Home Loan Mortgage Corporation

("Freddie Mac"). In addition, the Administrative Agent held a security interests in the Debtors'

rights to service the Freddie Mac Loans (the "Freddie Mac Servicing Rights"), subject to the

terms and conditions of a pre-petition acknowledgement agreement. During these cases, Freddie

Mac has asserted that, prior to the Petition Date, it validly terminated the Freddie Mac Servicing

Rights, a claim which the Debtors contested. In order to resolve the dispute as to Freddie Mac's

termination of the Freddie Mac Servicing Rights, the Debtors, the Administrative Agent and

Freddie Mac entered into a series of stipulations whereby the Debtors would (i) seek to sell the

Freddie Mac Servicing Rights, and (ii) in the interim, transfer the servicing of the Freddie Mac

Loans to the Administrative Agent pending a sale of the Freddie Mac Servicing Rights. To date,

the contemplated sale of the Freddie Mac Servicing Rights has not occurred, and the

Administrative Agent continues to service the Freddie Mac Loans on an interim basis.

## RELIEF REQUESTED

28.    By this Motion, the Debtors respectfully request entry of an order

approving the Stipulation pursuant to Bankruptcy Rule 9019(a) and sections 105(a), 362 and 363

of the Bankruptcy Code. The salient terms of the Stipulation[3] are:

- **Reaffirmation of Prior Releases**. The Debtors and the Committee will confirm they have no claims under the Loan Documents against the Pre-Petition Secured Parties or with respect to the Collateral other than those being resolved pursuant to the Stipulation. The Debtors and the Committee will (i) reaffirm the Prior Releases, and (ii) agree not to assert any other or further claims that were released pursuant to the Prior Releases or are being released pursuant to the Stipulation

- **Transfer of the Mortgage Loans**. (a) Bank of America, N.A. or its designee (the "New Servicer") will receive complete dominion and control over and discretion with respect to the Mortgage Loans and all servicing rights related thereto.

---

[3]        Any terms used but not defined in this summary of the Stipulation shall have meaning ascribed to such terms in the Stipulation. The summary of the terms of the Stipulation contained herein is for convenience only. In the event of any inconsistency, the Stipulation shall govern. Interested parties are encouraged to review the Stipulation in its entirety.

(b) The New Servicer will have complete responsibility for making all servicing advances and paying all other amounts required to be paid in connection with servicing the Mortgage Loans that arise from and after the Mortgage Loan Transfer Date. The New Servicer will be reimbursed from the first proceeds of Collateral, and to the extent that Collateral proceeds are insufficient, the New Servicer will be entitled to payment from the Pre-Petition Secured Parties. Amounts paid or reimbursed to the New Servicer will not be applied to reduce the Pre-Petition Secured Parties' claims under the Master Proof of Claim.

(c) If the Mortgage Loan Transfer Date does not occur within thirty (30) days after the Effective Date of the Stipulation, the Debtors will be entitled to reimbursement from the Collateral for servicing advances and other amounts required to be paid from that date until the Loan Transfer Date. Amounts paid in respect of such reimbursement will not be applied to reduce the Pre-Petition Secured Parties' claims asserted in the Master Proof of Claim.

(d) The Debtors will have no obligations with respect to the Mortgage Loans that arise from and after the Mortgage Loan Transfer Date.

(e) If the Debtors continue to own the Mortgage Loans after the Mortgage Loan Transfer Date, all costs associated with the continued ownership of the Mortgage Loans by the Debtors or any successor or assign of the Debtors after the Mortgage Loan Transfer Date will be satisfied from the proceeds of Collateral, however, such reimbursement will not be applied to reduce the Pre-Petition Secured Parties' claims asserted in the Master Proof of Claim.

- **Resolution of the LPMI Dispute**. The Debtors will release all rights and claims against the Pre-Petition Secured Parties with respect to LPMI Dispute, and the Administrative Agent will retain the approximately $5.4 million that is being held by the Administrative Agent pursuant to a letter agreement attached to the Stipulation as Exhibit A.

- **Resolution of Claims Relating to Designated Bank Accounts**. The Pre-Petition Secured Parties assign the Debtors their rights, liens and claims with respect to the approximately $6.898 million currently in the Designated Bank Accounts.

- **Pre-Petition Setoffs and Post-Petition Receipts**. To the extent not already waived and released pursuant to the Prior Releases, the Debtors will release all rights and claims against the Pre-Petition Secured Parties with respect to amounts paid to the Pre-Petition Secured Parties or applied to the obligations owing under the Loan Documents.

- **Servicing Advances Made By the Debtors**. The Debtors will release all claims against the Pre-Petition Secured Parties for reimbursement of Servicing Advances made prior to the Mortgage Loan Transfer Date. The Debtors will be entitled to retain from proceeds of Collateral cash in an amount equal to $251,968.45 in full satisfaction of the Debtors' claims for reimbursement of Advances the Debtors repurchased under the APA.

- **Reimbursement Claims for Professional Fees and Expenses**. Except as expressly provided otherwise in paragraphs 4(e), 13, 14 and 20(e) of the Stipulation, the Debtors will

release all claims against the Pre-Petition Secured Parties for professional fees related to the Pre-Petition Collateral.

- **Allocation of Calyon Servicing Litigation Proceeds**. To the extent the Debtors are entitled to proceeds of any type from the Calyon Litigation with respect to servicing rights, servicing fees or other servicing obligations, the Calyon Servicing Litigation Proceeds will be distributed as follows: (i) the Debtors will be entitled to retain (x) the first $2.6 million in cash proceeds, plus (y) an amount not to exceed in the aggregate $1 million that the Debtors and the Administrative Agent agree is necessary to resolve certain ancillary payment issues; and (ii) all other Calyon Servicing Litigation Proceeds will be paid or transferred to the Administrative Agent.

- **DB Appeal**. The Administrative Agent will have complete control and discretion with respect to the Appeal. The costs of the Appeal will be paid from the proceeds of the Collateral. Amounts paid related to the Appeal will not be applied to reduce the Pre-Petition Secured Parties' claims under the Master Proof of Claim.

  **Cure Claims Escrow**. Responsibility for litigating or otherwise resolving specific claims against the Cure Claims Escrow will be allocated between the Administrative Agent and the Debtors and set forth on Exhibit B to the Stipulation. Their respective amounts will be paid from the proceeds of the Collateral.

- **Designated REO Property**. The agreement between the Administrative Agent and the Committee with respect to the Designated REO Property will remain in full force and effect.

- **Sharing of Cash Receipts**. Paragraph 3 of the Committee Settlement, which provides for the sharing of Collateral and other cash receipts will be replaced with a new sharing agreement that permits the Debtors to receive fifty (50%) percent of proceeds of Collateral after the Benchmark Pre-Petition Claim has been paid in full. The parties have agreed that the outstanding amount of the Benchmark Pre-Petition Claim as of July 2, 2008 is $468,128,691.58.

- **Certain Outstanding Servicing Sale Proceeds**. All proceeds from the sale or other disposition of the Debtors' servicing rights and other servicing assets to parties other than the Purchaser, to the extent not already paid, will be distributed in accordance with the applicable Order of this Court.

- **Freddie Mac Servicing Rights**. Upon written request of the Administrative Agent, the Debtors will file and prosecute a motion in this Court for authority to abandon the Debtors' servicing rights with respect to the mortgage loans owned by the Federal Home Loan Mortgage Corporation, with the costs thereof to be borne by the Debtors.

- **Cessation of HELOC Advances**. The Debtors agree not to use or authorize the use of Collateral to fund advances to borrowers under home equity lines of credit.

- **State Bond Loans**. (a) The Debtors will provide the Administrative Agent with a list of, and certain documents or information with respect to, the BofA State Bond Loans and the Calyon State Bond Loans.

(b) The Debtors' standing to seek relief from the Bankruptcy Court with respect to the State Bond Loans will be delegated to the Administrative Agent or its designee.

(c) At the direction of the Administrative Agent, the Debtors will deliver all loan files, agreements, records and other documents in the Debtors' possession or control relating to the State Bond Loans to the Administrative Agent or its designee.

(d) The Administrative Agent and its designee, if any, and the Debtors will be entitled to reimbursement from the Collateral for their respective costs in connection with seeking recovery of value from the State Bond Loans, and amounts paid in respect of such reimbursement will not be applied to reduce the Pre-Petition Secured Parties' claims asserted in the Master Proof of Claim.

## BASIS FOR RELIEF REQUESTED

29.    Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P 9019(a). The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006); see also In re Penn Central Transportation Co., 596 F.2d 1102 (3d Cir. 1979) ("'administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims . . . .'"), quoting In re Protective Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

30.    In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimated the complexity, expense and likely duration of such litigation, and other factors relevant to a full and

fair assessment of the [claims]." In re Penn Central Transportation Co., 596 F.2d 1127, 1153 (3d Cir. 1979); see also In re Marvel Entertainment Group, Inc., 222 B.R. 243 (D. Del. 1998) (quoting, In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (describing "the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

      31.     The Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a settlement should be approved.  The four enumerated factors are:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  Meyers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); accord Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006).

      32.     The decision to approve a settlement "is within the sound discretion of the bankruptcy court."  In re World Health Alternatives, Inc., 344 B.R. at 296; see also In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in Meyers v. Martin (In re Martin), 91 F.3d 389.  The bankruptcy court should not substitute its judgment for that of the debtor.  See In re Neshaminy Office Building Associates, 62 B.R. at 803.  The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.  See In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); see also In re World Health Alternatives, Inc., 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

33.     Additionally, to the extent that sections 362 and 363 of the Bankruptcy
Code are implicated in connection with the settlement embodied in the Stipulation, the Debtors
seek authority thereunder to approve and effectuate the Stipulation.  The Debtors submit that the
terms of the Stipulation have a sound business purpose and represent the exercise of their sound
business judgment and, accordingly, any actions required to effectuate the terms of the
Stipulation should be authorized and approved pursuant to Section 363(b).  See In re Lionel
Corp., 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge
determining a 363(b) application expressly find from the evidence presented before him a
good business reason to grant the application."); In re Delaware Hudson Ry. Co., 124 B.R.
169, 179 (Bankr. Del. 1991).  The foregoing reasons also establish that "cause" exists for the
court to modify the automatic stay, to the extent that it applies, pursuant to section 362(d)(1),
to effectuate the terms of the Stipulation.  See 11 U.S.C. § 362(d)(1) ("[T]he court shall grant
relief from the stay provided under subsection (a) of this section . . . for cause[.]").  Finally,
authorizing the Debtors to enter into and effectuate the terms of the Stipulation is well within
the equitable powers of this court.  See 11 U.S.C. § 105(1) ("The court may issue any order,
process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." );
See also Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986)
("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant
to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R.
531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it
has a duty to protect whatever equities a debtor may have in property for the benefit of its
creditors as long as that protection is implemented in a manner consistent with the bankruptcy
laws.").

34.    The Debtors respectfully request that the Court approve the Stipulation because it lies well above the lowest point in the range of reasonable potential litigation possibilities.  Since the inception of these cases, the Debtors, the Administrative Agent, and, since appointed, the Committee have been negotiating and litigating over the rights and obligations of the Debtors and their estates vis a vis the Pre-Petition Secured Parties.  Following months of discussion and negotiation, which were at times contentious, and have left a paper-trail throughout the Court's docket, the Parties have agreed on a resolution of outstanding issues among them which is embodied in the Stipulation.  Settlement of these issues removes one of the greatest obstacles in these cases and allows the Debtors to efficiently and effectively move forward with the wind-down of their estates.  Each of the applicable Martin factors weigh in favor of approving the Stipulation.  Accordingly, the Stipulation should be approved pursuant to Bankruptcy Rule 9019 and section 105(a), 362 and 363 of the Bankruptcy Code.

## A.    The Probability Of Success In Litigation

35.    The settlement embodied in the Stipulation seeks to resolve numerous disputes and controversies between the Debtors and the Administrative Agent which have many moving parts and will often implicate the rights and interests of multiple third parties.  Due to the complexity and, at times, novelty of many of the disputed issues being resolved, the outcome of the litigation over each matter is uncertain.  Absent the settlement embodied in the Stipulation, the Debtors would be forced to litigate with the Administrative Agent in a piecemeal fashion over many separate complicated disputes, creating increased costs to the estate with little certainty as to what the outcome of each disputed issue may be.  The Stipulation, however, provides an efficient resolution for the Parties with definite outcomes as to each of the Global Issues and avoids the uncertainties inherent in litigating such complex and novel matters.

Accordingly, the Debtors submit that resolution of the Global Issues pursuant to the Stipulation meets the first factor of the Martin test.

**B.      The Complexity Of The Litigation Involved, And The Expense, Inconvenience And Delay Necessarily Attending It**

36.      The Stipulation satisfies the second factor in Martin's four-factor test as failure to achieve a consensual resolution threatens to drag these cases on and cannibalize the assets of these estates through litigation—an effect which will be borne by the Debtors' unsecured creditors.  There is no doubt that each of the settled issues in and of themselves would lead to complex, extensive, costly and time consuming litigation if not resolved.

37.      Litigating each issue to its conclusion would create an extreme delay in moving forward with the Debtors' liquidation of their estates and would continue to divert the attention of the Debtors' professionals from the wind-down of these cases.  Such delay is not only unnecessary but is also prejudicial to the parties that stand to lose the most if the Global Issues are not resolved—unsecured creditors.  Accordingly, this factor weighs in favor of approving the Stipulation.

**C.      The Paramount Interest Of Creditors**

38.      The Stipulation serves the paramount interest of the Debtors' creditors. There is no better evidence of this than the Committee's ultimate approval of the Stipulation. The Stipulation resolves the issues now outstanding among the Debtors, the Administrative Agent and the Committee.  This resolution will reduce the burden and administrative expense on the estates and will allow the Debtors' professionals to enhance their focus on confirming a plan of reorganization or liquidation.

39.      The Stipulation also serves to alleviate certain liquidity constraints that the Debtors may face as they work toward confirming a plan and prudently disposing of their

remaining assets. First, the Stipulation resolves the dispute with the Administrative Agent over the Designated Funds. Second, the Debtors will be entitled to receive the first proceeds upon resolution of the Calyon Servicing Litigation. Further, the Debtors will be able to apply a portion of the Pre-Petition Collateral to satisfy certain other costs and liabilities which may arise. Finally, the Stipulation provides unsecured creditors with a mechanism that fairly and efficiently apportions the Pre-Petition Collateral among the Administrative Agent and the unsecured creditors upon the satisfaction of the Benchmark Pre-Petition Claim and limits the potential deficiency claim of the Pre-Petition Secured Parties.

40.    The Stipulation is in the best interest of the Debtors' creditors because it allows the Debtors to avoid the costs of litigation and reduces the cost of maintaining the Pre-Petition Collateral, while providing immediate access to liquidity to meet the needs inherent in pursing a plan of confirmation. Accordingly, the third Martin factor is met.

### D.    The Likely Difficulties In Collection

41.    Finally, the fourth factor enunciated by the Third Circuit in Martin is satisfied. As noted above, the Parties have agreed to resolve their disputes over the Designated Funds and other estate property. With these matters resolved, the Debtors can proceed with enforcing their remaining rights in such property without needing to also dispute competing claims that the Administrative Agent may have in the same property. Moreover, as set forth in the Stipulation, the Administrative Agent has consented to the Debtors' use of the Pre-Petition Collateral to pay down certain claims and has allocated other funds directly to the Debtor free and clear of the Administrative Agent's claims on that property.

### E.    Summary

42.    The settlement embodied in the Stipulation: (i) is fair and equitable; (ii) represents a settlement that rests well above the lowest point in the reasonable range of potential

litigation outcomes; (iii) obviates the expense, delay, inconvenience and uncertainty that would attend any litigation of the such issues; and (iv) advances the paramount interests of creditors by adding value, as a matter of certainty, to the Debtors' estate.  Therefore, the Stipulation satisfies Bankruptcy Rule 9019 and should be approved by the Court.

## NOTICE

43.    Notice of this Motion will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the Administrative Agent; (iv) Counsel to the Debtors' Postpetition Lender; and (v) all parties entitled to notice under Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

44.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter an order, in the form attached hereto as Exhibit A, (i) approving the Stipulation pursuant to Bankruptcy Rule 9019(a) and sections 105(a), 362 and 363 of the Bankruptcy Code, and (ii) granting such other and further relief as may be just and proper.

Dated:  Wilmington, Delaware
        July 18, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton (No. 2202)
Robert S. Brady (No. 2847)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors-in-Possession