## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMERICAN HOME MORTGAGE<br>HOLDINGS, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 07-11047 (CSS)<br>(Jointly Administered) |

## NOTICE OF TRANSFER OF CLAIM PURSUANT TO F.R.B.P. RULE 3001(e)(2) FOR FILED CREDITOR INDYMAC BANK, F.S.B., CLAIM NO. 8677, IN THE AMOUNT OF $30,933,097.15, TO INDYMAC FEDERAL BANK, F.S.B.

To Transferor:　　　FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER
　　　　　　　　　　OF INDYMAC BANK, F.S.B.
　　　　　　　　　　ATTN: Associate Director, Receivership Operations
　　　　　　　　　　1601 Bryan Street
　　　　　　　　　　Dallas, Texas 75201

PLEASE TAKE NOTICE that the transfer of the above-referenced General Unsecured claim has been transferred to:

Transferee:　　　　FEDERAL DEPOSIT INSURANCE CORPORATION, AS
　　　　　　　　　　CONSERVATOR FOR INDYMAC FEDERAL BANK, F.S.B.
　　　　　　　　　　ATTN: Sunny K. Hur, Litigation Counsel
　　　　　　　　　　3465 Foothill Blvd.
　　　　　　　　　　Pasadena, CA 91107

A true and correct copy of the Purchase and Assumption Agreement among i) the Federal Deposit Insurance Corporation as receiver of IndyMac Bank, F.S.B., ii) the Federal Deposit Insurance Corporation, and iii) the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, F.S.B. is attached hereto pursuant to Rule 3001(e). No action is required if you do not object to the transfer of your claim. However, if you do object to the transfer of your claim, within 20 days of the date of this notice, you must:

- FILE A WRITTEN OBJECTION TO THE TRANSFER with:

　　　　　　　　　　Deputy Clerk
　　　　　　　　　　United States Bankruptcy Court
　　　　　　　　　　824 N. Market Street, 3rd Floor
　　　　　　　　　　Wilmington, DE 19801

- SEND A COPY OF YOUR OBJECTION TO THE TRANSFEREE.
　　　　　　　　　　Refer to INTERNAL CONTROL NO. ___ in your objection.
　　　　　　　　　　If you file an objection, a hearing will be scheduled

If your objection is not timely filed, the transferee will be substituted on our records as the claimant in this proceeding.

Dated: August 13, 2008

*(For Clerk's Office Use Only):*
This notice was mailed to the first named party, by first class mail, postage prepaid on _____, 2008.
INTERNAL CONTROL NO. _____
Copy: (check) Claims Agent _____ Transferree_____ Debtor's Attorney_____

Deputy Clerk

INSURED DEPOSIT
PURCHASE AND ASSUMPTION AGREEMENT


AMONG

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF INDYMAC BANK, FSB
PASADENA, CALIFORNIA, USA

FEDERAL DEPOSIT INSURANCE CORPORATION

and

FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB
PASADENA, CALIFORNIA


DATED AS OF

JULY 11, 2008

**ARTICLE I - DEFINITIONS** ........................................................................... 2

    **Accounting Records** ................................................................... 2

    **Acquired Subsidiaries** ............................................................... 2

    **Adversely Classified** ................................................................. 2

    **Affiliate** .................................................................................... 2

    **Affiliated Funding** .................................................................... 2

    **Agreement** ................................................................................ 2

    **Assets** ....................................................................................... 2

    **Assumed Deposits** .................................................................... 2

    **Bank Premises** .......................................................................... 3

    **Book Value** ............................................................................... 3

    **Business Day** ............................................................................ 3

    **Chartering Authority** ................................................................ 3

    **Commitment** ............................................................................. 3

    **Credit Documents** ..................................................................... 4

    **Credit File** ................................................................................ 4

    **Data Processing Lease** .............................................................. 4

    **Deposit** ..................................................................................... 4

    **Failed Bank Advances** .............................................................. 4

    **Fair Market Value** .................................................................... 4

    **Fixtures** .................................................................................... 5

    **Furniture and Equipment** ......................................................... 5

    **Indemnitees** .............................................................................. 5

    **Insured Deposit** ........................................................................ 5

    **Initial Payment** ......................................................................... 5

    **Legal Balance** ........................................................................... 5

    **Liabilities Assumed** .................................................................. 6

    **Lien** .......................................................................................... 6

    **Loans** ....................................................................................... 6

    **Obligor** ..................................................................................... 6

    **Payment Date** ........................................................................... 6

    **Person** ...................................................................................... 6

    **Primary Indemnitor** .................................................................. 6

    **Put Date** ................................................................................... 7

    **Put Notice** ................................................................................ 7

    **Qualified Financial Contract** .................................................... 7

    **Record** ...................................................................................... 7

    **Related Liability** ....................................................................... 7

    **Related Liability Amount** .......................................................... 7

    **Repurchase Price** ...................................................................... 7

    **Resolution Date** ........................................................................ 8

    **Safe Deposit Boxes** .................................................................. 8

    **Settlement Date** ........................................................................ 8

    **Settlement Interest Rate** ............................................................ 8

Subsidiary ....................................................................................................... 8


ARTICLE II - ASSUMPTION OF LIABILITIES ............................................... 9
    2.1     Liabilities Assumed by Assuming Bank....................................................... 9
    2.2     Interest on Deposit Liabilities ................................................................. 11
    2.3     Unclaimed Deposits................................................................................ 11
    2.4     Employee Benefit Plans .......................................................................... 11


ARTICLE III - PURCHASE OF ASSETS ......................................................... 12
    3.1     Assets Purchased by Assuming Bank........................................................ 12
    3.2     Consideration ........................................................................................ 14
    3.3     Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.................. 14
    3.4     Assets Not Acquired by Assuming Bank ................................................... 14
    3.5     Loans Essential to Receiver.................................................................... 15
    3.6     Puts of Assets to the Receiver ................................................................. 16
      (a)     Puts Prior to the Settlement Date ..................................................... 16
      (b)     Notices to the Receiver...................................................................... 17
      (c)     Purchase by Receiver....................................................................... 17
      (d)     Purchase Price and Payment Date .................................................... 17
      (e)     Servicing........................................................................................... 17
      (f)     Reversals .......................................................................................... 17
    3.5     Assets Not Purchased by Assuming Bank ................................................. 18
    3.6     Assets Essential to Receiver .................................................................... 19


ARTICLE IV - ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS ................. 19
    4.1     Continuation of Banking Business .......................................................... 19
    4.2     Agreement with Respect to Credit Card Business...................................... 20
    4.3     Agreement with Respect to Safe Deposit Business..................................... 20
    4.4     Agreement with Respect to Safekeeping Business...................................... 20
    4.5     Agreement with Respect to Trust Business................................................ 20
    4.6     Agreement with Respect to Leases........................................................... 21
      (a)     Option to Assume.............................................................................. 21
      (c)     Facilitation ....................................................................................... 21
      (d)     Occupancy ........................................................................................ 21
      (e)     Occupancy Costs ............................................................................... 21
      (f)     Certain Requirements as to Furniture, Equipment and Fixtures.............. 22
      (g)     Vacating Premises.............................................................................. 22
      (h)     Furniture and Equipment and Certain Other Equipment ..................... 23
    4.7     Agreement with Respect to Leased Data Processing Equipment ................ 23
    4.8     Agreement with Respect to Certain Existing Agreements .......................... 23
    4.9     Informational Tax Reporting ................................................................... 24
    4.10    Insurance................................................................................................ 24
    4.11    Office Space for Receiver and Corporation .............................................. 24
    4.12    Reserved................................................................................................ 25
    4.13    Agreement with Respect to Interim Asset Servicing and Interim Management .. 25
    4.14    Agreement With Respect to Certain Back Room Functions and Certain Data
Processing Services ........................................................................................ 25

ii

**ARTICLE V - DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK** 26
5.1    Payment of Checks, Drafts and Orders ................................................................ 26
5.2    Certain Agreements Related to Deposits ............................................................ 26
5.3    Notice to Depositors ........................................................................................... 26

**ARTICLE VI - RECORDS** .................................................................................................. 26
6.1    Transfer of Records ............................................................................................ 26
6.2    Delivery of Assigned Records ........................................................................... 27
6.3    Preservation of Records ..................................................................................... 27
6.4    Access to Records; Copies ................................................................................ 27

**ARTICLE VII - INITIAL PAYMENT; FINAL DISTRIBUTION** ............................................ 28
7.1.    Initial Payment ................................................................................................. 28
7.2.    Final Distribution ............................................................................................. 28

**ARTICLE VIII - ADJUSTMENTS** ....................................................................................... 28
8.1    Pro Forma Statement ......................................................................................... 28
8.2    Correction of Errors and Omissions; Other Liabilities ..................................... 29
8.3    Payments ........................................................................................................... 29
8.4    Interest .............................................................................................................. 29
8.5    Subsequent Adjustments ................................................................................... 29

**ARTICLE IX - CONTINUING COOPERATION** ................................................................. 30
9.1    General Matters ................................................................................................. 30
9.2    Additional Title Documents .............................................................................. 30
9.3    Claims and Suits ............................................................................................... 30
9.4    Payment of Deposits .......................................................................................... 30
9.5    Withheld Payments ........................................................................................... 31
9.6    Proceedings with Respect to Certain Assets and Liabilities ............................. 31
9.7    Information ........................................................................................................ 32

**ARTICLE X - CONDITION PRECEDENT** ......................................................................... 32

**ARTICLE XI - REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK** ...... 32
11.1    Corporate Existence and Authority ................................................................ 32
11.2    Third Party Consents ...................................................................................... 32
11.3    Execution and Enforceability.......................................................................... 32
11.4    Compliance with Law ..................................................................................... 32
11.5    Representations Remain True .......................................................................... 33

**ARTICLE XI - INDEMNIFICATION** ................................................................................. 33
12.1    Indemnification of Indemnitees ...................................................................... 33
12.2    Conditions Precedent to Indemnification ........................................................ 36
12.3    No Additional Warranty .................................................................................. 37
12.4    Indemnification of Receiver and Corporation ................................................. 37

12.5    Obligations Supplemental ................................................................ 37
12.6    Criminal Claims ............................................................................ 38
12.7    Limited Guaranty of the Corporation ............................................. 38
12.8    Subrogation .................................................................................. 38

ARTICLE XII - MISCELLANEOUS ................................................................ 38
13.1    Entire Agreement .......................................................................... 38
13.2    Headings ....................................................................................... 38
13.3    Counterparts ................................................................................. 38
13.4    Governing Law .............................................................................. 39
13.5    Successors ..................................................................................... 39
13.6    Modification; Assignment ............................................................. 39
13.7    Notice ............................................................................................ 39
13.8    Manner of Payment ....................................................................... 40
13.9    Costs, Fees and Expenses ............................................................. 40
13.10    Waiver ........................................................................................ 40
13.11    Severability ................................................................................ 40
13.12    Term of Agreement ..................................................................... 41
13.13    Survival of Covenants, Etc ......................................................... 41
SCHEDULE 2.1 - Certain Liabilities Assumed ............................................ 43
SCHEDULE 3.1 - Certain Assets Purchased ............................................... 44
    SCHEDULE 3.1(e) - Loans Fully Secured by Assumed Deposits ........... 45
SCHEDULE 3.1(E) Loans Fully Secured by Assumed Deposits .................... 45
SCHEDULE 3.1(v) - Other Real Estate Purchased ...................................... 46
SCHEDULE 3.1(h) - Acquired Subsidiaries ................................................ 47
SCHEDULE 3.2 - Purchase Price of Assets or assets ................................. 48
SCHEDULE 3.5(k) - Securities Not Purchased ........................................... 49
EXHIBIT 3.1(U) -- Valuation of Certain Qualified Financial Contracts ........ 50
Exhibit 4.13 - Interim Asset Servicing Arrangement .................................. 52
    INTERIM MANAGEMENT ARRANGEMENT ........................................... 54
EXHIBIT 4.13(a) - Interim Management Arrangement ................................. 54
    DEFINITIONS ....................................................................................... 54

## INSURED DEPOSIT PURCHASE AND ASSUMPTION AGREEMENT

**THIS AGREEMENT**, made and entered into as of July 11, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of INDYMAC BANK, FSB,** Pasadena, California USA (the "Receiver"), **FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB,** organized under the laws of the United States of America, and having its principal place of business in Pasadena, California, USA, (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

— — — — —

### WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed IndyMac Bank, FSB (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, pursuant to 12 U.S.C. § 1821(d)(2)(F)(i), with respect to savings banks and by application to the OTS, the Receiver may organize a new Federal savings association to take over such assets or liabilities as the Corporation may determine to be appropriate; and

**WHEREAS**, the Assuming Bank is unwilling to assume the Failed Bank's liabilities to certain creditors in consideration for the acquisition by it of certain of the Failed Bank's assets as provided in this Agreement, having concluded that the value of such assets is less than the amount of the liabilities assumed hereunder, and the Assuming Bank has therefore required as a condition to entering into this Agreement that the Corporation (i) agree to undertake the obligations of the Corporation as provided in this Agreement, and (ii) provide indemnification pursuant to Article XII; and

— — — **WHEREAS,** the Assuming Bank desires to acquire certain assets and assume certain deposit and other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" has the meaning provided in Section 3.1.

"**Adversely Classified**" means, with respect to any Loan or security, a Loan or security which, as of the date of the Information Package, has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

"**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Affiliated Funding**" means any form of secured or unsecured funding made to the Failed Bank by the Failed Bank's holding company or by any Subsidiary or Affiliate of the Failed Bank's holding company as of Bank Closing.

"**Agreement**" means this Insured Deposit Purchase and Assumption Agreement by and among the Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from time to time.

"**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

"**Assumed Deposits**" means Insured Deposits, excluding, however, brokered deposits, as defined by 12 USC 1831(f); and Deposits of public money (other than such liabilities that are Insured Deposits) in the Failed Bank to the extent such Deposits are properly and fully secured .

In the event that a depositor's aggregate Deposits in the Failed Bank are in excess of its Insured Deposit, the Corporation, in accordance with its standard policies and procedures, shall determine which Deposits are assumed.

A Deposit in the form of a negotiable instrument shall not be assumed by or transferred to the Assuming Bank, and any interest with respect thereto as provided in this Agreement shall not accrue or be paid until the owner thereof shall provide proof satisfactory to the Corporation that such negotiable instrument was negotiated to such owner prior to Bank Closing, as provided in 12 C.F.R. Section 330.4(b)(4).

**"Bank Closing"** means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

**"Bank Premises"** means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

**"Book Value"** means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Receiver for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections. The Book Value of an Acquired Subsidiary shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Failed Bank.

**"Business Day"** means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

**"Chartering Authority"** means the Office Thrift Supervision.

**"Commitment"** means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

"**Credit File**" means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Bank, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

"**Data Processing Lease**" means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

"**Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), and the regulations promulgated thereunder without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"**Failed Bank Advances**" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

"**Fair Market Value**" means (i)(a) "Market Value" as defined in the regulation prescribing the standards for real estate appraisals used in federally related transactions, 12 C.F.R. § 323.2(g), and accordingly shall mean the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;
(2) Both parties are well informed or well advised, and acting in what they consider their

own best interests;

(3) A reasonable time is allowed for exposure in the open market;

(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale;

as determined as of Bank Closing by an appraiser mutually acceptable to the Receiver and the Assuming Bank; any costs and fees associated with such determination shall be shared equally by the Receiver and the Assuming Bank, and (b) which, with respect to Bank Premises (to the extent, if any, that Bank Premises are purchased utilizing this valuation method), shall be determined not later than sixty (60) days after Bank Closing by an appraiser selected by the Receiver and the Assuming Bank within seven (7) days after Bank Closing; or (ii) with respect to property other than Bank Premises purchased utilizing this valuation method, the price therefor as established by the Receiver and agreed to by the Assuming Bank, or in the absence of such agreement, as determined in accordance with clause (i)(a) above.

**"Fixtures"** means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

**"Furniture and Equipment"** means the furniture and equipment (other than Safe Deposit Boxes, artwork, motor vehicles and leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance and security systems, artwork, and motor vehicles (which motor vehicles shall be deemed located at Bank Premises owned by the Failed Bank).

**"Indemnitees"** means, except as provided in paragraph (k) of Section 12.1, (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the directors, officers, employees and agents of the Assuming Bank and its Subsidiaries and Affiliates who are <u>not</u> also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

**"Insured Deposits"** means the net amount due to any depositor with respect to its Deposits as determined by the Receiver or the Corporation pursuant to 12 U.S.C. Sections 1813(l) and (m), and the regulations promulgated thereunder.

**"Initial Payment"** shall mean $0. There will be no Initial Payment.

**"Legal Balance"** means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

**"Liabilities Assumed"** has the meaning provided in Section 2.1.

**"Lien"** means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

**"Loans"** means all of the following owed to or held by the Failed Bank as of Bank Closing:

(i) loans, participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, United States and/or State-guaranteed student loans, and lease financing contracts;

(ii) all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

(iii) all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of Loans (a) any portion of the foregoing which the Failed Bank or the Assuming Bank (or any of their respective Subsidiaries) holds not for its own account but solely as agent or fiduciary for, or otherwise as representative of, any other Person, (b) any loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to the date of the Information Package, (c) loans recorded on the Accounting Records of the Failed Bank on "in substance foreclosure" status as of Bank Closing, (d) Commitments and (e) amounts owing under Qualified Financial Contracts.

**"Obligor"** means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

**"Payment Date"** means the first Business Day after Bank Closing.

**"Person"** means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

**"Primary Indemnitor"** means any Person (other than the Assuming Bank or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including

payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Put Date**" has the meaning provided in Section 3.4.

"**Put Notice**" has the meaning provided in Section 3.4.

"**Qualified Financial Contract**" means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

"**Record**" means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

"**Related Liability**" with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

"**Related Liability Amount**" with respect to any Related Liability on the books of the Assuming Bank, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Repurchase Price**" means with respect to any Asset or asset, which shall be determined by the Receiver, the lesser of (a) or (b):

(a) the amount paid by the Assuming Bank, decreased by the amount of any money received with respect thereto since Bank Closing and, if the Asset is a Loan or other interest bearing or earning asset, the resulting amount shall then be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of: (i) the contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received by or due to the Assuming Bank from the sale of collateral, any forgiveness of debt, or otherwise shall be deemed money received by the Assuming Bank; or

(b) the dollar amount thereof stated on the Accounting Records of the Assuming Bank as of the date as of which the Repurchase Price is being determined, as maintained in accordance with generally accepted accounting principles, and, if the asset is a Loan, regardless

of the Legal Balance thereof and adjusted in the same manner as the Book Value of a Failed Bank Loan would be adjusted hereunder.

Provided, however, (b), above, shall not be applicable for Loans repurchased pursuant to Section 3.4(a).

If any Asset or asset is purchased as part of a group of Assets or assets for Book Value and/or as a percentage of Book Value, the amount paid by the Assuming Bank, for purposes of (a), above, shall be the Book Value, as of the date of Bank Closing, of the individual Asset or asset being repurchased multiplied, if applicable, by the percentage paid.

**"Resolution Date"** means the date on which the Corporation implements a resolution with respect to the Assuming Bank in accordance with 12 U.S.C. § 1821(n) and/or § 1823(C) or other applicable law, which date shall be determined by the Corporation.

**"Safe Deposit Boxes"** means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits (other than fees collected prior to Bank Closing) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

**"Settlement Date"** means the first Business Day immediately prior to the day which is three hundred sixty-five (365) days after Bank Closing, or such other date prior thereto as may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

**"Settlement Interest Rate"** means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

**"Subsidiary"** has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

## ARTICLE II
## ASSUMPTION OF LIABILITIES

**2.1**    **Liabilities Assumed by Assuming Bank.** The Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"):

(a)    Assumed Deposits; provided, that as to any Deposits of public money which are Assumed Deposits, the Assuming Bank agrees to properly secure such Deposits with such of the Assets as appropriate which, prior to Bank Closing, were pledged as security therefor by the Failed Bank, or with assets of the Assuming Bank, if such securing Assets, if any, are insufficient to properly secure such Deposits;

(b)    liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting any Assets, if any; provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(c)    borrowings from Federal Reserve Banks and Federal Home Loan Banks, if any, provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the assets securing such liability as determined by the Receiver; and overdrafts, debit balances, service charges, reclamations, and adjustments to accounts with the Federal Reserve Banks as reflected on the books and records of any such Federal Reserve Bank within ninety (90) days after Bank Closing, if any;

(d)    ad valorem taxes applicable to any Asset, if any; provided, that the assumption oɪ any ad valorem taxes pursuant to this paragraph shall be limited to an amount equal to the market value of the Asset to which such taxes apply as determined by the Receiver;

(e)    liabilities, if any, for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including Bank Closing); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(f)    United States Treasury tax and loan note option accounts, if any;

(g)    liabilities for any acceptance or commercial letter of credit (other than (i) any such obligation to a Subsidiary of the Failed Bank that is not acquired by the Assuming Bank and (ii) "standby letters of credit" as defined in 12 C.F.R. Section

337.2(a)); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(h)    duties and obligations assumed pursuant to this Agreement including without limitation those relating to the Failed Bank's credit card business, overdraft protection plans, safe deposit business, safekeeping business or trust business, if any; and

(i)    liabilities, if any, for amounts owed to any Acquired Subsidiary.

(j)    liabilities, if any, with respect to Qualified Financial Contracts.

(k)    duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others, or mortgage servicing is provided to the Failed Bank by others.

(l)    duties and obligations under any contract pursuant to which the Failed Bank holds mortgage servicing rights;

(m)    such liabilities to trade creditors of the Failed Bank as may be determined by the Assuming Bank;

(n)    duties and obligations, if any, with respect to Loans in the form of loan participations;

(o)    liabilities, if any, to fund Commitments to consumers and Acquired Subsidiaries; and

(p)    liabilities (including liabilities for administration), if any, which have vested on or before Bank Closing under or with respect to any Failed Bank employees' pension, profit sharing or stock ownership plan, in accordance with the terms of any such plan that is determined by the Receiver to be adequately funded as of Bank Closing; provided, that the Assuming Bank shall not assume any liability hereunder with respect to any such plan until such time as the Receiver shall have given the Assuming Bank written notice of its election and determination pursuant to Section 2.4.

Notwithstanding the foregoing provisions of this Section 2.1, the Assuming Bank expressly does not assume under this Agreement any (w) Affiliated Funding, (x) obligation or liability of the Failed Bank to, or incurred on behalf of, any Subsidiary of the Failed Bank other than an Acquired Subsidiary, (except as provided in Section 2.1(j)), (y) certain liabilities with respect to the trust business of the Failed Bank as specified in Section 4.5(a), and (z) any liability for any assessment by the Corporation against the Failed Bank pursuant to 12 U.S.C. Section 1815(e).

Schedule 2.1 attached hereto and incorporated herein sets forth certain categories of Liabilities Assumed and the aggregate Book Value of the Liabilities Assumed in such categories.

Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII.

**22.** **Interest on Deposit Liabilities.** The Assuming Bank agrees that, from and after Bank Closing, it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at a rate(s) it shall determine. With respect to certificates of deposit, the Assuming Bank agrees to offer to enter into a new deposit agreement with the depositor, on the same terms and conditions and maturing on the same date, with respect to the insured amount of such certificate of deposit that existed between the Failed Bank and such depositor; provided, that if such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge. The Assuming Bank shall give notice to such depositors as provided in Section 5.3 of the rate(s) of interest which it has determined to pay.

**2.3** **Unclaimed Deposits.** If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such obligation (18)-month period, (i) refund to the Corporation the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation a schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits. During such eighteen (18)-month period, at the request of the Corporation, the Assuming Bank promptly shall provide to the Corporation schedules of unclaimed deposits in such form as may be prescribed by the Corporation.

**2.4** **Employee Benefit Plans.**

(a) The Assuming Bank agrees to assume, honor, and perform all duties, responsibilities and obligations of the Failed Bank which have vested on or before Bank Closing under or with respect to any Failed Bank employee pension, profit sharing or stock ownership plan, in the event that (i) the Receiver elects to have the Assuming Bank assume such duties, responsibilities and obligations with respect to such plan, and (ii) the Receiver determines in its discretion that such plan is adequately funded as of Bank Closing. The Assuming Bank shall have no obligation under this Section 2.4(a) until such time as the Receiver shall have given the Assuming Bank written notice of such election and determination.

(b) The Assuming Bank agrees to assume, honor and perform all duties and responsibilities of the Failed Bank under any health insurance plan of the Failed Bank with respect to individuals who were employees or former employees of the Failed Bank or any Subsidiary of the Failed Bank eligible for coverage thereunder.

## ARTICLE III
## PURCHASE OF ASSETS

**3.1**    <u>Assets Purchased by Assuming Bank</u>.  Subject to Sections 3.4 and 3.5, and Article VII, the Assuming Bank hereby acquires from the Receiver, and the Receiver hereby, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the following (which, except as otherwise specifically may be provided in this Agreement, initially shall be recorded at Book Value) (such assets referred to as "Assets"):

(a)    cash and receivables from depository institutions, including cash items in the process of collection, plus any accrued interest thereon computed to and including Bank Closing;

(b)    securities (other than the capital stock of Subsidiaries of the Failed Bank), plus any accrued interest thereon computed to and including Bank Closing, if any;

(c)    federal funds sold, if any, including any accrued interest thereon computed to and including Bank Closing;

(d)    Loans;

(e)    credit card business and revolving non-commercial credit plans, if any, subject to Section 4.2;

(f)    Safe Deposit Boxes and related business, safekeeping business and trust business, if any, subject to Sections 4.3, 4.4 and 4.5, respectively;

(g)    Records and other documents as provided in Section 6.1;

(h)    the capital stock of Subsidiaries of the Failed Bank listed on Schedule 3.1(i), if any (the "Acquired Subsidiaries");

(i)    amounts owed to the Failed Bank by any Acquired Subsidiary;

(j)    all insurance policies and agreements and the rights and benefits thereunder (including any prepaid assessments or prepaid insurance premiums, premium refunds derived from cancellation, or any proceeds payable with respect to any of the foregoing) of the Failed Bank with respect to insurance coverage for public liability, casualty, fire, extended coverage, and similar coverage provided with respect to assets of the Failed Bank acquired under this Agreement by the Assuming Bank (including such policies and agreements with respect to owned and leased Bank Premises, owned and leased Furniture and Equipment, Fixtures and Leasehold Improvements, and leased data processing equipment, which the Assuming Bank acquires or as to which the Assuming Bank accepts an assignment of the respective lease or enters into a sublease or negotiates a new lease in accordance with this Agreement;

(k)    the legal or equitable interest in receivables of the Failed Bank, including but not limited to, claims against any Person relating to or arising in connection with:  (i) the purported transfer prior to Bank Closing of any asset of the Failed Bank for less than adequate consideration, (ii) improper payment of actual or constructive dividends, (iii) overfunding of any pension plan that is assumed by the Assuming Bank pursuant to Section 2.4, (iv) assessments or premiums paid prior to Bank Closing in connection with any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank, (v) any right of contribution or indemnity in favor of the Failed Bank relating to or arising in connection with the Failed Bank being named as a party with its holding company and/or any Subsidiary or Affiliate of such holding company in any litigation, investigation or other official inquiry, or (vi) severance benefits or similar benefits of any director or officer of the Failed Bank;

(l)    any premium refunds or unearned premiums derived from cancellation of any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank;

(m)    prepaid regulatory assessments of the Failed Bank, if any;

(n)    amounts reflected on the books of the Failed Bank as of Bank Closing as a general or specific loss reserve or contingency account, if any with respect to an Asset;

(o)    assets securing any acceptance or commercial letter of credit at the Fair Market Value thereof;

(p)    assets securing Deposits of public money at the Fair Market Value thereof;

(q)    Commitments to consumers and Acquired Subsidiaries;

(r)    owned Bank Premises and owned Fixtures and owned Furniture and Equipment located on owned Bank Premises.

(s)    rights under all ground leases, if any, relating to land on which owned Bank Premises are located;

(t)    Qualified Financial Contracts, at the market value thereof determined in accordance with Exhibit 3.1(u). Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Bank;

(u)    mortgage servicing rights and related contracts;

(v)    Other Real Estate;

(w)    Federal Home Loan Bank stock, and any rights with respect to such stock relating to borrowings from Federal Home Loan Banks assumed under Section 2.1.

all Loans (not otherwise purchased pursuant to Section 3.1(d) above or pursuant to any asset sale agreement with the Assuming Bank or any other party) that have been fully charged-off (including, without limitation, Loans that have been charged-off to only a nominal Book Value amount) by the Failed Bank prior to Bank Closing, including, without limitation, Loans, or the residual rights from any such Loans, that, as of Bank Closing, were reflected on the books and records of the Failed Bank as judgements or deficiencies; (l)overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account).

Assets are acquired hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.

3.2    **Consideration.** (a) As consideration for the acquisition of Assets pursuant to this Agreement, the Assuming Bank (i) assumes certain liabilities pursuant to Article II, (ii) assumes certain duties and obligations under this agreement, and (iii) agrees to comply with the provisions of Article XII.

(b)    The purchase price for securities (other than the capital stock of any Acquired Subsidiary) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof as of Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as applicable), market price for each such security quoted at the close of the trading day effective on Bank Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is not available for any such security, the Assuming Bank will submit a bid  for each such security within three days of notification/bid request by the Receiver (unless a different time period is agreed to by the Assuming Bank and the Receiver) and the Receiver, in its sole discretion will accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from the Assuming Bank, each such security shall not pass to the Assuming Bank and shall be deemed to be an excluded asset hereunder.

3.3    **Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.** THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

3.4    **Assets Not Acquired by Assuming Bank.** The Assuming Bank does not purchase, or obtain an option to purchase under this Agreement:

(a)    any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank, or any proceeds with respect to any of the foregoing;

(b)     any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other similar insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other similar insurance policy of the Failed Bank in force as of Bank Closing;

(c)     any agreement or executory contract for the sale of any branch of the Failed Bank including the assets, liabilities and business related thereto;

(d)     any defensive litigation with respect to which the Failed Bank was a defendant or counter-claimant;

(e)     owned Bank Premises which the Receiver, in its discretion, determines may contain environmentally hazardous substances.

**3.5     Loans Essential to Receiver.**

(a)  The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to promptly assign, transfer, convey, and deliver to the Receiver, at no cost to the Receiver, all of the Assuming Bank's right, title and interest in and to, any Loan essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Loan that the Receiver determines to be:

(i)  made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

(ii)  the subject of any investigation relating to any claim described in Section 3.4(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

(iii)  made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

(iv)  secured by collateral which also secures any asset owned by the Receiver or any Subsidiary of the Failed Bank that is not an Acquired Subsidiary; or

(v) related to any asset of the Failed Bank not acquired by the Assuming Bank pursuant to this Agreement.

(b)     The Assuming Bank agrees to service and manage each such Loan in accordance with usual and prudent banking standards and practices until each such Loan is transferred to the Receiver.  All transfers necessitated by the transfer to the Receiver of any Loan under this Section 3.5 shall be made within seven (7) days after the date of the notice by the Receiver with respect thereto.  The Assuming Bank shall transfer all such Loans to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Loan, as provided in Section 11.4.

### 3.6    Puts of Assets and Liabilities Assumed to the Receiver.

(a)     **Puts Prior to the Settlement Date.** During the period from Bank Closing to and including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall be entitled to require the Receiver to purchase any Asset that was transferred to the Assuming Bank pursuant to Section 3.1, and to take back any Liabilities Assumed pursuant to Section 2.1.  Notwithstanding the foregoing, the Assuming Bank shall not have the right to require the Receiver to purchase any Loan if (i) the Obligor with respect to such Loan is an Acquired Subsidiary, or (ii) the Assuming Bank has:

(A)     made any advance in accordance with the terms of a Commitment or otherwise with respect to such Loan;

(B)     taken any action that increased the amount of a Related Liability with respect to such Loan over the amount of such liability immediately prior to the time of such action;

(C)     created or permitted to be created any Lien on such Loan which secures indebtedness for money borrowed or which constitutes a conditional sales agreement, capital lease or other title retention agreement;

(D)     entered into, agreed to make, grant or permit, or made, granted or permitted any modification or amendment to, any waiver or extension with respect to, or any renewal, refinancing or refunding of, such Loan or related Credit Documents; or

(E)     sold, assigned or transferred all or a portion of such Loan to a third party (whether with or without recourse).

The Assuming Bank shall transfer all such Loans to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Loan, as provided in Section 12.4.

**(b)** __Notices to the Receiver__. In the event that the Assuming Bank elects to require the Receiver to purchase one or more Assets, or take back any Liabilities Assumed, the Assuming Bank shall deliver to the Receiver a notice (a "Put Notice") which shall include:

(i) a list of all Assets that the Assuming Bank requires the Receiver to purchase, or Liabilities Assumed that the Assuming Bank required the Receiver to take back;

(ii) a list of all Related Liabilities with respect to the Assets or Liabilities Assumed identified pursuant to (i) above; and

(iii) a statement of the estimated Repurchase Price of each Asset identified pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the Receiver such documents, Credit Files and such additional information relating to the subject matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access to all other relevant books and records.

**(c)** __Purchase by Receiver__. The Receiver shall purchase Loans that are specified in the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of such Loans and Related Liabilities shall be effective as of a date determined by the Receiver, which date shall not be later than thirty (30) days after receipt by the Receiver of the Credit Files with respect to such Loans (the "Put Date").

**(d)** __Purchase Price and Payment Date__. Each Loan purchased by the Receiver pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such Loan less the Related Liability Amount applicable to such Loan, in each case determined as of the applicable Put Date. If the difference between such Repurchase Price and such Related Liability Amount is positive, then the Receiver shall pay to the Assuming Bank the amount of such difference; if the difference between such amounts is negative, then the Assuming Bank shall pay to the Receiver the amount of such difference. The Assuming Bank or the Receiver, as the case may be, shall pay the purchase price determined pursuant to this Section 3.4(e) not later than the twentieth (20th) Business Day following the applicable Put Date, together with interest on such amount at the Settlement Interest Rate for the period from and including such Put Date to and including the day preceding the date upon which payment is made.

**(e)** __Servicing__. The Assuming Bank shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent banking standards and business practices until such time as such Asset is purchased by the Receiver.

**(f)** __Reversals__. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming Bank shall repurchase such Asset (and assume such Related Liability) from the Receiver at a price computed so as to achieve the same economic result as would apply if the Receiver had never purchased such Asset pursuant to this Section 3.4.

**3.5**    <u>Assets Not Purchased by Assuming Bank</u>. The Assuming Bank does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement:

(a)    any financial institution bonds, banker's blanket bonds, or public liability, fire, or extended coverage insurance policy or any other insurance policy of the Failed Bank, or premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing;

(b)    any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing;

(c)    amounts reflected on the Accounting Records of the Failed Bank as of Bank Closing as a general or specific loss reserve or contingency account, if any;

(d)    owned Bank Premises which the Receiver, in its discretion, determines may contain environmentally hazardous substances;

(e)    any amounts owed to the Failed Bank by any Subsidiary of the Failed Bank other than an Acquired Subsidiary;

(f)    any "goodwill," as such term is defined in the instructions to the report of condition prepared by banks examined by the Corporation in accordance with 12 C.F.R. Section 304.4, and other intangibles;

(g)    any security if, in the discretion of the Receiver, the value of such security either cannot be determined or is determined to be zero pursuant to Section 3.2(b), and any security listed on Schedule 3.5(k), if any; and

(h)    any criminal restitution orders issued in favor of the Failed Bank.

The Assuming Bank only acquires assets and rights as provided in this Agreement. The foregoing shall not be construed to imply that any particular asset or right listed otherwise would have been sold or assigned or that any asset or right not listed is sold or assigned.

**3.6**  **Assets Essential to Receiver**.

(a)     The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to assign, transfer, convey, and deliver to the Receiver all of the Assuming Bank's right, title and interest in and to, any Asset or asset essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Asset or asset that the Receiver determines to be:

(i) made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

(ii) the subject of any investigation relating to any claim with respect to any item described in Section 3.5(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

(iii) made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

(iv) secured by collateral which also secures any asset owned by the Receiver; or

(v) related to any asset of the Failed Bank not purchased by the Assuming Bank under this Article III.

(b)     Each such Asset or asset purchased by the Receiver shall be purchased at a price equal to the Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Asset or asset, in each case determined as of the date of the notice provided by the Receiver pursuant to Section 3.6(a). The Receiver shall pay the Assuming Bank not later than the twentieth (20th) Business Day following receipt of related Credit Documents and Credit Files together with interest on such amount at the Settlement Interest Rate for the period from and including the date of receipt of such documents to and including the day preceding the day on which payment is made. The Assuming Bank agrees to administer and manage each such Asset or asset in accordance with usual and prudent banking standards and business practices until each such Loan is purchased by the Receiver. All transfers with respect to Loans under this Section 3.6 shall be made as provided in Section 9.6. The Assuming Bank shall transfer all such Assets or assets and Related Liabilities to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset or asset, as provided in Section 12.4.

## ARTICLE IV
## ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Bank agrees with the Receiver and the Corporation as follows:

**4.1**  **Continuation of Banking Business**. The Assuming Bank agrees to provide full service banking in the trade area of the Failed Bank commencing on the first banking business day (including a Saturday) after Bank Closing. At the option of the Assuming Bank, such

banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area.

4.2    **Agreement with Respect to Credit Card Business**. The Assuming Bank agrees to honor and perform, from and after Bank Closing, all duties and obligations with respect to the Failed Bank's credit card business, and/or processing related to credit cards, if any, and assumes all outstanding extensions of credit with respect thereto. Fees related to the credit card business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

4.3    **Agreement with Respect to Safe Deposit Business**. The Assuming Bank assumes and agrees to discharge, from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefor paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes; provided, that the Assuming Bank may relocate the Safe Deposit Boxes of the Failed Bank to any office of the Assuming Bank located in the trade area of the Failed Bank. Fees related to the safe deposit business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

4.4    **Agreement with Respect to Safekeeping Business**. The Receiver transfers, conveys and delivers to the Assuming Bank and the Assuming Bank accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Bank assumes and agrees to honor and discharge, from and after Bank Closing, the duties and obligations of the Failed Bank with respect to such securities and items held in safekeeping. The Assuming Bank shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; provided, that, fees related to the safe keeping business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank. The Assuming Bank shall provide to the Receiver written verification of all assets held by the Failed Bank for safekeeping within sixty (60) days after Bank Closing.

4.5    **Agreement with Respect to Trust Business**.

(a)    The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under trusts, executorships, administrations, guardianships, and agencies, and other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had assumed the same from the Failed Bank prior to Bank Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder. Fees related to the trust business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

(i) The Assuming Bank agrees to pay to the Receiver, or to appropriate third parties at the direction of the Receiver, during and for the period of any occupancy by it of (x) owned Bank Premises, the market rental value and all operating costs, and (y) leased Bank Premises, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Bank, including without limitation the timely payment of all rent. Operating costs include, without limitation all taxes, fees, charges, utilities, insurance and assessments, to the extent not included in the rental value or rent.

(ii) The Assuming Bank agrees during the period of occupancy by it of owned or leased Bank Premises, to pay to the Receiver rent for the use of all leased Furniture and Equipment and Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property owned by the Failed Bank shall be the market rental value thereof, as determined by the Receiver within sixty (60) days after Bank Closing. Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property.

**(f)      Certain Requirements as to Furniture, Equipment and Fixtures.** If the Assuming Bank accepts an assignment of the lease (or enters into a sublease or a new lease in lieu thereof) for leased Bank Premises as provided in Section 4.6(a) or 4.6(b), or if the Assuming Bank does not exercise such option but within twelve (12) months following Bank Closing obtains the right to occupy such premises (whether by assignment, lease, sublease, purchase or otherwise), other than in accordance with Section 4.6(a) or (b), the Assuming Bank shall (i) accept an assignment or a sublease of the leases or negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Bank and located thereon, and (ii) if applicable, accept an assignment or a sublease of any ground lease or negotiate a new ground lease with respect to any land on which such Bank Premises are located; provided, that the Receiver shall not have disposed of such Furniture and Equipment and Fixtures or repudiated the leases specified in clause (ii) or (iii).

**(g)      Vacating Premises.** If the Assuming Bank elects not to accept an assignment of the lease or sublease any leased Bank Premises, the notice of such election in accordance with Section 4.6(b) shall specify the date upon which the Assuming Bank's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred eighty (180) days after Bank Closing. Upon vacating such premises, the Assuming Bank shall relinquish and release to the Receiver such premises and the Fixtures and the Furniture and Equipment located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(b), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph (ii), the Assuming Bank shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the Receiver previously repudiated any such lease), and (y) be required to purchase all Furniture and Equipment and Fixtures owned by the Failed Bank and located on such premises as of Bank Closing.