**SCHEDULE 2.1 – Certain Liabilities Assumed**

**SCHEDULE 3.1 – Certain Assets Purchased**

**SCHEDULE 3.1(e) – Loans Fully Secured by Assumed Deposits**

**SEE ATTACHED LIST**

**THE LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHEDULE(S)) AND THE INFORMATION THEREIN, IS AS OF THE INFORMATION PACKAGE DATE. IT WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF THE LOANS AS OF THE DATE OF BANK CLOSING. THE LIST(S) MAY BE REPLACED WITH A MORE ACCURATE LIST POST CLOSING.**

**SCHEDULE 3.1(v) - Other Real Estate Purchased**

**SEE ATTACHED LIST**

**THE LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHEDULE(S)) AND THE INFORMATION THEREIN, IS AS OF THE INFORMATION PACKAGE DATE. IT WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF THE ASSETS AS OF THE DATE OF BANK CLOSING. THE LIST(S) MAY BE REPLACED WITH A MORE ACCURATE LIST POST CLOSING.**

**SCHEDULE 3.1(h) - Acquired Subsidiaries**

**All Subsidiaries, including IndyMac Resources, Inc; IndyMac Financial Services; IndyMac Agency, Inc.;  IndyMac ABS, Inc.; IndyMac MBS, Inc.; IndyMac Retained Assets, Inc.; IndyMac Securities Corporation; Loan Associates, LLC;AMC1 LLC; IndyMac Commercial Lending Corporation; and Financial Freedom Senior Funding Corporation.**

**SCHEDULE 3.5(k) - Securities Not Purchased**

**AS SPECIFIED IN SECTION 3.5**

## EXHIBIT 3.1(U) -- VALUATION OF CERTAIN
## QUALIFIED FINANCIAL CONTRACTS

A.   **Scope**

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

B.   **Exclusions**

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Bank but are not subject to adjustment from Book Value.

C.   **Adjustment**

The difference between the Book Value and market value as of Bank Closing.

D.   **Methodology**

1    The price at which the Assuming Bank sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Bank and the Receiver.

2.   In valuing all other Qualified Financial Contracts, the following principles will apply:

(i)     All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

(ii)    All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

(iii)   Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

(iv)    For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., The Wall Street Journal, Telerate, Reuters or other similar source) or regularly traded exchanges.

       (v)     For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Bank as of Bank Closing. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Bank will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.

**EXHIBIT 4.13**
**INTERIM ASSET SERVICING ARRANGEMENT**

(a)    With respect to each asset (or liability) designated from time to time by the Receiver to be serviced by the Assuming Bank pursuant to this Arrangement (such being designated as "Pool Assets"), during the term of this Arrangement, the Assuming Bank shall:

(i) Promptly apply payments received with respect to any Pool Assets;

(ii) Reverse and return insufficient funds checks;

(iii) Pay (A) participation payments to participants in Loans, as and when received; and (B) tax and insurance bills on Pool Assets as they come due, out of escrow funds maintained for purposes;

(iv) Maintain accurate records reflecting (A) the payment history of Pool Assets, with updated information received concerning changes in the address or identity of the obligors and (B) usage of data processing equipment and employee services with respect to servicing duties;

(v) Send billing statements to obligors on Pool Assets to the extent that such statements were sent by the Failed Bank;

(vi) Send notices to obligors who are in default on Loans (in the same manner as the Failed Bank);

(vii) Send to the Receiver, Attn: Managing Liquidator, at the address provided in Section 13.7 of the Agreement, via overnight delivery: (A) on a weekly basis, weekly reports for the Pool Assets, including, without limitation, reports reflecting collections and the trial balances, transaction journals and loan histories for Pool Assets having activity, together with copies of (1) checks received, (2) insufficient funds checks returned, (3) checks for payment to participants or for taxes and insurance, (4) pay-off requests, (5) notices to defaulted obligors, and (6) data processing and employee logs and (B) any other reports, copies or information as may be periodically or from time to time requested;

(viii) Remit on a weekly basis to the Receiver, Attn: Division of Finance, Cashier Unit, Operations, at the address in (vii), via wire transfer to the account designated by the Receiver, all payments received on Pool Assets managed by the Assuming Bank or at such time and place and in such manner as may be directed by the Receiver;

(ix) prepare and timely file all information reports with appropriate tax authorities, and, if required by the Receiver, prepare and file tax returns and pay taxes due on or before the due date, relating to the Pool Assets; and

(x)  provide and furnish such other services, operations or functions as may be required with regard to Pool Assets, including, without limitation, as may be required with

regard to any business, enterprise or agreement which is a Pool Asset, all as may be required by the Receiver.

Notwithstanding anything to the contrary in this Section, the Assuming Bank shall not be required to initiate litigation or other collection proceedings against any obligor or any collateral with respect to any defaulted Loan. The Assuming Bank shall promptly notify the Receiver, at the address provided above in subparagraph (a)(vii), of any claims or legal actions regarding any Pool Asset.

(b)    The Receiver agrees to reimburse the Assuming Bank for actual, reasonable and necessary expenses incurred in connection with the performance of duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, and data processing and employee services (based upon the number of hours spent performing servicing duties).

(c)    The Assuming Bank shall provide the services described herein for an initial period of ninety (90) days after Bank Closing. At the option of the Receiver, exercisable by notice given not later than ten (10) days prior to the end of such initial period or a renewal period, the Assuming Bank shall continue to provide such services for such renewal period(s) as designated by the Receiver, up to the Settlement Date.

(d)    At any time during the term of this Arrangement, the Receiver may, upon written notice to the Assuming Bank, remove one or more Pool Assets from the Pool, at which time the Assuming Bank's responsibility with respect thereto shall terminate.

(e)    At the expiration of this Agreement or upon the termination of the Assuming Bank's responsibility with respect to any Pool Asset pursuant to paragraph (d) hereof, the Assuming Bank shall:

(i) deliver to the Receiver (or its designee) all of the Credit Documents and Pool Records relating to the Pool Assets; and

(ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver (or its designee).

(f)    At the request of the Receiver, the Assuming Bank shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver and providing to the Receiver or its designee(s) (x) information and data regarding the Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool Assets to another system or systems, and (y) access to employees of the Assuming Bank involved in the management of, or otherwise familiar with, the Pool Assets.

**EXHIBIT 4.13A**
**INTERIM MANAGEMENT ARRANGEMENT**

**ARTICLE I**
**DEFINITIONS**

Capitalized terms used in this Interim Management Arrangement (the "Arrangement") not otherwise defined in the Agreement or herein shall have the meanings set forth below. As used herein, words importing the singular include the plural and vice versa.

**"Adjusted Pool Value"** means:

(i) with respect to any of the Pool Assets, exclusive of any Pool Assets constituting trust business or credit card business, an amount (not less than zero) equal to the sum of:

(A) the Base Pool Value of such Pool Asset; plus

(B) the aggregate amount of any advances that are made with respect to such Pool Asset after its transfer to the Pool and that are made in accordance with this Arrangement; plus

(C) the aggregate amount of any Capitalized Expenditures relating to such Pool Asset made after its transfer to the Pool; minus

(D) the aggregate amount of all Collections which are not recognized as income or as offsets to expenses pursuant to the Receivership Accounting Requirements with respect to such Pool Asset after its transfer to the Pool; and

(ii) with respect to any Pool Related Liability, the dollar amount thereof stated on the Pool Records as maintained in accordance with the Receivership Accounting Requirements.

The Adjusted Pool Value of any Pool Asset shall be reduced to zero upon Final Disposition of such Pool Asset.

**"Average Pool Assets"** means for any period the sum of the aggregate Adjusted Pool Values of all Pool Assets for each day of such period divided by the number of days in such period.

**"Base Pool Value"** means, with respect to any Pool Asset or Pool Related Liability, the amount required to be reflected on the Pool Records pursuant to the Receivership Accounting Requirements as of the date such Pool Asset or Pool Related Liability is transferred to the Pool. However, such shall exclude any Pool Assets constituting trust business or credit card business for purposes of the definition of Adjusted Pool Value.

**"Capitalized Expenditure"** means an expense of $25,000 or more (or such other amount approved by the Receiver) which would be capitalized under generally accepted

54

accounting principles. Expenditures of less than $25,000 do not constitute Capitalized Expenditures.

"**Collections**" mean, subject to the limitations set forth below in this definition, all cash or monetary revenues such as payments of principal and interest, fees, net proceeds of sale, net proceeds of collateral liquidation, and net insurance proceeds received, including by offset or similar exchange, or derived from a Pool Asset or an asset that otherwise would constitute a Pool Asset except for the fact that Final Disposition of such asset has occurred. The following receipts, exchanges, or transactions do not constitute Collections:

(i) the receipt of any promissory note, guarantee, or other obligation;

(ii) the receipt by any Person managing the Pool on behalf of the Receiver of any payments, fees, or other amounts to which such Person is paid, or compensated, by the Corporation or the Receiver under the Agreement, this Arrangement or any other agreement or arrangement; and

(iii) the receipt of consideration from the Assuming Bank or any Affiliate of the Assuming Bank for the purchase of any Pool Asset.

Solely for purposes of Section 5.1 hereof, Collections shall be subject to the following limitations:

(x) cash or monetary revenues derived from a loan that consists of revolving advances, revolving credit facilities, or similar credit arrangements that are received prior to Final Disposition of such loan and that would otherwise constitute Collections shall not constitute Collections until the earlier of (A) Final Disposition of such loan; or (B) the date upon which the duties of the Assuming Bank under this Arrangement are terminated. The amount of such cash or monetary revenues that shall be deemed to constitute Collections for such purpose shall be limited to the excess of the highest Adjusted Pool Value of such loan after its transfer to the Pool over the Adjusted Pool Value of such loan immediately prior to Final Disposition thereof or at the date the Assuming Bank's duties are terminated with respect thereto, as the case may be;

(y) Collections shall be reduced by the amount of gross reductions in Pool Related Liabilities excluding reductions from non-monetary settlements of such Pool Related Liabilities; and

(z) Collections derived from Excluded Subsidiaries shall be limited to those amounts actually paid to the Receiver as dividends or repayment of advances. Collections based on repayment of advances shall be subject to the same limitations as those with respect to loans that consist of revolving advances, revolving credit facilities and other similar credit arrangements as discussed in clause (x) above. Collections derived from any trust business or credit card business shall be excluded.

"**Cost of Carry**" means, for any calendar month, the one year "constant maturity" U.S. Treasury Rate as reported in The Wall Street Journal for the last Business Day of the preceding calendar month.

"**Counsel**" has the meaning set forth in Section 2.2 hereof.

"**Current Settlement Account**" has the meaning set forth in Section 4.2 hereot.

"**Excluded Subsidiary**" means any subsidiary of the Failed Bank designated by the Receiver as a Pool Asset.

"**Final Disposition**" means any event evidencing a legal or economic inability to produce further Collections for a Pool Asset, including full payment of the Legal Balance due under a Credit Document or, to the extent the following are effected in accordance with the procedures in the operations manual provided by the Receiver, a complete performance of final settlement agreements with Obligors, the sale of loans to the Corporation or to any third party or, with the approval of any oversight committee or other body established to oversee the management of the Pool, the voluntary and knowing abandonment of efforts to obtain further Collections.

"**Pool**" means such assets and related liabilities as determined by the Receiver from time to time for purposes of Section 4.13 of the Agreement.

"**Pool Assets**" means the assets as determined by the Receiver from time to time for purposes of Section 4.13 of the Agreement, to the extent designated by the Receiver as part of the Pool, including, without limitation, in whole or in part, the capital stock of Excluded Subsidiaries, any credit card business, and any trust business, if so designated, and related liabilities.

"**Pool Records**" means the books and records of the Pool established and maintained as provided in Section 4.1 hereof.

"**Pool Related Liability**" means any liability that is transferred to the Pool because it is a Related Liability with respect to a Pool Asset.

"**Receivership Accounting Requirements**" mean the rules, regulations, policies, procedures and reporting requirements relating to accounting for the Pool as determined by the Receiver, in its sole discretion, and communicated to the Assuming Bank from time to time. Unless otherwise directed by the Receiver, such requirements shall reflect generally accepted accounting principles.

## ARTICLE II
## ASSET MANAGEMENT

**2.1    Agreement with Respect to Management**. The Assuming Bank shall serve as an independent contractor to manage, administer, collect and liquidate the Pool Assets during the term of this Arrangement. The Assuming Bank shall be responsible to the Receiver for the performance of its duties hereunder, shall provide to the Receiver such reports as the Receiver deems advisable, and shall permit the Receiver to oversee, monitor and audit at any time the Assuming Bank's performance of its duties hereunder.

**2.2    Assuming Bank's Duties.** (a) In performance of its duties under this Arrangement, the Assuming Bank shall:

(i) liquidate, collect and manage the Pool Assets solely in the best interest of the Receiver;

(ii) exercise its best business judgment in managing the Pool Assets;

(iii) use its best efforts to maximize the net present value of net Collections with respect to the Pool Assets;

(iv) promptly advise the Receiver and its legal counsel (the "Counsel") of any situation (including but not limited to the initiation of any legal action) that may adversely affect any Pool Asset as provided in Article III hereof;

(v) adopt and implement accounting, reporting, recordkeeping and similar systems with respect to the Pool Assets as provided in Article IV hereof;

(vi) maintain fidelity bond coverage with respect to defalcations by its employees in connection with the services provided hereunder;

(vii) within thirty (30) days after transfer of an asset to the Pool, provide by mail a written notification, in a format acceptable to the Receiver, advising all Obligors with respect to such asset that such asset is held by the Receiver and that checks submitted as payments should be made payable to the Federal Deposit Insurance Corporation as Receiver of the Failed Bank and directing such Obligors to continue making loan payments as instructed in such notification;

(viii) comply in all respects with the operations manual provided by the Receiver;

(ix) permit Persons designated by the Receiver to conduct due diligence review of the Credit Documents of Pool Assets;

(x) provide adequate safekeeping for all Credit Documents of Pool Assets;

(xi) retain sufficient staff to perform its duties hereunder;

(xii) provide to the Receiver clerical or similar support staff as may be reasonably requested by the Receiver for use during the term of this Arrangement; and

57

(xiii) prepare and timely file all tax returns and information reports with appropriate tax authorities and pay taxes due on or before the due date, relating to the Pool and Pool Assets.

(b)     The Assuming Bank shall manage the Excluded Subsidiaries by (i) designating appropriate employees of the Assuming Bank to serve as officers subject to the approval of the board of directors of the Excluded Subsidiary, (ii) if the Receiver chooses to elect such employees, causing such employees to serve as directors of such Excluded Subsidiaries, and (iii) making such employees available for such periods as may be necessary to fulfill the duties of such offices. The officers of the Excluded Subsidiaries shall, in accordance with the laws of the relevant jurisdictions, manage the Excluded Subsidiaries at the direction of the duly elected directors of such Subsidiaries. Neither the Receiver nor any Excluded Subsidiary shall have any obligation to pay any compensation to the Assuming Bank or any of its employees for services provided pursuant to this Section 2.3(b). The Assuming Bank shall not be obligated under this Section 2.3(b) to pay any expense or liability of any Excluded Subsidiary other than the compensation and employment benefits of any employee of the Assuming Bank who serves as an officer or director of such Excluded Subsidiary pursuant to this Section 2.3(b).

(c)     In connection with the services provided by the Assuming Bank hereunder, the following shall be subject to the prior approval of the Receiver (whether or not reimbursable under Section 5.2 hereof):

(i) all purchases by the Assuming Bank of any Pool Asset and any transaction involving the Pool or any Pool Asset with an Affiliate of the Assuming Bank;

(ii) all compromises or settlements of loans that are Pool Assets, unless ninety percent (90%) or more of the Legal Balance is collected as a result of such compromise or settlement;

(iii) all releases of collateral for a cash payment of less than ninety percent (90%) of the appraised value of the collateral based upon a current, independent appraisal;

(iv) disposition of a Pool Asset that would result in a loss where the Adjusted Pool Value of such Pool Asset exceeds $25,000, other than a disposition which does not require approval as provided in Section 2.2(c)(ii) and (iii) hereof;

(v) restructuring of any loan including but not limited to the waiver of payment defaults or other material defaults, and/or the release of guarantors;

(vi) bulk sales of Pool Assets;

(vii) any expenditure in excess of $100,000, any Capitalized Expenditure, any proposed data processing conversions or changes in any existing data processing capabilities (including computer hardware and software), or any payment of a Pool Related Liability;

(viii) all loan disbursements (whether or not pursuant to a Commitment) with respect to any Pool Asset;

(ix) any subcontracting of the Assuming Bank's duties hereunder;

(x) incurring any obligation on behalf of the Receiver; and

(xi) the use of any employee of the Assuming Bank to (A) manage any Pool Asset for which he or she was the originating loan officer or for which he or she had personal and substantial involvement or responsibility (other than as a loan workout officer) as an employee of the Failed Bank or the Assuming Bank or in any other capacity; or (B) exercise supervisory responsibility over any other employee with respect to a Pool Asset that he or she would be prohibited from managing under clause (A) unless he or she is prohibited from making or influencing decisions with respect to such Pool Asset.

**2.3    Term and Termination.**

(a)    The Assuming Bank shall provide the services described herein for an initial period of ninety (90) days after Bank Closing. At the option of the Receiver, exercisable by notice given not later than ten (10) days prior to the end of such initial period or a renewal period, the Assuming Bank shall continue to provide such services for such renewal period(s) as designated by the Receiver, up to the Settlement Date.

(b)    The Receiver may, upon written notice to the Assuming Bank, remove one or more Pool Assets from the Pool, at which time the Assuming Bank's responsibility with respect thereto shall terminate.

(c)    At the expiration of this Arrangement or upon the termination of the Assuming Bank's responsibility with respect to any Pool Asset pursuant to Section 2.4(b) hereof, the Assuming Bank shall:

(i) deliver to the Receiver (or its designee) all of the Credit Documents and Pool Records relating to the Pool Assets; and

(ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver (or its designee).

(d)    At the request of the Receiver, the Assuming Bank shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver in connection with the selection of a permanent servicer for the Pool and providing to the Receiver or its designee(s) (x) information and data regarding the Pool and Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool and Pool Assets to another system or systems, (y) access to employees of the Assuming Bank involved in the management of, or otherwise familiar with, the Pool Assets, and (z) office space and facilities sufficient to facilitate the due diligence process.

## ARTICLE III
## LEGAL SERVICES

**3.1**    <u>Agreement with Respect to Legal Services</u>. The Assuming Bank shall perform the duties set forth in this Article III with respect to any dispute involving the Pool Assets and shall coordinate such matters with the Counsel.

**3.2**    <u>Assuming Bank's Duties</u>. (a) Unless otherwise directed by the Counsel or provided herein, the Assuming Bank shall:

(i) not commence any legal proceeding, or refer any dispute involving the Pool Assets to outside counsel without the prior approval of the Counsel;

(ii) supervise all existing litigation or other legal proceedings with respect to the Pool Assets and, continue to use outside counsel retained prior to Bank Closing by the Failed Bank with respect to such matters; <u>provided</u> <u>that</u>, the Counsel may at any time direct the Assuming Bank to use only such outside counsel which are on the Corporation's <u>List of Counsel Available</u>;

(iii) coordinate and oversee all disputes and related matters involving the Pool Assets;

(iv) whenever the Assuming Bank selects outside counsel under this Arrangement, attempt to refer at least ten percent (10%) of the matters described in clause (i) to minority and women-owned law firms approved by the Corporation or identified in the <u>List of Counsel Available</u>;

(v) monitor the performance of outside counsel;

(vi) provide to the Counsel any information that the Counsel may request regarding pleadings, case strategies, the performance of outside counsel and any other information relating to any dispute involving the Pool Assets;

(vii) immediately notify and forward to the Counsel any summons, complaint or any other legal document or service of process received by the Assuming Bank with respect to any Pool Asset or claim against the Corporation or the Receiver; <u>provided</u> <u>that</u>, the Assuming Bank is not an authorized agent of the Corporation or the Receiver upon which service of process may be made;

(viii) immediately notify the Counsel of any adverse order or judgment with respect to any Pool Asset and obtain the written approval of the Counsel prior to appealing or taking any other action with respect to such order or judgment;

(ix) as directed by the Counsel, submit any dispute involving a Pool Asset to binding arbitration or other alternative dispute resolution procedure and immediately thereafter move to dismiss any pending litigation or other legal proceeding relating to such dispute;

(x) to the extent not inconsistent with the terms of this Arrangement, comply with the requirements set forth in the Corporation's <u>Guide For Outside Counsel</u>, and assure that all outside counsel retained by the Assuming Bank pursuant to this Arrangement also comply with such requirements;

(xi) take all necessary action to protect the privileges applicable to the Corporation and the Receiver, including but not limited to attorney-client and work product privileges; and

(xii) preserve and protect the confidentiality of all information and documentation communicated to and received from the Corporation and the Receiver and Counsel and outside counsel.

(b)    The Assuming Bank shall submit to the Counsel on or before the fifteenth (15th) day of the next following calendar month a monthly legal services report which shall describe (i) each new matter referred by the Assuming Bank to outside counsel, including the identity of such outside counsel, the nature of the legal services to be provided and a description of the Pool Asset involved, and (ii) each matter concluded, terminated or otherwise withdrawn.

(c)    Upon written notice from the Counsel, allow the Receiver to audit compliance by the Assuming Bank with this Article III.

**3.3    Receiver's Rights.** The Counsel may (a) consult directly with outside counsel regarding any litigation or dispute involving the Pool Assets and/or (b) direct or control, at the Receiver's sole cost and expense and upon written notice to the Assuming Bank, any legal action or services with respect to such litigation or dispute

## ARTICLE IV
## POOL ACCOUNTING AND REPORTING

**4.1    Pool Records.** The Assuming Bank shall immediately establish and maintain the Pool Records on a separate general ledger and on subsidiary ledgers as appropriate to account for Pool Assets and Pool Related Liabilities with such income and expense classifications as the Receiver may require. As of the end of each calendar month, the Assuming Bank shall deliver to the Receiver a report of the financial condition and operations of the Pool. Such report shall be prepared in accordance with the Receivership Accounting Requirements and include a balance sheet, income statement and cash flow statement, report of Collections, postings to the Current Settlement Account and such additional information as shall be required by the Receiver. The report shall include an invoice in a format acceptable to the Receiver for the amount due from the Receiver as reflected in the Current Settlement Account. The Assuming Bank shall deliver the report to the Receiver on or before the 15th day of the next following calendar month. Pool Assets shall be recorded on the Pool Records at their Base Pool Values, together with Pool Related Liabilities, as of the date of transfer to the Pool. Thereafter, Pool Assets and Pool Related Liabilities shall be reflected at their Adjusted Pool Values. Subsidiary ledgers shall include and permit an accounting for (a) income and expense tracking for each loan with respect to each Obligor, and (b) legal fees paid with respect to each Pool Asset by law firm, attorney and each attorney's hourly rate. All accounting records of the Pool shall be maintained by the Assuming Bank on the cash basis of accounting.

**4.2**    **Current Settlement Account.** The Assuming Bank shall establish and maintain an account (the "Current Settlement Account") to which the amount of payments due to or from the Receiver shall be posted on a calendar month basis.

**4.3**    **Funding of Pool Asset Expenses.** The Assuming Bank shall establish a deposit account acceptable to the Receiver for the payment of (a) Pool Related Liabilities (except payments under participation agreements which are paid from Collections) and advances with respect to Pool Assets, in either case to the extent permitted by Section 2.3 hereof, (b) Capitalized Expenditures and (c) other expenses reimbursable under Section 5.2 hereof. Such account shall be maintained in accordance with the operations manual provided by the Receiver. As of the end of each calendar month, the Assuming Bank shall post to the Current Settlement Account the amount funded in accordance with this Section 4.3, together with interest for such period on the average daily balance of the amount of such fundings outstanding at a rate per annum equal to the Cost of Carry plus fifty (50) basis points (0.50%).

**4.4**    **Payments.** Payment of the invoice accompanying the monthly report provided for in Section 4.1 hereof shall be made no later than fifteen (15) Business Days after the date of receipt of such report by the Receiver. Payment made to the Assuming Bank shall be applied to reduce the amount due to the Assuming Bank pursuant to Section 4.3 hereof on the date of receipt of such payment. The Receiver may withhold payment if, in its judgment, a basis exists for denying eligibility for payment of any amount included in the invoice until the Assuming Bank, after notice by the Receiver, demonstrates that such amount is eligible for payment. Any amount withheld shall be paid by the Receiver no later than fifteen (15) Business Days after the Receiver has approved such payment.

**4.5**    **Collections.** The Assuming Bank shall establish and maintain in trust for the Receiver a deposit account acceptable to the Receiver to which all Collections shall be immediately deposited upon receipt thereof by the Assuming Bank. All collected funds in such account shall be wire transferred on a daily basis by the Assuming Bank to the bank account designated by the Receiver. Any amounts not promptly remitted to the Receiver pursuant to this Section 4.5 shall bear interest at a rate per annum equal to the Cost of Carry plus fifty (50) basis points (0.50%).

## ARTICLE V
## FEES AND EXPENSES

**5.1**    **Payment for Services.**

(a)    The Receiver agrees to pay the following monthly fees to the Assuming Bank:

(i) a fee equal to the product of (A) one percent (1%) of the Average Pool Assets during the month and (B) the number of days this Arrangement is in effect during such month divided by three hundred sixty-five (365); and

(ii) a fee equal to six percent (6%) of the amount of Collections during the month;

(iii) with regard to any Pool Asset constituting a trust business, the amount of fees the Failed Bank would have collected attributable to the services rendered by the Assuming Bank, to the extent actually collected;

(iv) with regard to any Pool Asset constituting a credit card business, the actual, reasonable and necessary expenses incurred in connection with the performance of duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, and data processing and employee services (based upon the number of hours spent performing servicing duties).

(b)     At the end of each calendar month, the Assuming Bank shall post to the Current Settlement Account the amount, if any, of fees due for such month.

5.2     **Reimbursable Expenses.**

(a)     The Receiver agrees to reimburse the Assuming Bank for its actual direct asset expenses (i) incurred to secure, maintain or sell any Pool Asset (including legal expenses therefor), or (ii) incurred to enforce any rights under the Credit Documents.

(b)     Any expense otherwise reimbursable under this Section 5.2 shall not be reimbursed if the Receiver determines:

(i) such expense was not incurred (A) in good faith, (B) with the same degree of care that the Assuming Bank would exercise in the collection of troubled assets in its own portfolio, and (C) in accordance herewith;

(ii) such expense was incurred for a product, service, or activity that is of an extravagant nature or design; or

(iii) the approval of the Receiver for the payment of such expense (or for the contract or other arrangement under which it was incurred) was required under this Arrangement but was not obtained.

(c)     The following categories of expenses shall not be reimbursable under this Section 5.2:

(i) Federal, State, or local income taxes and expenses related thereto;

(ii) salaries and related benefits of the Assuming Bank's employees, including any bonus or severance arrangements, training, payroll taxes, dues, or travel- or relocation-related expenses;

(iii) the cost of space occupied by the Assuming Bank and its staff, the rental and maintenance of furniture and equipment, and expenses for data processing (including data processing conversions);

(iv) except as otherwise provided herein, fees for accounting, legal and other independent professional consultants (including employees of the Assuming Bank);

(v) out-of-pocket miscellaneous operating expenses incurred by the Assuming Bank or any Affiliate in the management of the Pool Assets;

(vi) expenses related to any trust business except to the extent such are reimbursed by such trusts or third parties;

(vii) expenses related to any credit card business (except as such may be paid under Section 5.1); and

(vi) any other expenses that are not reimbursable under this Section 5.2.

## ARTICLE VI
## ADDITIONAL INDEMNITY

6.1    **Additional Indemnity.** The following additional indemnities are provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.1(a) of the Agreement:

(9) claims arising from any action or inaction in connection with the administration of any asset of the Failed Bank that is not acquired under Section 3.1 of the Agreement following a transfer to the Receiver of responsibility for such administration under any provision of the Arrangement;

(10) claims arising in connection with any refusal of the Assuming Bank, acting pursuant to instructions given in writing by the Receiver pursuant to any provision of the Arrangement, or any similar arrangement pertaining to the management of any asset of the Failed Bank that is not acquired under Section 3.1 of the Agreement or any similar arrangement pertaining to the management of such assets, to advance funds under a commitment to an obligor on any loan included among such assets;

(11) any action or inaction taken or omitted to be taken pursuant to this Arrangement in connection with the administration of any asset or the management of any Subsidiary of the Failed Bank that is not acquired under Section 3.1 of the Agreement (the "Management Services"), if such action or inaction is taken or omitted to be taken in good faith and in a manner reasonably believed to be in the best interests of the Receiver or such Subsidiary; and

(12) any action or inaction in connection with the Management Services which is taken or omitted to be taken upon the specific written direction of the Corporation or the Receiver.

6.2    **Additional Exclusions From Indemnity.** The following additional exclusions from indemnities are provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.1(b) of the Agreement:

(15) claims arising from any action or inaction by the Person claiming indemnification which constitutes bad faith, gross negligence or willful misconduct;

(16) claims that could have been enforced against the Person claiming indemnification if the Assuming Bank had not agreed to perform the Management Services;

(17) claims arising from any violation, as a result of action or inaction by the Assuming Bank, or any Subsidiary or Affiliate of the Assuming Bank of (x) any agreement or instrument to which it is a party or by which it or its assets are bound, or (y) its charter or by-laws.

**6.3    Additional Indemnity For Receiver and Corporation.** The following additional indemnity is provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.4 of the Agreement:

(3) claims arising from any action or inaction of any Indemnitee in connection with the Arrangement, if such action or inaction was taken or omitted in a manner constituting bad faith, gross negligence or willful misconduct.