## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------ x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, INC.
AMERICAN HOME MORTGAGE INVESTMENT CORP.
AMERICAN HOME MORTGAGE ACCEPTANCE, INC.
AHM SV, INC. (f/k/a American Home Mortgage Servicing, Inc.)
AMERICAN HOME MORTGAGE CORP.
AMERICAN HOME MORTGAGE VENTURES LLC
HOMEGATE SETTLEMENT SERVICES, INC.
GREAT OAK ABSTRACT CORP.

Debtors.[1]

------------------------------------------------------------------------ x

: Hon. Christopher S. Sontchi
: Chapter 11
:
: Case No. 07-11047
: Case No. 07-11048
: Case No. 07-11049
: Case No. 07-11050
: Case No. 07-11051
: Case No. 07-11052
: Case No. 07-11053
: Case No. 07-11054
:
: Jointly Administered

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS DATED AS OF AUGUST 15, 2008

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for the Debtors and Debtors in Possession

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc., a Delaware corporation (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

066585.1001

PLEASE NOTE THAT THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE UNDER SECTION 1125 OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.

**TABLE OF CONTENTS**

Page No.

I.    INTRODUCTION ........................................................................... 1

     A.    Disclosure Statement Enclosures ............................................ 4

     B.    Overview of the Plan .............................................................. 4

     C.    Recommendation ..................................................................... 9

II.   ELIGIBILITY TO VOTE ............................................................. 9

III.   BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES ................... 13

     A.    The Debtors' Corporate Structure .......................................... 13

         1.    AHM Investment and its Direct Subsidiaries ......................... 13

         2.    AHM Holdings and its Direct Subsidiaries ........................... 14

         3.    AHM Acceptance and its Direct Subsidiaries ....................... 14

         4.    AHM SV and its Direct Subsidiaries .................................. 14

         5.    AHM Corp. and its Direct Subsidiaries ............................... 14

         6.    AHM Ventures ............................................................... 15

         7.    Homegate .................................................................... 15

         8.    Great Oak .................................................................... 15

     B.    Overview of the Debtors' Businesses ..................................... 15

     C.    The Debtors' Business Segments ........................................... 16

         1.    Loan Origination ........................................................... 16

         2.    Hedging Activities ......................................................... 17

         3.    Loan Sales and Securitizations ........................................ 18

         4.    Loan Servicing .............................................................. 18

     D.    Principal Indebtedness of the Debtors .................................... 19

     E.    Properties .............................................................................. 20

     F.    Events Leading to the Debtors' Chapter 11 Filings .................. 20

     G.    The Chapter 11 Cases ........................................................... 21

         1.    Debtor in Possession Status ........................................... 22

         2.    Entry of the Debtors' First Day Orders .............................. 22

         3.    Debtor in Possession Financing and Use of Cash Collateral ................... 22

         4.    Appointment of the Committee ....................................... 24

         5.    Retention of Professionals .............................................. 24

         6.    Executive and Incentive Plan .......................................... 25

         7.    Contested Turnover/Stay Relief Motions Early in the Chapter 11 Cases. 26

         8.    Asset Sales ................................................................... 28

         9.    Schedules and Statements of Financial Affairs; Claims Bar Dates and Aggregate Claims Asserted ................................ 35

         10.    Return of Mortgage Loan Files and Destruction of Duplicate Mortgage Files .................................................. 36

         11.    Rejection of Leases and Executory Contracts ..................... 37

i

    12.    Extensions of Exclusivity ................................................................ 38
    13.    Litigation.......................................................................................... 38
    14.    Wells Fargo Stay Relief Litigation ................................................ 42
    15.    Bank of America Stay Relief Litigation ......................................... 43
    16.    Committee and Bank of America 9019 Motion............................... 44
    17.    The Purchaser's Administrative Expense Request ......................... 44
    18.    Bank of America Global 9019 Motion ............................................ 44
    19.    Calyon Settlements ......................................................................... 45
    20.    Objections to Claims....................................................................... 46
    21.    Miscellaneous Contested Matters .................................................. 46

IV.    PROPOSED INTERCOMPANY RESOLUTION EMBODIED IN THE PLAN............47

    A.    General Structure of the Plan .........................................................................47

    B.    Settlement of Intercompany Claims................................................................49

    C.    The Stipulated Asset Allocation ....................................................................51

V.    THE PLAN ........................................................................................................54

    A.    Classification of Claims and Interests.............................................................55

    B.    Treatment of Claims and Interests ..................................................................59
        1.    DIP Facility Claims......................................................................... 59
        2.    Administrative Claims .................................................................... 59
        3.    Statutory Fees.................................................................................. 61
        4.    Priority Tax Claims......................................................................... 61
        5.    Other Priority Claims ...................................................................... 62
        6.    Miscellaneous Secured Claims ...................................................... 62
        7.    BofA Syndicate Secured Claim ...................................................... 63
        8.    PNB Secured Claim ........................................................................ 63
        9.    Travelers Secured Claim ................................................................. 63
        10.    JPM Secured Claim......................................................................... 64
        11.    BofA Syndicate Unsecured Claim .................................................. 66
        12.    Other Unsecured Claims ................................................................. 66
        13.    Subordinated Trust Preferred Claims; Other Subordinated Claims; and
                Interests ........................................................................................... 66

    C.    Acceptance or Rejection of the Plan; Nonconsensual Confirmation....................66
        1.    Impaired Classes Entitled to Vote................................................... 66
        2.    Non-Consensual Confirmation ....................................................... 67

    D.    Settlement of Intercompany Claims; Stipulated Asset Allocation ......................67

    E.    Estimation and Allowance of EPD/Breach Claims ..........................................68
        1.    EPD Claims...................................................................................... 69
        2.    Breach of Warranty Claims ............................................................ 69
        3.    Interaction Between EPD Claims and Breach of Warranty Claims. ........ 71
        4.    EPD/Breach Claims Questionnaire................................................. 71

    F.    Means of Implementing the Plan ....................................................................72
        1.    Corporate Action; Dissolution of Debtors ..................................... 72

ii

| | 2. | Dissolution of the Committee | 72 |
| | 3. | The Plan Trust | 72 |
| | 4. | Vesting of Assets in Plan Trust; Assumption of Plan Obligations | 78 |
| | 5. | Plan Oversight Committee | 79 |
| | 6. | Liability; Indemnification | 81 |
| | 7. | Retention of Professionals | 81 |
| | 8. | Trustee as Successor | 82 |
| G. | | Distributions under the Plan | 83 |
| | 1. | Timing of Distributions | 83 |
| | 2. | Reserves | 83 |
| | 3. | Distribution Calculations | 85 |
| | 4. | Payment in Full of Unsecured Claims | 86 |
| | 5. | Manner of Distribution | 87 |
| | 6. | *De Minimis* Distributions | 87 |
| | 7. | Delivery of Distributions; Undeliverable Distributions | 87 |
| | 8. | Setoffs and Recoupments | 88 |
| | 9. | Distributions in Satisfaction; Allocation | 88 |
| | 10. | Cancellation of Notes and Instruments | 88 |
| | 11. | No Interest on Claims | 88 |
| | 12. | Withholding Taxes | 89 |
| | 13. | Reports | 89 |
| H. | | Claims Administration; Disputed Claims | 89 |
| | 1. | Reservation of Rights to Object to Claims | 89 |
| | 2. | Objections to Claims | 89 |
| | 3. | Service of Objections | 90 |
| | 4. | Determination of Claims | 90 |
| | 5. | No Distributions Pending Allowance | 90 |
| | 6. | Claim Estimation | 91 |
| I. | | Rejection of Executory Contracts, Unexpired Leases | 91 |
| J. | | Plan Injunction and Exculpation Provisions | 93 |
| K. | | Conditions Precedent to Effective Date; Revocation, Withdrawal, or Non-Consummation of the Plan | 94 |
| L. | | Miscellaneous Provisions | 95 |
| | 1. | Retention of Jurisdiction | 95 |
| | 2. | Final Order | 98 |
| | 3. | Amendments and Modifications | 98 |
| | 4. | Tax Exemption | 98 |
| | 5. | Securities Exemption | 99 |
| | 6. | Non-Severability | 99 |
| | 7. | Revocation | 99 |
| | 8. | Governing Law | 99 |
| | 9. | Filing of Additional Documents | 99 |
| M. | | Cramdown and Bankruptcy Rule 9019 Requests | 100 |

DB02:6842992.8

066585.1001

VI.    CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN..................100

   A.    Risk Factors Regarding Bankruptcy Cases........................................................100

      1.    Allowance of Claims.............................................................................. 100

      2.    Objections to Classification of Claims Pursuant to § 1122 of the
         Bankruptcy Code ............................................................................ 101

      3.    Court Modification of Stipulated Asset Allocation or Other Elements of
         Proposed Compromise and Settlement of Intercompany Claims ........... 101

      4.    Valuation Risk ....................................................................................... 101

      5.    Risk of Non-Confirmation of the Plan.................................................... 102

      6.    Nonconsensual Confirmation.................................................................. 102

      7.    Delays of Confirmation and/or Effective Date ....................................... 102

      8.    Plan Trust Operations ............................................................................ 102

      9.    Causes of Action ................................................................................... 103

   B.    Risk Factors Relating to Securities Laws ..........................................................103

      1.    Non-Transferability................................................................................. 103

      2.    Uncertainty of Value.............................................................................. 104

VII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................104

   A.    General....................................................................................................................104

   B.    United States Federal Income Tax Consequences of Payment of Allowed Claims
      Pursuant to Plan ..................................................................................................105

      1.    Recognition of Gain or Loss ................................................................. 105

      2.    Pending Payments................................................................................... 106

      3.    Payments Other than Pending Payments ................................................. 106

   C.    Certain Other Tax Consequences for Holders of Claims.....................................106

      1.    Receipt of Pre-Effective Date Interest .................................................... 106

      2.    Installment Method ................................................................................ 106

      3.    Information Reporting and Withholding ................................................. 107

   D.    Tax Consequences of the Plan to the Debtors .....................................................107

   E.    Importance of Obtaining Professional Tax Assistance.........................................107

VIII.  ALTERNATIVES TO CONFIRMATION OF THE PLAN .........................................107

IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING REQUIREMENTS108

   A.    Best Interests Test ................................................................................................108

   B.    Financial Feasibility Test......................................................................................110

   C.    Acceptance by Impaired Classes .........................................................................111

   D.    Voting Procedures.................................................................................................111

      1.    Ballots ................................................................................................... 111

      2.    Deadline for Voting ............................................................................... 112

      3.    Importance of Your Vote ....................................................................... 112

X.     RECOMMENDATION AND CONCLUSION........................................................................1

DB02:6842992.8

066585.1001

## I.    INTRODUCTION

The following debtors (the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on August 6, 2007 (the "Petition Date"), thereby commencing case numbers 07-11047, 07-11048, 07-11049, 07-11050, 07-11051, 07-11052, 07-11053 and 07-11054 (collectively, the "Chapter 11 Cases") currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"):

| DEBTOR | ADDRESS | CASE NO. |
|---|---|---|
| American Home Mortgage Holdings, Inc., a Delaware corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11047 |
| American Home Mortgage Investment Corp., a Maryland corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11048 |
| American Home Mortgage Acceptance, Inc., a Maryland corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11049 |
| AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11050 |
| American Home Mortgage Corp., a New York corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11051 |
| American Home Mortgage Ventures LLC, a Delaware limited liability company | 538 Broadhollow Road Melville, NY 11747 | 07-11052 |
| Homegate Settlement Services, Inc., a New York corporation | 538 Broadhollow Road Melville, NY 11747 | 00-11053 |
| Great Oak Abstract Corp., a New York corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11054 |

Since filing for bankruptcy protection, the Debtors have continued to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107 and 1008 of the Bankruptcy Code. On August 7, 2007, the Bankruptcy Court entered an order authorizing the joint administration of the Chapter 11 Cases under the lead case *In re American Home Mortgage Holdings, Inc.*, Case No. 07-11047 [Docket No. 60].[1]

On August 15, 2008, the Debtors filed their proposed Chapter 11 Plan of Liquidation of the Debtors (in such capacity, the "Plan Proponents") Dated as of August 15, 2008 (as such plan may be amended from time to time, the "Plan"). A copy of the Plan is annexed hereto as Exhibit A. THE PLAN PROPONENTS URGE CREDITORS TO VOTE IN FAVOR OF THE PLAN.

---

[1] Except as otherwise provided herein, references to docket numbers refer to the docket in the lead case.

DB02:6842992.8

066585.1001

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS ACCEPTANCE OR REJECTION OF THE PLAN.

The information used in preparing this Disclosure Statement was prepared by and is the sole responsibility of the Debtors. This Disclosure Statement does not constitute financial or legal advice. Creditors and interest holders of the Debtors should consult their own advisors if they have questions about the Plan or this Disclosure Statement. Capitalized terms used in this Disclosure Statement and not expressly defined herein have the meaning ascribed to them in the Plan. A reference in this Disclosure Statement to a "Section" refers to a section of this Disclosure Statement.

WHILE THIS DISCLOSURE STATEMENT DESCRIBES CERTAIN BACKGROUND MATTERS AND THE MATERIAL TERMS OF THE PLAN, IT IS INTENDED AS A SUMMARY DOCUMENT ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT. SIMILARLY, DESCRIPTIONS IN THIS DISCLOSURE STATEMENT OF PLEADINGS, ORDERS, AND PROCEEDINGS IN THESE CHAPTER 11 CASES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE RELEVANT DOCKET ITEMS. YOU SHOULD READ THE PLAN AND THE EXHIBITS TO OBTAIN A FULL UNDERSTANDING OF THEIR PROVISIONS. ADDITIONAL COPIES OF THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, AS WELL AS ANY DOCKET ITEMS FROM THESE CHAPTER 11 CASES, ARE AVAILABLE FOR INSPECTION DURING REGULAR BUSINESS HOURS AT THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 5TH FLOOR, 824 MARKET STREET, WILMINGTON, DELAWARE 19801. IN ADDITION, COPIES MAY BE OBTAINED FOR A CHARGE THROUGH DELAWARE DOCUMENT RETRIEVAL, 230 NORTH MARKET STREET, P.O. BOX 27, WILMINGTON, DELAWARE 19801, (302) 658-9971, OR VIEWED ON THE INTERNET AT THE BANKRUPTCY COURT'S WEBSITE (HTTP://WWW.DEB.USCOURTS.GOV/) BY FOLLOWING THE DIRECTIONS FOR ACCESSING THE ECF SYSTEM ON SUCH WEBSITE. COPIES ARE ALSO AVAILABLE FREE OF CHARGE ON EPIQ BANKRUPTCY SOLUTIONS LLC'S DEDICATED WEB PAGE RELATED TO THESE CASES (HTTP://CHAPTER11.EPIQSYSTEMS.COM – CLICK ON "AMERICAN HOME MORTGAGE").

THE STATEMENTS AND INFORMATION CONCERNING THE DEBTORS AND THE PLAN SET FORTH IN THIS DISCLOSURE STATEMENT CONSTITUTE THE ONLY STATEMENTS OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED

2

HEREIN.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.  THE DEBTORS ASSUME NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DO NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES, EXCEPT TO THE EXTENT, IF ANY, NECESSARY AT THE HEARING ON CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN.  CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS, INCLUDING THOSE ESTIMATES OF THE CASH THAT WILL BE AVAILABLE FOR DISTRIBUTION TO THE HOLDERS OF CLAIMS, ESTIMATES OF THE PERCENTAGE RECOVERY OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE AGGREGATE FINAL ALLOWED AMOUNTS OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE PROCEEDS FROM THE SALE, LIQUIDATION, OR OTHER DISPOSITION OF THE DEBTORS' REMAINING ASSETS AND ESTIMATES OF THE EXPENSES THAT WILL BE INCURRED BY THE PLAN TRUST DURING THE WIND-DOWN PERIOD.  THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN HEREIN, POSSIBLY BY MATERIAL AMOUNTS.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT.  PURSUANT TO THE PLAN, ANY SECURITIES ISSUED TO ANY PARTY UNDER, PURSUANT TO, OR IN EFFECTUATING THE PLAN, AND THE OFFERING AND INSURANCE THEREOF BY ANY PARTY, ARE EXEMPT FROM SECTION 5 OF THE SECURITIES ACT OF 1933, IF APPLICABLE, AND FROM ANY STATE OR FEDERAL SECURITIES LAWS REQUIRING REGISTRATION FOR THE OFFER OR SALE OF A SECURITY OR REGISTRATION OR LICENSING OF AN ISSUER OR UNDERWRITER OF, OR BROKER OR DEALER IN, A SECURITY, AND OTHERWISE ENJOY ALL EXEMPTIONS AVAILABLE FOR DISTRIBUTIONS OF SECURITIES UNDER A PLAN IN ACCORDANCE WITH ALL APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, SECTION 1145 OF THE BANKRUPTCY CODE.

DB02:6842992.8

066585.1001

A. **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

- A copy of the Plan (Exhibit A)

- A copy of the Order approving the Disclosure Statement entered [_____] (Exhibit B);

- An analysis of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code (Exhibit C);

- A ballot for acceptance or rejection of the Plan for Holders of Impaired Claims entitled to vote to accept or reject the Plan (the "Ballot"); and

- A notice setting forth: (i) the deadline for casting ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "Notice").

B. **Overview of the Plan**

The following is a brief overview of the Plan, which is qualified in its entirety by reference to the Plan, attached as Exhibit A to this Disclosure Statement.

Under the Plan, a single liquidating trust will be established for the benefit of Creditors of the Debtors, which Plan Trust will succeed to all Assets of each Debtor (including, but not limited to, all Causes of Action). The Plan Trustee will, among other things, liquidate the non-Cash Assets transferred to the Plan Trust (including the prosecution of any Causes of Action), reconcile all Claims against the Debtors, make distributions to Holders of Allowed Claims against each Debtor as provided in the Plan, and otherwise wind down the Chapter 11 Cases and the Debtors' Estates.

The Plan designates a series of Classes of Claims and Interests for each Debtor. These Classes take into account the differing nature of the various Claims and Interests, as well as their relative priority under the Bankruptcy Code.

The following table (the "Plan Summary Table") summarizes the classification and treatment of Claims and Interests under the Plan (including certain unclassified Claims), as well as the Debtors' estimate of the percentage recovery for Holders of Claims and Interests in each Class. **THE PLAN SUMMARY TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND DOES NOT ADDRESS ALL ISSUES REGARDING CLASSIFICATION, TREATMENT, AND ULTIMATE RECOVERIES. THE PLAN SUMMARY TABLE IS NOT A SUBSTITUTE FOR A FULL REVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN (ATTACHED HERETO AS EXHIBIT A) IN THEIR ENTIRETY.**

DB02:6842992.8

066585.1001

The percentage recovery for each Class set forth in the Plan Summary Table is based on the Debtors' good-faith estimate, based on all information currently known, of (i) the amount of Claims against each Debtor that will ultimately be Allowed[2] and (ii) the amount of Cash that will be available in each Estate for distribution to Holders of Allowed Claims after liquidation of all Plan Trust Assets by the Plan Trustee.[3]  The actual amounts of Allowed Claims against each Debtor and Cash available for distribution to Creditors of each Estate could vary materially from the Debtors' estimates, and the actual percentage recoveries for Creditors will necessarily depend upon the actual amounts of Allowed Claims, Cash realized from the liquidation of non-litigation assets, Cash realized from prosecuting Causes of Action, and expenses of the Plan Trust.

For the foregoing reasons, no representation can be, or is being, made with respect to whether the percentage recoveries set forth in the Plan Summary Table will be realized by the Holders of Allowed Claims against the respective Debtors.  **THERE IS NO GUARANTEED RECOVERY AND THERE ARE NO GUARANTEED AMOUNTS OF RECOVERY FOR ANY HOLDER OF A CLAIM OR INTEREST.**

In addition, the Plan provides for the establishment of Disputed Claims Reserves for the benefit of Holders of Disputed Claims.  Interim distributions of Cash on Allowed Claims of a given Class may be made from time to time, with sufficient Cash held in reserve to cover the Disputed Claims of such Class pending allowance or disallowance of such Disputed Claims.  As a result, the process of distributing all Cash to be distributed to Holders of Allowed Claims under the Plan will be completed over time.

| **Summary of Classification and Treatment of Claims and Interests under the Plan** | | | |
|---|---|---|---|
| **CLASS(ES)** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4]** | **ESTIMATED % RECOVERY** |
| n/a | DIP Facility Claims | Paid in full in Cash (or in a manner otherwise permitted or required pursuant to the terms of the DIP Facility and the DIP Loan Agreement). | 100% |
| n/a | Administrative Claims against all Debtors | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium. | 100% |

---

[2]  Estimated amounts of Allowed Claims do not constitute an admission by the Debtors or any other party as to the validity or amount of any particular Claim.  The Plan Proponents, on behalf of themselves, the Plan Trustee, and the Plan Oversight Committee, reserve the right to dispute the validity or amount of any Claim that has not already been Allowed by Order of the Bankruptcy Court or by agreement of the parties.

[3]  For purposes of the Plan Summary Table, estimated Cash excludes any recoveries that may be realized by the Plan Trustee from prosecuting Causes of Action.

[4]  The treatment of any Allowed Claim within a Class is subject to any agreement between the Holder of such Allowed Claim and the Debtors (if before the Effective Date) or the Plan Trustee (if after the Effective Date) which provides treatment of such Allowed Claim on terms no less favorable to the Debtors than the treatment provided in the Plan.

5

| Summary of Classification and Treatment of Claims and Interests under the Plan | | |
|---|---|---|
| **CLASS(ES)** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4]** | **ESTIMATED % RECOVERY** |
| n/a | Priority Tax Claims against all Debtors | Paid in Cash equal to the Allowed Amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of every calendar year after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus simple interest on any outstanding balance, calculated from the Effective Date at the interest rate available on ninety (90)-day United States Treasuries on the Effective Date. | 100% |
| 1A, 2A, 3A, 4A, 5A, 6A, 7A, and 8A | Priority Claims against all Debtors | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium. | 100% |
| 1B(1) *et seq.*, 2B(1)(a) *et seq.*, 3B(1)(a) *et seq.*, 4B(1)(a) *et seq.*, 5B(1)(a) *et seq.*, 6B(1) *et seq.*, 7B(1) *et seq.*, and 8B(1) *et seq.* | Miscellaneous Secured Claims against all Debtors | At the option of the Plan Trustee: (a) reinstated in full, leaving unaffected the Holder of such Claim's legal, equitable, and/or contractual rights, (b) paid in Cash up to the Allowed amount of such Claim, (c) satisfied in whole or in part by the transfer of all or any portion of the Assets securing such Claim, (d) paid in deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of the Claim that is not otherwise satisfied as of the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing the Claim, or (e) such other treatment as would provide the "indubitable equivalent" of the Allowed Claim | 100% |
| 2B(2), 3B(2), 4B(2) and 5B(3) | BofA Syndicate Secured Claim against AHM Investment, AHM Acceptance, AHM SV, and AHM Corp. | Treated in accordance with the BofA Global Settlement Stipulation | 100% |

6

066585.1001

| Summary of Classification and Treatment of Claims and Interests under the Plan | | | |
|---|---|---|---|
| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4] | ESTIMATED % RECOVERY |
| 5B(2) | PNB Secured Claim against AHM Corp. | At the option of the Plan Trustee: (a) reinstated in full, leaving unaffected the Holder of such Claim's legal, equitable, and/or contractual rights, (b) paid in Cash up to the Allowed amount of such Claim, (c) satisfied in whole or in part by the transfer of all or any portion of the Assets securing such Claim, (d) paid in deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of the Claim that is not otherwise satisfied as of the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing the Claim, or (e) such other treatment as would provide the "indubitable equivalent" of the Allowed Claim | 100% |
| 3B(4), 4B(3), and 5B(5) | Travelers Secured Claim against AHM Acceptance, AHM SV, and AHM Corp. | Treated in accordance with the Travelers Stipulation | 100% |
| 3B(3) and 5B(4) | JPM Secured Claim against AHM Acceptance and AHM Corp. | At the option of the Plan Trustee, (a) paid in Cash up to the Allowed amount of such Claim, (b) paid up to the Allowed amount of such Claim from the proceeds from the sale or other disposition of all or any portion of the Assets securing the Allowed Claim, after deducting the reasonable, necessary costs and expenses of preserving and disposing of such Assets; (c) satisfied in full or in part by the return of all or any portion of the Assets securing such Allowed JPM Secured Claim; (d) satisfied in full or in part by execution of the JPM Plan Note, as described more particularly in the Plan, or (e) such other treatment as will provide the "indubitable equivalent" of the Allowed Claim. | 100% |
| 1C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim) against AHM Holdings | Paid a Pro Rata share of the Net Distributable Assets of the AHM Holdings Estate | 5.86% |
| 2C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim) against AHM Investment | Paid a Pro Rata share of the Net Distributable Assets of the AHM Investment Estate | 0.83% |

7

| Summary of Classification and Treatment of Claims and Interests under the Plan | | | |
|---|---|---|---|
| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4] | ESTIMATED % RECOVERY |
| 3C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim) against AHM Acceptance | Paid a Pro Rata share of the Net Distributable Assets of the AHM Acceptance Estate | 0.72% |
| 4C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim) against AHM SV | Paid a Pro Rata share of the Net Distributable Assets of the AHM SV Estate | 0.11% |
| 5C(1) | Unsecured Claims (other than BofA Syndicate Unsecured Claim) against AHM Corp. | Paid a Pro Rata share of the Net Distributable Assets of the AHM Corp. Estate | 1.06% |
| 6C | Unsecured Claims against AHM Ventures | Paid a Pro Rata share of the Net Distributable Assets of the AHM Ventures Estate | 2.22% |
| 7C | Unsecured Claims against Homegate | Paid a Pro Rata share of the Net Distributable Assets of the Homegate Estate | 0.75% |
| 8C | Unsecured Claims against Great Oak | Paid a Pro Rata share of the Net Distributable Assets of the Great Oak Estate | 1.77% |
| 1C(2) | BofA Syndicate Unsecured Claim against AHM Holdings | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Holdings Estate | 5.53% |
| 2C(2) | BofA Syndicate Unsecured Claim against AHM Investment | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Investment Estate | 0.51% |
| 3C(2) | BofA Syndicate Unsecured Claim against AHM Acceptance | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Acceptance Estate | 0.39% |
| 4C(2) | BofA Syndicate Unsecured Claim against AHM SV | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM SV Estate | 0% |
| 5C(2) | BofA Syndicate Unsecured Claim against AHM Corp. | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Corp. Estate | 0.74% |

8

| Summary of Classification and Treatment of Claims and Interests under the Plan | | | |
|---|---|---|---|
| **CLASS(ES)** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4]** | **ESTIMATED % RECOVERY** |
| 1D and 2D | Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment | Holders of such Claims will neither retain nor receive any property on account of such Claims | 0% |
| 1E, 2E, 3D, 4D, 5D, 6D, 7D, and 8D | Subordinated Claims against all Debtors | Holders of such Claims will neither retain nor receive any property on account of such Claims | 0% |
| 1F, 2F, 3E, 4E, 5E, 6E, 7E, and 8E | Interests in all Debtors | Holders of such Interests will neither retain nor receive any property on account of such Interests | 0% |

**THE TREATMENT AND DISTRIBUTIONS, IF ANY, PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS PURSUANT TO THE PLAN WILL BE IN FULL AND COMPLETE SATISFACTION OF ALL LEGAL, EQUITABLE, OR CONTRACTUAL RIGHTS REPRESENTED BY SUCH ALLOWED CLAIMS AND INTERESTS.**

### C. <u>Recommendation</u>

**THE PLAN PROPONENTS RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ON THE PLAN CAST THEIR BALLOTS TO ACCEPT THE PLAN. THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS.**

## II.    ELIGIBILITY TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and therefore, such holders do not need to vote on the Plan.

The Claims in the Classes listed in the following table are unimpaired and conclusively presumed to have accepted the Plan:

| Class | Description |
|---|---|
| Class 1A | Priority Claims against AHM Holdings |
| Class 2A | Priority Claims against AHM Investment |

066585.1001

| Class | Description |
|---|---|
| Class 3A | Priority Claims against AHM Acceptance |
| Class 3B(4) | Travelers Secured Claim against AHM Acceptance |
| Class 4A | Priority Claims against AHM SV |
| Class 4B(3) | Travelers Secured Claim against AHM SV |
| Class 5A | Priority Claims against AHM Corp. |
| Class 5B(5) | Travelers Secured Claim against AHM Corp. |
| Class 6A | Priority Claims against AHM Ventures |
| Class 7A | Priority Claims against Homegate |
| Class 8A | Priority Claims against Great Oak |

If and to the extent that any Class identified as Unimpaired in the foregoing table is determined to be Impaired, such Class will be entitled to vote to accept or reject the Plan.

Under the Plan, holders of Claims in Classes listed in the following table are Impaired and are entitled to vote to accept or reject the Plan:

| Class(es) | Description |
|---|---|
| Class 1B(1) *et seq.* | Miscellaneous Secured Claims against AHM Holdings |
| Class 1C(1) | Unsecured Claims against AHM Holdings other than the BofA Syndicate Unsecured Claim |
| Class 1C(2) | BofA Syndicate Unsecured Claim against AHM Holdings |
| Class 2B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Investment |
| Class 2B(2) | BofA Syndicate Secured Claim against AHM Investment |
| Class 2C(1) | Unsecured Claims against AHM Investment other than the BofA Syndicate Unsecured Claim |
| Class 2C(2) | BofA Syndicate Unsecured Claim against AHM Investment |
| Class 3B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Acceptance |
| Class 3B(2) | BofA Syndicate Secured Claim against AHM Acceptance |

10

| Class(es) | Description |
|---|---|
| Class 3B(3) | JPM Secured Claim against AHM Acceptance |
| Class 3C(1) | Unsecured Claims against AHM Acceptance other than the BofA Syndicate Unsecured Claim |
| Class 3C(2) | BofA Syndicate Unsecured Claim against AHM Acceptance |
| Class 4B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM SV |
| Class 4B(2) | BofA Syndicate Secured Claim against AHM SV |
| Class 4C(1) | Unsecured Claims against AHM SV other than the BofA Syndicate Unsecured Claim |
| Class 4C(2) | BofA Syndicate Unsecured Claim against AHM SV |
| Class 5B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Corp. |
| Class 5B(2) | PNB Secured Claim against AHM Corp. |
| Class 5B(3) | BofA Syndicate Secured Claim against AHM Corp. |
| Class 5B(4) | JPM Secured Claim against AHM Corp. |
| Class 5C(1) | Unsecured Claims against AHM Corp. other than the BofA Syndicate Unsecured Claim |
| Class 5C(2) | BofA Syndicate Unsecured Claim against AHM Corp. |
| Class 6B(1) *et seq.* | Miscellaneous Secured Claims against AHM Ventures |
| Class 6C | Unsecured Claims against AHM Ventures |
| Class 7B(1) *et seq.* | Miscellaneous Secured Claims against Homegate |
| Class 7C | Unsecured Claims against Homegate |
| Class 8B(1) *et seq.* | Miscellaneous Secured Claims against Great Oak |
| Class 8C | Unsecured Claims against Great Oak |

Holders of Claims and Interests in the Classes listed in the following table are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan:

| Class | Description |
|---|---|
| Class 1D | Subordinated Trust Preferred Claims against AHM Holdings |
| Class 1E | Subordinated Claims against AHM Holdings |

11

066585.1001

| Class | Description |
|---|---|
| Class 1F | Interests in AHM Holdings |
| Class 2D | Subordinated Trust Preferred Claims against AHM Investment |
| Class 2E | Subordinated Claims against AHM Investment |
| Class 2F | Interests in AHM Investment |
| Class 3D | Subordinated Claims against AHM Acceptance |
| Class 3E | Interests in AHM Acceptance |
| Class 4D | Subordinated Claims against AHM SV |
| Class 4E | Interests in AHM SV |
| Class 5D | Subordinated Claims against AHM Corp. |
| Class 5E | Interests in AHM Corp. |
| Class 6D | Subordinated Claims against AHM Ventures |
| Class 6E | Interests in AHM Ventures |
| Class 7D | Subordinated Claims against Homegate |
| Class 7E | Interests in Homegate |
| Class 8D | Subordinated Claims against Great Oak |
| Class 8E | Interests in Great Oak |

The record date for determining any creditor's eligibility to vote on the Plan is [__ _____], 2008.  Only those Creditors entitled to vote on the Plan will receive a Ballot with this Disclosure Statement.

**CREDITORS WHOSE CLAIMS ARE SUBJECT TO A PENDING OBJECTION ARE NOT ELIGIBLE TO VOTE UNLESS SUCH OBJECTIONS ARE RESOLVED IN THEIR FAVOR OR, AFTER NOTICE AND A HEARING PURSUANT TO BANKRUPTCY RULE 3018(a), THE BANKRUPTCY COURT ALLOWS THE CLAIM TEMPORARILY OR ESTIMATES THE AMOUNT OF THE CLAIM FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN.  ANY CREDITOR THAT WANTS ITS CLAIM TO BE ALLOWED TEMPORARILY OR ESTIMATED FOR THE PURPOSE OF VOTING MUST TAKE THE STEPS NECESSARY TO ARRANGE AN APPROPRIATE HEARING WITH THE BANKRUPTCY COURT UNDER BANKRUPTCY RULE 3018(a).**

DB02:6842992.8

066585.1001

## III.    BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES

### A.    The Debtors' Corporate Structure



### 1.    AHM Investment and its Direct Subsidiaries

AHM Investment, a Maryland corporation, was incorporated in July of 2003 and is organized and operates as a real estate investment trust ("REIT") for federal income tax purposes.  Prior to the Petition Date, AHM Investment's common stock was publicly traded on the New York Stock Exchange under the symbol "AHM".[5]  AHM Investment is the ultimate parent of each of the other Debtors.  AHM Investment directly and wholly owns AHM Holdings, a Delaware corporation, and AHM Acceptance, a Maryland corporation, as well as four non-debtor entities: Baylis Trust I, a Delaware business trust; AHM Capital Trust I, a Delaware business trust; American Home Mortgage Securities LLC, a Delaware limited liability company; and AHM SPV III, LLC, a Delaware limited liability company.

---

[5]  AHM Investment's 9.75% Series A Cumulative Redeemable Preferred Stock and 9.25% Series B Cumulative Redeemable Preferred Stock were also traded on the NYSE under the symbols "AHM PrA" and "AHM PrB," respectively.

DB02:6842992.8

066585.1001

### 2.    AHM Holdings and its Direct Subsidiaries

AHM Holdings, a Delaware corporation, is a direct, wholly owned subsidiary of AHM Investment. AHM Holdings is a holding company for certain of its Debtor and non-debtor subsidiaries. AHM Holdings guarantees certain obligations of other Debtors and non-debtors, and is the direct obligor with respect to certain other transactions. AHM Holdings wholly owns AHM SV, a Maryland corporation, AHM Corp., a New York corporation, and AHM Ventures, a Delaware limited liability company. AHM Holdings also wholly owns non-debtor entities including American Home Securities, LLC, a Delaware limited liability company, American Home Bank ("AH Bank"), a United States federally chartered thrift,[6] and several Delaware business trusts.[7]

AH Bank is the most significant unencumbered Asset remaining in any Debtor's Estate and is expected to provide considerable value upon its sale or liquidation.

### 3.    AHM Acceptance and its Direct Subsidiaries

AHM Acceptance, a Maryland corporation, is a direct, wholly owned subsidiary of AHM Investment that, prior to the Petition Date, originated loans for the Debtors. AHM Acceptance also wholly owns two non-debtor entities: Melville Funding, LLC, a Delaware limited liability company, and AHM LF, LLC, a Delaware limited liability company.

### 4.    AHM SV and its Direct Subsidiaries

AHM SV, a Maryland corporation, is a direct, wholly owned subsidiary of AHM Holdings that, prior to the Petition Date, serviced the Debtors' loans as well as loans for third parties. AHM SV also wholly owns three non-debtor entities: CNI Reinsurance, Ltd., a company established under the laws of Turks & Caicos Islands; NAP Financial Services, LLC, a Maryland limited liability company; and CNI Title Services, LLC, a Maryland limited liability company (collectively, the "Servicing Subsidiaries").

The Debtors have explored possible sale or liquidation of the Servicing Subsidiaries, but do not anticipate realizing significant value therefrom.

### 5.    AHM Corp. and its Direct Subsidiaries

AHM Corp., a New York corporation, was formed in 1988 and was the first company formed as part of the American Home Mortgage Organization. AHM Corp. is a direct, wholly owned subsidiary of AHM Holdings and, together with AHM Acceptance, primarily originated loans for the Debtors prior to the Petition Date. AHM Corp. wholly owns Homegate and Great

---

[6] On October 2006, AHM Holdings acquired Flower Bank, fsb, of Chicago, Illinois, a federally chartered savings bank, which changed its name to American Home Bank.

[7] These business trusts include Baylis Trust II, Baylis Trust III, Baylis Trust IV, Baylis Trust V, Baylis Trust VI, Baylis Trust VII and Baylis Trust VIII.

Oak, both New York corporations, as well as several non-debtor entities.[8]  AHM Corp. is also a participant in the following joint ventures: Mortgage First Limited, LLC; Array Mortgage, LLC; and American Midwest Title Agency, LLC.

### 6.    AHM Ventures

AHM Ventures, a Delaware limited liability company, is a wholly owned subsidiary of AHM Holdings, that, prior to the Petition Date, provided residential mortgage brokerage services.  AHM Ventures also participates in several joint ventures.[9]

### 7.    Homegate

Homegate, a New York corporation, is a wholly owned subsidiary of AHM Corp., that , prior to the Petition Date, provided vendor management services to the Debtors' loan origination affiliates.

### 8.    Great Oak

Great Oak, a New York corporation, is a wholly owned subsidiary of AHM Corp., that provided title search and related services in New York State to certain of the Debtors' affiliates prior to the Petition Date.

### B.    Overview of the Debtors' Businesses

Prior to the Petition Date, the Debtors were in the business of investing in mortgage-backed securities and mortgage loans resulting from the securitization of residential mortgage loans that their subsidiaries originated and serviced.  The Debtors also invested in securitized mortgage loans originated by others.  Most of the Debtors' portfolio consisted of securitized adjustable-rate mortgage loans, or ARM loans, that were of prime and alternate-"A" quality.  An important element of the Debtors' business strategy was self-originating many of the securitized loans in which the Debtors invested, so as to acquire those loans at a lower cost than would be required to purchase similar loans in the capital markets.  In addition to investing in securitized mortgage loans, the Debtors also were in the businesses of originating and selling mortgage loans to institutional investors, as well as servicing mortgage loans owned by others.

In order to maintain adequate liquidity pending the ultimate sale of their loans, the Debtors entered into several warehouse financing arrangements (the "Warehouse Facilities"). Most of the arrangements were documented under committed master repurchase agreement facilities ("Master Repurchase Agreements").  Pursuant to these Warehouse Facilities, the loans

---

[8]  These wholly owned non-debtor entities include: Broadhollow Funding, LLC, a Delaware limited liability company; AHM SPV I, LLC, a Delaware limited liability company; AHM SPV II, LLC, a Delaware limited liability company; American Home Mortgage Assets LLC, a Delaware limited liability company; Melville Reinsurance Corp., a Vermont corporation; and American Home Escrow, LLC, a Delaware limited liability company.

[9]  These joint ventures include: HSS Mortgage, LLC; All Pro Mortgage, LLC; Silicon Mortgage, LLC; TDG Equities, LLC; Elite Lending Partners, LLC; Peak Experience Mortgage, LLC; U.S. Lending Company, LLC; American Home Mortgage V, LLC; and Private Mortgage Group, LLC.

066585.1001

were sold to an institution for a purchase price that was generally thought to be less than the fair market value of the loans. The sale was subject to an obligation of the Debtors to repurchase the loans at a price equal to the original purchase price, plus a differential representing the time value of money and was subject to an obligation on the part of the purchaser to resell the loan to the Debtors at that price. The Master Repurchase Agreements generally permitted the purchaser to periodically mark the purchased loans to market and, if the value of the loans had declined, to demand additional margin payments from the Debtors. If the Debtors failed to meet a margin call, the purchasers were entitled to declare an event of default and accelerate the Debtors' obligation to repurchase, thus extinguishing that right.

The Debtors also obtained warehouse loans under secured lending facilities and a commercial paper program. These facilities also generally permitted the lenders or credit support providers to mark the collateral to market and to demand additional margin payments.

As of December 31, 2006, the Debtors held a leveraged portfolio of mortgage loans and mortgage-backed securities valued at approximately $15.6 billion.

## C.   **The Debtors' Business Segments**

### 1.   **Loan Origination**

The Debtors' loan origination business originated and securitized loans in which the Debtors invested as well as additional loans that the Debtors sold, typically at a profit. The Debtors were one of the nation's largest home mortgage lenders and National Mortgage News ranked the Debtors as the nation's 10th largest residential mortgage lender for the third quarter of 2006. During 2006, the Debtors made loans to approximately 196,000 borrowers and their total originations were approximately $58.9 billion. The Debtors' loan origination business generated a significant portion of the Debtors' assets and the source of the Debtors' gain on sale revenue. It also was the source of many of the customers whose loans were being serviced by the Debtors.

The Debtors' originations were sourced through their own sales force of loan officers and account executives, as well as through mortgage brokers and loan correspondents. As of December 31, 2006, the Debtors conducted lending through over 550 retail and wholesale loan production offices located in 47 states and the District of Columbia.

The Debtors offered a broad array of mortgage products[10] and primarily made loans to borrowers with good credit profiles. The weighted-average FICO score for the Debtors' $58.9 billion of total originations in 2006 was 716. All of the loans the Debtors made in 2006 were secured by one- to four-family dwellings.

The Debtors' origination business sought to utilize a combination of skilled loan officers, advanced technology, a broad product line and a high level of customer service to successfully

---

[10] The Debtors' product line included ARM loans, conventional conforming fixed-rate loans, alternate-"A" loans, jumbo fixed-rate loans, home equity or second mortgage loans, government fixed-rate loans, non-prime loans and construction loans.

16

compete in the marketplace. The Debtors' primary goal in making a decision whether to extend a loan was whether that loan conformed to the expectations and underwriting standards of the secondary mortgage market. Typically, these standards focused on a potential borrower's credit history (often summarized by credit scores), income and stability of income, liquid assets and net worth, and the value and the condition of the property securing the loan. Whenever possible, the Debtors used "artificial intelligence" underwriting systems to determine whether a particular loan met those standards and expectations. In those cases where artificial intelligence was not available, the Debtors relied on their credit officer staff to make the determination. Once a customer applied for a loan, the Debtors' mortgage banking operation processed and underwrote the customer's application and the Debtors funded the customer's loan by drawing on a warehouse line of credit. These loans were then typically either sold, securitized with the resulting mortgage-backed securities being sold, or held as a long-term investment.

The Debtors' loan origination business rapidly grew in market share and scale since AHM Holdings became a public company in 1999. The aggregate principal amount of total loan originations was approximately $58.9 billion in 2006, compared to $45.3 billion in 2005, $23.1 billion in 2004, $21.7 billion in 2003 and $12.2 billion in 2002.

This growth gave the Debtors a relatively large presence in the secondary mortgage market, and, as a result, improved their ability to execute loan sales to third-party purchasers. In addition, their size enabled the Debtors to negotiate better terms with warehouse lenders and credit enhancers such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Finally, their size made it possible for the Debtors to profitably enter businesses ancillary to mortgage lending, such as mortgage reinsurance, title brokerage and vendor management.

The Debtors grew their mortgage origination business both through the acquisition of smaller mortgage origination companies and through organic growth. In each acquisition, the Debtors generally retained and grew the acquired company's loan production offices while substantially eliminating their centralized support operations and associated costs. These acquisitions significantly increased origination capability.

### 2.   Hedging Activities

The Debtors hedged interest rate risk and price volatility on their mortgage loan interest rate lock commitments and mortgage loans during the time they committed to acquire or originate mortgages at a pre-determined rate until the time they sold or securitized mortgages. The Debtors also hedged interest rate risk associated with funding their portfolio of mortgage loans and mortgage-backed securities. To reduce the sensitivity of earnings to interest rate and market value fluctuations, the Debtors hedged the risk of changes in the fair value of mortgage servicing rights. Also, to mitigate interest rate and price volatility risks, the Debtors entered into certain hedging transactions. The nature and quantity of their hedging transactions were determined based on various factors, including market conditions and the expected volume of mortgage acquisitions and originations.

17

### 3.    Loan Sales and Securitizations

As noted above, the Debtors sold a portion of the mortgage loans that they originated in the secondary mortgage market through whole loan sales or in the form of securitizations. With respect to mortgage loans that the Debtors originated but did not securitize, the Debtors typically sold those loans in the secondary mortgage market to securities dealers, large national banks, Fannie Mae, Freddie Mac, thrifts and smaller banks, real estate investment trusts and other institutional loan buyers. Typically, the Debtors sold loans on a limited recourse basis in order to reduce exposure to default risk, except that pursuant to the underlying purchase agreements, the Debtors generally committed to repurchase or substitute a loan if (i) a payment default occurred early in the life of the loan (an "Early Payment Default" or "EPD," and the resulting right to demand repurchase or substitution of a loan for which an EPD has occurred, an "EPD claim"), (ii) the selling entity breached its representations and warranties or (iii) the loan did not comply with the underwriting standards or other requirements of the ultimate investor.

The Debtors sold most of the loans they originated through whole loan sales. Other loans were sold into securitization trusts, out of which all of the ownership interests were sold to investors. For the loans the Debtors retained, the Debtors sold securities against those loans and retained a residual interest. The securitization trusts were distinct legal entities and were not included in the Debtors' chapter 11 filing.

### 4.    Loan Servicing

An active part of the Debtors' business was a servicing platform, which was conducted through AHM SV (f/k/a American Home Mortgage Servicing, Inc.). Loans were serviced primarily for the trusts of the Debtors' securitizations and for Fannie Mae, the Government National Mortgage Association ("Ginnie Mae"), and other third-party purchasers of the loans originated by the Debtors. Loan servicing activities were designed and implemented to ensure that the borrowers repaid each loan in a mortgage servicing portfolio in accordance with its terms. The Debtors' servicing business collected mortgage payments, administered tax and insurance escrows, responded to borrower inquiries and enabled the Debtors to maintain control over the collection and default mitigation processes. The loan servicing business also provided the Debtors with a stable cash flow.

As of December 31, 2006, AHM SV (f/k/a American Home Mortgage Servicing, Inc.) serviced approximately 197,000 loans with an aggregate unpaid principal balance ("UPB") of approximately $46.3 billion. The weighted-average servicing fee on the Debtors' servicing portfolio as of December 31, 2006, was 0.347% of the UPB of each loan serviced. In addition, the Debtors received other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.[11]

---

[11] Certain of the Debtors and their non-debtor subsidiaries engaged in other businesses that were ancillary to the Debtors' mortgage loan origination, servicing and sales activities, including two mortgage reinsurance subsidiaries,

### D.    Principal Indebtedness of the Debtors

As noted above, to finance mortgage loan production, the Debtors used Warehouse Facilities generally in the form of Master Repurchase Agreements,[12] pursuant to which each Warehouse Lender provided committed borrowing ability to the applicable Debtor(s) counterparty. In the ordinary course of their business, the Debtors used each Master Repurchase Agreement, together with their own capital, to fund the production of mortgage loans and/or the purchase of residential mortgage-backed securities ("RMBS").

A typical Master Repurchase Agreement provided for the sale[13] of one or more mortgage loans or RMBS to the Warehouse Lender in exchange for the transfer of funds from the Warehouse Lenders to the Debtors, subject to an obligation of the Debtors to repurchase the loans/RMBS on or before a date certain (e.g., 180 days) for a price consisting of the original purchase price paid to the Debtors plus a price differential that provided the Warehouse Lender a *per diem* rate of interest on the funds advanced against the loans/RMBS.

Warehouse Lenders typically transferred funds to the Debtors to originate mortgage loans, which were transferred to the Warehouse Lenders immediately after origination. The Debtors serviced the loans on an interim basis while they attempted to arrange for final disposition of the loans, either by sale to a private investor (usually on a whole-loan, or "servicing-released," basis) or to a securitization trust (usually on a "servicing-retained" basis). Upon final disposition of the mortgage loans, the loans were repurchased by the Debtors from the Warehouse Lenders, then transferred to the ultimate purchaser. The Debtors typically arranged for the sale or other disposition of mortgage loans within one to three months after origination, usually for a profit.

The Master Repurchase Agreements generally required the total value of the mortgage loans/RMBS held by the Warehouse Lenders to be at least equal to the Debtors' outstanding repurchase obligations (i.e., the purchase price plus the imputed interest component). In the event the value of the mortgage loans/RMBS dropped below the amount of the Debtors' repurchase obligations, the Master Repurchase Agreement permitted the Warehouse Lender to make a margin call, thus requiring the Debtors to post cash or additional loans/RMBS as security for the repurchase obligations. Failure to meet a margin call was an event of default under a Master Repurchase Agreement, which permitted the Warehouse Lender to discontinue funding and accelerate the Debtors' outstanding repurchase obligations.

---

a title abstract subsidiary and a vendor management company. In addition, American Home Bank, a non-debtor subsidiary of AHM Holdings conducts certain banking services.

[12]   Warehouse Facilities not taking the form of Master Repurchase Agreements were nonetheless functionally identical, and worked in the same way as described below with respect to margin calls.

[13]   Reference to the "purchase," "sale," and "repurchase" of mortgage loans or RMBS under Master Repurchase Agreements generally, or of the "purchase price," "repurchase price," or "repurchase obligations" relating thereto, are for ease of discussion only and do not constitute an admission concerning the proper legal characterization of transactions under or contemplated by a particular Master Repurchase Agreement, with respect to which the Plan Proponents, on behalf of themselves, the Plan Trustee, and the Plan Oversight Committee, reserve all rights.

DB02:6842992.8

066585.1001

As of the Petition Date, the Debtors had more than $4.3 billion in aggregate outstanding obligations under Warehouse Facilities (including Master Repurchase Agreements, traditional credit facilities, and commercial-paper facilities).

### E.      Properties

As of the Petition Date, the Debtors' Executive and Administrative Offices were located at 538 Broadhollow Road, Melville, New York 11747 ("538 Broadhollow Road").  Additionally, the Debtors owned an office building (consisting of approximately 35,700 square feet) located at 950 North Elmhurst Road, Mt. Prospect, Illinois.  Prior to the Petition Date, the Debtors also leased real estate premises at over 550 locations in 47 states and the District of Columbia.

### F.      Events Leading to the Debtors' Chapter 11 Filings

The Debtors fell victim to an unprecedented dislocation in the secondary mortgage market in the summer of 2007, fueled by, among other factors, falling real estate prices and a spike in consumer defaults on mortgage obligations.  These factors applied tremendous downward pressure on loan and security values industry-wide, which accelerated as more and more mortgage originators in the industry were forced to sell securities and loans in an effort to meet margin calls.  In the weeks leading up to the Petition Date, the markets for these assets were disrupted to the point of dysfunction.  The disruption in the credit markets during that time caused major write-downs of the Debtors' loan and security portfolios.

These events adversely impacted many mortgage originators and mortgage investors. Originators including Countrywide Financial Corp., Accredited Home Lenders, Inc., and IndyMac Bancorp all incurred unprecedented margin calls, and mortgage investors including Citigroup, Deutsche Bank, Bank of America, Merrill Lynch, UBS, Morgan Stanley and Bear Stearns all issued press releases concerning record losses and write-downs.

In the case of the Debtors, the write downs led to significant margin calls with respect to the Debtors' credit facilities and, as of late July 2007, the Debtors became unable to meet those margin calls.

As a consequence, most or all Warehouse Lenders asserted defaults and notified the Debtors that they intended to exercise certain rights, including the right to sell the mortgage loans financed under the credit facilities and offset the proceeds from such a sale against amounts owed by the Debtors.  Other Warehouse Lenders informed the Debtors that they intended to retain the mortgage loans to offset their value against amounts owed by the Debtors. Those Warehouse Lenders also sought to reserve their purported rights to seek recovery of any shortfall after that offset.

On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

During this same period, the Debtors retained a cadre of experienced advisors and made an all-out effort to preserve the Debtors' operations.  Between July 27 and August 2, 2007, at

least four entities with serious interest in purchasing the Debtors' retail and wholesale origination businesses, or some combination thereof, arrived at the Debtors' offices and engaged in active, around-the-clock negotiations. However, none of these transactions were able to gel and, having been unable to fund loans for three days, the Debtors were forced to shut down their origination business.

On August 3, 2007, the Debtors implemented a reduction in force, resulting in the termination of approximately 6,500 employees. The Debtors retained approximately 1,000 employees (450 servicing employees, 250 to close the retail branch offices and 300 other employees company-wide), who were absolutely essential to the Debtors' continued operations. Over the course of these proceedings, the Debtors have continued to terminate non-essential personnel and now employ 39 employees and 45 contractors.

## G.    The Chapter 11 Cases

The Debtors filed for chapter 11 protection on August 6, 2007, in order to preserve their remaining business operations and effectuate an orderly liquidation of their property for the benefit of creditors. As discussed below, during these Chapter 11 Cases, the Debtors have worked diligently to protect, preserve, and ultimately administer approximately $3 billion worth[14] of property for the benefit of the parties asserting valid interests therein, such as those parties' relative rights and priorities may be under the Bankruptcy Code and applicable nonbankruptcy law.

Unlike many chapter 11 debtors who financed their prepeition operations using a secured credit facility from a single secured lender having a blanket lien in all assets, the Debtors in these Chapter 11 Cases financed portions of their operations using repo facilities, traditional secured credit facilities, and commercial paper facilities of varying amounts from a variety of lenders and lender syndicates, many of whom had (and still have) significant exposure to the subprime mortgage crisis that precipitated the Debtors' decline into bankruptcy. The suddenness of the Debtors' bankruptcy filing, combined with the rapidly deteriorating state of the secondary mortgage market in August 2007, contributed to an atmosphere of near hysteria early in these Chapter 11 Cases, as lenders and purchasers of mortgage loans from the Debtors scrambled to exercise their remedies against the Debtors so as to be able to sell their mortgage loan collateral or holdings as quickly as possible. Complicating matters for the Debtors was the fact that many lenders asserted competing interests in the same property, which put the Debtors in the position of refereeing inter-creditor disputes, usually on an expedited basis, while at the same time attempting to conduct due diligence to determine whether there was any unencumbered value for the Debtors' Estates in the property at issue.

As discussed below, by using the tools available to them as debtors in possession under chapter 11 of the Bankruptcy Code, the Debtors were able to impose a measure of order on the chaos which, outside of bankruptcy, would likely have consumed the Debtors' businesses in their

---

[14] For purposes of arriving at this figure, Assets that were not (or have yet to be) sold or valued by the Bankruptcy Court are valued at book value.

DB02:6842992.8

066585.1001

entirety, resulting in diminished recoveries to the Debtors' secured creditors and, in all likelihood, no recovery whatsoever for the Debtors' general unsecured creditors.

### 1.    Debtor in Possession Status

Since filing for bankruptcy protection, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate in the ordinary course of business. Transactions outside of the ordinary course of business must be approved by the Bankruptcy Court.

### 2.    Entry of the Debtors' First Day Orders

Concurrently with filing their bankruptcy petitions, the Debtors filed several emergency motions (the "First Day Motions") with the Bankruptcy Court that were intended to stabilize the Debtors and enable them to continue certain limited operations. Pursuant to their First Day Motions, the Debtors sought and obtained from the Bankruptcy Court, among other relief, the following: (i) authority to jointly administer the Chapter 11 Cases [Docket Nos. 3 and 60]; (ii) approval of the appointment of EPIQ Bankruptcy Solutions, LLC ("EPIQ") as claims, notice and balloting agent in the Chapter 11 Cases [Docket Nos. 4 and 222]; (iii) establishment of adequate assurance procedures with respect to utility providers [Docket Nos. 5, 61 and 552]; (iv) authority to pay certain prepetition taxes, including trust fund and personal liability taxes [Docket Nos. 6 and 62]; (v) authority to continue insurance policies [Docket Nos. 7 and 63]; (vi) authority to pay prepetition obligations of certain critical vendors and service providers [Docket Nos. 8 and 64]; (vii) authority to honor prepetition employees wages and benefits [Docket Nos. 9 and 69]; (viii) authority to implement a non-insider employee retention plan [Docket Nos. 10, 112 and 355]; and (ix) authority to maintain their prepetition centralized cash management system [Docket Nos. 14 and 66].

Shortly thereafter, the Debtors filed other administrative motions with the Bankruptcy Court, including a motion seeking an extension of time to file the Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, the "Schedules") [Docket No. 161] and a motion establishing interim compensation procedures for professionals employed by the Debtors' estates [Docket No. 162]. Each of these motions was granted by the Bankruptcy Court [respectively, Docket Nos. 546 and 547].

### 3.    Debtor in Possession Financing and Use of Cash Collateral

Also on the first day of the Chapter 11 Cases, the Debtors sought and obtained approval of cash collateral usage and debtor-in-possession financing to maintain and stabilize their businesses and commence an orderly liquidation of their assets. Specifically, on the Petition Date, the Debtors filed a motion (the "Cash Collateral Motion") by which they sought interim and final orders authorizing the limited use of cash collateral generated by the Debtors' mortgage loan servicing business (the "Servicing Business") and the grant of adequate protection to Bank of America, N.A., as agent ("BofA as Administrative Agent") for itself and certain prepetition lenders (the "BofA Syndicate") [Docket No. 16]. On August 7, 2007, the Bankruptcy Court

22

approved the Cash Collateral Motion on an interim basis [Docket No. 68]. On September 4, 2007, the Bankruptcy Court entered a final order approving the Cash Collateral Motion [Docket No. 554] (as subsequently amended by Docket Nos. 2002, 2284, 2855, and 3699, the "Cash Collateral Order").

The Cash Collateral Order permitted, among other things, the Debtors to continue operating the Servicing Business pending a sale thereof, providing necessary access to cash to pay expenses such as employee payroll and other benefits, rent, a proportional share of the Debtors' corporate overhead, servicing advances, and other expenses reflected in the budget negotiated by the Debtors and BofA as Administrative Agent.

Also on the Petition Date, the Debtors filed a motion by which they sought interim and final orders authorizing them to enter into a debtor in possession financing facility agreement (the "DIP Credit Facility") with WLR Recovery Fund III, L.P., in its capacity as lender and administrative agent, and other lenders from time to time party thereto (collectively, the "DIP Lender") [Docket No. 17]. On August 7, 2007, the Bankruptcy Court approved the DIP Credit Facility on an interim basis [Docket No. 67] and then on September 4, 2007, the Bankruptcy Court entered a final order approving the DIP Credit Facility [Docket No. 555].

The original DIP Credit Facility was a senior secured, superpriority, $50 million revolving credit facility, which the Debtors could borrow from the DIP Lender. Each of the Debtors, except for AHM SV, is a joint-and-several obligor under the DIP Credit Facility. Pursuant to the DIP Credit Facility, each obligor granted the DIP Lender a valid, binding, and enforceable perfected first-priority security interest in, and lien on, all the property and assets of each obligor and its estate that was not otherwise encumbered by valid, perfected, enforceable, and nonavoidable security interests or liens on the Petition Date. The $50 million available under the DIP Credit Facility was explicitly not permitted to be used to fund the Servicing Business. On January 4, 2008, the Bankruptcy Court approved a modification to the DIP Credit Facility decreasing the available borrowing limit to $35 million and permitting the use of certain funds to purchase the release of liens in the BofA Construction Loans (as hereinafter defined), among other things [Docket No. 2594]. On August 1, 2008, the Debtors filed a motion seeking approval of a second modification to the DIP Credit Facility (i) reducing the available borrowing limit to $30 million, but effectively increasing borrowing capacity by limiting the $12 million LPMI Reserve Amount (as defined in the DIP Credit Facility), (ii) permitting the use of approximately $10.5 million in proceeds from the sale of non-performing loans for general operating expenses, (iii) extending maturity to November 5, 2008, and (iv) adjusting the interest rate, among other things [Docket No. 5291]. On August 5, 2008, the Bankruptcy Court approved a portion of the relief sought in the August 1 motion [Docket No. 5307], with the balance of the relief requested in the motion scheduled for hearing on August 18, 2008.

Prior to the sale of the Servicing Business discussed further below, the Debtors funded the Servicing Business's operations using cash collateral as provided by the Cash Collateral Order. Following the "Initial Close" of the sale of the Servicing Business to the Purchaser (as hereinafter defined), the Debtors sought and obtained approval to enter into a limited-recourse DIP credit facility to fund the working capital needs of the Servicing Business. On November 12, 2007, the Debtors filed a motion [Docket No. 1967] by which they sought interim and final

23

orders authorizing them to enter into a limited recourse post-petition financing facility (the "Limited Recourse DIP Credit Facility") with the Purchaser.  On November 14, 2007, the Bankruptcy Court approved the Limited Recourse DIP Credit Facility on an interim basis [Docket No. 1999] and then on November 28, 2007, the Bankruptcy Court entered a final order approving the Limited Recourse DIP Credit Facility [Docket No. 2205].  Pursuant to the Limited Recourse DIP Credit Facility, the Debtors were authorized to obtain nonrecourse postpetition financing from the Purchaser in the principal amount of $50 million, secured by a lien in Assets sold to the Purchaser in the Servicing Sale (as defined below), to fund the working capital needs of the Servicing Business.  On January 4, 2008, the Bankruptcy Court approved a modification to the Limited Recourse DIP Credit Facility increasing the available borrowing limit to $100 million [Docket No. 2590].

### 4.    Appointment of the Committee

On August 14, 2007, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 156].  Since its formation, the Committee has participated in virtually every aspect of these Chapter 11 Cases.

On December 7, 2007, the U.S. Trustee reconstituted the Committee [Docket No. 2317]. As of the date of this Disclosure Statement, the following were members of the Committee:

> Wilmington Trust Company
> Law Debenture Trust Company of New York
> Deutsche Bank National Trust Co.
> Nomura Credit & Capital, Inc.
> Impac Funding Corporation
> United Parcel Service

The Committee retained the law firms of Hahn & Hessen LLP [Docket No. 2203] and Blank Rome, LLP as its co-counsel [Docket No. 2202] and retained BDO Seidman LLP as its accountant [Docket No. 2201].  The Committee also retained Trenwith Securities, LLC to provide investment banking services [Docket No. 2988] and Hennigan, Bennett & Dorman LLP as special conflicts counsel [Docket No. 3947].

### 5.    Retention of Professionals

The Debtors retained professionals to assist them in managing the chapter 11 bankruptcy process, including Young Conaway Stargatt & Taylor, LLP as the Debtors' bankruptcy counsel [Docket No. 551], Kroll Zolfo Cooper LLC as the Debtors' restructuring advisors and interim management[15] [Docket No. 606], Milestone Advisors, LLC as investment bankers and financial

---

[15]  Specifically, the Debtors engaged Stephen F. Cooper as Chief Restructuring Officer and Kevin Nystrom as Director of Restructuring [Docket No. 606].  Mr. Cooper served as Chief Restructuring Officer until his resignation effective June 30, 2008, at which time Mr. Nystrom succeeded to Mr. Cooper as Chief Restructuring Officer, and Bret Fernandes succeeded to Mr. Nystrom as Director of Restructuring [Docket No. 4497].

advisors [Docket No. 1592], and Phoenix Capital, Inc. as investment bankers [Docket No. 1040]. The Debtors also obtained Bankruptcy Court approval to retain the following professionals: (i) Quinn Emanuel Urquhart Oliver & Hedges, LLP as the Debtors' special investigatory, litigation and conflicts counsel [Docket No. 741]; (ii) Allen & Overy, LLP as special regulatory, securities and class action litigation counsel [Docket No. 1730]; (iii) Cadwalader, Wickersham & Taft, LLP as special counsel [Docket No. 2000]; (iv) Muldoon Murphy & Aguggia LLP as special counsel [Docket No. 2663]; (v) PricewaterhouseCoopers LLP as tax advisors [Docket No. 3432]; (vi) DoveBid, Inc. as auctioneer [Docket No. 2727]; (vii) CB Richard Ellis, Inc. as real estate broker [Docket No. 3223]; and (viii) the following foreclosure professionals: Samuel I. White, P.C. [Docket No. 1709], Orlans Associates, P.C. [Docket No. 1710], Northwest Trustee Services, Inc. [Docket No. 713], Weinreb & Associates, PLLC [Docket No. 1594], Codilis & Associates, PC [Docket No. 1593], Adorno & Yoss LLP [Docket No. 1707], Weltman, Weinberg & Reis Co., LPA [Docket No. 2170], and the Law Offices of Daniel C. Consuegra [Docket No. 2169].

The Debtors also sought and obtained authority to continue to employ professionals, including attorneys, that the Debtors employed prepetition in the ordinary course of their businesses (collectively, the "Ordinary Course Professionals"), without having to file formal retention applications with the Bankruptcy Court [Docket Nos. 192, 607 and 643]. Each Ordinary Course Professional is assigned a monthly maximum amount (either $35,000, $75,000, or 6% of the selling price of real estate transactions for all real estate transactions having selling prices up to $3,000,000) that it may be paid without having to seek approval of the Bankruptcy Court.

### 6.    Executive and Incentive Plan

On November 8, 2007, the Debtors filed a motion [Docket No. 1885] (the "EIP Motion") seeking the approval of their executive incentive plan (the "EIP"). The Debtors proposed the EIP Motion for purposes of ensuring that senior management would be properly incentivized to achieve maximum value for the Debtors' stakeholders through the completion of these cases. The EIP provided a bonus pool for the payment of discretionary bonuses to certain executives, in exchange for which the executives were required to execute a general release and waiver of employment-related claims against the Debtors.

Since the early stages of these cases, the Debtors worked diligently to ensure that they would be able present the Bankruptcy Court with an incentive plan that was supported by the members of their senior management, yet unopposed by the Committee. This was a lengthy process that required significant negotiations with the Committee. An objection to the EIP Motion was filed by one of the Debtors' employees. After a hearing held on November 28, 2007, the Bankruptcy Court overruled the objection and entered an order approving the EIP [Docket No. 2210].

DB02:6842992.8

066585.1001

### 7. Contested Turnover/Stay Relief Motions Early in the Chapter 11 Cases

Beginning almost immediately after commencement of these Chapter 11 Cases, the Debtors were beset with motions seeking turnover of servicing files and/or relief from the automatic stay to terminate the Debtors' mortgage loans servicing rights, certain (but not all) of which are discussed below. The Debtors were largely successful in defending against and/or reaching a consensual compromise of these matters, which afforded the Debtors necessary breathing room to focus on maintaining and stabilizing their businesses until they were able to complete the sale of certain of their operating businesses and other assets—most notably, the Servicing Business. And while a number of the resulting compromises resulted in transition of the servicing rights to the movant's designee after the Debtors determined such rights were of dubious value to their Estates, the Debtors were able to arrange for such turnover on terms that minimized the disruption to the Debtors' remaining business operations and, often, in exchange for cash or other consideration beneficial to the Estates. Cooperation between the Debtors and the movants to orderly transition servicing also minimized the potential for claims against the Debtors (including, possibly, Administrative Claims) that might have resulted from a less orderly transition.

#### a. CSFB Motion for TRO

On the Petition Date, shortly after the commencement of these Chapter 11 Cases, Credit Suisse First Boston Mortgage Capital LLC ("CSFB"), a Warehouse Lender of the Debtors pursuant to a Master Repurchase Agreement, initiated an adversary proceeding against the Debtors in the Bankruptcy Court (the "CSFB Action") and filed an emergency motion (the "TRO Motion") seeking a temporary restraining order requiring the Debtors to turn over files related to the servicing of mortgage loans originated under the Master Repurchase Agreement, which CSFB requested be heard immediately at the Debtors' "first day" hearing on August 7, 2007. Among other things, the TRO Motion asserted that the Debtors' loan servicing rights had been validly terminated by CSFB prior to the Petition Date. The Bankruptcy Court scheduled the TRO Motion for hearing on August 16, 2007.

Prior to the hearing, the Debtors filed a motion to dismiss the CSFB Action and a memorandum of law in support thereof and in opposition to the TRO Motion, in which the Debtors asserted, among other things, that CSFB's purported termination of the Debtors' servicing rights prepetition was invalid, and that CSFB had failed to demonstrate the Debtors' continued possession of the loan servicing files and servicing of the loans posed a threat of "irreparable harm" justifying injunctive relief.

The Bankruptcy Court held a hearing on the TRO Motion on August 16 and 17, 2007, at which it heard evidence and argument from both parties. At the conclusion of the hearing, the Bankruptcy Court denied the TRO Motion, ruling that CSFB had failed to establish (i) a likelihood of success on the merits that it had validly terminated the Debtors' servicing rights and (ii) irreparable harm in the absence of injunctive relief [*see* Docket No. 411].

b.    *Morgan Stanley Motion for Injunctive Relief*

On August 15, 2007, Morgan Stanley Mortgage Capital Holdings, LLC ("Morgan Stanley") initiated an adversary proceeding against the Debtors in the Bankruptcy Court and filed an emergency motion for injunctive relief (the "PI Motion") seeking to compel turnover of files related to the servicing of mortgage loans owned by Morgan Stanley. Among other things, the PI Motion asserted that the Debtors' loan servicing rights had been validly terminated by Morgan Stanley prior to the Petition Date. After negotiations with Morgan Stanley, the Debtors reached a resolution of the PI Motion and the bulk of the relief requested in Morgan Stanley's complaint, which was embodied in a stipulation approved by the Bankruptcy Court on August 24, 2007 [Adv. Docket No. 14]. Pursuant to the stipulation, the Debtors agreed to transition servicing of the loans at issue to Morgan Stanley's designee in exchange for a cooperation fee.

c.    *DB Structured Stay Relief Motion*

On August 17, 2007, DB Structured Products, Inc. ("DB Structured"), filed a motion for relief from the automatic stay [Docket No. 229] to effectuate its alleged prepetition termination of the Debtors' mortgage loan servicing right under a Mortgage Loan Purchase and Servicing Agreement ("MLPSA"). The Debtors and the Committee objected on September 11 and 12, 2007 [Docket Nos. 702 and 714, respectively], on the basis that the alleged defaults under the MLPSA had been cured and, further, DB Structured had failed to establish a *prima facie* case for "cause" for stay relief. The Bankruptcy Court held a hearing on September 17, 2007, at which it heard witness testimony and oral argument, at the conclusion of which it denied relief from the stay because the Debtors had cured any prior servicing default under the MLPSA and DB Structured had failed to establish it was being harmed by the automatic stay or that the Debtors were in dereliction of their loan servicing duties [*see* Docket Nos. 835 and 908]. The Debtors subsequently sold their servicing rights under the MLPSA for approximately $1.6 million, which is currently being held in escrow pending resolution of DB Structured's appeal of the order approving such sale (as discussed further below).

d.    *Ginnie Mae Turnover Motion*

On August 20, 2007, Ginnie Mae filed a motion to compel turnover of loan origination and servicing files by the Debtors to Ginnie Mae (the "Turnover Motion") [Docket No. 243]. The Debtors and the Committee objected to the Turnover Motion [Docket Nos. 600 and 605] on a number of bases, including that Ginnie Mae's alleged prepetition termination of the Debtors' right to service mortgages backed by Ginnie Mae (the "Ginnie Mae Portfolio") was ineffective. The parties engaged in extensive discovery in relation to the Turnover Motion, resulting in the deposition of four witnesses and the review and production of thousands of pages of documents.

Ultimately, the parties agreed to a resolution of the Turnover Motion whereby the Debtors were permitted a limited window of time within which to market and sell the servicing rights for the Ginnie Mae Portfolio to a Ginnie Mae-approved servicer. The Bankruptcy Court approved the settlement between the Debtors and Ginnie Mae on September 20, 2007 [Docket No. 863], and Ginnie Mae withdrew its Turnover Motion the next day [Docket No. 956]. On

October 29, 2007, the Bankruptcy Court approved the sale of the servicing rights to the Ginnie Mae Portfolio, for value, to MidFirst Bank [Docket No. 1697].

### e.   *Bear Stearns and Calyon Adversary Proceedings*

On August 24 and 28, 2007, respectively, Bear Stearns Mortgage Capital Corp. and EMC Mortgage Corp. ("BS/EMC"), and Calyon New York Branch ("Calyon"), initiated adversary proceedings against the Debtors seeking declaratory and injunctive relief similar to that sought in the CSFB Action. Like CSFB, BS/EMC and Calyon filed emergency motions seeking to compel turnover of mortgage files. In light of the Bankruptcy Court's ruling on CSFB's TRO Motion, however, and after discussions with the Debtors, BS/EMC and Calyon ultimately agreed not to press their requests for preliminary injunctive relief and, instead, to work with the Debtors to establish an expedited trial schedule.

### f.   *Freddie Mac Stay Relief Motion*

Prior to the Petition Date, on August 3, 2007, Freddie Mac obtained a temporary restraining order from the United States District Court for the Northern District of Texas, requiring AHM Corp., among other things, to immediately turn over certain loan origination and servicing files relating to certain loans owned by Freddie Mac (the "Freddie Mac Portfolio"). On September 10, 2007, Freddie Mac filed a motion in the Chapter 11 Cases seeking relief from the automatic stay to effect the turnover of those files. The Debtors and Freddie Mac, along with BofA as Administrative Agent, ultimately entered into stipulations, approved by the Bankruptcy Court, which provided for the transfer of servicing of the Freddie Mac Portfolio to BofA as Administrative Agent on an interim basis [Docket No. 861] and permitted the Debtors a limited window of time within which to market and sell the servicing rights for the Freddie Mac Portfolio to a Freddie Mac-approved servicer [Docket No. 862]. To date, the Debtors have not found a buyer for the servicing rights to the Freddie Mac Portfolio and, pursuant to the BofA Global Settlement Stipulation (as hereinafter defined), BofA as Administrative Agent may direct the Debtors to abandon such rights.

### 8.   **Asset Sales**

### a.   *Sale of the Debtors' Servicing Business*

On the Petition Date, the Debtors filed a motion [Docket No. 11] (the "Servicing Sale Motion") requesting, among other things, authority to establish sale procedures and approve the sale of the Servicing Business (the "Servicing Sale"). By Order dated August 9, 2007 [Docket No. 113], the Bankruptcy Court established sale procedures for the Servicing Sale. After the selection of AH Mortgage Acquisition (the "Purchaser") as the stalking horse bidder for the Servicing Business, the Debtors filed a motion for authority to grant the Purchaser certain auction protections and to modify the sale procedures, which was approved by the Bankruptcy Court on September 25, 2007 [Docket No. 937].

The Debtors received more than thirty objections to the Servicing Sale, which were extensively briefed by the Debtors and several of the objecting parties. The Debtors also responded to expedited discovery requests from several parties in interest, and conducted several

28

depositions in the weeks leading up to the hearing on the Servicing Sale Motion (the "Servicing Sale Hearing").

A number of objections raised the Debtors' alleged loss of Fannie Mae-approved servicer status on July 31, 2007, and/or the Purchaser's lack of Fannie-Mae approved servicer status, as grounds for denial of the Servicing Sale, because the Debtors' servicing contracts with the objecting parties required the servicer to be a Fannie Mae-approved servicer. The Debtors disputed whether Fannie Mae had validly terminated the Debtors' approved-servicer status with respect to the portfolio of loans owned by Fannie Mae (the "Fannie Mae Portfolio") prior to the Petition Date, and had engaged Fannie Mae in settlement discussions following commencement of these Chapter 11 Cases. The Debtors and Fannie Mae reached a resolution of Fannie Mae's alleged termination of the Debtors' contract to service the Fannie Mae Portfolio by way of a settlement agreement approved by the Bankruptcy Court on September 4, 2007 [Docket No. 611], which allowed the Debtors to continue to service the Fannie Mae Portfolio for a period of time, in which the Debtors were able to market and find a buyer for the servicing rights to the Fannie Mae Portfolio. The Debtors, Fannie Mae, and the Purchaser subsequently executed a supplemental stipulation, which was approved by the Bankruptcy Court on October 15, 2007 [Docket No. 1544], and provided the Purchaser with conditional Fannie Mae-approved servicer status. The effect of these settlements was to moot many of the objections to the Servicing Sale.

The five-day Servicing Sale Hearing took place from October 15 to 19, 2007 during which time the Bankruptcy Court heard testimony from six witnesses, including one expert witness, and oral argument from counsel for a number of parties in interest and from one *pro se* litigant. The Debtors resolved the vast majority of objections during the course of the Servicing Sale Hearing, either by amendment to the Asset Purchase Agreement with the Purchaser dated September 25, 2007 (as subsequently amended and together with all exhibits and schedules thereto, the "Servicing APA"), by agreement to include particular language in the order approving the Servicing Sale, or, in the case of the objections by BS/EMC, by arranging for a private sale of the servicing rights at issue for a higher price than the Debtors would have received from the Purchaser [Docket No. 1619].[16]

At the conclusion of the Servicing Sale Hearing, only seven unresolved objections remained. Ultimately, after considering the evidence presented, pleadings filed, and the arguments presented, the Bankruptcy Court overruled these objections and approved the Servicing Sale. By Order dated October 30, 2007 [Docket No. 1711] (the "Servicing Sale Order"), the Bankruptcy Court approved the Servicing APA.

---

[16] In addition, on August 24, 2007, well in advance of the Servicing Sale Hearing, the Debtors filed a motion to approve the private sale to Barclays Bank PLC ("Barclays") of the servicing rights for a portfolio of loans owned by Barclays (the "Barclays Portfolio") [Docket No. 364]. The Bankruptcy Court approved the sale of the Barclays Portfolio servicing rights on September 4, 2007 [Docket No. 610]. The sale provided the Debtors greater value than they would have realized by selling the Barclays Portfolio servicing rights to the Purchaser under the Servicing APA, and resolved a dispute with Barclays regarding Barclays' alleged right to unilaterally terminate the Debtors' servicing rights.

Immediately after entry of the Sale Order, DB Structured and UBS Real Estate Securities, inc. ("UBS") filed emergency motions for stay of the Sale Order pending appeal. The Debtors and the Purchaser resolved the DB Structured motion by amending the Servicing APA to place the DB Structured MLPSA on the list of disputed agreements held in suspense pending final resolution of the dispute. UBS's motion was denied by the Bankruptcy Court.

DB Structured and UBS subsequently filed Notices of Appeal from the Servicing Sale Order [Docket Nos. 1799 and 1922]. UBS later withdrew its appeal [Docket No. 2089]. DB Structured's appeal went forward, and on February 27, 2008, counsel for the Debtors, the Committee and DB Structured participated in a mediation, but were unable to reach a consensual resolution. Briefing on the appeal is now complete, and the matter is currently pending in the United States District Court for the District of Delaware (the "District Court").

The appeal of the Servicing Sale Order did not affect the Debtors' ability to close the Servicing Sale.[17] The Servicing APA provided for the Servicing Sale to be closed in two steps, consisting of an "economic" close and a "legal" close. The "economic" close of the Servicing Sale occurred on November 16, 2007 (the "Initial Closing"), at which time the Purchaser paid the Purchase Price (as defined in the Servicing APA) of approximately $500 million, in cash, which was applied in permanent reduction of the BofA Syndicate Secured Claim.

The Debtors diligently worked with the Purchaser to effectuate the "legal" close (the "Final Closing"), while operating the Servicing Business in the Ordinary Course of Business (as defined in the Servicing APA), subject to the Bankruptcy Exceptions (as defined in the Servicing APA), for the economic benefit and risk of the Purchaser. To that end, the Debtors and the Purchaser spent significant time preparing applications for, and negotiating with, governmental authorities in numerous jurisdictions to obtain licensing rights for the Purchaser (which was a condition of the Final Closing).

In addition, the Debtors, together with the Purchaser in certain instances, took other steps toward consummation of the Final Closing. On December 27, 2007, the Debtors filed a motion [Docket No. 2527] (the "Transition Motion") seeking authorization to (i) create one or more non-debtor business entities (the "Transition Entities") for the purpose of entering into certain agreements relating to the transition of the assets purchased pursuant to the Servicing APA or relating to the operation of the Servicing Business; (ii) fund the Transition Entities with amounts sufficient to perform their respective obligations; (iii) amend the Servicing APA to provide that the Debtors' interests in the Transition Entities will be deemed "Purchased Assets" as defined in the Servicing APA; and (iv) enter into an employment agreement with Mr. David M. Friedman. By orders entered January 4, 2008 [Docket No. 2595] and January 15, 2008 [Docket No. 2723], the Bankruptcy Court granted the relief requested in the Transition Motion.

---

[17] Sale proceeds attributable to the servicing rights for the DB Structured loan portfolio (approximately $1.6 million) are being held in escrow pending resolution of the appeal. If the Debtors prevail in the appeal, these proceeds will be applied pursuant to the Cash Collateral Order and/or other applicable orders of the Bankruptcy Court.

In anticipation of the Final Closing, the Purchaser endeavored, with the involvement of the Debtors, to increase the volume of the Servicing Business. On December 27, 2007, the Debtors filed a motion for entry of an order approving the procedures for, and authorization of, AHM SV to enter into one or more subservicing agreements [Docket No. 2525] (the "Subservicing Authorization Motion"), pursuant to which AHM SV would act as a subservicer for servicing rights that the Purchaser intended to acquire. By Order dated January 4, 2008 [Docket No. 2597], the Bankruptcy Court approved the Subservicing Authorization Motion.

As a result of the efforts detailed above, the Final Closing occurred on April 11, 2008. Since that time, the Debtors and the Purchaser have attempted to resolve a number of outstanding disputes between them relating to the final reconciliation of payments due under the Servicing APA and the scope and nature of the Debtors' and the Purchaser's respective performance obligations thereunder.

         b.     *Broadhollow/Melville Loan Auction and Sale*

On August 22, 2007, the Debtors obtained approval of procedures for the sale of certain mortgage loans owned by two non-debtor affiliates of the Debtors: Broadhollow Funding, LLC ("Broadhollow") and Mellville Funding, LLC ("Mellville," and together with Broadhollow, the "Non-Debtor Affiliates"). Broadhollow and Mellville are non-Debtor special purpose entities established by AHM Investment to fund a portion of its prime mortgage origination. Prior to the Petition Date, the Non-Debtor Affiliates owned approximately 5,700 mortgage loans. On September 26, 2007, AHM SV conducted an auction and sold all but 32 mortgage loans owned by the Non-Debtor Affiliates.[18] The Non-Debtor Affiliates are in the process of obtaining buyers for the remaining loans.

         c.     *Sale to Indymac Bank F.S.B.*

On August 7, 2007, the Debtors and Indymac Bank F.S.B. ("Indymac") entered into a letter agreement (the "Indymac Letter Agreement"), whereby Indymac agreed and was bound to take assignment of, and assume the liabilities under, ninety-eight (98) office leases and to purchase certain furniture, fixtures and equipment located therein (collectively, the "Indymac Sale"). On August 24, 2007, the Bankruptcy Court approved the Indymac Letter Agreement and the terms of the Indymac Sale (the "Indymac Sale Order") [Docket No. 357].

Following entry of the Indymac Sale Order, the Debtors spent significant time negotiating the closing economics with Indymac. When it appeared that the Indymac Sale might not close prior to the Debtors' deadline under section 365(d)(4) of the Bankruptcy Code to assume or reject nonresidential real property leases, the Debtors filed a motion to enforce the terms of the Indymac Sale Order [Docket No. 3006] (the "Motion to Enforce").

Following the filing of the Motion to Enforce and after significant negotiations, the Debtors reached an agreement with Indymac on the closing of the sale, which agreement included certain modifications to the Indymac Letter Agreement. On February 22, 2008, the

---

[18] Since the auction, at least one of the 32 mortgages has been repaid in full by the borrower.

Debtors filed a motion to modify the terms of the Indymac Letter Agreement [Docket No. 3059], which was approved by the Bankruptcy Court on February 28, 2008 [Docket No. 3114] (the "Indymac Modification Order"). Pursuant to the Indymac Modification Order, Phase I of the Indymac Sale closed on February 23, 2008, and Phase II closed on March 3, 2008.

d.    *Encumbered Non-Performing Loan Sales*

On December 22, 2007, the Debtors filed the *Motion of the Debtors for Orders: (a)(i) Approving Sale Procedures; (ii) Approving Payment of the Expense Reimbursement (iii) Scheduling a Hearing to Consider Sale of Certain Non-Performing Loans* (the "Non-Performing Loans"); *(iv) Approving Form and Manner of Notice Thereof; and (v) Granting Related Relief; and (b)(i) Authorizing the Sale of Non-Performing Loans Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Sale Agreement Thereto; (iii) Authorizing the Distribution of the Proceeds; and (iv) Granting Related Relief* [Docket No. 2490] (the "Non-Performing Loan Sale Motion").

By order dated February 1, 2008 [Docket No. 2858], the Bankruptcy Court approved the sale procedures set forth in the Non-Performing Loan Sale Motion, authorizing the Debtors to sell approximately 424 whole mortgage loans, with an aggregate UPB of approximately $152,000,000, pursuant to a sealed, single-bid sale process.

On March 14, 2008, the Bankruptcy Court approved the sale on an "as is, where is" basis of certain Non-Performing Loans and REO property in which BofA as Administrative Agent had a perfected first priority security interest (collectively, the "BofA Non-Performing Loans/REO"), to Beltway Capital LLC [Docket No. 3283].

Also on March 14, 2008, the Bankruptcy Court approved the sale of certain Non-Performing Loans and REO property in which JPM asserted a security interest (collectively, the "JPM Non-Performing Loans/REO") to Lehman Capital, a division of Lehman Brothers Holdings Inc. [Docket No. 3314]. In connection with the sale of the JPM Non-Performing Loans/REO, certain disputes arose between the Debtors and the Committee, on one hand, and JPM, on the other hand, concerning, among other things, the perfection of JPM's alleged security interest in certain REO property and the Debtors' right to surcharge JPM's collateral pursuant to § 506(c) of the Bankruptcy Code. While the parties have engaged in settlement discussions, this dispute has not yet been resolved.

e.    *Compromise of Construction Loans*

On December 4, 2007, BofA as Administrative Agent filed a motion [Docket No. 2255] (the "Construction Loan Stay Relief Motion") requesting relief from the automatic stay to allow it to sell certain construction-to-permanent loans in which it held security interests and liens (the "BofA Construction Loans") to a potential purchaser. As of the date of the Construction Loan Stay Relief Motion, the UPB of the BofA Construction Loans was approximately $30,478,019.73.

The Debtors disputed the allegations in the Construction Loan Stay Relief Motion, and asserted that they could obtain greater value for the BofA Construction Loans than the value

32

estimated to be realized from the sale to the potential purchaser proposed by BofA as Administrative Agent, by simply facilitating the borrowers' refinancing of the loans (e.g., by offering reductions in principal), which would result in immediate payment in full, in cash. In fact, the Debtors and their financial advisors determined that if even a moderate number of BofA Construction Loans were refinanced, the Debtors would realize more value for their estates than would be realized from the sale to the potential purchaser.

To achieve this greater value and resolve the Construction Loan Stay Relief Motion, the Debtors engaged in good faith negotiations with the Committee, BofA as Administrative Agent, and the DIP Lender. As a result of these negotiations, the parties reached an agreement (the "BofA Construction Loan Settlement") whereby the Debtors would essentially "purchase" the BofA Construction Loans free of liens by paying BofA Administrative Agent $9,143,406 (less any amounts received by BofA as Administrative Agent from the Debtors on account of the BofA Construction Loans from November 28, 2007, through the date of payment) from (i) proceeds from the payoff, refinancing, or pay-downs of BofA Construction Loans and (ii) to the extent necessary, the DIP Lenders' cash collateral as provided by an amendment to the DIP Credit Facility. On December 27, 2007, the Debtors filed a motion [Docket No. 2531] (the "Construction Loan 9019 Motion") for approval of the BofA Construction Loan Settlement, which was approved by the Bankruptcy Court on January 4, 2008 [Docket No. 2593].

As indicated above, the Debtors' projections with respect to the BofA Construction Loans indicated that refinancing such loans would result in amounts received by the Debtors significantly in excess of $9,143,406. To realize this value, on January 11, 2008, the Debtors filed a motion [Docket No. 2709] (the "Construction Loan Compromise Motion") seeking authorization for the Debtors, in their business judgment and without further notice or hearing, to compromise the BofA Construction Loans to the extent necessary to effectuate the refinancing of such loans. By order dated February 1, 2008 [Docket No. 2860], the Bankruptcy Court approved the relief requested in the Construction Loan Compromise Motion. As of the date of this Disclosure Statement, the Debtors have realized more than $17.1 million from refinancings and other prepayments of BofA Construction Loans, with approximately $7.9 million in UPB of such loans remaining.

Shortly after entry of the order approving the Construction Loan Compromise Motion, ABN AMRO Bank N.V. ("ABN") contacted the Debtors to request that the Debtors continue servicing the construction loans with ABN (the "ABN Construction Loans"), and to offer certain refinancing initiatives to borrowers of the ABN Construction Loans, similar to the authority granted to the Debtors in connection with the BofA Construction Loans. ABN additionally offered to fund all of the Debtors' obligations with respect to a stay and bonus plan for the Debtors' construction loan employees.

The Debtors and ABN entered into good faith negotiations regarding the continued servicing of the ABN Construction Loans and the bonus plan for the Debtors' construction loan employees, which resulted in a stipulation (the "ABN Construction Loan Stipulation"). Pursuant to the ABN Construction Loan Stipulation, the Debtors agreed to use commercially reasonable efforts to keep in place the construction loan servicing group to service the ABN Construction Loans through June 30, 2008. In return, ABN agreed to (i) continue funding its *pro rata* share of

the budget for the servicing of the Debtors' construction loan portfolio to the second quarter of calendar 2008,[19] (ii) fund a $450,000 bonus pool to incentivize the construction loan servicing group to negotiate and effectuate compromises of the ABN Construction Loans, and (iii) waive certain claims against the Debtors and their estates.  The Debtors filed a motion [Docket No. 2972] (the "ABN Construction Loan 9019 Motion") seeking approval of the ABN Construction Loan Stipulation, including the authority to compromise the ABN Construction Loans and establishment of a bonus plan for the construction loan employees.  By order dated February 28, 2008 [Docket No. 3115], the Bankruptcy Court approved the relief requested by the ABN Construction Loan 9019 Motion.  The ABN Construction Loan Stipulation was subsequently extended by further stipulation between the parties, approved by the Bankruptcy Court on June 9, 2008 [Docket No. 4484], whereby the Debtors agreed to keep the construction loan servicing group in place through November 30, 2008, and ABN agreed, among other things, to fund an additional $225,000 bonus pool for construction loan servicing employees.

f.    *Unencumbered Non-Performing Loan Sale*

On July 17, 2008, the Bankruptcy Court entered the *Order, Pursuant to Sections 105(a0 and 363 of the Bankruptcy Code, (I) Authorizing the Private Sale of the Unencumbered Non-Performing Loans and REO Property To Beltway Capital, LLC Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Terms of the Sale Agreement, And (III) Granting Related Relief* [D.I. 5171].  Pursuant to this sale, the Debtors' sold approximately 82 non-performing loans and REO assets, with an approximate UPB of $26 million, to Beltway Capital, LLC for approximately $10.5 million (subject to certain holdbacks as described in the parties' Sale Agreement).  The Debtors are currently working with Beltway to address certain holdbacks under the Sale Agreement and have received, to date, approximately $9.7 million of the sale proceeds.

g.    *Performing Loan Sale*

On July 16, 2008, the Debtors filed a motion to establish bidding procedures with respect to, and to authorize, the sale of a portfolio of 243 performing, first-lien mortgage loans having a UPB of approximately $36.6 million (the "Performing Loan Sale") [Docket No. 5095].  The Bankruptcy Court approved the proposed bid procedures on August 5, 2008 [Docket No. 5310].  On August 12, 2008, the Debtors selected Vantium Capital Markets, L.P. as the stalking horse bidder for the Performing Loan Sale [Docket No. 5367].  The bid deadline for the Performing Loan Sale is August 22, 2008, and, if necessary, an auction will be held on August 26, 2008.  The hearing to consider approval of the Performing Loan Sale is currently scheduled for August 27, 2008.  The Performing Loan Sale is scheduled to close on August 28, 2008.

---

[19]  The Debtors' construction loan portfolio consists of loans originated under Warehouse Facilities with JPM, ABN, and Bank of America.  Due to the Debtors' inability to fund required advances to borrowers under the construction loans postpetition, JPM and ABN had agreed, by stipulations with the Debtors approved by the Bankruptcy Court [Docket Nos. 105 and 284, respectively], to make required advances and/or provide for the continued servicing of loans originated under their respective Warehouse Facilities in order to preserve the value of their interests in the construction loans.

34

9.    **Schedules and Statements of Financial Affairs; Claims Bar Dates and Aggregate Claims Asserted**

The Debtors each filed their Schedules on October 5, 2007 [Docket Nos. 1335, 1336, 1337, 1338, 1339, 1340, 1341, 1342, 1344, 1345, 1346, 1347, 1348, 1349 and 1350]. On November 6, 2007, the Debtors amended certain of their Schedules [Docket Nos. 1820, 1821, 1822, 1823 and 1824].

On October 30, 2007, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 1708] (the "General Bar Date Order"). Pursuant to the General Bar Date Order, the deadline for non-governmental entities to submit Proofs of Claim in the Chapter 11 Cases was January 11, 2008 (the "General Bar Date"). Subject to certain limited exceptions contained in the Bankruptcy Code, in the General Bar Date Order (including with respect to Claims arising from the rejection of executory contracts after the General Bar Date), and in the Borrowers Bar Date Order (as defined below), all Proofs of Claim filed against the Debtors were required to be submitted by the General Bar Date. The deadline for governmental units to assert prepetition Claims against any of the Debtors was February 4, 2008 (the "Government Bar Date").

On February 14, 2008, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing a Bar Date for Filing Proofs of Claim by Construction Loan and HELOC Borrowers and Approving the Form and Manner of Notice Thereof* [Docket No. 2987] (the "Borrowers Bar Date Order"). Pursuant to the Borrowers Bar Date Order, the deadline for borrowers under the Debtors' construction loans or home-equity-line-of-credit mortgage loans was April 30, 2008 (the "Borrowers Bar Date").

In addition to the General Bar Date, the Government Bar Date, and the Borrowers Bar Date, the Bankruptcy Court has from time to time established bar dates for asserting Claims in connection with certain relief requested by the Debtors (e.g., rejection damages bar dates, limited-purpose administrative bar dates relating to particular transactions). All of these bar dates remain in full effect and, where more than one bar date potentially applies to a given Claim, the earliest bar date is the effective date.

As of the date of this Disclosure Statement, approximately 10,444 Proofs of Claim in the aggregate, asserting liquidated Claims totaling approximately $14.25 billion against the Debtors, have been filed.[20] Approximately 4,985 Claims totaling $3.1 billion listed on the Debtors' Schedules are not identified as contingent, unliquidated, or disputed and have not been superseded by filed Claims. Accordingly, approximately $17.36 billion of liquidated Claims in the aggregate have been asserted against the Debtors.

---

[20]   The Plan Proponents make no admission as to the timeliness of any Filed Proof of Claim and, on behalf of themselves and the Plan Trustee and Plan Oversight Committee, reserve all rights to object to Proofs of Claim filed after the General Bar Date, Government Bar Date, or Borrowers Bar Date, as applicable.

As of the date of this Disclosure Statement, Administrative Claims (exclusive of DIP Facility Claims, Professional Claims, the Servicing APA Claim (as hereinafter defined), and Administrative Claims asserted under the WARN Act (as hereinafter defined) of approximately $2.5 million have been asserted against the Estates of the Debtors (approximately $1.5 million of which have been disallowed and expunged), and no Order has been entered establishing a bar date for filing Administrative Claims (the "Administrative Bar Date"). Upon establishment of the Administrative Bar Date, the Debtors expect that additional Administrative Claims may be filed.

10. **Return of Mortgage Loan Files and Destruction of Duplicate Mortgage Files**

On December 14, 2007, the Debtors filed a motion requesting authority to abandon and destroy certain duplicative copies of their mortgage loan files (the "Duplicate Hard Copy Loan Files") and to expend funds to complete the disposition of the mortgage loan files or, alternatively, to return the Duplicate Hard Copy Loan Files to the owner of such loans upon written request and payment of all reasonable costs and expenses associated with the retrieval, review and return (the "Returned Loan Files"), in accordance with the federal and state laws[21] which protect confidential consumer information [Docket No. 2395] (the "Destruction Motion"). The Debtors received twelve objections to the Destruction Motion and expended significant time negotiating with the objecting parties. On January 14, 2008, the Bankruptcy Court approved the Destruction Motion in part, authorizing the Debtors to immediately abandon and destroy only those Duplicate Hard Copy Loan Files for loans the Debtors did not fund [Docket No. 2724] (the "First Destruction Order").

Following entry of the First Destruction Order, the Debtors continued to negotiate with parties in interest regarding the establishment of a document return program. Thereafter, on February 5, 2008, the Debtors filed a reply and supplement to the Destruction Motion [Docket No. 2888] (the "Destruction Supplement"), pursuant to which the Debtors sought only approval of a document return program. The Debtors received twenty-five objections to the Destruction Supplement. Again, the Debtors expended substantial time negotiating with the objecting parties, including the Office of the United States Trustee, regarding the document return program. As a result of these significant efforts, the document return program was approved by the Bankruptcy Court on February 14, 2008 [Docket No. 3010]. As part of the document return program, the Bankruptcy Court established a deadline of March 14, 2008 (the "Return Request Deadline") by which a Requesting Party was required to file and serve a completed Loan File Return Declaration.

The Debtors received fourteen (14) Loan File Return Declarations prior to the Return Request Deadline [Docket Nos. 3271, 3275, 3289, 3290, 3291, 3294, 3297, 3300, 3302, 3304, 3305, 3307, 3327, and 3347], requesting approximately 278,995 Hard Copy Loan Files in the

---

[21] In the Destruction Motion, the Debtors sought (and ultimately obtained) authority to destroy files in accordance with 16 C.F.R. § 682.3(a), and an exemption from any other inconsistent federal or state laws or regulations, including with respect to the disposal or retention of non-public consumer information.

aggregate.[22]   Accordingly, of the 1.5 million Hard Copy Loan Files that were once located in ACRC, approximately 900,000 Hard Copy Loan Files remaining in the Debtors' possession are not subject to a Loan File Return Declaration, postpetition agreement, or order to return (the "Non-Requested Loan Files"). On June 5, 2008, the Debtors filed a motion seeking court approval to destroy these Non-Requested Loan Files [Docket No. 4387]. On June 25, 2008, the Bankruptcy Court held an evidentiary hearing and entered an order approving this relief [Docket No. 4858], and the Debtors are diligently working through the Loan Files to return or destroy such files as appropriate.

## 11.    Rejection of Leases and Executory Contracts

The Debtors have filed ten motions seeking authority to reject certain non-residential real property leases, equipment leases, and/or executory contracts in order to avoid burdening the Debtors' Estates with any unnecessary postpetition obligations [Docket Nos. 220, 510, 742, 967, 2192, 2541, 2841, 3109, 3334, and 4098]. The Bankruptcy Court has approved each of the Debtors' rejection motions [Docket Nos. 779, 843, 1018, 1600, 2446, 2805, 3085, 3416, 3692 and 4485] (collectively, the "Rejection Orders"). Pursuant to the Rejection Orders, the Debtors have rejected hundreds of leases and executory contracts.

On June 6, 2008, the Debtors filed a motion seeking to reject burdensome prepetition executive employment contracts with Stephen A. Hozie (Chief Financial Officer), Alan B. Horn (General Counsel), Robert C. Bernstein (Controller), Craig Pino (Chief Investment Officer and Treasurer), and Robert F. Johnson (Secondary Markets Executive) [Docket No. 4428], which was approved by the Bankruptcy Court by order dated June 24, 2008 [Docket No. 4825]. Pursuant to the EIP, each of these executives had executed a general release and waiver of employment-related claims against the Debtors as a condition to receiving his January 2008 bonus.

On July 29, 2008, the Debtors filed a motion seeking (i) to reject a burdensome prepetition executive employment contract with Michael J. Strauss, the Debtors' founder and former CEO and Chairman of the Board, and (ii) to approve a related stipulation between Mr. Strauss, the Debtors, and the Committee (the "Strauss Rejection/9019 Motion") [Docket No. 5267]. Among other things, the stipulation permits Mr. Strauss to continue to utilize his current office space and secretarial support until the Debtors sell or vacate the Melville, New York headquarters and to enjoy health and welfare benefits and perquisites generally available to the Debtors' employees for so long as such benefits remain available, while at the same time terminating Mr. Strauss's compensation and special benefits as of May 31, 2008, and requiring

---

[22]   Of these fourteen Loan File Return Declarations, three do not comply with the Second Order. Pursuant to their respective Loan File Return Declarations, Deutsche Bank National Trust Company [Docket No. 3305] and LaSalle Bank National Association [Docket No. 3347] have agreed to pay applicable Return Costs "only to the extent that sufficient funds are made available from the respective Trusts." In lieu of a Loan File Return Declaration, Wells Fargo Bank, N.A. filed an objection and reservation of rights to the Return Request Deadline established pursuant to the Second Order [Docket No. 3307]. The Debtors reserve all of their rights with respect to these Loan File Return Declarations, including, but not limited to, refusal to deliver Hard Copy Loan Files requested pursuant to the non-compliant Loan File Return Declarations.

Mr. Strauss to support the Debtors' efforts to maximize the value of their Estates, including, but not limited to, sales of assets and the confirmation of a chapter 11 plan. The Strauss Rejection/9019 Motion is currently set for hearing on August 18, 2008.

### 12.    Extensions of Exclusivity

By Order dated December 19, 2007, the Bankruptcy Court extended for ninety (90) days, through and including March 3, 2008, the exclusive period during with the Debtors have the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period") in the Chapter 11 Cases, and to extend for an additional ninety-one (91) days, through and including May 5, 2008, the period during which the Debtors have the exclusive right to solicit acceptances of a chapter 11 plan (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods") in the Chapter 11 Cases [Docket No. 2445].

Subsequently, on February 29, 2008, the Debtors moved to further extend the Exclusive Periods by approximately ninety (90) days [Docket No. 3133]. Specifically, the Debtors requested that the Bankruptcy Court enter an order extending the Exclusive Filing Period through and including June 2, 2008, and the Exclusive Solicitation Period through and including July 31, 2008. The Bankruptcy Court entered an order approving this request on March 26, 2008 [Docket No. 3415].

Most recently, on May 30, 2008, the Debtors moved to further extend the Exclusive Periods by approximately ninety (90) days [Docket No. 4329], to which BofA as Administrative Agent filed a limited objection [Docket No. 4703]. On July 17, 2008, the Bankruptcy Court entered an order granting the May 30 motion in part and extending the Exclusive Filing Period through and including August 19, 2008, and extending the Exclusive Solicitation Period through and including October 17, 2008 [Docket No. 5175]. The balance of the relief requested in the May 30 motion is currently scheduled for hearing on August 18, 2008.

### 13.    Litigation

The Debtors are party to a number of adversary proceedings initiated in the Bankruptcy Court, as well as certain non-bankruptcy litigation commenced prior to the Petition Date, certain of which are detailed below.

#### a.    *WARN Act Adversary Proceeding*

On August 8, 2007, certain former employees of the Debtors, on their own behalf and on behalf of other similarly situated former employees, filed a complaint for damages on account of alleged violations of the Worker Adjustment Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* (the "WARN Act"), resulting from the Debtors' August 3, 2007, reduction in workforce. On May 7, 2008, the plaintiffs amended their complaint to assert a claim under California's version of the WARN Act, California Labor Code, Section 1400 *et seq.* On May 21, 2008, the Bankruptcy Court approved the parties' stipulated order [Adv. Docket No. 65] certifying a class comprising all employees terminated without cause within 30 days of August 3, 2007, at one of the Debtors' "Affected Facilities" (as defined in the order). The case will thus proceed as a

certified class action.   The Debtors have answered the plaintiffs' amended complaint and discovery is underway.

The WARN Act plaintiffs seek payment of up to 60 days' wages and benefits to class members as an administrative expense pursuant to § 503(b)(1) of the Bankruptcy Code or, alternatively, with priority under § 507(b)(4) and/or (5) of the Bankruptcy Code (with the balance not entitled to priority payable as a general unsecured claim).  The WARN Act plaintiffs have asserted that the class they represent includes more than 4,000 members.  The Debtors dispute that any violation of the WARN Act (or the California version thereof) occurred.

b.    *Morgan Stanley Adversary Proceeding*

As discussed above, Morgan Stanley filed a complaint against the Debtors on August 15, 2007, seeking, among other things, declaratory and injunctive relief based on Morgan Stanley's assertion that the Debtors' servicing rights under a servicing agreement between Morgan Stanley and the Debtors were terminated prior to the Petition Date.  Most counts of the complaint were withdrawn in connection with the August 24, 2007, stipulation between the parties approved by the Bankruptcy Court [Adv. Docket No. 14].  The remaining counts of the complaint were dismissed by agreement of the parties on or about June 4, 2008 [Adv. Docket No. 18].

c.    *CSFB, Bear Stearns and Calyon Adversary Proceedings*

As discussed above, actions were filed by CSFB, BS/EMC, and Calyon early in these Chapter 11 Cases, each similarly asserting that the Debtors' rights under mortgage loan servicing agreements had terminated prepetition, and that the Debtors were obligated to transfer the servicing of certain loans over to entities designated by CSFB, BS/EMC, and Calyon, respectively.  The Debtors asserted certain counterclaims in the answers to these complaints.  The adversary proceedings with CSFB and BS/EMC were settled in November 2007 [respective Adv. Docket Nos. 73 and 23].  The litigation with Calyon continued, however, and the Bankruptcy Court held a "Phase I Trial" in connection with that adversary proceeding.

The Bankruptcy Court entered an opinion and order on the Phase I Trial on January 15, 2008, in which it found, among other things, that the Master Repurchase Agreement between the parties had provided for the sale of mortgage loans to Calyon on a servicing-retained basis and that Calyon was not entitled to terminate the Debtors' servicing rights postpetition.  Calyon filed a motion to alter or amend this opinion and order on January 25, 2008, which was denied on March 10, 2008.

Subsequently, Calyon filed an amended complaint on February 4, 2008, which the Debtors answered on March 3, 2008.  On July 21, 2008, the parties reached a settlement (the "Calyon Settlement"), which was approved by the Bankruptcy Court on August 8, 2008 [Adv. Docket No. 148].  Among other things, the Calyon Settlement provides for the transfer of servicing of the Calyon loan portfolio to Calyon's designee and for the release of certain disputed funds to the Debtors.

39

d.    *Waldner's Adversary Proceeding*

On August 22, 2007, Waldner's Business Environments Inc. ("Waldner's") filed a complaint against AHM Corp. for reclamation of goods and immediate payment of an administrative expense claim for goods shipped to AHM Corp. prior to the Petition Date. In addition, three other parties have asserted demands for reclamation of goods shipped prior to the Petition Date. After substantial negotiations, the Debtors entered into a stipulation with Waldner's that was approved by order of the Bankruptcy Court dated January 11, 2008.

e.    *Bank of America, N.A. Adversary Proceeding*

On October 22, 2007, certain of the Debtors filed a complaint against Bank of America, N.A., asserting a breach of payment obligations under certain swap agreements entered into in connection with mortgage loan purchases. Bank of America, N.A. filed a motion to dismiss the amended complaint on grounds of lack of jurisdiction or, in the alternative, abstention. On June 27, 2008, the Bankruptcy Court entered an order granting in part and denying in part the motion, specifically denying the motion on the issue of jurisdiction (finding subject matter jurisdiction) but granting the motion to dismiss AHM SV (f/k/a American Home Mortgage Servicing, Inc.) as a plaintiff.

f.    *Lehman Adversary Proceeding*

On October 24, 2007, AHM Investment filed a complaint against Lehman Brothers Inc. and Lehman Commercial Paper Inc. (collectively, "Lehman"), asserting that Lehman breached its contract with AHM Corp. when it sought to foreclose on certain private-label notes, and seeking the turnover of the notes as well as various declaratory relief. On November 26, 2007, Lehman filed a motion to partially dismiss the complaint. On May 23, 2008, the Bankruptcy Court entered an order granting Lehman's motion to partially dismiss the complaint [Docket No. 4203] (the "Lehman Order"). Pursuant to the Lehman Order, the Bankruptcy Court dismissed Counts I through IV of the complaint, as well as four of the five requests for declaratory judgment in Court V. By Order dated June 30, 2008, the Bankruptcy Court certified the Lehman Order as "final" for purposes of appeal. On July 11, 2008, AHM Investment filed a notice of appeal from the Lehman Order (as amended) and a request that the Bankruptcy Court certify its appeal directly to the United States Court of Appeals for the Third Circuit. The request was denied as moot after the appeal was docketed in the District Court.

g.    *Wells Fargo Adversary Proceeding*

On October 25, 2007, Wells Fargo Bank, N.A., in its capacity as Securities Administrator ("Wells"), filed an interpleader action, seeking a resolution of a dispute between the Debtors and BS/EMC regarding the rights to mortgage-backed certificates held by BS/EMC, as well as August 2007 principal and interest payments related to the mortgage-backed certificates. On November 19, 2007, Wells filed an amended complaint, which the Debtors answered on December 11, 2007. In July 2008, the parties filed cross-motions for summary judgment with respect to the interpleader complaint, and briefing closed on July 23, 2008. The motions are under consideration by the Bankruptcy Court.

40

h.   *Triad Adversary Proceeding*

On November 5, 2007, AHM Investment and AHM SV (f/k/a American Home Mortgage Servicing, Inc.) filed a complaint against Triad Guaranty Insurance Corp. ("Triad"), a private mortgage insurance company, asserting that Triad breached its insurance agreement by denying coverage for claims relating to certain defaulted mortgage loans that borrowers procured by fraud. Triad filed its answer and counterclaim on December 6, 2007, and the Debtors filed an answer to the counterclaim on December 26, 2007. Discovery is currently underway. Fact discovery is scheduled to be completed by September 10, 2008, and expert discovery is scheduled to be completed by November 8, 2008.

i.   *Waterfield Litigation*

In September 2006, AHM Corp. filed a lawsuit (the "Waterfield Action") in the United States District Court for the Southern District of New York (the "Southern District Court") against Union Federal Bank of Indianapolis ("Union Federal") seeking damages of at least $29 million arising from Union Federal's breach of a Stock and Mortgage Loan Purchase Agreement (the "Purchase Agreement") whereby AHM Corp. purchased all the stock of Waterfield Financial Corp. ("Waterfield Financial") as well as certain mortgage loans from Union Federal.

The Purchase Agreement imposed certain obligations on Union Federal, including the obligation to pay to AHM Corp. a post-closing purchase price adjustment (the "Purchase Price Adjustment") calculated using agreed formulae set forth in the Purchase Agreement. Union Federal also made certain representations and warranties to AHM Corp. in the Purchase Agreement regarding the accuracy of Waterfield Financial's financial statements and books and records, and agreed to indemnify AHM Corp. for any losses resulting from breaches of those representations and warranties.

The Purchase Agreement required that a portion of the purchase price be placed into an escrow account (the "Escrow") to provide a fund for (i) the Purchase Price Adjustment, if any, to be paid by Union Federal to AHM Corp. and (ii) indemnity payments Union Federal is obligated to make to AHM Corp. The Escrow amount was $55 million.

Under the terms of the Escrow agreement, if AHM Corp. believed that it had claims that were payable out of the Escrow, AHM Corp. was required to deliver a Claim Notice and a Certificate of Instruction setting forth its claims to the Escrow agent prior to the Escrow termination date, which was September 30, 2006. AHM Corp. provided the required Claim Notice and Certificate of Instruction to both Union Federal and the Escrow agent by letter dated September 29, 2006. On the same date, AHM Corp. filed its complaint initiating the Waterfield Action (the "Complaint"), in which it asserted (i) a claim for a Purchase Price Adjustment and (ii) claims for indemnification based on Union Federal's breaches of certain representations and warranties in the Purchase Agreement relating to the accuracy of Waterfield Corp.'s financial statements and books and records. Because AHM Corp. was unable to definitively quantify the damages it sought from Union Federal prior to the Escrow termination date, in both the Claim Notice and the Complaint AHM Corp. estimated the Purchase Price Adjustment to be not less than $29 million and stated that the additional damages resulting from Union Federal's breaches

41

of representations and warranties could not be determined prior to trial.  In its Certificate of Instruction, AHM Corp. indicated that the combined claims, along with interest, could equal or exceed the entire $55 million Escrow amount.

On August 22, 2007, the Southern District Court denied, in part, Union Federal's motion to dismiss the claims asserted in the Complaint, and sustained AHM Corp.'s Purchase Price Adjustment and indemnification claims.  In its answer to the Complaint, Union Federal asserted several counterclaims against AHM Corp., namely: (i) a claim that AHM Corp. failed to repurchase certain loans Union Federal asserts AHM Corp. was required to repurchase under the terms of the Purchase Agreement; (ii) a claim that AHM Corp. failed to assume control of certain litigation Union Federal asserts AHM Corp. was required to assume control of under the terms of the Purchase Agreement; and (iii) a claim that AHM Corp. improperly failed to release certain portions of the Escrow funds.  Union Federal also asserted certain affirmative defenses, including an alleged right of setoff or recoupment against the Escrow with respect to any judgment against AHM Corp.

On December 20, 2007, AHM Corp. moved to strike Union Federal's setoff/recoupment defense on the grounds that only AHM Corp.'s claims, and not Union Federal's claims, are secured by the Escrow.  Briefing on this motion is not yet complete.

On January 4, 2008, AHM Corp. moved to dismiss Union Federal's counterclaim relating to the Escrow.  Briefing on this motion is not yet complete.

On January 11, 2008, the Southern District Court granted a motion by Waterfield Shareholder, LLC ("Waterfield LLC") to intervene in the lawsuit based on Waterfield LLC's assertion that it held a legal interest in the Escrow fund and that it had assumed certain obligations of Union Federal concerning Waterfield Financial's operations prior to the closing of the sale of Waterfield Financial to AHM Corp.  On January 18, 2008, Waterfield LLC filed an answer to the Complaint, asserting counterclaims substantially identical to the counterclaims asserted by Union Federal, and an additional counterclaim seeking compensation for amounts allegedly paid by Waterfield LLC to a Bear Stearns-related entity ("EMC") in settlement of certain repurchase claims by EMC relating to loans EMC had purchased from Union Federal or Waterfield Financial prior to the closing of AHM Corp.'s acquisition of Waterfield Financial.

On August 7, 2008, AHM Corp. filed its answer to Waterfield LLC's counterclaims.  Discovery in the Waterfield Litigation is underway.  AHM Corp. intends to vigorously pursue its claims against Union Federal and Waterfield LLC, and to vigorously defend the counterclaims asserted against it, and anticipates the Plan Trustee will do the same.

### 14.    Wells Fargo Stay Relief Litigation

On March 24, 2008, Wells Fargo Bank, N.A. ("Wells Fargo") filed the Motion for Relief From the Automatic Stay to Recover a Payment Made in Error to One of the Debtors Through Recoupment, Imposition of a Constructive Trust, and/or an Equitable Lien [Docket No. 3387] (the "Wells Fargo Stay Relief Motion"), by which it sought relief from the automatic stay to assert the equitable remedies of recoupment, constructive trust and equitable lien in order to

42

recoup a $462,049.83 distribution Wells Fargo made on a certain note to the Debtors in March 2007 from future distributions to be made to the Debtors.

On April 8, 2008, the Debtors filed an objection to the Wells Fargo Stay Relief Motion (the "Wells Fargo Stay Relief Objection") arguing, among other things, that recoupment must be narrowly construed and that Wells Fargo failed to demonstrate that imposition of a constructive trust or an equitable lien was justified under the circumstances. On April 14, 2008, this Court held an evidentiary hearing on the matter, during which the Debtors presented witness testimony. On April 15, 2008, this Court enter an order denying the Wells Fargo Stay Relief Motion [Docket No. 3702] (the "Wells Fargo Stay Relief Order"). On April 25, 2008, Wells Fargo filed its Notice of Appeal of the Wells Fargo Stay Relief Order [Docket No. 3860], thereby appealing the Bankruptcy Court's decision with respect to certain of its alleged recoupment claims to the District Court.

### 15.    Bank of America Stay Relief Litigation

On February 22, 2008, BofA as Administrative Agent filed a Motion for Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing BofA as Administrative Agent to Exercise its Rights as a Secured Creditor [Docket No. 3054] (the "BofA Stay Relief Motion"), in which it sought authority to sell approximately $580 million in UPB of mortgage loans owned by the Debtors subject to BofA as Administrative Agent's security interest (the "BofA Portfolio"). On March 6, 2008, the Debtors filed their Preliminary Objection to the BofA Stay Relief Motion [Docket No. 3175] (the "Preliminary Objection"), which responded to certain allegations made in the BofA Stay Relief Motion concerning the Debtors' management of the BofA Portfolio and, further, argued that (i) BofA as Administrative Agent had failed to allege a *prima facie* case for "cause" under section 362(d)(1) of the Bankruptcy Code, (ii) BofA as Administrative Agent was entitled to adequate protection only from and after the date of the BofA Stay Relief Motion, (iii) BofA as Administrative Agent's interest in the BofA Portfolio was adequately protected, and (iv) the BofA Portfolio should not be sold into a down market. Thereafter, the Debtors and BofA Administrative Agent engaged in extensive, expedited discovery (including expert witness discovery) and pretrial briefing.

While discovery was underway on the BofA Stay Motion, BofA as Administrative Agent and the Committee negotiated and executed the BofA/Committee Stipulation (as hereinafter defined) resolving all outstanding issues under the Cash Collateral Order between the Committee and BofA as Administrative Agent. Following approval of the BofA/Committee Stipulation (discussed below), and pursuant thereto, the Committee filed a Statement in Support of the BofA Stay Relief Motion [Docket No. 3618] on April 9, 2008.

BofA as Administrative Agent and the Debtors exchanged pretrial briefs on April 11, 2008 [Docket Nos. 3667 & 3668], and an evidentiary hearing was held on April 16 and 17, 2008. At the conclusion of BofA as Administrative Agent's case in chief, the Debtors moved to dismiss the BofA Stay Relief Motion for failure to establish a *prima facie* case, which dismissal was granted. By Order dated April 25, 2008 [Docket No. 3850], the Bankruptcy Court denied the BofA Stay Relief Motion. The Bankruptcy Court extended the time for BofA as Administrative Agent to file an appeal of its ruling so as to provide the Debtors and BofA as Administrative

Agent time to reach a consensual resolution of remaining issues without the need for further litigation.

### 16.    Committee and Bank of America 9019 Motion

On March 13, 2008, BofA as Administrative Agent and the Committee filed a motion to shorten notice [Docket No. 3279] (the "BofA/Committee Motion to Shorten") with respect to a joint motion, filed subsequently on March 14, 2008 [Docket No. 3318] (the "BofA/Committee 9019 Motion"), to approve a settlement stipulation (the "BofA/Committee Stipulation") resolving all remaining issues under the Cash Collateral Order. On March 17, 2008, the Debtors filed an objection [Docket No. 3322] to the BofA/Committee Motion to Shorten, noting several troubling provisions of the BofA/Committee Stipulation and arguing it should go out on full notice. By Order dated March 17, 2008 [Docket No. 3325], the Bankruptcy Court denied the BofA/Committee Motion to Shorten.

On April 7, 2008, the Debtors filed an objection [Docket No. 3542] to the BofA/Committee 9019 Motion, arguing, among other things, that the Committee had exceeded its authority under the Cash Collateral Order, that the BofA/Committee Stipulation provided illusory value to the Debtors' estates, and that the Committee's concessions to BofA as Administrative Agent were disproportionate to the value received. Objections were also filed by the Purchaser [Docket No. 3541] and the United States Trustee [Docket No. 3552]. At the conclusion of the April 14, 2008 hearing on the BofA/Committee 9019 Motion, the BofA/Committee Stipulation was approved, with some modifications, by order of the Bankruptcy Court [Docket No. 3699].

### 17.    The Purchaser's Administrative Expense Request

On May 23, 2008, the Purchaser filed a request for payment of an administrative expense (the "Servicing APA Claim") [Docket No. 4233] in the amount of approximately $12 million (not including other, as-yet unliquidated amounts) on account of alleged breaches of the Servicing APA by the Debtors. The Debtors object to the Servicing APA Claim on both legal and factual bases, and engaged the Purchaser informally to express these objections and to obtain an extension of the Debtors' and the Committee's formal objection deadline. Following discussions with the Debtors, the Purchaser filed, then subsequently withdrew, a supplement to the Servicing APA Claim [Docket Nos. 4338 and 4359, respectively]. The Servicing APA Claim, and the Debtors' and Committee's objection deadline with respect thereto, have been continued by agreement of the parties to permit the Purchaser to review the factual underpinnings for its claims.

### 18.    Bank of America Global 9019 Motion

Immediately following dismissal of the BofA Stay Relief Motion as discussed above, the Debtors, the Committee, and BofA as Administrative Agent engaged in extensive settlement discussions concerning a global resolution of outstanding issues between the parties, including certain issues previously addressed by the BofA/Committee Stipulation. After several months of negotiation, the parties reached a mutually acceptable agreement and, on July 18, 2008, the Debtors filed a motion [Docket No. 5184] to approve a global settlement stipulation between the

44

Debtors, BofA as Administrative Agent, and the Committee (the "BofA Global Settlement"), certain confidential provisions of which were permitted to be filed under seal per Order of the Bankruptcy Court [Docket No. 5309]. The Bankruptcy Court approved the BofA Global Settlement on August 5, 2008 [Docket No. 5308].

The BofA Global Settlement provides, among other things, that: (i) the BofA Syndicate Unsecured Claim is capped at the lesser of $50 million or 50% of the actual amount of such claim, (ii) the remaining "benchmark" prepetition claim, as of July 2, 2008, is $468,128,691.58 (which confirms the remaining amount of the $1.082 billion prepetition claim after the liquidation of collateral during these Chapter 11 Cases) and provides for the sharing of cash receipts 50/50 between the Prepetition Lenders and the Debtors' Estates after satisfaction of the "benchmark" prepetition claim, (iii) the Debtors shall retain, free and clear, the first $2.6 million of the proceeds of the Calyon Settlement and be entitled to use up to $1 million of additional proceeds to satisfy certain ancillary costs, if any, (iv) as originally provided in the BofA/Committee Stipulation, asserted liens in certain REO properties are released and the proceeds of such properties will be held in trust for the benefit of general unsecured creditors other than the Prepetition Lenders,[23] (v) asserted liens in approximately $6.9 million of cash in certain bank accounts are released, (vi) the Debtors shall retain, free and clear, approximately $250,000 related to repurchased servicing advances, (vii) transfers the costs of administering the remaining BofA collateral to BofA as Administrative Agent, with certain limited exceptions, and (viii) BofA as Administrative Agent, shall have complete dominion and control over and discretion with respect to the Mortgage Loans and related servicing rights, which could require the Estates or the Plan Trust to maintain ownership of the Mortgage Loans and related servicing rights at no cost to the Estates or the Plan Trust.

### 19.    Calyon Settlements

In its capacity as administrative agent under the Repurchase Agreement dated November 21, 2006 (the "Calyon Repo"), Calyon has filed an adversary proceeding (as described above) and numerous motions and objections throughout the Debtors' Chapter 11 Cases. Many of the claims, issues and interests asserted by Calyon in various pleadings have been resolved by the following settlements: (a) the *Order Approving And Authorizing the Stipulation Between The Debtors And Calyon New York Branch, As Administrative Agent* [Docket No. 3918]; and (b) the *Order (I) Approving The Stipulation Between The Debtors And Calyon New York Branch, As Administrative Agent, And (II) Authorizing The Transfer Of Mortgage Servicing Rights Relating Thereto* [D.I. 5312]. The aforementioned settlements resolved complex disputes regarding over $12 million in funds to which Calyon asserted an entitlement, as well as an ongoing dispute as to the ownership of certain servicing rights and the payment of servicing fees. The settlements resulted in, among other things, approximately $10 million in funds returned to Calyon, servicing rights and the ownership thereof transferred to Calyon, payment to the Debtors of $5 million, and the assignment by Calyon to the Debtors of rights in certain state bond loans and remaining

---

[23] Also on August 5, 2008, the Bankruptcy Court approved a stipulation between the Debtors and the Committee [Docket No. 5311] permitting the Debtors to use proceeds of these REO properties, as well as proceeds from compromise of the BofA Construction Loans, to pay ongoing operating expenses in these Chapter 11 Cases.

funds and claims. The parties have not yet resolved , among other things, amounts owed to the Debtors' Estates in connection with the valuation and/or liquidation of the collateral retained by Calyon or certain disputes with respect to the amount, if any, of a deficiency claim of Calyon.

### 20.    Objections to Claims

As of the filing of this Disclosure Statement, the Debtors have filed thirteen (13) omnibus objections to Claims (the "Omnibus Objections") [Docket Nos. 3315, 3474, 3475, 3677, 3879, 3880, 4028, 4029, 4223, 4661, 4661, 5180, 5181]. Eight of the Omnibus Objections were on non-substantive grounds, including, among others, that a particular Proof of Claim (a) is duplicative of another Proof of Claim filed against the same Debtor, (b) has been amended or superseded by a subsequently filed Proof of Claim, (c) is solely on account of shareholder interests in the Debtors, (d) asserts a claim against the wrong Debtor entity, (e) has been satisfied by the Debtors post-petition, (f) was filed after the applicable Bar Date, and/or (g) attaches no supporting documentation  The remaining Omnibus Objections were on substantive grounds, including, among others, that a particular Proof of Claim (a) asserts a liability not reflected in the Debtors' books and records, (b) was wrongly filed against multiple Debtor entities, (c) asserts amounts that are in excess of the amounts reflected as due and owing in the Debtors' books and records, (d) asserts a priority interest not reflected in the Debtors' books and records, and (e) asserts an undetermined value.

In total, through the Omnibus Objections, the Debtors have objected to approximately 5,680 Proofs of Claim in the aggregate amount of approximately $2.64 billion. To date, 4416 Proofs of Claim have been reduced or disallowed by approximately $282 million in the aggregate [Docket Nos. 3696, 3945, 3946, 4027, 4291, 4295, 4289, 4526, 4527, and 4863].

### 21.    Miscellaneous Contested Matters

In addition to efforts to obtain the relief necessary to stabilize operations, improve the financial condition of their businesses and to liquidate assets, the Debtors also spent significant time opposing relief requested by other parties when appropriate and in the best interests of their Estates. For example, over twenty motions for relief from the automatic stay, certain of which are described above, have been filed by various parties in interest thus far in these Chapter 11 Cases. While the Debtors have agreed to consensual resolutions of certain of these motions, or objected only on limited bases, the Debtors have litigated a number of such motions before the Bankruptcy Court.

By way of further example, the Debtors litigated three motions seeking, among other things, (i) production of documents and examinations of the Debtors pursuant to Bankruptcy Rule 2004; (ii) appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code, and (iii) appointment of a trustee or examiner pursuant to section 1104 of the Bankruptcy Code, to which the Office of the United States Trustee joined in part.

Responding to, resolving, and in some instances litigating miscellaneous contested matters has been a significant, albeit necessary, drain on the Debtors' financial and human resources, and has contributed to the overall costs of administration of these Chapter 11 Cases.

46

## IV.    PROPOSED INTERCOMPANY RESOLUTION EMBODIED IN THE PLAN

### A.    General Structure of the Plan

In early 2008, the Debtors and the Committee began discussions in earnest regarding the terms of a joint chapter 11 plan of liquidation for the Debtors. One of the first matters discussed was whether the Debtors' Estates should be substantively consolidated. Notwithstanding that the Debtors' Estates are being jointly administered by the Bankruptcy Court, each of the Debtors remains a separate legal entity. As such, absent a party with standing convincing the Bankruptcy Court that the Estates should be substantively consolidated (which, as discussed below, requires a particularly strong evidentiary showing), any plan to be confirmed for the Debtors must provide that the assets of each Debtor are to be used only to pay claims against that Debtor, and claims against a Debtor cannot be asserted against other Debtors (except to the extent such other Debtors are co-liable on particular claims).

Substantive consolidation is an equitable remedy that treats multiple estates as one. That is, claims against any individual estate are deemed to be claims against the consolidated entity, and the assets of any individual estate are deemed to be assets of one consolidated entity. Thus, if the Debtors were to substantively consolidate, creditors with claims against multiple Estates would be treated as if they had one claim against the consolidated Estate, Assets of each Estate would be treated as Assets of the consolidated Estate, and Intercompany Claims would be eliminated.

The discussions of the Debtors and the Committee with respect to substantive consolidation had two purposes: first, to determine whether it was possible under governing law to substantively consolidate one or more Debtors' estates (and, if so, whether proposing a consolidated versus de-consolidated plan was prudent); second, in the event the Debtors proposed a de-consolidated plan and some party in interest argued for substantive consolidation, to evaluate the merits of such position. Discussions regarding substantive consolidation occurred against the backdrop of the Third Circuit's decision in In re Owens Corning, 419 F.3d 195 (3d Cir. 2005), as to the circumstances under which substantive consolidation of debtor estates may be permitted. In Owens Corning, the Third Circuit stated that substantive consolidation is an "extreme" remedy to be used "sparingly" and ruled that, absent the consent of affected creditors, a proponent of substantive consolidation must prove either (i) that pre-bankruptcy, the entities to be consolidated "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity" or (ii) that after filing for bankruptcy, the entities' assets and liabilities "are so scrambled that separating them is prohibitive and hurts all creditors." 419 F.3d at 211.

Under the facts and circumstances of these Chapter 11 Cases, certain factors militate in favor of substantive consolidation. For instance, both before and during these Chapter 11 Cases, the Debtors utilized a central cash management system whereby AHM Corp. made payments on behalf of other Debtor entities and paid certain shared corporate overhead expenses (including professionals' fees and other expenses of administration of these Chapter 11 Cases) that were

47

properly allocable between multiple Debtor entities. Not all payments on behalf of other Debtor entities prior to the Petition Date were properly recorded as intercompany transfers,[24] and not all shared overhead expenses were in fact allocated between the responsible Debtors. As an example of the former, AHM Corp. paid a number of expenses in connection with AHM Holdings' acquisition of AH Bank prior to the Petition Date which could have been recorded as intercompany transfers to AHM Holdings giving rise to intercompany receivables in favor of AHM Corp. As an example of the latter, salaries of the Debtors' upper-level management were borne entirely by AHM Corp. even though portions of such salaries would have been properly chargeable to other Debtor entities.

Certain other factors militate against substantive consolidation. For instance, while the Debtors' books and records do not perfectly reflect the separateness of the Debtor entities (e.g., with respect to unrecorded intercompany transfers and unallocated corporate overhead discussed above), the fact that the Debtors maintained separate books and records for each entity demonstrates the Debtors did not "disregard" entity separateness. In addition, the existence of holding company-level guarantees for certain operating company indebtedness (e.g., in connection with the BofA Syndicate Warehouse Facility) demonstrates that the holders of such guarantees relied on entity separateness in extending credit to the Debtors. Moreover, the Debtors are unaware of any instances of creditors who relied on the lack of entity separateness in deciding whether to extend credit to the Debtors.

All told, the Debtors completed a seventeen-point assessment of common factors cutting in favor of and against substantive consolidation, and reviewed the findings on each point with the Committee.

**Under the facts and circumstances of these Chapter 11 Cases as they exist at the time of this Disclosure Statement, the Plan Proponents believe that pursuing a de-consolidated plan is more prudent than pursuing a consolidated plan. While there may well be a basis in law and fact for substantively consolidating one or more Debtors' estates, the Plan Proponents believe that the benefits to be gained by substantive consolidation are outweighed by the risks and expenses associated with establishing an evidentiary basis for substantive consolidation (including, potentially, the costs of revising and resoliciting the plan if an evidentiary basis for substantive consolidation is not established) and, even if the Plan were confirmed, the risk and attendant delay and expense in the event a party aggrieved by substantive consolidation appealed that element of the plan. Accordingly, the Plan as proposed separately classifies Claims against each Debtor and treats the Assets of each Debtor as the separate Assets of each entity.**

The determination not to pursue substantive consolidation of the Debtors left open several key issues as to the structure of the Plan, including the resolution of Intercompany Claims and the proper allocation between the Debtors' Estates of the expenses of administering

---

[24]  In accordance with the Cash Management Order, the Debtors have, to the extent possible, kept complete and accurate records of payments made on behalf of other Debtor entities during these Chapter 11 Cases.

48

both these Chapter 11 Cases and the Plan. These issues, and the proposed resolution thereof in the form of the Stipulated Asset Allocation, are discussed below.

### B.    Settlement of Intercompany Claims

Absent substantive consolidation, intercompany claims survive and necessarily place each debtor's estate and creditors in an adverse posture with other debtors' estates and creditors. Potential conflicts are numerous, and the resolution of each may ultimately affect creditor recoveries by altering the respective debtors' assets available for distribution to creditors (e.g., a dispute between estates as to the rightful ownership of an asset, or appropriate allocation of a shared asset) or aggregate liabilities (e.g., a dispute between estates as to whether an intercompany "debt" will be respected as such, or should be recharacterized as equity). As a result, any fiduciary acting on behalf of multiple estates and charged with maximizing recoveries for the creditors of each will necessarily encounter situations where the interests of one estate and its creditors are directly (or indirectly) adverse to the interests of another estate and its creditors. Presented with such a conflict of interest, the fiduciary will have little choice but to seek outside help, which may take the form of a successor fiduciary for one or more estate, conflict counsel to act on behalf of each estate, or interpleader or similar action whereby the matter will be submitted for judicial determination.

The potential for debilitating inter-estate conflicts in jointly-administered chapter 11 cases prior to plan confirmation is minimized by oversight of the debtors in possession by the creditors' committee (which is ordinarily selected from creditors of the various estates), the Office of the United States Trustee, and the bankruptcy court, as well as by the transparency of the bankruptcy process and ability for creditors or other parties in interest to intervene and be heard on any matter in which their rights may be adversely affected. Accordingly, during these Chapter 11 Cases, the Debtors have been able to focus largely on taking actions for their common benefit, leaving to another day the resolution of Intercompany Claims and other inter-Debtor disputes. While postponing resolution of inter-Estate conflicts has resulted in cost savings and increased efficiency during these Chapter 11 Cases, it is obviously not possible to postpone their resolution indefinitely. Accordingly, in connection with negotiating the terms of a possible joint plan of liquidation, the Debtors and the Committee discussed whether it would be prudent to attempt to resolve any or all potential inter-Estate conflicts through the Plan rather than leaving their resolution to the Plan administrator (or administrators) following confirmation.

There are several advantages to resolving inter-Estate disputes in connection with confirmation of the Plan, rather than deferring their resolution until administration of the Plan.

First, it permits administration of the Plan by a single fiduciary, free from potentially debilitating conflicts of interest, the resolution of which conflict could delay Plan administration and lead to increased administrative expenses, which would delay and reduce distributions to Creditors. In light of the anticipated recoveries to Creditors in these Chapter 11 Cases, the Plan Proponents determined that the alternatives to settlement through a Plan—namely, appointing a separate fiduciary to liquidate the remaining Assets of each Debtor's Estate (including prosecution of Causes of Action), or appointing a single fiduciary retaining separate conflict counsel for matters pertaining to each Estate—would be prohibitively expensive and would

swallow Creditor recoveries in certain of the Chapter 11 Cases. Creation of a unitary Plan Trust administered by a single Plan Trustee on behalf of all Estates (in consultation with a Plan Oversight Committee representative of the various Estates) would minimize the costs associated with a multi-trust structure (including the payment of multiple trustees and professionals for each) for the benefit of all Estates. And creation of a Plan Trust free of potential conflicts of interest would further minimize the costs associated with resolution of inter-Estate issues (including, without limitation the retention of, and substantial duplication of efforts by, conflicts counsel on behalf of multiple Estates). Freeing the Plan Trustee from potential conflicts of interest should also help attract more qualified candidates to fill the office, insofar as the inability to offer indemnification against such conflicts[25] may deter otherwise qualified candidates from acting as Plan Trustee.

Second, it provides transparency, an opportunity for Creditors and other parties in interest to be heard in opposition (whether by simply voting or by filing formal pleading), and finality. By way of contrast, piecemeal resolution of inter-Estate conflicts after the Effective Date, even if submitted to the Bankruptcy Court for ultimate approval, would necessarily lack the procedural protections of the plan confirmation process (e.g., disclosure and solicitation), and would essentially impose upon Creditors potentially affected by such resolution an ongoing duty to monitor the administration of the Plan to ensure their rights are not being affected.

Third, as with any negotiated compromise, it avoids the delay and expense of litigating inter-Estate conflicts to a judicial resolution. This is particularly important with respect to certain Intercompany Claims documented in the Debtors' books and records as "loan-level" transactions (e.g., servicing advances on account of particular mortgage loans on the Debtors' loan servicing platform), resulting in over a million individual book entries during the eighteen months immediately preceding the Petition Date. While general conclusions as to the accuracy and validity of such entries may be drawn, e.g., from statistical samplings, wholesale investigation and resolution of disputes concerning their accuracy and validity would be prohibitively expensive for all involved.

For the foregoing reasons, among others, the Plan Proponents determined it was prudent to pursue a comprehensive settlement of potential inter-Estate disputes through the Plan, which disputes fall generally into the following categories:

   (i)    <u>Booked Intercompany Claims</u>: This category includes intercompany payables/receivables (pre- and post-Petition Date) arising in the ordinary course and reflected in the Debtors' books and records, which may be subject to challenge as to validity and/or amount and, in certain instances, may be subject to recharacterization as equity. An example of a Booked Intercompany Claim would be a servicing advance made by AHM SV on a loan owned by AHM Corp.

---

[25] Inter-Estate conflicts of interest raise "duty of loyalty" issues as distinct from "duty of care" issues (e.g., negligence, business judgment). As a general proposition, a fiduciary may be indemnified only against breaches of its duty of care, and not against breaches of its duty of loyalty.

(ii) <u>Imputed Intercompany Claims</u>: This category includes intercompany payables/receivables arising in the ordinary course which are not reflected in the Debtors' books and records, but could have been so reflected. Examples of Imputed Intercompany Claims include (i) AHM Corp.'s right to reimbursement from AHM Holdings for a portion of the costs of administering AH Bank, (ii) AHM SV's right to payment of market interest on P&I and T&I escrows held by AH Bank, and (iii) AHM Corp.'s right to reimbursement from other Debtors of administrative expenses (e.g., professionals' fees) of the Chapter 11 Cases paid by AHM Corp. on behalf of all Debtors.

(iii) <u>Intercompany Causes of Action</u>: This category includes potential actions of one Debtor against another, and may include Avoidance Actions under chapter 5 of the Bankruptcy Code. Because the Debtors are presumably "insiders" of one another under the Bankruptcy Code, any payments made or obligations incurred by one Debtor to another Debtor within the year preceding the Petition Date are potentially subject to avoidance as preferences or fraudulent transfers, to the extent the transferor/obligor Debtor was "insolvent" as of the date of such transfer(s), the other requirements of the applicable cause of action are established, and no defense to avoidance applies. This category also includes Intercompany Claims for contribution or reimbursement.

(iv) <u>Allocation of Unpaid Claims/Expenses</u>: This category includes both unpaid prepetition Claims and unpaid Administrative Claims, to the extent such Claims are properly allocable between multiple Estates.

(v) <u>Ownership of Shared Assets</u>: This category includes Assets in which more than one Debtor may assert an ownership interest, including Causes of Action for which more than one Debtor could be a plaintiff. An example of potentially shared Causes of Action are actions against Warehouse Lenders on account of prepetition margin calls against the American Home Mortgage loan origination entities, the aggregate effect of which margin calls, as described above, was to create an enterprise-wide liquidity crisis that drove several non-origination entities into bankruptcy.

(vi) <u>Allocation of Plan Trust Operating Expenses</u>: This category includes the anticipated expenses of administering the Plan, which should be borne ratably in some proportion by each Debtor.

## C.    The Stipulated Asset Allocation

After considering various alternatives, the Plan Proponents determined that the best mechanism for resolution of the inter-Estate conflicts would be a stipulated asset allocation, whereby the Plan Trustee would divide the proceeds of liquidation of any Plan Trust Asset between the respective Estates in accordance with a pre-set formula. The underlying premise of this asset allocation is that, so long as Estates agree upon and stipulate to (i) the residual value of the Assets being contributed to each Estate to the Plan Trust (i.e., gross Asset value net of S/A/P

51

Claims payable by such Estate); and (ii) the percentage share of Plan Trust Operating Expenses that will be borne by each Estate, it is possible for the Estates to share in the proceeds of all Plan Trust Assets while at the same time respecting entity separateness.

The resulting Plan Trust would be analogous to a partnership whereby each partner contributes assets of a certain value (fixed by agreement of the partners), and agrees to be responsible for a fixed percentage of partnership expenses, in exchange for a right to share in any proceeds of partnership assets in an amount equal to the asset value contributed by such partner (net of that partner's share of partnership expenses) as a percentage of all asset value contributed by all partners (net of all partnership expenses). Legal distinctions between the partners are undisturbed by the partnership relationship and, assuming (i) the validity of the agreed-upon value assigned to the partnership assets by the partners at the inception of their partnership arrangement and (ii) that the agreed-upon allocation of partnership expenses fairly reflects the relative costs associated with preserving and liquidating the assets contributed by each partner, economic distinctions between assets contributed by one partner versus another partner are preserved by virtue of the agreed-upon allocation of proceeds of partnership assets. To illustrate, suppose four partners each contribute assets having a value of $100 to the partnership and agree to bear partnership expenses equally. Each partner would thereby be entitled to 25% ($100 / $400) of the net proceeds of liquidation of any partnership asset. Thus, both before and after joining the partnership, each partner is in essentially the same economic position—before joining, each partner had a right to 100% of the net proceeds of $100 worth of assets, and after joining, each partner has a right to 25% of the net proceeds of $400 worth of assets. And when entering into the partnership arrangement, each partner has a real economic incentive to ensure that (i) the assets contributed by the other partners are not overvalued and (ii) the allocation of partnership expenses between the partners fairly reflects the relative costs of liquidating the assets contributed by each partner (e.g., so that a partner contributing primarily illiquid assets is allocated more expenses than a partner contributing more liquid assets).

The majority of inter-Estate conflicts sought to be resolved via the Stipulated Asset Allocation are relevant to determining the residual Asset value that will be contributed by each Debtor's Estate to the Plan Trust. To determine this value, the Plan Proponents began with an assumption of gross non-litigation Asset value[26] in each Estate as of the Petition Date, then made adjustments to each Estate's Asset value to reflect the settlement of prepetition intercompany payables/receivables (whether "booked" or "imputed"). For purposes of these adjustments, receivables from each Debtor (as modified to reflect imputed intercompany claims) were treated as Assets of the various payee-Debtors (and corresponding liabilities of the payor-Debtor), valued at an amount equal to the anticipated distribution to general unsecured creditors in the payor-Debtor's estate.

Adjusted gross Asset values for each Estate were further reduced by the amount of any (i) "direct" administrative costs (both paid and unpaid) properly chargeable to each Estate (and not properly allocable between multiple Estates) during the Chapter 11 Cases, (ii) payment or

---

[26] As discussed further below, the Plan Proponents believe that including litigation Asset value is not necessary given that any valuation of litigation Assets would be highly speculative.

other settlement of secured claims postpetition, and (iii) administrative costs (both paid and unpaid) allocable between multiple Estates (e.g., professional fees for services benefiting all Debtors), in the amount properly chargeable to such Estate.

Adjusted Gross Asset values for each Estate were reduced further by each Estate's estimated exposure to filed S/A/P Claims. The resulting Asset values represent the residual value of non-litigation Assets that will be contributed to the Plan Trust by each Estate for the benefit of its Creditors. (By reference to the partnership hypothetical posited above, this value represents the $100 contributed to the partnership by each partner.) The use of non-litigation Asset value as opposed to combined litigation and non-litigation Asset value for purposes of determining the value of Assets being contributed to the Plan Trust by each Estate is deliberate, and is based on the Plan Proponents' considered judgment that, to the extent this stipulated Asset value is the value from which each Estate will be deemed to have paid its S/A/P Claims, any reliance upon speculative valuation of litigation Assets for purposes of this calculation may call into question whether the Plan meets the Feasibility Test as to a given Debtor.

The next step in arriving at the Stipulated Asset Allocation was the determination of the proper share of Plan Trust Operating Expenses that would be borne by each Estate. In making this determination, the Plan Proponents considered a variety of factors, including the relative value, liquidity, and costs of maintaining and liquidating the Assets being contributed to the Plan Trust by each Estate and the anticipated simplicity or complexity of the Claim reconciliation process for each Estate. (By reference to the partnership hypothetical posited above, the resulting percentages represent each partner's fixed percentage responsibility for partnership expenses.) After determining each Estate's percentage share of Plan Trust Operating Expenses, the Plan Proponents further adjusted the gross Asset value of each Estate to reflect its share of a $6 million stipulated initial funding requirement for the Plan Trust Operating Expense Reserve.[27] The resulting Asset values represent the residual value of non-litigation Assets contributed to the Plan Trust by each Estate. The residual non-litigation Asset value of each Estate as a proportion of the total non-litigation Asset value of all Estates makes up the Stipulated Asset Allocation, namely:

- **AHM Holdings – 35.051%**

- **AHM Investment – 11.663%**

- **AHM Acceptance – 11.919%**

- **AHM SV – 1.895%**

- **AHM Corp. – 38.523%**

---

[27] This funding requirement is the Plan Proponents' good-faith estimate of cost for the Plan Trustee to administer the Plan and carry out its duties under the Plan Trust Agreement. To the extent actual costs of administration are less than the reserved amount, any residual amount will be redistributed to the Estates pursuant to the Stipulated Asset Allocation. To the extent the actual costs of administration prove greater than the reserved amount, the Plan permits the Plan Trustee, with the approval of the Plan Oversight Committee, to fund the Plan Trust Operating Expense Reserve from the proceeds of Plan Trust Assets or to obtain funding from third-party sources.

- **AHM Ventures – 0.479%**

- **Homegate – 0.091%**

- **Great Oak – 0.379%**

Given the uncertainty attendant in ascertaining the value of potential Causes of Action, and given that the Plan Trustee will ultimately determine the universe of Causes of Action that the Plan Trust will pursue, the Plan Proponents determined that the proceeds of litigation Assets should be allocated in accordance with the Stipulated Asset Allocation. Among other things, including litigation Assets as well as non-litigation Assets under the ambit of the Stipulated Asset Allocation will further streamline administration of the Plan by obviating determinations as to the proper allocation of the proceeds of shared Causes of Action and by permitting the Plan Trustee to allocate the proceeds of all Plan Trust Assets using a single formula. Moreover, insofar as the Stipulated Asset Allocation includes an allocation of Plan Trust Operating Expenses, certain of which will be incurred prosecuting litigation on behalf of the respective Estates (or any combination thereof), allocating the proceeds of such litigation between the Estates in accordance with their respective contributions to the Plan Trust Operating Expense Reserve is, in the Debtors' considered business judgment, reasonable in consideration of the benefits to all Estates gained from global settlement of potential inter-Estate conflicts through the Plan.

**As is apparent from the foregoing, the Stipulated Asset Allocation depends on a number of assumptions, including: (i) the amount of distributions to unsecured creditors of each Estate (for purposes of valuing prepetition receivables from each Debtor), (ii) the valuation of Assets of each Estate, (iii) each Estate's ultimate exposure to filed S/A/P Claims, and (iv) the sufficiency of the Plan Trust Operating Expense Reserve. By proposing the Stipulated Asset Allocation as an integral part of the Plan, the Debtors are obviously assuming the risk that these assumptions will turn out to be inaccurate, and to the extent they are, that the premises underlying the settlement of Intercompany Claims will be revealed (in hindsight) to have been inaccurate. In the Debtors' considered business judgment, these risks are significantly outweighed by the administrative efficiencies and cost savings possible in a unitary Plan Trust, single Plan Trustee structure where the Plan Trustee is freed from potentially debilitating conflicts of interest. Considering that the alternative to a global resolution of inter-Estate conflicts through a Plan settlement may be a structure whereby resolution of such conflicts would significantly erode Creditor recoveries, so much so that a Plan might not be confirmable as to all Debtors (resulting in conversion of certain Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code), the Plan Proponents strongly urge Creditors to vote in favor of the Plan and the Stipulated Asset Allocation.**

## V.    THE PLAN

The following summary of certain principal provisions of the Plan is qualified in its entirety by reference to the Plan, which is attached as <u>Exhibit A</u> to this Disclosure Statement. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and

reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.   In the event of any discrepancy between this Disclosure Statement, including the following summary description, and any provision of the Plan, the Plan or order confirming the Plan will control.

### A.    **Classification of Claims and Interests**

The categories of Claims and Interests listed below classify Claims (except for DIP Facility Claims, Administrative Claims, and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan.  As provided in § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article 3 of the Plan.

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| **AHM Holdings** | | |
| Class 1A | Priority Claims against AHM Holdings | Unimpaired - not entitled to vote |
| Classes 1B(1) *et seq.* | Miscellaneous Secured Claims against AHM Holdings | Impaired - entitled to vote |
| Class 1C(1) | Unsecured Claims against AHM Holdings other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 1C(2) | BofA Syndicate Unsecured Claim against AHM Holdings | Impaired - entitled to vote |
| Class 1D | Subordinated Trust Preferred Claims against AHM Holdings | Impaired - not entitled to vote |
| Class 1E | Subordinated Claims against AHM Holdings | Impaired - not entitled to vote |
| Class 1F | Interests in AHM Holdings | Impaired - not entitled to vote |
| **AHM Investment** | | |
| Class 2A | Priority Claims against AHM Investment | Unimpaired - not entitled to vote |
| Classes 2B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Investment | Impaired - entitled to vote |
| Class 2B(2) | BofA Syndicate Secured Claim against AHM Investment | Impaired - entitled to vote |

55

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class 2C(1) | Unsecured Claims against AHM Investment other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 2C(2) | BofA Syndicate Unsecured Claim against AHM Investment | Impaired - entitled to vote |
| Class 2D | Subordinated Trust Preferred Claims against AHM Investment | Impaired - not entitled to vote |
| Class 2E | Subordinated Claims against AHM Investment | Impaired - not entitled to vote |
| Class 2F | Interests in AHM Investment | Impaired - not entitled to vote |
| **AHM Acceptance** | | |
| Class 3A | Priority Claims against AHM Acceptance | Unimpaired - not entitled to vote |
| Classes 3B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Acceptance | Impaired - entitled to vote |
| Class 3B(2) | BofA Syndicate Secured Claim against AHM Acceptance | Impaired - entitled to vote |
| Class 3B(3) | JPM Secured Claim against AHM Acceptance | Impaired - entitled to vote |
| Class 3B(4) | Travelers Secured Claim against AHM Acceptance | Unimpaired - not entitled to vote |
| Class 3C(1) | Unsecured Claims against AHM Acceptance other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 3C(2) | BofA Syndicate Unsecured Claim against AHM Acceptance | Impaired - entitled to vote |
| Class 3D | Subordinated Claims against AHM Acceptance | Impaired - not entitled to vote |
| Class 3E | Interests in AHM Acceptance | Impaired - not entitled to vote |
| **AHM SV (f/k/a American Home Mortgage Servicing, Inc.)** | | |
| Class 4A | Priority Claims against AHM SV | Unimpaired - not entitled to vote |
| Classes 4B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM SV | Impaired - entitled to vote |

56

2c6b5d1d202bc7fa

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class 4B(2) | BofA Syndicate Secured Claim against AHM SV | Impaired - entitled to vote |
| Class 4B(3) | Travelers Secured Claim against AHM SV | Unimpaired - not entitled to vote |
| Class 4C(1) | Unsecured Claims against AHM SV other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 4C(2) | BofA Syndicate Unsecured Claim against AHM SV | Impaired - entitled to vote |
| Class 4D | Subordinated Claims against AHM SV | Impaired - not entitled to vote |
| Class 4E | Interests in AHM SV | Impaired - not entitled to vote |
| **AHM Corp.** | | |
| Class 5A | Priority Claims against AHM Corp. | Unimpaired - not entitled to vote |
| Classes 5B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Corp. | Impaired - entitled to vote |
| Class 5B(2) | PNB Secured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5B(3) | BofA Syndicate Secured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5B(4) | JPM Secured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5B(5) | Travelers Secured Claim against AHM Corp. | Unimpaired - not entitled to vote |
| Class 5C(1) | Unsecured Claims against AHM Corp. other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 5C(2) | BofA Syndicate Unsecured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5D | Subordinated Claims against AHM Corp. | Impaired - not entitled to vote |
| Class 5E | Interests in AHM Corp. | Impaired - not entitled to vote |
| **AHM Ventures** | | |
| Class 6A | Priority Claims against AHM Ventures | Unimpaired - not entitled to vote |

DB02:6842992.8

066585.1001

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Classes 6B(1) *et seq.* | Miscellaneous Secured Claims against AHM Ventures | Impaired - entitled to vote |
| Class 6C | Unsecured Claims against AHM Ventures | Impaired - entitled to vote |
| Class 6D | Subordinated Claims against AHM Ventures | Impaired - not entitled to vote |
| Class 6E | Interests in AHM Ventures | Impaired - not entitled to vote |
| **Homegate** | | |
| Class 7A | Priority Claims against Homegate | Unimpaired - not entitled to vote |
| Classes 7B(1) *et seq.* | Miscellaneous Secured Claims against Homegate | Impaired - entitled to vote |
| Class 7C | Unsecured Claims against Homegate | Impaired - entitled to vote |
| Class 7D | Subordinated Claims against Homegate | Impaired - not entitled to vote |
| Class 7E | Interests in Homegate | Impaired - not entitled to vote |
| **Great Oak** | | |
| Class 8A | Priority Claims against Great Oak | Unimpaired - not entitled to vote |
| Classes 8B(1) *et seq.* | Miscellaneous Secured Claims against Great Oak | Impaired - entitled to vote |
| Class 8C | Unsecured Claims against Great Oak | Impaired - entitled to vote |
| Class 8D | Subordinated Claims against Great Oak | Impaired - not entitled to vote |
| Class 8E | Interests in Great Oak | Impaired - not entitled to vote |

    Consistent with § 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class. **THE PLAN DOES NOT EFFECT A SUBSTANTIVE CONSOLIDATION OF THE DEBTORS.**

DB02:6842992.8
066585.1001

## B.    Treatment of Claims and Interests

The treatment of Claims and Interests in the Plan set forth below is in full and complete satisfaction of the legal, contractual, and equitable rights that each Entity holding an Allowed Claim or an Allowed Interest may have in or against the applicable Debtor or its property. This treatment supersedes and replaces any agreements or rights those Entities have in or against the applicable Debtor or its property. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Interest in accordance with the terms of the Plan. **EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF (I) ANY CLAIM THAT IS NOT AN ALLOWED CLAIM OR (II) ANY INTEREST.**

ALLOWED CLAIMS AGAINST ANY ONE DEBTOR WILL BE SATISFIED SOLELY FROM THE ASSETS OF SUCH DEBTOR AND ITS ESTATE CONTRIBUTED TO THE PLAN TRUST, GIVING EFFECT TO THE STIPULATED ASSET ALLOCATION SET FORTH IN ARTICLE 6 OF THE PLAN.

NOTHING IN THE PLAN OR THIS DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ANY ONE OF THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST ANY OTHER DEBTOR. A CLAIM AGAINST MULTIPLE DEBTORS, TO THE EXTENT ALLOWED IN EACH DEBTOR'S CASE, WILL BE TREATED AS A SEPARATE CLAIM AGAINST EACH DEBTOR'S ESTATE FOR ALL PURPOSES (INCLUDING, BUT NOT LIMITED TO, VOTING AND DISTRIBUTION, PROVIDED, HOWEVER, THAT THERE SHALL BE ONLY A SINGLE RECOVERY ON ACCOUNT OF SUCH CLAIMS AND ANY DISTRIBUTION FROM A DEBTOR ON ACCOUNT OF SUCH CLAIMS SHALL TAKE INTO ACCOUNT THE DISTRIBUTIONS TO BE MADE BY OTHER DEBTORS ON ACCOUNT OF SUCH CLAIMS PURSUANT TO THE PLAN), AND SUCH CLAIM WILL BE ADMINISTERED AND TREATED IN THE MANNER PROVIDED IN THE PLAN. NO HOLDER OF A CLAIM AGAINST MULTIPLE DEBTORS SHALL RECEIVE MORE THAN 100% OF ACCOUNT OF SUCH CLAIM.

### 1.    DIP Facility Claims

All Allowed DIP Facility Claims against the Debtors that are parties to the DIP Loan Agreement shall be satisfied (a) on or before the Effective Date in full in Cash, or in a manner otherwise permitted or required pursuant to the terms of the DIP Orders and the DIP Loan Agreement, or (b) on such other terms as may be mutually agreed upon among (i) the Holders of the DIP Facility Claims and (ii) the Debtors or the Plan Trustee.

### 2.    Administrative Claims

Subject to (a) the bar date provisions in the Plan and (b) additional requirements for Professionals and certain other Entities set forth in the Plan, each Holder of an Allowed Administrative Claim against any of the Debtors shall receive, in full satisfaction, settlement, release and extinguishment of such Claim, as set forth in Article 9A(1), Cash equal to the Allowed amount of such Administrative Claim, unless the Holder agrees or shall have agreed to

59

other treatment of such Claim no less favorable to the Debtors; provided, however, that any Administrative Claim (x) incurred postpetition by a Debtor in the ordinary course of its businesses or (y) arising pursuant to one or more postpetition agreements or transactions entered into by any Debtor with Bankruptcy Court approval, shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto, or as otherwise agreed by the applicable Debtor or the Plan Trustee, on the one hand, and the Holder of such Administrative Claim, on the other.    The Holder of an Allowed Administrative Claim shall not be entitled to, and shall not be paid, any interest, penalty, or premium thereon, and any interest, penalty, or premium asserted with respect to an Administrative Claim shall be deemed disallowed and expunged without the need for any further Order of the Bankruptcy Court.

### a.    General Administrative Bar Date

The Plan requires that requests for payment of Administrative Claims other than Professional Claims be Filed and served on counsel for the Debtors, counsel for the Committee or the Plan Oversight Committee (as applicable), the Plan Trustee, and counsel for the Plan Trustee no later than (a) thirty (30) days after the Effective Date, or (b) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of such 30-day period. Holders of Administrative Claims (including, without limitation, the Holders of any Claims for federal, state or local taxes, but excluding Professional Claims) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Plan Trust or any of their property. Notwithstanding the foregoing, any bar dates established during the course of these Chapter 11 Cases shall remain in full force and effect.

All objections to allowance of Administrative Claims (excluding Professional Claims) must be filed by any parties in interest no later than ninety (90) days after the Administrative Claim Bar Date (the "Administrative Claim Objection Deadline"). The Administrative Claim Objection Deadline may be initially extended for an additional ninety (90) days at the sole discretion of the Plan Trustee upon the filing of a notice of the extended Administrative Claim Objection Deadline with the Bankruptcy Court. Thereafter, the Administrative Claim Objection Deadline may be further extended by an Order of the Bankruptcy Court, which Order may be granted without notice to any creditors. If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, as may be extended, such Administrative Claim will be deemed Allowed, subject to the Bankruptcy Court's discretion to extend such bar date retroactively.

### b.    Professional Claim Bar Date

The Plan requires all Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of §§ 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date (including, inter alia, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Cases) to File and serve on counsel for the Debtors or the Plan Trustee (as applicable) and counsel for the Committee or the Plan Oversight Committee (as

applicable) an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Confirmation Date, no later than (a) sixty (60) days after the Effective Date or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 60-day period.

Objections to Professional Claims or Claims of other Persons for compensation or reimbursement of expenses must be Filed and served on counsel for the Debtors or the Plan Trustee (as applicable), counsel for the Committee or the Plan Oversight Committee (as applicable), and the Professionals or other Persons to whose application the objections are addressed on or before (a) twenty (20) days after the Professional Claims Bar Date or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 20-day period or upon agreement between the Debtors or the Plan Trustee, as applicable, and the affected Professional or other Person.

Any professional fees incurred by the Debtors or the Committee subsequent to the Confirmation Date may be paid by the Debtors or the Plan Trust without application to or Order of the Bankruptcy Court. The costs of the Plan Trust, including without limitation, the fees and expenses of the Plan Trustee and any Professionals retained by the Plan Trustee, shall be borne entirely by the Plan Trust.

### 3.    Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash from the S/A/P Claims Reserve. After the Effective Date, the Plan Trustee shall pay quarterly fees to the U.S. Trustee, in Cash from the Plan Trust Operating Expense Reserve, until the Chapter 11 Case for each applicable Debtor is (i) closed, and a final decree is entered, or (ii) converted to a case under chapter 7 of the Bankruptcy Code. In addition, the Plan Trust shall file post-Confirmation quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which will be deemed Administrative Claims against the applicable Debtors and their Estates.

### 4.    Priority Tax Claims

With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, at the sole option of the Plan Trustee, the Plan Trustee shall pay to each Holder of an Allowed Priority Tax Claim on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, and release of such Allowed Priority Tax Claim, in Cash from the S/A/P Claims Reserve, (a) in accordance with Bankruptcy Code section 1129(a)(9)(C) and (D), equal Cash payments made on or before the last Business Day of every calendar year after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus simple interest on any outstanding balance of such Allowed Priority Tax Claim, calculated from the Effective Date at the interest rate available on ninety (90)-day United States Treasuries on the Effective Date; (b) such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtors or the Plan Trustee in writing, _provided_ such treatment is no less favorable to the liable Debtor or the

Plan Trust than the treatment set forth in clause (a) hereof, or (c) payment in full as set forth in Article 9A(1) of the Plan.

The Holder of an Allowed Priority Tax Claim shall not be entitled to assess any premium or penalty on such Claim and any asserted premium or penalty shall be deemed disallowed and expunged under the Plan without the need for a further order of the Bankruptcy Court. The Plan Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Claim, in accordance with the foregoing, at any time on or after the Effective Date, without premium or penalty of any kind.

### 5.      Other Priority Claims

Each of Classes 1A, 2A, 3A, 4A, 5A, 6A, 7A, and 8A, which are Unimpaired, consist of all Allowed Priority Claims against a particular Debtor.  Unless the Holder of an Allowed Priority Claim and the Debtor against which such Claim is asserted (if prior to or on the Effective Date) or the Plan Trustee (if after the Effective Date) agree to a different treatment, the Plan Trustee shall pay each such Holder of an Allowed Priority Claim in full, in Cash, without interest, from the S/A/P Claims Reserve.

### 6.      Miscellaneous Secured Claims

Classes 1B(1) *et seq.*, 2B(1)(a) *et seq.*, 3B(1)(a) *et seq.*, 4B(1)(a) *et seq.*, 5B(1)(a) *et seq.*, 6B(1) *et seq.*, 7B(1) *et seq.*, and 8B(1) *et seq.*, which may be Impaired, comprise, respectively, all Allowed Miscellaneous Secured Claims against a particular Debtor.  The Claims in these Classes are secured by Liens on miscellaneous Assets of the Debtors, including Cash.

On the later of the Effective Date (or as soon thereafter as practicable) and the date a Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), with respect to each Allowed Miscellaneous Secured Claim, at the sole option of the Plan Trustee: (i) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable, and contractual rights of the Holder of such Allowed Miscellaneous Secured Claim shall be reinstated in full as of the Effective Date and remain unaltered, or (ii) the Holder of such Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Miscellaneous Secured Claim, one or a combination of the following: (a) payment in Cash up to the amount of the Allowed Miscellaneous Secured Claim, (b) all or any portion of the Assets securing the Allowed Miscellaneous Secured Claim, (c) deferred Cash payments having a present value on the Effective Date equal to the amount of the Allowed Miscellaneous Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim, (d) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Miscellaneous Secured Claim, or (e) such other treatment as may be agreed by the Holder and the Debtor against which the Allowed Miscellaneous Secured Claim is asserted (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

62

### 7.    BofA Syndicate Secured Claim

Classes 2B(2), 3B(2), 4B(2), and 5B(3), which are Impaired, consist of any Allowed BofA Syndicate Secured Claim against AHM Investment, AHM Acceptance, AHM SV, and AHM Corp., respectively.   The BofA Syndicate Secured Claim is secured by Liens in certain Assets of AHM Investment, AHM Acceptance, AHM SV, and AHM Corp. pursuant to the BofA Syndicate Loan Documents and the Cash Collateral Order, as modified by the BofA/Committee Settlement Stipulation and the BofA Global Settlement Stipulation.

In full satisfaction, settlement, and release of, and in exchange for, each Allowed BofA Syndicate Secured Claim, the Holder of such Claim shall receive treatment in accordance with the BofA Global Settlement Stipulation.

### 8.    PNB Secured Claim

Class 5B(2), which may be Impaired, consists of any Allowed PNB Secured Claim against AHM Corp.  The Class 5B(2) Claim is secured by a Lien in the Mt. Prospect Office Property and/or any Cash proceeds thereof.

On the later of the Effective Date (or as soon thereafter as practicable) and the date a PNB Secured Claim becomes an Allowed PNB Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), with respect to each Allowed PNB Secured Claim, at the sole option of the Plan Trustee: (i) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable, and contractual rights of the Holder of such Allowed PNB Secured Claim shall be reinstated in full on the Effective Date and remain unaltered, or (ii) the Holder of such Allowed PNB Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed PNB Secured Claim, one or a combination of the following: (a) payment in Cash up to the amount of the Allowed PNB Secured Claim, (b) all or any portion of the Assets securing the Allowed PNB Secured Claim, (c) deferred Cash payments having a present value on the Effective Date equal to the amount of the Allowed PNB Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim, (d) such other treatment as would provide the Holder the indubitable equivalent of its Allowed PNB Secured Claim, or (e) such other treatment as may be agreed by the Holder and the Debtor against which the Allowed PNB Secured Claim is asserted (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

### 9.    Travelers Secured Claim

Classes 3B(4), 4B(3), and 5B(5), which are Unimpaired, consist of any Allowed Travelers Secured Claim against AHM Acceptance, AHM SV, or AHM Corp., respectively.  The Travelers Secured Claim is secured by a Lien in Cash of AHM Acceptance, AHM SV, and/or AHM Corp.

Subject to the requirements of § 1124(2) of the Bankruptcy Code, with respect to each Allowed Travelers Secured Claim, the legal, equitable, and contractual rights of the Holder of such Allowed Travelers Secured Claim shall be reinstated in full on the Effective Date and remain unaltered in accordance with the Travelers Stipulation.

DB02:6842992.8

066585.1001

### 10.    JPM Secured Claim

Classes 3B(3) and 5B(4), which are Impaired, consist of any Allowed JPM Secured Claim against AHM Acceptance and AHM Corp., respectively.  The Class 3B(3) and 5B(4) Claims are secured by Liens in Assets of AHM Acceptance and AHM Corp., respectively, pursuant to the JPM Loan Documents.

On the later of the Effective Date (or as soon thereafter as practicable) and the date a JPM Secured Claim becomes an Allowed JPM Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), with respect to each JPM Secured Claim the Holder of such Allowed JPM Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed JPM Secured Claim, one or a combination of the following, at the sole option of the Plan Trustee:

a.    Payment in Cash up to the amount of such Allowed JPM Secured Claim;

b.    the proceeds from the sale or other disposition of all or any portion of the Assets securing the Allowed JPM Secured Claim, after deducting the reasonable, necessary costs and expenses of preserving and disposing of such Assets (including, without limitation, payment of Servicing Fees, Servicing Advances, and any ad valorem property taxes);

c.    all or any portion of the Assets securing such Allowed JPM Secured Claim;

d.    a 5-year promissory note (the "JPM Plan Note") substantially in the form to be filed with the Supplemental Plan Documents, which shall be executed by the Plan Trustee in a principal amount equal to the amount of the Allowed JPM Secured Claim that was not previously satisfied by distributions of property prior to the Effective Date or otherwise under the terms of the Plan; provided that

(1)    the JPM Plan Note shall:

- be without recourse to the Plan Trust or any Plan Trust Assets other than the Assets securing the Allowed JPM Secured Claim;

- be payable in a single balloon payment of principal and accrued interest at the stated maturity date, provided, however, that from and after the Effective Date all principal and interest collected on account of the JPM Loan Portfolio (net of Servicing Fees and Servicing Advances) shall be paid to the Holder of such JPM Plan Note directly from the Servicer, which payments shall be applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note;

- bear interest monthly at such a rate that the net present value, as of the Effective Date, of the balloon payment due upon maturity of the JPM Plan Note is no less than the value of the property securing the Allowed JPM

64

Secured Claim as of the Effective Date, as determined by the Bankruptcy Court in accordance with section 506 of the Bankruptcy Code;

- provide the Plan Trustee with the right to prepay the JPM Plan Note for its then present value at any time in whole or in part, which partial prepayments shall be applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note;

- provide the Plan Trustee with the right to surrender to the Holder of the JPM Plan Note all or any portion of the Assets securing such JPM Plan Note at any time, which Assets (if less than all Assets securing the JPM Plan Note) shall be valued by the Bankruptcy Court and applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note; and

- provide that from and after the Effective Date all proceeds (net of Servicing Fees and Servicing Advances) of any sale or other disposition of all or any portion of the JPM Loan Portfolio shall be paid to the Holder of such JPM Plan Note, which payments shall be applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note;

provided further that

(2)    the Holder of the Allowed JPM Secured Claim shall retain its Lien in the Assets securing such Claim until such Claim is satisfied in full, which Lien shall secure the JPM Plan Note until the JPM Plan Note is satisfied in full; and provided further that

(3)    the Servicing Rights for the JPM Loan Portfolio shall be surrendered to JPM, and the Mortgage Loans in the JPM Loan Portfolio may be sold on a servicing-released basis at any time, with or without the consent of the Servicer (whether the Servicer is JPM or its designee), upon payment of the market value of the Servicing Rights. The Bankruptcy Court shall value the Servicing Rights surrendered to JPM pursuant to the Plan, with such value to be applied to reduce the Allowed JPM Secured Claim prior to establishing the principal amount of the JPM Plan Note; or

e.    such other treatment as will provide the Holder of such Allowed JPM Secured Claim the indubitable equivalent of its Allowed JPM Secured Claim.

Except with respect to subsection 2(d) above, to the extent there is sufficient value in the Assets securing any Allowed JPM Secured Claim as contemplated by § 506(b) of the Bankruptcy Code, such Allowed JPM Secured Claim shall include (a) interest accrued (i) from the Petition Date to the Maturity Date at the non-default rate of interest under the JPM Loan Documents (ii) from the Maturity Date to the Effective Date at the lesser of (A) the non-default rate of interest under the JPM Loan Documents and (B) the federal judgment rate of interest and (b) any reasonable fees, costs, or charges payable under the JPM Loan Documents.

65

### 11.    BofA Syndicate Unsecured Claim

Classes 1C(2), 2C(2), 3C(2), 4C(2), and 5C(2), which are Impaired, consist of BofA Syndicate Unsecured Claim against AHM Holdings, AHM Investment, AHM Acceptance, AHM SV, and AHM Corp., respectively.    Pursuant to the BofA Global Settlement Stipulation, proceeds of Designated REO Properties are to be held in trust for the benefit of Creditors other than the BofA Syndicate.

Subject to all relevant provisions of the BofA Global Settlement Stipulation (including, but not limited to, the sharing of Cash receipts on the BofA Syndicate Secured Claim and the cap on the BofA Syndicate Deficiency Claim), each Holder of an Allowed Class 1C(2), 2C(2), 3C(2), 4C(2), and 5C(2) Claim shall receive its Pro Rata share of the BofA Syndicate Net Distributable Assets of the applicable Estate in full satisfaction, settlement, and release of, and in exchange for, its Allowed Unsecured Claim.

### 12.    Other Unsecured Claims

Classes 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C, which are Impaired, consist of all Allowed Unsecured Claims against each Debtor, respectively, other than BofA Syndicate Unsecured Claim.    Claims in Classes 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C may include EPD Claims and Breach of Warranty Claims, which are subject to the EPD/Breach Claims Protocol set forth in Article 7 of the Plan.

Each Holder of an Allowed Class 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C Claim shall receive its Pro Rata share of the Net Distributable Assets of the applicable Estate in full satisfaction, settlement, and release of, and in exchange for, its Allowed Unsecured Claim.

### 13.    Subordinated Trust Preferred Claims; Other Subordinated Claims; and Interests

Each of Classes 2D, 1E, 2E, 3D, 4D, 5D, 6D, 7D, 8D, 1F, 2F, 3E, 4E, 5E, 6E, 7E, and 8E, which are Impaired, consist of Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment, Subordinated Claims against all of the Debtors, and Interests in all of the Debtors.  Holders of Claims or Interests in Classes 2D, 1E, 2E, 3D, 4D, 5D, 6D, 7D, 8D, 1F, 2F, 3E, 4E, 5E, 6E, 7E, and 8E shall receive no distribution or dividend on account of such Claims or Interests.  The entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to the Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

### C.    Acceptance or Rejection of the Plan; Nonconsensual Confirmation

### 1.    Impaired Classes Entitled to Vote

As set forth above, Classes 1A, 2A, 3A, 3B(4), 4A, 4B(3), 5A, 5B(5), 6A, 7A, and 8A are Unimpaired by the Plan.    Pursuant to § 1126(f) of the Bankruptcy Code, each of these Classes of

66

Claims is conclusively presumed to have accepted the Plan, and the votes of Holders of Claims in such Classes therefore will not be solicited.  If and to the extent any Class identified as being Unimpaired is Impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), the Holders of Claims in such Class shall be entitled to vote to accept or reject the Plan.

Classes 1B(1) *et seq.*, 1C(1), 1C(2), 2B(1)(a) *et seq.*, 2B(2), 2C(1), 2C(2), 3B(1)(a) *et seq.*, 3B(2), 3B(3), 3C(1), 3C(2), 4B(1)(a) *et seq.*, 4B(2), 4C(1), 4C(2), 5B(1)(a) *et seq.*, 5B(2), 5B(3), 5B(4), 5C(1), 5C(2), 6B(1) *et seq.*, 6C, 7B(1) *et seq.*, 7C, 8B(1) *et seq.*, and 8C are (or may be) Impaired by the Plan, and Holders of Claims in these Classes shall be entitled to vote to accept or reject the Plan.

Classes 1D, 1E, 1F, 2D, 2E, 2F, 3D, 3E, 4D, 4E, 5D, 5E, 6D, 6E, 7D, 7E, 8D and 8E are Impaired by the Plan, but Holders of Claims and Interests in these Classes are not expected to retain or receive any property under the Plan on account of such Claims and Interests.  Pursuant to § 1126(g) of the Bankruptcy Code, these Classes are conclusively presumed to have rejected the Plan, and the votes of Holders of Claims or Interests in such Classes therefore will not be solicited.

## 2.    Non-Consensual Confirmation

As set forth in Article 15 of the Plan, if any Impaired Class fails to accept the Plan, the Plan Proponents intend to request that the Bankruptcy Court confirm the Plan as a Cramdown Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to such Class.

## D.    Settlement of Intercompany Claims; Stipulated Asset Allocation

In consideration of the settlements and compromises embodied in the Stipulated Asset Allocation described above, all Intercompany Claims shall be deemed Unimpaired and satisfied in full on the Effective Date.

The Cash proceeds of any Plan Trust Asset, and any residual balance in the S/A/P Claims Reserve or the Plan Trust Operating Expense Reserve, shall be distributed to each Estate ratably in accordance with the Stipulated Asset Allocation.

As discussed above, the Stipulated Asset Allocation is an integral component of the Plan Proponents' comprehensive compromise and settlement concerning Intercompany Claims.  The allocation percentages are a function of the net asset value that will be contributed by each Debtor to the Plan Trust for the benefit of its Creditors, as determined in light of a number of factors, including: (i) the relative value of Assets under administration in each Estate from the Petition Date to the Effective Date; (ii) the validity and enforceability of Intercompany Claims that are reflected on the Debtors' books and records (certain of which claims might be inadequately documented and/or subject to recharacterization as equity contributions); (iii) possible Intercompany Claims that are not reflected as intercompany payables or receivables in the Debtors' books and records (e.g., resulting from one Debtor's payment in full of a shared expense properly allocable between multiple Debtors, or payment of more than its fair share of a

67

joint-and-several liability to a third party); (iv) the reallocation of asset value between Estates that would result from allowance and payment of Intercompany Claims, in light of anticipated creditor recoveries in each of the Chapter 11 Cases; (v) the estimated exposure of each Estate to S/A/P Claims asserted but not paid as of the Effective Date, in light of possible Intercompany Claims for contribution or reimbursement that might result from one Estate's payment of S/A/P Claims that are properly allocable between multiple Estates; and (vi) the necessity of resolving any and all potential inter-Estate disputes via the Plan, so as to permit administration of multiple Estates by a single Plan Trustee unfettered by inter-Estate conflicts of interest.

### E.    Estimation and Allowance of EPD/Breach Claims

As noted above, many of the agreements that the Debtors used to sell mortgage loans in the secondary market or to complete securitizations permitted the buyer (or its successor in interest) to "put" the loans back to the Debtors if the Debtors breached certain seller representations and warranties (relating, e.g., to the creditworthiness of the borrower, the completeness of the loan documentation, etc.), or if the borrower defaulted in payment within a specified period of time (usually 30-60 days) after sale of the loan.  For purposes of the Plan, a "put" rights arising from (i) a breach of representation or warranty are called "Breach of Warranty Claims" and (ii) early payment defaults (or "EPDs") are called "EPD Claims" (collectively with "Breach of Warranty Claims," "EPD/Breach Claims").  EPD/Breach Claims can potentially arise with respect to any of hundreds of thousands of mortgage loans sold by the Debtors in the secondary market.

The Plan Proponents concluded that attempting to resolve these claims at the individual loan level would require both the loan owners and the Debtors' Estates to expend resources that would be grossly disproportionate to the amounts in controversy, which would deplete Assets of the Estates that would otherwise be available to make distributions to Creditors.  Moreover, litigating EPD/Breach Claims on a loan-by-loan basis would significantly delay distributions to loan owners on account of such Claims.  In addition, a review of the Proofs of Claim filed by Holders of Breach of Warranty Claims revealed that many of these Claims are contingent and unliquidated, and may not become liquidated for years to come.  This is so because most loan buyers have no reason to try and determine whether the originator-seller of a loan has breached a representation or warranty unless and until the borrower on that loan defaults.  Because loans have a life span of potentially thirty years, while the Plan contemplates a Plan Trust lasting approximately five years, the Plan must incorporate a mechanism for estimating and allowing contingent and/or unliquidated Breach of Warranty Claims.

The Plan Proponents developed a streamlined protocol to deal fairly with the foregoing issues, patterned closely after the protocol that was recently approved as part of the chapter 11 plan of *New Century TRS Holdings, Inc., et al.*, Docket No. 8596, Case No. 07-10416 (Bankr. D. Del. July 15, 2008).  The EPD/Breach Protocol appearing in Article 7 of the Plan is the result.

The protocol differentiates between EPD Claims and Breach of Warranty Claims.

### 1.     EPD Claims

The universe of EPD Claims is known because the period for a borrower payment default that could be considered an EPD passed generally by October 2007, if not before (because the Debtors stopped selling loans in July 2007 and the EPD provisions in most loan sale contracts only covered borrower defaults during approximately 30-60 days after the loan sale closed). The allowable amount of a given EPD Claim (i.e., the damages flowing from the Debtors' inability to repurchase loans for which an EPD had occurred), however, is more difficult to assess. Because the claimant was unable to resell these loans to the Debtors, it suffered damages, but the Plan Proponents assert that these damages are *not* equal to the UPB of the loans because the loans had value to the claimant. If such matters were litigated loan-by-loan they would involve such factual and legal issues as whether the amount of a "loss" realized by a claimant was the result of the Debtors' failure to repurchase loans or some combination of deteriorating market conditions, how the claimant dealt with the loan, or any number of other factors.

After surveying a number of asserted EPD Claims, the Plan Proponents determined that the major factors determining the loss for a loan were mortgage product type and the borrower's payment history. For example, if a loan was at one point in payment default but the borrower had cured that default and was presently performing, the loss resulting from the Debtors' failure to repurchase the loan would likely be *de minimis*. On the other hand, if the loan purchaser was in serious default (e.g., 90+ days delinquent), the loss was likely to be more severe. The Plan Proponents analyzed the Debtors' history of losses incurred by them when they had repurchased loans, the amounts asserted in the proofs of claim for EPD Claims, and industry data to develop a model for liquidating damages associated with EPDs. As a date certain from which to determine the amount of damages, the Plan Proponents used July 31, 2008. The protocol for liquidating EPD Claims is then based on the following grid for loans subject to EPD Claims, with the Allowed amount of such Claims being a percentage of the UPB as of July 31, 2008.

| Loan Product | Delinquency (days) | | | |
|---|---|---|---|---|
| | 0-30 | 31-60 | 61-90 | 90+ |
| Fixed-Rate Mortgage ("FRM") | 0% | 20% | 30% | 40% |
| Adjustable Rate Mortgage ("ARM") | 0% | 17% | 25% | 33% |
| Payment Option ARM ("POA") | 0% | 19% | 29% | 38% |
| Second-Lien ("2nd") | 0% | 50% | 75% | 95% |

With respect to any loan (or resulting REO) sold prior to July 31, 2008, the protocol will allow an EPD Claim in an amount equal to the UPB at the time of sale less the net proceeds realized from such sale.

### 2.     Breach of Warranty Claims

Breach of Warranty Claims are more complicated than EPD Claims. Determining whether the Debtors breached a representation or warranty in a loan sale agreement would entail a detailed loan-by-loan assessment of the specific allegation and that often would entail a degree

69

of subjectivity because some of the industry-standard representations and warranties are not susceptible to clear, objective assessment. In addition, many of the secondary loan buyers asserted in their proofs of claim that they would not be able to liquidate such claims fully for years since there often would be no reason to ferret out a breach unless and until the borrower defaulted. And after such assessments were made, it would be necessary to develop a methodology for assessing the damages that resulted from the Debtors' inability to repurchase the loans, as opposed to losses that the loan buyers suffered based on market and other conditions. The Plan Proponents analyzed substantial data and developed a protocol that takes into account reasonable assumptions as to the incidence of Breach of Warranty Claims over the life of a pool of loans. (These assumptions were necessary because, in the Debtors' experience prior to bankruptcy, Breach of Warranty Claims were seldom, if ever, actually asserted by secondary buyers.) For example, the protocol assumes that the highest incidence of breach would likely be recognized relatively soon after a pool of loans is sold. Conversely, the protocol assumes that, after a pool of loans has been held by a buyer for a number of years, it is less likely that new breaches will come to light. In addition, the protocol assumes a measure of damages which is integrally related with the assumptions as to the likelihood of breach based on the seasoning of a loan pool. The result is the following protocol.

Under the protocol established in the Plan, a Breach of Warranty Claim with respect to a pool of currently outstanding loans owned by the claimant is calculated based upon the loan vintage (i.e., year and quarter of origination), loan type, and the estimations and simplifying assumptions that (i) 0.22% of the loan amounts originated in the second quarter of 2007 will at some point give rise to valid Breach of Warranty Claims, (ii) as the age of the loans increases, the 0.22% incidence rate will decrease, tapering down to a zero incidence over time, and (iii) the damages resulting from the failure to repurchase a given loan will be a fixed percentage (equal to the loss severity percentages utilized for EPD Claims) of the UPB of the loan as of July 31, 2008, based on the loan type. A valid Breach of Warranty Claim shall be Allowed as an Unsecured Claim in an amount equal to the July 31, 2008, UPB of loans purchased from the applicable Debtor, multiplied by the applicable percentage in the "Damages" column of the following table:

| Year | Quarter | % Incidence | Damages as % of 7/31/08 UPB[28] | | | |
|------|---------|-------------|------|------|------|------|
| | | | FRM | ARM | POA | 2nd |
| 2007 | 2 | 0.22% | 0.09% | 0.07% | 0.08% | 0.21% |
| 2007 | 1 | 0.18% | 0.07% | 0.06% | 0.07% | 0.17% |
| 2006 | 4 | 0.14% | 0.06% | 0.05% | 0.05% | 0.13% |
| 2006 | 3 | 0.13% | 0.05% | 0.04% | 0.05% | 0.12% |
| 2006 | 2 | 0.10% | 0.04% | 0.03% | 0.04% | 0.09% |
| 2006 | 1 | 0.08% | 0.03% | 0.03% | 0.03% | 0.08% |
| 2005 | 4 | 0.06% | 0.02% | 0.02% | 0.02% | 0.06% |

---

[28] To arrive at these amounts, the Plan Proponents multiplied the assumed incidence of Breach of Warranty Claims within a given vintage of loans by the following assumed loss severities for the various loan types: FRMs – 40%, ARMs – 33%; POAs – 38%; and 2nds – 100%).

| Year | Quarter | % Incidence | Damages as % of 7/31/08 UPB[28] | | | |
|------|---------|-------------|------|------|------|------|
| | | | FRM | ARM | POA | 2nd |
| 2005 | 3 | 0.04% | 0.01% | 0.01% | 0.02% | 0.04% |
| 2005 | 2 | 0.02% | 0.0% | 0.01% | 0.01% | 0.02% |
| 2005 | 1 | 0.01% | 0.0% | 0.01% | 0.01% | 0.02% |
| 2004 | 4 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2004 | 3 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2004 | 2 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2004 | 1 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2003 | 4 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2003 | 3 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2003 2nd Quarter and earlier | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

### 3.    Interaction Between EPD Claims and Breach of Warranty Claims.

An EPD Claim will take precedence over a Breach of Warranty Claim with respect to a given loan.  Thus, to the extent a claimant asserts a valid EPD Claim for a loan, that loan's UPB will be subtracted from the UPB of the pool of loans for which Breach of Warranty Claims are computed.

### 4.    EPD/Breach Claims Questionnaire

In order to receive a Distribution under the Plan, each Holder of an EPD Claim and/or Breach of Warranty Claim must supply the Debtors with sufficient information from which to calculate the Allowed amount of such Claims in accordance with the EPD/Breach Claims Protocol and to ensure that multiple Creditors are not asserting duplicative EPD/Breach Claims. A request for such information shall be provided by the Debtors to each Creditor asserting an EPD Claim and/or Breach of Warranty Claim on or before the Effective Date, in the form of a questionnaire (the "EPD/Breach Claims Questionnaire") substantially in the form to be submitted as a Supplemental Plan Document. Each Creditor asserting an EPD Claim and/or Breach of Warranty Claim shall be required to complete the EPD/Breach Claims Questionnaire and return same to the Debtors or the Plan Trustee, as applicable, by the later of (i) sixty (60) days from the date of service thereof, (ii) such later date agreed upon by the Debtors or the Plan Trustee, as applicable, and the Creditor, or (iii) such other date as the Bankruptcy Court shall order upon application made prior to the end of the sixty (60)-day period set forth in Article 7D(i) of the Plan.  **Holders of EPD Claims and/or Breach of Warranty Claims that are required, but fail, to return an EPD/Breach Claims Questionnaire by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Plan Trust, or any of their Assets.**

71

F.    **Means of Implementing the Plan**

1.    **Corporate Action; Dissolution of Debtors**

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries. The officers and directors of the Debtors shall cease to serve immediately after the Effective Date.

Immediately after the Effective Date, (i) the Plan Trustee shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to dissolve the Debtors and their subsidiaries under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation; provided, however, that the Plan Trustee shall not be compelled to dissolve any Debtor or subsidiary thereof if to do so would unduly burden the Plan Trust or if such Debtor's or subsidiary's continued existence would aid the Plan Trustee in the Administration of the Plan Trust Assets or the discharge of its obligations under the Plan or the Plan Trust Agreement; and (ii) except as otherwise provided by subsequent amendment of the Plan pursuant to Article 14F thereof, no Assets of the Estates shall revest in the Debtors. The Plan Trustee shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of the Plan from and after the Effective Date except as specifically provided otherwise in the Plan.

2.    **Dissolution of the Committee**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Claims; (ii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iii) motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.

3.    **The Plan Trust**

On or prior to the Effective Date, the Plan Trust shall be formed. The Holders of Claims shall be the sole beneficiaries of the Plan Trust.

The Plan Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Plan Trustee and to ensure the treatment of the Plan Trust as a liquidating trust for federal income tax purposes. In the event a provision of the Plan or the Confirmation Order conflicts with a provision of the Plan Trust Agreement, the provision of the Plan Trust Agreement shall control.

a.    *The Plan Trustee*

No later than ten (10) days prior to the deadline to vote to accept or reject the Plan, the Plan Proponents will file the Plan Trust Agreement with the Bankruptcy Court, which Plan Trust Agreement shall identify the Plan Trustee. The Plan Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving as the Plan Trustee on the Effective Date; provided, however, that the party appointed as Plan Trustee shall be permitted to act in accordance with the terms of the Plan Trust Agreement from the Confirmation Date (or such earlier date as authorized by the Committee) through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Plan Trust Agreement and the Plan.

The Plan Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan and the Plan Trust Agreement, including, without limitation, the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Plan Trust as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulation 301.7701-4(d).

**The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Plan Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Plan Trustee.**

The Plan Trustee shall at all times maintain a bond acceptable to the Plan Oversight Committee and approved by the Bankruptcy Court.

The Plan Trustee shall initially be compensated as set forth in the Plan Trust Agreement (which compensation may be revised by the Plan Trust with the consent of the Plan Oversight Committee) and shall not be required to file a fee application to receive compensation. The Plan Trustee's compensation shall, however, be subject to the review and, if appropriate, objection of the Plan Oversight Committee as set forth in the Plan Trust Agreement.

The Plan Trustee may be removed or replaced at any time by the Plan Oversight Committee in accordance with the procedures in the Plan Trust Agreement. In the event of the death or incompetency (in the case of a Plan Trustee that is a natural person), dissolution (in the case of a Plan Trustee that is a corporation or other entity), bankruptcy, insolvency, resignation,

73

or removal of the Plan Trustee, the Plan Oversight Committee shall have the authority to appoint a successor trustee as set forth in the Plan Trust Agreement.

>   b.   *Liquidation of Plan Trust Assets; Responsibilities of Plan Trustee*

The Plan Trustee shall be vested with the rights, powers and benefits set forth in the Plan Trust Agreement.  The Plan Trust shall be subject to the directions of the Plan Oversight Committee as set forth in the Plan Trust Agreement.  Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, any act by the Plan Trustee, including discretionary acts, will require the consent of or consultation with the Plan Oversight Committee in accordance with and to the extent of the terms of the Plan Trust Agreement.  If there is any inconsistency or ambiguity between the Plan, Confirmation Order or the Plan Trust Agreement in respect of the Plan Oversight Committee's role in the Plan Trustee's authority to act, the provision of the Plan Trust Agreement shall control.

The Plan Trustee, in its reasonable business judgment and in an expeditious but orderly manner, shall liquidate and convert to Cash the Plan Trust Assets, make timely distributions and not unduly prolong the duration of the Plan Trust.  The liquidation of the Plan Trust Assets may be accomplished either through the sale of Plan Trust Assets (in whole or in combination), including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise.  The Plan Trustee shall distribute the proceeds of liquidation of the Plan Trust Assets between the Estates in accordance with the Stipulated Asset Allocation.

The Plan Trustee shall be expressly authorized to do the following:

- prosecute, collect, compromise and settle any Causes of Action in accordance with the Plan and without further approval of or application to the Bankruptcy Court or the Plan Oversight Committee, except as otherwise provided in the Plan or Plan Trust Agreement;

- file, prosecute, compromise and settle objections to Claims without further approval of or application to the Bankruptcy Court or the Plan Oversight Committee, except as otherwise provided in the Plan or Plan Trust Agreement;

- open and maintain bank accounts in the name of the Plan Trust, draw checks and drafts thereon on the sole signature of the Plan Trustee, and terminate such accounts as the Plan Trustee deems appropriate;

- sell or liquidate any Plan Trust Asset, without further approval of or application to the Bankruptcy Court or the Plan Oversight Committee, except as otherwise provided in the Plan or Plan Trust Agreement;

- execute any documents, file any pleadings, and take any other actions related to, or in connection with, the liquidation of the Plan Trust Assets and the exercise of the Plan Trustee's powers granted herein, including the exercise of the Debtors' or the Committee's respective rights to conduct discovery and oral examination of any party under Rule 2004 of the Federal Rules of Bankruptcy Procedure;

74

- hold legal title to any and all rights of the beneficiaries in or arising from the Plan Trust Assets, including the right to vote any Claim or Interest in an unrelated case under the Bankruptcy Code and to receive any distribution thereon;

- protect and enforce the rights to the Plan Trust Assets by any method it deems appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

- deliver distributions as may be authorized by the Plan;

- file, if necessary, any and all tax returns with respect to the Plan Trust; pay taxes, if any, properly payable by the Plan Trust; and make distributions to the beneficiaries net of such taxes in accordance with the requirements of the Plan and Plan Trust Agreement;

- make all necessary filings in accordance with any applicable law, statute or regulation;

- determine and satisfy any and all liabilities created, incurred or assumed by the Plan Trust;

- invest moneys received by the Plan Trust or otherwise held by the Plan Trust in accordance with Article 8F(8) of the Plan;

- in the event that the Plan Trustee determines that the beneficiaries or the Plan Trust may, will or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences;

- utilize the Plan Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Plan Trustee, and the Plan Oversight Committee and its members;

- obtain unsecured or secured credit to fund Plan Trust administration, litigation or for any other purpose consistent with the Plan Trust Agreement;

- create one or more Entities for the purpose of holding or managing Plan Trust Assets, or in connection with the sale or other disposition thereof, or for any other purpose consistent with the Plan, Confirmation Order, and Plan Trust Agreement;

- except as otherwise provided in the Plan Trust Agreement, in its sole discretion and without the prior approval of the Plan Oversight Committee, compromise, settle, decline to object to, and/or allow any Disputed Claim asserted in an amount less than (i) $250,000 for an S/A/P Claim or (ii) $2,500,000 for an Unsecured Claim;

75

- except as otherwise provided in the Plan Trust Agreement, in its sole discretion and without the prior approval of the Plan Oversight Committee or the Bankruptcy Court, retain, abandon, and/or destroy files, records, and other documents of the Debtors subject only to (A) the provision of reasonable notice to the Plan Oversight Committee of any proposed abandonment or destruction, (B) applicable laws concerning the protection of confidential consumer information, and (C) any and all prior Orders of the Bankruptcy Court concerning the preservation and destruction of documents generally or with respect to certain third parties [including, without limitation, Docket Nos. 14, 610, 860, 1697, 2986, 3314, and 5171], which Orders shall be preserved and shall continue in effect against the Plan Trustee as successor to the Debtors;

- prepare and report telephonically, and if requested by the Plan Oversight Committee, in writing or in person, a quarterly report of the status of the process of winding down the Estates including Causes of Action.

The Plan Trustee may request an expedited determination of taxes of the Plan Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust.

c.    *Valuation of Assets*

As soon as possible after the Effective Date the Plan Trustee shall (i) determine the fair market value, as of the Effective Date, of the Plan Trust Assets based on its own good-faith determination, provided that nothing in the Plan shall be construed to prevent the Debtors (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) from seeking a judicial valuation of the Plan Trust Assets as of the Effective Date by the Bankruptcy Court, and (ii) apprise the Holders of Unsecured Claims in writing of such valuation (and indicate in such writing each Holder's percentage ownership interest in the Plan Trust based on each such Holder's relative beneficial interest in the Plan Trust or portion thereof as of the Effective Date). The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Plan Trustee, and Holders of Unsecured Claims) for all federal income tax purposes.

d.    *Payments by the Plan Trust; Investment Powers and Permitted Cash Expenditures*

The Plan Trust shall make Distributions to Holders of Allowed Claims in accordance with Article 9 of the Plan.

All funds held by the Plan Trustee shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Plan Trust Agreement; provided, however, that the right and power of the Plan Trustee to invest Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. The Plan Trustee may expend the

Cash of the Plan Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Plan Trust during liquidation, (y) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trust) and (z) to satisfy other liabilities incurred by the Plan Trust in accordance with the Plan or the Plan Trust Agreement.

e.    *Reporting Duties*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), the Plan Trustee shall file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Plan Trustee shall also send to each holder of a beneficial interest in the Plan Trust an annual statement setting forth the holder's share of items of income, gain, loss, deduction or credit and provide to all such holders information for reporting such items on their federal income tax returns, as appropriate. The Plan Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Plan Trust that are required by any Governmental Unit.

Allocations of Plan Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Plan Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the beneficial interests in the Plan Trust (treating any Holder of a Disputed Claim, for this purpose, as a current Holder of a beneficial interest in the Plan Trust entitled to distributions), taking into account all prior and concurrent distributions from the Plan Trust (including all distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Plan Trust Assets. For this purpose, the tax book value of the Plan Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Plan Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

The Plan Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Plan Trust that are required by any governmental unit.

f.    *Registry of Beneficial Interests; Non-Transferability*

To evidence the beneficial interest in the Plan Trust of each Holder of such an interest, the Plan Trustee shall maintain a registry of such Holders.

Upon issuance, interests in the Plan Trust shall be non-transferable, except with respect to a transfer by will or under the laws of descent and distribution. Any such transfer, however, shall not be effective until and unless the Plan Trustee receives written notice of such transfer.

066585.1001

g.   *Termination*

The Plan Trust shall terminate after its liquidation, administration and distribution of the Plan Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in its Plan Trust Agreement.  The Plan Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, within a period of six (6) months prior to such termination date or any extended termination date, the Plan Trustee, with the consent of the Plan Oversight Committee, may extend the term of the Plan Trust if it is necessary to facilitate or complete the liquidation of the Plan Trust Assets administered by the Plan Trust; provided further, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Plan Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Plan Trust as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulations 301.7701-4(d).

h.   *Purpose of the Plan Trust*

The Plan Trust shall be established for the sole purpose of liquidating and distributing the Plan Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  Subject to definitive guidance from the IRS, all parties shall treat the Plan Trust as a liquidating trust for all federal income tax purposes.  The Plan Trust shall not be deemed to be the same legal entity as any of the Debtors, but only the assignee of the assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code.  Neither the Plan Trust nor any portion thereof, nor any reserve, account or fund established by the Plan shall be treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9(b)(1).

4.   **Vesting of Assets in Plan Trust; Assumption of Plan Obligations**

Except as otherwise provided by amendment to the Plan pursuant to Article 14F thereof, on the Effective Date, all Assets of the Estates shall vest in, and constitute Assets of, the Plan Trust, and each Debtor shall be deemed for all purposes to have transferred legal and equitable title of all Assets of its Estate to the Plan Trust for the benefit of the Holders of Claims against its Estate, whether or not such Claims are Allowed Claims as of the Effective Date.

On the Effective Date or as soon as practicable thereafter, the Debtors shall take all actions reasonably necessary to transfer control of the Plan Trust Assets to the Plan Trustee. Upon the transfer of control of the Plan Trust Assets to the Plan Trustee in accordance with this section, the Debtors shall have no further interest in or with respect to the Plan Trust Assets or the Plan Trust.

On the Effective Date, all of the Debtors' rights and obligations with respect to each and every S/A/P Claim, and all other rights and obligations of the Debtors under the Plan, shall be assigned to and assumed by the Plan Trust.

DB02:6842992.8

066585.1001

For federal income tax purposes, all parties (including the Debtors, the Plan Trustee, and the Holders of Claims) shall treat the transfer of the Plan Trust Assets to the Plan Trust in accordance with the terms of the Plan as a transfer to the Holders of the Claims that have a beneficial interest in the Plan Trust, with the Holders of Claims receiving an undivided interest in the Plan Trust Assets attributable to their respective Debtor, followed by a transfer of the Plan Trust Assets by such Holders to the Plan Trust, and the beneficiaries of the Plan Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Plan Trust.

## 5.    Plan Oversight Committee

On the Effective Date, the Plan Oversight Committee shall be deemed appointed and shall adopt bylaws to govern the actions of the Plan Oversight Committee.

### a.    *Membership*

The Plan Oversight Committee shall consist of up to five (5) members of the Committee chosen from those members of the Committee that notify counsel to the Committee in writing no later than fifteen (15) days prior to the Confirmation Hearing of their intention to serve on the Plan Oversight Committee. In the event that less than five (5) of the members of the Committee notify counsel to the Committee of their intent to serve on the Plan Oversight Committee within fifteen (15) days prior to the Confirmation Hearing, then the Committee will choose from among the Holders of Unsecured Claims to fill any vacancy until five (5) members have been designated. Unless and until such vacancy is filled, the Plan Oversight Committee shall function with such reduced membership. In the event of the resignation of a member of the Plan Oversight Committee, the remaining members may, but need not, designate a successor from among the Holders of Unsecured Claims. Unless and until such vacancy is filled, the Plan Oversight Committee shall function with such reduced membership.

### b.    *Rights and Duties*

The Plan Oversight Committee's role shall be to advise and approve the actions of the Plan Trustee as more particularly set forth in the Plan Trust Agreement. The fiduciary duties that applied to the Committee prior to the Effective Date shall apply to the Plan Oversight Committee. The Plan Oversight Committee shall have the rights and duties set forth in the Plan Trust Agreement, including without limitation:

- to terminate the Plan Trustee with or without cause and upon such termination or upon the resignation, death, incapacity or removal of the Plan Trustee, to appoint a successor Plan Trustee; provided, that the Plan Oversight Committee shall file with the Bankruptcy Court a notice appointing such successor trustee;

- to approve any release or indemnity in favor of any third party granted or agreed to by the Plan Trustee, except with respect to any sales, liquidations, settlements or Claim allowances that are within the Plan Trustee's discretion under subsections 4(d),(e) and (f) below and other than as set forth in the Plan or the Plan Trust Agreement;

79

- to authorize the Plan Trustee to commence or continue to prosecute any Cause of Action;

- to approve the settlement of any Cause of Action if the amount sought to be recovered by the Plan Trustee in the complaint or other document initiating or evidencing such Cause of Action exceeds $1,000,000;

- to approve the allowance of any Disputed Claim if the asserted amount of such Claim exceeds (i) $250,000 for any S/A/P Claim, or (ii) $2,500,000 for any Unsecured Claim;

- to approve the sale or liquidation of any Plan Trust Assets by the Plan Trustee for an amount exceeding $1,000,000;

- with respect to each six-month period, to approve any budget for the Plan Trust Operating Expense Reserve prepared by the Plan Trustee in respect of the Plan Trust Operating Expenses and to approve any additional funding of the such reserve;

- to approve the making of distributions under the Plan, except as set forth therein or in the Plan Trust Agreement;

- to review and object to fees and expenses of Professionals retained by the Plan Trust; and

- to approve of any investment of Cash or other Plan Trust Assets pending distributions to Holders of the beneficial interests in the Plan Trust.

The duties and powers of the Plan Oversight Committee shall terminate upon the termination of the Plan Trust.

Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Plan Oversight Committee, including reasonable attorneys fees subject to a cap to be established by the Plan Oversight Committee in its discretion, the members of the Plan Oversight Committee shall serve without compensation. Reasonable expenses, as set forth in this Article 8G(5), incurred by members of the Plan Oversight Committee may be paid by the Plan Trust without need for approval of the Bankruptcy Court.

c.    *Objection to Fees*

The Plan Oversight Committee shall have twenty (20) days, or such other period as determined by the Plan Oversight Committee and the Plan Trustee, from the delivery of a fee statement to object to the fees of any professional retained by either the Plan Trust or the Plan Oversight Committee by giving notice of any such objection to the professional seeking compensation or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees subject to the objection and the basis for the objection. Any objection

80

that remains unresolved fifteen (15) days after it is made shall be submitted to the Bankruptcy Court for resolution. The uncontested portion of each invoice shall be paid within thirty (30) days after its delivery to the Plan Oversight Committee and the Plan Trustee.

6.    **Liability; Indemnification**

**Neither the Plan Trustee, the Plan Oversight Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Plan Trustee or the Plan Oversight Committee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of such Plan Trustee or Plan Oversight Committee, nor shall such Plan Trustee, or any member of the Plan Oversight Committee, be liable for any act or omission taken or omitted to be taken in its capacity as Plan Trustee, or as a member of the Plan Oversight Committee, respectively, other than for specific acts or omissions resulting from such Plan Trustee's or such member's willful misconduct, gross negligence or fraud.**

**The Plan Trustee and the Plan Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Trustee or the Plan Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Trustee or Plan Oversight Committee or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud.**

**The Plan Trust shall indemnify and hold harmless the Plan Trustee and Plan Oversight Committee and its members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud.**

7.    **Retention of Professionals**

The Plan Trustee may retain professionals, including but not limited to, counsel, accountants, investment advisors, auditors and other agents on behalf of the Plan Trust as necessary or desirable to carry out the obligations of the Plan Trustee under the Plan and the Plan

81

Trust Agreement.  More specifically, the Plan Trustee may retain counsel in any matter related to administration of the Plan, including counsel that has acted as counsel for the Debtors, the Committee, or any of the individual members of the Committee in the Chapter 11 Cases.

Prior to the Effective Date, the Committee shall approve a budget for the six (6)-month period beginning on the Effective Date, on a professional-by-professional basis, for professional fees for services to be rendered to the Plan Trust, which budget may be altered from time to time by the Plan Oversight Committee in accordance with the Plan Trust Agreement, provided that any fees and expenses of professionals retained by the Plan Trust that have been incurred prior to the date of the modification of the budget shall constitute budgeted amounts.  Except with respect to services rendered and expenses incurred in connection with Fee Applications pending on the Effective Date or filed after the Effective Date, the Professionals retained by the Debtors or the Committee shall only be entitled to compensation for services performed and expenses incurred after the Effective Date to the extent, if any, of the amount budgeted for each respective Professional.  Following the Effective Date, the Plan Trustee may pay, without application to the Bankruptcy Court or any other court of competent jurisdiction, such professionals retained by the Plan Trust in accordance with agreements that the Plan Trustee determines to be reasonable. The Plan Oversight Committee shall approve in advance the Plan Trustee's retention of professionals and their compensation arrangements.

The Plan Oversight Committee shall have the right to retain counsel of its choice in the event of a dispute or conflict with the Plan Trustee or for other purposes set forth in the Plan Trust Agreement, and the reasonable fees and expenses of such counsel shall be paid by the Plan Trust.

## 8.    Trustee as Successor

The Plan Trust shall be the successor to the Debtors for the purposes of §§ 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation-related matters.  The Plan Trust shall succeed to the attorney-client privilege of the Debtors with respect to all Causes of Action and other litigation-related matters, and the Plan Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matter, or portion thereof, in the Plan Trustee's discretion.

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with § 1123(b) of the Bankruptcy Code, the Plan Trust shall be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors, the Estates, the Committee or the Plan Trust may have against any Person or other Entity.  The Plan Trustee may pursue such retained claims or Causes of Action in accordance with the best interests of the creditors, the Estates, or the Plan Trust.

### G.    Distributions under the Plan

#### 1.    Timing of Distributions

##### a.    *S/A/P Claims*

The Plan Trustee shall pay any Allowed S/A/P Claim against the Debtors in Cash from the S/A/P Claims Reserve, except as otherwise provided in the Plan, as soon as practicable after the later of (a) the Effective Date, and (b) the date upon which any such Claim becomes an Allowed Claim.

##### b.    *Interim Distributions on Unsecured Claims*

Subject to approval of the Plan Oversight Committee as set forth in the Plan Trust Agreement, the Plan Trustee shall (a) make annual interim Distributions on account of Allowed Unsecured Claims from the Net Distributable Assets or BofA Syndicate Net Distributable Assets, as applicable, of the applicable Estate then available, provided that any such distribution is warranted, economical and not unduly burdensome to the Plan Trust, and (b) have the right to make more frequent interim distributions to Holders of Allowed Unsecured Claims if the Plan Trustee determines that such interim distributions are warranted, economical and not unduly burdensome to the Plan Trust; provided, however, that any such distribution(s) shall only be made if (i) the Plan Trust Operating Expense Reserve is fully funded and will remain fully funded after such interim distributions are made; (ii) the S/A/P Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; (iii) the Unsecured Claims Reserve of the applicable Estate is fully funded and will remain fully funded after such interim distributions are made; and (iv) the Plan Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Plan Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Plan Trust in accordance with the Plan or the Plan Trust Agreement.  Interim distributions under the Plan shall be consistent with Revenue Procedure 94-45 § 3.10.

##### c.    *Final Distributions on Unsecured Claims*

Notwithstanding anything else in the Plan, after the settlement or satisfaction of all S/A/P Claims and Unsecured Claims, the prosecution, settlement, or abandonment of all Causes of Action, and the liquidation or abandonment of all other Plan Trust Assets, the Plan Trustee shall distribute, as soon as practicable, all remaining Plan Trust Assets pursuant to the terms of the Plan.

#### 2.    Reserves

##### a.    *Plan Trust Operating Expense Reserve*

On the Effective Date, the Plan Trustee shall establish the Plan Trust Operating Expense Reserve to fund administrative and all other miscellaneous needs of the Plan Trust pursuant to the Plan, Confirmation Order and Plan Trust Agreement.  The initial amount of the Plan Trust Operating Expense Reserve shall be based on the Plan Trustee's good faith estimate of the

amount necessary to complete the Plan Trust's obligations under the Plan and the Plan Trust Agreement. The Plan Trust shall pay all costs and expenses related to carrying out its obligations under the Plan and the Plan Trust Agreement from the Plan Trust Operating Expense Reserve and, in the Plan Trustee's discretion, and with approval of the Plan Oversight Committee, may add additional amounts to the Plan Trust Operating Expense Reserve for administration and other miscellaneous needs of the Plan Trust without further notice or motion in accordance with the terms of the Plan, Confirmation Order and Plan Trust Agreement.

b.   *S/A/P Claims Reserve*

On the Effective Date, the Plan Trustee shall establish the S/A/P Claims Reserve for all Disputed S/A/P Claims and Allowed S/A/P Claims not paid prior to the Effective Date. The amount reserved for each Disputed Administrative Claim and each Allowed Administrative Claim not paid prior to the Effective Date shall be the lower of (i) the amount set forth in the request for payment of Administrative Claim filed by the Holder of such Claim, or, if no such request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10F of the Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be liable, the Plan Trustee shall contribute to the S/A/P Claims Reserve on account of only one such Claim.

The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Miscellaneous Secured Claim or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Miscellaneous Secured Claim that is not paid prior to the Effective Date shall be the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or, if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court pursuant to Article 10F of the Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be liable, the Plan Trustee shall contribute to the S/A/P Reserve on account of only one such Claim.

As soon as practicable after (and to the extent) that a Disputed S/A/P Claim becomes an Allowed S/A/P Claim, the Plan Trustee shall make a payment from the S/A/P Claims Reserve to the Holder of such Claim in the Allowed amount of such Claim, unless such Claim is an Allowed Miscellaneous Secured Claim for which the Plan Trustee elects an alternate treatment pursuant to Article 4B of the Plan. After (and to the extent) a Disputed S/A/P Claim is determined not to be an Allowed S/A/P Claim, the portion of the S/A/P Claims Reserve reserved for such Claim shall be released from the S/A/P Claims Reserve and distributed to the Estates pursuant to the Stipulated Asset Allocation. Any amount remaining in the S/A/P Claims Reserve following the final disposition of all S/A/P Claims shall constitute a Plan Trust Asset and shall be released from the S/A/P Claims Reserve and distributed to the Estates pursuant to the Stipulated Asset Allocation. The S/A/P Claims Reserve shall be funded on the Effective Date from Plan Trust Assets consisting of Cash.

c. *Unsecured Claims Reserves*

Prior to making any Distributions on account of Unsecured Claims, the Plan Trustee shall establish an Unsecured Claims Reserve on account of each applicable Debtor. With respect to any interim distribution made to Holders of Allowed Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court pursuant to Article 10F of the Plan.

As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against the applicable Debtor becomes an Allowed Unsecured Claim against such Debtor, the Plan Trustee shall make a payment from the applicable Unsecured Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Plan Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the applicable Unsecured Claims Reserve and distributed pursuant to the terms of the Plan. After (and to the extent) a Disputed Unsecured Claim against the applicable Debtor becomes a Disallowed Claim, the portion of the applicable Unsecured Claims Reserve reserved for such Claim shall be released from the applicable Unsecured Claims Reserve and distributed pursuant to the terms of the Plan. Any amount remaining in an Unsecured Claims Reserve following the final disposition of all Disputed Unsecured Claims against the applicable Debtor shall be released from the applicable Unsecured Claims Reserve and distributed pursuant to the terms of the Plan.

**3.     Distribution Calculations**

a. *Net Distributable Assets and BofA Syndicate Net Distributable Assets*

The total gross Cash proceeds of Plan Trust Assets allocated to an Estate pursuant to the Stipulated Asset Allocation as of any date of determination, less the amount, if any, of Cash required to be (i) contributed to the Plan Trust Operating Expense Reserve as additional funding pursuant to Article 9B(1) of the Plan, and (ii) reserved for payment of Unsecured Claims pursuant to Article 9B(3) of the Plan, shall constitute the "Net Distributable Assets" of such Estate as of such date.

The total gross Cash proceeds of Plan Trust Assets other than Designated REO Assets allocated to an Estate pursuant to the Stipulated Asset Allocations as of any date of determination, less the amount, if any, of Cash required to be (i) contributed to the Plan Trust Operating Expense Reserve as additional funding pursuant to Article 9B(1) of the Plan, and (ii) reserved for payment of Unsecured Claims pursuant to Article 9B(3) of the Plan, shall constitute the "BofA Syndicate Net Distributable Assets" of such Estate as of such date.

b.    *Interim Distributions*

The Plan Trustee may make an interim distribution (a) to Holders of Allowed Unsecured Claims (other than an Allowed BofA Syndicate Unsecured Claim) against a Debtor up to the amount of the Net Distributable Assets of the Debtor's Estate calculated as of the date of the interim distribution; and (b) to Holders of Allowed BofA Syndicate Unsecured Claims up to the amount of the BofA Syndicate Net Distributable Assets calculated as of the date of the interim distribution.

### 4.    Payment in Full of Unsecured Claims

a.    *Limitation on Distributions on Account of Allowed Unsecured Claims*

Any Allowed Unsecured Claim is paid in full under the Plan at such time as the Holder of such Allowed Unsecured Claim has been paid the allowed amount of such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court); provided, however, that where a Creditor holds Allowed Unsecured Claims for which more than one Debtor is liable, whether jointly, as co-obligor, pursuant to a Guaranty or otherwise, such Creditor is not entitled to receive distributions under the Plan in excess of the Allowed amount of such Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court), and the Creditor's Allowed Unsecured Claim for which more than one Debtor is liable shall be deemed paid in full at such time as the Creditor has been paid the Allowed amount of one such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court).

b.    *Payment of Interest on Allowed Unsecured Claims*

If, and only if, all Holders of Allowed Unsecured Claims against an applicable Debtor have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of such Debtor; provided, however; that with respect to Allowed Unsecured Claims for which more than one Debtor is liable, interest is payable on such Claims based on the allowed amount of the joint liability fixed by such Claims.

c.    *Payment in Full of Allowed Unsecured Claims for Which More Than One Debtor is Liable*

To the extent a Holder of Allowed Unsecured Claims for which more than one Debtor is liable is paid 100% of the allowed amount of the joint liability fixed by such Claims through interim distributions, the Plan Trustee shall retain any further interim distributions that would be made on account of such Claims as if only one Debtor were liable for such Claim until the Plan Trustee makes a final distribution under the Plan.  Prior to making a final distribution under the Plan, the Plan Trustee shall determine, with respect to every Allowed Unsecured Claim for which more than one Debtor is liable that has been paid 100% of the allowed amount of the joint liability fixed by such Claim, the amount of distributions in respect of such Claim made on

86

account of such Debtor's Estate. The Plan Trustee shall reallocate the excess distributions, if any, that it has retained among the liable Estates in proportion to the amount of distributions made to Claims from such Estates on account of such joint liability.

### 5.    Manner of Distribution

Notwithstanding any other provisions of the Plan or the Plan Trust Agreement providing for a distribution or payment in Cash, at the option of the Plan Trustee, any distributions under the Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer, or by ACH. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Any Cash distributions or payments will be issued to Holders in whole cents (rounded to the nearest whole cent when and as necessary).

### 6.    *De Minimis* Distributions

All *De Minimis* Distributions will be held by the Plan Trust for the benefit of the Holders of Allowed Claims entitled to *De Minimis* Distributions. When the aggregate amount of *De Minimis* Distributions held by the Plan Trust for the benefit of a Creditor exceeds $100.00, the Plan Trust will distribute such *De Minimis* Distributions to such Creditor. If, at the time that the final distribution under the Plan is to be made, the *De Minimis* Distributions held by the Plan Trust for the benefit of a Creditor total less than $100.00, such funds shall not be distributed to such Creditor, but rather, shall constitute Plan Trust Assets to be allocated among the Estates in accordance with the Stipulated Asset Allocation.

### 7.    Delivery of Distributions; Undeliverable Distributions

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Debtors, if on the Effective Date, or the Plan Trustee, if after the Effective Date, (i) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or the Debtors or the Plan Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes filed with the Bankruptcy Court and served on the Plan Trustee after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and written notice of address change has not been filed with the Bankruptcy Court and served on the Plan Trustee.

If payment or distribution to the Holder of an Allowed Claim under the Plan is returned for lack of a current address for the Holder or otherwise, the Plan Trustee shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment. If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the Holder shall be distributed to the Holders of Allowed Claims in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied and released, with no recourse to the Plan Trust, the Plan Trustee or the Plan Trust Assets, to the same extent as if payment or distribution had been made to the Holder of the Allowed Claim.

87

8.      **Setoffs and Recoupments**

The Debtors, if before the Effective Date, or the Plan Trustee, if after the Effective Date, may, pursuant to §§ 502(h), 553, and 558 of the Bankruptcy Code or applicable non-bankruptcy law, shall be entitled but not required to, set off against or recoup from any Claim on which payments are to be made pursuant to the Plan, any claims or Causes of Action of any nature whatsoever that the Debtors, the Estates, the Committee or the Plan Trust may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Estates, the Committee or the Plan Trust of any right of setoff or recoupment that the Debtors, the Committee, the Plan Trust or the Estates may have against the Holder of such Claim, nor of any other claim or Cause of Action.

9.      **Distributions in Satisfaction; Allocation**

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Debtors, the Plan Trust, the Plan Trust Assets and the Estates and the assets and properties of the Debtors, the Plan Trust, the Plan Trust Assets and the Estates, whether known or unknown, arising or existing prior to the Effective Date.  Distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

10.      **Cancellation of Notes and Instruments**

As of the Effective Date, all notes, agreements and securities evidencing Claims or Interests and the rights thereunder of the Holders thereof shall, with respect to the Debtors, be canceled and deemed null and void and of no further force and effect, and the Holders thereof shall have no rights against the Debtors, the Plan Trust, the Plan Trust Assets or the Estates, and such instruments shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

11.      **No Interest on Claims**

Unless otherwise specifically provided in the Plan and except as set forth in Article 9 thereof, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a Holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes and Allowed Claim.

### 12.    Withholding Taxes

The Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date, shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan.   As a condition to making any distribution under the Plan, the Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date, may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date, to comply with applicable tax reporting and withholding laws.

### 13.    Reports

From the Effective Date, until a Final Decree is entered, the Plan Trustee shall submit quarterly reports to the U.S. Trustee within thirty (30) days of the end of each fiscal quarter setting forth all receipts and disbursements of the Plan Trust as required by the U.S. Trustee guidelines.

### H.    Claims Administration; Disputed Claims

### 1.    Reservation of Rights to Object to Claims

Unless a Claim or Interest is expressly described as an Allowed Claim or Allowed Interest pursuant to or under the Plan, or otherwise becomes an Allowed Claim or Allowed Interest prior to the Effective Date, upon the Effective Date, the Plan Trustee shall be deemed to have a reservation of any and all rights, interests and objections of the Debtors, the Committee or the Estates to any and all Claims or Interests and motions or requests for the payment of or on account of Claims or Interests, whether administrative expense, priority, secured or unsecured, including without limitation any and all rights, interests and objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, Subordinated Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.   The Debtors' or the Plan Trustee's failure to object to any Claim or Interest in the Chapter 11 Cases shall be without prejudice to the Plan Trustee's rights to contest or otherwise defend against such Claim or Interest in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim or Interest.

### 2.    Objections to Claims

Prior to the Effective Date, the Debtors shall be responsible for pursuing any objection to the allowance of any Claim or Interest.   From and after the Effective Date, the Plan Trustee will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims and Interests (including those Claims or Interests that are subject to objection by the Debtors as of the Effective Date), subject to any approvals of the Plan Oversight Committee that may be required.   Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims or Interests by the Liquidating Trustee will be filed and served not later than 1 year after the later of

89

(i) the Effective Date or (ii) the date such Claim is filed, provided that the Plan Trustee may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court without any requirement to provide notice to any party, based upon a reasonable exercise of the Plan Trustee's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

### 3.    Service of Objections

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if the Plan Trustee effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.

### 4.    Determination of Claims

Except as otherwise agreed by the Debtors or the Plan Trustee, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties without the need for Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Plan Trustee on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in Article 10 of the Plan shall constitute or be deemed a waiver of any claims, rights, interests or Causes of Action that the Debtors or the Plan Trustee may have against any Person in connection with or arising out of any Claim or Claims, including without limitation any rights under 28 U.S.C. § 157.

Allowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

### 5.    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim;

90

provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Plan Trustee may, in its discretion, make a distribution pursuant to the Plan on account of the portion of such Claim that becomes an Allowed Claim.

### 6.     Claim Estimation

In order to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Debtors (if on or prior to the Effective Date) and the Plan Trustee (if after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for claim allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court shall determine (i) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

### I.     Rejection of Executory Contracts, Unexpired Leases

On the Effective Date, except for any Executory Contract (i) that was previously assumed or rejected by an Order of the Bankruptcy Court or otherwise pursuant to section 365 of the Bankruptcy Code or (ii) that is subject to a pending motion to assume or reject before the Bankruptcy Court, each Executory Contract entered into by the any of the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejection pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Confirmation Date.

#### a.     *D&O Obligations; Employee Benefit Plans*

Without limiting the generality of the foregoing, and solely for the avoidance of doubt, the obligations of the Debtors to indemnify any Person or Entity having served as one of their officers and directors, or currently serving as one of their directors, officers, or employees, by reason of such Person's or Entity's service in such capacity, to the extent provided in the Debtors' corporate governance documents or by a written agreement with the Debtors or by the applicable states' corporation law, each as applicable, shall be deemed and treated as Executory Contracts that are rejected by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.

Also without limiting the foregoing, and solely for the avoidance of doubt, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, retirees and non-employee directors and the employees and retirees of their subsidiaries, including all savings plans, retirement plans, pension plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, shall be deemed and treated as Executory

Contracts that are rejected by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.

b.     *Rejection Damages Bar Date*

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, any Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under the Plan (including Claims under section 365(d)(3) of the Bankruptcy Code) must be sent by mail to American Home Mortgage Claims Processing, P.O. Box 5076, FDR Station, New York, NY 10150-5076 or by overnight courier or hand delivery to EPIQ Bankruptcy Solutions, LLC, Attn: American Home Mortgage Claims Processing, 757 Third Avenue, 3rd Floor, New York, NY 10017, and a copy served on counsel for the Plan Proponents and the Plan Trustee, within thirty (30) days after the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Plan Trust, the Plan Trustee, their successors, their assigns, or their Assets. Any Allowed Claim arising from the rejection of an Executory Contract shall be treated as a Claim in Class 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C, as applicable. Nothing in the Plan extends or modifies any previously applicable Bar Date.

c.     *Insurance Policies*

To the extent that any or all of the insurance policies to be set forth in an Exhibit filed with the Plan Supplement Documents (the "Designated Insurance Policies") are considered to be Executory Contracts, then notwithstanding anything contained in the Plan to the contrary, the Plan shall constitute a motion to assume the Designated Insurance Policies in connection with the Plan and to assign them to the Plan Trust. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases.

Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each Designated Insurance Policy. To the extent that the Bankruptcy Court determines otherwise with respect to any Designated Insurance Policy, the Plan Proponents reserve the right to seek rejection of such insurance policy or other available relief. The Plan shall not affect contracts that have been assumed and assigned by Order of the Bankruptcy Court prior to the Confirmation Date. For the avoidance of doubt, the certain insurance policies (including any insurance policies that are not Executory Contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on an Exhibit to be filed with the Plan Supplement Documents (the "Designated Non-Executory Insurance Policies") and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute, and benefit from claims) are retained and will be transferred to the Plan Trust pursuant to the Plan.

92

J.    **Plan Injunction and Exculpation Provisions**

Except as otherwise expressly provided in the Plan, the documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons and other Entities who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including but not limited to states and other governmental units, and any state official, employee, or other entity acting in an individual or official capacity on behalf of any state or other governmental units) are permanently enjoined from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of the Plan. Any Person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. Nothing contained in this Article 12 shall prohibit the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of the Debtors, the Plan Trustee, or the Plan Trust under the Plan. The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any claim or cause of action against any Protected Party or any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under Article 4 of the Plan have been made or are not yet due under Article 4 of the Plan.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court, under §§ 105 or 362 of the Bankruptcy Code, the Plan, or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Plan Trust.

On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under

93

**the Plan, except for claims, causes of action or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability.**

Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of the Plan or the Disclosure Statement shall be deemed to act or release any claims, Causes of Action or liabilities that the Plan Trust or the Estates may have against any Person or entity for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases, nor shall any provision of the Plan be deemed to act to release any Avoidance Actions.

Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not the Holder has filed a Claim. The rights, benefits and obligations of any Person named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

### K. Conditions Precedent to Effective Date; Revocation, Withdrawal, or Non-Consummation of the Plan

The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full:

- The Bankruptcy Court shall have approved a disclosure statement to the Plan in form and substance acceptable to the Plan Proponents in their sole and absolute discretion.

- The compromises and settlements contained in the Plan, including without limitation those set forth in Articles 4, 6, and 7 of the Plan, shall be approved without material modification by Final Order in accordance with Bankruptcy Rule 9019 and shall be binding and enforceable against all Holders of Claims and Interests under the terms of the Plan.

- The Confirmation Order shall be in form and substance acceptable to the Plan Proponents in their sole and absolute discretion.

- The Confirmation Order (i) shall have been entered by the Bankruptcy Court, (ii) shall not be subject to any stay of effectiveness, and (iii) shall have become a

94

Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

- The Plan Trust shall have been formed, and all formation documents for such entities shall have been properly executed and filed as required by the Plan and applicable law.

- The appointment of the Plan Trustee shall have been confirmed by order of the Bankruptcy Court.

If after the Confirmation Order is entered, each of the conditions to effectiveness has not been satisfied or duly waived on or by ninety (90) days after the Confirmation Date, then upon motion by the Plan Proponents, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. As used in the preceding sentence, a condition to effectiveness may only be waived by a writing executed by the Plan Proponents. If the Confirmation Order is vacated pursuant to Article 13B of the Plan, the Plan shall be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, nor any pleadings filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors (iii) prejudice in any manner the rights of the Plan Proponents in the Chapter 11 Cases, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any party prior to the Confirmation Date.

## L.    **Miscellaneous Provisions**

### 1.    **Retention of Jurisdiction**

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, on and after the Confirmation Date, the Bankruptcy Court shall retain jurisdiction to the fullest extent permitted by 28 U.S.C. §§ 1334 and 157 (i) to hear and determine the Chapter 11 Cases and all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Cases, and (ii) to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Cases, including, without limitation, matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Without limiting the generality of the foregoing, the Bankruptcy Court's post-Confirmation Date jurisdiction shall include jurisdiction:

- over all Causes of Action (including, without limitation, Avoidance Actions) and proceedings to recover Assets of the Estates or of the Plan Trust, wherever located;

95

- over motions to assume, reject, or assume and assign executory contracts or unexpired leases, and the allowance or disallowance of any Claims resulting therefrom;

- over disputes concerning the ownership of Claims or Interests;

- over disputes concerning the distribution or retention of consideration under the Plan;

- over objections to Claims and motions to estimate Claims;

- over proceedings to determine the extent, validity, and/or priority of any Lien asserted against property of the Debtors, the Estates, or the Plan Trust, or property abandoned or transferred by the Debtors, the Estates, or the Plan Trustee;

- over proceedings to determine the amount, if any, of interest to be paid to Holders of Allowed Unsecured Claims if any Allowed Unsecured Claims are paid in full pursuant to the terms of the Plan;

- over matters related to the assets of the Estates or of the Plan Trust, including, without limitation, liquidation of Plan Trust Assets; provided that the Plan Trustee shall have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or other disposition of Plan Trust Assets; and provided further that the Plan Trustee may seek orders of the Bankruptcy Court approving the sale, transfer, assignment or other disposition of Plan Trust Assets as appropriate to facilitate such transactions;

- over matters relating to the subordination of Claims or Interests;

- to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

- to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- to issue orders in aid of execution, implementation, or consummation of the Plan;

- over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

- over requests for allowance and/or payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code and any objections thereto;

96

066585.1001

- over all Fee Applications;

- over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- over conflicts and disputes between the Plan Trustee, the Plan Trust, the Plan Oversight Committee, and Holders of Claims or Interests;

- over disputes concerning the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- over matters concerning the Debtors' insurance policies, if any, including jurisdiction to re-impose the automatic stay or its applicable equivalent provided in the Plan;

- to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Debtors, the Estates or their property, the Committee, the Plan Trust or its property, the Plan Trustee, the Plan Oversight Committee, the Professionals, or the Confirmation Order;

- to enter a Final Decree closing the Chapter 11 Cases;

- to enforce all orders previously entered by the Bankruptcy Court; and

- over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan.

The preceding list is non-exhaustive, it being the intent of the Plan Proponents as set forth in the Plan that the Bankruptcy Court retain subject-matter jurisdiction to the maximum extent permitted by applicable law, which will maximize the Plan Trustee's flexibility when choosing the forum for the liquidation of litigation assets. Retention of jurisdiction by the Bankruptcy Court will benefit all creditors of the Estates as to those litigation assets for which the Bankruptcy Court proves to be the most economical and/or efficient forum. In addition, with respect to controversies asserting common questions of law on which the Bankruptcy Court has already promulgated the law of the case and/or the United States District Court for the District of Delaware or the Third Circuit Court of Appeals has provided (or will provide) definitive guidance (e.g., in the appeal in the *Lehman* adversary proceeding), prosecution of Causes of Action in the Bankruptcy Court may provide certainty of outcome (and resulting reduction in litigation expenses) not attainable outside of the Bankruptcy Court in a jurisdiction that will consider previously settled questions of law anew.

97

More specifically, the Plan Proponents anticipate there may viable Causes of Action against one or more Warehouse Lenders arising from prepetition conduct, including but not limited to margin calls and the liquidation of mortgage loans or RMBS held as collateral (or, in the case of Master Repurchase Agreements, "owned" subject to the Debtors' "repurchase" obligations. In addition, and without prejudice to the retention of jurisdiction over any Cause of Action discovered by the Plan Proponents or the Plan Trustee after the date of this Disclosure Statement, the Plan Proponents believe there is a potential Cause of Action against JPM for avoidance of its lien in certain REO and for recovery of amounts expended by the Debtors' Estates maintaining, preserving, and liquidating JPM's mortgage loan collateral, which Cause of Action may be prosecuted in the Bankruptcy Court.

### 2.    Final Order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if after the Effective Date) upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

### 3.    Amendments and Modifications

The Plan Proponents may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of the Plan with respect to any Debtor, the Plan Proponents, the Plan Oversight Committee, or the proposed Plan Trustee, as appropriate, may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 services list only, and the solicitation of all Creditors and other parties in interest shall not be required.

### 4.    Tax Exemption

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of any security, or the execution, delivery or recording of an instrument of transfer shall be deemed to be made pursuant to and under the Plan, including, without limitation, any such acts by the Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date (including, without limitation, any subsequent transfers of property by the Plan Trust or the Plan Trustee), and shall not be taxed under any law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

DB02:6842992.8

066585.1001

5.    **Securities Exemption**

Any rights issued under, pursuant to or in effecting the Plan and the offering and issuance thereof by any party, including without limitation the Debtors or the Plan Trust, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code.

6.    **Non-Severability**

**Except as specifically provided in the Plan, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of those Articles may be stricken, altered, or invalidated.**

7.    **Revocation**

The Plan Proponents reserve the right to revoke and withdraw the Plan prior to the Confirmation Date in whole or as to any one or more of the Debtors.  If the Plan Proponents revoke or withdraw the Plan, then the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, the Committee, or any other Person or to prejudice in any manner the rights of the Debtors, the Committee, or any Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors and/or the Committee, including with respect to the amount or allowability of any Claim or the value of any property of the Estates.

8.    **Governing Law**

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and, with respect to the Debtors incorporated in Delaware, corporate governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles.  Corporate governance matters relating to any Debtor not incorporated in Delaware shall be governed by the law of the state of incorporation of the applicable Debtor.

9.    **Filing of Additional Documents**

On or before "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of the Plan, the Plan Proponents may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate and further evidence the terms and conditions of the Plan.

**M.**    **Cramdown and Bankruptcy Rule 9019 Requests**

The Plan Proponents will request confirmation of the Plan as a Cramdown Plan with respect to any Impaired Class that does not accept the Plan or is deemed to have rejected the Plan. In addition, pursuant to Bankruptcy Rule 9019, the Plan Proponents will request approval of all compromises and settlements included in the Plan, including, without limitation, any compromises and settlements implicated by Article 4 (providing treatment of claims), Article 6 (providing for settlement of Intercompany Claims), and Article 7 (establishing the EPD/Breach Claims Protocol) of the Plan

## VI.    CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN

Holders of Claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

**A.**    **Risk Factors Regarding Bankruptcy Cases**

**1.**    **Allowance of Claims**

This Disclosure Statement has been prepared based on preliminary information and review of filed Claims and the Debtors' books and records. Upon completion of more detailed analysis of filed Claims, the actual amount of Allowed Claims may differ from the Debtors' current estimates.

As discussed above, approximately 10,444 Claims were filed against the Debtors asserting liquidated amounts of approximately $14.25 billion in the aggregate. While the Debtors have already filed thirteen Omnibus Objections to Claims, covering approximately 5,680 Claims (4,416 of which were reduced or disallowed by the Bankruptcy Court by approximately $282 million in the aggregate), the Debtors believe that they have valid objections to many more of the filed Claims and, thus, that the ultimate allowed amount of such Claims will be significantly less than the asserted amounts. Nevertheless, the amount of Disputed Claims in these cases is expected to be material. As a result, the ultimate amount of Allowed Claims in these cases could significantly exceed the Debtors' estimates in the development of the Plan as set forth in the Plan Summary Table.

The Debtors' estimate of recoveries for Holders of Allowed Unsecured Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C under the Plan are based on their estimates of the legitimate Secured, Administrative, Priority Tax, and Priority Claims (collectively, "S/A/P Claims"), including those asserted as of the date of this Disclosure Statement. There can be no assurance, however, that the Debtors' estimates of the likely aggregate allowed amount of such S/A/P Claims will prove to be accurate. In addition, S/A/P Claims may be allowed in amounts in excess of the Debtors' current expectations. If that occurs, the actual amount of Cash available for distribution to holders of Allowed Claims in

100

Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C would be less than estimated, and the difference could be material.

### 2. Objections to Classification of Claims Pursuant to § 1122 of the Bankruptcy Code

In evaluating whether the Plan meets the requirements for confirmation under § 1129 of the Bankruptcy Code, this Disclosure Statement assumes the validity of the Plan's classifications of claims and interests. If the Holder of a Claim or Interest were to object to the proposed classification of such Claim or Interest in the Plan pursuant to § 1122 of the Bankruptcy Code, and prevail in such objection, then the requirements for confirmation of the Plan may be different from what is set forth in this Disclosure Statement. This difference may or may not have a material effect on the confirmability of the Plan.

### 3. Court Modification of Stipulated Asset Allocation or Other Elements of Proposed Compromise and Settlement of Intercompany Claims

As described above, the Plan assumes a compromise and settlement of Intercompany Claims resulting in the Stipulated Asset Allocation, which reflects, among other things, an allocation of the expenses of administering both these Chapter 11 Cases and the Plan. To the extent that the Bankruptcy Court determines that a different allocation of Plan Trust Assets between the Debtors' Estates is appropriate (whether resulting from a re-allocation of the expenses of administering the Chapter 11 Cases and/or the Plan), or otherwise modifies or conditions the proposed compromise and settlement of Intercompany Claims, the respective recovery percentages of the Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C may be altered, and such alteration may be material.

### 4. Valuation Risk

As discussed above, the Plan assumes a compromise and settlement of Intercompany Claims resulting in the Stipulated Asset Allocation, which allocation assumes, among other things, values as of the Effective Date for the aggregate Assets contributed by each Debtor's Estate to the Plan Trust. To the extent the value actually realized by the Plan Trustee from Assets contributed by a particular Estate is more than the value of such Assets assumed in connection with the Stipulated Asset Allocation, the Stipulated Asset Allocation may provide a higher recovery to Creditors of other Estates at the expense of Creditors of the contributing Estate. Conversely, to the extent the value actually realized by the Plan Trustee from Assets contributed by a particular Estate is less than the value of such Assets assumed in connection with the Stipulated Asset Allocation, the Stipulated Asset Allocation may provide a higher recovery to Creditors of the contributing Estate at the expense of Creditors of one or more other Estates. Accordingly, inaccuracy of assumed valuations may materially affect distributions to Creditors under the Plan. **While the Plan Proponents believe that this risk is reasonable in light of the benefits to be gained from a global resolution of Intercompany Claims through the Plan as opposed to piecemeal resolution of Intercompany Claims (and potential disputes over allocation of proceeds of shared assets) by the Plan Trustee, Creditors should**

be cognizant of this risk and consider it when deciding whether to vote to accept or reject the Plan.

### 5.    Risk of Non-Confirmation of the Plan

Even if all Impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things: (a) that the Confirmation of the Plan not be followed by a need for further liquidation or reorganization; (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Debtors otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 6.    Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan as to a given Debtor if at least one Impaired Class of Claims against such Debtor has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each Impaired Class of Claims against or Interests in such Debtor that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Impaired Class.

The Plan Proponents reserve the right to modify the terms of the Plan as necessary for Confirmation without the acceptance of all Impaired Classes. Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided by the Plan.

### 7.    Delays of Confirmation and/or Effective Date

Any delay in Confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Claims. These or any other negative effects of delays in Confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

### 8.    Plan Trust Operations

The ultimate amount of Cash available to satisfy the allowed amount of Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C depends, in part, on the manner in which the Plan Trustee operates the Plan Trust and the expenses the Plan Trustee (and Plan Oversight Committee) incurs. By virtue of the Plan Trustee's ability, with approval of the Plan Oversight Committee), to supplement the funding of the Plan Trust Operating Expense Reserve from Plan Trust Assets after the Effective Date, the expenses of the Plan Trustee (and Plan Oversight Committee) will have *de facto* priority over distributions to holders of Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1),

102

5C(2), 6C, 7C, and 8C. As a result, if the Plan Trustee and Plan Oversight Committee incur professional or other expenses in excess of current expectations, the amount of Cash remaining to satisfy Allowed Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C will be less than anticipated.

The ultimate amount of Cash available for distribution to holders of Allowed Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C also will be affected by the performance and relative success of the Plan Trustee in liquidating Plan Trust Assets, including the prosecution of Causes of Action against potential defendants. The less successful the Plan Trustee is in pursuing such matters, the less Cash there will be available for distribution to satisfy Allowed Claims. For the avoidance of doubt, the Plan Proponents have not assumed any recovery on account of such potential Causes of Action for purposes of (i) estimating recoveries on Allowed Claims under the Chapter 7 Liquidation Analysis or (ii) determining whether the Plan meets the Feasibility Test.

### 9.    Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, even after confirmation of the Plan, the Plan Trustee will retain and may enforce any claims, demands, rights and Causes of Action that the Estates may have against any person or Entity, including claims for preference, fraudulent conveyance and setoff. In pursuing any such claims, the Plan Trustee will act in the best interest of the Estates. Accordingly, a Holder of a Claim may be subject to one or more such claims brought by the Plan Trustee, even if such Holder voted in favor of the Plan.

### B.    **Risk Factors Relating to Securities Laws**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property. To the extent that the rights to distributions from the Plan Trust are deemed to constitute securities issued in accordance with the Plan, the Plan Proponents believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

### 1.    **Non-Transferability**

Holders of Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C also should be aware that their rights to distribution from the Plan Trust are not transferable. Therefore, there will not be any trading market for such rights, nor will those the rights be listed on any public exchange or other market. The lack of liquidity of the rights to distributions from the Plan Trust may have a negative impact on their value.

### 2.    Uncertainty of Value

In addition to the prohibition on the transfer of rights to distributions from the Plan Trust as discussed above, the value of such rights will depend on the various risks and uncertainties outlined above. The realizable value of Plan Trust Assets will vary depending upon the extent to which these risks materialize. In addition, the resolution of Causes of Action held by the Plan Trust and the reconciliation of Claims against the Debtors' Estates may require a substantial amount of time, during which time interest will not accrue on Allowed Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C. These delays could reduce the ultimate value of any recovery.

## VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    <u>General</u>

**A description of the United States federal income tax consequences of the Plan is provided below. This description is based on the Internal Revenue Code, Treasury Regulations issued thereunder, judicial decisions and Internal Revenue Service and administrative determinations, all as in effect on the date of this Disclosure Statement and all subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below.**

**The United States federal income tax consequences of the Plan are complex and in important respects uncertain. No ruling has been requested from the Internal Revenue Service; no opinion has been requested from the Debtors' or Committee's counsel concerning any tax consequence of the Plan; and no tax opinion is given by this disclosure statement.**

**The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or Holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers nor does it address tax consequences to holders of Interests in the Debtors. In addition, the description does not discuss state, local or non-U.S. tax consequences.**

**For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim or Interest. Holders of Claims or Interests are urged to consult with their own tax advisors regarding the federal, state, local and non-U.S. tax consequences of the Plan.**

DB02:6842992.8

066585.1001

**B.    United States Federal Income Tax Consequences of Payment of Allowed Claims Pursuant to Plan**

The United States federal income tax consequences of Plan implementation to the Holders of Allowed Claims will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives distributions under the Plan in more than one taxable year, whether the Holder's claim is allowed or disputed at the Effective Date, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

### 1.    Recognition of Gain or Loss

#### a.    *In General*

In general, a holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, its deduction of the loss may be subject to limitation. The holder's aggregate Tax basis for any property received under the Plan generally will equal the amount realized. The holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.

#### b.    *Post-Effective Date Cash Distributions*

Because certain holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the subsequent distributions as imputed interest. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their claims.

#### c.    *Bad Debt and/or Worthless Securities Deduction*

A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the

instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 2.    Pending Payments

Cash and other Plan Trust Assets that the Plan Trustee holds as a payment pending to the Holder of an Allowed Claim (a "Pending Payment") after the Effective Date should be deemed to have been paid to the Holder of the Claim entitled to receive such Pending Payment on the date that the Plan Trust received it and to have been contributed by such Holder to the Plan Trust as a grantor and beneficiary of the Plan Trust. Thus, the Holder should recognize gain or loss based upon the amount deemed received and contributed to the Plan Trust on the Effective Date, and any income subsequently realized by the Plan Trust with respect to such Pending Payment will be reported by the Plan Trustee as income of the grantor-beneficiary in the year realized, prior to the actual distribution of the Pending Payment to the Holder of the Allowed Claim. The actual receipt of the Pending Payments from the Plan Trust will not be a taxable event.

### 3.    Payments Other than Pending Payments

If any payment other than a Pending Payment is to be made from the Plan Trust, such payment will not be deemed to have been made to any recipient until, and to the extent that, the amount to which the payee is entitled has been determined and distributed. Any income realized by Plan Trust prior to such time will be reported by the Plan Trustee as income of and taxable to the Plan Trust.

### C.    Certain Other Tax Consequences for Holders of Claims

### 1.    Receipt of Pre-Effective Date Interest

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that all distributions to a Holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any prepetition accrued interest included in such Claim. There is no assurance, however, that the Internal Revenue Service will respect this treatment and will not determine that all or a portion of amounts distributed to Holders of Allowed Claims is properly allocable to prepetition interest. Each such Holder is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

### 2.    Installment Method

A Holder of a Claim constituting an installment obligation for Tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to

106

the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of § 453B of the Internal Revenue Code.

### 3.    Information Reporting and Withholding

Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### D.    Tax Consequences of the Plan to the Debtors

The Debtors believe that they will have net operating losses ("NOLs") for taxable year 2007 and anticipate there will be additional NOLs with respect to taxable year 2008. These NOLs will be available to offset taxable income or gain that may arise as a result of consummation of the Plan. Accordingly, the Debtors do not expect to incur a substantial tax liability as a result of implementation of the Plan. It is noted, however, that the Debtors may incur tax liability with respect taxable "excess inclusion income" arising out of certain Debtors holding residual interests in real estate mortgage investment conduits ("REMICs"). Debtors that are characterized as REITs for federal income taxes may also have tax exposure for excess inclusion income as a result of characterization of the REIT or any part of the REIT as a taxable mortgage pool. Under the provisions of the Internal Revenue Code applicable to the calculation and taxation of excess inclusion income, NOLs cannot be used to offset excess inclusion income. The Debtors are continuing to analyze the extent to which they will be subject to income tax exposure for excess inclusion income arising as a result of holding residual interests in REMICs or as a result of any Debtor's characterization as a REIT or qualified REIT subsidiary.

### E.    Importance of Obtaining Professional Tax Assistance

**The foregoing discussion is intended only as a summary of certain U.S. Federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional.  The above discussion is for information purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances.  Accordingly, holders are urged to consult with their tax advisors about federal, state, local and non-U.S. tax consequences to the Plan.**

## VIII.   ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Plan Proponents believe that the Plan provides a recovery to creditors that is greater than or equal to the probable recoveries by creditors if the Debtors were liquidated under Chapter

7 of the Bankruptcy Code. **If the Plan is not confirmed because the requisite Classes did not vote to accept the Plan, then the Debtors will likely file a motion to convert the Chapter 11 Cases to cases under Chapter 7, in which event the Plan Proponents believe that Creditor recoveries will be substantially diminished.**

## IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING REQUIREMENTS

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code; (iv) the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of Creditors or Interest Holders in each class (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by further financial restructuring of the Debtors; (viii) the Plan is in the "best interests" of all Holders of Claims or Interests in an Impaired class (see "Best Interests Test" below); and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Plan Proponents believe that the Plan satisfies all the requirements for confirmation.

### A.    **Best Interests Test**

Each Holder of a Claim or Interest in an Impaired class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to the Holders in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interests Test"). The Plan Proponents believe that the Holders of Claims against and Interests in the Debtors will have an equal or greater recovery as a result of the liquidation of the Debtors' Assets by the Plan Trust as discussed herein and than could be realized in a Chapter 7 liquidation.

The Debtors are liquidating and therefore are not seeking to require Creditors to accept non-Cash consideration so that the Estates could pursue going concern value. Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a Chapter 7 trustee.

To determine the value that a Holder of a Claim or Interest in an Impaired Class would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' Assets if the Debtors' Chapter 11 Cases had been converted to a Chapter 7 liquidation case and the

Debtors' Assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from distribution of the Debtors' Assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a Chapter 7 liquidation case that do not arise in a Chapter 11 case.

As explained below, the Liquidation Value available for satisfaction of Claims and Interests in the Debtors would be reduced by: (a) the costs, fees and expenses of the liquidation under Chapter 7, which would include disposition expenses and the compensation of one or more trustees and their counsel and other retained professionals, (b) the fees of the Chapter 7 trustee(s) and (c) certain other costs arising from conversion of the Chapter 11 Cases to Chapter 7. A hypothetical chapter 7 liquidation analysis prepared by the Plan Proponents (the "Liquidation Analysis") is attached to this Disclosure Statement as Exhibit C.

As is evident from the Liquidation Analysis, the Plan Proponents believe that Creditors have and will continue to clearly benefit from the liquidation under chapter 11 of the Bankruptcy Code. Had the Assets been liquidated by a Chapter 7 trustee, the Plan Proponents project that the maximum recovery would have been substantially less. The Debtors have realized a greater return than a Chapter 7 trustee would have obtained on the sale of their Assets, specifically due to the Debtors' familiarity with the Assets and their ability to negotiate the highest and best price for the sale thereof. The Debtors have already reduced the significant majority of their Assets to Cash through auction or private sales approved by the Bankruptcy Court. Therefore, the Debtors have already established systems and protocols for the efficient disposition of the Assets of the Estates and are in the process of liquidating their limited remaining Assets.

In addition, converting the Chapter 11 Cases to a Chapter 7 liquidation at this stage of the wind-down would result in an immense waste of the Debtors' resources that were already expended in connection with the sale of the Assets and would delay converting the remaining Assets to Cash. It would also result in substantial additional claims against the Estates.

Moreover, under the Plan the Debtors will avoid the increased costs and expenses of a Chapter 7 liquidation, including the fees payable to the Chapter 7 trustee(s) and their professionals. If the Plan is not confirmed, the settlement of Intercompany Claims will not be effective and any Chapter 7 trustee(s) will be saddled with inter-Estate litigation and/or significant conflict-of-interest issues and related litigation. This alone could erode any potential recoveries for Holders of Unsecured Claims. In addition, although the Debtors have already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the statutory fee payable to the Chapter 7 trustee(s), which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the Chapter 7 trustee. Section 326(a) of the Bankruptcy Code permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors. Professionals of the Chapter 7 trustee(s), including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtors. Moreover, these Chapter 7 trustee fees would reduce the Assets available for distribution to the Estates' Creditors from additional recoveries such as preferential payments, expunged administrative claims and the process of successful Estate litigation or settlement.

109

It is also anticipated that a Chapter 7 liquidation would result in a significant delay in payments being made to Creditors. Bankruptcy Rule 3002(c) provides that conversion of Chapter 11 cases to Chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be more than 90 days after the Chapter 11 cases convert. Not only would a Chapter 7 liquidation delay distribution to Creditors, but it is possible that additional Claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates. The Debtors have received and are analyzing late-filed Claims and may file additional claims objections in the near future. Reopening the Bar Dates in connection with conversion to Chapter 7 would provide these and other claimants an additional opportunity to timely file Claims against the Estates. Moreover, the Debtors would lose the benefit of having an established Administrative Claim Request Deadline.

For the reasons set forth above, the Plan Proponents believe that the Plan provides a superior recovery for the Holders of Claims, and the Plan meets the requirements of the Best Interests Tape.

**B.    Financial Feasibility Test**

In order to confirm a plan, the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "Feasibility Test"). Thus, for a plan to meet the Feasibility Test, the Bankruptcy Court must find that there is a reasonable likelihood that the reorganized debtor will possess the working capital and other resources necessary to meet its obligations under the plan. Because a form of liquidation is proposed in the Plan and no further financial reorganization of the Debtors will be possible, and because the Debtors will be able to satisfy all S/A/P Claims in accordance with the requirements of the Bankruptcy Code, the Plan Proponents believe that the plan meets the feasibility requirement.

**C.    Acceptance by Impaired Classes**

Section 1129(a) of the Bankruptcy Code requires that each class of claims or interests that is impaired under a plan accept the plan (subject to the "cramdown" exception contained in section 1129(b) of the Bankruptcy Code. Under section 1129(b) of the Bankruptcy Code, if at least one but not all impaired classes do not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if (i) the Plan meets all confirmation requirements except the requirement of section 1129(a)(8) of the Bankruptcy Code that the Plan be accepted by each class of claims or interests that is impaired and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan, as referred to in section 1129(b) of the Bankruptcy Code and applicable case law.

A class of claims under a plan "accepts" the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the

class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated. Under the Plan, Classes 1A, 2A, 3A, 3B(4), 4A, 4B(3), 5A, 5B(5), 6A, 7A, and 8A are not Impaired and are deemed to accept the Plan, while Classes 1D, 1E, 1F, 2D, 2E, 2F, 3D, 3E, 4D, 4E, 5D, 5E, 6D, 6E, 7D, 7E, 8D and 8E are not entitled to receive or retain any property under the Plan on account of Claims or Interests and are conclusively presumed to have rejected the Plan. All other Classes of Claims under the Plan are Impaired under the Plan and Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan.

The Plan provides fair and equitable treatment of impaired Claims, as either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed Claim or (b) the Holders of Claims and Interests that are junior to such Class of impaired claims will not receive or retain any property under the Plan, subject to the applicability of the judicial new value doctrine. Pursuant to the Plan, no Holders of any Claim or Interest junior to the Holders of such impaired Classes will receive or retain any property on account of such junior Claims.

As noted above, Holders of Claims and Interests in Claims and Interests in Classes 1D, 1E, 1F, 2D, 2E, 2F, 3D, 3E, 4D, 4E, 5D, 5E, 6D, 6E, 7D, 7E, 8D and 8E are receiving no property under the Plan and are therefore deemed to reject the Plan. However, the Plan provides fair and equitable treatment to these Holders because there are no Classes junior to these Classes and no Class senior to these Classes is being paid more than in full on its Allowed Claims.

If any Impaired Class fails to accept the Plan, the Plan Proponents intend to request that he Bankruptcy Code confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to those Classes.

**D.    Voting Procedures**

**1.    Ballots**

If voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class. Please read the voting instructions on the reverse side of the Ballot for a thorough explanation of voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT EPIQ BANKRUPTCY SOLUTIONS, LLC AT (866) 493-7277 BETWEEN THE HOURS OF 9:00 AM. AND 6:00 P.M. (EASTERN**

**TIME), MONDAY THROUGH FRIDAY. EPIQ BANKRUPTCY SOLUTIONS, LLC CANNOT PROVIDE YOU WITH LEGAL ADVICE.**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims or Interests in more than one Class and you are entitled to vote Claims or Interests in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class.

Unless otherwise directed in your solicitation package, mail your completed Ballot(s) to: EPIQ Bankruptcy Solutions, LLC, Attn: American Home Mortgage Ballots Processing, 757 Third Avenue, 3rd Floor, New York, NY 10017. **DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT.** A Ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one Ballot voting the same Claim before 4:00 p.m. (Eastern Time) on the voting deadline, the last Ballot received before the voting deadline will be deemed to reflect your intent and thus will supersede any prior Ballots. Additionally, you may not split your votes for your Claims within a particular Class under the Plan either to accept or reject the Plan. Therefore, a Ballot or a group of Ballots within a Plan Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

Unless the Bankruptcy Court permits you to do so after notice and hearing to determine whether sufficient cause exists to permit the change, you may not change your vote after the voting deadline passes. **DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER SECURITIES WITH YOUR BALLOT. FACSIMILE, EMAIL OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

**PLEASE PUT YOUR TAXPAYER IDENTIFICATION NUMBER ON YOUR BALLOT; THE DISBURSING AGENT MAY NOT BE ABLE TO MAKE DISTRIBUTIONS TO YOU WITHOUT IT.**

2.    **Deadline for Voting**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE <u>RECEIVED</u> BY 4:00 P.M. (EASTERN TIME) ON [_____], 2008.**

3.    **Importance of Your Vote**

Your vote is important. The Bankruptcy Code defines acceptance by a Class of Claims as acceptance by Holders of at least two-thirds in amount and a majority in number of Allowed Claims in that Class that vote. **ONLY THOSE CREDITORS WHO ACTUALLY VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS HAS VOTED TO ACCEPT THE PLAN. YOUR FAILURE TO VOTE WILL LEAVE TO OTHERS THE DECISION TO ACCEPT OR REJECT THE PLAN.**

## X.    RECOMMENDATION AND CONCLUSION

THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS AND THAT THE PLAN SHOULD BE CONFIRMED. THE PLAN PROPONENTS STRONGLY RECOMMEND THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.

Dated:  August 15, 2008,

Respectfully submitted,

AMERICAN HOME MORTGAGE HOLDINGS, INC.
AMERICAN HOME MORTGAGE INVESTMENT CORP.
AMERICAN HOME MORTGAGE ACCEPTANCE, INC.
AHM SV, INC. (f/k/a American Home Mortgage Servicing, Inc.)
AMERICAN HOME MORTGAGE CORP.
AMERICAN HOME MORTGAGE VENTURES LLC
HOMEGATE SETTLEMENT SERVICES, INC.
GREAT OAK ABSTRACT CORP.

By:  Kevin Nystrom
Their:  Chief Restructuring Officer

## EXHIBIT A

**The Joint Chapter 11 Plan of Liquidation**

**[FILED SEPARATELY]**

## **EXHIBIT B**

**The Disclosure Statement Order**

**[TO BE PROVIDED]**

# EXHIBIT C

## Chapter 7 Liquidation Analysis

**[TO BE PROVIDED]**