## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
In re:                                                  : Chapter 11
                                                        :
AMERICAN HOME MORTGAGE                                   : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]      :
                                                        : Jointly Administered
            Debtors.                                    :
                                                        : **Hearing Date: 08/27/08 at 10:00 a.m.**
                                                        : **(Scheduling Conference)**
                                                        : **Objection Deadline: 08/21/08 at 4:00 p.m.**
                                                        : **(By Agreement)**
                                                        : **Related Document Nos. 4233, 4338, 4359**
------------------------------------------------------- x

### AMENDED MOTION OF AMERICAN HOME MORTGAGE SERVICING, INC., FORMERLY KNOWN AS AH MORTGAGE ACQUISITION CO., INC., FOR AN ORDER GRANTING THE ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM FOR BREACHES BY CERTAIN DEBTORS OF THE ASSET PURCHASE AGREEMENT FOR THE SALE OF THE DEBTORS' MORTGAGE SERVICING BUSINESS

American Home Mortgage Servicing, Inc., a Delaware corporation formerly

known as AH Mortgage Acquisition Co., Inc. (the "Purchaser"), through its undersigned counsel,

hereby moves the Court for the entry of an order granting the allowance and payment of an

administrative expense claim for breaches by Debtors AHM SV, Inc., a Maryland corporation

---

[1] The above-captioned debtors and debtors in possession in these cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc., a Maryland corporation, formerly known as American Home Mortgage Servicing, Inc. (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

formerly known as American Home Mortgage Servicing, Inc. ("SVI"),[2] SVI's parent company,

American Home Mortgage Investment Corp. ("Parent") and American Home Mortgage Corp.

(collectively with SVI and Parent, the "Sellers"), under the Asset Purchase Agreement dated as

of September 25, 2007 (as subsequently amended, the "APA") as approved by this Court's *Order*

*Pursuant to Sections 105, 363, 364, 365, and 503(B) of the Bankruptcy Code, and Rules 2002,*

*4001, 6004, 6006, 7062, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (A)*

*Approving (i) the Sale of the Debtors' Mortgage Servicing Business Free and Clear of Liens,*

*Claims and Interests, (ii) the Assumption and Assignment of Certain Executory Contracts and*

*Unexpired Leases Related Thereto, and (B) Granting Certain Related Relief* [Docket No. 1711]

(the "Servicing Sale Order").  In support of this Amended Motion, the Purchaser submits:  (i) the

Declaration of Joel Gendron (the "Gendron Declaration"), which is attached hereto as Exhibit A

and incorporated herein by reference; (ii) the Declaration of David M. Friedman (the "Friedman

Declaration"), which is attached hereto as Exhibit B and incorporated herein by reference; and

(iii) the Declaration of Jonathan D. Vanderveen (the "Vanderveen Declaration"), which is

attached hereto as Exhibit C and incorporated herein by reference; and respectfully represents as

follows:

## PRELIMINARY STATEMENT

1.    Since the Initial Closing (as defined below) under the APA on November

16, 2007, the Sellers have materially breached the APA in several respects.  These breaches,

which, other than the Sellers' failure to pay document delivery costs, were all discovered after the

Final Closing (as defined below), include, among other things, refusals to pay certain costs the

---

[2]    SVI was formerly known as American Home Mortgage Servicing, Inc.  Following the final closing on the APA, Debtor American Home Mortgage Servicing Inc. changed its name to AHM SV, Inc.

Sellers are obligated to pay under the APA as well as inappropriate uses of cash from the separate accounts set up for the benefit of the Purchaser under the APA to pay liabilities that the Sellers retained under the APA.

2.      In particular, the Sellers have refused to pay certain amounts owed in respect of lender paid mortgage insurance and prepayment penalties as required under the APA, as well as the cost of delivery of the applicable mortgage loan files to Irving, Texas as the APA expressly requires.  SVI also breached the APA by using cash from the Purchaser's accounts to satisfy SVI's obligations to the holders of certain home equity line of credit loans — loans for which the Purchaser did not even acquire the servicing rights.

3.      Furthermore, prior to the Initial Closing, SVI remitted to the operating account of Parent, or satisfied certain obligations of Parent with, funds collected in connection with the servicing of mortgage loans that were required to be held in custodial accounts for the benefit of, or were otherwise required to be remitted to, the applicable holder of certain loans, including securitization investment trusts, under the applicable servicing agreements.  The applicable servicing agreements required that these custodial accounts be replenished prior to the Initial Closing.  Nonetheless, when SVI discovered these problems after the Initial Closing, rather than seeking return of the funds from Parent, SVI in some instances used cash from the separate accounts set up for the benefit of the Purchaser to make payments to the applicable trust or holder of the loan.  In other instances, although the Purchaser has timely made all remittances due to the securitization trusts to date, there still remains an expected cash shortage in the custodial accounts as a result of SVI's remittance of funds to Parent, rather than the custodial accounts.  The Sellers' use of cash from the Purchaser's accounts or failure to replenish the custodial accounts breached the APA, which prohibits the Sellers from using the Purchaser's

cash to satisfy pre-Initial Closing liabilities of SVI and expressly provides that the Sellers shall retain and be liable for all liabilities relating to events or actions that occurred prior to the Initial Closing. Moreover, the APA requires the Sellers — not the Purchaser — to cure pre-Initial Closing defaults under the mortgage loan servicing agreements assumed and assigned to the Purchaser. Accordingly, the Purchaser is entitled to be reimbursed for these improper uses of the Purchaser's accounts and for payments actually made, or that will be made, to satisfy expected cash shortages in the custodial accounts created by SVI's actions prior to the Initial Closing.

4.      As described in detail below, as a result of all these various breaches, the Purchaser has incurred damages, and is entitled to an allowed administrative priority claim, aggregating $17,238,989. For the convenience of the Court, a chart summarizing each of the Purchaser's claims under the APA is attached hereto as Exhibit D and incorporated herein by reference.

### JURISDICTION AND STATUS OF THE CASE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      On August 6, 2007, each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

8.      On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors.  No trustee or examiner has been appointed.

## BACKGROUND REGARDING THE AMENDED MOTION

9.      On May 23, 2008, the Purchaser filed the Motion of American Home Mortgage Servicing, Inc., Formerly Known as AH Mortgage Acquisition Co., Inc., for an Order Granting the Allowance and Payment of an Administrative Expense Claim for Breaches by Certain Debtors of the Asset Purchase Agreement for the Sale of the Debtors' Mortgage Servicing Business (Docket No. 4233) (the "Original Motion"), seeking the allowance and payment of an administrative expense claim for certain breaches of the APA by the Sellers.  The Purchaser's investigation of certain categories of transactions, however, was not complete, and the Purchaser did not have final amounts for certain of the claims.  Accordingly, the Original Motion noted that certain of the amounts were only approximate amounts and stated that the Purchaser would supplement the Original Motion as soon as the Purchaser determined the exact amounts of these claims.[3]  The Original Motion also noted that the Purchaser expressly reserved the right to amend the Original Motion to include additional claims.[4]

10.      On June 2, 2008, the Purchaser filed the Supplement to Motion for an Order Granting the Allowance and Payment of an Administrative Expense Claim for Breaches by Certain Debtors of the Asset Purchase Agreement for the Sale of the Debtors' Mortgage Servicing Business (Docket No. 4338) (the "Supplement"), pursuant to which the Purchaser clarified the amount of certain components of the administrative claim it was seeking.

---

[3]      Original Mot. at 17 n.4.

[4]      Original Mot. at 16.

Subsequent to filing the Supplement, however, the Purchaser's ongoing review of its books and records identified additional information that could affect certain of its claims. Accordingly, the Purchaser withdrew the Supplement (Docket No. 4359) on June 4, 2008, pending the Purchaser's confirmation of the claim amounts. Due to the number of transactions involved and nature and extent of the work, and to reduce the burden on the Purchaser's financial personnel, the Purchaser's counsel thereafter retained Alvarez & Marsal to examine and evaluate the books and records maintained in the ordinary course of business by SVI and the Purchaser with respect to certain transactions involving SVI and to quantify and document such transactions.[5]

11.    Having now finalized the components and amounts of its administrative claim request, the Purchaser hereby files this Amended Motion.[6]

## BACKGROUND

### The Debtors' Mortgage Servicing Business

12.    Prior to the filing of these bankruptcy cases, the Debtors' businesses primarily consisted of the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. The Debtors also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors.

13.    A large component of the Debtors' businesses was the servicing of loans (the "Servicing Business"), which the Debtors conducted primarily through SVI. The Servicing Business entails, among other things, collecting mortgage payments, administering tax and

---

[5]    Gendron Decl. ¶ 4.

[6]    Because the Purchaser is now asserting certain additional claims that were not described in the Original Motion and to avoid the need to refer to both the Original Motion and a supplement to determine the exact amounts and components of all claims, the Purchaser is filing an Amended Motion that supersedes the Original Motion.

insurance escrows, responding to borrower inquiries, and maintaining control over collection and default mitigation processes. Many of the loans the Debtors originated were to be serviced by the Servicing Business, thus assuring that the Servicing Business would obtain additional servicing rights as existing mortgage loans were repaid in whole or in part.

14.    As is well documented in these cases, unprecedented disruptions in the credit markets in 2006 and 2007 undermined the value of the Debtors' loan portfolio, thereby causing significant write-downs in the Debtors' loan and security portfolios. This decrease in the Debtors' loan portfolio resulted in margin calls for hundreds of millions of dollars that, in turn, resulted in defaults under the Debtors' various credit facilities thus severing the Debtors' access to credit and impairing their ability to originate loans. The Debtors' deteriorating financial condition also served as grounds for counterparties to the Debtors' master servicing agreements to seek termination of those agreements.

**The Debtors' Emergency Sale Motion**

15.    Although the Debtors' Servicing Business remained viable, without the ability to originate new loans that the Debtors would service, and given the threat of termination of master service agreements, the Debtors faced the prospect of a total loss of value of their Servicing Business. Accordingly, to preserve the value of their assets, the Debtors initiated these proceedings and immediately began to market the Servicing Business by filing their *Emergency Motion of the Debtors for Orders: (A)(i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of Certain Assets Used In the Debtors' Loan Servicing Business; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief; and (B)(i) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and*

*(iv) Granting Related Relief* [Docket No. 11] (the "Initial Servicing Sale Motion").  By Order

dated August 9, 2007 [Docket No. 113], the Court granted the Initial Servicing Sale Motion.

16.     Thereafter, the Debtors concluded, in the exercise of their business

judgment, that having a stalking horse bidder for the sale would be in the best interests of their

estates, and commenced good faith arm's length negotiations with the Purchaser with respect to a

transaction whereby the Purchaser would agree to purchase the Servicing Business and become

the stalking horse for the sale process.  Accordingly, on September 21, 2007, the Debtors filed

their *Motion of the Debtors for Order Pursuant to Sections 105(a), 363, 364, 365, and 503(b) of*

*the Bankruptcy Code and Rules 2002, 4001, 6004, 6006, 7062, 9007 and 9014 of the Federal*

*Rules of Bankruptcy Procedure (A) Approving Revised Procedures for the Sale of the Debtors'*

*Mortgage Servicing Business; (B) Approving Certain Protections for the Stalking Horse Bidder*

*in Such Sale; (C) Directing that Certain Notices of Such Sale and Deadline be Given; and*

*(D) Authorizing, on an Interim Basis, the Debtors to Grant Certain Liens and Other Protections*

*for the Purchaser's Collateral Effective After the Initial Closing* [Docket No. 865].  The Court

approved the revised motion by order dated September 25, 2007 [Docket No. 937].

17.     No other qualified bids were received for the Servicing Business, and on

October 15, 2007, the Court conducted a sale hearing.  Thereafter, on October 30, 2007, the

Court entered the Servicing Sale Order authorizing the sale of the Servicing Business to the

Purchaser.

**The Need for Regulatory Approval and the Two-Step Closing Process**

18.     Because the Purchaser was not yet licensed to service mortgage loans in

the various jurisdictions necessary to operate the Servicing Business, the APA and the Servicing

Sale Order provide for a two-step closing process designed so that the sale could close from an

"economic" perspective while the Purchaser obtained the necessary regulatory approvals and

licensing. At the "economic" close, which occurred on November 16, 2007 (the "Initial Closing"), the Purchaser paid the Purchase Price in the manner and to the parties in interest as contemplated by the APA, but the Sellers, with SVI as the licensed servicing entity, retained ownership of the Servicing Business. From the Initial Closing until April 11, 2008, the date upon which the ownership of the Servicing Business was transferred to the Purchaser (the "Final Closing"), the Sellers were required to operate the Servicing Business in the ordinary course of business for the economic benefit (and risk) of the Purchaser, but the Purchaser was required to provide such liquidity and working capital as necessary to enable the Sellers to operate the business from the Initial Closing to the Final Closing (the "Interim Period").

## RELIEF REQUESTED

19.     Pursuant to sections 503(a) and (b) of the Bankruptcy Code, the Purchaser respectfully requests entry of an order (a) granting the Purchaser an allowed claim against the Sellers' estates, entitled to administrative expense priority, for certain damages arising from the Sellers' breaches of the APA, (b) directing the Sellers to pay that administrative claim as soon as reasonably practicable and (c) granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

20.     Section 503(a) of the Bankruptcy Code provides that "[a]n entity may timely file a request for payment of an administrative expense," and section 503(b) provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate . . . ."[7] It is well-established that obligations under agreements entered into postpetition are actual and necessary costs of

---

[7]     11 U.S.C. §§ 503(a) and (b).

preserving the estate and that a claim for damages arising from a debtor's postpetition breach of a

postpetition contract is entitled to administrative expense priority.[8]  Additionally, the APA,

which was approved by the Court after notice and a hearing pursuant to the Servicing Sale Order,

specifically provides that "[a]ny claims arising from breaches by any Sellers of their obligations

pursuant to the terms of this Agreement shall constitute allowed administrative expense claims

against the Sellers under Sections 503(b)(1) and 507(a)(1), as applicable, of the Bankruptcy

Code."[9]  Accordingly, any claim the Purchaser has against the Sellers for any breach of the APA

is entitled to administrative expense priority.

## ARGUMENT

21.    The Purchaser has a claim against the Sellers in an aggregate amount of

$17,238,989 arising from the Sellers' breach of various provisions of the APA.  As expressly

provided for in the APA and under applicable law as noted above, the Purchaser's claim is

entitled to administrative expense priority.  For the convenience of the Court, a chart

summarizing each of the Purchaser's claims under the APA is attached hereto as Exhibit D and

incorporated herein by reference.  A detailed discussion of the particular components of the

Purchaser's claim is set forth below.

---

[8]    In re Mushroom Transp. Co., Inc., 78 B.R. 754, 761 (Bankr. E.D. Pa. 1987) ("[t]hus, Mushroom's failure to cure would represent, simply, the postpetition breach of a postpetition contract. This, in turn, would give rise to an administrative claim."); GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.), 761 F.2d 1503, 1509 (11th Cir. 1985) ("[t]he policy behind treating claims arising from post-petition breaches as administrative expenses is clear. The debtor in possession or trustee by assuming or entering into the contract makes a determination that the contract is in the best interest of the estate and its creditors."); In re Chugiak Boat Works, Inc., 18 B.R. 292, 298 (Bankr. D. Alaska 1982) (holding that damages arising from a contract into which the debtor entered postpetition but prior to conversion to Chapter 7 liquidation were permissible administrative expenses).

[9]    APA § 11.3(c).

**Sellers' Refusal to Pay Certain Costs They Are Obligated to Pay Under the APA**

22.    To date, the Sellers have refused to pay the Purchaser almost $4.6 million for lender paid mortgage insurance ("LPMI") premiums and prepayment penalties and $31,200 in respect of estimated costs to deliver certain business records to the Purchaser, in each case as required by the APA.

*Lender Paid Mortgage Insurance and Prepayment Penalties: $4,592,887*

23.    Within the mortgage loan servicing business, lenders sometimes purchase LPMI on certain loans.[10]  For loans on which a lender has procured LPMI, the mortgage loan servicing company normally deducts, among other deductions permitted by the servicing agreements, LPMI premiums from the principal and interest payments that the servicer receives from the borrower and remits the remainder to the owner of the loan.[11]  The servicer then uses the applicable portion of the retained amount to pay the LPMI premiums to the insurance company when due.[12]

24.    Some mortgage loans provide that the borrower must pay a prepayment penalty if the loan is repaid prior to the end of its term.[13]  The mortgage servicing company normally collects the prepayment penalty, which it subsequently forwards to the owner of the loans.[14]  Amounts deducted by the mortgage servicing company for the payment of LPMI

---

[10]    Friedman Decl. ¶ 3.

[11]    *Id.*

[12]    *Id.*

[13]    *Id.* ¶ 4.

[14]    *Id.*

premiums and the collection of prepayment penalties normally are deposited in one or more accounts used to remit LPMI premiums or prepayment penalties.[15]

25.    Prior to the Initial Closing, SVI deposited prepayment penalties that it received and amounts deducted from principal and interest payments for LPMI premiums into Parent's general operating account (the "434 Account"), which SVI used to fund a wide variety of its servicing activities.[16]  Because the Purchaser would receive only a portion of the funds SVI had collected for LPMI premiums and prepayment penalties, the parties agreed that there would be a $6,061,810 reduction in the Purchase Price in addition to the transfer of certain funds to the Purchaser at the Initial Closing representing a portion of the monies SVI had collected as premiums for LPMI or as prepayment penalties.[17]  This agreement was reflected in the Third Amendment to the Asset Purchase Agreement dated as of November 16, 2007 (the "Third Amendment").[18]  Pursuant to the Third Amendment, at the time of the Initial Closing, the Sellers transferred $3,326,152 to the Purchaser, reflecting a total payment/adjustment in respect of LPMI premiums and prepayment penalties of $9,387,962.[19]  The parties also recognized, however, that this amount was an estimate and accordingly, agreed in the Third Amendment to "work together in good faith to determine whether the amount transferred under . . . Section 4 and the $6,061,810 reduction from the Purchase Price . . . was the appropriate amount with respect to such [prepayment penalties] and LPMI . . . ."[20]  The Third Amendment further

---

[15]    *Id.*

[16]    Vanderveen Decl. ¶ 4.

[17]    Friedman Decl. ¶ 5.

[18]    *Id.*

[19]    Vanderveen Decl. ¶ 4.

[20]    Friedman Decl. ¶ 5; Third Amendment § 4.

provides that if it is determined that the $9,387,962 is less than the appropriate amount with respect to prepayment penalties and LPMI, "Sellers shall pay an amount equal to such deficiency by wire transfer of immediately available funds to Purchaser."[21]

26.     The Purchaser paid an aggregate of $6,476,423 to insurers for LPMI premiums that SVI collected prior to the Initial Closing and an aggregate of $7,504,426 to the owners of certain loans for prepayment penalties that SVI collected prior to the Initial Closing.[22] After reducing the total of these deficiencies ($13,980,849) by the total of the credits described above ($9,387,962), there remains a deficiency of $4,592,887.[23]  The Sellers have to date refused to pay the Purchaser the nearly $4.6 million required to satisfy this deficiency as required under the Third Amendment.[24]

### Document Delivery Costs:  $31,200

27.     The costs of shipping the servicing files and other books and records relating to the servicing business (the "Servicing Documents") from the Sellers' warehouse in New York to the Purchaser's office in Irving, Texas will cost an estimated $31,200.[25]  Based on communications with the Sellers concerning the volume of documents yet to be delivered, the Purchaser expects that it will take four tractor trailers to deliver all the Servicing Documents to

---

[21]     *Id.*

[22]     Vanderveen Decl. ¶ 4.

[23]     *Id.*

[24]     Friedman Decl. ¶ 6.

[25]     *Id.* ¶ 7.

Irving, Texas, at an approximate cost of $7,800 each.[26]  Pursuant to the terms of the APA, the

Sellers are responsible for that cost.

      28.     Specifically, Section 2.1 of the APA provides that

> Sellers shall sell, convey, transfer, assign and *deliver* to
> Purchaser . . . all of the right, title and interest of all Sellers and
> their Affiliates as of the Final Closing Date in and to all assets and
> properties related to the Business, whether tangible or intangible,
> real, personal or mixed . . . and including . . . all of Sellers'
> Servicing Rights and rights to receive Servicing Fees . . . .[27]

Servicing Rights are defined in the APA to include, among other things, "the right of ownership,

possession, control or use of any and all Servicing Files and Mortgage Loan Documents

pertaining to the servicing of the Mortgage Loans as provided in the Servicing Agreements."[28]

Servicing Files are defined in the APA as "copies of the Mortgage Loan Documents and all other

documents, files and other items related thereto required to be maintained by the servicer

pursuant to the applicable Servicing Agreement."[29]  Those are precisely the files that were and

are stored in the Sellers' New York warehouse and that were in part shipped to the Purchaser at

the *Purchaser's* cost and that in part remain to be shipped to the Purchaser.

      29.     Additionally, Section 6.10(a) of the APA provides that

> Sellers shall, in accordance with Purchaser's reasonable
> instructions, take all steps, and execute and *deliver* all such
> agreements, letters or other documents as are reasonably requested
> by Purchaser to effect the transfer of the Servicing Agreements . . .
> such that, after the Final Closing Date, Purchaser or its designee
> *has* all of the Servicing Rights, the Servicing Files and any and all

---

[26]    *Id.*  At this time, the Purchaser has received only one tractor-trailer shipment of the
Servicing Documents and other books and records, which cost the Purchaser $7,800.  *Id.*

[27]    APA § 2.1 (emphasis added).

[28]    APA § 1.1.

[29]    *Id.*

assets and rights necessary to perform its obligations under such
Servicing Agreements.[30]

Despite this unequivocal contractual language and repeated requests, the Sellers have refused to

pay the costs of delivery, agreeing only to have the files pulled from the Sellers' warehouse in

New York at Sellers' cost and expense for either pick up by the Purchaser at the warehouse or

delivery to the Purchaser at the Purchaser's expense.[31]  At the time of the Final Closing, the

parties entered into a letter agreement pursuant to which the Sellers agreed that the Purchaser's

rights and claims under the APA relating to the location where the files were to be delivered

would be preserved.[32]  A copy of that letter is attached as Exhibit B to the Friedman Declaration.

30.    In refusing to honor this obligation, the Sellers rely on the so-called "As Is

Where Is" clause of the APA, which provides, in pertinent part, that "*except as expressly set forth*

*in the Agreement*, Purchaser will accept the Purchased Assets on the Final Closing Date 'AS IS'

and 'WHERE IS'."[33]  The Sellers have argued that the files were therefore purchased "Where Is"

and the costs of delivery to the Purchaser's office in Irving, Texas should be borne by the

Purchaser.

31.    The Sellers' argument, however, ignores the fact that the "As Is Where Is"

clause, by its own terms, does not supersede the express provisions of the APA.  As cited above,

the parties expressly agreed in sections 2.1 and 6.10 of the APA that the Sellers would be

responsible for delivery of the Servicing Files.  Moreover, the cost of this delivery should be a

cost and expense of the Sellers since Section 11.3 of the APA states that "[e]xcept as otherwise

---

[30]    APA § 6.10 (emphasis added).

[31]    Friedman Decl. ¶ 7.

[32]    *Id.*

[33]    APA § 2.11 (emphasis added).

provided in this Agreement, all costs and expenses incurred in connection with this Agreement

and the consummation of the Transaction shall be paid by the party incurring such expenses."

Accordingly, the Purchaser is entitled to an administrative claim for $31,200 for the costs of

delivering the Servicing Agreements to the Purchaser's offices in Irving, Texas.

**Wrongful Use of the Purchaser's Accounts to Satisfy Retained**
**Liabilities and Expected Cash Shortages in Custodial Accounts**

32.     Prior to the Initial Closing, SVI transferred to Parent (via the 434

Account) funds that were required to be held for the benefit of, and remitted to, the applicable

holder of certain loans, including securitization investment trusts.  There are seven categories of

transactions (described in detail below) in which monies that should have been held in custodial

accounts or otherwise remitted to the holders of the loans were instead transferred to Parent via

the 434 Account, resulting in expected cash shortages in the applicable custodial accounts.

Instead of using the Parent's funds to rectify these expected cash shortages, however, SVI

improperly used funds from the accounts established for the benefit of the Purchaser in violation

of the APA.  Other expected cash shortages remain uncured, and the Purchaser is entitled to be

reimbursed for payments actually made, or that will be made, to satisfy the expected cash

shortages in the custodial accounts created by SVI's actions prior to the Initial Closing.

*Overpayment of Advances:  $1,496,586*

33.     In connection with servicing loans, SVI routinely made advances

("Advances") on behalf of the loan owners to pay various costs and expenses relating to those

loans, including, for example, advances to pay scheduled principal and interest not yet received,

taxes or insurance premiums, or costs associated with an enforcement action or judicial

proceeding relating to a loan.[34]  As SVI collected funds relating to those loans, including in

respect of mortgage insurance claims, delinquent principal and interest payments or as a result of

loan foreclosures or liquidating real estate owned properties ("REO Properties"), SVI was

required to deposit those collections in custodial accounts for the benefit of the applicable

securitization trust or loan owner.[35]  Under the servicing agreements, however, SVI was entitled

to reimburse itself for Advances from the custodial accounts.[36]

        34.     From time to time prior to the Initial Closing, SVI withdrew funds from

the 434 Account to make Advances.[37]  SVI would use its automated system, the LSAMS system,

to systematically repay Advances by transferring certain of the funds collected to the

434 Account.[38]  On July 2, 2007, SVI manually transferred $5,082,009 from a custodial account

to the 434 Account to repay certain Advances.[39]  However, by the time of the manual transfer,

LSAMS had already automatically repaid, by transfer to the 434 Account, amounts aggregating

$1,496,586 of the same Advances that were repaid with the manual transfer.[40]  Under the

applicable servicing agreement or agreements, SVI is permitted to withdraw only amounts from

custodial accounts as necessary for reimbursement of advances and not amounts in excess of

such amounts and is further obligated to promptly replenish any shortfall.[41]  Well prior to the

Initial Closing, the custodial account was due reimbursement of $1,496,586 as a result of the

---

[34]     Friedman Decl. ¶ 8.

[35]     *Id.*

[36]     *Id.*

[37]     Vanderveen Decl. ¶ 5.

[38]     *Id.*

[39]     *Id.*

[40]     *Id.*

[41]     Friedman Decl. ¶ 9.

repayment through both the manual transfer and through LSAMS.[42]  During the Interim Period,

the Sellers used cash from the separate accounts established for the benefit of the Purchaser to

rectify this double repayment to Parent's 434 Account and replenish the custodial account.[43]

### Collections and Payments Related to Paid in Full Loans That SVI Failed to Remit to Third Parties: $2,976,298

35.    Prior to the Initial Closing, SVI remitted $1,762,957 to Parent for

collections on paid in full loans that SVI mistakenly believed Parent owned but that Parent had

sold to third parties.[44]  These collections should have been remitted to the third party owners'

custodial accounts, rather than to Parent, and then remitted from their custodial accounts directly

to the third party owners.  Instead, Parent retained the paid in full amounts it received and made

the required remittance from the third party owners' custodial accounts to them for the paid in

full amounts, creating an expected cash shortage in those accounts.[45]  During the Interim Period,

rather than having Parent return the funds it had improperly received, SVI transferred $164,303

from the separate accounts established for the Purchaser's benefit to partially rectify those

expected cash shortages in the investors' custodial accounts.[46]  There remains an expected cash

shortage in an aggregate amount of $1,598,654 as a result of SVI's remittance of these

collections to Parent's 434 Account rather than the custodial accounts of the third party loan

owners.[47]

---

[42]    Vanderveen Decl. ¶ 5.

[43]    *Id.*

[44]    Vanderveen Decl. ¶ 6.

[45]    *Id.*

[46]    *Id.*

[47]    *Id.*

36.    In addition, prior to the Initial Closing, SVI failed to pay certain "compensating interest" that was owed to certain custodial accounts in respect of certain paid in full loans.[48]  In particular, SVI, as servicer, is required to pay the investor a full month of interest for the month in which a loan is paid in full (regardless of what day of the month the loan is paid off).[49]  Accordingly, the difference between the interest paid by the borrower and the full month of scheduled interest is a loss to SVI, and SVI is required to pay the difference (the compensating interest) to the investor's custodial account.[50]  Prior to the Initial Closing, SVI failed to pay to the appropriate custodial accounts an aggregate of $1,213,341 in such compensating interest.[51]  During the Interim Period, SVI transferred $1,213,341 from the Purchaser's accounts to rectify this pre-Initial Closing failure to pay compensating interest.[52]

### Liquidation Proceeds: $2,040,718

37.    Prior to the Initial Closing, SVI received and remitted to Parent's 434 Account $2,040,718 in payments in connection with loans that it was servicing under servicing agreements eventually acquired by the Purchaser that were in foreclosure.[53]  These amounts included payments from mortgage insurance and full liquidation proceeds[54] and should have been transferred to the appropriate custodial accounts for eventual remittance to the owners of the underlying loans upon liquidation of the loan and reporting of the loss, pursuant to the terms

---

[48]    Vanderveen Decl. ¶ 7.

[49]    Friedman Decl. ¶ 10.

[50]    *Id.*

[51]    Vanderveen Decl. ¶ 7.

[52]    *Id.*

[53]    Vanderveen Decl. ¶ 8.

[54]    *Id.*

of their respective servicing agreements.[55]  Because, prior to the Initial Closing, SVI remitted these liquidation proceeds to Parent's 434 Account rather than holding these funds in the appropriate custodial accounts, upon liquidation of the loan, the custodial accounts will have an expected cash shortage in the aggregate amount of $2,040,718.[56]

### *Repurchases: $738,384*

38.    Prior to the Initial Closing, certain loans that Parent had originated and sold to investors became delinquent within a short time period, triggering an obligation of Parent to repurchase those loans under the applicable loan sale agreements.[57]  Rather than using Parent's own funds, however, the Sellers satisfied Parent's repurchase obligations prior to the Initial Closing by transferring funds to the investors from the investors' own custodial accounts.[58]  The Sellers never reimbursed the custodial accounts for these repurchase amounts, and as a result, the accounts had an expected cash shortage in the amount of $738,384 as of the Initial Closing.[59]

### *Guaranty Fees: $834,648*

39.    For loans guaranteed by the Federal National Mortgage Association ("FNMA"), loan servicers generally collect the guaranty fees due to FNMA (the "Guaranty Fees") from payments made by the borrowers and remit such fees to FNMA.[60]  Prior to the Initial Closing, SVI deducted amounts for Guaranty Fees from principal and interest payments made by borrowers and deposited those funds in Parent's 434 Account pending remittance to

---

[55]    Friedman Decl. ¶ 13.

[56]    Vanderveen Decl. ¶ 8.

[57]    Friedman Decl. ¶ 11.

[58]    Vanderveen Decl. ¶ 9.

[59]    *Id.*

[60]    Friedman Decl. ¶ 12.

FNMA.[61]  When certain of the Guaranty Fees became due during the Interim Period, however, rather than using the funds that had been collected from borrowers and deposited into the 434 Account, the Sellers paid those Guaranty Fees, aggregating $834,648, from the separate accounts established for the benefit of the Purchaser.[62]

### Payment Clearing Account Deficiency:  $2,423,759

40.    In connection with servicing loans, SVI maintained a clearing account.[63] SVI deposited collections from borrowers and third parties in the clearing account pending transfer of the funds to the appropriate custodial accounts using LSAMS, which was SVI's only vehicle to post funds to individual loans.[64]  These postings would credit the applicable borrower and fund the appropriate investor custodial account.[65]  Prior to the Initial Closing, SVI miscoded certain non-cash transactions relating to the establishment of new loans in LSAMS.[66] Specifically, SVI coded the establishment of these new loans as if the clearing account had received cash equal to the principal balance of these new loans.[67]  These errant transactions caused the payment clearing account to appear over-funded, although no funds were actually deposited in the account.[68]  Believing that the clearing account was over-funded, SVI manually transferred amounts aggregating $2,423,759 to either the 434 Account or its predecessor.[69]

---

[61]    Vanderveen Decl. ¶ 10.

[62]    *Id.*

[63]    Vanderveen Decl. ¶ 11.

[64]    *Id.*

[65]    *Id.*

[66]    *Id.*

[67]    *Id.*

[68]    *Id.*

[69]    *Id.*

These manual transfers created a shortfall of $2,423,759 in the clearing account, which existed at the Initial Closing.[70] At the Initial Closing and prior to full functionality of the accounts to be established for the benefit of the Purchaser, the Purchaser deposited roughly $45 million into the payment clearing account to fund, among other items, Advances to investors.[71] As a result of the extra funds the Purchaser had provided, the balance in the payment clearing account remained more than sufficient to post all required funds to the appropriate custodial accounts.[72] The Purchaser did not discover that SVI had transferred funds to Parent's operating accounts that were required to be remitted to custodial accounts until the Purchaser recently closed the payment clearing account, at which point the Purchaser was short the $2,423,759.[73]

### Expenses Denied by Wells Fargo: $749,406

41.     Prior to the Initial Closing, SVI incurred $749,406 in expenses in connection with the foreclosure of certain loans that Wells Fargo Bank, N.A. ("Wells Fargo"), the master servicer for the loans, did not agree SVI could pass onto the investors pursuant to the applicable servicing agreements.[74]  Accordingly, Wells Fargo required SVI to remit to the investor from the investor's custodial accounts an amount equal to the liquidation proceeds *without* reduction for these expenses.[75]  Since SVI had already deducted these expenses from the

---

[70]     *Id.*

[71]     *Id.*

[72]     *Id.*

[73]     *Id.*

[74]     Vanderveen Decl. ¶ 12.  Although Wells Fargo denied these expenses, SVI or the Purchaser, as applicable, has resubmitted certain of these denied expenses to Wells Fargo for reconsideration.  To the extent Wells Fargo reconsiders any of the expenses it previously denied, the Purchaser will supplement this Amended Motion to reflect a corresponding reduction in the amount of this component of its administrative claim.

[75]     *Id.*

proceeds it had remitted to the custodial accounts, SVI's remittance to the investor from the investor's custodial accounts of the proceeds without reduction for these expenses resulted in an expected cash shortage to the custodial accounts, which SVI had an obligation to rectify.[76]  SVI, however, failed to replenish the custodial accounts, and accordingly, the custodial accounts had an expected cash shortage of $749,406 at the time of the Initial Closing.[77]

42.     As described above, at various times during the Interim Period, SVI discovered that, prior to the Initial Closing, it had incorrectly remitted to Parent's 434 Account certain funds that should have been maintained in custodial accounts or otherwise remitted to the holders of the loans.  Notwithstanding that Parent had received these funds and very well may have been still holding these funds, SVI remedied a substantial portion of these expected cash shortages by using funds held in the separate accounts established for the benefit of the Purchaser.  In other instances, the Purchaser discovered these issues after the Final Closing, and the Purchaser is entitled to be reimbursed for payments actually made, or that will be made, to cure expected cash shortages in the custodial accounts created by SVI's actions prior to the Initial Closing.

43.     The APA expressly prohibits the Sellers from using cash in the Purchaser's accounts to satisfy pre-Initial Closing liabilities (in this case, expected cash shortages in the custodial accounts).  Specifically, section 6.14(d) of the APA, as amended by the First Amendment to Asset Purchase Agreement dated as of November 1, 2007 (the "First Amendment"), prohibits the use of cash in those accounts other than for operation of the Business in the Ordinary Course (as defined in the APA):

---

[76]     Friedman Decl. ¶ 14.

[77]     Vanderveen Decl. ¶ 12.

> . . . Sellers will deposit all cash and cash equivalents received in
> connection with the Business and the Purchased Assets during the
> period from the Initial Closing until the later of the Final Closing
> and payment of the Reconciliation Payment in cash accounts that
> are separate from any other accounts maintained or used by Sellers
> or any of their Affiliates. The cash in such accounts will be used
> only for the operation of the Business in the Ordinary Course or as
> required by the agreements for the Financing.[78]

Section 12 of the First Amendment explicitly provides that, "[a]fter the Initial Closing, the

Retained Liabilities and Excluded Assets shall be deemed not to be a part of the Business."[79]

The APA defines Retained Liabilities as:

> any and all Claims and Liabilities of any kind or nature whatsoever
> of a Seller or any of its Affiliates or affecting any of the Purchased
> Assets (other than the Assumed Liabilities), including any Claims
> and Liabilities . . . relating to any action, event, circumstance or
> condition occurring or existing on or prior to the Initial
> Closing . . . .[80]

44.     Thus, all liabilities that arose prior to the Initial Closing are Retained

Liabilities of the Sellers and, therefore, are deemed not to be part of the Business. Accordingly,

the Sellers' use of cash from the separate accounts established for the benefit of the Purchaser to

remedy expected cash shortages in the custodial accounts that existed on or prior to the Initial

Closing breached the APA because the use of such cash was strictly limited to use for "operation

of the Business in the Ordinary Course." Furthermore, it is not within the ordinary course of

business generally to make payments out of operating cash to the holder or owner of mortgage

loans to cure expected cash shortages in custodial accounts due to the misdirection of

remittances.

---

[78]     First Amendment § 6.14(d); APA § 6.14(d).

[79]     First Amendment § 12.

[80]     APA § 1.1.

45.    With respect to the pre-Initial Closing expected cash shortages in the custodial accounts, Section 2.6 of the APA expressly provides that the "Sellers shall retain and be liable and responsible for all Retained Liabilities," which, as noted above, includes all liabilities relating to any events or actions occurring prior to the Initial Closing.[81]  Moreover, the APA also makes clear that it is the <u>Sellers'</u> obligation, not the Purchaser's, to cure pre-Initial Closing defaults under the mortgage servicing agreements being assumed and assigned to the Purchaser.  Specifically, Retained Liabilities is defined to include, among other things, the Initial Cure Amount and Interim Cure Amount, which, in turn, are defined to mean the maximum amount (as such amount is limited by the Servicing Sale Order), payable to cure all defaults with respect to any acts or omissions under Assumed Contracts as of, respectively, the date that the Servicing Sale Order was entered and the Initial Closing Date.[82]

46.    In declining to satisfy the foregoing claims, the Sellers have misplaced reliance upon the so-called "As Is Where Is" provisions of the APA contained in Section 2.11:

> <u>"As Is Where Is" Transaction</u>.  Purchaser hereby acknowledges and agrees that, notwithstanding anything to the contrary contained herein, except as expressly set forth in this Agreement, Sellers make no *representations or warranties* whatsoever, express or implied, with respect to any matter relating to the Purchased Assets.  Without in any way limiting the foregoing, Sellers hereby disclaim *any warranty* (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.  Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the Purchased Assets and all such other matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets, Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, *except as expressly set forth in the Agreement*, Purchaser will accept the Purchased Assets on the Final Closing Date "AS IS" and "WHERE IS".[83]

---

[81]    APA § 2.6.

[82]    First Amendment § 1.1.

[83]    APA § 2.11 (emphasis added).

47.     The foregoing provision does not, however, relieve the Sellers of their
obligations to remedy their breaches of the APA.  First, the Sellers' argument ignores the fact
that the "As Is Where Is" clause, by its own terms, does not supersede the express provisions of
the APA.  Second, the stated intent of Section 2.11 of the APA is that the Sellers are not making
any *representation or warranty* with respect to the Purchased Assets.  However, the Purchaser's
claims are not based on breaches of representations or warranties, but on breaches of covenants
and obligations of the Sellers under the APA (*e.g.*, breach of the Sellers' obligation not to use
cash from the Purchaser's accounts to satisfy Retained Liabilities and breach of Sellers'
obligations to remain responsible for Retained Liabilities and to cure pre-Initial Closing defaults
under the servicing agreements being assumed and assigned to the Purchaser).  If the "As Is
Where Is" clause were read as broadly as the Sellers propose, it would essentially nullify all the
Sellers' covenants and obligations under the APA and eviscerate the Purchaser's ability to
recover for any breach thereof, which is clearly in contravention of the intent of the APA since it
provides for administrative expense priority for any "claims arising from breaches by any Sellers
of their obligations under the terms of [the APA] . . . ."[84]

**Wrongful Use of the Purchaser's Accounts to Pay Obligations**
**Under Servicing Agreements That the Purchaser Did Not Acquire**

48.     Under the APA, the Purchaser did not acquire servicing rights for loans
that permitted borrowers to borrow against the equity of their homes in the form of a home
equity line of credit (a "HELOC").[85]  Section 11.2 of the First Amendment provided that certain
servicing agreements, including all the HELOC servicing agreements, would be Excluded Assets

---

[84]     APA § 11.3(c).

[85]     First Amendment § 11.2.

and that the "obligations thereunder or relating thereto shall be Retained Liabilities."[86] With

respect to the HELOC loans that SVI serviced, it was SVI's practice, when a borrower requested

to draw on the line of credit, to remit the requested draw amount directly to the borrower from

Parent's 434 Account.[87] SVI would then transfer funds from the investor's custodial account to

the 434 Account to reimburse Parent for the draw advances.[88] At various times prior to the

Initial Closing, SVI transferred amounts in excess of the underlying draws from the custodial

accounts to the 434 Account.[89] As a result, these custodial accounts had expected cash shortages

in the aggregate amount of $597,677 as of the Initial Closing.[90] SVI improperly replenished the

expected cash shortages in these HELOC custodial accounts during the Interim Period by

transferring funds from the Purchaser's accounts even though the Purchaser was not acquiring the

servicing rights for these loans.[91]

       49.     After the Initial Closing, the Retained Liabilities and Excluded Assets

were deemed not to be a part of the Business.[92] Because the servicing agreements for the

HELOC loans were Excluded Assets, and the related liabilities were Retained Liabilities, they

are deemed not to be a part of the Business. The Sellers' use of funds from the Purchaser's

accounts to remedy any expected cash shortages in the HELOC custodial accounts therefore

---

[86]    First Amendment § 11.2. Specifically, Section 11.2 states that the servicing agreements set forth on Exhibit B, referred to as the "Deleted Servicing Agreements," shall be Excluded Assets and obligations thereunder Retained Liabilities. The Deleted Servicing Agreements include all HELOC servicing agreements.

[87]    Vanderveen Decl. ¶ 13.

[88]    *Id.*

[89]    *Id.*

[90]    *Id.*

[91]    *Id.*

[92]    First Amendment § 12.

violated the APA because such use was not for "operation of the Business in the Ordinary Course."

50.     Moreover, the First Amendment expressly prohibits such use of the Purchaser's accounts.  In particular, section 11.3 of the First Amendment to the APA makes clear that, with respect to certain mortgage loans described on Exhibit C to the First Amendment, which includes all HELOC mortgage loans, the Purchaser shall have no obligation to fund any draw or borrowings under those loans and that no such obligations for draws or borrowings "shall be funded or paid using cash or cash equivalents received in connection with the Business and the Purchased Assets . . . during the period from and after the Initial Closing."  Sellers breached the APA by using Purchaser's accounts, which consisted of cash generated by the Business from and after the Initial Closing, to repay funds to custodial accounts for draws on HELOC loans.

**The Signature Bank Agreement**

51.     On the Initial Closing date, the Purchaser paid the purchase price for the assets to be transferred to it at the Final Closing.[93]  The purchase price was based, in part, on the outstanding unpaid principal balance of loans serviced pursuant to various mortgage servicing agreements listed on Schedule 1.1(j) of the APA.[94]  One of those mortgage servicing agreements was an agreement dated as of March 4, 2004 between Signature Bank and the Debtors' predecessor, Columbia National Incorporated (the "Signature Agreement").[95]

---

[93]     Friedman Decl. ¶ 15.

[94]     *Id.*

[95]     *Id.*

52.    The Signature Agreement empowered Signature Bank (a) to terminate the servicing company without cause at any time prior to expiration of the initial term of the Signature Agreement; and (b) to sell the servicing rights at any time pursuant to Section 2.5(d) of the Signature Agreement.[96]  An agreement with these characteristics that could evaporate at the whim of the counterparty could not have been intended by the parties to have justified a $757,426 purchase price and, accordingly could not have been intended to have been included on Schedule 1.1(j).  Moreover, the Signature Agreement did not transfer "mortgage servicing rights" as the term is understood in the industry.[97]

53.    Inclusion of the Signature Agreement among the servicing agreements that formed part of the basis for the calculation of the purchase price caused the purchase price to be overstated by $757,426, which represents a price of approximately 0.92% of the amount, as of the Initial Closing, of the unpaid balance of mortgage loans that were being serviced pursuant to the Signature Agreement.[98]  Accordingly, the Purchaser is entitled to a return of the $757,426.[99]

---

[96]    *Id.* ¶ 16.

[97]    *Id.*

[98]    *Id.* ¶ 17.

[99]    As required by Sections 4.1(b) and (c) of the APA, by letter dated December 13, 2007, the Purchaser gave notice to the Sellers that it disputed the inclusion of the Signature Agreement among the servicing agreements that formed part of the basis of the calculation of the purchase price paid by the Purchaser as of the Initial Closing and that the Purchaser believed that it was entitled to a reduction in the purchase price in the amount of $757,426.  Friedman Decl. ¶ 18.  A copy of the December 13, 2007 letter is attached to the Friedman Declaration as Exhibit D.  By letter dated December 28, 2007, the Sellers advised the Purchaser that it did not agree that the Signature Agreement was erroneously included among the servicing agreements assumed by the Purchaser.  *Id.* ¶ 19.  A copy of the December 28, 2007 letter is attached to the Friedman Declaration as Exhibit E.  In that letter, the Sellers further stated that the "Signature Agreement is not a dispute that is susceptible to resolution under the dispute resolution procedures set forth in Section 4, *i.e.*, that the dispute relates to a matter that can be resolved by accountants reviewing calculations and determining whether the amounts were properly calculated."

## RESERVATION OF RIGHTS

54.     The Purchaser expressly reserves the right to amend this motion to include additional claims or to file an additional request for allowance and payment of additional claims. The Purchaser specifically reserves the right to modify or amend this motion, file additional papers in support of this motion or take other appropriate actions, including to: (a) respond to any allegation, legal theory or defense that may be raised in a response by or on behalf of the Sellers; and (b) raise any additional argument in support of the relief requested herein based on additional information that may be discovered upon further review by the Purchaser or through discovery pursuant to the applicable provisions of the Bankruptcy Rules.

WHEREFORE, for all the foregoing reasons, the Purchaser respectfully requests entry of an order, substantially in the form attached hereto as Exhibit E: (i) granting the Purchaser an allowed claim entitled to administrative expense priority in the amount of $17,238,989 (the "Allowed Administrative Claim"), (ii) directing the Sellers to pay the Allowed Administrative Claim as soon as reasonably practicable; and (iii) granting the Purchaser such other and further relief as is just and appropriate.

---

(continued...)

Notwithstanding the Purchaser's repeated demands, the Sellers have refused to refund the $757,426 of the purchase price attributable to the Signature Agreement. *Id.* ¶ 20.

Dated:  August 18, 2008
       Wilmington, Delaware

GREENBERG TRAURIG, LLP

Victoria W. Counihan (BAR #3488)
Sandra G. M. Selzer (BAR # 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000

and

JONES DAY
Keith C. McDole (TX 13533740)
Daniel P. Winikka (TX 00794873)
2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939

COUNSEL FOR AMERICAN HOME
MORTGAGE SERVICING, INC., FORMERLY
KNOWN AS AH MORTGAGE ACQUISITION
CO., INC.