# EXHIBIT B

## (Declaration of David M. Friedman)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------- x
In re:                                              : Chapter 11
                                                    :
AMERICAN HOME MORTGAGE                              : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al., :
                                                    : Jointly Administered
        Debtors.                                   :
------------------------------------------------------- x

## DECLARATION OF DAVID M. FRIEDMAN

I, David M. Friedman, declare as follows:

1.      I am President of American Home Mortgage Servicing, Inc., formerly

known as AH Mortgage Acquisition Co., Inc. (the "Purchaser").  During the period between

November 16, 2007 (the "Initial Closing") and April 11, 2008 (the "Final Closing") (which

period is referred to herein as the "Interim Period"), I was Executive Vice President -- Director of

Servicing for Debtor AHM SV, Inc. ("SVI"), formerly known as American Home Mortgage

Servicing, Inc.

2.      I am over the age of twenty-one and am competent to make this

Declaration submitted in support of the Amended Motion of American Home Mortgage

Servicing, Inc., Formerly Known as AH Mortgage Acquisition Co., Inc., for an Order Granting

the Allowance and Payment of an Administrative Expense Claim for Breaches by Certain

Debtors of the Asset Purchase Agreement for the Sale of the Debtors' Mortgage Servicing

Business (the "Amended Motion").  The facts stated herein are true and correct and, unless

otherwise noted below, are based on my personal knowledge and/or the books and records of

SVI and the Purchaser maintained in the ordinary course of business.

DLI-6203638v7

*Lender Paid Mortgage Insurance and Prepayment Penalties[1]*

3.    Within the mortgage loan servicing business, lenders sometimes purchase lender paid mortgage insurance ("LPMI") on certain loans.  For loans on which a lender has procured LPMI, the mortgage loan servicing company normally deducts, among other deductions permitted by the servicing agreements, LPMI premiums from the principal and interest payments that the servicer receives from the borrower and remits the remainder to the owner of the loan.  The servicer then uses the applicable portion of the retained amount to pay the LPMI premiums to the insurance company when due.

4.    Some mortgage loans provide that the borrower must pay a prepayment penalty if the loan is repaid prior to the end of its term.  The mortgage servicing company normally collects the prepayment penalty, which it subsequently forwards to the owner of the loans.  Amounts deducted by the mortgage servicing company for the payment of LPMI premiums and the collection of prepayment penalties normally are deposited in one or more accounts used to remit LPMI premiums or prepayment penalties.

5.    As reflected in the Third Amendment to the Asset Purchase Agreement dated as of November 16, 2007 (the "Third Amendment"),[2] the parties agreed to a purchase-price adjustment in respect of LPMI premiums or prepayment penalties collected by SVI prior to the Initial Closing:

> At the Initial Closing, Purchaser shall pay the Purchase Price []less
> . . . $6,061,810 to reconcile a deficiency in the cash available to be
> transferred to Purchaser's accounts contemporaneously with the
> Initial Closing with respect to amounts collected to pay premiums

---

[1]    Section and paragraph headings found herein have been inserted solely for the convenience of the Court and parties in interest and should not be considered testimony of the Declarant.

[2]    A true and correct copy of the APA and all six of the amendments thereto, including the Third Amendment, are attached hereto as Exhibit A and incorporated herein by reference.

for [LPMI] and with respect to amounts collected for prepayment penalties . . . .[3]

The Third Amendment also provides that the Sellers would transfer certain funds to the Purchaser: "[c]ontemporaneous with the Initial Closing, Sellers shall cause all amounts held by Sellers as of the Initial Closing representing monies collected by Sellers as premiums for LPMI or as PP to be transferred to an account or accounts designated by Purchaser . . . ."[4] The Third Amendment further states:

> after the Initial Closing Date the parties shall work together in good faith to determine whether the amount transferred under this Section 4 and the $6,061,810 reduction from the Purchase Price set forth in Section 4.1(a) of the Agreement (the "Aggregate Amount") was the appropriate amount with respect to such PP and LPMI (the "Appropriate Amount"). To the extent it is finally determined that the Aggregate Amount exceeded the Appropriate Amount, Purchaser, on behalf of Sellers, shall pay an amount equal to such excess . . . . To the extent it is finally determined that the Aggregate Amount was less than the Appropriate Amount, Sellers shall pay an amount equal to such deficiency . . . .[5]

6.      The Sellers have not to date paid the amount required to satisfy the LPMI and prepayment penalty deficiency.

### *Document Delivery Costs*

7.      At the time of the Initial Closing, SVI maintained Servicing Files and Mortgage Loan Documents (as those terms are defined in Section 1.1 of the Asset Purchase Agreement dated as of September 25, 2007 (as subsequently amended, the "APA")) in warehouse facilities located in New York. SVI has refused to pay the costs of delivering those documents to the Purchaser at its principal place of business in Irving, Texas, paying only to have the files pulled from the Sellers' warehouse in New York at Sellers' cost and expense and

---

[3]      Third Amendment § 3(b).

[4]      Third Amendment § 4.

[5]      *Id.*

requiring the Purchaser to pay for delivery to Irving, Texas.  At the time of the Final Closing, the

parties entered into a letter agreement, which provided:

> Sellers acknowledge and agree that Purchaser does not hereby
> waive any of its rights or Claims, and Purchaser hereby reserves all
> of its rights and Claims, under the Asset Purchase Agreement,
> including, without limitation, those relating to the location of
> where the Stored Files are to be delivered by Sellers and who
> should bear the costs and expenses of such delivery.[6]

The Purchaser has determined that it will incur estimated delivery costs aggregating $31,200 for

shipment of the Servicing Files and Mortgage Loan Documents from New York to the

Purchaser's facilities in Irving, Texas.  Based on communications with the Sellers concerning the

volume of documents yet to be delivered, the Purchaser expects that it will take four tractor

trailers to deliver all the Servicing Documents to Irving, Texas, at an approximate cost of $7,800

each.  At this time, the Purchaser has received only one tractor-trailer shipment of the Servicing

Documents and other books and records, which cost the Purchaser $7,800.  SVI has refused to

pay these costs or to otherwise deliver the documents to the Purchaser's facilities.

### *Custodial Accounts Transactions*

8.    *Advances*.  In connection with servicing loans, SVI routinely made

advances ("Advances") on behalf of the loan owners to pay various costs and expenses relating

to those loans, including, for example, advances to pay scheduled principal and interest not yet

received, taxes or insurance premiums, or costs associated with an enforcement action or judicial

proceeding relating to a loan.  As SVI collected funds relating to those loans, including in respect

of mortgage insurance claims, delinquent principal and interest payments or as a result of loan

foreclosures or liquidating real estate owned properties, SVI was required to deposit those

---

[6]    Letter Agreement at 3.  A true and correct copy of the letter agreement preserving the
document-delivery issue is attached hereto as Exhibit B and incorporated herein by
reference.

collections in custodial accounts for the benefit of the applicable securitization trust or loan owner. Under the servicing agreements, however, SVI was entitled to reimburse itself for Advances from the custodial accounts.

9.    Although the applicable servicing agreements permit SVI to reimburse itself from the custodial accounts for Advances, SVI may withdraw from custodial accounts only amounts as necessary for reimbursement of advances and not amounts in excess of such amounts and is further obligated to promptly replenish any shortfall.

10.    *Collections and Payments Related to Paid in Full Loans Not Remitted to Third Parties.* Amounts collected by SVI on paid in full loans that SVI mistakenly believed Parent owned but that Parent had sold to third parties should have been remitted to the third party owners' custodial accounts, rather than to Parent, and then remitted from their custodial accounts directly to the third party owners. SVI, as servicer, is required to pay the investor a full month of interest for the month in which a loan is paid in full (regardless of what day of the month the loan is paid off), commonly referred to as "compensating interest." Accordingly, the difference between the interest paid by the borrower and the full month of scheduled interest is a loss to SVI, and SVI is required to pay the difference (the compensating interest) to the investor's custodial account.

11.    *Repurchases.* Prior to the Initial Closing, certain loans that Parent had originated and sold to investors became delinquent within a short time period, triggering an obligation of Parent to repurchase those loans under the applicable loan sale agreements.

12.    *Guaranty Fees.* For loans guaranteed by the Federal National Mortgage Association ("FNMA"), loan servicers generally collect the guaranty fees due to FNMA from payments made by the borrowers and remit such fees to FNMA.

13.    *Liquidation Proceeds.* Prior to the Initial Closing, SVI received proceeds relating to the liquidation of loans that should have been transferred to the appropriate custodial accounts eventually to be remitted to the owners of the underlying loans upon liquidation of the loan and reporting of the loss, pursuant to the terms of their respective servicing agreements.

14.    *Expenses Denied by Wells Fargo.* In connection with the foreclosure of certain loans for which Wells Fargo, N.A. ("Wells Fargo") was the master servicer and Wells Fargo's denial of certain expenses related to the foreclosures, SVI had an obligation under the applicable servicing agreements to rectify expected cash shortages in the custodial account that resulted from SVI's deduction of certain denied expenses from proceeds remitted to the investors' custodial accounts.

## *The Signature Bank Agreement*

15.    On the Initial Closing date, the Purchaser paid the purchase price for the assets to be transferred to it at the Final Closing. The purchase price was based, in part, on the outstanding unpaid principal balance of loans serviced pursuant to various mortgage servicing agreements listed on Schedule 1.1(j) of the APA. One of those mortgage servicing agreements was an agreement dated as of March 4, 2004 between Signature Bank and the Debtors' predecessor, Columbia National Incorporated (the "Signature Agreement").[7]

16.    The Signature Agreement empowered Signature Bank (a) to terminate the servicing company without cause at any time prior to expiration of the initial term of the Signature Agreement; and (b) to sell the servicing rights at any time pursuant to Section 2.5(d) of the Signature Agreement. As the term "mortgaging servicing rights" is usually and customarily

---

[7]    A true and correct copy of the Signature Agreement is attached hereto as Exhibit C and incorporated herein by reference

understood within the mortgage servicing industry, the Signature Agreement did not contain "mortgage servicing rights" to transfer to the Purchaser.

17.    Inclusion of the Signature Agreement among the servicing agreements that formed part of the basis for the calculation of the purchase price paid by the Purchaser caused the purchase price to be overstated by $757,426, which represents a price of approximately 0.92% of the amount, as of the Initial Closing, of the unpaid balance of mortgage loans that were being serviced pursuant to the Signature Agreement.

18.    On December 13, 2007, the Purchaser sent a letter to the Debtors regarding its position on the Signature Agreement's inclusion in the calculation of the purchase price. A true and correct copy of that letter is attached hereto as Exhibit D and incorporated herein by reference.

19.    On December 28, 2007, the Debtors sent a letter to the Purchaser in response, setting forth their position regarding the Signature Agreement's inclusion in the calculation of the purchase price. A true and correct copy of the Debtors' response is attached hereto as Exhibit E and incorporated herein by reference.

20.    Notwithstanding the Purchaser's repeated demands, the Debtors have refused to refund the $757,426 of the purchase price to the Purchaser attributable to the Signature Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 15, 2008

David M. Friedman

DLI-6203638v7                                -7-