# EXHIBIT A

**(APA and Amendments Thereto)**

**Execution Version**

ASSET PURCHASE AGREEMENT

by and among

AH MORTGAGE ACQUISITION CO., INC.,

AMERICAN HOME MORTGAGE INVESTMENT CORP.,

AMERICAN HOME MORTGAGE CORP.

and

AMERICAN HOME MORTGAGE SERVICING INC.

dated as of

September 25, 2007

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS AND INTERPRETATION | 1 |
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Interpretation | 16 |
| ARTICLE II | PURCHASE AND SALE OF ASSETS | 17 |
| Section 2.1 | Purchase and Sale of Assets | 17 |
| Section 2.2 | Excluded Assets | 18 |
| Section 2.3 | Post-Final Closing Date Asset Deliveries | 20 |
| Section 2.4 | Non-Assignment of Assets | 20 |
| Section 2.5 | Assumption of Certain Liabilities | 21 |
| Section 2.6 | Retained Liabilities | 21 |
| Section 2.7 | Initial Closing; Final Closing | 21 |
| Section 2.8 | Ancillary Agreements | 22 |
| Section 2.9 | Deliveries by Purchaser | 22 |
| Section 2.10 | Deliveries by Sellers | 23 |
| Section 2.11 | "As Is Where Is" Transaction | 24 |
| ARTICLE III | TRANSFERRED EMPLOYEES | 24 |
| Section 3.1 | Transferred Employees | 24 |
| Section 3.2 | Employee Benefit Plans | 25 |
| Section 3.3 | COBRA | 25 |
| Section 3.4 | WARN | 25 |
| Section 3.5 | Cooperation | 25 |
| Section 3.6 | No Third Party Rights | 25 |
| ARTICLE IV | PURCHASE PRICE; ADJUSTMENT; ALLOCATION | 25 |
| Section 4.1 | Purchase Price | 25 |
| Section 4.2 | Allocation of the Purchase Price | 27 |
| Section 4.3 | Deposit | 28 |
| Section 4.4 | Dispute Escrow | 28 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF THE SELLERS | 29 |
| Section 5.1 | Authorization; Validity of Agreement; Seller Action | 29 |
| Section 5.2 | Organization and Good Standing | 30 |

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 5.3 | Governmental Consents and Approvals; No Violations | 30 |
| Section 5.4 | Noncontravention | 31 |
| Section 5.5 | Title to Assets and Properties; Liens | 31 |
| Section 5.6 | Mortgage Servicing Portfolio; Servicing Agreements; Assumed Contracts; Mortgage Loans | 31 |
| Section 5.7 | Compliance with Laws | 33 |
| Section 5.8 | Litigation; Proceedings | 33 |
| Section 5.9 | Sufficiency of Assets | 33 |
| Section 5.10 | Financial Statements | 34 |
| Section 5.11 | Seller/Servicer Status | 34 |
| Section 5.12 | MERS Membership | 34 |
| Section 5.13 | Status of Mortgage Loans | 35 |
| Section 5.14 | Brokers | 35 |
| ARTICLE VI | COVENANTS | 35 |
| Section 6.1 | Interim Operations of Sellers | 35 |
| Section 6.2 | Operations Following the Initial Closing | 37 |
| Section 6.3 | Access; Books and Records | 40 |
| Section 6.4 | Cooperation; Efforts and Actions to Cause Closings | 41 |
| Section 6.5 | Confidentiality | 42 |
| Section 6.6 | Subsequent Actions | 43 |
| Section 6.7 | Post-Final Closing Amounts Received and Paid | 43 |
| Section 6.8 | Notices of Certain Events | 43 |
| Section 6.9 | Interim Financial Information | 44 |
| Section 6.10 | Procedures for Transfer of Servicing | 44 |
| Section 6.11 | Bankruptcy Actions | 46 |
| Section 6.12 | Maintenance of Insurance | 47 |
| Section 6.13 | Laws | 47 |
| Section 6.14 | Financing Assistance and Protection of Purchased Assets | 47 |
| Section 6.15 | Excluded Contracts | 49 |
| Section 6.16 | Assumption of Certain Assumed Contracts | 49 |

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 6.17 | Provisions Regarding Advances | 49 |
| Section 6.18 | FNMA | 50 |
| Section 6.19 | Option to Purchase Excluded Assets | 51 |
| Section 6.20 | Compensation Plan | 51 |
| Section 6.21 | Approved FNMA Servicer | 51 |
| ARTICLE VII | BANKRUPTCY COURT MATTERS | 52 |
| Section 7.1 | Competing Transaction | 52 |
| Section 7.2 | Break-Up Fee | 52 |
| Section 7.3 | Bankruptcy Court Filings | 52 |
| ARTICLE VIII | CONDITIONS | 53 |
| Section 8.1 | Conditions to Obligations of Purchaser and Sellers On or Prior to the Initial Closing Date | 53 |
| Section 8.2 | Conditions to Obligations of Sellers On or Prior to the Initial Closing Date | 53 |
| Section 8.3 | Conditions to Obligations of Purchaser On or Prior to the Initial Closing Date | 54 |
| Section 8.4 | Condition to Obligations of Purchaser On or Prior to the Final Closing Date | 55 |
| ARTICLE IX | TERMINATION | 56 |
| Section 9.1 | Termination | 56 |
| Section 9.2 | Procedure and Effect of Termination | 57 |
| ARTICLE X | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 58 |
| Section 10.1 | Legal Power; Organization; Qualification of Purchaser | 58 |
| Section 10.2 | Binding Agreement | 58 |
| Section 10.3 | No Conflict or Default | 58 |
| Section 10.4 | Funding | 59 |
| Section 10.5 | Brokers | 59 |
| Section 10.6 | Independent Investigation | 59 |
| ARTICLE XI | MISCELLANEOUS | 59 |
| Section 11.1 | No Survival of Representations and Warranties | 59 |
| Section 11.2 | Transfer Taxes | 59 |

iii

# TABLE OF CONTENTS
(continued)

Section 11.3    Fees and Expenses; Allowed Administrative Expenses ................................. 60

Section 11.4    Amendment; Waiver ..................................................................................... 60

Section 11.5    Publicity ....................................................................................................... 60

Section 11.6    Notices .......................................................................................................... 61

Section 11.7    Counterparts .................................................................................................. 62

Section 11.8    Entire Agreement; No Third Party Beneficiaries............................................ 62

Section 11.9    Severability .................................................................................................... 63

Section 11.10   Governing Law .............................................................................................. 63

Section 11.11   Venue and Retention of Jurisdiction............................................................. 63

Section 11.12   No Punitive Damages .................................................................................... 64

Section 11.13   Assignment .................................................................................................... 64

Section 11.14   Fulfillment of Obligations............................................................................. 64

Section 11.15   Specific Performance ..................................................................................... 64

Section 11.16   Waiver of Bulk Transfer Laws ...................................................................... 64

Section 11.17   Personal Liability .......................................................................................... 64

ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement dated as of September 25, 2007, is entered into by and among AH Mortgage Acquisition Co., Inc. ("Purchaser"), a Delaware corporation, American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing Inc., a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Sellers own and/or are engaged in the Business (as hereinafter defined).

WHEREAS, on August 6, 2007 (the "Petition Date"), the Filing Subsidiaries (as hereinafter defined) filed voluntary petitions ("Petitions") for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction with respect to the Bankruptcy Cases, the "Bankruptcy Court").

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, all of the Purchased Assets (as hereinafter defined), and Purchaser is willing to assume all of the Assumed Liabilities (as hereinafter defined).

WHEREAS, Sellers, as debtors and debtors-in-possession, have continued in the possession of their respective assets and in the management of the Business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions. As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings set forth below when used herein with initial capital letters:

"Administrative Agent" means Bank of America, N.A. in its capacity as the administrative agent under the Existing BOA Bank Facility.

"Administrative Agent Cash Proceeds" has the meaning set forth in Section 2.2(a).

"Advances" means (i) with respect to each Servicing Agreement, including any Disputed Servicing Agreement, the aggregate outstanding amount that as of any date of determination has

been advanced directly by Sellers from their own funds or funds borrowed by Sellers from a third party (but not with funds borrowed from any custodial or other accounts under such Servicing Agreement) in connection with servicing Mortgage Loans in accordance with the terms of such Servicing Agreement, including with respect to principal, interest, Taxes, insurance premiums and other advances made pursuant to the applicable Servicing Agreement; and (ii) with respect to the Servicing Rights Held for Sale and the Mortgage Loans set forth on Schedule 6.10(f), the aggregate outstanding amount that as of any date of determination has been advanced directly by Sellers from their own funds or funds borrowed by Sellers from a third party (but not with funds borrowed from any custodial or other accounts maintained in connection with performing the Servicing Rights Held for Sale or servicing the Mortgage Loans set forth on Schedule 6.10(f)) in connection with the Company's performing the Servicing Rights Held for Sale or servicing of the Mortgage Loans set forth on Schedule 6.10(f), including with respect to principal, interest, Taxes, insurance premiums and other advances.

"Advances Amount" means, as of the close of business on the Business Day immediately prior to the Initial Closing  Date (the "Advances Amount Determination Time"), the amount of outstanding Advances which have been paid out by Sellers and not yet collected from third parties.

"Advances Amount Determination Time" has the meaning set forth in the definition of Advances Amount.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the schedules and exhibits hereto.

"Allocation Schedule" has the meaning specified in Section 4.2 hereof.

"Ancillary Agreements" has the meaning specified in Section 2.8 hereof.

"Ancillary Income" means any and all income, revenue, fees, expenses, charges or other moneys that Sellers are entitled to receive, collect or retain as servicer, subservicer or master servicer pursuant to the Servicing Agreements (other than Servicing Fees).

"Applicable Requirements" means, with respect to each Seller, all applicable requirements of Law, including those relating to servicing, insuring or filing of claims in connection with Mortgage Loans, and all contractual obligations of Sellers.

"Arbitrating Accountants" has the meaning specified in Section 4.1(c) hereof.

"Assigned Leases" means those Leases used in the operation of the Business listed on Schedule 1.1(b).

"Assignment and Assumption Agreement" means the assignment and assumption agreement to be executed by Sellers in favor of Purchaser in respect of the Assumed Contracts and Assumed Liabilities, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Assignment and Assumption of Lease Agreements" means the assignment and assumption of lease agreements to be executed by Sellers in favor of Purchaser in respect of the Real Property Leases, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Assumed Contracts" has the meaning set forth in Section 2.1(b).

"Assumed Liabilities" means the (i) obligations of Sellers as servicer, subservicer or master servicer arising under any Servicing Agreement (other than Disputed Servicing Agreements unless specifically assumed by Purchaser hereunder) including, specifically, the obligation to advance delinquent scheduled principal and interest payments under any Servicing Agreements to the extent such advance could not be borrowed from any custodial or other accounts under such Servicing Agreement, after assignment thereof to Purchaser at the Final Closing, (ii) obligations of Sellers under any Assigned Lease or Assumed Contract (other than Servicing Agreements) after the assignment thereof to Purchaser at the Final Closing, (iii) all Losses incurred by Sellers or their Affiliates in the operation of the Business pursuant to Sections 6.1 and 6.2 or otherwise arising as a result of, or in connection with, the continued ownership by Sellers of the Purchased Assets and operation of the Business after the Initial Closing Date, including, without limitation, any Claims and Liabilities of the Company arising with respect to Business Employees whose employment is terminated after the Initial Closing under WARN, COBRA or any other similar Law, and (iv) the Liabilities of Sellers set forth on Schedule 1.1(c); provided, however, with respect to clause (iii) no such Liability shall constitute an Assumed Liability to the extent it relates to any period, or act or omission occurring, prior to the Initial Closing (e.g., severance or retention accrued prior to the Initial Closing but not payable until after the Initial Closing).

"Assumed Pre-Petition Contracts" has the meaning specified in Section 6.11(c) hereof.

"Assumed Rights and Claims" has the meaning specified in Section 2.1(j) hereof.

"Auction" has the meaning specified in the Revised Sale Procedures Order.

"Auction Date" has the meaning specified in the Revised Sale Procedures Order.

"Bankruptcy Cases" has the meaning specified in the Recitals.

"Bankruptcy Code" has the meaning specified in the Recitals.

"Bankruptcy Court" has the meaning specified in the Recitals.

"Bankruptcy Exceptions" means any limitations, omissions or failures of performance arising due to the fact that the Sellers are operating as debtors in possession under the

Bankruptcy Code, including but not limited to, (i) Sellers' inability to maintain the services of their officers or other employees or the fact that a substantial number of Sellers' employees have left their positions and continue to leave their positions, (ii) Sellers' inability to maintain the continued operation of any operating function at a standard consistent with past practice, (iii) vendors and counterparties of Sellers failing to continue to perform their obligations to Sellers, and (iv) ongoing litigation with respect to the Business and the Purchased Assets.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bills of Sale" means the bills of sale to be executed by Sellers in favor of Purchaser in respect of the Purchased Assets, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Books and Records" means all books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) Related to the Business or directly relating to the Purchased Assets, and the Assumed Liabilities.

"Break-Up Fee" has the meaning specified in Section 7.2 hereof.

"Budget" means a budget prepared in substantially the same manner and using substantially the same assumptions utilized in the preparation of the budget annexed to the Cash Collateral Order (except to include Professional Fees as such term is defined in the Sale Approval Order), which budget shall cover the period following the Initial Closing Date and give effect to a 10% variance (other than with respect to cash payments to the lenders provided therein, if any); provided that Sellers and Purchaser shall in good faith attempt to agree to a revised budget for the period following the Initial Closing Date through the Final Closing Date and, in the event of such agreement, such revised budget shall be deemed the "Budget" hereunder.

"Business" means the business (whether existing now or existing at or before the Initial Closing) of providing servicing for Mortgage Loans, including pursuant to the Servicing Agreements.

"Business Day" means a day other than Saturday, Sunday or any day on which the Federal Reserve Bank of New York is closed.

"Business Employee" means each employee of Sellers whose sole responsibility is to provide services Related to the Business and each other employee of Sellers having significant responsibility Related to the Business listed on the Business Employee List and any other such employee hired after the date hereof not in violation of any provision hereof.

"Business Employee List" has the meaning specified in Section 3.1 hereof.

"Business Interim Financial Statements" has the meaning specified in Section 5.10 hereof.

"Cash Collateral Order" means the Final Order (i) Authorizing Debtors' Use of Cash Collateral and (ii) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition

Secured Creditors, dated September 4, 2007, entered by the Bankruptcy Court in the Bankruptcy Cases.

"Cash Deposit" has the meaning specified in Section 4.3 hereof.

"Charter Documents" means, with respect to any Person, the certificate or articles of incorporation and by-laws, the certificate of limited partnership, the limited partnership agreement, the partnership agreement or the limited liability company operating agreement and certificate of formation or articles of organization or such other organizational documents of such Person.

"Claims" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy, including for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"COBRA" means the U.S. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or any similar State or Local Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Agent" means Bank of America, N.A. in its capacity as the collateral agent under the Existing BOA Bank Facility.

"Company" has the meaning set forth in the preamble.

"Competing Transaction" has the meaning specified in Section 7.1 hereof.

"Computer Equipment" means all equipment and devices (including data processing hardware and related telecommunications equipment, media, and tools) Related to the Business, including Sellers' rights under all related warranties, including all items listed in Schedule 1.1(g).

"Confidential Information" has the meaning specified in Section 6.5(b) hereof.

"Confidentiality Agreement" has the meaning specified in Section 9.2 hereof.

"Consent" means any consent, approval, license, waiver or authorization.

"Contracts" means all agreements, contracts, leases and subleases, purchase orders, arrangements, commitments and licenses.

"Copyrights" has the meaning set forth in the definition of "Intellectual Property."

"Cure Amount" means collectively the Initial Cure Amount, the Interim Cure Amount and Purchaser's Cure Amount.

"Cure Escrow Agreement" means an escrow agreement by and among Purchaser, Sellers and an escrow agent reasonably agreeable to each of Purchaser and Sellers to be entered into at the Initial Closing, in substantially the form set forth in Exhibit A hereto.

"Defaulted Mortgage Loan" means a Mortgage Loan that is 60 days or more delinquent in accordance with the OTS method of calculating delinquencies.

"Deposit Escrow Agent" means a bank or other financial institution selected by Purchaser and reasonably acceptable to the Company.

"Deposit Escrow Agreement" means a deposit escrow agreement by and among Purchaser, Sellers and the Deposit Escrow Agent, as escrow agent, in substantially the form set forth in Exhibit B hereto.

"DIP Financing Agreement" means the Debtor-In-Possession Loan and Security Agreement, dated August 6, 2007, among Parent, as debtor and debtor-in-possession, certain Affiliates, as debtors and debtors-in-possession, the lenders party thereto and WLR, as Administrative Agent, as such may be amended from time to time.

"Disclosure Schedules" means the disclosure schedules delivered by Sellers to Purchaser in connection with this Agreement.

"Dispute Amount" has the meaning set forth in Section 4.4.

"Dispute Escrow Agent" means the escrow agent party to the Dispute Escrow Agreement.

"Dispute Escrow Agreement" means an escrow agreement by and among Purchaser, Sellers and an escrow agent reasonably agreeable to each of Purchaser and Sellers to be entered into at the Initial Closing, in substantially the form set forth in Exhibit C hereto.

"Disputed Servicing Agreement" means a Servicing Agreement described in and set forth on Schedule 1.1(k) .

"Enforceability Exceptions" has the meaning specified in Section 5.1 hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business, whether or not incorporated, (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any Seller or (ii) which together with any Seller would be deemed a "single employer" within the meaning of Section 414 of the Code.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning specified in Section 2.2 hereof.

"Excluded Contracts" has the meaning specified in Section 6.15 hereof.

"Existing BOA Bank Facility" means the Second Amended and Restated Credit Agreement, dated August 10, 2006, among Sellers, certain of their Affiliates, Bank of America, N.A., as administrative agent, and certain other parties, as amended.

"Expense Reimbursement" means a reimbursement to Purchaser not to exceed $2.0 million of Purchaser's actual reasonable documented out-of-pocket expenses incurred in connection with the transactions contemplated by this Agreement, including professional fees.

"Fannie Mae Stipulation Order" means that certain Order Granting Debtors' Motion Pursuant to Section 105(A) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving and Authorizing Compromise and Settlement Agreement with Fannie Mae granted by the Bankruptcy Court on September 4, 2007, as amended or supplemented.

"Filing Subsidiaries" means Parent and the Company and the Affiliates of the Company set forth on Schedule 1.1(f).

"Final Closing" has the meaning specified in Section 2.7 hereof.

"Final Closing Date" has the meaning specified in Section 2.7 hereof.

"Final Order" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing has been filed or sought or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided, that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"Financing" has the meaning specified in Section 6.14.

"Fixtures and Equipment" means all furniture, fixtures, furnishings, vehicles, equipment, leasehold improvements, Computer Equipment, tools and other tangible personal property Related to the Business, wherever located, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person.

"FNMA" means the Federal National Mortgage Association and any successor agency.

"FNMA Servicing Rights" has the meaning specified in Section 6.18 hereof.

"GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

"Government Entity" means any foreign, federal, state or local court, administrative body or other governmental or quasi-governmental entity with competent jurisdiction, or any agency, instrumentality or authority thereof, including the FNMA and the Federal Trade Commission.

"Government Requirements" has the meaning specified in Section 5.3 hereof.

"Governmental Authorizations" means all licenses, permits, certificates and other authorizations and approvals Related to the Business or relating to the Purchased Assets, the Assumed Liabilities or the Assumed Contracts and issued by or obtained from a Government Entity.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"Independent Accounting Firm" has the meaning specified in Section 4.2 hereof.

"Initial Closing" has the meaning specified in Section 2.7 hereof.

"Initial Closing Date" means the date upon which the Initial Closing occurs.

"Initial Closing Date Mortgage Loan Schedule" has the meaning specified in Section 5.6(a) hereof.

"Initial Closing Date Report" has the meaning specified in Section 4.1(b) hereof.

"Initial Closing Servicing Balance" means an amount equal to the unpaid principal balance of the Mortgage Loans under the Servicing Agreements as of the close of business on the day prior to the Initial Closing Date, after application of all payments received on or prior to such date.

"Initial Cure Amount" means the maximum amount payable or that may be payable by Sellers in order to cure all defaults on Assumed Contracts as of the date the Sale Approval Order is entered by the Bankruptcy Court and effectuate the assumption by Sellers of an Assumed Contract and the assignment to Purchaser (or Purchaser's designee) pursuant to Section 365 of the Bankruptcy Code (a) as provided in the Sale Approval Order or other Order of the Bankruptcy Court, entered at or prior to the Sale Hearing or (b) pursuant to a written agreement among the parties to the Assumed Contract (subject, in the case of Sellers, to the prior written consent of the Administrative Agent and prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases) and Purchaser (or such designee) that is in effect prior to the date on which the Sale Approval Order is entered by the Bankruptcy Court.

"Intellectual Property" means (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, together with the goodwill associated with any of the foregoing, all applications and registrations for the foregoing, including all renewals of same (collectively, "Trademarks"); (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including

renewals, extensions and reissues (collectively, "Patents"); (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "Trade Secrets"); (iv) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of information), including mask rights, copyrights therein and thereto, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); and (v) any other intellectual property or proprietary rights.

"Interim Cure Amount" means the maximum amount, other than the Initial Cure Amount, payable or that may be payable by Sellers in order to cure all defaults on Assumed Contracts as of the Initial Closing Date and effectuate the assumption by Sellers of an Assumed Contract and the assignment to Purchaser (or Purchaser's designee) pursuant to Section 365 of the Bankruptcy Code.

"IRS" means the Internal Revenue Service.

"IT Assets" means Technical Documentation, Software Contracts and Computer Equipment, in each case Related to the Business.

"Knowledge of Sellers" concerning a particular subject, area or aspect of the Business or the affairs of Seller, means the actual (and not constructive or imputed) knowledge of any individual listed on Schedule 1.1(a) after making a reasonable inquiry as to the accuracy of the representation and warranty in question.

"Law" means any law, statute, ordinance, rule, regulation, code, Order, judgment, writ, injunction or decree enacted, issued, promulgated, enforced, or entered by a Government Entity.

"Lease" means each lease or other Contract pursuant to which a Seller leases any Real Property or personal property, either as lessor or lessee, and all ancillary documents relating thereto.

"Leased Real Property" means all Real Property, including leasehold improvements, that are the subject of the Assigned Leases, as set forth on Schedule 1.1(d).

"Liabilities" means any and all claims, debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any contract or tort based on negligence or strict liability) and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto, including all costs and expenses relating thereto.

"Lien" means, as applied to any Person, any lien, charge, claim, pledge, conditional sale agreement or other title retention agreement, lease, mortgage, deed of trust, right of first refusal, security interest, option, proxy, voting trust or agreement, transfer restriction or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Loss" or "Losses" means any and all losses, Liabilities, costs, claims, damages, penalties and expenses (including reasonable attorneys' fees and expenses and costs of investigation, enforcement and litigation).

"Material Adverse Effect" means any result, occurrence, change, effect, event or circumstance, that, individually or in the aggregate, has had or would reasonably be expected to have, a material adverse effect or change in the Purchased Assets, the Assumed Liabilities, the Assumed Contracts and the Business taken as a whole or the ability of Sellers to perform their obligations under this Agreement, except for any result, occurrence, change, effect, event, or circumstance relating to (i) the economy or the financial markets in general, except to the extent specifically related to or disproportionately impacting Sellers, the Purchased Assets, the Assumed Liabilities, the Assumed Contracts or the Business, (ii) the industry in which the Business operates in general and not specifically relating to the Business, except to the extent disproportionately impacting Sellers, the Purchased Assets, the Assumed Liabilities, the Assumed Contracts or the Business, (iii) the announcement of this Agreement or the transaction contemplated hereby or the identity of Purchaser, (iv) changes in applicable Laws after the date hereof, (v) the fact that Sellers will be operating as debtors-in-possession under the Bankruptcy Code, (vi) changes in GAAP or regulatory accounting principles after the date hereof, or (vii) changes in the value of the Mortgage Loans or the Servicing Rights.

"Mortgage Loan Documents" means, for each Mortgage Loan, all documents pertaining to such Mortgage Loan, including the Mortgage Note, the mortgage or deed of trust and all assignments of the mortgage or deed of trust, all endorsements and allonges to the Mortgage Note, the title insurance policy with all endorsements thereto, any security agreement and financing statements, any account agreements, and any assignments, assumptions, modifications, continuations or amendments to any of the foregoing.

"Mortgage Loan Schedule" has the meaning specified in Section 5.6(a) hereof.

"Mortgage Loans" means any residential mortgage loan or other extension of credit secured by a Lien on real property of a borrower.

"Mortgage Note" means, with respect to a Mortgage Loan, a promissory note or notes, or other evidence of indebtedness, with respect to such Mortgage Loan secured by a mortgage or mortgages, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Mortgaged Property" means a fee simple property (or such other estate in real property as is commonly accepted as collateral for Mortgage Loans that are subject to secondary mortgage sales or securitizations) that secures a Mortgage Note and that is subject to a mortgage.

"Necessary Consent" has the meaning specified in Section 2.4 hereof.

"Net Proceeds" has the meaning specified in Section 4.1(a) hereof.

"New Financing Liens" means Liens on the Purchased Assets in respect of the Financing.

"Non-Governmental Authorizations" means all licenses, permits, certificates and other authorizations and approvals other than Governmental Authorizations that are (i) held by Sellers or any of their Affiliates and (ii) Related to the Business.

"Order" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Government Entity affecting such Person or any of its properties or assets.

"Ordinary Course of Business" means (i) with respect to the period prior to the Initial Closing Date, the ordinary course of business of the Business, consistent with the customs and practices of Sellers and their Affiliates from and after the Petition Date and (ii) with respect to the period following the Initial Closing Date, the ordinary course of business of the Business, consistent with the customs and practices of Sellers and their Affiliates from and after the Petition Date and consistent with the Budget.

"Parent" has the meaning specified in the preamble.

"Permits" has the meaning set forth in Section 5.7 hereof.

"Permitted Lien" means (i) Liens arising under the terms of an Assumed Contract and (ii) Liens arising on the Purchased Assets after the Initial Closing Date that are not the result of a breach by any Seller of this Agreement.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"Petitions" has the meaning specified in the Recitals.

"Petition Date" has the meaning specified in the Recitals.

"Plan" means each "employee benefit plan" as defined in Section 3(3) of ERISA, each deferred compensation and each bonus, retention, salary continuation, incentive compensation, stock purchase, stock option, restricted stock, phantom stock and other equity compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, consulting, retention, change in control, termination or severance agreement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Sellers or by any ERISA Affiliate, or to which Sellers or an ERISA Affiliate is party, whether written or oral, qualified or non-qualified, funded or unfunded, foreign or domestic, currently effective or terminated for the benefit of any present or former director, employee, consultant, or independent contractors of Sellers or any ERISA Affiliate, or with respect to which Sellers or any ERISA Affiliate has any Liability, and all insurance policies, fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrow, surety bonds, letter of credit and other contracts primarily relating (but solely to the extent relating) to any of the foregoing.

"Privileged Documents" has the meaning specified in Section 2.3 hereof.

"Proximate Cause Party" has the meaning specified in Section 9.1(b)(i) hereof.

"Purchaser's Cure Amount" means the amount, other than the Initial Cure Amount and the Interim Cure Amount, payable in order to cure all defaults on Assumed Contracts and effectuate the assumption by Sellers of an Assumed Contract and the assignment to Purchaser (or Purchaser's designee) pursuant to Section 365 of the Bankruptcy Code (a) as provided in an Order of the Bankruptcy Court, or (b) pursuant to a written agreement among the parties to the Assumed Contract and Purchaser (or such designee) entered into after the Initial Closing Date.

"Purchase Price" has the meaning specified in Section 4.1(a) hereof.

"Purchased Assets" has the meaning specified in Section 2.1 hereof.

"Purchaser" has the meaning specified in the preamble.

"Purchaser Subservicing Agreement" means a servicing agreement to be executed on behalf of each of Sellers and Purchaser, in form and substance reasonably satisfactory to Sellers and Purchaser, under which Purchaser will, after the Final Closing, serve as a subservicer for certain Mortgage Loans and with respect to any Disputed Servicing Agreements that, upon the Final Closing, are treated as Excluded Assets in accordance with Section 4.4.

"Real Property" means all real property that is leased, licensed to, used, occupied or owned by Sellers Related to the Business or that is reflected as an asset of the Company on the Balance Sheet and used in connection with the Business.

"Real Property Leases" means the leases pursuant to which a Seller occupies the Leased Real Property, including the leases described in Schedule 1.1(b).

"Reconciliation Calculation" has the meaning set forth in Section 6.2.

"Reconciliation Payment" has the meaning set forth in Section 6.2.

"Reconciliation Payment Report" has the meaning set forth in Section 6.2.

"Reconciliation Period" has the meaning set forth in Section 6.2.

"Reconciliation Report" has the meaning set forth in Section 6.2.

"Related to the Business" means primarily used or held primarily for use in connection with the Business as conducted by Sellers and their Affiliates.

"REO Property" means a Mortgaged Property acquired by a Seller through foreclosure, acceptance of a deed in lieu of foreclosure or otherwise in connection with the default or imminent default of a Mortgage Loan.

"Representatives" means, with respect to any Person, the directors, officers, employees, accountants, agents, counsel, insurance brokers, insurance companies, lenders and other financing sources and other representatives of such Person.

"Requested Party" has the meaning specified in Section 6.3(b) hereof.

"Requesting Party" has the meaning specified in Section 6.3(b) hereof.

"Retained Liabilities" means any and all Claims and Liabilities of any kind or nature whatsoever of a Seller or any of its Affiliates or affecting any of the Purchased Assets (other than the Assumed Liabilities), including any Claims and Liabilities (i) arising from any early payment default claims with respect to any Mortgage Loans, loan repurchase obligations or premium recapture obligations or from any deficiency with respect to any existing loan facilities of Sellers or relating to obligations as an originator, (ii) except as otherwise provided in Section 3.2, relating to any and all Plans, (iii) relating to any Disputed Servicing Contract, unless specifically assumed by Purchaser hereunder, (iv) relating to any action, event, circumstance or condition occurring or existing on or prior to the Initial Closing Date, including (a) arising, with respect to employees whose employment is terminated at or before the Initial Closing, under WARN, COBRA or any other similar Law, (b) for any employee severance relating to the employment or termination of employment by Sellers of any employees of Sellers prior to the Initial Closing and (c) resulting from any and all lawsuits or governmental examinations, audits or investigations commenced and claims made or pertaining to the period prior to the Initial Closing Date, (v) for the Initial Cure Amount and the Interim Cure Amount or (vi) that are Liabilities of Sellers under this Agreement.

"Revised Sale Procedures" means the Revised Sale Procedures substantially in the form set forth in Exhibit D.

"Revised Sale Procedures Order" means an Order of the Bankruptcy Court, substantially in the form set forth in Exhibit D that, among other things, approves the Revised Sale Procedures, designates Purchaser as a "stalking horse bidder," and authorizes Sellers to pay the Break-Up Fee and Expense Reimbursement in accordance with this Agreement and the Revised Sale Procedures.

"Sale Approval Order" means a Final Order or Final Orders of the Bankruptcy Court issued pursuant to Sections 105, 363, 364 and 365 of the Bankruptcy Code, in substantially the form set forth in Exhibit E hereto, that among other things, (i) authorizes and approves (a) the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities to Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Liens (other than Permitted Liens), "claims" (as such term is defined in the Bankruptcy Code) and interests, (b) the assumption and assignment of the Assumed Contracts and Assumed Liabilities in connection therewith and as a part thereof and (c) approves the granting of liens and administrative superpriority claims contemplated by Section 6.14; (ii) finds that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) finds that this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) states the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement,

or any breach hereof as provided in <u>Section 11.11</u> hereof; (v) orders that this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Sellers or any chapter 7 or chapter 11 trustee of Sellers; and (vi) provides that such Sale Approval Order may only be modified upon notice and pursuant to a further Order of the Bankruptcy Court, provided that if such modification is adverse to Purchaser, such modification shall be subject to the approval of Purchaser, in its sole discretion.

"<u>Sale Hearing</u>" has the meaning specified in the Revised Sale Procedures Order.

"<u>Sale Motion</u>" means the motion filed by Parent with the Bankruptcy Court for the approval of the Revised Sale Procedures Order and the Sale Approval Order, in form and substance reasonably satisfactory to Purchaser.

"<u>Sellers</u>" has the meaning specified in the preamble.

"<u>Servicing Agreements</u>" means the servicing agreements, pooling and servicing agreements, subservicing agreements, master servicing agreements, interim servicing agreements and related agreements Related to the Business which are contained in the agreements identified on <u>Schedule 1.1(j)</u>, other than (i) any such agreements for the FNMA Servicing Rights if the FNMA Servicing Rights, pursuant to <u>Section 6.18</u>, are to be Excluded Assets and (ii) any such agreements for the Servicing Rights Held for Sale.

"<u>Servicing Fees</u>" means the sum of (i) the servicing fees (excluding any Ancillary Income) paid to a Seller as set forth in a Servicing Agreement and (ii) any Ancillary Income.

"<u>Servicing File</u>" means, for each Mortgage Loan, copies of the Mortgage Loan Documents and all other documents, files and other items related thereto required to be maintained by the servicer pursuant to the applicable Servicing Agreement, and, if not specifically set forth in the applicable Servicing Agreement, pursuant to the applicable servicing standard.

"<u>Servicing Rights</u>" means all right, title and interest of Sellers in and to: (i) the right to service the Mortgage Loans under the Servicing Agreements, including the right to receive the Servicing Fees and Ancillary Income; (ii) the related master servicing and/or servicing obligations as specified in each Servicing Agreement, including the obligations to administer and collect the payments of or relating to the Mortgage Loans, and to remit all amounts and provide information reporting to others in accordance with the Servicing Agreements; (iii) the right of ownership, possession, control or use of any and all Servicing Files and Mortgage Loan Documents pertaining to the servicing of the Mortgage Loans as provided in the Servicing Agreements; (iv) the rights with respect to, and obligations to make, any advances required pursuant to any Servicing Agreement, including obligations to reimburse funds borrowed from any custodial or other accounts under a Servicing Agreement; (v) the "clean-up call" right, if any, to purchase the related Mortgage Loans upon the aggregate principal balance thereof being reduced below a specified amount to the extent provided for in the Servicing Agreement; and (vi) all other rights, powers and privileges of Sellers as the master servicer, servicer or subservicer under the Servicing Agreements as expressly set forth therein or as deemed at Law; <u>provided</u>, that all indemnification rights and obligations of Sellers with respect to acts occurring

prior to the Initial Closing Date shall not be transferred to Purchaser (other than the Purchased Assets and Assumed Liabilities).

"Servicing Rights Held for Sale" has the meaning specified in Section 6.1(a) hereof.

"Software Contracts" means all Contracts, agreements, licenses, and other commitments and arrangements with any Person respecting the ownership, license, acquisition, design, development, distribution, marketing, development, use, outsourcing or maintenance of computer program code, related technical or user documentation, and databases, in each case Related to the Business, other than such of the foregoing as are identified in the Excluded Assets, including the items set forth on Schedule 1.1(h) as (i) licenses from third parties (development and/or marketing); (ii) licenses from third parties (internal use only); (iii) development contracts, work-for-hire agreements, information technology outsourcing agreements, and consulting and employment agreements; (iv) licenses and sublicenses to others; and (v) maintenance, support, or enhancement agreements.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (i) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person and/or by any one or more of its Subsidiaries, or (ii) such Person or any other Subsidiary of such Person is a general partner.

"Tax" or "Taxes" means all taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, sales, gain, use, ad valorem, inventory, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns and any successor, transferee or secondary Liability in respect of taxes, including, in each case, any interest, penalty, fines or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, estimate or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto, and including any amendment thereof.

"Technical Documentation" means all technical and descriptive materials relating to the acquisition, design, development, use, or maintenance of computer code, program documentation, Computer Equipment and materials Related to the Business.

"Termination Date" has the meaning specified in Section 9.1 hereof.

"Trade Secrets" has the meaning specified in the "Intellectual Property" definition.

"Trademark Assignments" means the trademark assignments to be executed by Sellers in favor of Purchaser in respect of the Trademarks in a form suitable for recording in the U.S. trademark office, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Trademarks" has the meaning specified in the "Intellectual Property" definition.

"Transfer Taxes" means any federal, state, county, local, foreign and other sales, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Transferred Employee" has the meaning specified in Section 3.1(b) hereof.

"Transferred Intellectual Property" means all the Intellectual Property Related to the Business owned by, or licensed to, Sellers or their Affiliates, including all invoices, shipping documents, purchase orders and other preprinted business forms that have any Trademark thereon, used in connection with the Business, including those set forth on Schedule 1.1(i).

"Transition Services Agreement" means the transition services agreement to be entered into by and between Purchaser, Parent and the Company as set forth in Exhibit F.

"VA" means the Department of Veteran Affairs and any successor thereto.

"WARN" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended or any similar state or local (including, for the avoidance of doubt, the California Worker Adjustment and Retraining Notification Act, as amended).

"WLR" means WLR Recovery Fund III, L.P.


Section 1.2    Interpretation.  When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)    Whenever the words "include" "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g)    Any reference in this Agreement to $ shall mean U.S. dollars.

(h)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth herein, on the Final Closing Date, Sellers shall sell, convey, transfer, assign and deliver to Purchaser (or to one or more designees of Purchaser), and Purchaser shall purchase (or cause such designee or designees to purchase) from Sellers, free and clear of all Claims and Liens, other than Permitted Liens and New Financing Liens, all of the right, title and interest of all Sellers and their Affiliates as of the Final Closing Date in and to all assets and properties Related to the Business, whether tangible or intangible, real, personal or mixed (collectively, the "Purchased Assets") and including:

(a)    all of Sellers' Servicing Rights and rights to receive Servicing Fees;

(b)    subject to Section 6.15, all rights and benefits under (i) Contracts set forth in Schedule 2.1(b)(i), (ii) Real Property Leases, (iii) Software Contracts, (iv) the Assigned Leases, (v) Servicing Agreements (subject to Section 4.4), and (vi) Contracts Related to the Business entered into or made by any Seller in the Ordinary Course of Business after the date hereof, before the Final Closing Date and in accordance with the covenants herein; provided, that except as set forth in Schedule 2.1(b)(ii), in the case of any such Contract referred to in this clause (b), Sellers shall have furnished Purchaser a true, correct and complete copy of such Contract (collectively, the "Assumed Contracts");

(c)    all Transferred Intellectual Property;

(d)     all Books and Records that are not Excluded Assets;

(e)     all Fixtures and Equipment;

(f)     all IT Assets;

(g)     the Leased Real Property, including all easements and other rights and interests appurtenant thereto;

(h)     subject to Section 6.17, the right to be reimbursed for Advances;

(i)     all credits, prepaid expenses, deferred charges, security deposits, prepaid items and duties to the extent primarily related to a Servicing Agreement, an Assumed Liability, an Assumed Contract or a Purchased Asset;

(j)     all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims of any nature available to or being pursued by Sellers or any of their Affiliates (A) to the extent related to the Purchased Assets within subsections (a) through (i) and (k) through (n) of this Section 2.1 and arising or accruing from and after the Initial Closing or (B) except as set forth in Section 2.2(c)(ii), to the extent related to the Assumed Liabilities or Assumed Contracts, whether arising by way of counterclaim or otherwise ("Assumed Rights and Claims");

(k)     to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of Sellers or any of their Affiliates to the extent related to any Servicing Agreement, any Purchased Asset within subsections (a) through (j) and (l) through (n) of this Section 2.1 or any Assumed Liability or Assumed Contract;

(l)     to the extent transferable, all Permits held by Sellers necessary for the operation or ownership of the Business or any of the Purchased Assets within subsections (a) through (k) of this Section 2.1 and Governmental Authorizations, and all Non-Governmental Authorizations, including those listed on Schedule 2.1(l);

(m)     to the extent transferable, (i) all rights under insurance policies and insurance proceeds directly relating to Mortgage Loans serviced pursuant to any Servicing Agreements (other than Disputed Servicing Agreements unless specifically assumed by Purchaser hereunder), and (ii) subject to Section 2.2(a), all bank accounts (other than bank accounts maintained by the Collateral Agent and the Administrative Agent), other accounts, safe deposit boxes, lock boxes and safes Related to the Business, including accounts associated with the Liabilities set forth on Schedule 1.1(c) and all cash and cash equivalents held in or required to be held in such accounts; and

(n)     all goodwill and other intangible assets associated with the Business, (including the rights in and to the name "American Home Mortgage Servicing" and similar names thereto and the goodwill associated with the Transferred Intellectual Property and all properties, rights and assets acquired by Sellers in connection with the operation of the Business between the Initial Closing and the Final Closing).

Section 2.2    Excluded Assets. Notwithstanding anything herein to the contrary, Sellers shall retain all of their existing right, title and interest in and to any and all assets that are not Purchased Assets, and there shall be excluded from the sale, conveyance, assignment or transfer to Purchaser or any designee of the Purchaser hereunder, and the Purchased Assets shall not include, the following assets whether tangible or intangible, real, personal or mixed (collectively, the "Excluded Assets"):

(a)    all cash and cash equivalents (including all cash and cash equivalents on deposit in bank accounts maintained by the Collateral Agent and Administrative Agent and cash that was received by the Sellers on or prior to the Initial Closing Date that is or was required to be deposited into accounts maintained by the Collateral Agent and the Administrative Agent pursuant to the Cash Collateral Order (the "Administrative Agent Cash Proceeds"), but excluding (i) cash flows under any Servicing Agreements or any net cash flow generated by operation of the Business on or after the Initial Closing Date, (ii) any collections of Advances included in the Advances Amount after the Advances Amount Determination Time (which, notwithstanding any provision hereof, will constitute Purchased Assets) and (iii) accounts associated with the Liabilities set forth on Schedule 1.1(c) and all cash and cash equivalents held in or required to be held in such accounts;

(b)    all Tax Returns of Sellers or any of their Affiliates and all Books and Records (including working papers) related thereto, (other than any such Tax documents primarily related to the Purchased Assets, Assumed Liabilities or Assumed Contracts), and any Books and Records which Seller is required by Law to retain, provided that Seller shall, upon the request of Purchaser, provide Purchaser with copies of such Books and Records which Sellers are required by Law to retain;

(c)    all (i) causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims of any nature other than the Assumed Rights and Claims and (ii) any and all defenses and counterclaims relating acts or omissions under the Assumed Contracts that occurred prior to the Initial Closing;

(d)    all rights or Liabilities in connection with and assets of the Plans;

(e)    any rights, demands, claims, actions and causes of action constituting avoidance actions of Sellers' estate under Chapter 5 of the Bankruptcy Code, and any other applicable provisions of the Bankruptcy Code, including any and all proceeds of the foregoing;

(f)    all of Sellers' rights, demands, Claims and causes of action arising with respect to the assertion or defense of claims against the Filing Subsidiaries under Section 502 and 503 of the Bankruptcy Code and Rule 3007 thereunder;

(g)    any of the rights of Sellers under this Agreement (or any agreements between either Seller, on the one hand, and Purchaser or any of its Affiliates, on the other hand, entered into on or after the date of this Agreement);

(h)    other than those described in Section 2.1(m), all insurance proceeds that Sellers or any of their Affiliates have a right to receive as of the Initial Closing or that relate to

events, circumstances or occurrences prior to the Initial Closing (which for the avoidance of doubt shall include the proceeds of Parent's directors and officers insurance policy);

       (i)      other than those described in <u>Section 2.1(m)</u>, all insurance policies;

       (j)      Tax refunds;

       (k)      the Purchase Price;

       (l)      all Privileged Documents;

       (m)      the Real Property located in Melville, New York, that is the headquarters facility for Parent;

       (n)      the assets listed on <u>Schedule 2.2(n)</u>;

       (o)      any Excluded Contracts;

       (p)      any Disputed Servicing Agreements designated as Excluded Assets pursuant to <u>Section 4.4</u> and any Servicing Rights Held for Sale; and

       (q)      all rights, claims and causes of action relating to any Excluded Asset within <u>subsections (a)</u> through <u>(p)</u> of this <u>Section 2.2</u> or any Retained Liability.

       Section 2.3    <u>Post-Final Closing Date Asset Deliveries</u>.  If any Seller, in its reasonable discretion, determines after the Final Closing Date that books, records or other materials constituting Purchased Assets are still in the possession of such Seller or any of its Affiliates, such Seller shall, or shall cause such Affiliates to, promptly deliver them to the Purchaser. If any Seller or Purchaser, in its reasonable discretion, determines after the Final Closing Date that books, records or other materials constituting Excluded Assets were delivered to Purchaser, Purchaser shall promptly return them to the applicable Seller. In furtherance and not in limitation of the foregoing (and notwithstanding any provision in this Agreement to the contrary), each of Sellers and Purchaser acknowledges and agrees that it is neither Sellers' nor Purchaser's intention to sell, assign or transfer possession of any documents or communications of Sellers that are subject to Sellers' attorney-client privilege and/or the work-product immunity doctrine (except to the extent such documents or communications are related to Purchaser's continued conduct of the Business) (the "<u>Privileged Documents</u>").  In the event it is discovered that any such Privileged Documents have been inadvertently or unintentionally turned over to Purchaser, Purchaser agrees, upon Sellers' request, to promptly turn over to Sellers or destroy such Privileged Documents, in each case at Sellers' sole cost and expense; <u>provided</u>, that (a) Purchaser shall in no way be obligated or responsible for reviewing, identifying or making a determination that any documents or communications in its possession are Privileged Documents and (b) Purchaser shall not be obligated to take any actions under this <u>Section 2.3</u> that may subject it to any liability or otherwise be in violation with any applicable Law.

Section 2.4    Non-Assignment of Assets.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder unless the Bankruptcy Court has entered a Final Order (which may include the Sale Approval Order) whose effectiveness has not been stayed providing that such Necessary Consent is not required.    If the Bankruptcy Court has not entered such an Order, Sellers and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request.    If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Purchaser would not in fact receive all such rights, such Seller and Purchaser will cooperate in a mutually agreeable arrangement under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including, to the extent that such an arrangement would be permitted by Law and the related Contract, subcontracting, sub-licensing, or sub-leasing to Purchaser, or under which such Seller would enforce for the benefit of Purchaser, with Purchaser assuming such Seller's obligations, any and all rights of such Seller against a third party thereto.

Section 2.5    Assumption of Certain Liabilities.    On the terms and subject to the conditions set forth herein and as additional consideration for the Purchased Assets, at the Final Closing, Purchaser shall assume and discharge or perform when due in accordance with their respective terms and subject to the respective conditions thereof, the Assumed Liabilities.    Other than the Assumed Liabilities, Purchaser shall not assume any Liability of any nature or kind whatsoever of Sellers.

Section 2.6    Retained Liabilities.    Sellers shall retain and be liable and responsible for all Retained Liabilities.

Section 2.7    Initial Closing; Final Closing.

(a)    Subject to the terms and conditions of this Agreement, the initial closing (the "Initial Closing") of the transactions contemplated hereby shall take place at such location as the parties hereto shall mutually agree on the second Business Day following the date on which the conditions set forth in Sections 8.1 through 8.3 (other than those conditions that by their nature can be satisfied only at the Initial Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived or at such other time and place as the parties hereto may mutually agree.    Purchaser's obligation to close on the second Business Day following the date on which the conditions set forth in Sections 8.1 through 8.3 have been satisfied (other than those conditions that by their nature can be satisfied only at the Initial Closing but subject to the fulfillment or waiver of those conditions) shall not be subject to the cure period set forth in Section 9.1(d)(ii). At the Initial Closing, Purchaser shall deliver the Purchase Price in accordance

with <u>Section 4.1</u>. In consideration of payment of such Purchase Price on the Initial Closing Date, from the Initial Closing Date until the Final Closing Date, Sellers shall operate the Business in the Ordinary Course of Business, subject to the Bankruptcy Exceptions, for the economic benefit of Purchaser.  Sellers shall operate the Business in accordance with <u>Sections 6.1</u> and <u>6.2</u> and shall not take any actions inconsistent with such sections without the prior written consent of Purchaser.  For the avoidance of doubt, the Purchase Price shall be determined based on the Initial Closing Servicing Balance and the Advances Amount as finally determined from the Initial Closing Date Report and no adjustment shall be made to the Purchase Price in respect of changes to servicing balances or advances amounts during the period from the Initial Closing Date through the Final Closing Date.  On the Initial Closing Date, the appropriate parties shall take all actions required under <u>Sections 2.9(a)</u> and <u>2.10(a)</u> and all other actions not previously taken but required to be taken hereunder at or prior to the Initial Closing Date.

(b)    Subject to the terms and conditions of this Agreement, the final closing (the "<u>Final Closing</u>") and the transfer of title to the Purchased Assets, Assumed Liabilities and Assumed Contracts contemplated hereby shall take place at such location as the parties hereto shall mutually agree on the Business Day following the date on which the condition set forth in <u>Section 8.4(a)</u> has been satisfied or waived or at such other time and place as the parties hereto may mutually agree (such date, the "<u>Final Closing Date</u>").  On the Final Closing Date, the appropriate parties shall take all actions required under <u>Sections 2.8</u>, <u>2.9(b)</u> and <u>2.10(b)</u> and all other actions not previously taken but required to be taken hereunder at or prior to the Final Closing Date.  In the event that the condition set forth in <u>Section 8.4(a)</u> has not been satisfied or waived prior to September 30, 2008, Sellers shall either (i) effect the transfer of title to the Purchased Assets, Assumed Liabilities and Assumed Contracts to Purchaser on such date or (ii) at the direction and expense of Purchaser, within 60 days after September 30, 2008, sell, transfer and assign, subject to any required Bankruptcy Court approval, for such purchase price as Purchaser shall have negotiated, the Purchased Assets, Assumed Liabilities and Assumed Contracts to any third party or third parties designated by Purchaser on or before September 30, 2008, and deliver to Purchaser all proceeds of such sale, net of an amount equal to the value of any Assumed Liabilities not so transferred and any Losses that represent the incremental costs incurred by Sellers in connection with such sale that would not have otherwise been incurred with respect to a transfer to Purchaser.

(c)    Notwithstanding any other provision of this Agreement, Purchaser does not have the right to direct the management or policies of Sellers.  The right to direct the management and policies of Sellers is solely the responsibility of the respective executive officers and directors of each Seller.

Section 2.8    <u>Ancillary Agreements</u>.  On the Final Closing Date, Sellers shall duly execute and deliver to Purchaser, and Purchaser shall duly execute and deliver to Sellers, each of the following agreements to which they are to be a party (the "<u>Ancillary Agreements</u>"):

(a)    Trademark Assignments;

(b)    the Transition Services Agreement;

(c)     the Bills of Sale;

(d)     the Assignment and Assumption Agreement;

(e)     the Assignment and Assumption of Lease Agreements;

(f)     the Purchaser Subservicing Agreement; and

(g)     all instruments or documents necessary to change the names of the individuals who have access to or are authorized to make withdrawals from or dispositions of all bank accounts, other accounts, safe deposit boxes, lock boxes and safes Related to the Business or related to the Purchased Assets, all keys and combinations to all safe deposit boxes, lock boxes and safes Related to the Business and all keys related to the Purchased Assets.

Section 2.9     Deliveries by Purchaser.

(a)     At the Initial Closing, Purchaser shall deliver to Sellers the following:

(i)     the Purchase Price in accordance with Section 4.1;

(ii)     the duly executed Dispute Escrow Agreement and Cure Escrow Agreement; and

(iii)     the certificate to be delivered pursuant to Section 8.2(c).

(b)     On the Final Closing Date (and any earlier date after the Initial Closing Date on which Purchaser desires to have a Purchased Asset conveyed pursuant to this Agreement), Purchaser shall deliver to Sellers the following:

(i)     such instruments of assumption and other instruments or documents, in form and substance reasonably acceptable to Sellers, as may be necessary to effect Purchaser's assumption of the Assumed Liabilities and the effective assignment of any Assumed Contracts, Assigned Leases or other Purchased Assets; and

(ii)     such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Sellers, as may be required to give effect to this Agreement or any Ancillary Agreement.

Section 2.10     Deliveries by Sellers.

(a)     At the Initial Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

(i)     certified copies of (A) the Revised Sale Procedures Order and the Sale Approval Order, neither of which shall have been modified or amended in any manner adverse to Purchaser that has not been agreed to in writing by Purchaser and shall have become a Final Order and not be subject to any stay of effectiveness, and (B) all

other Orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements;

      (ii)     the duly executed Dispute Escrow Agreement;

      (iii)    the duly executed Cure Escrow Agreement;

      (iv)    the certificates to be delivered pursuant to Section 8.3(c);

      (v)     affidavits executed by each Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

      (vi)    a receipt acknowledging payment of the Purchase Price payable in accordance with Section 4.1.

      (b)    On the Final Closing Date (and any earlier date after the Initial Closing Date on which Purchaser desires to have a Purchased Asset conveyed pursuant to this Agreement), Sellers shall deliver, or cause to be delivered, to Purchaser the following:

      (i)     a master copy of each software program Related to the Business, which is a Purchased Asset (in both object code, and to the extent available, source code form);

      (ii)    such instruments of assumption and other instruments or documents, in form and substance reasonably acceptable to Purchaser, as may be necessary to effect Sellers' assignment of any Assumed Contracts, Assigned Leases or other Purchased Assets to Purchaser or its designee; and

      (iii)    such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement or any Ancillary Agreement.

      Section 2.11    "As Is Where Is" Transaction.  Purchaser hereby acknowledges and agrees that, notwithstanding anything to the contrary contained herein, except as expressly set forth in this Agreement, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets.  Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the Purchased Assets and all such other matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets, Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, except as expressly set forth in the Agreement, Purchaser will accept the Purchased Assets on the Final Closing Date "AS IS" and "WHERE IS".

## ARTICLE III
## TRANSFERRED EMPLOYEES

Section 3.1    Transferred Employees.  With respect to each Business Employee, Sellers have previously provided to Purchaser lists (the "Business Employee List"), setting forth, to the extent such information is permitted to be disclosed under applicable Law:  (i) each such person's title or job/position; (ii) each such person's job designation (*i.e.*, salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (*i.e.*, actively employed or not actively at work (due to, *e.g.*, illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's annual base rate of compensation and target bonus amount for the current fiscal year to which he or she is entitled and any such bonus amount which he or she has received prior to the date hereof; and (vi) if applicable, any material, individual specific provisions relating to such person's employment (*e.g.*, golden parachute, etc.).

(a)    Not later than 10 days prior to the Final Closing Date, Sellers will provide Purchaser with an updated Business Employee List.

(b)    Prior to the Final Closing Date, and effective as of the Final Closing Date, Purchaser shall offer employment to substantially all Business Employees identified on the Business Employee List (as updated in accordance with clause (a) of this Section 3.1).  Each such offer of employment shall comply with the requirements of this Section 3.1.  The new employment of each Business Employee who accepts Purchaser's offer of employment shall commence with effect from the later of the Final Closing Date or the date of acceptance.  Each Business Employee who accepts Purchaser's offer of employment and who becomes an employee of Purchaser as of the Final Closing Date shall be a "Transferred Employee."

(c)    Purchaser's offer of employment will be at a level of compensation and benefits that, in the aggregate, Purchaser determines in good faith is reasonably comparable to the compensation and benefits of such Person immediately prior to the Petition Date, without giving effect to any key employee retention plan and any compensation or bonus plan, agreement or arrangement designed to retain employees during the pendency of the Bankruptcy Cases.  Purchaser shall give service credit for pre-Final Closing Date service with Sellers for purposes of the eligibility and vesting (but not benefit accrual) provisions of the plans and programs in which such employees participate, and give appropriate credit for unused vacation time and co-pays and deductibles under welfare benefit plans.

Section 3.2    Employee Benefit Plans.    Sellers represent and warrant to Purchaser that Schedule 3.2 sets forth a true, complete and correct list of each Plan that covers any Business Employee and Sellers have made available to Purchaser true, complete and correct copies of each such Plan.  Purchaser and its Affiliates shall not assume any Plans or any Liabilities under or with respect to the Plans (except, in Purchaser's sole discretion, as to any permitted "rollover" accepted by the applicable plan of Purchaser or one of its Affiliates that is elected by a Transferred Employee under a Plan intended to be qualified under Section 401(a) of the Code).  Effective as of the Final Closing Date, Sellers shall cause each Business Employee to

be 100% fully vested in his benefits under each of the Plans intended to be qualified under Section 401(a) of the Code that provides for vesting.

Section 3.3    COBRA.  Sellers shall retain all obligations relating to compliance with the continuation health care coverage requirements of COBRA under the Plans with respect to all current and former Business Employees (and their dependents) for qualifying events occurring on or prior to the Initial Closing Date.  Subject to the other limitations of this Agreement, this Section 3.3 shall not, however, limit the ability of the Sellers to amend or terminate any Plan at any time.

Section 3.4    WARN.  Sellers agree to provide any required notice under and to otherwise retain all Liabilities relating to WARN, or any similar Laws, with respect to any event on or prior to the Initial Closing Date affecting Business Employees.

Section 3.5    Cooperation.  Sellers and Purchasers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article III.

Section 3.6    No Third Party Rights.  No provision of this Agreement confers rights or remedies upon any Person, including any Business Employee or any Transferred Employee, other than the parties hereto.

## ARTICLE IV
## PURCHASE PRICE; ADJUSTMENT; ALLOCATION

Section 4.1    Purchase Price.  (a) The aggregate consideration for the Purchased Assets (as adjusted pursuant to this Article IV, the "Purchase Price") shall, subject to the terms and conditions of this Article IV, equal the sum of (A) $6.0 million, (B) an amount equal to the "Initial Closing Servicing Balance Price" determined as set forth on Schedule 4.1(a) and (C) an amount equal to 92% of the Advances Amount.  The Purchase Price to be paid at the Initial Closing shall be based on the Initial Closing Servicing Balance and the Advances Amount as determined from the Initial Closing Date Report.  At the Initial Closing, Purchaser shall pay the Purchase Price as follows (and in the following order of priority) (i) an amount equal to the Dispute Amount to the Dispute Escrow Agent, (ii) an amount equal to the necessary direct costs of the Sellers incurred in connection with this Agreement which are reasonably acceptable to the Administrative Agent (it being agreed that the fees, costs, and expenses of Kroll Zolfo Cooper are not to be deducted and that such amount shall be reduced by any amounts that are disputed by the Administrative Agent in accordance with the Cash Collateral Order) as directed by Sellers, (iii) an aggregate amount equal to the Initial Cure Amount for each Assumed Contract, in cash by wire transfer of immediately available funds to be held pursuant to the Cure Escrow Agreement and (iv) the remaining Purchase Price (less any amounts delivered on behalf of Sellers in accordance with Section 4.3(a)) shall be paid by wire transfer of immediately available funds to an account or accounts designated by the Administrative Agent (pursuant to the Sale

Approval Order) in writing to the Purchaser, not less than two Business Days prior to the Initial Closing, on behalf of Sellers, to the Administrative Agent in accordance with the Cash Collateral Order (the amounts payable under clause (iv) hereinafter referred to as "Net Proceeds").

(b)     Sellers shall prepare the calculation, as of the close of business on the day preceding the Initial Closing Date (the "Initial Closing Date Report"), of (i) the outstanding stated principal balance of all Mortgage Loans under the Servicing Agreements in the Initial Closing Date Mortgage Loan Schedule (which shall include a subtotal of the outstanding principal balance of all Mortgage Loans under Disputed Servicing Agreements) and (ii) the Advances Amount. Sellers shall provide Purchaser with the Initial Closing Date Report not later than the Initial Closing. Within the 30-day period following the date of the Initial Closing Date, Purchaser shall have the right to dispute the amounts set forth in the Initial Closing Date Report as the Initial Closing Servicing Balance (and the subtotal of the outstanding principal balance of all Mortgage Loans under the Disputed Servicing Agreements) and the Advances Amounts and Sellers shall have the right to correct any manifest errors with respect to the amounts set forth in the Initial Closing Date Report as the Initial Closing Servicing Balance and the Advances Amount; provided, however, that Purchaser shall have 30 days after the correction of any manifest error by Sellers to dispute any such correction. If Purchaser does not dispute the Initial Closing Date Report within such 30-day period after delivery of the Initial Closing Date Report or, if applicable the 30-day period after Sellers' correction of any manifest error in the Initial Closing Date Report, such items shall be deemed final by Sellers and Purchaser, and the Purchase Price calculated pursuant to Section 4.1(a) and the Dispute Amount calculated pursuant to Section 4.4 shall be deemed final.

(c)     If Purchaser disputes the Initial Closing Date Report (or any item included therein) as set forth in Section 4.1(b) above, such dispute shall be resolved in the following manner:  (i) Purchaser shall notify Sellers of such dispute within 30 days after Purchaser's receipt of the Initial Closing Date Report, or, if applicable, within 30 days after Sellers' correction of any manifest error in the Initial Closing Date Report, which notice shall specify in reasonable detail the nature of the dispute; (ii) during the 15-day period following Sellers' receipt of such notice, Sellers and Purchaser shall use their commercially reasonable efforts to resolve such dispute in good faith; and (iii) if at the end of such 15-day period Sellers and Purchaser shall have failed to resolve such dispute in writing, Sellers and Purchaser shall submit the item(s) in dispute as promptly as practicable to a national accounting or consulting firm (the "Arbitrating Accountants") with experience in the mortgage loan servicing business and that is independent of Sellers and Purchaser and their respective Affiliates, to be selected by mutual agreement between Sellers and Purchaser. The Arbitrating Accountants shall act as an arbitrator and shall resolve the dispute as promptly as practicable after such dispute is referred to it.  Each of the parties hereto shall bear all costs and expenses incurred by it in connection with such arbitration, except that the cost of the Arbitrating Accountants hereunder shall be borne equally by Sellers and Purchaser.  This provision for arbitration shall be specifically enforceable by the parties hereto.  The decision of the Arbitrating Accountants in accordance with the provisions hereof shall be final and binding (absent manifest error), and there shall be no right of appeal therefrom. Upon the resolution of the disputes, the Purchase Price (and the Dispute Amount, if applicable) shall be recalculated based on the final Initial Closing Date Report as determined in accordance with this Section 4.1(c), and Purchaser shall pay by wire transfer of immediately available funds to an account or accounts designated by Sellers, on behalf of Sellers, to the Administrative Agent

any portion of the Purchase Price not already paid pursuant to <u>Section 4.1(a)</u> (other than any portion relating to the Disputed Servicing Agreements which shall be delivered to the Dispute Escrow Agent to be included in the Dispute Amount) or Sellers shall pay by wire transfer of immediately available funds to an account or accounts designated by Purchaser to Purchaser any overpayment of Purchase Price previously paid by Purchaser (other than any portion relating to the Disputed Servicing Agreements which shall be paid to Purchaser by the Dispute Escrow Agent from the Dispute Amount and Purchaser and Sellers shall jointly instruct the Dispute Escrow Agent to deliver such amount (together with any interest and earnings allocable thereto) to Purchaser), as the case may be.  Sellers shall keep the Administrative Agent and the official unsecured creditors committee in the Bankruptcy Cases reasonably informed of activities arising under this <u>Section 4.1(c)</u> and shall provide the Administrative Agent with copies of all correspondence and schedules delivered by the parties under this <u>Section 4.1</u>.  To the extent that any matter becomes the subject of an arbitration proceeding, Sellers shall provide the Administrative Agent with reasonable prior written notice of any written submissions and to the extent there are scheduled any formal or informal proceedings associated with such arbitration, the Administrative Agent shall be entitled to send one or more parties to such proceedings, solely to monitor the same.  Sellers shall obtain the Administrative Agent's prior written approval to settle or agree to return any overpayment amount or to agree to compromise any disputed overpayment amount.

Section 4.2    <u>Allocation of the Purchase Price</u>.  (a) The Purchase Price and the value of any Assumed Liabilities shall be allocated among the Business, the Purchased Assets and the agreements provided herein for transfer of the Business to Purchaser in a manner consistent with an allocation schedule (the "<u>Allocation Schedule</u>"), which Allocation Schedule shall be mutually agreed upon by Purchaser and Sellers prior to the Initial Closing Date to the extent reasonably possible, in compliance with Section 1060 of the Code and the regulations promulgated thereunder.  If the Allocation Schedule is not mutually agreed upon within such period, the parties shall submit such dispute to a nationally recognized independent accounting firm mutually chosen by the parties (the "<u>Independent Accounting Firm</u>") for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable forms with the IRS and other Tax authorities.  The Independent Accounting Firm's review shall be final and binding on all parties.  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers, on the one hand, and 50% by Purchaser, on the other hand.

(b)    Each of Sellers and Purchaser shall (i) timely file any forms (including IRS Form 8594) and Tax Returns required to be filed in connection with the Allocation Schedule, (ii) be bound by such allocation for purposes of determining Taxes, (iii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation and (iv) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return.  Each of Purchaser, on the one hand, and Sellers, on the other hand, will provide the other with copies of IRS Form 8594 and any required exhibits thereto, consistent with the allocation determined pursuant to this <u>Section 4.2</u> upon request.  In the event that the allocation set forth on the Allocation Schedule is disputed by any taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

Section 4.3    Deposit.    Upon execution of this Agreement, Purchaser will execute and deliver to Sellers and the Deposit Escrow Agent the Deposit Escrow Agreement and, upon execution and delivery thereof by each of the other parties thereto, Purchaser will simultaneously deliver to the Deposit Escrow Agent, pursuant to the terms of the Deposit Escrow Agreement, $15,000,000 in immediately available funds (the "Cash Deposit"). Any Cash Deposit shall be held by the Deposit Escrow Agent in an interest bearing account reasonably acceptable to Purchaser and Sellers. The Cash Deposit shall be held by the Deposit Escrow Agent to serve as an earnest money deposit under this Agreement to be released as follows:

(a)    Effect of Closing.    If the Initial Closing shall occur, Sellers and Purchaser shall jointly instruct the Deposit Escrow Agent to, on the Initial Closing Date, deliver the Cash Deposit, together with all accrued investment income thereon, by wire transfer of immediately available funds, on behalf of Sellers, to the Administrative Agent (and such amounts shall be applied toward the payment of the Purchase Price) in accordance with the terms of the Deposit Escrow Agreement.

(b)    Effect of Termination.    If this Agreement is validly terminated prior to the Initial Closing Date, the Deposit Escrow Agent shall deliver the Cash Deposit in accordance with the terms of the Deposit Escrow Agreement. If pursuant to this Agreement and the Deposit Escrow Agreement the Cash Deposit is delivered to, or becomes deliverable to, anyone other than Purchaser the Cash Deposit will constitute liquidated damages and shall be delivered to an account or accounts designated by the Administrative Agent (pursuant to the Sale Approval Order) on behalf of Sellers. Because it would be impractical and extremely difficult ,to determine the extent of any damages that might result from a breach of, or default under, this Agreement by Purchaser prior to the Initial Closing Date, it is understood and agreed that such liquidated damages represent Purchaser's and Sellers' reasonable estimate of actual damages, such liquidated damages do not constitute a penalty and the Cash Deposit will constitute Sellers' sole and exclusive remedy for any breach of, or default under, this Agreement by Purchaser prior to the Initial Closing Date.

Section 4.4    Dispute Escrow.    At the Initial Closing, Purchaser shall deliver to the Dispute Escrow Agent, to be held pursuant to the Dispute Escrow Agreement, an amount equal to 0.92% of the unpaid principal balance (as set forth in the Initial Closing Date Report) of the Mortgage Loans under the Disputed Servicing Agreements (such amount, as adjusted pursuant to Section 4.1(c), the "Dispute Amount") in immediately available funds. With respect to each Disputed Servicing Agreement, Sellers shall use their commercially reasonable efforts to negotiate a settlement or have issued as soon as possible a Final Order determining whether such Disputed Servicing Agreement was terminated at or prior to the Petition Date, provided, that Sellers may, in their reasonable discretion, determine that Sellers will not seek to negotiate a settlement or have issued a Final Order with respect to any one or more Disputed Servicing Agreements, and provided further that without the prior written consent of Purchaser Sellers shall not agree to a settlement which adversely affects Purchaser's rights and benefits under such Disputed Servicing Agreement if it otherwise were to become a Purchased Asset. To the extent requested by Sellers, Purchaser shall use its commercially reasonable efforts to assist in such negotiations with respect to Disputed Servicing Agreements. For each Disputed Servicing Agreement for which a settlement is negotiated or a Final Order is issued determining that such