Disputed Servicing Agreement was not terminated at or prior to the Petition Date, Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver the portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to the Administrative Agent on behalf of Sellers and such Servicing Agreement shall be a Purchased Asset. For each Disputed Servicing Agreement for which a Final Order is issued determining that such Disputed Servicing Agreement was terminated at or prior to the Petition Date, or with respect to which Sellers reasonably determine that neither a negotiated settlement nor a Final Order will be sought, Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver the portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to Purchaser and such Servicing Agreement shall be an Excluded Asset. In the event any Disputed Servicing Agreement has not become an Excluded Asset pursuant to the foregoing sentence by the later of (i) Final Closing and (ii) September 30, 2008, Purchaser may elect to (a) treat such Servicing Agreement as an Excluded Asset and Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver any portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to Purchaser or (b) treat such Servicing Agreement as a Purchased Asset and Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver any portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to an account or accounts designated by the Administrative Agent (pursuant to the Sale Approval Order) on behalf of Sellers.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Disclosure Schedules, Sellers jointly and severally represent and warrant to Purchaser that the statements contained in this Article V are true and correct as of the date of this Agreement (or, if made as of a specified date, as of such date), and shall be true and correct as of the Initial Closing Date as though made on the Initial Closing Date.

Section 5.1    Authorization; Validity of Agreement; Seller Action. Each Seller has the corporate power and authority (a) to execute and deliver this Agreement and each Ancillary Agreement to which such Seller is or will be a party, (b) to perform its obligations hereunder and thereunder (subject to entry and effectiveness of the Revised Sale Procedures Order), and (c) to consummate the transactions contemplated hereby and thereby (subject to entry and effectiveness of the Sale Approval Order). The execution, delivery and performance of this Agreement by each Seller and of each Ancillary Agreement by each Seller that is or will be a party thereto, and the consummation by each Seller of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate action on the part of each Seller and no other corporate actions or proceedings on the part of such Seller are necessary to authorize this Agreement, any Ancillary Agreement or any of the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by or on behalf of each Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser) constitutes the legal, valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except (i) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of

creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability (the "Enforceability Exceptions"), (ii) that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry and effectiveness of the Sale Approval Order or any other action by the Bankruptcy Court and (iii) that enforceability of all other provisions hereof is subject to entry and approval of the Revised Sale Procedures Order or any other action by the Bankruptcy Court.  Subject to entry and effectiveness of the Sale Approval Order, when required by this Agreement to be delivered to Purchaser each Ancillary Agreement will be duly and validly executed and delivered by each Seller that will be a party thereto, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its respective terms, subject to the Enforceability Exceptions.

Section 5.2    Organization and Good Standing.  Except as a result of the commencement of the Bankruptcy Cases, each Seller (i) is a legal entity duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation, and (ii) has all requisite corporate power and, subject to any required Bankruptcy Court approval, authority to carry on the Business as presently conducted, except as would not reasonably be expected to have a Material Adverse Effect.  Except as a result of the commencement of the Bankruptcy Cases, each Seller is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the operation of the Business or otherwise conducts the Business, except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

Section 5.3    Governmental Consents and Approvals; No Violations.  Subject to the entry and effectiveness of the Sale Approval Order and the satisfaction of the conditions set forth therein, no Consent of, or declaration, filing or registration with, any Government Entity is required to be obtained or made, as applicable, by either Seller in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement (the "Governmental Requirements"), or the consummation of the transactions contemplated by this Agreement or by any Ancillary Agreement, except for:  (a) the filing of a notification and report form under the HSR Act and the expiration or earlier termination of the applicable waiting period thereunder and (b) Consents, declarations, filings and registrations of Government Entities, the failure to have which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.4    Noncontravention.  The execution, delivery and performance by the Sellers of this Agreement and the Ancillary Agreement to which they are or will be a party do not, and the consummation of the transactions contemplated herein and therein will not, (a) violate, conflict with, or result in any breach of any of the terms, conditions or provisions of the Sellers' Charter Documents, (b) except as set forth on Schedule 5.4(b), assuming the entry and effectiveness of the Sale Approval Order, and further assuming for purposes of this representation that Section 2.4 were not a part of this Agreement, require a Consent or violate or

result in any violation or breach of, or constitute a default (with or without due notice or lapse of time or both) under, or give rise to any right of termination, cancellation or acceleration under, or a material loss of any benefits under, any of the terms, conditions or provisions of any Assumed Contract, (c) except as set forth on <u>Schedule 5.4(c)</u>, violate any Law applicable to the Sellers or by which any portion of the Purchased Assets is bound or subject or (d) assuming the entry and effectiveness of the Sale Approval Order, result in the creation or imposition of any Lien, other than Permitted Liens and New Financing Liens, upon the Purchased Assets, except in the case of <u>subsections (b)</u> and <u>(c)</u> above, as has not had and would not reasonably be expected to have a Material Adverse Effect.

Section 5.5    <u>Title to Assets and Properties; Liens</u>.    Subject to entry and effectiveness of the Sale Approval Order, at the Final Closing, Sellers shall transfer to Purchaser (or one or more designees of Purchaser) good, valid, legal and marketable title to, or a valid lease or license interest in, all of the Purchased Assets, free and clear of all Liens and Claims, other than Permitted Liens and New Financing Liens.

Section 5.6    <u>Mortgage Servicing Portfolio; Servicing Agreements; Assumed Contracts; Mortgage Loans</u>.

(a)    <u>Mortgage Servicing Portfolio</u>.    Sellers have delivered to Purchaser in a spreadsheet attached as <u>Schedule 5.6(a)</u> a correct and complete schedule dated as of September 17, 2007 that provides information with respect to the Mortgage Loans serviced pursuant to the Servicing Agreements (the "<u>Mortgage Loan Schedule</u>," which term includes, except where the context requires otherwise, a correct and complete updated schedule (the "<u>Initial Closing Date Mortgage Loan Schedule</u>") to be prepared as of the close of business on the day preceding the Initial Closing Date and delivered on the Initial Closing Date).

(b)    <u>Assumed Contracts</u>.    Except as set forth on <u>Schedule 5.6(b)(i)</u>, the Servicing Agreements set forth all of the material provisions with respect to fees and other income and set forth in all material respects all of the other terms and conditions of Sellers' rights and obligations relating to the servicing of the Mortgage Loans, and there are no other agreements, written or oral, that modify or affect the Servicing Agreements or the Servicing Fees and the Servicing Rights thereunder. The Company and American Home Mortgage Corp., as applicable, own the entire right, title and interest in and to the Servicing Rights and the right to service the Mortgage Loans underlying the Servicing Agreements free and clear of all Liens and Claims subject to the entry and effectiveness of the Sale Approval Order, except for the rights of subservicers and other Liens and Claims disclosed on <u>Schedule 5.6(b)(ii)</u>. Except as set forth on <u>Schedule 5.6(b)(iii)</u>:    (i) the transfer, assignment and delivery of the Servicing Rights in accordance with the terms and conditions of this Agreement shall, upon execution and delivery of the applicable Assignment and Assumption Agreements by the parties thereto, grant to Purchaser all of Sellers' Servicing Rights; (ii) each Assumed Contract is in full force and effect, is the valid, binding and enforceable agreement of Sellers and, to the Knowledge of Sellers, each other party thereto, except for the Enforceability Exceptions, and, upon the assignment of each such Assumed Contract to Purchaser in accordance with this Agreement, will be enforceable by Purchaser, except for the Enforceability Exceptions; (iii) none of the other parties to any of the

Assumed Contracts has provided written notice to any of Sellers that such party will be terminating, modifying or amending any of the Assumed Contracts (or otherwise seeking to terminate, modify or amend, or reduce Seller's benefits under any Assumed Contracts, including the Servicing Rights under any of the Servicing Agreements); (iv) no written claim has been made against a Seller for indemnification pursuant to any Assumed Contract; (v) to the Knowledge of the Sellers, no other party thereto is or, with the lapse of time or giving of notice or both, would be, in violation or default of an Assumed Contract; (vi) Schedule 5.6(b)(iv) hereto sets forth each Assumed Contract; (vii) except as set forth on Schedule 5.6(b)(iii), the Assumed Contracts constitute all of the material contracts existing or utilized in connection with the Business; and (viii) other than engagement of the Company, Sellers have not engaged any subservicers, to perform any of the Servicing Rights; except in each of clauses (i) through (viii) as would not reasonably be expected to have a Material Adverse Effect.

(c)     Compliance with Applicable Servicing Agreements and Law. Except as set forth on Schedule 5.6(c), from and after the time a Mortgage Loan became subject to the applicable Servicing Agreements, the servicing of the Mortgage Loans has been performed by the applicable Seller in compliance, in all material respects, with all provisions of the related Mortgage Loan Documents, the applicable Servicing Agreements and Law.

(d)     Advances. Except as set forth on Schedule 5.6(d)(i), (i) all Advances described in clause (i) of the definition of Advances made by Sellers prior to and through and including the date set forth on Schedule 5.6(d)(ii) and the Initial Closing Date have been made in compliance in all material respects with the terms of the applicable Servicing Agreement; (ii) the amount of each Advance described in clause (i) of the definition of Advances (shown both gross and net, where applicable, of any unscheduled principal and interest payments), in each case in accordance with the applicable Servicing Agreement, is set forth on Schedule 5.6(d)(ii) (which shall be updated as of the Initial Closing Date) as of the date set forth on such schedule and the Initial Closing Date; (iii) all Advances described in clause (i) of the definition of Advances are valid and subsisting amounts owing to Sellers, payable at the times and in accordance with the provisions of the applicable Servicing Agreement, free and clear of all Liens, subject to the entry and effectiveness of the Sale Approval Order, (other than Liens arising under any servicing advance facility which shall be satisfied as of the Initial Closing), Claims, defenses, and rights of set-off (other than defenses and rights of set-off of any borrower under any Mortgage Loan which such defenses and rights of set-off are, to the Knowledge of Sellers, not material in the aggregate); and (iv) all of the Advances described in clause (i) of the definition of Advances included in the Purchased Assets relate to Mortgage Loans that are being serviced by Sellers pursuant to a Servicing Agreement. Except as set forth on Schedule 5.6(d)(iii), (i) all Advances described in clause (ii) of the definition of Advances made by Sellers prior to and through and including the date set forth on Schedule 5.6(d)(iv) and the Initial Closing Date have been made in compliance in all material respects with the terms of the applicable Mortgage Loan Documents and, to the extent applicable, the agreements governing the rights that have become the Servicing Rights Held for Sale; (ii) the amount of each Advance described in clause (ii) of the definition of Advances (shown both gross and net, where applicable, of any unscheduled principal and interest payments), in each case in accordance with the applicable Mortgage Loan Document and, to the extent applicable, the agreements that govern the rights that have become the Servicing Rights Held for Sale, is set forth on Schedule 5.6(d)(iv) (which shall be updated as of the Initial Closing Date) as of the date set forth on such schedule and the Initial Closing Date;

(iii) all Advances described in clause (ii) of the definition of Advances are valid and subsisting amounts owing to Sellers, payable at the times and in accordance with the provisions of the applicable Mortgage Loan Document and, to the extent applicable, the agreements governing the rights that have become the Servicing Rights Held for Sale, free and clear of all Liens, subject to the entry and effectiveness of the Sale Approval Order, (other than Liens arising under any servicing advance facility which shall be satisfied as of the Initial Closing), Claims, defenses, and rights of set-off (other than defenses and rights of set-off of any borrower under any Mortgage Loan which such defenses and rights of set-off are, to the Knowledge of Sellers, not material in the aggregate); and (iv) all of the Advances described in clause (ii) of the definition of Advances included in the Purchased Assets relate to Mortgage Loans set forth on Schedule 6.10(f) or, to the extent applicable, the Servicing Rights Held for Sale.

Section 5.7    Compliance with Laws.  Except as set forth on Schedule 5.7(a), each Seller (i) is in compliance with and is operating the Business, and each of the Purchased Assets and Assumed Contracts is, in compliance with all Applicable Requirements in all material respects and (ii) holds all material permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Entities necessary for the lawful conduct of the Business (the "Permits").  Except as set forth in Schedule 5.7(b), the Permits are valid and in full force and effect.  Except as set forth in Schedule 5.7(c), no Seller has received any written notice or other written communication from any Governmental Entity or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit or (ii) notifying a Seller or any of its Subsidiaries of the non-renewal, revocation or withdrawal of any Permit.  Each Seller is in material compliance with the terms of the Permits.

Section 5.8    Litigation; Proceedings.  Except as set forth on Schedule 5.8, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to the Knowledge of the Sellers, threatened against or Related to the Business, or related to the Purchased Assets, the Assumed Liabilities or the Assumed Contracts, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Entity, nor are there any investigations relating to the Business, or related to the Purchased Assets, the Assumed Liabilities or the Assumed Contracts, pending or, to the Knowledge of the Sellers, threatened by or before any arbitrator or any Governmental Entity. None of the Purchased Assets is subject to any judgment, injunction, order, consent or decree of any Governmental Entity or any settlement agreement with any Person.

Section 5.9    Sufficiency of Assets.  Except as set forth on Schedule 5.9, the Purchased Assets constitute substantially all of the assets reasonably necessary for the operation of the Business as conducted by Sellers as of the date hereof and substantially all of the assets that are used by Sellers to operate the Business in the manner presently conducted.

Section 5.10   Financial Statements.

(a)      Attached to Schedule 5.10(a) is certain unaudited financial summary information of the Business as of July 31, 2007 and for the seven month period then ended (the "Business Interim Financial Statements"). The Business Interim Financial Statements were prepared by Sellers from the books and records of Sellers and do not include all of the information and footnotes required by GAAP. Historically, neither the Company nor Sellers have maintained separate financial statements for the Business on the basis presented in Schedule 5.10(a) or on any other comparable basis. In addition, the historical consolidated financial statements of Parent are currently being reviewed by the Securities and Exchange Commission. The operating results for the seven month period ended July 31, 2007 are not necessarily indicative of the results that may be expected for a full twelve month period and further, may not be representative of the Business as an independent, stand-alone entity as more fully described in Schedule 5.10(a). The Business Interim Financial Statements are presented on an accrual basis, except that Servicing Fees and ancillary fees are recognized when received. The Business Interim Financial Statements were not audited or reviewed by an independent accountant.

(b)      Attached to Schedule 5.10(b) is certain unaudited financial summary information of the Business as of July 31, 2007 and for the seven month period then ended recast to more closely reflect the operations of the Business on a stand-alone basis (the "Recast Business Interim Financial Statements"). The Recast Business Interim Financial Statements were prepared by Sellers from the Business Interim Financial Statements, and as more thoroughly described in Schedule 5.10(b), include the use of certain assumptions and estimates. Sellers prepared the Recast Business Interim Financial Statements in good faith as a reasonable pro forma estimate of the assets and liabilities, results of operations and cash flows of the Business as of July 31, 2007 and for the seven month period then ended.

(c)      The parties hereto recognize and acknowledge that the Recast Business Interim Financial Statements were prepared in connection with negotiating the sale of the Business, and, accordingly required the development and application of the assumptions and estimates described in Schedule 5.10(b).

Section 5.11    Seller/Servicer Status.    The Company is a FNMA approved servicer of Mortgage Loans, eligible to service FNMA Mortgage Loans. Except as set forth on Schedule 5.11, the Company is licensed, approved or exempt from licensure and/or approval as a servicer under state mortgage regulatory agencies in each state where the failure to be so licensed, approved or exempt could materially and adversely affect Servicing Rights in respect of Servicing Agreements.

Section 5.12    MERS Membership.    American Home Mortgage Holdings, Inc. is a MERS Member, and the Company and American Home Mortgage Corp. in their capacity as affiliates of American Home Mortgage Holdings, Inc. are each authorized users of the MERS System pursuant to American Home Mortgage Holding, Inc.'s membership and, except as set forth on Schedule 5.12, American Home Mortgage Holdings, Inc. is in compliance with all terms and conditions of its membership in MERS.

Section 5.13    Status of Mortgage Loans.    As of September 17, 2007, the aggregate amount of Defaulted Mortgage Loans serviced pursuant to the Servicing Agreements is not more than 4.8% of the aggregate outstanding principal balance of all Mortgage Loans that are being serviced pursuant to the Servicing Agreements.

Section 5.14    Brokers.    Other than Milestone Advisors, LLC and Phoenix Capital Inc. whose fee shall be paid by Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

## ARTICLE VI
## COVENANTS

Section 6.1    Interim Operations of Sellers.    Sellers covenant and agree that, after the date hereof and through the Final Closing Date, with respect to the Purchased Assets, the Assumed Contracts and the Business, except as expressly provided in this Agreement or as may be agreed in writing by Purchaser:

(a)    the Business shall be conducted in the Ordinary Course of Business, subject to the Bankruptcy Exceptions, and Sellers shall use commercially reasonable efforts, to preserve the business organization of the Business intact, keep available the services of the current officers and employees of the Business and maintain the existing relations with customers, suppliers, creditors, business partners and others having business dealings with the Business; provided that prior to the Initial Closing Date, Sellers may deliver a written notice to Purchaser describing which servicing rights (but not the related Advances to the extent they have not been sold prior to the Initial Closing) set forth on Schedule 6.1(a) Sellers intend to sell to third parties, which servicing rights may not relate to mortgage loans having unpaid principal balances exceeding $10 billion in the aggregate (the servicing rights described in such notice (but not the related Advances to the extent they have not been sold prior to the Initial Closing) being referred to in this Agreement as the "Servicing Rights Held for Sale");

(b)    Sellers and their Affiliates shall not assign, modify, amend or terminate any of the Assumed Contracts, except (1) in the Ordinary Course of Business, (2) as necessary to assume and assign the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code to Purchaser or any designee of Purchaser and with the written consent of Purchaser or such designee, (3) as set forth on Schedule 6.1(b), or (4) for the Servicing Rights Held for Sale;

(c)    Sellers and their Affiliates shall not terminate or permit to lapse any Permits or other Government Authorizations that are necessary for the operation of the Business and the termination or lapse of which would cause a Material Adverse Effect, except when such termination or lapse results from any Order or other proceeding instituted by any Government Entity and such termination or lapse has been duly contested by Seller with commercially reasonable efforts;

(d)      Sellers and their Affiliates shall not (1) permit any Liens or Claims to arise with respect to the Purchased Assets other than in the Ordinary Course of Business; or (2) purchase, transfer, sell or dispose of any assets of the Business other than in the Ordinary Course of Business or dispose of or permit to lapse any rights to any material Intellectual Property other than in the Ordinary Course of Business; provided that prior to the Initial Closing Date, Sellers may sell, or enter into agreements to sell, the Servicing Rights Held for Sale;

(e)      Sellers and their Affiliates shall not make any change to increase the rate of base compensation or bonus opportunity of any Business Employee other than as set forth on Schedule 6.1(e) or as is reasonably acceptable to Purchaser; provided, however, that, subject to any required Bankruptcy Court Approval, Sellers shall, after the Initial Closing, modify or replace any employee retention plan or similar plan applicable to any Business Employee employed in Texas as is requested by Purchaser;

(f)      Sellers and their Affiliates shall not waive or release any material right that constitutes a Purchased Asset;

(g)      Sellers and their Affiliates shall not (1) enter into any material settlement or release with respect to any legal proceeding relating to or affecting the Purchased Assets, the Assumed Liabilities, the Assumed Contracts or the Business, other than in the Ordinary Course of Business, as required by Law, or with respect to Disputed Servicing Agreements (provided that Sellers or their Affiliates shall not, without Purchaser's written consent, enter into any settlement or release with respect to any Disputed Servicing Agreement that adversely affects Purchaser, it being understood that any settlement or release which results in the return to the Purchaser of the Purchase Price, or relieves Purchaser of the obligation to pay the Purchase Price, allocable to such Disputed Servicing Agreement will not be deemed to adversely affect Purchaser) or (2) pay any amount, perform any obligation or agree to pay any amount or perform any obligation, in settlement or compromise of any suits or claims of Liability Related to the Business, in each case in excess of $100,000; provided that Sellers shall be permitted to enter into settlement agreements prior to the Initial Closing Date in connection with (A) the transfer of Servicing Rights Held for Sale, (B) with the written consent of Purchaser (which shall not be unreasonably withheld or delayed), the Disputed Servicing Agreements and (C) any Liabilities that are not Assumed Liabilities provided that Purchaser will not have any Loss with respect thereto;

(h)      Other than as provided in Section 4.4, Sellers and their Affiliates shall not (1) breach, reject or terminate any Assumed Contract or seek Bankruptcy Court approval to do so or (2) fail to use commercially reasonable efforts to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Assumed Contract; provided that, prior to the Initial Closing Date, Sellers may (A) with the consent of Purchaser (which shall not be unreasonably withheld or delayed), reject any Assumed Contract (other than Servicing Agreements) that is not material to the Business or readily replaceable at substantially the same cost and without disruption to the operation of the Business and (B) with the written consent of Purchaser (which shall not be unreasonably withheld or delayed), terminate and reject a Disputed Servicing Contract;

(i)        With respect to any Purchased Asset, Sellers and their Affiliates shall not: (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; (2) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases; (3) agree to a rejection of any Assumed Contract except as provided in Section 6.1(h)(A) or (B); or (4) fail to use commercially reasonable efforts to oppose any action by a Person (other than Purchaser) seeking to have an Assumed Contract rejected, except as provided in provisos (A) and (B) in Section 6.1(h);

(j)        Except as required by Law or the Bankruptcy Court, Sellers and their Affiliates shall not take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions to the Initial Closing set forth in Article VIII not being satisfied, or would make any representation or warranty of Sellers contained herein inaccurate in any material respect at, or as of any time prior to, the Initial Closing Date or that would materially impair the ability of Sellers or Purchaser to consummate the Initial Closing in accordance with the terms hereof or materially delay such consummation;

(k)        Sellers shall conduct the Business (1) in accordance with Law except where the failure to do so will not result in a Material Adverse Effect or where the failure to do so results from any Order or other proceeding instituted by any Government Entity that has been duly contested by Sellers with commercially reasonable efforts and (2) in accordance with the other Applicable Requirements in the Ordinary Course of Business and subject to the Bankruptcy Exceptions and except when any failure to conduct the Business in accordance with the Applicable Requirements results from any Order or other proceeding instituted by any Government Entity that has been duly contested by Sellers with commercially reasonable efforts; and

(l)        No Seller nor any of Sellers' Affiliates shall enter into any agreement, Contract, contract commitment or arrangement to do any of the foregoing, or authorize, recommend, propose or announce an intention to do, any of the foregoing.

Section 6.2    Operations Following the Initial Closing.

(a)        From the Initial Closing to the Final Closing, Sellers shall operate the Business and manage the Purchased Assets, Assumed Liabilities and Assumed Contracts in the Ordinary Course of Business, subject to the Bankruptcy Exceptions and consistent with Section 6.1 (provided that, with respect to Sections 6.1(a), (c), (d)(1), (d)(2) (but solely with respect to the lapse of rights to material Intellectual Property referred to therein), (f), (h)(1) (but solely with respect to the breach of an Assumed Contract referred to therein), (k), and (l) (but solely to the extent (l) relates to any of the matters referred to in the foregoing listed subsections of Section 6.1) Sellers shall have liability for a breach thereof only through bad faith, willful misconduct or gross negligence); provided that Purchaser, at Purchaser's cost and expense shall provide, or arrange for, as part of the Financing, such liquidity and working capital as may be necessary to enable Sellers to operate the Business from the Initial Closing to the Final Closing. Notwithstanding any provision of this Section 6.2, other than with respect to Retained Liabilities, Sellers shall have no obligation to fund any Liabilities of the Business following the Initial Closing other than from proceeds of the Financing and revenues generated by the Business after

the Initial Closing.  Subject to Section 2.7(c), Sellers shall regularly consult with Purchaser with respect to such operations and to prepare the Business to be transitioned to Purchaser at the Final Closing as a stand alone business.  Notwithstanding the foregoing, Purchaser shall not have the right to direct the management or policies of Sellers.

(b)    From the Initial Closing until the Final Closing, all profits and Losses of the Business shall be solely for the account of Purchaser, and Purchaser shall be solely responsible for all Losses, costs and expenses of the Business during such period and shall bear all Liabilities of the Business and all Losses incurred by Sellers or their Affiliates in the operation of the Business or otherwise arising as a result of, or in connection with, the continued ownership by Sellers of the Purchased Assets and the operation of the Business after the Initial Closing; provided that Sellers acknowledge and agree that such Liabilities and Losses shall not include any Liabilities or Losses incurred by Sellers in connection with the resolution or attempted resolution of Claims with respect to the Disputed Servicing Agreements, including any and all costs of adjudicating same to a Final Order or negotiating a settlement thereof, which Liabilities and Losses shall be borne by Sellers.  Following the Initial Closing, Sellers and Purchaser shall, for each three month period following the Initial Closing through the Final Closing and for any shorter period between the last full three month period and the Final Closing (each such period a "Reconciliation Period"), reconcile the net cash flow of the Business as contemplated by Exhibit G (each a "Reconciliation Calculation").  Following the Final Closing and the determination of the final Reconciliation Report for the last Reconciliation Period pursuant to Section 6.2(d) or 6.2(e), Sellers or Purchaser, as the case may be, shall make a reconciliation payment to the other with respect to the net sources and uses of cash for the period from the Initial Closing through the Final Closing (the "Reconciliation Payment") based on the final Reconciliation Reports as determined pursuant to Section 6.2(d) or 6.2(e) for each Reconciliation Period as may be necessary to ensure each party is placed in the same economic position as if the Purchased Assets, Assumed Liabilities and Assumed Contracts had been transferred to the Purchaser on the Initial Closing Date and that Sellers have not benefited from any profits nor suffered any Losses in connection with the operation of the Business during the period from the Initial Closing through the Final Closing.  Any Reconciliation Payment payable by Sellers to Purchaser shall be payable exclusively out of cash held by the Company at the time the Reconciliation Payment is required to be paid and only from cash arising out of the operation of the Business after the Initial Closing and through the Final Closing.  Notwithstanding anything to the contrary herein, the parties acknowledge that Sellers shall be operating as debtors in possession under the Bankruptcy Code.

(c)    With respect to Sellers' operation of the Business from the Initial Closing to the Final Closing, Sellers shall indemnify Purchaser for any Losses to the extent arising out of (i) Sellers' bad faith, willful misconduct or gross negligence in its operation of the Business or (ii) a breach of this Agreement (other than Sections 6.1(a), (c), (d)(1), (d)(2) (but solely with respect to the lapse of rights to material Intellectual Property referred to therein), (f), (h)(1) (but solely with respect to the breach of an Assumed Contract referred to therein), (k), and (l) (but solely to the extent (l) relates to any of the matters referred to in the foregoing listed subsections of Section 6.1), with respect to which Sellers shall have liability for a breach thereof only through willful misconduct, bad faith or gross negligence).  Following the Final Closing, Purchaser shall indemnify Sellers and their Affiliates for any Losses arising out of operation of the Business or otherwise arising as a result of, or in connection with, the continued ownership

by Sellers of the Purchased Assets and operation of the Business after the Initial Closing through the Final Closing, except for any Losses arising out of (i) Sellers' or their Affiliates' bad faith, willful misconduct or gross negligence, or (ii) a breach of this Agreement (other than Sections 6.1(a), (c), (d)(1), (d)(2) (but solely with respect to the lapse of rights to material Intellectual Property referred to therein), (f), (h)(1) (but solely with respect to the breach of an Assumed Contract referred to therein), (k), and (l) (but solely to the extent (l) relates to any of the matters referred to in the foregoing listed subsections of Section 6.1) with respect to which Sellers shall have liability for a breach thereof only through bad faith, willful misconduct or gross negligence). Notwithstanding anything to the contrary herein, the parties hereby agree that "gross negligence" shall not include, and Sellers shall not be liable, for any Losses arising due to the Bankruptcy Exceptions.  In addition, Purchaser shall be obligated to pay the Purchaser's Cure Amount.

(d)     Sellers shall prepare each Reconciliation Calculation for each Reconciliation Period in accordance with Exhibit G (a "Reconciliation Report"). Sellers shall provide Purchaser with each Reconciliation Report as promptly as possible after the applicable Reconciliation Period but not later than 30 days thereafter. Within the 30 day period following receipt of each Reconciliation Report, Purchaser shall have the right to dispute the amounts set forth therein, as set forth in Section 6.2(e). If Purchaser does not dispute the Reconciliation Report within such 30 day period, such report shall be deemed final by Sellers and Purchaser, and Purchaser shall be barred from disputing the portion of the Reconciliation Payment Report corresponding to such Reconciliation Report.  Sellers shall prepare the calculation of the Reconciliation Payment which shall be a summation on the final Reconciliation Reports for each Reconciliation Period (the "Reconciliation Payment Report"). Sellers shall provide Purchaser with the Reconciliation Payment Report within five days of the final determination of the Reconciliation Report for the last Reconciliation Period. Within the 5 day period following receipt of the Reconciliation Payment Report, Purchaser shall have the right to dispute the Reconciliation Payment solely in the event that the Reconciliation Payment Report differs from the sum of the final Reconciliation Reports. If Purchaser does not dispute the Reconciliation Payment Report within such 5 day period, such report shall be deemed final by Sellers and Purchaser, and, Sellers or Purchaser, as the case may be, shall immediately thereafter deliver the Reconciliation Payment.

(e)     If Purchaser disputes any Reconciliation Report or the Reconciliation Payment Report (or any item included therein) as set forth in Section 6.2(d) above, such dispute shall be resolved in the following manner: (i) Purchaser shall notify Sellers of such dispute within 30 days after Purchaser's receipt of the applicable report, which notice shall specify in reasonable detail the nature of the dispute; (ii) during the 15-day period following Sellers' receipt of such notice, Sellers and Purchaser shall use their commercially reasonable efforts to resolve such dispute in good faith; and (iii) if at the end of such 15-day period Sellers and Purchaser shall have failed to resolve such dispute in writing, Sellers and Purchaser shall submit the item(s) in dispute as promptly as practicable to Arbitrating Accountants with experience in the mortgage loan servicing business and that are independent of Sellers and Purchaser and their respective Affiliates to be selected by mutual agreement between Sellers and Purchaser. The Arbitrating Accountants shall act as an arbitrator and shall resolve the dispute as promptly as practicable after such dispute is referred to it. Each of the parties hereto shall bear all costs and expenses incurred by it in connection with such arbitration, except that the cost of the Arbitrating

Accountants hereunder shall be borne equally by Sellers and Purchaser. This provision for arbitration shall be specifically enforceable by the parties hereto. The decision of the Arbitrating Accountants in accordance with the provisions hereof shall be final and binding (absent manifest error), and there shall be no right of appeal therefrom. Upon the resolution of the disputes (A) with respect to any Reconciliation Report, the Reconciliation Report determined in accordance with this Section 6.2(e) will be the final Reconciliation Report for such Reconciliation Period and (B) with respect to the Reconciliation Payment Report, the Reconciliation Payment shall be recalculated based on the final Reconciliation Payment Report as determined in accordance with this Section 6.2(e), and Sellers or Purchaser, as the case may be, shall immediately thereafter deliver the Reconciliation Payment.

(f)     From the Initial Closing Date through the Final Closing Date, Sellers shall service the (i) Mortgage Loans serviced under the Disputed Servicing Agreements, (ii) Mortgage Loans serviced by the Servicing Rights Held for Sale and (iii) Mortgage Loans set forth on Schedule 6.10(f). In consideration of such servicing (A) Sellers shall remit to the Business (or the Business may retain, as the case may be) an amount equal to all Servicing Fees payable to the servicing agent for servicing the Mortgage Loans described in subclauses (i) through (iii) hereof at the time of the receipt thereof, (B) Sellers shall remit to the Business, on a monthly basis, for servicing the Mortgage Loans described in subclause (ii) and (iii) hereof (I) $15 per month per Mortgage Loan serviced during the two month period following the Initial Closing Date, $20 per month per Mortgage Loan serviced during the two month period following such period and $25 per Mortgage Loan serviced after the four month period following the Initial Closing Date minus (II) the monthly Servicing Fees collected by the Business with respect to servicing such Mortgage Loan and (C) Sellers shall remit to the Business, on a monthly basis, $25 for each Mortgage Loan described in subclauses (ii) and (iii) that is "deboarded."

(g)     Upon (i) a sale by Sellers of the Mortgage Loans described on Schedule 6.10(f) or the servicing rights with respect thereto or (ii) a sale by Sellers of the Servicing Rights Held for Sale, Sellers shall undertake a review of the number of Business Employees reasonably necessary to continue to service the Servicing Agreements as compared to the number of Business Employees which were servicing all such servicing rights immediately prior to such sale or termination. In the event that in Sellers' reasonable business judgment (taking into account, without limitation, the need for Business Employees to service future servicing rights which may be acquired by the Business, and the need for additional Business Employees to service Defaulted Mortgage Loans), such sale or termination directly results in there being excess Business Employees, Sellers shall terminate such Business Employees and shall be liable for and bear any Liabilities incurred by the Business as a result of such terminations (and such Liabilities shall not be borne by Purchaser or the Business).

Section 6.3    Access; Books and Records.    (a) Between the date of this Agreement and the Final Closing Date, Sellers shall, at Purchaser's expense, (i) afford Purchaser and its authorized Representatives access to all books and records, offices and other facilities Related to the Business, as well as management and other employees Related to the Business, of Sellers, (ii) permit Purchaser to make inspections and to make copies of such books and records Related to the Business as it may require and (iii) furnish Purchaser with such financial and operating data Related to the Business and other information which is Related to the Business as

Purchaser may from time to time request; provided, however, that prior to the Initial Closing, such access (y) shall be reasonable and (z) shall not unreasonably disrupt the business of Sellers. For an abundance of clarity, under no circumstances shall this right to access be construed as a "diligence out" or termination right of Purchaser.

(b)     Purchaser and Sellers shall preserve for a period of six years after the Final Closing Date (or such longer period as may be required by any Government Entity or ongoing claim) all books and records Related to the Business prior to the Final Closing Date. After the Final Closing Date, where there is a legitimate purpose, the party hereto that has received a request for access (the "Requested Party") shall provide the party hereto requesting access (the "Requesting Party") with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to the books of account and records of the Requested Party, but, in each case, only to the extent relating to the conduct of the Business prior to the Final Closing Date, and the Requesting Party and its Representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of the Requested Party; and provided, further, that such information shall be held by the Requesting Party in confidence to the extent required by, and in accordance with, the Confidentiality Agreement. Such records may nevertheless be destroyed by either party if such party sends to the other party written notice of its intent to destroy records, specifying with particularity the contents of the records to be destroyed. Such records may then be destroyed after the 30th day after such notice is given unless the party receiving the notice objects to the destruction, in which case the party that provided the notice shall deliver, at the objecting party's expense, such records to the objecting party.

(c)     At Sellers' request following the Final Closing Date, Purchaser shall provide Sellers with reasonable access to the Transferred Employees and shall cooperate with Purchaser for the purpose of assisting Sellers with the winding down of Parent and the Filing Subsidiaries in conjunction with the Bankruptcy Cases and the provision of any information required for the purpose of filing Tax returns; provided, that such access shall not unreasonably disrupt the business of Purchaser.

Section 6.4    Cooperation; Efforts and Actions to Cause Closings.  (a) Following the date hereof and through the Final Closing Date, upon the terms and subject to the conditions of this Agreement, Purchaser and Sellers shall cooperate in good faith and use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done and cooperate with each other in order to do, all things necessary, proper or advisable (subject to any applicable Laws) to satisfy the conditions to each of the Initial Closing Date and the Final Closing Date, as applicable, set forth in Article VIII and to consummate the transactions contemplated hereby as promptly as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the transactions contemplated hereby and the taking of such actions as are necessary to obtain all requisite Consents, orders, Permits, qualifications or exemption from consents by any third party or Government Entity, including the Revised Sale Procedures Order and the Sale Approval Order. Sellers and Purchaser shall each file their Notification and Report Form under the HSR Act

within 10 Business Days after the entry of the Sale Approval Order. The filing fee with respect thereto shall be borne one-half by Purchaser and one-half by Sellers.

(b)    Following the date hereof and through the Final Closing Date, each party shall promptly consult with the other parties hereto with respect to, provide any necessary information with respect to, and provide the other parties (or their respective counsel) with copies of, all filings made by such party with any Government Entity or any other information supplied by such party to a Government Entity in connection with this Agreement and the transactions contemplated hereby. Each party hereto shall promptly provide the other parties with copies of any communication (including any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby or the entry of the Revised Sale Procedures Order or the Sale Approval Order) received by such party from any Government Entity or any other Person regarding the transactions contemplated hereby. If any party hereto or Affiliate thereof receives a request for additional information or documentary material from any such Government Entity with respect to the transactions contemplated hereby, then such party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other parties, an appropriate response in compliance with such request. To the extent that transfers, amendments or modifications of Permits are required as a result of the execution of this Agreement or consummation of the transactions contemplated hereby, Sellers shall use their commercially reasonable efforts to effect such transfers, amendments or modifications.

(c)    To the extent not otherwise provided in the Sale Approval Order, Sellers shall use their commercially reasonable efforts to obtain, prior to the Initial Closing, all requisite approvals, including the Consent to the transactions contemplated hereby of each other party to each Contract (other than a Servicing Agreement) to which it is a party or to which the Purchased Assets or Assumed Liabilities are subject with a Seller or any Affiliate of a Seller (including under any Software Contract or Contract relating to the Transferred Intellectual Property and the IT Assets), if required by the terms of such Contract.

Section 6.5    Confidentiality. (a) After the Initial Closing, the Sellers will, and cause their respective Affiliates and Representatives to, hold in confidence and not use in any manner detrimental to the Business all Confidential Information concerning the Business, the Purchased Assets, the Assumed Liabilities or the Assumed Contracts, except to the extent that such information can be shown to have been (i) in the public domain prior to the Initial Closing or (ii) in the public domain at or after the Initial Closing through no fault of the Sellers or any of their Affiliates or any of their respective Representatives. If, after the Initial Closing, Sellers or any of their Affiliates or any of their respective Representatives are legally required to disclose any Confidential Information, Sellers shall to the extent permitted by Law (A) promptly notify Purchaser to permit Purchaser, at its expense, to seek a protective order or take other appropriate action and (B) cooperate as reasonably requested by Purchaser in Purchaser's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information, but only at Purchaser's sole cost and expense. If, after the Initial Closing and in the absence of a protective order, Sellers or any of their Affiliates or any of their respective Representatives are compelled as a matter of Law to disclose any such Confidential Information to a third party, such Person may disclose to the third party compelling disclosure

only the part of such Confidential Information as is required by Law to be disclosed; provided, however, that to the extent permitted by Law, prior to any such disclosure, such Person consults in good faith with Purchaser and its legal counsel as to such disclosure and the nature and wording of such disclosure.

(b)     For purposes of Section 6.5(a), "Confidential Information" shall mean any confidential information concerning the Business, the Purchased Assets, the Assumed Liabilities or the Assumed Contracts, including, without limitation, methods of operation, products, prices, fees, costs, markets or other specialized information or proprietary matters.

Section 6.6     Subsequent Actions.  Subject to the Bankruptcy Exceptions, each of the parties shall use reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable and to cause to be satisfied the conditions in Article VIII.  If at any time before or after the Final Closing Date, Purchaser shall consider or be advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in Purchaser (or, subject to Bankruptcy Court approval, its designee), its right, title or interest in, to or under any or all of the Purchased Assets or Assumed Contracts, (ii) to vest, perfect or confirm ownership (of record or otherwise) in a Seller, any of its rights, properties or assets or (iii) otherwise to carry out this Agreement, Sellers shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments and assurances and take and do all such other actions and things as may be reasonably requested by Purchaser (or, subject to Bankruptcy Court approval, its designee) in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Purchaser or Sellers, in each case at Purchaser's cost and expense.  In furtherance of the foregoing, Purchaser shall use commercially reasonable efforts to satisfy the condition set forth in Section 8.4(a) as soon as reasonably practical after the Initial Closing.

Section 6.7     Post-Final Closing Amounts Received and Paid.  All amounts that are received by a Seller or any of its Affiliates in respect of any of the Purchased Assets with respect to a period following the Final Closing shall be received by such Person as agent, in trust for and on behalf of Purchaser, and following the Final Closing, Sellers shall, on a monthly basis, pay, or cause to be paid, by wire transfer of immediately available funds to Purchaser all such amounts received by or paid to any such Seller or any of their respective Affiliates, and shall provide Purchaser with information as to the nature and source of all such payments, including any invoice related thereto.  All amounts that are received by Purchaser or any of its Affiliates following the Final Closing in respect of any Excluded Assets with respect to a period prior to the Final Closing shall be received by such Person as agent, in trust for and on behalf of Sellers, and Purchaser shall, on a monthly basis, pay or cause to be paid all such amounts over to Sellers by wire transfer of immediately available funds and shall provide Seller with information as to the nature and source of all such payments, including any invoice relating thereto.

Section 6.8    Notices of Certain Events.  From the date hereof until the Initial Closing Date,

(a)    Sellers shall promptly notify Purchaser of:

(i)    any written notice or other written communication from any Person (including any notices or communications filed with the Bankruptcy Court other than notices or other written communications which provide for a copy to be provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)    any written notice or other written communication from any Government Entity in connection with the transactions contemplated by this Agreement; and

(iii)    any change or fact with respect to any of Sellers' representations, warranties or obligations hereunder of which it is aware that, with notice or lapse of time or both, will or is reasonably likely to result in a material breach by Sellers of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied.

(b)    Purchaser shall promptly notify Sellers of:

(i)    any written notice or other written communication from any Person (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)    any written notice or other written communication from any Government Entity (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) in connection with the transactions contemplated by this Agreement; and

(iii)    any change or fact with respect to any of Purchaser's representations, warranties or obligations hereunder of which it is aware that, with notice or lapse of time or both, will or is reasonably likely to result in a material breach by Purchaser of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied.

No disclosure by any party hereto pursuant to this Section 6.8 shall be deemed to amend or supplement the Disclosure Schedule with respect thereto or prevent or cure any misrepresentation or breach of warranty for purposes of this Agreement.

Section 6.9    Interim Financial Information. From the date of this Agreement until the Final Closing Date, Sellers will deliver to Purchaser such financial and operating information Related to the Business as is provided (and when provided) to the board of directors or the operating or financial management of Sellers in the Ordinary Course of Business.

Section 6.10    Procedures for Transfer of Servicing.

(a)    Transfer. Without limiting any other provision of this Agreement, on the Final Closing Date, Sellers shall, in accordance with Purchaser's reasonable instructions, take all steps, and execute and deliver all such agreements, letters or other documents, as are reasonably requested by Purchaser to effect the transfer of the Servicing Agreements (and the related Purchased Assets) from Sellers to Purchaser or Purchaser's designee such that, after the Final Closing Date, Purchaser or its designee has all of the Servicing Rights, the Servicing Files and any and all assets and rights necessary to perform its obligations under such Servicing Agreements.

(b)    Name Changes. As soon as practicable after the Final Closing Date, each of Sellers and Purchaser agree to take all such actions as are required, in accordance with the Purchaser's reasonable instructions, to change the named party to Purchaser or its designee on documents related to the Servicing Agreements that are currently in the name of Sellers, in their capacity as Servicer, including on all financing statements and insurance policies.

(c)    Invoices and Collections. All invoices (including legal, tax and insurance invoices) and collections pertaining to the servicing of the Mortgage Loans after the Initial Closing Date that Sellers receive after the Final Closing Date shall be promptly forwarded by Sellers to Purchaser by reputable overnight courier for a period of not less than 90 days after the Final Closing Date and thereafter by regular mail within a reasonable time after receipt for a period of not less than 180 days. Purchaser agrees to pay each such invoice promptly upon the receipt of such invoice from Sellers together with an officer's certificate from Sellers stating that Seller has received no benefit under such invoice and that such invoices should be paid by Purchaser and constitute expenses of the applicable trust pursuant to the applicable Servicing Agreements.

(d)    Existing Litigation and Indemnities. As promptly as possible after the date hereof (and in any event prior to the Initial Closing), Sellers and Purchaser shall agree upon mechanics and procedures to identify and schedule all litigation (other than litigation against Sellers) presently being handled by Sellers as servicer under the Servicing Agreements and, if applicable, transfer to Purchaser or its designee responsibility from and after the Final Closing Date for such litigation.

(e)    Compliance Costs; Reporting Obligations. Sellers shall be responsible for all costs of compliance related to the operation of the Business and the Purchased Assets prior to the Initial Closing Date. After the Initial Closing Date, Sellers shall be responsible for completing any requested compliance and/or servicer certificate related to the operation of the Business and the Purchased Assets prior to the Initial Closing Date, including but not limited to pursuant to Regulation AB under the Exchange Act and Form 1098 tax reporting. If requested

by Sellers, Purchaser shall be of reasonable assistance to Sellers in connection with the foregoing so long as (i) Sellers pay to Purchaser a mutually agreeable nominal fee in connection with such assistance and (ii) Sellers provide to Purchaser all information needed by Purchaser in connection with such assistance. Nothing in this <u>Section 6.10(e)</u> affects Sellers' obligations under the Applicable Requirements in connection with the operation of the Business, or affects in any manner <u>Section 2.7(c)</u>.

(f)    <u>Subservicing of AHM Loans</u>. Following the Final Closing Date, pursuant to the terms of the Purchaser Subservicing Agreement, Purchaser or its designee shall serve as subservicer for (i) Mortgage Loans serviced under the Disputed Servicing Agreements that are treated as Excluded Assets and, prior to the sale to a third party, the Servicing Rights Held for Sale and (ii) Mortgage Loans set forth on <u>Schedule 6.10(f)</u>. In consideration of such subservicing (A) Purchaser or its designee shall retain all Servicing Fees payable to the servicing agent for servicing the Mortgage Loans described in subclauses (i) and (ii) hereof, (B) Sellers shall pay to Purchaser or its designee, on a monthly basis, as invoiced by Purchaser or its designee, for servicing the Mortgage Loans described in subclause (ii) hereof (I) $15 per month per Mortgage Loan serviced during the two month period following the Initial Closing Date, $20 per month per Mortgage Loan serviced during the two month period following such period and $25 per Mortgage Loan serviced after the four month period following the Initial Closing Date minus (II) the monthly Servicing Fees collected by the Business with respect to servicing such Mortgage Loan and (C) Sellers shall pay to Purchaser or its designee, as invoiced by Purchaser or its designee, $25 for each Mortgage Loan described in subclause (ii) hereof that is "deboarded".

(g)    <u>Transition Services</u>. Following the Final Closing, Sellers, other than the Company, shall provide, or cause to be provided, to the Business certain services that are currently provided to the Business by Sellers and certain Affiliates of Sellers, all as more fully set forth in the Transition Services Agreement to be entered into by the Sellers and the Purchaser as of the Final Closing Date.

Section 6.11    <u>Bankruptcy Actions</u>. (a) Sellers hereby agree that they shall, and Sellers shall cause all of their Affiliates to, comply with all of the obligations of Sellers under (i) the Revised Sale Procedures Order (after entry of such Order by the Bankruptcy Court) and (ii) the Sale Approval Order (after the entry of such Order by the Bankruptcy Court).

(b)    Sellers shall use reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement, including serving on all required Persons in the Bankruptcy Cases (including (i) all Persons who are known to possess or assert a Lien against or interest in any of the Purchased Assets, (ii) the IRS, (iii) all applicable state attorneys general, local realty enforcement agencies and local Government Entities, (iv) all applicable state and local Government Entities with taxing authority and (v) all other Persons required by any order of the Bankruptcy Court notice of the Sale Motion, the Sale Hearing, the Revised Sale Procedures Order, the Sale Approval Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules, the Revised Sale Procedures Order, and any applicable local rules of the Bankruptcy Court.

(c)      As provided in the Revised Sale Procedures Order, Sellers shall move to assume and assign to Purchaser (or Purchaser's designee or designees) the Assumed Contracts that are executory contracts capable of being assumed pursuant to Section 365 of the Bankruptcy Code (collectively, the "Assumed Pre-Petition Contracts") and shall provide notice thereof in accordance with all applicable Bankruptcy Rules, the Revised Sale Procedures Order, and any applicable local rules of the Bankruptcy Court. Sellers shall pay Cure Amounts in the time and manner specified by the Sale Approval Order; provided that Purchaser shall pay any Cure Amounts relating to a default on Assumed Contracts occurring after the Initial Closing which default is not the result of Sellers' breach of this Agreement.

Section 6.12      Maintenance of Insurance. From the date of this Agreement until the Final Closing Date, Parent shall, in connection with the Business, cause the Company to (a) continue to carry Sellers' existing insurance through the Final Closing Date, and (b) shall use reasonable efforts to not allow any breach, default, termination or cancellation of such insurance policies or agreements to occur or exist.

Section 6.13      Laws. From the date of this Agreement until the Initial Closing Date, Sellers shall promptly notify Purchaser concerning the existence of any new Law of which Sellers become aware, which restricts, prevents, prohibits, makes illegal or enjoins the operation of the Business, the Purchased Assets, the Assumed Liabilities, the Assumed Contracts or the transactions contemplated hereby.

Section 6.14      Financing Assistance and Protection of Purchased Assets. (a)  In connection with Purchaser obtaining financing for the operation of the Business for the period from the Initial Closing through the Final Closing and refinancing funds paid by Purchaser in cash necessary to consummate the transactions contemplated by this Agreement (the "Financing"), Sellers shall, and shall cause their respective officers, employees, and advisors to, provide to Purchaser all reasonable cooperation, on a timely basis, reasonably requested by Purchaser that is reasonably necessary or customary including:  (i) causing senior management and other appropriate employees of the Business upon reasonable advance notice by Purchaser and on a reasonable number of occasions, to be available for meetings, including management and other presentations, rating agency presentations, participation in due diligence sessions, to review and comment on disclosure documents and to assist with the preparation of business projections and similar materials in connection with any such financing; (ii) subject to the Bankruptcy Exceptions, taking all actions reasonably necessary to permit prospective financing providers involved in the Financing to evaluate the Business's assets and operations; (iii) subject to the Bankruptcy Exceptions, providing reasonable assistance in the timely preparation of offering memoranda, prospectuses, rating agency, lender and investor presentations, syndication or information memoranda, marketing materials and other similar documents, if applicable, including but not limited to causing management and other personnel to participate in related drafting sessions; (iv) timely furnishing such financial and other information regarding the Business as shall exist or, subject to the Bankruptcy Exceptions, become available as may be reasonably requested by Purchaser; (v) after the Initial Closing through the Final Closing, executing and delivering any loan agreement, indenture, pledge and security documents, other

definitive financing documents, or other certificates or documents as may be reasonably requested by Purchaser and otherwise facilitating, after the Initial Closing, the pledging of, and granting, recording and perfection of first priority security interests in the Purchased Assets and cash and cash equivalents and other proceeds received in connection with the Business and the Purchased Assets after the Initial Closing (in favor of Purchaser or the applicable lenders under the Financing), which assistance may include, but shall not be limited to, becoming directly liable for any loans or other indebtedness relating to the Financing (so long as recourse therefore is limited to the Purchased Assets and cash and cash equivalents and other proceeds received in connection with the Business and the Purchased Assets during the period after the Initial Closing); (vi) promptly filing with the Bankruptcy Court and using commercially reasonable efforts to seek the approval of any motion that may be necessary or appropriate in connection with any of the foregoing as reasonably requested by Purchaser. The foregoing notwithstanding, neither Sellers nor any other person shall be required to take any action with respect to the foregoing to the extent that the approval of the Bankruptcy Court is required for such action and such approval has not yet been obtained, provided that such action shall be required to be taken promptly upon obtaining such approval. Purchaser shall indemnify Sellers from and against any and all Losses incurred by them relating to their provision of cooperation pursuant to this Section 6.14(a) other than Losses arising from Sellers' bad faith, willful misconduct or gross negligence.

(b)     To secure Sellers' obligations under this Agreement, Sellers grant to Purchaser, as of the Initial Closing, a first priority (subject only to any Permitted Liens and Liens securing the Financing) lien on and security interest in all of the Purchased Assets and Sellers' cash and cash equivalents and other proceeds received in connection with the Business and the Purchased Assets after the Initial Closing (which lien and security interest may be assigned to any lender of the Purchaser), provided any such liens and security interest granted to Purchaser shall not extend to any Administrative Agent Cash Proceeds. Sellers shall execute and deliver any pledge and security documents or other certificates or documents as may be reasonably requested by Purchaser to facilitate the pledging of, and granting, recording and perfection of such lien and security interest and shall promptly file with the Bankruptcy Court and using commercially reasonable efforts to seek the approval of any motion that may be necessary or appropriate in connection with any of the foregoing as reasonably requested by Purchaser, including seeking approval from the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code for such liens and security interest.

(c)     If Sellers, in connection with the operation of the Business after the Initial Closing, enter into any servicing agreements with respect to Mortgage Loans, then Sellers shall include in such servicing agreements such provisions as Purchaser may reasonably request to facilitate (i) lenders to make or continue their loans or (ii) the Financing. Such provisions may include provisions authorizing the servicer to finance, pledge and/or assign any or all of its right, title and interest in, to and under the servicing agreement to one or more lenders selected by the servicer, providing for the lenders to designate successor servicers, and providing for remedies for, and waivers of, defaults under the servicing agreement. Without limiting any other rights or remedies of Sellers, to the extent Sellers suffer any Losses with respect to any such new servicing agreements the economic consequences of which are not fully borne by Purchaser through the Reconciliation Payment or otherwise, Sellers may set off the amount of such Losses against any moneys owed by Sellers to Purchaser under this Agreement or against the Purchased Assets.

(d)      Sellers will deposit all cash and cash equivalents received in connection with the Business and the Purchased Assets during the period from the Initial Closing until the later of the Final Closing and payment of the Reconciliation Payment in cash accounts that are separate from any other accounts maintained or used by Sellers or any of their Affiliates. The cash in such accounts will be used only for the operation of the Business in the Ordinary Course or as required by the agreements for the Financing. Such accounts shall be subject to such control agreements and rights for the benefit of the lenders for the Financing as are required by such lenders and such other control agreements as, to the extent permitted by law, are requested by Purchaser. If Sellers are required to pay a Reconciliation Payment, Sellers shall use the moneys in such accounts for such purpose. Sellers shall not deposit or commingle any other amounts with such separate accounts and Sellers shall provide a statement of all transactions relating to such accounts upon request of Purchaser.

Section 6.15    Excluded Contracts.  From time to time prior to the Final Closing Date, Purchaser may designate to Sellers any Assumed Contract (other than (x) prior to the Initial Closing, any Servicing Agreement and (y) any Disputed Servicing Agreement while it is a Disputed Servicing Agreement) that Purchaser wants to exclude from the Assumed Contracts (the "Excluded Contracts") and, if the Initial Closing occurs, upon such designation the Purchased Assets, Assumed Liabilities and Assumed Contracts shall exclude any Excluded Contracts and the Liabilities associated therewith. For the avoidance of doubt, the designation of any Assumed Contract as an Excluded Contract shall not result in a reduction of the Purchase Price.

Section 6.16    Assumption of Certain Assumed Contracts.  If, prior to the Final Closing, but after the Initial Closing has occurred, Sellers are by Section 365(d)(4) of the Bankruptcy Code required to either assume a lease of nonresidential real property (within the meaning of Section 365 of the Bankruptcy Code) by a certain deadline or it will be deemed rejected, Sellers shall undertake commercially reasonable efforts to obtain an extension of such deadline, and if they are unable to obtain such extension, shall assume such lease if so directed by Purchaser in writing. If Sellers later reject such lease, Purchaser shall indemnify Sellers for an amount equal to (x) any administrative expense priority claim under Section 503 of the Bankruptcy Code that arises from such rejection for the period of two years following the earlier of (A) the rejection date and (B) fifteen business days following the date that Purchaser notifies Sellers of its request to treat such lease as a rejected contract, minus (y) the product of (1) the amount of such lessor's unsecured claim that would have been allowed if such lease been rejected as of the Initial Closing Date multiplied by (2) a reasonable estimate of the recovery percentage on account of general unsecured claims (after giving effect to the indemnification payment pursuant to this Section 6.16) in the applicable Bankruptcy Case.

Section 6.17    Provisions Regarding Advances.

(a)      Sellers shall use their commercially reasonable efforts to sell, within 180 days after the Initial Closing Date, (i) the Mortgage Loans described on Schedule 6.10(f) or the servicing rights with respect thereto and (ii) the Servicing Rights Held for Sale. Simultaneous

with and as a condition to each such sale, Sellers shall pay or cause Purchaser to be paid, for any outstanding Advances relating to such Mortgage Loans or relating to the Mortgage Loans serviced under the servicing rights being sold, an amount equal to the amount of such Advances. On the six-month anniversary of the Initial Closing Date, Sellers shall purchase from Purchaser or the Business, as the case may be, any outstanding Advances held by Purchaser or the Business relating to such Mortgage Loans or relating to the Mortgage Loans serviced under the Servicing Rights Held for Sale for a price equal to the amount of such Advances. To the extent required for Sellers to have the funds to pay such price, Sellers will borrow the moneys therefor by making a draw under the DIP Financing Agreement. From and after the date of such purchase, such Advances shall be Excluded Assets and the price so paid shall be Purchased Assets.

(b)     Any Advances required to be made after the Initial Closing with respect to (i) the Mortgage Loans described on Schedule 6.10(f), (ii) the Servicing Rights Held for Sale or (iii) any Disputed Servicing Agreement during such time as it remains a Disputed Servicing Agreement, shall be made by Sellers with funds borrowed by Sellers under the DIP Financing Agreement or otherwise, and such Advances shall be Excluded Assets. Purchaser shall not have any obligation to make any such Advances, but it shall have the right to do so if they are not made by Sellers in which case such Advances will be Purchased Assets. Purchaser and Sellers hereby agree that the amount of any Advances required to be made under this Section 6.17 by Sellers out of their own funds or by making a draw on the DIP Financing Agreement, shall be delivered to Sellers (with respect to periods prior to the Final Closing Date), or to Purchaser (with respect to periods following the Final Closing Date) and upon receipt of such funds, Sellers or Purchaser shall administer the application of such Advances in the same manner in which it administers all Advances which are Purchased Assets.

(c)     After the Initial Closing, within five Business Days after any Disputed Servicing Agreement ceases to be a Disputed Servicing Agreement under circumstances in which it has not become an Excluded Asset, Purchaser will pay Sellers, for any outstanding Advances made by Sellers after the Initial Closing, an amount equal to the amount of such Advances and such Advance shall be Purchased Assets; provided, however, that Purchaser will deliver such payment to the lender under the DIP Financing Agreement to repay any obligations of Sellers outstanding under the DIP Financing Agreement that were incurred to fund Advances under this Section 6.17 (or, to the extent there are no such obligations, shall deliver such payment to Sellers). At such time as any Disputed Servicing Agreement becomes an Excluded Asset, Sellers shall purchase from Purchaser or the Business, as the case may be, any outstanding Advances held by Purchaser or the Business relating to such Disputed Servicing Agreement for a price equal to the amount of such Advances. To the extent required for Sellers to have the funds to pay such price, Sellers will borrow the moneys therefor by making a draw under the DIP Financing Agreement. From and after the date of such purchase, such Advances shall be Excluded Assets and the price so paid shall be Purchased Assets.

(d)     Any collections by Sellers or Purchaser with respect to Advances relating to a Mortgage Loan shall, for any outstanding Advances made before the Initial Closing with respect to such Mortgage Loan and any outstanding Advances made at or after the Initial Closing with respect to such Mortgage Loan, be applied first to the earliest funded outstanding Advance relating to such Mortgage Loan.

(e)    Purchaser and Sellers shall, and Purchaser shall cause its Affiliates to, use their respective commercially reasonable efforts to cause the DIP Financing Agreement and the Order approving the DIP Financing Agreement to be amended prior to the Initial Closing to permit Sellers to borrow under the DIP Financing Agreement amounts that may be necessary to fund any Advances in accordance with this Section 6.17.

Section 6.18    FNMA.    Prior to the later of October 17, 2007 and the date that is two weeks prior to the date set forth in the Fannie Mae Stipulation Order, as such date may be extended, by which the "Closing" (as defined in the Fannie Mae Stipulation Order) must occur, and in no event later than the Initial Closing Date, Purchaser shall notify Sellers of Purchaser's determination of whether to include any of Sellers' Servicing Rights and Servicing Agreements with FNMA and related Advances (the "FNMA Servicing Rights") as Purchased Assets. The Sellers agree to take commercially reasonable efforts to reasonably extend the date set forth in the Fannie Mae Stipulation Order by which the "Closing" (as defined in the Fannie Mae Stipulation Order) must occur. If Purchaser notifies Sellers that the FNMA Servicing Rights will be included as Purchased Assets, then the FNMA Servicing Rights will be Purchased Assets and the Initial Closing Servicing Balance shall include the unpaid principal balance of the Mortgage Loans being serviced pursuant to the FNMA Servicing Rights and the Advances Amount shall include the Advances related thereto. Otherwise, the FNMA Servicing Rights will be Excluded Assets. Notwithstanding the foregoing, if Purchaser has timely notified Sellers that the FNMA Servicing Rights are to be Purchased Assets and the FNMA Servicing Rights cannot be included as Servicing Agreements other than as a result of Sellers' breach of the FNMA Servicing Rights after the date of this Agreement or Sellers' failure to pay any Initial Cure Amount or any Interim Cure Amount with respect to the FNMA Servicing Rights, then the unpaid principal balance of the Mortgage Loans being serviced pursuant to the FNMA Servicing Rights shall be included in the Initial Closing Servicing Balance and the Advances Amount shall include the Advances related thereto notwithstanding that the FNMA Servicing Rights cannot be included as Servicing Agreements and such rights are not being transferred to Purchaser. In such event Sellers will use commercially reasonable efforts to sell the FNMA Servicing Rights on commercially reasonable terms. If Sellers are able to so sell the FNMA Servicing Rights, then the amount of the Purchase Price payable by the Purchaser with respect to the FNMA Servicing Rights shall be reduced by an amount (which amount shall not exceed the portion of the Purchase Price payable with respect to the FNMA Servicing Rights) equal to the net proceeds of such sale, after payment of all expenses incurred by Sellers in connection with such sale (or, if such Purchase Price already has been paid, such amount shall be refunded to Purchaser).

Section 6.19    Option to Purchase Excluded Assets.    In the event that at the Final Closing or at the end of the term of the Transition Services Agreement the Excluded Assets designated with an asterisk on Schedule 2.2(n) are no longer required for use by Sellers in any capacity (including under the Transition Services Agreement) and are no longer needed for the administration of Sellers' estate, Purchaser shall have the option to purchase such assets, or any of them, upon payment of their net book value; provided that Purchaser shall pay any change of control, breakage fees or similar fees in respect of such purchase.

Section 6.20    Compensation Plan.  Prior to the Initial Closing, Purchaser shall use its commercially reasonable efforts to prepare and deliver to Sellers a replacement compensation plan for any Business Employees employed in Texas and Sellers shall use their commercially reasonable efforts to seek an Order of the Bankruptcy Court approving such compensation plan.  If, despite the commercially reasonable efforts of Purchaser and Sellers prior to the Initial Closing, a replacement compensation plan for Business Employees employed in Texas is not approved by an Order of the Bankruptcy Court prior to the Initial Closing, Purchaser shall be responsible for any amounts accruing after the Initial Closing with respect to Business Employees employed in Texas under the "Non-Insider Employee Retention Plan" described on Schedule 3.2 from the Initial Closing until the effective date of a replacement compensation plan for Business Employees employed in Texas.

Section 6.21    Approved FNMA Servicer.  From the date of this Agreement until the earlier of the Final Closing and the termination of this Agreement, (i) Sellers will use their best efforts to remain an approved FNMA servicer (as contemplated by the Fannie Mae Stipulation Order) and (ii) Purchaser shall use its best efforts to become an approved FNMA servicer.  Purchaser and Sellers shall each reasonably cooperate with each other in their respective efforts to comply with the foregoing covenants.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers' creditor constituencies and the Bankruptcy Court of higher or better competing bids.  Purchaser acknowledges that following the date hereof until (but not beyond) the Auction Date, Sellers and their respective Representatives and Affiliates may, with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of a material portion of the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a plan of reorganization or liquidation) the consummation of which would be substantially inconsistent with the transactions herein contemplated (a "Competing Transaction"):  (a) continue to initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser and its Affiliates, agents and representatives), (b) respond to any inquiries or offers to purchase all or any part of the Purchased Assets and (c) perform any and all other acts related thereto contemplated by the Revised Sale Procedures Order, including supplying information relating to the Business and the assets of Sellers to prospective purchasers that satisfy the conditions therefor specified in the Revised Sale Procedures Order.  Notwithstanding the foregoing, in no event may Sellers or their respective Affiliates initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser and its Affiliates, agents and representative) with respect to a Competing Transaction or accept an offer or proposal from any Person (other than Purchaser and its Affiliates, agents and representative) with respect to a Competing Transaction (i) other than pursuant to and in compliance with the terms and conditions of the Revised Sale Procedures Order or (ii) after the Auction.

Section 7.2    Break-Up Fee.  In the event that this Agreement is terminated pursuant to Section 9.1(e), Sellers shall pay to Purchaser a cash amount equal to $5,000,000 (the "Break-Up Fee"), and the Expense Reimbursement in cash.  The Expense Reimbursement will be due and payable on the Business Day immediately following such termination.  The Break-Up Fee will be due and payable upon the earlier of the closing of, and termination of the agreement providing for, a Competing Transaction; provided, however, that the Break-Up Fee shall only be due and payable upon the termination of an agreement providing for a Competing Transaction if Sellers are entitled to retain a deposit made in connection with the Competing Transaction. Notwithstanding anything to the contrary contained in this Agreement, (1) upon payment of the Break-Up Fee and the Expense Reimbursement in accordance herewith, Sellers and their respective Representatives and Affiliates shall be fully released and discharged from any Liability under or resulting from this Agreement and, neither Purchaser nor any other Person shall have any other remedy or cause of action under or relating to this Agreement, including for reimbursement of expenses and (2) Sellers' obligations hereunder shall be joint and several. Notwithstanding this Section 7.2, if Purchaser is the Next Highest Bidder (as such term is defined in the Revised Sale Procedures) and Purchaser closes under this Agreement as a result of a failure to close under a Competing Transaction, then Sellers shall have no obligation to pay, and Purchaser shall not be entitled to receive, the Expense Reimbursement or Break-Up Fee.

Section 7.3    Bankruptcy Court Filings.  As promptly as practicable following the execution of this Agreement, Sellers shall file with the Bankruptcy Court the Sale Motion, and, subject to Section 7.1, Sellers shall thereafter pursue diligently the entry of the Revised Sale Procedures Order and the Sale Approval Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Revised Sale Procedures Order and the Sale Approval Order and all parties hereto shall use their respective reasonable best efforts to obtain a finding of adequate assurance of future performance by Purchaser or its designee or designees under the Assumed Pre-Petition Contracts, and demonstrating that each of Purchaser and such designees is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court.  In the event the entry of the Revised Sale Procedures Order or the Sale Approval Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII
## CONDITIONS

Section 8.1    Conditions to Obligations of Purchaser and Sellers On or Prior to the Initial Closing Date.  The respective obligations of each party to consummate the transactions contemplated by this Agreement on the Initial Closing Date shall be subject to the satisfaction, or waiver by Purchaser and Sellers, on or prior to the Initial Closing Date of the following conditions precedent:

(a)    Revised Sale Procedures Order.  The Revised Sale Procedures Order (A) shall have been entered by the Bankruptcy Court and not be subject to any stay of

effectiveness, (B) shall not have been modified or amended in any manner adverse to Purchaser unless agreed to in writing by Purchaser in its sole discretion, and (C) shall have become a Final Order.

(b)  Sale Approval Order.  The Sale Approval Order (A) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (B) shall not have been modified or amended in any manner adverse to Purchaser unless agreed to in writing by Purchaser in its sole discretion, and (C) shall have become a Final Order.

(c)  No Law, Judgments, Etc.  No Government Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law which is in effect and which restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement.

(d)  Hart-Scott-Rodino; Competition Approvals.  The applicable waiting period under the HSR Act shall have expired or been earlier terminated without action by the Department of Justice or the Federal Trade Commission to prevent consummation of the transactions contemplated by this Agreement.

Section 8.2  Conditions to Obligations of Sellers On or Prior to the Initial Closing Date.  The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Sellers, on or prior to the Initial Closing Date of each of the following conditions:

(a)  Representations and Warranties.  The representations and warranties made herein by Purchaser shall be true and correct on the date of this Agreement (without regard to any materiality or Material Adverse Effect qualifier contained therein and after giving effect to any cure of such breach of representation or warranty prior to the Initial Closing Date) and shall be true and correct on the Initial Closing Date as though made on the Initial Closing Date, except to the extent such representations and warranties speak as of a specified earlier date (in which case such representations and warranties shall be true and correct as of such specified earlier date), and except to the extent that any such failure of representations or warranties to be true and correct, individually or in the aggregate, has not had or would not reasonably be expected to have a Material Adverse Effect.

(b)  Covenants.  Each of the covenants and agreements of Purchaser to be performed on or prior to the Initial Closing Date shall have been duly performed in all material respects.

(c)  Certificate.  Sellers shall have received a certificate, signed by a duly authorized officer of Purchaser and dated the Initial Closing Date, to the effect that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied.

(d)  Deliveries.  Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.9.

(e)    Minimum Proceeds.  The Net Proceeds payable to the Administrative Agent on the Initial Closing Date pursuant to Section 4.1(a)(iv) shall not be less than an amount equal to the "Minimum Net Proceeds" determined as set forth on Schedule 8.2(e).

Section 8.3    Conditions to Obligations of Purchaser On or Prior to the Initial Closing Date.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Purchaser, on or prior to the Initial Closing Date of each of the following conditions:

(a)    Representations and Warranties.   The representations and warranties made herein by Seller shall be true and correct on the date of this Agreement (without regard to any materiality or Material Adverse Effect qualifier contained therein and after giving effect to any cure of such breach of representation or warranty prior to the Initial Closing Date) and shall be true and correct on the Initial Closing Date as though made on the Initial Closing Date, except to the extent such representations and warranties speak as of a specified earlier date (in which case such representations and warranties shall be true and correct as of such specified earlier date), and except to the extent that any such failure of representations or warranties to be true and correct, individually or in the aggregate, has not had or would not reasonably be expected to have a Material Adverse Effect.

(b)    Covenants.  Each of the covenants and agreements of Sellers to be performed on or prior to the Initial Closing Date shall have been duly performed in all material respects.

(c)    Certificate.  Purchaser shall have received certificates, signed by duly authorized officers of Sellers and dated the Initial Closing Date to the effect that the conditions set forth in Sections 8.3(a) and 8.3(b) have been satisfied.

(d)    Sale Approval Order.  With respect to obligations and benefits that can be realized prior to the Initial Closing Date, Sellers shall have complied, in all material respects, with all of their obligations under, and Purchaser shall have received the benefits of, the Sale Approval Order.

(e)    Deliveries.  Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.10(a).

(f)    No Material Adverse Effect.  From the date of this Agreement through the Initial Closing Date there shall not have occurred any action, failure to act, event or circumstance that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)    Consents.  All Consents set forth on Schedule 8.3(g) hereto shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

(h)    Status of Mortgage Loans. As of the Initial Closing Date, the aggregate amount of Defaulted Mortgage Loans serviced pursuant to the Servicing Agreements shall not constitute more than 8% of the aggregate outstanding principal balance of all Mortgage Loans which are being serviced pursuant to the Servicing Agreements and a duly authorized officer of Parent shall have delivered a certificate as of the Initial Closing Date certifying as to such fact.

(i)    Minimum Servicing Agreement Balance.    The Initial Closing Date Mortgage Loan Schedule shall include Mortgage Loans serviced pursuant to the Servicing Agreements (which are not Disputed Servicing Agreement) with an unpaid principal balance of not less than $38 billion.

Section 8.4    Condition to Obligations of Purchaser On or Prior to the Final Closing Date. The obligations of Purchaser to effectuate the Final Closing shall be subject to the satisfaction or waiver by Purchaser, at or prior to the Final Closing Date of the following condition:

(a)    Governmental Consents.    Purchaser shall have obtained all licenses, permits, certificates, regulatory approvals, concessions, grants, franchises, and other authorizations required by any Government Entity to permit the transfer of the Business to Purchaser as contemplated by this Agreement and as may be necessary or appropriate for the operation by the Business in the Ordinary Course of Business.

## ARTICLE IX
## TERMINATION

Section 9.1    Termination.  Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time on or prior to the Initial Closing Date:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by either Sellers or Purchaser, upon written notice to the other:

(i)    if the closing condition set forth in Section 8.1(b) or Section 8.1(d) shall not have been satisfied on or before December 31, 2007 (unless such deadline is extended with the written consent of Purchaser) and if all other conditions to the respective obligations of the parties with respect to the Initial Closing that are capable of being fulfilled by such date shall have been so fulfilled or waived; provided, however, that the party proposing to terminate (and its Affiliates) shall not have breached in any material respect any of their respective representations, warranties, covenants or agreements contained in this Agreement in any manner that shall have proximately contributed to such failure (such breaching party, a "Proximate Cause Party");

(ii)    if the Initial Closing Date shall not have occurred on or before December 31, 2007 (unless such deadline is extended with the consent of Purchaser) (the

"Termination Date"); provided, however, that the party proposing to terminate or any of its Affiliates is not a Proximate Cause Party; or

      (iii)    if a Government Entity shall have issued a Final Order or taken any other action permanently restricting, preventing, prohibiting, making illegal or enjoining the transactions contemplated by this Agreement, unless such Final Order or action was issued or taken at the request or with the support of the party seeking to terminate this Agreement (or any of its Affiliates); it being agreed that the parties hereto shall promptly appeal any such adverse order or other determination that is not non-appealable (and pursue such appeal with reasonable diligence); or

      (c)    by Purchaser, upon written notice to Sellers:

      (i)    if any condition to the obligations of Purchaser set forth in Sections 8.1 and 8.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

      (ii)    if there shall be a breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 8.1 or 8.3 and which breach has not been cured by the earlier of (i) 20 Business Days after the giving of written notice by Purchaser to Sellers of such breach and (ii) the Termination Date; or

      (iii)    if the Revised Sale Procedures Order has not been entered at least two days prior to any bid deadline set by Sellers with respect to the sale of the Business but in any event no later than October 15, 2007, or if the Revised Sale Procedures Order, once entered, is changed in a manner that is adverse to Purchaser without the consent of Purchaser in its sole discretion; or

      (iv)    if the Sale Approval Order has not been entered and become a Final Order without stay of its effectiveness by November 15, 2007, or if the Sale Approval Order, once entered, is changed in a manner that is adverse to Purchaser without the consent of Purchaser in its sole discretion.

      (d)    by Sellers, upon written notice to Purchaser:

      (i)    if any condition to the obligations of Sellers set forth in Sections 8.1 and 8.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

      (ii)    if there shall be a breach in any material respect by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 8.1 or 8.2 and which breach, except as provided in Section 2.7(a), has not been cured by the earlier of (i) 20 Business Days after the giving of written notice by Sellers to Purchaser of such breach and (ii) the Termination Date;

(e)    automatically if the Bankruptcy Court shall enter an Order approving a Competing Transaction, subject to Purchaser's right to payment of the Break-Up Fee and Expense Reimbursement in accordance with the provision of Section 7.2; provided, however, that if the Auction is held pursuant to the Revised Sale Procedures, and Purchaser is designated as the Next Highest Bidder (as such term is defined in the Revised Sale Procedures), then this Agreement shall not terminate pursuant to this subsection (e) until the earlier of (i) the closing on the bid initially selected as the "Successful Bid" at the Auction (as such term is defined in the Revised Sale Procedures); and (ii) December 31, 2007.   While Purchaser remains the Next Highest Bidder (as such term is defined in the Revised Sale Procedures), the obligations of Purchaser and Sellers described in Sections 6.4, 6.6, 6.10(d), 6.11(b) and (c) and 6.17(e) shall be held in abeyance until the purchase agreement with the bidder or purchase agreements with the bidders, as the case may be, who made the "Successful Bid" at the Auction (as such term is defined in the Revised Sale Procedures) are terminated.

Section 9.2    Procedure and Effect of Termination.    If this Agreement is terminated in accordance with Section 9.1, this Agreement shall become void and of no further force and effect (subject to the provisions of this Article IX) and the transactions contemplated by this Agreement shall be abandoned, without further action by any party, and no party shall have any Liability or further obligation to any other party resulting from such termination (a) except for the provisions of:  (i) that certain Confidentiality Agreement, dated July 31, 2007, between Parent and WL Ross & Co., LLC (the "Confidentiality Agreement"); (ii) Article IX (Termination); and (iii) Sections 4.3 (Deposit), 7.2 (Break-Up Fee), 9.2 (Procedure and Effect of Termination), 11.3 (Fees and Expenses; Allowed Administrative Expenses), 11.4 (Amendment; Waiver), 11.5 (Publicity), 11.6 (Notices), 11.8 (Entire Agreement; No Third Party Beneficiaries), 11.10 (Governing Law), 11.11 (Venue and Retention of Jurisdiction), 11.12 (No Punitive Damages), 11.13 (Assignment) and 11.17 (Personal Liability), all of which shall remain in full force and effect; and (b) except that no such termination shall relieve any party from any Liability (other than for punitive or exemplary damages) which such party may have to another party for Losses arising out of any breach of this Agreement by such party which occurs upon or prior to the termination of this Agreement.  If this Agreement is terminated in accordance with Section 9.1, Sellers shall, unless the termination shall be pursuant to Section 9.1(d)(ii), pay Purchaser the Expense Reimbursement.

## ARTICLE X
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers that all of the statements contained in this Article X, are true and correct as of the date of this Agreement (or, if made as of a specified date, as of such date) and will be true and correct as of the Initial Closing Date as though made on the Initial Closing Date.

Section 10.1    Legal Power; Organization; Qualification of Purchaser.  Purchaser has been duly incorporated, and is validly existing and in good standing under the Laws of its jurisdiction of incorporation, has all requisite power and authority to execute and deliver this

Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby, and has taken all necessary corporate or other action to authorize the execution, delivery and performance of this Agreement.

Section 10.2    Binding Agreement.  This Agreement has been duly executed and delivered by Purchaser and, assuming due and valid authorization, execution and delivery by Sellers, this Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.  When required by this Agreement to be delivered to Sellers, each Ancillary Agreement will be duly and validly executed and delivered by Purchaser, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its respective terms, except as limited by the Enforceability Exceptions.

Section 10.3    No Conflict or Default.  Neither the execution and delivery of this Agreement nor the consummation by Purchaser of the transactions contemplated hereby will result in a violation of, or a default under, or conflict with, or require any consent, approval or notice under, any material contract, trust, commitment, agreement, obligation, understanding, arrangement or restriction of any kind to which Purchaser is a party or by which Purchaser is bound or to which any properties or assets owned by Purchaser are subject.  Consummation by Purchaser of the transactions contemplated hereby will not violate, or require any consent, approval or notice under, any provision of any material judgment, order, decree, statute, Law, rule or regulation applicable to such Purchaser other than those set forth on Schedule 10.3.

Section 10.4    Funding.  The Purchaser has provided Sellers with a copy of its equity financing commitment.  Purchaser acknowledges that its obligations under this Agreement are not subject to it securing any debt financing or debt financing commitment with respect to the transactions contemplated by this Agreement.

Section 10.5    Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

Section 10.6    Independent Investigation.  In making the decision to enter into this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby and thereby, Purchaser has conducted its own independent investigation, review and analysis of the Purchased Assets, Assumed Liabilities, and Business, which investigation, review and analysis was done by Purchaser, its Affiliates and its Representatives.  Purchaser acknowledges that it and its Representatives have been provided adequate access to the personnel, properties, premises and records of the Business for such purpose.  In entering into this Agreement and the Ancillary Agreements, Purchaser acknowledges that Purchaser, its Affiliates and its Representatives have relied solely upon the aforementioned investigation,

review and analysis and not on any factual representations or opinions of Sellers, their Affiliates or their Representatives (except the specific representations and warranties of Seller set forth in this Agreement. Purchaser hereby acknowledges and agrees that (a) other than the representations and warranties made in this Agreement, none of Sellers, their Affiliates or their Representatives makes or has made any representation or warranty, express or implied, at law or in equity, with respect to the Purchased Assets, Assumed Liabilities or the Business, including as to (i) merchantability or fitness for any particular use or purpose, (ii) the performance of the Purchased Assets and the Business after the Initial Closing or (iii) the probable success or profitability of the Purchased Assets or the Business, and (b) none of Sellers, their Affiliates or their Representatives will have or be subject to any Liability or indemnification obligation to Purchaser or to any other Person resulting from the distribution to Purchaser, its Affiliates or its Representatives of, or Purchaser's use of, any information relating to the Purchased Assets, Assumed Liabilities or the Business and any information, documents or material made available to Purchaser, whether orally or in writing, in management presentations, responses to questions submitted on behalf of Purchaser or in any other form in expectation of the transactions contemplated hereby.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1   <u>No Survival of Representations and Warranties</u>. The parties hereto agree that the representations and warranties contained in this Agreement and in any certificate delivered pursuant hereto by any Person shall not survive the Initial Closing Date hereunder and none of the parties shall have any Liability to each other after the Initial Closing Date for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Initial Closing Date shall survive the Initial Closing Date hereunder.

Section 11.2   <u>Transfer Taxes</u>. All Transfer Taxes attributable to the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne one-half by Purchaser and one-half by Sellers. Sellers and Purchaser shall cooperate to timely prepare, and Purchaser shall file or cause to be filed any returns or other filings relating to such Transfer Taxes (unless Sellers are required by applicable Law to file the return), including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

Section 11.3   <u>Fees and Expenses; Allowed Administrative Expenses</u>. (a) Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the consummation of the Transaction shall be paid by the party incurring such expenses.

(b)    The Break-Up Fee, Expense Reimbursement and any Reconciliation Payment payable to Purchaser shall constitute allowed superpriority administrative expense claims against the Sellers with priority over all administrative expense claims and unsecured claims against the Sellers, including any adequate protection-related claims and any

administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, to the extent permitted by Law, subject only to any superpriority claims arising under the DIP Financing Agreement and the Bankruptcy Court Order approving such Agreement.

      (c)    Any claims arising from breaches by any Sellers of their obligations pursuant to the terms of this Agreement shall constitute allowed administrative expense claims against the Sellers under Sections 503(b)(1) and 507(a)(1), as applicable, of the Bankruptcy Code.

      Section 11.4  <u>Amendment; Waiver</u>. This Agreement may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law. Sellers shall not agree to amend, modify or supplement this Agreement or any Ancillary Agreement, or waive any provision of this Agreement or any Ancillary Agreement (including but not limited to <u>Section 8.2(e)</u> hereof) without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

      Section 11.5  <u>Publicity</u>. The initial press release with respect to the execution of this Agreement shall be a joint press release reasonably acceptable to Purchaser and Sellers. Thereafter, until the Final Closing Date, or the date the transactions contemplated hereby are terminated or abandoned pursuant to <u>Article IX</u>, Parent and Purchaser will consult with each other in good faith prior to issuing or causing (directly or through another Person) the publication of any press release or other similar public statement with respect to this Agreement or the transactions contemplated hereby.

      Section 11.6  <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be delivered personally by hand, by facsimile (which is confirmed) or sent by an overnight courier service to the parties at the following addresses (or at such other address for a party as shall be specified by such party by like notice):

if to Purchaser, to:

> AH Mortgage Acquisition Co., Inc.
> c/o WL Ross & Co. LLC
> 1166 Avenue of the Americas, 27th Floor
> New York, New York  10036
> Facsimile:  (212) 317-4891
> Attention:  Mr. Wilbur L. Ross, Chairman

with copies to (which copies shall not constitute notice):

> Jones Day
> 222 East 41st Street
> New York, New York  10017
> Facsimile:  (212) 755-7306
> Attention:  Robert A. Profusek, Esq.

if to Sellers, to:

> c/o American Home Mortgage Investment Corp.
> 538 Broadhollow Road
> Melville, New York 11747
> Facsimile:  (516) 949-3929
> Attention:  Mr. Steven Cooper

with copies to (which copies shall not constitute notice):

> Kroll Zolfo Cooper
> 101 Eisenhower Parkway
> Roseland, New Jersey 07068
> Facsimile:  (973) 618-9430
> Attention:  Elizabeth S. Kardos, Esq.

> And

> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801
> Facsimile:  (302) 571-1253
> Attention:  James L. Patton, Jr., Esq.

> And

Banc of America
Strategic Solutions, Inc.
901 Main Street, 66th Floor
Dallas, TX 75202
Facsimile: (214) 290-9475
Attention: Jay T. Wampler

And

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Facsimile: (212) 836-6545
Attention: Mark Liscio, Esq.

And

Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Facsimile: (212) 478-7400
Attention: Mark S. Indelicato, Esq.

All notices given pursuant to this <u>Section 11.6</u> shall be deemed to have been given (i) if delivered personally on the date of delivery or on the date delivery was refused by the addressee, (ii) if delivered by facsimile, when transmitted to the applicable number so specified in (or pursuant to) this <u>Section 11.6</u> and an appropriate answerback is received, or (iii) if delivered by overnight courier, on the date of delivery as established by the return receipt or courier service confirmation (or the date on which the courier service confirms that acceptance of delivery was refused by the addressee).

Section 11.7    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 11.8    <u>Entire Agreement; No Third Party Beneficiaries</u>.  This Agreement (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Initial Closing Date, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.

Section 11.9 <u>Severability</u>. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.10 <u>Governing Law</u>. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 11.11 <u>Venue and Retention of Jurisdiction</u>. (a) Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 11.6</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases of the Sellers have closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 11.6</u>.

Section 11.12 <u>No Punitive Damages</u>. In no event will any party to this Agreement be liable to any other party for any punitive or exemplary damages or any claim of diminution in value of the Business.

Section 11.13 <u>Assignment</u>.   Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties.  Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.  Notwithstanding anything to the contrary in this Agreement, Purchaser may assign or pledge its rights hereunder to secure financing for the transactions contemplated hereby.

Section 11.14 <u>Fulfillment of Obligations</u>.  Any obligation of any party to any other party under this Agreement, which obligation is performed, satisfied or fulfilled completely by an Affiliate of such party, shall be deemed to have been performed, satisfied or fulfilled by such party.

Section 11.15 <u>Specific Performance</u>.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that Purchaser and Sellers shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at Law or in equity.  Nothing herein will affect the terms and conditions of Purchaser's equity commitment.

Section 11.16 <u>Waiver of Bulk Transfer Laws</u>.   Unless Purchaser requests otherwise, Sellers and Purchaser agree to waive compliance with (a) Article 6 of the Uniform Commercial Code as adopted in each of the jurisdictions in which any of the Purchased Assets are located to the extent that such Article is applicable to the transactions contemplated hereby and (b) any other so called "bulk sales" laws; <u>provided</u> <u>that</u> if Purchaser requests otherwise, Sellers' compliance with such request shall be at the sole expense of Purchaser.

Section 11.17 <u>Personal Liability</u>.  This Agreement shall not create or be deemed to create or permit any personal Liability or obligation on the part of any officer, director, employee, Representative or investor (including WLR) of any party hereto.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.

By: _____
    Name: David Storper
    Title: Vice President and Secretary

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name:
    Title:

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name:
    Title:

AMERICAN HOME MORTGAGE SERVICING,
    INC.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name:
    Title

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.

By:_____
    Name:
    Title:

AMERICAN HOME MORTGAGE
INVESTMENT CORP.,
as Seller and Debtor and Debtor-in-Possession

By:_____
    Name: Michael Strauss
    Title: Chief Executive Officer

AMERICAN HOME MORTGAGE CORP,
as Seller and Debtor and Debtor-in-Possession

By:_____
    Name: Michael Strauss
    Title: Chief Executive Officer

AMERICAN HOME MORTGAGE SERVICING,
INC.,
as Seller and Debtor and Debtor-in-Possession

By:_____
    Name: Michael Strauss
    Title: Chief Executive Officer