Execution Version

FIRST AMENDMENT TO
ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement dated as of November 1, 2007 (this "First Amendment"), is entered into by and among AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser"), American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing Inc, a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement dated as of September 25, 2007 (the "Agreement");

WHEREAS, Section 11.4 of the Agreement permits amendment of the Agreement by a written instrument signed by all of the parties to the Agreement with the prior written consent of the Administrative Agent (as defined in the Agreement) and with prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases (as defined in the Agreement); and

WHEREAS, the parties to the Agreement desire to amend certain provisions of the Agreement pursuant to this First Amendment in order to amend and clarify the Agreement,

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.        Definitions.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

Section 2.        Additional and Amended Definitions.

2.1        Section 1.1 of the Agreement is amended by deleting the definitions of "Cure Escrow Agreement", "Initial Cure Amount", "Interim Cure Amount" and "Purchaser's Cure Amount" as each appears therein and inserting the following definitions in their place:

"Cure Escrow Agreement" means an escrow agreement by and between Sellers and an escrow agent reasonably acceptable to each of Purchaser and Sellers to be entered into at the Initial Closing, in substantially the form set forth in Exhibit A hereto.

"Initial Cure Amount" means the sum of (i) the maximum amount (as such amount is limited by the Sale Approval Order) to cure all defaults with respect to any acts or omissions occurring prior to the entry of the Sale Approval Order by the Bankruptcy Court under Assumed Contracts that are executory contracts within

the meaning of Section 365 of the Bankruptcy Code and to effectuate the assumption by Sellers of such Assumed Contracts and the assignment thereof to Purchaser (or Purchaser's designee) pursuant to Section 365 of the Bankruptcy Code; and (ii) the maximum amount (as such amount is limited by the Sale Approval Order) to cure all defaults and satisfy any Claims, counterclaims, offsets and defenses, whether contractual or otherwise (including any right of recoupment) with respect to any acts or omissions occurring prior to the entry of the Sale Approval Order by the Bankruptcy Court under Assumed Contracts that are not executory contracts within the meaning of Section 365 of the Bankruptcy Code in either case (a) as provided in the Sale Approval Order or other Order of the Bankruptcy Court, or (b) pursuant to a written agreement among the parties to such Assumed Contract(s) (subject, in the case of the Sellers, to the prior written consent of the Administrative Agent and prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases).

"Interim Cure Amount" means the sum of (i) the maximum amount (as such amount is limited by the Sale Approval Order), other than any amount included in the Initial Cure Amount, to cure all defaults with respect to any acts or omissions occurring between the entry of the Sale Approval Order by the Bankruptcy Court and the Initial Closing under Assumed Contracts that are executory contracts within the meaning of Section 365 of the Bankruptcy Code and to effectuate the assumption by Sellers of such Assumed Contracts and the assignment thereof to Purchaser (or Purchaser's designee) pursuant to Section 365 of the Bankruptcy Code; and (ii) the maximum amount (as such amount is limited by the Sale Approval Order), other than any amount included in the Initial Cure Amount, to cure all defaults and satisfy any Claims, counterclaims, offsets and defenses, whether contractual or otherwise (including any right of recoupment) with respect to any acts or omissions occurring during the period between the entry of the Sale Approval Order by the Bankruptcy Court and the Initial Closing under Assumed Contracts that are not executory contracts within the meaning of Section 365 of the Bankruptcy Code in either case (a) as provided in the Sale Approval Order or other Order of the Bankruptcy Court, or (b) pursuant to a written agreement among the parties to such Assumed Contract(s) (subject, in the case of the Sellers, to the prior written consent of the Administrative Agent and prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases).

Case 07-11047-CSS    Doc 5495-5    Filed 08/18/08    Page 3 of 67



"Purchaser's Cure Amount" means the sum of (i) the amount, other than any amount included in the Initial Cure Amount or the Interim Cure Amount, in order to cure all defaults with respect to acts or omissions occurring during the period from the Initial Closing until the Final Closing under Assumed Contracts that are executory contracts within the meaning of Section 365 of the Bankruptcy Code and to effectuate the assumption by Sellers of such Assumed Contracts and the assignment thereof to Purchaser (or Purchaser's designee) pursuant to Section 365 of the Bankruptcy Code; and (ii) the amount, other than any amount included in the Initial Cure Amount or the Interim Cure Amount, that is necessary to cure all defaults and satisfy any Claims, counterclaims, offsets and defenses, whether contractual or otherwise (including any right of recoupment) with respect to acts or omissions occurring during the period from the Initial Closing until the Final Closing under any Assumed Contracts that are not executory contracts within the meaning of Section 365 of the Bankruptcy Code in either case (a) as provided in an Order of the Bankruptcy Court, or (b) pursuant to a written agreement among the parties to the Assumed Contract(s) and Purchaser (or such designee) entered into after the Initial Closing.

2.2    Section 1.1 of the Agreement is further amended by adding the following definitions:

"FNMA Amount" means an amount that is not less than the Minimum FNMA Amount and not more than $7,966,949.18.

"FNMA Closing Payment" has the meaning specified in Section 4.1(d).

"FNMA Unresolved Amount" means an amount equal to $510,324.81.

"Minimum FNMA Amount" means $7,456,624.37.

"Servicer" means the "Servicer", "Master Servicer" or "Subservicer", as defined in any Servicing Agreement, in its capacity as such and as it applies to any Seller thereunder.

"Servicer Indemnity" means the Servicer's express indemnity obligations under each of the Servicing Agreements in its capacity as Servicer.

Section 3.    Assumption of Certain Liabilities.    Section 2.5 of the Agreement is amended by adding the following after the last sentence thereof:

Nothing contained herein shall be construed to limit Purchaser's obligation to perform the obligations of the Servicer under the Servicing Agreements after the Final Closing based on the status at that time of the Mortgage Loans being serviced under such Servicing Agreements, although such performance obligation shall not be deemed to cause Purchaser to assume any Liability for any act or omission of Sellers or their Affiliates (whether as originator, Servicer or otherwise), any indenture trustee or any other Person occurring before the Final Closing with respect to such Servicing Agreements; provided, however, and for the avoidance of doubt, nothing contained in this sentence is intended to relieve Purchaser from its indemnification obligations relating to its acts or omissions under the Servicer Indemnity occurring after the Final Closing, it being understood, however, that the Purchaser shall not have any indemnification obligations relating to any act or omission of Sellers or their Affiliates (whether as originator, Servicer or otherwise), any indenture trustee or any other Person occuring before the Final Closing.

Section 4.    Effectiveness of Initial Closing.  Section 2.7 (a) of the Agreement is amended by adding the following after the third sentence thereof:

The Initial Closing shall be deemed to occur and be effective as of 12:01 AM (prevailing Eastern time) on the Initial Closing Date.

Section 5.    Effectiveness of Final Closing.  Section 2.7(b) of the Agreement is amended by adding the following after the first sentence thereof:

The Final Closing shall be deemed to occur and be effective as of 12:01 AM (prevailing Eastern time) on the Final Closing Date.

Section 6.    Initial Closing Date Receipts.  Section 6.14(d)  of the Agreement is amended by deleting the first sentence thereof and adding the following in its place:

Except as otherwise required under any Servicing Agreement, including, without limitation, any requirements relating to deposits of cash and cash equivalents received by Sellers as insurance and tax escrows or principal and interest payments with respect to any Mortgage Loan, Sellers will deposit all cash and cash equivalents received in connection with the Business and the Purchased Assets during the period from the Initial Closing until the later of the Final Closing and payment of the Reconciliation Payment in cash accounts that are separate from any other accounts maintained or used by Sellers or any of their Affiliates.

Section 7.    Purchase Price.  The third sentence of Section 4.1(a) of the Agreement is deleted and the following sentence is inserted in its place:

At the Initial Closing, Purchaser shall pay the Purchase Price as follows (and in the following order of priority) (i) an amount equal to the Dispute Amount to the Dispute Escrow Agent, (ii) subject to Section 4.1(d), an amount equal to the FNMA Closing Payment, on behalf of Sellers, to FNMA by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing no less than two Business Days prior to the Initial Closing to Purchaser on behalf of FNMA, (iii) an amount equal to the necessary direct costs of the Sellers incurred in connection with this Agreement which are reasonably acceptable to the Administrative Agent (it being agreed that the fees, costs, and expenses of Kroll Zolfo Cooper are not to be deducted and that such amount shall be reduced by any amounts that are disputed by the Administrative Agent in accordance with the Cash Collateral Order) as directed by Seller, (iv) an amount equal to $10,000,000 in cash by wire transfer of immediately available funds to be held pursuant to the Cure Escrow Agreement and (v) the remaining Purchase Price (less any amounts delivered on behalf of Sellers in accordance with Section 4.3(a)) shall be paid by wire transfer of immediately available funds to an account or accounts designated by the Administrative Agent (pursuant to the Sale Approval Order) in writing to the Purchaser, no less than two Business Days prior to the Initial Closing, on behalf of Sellers, to the Administrative Agent in accordance with the Cash Collateral Order (the amounts payable under clause (v) hereinafter referred to as "Net Proceeds").

Section 8    FNMA Amount.  Section 4.1 of the Agreement is amended by adding the following Section 4.1(d).

(d)    Not less than two Business Days prior to the Initial Closing Date, Sellers shall either (i) notify the Purchaser in writing of the FNMA Amount to be paid to FNMA at the Initial Closing in accordance with the Fannie Mae Stipulation Order or (ii) direct Purchaser in writing to pay the Minimum FNMA Amount to FNMA at the Initial Closing and withhold the FNMA Unresolved Amount from the payments of the Purchase Price to be made pursuant to Section 4.1(a) at the Initial Closing (the amount payable to FNMA at the Initial Closing Date is herein referred to as the "FNMA Closing Payment"); provided, however, that, if Purchaser is directed to pay the Minimum FNMA Amount to FNMA at the Initial Closing, the FNMA Unresolved Amount shall be held by Purchaser in trust for FNMA and Purchaser shall pay the FNMA Unresolved Amount in such amounts and in such proportions as required by the Fannie Mae Stipulation Order. Purchaser's obligations and liabilities with respect to the withholding and payment of the FNMA Unresolved Amount shall

5

be limited to the payment and distribution of the FNMA
Unresolved Amount in accordance with this Section 4.1(d).

Section 9.    Minimum Proceeds.  Section 8.2(e) of the Agreement is amended by
deleting "Section 4.1(a)(iv)" as it appears therein and inserting "Section 4.1(a)(v)" in its place.

Section 10.    Consents.  Section 8.3(g) of the Agreement is amended by adding "(other
than the payment of any Sellers' Cure Amount (as defined in the Sale Approval Order) and
Purchaser's Cure Amount (as defined in the Sale Approval Order) in the manner and to the
extent required by the Sale Approval Order)" after the word "condition" as it appears therein.

Section 11.    Schedules and Exhibits.

11.1    Software Contracts.  The Software Contracts set forth on Exhibit A are
deleted from Schedule 1.1(h) to the Agreement, shall be Excluded Assets, and obligations
thereunder or relating thereto shall be Retained Liabilities.

11.2    Servicing Agreements.  The Servicing Agreements set forth on Exhibit B
are deleted from Schedule 1.1(j) to the Agreement (each such deleted Servicing Agreement being
referred to herein as a "Deleted Servicing Agreement") and the Servicing Agreements referred to
as Countrywide, AHMIT 2005-1, AHMIT 2005-2 and AHMIT 2005-4A are deleted from
Schedule 1.1(k) to the Agreement.  Each of the Deleted Servicing Agreements shall be Excluded
Assets, and obligations thereunder or relating thereto shall be Retained Liabilities.  In addition,
items listed on Schedules 5.6(a), 5.6(b)(i) and 5.6(d)(ii) to the Agreement that were included
thereon only as a result of the Deleted Servicing Agreements having been originally included on
Schedules 1.1(j) and 1.1(k) to the Agreement are hereby deleted from such Schedules.

11.3    Subserviced Mortgage Loans.  The Mortgage Loans described on Exhibit
C (the "Additional Mortgage Loans") are inserted on Schedule 6.10(f) to the Agreement;
provided, however, that (i) any Mortgage Loans serviced under the agreements set forth as items
1 through 8 on Exhibit C (the "HELOC Agreements") are included on Schedule 6.10(f) to the
Agreement only for purposes of Sections 6.2(f) and 6.2(g) of the Agreement and not for any
other purposes, including, specifically, Sections 6.10(f) and 6.17 of the Agreement (provided that
if, prior to the Final Closing Date, there is consent by the counterparties to a HELOC Agreement
(and, but only to the extent their consent would have been required prepetiton, any express third
party beneficiaries of such HELOC Agreement) or an Order of the Bankruptcy Court that
Mortgage Loans under such HELOC Agreement can be subserviced by Purchaser, then the
Mortgage Loans under such HELOC Agreement shall be deemed to be included on Schedule
6.10(f) to the Agreement for all purposes of the Agreement other than Section 6.17 of the
Agreement and any advances required to be made by the servicer after the Final Closing Date
shall continue to be made by Sellers in accordance with the second sentence of this Section
11.3); and (ii) all advances relating to HELOC Agreements or the Mortgage Loans serviced
thereunder that would be Advances are excluded from the definition of Advances and shall be
Excluded Assets.  Any advances required to be made by the servicer after the Initial Closing with
respect to Mortgage Loans serviced under the HELOC Agreements shall be made by Sellers with
funds borrowed by Sellers under the DIP Financing Agreement or otherewise and such advances
shall be Excluded Assets.  In no event shall Purchaser be obligated to fund any Advances with

6

respect to, or to fund any draws or borrowings under or in respect of, any Additional Mortgage Loans, and no such obligations shall be funded or paid using cash or cash equivalents received in connection with the Business and the Purchased Assets (other than draws or borrowings that are permitted to be made out of excess payments collected with respect to Additional Mortgage Loans) during the period from and after the Initial Closing.  All such obligations shall be Retained Liabilities.

        11.4    Vendor Contracts.  The contracts set forth on Exhibit D are deleted from Schedule 2.1(b)(i) to the Agreement, shall be Excluded Assets, and obligations thereunder or relating thereto shall be Retained Liabilities.

        11.5    Other Agreements.  The agreement set forth on Exhibit E is inserted on Schedule 5.6(b)(i) to the Agreement.

        11.6    Minimum Sale Proceeds.  Schedule 8.2(e) to the Agreement is deleted and Schedule 8.2(e) as set forth on Exhibit F is inserted in its place.

        11.7    Consents.  Schedule 8.3(i) to the Agreement is redesignated as Schedule 8.3(g) to the Agreement.

        11.8    Cure Escrow Agreement.  Exhibit A to the Agreement is deleted and Exhibit A to the Agreement as set forth on Exhibit G is inserted in its place.

    Section 12.    Excluded Assets.  After the Initial Closing, the Retained Liabilities and Excluded Assets shall be deemed not to be a part of the Business.

    Section 13.    Cure Escrow Agreement.  Section 2.9(a)(ii) is amended by deleting the words "and Cure Escrow Agreement" as they appear therein.

    Section 14.    Consent; Consultation.  Sellers jointly and severally represent and warrant to Purchaser that Sellers have obtained the prior written consent of the Administrative Agent to enter into this First Amendment and have consulted with the official committee of unsecured creditors appointed in the Bankruptcy Cases prior to entering into this First Amendment.

    Section 15.    Amendment.  This First Amendment may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this First Amendment.  Sellers shall not agree to amend, modify or supplement this First Amendment, or waive any provision of this First Amendment without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

    Section 16.    Counterparts.  This First Amendment may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 17.    <u>Entire Agreement; No Third Party Beneficiaries</u>.  The Agreement as amended by this First Amendment (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Initial Closing Date, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.

Section 18.    <u>Governing Law</u>.  THIS FIRST AMENDMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**[SIGNATURES ON FOLLOWING PAGE]**

DB02:6302859.15                                                                                                              066585.1001

IN WITNESS WHEREOF, Purchaser and Sellers have executed this First Amendment or caused this First Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
     as Purchaser

By: _____
     Name: DAVID H. STORPER
     Title: VICE PRESIDENT

AMERICAN HOME MORTGAGE
     INVESTMENT CORP.,
     as Seller and Debtor and Debtor-in-Possession


By: _____
     Name:
     Title:

AMERICAN HOME MORTGAGE CORP,
     as Seller and Debtor and Debtor-in-Possession


By: _____
     Name:
     Title:

AMERICAN HOME MORTGAGE SERVICING,
     INC.,
     as Seller and Debtor and Debtor-in-Possession


By: _____
     Name:
     Title:

IN WITNESS WHEREOF, Purchaser and Sellers have executed this First Amendment or caused this First Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By:_____
    Name:
    Title:

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name: Michael STRAUSS
    Title: Calef Executive Officer

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name: Michael Strauss
    Title: chief Executive Officer

AMERICAN HOME MORTGAGE SERVICING,
    INC.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name: Michael Strauss
    Title: Chief Executive Officer

DB02:6302859.15                                          066585.1001

Exhibit A

**Deleted**
**Software Contracts**

| Counter Party | AHM Contracting Entity | Description of Agreement |
|---|---|---|
| Softlanding Software | American Home Mortgage Corp. | Software for managing code versions on AS400 |
| Federal Home Mortgage Corporation | American Home Mortgage Corp. | EarlyIndicator Software License and Maintenance Agreement |

**Deleted**
**Servicing Agreements**

| INDEX | NAME OF AGREEMENT | TYPE OF AGREEMENT/ARRANGEMENT |
|---|---|---|
| 1.1 (j) g | (Servicing Released) ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT, dated as of March 1, 2006, among Morgan Stanley Capital I Inc., a Delaware corporation (the "Depositor"), Morgan Stanley Mortgage Capital Inc. ("MSMCI"), American Home Mortgage Corp., as seller (the "Seller"), American Home Mortgage Servicing, Inc., as servicer (the "Servicer"), and acknowledged by LaSalle Bank National Association, as trustee (the "Trustee") of Morgan Stanley Mortgage Loan Trust 2006-5AR (the "Trust") | Third Party Securitization (MSM 2006-5AR) |
| 1.1 (j) l | (Servicing-Released) ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT, dated as of April 1, 2006, among Morgan Stanley Capital I Inc., a Delaware corporation (the "Depositor"), Morgan Stanley Mortgage Capital Inc. ("MSMCI"), American Home Mortgage Corp., as seller (the "Seller"), American Home Mortgage Servicing, Inc., as servicer (the "Servicer"), and acknowledged by LaSalle Bank National Association, as trustee (the "Trustee") of Morgan Stanley Mortgage Loan Trust 2006-6AR (the "Trust") | Third Party Securitization (MSM 2006-6AR) |
| 1.1 (j) au | (Servicing-Released) Assignment, Assumption and Recognition Agreement, as of July 31, 2007, among HSBC Bank, National Association (the "Assignor"), HSI Asset Securitization Corporation (the "Assignee"), Wells Fargo Bank, N.A., as master servicer (the "Master Servicer"), Deutsche Bank National Trust Company (the "Trustee") not individually but solely as trustee on behalf of the HSI Asset Loan Obligation Trust 2007-AR2, American Home Mortgage Corp. (the "Company") and American Home Mortgage Servicing, Inc. (the "Servicer") | Third Party Securitization (HALO 2007-AR2) |
| 1.1 (j) cd | Purchase, Warranties and Servicing Agreement, dated as of March 1, 2006, by and among EMC Mortgage Corp. (Purchaser), American Home Mortgage Corp. (Company) and American Home Mortgage Servicing, Inc. (Servicer) (Servicing-Retained) | Loan Sale/Servicing Agreement |
| 1.1 (j) ch | Mortgage Loan Sale Agreement, dated as of April 1, 2006, by and among American Home Mortgage Corp. (Seller), American Home Mortgage Servicing, Inc. (Servicer) and JP Morgan Mortgage Acquisition Corp. (Purchaser) | Loan Sale/Servicing Agreement |

| 1.1 (j) ci | Flow Mortgage Loan Interim Servicing Agreement, dated as of April 1, 2006, by and between J.P. Morgan Mortgage Acquisition Corp. and American Home Mortgage Servicing, Inc. | Loan Sale/Servicing Agreement |
|---|---|---|
| 1.1 (j) cj | Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of January 25, 2007, by and among American Home Mortgage Corp. (Seller), American Home Mortgage Servicing, Inc. (Interim Servicer) and Wells Fargo Funding, Inc. (Initial Purchaser)* <br><br> *This Servicing Agreement was erroneously reflected as dated January 25, 2007 in Schedule 1.1(j) to the Agreement. The Servicing Agreement is actually dated January 25, 2006. | Loan Sale/Servicing Agreement |
| 1.1 (j) dc | Mortgage Loan Purchase and Servicing Agreement, dated as of March 14, 2006, by and between American Home Mortgage Corp. (Seller) and Countrywide Bank, NA (Purchaser) | Loan Sale/Servicing Agreement |
| 1.1 (j) dk | Mortgage Loan Purchase and Servicing Agreement, dated as of May 1, 2007, by and between American Home Mortgage Corp. and Countrywide Home Loans, Inc., as Purchaser | Loan Sale/Servicing Agreement |
| 1.1 (j) dq | Servicing Agreement, dated as of December 21, 2004, among GMAC Mortgage Corporation, as HELOC Master Servicer, American Home Mortgage Investment Trust 2004-4, as Issuer, American Home Mortgage Acceptance, Inc., as Seller, and The Bank of New York, as Indenture Trustee | AHM Securitization |
| 1.1 (j) dr | HELOC Subservicing Agreement, dated as of December 21, 2004, between GMAC Mortgage Corporation, as HELOC Master Servicer, and American Home Mortgage Servicing, Inc., as HELOC Subservicer | AHM Securitization |
| 1.1 (j) dt | HELOC Servicing Agreement, dated as of March 23, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | AHM Securitization |

| 1.1 (j) dv | HELOC Servicing Agreement, dated as of June 22, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | AHM Securitization |
|---|---|---|
| 1.1 (j) dy | HELOC Servicing Agreement, dated as of October 7, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | AHM Securitization |
| 1.1 (j) ea | HELOC Subservicing Agreement, dated as of October 7, 2005, among American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as HELOC Servicer, and American Home Mortgage Servicing, Inc., as HELOC Subservicer | AHM Securitization |
| 1.1 (j) eg | HELOC Servicing Agreement, dated as of June 30, 2006, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2006-2, as Issuing Entity, Deutsche Bank Trust Company Americas, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | AHM Securitization |
| 1.1 (j) en | HELOC Servicing Agreement, dated as of March 13, 2007, among GMAC Mortgage, LLC, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer | AHM Securitization |
| 1.1 (j) fn | Sale and Servicing Agreement, dated as of February 1, 2003, by and between Columbia National, Incorporated (currently known as American Home Mortgage Servicing, Inc.), as Seller and Servicer, and EMC Mortgage Corporation, as Purchaser | Loan Sale/Servicing Agreement |

<u>EXHIBIT C</u>

Additional
<u>Subserviced Mortgage Loans</u>

All Mortgage Loans serviced under the following servicing agreements:

| | |
|---|---|
| 1. | Servicing Agreement, dated as of December 21, 2004, among GMAC Mortgage Corporation, as HELOC Master Servicer, American Home Mortgage Investment Trust 2004-4, as Issuer, American Home Mortgage Acceptance, Inc., as Seller, and The Bank of New York, as Indenture Trustee |
| 2. | HELOC Subservicing Agreement, dated as of December 21, 2004, between GMAC Mortgage Corporation, as HELOC Master Servicer, and American Home Mortgage Servicing, Inc., as HELOC Subservicer |
| 3. | HELOC Servicing Agreement, dated as of March 23, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer |
| 4. | HELOC Servicing Agreement, dated as of June 22, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer |
| 5. | HELOC Servicing Agreement, dated as of October 7, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Acceptance, Inc., as HELOC Servicer |
| 6. | HELOC Subservicing Agreement, dated as of October 7, 2005, among American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as HELOC Servicer, and American Home Mortgage Servicing, Inc., as HELOC Subservicer |
| 7. | HELOC Servicing Agreement, dated as of June 30, 2006, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2006-2, as Issuing Entity, Deutsche Bank Trust Company Americas, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Acceptance, Inc., as HELOC Servicer |
| 8. | HELOC Servicing Agreement, dated as of March 13, 2007, among GMAC Mortgage, LLC, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American |

|  | Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer |
|---|---|
| 9. | Purchase, Warranties and Servicing Agreement, dated as of March 1, 2006, by and among EMC Mortgage Corp. (Purchaser), American Home Mortgage Corp. (Company) and American Home Mortgage Servicing, Inc. (Servicer) (Servicing-Retained) |
| 10. | Mortgage Loan Purchase and Servicing Agreement, dated as of March 14, 2006, by and between American Home Mortgage Corp. (Seller) and Countrywide Bank, NA (Purchaser) |

<u>EXHIBIT D</u>

Deleted
<u>Vendor Contracts</u>

<u>Name of Vendor</u>                                          <u>Agreement</u>

JPMorgan Chase Bank, N.A.                          JPMorgan Treasury Services Master
                                                   Implementation Form, dated as of October
                                                   25, 2005, by and between JPMorgan Chase
                                                   Bank, N.A. and American Home Mortgage
                                                   Servicing, Inc.

EXPERIAN                                           MISSING

FNC, Inc.                                          National Collateral Database Appraisal Data
                                                   Sharing Agreement, dated as of July 28,
                                                   2006, by and between FNC, Inc. and
                                                   Homegate Settlement Services, Inc.

<u>Exhibit E</u>

Additional
<u>Other Agreements Containing Material Servicing Provisions</u>

| INDEX | NAME OF AGREEMENT | TYPE OF AGREEMENT/ ARRANGEMENT |
|---|---|---|
| 5.6(b) au | Sale and Servicing Agreement, dated as of February 1, 2003, by and between Columbia National, Incorporated (currently known as American Home Mortgage Servicing, Inc.), as Seller and Servicer, and EMC Mortgage Corporation, as Purchaser | Loan Sale/Servicing Agreement |

EXHIBIT F

Schedule 8.2(e)

| If the Initial Closing Servicing Balance is: | | The Minimum Net Proceeds are: |
|---|---|---|
| Greater than ($Billion) | and less than or equal to ($Billion) | |
| 38.00 | 38.25 | $407,253,050.82 |
| 38.25 | 38.50 | $409,432,078.60 |
| 38.50 | 38.75 | $411,615,134.15 |
| 38.75 | 39.00 | $413,802,217.49 |
| 39.00 | 39.25 | $415,993,328.60 |
| 39.25 | 39.50 | $418,188,467.49 |
| 39.50 | 39.75 | $420,387,634.15 |
| 39.75 | 40.00 | $422,590,828.60 |
| 40.00 | 40.25 | $424,798,050.82 |
| 40.25 | 40.50 | $427,009,300.82 |
| 40.50 | 40.75 | $429,224,578.60 |
| 40.75 | 41.00 | $431,431,488.32 |
| 41.00 | ----- | $433,587,738.32 |
| | | plus 0.92% of the portion of the Initial Closing Servicing Balance over $41.00 Billion |

<u>EXHIBIT G</u>

Cure Escrow Agreement

[SEE ATTACHED]

**EXHIBIT A**

### Cure Escrow Agreement

Cure Escrow Agreement (this "Escrow Agreement"), dated as of _____, 2007, by and among, American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing Inc., a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, "Sellers"), and North Fork Bank, a Division of Capital One, N.A., as escrow agent (the "Escrow Agent").

### W I T N E S S E T H

Whereas, AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser") and Sellers have previously entered into an Asset Purchase Agreement, dated as of September 25, 2007 (the "Asset Purchase Agreement"), involving the purchase of certain assets and the assumption of certain liabilities of Sellers by Purchaser;

WHEREAS, Purchaser and Sellers have previously entered into the First Amendment to the Asset Purchase Agreement, dated as of October [   ] 2007;

WHEREAS, the Bankruptcy Court entered the Sale Approval Order (the "Order") on _____, 2007;

WHEREAS, Paragraph 4.1 of the Asset Purchase Agreement and Paragraph 32 of the Order contemplate that, at the Initial Closing, Purchaser will deliver to the Escrow Agent $10,000,000.00 in immediately available funds (the "Cure Escrow") in order to satisfy the Sellers' Cure Amount (as defined in the Order);

WHEREAS, Paragraph 35 of the Order provides that the allowed cure claims for each Assumed Contract for the period prior to the Initial Closing (such allowed cure claims, collectively "Allowed Cure Claims") shall be paid exclusively from the funds in the Cure Escrow;

WHEREAS, Paragraph 36 of the Order provides that all Setoff Claims, to the extent allowed (such allowed Setoff Claims, collectively "Allowed Setoff Claims"), shall be paid exclusively from the funds in the Cure Escrow;

WHEREAS, Paragraph 39 of the Order provides that all Transfer Cost Claims, to the extent allowed (such allowed Transfer Cost Claims, collectively "Allowed Transfer Cost Claims"), shall be paid exclusively from the funds in the Cure Escrow;

WHEREAS, Paragraphs 33, 34 and 35 of the Order set forth procedures for the filing and resolution of cure claims, Setoff Claims and Transfer Cost Claims,

WHEREAS, Sellers desire to appoint the Escrow Agent to act as escrow agent hereunder in the manner hereinafter set forth and the Escrow Agent is willing to act in such capacity;

Now therefore, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and the Escrow Agent hereby agree as follows:

1.    Cure Reserves.

(a)    The Escrow Agent shall establish and maintain on behalf of the parties hereto, an interest bearing account (the "Escrow Account") in the name of Sellers, subject to the terms and conditions of this Escrow Agreement. Funds held in the Escrow Account shall be applied and disbursed only as provided herein. The Escrow Agent shall, to the extent required by law, segregate the funds held in the Escrow Account from its other funds held as an escrow agent.

(b)    At the Initial Closing, Purchaser shall deliver the Cure Escrow to the Escrow Agent for deposit in the Escrow Account pursuant to Paragraph 4.1 of the Asset Purchase Agreement.

(c)    The Cure Escrow shall be delivered by wire transfer to the following account of the Escrow Agent (or to such other account of the Escrow Agent as the Escrow Agent shall notify Sellers and Purchaser in writing prior to the transfer of funds and which account Sellers and Purchaser approve):

ABA No.:  021407912
Account No.:
Account Name:  America Home Mortgage Investment Corp.
                      Cure Escrow Account

(d)    The Escrow Agent shall immediately upon receipt confirm in writing to Sellers and Purchaser its receipt of the Cure Escrow.

(e)    Funds on deposit in the Escrow Account shall be held in an interest bearing depository account with the Escrow Agent.

(f)    Parent shall be deemed the owner of the Cure Escrow held in the Escrow Account. As such, Parent shall be responsible for the preparation of all tax returns associated with the investments therein and shall pay all costs relating to such returns, including taxes, fines and penalties and interest. The Escrow Account shall be assigned the federal tax identification number of Parent. Parent shall provide Escrow Agent, at any time upon request of Escrow Agent, with a Form W-8 or W-9 to evidence Parent is not subject to any back-up withholding under the United States Internal Revenue Code. Parent shall report all income, if any, that is earned on, or derived from, the Cure Escrow as its income, in the taxable year or years in which such income is properly includible and pay any taxes attributable thereto. Except as required by applicable law, the Escrow Agent has no duty to withhold or file any report or any tax liability under any federal or state income tax, local or state property tax, local or state sales or use taxes, or any other tax by any taxing authority.

(g)    The parties hereto acknowledge that, in accordance with Paragraph 11 of the Order, the Cure Escrow and all accrued interest thereon (subject to the provisions of Section 2 below with respect to the withdrawal and disbursement thereof) are subject to the Administrative Agent's existing security interests in and liens as provided in the Cash Collateral Order.

2.    Distributions.

(a)    Funds on deposit in the Escrow Account shall be withdrawn and disbursed by the Escrow Agent only in accordance with this Section 2.

(b)    The determination of whether any claim or right shall be an Allowed Cure Claim, Allowed Setoff Claim, or an Allowed Transfer Cost Claim, and the dollar amount of any such Allowed Cure Claim, Allowed Setoff Claims, or Allowed Transfer Cost Claim, shall be pursuant to (a) a Final Order of the Bankruptcy Court, (as defined in the Order) or (b) a written agreement among the parties to the Assumed Contract with respect to which such claim(s) were made (a "Settlement") subject, in the case of Sellers, to the prior written consent of the Administrative Agent and the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "Committee"). All Debtors and all Persons purporting to hold an Allowed Cure Claim, Allowed Setoff Claim, or Allowed Transfer Cost Claim shall follow the procedures set forth in the Order, or further Order of the Bankruptcy Court, in connection with such determinations.

(c)    In the event that, at any time (and from time to time), but at least thirty (30) days after the Initial Closing, the amount of the Cure Escrow then held in the Escrow Account, is greater than the aggregate maximum amount potentially payable to all Counterparties from the Cure Escrow (the "Maximum Payment Amount", and such excess amount, the "Excess Cure Reserve"), (i) the Sellers shall direct the Escrow Agent in writing that such Excess Cure Reserve and all accrued interest income thereon shall be paid, on behalf of Sellers, to the Administrative Agent, by the Escrow Agent and (ii) the Escrow Agent shall, on the Business Day specified in such written instructions, which shall be at least two Business Days after the Escrow Agent's receipt of such written instructions, disburse such amount specified in such written instructions, and all accrued interest income thereon, on behalf of Sellers, to the Administrative Agent in accordance with the wire transfer instructions set forth in such written instructions.

(d)    In furtherance and not in limitation of Section 2(c) above, in the event that at any time (and from time to time), but at least thirty (30) days after the Initial Closing, the Purchaser designates an Assumed Contract as an Excluded Contract pursuant to the provisions of the Asset Purchase Agreement and the amount of the Cure Escrow then held in the Escrow Account is greater than or equal to the Maximum Payment Amount, including all amounts potentially payable from the Cure Escrow with respect to such Excluded Contract (the "Excluded Contract Amount"), the Excluded Contract Amount shall constitute an Excess Cure Reserve and (i) the Sellers shall direct the Escrow Agent in writing that such Excess Cure Reserve and all accrued interest income thereon shall be paid, on behalf of Sellers, to the Administrative Agent, by the Escrow

Agent and (ii) the Escrow Agent shall, on the Business Day specified in such written instructions, which shall be at least two Business Days after the Escrow Agent's receipt of such written instructions, disburse such amount specified in such written instructions, and all accrued interest income thereon, on behalf of Sellers, to the Administrative Agent in accordance with the wire transfer instructions set forth in such written instructions.

(e)     In the event that Purchaser designates an Assumed Contract as an Excluded Contract pursuant to the provisions of the Asset Purchase Agreement, and the Maximum Payment Amount (including the Excluded Contract Amount ) is greater than the amount of the Cure Escrow then held in the Escrow Account, the amount to be disbursed from the Escrow Account to the Administrative Agent (the "Pro Rated Excluded Contract Amount") shall be equal to the product of (i) the Excluded Contract Amount, multiplied by (ii) a fraction, the numerator of which shall be the Excluded Contract Amount and the denominator of which shall be the Maximum Payment Amount (including the Excluded Contract Amount).  The Prorated Excluded Contract Amount shall be deemed an Excess Cure Reserve, and (i) the Sellers shall direct the Escrow Agent in writing that such Excess Cure Reserve and all accrued interest income thereon shall be paid, on behalf of Sellers, to the Administrative Agent, by the Escrow Agent and (ii) the Escrow Agent shall, on the Business Day specified in such written instructions, which shall be at least two Business Days after the Escrow Agent's receipt of such written instructions, disburse such amount specified in such written instructions, and all accrued interest income thereon, on behalf of Sellers, to the Administrative Agent in accordance with the wire transfer instructions set forth in such written instructions.

(f)     In the event that the aggregate dollar amount of all Allowed Cure Claims, Allowed Setoff Claims, and Allowed Transfer Cost Claims exceeds the amount of the Cure Escrow, distributions to the Counterparties shall be made on a pro rata basis (after taking into account reductions in the Cure Escrow pursuant to Sections 2(c), (d) and (e) above).  The good faith estimate of a Transfer Cost Claim filed and served pursuant to Paragraph 34 of the Order shall be used to calculate the existence of an Excess Cure Reserve and the Counterparties' pro rata share of the Cure Escrow prior to the final determination of the amount of such Allowed Transfer Cost Claim.

(g)     If the Escrow Agent receives written instructions signed by the Sellers ("Disbursement Instructions") that (i) state that a Settlement has been negotiated with the prior written consent of the Administrative Agent and the Committee or a Final Order has been issued determining, with respect to an Assumed Contract, the actual the dollar amount of any such Allowed Cure Claim, Allowed Setoff Claim, Allowed Transfer Cost Claim, as the case may be, and (ii) direct that the Escrow Agent pay from the Cure Escrow the actual dollar amount of any such Allowed Cure Claim, Allowed Setoff Claim, Allowed Transfer Cost Claim, as the case may be, for such Assumed Contract to the Counterparty to such Assumed Contract, the Escrow Agent shall disburse to such Counterparty to such Assumed Contract the dollar amount specified in such Disbursement Instructions in accordance with the wire transfer instructions set forth in such Disbursement Instructions on the later of  the business day specified in such Disbursement Instructions, which shall be at least two Business Days after the Escrow Agent's receipt of such Disbursement Instructions.  Disbursements with respect to

Allowed Cure Claims and Allowed Setoff Claims shall be made promptly after the Final Closing Date and disbursements with respect to any Allowed Transfer Cost Claim shall be made promptly after the determination of the actual amount of such Allowed Transfer Cost Claim in accordance with the procedures set forth in the Order, or further Order of the Bankruptcy Court.

        (h)    The Sellers shall provide written notice (a "Disbursement Notice") to the Administrative Agent and Committee at least ___ Business Days in advance of sending notice disbursement instructions to the Escrow Agent. Within ___ Business Days after receipt of a Disbursement Notice, either the Administrative Agent or the Committee (the "Notifying Party") may notify the Escrow Agent and the Sellers that the Notifying Party believes there should not be a disbursement from the Cure Escrow and accrued interest income thereon (an "Escrow Action"). Any such notice (the "Dispute Notice") shall state the reason that the Notifying Party believes such Escrow Action should not occur. If the Escrow Agent receives a Dispute Notice, the Escrow Agent shall not take any Escrow Action until the Escrow Agent receives either an order of the Bankruptcy Court, which order has become final and not subject to appeal and has been certified by the clerk of the Bankruptcy Court or other appropriate official, or joint written notice signed by the Notifying Party and Sellers indicating that the dispute has been resolved and directing the Escrow Agent to take a specific Escrow Action (collectively, a "Final Resolution"). Within two Business Days of its receipt of the written evidence of a Final Resolution required above in this Section 2(h), the Escrow Agent shall take the specified Escrow Action. The Escrow Agent shall be entitled to rely, exclusively, on any representation jointly made by the Notifying Party and Sellers in writing in relation to any Escrow Action, and shall take Escrow Actions from time to time as directed in any such joint written instruction from the Notifying Party and Sellers or pursuant to a Final Resolution.

    3.    Termination of Escrow Agreement. This Escrow Agreement shall terminate upon (a) disbursement of all of the funds in the Escrow Account by the Escrow Agent in accordance with this Escrow Agreement or (b) upon transfer of all amounts in the Escrow Account then in the possession of the Escrow Agent to a successor escrow agent in accordance with the terms of Section 6 below, to the Bankruptcy Court, or to such other party as shall be ordered by the Bankruptcy Court.

    4.    Escrow Agent.

        (a)    Sellers, jointly and severally, agree to pay the Escrow Agent compensation for its services as Escrow Agent hereunder, as described on Schedule A annexed hereto, promptly upon request therefor, and to reimburse the Escrow Agent for all reasonable expenses of or disbursements incurred by the Escrow Agent in the performance of its duties hereunder, including the reasonable fees, expenses and disbursements of counsel to the Escrow Agent.

        (b)    The Escrow Agent may retain that portion of the Escrow Account equal to any such unpaid reasonable costs, expenses and fees incurred by the Escrow

Agent as contemplated by Section 4(a) above until such time as such costs, expenses and fees have been paid.

5.      Rights, Duties and Immunities of Escrow Agent.  Acceptance by the Escrow Agent of its duties under this Escrow Agreement is subject to the following terms and conditions, which all parties to this Escrow Agreement hereby agree shall govern and control the rights, duties and immunities of the Escrow Agent:

(a)      The duties and obligations of the Escrow Agent shall be determined solely by the express provisions of this Escrow Agreement and the Escrow Agent shall not be liable, except for the performance of such duties and obligations as are specifically set out in this Escrow Agreement.  The Escrow Agent shall not be required to inquire as to the performance or observation of any obligation, term or condition under any agreement or arrangement by Purchaser and Sellers.  The Escrow Agent is not a party to, and is not bound by, any agreement or other document out of which this Escrow Agreement may arise.  The Escrow Agent shall be under no liability to any party hereto by reason of any failure on the part of any other party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document.  The Escrow Agent shall not be bound by any waiver, modification, termination or rescission of this Escrow Agreement or any of the terms hereof, unless evidenced by a writing delivered to the Escrow Agent signed by the proper party or parties and, if the duties or rights of the Escrow Agent are affected, unless it shall give its prior written consent thereto (which consent shall not be unreasonably withheld).  This Escrow Agreement shall not be deemed to create a fiduciary relationship between the parties hereto under state or federal law.

(b)      The Escrow Agent shall not be responsible in any manner for the validity or sufficiency of this Escrow Agreement or of any property delivered hereunder, or for the value or collectibility of any note, check or other instrument, if any, so delivered, or for any representations made or obligations assumed by any party other than the Escrow Agent.  Nothing herein contained shall be deemed to obligate the Escrow Agent to deliver any cash, instruments, documents or any other property referred to herein, unless the same shall have first been received by the Escrow Agent pursuant to this Escrow Agreement.

(c)      Sellers shall, jointly and severally, reimburse and indemnify the Escrow Agent for, and hold it harmless against, any loss, liability, costs or expenses, (including but not limited to reasonable counsel fees, disbursements and other charges of counsel incurred by Escrow Agent in any dispute, controversy, action or legal proceeding between it and one of the parties hereto, or between it and a third party) arising out of or in conjunction with its acceptance of, or the performance of its duties and obligations under this Escrow Agreement (except those arising out of or in connection with Escrow Agent's willful misconduct, gross negligence or bad faith) as well as the costs and expenses of defending against any claim or liability arising out of or relating to this Escrow Agreement (except those costs and expenses of defending against any claim or liability arising out of or in connection with Escrow Agent's willful misconduct, gross negligence or bad faith).

(d)     The Escrow Agent shall be fully protected in acting on and relying upon any written notice direction, request, waiver, consent, receipt or other paper or document which the Escrow Agent in good faith believes to have been signed and presented by the proper party or parties.  The Escrow Agent shall not be responsible for (i) the sufficiency or accuracy of the form of, or the execution, validity, value or genuineness of, any document or property received, held or delivered by it pursuant to the terms of this Escrow Agreement, or of any signature or endorsement on such document or property (other than the signature or endorsement of the Escrow Agent, if any), (ii) the lack of endorsement on such document, or (iii) any description set forth in such document.  The Escrow Agent shall not be responsible or liable to the other parties hereto or to anyone else in any respect on account of the identity or authority of the persons executing or delivering or purporting to execute or deliver any document or property pursuant to the terms of this Escrow Agreement (other than the identity and authority of any person executing or delivering or purporting to execute or deliver any property on behalf of the Escrow Agent) or of the persons executing or delivering or purporting to execute and deliver this Escrow Agreement, other than the identity and authority of the person executing this Escrow Agreement on behalf of the Escrow Agent.

(e)     The Escrow Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake in act or law, or for anything which it may do or refrain from doing in connection herewith, except its own gross negligence, willful misconduct or bad faith.  Notwithstanding any provisions in this Escrow Agreement to the contrary, the Escrow Agent shall not be liable for any special, indirect, punitive, exemplary or consequential damages or lost profits.

(f)     The Escrow Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Escrow Agreement or its duties hereunder, and it shall incur no liability and shall be fully protected in respect of any action taken, omitted or suffered by it in good faith in accordance with the written advice or opinion of such counsel.

(g)     The parties hereto agree that should any dispute arise with respect to the payment, ownership or right of possession of the Escrow Account, the Escrow Agent is authorized and directed to retain in its possession, without liability to anyone, except for its bad faith, willful misconduct or gross negligence, all or any part of the Escrow Account until such dispute shall have been settled either by mutual agreement by the parties concerned or by the final order, decree or judgment of the Bankruptcy Court and a notice executed by the parties to the dispute or their authorized representatives shall have been delivered to the Escrow Agent setting forth the resolution of the dispute, which notice Sellers hereby agree to so execute and deliver to the Escrow Agent in the event that such an order, decree or judgment is obtained from or issued by the Bankruptcy Court.  The Escrow Agent shall be under no duty whatsoever to institute, defend or partake in such proceedings.

(h)     The Escrow Agent shall have no liability for loss arising from any cause beyond its control, including, but not limited to, the following:  (i) the act, failure or neglect of any agent or correspondent selected by the other parties hereto; (ii) any

delay, error or omission or default of any mail, telephone or wireless agency or operator; and (iii) the acts or edicts of any government or governmental agency or other group or entity exercising governmental powers.

(i)     The agreements set forth in this Section 5 shall survive the resignation or removal of the Escrow Agent, the termination of this Escrow Agreement and the payment of all amounts hereunder.

6.     Resignation of Escrow Agent.  The Escrow Agent shall have the right to resign upon twenty (20) days written notice to Sellers, the Committee, and the Administrative Agent. In the event of such resignation, Sellers, the Committee and the Administrative Agent shall mutually agree upon and appoint a successor escrow agent hereunder (subject to the provisions of Paragraph 8 of the Order) by delivering to the Escrow Agent a written notice of such appointment.  Upon receipt of such notice, the Escrow Agent shall deliver to the designated successor escrow agent all money and other property held hereunder and shall thereupon be released and discharged from any and all further responsibilities whatsoever under this Escrow Agreement; provided, however, that the Escrow Agent shall not be deprived of its compensation earned prior to such time.  If no successor escrow agent shall have been designated by the date specified in the Escrow Agent's notice, all obligations of the Escrow Agent hereunder shall nevertheless cease and terminate.  Its sole responsibility thereafter shall be to keep safely all property then held by it and to deliver the same to a person designated by Sellers, the Committee and the Administrative Agent (subject to the provisions of Paragraph 8 of the Order) or in accordance with the direction of a final order or judgment of the Bankruptcy Court.

7.     Notices.  All instructions, claims, notices, consents, objections and other communications under this Escrow Agreement shall be in writing with a copy to the Administrative Agent and the Committee and shall, except as otherwise provided herein, be deemed to have been duly given and received when (i) delivered by hand, (ii) sent by facsimile (with receipt confirmed), or (iii) when received by the addressee, if sent by Express Mail, Federal Express or other reputable overnight delivery service, in each case, at the appropriate addresses and facsimile numbers as set forth below:

ESCROW AGENT:                              North Fork Bank,
                                           a Division of Capital One, N.A.
                                           275 Broadhollow Road
                                           Melville, New York 11747
                                           Attention:  Michael Weisbrod
                                           Telephone:  (631) 844-1376
                                           Facsimile:  (631) 844-1452

                                           With copies (which shall not constitute notice) to:

                                           North Fork Bank, a Division of Capital One, N.A.
                                           275 Broadhollow Road
                                           Melville, New York 11747
                                           Attention:  Legal Department
                                           Facsimile:  (631) 577-2836

PURCHASER:

AH Mortgage Acquisition Co., Inc.
c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 27th Floor
New York, New York 10036
Facsimile:  (212) 317-4891
Attention:  Mr. Wilbur L. Ross, Chairman

With copies (which shall not constitute notice) to:

Jones Day
222 East 41st Street
New York, New York 10017
Facsimile:  (212) 755-7306
Attention:  Robert A. Profusek, Esq.

SELLERS:

c/o American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, New York 11747
Facsimile:  (516) 949-3929
Attention:  Mr. Steven Cooper

With copies (which shall not constitute notice) to:

Kroll Zolfo Cooper
101 Eisenhower Parkway
Roseland, New Jersey 07068
Facsimile:  (973) 618-9430
Attention:  Elizabeth S. Kardos, Esq.

and

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Facsimile:  (302) 571-1253
Attention:  James L. Patton, Jr., Esq.

ADMINISTRATIVE AGENT:

Banc of America
Strategic Solutions, Inc.
901 Main Street, 66th Floor
Dallas, TX 75202
Facsimile:  (214) 290-9475
Attention:  Jay T. Wampler

With copies (which shall not constitute notice) to:

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Facsimile: (212) 836-6545
Attention: Mark F. Liscio, Esq.

COMMITTEE:                    Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Facsimile: (212) 478-7400
Attention: Mark S. Indelicato, Esq.

(or to such other addresses and facsimile numbers as a party may designate as to itself by notice to the other parties). Notwithstanding any of the foregoing, any computation of a time period which is to begin after receipt of a notice by the Escrow Agent shall run from the date of receipt by it.

8.    Successors. This Escrow Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that this Escrow Agreement may not be assigned by any party without the prior written consent of the other parties, which consent shall not be unreasonably withheld.

9.    Severability. If any portion or provision of this Escrow Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Escrow Agreement shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law. The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

10.    Amendments. Subject to the provisions of Paragraph 27 of the Order, this Escrow Agreement may be amended or modified at any time or from time to time in writing executed by the parties to this Escrow Agreement.

11.    Governing Law. This Escrow Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the State of New York, without regard to the conflict of laws principles thereof or of any other jurisdiction.

12.    JURISDICTION. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO RESOLVE ANY AND ALL DISPUTES ARISING UNDER THIS ESCROW AGREEMENT AND EACH OF THE PARTIES HERETO HEREBY EXPRESSLY CONSENTS TO SUCH EXCLUSIVE JURISDICTION.

13.    Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of any party to require the performance of any term or obligation of this Escrow Agreement, or the waiver by any party of any breach of this Escrow Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

14.    Defined Terms; Headings.  Capitalized terms used herein and not otherwise defined in this Escrow Agreement shall have the meaning ascribed to them in the Asset Purchase Agreement or the Order, as the case may be.  The headings and captions in this Escrow Agreement are for convenience of reference only and shall not in any way affect the meaning or interpretation of this Escrow Agreement.

15.    Counterparts.  This Escrow Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which together shall constitute one and the same agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the undersigned have executed this Escrow Agreement as of the date first written above.

> AMERICAN HOME MORTGAGE INVESTMENT CORP.
> as Seller and Debtor and Debtor-in-Possession
>
>
> By: _____
>     Name:
>     Title:
>
>
> AMERICAN HOME MORTGAGE CORP.
> as Seller and Debtor and Debtor-in-Possession
>
>
> By: _____
>     Name:
>     Title:
>
>
> AMERICAN HOME MORTGAGE SERVICING, INC.
> as Seller and Debtor and Debtor-in-Possession
>
>
> By: _____
>     Name:
>     Title:
>
>
> NORTH FORK BANK, a Division of Capital One, N.A.
> as Escrow Agent
>
>
> By: _____
>     Name: Michael Weisbrod
>     Title: Vice President

SECOND AMENDMENT
TO ASSET PURCHASE AGREEMENT

This Second Amendment to Asset Purchase Agreement dated as of November 6, 2007 (this "Second Amendment"), is entered into by and among AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser"), American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing Inc, a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement dated as of September 25, 2007, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of November 1, 2007 (the "Agreement");

WHEREAS, Section 11.4 of the Agreement permits amendment of the Agreement by a written instrument signed by all of the parties to the Agreement with the prior written consent of the Administrative Agent (as defined in the Agreement) and with prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases (as defined in the Agreement); and

WHEREAS, the parties to the Agreement desire to amend certain provisions of the Agreement pursuant to this Second Amendment in order to amend the provisions relating to Disputed Servicing Agreements,

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.     Definitions.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

Section 2.     Amended Definition.  Section 1.1 of the Agreement is amended by deleting the definitions of "Disputed Servicing Agreement" and "Purchaser Subservicing Agreement" as they appear therein and respectively inserting the following definitions in their place:

"Disputed Servicing Agreement" means a Servicing Agreement described in and set forth on Schedule 1.1(k) or on Schedule 1.1(l).

"Purchaser Subservicing Agreement" means a servicing agreement to be executed on behalf of each of Sellers and Purchaser, in form and substance reasonably satisfactory to Sellers and Purchaser, under which Purchaser will, after the Final Closing, serve as a subservicer for certain Mortgage Loans and with respect to any Disputed Servicing Agreements that, as of the Final

Closing, have not become Purchased Assets in accordance with Section 4.4.

Section 3.    Dispute Escrow.  The Agreement is amended by deleting Section 4.4 of the Agreement and inserting the following new Section 4.4 of the Agreement in its place:

Section 4.4    Dispute Escrow.  At the Initial Closing, Purchaser shall deliver to the Dispute Escrow Agent, to be held pursuant to the Dispute Escrow Agreement, an amount equal to 0.92% of the unpaid principal balance (as set forth in the Initial Closing Date Report) of the Mortgage Loans under the Disputed Servicing Agreements (such amount, as adjusted pursuant to Section 4.1(c), the "Dispute Amount") in immediately available funds.  With respect to each Disputed Servicing Agreement, Sellers shall use their commercially reasonable efforts to (i) negotiate a settlement or have issued as soon as possible a Final Order determining whether such Disputed Servicing Agreement was terminated at or prior to the Petition Date in the case of any Disputed Servicing Agreement set forth on Schedule 1.1(k); or (ii) defend (or negotiate a resolution of) any appeal of the Sale Approval Order relating to the Disputed Servicing Agreement set forth on Schedule 1.1(l), provided, that Sellers may, in their reasonable discretion, determine that Sellers will not seek to negotiate a settlement or have issued a Final Order with respect to any one or more Disputed Servicing Agreements set forth on Schedule 1.1(k) or, with the written consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases, to defend (or negotiate a resolution of) any appeal of the Sale Approval Order relating to the Disputed Servicing Agreement set forth on Schedule 1.1(l), and provided further, that, without the prior written consent of Purchaser, Sellers shall not agree to a settlement (including any resolution of any appeal of the Sale Approval Order) which adversely affects Purchaser's rights and benefits under a Disputed Servicing Agreement if it otherwise were to become a Purchased Asset or which adversely affects Purchaser's rights and benefits under this Agreement or the Sale Approval Order.  To the extent requested by Sellers, Purchaser shall use its commercially reasonable efforts to assist in any negotiations with respect to Disputed Servicing Agreements or defense of any appeal of the Sale Approval Order relating to any Disputed Servicing Agreements.  For each Disputed Servicing Agreement set forth on Schedule 1.1(k) for which a settlement is negotiated or a Final Order is issued determining that such Disputed Servicing Agreement was not terminated at or prior to the Petition Date and for the Disputed Servicing Agreement set forth on Schedule 1.1(l) with respect to which the Sale Approval Order becomes a Final

Order permitting transfer of such Disputed Servicing Agreement to Purchaser as contemplated by this Agreement and in the same manner as Servicing Agreements are to be transferred under the Sale Approval Order in the form entered on October 30, 2007, Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver the portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to the Administrative Agent on behalf of Sellers and such Servicing Agreement shall be a Purchased Asset.  For each Disputed Servicing Agreement set forth on <u>Schedule 1.1(k)</u> for which a Final Order is issued determining that such Disputed Servicing Agreement was terminated at or prior to the Petition Date and for each Disputed Servicing Agreement set forth on <u>Schedule 1.1(l)</u> for which a Final Order is issued determining that transfer of such Disputed Servicing Agreement to Purchaser as contemplated by this Agreement and in the same manner as Servicing Agreements are to be transferred under the Sale Approval Order in the form entered on October 30, 2007, is not permissible, or, with respect to either type of Disputed Servicing Agreement, with respect to which Sellers reasonably determine (with the written consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases in the case of a determination regarding the Disputed Servicing Agreement set forth on <u>Schedule 1.1(l)</u>) that neither a negotiated settlement nor a Final Order will be sought (including a determination not to defend any appeal of the Sale Approval Order with respect to the Disputed Servicing Agreement set forth on <u>Schedule 1.1(l)</u>), Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver the portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to Purchaser and such Servicing Agreement shall be an Excluded Asset.  In the event any Disputed Servicing Agreement has not become an Excluded Asset pursuant to the foregoing sentence by the later of (i) Final Closing and (ii) September 30, 2008, Purchaser may elect to (a) treat such Servicing Agreement as an Excluded Asset and Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver any portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to Purchaser or (b) treat such Servicing Agreement as a Purchased Asset and Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver any portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to an account or accounts designated by the Administrative Agent (pursuant to the Sale Approval Order) on behalf of Sellers.

Section 4.    <u>Subservicing of AHM Loans</u>.  <u>Section 6.10(f)</u> of the Agreement is amended by deleting subclause (i) as it appears therein and inserting the following subclause (i):

> (i) Mortgage Loans serviced under the Disputed Servicing Agreements that, as of the Final Closing Date, have not become Purchased Assets and, prior to the sale to a third party, the Servicing Rights Held for Sale and

Section 5.    <u>Schedules</u>. The Agreement is amended by adding <u>Schedule 1.1(l)</u> as set forth on <u>Exhibit A</u>.

Section 6.    <u>Minimum Sale Proceeds</u>.  <u>Schedule 8.2(e)</u> to the Agreement is deleted and <u>Schedule 8.2(e)</u> as set forth on <u>Exhibit B</u> is inserted in its place.

Section 7.    <u>Consent; Consultation</u>.  Sellers jointly and severally represent and warrant to Purchaser that Sellers have obtained the prior written consent of the Administrative Agent to enter into this Second Amendment and have consulted with the official committee of unsecured creditors appointed in the Bankruptcy Cases prior to entering into this Second Amendment.

Section 8.    <u>Amendment</u>.  This Second Amendment may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Second Amendment. Sellers shall not agree to amend, modify or supplement this Second Amendment, or waive any provision of this Second Amendment without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

Section 9.    <u>Counterparts</u>.  This Second Amendment may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 10.    <u>Entire Agreement; No Third Party Beneficiaries</u>.  The Agreement as amended by this Second Amendment (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Initial Closing Date, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.

Section 11.    <u>Governing Law</u>.  THIS SECOND AMENDMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

IN WITNESS WHEREOF, Purchaser and Sellers have executed this First Amendment or caused this First Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
    as Purchaser

By: _____
    Name: DAVID H. STORPER
    Title: VICE PRESIDENT

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
    as Seller and Debtor and Debtor-in-Possession


By: _____
    Name:
    Title:

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-Possession


By: _____
    Name:
    Title:

AMERICAN HOME MORTGAGE SERVICING,
    INC.,
    as Seller and Debtor and Debtor-in-Possession


By: _____
    Name:
    Title:

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Second Amendment or caused this Second Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser


By: _____
        Name:
        Title:

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
    as Seller and Debtor and Debtor-in-Possession


By: _____
        Name: Michael Strauss
        Title: Chief Executive Officer

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-
    Possession


By: _____
        Name: Michael Strauss
        Title: President

AMERICAN HOME MORTGAGE
    SERVICING, INC.,
    as Seller and Debtor and Debtor-in-Possession


By: _____
        Name: Michael Strauss
        Title: President.

EXHIBIT A

Schedule 1.1(l)

Disputed Contract

| NAME OF AGREEMENT | TYPE OF AGREEMENT/ARRANGEMENT |
|---|---|
| Master Mortgage Loan Purchase and Servicing Agreement, dated as of May 1, 2006, by and among American Home Mortgage Corp. (Seller), American Home Mortgage Servicing, Inc. (Servicer) and DB Structured Products, Inc. (Initial Purchaser) | Loan Sale/Servicing Agreement |

EXHIBIT B

Schedule 8.2(e)

| If the Initial Closing Servicing Balance is: | | The Minimum Net Proceeds are: |
|---|---|---|
| Greater than ($Billion) | and less than or equal to ($Billion) | |
| 38.00 | 38.25 | $405,253,050.82 |
| 38.25 | 38.50 | $407,432,078.60 |
| 38.50 | 38.75 | $409,615,134.15 |
| 38.75 | 39.00 | $411,802,217.49 |
| 39.00 | 39.25 | $413,993,328.60 |
| 39.25 | 39.50 | $416,188,467.49 |
| 39.50 | 39.75 | $418,387,634.15 |
| 39.75 | 40.00 | $420,590,828.60 |
| 40.00 | 40.25 | $422,798,050.82 |
| 40.25 | 40.50 | $425,009,300.82 |
| 40.50 | 40.75 | $427,224,578.60 |
| 40.75 | 41.00 | $429,431,488.32 |
| 41.00 | ----- | $431,587,738.32 |
| | | plus 0.92% of the portion of the Initial Closing Servicing Balance over $41.00 Billion |

THIRD AMENDMENT
TO ASSET PURCHASE AGREEMENT

This Third Amendment to Asset Purchase Agreement dated as of November 16, 2007 (this "Third Amendment"), is entered into by and among AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser"), American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing Inc, a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of September 25, 2007, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of November 1, 2007, and that certain Second Amendment to Asset Purchase Agreement, dated as of November 6, 2007 (the "Agreement");

WHEREAS, Section 11.4 of the Agreement permits amendment of the Agreement by a written instrument signed by all of the parties to the Agreement with the prior written consent of the Administrative Agent (as defined in the Agreement) and with prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases (as defined in the Agreement); and

WHEREAS, the parties to the Agreement desire to amend certain provisions of the Agreement pursuant to this Third Amendment in order to provide for certain temporary employees (and any Liabilities related thereto) to be retained for the benefit of Sellers and to amend Exhibit G to the Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.       Definitions.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

Section 2.       Temporary Employees.  After the Initial Closing, Sellers shall retain, on a temporary basis, up to 28 employees ("Box Employees") currently employed by American Home Mortgage Servicing Inc. to facilitate the completion of certain documentation related requirements of Sellers (the "Box Project").  Sellers shall provide Purchaser with a list of all Box Employees prior to the Initial Closing Date and shall be responsible for (i) all salaries, benefit costs, employment taxes and any other out of pocket costs or expenses associated with the continued employment of Box Employees, including any costs arising as a result of the termination of Box Employees upon completion of the Box Project.  Within 5 calendar days after the end of each calendar month in which Box Employees continue to be employed, Purchaser and Sellers shall reconcile all actual salaries, benefit costs, employment taxes, termination of employment costs and any other out of pocket costs or expenses incurred by the Business in connection with the continued employment of Box Employees and Sellers shall remit to the

Business the amount of such actual costs. For the avoidance of doubt and notwithstanding anything to the contrary in the Agreement, Sellers acknowledge and agree that (A) Box Employees will not be Transferred Employees and (B) Sellers will retain all Liabilities related to Box Employees, including any Liabilities arising under any Plan or under WARN, COBRA or any other similar Law.

     Section 3.    <u>Purchase Price</u>.

     (a)    The first sentence of Section 4.1(a) of the Agreement is amended by deleting "$6.0 million" as it appears therein and inserting "$3.45 million" in its place; and

     (b)    The third sentence of Section 4.1(a) of the Agreement is deleted and the following sentence is inserted in its place:

> At the Initial Closing, Purchaser shall pay the Purchase Price (less (x) an amount equal to $757,350 (the "<u>MERS Amount</u>") to be held by Purchaser for the sole purpose of paying all assignment fees payable to MERS upon the Final Closing (the "<u>MERS Costs</u>") in connection with the transfer of Servicing Rights included in the Purchased Assets and (y) $6,061,810 to reconcile a deficiency in the cash available to be transferred to Purchaser's accounts contemporaneously with the Initial Closing with respect to amounts collected to pay premiums for lender paid mortgage insurance ("<u>LPMI</u>") and with respect to amounts collected for prepayment penalties ("<u>PP</u>")) as follows (and in the following order of priority) (i) an amount equal to the Dispute Amount to the Dispute Escrow Agent, (ii) subject to Section 4.1(d), an amount equal to the FNMA Closing Payment, on behalf of Sellers, to FNMA by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing no less than two Business Days prior to the Initial Closing to Purchaser on behalf of FNMA, (iii) an amount equal to the necessary direct costs of Sellers incurred in connection with this Agreement which are reasonably acceptable to the Administrative Agent (it being agreed that the fees, costs, and expenses of Kroll Zolfo Cooper are not to be deducted and that such amount shall be reduced by any amounts that are disputed by the Administrative Agent in accordance with the Cash Collateral Order) as directed by Sellers (but in no event will Purchaser be required to pay an aggregate amount in excess of the aggregate amount directed by Sellers to be paid pursuant to this <u>Section 4.1(a)(iii)</u> for the satisfaction of such direct costs), (iv) an amount equal to $10,000,000 in cash by wire transfer of immediately available funds to be held pursuant to the Cure Escrow Agreement and (v) the remaining Purchase Price (less any amounts delivered on behalf of Sellers in accordance with Section 4.3(a)) shall be paid by wire transfer of immediately available funds to an account or accounts designated by the Administrative

Agent (pursuant to the Sale Approval Order) in writing to the Purchaser, no less than two Business Days prior to the Initial Closing, on behalf of Sellers, to the Administrative Agent in accordance with the Cash Collateral Order (the amounts payable under clause (v) hereinafter referred to as "Net Proceeds"). To the extent the MERS Costs payable upon the Final Closing are less than the MERS Amount, on the Final Closing Date, Purchaser shall pay the excess amount on behalf of Sellers to the Administrative Agent in accordance with the Cash Collateral Order.

Section 4.    LPMI and Prepayment Penalty Amounts. Contemporaneous with the Initial Closing, Sellers shall cause all amounts held by Sellers as of the Initial Closing representing monies collected by Sellers as premiums for LPMI or as PP to be transferred to an account or accounts designated by Purchaser; provided that after the Initial Closing Date the parties shall work together in good faith to determine whether the amount transferred under this Section 4 and the $6,061,810 reduction from the Purchase Price set forth in Section 4.1(a) of the Agreement (the "Aggregate Amount") was the appropriate amount with respect to such PP and LPMI (the "Appropriate Amount"). To the extent it is finally determined that the Aggregate Amount exceeded the Appropriate Amount, Purchaser, on behalf of Sellers, shall pay an amount equal to such excess by wire transfer of immediately available funds to an account or accounts designated by the Administrative Agent (pursuant to the Sale Approval Order) in writing to the Purchaser in accordance with the Cash Collateral Order. To the extent it is finally determined that the Aggregate Amount was less than the Appropriate Amount, Sellers shall pay an amount equal to such deficiency by wire transfer of immediately available funds to Purchaser.

Section 5.    Allocation of the Purchase Price. The first sentence of Section 4.2(a) of the Agreement is deleted and the following sentence is inserted in its place:

The Purchase Price and the value of any Assumed Liabilities shall be allocated among the Business, the Purchased Assets and the agreements provided herein for transfer of the Business to Purchaser in a manner consistent with an allocation schedule (the "Allocation Schedule"), which Allocation Schedule shall be mutually agreed upon by Purchaser and Sellers within 60 days following the Initial Closing Date to the extent reasonably possible, in compliance with Section 1060 of the Code and the regulations promulgated thereunder.

Section 6.    Subservicing. Section 6.10(f) of the Agreement is hereby amended by adding the following sentence at the end of such section:

Notwithstanding the foregoing, if on the Final Closing Date the outstanding principal and interest balance of Defaulted Mortgage Loans included in (i) the Mortgage Loans serviced under the Disputed Servicing Agreements that are treated as Excluded Assets and (ii) Mortgage Loans set forth on Schedule 6.10(f) are equal to

- 3 -

or greater than 12% of the outstanding principal and interest balance of all such Mortgage Loans described in (i) and (ii) hereof, then Purchaser and Sellers shall negotiate in good faith to establish a per Mortgage Loan monthly Servicing Fee that is equal to the actual costs of Purchaser to service such Mortgage Loans.

Section 7.    Exhibit G.  Exhibit G to the Agreement is deleted and Exhibit G attached to this Third Amendment is inserted in its place.

Section 8.    Bankruptcy Court Approval.  Sellers hereby represent and warrant to Purchaser that the amendments and modifications to the Agreement set forth in this Third Amendment does not have a material adverse effect on the Debtors' (as defined in the Sale Approval Order) estate and that the Administrative Agent and the official committee of unsecured creditors appointed in the Bankruptcy Cases have waived the five business day prior written notice requirement of paragraph 27 of the Sale Approval Order. Sellers shall promptly file a notice of the entry into this Third Amendment with the Bankruptcy Court as contemplated by paragraph 27 of the Sale Approval Order.

Section 9.    Payments "to the Business".  For the avoidance of doubt, the parties hereto acknowledge and agree that (a) where there are provisions that require Sellers to "remit to the Business" or "pay to the Business" (or similar phrases) that Sellers are required to (i) pay those amounts from funds that are not (x) funds received in connection with the operation of the Business or in connection with the Purchased Assets during the period from the Initial Closing until the later of the Final Closing and payment of the Reconciliation Payment or (y) funds drawn on the financing provided by Purchaser for the operation of the Business from the Initial Closing to the Final Closing as contemplated by Section 6.2(a) of the Agreement and (ii) deposit those amounts into the separate accounts of the Business that are required to be established pursuant to Section 6.14(d) of the Agreement and (b) such funds so remitted or paid to the Business will be available for payment of the Reconciliation Payment and subject to the liens granted to Purchaser in paragraph 10 of the Sale Order.

Section 10.    Consent; Consultation.  Sellers jointly and severally represent and warrant to Purchaser that Sellers have obtained the prior written consent of the Administrative Agent to enter into this Third Amendment and have consulted with the official committee of unsecured creditors appointed in the Bankruptcy Cases prior to entering into this Third Amendment.

Section 11.    Amendment.  This Third Amendment may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Third Amendment.  Sellers shall not agree to amend, modify or supplement this Third Amendment, or waive any provision of this Third Amendment without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

Section 12.    Counterparts.  This Third Amendment may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to

- 4 -

the other parties.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 13.    Entire Agreement; No Third Party Beneficiaries.  The Agreement as amended by this Third Amendment (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Initial Closing Date, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.

Section 14.    Governing Law.  THIS THIRD AMENDMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**[SIGNATURES ON FOLLOWING PAGE]**

DLI-6155961v5

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Third Amendment or caused this Third Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
    as Purchaser

By: _____
      Name:  JOSH SECGOPAVL
      Title:  VP

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
      as Seller and Debtor and Debtor-in-Possession

By: _____
      Name:
      Title:

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-
    Possession

By: _____
      Name:
      Title:

AMERICAN HOME MORTGAGE
    SERVICING, INC.,
      as Seller and Debtor and Debtor-in-Possession

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Third Amendment or caused this Third Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By: _____
    Name:
    Title:

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name: Michael Strauss
    Title: CEO

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-
    Possession

By: _____
    Name: Michael Strauss
    Title: President

AMERICAN HOME MORTGAGE
    SERVICING, INC.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
    Name: Michael Strauss
    Title: President

Exhibit G

[See Attached.]

**EXHIBIT G - AMENDED**

Sources of Cash[a]
 Servicing Receipts[b] ...............................................
 Investment Income[c] ...............................................
 Other Servicing Revenue[d] .....................................
 Borrowings under liquidity and working capital
  financing as may be necessary to enable Sellers
  to operate the Business from the Initial Closing
  to the Final Closing as contemplated by
  Section 6.2(a) (the "Interim Financing") ..............
 Employee Funding[e] ................................................
 Other Receipts Generated by the Purchased
  Assets .................................................................
   Total Sources ................................................

Uses of Cash[f]
 Payroll and Payroll Taxes[g] .....................................
 Health Insurance – BCBS[g] .....................................
 Direct Non-Payroll Costs[h] ......................................
 Allocated Corporate Overhead Costs[i] ....................
 Servicing Advances[j] ...............................................
 Payments under Interim Financing ..........................
   Total Uses ....................................................

-----

(a)  Excludes any draws under the DIP Financing Agreement

(b)  Comprised of fees and other funds that the servicer receives and is entitled to retain, including any ancillary fees, under Servicing Agreements or other agreements included in the Purchased Assets and all recoveries of Advances that are not Excluded Assets

(c)  Comprised of earnings on payments before remittance thereof under Servicing Agreements or in respect of Advances included in the Purchased Assets

(d)  Includes, the amounts contemplated by Section 6.2(f). Revenue under Section 6.2(f) will be calculated based on actual daily loan volumes for each month following the Initial Closing Date. The Business will be entitled to $15 per loan per month (based on a daily average count) during the two month period following the Initial Closing Date, $20 per loan per month for the subsequent two month period, and $25 per loan per month thereafter (such amounts, as applicable, the "Monthly Fee"). The foregoing Monthly Fees shall be payable as follows. The Business shall collect the monthly Servicing Fees for the subject loans. If the aggregate Servicing Fees collected by the Business for these loans in each monthly period is less than the product of the number of subject Mortgage

Loans multiplied by the applicable Monthly Fee per Mortgage Loan set forth in <u>Section 6.2(f)</u>, Sellers shall remit to the Business the amount of such deficiency. If such Servicing Fees collected by the Business are greater than the product of the number of subject Mortgage Loans multiplied by the applicable Monthly Fee per Mortgage Loan set forth in <u>Section 6.2(f)</u>, the Business will remit the excess to Sellers. Additionally, on a monthly basis, Sellers shall remit to the Business $25 for each of the subject loans that is "deboarded" during such month.

(e)     Up to 28 existing employees are being temporarily retained by American Home Mortgage Servicing Inc. to facilitate the completion of documentation related requirements for the benefit of Sellers. Sellers will make periodic payments to the Business to cover the salary and benefit costs of those employees. It is estimated that these monthly costs will be approximately $90,000. Payments will be based on actual costs incurred

(f)     Each item set forth below excludes uses of cash to the extent such uses relate to liabilities or obligations (i) accrued at or prior to the Initial Closing; (ii) associated with Excluded Assets; (iii) with respect to adjudicating or settling Disputed Servicing Agreements; or (iv) included in Assumed Liabilities. Uses of cash will exclude (A) payment of any Initial Cure Amounts; (B) payments of any Interim Cure Amounts; and (C) repayments of draws under the DIP Financing Agreement

(g)     Uses of Cash will exclude any compensation paid or payable or benefits with respect to (i) persons providing the Allocated Corporate Overhead services and (ii) the Executive Incentive Plan referred to on <u>Schedule 6.1(e)</u>

(h)     Comprised of occupancy and equipment, data processing and communications, office supplies and expenses and other direct costs of the Business

(i)     Calculated initially at the amounts per month set forth below, with each such amount being reduced from time to time and in such amounts as Purchaser and Sellers mutually reasonably agree to reflect any cost savings achieved by Sellers as a result of any decrease in utilization by the Business of corporate level support provided by Sellers whether as a result of increased resources within the Business or otherwise:

| Category | Initial Amount per Month |
|---|---|
| Information Technology | $ 290,000 |
| Accounting/Tax | $  50,000 |
| Legal/Human Resources | $  10,000 |

Notwithstanding the foregoing, Seller shall not agree to any such reductions without the prior reasonable consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

(j)     Comprised of advances under Servicing Agreements included in the Purchased Assets

FOURTH AMENDMENT
TO ASSET PURCHASE AGREEMENT

This Fourth Amendment to Asset Purchase Agreement dated as of January 7, 2008 (this "Fourth Amendment"), is entered into by and among AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser"), American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing, Inc, a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of September 25, 2007, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of November 1, 2007, that certain Second Amendment to Asset Purchase Agreement, dated as of November 6, 2007, and that certain Third Amendment to Asset Purchase Agreement dated as of November 16, 2007 (the "Agreement");

WHEREAS, Section 11.4 of the Agreement permits amendment of the Agreement by a written instrument signed by all of the parties to the Agreement with the prior written consent of the Administrative Agent (as defined in the Agreement) and with prior consultation with the official committee of unsecured creditors (the "Committee") appointed in the Bankruptcy Cases (as defined in the Agreement); and

WHEREAS, the parties to the Agreement desire to amend certain provisions of the Agreement pursuant to this Fourth Amendment in order to clarify the assets that will be acquired on the Final Closing Date by Purchaser.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.    Definitions.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

Section 2.    Formation of Transition Entities.  The Company shall cause one or more entities (which may include, without limitation, corporations, limited liability companies, limited partnerships, trusts, general partnerships and the like entities) (each a "Transition Entity" and collectively the "Transition Entities") to be formed and organized in the jurisdictions and the manner as reasonably specified by Purchaser.  From the date of such formation until the Final Closing, the Company shall (a) hold beneficially and of record all capital stock and other securities of and ownership interests in the Transition Entities, (b) own such capital stock, securities and ownership interests free and clear of all Claims and Liens other than any New Financing Liens and Permitted Liens and (c) cause the Transition Entities to own their respective assets free and clear of all Claims and Liens other than New Financing Liens and Permitted Liens.  For purposes of the prior sentence, contracts entered into by the Transition Entities in accordance with the provisions of the Agreement (including Sections 6.1 and 6.2 thereof) shall

be deemed "Assumed Contracts" with respect to the definition of "Permitted Lien" in Section 1.1 of the Agreement and the capital stock, securities of and ownership interests in the Transition Entities and the assets of the Transition Entities shall be deemed "Purchased Assets" with respect to the definition of "Permitted Lien" in Section 1.1 of the Agreement.  All Liabilities incurred by the Company in connection with the formation and organization of the Transition Entities in accordance with this Section 2 shall be deemed to be incurred in connection with the operation of the Business in the Ordinary Course.  For purposes of Sections 2.7(b), 6.1, 6.2(a)-(c), 6.3, 6.5, 6.9, 6.14(b) and 6.14(d) of the Agreement, the business of the Transition Entities shall be deemed to be a part of the Business.  For purposes of Sections 6.1, 6.2(a)-(c), 6.5, 6.7, 6.14(b) and 6.14(d) of the Agreement, the assets of the Transition Entities shall be deemed Purchased Assets and for purposes of Sections 6.1, 6.2(a) and 6.5 of the Agreement, the Contracts of the Transition Entities shall be deemed Assumed Contracts.  For purposes of Sections 2.7(b), 6.1, 6.2(a)-(c), 6.5, 6.7, 6.14(b) and 6.14(d) of the Agreement, the capital stock and other securities of and ownership interests in the Transition Entities shall be deemed Purchased Assets.  In addition, for purposes of subpart (ii) of the last sentence of Section 2.7(b) of the Agreement, the Liabilities of the Transition Entities incurred in the operation of the Business pursuant to Sections 6.1 and 6.2 of the Agreement shall be deemed to be Assumed Liabilities.

       Section 3.     Transfer of Ownership Interests.  At the Final Closing, the Company shall, for no additional consideration, deliver to Purchaser, as Purchased Assets, a certificate or certificates duly endorsed in blank for transfer with respect to any capital stock and other securities of and ownership interests in the Transition Entities or such other transfer instruments and documentation reasonably requested by Purchaser with respect to the ownership interests in the Transition Entities each in form and substance reasonably acceptable to Purchaser.

       Section 4.     Subservicing Agreements.  The Company shall enter into or be assigned and assume one or more subservicing agreements (the "Greenwich Subservicing Agreements") for the performance of the servicing of certain mortgage loans with respect to which Greenwich Capital Financial Products, Inc. has the right to appoint the servicer of such loans, subject to (a) the Debtors' review and consent to one or more forms of subservicing agreement, which such consent thereto and execution thereof will not be unreasonably withheld or delayed and (b) the Administrative Agent's and the Committee's review in accordance with the Subservicing Order (as defined below), and so long as Purchaser provides the Company an indemnity in substantially the form attached hereto as Exhibit A.  From time to time, upon Purchaser's reasonable request, Sellers will file with the Bankruptcy Court one or more Subservicing Notices (as defined in the Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Approving (A) Procedures for AHM Servicing's Entry Into Subservicing Agreements and (B) the Entry Into One or More Subservicing Agreements, entered on January 4, 2008 (the "Subservicing Order")) and, assuming either no objection to the Proposed Subservicing (as defined in the Subservicing Order) or any such objections having been withdrawn, overruled or otherwise resolved, the Company shall enter into one or more new subservicing agreements or assume one or more existing subservicing agreements, as applicable, with respect to each such Proposed Subservicing (each a "Subservicing Agreement" and collectively, together with the Greenwich Subservicing Agreements, the "Subservicing Agreements"), so long as Purchaser provides the Company an indemnity in substantially the form attached hereto as Exhibit A.  The Administrative Agent and the Committee may object to any Proposed Subservicing or to the Company entering into or assuming, as applicable, any Subservicing Agreements with respect to such Proposed

Subservicing only in accordance with the Subservicing Order. For purposes of <u>Sections 2.7(b),</u> <u>6.2(a)-(c)</u>, <u>6.3</u>, <u>6.5</u>, <u>6.7</u>, <u>6.9</u>, <u>6.14(b)</u> and <u>6.14(d)</u> of the Agreement, the Subservicing Agreements shall be deemed to be a part of the Business, and to be Purchased Assets and Assumed Contracts. In addition, for purposes of <u>Sections 2.5</u> and <u>2.7(b)</u> of the Agreement, Liabilities incurred by the Company under the Subservicing Agreements in accordance with <u>Sections 6.1</u> and <u>6.2</u> of the Agreement shall be deemed Assumed Liabilities. Any indemnity provided to the Company with respect to the Subservicing Agreements pursuant to this <u>Section 4</u> shall be in addition to, and not in limitation of, any rights Sellers may have under the last sentence of <u>Section 6.14(c)</u> of the Agreement; provided that in no event shall Sellers be entitled to duplicative recovery for the same Losses. For the avoidance of doubt, Subservicing Agreements shall constitute "servicing agreements" as such term is used in <u>Section 6.14(c)</u> of the Agreement.

Section 5.    <u>Limitation on Assignment of Liens and Financing</u>.  Notwithstanding the provisions of <u>Section 6.14(a)</u> of the Agreement permitting assignment, Purchaser agrees that Purchaser will not assign the lien on and security interest in the Purchased Assets granted to Purchaser pursuant to <u>Section 6.14(b)</u> of the Agreement unless the assignee of such lien and security interest agrees that it shall be subject to the same counterclaims, defenses and rights of set-off as if such lien and security interest remained directly held by Purchaser.

Section 6.    <u>Consent; Consultation</u>.  Sellers jointly and severally represent and warrant to Purchaser that Sellers have obtained the prior written consent of the Administrative Agent to enter into this Fourth Amendment and have consulted with the Committee prior to entering into this Fourth Amendment.

Section 7.    <u>Amendment</u>.  This Fourth Amendment may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Fourth Amendment. Sellers shall not agree to amend, modify or supplement this Fourth Amendment, or waive any provision of this Fourth Amendment without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

Section 8.    <u>Counterparts</u>.  This Fourth Amendment may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 9.    <u>Entire Agreement; No Third Party Beneficiaries</u>.  The Agreement as amended by this Fourth Amendment (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Initial Closing Date, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.

- 3 -

Section 10.    <u>Governing Law</u>.  THIS FOURTH AMENDMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**[SIGNATURES ON FOLLOWING PAGE]**

DLI-6163778v9

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Fourth Amendment or caused this Fourth Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
    as Purchaser

By: _____
    Name: JOSH SEEGOPAUL
    Title: VP

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
    as Seller and Debtor and Debtor-in-Possession


By: _____
    Name:
    Title:

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-
    Possession


By: _____
    Name:
    Title:

AMERICAN HOME MORTGAGE
    SERVICING, INC.,
    as Seller and Debtor and Debtor-in-Possession


By: _____
    Name:
    Title:

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Fourth Amendment or caused this Fourth Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By: _____
        Name:
        Title:

AMERICAN HOME MORTGAGE
    INVESTMENT CORP.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
        Name: Alan Horn
        Title:Executive Vice President/Secretary

AMERICAN HOME MORTGAGE CORP,
    as Seller and Debtor and Debtor-in-
    Possession

By: _____
        Name: Alan Horn
        Title:Executive Vice President/Secretary

AMERICAN HOME MORTGAGE
    SERVICING, INC.,
    as Seller and Debtor and Debtor-in-Possession

By: _____
        Name: Alan Horn
        Title:Executive Vice President/Secretary

<u>Exhibit A</u>

Form of Indemnity

AH Mortgage Acquisition Co., Inc. hereby agrees (A) to indemnify and hold harmless American Home Mortgage Servicing, Inc. and its Affiliates from and against any Losses arising as a result of or in connection with the provision of services by American Home Mortgage Servicing, Inc. pursuant to, or otherwise arising out of or in connection with, that certain [Describe the Subservicing Agreement], and (B) that until the later of (i) the Final Closing Date (as defined in the APA) and (ii) the satisfaction of (or the establishment of reserves in the amount of) any and all indemnity claims outstanding at the Final Closing arising in favor of American Home Mortgage Servicing, Inc. and its Affiliates in connection with services provided by American Home Mortgage Servicing, Inc. pursuant to the [Describe the Subservicing Agreement], AH Mortgage Acquisition Co., Inc. shall not encumber its assets through the incurrence or issuance of indebtedness for borrowed money or withdraw or distribute any of its capital, other than withdrawals or distributions in amounts equal to any amounts received by AH Mortgage Acquisition Co., Inc. as an adjustment to the Purchase Price (as defined in the APA), including, without limitation, amounts received pursuant to Section 4.1(c) or Section 4.4 of the APA. AH Mortgage Acquisition Co., Inc. further agrees that the [Describe the Subservicing Agreement] shall provide that upon the assignment of [Describe the Subservicing Agreement] by American Home Mortgage Servicing, Inc. to AH Mortgage Acquisition Co., Inc. at the Final Closing Date, AH Mortgage Acquisition Co., Inc. shall assume all of American Home Mortgage Servicing, Inc. obligations and liabilities, whether arising prior to or after the Final Closing Date. Finally, AH Mortgage Acquisition Co., Inc. shall use commercially reasonable efforts to secure a release in favor of American Home Mortgage Servicing, Inc. of all claims arising out of or in connection with the [Describe the Subservicing Agreement], such release to be effective upon the assignment of [Describe the Subservicing Agreement] to AH Mortgage Acquisition Co., Inc.

FIFTH AMENDMENT
TO ASSET PURCHASE AGREEMENT

This Fifth Amendment to Asset Purchase Agreement dated as of January 15, 2008 (this "Fifth Amendment"), is entered into by and among AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser"), American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing, Inc, a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of September 25, 2007, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of November 1, 2007, that certain Second Amendment to Asset Purchase Agreement, dated as of November 6, 2007, that certain Third Amendment to Asset Purchase Agreement dated as of November 16, 2007, and that certain Fourth Amendment to Asset Purchase Agreement dated as of January 7, 2008 (the "Agreement");

WHEREAS, Section 11.4 of the Agreement permits amendment of the Agreement by a written instrument signed by all of the parties to the Agreement with the prior written consent of the Administrative Agent (as defined in the Agreement) and with prior consultation with the official committee of unsecured creditors (the "Committee") appointed in the Bankruptcy Cases (as defined in the Agreement); and

WHEREAS, the parties to the Agreement desire to amend certain provisions of the Agreement pursuant to this Fifth Amendment in order to clarify the assets that will be acquired on the Final Closing Date by Purchaser.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.    Definitions.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

Section 2.    Assignment and Assumption of Employment Agreement.  The Company shall enter into an employment agreement with David Friedman (the "Friedman Agreement") in substantially the form attached hereto as Exhibit A.  For purposes of Sections 2.7(b), 6.2(a)-(c), 6.3, 6.5, 6.7, 6.9, 6.14(b) and 6.14(d) of the Agreement, the Friedman Agreement shall be deemed to be a part of the Business, and to be a Purchased Asset and an Assumed Contract.  In addition, for purposes of Sections 2.5 and 2.7(b) of the Agreement, Liabilities incurred by the Company under the Friedman Agreement in accordance with Sections 6.1 and 6.2 of the Agreement shall be deemed Assumed Liabilities.

Section 3.    Consent; Consultation.  Sellers jointly and severally represent and warrant to Purchaser that Sellers have obtained the prior written consent of the Administrative Agent to

enter into this Fifth Amendment and have consulted with the Committee prior to entering into this Fifth Amendment.

Section 4.    Amendment.  This Fifth Amendment may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Fifth Amendment.  Sellers shall not agree to amend, modify or supplement this Fifth Amendment, or waive any provision of this Fifth Amendment without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

Section 5.    Counterparts.  This Fifth Amendment may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 6.    Entire Agreement; No Third Party Beneficiaries.  The Agreement as amended by this Fifth Amendment (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Initial Closing Date, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.

Section 7.    Governing Law.  THIS FIFTH AMENDMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**[SIGNATURES ON FOLLOWING PAGE]**

- 2 -

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Fifth Amendment or caused this Fifth Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By: _____

Name:  JOSH SEEGOPAUL

Title:  VICE PRESIDENT

AMERICAN HOME MORTGAGE
INVESTMENT CORP.,
as Seller and Debtor and Debtor-in-Possession

By: _____

Name:

Title:

AMERICAN HOME MORTGAGE CORP,
as Seller and Debtor and Debtor-in-
Possession

By: _____

Name:

Title:

AMERICAN HOME MORTGAGE
SERVICING, INC.,
as Seller and Debtor and Debtor-in-Possession

By: _____

Name:

Title:

DLI-6165769v1

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Fifth Amendment or caused this Fifth Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
   as Purchaser


By: _____
      Name:
      Title:

AMERICAN HOME MORTGAGE
   INVESTMENT CORP.,
   as Seller and Debtor and Debtor-in-Possession

By: _____
      Name: Alan Horn
      Title:Executive Vice President/Secretary

AMERICAN HOME MORTGAGE CORP,
   as Seller and Debtor and Debtor-in-
   Possession

By: _____
      Name: Alan Horn
      Title:Executive Vice President/Secretary

AMERICAN HOME MORTGAGE
   SERVICING, INC.,
   as Seller and Debtor and Debtor-in-Possession

By: _____
      Name: Alan Horn
      Title:Executive Vice President/Secretary

EXECUTION VERSION

SIXTH AMENDMENT
TO ASSET PURCHASE AGREEMENT

This Sixth Amendment to Asset Purchase Agreement, dated as of April 11, 2008 (this "Sixth Amendment"), is entered into by and among AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser"), American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing, Inc, a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of September 25, 2007, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of November 1, 2007, that certain Second Amendment to Asset Purchase Agreement, dated as of November 6, 2007, that certain Third Amendment to Asset Purchase Agreement, dated as of November 16, 2007, that certain Fourth Amendment to Asset Purchase Agreement, dated as of January 7, 2008, and that certain Fifth Amendment to Asset Purchase Agreement, dated as of January 15, 2008 (the "Agreement");

WHEREAS, Section 11.4 of the Agreement permits amendment of the Agreement by a written instrument signed by all of the parties to the Agreement with the prior written consent of the Administrative Agent (as defined in the Agreement) and with prior consultation with the official committee of unsecured creditors (the "Committee") appointed in the Bankruptcy Cases (as defined in the Agreement); and

WHEREAS, the parties to the Agreement desire to amend certain provisions of the Agreement pursuant to this Sixth Amendment in order to clarify the date by which the Allocation Schedule is to be agreed upon and the duration of the Reconciliation Periods.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.    Definitions.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

Section 2.    Allocation Schedule.  Section 4.2(a) of the Agreement is deleted in its entirety and the following is inserted in its place:

> The Purchase Price and the value of any Assumed
> Liabilities shall be allocated among the Business, the Purchased
> Assets and the agreements provided herein for transfer of the
> Business to Purchaser in a manner consistent with an allocation
> schedule (the "Allocation Schedule"), which Allocation Schedule
> shall be mutually agreed upon by Purchaser and Sellers by
> April 30, 2008, to the extent reasonably possible, in compliance
> with Section 1060 of the Code and the regulations promulgated



thereunder.  If the Allocation Schedule is not mutually agreed upon by such date, the parties shall submit such dispute to a nationally recognized independent accounting firm mutually chosen by the parties (the "Independent Accounting Firm") for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable forms with the IRS and other Tax authorities.  The Independent Accounting Firm's review shall be final and binding on all parties.  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers, on the one hand, and 50% by Purchaser, on the other hand.

Section 3.    Reconciliation Period.

(a)    The second sentence of Section 6.2(b) of the Agreement is deleted and the following sentence is inserted in its place:

Following the Initial Closing, Sellers and Purchaser shall, (i) for each six month period following the Initial Closing through the Final Closing and for any shorter period between the last full six month period and the Final Closing or (ii) for the period following the Initial Closing through the Final Closing if such period is less than six months (each such period a "Reconciliation Period"), reconcile the net cash flow of the Business as contemplated by Exhibit G (each a "Reconciliation Calculation").

(b)    Section 6.3(c) of the Agreement is deleted and the following Section 6.3(c) is inserted in its place:

(c)    At Sellers' request following the Final Closing Date, Purchaser shall provide Sellers with reasonable access to the Transferred Employees and shall cooperate with Sellers for the purpose of preparing the Reconciliation Calculation, assisting Sellers with the winding down of Parent and the Filing Subsidiaries in conjunction with the Bankruptcy cases, and the provision of any information required for the purpose of filing Tax returns; provided, that such access shall not unreasonably disrupt the business of Purchaser.

Section 4.    Dispute Escrow.  The last sentence of Section 4.4 of the Agreement is deleted and the following sentence is inserted in its place:

In the event any Disputed Servicing Agreement has not become an Excluded Asset pursuant to the foregoing sentence by the later of (i) Final Closing and (ii) September 30, 2008, in the case of any Disputed Servicing Agreement set forth on Schedule 1.1(k) or March 31, 2009, in the case of any Disputed Servicing Agreement set forth on Schedule 1.1(l), Purchaser may elect to (a) treat such

- 2 -

DLI-6167018v3

Servicing Agreement as an Excluded Asset and Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver any portion of the Dispute Amount (together with any interest and earnings allocable thereto) related so such Servicing Agreement to Purchaser or (b) treat such Servicing Agreement as a Purchased Asset and Sellers and Purchaser shall instruct the Dispute Escrow Agent to deliver any portion of the Dispute Amount (together with any interest and earnings allocable thereto) related to such Servicing Agreement to an account or accounts designated by the Administrative Agent (pursuant to the Sale Approval Order) on behalf of Sellers.

Section 5.    Bankruptcy Court Approval. Sellers hereby jointly and severally represent and warrant to Purchaser that the amendments and modifications to the Agreement set forth in this Sixth Amendment does not have a material adverse effect on the Debtors' (as defined in the Sale Approval Order) estate and that the Administrative Agent and the Committee have waived the five business day prior written notice requirement of paragraph 27 of the Sale Approval Order. Sellers shall promptly file a notice of the entry into this Sixth Amendment with the Bankruptcy Court as contemplated by paragraph 27 of the Sale Approval Order.

Section 6.    Consent; Consultation. Sellers hereby jointly and severally represent and warrant to Purchaser that Sellers have obtained the prior written consent of the Administrative Agent to enter into this Sixth Amendment and have consulted with the Committee prior to entering into this Sixth Amendment.

Section 7.    Amendment. This Sixth Amendment may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Sixth Amendment. Sellers shall not agree to amend, modify or supplement this Sixth Amendment, or waive any provision of this Sixth Amendment without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

Section 8.    Counterparts. This Sixth Amendment may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 9.    Entire Agreement; No Third Party Beneficiaries. The Agreement as amended by this Sixth Amendment (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.



DLI-6167018v3

Section 10.    <u>Governing Law</u>.  THIS SIXTH AMENDMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**[SIGNATURES ON FOLLOWING PAGE]**

- 4 -

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Sixth Amendment or caused this Sixth Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By: _____
Name:  JOSH SEEGOPAUL
Title:  VP

AMERICAN HOME MORTGAGE
INVESTMENT CORP.,
as Seller and Debtor and Debtor-in-Possession

By: _____
Name:
Title:

AMERICAN HOME MORTGAGE CORP,
as Seller and Debtor and Debtor-in-Possession

By: _____
Name:
Title:

AMERICAN HOME MORTGAGE
SERVICING, INC.,
as Seller and Debtor and Debtor-in-Possession

By: _____
Name:
Title:

*Signature Page to Sixth Amendment*

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Sixth Amendment or caused this Sixth Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By: _____
        Name:
        Title:

AMERICAN HOME MORTGAGE
        INVESTMENT CORP.,
        as Seller and Debtor and Debtor-in-Possession

By: _____
        Name: Craig Pino
        Title: EVP & Treasurer

AMERICAN HOME MORTGAGE CORP,
        as Seller and Debtor and Debtor-in-
        Possession

By: _____
        Name: Craig Pino
        Title: EVP - Treasurer

AMERICAN HOME MORTGAGE
        SERVICING, INC.,
        as Seller and Debtor and Debtor-in-Possession

By: _____
        Name: Craig Pino
        Title: EVP & Treasurer