# EXHIBIT C

**(Declaration of Jonathan D. Vanderveen)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re:                                                       : Chapter 11
                                                             :
AMERICAN HOME MORTGAGE                                       : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,              :
                                                             : Jointly Administered
       Debtors.                                              :
------------------------------------------------------------ x

### DECLARATION OF JONATHAN D. VANDERVEEN

I, Jonathan D. Vanderveen, declare as follows:

1. I am a Managing Director with Alvarez & Marsal Dispute Analysis & Forensic Services, LLC ("A&M"). I have over twenty years of financial reporting experience, including auditing public companies, serving in various financial reporting positions at a public company, consulting with companies on business disputes involving accounting issues and serving as an independent expert or arbitrator for disputes or investigations involving the application of accounting principles. As a Managing Director with A&M, my practice focuses on providing post-acquisition arbitration services arising from purchase price disputes, consulting and expert witness services to clients involved in litigation and other business disputes, and corporate investigative services to clients addressing critical issues related to questionable financial transactions or accounting irregularities. I have experience representing clients in the mortgage loan servicing business and a thorough knowledge of financial accounting standards applicable to that industry, including the standards relating to mortgage banking activities and servicing of financial assets. Prior to joining A&M in 2004, I was a partner for four years with Deloitte & Touche LLP. I hold a bachelor's degree in Business Administration and am a Certified Public Accountant, Certified Fraud Examiner and a member

of the American Institute of Certified Public Accountants and the Association of Certified Fraud Examiners.[1]

2. I submit this declaration in support of the Amended Motion of American Home Mortgage Servicing, Inc., Formerly Known as AH Mortgage Acquisition Co., Inc., for an Order Granting the Allowance and Payment of an Administrative Expense Claim for Breaches by Certain Debtors of the Asset Purchase Agreement for the Sale of the Debtors' Mortgage Servicing Business (the "Amended Motion").[2] The facts stated herein are true and correct and, unless otherwise noted below, are based upon the books and records maintained in the ordinary course of business (the "Books and Records")[3] by AHM SV, Inc., formerly known as American Home Mortgage Servicing, Inc. ("SVI"), and American Home Mortgage Servicing, Inc., formerly known as AH Mortgage Acquisition Co, Inc. (the "Purchaser").

3. In June 2008, A&M was retained by counsel for the Purchaser to examine and evaluate the Books and Records with respect to certain transactions involving SVI and to quantify and document such transactions. To that end, under my direction and supervision, A&M professionals devoted considerable time to (a) examining the Books and Records and reports relating to these transactions, including bank statements, internal banking reports, wire remittance requests, custodial bank account reconciliations, query results from certain information systems, check requests and paid invoices; and (b) communicating with the

---

[1] A copy of my curriculum vitae is attached hereto as Exhibit A and incorporated herein by reference.

[2] Capitalized terms not otherwise defined herein have the meanings given to such terms in the Amended Motion.

[3] References herein to the Books and Records are to those maintained by the Sellers and/or SVI prior to the Initial Closing, by the Sellers for the benefit of the Purchaser during the Interim Period and by the Purchaser after the Final Closing.

Purchaser's employees to ensure that the transactions described below are accurate and fully documented.

### *Lender Paid Mortgage Insurance and Prepayment Penalties[4]*

4.     Based upon A&M's review of the Books and Records and discussions with the Purchaser's employees, prior to the Initial Closing, SVI deposited prepayment penalties that it received and amounts deducted from principal and interest payments for Lender Paid Mortgage Insurance ("LPMI") into Parent's general operating account (the "434 Account"), which SVI used to fund a wide variety of its servicing activities. At the time of the Initial Closing, the Sellers transferred $3,326,152 to the Purchaser, representing amounts collected as LPMI premiums and prepayment penalties by SVI prior to the Initial Closing. This transfer, coupled with a related purchase-price adjustment of $6,061,810, results in a total payment/adjustment in respect of LPMI premiums and prepayment penalties of $9,387,962. According to the Books and Records, the Purchaser paid an aggregate of $6,476,423 to insurers for LPMI premiums SVI collected prior to the Initial Closing and an aggregate of $7,504,426 to the owners of certain loans for prepayment penalties that SVI collected prior to the Initial Closing. After reducing the total of these deficiencies ($13,980,849) by the total of the credits described above ($9,387,962), there remains a deficiency of $4,592,887.

### *Custodial Accounts Transactions*

5.     *Advances.* From time to time prior to the Initial Closing, SVI withdrew funds from the 434 Account to make Advances. SVI would use its automated system, the LSAMS system, to systematically repay Advances by transferring certain of the funds collected to the 434 Account. On July 2, 2007, SVI manually transferred $5,082,009 from a custodial

---

[4]     Section and paragraph headings found herein have been inserted solely for the convenience of the Court and parties in interest and should not be considered testimony of the Declarant.

account to the 434 Account to repay loans for Advances. However, by the time of the manual transfer, LSAMS had already automatically repaid, by transfer to the 434 Account, amounts aggregating $1,496,586 of the same Advances that were repaid with the manual transfer. Prior to the Initial Closing, the custodial account was due reimbursement of $1,496,586 as a result of the repayment through both the manual transfer and through LSAMS. During the Interim Period, the Sellers used cash from the separate accounts established for the benefit of the Purchaser to rectify this double repayment to Parent's 434 Account and replenish the custodial account.

6. *Collections and Payments Related to Paid in Full Loans Not Remitted to Third Parties.* Prior to the Initial Closing, SVI remitted $1,762,957 to Parent for collections on paid in full loans that SVI believed Parent owned but that Parent actually had sold to third parties. Instead, Parent retained the paid in full amounts it received and made the required remittance from the third party owners' custodial accounts to them for the paid in full amounts, creating an expected cash shortage in those accounts. During the Interim Period, SVI transferred $164,303 from the separate accounts established for the Purchaser's benefit to partially rectify the resulting expected cash shortage in the investors' custodial accounts. There remains an expected cash shortage in an aggregate amount of $1,598,654 as a result of SVI's remittance of these collections to Parent's 434 Account.

7. Prior to the Initial Closing, SVI did not pay certain "compensating interest" that was owed to certain custodial accounts in respect of certain paid in full loans in an aggregate of $1,213,341. During the Interim Period, SVI transferred $1,213,341 from the Purchaser's accounts to rectify the resulting expected cash shortage in the applicable custodial accounts.

8. *Liquidation Proceeds.* Prior to the Initial Closing, SVI received and remitted to Parent's 434 Account $2,040,718 in payments in connection with loans that it was servicing under servicing agreements eventually acquired by the Purchaser that were in foreclosure. These amounts included payments from mortgage insurance and full liquidation proceeds. Because, prior to the Initial Closing, SVI remitted these liquidation proceeds to Parent's 434 Account, upon liquidation of the loan, the custodial accounts will have an expected cash shortage in the aggregate amount of $2,040,718.

9. *Repurchases.* The Sellers satisfied Parent's repurchase obligations prior to the Initial Closing by transferring funds to the investors from the investors' own custodial accounts. The Sellers never reimbursed the custodial accounts for these repurchase amounts, and as a result, those custodial accounts had an expected cash shortage in the amount of $738,384 as of the Initial Closing.

10. *Guaranty Fees.* Prior to the Initial Closing, SVI deducted amounts for guaranty fees (the "Guaranty Fees") due to Federal National Mortgage Association ("FNMA") from principal and interest payments made by borrowers and deposited those funds in Parent's 434 Account, pending remittance to FNMA. When certain of the Guaranty Fees became due during the Interim Period, the Sellers paid those Guaranty Fees, aggregating $834,648, from the separate accounts established for the benefit of the Purchaser.

11. *Payment Clearing Account.* In connection with servicing loans, SVI maintained a clearing account. SVI deposited collections from borrowers and third parties in the clearing account, pending transfer of the funds to the appropriate custodial accounts using LSAMS, which was SVI's only vehicle to post funds to individual loans. These postings would credit funds to the applicable borrower and fund the appropriate custodial account. Prior to the

Initial Closing, SVI miscoded certain non-cash transactions relating to the establishment of new loans in LSAMS. Specifically, SVI coded the establishment of these new loans as if the clearing account had received cash equal to the principal balance of these new loans. These errant transactions caused the payment clearing account to appear over-funded, although no funds were actually deposited in the account. SVI manually transferred amounts aggregating $2,423,759 to either the 434 Account or its predecessor. These manual transfers created a shortfall of $2,423,759 in the clearing account, which existed at the Initial Closing. At the Initial Closing and prior to full functionality of the accounts to be established for the benefit of the Purchaser, the Purchaser deposited roughly $45 million into the payment clearing account to fund, among other items, Advances to investors. As a result of the extra funds the Purchaser had provided, the balance in the payment clearing account remained more than sufficient to post all required funds to the appropriate custodial accounts. The Purchaser did not discover that SVI had transferred funds to the Parent's operating accounts that were required to be remitted to custodial accounts until the Purchaser recently closed the payment clearing account, at which point the Purchaser was short the $2,423,759.

12. *Expenses Denied by Wells Fargo.* Prior to the Initial Closing, SVI incurred $749,406 in expenses in connection with the foreclosure of certain loans that Wells Fargo Bank, N.A. ("Wells Fargo"), the master servicer for the loans, did not agree SVI could pass onto the investors pursuant to the applicable servicing agreements. Accordingly, Wells Fargo required SVI to remit to the investor from the investor's custodial accounts an amount equal to the liquidation proceeds *without* reduction for these expenses. As a result, prior to the Initial Closing, the custodial accounts had an expected cash shortage in the aggregate amount of $749,406.

## *The Use of the Purchaser's Accounts to Pay Obligations Under Servicing Agreements That the Purchaser Did Not Acquire*

13. With respect to loans that SVI serviced that permitted borrowers to borrow against the equity of their homes in the form of a home equity line of credit (a "HELOC Loan"), it was SVI's practice, when a borrower requested to draw on the line of credit, to remit the requested draw amount directly to the borrower from Parent's 434 Account. SVI would then transfer funds from the investor's custodial account to the 434 Account to reimburse Parent for the draw advances. At various times prior to the Initial Closing, SVI transferred amounts in excess of the underlying draws from the custodial accounts to the 434 Account. As a result, these custodial accounts had an expected cash shortage in the aggregate amount of $597,677 as of the Initial Closing. SVI replenished the expected cash shortage in these HELOC custodial accounts during the Interim Period by transferring funds from the separate accounts established for the benefit of the Purchaser.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 18, 2008

Jonathan D. Vanderveen

# EXHIBIT A

## (Curriculum Vitae)

**JONATHAN D. VANDERVEEN**
**Managing Director**
**Dispute Analysis and Forensic Services**
**Alvarez & Marsal, Chicago, Illinois**

Jonathan Vanderveen, a Managing Director in A&M's Dispute Analysis and Forensic Group, provides post-acquisition arbitration services and consultative and expert witness services to clients involved in litigation or other business disputes. He also specializes in providing corporate investigative services to clients addressing critical issues related to questionable financial transactions and/or accounting irregularities.

With over 20 years of financial reporting experience, Mr. Vanderveen has consulted to clients on a variety of accounting-based issues. Mr. Vanderveen has acted as a consultant, an independent expert, and a third party neutral on numerous disputes or investigations surrounding the application of GAAP. He began his career in public accounting auditing companies various industries. Mr. Vanderveen spent several years in industry where he held various financial reporting positions at a public company. He returned to public accounting in a consulting capacity. Prior to joining A&M, Mr. Vanderveen was a partner in a Big Four public accounting firm.

**PRACTICE AREAS:**

Provide post-acquisition arbitration services arising from purchase price disputes.

Provide consultative and expert witness services to clients involved in litigation and other business disputes.

Provide investigative services involving a variety of fraud and forensic accounting related issues.

**SELECTED ENGAGEMENTS:**

**Arbitration Services:**

- Arbitrated a purchase price dispute in the telecommunications industry. The dispute centered on the proper accounting for numerous accounts in a seller-prepared working capital calculation.

- Assisted the seller in a purchase price dispute in the automotive supply (metals) industry. The dispute centered on a working capital adjustment calculated on a buyer-prepared closing balance sheet.

- Assisted the seller in a purchase price dispute in the eye lenses industry. The dispute centered on a working capital adjustment calculated on a buyer-prepared closing balance sheet.

- Assisted the buyer in a purchase price dispute over a purchase price adjustment related to the accounting for the net assets of a company in a manufacturing industry.

**Jonathan D. Vanderveen**
Page 2

- Arbitrated a purchase price dispute in the automotive supply industry. The dispute centered on the proper accounting for items in a seller-prepared closing balance sheet.

- Assisted the seller in a purchase price dispute over a purchase price adjustment related to the value of certain inventories of a paper manufacturer.

- Arbitrated a purchase price dispute in the radio broadcasting industry. The dispute centered on the accounting and financial reporting reflected in a buyer-prepared earn out calculation.

- Arbitrated a purchase price dispute related to the sale of the assets of a business college. The dispute centered on the proper accounting for items in a buyer-prepared net asset value comparison.

- Arbitrated a purchase price dispute for a commercial real estate joint venture. The dispute centered on the accounting and financial reporting reflected in a seller-prepared earn out calculation.

- Arbitrated a purchase price dispute in the healthcare industry. The dispute centered on the proper accounting for items repurchased from a physician group management and billing agency.

- Analyzed and rebutted an arbitrated claim for indemnification of environmental remediation costs associated with a clean up mandated by the USEPA.

- Analyzed and rebutted an arbitrated damages claim of a manufacturing company executive alleging a stock and cash bonus was due him based upon the company's achievement of a defined cumulative net earnings amount.

**Litigation Services:**

- Prepared a lost profits claim due to alleged infringement on select patents for a manufacturer of smoke detectors.

- Performed certain agreed-upon procedures on the financial statements and business records of a hazardous waste company for purposes of determining royalty payments due to former owners of a hazardous waste landfill.

- Prepared a lost profits claim due to alleged breach of contract and loss of retail markets for a lock manufacturer.

- With respect to a false advertising claim, analyzed records in order to determine the defendant's ability to manufacture products labeled "Made in USA." The engagement included a review of the origin and timing of receipt of all components used to manufacture the products in question.

- Analyzed and rebutted plaintiff's damages claim and prepared an alternative damages calculation with respect to a breach of contract claim in the video dispensing machine industry.

- Consulted on the rebuttal of a plaintiff's claim for lost profits in the banking software industry. Our work included testifying in a mock trial and developing the complete cross-examination for the plaintiff's damages expert.

**Jonathan D. Vanderveen**
Page 3

- With respect to a professional malpractice claim against a large accounting firm accused of audit failure in the factoring industry, reviewed plaintiffs' damages claim and prepared an alternative damages claim.

- Analyzed and critiqued a heat treating company's property and lost profits claims associated with a fire and ensuing explosion. Also analyzed plaintiff's property claims and provided deposition assistance to counsel. Prepared an alternative lost profits damages claim comprising analyses of lost sales, loss period, incremental costs, mitigation of damages, capacity constraints and industry trends.

- Performed accounting analyses on select financial statements of a major regional title insurance company in order to rebut claims of sound financial condition.

- Assisted counsel of a third party administrator in building its defense beyond the analysis of discovery documentation, including the creation of financial impact scenarios and industry cost models.

- Rebutted plaintiff's damages for lost profits related to claims of breach of contract and misrepresentation. Plaintiff's claims arose from the alleged breach of a royalty agreement with a manufacturer of motorized recreational vehicles.

**Forensic and Investigative Services:**

- Investigated alleged accounting irregularities surrounding contract accounting. The investigation centered on the proper accounting for portfolios of long term contracts and the proper accounting (percentage of completion, completed contract, or other) for the contracts. The investigation identified inappropriate contract accounting used to manage earnings. Our work then shifted to assisting the company in properly accounting for the contracts and providing the information necessary for a restatement of the company's financial information.

- Investigated alleged accounting irregularities and the theft of company funds at a construction company. Company employees were allegedly involved in fraudulent activities including off-book construction projects, unrecorded and illegal bartering arrangements, vendor kickbacks, and off-book payroll at this newly acquired subsidiary company of a large public utility and energy conglomerate. The investigation included forensic accounting analyses, the use of computer forensics to retrieve deleted files containing invoices for "off-book" projects, dozens of interviews with current and former employees, retrieval and reconstruction of the information contained within corrupted general ledger software, and the use of external private investigators.

- Investigated alleged accounting irregularities at a publicly held transportation company. The investigation included assisting management in reprocessing all accounting transactions for a two-year period and reissuing quarterly and year end financial statements. The investigation also included presenting our findings to the SEC.

- Investigated alleged accounting irregularities including improper revenue recognition and understatement of reserves at a subsidiary of an international food service manufacturer/retail food

**Jonathan D. Vanderveen**
**Page 4**

supplier. The investigation included the presentation of the investigative findings to the client in order for the client and its external auditors to determine the need for a restatement of the financial statements. The investigation also included presenting our findings to the SEC.

- Investigated alleged accounting irregularities involving a retail grocery store chain's accounts payable activities. The procedures included numerous interviews of key personnel and analysis of accounting systems information. The investigative team presented its findings to the company's Board of Directors and legal counsel to aid in their assessment of possible financial restatement.

- Investigated alleged accounting irregularities and management improprieties at a transaction processing company in the financial services industry. The investigation involved numerous background checks on current and former employees, a critical assessment of the client's billing systems, and a review of various representations made by the former owner in the purchase contract. The investigation team identified significant weaknesses in the billing systems, errors in customer billings, management improprieties, and several breaches of warranties and misrepresentations by the former owner.

- Investigated alleged accounting irregularities at a Venezuelan joint-venture subsidiary of an international manufacturer and distributor of OEM and aftermarket automotive products. The investigation included conducting interviews with current and former employees, visiting several factories, and gathering and analyzing information for assessment of improper revenue recognition, falsification of revenues, and the understatement of liabilities. The investigative team presented its findings to the U.S. parent company in order for the company and its external auditors to evaluate a possible divestment or buyout of the joint-venture subsidiary.

- Investigated alleged accounting irregularities, including improper revenue recognition and understatement of liabilities, and the possible embezzlement at a subsidiary of an international petroleum, chemical, and construction conglomerate. The engagement included analyzing information relevant to the alleged accounting irregularities and possible embezzlement. The investigative team presented its findings to the company's Board of Directors and its external auditors for their determination as to the need for a restatement of the company's financial statements.

- Investigated alleged accounting irregularities and embezzlement by the controller of a subsidiary of a recreational vehicle manufacturer. The procedures included asset tracing to locate embezzled funds, filing a proof of claim for a fidelity loss, and issuing expert reports in a successful civil proceeding against the controller. In addition, the investigative team provided a procedures and findings report to the FBI and U. S. Attorney's Office for successful criminal action against the controller, and presented its findings to the SEC.

- Investigated alleged accounting irregularities involving substantial inventory shrinkage and possible inappropriate vendor relationships at the Mexican subsidiary of an international manufacturer and distributor of OEM and afermarket heavy transportation products. This engagement included conducting numerous interviews, performing computer forensics procedures, and analyzing information relevant to the alleged accounting irregularities. The investigative team summarized the weaknesses it discovered involving internal controls and processing of accounting information as well as reported the inappropriate vendor payments to the parent company and its external auditors.

Jonathan D. Vanderveen
Page 5

- Investigated potential fraudulent activity at a major regional title insurance company. The engagement included using computer forensic tools, sophisticated data analysis methods, and interviews to uncover a pattern of fraud conducted by the owners of the company. The investigative team presented the findings to counsel to pursue legal action against the owners.

- Investigated alleged accounting irregularities at a subsidiary of a manufacturer and marketer of sporting goods. The procedures involved analyzing certain accounting information, including account reconciliations and non-standard journal entries, as well as assessing the internal controls of the purchasing and payment cycles in order to make recommendations for improvement. The investigative team identified several material control weaknesses in the company's purchasing and payment processes and presented its findings to the company's Board of Directors.

- Investigated alleged accounting irregularities at a manufacturer and marketer of home protection devices. The accounting irregularities were allegedly created prior to the sale of the company. The procedures included reviewing the pre and post acquisition reserve balances based upon the seller's reserve methodologies. The engagement team presented its findings to management and legal counsel to determine whether to pursue litigation regarding the matter.

**PROFESSIONAL HISTORY:**
Deloitte & Touche LLP
Price Waterhouse LLP
SPSS Inc.
Altschuler, Melvoin & Glasser

**PROFESSIONAL AFFILIATIONS:**
Certified Public Accountant in Illinois
   Member, American Institute of Certified Public Accountants
Certified Fraud Examiner
   Member, Association of Certified Fraud Examiners

**EDUCATION:**
Bachelor of Arts, Business Administration
Hope College, Holland, Michigan