```
                 IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE

                              - - -

IN RE:                     :  CHAPTER 11
                           :  Case No. 07-11047 (CSS)
                           :
AMERICAN HOME MORTGAGE      :  Wilmington, Delaware
HOLDINGS, INC.,            :  August 5, 2008
          Debtors         :  3:41 o'clock p.m.
. . . . . . . . . . . . . . . . :

                         HEARING
            BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
               UNITED STATES BANKRUPTCY COURT JUDGE

                              - - -

APPEARANCES:

For the Debtors:    SEAN BEACH, ESQUIRE
                    MAGGIE WHITEMAN, ESQUIRE
                    Young Conaway Stargatt
                    & Taylor, LLP
                    The Brandywine Building
                    1000 West Street
                    17th Floor
                    Wilmington, DE  19801

For Bank of         ANA ALFONSO, ESQUIRE
America:            Kaye Scholer, LLP
                    425 Park Avenue
                    New York, NY  10022
                            -and-
                    GABRIEL R. MAC CONAILL, ESQUIRE
                    Potter, Anderson & Corroon, LP
                    1313 N. Market Street
                    Wilmington, DE  19801

For the U.S.        JOSEPH J. McMAHON, ESQUIRE
Trustee:            U.S. Department of Justice
                    Office of the United States Trustee
                    J. Caleb Boggs Federal Building
                    844 King Street, Suite 2007
                    Wilmington, DE  19801
```

APPEARANCES:  (continued)

```
For the Creditors   MARK POWER, ESQUIRE
Committee:          Hahn & Hesson LLP
                    488 Madison Avenue
                    New York, NY  10022
                              -and-
                    DAVID W. CARICKHOFF, ESQUIRE
                    Blank Rome LLP
                    1201 Market Street
                    Suite 800
                    Wilmington, DE  19801


For WLR/AHM         VICTORIA W. COUNIHAN, ESQUIRE
Servicing:          Greenburg Traurig
                    The Nemours Building
                    1007 North Orange Street
                    Suite 1200
                    Wilmington, DE  19801


For Freddie Mac:    J. CORY FALGOWSKI, ESQUIRE
                    Reed Smith
                    1201 Market Street
                    Suite 1500
                    Wilmington, DE  19801


For Calyon:         BENJAMIN C. ACKERLY, ESQUIRE
                    Hunton & Williams LLP
                    Riverfront Plaza, East Tower
                    951 East Byrd Street
                    Richmond, VA  23219-4074
                              -and-
                    KEVIN J. MANGAN, ESQUIRE
                    Womble Carlyle
                    222 Delaware Avenue
                    Suite 1501
                    Wilmington, DE  19801



                              - - -


Audio Operator:        Jennifer Pasierb

Transcribed by:        Paula L. Curran, CET
```

        (Proceedings recorded by For The Record Gold digital
sound recording; transcript provided by AAERT-certified
transcriber.)

1              (The following occurred in open court at 3:41

2    o'clock p.m.)

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.  Good afternoon.

5              MR. BEACH:  Good afternoon, your Honor.  May it

6    please the Court, Sean Beach from Young, Conaway, Stargatt &

7    Taylor on behalf of the debtors.  First of all, your Honor,

8    thank you for allowing us to squeeze this hearing in here.

9    As you've probably seen, there are a number of very important

10   pleadings before the Court today which will allow the debtors

11   to move forward in a less litigious fashion, we all hope,

12   towards a plan of reorganization or liquidation in these

13   cases.  To that end, your Honor, all five of the motions up

14   for hearing today are critical in the debtor's efforts to

15   move forward with the plan process in these cases.

16              Your Honor, the first motion on the agenda is the

17   settlement with Calyon and the settlement has, essentially,

18   two tranches to it.  The first piece of the settlement is to

19   resolve the Servicing litigation issues and the litigation

20   itself.  The primary terms of that settlement are a payment

21   to or the ability for the debtors to use the proceeds from

22   the $5 million reserve that was set aside in connection with

23   prior stipulations of the Court.  It also provides that the

24   debtors would be assigned approximately $652,000 UPB state

25   bond loans and the debtors would be assigned approximately a

1   million dollar claim with respect to certain funds that were

2   swept from the debtor's bank accounts either pre-petition or

3   early on in these bankruptcy cases.

4          Then the second tranche to the settlement, your

5   Honor, deals with a resolution of the remaining issues in

6   connection with a fund stipulation that this Court previously

7   approved and the primary terms in connection with that

8   tranche of the settlement are a resolution of a principal in

9   interest funds dispute.  There is about $415,000 set aside

10  from the prior stipulation in connection with that dispute.

11  And then there were certain other ancillary or miscellaneous

12  fund issues that needed to be resolved, where the debtors had

13  some obligations to track down those funds.  And to the

14  extent that they were recovered, they were to be paid over to

15  Calyon.

16         In connection with this tranche of the settlement,

17  the debtors are to pay to Calyon, within in five business

18  days after the effective date, $50,000.  The debtors can

19  retain the $415,000 that is in that P&I dispute escrow

20  account.  And Calyon has assigned to the debtors those kind

21  of miscellaneous funds that were dealt with in the prior

22  stipulation.

23         Your Honor, the debtors firmly believe that this

24  settlement is within -- is a sound use of the debtor's

25  business judgment.  That it falls well above the lowest

1    reasonableness test and ultimately should be approved by the

2    Court.  Your Honor, in the courtroom today is Brett

3    Fernandez, who is with Crawls (ph) Elko (ph) Cooper and I

4    have  brief proffer of evidence to support this settlement.

5            THE COURT:  Any objection to the use of a proffer?

6    All right, hearing none, you may proceed.

7            MR. BEACH:  If called to the stand, Mr. Fernandez

8    would testify that as of June 30, 2008, he was appointed as

9    the Director of Restructuring for the debtors.  Prior to that

10   date and since the filing of the debtor's petitions, Mr.

11   Fernandez has been actively involved in the debtor's Chapter

12   11 cases, as one of Crawls associate directors.  Mr.

13   Fernandez has worked as a restructuring advisor for Crawls,

14   Elko, Cooper for approximately nine years and prior to that

15   time, among other things, worked as a consultant for Price

16   Waterhouse Coopers.  Mr. Fernandez received a Bachelor Degree

17   in Business Economics with an emphasis in accounting from

18   UC-Santa Barbara.

19           With respect to the Calyon settlement, Mr. Fernandez

20   would testify that he has participated in the negotiations

21   surrounding the settlement and has reviewed the stipulation.

22   Mr. Fernandez would testify that the settlement is the result

23   of good faith arm's-length negotiations with Calyon.  And

24   that in the debtor's business judgment, the settlement is

25   fair and equitable, represents the settlement that rests well

1    above the lowest point in the reasonable range of potential

2    litigation outcomes, obviates the expense delay and

3    uncertainty surrounding the litigation and advances the

4    paramount interest of creditors.

5        Mr. Fernandez would testify that the probability

6    that the debtors would succeed in litigating the Phase II

7    trial and outstanding issues associated with the funds

8    stipulation is uncertain and the debtors have no assurances

9    of a favorable outcome.  Mr. Fernandez would further testify

10    that the issues surrounding those disputes involve complex

11    issues, which would require discovery, a majority of which

12    has not commenced due to the status of negotiations.

13    Mr. Fernandez would testify that continuing the Calyon

14    litigation would be expensive and time consuming with no

15    certainty of a favorable outcome.

16        Moreover, Mr. Fernandez would testify that entry of

17    the stipulation also serves the interests of the debtor's

18    creditors and that the debtors have been advised that the

19    committee does not oppose the settlement.  By the settlement

20    of the servicing rights litigation, the debtors are receiving

21    all rights of Calyon and more than $5 million in funds, an

22    assignment of state bond loans with a UPB of approximately

23    $650,000 and the assignment of a $1 million claim for certain

24    swept funds, while simultaneously reducing potential,

25    substantial litigation costs.

1          By the settlement of the remaining funds stipulation

2    disputes, the debtors are receiving a net benefit, without

3    litigation, of approximately $365,000 plus the assignment of

4    certain claims with an uncertain value.  Such a result adds

5    value to the debtor's estates which directly results in a

6    benefit to their creditors.

7          Mr. Fernandez would further testify that the

8    assignment of Calyon's rights and various funds alleviates

9    the likely difficulties, not only in litigating the issues,

10   but in collecting any judgments with respect to those

11   disputed funds.  As a result, Mr. Fernandez would testify

12   that he believes entry of the stipulation was a product of

13   the debtor's sound business judgment and would respectfully

14   request that the Court approve the order.

15         Your Honor, that would conclude the testimony of Mr.

16   Fernandez.

17         THE COURT:  Does anyone wish to cross-examine the

18   witness?  All right, the Court hears none.

19         MR. BEACH:  Your Honor, we have received no formal

20   objections to the stipulation.  We did have conversations

21   with AH Acquisition, which is now American Home Mortgage

22   Servicing, Inc. and agreed with them that we would make a

23   representation on the record.  If I may, I'll make that

24   representation now.

25         THE COURT:  Very good.

1          MR. BEACH:  The stipulation between the debtors and

2   Calyon New York branch, as administrative agent and the

3   requested order approving the stipulation is not intended to

4   modify agreements between the debtors and the purchaser of

5   the mortgage servicing business, who is now known as American

6   Home Mortgage Servicing, Inc.  Including the asset purchase

7   agreement, any of the interim or sub-servicing agreements

8   between the debtors and the purchaser or any other agreements

9   between them, including any obligation of the debtors

10   contained in such agreements, to pay costs and expenses

11   incurred by the purchaser in connection with the transfer of

12   the servicing rights that are subject of this stipulation.

13          Your Honor, the stipulation does provide an

14   additional benefit that I neglected to mention earlier, which

15   is that Calyon will be responsible for paying the cost of the

16   servicing rights after the stipulation goes effective.

17   That's an obligation of Calyon to the stipulation to the

18   debtors.  What this representation is saying is that we're

19   not changing our legal obligations to American Home Mortgage

20   Servicing.

21          THE COURT:  All right.

22          MR. BEACH:  With that, your Honor, I would ask that

23   you approve the order.

24          THE COURT:  Does anyone wish to be heard?  All

25   right, hearing none, the Court will approve the order.

1          MR. BEACH:  May I approach, your Honor?

2          THE COURT:  Mm-hmm.

3          MR. BEACH:  Thank you.

4          (Pause.)

5          THE COURT:  Okay.

6          MR. BEACH:  Thank you, your Honor.  Your Honor, the

7    next item on the agenda today is the motion of the debtors

8    for approval of sale procedures and an expense reimbursement,

9    as well as the ability to name a stalking horse with respect

10   to the sale of substantially all of the debtor's remaining

11   loans that are encumbered only by the DIP.

12          Your Honor, those loans are -- it's approximately

13   243 loans with approximately $36 million unpaid principal

14   balance on those loans.  These are all performing loans as of

15   July 12th and the debtors are seeking a sale process.  The

16   debtors have already had 14 non-disclosure agreements entered

17   into by potential bidders and are working with those bidders

18   on the due diligence process.  The debtors expect to have

19   certain additional interested parties look at these assets

20   and have established an internet website with the critical

21   due diligence information on that website.

22          What the debtors propose in the sale procedures is

23   to have the ability to name a stalking horse in connection

24   with this sale.  If the debtors can name a stalking horse and

25   file a notice of that stalking horse with an executed,

1    fully-bonding asset purchase agreement on or before August

2    12th.  The stipulation or some of the criteria for naming a

3    stalking horse are, one, that the committee consents to that

4    stalking horse and the debtors have been working very closely

5    with the committee on the sale process and certainly will

6    continue to do so throughout the sale process.  The stalking

7    horse bidder must enter an asset purchase agreement, which is

8    substantially similar to the format of that purchase

9    agreement which was filed prior to this hearing.  And that

10   the stalking horse bidder must not be an insider of the

11   debtors.  That was an addition that the debtors made in

12   consultation with the Office of the United States Trustee.

13   And finally, that the debtors file that notice of the

14   stalking horse bidder prior to August 12th to get the most

15   benefit from setting a floor with respect to any stalking

16   horse bid.

17          The debtors also propose that there be a bid line

18   established, a bid deadline established of August 22nd and to

19   the extent that more than one qualified bid is received, to

20   hold that auction on August 26th or the sale hearing on

21   August 27th and a closing on August 28th.

22          In connection with these sale procedures, your

23   Honor, the debtors are seeking authority to award an

24   aggregate amount of actual and reasonable expense

25   reimbursement costs to one or more potential bidders in

1    connection with this pool.  Your Honor, the debtors believe

2    that this is a critical component to be able to maximize the

3    value of these loans.  In a sale of loans outside of the

4    bankruptcy context, the due diligence typically happens, as

5    your Honor is probably aware, after the sale occurs.  In this

6    context, it's an as-is, where-is sale and the due diligence

7    period is prior to the sale.

8            Your Honor, we had a similar expense reimbursement

9    component entered previously in the case, but the debtor

10   believed that it's particularly important in this context

11   given the fact that there is a lot of competition in the

12   market, both in the bankruptcy courts and outside of

13   bankruptcy courts.  And potential purchasers have expressed

14   that they are not willing to participate in the process

15   unless they are getting, at least, a portion of their expense

16   reimbursements paid.

17           Now, the debtors have had a lot of expressions of

18   interest and certain of those parties said that they're going

19   to move out of the process and go elsewhere if they are not

20   provided with, at least, some payment.  And the debtors

21   believe that having more bidders involved in the process will

22   certainly lead to a much higher likelihood that will

23   ultimately get more qualified bids and have a spirited

24   auction process.  In addition, having more bidders involved

25   in the process, right now, allows or gives the debtors a

 1  better negotiating standpoint with other bidders during this

 2  process.

 3          Your Honor, there are no formal objections made to

 4  the sale procedures.  There was an informal objection

 5  expressed by the Office of the United States Trustee to two

 6  components of these bid procedures.  One was in connection

 7  with stalking horse piece and the other was in connection

 8  with the expense reimbursement piece.  In conversations with

 9  the Office of the United States Trustee, I believe they are

10  no longer objecting to the stalking horse piece of it, but

11  are pursuing an objection in connection with the expense

12  reimbursement.  Prior to hearing what the U.S. Trustee has to

13  say, what I'd like to do is, if it's acceptable to your

14  Honor, is proffer the testimony of Mr. Damien Voulo, who is

15  present in the courtroom today for cross-examination.

16          THE COURT:  Any objection to the use of a proffer?

17  You may proceed.

18          MR. BEACH:  Thank you, your Honor.  If called to the

19  stand, Mr. Voulo would testify that he is the Senior Vice

20  President of Capital Markets Risk Management for American

21  Home Mortgage Corporation and has been with the company in

22  that capacity, since November, 2005.  Mr. Voulo received a

23  Bachelor of Science degree in finance from St. John's

24  University in 1986.  In his capacity of Senior Vice President

25  in Capital Markets Risk Management with the company, Mr.

1  Voulo's responsibilities include, among other things,

2  overseeing the management and the sale of certain mortgage

3  loans and the management of the risks associated with those

4  loans.

5          Additionally, Mr. Voulo has worked in the bank and

6  mortgage industry for approximately 22 years.  Prior to

7  joining American Home, Mr. Voulo also worked for 19 years as

8  a Senior Vice President of Risk Management with J.P. Morgan

9  Chase.  In his career in the mortgage lending industry, he

10  has overseen or participated in numerous sales and mortgage

11  loans.

12          Mr. Voulo would testify that he has reviewed and is

13  familiar with the performing loan sale motion, the sale

14  procedures and the loan sale agreement currently before the

15  Court today and is involved in the marketing and sale process

16  of the performing loans.  He would also testify that pursuant

17  to the performing loan sales motion, the debtors are seeking

18  authority to market and sell their first-name loans with

19  respect to which to date, the mortgages are fulfilling the

20  terms, covenants, conditions and obligations required under

21  the mortgage.  As of June 30th, the debtors own 243 mortgage

22  loans with an aggregate unpaid principal balance of

23  $36,641,482.

24          Mr. Voulo would further testify that he is familiar

25  with the sale procedures related to the proposed sale and the

1    various dates set forth therein.  The sale procedures

2    contemplate an auction process pursuant to which bids for the

3    performing loans would be subject to higher and better

4    offers.  Mr. Voulo would testify that the sale procedures, as

5    a whole and particularly the expense reimbursement and option

6    to name a stalking horse, provide a structure which will help

7    maximize value for these performing loans.  Moreover, Mr.

8    Voulo would testify that notice of the auction and sale

9    procedures are designed to provide adequate notice to all

10   potentially interested parties.

11          Mr. Voulo would testify that having the option of

12   naming a stalking horse bidder ensures that the highest and

13   best bid for the performing loans will be obtained by

14   providing a catalyst for other parties to submit competing,

15   qualified bids.  Mr. Voulo would further testify that naming

16   a stalking horse bidder, without further Court approval, is

17   fair and reasonable under the circumstances.

18          Mr. Voulo would testify that the debtors seek

19   authority to pay reasonable costs and expenses, not to exceed

20   $350,000 in the aggregate in connection with the due

21   diligence process of potential bidders designated by the

22   debtors.  The debtors request that they be authorized to pay

23   a stalking horse bidder a portion of the expense

24   reimbursement of up to $150,000 and that any amounts paid to

25   a stalking horse bidder would reduce the overall

1    availability.

2              Mr. Voulo would testify that the expense

3    reimbursement would be payable solely from the proceeds

4    received from the sale and no other source.  May be paid only

5    upon the consent of the committee and only if the potential

6    bidder submits a qualified bid, which pursuant to the sale

7    procedures, requires bidders to exceed the stalking horse bid

8    by $200,000.  The debtors are not obligated to pay an expense

9    reimbursement under the procedures to the extent that the

10   sale of the performing loans is not consummated.  And no

11   expense reimbursements will be paid to a successful bidder.

12             Mr. Voulo would testify that there is sound business

13   justification for approving the expense reimbursement because

14   it will assist the debtors in obtaining the maximum return

15   for the performing loans.  The expense reimbursement brings

16   potential bidders into the sale process.  Moreover, because

17   the expense reimbursement may only be paid if a qualified bid

18   is made, the debtors believe that the expense reimbursement

19   will build on that due to the sale process.  Potential

20   bidders have already expressed that they are not willing to

21   engage in the sale process unless they are provided with, at

22   least, a partial expense reimbursement.

23             Mr. Voulo would testify that the expense

24   reimbursements are fair and reasonable for several additional

25   reasons.  First, the expense reimbursements will only be paid

1    with the consent to the community and the reimbursements

2    shall be payable only from the proceeds received from the

3    sale of the performing loans.  Mr. Voulo would further

4    testify that with respect to the combined amount of the

5    expense reimbursement, it is de minimis when compared to the

6    value anticipated to be achieved from the successful bid.

7                Your Honor, that would conclude the testimony of Mr.

8    Voulo.

9                THE COURT:  Anyone wish to cross-examine the

10   witness?  All right, hearing none, you may proceed.

11               MR. BEACH:  Your Honor, with that, I think it makes

12   sense to hear from the U.S. Trustee and I can address that.

13               THE COURT:  Very good.  Mr. McMahon?

14               MR. McMAHON:  Your Honor, good afternoon and may it

15   please the Court.  Joseph McMahon for the United States

16   Trustee.  Two very basic concerns here, your Honor.  First,

17   with respect to the stalking horse.  I don't think that

18   debtor's counsel and I have a, I guess, a common

19   understanding as to what our position is.  We don't have a

20   problem with the debtors coming back, I guess, at a later

21   date and seeking approval of a stalking horse agreement.

22   That would be done on notice after the stalking horse was

23   selected by the debtors, if they wanted to do so in

24   consultation with the committee or with any big protections

25   to be, I guess, identified at that time.  The problem is we

17

1    don't have any agreement in front of the Court right now.

2    This is, essentially, the debtors are, essentially, seeking

3    authority to dangle stalking horse status and wants having

4    picked the appropriate entity deemed approved by this Court.

5    And that's a concern in any context.

6         With respect to the multiple expense reimbursements,

7    we went through this before in these cases earlier on.  The

8    existence of the stalking horse relief, from our perspective,

9    kind of, I'd say, detracts from the need for multiple expense

10   reimbursements in connection with the sale process.  To the

11   extent that the debtors are planning on seeking stalking

12   horse relief, it would seem to us that the need to expend

13   moneys to establish a floor, which is what was being done in

14   connection with the non-performing loans option, that we had

15   before, where there essentially was no stalking horse

16   agreement.  The need for that relief, I think, becomes

17   effectively unnecessary, because if you're going to have a

18   stalking horse establish an auction for it, there's no need

19   to pay an expense reimbursement out to two, four or six

20   entities simply just to submit a qualifying bid.  There is

21   no, I guess, no benefit to the estate beyond having them

22   submit that bid.  And they're not obligated to bid up at an

23   auction.

24        We believe that what O'Brien dictates in the

25   circumstance is it's really one or the other.  Essentially,

 1    meaning that if we're going to be talking about a stalking

 2    horse, then we should, I guess, address that subject and we

 3    don't need to get to the multiple expense reimbursements for

 4    multiple bidders.  That's basically the approach we come to.

 5              THE COURT:  Mr. Power?

 6              MR. POWER:  Good afternoon, your Honor, Mark Power

 7    from Hahn & Hesson on behalf of the committee.  Your Honor,

 8    Mr. Beach is correct, the committee has worked really very

 9    closely in this auction with the debtor.  And I think it

10    would help the Court to understand exactly how we are running

11    this auction, the debtor is consulting with the committee.

12              If your Honor recalls, the debtor ran an auction

13    last fall where it sold significant loans pursuant to an open

14    auction and we had a open bid.  And then in the fall, your

15    Honor approved the process where we had non-performing loans

16    and that was a closed bid process, where three bidders were

17    selected out of a pool and each one was given expense

18    reimbursement.  And then we got one sealed bid from those

19    three.

20              And the fundamental business reason for that is,

21    when you're talking about non-performing loans, generally,

22    our experience is that the bidders tend to value the loans

23    very differently.  They all value them based on the property

24    values and certain other things and you can end up with wild,

25    varying bids in that case.  So, the view was, if you did a

1   closed-bid process, we may end up catching more value by

2   having one bidder here and the other two down here.  And we

3   did that process and sure enough, one bidder was not

4   significantly higher, but about ten percent higher than the

5   others.

6           This auction is a little different.  These are

7   performing loans, there's about $37 million of them.  We

8   expect to get, hopefully, around $20 million of proceeds,

9   give or take.  So, the break-up fee expense reimbursement is

10  less than one and a half percent total and but less than one

11  percent for the stalking horse, in terms of an economic

12  value.  Nor are the performing loans in the experience of --

13  when we do these auctions is, the bidders tend to value them

14  very similarly, because they're performing loans.  And so, we

15  hopefully, will have similar bids and can have a very

16  competitive auction.  That's why the parties decided doing an

17  open auction in this case.  We think we will have a

18  competitive auction at the end of August.

19          The tricky part about these loans is and I think,

20  you know, if you have the witness testify, the reasons these

21  loans are un-encumbered is because they were kicked off of

22  the repo lines.  They didn't qualify for various reasons.

23  Either they, you know, the loan to values are off or they

24  were mobile homes or they were investor properties and those

25  require a specific amount of due diligence.  Because, when

1    you have a pool like this, which is what we call kick loans,

2    it requires investors to look behind the scenes and try to

3    understand what is going on with these loans.  What is the

4    risk I am taking?  Are they going to still perform?  Why were

5    they not on a line?  Why are they not conforming, they're not

6    agency loans?   And that, in our experience, requires a firm

7    and a due diligence.

8            So, we've been working with bidders and the

9    committee's been working with bidders and trying to go

10   through that.  And I will tell you, these loans vary greatly.

11   There's one loan from Ohio, which is over $3 million.

12   There's several loans in Tennessee, I think, which are one or

13   two major investors, which are multiple loans, I think about

14   40 of them.  And so, the pool is a very complex pool, in

15   which we're finding from bidders is they're saying in order

16   to do the work to be able to put a solid bid in this case, I

17   need to spend some money to do due diligence.  And so, when

18   the committee and the debtor got together, we decided this

19   process was the best way to maximize value.  And we're asking

20   the Court for flexibility to do that.

21           We have been in negotiations.  We hope to have a

22   stalking horse, but again, if your Honor recalls, the initial

23   bids come in, they're not -- they're subject to due diligence

24   and we don't want a situation where that bid fades away

25   quickly and we've committed to a horse without knowing

1   whether that horse can finish the race.  So, the reason the

2   process is this way is, we think we'll have a stalking horse

3   and we expect somebody to give us a firm bid.  But if we

4   don't have that, we don't want to make them a stalking horse

5   until we're sure that that's the best bid out there, at

6   least, to go into the auction with.

7        So, I know, your Honor, in other matters and this

8   Court has approved other judges.  Stalking horse is we have a

9   naked auction, but you seek bid protections if you can get

10  someone to come to the plate and step up.  We think we may be

11  able to get somebody to step up in this situation to act as a

12  stalking horse, that will give us a decent price and we need

13  to give them expense reimbursement for that.

14        THE COURT:  Well, fine, but shouldn't we have a

15  separate hearing, once you identify a stalking horse?

16        MR. POWER:  I guess, your Honor, the way this

17  process is worked, the debtor needs to move forward with the

18  auction process.  It's now paying money to the servicer to

19  try to continue to service these loans.  And because of its

20  financial situation, we need to move these loans off of the

21  debtor's estate.  Right now, the market is pretty good.

22  There's a significant number of buyers.  If we wait until we

23  get a firm bid, we would have to delay the auction another 30

24  days.  And given that we're simply seeking to understand --

25  simply, all we're asking your Honor to do --

1           THE COURT:  When are the bids due?

2           MR. POWER:  The bids are due the 22nd -- 22nd.

3           THE COURT:  And when's the auction?

4           MR. POWER:  A few days later, your Honor.

5           THE COURT:  So, why can't we have a stalking horse

6   hearing between the 22nd and the 26th?

7           MR. POWER:  Because we would like to declare the

8   stalking horse two weeks before the bids are due, so people

9   know what the price is.

10          THE COURT:  Well, why can't we have, why can't we

11  have the hearing before you do that?

12          MR. POWER:  Well, your Honor, we could, but I guess,

13  if your Honor approves the conditions that are currently in

14  place, then we would just have to announce who that party is.

15  It seems to me, all the protections are in place for a

16  stalking horse bid.  I don't know, all we would be doing is

17  simply adding a name and announcing that name.  So, I guess

18  our view was that if --

19          THE COURT:  Then we won't know what the bid is, so,

20  how do I make a judgment as to whether the protections are

21  within a reasonable range, if I don't know what the bid is?

22          MR. POWER:  Your Honor, I would suggest that we

23  could deal with that by simply providing it will not exceed

24  x-percent.  I think that would be fine.

25          THE COURT:  You just set a minimum threshold?

```
 1              MR. POWER:  Yes, your Honor, I think that will be

 2    fine.

 3              THE COURT:  And what will X be?

 4              MR. POWER:  I would say --

 5              THE COURT:  50?

 6              MR. POWER:  No, no.  Well, three percent, for sure,

 7    but I would say we could go lower.

 8              THE COURT:  Did you ever see a movie called Tin Man?

 9    It's a great movie.

10              MR. POWER:  Yes, sir, I have seen that.

11              THE COURT:  It takes in place in Baltimore, they're

12    having sales and the guy's negotiating on a Cadillac and he

13    says, what do you want to pay?  A dollar.

14              MR. POWER:  Right.

15              THE COURT:  So, I'll give you .1 percent and we can

16    move up from there.

17              MR. POWER:  Your Honor, could we have one moment?

18              THE COURT:  Take as long as you need.

19              (Discussion off the record.)

20              MR. POWER:  Your Honor, we'll go with one percent.

21              THE COURT:  Okay.

22              MR. POWER:  We think with that as a parameter, that

23    we can't award a stalking horse number above one percent of

24    the hard price.

25              THE COURT:  Well, based on that change, I'll
```

1  overrule the objection in connection with the stalking horse.

2  Do you have anything further to say, either you or Mr. Beach

3  on the expense reimbursement?  That would not be included in

4  the one percent.  That's a set amount, is my memory.

5          MR. BEACH:  The way we have it structured is that we

6  are asking for authority for an aggregate total of --

7  authority for awarding up to $350,000 --

8          THE COURT:  Right.

9          MR. BEACH:  -- as an expense reimbursement.

10         THE COURT:  Right.

11         MR. BEACH:  To the extent we name a stalking horse

12  and pay that stalking horse part of that expense

13  reimbursement, it will reduce the $350.

14         THE COURT:  Okay.  And that would be included in the

15  one percent?

16         MR. BEACH:  Yeah.

17         THE COURT:  Or in addition to?

18         MR. POWER:  Your Honor, my understanding is it's

19  $350 total.

20         THE COURT:  Right.

21         MR. POWER:  Of which the stalking horse will

22  probably be around $150,000, which would be less than one

23  percent of the stalking horse's bid.  We want authority to

24  spend the additional funds to give expense reimbursements to

25  other bidders.

1            THE COURT:  Right.

2            MR. POWER:  And --

3            THE COURT:  I understand that issue.  My question is

4    would you set a ceiling on the stalking horse of one percent?

5    It's not just expense reimbursement to the stalking horse.

6            MR. POWER:  It's all in, expense and break-up fee.

7            THE COURT:  All right, so that one percent would be

8    break-up fee -- the expense reimbursement, plus break-up fee

9    will not exceed one percent?

10            MR. POWER:  Yes, your Honor.

11            THE COURT:  Okay, understood.  Well, based on that

12    and based on my experience in the previous cases and also,

13    frankly, I disagree with the comment that it's either an

14    expense reimbursement or a break-up fee.  It's actually quite

15    common to be both.  They are somewhat different issues.  One

16    deals more with the opportunity costs and the risks inherent

17    in being the first bidder and the other deals with the

18    out-of-pocket costs that are necessarily associated with

19    doing due diligence and making any kind of asset purchase.

20    So, I'll overrule the Office of the U.S. Trustee's objection

21    and I'll approve the procedures as modified.

22            MR. BEACH:  Thank you, your Honor.

23            THE COURT:  And I'll take it in an interlineated

24    order, if that's what you'd like to do.  Yes, Mr. McMahon?

25            MR. McMAHON:  Very briefly, just for purposes of

1   clarification and I understand the Court's ruling.  Our

2   position wasn't a break-up fee or expense reimbursement, like

3   either or.  It was if we're going to do the stalking horse,

4   we don't need to do all the additional expense

5   reimbursements.  So, just to clarify that for the Court.

6            THE COURT:  I understand, okay.

7            MR. McMAHON:  Thanks.  It's late in the day, so.

8            MR. BEACH:  Thank you, your Honor.  We'll

9   interlineate the one percent in there and hand that order up,

10  if it's acceptable, at the end of the hearing.

11           THE COURT:  That's fine.

12           MR. BEACH:  Your Honor, I do have a blackline of the

13  order, which just makes some changes to the file version of

14  the order to reflect the changes to the sale procedures that

15  were filed.  If I may approach, your Honor?

16           THE COURT:  Right.  Can we go through that after

17  you've finalized your order?

18           MR. BEACH:  Sure.

19           (Pause.)

20           MR. BEACH:  With that, your Honor, we're moving to

21  the third item on the agenda today, which is a motion to

22  approve a settlement stipulation between the debtors and the

23  committee in connection with the use of certain construction

24  loan proceeds and certain REO proceeds, which have been held

25  in a segregated account pursuant to separate court orders and

```
 1    both subject to further order of the Court.

 2              Your Honor, the debtors have been in discussions

 3    with the committee about the use of those proceeds while the

 4    debtors continue their liquidation efforts.  The way that the

 5    settlement is structured is that once the DIP is paid off and

 6    once other assets are liquidated, those funds would go back

 7    into the segregated accounts, essentially, pursuant to the

 8    prior orders.  But the debtors and the committee have been in

 9    negotiations and have come to an agreement that it makes

10    sense for the debtors to use these funds now, rather than

11    seeking additional financing or hopefully, to be in a

12    position to use less than the financing that we hope to be

13    available under the amended DIP that we'll be addressing with

14    your Honor shortly.

15              In connection with this settlement, your Honor,

16    there have been no formal objections to the entry of the

17    order.  We've been in discussions with the United States

18    Trustee.  I believe the understanding is that he is -- the

19    United States Trustee is not objecting to the portion of the

20    settlement agreement related to the construction loans.  The

21    proceeds currently in that account are approximately $8.3

22    million.  But I believe that the United States Trustee is

23    objecting to our ability to use, pursuant to this

24    stipulation, the funds that have been set aside in connection

25    with the REO proceeds, which are currently, approximately,
```

1    $3.6 million.

2            So, unless your Honor has questions for me, I'll

3    ceded the podium to the Office of the U.S. Trustee to address

4    that objection.

5            THE COURT:  Are you going to put any evidence on?

6            MR. BEACH:  I hadn't --

7            THE COURT:  Okay, I'm just asking.

8            MR. BEACH:  -- anticipated doing it.

9            THE COURT:  All right, let me hear from Mr. McMahon.

10           MR. McMAHON:  Your Honor, good afternoon.  We took a

11   look at the two orders at issue and while the, I believe, the

12   issue presented to the Court at the time, was somewhat

13   similar, the language in each order is different.  The

14   difference being the language in the second order that was

15   entered, that's referenced in the motion, is, at least, in

16   our view, much more restrictive from the standpoint of what,

17   you know, can or can't be done with the funds.  The word

18   distribute is actually used and it appears to us, that based

19   upon our reading of that order, that the funds were to be

20   reserved for distribution pursuant to a plan or in a Chapter

21   7 proceeding.

22           With respect to the first order, your Honor, there

23   is more, say, a liberal language, dealing with the funds

24   being held for the benefit of general unsecured creditors and

25   the ability of the committee to consent to use of the funds

1    and/or this Court ordering a particular use of the funds.

2    That is, essentially, the basis for the position we took with

3    the debtors, which is, provided that entry of this order

4    doesn't affect whether the, I guess, the repayment the funds

5    from fund one would be property of the estates or otherwise.

6    But we believe that the language in the first stipulation

7    wouldn't bar the relief that the debtors and committee are

8    seeking here today.

9         With respect to the second stipulation, there would

10   have to be some, I guess, further relief that the debtors and

11   committee would seek with respect to that second order,

12   before they could do what they want to do pursuant to the

13   stipulation with those funds.  So, unless the Court has

14   questions for our office, we believe that the first

15   stipulation or the first order, excuse me, that was entered

16   by the Court arguably permits the proposed use.  While the

17   second stipulation, it just does not condone it.  Thank you.

18        MR. BEACH:  Your Honor, for the record, Sean Beach.

19   The language, in particular, in the order related to the REO

20   proceeds, says that those proceeds shall be held in trust for

21   the benefit of general and secured creditors of the debtors,

22   to be distributed pursuant to a confirmed Chapter 11 plan or

23   further order of the Court.

24        In addition, under the REO order, the Court also

25   stated or actually, I'm not clear as to whether it was on the

1    order or whether it was part of the transcript.  But it was

2    stated that notwithstanding anything contained in the final

3    stipulation, this relates the V of A committee stipulation

4    that was entered.  To the contrary, no funds could be

5    distributed to general, unsecured claimants until all

6    administrative and priority claims of, particularly of debtor

7    are paid in full or the Court makes a finding that there is

8    sufficient available funds to pay allowed admin and priority

9    claimants of a particular debtor in full.

10          Your Honor, with the language in the order that says

11   it could be pursuant to further order of the Court and with

12   the understanding and the language that is in that order,

13   it's paragraph four, Romanet (ph) two, the debtors and I

14   believe, the committee, think that it's quite clear that not

15   only can these funds be used to pay for administrative claims

16   or operating claims of the estate during the bankruptcy case,

17   because they have to be used for that purpose prior to any

18   payments to general unsecured creditors.  These funds will be

19   used to assist in a plan process and ultimately, will benefit

20   general unsecured creditors, at the end of the day.   And

21   once further funds are liquidated and the DIP is paid off,

22   these funds, pursuant to this stipulation, will go back into

23   that separate account for the benefit of general unsecured

24   creditors.  So, your Honor, I believe that the largely

25   technical argument of the United States Trustee doesn't hold

1    with respect to the language and their proper use of these

2    funds.

3              MR. POWER:  Your Honor, Mark Power from Hahn &

4    Hesson, for the committee.  It's fairly interesting because

5    we've come full circle.  And if your Honor recalls, several

6    months ago, when we did the settlement with V of A, we had

7    language in there that the money was set aside for general

8    unsecured creditors and the U.S. Trustee objected and the DIP

9    lender objected and some number of creditors objected.  So,

10   we said it wasn't our purpose to do a special carve-out, it

11   was our purpose, simply, to set aside the funds, because we

12   haven't figured out which estate they belonged.  We settled

13   with V of A over all the, you know, all the estates.  And we

14   wanted some control over where those funds went.

15             Now, we're before your Honor suggesting that we

16   should permit the debtor to use the funds, because the debtor

17   has an outstanding balance on the DIP loan that's charging

18   interest and expense.  And it doesn't make sense to have

19   funds sitting to account, earning one or two percent, while

20   the debtor is paying interest on a DIP loan.  We ought to be

21   able to use the funds to basically pay the operating

22   expenses, knock all in the DIP or reduce the ball into the

23   DIP and basically, save funds with the understanding that

24   those moneys we put back when we get to the plan process,

25   which we're working on right now.

1           So, I, quite frankly, don't see the U.S. Trustee's

2    argument here, at all.  We have specifically put in the

3    language that the funds will be used for doing those -- all

4    pursuant to your Honor's order.  This is exactly the

5    situation we contemplated for that order.  Was when we need

6    the funds for the a purpose that the committee consents, that

7    we would ask your Honor to approve it, understanding they're

8    going to be used for administrative expenses and ongoing

9    expenses of the estate.

10           So, for that reason, I would ask your Honor to

11   approve the stipulation and overrule the objection.

12           MR. McMAHON:   Two points in reply, your Honor.

13   First, I don't believe that there was any like, specific

14   notices of class given to unsecured priority claims with

15   respect to this motion.  Presumably, having creditors to the

16   extent that they were on the 2002 list, could have received

17   notice, but that's a separate issue.

18           With respect to the language, the text of the order,

19   I have it here and I'm referring to paragraph four of the,

20   what I've just called the second order.  The only operative

21   verb is the verb distribute or distributed.  There is no

22   provision, whatsoever, made for using the funds to finance

23   ongoing operations of the debtor's estates.  Now, there is a

24   provision, Romanet three, that the funds due constitute

25   property of the debtor's estates.  But there, in Romanet one

1  and Romanet two, I think the Court made it clear that the

2  funds were being received and they weren't going to be

3  distributed until there was the allocation that Mr. Power

4  talked about and the Court was satisfied that the 1129

5  requisite findings could be made.  So, I have the language

6  here from paragraph four, if the Court would like to see it.

7  I don't have the attached exhibit --

8            THE COURT:  That's fine.

9            MR. McMAHON:  -- but I don't think it's -- may I

10  approach?

11            THE COURT:  Yes.

12            (Pause.)

13            THE COURT:  To the extent that funds, other than

14  funds pursuant to the final stipulation, exist in such

15  debtor's estate to satisfy any unpaid admin and priority

16  claims, then such other funds shall be used first to satisfy

17  those claims before utilizing any funds received pursuant to

18  this stipulation.  Are there any such funds available other

19  than the revolver?

20            MR. BEACH:  Not at this time, your Honor.  The

21  debtors have other assets.  We are liquidating other assets.

22            THE COURT:  They're not liquid ones.

23            MR. BEACH:  Not -- we need these funds, your Honor.

24            THE COURT:  All right.  Well, I'll overrule the

25  objection of the Office of the United States Trustee.  I

1    think the language, first of all, I don't put the

2    significance on the use of word distributed that Mr. McMahon

3    does.  I don't believe that it means distributed solely

4    pursuant to a confirmed plan or under Chapter 7.  I think it

5    simply means spent, frankly or transferred.  And it's clear

6    under Romanet one that further order of the Court on all

7    notice to other parties that have requested notice pursuant

8    to Bankruptcy Rule 2002 is sufficient.  And I think Romanet

9    three, I'm sorry, not Romanet three.  Well, Romanet three,

10   which makes it clear the funds are property of the debtor's

11   estate, I think, is significant.  And then the final

12   provision, which provides that you can't use these until

13   you've used all other available funds, based on the

14   representation of Mr. Beach, I believe is satisfied.  So,

15   I'll approve the order.

16            MR. BEACH:  Thank you, your Honor.  May I approach

17   and I also have the interlineated sale order.  May I approach

18   with that, as well?

19            THE COURT:  Yes and a blackline?

20            MR. BEACH:  Yes.

21            THE COURT:  Yes, okay, thank you.

22            (Pause.)

23            MR. BEACH:  Your Honor, there were two -- in

24   addition to the blackline, there were two interlineated and

25   the blackline is only with respect to the changes to the

```
1   order to reflect the changes that were made with the filed

2   sale procedures.  But the interlineated portions are

3   contained in this one interlineation in the sale procedures

4   and one in the proposed notice of auction and sale procedures

5   with respect to the one percent.

6             THE COURT:  It's in the order?

7             MR. BEACH:  It's not actually in the order, it's in

8   the sale procedures and the -- what the order says is that

9   expense reimbursement is approved as set forth in the sale

10  procedures.

11            THE COURT:  Oh, all right.

12            (Pause.)

13            THE COURT:  All right, I'll sign the order.  I

14  already signed the other one.

15            MR. BEACH:  Thank you, your Honor.

16            THE COURT:  Is that item four?

17            MR. BEACH:  Yes, your Honor.  Actually, item number

18  five of the agenda is a sealed motion with respect to Section

19  12 of the Bank of America stipulation and it probably makes

20  sense to address that first.  We've been in discussions with

21  the United States Trustee.  I believe his position is not to

22  take a position with respect to the sealed motion.

23            The debtors believe that the information to be

24  sealed or being requested to be sealed, is confidential,

25  commercial information that's central to the debtor's
```

```
 1    business as a liquidating debtor in these bankruptcy cases.

 2    I'll concede, your Honor, that Bank of America's position

 3    with respect to this being confidential, commercial

 4    information is probably better than the debtor's position

 5    based on some prior rulings in this court, with respect to

 6    sealing certain provisions and documents.

 7              But, I'm trying to have a general discussion here

 8    and if your Honor wants to get into some more specifics, I

 9    would ask that we seal the courtroom with respect to some of

10    the specifics of that provision that we're asking to seal.

11    But it is going forward on an uncontested basis.  We do

12    believe that it would have a negative impact in connection

13    with certain pending litigation in these bankruptcy cases.

14    We are only asking that it be sealed for a limited time until

15    that litigation has concluded and then can be unsealed.  And

16    we believe that it is proper under the circumstances here.

17              THE COURT:  Any comments in connection with the

18    motion to seal the document?  All right, I'll approve it.

19              MR. BEACH:  Thank you, your Honor.  I'll hold that

20    order until we --

21              THE COURT:  You can bring it up.

22              MR. BEACH:  -- or I'll approach.

23              THE COURT:  Otherwise, we'll lose track.  Thank you.

24              (Pause.)

25              MR. BEACH:  Sorry, your Honor.  That brings us back
```

1    to item number four in the agenda, which is the settlement

2    between the debtors, the committee and Bank of America as

3    administrative agent.

4              Your Honor, we are pleased to come before you today,

5    after several months of negotiations and some heated

6    litigation and expensive litigation in these bankruptcy

7    cases, with a settlement that settles the outstanding issues

8    between the parties, as we know them and as we know them

9    today.  And the settlement, as your Honor has probably seen,

10   deals with a number of complex issues, that if needed to be

11   litigated to conclusion, could certainly devour the resources

12   of this estate.  And the debtors have worked hard to come to

13   a settlement that they believe will provide some significant

14   benefits to the estate and cut down on the litigation costs

15   of continued litigation with Bank of America.

16             As the Court may recall in the petition data,

17   approximately $1,082,000,000 was outstanding under the

18   debtor's credit agreement with Bank of America.  The

19   indebtedness was secured primarily by servicing assets, by

20   mortgage loans and by construction loans.  The debtors have

21   liquidated a majority of the servicing assets and have bought

22   the construction loan assets from Bank of America and have

23   sold certain non-performing loans in the portfolio.

24             After those dispositions of some of Bank of

25   America's collateral, the benchmark pre-petition claim, as

1  it's defined in the stipulation, is currently

2  $468,128,691.58, which is as of July 2, 2008 and that's a

3  stipulated number between the parties to prevent further

4  disputes as to what the outstanding amount of that claim is.

5  With respect to the relief being requested in this

6  stipulation, your Honor, Bank of America was clear that they

7  wanted a reaffirmation of prior releases in connection with

8  this settlement.  So, both the debtors and the committee are

9  reaffirming their releases.

10  To the extent that the parties may have a dispute as to

11  whether something in the future was released under those

12  releases, the parties are reserving their rights as to that.

13  But as to what has happened in the past, those issues are

14  being settled and may of them released under the terms of the

15  settlement stipulation.

16          In connection with this settlement, your Honor, one

17  of the key components of the settlement is the transfer of

18  the mortgage loans to Bank of America or in fact, were

19  transferring total dominion and control of those mortgage

20  loans and the servicing rights with respect to those mortgage

21  loans, to Bank of America.  The issue of ownership is one

22  that is possibly -- it's possible that that ownership, in

23  fact, will be transferred, at some point.  But in order to

24  get the stipulation done and before the Court, before

25  considering the affects of the possible transfer of ownership

1    and what affect that would have on Bank of America and their

2    ability to take ownership of that, we have stipulated that

3    dominion and control be transferred over to the Bank of

4    America.  And to the extent there are any costs, at all, in

5    connection with the debtor's continued ownership of those

6    mortgage loans, then those costs will be paid out of the

7    collateral in connection with that continued ownership.

8           The settlement also resolves an LPMI dispute before

9    the parties and permits Bank of America to retain the

10   approximately, $5.4 million that is being held by the

11   administrative agent in an escrow account.  It also resolves

12   the claims related to certain designated bank accounts and

13   certain pre-petition set-offs and post-petition receipts.

14   The debtors had made claims that there were certain moneys

15   that were swept from the account pre-petition and transferred

16   from certain of debtor accounts post-petition, that should

17   not have gone to the Bank of America.  Bank of America

18   contests those assertions.  And in addition, Bank of America

19   asserts a lien over approximately, $6.9 million currently in

20   the debtor's bank account.  And in connection with this

21   settlement, the administrative agent is releasing any liens

22   to that $6.9 million.

23           There are certain other parties that are still

24   asserting some interest in those funds.  We believe we'll be

25   able to free up, on a pretty quick basis, much of those funds

1    in the short term.  But there are still other parties that

2    we're working with in connection with interests that they've

3    asserted in some of those funds.

4         The debtors have also asserted that Bank of America

5    owes the debtors for certain servicing advances that were

6    made throughout the course of the case.  The debtors are

7    releasing prior claims with respect to servicing advances in

8    connection with the overall settlement here today.  And the

9    debtors, in connection with certain servicing advances that

10   were re-purchased back from the Wilber Ross entity that

11   bought the servicing business, the debtors will be able to

12   take $251,968.45 from the collateral and retain and Bank of

13   America is not asserting or releasing any claims that they

14   might have to those amounts.

15        With respect to reimbursement of certain

16   professional fees and expenses, the debtors have been paid

17   for certain professional fees and expenses from the proceeds

18   of the initial servicing sale and some of the other sales in

19   these cases.  The debtors asserted, in connection with this

20   settlement, that they were owed certain additional amounts.

21   Those additional amounts are being released in connection

22   with this settlement.

23        There is a resolution of the allocation of the

24   servicing litigation proceeds, the kind of first tranche of

25   that Calyon settlement that we addressed as the first item on

1    the agenda.  From the proceeds of that $5 million, the

2    debtors will retain $2.6 million of that.  They'll have an

3    additional million to resolve certain ancillary payment

4    issues that might arise.  And the other servicing -- Calyon

5    Servicing litigation proceeds, the other $2.4 million in

6    cash.  I'm sorry, at least, $1.4 million in cash and to the

7    extent that there's -- that million dollars is not used, that

8    will go to Bank of America, as well.  Bank of America will

9    also be assigned the state bond loans that were settled in

10   connection with that litigation.  And Bank of America, well,

11   in connection with this settlement, we're also releasing that

12   $1 million claim that the debtors received in connection with

13   that Calyon settlement.

14           With respect to the DB appeal, the administrative

15   agent, as the stipulation is currently drafted, the

16   administrative agent has complete control and discretion with

17   respect to that litigation.  The debtors and Bank of America

18   have been in some discussions with the Office of the United

19   States Trustee about that particular provision.  And this is

20   probably the appropriate time to cede the podium to Ms.

21   Alfonso.  I think we have language that works for the parties

22   to get over that potential objection.

23           THE COURT:  All right, thank you.

24           MS. ALFONSO:  Thank you, your Honor.  Ana Alfonso

25   from Kaye Scholer for the administrative agent.  Paragraph 13

1    is the provision that we're looking at now.

2              THE COURT:  Okay.

3              MS. ALFONSO:  The first sentence begins with the

4    phrase, "The administrative agent shall have complete control

5    and discretion with respect to the debtor's litigation,

6    settlement or other resolution of the appeal."  To address

7    the U.S. Trustee's objection, we propose to change the

8    language as follows.  Delete everything from  "the

9    administrative agent shall have complete control and

10   discretion with respect to."  And just change that to read,

11   "The debtor's litigation, settlement or other resolution of

12   the appeal shall be subject to the administrative agent's

13   consent."

14             THE COURT:  Okay.  Mr. McMahon, will that do it?

15             MR. McMAHON:  That's agreeable, your Honor.

16             MS. ALFONSO:  Thank you.

17             MR. BEACH:  Your Honor, with respect to that

18   litigation, to the extent the debtor has incurred costs,

19   those costs will be paid from the proceeds of the collateral,

20   as well, similar to a number of other provisions.  But the

21   next one in connection with certain cure claims, there was

22   the $10 million escrow established pursuant to the servicing

23   business sale.  And a number of parties that filed cure

24   claims to avoid the need to hire certain conflicts counsel,

25   the debtors agreed to help litigate certain of those cure

1    claims and to be paid out of the proceeds of the collateral

2    and the administrative agent is going to be dealing the

3    remainder of those cure claims.

4            The designated REO property that was discussed

5    earlier in connection with the estate funds motion, that

6    agreement between the administrative agent and the committee

7    remains in place and those REO proceeds remain in place.

8            With respect to one of the key provisions in this

9    settlement for the debtors and the committee is a cap on any

10   deficiency claim that Bank of America might assert in these

11   cases.  There is -- the cap provides that the deficiency

12   claim will the lesser of $50 million or 50 percent of the

13   outstanding amount of the benchmark, well, out of the

14   pre-petition claims, the $1 billion number.  So, the lesser

15   of $50 million or 50 percent of what's outstanding.

16           In addition to that, if the administrative agent

17   receives full payment on that $1,082,000,000 number before

18   any other fees or other obligations might be paid under that

19   claim, the debtors and Bank of America will or the estate and

20   Bank of America will share 50 percent in any additional

21   proceeds that are derived.

22           Your Honor, the stipulation also deals with certain

23   servicing sale proceeds that haven't been received yet.  And

24   once those payments are received, they'll go to be

25   distributed to the administrative agent pursuant or pursuant

1   to any order of the Court dealing with those asset sales.

2           With respect to the Freddie Mac servicing rights,

3   upon a written request of the administrative agent, the

4   debtors will file and prosecute a motion, at their cost, to

5   abandon those servicing rights.  The debtors have agreed that

6   they will not fund from the collateral any home equity loan

7   advances.  And with respect to the state bond loans, the

8   debtors have agreed to provide certain information to the

9   administrative agent to attain value from those, from that

10  collateral.

11          Your Honor, those are the primary terms of the

12  stipulation.  If it's acceptable to your Honor, what I'd like

13  to do is proffer the testimony of Mr. Brett Fernandez, who is

14  in the courtroom today and available for cross-examination.

15          THE COURT:  All right.  Any objection to the use of

16  a proffer?  You may proceed.

17          MR. BEACH:  Your Honor, I'll dispense with his

18  background, since we already dealt with that earlier today.

19          THE COURT:  All right.

20          MR. BEACH:  With respect to the B of A settlement,

21  Mr. Fernandez would testify that he has participated in the

22  negotiations surrounding the settlement and has reviewed the

23  stipulation.  Mr. Fernandez would further testify that the

24  settlement is the result of good faith, arm's-length

25  negotiation.  In the debtor's business judgment, the

1   settlement is fair and equitable, represents a settlement

2   that rests well below the lowest point in the reasonable

3   range of potential litigation outcomes, obviates the expense

4   to lay an uncertainty surrounding the litigation and advances

5   the paramount interests of creditors.

6           Mr. Fernandez wold testify that the settlement

7   resolves numerous disputes and controversies between the

8   debtors and Bank of America, which often implicate the rights

9   of third parties.  These matters are complex and at time,

10  present novel issues of both law and fact.  As a result, Mr.

11  Fernandez would testify that there is a large uncertainty

12  with respect to the success of each litigation.

13          Moreover, Mr. Fernandez would testify that

14  litigating each matter would be at a substantial cost to the

15  estate.  Accordingly, continuing these litigation matters

16  could delay these Chapter 11 cases, costing a significant

17  amount of money for the estate, with an uncertain return and

18  divert attention of key employees and professionals from the

19  wind-down effort.

20          With respect to interest of creditors, Mr. Fernandez

21  would testify that the resolution embodied in the stipulation

22  will reduce the burden and administrative expense on the

23  estate and alleviates certain liquidity constraints that the

24  debtors may face as they work toward confirming a plan and

25  maximizing the value of the estate by prudently disposing of

1   the remaining assets.

2          With the outstanding B of A issues resolved, the

3   debtors can proceed with enforcing their remaining rights in

4   estate property, without needing to dispute competing claims

5   of B of A.  Mr. Fernandez would further testify that because

6   B of A has consented to the debtor's use of the pre-petition

7   collateral, in certain respects, under the stipulation and

8   has allocated other funds directly to the debtors free and

9   clear of B of A's claims, the settlement enures to the

10  benefit of the debtor's estates.

11         In particular, among other things, the debtors will

12  receive $2.6 million from the Calyon settlement, the release

13  of liens and approximately, $6.9 million of cash in certain

14  bank accounts, reduced costs of servicing the mortgage loans,

15  reduced litigation costs, receive approximately, $250,000

16  related to re-purchase of servicing advances, cap any

17  deficiency claim at the lesser of $50 million or 50 percent

18  of such claim and share in 50 percent of any additional

19  proceeds after the benchmark pre-petition claim is paid.

20         As a result, Mr. Fernandez would testify that he

21  believes that the entry into the stipulation was the product

22  of the debtor's sound business judgment and should be

23  approved.  Your Honor, that would conclude Mr. Fernandez's

24  testimony.

25              THE COURT:  Does anyone wish to cross-examine the

47

1    witness?  Hearing none, the Court will accept the testimony.

2              MR. BEACH:  Your Honor, I understand that this

3    settlement has a number of things contained in it.  To the

4    extent your Honor has any questions, I'll certainly take

5    those now or cede the podium to other parties.

6              THE COURT:  No, let me hear, does anyone else with

7    to be heard?  Ms. Counihan?

8              MS. COUNIHAN:  In a moment.

9              MR. BEACH:  I'm sorry, your Honor, I was supposed to

10   do a reservation with respect to this.

11             THE COURT:  You should have this memorized by now,

12   Mr. Beach.

13             MR. BEACH:  I'm trying, your Honor.

14             THE COURT:  When are you going to start building it

15   in the order?

16             MR. BEACH:  I should.  Your Honor, with respect to

17   the settlement, the debtors were in discussion with American

18   Home Mortgage Servicing and agreed to make the following

19   representation on the record.

20             The stipulation of settlement, including Section 4-D

21   of the stipulation among the debtors, B of A as

22   administrative agent and the Official Committee of Unsecured

23   Creditors, is not intended to modify any agreements with the

24   purchaser of the mortgage servicing business, now known as

25   American Home Mortgage Servicing, Inc., including the asset

1   purchase agreement, any of the interim or subservicing

2   agreements between the debtors and the purchaser or any other

3   agreement between them.

4          THE COURT:  All right.  Anyone else?  Ms. Counihan?

5   Good afternoon.

6          MS. COUNIHAN:  Good afternoon, your Honor.  In

7   addition, we did understand that the entry of the

8   stipulation, in particular Section 4-A, which talks about the

9   new servicer receiving complete dominion and control over and

10  discretion with respect to the mortgage loans and the

11  servicing rights related thereto, doesn't effect an immediate

12  transfer of the title and the mortgage loans or the servicing

13  rights.  And based on that representation from Mr. Beach, we

14  don't have any issues with that.

15         THE COURT:  Okay, thank you.  Anyone else?  Yes,

16  ma'am?

17         MS. ALFONSO:  Ana Alfonso for the administrative

18  agent, very quickly.  I just wanted to note that Mr. Beach

19  gave a rather long summary of the settlement agreement.  And

20  while I didn't hear anything that I disagreed with,

21  obviously, the terms speak for themselves.

22         THE COURT:  All right.

23         MS. ALFONSO:  So, I just wanted to make that clear

24  and we would ask that your Honor enter the order as soon as

25  possible, so that we can begin the transfer process.

1          THE COURT:  Okay, thank you.  Anyone else?  Mr.

2   Power?

3          MR. POWER:  Your Honor, Mark Power from Hahn &

4   Hesson, just because we're a party to the stipulation.  This

5   does, if your Honor recalls the last hearing we had, we had

6   an upside and where we've traded some of the upside to cover

7   the downside in this deal.  But we were part of the

8   negotiations and we are satisfied this deal is in the best

9   interest of the estate.  It resolves multiple disputes, many

10  of which would be litigated for a long time in this court, if

11  they were not settled.  So, we support the settlement.

12         THE COURT:  All right, thank you.  Anyone else?  All

13  right, first of all, I congratulate the parties on having

14  reached a settlement of so many outstanding issues.  And I

15  believe that the evidence clearly establishes that the

16  settlement is a sound exercise of the debtor's business

17  judgment and easily meets the standard governing such and

18  I'll be happy to approve the order.

19         (Pause.)

20         MS. ALFONSO:  Your Honor, I think Mr. Beach is about

21  to hand up an interlineated form of the settlement, but it's

22  a redacted version.  So, to be clear, we'll also be filing an

23  un-redacted interlineated version that reflects the change

24  that we discussed.

25         THE COURT:  Under seal, yes, very good.

1          MR. BEACH:  May I approach, your Honor?

2          THE COURT:  Yes.  Thank you.

3          (Pause.)

4          THE COURT:  All right, I signed the order.  Andrew,

5    can you take this downstairs and ask them to docket it right

6    away or give it to Cheryl.  You asked for it right away,

7    right?

8          MS. ALFONSO:  Yes, thank you.

9          THE COURT:  We're a full service court here.

10          MS. ALFONSO:  Thank you, your Honor.

11          THE COURT:  That's what keeps Mr. Remi so trimmed.

12    All right.

13          MR. BEACH:  Item six -- item number six, your Honor

14    is -- and thank you, your Honor for entering the order to

15    hear this emergency motion in such short time.  It is the

16    debtor's emergency motion for an interim and final order

17    authorizing and approving the second amendment to the

18    post-petition debtor in possession financing facility.  As

19    your Honor may recall, the original DIP was initially

20    approved at the first day hearing and on a final basis, on

21    September 4th.  Last December, the debtors filed a motion to

22    approve the first amendment to the DIP.  Which, among other

23    things, did decrease the total commitment from $50 million to

24    $35 million.  And the $35 million in availability was reduced

25    by the LPMR reserve of approximately, $12 million, leaving

1    the debtors with approximately, $23 million in availability.

2    And on January 4th, the Court approved that first amendment

3    to the DIP.

4            Pursuant to the terms of the DIP, the DIP expires on

5    the maturity date of August 6th or tomorrow.  And the debtors

6    are seeking certain interim relief today with respect to the

7    DIP.  The interim relief is limited to an extension of the

8    DIP until August 18th.  It provides for the availability in

9    up to $9 million of the Beltway sale proceeds to be used for

10   operating expenses of the estate and provides for the ability

11   for the debtors to immediately pay a DIP amendment fee of 2.5

12   percent times $9 million or $225,000.

13           The debtors are requesting that, at the final

14   hearing, which has been requested for August 18th, that the

15   Court approve the second DIP amendment, which would provide

16   for a $30 million debtor in possession financing facility.

17   Which, in fact, it reduces the prior DIP facility from $35

18   million to $30 million, but it doesn't reduce the

19   availability under the facility by the $12 million in LPMR

20   reserves.  So, it results in an effective additional

21   availability of $7 million, minus certain fees that need to

22   be escrowed under that second DIP amendment.

23           It also provides for an increase in the interest

24   rate effective August 6th to Libor (ph) plus 12 percent, an

25   extension of the maturity date through and including November

1  5, 2008, bars retention of the remaining Beltway proceeds --

2          THE COURT:  You couldn't get a credit card at a

3  lower interest rate?

4          MR. BEACH:  No, your Honor.

5          THE COURT:  Maybe a payday loan?

6          MR. BEACH:  I asked Mr. Patton, but he wouldn't loan

7  it.

8          THE COURT:  Well, okay, I'm sorry.  Go ahead.

9          MR. BEACH:  I thought there might be a stopping

10  point there.

11          THE COURT:  Mr. Power, are you still breathing over

12  there?

13          MR. POWER:  Yes.

14          THE COURT:  All right.

15          MR. POWER:  Your Honor, I pay the --

16          THE COURT:  Okay.

17          MR. BEACH:  The borrowers would be able to retain

18  and use for operating expenses up to approximately, $10.5

19  million of the Beltway proceeds.  On an interim basis, we're

20  asking to use up to $9 million, but under the sale agreement,

21  we could get proceeds up to $10.5 million.  There are certain

22  holdbacks that haven't been paid yet.  An the payment to the

23  DIP lenders on a final basis, of an additional amendment fee,

24  in the aggregate amount of $2.5 percent times $21 million or

25  $525,000.

1          Your Honor, we're not asking for that relief today.

2     We are asking for the interim relief today and we will be

3     asking for that relief on a final basis, hopefully, at the

4     hearing on August 18th.  If your Honor will permit me, I'd

5     like to make a proffer of Mr. Fernandez with respect to this

6     first DIP amendment.  He is available and subject to

7     cross-examination.

8          THE COURT:  All right, any objection to the use of a

9     proffer?  Hearing none, you may proceed.

10          MR. BEACH:  Your Honor, again, I'll dispense with

11     the background.  With respect to the second DIP amendment,

12     Mr. Fernandez would testify that he has participated in

13     negotiations surrounding the second DIP amendment and has

14     reviewed and is familiar with the original DIP facility, the

15     previous amendment and the current documents relating to the

16     DIP.

17          Mr. Fernandez would further testify that the second

18     DIP amendment is a result of good faith, arm's length

19     negotiations and is necessary, given the debtor's current

20     financial condition.  Mr. Fernandez would testify that he is

21     familiar with the current financial issues surrounding the

22     debtors and is knowledgeable with respect to the debtor's

23     wind-down efforts.  Mr. Fernandez would testify that the

24     debtors continue to wind-down their affairs and liquidate

25     their assets and are currently in the process of marketing

1    and consummating sales of certain assets.

2              He would further testify that a significant portion

3    of the assets being marketed are subject to the liens under

4    the DIP facility.  Mr. Fernandez would testify that under the

5    DIP facility, the debtors are required to apply the proceeds

6    from the sale of certain collateral to reduce the principal

7    amount outstanding under the DIP facility.  And as a result,

8    the debtors are unable to use the proceeds from the sale of

9    the collateral to fund their operations.

10             Moreover, Mr. Fernandez would testify that the

11   debtors currently do not have any additional availability

12   under the DIP facility.  And without the second DIP facility

13   amendment, the debtors will likely not have access to

14   sufficient cash necessary to fund operations and pay off the

15   DIP.

16             Mr. Fernandez would also testify that the debtor's

17   financial constraints are compounded by the fact that the DIP

18   facility is set to expire tomorrow, August 6, 2008.  And

19   absent the extension contemplated by the second DIP

20   amendment, the debtors would be required to pay all

21   outstanding obligations under the DIP facility tomorrow.

22             Mr. Fernandez would testify that although the

23   debtors are marketing and negotiating sales of the majority

24   of the remaining collateral, such sales will not be

25   consummated prior to the current maturity date.  Mr.

1   Fernandez would testify that the three month extension

2   contemplated by the second amendment, will allow the debtors

3   to continue an orderly disposition of their assets and if

4   necessary, to pursue additional liquidity.

5           Mr. Fernandez would testify that the debtors have

6   extensively and diligently pursued the new post-petition

7   financing or pursued a new post-petition financing

8   arrangement.  The debtors prepared a due diligence package

9   containing, among other things, information regarding the

10  debtors un-encumbered assets, which was made available to

11  parties that signed non-disclosure agreements.  In connection

12  with such activities, the debtors had discussions with ten

13  potential lenders.  However, to date, the debtors have been

14  unable to secure financing or replacement financing from any

15  other parties on more favorable terms that as proposed in the

16  second DIP amendment.  Mr. Fernandez would testify that the

17  debtor's pursued an extension and/or amendment of the DIP

18  facility as an alternative to new financing.

19          The debtors were able to negotiate the second DIP

20  amendment which provides for an extension until November 5,

21  2008, to allow the debtors to continue their orderly

22  liquidation process.  And an amendment to the DIP facility to

23  allow the debtors additional liquidity needed to pursue a

24  Chapter 11 plan of approximately, $15 million.  In exchange

25  for such benefits, the debtors have agreed to pay an

1   aggregate amount of 2.5 times $30 million as an amendment fee

2   or $750,000.  And to increase the interest rate under the DIP

3   facility to a rate effectively equal to Libor plus 12.

4           He would testify that the debtors are seeking only a

5   portion of such relief today.  In particular, the debtors are

6   seeking an extension of the maturity date until August 18th,

7   the use of up to $9 million of the Beltway proceeds for

8   operation and the payment of a portion of the amendment fee

9   equal to 2.5 percent times $9 million or $225,000.

10          Mr. Fernandez would testify that the terms and

11  conditions of the second DIP amendment are fair and

12  reasonable under the circumstances, given that to date, the

13  debtors have been unable to secure any other financing and

14  were negotiated by the parties in good faith and at arm's

15  length.

16          Moreover, Mr. Fernandez would testify that absent

17  the approval of the second DIP amendment, the debtor's

18  wind-down efforts may come to a standstill, causing immediate

19  and irreparable harm to the debtors, their estates and

20  creditors.   The debtors engaged numerous parties in

21  discussions regarding alternative post-petition financing,

22  but were unsuccessful as a result of, among other things, the

23  nature of the collateral that would secure the loan.

24  Accordingly, Mr. Fernandez would testify that entry of the

25  second DIP amendment is reasonable and justified under the

1    circumstances.  And is in the best interest of the debtor's

2    estates, creditors and other parties in interest.  That would

3    conclude Mr. Fernandez's testimony.

4              THE COURT:  Does anyone wish to cross-examine the

5    witness?  All right, hearing none, the Court will accept the

6    testimony.  Does anyone wish to be heard in connection with

7    the motion?  Mr. Power?

8              MR. POWER:  Good evening, your Honor, Mark Power

9    from Hahn & Hesson.  Your Honor, the committee, as your Honor

10   can imagine, is not happy with the terms, they're extremely

11   expensive and disappointed we're in this situation.  Having

12   said that, we have been working with the debtor to try to

13   find an alternative and we're just -- there really are no

14   reasonable terms available to the estate, at this point.  We

15   have a number of asset sales.  We have a couple of major

16   sales coming, but to liquidate those assets takes a long time

17   and it's a process that we're currently going through.  So,

18   unfortunately, we're in a position where we are right now,

19   where we have to hold our nose and ask the Court to approve

20   this DIP amendment.  Hopefully, we will have sales completed

21   quickly and we'll pay down the DIP very quickly, as soon as

22   we can, this diminishing the cost of this extension.  And

23   that's where we are currently.

24             THE COURT:  All right.

25             MR. POWER:  So, with that, the committee supports

1   the debtor's motion.

2            THE COURT:  Thank you.  Anyone else?  Any changes to

3   the order, Mr. Beach?

4            MR. BEACH:  No, your Honor, there haven't been any.

5            THE COURT:  All right, I have reviewed the interim

6   order.  Based on the evidence and the support of the

7   committee, which is critical in this situation, I'll approve

8   the order.

9            MR. BEACH:  Thank you, your Honor.  May I approach?

10           THE COURT:  Yes.

11           (Pause.)

12           MR. BEACH:  Thank you.

13           THE COURT:  All right.  Anything else?

14           MR. BEACH:  No, your Honor, that concludes the

15  agenda.

16           THE COURT:  All right, thank you very much.  The

17  hearing is adjourned.

18           MR. BEACH:  Thank you.

19           (Proceeding adjourned 5:06 o'clock p.m.)

20                                    * * *

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Geraldine C. Laws, CET          Dated 8/19/08
Laws Transcription Service