IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | Case No. 07-11047 (CSS) |
| | : | |
| AMERICAN HOME MORTGAGE | : | Wilmington, Delaware |
| HOLDINGS, INC., | : | July 17, 2008 |
| Debtors | : | 2:07 o'clock p.m. |
| . . . . . . . . . . . . . . . . | : | |

HEARING
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

- - -

APPEARANCES:

For the Debtors:       SEAN BEACH, ESQUIRE
                       NATHAN GROW, ESQUIRE
                       Young Conaway Stargatt
                       & Taylor, LLP
                       The Brandywine Building
                       1000 West Street
                       17th Floor
                       Wilmington, DE  19801

For Bank of            GABRIEL R. MAC CONAILL, ESQUIRE
America:               Potter, Anderson & Corroon, LP
                       1313 N. Market Street
                       Wilmington, DE  19801

For the U.S.           JOSEPH J. McMAHON, ESQUIRE
Trustee:               U.S. Department of Justice
                       Office of the United States Trustee
                       J. Caleb Boggs Federal Building
                       844 King Street, Suite 2007
                       Wilmington, DE  19801

For the Creditors      MARK POWER, ESQUIRE
Committee:             Hahn & Hesson LLP
                       488 Madison Avenue
                       New York, NY  10022
                                 -and-
                       JASON STAIB, ESQUIRE
                       Blank Rome LLP
                       1201 Market Street
                       Suite 800
                       Wilmington, DE  19801

APPEARANCES:  (continued)

```
For WLR/AHM          VICTORIA W. COUNIHAN, ESQUIRE
Servicing:           Greenburg Traurig
                     The Nemours Building
                     1007 North Orange Street
                     Suite 1200
                     Wilmington, DE  19801
                               - and -
                     BRETT P. BARAGATE, ESQUIRE
                     Jones Day
                     222 East 41st Street
                     New York, NY  10017-6702

For JP Morgan        MATTHEW McGUIRE, ESQUIRE
Chase:               Landis Rath & Cobb LLP
                     919 Market Street
                     Suite 600
                     Wilmington, DE  19899

For Thomas and       ELIHU E. ALLINSON, III, ESQUIRE
Sara Chavez:         Sullivan Hazeltine Allinson LLC
                     4 East 8th Street, Suite 400
                     Wilmington, DE  19801

For Watsons:         DANIEL HOGAN, ESQUIRE
                     The Hogan Firm
                     1311 Delaware Avenue
                     Wilmington, DE  19806

                               - - -

Audio Operator:         Leslie Murin

Transcribed by:         Paula L. Curran, CET
```

        (Proceedings recorded by For The Record Gold digital
sound recording; transcript provided by AAERT-certified
transcriber.)

1        (The following occurred in open court at 2:07

2    o'clock p.m.)

3            THE CLERK:  All rise.

4            THE COURT:  Please be seated.

5            MR. BEACH:  Good afternoon, your Honor.  May it

6    please the Court, Sean Beach from Young, Conaway, Stargatt &

7    Taylor on behalf of the debtors.

8            Your Honor, items one through 12 on the amended

9    agenda have been adjourned.  Item number 13 has been

10   resolved.

11           THE COURT:  Hang on for a minute.

12           MR. BEACH:  Okay.

13           (Pause.)

14           THE COURT:  I came out without my agenda, I'm sorry.

15   Do you have another amended agenda?

16           MR. BEACH:  I do have a copy, your Honor.

17           THE COURT:  I marked mine up, though.

18           MR. BEACH:  May I approach?

19           THE COURT:  Yes, please.

20           (Pause.)

21           THE COURT:  Thank you.  I'm sorry, you may proceed.

22           MR. BEACH:  Thank you, your Honor.  Items one

23   through 12 have been adjourned.  Item 13 has been resolved.

24   Item 14, your Honor, is moot and we've had a discussion with

25   the party who filed that motion.  The motion is a motion to

1    reschedule or cancel a hearing in connection with a claim

2    objection.  In connection with that motion, they also filed

3    an amended claim.  It's a claim related to an equity interest

4    and in the amended claim, they made some additional

5    assertions, so we agreed to withdraw that objection, at this

6    time, preserving all rights in connection with any further

7    objections to that claim and to any objections that we may

8    have to the amended claim.

9            THE COURT:  Okay.

10           MR. BEACH:  Items 15 and 16, your Honor, have been

11   adjourned.  Item Number 17 relates to all the first lien

12   foreclosures and I believe certificates of counsel have been

13   filed with respect to all of them.  There was one that wasn't

14   filed when the original agenda was filed, but I think that's

15   subsequently has been filed.

16           THE COURT:  Yes, I received that this morning.  I

17   signed the order.

18           MR. BEACH:  Thank you.

19           THE COURT:  I've signed all the orders where I

20   received certifications.

21           MR. BEACH:  Okay.  Item 18, your Honor, has been

22   adjourned pursuant to the amended agenda, which brings us to

23   Item 19, which is the exclusivity motion.  Your Honor, the

24   debtors have been in discussions with the committee, who had

25   some informal concerns regarding the exclusivity motion.  And

1    we've been in discussions with Bank of America, who filed an

2    objection with respect to the exclusivity motion.  We now

3    have agreement with both parties that will proceed today with

4    a limited extension of exclusivity to August 19th and that

5    the balance of the motion will be adjourned until the August

6    18th hearing.

7            Your Honor, we do believe that there is cause for an

8    extension of exclusivity.  I'm happy to walk through what the

9    debtors have been working on or I could bring up a revised

10   form of order to your Honor.

11           THE COURT:  That's not necessary, the order is fine.

12           MR. BEACH:  Thank you, your Honor.  May I approach?

13           THE COURT:  Yes.

14           (Pause.)

15           MR. BEACH:  Thank you.  Your Honor, the revised form

16   of order seeks the extension of the exclusivity or the

17   deadline to file a plan until August 19th and the

18   solicitation period until October 17th and indicates that the

19   balance of the relief in the motion and of course, the

20   objection, will be adjourned until the August 18th hearing.

21           THE COURT:  All right.  I'll sign the order as

22   agreed.

23           MR. BEACH:  Thank you, your Honor.

24           THE COURT:  Sorry, I'm trying to make it cooler in

25   here, so if you see people running around, that's what's

```
 1  going on.  Go ahead.

 2              MR. BEACH:  Your Honor, item number 20 on the agenda

 3  is the motion of Paula Rush for relief from the automatic

 4  stay.  I believe she's present in the courtroom today.  The

 5  debtor has filed a reservation of rights, but don't have any

 6  objection to the entry of the order that was attached to the

 7  motion.  So, I'll cede the podium to Ms. Rush.

 8              THE COURT:  All right.

 9              MS. RUSH:  Good afternoon.

10              THE COURT:  Good afternoon, Ms. Rush.

11              MS. RUSH:  Well, first of all, I'd like to thank

12  you.  You've been indulgent since this began with my coming

13  into the courtroom and addressing issues that I saw with

14  American Homes.  Obviously, today's about my personal matter.

15  My lawsuit has been pending since April of 2007 in District

16  Court in Greenbelt, Maryland.  It was put on hold, obviously,

17  when the debtors went into bankruptcy.  Their attorneys tried

18  to get me dismissed just days before they went into

19  bankruptcy, which I have issues with that.

20              But the other thing that has happened since October

21  is I have gotten an extraordinary amount of information that

22  I did not have then.  I believe, at this time, Goldman Sachs

23  is the owner of my note.  I found it in the FCC filing on

24  their trust.  I was told again this week by Mr. Enos (ph)

25  that my loan, they believe, is still in the trust that it was
```

1  in, at that time.  My Teela 1641 F2 request was never

2  complied with.  I found this information on my own.  I've

3  confronted Goldman Sachs and Wells Fargo, whose master

4  servicer on my trust and they are both refusing to admit or

5  deny that they have anything to do with my loan.

6          So, American Home, obviously, is an indispensable

7  party to my suit.  They were the originator of my loan.  In

8  my exhibit that I put on file, a lot of which came out of my

9  loan file that I did get in October, show that my loan was

10  assigned almost immediately after I went to the broker, to

11  American Home Mortgage, through American Broker's conduit.

12  They prepared all my good faith estimates.  They prepared the

13  HUD one, so, they cannot say, which I've heard them say many

14  times in this courtroom, that they had nothing to do with the

15  origination of my loan.  I've also obtained a training manual

16  for the pay option arm loans from American Home, that they

17  provided to the brokers.  Obviously, they were highly

18  involved in the origination process.

19          My case has turned into a mess because Service Links

20  Chicago Title, who was the title agent and the settlement

21  provider was also enjoined in my suit, in the beginning, as

22  was the appraiser.  Again, an employee of Homegate Settlement

23  Services, which I found out in my file that I obtained on

24  October 31st.  So, these parties are all intertwined.  I have

25  talked to title agents who say that Service Link is a

1  lender-affiliated platform and I believe that there is a

2  connection to American Home there.

3          But since this all began and it was put on hold,

4  Service Link pushed to have it bumped out because the rest of

5  it was on hold.  Now they're in State Court, we went back and

6  forth.  We're back in State Court again.  It's a mess for me.

7  I'm going to have now litigate suits allover the place

8  because of what has happened in this bankruptcy.  I can't do

9  anything about that now, but I need the relief from stay.

10 They are threatening again, foreclosure on my house.  I

11 received a letter from their attorney, which I put again, in

12 my exhibits with my relief from stay.  That my, you know,

13 according to the letter, my case is stayed and you know, they

14 can move forward.  That was their letter to me.  So, if

15 that's the intention, then it is an emergency that I get my

16 relief from stay and be able to continue with my suit against

17 the debtor in Federal Court.

18          I have to say that I have asked in my relief from

19 stay motion, I do think that the debtor's attorneys should be

20 sanctioned, as well as the debtor, for refusing to comply

21 with my request under Tela 1641 F2.  And I attached a case

22 that happened in Philadelphia, against Countrywide.  This is

23 the very central issue that went on there and the judge was

24 disgusted that the attorneys basically, you know, did this

25 purposefully and I feel like it was done purposefully to me.

1    And it caused me a lot of hours of extra work trying to

2    figure all this out on my own.  And it's very easy for the

3    debtors to ascertain this information.

4         Again, as shown on my servicing records, there's an

5    investor number.  That investor number corresponds to a trust

6    and that they know exactly where the loans are.  They can

7    tell people in two seconds.  I've heard them over and over

8    and over again, say in this courtroom, who knows who owns the

9    loan.  You know, I've heard all the statements that have been

10   made and meant to mislead borrowers and to mislead this

11   Court.  And I take great offense at that.

12        I also take great offense at the fact that Mr.

13   Indeligato (ph), Mr. Dorsey and Young, Conaway, Stargatt and

14   Taylor have all called borrowers into this courtroom.

15   They've called them disgruntled borrowers.  They've called

16   them, they're just trying to get out of their financial

17   obligations.  First of all, they know nothing about what we

18   went through as borrowers with this company.  Hopefully, with

19   the Countrywide lawsuit, with the securities lawsuit against

20   American Home, somebody will be getting a clue what borrowers

21   really went through with these lenders and what they did.

22   Maybe, I hope.

23        The harm to me is substantial.  I've owned my home

24   now for four years.  This is the seventh home I've owned in

25   my life.  I'm not a 20-year-old kid.  I'm responsible.  I've

1    never had a house foreclosed before.  I was misled into this

2    loan.  All of my documents clearly say one percent, one

3    percent.  From the time I got the advertising flyer to the

4    time I went to settlement, there's been plenty of cases, FTC,

5    Chevy Chase Bank, Countrywide's getting hammered for this

6    now.  There's been plenty of actions against lenders for

7    misrepresenting these loans.  I'm not alone.  There's a lot

8    of people out there in the same boat I'm in because of these

9    loans.

10             My merits, I feel, are overwhelming.  I think I have

11   plenty of proof in my documents of what happened to me, how

12   it happened to me.  So, I'm here today to ask this Court for

13   my relief from stay, so that I can move forward and try to

14   remedy something that has now tied up my life for almost two

15   years.

16             THE COURT:  All right, thank you, Ms. Rush.

17             MS. RUSH:  Thank you.

18             THE COURT:  Any comments?

19             MR. BEACH:  Your Honor, my only comment is with

20   respect to Ms. Rush's indication that she believes that

21   sanctions should be awarded in connection with any conduct of

22   the debtor's attorneys or the debtors, generally.  Your

23   Honor, she has not demonstrated any cause.  The debtors have

24   always been sympathetic to borrowers and we've done

25   everything we can in these very busy and time-consuming cases

1    to address any concerns or questions that borrowers have

2    raised.  As your Honor is well aware, we have done as much as

3    we could possibly do to address Ms. Rush's concerns

4    throughout the course of this case.  And your Honor, I would

5    ask you that you overrule the motion with respect to any

6    request for sanctions.

7            THE COURT:  Anyone else?  Well, I'm not going to

8    award sanctions at this time.  First of all, under our local

9    rules, any stay relief must be a separate issue and cannot be

10   combined with a request for any other relief.

11           Second of all, there are certain obligations in

12   bringing a rule and a motion, certain procedures, which has

13   not been complied with in this instance.  I'm making no

14   ruling as to the merits of whether sanctions can or should be

15   awarded against counsel or the debtor.  Ms. Rush's rights in

16   connection with seeking such sanctions are fully preserved,

17   as are the rights of the attorneys and the debtor to contest

18   any such request.

19           Based upon the statements contained in the motion,

20   the documents attached and the statements by Ms. Rush, at the

21   hearing and based upon the debtor's reservation of rights,

22   but non-opposition to the stay relief motion, I will grant

23   the motion and sign the order that was attached to the

24   motion, granting relief from the automatic stay.

25           MR. BEACH:  Your Honor, I don't know if Ms. Rush has

12

1   a form of order to hand up, but --

2           THE COURT:  There was an order attached to the

3   motion.

4           MR. BEACH:  Okay.  Your Honor, that brings us to

5   items number 21 and 22 in the agenda, which are the claim

6   objections and I'd like to cede the podium to Mr. Grow to

7   handle those.

8           MR. GROW:  Good afternoon, your Honor.  Nathan Grow

9   of Young, Conaway, Stargatt and Taylor on behalf of the

10  debtors.  Matter number 21 on the amended agenda is the

11  debtor's omnibus non-substantive objection to claims.

12          First of all, I'd like to apologize to the Court,

13  because I believe there was some confusion in getting a copy

14  of the exhibits to the 10th Omnibus objection over to your

15  chambers.

16          THE COURT:  Okay.  All right, no problem.  It's

17  amazing what happens that I'm not aware of.

18          MR. GROW:  Okay, so, discussing the 10th Omnibus

19  objection, do you want me to walk through the various

20  exhibits and the bases for the our objections?  Or should we

21  just talk about the responses?

22          THE COURT:  Why don't we talk about the responses.

23          MR. GROW:  Okay, we received a number of responses

24  and I have a revised form of order reflecting some of the

25  changes made in response to these various responses.  I can

1    hand it up, if I can approach.

2            THE COURT:  All right, I think I followed that.

3            (Pause.)

4            MR. GROW:  Okay, to begin with, there were 73

5    responses filed by claimants who alleged claims on the basis

6    of their equity interests in the debtors.  Out of these 73,

7    there were 62 responses that failed to offer any valid

8    arguments to suggest that these claims should not be

9    expunged.  Some of these respondents merely filed the notice

10   that they received in connection with the objection.  Others

11   merely stated that they opposed the relief or otherwise

12   offered arguments that have no bearing on whether or not

13   these claims should be expunged.

14           THE COURT:  Okay.

15           MR. GROW:  None of these 61, I'm sorry, 62 include

16   additional information or allegations that would support

17   characterization as a claim.  11 of the responses to equity

18   claim objections, do raise additional allegations against the

19   debtors in addition to the claimant's asserted equity

20   interests.  These responses are items 8, 15, 24, 26, 29, 31,

21   33, 46, 47, 50 and 61 on a chart related to the 10th Omnibus

22   objection that's attached to the amended agenda.  In light of

23   your Honor's ruling and a previous hearing on the 5th Omnibus

24   objection with regard to equity claims, the debtors have

25   withdrawn their objection to these proofs of claim and

14

1   reserve the right to object to these proofs of claim on any

2   grounds in a future objection.

3              THE COURT:  Okay.

4              MR. GROW:  To talk about one specific response,

5   number one on the chart relating to the 10th Omnibus

6   objection in the amended agenda, is a response filed by

7   Option Direct.  This is a response that actually dates back

8   to the 4th Omnibus objection.  It was put on the amended

9   agenda here by mistake.  This response was received after an

10  order was entered sustaining the 4th Omnibus objection.  It

11  does include some additional allegations, including fraud.

12  Given that this was a response received after the order

13  sustaining the 4th Omnibus objection was received, the

14  debtors submit that it's not a proper response.

15             I contacted counsel or not counsel, but a

16  representative of Option Direct and told him we didn't think

17  this was a proper response and that if he disagreed with the

18  order, he should file something else.  He told me that we'll

19  talk it over with Option Direct.  If they want to oppose the

20  order, they will through an additional filing.

21             THE COURT:  All right.

22             MR. GROW:  So, for the purposes of the amended

23  agenda, you can just disregard item one.

24             THE COURT:  Okay.

25             MR. GROW:  There were two claimants who filed

1    responses to the 10th Omnibus objection, to the debtors

2    objection, to claims that the claimants filed without any

3    supporting documentation.  These are items 27 and 48.  So,

4    these claimants failed to file any supporting documentation

5    along with the claims that they filed.  But along with their

6    responses, they filed some additional documentation.  So, the

7    debtors will continue to review this documentation and seek

8    to come to a resolution with these claimants.  In the

9    meantime, the debtors request that the 10th Omnibus

10   objection, as to these claims, be adjourned until the next

11   hearing.

12            THE COURT:  Well, item 48 on the list says it's

13   going forward?

14            MR. GROW:  Yes.  We erroneously marked it as going

15   forward on the amended agenda.  The revised --

16            THE COURT:  I see, it's in the order.  Okay.

17            MR. GROW:  -- the revised form of order has it

18   listed as adjourned.

19            THE COURT:  Yes, I see it.

20            MR. GROW:  I apologize for the confusion.

21            THE COURT:  That's okay.

22            MR. GROW:  Okay, there were two responses filed by

23   claimants who filed late-filed claims.  These are items 42

24   and 43 in the table attached to the amended agenda.

25            THE COURT:  Mm-hmm.

1          MR. GROW:  And the debtors wish to adjourn the 10th

2    Omnibus objection, as to these claims, until the next

3    hearing.

4          THE COURT:  Okay.  I have one issue.

5          MR. GROW:  Okay, do you want to talk about it now?

6          THE COURT:  Yup.  Exhibit F, no supporting

7    documentation claims, Claims 2665 of Tiffany Zari. It has the

8    document attache to it.  And under our Local Rule 3007-1 D6,

9    any basis lack of documentation is substantive, if the claim

10   attached to it, if there's anything attached to it.  So, I

11   think you need to withdraw that claim without prejudice to

12   add it at a different time.

13         MR. GROW:  Okay.

14         THE COURT:  Tiffany Zari -- Tiffany J. Zari,

15   Z-A-R-I, claim number 2655.

16         MR. GROW:  Okay, we can do that.  And if you'd like,

17   we can make a handwritten adjustment to the form of order or?

18         THE COURT:  That's fine.

19         MR. GROW:  Okay.

20         THE COURT:  Any other comments in connection?

21         MR. GROW:  One other comment regarding item 45 on

22   the chart relating to the 10th Omnibus objection.

23         THE COURT:  Okay.

24         MR. GROW:  This item is listed as adjourned, but

25   based on communications with Cecilia Rosenauer, who is

1    counsel to the claimant, JGL, LLC, the debtors wish to go for

2    with the objection of this claim today.  And that is

3    reflected in the revised form of order.  The debtors objected

4    to the proof claim, number 9259, filed by JGL, LLC on the

5    basis that it was satisfied by a security deposit held in the

6    claimant's possession.  JGL filed a response stating that it

7    has not set off the security deposit against its claim,

8    because the automatic stay prevents them from doing so.  The

9    amount of the claim is only $2,305.  The amount of the

10   security deposit exceeds the amount of this claim.  Rather

11   than going through any more formal process to consent to

12   lifting the stay for such a small claim, the debtors would

13   like to state on the record that they consent to JGL's use of

14   the security deposit to offset JGL's claim.  And will not

15   object to such use as a violation of the automatic stay.

16   JGL has agreed to apply the security interest toward their

17   claim and send the debtors confirmation that their claim has

18   been satisfied.  And JGL has also agreed to return the unused

19   portion of the security deposit to the debtors.

20          I have spoken with Cecilia Rosenauer, counsel to

21   JGL, concerning this matter and she has agreed to what I have

22   just outlined.  And on the basis of this representation, she

23   has decided not to make a telephonic appearance in today's

24   hearing.

25          THE COURT:  Does anyone have any comments in

18

1  connection with that resolution?  All right, hearing none, I

2  think you need an order per stay relief, so, I'll so order

3  the record to allow the stay of relief as set, to allow for

4  the set off with the security deposit as described.

5          MR. GROW:  Okay, thank you, your Honor.

6          THE COURT:  Anything further with the 10th Omnibus

7  objection?

8          MR. GROW:  Nothing further on the 10th.

9          THE COURT:  All right, subject to the change I

10  outlined in connection with Ms. Zari's claim and the

11  resolutions or adjournments and withdrawals, as outlined,

12  I'll approve the order.

13          MR. GROW:  Okay, thank you, our Honor.

14          THE COURT:  I'll give that back to you, you can add

15  Ms. Zari.

16          MR. GROW:  Okay.  And we'll move on to the 11th

17  Omnibus substantive objection and could I hand up a revised

18  form of order for that?

19          (Pause.)

20          MR. GROW:  Okay, your Honor, would you like me to

21  walk through the different basis and exhibits to the 11th

22  Omnibus objection?

23          THE COURT:  No, we don't need to do that.

24          MR. GROW:  Okay.

25          THE COURT:  Let's just deal with the responses.

1          MR. GROW:  Debtors received only two responses to

2    the 11th Omnibus objection, which are items and two on the

3    chart related to the 11th Omnibus objection attached to the

4    amended agenda.  The debtors wish to adjourn the objection

5    with respect to the claims addressed in these two responses

6    and that is all we have to say about that one.

7          THE COURT:  All right.

8          MR. GROW:  Unless your Honor has any other

9    questions?

10          THE COURT:  I do not.  I'll approve the order.

11          MR. GROW:  Okay, then I will make the one little

12    change to the 10th Omnibus objection and cede the podium back

13    to Mr. Beach.

14          THE COURT:  Okay, thank you.

15          MR. BEACH:  Your Honor, would you like me to proceed

16    while Mr. Grow is making that change to the order.

17          THE COURT:  Yes.

18          MR. BEACH:  Your Honor, item number 23 on the agenda

19    is the motion by Thomas and Sara Chavez for relief from the

20    automatic stay.  Debtors and movant have agreed to a proposed

21    form of order, to the extent set forth in that revised form

22    of order.  And the debtor's reservation of rights that they

23    filed in connection with that motion.  The revised form of

24    order is not intended to limit, in any way, the movant's

25    ability to proceed against insurance proceeds in connection

1   with any judgment that they may obtain in connection with the

2   litigation.  Nor is it intended to prejudice or limit the

3   debtor's rights or the insurance company's rights in

4   connection with defending any of those claims.

5           Your Honor, I indicated to counsel that I would make

6   that representation on the record and Mr. Allinson is in the

7   courtroom today.  I'm not sure if he has any additional

8   comments.

9           THE COURT:  Mr. Allinson?

10          MR. ALLINSON:  Good afternoon, your Honor.  Elihu

11  Allinson of Sullivan, Hazeltine, Allinson, LLC for Thomas and

12  Sara Chavez.

13          The representation is fine, as far as it goes.

14  We've had one, perhaps, semantic sticking point that I just

15  want to the Court's attention.  And that is that the

16  reservation of rights in the revised proposed form of order,

17  allowing relief from the automatic stay, was also intended

18  not to interfere with the movant's rights to execute on a

19  judgment, if they obtained one against any of the defendant

20  debtors in the State Court action.

21          However, that is not to say that they're entitled to

22  any end run around normal bankruptcy procedures.  They are

23  not entitled to any distribution in advance of a plan or

24  anything like that.  There was some hesitancy about raising

25  the word execution because it had un, perhaps, foreseen

1    consequences.  We just want to make sure that it's clear that

2    to the extent that any judgment is obtained against the

3    debtor, the defendant debtors, and an execution is necessary

4    under applicable State Court Law in order to pursue any

5    applicable insurance that the movants are free to do so.

6              THE COURT:  All right.

7              MR. ALLINSON:  Thank you.

8              MR. BEACH:  Your Honor, the representation is fine

9    with the debtors.

10             THE COURT:  Okay.

11             MR. BEACH:  We just wanted to make sure they weren't

12   going to execute any liens against the estate or anything

13   like that.

14             THE COURT:  Right.

15             MR. BEACH:  Your Honor, I have a revised form of

16   order, may I approach?

17             THE COURT:  Yes, I'll sign it as revised and agreed.

18   Thank you.

19             (Pause.)

20             MR. BEACH:  Your Honor, the next item is item number

21   24, it's also a motion by the --

22             THE COURT:  We just did 24, didn't we?  Oh, no, no,

23   I'm sorry --

24             MR. BEACH:  -- I believe we did number 23.

25             THE COURT:  -- we did 23, I apologize.

1           MR. BEACH:  Yeah, number 24 is with respect to

2   deeming proofs of claims timely filed, the debtor filed a

3   reservation of rights and don't object to the entry of the

4   form of order attached to the motion.

5           THE COURT:  All right.

6           (Pause.)

7           THE COURT:  I signed the order.

8           MR. BEACH:  Thank you, your Honor.

9           MR. ALLINSON:  Your Honor, may I be excused?

10          THE COURT:  Yes, you may.

11          MR. ALLINSON:  Thank you.

12          MR. BEACH:  Your Honor, items number 25 and 26 were

13  motions filed by Mark and Kelly Watson, one for relief from

14  the stay, the other one to deem a claim or for leave to file

15  a late claim.  I believe certificates of no objection have

16  been filed to those.  The debtors filed a reservation of

17  rights, but don't object to the forms of order attached to

18  those motions, being entered.

19          THE COURT:  Thank you.  I didn't see the CNOs, but.

20          MR. HOGAN:  Good afternoon, your Honor.

21          THE COURT:  Good afternoon.

22          MR. HOGAN:  David Hogan on behalf of the Watsons.

23  Your Honor, if my recollection serves me correctly, those

24  CNOs were filed either late yesterday or first thing this

25  morning.  And so, they'll be forthcoming to you, your Honor.

1        THE COURT:  All right, I'll sign them when I get

2    them.

3        MR. HOGAN:  Thank you.

4        THE COURT:  You're welcome.

5        MR. BEACH:  Item number 27, your Honor, is a motion

6    by the debtors for essentially procedures and authority to

7    compromise mortgage loans and to sell mortgage loans with an

8    unpaid principal balance of under $3 million.  Your Honor,

9    the reason for this motion is our ability to compromise

10   mortgage loans by giving borrowers certain incentives like a

11   waiver of prepayment penalties or the like, will allow the

12   debtors some flexibility to attain the highest value for

13   mortgage loans and perhaps, incentivizing borrowers to get

14   those mortgage loans refinanced.

15       Similarly, there are certain mortgage loans that the

16   debtors may need to sell on a one-off basis.  I believe the

17   most efficient process is to get procedures approved to do

18   that.  For instance, there are some mortgage loans we call

19   the Amex mortgage loans, which are mortgage loans that are

20   paid by borrowers on their Amex cards.  And pursuant to

21   agreements in connection with those small number of loans, I

22   think it's about five loans, there are restrictions on who

23   you can sell those to and it's -- the debtors believe it's

24   more efficient to set up more streamlined procedures to be

25   able to sell those mortgage loans, subject to the protections

1    that we have built into both the compromise procedures and

2    the sale procedures.

3         In connection with this motion, your Honor, we've

4    received comments from the United States Trustee and have

5    inserted those comments into our revised form of order.  We

6    have also had a request from JPMorgan Chase to take out the

7    pool of JPMorgan Chase loans from the authority that we're

8    requesting be entered in connection with that loan and we've

9    done that, your Honor.  So, the relief we're requesting is in

10   connection with what we dub un-encumbered loans, but these

11   loans are encumbered by the DIP and we've made revisions in

12   connection with discussions with WLR Recovery, which, I

13   believe, addressed their concerns.  And to the extent that

14   they have any concerns with what we propose to do, either to

15   compromise or sell, the DIP lender will be receiving notice

16   under the procedures in connection there with.

17        Your Honor, if I may, it may be helpful if I

18   approach with a revised form or order, to the extent that any

19   parties wish to be heard.  I can address any responses that

20   they may have.

21        (Pause.)

22        MR. BEACH:  Your Honor, there's, I think, some minor

23   language changes that the U.S. Trustee is asking that we make

24   to the revised form of order.  I still would like to had a

25   blackline up to your Honor and then, perhaps, at the end of

1    the hearing, I can make some of those changes to the clean

2    copy of the order and then hand that up.  May I approach,

3    your Honor?

4            THE COURT:  Yes.

5            (Pause.)

6            MR. BEACH:  Your Honor, the first change to the form

7    of order is to add in language, at the request of the

8    trustee, with respect to compliance, well, that we're not

9    selling, firstly, identifiable information.  Similar language

10   that we put in other sale orders.  The second change in the

11   second order paragraph is to make it clear that the loans

12   that we're seeking to compromise and to sell, are encumbered

13   by the DIP.  And then there are some changes to the

14   procedures in taking out JPMorgan from those compromise

15   procedures.  And then to change the notice period from three

16   business days to five business days, which was a request from

17   the United States Trustee.  And I believe, also, a request

18   from the DIP lender.

19           We had also made a change throughout the defined

20   term.  Instead of mortgage loan, we've changed it to

21   un-encumbered loan, which is not quite accurate in connection

22   with the DIP issue, but we wanted to make it clear that we

23   were not asking for authority to do these compromises in

24   sales just in connection with performing loans, but perhaps,

25   that would be in connection with non-performing loans, as

1    well.

2         THE COURT:  Why did you define them as un-encumbered

3    loans if they're encumbered by the debtor?

4         MR. BEACH:  Your Honor, this is really a relic from

5    a prior motion that we did when we were differentiating pools

6    between B of A, JPMorgan and the debtors.  It shouldn't be

7    defined as such, but --

8         THE COURT:  But they are, they're subject to the

9    DIP?

10        MR. BEACH:  They are, your Honor.

11        THE COURT:  All right.  All right, you got me

12   confused there for a minute.

13        MR. BEACH:  I apologize.

14        THE COURT:  That's why I interrupted you.  Go ahead.

15        MR. BEACH:  In connection with the sale procedures,

16   your Honor, we made a few additional changes to identify the

17   potential purchaser and to identify any other material

18   transaction terms that may affect the purchase price.  That

19   was based on a request of the United States Trustee.

20        And then in the third to last order paragraph, we

21   made some changes to the reporting requirements to identify

22   the purchaser of any loans that are sold or compromised.  And

23   to add a paragraph saying that the rights to any parties that

24   wish that information to be sealed, to be reserved.

25        And then we've added in the second to last so

1   ordered paragraph, the 363(o) language.  I believe, your

2   Honor, that is the paragraph that the U.S. Trustee is asking

3   for some minor edits to and I'll work with him on those at

4   the end of the hearing.

5          THE COURT:  Right.  Does anyone wish to be heard?

6   All right, hearing none, I'll -- subject to the comments of

7   the Office of the U.S. Trustee on the language that's still

8   open, I'll approve the order as modified.

9          MR. BEACH:  Thank you, your Honor.  And that brings

10  us, your Honor, to the last item on the -- no, I'm sorry,

11  item number 28 on the agenda is a motion by Brudd Rossmann

12  for relief from the automatic stay.  Similar to the other

13  motions, the debtors filed a reservation of rights and have

14  no objection to the entry of the form of order attached to

15  the motion.

16         Your Honor, my understanding is that a certification

17  of no objection has been filed, although, it may have been

18  filed after the amended agenda was filed.

19         THE COURT:  All right, I'll sign the order attached.

20         MR. BEACH:  Thank you, your Honor.  Your Honor, that

21  brings us to the last item on the agenda today, which is the

22  debtor's motion to sell certain non-performing loans to

23  Beltway Capital, LLC under a private sale.

24         Your Honor, we have received only one objection to

25  this motion and that was an objection by WLR Recovery.  We've

1    come to an interim resolution in connection with that

2    objection and that is that we will be escrowing any proceeds

3    that the debtor's estates would otherwise be entitled to,

4    subject to either a further hearing or agreement between the

5    DIP lender and the debtors as to how those proceeds will be

6    addressed.  Your Honor, the debtors and the DIP lender are in

7    discussions about an extension of the DIP and so, we are

8    essentially reserving on that issue in connection with the

9    proceeds of this sale.  Whether it needs to go to pay down

10   the DIP immediately or whether some other resolution will be

11   included in a further resolution on an extension.

12          Before I go further with respect to the balance of

13   relief and the motion, I believe Mr. Baragate had some

14   comments that he wanted to say in connection with that

15   objection, so this may be the appropriate time to do that.

16          THE COURT:  All right, thank you.

17          MR. BARAGATE:  Good afternoon, your Honor, Brett

18   Baragate from Jones Day, on behalf of WLR Recovery.  As Mr.

19   Beach indicated, we're okay with the sale motion.  It really

20   became a dispute over what's going to happen with the

21   proceeds.  The proceeds of the sale of these loans constitute

22   our collateral under the DIP.  The DIP requires the

23   pre-payment of the proceeds against the loans and a reduction

24   of the commitment.  But to facilitate our discussions over

25   the extension of the DIP, we've agree to have them held in

1    escrow as Mr. Beach indicated.  And we just wanted to note on

2    the record that that is without prejudice to our rights at

3    the maturity of our facility, which is coming up on August

4    6th.  So, hopefully, between now and then, we'll work out an

5    extension.  But again, it's not -- again, this agreement is

6    without prejudice to our rights at maturity.

7              THE COURT:  Okay.

8              MR. BARAGATE:  Thanks.

9              THE COURT:  Thank you.

10             MR. BEACH:  Your Honor, some -- just a little bit of

11   background on this sale.  These non-performing loans, as your

12   Honor may recall or a substantial portion of these

13   non-performing loans, which we also dubbed un-encumbered,

14   inappropriately.  But were marketed in connection with a

15   marketing process that your Honor approved earlier this year.

16   And there were two other pools of loans that were being

17   marketed in that process.  We called them the B of A

18   non-performing loans and the JPM non-performing loans.  We

19   went forward with the sale of the two pools of B of A and JPM

20   non-performing loans and determined, at that time, that the

21   debtors would not go forward even though we had received

22   bids, including the highest big being from Beltway Capital,

23   with the sale of those non-performing loans.  Because the

24   debtors wanted to explore other options to maximize the value

25   of those loans.

1          The debtors have determined, at this time, that it

2    makes sense and to proceed with the sale to Beltway in a

3    private sale.  We don't believe that a further marketing

4    process would yield higher and better value for these loans

5    in this market.  And we believe we've gotten a fair price

6    from Beltway in connection with this sale.  Since filing --

7    since we withdrew the prior sale motion and since we filed

8    the private sale motion, we have not received any additional

9    bids in connection with these non-performing loans.  We did

10   receive some calls from parties who were interested in taking

11   a look at the data tape, but have not received any additional

12   bids in connection with those pools.

13          As such, your Honor, the debtors believe that it's

14   appropriate to move forward with this sale and the price is

15   in line with the price that we've sold non-performing loans

16   for previously in this case.  The pool of non-performing

17   loans is about -- it's 82 loans of approximately, $26 million

18   in unpaid principal balance.  The purchase price is 40.25

19   percent calculated based on the UPV of the loans.  And the

20   way that we've structured this deal, Which is slightly

21   different than the other deals, is that we've gotten a

22   loan-by-loan bid, so, this is a different purchase price

23   percentage for each loan in connection with this sale.

24          And the primary reason for that is that the buyer

25   was concerned about some -- whether or not we could get the

1    required documentation in connection with certain of the

2    loans in the pool and wanted to make sure that they got,

3    since the 40.25 percent was the weighted average over the

4    pool, they wanted to make sure that we could provide the

5    documentation for the loans that they -- well, that they

6    wouldn't pay 40.25 percent and then get loans where they

7    essentially would have bid lower, without getting the ones

8    that they attributed higher value to.

9         So, the way that we've structured this deal is that

10   if we provide Beltway with the required documents upon the

11   closing of the sale, which is anticipated to be tomorrow,

12   then, in any event, Beltway is supposed to give us the full

13   purchase price.  But for the portion of that purchase price,

14   it's approximately, $10.5 million.  For the portion of that

15   purchase price that we provide the required documents by the

16   closing date, the debtors will take that amount and put it in

17   an escrow, subject to the agreement with WLR Ross for the

18   balance of the purchase price.  The debtors will keep that in

19   an escrow account until we provide the required documentation

20   to Beltway and we've built into the asset purchase agreement

21   a 60-day period to provide that documentation to Beltway.

22        It's the debtor's expectation that out of the 82

23   loans, we'll be able to provide, at least, the required

24   documentation on 67 of those loans, with an unpaid principal

25   balance -- well, actually, I don't know the unpaid principal

1    balance.  But the purchase price attributable to those loans

2    which we certainly expect to provide the required

3    documentation, is in excess of $9 million.  So, we do expect

4    to get those proceeds or have those proceeds made available

5    at the closing date.  We do expect to have more than that,

6    but -- and believe that the 67 is a conservative number.  It

7    turns out that the weighted average purchase price in

8    connection with that is 40.085 percent, so, it's very close

9    to what the purchase price percentage was for the whole pool,

10   in any event.  And then the remainder, approximately, I think

11   $1.8 million will be held in escrow unless we can provide

12   those documentation -- documentation on those loans prior to

13   the closing date.

14        Your Honor, with respect to what the required

15   documentation is, the required documentation in the asset

16   purchase agreement is simply that we provide a note or a loss

17   note affidavit to the purchaser, either by the closing date

18   or within that 60-day period of time.  And we've also

19   committed to provide the purchaser with any other

20   documentation in our possession, related to these mortgage

21   loans.

22        The buyer has indicated that they, that they believe

23   that it will be required to provide -- that we'll be required

24   to provide some additional documentation and the debtors have

25   been in some constructive discussions with Beltway about

1    that.  So, with the remaining 15 or so loans, the debtors

2    will have to work out what, you know, what the appropriate

3    documentation is.  We believe the asset purchase agreement,

4    which is executed by Beltway, it's very clear that we only

5    have to provide the note or a lost note affidavit.  But we

6    believe that we'll work this out over the 60-day period of

7    time that we have in connection with this sale.

8            Unless your Honor has any questions, Mr. Damien

9    Voulo is in the courtroom today.  I would request that I be

10   able to proffer his testimony in connection with this sale?

11           THE COURT:  Any objection to the use of a proffer?

12   All right, hearing none, you may proceed.

13           MR. BEACH:  Thank you, your Honor.  Your Honor,

14   Damien Voulo, V-O-U-L-O, is present in the courtroom to

15   testify.  If called to the stand, Mr. Voulo would testify

16   that he is the Senior Vice President of Capital Markets Risk

17   Management for American Home Mortgage Corporation.  And has

18   been with the company in that capacity since November, 2005.

19   Mr. Voulo received a Bachelor of Science Degree in Finance

20   from St. John's University in 1986.  In his capacity as

21   Senior Vice President in Capital Markets Risk Management with

22   the company, Mr. Voulo's responsibilities included, among

23   other things, overseeing the management and/or the sale of

24   certain mortgage loans and the management of risk associated

25   with those loans.

1          Additionally, Mr. Voulo has worked in the banking

2     and lending industry for approximately 22 years.  Prior to

3     joining American Home Mortgage Corp. Mr. Voulo also worked

4     for 19 years as a Senior Vice President of Risk Management

5     with JPMorgan Chase.  In his career in the mortgage lending

6     industry, he has overseen and participated in numerous sales

7     of mortgage loans.

8          Mr. Voulo would testify that he has reviewed and is

9     familiar with the private sale motion currently before the

10    Court and he has been involved in the marketing and sale

11    process of the non-performing loans.

12         He would also testify that pursuant to the private

13    sale motion, the debtors are seeking authority to sell 82

14    non-performing loans with an approximate unpaid principal

15    balance as of the cutoff date of June 30, 2008, of

16    $26,278,541.66 to Beltway Capital, LLC, on an as-is, whereas

17    basis.

18         Mr. Voulo would further testify that the pool of

19    non-performing loans consists of first lien loans, the vast

20    majority of which are loans which mortgagers had failed to

21    fulfill one or more of the terms, covenants, conditions or

22    obligations and are 30 days or more delinquent.  And that the

23    sale will also include certain un-encumbered, non-performing

24    or certain non-performing loans that have turned to real

25    estate owned or REO property, since filing the motion.

1          Mr. Voulo would testify that pursuant to the sale

2    agreement, the purchase price percentage for the 82

3    non-performing loans is 40.25 percent of the stated unpaid

4    principal balance and that this percentage represents the

5    average purchase price percentage assigned to each

6    non-performing loan.

7          He would also testify that pursuant to the sale

8    agreement, Beltway is not obligated to purchase any

9    non-performing loan, currently in the pool of loans, if the

10   debtors are unable to provide either the original note or a

11   copy of the note with a lost note affidavit.  To the extent

12   that the debtors are unable to produce either of those

13   documents within a 60 day cure period, the loan would not be

14   included as part of the sale.

15         The purchaser is required to fund the full purchase

16   price as of the closing date and the funds related to any

17   loans where the required documentation is not provided as of

18   the closing date of July 18, 2008, shall be held by the

19   debtors in escrow.  If all 82 loans are sold, the purchase

20   price for the pool will be approximately, $10,577,113.01.

21   The debtors estimate that the required documentation will be

22   provided for at least 67 loans as of the closing date, which

23   would yield a payment of approximately, $9,419,254.06.  And a

24   weighted average of 40.0805 purchase price percentage to the

25   debtors, at closing, with the remaining balance of

1    $1,157,858.95 with a weighted average of 41.684 percent to be

2    held in escrow.

3           Mr. Voulo would testify that the debtors engaged in

4    an extensive marketing effort with respect to the majority of

5    these non-performing loans.  Mr. Voulo would further testify

6    to that and that in December, the debtors filed a procedures

7    motion -- the sale procedures motion to authorize the sale of

8    three pools of non-performing loans.  That he's familiar with

9    those sale procedures and participated in the prior marketing

10    process.  He would testify that in accordance with those

11    procedures, the debtors designated and posted to the debtor's

12    internet website, due diligence information relevant to the

13    non-performing loans.  Including certain books and records,

14    material contracts, data tapes, form sale agreements and

15    other financial data.  Mr. Voulo would testify that access to

16    the website was made to any party that signed a non-

17    disclosure agreement within 24 hours of executing such an

18    agreement.

19           Mr. Voulo would also testify that in accordance with

20    those sale procedures, the indicative bid deadline for those

21    loans was 12:00 p.m. on February 1, 2008 and the final bid

22    deadline was 4:00 p.m. on February 26, 2008.  As part of the

23    court-approved marketing process, the debtors, through

24    professionals, received expressions of interest from 19

25    parties with respect to the non-performing loans.  He would

1   testify that during the due diligence periods, 15 of those

2   parties submitted indicative bids and five of those parties,

3   which included Beltway, submitted qualified final bids.  He

4   would testify that Beltway's final bid was the highest and

5   best bid for the non-performing loans, at that time. But the

6   debtors determined not to proceed with the sale of the

7   non-performing, at that time, while other options to maximize

8   value were explored.  Accordingly, the debtors withdrew this

9   sale motion solely as it related to that pool of non-

10  performing loans on March 28, 2008.

11          Mr. Voulo would testify that he has reviewed the

12  Beltway bid and that its bid for the unencumbered, non-

13  performing loans in the debtor's business judgment

14  represents, in light of the previous marketing efforts in

15  accordance with the sale procedures and given the nature of

16  these loans, the highest and best value for the debtor's

17  estates.  That the debtor's execution of the proposed sale

18  agreement with Beltway represents an arm's-length agreement

19  and is entered into in good faith.  The proposed purchase

20  price with respect -- with all of the terms and conditions of

21  the sale agreement, is fair and reasonable.  That entry into

22  the sale agreement with Beltway is the exercise of the

23  debtor's sound business judgment.  That the sale of the

24  non-performing loans to Beltway is in the best interest of

25  the debtor's estate and creditors.  And that Beltway is in no

1  way affiliated with the debtor's or related to the debtors.

2  Your Honor, that would conclude Mr. Voulo's proffer.

3              THE COURT:  But why are there 15 loans where you

4  can't locate the note or file a lost note affidavit?

5              MR. BEACH:  Your Honor, we believe that the number

6  where we can't find the note or file a lost note affidavit,

7  at this time, is much smaller than 15.  But we're trying to

8  work with Beltway and get them comfortable with the

9  documentation in connection with the loans altogether.

10             THE COURT:  Right, so when you say 67, they've, in

11  effect, agreed that for at least 67 of them, what you've been

12  able to find is satisfactory?

13             MR. BEACH:  That's right, your Honor.

14             THE COURT:  All right.  Does anyone wish to

15  cross-examine the witness?  All right, hearing none, the

16  Court will accept the proffer of testimony.  Do you have an

17  order?

18             MR. BEACH:  Yes, your Honor.  May I approach?

19             THE COURT:  Yes.

20             (Pause.)

21             THE COURT:  Did he make a proffer on the consumer

22  credit stuff, is that what you're asking about, Mr. McMahon?

23             MR. McMAHON:  Your Honor, good afternoon.  Joseph

24  McMahon for the United States Trustee.  I don't even,

25  frankly, we've had so many sales on that same issue, I'm

1    considering a law of the case issue, at this point.

2              THE COURT:  All right.

3              MR. McMAHON:  But your Honor --

4              THE COURT:  I think it is.

5              MR. McMAHON:  -- what your Honor ruled in the fall

6    is good for all of these types of transactions.

7              THE COURT:  All right, I like that, that's like a

8    standing objection.

9              MR. BEACH:  Your Honor, that language was in the

10   order.

11             THE COURT:  Right.

12             MR. BEACH:  Mr. McMahon had requested that we put it

13   in the so-ordered paragraph, so, that's the only change.  But

14   what Mr. McMahon was just telling me is that he has the same

15   tweak as with the compromise order.  So, it's probably not

16   worth handing you a blackline, since we just moved one

17   paragraph down below in the order.

18             THE COURT:  Has there been any other changes?

19             MR. BEACH:  No, other than --

20             THE COURT:  All right.

21             MR. BEACH:  -- what we're --

22             THE COURT:  All right, well, subject to Mr.

23   McMahon's comments, I'll approve the order.

24             MR. BEACH:  Thank you, your Honor.

25             THE COURT:  Based on the evidence before the Court.

1          MR. BEACH:  Thank you, your Honor.

2          THE COURT:  You're welcome.

3          MR. BEACH:  Your Honor, it may take us a few minutes

4   to just make these changes to the two forms of order.  But,

5   if I may take just another minute of your Honor's time, I did

6   just want to give you a quick update on some of the other

7   things that the debtors are being involved in, since your

8   Honor hasn't seen us pretty much every week on contested

9   matters over the last month or so, you may have forgotten a

10  little bit about it.  So, I just want to make sure you

11  remember.

12          THE COURT:  I may have.  That may be by choice, Mr.

13  Beach.  All right, what's up?

14          MR. BEACH:  Your Honor, I just wanted to let you

15  know that we have been marketing the HM Bank for, basically,

16  since the beginning of these cases and we are getting close

17  to, hopefully, naming a stalking horse within the next week

18  or so.  And then engaging in an auction process.  We are

19  looking at doing an out-of-court auction process because we

20  believe the bid we're going to receive is an asset and that

21  it's a non-debtor, but we'll be seeking authority from the

22  Court, at some point, to authorize the majority shareholders

23  to sell substantially all the assets of the bank.  But I did

24  want to inform your Honor, that given the size of that asset,

25  that our current proposal out to the potential bidder, is

41

1    that we do an out-of-court auction process, partially because

2    of the timing that they are looking at and given that it's an

3    asset sale of a non-debtor.

4         THE COURT:  All right.

5         MR. BEACH:  I also want to --

6         THE COURT:  I reserve my right to say I don't have

7    jurisdiction over your motion, but I'll await the filing.

8         MR. BEACH:  Okay.  Your Honor, we are also pursuing

9    and hopefully getting close on signing up a bidder and

10   pursuing an auction process in connection with the sale of

11   the 538 Broad Hollow property, as well as the Mount Prospect

12   property, as well.

13        In addition, your Honor, we have been in substantial

14   discussions with Bank of America and Calyon over separate

15   settlements with those parties.  We do hope, your Honor, to

16   get those settlements teed up for the hearing on August 5th.

17   It would be on shortened notice, but the settlements would

18   provide a substantial benefit to help the debtors move

19   forward in these cases and I just wanted to give you a head's

20   up.

21        THE COURT:  This was the settlement of the adversary

22   proceeding?

23        MR. BEACH:  As well as --

24        THE COURT:  And other matters?

25        MR. BEACH:  -- yeah, some additional matters.

```
 1              THE COURT:  All right, go ahead.

 2              MR. BEACH:  That's probably my only --

 3              THE COURT:  Well, I'll look at the motion when I get

 4    it.

 5              MR. BEACH:  Of course, your Honor, I just wanted to

 6    give you a head's up.  With that, your Honor, I think that

 7    concludes our agenda today.

 8              THE COURT:  Well, how about --

 9              MR. HERNANDEZ:  Begging your pardon, your Honor, can

10    you hear us?

11              THE COURT:  I can't hear you, you're going to have

12    to speak up.

13              MR. HERNANDEZ:  I'm sorry, this is Matt Hernandez

14    concerning item number 11.  We were unable to hear what -- we

15    weren't able to hear whether anything was said or adjourned?

16              THE COURT:  Item number 11?  That was continued,

17    wasn't it?

18              MR. HERNANDEZ:  It's the claim of Matt and Melanie

19    Hernandez, Claim Number 4090.

20              THE COURT:  That's not item 11.

21              MR. HERNANDEZ:  It was adjourned from the hearing on

22    the 6th Omnibus objection.

23              THE COURT:  Mr. Grow?

24              MR. GROW:  I know the objection as to Mr.

25    Hernandez's claim is adjourned.  I'm not sure what item it is
```

43

1    on the exhibit, but in the chart attached to the amended

2    agenda, it's listed on there as adjourned.

3            THE COURT:  All right, did you hear that, sir?

4            MS. HERNANDEZ:  This is Melanie Hernandez.  Why is

5    it adjourned again?  It was already adjourned once.

6            THE COURT:  Mr. Grow?

7            MR. GROW:  Ms. Hernandez, I could give you a call

8    when we're out of court, we could talk about the claim going

9    forward.  But we've continued to adjourn it because the

10   debtors are still looking at the claim and considering the

11   merits.

12           MS. HERNANDEZ:  Okay, do I call you -- how do I call

13   you?

14           THE COURT:  At 302-571-6600.

15           MS. HERNANDEZ:  I have dyslexia, can you repeat

16   that?

17           THE COURT:  Yes, it's 302-571-6600.

18           MR. GROW:  Ask for Nathan Grow.

19           THE COURT:  Yes, give him about 15 minutes to walk

20   back, it's hot today.

21           MS. HERNANDEZ:  Okay.

22           MR. HERNANDEZ:  Thank you, your Honor.

23           THE COURT:  You're welcome.  Just so you know, I

24   understand it's frustrating that this is pending.  However,

25   we're not in a position to pay out or excuse me, the debtors

1   are not in a position, at this time, to actually pay anything

2   on claims.  There's been no plan, so, while this is pending,

3   it's not actually holding up any payment for you.

4          MR. HERNANDEZ:  We understand, your Honor.  We

5   haven't heard the claim specifically addressed, in any way,

6   so far.  So, we wanted to make sure we don't miss out on the

7   opportunity to, you know, explain it and seek, you know, or

8   you to be able to rule on, you know, whether at some point,

9   whether or not they should pay and fairly deal with the

10  claim.  Or otherwise give us an opportunity for a remedy some

11  other way.

12         THE COURT:  I completely understand, Mr. Hernandez

13  and we will -- it will either be resolved or you will have a

14  full and fair opportunity to present your case.  No question.

15         MR. HERNANDEZ:  We appreciate that.

16         MS. HERNANDEZ:  This is Melanie Hernandez, I just --

17  that's fine, we'll call you.

18         THE COURT:  All right, Mr. Grow, you'll --

19         MR. HERNANDEZ:  We appreciate it, your Honor.

20         THE COURT:  Okay.

21         MS. HERNANDEZ:  Thank you.

22         THE COURT:  We had an issue long ago in the case

23  with Indy Mac, that was resolved, is that correct?

24         MR. BEACH:  Yeah, I mean.

25         THE COURT:  Yeah?

```
1              MR. BEACH:  Your Honor, it was resolved.  It was the

2    closing of a sale of a number of our office locations.  It

3    was not a pretty closing, but we did get it mostly resolved.

4    They do have some indemnification obligations to us, which

5    I'm not sure.

6              THE COURT:  They're worth the paper they're written

7    on?

8              MR. BEACH:  We're pursuing, at this point, but,

9    they're not significant, in any event.

10              THE COURT:  All right, other than that, there's no

11    pending issue with Indy Mac?

12              MR. BEACH:  No, your Honor.

13              THE COURT:  Or with the debtors and Indy Mac?

14              MR. BEACH:  No, your Honor.

15              THE COURT:  Okay.  Mr. Grow, do you have that

16    revised order?  You may approach.

17              (Pause.)

18              MR. BEACH:  Thank you.

19              THE COURT:  All right, I'll sign this order as

20    revised.  This is in connection with, so the record's clear,

21    the 10th Omnibus non-substantive objection.  All right.

22    We'll adjourn the hearing.  Mr. Beach, whenever you have an

23    order, just let my office know and you can submit it.

24              MR. BEACH:  Thank you, your Honor.

25              THE COURT:  All right.  Hand interlineations are
```

1   fine.

2               MR. BEACH:  Okay.

3               THE COURT:  Thank you very much, the hearing is

4   adjourned.

5               (Proceeding adjourned 3:10 o'clock p.m.)

6                                    *  *  *

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Geraldine C. Laws, CET            Dated 8/19/08
Laws Transcription Service