## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------- x
In re:                                      :   Chapter 11
                                            :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,      :   Case No. 07-11047 (CSS)
a Delaware corporation, et al.,¹            :
                                            :   Jointly Administered
                                            :
         Debtors.                           :
------------------------------------------------------------------- x
```

## SUPPLEMENTAL DECLARATION OF PUNEET AGRAWAL IN SUPPORT OF DEBTORS' FIFTEENTH OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS PURSUANT TO SECTION 502(b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 3003 AND 3007, AND LOCAL RULE 3007-1

I, Puneet Agrawal, pursuant to 28 U.S.C. § 1746, declare:

1.    I am a Manager at Kroll Zolfo Cooper LLC, the court-approved financial advisor of the above-captioned debtors and debtors in possession (the "Debtors").  In this capacity, I am one of the persons responsible for overseeing the claims reconciliation and objection process in the Debtors' chapter 11 cases.  I submit this Supplemental Declaration to supplement the declaration of Marissa Morelle, dated August 15, 2008, which was filed in support of the Debtors' Fifteenth Omnibus (Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007, and Local Rule 3007-1 [Docket No. 5447] (the "Objection").²

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); American Home Mortgage Servicing, Inc., a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580).  The mailing address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Objection.

2.      This Supplemental Declaration is intended to provide additional legal and documentary support for the relief requested by the Debtors in the Objection with respect to certain proofs of claim that are addressed herein.  The Debtors have conducted further review their books and records and have identified several documents that lend additional support to the Objection which are attached hereto as exhibits.  The Debtors reserve the right to supplement this declaration and the right to further object to the proofs of claims discussed herein on any substantive or non-substantive grounds.

A.      **Employee Claims for Unused Vacation Time**

3.      The Debtors objected to the following claims as No Liability Claims in Exhibit A to the Objection on the basis that the claimants are not entitled to payment for unused vacation days:

a.      Michelle Asnicar [POC No. 279], Anna Elizabeth Frazer [POC No. 503], and Thomas R. Johnston [POC No. 7845]:  These claimants are not entitled to vacation payouts because they were part-time employees.  Pursuant to the Vacation and Sick & Personal Day Policy (the "Policy") attached hereto as Exhibit 1, part-time employees working less than thirty (30) hours per week, such as these claimants, were not entitled to paid vacation days.  In addition, with respect to POC No. 279, the claimant had received all amounts owed for her vacation pay prior to maternity leave.  She was a part-time employee upon her return from leave and, per the Policy, no longer eligible for paid vacation days.

b.      Joy A. Cochran [POC No. 4283], Kenneth R. Hefner [POC No. 10242], T. Crain Houston [POC No. 729], Christine Jarret [POC No. 512], Michael Kalmonson [POC No. 708], Amy Morbeck [POC No. 675], Robert O'Branovich [POC No. 200], Linda E. Pond [POC No. 781], Robert Sweeney [POC No. 7470], Kimberly M. Thompson [POC No. 401], and Michael James Wheeler [POC No. 7319]:  These claimants are not entitled to vacation payouts because they were members of the sales staff and/or management and therefore, while entitled to take days off from work, per the Policy they were not entitled to paid vacation days.

c.      Teresa Greener [POC No. 343] and David S. Kirby [POC No. 8406]: These claimants are not entitled to vacation payouts because the Debtors' books and records indicate the claimants have no unused vacation time.  In particular, POC No. 343 should be disallowed because the payroll records, attached hereto as Exhibit 2, show that this claimant used her allotted eighty (80) hours of vacation

time for which she received her entitled payment of $1,200.00.  Similarly, POC No. 8406 should be disallowed because the claimant had no unused vacation time in accordance with the Debtors' record attached hereto as <u>Exhibit 3</u>.

     d.     Malathy Moralidharan [POC No. 2428]: The Debtors have no record of this person ever working for any of the Debtors.

**B.**     <u>Employee Claims for Unused Sick and Personal Time</u>

     4.     The Debtors objected to the following claims as No Liability Claims in Exhibit A to the Objection on the basis that the claimants are not entitled to payment for unused sick and/or personal time:

     a.     Mollie Evanichko [POC No. 501], Karen A. Fisher [POC No. 548], Rosa M. Mora [POC No. 4179], Sheryl A. Seus [POC No. 7478], Cecilia Symons [POC No. 1431], Barbara L. Wagner [POC No. 193], Donna Weilburg [POC No. 801], and Tracey K. Weinheimer [POC No. 1073]:  These claimants are not entitled to payouts for unused sick and personal days because the Policy states that "Employees who leave the Company during the year will not receive pay for unused sick/personal days." All of the employees asserting the above-listed claims ceased working for the Debtors during the year for which they claim payouts for unused sick and personal days.

     b.     Anna Elizabeth Frazer [POC No. 503]: The claimant is not entitled to a payout for sick and personal days because she was a part-time employee and therefore, per the Policy, was not entitled to receive any paid sick and personal days.

**C.**     <u>Employee Claims for Unpaid Bonuses</u>

     5.     The Debtors objected to the following claims as No Liability Claims in Exhibit A to the Objection on the basis that the claimants are not entitled to payment for unused sick and/or personal time:The Debtors objected to proofs of claim filed by Julie J. Dickson [POC No. 833], Nancy Levine [POC No. 329], Judy McGaha [POC No. 527] and Tammy Pederson [POC No. 183] as No Liability Claims in Exhibit A of the Objection.  These claimants are not entitled to the bonuses claimed in their proofs of claim because they were not employed on the scheduled payment date for the alleged bonuses.  Ms. Levine's employment agreement, which was attached

to her proof of claim and is attached hereto as <u>Exhibit 4</u>, expressly states that on page 8 or 9 that she must be employed on the scheduled payment date in order to receive a bonus.

**D.    <u>Other Miscellaneous Employee Claims</u>**

6.    The Debtors objected to a proof of claim filed by Robin Balfour [POC No. 931] in the amount of $43,541.62 as a No Liability Claim in Exhibit A of the Objection. Ms. Balfour claims she is owed for an unpaid quarterly bonus, unused vacation time and four weeks of termination pay. However, Ms. Balfour is not entitled to the alleged unpaid bonus because she was not employed on the scheduled payment date for that bonus. Additionally, as a sales employee, Ms. Balfour was not entitled to receive payment for unused vacation time. Ms. Balfour may be entitled to four weeks of termination pay, however, the amount of such pay should only be $8,846.15 (Ms. Balfour's annual salary was $115,000, which multiplied by 4/52 equals $8,846.15). Therefore, the Debtors request that the Court reduce the amount of Ms. Balfour's claim to $8,846.15 priority, rather than expunging the claim in its entirety.

7.    The Debtors objected to a proof of claim filed by Al Crisanty [POC No. 1908] in the amount of $713,210.00 as a No Liability Claim in Exhibit A of the Objection. Mr. Crisanty failed to include any explanation or basis for the amount alleged in his proof of claim. Therefore, the Debtors assert that Mr. Crisanty has failed to assert a prima facie claim. It appears that Mr. Crisanty may be asserting that he is owed a year end bonus that is listed on a pay stub that he attached to his proof of claim. However, the pay stub lists this bonus in a column titled "year to date," which seems to indicate that this is an amount that has already been paid to Mr. Crisanty. Moreover, neither the Debtors' books and records nor Mr. Crisanty's employment agreement, which is attached hereto as <u>Exhibit 5</u> indicate that Mr. Crisanty is due to receive any outstanding bonuses.

8.      The Debtors objected to the proof of claim of Thomas Fiddler [POC No. 1318] in the amount of $61,587.40 as a No Liability Claim in Exhibit A of the Objection. Mr. Fiddler alleged that he is owed Profit Participation Payments for a portion of 2007. However, pursuant to section 6(b)(iii) of Mr. Fiddler's employment agreement, which is attached hereto as Exhibit 6, Mr. Fiddler's Profit Participation Payments were calculated on a yearly basis using the profits of the Debtors' eastern division. The Debtors' books and records show that the Debtors' eastern division did not have any profits for 2007.

9.      The Debtors objected to the proof of claim filed by Jeffrey W. Jameson [POC No. 2606] in the amount of $9,738.00 as a No Liability Claim in Exhibit A of the Objection. Mr. Jameson's proof of claim alleges that he is owed this amount for wages, however, he failed to include any explanation or basis for the amount alleged in his proof of claim. Therefore, the Debtors assert that Mr. Jameson has failed to assert a prima facie claim. Moreover, the Debtors' books and records do not reflect any such amount owed to Mr. Jameson.

10.     The Debtors objected to the proof of claim filed by Mark E. McAmis [POC No. 5412] in the amount of $2,890.00 as a No Liability Claim in Exhibit A of the Objection. Mr. McAmis's proof of claim alleges that he is owed this amount for wages, however, he failed to include any explanation or basis for the amount alleged in his proof of claim. Therefore, the Debtors assert that Mr. McAmis has failed to assert a prima facie claim. Moreover, the Debtors' books and records do not reflect any such amount owed to Mr. McAmis.

11.     The Debtors objected to three proofs of claim filed by John A. Johnston [POC Nos. 7961, 8772, and 7854]. Proof of claim 7961 in the amount of $397,289.12 was included as a No Liability Claim in Exhibit A of the Objection. The amounts asserted in this proof of claim are for unused vacation time from 2000 through 2007 and unpaid Volume Override Payments

and Profit Participation Payouts for 2007. Mr. Johnston was not entitled to pay for unused

vacation time. Moreover, Mr. Johnston has never reported to the Debtors what days he took off

for vacation over the time period covered in his proof of claim. Mr. Johnston was not entitled to

receive the override bonuses and profitability payouts alleged in his proof of claim because

pursuant to section 6(c)(iii)(B) of Mr. Johnston's employment agreement, which is attached

hereto as <u>Exhibit 7</u>, these bonuses should be calculated on the basis of year end profitability of

the Debtors' western division. The Debtors' books and records show that the Debtors' western

division did not have any profits for 2007.

12.    Proof of claim 8772 in the amount of $1,200,000.00 was included as a No

Liability Claim in Exhibit A of the Objection. Mr. Johnston asserted in proof of claim 8772 that

he is entitled to three years of compensation after termination pursuant to section 8 of his

employment agreement, which is attached hereto as <u>Exhibit 7</u>  However, section 8(a) of his

employment agreement provides that Mr. Johnston is only entitled to compensation after

termination if the Debtors terminate his employment other than pursuant to section 7(b), or if he

resigns for "Good Reason," as that term is defined in section 7(c). Mr. Johnston resigned from

his position with the Debtors and has not alleged that it was on the basis of a "Good Reason."

Therefore, he is not entitled to any compensation after termination pursuant to section 8 of his

employment agreement.

13.    Proof of claim 7854 in the amount of $258,180.97 was included as a Modified

Amount Claim in Exhibit C of the Objection. Mr. Johnston asserted proof of claim 7854 in the

amount of $258,180.97 for reimbursement of business expenses. Mr. Johnston included a credit

card bill along with this proof of claim, however, he failed to provide any details as to what these

expenses were for or why they should be reimbursed by the Debtors. The Debtors' books and

records indicate that Mr. Johnston is entitled to a reimbursement in the amount of $203,177.00. Therefore, the Debtors' objected to proof of claim 7854 as a Modified Amount Claim and requested that it be reduced to $203,177.00.

14.    The Debtors objected to a proof of claim filed by Stanley Bergum, Jr. [POC No. 7638] in the amount of $249,579.44  as a Modified Amount Claim, requesting that it be reduced to $155,958.85.  Mr. Bergum asserted this proof of claim for deferred compensation, unpaid salary, unpaid bonuses, and unused vacation time.  The Debtors agree that Mr. Bergum has a claim for $155,958.85 for deferred compensation, however, Mr. Bergum is not entitled to the bonuses he claims because he was not present on the scheduled payment date for those bonuses. Pursuant to paragraph 5(b) of Mr. Bergum's employment agreement, which is attached hereto as Exhibit 8, Mr. Bergum "shall not be entitled to any unpaid bonuses if he . . . is no longer employed by the Company as of the payment date."  Furthermore, Mr. Bergum is not entitled to payment for unused vacation time because he was a Senior Vice President.  Pursuant to the Policy, which is attached hereto as Exhibit 1, Assistant Vice Presidents and those employees that are more senior than Assistant Vice Presidents are excluded from the Policy.

15.    The Debtors objected to a proof of claim filed by John Manglardi [POC No. 510] in the amount of $112,789.93 as a Modified Amount Wrong Debtor Claim, requesting that it be reduced to $83,789.93.  Mr. Manglardi asserted this proof of claim for expense reimbursements and profitability bonuses that add up to $83,789.93.  However, he asserts no basis for the remaining $29,000 of his proof of claim.  He attached to his proof of claim a pay stub of another employee who was paid a $29,000 profitability bonus, but provides no viable reason why he should receive the same bonus.  The Debtors' books and records reflect no such liability to Mr. Manglardi.

16.    I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

Executed on August 29, 2008

_____

Puneet Agrawal

Manager

Kroll Zolfo Cooper LLC

Aug 29, 2008

**EXHIBIT 1**

## American Home Mortgage - Employee Handbook

### Vacation

*The following vacation policy goes into effect January 1, 2003, however, no employee employed by the Company on December 31, 2002 will receive less vacation time in the future than they currently receive today. All employees who had a vacation benefit on December 31, 2002 greater than the benefits in the following schedule will be "grandfathered" and will not lose vacation time as a result of the following policy.*

Only full-time non-exempt, full-time commissioned (time away as described below), and full-time exempt employees and part-time employees working a minimum of 30 hours per week (excluding Assistant Vice President's and above) are eligible for vacation benefits described. Effective January 1, 2003, American Home Mortgage's vacation benefits will be as follows:

Only employees hired on or before June 30th of any year will be eligible for vacation during that calendar year.

Each January employees (provided they are eligible in accordance with the first paragraph of this section) will receive vacation time as outlined below:

- Two weeks per year
- Three weeks per year
- Four weeks per year

- 1-5 years of service
- 6-10 years of service
- 10 years of service

Full-time commissioned employees will be eligible for time away from the office consistent with the service schedule above and will be paid commission but not vacation pay. All officers (Assistant Vice President and above) hired before June 30th of any year are eligible for three (3) weeks vacation for each year and will receive vacation time as outlined below:

- Three weeks per year
- Four weeks per year
- Five weeks per year

- 1-5 years of service
- Over 5 years of service
- 15 years of service for Senior Vice Presidents and above

New employees who have used and are paid for any vacation during their first six (6) months of employment and who subsequently resign within the first six (6) months will be considered not to have earned this time, and the Company will deduct the time from their final paycheck.

**All vacation time must be used during the year in which it is earned except that in situations where an employee cannot use all of his or her vacation time during the year it was earned due to business demands, the employee may carry over a maximum of one week of unused vacation time into the next calendar year. Any carried over vacation time must be used within the first quarter of the following year. Under no circumstances will employees be paid for unused vacation time.**

d) Termination of Employment. Upon cessation of employment, employees will be compensated for unused vacation time as follows:

- Employees who are eligible to receive two weeks paid vacation and who resign within the first six months of the year are eligible to be paid for up to one week of vacation upon termination less any used vacation through the termination date. Employees who terminate in the second half of the year are eligible for up to two weeks vacation pay less any used vacation time that year.
- Employees on a three or four week schedule whose employment is terminating will be eligible for payout of vacation according to the following schedule: 50% of annual vacation allotment paid if the termination occurs in the first half of the year. If termination occurs during second half of the year, the maximum payout will be equal to the lesser amount of two weeks of unused vacation time or $6,000.
- Employees must provide two weeks written notice of resignation to the Company to be eligible to receive payment of unused and earned vacation time, except as otherwise provided by state law. Once an employee gives notice of termination, the Company does not permit vacation time to be taken as paid days off during the two-week termination period. This is a critical timeframe in which the terminating employee is needed to assist in a smooth transition.

### Sick and Personal Days

*The following sick and personal day policy goes into effect January 1, 2003, however, no employee working at the company on December 31, 2002 will receive less sick and personal days in the future than they currently receive today. All employees who have an annual*

*allowance of more than seven sick and personal days on December 31, 2002 will be "grandfathered" and will not lose sick and personal days as a result of the following policy.*

All regular full time exempt and full time non-exempt employees who were employees of the company on January 1 of a given year will receive seven paid Sick / Personal Days for that calendar year. The sick and personal days will become available on January 1 and are to be used throughout the year for sick and personal time off. Non-exempt employees may take personal / sick time in half (½) day or full day increments.

Full time exempt and full time non-exempt employees who were not employees of the company on January 1 (new hires) will receive one Sick / Personal Day for every 1.71 months of completed employment continuing through December 31. Employees who have used all of their sick / personal days and, are subsequently absent, will not be paid for unworked time (additional absence).

Full-time non-exempt employees who do not use all of their sick or personal days during a year will receive a cash award for good attendance equal to their hourly rate times the number of hours they are scheduled to work during a day (either 8 or 7.5 depending on their location) times the number of sick / personal days they did not use. The award for good attendance for a given year will be paid during the first quarter of the following year. Pay will be based upon the prevailing hourly rate of pay on December 31.

Employees who leave the Company during the year will not receive pay for unused sick / personal days.

**EXHIBIT 2**



ADP PC/Payroll for Windows with HR/Profile

Employee   Paydata   Edit   Cycle   Setup   Utilities   Window   Help

CheckView - 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 Teresa Greener

| Wk | Pay Date | Per.End | Gross | Net | Check # | Co/File # |
|---|---|---|---|---|---|---|
| 32-2 | 08/08/2007 | 08/03/2007 | 360.00 | | 00326944 | R4F/30215 |
| 32-1 | 08/07/2007 | 07/31/2007 | 2,774.51 | | 00326191 | R4F/30215 |
| 30-1 | 07/25/2007 | 07/15/2007 | 1,428.75 | | 00306374 | R4F/30215 |

| Type | Total |
|---|---|
| Hours | 1,414.25 |
| Earnings | 29,945.95 |
| Taxes | 4,986.34 |
| Deductions | 5,961.84 |
| Deposits | 18,997.77 |
| Memos | 4,483.69 |
| Gross | 29,945.95 |
| Net | 0.00 |

| Code | Description | Hours | Earnings |
|---|---|---|---|
| | Regular | 1200.75 | 18,011.25 |
| | Overtime | 53.50 | 1,203.77 |
| 32 | LO Assistant | | 6,688.48 |
| H | Holiday | 48.00 | 720.00 |
| V | Vacation | 80.00 | 1,200.00 |
| S | Sick | 16.00 | 240.00 |
| U | Sick '07 | | 15.00 |
| C | Commission | | 1,627.45 |

View Mode:   Cumulative

Select Checks...

⚠ You do not have access to historical data for one or more companies or departments. Checks within restricted companies or departments will not be displayed. Contact your system administrator for more information.

Close
Distributions...
Next
Prev
Preview...
Print
Print Setup...
Help

Start   7 Internet Explorer   7 Microsoft Office Outl...   6 Microsoft Office Excel   ADP PC/Payroll fo

**EXHIBIT 3**

| Person Name | Job Name | Functional Job Title | Assignment Organization Name | sales/non on | Location Name | Actual Separation Date | Original Date Of Hire | Hire Date | Vacation as of term date | Carryover Vacation | Total Vacation Hrs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kirby, Da | 159299S | RM | 000398 - | NONSALI | CA-IRV1: | ###### | ###### | ###### | 0 | 0 | 0 |

| S/P as of term date | Daily hours | Hourly rate | Salary amt | Annual salary | | Entitled? | Agreement Checked | Checked ADP | Notes | Checked Etime | Payout |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 8 | 60.58 | 126000 | 126000 | | Entitled | | | | | $0.00 |

**EXHIBIT 4**

*[handwritten:]* please see page 8 of 9 - Production Bonus
I was paid the Bonus from 11/1 - 4/30/07. Still
owed Bonus on production from May 1, 2007.

# LOAN OFFICER EMPLOYMENT AGREEMENT

*[handwritten: Oct. 30, 2006]* THIS LOAN OFFICER EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of _____, 2006 ("Effective Date"), by and between AMERICAN HOME MORTGAGE CORP., a New York corporation having a place of business at 538 Broadhollow Road, Melville, NY 11747 (the "Company") and Nancy Levine (the "Employee").

1.    **Employment**.  The Employee agrees to enter into the employment of the Company as a Loan Officer as of the Effective Date, and the Company agrees to employ and compensate the Employee as a Loan Officer in accordance with the terms and conditions set forth in this Agreement.  The Employee understands and agrees that during the term of the Employee's employment with the Company:  (a) The Employee may assist only the Company in the performance of activities contemplated by this Agreement; and (b) The Employee may not engage, participate or become interested, either directly or indirectly, in any business in competition with the Company, in any capacity.

The Employee's employment with the Company is contingent upon the satisfactory completion of a background and credit investigation as determined solely in the discretion of the Company.  It is understood that any investigation found unsatisfactory to the Company, may result in immediate termination of employment.

2.    **At Will**.  The Employee understands and agrees that the Employee's employment with the Company shall be at all times "at will" employment.  The Company reserves the right to terminate the Employee's employment with the Company at any time, with or without cause, and with or without notice.  Likewise, the Employee may resign from the Company at any time for any reason.  The term of this Agreement shall begin on the Effective Date and shall end on the date it is terminated by either the Company or the Employee.

3.    **Duties and Responsibilities.**  The Employee understands and acknowledges that, in performing duties on behalf of the Company, the Employee shall work away from the offices of the Company on a regular basis.  The Employee's duties and responsibilities shall include, but are not limited to, the following:  collecting and analyzing customer financial information; determining which financial products of the Company best meet a customer's needs and financial circumstances; advising customers regarding the advantages and disadvantages of different financial products of the Company; marketing, servicing and promoting the Company's financial products; and such other duties that are assigned to the Employee by management.

4.    **Duty of Loyalty.**

The Employee agrees that, during the term of Employee's employment with the Company, Employee shall devote the Employee's full business time, attention, best efforts, skill and ability exclusively to the business of the Company.  The Employee agrees to do the Employee's utmost to further the interests of the Company, and agrees not to take any action intended to harm the Company.

The Employee agrees that, during the term of the Employee's employment with the Company, the Employee shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company.  The Employee expressly agrees that this section is fair and reasonable and that the Employee is being adequately compensated for agreeing to the terms of this section.

Initials _____

5.    **Commission.**    The Company will pay the Employee a commission on each loan produced by the Employee that was originated in accordance with the Company's policies.   Generally, a loan will be considered produced by the Employee if 1) the loan disburses, 2) the loan was based on an application submitted for processing and funding by the Employee and 3) the loan was based on an application that was signed by the Employee.  Except as otherwise agreed in writing between the Company and the Employee, the Company is not obligated to pay commission on the same loan to more than one Employee, and disputes regarding entitlement to commission among Employees will be decided by the Company in its sole discretion.

During the term of this Agreement, the amount of commission the Company will pay the Employee will be determined in accordance with the Commission Plan attached hereto as Exhibit 1, which may be amended by the Company in its sole discretion.  No commission will be due the Employee for loans that fund more than 30 days after the termination of this Agreement.

The Employee acknowledges that the Employee's compensation will be reported to the Internal Revenue Service on a Form W-2, and the Company will withhold taxes from the Employee's pay as required by law.

The Employee acknowledges that the Employee is not entitled to extra pay for absences from work, including holidays and sick days, or for overtime, but will be entirely compensated pursuant to the commission provisions of this section.

6.    **Compliance with Company Policies.**    The Employee agrees to comply with, and be subject to, all Company policies and procedures, including amendments to such policies and procedures adopted by the Company in its sole discretion either prior to, on, or subsequent to the Effective Date of this Agreement.

7.    **Compliance with Manager and Officer Directives.**    The Employee agrees to comply fully with all lawful instructions, directives, and orders given by the Employee's Branch Manager or by an officer of the Company.

8.    **Compliance with Laws & Regulations.**    The Employee agrees to comply fully with all federal, state and local laws and regulations applicable to mortgage lending activities undertaken by the Company and the Employee. This obligation includes, but is not limited to, the Employee complying with any and all applicable individual licensing requirements imposed by the state(s) in which the Employee originates mortgage loans.

9.    **Prohibition against Inaccurate Applications and False Information.**    The Employee agrees not to submit loan applications to the Company, or to facilitate in any way, the making of loan applications that are inaccurate or misleading. In addition, the Employee agrees not to create or assist in the creation or submission to the Company of any false information in connection with loan applicants or in connection with real property, including the ownership and value thereof. The Employee agrees to reimburse the Company for any damages it suffers as a result of the Employee's breach of this section.

10.    **Benefits**.   The Employee is eligible to participate in such benefit programs that the Company may from time to time maintain for employees of the Employee's level.  The Company reserves the right to modify, substitute, or eliminate such benefits at any time and in its sole discretion.  Benefits available to the Employee will be based on the Employee's tenure at the Company, position at the Company, state and county of residence and other factors determined by the Company.  The Employee acknowledges that certain of the Company's optional benefits require the Employee to pay for some or all of the cost of those benefits.  The Employee agrees to pay such costs in accordance with the Company's policies.

Initials 

11.    **Charge-backs; Right of Setoff; Employee's Agreement to Pay Amounts Owed to the Company.** The Employee acknowledges that certain of the Company's policies and procedures, as may from time to time be amended by the Company in its sole discretion, including but not limited to those relating to collection of fees, marketing and other expenses, administrative assistant support, interest rate lock-ins, employee benefits, buy-backs, and other charge-backs to the Employee, may result in the Employee becoming indebted to the Company. The Employee hereby grants the Company an unconditional right of setoff against commissions and all other amounts otherwise due the Employee, for such amounts owed by the Employee to the Company. Notwithstanding the foregoing, the Company reserves the right to demand, for immediate payment, all such sums due and owing to the Company from the Employee. Nothing in this section shall constitute a waiver or limitation of the Company's rights to collect sums due and owing from the Employee through any and all legal means available to the Company.

12.    **Confidential and Proprietary Information; Company Property.** For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, personal employee information and cost and pricing policies.   All Confidential Information disclosed or provided to the Employee by the Company, or developed or created by the Employee during the term of the Employee's employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company. The Employee agrees not to disclose Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary for the Employee to perform the Employee's responsibilities as a Loan Officer of the Company. The Employee also agrees not to use Confidential Information for any purpose other than to fulfill the Employee's responsibilities as a Loan Officer of the Company.

The Employee acknowledges, understands, and agrees that Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if Employee breaches or threatens to breach any of the provisions of this Agreement relating to Employee's use or disclosure of any of Confidential Information.

The Employee further acknowledges that the Company may provide the Employee with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Employee agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time in the sole discretion of the Company. The Employee further agrees promptly to return in good working condition all Company Property in the Employee's possession upon termination of the Employee's employment with the Company for any reason, and shall be liable for damages, including but not limited to replacement cost, for any financial loss to the Company if Company Property is not returned in such manner.

The Employee agrees that this section shall survive the termination of this Agreement, and that all of the Employee's obligations set forth in this section shall remain in full force and effect after this Agreement is terminated. The Employee further agrees that, upon termination of this Agreement, the Employee will return to the Employee's branch manager, or if no branch manager is available, then to a Company officer, all

Initials _____

Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Employee's possession or custody.

13. **Non-Solicitation; Non-Disparagement.**    The Employee agrees that during the term of the Employee's employment with the Company, and for a period of one (1) year after termination of the Employee's employment with the Company, whether such termination is voluntary or involuntary, with or without cause, the Employee shall not, directly or indirectly: (a) attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers and/or potential customers of the Company which have been derived from leads and/or lists developed and provided to the Employee by the Company; (b) influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company; (c) influence or advise any person who is an employee of the Company to leave the employment of the Company; and (d) employ any person who is an employee of the Company.

The Company and the Employee agree that neither will disparage the other, and that their representatives will not disparage either party hereto.

The Employee expressly agrees that this section is fair and reasonable and that Employee is being adequately compensated for agreeing to the terms of this section. The Employee's obligations as set forth in this section shall survive the termination of this Agreement.

14. **Employee Authority.**  The Employee shall have no authority to bind the Company to the payment of any money or the doing of any action or thing, or incur any debt, obligation, liability, or expense for which the Company is or may become liable without first obtaining the written consent of an appropriate officer of the Company. In the absence of such prior written consent, any debt, obligation, liability or expense incurred by the Employee shall be the sole responsibility of Employee, and the Company shall have no liability for or obligation to Employee regarding such debt, obligation, liability or expense. The Company reserves the right to recover from the Employee all losses to the Company resulting from the Employee exceeding the Employee's authority as limited by this section, through any and all means available by law.

15. **Power of Attorney.**    The Employee hereby irrevocably appoints the Company, or any of its authorized agents, as Employee's attorney-in-fact to act for the Employee and in the Employee's name (in any way the Employee could act in person) with respect to the following powers: (a) to open and review all any and all correspondence, envelopes or packages addressed to the Employee and delivered via the United States Mail or other means to the Company's offices, and to take for itself any currency, checks, drafts, money orders, or other forms of payment enclosed therein to which the Company is or may be entitled; or (b) to deposit any currency and endorse and negotiate any and all checks, drafts, money orders or other forms of payment made payable to the Employee which are the property of the Company.

16. **Insurance.**  The Employee agrees that during the term of the Employee's employment with the Company, the Employee will maintain in effect on any and all motor vehicles used by the Employee in the conduct of the Company's business a minimum of $250,000.00 in combined single-limit bodily injury/property damage liability insurance. The Employee further agrees to defend, indemnify, and hold the Company harmless from and against any and all claims against the Company for injuries or damages caused, or alleged to have been caused, by the Employee while operating any motor vehicle in the course and scope of the Employee's employment with the Company. .

17. **Claims or Actions against the Company.**  If any civil or criminal complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance is filed, commenced, asserted, issued to or

Page 4 of 9

Initials 

made against the Company on account of or as a result of any act or omission by the Employee in violation of (a) any of the Company's policies as amended, instructions, directives, or orders, or (b) any of the laws and regulations of any and all government entities with jurisdiction over mortgage lending activities engaged in by the Employee, the Employee agrees to defend, indemnify, and hold the Company harmless from and against any loss, liability, damages, fines, penalties, costs, or expenses (including reasonable attorneys' fees) incurred by the Company in connection with any such lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance, including any settlement thereof, regardless of whether (a) the Employee is named as a party in any such complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance; (b) the Employee is employed by the Company at the time the loss, liability, damages, cost, or expenses (including reasonable attorneys' fees) is incurred by the Company; or (c) the Company ultimately prevails in, or successfully defends against, the complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance. This section shall survive the termination of this Agreement, and all of the Employee's obligations pursuant to this section shall remain in full force and effect after this Agreement is terminated.

18.  **Acknowledgement.**  The Employee represents and warrants that the Employee is not subject to any agreement, order, judgment, or decree of any kind which would prevent the Employee from entering into this Agreement or performing fully the Employee's obligations hereunder. The Employee acknowledges that: (a) it is the Company's policy not to seek access to or make use of trade secrets or confidential business information belonging to other persons or organizations, including but not limited to, competitors or former employers; and (b) the Employee should not, under any circumstances, reveal to the Company or any of its affiliates or make use of trade secrets or confidential business information belonging to any other person or organization. The Employee represents and warrants that the Employee has not violated and shall not violate such instructions.

19.  **Waiver of Jury Trial.**  The Employee waives any right to a trial by jury in any action to enforce or defend any right under this Agreement or any amendment, instrument, document or agreement delivered or to be delivered in connection with this Agreement or arising from any relationship existing in connection with this Agreement, and agrees that any action shall be tried before a court and not before a jury.

20.  **Construction.**  The titles or headings of the sections of this Agreement are intended for convenience of reference only and are not intended to change, limit or otherwise affect the meaning or construction of the terms of this Agreement. The term "person" shall include an individual, corporation, partnership, association, or other legal entity. The term "Employer" or "the Company" shall include any affiliate, parent, subsidiary or sister company of the Company.

21.  **Governing Law.**  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

22.  **Entire Agreement.**  This Agreement, together with the Commissions Agreement attached hereto as Exhibit 1, as may be amended or modified from time to time in the Company's sole discretion, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements, discussions, negotiations, or understandings, whether oral or written, between the parties relating to the matters addressed herein.

23.  **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement, or any portion of any provision of this Agreement, is found to be unlawful or invalid or otherwise unenforceable, all valid and enforceable provisions of this Agreement shall remain in full force and effect.

Initials 

24.   **Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto and their respective heirs, estates, legal representatives, executors, successors, and assigns.

25.   **Attorney Fees**.  The Employee agrees to pay the reasonable costs and attorney fees incurred by the Company resulting from the Company's successful enforcement of the terms and provisions of this Agreement.

26.   **Waiver**.  No waiver, or alleged waiver, by the Company of any term, condition or provision of this Agreement shall be effective for any purpose whatsoever unless such waiver is in writing and signed by a Regional Vice President, Executive Vice President, Division President or the President of the Company.  No express waiver by the Company of a breach of this Agreement by the Employee shall operate or be construed as a waiver of any subsequent breach of this Agreement by the Employee.

27.   **Notices**.  All notices required or permitted under this Agreement shall be sufficient if in writing and mailed through the United States Postal Service to the Employee at such residence address on file with the Company, and to the Company, at 538 Broadhollow Road, Melville, New York 11747, Attn: Senior Vice President, Director of Human Resources.

**IN WITNESS WHEREOF**, the parties have executed this AGREEMENT as of the Effective Date.

**American Home Mortgage Corp.**

By:   _____
      General Counsel

      _____
      The Employee

Initials _____

**American Home Mortgage**
**Commission Plan**

Exhibit 1 to the Loan Officer Employment Agreement between American Home Mortgage Corp. (the "Company") and Nancy Levine (the "Employee") dated as of _____, 2006. The Company reserves the right, in its sole discretion, to modify, amend, or terminate any of the terms and conditions of this Commission Plan at any time. All calculations required pursuant to this Commission Plan shall be made in the sole discretion of the Company in accordance with methodologies, policies, and procedures of the Company which may be in effect from time to time.

### Base Commission

The Company will pay the Employee commissions for each month of employment based on one of the two schedules below. The Company will pay the Employee based on the schedule that is more favorable to the Employee for the month being paid:

### Schedule 1

| Aggregate Principal Amount Of Loans Produced By The Employee During A Calendar Month | Percent Of The Cumulative Amount Of Loan Principal For The Month The Company Will Pay Employee |
|---|---|
| $1 - $499,999 | .35% (35 Basis Points) |
| $500,000 - $999,999 | .45% (45 Basis Points) |
| $1,000,000 - $1,499,999 | .50% (50 Basis Points) |
| $1,500,000 - $1,999,999 | .55% (55 Basis Points) |
| $2,000,000 + | .60% (60 Basis Points) |

### Schedule 2

| Number Of Loans Produced By The Employee During A Calendar Month | Percent Of The Cumulative Amount Of Loan Principal For The Month The Company Will Pay Employee |
|---|---|
| 1-3 | .35% (35 Basis Points) |
| 4-7 | .45% (45 Basis Points) |
| 8-11 | .50% (50 Basis Points) |
| 12-15 | .55% (55 Basis Points) |
| 16+ | .60% (60 Basis Points) |

Initials _____ 

For purposes of Schedule 2, first lien loans, second lien loans, and HELOCS collateralized by the same property shall be credited to the Employee as one loan.

### a) FHA and VA Bonus

For FHA and VA loans produced, the Company will pay the Employee a base commission of 1.2% of the loan principle of the loans instead of the amount set forth in the schedules above.

### b) Home Equity Lines of Credit

The Company will pay the Employee $125.00 or .15% (15 basis points), whichever is greater, for each open-end Home Equity Line of Credit ("HELOC") produced by the Employee. The Company will pay the Employee $250.00 or .30% (30 basis points), whichever is greater, for each closed-end HELOC produced by the Employee.

### c) Early Repayments

If the Employee produces a refinance of a loan secured by a property on which the Company granted a first mortgage loan the Employee will not receive commission on the loan if the refinance occurs within 180 days of the date of the loan that was on the property prior to the refinance.

### d) Overages and Shortages

The company will pay the Employee 50% of the overages charged by the Employee to a borrower on a given loan, and will charge the Employee 50% of a shortage due to a reduction in cost to a borrower allowed by the Employee. All calculations of overages and shortages will be made by the Company using its usual practices as may be amended from time-to-time and the calculations of the Company will be final. All overages charged must be in accordance with the Company's policies and all applicable laws and regulations.

## Welcome Bonus

The Employee shall be eligible for a Welcome Bonus of $25,000.00, which will be paid on the first available pay date following the execution of a Loan Officer Employment Agreement and commencement of employment hereunder. **THE EMPLOYEE AGREES THAT IF THE EMPLOYEE'S EMPLOYMENT WITH THE COMPANY TERMINATES FOR ANY REASON WITHIN EIGHTEEN (18) MONTHS FROM THE COMMENCEMENT OF EMPLOYMENT HEREUNDER, THE EMPLOYEE WILL IMMEDIATELY REPAY TO THE COMPANY THE FULL AMOUNT OF THE WELCOME BONUS RECEIVED BY THE EMPLOYEE.**

## Production Bonus



The Employee shall be eligible to receive a production bonus (the "Production Bonus") in an amount equal to .1% (10 basis points) of the aggregate internal closed loan production originated by the Employee: (i) during the first six (6) months of employment with the Company; and (ii) during months seven through twelve of employment with the Company. The Production Bonus payments shall be made on the first available pay date following each corresponding bonus period. To be eligible to receive the Production Bonus, the Employee must be employed on the scheduled bonus payment dates. THE EMPLOYEE AGREES THAT IF THE EMPLOYEE'S EMPLOYMENT WITH THE COMPANY TERMINATES FOR ANY REASON WITHIN EIGHTEEN (18) MONTHS FROM THE COMMENCEMENT OF EMPLOYMENT HEREUNDER, THE

Initials 

EMPLOYEE WILL IMMEDIATELY REPAY TO THE COMPANY THE FULL AMOUNT OF THE
PRODUCTION BONUS RECEIVED BY THE EMPLOYEE.

**Non-Payment of Bonuses**

The Employee shall not be entitled to any bonus payments hereunder if the Employee is not employed by the
Company on the bonus payment date.

_____          _____
Employee                                                         Date

Agreed and Accepted:

American Home Mortgage Corp.

By: _____

Title: _____

Initials _____

**EXHIBIT 5**

### EMPLOYMENT AGREEMENT

This Employment Agreement, dated as of January 1, 2004 (this "Agreement"), is by and between American Home Mortgage Corp., a New York corporation having a place of business at 520 Broadhollow Road, Melville, NY 11747 (the "Company"), and Al Crisanty, residing at 8440 Spruce Meadow Lane, Granite Bay, CA 95746 (the "Executive").

Whereas the Company wishes to assure itself of the services of the Executive, and the Executive desires to be employed by the Company, upon the terms and conditions hereinafter set forth.

Now, therefore, the Company and the Executive hereby agree as follows:

1.      <u>Employment</u>. The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company during the term set forth in Section 2 and upon the other terms and conditions of this Agreement. The Executive's employment shall be deemed to be, at all times, at will, and may be terminated at any time, and for any reason, by either the Company or the Executive upon written notice to the other party.

2.      <u>Term</u>. The term of this Agreement shall be for a period of one (1) year from the date first stated above.

3.      <u>Position, Duties and Responsibilities, Rights</u>.

(a) During the term of this Agreement, the Executive shall serve as, and hold the office and title of Senior Vice President of the ABC West Region of the Company (the "Business"), and shall report to the Executive Vice President, Wholesale, or to such other similarly situated person or persons as may be deemed appropriate by the CEO of the Company. The Executive shall have all of the powers and duties incident to the office of the Executive and shall be given authority to operate the Business consistent with similarly situated executives in the Company, shall have powers to perform such other reasonable additional duties as may from time to time be lawfully assigned to the Executive and will be provided such benefits and insurance coverage (including Directors & Officers Liability Insurance) provided to similarly situated executives of the Company, in accordance with the Company's policies and procedures in effect from time to time.

(b) The Executive shall be responsible and shall have authority for managing and enhancing the Business, in accordance with the policies and procedures of the Company as may be in effect from time to time.

(c) During the term of this Agreement, the Executive agrees to devote substantially all the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, and (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker; *provided, however,* that the performance of the Executive's duties or responsibilities in

any of such capacities does not materially interfere with the regular performance of the Executive's duties and responsibilities hereunder.

(d) <u>Place of Performance</u>.    In connection with the Executive's employment by the Company, the Executive shall be based in Sacramento, California, or such other place as may be mutually agreed upon in writing, and shall not be required to be absent from there on travel status or otherwise for more than a reasonable time each year as necessary or appropriate for the performance of the Executive's duties hereunder.

4.    <u>Compensation</u>.

(a) During the term of this Agreement, the Company shall pay the Executive, and the Executive agrees to accept a base salary at the rate of $350,000 per year (the annual base salary as increased from time to time during the term of this Agreement being hereinafter referred to as the "Base Salary"). The Base Salary shall be paid in installments no less frequently than monthly. Any increase in Base Salary or other compensation shall not limit or reduce any other obligation of the Company hereunder, and once established at an increased specified rate, the Executive's Base Salary hereunder shall not thereafter be reduced.

(b) During the term of this Agreement, the Company will pay the Executive five percent (5%) of the Pre-tax Profits of the Business, as defined below to be calculated, for purposes of this Agreement, for the period beginning January 1, 2004. Eighty (80%) of said amount earned during each calendar quarter shall be paid within thirty (30) days following the end of said quarter, with the balance to be paid prior to the end of the first quarter of the subsequent year.

(c) "Pre-tax Profits" will be determined solely by the Company in accordance with its usual and customary policies and practices in this regard applicable to branches managed by the Executive, as may be in effect from time to time.

(d) The Executive shall be paid a one-time bonus of $50,000 if he is employed by the Company through December 31, 2004.

(e) Upon the execution of this Agreement, the Company will grant the Executive options on 50,000 shares of common stock of American Home Mortgage Investment Corp. (the "Stock Options"). The Stock Options will be subject to the 1999 Omnibus Stock Incentive Plan and the execution of a Stock Option Grant Agreement in a form substantially similar to that attached as Exhibit A, and shall vest as follows: fifty percent (50%) on September 4, 2005; and fifty percent (50%) on September 4, 2006.

(f) During the term of this Agreement, Executive shall be entitled to reimbursement, upon proper accounting, of all reasonable expenses and disbursements incurred by the Executive in the course of Executive's duties, including for airline travel exceeding three (3) hours in duration in first or business class.

(g) If the Executive's employment pursuant to this Agreement is terminated without cause, the Executive will be maintained as an active employee of the Company for a period of three (3) months (the "Severance Period). The Executive shall be entitled to Base Salary prorated for the Severance Period, and shall be eligible for benefits as if employed by the Company during the Severance Period. The Executive shall not be eligible for profit participation a set forth in section 4(c) of this Agreement

during the Severance Period.   For purposes of this section, "Cause" means (i) the Executive is convicted, or pleads nolo contender or guilty to the commission of a felony; or (ii) the Company makes a reasonable and good faith determination that: (A) the Executive has failed to effectively perform his material duties, including fiduciary duties and material duties under this Agreement (other than by reason of the Executive's death or disability), and that failure continues for more than thirty (30) days after written notice from the Company specifically identifying the breach and the steps that must be taken by the Executive to cure such breach within the foregoing 30-day period, or (B) the Executive has committed fraud or gross misconduct.

5.   Entire Agreement; Amendment.

(a) This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties, their predecessors and affiliates.

(b) Any amendment of this Agreement shall not be binding unless in writing and signed by both (i) the CEO of the Company and (ii) the Executive.

6.   Enforceability.   In the event that any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

7.   Notices.   All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery; registered or certified mail, return receipt requested or overnight courier, if to the Executive, to him at the address stated above, and, if to the Company, to it at its principal executive offices at 520 Broadhollow Road, Melville, NY 11747, Attention: Human Resources Officer and a copy to General Counsel at the same address listed above, and shall be deemed given when received; provided that if such notice is refused or unclaimed it will be deemed given when sent.   Either party may by like notice to the other party change the address at which it is to receive notices hereunder.

8.   Non-Disparagement.   The Company and the Executive agree that neither will disparage the other and that their representatives will not disparage either party hereto.

9.   Non-Solicitation.   The Executive agrees that, for a period of 90 days beginning from the termination of the Executive's employment with the Company for any reason, or the end of a Severance Period, whichever is later, the Executive will neither solicit directly or indirectly any employee of the Company to leave the Company nor directly or indirectly hire any employee of the Company.   The Company and the Executive expressly agree that the terms of this section are reasonable, customary, and not burdensome to the Executive, and shall survive the termination of this Agreement.

10.   Confidential Information.   The Company and the Executive agree to keep the terms of this Agreement confidential except that the Executive may divulge the terms of this Agreement to the Executive's spouse and either party may divulge the terms to such party's

attorney, financial advisor and accountant provided they agree to keep the terms of this Agreement confidential or provided that such disclosure is made by either party to its legal representative to enforce its rights under this Agreement. The Executive agrees to protect, not disclose, and not use for the Executive's benefit any confidential information or trade secrets belonging to the Company, including information regarding proprietary procedures and techniques, accounts, or personnel (excepting information that was already disclosed by the Company or otherwise was made public other than by breach of this Agreement by the Executive). The preceding two sentences shall not apply to disclosures required due to the laws or regulations of governments, or the orders of courts having jurisdiction over the Company and the Executive and pursuant to any litigation brought by the parties against each other to enforce their respective rights herein. In the event that the Executive party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Company confidential information, Executive shall provide prompt written notice of such request so that the Company may seek an appropriate protective order.

11.   Indemnification. The Company shall indemnify the Executive while the Executive is acting within his scope of employment to the fullest extent permitted by the bylaws, charter and general corporation law of the state of New York, as amended from time to time.

12.   Survival. Sections 7, 11, 12, 13 and 14 shall survive termination of this Agreement.

13.   Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

14.   Successors. This Agreement shall be binding upon and shall inure to the benefit of the Company's successors and assigns.

15.   Counterparts. This Agreement may be executed in counterparts, and shall be so binding on the parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

American Home Mortgage Corp.

By: _____
Donald Henig
Executive Vice President

_____
Al Crisanty

4

**Exhibit A**

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**
520 Broadhollow Road
Melville, New York 11747

**1999 OMNIBUS STOCK INCENTIVE PLAN**

**NON-QUALIFIED STOCK OPTION GRANT AGREEMENT**

Optionee: Al Crisanty    Date of Grant:                [          ]

Option Expiration Date [10 years from the Date of Grant]  Total No. of Shares: 50,000

Exercise Price Per Share: [          ]            Social Security No.:        [          ]

We are pleased to inform you that Board of Directors of American Home Mortgage Investment Corp. (the "Company") has today granted you an option (the "Option") pursuant to the Company's 1999 Omnibus Stock Incentive Plan (the "Plan") to purchase the aggregate number of shares of common stock of the Company, par value $.01 per share ("Common Stock") on the following terms and conditions (the "Agreement"):

1.    The exercise price per share of the Common Stock subject to this Option is [$          ] per share.

2.    The period in which you may exercise this Option shall expire at the close of business on December 31, 2013; *provided, however,* if your employment with the Company terminates prior to December 31, 2013, the period in which you may exercise this Option shall terminate prior to such date in accordance with the provisions of Section 7.

3.    (a) Except as provided in Section 3(b) below, you must remain in the employ of the Company in order for your Option to vest and become exercisable in the increments and upon the dates set forth below:

| Percentage of Shares to Vest | Date of Earliest Exercise (Vesting) |
| --- | --- |
| 50 | September 4, 2005 |
| 50 | September 4, 2006 |

       (b) Notwithstanding the provisions of Section 3(a), this Option shall become fully vested and exercisable upon the occurrence of a Change in Control (as defined in the Plan).

4.    This Option is not intended to qualify as an "Incentive Stock Option" within the provisions of Section 422 of the Internal Revenue Code ("Code"). This Option shall be treated for all purposes as a Non-Qualified Stock Option under the Code.

5.    The exercise price for this Option shall be payable by you at the time this Option is exercised, (i) in cash; (ii) by delivering shares of Common Stock of the Company which you have owned for at least six months prior to such exercise, or a combination of cash and such shares, having an aggregate value equal to the aggregate exercise price of the shares as to which this Option is exercised (basing the value of any such shares of Common Stock on the fair market value of the Common Stock on the date of exercise); (iii) a combination of (i) and (ii); or (iv) pursuant to a broker-assisted "cashless exercise" upon such terms and conditions as the Company shall prescribe. No shares of Common Stock shall be issued pursuant to exercise of this Option until full payment has been made for such shares.

6.    This Option may be exercised only by you and may not be transferred except by will or the laws of descent and distribution. In the event of your death, your legal representatives may exercise this Option as to the shares of Common Stock which were immediately purchasable by you at the date of death, within one year following the date of death (but in no event later than                ).

7.      If your employment with the Company terminates for any reason other than due to your permanent disability (as determined by the Committee designated in the Plan), your option privileges shall be limited to the shares of Common Stock which were immediately purchasable by you at the date of such termination, and such option privileges shall expire unless exercised within 180 days after the date of such termination and prior to the close of business on _____.    If your employment is terminated due to your retirement or permanent disability (as determined by the Committee designated in the Plan), your option privileges shall also be limited to the shares of Common Stock which were immediately purchasable by you at the date of such termination, and such option privileges shall expire unless exercised within one year after the date of such termination and prior to the close of business on _____.

8.      The Company has the right to delay the exercise of your Option if listing, registration or qualification of the Common Stock under any federal or state securities law or stock exchange or similar rule is required and has not been obtained.

9.      Nothing in this Agreement shall restrict the right of the Company to terminate your employment at any time, with or without cause, or to withhold required amounts upon the exercise of your Option.  The Company shall have the right to require you to pay, or make other arrangements satisfactory to the Committee to satisfy, all tax withholding obligations in connection with the exercise of your Option.

10.     This Agreement shall be construed, administered and enforced according to the laws of the State of New York without giving effect to the conflict of laws principles thereof, except to the extent that such laws are preempted by the federal law.

11.     This Agreement may be amended, in whole or in part and in any manner not inconsistent with the provisions of the Plan, at any time and from time to time, by written agreement between the Company and you.

12.     This Agreement and the rights and obligations created hereunder shall be subject to all of the terms and conditions of the Plan.  In the event of any conflict between the provisions of the Plan and the provisions of this Agreement, the terms of the Plan, which are incorporated herein by reference, shall control.  By signing this Agreement, you acknowledge receipt of a copy of the Plan.

The undersigned hereby:

        (a)  acknowledges receipt of this Option and understands that all rights and liabilities connected with this Option are set forth in this Agreement and the Plan; and

        (b)  acknowledges that as of the date of grant of this Option, this Agreement sets forth the entire understanding between the undersigned and the Company and this Agreement supersedes all prior oral and written agreements on the subject with the American Home Mortgage Investment Corp.


Duly authorized on
Behalf of the
Board of Directors


_____          _____
Michael Strauss                                          Al Chisarty
President and Chief Executive Officer      Address: _8440 SPRUCE MEADOW LN_

Attachment:                                            _GRANITE BAY, CA 95746_
1999 Omnibus Stock Incentive Plan

6

**Exhibit A**

## AMERICAN HOME MORTGAGE INVESTMENT CORP.
520 Broadhollow Road
Melville, New York 11747

### 1999 OMNIBUS STOCK INCENTIVE PLAN

### NON-QUALIFIED STOCK OPTION GRANT AGREEMENT

Optionee: Al Crisanty      Date of Grant:                    [_____]

Option Expiration Date [10 years from the Date of Grant]  Total No. of Shares:  50,000

Exercise Price Per Share: [_____]                 Social Security No.:      [_____]

We are pleased to inform you that Board of Directors of American Home Mortgage Investment Corp. (the "Company") has today granted you an option (the "Option") pursuant to the Company's 1999 Omnibus Stock Incentive Plan (the "Plan") to purchase the aggregate number of shares of common stock of the Company, par value $.01 per share ("Common Stock") on the following terms and conditions (the "Agreement"):

1.     The exercise price per share of the Common Stock subject to this Option is [$_____] per share.

2.     The period in which you may exercise this Option shall expire at the close of business on December 31, 2013; *provided, however,* if your employment with the Company terminates prior to December 31, 2013, the period in which you may exercise this Option shall terminate prior to such date in accordance with the provisions of Section 7.

3.     (a) Except as provided in Section 3(b) below, you must remain in the employ of the Company in order for your Option to vest and become exercisable in the increments and upon the dates set forth below:

| Percentage of Shares to Vest | Date of Earliest Exercise (Vesting) |
|---|---|
| [34] | [2 years from the Date of Grant] |
| [33] | [3 years from the Date of Grant] |
| [33] | [4 years from the Date of Grant] |

       (b) Notwithstanding the provisions of Section 3(a), this Option shall become fully vested and exercisable upon the occurrence of a Change in Control (as defined in the Plan).

4.     This Option is not intended to qualify as an "Incentive Stock Option" within the provisions of Section 422 of the Internal Revenue Code ("Code"). This Option shall be treated for all purposes as a Non-Qualified Stock Option under the Code.

5.     The exercise price for this Option shall be payable by you at the time this Option is exercised, (i) in cash; (ii) by delivering shares of Common Stock of the Company which you have owned for at least six months prior to such exercise, or a combination of cash and such shares, having an aggregate value equal to the aggregate exercise price of the shares as to which this Option is exercised (basing the value of any such shares of Common Stock on the fair market value of the Common Stock on the date of exercise); (iii) a combination of (i) and (ii); or (iv) pursuant to a broker-assisted "cashless exercise" upon such terms and conditions as the Company shall prescribe. No shares of Common Stock shall be issued pursuant to exercise of this Option until full payment has been made for such shares.

6.     This Option may be exercised only by you and may not be transferred except by will or the laws of descent and distribution. In the event of your death, your legal representatives may exercise this Option as to the shares of Common Stock which were immediately purchasable by you at the date of death, within one year following the date of death (but in no event later than:_____).

7.    If your employment with the Company terminates for any reason other than due to your permanent disability (as determined by the Committee designated in the Plan), your option privileges shall be limited to the shares of Common Stock which were immediately purchasable by you at the date of such termination, and such option privileges shall expire unless exercised within 180 days after the date of such termination and prior to the close of business on _____.  If your employment is terminated due to your retirement or permanent disability (as determined by the Committee designated in the Plan), your option privileges shall also be limited to the shares of Common Stock which were immediately purchasable by you at the date of such termination, and such option privileges shall expire unless exercised within one year after the date of such termination and prior to the close of business on _____.

8.    The Company has the right to delay the exercise of your Option if listing, registration or qualification of the Common Stock under any federal or state securities law or stock exchange or similar rule is required and has not been obtained.

9.    Nothing in this Agreement shall restrict the right of the Company to terminate your employment at any time, with or without cause, or to withhold required amounts upon the exercise of your Option.  The Company shall have the right to require you to pay, or make other arrangements satisfactory to the Committee to satisfy, all tax withholding obligations in connection with the exercise of your Option.

10.   This Agreement shall be construed, administered and enforced according to the laws of the State of New York without giving effect to the conflict of laws principles thereof, except to the extent that such laws are preempted by the federal law.

11.   This Agreement may be amended, in whole or in part and in any manner not inconsistent with the provisions of the Plan, at any time and from time to time, by written agreement between the Company and you.

12.   This Agreement and the rights and obligations created hereunder shall be subject to all of the terms and conditions of the Plan.  In the event of any conflict between the provisions of the Plan and the provisions of this Agreement, the terms of the Plan, which are incorporated herein by reference, shall control.  By signing this Agreement, you acknowledge receipt of a copy of the Plan.

The undersigned hereby:

      (a)  acknowledges receipt of this Option and understands that all rights and liabilities connected with this Option are set forth in this Agreement and the Plan; and

      (b)  acknowledges that as of the date of grant of this Option, this Agreement sets forth the entire understanding between the undersigned and the Company and this Agreement supersedes all prior oral and written agreements on the subject with the American Home Mortgage Investment Corp.

Duly authorized on
Behalf of the
Board of Directors

_____                    _____
Michael Strauss                                          Al Crisanty
President and Chief Executive Officer        Address:_____

Attachment:                                          _____
1999 Omnibus Stock Incentive Plan

**EXHIBIT 6**

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This Amended and Restated Employment Agreement (this "Agreement") is made and entered into this ___ day of December, 2004, effective as of as of July 1, 2003 (the "Effective Date"), by and between American Home Mortgage Holdings, Inc., a Delaware corporation (the "Company"), and Thomas J. Fiddler (the "Executive").

WHEREAS, reference is made to that certain Agreement and Plan of Merger, dated as of January 17, 2000, by and among the Company, American Home Mortgage Sub II, Inc., First Home Mortgage Corp. ("First Home") and the stockholders of First Home listed on the signature pages thereto (as amended from time to time, the "Merger Agreement");

WHEREAS, in connection with the Merger Agreement, the Company and the Executive previously entered into that certain Employment Agreement, dated as of January 17, 2000 (the "Original Employment Agreement"), by and between the Company and the Executive, and that certain Non-Competition Agreement, dated as of January 17, 2000 (the "Non-Competition Agreement"), by and between the Company and the Executive;

WHEREAS, the Company desires to continue to assure itself of the services of the Executive, upon the terms and conditions hereinafter set forth;

WHEREAS, the Executive desires to continue to be employed by the Company, upon the terms and conditions hereinafter set forth; and

WHEREAS, it is the intention of the Company and the Executive that, as of the Effective Date (as hereinafter defined), this Agreement shall supersede and replace in full any and all other agreements between the parties with respect to the subject matter hereof, including, but not limited to, the Original Employment Agreement and the Non-Competition Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Executive hereby agree as follows:

1.      Definitions.  Unless defined elsewhere in this Agreement, capitalized terms contained herein shall have the meanings set forth or incorporated by reference in Section 18 hereof.

2.      Employment.  The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company and/or any subsidiary or affiliate of the Company, during the term set forth in Section 3 hereof and upon the other terms and conditions of this Agreement.

3.     Term.

(a)     The term of this Agreement shall commence as of July 1, 2003 (the "Effective Date"), and, subject to Section 3(b) hereof, shall terminate at the close of business on the fifth anniversary of such date (the "Fifth Anniversary").

(b)     The term of this Agreement set forth in Section 3(a) hereof shall be extended or further extended, as the case may be, without any action by the Company or the Executive, on the Fifth Anniversary and on each subsequent anniversary of the date thereof, for an additional period of one year, until either party gives a Notice of Termination (as defined in Section 7(g) hereof) to the other party six (6) months in advance of any such anniversary of the Effective Date, in the manner set forth in Section 15 hereof, that the term in effect when such notice is given is not to be extended or further extended, as the case may be, beyond the next anniversary of the Effective Date. If the Executive shall continue in the full-time employment of the Company after the Fifth Anniversary, such continued employment shall be subject to the terms and conditions of this Agreement, including, without limitation, the continuation of the Executive's compensation hereunder, except to the extent that the parties hereto mutually agree in writing to revise any of the terms hereof.

4.     Position, Duties and Responsibilities, Rights.

(a)     From the Effective Date until the Fifth Anniversary, the Executive shall serve as, and be elected to and hold the office and title of, Executive Vice President, Eastern Division, of the Company.  As such, the Executive shall report only to the President, Eastern Division, of the Company and the Chief Executive Officer of the Company, and shall have all of the powers and duties usually incident to the office of Executive Vice President of the Eastern Division of the Company, and shall have powers to perform such other reasonable additional duties as may from time to time be lawfully assigned to the Executive by the President, Eastern Division, of the Company or the Chief Executive Officer of the Company.  Among other duties, the Executive shall be responsible for profit and loss and sales management for the Company's Eastern Division.

(b)     During the term of this Agreement, the Executive agrees to devote substantially all of the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries or affiliates, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker or arbitrator, or engage in the following business activities or businesses: (A) serve as a member of the board of directors of a bank, provided the bank is not significantly engaged in mortgage lending activities; (B) real estate brokerage; (C) title insurance; (D) real estate development; (E) real estate investment; or (F) credit bureau services; *provided, however,* that the performance of the Executive's duties or responsibilities in any of such capacities does not

-2-

materially interfere with the regular performance of the Executive's duties and responsibilities hereunder.

     5.    <u>Place of Performance</u>. In connection with the Executive's employment by the Company, the Executive shall be based at a location designated by the Company in the Chicagoland area as the principal executive offices of the Company's Eastern Division, and shall not be required to be absent therefrom on travel status or otherwise for more than a reasonable time each year as necessary or appropriate for the performance of the Executive's duties hereunder.

     6.    <u>Compensation</u>. During the term of this Agreement, the Executive shall be compensated by the Company as follows:

     (a)    <u>Base Salary</u>. The Company shall pay the Executive, and the Executive agrees to accept, an annual base salary in the amount of (i) from the Effective Date to July 1, 2004, not less than $224,167, and (ii) on or after July 1, 2004, not less than $400,000, which annual base salary may be increased by the Company in its sole discretion (the annual base salary as may be increased from time to time during the term of this Agreement being hereinafter referred to as the "<u>Base Salary</u>"). The Base Salary shall be paid in 24 equal semi-monthly installments; *provided, however*, in the event that the Company changes its normal payroll cycle, such payment installments will be adjusted accordingly, but in no event will the Base Salary be paid less frequently than monthly. Any and all Base Salary due the Executive as of the date of the execution of this Agreement, but not previously paid, shall be paid to the Executive in a lump sum no later than ten (10) days after the date of execution of this Agreement.

     (b)    <u>Performance-Based Compensation</u>.

     (i)    <u>Volume Override Payment</u>. For each fiscal quarter of the Company during the term of this Agreement, the Executive shall receive in cash an amount equal to one-quarter (0.25) of a basis point of Origination Volume of loan production of the Eastern Division (the "<u>Volume Override Payment</u>").

     (ii)    <u>Profit Participation Payment</u>. For each fiscal year of the Company during the term of this Agreement, the Executive shall receive three and one-quarter percent (3.25%) of the difference between any Profits of the Eastern Division *less* the amount of the Invested Capital Charge (the "<u>Profit Participation Payment</u>").

     (iii)    <u>Payment of Volume Override Payment and Profit Participation Payment</u>. The Company shall pay any Volume Override Payment due the Executive on a quarterly basis in a lump sum no later than 30 days after the end of each fiscal quarter to which the Volume Override Payment relates. The Company shall pay any Profit Participation Payment due the Executive on an annual basis in a lump sum no later than March 31st of the fiscal year that immediately follows the fiscal year to which the Profit Participation Payment relates.

     (iv)    <u>Determination of Volume Override Payment and Profit Participation Payment</u>. Within ten (10) days after the end of each fiscal quarter during the term of this Agreement, the Company shall determine the amount of any Volume

Override Payment due to the Executive (a "Volume Override Payment Determination") and furnish the Volume Override Payment Determination to the Executive together with information reflecting the basis for the determination. Within 60 days after the end of each fiscal year during the term of this Agreement, the Company shall determine the amount of any Profit Participation Payment due to the Executive (a "Profit Participation Payment Determination") and furnish the Profit Participation Payment Determination to the Executive together with information reflecting the basis for such determination. After receipt of any Volume Override Payment Determination or Profit Participation Payment Determination, the Executive may request from the Company an audit of the determination (a "Payment Audit"), which Payment Audit shall be performed by the Company's independent public accountants at such time. Any request by the Executive for a Payment Audit must be in writing and must be received by the Company within 30 days of the Executive's receipt of the Volume Override Payment Determination or Profit Participation Payment Determination to which the request for a Payment Audit relates. The Company shall bear the cost of any Payment Audit requested by the Executive under this Section 6(c)(iv); *provided, however,* that if the Volume Override Payment or Profit Participation Payment determined by the Company's independent public accountants after conducting the Payment Audit is not more than one percent (1%) greater than amount of the Volume Override Payment or Profit Participation Payment in the Volume Override Payment Determination or Profit Participation Payment Determination, as the case may be, the Executive shall bear the full cost of the Payment Audit.

(c)     Payments under the Merger Agreement.

(i)     The Company shall continue to pay the Executive all amounts, if any, due to the Executive under Sections 2.4(c) and 2.4(e) of the Merger Agreement, upon the terms and conditions set forth in the Merger Agreement, and until such provisions have terminated in accordance with the terms of the Merger Agreement.

(ii)     For Volume Override Payments and Profit Participation Payments relating to all periods from the Effective Date through June 30, 2005 (i.e., the date on which Section 2.4(d) of the Merger Agreement expires), the Executive shall be paid the Volume Override Payments and Profit Participation Payments described above in lieu of all amounts, if any, due to the Executive under Section 2.4(d) of the Merger Agreement. The Volume Override Payments and Profit Participation Payments payable for all such periods, up to an aggregate amount not to exceed $1,019,084.21 per annum, shall be paid to the Executive as if payable under Section 2.4(d) of the Merger Agreement, and the Company and the Executive agree to treat payments up to such aggregate amount in all respects as if they had been paid pursuant to the Merger Agreement.

(iii)     Except as set forth in this Section 6(c), as of the Effective Date of this Agreement, the Company shall not be obligated to make any other payments, or fulfill any other obligations, to the Executive under the Merger Agreement.

(d)     Perquisites and Reimbursement of Expenses.     During the term of this Agreement, the Executive shall be entitled to (i) perquisites, including, without limitation, an office and secretarial and clerical staff, and (ii) fringe benefits, including, without limitation,

-4-

health insurance, in each case at least equal to, and on the same terms and conditions as, those attached to the Executive's office on the date hereof, as the same may be improved from time to time during the term of this Agreement, as well as to reimbursement, upon proper accounting, of all reasonable expenses and disbursements incurred by the Executive in the course of the Executive's duties.

(e)     Dependents and Beneficiaries.   The Executive and the Executive's dependents and beneficiaries shall be entitled to all benefits and service credit for benefits during the term of this Agreement to which senior officers of the Company and their dependents and beneficiaries are entitled as the result of the employment of such officers during the term of this Agreement under the terms of employee plans and practices of the Company and its subsidiaries and affiliates, including, without limitation, any pension plans, profit sharing plans, any non-qualified deferred compensation plans and related "rabbi" trusts, the Company's life insurance plans, its disability benefit plans, its vacation and holiday pay plans, its medical, dental and welfare plans, and other present or successor plans and practices of the Company and its subsidiaries and affiliates for which senior officers, their dependents and beneficiaries are eligible, and to all payments and other benefits under any such plan or practice subsequent to the term of this Agreement as a result of participation in such plan or practice during the term of this Agreement.

7.     Termination of Employment.

(a)     The term of this Agreement shall terminate upon the death of the Executive.

(b)     The Company may terminate the Executive's employment during the term of this Agreement for Cause as provided in Section 7(b)(i) hereof or in the event of Disability as provided in Section 7(b)(ii) hereof.

(i)     This Agreement shall be considered terminated for "Cause" only:

(A)     if the Executive willfully fails to substantially perform the duties reasonably assigned to him by the Chief Executive Officer, other than by reason of a Disability;

(B)     if the Executive is grossly negligent or engages in gross misconduct in the performance of the Executive's duties hereunder;

(C)     if the Executive knowingly engages in an act of dishonesty, an act of fraud or embezzlement, or any conduct resulting in a felony conviction; or

(D)     if the Executive violates the provisions of Section 9 hereof,

and, in the case of each of clauses (A), (B) (C) and (D) above, the applicable conditions set forth in Section 7(f) hereof are satisfied.

Anything in this Section 7(b) to the contrary notwithstanding, the Executive's employment shall in no event be considered terminated by the Company for Cause if termination takes place as the result of bad judgment or negligence on the part of the Executive other than gross negligence or willful or reckless misconduct.

(ii)    The term "Disability" as used in this Agreement means an accident or physical or mental illness which prevents the Executive from substantially performing the Executive's duties hereunder for six consecutive months. The term of this Agreement shall end as of the close of business on the last day of such six-month period but without prejudice to any payments due to the Executive in respect of disability under this Agreement or any plan or practice of the Company.

(c)    The Executive may terminate the Executive's employment during the term of this Agreement for Good Reason. For purposes of this Agreement, "Good Reason" shall mean (i) a reduction of the Executive's rate of compensation or any other failure by the Company to comply with Section 6 hereof; (ii) failure by the Company to comply with Section 5 hereof; (iii) failure by the Company to obtain the assumption of, and the agreement to perform, this Agreement by any successor as contemplated in Section 11(a) hereof; or (iv) in the event of a Change in Control; except that, the Executive may not terminate his employment hereunder for Good Reason unless the Company fails to cure such Good Reason within thirty (30) days of receipt of written notice from the Executive pursuant to Section 7(d). For purposes of this section, a Change in Control shall occur if, within ten (10) years of the date of this Agreement, any person or entity other than, individually or collectively, the Board of Directors of AHMIC, as constituted as of the date of this Agreement, obtains control of more than fifty percent (50%) of the voting securities of AHMIC or of the Company (except, in the case of the Company, as the result of an internal reorganization of AHMIC), and, as a result thereof, the Executive is discharged, or there is a diminution or other adverse change in the Executive's job description, responsibilities, working conditions or authority and the Executive consequently resigns.

(d)    Any termination by the Company pursuant to Section 7(b) hereof, by the Executive pursuant to Section 7(c) hereof, or by the Company or the Executive pursuant to Section 3(b) hereof, shall be communicated by a Notice of Termination to the other party hereto. For purposes of this Agreement, "Notice of Termination" shall mean (i) with respect to termination pursuant to Sections 7(b) or 7(c) hereof, a written notice which indicates the specific termination provision(s) in this Agreement relied upon and sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision(s) so indicated.

(e)    Notwithstanding anything to the contrary set forth herein, the Company shall have the right to terminate the Executive's employment for any reason other than Cause at any time, subject to the consequences of such termination as set forth in Section 8 hereof.

(f)    In no event shall the Company be entitled to terminate the Executive's employment during the term of this Agreement for Cause pursuant to Section 7(b) hereof, unless and until all of the following take place, *provided* that Sections 7(f)(i) through (iii) shall not apply to any termination for Cause pursuant to Section 7(b)(i)(C):

-6-

(i) the Secretary of the Company gives written notice to the Executive (the "Warning Notice") setting forth (A) the specific provision(s) of this Agreement that the Executive is alleged to have failed to satisfy, (B) the acts or omissions alleged to constitute such failure, (C) the date on which the Executive shall be given a reasonable opportunity to appear before and be heard by the Board of Directors of the Company concerning the allegations, which date shall be not less than 30, nor more than 90, days after the Executive's receipt of the Warning Notice, and (D) the loss of rights under this Agreement that shall occur unless the Executive diligently and in good faith takes reasonable steps to remedy such failure within 30 days after the Executive's receipt of the Warning Notice;

(ii) the Executive does not diligently and in good faith take all reasonable steps to remedy such failure within 30 days after the Executive's receipt of the Warning Notice; and

(iii) the Executive is given a reasonable opportunity to appear before and be heard by the Board of Directors of the Company concerning the allegations, in accordance with the Warning Notice.

(g) "Date of Termination" shall mean (i) if the Executive's employment is terminated by the Executive's death, the date of the Executive's death, (ii) if the Executive's employment is terminated pursuant to Section 7(b)(ii) hereof, 30 days after Notice of Termination is given (provided that the Executive shall not have returned to the performance of the Executive's duties on a full-time basis during such 30-day period), and (iii) if the Executive's employment is terminated for any other reason, the date on which Notice of Termination is given.

8.    Compensation on Termination. The parties recognize and agree that, if the Company terminates the Executive's employment during the term of this Agreement other than pursuant to Section 7(b) hereof, or if the Executive terminates the Executive's employment during the term of this Agreement for Good Reason pursuant to Section 7(c) hereof, the actual damages to the Executive would be difficult if not impossible to ascertain and agree that the Executive's sole remedy shall be a right to receive amounts determined and paid in accordance with the provisions of this Section 8. The Executive shall not be required to mitigate the amount of any payment provided for in this Section 8 by seeking other employment or otherwise, nor shall any compensation earned by the Executive in other employment or otherwise reduce the amount of any payment provided for in this Section 8.

(a)    If the Company shall terminate the Executive's employment during the term of this Agreement other than pursuant to Section 7(b) hereof, or if the Executive shall terminate the Executive's employment during the term of this Agreement for Good Reason pursuant to Section 7(c) hereof, or if the Executive's employment shall terminate by reason of the Company electing not to extend or further extend the term of this Agreement pursuant to Section 3(b) hereof, then, as severance pay or liquidated damages or both:

(i)    the Company shall pay to the Executive the Executive's Base Salary at the rate in effect at the time Notice of Termination is given for a period of five (5) years from the Date of Termination, together with any other amounts payable to the

Executive under Section 6 hereof for periods prior to the Date of Termination (the Base Salary payable to the Executive after termination of employment under this Section 8(a)(i) shall be paid in 24 equal semi-monthly installments per year, in accordance with the Company's normal payroll cycle; *provided, however*, in the event that the Company changes its normal payroll cycle, such payment installments will be adjusted accordingly, but in no event will the Base Salary be paid less frequently than monthly);

(ii)    the Company shall make any payments if and when due to the Executive under Section 6(c) hereof; and

(iii)    for a period of five (5) years from the Date of Termination, the Executive and his dependents and beneficiaries shall be entitled to receive health insurance from the Company on substantially the same terms and conditions as the Executive's health insurance in effect at the time Notice of Termination is given.

(b)    If the Executive's employment terminates under any circumstance that does not entitle the Executive to payments under Section 8(a) hereof (including a termination by reason of the death or Disability of the Executive, or by reason of the Executive electing not to extend or further extend the term of this Agreement pursuant to Sections 3(b) and 7(d) hereof), the Executive (i) shall not be entitled to receive any compensation under Section 6 accruing after the date of such termination (other than any payments due under Section 6(c) hereof), and (ii) shall be (x) subject to the Non-Competition Restrictions (as defined in Section 9 hereof) for a period of three (3) years from the Date of Termination and (y) subject to the Non-Solicitation Restrictions (as defined in Section 9 hereof) for a period of eight (8) years from the Date of Termination.

9.    Non-Competition; Non-Solicitation.

(a)    The Executive agrees that for the period ending on the Fifth Anniversary or for such longer period of time if the Executive is employed by the Company in accordance with Section 3(b) hereof or as may be extended under this Section 9, or as otherwise set forth in this Agreement (the "Non-Competition Period"), the Executive shall not, directly or indirectly (whether as a sole proprietor, partner or venturer, stockholder, director, officer, employee, consultant or in any other capacity as principal or agent or through any Person, subsidiary, affiliate or employee acting as nominee or agent):

(i)    conduct or engage in or be interested in or associated with any Person which conducts or engages in the AHM Business (as hereinafter defined) within the United States;

(ii)    take any action, directly or indirectly, to finance, guarantee or provide any other material assistance to any Person engaged in the AHM Business;

(iii)    solicit, contact or accept business of any client or counterparty whom the Company served or conducted business with or whose name became known to the Executive as a potential client or counterparty while in the employ of the Company or during the Non-Competition Period; or

-8-

(iv)    influence or attempt to influence any Person that is a contracting party with the Company at any time during the Non-Competition Period to terminate any written or oral agreement with the Company.

The restrictions set forth in paragraphs (i) through (iv) of this Section 9(a) shall be collectively referred to herein as the "Non-Competition Restrictions." For purposes of this Agreement, the term "AHM Business" shall mean the residential mortgage lending or residential mortgage brokerage business as conducted by the Company and any business involving the supply of services substantially similar to services provided by the Company at the time of the termination of the Executive's employment.

(b)    The Executive agrees that for the period ending on the Fifth Anniversary or for such longer period of time if the Executive is employed by the Company in accordance with Section 3(b) hereof or as may be extended under this Section 9, or as otherwise set forth in this Agreement (the "Non-Solicitation Period"), the Executive shall not, whether for the Executive's own account or in conjunction with or on behalf of any other Person, solicit or entice away from the Company any officer, employee or customer of the Company or any subsidiary or affiliate of the Company during the Non-Solicitation Period nor engage, hire, employ, or induce the employment of any such Person whether or not such officer, employee or customer would commit a breach of contract by reason of leaving service or transferring business; except, the Executive may hire up to two (2) employees of the Company who reported directly to the Executive at the Company, who, at no time while employed by the Company, individually earned in excess of $100,000.00 in any calendar year, and so long as such employees, prior to terminating their employment with the Company, execute non-solicitation and non-hire agreements with the Company in a form deemed acceptable by the Company. The restrictions set forth in this Section 9(b) shall be collectively referred to herein as the "Non-Solicitation Restrictions."

(c)    Notwithstanding anything herein to the contrary, the restrictive provisions hereof shall not prohibit the Executive from (i) engaging in any of the business activities or businesses described in Section 4(b) hereof during the term of this Agreement and/or during the Non-Competition Period, (ii) having an equity interest in the securities of any entity engaged in the AHM Business or any business with respect to which the Executive obtained confidential or proprietary data or information, which entity's securities are listed on the New York Stock Exchange, the American Stock Exchange or the Nasdaq National Market, to the extent that such interest does not exceed one percent (1%) of the outstanding equity interests of such entity or (iii) with the prior written consent of the Company, serving as a director or other advisor to any other Person.

(d)    The Executive agrees that the covenants and restrictions contained in this Section 9 are reasonable covenants and restrictions under the circumstances, and further agrees that if in the opinion of a court of competent jurisdiction, such restraint is not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants which as to such court shall appear not reasonable, including, but not limited to, the right, power and authority to reduce the periods during which the Executive is subject to the restrictions set forth in this Section 9, and to enforce the remainder thereof as so amended.

-9-

(e)     Notwithstanding anything in this Agreement to the contrary, if either the Executive or the Company shall terminate the Executive's employment during the term of this Agreement for any reason, including, but not limited to, the election by the Company or the Executive not to extend or further extend the term of this Agreement pursuant to Sections 3(b) and 7(d) hereof, the Executive shall be subject to the Non-Competition Restrictions set forth in this Section 9 for a period of three (3) years from the Date of Termination

(f)     Notwithstanding anything in this Agreement to the contrary, if either the Executive or the Company shall terminate the Executive's employment during the term of this Agreement for any reason, including, but not limited to, the election by the Company or the Executive not to extend or further extend the term of this Agreement pursuant to Sections 3(b) and 7(d) hereof, the Executive shall be subject to the Non-Solicitation Restrictions set forth in this Section 9 for a period of eight (8) years from the Date of Termination.

(g)     The Non-Competition Agreement shall be terminated as of the Effective Date of this Agreement.

10.     <u>Indemnification</u>.   The Company shall indemnify the Executive to the fullest extent permitted by the General Corporation Law of the State of Delaware, as amended from time to time.

11.     <u>Successors; Binding Agreement</u>.

(a)     The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the extent that the Company would be required to perform it if no such succession had taken place; *provided, however,* that no such agreement with a successor shall release the Company without the Executive's express written consent. Failure of the Company to obtain such agreement prior to the effectiveness of any such succession shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive's employment were terminated by the Company other than pursuant to Section 7(b) hereof, except that the Non-Competition Restrictions and the Non-Solicitation Restrictions set forth in section 9 of this Agreement shall remain in full force and effect for a period of three (3) years from the Date of Termination, and that, for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

(b)     If the Executive should die while any amounts are due and payable to the Executive hereunder, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of the Agreement to the Executive's devisees, legatee or other designee or, if there be no such designee, to the Executive's estate.

(c)     Except as to withholding of any tax under the laws of the United States or any state or locality, neither this Agreement nor any right or interest hereunder nor any amount payable at any time hereunder shall be subject in any manner to alienation, sale, transfer, assignment, pledge, attachment or other legal process, or encumbrance of any kind by the

Executive or the beneficiaries of the Executive or by legal representatives without the Company's prior written consent, nor shall there be any right of set-off or counterclaim in respect of any debts or liabilities of the Executive, the Executive's beneficiaries or legal representatives against any right or interest hereunder or any amount payable at any time hereunder to the Executive, the Executive's beneficiaries or legal representatives; *provided, however,* that nothing in this Section 11 shall preclude the Executive from designating a beneficiary to receive any benefit payable on the Executive's death, or the legal representatives of the Executive from assigning any rights hereunder to the Person or Persons entitled thereto under the Executive's will or, in case of intestacy, to the Person or Persons entitled thereto under the laws of intestacy applicable to the Executive's estate.

12. Parties. This Agreement shall be binding upon and shall inure to the benefit of the Company and the Executive, the Executive's heirs, beneficiaries and legal representatives.

13. Entire Agreement; Amendment.

(a) This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties with respect to the subject matter hereof, including, but not limited to, the Original Employment Agreement and the Non-Competition Agreement.

(b) Any amendment of this Agreement shall not be binding unless in writing and signed by both (i) an officer or director of the Company duly authorized to do so and (ii) the Executive.

14. Enforceability. In the event that any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

15. Notices. All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery, registered or certified mail, return receipt requested, overnight courier or facsimile, if to the Executive, to him at 13 Averill Ct., North Barrington, Illinois 60010: (____) ____-____, with a copy to Lorenzini & Associates, Ltd., 1900 Spring Road, Suite 501, Oak Brook, Illinois 60523, Attention: Ronald N. Lorenzini, Esq., Facsimile: (630) 684-0410, and, if to the Company, to it at its principal executive offices at 538 Broadhollow Road, Melville, New York 11747, Attention: General Counsel, Facsimile: (800) 209-7276, with a copy to the Company, to it at its principal executive offices at 538 Broadhollow Road, Melville, New York, 11747, Attention: Director of Human Resources,, and shall be deemed given when sent, *provided* that any Notice of Termination or other notice given pursuant to Section 7 shall be deemed given only when received. Either party may by like notice to the other party change the address at which the Executive or it is to receive notices hereunder.

16.    Governing Law. THIS AGREEMENT IS EXECUTED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

17.    Effective Date. This Agreement shall become effective as of July 1, 2003.

18.    Definitions. The following terms, when capitalized in this Agreement, shall have the meanings set forth or incorporated by reference in this Section 18.

(a)    "Alt-A Loans" shall mean alternate "A" mortgage loans.

(b)    "Applicable Reference Price" shall mean (i) with respect to loans (other than HELOC Loans) that will be sold to a third party and not held, in securitized or whole-loan form, by AHMIC or any affiliate or subsidiary thereof, the highest price quoted by any one of the Reference Banks (expressed as a percentage of par) for best efforts delivery and a delivery window not less than, but closest to, the lock-in period granted by the secondary marketing desk of AHMIC (or its affiliate or subsidiary, as the case may be) at the time the loan is locked; (ii) with respect to loans that will be held by AHMIC or any affiliate or subsidiary thereof (other than loans designated by the Company as Alt-A Loans and subprime loans), including loans held in securitized or whole-loan form, the price posted by AHMIC (or its affiliate or subsidiary, as the case may be) with respect to each such loan; (iii) with respect to loans that have been designated by the Company as Alt-A Loans or subprime loans and will be held by AHMIC or any affiliate or subsidiary thereof, in securitized or whole-loan form, the price posted by AHMIC (or its affiliate or subsidiary, as the case may be) with respect to each such loan, plus 0.375% of the principal amount of such loan; and (iv) with respect to all HELOC Loans, whether or not such loans are sold to a third party or held, in securitized or whole-loan form, by AHMIC or any affiliate or subsidiary thereof, 100.625% of the original funded balance at the time of the closing of such loan.

(c)    "AHMIC" means American Home Mortgage Investment Corp., a Maryland corporation and the parent company of the Company.

(d)    "Base Salary" shall have the meaning set forth in Section 6(a) hereof.

(e)    "Borrower Price" with respect to a loan shall mean (i) with respect to all loans other than HELOC Loans, 100% of the principal amount of such loan, minus any points, whether denominated as origination fees or discounts, paid by the borrower in connection with such loan, and (ii) with respect to HELOC Loans, 100% of the original funded balance at the time of the closing of such loan, minus any points, whether denominated as origination fees or discounts, paid by the borrower in connection with such loan.

(f)    "Cause" shall have the meaning set forth in Section 7(b)(i) hereof.

(g)    "Company" means American Home Mortgage Holdings, Inc., a Delaware corporation, and any successors to its business and/or assets, which executes and delivers an agreement provided for in Section 11(a) or which otherwise becomes bound by all the terms and conditions of this Agreement by operation of law.

-12-

(h)    "Credit Loss" shall mean the Company's good faith estimate of the loss it incurs if the Company is forced to repurchase a loan or the Company is forced to indemnify a loan. The sum of the losses for such repurchased and indemnified loans at the end of the applicable time period will be equal to the credit losses for such period.

(i)    "Date of Termination" shall have the meaning set forth in Section 7(h) hereof.

(j)    "Disability" shall have the meaning set forth in Section 7(b)(ii) hereof.

(k)    "Eastern Division" shall include all of the Company's retail channel branches and retail channel sales personnel designated by the Chief Executive Officer as part of the Eastern Division of the Company; provided, however, that the Eastern Division shall not include MortgageSelect, American Brokers Conduit or any other unit or division of the Company that reports to the Company's Alternative Division; and provided, further, that the Eastern Division may from time to time be expanded or reduced (by state or otherwise) by the Chief Executive Officer to reflect the operational needs of the Company; and provided, further, that for purposes of determining any compensation due the Executive under Section 6 hereof, the term "Eastern Division" shall not include the retail channel branches and retail channel sales personnel acquired in connection with any Excluded Acquisition.

(l)    "Eastern Division Acquisition" means any acquisition, except for an Excluded Acquisition, by the Company of any company, business, mortgage origination pipeline, group of employees or other assets, whether by merger, acquisition, asset purchase or any other transaction, that is designated by the Chief Executive Officer as an Eastern Division Acquisition.

(m)    "Excluded Acquisition" shall mean any Eastern Division Acquisition proposed by the Company which the Executive believes is not in his best interests, and with respect to which the Executive, as soon as practicable prior to the Company's completion of such acquisition, notifies the Company in writing that such acquisition should not be treated as an Eastern Division Acquisition for purposes of this Agreement. With respect to an Excluded Acquisition, (i) the Invested Capital Charge shall not be increased to take into account any capital outlays incurred by the Company in connection with such Excluded Acquisition, and (ii) the retail sales channel branches and retail channel sales personnel acquired in connection with such Excluded Acquisition shall not be included in the term "Eastern Division" for purposes of determining any compensation due the Executive under Section 6 hereof.

(n)    "Expenses" shall include all direct and allocated costs charged to the Eastern Division, including, but not limited to, (i) employment costs, such as wages, salaries, commissions, overrides, profit participation and profit-sharing type costs (including, but not limited to, the Profit Participation Payment payable to the Executive hereunder), payroll taxes, employee benefits and all other employment expenses; (ii) Credit Losses; (iii) costs to determine a borrower's eligibility for a loan, including appraisals, credit reports, automated underwriting fees, social security checks and other investigation fees; (iv) costs of marketing, including advertising, promotion and public relations; (v) other costs for loan origination and processing, including copying, messenger and overnight delivery and office consumables; (vi) costs of

-13-

running branches and offices, including rent, insurance, utilities, office maintenance and upkeep and depreciation; (vii) allocated costs for corporate overhead not to exceed $585 per loan, *provided, however,* that if a loan is a second lien that is closed concurrently with a first lien, such corporate overhead costs shall not exceed $195 per loan; and (viii) Invested Capital Charges; and all of such Expenses shall be calculated according to the Company's standard practices as may be amended from time to time.

(o)     "Good Reason" shall have the meaning set forth in Section 7(c) hereof.

(p)     "HELOC Loan" shall mean a home equity line of credit.

(q)     "Invested Capital Charge" initially shall equal the amount of $6,000,000, but shall be adjusted in the event that the Company engages in one or more Eastern Division Acquisitions during a given fiscal year, such that the Invested Capital Charge shall be increased to take into account any capital outlays incurred by the Company in connection with such Eastern Division Acquisition(s), with any such increase in the Invested Capital Charge to be determined in good faith by the Chief Executive Officer prior to the consummation of such Eastern Division Acquisition(s); *provided, however,* that the Invested Capital Charge shall not include any capital outlays incurred by the Company in connection with an Excluded Acquisition.

(r)     "Merger Agreement" shall have the meaning set forth in the recitals.

(s)     "Net Interest Income" shall mean (i) for the eighteen months ending December 31, 2004, 16 basis points per loan, and (ii) for all subsequent fiscal years, an amount determined in good faith by the Chief Executive Officer.

(t)     "Non-Competition Agreement" shall have the meaning set forth in the recitals.

(u)     "Non-Competition Period" shall have the meaning set forth in Section 9(a) hereof.

(v)     "Non-Competition Restrictions" shall have the meaning set forth in Section 9(a) hereof.

(w)     "Non-Solicitation Period" shall have the meaning set forth in Section 9(b) hereof.

(x)     "Non-Solicitation Restrictions" shall have the meaning set forth in Section 9(b) hereof.

(y)     "Notice of Termination" shall have the meaning set forth in Section 7(g) hereof.

(z)     "Original Employment Agreement" shall have the meaning set forth in the recitals.

(aa)    "Origination Volume" shall mean the dollar volume of Eastern Division loan originations.

(bb)    "Payment Audit" shall have the meaning set forth in Section 6(b)(iv) hereof.

(cc)    "Payment Determination" shall have the meaning set forth in Section 6(b)(iv) hereof.

(dd)    "Per Loan Revenue" for each loan shall be the sum of (i) the product of the difference between the Applicable Reference Price for the loan (expressed as a percentage of par) *less* the Borrower Price for such loan (expressed as a percentage of par) and (x) with respect to all loans other than HELOC Loans, the loan's principal amount, and (y) with respect to HELOC Loans, the original funded balance at the time of the closing of such loan, all at the time such loan is last locked; (ii) all fees (excluding points included in the price paid by the borrower that are included in (i) above) charged the borrower by the Company in connection with the borrower's loan application and loan closing (but excluding fees associated with the Company's ongoing ownership of the borrower's loan after the closing of the loan) including, but not limited to, servicing of the borrower's loan, or delivery of any services or financing or products for the borrower; (iii) fees earned from brokering loan applications to outside companies; (iv) the Secondary Allocation; and (v) Net Interest Income on loans held for sale.

(ee)    "Person" means any individual, corporation, partnership, limited liability company, limited duration company, trust or other entity of any nature whatsoever.

(ff)    "Profit Participation Payment" shall have the meaning set forth in Section 6(b)(ii) hereof.

(gg)    "Profits" means, with respect to the Eastern Division, for any measurement period, the sum of the Per Loan Revenue for all loans that were funded by the Company during the measurement period, or were brokered by the Company and closed by another lender during the measurement period, and in all cases, were originated by the Eastern Division, minus Expenses.

(hh)    "Reference Banks" shall mean Chase Manhattan Mortgage, Citicorp Mortgage, Countrywide Credit Corp., Washington Mutual and Wells Fargo Mortgage.

(ii)    "Reference Price Verification" shall have the meaning set forth in Section 19 hereof.

(jj)    "Secondary Allocation" shall mean (i) for the eighteen months ending December 31, 2004, 20 basis points per loan, and (ii) for all subsequent fiscal years, an amount determined in good faith by the Chief Executive Officer.

(kk)    "Volume Override Payment" shall have the meaning set forth in Section 6(b)(i) hereof.

19.    <u>Reference Price Verification</u>.  Not more than twelve times in any year during the term of this Agreement, the Executive shall be entitled to request information from the Company in order to verify the Applicable Reference Price with respect to a given loan (a "<u>Reference Price Verification</u>").  The Executive shall send any request for a Reference Price Verification to the Company in writing.  Upon receipt of such request, the Company's capital markets group shall furnish information to the Executive in order to verify that the Applicable Reference Price with respect to such loan was established in accordance with the terms of this Agreement.

**[Signature Page to Follow]**

-16-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

AMERICAN HOME MORTGAGE
HOLDINGS, INC.

By: _____
    Name:  Michael Strauss
    Title:  Chief Executive Officer and President

EXECUTIVE


_____
Thomas J. Fiddler

**<u>EXHIBIT 7</u>**

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This Amended and Restated Employment Agreement (this "Agreement") is made as of April __, 2004, by and between American Home Mortgage Holdings, Inc., a Delaware corporation (the "Company"), and John A. Johnston (the "Executive").

WHEREAS, reference is made to that certain Agreement and Plan of Merger, dated as of December 29, 1999, by and among the Company, American Home Mortgage Sub I, Inc., Marina Mortgage Company, Inc. ("Marina") and the stockholders of Marina listed on the signature pages thereto (the "Merger Agreement");

WHEREAS, in connection with the Merger Agreement, the Company and the Executive previously entered into that certain Employment Agreement, dated as of December 29, 1999 (the "Original Employment Agreement"), by and between the Company and the Executive, and that certain Non-Competition Agreement, dated as of December 29, 1999 (the "Non-Competition Agreement"), by and between the Company and the Executive;

WHEREAS, the Company desires to continue to assure itself of the services of the Executive, upon the terms and conditions hereinafter set forth;

WHEREAS, the Executive desires to continue to be employed by the Company, upon the terms and conditions hereinafter set forth; and

WHEREAS, it is the intention of the Company and the Executive that, as of the Effective Date (as hereinafter defined), this Agreement shall supersede and replace in full any and all other agreements between the parties with respect to the subject matter hereof, including, but not limited to, the Original Employment Agreement and the Non-Competition Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Executive hereby agree as follows:

1.    Definitions.    Unless defined elsewhere in this Agreement, capitalized terms contained herein shall have the meanings set forth or incorporated by reference in Section 18 hereof.

2.    Employment.    The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company and/or any subsidiary or affiliate of the Company, during the term set forth in Section 3 hereof and upon the other terms and conditions of this Agreement.

3.   Term.

(a)   The term of this Agreement shall commence as of January 1, 2004 (the "Effective Date"), and, subject to Section 3(b) hereof, shall terminate at the close of business on the fifth anniversary of such date (the "Fifth Anniversary").

(b)   The term of this Agreement set forth in Section 3(a) hereof shall be extended or further extended, as the case may be, without any action by the Company or the Executive, on the Fifth Anniversary and on each subsequent anniversary of the date thereof, for an additional period of one year, until either party gives a Notice of Termination (as defined in Section 7(g) hereof) to the other party twelve months in advance of any such anniversary of the Effective Date, in the manner set forth in Section 15 hereof, that the term in effect when such notice is given is not to be extended or further extended, as the case may be, beyond the year following the next anniversary of the Effective Date.  If the Executive shall continue in the full-time employment of the Company after the Fifth Anniversary, such continued employment shall be subject to the terms and conditions of this Agreement, including, without limitation, the continuation of the Executive's compensation hereunder, except to the extent that the parties hereto mutually agree in writing to revise any of the terms hereof.

4.   Position, Duties and Responsibilities, Rights.

(a)   From the Effective Date until the Fifth Anniversary, the Executive shall serve as, and be elected to and hold the office and title of, President, Western Division, of the Company.  As such, the Executive shall report only to the Chief Executive Officer of the Company, and shall have all of the powers and duties usually incident to the office of President of the Western Division of the Company, and shall have powers to perform such other reasonable additional duties as may from time to time be lawfully assigned to the Executive by the Chief Executive Officer of the Company.  Among other duties, the Executive shall be responsible for profit and loss and sales management for the Company's Western Division.

(b)   During the term of this Agreement, the Executive agrees to devote substantially all of the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, and (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries or affiliates, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker or arbitrator; *provided, however*, that the performance of the Executive's duties or responsibilities in any of such capacities does not materially interfere with the regular performance of the Executive's duties and responsibilities hereunder.

5.   Place of Performance.  In connection with the Executive's employment by the Company, the Executive shall be based at the principal executive offices of the Company's Western Division, and shall not be required to be absent therefrom on travel status or otherwise

-2-

for more than a reasonable time each year as necessary or appropriate for the performance of the Executive's duties hereunder.

      6.    <u>Compensation</u>. During the term of this Agreement, the Executive shall be compensated by the Company as follows:

      (a)    <u>Base Salary</u>. The Company shall pay the Executive, and the Executive agrees to accept, a base salary in the amount of not less than $400,000 per year, which amount may be increased by the Company in its sole discretion (the "<u>Base Salary</u>"). The Base Salary shall be paid in 24 equal bi-monthly installments; *provided, however*, in the event that the Company changes its normal payroll cycle, such payment installments will be adjusted accordingly.

      (b)    <u>Payments under Section 2.4(f) of the Merger Agreement</u>. The Company shall pay the Executive any amounts due under Section 2.4 of the Merger Agreement on the terms and subject to the conditions set forth in the Merger Agreement. In lieu of the Company's obligation to make such payments under Section 2.4 of the Merger Agreement, the Company agrees to make such payments under this Agreement. Section 2.4(f) of the Merger Agreement and any defined terms used in said section and defined in the Merger Agreement shall be deemed incorporated by reference herein. The Company agrees to treat any payments of such amounts in all respects as if they had been paid pursuant to the Merger Agreement.

      (c)    <u>Performance-Based Compensation</u>.

      (i)    <u>Volume Override Payment</u>.

      (A)    Subject to the provisions of Section 6(c)(iii) below, for each fiscal year of the Company during the term of this Agreement, the Executive shall receive in cash an amount equal to one-quarter (0.25) of a basis point of Origination Volume of loan production of the Western Division (the "<u>Volume Override Payment</u>"), which Volume Override Payment may be adjusted in respect of a given fiscal year in accordance with Section 6(c)(ii) hereof.

      (B)    The Volume Override Payment provided in Section 6(c)(i) hereof shall be subject to adjustment as follows:

      (1)    For the fiscal year ended December 31, 2004, the Volume Override Payment shall be increased by the Payment Multiplier; and

      (2)    For all fiscal years subsequent to the fiscal year ended December 31, 2004, but during the term of this Agreement, the Volume Override Payment may, in the sole discretion of the Chief Executive Officer, be increased by a multiplier (which, if any, may be equal to, greater than or less than the Payment Multiplier) to be determined in good faith by the Chief Executive Officer; *provided, however*, that in no event shall the Chief Executive Officer be obligated to increase the Volume Override Payment by any multiplier in respect of any such fiscal year.

(ii)    Profit Participation Payment.

(A)    Subject to the provisions of Section 6(c)(iii) below, for each fiscal year of the Company during the term of this Agreement, the Executive shall receive three and one-quarter percent (3.25%) of the difference between any Profits of the Western Division *less* the amount of the Invested Capital Charge (the "Profit Participation Payment").

(B)    The Profit Participation Payment provided in Section 6(c)(ii) hereof shall be subject to adjustment as follows:

(1)    For the fiscal year ended December 31, 2004, the Profit Participation Payment shall be increased by the Payment Multiplier; and

(2)    For all fiscal years subsequent to the fiscal year ended December 31, 2004, but during the term of this Agreement, the Profit Participation Payment may, in the sole discretion of the Chief Executive Officer, be increased by a multiplier (which, if any, may be equal to, greater than or less than the Payment Multiplier) to be determined in good faith by the Chief Executive Officer; *provided, however*, that in no event shall the Chief Executive Officer be obligated to increase the Profit Participation Payment by any multiplier in respect of any such fiscal year.

(iii)    Payment of Volume Override Payment and Profit Participation Payment.

(A)    Notwithstanding any other provisions contained in this Agreement or otherwise, the aggregate Volume Override Payment and Profit Participation Payment, if any, due the Executive in respect of any fiscal year during the term of this Agreement, shall be reduced by any amounts payable to the Executive under Section 6(b) above for such fiscal year.

(B)    The Company shall calculate and pay any Volume Override Payment and/or Profit Participation Payment due the Executive on an annual basis and any such payments shall be paid in a lump sum no later than March 31 of the fiscal year that immediately follows the fiscal year to which such payment relates.

(iv)    Determination of Volume Override Payment and Profit Participation Payment.  Within 60 days after the end of each fiscal year during the term of this Agreement, the Company shall determine the amount of any Volume Override Payment and Profit Participation Payment due to the Executive (a "Payment Determination") and furnish the Payment Determination to the Executive together with information respecting the basis for such Payment Determination.  After receipt of the Payment Determination, the Executive may request from the Company an audit of the Payment Determination (a "Payment Audit"), which Payment Audit shall be performed by the Company's independent public accountants at such time.  Any request by the Executive for a Payment Audit must be in writing and must be received by the Company within 30 days of the Executive's receipt of the Payment Determination.  The Company




shall bear the cost of any Payment Audit requested by the Executive under this Section 6(c)(iv); *provided, however*, that if the Volume Override Payment or Profit Participation Payment determined by the Company's independent public accountants after conducting the Payment Audit is not more than one percent (1%) greater than amount of the Volume Override Payment or Profit Participation Payment in the Payment Determination, the Executive shall bear the full cost of the Payment Audit.

(d)     <u>Payments under Section 2.4(e) of the Merger Agreement</u>.  The Company shall continue to pay the Executive any amounts due to the Executive under Section 2.4(e) of the Merger Agreement on the terms and conditions set forth in the Merger Agreement.

(e)     <u>Perquisites and Reimbursement of Expenses</u>.  During the term of this Agreement, the Executive shall be entitled to (i) perquisites, including, without limitation, an office and secretarial and clerical staff, and (ii) fringe benefits, including, without limitation, health insurance, in each case at least equal to, and on the same terms and conditions as, those attached to the Executive's office on the date hereof, as the same may be improved from time to time during the term of this Agreement, as well as to reimbursement, upon proper accounting, of all reasonable expenses and disbursements incurred by the Executive in the course of the Executive's duties.

(f)     <u>Dependents and Beneficiaries</u>.  The Executive and the Executive's dependents and beneficiaries shall be entitled to all benefits and service credit for benefits during the term of this Agreement to which senior officers of the Company and their dependents and beneficiaries are entitled as the result of the employment of such officers during the term of this Agreement under the terms of employee plans and practices of the Company and its subsidiaries and affiliates, including, without limitation, any pension plans, profit sharing plans, any non-qualified deferred compensation plans and related "rabbi" trusts, the Company's life insurance plans, its disability benefit plans, its vacation and holiday pay plans, its medical, dental and welfare plans, and other present or successor plans and practices of the Company and its subsidiaries and affiliates for which senior officers, their dependents and beneficiaries are eligible, and to all payments and other benefits under any such plan or practice subsequent to the term of this Agreement as a result of participation in such plan or practice during the term of this Agreement.

7.     <u>Termination of Employment</u>.

(a)     The term of this Agreement shall terminate upon the death of the Executive.

(b)     The Company may terminate the Executive's employment during the term of this Agreement for Cause as provided in Section 7(b)(i) hereof or in the event of Disability as provided in Section 7(b)(ii) hereof.

(i)     This Agreement shall be considered terminated for "<u>Cause</u>" only:

(A)     if the Executive willfully fails to substantially perform the duties assigned to him by the Chief Executive Officer, other than by reason of a Disability;



(B)    if the Executive is grossly negligent or engages in gross misconduct in the performance of the Executive's duties hereunder;

(C)    if the Executive knowingly engages in an act of dishonesty, an act of fraud or embezzlement, or any conduct resulting in a felony conviction; or

(D)    if the Executive violates the provisions of Section 9 hereof,

and, in the case of each of clauses (A), (B) (C) and (D) above, the applicable conditions set forth in Section 7(f) hereof are satisfied.

Anything in this Section 7(b) to the contrary notwithstanding, the Executive's employment shall in no event be considered terminated by the Company for Cause if termination takes place as the result of bad judgment or negligence on the part of the Executive other than gross negligence or willful or reckless misconduct.

(ii)    The term "Disability" as used in this Agreement means an accident or physical or mental illness which prevents the Executive from substantially performing the Executive's duties hereunder for six consecutive months.  The term of this Agreement shall end as of the close of business on the last day of such six-month period but without prejudice to any payments due to the Executive in respect of disability under this Agreement or any plan or practice of the Company.  The amount of any payments payable under Section 6(a)(i) or (b)(i) hereof during such six-month period shall be reduced by any payments to which the Executive may be entitled for the same period because of disability under any disability or pension plan or arrangement of the Company or any subsidiary or affiliate thereof.

(c)    The Executive may terminate the Executive's employment during the term of this Agreement for Good Reason.  For purposes of this Agreement, "Good Reason" shall mean (i) a reduction of the Executive's rate of compensation or any other failure by the Company to comply with Section 6 hereof; (ii) failure by the Company to comply with Section 5 hereof; (iii) failure by the Company to obtain the assumption of, and the agreement to perform, this Agreement by any successor as contemplated in Section 11(a) hereof; or (iv) such reduction described in the foregoing clause (i) or failure or breach described in the foregoing clauses (ii) or (iii), as the case may be, is not cured within 30 days after receipt by the Company of written notice from the Executive describing such event.

(d)    In accordance with Section 3(b) hereof, the Company or the Executive may terminate the Executive's employment under this Agreement by delivering a Notice of Termination to the other party stating that the term of this Agreement in effect when such notice is given is not to be extended or further extended, as the case may be, beyond the Fifth Anniversary or the year following the applicable anniversary of the Effective Date.

(e)    Notwithstanding anything to the contrary set forth herein, the Company shall have the right to terminate the Executive's employment for any reason other than Cause at any time, subject to the consequences of such termination as set forth in Section 8 hereof.

-6-

(f)    In no event shall the Company be entitled to terminate the Executive's employment during the term of this Agreement for Cause pursuant to Section 7(b) hereof, unless and until all of the following take place, *provided* that Sections 7(f)(i) through (iii) shall not apply to any termination for Cause pursuant to Section 7(b)(i)(C):

(i)    the Secretary of the Company gives written notice to the Executive (the "Warning Notice") setting forth (A) the specific provision(s) of this Agreement that the Executive is alleged to have failed to satisfy, (B) the acts or omissions alleged to constitute such failure, (C) the date on which the Executive shall be given a reasonable opportunity to appear before and be heard by the Board of Directors of the Company concerning the allegations, which date shall be not less than 30, nor more than 90, days after the Executive's receipt of the Warning Notice, and (D) the loss of rights under this Agreement that shall occur unless the Executive diligently and in good faith takes reasonable steps to remedy such failure within 30 days after the Executive's receipt of the Warning Notice;

(ii)    the Executive does not diligently and in good faith take all reasonable steps to remedy such failure within 30 days after the Executive's receipt of the Warning Notice; and

(iii)    the Executive is given a reasonable opportunity to appear before and be heard by the Board of Directors concerning the allegations, in accordance with the Warning Notice.

(g)    Any termination by the Company pursuant to Section 7(b) hereof, by the Executive pursuant to Section 7(c) hereof, or by the Company or the Executive pursuant to Section 7(d) hereof, shall be communicated by a Notice of Termination to the other party hereto. For purposes of this Agreement, "Notice of Termination" shall mean (i) with respect to termination pursuant to Sections 7(b) or 7(c) hereof, a written notice which indicates the specific termination provision(s) in this Agreement relied upon and sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision(s) so indicated, and (ii) with respect to termination pursuant to Section 7(d) hereof, written notice by one party to the other party that the term of this Agreement in effect when such notice is given is not to be extended or further extended, as the case may be, beyond the Fifth Anniversary or the year following the applicable anniversary of the Effective Date, which notice must be given twelve months in advance of the Fifth Anniversary or the applicable anniversary of the Effective Date.

(h)    "Date of Termination" shall mean (i) if the Executive's employment is terminated by the Executive's death, the date of the Executive's death, (ii) if the Executive's employment is terminated pursuant to Section 7(b)(ii) hereof, 30 days after Notice of Termination is given (provided that the Executive shall not have returned to the performance of the Executive's duties on a full-time basis during such 30-day period), and (iii) if the Executive's employment is terminated for any other reason, the date on which Notice of Termination is given.

NYLIB1 682969.9

8.    <u>Compensation on Termination</u>.  The parties recognize and agree that, if the Company terminates the Executive's employment during the term of this Agreement other than pursuant to Section 7(b) hereof, or if the Executive terminates the Executive's employment during the term of this Agreement for Good Reason pursuant to Section 7(c) hereof, the actual damages to the Executive would be difficult if not impossible to ascertain and agree that the Executive's sole remedy shall be a right to receive amounts determined and paid in accordance with the provisions of this Section 8.  The Executive shall not be required to mitigate the amount of any payment provided for in this Section 8 by seeking other employment or otherwise, nor shall any compensation earned by the Executive in other employment or otherwise reduce the amount of any payment provided for in this Section 8.

(a)    If the Company shall terminate the Executive's employment during the term of this Agreement other than pursuant to Section 7(b) hereof, or if the Executive shall terminate the Executive's employment during the term of this Agreement for Good Reason pursuant to Section 7(c) hereof, or if the Executive's employment shall terminate by reason of the Company electing not to extend or further extend the term of this Agreement pursuant to Section 3(b) hereof, then, as severance pay or liquidated damages or both:

(i)    the Company shall pay to the Executive the Executive's Base Salary at the rate in effect at the time Notice of Termination is given for a period of three (3) years from the Date of Termination, together with any other amounts payable to the Executive under Section 6 hereof for periods prior to the Date of Termination (the Base Salary payable to the Executive after termination of employment under this Section 8(a)(i) shall be paid in 24 equal bi-monthly installments per year, in accordance with the Company's normal payroll cycle; *provided, however,* in the event that the Company changes its normal payroll cycle, such payment installments will be adjusted accordingly);

(ii)    the Company shall make any payments if and when due to the Executive under Sections 6(b) and 6(d) hereof; and

(iii)    for a period of three (3) years from the Date of Termination, the Executive and his dependents and beneficiaries shall be entitled to receive health insurance from the Company on the same terms and conditions as the Executive's health insurance in effect at the time Notice of Termination is given.

(b)    If the Executive's employment terminates under any circumstance that does not entitle the Executive to payments under Section 8(a) hereof (including a termination by reason of the death or Disability of the Executive, or by reason of the Executive electing not to extend or further extend the term of this Agreement pursuant to Sections 3(b) and 7(d) hereof), the Executive (i) shall not be entitled to receive any compensation under Section 6 accruing after the date of such termination (other than any payments due under Sections 6(b) and 6(d) hereof), and (ii) shall be (x) subject to the Non-Competition Restrictions (as defined in Section 9 hereof) for a period of three (3) years from the Date of Termination and (y) subject to the Non-Solicitation Restrictions (as defined in Section 9 hereof) for a period of eight (8) years from the Date of Termination; *provided, however,* that if the termination is a result of the death or

-8-

Disability of the Executive, the Executive shall be entitled to payments under Sections 6(b) and 6(d) hereof as if the Executive were still in the employ of the Company.

9.    Non-Competition; Non-Solicitation.

(a)    The Executive agrees that for the period ending on the Fifth Anniversary or for such longer period of time if the Executive is employed by the Company in accordance with Section 3(b) hereof or as may be extended under this Section 9 (the "Non-Competition Period"), the Executive shall not, directly or indirectly (whether as a sole proprietor, partner or venturer, stockholder, director, officer, employee, consultant or in any other capacity as principal or agent or through any Person, subsidiary, affiliate or employee acting as nominee or agent):

(i)    conduct or engage in or be interested in or associated with any Person which conducts or engages in the AHM Business (as hereinafter defined) within the United States;

(ii)    take any action, directly or indirectly, to finance, guarantee or provide any other material assistance to any Person engaged in the AHM Business;

(iii)    solicit, contact or accept business of any client or counterparty whom the Company served or conducted business with or whose name became known to the Executive as a potential client or counterparty while in the employ of the Company or during the Non-Competition Period; or

(iv)    influence or attempt to influence any Person that is a contracting party with the Company at any time during the Non-Competition Period to terminate any written or oral agreement with the Company.

The restrictions set forth in paragraphs (i) through (iv) of this Section 9(a) shall be collectively referred to herein as the "Non-Competition Restrictions."  For purposes of this Agreement, the term "AHM Business" shall mean the residential mortgage lending or residential mortgage brokerage business as conducted by the Company and any business involving the supply of services substantially similar to services provided by the Company at the time of the termination of the Executive's employment.

(b)    The Executive agrees that for the period ending on the Fifth Anniversary or for such longer period of time if the Executive is employed by the Company in accordance with Section 3(b) hereof or as may be extended under this Section 9 (the "Non-Solicitation Period"), the Executive shall not, whether for the Executive's own account or in conjunction with or on behalf of any other Person, solicit or entice away from the Company any officer, employee or customer of the Company or any subsidiary or affiliate of the Company during the Non-Solicitation Period nor engage, hire, employ, or induce the employment of any such Person whether or not such officer, employee or customer would commit a breach of contract by reason of leaving service or transferring business.  The restrictions set forth in this Section 9(b) shall be collectively referred to herein as the "Non-Solicitation Restrictions."

(c)    The restrictive provisions hereof shall not prohibit the Executive from (i) having an equity interest in the securities of any entity engaged in the AHM Business or any

NYLIB1 682969.9



business with respect to which the Executive obtained confidential or proprietary data or information, which entity's securities are listed on the New York Stock Exchange, the American Stock Exchange or the Nasdaq National Market, to the extent that such interest does not exceed one percent (1%) of the outstanding equity interests of such entity or (ii) with the prior written consent of the Company, serving as a director or other advisor to any other Person.

(d)    The Executive agrees that the covenants and restrictions contained in this Section 9 are reasonable covenants and restrictions under the circumstances, and further agrees that if in the opinion of a court of competent jurisdiction, such restraint is not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants which as to such court shall appear not reasonable, including, but not limited to, the right, power and authority to reduce the periods during which the Executive is subject to the restrictions set forth in this Section 9, and to enforce the remainder thereof as so amended.

(e)    Notwithstanding anything herein to the contrary, if either the Executive or the Company shall terminate the Executive's employment during the term of this Agreement for any reason, including, but not limited to, the election by the Company or the Executive not to extend or further extend the term of this Agreement pursuant to Sections 3(b) and 7(d) hereof, the Executive shall be subject to the Non-Competition Restrictions set forth in this Section 9 for a period of three (3) years from the Date of Termination.

(f)    Notwithstanding anything herein to the contrary, if either the Executive or the Company shall terminate the Executive's employment during the term of this Agreement for any reason, including, but not limited to, the election by the Company or the Executive not to extend or further extend the term of this Agreement pursuant to Sections 3(b) and 7(d) hereof, the Executive shall be subject to the Non-Solicitation Restrictions set forth in this Section 9 for a period of eight (8) years from the Date of Termination.

(g)    The Non-Competition Agreement shall be terminated as of the Effective Date of this Agreement.

10.    <u>Indemnification</u>.    The Company shall indemnify the Executive to the fullest extent permitted by the General Corporation Law of the State of Delaware, as amended from time to time.

11.    <u>Successors; Binding Agreement</u>.

(a)    The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the extent that the Company would be required to perform it if no such succession had taken place; *provided, however*, that no such agreement with a successor shall release the Company without the Executive's express written consent. Failure of the Company to obtain such agreement prior to the effectiveness of any such succession shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive's



employment were terminated by the Company other than pursuant to Section 7(b) hereof, except that for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

(b)     If the Executive should die while any amounts are due and payable to the Executive hereunder, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of the Agreement to the Executive's devisees, legatee or other designee or, if there be no such designee, to the Executive's estate.

(c)     Except as to withholding of any tax under the laws of the United States or any state or locality, neither this Agreement nor any right or interest hereunder nor any amount payable at any time hereunder shall be subject in any manner to alienation, sale, transfer, assignment, pledge, attachment or other legal process, or encumbrance of any kind by the Executive or the beneficiaries of the Executive or by legal representatives without the Company's prior written consent, nor shall there be any right of set-off or counterclaim in respect of any debts or liabilities of the Executive, the Executive's beneficiaries or legal representatives against any right or interest hereunder or any amount payable at any time hereunder to the Executive, the Executive's beneficiaries or legal representatives; *provided, however*, that nothing in this Section 11 shall preclude the Executive from designating a beneficiary to receive any benefit payable on the Executive's death, or the legal representatives of the Executive from assigning any rights hereunder to the Person or Persons entitled thereto under the Executive's will or, in case of intestacy, to the Person or Persons entitled thereto under the laws of intestacy applicable to the Executive's estate.

12.     Parties.   This Agreement shall be binding upon and shall inure to the benefit of the Company and the Executive, the Executive's heirs, beneficiaries and legal representatives.

13.     Entire Agreement; Amendment.

(a)     This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties with respect to the subject matter hereof, including, but not limited to, the Original Employment Agreement and the Non-Competition Agreement.

(b)     Any amendment of this Agreement shall not be binding unless in writing and signed by both (i) an officer or director of the Company duly authorized to do so and (ii) the Executive.

14.     Enforceability.   In the event that any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

15.     Notices.   All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery, registered or certified mail, return receipt requested, overnight courier or facsimile, if to

-11-

the Executive, to him at [Address], Attention: John A. Johnston, Facsimile: [(___) _____], with a copy to King, Holmes, Paterno & Berliner, LLP, 1900 Avenue of the Stars, 25th Floor, Los Angeles, California 90067, Attention: Keith Holmes, Esq., Facsimile: (310) 282-8903, and, if to the Company, to it at its principal executive offices at 520 Broadhollow Road, Melville, New York 11747, Attention: General Counsel, Facsimile: (800) 209-7276, with a copy to Cadwalader, Wickersham & Taft LLP, 100 Maiden Lane, New York, New York 10038, Attention: Louis J. Bevilacqua, Esq., Facsimile: (212) 504-6666, and shall be deemed given when sent, *provided* that any Notice of Termination or other notice given pursuant to Section 7 shall be deemed given only when received. Either party may by like notice to the other party change the address at which the Executive or it is to receive notices hereunder.

16.    Governing Law. THIS AGREEMENT IS EXECUTED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

17.    Effective Date. This Agreement shall become effective as of January 1, 2004.

18.    Definitions. The following terms, when capitalized in this Agreement, shall have the meanings set forth or incorporated by reference in this Section 18.

(a)    "Alt-A Loans" shall mean alternate "A" mortgage loans.

(b)    "Applicable Reference Price" shall mean (i) with respect to loans (other than HELOC Loans) that will be sold to a third party and not held, in securitized or whole-loan form, by AHMIC or any affiliate or subsidiary thereof, the highest price quoted by any one of the Reference Banks (expressed as a percentage of par) for best efforts delivery and a delivery window not less than, but closest to, the lock-in period granted by the secondary marketing desk of AHMIC (or its affiliate or subsidiary, as the case may be) at the time the loan is locked; (ii) with respect to loans that will be held by AHMIC or any affiliate or subsidiary thereof (other than loans designated by the Company as Alt-A Loans and subprime loans), including loans held in securitized or whole-loan form, the price posted by AHMIC (or its affiliate or subsidiary, as the case may be) with respect to each such loan, plus the Principal Financial Branch Acquisition Adjustment; (iii) with respect to loans that have been designated by the Company as Alt-A Loans or subprime loans and will be held by AHMIC or any affiliate or subsidiary thereof, in securitized or whole-loan form, the price posted by AHMIC (or its affiliate or subsidiary, as the case may be) with respect to each such loan, plus 0.375% of the principal amount of such loan, plus the Principal Financial Branch Acquisition Adjustment; and (iv) with respect to all HELOC Loans, whether or not such loans are sold to a third party or held, in securitized or whole-loan form, by AHMIC or any affiliate or subsidiary thereof, 100.625% of the original funded balance at the time of the closing of such loan.

(c)    "AHMIC" means American Home Mortgage Investment Corp., a Maryland corporation and the parent company of the Company.

(d)    "Base Salary" shall have the meaning set forth in Section 6(a) hereof.

-12-




(e)    "Board of Directors" means the Board of Directors of the Company, as constituted from time to time.

(f)    "Borrower Price" with respect to a loan shall mean (i) with respect to all loans other than HELOC Loans, 100% of the principal amount of such loan, minus any points, whether denominated as origination fees or discounts, paid by the borrower in connection with such loan, and (ii) with respect to HELOC Loans, 100% of the original funded balance at the time of the closing of such loan, minus any points, whether denominated as origination fees or discounts, paid by the borrower in connection with such loan.

(g)    "Cause" shall have the meaning set forth in Section 7(b)(i) hereof.

(h)    "Company" means American Home Mortgage Holdings, Inc., a Delaware corporation, and any successors to its business and/or assets, which executes and delivers an agreement provided for in Section 11(a) or which otherwise becomes bound by all the terms and conditions of this Agreement by operation of law.

(i)    "Credit Loss" shall mean the Company's good faith estimate of the loss it incurs if the Company is forced to repurchase a loan or the Company is forced to indemnify a loan. The sum of the losses for such repurchased and indemnified loans at the end of the applicable time period will be equal to the credit losses for such period.

(j)    "Date of Termination" shall have the meaning set forth in Section 7(h) hereof.

(k)    "Disability" shall have the meaning set forth in Section 7(b)(ii) hereof.

(l)    "Excluded Acquisition" shall mean any Western Division Acquisition proposed by the Company which the Executive believes is not in his best interests, and with respect to which the Executive, as soon as practicable prior to the Company's completion of such acquisition, notifies the Company in writing that such acquisition should not be treated as a Western Division Acquisition for purposes of this Agreement. With respect to an Excluded Acquisition, (i) the Invested Capital Charge shall not be increased to take into account any capital outlays incurred by the Company in connection with such Excluded Acquisition, and (ii) the retail sales channel branches and retail channel sales personnel acquired in connection with such Excluded Acquisition shall not be included in the term "Western Division" for purposes of determining any compensation due the Executive under Section 6 hereof.

(m)    "Expenses" shall include all direct and allocated costs charged to the Western Division, including, but not limited to, (i) employment costs, such as wages, salaries, commissions, overrides, profit participation and profit-sharing type costs (including, but not limited to, the Profit Participation Payment payable to the Executive hereunder), payroll taxes, employee benefits and all other employment expenses; (ii) Credit Losses; (iii) costs to determine a borrower's eligibility for a loan, including appraisals, credit reports, automated underwriting fees, social security checks and other investigation fees; (iv) costs of marketing, including advertising, promotion and public relations; (v) other costs for loan origination and processing, including copying, messenger and overnight delivery and office consumables; (vi) costs of running branches and offices, including rent, insurance, utilities, office maintenance and upkeep

NYLIB1 682969.9

and depreciation; (vii) allocated costs for corporate overhead not to exceed $585 per loan, *provided, however*, that if a loan is a second lien that is closed concurrently with a first lien, such corporate overhead costs shall not exceed $195 per loan, or, if a loan is a second or third lien downpayment assistance loan provided by the State of California or a political subdivision thereof, or a government housing assistance program through the State of California or any municipality thereof, such corporate overhead costs shall be zero; and (viii) Invested Capital Charges; and all of such Expenses shall be calculated according to the Company's standard practices as may be amended from time to time.

(n)   "Good Reason" shall have the meaning set forth in Section 7(c) hereof.

(o)   "HELOC Loan" shall mean a home equity line of credit.

(p)   "Invested Capital Charge" initially shall equal the amount of $500,000, but shall be adjusted in the event that the Company engages in one or more Western Division Acquisitions during a given fiscal year, such that the Invested Capital Charge shall be increased to take into account any capital outlays incurred by the Company in connection with such Western Division Acquisition(s), with any such increase in the Invested Capital Charge to be determined in good faith by the Chief Executive Officer prior to the consummation of such Western Division Acquisition(s); *provided, however*, that the Invested Capital Charge shall not include any capital outlays incurred by the Company in connection with an Excluded Acquisition.

(q)   "Merger Agreement" shall have the meaning set forth in the recitals.

(r)   "Net Interest Income" shall mean (i) for the fiscal year ending December 31, 2004, 16 basis points per loan, and (ii) for all subsequent fiscal years, an amount determined in good faith by the Chief Executive Officer.

(s)   "Non-Competition Agreement" shall have the meaning set forth in the recitals.

(t)   "Non-Competition Period" shall have the meaning set forth in Section 9(a) hereof.

(u)   "Non-Competition Restrictions" shall have the meaning set forth in Section 9(a) hereof.

(v)   "Non-Solicitation Period" shall have the meaning set forth in Section 9(b) hereof.

(w)   "Non-Competition Restrictions" shall have the meaning set forth in Section 9(b) hereof.

(x)   "Notice of Termination" shall have the meaning set forth in Section 7(g) hereof.

-14-

(y) "<u>Original Employment Agreement</u>" shall have the meaning set forth in the recitals.

(z) "<u>Origination Volume</u>" shall mean the dollar volume of Western Division loan originations.

(aa) "<u>Payment Audit</u>" shall have the meaning set forth in Section 6(c)(iv) hereof.

(bb) "<u>Payment Determination</u>" shall have the meaning set forth in Section 6(c)(iv) hereof.

(cc) "<u>Payment Multiplier</u>" shall, for the fiscal year ended December 31, 2004, equal 1.75 (<u>i.e.</u>, multiplied by 175).

(dd) "<u>Per Loan Revenue</u>" for each loan shall be the sum of (i) the product of the difference between the Applicable Reference Price for the loan (expressed as a percentage of par) *less* the Borrower Price for such loan (expressed as a percentage of par) and (x) with respect to all loans other than HELOC Loans, the loan's principal amount, and (y) with respect to HELOC Loans, the original funded balance at the time of the closing of such loan, all at the time such loan is last locked; (ii) all fees (excluding points included in the price paid by the borrower that are included in (i) above) charged the borrower by the Company in connection with the borrower's loan application and loan closing (but excluding fees associated with the Company's ongoing ownership of the borrower's loan after the closing of the loan) including, but not limited to, servicing of the borrower's loan, or delivery of any services or financing or products for the borrower; (iii) fees earned from brokering loan applications to outside companies; (iv) the Secondary Allocation; and (v) Net Interest Income on loans held for sale.

(ee) "<u>Person</u>" means any individual, corporation, partnership, limited liability company, limited duration company, trust or other entity of any nature whatsoever.

(ff) "<u>Principal Financial Branch Acquisition Adjustment</u>" shall equal (i) with respect to the branches of the Western Division listed on <u>Schedule I</u> hereto, the amount set forth opposite each such branch on <u>Schedule I</u> hereto, and (ii) with respect to all other branches of the Western Division, zero.

(gg) "<u>Profit Participation Payment</u>" shall have the meaning set forth in Section 6(c)(ii) hereof.

(hh) "<u>Profits</u>" means, with respect to the Western Division, for any measurement period, the sum of the Per Loan Revenue for all loans that were funded by the Company during the measurement period, or were brokered by the Company and closed by another lender during the measurement period, and in all cases, were originated by the Western Division, minus Expenses.

(ii) "<u>Reference Banks</u>" shall mean Chase Manhattan Mortgage, Citicorp Mortgage, Countrywide Credit Corp., Washington Mutual and Wells Fargo Mortgage.

(jj)     "<u>Reference Price Verification</u>" shall have the meaning set forth in Section 19 hereof.

(kk)     "<u>Secondary Allocation</u>" shall mean (i) for the fiscal year ending December 31, 2004, 20 basis points per loan, and (ii) for all subsequent fiscal years, an amount determined in good faith by the Chief Executive Officer.

(ll)     "<u>Volume Override Payment</u>" shall have the meaning set forth in Section 6(c)(i) hereof.

(mm)   "<u>Western Division</u>" shall include all of the Company's retail channel branches and retail channel sales personnel designated by the Chief Executive Officer as part of the Western Division of the Company; *provided, however*, that the Western Division shall not include MortgageSelect or any other unit or division of the Company that reports to the Company's Alternative Division; and *provided, further*, that the Western Division may from time to time be expanded or reduced (by state or otherwise) by the Chief Executive Officer to reflect the operational needs of the Company; and *provided, further*, that for purposes of determining any compensation due the Executive under Section 6 hereof, the term "Western Division" shall not include the retail channel branches and retail channel sales personnel acquired in connection with any Excluded Acquisition.

(nn)     "<u>Western Division Acquisition</u>" means any acquisition, except for an Excluded Acquisition, by the Company of any company, business, mortgage origination pipeline, group of employees or other assets, whether by merger, acquisition, asset purchase or any other transaction, that is designated by the Chief Executive Officer as a Western Division Acquisition.

19.     <u>Reference Price Verification</u>.   Not more than twelve times in any year during the term of this Agreement, the Executive shall be entitled to request information from the Company in order to verify the Applicable Reference Price with respect to a given loan (a "<u>Reference Price Verification</u>").   The Executive shall send any request for a Reference Price Verification to the Company in writing.   Upon receipt of such request, the Company's capital markets group shall furnish information to the Executive in order to verify that the Applicable Reference Price with respect to such loan was established in accordance with the terms of this Agreement.

**[Signature Page to Follow]**

NYLIB1 682969.9



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

AMERICAN HOME MORTGAGE
HOLDINGS, INC.


By: _____
Name:  Michael Strauss
Title:  Chief Executive Officer and President


EXECUTIVE


_____
John A. Johnston

**EXHIBIT 8**

## REGIONAL MANAGER EMPLOYMENT AGREEMENT

THIS REGIONAL MANAGER EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of _____ ("Effective Date"), by and between AMERICAN HOME MORTGAGE CORP., (the "Company") and Stanley Bergum (the "Executive").

THE COMPANY AND EXECUTIVE AGREE AS FOLLOWS:

    1.    **Employment.**  The Executive agrees to enter into the employment of the Company as a Senior Vice President and Regional Manager as of the Effective Date, and the Company agrees to employ and compensate the Executive as a Senior Vice President and Regional Manager in accordance with the terms and conditions set forth in this Agreement. The Executive understands and agrees that during the term of his or her employment with the Company:  (a) The Executive may assist only the Company in the performance of activities contemplated by this Agreement; and (b) The Executive may not engage, participate or become interested, either directly or indirectly, in any business in competition with the Company, in any capacity.

    2.    **At Will.**  The Executive understands and agrees that the Executive's employment with the Company shall be at all times "at will" employment.  The Company reserves the right to terminate the Executive's employment with the Company at any time for any reason whatsoever, with or without cause. Likewise, the Executive may resign from the Company at any time for any reason. The term of this Agreement shall begin on the Effective Date and shall end on the date it is terminated by either the Company or the Executive.

    3.    **Duties and Responsibilities.**  The Executive's region shall be that portion of the Company's retail lending business defined by the Company as the Far West Region (hereinafter referred to as the "Region"). Without limiting the foregoing, the Executive is responsible for managing the financial performance of the Region, the personnel working in the Region, the selling and marketing of the Company's products within the Region, and profitable growth of the Company's franchise within the Region. It is mutually agreed that the Company may, at any time, change the make-up and size of the Region at its sole discretion, including adding or deleting territory to or from the Region.

    4.    **Duty of Loyalty.**  The Executive agrees that during the term of Executive's employment with the Company, the Executive shall devote his or her full business time, attention, best efforts, skill and ability exclusively to the business of the Company. The Executive agrees to do his or her utmost to further the interests of the Company, and agrees not to take any action intended to harm the Company.

    5.    **Compensation.**  The Company will pay the Executive a percentage of the principal amount of loans closed within the Region (hereinafter referred to as an "Override Bonus"), and a percentage of the profit earned by the Region, all subject to certain limitations as set forth below. All computations pursuant to this Agreement shall be made solely by the Company, in accordance with methodologies, policies and procedures which may be in effect from time to time, and which may be changed by the Company at any time in its sole discretion. The Executive acknowledges that his or her compensation will be reported to the Internal Revenue Service on Form W-2, and the Company will withhold taxes from the Executive's pay as required by law. The Executive acknowledges that he or she is not entitled to extra pay for absences from work, including holidays and sick days, or for overtime, but will be entirely compensated pursuant to the provisions of this section 5.

    (a) For each month during the term of this Agreement, the Company will pay the Executive an Override Bonus, pursuant to the terms of Addendum A of this Agreement. The terms of Addendum A used to calculate the Override Bonus may be changed by the Company in its sole discretion upon 30 days written notice to the Executive.

(b) Beginning with the Effective Date, the Company will pay the Executive a percentage of the annual profit of the Region, in accordance with Addendum A of this Agreement (the "NOI Bonus"). The terms of Addendum A used to calculate the NOI Bonus may be changed by the Company in its sole discretion upon 30 days written notice to the Executive.

The total maximum compensation paid to the Executive may be limited by Addendum A or, if applicable, Addendum B of this Agreement, which may be changed by the Company in its sole discretion upon 30 days written notice to the Executive.

Notwithstanding the terms of this section 5, the Executive shall not be entitled to any unpaid bonuses if he or she is no longer employed by the Company as of the payment date.

6. **Compliance with Company Polices.** The Executive agrees that he or she will fully comply with, and shall be subject to, all of the Company's policies and procedures, including amendments to such policies and procedures adopted by the Company in its sole discretion prior to, on, or subsequent to the Effective Date of this Agreement.

7. **Compliance with Directives.** The Executive agrees that he or she will fully comply with all lawful instructions, directives and orders given by an Executive Vice President of the Company, a Division President of the Company, or the President of the Company. The Executive further agrees that he or she will cooperate at all times with other Company personnel.

8. **Compliance with Laws & Regulations.** The Executive agrees that he or she will comply with all federal, state and local laws and regulations applicable to mortgage lending and brokering activities undertaken by the Company and the Executive.

9. **Prohibition against Inaccurate Applications and False Information.** The Executive agrees to not submit loan applications to the Company, or to facilitate in any way, the making of loan applications that are inaccurate or misleading. In addition, the Executive agrees not to create or assist in the creation or submission to the Company of any false information in connection with loan applicants or in connection with real property, including the ownership and value thereof. The Executive agrees to reimburse the Company for any damages it suffers as a result of the Executive's breach of this section 9. The obligations of the Executive and the rights of the Company with respect to the preceding sentence, shall survive the termination of this Agreement.

10. **Benefits.** The Executive is eligible to participate in the Company's benefits programs as may be amended by the Company in its sole discretion. Benefits available to the Executive will be based on the Executive's tenure at the Company, position at the Company, state and county of residence and other factors determined by the Company. The Executive acknowledges that certain of the Company's optional benefits programs may require the Executive to pay for some or all of the cost of those benefits. The Executive agrees to pay such costs in accordance with the Company's policies.

11. **Right of Setoff; Executive's Agreement to Pay Amounts Owed to the Company.** The Executive hereby grants the Company an unconditional right of setoff and authorizes the Company to deduct any amounts owed by the Executive to the Company from compensation and other amounts due the Executive from the Company. Notwithstanding the foregoing, the Company reserves the right to demand, for immediate payment, any amount due the Company from the Executive. Nothing in this section 11 shall constitute a waiver or limitation of the Company's rights to collect sums due and owing from the Executive through any and all legal means available to the Company. This section 11 shall survive the termination of this Agreement.

12.     **Confidential and Proprietary Information; Company Property.**  For the purpose of this section 12, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information, including names and contact information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, and cost and pricing policies.  All Confidential Information disclosed or provided to the Executive by the Company, or developed or created by the Executive during the term of his or her employment with the Company, or developed or created by the Executive during the term of his or her employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company.  The Executive agrees not to disclose the Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary in order for the Executive to perform his or her responsibilities as a Senior Vice President and Regional Manager of the Company.  The Executive also agrees that he or she will not use the Confidential Information for any purpose other than to fulfill his or her responsibilities as a Senior Vice President and Regional Manager of the Company.

The Executive acknowledges, understands, and agrees that the Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate.  Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if Executive breaches or threatens to breach any of the provisions of this Agreement relating to Executive's use or disclosure of any of the Confidential Information.

The Executive further acknowledges that the Company may provide the Executive with access to or use of equipment or other property owned or leased by the Company ("Company Property").  The Executive agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time at the sole discretion of the Company. The Executive further agrees to promptly return in good working condition all Company Property in his or her possession upon termination of the Executive's employment with the Company for any reason, and shall be liable in damages, including but not limited to replacement cost, for any financial loss resulting to the Company if Company Property is not returned in such manner.

The Executive agrees that this section 12 shall survive the termination of this Agreement, and that all of the obligations of the Executive set forth in this section 12 shall remain in full force and effect after this Agreement is terminated.  The Executive further agrees that, upon termination of this Agreement, he or she will return to his or her Division President, or if such Division President is not available, to the Company's General Counsel, all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, his or her possession or custody.

13.     **Non-Solicitation.**

The Executive agrees that during the term of Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is voluntary or involuntary, or with or without cause, the Executive shall not, directly or indirectly, influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company ; shall not, directly or indirectly, influence or advise any employee of the Company to leave the employment of the Company; and shall not employ, on behalf of any business venture other than the Company, any person who is an employee of the Company.

The Executive agrees that during the term of Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is

voluntary or involuntary, or with or without cause , the Executive shall not, directly or indirectly, attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers or business referral sources, including but not limited to realtors, builders and affinity organizations, joint venture partners, borrowers and loan applicants, whether such customers or business referral sources were obtained by the Executive on behalf of the Company, or were otherwise obtained by, or whose contact information is stored in the records of, the Company.

The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section. The Executive's obligations as set forth in this section 13 shall survive the termination of this Agreement.

14.    **Non-Compete.** The Executive agrees that, during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm, corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company in any county in which the Company is doing business at the time the Executive's employment with the Company terminates. The Executive expressly agrees that this section is fair and reasonable and that the Executive is being adequately compensated for agreeing to the terms of this section. The Executive's obligations as set forth in this section 14 shall survive the termination of this Agreement.

15.    **Non-Disparagement.** The Company and the Executive agree that neither will disparage that other, and that their representatives will not disparage either party to this Agreement. This section 15 shall survive the termination of this Agreement.

16.    **Power of Attorney.**    The Executive hereby irrevocably appoints the Company, or any of its authorized agents, as Executive's attorney-in-fact to act for the Executive and in the Executive's name (in any way the Executive could act in person) with respect to the following powers: (a) to open and review all any and all correspondence, envelopes or packages addressed to the Executive and delivered via the United States Mail or other means to the Company's offices, and to take for itself any currency, checks, drafts, money orders, or other forms of payment enclosed therein to which the Company is or may be entitled; or (b) to deposit any currency and endorse and negotiate any and all checks, drafts, money orders or other forms of payment made payable to the Executive which are the property of the Company.

17.    **Construction.**    The titles or headings of the paragraphs of this Agreement are intended for convenience of reference only and are not intended to change, limit or otherwise affect the meaning or construction of the terms of this Agreement. The term "person" shall include an individual, corporation, partnership, association, or other legal entity. The term "Employer" or "the Company" shall include any affiliate, parent, subsidiary or related company of the Company.

18.    **Governing Law.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York.

19.    **Entire Agreement.** This Agreement, together with the any schedules and Addenda attached hereto, as may be amended or modified from time to time in the Company's sole discretion, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements, discussions, negotiations, or understandings, whether oral or written, between the parties relating to the matters addressed herein.

20.    **Severability.**    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement, or any

portion of any provision of this Agreement, is found to be unlawful or invalid or otherwise unenforceable, all valid and enforceable provisions of this Agreement shall remain in full force and effect.

21. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto and their respective heirs, estates, legal representatives, executors, successors, and assigns.

22. **Attorney Fees.** The Executive agrees to pay the reasonable costs and attorney fees incurred by the Company resulting from the enforcement of the terms and provisions of this Agreement.

23. **Waiver.** No waiver, or alleged waiver, by the Company of any term, condition or provision of this Agreement shall be effective for any purpose whatsoever unless such waiver is in writing and signed by a Division President or the President of the Company. No express waiver by the Company of a breach of this Agreement by the Executive shall operate or be construed as a waiver of any subsequent breach of this Agreement by the Executive.

24. **Notices.** All notices required or permitted under this Agreement shall be sufficient if in writing and mailed through the United States Postal Service to the Executive at such residence address on file with the Company, and to the Company, at 538 Broadhollow Road, Melville, New York 11747, Attn: General Counsel.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the Effective Date.

**American Home Mortgage Corp.**

By:_____
       **Division President**
By: _____
       **General Counsel**

**The Executive:** _____

### REGIONAL MANAGER EMPLOYMENT AGREEMENT
### ADDENDUM B

The following sets forth Addendum B to the Regional Manager Employment Agreement  by and between AMERICAN HOME MORTGAGE CORP. (the "Company") and Stanley Bergum (the "Executive") dated as of _____ (the "Agreement")

**The Company And The Executive Agree As Follows:**

1. **Terms and Conditions.** Terms and conditions herein shall be defined by, and are subject to, the Agreement and Addendum A thereto, unless otherwise specifically set forth in this Addendum B.

2. **Addendum B Bonus.** If the Executive would have earned cash compensation of more than $800,000.00 if not for the $800,000.00 compensation limit set forth in section 6 of Addendum A, this Addendum B shall apply to any compensation which would have been earned by the Executive under the Agreement in excess of $800,000.00 if not for the compensation limit set forth in section 6 of Addendum A ("Excess Compensation").

3. **Excess Compensation.** Excess Compensation, as calculated pursuant to section 4, below, shall be paid to the Executive in the form of a restricted stock grant issued in accordance with the Company's 1999 Omnibus Stock Incentive Plan (the "Plan"). The Executive will be required to execute an agreement setting forth the terms of said grant, in a form to be provided by the Company in accordance with the Plan (the "Grant Agreement"). If earned, the number of shares granted will be determined by dividing the Excess Compensation by the closing price of the common stock of the Company's publicly traded parent, American Home Mortgage Investment Corp., on the grant date., and such shares, if granted, will vest 50% two years from the date of the grant, and 50% three years from the date of the grant.

4. **Computation of Excess Compensation Earned.** The Executive shall be paid a percentage of Excess Compensation in accordance with the following formula:

**_Percentage Refi_**

|  | Less Than or Equal to 20% Refi | Greater Than 20%, Less Than or Equal to 30% Refi | Greater Than 30%, Less Than or Equal to 40% Refi | Greater Than 40%, Less Than or Equal to 50% Refi | Greater Than 50% Refi |
|---|---|---|---|---|---|
| **Greater Than 100 Bps** | 90% | 80% | 70% | 60% | 50% |
| **Greater Than 90 Bps, Less Than or Equal to 100 Bps** | 85% | 75% | 65% | 55% | 45% |
| **Greater Than 80 Bps, Less Than or Equal to 90 Bps** | 80% | 70% | 60% | 50% | 40% |

*NOI*

Last revised 7/30/04                                                 Initials _____

| | | | | | |
|---|---|---|---|---|---|
| **Profit** | **Greater Than 70 Bps, Less Than or Equal to 80 Bps** | 75% | 65% | 55% | 45% | 35% |
| | **Greater Than 60 Bps, Less Than or Equal to 70 Bps** | 70% | 60% | 50% | 40% | 30% |
| **Of** | **Greater Than 50 Bps, Less Than or Equal to 60 Bps** | 65% | 55% | 45% | 35% | 25% |
| **Region** | **Greater Than 45 Bps, Less Than or Equal to 50 Bps** | 60% | 50% | 40% | 30% | 20% |
| | **Greater Than 40 Bps, Less Than or Equal to 45 Bps** | 55% | 45% | 35% | 25% | 15% |

For purposes of this Section 6, "NOI Profit of Region" is the profit of the Region during the Term as calculated by the Company;  a "Bp" is .01 percent (.01%); and "Refi" refers to refinanced loans closed during the Term by the Region, as determined solely by the Company.  Percentages set forth in the above chart represent percentages of the amount over $1 million otherwise earned by the Executive pursuant to Addendum A, which shall be payable to the Executive per Section 4, above. Thus, for example, if the Executive's Region has a NOI of greater than 80Bps and less than 90 Bps, and Refis are greater than 20% and less than 30%, the Executive shall receive 70% of Excess Compensation in the form of a restricted stock grant, as set forth in Section 5, above.

5. **Maximum Compensation.**  In no event shall the total compensation paid to the Executive pursuant to the Agreement, including Addendum A and Addendum B of the Agreement, exceed $2 million during the Term.

6. **Calculation of Addendum B Amounts Due.**   All amounts due under this Addendum B shall be calculated in the sole discretion of the Company in accordance with methodologies, policies and procedures which may be in effect from time to time, and which may be changed by the Company at any time in its sole discretion.

7. **Non-Payment of Bonuses.**  Notwithstanding the terms of this Addendum B, the Executive shall not be entitled to any unpaid bonuses or compensation pursuant to this Addendum B if he or she is not employed by the Company as of the payment date.

8.

**IN WITNESS WHEREOF,** the parties have executed this Addendum B as of _____.

American Home Mortgage Corp.

By:  _____
     Division President

By:  _____
     General Counsel

Executive : _____

Initials _____

Last revised 7/30/04                                        Initials _____