## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDING, INC., a Delaware corporation, | ) | Jointly Administered |
| et al., | ) | |
| | ) | |
| Debtors. | ) | |
| ——————————————————— | ) | |

## MOTION FOR ORDER APPOINTING AN OFFICIAL
## COMMITTEE OF BORROWERS PURSUANT TO
## SECTION 1102(a)(2) OF THE BANKRUPTCY CODE

Certain individuals (the "Movants")[1] who entered into mortgage contracts with one or more of the debtors in these cases (collectively, "American Home" or the "Debtors") respectfully submit this memorandum in support of their motion (the "Motion") for the appointment of an Official Committee of Borrowers (a "Borrowers Committee").

---

[1] The Movants are Tilton Jack, Grace Mullins, Christopher Bilek and Mary Bilek, Sam Acquisto, Delena Lamacchia, and Paula Rush.

**TABLE OF CONTENTS**

Page.

I.    PRELIMINARY STATEMENT ............................................................. 1

II.   BACKGROUND ........................................................................... 3

III.  ARGUMENT.................................................................................. 14

    A.    Borrowers Are Not Adequately Represented ........................................... 14

        1.    These Chapter 11 Cases Are Very Large And Complex............. 15

        2.    The Borrowers Have Contrary And Additional Interests
            As Compared To Other Creditors.............................................. 15

        3.    Large Financial Institutions Dominate The Committee ............. 17

    B.    The Court Should Exercise Its Discretion To Appoint A
      Borrowers Committee....................................................................... 18

        1.    The Cost Associated with Appointment Is
            Relatively Small .......................................................................... 18

        2.    The Time Of The Application Must Be Viewed
            Together With The Lack Of Notice To Borrowers ..................... 19

        3.    A Borrowers Committee Will Not Add Complexity................... 19

        4.    Borrowers Will Not Be Heard Absent A
            Borrowers Committee ................................................................. 20

    C.    The Debtors' Proposal Of An Unconfirmable Plan
      Demonstrates That Borrower Claimants Are Not
      Represented Adequately ..................................................................... 21

        1.    The Plan Would Give Effect To Bar Dates That
            Were Unknown To Most Borrowers ........................................... 21

        2.    The Plan Creates An Inherent Conflict For The
            Plan Trustee And Provides Improper Authority
            To The Plan Oversight Committee............................................ 22

a. The Trustee's lack of independence from the Plan Oversight Committee will likely create a conflict of interest in the course of the Trustee's duties ............................................. 23

b. The Plan improperly provides for advance exculpation of the Trustee and the POC Members ........................................................ 24

3. The Plan Improperly Classifies Claims ...................................... 25

4. The Plan Impermissibly Provides More Favorable Treatment to Early-Payment-Default Claims and Breach-of-Warranty Claims than to Other Unsecured Claims In Violation of Section 1123(a)(4) ................ 26

5. The Plan's Structure and Priority Scheme Arguably Preclude The Possibility of Equitable Subordination of Claims ................ 28

6. The Plan's Structure and Priority Scheme Preclude Substantive Consolidation Claims ............................................. 29

7. The Plan Improperly Hinders Borrower Claims ......................... 29

8. The Plan Does Not Protect the Borrowers' Claims and Defenses Under Their Mortgage Loans ................................ 30

D. The Debtors' Proposal of an Disclosure Statement Lacking Essential Information Demonstrates that Borrower Claimants Are Not Represented Adequately ......................................................... 32

IV. CONCLUSION ................................................................................. 36

## I.    PRELIMINARY STATEMENT

Thousands of individual homeowners across the United States have claims or potential claims against American Home.  These individuals allege that American Home routinely engaged in deceptive and fraudulent lending practices, systematically originated and serviced mortgages in violation of federal and state consumer protection laws, and intentionally collected millions of dollars in illegal fees and interest.  Many of theses individuals have lost their homes or are at risk of losing them.  These borrowers are unsophisticated and have little money to spare. They can barely make their monthly mortgage payments, let alone hire counsel to represent them in the American Home bankruptcy cases.  American Home's bankruptcy cases may have a profound impact on the lives of many individual borrowers, but individual borrowers have had almost no voice in these proceedings.

These bankruptcy cases have been dominated by warehouse lenders, mortgage securitizers, and other financial institutions that, on several issues, have direct conflicts with the borrowers.  As the Debtors' proposed Plan of Liquidation (the "Plan") and accompanying disclosure statement make plain, American Home and the dominant creditors in these cases regard the borrowers as sources of income for the Debtors' estates, not as an important creditor constituency with rights to be protected and damages claims to be paid.  With borrowers excluded from negotiations over the Plan, American Home has proposed terms that would improperly impair borrowers' rights in numerous respects, minimize or eliminate their claims without due process, and make it much more difficult for them to protect themselves and their families in the event of foreclosure proceedings.

Moreover, although some borrowers have filed proofs of claim in these cases, the vast majority of borrowers apparently have not.  The reason for that is simple:  the Debtors failed to

provide actual notice of the case or bar dates to borrowers. Although American Home has the names and addresses of most potential borrower claimants – after all, their claims arise from American Home's activities with respect to their personal residences – American Home relied primarily on limited newspaper advertising to notify borrowers of their rights and obligations in these cases.

In the thirteen months since these cases were filed, the official committee of unsecured creditors (the "Committee") has not acted to protect the interests of borrowers. This is not surprising, as most of American Home's creditors support (and many have participated in) the efforts of various entities to obtain payment under mortgage contracts that borrowers contend were illegally originated by American Home. To the extent that the borrowers have valid defenses to American Home's claims for payment, the success of the borrowers' defenses may reduce the assets of the bankruptcy estate available to pay other creditors. At the same time, many borrowers have fraud, consumer protection, and other claims against American Home and, in several instances, against other creditors as well. To the extent that those claims by borrowers succeed, the assets of the American Home bankruptcy estate available to pay other creditors again would be reduced, and, in some instances, other creditors of American Home may themselves be held liable or otherwise affected by the adverse finding against American Home.

There are numerous respects in which renegotiation of the Plan and/or revision of the disclosure statement may be necessary to ensure compliance with the Bankruptcy Code and other state and federal laws. But negotiating a new plan is an expensive and difficult task that no individual borrower or group of borrowers is equipped to undertake. The only way to ensure that the borrowers' rights and interests are protected is to appoint an official Borrowers Committee

that will have the resources to advocate on behalf of individual mortgagors who are incapable of representing themselves.

With a Plan that would unfairly affect their rights now on file, Movants recently engaged undersigned counsel for the limited purpose of seeking the appointment of a Borrowers Committee. Undersigned counsel have *not* agreed to represent the Movants in connection with their claims, objections to the disclosure statement, objections to the Plan, or other matters. Unfortunately, to the extent that any individual borrowers wish to litigate such issues, they probably will have to do so *pro se*. Experienced chapter 11 attorneys are not likely to address plan and disclosure statement issues on their behalf unless an official Borrowers Committee is appointed.

## II.   BACKGROUND

American Home's business model involved four main components.

First, American Home borrowed vast sums of money from major financial institutions. Often, this money was obtained pursuant to so-called warehouse loan agreements. In some instances, the money was obtained through the issuance of bonds. Generally speaking, the lenders and bondholders understood that the money loaned to American Home would be used primarily to fund mortgage originations. Many of the creditors in these cases participated in these corporate debt transactions.

Second, American Home used the money it borrowed in step one to originate mortgages. These mortgages were typically high-risk, high-interest loans. The Movants and the other borrower claimants are (or will be) creditors of American Home because American Home engaged in illegal practices in the course of originating these mortgages, thereby causing the borrowers to suffer damages and, in some cases, to lose their homes.

Third, American Home sold most of the mortgages it originated to major financial institutions, known as securitizers, which used the mortgages to create mortgage-backed securities. American Home generally provided a guaranty that the mortgagors would make their monthly payments, and American Home promised to buy back any delinquent mortgages. Many of the creditors in these cases are securitizers (or their successors) that claim they are entitled to sell delinquent mortgages back to American Home.

Fourth, American Home earned fees by servicing mortgages. In other words, for some mortgages, American Home was the entity that collected monthly payments from borrowers and, when the borrowers defaulted, sought to foreclose on them. Some borrowers have claims against American Home for performing this role in a manner that violated applicable federal and state law.

Frequently, the financial institutions involved in the third step were also involved in the first step. The mortgage securitizers would in effect "place an order" for specific types of mortgages in step one, American Home would solicit and obtain such mortgages in step two, and American Home would satisfy the securitizer's order in step three. Some borrower claimants in American Home's cases also have claims against financial institutions that funded American Home's activities and securitized American Home's mortgages.[2]

### American Home's Risky Mortgage Products

By its own account, American Home originated hundreds of thousands of loans. In 2006, it was the tenth largest mortgage lender in the United States. It built its market share by

---

[2] For a general discussion of borrower claims against securitizers, see Christopher L. Peterson, *Predatory Structured Finance*, 28 Cardozo L. Rev. 2185 (2007). A copy is attached hereto as *Exhibit A*.

originating risky loans to borrowers, including many who did not understand their terms and could not meet their obligations.

A now unknown number of borrowers have lost or will lose their homes, their money, and their good credit because of American Home's products and sales tactics. American Home compensated its loan officers based on sales volume and routinely paid brokers "yield spread premiums" that pegged their bonuses to the additional fees and higher interest rates they were able to charge. The company induced consumers to buy adjustable rate mortgages ("ARMs") with low "teaser" rates, but the rates typically rose much higher after a few days or months, at which point many borrowers were shocked to discover that they could no longer keep up with their monthly payments. In particular, American Homes steered customers to "payment option" ARMs, which are among the most complicated mortgage product ever marketed to consumers. Such products are also risky because they can result in negative amortization, with the result that the principal amount owed by borrowers will increase rather than decrease over time, even if the borrower is never late on a single payment. Steep prepayment penalties trapped borrowers in loans even after dramatic resets by making it too expensive for borrowers to refinance.

### Claims Against American Home

Many American Home borrowers have causes of action under federal, state, and common law. The legal basis of these claims includes:

- Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*

- Home Ownership and Equity Protection Act, 15 U.S.C. § 1639

- Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*

- Common law fraud

- State deceptive and unfair practices, predatory lending, or usury laws

These causes of action may apply to a variety of participants in the mortgage process. For example, it is not uncommon for a borrower to name three different entities – the mortgage originator, the mortgage servicer, and the current mortgage holder – as defendants in a lawsuit. Some plaintiffs name warehouse lenders and mortgage securitizers as well.

### *Movant Tilton Jack*

Tilton Jack is an 82 year old African-American homeowner who moved into his home in Brooklyn, New York in 1985, and raised eight children there.[3]  He now lives on a fixed income pension and social security of $2400 per month.[4]

According to the lawsuit he filed against American Home and others (including a number of creditors in these bankruptcy cases), Mr. Jack responded to a brochure advertising low cost mortgages.[5]  He was told by a broker working as an agent for American Home that he qualified for a loan with a 1% interest rate.[6]  At the time, Mr. Jack had a fixed interest rate mortgage at 7.4% with monthly payments of $1,800.[7]  The loan provided by American Home was an "MTA Power ARM," a type of payment option ARM.[8]  The mortgage's 1% teaser rate was in effect for one day before the interest rate jumped to 8.132%.[9]  Despite this fact, the minimum monthly payment quoted to Mr. Jack was calculated based on the 1% interest rate.[10]

Mr. Jack's monthly statements gave him the choice of four payment options.[11]  The payment amount described to him before he entered into the mortgage was only the minimum

---

[3] First Amended Complaint, *Jack v. American Brokers Conduit, Inc.*, No. 07-CV-3088 (E.D.N.Y. filed August 16, 2007), at 5, 7.  A copy of the complaint is attached as *Exhibit B*.
[4] *Id.* at 4.
[5] *Id.* at 8.
[6] *Id.*
[7] *Id.*
[8] *Id.* at 2.
[9] *Id.* at 11.
[10] *Id.*
[11] *Id.* at 13.

monthly payment option of $1385.30.[12]  A full interest-only payment was $2651.54, and the

fully amortizing payment was $2,872.03 -- both well above his income.[13]  The minimum

payment does not cover the interest accrued each month, and the shortfall is added to the

outstanding principal, making the loan negatively amortize.[14]  Eventually, Mr. Jack may owe

$34,000 more than he originally borrowed.  These terms were misrepresented by American

Home's agent, who repeatedly pressed Mr. Jack to sign the mortgage papers and discouraged

him from having a lawyer present.[15]

### Movant Grace Mullins

Now 77 years old, Ms. Mullins has lived in her home in Columbus, Ohio for nearly forty

years.[16]  She suffers from several serious illnesses and cares for her terminally ill daughter and

another daughter who is chronically ill.[17]  In 2000, she obtained a $41,400 mortgage on her home

to pay off medical and other bills.[18]  In 2005, on the eve of foreclosure, she applied for a loan

from American Home.[19]  According to pleadings she recently filed, the loan officer advised her

to transfer the financing to him.[20]  She would make payments to him for a year and then he

would return the mortgage to her.[21]

---

[12] *Id.* at 13-14.
[13] *Id.* at 14.
[14] *Id.*
[15] *Id.* at 9-10.
[16] Memorandum in Support of Defendant Grace Mullins' Motion to Vacate October 22, 2007 Default Judgment as Void, and Alternatively Motion for Relief from October 22, 2007 Judgment Pursuant to Ohio Civil Rule 60(B), *Freedom Mortgage Corporation v. Groom*, No. 07 CV 011165 (Ohio Ct. of Common Pleas, Franklin County filed April 24, 2008) at 3.  A copy of this motion is attached as *Exhibit C*.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 3-4.
[20] *Id.* at 4.
[21] *Id.*

Without realizing what she had done, Ms. Mullins signed over the title to her home for $35,600 and executed a land contract to purchase her home back in 12 months for $47,000.[22] She also made monthly payments of $400 to the loan officer at American Home.[23]  The American Home employee took out his own mortgage on the home, and the employee's lender initiated foreclosure proceedings against him.[24]  After receiving notice, Ms. Mullins sought the assistance of attorneys but could not afford their help.[25]  She filed a *pro se* answer to the complaint, which was mistakenly filed after the deadline.[26]  The lender received a default judgment.[27]  However, the bankruptcy of the American Home employee stayed the foreclosure, and legal aid lawyers, the Ohio Attorney General, and Columbus police now are involved.[28]

### Movants Christopher and Mary Bilek

The Bileks live in Illinois.  They filed suit against American Home Mortgage Servicing, Inc. in July 2007 for repeated errors in the servicing of their three mortgages.[29]  They claim that: (1) they were charged undeserved late fees and overcharged for insurance; and (2) American Home misreported their loans as delinquent to the credit bureaus, asserted that the Bileks failed to pay insurance despite the existence of an insurance escrow, failed to pay insurance premiums on their behalf, and attempted to force place insurance, even though insurance was in place.  On many occasions, American Home failed to respond to the Bileks' correspondence or to take corrective action, as required by law.

---

[22] *Id.*

[23] *Id.*

[24] *Id.* at 5-6.

[25] *Id.* at 7.

[26] *Id.*

[27] *Id.*

[28] *Id.* at 8-9.

[29] Complaint, *Bilek v. American Home Mortgage Servicing Inc.*, No. 07-CV-4147 (N.D. Ill. filed July 23, 2007).  A copy of the complaint is attached as *Exhibit D.*

### Movant Sam Acquisto

Sam Acquisto and his wife Debbie contacted PC Lending, Inc. ("PC Lending") in response to an internet advertisement offering low interest rate refinancing.[30] The Acquistos initially were provided with an estimate for a $459,000.00 "60 MTA Pay Option Arm" mortgage loan that they were led to believe would carry a 1.9% interest rate for 60 months before the interest rate would become variable.[31] At settlement, when the Acquistos pointed out that the closing documentation reflected higher finance charges, amounts financed, interest, and total payments than previously discussed, PC Lending responded that these were clerical errors and would be fixed.[32] Based on PC Lending's representations, Mr. and Mrs. Acquisto signed their loan documents.[33] The closing documents included an Adjustable Rate Rider stating that the yearly interest rate of 1.9% would apply for three days before increasing to 8.533%.[34] The timing and extent of this rate increase were not disclosed to the Acquistos prior to settlement.[35] The Acquistos later learned that PC Lending received an undisclosed yield spread premium from the lender.[36] American Home subsequently purchased and serviced the Acquistos' loan.[37] American Home has denied the Acquistos' requests for amendment or rescission.[38]

### Movant Delena LaMacchia

Delena LaMacchia, of Cherryville, North Carolina, took out a mortgage with a teaser interest rate of 2.25%. That rate applied for one day and then increased to 10.25%. Ms.

---

[30] Complaint, *Acquisto v. PC Lending, Inc. and American Home Mortgage Servicing Inc.*, (Fla. Cir. Ct. filed August 13, 2007). A copy of the complaint is attached as *Exhibit E*.
[31] *Id.* at 3.
[32] *Id.* at 4-5.
[33] *Id.* at 6.
[34] *Id.* at 7.
[35] *Id.*
[36] *Id.* at 6.
[37] *Id.* at 7-8.
[38] *Id.*

LaMacchia alleges that the nature of this increase was never disclosed to her. In addition, she alleges that her monthly income was inflated by the American Home agent on her loan documents by $3,000 per month and that a number of required documents were not provided or explained to her at settlement. She now is at serious risk of foreclosure.

### Movant Paula Rush[39]

Paula Rush, of Churchville, Maryland, alleges that she received a flyer in the mail promising that, based on her good credit and equity in her home, she had prequalified for an American Home mortgage with a 1% interest rate. In her subsequent conversations with an American Home's broker, Ms. Rush alleges she was promised that the mortgage would help her save money and pay down her debt, but she was never advised of the variable rate, the true payment rate, the existence of a prepayment penalty, or the possibility of negative amortization. In her complaint, Ms. Rush cites advertisements run by American Home at roughly the same time for the same MTA ARM product that she took out. The ad prominently described a fixed five year interest rate of 1.25% and fixed monthly payments, but only the fine print at the end indicated that interest would accrue during this period at 7.25%.

Ms. Rush took out a $585,000 pay option ARM, which she alleges was falsely described as a "conventional" mortgage. The 1% interest rate was in effect for 23 days, when it adjusted to 7.43%, almost two percentage points above her previous mortgage. The monthly payment disclosed in the Truth in Lending Disclosure Statement was based on this 1% interest rate. The monthly payment masked $2,300 a month in unpaid principal and interest, which were added to the balance of the loan. She alleges that in the first year of the mortgage, she lost $30,000 in

---

[39] A copy of Ms. Rush's proof of claim (claim number 8743) is attached as *Exhibit F.*

equity in her home. The broker earned a $19,794 yield spread premium for the mortgage. Ms. Rush also claims that American Home used and concealed an inflated appraisal on her home.

### The Official Committee of Unsecured Creditors

On August 14, 2007, the United States Trustee appointed an official committee of unsecured creditors in these cases, which was reconstituted on December 7, 2007. The Committee's six current members are Wilmington Trust Company, Law Debenture Trust Company of New York, Deutsche Bank National Trust Company, Nomura Credit & Capital, Inc., Impac Funding Corp., and United Parcel Service.[40]

Three of the Committee members – Deutsche Bank National Trust, Nomura Credit & Capital, and Impac Funding – appear to be securitizers of American Home mortgage loans. As discussed more fully below, some securitizers may be vulnerable to claims that they conspired with, aided and abetted, or otherwise supported illegal lending practices by American Home. Those three Committee members also appear to be entities with claims that would be processed under the claims protocol for breach-of-warranty and early-payment-default claims.

Two Committee members – Wilmington Trust Company and Law Debenture Trust Company of New York – appear to be indenture trustees for various securities. It is not clear who currently holds those securities but, upon information and belief, American Home disclosed to the initial purchasers of the securities that the revenue generated from them would be used primarily to fund American Home's loan origination business, with the goal of selling the originated loans to securitizers.

The remaining Committee member – United Parcel Service – appears to be an ordinary trade creditor. No borrowers serve on the Committee.

---

[40] *See* Disclosure Statement at 24.

### *Bar Dates*

In this case, the Debtors requested two bar dates. First, the Court set a general bar date of January 11, 2008 (the "General Bar Date"). In connection with the General Bar Date, the Debtors served notice to certain creditors by mail and published notice in *The New York Times*, *The Dallas Morning News* and *The St. Louis Post-Dispatch* on November 6, 2007. Second, the Court set a bar date of March 14, 2008 (the "Supplemental Bar Date"). In connection with the Supplemental Bar Date, the Debtors mailed notice to holders of construction loans and home equity loans and published notice in *The New York Times* on February 25, 2008. Apparently neither of the notices of bar dates were mailed to many thousands of borrowers holding mortgage loans originated and serviced by American Home. The Plan also would impose a post-confirmation bar date for administrative claims, which presumably would apply to borrowers' post-petition tort claims and similar claims.

### *The Plan*

American Home's proposed Plan would liquidate American Home rather than reorganize it. Technically, the Plan does not discharge any claims, but as a practical matter, the Plan would achieve a discharge-like result, as it would require creditors to accept payment under the Plan in full satisfaction of their claims and would enjoin additional efforts to obtain recoveries from the Debtors' estates. Claims submitted after applicable bar dates would not be paid. The Plan also includes a Stipulated Asset Allocation that is designed to eliminate inter-creditor claims and resolve potential substantive consolidation disputes. The Plan also contains a classification and priority-of-payment scheme that at least arguably forecloses equitable subordination claims.

The Plan would create a liquidating Trust to which all assets and liabilities of the estate would be transferred. The Trust would be overseen by a Trustee, who would be overseen by a

Plan Oversight Committee (the "POC"). The POC would have authority to overrule important Trustee decisions as well as authority to remove the Trustee without cause at any time. Together, the Trustee and POC would have authority over claim "determination," as well as many other activities that are currently subject to court oversight, including asset sales, asset abandonment, and the prosecution, defense, and settlement of litigation, including litigation over claims, equitable subordination, and inter-creditor contribution claims. The Trustee and POC also would hold "all rights of the beneficiaries in or arising from" assets of the Trust, apparently including such rights of the borrowers and other creditors.

The POC would consist of current members of the Official Committee of Unsecured Creditors. Thus, many, most or even all of the persons with ultimate decision-making authority under the Plan may be financial institutions that played roles in American Home's lending by making warehouse loans, securitizing mortgages, or servicing mortgages – activities that borrowers may cite as grounds for holding those same financial institutions liable for American Home's misconduct.

Under the Plan, even after its effective date, anyone wishing to sue the Trustee would still be subject to the automatic stay, and no litigation could be brought against the Trust in any jurisdiction other than the United States Bankruptcy Court for the District of Delaware. The Trustee and POC would receive an advance exculpation for most types of claims, including negligence or breach of duty claims that did not involve intentional wrongdoing or gross negligence.

Entities with early-payment-default claims or breach-of-warranty claims would have their claims processed through a claims protocol, which would be applied based on the claimants' answers to a still-undisclosed questionnaire. Those would be the only types of creditors with the

opportunity to liquidate their claims pursuant to a standardized matrix. No similar option would be available to borrower claimants, even though they would be in the same unsecured classes.

## III.    ARGUMENT

The Bankruptcy Code specifically authorizes the appointment of an additional committee of creditors "if necessary to assure adequate representation of creditors."[41] In determining whether to appoint an additional committee, the Court engages in a two-step analysis: First, the Court must determine whether appointment of an additional committee is necessary to assure that the Movants are adequately represented. Second, if adequate representation is lacking, the Court must determine whether to exercise discretion by appointing an additional committee.[42] The Movants have the burden of showing that appointment of a committee is necessary to assure adequate representation, and any opponents to this Motion have the burden of showing that the Court should not exercise its discretion to appoint an additional committee.[43] In these cases, the Movants and other borrowers have not been adequately represented. Their rights will be protected only if the Court exercises its discretion by appointing a Borrowers Committee.[44]

### A.    Borrowers Are Not Adequately Represented.

Although the Bankruptcy Code does not define "adequate representation," the question is case-specific and addresses whether the interests of the creditor constituency have a meaningful voice on the creditors' committee.[45] The Court must consider all relevant factors, including (1) whether the case is large and complex, (2) how the interests of the creditor constituency

---

[41] 11 U.S.C. § 1102(a)(2) (2008).

[42] *In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997); *In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985).

[43] *In re Dow Corning Corp.*, 194 B.R.at 141.

[44] *See Beker Indus.*, 55 B.R. at 949 (case requiring active participation by creditor constituency supports appointment of additional committee).

[45] *Dow Corning*, 194 B.R. at 141.

balance against the interests of other groups on the committee and (3) what is the composition of the creditors' committee and is it so dominated by one group of creditors that a separate group has virtually no say in the decision-making process.[46]  Each of these factors favors the appointment of a Borrowers Committee.

### 1.    These Chapter 11 Cases Are Very Large And Complex.

As a matter of public record, these chapter 11 cases are very large and complex. American Home's assets and liabilities are measured in the billions.  The cases also are complex in view of American Home's businesses, its debt structure and transactions, and the number of parties in interest.  Indeed, the Disclosure Statement spends 25 pages discussing all of the events that have occurred to date in these chapter 11 cases.[47]  The existence of over 5300 docket entries from the first year of these cases further illustrates their complexity.[48]

### 2.    The Borrowers Have Contrary And Additional Interests As Compared To Other Creditors.

The borrowers have fundamentally different interests from the other creditors in these cases.  Other creditors – such as warehouse lenders, securitizers, and third party servicers – have sought in these cases to maximize the value of the loans on which borrowers are liable and to maximize the amount generated by selling the rights to service those loans.  Borrowers, on the other hand, have interests other than merely maximizing American Home's assets.  Most notably, borrowers do not want to lose their homes or to have their claims against third parties or their rights with respect to their loans adversely affected by these chapter 11 cases.

---

[46] *Id.* at 141-42.

[47] *See* Disclosure Statement at 21-46.

[48] *See In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996) (examining number of docket entries to determine complexity of case and finding case not complex that had only about 220 docket entries in the first three months); *In re Wang Labs., Inc.*, 149 B.R. 1, 3 (Bankr. D. Mass. 1992) (same).

Unlike the other claims in these cases, the borrowers' claims all allege injury suffered by consumers as a result of American Home's improper conduct in the origination and servicing of mortgage loans. This predicate to the borrowers' claims may put them at odds with other creditors in important respects. Borrowers may want to establish that their mortgage terms were illegal. Other creditors may want to establish that they were legal. Borrowers may want to establish that warehouse lenders, securitizers, and third party servicers are jointly liable with American Home.[49] Other creditors want to establish just the opposite. Borrowers may want to pay lower interest and fees than provided under the original mortgage contracts. Other creditors may want the borrowers to pay the highest interest and fees possible. Borrowers may wish to establish their right to rescind certain mortgage contracts. Other creditors may want the mortgage contracts enforced. Borrowers may want the claims of warehouse lenders, securitizers, and third party servicers to be equitably subordinated. Such creditors obviously would contest such treatment.

This case is similar to *In re Mansfield Ferrous Castings, Inc.*,[50] which appointed an additional committee of employee creditors. In that case, the court reasoned that the employees were not adequately represented by the creditors' committee because the employees wore different hats as equity security holders in addition to having claims.[51] Likewise, in this case, borrowers have interests that go beyond maximizing the distribution to unsecured creditors.

In sum, the borrowers' interests diverge from those of other creditors. As a result, other creditors cannot adequately represent the interests of borrowers.

---

[49] *See.* Peterson, *supra* note 3, at 2213-226.
[50] 96 B.R. 779 (Bankr. N.D. Ohio 1988).
[51] *Id.* at 781; *see also Beker Indus.*, 55 B.R. at 949 (noting that debentures are partially or wholly secured).

### 3.    Large Financial Institutions Dominate The Committee.

The borrowers have no representation on the Committee, which is comprised entirely of large financial institutions, indenture trustees that owe duties to large financial institutions, and a single trade creditor.  At least three members of the Committee have engaged in transactions with American Home that involve mortgage loans it originated, including Impac Funding Corporation (purchased mortgage loans originated by the Debtors and servicing rights); Nomura Credit & Capital, Inc. (purchased mortgage loans originated by the Debtors through a Loan Purchase Agreement); and Deutsche Bank National Trust Co. (trustee for certain mortgage loan securitization transactions sponsored by the Debtors).  These and the other financial institutions that sit on the Committee will not support the interests of borrowers to the extent that borrowers have interests separate and aside from the maximization of the estates' value.  In other words, the financial institutions dominate the Committee, and borrowers have no say in its decisions.[52]

The Office of the United States Trustee has previously appointed an official borrowers committee in another case involving similar borrower claims and interests, *In re First Alliance Mortgage Co.*[53]  There, as here, the borrowers accused the debtor of misleading them through sales tactics that obscured the mortgages' high interest rates and fees:

> [L]oan officers would employ a standardized sales presentation to persuade borrowers to take out loans with high interest rates and hidden origination fees or "points" and other "junk" fees, of which borrowers were largely unaware.  The key to the fraud was that loan officers would point to the "amount financed" and represent it as the "loan amount," disregarding other charges that increased the total amount borne by the borrowers. . . .  First Alliance's loan officers were taught to present the state and federal disclosure documents in a misleading manner, and the presentation was so well performed that at least some borrowers had no idea that they were being charged points and fees and costs averaging 11 percent above the amount they thought they had agreed to.[54]

---

[52] *See Dow Corning*, 194 B.R. at 142.
[53] 471 F.3d 977 (9th Cir. 2006).
[54] *Id.* at 985.

Unfortunately, because of the importance of filing this Motion prior to the hearing on the

Disclosure Statement, the Movants did not have an opportunity to consult first with the Office of

the United States Trustee concerning their request to appoint a Borrowers Committee.

Nevertheless, in view of the *First Alliance* precedent and the divergent interests between

borrowers and the existing members of the Committee, the Movants are hopeful that the Office

of the United States Trustee will conclude that borrowers in this case are not adequately

represented.

### B.    The Court Should Exercise Its Discretion To Appoint A Borrowers Committee.

The Court should exercise its discretion to appoint a Borrowers Committee.  The

discretionary factors that the Court should consider include (1) the cost associated with the

appointment, (2) the time of the application, (3) the potential for added complexity, and (4) the

presence of other avenues for creditor participation.[55]  The discretionary factors are only

considerations and should not prevent appointment of an additional committee if such

appointment is otherwise justified by the facts.[56]

### 1.    The Cost Associated With Appointment Is Relatively Small.

The extra cost associated with a Borrowers Committee will be small relative to the size of

these cases.  Although a Borrowers Committee would have the right to retain professionals, the

overall cost of professionals should be minimal because these cases have already been pending

for over one year and American Home has liquidated most of its assets.  The main considerations

remaining are addressing the rights and claims of borrowers in connection with a liquidation

---

[55] *Dow Corning*, 194 B.R. at 143.
[56] *Id.*

plan.  Accordingly, the responsibilities of a Borrowers Committee should have little overlap with those of the Committee.

### 2.    The Time Of The Application Must Be Viewed Together With The Lack Of Notice To Borrowers.

It is true that this Motion comes over one year after the Petition Date and within one week of the hearing to approve the Disclosure Statement.  But the Court must keep in mind that American Home failed to give notice of its cases or bar dates to the vast majority of its borrowers.  The Court should not penalize the Movants and borrowers generally because American Home declined to provide borrowers with notice of these proceedings.[57]  Furthermore, the Court should consider how this Motion would have played out had it been filed a year ago, with borrowers receiving notice of case commencement.  At that point, the concerns of the borrowers would have been more speculative.  At this point, given the structure and terms of the Plan, there is an immediate and concrete need for borrower representation.

### 3.    A Borrowers Committee Will Not Add Complexity.

The appointment of a Borrowers Committee will not add complexity to these cases that is not already present.  Instead, a Borrowers Committee offers the Court a single voice represented by experienced bankruptcy counsel to represent the interests of thousands of borrowers.  Rather than add complexity, counsel for the Borrowers Committee should be able to make these proceedings more efficient for the Court.  Although a Borrowers Committee may require time to negotiate a liquidating plan that is acceptable to its constituency, the tradeoff is that this Court and other courts should be able to avoid many complaints that borrowers eventually would make – either *pro se* or represented by consumer advocates without chapter 11 bankruptcy law

---

[57] *Cf. Kavlar Microfilm*, 195 B.R. at 601 (noting that shareholder did not contact debtor about valuation concerns for eight months after it had notice of proposed restructuring).

experience – if borrowers were forced to address the Plan's failings in the post-confirmation, in the context of emergency foreclosure proceedings or other consumer litigation.[58]

### 4. Borrowers Will Not Be Heard Absent A Borrowers Committee.

The borrowers are a diverse creditor group spread across the country. Borrower claims are not concentrated in any one or few parties. As a result, they are analogous to creditor or shareholder constituencies where the debt or securities are widely held.[59]

More importantly, borrowers with claims against American Home are typically threatened with foreclosure and do not have surplus income. Many have had their personal finances destroyed by American Home mortgages. Many are faced with foreclosure proceedings that could result in their families losing their homes. Few if any borrowers have the financial means even to appear themselves in this Court, and still fewer have the means to hire counsel to protect their interests. To the extent they are represented by counsel at all, most borrowers are represented by overworked legal services lawyers who handle large caseloads in local courts and lack the time, expertise, and resources needed to litigate effectively in this Court. Without a Borrowers Committee, borrowers lack the resources individually to make their voice heard.[60]

Finally, there is no other avenue for borrower participation. The addition of one or two borrowers to the Committee will not result in adequate representation for borrowers because they will not be able to persuade the other members of the Committee to vote in favor of borrower

---

[58] *Cf. In re Mayer-Myers*, No. 05-12466, 2007 Bankr. LEXIS 908 (Bankr. D. Vt. 2007) (court disallowed borrowers recoupment claim where Vermont borrower did not present objections to sale terms in the course of loan originators' bankruptcy case in Chicago and the transactions impairing the borrower's rights had already been approved by the bankruptcy court presiding over the loan originator's bankruptcy case).

[59] *See, e.g., Kavlar Microfilm*, 195 B.R. at 601 (noting that shares are publicly traded and widely held); *Mansfield Ferrous Castings*, 96 B.R. at 781; *Beker Indus.*, 55 B.R. at 949 (noting that there are at least 400 holders of small amounts of public debt who need an official committee acting on their behalf).

[60] *See Mansfield Ferrous Castings*, 96 B.R. at 781 (finding that the 141 employees lacked the resources to protect their interests individually in the bankruptcy proceedings).

interests that are contrary to the interests of the other members. The Committee would still be dominated by financial institutions whose interests are often contrary to the interests of borrowers. Accordingly, adequate representation of borrowers will not be possible unless a separate Borrowers Committee is created.

**C.    The Debtors' Proposal Of An Unconfirmable Plan Demonstrates That Borrower Claimants Are Not Represented Adequately.**

To observe the lack of representation afforded to borrowers by the existing bankruptcy constituencies to date, one need look no further than the proposed Plan, which, if confirmed, would substantially impairs the rights and claims of borrowers.

**1.    The Plan Would Give Effect To Bar Dates That Were Unknown To Most Borrowers.**

As currently formulated, the Plan would cut off claims pursuant to bar dates of which most borrowers were not provided with constitutionally sufficient notice. "The Supreme Court has held that 'an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"[61] In bankruptcy proceedings, courts distinguish between "known" creditors who are entitled to receive direct notice, and "unknown" creditors for whom publication notice is sufficient.[62] On one hand, unknown creditors have interests that are either conjectural, future, or unlikely to come to the debtor's attention during the course of its business.[63] On the other hand, the names and addresses of known creditors are readily ascertainable by the debtor.[64]

---

[61] *In re Feldman*, 261 B.R. 568, 578 (Bankr. E.D.N.Y. 2001) (quoting *Mullane v. Central Hanover Bank*, 339 U.S. 306, 314 (1950)).
[62] *In re Arch Wireless, Inc.*, 534 F.3d 76, 80 (1st Cir. 2008).
[63] *Id.* (citing *Mullane*, 339 U.S. 306, 317 (1950));
[64] *Fogel v. Zell*, 221 F.3d 955, 963 (7th Cir. 2000).

> The issue is not whether the creditor is known to the trustee but whether
> the creditor's name and address can be readily ascertained by the trustee,
> making it feasible to send the creditor the notice directly and not force him
> to read the fine print of the *Wall Street Journal*.[65]

A known creditor who has not been provided with appropriate notice of a bankruptcy proceeding cannot have his or her claim affected by a settlement occurring therein.[66]

Given the widespread allegations against the Debtors concerning their loan origination and servicing practices, and the high rate of foreclosures resulting from resetting mortgage interest rates, the Debtors should have known that many borrowers would have claims against the Debtors. Most importantly, the Debtors had the borrowers' names and addresses readily available and nevertheless declined to provide actual notice. The Debtors should have treated the borrowers as known creditors and provided them actual notice of the bar dates.

Even if the Court were to view borrowers as unknown creditors, the publication notice made by the Debtors was patently deficient. The Debtors operated in all 50 states, and they originated and serviced hundreds of thousands of loans. Placing advertisements in three newspapers published in New York, St. Louis and Dallas is not an appropriate way to reach all borrowers in all parts of the country with claims relating to American Home mortgages.

Under the circumstances, this Court should refrain from further action on the Plan until a committee can be appointed to represent borrowers' interests.

### 2. The Plan Creates An Inherent Conflict For The Plan Trustee And Provides Improper Authority To The Plan Oversight Committee.

Under the Plan, the Trust would be established for the final liquidation and distribution of the Debtors' assets. Its responsibilities would include the "determination" of creditor claims and the pursuit of various causes of action. Although liquidating trusts are commonplace, under this

---

[65] *Id.*

[66] *Jones v. Chemetron Corp.*, 212 F.3d 199, 209-10 (3d Cir. 2000).

Plan the Trustee's fiduciary duties to act for the benefit of all creditors would be impermissibly compromised by the Trustee's subservence to the POC, which would be comprised of certain of the Debtors' largest creditors, that is, institutions whose interests are often opposed to the interests of borrowers.

>      a.      **The Trustee's lack of independence from the Plan Oversight Committee would likely create a conflict of interest in the course of the Trustee's duties.**

Under the Plan, the Trustee would not be able to act in the best interests of all creditors, let alone the borrowers. The Trustee would answer to the bank-dominated POC, which is not likely to favor the allowance of borrowers' claims, or litigation against warehouse lenders or securitizers for equitable subordination of their claims or other relief. Even if a particular member of the POC abstained from opining on a possible action against that particular member by the Trustee, other POC members would not be likely to favor such action, lest they be subject to a similar action themselves.

Under section 1123(a)(7), the Plan must be consistent with public policy with respect to the selection of any trustee or director under the plan.[67] Given the circumstances of this case, the Trustee's selection by and lack of independence from the POC would violate public policy and create an irreconcilable conflict of interest for the Trustee. When chapter 11 debtors are functioning under bankruptcy court supervision, debtors-in-possession and trustees have a duty of impartiality and are precluded from favoring particular creditor constituencies. Indeed, bankruptcy courts replace debtors-in-possession with disinterested parties when the debtors are unable to act with impartiality.[68] By establishing a liquidating trust and empowering the POC to

---

[67] 11 U.S.C. § 1123(a)(7).

[68] *See, e.g., In re Suncruz Casinos, LLC*, 298 B.R. 821, 832 (Bankr. S.D. Fla. 2003) (removal for conflict of interest where debtor could not balance the fiduciary duties owed to its creditor/owner and duties it owed to the remaining

dominate the Trustee, the Plan effectively would remove a court-supervised entity with enforceable fiduciary duties and replace it with an individual with largely unenforceable fiduciary duties who is beholden to large financial institutions.[69]

The *First Alliance* case demonstrates the importance of having an independent assessment of potential claims against creditors.  In addition to looking out for the interests of borrowers throughout the *First Alliance* bankruptcy case, the *First Alliance* borrowers committee filed suit against one of the debtor's mortgage securitizers, accusing it of aiding and abetting First Alliance's fraud.  The securitizer's liability was predicated on its knowledge of First Alliance's fraudulent practices, which involved loan structures and sales incentives much like American Home's, and on the fact that First Alliance would not have been able to continue its illegal conduct without a line of credit from the securitizer.  A jury agreed, and the Ninth Circuit affirmed.[70]

Thus, the POC's influence might deter the Trustee from investigating members of the POC and other financial institutions.  Preferential treatment of this nature frustrates the goals of the bankruptcy process and should not be permitted.

> **b.**    **The Plan improperly provides for advance exculpation of the Trustee and the POC Members.**

The Debtors' proposed plan provides for the exculpation of the Plan Trustee, Plan Oversight Committee, and their members, designees, professionals, agents and/or representatives (collectively, the "Protected Parties") for actions or omissions taken pursuant to their responsibilities under the proposed plan, except for acts or omissions that rise to the level of

---

creditors); *see also In re Tel-Net Hawaii, Inc.*, 105 B.R. 594 (Bankr. D. Haw. 1989) (replacing debtor-in-possession who refused to take preference action against controlling shareholder of debtor).

[69] *Cf. Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (directors who through personal or other relationships are beholden to the controlling person lack independence from that person).

[70] *See First Alliance*, 471 F.3d at 977.

"willful misconduct, gross negligence or fraud."[71] The indemnification provided to the Protected Parties under the Plan would encompass violations of the Protected Parties' fiduciary duties to the borrowers and other unsecured creditors, including breaches of the duty of loyalty and some breaches of the duty of good faith. Thus, the Plan's exculpation provision generally would preclude borrowers from pursuing claims against the Protected Parties based on any improper handling or treatment of their claims, even if such improper claims-handling was the result of a conflict of interest. Several bankruptcy courts have denied confirmation to plans that provide exculpation to plan fiduciaries for breaches of the duties of loyalty and good faith and for negligence.[72]

### 3.    The Plan Improperly Classifies Claims.

The Plan's placement of all general unsecured claims (other than certain Bank of America unsecured claims) into a single class violates Section 1122(a), which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class."[73] Borrower claims are not substantially similar to other general unsecured claims because mortgagor claims may encompass contractual or legal rights that exceed or at least differ from the rights of other

---

[71] Plan at 57.

[72] *See, e.g., In re WCI Cable, Inc.*, 282 B.R. 457, 479 (Bankr. D. Or. 2002) (court required plan exculpation clause applicable to a post-bankruptcy trust to except negligence and breaches of fiduciary duty); *In re Gillette Holdings, Inc.*, 137 B.R. 452, 458 (Bankr. D. Colo. 1991) (finding that indemnity of fiduciaries for negligence or misfeasance was "entirely improper and unacceptable"); *In re Allegheny Int'l., Inc.*, 100 B.R. 244, 246 (Bankr. W.D. Pa. 1989) (court required plan exculpation provisions applicable to professionals retained by the debtor and creditors' committee to exclude negligence, noting "holding a fiduciary harmless for its own negligence is shockingly inconsistent with the strict standard of conduct for fiduciaries"). *But see In re PWS Holding Corp.*, 228 F.3d 244 (3d Cir. 2000) (court approved a plan provision limiting liability of the debtors, the reorganized debtors, the creditors' committee and their respective officers, directors, employees, and agents, among others, to liability arising with respect to the subject chapter 11 cases as a result of willful misconduct or gross negligence); *In re Halpern*, 248 B.R. 43 (Bankr. S.D.N.Y. 2000) (court approved an investment advisor contract that provided for indemnification of the investment advisor for its own acts of negligence).

[73] 11 U.S.C. § 1122(a).

unsecured creditors.[74]  A borrower could, for instance, seek rescission or modification of the

mortgage loan.  Accordingly, borrowers' claims are not substantially similar to other general

unsecured claims and must be classified separately.

4.    **The Plan Impermissibly Provides More Favorable Treatment To Early-Payment-Default Claims And Breach-of-Warranty Claims Than To Other Unsecured Claims, In Violation Of Section 1123(a)(4).**

The Plan would impermissibly favor certain unsecured claims of financial institutions

over unsecured claims of other creditors by creating a claims resolution protocol that would

expedite the estimation and allowance of "early-payment-default claims" and "breach-of-

warranty claims."  By giving certain financial institutions the benefit of an efficient and reliable

claims protocol, the Plan discriminates unfairly against the borrowers and other unsecured

creditors, who hold claims that also could be processed more efficiently and reliably pursuant to

a claims protocol.  This discrimination violates section 1123(a)(4) of the Bankruptcy Code,

which requires that a plan of reorganization "provide the same treatment for each claim or

interest of a particular class...."[75]

Early-payment-default claims and breach-of-warranty claims are claims held by large

financial institutions that purchased loans from the Debtors pursuant to agreements allowing the

purchasers to "put the loans back to the Debtors if the Debtors breached certain seller

---

[74] *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 2007) (Bankr. S.D.NY. 1992)) ("the relevant inquiry is whether all claims of a class have substantially similar rights to the debtor's assets").
[75] 11 U.S.C. § 1123(a)(4); *see also In re Finova Group*, Inc., 304 B.R. 630, 637 (D. Del. 2004) (district court affirmed this Court's refusal to approve a plan that would result in the payment of fees to some creditors holding contract claims, but not others, finding that all of the claims at issue "were essentially the same" and that to treat them differently would "elevate form over substance and violate the equal treatment mandate of section 1123(a)(4)").  But a plan satisfies section 1123(a)(4) when it provides all claims in the same class with the same process for determining and paying their claims.  *See, e.g., In re Dow Corning*, 280 F.3d 648, 662-663 (6th Cir. 2002) (court found that claimants in the same class received equal treatment under the plan because all class members retained their rights to pursue full payment of their claims through a litigation facility); *In re Medic. Ctr., Inc.*, 122 B.R. 568 (Bankr. E.D. Mo. 1990) (holding that plan complied with section 1123(a)(4) because it subjected all members of a class to the same lottery process for claim satisfaction).

representations and warranties" in the sale agreements, or if the borrower under a transferred loan defaulted within a specified period of time after the loan sale.[76] These claims are subject to a protocol outlined in Article 7 of the Plan that requires holders of such claims to submit a questionnaire containing information that will enable the Debtors to calculate the allowed amount of such claims.[77]

The Debtors have explained the purpose of this claims protocol. It is designed to avoid: (1) expending "resources that would be grossly disproportionate to the amounts in controversy, which would deplete Assets of the Estates that would otherwise be available to make distributions to Creditors;" and (2) "delay[ed] distributions to loan owners on account of such claims."[78] As the Debtors explained, these concerns are exacerbated by the contingent and unliquidated nature of early-payment-default claims and breach-of-warranty claims, which may arise years from now, only after a borrower defaults on a loan.[79]

Claims protocols can indeed serve the purposes described by the Debtors, but the same concerns that necessitate a claims protocol for the early-payment-default claims and breach-of-warranty claims also would justify a claims protocol for borrowers' claims. The number of claims likely to be asserted by borrowers against the Debtors based on the Debtors' lending practices is significant, but each individual borrower's claim will be for a relatively small amount. Resolving borrowers' claims on a claim-by-basis would require disproportionately large expenditures by the Debtors and by borrowers (who, unlike financial institutions, cannot afford to spend very much to liquidate their claims). Furthermore, like the early-payment-default

---

[76] Disclosure Statement at 68.
[77] *Id.*
[78] *Id.*
[79] *Id.*

claims and breach-of-warranty claims, many borrowers' claims are contingent, unliquidated, and could arise at any point during the term of a loan.

Thus, borrowers' claims bear the same relevant characteristics as the early-payment-default claims and breach-of-warranty claims that share the same classification, but borrowers' claims would not receive the benefit of a streamlined protocol. Instead, the borrowers would be left to hope that their claims were "determined" fairly by a POC-dominated Trustee, using whatever methods the Trustee and POC thought appropriate. For these reasons, the Plan does not satisfy section 1123(a)(4)'s requirement that all claims in a particular class receive the same treatment.

5.    **The Plan's Structure and Priority Scheme Arguably Preclude The Possibility Of Equitable Subordination Of Claims.**

The proposed plan arguably eliminates the ability of either the Trustee or the borrowers to pursue claims for equitable subordination against other unsecured creditors based on the malfeasance of such creditors. Equitable subordination is appropriate when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants.[80] While it is premature for Movants to state that any particular creditor's claim should be equitably subordinated, it is appropriate to note that this may be a case in which equitable subordination is appropriate as to some creditors. For example, to the extent that some creditors knew about, yet participated in the Debtors' schemes, they may be liable for aiding and abetting the Debtors' illegal acts and their claims may be appropriate for subordination.[81] Other bases for equitable subordination also may apply to certain creditors. Yet there is no indication

---

[80] *In re SubMicron Sys. Corp.*, 432 F.3d 454 (3d Cir. 2006).
[81] At least one court has found that allegations of aiding and abetting fraud satisfied the pleading requirement for equitable subordination. *In re Granite Partners,* 210 B.R. 508 (Bankr. S.D.N.Y. 1997).

in the disclosure statement or otherwise that equitable subordination claims have been given serious consideration by anyone with the authority or resources to prosecute such claims.

As structured now, the Plan arguably would preclude any post-confirmation claims for equitable subordination, either by the Trustee or the borrowers. There are two different mechanisms by which the Plan may do this. First, the Plan does not explicitly provide for any potential modifications to its payment priority scheme. Second, the Plan would confer the authority to control equitable subordination claims on the Trustee, who in turn would answer to the POC, which, for reasons stated, may be very reluctant to authorize such claims.

6.    **The Plan's Structure And Priority Scheme Preclude Substantive Consolidation Claims.**

The Plan also would preclude the possibility of substantively consolidating the various Debtors' estates. Instead, the Plan would effect a settlement of intercompany claims and impose a "Stipulated Asset Allocation." It appears that the major financial institution creditors have stipulated to the Stipulated Asset Allocation. Maybe so, but none of the Movants was ever asked about it. To the extent that a financial institution has claims against multiple Debtors, or those claims are subject to cross-guarantees, the stipulation may streamline the claims payment process and, perhaps, increase that institution's recovery. But to the extent that a borrower has a claim against one debtor and can seek recovery against the others only though veil-piercing or substantive consolidation theories, the Stipulated Asset Allocation may have an entirely different effect, and may place new obstacles in the way of borrowers seeking payment on their claims.

7.    **The Plan Improperly Hinders Borrower Claims.**

To the extent that borrowers are permitted to pursue litigation against the Trust at all, the Plan would put numerous roadblocks in their way, thereby making borrowers' efforts to

vindicate their rights much more difficult. The Plan would require borrowers to file any

litigation against the Trust in the United States Bankruptcy Court for the District of Delaware.

As applied to individual borrowers, that requirement borders on unconscionable. A borrower

who cannot afford to make monthly mortgage payments, and is rushing into a local court to seek

an emergency restraining order enjoining an imminent foreclosure by a financial institution and

the local sheriff, is hardly in a position to file a second lawsuit in a bankruptcy court that may be

hundreds or thousands of miles away. Requiring a Delaware lawsuit would impose

extraordinary burdens on mortgagors while creating the distinct possibility of inconsistent

rulings by this Court and the local courts with respect to a panoply of consumer protection

issues. The Plan also would perpetuate the automatic stay; reinforcing the requirement that

borrowers come to Delaware to enforce their rights.

With the consent of the POC, the Trustee also would be authorized by the Plan to throw

away documents. The problem with this scenario is that destroyed documents potentially may

constitute critical evidence for borrowers in their ongoing and future cases. That evidence may

be relevant against not only the Trust but also third parties, including, potentially, other creditors

in these cases that may share responsibility for the Debtors' misconduct.

> **8.    The Plan Does Not Protect the Borrowers' Claims and Defenses Under Their Mortgage Loans.**

Although the borrowers' claims have been preserved in sales of mortgage loans by the

Debtors to date, the Plan would not explicitly ensure that the borrowers' claims and defenses

under their mortgage loans will remain protected in connection with loan transfers occurring

after confirmation.

Section 363(o) of the Bankruptcy Code provides that

> If a person purchases any interest in a consumer-credit transaction that is
> subject to the Truth in Lending Act or any interest in a consumer credit
> contract…and if such interest is purchased through a sale under this
> section, then such person shall remain subject to all claims and defenses
> that are related to such consumer credit transaction or consumer credit
> contract, to the same extent as such person would be subject to such
> claims and defenses of the consumer had such interest been purchased at a
> sale not under this section.

The Truth in Lending Act applies to mortgages originated by the Debtors because, among other reasons, the mortgages were payable in more than four installments and the mortgages provided for the payment of finance charges.[82] Previously in these cases, when approving the sales of mortgage loans originated by the Debtors, the Court has incorporated language in its sale-approval orders that tracks section 363(o) and makes clear that a purchaser shall remain subject to the claims and defenses that borrowers may have under their mortgages.[83]

The Plan would provide no such explicit protection. Under the Plan, "Plan Trust Assets," which include the Debtors' "Mortgage Loans and Servicing Rights," shall vest in the Trust following confirmation.[84] The Trustee is to liquidate the Plan Trust Assets through a sale or otherwise.[85] Pursuant to 11 U.S.C. § 1141(c), after confirmation of a plan, "the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." The Plan also would allow the Trustee to abandon certain servicing rights without ensuring that mortgagors will be adequately protected when new entities begin servicing the mortgages themselves.

---

[82] *See* 15 U.S.C. § 1601 *et seq.* and its implementing regulations, Federal Reserve Board Regulation Z, 12 C.F.R. § 226.
[83] See Order Pursuant to Sections 105 and 363 of the Bankruptcy Code: (I) Approving Sale Procedures; (II) Approving Expense Reimbursements; (III) Scheduling a Hearing To Consider Sale of Certain Mortgage Loans; (IV) Approving Form and Manner of Notice Thereof; and (V) Granting Related Relief, Docket No. 5310 (August 5, 2008).
[84] Plan at 45.
[85] *Id.* at 48.

If the Debtors were not in bankruptcy, subsequent holders of mortgage loans could be found liable as assignees under TILA and/or HOEPA. Thus, the transfers to or by the Trustee arguably may extinguish borrowers' claims under mortgages that are dealt with by the Plan. If a plan provides for the continued existence of a lien or if some provision is made for the protection of a party with an interest in certain property, then the terms of the plan govern and supersede the application of section 1141(c).[86] As presently formulated, unfortunately, the Plan does not include any such provision with respect to borrowers' claims.

**D.    The Debtors' Proposal Of A Disclosure Statement Lacking Essential Information Demonstrates That Borrower Claimants Are Not Represented Adequately.**

The disclosure statement does not contain adequate information. The goal of a disclosure statement is to ensure that all voters have the opportunity to make an informed decision about whether to accept or reject a proposed plan. *See* 11 U.S.C. § 1125(a). Accordingly, the Court may approve a disclosure statement only if it provides voting parties with "adequate information" upon which to base their respective votes:

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of claims or interest of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1). Although there is no talismanic list of items that must be included in a disclosure statement, numerous courts have considered the following factors relevant to any evaluation of the adequacy of a disclosure statement[87]:

---

[86] *See JCB, Inc. v. Union Planters Bank, NA*, No. 07-2968 2008, U.S. App. LEXIS 18235 (8th Cir. 2008).
[87] *See In re Metrocraft Publishing Servs.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); *see also In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (listing factors); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988) (listing factors); *In re Dakota Rail, Inc.*, 104 B.R. 138 (Bankr. D. Minn. 1989); *In re Jeppson*, 66 B.R. 269 (Bankr. D. Utah 1986); *In re S.E.T. Income Properties, III*, 83 B.R. 791, 792

(1)     The events which led to the filing of bankruptcy;
(2)     A description of the available assets and their value;
(3)     The anticipated future of the company;
(4)     The source of information stated in the disclosure statement;
(5)     A disclaimer;
(6)     The present condition of the debtor while in Chapter 11;
(7)     The scheduled claims;
(8)     The estimated return to creditors under a Chapter 7 liquidation;
(9)     The accounting method utilized to produce financial information and the name of the accountants responsible for such information;
(10)    The future management of the debtor;
(11)    The Chapter 11 plan or a summary thereof;
(12)    The estimated administrative expenses, including attorneys' and accountants' fees;
(13)    The collectability of accounts receivable;
(14)    Financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
(15)    Information relevant to the risks posed to creditors under the plan;
(16)    The actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;
(17)    Litigation likely to arise in a non-bankruptcy context;
(18)    The tax attributes of the debtor; and
(19)    The relationship of the debtor with affiliates.

To the extent these items are known or readily ascertainable, a plan proponent should include them in any disclosure statement submitted to creditors.[88]  Such information is necessary because creditors rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan.[89]  At a minimum, the Disclosure Statement is missing the following basic information:

- The Trust-related documents are omitted from the Plan and Disclosure Statement;

- There is no information about the valuation of borrower claims or the process for handling them;

- No liquidation analysis is attached to the Disclosure Statement;

---

(Bankr. N.D. Okl. 1988) (listing factors); *In re Malek*, 35 B.R. 443, 443-44 (Bankr. E.D. Mich. 1984) (listing factors).

[88] *See In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) ("Information to be provided should be comprised of all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan.").

[89] *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

- There is no information about the Debtors' apparent decision not to pursue equitable subordination claims;

- The Disclosure Statement does not disclose the amounts or bases for intercompany claims;

- The Disclosure Statement does not disclose whether or how borrower consumer protection claims could result in contribution claims between the Debtors and whether such claims could affect, or be affected by, the Stipulated Asset Allocation;

- The Disclosure statement does not disclose or describe intercompany guarantees and co-obligations;

- The Disclosure statement does not describe the Debtors' observance or non-observance of corporate formalities, such as the presence or absence of consolidated financial statements, and whether the entities have common directors and officers;

- The disclosure statement does not disclose how the Debtors' and other parties determined that the Stipulated Asset Allocation was appropriate;

- There is no information about how borrowers' or other creditors' recoveries would change if the Debtors' were substantively consolidated;

- There is no information identifying current holders of mortgages originated by American Home, nor is there any information about how such holders can be identified;

- No financial information is given regarding the value of the Debtors' assets, including mortgage loans;

- There is no description of the Debtors' available assets and their value;

- There is no disclosure of the amount of scheduled or filed claims by class;

- The identity and the qualifications of the Trustee and POC remain a mystery;

- There is no estimate of administrative expenses or professional fees;

- There are no projections regarding recoveries from avoidance actions;

- There is no discussion of other potential litigation to be commenced by the Plan Trustee, including possible claims against warehouse lenders; and

- There is no discussion of litigation likely to arise in a non-bankruptcy context, such as mortgagor claims based on consumer protection laws.

34

Aside from the omission of such basic information, the Disclosure Statement also fails to contain any information about the standards that the Trustee will apply to mortgagor claims and mortgage loans.  Nor does the Disclosure Statement disclose whether and how the Trustee will renegotiate illegal mortgages or modify existing mortgage loans.  Finally, the Disclosure Statement does not inform borrowers about the servicing of their loans if the Trustee determines to abandon its servicing contracts.  Indeed, borrower claims and rights are barely mentioned at all.

Furthermore, although the Disclosure Statement contains a copy of the Plan's injunction and exculpation provisions, there is no explanation of them in the Disclosure Statement.  There is no discussion as to why the Trustee and the members of the POC should be entitled to the injunction and exculpation provisions.  There is no discussion about how the Plan provisions might affect and cut off rights of borrowers in connection with their mortgage loans.  Nor is there any discussion of how the various restrictions on litigation against the Trust, such as the extension of the automatic stay and the requirement that litigation be brought in Delaware, could affect borrowers.

## IV.    CONCLUSION

The events occurring over the past year in these cases, including the Debtors' proposal of their Plan, leave little doubt that if an official Borrowers Committee is not appointed to protect the victims of American Home's illegal lending practices, no one will stand up for them. This Court should direct the United States Trustee to appoint an official Borrowers Committee.

Dated: Wilmington, Delaware
        September 9, 2008

ZUCKERMAN SPAEDER LLP

Thomas G. Macauley (ID No. 3411)
919 Market Street, Suite 990
Wilmington, DE 19801
Telephone:  (302) 427-0400
Facsimile:  (302) 427-8242
            - and -
Linda Singer
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone:  (202) 778-1800
Facsimile:  (202) 822-8106

            - and -

GILBERT RANDOLPH LLP
Stephen A. Weisbrod
W. Hunter Winstead
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Telephone:  (202) 772-1962
Facsimile:  (202) 772-3962

Attorneys for the Movants

36