IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| AMERICAN HOME MORTGAGE | § | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation, | § | |
| et al., | § | (Jointly Administered) |
| | § | |
| | § | Objection Deadline: September 10, 2008 at 4:00 |
| | § | p.m. (extended for JPMC) |
| | § | Hearing Date: September 15, 2008 at 10:00 a.m. |
| Debtors. | § | |
| | | Docket Ref. Nos. 5450, 5451 & 5554 |

**OBJECTION OF JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
TO (I) PROPOSED DISCLOSURE STATEMENT FOR DEBTORS' CHAPTER 11 PLAN
OF LIQUIDATION AND (II) DEBTORS' MOTION FOR ORDER ESTABLISHING
PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES**

JPMorgan Chase Bank, National Association ("JPMC"), by and through its undersigned counsel and pursuant to 11 U.S.C. § 1125 and Fed. R. Bank. P. 3017(a), submits its objection (the "Objection") to (i) the adequacy of the proposed *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Chapter 11 Plan of Liquidation of the Debtors Dated as of August 15, 2008* [Docket No. 5451] (the "Disclosure Statement") and (ii) *Debtors' Motion for Order (I) Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, Including (A) Approving Form and Manner of Solicitation Packages, (B) Approving the Form and Manner of Notice of the Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing Deadline for Receipt of Ballots, and (F) Approving Procedures for Vote Tabulations; (III) Establishing Deadline and Procedures for Filing Objections to Confirmation of the Plan; and (IV) Granting Related Relief* [Dkt. No. 5554] (the "Solicitation Procedures Motion") and in support of its Objection respectfully represents as follows:

519.000-21962

**BACKGROUND**

1. On August 6, 2007 (the "Petition Date"), American Home Mortgage Investment Corp. ("AHMIC") and certain of its affiliates and subsidiaries (collectively, the "Debtors" and, individually, a "Debtor") commenced voluntary cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Bankruptcy Cases"). Through the Bankruptcy Cases, the Debtors have liquidated much of their property, and remain in possession of what remains as they continue their liquidation. No Chapter 11 trustee has been appointed in the Bankruptcy Cases as of the date of this Motion. On August 14, 2007, an official committee of unsecured creditors was appointed to represent the interests of the general unsecured creditors in these Bankruptcy Cases.

2. According to the Debtors, prior to the Petition Date, the Debtors were one of the largest residential real-estate lenders by volume in the United States. The Debtors' principal business consisted of originating residential mortgage loans and providing mortgage-servicing operations. The Debtors no longer originate mortgage loans and have sold their servicing business; to the extent that they continue to perform any servicing it is purely incidental to the wind down of their operations and liquidation of their assets.

3. JPMC is one of the Debtors' warehouse lenders. As explained in further detail below, JPMC acts as both administrative agent and lender under a warehouse facility with the Debtors and also participates as a lender in another syndicated facility in which Bank of America, N.A. acts as agent (the "BoA Facility"). As of the Petition Date, the Debtors owed JPMC over $225 million (not including accrued interest, fees and other expenses) with respect to these two facilities. In addition, JPMC is a participant in a conduit repurchase facility in which Calyon New York Branch acts as the agent (the "Calyon Facility"), and the Debtors are in breach

of other pre-petition obligations to JPMC and its affiliates, including, for example, the obligation to repurchase certain mortgage loans under the terms of various loan-purchase agreements.

**The 1/06 $200 Million Warehouse Facility**

4.  AHMIC and AHM Corp.[1] entered into a $150 million senior, secured revolving warehouse facility dated January 24, 2006 (the "Warehouse Facility") with JPMC (as Administrative Agent and sole Lender), pursuant to that certain 1/06 SENIOR SECURED CREDIT AGREEMENT (as subsequently amended, supplemented and extended) (the "1/06 Credit Agreement"). In connection with the 1/06 Credit Agreement, AHMIC and AHM executed that certain $150,000,000 1/06 JPMORGAN CHASE BANK SENIOR CREDIT NOTE dated January 24, 2006 in favor of JPMC (the "1/06 Senior Note")[2].

5.  Pursuant to Article VII of the 1/06 Credit Agreement, AHMIC and AHM granted to JPMC a first-priority lien and security interest in, among other things, the pledged residential loans upon which the financing under the Warehouse Facility was to be extended, the underlying chattel paper and other loan documentation evidencing those loans, and all proceeds, accessions or other rights of any kind related to these loans (collectively, the "Warehouse Facility Collateral"). The Warehouse Facility Collateral includes, but is not limited to, Single-family Collateral, Manufactured Home Loan Collateral, Construction/Permanent Loan Collateral and Underperforming Collateral, and, under the terms of the Warehouse Facility Documents, may

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Plan and Disclosure Statement.

[2] AHMIC, AHM and JPMC amended the 1/06 Credit Agreement four (4) separate times (collectively, the "1/06 Credit Amendments") including, without limitation, the 5/07 AMENDMENT TO SENIOR SECURED CREDIT AGREEMENT, dated May 14, 2007 (the "5/07 Amendment"). Among other things, the 5/07 Amendment extended the 1/06 Credit Agreement's maturity date to May 12, 2008 and increased the Maximum Aggregate Commitment to $200,000,000. In conjunction with the 5/07 Amendment, AHMIC and AHM executed the "$200,000,000 5/07 JPMORGAN CHASE BANK SENIOR CREDIT NOTE" (the "5/07 Senior Note"), which is the currently effective note in favor of JPMC under the Warehouse Facility. (The 1/06 Credit Agreement, as amended by the 1/06 Credit Amendments, together with any accompanying financing statements, and all other related documents are sometimes collectively referred to herein as the "Warehouse Facility Documents".)

also include Residential Lot Loan Collateral and Subprime Loan Collateral. JPMC has, as Administrative Agent for the Warehouse Facility, perfected the liens and security interests granted to it in and against the Warehouse Facility Collateral.

6. As of August 1, 2008, there are at least 247 Warehouse Loans with an unpaid principal balance ("UPB") of $93,872,141.57 constituting Warehouse Facility Collateral.[3] The outstanding principal balance and accrued non-default interest was $97,070,139.25.[4]

**The C/P Stipulation**

7. Over a year ago, AHMIC, AHM and JPMC entered into the Stipulation by and between Debtors and JPMorgan Chase Bank, National Association, dated August 9, 2007 (the "C/P Stipulation"), which C/P Stipulation the Court approved on August 9, 2007 (Docket No. 105). On January 4, 2008, the Court entered the Order Granting Motion for Relief from Automatic Stay of JPMorgan Chase Bank, National Association to Foreclose on and Preserve Collateral Consisting of Outstanding Construction/Permanent Loans on Single Family Residences (the "C/P Stay Relief Order) (Docket No. 2585). As of the date hereof, JPMC has made advances for loan principal and other costs in the amount of $4,875,604.93, excluding other out of pocket costs and expenses with respect to the Construction/Permanent Loans (as defined in the C/P Stipulation and the C/P Stay Relief Order) (collectively, the "C/P Advances").

---

[3] The 247 Warehouse Loans excludes three (3) loans reported by the Debtors as "missing." JPMC is awaiting further information from the Debtors to clarify the status of these Warehouse Loans.

[4] From the payments they have received on the Warehouse Facility Collateral (the "Warehouse Loan Collections") since their last Pre-Petition Distribution to JPMC through September 2, 2008, the Debtors have paid $74,134,676.27 to JPMC. Upon information and belief, the Debtors continue to deposit Warehouse Loan Collections in a segregated account ####-###-956 (the "Segregated Account"). Upon information and belief, the Debtors have received Warehouse Loan Collections in an amount that exceeds the amounts that the Debtors have paid to JPMC (the "Withheld Warehouse Loan Collections"). JPMC reserves all rights with respect to the Withheld Warehouse Loan Collections.

**JPMC's Proofs of Claim**

        8.        On January 8, 2008, JPMC or its affiliated entities timely filed the following proofs of claim against the Debtors:

> Claim No. 8262 against American Home Mortgage Investment Corp., asserting a secured claim for amounts owing as of the Petition Date under the 1/06 Credit Agreement, including, *inter alia*, advances in the amount of $158,514,313.90; accrued and unpaid interest in the amount of $1,121,017.37; and fees and disbursements of $66,995.45;

> Claim No. 8258 against American Home Mortgage Corp, asserting a secured claim for amounts owing as of the Petition Date under the 1/06 Credit Agreement, including, *inter alia*, advances in the amount of $158,514,313.90; accrued and unpaid interest in the amount of $1,121,017.37; and fees and disbursements of $66,995.45;

> Claim No. 8397 against American Home Mortgage Corp., asserting a secured claim in the amount of $160,600.00 for amounts owing under that certain Standby Letter of Credit dated August 16, 2006;

> Claim No. 7969 against American Home Mortgage Investment Corp., asserting a general unsecured claim in the amount of $88,174.79 for fees and costs related to the October 10, 2006 retention of J.P. Morgan Securities, Inc.;

> Claim No. 8261 against American Home Mortgage Corp., asserting a general unsecured claim in the amount of $96,844,421.32 in connection with various breaches of that certain Mortgage Loan Sale Agreement (the "MLSA"), dated April 1, 2006;

> Claim No. 8396 against American Home Mortgage Servicing, Inc., asserting a general unsecured claim in the amount of $20,233.38 in connection with insurance and tax related costs arising from the MLSA;

> Claim No. 8399 against American Home Mortgage Corp., asserting a general unsecured claim in the amount of $308,000.00 in connection with breaches of representations and warranties in the MLSA;

> Claim No. 8248 against Homegate Settlement Services, Inc., asserting a general unsecured claim in the amount of $413,567.00 in connection with checks returned NSF;

Claim No. 8383 against American Home Mortgage Corp., asserting a general unsecured claim in the amount of $32,728.38 in connection with depository account fees[5]; and

Claim No. 8398 against American Home Mortgage Investment Corp., asserting a general unsecured claim in the amount of $1,397,266 in connection with losses incurred by J.P. Morgan Securities Inc. on behalf of the Debtors.

(the foregoing proofs of claim, collectively, the "JPMC POC's"). The Debtors have not objected to the JPMC POC's.[6]

**Proceeds of Alleged REO Property**

9. On March 14, 2008, the Court entered that certain Order (I) Authorizing the Sale of JPM Non-Performing Loans and REO Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Sale Agreement Thereto; (III) Authorizing the Distribution of the Proceeds; and (IV) Granting Related Relief (the "Sale Order") (Docket No. 3283). Pursuant to the Sale Order, the Debtors deposited $5,775,405.45 in escrow (the "Disputed REO Escrow") pending resolution of disputes in connection with JPMC's entitlement to such funds, which have been alleged to have been collected by the Debtors in connection with certain properties alleged to be real estate owned (all such property alleged to be real estate owned referred to collectively as the "REO Property"). The Debtors have alleged that the REO Property was acquired by foreclosure upon certain Warehouse Facility Collateral.

---

[5] Consistent with the Court's Order Pursuant to Sections 105(a), 345, and 503(b)(1) of the Bankruptcy Code (I) Authorizing Debtors to Maintain and Use Existing Bank Accounts and Business Forms, (II) Authorizing the Debtors to Maintain and Use Existing Cash Management System, and (III) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code, entered August 7, 2007 (Docket No. 66), the Debtors paid JPMC the account fees in the amount of $30,722.83 on March 13, 2008. The portion of Claim No. 8383 in the amount of $2,005.55 for the returned check remains.

[6] On April 25, 2008, JPMC's affiliate J.P. Morgan Acceptance Corporation I ("JPMAC") filed Claim No. 10275 against American Home Mortgage Corp. (the "JPMAC POC"). In addition, prior to the merger between The Bear Stearns Companies Inc. ("Bear Stearns") and JPMorgan Chase & Co., certain affiliates of Bear Stearns had filed proofs of claim against various of the Debtors (collectively, the "Bear Stearns POCs").

519.000-21962                                6

10. The Debtors have asserted that transfers of (a) $752,983.82 of proceeds of REO Property within the ninety (90) days prior to the Petition Date (the "Prepetition REO Proceeds") and (b) in a report delivered mid-July approximately $5,620,415.12 of proceeds of REO Property after the Petition Date (the "Postpetition REO Proceeds") may be subject to avoidance by the Bankruptcy Court.

11. JPMC disputes any claim by the Debtors to ownership of funds in the Disputed REO Escrow, and any claims by the Debtors with respect to the Prepetition REO Proceeds or the Postpetition REO Proceeds.

**Discussions with the Debtors**

12. JPMC has requested that the Debtors transfer complete dominion and control over, and discretion with respect to, the Warehouse Loans, including the transfer of the servicing of the Warehouse Loans, to JPMC or its designee. As of the date hereof, the Debtors have refused such requests from JPMC.

13. On September 10, 2008, JPMC filed its *Motion for Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(d), to Foreclose on Mortgage Loans* (the "Stay Relief Motion") in which it asserts that the Debtors have no equity in the Warehouse Loans that currently serve as Warehouse Facility Collateral. A hearing on the Stay Relief Motion has been scheduled for October 2, 2008.

**The Disclosure Statement and Plan**

14. On August 15, 2008, the Debtors filed the Disclosure Statement, and the Chapter 11 Plan of Liquidation of the Debtors Dated as of August 15, 2008 [Docket No. 5450] (the "Plan"). Generally, the Plan provides for the non-substantive consolidation of the Debtors'

estates and the administration of post-petition claim reconciliation and distribution to creditor by a plan trustee (the "Plan Trustee").

15. Among other things, the Plan provides for treatment of JPMC's secured claim under the Warehouse Facility. Specifically, the Plan would allow the Plan Trustee, in lieu of cash payment or surrender of the Warehouse Facility Collateral, to issue a non-recourse note to JPMC in satisfaction of its secured claims (the "JPMC Plan Note"). Under the terms of the Plan and the proposed JPMC Plan Note, the Plan Trustee would, at his option, have the right to hold the Warehouse Facility Collateral for a period of up to five (5) years prior to full redemption of the JPMC Plan Note.

16. On August 28, 2008, the Debtors filed the Solicitation Procedures Motion. The Solicitation Procedures Motion moves this Court for approval of the Disclosure Statement and requests, among other things, entry of an order approving (a) the form and manner of Plan solicitation packages and notices of the confirmation hearing on the Plan, (b) the form of the ballots, (c) record dates and deadlines relating to Plan acceptance and confirmation, (d) "procedures" relating to creditors' voting rights on the Plan, and (e) a deadline and further "procedures" for objecting to Plan confirmation.

## OBJECTIONS TO PROPOSED DISCLOSURE STATEMENT

17. <u>Section 1125</u>: Section 1125 of the Bankruptcy Code, as amended, provides that a disclosure statement must, among other things, contain "adequate information" defined, in pertinent part, as:

> <u>Information of a kind, and in sufficient detail,</u> as far as is reasonably practical in light of the nature and history of the debtor and the condition of the debtor's records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, <u>that would</u>

> enable such a hypothetical investor of the relevant class to make an to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

11 U.S.C. § 1125(a)(1) (emphasis added).

18.    This disclosure requirement is "crucial to the effective functioning of the federal bankruptcy system." Ryan Operations G.P. v. Santiam-Midwest Lumber, Co., 81 F.3d 355, 363 (3d Cir. 1996); see also In re Oneida Motor Freight, Inc., 848 F.2d 414, 417 (3d Cir. 1988) ("The preparing and filing of a disclosure statement is a critical step in the reorganization of the Chapter XI debtor."). The importance of adequate information is underscored by the reliance creditors and the court place on the information the plan proponent provides in the disclosure statement in determining whether or not to approve the proposed plan of reorganization. See Ryan Operations, 81 F.3d at 362; Oneida, 848 F.2d at 417. Without "sufficient financial and operational information to enable each participant to make an 'informed judgment' whether to approve or reject the proposed plan," the proposed disclosure statement fails to meet the requirements of Section 1125(a)(1). In re Civitella, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981).

19.    Objections to the Disclosure Statement. For the following reasons, the Disclosure Statement lacks adequate information of a kind and in sufficient detail to enable JPMC (and any other similar holders of interests) to determine the proposed classification and treatment of their interests. Additional disclosure on the following matters is necessary to JPMC and similarly situated parties in interest.

    a.    Classification of JPMC's Secured Claims. The Disclosure Statement reflects that the Plan will treat JPMC's secured claims on account of the Warehouse Facility by

classifying them as Class 3B(3) against AHM Corp. and Class 5B(4) against AHM Acceptance. As stated above, JPMC has filed two secured claims against AHM Corp and AHM Investment, respectively. Indeed, AHM Acceptance is not a party to any of the Warehouse Facility Documents. The Disclosure Statement is bereft of any information which would allow JPMC to determine why the Debtors believe that JPMC's secured claim is asserted against AHM Acceptance and not AHM Investment.

      b.      Unless a party in interest objects to a timely filed proof of claim, such proof of claim serves as *prima facie* evidence of the claim's validity. See 11 U.S.C. § 502; In re Oakwood Homes Corp., 449 F.3d 588, 600 (3d. Cir. 2006). As of the date hereof, neither the Debtors nor any other party-in-interest have filed an objection to Claim #7969, JPMC's secured claim against AHM Investment Corp. As such, Claim #7969 is a valid proof of claim against AHM Investment and the Plan and Disclosure Statement must be amended to reflect the claim's treatment under the Plan, or provide other such information which would allow JPMC to evaluate the Debtors' contention that JPMC has asserted a secured claim against AHM Acceptance.

      c.      <u>Treatment of JPMC's Secured Claims.</u> Article 4F of the Plan generally provides for the treatment of JPMC's secured claims. Specifically, Article 4F(2)(d), provides that in lieu of payment in full of JPMC's secured claim as of the effective date of the Plan, the Plan Trustee may issue the JPMC Plan Note. Among other things, the JPMC Plan Note would (i) be non-recourse against any Plan Trust Assets except for those securing JPMC's secured claim, (ii) be payable in a single balloon payment upon the expiration of the 5-year term, and (iii) allow for the post-confirmation Plan Trustee to surcharge JPMC's collateral without it's consent. While Article 4F of the Plan also provides that JPMC's secured claim may be satisfied by (x)

cash; (y) proceeds from the sale of the Warehouse Facility Collateral; or (z) turnover of the Warehouse Facility Collateral, the Disclosure Statement provides no information with regard to which option the Debtors believe is likely to fully satisfy JPMC's secured claim in a manner designed to reduce JPMC's deficiency claim, or, indeed, whether the reduction of JPMC's deficiency claim is of any consequence to the Debtors. Further, to the extent that the Debtors and Plan Trustee actually seek to issue the JPMC Plan Note, there is no information as to how the Plan Trust, after issuing a non-recourse note, will provide JPMC with adequate protection in connection with collateral that is deteriorating in value[7] or how such treatment of JPMC's secured claim would receive the indubitable equivalent of payment in full, in cash, as of the effective date of the Plan. On both issues, the Disclosure Statement is patently defective with regards to the information required for JPMC to make an informed decision on whether to accept or reject the Plan, as proposed. Finally, the Disclosure Statement does not provide any information with how the Debtors intend to address the Disputed REO Escrow. At bottom, this proposed treatment amounts to just another strategy for holding JPMC's collateral hostage for an indeterminate length of time so that the Debtors can use it as a bargaining chip in a wide range of disputes they currently have with JPMC.

    d. <u>Treatment of EPD/Warranty Claims</u>. Although the Plan provides for the treatment of claims arising from early payment defaults ("<u>EPD Claims</u>") and the Debtors' breach of warranties ("<u>Warranty Claims</u>") related to the Debtors repurchase obligations, Article 4E of the Disclosure Statement provides only a perfunctory summary of the two protocols that will be used to allow EPD and Warranty Claims. These protocols allow the Debtors to reduce EPD and Warranty Claims by as much as 100% of the outstanding UPB without any evidentiary showing

---

[7] For this very reason, on September 10, 2008, JPMC filed the Stay Relief Motion. Prior to approval of the Disclosure Statement, the Debtors should amend the Disclosure Statement to reflect their position on the Stay Relief Motion.

by the Debtors. JPMC has filed a claim in the amount of $96,844,421.32 related to EPD and Warranty Claims under the MLSA. Under the protocols proposed by the Debtors, the full amount of JPMC's EPD and Warranty Claims may be reduced to $0 without any further explanation by the Debtors. Put simply, the Disclosure Statement fails to provide even a hint of information related to how the Debtors came to the calculations presented in the EPD and Warranty Claim protocols. The Debtors must provide a description of their methodology and the basis for these protocols. Regardless, holders of EPD and Warranty Claims should be permitted to vote and have allowed the full value of their otherwise *prima facie* valid claims recognized. See 11 U.S.C. § 502; In re Oakwood Homes Corp., 449 F.3d 588, 600 (3d. Cir. 2006).

e. Failure to Provide Information Regarding Allocation of Estate Assets. The Disclosure Statement explains (or attempts to explain) that the Debtors have decided that, rather than substantively consolidate their respective estates, or allow creditors to recover against the assets of each particular Debtor, they will assign each respective Debtor with a stipulated amount of assets of the Debtors' estates. Without any factual support for such treatment, the Debtor discloses that the various Debtors will be assigned the following percentages of the Debtors' gross assets:

    AHM Holdings – 35.051%
    AHM Investment – 11.663%
    AHM Acceptance – 11.919%
    AHM SV – 1.895%
    AHM Corp. – 38.523%
    AHM Ventures – 0.479%
    Homegate – 0.091%
    Great Oak – 0.379%

The Debtors have provided absolutely no basis for these allocations in the Disclosure Statement, noting only that the Stipulated Asset Allocation "depend on a number of assumptions." Until the Debtors are prepared and able to disclose the formula and process by which they created the

Stipulated Asset Allocation, approval of the Disclosure Statement should be denied because it lacks not only adequate, but basic information required for creditors to decide whether to accept or reject the Plan.

20. <u>Joinder in Objection of Wells Fargo Funding, Inc.</u> JPMC joins in the *Objection to (I) Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Chapter 11 Plan of Liquidation of the Debtors Dated as of August 15, 2008 and (II) Debtors' Motion for Order Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan and Seeking Related Relief* [Docket No. 5614] filed by Wells Fargo Funding, Inc.

## OBJECTIONS TO SOLICITATION PROCEDURES MOTION

21. The Solicitation Procedures Motion seeks a variety of relief from this Court related to the Disclosure Statement and the solicitation and voting procedures on the Plan. Some of this requested relief violates basic precepts of bankruptcy law and is therefore objectionable. JPMC sets forth each of the objectionable provisions in turn.

22. <u>The Debtor May Not Unilaterally Impair the Voting Rights of Creditors' Claims via the Solicitation Procedures Motion</u>. Paragraph 17 of the Solicitation Procedures Motion contains three provisions that seek to unilaterally impair the voting rights of contingent and unliquidated claims without the Debtors' ever having filed an objection to such claims as required under Bankruptcy Code § 502(b) and Rule 3007 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>" or "<u>FRBP</u>"). 11 U.S.C. § 502(b); FED. R. BANKR. P. 3007. These provisions seek, without any explanation or authority, to rewrite or eliminate provisions of the Bankruptcy Code and Bankruptcy Rules and to usurp this Court's authority.

23. First, Paragraph 17(b) seeks to limit the amount of a claim entitled to vote only to the "noncontingent and liquidated amount" specified in a particular proof of claim. (Sol. P. Mtn.

¶ 17(b)). The Debtors attempt to reduce the value of these claims in this manner without first having objected to such claims. Second, Paragraph 17(c) imposes certain "EPD/Breach Claim Tabulation Rules" on holders of EPD/Breach Claims (as defined in the Solicitation Procedures Motion). These lengthy procedures also establish a mechanism by which the Debtors can reduce the value of the EPD/Breach Claims for voting purposes without first filing an objection to these claims (which would require, *inter alia*, that the Debtors provide sufficient evidence to rebut these claims' *prima facie* validity). (Id. ¶ 20). Third, Paragraph 17(e) similarly tries to limit the voting rights of creditors who have filed proofs of claim in unknown or "unliquidated" amounts but whose claims either are not listed in the Debtors' schedules or are listed as disputed, contingent or unliquidated. (Id. ¶ 17(e)). In this case, these creditors' votes will count for purposes of determining the numerosity requirement of Bankruptcy Code § 1126, but not the aggregate claim amount requirement. (Id. ¶ 17(e)). The Debtors do not attempt to define the terms "unknown" or "unliquidated" in the Solicitation Procedures Motion.

24. This relief flatly contradicts the express provisions of §§ 1126 and 502 regarding a creditor's right to vote its claim. 11 U.S.C. §§ 502 & 1126. Under § 1126, a "holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." Id. § 1126(a). Likewise, § 502(a) provides that a claim "proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest...objects." Id. § 502(a); see also In re Planet Hollywood Int'l, 274 B.R. 391, 394 (Bankr. D. Del. 2001). Thus, a party who has properly filed a claim has the right to vote the entire amount of its claim (including any contingent and allegedly unliquidated portion of that claim) unless a party has objected to the claim. See Planet Hollywood, 274 B.R. at 394. A debtor who wants to prevent a creditor from voting all or any portion of its claim must first object to that claim. At that point, the creditor may, if it desires,

move for the estimation of its claim for voting purposes under § 502(c) and FRBP 3018. Then, the bankruptcy court (and not the Debtors) may hold a hearing on the motion and may estimate the claim. 11 U.S.C. § 502(c); FED. R. BANKR. P. 3018. The relief sought in Paragraph 17(b), 17(c), and 17(e) of the Solicitation Procedures Motion attempts an end-run around these requirements. This Court should halt that effort in its tracks and prohibit the Debtors from attempting to unilaterally impair creditors' voting rights via the Solicitation Procedures Motion.[8]

25.  **The Debtors May Not Prevent Creditors With More than One Claim From Voting All Their Claims.** In Paragraph 21(a) of the Solicitation Procedures Motion, the Debtors seek to limit the voting rights of creditors holding more than one claim in a particular claim class. (Sol. P. Mtn. ¶ 21(a)). The Solicitation Procedures Motion provides that "[f]or purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate claims held by a single creditor in a particular class will be aggregated as if such creditor held one claim against the Debtors in such class, and the votes related to such claims will be treated as a single vote to accept or reject the Plan." (Id.)

26.  This requested relief (for which the Debtors offer no authority or citation in support) flies in the face of § 1126. Under § 1126(c), claims vote, not creditors. As explained by one court, "[t]he formula contained in Section 1126(c) speaks in terms of the *number of claims*, not the number of creditors, that actually vote for or against the plan." In re Gilbert, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989). For this reason, a creditor who has two or more distinct claims in a particular class has the right to vote *all* its claims and have the votes of all those claims counted for all purposes under § 1126(c). 11 U.S.C. § 1126(c); Gilbert, 104 B.R. at 211 (holding that a creditor with two distinct claims in the same class was entitled to one vote for

---

[8] Wells Fargo Funding, Inc. ("Wells Fargo") raises precisely the same point in its Objection [Docket No. 5614] (Wells Fargo Obj. ¶ 13). JPMC adopts by reference Wells Fargo's arguments in Paragraph 13 of its Objection in their entirety.

each of his claims); 7 LAWRENCE P. KING ET. AL., COLLIER ON BANKRUPTCY ¶ 1126.02[3] (15th ed. 2008) ("A single creditor who holds two distinct claims may vote each claim separately even though the claims may be in the same class."). Thus, the Debtors' effort to "aggregate" multiple claims held by a single creditor so that such a creditor gets only one vote in any given class is contrary to the Bankruptcy Code and should be rejected.

27.  <u>The Procedures for Objecting to the Plan Are Inappropriate</u>.  Finally, in Paragraph 23, the Debtors request that this Court establish various procedures for creditors to follow when objecting to the Plan. Although much of this relief is ministerial, at least one provision is not. To wit, the Debtors purport to require any party objecting to the Plan to file "proposed language to remedy such objections" along with its objection to the Plan. (<u>Sol. P. Mtn.</u> ¶ 23). Such a demand simply does not belong in an order of this Court.

28.  Under Bankruptcy Code § 1121, the Debtors propose the Plan, not the creditors. FRBP 3020(b), which governs the procedure for objecting to the confirmation of a plan of reorganization under Chapter 11 or Chapter 9, nowhere requires a creditor to provide language to a debtor to address deficiencies in the debtor's own plan. FED. R. BANKR. P. 3020(b). Indeed, a plan might under some circumstances so clearly violate the Bankruptcy Code that no proposed language could ever hope to fix it. In this case, although JPMC anticipates working with the Debtors to address any objectionable provisions in the Plan if JPMC does object to confirmation, JPMC opposes any mandatory requirement in an order of this Court that it write the Debtors' plan for them. In truth, this provision is nothing more than a transparent stratagem by the Debtors to complicate the process of objecting to their Plan. This Court should reject this effort.

## RESERVATION OF RIGHTS

29. JPMC reserves the right to supplement or amend this Objection, including supplementation or amendment to allege that any obligations owed to JPMC by any one or more of the Debtors are duties or obligations owed by any other or all Debtors to JPMC (individually or in any combination). JPMC also reserves the right to object to the Plan on any available ground.

## CONCLUSION

WHEREFORE, JPMC respectfully requests that the Court deny approval of the Disclosure Statement and Solicitation Procedures Motion or, in the alternative, approve the Disclosure Statement and Solicitation Procedures Motion only with amendments sufficient to resolve the foregoing objections.

Dated: September 10, 2008

LANDIS RATH & COBB LLP

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 600
Wilmington, DE 19801
(302) 467-4400

-and-

LOCKE LORD BISSELL & LIDDELL LLP
Thomas H. Grace
Texas Bar No. 00785453
W. Steven Bryant
Texas Bar No. 24027413
600 Travis Street, Suite 3400
Houston, Texas 77002
Telephone: 713-226-1200
Facsimile: 713-223-3717

ATTORNEYS FOR JPMORGAN CHASE BANK, NATIONAL ASSOCIATION