**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | |
| HOLDINGS, INC., a Delaware corporation, | ) | Case No. 07-11047 (CSS) |
| et al.[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Ref. Docket Nos. 4233, 4338, 4359 & 5495** |
| ------------------------------------------------------------ | ) | |

**DEBTORS' PRELIMINARY OBJECTION TO AMENDED MOTION OF
AMERICAN HOME MORTGAGE SERVICING, INC., f/k/a AH MORTGAGE
ACQUISITION CO., INC., FOR AN ORDER GRANTING THE ALLOWANCE
AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM FOR
BREACHES BY CERTAIN DEBTORS OF THE ASSET PURCHASE AGREEMENT
FOR SALE OF THE DEBTORS' MORTGAGE SERVICING BUSINESS**

The above-captioned debtors and debtors-in-possession (the "Debtors") make this

preliminary objection (the "Preliminary Objection") to the *Amended Motion of American Home*

*Mortgage Servicing, Inc., f/k/a AH Mortgage Acquisition Co., Inc.* (the "Purchaser") *for an*

*Order Granting the Allowance and Payment of an Administrative Expense Claim for Breaches*

*by Certain Debtors of the Asset Purchase Agreement for the sale of the Debtors' Mortgage*

*Servicing Business* [Docket No. 5495] (the "Amended Motion")[2] filed on August 18, 2008. In

support of this Preliminary Objection, the Debtors respectfully represent as follows:

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc., f/k/a American Home Mortgage Servicing, Inc. ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

[2]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Amended Motion.

## PRELIMINARY STATEMENT

The Amended Motion requests payment of approximately $17 million as an expense of administration, based on purported breaches of the APA resulting, ironically enough, from alleged acts and omissions of many of the Purchaser's own employees—prior to the Final Closing, while they were still in the Debtors' employ.  Because the Debtors no longer have access to these employees, the Debtors will need to rely heavily on the discovery process to determine and test the factual bases for the various claims asserted by the Purchaser.  As discussed below, however, it is possible to dispose of approximately $9.2 million of the Purchaser's claims as a matter of law,[3] based on the Purchaser's description of such claims in the Amended Motion.

The Amended Motion is deceptively simple, painting in very broad strokes to classify a wide variety of acts, omissions, or transfers of property—whether occurring prepetition, postpetition, pre-Initial Closing, or post-Initial Closing—as breaches of the APA. Upon closer scrutiny, however, most of the Purchaser's breach claims rely either on a tortured reading of the APA (usually, as a way to get around the unambiguous "As Is Where Is" provision) or an incomplete understanding of the interplay between the APA, the Servicing Agreements, and relevant provisions of the Servicing Sale Order.  In this Preliminary Objection, the Debtors have attempted to highlight for the Court the often nuanced distinctions between the Purchaser's various claims and outline what would appear to be the appropriate legal analysis (and remedies, if any, of the Purchaser) for each category of claim.

---

[3]  Specifically, the Cure Claims (as hereinafter described, $5,127,162), the Reimbursement Claim (as hereinafter defined, $2,423,759), the claim for document delivery costs ($31,200), the claim for FNMA Guaranty Fees ($834,648), and the claim relating to the Signature Bank Agreement ($757,426).

## OBJECTION

I.  **THIS IS A CONTESTED MATTER WITH DISPUTED MATERIAL FACTS, WHICH REQUIRES A FULL EVIDENTIARY HEARING AFTER AN OPPORTUNITY TO CONDUCT DISCOVERY**

For the record, the Debtors request, and are entitled to, a full evidentiary hearing on the Amended Motion after an opportunity to conduct discovery. As discussed more fully herein, the Debtors deny any breach of the APA and dispute several of the Purchaser's material factual allegations in the Amended Motion. The filing of this Preliminary Objection gives rise to a contested matter governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure. See In re Chester County Plastics, Inc., 174 B.R. 41, 43 (Bankr. E.D. Pa. 1994). The Debtors, as the party against whom relief is sought, are entitled to the same due process rights as those afforded defendants in adversary proceedings. See In re Morrison, 375 B.R. 179, 194 (Bankr. W.D. Pa. 2007) (citing 6 Norton Bankr. L. & Prac. 2d § 138:5 (2007)). These due process rights include the Debtors' entitlement to an evidentiary hearing with witness testimony when a contested motion cannot be decided without resolving a disputed material issue of fact. See Fed. R. Bankr. P. 9014(d) Advisory Committee's Note ("Subdivision (d) is added to clarify that if the motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held at which testimony of witness is taken in the same manner as testimony is taken in an adversary proceeding or trial in a district court civil case.").

Bankruptcy Rule 9014 also provides that the Debtors, as a party to a contested matter, may avail themselves of the whole array of discovery devices provided for in Bankruptcy Rules 7026, 7028-37, including taking depositions and propounding written discovery. Fed. R. Bankr. P. 9014(c). As discussed further herein, neither the Amended Motion nor the appended exhibits and declarations provide adequate information for the Debtors to prepare a defense to the vast majority of the Purchaser's asserted claims, which aggregate more than $17 million and

3

encompass literally thousands of transfers and other transactions, often at the loan level, many of which occurred prior to the Petition Date. The Debtors' need for discovery is further underscored by the fact that the Purchaser is at a tremendous informational advantage insofar as most, if not all, of the Debtors' former employees having knowledge of the relevant business transactions currently work for the Purchaser.

It is imperative that the Debtors have an opportunity to conduct complete discovery regarding all of the alleged breaches of the APA. In fact, the Debtors have already informed Purchaser of their intent to seek discovery in connection with this Preliminary Objection and requested that the Purchaser take necessary steps to preserve all documents (as that term is defined in the Federal Rules of Civil Procedure) that may have any relevance to the Amended Motion, the underlying contracts that form the basis of the Purchaser's purported claim and Purchaser's operations from September 6, 2007 through the present. (See Letter from J. Dorsey to K. McDole dated May 30, 2008, attached hereto as Exhibit A). Accordingly, to the extent the Debtors and the Purchaser are unable to reach a consensual scheduling order, the Debtors request that the Court enter a scheduling order in this contested matter which will permit the Debtors to conduct reasonable discovery prior to any hearing on the Amended Motion.

## II. THE PURCHASER'S CLAIMS ARE WITHOUT MERIT, AND MOST SHOULD BE DISMISSED AS A MATTER OF LAW

To be clear, the Debtors dispute each and every one of the Purchaser's claims. Conceptually, the majority of these claims fall within the following three categories:

- **Cure Claims.** The Purchaser asserts there are currently shortfalls in various custodial accounts resulting from pre-Initial Closing acts or omissions of AHM SV. The Purchaser argues these shortfalls constitute "Retained Liabilities" of the Sellers under the APA and, further, that it is entitled to be reimbursed for payments it anticipates making to remedy these shortfalls. Claims premised upon this theory total $5,127,162, and for the sake of discussion herein will be referred to, collectively, as "Cure Claims".

- **Reimbursement Claims.** The Purchaser asserts that, as of the Initial Closing, there was a shortfall in AHM SV's payment clearing account in the amount of $2,423,759, which the Purchaser inadvertently remedied at the Initial Closing when it deposited roughly $45 million into the account. The Purchaser asserts a right of reimbursement for the $2,423,759, presumably on the same theory as the Cure Claims (i.e., that the APA affirmatively required the Debtors to make good pre-Initial Closing shortfalls in their various accounts). For the sake of discussion herein, this claim shall be referred to as a "Reimbursement Claim", which category will also encompass Cure Claims to the extent the Purchaser actually makes payment to remedy the alleged shortfalls in the respective custodial accounts.

- **Misappropriation Claims.** The Purchaser asserts that, during the Interim Period, $3,471,907 in the aggregate was remitted by AHM SV from accounts set up for the benefit of the Purchaser into various custodial accounts in order to remedy pre-Initial Closing shortfalls therein. The Purchaser argues this was wrongful because any shortfalls in custodial accounts existing at the Initial Closing constituted "Retained Liabilities" of the Sellers under the APA, and during the Interim Period AHM SV was only authorized to operate "the Business" in the "Ordinary Course" (as defined in the APA), which does not include the payment of Retained Liabilities. For the sake of discussion herein, Claims premised upon this theory will be referred to, collectively, as "Misappropriation Claims".[4]

The Purchaser's remaining claims (i.e., relating to LPMI and prepayment penalties, FNMA Guaranty Fees, the Signature Bank Agreement, and document delivery costs) are *sui generis* and do not fall neatly within the above categories.

For the Court's convenience, a chart identifying each of the Purchaser's claims, or portions thereof (as described by the Purchaser in Exhibit D to the Amended Motion) as a Cure Claim, a Reimbursement Claim, a Misappropriation Claim, or *sui generis* is attached hereto as Exhibit B.

A.    <u>Cure Claims ($5,127,162)</u>

The Cure Claims are truly puzzling. The common element of these claims is an alleged shortfall or anticipated shortfall in a custodial account *as of the Initial Closing* and totally

---

[4]  This category also encompasses the Purchaser's claim relating to the alleged transfers of funds into HELOC custodial accounts during the Interim Period to remedy pre-Initial Closing shortfalls, which the Purchaser asserts was wrongful not only because such shortfalls constituted "Retained Liabilities" under the APA, but also because the HELOC servicing agreements were "Excluded Assets" under the APA that were carved out from "the Business" to be operated in the "Ordinary Course."

066585.1001

unrelated to any conduct of the Sellers during the Interim Period. The Purchaser asserts that the Sellers' "failure to replenish the custodial accounts breached the APA" (Amended Motion ¶ 3), but it fails to identify any provision of the APA that requires the Sellers to replenish pre-Initial Closing shortfalls in the custodial accounts.

Parties would typically provide for this, if at all, via a representation or warranty as to the adequacy of the custodial accounts. However, under the "As Is Where Is" provision of the APA, the Sellers specifically disclaimed any "representations or warranties whatsoever . . . with respect to any matter relating to the Purchased Assets" (APA § 2.11), which disclaimer is obviously broad enough to encompass any implied representation or warranty as to the adequacy of the custodial accounts. Indeed, most of the alleged deficiencies in the various custodial accounts demonstrate precisely the purpose and operation of an "As Is Where Is" provision, insofar as such deficiencies stem from alleged pre-Initial Closing negligence of the Sellers (i.e., erroneous transfers from custodial accounts into the 434 Account) which were not discovered by the Purchaser in its initial due diligence. Any loss associated with servicing accounts being out of balance is a foreseeable risk of purchasing a mortgage loan servicing platform as a going concern, and if the Purchaser had wished to hedge against this risk, it could have bargained for representations and warranties from the Sellers. It did not, agreeing instead to take the Purchased Assets "AS IS" and "WHERE IS."

The "As Is Where Is" provision applies by default in the absence of a contrary provision "expressly set forth" in the APA. (APA § 2.11.) To get around the "As Is Where Is" provision, the Purchaser argues its Cure Claims are based not on breaches of "representations or warranties," but on breaches of "covenants and obligations" of the Sellers under the APA. (Amended Motion ¶ 47.) According to the Purchaser, these covenants and obligations reside in

6

section 2.6 of the APA, which provides that "Sellers shall retain and be liable and responsible for all Retained Liabilities." (Amended Motion ¶ 45.) The term "Retained Liabilities" is defined to include the "Initial Cure Amount" and "Interim Cure Amount," which terms, in turn, are defined as the maximum amount payable to cure defaults under "Assumed Contracts" relating to pre-Initial Closing acts or omissions of the Sellers. (First Amendment § 1.1.)

From Section 2.6 of the APA, the Purchaser makes two implicit analytical leaps to arrive at its conclusion that Cure Claims are payable to it as expenses of administration: <u>first</u>, that the Sellers' agreement to "retain" and "be liable and responsible for" the Retained Liabilities constitutes an affirmative covenant to *discharge* such liabilities, in full and in administrative dollars; <u>second</u>, that breach of this covenant would constitute material breach of the APA giving rise to a claim for money damages by the Purchaser. Neither of these assumptions is supported by the plain language of the APA.[5] More importantly, both are belied by the Servicing Sale Order, which ultimately controls.[6]

The Servicing Sale Order is fatal to the Cure Claims in two related ways. <u>First</u>, it deems all pre-Initial Closing defaults under the Assumed Contracts (which would include any shortfalls in custodial accounts) cured and satisfied in full upon the Sellers' establishment of a $10 million "Cure Reserve" and, further, establishes a bar date by which any such defaults must be asserted against the Cure Reserve or be waived forever. <u>Second</u>, the Servicing Sale Order makes *painstakingly clear* that pre-Initial Closing liabilities retained by the Sellers are absolutely unenforceable against the Purchaser under any circumstances. In light of the foregoing, it is

---

[5] A natural reading of Section 2.6 of the APA is that it merely identifies and clarifies which liabilities of the Sellers the Purchaser is *not* assuming (i.e., "Retained Liabilities"). Reading an affirmative duty of performance into this provision would lead to absurd results. For example, the universe of "Retained Liabilities" under the APA is broad and would include any and all prepetition claims against any of the Sellers. If Section 2.6 of the APA were read to affirmatively require the discharge of Retained Liabilities, the Sellers' failure to pay *any* prepetition claim in full would constitute a breach of the APA.

[6] (Servicing Sale Ord. ¶ 65 ("To the extent of any conflict between or among the express terms of the APA . . . and this Order, the terms and provisions of this Order shall govern.").)

DB02:7336551.2                                                                                          066585.1001

difficult to imagine why the Sellers would have covenanted to the Purchaser in the APA that they would replenish pre-Initial Closing shortfalls in the custodial accounts above and beyond the $10 million Cure Reserve amount. More importantly, even if the Sellers *had* covenanted to do this, there can be no legally cognizable harm to the Purchaser resulting from breach of this covenant, as there are no circumstances under which the Purchaser could be called upon to replenish pre-Initial Closing shortfalls in the custodial accounts.

Regarding the cure of pre-Initial Closing defaults under Assumed Contracts, the Servicing Sale Order contains the following specific findings and decrees:

- "The Debtors have (i) by establishing the Cure Escrow . . . , cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Initial Closing under any of the Assumed Contracts . . . ." (Servicing Sale Ord. ¶ K.)

- "Upon the establishment and funding of the Cure Escrow . . . all of the requirements of sections 363, 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption and the assignment or transfer by the Debtors to the Purchaser of each of the Assumed Contracts. The amount of the Cure Escrow is sufficient to satisfy the requirements of sections 363 and 365(b) of the Bankruptcy Code with respect to the Sellers' Cure Amount.[7]" (Id. ¶ O.)

- "[W]ith respect to any Assumed Contract that is not an executory contract . . . , other than the Initial Cure Amount, if any, which will be satisfied solely from the Cure Escrow, there are (x) no material uncured defaults or breaches under such agreements that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the date of the entry of this Order, and (y) no Claims . . . with respect to such Assumed Contract, that relate to any acts or omissions that occurred prior to the date of the entry of this Order. The amount of the Cure Escrow is sufficient to satisfy any Claims . . . with respect to Assumed Contracts, that relate to any acts or omissions that occurred prior to the Initial Closing. For the avoidance of doubt, (i) *there are no defaults relating to acts or omissions that occurred prior to the Initial Closing other than those that will be satisfied from the Cure Escrow* . . . ." (Id. ¶ R (emphasis added).)

- "At the Initial Closing, $10,000,000 from the Purchase Price shall be placed into escrow . . . *in full satisfaction of the Sellers' Cure Amount.*" (Id. at ¶ 32 (emphasis added).)

---

[7]  "Sellers' Cure Amount" is defined as the "Initial Cure Amount" together with the "Interim Cure Amount" (Servicing Sale Ord. ¶ 35)—in other words, the amount reflecting all pre-Initial Closing defaults under the Assumed Agreements.

066585.1001

- "Unless an objection to the proposed cure amount for an Assumed Contract set forth in the Interim Period Cure Schedule is filed and served by the Counterparty . . . , such Counterparty will be deemed to have consented to the cure amount set forth in the Interim Period Cure Schedule for such Assumed Contract, and be *forever barred from objecting thereto in the future with respect to any cure amounts or defaults arising from acts or omissions that occurred prior to the Initial Closing*." (Id. ¶ 34 (emphasis added).)

- "The Initial Cure Amount and the Interim Cure Amount . . . shall constitute all amounts, if any, owed with respect to defaults relating to the Assumed Contracts relating to acts or omissions that occurred prior to the Initial Closing; provided, however, that the maximum amount of the Sellers' Cure Amount shall be $10,000,000; and provided, further, that *all payments on account of and related to the Sellers' Cure Amount shall be limited to and satisfied from the Cure Escrow . . . .*" (Id. ¶ 35 (emphasis added).)

- "All defaults and all other obligations or Liabilities under any Assumed Contract arising or accruing prior to the date of the assignment or transfer to the Purchaser *shall be deemed cured or satisfied upon payment by the Sellers of the Sellers' Cure Amount . . . .*" (Id. ¶ 40 (emphasis added).)

- "Any exercise or assertion of any right of setoff, recoupment or any defense that arose from any act or omission that occurred prior to the Initial Closing, against any amounts due by such Person to (a) the Sellers on and after the Initial Closing but before the Final Closing . . . is hereby *prohibited and enjoined*." (Id. ¶ 45 (emphasis added).)

- "Upon the establishment and funding of the Cure Escrow . . . , each Counterparty is hereby forever barred, estopped, and permanently enjoined from asserting against . . . the Debtors . . . any . . . default, breach or Claim, or pecuniary loss . . . arising under or relating to an Assumed Contract existing as of the Final Closing (or earlier assignment or transfer, as the case may be) . . . ." (Id. ¶ 46.)

- "Except to the extent asserted against the Cure Escrow, no Person shall assert . . . any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), Liabilities, [or] Interests . . . under or with respect to, any Purchased Assets (including, without limitation, an Assumed Contract), with respect to any act or omission that occurred prior to the Initial Closing or with respect to any . . . obligation of the Debtors that is not an Assumed Liability." (Id. ¶ 47.)[8]

Regarding the protection of the Purchaser against pre-Initial Closing liabilities of the Sellers, the

Servicing Sale Order contains the following decrees:

---

[8] Notably, to the extent this decree applies broadly to "any Person" it appears to preclude *the Purchaser* from asserting Cure Claims against the Debtors rather than the Cure Escrow. The Debtors hereby reserve all rights to seek and recover damages from the Purchaser (including, but not limited to, attorneys' fees) on account of any willful violation of the Servicing Sale Order.

DB02:7336551.2                                                                                                    066585.1001

- "No Person shall be entitled to exercise or assert any right of setoff, recoupment or any defense that arose from any act or omission that occurred prior to the Initial Closing, against any amounts due by such Person to . . . the Purchaser on and after the Initial Closing. All such rights of setoff, offset and/or recoupment . . . shall (i) constitute a Sellers' Cure Amount, (ii) be paid exclusively from the funds in the Cure Escrow, and (iii) be governed by and resolved in accordance with the procedures set forth in paragraphs 33-35 of this Order." (Servicing Sale Ord. ¶ 36 (emphasis added).)

- "[T]he Purchaser shall have no liability to a Counterparty with respect to such Counterparty's Assumed Contract other than the Purchaser's obligation to perform such duties under such Assumed Contract that arise from acts or omissions that occurred *on and after the assignment or transfer of such Assumed Contract to the Purchaser*." (Id. ¶ 38 (emphasis added).)

- "After the Initial Closing, except for Persons entitled to enforce Assumed Liabilities and Permitted Liens, all Persons . . . holding Interests against or in the Purchased Assets or Purchaser's Collateral of any kind or nature whatsoever shall be, and hereby are, *forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Interests of any kind or nature whatsoever against the Purchaser* or any Affiliate of the Purchaser or any of their respective property, successors and assigns, or the Purchaser's Assets or Purchaser's collateral, as an alleged successor or on any other grounds . . . . Any exercise or assertion of any right of setoff, recoupment or any defense that arose from any act or omission that occurred prior to the Initial Closing, against any amounts due by such Person to . . . the Purchaser on and after the Initial Closing is hereby *prohibited and enjoined*." (Id. ¶ 45 (emphasis added).)

- "Upon the establishment and funding of the Cure Escrow . . . , each Counterparty is hereby forever barred, estopped, and permanently enjoined from asserting against (a) the Purchased Assets or the Purchaser's Collateral, the Purchaser, its Affiliates or their respective property any setoff, defense, recoupment, Claim, counterclaim or default asserted or assertable against, or otherwise delay, defer or impair any rights of the Purchaser with respect to the Purchased Assets with respect to an act or omission of, the Debtors or (b) the . . . Purchased Assets or the Purchaser's Collateral, the Purchaser or its Affiliates any . . . default, breach or Claim, or pecuniary loss . . . arising under or relating to an Assumed Contract existing as of the Final Closing (or earlier assignment or transfer, as the case may be) . . . ." (Id. ¶ 46.)

- "Except to the extent asserted against the Cure Escrow, no Person shall assert, and the Purchaser, the Purchased Assets, and Purchaser's Collateral shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), Liabilities, Interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Purchaser . . . under or with respect to, any Purchased Assets (including, without limitation, an Assumed Contract), with respect to any act or omission that occurred prior to the Initial Closing or with respect to any . . . obligation of the Debtors that is not an Assumed Liability." (Id. ¶ 47.)

- "[T]he Purchaser shall not be liable for any Interests in or against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Final Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors hereunder or under the APA arising prior to the Final Closing." (Id. ¶ 48.)

The foregoing provisions of the Servicing Sale Order state unequivocally that the sole remedy for pre-Initial Closing defaults under the Assumed Agreements is a timely filed claim against the Cure Reserve and that no such defaults are enforceable against the Debtors or the Purchaser under any other circumstances. Therefore, the Purchaser's attempt to convert the Cure Claims into administrative claims should be denied on any number of bases, including, without limitation (i) that the Purchaser lacks standing to raise such claims, (ii) that such claims are duplicative of claims already asserted against the Cure Reserve (or, to the extent not already asserted, claims that are now barred and unenforceable), (iii) that the Sellers' alleged failure to remedy pre-Initial Closing shortfalls did not breach the APA, and/or (iv) that even if the Sellers did breach the APA, the Purchaser has not suffered (and will not suffer) any legally cognizable harm as a result of such breach.

To the extent the Court is inclined to reach the merits of individual Cure Claims, the Debtors raise the following specific objections, while reserving the right to raise additional or supplemental objections as the Debtors learn more about the putative basis for such claims.

### 1.   Paid-in-Full Loans Sold to Third Parties ($1,598,654)

Paragraph 35 of the Amended Motion describes alleged pre-Initial Closing shortfalls in certain investors' custodial accounts resulting from "collections on paid in full loans that [AHM SV] mistakenly believed [AHM Corp.] owned but that [AHM Corp.] had sold to third parties". Based on information provided by the Purchaser and gathered by the Debtors in connection with the Original Motion, the Purchaser's description of these alleged account

11

shortfalls is not entirely accurate and omits key facts. By the Debtors' estimation, these alleged

"account shortfalls" would have arisen, if at all, as follows:

- AHM Corp. originates a loan on a warehouse credit line, and bundles the loan with other loans for sale/securitization by an investor.

- Prior to closing of the sale/securitization, the borrower pays the loan in full to AHM SV, the servicer, which remits the proceeds to the 434 Account for the benefit of AHM Corp.

- The investor remits sale/securitization proceeds to AHM Corp., representing payment for *all* loans in the pool, including the paid-in-full loan.

The result of the foregoing would *not* be a shortfall in the investor's custodial account giving rise

to a default under the Servicing Agreement with the investor; rather, it would be a prepetition

claim against AHM Corp. for breach of a seller representation/warranty in connection with the

sale/securitization.

        As the Court will recall, the severability of servicing-related obligations from loan

sale-related obligations was a key point of contention at the 5-day evidentiary hearing to consider

approval of the servicing sale. The Court's ruling that such obligations were in fact severable is

memorialized in the Servicing Sale Order, which distinguishes between "Servicing Agreements,"

which were sold/assigned to the Purchaser and "Other Agreements," which were not. (Servicing

Sale Ord. ¶ J.) Other Agreements are not enforceable against the Purchaser. (Id.) Accordingly,

the Purchaser's theory of damages on account of alleged shortfalls relating to paid-in-full loans is

even more attenuated than with respect to other Cure Claims, because the unenforceability of

Other Agreements against the Purchaser would provide a further defense to any attempted

enforcement of loan sale-related claims against the Purchaser.

        In addition to the legal deficiencies in the Purchaser's Cure Claims relating to

paid-in-full loans sold to third parties, there may be factual deficiencies. Specifically, based on

information provided by the Purchaser and gathered by the Debtors in connection with the

12

Original Motion, it appears in at least one instance AHM Corp. refunded the sale/securitization proceeds received on account of paid-in-full loans to the applicable investor, in which case there should be no amounts owing to the investor.

### 2.    Other Cure Claims

At the time of the filing of this Preliminary Objection, the Debtors have insufficient information regarding Cure Claims relating to "Liquidation Proceeds" (Amended Motion ¶ 37 ($2,040,718)), "Repurchases" (id. ¶ 38 ($738,384)), and "Expenses Denied by Wells Fargo" (id. ¶ 41 ($749,406)) to evaluate the specific factual and legal basis for, or to formulate a meaningful response to, such claims. The Debtors therefore object generally to these Cure Claims and respectfully request that the Court hold the Purchaser to its evidentiary burden with respect thereto. This is especially important in light of the Purchaser's significant informational advantage, given that it currently employs most (if not all) of the individuals having first-hand knowledge of any acts or omissions of the Sellers prior to the Initial Closing.

### B.    Reimbursement Claim ($2,423,759)

The Reimbursement Claim arises from the Purchaser's inadvertent cure of an alleged pre-Initial Closing shortfall in the Sellers' payment clearing account of approximately $2.4 million, which occurred when the Purchaser funded the account with approximately $45 million on the date of the Initial Closing. The Purchaser's theory of recovery appears to be the same as the Cure Claims (i.e., breach of the APA for failure to make good on a pre-Initial Closing shortfall), except that the Purchaser's alleged damages are more readily ascertainable (i.e., the amount of the payment actually made by the Purchaser).

As a breach of contract claim, the Reimbursement Claim fails as a matter of law for the same reasons the Cure Claims fail. Like the Cure Claims, the Reimbursement Claim

13

resembles a claim for breach of a representation or warranty as to the proper funding of a servicing account. However, per the "As Is Where Is" provision of the APA, the Sellers specifically disclaimed any "representations or warranties whatsoever . . . with respect to any matter relating to the Purchased Assets" (APA § 2.11), which disclaimer is obviously broad enough to encompass any implied representation or warranty concerning the payment clearing account.

        As with the Cure Claims, the Purchaser appears to rely on Section 2.6 of the APA, whereby the Sellers remain liable and responsible for "Retained Liabilities," to get around the "As Is Where Is" provision and establish that the alleged under-funding of the payment clearing account constituted a breach of an obligation or covenant under the APA. Assuming *arguendo* that the payment clearing account was in fact underfunded as of the Initial Closing, resulting in anticipated shortfalls in the various investors' custodial accounts, such shortfalls would have constituted defaults under the applicable contracts with the investors resulting from pre-Initial Closing acts or omissions of the Sellers. As discussed above in connection with the Cure Claims, these defaults would have been "Retained Liabilities" of the Sellers under the APA (for which the Purchaser was, admittedly, not responsible) and, more specifically, "Seller Cure Amounts" under the Servicing Sale Order. By operation of the provisions of the Servicing Sale Order discussed above, the Sellers' liability for Seller Cure Amounts (and thus, any liability under the APA to discharge these Retained Liabilities) was discharged in full upon creation of the Cure Escrow. Accordingly, to the extent the Reimbursement Claim is premised upon a breach of contract theory, it fails because (i) as discussed above, Section 2.6 of the APA does not affirmatively require the cure of "Retained Liabilities," and (ii) even if it does, the alleged

14

shortfall in the payment clearing account was a "Seller Cure Amount" deemed cured by the Servicing Sale Order upon creation of the Cure Escrow.

In light of the foregoing, it appears the Reimbursement Claim is properly considered an equitable claim for restitution, based on the Purchaser's inadvertent satisfaction of a "Retained Liability" of the Sellers. However, a restitution theory does no better than a breach of contract theory in establishing an entitlement to an administrative expense claim. For example, in an action for unjust enrichment, the measure of damages would be the amount of any pecuniary benefit to the Sellers resulting from the Purchaser's cure of the shortfall in the payment clearing account. However, any anticipated shortfalls in custodial accounts resulting from the alleged shortfall in the payment clearing account constituted "Sellers' Cure Amounts" under the Servicing Sale Order, which were assertable only against the Cure Reserve and were deemed cured upon establishment thereof. Accordingly, any benefit to the Sellers resulting from the Purchaser's cure of the alleged shortfall in the payment clearing account is dubious at best, because if the Purchaser had *not* cured such shortfall, the Debtors would have essentially been no worse off. That is, potential claims against the Cure Reserve would have increased by $2.4 million, but the Sellers' administrative exposure would have remained capped at the $10 million reserve amount.[9] Indeed, if the Reimbursement Claim were allowed as an administrative expense against the Sellers, then they would actually be *worse* off as a result of the Purchaser's cure of the shortfall in the payment clearing account, because it would have increased their overall administrative exposure from $10 million to approximately $12.4 million.

To the extent the Court finds that the Purchaser satisfied a "Retained Liability" of the Sellers, the appropriate remedy would be to subrogate the Purchaser to the rights of the

---

[9] To the extent claims against the Cure Reserve exceed $10 million, cure claimants share *pro rata* in the $10 million and their right to file an unsecured claim against the applicable Debtor's estate for the unpaid balance is preserved. (Servicing Sale Ord. ¶ 35.)

various investors whose custodial accounts the Purchaser inadvertently replenished. The

Reimbursement Claim would thus be assertable, if at all, solely against the Cure Escrow in

accordance with the relevant provisions of the Servicing Sale Order. The Debtors respectfully

submit that it would be inequitable to the Sellers and their creditors for the Purchaser, by virtue

of its unilateral and gratuitous satisfaction of a liability of the Sellers to certain creditors, to

succeed to greater rights against the Sellers than were originally possessed by those creditors.

### C.   Misappropriation Claims ($3,471,907)

The Misappropriation Claims relate to alleged pre-Initial Closing shortfalls in

certain custodial accounts with investors, which AHM SV allegedly cured during the Interim

Period using the Purchaser's funds. Misappropriation Claims comprise claims related to

"Overpayment of Advances" (Amended Motion ¶ 32 ($1,496,586)), "Paid-in-Full Loans Sold to

Third Parties" (id. ¶ 35 ($164,303)), "Paid-in-Full Loans – Compensating Interest" (id. ¶ 36

($1,213,341)), and "Funding of HELOC Custodial Accounts" (id. ¶ 48 ($597,677)). At the time

of the filing of this Preliminary Objection, the Debtors have insufficient information regarding

the Misappropriation Claims to evaluate the specific factual and legal basis for, or to formulate a

meaningful response to, such claims. The Debtors therefore object generally to the

Misappropriation Claims and respectfully request that the Court hold the Purchaser to its

evidentiary burden with respect thereto. This is especially important in light of the Purchaser's

significant informational advantage, given that it currently employs most (if not all) of the

individuals having first-hand knowledge of any acts or omissions of the Sellers prior to the Final

Closing.

Notwithstanding the foregoing, the Debtors have several observations regarding

the Misappropriation Claims.

First, the Amended Motion insinuates that AHM SV intentionally utilized the Purchaser's funds to cure pre-Initial Closing shortfalls in the custodial accounts "rather than seeking return of the funds from [AHM Corp.]" (Amended Motion ¶ 3.) As discussed above in connection with the Cure Claims, however, any pre-Initial Closing shortfalls in custodial accounts would have constituted Sellers' Cure Amounts under the Servicing Sale Order, enforceable only against the Cure Reserve. Accordingly, there would have been no legal basis or motive for AHM SV to seek return of missing funds from AHM Corp., and AHM SV would have nothing to gain by using the Purchaser's funds to replenish the custodial accounts if to do so would expose the Sellers to administrative liability (i.e., to the Purchaser) above and beyond the $10 million Cure Escrow. Indeed, if an employee of AHM SV had authorized such a use of the Purchaser's funds during the Interim Period, the employee may well have breached his or her fiduciary duties to AHM SV and/or its bankruptcy estate in so doing.

Second, the Debtors note that, during the Interim Period, the *only* funds available to AHM SV to operate the servicing business were the proceeds of a limited-recourse, working capital debtor-in-possession facility (the "Working Capital DIP") with the Purchaser. Accordingly, any funds that were disbursed by AHM SV from the Purchaser's accounts for any purpose would have been put there by the Purchaser in its capacity as the Working Capital DIP lender. During the Interim Period, as contemplated by the APA, AHM SV and the Purchaser consulted regularly concerning the operation of the servicing business and its eventual transition to the Purchaser. (See APA § 6.2(a).) The Debtors expect discovery will reveal the extent to which the Purchaser authorized, knew, or should have known about any of the transfers during the Interim Period about which it now complains, and the Debtors reserve all rights to determine the legal effect, if any, thereof.

DB02:7336551.2                                    066585.1001

Third, the Debtors note that, in light of the Court's approval of the APA in the Servicing Sale Order, any transfers of funds by AHM SV in violation of the APA likely would have constituted unauthorized postpetition transfers that may be avoided and recovered by the Debtors under 11 U.S.C. §§ 549 and 550.

### D.    LPMI and Prepayment Penalties ($4,592,887)

The Purchaser asserts it has paid an aggregate of $13,980,849 to insurers (for LPMI premiums) and owners of certain loans (for prepayment penalties) on account of amounts allegedly collected by AHM SV prior to the Initial Closing, and asserts the excess of this amount over the parties' prior tentative payment/purchase price adjustment of $9,387,962 (as provided in the Third Amendment to the APA) as an administrative expense. At the time of the filing of this Preliminary Objection, the Debtors have insufficient information regarding the Purchaser's calculation of its LPMI and prepayment penalty figures to evaluate the specific factual and legal basis therefor, or to formulate a meaningful response thereto. The Debtors therefore object generally to the entire $13,980,849 amount and respectfully request that the Court hold the Purchaser to its evidentiary burden with respect thereto.

Notwithstanding the foregoing, based on information provided by the Purchaser and gathered by the Debtors in connection with the Original Motion, the Debtors have reason to believe there may be serious flaws in the Purchaser's methodology for calculating the alleged LPMI deficiency. Specifically:

- The Purchaser's methodology in the Original Motion considered all LPMI premiums collected from September 2007 forward, versus all LPMI premiums paid from September 2007 forward. This is inaccurate, however, because LPMI premiums collected in one month are not payable until the following month. Thus, a proper methodology would have to consider, e.g., LPMI premiums collected from September 2007 forward, versus LPMI premiums paid from October 2007 forward.

18

- The Purchaser's methodology in the Original Motion failed to credit AHM Corp. for LPMI premiums it paid in October 2007.

- The Purchaser's methodology in the Original Motion included LPMI premiums paid on account of delinquent loans to arrive at the aggregate LPMI premiums paid by the Purchaser. However, LPMI premiums payable after the Initial Closing on account of delinquent loans in which the Debtors have no interest (for which LPMI premiums are not collectable)[10] constitute "servicing advances" for which the Purchaser is responsible under its Servicing Agreements with the owners of the loans.

The Debtors' preliminary analysis of the Original Claim revealed that, owing to the foregoing defects in the Purchaser's methodology for calculating its alleged LPMI deficiency, and assuming *arguendo* that the figures relied upon by the Purchaser were otherwise accurate, the Purchaser likely overstated the alleged LPMI deficiency by at least $2 million.

While it appears the Purchaser may have remedied certain of the foregoing defects in its methodology for calculating the alleged LPMI deficiency, the Debtors will ultimately need more information than what is provided in the Amended Motion and declarations in support thereof to determine if this is so. The Debtors note that if the approximately $14 million aggregate LPMI and prepayment deficiencies asserted by the Purchaser were overstated by 33% (approximately $4.6 million) or more, then the tentative payment/purchase price adjustment set forth in the Third Amendment to the APA will have been too great, and the Purchaser will owe *the Sellers* money on account of LPMI and prepayment penalties.

E.   **FNMA Guaranty Fees ($834,648)**

At first blush, the Purchaser's claim related to FNMA Guaranty Fees looks like a Misappropriation Claim, because it involves an allegedly wrongful transfer of funds during the Interim Period from accounts established for the benefit of the Purchaser. Importantly, however, Misappropriation Claims all involved the alleged payment of a "Retained Liability" of the

---

[10] LPMI premiums are typically collected from interest payments made by borrowers. Thus, if a borrower is in payment default, there is nothing from which to collect LPMI premiums.

DB02:7336551.2                                                                 066585.1001

Sellers arising *prior* to the Initial Closing. The claim for FNMA Guaranty Fees, however, involves the payment of a liability the Purchaser itself acknowledges "became due *during the Interim Period.*" (Amended Motion ¶ 21 (emphasis added).)

The Purchaser states simply that, prior to the Initial Closing, AHM SV deducted amounts for FNMA Guaranty Fees from borrowers' principal and interest payments and deposited these amounts in the 434 Account pending remittance to FNMA. Notably, however, the Purchaser does not allege (nor can it fairly be inferred from what is alleged) that these deductions, or subsequent deposits into the 434 Account, constituted a breach of the applicable servicing agreement(s) as of the Initial Closing. In the absence of a pre-Initial Closing breach, and to the extent the FNMA Guaranty Fees constituted a post-Initial Closing liability, it is unclear how AHM SV's payment of the FNMA Guaranty Fees as they came due during the Interim Period could have breached the APA. The APA specifically required the Sellers to perform under the Assumed Contracts (see APA § 6.1(h) (prohibiting breach of an Assumed Contract)) and specifically provided that the Purchaser would "bear all Liabilities of the Business" during the Interim Period (APA § 6.2(b)). Given that AHM SV's only source of operating funds following the Initial Closing was the Working Capital DIP provided by the Purchaser, it was necessary for AHM SV to use such funds to pay the FNMA Guaranty Fees when due, so as to avoid defaulting on the underlying Servicing Agreement(s) in violation of the APA. Given that such FNMA Guaranty Fees were an obligation under an Assumed Contract arising during the Interim Period, there was no breach of the APA as a result of the payment of such fees by AHM SV.

F.    **Signature Bank Agreement ($757,426)**

Under Section 2.1(a) of the APA, the Purchaser agreed to purchase "all of Seller's Servicing Rights and rights to receive Servicing Fees." The term "Servicing Rights" is specifically defined in Section 1.1 of the APA to include "all right, title and interest of Sellers in and to: (i) the right to service the Mortgage Loans under the Servicing Agreements, including the right to receive the Servicing Fees and Ancillary Income; . . . ." The term "Servicing Agreements" is specifically defined in Section 1.1 of the APA to include "the servicing agreements . . . which are contained in the agreements identified on <u>Schedule 1.1(j)</u>". The Signature Bank Agreement is identified on Schedule 1.1(j), it clearly grants the Debtors certain "rights" with respect to the servicing of "Mortgage Loans,"[11] and such rights fall squarely within the definition of "Servicing Rights" set forth in the APA. Indeed, the Purchaser essentially acknowledges as much in its Amended Motion when it refers to "mortgage loans that were being *serviced pursuant to the Signature Agreement*". (Mot. at p. 29, ¶ 53 (emphasis added).)

The Purchaser's argument for a refund of the Purchase Price attributable to the Signature Bank Agreement is that the agreement did not transfer "mortgage servicing rights" as understood within the mortgage industry, and thus "could not have been intended" by the parties to appear on Schedule 1.1(j) to the APA. (Amended Motion at ¶ 52, p. 29.)

As a threshold matter, the APA nowhere refers to "mortgage servicing rights" as understood within the mortgage industry (a.k.a. "MSRs"), even though the parties were perfectly aware of this industry term and could easily have chosen it as a point of reference when drafting the APA. Instead, the APA uses the defined term "Servicing Rights," which, as discussed above, plainly covers the rights under the Signature Bank Agreement. Given that the APA is a fully

---

[11] As defined in the APA, "Mortgage Loans" means "any residential mortgage loan or other extension of credit secured by a Lien on real property of a borrower." (APA § 1.1, at 10.)

066585.1001

integrated agreement,[12] what the parties "could" or "could not have intended" by the term "Servicing Rights" is irrelevant in the absence of any ambiguity.

Nevertheless, to the extent that industry understanding or speculation as to the parties' subjective intent is relevant, the Debtors note that, despite David Friedman's self-serving testimony to the contrary,[13] the Signature Bank Agreement did afford the Debtors rights and obligations that are typically associated with those of a mortgage loan servicer, including obligations to receive and apply principal and income payments, to receive, escrow, and apply tax and insurance payments, and the rights to retain servicing fees out of amounts received, to initiate foreclosures, and to collect and retain "ancillary income" from mortgage borrowers. Thus, the Purchaser's assertion that the rights under the Signature Bank Agreement are not typical in the mortgage servicing industry lacks merit.

The Purchaser contends that Signature Bank's ability to terminate the Servicing Rights under the Signature Bank Agreement upon a sale of the underlying Mortgage Loans pursuant to Section 2.5(d) of the agreement demonstrates that inclusion of the Signature Bank Agreement on Schedule 1.1(j) was inappropriate. However, the Purchaser neglects to mention that if Signature Bank terminates Servicing Rights upon the sale of any underlying Mortgage Loans on a "servicing-released" basis, it is required to pay a fee of $750 per loan to the servicer. Moreover, per Section 2.5(c) of the Signature Bank Agreement, if Signature Bank sells an underlying Mortgage Loan on a "servicing-retained" basis, the servicer is entitled to receive an additional fee of $1.00 per month with respect to servicing such Mortgage Loans.

---

[12] (See APA § 11.8, at 64 ("This Agreement . . . constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof . . . .").)

[13] Mr. Friedman, who is now president of the Purchaser, headed the Debtors' servicing business at the time the APA was executed, and he and/or those working under him assisted the Debtors in identifying and assembling the servicing agreements to be included on Schedule 1.1(j). Needless to say, the Debtors are curious to learn at what point Mr. Friedman formed his current belief as to the meaning of "mortgage servicing rights" as understood in the mortgage industry.

Section 2.11 of the APA specifically acknowledges that the Purchaser "conducted an independent inspection and investigation of the physical condition of all . . . matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate" and that, accordingly, the Purchaser would accept the Purchased Assets "AS IS" and "WHERE IS" at the Final Closing. (APA § 2.11.) That the Purchaser, upon further reflection, now believes the terms of and fees payable under the Signature Bank Agreement are below-market and that it overpaid for the Servicing Rights thereunder is neither the Sellers' nor this Court's problem. There is no basis in law or equity for the Court to reform the parties' negotiated bargain under the APA by relieving the Purchaser of the known risks of an "as is" and "where is" transaction.

### G.    Document Delivery Costs ($31,200)

The Purchaser's claim for document delivery costs should be denied as a matter of law. The term "Purchased Assets" under the APA encompasses "Books and Records" (APA § 2.1(d)), which is defined to include all "files", "reports," and "other materials (in any form or medium) Related to the Business or directly relating to the Purchased Assets, and the Assumed Liabilities" (APA § 1.1). The Servicing Documents described in the Amended Motion thus constitute "Purchased Assets" under the APA. Except as expressly provided otherwise in the APA, the Purchaser took all Purchased Assets "AS IS" and "WHERE IS" on the Final Closing. (APA § 2.11.) Accordingly, in the absence of an express provision of the APA requiring the Sellers to transport the Servicing Documents to Irving, Texas, the Purchaser took title to such documents F.O.B. the warehouse in Melville, New York (i.e., "WHERE IS").

To get around the "As Is Where Is" provision, the Purchaser relies on tortured readings of two provisions of the APA.

First, the Purchaser cites the general language of conveyance regarding the Purchased Assets, requiring the Sellers to "convey, transfer, assign and *deliver* to Purchaser . . . all of the right, title and interest of all Sellers . . . in and to all assets related to the Business . . . ." (APA § 2.1 (emphasis in the Amended Motion).)  The Purchaser notes that among the "assets related to the Business" are "all of Sellers' Servicing Rights" (APA § 2.1), and further notes that that "Servicing Rights" is defined to include "the right of ownership, possession, control or use of any and all Servicing Files and Mortgage Loan Documents" (APA § 1.1).

The Purchaser's reliance on the term "deliver" in Section 2.1 is misplaced, because it overlooks the broader context of that section and the APA as a whole.  By itself, the term "deliver" is ambiguous because it can connote either *physical* delivery (e.g., of a package to an address) or *legal* delivery (e.g., of title to real property).  Without explanation or analysis, the Purchaser assumes the former connotation, reading the phrase "deliver to Purchaser" in Section 2.1 to mean "physically deliver to Irving, Texas."  This reading overlooks the direct object of the verb "deliver" in Section 2.1, namely "all of the *right, title, and interest . . . in and to* all assets," which is classic language of conveyance connoting *legal* delivery rather than *physical* delivery.  In this connection, it is noteworthy that the definition of "Servicing Rights" cited by the Purchaser includes "the *right* of ownership, possession, control or use of . . . Servicing Files and Mortgage Loan Documents"—again, connoting that "delivery" of "Servicing Rights" requires only a transfer of *the right* of possession of the Servicing Documents.

Next, the Purchaser cites a provision dealing with the transition of loan servicing operations from the Sellers to the Purchaser and requiring that the Sellers, on the Final Closing Date,

> in accordance with Purchaser's reasonable instructions, take all steps, and execute and
> *deliver* all such agreements, letters, and other documents as are reasonably requested by

> Purchaser to effect the transfer of the Servicing Agreements . . . such that, after the Final
> Closing Date, Purchaser or its designee *has* all of the Servicing Rights [and] the
> Servicing Files . . . .

(APA § 6.10(a) (emphasis in the Amended Motion).)  Again, the Purchaser relies on the verb

"deliver" without taking into account the surrounding context—in particular, the requirement

that the Sellers "execute *and* deliver" the "documents" referred to in Section 6.10(a).  The

Servicing Documents, though "documents," cannot be "executed" by the Sellers in any sense of

the word.  A more natural reading of this Section 6.10(a) is that it refers to documents incidental

to the transfer of servicing which may yet need to be executed by the Sellers, such as notices to

borrowers and/or investors, or instruments necessary to perfect the transfer of ownership (i.e.,

documents that would need to be "executed *and* delivered" by the Sellers).  Even if the

"documents" referenced in Section 6.10(a) included the Servicing Documents, the Debtors note

that nothing in that provision addresses who will bear the costs for "delivering" such documents.

The Debtors further note that Section 6.10(a) contains a reasonableness requirement on the part

of the Purchaser and that, in light of the Purchaser's agreement to take the Purchased Assets "As

Is Where Is" as of the Final Closing, it would not be reasonable for the Purchaser, at or following

the Final Closing, to demand that the Sellers physically deliver the Servicing Documents to

Texas at their own expense.  Simply put, following the Final Closing, the Purchaser "has" the

Servicing Documents it bargained for—as is, where is, in Melville, New York.

## III.  ANY ALLOWED ADMINISTRATIVE CLAIM SHOULD BE REDUCED ON ACCOUNT OF THE PURCHASER'S PURPORTED SETOFF AGAINST AMOUNTS OWED TO AHM CORP.

The Amended Motion neglects to mention that the Purchaser purported to

exercise a right of setoff (the "Purported Setoff") with respect to approximately $2.6 million

owed to AHM Corp. for certain corporate overhead and insurance costs it paid on behalf of the

servicing business during the Interim Period.  Copies of the March 27 and May 5, 2008, invoices

from AHM Corp. to the Purchaser reflecting these amounts are attached hereto as <u>Exhibit C</u>.  To the extent the Court is inclined to allow the Purchaser an administrative claim in any amount, such claim should be reduced by up to the full amount of the Purported Setoff.  Any excess of the Purported Setoff over the Purchaser's allowed administrative claim (if any) should be paid to the Debtors forthwith.

<h3 style="text-align:center"><u>RESERVATION OF RIGHTS</u></h3>

The Debtors reserve all rights to file a complete response to the Amended Motion. This Preliminary Objection does not waive any right of the Debtors to dispute any and all assertions in the Amended Motion, on any and all bases, including, but not limited to the applicability of administrative expense priority.

The Debtors also reserve their right to request the application of Bankruptcy Rules 7008 (Affirmative Defenses), 7012 (Motion for Judgment on the Pleadings), 7013 (Counterclaim and Cross-Claim), and/or 7056 (Summary Judgment) to this contested matter. <u>See</u> Fed. R. Bankr. P. 9014 ("The court may at any stage in a particular matter direct that one or more of the [rules applicable to adversary proceedings] shall apply.").

To the extent the Purchaser is allowed an administrative claim in any amount with respect to the Amended Motion, the Debtors reserve all rights as against third parties (i) from whom the Debtors may seek contribution or indemnity, including, but not limited to, the Debtors' former employees, and (ii) to bring actions to avoid transfers made to or for the benefit of such parties during the Interim Period.

066585.1001

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter a scheduling order to govern briefing, discovery and evidentiary hearing dates in this contested matter and grant the Debtors such other and further relief as is just and proper, including, ultimately, denial of the Amended Motion with prejudice.

Dated: Wilmington, Delaware
      September 10, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John T. Dorsey (No. 2988)
Erin Edwards (No. 4392)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and
Debtors in Possession

DB02:7336551.2        066585.1001