# Exhibit A

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

American Home Mortgage Claims Processing Center
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: American Home Mortgage Holdings, Inc., et al., Debtors. | Chapter 11 Case No. 07-11047 (CSS) Jointly Administered |
|---|---|
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| American Home Mortgage Corp. | 07-11051 |

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

Creditor: NOMURA CREDIT & CAPITAL, INC.
2 World Financial Center
Building B
New York, New York 10281-1191

Notice: Richard H. Wyron, Esq.
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone number: (202) 339-8514
Email Address:    rwyron@orrick.com

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☑ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Account or other number by which creditor identifies debtor:

Check here if this claim: ☐ replaces    ☐ amends a previously filed claim, dated:

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other    See Attachment    (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last Four Digits of your SS#:    ___  ___  ___  ___
Unpaid compensation for services performed
from _____ to _____
              (date)                              (date)

**2. Date debt was incurred:**
See Attachment

**3. If court judgment, date obtained:**
Not applicable.

**4. Total Amount of Claim at Time Case Filed:** $ See attachment    +    _____ (secured)    +    _____ (unsecured priority)    = See Attachment (Total)
                                                    (unsecured nonpriority)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $ _____
Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**6. Unsecured Nonpriority Claim:** $ See attachment
☑ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**FILED / RECEIVED**

JAN 11 2008

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| 1/11/2008 | Mark Brown, President |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE<br>American Home Mortgage Claims Processing Center<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **PROOF OF CLAIM** |
|---|---|

| In Re:<br>American Home Mortgage Holdings, Inc., et al.,<br>Debtors. | Chapter 11<br>Case No. 07-11047 (CSS)<br>Jointly Administered | |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>American Home Mortgage Corp. | Case No of Debtor<br>07-11051 | |

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

THIS SPACE IS FOR COURT USE ONLY

**Name and address of Creditor :** (and name and address where notices should be sent if different from Creditor)

Creditor: NOMURA CREDIT & CAPITAL, INC.
2 World Financial Center
Building B
New York, New York 10281-1191

Notice:  Richard H. Wyron, Esq.
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone number: (202) 339-8514
Email Address:   rwyron@orrick.com

- ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
- ☑ Check box if you have never received any notices from the bankruptcy court in this case.
- ☐ Check box if the address differs from the address on the envelope sent to you by the court.

**Account or other number by which creditor identifies debtor:**

Check here if this claim:  ☐ replaces  ☐ amends a previously filed claim, dated: _____

| 1.  **Basis for Claim**<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☑ Other___See Attachment_____ (explain) | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Last Four Digits of your SS#: ___ ___ ___ ___<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date)          (date) |
|---|---|

2.  **Date debt was incurred:**
    See Attachment

3.  **If court judgment, date obtained:**
    Not applicable.

4.  **Total Amount of Claim at Time Case Filed:** $ ___See attachment___ + _____ + _____ = ___See Attachment___
    (unsecured nonpriority)   (secured)   (unsecured priority)   (Total)
    If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
    ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5.  **Secured Claim.**
    ☐ Check this box if your claim is secured by collateral (including a right of setoff).
    Brief Description of Collateral:
    ☐ Real Estate  ☐ Motor Vehicle
    ☐ Other _____
    Value of Collateral: $ _____
    Amount of arrearage and other charges at time case filed included in secured claim, if any:  $ _____

7.  **Unsecured Priority Claim.**
    ☐ Check this box if you have an unsecured priority claim
    Amount entitled to priority $ _____
    Specify the priority of the claim:
    ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
    ☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
    ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
    ☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
    ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
    ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___ ).

6.  **Unsecured Nonpriority Claim:** $ ___See attachment___
    ☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

THIS SPACE IS FOR COURT USE ONLY

8.  **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

9.  **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.

    **DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

10  Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date<br>1/16/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Mark Brown, President | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## DEFINITIONS

**Debtor**
The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

**Creditor**
A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

**Proof of Claim**
A form filed with the clerk of the bankruptcy court where the bankruptcy case was filed, to tell the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed

**Secured Claim**
A claim is a secured claim if the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began. In some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. *(See also Unsecured Claim)*

**Unsecured Claim**
If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Priority Claim**
Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

## Items to be completed in Proof of Claim form (if not already filled in)

**Name of Debtor and Case Number:**
Fill in the name of the debtor in the bankruptcy case, and the bankruptcy case number.

| | |
|---|---|
| American Home Mortgage Holdings, Inc | 07-11047 |
| American Home Mortgage Investment Corp | 07-11048 |
| American Home Mortgage Acceptance, Inc | 07-11049 |
| American Home Mortgage Servicing, Inc | 07-11050 |
| American Home Mortgage Corp | 07-11051 |
| American Home Mortgage Ventures LLC | 07-11052 |
| Homegate Settlement Services, Inc. | 07-11053 |
| Great Oak Abstract Corp | 07-11054 |

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**
Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**
Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Claim at Time Case Filed:**
Fill in the applicable amounts, including the total amount of the entire claim. If interest or other charges in addition to the principal amount of claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Secured Claim:**
Check the appropriate place if the claim is a secured claim. You must state the type and value of the property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

**6. Unsecured Nonpriority Claim:**
Check the appropriate place if you have an unsecured nonpriority claim, sometimes referred to as a "general unsecured claim". (See DEFINITIONS, above.) If your claim is partly secured and partly unsecured, state here the amount that is unsecured. If part of your claim is entitled to priority, state here the amount not entitled to priority.

**7. Unsecured Priority Claim:**
Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

**8. Credits:**
By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**9. Supporting Documents:**
You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE | ) Case No. 07-11047 (CSS) |
| HOLDINGS, a Delaware Corporation, et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

## ATTACHMENT TO THE PROOF OF CLAIM
## OF NOMURA CREDIT & CAPITAL, INC.

1.      This Attachment, and the Exhibits and Schedules attached hereto, constitute part of the proof of claim submitted in the above-captioned bankruptcy proceedings by Nomura Credit & Capital, Inc. and its affiliates (collectively, "NCCI") against American Home Mortgage Corp. (the "Debtor").[1]

### I.      THE LOAN PURCHASE TRANSACTIONS

2.      The Debtor and NCCI entered into a letter agreement setting forth the master terms for mortgage loan purchases, dated January 1, 2005 (the "Master Terms"), a true copy of which is attached as Exhibit 1.  The Debtor and NCCI also entered into a Master Mortgage Loan Purchase Agreement, dated as of January 1, 2005 (the "Mortgage Purchase Agreement"), as amended by Amendment No. 1, dated December 1, 2005 (the "Amendment" and together with the Mortgage Purchase Agreement, the "MMLPA"), a true copy of which is attached as Exhibit 2.  In addition, between January 28, 2005 through and including March 7, 2007, the Debtor and NCCI entered into six Pool Summary and Trade Confirmations (each, an "MMLPA Confirmation" and together, the

---

[1] American Home Mortgage Corp.'s case number is 07-11051 but has been consolidated for administrative purposes as case number 07-11047.

OHS East:160363389.1
6180-87 C43/C43

"MMLPA Confirmations"), each of which incorporate the Master Terms and the MMLPA, as follows:

    a) January 28, 2005
    b) March 9, 2005
    c) February 22, 2006
    d) August 1, 2006
    e) September 11, 2006
    f) March 7, 2007

True copies of the MMLPA Confirmations are attached as Exhibits 3A-F, respectively. Additionally, Debtor and NCCI entered into another letter agreement setting forth the master terms for mortgage loan purchases dated June 1, 2005 (the "Master Terms-2"), a true copy of which is attached as Exhibit 4. On June 9, 2005, the Debtor and NCCI entered into a Pool Summary and Trade Confirmation (the "Master Terms-2 Confirmation," and together with the MMLPA Confirmations, the "Confirmations"), incorporating the Master Terms-2 and the MMLPA, a true copy of which is attached as Exhibit 5.

    3.    The Master Terms, MMLPA, Master Terms-2, and Confirmations (collectively, the "Governing Documents") provide for the sale by the Debtor and the purchase by NCCI of certain mortgage loans (individually, a "Purchased Loan" and collectively, the "Purchased Loans"). NCCI purchased such Purchased Loans from the Debtor in seven separate transactions; each purchase transaction is reflected in a Confirmation. The first transaction was designated as "AHM 01;" the applicable Confirmation is attached as Exhibit 3A. The second transaction was designated as "AHM 02;" the applicable Confirmation is attached as Exhibit 3B. The third transaction was designated as "AHM 03;" the applicable Confirmation is attached as Exhibit 3C. The fourth transaction was designated as "AHM SP 01;" the applicable Confirmation is

attached as Exhibit 5. The fifth transaction was designated as "AHM 04;" the applicable Confirmation is attached as Exhibit 3D. The sixth transaction was designated as "AHM 05;" the applicable Confirmation is attached as Exhibit 3E. The seventh transaction was designated as "AHM 06;" the applicable Confirmation is attached as Exhibit 3F.

4.      The Governing Documents set out certain rights and obligations of the Debtor and NCCI with respect to the Purchased Loans.

5.      The Debtors are in breach of certain terms of the Governing Documents. NCCI hereby asserts claims for all damages arising from such breaches, including damages liquidated as of the date hereof, and all contingent and/or unliquidated damages arising or which may in the future arise, with respect to such breaches. The Purchased Loans as to which there has been a breach identified by NCCI are described in Section II of this Attachment.

6.      The Governing Documents contain numerous warranties, representations, covenants and other promises made by the Debtor which (i) may have been breached or may be inaccurate, but NCCI does not presently have knowledge of such facts, or (ii) may be breached or determined to be inaccurate in the future. NCCI cannot predict with certainty on which Purchased Loan(s) there will be a default and whether such defaults and/or other damages will involve a breach by the Debtor of one or more warranties, representations, covenants and/or other provisions of the Governing Documents. Accordingly, as set out in Section III below, NCCI asserts a contingent claim for all such potential damages with respect to all Purchased Loans as to which there has not yet been a breach identified by NCCI. NCCI reserves all rights to amend, supplement and modify

this proof of claim as breaches occur and/or become known to NCCI and/or as damages become fixed or liquidated.

## II.    EARLY PAYMENT DEFAULT CLAIMS

7.    Pursuant to the Governing Documents, the Debtor was required to repurchase any mortgage loans at the related Purchase Price Percentage times the aggregate principal balance of such Mortgage Loan as of the date of repurchase, if the related mortgagor failed to make timely any of the first three scheduled monthly payments due to NCCI following the related Cut-Off Date. This provision is commonly referred to as an "Early Payment Default" or "EPD" provision.

8.    With respect to each of the Purchased Loans identified on Schedule I attached hereto,[2] one or more scheduled monthly payments within the scope of the applicable EPD provision was not made within the time period set forth in the applicable EPD provision. As a result, the Debtor is required to repurchase each such Purchased Loan in the amount calculated in accordance with the applicable EPD provision and the other Governing Documents. To the extent, if any, that demand is required but has not previously been made for any such repurchase, this proof of claim shall constitute notice of such demand.

9.    The Debtor's repurchase obligations with respect to EPD Claims, as set out in Schedule I, is in the aggregate amount of $14,497,867.13. NCCI asserts a claim for damages in this amount, plus interest, costs and other damages to the extent allowed by the Governing Documents and applicable law.

---

[2] Individual identifying information has not been included in the attached schedules in order to respect privacy concerns. Such information is already available to the Debtor, or will be provided with appropriate confidential protections.

### III.   CONTINGENT CLAIMS

10.   In connection with NCCI's purchase of the Purchased Loans, the Debtor made numerous representations, warranties and covenants, and undertook other obligations, in the Governing Documents. Such representations, warranties, covenants, and other provisions of the Governing Document may be breached in the future, or may already have been breached, but such breach is not known to NCCI. As a result of any such breach, the Debtor would be obligated to repurchase such loan(s) or otherwise would be liable for damages.

11.   Accordingly, NCCI hereby asserts a contingent claim in the aggregate amount of the unpaid principal balance of all Purchased Loans, other than the Purchased Loans identified on Schedule I (EPD Claims) plus interest, costs and other damages to the extent allowed by the Governing Documents and applicable law. Such Purchased Loans are identified in Schedule II. The aggregate amount of NCCI's contingent claim is $343,603,548.27.

### IV.   RESERVATION OF RIGHTS

12.   NCCI reserves all rights with respect to any Purchased Loan listed on Schedules I of II, including, without limitation, the right to assert additional claims of which NCCI may become aware in the future, the right to seek (if necessary) temporary allowance of its claim (including any contingent portion of its claim) for voting purposes, the right to seek (if necessary) estimation of its claim (including any contingent portion of its claim) for allowance and/or distribution purposes, and the right to supplement or amend this proof of claim to identify additional Purchased Loans.

13.   NCCI is not aware that this proof of claim is subject to any setoff or counterclaim by the Debtor. NCCI expressly reserves and does not waive any and all

other claims or sources of repayment, if any, with respect to the claims asserted in this proof of claim or which may be considered security for this proof of claim, including without limitation, claims for contribution or indemnity (whether contractual, equitable or otherwise) against any other party, rights of setoff, offset, recoupment or the like against the Debtor to the extent the Debtor holds or asserts any claims against NCCI, proceeds of any bond or surety, if any, and any subrogation rights NCCI may have.

14.    NCCI reserves the right to seek secured, administrative expense priority, and/or priority claim status for any claims asserted herein, and for any other claim NCCI may have, to the extent such claims qualify for such treatment under the Bankruptcy Code.  NCCI reserves all rights with respect to any claim against the Debtor for which a proof of claim is not required to be filed.

15.    The filing of this proof of claim is not to be construed as an election of remedies.  NCCI reserves the right to further amend and supplement this claim, to specify and quantify costs, expenses, and other charges or claims incurred by or owed to NCCI, and to file additional or supplemental proofs of claim.

## V.    SUMMARY

16.    In summary, NCCI asserts claims in the following amounts:

| | | |
|---|---|---|
| (a) | EPD Claims (Schedule I) | $14,497,867.13 |
| (b) | Contingent Claims (Schedule II) | $343,603,548.27 |
| | Total for this Proof of Claim: | **$358,101,415.40** |

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit 1 | Letter agreement, dated as of January 1, 2005 |
| Exhibit 2 | Master Mortgage Loan Purchase Agreement, dated as of January 1, 2005 (MMLPA), and the MMLPA Amendment No. 1, dated as of December 1, 2005 |
| Exhibit 3A | Pool Summary and Trade Confirmation, dated January 28, 2005 (AHM 01) |
| Exhibit 3B | Pool Summary and Trade Confirmation, dated March 9, 2005 (AHM 02) |
| Exhibit 3C | Pool Summary and Trade Confirmation, dated February 22, 2006 (AHM 03) |
| Exhibit 3D | Pool Summary and Trade Confirmation, dated August 1, 2006 (AHM 04) |
| Exhibit 3E | Pool Summary and Trade Confirmation, dated September 11, 2006 (AHM 05) |
| Exhibit 3F | Pool Summary and Trade Confirmation, dated March 7, 2007 (AHM 06) |
| Exhibit 4 | Letter Agreement, dated June 1, 2005 |
| Exhibit 5 | Pool Summary and Trade Confirmation, dated June 9, 2005 (AHM SP 01) |
| Schedule I | EPD Claims |
| Schedule II | Contingent Claims |

# EXHIBIT 1

# NOM/URA

NOMURA CREDIT & CAPITAL, INC.
2 World Financial Center, Building B
New York, NY 10281-1198

January 1, 2005

**American Home Mortgage Corp.**
538 Broadhollow Road
Melville, New York 11747

Attention: Mr. Peter Weingold

Re: Master Terms for Mortgage Loan Purchases

Ladies and Gentlemen:

    This agreement (this "Agreement") sets forth the master terms and conditions under which **[SELLER]** (the "Seller") will from time to time sell, on a mandatory delivery basis, and Nomura Credit & Capital, Inc. (the "Purchaser") will purchase, conventional residential mortgage loans.

## 1. Master Terms

    In connection with each purchase and sale of a specified group of Mortgage Loans (as defined below) a trade confirmation and pool summary (a "Trade Confirmation"), a form of which is attached as Exhibit A hereto), shall be executed by the Seller and the Purchaser. The terms set forth herein (the "Master Terms"), together with the related Trade Confirmation and MLPA (as defined below), and any other documents provided in connection with a Closing Date shall constitute the entire agreement of the Purchaser and the Seller with respect to such Mortgage Loans. Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the related Trade Confirmation.

## 2. Documentation

    Prior to the closing of the first transaction between the parties, the Seller and the Purchaser shall execute the Purchaser's standard form of Master Mortgage Loan Purchase Agreement (the "MLPA") in a form mutually acceptable to the Purchaser and the Seller. The MLPA shall govern all closings between the parties. The MLPA shall contain industry standard life-of-loan representations, warranties, covenants and indemnities by the Seller in its capacity as loan seller and interim servicer including, without limitation, those relating to (a) the Seller's compliance with applicable federal, state and local laws, including predatory and abusive lending laws, and the Seller's underwriting guidelines, (b) corporate organization, due

authorization, qualification and good standing and absence of pending or threatened claims or consumer complaints, and (c) the characteristics of the Mortgage Loans, the accuracy of the related mortgage loan schedule, proper servicing, validity and enforceability of loan documentation, completeness of legal files and early payment default protection. In the event of a breach of any corporate or loan level representation or warranty, the Seller shall repurchase the related Mortgage Loan at the related Repurchase Price or, if notification is given by the Purchaser prior to the Premium Protection Date (as extended, if applicable) set forth in the related Trade Confirmation, at the related Purchase Price Percentage, times the aggregate principal balance of such Mortgage Loan as of the date of repurchase, together with accrued interest and provide a market indemnity for such breach.

### 3. Settlement Schedule

The Mortgage Loans identified on the mortgage loan schedule attached to each Trade Confirmation (each, a "Mortgage Loan" and collectively, the "Mortgage Loans") shall be sold by the Seller to the Purchaser on the related Closing Date as set forth in the Trade Confirmation, or such other date that is mutually acceptable to the Seller and the Purchaser, provided, however, that if for any reason, the closing is delayed beyond the Closing Date set forth in the related Trade Confirmation, and the Purchaser, in its sole discretion, elects to purchase the Mortgage Loans, after the scheduled Closing Date, the Purchaser shall pay the Seller accrued interest at LIBOR flat for each day of delay from the Closing Date set forth in the Trade Confirmation through and including the day prior to the date on which the delayed closing takes place. If the Closing Date is extended or delayed for any reason, the Premium Protection Date will also be extended, and the payments subject to early payment default protection shall be adjusted, as necessary, to provide the Purchaser with equivalent protection notwithstanding such extension or delay. The Purchaser shall be entitled to all payments of principal, interest and other recoveries on each Mortgage Loan received after the Cut-off Date. The first remittance to the Purchaser shall occur on the related First Remittance Date.

### 4. Mortgage Loan Characteristics

The MLPA and the Master Terms will apply to various types of mortgage loans. Fixed-Rate Mortgage Loans (each, a "Fixed-Rate Mortgage Loan") accrue interest at fixed pass through rates. Adjustable-Rate Mortgage Loans (each, an "Adjustable-Rate Mortgage Loan") accrue interest at a rate which adjusts periodically throughout the term of the loan. The Purchaser may purchase from the Seller, separately or in any combination agreed to by the parties, Fixed-Rate Mortgage Loans secured by first liens (each a "first lien Fixed-Rate Mortgage Loan"), Fixed-Rate Mortgage Loans secured by second liens (each a "second lien Fixed-Rate Mortgage Loan"), Adjustable-Rate Mortgage Loans secured by first liens (each, a "first lien Adjustable-Rate Mortgage Loan", together with first lien Fixed-Rate Mortgage Loans, the "First Lien Mortgage Loans"), Adjustable-Rate Mortgage Loans secured by second liens (each, a "second lien Adjustable-Rate Mortgage Loan", together with second lien Fixed-Rate Mortgage Loans, the "Second Lien Mortgage Loans").

As of the Cut-off Date, (a) the first lien Fixed-Rate Mortgage Loans, if any, shall have an actual unpaid principal balance equal to the first lien Fixed-Rate Cut-off Date Principal Balance and the characteristics described in the first lien Fixed-Rate Mortgage Loan Schedule, (b) the second lien Fixed-Rate Mortgage Loans, if any, shall have an actual unpaid principal balance equal to the second lien Fixed-Rate Cut-off Date Principal Balance and the

characteristics described in the second lien Fixed-Rate Mortgage Loan Schedule, (c) the first lien Adjustable-Rate Mortgage Loans, if any, shall have an actual unpaid principal balance equal to the first lien Adjustable-Rate Cut-off Date Principal Balance and the characteristics described in the first lien Adjustable-Rate Mortgage Loan Schedule, and (d) the second lien Adjustable-Rate Mortgage Loans, if any, shall have an actual unpaid principal balance equal to the second lien Adjustable-Rate Cut-off Date Principal Balance and the characteristics described in the second lien Adjustable-Rate Mortgage Loan Schedule.

As of the Closing Date, all Mortgage Loans shall have made their scheduled payments for the Paid Through Date (and such payments have been applied).

## 5. Purchase Price

The total purchase price for the Mortgage Loans shall equal the sum, with respect to each type of Mortgage Loan being purchased as indicated on the Trade Confirmation, of (A) the product of (i) the (a) first lien Fixed-Rate Mortgage Loan Purchase Price Percentage, (b) second lien Fixed-Rate Mortgage Loan Purchase Price Percentage, (c) first lien Adjustable-Rate Mortgage Loan Purchase Price Percentage, or (d) second lien Adjustable-Rate Mortgage Loan Purchase Price Percentage, as applicable, times (ii) the aggregate principal balance of the related Mortgage Loans as of the Cut-off Date, plus (B) accrued interest on each Mortgage Loan at the related Mortgage Interest Rate (as defined below), from the related Paid Through Date to, but not including, the Closing Date. For purposes of the foregoing, "Mortgage Interest Rate" means, with respect to any Mortgage Loan, the mortgage interest rate set forth in the mortgage with respect to such Mortgage Loan.

If a buy-up/buy-down adjustment has been specified in the Trade Confirmation with respect to a particular type of Mortgage Loan, the Purchase Price Percentage applicable to the related Mortgage Loan may be subject to adjustment as follows:

a. If the Closing Date gross weighted average coupon ("WAC") for such subset of the Mortgage Loans differs from the related WAC provided to the Purchaser on the Trade Date ("Bid WAC"), the applicable Purchase Price Percentage shall be recalculated as follows: (i) if the WAC is higher than the Bid WAC, an amount equal to the WAC buy-up multiple multiplied by the amount of the percentage increase in the WAC shall be added to the Purchase Price Percentage for such Mortgage Loans, and (ii) if the WAC is lower than the Bid WAC, an amount equal to the WAC buy-down multiple multiplied by the amount of the percentage decrease in the WAC shall be subtracted from the Purchase Price.

b. If the Closing Date weighted average margin ("Margin") for such subset of the Mortgage Loans differs from the related margin provided to the Purchaser on the Trade Date ("Bid Margin"), the applicable Purchase Price Percentage shall be recalculated as follows: (i) if the Margin is higher than the Bid Margin, an amount equal to the Margin buy-up multiple multiplied by the amount of the percentage increase in the Margin shall be added to the Purchase Price Percentage for such Mortgage Loans, and (ii) if the Margin is lower than the Bid Margin an amount equal to the Margin buy-down multiple multiplied by the amount of the percentage decrease in the Margin shall be subtracted from the Purchase Price.

In the event that the aggregate principal balance at the Cut-Off Date of the Mortgage Loans actually delivered by Seller on the Closing Date and accepted for purchase by the Purchaser on the Closing Date is less than the (i) first lien Fixed-Rate Mortgage Loan minimum delivery amount, (ii) second lien Fixed-Rate Mortgage Loan minimum delivery amount, (iii) first lien Adjustable-Rate Mortgage Loan minimum delivery amount, or (iv) second lien Adjustable-Rate Mortgage Loan minimum delivery amount, as applicable, then Seller shall pay to Purchaser on the Closing Date a pair-off fee in an amount equal to the product of (A) the difference between each related minimum delivery amount and the related amount actually delivered, and (B) the greater of (x) the positive difference, if any, between the applicable Benchmark Price calculated on the Trade Date and the applicable Benchmark Price calculated on the Closing Date, and (y) 0.375.

The Purchase Price Percentage may be adjusted on a loan-level basis as a result of information discovered in due diligence, including, without limitation, appraised values, FICO scores, or automated re-underwriting as described more fully in Section 7 herein. If on any Closing Date the loan characteristics of a particular type of Mortgage Loan delivered pursuant to the Trade Confirmation, taken as a whole, materially differ from the loan characteristics of such Mortgage Loans on the related Trade Date, the Purchase Price Percentage for such Mortgage Loans shall be recalculated as mutually agreed by the Seller and the Purchaser.

In the event that (i) the principal due on any Mortgage Loan is prepaid in full within three months of the Closing Date or the date specified in the Trade Confirmation (the "Premium Protection Date"), the Seller shall pay to the Purchaser, within five (5) Business Days of Purchaser notifying Seller of such prepayment, an amount equal to the product of (A) the amount of such prepayment, times (B) the excess, if any, of the related Purchase Price Percentage, as set forth on the related Trade Confirmation, over 100%, or (ii) any of the first three scheduled monthly payments due to the Purchaser following the related Cut-off Date on any Mortgage Loan are not made by the related mortgagor by the last day of the month in

which each of them is or was due, such Mortgage Loan shall be repurchased by the Seller at the related Purchase Price Percentage, times the aggregate principal balance of such Mortgage Loan as of the date of repurchase, together with accrued interest or, at the Purchaser's sole option, the Purchaser may allow the Seller, pursuant to a separate written agreement, to refund a portion of the Purchase Price to the Purchaser, with the Purchaser retaining the related Mortgage Loan.

## 6.  Delivery of Documents

The Purchaser (or an affiliate thereof) shall designate a custodian for the Mortgage Loans, which initially shall be JPMorgan Chase Bank, or any successor custodian identified by the Purchaser (the "Custodian"). No later than seven (7) business days prior to the related Closing Date, the Seller shall assemble and deliver to the Custodian the legal documents described in the following paragraph.

The legal documents for each Mortgage Loan, which shall be delivered to the Custodian, shall include the following:

a.  the original mortgage note, with a complete chain of endorsements to the Seller;

b.  the original recorded mortgage or a certified copy with evidence of recording thereon;

c.  originals (or certified copies) with evidence or recording thereon of all intervening assignments;

d.  original powers of attorney, if applicable, with evidence of recording thereon, if required;

e.  originals (or certified copies) of all modifications, assumptions, consolidation or extension agreements, if applicable, with evidence of recording thereon;

f.  the original of any guarantee executed in connection with the mortgage note; and

g.  the original of a certified copy or a title insurance policy or title commitment or an attorney's opinion of title accompanied by a title abstract.

In addition the Seller shall, at its own expense, prepare and execute assignments of each mortgage, in recordable form, and shall endorse each mortgage note, in each case with endorsee/assignee information left blank or as otherwise directed by the Purchaser. When, as and if directed by the Purchaser, the Seller shall arrange for delivery of such additional documents to the Custodian and pay for recordation of such assignments.

No restrictive or qualified endorsement on any legal document related to any Mortgage Loan shall impair any of the representations and warranties made in the MLPA, and, notwithstanding any provision herein to the contrary, the rights and obligations set forth in this Section 6 shall survive the related Closing Date and shall not merge into the closing documents but shall be independently enforceable by the parties hereto.

## 7. Due Diligence

The Seller shall provide information and otherwise cooperate with the due diligence review conducted by the Purchaser and its designees. The Seller shall deliver the legal file to the Custodian and the credit files, together with any payment histories, and any other information with respect to the Mortgage Loans reasonably requested by the Purchaser, to the Purchaser or its designees during normal business hours no later than the related Diligence File Delivery Date. Failure of the Seller to deliver all documents required for the Purchaser to perform due diligence may increase the number of Mortgage Loans which may be deemed unacceptable for purchase by the Purchaser based on incomplete due diligence results. It is understood that the Purchaser will need twelve (12) months of payment history for each Mortgage Loan prior to the related Closing Date, or, with respect to any Mortgage Loan closed less than twelve (12) months prior to the related Closing Date, a complete payment history since origination.

The Purchaser shall have the right to reject any Mortgage Loan (a) for which the legal documentation is missing or defective, (b) that does not conform to the terms of this Agreement, (c) that is not underwritten in adherence to the Applicable Underwriting Guidelines, (d) that would be in breach of the representations and warranties contained in the MLPA, (e) that the Purchaser believes, in good faith, has been originated or serviced in contravention of applicable federal, state or local law or regulations, or using predatory or deceptive lending practices, (f) which has been originated with a loan-to-value ratio in excess of 100% based on the lesser of sales price and appraised value, (g) for which total combined points and fees are 10% or greater of the original loan amount, (h) for which single premium credit life or disability insurance was purchased by the mortgagor in conjunction with the loan origination, (i) that has a debt-to-income ratio greater than 60%, (j) that is not otherwise eligible for securitization and inclusion in a REMIC without unreasonable credit enhancement, as determined by the Purchaser or (k) that the Purchaser, based on its due diligence, determines in its sole discretion is not suitable for purchase. Satisfaction of delivery requirements by the Seller, price adjustments and similar matters relating to each pool of Mortgage Loans delivered by the Seller with respect to each Trade Confirmation will be determined by the Purchaser after taking into account any adjustments resulting from the Purchaser's due diligence.

All Mortgage Loans have life of loan tax and flood contracts that are transferable at no charge. The Purchaser will deduct the following amounts from net proceeds on the Closing Date: (i) for First Lien Mortgage Loans without tax service contracts $75.00 per Mortgage Loan, (ii) for Mortgage Loans without flood certificates $1.50 per Mortgage Loan and (iii) for all Mortgage Loans a custodial service fee of $3.50 per Mortgage Loan. On the related Servicing Transfer Date, the Seller shall wire to the Purchaser's servicer the balance in each borrower's escrow account, less tax and insurance disbursements the Seller is required to make after such date.

For any re-disclosure required under any Truth-in-Lending, Real Estate Settlement Procedures, Consumer Credit Protection or Fair Credit Reporting laws, rules and regulations, including the Home Ownership and Equity Protection Act of 1994, as amended, the Seller shall either: (a) if permissible under applicable law and regulations, re-disclose such information at its own expense, or (b) delete the related Mortgage Loan from the portfolio.

The Purchaser may utilize an automatic underwriting system to select Mortgage Loans for purchase. Accordingly, any Mortgage Loans that are selected on the basis of inaccurate data provided by the Seller will be subject to removal on or before the related Closing Date, or, if applicable, repurchase as noted herein.

The Purchase Price Percentage for each Mortgage Loan reflects, among other things, the related Mortgage Loan characteristics set forth in the (i) first lien Fixed-Rate Mortgage Loan Schedule, (ii) second lien Fixed-Rate Mortgage Loan Schedule, (iii) first lien Adjustable-Rate Mortgage Loan Schedule, or (iv) second lien Adjustable-Rate Mortgage Loan Schedule, as applicable, delinquency status and credit underwriting. If the delinquency status of the Mortgage Loans deteriorates prior to the settlement or the underwriting results are determined, in the Purchaser's sole discretion, to be inadequate the Purchaser will adjust the Purchase Price Percentage.

The Purchaser may verify appraisal values, order FICO scores to aid in assessing the creditworthiness of the mortgagors and may engage in alternative forms of due diligence as it deems appropriate. Notwithstanding the foregoing, the Purchaser may purchase all or part of the Mortgage Loans without conducting any partial or complete due diligence examination. The fact that the Purchaser has conducted or failed to conduct any partial or complete examination of the files shall not affect the Purchaser's (or any of its successors') right to demand repurchase or other relief for breach of any representation and warranty with respect to such Mortgage Loan.

## 8. Servicing Released

The Seller shall interim service the Mortgage Loans for the Purchaser as interim contract servicer, from the related Closing Date until the date on which the servicing is transferred under the MLPA (the "Servicing Transfer Date"). On the Servicing Transfer Date, the Seller shall transfer servicing to a servicer designated by the Purchaser which initially shall be GMAC Mortgage Corporation, or any successor identified by the Purchaser. The Seller agrees to cooperate with the Purchaser and the applicable successor servicer in effecting the termination of its responsibilities and rights as interim servicer, including, without limitation, delivering to the successor servicer all documents and records requested by the successor servicer necessary to enable it to properly service the Mortgage Loans. Pursuant to the MLPA, the Purchaser shall have the right to terminate the Seller's interim servicing of the Mortgage Loans at any time upon fifteen (15) days' notice, without cause and without the payment of any termination fee, penalty or expense. The servicing fee (the "Servicing Fee") shall be payable to the Seller monthly and shall equal $6.00 per Mortgage Loan for each full month, pro rated for partial months. All principal, interest and all other proceeds of any kind, with respect to the Mortgage Loans, received after the Cut-off Date, shall belong to the Purchaser.

## 9. Securitization

The parties acknowledge that the Purchaser may sell some or all of the Mortgage Loans to one or more subsequent purchasers (a "Whole Loan Sale") or may securitize the Mortgage Loans (a "Securitization"), and in connection therewith may assign certain of its rights and obligations hereunder and/or under the MLPA with respect to those Mortgage Loans. In either event, the Seller, as seller and interim servicer, agrees to cooperate with the Purchaser

by restating any representations or warranties in the MLPA as of the date of the Whole Loan Sale or the date that the Securitization closes.

## 10. Closing

The Purchaser's obligation to purchase the Mortgage Loans on any Closing Date shall be subject to each of the following conditions:

a) The Seller and the Purchaser shall have executed and delivered the MLPA and such other agreements and documents required thereunder.

b) The Seller shall have performed all of its obligations hereunder and under the MLPA, to the extent that such obligations were to be performed on or before the related Closing Date (unless waived by the Purchaser in writing).

c) The covenants of the Seller contained herein and the representations and warranties contained in the MLPA shall be true and correct in all material respects as of the related Closing Date.

d) The results of the Purchaser's due diligence review shall have been satisfactory to the Purchaser in its sole discretion.

e) The Purchaser shall have received a Trust Receipt from the Custodian for each of the related Mortgage Loans.

f) The pool population and purchase balances must be finalized by 2:00 pm eastern time on the day before the Closing Date to qualify for funding on the scheduled Closing Date.

g) All other terms and conditions of this Agreement, to the extent not in the Purchaser's control, shall have been complied with (unless waived in writing by the Purchaser).

## 11. Costs

The Purchaser may net from the Purchase Price any costs and expenses of the Seller hereunder. The Purchaser shall pay its due diligence fees and the fees and expenses of its counsel. All costs, fees and expenses incurred in connection with the transfer of the Mortgage Loans, including without limitation costs, fees and expenses to transfer files and prepare assignments/endorsements, custodial fees (including the costs associated with clearing exceptions) together with the fees and expenses of the Seller's counsel, shall be payable by the Seller. The Seller shall be responsible for all recording costs, including without limitation the costs to record intervening assignments and final assignments to the Purchaser, or its designee, powers of attorney and assumption and modification agreements. The Seller shall pay all costs or fees (e.g., termination fees, packaging fees, etc.) charged by its existing custodian in connection with the transfer of all documents related to the Mortgage Loans to the Purchaser, or its designee.

Neither the Seller nor the Purchaser has employed or shall employ a broker in connection with any transaction contemplated herein, and the Seller and the Purchaser shall not be responsible for brokerage fees of the other party hereto.

12. **Confidential Information**

The Seller, the Purchaser and their respective agents shall keep confidential and shall not divulge to any person, other than affiliates, without the prior written consent of the other party hereto, the Purchase Price Percentage, or any other written material provided by the Purchaser, except to the extent required by law or judicial order or as is necessary in working with legal counsel, auditors, agents, taxing authorities or other governmental agencies. Notwithstanding anything to the contrary in this Agreement, no conditions of confidentiality within the meaning of Internal Revenue Code Section 6111 or US Treasury Regulation Section 1.6011-4 are intended and taxpayer may disclose to any and all persons, without limitation of any kind, the United States tax treatment (federal state and local) and tax structure of any transaction and all materials of any kind relating to such tax treatment and tax structure. Notwithstanding any provision contained herein to the contrary, the rights and obligations set forth in this Section 12 shall survive the Closing Date and shall not merge into the closing documents but shall be independently enforceable by the parties hereto.

13. **Governing Law**

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW.

14. **Further Assurances**

The Purchaser and the Seller each agree to execute and deliver to the other such additional documents, instruments or agreements as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement.

15. **Notices**

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified below, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder shall reference the applicable Transaction Code and may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence. Notices to the Purchaser should be sent as follows: if via email to wholeloans@us.nomura.com and in all other instances should be directed to Nomura – NCCI Residential Mortgage Loan Trading, 2 World Financial Center, Building B, 21st Floor, New York, NY 10281-1198, Attention: (i) N. Dante LaRocca for documentation and all legal notices (Tel: 212-687-9804, Fax: 212-587-9804), (ii) Brett Marvin for trading issues (Tel: 212-667-1888, Fax: 646-587-1888) or (iii) Joe Piazza for operational issues (Tel: 212-667-2270, Fax: 646-587-8770). Notices to the Seller should be sent as follows: American Home Mortgage Corp., 538 Broadhollow Road, Melville, New York 11747, Attention: Mr. Peter Weigold (Tel: 631-608-2342).

### 16. Survival and Conflicts

The agreements herein shall survive the sale of the Mortgage Loans notwithstanding any restrictive or qualified endorsement on any Mortgage Loan document. On and after the Closing Date, in the event of a conflict between this Agreement and the definitive, fully executed MLPA, the terms and conditions of the MLPA will control, except that the repurchase pricing information applicable to purchase premium protection set forth in Section 2 herein shall control over contrary language in the MLPA.

### 17. No Assignments:  No Third-Party Beneficiaries

Except to the extent provided otherwise in Section 9, the Seller may not assign its rights or obligations hereunder without the express written consent of the Purchaser and neither signatory of this Agreement intends that there be, and there is not, any third-party beneficiary of any provision hereof or benefit conveyed hereunder.

### 18. Non-Solicitation

From and after the Closing Date, the Seller hereby agrees that it will not take any action or permit or cause any action to be taken by any of its agents, or by any independent contractors on the Seller's behalf, to personally, by telephone or mail, solicit the borrower or mortgagor under any Mortgage Loan to refinance such Mortgage Loan, in whole or in part, without the prior written consent of the Purchaser. It is understood and agreed that all rights and benefits relating to the solicitation of any mortgagor for the purposes of refinancing the mortgagor's related Mortgage Loan shall be transferred to the Purchaser pursuant hereto on the Closing Date and the Seller shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, offers to refinance a Mortgage Loan made within thirty (30) days following the Seller's receipt of a payoff demand or request for verification of mortgage related to a mortgagor, promotions made to the general public at large, including, without limitation, mass mailings or calling campaigns based on commercially developed solicitation lists, newspaper, internet, radio and television advertisements shall not constitute solicitations under this Section 18.

### 19. Facsimile and Electronic Signatures

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same Agreement. The parties agree that this Agreement and any notices hereunder may be transmitted between them by email and/or by facsimile machine. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on the parties. The original document shall be promptly delivered, if requested.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]

Please acknowledge your receipt of and agreement to this Agreement by executing and returning this Agreement, via facsimile, to the attention of Susan Becka at (646) 587-9701 or nccitransactionmgmt@us.nomura.com.

Very truly yours,

**NOMURA CREDIT & CAPITAL, INC.**

By: _____

Name: _____
JOHN P. GRAHAM
Managing Director

Title: _____


ACCEPTED AND AGREED:

**AMERICAN HOME MORTGAGE CORP.**

By: _____

Name:  Robert Johnson

Title:   Executive Vice President

[TPW: NYLEGAL 281835.11] 17718-00066 12/16/2004 05:18 PM        11

# EXHIBIT  2

# MASTER MORTGAGE LOAN PURCHASE AGREEMENT

## SERVICING RELEASED

## AMERICAN HOME MORTGAGE CORP.
Seller

and

## NOMURA CREDIT & CAPITAL, INC.
Initial Purchaser

Dated as of January 1, 2005

First and Second Lien
Fixed Rate and Adjustable Rate Mortgage Loans

# TABLE OF CONTENTS

Page

SECTION 1.        Definitions..................................................................................1

SECTION 2.        Agreement to Purchase. ..........................................................11

SECTION 3.        Mortgage Loan Schedules.......................................................12

SECTION 4.        Purchase Price. .......................................................................12

SECTION 5.        Examination of Mortgage Files. .............................................12

SECTION 6.        Conveyance from Seller to Initial Purchaser. .........................13

   Subsection 6.01.    Conveyance of Mortgage Loans. ..............................................13

   Subsection 6.02.    Books and Records. .................................................................13

   Subsection 6.03.    Delivery of Mortgage Loan Documents. ..................................14

SECTION 7.        Representations Warranties and Covenants of the Seller: Remedies
                  for Breach..................................................................................14

   Subsection 7.01.    Representations and Warranties Respecting the Seller...............14

   Subsection 7.02.    Representations and Warranties Regarding Individual Mortgage Loans. .17

   Subsection 7.03.    Remedies for Breach of Representations and Warranties.........33

SECTION 8.        Closing. ...................................................................................35

SECTION 9.        Closing Documents. .................................................................35

SECTION 10.       Costs.........................................................................................37

SECTION 11.       Seller's Servicing Obligations. ................................................37

SECTION 12.       Removal of Mortgage Loans from Inclusion under This Agreement
                  Upon a Whole Loan Transfer or a Pass-Through Transfer on One or
                  More Reconstitution Dates. ......................................................37

SECTION 13.       Financial Statements. ...............................................................39

SECTION 14.       Mandatory Delivery; Grant of Security Interest. .....................39

SECTION 15.       Notices. ....................................................................................40

SECTION 16.       Severability Clause. .................................................................40

SECTION 17.       Counterpart, Electronic and Facsimile Signatures....................41

SECTION 18.       Governing Law. .......................................................................41

SECTION 19.       Intention of the Parties..............................................................41

SECTION 20.       Successors and Assigns.............................................................42

SECTION 21.       Waivers. ...................................................................................42

i

SECTION 22.        Exhibits. .................................................................................................42

SECTION 23.        General Interpretive Principles. .............................................................42

SECTION 24.        Nonsolicitation. ......................................................................................43

SECTION 25.        Reproduction of Documents. ..................................................................43

SECTION 26.        Further Agreements. ...............................................................................43

[TPW: NYLEGAL:313373.4] 17718-00066  03/07/2005 03:28 PM

## EXHIBITS AND SCHEDULES

EXHIBIT 1        FORM OF SELLER'S OFFICER'S CERTIFICATE
EXHIBIT 2        FORM OF OPINION OF COUNSEL TO THE SELLER
EXHIBIT 3        FORM OF SECURITY RELEASE CERTIFICATION
EXHIBIT 4        FORM OF ASSIGNMENT AND CONVEYANCE
EXHIBIT 5        MORTGAGE LOAN DOCUMENTS
EXHIBIT 6        CONTENTS OF EACH MORTGAGE FILE
EXHIBIT 7        INTERIM SERVICING REQUIREMENTS
EXHIBIT 8        TRANSFER INSTRUCTIONS
EXHIBIT 9        SELLER'S UNDERWRITING GUIDELINES

[TPW NYLEGAL:313373.4] 17718-00066 03/07/2005 03:28 PM

## MASTER MORTGAGE LOAN PURCHASE AGREEMENT

This is a MASTER MORTGAGE LOAN PURCHASE AGREEMENT (the "Agreement"), dated as of January 1, 2005, by and between Nomura Credit & Capital, Inc., having an office at 2 World Financial Center, Building B, New York, New York 10281 (the "Initial Purchaser", and the Initial Purchaser or the Person, if any, to which the Initial Purchaser has assigned its rights and obligations hereunder as Purchaser with respect to a Mortgage Loan, and each of their respective successors and assigns, the "Purchaser") and American Home Mortgage Corp., having an office at 538 Broadhollow Road, Melville, New York 11747 (the "Seller").

## W I T N E S S E T H:

WHEREAS, the Seller desires to sell, from time to time, to the Purchaser, and the Purchaser desires to purchase, from time to time, from the Seller, certain conventional fixed and adjustable rate residential first and second lien mortgage loans, (the "Mortgage Loans") and certain fixed and adjustable rate cooperative loans (the "Cooperative Loans") as described herein on a servicing-released basis, and which shall be delivered in groups of whole loans on various dates as provided herein (each, a "Closing Date");

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument creating a first or second lien on a residential dwelling located in the jurisdiction indicated on the Mortgage Loan Schedule for the related Mortgage Loan Package, which is to be annexed to the related Assignment and Conveyance on each Closing Date as Schedule I;

WHEREAS, each Cooperative Loan is secured by a pledge of shares of stock issued by a Cooperative and the assignment of the appurtenant proprietary lease, all relating to a specified dwelling unit in an apartment building owned by the Cooperative and located in the states indicated on the Mortgage Loan Schedule;

WHEREAS, the Purchaser and the Seller wish to prescribe the manner of the conveyance, servicing and control of the Mortgage Loans and the Cooperative Loans; and

WHEREAS, following its purchase of the Mortgage Loans and Cooperative Loans from the Seller, the Purchaser desires to sell some or all of the Mortgage Loans and Cooperative Loans to one or more purchasers in one or more whole loan transfers in a whole loan or participation format or in one or more public or private mortgage-backed securities transactions;

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

SECTION 1.  Definitions.

For purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below.

Adjustable Rate Mortgage Loan:  A Mortgage Loan which provides for the adjustment of the Mortgage Interest Rate payable in respect thereto.

Adjustment Date:  With respect to each Adjustable Rate Mortgage Loan, the date set forth in the related Mortgage Note on which the Mortgage Interest Rate on such Adjustable Rate Mortgage Loan is adjusted in accordance with the terms of the related Mortgage Note

Agreement:  This Master Mortgage Loan Purchase Agreement including all exhibits, schedules, amendments and supplements hereto.

Appraised Value:  With respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac.

Assignment and Conveyance:  With respect to any Mortgage Loan Package purchased and sold on any Closing Date, the assignment and conveyance in the form annexed hereto as Exhibit 4 (including any exhibits, schedules and attachments thereto), identifying the Mortgage Loans purchased by the Purchaser on such Closing Date.

Assignment of Mortgage:  An individual assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to give record notice of the sale of the Mortgage to the Purchaser or its designee.

Assignment of the Mortgage Note and Pledge Agreement:  With respect to a Cooperative Loan, an assignment of the Mortgage Note and Pledge Agreement.

Assignment of Proprietary Lease:  An assignment of the Proprietary Lease.

Balloon Loan:  A Mortgage Loan identified on the Mortgage Loan Schedule as a balloon mortgage loan.

Business Day:  Any day other than a Saturday or Sunday, or a day on which banking and savings and loan institutions in the State of New York are authorized or obligated by law or executive order to be closed.

Cash-Out Refinancing:  A Refinanced Mortgage Loan the proceeds of which were in excess of the principal balance of any existing first mortgage loan on the related Mortgaged Property and related closing costs, and were used to pay any such existing first mortgage, related closing costs and subordinate mortgage loans on the related Mortgaged Property.

2

Closing Date:  The date or dates on which the Purchaser from time to time shall purchase from the Seller and the Seller from time to time shall sell to the Purchaser, the Mortgage Loans listed on the related Mortgage Loan Schedule with respect to the related Mortgage Loan Package, as set forth in the related Trade Confirmation, or such other date as agreed by the Seller and the Purchaser.

Closing Documents:  With respect to any Closing Date, the documents required pursuant to Section 9.

Code:  The Internal Revenue Code of 1986, or any successor statute thereto.

Combined Loan-to-Value Ratio or CLTV:  With respect to any Mortgage Loan, the fraction, expressed as a percentage, the numerator of which is the sum of (a) the original principal balance of the First Lien Mortgage Loan (or the unpaid principal balance of the First Lien Mortgage Loan, if available), plus (b) the unpaid principal balance of the related Second Lien Mortgage Loan or other related subordinate mortgage loan or loans secured by the Mortgaged Property, and the denominator of which is the Appraised Value of the related Mortgaged Property.

Condemnation Proceeds:  All awards, compensation and settlements in respect of a taking of all or part of a Mortgaged Property by exercise of the power of condemnation or the right of eminent domain.

Consent:  A document executed by the Cooperative (i) consenting to the sale of the Cooperative Apartment to the Mortgagor and (ii) certifying that all maintenance charges relating to the Cooperative Apartment have been paid.

Convertible Mortgage Loan:  An Adjustable Rate Mortgage Loan that by its terms and subject to certain conditions contained in the related Mortgage or Mortgage Note allows the Mortgagor to convert the adjustable Mortgage Interest Rate on such Mortgage Loan to a fixed Mortgage Interest Rate.

Cooperative:  The private, non-profit cooperative apartment corporation which owns all of the real property that comprises the Project, including the land, separate dwelling units and all common areas.

Cooperative Apartment:  The specific dwelling unit relating to a Cooperative Loan.

Cooperative Lien Search:  A search for (a) federal tax liens, mechanics' liens, lis pendens, judgments of record or otherwise against (i) the Cooperative, (ii) the seller of the Cooperative Apartment and (iii) the Mortgagor if the Cooperative Loan is a Refinanced Loan, (b) filings of Financing Statements and (c) the deed of the Project into the Cooperative.

Cooperative Loan:  Any Mortgage Loan secured by Cooperative Shares and the related Proprietary Lease conferring exclusive occupancy rights to a cooperative unit.

Cooperative Shares:  The shares of stock issued by the Cooperative, owned by the Mortgagor, and allocated to a Cooperative Apartment and represented by a Stock Certificate.

3

Credit Score: The credit score of the Mortgagor provided by Fair, Isaac & Company, Inc. or such other organization providing credit scores at the time of the origination of a Mortgage Loan. If two credit scores are obtained, the Credit Score shall be the lower of the two credit scores. If three credit scores are obtained, the Credit Score shall be the middle of the three credit scores.

Custodian: The document custodian designated by the Initial Purchaser in writing.

Cut-off Date: The date set forth in the related Trade Confirmation, or in the absence of any specified date, the day which is one Business Day prior to the related Closing Date.

Deleted Mortgage Loan: A Mortgage Loan replaced or to be replaced by a Qualified Substitute Mortgage Loan.

Due Date: The day on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Escrow Payments: The amounts constituting ground rents, taxes, assessments, water charges, sewer rents, Primary Insurance Policy premiums, fire and hazard insurance premiums and other payments required to be escrowed by the Mortgagor with the Mortgagee pursuant to the terms of any Mortgage Note or Mortgage.

Fannie Mae: Fannie Mae or any successor thereto.

Financing Statement: A financing statement in the form of a UCC-1 filed pursuant to the Uniform Commercial Code to perfect a security interest in the Cooperative Shares and Pledge Instruments.

First Lien: With respect to each Mortgaged Property, the lien of the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a first lien on the Mortgaged Property.

Fixed Rate Mortgage Loan: A Mortgage Loan with respect to which the Mortgage Interest Rate set forth in the Mortgage Note is fixed for the term of such Mortgage Loan.

Freddie Mac: Freddie Mac, formerly known as the Federal Home Loan Mortgage Corporation, or any successor thereto.

Gross Margin: With respect to any Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note and the related Mortgage Loan Schedule that is added to the Index on each Adjustment Date in accordance with the terms of the related Mortgage Note to determine the new Mortgage Interest Rate for such Mortgage Loan.

HUD: The United States Department of Housing and Urban Development or any successor thereto.

4

Index:  With respect to any Adjustable Rate Mortgage Loan, the index identified on the Mortgage Loan Schedule and set forth in the related Mortgage Note for the purpose of calculating the interest rate thereon.

Initial Closing Date:  The Closing Date on which the Initial Purchaser purchases and the Seller sells the first Mortgage Loan Package hereunder.

Initial Purchaser:  Nomura Credit & Capital, Inc., or any successor or assigns thereto.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interim Servicing Requirements:  The interim servicing requirements, attached hereto as Exhibit 7, which provides for certain obligations of the Seller in connection with the interim servicing of the Mortgage Loans.

Lender Paid Mortgage Insurance Policy or LPMI Policy:  A policy of mortgage guaranty insurance issued by a Qualified Insurer in which the owner or servicer of the Mortgage Loan is responsible for the premiums associated with such mortgage insurance policy.

Liquidation Proceeds:  Amounts, other than Insurance Proceeds and Condemnation Proceeds, received in connection with the liquidation of a defaulted Mortgage Loan through trustee's sale, foreclosure sale or otherwise.

Loan-to-Value Ratio or LTV:  With respect to any Mortgage Loan as of any date of determination, the ratio on such date of the outstanding principal amount of the Mortgage Loan, to the Appraised Value of the Mortgaged Property.

Master Terms:  The letter agreement between the Seller and the Purchaser, dated as of January 1, 2005, setting forth additional terms and conditions, pursuant to which Mortgage Loans will be purchased hereunder, as amended from time to time.

Maximum Mortgage Interest Rate:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Adjustment Date.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The system of recording transfers of mortgages electronically maintained by MERS.

MIN:  The Mortgage Identification Number for any MERS Mortgage Loan.

Minimum Mortgage Interest Rate:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Adjustment Date.

Monthly Payment:  With respect to any Mortgage Loan, the scheduled payment of principal and/or interest payable by a Mortgagor under the related Mortgage Note on each Due Date.

Mortgage:  The mortgage, deed of trust or other instrument creating a first lien or second lien on Mortgaged Property securing the Mortgage Note.

Mortgagee:  The mortgagee or beneficiary named in the Mortgage and the successors and assigns of such mortgagee or beneficiary.

Mortgage File:  The items pertaining to a particular Mortgage Loan referred to in Exhibit 6 annexed hereto, and any additional documents required to be added to the Mortgage File pursuant to this Agreement or the related Trade Confirmation.

Mortgage Interest Rate:  With respect to each Fixed Rate Mortgage Loan, the fixed annual rate of interest provided for in the related Mortgage Note and, with respect to each Adjustable Rate Mortgage Loan, the annual rate that interest accrues on such Adjustable Rate Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note.

Mortgage Loan:  Each first or second lien, residential mortgage loan, sold, assigned and transferred to the Purchaser pursuant to this Agreement and the related Assignment and Conveyance and identified on the Mortgage Loan Schedule annexed to the related Assignment and Conveyance on such Closing Date, the related Mortgage Loan Documents, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.  Unless otherwise indicated herein, all references to "Mortgage Loans" shall include Cooperative Loans.

Mortgage Loan Documents:  The documents listed in Exhibit 5 annexed hereto pertaining to any Mortgage Loan.

Mortgage Loan Package:  The Mortgage Loans and Cooperative Loans listed on a Mortgage Loan Schedule, delivered to the Custodian and the Purchaser at least five (5) Business Days prior to the related Closing Date and attached to the related Assignment and Conveyance as Schedule I on the related Closing Date.

Mortgage Loan Schedule:  With respect to each Mortgage Loan Package, the schedule of Mortgage Loans to be annexed to the related Assignment and Conveyance as Schedule I (or a supplement thereto) on each Closing Date for the Mortgage Loan Package delivered on such Closing Date in both hard copy and electronic form, such schedule setting forth the following

6

information with respect to each Mortgage Loan in the Mortgage Loan Package: (1) the Seller's Mortgage Loan identifying number; (2) the Mortgagor's first and last name; (3) the street address of the Mortgaged Property including the city, state and zip code; (4) a code indicating whether the Mortgaged Property is owner-occupied; (5) the type of Residential Dwelling constituting the Mortgaged Property; (6) the original months to maturity; (7) the original date of the Mortgage Loan and the remaining months to maturity from the Cut-off Date, based on the original amortization schedule; (8) the Loan-to-Value Ratio at origination; (9) the Mortgage Interest Rate in effect immediately following the Cut-off Date; (10) the date on which the first Monthly Payment was due on the Mortgage Loan; (11) the stated maturity date; (12) the amount of the Monthly Payment at origination; (13) the amount of the Monthly Payment as of the Cut-off Date; (14) the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance; (15) the original principal amount of the Mortgage Loan; (16) the Stated Principal Balance of the Mortgage Loan as of the close of business on the Cut-off Date; (17) with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date; (18) with respect to each Adjustable Rate Mortgage Loan, the Gross Margin; (19) a code indicating the purpose of the loan (i.e., purchase financing, Rate/Term Refinancing, Cash-Out Refinancing); (20) with respect to each Adjustable Rate Mortgage Loan, the Maximum Mortgage Interest Rate under the terms of the Mortgage Note; (21) with respect to each Adjustable Rate Mortgage Loan, the Minimum Mortgage Interest Rate under the terms of the Mortgage Note; (22) the Mortgage Interest Rate at origination; (23) with respect to each Adjustable Rate Mortgage Loan, the Periodic Rate Cap; (24) with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date immediately following the related Cut-off Date; (25) with respect to each Adjustable Rate Mortgage Loan, the Index; (26) the date on which the first Monthly Payment was due on the Mortgage Loan and, if such date is not consistent with the Due Date currently in effect, such Due Date; (27) a code indicating whether the Mortgage Loan is an Adjustable Rate Mortgage Loan or a Fixed Rate Mortgage Loan; (28) a code indicating the documentation style (i.e., full, alternative or reduced); (29) a code indicating if the Mortgage Loan is subject to a Primary Insurance Policy or LPMI Policy; and if so, the provider of such insurance, the coverage percentage of such insurance and the fee payable to the provider in respect of such insurance; (30) the Appraised Value of the Mortgaged Property; (31) the sale price of the Mortgaged Property, if applicable; (32) a code indicating whether the Mortgage Loan is subject to a Prepayment Charge, the term of such Prepayment Charge and the amount of such Prepayment Charge; (33) the product type (e.g., 2/28, 15 year fixed, 30 year fixed, 15/30 balloon, etc.); (34) the Mortgagor's debt to income ratio; (35) a code indicating whether the Mortgaged Property is subject to a First Lien or a Second Lien; (36) with respect to a Second Lien Mortgage Loan, a code indicating whether it is a "piggy back" second lien and a code identifying the related First Lien Mortgage Loan; (37) a code indicating the Credit Score of the Mortgagor at the time of origination of the Mortgage Loan; (38) the Mortgage Loan's payment history; (39) a code indicating the form of appraisal (i.e. form 1004, 2055, etc.); (40) a code indicating whether the Mortgage Loan is a MERS Mortgage Loan and, if so, the corresponding MIN; (41) a code indicating if the Mortgage Loan is an interest-only Mortgage Loan and, if so, the term of the interest-only period of such Mortgage Loan; (42) a code indicating whether the Mortgage Loan is a "Home Loan" as defined in the current Standard & Poor's LEVELS® Glossary Revised, Appendix E; (43) the rate change cap at the first interest rate adjustment date; (44) the maximum rate change cap; (45) the fixed period of the loan; (46) the first payment adjustment date; (47) the second payment adjustment date; (48) the number of days from the ARM adjustment date to look

7

back to the index to determine the rate change; (49) the current months left until the next rate adjustment date; (50) a code indicating the credit grade of the Mortgage Loan; and (51) a code indicating whether the Mortgage Loan is prime, alta-a or subprime.  With respect to the Mortgage Loan Package in the aggregate, the Mortgage Loan Schedule shall set forth the following information, as of the related Cut-off Date: (1) the number of Mortgage Loans; (2) the current principal balance of the Mortgage Loans; (3) the weighted average Mortgage Interest Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans.

Mortgage Note:  The original executed note or other evidence of the Mortgage Loan indebtedness of a Mortgagor secured by a Mortgage or a Pledge Agreement.

Mortgaged Property:  (a) With respect to each Mortgage Loan, the Mortgagor's real property securing repayment of a related Mortgage Note, consisting of a fee simple interest in a single parcel of real property improved by a Residential Dwelling and (b) with respect to each Cooperative Loan, the Cooperative Shares and Proprietary Lease.

Mortgagor:  The obligor on a Mortgage Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related Mortgage and such grantor's or mortgagor's successor's in title to the Mortgaged Property.

Officer's Certificate:  A certificate signed by the Chairman of the Board or the Vice Chairman of the Board or a President or a Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Person on behalf of whom such certificate is being delivered.

Opinion of Counsel:  A written opinion of counsel, who may be salaried counsel for the Person on behalf of whom the opinion is being given, reasonably acceptable to each Person to whom such opinion is addressed.

Pass-Through Transfer:  The sale or transfer of some or all of the Mortgage Loans by the Purchaser to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction.

Periodic Rate Cap:  With respect to each Adjustable Rate Mortgage Loan and any Adjustment Date therefor, a number of percentage points per annum that is set forth in the related Mortgage Loan Schedule and in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Adjustable Rate Mortgage Loan may increase (without regard to the Maximum Mortgage Interest Rate) or decrease (without regard to the Minimum Mortgage Interest Rate) on such Adjustment Date from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date.

Person:  An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Pledge Agreement:  The specific agreement creating a first or second lien on and pledge of the Cooperative Shares and the appurtenant Proprietary Lease securing a Cooperative Loan.

8

Pledge Instruments:  The Stock Power, the Assignment of the Proprietary Lease and the Assignment of the Mortgage Note and Pledge Agreement.

Prepayment Charge:  With respect to any Mortgage Loan, any prepayment penalty or premium thereon payable in connection with a principal prepayment on such Mortgage Loan pursuant to the terms of the related Mortgage Note.

Primary Insurance Policy:  A policy of primary mortgage guaranty insurance issued by a Qualified Insurer.

Principal Prepayment:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Charge or premium thereon, which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Project:  All real property owned by the Cooperative including the land, separate dwelling units and all common areas.

Proprietary Lease:  A lease on a Cooperative Apartment evidencing the possessory interest of the Mortgagor in such Cooperative Apartment.

Purchase Price:  The price paid on the related Closing Date by the Purchaser to the Seller pursuant to the related Trade Confirmation in exchange for the Mortgage Loans purchased on such Closing Date, as calculated as provided in Section 4.

Qualified Insurer:  Any insurer which meets the requirements of Fannie Mae and Freddie Mac.

Qualified Substitute Mortgage Loan:  A mortgage loan substituted for a Deleted Mortgage Loan pursuant to the terms of this Agreement which must, on the date of such substitution, (i) have an outstanding principal balance, after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of the Stated Principal Balance of the Deleted Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a Mortgage Interest Rate not less than (and not more than one percentage point in excess of) the Mortgage Interest Rate of the Deleted Mortgage Loan, (iii) have a remaining term to maturity not greater than (and not less than) that of the Deleted Mortgage Loan, (iv) have the same Due Date as the Due Date on the Deleted Mortgage Loan, (v) have a Loan-to-Value Ratio as of the date of substitution equal to or lower than the Loan-to-Value Ratio of the Deleted Mortgage Loan as of such date, (vi) be covered under a Primary Insurance Policy if such Qualified Substitute Mortgage Loan has a Loan-to-Value Ratio in excess of 80% and the Deleted Mortgage Loan was covered under a Primary Insurance Policy, (vii) conform to each representation and warranty set forth in Subsection 7.02 of this Agreement and (viii) be the same type of mortgage loan (i.e. fixed or adjustable rate with the same Gross Margin and Index as the Deleted Mortgage Loan, first or second lien, and have the same credit grade).  In the event that one or more mortgage loans are substituted for one or more Deleted Mortgage Loans, the amounts described in clause (i) hereof shall be determined on the basis of aggregate principal balances, the Mortgage Interest Rates

9

described in clause (ii) hereof shall be determined on the basis of weighted average Mortgage Interest Rates and shall be satisfied as to each such mortgage loan, the terms described in clause (iii) shall be determined on the basis of weighted average remaining terms to maturity, the Loan-to-Value Ratios described in clause (v) hereof shall be satisfied as to each such mortgage loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (vii) hereof must be satisfied as to each Qualified Substitute Mortgage Loan or in the aggregate, as the case may be. In addition, the substitution of more than one Mortgage Loan pursuant to the previous sentence shall be subject to the Purchaser's approval in its sole discretion.

Rate/Term Refinancing:  A Refinanced Mortgage Loan, the proceeds of which are not in excess of the sum of the existing first mortgage loan on the related Mortgaged Property and related closing costs, and which were used exclusively to satisfy the then existing first mortgage loan of the Mortgagor on the related Mortgaged Property and to pay related closing costs.

Recognition Agreement:  An agreement whereby a Cooperative and a lender with respect to a Cooperative Loan (i) acknowledge that such lender may make, or intends to make, such Cooperative Loan, and (ii) make certain agreements with respect to such Cooperative Loan.

Reconstitution Agreements:  The agreement or agreements entered into by the Seller and the Purchaser and/or certain third parties on the Reconstitution Date or Dates with respect to any or all of the Mortgage Loans conveyed hereunder, in connection with a Whole Loan Transfer or a Pass-Through Transfer as provided in Section 12.

Reconstitution Date:  The date or dates on which any or all of the Mortgage Loans serviced under this Agreement shall be removed from this Agreement and reconstituted as part of a Whole Loan Transfer or Pass-Through Transfer pursuant to Section 12 hereof.

Refinanced Mortgage Loan:  A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

Repurchase Price:  With respect to any Mortgage Loan, a price equal to the sum of (a) the product of (i) the Stated Principal Balance of such Mortgage Loan, and (ii) the purchase price percentage used to calculate the Purchase Price, as stated in the related Trade Confirmation, plus (b) interest on such Stated Principal Balance at the Mortgage Interest Rate from and including the last Due Date through which interest has been paid by or on behalf of the Mortgagor to the first day of the month following the date of repurchase, less amounts received in respect of such repurchased Mortgage Loan, plus (c) all costs and damages incurred in connection with the violation of such Mortgage Loan of any predatory or abusive lending law.

Residential Dwelling:  Any one of the following:  (i) a detached one-family dwelling, (ii) a detached two- to four-family dwelling, (iii) a one-family dwelling unit in a Fannie Mae eligible condominium project, (iv) a detached one-family dwelling in a planned unit development or (v) a Cooperative Apartment, none of which is a mobile or manufactured home.

Servicing File:  With respect to each Mortgage Loan, the file retained by the Seller until the Transfer Date, consisting of originals of all documents in the Mortgage File which are not delivered to the Purchaser or the Custodian and copies of the Mortgage Loan Documents.

Stock Certificates:   The certificates evidencing ownership of the Cooperative Shares issued by the Cooperative.

Stock Power:   An assignment of the Stock Certificate or an assignment of the Cooperative Shares issued by the Cooperative.

Second Lien: With respect to each Mortgaged Property, the lien of the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a second lien on the Mortgaged Property.

Second Lien Mortgage Loan: A Mortgage Loan secured by the lien on the Mortgaged Property, subject to one prior lien on such Mortgaged Property securing financing obtained by the related Mortgagor.

S&P or Standard & Poor's:   Standard & Poor's, a division of the McGraw-Hill Companies, Inc., or its successor in interest.

Stated Principal Balance:  As to each Mortgage Loan as of any date of determination, (i) the principal balance of the Mortgage Loan as of the Cut-off Date after giving effect to payments of principal received on or before such date, minus (ii) all amounts previously distributed to the Purchaser with respect to the related Mortgage Loan representing payments or recoveries of principal.

Trade Confirmation:   With respect to any Mortgage Loan Package, the Trade Confirmation and Pool Summary attached as Exhibit A to the Master Terms.

Transfer Date:  As defined in Section 11.

Transfer Instructions:  The servicing transfer instructions of the Purchaser or its designee, attached as Exhibit 8 hereto, as amended, supplemented or replaced from time to time.

Underwriting Guidelines:  The lending guidelines and parameters of the Seller, a copy of which has been delivered to the Initial Purchaser and are attached hereto as Exhibit 9.

Whole Loan Transfer:  Any sale or transfer of some or all of the Mortgage Loans by the Purchaser to a third party, which sale or transfer is not a Pass-Through Transfer.

SECTION 2.  Agreement to Purchase.

The Seller agrees to sell, and the Purchaser agrees to purchase, from time-to-time, Mortgage Loans and Cooperative Loans having an aggregate principal balance on the related Cut-off Date in an amount as set forth in the related Trade Confirmation, or in such other amount as agreed to by the Purchaser and the Seller as evidenced by the actual aggregate principal balance of the Mortgage Loans accepted by the Purchaser on the related Closing Date.

11

SECTION 3.  Mortgage Loan Schedules.

The Seller shall deliver the Mortgage Loan Schedule for a Mortgage Loan Package to be purchased on a particular Closing Date to the Purchaser at least five (5) Business Days prior to the related Closing Date.

SECTION 4.  Purchase Price.

The Purchase Price for each Mortgage Loan and Cooperative Loan listed on the related Mortgage Loan Schedule shall be the percentage of par as stated in the related Trade Confirmation (subject to adjustment as provided therein or in the Master Terms), multiplied by its Stated Principal Balance as of the related Cut-off Date.  If so provided in the related Trade Confirmation, portions of the Mortgage Loans shall be priced separately.

In addition to the Purchase Price as described above, the Initial Purchaser shall pay to the Seller, at closing, accrued interest on the Stated Principal Balance of each Mortgage Loan and Cooperative Loan as of the related Cut-off Date at the Mortgage Interest Rate from the related Cut-off Date through the day prior to the related Closing Date, both inclusive.

The Purchaser shall own and be entitled to receive with respect to each Mortgage Loan purchased, all recoveries of principal and interest collected after the related Cut-off Date.

It is intended that the conveyance pursuant to this Agreement of the Seller's right, title and interest in and to the Mortgage Loans and Cooperative Loans shall constitute and shall be construed as, a sale of such property and not a grant of a security interest to secure a loan.  However, if such conveyance is deemed to be or to be made as security for a loan, it is intended that: (1) the rights and obligations of the parties shall be established pursuant to the terms of this Agreement; (2) the Seller hereby grants to the Purchaser a first priority security interest in all of the Seller's right, title and interest in, to and under the related Mortgage Loans, whether now owned or hereafter acquired; and (3) this Agreement shall constitute a security agreement under applicable law.

The Seller shall be responsible for maintaining, and shall maintain until the related Transfer Date for the related Mortgage Loan and related Cooperative Loan, a complete set of books and records for such Mortgage Loan, which shall be marked clearly to reflect the ownership of such Mortgage Loan and Cooperative Loan by the Purchaser.  In particular, the Seller shall maintain in its possession, available for inspection by the Purchaser, and shall deliver to the Purchaser upon reasonable notice, evidence of compliance with all applicable federal, state and local laws, rules and regulations.

SECTION 5.  Examination of Mortgage Files.

In addition to the rights granted to the Initial Purchaser under the Master Terms to underwrite the Mortgage Loans and review the Mortgage Files prior to the Closing Date, the Seller shall, prior to the related Closing Date deliver to the Custodian in escrow, for examination with respect to each Mortgage Loan to be purchased on such Closing Date, the related Mortgage File, including the Assignment of Mortgage, pertaining to each Mortgage Loan and Assignment

12

of the Mortgage Note and Pledge Agreement, pertaining to each Cooperative Loan. Such examination may be made by the Initial Purchaser or its designee at any reasonable time before or after the related Closing Date. If the Initial Purchaser makes such examination prior to the related Closing Date and identifies any Mortgage Loans that do not conform to the terms of the related Trade Confirmation, the Master Terms or the Initial Purchaser's underwriting standards, such Mortgage Loans may, at the Initial Purchaser's option, be rejected for purchase by the Initial Purchaser. If not purchased by the Initial Purchaser, such Mortgage Loans shall be deleted from the related Mortgage Loan Schedule. The Initial Purchaser may, at its option and without notice to the Seller, purchase all or part of any Mortgage Loan Package without conducting any partial or complete examination. The fact that the Initial Purchaser has conducted or has determined not to conduct any partial or complete examination of the Mortgage Files shall not affect the Initial Purchaser's (or any of its successor's) rights to demand repurchase or other relief or remedy provided for in this Agreement.

The Initial Purchaser shall have the opportunity to conduct a corporate due diligence of the Seller, including but not limited to, on site review of the Seller's facilities and discussions with the Seller's management. The Initial Purchaser may conduct such review prior to or following the Initial Closing Date. In addition, the Initial Purchaser may perform additional reviews as the Initial Purchaser, in its sole discretion, deems necessary.

SECTION 6.   Conveyance from Seller to Initial Purchaser.

Subsection 6.01.   Conveyance of Mortgage Loans.

The Seller, simultaneously with the payment of the Purchase Price, shall execute and deliver to the Initial Purchaser an Assignment and Conveyance with respect to the related Mortgage Loan Package in the form attached hereto as Exhibit 4. On or before the Transfer Date, the Seller shall release from its custody the contents of each Servicing File.

In addition, in connection with the assignment of any MERS Mortgage Loans, the Seller agrees that it will cause, at its own expense, the MERS System to indicate that such Mortgage Loans have been assigned by the Seller to the Purchaser in accordance with this Agreement by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement prior to the related Transfer Date) in such computer files the information required by the MERS System to identify the Purchaser as the owner of such Mortgage Loans.

Subsection 6.02.   Books and Records.

Record title to each Mortgage and the related Mortgage Note and Pledge Agreement as of the related Closing Date shall be in the name of the Seller, the Purchaser or one or more designees of the Purchaser, as the Purchaser shall designate. Notwithstanding the foregoing, beneficial ownership of each Mortgage and the related Mortgage Note and Pledge Agreement shall be vested solely in the Purchaser or the appropriate designee of the Purchaser, as the case may be. All rights arising out of the Mortgage Loans including, but not limited to, all funds received by the Seller after the related Cut-off Date on or in connection with a Mortgage Loan as provided in Section 4 shall be vested in the Purchaser or one or more designees of the Purchaser;

13

provided, however, that all such funds received on or in connection with a Mortgage Loan as provided in Section 4 shall be received and held by the Seller in trust for the benefit of the Purchaser or the assignee of the Purchaser, as the case may be, as the owner of the Mortgage Loans pursuant to the terms of this Agreement.

It is the express intention of the parties that the transactions contemplated by this Agreement be, and be construed as, a sale of the Mortgage Loans by the Seller and not a pledge of the Mortgage Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller. Consequently, the sale of each Mortgage Loan shall be reflected as a sale on the Seller's business records, tax returns and financial statements.

Subsection 6.03.    Delivery of Mortgage Loan Documents.

At least seven (7) Business Days prior to each Closing Date, the Seller shall deliver and release to the Custodian the Mortgage File (other than the portion thereof constituting the Servicing File) with respect to each Mortgage Loan to be purchased and sold on the related Closing Date and set forth on the related Mortgage Loan Schedule delivered with such Mortgage Loan Documents.

The Seller shall provide the Custodian with a certified true copy of any such document submitted for recordation within two weeks of its execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within ninety days of its submission for recordation.

In the event that new, replacement, substitute or additional Stock Certificates are issued with respect to existing Cooperative Shares, the Seller shall within ten (10) Business Days deliver to the Custodian the new Stock Certificates, together with the related Stock Powers in blank. Such new Stock Certificates shall be subject to the related Pledge Instruments and shall be subject to all of the terms, covenants and conditions of this Agreement.

SECTION 7.    Representations Warranties and Covenants of the Seller:  Remedies for Breach.

Subsection 7.01.    Representations and Warranties Respecting the Seller.

The Seller represents, warrants and covenants to the Purchaser as of the Initial Closing Date and each subsequent Closing Date or as of such date specifically provided herein or in the applicable Assignment and Conveyance:

(a)    The Seller is duly organized, validly existing and in good standing under the laws of the State of New York, and has all licenses necessary to carry on its business as now being conducted. It is licensed in, qualified to transact business in and is in good standing under the laws of the state in which any Mortgaged Property is located and is and will remain in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loan in accordance with the terms of this Agreement. No licenses or

14

approvals obtained by the Seller have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(b)     The Seller has the full corporate power and authority to hold each Mortgage Loan, to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization or other laws affecting creditors' rights generally;

(c)     The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's Articles of Incorporation and By-Laws or result in a material breach of any legal restriction or any agreement or instrument to which Seller is now a party or by which it is bound, or constitute a material default or result in an acceleration under any of the foregoing;

(d)     The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(e)     The Seller is an approved seller/servicer for Fannie Mae and Freddie Mac in good standing, and is a HUD approved mortgagee pursuant to Section 203 of the National Housing Act. No event has occurred, including but not limited to a change in insurance coverage, which would make the Seller unable to comply with Fannie Mae, Freddie Mac or HUD eligibility requirements or which would require notification to Fannie Mae, Freddie Mac or HUD;

(f)     The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(g)     The Mortgage Loan Documents and any other documents required to be delivered with respect to each Mortgage Loan pursuant to this Agreement have been delivered to the Custodian all in compliance with the specific requirements of Section 8(c) hereof. With respect to each Mortgage Loan, the Seller is in

15

possession of a complete Mortgage File in compliance with <u>Exhibit 6</u>, except for such documents as have been delivered to the Custodian;

(h)     Immediately prior to the payment of the Purchase Price for each Mortgage Loan, the Seller was the owner of record of the related Mortgage or Pledge Agreement, as the case may be, and the indebtedness evidenced by the related Mortgage Note and upon the payment of the Purchase Price by the Purchaser, in the event that the Seller retains record title, the Seller shall retain such record title to each Mortgage, each related Mortgage Note and the related Mortgage Files with respect thereto in trust for the Purchaser as the owner thereof and only for the purpose of servicing and supervising the servicing of each Mortgage Loan;

(i)     There are no actions or proceedings against, or investigations of, the Seller before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the sale of the Mortgage Loans or the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Seller of its obligations under, or the validity or enforceability of this Agreement;

(j)     No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement or the consummation of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date;

(k)     The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes, the Mortgages and the Pledge Agreements by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions;

(l)     The transfer of the Mortgage Loans shall be treated as a sale on the books and records of the Seller, and the Seller has determined that, and will treat, the disposition of the Mortgage Loans pursuant to this Agreement for tax and accounting purposes as a sale. The Seller shall maintain a complete set of books and records for each Mortgage Loan which shall be clearly marked to reflect the ownership of each Mortgage Loan by the Purchaser;

(m)     The consideration received by the Seller upon the sale of the Mortgage Loans constitutes fair consideration and reasonably equivalent value for such Mortgage Loans;

(n)     The Seller is solvent and will not be rendered insolvent by the consummation of the transactions contemplated hereby. The Seller is not transferring any Mortgage Loan with any intent to hinder, delay or defraud any of its creditors;

16

(o)     The information delivered by the Seller to the Purchaser with respect to the Seller's loan loss, foreclosure and delinquency experience for the twelve (12) months immediately preceding the Initial Closing Date on mortgage loans underwritten to the same standards as the Mortgage Loans and covering mortgaged properties similar to the Mortgaged Properties, is true and correct in all material respects;

(p)     Neither this Agreement nor any written statement, report or other document prepared and furnished or to be prepared and furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading;

(q)     The Underwriting Guidelines delivered to the Purchaser are true, correct and complete; and

(r)     If the Seller is or becomes a member of MERS, the Seller is in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Mortgage Loans for as long as such Mortgage Loans are registered with MERS.

Subsection 7.02.    Representations and Warranties Regarding Individual Mortgage Loans.

The Seller hereby represents and warrants to the Purchaser that, as to each Mortgage Loan, as of the related Closing Date for such Mortgage Loan:

(a)     The information set forth in the related Mortgage Loan Schedule and the Mortgage Loan data delivered to the Purchaser is complete, true and correct;

(b)     The Mortgage Loan is in compliance with all requirements set forth in the Master Terms and the related Trade Confirmation, and the characteristics of the related Mortgage Loan Package as set forth in the related Trade Confirmation are true and correct;

(c)     All payments required to be made up to the close of business on the Closing Date for such Mortgage Loan under the terms of the Mortgage Note have been made; the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the related Mortgaged Property, directly or indirectly, for the payment of any amount required by the Mortgage Note or Mortgage; and there has been no delinquency, exclusive of any period of grace, in any payment by the Mortgagor thereunder since origination of the Mortgage Loan; and, if the Mortgage Loan is a Cooperative Loan, no foreclosure action or private or public sale under the Uniform Commercial Code has ever been threatened or commenced with respect to the Cooperative Loan;

17

(d)    There are no delinquent taxes, ground rents, water charges, sewer rents, assessments, insurance premiums, leasehold payments, including assessments payable in future installments or other outstanding charges affecting the related Mortgaged Property;

(e)    The Mortgaged Property is located in the state identified in the related Mortgage Loan Schedule and is improved by a Residential Dwelling;

(f)    The terms of the Mortgage Note and the Mortgage and (x) with respect to each Mortgage Loan, the Mortgage and (y) with respect to each Cooperative Loan, the Pledge Agreement, the Proprietary Lease, and the Pledge Instruments have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage, and which have been delivered to the Custodian; the substance of any such waiver, alteration or modification has been approved by the insurer under the Primary Insurance Policy or LPMI Policy, if any, and the title insurer, to the extent required by the related policy, and is reflected on the related Mortgage Loan Schedule.  No instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the insurer under the Primary Insurance Policy or LPMI Policy, if any, the title insurer, to the extent required by the policy, and which assumption agreement has been delivered to the Custodian and the terms of which are reflected in the related Mortgage Loan Schedule; the Financing Statements with respect to each Cooperative Loan are in full force and effect;

(g)    With respect to each Mortgage Loan, the Mortgage Note and the Mortgage and with respect to each Cooperative Loan, the Pledge Agreement, are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and/or the Mortgage, or the exercise of any right thereunder, render the Mortgage or the Mortgage Note unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(h)    With respect to each Mortgage Loan, all buildings upon the Mortgaged Property, and with respect to any Cooperative Loan, the related Project is insured by an insurer acceptable to Fannie Mae and Freddie Mac against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located, pursuant to insurance policies conforming to the requirements of Fannie Mae and Freddie Mac.  All such insurance policies contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid.  If the Mortgaged Property is in an area identified on a Flood Hazard Map or Flood Insurance Rate Map issued by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available)

18

a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect which policy conforms to the requirements of Fannie Mae and Freddie Mac. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(i)    Any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing or disclosure laws and all predatory and abusive lending laws applicable to the origination and servicing of the Mortgage Loans have been complied with and the consummation of the transactions contemplated hereby will not involve the violation of any such laws, and the Seller shall maintain in its possession, available for the inspection of the Purchaser or its designee, and shall deliver to the Purchaser or its designee, upon two Business Days' request, evidence of compliance with such requirements;

(j)    The Mortgage has not been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release;

(k)    With respect to each Mortgage Loan, the related Mortgage is properly recorded and is a valid, existing and enforceable (A) First Lien and first priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a First Lien (as reflected on the Mortgage Loan Schedule), or (B) Second Lien and second priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien (as reflected on the Mortgage Loan Schedule), in either case, on the Mortgaged Property, including all improvements on the Mortgaged Property subject only to (i) the lien of current real property taxes and assessments not yet due and payable, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised Value of the Mortgaged Property, (iii) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property and (iv) with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule) a First Lien on the Mortgaged Property. Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid,

19

existing and enforceable (A) First Lien and first priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a First Lien (as reflected on the Mortgage Loan Schedule) or (B) Second Lien and second priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule), in either case, on the property described therein and the Seller has full right to sell and assign the same to the Purchaser. The Mortgaged Property was not, as of the date of origination of the Mortgage Loan, subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage;

(l)     With respect to each Cooperative Loan, each Pledge Agreement creates a valid, enforceable and subsisting first security interest in the Collateral securing the related Mortgage Note subject only to (a) the lien of the related Cooperative for unpaid assessments representing the Mortgagor's pro rata share of the Cooperative's payments for its blanket mortgage, current and future real property taxes, insurance premiums, maintenance fees and other assessments to which like collateral is commonly subject and (b) other matters to which like collateral is commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Pledge Agreement; provided, however, that the appurtenant Proprietary Lease may be subordinated or otherwise subject to the lien of any mortgage on the Project. There are no liens against or security interests in the Collateral which have priority over the lender's security interest in the Collateral, and such priority interest cannot be created in the future;

(m)     The Mortgage Note and, (x) with respect to each Mortgage Loan, the related Mortgage and (y) with respect to each Cooperative Loan, the Pledge Agreement, are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as the enforcement thereof may be limited by laws respecting bankruptcy, insolvency or reorganization and other laws of general application affecting creditors' rights and subject to the application of rules of equity;

(n)     With respect to each Cooperative Loan, all parties to the Mortgage Note and the Mortgage Loan had legal capacity to execute and deliver the Mortgage Note, the Pledge Agreement, the Proprietary Lease, the Stock Power, the Recognition Agreement, the Financing Statement and the Assignment of the Proprietary Lease and such documents have been duly and properly executed by such parties. Each Stock Power (i) has all signatures guaranteed or (ii) if all signatures are not guaranteed, then such Cooperative Shares will be transferred by the stock transfer agent of the Cooperative if the Seller undertakes to convert the ownership of the collateral securing the related Cooperative Loan;

(o)     The Mortgagor is a natural person;

(p)     The proceeds of the Mortgage Loan have been fully disbursed to or for the account of the Mortgagor and there is no obligation for the Mortgagee to

20

advance additional funds thereunder and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage have been paid, and the Mortgagor is not entitled to any refund of any amounts paid or due to the Mortgagee pursuant to the Mortgage Note or Mortgage;

(q)     The Seller is the sole legal, beneficial and equitable owner of the Mortgage Note and (x) with respect to any Mortgage Loan, the Mortgage and (y) with respect to any Cooperative Loan, the Pledge Agreement, and has full right and authority under all governmental and regulatory bodies having jurisdiction over such Seller, subject to no interest or participation of, or agreement with, any party, to transfer and sell the Mortgage Loan to the Purchaser pursuant to this Agreement free and clear of any encumbrance or right of others, equity, lien, pledge, charge, mortgage, claim, participation interest or security interest of any nature (collectively, a "Lien"); and immediately upon the transfers and assignments herein contemplated, the Seller shall have transferred and sold all of its right, title and interest in and to each Mortgage Loan and the Purchaser will hold good, marketable and indefeasible title to, and be the owner of, each Mortgage Loan subject to no Lien;

(r)     All parties which have had any interest in (x) with respect to any Mortgage Loan, the Mortgage and (y) with respect to any Cooperative Loan, the Pledge Agreement, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (A) organized under the laws of such state, or (B) qualified to do business in such state, or (C) federal savings and loan associations or national banks having principal offices in such state, or (D) not doing business in such state so as to require qualification or licensing, or (E) not otherwise required to be licensed in such state. All parties which have had any interest in the Mortgage Loan were in compliance with any and all applicable "doing business" and licensing requirements of the laws of the state wherein the Mortgaged Property is located or were not required to be licensed in such state;

(s)     With respect to each Cooperative Loan, there is no default in complying with the terms of the Mortgage Note, the Pledge Agreement and the Proprietary Lease and all maintenance charges and assessments (including assessments payable in the future installments, which previously became due and owing) have been paid. The Seller has the right under the terms of the Mortgage Note, Pledge Agreement and Recognition Agreement to pay any maintenance charges or assessments owed by the Mortgagor;

(t)     The Mortgage Loan is covered by an American Land Title Association ("ALTA") lender's title insurance policy (which, in the case of an Adjustable

21

Rate Mortgage Loan has an adjustable rate mortgage endorsement in the form of ALTA 6.0 or 6.1) acceptable to Fannie Mae and Freddie Mac, issued by a title insurer acceptable to Fannie Mae and Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (k)(i)-(iii) with respect to each First Lien Mortgage Loan and subject to the exceptions contained in (k)(i)-(iv) with respect to each Second Lien Mortgage Loan) the Seller, its successors and assigns as to the first priority lien of the Mortgage in the original principal amount of the Mortgage Loan and, with respect to any Adjustable Rate Mortgage Loan, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress to and from the Mortgaged Property, and against encroachments by or upon the Mortgaged Property or any interest therein. The Seller is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(u)     With respect to each Cooperative Loan, a Cooperative Lien Search has been made by a company competent to make the same which company is acceptable to FNMA and qualified to do business in the jurisdiction where the Cooperative Apartment is located;

(v)     There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration. With respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule) (i) the First Lien is in full force and effect, (ii) there is no default, breach, violation or event of acceleration existing under such First Lien mortgage or the related mortgage note, (iii) no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration thereunder, and either (A) the First Lien mortgage contains a provision which allows or (B) applicable law requires, the mortgagee under the Second Lien Mortgage Loan to receive notice of, and affords such mortgagee an opportunity to cure any default by payment in full or otherwise under the First Lien mortgage;

(w)     There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give

22

rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(x)   All improvements which were considered in determining the Appraised Value of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property;

(y)   The Mortgage Loan was originated by the Seller, or by a savings and loan association, a savings bank, a commercial bank or similar banking institution which is supervised and examined by a federal or state authority, or by a mortgagee approved as such by the Secretary of HUD;

(z)   Payments on the Mortgage Loan shall commence (with respect to any newly originated Mortgage Loans) or commenced no more than sixty days after the proceeds of the Mortgage Loan were disbursed.   The Mortgage Loan bears interest at the Mortgage Interest Rate.  With respect to each Mortgage Loan, the Mortgage Note is payable on the first day of each month in Monthly Payments, which, (A) in the case of a Fixed Rate Mortgage Loan, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage Interest Rate, (B) in the case of an Adjustable Rate Mortgage Loan, are changed on each Adjustment Date, and in any case, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage Interest Rate and (C) in the case of a Balloon Loan, are based on a fifteen (15) or thirty (30) year amortization schedule, as set forth in the related Mortgage Note, and a final monthly payment substantially greater than the preceding monthly payment which is sufficient to amortize the remaining principal balance of the Balloon Loan and to pay interest at the related Mortgage Interest Rate. No Mortgage Loan is a Balloon Loan that has an original stated maturity of less than seven (7) years. The Index for each Adjustable Rate Mortgage Loan is as defined in the related Mortgage Loan Schedule.   With respect to each Mortgage Loan identified on the Mortgage Loan Schedule as an interest-only Mortgage Loan, the interest-only period shall not exceed the period specified on the Mortgage Loan Schedule and following the expiration of such interest-only period, the remaining Monthly Payments shall be sufficient to fully amortize the original principal balance over the remaining term of the Mortgage Loan. The Mortgage Note does not permit negative amortization. No Mortgage Loan is a Convertible Mortgage Loan;

(aa)   The origination and collection practices used by the Seller with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing industry.   The Mortgage Loan has been serviced by the Seller and any predecessor servicer in accordance with all applicable laws, rules and regulations, the terms of the Mortgage Note and Mortgage, and the Fannie Mae and Freddie Mac servicing guides.  With respect to escrow deposits and Escrow Payments (other than with

23

respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan and for which the mortgagee under the First Lien is collecting Escrow Payments (as reflected on the Mortgage Loan Schedule)), if any, all such payments are in the possession of, or under the control of, the Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or Escrow Payments or other charges or payments due the Seller have been capitalized under any Mortgage or the related Mortgage Note and no such escrow deposits or Escrow Payments are being held by the Seller for any work on a Mortgaged Property which has not been completed;

(bb)    To the best of the Seller's knowledge, with respect to a Mortgage Loan, the Mortgaged Property, and with respect to a Cooperative Loan, the related Cooperative Apartment and Project, are free of damage and waste. With respect to a Mortgage Loan, there is no proceeding pending or, to the best of the Seller's knowledge, threatened for the total or partial condemnation thereof nor is such a proceeding currently occurring;

(cc)    With respect to each Cooperative Loan, each Pledge Agreement contains enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization of the benefits of the security provided thereby. The Pledge Agreement contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Note in the event the Cooperative Apartment is transferred or sold without the consent of the holder thereof;

(dd)    The Mortgage and related Mortgage Note contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) otherwise by judicial foreclosure. The Mortgaged Property has not been subject to any bankruptcy proceeding or foreclosure proceeding and the Mortgagor has not filed for protection under applicable bankruptcy laws. There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage. The Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers' Civil Relief Act;

(ee)    The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines of the Seller in effect at the time the Mortgage Loan was originated, and the Mortgage Note and Mortgage are on forms acceptable to Fannie Mae and Freddie Mac;

(ff)    The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage on the Mortgaged Property, or Pledge

24

Agreement, as the case may be, and the security interest of any applicable security agreement or chattel mortgage referred to in (k) above;

(gg)    The Mortgage File contains an appraisal of the related Mortgaged Property which satisfied the standards of Fannie Mae and Freddie Mac and was made and signed, prior to the approval of the Mortgage Loan application, by a qualified appraiser, duly appointed by the Seller, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the Mortgage Loan and who met the minimum qualifications of Fannie Mae and Freddie Mac. Each appraisal of the Mortgage Loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;

(hh)    With respect to each Mortgage Loan, in the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(ii)    No Mortgage Loan contains provisions pursuant to which Monthly Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor, or anyone on behalf of the Mortgagor, (b) paid by any source other than the Mortgagor or (c) contains any other similar provisions which may constitute a "buydown" provision. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(jj)    The Mortgagor has executed a statement to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of fixed adjustable rate mortgage loans in the case of Fixed Rate Mortgage Loans, and adjustable rate mortgage loans in the case of Adjustable Rate Mortgage Loans and rescission materials with respect to Refinanced Mortgage Loans, and such statement is and will remain in the Mortgage File;

(kk)    No Mortgage Loan was made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property or Cooperative Apartment; each Mortgagor represented that such Mortgagor would occupy the Mortgaged Property or Cooperative Apartment, as the case may be, as the Mortgagor's primary residence;

(ll)    The Seller has no knowledge of any circumstances or condition with respect the Mortgaged Property, the Mortgagor, the Mortgagor's credit standing or (x) with respect to each Mortgage Loan, the Mortgage, or (y) with respect to any Cooperative Loan, the Pledge Agreement, the Cooperative Apartment or the Project that can reasonably be expected to cause private institutional investors to

25

regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value of the Mortgage Loan;

(mm) No Mortgage Loan had an LTV or CLTV at origination in excess of 100%. Except as set forth on the Mortgage Loan Schedule, each Mortgage Loan with an LTV at origination in excess of 80% is and will be subject to a Primary Insurance Policy, issued by a Qualified Insurer, which insures that portion of the Mortgage Loan in excess of the portion of the Appraised Value of the Mortgaged Property required by Fannie Mae; provided that, a Primary Mortgage Insurance Policy will not be required for any Cooperative Loan if (i) the proceeds of such Cooperative Loan were used to purchase a Cooperative Apartment at the "insider's price" when the building was converted to a Cooperative, (ii) the value of the Cooperative Apartment for purposes of establishing the LTV at origination was such "insider's price", (iii) the principal amount of the Cooperative Loan at origination was not more than 100% of such "insider's price" and (iv) the LTV at origination, as calculated using the appraised value at origination, was less than or equal to 80%. All provisions of such Primary Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage subject to any such Primary Insurance Policy obligates the Mortgagor thereunder to maintain such insurance and to pay all premiums and charges in connection therewith. The Mortgage Interest Rate for the Mortgage Loan does not include any such insurance premium;

(nn) To the best of the Seller's knowledge, in the case of a Mortgage Loan, the Mortgaged Property is lawfully occupied under applicable law; all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities. No improvement located on or being part of any Mortgaged Property is in violation of any applicable zoning law or regulation;

(oo) To the best of the Seller's knowledge, in the case of a Cooperative Loan, the related Cooperative Apartment, is lawfully occupied under applicable law; all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Cooperative Apartment and the related Project and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities;

(pp) No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan;

26

(qq)    Each original Mortgage was recorded and all subsequent assignments of the original Mortgage (other than the assignment to the Purchaser) have been recorded, or are in the process of being recorded, in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof as against creditors of the Seller.  As to any Mortgage Loan which is not a MERS Mortgage Loan, the Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(rr)    Any principal advances made to the Mortgagor prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Mortgage Loan Schedule. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having (A) First Lien priority with respect to each Mortgage Loan which is indicated by the Seller to be a First Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule), or (B) Second Lien priority with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule), in either case, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Fannie Mae and Freddie Mac.  The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(ss)    If the Residential Dwelling on the Mortgaged Property is a condominium unit or a unit in a planned unit development (other than a de minimis planned unit development) such condominium or planned unit development project meets the eligibility requirements of Fannie Mae and Freddie Mac and/or the Underwriting Guidelines;

(tt)    No Mortgage Loan which is a Cash-Out Refinancing was originated in the State of Texas;

(uu)    The source of the down payment with respect to each Mortgage Loan has been fully verified by the Seller, except as otherwise allowed by the terms of the Mortgage Note;

(vv)    Interest on each Mortgage Loan is calculated on the basis of a 360-day year consisting of twelve 30-day months;

(ww)    To the best of the Seller's knowledge, the Mortgaged Property is in material compliance with all applicable environmental laws pertaining to environmental hazards including, without limitation, asbestos, and neither the Seller nor, to the Seller's knowledge, the related Mortgagor, has received any notice of any violation or potential violation of such law;

27

(xx)    With respect to each Mortgage Loan, the Seller has fully and accurately furnished complete information (i.e., favorable and unfavorable) on the related borrower credit files to Equifax, Experian and Trans Union Credit Information Company, in accordance with the Fair Credit Reporting Act and its implementing regulations, on a monthly basis and the Seller for each Mortgage Loan will furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company, on a monthly basis;

(yy)    No Mortgage Loan is (a) subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended ("HOEPA"), (b) a "high cost home", "covered" (excluding home loans defined as "covered home loans" pursuant to clause (1) of the definition of that term in the New Jersey Home Ownership Security Act), "high risk home", "threshold" or "predatory" loan under any other applicable state, federal, or local law, including any predatory or abusive lending laws, or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees or (c) a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the Standard and Poor's LEVELS® Glossary Revised, Appendix E);

(zz)    No predatory, abusive, or deceptive lending practices, including but not limited to, the extension of credit to a mortgagor without regard for the mortgagor's ability to repay the Mortgage Loan and the extension of credit to a mortgagor which has no apparent benefit to the mortgagor, were employed in connection with the origination of the Mortgage Loan.    Each Mortgage Loan is in compliance with the anti-predatory lending eligibility for purchase requirements of the Fannie Mae Guides;

(aaa)   The debt-to-income ratio of the related Mortgagor was not greater than 60% at the origination of the related Mortgage Loan;

(bbb)   No Mortgagor was required to purchase any credit life, disability, accident or health insurance product or debt cancellation agreement as a condition of obtaining the extension of credit.    No Mortgagor obtained a prepaid single premium credit life, disability, accident or health insurance policy in connection with the origination of the Mortgage Loan. No proceeds from any Mortgage Loan were used to finance or purchase single premium credit insurance policies or debt cancellation agreements as part of the origination of, or as a condition to closing, such Mortgage Loan;

(ccc)   The Mortgage Loans were not selected from the outstanding one to four-family mortgage loans in the Seller's portfolio at the related Closing Date as to which the representations and warranties set forth in this Agreement could be made in a manner so as to affect adversely the interests of the Purchaser:

28

(ddd)    The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(eee)    The Mortgage Loan complies with all applicable consumer credit statutes and regulations, including, without limitation, the respective Uniform Consumer Credit Code laws in effect in Colorado, Idaho, Indiana, Iowa, Kansas, Maine, Oklahoma, South Carolina, Utah and Wyoming, has been originated by a properly licensed entity, and in all other respects, complies with all of the material requirements of any such applicable laws;

(fff)    The Prepayment Charge information set forth in the Mortgage Loan Schedule is complete, true and correct in all material respects and each Prepayment Charge is permissible, enforceable and collectable under applicable federal and state law;

(ggg)    The Mortgage Loan was not prepaid in full prior to the Closing Date and the Seller has not received notification from a Mortgagor that a prepayment in full shall be made after the Closing Date;

(hhh)    No Mortgage Loan is secured by commercial property or mixed use property;

(iii)    Each Mortgage Loan is eligible for sale in the secondary market or for inclusion in a Pass-Through Transfer without unreasonable credit enhancement;

(jjj)    With respect to any Mortgage Loan that contains a provision permitting imposition of a Prepayment Charge: (i) prior to the Mortgage Loan's origination, the Mortgagor agreed to such Prepayment Charge in exchange for a monetary benefit, including but not limited to a rate or fee reduction, (ii) prior to the Mortgage Loan's origination, the Mortgagor was offered the option of obtaining a mortgage loan that did not require payment of such a premium, (iii) the Prepayment Charge is disclosed to the Mortgagor in the Mortgage Loan documents pursuant to applicable state and federal law, (iv) for Mortgage Loans originated on or after October 1, 2002, the duration of the prepayment penalty period shall not exceed three (3) years from the date of the Mortgage Note, unless the Mortgage Loan was modified to reduce the prepayment period to no more than three years from the date of the Mortgage Note and the Mortgagor was notified in writing of such reduction in prepayment period, (v) for Mortgage Loans originated prior to October 1, 2002, the duration of the prepayment penalty period shall not exceed five (5) years from the date of the Mortgage Note, and (vi) notwithstanding any state or federal law to the contrary, the Seller shall not impose such Prepayment Charge in any instance when the Mortgage debt is accelerated as the result of the Mortgagor's default in making the Mortgage Loan payments;

29

(kkk)    The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws. No Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "Executive Order") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the "OFAC Regulations") or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

(lll)    No Mortgage Loan is secured in whole or in part by the interest of the Mortgagor as a lessee under a ground lease of a Mortgaged Property;

(mmm)   No Mortgage Loan is secured by real property located in the state of Georgia unless (x) such Mortgage Loan was originated (or modified) prior to October 1, 2002 or after March 6, 2003, or (y) the property securing the Mortgage Loan is not, nor will be, occupied by the Mortgagor as the Mortgagor's principal dwelling. No Mortgage Loan is a "High Cost Home Loan" as defined in the Georgia Fair Lending Act, as amended (the "Georgia Act"). Each Mortgage Loan that is a "Home Loan" under the Georgia Act complies with all applicable provisions of the Georgia Act;

(nnn)    No Mortgagor was encouraged or required to select a Mortgage Loan product offered by the Mortgage Loan's originator which is a higher cost product designed for less creditworthy borrowers, unless at the time of the Mortgage Loan's origination, such Mortgagor did not qualify taking into account credit history and debt to income ratios for a lower cost credit product then offered by the Mortgage Loan's originator or any affiliate of the Mortgage Loan's originator. If, at the time of loan application, the Mortgagor may have qualified for a lower cost credit product then offered by any mortgage lending affiliate of the Mortgage Loan's originator, the Mortgage Loan's originator referred the Mortgagor's application to such affiliate for underwriting consideration;

(ooo)    The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the Mortgagor's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the Mortgagor's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination

30

(application/approval) the Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan;

(ppp)   No Mortgage Loan is secured by manufactured housing;

(qqq)   Except in the case of a Mortgage Loan in an original principal amount of less than $60,000 which would have resulted in an unprofitable origination, no related Mortgagor was charged "points and fees" (whether or not financed) in an amount greater than 5% of the principal amount of such loan, such 5% limitation is calculated in accordance with Fannie Mae's anti-predatory lending requirements as set forth in the Fannie Mae Selling Guide. All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each such Mortgage Loan were disclosed in writing to the related Mortgagor in accordance with applicable state and federal law and regulation;

(rrr)   The Seller will transmit full-file credit reporting data for each Mortgage Loan pursuant to Fannie Mae Guide Announcement 95-19 and for each Mortgage Loan, Seller agrees it shall report one of the following statuses each month as follows: new origination, current, delinquent (30-, 60-, 90-days, etc.), foreclosed, or charged-off;

(sss)   With respect to each MERS Mortgage Loan, a MIN has been assigned by MERS and such MIN is accurately provided on the related Mortgage Loan Schedule. The related assignment of Mortgage to MERS has been duly and properly recorded;

(ttt)   With respect to each MERS Mortgage Loan, the Seller has not received any notice of liens or legal actions with respect to such Mortgage Loan and no such notices have been electronically posted by MERS;

(uuu)   No Mortgage Loan is a "High-Cost" loan as defined under the New York Banking Law Section 6-1, as amended effective as of April 1, 2003;

(vvv)   No Mortgage Loan is a "High Cost Home Loan" as defined in the Arkansas Home Loan Protection Act effective July 16, 2003, as amended (Act 1340 or 2003);

(www)   No Mortgage Loan is a "High Cost Home Loan" as defined in the Kentucky high-cost loan statute effective June 24, 2003, as amended (Ky. Rev. Stat. Section 360.100);

(xxx)   No Mortgage Loan secured by property located in the State of Nevada is a "home loan" as defined in the Nevada Assembly Bill No. 284, as amended;

(yyy)   No Mortgage Loan is a "high cost home," "covered" (excluding home loans defined as "covered home loans" in the New Jersey Home Ownership Security

31

Act of 2002 that were originated between November 26, 2003 and July 7, 2004), "high risk home" or "predatory" loan under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates. points and/or fees);

(zzz)    Each Mortgage Loan constitutes a "qualified mortgage" under Section 860G(a)(3)(A) of the Code and Treasury Regulation Section 1.860G-2(a)(1);

(aaaa)    No Mortgage Loan is a subsection 10 mortgage under the Oklahoma Home Ownership and Equity protection Act, as amended;

(bbbb)    No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, as amended (N.M. Stat. Ann. §§ 58-21A-1 et seq.);

(cccc)    No Mortgage Loan is a "High-Risk Home Loan" as defined in the Illinois High-Risk Home Loan Act effective January 1, 2004, as amended (815 Ill. Comp. Stat. 137/1 et seq.);

(dddd)    No Mortgage Loan originated in the City of Los Angeles is subject to the City of Los Angeles California Ordinance 175008, as amended, as a "home loan";

(eeee)    No Mortgage Loan originated in the City of Oakland is subject to the City of Oakland, California Ordinance 12361, as amended, as a "home loan";

(ffff)    No Mortgage Loan that is secured by property located within the State of Maine meets the definition of a (i) "high-rate, high-fee" mortgage loan under Article VIII, Title 9-A of the Maine Consumer Credit Code or (ii) "High-Cost Home Loan" as defined under the Maine House Bill 383 L.D. 494, as amended effective as of September 13, 2003;

(gggg)    With respect to any Mortgage Loan originated on or after August 1, 2004, (i) the Mortgage Loan is not subject to mandatory arbitration and (ii) neither the related Mortgage nor the related Mortgage Note requires the borrower to submit to arbitration to resolve any dispute arising out of or relating in any way to the Mortgage Loan transaction;

(hhhh)    No Mortgage Loan is a "High-Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C);

(iiii)    No Mortgage Loan secured by a Mortgage Property located in the State of Illinois is in violation of the provisions of the Illinois Interest Act, including Section 4.1a which provides that no such Mortgage Loan with a Mortgage Interest Rate in excess of 8.0% per annum has lender-imposed fees (or other

32

charges) in excess of 3.0% of the original principal balance of the Mortgage Loan;

(jjjj)    With respect to each Cooperative Loan, (i) the terms of the related Proprietary Lease is longer than the terms of the Cooperative Loan, (ii) there is no provision in any Proprietary Lease which requires the Borrower to offer for sale the Cooperative Shares owned by such Borrower first to the Cooperative and (iii) there is no prohibition in any Proprietary Lease against pledging the Cooperative Shares or assigning the Proprietary Lease; and

(kkkk)    No Mortgage Loan is a "High Cost Home Loan" as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9).

Subsection 7.03.   Remedies for Breach of Representations and Warranties.

It is understood and agreed that the representations and warranties set forth in Subsections 7.01 and 7.02 shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note, Assignment of Mortgage or Assignment of the Mortgage Note and Pledge Agreement or the examination or lack of examination of any Mortgage File. Upon discovery by either the Seller or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser (or which materially and adversely affects the interests of the Purchaser in the related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), the party discovering such breach shall give prompt written notice to the other.

Within sixty (60) days of the earlier of either discovery by or notice to the Seller of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans, the Seller shall use its best efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Seller shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price within two (2) Business Days following the expiration of the related cure period. In the event that a breach shall involve any representation or warranty set forth in Subsection 7.01 and such breach cannot be cured within 60 days of the earlier of either discovery by or notice to the Seller of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Seller at the Repurchase Price. With respect to any representations and warranties made by the Seller, in the event that it is discovered that the circumstances with respect to the Mortgage Loan are not accurately reflected in such representation and warranty notwithstanding the actual knowledge or lack of knowledge of Seller, then, notwithstanding that such representation and warranty is made "to the best of the Seller's knowledge," or in reliance on or based on other information, there shall be a breach of such representation and Seller shall cure such breach or repurchase the affected Mortgage Loan as provided in this Subsection 7.03. The Seller shall, at the request of the Purchaser and assuming that the Seller has a Qualified Substitute Mortgage Loan, rather than repurchase the Mortgage Loan as provided above, remove such Mortgage Loan and substitute in its place a Qualified Substitute Mortgage Loan or Loans; provided that such substitution shall be effected not later than 120 days after notice to the Seller of such breach. If the Seller has no

33

Qualified Substitute Mortgage Loan, the Seller shall repurchase the deficient Mortgage Loan. Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Subsection 7.03 shall occur on a date designated by the Purchaser and shall be accomplished by wire transfer of immediately available funds on the repurchase date to an account designated by the Initial Purchaser. Notwithstanding anything to the contrary contained herein, it is understood by the parties hereto that a breach of the representations and warranties made in Subsections 7.02(xx), (yy), (bbb), (jjj), (kkk), (mmm), (ppp), (yyy) or (gggg) will be deemed to materially and adversely affect the value of the related Mortgage Loan or the interest of the Purchaser therein.

At the time of repurchase of any deficient Mortgage Loan, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Custodian relating to the repurchased Mortgage Loan. Upon such repurchase the related Mortgage Loan Schedule shall be amended to reflect the withdrawal of the repurchased Mortgage Loan from this Agreement.

As to any Deleted Mortgage Loan for which the Seller substitutes a Qualified Substitute Mortgage Loan or Loans, the Seller shall effect such substitution by delivering to the Purchaser for such Qualified Substitute Mortgage Loan or Loans the Mortgage Note, the Mortgage, the Assignment of Mortgage and such other documents and agreements as are required by this Agreement, with the Mortgage Note endorsed as required herein. The Seller shall give written notice to the Purchaser that such substitution has taken place and shall amend the Mortgage Loan Schedule to reflect the removal of such Deleted Mortgage Loan from the terms of this Agreement and the substitution of the Qualified Substitute Mortgage Loan. Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement in all respects, and the Seller shall be deemed to have made with respect to such Qualified Substitute Mortgage Loan or Loans, as of the date of substitution, the covenants, representations and warranties set forth in Sections 7.01 and 7.02.

For any month in which the Seller substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Seller will determine the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (after application of scheduled principal payments due in the month of substitution), and an amount equal to the sum of (x) the product of (i) the amount of such shortfall and (ii) the purchase price percentage used to calculate the Purchase Price, as stated in the related Trade Confirmation and (y) accrued interest on the amount of such shortfall to the last day of the month such substitution occurs, shall be distributed by the Seller to the Purchaser on the last Business Day of the month of such substitution.

In addition to such cure, repurchase and substitution obligation, the Seller shall indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of the Seller's representations and warranties contained in this Section 7 and its interim servicing of the Mortgage Loans. It is understood and agreed that the obligations of the Seller set forth in this Subsection 7.03 to cure or repurchase a defective Mortgage Loan and to

34

indemnify the Purchaser as provided in this Subsection 7.03 constitute the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties. The indemnification obligation of the Seller set forth herein shall survive the termination of this Agreement notwithstanding any applicable statute of limitations, which the Seller hereby expressly waives.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Subsections 7.01 or 7.02 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Seller to the Purchaser, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser for compliance with the relevant provisions of this Agreement.

SECTION 8.  Closing.

The closing for each Mortgage Loan Package shall take place on the related Closing Date. At the Purchaser's option, the closing shall be either: electronically, by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

The closing for the Mortgage Loans to be purchased on each Closing Date shall be subject to each of the following conditions:

(a)     all of the representations and warranties of the Seller under this Agreement shall be true and correct as of the related Closing Date and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement;

(b)     the Initial Purchaser shall have received, or the Initial Purchaser's attorneys shall have received in escrow, all Closing Documents as specified in Section 9, in such forms as are agreed upon and acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the terms hereof;

(c)     the Seller shall have delivered and released to the Custodian all documents required pursuant to this Agreement; and

(d)     all other terms and conditions of this Agreement shall have been complied with.

Subject to the foregoing conditions and the conditions set forth in the Master Terms and Trade Confirm, the Initial Purchaser shall pay to the Seller on the related Closing Date the Purchase Price, plus accrued interest pursuant to Section 4, by wire transfer of immediately available funds to the account designated by the Seller.

SECTION 9.  Closing Documents.

(a)     On or before the Initial Closing Date, the Seller shall submit to the Initial Purchaser fully executed originals of the following documents:

35

(i)    this Agreement, in four counterparts;

(ii)    the Master Terms, in four counterparts;

(iii)    an Officer's Certificate, in the form of Exhibit 1 hereto, including all attachments thereto;

(iv)    an Opinion of Counsel to the Seller, in the form of Exhibit 2 hereto; and

(v)    the Seller's Underwriting Guidelines for each of the Seller's origination programs.

(b)    The Closing Documents for the Mortgage Loans to be purchased on each Closing Date shall consist of fully executed originals of the following documents:

(i)    the related Assignment and Conveyance;

(ii)    the related Trade Confirmation;

(iii)    the related Mortgage Loan Schedule, one copy to be attached to the related Assignment and Conveyance and one copy to be delivered to the Custodian;

(iv)    a Custodian's trust receipt and initial certification, indicating that the related Mortgage Files have been received by the Custodian;

(v)    an Officer's Certificate, in the form of Exhibit 1 hereto, including all attachments thereto;

(vi)    if requested by the Initial Purchaser, an Opinion of Counsel to the Seller, in the form of Exhibit 2 hereto;

(vii)    if applicable, a Security Release Certification, in the form of Exhibit 3 hereto executed by any Person, as requested by the Initial Purchaser, if any of the Mortgage Loans has at any time been subject to any security interest, pledge or hypothecation for the benefit of such Person;

(viii)    a certificate or other evidence of merger or change of name, signed or stamped by the applicable regulatory authority, if any of the Mortgage Loans were acquired by the Seller by merger or acquired or originated by the Seller while conducting business under a name other than its present name, if applicable; and

(ix)    to the extent that the Underwriting Guidelines are modified, amended or supplemented at any time following the Initial Closing Date, the Seller shall notify the Purchaser of such change and provide the Purchaser a copy in both electronic and hard copy of such modification, amendment or supplement.

[ TPW: NYLEGAL.313373.4] 17718-00066 03 07.2005 03.28 PM

SECTION 10. Costs.

The Purchaser shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys. All other costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, including without limitation recording fees, fees for title policy endorsements and continuations, fees for recording Assignments of Mortgage, the fees of the Custodian and the Seller's attorney's fees, shall be paid by the Seller.

SECTION 11. Seller's Servicing Obligations.

The Mortgage Loans are being sold on a servicing-released basis. On the date specified in the related Trade Confirmation, or as otherwise agreed to by the parties, the Purchaser, or its designee, shall assume all servicing responsibilities related to the Mortgage Loans and the Seller shall cease all servicing responsibilities related to the Mortgage Loans (the date of the actual transfer of servicing responsibilities for any Mortgage Loan being herein referred to as the "Transfer Date"). During the period between the related Cut-off Date and the related Transfer Date, the Seller or an affiliate of the Seller, as independent contract servicer, shall service the related Mortgage Loans for the benefit of the Purchaser in accordance with the terms of the related Mortgages and Mortgage Notes and shall service the related Mortgage Loans in order to protect Purchaser's interest in such Mortgage Loans and Cooperative Loans to the extent that a reasonably prudent servicer would for mortgage loans of the same type in the applicable jurisdiction, in compliance with all applicable laws, rules and regulations and the loan documents and shall perform each of the requirements set forth in Exhibit 7 hereto. During the period between the related Closing Date and the related Transfer Date, the Seller shall, at its cost and expense, take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related Mortgage Loans to the Purchaser or its designee, including compliance with the Transfer Instructions attached hereto as Exhibit 8.

The Purchaser shall have the right to terminate the Seller as interim servicer of the Mortgage Loans at any time upon twenty (20) days' notice, without cause and without the payment of any termination fee, penalty or expense.

SECTION 12. Removal of Mortgage Loans from Inclusion under This Agreement Upon a Whole Loan Transfer or a Pass-Through Transfer on One or More Reconstitution Dates.

    (a)    The Seller and the Purchaser agree that with respect to some or all of the Mortgage Loans, the Purchaser may effect either:

        (i)    one or more Whole Loan Transfers; and/or

        (ii)    one or more Pass-Through Transfers.

    (b)    With respect to each Whole Loan Transfer or Pass-Through Transfer, as the case may be, entered into by the Purchaser, the Seller agrees:

        (i)    to cooperate fully with the Purchaser and any prospective purchaser with

respect to all reasonable requests and due diligence procedures and with respect to the preparation (including, but not limited to, the endorsement, delivery, assignment, and execution) of the Mortgage Loan Documents and other related documents, and with respect to servicing requirements reasonably requested by the rating agencies and credit enhancers;

(ii)    to execute all Reconstitution Agreements provided that each of the Seller and the Purchaser is given an opportunity to review and reasonably negotiate in good faith the content of such documents not specifically referenced or provided for herein;

(iii)    with respect to any Whole Loan Transfer or Pass-Through Transfer, the Seller shall make the representations and warranties regarding the Seller and the Mortgage Loans as of the date of the Whole Loan Transfer or Pass-Through Transfer, modified to the extent necessary to accurately reflect the pool statistics of the Mortgage Loans as of the date of such Whole Loan Transfer or Pass-Through Transfer and supplemented by additional representations and warranties that are not unreasonable under the circumstances as of the date of such Whole Loan Transfer or Pass-Through Transfer, to the extent that any events or circumstances, including changes in applicable law occurring subsequent to the related Closing Date(s), would render a related Mortgage Loan unmarketable to a material segment of the secondary mortgage or mortgage-backed securities market;

(iv)    to deliver to the Purchaser for inclusion in any prospectus or other offering material such publicly available information regarding the Seller, its financial condition and its mortgage loan delinquency, foreclosure and loss experience and any additional information requested by the Purchaser, and to deliver to the Purchaser any similar non-public, unaudited financial information, in which case the Purchaser shall bear the cost of having such information audited by certified public accountants if the Purchaser desires such an audit, or as is otherwise reasonably requested by the Purchaser and which the Seller is capable of providing without unreasonable effort or expense, and to indemnify the Purchaser and its affiliates for material misstatements or omissions contained (i) in such information and (ii) on the Mortgage Loan Schedule;

(v)    to deliver to the Purchaser and to any Person designated by the Purchaser, at the Purchaser's expense, such statements and audit letters of reputable, certified public accountants pertaining to information provided by the Seller pursuant to clause b(iv) above as shall be reasonably requested by the Purchaser; and

(vi)    to deliver to the Purchaser, and to any Person designated by the Purchaser, such legal documents and in-house Opinions of Counsel as are customarily delivered by originators or servicers, as the case may be, and

38

reasonably determined by the Purchaser to be necessary in connection with Whole Loan Transfers or Pass-Through Transfers, as the case may be, such in-house Opinions of Counsel for a Pass-Through Transfer to be in the form reasonably acceptable to the Purchaser, it being understood that the cost of any opinions of outside special counsel that may be required for a Whole Loan Transfer or Pass-Through Transfer, as the case may be, shall be the responsibility of the Purchaser.

All Mortgage Loans not sold or transferred pursuant to a Whole Loan Transfer or Pass-Through Transfer shall be subject to this Agreement and shall continue to be serviced for the remainder of the interim servicing period in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

SECTION 13. Financial Statements.

The Seller understands that in connection with the Purchaser's marketing of the Mortgage Loans, the Purchaser shall make available to prospective purchasers the Seller's financial statements for the most recently completed three fiscal years respecting which such statements are available. The Seller also shall make available any comparable interim statements to the extent any such statements have been prepared by the Seller (and are available upon request to members or stockholders of the Seller or the public at large). The Seller, if it has not already done so, agrees to furnish promptly to the Purchaser copies of the statements specified above. For so long as any Mortgage Loan is being serviced hereunder, or if a purchase of mortgage loans from the Seller is mutually contemplated by the Seller and the Purchaser, the Seller also shall make available information on its servicing performance with respect to mortgage loans serviced for others, including delinquency ratios.

The Seller also agrees to allow access, upon reasonable notice and during normal business hours, to knowledgeable financial, accounting, origination and servicing officers of the Seller for the purpose of answering questions asked by any prospective purchaser regarding recent developments affecting the Seller, its loan origination or servicing practices or the financial statements of the Seller.

SECTION 14. Mandatory Delivery; Grant of Security Interest.

The sale and delivery of each Mortgage Loan on or before the related Closing Date is mandatory from and after the date of the execution of the related Trade Confirmation, it being specifically understood and agreed that each Mortgage Loan is unique and identifiable on the date hereof and that an award of money damages would be insufficient to compensate the Initial Purchaser for the losses and damages incurred by the Initial Purchaser (including damages to prospective purchasers of the Mortgage Loans) in the event of the Seller's failure to deliver each of the related Mortgage Loans or one or more Mortgage Loans otherwise acceptable to the Initial Purchaser on or before the related Closing Date. The Seller hereby grants to the Initial Purchaser a lien on and a continuing security interest in each Mortgage Loan and each document and instrument evidencing each such Mortgage Loan to secure the performance by the Seller of its obligation hereunder, and the Seller agrees that it holds such Mortgage Loans in custody for the Initial Purchaser subject to the Initial Purchaser's (i) right to reject any Mortgage Loan under the

39

terms of this Agreement, the Master Terms and the related Trade Confirmation, and (ii) obligation to pay the related Purchase Price for the Mortgage Loans. All rights and remedies of the Purchaser under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

SECTION 15. Notices.

Any and all statements, demands, notices and other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the addresses specified below, or sent to such party at any other place specified in a change of address hereafter received by the other. All communications shall reference the applicable Closing Date and may be made orally, if confirmed promptly in writing or by other communication as specified above.

     (a)     if to the Purchaser:

          Nomura Credit & Capital, Inc.
          2 World Financial Center, Building B, 21st Floor
          New York, New York 10281

          Attn:   Dante LaRocca, Managing Director
                  with a copy to NCCI Legal, 18th Floor
                  Fax:  (212) 667-1024

     (b)     if to the Seller:

          American Home Mortgage Corp.
          538 Broadhollow Road
          Melville, New York 11747

          Attn:   Robert Johnson, Executive Vice President

     With a copy to General Counsel at the same address

SECTION 16. Severability Clause.

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision,

40

representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

SECTION 17. Counterpart, Electronic and Facsimile Signatures.

This Agreement may be executed simultaneously or in any number of counterparts. Each counterpart shall be deemed to be an original, and all of which together shall constitute one and the same instrument. The parties agree that this Agreement and any notices hereunder may be transmitted between them by email and/or by facsimile. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties. The original documents shall be promptly delivered, if requested.

SECTION 18. Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY: (A) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, OR THE COURTS OF THE STATE OF NEW YORK, WITHIN THE COUNTY OF NEW YORK, IN THE EVENT THE FEDERAL COURT LACKS OR DECLINES JURISDICTION; (B) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME; (C) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH THE OTHER PARTY SHALL HAVE BEEN NOTIFIED; AND (D) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

SECTION 19. Intention of the Parties.

It is the intention of the parties that the Initial Purchaser is purchasing, and the Seller is selling, the Mortgage Loans and not a debt instrument of the Seller or another security.

Accordingly, the parties hereto each intend to treat the transaction for Federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans. The Initial Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan Files to determine the characteristics of the Mortgage Loans which shall affect the Federal income tax consequences of owning the Mortgage Loans and the Seller shall cooperate with all reasonable requests made by the Initial Purchaser in the course of such review.

SECTION 20. <u>Successors and Assigns</u>.

This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective successors and assigns of the Seller and the Purchaser. The Purchaser may assign this Agreement to any Person to whom any Mortgage Loan is transferred whether pursuant to a sale or financing and to any Person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred. Upon any such assignment, the Person to whom such assignment is made shall succeed to all rights and obligations of the Purchaser under this Agreement to the extent of the related Mortgage Loan or Mortgage Loans and this Agreement, to the extent of the related Mortgage Loan or Loans, shall be deemed to be a separate and distinct Agreement between the Seller and such Purchaser, and a separate and distinct Agreement between the Seller and each other Purchaser to the extent of the other related Mortgage Loan or Loans. In the event that this Agreement is assigned to any Person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred, the rights and benefits under this agreement which inure to the Purchaser shall inure to the benefit of both the Person to whom such Mortgage Loan is transferred and the Person to whom the servicing or master servicing of the Mortgage Loan has been transferred; provided that, the right to require a Mortgage Loan to be repurchased by the Seller pursuant to Subsection 7.03 shall be retained solely by the Purchaser. Except with respect to an affiliate of the Seller, this Agreement shall not be assigned, pledged or hypothecated by the Seller to a third party without the consent of the Purchaser, which consent shall not be unreasonably withheld.

SECTION 21. <u>Waivers</u>.

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

SECTION 22. <u>Exhibits</u>.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

SECTION 23. <u>General Interpretive Principles</u>.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

42

(a)     the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)     accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)     references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other Subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)     reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include" or "including" shall mean without limitation by reason of enumeration.

SECTION 24. Nonsolicitation.

The Seller covenants and agrees that it shall not take any action to solicit the refinancing of any Mortgage Loan following the date hereof or provide information to any other entity to solicit the refinancing of any Mortgage Loan; provided that, the foregoing shall not preclude the Seller from engaging in solicitations to the general public by newspaper, radio, television or other media which are not directed toward the Mortgagors or from refinancing the Mortgage Loan of any Mortgagor who, without solicitation, contacts the Seller to request the refinancing of the related Mortgage Loan.

SECTION 25. Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, maybe reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 26. Further Agreements.

The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

43

IN WITNESS WHEREOF, the Seller and the Initial Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

AMERICAN HOME MORTGAGE CORP.
(Seller)

By: _____
Name: Robert Johnson
Title: Executive Vice President


NOMURA CREDIT & CAPITAL, INC.
(Initial Purchaser)

By: _____
Name: JOHN P. GRAHAM
Title: Managing Director

44

## EXHIBIT 1

### SELLER'S OFFICER'S CERTIFICATE

I, _____, hereby certify that I am the duly elected _____ of American Home Mortgage Corp., a New York corporation (the "Seller"), and further certify, on behalf of the Seller as follows:

(a)    Attached hereto as Attachment I are a true and correct copy of the Certificate of Incorporation and by-laws of the Seller as are in full force and effect on the date hereof.

(b)    No proceedings looking toward merger, liquidation, dissolution or bankruptcy of the Seller are pending or contemplated.

(c)    Each person who, as an officer or attorney-in-fact of the Seller, signed (a) the Master Mortgage Loan Purchase Agreement (the "Purchase Agreement"), dated as of January 1, 2005 by and between the Seller and Nomura Credit & Capital, Inc. (the "Purchaser"); (b) the Master Terms, dated January 1, 2005 between the Seller and the Purchaser (the "Master Terms"); (c) the Trade Confirmation and Pool Summary, dated _____ ___, 200_ between the Seller and the Purchaser (the "Trade Confirmation"); and (d) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of the Mortgage Loans in accordance with the Purchase Agreement and the Master Terms was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact, and the signatures of such persons appearing on such documents are their genuine signatures.

(d)    Attached hereto as Attachment II is a true and correct copy of the resolutions duly adopted by the board of directors of the Seller on _____ (the "Resolutions") with respect to the authorization and approval of the sale and servicing of the Mortgage Loans; said Resolutions have not been amended, modified, annulled or revoked and are in full force and effect on the date hereof.

(e)    Attached hereto as Attachment III is a Certificate of Good Standing of the Seller dated _____, 200_. No event has occurred since _____ 200_ which has affected the good standing of the Seller under the laws of the State of _____.

(f)    All of the representations and warranties of the Seller contained in Subsections 7.01 and 7.02 of the Purchase Agreement were true and correct in all material respects as of the date of the Purchase Agreement and are true and correct in all material respects as of the date hereof.

(g)    The Seller has performed all of its duties and has satisfied all the material conditions on its part to be performed or satisfied prior to the related Closing Date

pursuant to the Purchase Agreement, the Master Terms and the related Trade Confirmation.

All capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated: _____

     [Seal]

                    AMERICAN HOME MORTGAGE CORP.
                    (Seller)

                    By: _____
                    Name: _____
                    Title:  (Vice President or higher)

I, _____, Secretary of the Seller, hereby certify that _____ is the duly elected, qualified and acting _____ of the Seller and that the signature appearing above is his genuine signature.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: _____

     [Seal]

                    AMERICAN HOME MORTGAGE CORP.
                    (Seller)

                    By: _____
                    Name: _____
                    Title:  [Assistant] Secretary

2

## EXHIBIT 2

### [FORM OF OPINION OF COUNSEL TO THE SELLER]

_____
(Date)

Nomura Credit & Capital, Inc.
2 World Financial Center, Building B
New York, New York 10281

Re:    Master Mortgage Loan Purchase Agreement, dated as of January 1, 2005

Gentlemen:

I have acted as counsel to American Home Mortgage Corp. (the "Seller"), in connection with the sale of certain mortgage loans by the Seller to Nomura Credit & Capital, Inc. (the "Purchaser") pursuant to (i) a Master Mortgage Loan Purchase Agreement, dated as January 1, 2005, between the Seller and the Purchaser (the "Purchase Agreement"), (ii) the Master Terms, dated January 1, 2005, between the Seller and the Purchaser (the "Master Terms") and (iii) the Trade Confirmation and Pool Summary, dated _____ ____, 200_ between the Seller and the Purchaser (the "Trade Confirmation"). Capitalized terms not otherwise defined herein have the meanings set forth in the Purchase Agreement.

In connection with rendering this opinion letter, I, or attorneys working under my direction, have examined, among other things, originals, certified copies or copies otherwise identified to my satisfaction as being true copies of the following:

(a)    the Purchase Agreement;

(b)    the Master Terms;

(c)    the Trade Confirmation;

(d)    the Seller's Certificate of Incorporation and by-laws, as amended to date; and

(e)    resolutions adopted by the Board of Directors of the Seller with specific reference to actions relating to the transactions covered by this opinion (the "Board Resolutions").

For the purpose of rendering this opinion, I have made such documentary, factual and legal examinations as I deemed necessary under the circumstances. As to factual matters, I have relied upon statements, certificates and other assurances of public officials and of officers and other representatives of the Seller, and upon such other certificates as I deemed appropriate, which factual matters have not been independently established or verified by me. I have also assumed, among other things, the genuineness of all signatures, the legal capacity of all natural

persons, the authenticity of all documents submitted to me as originals, and the conformity to original documents of all documents submitted to me as copies and the authenticity of the originals of such copied documents.

On the basis of and subject to the foregoing examination, and in reliance thereon, and subject to the assumptions, qualifications, exceptions and limitations expressed herein, I am of the opinion that:

(f)     The Seller has been duly incorporated and is validly existing and in good standing under the laws of the State of New York with corporate power and authority to own its properties and conduct its business as presently conducted by it. The Seller has the corporate power and authority to service the Mortgage Loans, and to execute, deliver, and perform its obligations under the Purchase Agreement, the Master Terms and the Trade Confirmation (sometimes collectively, the "Agreements").

(g)     The Purchase Agreement, the Master Terms and the Trade Confirmation have been duly and validly authorized, executed and delivered by the Seller.

(h)     The Purchase Agreement, the Master Terms and the Trade Confirmation constitute valid, legal and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms.

(i)     No consent, approval, authorization or order of any state or federal court or government agency or body is required for the execution, delivery and performance by the Seller of the Purchase Agreement, the Master Terms and the Trade Confirmation or the consummation of the transactions contemplated by the Purchase Agreement, the Master Terms and the Trade Confirmation, except for those consents, approvals, authorizations or orders which previously have been obtained.

(j)     Neither the servicing of the Mortgage Loans by the Seller as provided in the Purchase Agreement and the Master Terms nor the fulfillment of the terms of or the consummation of any other transactions contemplated in the Purchase Agreement, the Master Terms and the Trade Confirmation will result in a breach of any term or provision of the certificate of incorporation or by-laws of the Seller, or, to the best of my knowledge, will conflict with, result in a breach or violation of, or constitute a default under, (i) the terms of any indenture or other agreement or instrument known to me to which the Seller is a party or by which it is bound, (ii) any State of New York or federal statute or regulation applicable to the Seller, or (iii) any order of any State of New York or federal court, regulatory body, administrative agency or governmental body having jurisdiction over the Seller, except in any such case where the default, breach or violation would not have a material adverse effect on the Seller or its ability to perform its obligations under the Purchase Agreement or the Master Terms.

2

(k)     There is no action, suit, proceeding or investigation pending or, to the best of my knowledge, threatened against the Seller which, in my judgment, either in any one instance or in the aggregate, would draw into question the validity of the Purchase Agreement or the Master Terms or which would be likely to impair materially the ability of the Seller to perform under the terms of the Purchase Agreement or the Master Terms.

(l)     The sale of each Mortgage Note and Mortgage as and in the manner contemplated by the Purchase Agreement is sufficient fully to transfer to the Purchaser all right, title and interest of the Seller thereto as noteholder and mortgagee.

(m)     The Assignments of Mortgage are in recordable form and upon completion will be acceptable for recording under the laws of the State of New York.  When endorsed, as provided in the Purchase Agreement, the Mortgage Notes will be duly endorsed under New York law.

The opinions above are subject to the following additional assumptions, exceptions, qualifications and limitations:

(n)     I have assumed that all parties to the Agreements other than the Seller have all requisite power and authority to execute, deliver and perform their respective obligations under each of the Agreements, and that the Agreements have been duly authorized by all necessary corporate action on the part of such parties, have been executed and delivered by such parties and constitute the legal, valid and binding obligations of such parties.

(o)     My opinion expressed in paragraphs 3 and 7 above is subject to the qualifications that (i) the enforceability of the Agreements may be limited by the effect of laws relating to (1) bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, including, without limitation, the effect of statutory or other laws regarding fraudulent conveyances or preferential transfers, and (2) general principles of equity upon the specific enforceability of any of the remedies, covenants or other provisions of the Agreements and upon the availability of injunctive relief or other equitable remedies and the application of principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) as such principles relate to, limit or affect the enforcement of creditors' rights generally and the discretion of the court before which any proceeding for such enforcement may be brought; and (ii) I express no opinion herein with respect to the validity, legality, binding effect or enforceability of (a) provisions for indemnification in the Agreements to the extent such provisions may be held to be unenforceable as contrary to public policy or (b) Section 18 of the Purchase Agreement.

(p)     I have assumed, without independent check or certification, that there are no agreements or understandings among the Seller, the Purchaser and any other party which would expand, modify or otherwise affect the terms of the documents described herein or the respective rights or obligations of the parties thereunder.

3

I am admitted to practice in the State of New York, and I render no opinion herein as to matters involving the laws of any jurisdiction other than the State of New York and the Federal laws of the United States of America.

Very truly yours,

[TPW: NYLEGAL.313373.4] 17718-00066 03 07 2005 03:28 PM

## EXHIBIT 3

### SECURITY RELEASE CERTIFICATION

i.    <u>Release of Security Interest</u>

_____ hereby relinquishes any and all right, title and interest it may have in and to the Mortgage Loans described in Exhibit A attached hereto upon purchase thereof by Nomura Credit & Capital, Inc. from the Seller named below pursuant to that certain Master Mortgage Loan Purchase Agreement, dated as of January 1, 2005, as of the date and time of receipt by_____ of $_____ for such Mortgage Loans (the "Date and Time of Sale"), and certifies that all notes, mortgages, assignments and other documents in its possession relating to such Mortgage Loans have been delivered and released to the Seller named below or its designees as of the Date and Time of Sale.

Name and Address of Financial Institution:    _____

    _____

    _____

    _____

    _____

By: _____

Name: _____

Title: _____

ii.    <u>Certification of Release</u>

The Seller named below hereby certifies to Nomura Credit & Capital, Inc. that, as of the Date and Time of Sale of the above mentioned Mortgage Loans to Nomura Credit & Capital, Inc., the security interests in the Mortgage Loans released by the above named corporation comprise all security interests relating to or affecting any and all such Mortgage Loans.  The Seller warrants that, as of such time, there are and will be no other security interests affecting any or all of such Mortgage Loans.

American Home Mortgage Corp.
(Seller)

By: _____

Name: _____

Title: _____

2

## EXHIBIT 4

### ASSIGNMENT AND CONVEYANCE

On this _____ day of _____, 200_, American Home Mortgage Corp. ("Seller") as the Seller under that certain Master Mortgage Loan Purchase Agreement, dated as of January 1, 2005 (the "Agreement") does hereby sell, transfer, assign, set over and convey to Nomura Credit & Capital, Inc. as Purchaser under the Agreement, without recourse, but subject to the terms of the Agreement, all rights, title and interest of the Seller in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto as Schedule I, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Section 6.03 of the Agreement, the Seller has delivered to the Custodian the documents for each Mortgage Loan to be purchased as set forth in the Agreement. The ownership of each Mortgage Note, Mortgage, and the contents of the Mortgage File and Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Seller shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in such custodial capacity only.

The Seller confirms to the Purchaser that the representation and warranties set forth in Sections 7.01 and 7.02 of the Agreement are true and correct as of the date hereof; and that all statements made in the Seller's Officer's Certificates and all Attachments thereto remain complete, true and correct in all respects as of the date hereof.

The Seller further confirms that there have been no changes to the Underwriting Guidelines except as provided to the Purchaser and that each of the Mortgage Loans conforms to such Underwriting Guidelines.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

AMERICAN HOME MORTGAGE CORP.

(Seller)

By: _____

Name: _____

Title: _____

**EXHIBIT 5**

**MORTGAGE LOAN DOCUMENTS**

The term "Mortgage Loan Documents" means:

(q)   With respect to each Mortgage Loan other than a Cooperative Loan, the following documents:

(i)   the original Mortgage Note, endorsed, "Pay to the order of [blank], without recourse" and signed in the name of the last named endorsee by an authorized officer.   The Mortgage Note shall include all intervening original endorsements showing a complete chain of title from the originator to the last named endorsee.   If the Mortgage Note has been signed by a Person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such Person to sign or a copy of such power of attorney together with an Officer's Certificate certifying that such copy represents a true and correct copy and that such original has been duly recorded in the appropriate records depository for the jurisdiction in which the Mortgaged Property is located. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge.   Such allonge shall be firmly affixed to the Mortgage Note so as to become a part thereof.

(ii)   the original of any loan agreement and guarantee(s) executed in connection with the Mortgage Note;

(iii)   in the case of a Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage, with evidence of recording thereon, or, if the original Mortgage has not yet been returned from the recording office, a copy of the original Mortgage without evidence of recording thereon together with a certificate of either the closing attorney or an officer of the title insurer which issued the related title insurance policy, certifying that the copy is a true copy of the original of the Mortgage which has been delivered by such attorney or officer for recording in the appropriate recording office of the jurisdiction in which the Mortgaged Property is located;

(iv)   in the case of a Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage Assignment for each Mortgage Loan to [blank], in form and substance acceptable for recording and signed in the name of the last endorsee by an authorized officer;

(v)   the originals of all intervening assignments of mortgage, if any, with evidence of recording thereon or copies thereof certified by the related recording office or, if the original of any such assignment has not yet been returned from the recording office, a copy of the original of any such assignment without evidence of recording thereon together with a

certificate of either the closing attorney or an officer of the title insurer which issued the related title insurance policy, certifying that the copy is a true copy of the original of any such assignment which has been delivered by such attorney or officer for recording in the appropriate recording office of the jurisdiction in which the Mortgaged Property is located;

(vi)     the originals of all assumption, modification, consolidation or extension agreements, if any, with evidence of recording thereon;

(vii)    as to each Mortgage Loan, (i) the original mortgagee title insurance policy or (ii) if such policy has not been issued, (a) a written commitment or binder for such policy issued by a title insurer or (b) a preliminary title report issued by a title insurer in anticipation of issuing a title insurance policy; and

(viii)   for each Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded.

(r)     With respect to each Cooperative Loan, the following documents:

(i)      the original Mortgage Note, endorsed, "Pay to the order of [blank], without recourse" and signed in the name of the last named endorsee by an authorized officer. If the Mortgage Note has been signed by a Person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such Person to sign or a copy of such power of attorney together with an Officer's Certificate certifying that such copy represents a true and correct copy and that such original has been duly recorded in the appropriate records depository for the jurisdiction in which the Mortgaged Property is located. Such signature on the Mortgage Note shall be an original signature of such authorized officer. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge. Such allonge shall be firmly affixed to the Mortgage Note so as to become a part thereof;

(ii)     the original Pledge Agreement;

(iii)    the original Assignment of the Mortgage Note and Pledge Agreement to [blank], in form and substance acceptable for recording and signed in the name of the last endorsee by an authorized officer;

2

(iv)    the originals of all intervening assignments of the Pledge Agreement, if any;

(v)    the original or acknowledgment copy of Form UCC-1 and any continuation statements with evidence of filing thereon;

(vi)    the original or acknowledgment copy of Form UCC-3 with evidence of filing thereon;

(vii)    Stock Certificate(s) representing the stock allocated to the Cooperative Apartment in the Cooperative pledged with respect to such Cooperative Loan with a Stock Power in blank;

(viii)    the original or a copy of the Recognition Agreement;

(ix)    the originals of all assumption, modification, consolidation or extension agreements, if any, with evidence of recording thereon; and

(x)    the original Assignment of Proprietary Lease, and the assignment of the Assignment of Proprietary Lease.

The Seller shall promptly forward or shall cause to be forwarded to the Custodian any additional original documents received by the seller.

3

## EXHIBIT 6

### CONTENTS OF EACH MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser and which shall be retained by the Seller or delivered to the Custodian:

(s)     Mortgage Loan Documents.

(t)     Residential loan application.

(u)     Mortgage Loan closing statement.

(v)     Verification of employment and income.

(w)    Verification of acceptable evidence of source and amount of down payment.

(x)     Credit report on Mortgagor.

(y)     Residential appraisal report.

(z)     Photograph of the Mortgaged Property.

(aa)    Survey of the Mortgaged Property.

(bb)    Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

(cc)    All required disclosure statements and statement of Mortgagor confirming receipt thereof.

(dd)    If available, termite report, structural engineer's report, water potability and septic certification.

(ee)    Sales Contract, if applicable.

(ff)    Hazard insurance policy.

(gg)    Tax receipts, insurance premium receipts, ledger sheets, payment history from date of origination, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and losing papers and records which are customarily contained in a mortgage loan file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

(hh)    Amortization schedule, if available.

(ii)    Payment history for Mortgage Loans that have been closed for more than 90 days.

## EXHIBIT 7

## INTERIM SERVICING REQUIREMENTS

In addition to the servicing transfer requirements set forth on Exhibit 8, the Seller's obligations with respect to the transfer of servicing of the Mortgage Loans shall include, but shall not be limited to, the following:

(jj) Notice to Mortgagors. Mail to each Mortgagor a letter advising such Mortgagor of the transfer of the servicing of the related Mortgage Loan to Purchaser or its designee in accordance with the Cranston Gonzalez National Affordable Housing Act of 1990, as the same may be amended from time to time, provided, however, the content and format of the letter shall have the prior approval of Purchaser. Seller shall provide Purchaser with copies of all such notices no later than the related Transfer Date.

(kk) Notice to Taxing Authorities and Insurance Companies. Transmit to the applicable taxing authorities and insurance companies (including primary mortgage insurance policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to Purchaser from and after the related Transfer Date. Seller shall provide Purchaser with copies of all such notices no later than the related Transfer Date.

(ll) Delivery of Servicing Records. On or prior to the related Transfer Date, forward to Purchaser, or its designee, all servicing records (if on microfiche or microfilm, such records shall be provided in triplicate), the Servicing File and the Mortgage File in any servicer's possession relating to each Mortgage Loan including, but not limited to, the appraisal, loan application and underwriting file obtained in connection with the origination of the related Mortgage Loan, as well as a payment history for the related Mortgage Loan for the past five (5) years or in the case of a Mortgage Loan originated within the past five years, since the origination of such Mortgage Loan.

(mm) Escrow Payments. On the related Transfer Date provide Purchaser with an accounting statement of the escrow and other payments, for taxes, governmental assessments, insurance premiums, security deposits, water, sewer and municipal charges, and suspense balances and loss draft balances sufficient to enable Purchaser to reconcile the amount of such payment with the accounts of the related Mortgage Loans.

(nn) Corporate Advances. On the related Transfer Date, provide Purchaser, or its designee, with copies of all receipts, invoices and bills, if any, pertaining to foreclosure expenses, attorney's fees, bankruptcy fees and other corporate advances along with a loan level report providing detail on each expense paid by Seller. In addition, Seller shall forward on a weekly basis all receipts, invoices and bills pertaining to foreclosure expenses, attorney's fees, bankruptcy fees and

other corporate advances, if any, received by Seller after the related Transfer Date. Purchaser and Seller acknowledge that the amount of the escrow and corporate advances (as described in this paragraph (e) and paragraph (d) above) may vary from the amount shown on the Mortgage Loan Schedule to reflect activity occurring after the related Closing Date.

(oo)   <u>Payoffs and Assumptions</u>.  On or prior to the related Transfer Date, provide to Purchaser, or its designee, copies of all assumption and payoff statements generated with respect to the Mortgage Loans from the period beginning sixty (60) days prior to the related Transfer Date until the related Transfer Date.

(pp)   <u>Payments Received Prior to the Transfer Date</u>.  Prior to the related Transfer Date all payments received by Seller on each Mortgage Loan shall be properly applied by Seller to the account of the particular Mortgagor. Any unapplied funds and suspense payments shall be wire transferred to Purchaser on the related Transfer Date and shall be applied by Purchaser as deemed appropriate in Purchaser's sole discretion. In the event the related Transfer Date is more than 30 days following the related Closing Date, in addition to such related Transfer Date payment, Seller shall remit to Purchaser on the fifth business day of each month all amounts received with respect to the Mortgage Loans which have not previously been remitted.

(qq)   <u>Payments Received After the Transfer Date</u>.  The amount of any payments received by Seller after the related Transfer Date with respect to the related Mortgage Loans shall (i) in the case of payments received within thirty days of the related Transfer Date, be forwarded to Purchaser by overnight mail or courier on the date of receipt and (ii) in the case of payments received thereafter, be forwarded to Purchaser on a weekly basis. Notwithstanding the foregoing, any payment received by Seller for the purposes of a full payoff and received within ninety days of the related Transfer Date shall be forwarded to Purchaser by courier or overnight mail on the date of receipt. Seller shall notify Purchaser of the particulars of such payment, which notification requirements shall be satisfied if Seller forwards with the payment sufficient information to permit appropriate processing of the payment by Purchaser and shall provide necessary and appropriate legal application of such payments which shall include, but not be limited to, endorsement of such payment to Purchaser or equivalent substitute payment with the particulars of the payment such as the account number, dollar amount, date received and any special Mortgagor application instructions.

(rr)   <u>Misapplied Payments</u>.  Misapplied payments shall be processed as follows:

  (i)     All parties shall cooperate in correcting misapplication errors;

  (ii)    The party receiving notice of a misapplied payment occurring prior to the related Transfer Date shall immediately notify the other party;

  (iii)   If a misapplied payment which occurred prior to the related Transfer Date

2

cannot be identified and said misapplied payment has resulted in a shortage in any accounts established for the purpose of depositing payments with respect to the Mortgage Loans, Seller shall be liable for the amount of such shortage. Seller shall reimburse Purchaser for the amount of such shortage within 30 days after receipt of written demand therefor from Purchaser;

(iv)    If a misapplied payment which occurred prior to the related Transfer Date has created an incorrect Purchase Price as the result of an inaccurate outstanding principal balance, a check shall be issued to the party disadvantaged by the incorrect payment application within five (5) Business Days after notice therefor by the other party; and

(v)    Any check issued under the provisions of this Exhibit 7 shall be accompanied by a statement indicating the corresponding Seller and/or Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments.

(ss)    <u>Books and Records</u>. On the related Transfer Date, the books, records and accounts of Seller with respect to the related Mortgage Loans shall be in accordance with all applicable industry standards, and with all additional Purchaser requirements as to which Seller has received notice.

(tt)    <u>Reconciliation</u>. On or prior to the related Transfer Date, with respect to the related Mortgage Loans, reconcile principal balances and make any monetary adjustments required by Purchaser. Any such monetary adjustments will be transferred between Seller and Purchaser as appropriate.

(uu)    <u>IRS Forms</u>. File, as and when required by law, all IRS forms 1099, 1099A, 1098 or 1041 and K-1 in relation to the servicing and ownership of the Mortgage Loans for the portion of such year the Mortgage Loans were serviced by Seller. Seller shall provide copies of such forms to Purchaser upon request and Seller shall reimburse Purchaser for any costs or penalties incurred by Purchaser due to Seller's failure to comply with this paragraph.

(vv)    <u>Consultation with Purchaser</u>. During the period between the related Cut-off Date and the related Transfer Date, consult with Purchaser (i) prior to instituting any new foreclosure proceedings or seeking bankruptcy relief on any Mortgage Loan or (ii) with respect to any default expenditures incurred (exclusive of property inspection expenditures, loss mitigation expenditures or loss mitigation actions taken) relating to any Mortgage Loan.

(ww)    <u>Transfer of Servicing</u>. On the related Transfer Date Seller shall transfer servicing of the related Mortgage Loans to Purchaser pursuant to the terms of this Agreement and the servicing transfer instructions set forth in <u>Exhibit 8</u>. At Purchaser's option and upon reasonable notice, Seller shall effect the transfer of servicing for the related Mortgage Loans by means of a "tape to tape" transfer.

3

All information provided to Purchaser or its designee shall be provided electronically. Seller shall pay any costs and expenses Purchaser incurs related to the manual transfer of any information to Purchaser or its designee.

(xx)    <u>Mortgage Loans in Litigation</u>.  On or prior to the related Transfer Date:

   (i)    deliver written notification to Purchaser, pursuant to Section 15, of the Mortgage Loans in litigation on the related Transfer Date including the names and addresses of all parties involved in such litigation and Seller shall deliver to Purchaser all documents related to such litigation; and

   (ii)    notify the clerk of the court and all counsel of record involved in such litigation that ownership of the Mortgage Loan in question has been transferred from Seller to Purchaser.

On or prior to the related Transfer Date, Seller shall, through its attorney, if requested by Purchaser and in cooperation with Purchaser's attorney, file appropriate pleadings with the court that will (i) substitute Purchaser's attorney for Seller's attorney, and (ii) remove Seller as a party to the litigation and substitute Purchaser as the real party in interest.  If Seller fails to substitute Purchaser's attorney for Seller's attorney or to remove Seller as a party in interest, then Seller shall pay continued legal expenses in such litigation until such time as the substitution is effected.  In addition, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, Seller's failure to effect the substitution required pursuant to this paragraph (o).  In no event shall Purchaser be liable for any contingency arrangements of Seller with Seller's attorneys.

(yy)    <u>Notice to Attorneys</u>.  Mail to each of Seller's bankruptcy attorney, Seller's foreclosure attorney, the Mortgagor's attorney and the bankruptcy trustee a letter advising such attorney that Seller has sold the Mortgage Loan on the related Closing Date to Purchaser.  Seller shall provide Purchaser with copies of such letters no later than the related Transfer Date.

(zz)    <u>Mortgagors in Bankruptcy</u>.  In accordance with Bankruptcy Rule 3001(e), Seller shall take all actions necessary to file, on or prior to the related Transfer Date, (i) proofs of claims in pending bankruptcy cases involving any Mortgage Loans for which Seller has not already filed a proof of claim, and (ii) evidence of the terms of the purchase of the Mortgage Loans with the appropriate bankruptcy court in cases in which Seller has filed proofs of claims.  Seller shall prepare and provide to Purchaser on the related Transfer Date, an affidavit and assignment of claim in such reasonable form as is provided by Purchaser to Seller (modified as appropriate to comply with applicable recording statutes) for all Mortgage Loans that are in bankruptcy as of the related Transfer Date.  In addition, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties,

4

fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, Seller's failure to effect the actions required pursuant to this paragraph.

5

**EXHIBIT 8**

**TRANSFER INSTRUCTIONS**

# EXHIBIT 9

## SELLER'S UNDERWRITING GUIDELINES

AMENDMENT NUMBER 1
Master Mortgage Loan Purchase Agreement
dated as of December 1, 2005
by and between
**AMERICAN HOME MORTGAGE CORP.**

and

NOMURA CREDIT & CAPITAL, INC.

This AMENDMENT NUMBER 1 (this "Amendment") is made this 1st day of December, 2005, by and between **AMERICAN HOME MORTGAGE CORP.**, having an address at 538 Broadhollow Road, Melville, New York 11747 (the "Seller") and NOMURA CREDIT & CAPITAL, INC. having an address at 2 World Financial Center, Building B, New York, New York 10281 (the "Purchaser"), to the Master Mortgage Loan Purchase Agreement, dated as of January 1, 2005, by and between the Purchaser and the Seller (the "Agreement").

<u>RECITALS</u>

WHEREAS, the Purchaser and the Seller desire to amend the Agreement, subject to the terms of this Amendment, to modify the Agreement as specified herein; and

WHEREAS, the Purchaser and the Seller each have agreed to execute and deliver this Amendment on the terms and conditions set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

SECTION 1.  <u>Amendment</u>.  Effective as of the date hereof, the Agreement is hereby amended as follows:

(a)    Section 1 of the Agreement is hereby amended by adding the following definitions:

<u>Commission</u>: The United States Securities and Exchange Commission.

<u>Depositor</u>: The depositor, as such term is defined in Regulation AB, with respect to any Securitization Transaction.

<u>Exchange Act</u>: The Securities Exchange Act of 1934, as amended.

<u>Qualified Correspondent</u>: Any Person from which the Seller purchased Mortgage Loans, provided that the following conditions are satisfied: (i) such Mortgage Loans were originated pursuant to an agreement between the Seller and such Person that contemplated that such Person would underwrite mortgage loans from time to time, for sale to the Seller, in accordance with underwriting guidelines designated by the Seller ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such Mortgage Loans were in fact

underwritten as described in clause (i) above and were acquired by the Seller within 180 days after origination; (iii) either (x) the Designated Guidelines were, at the time such Mortgage Loans were originated, used by the Seller in origination of mortgage loans of the same type as the Mortgage Loans for the Seller's own account or (y) the Designated Guidelines were, at the time such Mortgage Loans were underwritten, designated by the Seller on a consistent basis for use by lenders in originating mortgage loans to be purchased by the Seller; and (iv) the Seller employed, at the time such Mortgage Loans were acquired by the Seller, pre-purchase or post-purchase quality assurance procedures (which may involve, among other things, review of a sample of mortgage loans purchased during a particular time period or through particular channels) designed to ensure that Persons from which it purchased mortgage loans properly applied the underwriting criteria designated by the Seller.

Reconstitution: Any Securitization Transaction or Whole Loan Transfer.

Regulation AB: Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Securities Act: The Securities Act of 1933, as amended.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Seller Information: As defined in Subsection 12A.04(i).

Static Pool Information: Static pool information as described in Item 1105(a)(1)-(3) and 1105(c) of Regulation AB.

Third-Party Originator: Each Person, other than a Qualified Correspondent, that originated Mortgage Loans acquired by the Seller.

Whole Loan Transfer: Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

(b)     Section 1 of the Agreement is hereby amended by deleting the definition of "Pass-Through Transfer" and replacing each reference to "Pass-Through Transfer" with "Securitization Transaction".

(c)     The Agreement is hereby amended by adding the following Section 12A immediately after Section 12:

SECTION 12A.      <u>Compliance With Regulation AB</u>

Subsection 12A.01    <u>Intent of the Parties; Reasonableness.</u>

The Purchaser and the Seller acknowledge and agree that the purpose of Section 12A of this Agreement is to facilitate compliance by the Purchaser and any Depositor with the provisions of Regulation AB and related rules and regulations of the Commission. Neither the Purchaser nor any Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder. The Seller acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser or any Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. In connection with any Securitization Transaction, the Seller shall cooperate fully with the Purchaser to deliver to the Purchaser (including any of its assignees or designees) and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser or any Depositor to permit the Purchaser or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Seller, any Third-Party Originator and the Mortgage Loans, reasonably believed by the Purchaser or any Depositor to be necessary in order to effect such compliance. In the event of any conflict between Section 12A and Section 12 or Section 26 of this Agreement, the provisions of Section 12A shall control.

Subsection 12A.02.    <u>Additional Representations and Warranties of the Seller.</u>

(a)    The Seller hereby represents to the Purchaser and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under Subsection 12A.03 that, except as disclosed in writing to the Purchaser or such Depositor prior to such date: (i) the Seller is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of the Seller; (ii) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Seller or any Third-Party Originator; and (iii) there are no affiliations, relationships or transactions relating to the Seller or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB.

(b)    If so requested by the Purchaser or any Depositor on any date following the date on which information is first provided to the Purchaser or any Depositor under Subsection 12A.03, the Seller shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Subsection or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Subsection 12A.03. <u>Information to Be Provided by the Seller.</u>

In connection with any Securitization Transaction the Seller shall (i) within five Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or cause each Third-Party Originator to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (a) and (b) of this Subsection, and (ii) as promptly as practicable following notice to or discovery by the Seller, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (c) of this Subsection.

(a)    If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding (i) the Seller, as originator of the Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), or (ii) each Third-Party Originator, as is requested for the purpose of compliance with Items 1103(a)(1), 1105, 1110, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)    a description of the applicable originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of such originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including such originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

(B)    a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Seller and each Third-Party Originator; and

(C)    a description of any affiliation or relationship between the Seller and each Third-Party Originator and any of the following parties to a Securitization Transaction, as such parties are identified to the Seller by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

(i)      the sponsor;
(ii)     the depositor;
(iii)    the issuing entity;
(iv)     any servicer;
(v)      any trustee;
(vi)     any originator;
(vii)    any significant obligor;
(viii)   any enhancement or support provider; and
(ix)     any other material transaction party.

(b)    If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide) Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the

Purchaser as provided below) originated by (i) the Seller, if the Seller is an originator of Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), and/or (ii) each Third-Party Originator. Such Static Pool Information shall be prepared by the Seller (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB. To the extent that there is reasonably available to the Seller (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify whether some or all of such information shall be provided pursuant to this paragraph. The content of such Static Pool Information may be in the form customarily provided by the Seller, and need not be customized for the Purchaser or any Depositor. Such Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such statements and agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Seller's or Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such statements and letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. Any such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

(c)    If so requested by the Purchaser or any Depositor for the purpose of satisfying its reporting obligation under the Exchange Act with respect to any class of asset-backed securities, the Seller shall (or shall cause each Third-Party Originator to) (i) notify the Purchaser and any Depositor in writing of (A) any material litigation or governmental proceedings pending against the Seller or any Third-Party Originator and (B) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Seller or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (a) of this Subsection (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (ii) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

Subsection 12A.04.    Indemnification; Remedies.

The Seller shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

> (i)(A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, accountants' letter or other material provided under this Section 12A by or on behalf of the Seller, or provided under this Section 12A by or on behalf of any Third-Party Originator (collectively, the "Seller Information"), or (B) the omission or alleged omission to state in the Seller Information a material fact required to be stated in the Seller Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, by way of clarification, that clause (B) of this paragraph shall be construed solely by reference to the Seller Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Seller Information or any portion thereof is presented together with or separately from such other information;

> (ii)     any failure by the Seller or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Section 12A; or

> (iii)    any breach by the Seller of a representation or warranty set forth in Subsection 12A.02(a) or in a writing furnished pursuant to Subsection 12A.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Seller of a representation or warranty in a writing furnished pursuant to Subsection 12A.02(b) to the extent made as of a date subsequent to such closing date.

In the case of any failure of performance described in clause (ii) of this Subsection, the Seller shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by the Seller or any Third-Party Originator.

SECTION 2.  <u>Defined Terms</u>.  Any terms capitalized but not otherwise defined in this Amendment shall have the respective meanings set forth in the Agreement.

SECTION 3.  <u>Limited Effect</u>. Except as amended by this Amendment, the Agreement shall continue in full force and effect in accordance with its terms. Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.  This Amendment shall apply to all Mortgage Loans subject to the Agreement notwithstanding that any such Mortgage Loans were purchased prior to the date of this Amendment.

SECTION 4.  <u>Governing Law</u>. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW. EACH PARTY TO THIS AMENDMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY: (A) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AMENDMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, OR THE COURTS OF THE STATE OF NEW YORK, WITHIN THE COUNTY OF NEW YORK, IN THE EVENT THE FEDERAL COURT LACKS OR DECLINES JURISDICTION; (B) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME; (C) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH THE OTHER PARTY SHALL HAVE BEEN NOTIFIED; AND (D) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

SECTION 5.  <u>Counterparts</u>. This Amendment may be executed simultaneously or in any number of counterparts. Each counterpart shall be deemed to be an original, and all of which together shall constitute one and the same instrument. The parties agree that this Amendment and any notices hereunder may be transmitted between them by email and/or by facsimile. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties. The original documents shall be promptly delivered, if requested.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

AMERICAN HOME MORTGAGE CORP.

(Seller)

By: _____
Name: _____
    Alan B. Horn
Title: _____
    Executive Vice President
    General Counsel & Secretary


NOMURA CREDIT & CAPITAL, INC.
(Purchaser)

By: _____
Name: _____
    JOHN P. GRAHAM
Title: _____
    Managing Director

# EXHIBIT 3A

FEB. 28. 2005  2:17PM                                          NO. 5211   P. 1

# NOMURA

**NOMURA CREDIT & CAPITAL, INC.**
2 World Financial Center, Building B
New York, NY 10281-1198

## POOL SUMMARY AND TRADE CONFIRMATION

This Pool Summary and Trade Confirmation, dated January 28, 2005 is between Nomura Credit & Capital, Inc. (the "Purchaser") and American Home Mortgage Corp. (the "Seller"), and incorporates the terms and conditions of the letter agreement, dated January 1, 2005 between the Purchaser and the Seller (the "Master Terms"). Any signatory hereto is presumed to be knowledgeable regarding the Master Terms.

Please confirm your agreement to sell the mortgage loans (the "Mortgage Loans") identified on the mortgage loan schedule attached hereto as Exhibit A in accordance with the Master Terms as supplemented hereby by returning an executed copy of this Pool Summary and Trade Confirmation by facsimile to Susan Becka at (646) 587-9701 or via .pdf file to nceitransactionmanagement@us.nomura.com.  Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Master Terms.

### I. GENERAL:

| | |
|---|---|
| 1. TRANSACTION CODE | AHM01 |
| 2. TRADE DATE | January 28, 2005 |
| 3. CLOSING DATE | March 1, 2005 |
| 4. AGGREGATE PRINCIPAL BALANCE | $5,623,550 |
| 5. INTEREST PAID THROUGH DATE | March 1, 2005 |
| 6. CUT-OFF DATE | March 1, 2005 |
| 7. FIRST REMITTANCE DATE | April 5, 2005 |
| 8. SERVICING TRANSFER DATE | April 1, 2005 |
| 9. DILIGENCE FILE DELIVERY DATE | February 7, 2005 |
| 10. CUSTODIAL FILE DELIVERY DATE | February 14, 2005 |
| 11. SCHEDULED SECURITIZATION CLOSING DATE | June 30, 2005 |
| 12. EARLY PAY DEFAULT AND PREMIUM PROTECTION DATE | June 30, 2005 |
| 13. APPLICABLE UNDERWRITING GUIDELINES | Seller's Guidelines as previously provided to the Purchaser. |

[TPW: NYLEGAL.282009.5] 17718-00000 11/08/2004 09:53 AM

## II. FIXED-RATE MORTGAGE LOANS:

### SECOND LIENS:

| | |
|---|---|
| 1. FIXED-RATE CUT-OFF PRINCIPAL BALANCE | $5,623,550 |
| 2. PURCHASE PRICE PERCENTAGE | 102.0000% |
| 3. MINIMUM DELIVERY AMOUNT | $5,342,372 |
| 4. MAXIMUM DELIVERY AMOUNT | $5,904,727 |
| 5. BENCHMARK YIELD | MID SWAPS 2Yr 3.579% |
| 6. BENCHMARK PRICE | 2Yr Treasury 3.125% 01/07 99.25 |
| 7. SUBJECT TO BUY UP/BUY DOWN? | YES |

8. WEIGHTED AVERAGE COUPON ("WAC") ADJUSTMENTS ARE AS FOLLOWS:

| PRODUCT | BALANCE | BID WAC | WAC BUY-UP MULTIPLE | WAC BUY-DOWN MULTIPLE | FICO | CLTV |
|---|---|---|---|---|---|---|
| Fixed | $5,623,550 | 11.937 | 1.00 | 1.50 | 732 | 95.91 |

### III. EXCEPTIONS TO MASTER TERMS:                       None

Your failure to return this Pool Summary and Trade Confirmation letter to us by February 2, 2005 shall give us the right to declare the oral agreement confirmed hereby null and void.

NOMURA CREDIT & CAPITAL, INC.

By: _____

Name: _____

Title: **Brian Murphy - Vice President**

ACCEPTED AND AGREED:

AMERICAN HOME MORTGAGE CORP.

By: _____

Name: _____Joshua D. Buckley_____

Title: _____Avp, Trade_____

FEB. 28. 2005   2: 7PM                                    NO. 5211   P. 4

## Exhibit A

Mortgage Loan Schedule

# EXHIBIT 3B

MAR. 9. 2005  12:58PM                                          NO. 0333   P. 1

# NOMURA

NOMURA CREDIT & CAPITAL, INC.
2 World Financial Center, Building B
New York, NY 10281-1198

## POOL SUMMARY AND TRADE CONFIRMATION

This Pool Summary and Trade Confirmation, dated March 9, 2005 is between Nomura Credit & Capital, Inc. (the "Purchaser") and American Home Mortgage Corp. (the "Seller"), and incorporates the terms and conditions of the letter agreement, dated January 1, 2005 between the Purchaser and the Seller (the "Master Terms"). Any signatory hereto is presumed to be knowledgeable regarding the Master Terms.

Please confirm your agreement to sell the mortgage loans (the "Mortgage Loans") identified on the mortgage loan schedule attached hereto as Exhibit A in accordance with the Master Terms as supplemented hereby by returning an executed copy of this Pool Summary and Trade Confirmation by facsimile to Susan Reeks at (646) 587-9701 or via .pdf file to nccitransactionmanagement@us.nomura.com. Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Master Terms.

## I. GENERAL:

| | | |
|---|---|---|
| 1. | TRANSACTION CODE | AHM02 |
| 2. | TRADE DATE | March 9, 2005 |
| 3. | CLOSING DATE | April 6, 2005 |
| 4. | AGGREGATE PRINCIPAL BALANCE | $31,231,405 |
| 5. | INTEREST PAID THROUGH DATE | April 1, 2005 |
| 6. | CUT-OFF DATE | April 1, 2005 |
| 7. | FIRST REMITTANCE DATE | May 5, 2005 |
| 8. | SERVICING TRANSFER DATE | May 1, 2005 |
| 9. | DILIGENCE FILE DELIVERY DATE | March 17, 2005 |

Due diligence will be performed at AMC on a 140 file sample, March 21 - 24, 2005.

| | | |
|---|---|---|
| 10. | CUSTODIAL FILE DELIVERY DATE | March 31, 2005 |
| 11. | SCHEDULED SECURITIZATION CLOSING DATE | July 30, 2005 |
| 12. | EARLY PAY DEFAULT AND PREMIUM PROTECTION DATE | July 30, 2005 |
| 13. | APPLICABLE UNDERWRITING GUIDELINES | Seller's Guidelines as previously provided to the Purchaser. |

## II. FIXED-RATE MORTGAGE LOANS:

### SECOND LIENS:

| | | |
|---|---|---|
| 1. | FIXED-RATE CUT-OFF PRINCIPAL BALANCE | $31,231,405 |
| 2. | PURCHASE PRICE PERCENTAGE | 102.90625% |
| 3. | MINIMUM DELIVERY AMOUNT | $29,669,834 |
| 4. | MAXIMUM DELIVERY AMOUNT | $32,792,975 |
| 5. | BENCHMARK YIELD | MID SWAPS 2Yr 4.023% |
| 6. | BENCHMARK PRICE | 2Yr Treasury 3.375% 02/07 99-15.3 |
| 7. | SUBJECT TO BUY UP/BUY DOWN? | YES |
| 8. | WEIGHTED AVERAGE COUPON ("WAC") ADJUSTMENTS ARE AS FOLLOWS: | |

| PRODUCT | BALANCE | BID WAC | WAC BUY-UP MULTIPLE | WAC BUY-DOWN MULTIPLE | FICO | CLTV |
|---|---|---|---|---|---|---|
| Fixed | $31,231,405 | 10.926 | 1.00 | 1.50 | 706 | 95.14 |

## III. EXCEPTIONS TO MASTER TERMS:                         None

Your failure to return this Pool Summary and Trade Confirmation letter to us by March 11, 2005 shall give us the right to declare the oral agreement confirmed hereby null and void.

NOMURA CREDIT & CAPITAL, INC.

By: _____

Name: _____

Title: _____
     Brett Marvin - Managing Director

ACCEPTED AND AGREED:

AMERICAN HOME MORTGAGE CORP.

By: _____

Name: _Joshua D. Buckley_____

Title: _AVP, trader_____

## Exhibit A

Mortgage Loan Schedule

# EXHIBIT 3C

# NOMURA

**NOMURA CREDIT & CAPITAL, INC.**
2 World Financial Center, Building B
New York, NY 10281-1198

## TRADE CONFIRMATION AND POOL SUMMARY

This Trade Confirmation and Pool Summary, dated February 22, 2006 is between Nomura Credit & Capital, Inc. (the "Purchaser") and American Home Mortgage Corp. (the "Seller"), and incorporates the terms and conditions of the letter agreement, dated January 1, 2005 between the Purchaser and the Seller (the "Master Terms"). Any signatory hereto is presumed to be knowledgeable regarding the Master Terms.

Please confirm your agreement to sell the mortgage loans (the "Mortgage Loans") identified on the mortgage loan schedule attached hereto as <u>Exhibit A</u> in accordance with the Master Terms as supplemented hereby by returning an executed copy of this Pool Summary and Trade Confirmation by facsimile to Krista Otis at (646) 587-1653 or via .pdf file to nccitransactionmgmt@us.nomura.com. Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Master Terms.

### I. <u>GENERAL</u>:

| | | |
|---|---|---|
| 1. | TRANSACTION CODE | AHM03 |
| 2. | TRADE DATE | February 22, 2006 |
| 3. | CLOSING DATE | March 28, 2006 |
| 4. | AGGREGATE PRINCIPAL BALANCE | $172,905,838 |
| 5. | INTEREST PAID THROUGH DATE | April 1, 2006 |
| 6. | CUT-OFF DATE | March 24, 2006 |
| 7. | FUNDING BALANCE (ACTUAL OR SCHEDULED) | Actual |
| 8. | FIRST REMITTANCE DATE | May 5, 2006 |
| 9. | SERVICING TRANSFER DATE (CONFIRMED BY SELLER'S SERVICING DEPT.) | April 21, 2006 |
| 10. | DILIGENCE FILE DELIVERY DATE | March 6, 2006 |
| 11. | CUSTODIAL FILE DELIVERY DATE | March 14, 2006 |
| 12. | SCHEDULED SECURITIZATION CLOSING DATE | June 30, 2006 |

| 13. MINIMUM DELIVERY AMOUNT | $164,260,546 |
|---|---|

In the event that the actual Cut-Off Date Principal Balance of the Mortgage Loans delivered by Seller and accepted for purchase by the Purchaser on the Closing Date is less than the minimum delivery amount, then Seller shall pay to Purchaser on the Closing Date a pair-off fee in an amount equal to the product of (A) the difference between the minimum delivery amount and the amount actually delivered, and (B) the greater of (x) the positive difference, if any, between the Benchmark Yield calculated on the Trade Date and the Benchmark Yield calculated on the Closing Date multiplied by 2.5, and (y) 0.375%.

In Addition, in the event that (A) the actual delivery amount exceeds the permitted Balance Variance, or (B) the delivered gross WAC exceeds the permitted WAC variance, or (C) the credit enhancement levels are significantly different, the Mortgage Loans are subject to re-price under the market conditions of the Trade Date.

## 14. EARLY PAY DEFAULT

In the event that any of the first three scheduled monthly payments due to the Purchaser following the related Cut-off Date on any Mortgage Loan are not made by the related mortgagor by the last day of the month in which each of them is or was due through and including the June 2006 borrower payment, such Mortgage Loan shall be repurchased by the Seller at the related Purchase Price Percentage, times the aggregate principal balance of such Mortgage Loan as of the date of repurchase, together with accrued interest.

## 15. PREMIUM PROTECTION DATE

In the event that the principal due on any Mortgage Loan is prepaid in full in the three months following the month of the Closing Date, the Seller shall pay to the Purchaser, within five (5) Business Days of Purchaser notifying Seller of such prepayment, an amount equal to the product of (A) the amount of such prepayment, times (B) the excess, if any, of the related Purchase Price Percentage, as set forth on the related Trade Confirmation, over 100%, less any Prepayment Penalty collected by Purchaser.

| 16. APPLICABLE UNDERWRITING GUIDELINES | Seller's Guidelines as previously provided to the Purchaser. |
|---|---|

## II. **FIXED-RATE MORTGAGE LOANS:**

FIRST LIENS:

| 1. FIXED-RATE CUT-OFF PRINCIPAL BALANCE | $172,905,838 |
|---|---|
| 2. PURCHASE PRICE PERCENTAGE ("PPP") | 101.546875% |
| 3. MINIMUM DELIVERY AMOUNT ("MDA") | $164,260,546 |
| 4. BENCHMARK YIELD | MID SWAPS 3YR 5.07% |

5.  BENCHMARK PRICE                                          MID SWAPS 3YR
                                                            5.07%

6.  SUBJECT TO BUY UP/BUY DOWN?                             YES

7.  WEIGHTED AVERAGE COUPON ("WAC") AND MARGIN ADJUSTMENTS ARE AS
    FOLLOWS:

| PRODUCT | BALANCE | BID WAC | LPMI | BID WAC LESS LPMI | WAC BUY-UP MULTIPLE | WAC BUY-DOWN MULTIPLE |
|---------|---------|---------|------|-------------------|---------------------|-----------------------|
| Fixed | $172,905,838 | 7.379 | 0.00 | 7.379 | 2.00 | 3.00 |

## III. EXCEPTIONS TO MASTER TERMS:

-   No Mortgage Loan shall be secured by Manufactured Housing, unique or log homes, or
    Condotels.

-   No Mortgage Loan shall be secured by a mortgagor whose DTI is greater than 55% and/or whose
    FICO score is less than 580 or 620 for ARMs.

-   No delinquent loans.

-   No Mortgage Loan shall have an Original Balance less than $50,000 for first liens and $10,000
    for second liens.

-   No Mortgage Loan shall have a CLTV/LTV greater than 100%.

-   No Mortgage Loans shall be to foreign nationals with LTV's greater than 80% without MI.

-   For first time buyers, no SISA, NINA or NO DOC loans shall have an LTV/CLTV greater than
    95%.

-   No Mortgage Loans shall have points and fees greater than 5%.

-   Non-warrantable condos/coops are subject to repricing unless clearly identified on tape prior to
    bid.

-   No loans with seasoning greater than three months.

-   No DU/LP underwritten loans.

-   No Foreign Nationals.

-   No term greater than 360.

-   Permitted WAC variance is +/- 0.10% (10 basis points).

- Permitted Balance variance is +/- 5%.

- Minimum of 6 months seasoning on cashout /refis.

- No escrow holdbacks or Seller rent carry backs.

- HMDA information must be provided for all borrowers.

- No loans secured by properties in Fallon, Nevada (zip 89406) due to arsenic in groundwater.

- With respect to any Mortgage Loan previously rejected by Nomura from a prior trade between the Seller and Nomura or repurchased by the Seller from Nomura that was not identified by the Seller as such, Nomura may remove such Mortgage Loan from the subject trade and the Seller shall reimburse Nomura for any additional cost and expense incurred by Nomura with respect to such Mortgage Loan prior to the closing date for the subject trade or the purchase price will be reduced on the closing date for such costs and expenses.

- The Seller and Purchaser shall execute an amendment to the MLPA within a reasonable timeframe that will address Regulation AB requirements between the parties. The Amendment shall follow the industry standard "ASF Model" (American Securitization Forum).

- Second liens behind Negative Amortization First liens must be identified.

- Regarding Negative Amortization loans, CLTV's need to be shown on a grossed up basis.

- Second liens behind Negative Amortization First liens must not have a CLTV greater than 100%. CLTV's will be based off a grossed up First lien LTV.

- Cut-off date for buyer due diligence list is February 23, 2006.

- Files to be shipped in.

Your failure to return this Trade Confirmation and Pool Summary to us by March 1, 2006 shall give us the right to declare the oral agreement confirmed hereby null and void.

**NOMURA CREDIT & CAPITAL, INC.**

By: _____

Name: _____

Title: _____


ACCEPTED AND AGREED:

**AMERICAN HOME MORTGAGE CORP.**

By: _____

Name: _____Alan B. Horn_____

Title: ____Executive Vice President____
         ____General Counsel & Secretary____

**Exhibit A**

## ASSIGNMENT AND CONVEYANCE

On this 28th day of March, 2006, American Home Mortgage Corp. ("Seller") as the Seller under that certain MASTER MORTGAGE LOAN PURCHASE AGREEMENT, dated as of January 1, 2005 (the "Agreement") does hereby sell, transfer, assign, set over and convey to Nomura Credit & Capital, Inc. as Purchaser under the Agreement, without recourse, but subject to the terms of the Agreement, all rights, title and interest of the Seller in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Section 6.03 of the Agreement, the Seller has delivered to the Custodian the documents for each Mortgage Loan to be purchased as set forth in the Agreement. The ownership of each Mortgage Note, Mortgage, and the contents of the Mortgage File and Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Seller shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in such custodial capacity only.

The Seller confirms to the Purchaser that the representation and warranties set forth in Sections 7.01 and 7.02 of the Agreement are true and correct as of the date hereof; and that all statements made in the Seller's Officer's Certificates and all Attachments thereto remain complete, true and correct in all respects as of the date hereof.

The Seller further confirms that there have been no changes to the Underwriting Guidelines except as provided to the Purchaser and that each of the Mortgage Loans conforms to such Underwriting Guidelines.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

**AMERICAN HOME MORTGAGE CORP.**
(Seller)

By: _____

Name:

Title:
     **Alan B. Horn**
     **Executive Vice President**
     **General Counsel & Secretary**

# EXHIBIT 3D

# NOMURA

**NOMURA CREDIT & CAPITAL, INC.**
2 World Financial Center, Building B
New York, NY 10281-1198

## TRADE CONFIRMATION AND POOL SUMMARY

This Trade Confirmation and Pool Summary, dated August 1, 2006, is between Nomura Credit & Capital, Inc. (the "Purchaser") and American Home Mortgage Corp. (the "Seller"), and incorporates the terms and conditions of the letter agreement, dated January 1, 2005, between the Purchaser and the Seller (the "Master Terms"). Any signatory hereto is presumed to be knowledgeable regarding the Master Terms.

Please confirm your agreement to sell the mortgage loans (the "Mortgage Loans") identified on the mortgage loan schedule attached hereto as Exhibit A in accordance with the Master Terms as supplemented hereby by returning an executed copy of this Pool Summary and Trade Confirmation by facsimile to Erica Sugai at (646) 587-8808 or via .pdf file to nccitransactionmgmt@us.nomura.com. Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Master Terms.

## I. GENERAL:

| | | |
|---|---|---|
| 1. | TRANSACTION CODE | AHM 04 |
| 2. | TRADE CUSIP | AO68012XL |
| 3. | TRADE DATE | August 1, 2006 |
| 4. | CLOSING DATE | August 31, 2006 |
| 5. | AGGREGATE PRINCIPAL BALANCE | $158,829,962 |
| 6. | INTEREST PAID THROUGH DATE | August 1, 2006 |
| 7. | CUT-OFF DATE | August 29, 2006 |
| 8. | FUNDING BALANCE (ACTUAL OR SCHEDULED) | Actual |
| 9. | FIRST REMITTANCE DATE | September 5, 2006 |
| 10. | SERVICING TRANSFER DATE | October 2, 2006 |
| | (CONFIRMED BY SELLER'S SERVICING DEPT.) | |
| 11. | DILIGENCE FILE DELIVERY DATE | August 11, 2006 |

| | |
|---|---|
| 12. CUSTODIAL FILE DELIVERY DATE | August 17, 2006 |
| 13. SCHEDULED SECURITIZATION CLOSING DATE | November 30, 2006 |
| 14. MINIMUM DELIVERY AMOUNT | $150,888,463 |

In the event that the actual Cut-Off Date Principal Balance of the Mortgage Loans delivered by Seller and accepted for purchase by the Purchaser on the Closing Date is less than the minimum delivery amount, then Seller shall pay to Purchaser on the Closing Date a pair-off fee in an amount equal to the product of (A) the difference between the minimum delivery amount and the amount actually delivered, and (B) the greater of (x) the positive difference, if any, between the Benchmark Yield calculated on the Trade Date and the Benchmark Yield calculated on the Closing Date multiplied by 2.00, and (y) 0.375%.

In Addition, in the event that (A) the actual delivery amount exceeds the permitted Balance Variance, or (B) the delivered gross WAC exceeds the permitted WAC variance, or (C) the credit enhancement levels are significantly different, the Mortgage Loans are subject to re-price under the market conditions of the Trade Date.

## 15. EARLY PAY DEFAULT

In the event that any of the first three (3) scheduled monthly payments due to the Purchaser following the related Cut-off Date on any Mortgage Loan are not made by the related mortgagor by the last day of the month in which each of them is or was due through and including the November 2006 borrower payment, such Mortgage Loan shall be repurchased by the Seller at the related Purchase Price Percentage, times the aggregate principal balance of such Mortgage Loan as of the date of repurchase, together with accrued interest.

## 16. PREMIUM PROTECTION DATE

In the event that the principal due on any Mortgage Loan is prepaid in full in the three (3) months following the month of the Closing Date, the Seller shall pay to the Purchaser, within five (5) Business Days of Purchaser notifying Seller of such prepayment, an amount equal to the product of (A) the amount of such prepayment, times (B) the excess, if any, of the related Purchase Price Percentage, as set forth on the related Trade Confirmation, over 100%, less any Prepayment Penalty collected by Purchaser.

| | |
|---|---|
| 17. APPLICABLE UNDERWRITING GUIDELINES | Seller's Guidelines as previously provided to the Purchaser. |

## II. FIXED-RATE MORTGAGE LOANS:

SECOND LIENS:

| | |
|---|---|
| 1.  FIXED-RATE CUT-OFF PRINCIPAL BALANCE | $158,829,962 |
| 2.  PURCHASE PRICE PERCENTAGE | 102.28125% |

3.  MINIMUM DELIVERY AMOUNT               $150,888,463

4.  MAXIMUM DELIVERY AMOUNT               $166,771,460

5.  BENCHMARK YIELD                       2yr Treasury 5%  7/08
                                          4.97%

6.  BENCHMARK PRICE                       2yr Treasury 5%  7/08
                                          100-02

7.  SUBJECT TO BUY UP/BUY DOWN?           YES

8.  WEIGHTED AVERAGE COUPON ("WAC") ADJUSTMENTS ARE AS FOLLOWS:

| PRODUCT | BALANCE | BID WAC | WAC BUY-UP MULTIPLE | WAC BUY-DOWN MULTIPLE | FICO | CLTV |
|---------|---------|---------|---------------------|------------------------|------|------|
| Fixed | $158,829,962 | 12.234 | 1.00 | 1.50 | 704 | 96.83 |

## III. EXCEPTIONS TO MASTER TERMS:

- No Mortgage Loan shall be secured by Manufactured Housing, unique or log homes, or Condotels.

- No Mortgage Loan shall be secured by a mortgagor whose DTI is greater than 55% and/or whose FICO score is less than 580.

- No delinquent loans.

- No Mortgage Loan shall have an Original Balance less than $10,000.

- No Mortgage Loan shall have a CLTV/LTV greater than 100%.

- For first time buyers, no SISA, NINA or NO DOC loans shall have an LTV/CLTV greater than 95%.

- No Mortgage Loans shall have points and fees greater than 5%.

- Non-warrantable condos/coops are subject to repricing unless clearly identified on tape prior to bid.

- No loans with seasoning greater than three months, except as disclosed on bid tape.

- No DU/LP underwritten loans.

- No Foreign Nationals.

- No term greater than 360 months.

- Permitted WAC variance is +/- 0.10% (10 basis points).

- Minimum of 6 months seasoning on cashout /refis.

- No escrow holdbacks or Seller rent carry backs.

- HMDA information must be provided for all borrowers.

- No loans secured by properties in Fallon, Nevada (zip 89406) due to arsenic in groundwater.

- With respect to any Mortgage Loan previously rejected by Nomura from a prior trade between the Seller and Nomura or repurchased by the Seller from Nomura that was not identified by the Seller as such, Nomura may remove such Mortgage Loan from the subject trade and the Seller shall reimburse Nomura for any additional cost and expense incurred by Nomura with respect to such Mortgage Loan prior to the closing date for the subject trade or the purchase price will be reduced on the closing date for such costs and expenses.

- No second liens behind Neg Am firsts.

- 40% due diligence on-site (site is still to be determined)

- Settlement will be on 8/31/2006 with a trail funding on 9/15/2006.

- The trail funding price will be adjusted for carry.

Your failure to return this Trade Confirmation and Pool Summary to us by August 14, 2006, shall give us the right to declare the oral agreement confirmed hereby null and void.

NOMURA CREDIT & CAPITAL, INC.

By: _____

Name: __Timothy P. F. Crowley__

Title: _____Vice President_____

ACCEPTED AND AGREED:

AMERICAN HOME MORTGAGE CORP.

By: _____

Name: _____

Title: _____

Your failure to return this Trade Confirmation and Pool Summary to us by August 14, 2006, shall give us the right to declare the oral agreement confirmed hereby null and void.

NOMURA CREDIT & CAPITAL, INC.

By: _____

Name: _____

Title: _____

ACCEPTED AND AGREED:

AMERICAN HOME MORTGAGE CORP.

By: _____

Name: _____

Title: Robert F. Johnson
Executive Vice President

## **Exhibit A**

## ASSIGNMENT AND CONVEYANCE

On this 31st day of Auugst, 2006, American Home Mortgage Corp. ("Seller") as the Seller under that certain MASTER MORTGAGE LOAN PURCHASE AGREEMENT, dated as of January 1, 2005 (the "Agreement") does hereby sell, transfer, assign, set over and convey to Nomura Credit & Capital, Inc. as Purchaser under the Agreement, without recourse, but subject to the terms of the Agreement, all rights, title and interest of the Seller in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Section 6.03 of the Agreement, the Seller has delivered to the Custodian the documents for each Mortgage Loan to be purchased as set forth in the Agreement. The ownership of each Mortgage Note, Mortgage, and the contents of the Mortgage File and Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Seller shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in such custodial capacity only.

The Seller confirms to the Purchaser that the representation and warranties set forth in Sections 7.01 and 7.02 of the Agreement are true and correct as of the date hereof; and that all statements made in the Seller's Officer's Certificates and all Attachments thereto remain complete, true and correct in all respects as of the date hereof.

The Seller further confirms that there have been no changes to the Underwriting Guidelines except as provided to the Purchaser and that each of the Mortgage Loans conforms to such Underwriting Guidelines.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

AMERICAN HOME MORTGAGE CORP.
(Seller)

By: _____
Name:
Title:

**Robert F. Johnson**
**Executive Vice President**