IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
```

In re:                                              :   Chapter 11
                                                    :
AMERICAN HOME MORTGAGE HOLDINGS, INC., :   Case No. 07-11047 (CSS)
a Delaware corporation, <u>et al.</u>,[1]               :
                                                    :   Jointly Administered
                                                    :
    Debtors.                                        :   Ref. D.I.:  5675
                                                    :
```
------------------------------------------------------------- x
```

### DEBTORS' OBJECTION TO THE MOTION FOR ORDER APPOINTING OFFICIAL COMMITTEE OF BORROWERS PURSUANT TO SECTION 1102(a)(2) OF THE BANKRUPTCY CODE

American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "<u>AHM</u>" or the "<u>Debtors</u>"), hereby object (the "<u>Objection</u>") to the *Motion for Order Appointing Official Committee of Borrowers Pursuant to Section 1102(a)(2) of the Bankruptcy Code* [D.I. 5675] (the "<u>Motion</u>") filed by certain individual borrowers of the Debtors ("<u>Movants</u>").[2]  In support of the Objection, the Debtors respectfully represent as follows:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp. , a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for American Home Mortgage Servicing, Inc., whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2]     Movants are Tilton Jack, Grace Mullins, Christopher Bilek and Mary Bilek, Sam Acquisto, Delena Lamacchia, and Paula Rush.

1

## PRELIMINARY STATEMENT

Movants' request for an official committee of borrowers comes thirteen months after the above-captioned cases were filed.  Given that certain Movants began actively participating in the bankruptcy nearly a year ago, there is simply no acceptable excuse for such an untimely request.  Moreover, the fact that the request has been made on the eve of a hearing to consider the adequacy of the Debtors' disclosure statement leads to the conclusion that such delay was, in fact, a deliberate strategy to pursue these Movants' personal interests against the Debtors.  Such a conclusion is bolstered by the Movants' own motion, which (i) does not allege any violations of the Committee's fiduciary duties, (ii) confirms that the Committee has, indeed, sought to maximize the value of the Debtors' estates, and (iii) bases the request upon their personal interests that "are separate and aside from the maximization of the estates' value."

## BACKGROUND

1.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

3.      On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed.

## RELEVANT BACKGROUND

**A.    The Official Committee of Unsecured Creditors**

4.    On August 14, 2007, the United States Trustee for the District of Delaware appointed the Committee comprised of five financial institutions and two trade creditors.  The initial members of the Committee were (i) Wilmington Trust Company; (ii) The Bank of New York Trust Company, N.A., (iii) Deutsche Bank National Trust Co., (iv) Nomura Credit & Capital Inc.; (v) Impac Funding Corporation; (vi) Waldners Business Environments, Inc.; and (vii) United Parcel Service [D.1. 156].

5.    The Bank of New York Trust Company, N.A. resigned from the Committee and was replaced with Law Debenture Trust Company of New York pursuant to a notice from the Office of the United States Trustee dated December 7, 2007.  Waldner Business Environments, Inc. subsequently resigned from the Committee and has not yet been replaced.

6.    On November 28, 2007, the Court authorized the Committee to employ Blank Rome LLP [D.I. 2202] and  Hahn & Hessen LLP [D.I. 2203] as attorneys to represent it, effective as of August 14, 2007.  On the same day, the Court authorized the Committee to employ BDO Seidman LLP as its financial advisors to assist it in this proceeding effective as of August 14, 2007 [D.I. 2201].

**B.    Accomplishments of the Debtors and the Committee**

7.    Over the last thirteen months, the Debtors and the Committee have worked diligently to maximize the value of the Debtors' estates and to negotiate a confirmable chapter 11 plan.  A full description of these accomplishments is set forth in the Debtors' disclosure statement, and includes the following:

### 1.    *Liquidation of Assets*

8.    The parties actively participated in a five-day hearing regarding the sale of the Debtors' servicing business (the "Servicing Sale"), while resolving all but seven of the thirty objections filed in opposition of the sale.  Ultimately, after considering the evidence presented, pleadings filed, and the arguments presented, the Court overruled the objections and approved the Servicing Sale [D.I. 1711].  The Servicing Sale closed in two steps: an economic close, which occurred on November 16, 2007, and a legal close, which occurred on April 11, 2008.

9.    In addition to the Servicing Sale, the Debtors, in consultation with the Committee, have liquidated a substantial portion of the Debtors' assets including, but not limited to, certain unencumbered non-performing loans [D.I. 5171], performing loans [D.I. 5550], marking portals and website software [D.I. 5862], and office leases [D.I. 357].

### 2.    *Authorization to Compromise Loans*

10.    Following good-faith negotiations among the Debtors, the Committee, Bank of America, N.A. ("BofA"), and the Debtors' post-petition lender (the "DIP Lender"), the parties reached an agreement regarding certain construction-to-permanent loans in which BofA held security interests and liens (the "BofA Construction Loans").  To maximize the value of the BofA Construction Loans, on January 11, 2008, the Debtors filed a motion [Docket No. 2709] (the "Construction Loan Compromise Motion") seeking authorization for the Debtors to compromise the BofA Construction Loans to the extent necessary to facilitate the refinancing of such loans by the borrowers.  The Court approved the Construction Loan Compromise Motion by order dated February 1, 2008 [Docket No. 2860].

11.    Shortly after entry of the order approving the Construction Loan Compromise Motion, ABN AMRO Bank N.V. ("ABN") contacted the Debtors to request that

the Debtors continue servicing the ABN construction loans (the "ABN Construction Loans"),

and to offer certain refinancing initiatives to borrowers of the ABN Construction Loans, similar

to the authority granted to the Debtors in connection with the BofA Construction Loans.  ABN

additionally offered to fund all of the Debtors' obligations with respect to a stay-on and incentive

bonus plan for the Debtors' construction loan employees.  The Court approved the motion to

compromise the ABN Construction Loans on February 28, 2008 [Docket No. 3115].

>        *3.*        ***Negotiations with BofA***

>        12.        On February 22, 2008, BofA filed its *Motion for Relief from Automatic*

*Stay, Pursuant to 11 U.S.C. § 362(d), Allowing BofA as Administrative Agent to Exercise its*

*Rights as a Secured Creditor* [Docket No. 3054] (the "BofA Stay Relief Motion"), in which it

sought authority to sell or otherwise dispose of approximately $580 million in UPB of mortgage

loans owned by the Debtors subject to BofA's security interest (the "BofA Portfolio").

>        13.        While discovery was underway on the BofA Stay Motion, BofA and the

Committee negotiated and executed a settlement (the "BofA/Committee Stipulation") resolving

all outstanding issues under the Cash Collateral Order [D.I. 554, 2002, 2284, 2855 & 3699]

between the Committee and BofA.

>        14.        Following denial of the BofA Stay Relief Motion, the Debtors, the

Committee, and BofA engaged in extensive settlement discussions concerning a global

resolution of outstanding issues between the parties, including certain issues previously

addressed by the BofA/Committee Stipulation.  After several months of negotiation, the parties

reached a mutually acceptable agreement and, on July 18, 2008, the Debtors filed a motion

[Docket No. 5184] to approve a global settlement stipulation between the Debtors, BofA, and the

Committee (the "BofA Global Settlement"). The Court approved the BofA Global Settlement on August 5, 2008 [Docket No. 5308].

### 4.    Filing of a Proposed Chapter 11 Plan and Disclosure Statement

15.    On August 15, 2008, the Debtors filed their proposed plan [D.I. 5450] (the "Plan") and disclosure statement [D.I. 5451] (the "Disclosure Statement"), which provides for a de-consolidated plan of liquidation. The Plan contemplates the creation of a plan trust to administer the remaining assets of the Debtors' estates (including litigation of causes of action), reconcile claims against the Debtors, and make distributions to creditors.

### C.    Borrowers' Notice of, and Participation in, the Bankruptcy Proceedings

16.    AHM's liquidity crisis and ultimate bankruptcy filing literally made headlines. The news story was picked up by all major news agencies, including *USA Today*, *The New York Times*, *The Wall Street Journal*, CNBC, and CNN.

17.    Shortly after the Petition Date, the Debtors posted information on their financial restructuring on their website, www.americanhm.com. Such information included a letter to the Debtors' customers (i.e., the borrowers) dated August 13, 2007, in which the Debtors provided customers with information regarding the bankruptcy filing and answered frequently asked questions for their customers.

18.    The Debtors' website also directs customers and parties in interest to additional information provided on the website of Epiq Systems, Inc. ("Epiq"), the Debtors' claims agent. At the Debtors' request, Epiq uploads and maintains the full docket of the Debtors' chapter 11 cases on its website, allowing borrowers and other parties in interest full, free access to all pleadings and docket entries in these chapter 11 cases. Epiq's website also provides contact information for Debtors' counsel, Committee's counsel and the Office of the

United States Trustee.  Additionally, the Debtors set up a hotline for inquiries regarding the bankruptcy filings and have received more than 2,000 creditor and borrower inquiries.

19.    A number of borrowers have sought relief before the Court or otherwise participated in these proceedings.

### 1.    *Filing 2004 Exam/Trustee Motions*

20.    In response to the Debtors' bankruptcy filing, on or about October 4, 2007, certain borrowers filed individual *pro se Motions for Disclosure Under 11 U.S.C. § 363, § 1105, and Bankruptcy Rule 2004, Directing Examination of, and Production of Documents By Debtors; Limited Objection to Asset Purchase Agreement; Complaint for Injunction Against the Sale of Mortgage Notes Free and Clear of Liens or Liabilities; and Request for Appointment of Consumer Privacy Ombudsman Pursuant to 11 U.S.C. § 332 and Trustee or Examiner Pursuant to 11 U.S.C. § 1104* [Docket Nos. 1489, 1490, and 1491] (collectively, the "2004 Exam/Trustee Motions").  By the 2004 Exam/Trustee Motions, the movants sought: (i) an examination of, and production of documents by, the Debtors pursuant to Bankruptcy Rule 2004; (ii) the appointment of a trustee or examiner pursuant to section 1104 of the Bankruptcy Code; (iii) the appointment of a consumer privacy ombudsman pursuant to section 363 of the Bankruptcy Code; and (iv) certain injunctive relief.  The Debtors timely responded to the 2004 Exam/Trustee Motions [D.I. 1656].

21.    A hearing on the 2004 Exam/Trustee Motions was held on October 31, 2007, wherein Ms. Rush and Ms. Beall presented arguments to this Court and cross-examined the Debtors' witnesses.  See Hr'g Tr. [D.I. 1997], pp. 11-78.  Upon consideration of the pleadings and evidence presented at the October 2007 Hearing, the Court denied the 2004 Exam/Trustee Motions [D.I. 1779].

22.     On or about June 25, 2008, Elvin and Phyllis Valenzuela (the "Valenzuelas") filed their *Motion for Order Requiring Appearance of Debtor for Examination and Production of Documents Pursuant to Federal Rule of Bankruptcy Procedure 2004 and Local Rule 2004-1(a)* [D.I. 4826] (the "Valenzuela 2004 Exam Motion").  Following the Debtors' objection to the Valenzuela 2004 Exam Motion [D.I. 5043] and negotiations between their counsel, the Valenzuelas withdrew the motion [D.I. 5066].

**2.     Objection to Sales of the Debtors' Assets**

23.     A five-day hearing on the sale of the Debtors' servicing business (the "Servicing Sale Hearing") was held from October 15 to 19, 2007.  Ms. Rush participated in the Servicing Sale Hearing by cross-examining witnesses, 10/16/07 Hr'g Tr. [D.I. 1632], pp. 213-27, and presenting a closing argument, 10/19/07 Hr'g Tr. [D.I. 1663], pp. 158-160.

24.     On or about January 29, 2008, Ms. Rush filed her *Objection to Sale of Loans Free and Clear of Liens or Liabilities* [D.I. 2816] (the "Non-Performing Loan Sale Objection").  Ms. Rush participated in the hearing with respect to her Non-Performing Loan Sale Objection and the underlying sale.  See 2/1/08 Hr'g Tr. [D.I. 2951], pp 46-49.

**3.     Notice and Filing of Claims**

25.     By order dated October 30, 2007 [D.I. 1708] (the "Bar Date Order"), the Court established January 11, 2008 as the deadline by which any person or entity holding a prepetition claim against the Debtors must file a proof of claim (the "General Bar Date").  In accordance with the terms of the Bar Date Order, the Debtors mailed notices of the General Bar Date to, among others, all known entities holding potential prepetition claims.  Service to these known entities included service to borrowers or their counsel (if known) who had commenced or threatened litigation against the Debtors.  See Docket Nos. 2439, 2460, 2461, 2604, 2749, 2751,

2752, 2800.  Additionally, the Debtors published notice in the *Dallas Morning Star,* the *Saint Louis Post-Dispatch* and the national edition of the *New York Times.*  See Docket Nos. 3286, 3285 & 3284, respectively.

26.    On or about February 1, 2008, the Debtors filed their *Motion of the Debtors for an Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing a Bar Date for Filing Proofs of Claim By Construction Loan and HELOC Borrowers and Approving the Form and Manner of Notice Thereof* [D.I. 2848] (the "Borrower Bar Date Motion"), requesting a later bar date for borrowers under home equity and construction loans to ensure that each applicable borrower was given adequate notice of his or her right to file a proof of claim in these cases.  By order dated February 14, 2008 [D.I. 2987], the Court established April 30, 2008 as the date in which any borrower holding a claim against the Debtors must file a proof of claim (the "Borrowers Bar Date").  In accordance with the terms of the order, the Debtors mailed notices of the Borrowers Bar Date to all known borrowers under home equity and construction loans [D.I. 3239].  Additionally, the Debtors published notice in the national edition of the *New York Times* [D.I. 5999].

27.    Based on a review of the claims register and in consultation with the court-appointed claims agent, the Debtors believe that approximately 450 claims have been filed by individual borrowers against one or more of the Debtors' estates.  Such claims relate to, among other things, reimbursement for advanced fees, costs of appraisals, borrower litigation, bounced checks, funds held in escrow, customer fees, and deposits, and some relate to construction loans and home equity lines of credit.

28. Specific to the current Motion, several Movants timely filed proofs of claim against on or more of the Debtors' estates:[3]

- On or about October 15, 2007, Mr. Tilton filed claim numbered 1564 (the "Tilton Claim") in the amount of $1,160,263.98.

- On or about January 11, 2008, Ms. Rush filed claim numbered 8743 (the "Rush Claim") in the amount of $1,790,000.00.

- On or about January 11, 2008, the Acquistos filed claim numbered 8741 (the "Acquisto Claim") in the approximate amount of $459,000.

### 4. Stay Relief Motions

29. On or about August 31, 2007, Mr. Richard Horvath, *pro* se, filed his *Motion to Lift Automatic Stay* [D.I. 612] (the "Horvath Motion"). On September 24, 2007, the Debtors filed their objection [D.I. 922] to the Horvath Motion. Shortly thereafter, Mr. Horvath filed a response and the Horvath Motion was heard on October 1, 2007 (the "Horvath Hearing"). At the Horvath Hearing, the Court denied the Horvath Motion without prejudice, but deemed the Horvath Motion and related response to be Mr. Horvath's proof of claim. The Debtors worked with Mr. Horvath regarding appropriate language for a proposed form of order, which was entered by the Court on October 9, 2007 [D.I. 1389]. On or about August 25, 2008, Mr. Horvath submitted a letter to the court [D.I. 5542] regarding the status of his loan now being serviced by American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage Acquisition Co., Inc.).

30. On or about November 16, 2007, Ms. Cutisha Cauthorne filed her *Emergency Motion of Cutisha Cauthorne for an Order for Relief from the Automatic Stay Under Section 362 of the Bankruptcy Code* [D.I. 2065] (the "Cauthorne Motion"), which requested a hearing on four-days' notice [D.I. 2087]. On November 21, 2007, the Court considered limited

---

[3] Based on a review of the claims register, the Bileks did not file a proof of claim. Notice of the General Bar Date was mailed to their attorneys' address. See D.I. 2439, p. 27 of Exhibit C.

arguments from the parties and concluded that an evidentiary hearing with respect the Cauthorne Motion should be scheduled shortly after the Bar Date passed.[4]  Following the evidentiary hearing, the Court authorized Ms. Cauthorne to initiate her lawsuit against the Debtors [D.I. 2795].

31.     On or about June 16, 2008, Ms. Rush filed her *Emergency Motion for an Order of Relief From the Automatic Stay* [D.I. 4637], which was granted on July 17, 2008 [D.I. 5173] upon the filing of the Debtors' reservation of rights [D.I. 4977].

32.     Multiple other borrowers have been granted relief from the automatic stay – without opposition from the Debtors – to proceed to trial against the Debtors including, but not limited to:

- Thomas and Sara Chavez [D.I. 4725, 4739, 5030, 5041, 5165 & 5168];

- Mark and Kelly Watson [D.I. 4781, 4783, 5031, 5042, 5204 & 5205];

- Brud Rossmann [D.I. 4945, 5032 & 5245]; and

- Zel Ramsey [D.I. 4996, 5381 & 5454].

33.     Additional borrowers have filed *pro se* motions for relief from stay [D.I. 3585 & 5376], but such motions have not yet been scheduled for hearing.

**5.     *Disclosure Statement Responses***

34.     On or about September 9, 2008, Ms. Rush filed her *pro se Objection to the Adequacy of Disclosure Statement* [D.I. 5828].  Other borrowers have also responded, formally and informally, upon receipt of the notice of the disclosure statement hearing [D.I. 5829 & 5832].

---

[4]     Ms. Cauthorne's claim is numbered 8738, which asserts an unliquidated amount.

DB02:7387786.2                                                                                          066585.1001

# OBJECTION[5]

35.     Section 1102(a)(2) of the Bankruptcy Code addresses the appointment of

an additional committee of creditors, which provides, in relevant part:

> On request of a party in interest, the court may order the
> appointment of additional committees of creditors or of equity
> security holders if necessary to assure adequate representation of
> creditors or of equity security holders. The United States trustee
> shall appoint any such committee.

11 U.S.C. § 1102(a)(2).

36.     Appointment of an additional committee is an extraordinary remedy that

courts are reluctant to grant.  In re Garden Ridge Corp., No. 04-10325, 2005 Bankr. LEXIS 323,

*7 (Bankr. D. Del. March 2, 2005); citing In re Sharon Steel Corp., 100 B.R. 767, 777-78

(Bankr. W.D. Pa. 1989).  In considering this extraordinary remedy, courts employ a two-step

process.  First, the court determines whether the appointment of an additional committee is

necessary to assure the movants are adequately represented.  Second, if the answer to the first

question is "yes," then the court must decide whether it should exercise its discretion and order

the appointment.  See In re Garden Ridge Corp., 2005 Bankr. LEXIS 323 at *7 (citing In re

Enron Corp., 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002)).

37.     The burden is on the moving party to prove that the existing committee

does not provide adequate representation.  In re Enron Corp., 279 B.R. at 685 (citing In re Dow

Corning Corp., 194 B.R. 121, 144 (Bankr. E.D. Mich. 1996)).  Although there is no framework

provided in the Bankruptcy Code for courts to determine "adequate representation," the courts

apply various factors in analyzing the adequacy of the representation such as (1) the nature of the

case; (2) the ability of the committee to properly function; and (3) the standing and desires of the

---

[5]   What follows are primarily substantive objections to the relief requested in the Motion.  The Debtors reserve all
rights to raise procedural objections at the hearing on the Motion, including, but not limited to, objections based on
Movants' lack of standing and the failure to file a statement under Bankruptcy Rule 2019.

various constituencies.  In re Garden Ridge Corp, 2005 Bankr. LEXIS 323 at *6; see also In re

Dow Corning Corp., 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), rev'd on other grounds, 212

B.R. 258 (E.D. Mich. 1997); In re Wang Labs., Inc., 149 B.R. 1, 2 (Bankr. D. Mass. 1992).

Other considerations include: (a) the ability of creditors to participate in the case even without an

official committee; (b) the potential to recover expenses pursuant to § 503(b); (c) whether

different classes may be treated differently under a plan and need representation; (d) the

motivation of the movants; (e) the costs incurred by the appointment of additional committees;

(f) and the tasks that a committee or separate committee is to perform.  See In re Garden Ridge

Corp., 2005 Bankr. LEXIS 323,at * 6-7.

38.    The second step in the analysis calls for the court to exercise discretion.

This discretion derives from the language of § 1102(a)(2) where it states "the court *may* order the

appointment…." 11 U.S.C. § 1102(a)(2).  The discretionary factors typically considered are:

(a) the cost associated with appointment; (b) the time of the application; (c) the potential for

added complexity; and (d) the presence of other avenues for creditor participation.  In re Dow

Corning Corp., 194 B.R. at 144.

**B.**    **The Borrowers Are Adequately Represented By the Committee**

39.    As in most chapter 11 cases, the Debtors have an array of unsecured

creditors other than institutional banks and trade creditors, such as landlords, utilities, taxing

authorities, former employees, and tort claimants.  Whether the Committee adequately represents

these sub-groups does not, as Movants suggest, turn on whether or the extent to which members

of these sub-groups have a seat at the Committee table.  What matters is whether the Committee

is servicing their interests as unsecured creditors.  See In re Enron, at 279 B.R. 690 ("The issue is

not whether the creditors committee is an exact replica of the creditor body, but whether

representation of various creditor types is adequate."). The Debtors submit that, to the extent

that borrowers are also unsecured creditors, their interests have been, and continue to be, aptly

represented by the Committee.

## 1. The Committee Is Appropriately Comprised of the Debtors' Major Creditors

40.    Movants make much of the fact that the Committee is comprised mainly

of large financial institutions; however, Movants fail to recognize that *all* of the Debtors' *40*

largest unsecured creditors were large financial institutions, each asserting millions of dollars

(some, billions) in claims against the Debtors' estates.  Accordingly, this composition fits

squarely within the guidelines Congress set forth in the Bankruptcy Code.  11 U.S.C. §

1102(b)(1) ("A committee of creditors appointed under subsection (a) . . .  shall ordinarily

consist of the persons, willing to service, that hold the seven largest claims against the debtor of

the kinds represented on such committee. . . .").

41.    Further, adequate representation does not require proportionate

representation of distinct groups of creditors on a committee of unsecured creditors.  In re

Garden Ridge Corp., 2005 Bankr. LEXIS 323, at *10, (citing In re Dow Corning Corp., 194 B.R.

at 141).  As discussed more fully below, Movants have not alleged that the current Committee

has breached its duties, nor have they provided any support for their allegations that they have

been "silenced" by the financial institutions.  To the contrary, the record reflects that borrowers

have regularly asserted their interests before the Court.

42.    Representation of unsecured creditors by a majority of financial

institutions has been used in other, similar cases in this jurisdiction.  See In re New Century TRS

Holdings, Inc., Case No. 07-10416, D.I. 143 (Carey, J) (Bankr. D. Del. Apr. 9, 2007); In re Aegis

Mortgage Corporation, Case No. 07-11119,  D.I. 87 (Shannon, J.) (Bank. D. Del. Aug. 24,

14

2007); In re HomeBanc Mortgage Corp., Case No. 07-11079, D.I. 83 (Carey, J.) (Bankr. D. Del.

Aug. 23, 2007); In re Mortgage Lenders Network USA, Inc., Case No. 07-10146, D.I. 88

(Walsh, J) (Bankr. D. Del. Feb. 20, 2007). There is nothing unique or different about this case to

warrant a separate borrower committee.

> **2.      Movants Do Not Assert Any Violation
> of the Committee's Fiduciary Duties**

43.      Movants apparently concede that the current Committee is fulfilling its

fiduciary obligations to maximize the value of the Debtors' estates. See Motion, p. 15, 17

(stating that other creditors and the Committee have sought to maximize the value of the loans

and to maximize amounts generated by selling the rights to service the loans); In re Garden

Ridge Corp., 2005 Bankr. LEXIS 323, at *9 ("The chief purpose of an official committee is to

maximize distribution to this class."); Walsh v. Westmoreland Human Opportunities, Inc. (In re

Life Serv. Sys.), 279 B.R. 504, 513 (Bankr. W.D. Pa. 2002) (same). Instead, they assert that

another committee must be appointed because the Committee will not support them in their

personal endeavors. Motion, p. 17 ("These and the other financial institutions that sit on the

Committee will not support the interests of borrowers *to the extent that borrowers have interests

separate and aside from the maximization of the estates' value.*") (emphasis added). However,

the Motion cannot be granted because "[an] [o]fficial [c]ommittee is simply not intended to

represent individual creditor interests." In re Garden Ridge Corp., 2005 Bankr. LEXIS 323, at

*12 (finding that if the member advances its own interests through its position on the committee,

that member is in breach of its fiduciary duty to committee constituents).

> **3.      The Committee Has Aptly Functioned and Continues to Function**

44.      Courts generally will not authorize an additional committee of unsecured

creditors unless the current committee is "hopelessly divided, unable to take a position on

important matters and ineffective." In re Garden Ridge Corp. 2003 Bankr. LEXIS 323, at *11

citing In re Enron Corp., 279 B.R. at 686.  Here, the Committee has actively and aptly

participated in the bankruptcy proceedings with no signs of ineffectiveness.  Indeed, the

Committee has worked diligently to assist in efforts to maximize the value of the Debtors'

estates by, among other things (i) consulting on appropriate auction and sale procedures for

various assets; (ii) seeking to reduce the administrative costs of the estate, (iii) investigating

potential causes of action on behalf of the estate; (iv) negotiating a settlement with one of the

Debtors' prepetition secured lenders on behalf of all general unsecured creditors; (v) negotiating

the use of estate funds to avoid unnecessary administrative burdens relating to high DIP

financing costs; and (vi) consulting on plan and disclosure statement issues.

> **4.      Additional Interests of the Borrowers Are
>          Not Being Affected by the Committee**

45.     To the extent that borrowers have interests other than merely maximizing

value for general unsecured creditors, these interests are not being adversely affected by the

Committee.  As noted in the Motion, fundamentally, these borrowers do not want to lose their

homes or to have their claims against third parties or their rights with respect to their loans

adversely affected by these chapter 11 cases.  Motion, p. 15.  Accordingly, Movants assert that

borrowers may wish (i) to establish that their mortgage terms were illegal; (ii) to assert joint

liability against warehouse lenders, securitizers, and third-party servicers; and/or (iii) to pay

lower interest and fees than provided under the original mortgage contracts.  Motion, p. 16.  As a

threshold matter, the Debtors note that the vast majority of mortgage loans originated by the

Debtors prepetition, as well as the related servicing rights, have been sold or otherwise

transferred to third parties during these chapter 11 cases, and most of the relatively few

remaining loans that still constitute property of the Debtors' bankruptcy estates (such as, e.g., the

16

BofA loan portfolio) are not under the Debtors' control.  Nevertheless, even as to those remaining loans that are owned and/or serviced by the Debtors, the Committee's focus on maximizing value for the unsecured creditors has not prevented the borrowers from exercising their legal rights and otherwise pursuing their personal interests with respect to their individual mortgage loans.

46.     For example, if individual borrowers wish to defend a foreclosure action on the basis that their mortgage terms were illegal (or any other basis), nothing in the Bankruptcy Code prohibits them from doing so.[6]  Moreover, as set forth more fully above, borrowers who have indicated a desire to pursue an affirmative action against the Debtors for similar alleged violations have been routinely granted relief from the automatic stay to pursue actions in state court.  Furthermore, the automatic stay, orders for relief from the stay, the proposed Plan, or other pleadings filed within this case do not affect a borrower's ability to assert joint liability against third parties.  Finally, the Debtors have requested and received, with Committee support, authority to compromise and provide incentives for refinancing of mortgage loans under certain circumstances.

---

[6] With respect to sales of the borrowers' loans, Section 363(o) of the Bankruptcy Code expressly provides that all claims and defenses related to a consumer credit transaction shall remain to the same extent that such sale had occurred outside of the bankruptcy context.  11 U.S.C. § 363(o).

   **5.      *Movants' Arguments With Respect to the Plan and
            Disclosure Statement Are Not Grounds For Appointing a Committee***

         47.      Movants raise a number of objections to the Plan and Disclosure

Statement as evidence of the borrowers' lack of adequate representation in these chapter 11

cases.  Motion, pp. 21-35.  The majority of these objections are not borrower-specific, and mirror

similar concerns raised by other creditors and parties in interest (whether formally or informally),

including: (i) the scope of the Plan's exculpation provisions, Motion, pp. 24-25; (ii) the Debtors'

decision not to pursue substantive consolidation, Motion, p. 6; (iii) the absence of a liquidation

analysis (which is to be filed prior to the hearing on the Disclosure Statement), Motion pp. 33-

34; and (iv) the data underlying the Stipulated Asset Allocation.  As is common in a complex

chapter 11 case, the Debtors, in consultation with the Committee and other parties in interest, are

working diligently to resolve these issues, to the extent possible, via amendments to the Plan and

Disclosure Statement to be filed before the hearing to approve the Disclosure Statement.  The

Debtors submit that the existence of general, non-borrower-specific objections to the Plan and

Disclosure Statement is unremarkable in itself and does not warrant the drastic remedy of

appointment of an additional statutory committee.

         48.      Movants also raise a number of borrower-specific objections to the Plan

and Disclosure Statement, for example, concerning: (i) the enforcement of previously established

bar dates as to borrower claimants, Motion, p. 21; (ii) the allegedly improper classification of

borrower claims as general unsecured claims, Motion, pp. 25-26; (iii) the allegedly preferential

treatment of EPD/Breach Claims (as defined in the Plan) resulting from the EPD/Breach Claims

Protocol, Motion, pp. 26-28; (iv) the "arguable" preclusion of equitable subordination claims

against creditors that "may be liable for aiding and abetting the Debtors' illegal acts" prepetition,

Motion, pp. 28-29; (v) the alleged hindrance of borrower litigation by virtue of continuation of

the automatic stay, retention of jurisdiction in Delaware, and the plan trustee's ability to destroy documents, Motion, pp. 29-30; (vi) the preservation of borrowers' claims and defenses under the Truth in Lending Act, Motion, pp. 30-32; and (vii) the alleged lack of disclosure regarding the treatment of borrower claims, the restructuring of borrowers' loans, and the identification of the holders of the borrowers' loans, Motion, pp. 33-35.

49.     While the Debtors believe the foregoing objections are without merit, the Debtors, in consultation with the Committee and other parties in interest, are currently considering several amendments to the Plan and Disclosure Statement that are responsive to Movants' primary concerns, which amendments will, among other things, clarify the Plan's effect (or lack thereof, in most instances) on borrowers' rights vis-à-vis their individual mortgage loans.  The Debtors have no doubt that the Court will afford Movants a full and fair opportunity to be heard in response to such amendments, and otherwise with respect to the concerns expressed in the Motion and adopted by Ms. Rush on an individual basis, at the hearing to approve the Disclosure Statement and, ultimately, the hearing to confirm the Plan.

50.     In sum, Movants are being treated as any other objecting party, and their objections are being taken every bit as seriously as other objections.  The mere existence of borrower-specific objections to the Plan does not mean that borrowers are inadequately represented by the Committee, any more than the existence of objections by holders of EPD/Breach Claims (of which there are many) mean that major financial institutions are inadequately represented.  As with nearly any complex chapter 11 case, the Disclosure Statement and Plan ultimately approved/confirmed in these cases will necessarily be the product of compromise and collaboration between the Plan's proponents and the various objecting parties. The Debtors are confident that the amended Plan and Disclosure Statement filed in advance of

the hearing to approve the Disclosure Statement will demonstrate that this dynamic process is

working thus far, and should not be disrupted by the appointment of an additional statutory

committee.

> **6.      More Appropriate Avenues Exist for**
> **Asserting Individual Borrower Interests**

51.      Given that the appointment of an additional official committee is an

extreme remedy, many courts have considered what other options are available to creditors

including, among others, the ability of creditors to participate in the case without an official

committee and the potential to recover expenses pursuant to section 503(b) of the Bankruptcy

Code.  In re Garden Ridge Corp., 2005 Bankr. LEXIS 323, at *6 (citing In re Enron Corp., 279

B.R. at 685).  Because both these remedies have been, and are, available to borrowers, this Court

should not appoint an additional committee.

52.      Movants' argument that borrowers will not be heard absent the

appointment of an additional committee is belied by the record of these cases.  Borrowers have

actively participated (both in person and telephonically) in these bankruptcy proceedings, and the

mere fact that they have not formed a "unified" front should not undercut their involvement.  By

asserting their individual interests, borrowers have requested (i) an examination of, and

production of documents by, the Debtors pursuant to Bankruptcy Rule 2004; (ii) the appointment

of a trustee or examiner pursuant to section 1104 of the Bankruptcy Code; and (iii) the

appointment of a consumer privacy ombudsman pursuant to section 363 of the Bankruptcy Code.

Additionally, borrowers have addressed their concerns regarding the sale or other disposition of

their assets through objections to sales of the Debtors' assets, including the sale of the Servicing

Business and requesting individual loan file information in accordance with the procedures set

forth by this Court.  They have affirmatively protected and pursued their interest by filing claims,

responding to claim objections, and seeking relief from the automatic stay to liquidate alleged claims.  Most recently, the borrowers have raised individual objections to the proposed plan and disclosure statement, thereby protecting their interests in the event that the relief requested in the current Motion is not granted.  Such involvement has not only been on a *pro se* basis, but also with the assistance of counsel.

53.     Moreover, borrowers who desire to act in concert with other similarly situated borrowers may form an informal committee to act at their behest.  The members of an informal committee may work collectively and could be heard as a party in interest in this case.[7] See In re Garden Ridge Corp., 2005 Bankr. LEXIS 323, at *14.  In the event that the informal committee provides a substantial contribution to the estate, then it may be entitled to reasonable compensation, including the reimbursement of professional fees, at the conclusion of the case. See 11 U.S.C. § 503(b).  The establishment of an informal committee and the opportunity to receive reimbursement for a substantial contribution in these cases appropriately balances the risks of duplication of services between two official committees and the potential that such services were provided for the benefit of individual borrowers, and not for the benefit of the Debtors' estates.  See generally In re Garden Ridge Corp., 2005 Bankr. LEXIS 323, at *14-15.

**C.     Assuming *Arguendo* That Borrowers Are Not Adequately Represented, This Court Should Not Exercise Its Discretion to Appoint a Borrowers Committee**

54.     Assuming *arguendo* that borrowers are not adequately represented, this Court should not appoint an additional, official committee for borrowers this late in the game. See In re Dow Corning Corp., 194 B.R. at 143 (Courts "need not order the appointment of an additional committee even if the present ones do not adequately represent the movants'

---

[7]     With respect to costs, the Debtors respectfully submit that, assuming Movants' assertion that "thousands" of borrowers have claims against the Debtors' estate is true, the widespread distribution of legal costs would accommodate borrowers' individual financial circumstances.

interests."). Simply put, the appointment of a borrowers committee on the eve on confirmation will undoubtedly increase administrative costs and unnecessarily delay confirmation. Such prejudices against the Debtors' estates and other creditors are unwarranted given the borrowers' knowledge of, and past active participation in, these bankruptcy proceedings and the presence of other avenues for creditor participation (as discussed more fully above).

        **1.**        ***The Debtors' Estate Would Incur Substantial Costs Associated***
                          ***with the Appointment of an Additional Official Committee***

        55.      It is undisputed that these cases are large and complex. As noted by Movants, the complexity of these cases stem from the business itself, the debt structure and transactions and the number of parties in interest resulting in over 5300 docket entries. Motion, p. 15. Despite these assertions, Movants argue that professionals will incur "minimal" costs to represent the borrowers in connection with the rights of the borrowers with respect to the plan. This assertion fails to recognize that any professional would be required to "get up to speed" on the issues raised, settlements reached, and assets sold to participate effectively in the plan process.[8]

        56.      Further, every specific creditor group would prefer to have an official committee focused on just their issues and paid for by all other creditors; however, that is simply not the construct of the Bankruptcy Code.

        **2.**        ***The Timing of an Appointment Could Unnecessarily Delay Confirmation***

        57.      Movants argument regarding the timing of their request, after a year of active borrower participation in these proceedings, including direct participation in multiple hearings by certain Movants, is disingenuous and should be reason, alone, to deny the request.

---

[8]      For illustration purposes, the professional fees for the Committee, accrued through April 2008, are nearly $4 million.

                                                          

See In re Dow Corning Corp., 194 B.R. at 143 (Courts place "heavy weight" on the timeliness of the motion and are "especially skeptical of motions filed after the debtor has filed a plan or reorganization.").

58.     The bankruptcy filing immediately became headline news and was at the forefront of discussions regarding the failing mortgage industry.  A letter to borrowers was posted to the Debtors' website approximately one week after the Petition Date.  Moreover, parties involved in prepetition litigation received suggestions of bankruptcy, immediately becoming aware of the pending bankruptcy.  The first borrower participating in these cases, Mr. Horvath, filed his motion for relief from stay within the same month of the initial filing. Moreover, Movant Rush filed her first pleading in this case, one of several 2004 Exam/Trustee Motions, nearly one year ago.  As set forth more fully above, since that time, Ms. Rush has attended and participated in multiple hearings throughout the last year.  Movant Tilton Jack filed his proof of claim on October 15, 2007, two weeks before the Bar Date Order was entered.

59.     Movants attempt to deflect their own culpability in the delay by arguing that the Debtors "should have treated the borrowers as known creditors and provided them actual notice of the bar dates."  Motion, p. 22.   This argument fails not only because the record clearly shows Movants' longstanding knowledge of the case, but also because the Debtors provided notice, in accordance with the Bankruptcy Rules, to those borrowers whom they knew to be potential creditors of the estate.

60.     The Bankruptcy Rules specify that known creditors must receive notice of, among other things, deadlines for filing proofs of claim, Fed. R. Bankr. 2002(a)(7).  To determine whether a creditor's claim is "known" or "unknown," courts analyze whether the creditor's claim was reasonably ascertainable or, in other words, if the creditor can be identified

by reasonably diligent efforts.  In re Feldman, 261 B.R. 568, 576 (Bankr. E.D.N.Y. 2001).

Although reasonable diligence varies in different contexts and depends on the particular facts of

the case, "a debtor does not have a duty to search out each conceivable or possible creditor and

urge that person or entity to make a claim against it."  Id.  To the extent that a creditor is

"unknown" to a debtor, publication notice of the claims bar date may satisfy the requirements of

due process.  Id. at 577 (citing Mullane v. Central Hanover Bank, 339 U.S. 306 (1950)).

      61.     Despite Movants' bald assertion to the contrary, the Debtors have no

reason to believe that each borrower is a creditor of their estates.[9]  Instead, the Debtors worked

with their in-house legal departments to obtain addresses for borrowers who had asserted

prepetition litigation, had threatened litigation, or otherwise asserted claims against the Debtors.

Moreover, the Debtors established a bar date for borrowers of certain types of loans that may

have incurred potential claims against the Debtors – those parties who had home equity lines of

credit and construction loans.  Accordingly, the Debtors submit that their efforts reasonably

ascertained those borrowers who were creditors of the Debtors' estate.  To the extent that

borrowers had not otherwise asserted claims against the Debtors, such borrowers received the

appropriate publication notice through publication in the national edition of the *New York Times*.

As a result, over 450 claims on behalf of borrowers have been filed.[10]

      62.     Movants themselves exemplify the success of the Debtors' reasonable

diligence.  With the exception of the Bileks (who received notice of the Bar Date), each Movant

who had asserted prepetition litigation against the Debtors timely filed proofs of claim.  To the

Debtors' knowledge, Ms. Lamacchia has not defaulted on her loan or otherwise asserted any

---

[9]     Unlike the debtor in In re First Alliance Mortgage Co., 471 F.3d 977 (9th Cir. 2006), AHM's portfolio consisted mostly of loans of prime and alternate-A quality.

claims against the Debtors.  Ms. Mullins does not have a loan with the Debtors and did not

enforce her rights with respect to an REO property until April 2008 of this year.  To date, despite

being Movants with respect to the current motion, neither Ms. Lamacchia nor Ms. Mullins has

filed a claim against the Debtors.[11]

63.     Additionally, although Movants' counsel has disclaimed the contents of

the Motion as not being an objection to the proposed Disclosure Statement or Plan, the

arguments in the Motion relating to the Disclosure Statement and Plan have been essentially

adopted by Ms. Rush in her *pro se* objection to the Disclosure Statement [D.I. 5828].  As noted

above, the Debtors believe that these issues can be addressed on or before the hearing through

proposed modifications, and appointment of a borrowers committee would unnecessarily delay

confirmation and increase costs to the detriment of all creditors.

---

[10]     The Debtors reserve their rights with respect to the validity of such claims.

[11]     The Debtors reserve the right to contest the standing of these Movants to seek the relief requested.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court deny

the relief requested in the Motion.

Dated: September 25, 2008
        Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Margaret B. Whiteman
_____
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Sean M. Beach (No. 4070)
Margaret B. Whiteman (No. 4652)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and
Debtors in Possession