IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X   Chapter 11
In re

AMERICAN HOME MORTGAGE
HOLDINGS, INC., *et al.*,

         Debtors.
------------------------------------------------------------X

Case No. 07-11047 (CSS)
(Jointly Administered)

Objection Deadline: September 29, 2008 at 4:00 p.m.
Hearing Date: October 2, 2008 at 11:00 a.m.

RE: Docket No. 5791

## RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF JPMORGAN CHASE BANK, NATIONAL ASSOCIATION FOR RELIEF FROM AUTOMATIC STAY, PURSUANT TO 11 U.S.C. § 362(d), TO FORECLOSE ON MORTGAGE LOANS

The Official Committee of Unsecured Creditors (the "**Committee**") of American Home Mortgage Holdings, Inc., *et al.*, (collectively, the "**Debtors**") hereby responds to the "Motion Of JPMorgan Chase Bank, National Association For Relief From Automatic Stay, Pursuant To 11 U.S.C. § 362(d), To Foreclose On Mortgage Loans" (Docket No. 5791) (the "**Motion**") as follows:

    1.  On September 10, 2008, JPMorgan Chase Bank, N.A. ("**JPMorgan**") filed the Motion, seeking relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code, so that it "may exercise its rights and remedies with respect to the Warehouse Loans and Warehouse Facility Collateral under the Warehouse Facility Documents and applicable law" *See* Motion, at 16.

    2.  As more fully discussed below, the Motion should be granted only on the condition that: (a) any order granting such relief should require JPMorgan to reimburse the Debtors' estates for all costs and expenses that have been incurred by the estates in preserving and maintaining the collateral of JPMorgan (the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code, as well as all costs and expenses associated with transferring

- 1 -

the Collateral to JPMorgan, (b) JPMorgan shall not be permitted to take any actions to exercise remedies with respect to any real property acquired by the Debtors through foreclosure or deed in lieu of foreclosure of any loans that were previously a part of the Collateral; and (c) all rights of the Debtors' estates against JPMorgan shall be preserved, including without limitation (i) any claims, defenses, causes of action or rights relative to any deficiency claim that JPMorgan might assert against the Debtors; (ii) any objections to any proofs of claim that have been filed by JPMorgan; (iii) any rights the estates may have to avoid any security interest in the Collateral asserted by JPMorgan; and (iv) and any other right or claim of the estates against JPMorgan or the Collateral.

### A.  BACKGROUND.

3. On or about January 24, 2006, the Debtors entered into that certain "1/06 Senior Secured Credit Agreement" (the "**1/06 Credit Agreement**") with JPMorgan, as administrative agent and sole lender, pursuant to which JPMorgan provided a revolving line of credit to the Debtors to be secured by mortgage loans that were originated and/or owned by the Debtors. Since the execution of the 1/06 Credit Agreement, the parties amended it four (4) separate times. (The 1/06 Credit Agreement as amended by the parties is hereinafter referred to as the "**Amended Credit Agreement**"). As a result of these amendments, the amount of revolving credit available to the Debtors pursuant to the Amended Credit Agreement totaled $200 million.

4. As security for repayment of the funds advanced pursuant to the Amended Credit Agreement, the Debtors granted security interests to JPMorgan in certain mortgage loans that were owned or would later be originated and/or owned by the Debtors (collectively, the "**JPMorgan Collateral Mortgages**"). JPMorgan recorded financing

statements with respect to each of the JPMorgan Collateral Mortgages pursuant to the Uniform Commercial Code, as adopted in the relevant jurisdictions.[1]

5. The Amended Credit Agreement also provided that the Debtors would grant a security interest in "each lot, parcel, tract or leasehold estate (as the case may be) of present or future real property owned by [the Debtors] after foreclosure or conveyance in lieu of foreclosure of any Underperforming Loan or other Pledged Loan . . . ***by*** executing, acknowledging sufficiently for recording and delivering to the Agent or (where appropriate) to a trustee designated by the Agent, a recordable mortgage, deed of trust or security deed . . . ." Amended Credit Agreement 7.4 at 44 (emphasis added). Accordingly, pursuant to this provision of the Amended Credit Agreement, JPMorgan could have obtained a security interest in "each lot, parcel, tract or leasehold estate (as the case may be) of present or future real property owned by [the Debtors] after foreclosure or conveyance in lieu of foreclosure" ***only*** by obtaining an appropriate mortgage or other security document. However, the Committee understands that no mortgages, deeds of trust or security deeds were ever executed by the Debtors or recorded in any real property records.

6. These chapter 11 cases were commenced on August 6, 2007. For over a year following the filing of these chapter 11 cases, JPMorgan chose not to seek relief from the automatic stay to foreclose on the Collateral; apparently content to wait and see if the Debtors could dispose of it without further action by, or expense to, JPMorgan. On September 10, 2008, JPMorgan filed the present Motion, seeking relief from the automatic stay to permit it to foreclose on the Collateral.[2]

---

[1] The foregoing allegation is intended to provide background facts and no admission or concession is made by the Debtors regarding the perfection of the security interest of JPMorgan in the JPMorgan Collateral Mortgages.

[2] In the Motion, JPMorgan implies that the Debtors are somehow at fault because they have not "returned" the loans to JPMorgan previously and complains that it has been placed in the "untenable position of having to seek relief from this Court to obtain its collateral." *See* (footnote continued)

7. During the course of these chapter 11 cases, the Debtors' estates have incurred substantial costs and expenses relating to the preservation and maintenance of the Collateral. These expenses have included, among other things, the payment of (a) professional fees incurred in disposing of a portion of the Collateral; (b) servicing fees relating to the Collateral; (c) PMSI premium advances; (d) unrecovered servicing advances relating to the Collateral; and (d) other miscellaneous costs and expenses.[3]

### B. THE REO ASSETS

8. Prior to and following the filing of these chapter 11 cases, certain of the borrowers under the JPMorgan Collateral Mortgages defaulted in their obligations and the Debtors foreclosed on those defaulted mortgages thereby acquiring the real property that previously secured the JPMorgan Collateral Mortgages or, in some cases acquired the real property through a deed in lieu of foreclosure from the borrowers under the JPMorgan Collateral Mortgages. (The real property acquired from defaulting mortgage borrowers is hereinafter referred to as the "**REO Assets**"). Because the Debtors never executed any mortgages, deeds of trust, security deeds or similar instruments granting JPMorgan any security interest in such REO Assets, JPMorgan does not have a security interest in the REO Assets or the proceeds of the REO Assets.

---

Motion, at 1-2. JPMorgan could have filed its current Motion any time within the last year and the Debtors certainly took no action that would have prevented JPMorgan from doing just that. In fact, as reflected in the Motion, JPMorgan previously entered into one stipulation concerning a portion of its collateral and filed a motion for relief from stay concerning another portion of its collateral. *Id*. at 5, ¶ 8. Other institutional creditors have filed similar motions throughout these chapter 11 cases. The Committee suggests that JPMorgan delayed seeking relief from the automatic stay simply because it was content to have the Debtors incur the expense of managing the Collateral rather than taking responsibility itself for the management and disposition thereof.

[3] The Committee anticipates that the Debtors will specifically delineate the amounts of the costs and expenses incurred in connection with the Collateral.

9.      Moreover, even if JPMorgan contends that the Amended Credit Agreement was sufficient to give it a security interest in the REO Assets, that security interest was unperfected as of the date of the filing of these chapter 11 cases and JPMorgan's security interest in the REO Assets is voidable by the Debtors pursuant to section 544 of the Bankruptcy Code. *See, e.g., In re Seaway Express Corp.*, 912 F.2d 1125 (9th Cir. 1990).[4]

### C.    THE COURT SHOULD LIMIT OR CONDITION RELIEF

10.      Based on the foregoing, the Court should carefully limit and condition any relief granted pursuant to the Motion.

11.      Because the Debtors' estates have incurred substantial expenses in preserving the Collateral during the more than one year period during which JPMorgan has been content to allow the Debtors to manage the Collateral, it is entirely appropriate that as a condition to granting relief from the automatic stay, that the Court determine the amount that JPMorgan must reimburse the estate for all such expenses. *See e.g., In re The Bennett Funding Group, Inc.*, 1997 Bankr. Lexis 2359, (Bankr. N.D.N.Y., 1997) (ordering the recovery by the estate pursuant to section 506(c) of the Bankruptcy Code in connection with relief from automatic stay). In addition, any cost or expense associated with transferring the

---

[4] This issue was raised by the Committee previously in its "Limited Objection Of The Official Committee Of Unsecured Creditors To Motion Of The Debtors For Orders: (A)(I) Approving Sale Procedures; (II) Approving Payment Of Expense Reimbursement; (III) Scheduling A Hearing To Consider Sale Of Certain Non-Performing Loans; (IV) Approving Form And Manner Of Notice Thereof; And (V) Granting Related Relief; And (B)(I) Authorizing The Sale Of Non-Performing Loans Free And Clear Of Liens, Claims, Encumbrances And Other Interests; (II) Authorizing And Approving Sale Agreement Thereto; (III) Authorizing The Distribution of The Proceeds; And (IV) Granting Related Relief" [Docket No. 3211]. As a result, proceeds totaling approximately $5.7 million from the sale of certain non performing loans attributable to the REO Assets have been placed in escrow, pending a resolution of this issue. The Motion seeks only relief from the automatic stay to permit JPMorgan to foreclose on its collateral and the Committee does not understand the Motion to contain any request for relief relating to this escrow, although the existence of the escrow is mentioned in the Motion.

JPMorgan Collateral Mortgages or the servicing of the JPMorgan Collateral Mortgages must be borne by JPMorgan.

12. The Court should also not permit JPMorgan relief from the automatic stay to enable it to take any steps to enforce remedies against the REO Assets or the funds currently in escrow that are proceeds of REO Assets. JPMorgan cannot demonstrate that it has a perfected security interest in any of the REO Assets and it is therefore inappropriate to grant relief from the automatic stay to a secured creditor holding an unperfected lien. *See In Re Utah Aircraft Alliance,* 342 B.R. 327, 332, 338 (10th Cir. B.A.P. 2006) (affirming a denial of relief from automatic stay where creditor failed to demonstrate that it held a perfected security or ownership interest); *In Re Omega Environmental Inc.*, 219 F.3d 984, 986 (9th Cir. 2000)("A creditor holding an unperfected security interest is not entitled to relief from an automatic stay imposed under *Bankruptcy Code § 362*."); *First National Bank of Denver, Denver, CO v. George Buddy Turley and Carole Lynn Turley,* 705 F.2d 1024, 1027 (8th Cir. 1983) ("We conclude, therefore, that Mobilehome is not entitled to relief from the automatic stay to reclaim the mobile home because Mobilehome had an unperfected security interest at the time of the filing of the bankruptcy petition, which does not defeat the trustee's interest as a hypothetical judicial lien creditor.") Accordingly, JPMorgan should not be permitted to take any steps to exercise remedies with respect to the REO Assets or the funds currently in escrow that are proceeds of REO Assets, pending a resolution of this dispute.

13. Finally, there are a number of other disputes and potential disputes existing between JPMorgan and the Debtors' estates, including potential claims against JPMorgan pursuant to sections 544, 547, 549 and 552 of the Bankruptcy Code, as well as disputes and potential disputes concerning deficiency claims that JPMorgan might file and the proofs of claim that it has already filed. Accordingly, any order on the Motion should

clearly state that it is without prejudice to any such claims or defenses and all such matters are reserved by the parties.

Dated: September 29, 2008
       Wilmington, Delaware

_____
Ian Connor Bifferato (#3273)
Garvan F. McDaniel (#4167)
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900

*Proposed Special Conflicts Counsel for*
*Official Committee of Unsecured Creditors*

-and-

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett (Admitted *Pro hac vice*)
Michael A. Morris (Admitted *Pro hac vice*)
865 S. Figueroa Street, Suite 2900
Los Angeles, California 90017
(213) 694-1200

*Special Conflicts Counsel for*
*Official Committee of Unsecured Creditors*