IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
In re:                                         :  Chapter 11
                                               :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,:  Case No. 07-11047 (CSS)
a Delaware corporation, et al.,¹               :
                                               :  Jointly Administered
       Debtors.                                :  Ref. D.I.: 5791
                                               :
------------------------------------------------------------- x
```

## DEBTORS' PRELIMINARY OBJECTION TO THE MOTION OF JPMORGAN CHASE BANK, NATIONAL ASSOCIATION FOR RELIEF FROM THE AUTOMATIC STAY, PURSUANT TO 11 U.S.C. § 362(d), TO FORECLOSE ON MORTGAGE LOANS

American Home Mortgage Holdings, Inc., a Delaware corporation, and certain of

its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the

above cases (collectively, the "Debtors"), hereby object  (the "Objection") to the *Motion of*

*JPMorgan Chase Bank, National Association for Relief from the Automatic Stay, Pursuant to 11*

*U.S.C. § 362(d), to Foreclose on Mortgage Loans* [D.I. 5791] (the "Motion") filed by JPMorgan

Chase Bank, N.A. ("JPM").  In support of the Objection, the Debtors respectfully represent as

follows:

---

¹  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland
corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc.
(f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp.,
a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company
(1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp. , a New
York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

## OBJECTION[2]

I.    **JPM Is Not Entitled to Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(2)**

    A.    **The Debtors May Have Equity in the Warehouse Loans; JPM has the Burden of Proving Otherwise**

JPM asserts it is "inconceivable" the Debtors have equity in the Warehouse Loans because the Warehouse Loans have an unpaid principal balance ("UPB") of approximately $93.9 million and JPM asserts a claim of approximately $97.1 million.[3] (Motion ¶ 21.) Of course, this argument overlooks that several other items of potential collateral in which JPM asserts an interest, namely: (i) Construction/Permanent loans of an undisclosed value (Motion ¶ 8), which loans the Debtors believe have an aggregate UPB of approximately $20 million,[4] (ii) as of September 29, 2008, approximately $35 million in UPB of unsold REO (which is not mentioned in the Motion), (iii) the approximately $5.8 million currently being held in the Disputed REO Escrow (id. ¶ 10), and (iv) to the extent such amounts have not been applied by JPM to its outstanding debt (the Motion is unclear on this point), approximately $753,000 of Prepetition REO Proceeds and approximately $5.6 million of Postpetition REO Proceeds (id. ¶ 11). The Debtors deny that JPM has an enforceable security interest in the Disputed REO Escrow, the Prepetition REO Proceeds, the Postpetition REO Proceeds, and any unsold REO. Nevertheless, so long as JPM asserts an interest in this property it must be considered when determining

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

[3] References to the amount of JPM's claim, the UPB of the Warehouse Loans, and the amount of any payments to JPM on account of its claims in this Objection are for purposes of discussion only, and do not constitute an admission of the accuracy of such amounts or the validity of such claims, all rights with respect thereto being expressly reserved by the Debtors.

[4] While it is true JPM foreclosed upon these loans pursuant to the C/P Stay Relief Order, such foreclosure did not change the fact that the loans constitute Warehouse Facility Collateral which JPM is required to liquidate in a commercially reasonable manner and apply against the outstanding indebtedness owed by the Debtors.

whether the Debtors have equity in any of the Warehouse Facility Collateral. JPM cannot have it both ways, i.e., asserting its security interest for purposes of prolonging a dispute with the Debtors over the REO proceeds, but effectively ignoring its putative security interest when valuing its collateral pool.

JPM has the burden of establishing the Debtors' lack of equity in the Warehouse Loans. 11 U.S.C. § 362(g)(2). To do so, it must quantify *both* the amount of its allowed claim[5] *and* the value of its entire collateral package. In re Beaver Valley Builder's Supply, Inc., 177 B.R. 507, 515-16 (Bankr. W.D. Pa. 1995); see In re Opelika Mfg. Corp., 66 B.R. 444, 448 (Bankr. N.D. Ill. 1986) (determining amount of equity in property requires consideration of secured creditor's "entire security package, not just a portion thereof"). As the Beaver Valley court explained, were this otherwise, "an overzealous lienholder might under certain circumstances obtain relief from the automatic stay where it would be inappropriate." 177 B.R. at 515-16.

> Assume, for instance, that A, B, and C all are in bankruptcy; that the value of the assets of A, B, and C is less taken individually than the amount of D's lien; and that the value of their assets taken collectively exceeds the amount of D's lien.
>
> If the value of A's, B's, and C's assets are considered in isolation; and if D were to proceed against only A's assets, and then against only B's assets, and finally against C's assets, D would be entitled to relief from the automatic stay with respect to all three debtors even though the combined value of their assets exceeds the amount of D's lien.
>
> Under this scenario, D would be able to take action against the assets of all three debtors even though they collectively have equity therein. Any equity that exists may not be available for distribution to other creditors. Such an outcome is not in keeping with one of the fundamental tenets of bankruptcy.

---

[5] The Debtors note that JPM's claim has not been allowed by agreement of the Debtors or by order of this Court. The Debtors are still evaluating the merits of JPM's claim and reserve all rights with respect to challenging its validity and amount.

Id. So too here, if JPM were permitted to proceed against the (putative) Warehouse Facility Collateral in piecemeal fashion, it could circumvent its evidentiary burden under § 362(g)(1) by filing sequential § 362(d)(2) motions seeking limited relief with respect to discrete items of collateral—indeed, this appears to be precisely JPM's strategy. (See Motion ¶ 34 ("[B]ecause this Motion applies only to the Warehouse Loans . . . JPMC expressly reserves the rights to file one or more additional motions regarding the remaining Warehouse Facility Collateral . . . .")[6]

    To satisfy its burden of establishing the Debtors' lack of equity in the Warehouse Facility Collateral as a whole, JPM must present evidence as to *both* the amount of any cash in which asserts an interest (e.g., the Disputed REO Escrow) *and* the value of non-cash collateral in which it asserts an interest (which, at a minimum, includes the Construction/Permanent loans, the REO, and the 247 Warehouse Loans referenced in the Motion). The only evidence of the value of any loans referenced in the Motion is the price obtained by the Debtors for sales of other loans in these chapter 11 cases (which was less than the outstanding UPB of the loans), from which JPM concludes that "there can be no serious argument that the value of the Warehouse Facility Collateral exceeds JPMC's debt" of more than $97 million. Of course, a hidden premise of this argument is that "value" for purposes of determining the Debtors' equity in property is equal to market value. However, as discussed further below, mortgage loans are financial instruments that are fundamentally dissimilar to most forms of collateral treated in the established case law— e.g., a consumer debtor's automobile or residence; single-asset real estate (e.g., a hotel); or the plant, equipment, and/or inventory of a going-concern business—and rote deference to market value (especially given the current market conditions) for purposes of determining the Debtors'

---

[6] To illustrate the potential absurdity of this approach, suppose JPM had filed a separate motion under § 362(d)(2) with respect to each of the 247 Warehouse Loans, the value of any one of which would be dwarfed by the amount of JPM's alleged $97 million claim.

equity in mortgage loans would overlook a rather obvious feature of mortgage loans: their cash

flow.  As JPM itself asserts, it has been receiving this cash flow during the pendency of these

cases, and has applied such cash to pay down its asserted claim by more than $74 million.

(Motion ¶ 7 n.5.)  JPM has been content to receive this cash flow for over a year, and now

criticizes the Debtors for "holding JPMC's collateral hostage" (a familiar refrain) and "hold[ing]

out hope that by some miracle, a market correction will increase the value of the Warehouse

Loans".  (Motion pp. 1-2, ¶ 26.)

        JPM either misunderstands or deliberately mischaracterizes the Debtors' strategy

with respect to the Warehouse Loans, which in fact has little to do with hostage-taking or

miracle-seeking.  To the contrary, in the face of a secondary market for mortgage loans and

related financial instruments that is in utter ruins, completely saturated with sellers but bereft of

purchasers (other than the United States government, it appears), the Debtors have made the

sensible, if unremarkable, decision to continue to collect the income stream from the Warehouse

Loans rather than sell this income stream (i.e., cash) at a steep discount in the marketplace.

Indeed, the Debtors attempted to obtain relief that would allow them to pursue additional non-

sale alternatives to realizing value from the Warehouse Loans, e.g., by offering incentives such

as principal reductions and waiver of prepayment penalties to entice borrowers to refinance their

loans.[7]  [See *Debtors' Motion for Order Authorizing the Debtors to Compromise or Sell Certain*

*Mortgage Loans in the Ordinary Course of Business Without Further Hearing or Notice*, D.I.

4922.]  However, JPM insisted the Warehouse Loans be removed from the pool of loans for

which such relief was requested, and the Debtors complied.  JPM's apparent desire to

---

[7]  The Debtors have had substantial success with this approach in other contexts, most notably with the Bank of America construction-to-permanent loan portfolio, whereby the Debtors have, to date, realized approximately $18.1 million in proceeds from refinancing (with approximately $6.3 million UPB in remaining loans) on a portfolio that would otherwise have sold for approximately $9.1 million.

disentangle itself from these bankruptcy cases by foreclosing upon and selling the Warehouse

Loans into a down market, and its apparent willingness to take a loss in so doing (thus increasing

the deficiency claim it will assert against the Debtors' estates, which will dilute recoveries to

general unsecured creditors), are simply not valid considerations for the Debtors, as fiduciaries

acting on behalf of their estates and creditors, to shape their strategy with respect to the

management of property of their estates.

      In sum, the Debtors intend to put JPM to its burden under § 362(g)(1) of proving

the Debtors' lack of equity in the Warehouse Loans, which, the Debtors submit, will require

evidence of the cash-flow value of the Warehouse Loans.

### B.     The Mortgage Loans are Necessary for an Effective Liquidation

      With respect to the second requirement for stay relief under § 362(d)(2), that the

Warehouse Loans are not "necessary to an effective reorganization," JPM notes that the Debtors

are liquidating and concludes, therefore, that no "reorganization" is in prospect.  (Motion ¶ 27.)

This simple play on words overlooks the ample authority for the proposition that § 362(d)(2)'s

"effective reorganization" test "may be satisfied by showing that the property at issue is

necessary to an effective liquidation of the debtor under chapter 11, as distinguished from an

effective rehabilitation of the debtor." In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d

363, 371 n.14 (5th Cir. 1987) (en banc), aff'd sub nom. United Sav. Ass'n v. Timbers of Inwood

Forest Assocs., 484 U.S. 365 (1988); accord In re Conroe Forge & Manuf. Corp., 82 B.R. 781,

785 (Bankr. W.D. Pa. 1988) (Fitzgerald, J.); In re Associated Investors Joint Venture, 91 B.R.

555, 558 (Bankr. C.D. Cal. 1988); In re Paolino, 72 B.R. 555, 559 (Bankr. E.D. Pa. 1987); In re

Planned Sys., Inc., 78 B.R. 852, 866 (Bankr. S.D. Ohio 1987); In re Koopmans, 22 B.R. 395, 398

(Bankr. D. Utah 1982) (Mabey, J.).

           

The Warehouse Loans are necessary for an effective liquidation because, as contemplated by the Debtors' current liquidating plan, the income stream from the loans will be used to pay down JPM's secured claim over time, maximizing the payout on such claim (as compared to a "fire sale" liquidation of the Warehouse Loans) and minimizing the amount of any deficiency claim that will dilute recoveries to general unsecured creditors.

**II.     JPM Is Not Entitled to Relief From the Automatic Stay for Lack of Adequate Protection  Under § 362(d)(1)**

**A.     The Warehouse Loans are not Declining in "Value" for Adequate Protection Purposes**

In its Motion, JPM presupposes that "value" of the Warehouse Loans for adequate protection purposes is their market value.  However, "value" under § 361 of the Bankruptcy Code is not a "one-size-fits-all" concept.  As noted in the legislative history to § 361:

> The section does not specify how value is to be determined, nor does it specify when it is to be determined.  These matters are left to case-by-case interpretation and development.  *It is expected that the courts will apply the concept in light of facts of each case and general equitable principles.*  It is not intended that the courts will develop a hard and fast rule that will apply in every case.  The time and method of valuation is not specified precisely, in order to avoid that result. There are an infinite number of variations possible in dealings between debtors and creditors, the law is continually developing, and new ideas are continually being implemented in this field.  *The flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.*
>
> Neither is it expected that the courts will construe the term value to mean, in every case, forced liquidation value or full going concern value.  There is wide latitude between those two extremes.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 338-40 (1977 (emphasis added).

In any further briefing on Motion, JPM will likely cite any number of cases where relief from the automatic stay was granted with respect to collateral that does not at all resemble the Warehouse Loans—e.g., a consumer debtor's automobile[8] or residence;[9] single-asset real

---

[8]     A consumer debtor's automobile is a rapidly depreciating, non-income producing asset, for which market value is the only metric of "value" for adequate protection purposes.

estate (e.g., a hotel);[10] or the plant, equipment, and/or inventory of a going-concern business.[11]
This is not surprising, insofar as the adequate protection of a security interest in residential
mortgage loans is (at least, so far as the Debtors are aware) uncharted territory in the reported
case law.  In the absence of guidance from cases involving assets similar to the Warehouse
Loans, however, the Court should resist the urge to employ rules of law developed to deal with
other, dissimilar forms of collateral and should instead retreat to first principles.

       The concept of "adequate protection" is rooted both in the Fifth Amendment's
Due Process Clause (protecting property interests) as well as a bankruptcy policy favoring
preserving the essential benefit of a secured creditor's bargain under state law.  <u>See generally</u> <u>In
re Timbers of Inwood Forest Assocs., Ltd.</u>, 793 F.2d 1380, 1389-1401 (5th Cir. 1986) ("<u>Timbers
Cir.</u>"), <u>aff'd sub nom. United Sav. Ass'n v. Timbers of Inwood Forest Assocs.</u>, 484 U.S. 365
(1988) ("<u>Timbers U.S.</u>"); <u>see also</u> <u>In re Cason</u>, 190 B.R. 917, 928 (Bankr. N.D. Ala. 1995)
("Adequate protection protects Fifth Amendment property rights and replaces the secured
creditor's right of possession." (citing <u>United States v. Whiting Pools, Inc.</u>, 462 U.S. 198, 207
(1983)).  Adequate protection is not intended to compensate a secured creditor for lost
opportunity costs resulting from its inability to foreclose upon and liquidate its collateral.
<u>Timbers U.S.</u>, 484 U.S. at 370-371 (rejecting argument that the "interest in property" entitled to

---

[9]     A residence, of course, is an entirely different animal than a residential mortgage loan—the former is a
fixed, non-income generating real property asset, while the latter is an income-producing debt instrument that is
*secured* by a fixed real property asset.

[10]     While cash-flow value of income-producing real property may be an appropriate metric of "value" for
adequate protection purposes, this value (unlike the cash-flow value of a residential mortgage loan) will be heavily
dependent on the debtor's management acumen and prospects for reorganization, which often drive the outcome in
single-asset real estate cases.  The Warehouse Loans, by way of contrast, are "managed" by a third-party servicer
completely independent of who owns them.

[11]     Like income-producing real property, the cash-flow value of plant and equipment depends heavily on who
owns and manages them.  In addition, under certain circumstances, market value may be a better metric of the
"value" of plant and equipment for adequate protection purposes.  Inventory is generally valued at market value, and
may be subject to risks of seasonality, obsolescence, and/or deterioration that have little in common with the risks
inherent in the Warehouse Loans.

                    

adequate protection "also includes the secured party's right (suspended by the stay) to take immediate possession of the defaulted security, and apply it in payment of the debt"). Rather, the purpose of adequate protection is to *preserve* the secured creditor's collateral position against diminution during the pendency of the automatic stay. Timbers Cir., 793 F.2d at 1389 (5th Cir. 1986) ("Our examination of the language of the adequate protection provisions suggests that they were intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay.").

Evaluating the nature and characteristics of the Warehouse Loans in light of the purposes of adequate protection, it is clear that the Warehouse Loans' actual cash-flow value is the "value" entitled to adequate protection under § 362(d)(1) of the Bankruptcy Code.

1.   *The actual cash-flow value of the Warehouse Loans was fixed upon their origination and neither increases nor decreases over time*

By definition, the actual cash-flow value of a residential mortgage loan—i.e., the cash-flow value one would assign to the loan given perfect knowledge of the amount and timing of the future payments—is fixed as of the moment the loan is originated and neither increases nor decreases over time (except insofar as it decreases in proportion to the income thrown off). That is to say, once the extension of credit is made to the borrower, the loan is a *fait accompli*, and all future risks of nonpayment are built into the loan. As with any true "debt" instrument, the lender's potential upside benefit is capped at the amount of the interest borne by the loan. In practice, this interest rate may or may not be sufficient to compensate the lender for the "true" risk of nonpayment embedded in the loan.[12] In any event, once the loan is originated, it cannot be un-originated, and all the lender and any subsequent holder of the loan can really do to

maximize the return on their investment is to engage a servicer (or perform servicing itself) who will ensure that every payment that can be collected from the borrower under the circumstances (such as they may be at any given time) is in fact collected.

Beyond servicing, there is nothing a holder of a loan can do or not do that will affect the actual cash-flow value of the loan. And while the market's *perception of the risk* associated with the loan will change over time in response to changing conditions, which will have an obvious effect on the projected cash-flow value and the market value of the loan, the *actual risk* associated with the loan (and thus, its actual cash-flow value), is what it is. It is therefore somewhat misleading to characterize the volatility in the projected cash-flow values and market values of residential mortgage loans as increasing or decreasing the "value" of the loans in some absolute sense of the word. In reality, the market is simply "re-pricing" the risk premium previously assigned to those loans, to more closely approximate the risk premium that, in a perfectly efficient market, would have been assigned to the loans (and reflected in their interest rate) when they were originated.

## 2. *The actual cash-flow value of the Warehouse Loans is the appropriate metric of "value" for adequate protection purposes*

Insofar as the purpose of adequate protection is to preserve—and not to improve—the secured creditor's collateral position during the pendency of the bankruptcy case, it follows that the actual cash-flow value of the Warehouse Loans is the "value" protected by § 362(d)(1) of the Bankruptcy Code. That the actual cash-flow value is discernible only in hindsight is perfectly consistent with § 507(b) of the Bankruptcy Code, which employs a backward-looking test for determining the amount (if any) of a secured creditor's super-priority

---

[12]     <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465, 488 n.3 (Thomas, J., concurring) (2004) (noting that, "in an efficient market, th[e true] risk [of default] has been (or will be) built into the interest rate of the original loan").

claim resulting from adequate protection that turned out to be inadequate. Moreover, as discussed below, the ability to provide the "indubitable equivalent" of the actual cash-flow value of residential mortgage loans—i.e., by ensuring the loans are properly serviced and remitting the income stream generated from the loans into a collateral account for the benefit of the secured creditor—makes it possible to grant adequate protection prospectively without having to engage the services of an omniscient appraiser to establish the actual cash-flow value as of the date of the adequate protection demand. That the actual cash-flow value of the Warehouse Loans is the appropriate metric of "value" for adequate protection purposes is further demonstrated in light of the consequences of tying adequate protection to projected cash-flow value or market value.

Adopting projected cash-flow value would impose significant evidentiary burdens on the parties and the Court, as it would require consideration of expert valuation testimony in order to establish a baseline for determining whether, and to what extent, the "value" of the Warehouse Loans would decline in the future. After hearing this evidence, the Court could establish a baseline "value" and, perhaps, an amount of any periodic cash payments the Debtors would be required to make in order to continue to hold the Warehouse Loans. However, if the actual cash-flow value going forward turned out to be higher than the projected cash-flow value established at the valuation hearing, JPM's collateral position would have actually *improved* as a result of the putative "adequate protection" payments. And if the actual cash-flow value going forward turned out to be *lower* than the projected cash-flow value, JPM would no doubt be back in Court demanding additional cash to cover this shortfall. However, this would essentially reward under-pricing the risk associated with the Warehouse Loans, insofar as a *better, more accurate valuation* at the initial hearing would have foreseen the amount of this additional decline, and therefore would have produced a lower projected cash-flow value. The result,

again, is that JPM's collateral position is *improved* by the amount of any putative "adequate protection" payments that were keyed to the overly inflated projected cash-flow value.

Tying adequate protection to projected cash-flow value would similarly reward JPM's under-pricing of its own collateral risk (in the warehouse credit agreement) by forcing the Debtors' bankruptcy estates to act as *de facto* mortgage insurers for the benefit of JPM. In an efficient market, the "true" risk of default would have been built into the interest rate charged to the borrower under each of the Warehouse Loans constituting JPM's collateral, and the projected cash-flow value and actual cash-flow value would be one in the same.

Because market value is in part a function of projected cash-flow value, keying adequate protection to market value would present many of the same problems. In addition, the secondary mortgage market is operating inefficiently at the moment, due to supply- *and* demand-side shocks that have driven market prices down below projected cash-flow values for many types of mortgage assets. In light of the market's inefficiency, tying adequate protection to market value as opposed to cash-flow value would lead to anomalous results.

**B.    By Receiving All Income Generated by the Warehouse Loans JPM is Realizing the "Indubitable Equivalent" of its Lien**

Under Section 361(3) of the Bankruptcy Code, the Court may provide JPM adequate protection by "granting such other relief . . . as will result in the realization by [JPM] of the indubitable equivalent of [its lien] in [the Warehouse Loans]." 11 U.S.C. § 361(3). The term "indubitable equivalent" derives from Judge Learned Hand's observation, in <u>In re Murel Holding Corp.</u>, 75 F.2d 941 (2d Cir. 1935), that

> [i]t is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; *he wishes to get his money or at least the property.* We see no reason to suppose that the statute was

> intended to deprive him of that in the interest of junior holders, unless by *a*
> *substitute of the most indubitable equivalence.*

Id. at 942.  There is precious little case law construing the "indubitable equivalence" standard.

However, in the case of the Warehouse Loans, it is possible to give JPM *both* "its money" (i.e.,

payment up to the amount of its allowed secured claim) *and* "the property" (i.e., the cash flow

from the Warehouse Loans), so long as the proceeds of the Warehouse Loans continue to be

deposited into segregated accounts for the benefit of JPM.  Because the actual cash-flow value of

the Warehouse Loans is their "value" for adequate protection purposes, and because the actual

cash-flow value of the Warehouse Loans and the future income stream from those loans are

economic equivalents, the Debtors submit that JPM is already receiving the ultimate form of

adequate protection insofar as it is receiving "the value" of the Warehouse Loans—in other

words, it is already receiving the "indubitable equivalent" of its lien.

It appears from the Motion that JPM wishes to (or at least, to have the right to)

sell its right to the future income stream from the Warehouse Loans at a discount, no doubt so it

can utilize the proceeds for other purposes.  However, a secured creditor's interest in liquidating

its collateral and reinvesting the proceeds elsewhere (i.e., making up for lost opportunity cost),

while understandable, is not entitled to adequate protection under §§ 362(d)(1) and 361 of the

Bankruptcy Code.  Timbers U.S., 484 U.S. at 370-371 (rejecting argument that the "interest in

property" entitled to adequate protection "also includes the secured party's right (suspended by

the stay) to take immediate possession of the defaulted security, and apply it in payment of the

debt").  Because JPM is currently realizing the indubitable equivalent of its lien in the

Warehouse Loans, the Debtors (and the plan trustee, as successor to the Debtors)[13] should be

---

[13]   While JPM bemoans its treatment in the Debtors' proposed liquidating plan, the Debtors note that JPM will
continue to receive the "indubitable equivalent" of its lien in the Warehouse Loans insofar as it will continue to
receive the income stream from those loans.  Contrary to JPM's assertion in its objection to the disclosure statement,

permitted to sell or hold the Warehouse Loans as they see fit, in the exercise of their business

judgment and in accordance with their fiduciary obligations to creditors, both of which require

the Debtors to try and pay off as much of JPM's claim as possible.

## RESERVATION OF RIGHTS

The Debtors reserve the right to amend, modify, or supplement this Objection

based upon information obtained from JPM in discovery or otherwise, or as a result of

subsequent developments.  If the Court is inclined to grant the Motion, the Debtors reserve the

right to request that the Court condition any stay relief on JPM providing the estate with

information and certain other protections.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court deny

the relief requested in the Motion.

Dated: September 30, 2008
     Wilmington, Delaware

            YOUNG CONAWAY STARGATT & TAYLOR, LLP

            James L. Patton, Jr. (No. 2202)
            Robert S. Brady (No. 2847)
            Sean M. Beach (No. 4070)
            Margaret B. Whiteman (No. 4652)
            Patrick A. Jackson (No. 4976)
            The Brandywine Building
            1000 West Street, 17th Floor
            Wilmington, Delaware 19801
            Telephone: (302) 571-6600
            Facsimile: (302) 571-1253

            Counsel for Debtors and
            Debtors in Possession

---

JPM is not entitled to the indubitable equivalent of payment in full, in cash on the effective date of the plan—rather, it is entitled to the indubitable equivalent of its *lien*, which it will receive.