# BLACKLINE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ------------------------------------------------------ x | Hon. Christopher S. Sontchi | |
|  | : | Chapter 11 |
| In re: | : | |
|  | : | Case No. 07-11047 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC. | : | Case No. 07-11048 |
| AMERICAN HOME MORTGAGE INVESTMENT CORP. | : | Case No. 07-11049 |
| AMERICAN HOME MORTGAGE ACCEPTANCE, INC. | : | Case No. 07-11050 |
| AHM SV, INC. (f/k/a American Home Mortgage Servicing, Inc.) | : | Case No. 07-11051 |
| AMERICAN HOME MORTGAGE CORP. | : | Case No. 07-11052 |
| AMERICAN HOME MORTGAGE VENTURES LLC | : | Case No. 07-11053 |
| HOMEGATE SETTLEMENT SERVICES, INC. | : | Case No. 07-11054 |
| GREAT OAK ABSTRACT CORP. | : | |
|  | : | Jointly Administered |
| Debtors.[1] | : | |
| ------------------------------------------------------ x | | |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS DATED AS OF AUGUST 15,SEPTEMBER 30, 2008

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for the Debtors and Debtors in Possession

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc., a Delaware corporation (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

066585.1001

PLEASE NOTE THAT THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE UNDER SECTION 1125 OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.

# TABLE OF CONTENTS

Page No.

...........1

I.    INTRODUCTION ...................................................................................4

    A.    Disclosure Statement Enclosures...................................................4

    B.    Overview of the Plan ............................................................9~~11~~

    C.    Recommendation ...............................................................9~~11~~

II.   ELIGIBILITY TO VOTE...........................................................13~~15~~

III.  BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES ...........13~~15~~

    A.    The Debtors' Corporate Structure...............................................13~~15~~

        1.    AHM Investment and its Direct Subsidiaries .......................14~~16~~

        2.    AHM Holdings and its Direct Subsidiaries ..........................14~~16~~

        3.    AHM Acceptance and its Direct Subsidiaries .......................14~~16~~

        4.    AHM SV and its Direct Subsidiaries ..................................14~~16~~

        5.    AHM Corp. and its Direct Subsidiaries ...............................14~~16~~

        6.    AHM Ventures...............................................................15~~17~~

        7.    Homegate ....................................................................15~~17~~

        8.    Great Oak ....................................................................15~~17~~

    B.    Overview of the Debtors' Businesses ...........................................16~~18~~

    C.    The Debtors' Business Segments.................................................16~~18~~

        1.    Loan Origination...........................................................17~~19~~

        2.    Hedging Activities .........................................................18~~20~~

        3.    Loan Sales and Securitizations ........................................18~~20~~

        4.    Loan Servicing .............................................................19~~21~~

    D.    Principal Indebtedness of the Debtors .........................................20~~22~~

    E.    Properties ............................................................................20~~22~~

    F.    Events Leading to the Debtors' Chapter 11 Filings..........................21~~23~~

    G.    The Chapter 11 Cases .............................................................22~~24~~

        1.    Debtor in Possession Status .............................................22~~24~~

        2.    Entry of the Debtors' First Day Orders................................22~~24~~

        3.    Debtor in Possession Financing and Use of Cash Collateral...............22~~24~~

        4.    Appointment of the Committee .........................................24~~26~~

        5.    Retention of Professionals ...............................................24~~26~~

i

066585.1001

6.    Executive Incentive Plan.................................................................. 2527

7.    Contested Turnover/Stay Relief Motions Early
      in the Chapter 11 Cases................................................................. 2628

      a.    *CSFB Motion for TRO* ........................................................ 28

      b.    *Morgan Stanley Motion for Injunctive Relief* ....................... 29

      c.    *DB Structured Stay Relief Motion* ....................................... 29

      d.    *Ginnie Mae Turnover Motion* ............................................. 30

      e.    *Bear Stearns and Calyon Adversary Proceedings* .............. 30

      f.    *Freddie Mac Stay Relief Motion* ....................................... 30

8.    Asset Sales ................................................................................ 2831

      a.    *Sale of the Debtors' Servicing Business* ............................. 31

      b.    *Broadhollow/Melville Loan Auction and Sale* ..................... 33

      c.    *Sale to Indymac Bank F.S.B.* ............................................ 34

      d.    *Encumbered Non-Performing Loan Sales* ........................... 34

      e.    *Compromise of Construction Loans* ................................... 35

      f.    *Unencumbered Non-Performing Loan Sale* ......................... 36

      g.    *Performing Loan Sale* ..................................................... 37

9.    Schedules and Statements of Financial Affairs;
      Claims Bar Dates and Aggregate Claims Asserted.......................... 3537

10.   Return of Mortgage Loan Files and Destruction of
      Duplicate Mortgage Files............................................................. 3639

11.   Rejection of Leases and Executory Contracts ................................ 3740

12.   Extensions of Exclusivity ............................................................ 3840

13.   Litigation................................................................................... 3841

      a.    *Waterfield Litigation* ...................................................... 41

      b.    *American Home Mortgage Securities Litigation* ................. 44

      c.    *WARN Act Adversary Proceeding* ..................................... 45

      d.    *Morgan Stanley Adversary Proceeding* ............................. 46

      e.    *CSFB, Bear Stearns and Calyon Adversary Proceedings* ..... 46

      f.    *Waldner's Adversary Proceeding* ...................................... 46

      g.    *Bank of America, N.A. Adversary Proceeding* .................... 47

      h.    *Lehman Adversary Proceeding* ......................................... 47

      i.    *Wells Fargo Adversary Proceeding* .................................... 47

066585.1001

    i. *Triad Adversary Proceeding*.................................................48

  14. Wells Fargo Stay Relief Litigation ........................................ 42~~48~~

  15. Bank of America Stay Relief Litigation ................................... 43~~48~~

  16. Committee and Bank of America 9019 Motion............................ 44~~49~~

  17. The Purchaser's Administrative Expense Request ........................ 44~~51~~

  18. Bank of America Global 9019 Motion .................................... 45~~52~~

  19. Calyon Settlements ..................................................... 45~~52~~

  20. JPM Stay Relief Litigation.............................................52

  21. Objections to Claims...................................................46~~52~~

  ~~21.~~22. Miscellaneous Contested Matters ...................................... 46~~53~~

IV. PROPOSED INTERCOMPANY RESOLUTION EMBODIED IN THE PLAN..........47~~53~~

 A. General Structure of the Plan............................................49~~55~~

 B. Settlement of Intercompany Claims.......................................51~~60~~

 C. The Stipulated Asset Allocation .........................................54~~65~~

V. THE PLAN ..................................................................55~~65~~

 A. Classification of Claims and Interests....................................59~~69~~

 B. Treatment of Claims and Interests .......................................59~~70~~

  1. DIP Facility Claims....................................................59~~70~~

  2. Administrative Claims .................................................59~~70~~

   a. *General Administrative Bar Date* ...................................70

   b. *Professional Claim Bar Date* ......................................71

  3. Statutory Fees........................................................61~~71~~

  4. Priority Tax Claims...................................................61~~72~~

  5. Other Priority Claims ................................................62~~72~~

  6. Miscellaneous Secured Claims .........................................63~~73~~

  7. BofA Syndicate Secured Claim .........................................63~~74~~

  8. PNB Secured Claim ...................................................63~~74~~

  9. Travelers Secured Claim...............................................64~~74~~

  10. JPM Secured Claim....................................................64~~74~~

  11. Unsecured Claims Other than the BofA Syndicate
Unsecured Claim ~~66~~ and Subordinated Trust Preferred Claims.............76

  12. ~~Other~~BofA Syndicate Unsecured ~~Claims~~............................66 Claim
.........................................................................77

iii

13.    Subordinated Trust Preferred Claims; 77
14.    Other Subordinated Claims; and Interests ........................................... 6680

C.    Acceptance or Rejection of the Plan; Nonconsensual Confirmation................6681
    1.    Impaired Classes Entitled to Vote.....................................................6781
    2.    Non-Consensual Confirmation .......................................................6781
D.    Settlement of Intercompany Claims; Stipulated Asset Allocation ...................6882
E.    Estimation and Allowance of EPD/Breach Claims ...........................................6882
    1.    EPD Claims...........................................................................6983
        a.    Loss Frequency ..............................................................84
        b.    Loss Severity .................................................................84
        c.    Allowance of Unliquidated EPD Claims ...........................85
        d.    Allowance of Liquidated EPD Claims ...............................85
    2.    Breach of Warranty Claims .......................................................6986
        a.    Incidence of Breach ........................................................86
        b.    Loss Frequency and Loss Severity ...................................88
        c.    Allowance of Breach of Warranty Claims .........................88
    3.    Interaction Between EPD Claims and Breach of Warranty Claims. ....7189
    4.    EPD/Breach Claims Questionnaire......................................................7289
F.    Means of Implementing the Plan ..................................................................7289
    1.    Corporate Action; Dissolution of Debtors ......................................7289
    2.    Dissolution of the Committee .....................................................7290
    3.    The Plan Trust........................................................................91
        a.    The Plan Trustee ..............................................................91
        b.    Liquidation of Plan Trust Assets;
               Responsibilities of Plan Trustee.......................................92
        c.    Valuation of Assets...........................................................94
        d.    Payments by the Plan Trust;
               Investment Powers and Permitted Cash Expenditures .....94
        e.    Reporting Duties ..............................................................95
        f.    Registry of Beneficial Interests; Non-Transferability........95
        g.    Termination......................................................................96
        h.    Purpose of the Plan Trust .................................................96
    4.    Vesting of Assets in Plan Trust; Assumption of Plan Obligations .......7896

iv

066585.1001

5.  Plan Oversight Committee ..................................................................... ~~79~~97
     a.  *Membership* ........................................................................................ 97
     b.  *Rights and Duties* .............................................................................. 98
     c.  *Objection to Fees* .............................................................................. ~~81~~99
6.  Liability; Indemnification ................................................................... ~~81~~100
7.  Retention of Professionals ................................................................. ~~82~~101
8.  Trustee as Successor ......................................................................... ~~83~~101
G.  Distributions under the Plan ............................................................... ~~83~~101
     1.  Timing of Distributions ................................................................ ~~83~~101
          a.  *S/A/P Claims* .................................................................................. 101
          b.  *Interim Distributions on Unsecured Claims* ................................... 101
          c.  *Final Distributions on Unsecured Claims* ...................................... 102
     1.  Final Distributions on Unsecured Claims ........................................ ~~83~~102
     2.  Reserves ..................................................................................... 102
          a.  *Plan Trust Operating Expense Reserve* .......................................... 102
          b.  *S/A/P Claims Reserve* ..................................................................... 102
          c.  *Unsecured Claims Reserves* ........................................................... 103
          Unsecured Claims Reserves ........................................................... ~~85~~104
     3.  Distribution Calculations ............................................................ ~~85~~104
          a.  *Net Distributable Assets and :*
               *BofA Syndicate Net Distributable Assets* ...................................... 104
          b.  *Interim Distributions* ..................................................................... 104
          Interim Distributions ................................................................... ~~86~~104
     4.  Payment in Full of Unsecured Claims ............................................ ~~86~~104
          a.  *Limitation on Distributions on Account of*
               *Allowed Unsecured Claims* ........................................................... 104
          b.  *Payment of Interest on Allowed Unsecured Claims* ....................... 105
          c.  *Payment in Full of Allowed Unsecured Claims*
               *for Which More Than One Debtor is Liable* ................................... 105
               for Which More Than One Debtor is Liable ................................... ~~87~~105
     5.  Manner of Distribution ................................................................ ~~87~~105
     6.  *De Minimis* Distributions ............................................................ ~~87~~105
     7.  Delivery of Distributions; Undeliverable Distributions ..................... ~~87~~106
     8.  Setoffs and Recoupments ............................................................ ~~88~~106
     9.  Distributions in Satisfaction; Allocation ......................................... ~~88~~106
     10. Cancellation of Notes and Instruments .......................................... ~~88~~107
     11. No Interest on Claims .................................................................. ~~88~~107

v

12.    Withholding Taxes ................................................................ 89107

13.    Reports ................................................................................ 89108

H.    Claims Administration; Disputed Claims ................................ 89108

1.    Reservation of Rights to Object to Claims ........................ 89108

2.    Objections to Claims ........................................................ 89108

3.    Service of Objections ........................................................ 90109

4.    Determination of Claims .................................................. 90109

5.    No Distributions Pending Allowance ............................... 90109

6.    Claim Estimation .............................................................. 91110

I.    Rejection of Executory Contracts, Unexpired Leases ............. 91110

a.    *D&O Obligations: Employee Benefit Plans* ............. 110

b.    *Rejection Damages Bar Date* ................................. 111

c.    *Insurance Policies* ................................................. 111

J.    Plan Injunction and Exculpation Provisions ........................ 93 112

K.    Continuation of Existing Injunctions and Stays ................... 112

L.    Exculpation ....................................................................... 113

M.    Binding Effect of the Plan ................................................. 113

N.    Conditions Precedent to Effective Date; Revocation, Withdrawal,
         or Non-Consummation of the Plan ................................... 94114
                                                                                             95115

L.O.    Miscellaneous Provisions .................................................. 95115

1.    Retention of Jurisdiction ................................................ 98118

2.    Final Order .................................................................... 98118

3.    Amendments and Modifications ..................................... 98119

4.    Tax Exemption .............................................................. 99119

5.    Securities Exemption ..................................................... 99119

6.    Non-Severability ........................................................... 99119

7.    Revocation ..................................................................... 99119

8.    Governing Law .............................................................. 99120

9.    Filing of Additional Documents .................................... 100120

M.P.    Cramdown and Bankruptcy Rule 9019 Requests ............... 100120

VI.    CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN ........... 100120

A.    Risk Factors Regarding Bankruptcy Cases ......................... 100120

vi

1.    Allowance of Claims.................................................................. ~~100~~120
2.    Objections to Classification of Claims Pursuant to
      § 1122 of the Bankruptcy Code ........................................ ~~101~~121
3.    Court Modification of Stipulated Asset Allocation or
      Other Elements of Proposed Compromise and
      Settlement of Intercompany Claims................................. ~~101~~121
4.    Valuation Risk ................................................................... ~~101~~121
5.    Risk of Non-Confirmation of the Plan.............................. ~~102~~122
6.    Nonconsensual Confirmation............................................ ~~102~~122
7.    Delays of Confirmation and/or Effective Date ................ ~~102~~122
8.    Plan Trust Operations ....................................................... ~~102~~123
9.    Causes of Action ............................................................... ~~103~~123
B.    Risk Factors Relating to Securities Laws ................................. ~~103~~123
1.    Non-Transferability............................................................ ~~103~~124
2.    Uncertainty of Value.......................................................... ~~104~~124

VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......... ~~104~~124
A.    General.................................................................................... ~~104~~124
B.    United States Federal Income Tax Consequences of Payment of
      Allowed Claims Pursuant to Plan .......................................... ~~105~~125
1.    Recognition of Gain or Loss .............................................. ~~105~~125
      a.    *In General* ............................................................. 125
      b.    *Post-Effective Date Cash Distributions* .................. 125
      c.    *Bad Debt and/or Worthless Securities Deduction* .... 125
2.    Pending Payments............................................................... ~~106~~126
3.    Payments Other than Pending Payments ........................... ~~106~~126
C.    Certain Other Tax Consequences for Holders of Claims............. ~~106~~126
1.    Receipt of Pre-Effective Date Interest .............................. ~~106~~126
2.    Installment Method ........................................................... ~~107~~127
3.    Information Reporting and Withholding ............................ ~~107~~127
D.    Tax Consequences of the Plan to the Debtors .......................... ~~107~~127
E.    Importance of Obtaining Professional Tax Assistance.............. ~~107~~127

VIII.    ALTERNATIVES TO CONFIRMATION OF THE PLAN .................. ~~107~~128

066585.1001

DB02:7418039.1

IX.  ACCEPTANCE AND CONFIRMATION OF THE PLAN;
     VOTING REQUIREMENTS ................................................................. ~~108~~128

     A.   Best Interests Test ...................................................................... ~~110~~130

     B.   Financial Feasibility Test .......................................................... ~~110~~130

     C.   Acceptance by Impaired Classes ............................................... ~~111~~131

     D.   Voting Procedures ...................................................................... ~~111~~131

          1.   Ballots ............................................................................ ~~112~~132

          2.   Deadline for Voting ........................................................ ~~112~~132

          3.   Importance of Your Vote ................................................ 1

X.   RECOMMENDATION AND CONCLUSION ...................................... 1

066585.1001

DB02:7418039.1

## I.    INTRODUCTION

The following debtors (the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on August 6, 2007 (the "Petition Date"), thereby commencing case numbers 07-11047, 07-11048, 07-11049, 07-11050, 07-11051, 07-11052, 07-11053 and 07-11054 (collectively, the "Chapter 11 Cases") currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"):

| DEBTOR | ADDRESS | CASE NO. |
|---|---|---|
| American Home Mortgage Holdings, Inc., a Delaware corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11047 |
| American Home Mortgage Investment Corp., a Maryland corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11048 |
| American Home Mortgage Acceptance, Inc., a Maryland corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11049 |
| AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11050 |
| American Home Mortgage Corp., a New York corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11051 |
| American Home Mortgage Ventures LLC, a Delaware limited liability company | 538 Broadhollow Road Melville, NY 11747 | 07-11052 |
| Homegate Settlement Services, Inc., a New York corporation | 538 Broadhollow Road Melville, NY 11747 | 00-11053 |
| Great Oak Abstract Corp., a New York corporation | 538 Broadhollow Road Melville, NY 11747 | 07-11054 |

Since filing for bankruptcy protection, the Debtors have continued to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107 and 1008 of the Bankruptcy Code. On August 7, 2007, the Bankruptcy Court entered an order authorizing the joint administration of the Chapter 11 Cases under the lead case *In re American Home Mortgage Holdings, Inc.*, Case No. 07-11047 [Docket No. 60].[1]

On August 15, 2008, the Debtors filed their proposed *Chapter 11 Plan of Liquidation of the Debtors* (in such capacity, the "Plan Proponents") *Dated as of August 15, 2008* (the "Original Plan"). On September 30, 2008, the Debtors filed an *Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of September 30, 2008* (as such plan may be amended from time to time, the "Plan"). A copy of the Plan is annexed hereto as Exhibit A. BOTH THE PLAN PROPONENTSORIGINAL PLAN AND THE PLAN ARE THE PRODUCT OF CLOSE COLLABORATION BETWEEN THE DEBTORS, THE OFFICIAL COMMITTEE OF

---

[1] Except as otherwise provided herein, references to docket numbers refer to the docket in the lead case.

DB02:7418039.1

066585.1001

UNSECURED CREDITORS (THE "COMMITTEE"), AND THEIR RESPECTIVE PROFESSIONALS. AS SET FORTH IN THE LETTER FROM THE COMMITTEE'S PROFESSIONALS ACCOMPANYING THIS DISCLOSURE STATEMENT, THE COMMITTEE SUPPORTS THE PLAN AND URGES CREDITORS TO VOTE IN FAVOR OF THE PLAN. THE DEBTORS LIKEWISE URGE CREDITORS TO VOTE IN FAVOR OF THE PLAN.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS ACCEPTANCE OR REJECTION OF THE PLAN.

The information used in preparing this Disclosure Statement was prepared by and is the sole responsibility of the Debtors. This Disclosure Statement does not constitute financial or legal advice. Creditors and interest holders of the Debtors should consult their own advisors if they have questions about the Plan or this Disclosure Statement. Capitalized terms used in this Disclosure Statement and not expressly defined herein have the meaning ascribed to them in the Plan. A reference in this Disclosure Statement to a "Section" refers to a section of this Disclosure Statement.

WHILE THIS DISCLOSURE STATEMENT DESCRIBES CERTAIN BACKGROUND MATTERS AND THE MATERIAL TERMS OF THE PLAN, IT IS INTENDED AS A SUMMARY DOCUMENT ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT. SIMILARLY, DESCRIPTIONS IN THIS DISCLOSURE STATEMENT OF PLEADINGS, ORDERS, AND PROCEEDINGS IN THESE CHAPTER 11 CASES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE RELEVANT DOCKET ITEMS. YOU SHOULD READ THE PLAN AND THE EXHIBITS TO OBTAIN A FULL UNDERSTANDING OF THEIR PROVISIONS. ADDITIONAL COPIES OF THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, AS WELL AS ANY DOCKET ITEMS FROM THESE CHAPTER 11 CASES, ARE AVAILABLE FOR INSPECTION DURING REGULAR BUSINESS HOURS AT THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 5TH FLOOR, 824 MARKET STREET, WILMINGTON, DELAWARE 19801. IN ADDITION, COPIES MAY BE OBTAINED FOR A CHARGE THROUGH DELAWARE DOCUMENT RETRIEVAL, 230 NORTH MARKET STREET, P.O. BOX 27, WILMINGTON, DELAWARE 19801, (302) 658-9971, OR VIEWED ON THE INTERNET AT THE BANKRUPTCY COURT'S WEBSITE (HTTP://WWW.DEB.USCOURTS.GOV/) BY FOLLOWING THE DIRECTIONS FOR ACCESSING THE ECF SYSTEM ON SUCH WEBSITE. COPIES ARE ALSO AVAILABLE FREE OF CHARGE ON EPIQ BANKRUPTCY SOLUTIONS LLC'S DEDICATED WEB PAGE RELATED TO THESE CASES (HTTP://CHAPTER11.EPIQSYSTEMS.COM – CLICK ON "AMERICAN HOME MORTGAGE").

2

066585.1001

THE STATEMENTS AND INFORMATION CONCERNING THE DEBTORS AND THE PLAN SET FORTH IN THIS DISCLOSURE STATEMENT CONSTITUTE THE ONLY STATEMENTS OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED. THE DEBTORS ASSUME NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DO NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES, EXCEPT TO THE EXTENT, IF ANY, NECESSARY AT THE HEARING ON CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS, INCLUDING THOSE ESTIMATES OF THE CASH THAT WILL BE AVAILABLE FOR DISTRIBUTION TO THE HOLDERS OF CLAIMS, ESTIMATES OF THE PERCENTAGE RECOVERY OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE AGGREGATE FINAL ALLOWED AMOUNTS OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE PROCEEDS FROM THE SALE, LIQUIDATION, OR OTHER DISPOSITION OF THE DEBTORS' REMAINING ASSETS AND ESTIMATES OF THE EXPENSES THAT WILL BE INCURRED BY THE PLAN TRUST DURING THE WIND-DOWN PERIOD. THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN HEREIN, POSSIBLY BY MATERIAL AMOUNTS.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT. PURSUANT TO THE PLAN, ANY SECURITIES ISSUED TO ANY PARTY UNDER, PURSUANT TO, OR IN EFFECTUATING THE PLAN, AND THE OFFERING AND INSURANCE THEREOF BY ANY PARTY, ARE EXEMPT FROM SECTION 5 OF THE SECURITIES ACT OF 1933, IF APPLICABLE, AND FROM ANY STATE OR FEDERAL SECURITIES LAWS REQUIRING REGISTRATION FOR THE OFFER OR SALE OF A SECURITY OR REGISTRATION OR LICENSING OF AN ISSUER OR UNDERWRITER OF, OR BROKER OR DEALER

DB02:7418039.1

066585.1001

IN, A SECURITY, AND OTHERWISE ENJOY ALL EXEMPTIONS AVAILABLE FOR DISTRIBUTIONS OF SECURITIES UNDER A PLAN IN ACCORDANCE WITH ALL APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, SECTION 1145 OF THE BANKRUPTCY CODE.

### A.   Disclosure Statement Enclosures

Accompanying this Disclosure Statement are:

- A copy of the Plan (Exhibit A)

- A copy of the Order approving the Disclosure Statement entered October [ _____], 2008 (Exhibit B);

- An analysis of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code (Exhibit C);

- A letter from the Committee's professionals in support of the Plan;

- A ballot for acceptance or rejection of the Plan for Holders of Impaired Claims entitled to vote to accept or reject the Plan (the "Ballot"); and

- A notice setting forth: (i) the deadline for casting ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "Notice").

### B.   Overview of the Plan

The following is a brief overview of the Plan, which is qualified in its entirety by reference to the Plan, attached as Exhibit A to this Disclosure Statement.

Under the Plan, a single liquidating trust will be established for the benefit of Creditors of the Debtors, which Plan Trust will succeed to all Assets of each Debtor (including, but not limited to, all Causes of Action). The Plan Trustee will, among other things, liquidate the non-Cash Assets transferred to the Plan Trust (including the prosecution of any Causes of Action), reconcile all Claims against the Debtors, make distributions to Holders of Allowed Claims against each Debtor as provided in the Plan, and otherwise wind down the Chapter 11 Cases and the Debtors' Estates.

The Plan designates a series of Classes of Claims and Interests for each Debtor. These Classes take into account the differing nature of the various Claims and Interests, as well as their relative priority under the Bankruptcy Code.

The following table (the "Plan Summary Table") summarizes the classification and treatment of Claims and Interests under the Plan (including certain unclassified Claims), as well as the Debtors' estimate of the percentage recovery for Holders of Claims and Interests in each

4

Class.    **THE PLAN SUMMARY TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND DOES NOT ADDRESS ALL ISSUES REGARDING CLASSIFICATION, TREATMENT, AND ULTIMATE RECOVERIES.  THE PLAN SUMMARY TABLE IS NOT A SUBSTITUTE FOR A FULL REVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN (ATTACHED HERETO AS EXHIBIT A) IN THEIR ENTIRETY.**

The percentage recovery for each Class set forth in the Plan Summary Table is based on the Debtors' good-faith estimate, based on all information currently known, of (i) the amount of Claims against each Debtor that will ultimately be Allowed[2] and (ii) the amount of Cash that will be available in each Estate for distribution to Holders of Allowed Claims after liquidation of all Plan Trust Assets by the Plan Trustee.[3]  The actual amounts of Allowed Claims against each Debtor and Cash available for distribution to Creditors of each Estate could vary materially from the Debtors' estimates, and the actual percentage recoveries for Creditors will necessarily depend upon the actual amounts of Allowed Claims, Cash realized from the liquidation of non-litigation assets, Cash realized from prosecuting Causes of Action, and expenses of the Plan Trust.

For the foregoing reasons, no representation can be, or is being, made with respect to whether the percentage recoveries set forth in the Plan Summary Table will be realized by the Holders of Allowed Claims against the respective Debtors.  **THERE IS NO GUARANTEED RECOVERY AND THERE ARE NO GUARANTEED AMOUNTS OF RECOVERY FOR ANY HOLDER OF A CLAIM OR INTEREST.**

In addition, the Plan provides for the establishment of Disputed Claims Reserves for the benefit of Holders of Disputed Claims.  Interim distributions of Cash on Allowed Claims of a given Class may be made from time to time, with sufficient Cash held in reserve to cover the Disputed Claims of such Class pending allowance or disallowance of such Disputed Claims.  As a result, the process of distributing all Cash to be distributed to Holders of Allowed Claims under the Plan will be completed over time.

---

[2]  Estimated amounts of Allowed Claims do not constitute an admission by the Debtors or any other party as to the validity or amount of any particular Claim.  The Plan ProponentsDebtors, on behalf of themselves, the Plan Trustee, and the Plan Oversight Committee, reserve the right to dispute the validity or amount of any Claim that has not already been Allowed by Order of the Bankruptcy Court or by agreement of the parties.

[3]  For purposes of the Plan Summary Table, estimated Cash excludes any recoveries that may be realized by the Plan Trustee from prosecuting Causes of Action.

066585.1001

DB02:7418039.1

| Summary of Classification and Treatment of Claims and Interests under the Plan | | | |
|---|---|---|---|
| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4] | ESTIMATED % RECOVERY |
| n/a | DIP Facility Claims | Paid in full in Cash (or in a manner otherwise permitted or required pursuant to the terms of the DIP Facility and the DIP Loan Agreement). | 100% |
| n/a | Administrative Claims against all Debtors | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium. | 100% |
| n/a | Priority Tax Claims against all Debtors | Paid in Cash equal to the Allowed Amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of every ~~calendar year~~fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus ~~simple~~ interest on any outstanding balance, calculated from the Effective Date at ~~the interest rate available on ninety (90)-day United States Treasuries on the Effective Date~~a rate to be determined pursuant to section 511 of the Bankruptcy Code. | 100% |
| 1A, 2A, 3A, 4A, 5A, 6A, 7A, and 8A | Priority Claims against all Debtors | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium. | 100% |
| 1B(1) *et seq.*, 2B(1)(a) *et seq.*, 3B(1)(a) *et seq.*, 4B(1)(a) *et seq.*, 5B(1)(a) *et seq.*, 6B(1) *et seq.*, 7B(1) *et seq.*, and 8B(1) *et seq.* | Miscellaneous Secured Claims against all Debtors | At the option of the Plan Trustee: (a) reinstated in full, leaving unaffected the Holder of such Claim's legal, equitable, and/or contractual rights, (b) paid in Cash up to the Allowed amount of such Claim, (c) satisfied in whole or in part by the transfer of all or any portion of the Assets securing such Claim, (d) paid in deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of the Claim that is not otherwise satisfied as of the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing the Claim, or | 100% |

---

[4]  The treatment of any Allowed Claim within a Class is subject to any agreement between the Holder of such Allowed Claim and the Debtors (if before the Effective Date) or the Plan Trustee (if after the Effective Date) which provides treatment of such Allowed Claim on terms no less favorable to the Debtors than the treatment provided in the Plan.

6

066585.1001

DB02:7418039.1

| Summary of Classification and Treatment of Claims and Interests under the Plan | | | |
|---|---|---|---|
| **CLASS(ES)** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4]** | **ESTIMATED % RECOVERY** |
| | | (e) such other treatment as would provide the "indubitable equivalent" of the Allowed Claim | |
| 2B(2), 3B(2), 4B(2) and 5B(3) | BofA Syndicate Secured Claim against AHM Investment, AHM Acceptance, AHM SV, and AHM Corp. | Treated in accordance with the BofA Global Settlement Stipulation | 100% |
| 5B(2) | PNB Secured Claim against AHM Corp. | At the option of the Plan Trustee: (a) reinstated in full, leaving unaffected the Holder of such Claim's legal, equitable, and/or contractual rights, (b) paid in Cash up to the Allowed amount of such Claim, (c) satisfied in whole or in part by the transfer of all or any portion of the Assets securing such Claim, (d) paid in deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of the Claim that is not otherwise satisfied as of the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing the Claim, or (e) such other treatment as would provide the "indubitable equivalent" of the Allowed Claim | 100% |
| 3B(4~~3~~), 4B(3), and 5B(5) | Travelers Secured Claim against AHM Acceptance, AHM SV, and AHM Corp. | Treated in accordance with the Travelers Stipulation | 100% |
| ~~3~~2B(3) and 5B(4) | JPM Secured Claim against AHM ~~Acceptance~~Investment and AHM Corp. | At the option of the Plan Trustee, (a) paid in Cash up to the Allowed amount of such Claim, (b) paid up to the Allowed amount of such Claim from the proceeds from the sale or other disposition of all or any portion of the Assets securing the Allowed Claim, after deducting the reasonable, necessary costs and expenses of preserving and disposing of such Assets; (c) satisfied in full or in part by the return of all or any portion of the Assets securing such Allowed JPM Secured Claim; (d) satisfied in full or in part by execution of the JPM Plan Note, as described more particularly in the Plan, or (e) such other treatment as will provide the "indubitable equivalent" of the Allowed Claim. | 100% |

7

066585.1001

| Summary of Classification and Treatment of Claims and Interests under the Plan | | | |
|---|---|---|---|
| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4] | ESTIMATED % RECOVERY |
| 1C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim and Subordinated Trust Preferred Claims) against AHM Holdings | Paid a Pro Rata share of the Net Distributable Assets of the AHM Holdings Estate | 5.86%[5] |
| 2C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim and Subordinated Trust Preferred Claims) against AHM Investment | Paid a Pro Rata share of the Net Distributable Assets of the AHM Investment Estate | 0.83%[6] |
| 3C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim) against AHM Acceptance | Paid a Pro Rata share of the Net Distributable Assets of the AHM Acceptance Estate | 0.72% |
| 4C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim) against AHM SV | Paid a Pro Rata share of the Net Distributable Assets of the AHM SV Estate | 0.11% |
| 5C(1) | Unsecured Claims (other than the BofA Syndicate Unsecured Claim) against | Paid a Pro Rata share of the Net Distributable Assets of the AHM Corp. | 1.06% |

[5] Estimated recovery percentage assumes all Allowed Unsecured Claims against AHM Holdings constitute Senior Unsecured Claims entitled to the benefits of subordination under the Subordinated Trust Preferred Indentures. To the extent any Allowed Unsecured Claim against AHM Holdings is not a Senior Unsecured Claim: (i) the Holder of such Claim may recover less than the amount reflected in this table, because such Holder will not be entitled to receive any portion of the distributions made on account of Allowed Subordinated Trust Preferred Claims against AHM Holdings pursuant to the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan; and (ii) the Holders of Senior Unsecured Claims against AHM Holdings may recover more than the amount reflected in this table because such Holders will be entitled to a Pro Rata share of distributions made on account of Allowed Subordinated Trust Preferred Claims against AHM Holdings pursuant to the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan.

[6] Estimated recovery percentage assumes all Allowed Unsecured Claims against AHM Investment constitute Senior Unsecured Claims entitled to the benefits of subordination under the Subordinated Trust Preferred Indentures. To the extent any Allowed Unsecured Claim against AHM Investment is not a Senior Unsecured Claim: (i) the Holder of such Claim may recover less than the amount reflected in this table, because such Holder will not be entitled to receive any portion of the distributions made on account of Allowed Subordinated Trust Preferred Claims against AHM Investment pursuant to the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan; and (ii) the Holders of Senior Unsecured Claims against AHM Investment may recover more than the amount reflected in this table because such Holders will be entitled to a Pro Rata share of distributions made on account of Allowed Subordinated Trust Preferred Claims against AHM Investment pursuant to the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan.

066585.1001

DB02:7418039.1

| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4] | ESTIMATED % RECOVERY |
|---|---|---|---|
| Summary of Classification and Treatment of Claims and Interests under the Plan | | | |
| | AHM Corp. | Estate | 2.22% |
| 6C | Unsecured Claims against AHM Ventures | Paid a Pro Rata share of the Net Distributable Assets of the AHM Ventures Estate | |
| 7C | Unsecured Claims against Homegate | Paid a Pro Rata share of the Net Distributable Assets of the Homegate Estate | 0.75% |
| 8C | Unsecured Claims against Great Oak | Paid a Pro Rata share of the Net Distributable Assets of the Great Oak Estate | 1.77% |
| 1C(2) | BofA Syndicate Unsecured Claim against AHM Holdings | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Holdings Estate | 5.53%[7] |
| 2C(2) | BofA Syndicate Unsecured Claim against AHM Investment | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Investment Estate | 0.51%[8] |
| 3C(2) | BofA Syndicate Unsecured Claim against AHM Acceptance | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Acceptance Estate | 0.39% |
| 4C(2) | BofA Syndicate Unsecured Claim against AHM SV | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of | 0% |

---

[7]  Estimated recovery percentage assumes all Allowed Unsecured Claims against AHM Holdings constitute Senior Unsecured Claims entitled to the benefits of subordination under the Subordinated Trust Preferred Indentures.  To the extent any Allowed Unsecured Claim against AHM Holdings is not a Senior Unsecured Claim, the Holder(s) of the Allowed BofA Syndicate Unsecured Claim(s) against AHM Holdings may recover more than the amount reflected in this table because such Holder(s) will be entitled to a Pro Rata share of distributions made on account of Allowed Subordinated Trust Preferred Claims against AHM Holdings pursuant to the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan.

[8]  Estimated recovery percentage assumes all Allowed Unsecured Claims against AHM Investment constitute Senior Unsecured Claims entitled to the benefits of subordination under the Subordinated Trust Preferred Indentures.  To the extent any Allowed Unsecured Claim against AHM Investment is not a Senior Unsecured Claim, the Holder(s) of the Allowed BofA Syndicate Unsecured Claim(s) against AHM Investment may recover more than the amount reflected in this table because such Holder(s) will be entitled to a Pro Rata share of distributions made on account of Allowed Subordinated Trust Preferred Claims against AHM Investment pursuant to the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan.

9

066585.1001

| | | | |
|---|---|---|---|
| **Summary of Classification and Treatment of Claims and Interests under the Plan** | | | |
| **CLASS(ES)** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS**[4] | **ESTIMATED % RECOVERY** |
| | | the AHM SV Estate | 0.74% |
| 5C(2) | BofA Syndicate Unsecured Claim against AHM Corp. | Subject to all provisions of the BofA Global Settlement Stipulation and BofA/Committee Stipulation, paid a Pro Rata share of the BofA Syndicate Net Distributable Assets of the AHM Corp. Estate | |
| 1~~D~~C(3) and 2~~D~~C(3) | Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment | ~~Holders of such~~Paid a Pro Rata share of the Net Distributable Assets of the AHM Holdings and AHM Investment Estates, respectively, subject to the Senior Unsecured Claims ~~will neither retain nor receive any property on account of such Claims~~Procedure | 0%[9] |
| 1~~E~~D, 2~~E~~D, 3D, 4D, 5D, 6D, 7D, and 8D | Subordinated Claims against all Debtors | Holders of such Claims will neither retain nor receive any property on account of such Claims | 0% |
| 1~~F~~E, 2~~F~~E, 3E, 4E, 5E, 6E, 7E, and 8E | Interests in all Debtors | Holders of such Interests will neither retain nor receive any property on account of such Interests | 0% |

THE TREATMENT AND DISTRIBUTIONS, IF ANY, PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS PURSUANT TO THE PLAN WILL BE IN FULL AND COMPLETE SATISFACTION OF ALL LEGAL, EQUITABLE, OR CONTRACTUAL RIGHTS REPRESENTED BY SUCH ALLOWED CLAIMS AND INTERESTS.

C.    Recommendation

THE ~~PLAN PROPONENTS~~DEBTORS RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ON THE PLAN CAST THEIR BALLOTS TO ACCEPT THE PLAN. THE ~~PLAN PROPONENTS~~DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS.

---

[9]  Recovery estimate based on assumption that distributions made on account of Subordinated Trust Preferred Claims will be paid over to Holders of Senior Unsecured Claims pursuant to the Senior Unsecured Claims Procedure.

10

## II.    ELIGIBILITY TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and therefore, such holders do not need to vote on the Plan.

The Claims in the Classes listed in the following table are unimpaired and conclusively presumed to have accepted the Plan:

| Class | Description |
|---|---|
| Class 1A | Priority Claims against AHM Holdings |
| Class 2A | Priority Claims against AHM Investment |
| Class 3A | Priority Claims against AHM Acceptance |
| Class 3B(43) | Travelers Secured Claim against AHM Acceptance |
| Class 4A | Priority Claims against AHM SV |
| Class 4B(3) | Travelers Secured Claim against AHM SV |
| Class 5A | Priority Claims against AHM Corp. |
| Class 5B(5) | Travelers Secured Claim against AHM Corp. |
| Class 6A | Priority Claims against AHM Ventures |
| Class 7A | Priority Claims against Homegate |
| Class 8A | Priority Claims against Great Oak |

If and to the extent that any Class identified as Unimpaired in the foregoing table is determined to be Impaired, such Class will be entitled to vote to accept or reject the Plan.

Under the Plan, holders of Claims in Classes listed in the following table are Impaired and are entitled to vote to accept or reject the Plan:

| Class(es) | Description |
|---|---|
| Class 1B(1) *et seq.* | Miscellaneous Secured Claims against AHM Holdings |
| Class 1C(1) | Unsecured Claims against AHM Holdings other than the BofA Syndicate Unsecured Claim |
| Class 1C(2) | BofA Syndicate Unsecured Claim against AHM Holdings |

11

| Class(es) | Description |
|---|---|
| Class 1C(3) | Subordinated Trust Preferred Claims against AHM Holdings |
| Class 2B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Investment |
| Class 2B(2) | BofA Syndicate Secured Claim against AHM Investment |
| Class 2B(3) | JPM Secured Claim against AHM Investment |
| Class 2C(1) | Unsecured Claims against AHM Investment other than the BofA Syndicate Unsecured Claim |
| Class 2C(2) | BofA Syndicate Unsecured Claim against AHM Investment |
| Class 2C(3) | Subordinated Trust Preferred Claims against AHM Investment |
| Class 3B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Acceptance |
| Class 3B(2) | BofA Syndicate Secured Claim against AHM Acceptance |
| Class 3B(3) | JPM Secured Claim against AHM Acceptance |
| Class 3C(1) | Unsecured Claims against AHM Acceptance other than the BofA Syndicate Unsecured Claim |
| Class 3C(2) | BofA Syndicate Unsecured Claim against AHM Acceptance |
| Class 4B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM SV |
| Class 4B(2) | BofA Syndicate Secured Claim against AHM SV |
| Class 4C(1) | Unsecured Claims against AHM SV other than the BofA Syndicate Unsecured Claim |
| Class 4C(2) | BofA Syndicate Unsecured Claim against AHM SV |
| Class 5B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Corp. |
| Class 5B(2) | PNB Secured Claim against AHM Corp. |
| Class 5B(3) | BofA Syndicate Secured Claim against AHM Corp. |
| Class 5B(4) | JPM Secured Claim against AHM Corp. |
| Class 5C(1) | Unsecured Claims against AHM Corp. other than the BofA Syndicate Unsecured Claim |
| Class 5C(2) | BofA Syndicate Unsecured Claim against AHM |

DB02:7418039.1

066585.1001

| Class(es) | Description |
|---|---|
|  | Corp. |
| Class 6B(1) *et seq.* | Miscellaneous Secured Claims against AHM Ventures |
| Class 6C | Unsecured Claims against AHM Ventures |
| Class 7B(1) *et seq.* | Miscellaneous Secured Claims against Homegate |
| Class 7C | Unsecured Claims against Homegate |
| Class 8B(1) *et seq.* | Miscellaneous Secured Claims against Great Oak |
| Class 8C | Unsecured Claims against Great Oak |

Holders of Claims and Interests in the Classes listed in the following table are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan:

| Class | Description |
|---|---|
| ~~Class 1D~~ | ~~Subordinated Trust Preferred Claims against AHM Holdings~~ |
| Class 1~~E~~D | Subordinated Claims against AHM Holdings |
| ~~Class 1F~~ | ~~Interests in AHM Holdings~~ |
| Class ~~2D~~1E | ~~Subordinated Trust Preferred Claims against~~Interests in AHM ~~Investment~~Holdings |
| Class 2~~E~~D | Subordinated Claims against AHM Investment |
| Class 2~~F~~E | Interests in AHM Investment |
| Class 3D | Subordinated Claims against AHM Acceptance |
| Class 3E | Interests in AHM Acceptance |
| Class 4D | Subordinated Claims against AHM SV |
| Class 4E | Interests in AHM SV |
| Class 5D | Subordinated Claims against AHM Corp. |
| Class 5E | Interests in AHM Corp. |
| Class 6D | Subordinated Claims against AHM Ventures |
| Class 6E | Interests in AHM Ventures |
| Class 7D | Subordinated Claims against Homegate |
| Class 7E | Interests in Homegate |
| Class 8D | Subordinated Claims against Great Oak |

13

066585.1001

| Class | Description |
|-------|-------------|
| Class 8E | Interests in Great Oak |

The record date for determining any creditor's eligibility to vote on the Plan is [___
_____], 2008.  Only those Creditors entitled to vote on the Plan will receive a Ballot with this Disclosure Statement.

**CREDITORS WHOSE CLAIMS ARE SUBJECT TO A PENDING OBJECTION ARE NOT ELIGIBLE TO VOTE UNLESS SUCH OBJECTIONS ARE RESOLVED IN THEIR FAVOR OR, AFTER NOTICE AND A HEARING PURSUANT TO BANKRUPTCY RULE 3018(a), THE BANKRUPTCY COURT ALLOWS THE CLAIM TEMPORARILY OR ESTIMATES THE AMOUNT OF THE CLAIM FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN.  ANY CREDITOR THAT WANTS ITS CLAIM TO BE ALLOWED TEMPORARILY OR ESTIMATED FOR THE PURPOSE OF VOTING MUST TAKE THE STEPS NECESSARY TO ARRANGE AN APPROPRIATE HEARING WITH THE BANKRUPTCY COURT UNDER BANKRUPTCY RULE 3018(a).**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

066585.1001

## III.  BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES

### A.  The Debtors' Corporate Structure



### 1.  AHM Investment and its Direct Subsidiaries

AHM Investment, a Maryland corporation, was incorporated in July of 2003 and is organized and operates as a real estate investment trust ("REIT") for federal income tax purposes. Prior to the Petition Date, AHM Investment's common stock was publicly traded on the New York Stock Exchange under the symbol "AHM".[10] AHM Investment is the ultimate parent of each of the other Debtors. AHM Investment directly and wholly owns AHM Holdings, a Delaware corporation, and AHM Acceptance, a Maryland corporation, as well as four non-debtor entities: Baylis Trust I, a Delaware business trust; AHM Capital Trust I, a Delaware business trust; American Home Mortgage Securities LLC, a Delaware limited liability company; and AHM SPV III, LLC, a Delaware limited liability company.

---

[10]  AHM Investment's 9.75% Series A Cumulative Redeemable Preferred Stock and 9.25% Series B Cumulative Redeemable Preferred Stock were also traded on the NYSE under the symbols "AHM PrA" and "AHM PrB," respectively.

15

066585.1001

### 2.    AHM Holdings and its Direct Subsidiaries

AHM Holdings, a Delaware corporation, is a direct, wholly owned subsidiary of AHM Investment. AHM Holdings is a holding company for certain of its Debtor and non-debtor subsidiaries. AHM Holdings guarantees certain obligations of other Debtors and non-debtors, and is the direct obligor with respect to certain other transactions. AHM Holdings wholly owns AHM SV, a Maryland corporation, AHM Corp., a New York corporation, and AHM Ventures, a Delaware limited liability company. AHM Holdings also wholly owns non-debtor entities including American Home Securities, LLC, a Delaware limited liability company, American Home Bank ("AH Bank"), a United States federally chartered thrift,[611] and several Delaware business trusts.[712]

AH Bank is the most significant unencumbered Asset remaining in any Debtor's Estate and is expected to provide considerable value upon its sale or liquidation.

### 3.    AHM Acceptance and its Direct Subsidiaries

AHM Acceptance, a Maryland corporation, is a direct, wholly owned subsidiary of AHM Investment that, prior to the Petition Date, originated loans for the Debtors. AHM Acceptance also wholly owns two non-debtor entities: Melville Funding, LLC, a Delaware limited liability company, and AHM LF, LLC, a Delaware limited liability company.

### 4.    AHM SV and its Direct Subsidiaries

AHM SV, a Maryland corporation, is a direct, wholly owned subsidiary of AHM Holdings that, prior to the Petition Date, serviced the Debtors' loans as well as loans for third parties. AHM SV also wholly owns three non-debtor entities: CNI Reinsurance, Ltd., a company established under the laws of Turks & Caicos Islands; NAP Financial Services, LLC, a Maryland limited liability company; and CNI Title Services, LLC, a Maryland limited liability company (collectively, the "Servicing Subsidiaries").

The Debtors have explored possible sale or liquidation of the Servicing Subsidiaries, but do not anticipate realizing significant value therefrom.

### 5.    AHM Corp. and its Direct Subsidiaries

AHM Corp., a New York corporation, was formed in 1988 and was the first company formed as part of the American Home Mortgage Organization. AHM Corp. is a direct, wholly owned subsidiary of AHM Holdings and, together with AHM Acceptance, primarily originated loans for the Debtors prior to the Petition Date. AHM Corp. wholly owns Homegate and Great

---

[611] On October 2006, AHM Holdings acquired Flower Bank, fsb, of Chicago, Illinois, a federally chartered savings bank, which changed its name to American Home Bank.

[712] These business trusts include Baylis Trust II, Baylis Trust III, Baylis Trust IV, Baylis Trust V, Baylis Trust VI, Baylis Trust VII and Baylis Trust VIII.

066585.1001

DB02:7418039.1

Oak, both New York corporations, as well as several non-debtor entities.[813] AHM Corp. is also a participant in the following joint ventures: Mortgage First Limited, LLC; Array Mortgage, LLC; and American Midwest Title Agency, LLC.

### 6.    AHM Ventures

AHM Ventures, a Delaware limited liability company, is a wholly owned subsidiary of AHM Holdings, that, prior to the Petition Date, provided residential mortgage brokerage services. AHM Ventures also participates in several joint ventures.[914]

### 7.    Homegate

Homegate, a New York corporation, is a wholly owned subsidiary of AHM Corp., that , prior to the Petition Date, provided vendor management services to the Debtors' loan origination affiliates.

### 8.    Great Oak

Great Oak, a New York corporation, is a wholly owned subsidiary of AHM Corp., that provided title search and related services in New York State to certain of the Debtors' affiliates prior to the Petition Date.

### B.    Overview of the Debtors' Businesses

Prior to the Petition Date, the Debtors were in the business of investing in mortgage-backed securities and mortgage loans resulting from the securitization of residential mortgage loans that their subsidiaries originated and serviced. The Debtors also invested in securitized mortgage loans originated by others. Most of the Debtors' portfolio consisted of securitized adjustable-rate mortgage loans, or ARM loans, that were of prime and alternate-"A" quality. An important element of the Debtors' business strategy was self-originating many of the securitized loans in which the Debtors invested, so as to acquire those loans at a lower cost than would be required to purchase similar loans in the capital markets. In addition to investing in securitized mortgage loans, the Debtors also were in the businesses of originating and selling mortgage loans to institutional investors, as well as servicing mortgage loans owned by others.

In order to maintain adequate liquidity pending the ultimate sale of their loans, the Debtors entered into several warehouse financing arrangements (the "Warehouse Facilities"). Most of the arrangements were documented under committed master repurchase agreement

---

[813]   These wholly owned non-debtor entities include: Broadhollow Funding, LLC, a Delaware limited liability company; AHM SPV I, LLC, a Delaware limited liability company; AHM SPV II, LLC, a Delaware limited liability company; American Home Mortgage Assets LLC, a Delaware limited liability company; Melville Reinsurance Corp., a Vermont corporation; and American Home Escrow, LLC, a Delaware limited liability company.

[914]   These joint ventures include: HSS Mortgage, LLC; All Pro Mortgage, LLC; Silicon Mortgage, LLC; TDG Equities, LLC; Elite Lending Partners, LLC; Peak Experience Mortgage, LLC; U.S. Lending Company, LLC; American Home Mortgage V, LLC; and Private Mortgage Group, LLC.

066585.1001

facilities ("Master Repurchase Agreements"). Pursuant to these Warehouse Facilities, the loans were sold to an institution for a purchase price that was generally thought to be less than the fair market value of the loans. The sale was subject to an obligation of the Debtors to repurchase the loans at a price equal to the original purchase price, plus a differential representing the time value of money and was subject to an obligation on the part of the purchaser to resell the loan to the Debtors at that price. The Master Repurchase Agreements generally permitted the purchaser to periodically mark the purchased loans to market and, if the value of the loans had declined, to demand additional margin payments from the Debtors. If the Debtors failed to meet a margin call, the purchasers were entitled to declare an event of default and accelerate the Debtors' obligation to repurchase, thus extinguishing that right.

The Debtors also obtained warehouse loans under secured lending facilities and a commercial paper program. These facilities also generally permitted the lenders or credit support providers to mark the collateral to market and to demand additional margin payments.

As of December 31, 2006, the Debtors held a leveraged portfolio of mortgage loans and mortgage-backed securities valued at approximately $15.6 billion.

## C.    The Debtors' Business Segments

### 1.    Loan Origination

The Debtors' loan origination business originated and securitized loans in which the Debtors invested as well as additional loans that the Debtors sold, typically at a profit. The Debtors were one of the nation's largest home mortgage lenders and National Mortgage News ranked the Debtors as the nation's 10th largest residential mortgage lender for the third quarter of 2006. During 2006, the Debtors made loans to approximately 196,000 borrowers and their total originations were approximately $58.9 billion. The Debtors' loan origination business generated a significant portion of the Debtors' assets and the source of the Debtors' gain on sale revenue. It also was the source of many of the customers whose loans were being serviced by the Debtors.

The Debtors' originations were sourced through their own sales force of loan officers and account executives, as well as through mortgage brokers and loan correspondents. As of December 31, 2006, the Debtors conducted lending through over 550 retail and wholesale loan production offices located in 47 states and the District of Columbia.

The Debtors offered a broad array of mortgage products[15] and primarily made loans to borrowers with good credit profiles. The weighted-average FICO score for the Debtors' $58.9 billion of total originations in 2006 was 716. All of the loans the Debtors made in 2006 were secured by one- to four-family dwellings.

---

[15] The Debtors' product line included ARM loans, conventional conforming fixed-rate loans, alternate-"A" loans, jumbo fixed-rate loans, home equity or second mortgage loans, government fixed-rate loans, non-prime loans and construction loans.

18

066585.1001

The Debtors' origination business sought to utilize a combination of skilled loan officers, advanced technology, a broad product line and a high level of customer service to successfully compete in the marketplace. The Debtors' primary goal in making a decision whether to extend a loan was whether that loan conformed to the expectations and underwriting standards of the secondary mortgage market. Typically, these standards focused on a potential borrower's credit history (often as summarized by credit scores), income and stability of income, liquid assets and net worth, and the value and the condition of the property securing the loan. Whenever possible, the Debtors used "artificial intelligence" underwriting systems to determine whether a particular loan met those standards and expectations. In those cases where artificial intelligence was not available, the Debtors relied on their credit officer staff to make the determination. Once a customer applied for a loan, the Debtors' mortgage banking operation processed and underwrote the customer's application and the Debtors funded the customer's loan by drawing on a warehouse line of credit. These loans were then typically either sold, securitized with the resulting mortgage-backed securities being sold, or held as a long-term investment.

The Debtors' loan origination business rapidly grew in market share and scale since AHM Holdings became a public company in 1999. The aggregate principal amount of total loan originations was approximately $58.9 billion in 2006, compared to $45.3 billion in 2005, $23.1 billion in 2004, $21.7 billion in 2003 and $12.2 billion in 2002.

This growth gave the Debtors a relatively large presence in the secondary mortgage market, and, as a result, improved their ability to execute loan sales to third-party purchasers. In addition, their size enabled the Debtors to negotiate better terms with warehouse lenders and credit enhancers such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Finally, their size made it possible for the Debtors to profitably enter businesses ancillary to mortgage lending, such as mortgage reinsurance, title brokerage and vendor management.

The Debtors grew their mortgage origination business both through the acquisition of smaller mortgage origination companies and through organic growth. In each acquisition, the Debtors generally retained and grew the acquired company's loan production offices while substantially eliminating their centralized support operations and associated costs. These acquisitions significantly increased origination capability.

## 2.    Hedging Activities

The Debtors hedged interest rate risk and price volatility on their mortgage loan interest rate lock commitments and mortgage loans during the time they committed to acquire or originate mortgages at a pre-determined rate until the time they sold or securitized mortgages. The Debtors also hedged interest rate risk associated with funding their portfolio of mortgage loans and mortgage-backed securities. To reduce the sensitivity of earnings to interest rate and market value fluctuations, the Debtors hedged the risk of changes in the fair value of mortgage servicing rights. Also, to mitigate interest rate and price volatility risks, the Debtors entered into certain hedging transactions. The nature and quantity of their hedging transactions were determined based on various factors, including market conditions and the expected volume of mortgage acquisitions and originations.

19

066585.1001

DB02:7418039.1

### 3.    Loan Sales and Securitizations

As noted above, the Debtors sold a portion of the mortgage loans that they originated in the secondary mortgage market through whole loan sales or in the form of securitizations. With respect to mortgage loans that the Debtors originated but did not securitize, the Debtors typically sold those loans in the secondary mortgage market to securities dealers, large national banks, Fannie Mae, Freddie Mac, thrifts and smaller banks, real estate investment trusts and other institutional loan buyers. Typically, the Debtors sold loans on a limited recourse basis in order to reduce exposure to default risk, except that pursuant to the underlying purchase agreements, the Debtors generally committed to repurchase or substitute a loan if (i) a payment default occurred early in the life of the loan (an "Early Payment Default" or "EPD," and the resulting right to demand repurchase or substitution of a loan for which an EPD has occurred, an "EPD claim"), (ii) the selling entity breached its representations and warranties or (iii) the loan did not comply with the underwriting standards or other requirements of the ultimate investor.

The Debtors sold most of the loans they originated through whole loan sales. Other loans were sold into securitization trusts, out of which all of the ownership interests were sold to investors. For the loans the Debtors retained, the Debtors sold securities against those loans and retained a residual interest. The securitization trusts were distinct legal entities and were not included in the Debtors' chapter 11 filing.

### 4.    Loan Servicing

An active part of the Debtors' business was a servicing platform, which was conducted through AHM SV (f/k/a American Home Mortgage Servicing, Inc.). Loans were serviced primarily for the trusts of the Debtors' securitizations and for Fannie Mae, the Government National Mortgage Association ("Ginnie Mae"), and other third-party purchasers of the loans originated by the Debtors. Loan servicing activities were designed and implemented to ensure that the borrowers repaid each loan in a mortgage servicing portfolio in accordance with its terms. The Debtors' servicing business collected mortgage payments, administered tax and insurance escrows, responded to borrower inquiries and enabled the Debtors to maintain control over the collection and default mitigation processes. The loan servicing business also provided the Debtors with a stable cash flow.

As of December 31, 2006, AHM SV (f/k/a American Home Mortgage Servicing, Inc.) serviced approximately 197,000 loans with an aggregate unpaid principal balance ("UPB") of approximately $46.3 billion. The weighted-average servicing fee on the Debtors' servicing portfolio as of December 31, 2006, was 0.347% of the UPB of each loan serviced. In addition, the Debtors received other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.[16]

---

[16] Certain of the Debtors and their non-debtor subsidiaries engaged in other businesses that were ancillary to the Debtors' mortgage loan origination, servicing and sales activities, including two mortgage reinsurance subsidiaries,

20

066585.1001

D.    **Principal Indebtedness of the Debtors**

As noted above, to finance mortgage loan production, the Debtors used Warehouse Facilities generally in the form of Master Repurchase Agreements,[1217] pursuant to which each Warehouse Lender provided committed borrowing ability to the applicable Debtor(s) counterparty. In the ordinary course of their business, the Debtors used each Master Repurchase Agreement, together with their own capital, to fund the production of mortgage loans and/or the purchase of residential mortgage-backed securities ("RMBS").

A typical Master Repurchase Agreement provided for the sale[1318] of one or more mortgage loans or RMBS to the Warehouse Lender in exchange for the transfer of funds from the Warehouse Lenders to the Debtors, subject to an obligation of the Debtors to repurchase the loans/RMBS on or before a date certain (e.g., 180 days) for a price consisting of the original purchase price paid to the Debtors plus a price differential that provided the Warehouse Lender a *per diem* rate of interest on the funds advanced against the loans/RMBS.

Warehouse Lenders typically transferred funds to the Debtors to originate mortgage loans, which were transferred to the Warehouse Lenders immediately after origination. The Debtors serviced the loans on an interim basis while they attempted to arrange for final disposition of the loans, either by sale to a private investor (usually on a whole-loan, or "servicing-released," basis) or to a securitization trust (usually on a "servicing-retained" basis). Upon final disposition of the mortgage loans, the loans were repurchased by the Debtors from the Warehouse Lenders, then transferred to the ultimate purchaser. The Debtors typically arranged for the sale or other disposition of mortgage loans within one to three months after origination, usually for a profit.

The Master Repurchase Agreements generally required the total value of the mortgage loans/RMBS held by the Warehouse Lenders to be at least equal to the Debtors' outstanding repurchase obligations (i.e., the purchase price plus the imputed interest component). In the event the value of the mortgage loans/RMBS dropped below the amount of the Debtors' repurchase obligations, the Master Repurchase Agreement permitted the Warehouse Lender to make a margin call, thus requiring the Debtors to post cash or additional loans/RMBS as security for the repurchase obligations. Failure to meet a margin call was an event of default under a

---

a title abstract subsidiary and a vendor management company.  In addition, American Home Bank, a non-debtor subsidiary of AHM Holdings conducts certain banking services.

[1217]  Warehouse Facilities not taking the form of Master Repurchase Agreements were nonetheless functionally identical, and worked in the same way as described below with respect to margin calls.

[1318]  Reference to the "purchase," "sale," and "repurchase" of mortgage loans or RMBS under Master Repurchase Agreements generally, or of the "purchase price," "repurchase price," or "repurchase obligations" relating thereto, are for ease of discussion only and do not constitute an admission concerning the proper legal characterization of transactions under or contemplated by a particular Master Repurchase Agreement, with respect to which the ~~Plan Proponents~~Debtors, on behalf of themselves, the Plan Trustee, and the Plan Oversight Committee, reserve all rights.

21

066585.1001

Master Repurchase Agreement, which permitted the Warehouse Lender to discontinue funding and accelerate the Debtors' outstanding repurchase obligations.

As of the Petition Date, the Debtors had more than $4.3 billion in aggregate outstanding obligations under Warehouse Facilities (including Master Repurchase Agreements, traditional credit facilities, and commercial-paper facilities).

### E.    Properties

As of the Petition Date, the Debtors' Executive and Administrative Offices were located at 538 Broadhollow Road, Melville, New York 11747 ("538 Broadhollow Road"). Additionally, the Debtors owned an office building (consisting of approximately 35,700 square feet) located at 950 North Elmhurst Road, Mt. Prospect, Illinois. Prior to the Petition Date, the Debtors also leased real estate premises at over 550 locations in 47 states and the District of Columbia.

### F.    Events Leading to the Debtors' Chapter 11 Filings

The Debtors fell victim to an unprecedented dislocation in the secondary mortgage market in the summer of 2007, fueled by, among other factors, falling real estate prices and a spike in consumer defaults on mortgage obligations. These factors applied tremendous downward pressure on loan and security values industry-wide, which accelerated as more and more mortgage originators in the industry were forced to sell securities and loans in an effort to meet margin calls. In the weeks leading up to the Petition Date, the markets for these assets were disrupted to the point of dysfunction. The disruption in the credit markets during that time caused major write-downs of the Debtors' loan and security portfolios.

These events adversely impacted many mortgage originators and mortgage investors. Originators including Countrywide Financial Corp., Accredited Home Lenders, Inc., and IndyMac Bancorp all incurred unprecedented margin calls, and mortgage investors including Citigroup, Deutsche Bank, Bank of America, Merrill Lynch, UBS, Morgan Stanley and Bear Stearns all issued press releases concerning record losses and write-downs.

In the case of the Debtors, the write downs led to significant margin calls with respect to the Debtors' credit facilities and, as of late July 2007, the Debtors became unable to meet those margin calls.

As a consequence, most or all Warehouse Lenders asserted defaults and notified the Debtors that they intended to exercise certain rights, including the right to sell the mortgage loans financed under the credit facilities and offset the proceeds from such a sale against amounts owed by the Debtors. Other Warehouse Lenders informed the Debtors that they intended to retain the mortgage loans to offset their value against amounts owed by the Debtors. Those Warehouse Lenders also sought to reserve their purported rights to seek recovery of any shortfall after that offset.

On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

066585.1001

During this same period, the Debtors retained a cadre of experienced advisors and made an all-out effort to preserve the Debtors' operations. Between July 27 and August 2, 2007, at least four entities with serious interest in purchasing the Debtors' retail and wholesale origination businesses, or some combination thereof, arrived at the Debtors' offices and engaged in active, around-the-clock negotiations. However, none of these transactions were able to gel and, having been unable to fund loans for three days, the Debtors were forced to shut down their origination business.

On August 3, 2007, the Debtors implemented a reduction in force, resulting in the termination of approximately 6,500 employees. The Debtors retained approximately 1,000 other employees (450 servicing employees, 250 to close the retail branch offices and 300 other employees company-wide), who were absolutely essential to the Debtors' continued operations. Over the course of these proceedings, the Debtors have continued to terminate non-essential personnel and now employ 39 employees and 45 contractors.

## G.    The Chapter 11 Cases

The Debtors filed for chapter 11 protection on August 6, 2007, in order to preserve their remaining business operations and effectuate an orderly liquidation of their property for the benefit of creditors. As discussed below, during these Chapter 11 Cases, the Debtors have worked diligently to protect, preserve, and ultimately administer approximately $3 billion worth[14][12] of property for the benefit of the parties asserting valid interests therein, such as those parties' relative rights and priorities may be under the Bankruptcy Code and applicable nonbankruptcy law.

Unlike many chapter 11 debtors who financed their ~~prepeition~~ prepetition operations using a secured credit facility from a single secured lender having a blanket lien in all assets, the Debtors in these Chapter 11 Cases financed portions of their operations using repo facilities, traditional secured credit facilities, and commercial paper facilities of varying amounts from a variety of lenders and lender syndicates, many of whom had (and still have) significant exposure to the subprime mortgage crisis that precipitated the Debtors' decline into bankruptcy. The suddenness of the Debtors' bankruptcy filing, combined with the rapidly deteriorating state of the secondary mortgage market in August 2007, contributed to an atmosphere of near hysteria early in these Chapter 11 Cases, as lenders and purchasers of mortgage loans from the Debtors scrambled to exercise their remedies against the Debtors so as to be able to sell their mortgage loan collateral or holdings as quickly as possible. Complicating matters for the Debtors was the fact that many lenders asserted competing interests in the same property, which put the Debtors in the position of refereeing inter-creditor disputes, usually on an expedited basis, while at the same time attempting to conduct due diligence to determine whether there was any unencumbered value for the Debtors' Estates in the property at issue.

---

[14][12]    For purposes of arriving at this figure, Assets that were not (or have yet to be) sold or valued by the Bankruptcy Court are valued at book value.

066585.1001

DB02:7418039.1

As discussed below, by using the tools available to them as debtors in possession under chapter 11 of the Bankruptcy Code, the Debtors were able to impose a measure of order on the chaos which, outside of bankruptcy, would likely have consumed the Debtors' businesses in their entirety, resulting in diminished recoveries to the Debtors' secured creditors and, in all likelihood, no recovery whatsoever for the Debtors' general unsecured creditors.

### 1.    Debtor in Possession Status

Since filing for bankruptcy protection, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate in the ordinary course of business. Transactions outside of the ordinary course of business must be approved by the Bankruptcy Court.

### 2.    Entry of the Debtors' First Day Orders

Concurrently with filing their bankruptcy petitions, the Debtors filed several emergency motions (the "First Day Motions") with the Bankruptcy Court that were intended to stabilize the Debtors and enable them to continue certain limited operations. Pursuant to their First Day Motions, the Debtors sought and obtained from the Bankruptcy Court, among other relief, the following: (i) authority to jointly administer the Chapter 11 Cases [Docket Nos. 3 and 60]; (ii) approval of the appointment of EPIQ Bankruptcy Solutions, LLC ("EPIQ") as claims, notice and balloting agent in the Chapter 11 Cases [Docket Nos. 4 and 222]; (iii) establishment of adequate assurance procedures with respect to utility providers [Docket Nos. 5, 61 and 552]; (iv) authority to pay certain prepetition taxes, including trust fund and personal liability taxes [Docket Nos. 6 and 62]; (v) authority to continue insurance policies [Docket Nos. 7 and 63]; (vi) authority to pay prepetition obligations of certain critical vendors and service providers [Docket Nos. 8 and 64]; (vii) authority to honor prepetition employees wages and benefits [Docket Nos. 9 and 69]; (viii) authority to implement a non-insider employee retention plan [Docket Nos. 10, 112 and 355]; and (ix) authority to maintain their prepetition centralized cash management system [Docket Nos. 14 and 66].

Shortly thereafter, the Debtors filed other administrative motions with the Bankruptcy Court, including a motion seeking an extension of time to file the Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, the "Schedules") [Docket No. 161] and a motion establishing interim compensation procedures for professionals employed by the Debtors' estates [Docket No. 162]. Each of these motions was granted by the Bankruptcy Court [respectively, Docket Nos. 546 and 547].

### 3.    Debtor in Possession Financing and Use of Cash Collateral

Also on the first day of the Chapter 11 Cases, the Debtors sought and obtained approval of cash collateral usage and debtor-in-possession financing to maintain and stabilize their businesses and commence an orderly liquidation of their assets. Specifically, on the Petition Date, the Debtors filed a motion (the "Cash Collateral Motion") by which they sought interim and final orders authorizing the limited use of cash collateral generated by the Debtors' mortgage

24

loan servicing business (the "Servicing Business") and the grant of adequate protection and other relief to Bank of America, N.A., as agent ("BofA as Administrative Agent") for itself and certain prepetition lenders (the "BofA Syndicate") [Docket No. 16]. On August 7, 2007, the Bankruptcy Court approved the Cash Collateral Motion on an interim basis [Docket No. 68]. On September 4, 2007, the Bankruptcy Court entered a final order approving the Cash Collateral Motion [Docket No. 554] (as subsequently amended by Docket Nos. 2002, 2284, 2855, 3142, 3172, and 3699, the "Cash Collateral Order").

The Cash Collateral Order permitted the Debtors to, among other things, the Debtors to continue operating the Servicing Business pending a sale thereof, providing necessaryand obtain access to cash to pay certain expenses such as employee payroll and other benefits, rent, a proportional share of the Debtors' corporate overhead, servicing advances, and other expenses reflected in the budget negotiated by the Debtors and BofA as Administrative Agent.

Also on the Petition Date, the Debtors filed a motion by which they sought interim and final orders authorizing them to enter into a debtor in possession financing facility agreement (the "DIP Credit Facility") with WLR Recovery Fund III, L.P., in its capacity as lender and administrative agent, and other lenders from time to time party thereto (collectively, the "DIP Lender") [Docket No. 17]. On August 7, 2007, the Bankruptcy Court approved the DIP Credit Facility on an interim basis [Docket No. 67] and then on September 4, 2007, the Bankruptcy Court entered a final order approving the DIP Credit Facility [Docket No. 555].

The original DIP Credit Facility was a senior secured, superpriority, $50 million revolving credit facility, which the Debtors could borrow from the DIP Lender. Each of the Debtors, except for AHM SV, is a joint-and-several obligor under the DIP Credit Facility. Pursuant to the DIP Credit Facility, each obligor granted the DIP Lender a valid, binding, and enforceable perfected first-priority security interest in, and lien on, all the property and assets of each obligor and its estate that was not otherwise encumbered by valid, perfected, enforceable, and nonavoidable security interests or liens on the Petition Date. The $50 million available under the DIP Credit Facility was explicitly not permitted to be used to fund the Servicing Business. On January 4, 2008, the Bankruptcy Court approved a modification to the DIP Credit Facility decreasing the available borrowing limit to $35 million and permitting the use of certain funds to purchase the release of liens in the BofA Construction Loans (as hereinafter defined), among other things [Docket No. 2594]. On August 1, 2008, the Debtors filed a motion seeking approval of a second modification to the DIP Credit Facility (i) reducing the available borrowing limit to $30 million, but effectively increasing borrowing capacity by limiting the $12 million LPMI Reserve Amount (as defined in the DIP Credit Facility), (ii) permitting the use of approximately $10.5 million in proceeds from the sale of non-performing loans for general operating expenses, (iii) extending maturity to November 5, 2008, and (iv) adjusting the interest rate, among other things [Docket No. 5291]. On August 5, 2008, the Bankruptcy Court approved a portion of the relief sought in the August 1 motion [Docket No. 5307], with the balance of the relief requested in the motion scheduled for hearing on August 18, 2008.

Prior to the sale of the Servicing Business discussed further below, the Debtors funded the Servicing Business's operations using cash collateral as provided by the Cash Collateral Order. Following the "Initial Close" of the sale of the Servicing Business to the Purchaser (as

066585.1001

hereinafter defined), the Debtors sought and obtained approval to enter into a limited-recourse DIP credit facility to fund the working capital needs of the Servicing Business. On November 12, 2007, the Debtors filed a motion [Docket No. 1967] by which they sought interim and final orders authorizing them to enter into a limited recourse post-petition financing facility (the "Limited Recourse DIP Credit Facility") with the Purchaser. On November 14, 2007, the Bankruptcy Court approved the Limited Recourse DIP Credit Facility on an interim basis [Docket No. 1999] and then on November 28, 2007, the Bankruptcy Court entered a final order approving the Limited Recourse DIP Credit Facility [Docket No. 2205]. Pursuant to the Limited Recourse DIP Credit Facility, the Debtors were authorized to obtain nonrecourse postpetition financing from the Purchaser (as defined in § III.G.8. below) in the principal amount of $50 million, secured by a lien in the Assets sold to the Purchaser in the Servicing Sale (as defined in § III.G.8. below), to fund the working capital needs of the Servicing Business. On January 4, 2008, the Bankruptcy Court approved a modification to the Limited Recourse DIP Credit Facility increasing the available borrowing limit to $100 million [Docket No. 2590].

### 4.    Appointment of the Committee

On August 14, 2007, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 156]. Since its formation, the Committee has participated in virtually every aspect of these Chapter 11 Cases.

On December 7, 2007, the U.S. Trustee reconstituted the Committee [Docket No. 2317]. As of the date of this Disclosure Statement, the following were members of the Committee:

> Wilmington Trust Company
> Law Debenture Trust Company of New York
> Deutsche Bank National Trust Co.
> Nomura Credit & Capital, Inc.
> Impac Funding Corporation
> United Parcel Service

The Committee retained the law firms of Hahn & Hessen LLP [Docket No. 2203] and Blank Rome, LLP as its co-counsel [Docket No. 2202] and retained BDO Seidman LLP as its accountant [Docket No. 2201]. The Committee also retained Trenwith Securities, LLC to provide investment banking services [Docket No. 2988] and Hennigan, Bennett & Dorman LLP as special conflicts counsel [Docket No. 3947].

### 5.    Retention of Professionals

The Debtors retained professionals to assist them in managing the chapter 11 bankruptcy process, including Young Conaway Stargatt & Taylor, LLP as the Debtors' bankruptcy counsel [Docket No. 551], Kroll Zolfo Cooper LLC as the Debtors' restructuring advisors and interim

26

management[1520] [Docket No. 606], Milestone Advisors, LLC as investment bankers and financial advisors [Docket No. 1592], and Phoenix Capital, Inc. as investment bankers [Docket No. 1040]. The Debtors also obtained Bankruptcy Court approval to retain the following professionals: (i) Quinn Emanuel Urquhart Oliver & Hedges, LLP as the Debtors' special investigatory, litigation and conflicts counsel [Docket No. 741]; (ii) Allen & Overy, LLP as special regulatory, securities and class action litigation counsel [Docket No. 1730]; (iii) Cadwalader, Wickersham & Taft, LLP as special counsel [Docket No. 2000]; (iv) Muldoon Murphy & Aguggia LLP as special counsel [Docket No. 2663]; (v) PricewaterhouseCoopers LLP as tax advisors [Docket No. 3432]; (vi) DoveBid, Inc. as auctioneer [Docket No. 2727]; (vii) CB Richard Ellis, Inc. as real estate broker [Docket No. 3223]; and (viii) the following foreclosure professionals: Samuel I. White, P.C. [Docket No. 1709], Orlans Associates, P.C. [Docket No. 1710], Northwest Trustee Services, Inc. [Docket No. 713], Weinreb & Associates, PLLC [Docket No. 1594], Codilis & Associates, PC [Docket No. 1593], Adorno & Yoss LLP [Docket No. 1707], Weltman, Weinberg & Reis Co., LPA [Docket No. 2170], and the Law Offices of Daniel C. Consuegra [Docket No. 2169].

The Debtors also sought and obtained authority to continue to employ professionals, including attorneys, that the Debtors employed prepetition in the ordinary course of their businesses (collectively, the "Ordinary Course Professionals"), without having to file formal retention applications with the Bankruptcy Court [Docket Nos. 192, 607 and 643]. Each Ordinary Course Professional is assigned a monthly maximum amount (either $35,000, $75,000, or 6% of the selling price of real estate transactions for all real estate transactions having selling prices up to $3,000,000) that it may be paid without having to seek approval of the Bankruptcy Court.

### 6.    Executive Incentive Plan

On November 8, 2007, the Debtors filed a motion [Docket No. 1885] (the "EIP Motion") seeking the approval of their executive incentive plan (the "EIP"). The Debtors proposed the EIP Motion for purposes of ensuring that senior management would be properly incentivized to achieve maximum value for the Debtors' stakeholders through the completion of these cases. The EIP provided a bonus pool for the payment of discretionary bonuses to certain executives, in exchange for which ~~the executives were~~each executive was required to execute a general release and waiver of employment-related claims against the Debtors.

Since the early stages of these cases, the Debtors worked diligently to ensure that they would be able to present the Bankruptcy Court with an incentive plan that was supported by the members of their senior management, yet unopposed by the Committee. This was a lengthy process that required significant negotiations with the Committee. An objection to the EIP Motion was filed by one of the Debtors' employees [Docket No. 2137]. After a hearing held on November 28, 2007, the Bankruptcy Court overruled the objection and entered an order approving the EIP [Docket No. 2210].

---

[1520]    Specifically, the Debtors engaged Stephen F. Cooper as Chief Restructuring Officer and Kevin Nystrom as Director of Restructuring [Docket No. 606]. Mr. Cooper served as Chief Restructuring Officer until his resignation effective June 30, 2008, at which time Mr. Nystrom succeeded to Mr. Cooper as Chief Restructuring Officer, and Bret Fernandes succeeded to Mr. Nystrom as Director of Restructuring [Docket No. 4497].

066585.1001

### 7.    Contested Turnover/Stay Relief Motions Early in the Chapter 11 Cases

Beginning almost immediately after commencement of these Chapter 11 Cases, the Debtors were beset with motions seeking turnover of servicing files and/or relief from the automatic stay to terminate the Debtors' mortgage loans servicing rights, certain (but not all) of which are discussed below. The Debtors were largely successful in defending against and/or reaching a consensual compromise of these matters, which afforded the Debtors necessary breathing room to focus on maintaining and stabilizing their businesses until they were able to complete the sale of certain of their operating businesses and other assets—most notably, the Servicing Business. And while a number of the resulting compromises resulted in transition of the servicing rights to the movant's designee after the Debtors determined such rights were of dubious value to their Estates, the Debtors were able to arrange for such turnover on terms that minimized the disruption to the Debtors' remaining business operations and, often, in exchange for cash or other consideration beneficial to the Estates. Cooperation between the Debtors and the movants to orderly transition servicing also minimized the potential for claims against the Debtors (including, possibly, Administrative Claims) that might have resulted from a less orderly transition.

#### a.    *CSFB Motion for TRO*

On the Petition Date, shortly after the commencement of these Chapter 11 Cases, Credit Suisse First Boston Mortgage Capital LLC ("CSFB"), a Warehouse Lender of the Debtors pursuant to a Master Repurchase Agreement, initiated an adversary proceeding against the Debtors in the Bankruptcy Court (the "CSFB Action") and filed an emergency motion (the "TRO Motion") seeking a temporary restraining order requiring the Debtors to turn over files related to the servicing of mortgage loans originated under the Master Repurchase Agreement, which CSFB requested be heard immediately at the Debtors' "first day" hearing on August 7, 2007. Among other things, the TRO Motion asserted that the Debtors' loan servicing rights had been validly terminated by CSFB prior to the Petition Date. The Bankruptcy Court scheduled the TRO Motion for hearing on August 16, 2007.

Prior to the hearing, the Debtors filed a motion to dismiss the CSFB Action and a memorandum of law in support thereof and in opposition to the TRO Motion, in which the Debtors asserted, among other things, that CSFB's purported termination of the Debtors' servicing rights prepetition was invalid, and that CSFB had failed to demonstrate the Debtors' continued possession of the loan servicing files and servicing of the loans posed a threat of "irreparable harm" justifying injunctive relief.

The Bankruptcy Court held a hearing on the TRO Motion, which the Court considered as a motion for preliminary injunction, on August 16 and 17, 2007, at which it heard evidence and argument from both parties. At the conclusion of the hearing, the Bankruptcy Court denied the TRO Motion, ~~ruling~~finding that CSFB had failed to establish (i) a likelihood of success on the

066585.1001

merits that it had validly terminated the Debtors' servicing rights prepetition and (ii) irreparable harm in the absence of injunctive relief [*see* Docket No. 411].[21]

b.    *Morgan Stanley Motion for Injunctive Relief*

On August 15, 2007, Morgan Stanley Mortgage Capital Holdings, LLC ("Morgan Stanley") initiated an adversary proceeding against the Debtors in the Bankruptcy Court and filed an emergency motion for injunctive relief (the "PI Motion") seeking to compel turnover of files related to the servicing of mortgage loans owned by Morgan Stanley. Among other things, the PI Motion asserted that the Debtors' loan servicing rights had been validly terminated by Morgan Stanley prior to the Petition Date. After negotiations with Morgan Stanley, the Debtors reached a resolution of the PI Motion and the bulk of the relief requested in Morgan Stanley's complaint, which was embodied in a stipulation approved by the Bankruptcy Court on August 24, 2007 [Adv. Docket No. 14]. Pursuant to the stipulation, the Debtors agreed to transition servicing of the loans at issue to Morgan Stanley's designee in exchange for a cooperation fee.

c.    *DB Structured Stay Relief Motion*

On August 17, 2007, DB Structured Products, Inc. ("DB Structured"), filed a motion for relief from the automatic stay [Docket No. 229] to effectuate its alleged prepetition termination of the Debtors' mortgage loan servicing right under a Mortgage Loan Purchase and Servicing Agreement ("MLPSA"). The Debtors and the Committee objected on September 11 and 12, 2007 [Docket Nos. 702 and 714, respectively], on the basis that the alleged defaults under the MLPSA had been cured and, further, DB Structured had failed to establish a *prima facie* case for "cause" for stay relief. The Bankruptcy Court held a hearing on September 17, 2007, at which it heard witness testimony and oral argument, at the conclusion of which it denied relief from the stay because the Debtors had cured any prior servicing default under the MLPSA and DB Structured had failed to establish it was being harmed by the automatic stay or that the Debtors were in dereliction of their loan servicing duties [*see* Docket Nos. 835 and 908]. The Debtors subsequently sold their servicing rights under the MLPSA for approximately $1.6 million, which is currently being held in escrow pending resolution of DB Structured's appeal of the order approving such sale (as discussed further below).

---

[21]  The Bankruptcy Court also found, on the preliminary record before it, that CSFB had demonstrated a likelihood of success on the merits of its claim that (i) the Master Repurchase Agreement was a "repurchase agreement" within the meaning of 11 U.S.C. § 559, (ii) the Debtors' bankruptcy filing constituted an immediate event of default under the agreement, and (iii) CSFB would be entitled to exercise its remedies under the agreement postpetition, including by terminating the Debtors' servicing rights, notwithstanding the automatic stay and the Bankruptcy Code's general invalidation of *ipso facto* default provisions.    However, because CSFB had not established a likelihood of irreparable harm in the absence of preliminary injunctive relief, the Court denied the TRO Motion without prejudice and, ultimately, scheduled a consolidated trial of the CSFB Action and similar actions by BS/EMC and Calyon (as defined in § III.G.7.e. below), to consider, among other things, whether termination of the Debtors' servicing rights postpetition was permitted by virtue of the statutory safe harbor for "repurchase agreements" set forth in 11 U.S.C. § 559.

29

066585.1001

d.    *Ginnie Mae Turnover Motion*

On August 20, 2007, Ginnie Mae filed a motion to compel turnover of loan origination and servicing files by the Debtors to Ginnie Mae (the "Turnover Motion") [Docket No. 243]. The Debtors and the Committee objected to the Turnover Motion [Docket Nos. 600 and 605] on a number of bases, including that Ginnie Mae's alleged prepetition termination of the Debtors' right to service mortgages backed by Ginnie Mae (the "Ginnie Mae Portfolio") was ineffective. The parties engaged in extensive discovery in relation to the Turnover Motion, resulting in the deposition of four witnesses and the review and production of thousands of pages of documents.

Ultimately, the parties agreed to a resolution of the Turnover Motion whereby the Debtors were permitted a limited window of time within which to market and sell the servicing rights for the Ginnie Mae Portfolio to a Ginnie Mae-approved servicer. The Bankruptcy Court approved the settlement between the Debtors and Ginnie Mae on September 20, 2007 [Docket No. 863], and Ginnie Mae withdrew its Turnover Motion the next day [Docket No. 956]. On October 29, 2007, the Bankruptcy Court approved the sale of the servicing rights to the Ginnie Mae Portfolio, for value, to MidFirst Bank [Docket No. 1697].

e.    *Bear Stearns and Calyon Adversary Proceedings*

On August 24 and 28, 2007, respectively, Bear Stearns Mortgage Capital Corp. and EMC Mortgage Corp. ("BS/EMC"), and Calyon New York Branch ("Calyon"), initiated adversary proceedings against the Debtors seeking declaratory and injunctive relief similar to that sought in the CSFB Action. Like CSFB, BS/EMC and Calyon filed emergency motions seeking to compel turnover of mortgage files. In light of the Bankruptcy Court's ruling on CSFB's TRO Motion, however, and after discussions with the Debtors, BS/EMC and Calyon ultimately agreed not to press their requests for preliminary injunctive relief and, instead, to work with the Debtors to establish an expedited trial schedule.

f.    *Freddie Mac Stay Relief Motion*

Prior to the Petition Date, on August 3, 2007, Freddie Mac obtained a temporary restraining order from the United States District Court for the Northern District of Texas, requiring AHM Corp., among other things, to immediately turn over certain loan origination and servicing files relating to certain loans owned by Freddie Mac (the "Freddie Mac Portfolio"). On September 10, 2007, Freddie Mac filed a motion in the Chapter 11 Cases seeking relief from the automatic stay to effect the turnover of those files. The Debtors and Freddie Mac, along with BofA as Administrative Agent, ultimately entered into stipulations, approved by the Bankruptcy Court, which provided for the transfer of servicing of the Freddie Mac Portfolio to BofA as Administrative Agent on an interim basis [Docket No. 861] and permitted the Debtors a limited window of time within which to market and sell the servicing rights for the Freddie Mac Portfolio to a Freddie Mac-approved servicer [Docket No. 862]. To date, the Debtors have not found a buyer for the servicing rights to the Freddie Mac Portfolio and, pursuant to the BofA Global Settlement Stipulation (as hereinafter defined), BofA as Administrative Agent may direct the Debtors to abandon such rights.

066585.1001

8.   **Asset Sales**

a.   *Sale of the Debtors' Servicing Business*

On the Petition Date, the Debtors filed a motion [Docket No. 11] (the "Servicing Sale Motion") requesting, among other things, authority to establish sale procedures and approve the sale of the Servicing Business (the "Servicing Sale"). By Order dated August 9, 2007 [Docket No. 113], the Bankruptcy Court established sale procedures for the Servicing Sale. After the selection of AH Mortgage Acquisition Co., Inc. (the "Purchaser") as the stalking horse bidder for the Servicing Business, the Debtors filed a motion for authority to grant the Purchaser certain auction protections and to modify the sale procedures, which was approved by the Bankruptcy Court on September 25, 2007 [Docket No. 937].

The Debtors received more than thirty objections to the Servicing Sale, which were extensively briefed by the Debtors and several of the objecting parties. The Debtors also responded to expedited discovery requests from several parties in interest, and conducted several depositions in the weeks leading up to the hearing on the Servicing Sale Motion (the "Servicing Sale Hearing").

A number of objections raised the Debtors' alleged loss of Fannie Mae-approved servicer status on July 31, 2007, and/or the Purchaser's lack of Fannie-Mae approved servicer status, as grounds for denial of the Servicing Sale, because the Debtors' servicing contracts with the objecting parties required the servicer to be a Fannie Mae-approved servicer. The Debtors disputed whether Fannie Mae had validly terminated the Debtors' approved-servicer status with respect to the portfolio of loans owned by Fannie Mae (the "Fannie Mae Portfolio") prior to the Petition Date, and had engaged Fannie Mae in settlement discussions following commencement of these Chapter 11 Cases. The Debtors and Fannie Mae reached a resolution of Fannie Mae's alleged termination of the Debtors' contract to service the Fannie Mae Portfolio by way of a settlement agreement approved by the Bankruptcy Court on September 4, 2007 [Docket No. 611], which. The settlement allowed the Debtors to continue to service the Fannie Mae Portfolio for a period of time, in which the Debtors were able to market and find a buyer for the servicing rights to the Fannie Mae Portfolio. The Debtors, Fannie Mae, and the Purchaser subsequently executed a supplemental stipulation, which was approved by the Bankruptcy Court on October 15, 2007 [Docket No. 1544], and provided the Purchaser with conditional Fannie Mae-approved servicer status. The effect of these settlements was to render moot manyseveral of the objections to the Servicing Sale.

The five-day Servicing Sale Hearing took place from October 15 to 19, 2007 during which time the Bankruptcy Court heard testimony from six witnesses, including one expert witness, and oral argument from counsel for a number of parties in interest and from one *pro se* litigant. The Debtors resolved the vast majority of objections during the course of the Servicing Sale Hearing, either by amendment to the Asset Purchase Agreement with the Purchaser dated September 25, 2007 (as subsequently amended and together with all exhibits and schedules thereto, the "Servicing APA"), by agreement to include particular language in the order approving the Servicing Sale, or, in the case of the objections by BS/EMC, by arranging for a

31

private sale of the servicing rights at issue for a higher price than the Debtors would have received from the Purchaser [Docket No. 1619].[1622]

At the conclusion of the Servicing Sale Hearing, only seven unresolved objections remained. Ultimately, after considering the evidence presented, pleadings filed, and the arguments presented, the Bankruptcy Court overruled these objections and approved the Servicing Sale. By Order dated October 30, 2007 [Docket No. 1711] (the "Servicing Sale Order"), the Bankruptcy Court approved the Servicing APA.

Immediately after entry of the Sale Order, DB Structured and UBS Real Estate Securities, inc. ("UBS") filed emergency motions for stay of the Sale Order pending appeal. The Debtors and the Purchaser resolved the DB Structured motion by amending the Servicing APA to place the DB Structured MLPSA on the list of disputed agreements held in suspense pending final resolution of the dispute. UBS's motion was denied by the Bankruptcy Court.

DB Structured and UBS subsequently filed Notices of Appeal from the Servicing Sale Order [Docket Nos. 1799 and 1922]. UBS later withdrew its appeal [Docket No. 2089]. DB Structured's appeal went forward, and on February 27, 2008, counsel for the Debtors, the Committee and DB Structured participated in a mediation, but were unable to reach a consensual resolution. Briefing on the appeal is now complete, and the matter is currently pending in the United States District Court for the District of Delaware (the "District Court").

The appeal of the Servicing Sale Order did not affect the Debtors' ability to close the Servicing Sale.[1723] The Servicing APA provided for the Servicing Sale to be closed in two steps, consisting of an "economic" close and a "legal" close. The "economic" close of the Servicing Sale occurred on November 16, 2007 (the "Initial Closing"), at which time the Purchaser paid the Purchase Price (as defined in the Servicing APA) of approximately $500 million, in cash, which, subject to certain holdbacks and/or escrowed amounts, was applied in permanent reduction of the BofA Syndicate Secured Claim.

The Debtors diligently worked with the Purchaser to effectuate the "legal" close (the "Final Closing"), while operating the Servicing Business in the Ordinary Course of Business (as defined in the Servicing APA), subject to the Bankruptcy Exceptions (as defined in the Servicing APA), for the economic benefit and risk of the Purchaser. To that end, the Debtors and the

---

[1622] In addition, on August 24, 2007, well in advance of the Servicing Sale Hearing, the Debtors filed a motion to approve the private sale to Barclays Bank PLC ("Barclays") of the servicing rights for a portfolio of loans owned by Barclays (the "Barclays Portfolio") [Docket No. 364]. The Bankruptcy Court approved the sale of the Barclays Portfolio servicing rights on September 4, 2007 [Docket No. 610]. The sale provided the Debtors greater value than they would have realized by selling the Barclays Portfolio servicing rights to the Purchaser under the Servicing APA, and resolved a dispute with Barclays regarding Barclays' alleged right to unilaterally terminate the Debtors' servicing rights.

[1723] Sale proceeds attributable to the servicing rights for the DB Structured loan portfolio (approximately $1.6 million) are being held in escrow pending resolution of the appeal. If the Debtors prevail in the appeal, these proceeds will be applied pursuant to the Cash Collateral Order and/or other applicable orders of the Bankruptcy Court.

066585.1001

Purchaser spent significant time preparing applications for, and negotiating with, governmental authorities in numerous jurisdictions to obtain licensing rights for the Purchaser (which was a condition of the Final Closing).

In addition, the Debtors, together with the Purchaser in certain instances, took other steps toward consummation of the Final Closing. On December 27, 2007, the Debtors filed a motion [Docket No. 2527] (the "Transition Motion") seeking authorization to (i) create one or more non-debtor business entities (the "Transition Entities") for the purpose of entering into certain agreements relating to the transition of the assets purchased pursuant to the Servicing APA or relating to the operation of the Servicing Business; (ii) fund the Transition Entities with amounts sufficient to perform their respective obligations; (iii) amend the Servicing APA to provide that the Debtors' interests in the Transition Entities will be deemed "Purchased Assets" as defined in the Servicing APA; and (iv) enter into an employment agreement with Mr. David M. Friedman. By orders entered January 4, 2008 [Docket No. 2595] and January 15, 2008 [Docket No. 2723], the Bankruptcy Court granted the relief requested in the Transition Motion.

In anticipation of the Final Closing, the Purchaser endeavored, with the involvement of the Debtors, to increase the volume of the Servicing Business. On December 27, 2007, the Debtors filed a motion for entry of an order approving the procedures for, and authorization of, AHM SV to enter into one or more subservicing agreements [Docket No. 2525] (the "Subservicing Authorization Motion"), pursuant to which AHM SV would act as a subservicer for servicing rights that the Purchaser intended to acquire. By Order dated January 4, 2008 [Docket No. 2597], the Bankruptcy Court approved the Subservicing Authorization Motion.

As a result of the efforts detailed above, the Final Closing occurred on April 11, 2008. Since that time, the Debtors and the Purchaser have attempted to resolve a number of outstanding disputes between them relating to the final reconciliation of payments due under the Servicing APA and the scope and nature of the Debtors' and the Purchaser's respective performance obligations thereunder.

    b.    *Broadhollow/Melville Loan Auction and Sale*

On August 22, 2007, the Debtors obtained approval of procedures for the sale of certain mortgage loans owned by two non-debtor affiliates of the Debtors: Broadhollow Funding, LLC ("Broadhollow") and Mellville Funding, LLC ("Mellville," and together with Broadhollow, the "Non-Debtor Affiliates"). Broadhollow and Mellville are non-Debtor special purpose entities established by AHM Investment to fund a portion of its prime mortgage origination. Prior to the Petition Date, the Non-Debtor Affiliates owned approximately 5,700 mortgage loans. On September 26, 2007, AHM SV conducted an auction and sold all but 32 mortgage loans owned by the Non-Debtor Affiliates.[24] The Non-Debtor Affiliates are in the process of obtaining buyers for the remaining loans.

---

[24] Since the auction, at least one of the 32 mortgages has been repaid in full by the borrower.

066585.1001

DB02:7418039.1

c.    *Sale to Indymac Bank F.S.B.*

On August 7, 2007, the Debtors and Indymac Bank F.S.B. ("Indymac") entered into a letter agreement (the "Indymac Letter Agreement"), whereby Indymac agreed and was bound to take assignment of, and assume the liabilities under, ninety-eight (98) office leases and to purchase certain furniture, fixtures and equipment located therein (collectively, the "Indymac Sale"). On August 24, 2007, the Bankruptcy Court approved the Indymac Letter Agreement and the terms of the Indymac Sale (the "Indymac Sale Order") [Docket No. 357].

Following entry of the Indymac Sale Order, the Debtors spent significant time negotiating the closing economics with Indymac. When it appeared that the Indymac Sale might not close prior to the Debtors' deadline under section 365(d)(4) of the Bankruptcy Code to assume or reject nonresidential real property leases, the Debtors filed a motion to enforce the terms of the Indymac Sale Order [Docket No. 3006] (the "Motion to Enforce").

Following the filing of the Motion to Enforce and after significant negotiations, the Debtors reached an agreement with Indymac on the closing of the sale, which agreement included certain modifications to the Indymac Letter Agreement. On February 22, 2008, the Debtors filed a motion to modify the terms of the Indymac Letter Agreement [Docket No. 3059], which was approved by the Bankruptcy Court on February 28, 2008 [Docket No. 3114] (the "Indymac Modification Order"). Pursuant to the Indymac Modification Order, Phase I of the Indymac Sale closed on February 23, 2008, and Phase II closed on March 3, 2008.

d.    *Encumbered Non-Performing Loan Sales*

On December 22, 2007, the Debtors filed the *Motion of the Debtors for Orders: (a)(i) Approving Sale Procedures; (ii) Approving Payment of the Expense Reimbursement (iii) Scheduling a Hearing to Consider Sale of Certain Non-Performing Loans* (the "Non-Performing Loans"); *(iv) Approving Form and Manner of Notice Thereof; and (v) Granting Related Relief; and (b)(i) Authorizing the Sale of Non-Performing Loans Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Sale Agreement Thereto; (iii) Authorizing the Distribution of the Proceeds; and (iv) Granting Related Relief* [Docket No. 2490] (the "Non-Performing Loan Sale Motion").

By order dated February 1, 2008 [Docket No. 2858], the Bankruptcy Court approved the sale procedures set forth in the Non-Performing Loan Sale Motion, authorizing the Debtors to sell approximately 424 whole mortgage loans, with an aggregate UPB of approximately $152,000,000, pursuant to a sealed, single-bid sale process.

On March 14, 2008, the Bankruptcy Court approved the sale on an "as is, where is" basis of certain Non-Performing Loans and REO property in which BofA as Administrative Agent had a perfected first priority security interest (collectively, the "BofA Non-Performing Loans/REO"), to Beltway Capital LLC [Docket No. 3283].

Also on March 14, 2008, the Bankruptcy Court approved the sale of certain Non-Performing Loans and REO property in which JPM asserted a security interest (collectively, the "JPM Non-Performing Loans/REO") to Lehman Capital, a division of Lehman Brothers

34

Holdings Inc. [Docket No. 3314]. In connection with the sale of the JPM Non-Performing Loans/REO, certain disputes arose between the Debtors and the Committee, on one hand, and JPM, on the other hand, concerning, among other things, the perfection of JPM's alleged security interest in certain REO property and the Debtors' right to surcharge JPM's collateral pursuant to § 506(c) of the Bankruptcy Code. While the parties have engaged in settlement discussions, this dispute has not yet been resolved.

e.    *Compromise of Construction Loans*

On December 4, 2007, BofA as Administrative Agent filed a motion [Docket No. 2255] (the "Construction Loan Stay Relief Motion") requesting relief from the automatic stay to allow it to sell certain construction-to-permanent loans in which it held security interests and liens (the "BofA Construction Loans") to a potential purchaser. As of the date of the Construction Loan Stay Relief Motion, the UPB of the BofA Construction Loans was approximately $30,478,019.73.

The Debtors disputed the allegations in the Construction Loan Stay Relief Motion, and asserted that they could obtain greater value for the BofA Construction Loans than the value estimated to be realized from the sale to the potential purchaser proposed by BofA as Administrative Agent, by simply facilitating the borrowers' refinancing of the loans (e.g., by offering reductions in principal), which would result in immediate payment in full, in cash. In fact, the Debtors and their financial advisors determined that if even a moderate number of BofA Construction Loans were refinanced, the Debtors would realize more value for their estates than would be realized from the sale to the potential purchaser.

To achieve this greater value and resolve the Construction Loan Stay Relief Motion, the Debtors engaged in good faith negotiations with the Committee, BofA as Administrative Agent, and the DIP Lender. As a result of these negotiations, the parties reached an agreement (the "BofA Construction Loan Settlement") whereby the Debtors would essentially "purchase" the BofA Construction Loans free of liens by paying BofA as Administrative Agent $9,143,406 (less any amounts received by BofA as Administrative Agent from the Debtors on account of BofA Construction Loans from November 28, 2007, through the date of payment) from (i) proceeds from the payoff, refinancing, or pay-downs of BofA Construction Loans and (ii) to the extent necessary, the DIP Lenders' cash collateral as provided by an amendment to the DIP Credit Facility. On December 27, 2007, the Debtors filed a motion [Docket No. 2531] (the "Construction Loan 9019 Motion") for approval of the BofA Construction Loan Settlement, which was approved by the Bankruptcy Court on January 4, 2008 [Docket No. 2593].

As indicated above, the Debtors' projections with respect to the BofA Construction Loans indicated that refinancing such loans would result in amounts received by the Debtors significantly in excess of $9,143,406. To realize this value, on January 11, 2008, the Debtors filed a motion [Docket No. 2709] (the "Construction Loan Compromise Motion") seeking authorization for the Debtors, in their business judgment and without further notice or hearing, to compromise the BofA Construction Loans to the extent necessary to effectuate the refinancing of such loans. By order dated February 1, 2008 [Docket No. 2860], the Bankruptcy Court approved the relief requested in the Construction Loan Compromise Motion. As of the date of this

35

066585.1001

Disclosure Statement, the Debtors have realized more than $~~17.1~~18.1 million (gross) from refinancings and other prepayments of BofA Construction Loans, with approximately $~~7.9~~6.3 million in UPB of such loans remaining.

Shortly after entry of the order approving the Construction Loan Compromise Motion, ABN AMRO Bank N.V. ("ABN") contacted the Debtors to request that the Debtors continue servicing the construction loans with ABN (the "ABN Construction Loans"), and to offer certain refinancing initiatives to borrowers of the ABN Construction Loans, similar to the authority granted to the Debtors in connection with the BofA Construction Loans. ABN additionally offered to fund all of the Debtors' obligations with respect to a stay and bonus plan for the Debtors' construction loan employees.

The Debtors and ABN entered into good faith negotiations regarding the continued servicing of the ABN Construction Loans and the bonus plan for the Debtors' construction loan employees, which resulted in a stipulation (the "ABN Construction Loan Stipulation"). Pursuant to the ABN Construction Loan Stipulation, the Debtors agreed to use commercially reasonable efforts to keep in place the construction loan servicing group to service the ABN Construction Loans through June 30, 2008. In return, ABN agreed to (i) continue funding its *pro rata* share of the budget for the servicing of the Debtors' construction loan portfolio to the second quarter of calendar ~~2008,~~[19]2008,[25] (ii) fund a $450,000 bonus pool to incentivize the construction loan servicing group to negotiate and effectuate compromises of the ABN Construction Loans, and (iii) waive certain claims against the Debtors and their estates. The Debtors filed a motion [Docket No. 2972] ~~(the "ABN Construction Loan 9019 Motion")~~ seeking approval of the ABN Construction Loan Stipulation, including the authority to compromise the ABN Construction Loans and establishment of a bonus plan for the construction loan employees. By order dated February 28, 2008 [Docket No. 3115], the Bankruptcy Court approved the ~~relief requested by the~~ ABN Construction Loan ~~9019 Motion~~Stipulation. The ABN Construction Loan Stipulation was subsequently extended by further stipulation between the parties, approved by the Bankruptcy Court on June 9, 2008 [Docket No. 4484], whereby the Debtors agreed to keep the construction loan servicing group in place through November 30, 2008, and ABN agreed, among other things, to fund an additional $225,000 bonus pool for construction loan servicing employees.

f.    *Unencumbered Non-Performing Loan Sale*

On July 17, 2008, the Bankruptcy Court entered the *Order, Pursuant to Sections 105(a0 and 363 of the Bankruptcy Code, (I) Authorizing the Private Sale of the Unencumbered Non-Performing Loans and REO Property To Beltway Capital, LLC Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Terms of the Sale Agreement, And (III)*

---

[19]25   The Debtors' construction loan portfolio consists of loans originated under Warehouse Facilities with JPM, ABN, and Bank of America. Due to the Debtors' inability to fund required advances to borrowers under the construction loans postpetition, JPM and ABN had agreed, by stipulations with the Debtors approved by the Bankruptcy Court [Docket Nos. 105 and 284, respectively], to make required advances and/or provide for the continued servicing of loans originated under their respective Warehouse Facilities in order to preserve the value of their interests in the construction loans.

36

066585.1001

*Granting Related Relief* [D.I. 5171]. Pursuant to this sale, the Debtors' sold approximately 82 non-performing loans and REO assets, with an approximate UPB of $26 million, to Beltway Capital, LLC for approximately $10.5 million (subject to certain holdbacks as described in the parties' Sale Agreement). The Debtors are currently working with Beltway to address certain holdbacks under the Sale Agreement and have received, to date, approximately $~~9.7~~10.3 million of the sale proceeds.

g.      *Performing Loan Sale*

On July 16, 2008, the Debtors filed a motion to establish bidding procedures with respect to, and to authorize, the sale of a portfolio of 243 performing, first-lien mortgage loans having a UPB of approximately $36.6 million (the "Performing Loan Sale") [Docket No. 5095]. The Bankruptcy Court approved the proposed bid procedures on August 5, 2008 [Docket No. 5310]. On August 12, 2008, the Debtors selected Vantium Capital Markets, L.P. ("Vantium") as the stalking horse bidder for the Performing Loan Sale [Docket No. 5367]. The bid deadline for the Performing Loan Sale ~~is~~was August 22, ~~2008, and, if necessary, an auction will be held on August 26, 2008.~~ 2008 and no qualified bids were received.  The hearing to consider approval of the Performing Loan Sale ~~is currently scheduled for August 27, 2008.~~ was held on August 27, 2008 and the Court entered an order approving the Sale to Vantium [Docket No. 5550].  The Performing Loan Sale ~~is scheduled to close~~closed on August 28, ~~2008.~~2008.  To date, the Debtors have received approximately $18.9 million in sale proceeds.

**9.      Schedules and Statements of Financial Affairs; Claims Bar Dates and Aggregate Claims Asserted**

The Debtors each filed their Schedules on October 5, 2007 [Docket Nos. 1335, 1336, 1337, 1338, 1339, 1340, 1341, 1342, 1344, 1345, 1346, 1347, 1348, 1349 and 1350].  On November 6, 2007, the Debtors amended certain of their Schedules [Docket Nos. 1820, 1821, 1822, 1823 and 1824].

On October 30, 2007, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 1708] (the "General Bar Date Order"). Pursuant to the General Bar Date Order, the deadline for non-governmental entities to submit Proofs of Claim in the Chapter 11 Cases was January 11, 2008 (the "General Bar Date"). Subject to certain limited exceptions contained in the Bankruptcy Code, in the General Bar Date Order (including with respect to Claims arising from the rejection of executory contracts after the General Bar Date), and in the Borrowers Bar Date Order (as defined below), all Proofs of Claim filed against the Debtors were required to be submitted by the General Bar Date. The deadline for governmental units to assert prepetition Claims against any of the Debtors was February 4, 2008 (the "Government Bar Date").

On February 14, 2008, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing a Bar Date for Filing Proofs of Claim by Construction Loan and HELOC Borrowers and Approving the Form and Manner of Notice Thereof* [Docket No. 2987] (the "Borrowers Bar Date Order"). Pursuant to the Borrowers Bar

37

Date Order, the deadline for borrowers under the Debtors' construction loans or home-equity-line-of-credit mortgage loans was April 30, 2008 (the "Borrowers Bar Date").

In addition to the General Bar Date, the Government Bar Date, and the Borrowers Bar Date, the Bankruptcy Court has from time to time established bar dates for asserting Claims in connection with certain relief requested by the Debtors (e.g., rejection damages bar dates, limited-purpose administrative bar dates relating to particular transactions). All of these bar dates remain in full effect and, where more than one bar date potentially applies to a given Claim, the earliest bar date is the effective date.

As of ~~the date of this Disclosure Statement, approximately 10,444~~September 15, 2008, at least 10,149 Proofs of Claim in the aggregate, asserting liquidated Claims totaling ~~approximately~~ ~~$14.25~~at least $15.51 billion against the Debtors, have been filed.[20][26]  Approximately 4,985 Claims totaling $3.1 billion listed on the Debtors' Schedules are not identified as contingent, unliquidated, or disputed and have not been superseded by filed Claims.  Accordingly, ~~approximately $17.36~~at least $18.62 billion of liquidated Claims in the aggregate have been asserted against the Debtors.  As of ~~the date of this Disclosure Statement,~~September 15, 2008, Administrative Claims (exclusive of DIP Facility Claims, Professional Claims, the Servicing APA Claim (as hereinafter defined), and Administrative Claims asserted under the WARN Act (as hereinafter defined)) of approximately ~~$2.5~~2.55 million have been asserted against the Estates of the Debtors ~~(approximately $1.5 million of which have been disallowed and expunged)~~, and no Order has been entered establishing a bar date for filing Administrative Claims (the "Administrative Bar Date").  Upon establishment of the Administrative Bar Date, the Debtors expect that additional Administrative Claims may be filed.  Filed Claims by Debtor entity are as follows:

| Debtor | Secured | | Administrative | | Priority | | General Unsecured | |
|---|---|---|---|---|---|---|---|---|
| | # | $ Amount | # | $ Amount | # | $ Amount | # | $ Amount |
| All | — | — | — | — | 2 | $61,072 | 6 | $237,664 |
| AHM Acceptance | 8 | $197,546,045 | 2 | $1,948 | 11 | $56,388 | 33 | $2,419,044,731 |
| AHM Corp. | 133 | $338,576,757 | 19 | $638,753 | 1,236 | $10,601,002 | 1,074 | $3,346,533,621 |
| AHM Holdings | 220 | $201,602,570 | 31 | $1,843,340 | 387 | $59,477,627 | 909 | $2,093,791,627 |
| AHM Investment | 70 | $274,146,351 | 2 | $9,294 | 98 | $1,971,048 | 706 | $2,909,120,548 |
| AHM SV | 66 | $26,921,903 | 5 | $55,769 | 28 | $292,428 | 91 | $2,899,627,274 |
| AHM | 1 | $21,588 | 1 | $1,750 | 9 | $34,759 | 13 | $212,826,847 |

---

[20][26]  The ~~Plan Proponents~~Debtors make no admission as to the timeliness of any Filed Proof of Claim and, on behalf of themselves and the Plan Trustee and Plan Oversight Committee, reserve all rights to object to Proofs of Claim filed after the General Bar Date, Government Bar Date, or Borrowers Bar Date, as applicable.

066585.1001

| Debtor | Secured | | Administrative | | Priority | | General Unsecured | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | # | $ Amount | # | $ Amount | # | $ Amount | # | $ Amount |
| Ventures | - | - | - | - | 5 | $245,353 | 7 | $212,748,742 |
| Great Oak | 2 | $4,726 | - | - | 105 | $224,342 | 191 | $215,108,129 |
| Homegate | 3 | $21,120 | - | - | 105 | $224,342 | 191 | $215,108,129 |
| None | 361 | $17,558,445 | 2 | $758 | 1,300 | $16,093,929 | 3,012 | $57,367,292 |
| TOTAL | 864 | $1,056,399,504 | 62 | $2,551,613 | 3,181 | $89,057,948 | 6,042 | $14,366,406,473 |

## 10. Return of Mortgage Loan Files and Destruction of Duplicate Mortgage Files

On December 14, 2007, the Debtors filed a motion requesting authority to abandon and destroy certain duplicative copies of their mortgage loan files (the "Duplicate Hard Copy Loan Files") and to expend funds to complete the disposition of the mortgage loan files or, alternatively, to return the Duplicate Hard Copy Loan Files to the owner of such loans upon written request and payment of all reasonable costs and expenses associated with the retrieval, review and return (the "Returned Loan Files"), in accordance with the federal and state laws[2127] which protect confidential consumer information [Docket No. 2395] (the "Destruction Motion"). The Debtors received twelve objections to the Destruction Motion and expended significant time negotiating with the objecting parties. On January 14, 2008, the Bankruptcy Court approved the Destruction Motion in part, authorizing the Debtors to immediately abandon and destroy only those Duplicate Hard Copy Loan Files for loans the Debtors did not fund [Docket No. 2724] (the "First Destruction Order").

Following entry of the First Destruction Order, the Debtors continued to negotiate with parties in interest regarding the establishment of a document return program. Thereafter, on February 5, 2008, the Debtors filed a reply and supplement to the Destruction Motion [Docket No. 2888] (the "Destruction Supplement"), pursuant to which the Debtors sought only approval of a document return program. The Debtors received twenty-five objections to the Destruction Supplement. Again, the Debtors expended substantial time negotiating with the objecting parties, including the Office of the United States Trustee, regarding the document return program. As a result of these significant efforts, the document return program was approved by the Bankruptcy Court on February 14, 2008 [Docket No. 3010]. As part of the document return program, the Bankruptcy Court established a deadline of March 14, 2008 (the "Return Request Deadline") by which a Requesting Party was required to file and serve a completed Loan File Return Declaration.

---

[2127] In the Destruction Motion, the Debtors sought (and ultimately obtained) authority to destroy files in accordance with 16 C.F.R. § 682.3(a), and an exemption from any other inconsistent federal or state laws or regulations, including with respect to the disposal or retention of non-public consumer information.

066585.1001

The Debtors received fourteen (14) Loan File Return Declarations prior to the Return Request Deadline [Docket Nos. 3271, 3275, 3289, 3290, 3291, 3294, 3297, 3300, 3302, 3304, 3305, 3307, 3327, and 3347], requesting approximately 278,995 Hard Copy Loan Files in the aggregate.[2228] Accordingly, of the 1.5 million Hard Copy Loan Files remaining in the Debtors' possession are ACRC, approximately 900,000 Hard Copy Loan Files that were once located in not subject to a Loan File Return Declaration, postpetition agreement, or order to return (the "Non-Requested Loan Files"). On June 5, 2008, the Debtors filed a motion seeking court approval to destroy these Non-Requested Loan Files [Docket No. 4387]. On June 25, 2008, the Bankruptcy Court held an evidentiary hearing and entered an order approving this relief [Docket No. 4858], and the Debtors are diligently working through the Loan Files to return or destroy such files as appropriate.

### 11.    Rejection of Leases and Executory Contracts

The Debtors have filed ten motions seeking authority to reject certain non-residential real property leases, equipment leases, and/or executory contracts in order to avoid burdening the Debtors' Estates with any unnecessary postpetition obligations [Docket Nos. 220, 510, 742, 967, 2192, 2541, 2841, 3109, 3334, and 4098]. The Bankruptcy Court has approved each of the Debtors' rejection motions [Docket Nos. 779, 843, 1018, 1600, 2446, 2805, 3085, 3416, 3692 and 4485] (collectively, the "Rejection Orders"). Pursuant to the Rejection Orders, the Debtors have rejected hundreds of leases and executory contracts.

On June 6, 2008, the Debtors filed a motion seeking to reject burdensome prepetition executive employment contracts with Stephen A. Hozie (Chief Financial Officer), Alan B. Horn (General Counsel), Robert C. Bernstein (Controller), Craig Pino (Chief Investment Officer and Treasurer), and Robert F. Johnson (Secondary Markets Executive) [Docket No. 4428], which was approved by the Bankruptcy Court by order dated June 24, 2008 [Docket No. 4825]. Pursuant to the EIP, each of these executives had executed a general release and waiver of employment-related claims against the Debtors as a condition to receiving his January 2008 bonus.

On July 29, 2008, the Debtors filed a motion seeking (i) to reject a burdensome prepetition executive employment contract with Michael J. Strauss, the Debtors' founder and former CEO and Chairman of the Board, and (ii) to approve a related stipulation between Mr. Strauss, the Debtors, and the Committee (the "Strauss Rejection/9019 Motion") [Docket No. 5267]. Among other things, the stipulation permits Mr. Strauss to continue to utilize his current office space and secretarial support until the Debtors sell or vacate the Melville, New York

---

[2228] Of these fourteen Loan File Return Declarations, three do not comply with the Second Order. Pursuant to their respective Loan File Return Declarations, Deutsche Bank National Trust Company [Docket No. 3305] and LaSalle Bank National Association [Docket No. 3347] have agreed to pay applicable Return Costs "only to the extent that sufficient funds are made available from the respective Trusts." In lieu of a Loan File Return Declaration, Wells Fargo Bank, N.A. filed an objection and reservation of rights to the Return Request Deadline established pursuant to the Second Order [Docket No. 3307]. The Debtors reserve all of their rights with respect to these Loan File Return Declarations, including, but not limited to, refusal to deliver Hard Copy Loan Files requested pursuant to the non-compliant Loan File Return Declarations.

headquarters and to enjoy health and welfare benefits and perquisites generally available to the Debtors' employees for so long as such benefits remain available, while at the same time terminating Mr. Strauss's compensation and special benefits as of May 31, 2008, and requiring Mr. Strauss to support the Debtors' efforts to maximize the value of their Estates, including, but not limited to, sales of assets and the confirmation of a chapter 11 plan. The Bankruptcy Court approved the Strauss Rejection/9019 Motion is currently set for hearing on by order dated August 18, 2008. 2008 [Docket No. 5467].

### 12.    Extensions of Exclusivity

By Order dated December 19, 2007, the Bankruptcy Court extended for ninety (90) days, through and including March 3, 2008, the exclusive period during with the Debtors have the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period") in the Chapter 11 Cases, and to extend for an additional ninety-one (91) days, through and including May 5, 2008, the period during which the Debtors have the exclusive right to solicit acceptances of a chapter 11 plan (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods") in the Chapter 11 Cases [Docket No. 2445].

Subsequently, on February 29, 2008, the Debtors moved to further extend the Exclusive Periods by approximately ninety (90) days [Docket No. 3133]. Specifically, the Debtors requested that the Bankruptcy Court enter an order extending the Exclusive Filing Period through and including June 2, 2008, and the Exclusive Solicitation Period through and including July 31, 2008. The Bankruptcy Court entered an order approving this request on March 26, 2008 [Docket No. 3415].

Most recently, on May 30, 2008, the Debtors moved to further extend the Exclusive Periods by approximately ninety (90) days [Docket No. 4329], to which BofA as Administrative Agent filed a limited objection [Docket No. 4703]. On July 17, 2008, the Bankruptcy Court entered an order granting the May 30 motion in part and extending the Exclusive Filing Period through and including August 19, 2008, and extending the Exclusive Solicitation Period through and including October 17, 2008 [Docket No. 5175]. The Debtors filed their Original Plan on August 15, 2008, before expiration of the Exclusive Filing Period. On August 18, 2008, the Bankruptcy Court granted the balance of the relief requested in the May 30 motion is currently scheduled for hearing on August 18, [Docket No. 5462], extending the Exclusive Filing Period through and including September 2, 2008, and extending the Exclusive Solicitation Period through and including October 29, 2008.

### 13.    Litigation

The Certain Debtors are (or were) party to a number of adversary proceedings initiated in the Bankruptcy Court, as well as certain non-bankruptcy litigation commenced prior to the Petition Date, certain of which are detailed below.

#### a.    *Waterfield Litigation*

On September 29, 2006, AHM Corp. filed suit against Union Federal Bank of Indianapolis ("Union Federal") in the United States District Court for the Southern District of

41

New York (the "District Court"). The case is captioned *American Home Mortgage Corp. v. Union Federal Bank of Indianapolis*, No. 1:06-cv-07864-JGK, and is pending before the Honorable John G. Koeltl (the "Waterfield Litigation"). AHM Corp. asserts claims arising under a Stock and Mortgage Loan Purchase Agreement between itself, Union Federal, and Waterfield Financial Corporation ("WFC"), dated January 12, 2006 (the "Purchase Agreement"). As set forth in the Purchase Agreement, AHM Corp. acquired all of the outstanding shares of WFC, as well as certain mortgage loans. In exchange for the acquired assets, AHM Corp. paid the net book value of WFC, and agreed to take on certain liabilities of Union Federal relating to mortgage loans that previously had been sold to investors.

AHM Corp. seeks a post-closing purchase price adjustment ("PPA"), declaratory relief, and damages for alleged breaches of various representations and warranties in the Purchase Agreement. AHM Corp. asserts that it is entitled to a PPA because loans that were sold by Union Federal to investors before the transaction were "subject to repurchase" at the time of closing. AHM Corp. also asserts indemnification claims relating to alleged misrepresentations concerning, *inter alia*, WFC's accounting. Union Federal disputes AHM Corp.'s claims, among other reasons, based on Union Federal's allegations that: the loans at issue were not subject to repurchase; the disputed loans were disclosed to AHM Corp. prior to closing; AHM Corp.'s PPA claim was untimely and did not comply with other requirements to assert such a claim; and the accounting practices of WFC were sound and in accord with generally accepted accounting principles.

Union Federal moved to dismiss AHM Corp.'s Complaint, and, on August 22, 2007, the District Court dismissed negligent misrepresentation claims asserted by AHM Corp. AHM Corp.'s PPA claims and its claims for breaches of representations relating to WFC's accounting survived, and Union Federal generally denied AHM Corp.'s remaining claims in its answer. Union Federal also filed counterclaims against AHM Corp. asserting that AHM Corp. had breached the Purchase Agreement and the related Escrow Agreement (as defined below) by, among other alleged misconduct, refusing to perform its obligation to repurchase certain loans from investors. Union Federal also asserts affirmative defenses against AHM Corp., including that any PPA or other damages that AHM Corp. may recover must be reduced by the amount of Union Federal's damages under the legal doctrines of setoff and recoupment.

On November 30, 2007, Waterfield Shareholder LLC ("Waterfield"), a surviving entity of the transaction set forth in the Purchase Agreement, moved to intervene in the Waterfield Litigation. AHM Corp. opposed Waterfield's intervention. On January 10, 2008, the District Court overruled AHM Corp.'s objection and granted Waterfield's motion to intervene.

AHM has alleged claims of approximately $29.2 million against Union Federal, and Union Federal and Waterfield have asserted counterclaims against AHM Corp. for damages in an amount to be determined at trial. In addition, Union Federal and Waterfield seek the release of all escrow amounts in excess of $29.2 million.

42

066585.1001

History of the Transaction

On January 12, 2006, AHM Corp. acquired WFC from Union Federal pursuant to the Purchase Agreement. Under the terms of the Purchase Agreement, AHM Corp. acquired the capital stock of WFC and certain of the mortgage loans held by WFC and Union Federal. At closing, Union Federal transferred all of the stock of WFC and certain loans purchased by AHM through the Purchase Agreement to AHM Corp. AHM Corp. also assumed certain liabilities of WFC and Union Federal.

The Purchase Agreement provides that the purchase price for the transaction could be subject to a post-closing adjustment. Specifically, Section 2.4 provided for the submission by AHM Corp. of a PPA request, and prescribed the timing and form of the submission.

On January 20, 2006, in conjunction with the Purchase Agreement, the parties entered into an escrow agreement (the "Escrow Agreement") between AHM Corp., Union Federal, Waterfield, and JPMorgan Chase Bank, N.A. (the "Escrow Agent"). The purpose of the Escrow Agreement was to provide a fund for (a) a post-closing purchase price adjustment, if any, under the Purchase Agreement, and (b) indemnity payments to AHM Corp., if any. The escrowed funds, which total $55 million, represent a portion of the purchase price. The escrowed funds were to be held and delivered by the Escrow Agent per the terms of the Escrow Agreement.

On April 11, 2006, AHM Corp. sent Union Federal a PPA demand of approximately $29.2 million. Union Federal thereafter notified AHM Corp. that it disagreed with AHM Corp.'s claim as untimely and substantively inaccurate (the "Notice of Disagreement"). After Union Federal provided AHM Corp. with the Notice of Disagreement, the parties attempted to resolve their disputes. Negotiations failed, and AHM Corp. then submitted its claim to PricewaterhouseCoopers ("PwC"). Union Federal objected to AHM Corp.'s submission to PwC as outside the scope of PwC's engagement under the terms of the Purchase Agreement claiming, among other things, the PPA claim was untimely and AHM Corp. did not provide Union Federal with the required Statements of Net Book Value.

On September 29, 2006, after further negotiations failed, AHM Corp. submitted a Claim Notice and Certificate of Instruction (as defined in the Escrow Agreement) to the Escrow Agent and Union Federal. AHM Corp.'s Claim Notice and Certificate of Instruction described AHM Corp.'s PPA claim as being in excess of $29 million, and stated that its claim for indemnification based on breaches of representations and warranties could not be quantified at that time. AHM Corp.'s Claim Notice instructed the Escrow Agent to retain the entirety of the escrowed funds until AHM Corp.'s PPA and breach of representations and warranties claims were fully resolved. Union Federal and Waterfield objected to AHM Corp.'s Certificate of Instruction, and asserted a claim to the entire $55 million. At present, the funds remain in escrow.

Lawsuit with Union Federal and Waterfield

On September 29, 2006, AHM Corp. filed its complaint against Union Federal (the "Complaint") in the District Court. In the Complaint, AHM Corp. seeks declaratory and injunctive relief, and damages for allegations of breach of contract and negligent misrepresentation. The Complaint requests relief relating to AHM Corp.'s claim for a PPA and

43

066585.1001

claims for indemnification based on Union Federal's alleged breach of representations and warranties in the Purchase Agreement. Union Federal moved to dismiss the Complaint on October 23, 2006. On August 22, 2007, the District Court dismissed AHM Corp.'s four negligent misrepresentation claims, but denied the motion as to AHM Corp.'s PPA and breach of representations and warranties claims.

On November 30, 2007, Union Federal filed its Answer, Affirmative Defenses, and Counterclaims against AHM Corp. (the "Union Federal Answer"). The Union Federal Answer generally denies the allegations contained in the Complaint, asserts certain affirmative defenses, and asserts counterclaims against AHM Corp. Among other things, Union Federal alleges that AHM Corp. breached the Purchase Agreement by refusing to carry out its loan-repurchase obligations after closing by refusing to buy back required loans from investors. The counterclaims also concern the Escrow Agreement, and allegations by Union Federal that AHM Corp. failed to assume the defense of various litigations involving WFC and/or the mortgage loan business, which Union Federal alleges AHM Corp. had agreed in the Purchase Agreement to defend. Union Federal seeks damages and other relief against AHM Corp. due to AHM Corp.'s breaches of the Purchase Agreement. Union Federal also asserts a variety of defenses, including that the amount of any damages awarded to Union Federal should be set off against any damages awarded to AHM Corp. under the legal doctrines of setoff and recoupment.

On January 10, 2008, over AHM Corp.'s objection, the District Court granted Waterfield's motion to intervene in the Waterfield Litigation. On January 18, 2008, Waterfield filed its Answer, Affirmative Defenses, and Counterclaims against AHM Corp. (the "Waterfield Answer" and, collectively with the Union Federal Answer, the "Answers") generally denying the allegations in the Complaint, asserting counterclaims and interposing affirmative defenses similar to those asserted by Union Federal. Waterfield also asserted an additional, alternative counterclaim for unjust enrichment against AHM Corp. because Union Federal and Waterfield obtained a release of liability relating to all mortgage loans that Union Federal sold to EMC Mortgage Corporation before the AHM Corp. transaction occurred (the "EMC Counterclaim"). The counterclaims seek damages from AHM Corp. in an amount to be determined at trial. Union Federal and Waterfield also seek an order from the District Court releasing all escrowed funds in excess of $29.2 million.

After the counterclaims were filed, AHM Corp. moved to dismiss the fifth counterclaim, which alleges that AHM Corp. is in breach of the Escrow Agreement. On July 10, 2008, AHM Corp. withdrew that motion to dismiss, and, in exchange, Union Federal and Waterfield filed amended answers, affirmative defenses, and counterclaims to the AHM Corp. Complaint (the "Amended Counterclaims") that addressed issues regarding Union Federal's and Waterfield's escrow-related counterclaims that were raised in AHM Corp.'s motion to dismiss. AHM Corp. also moved to dismiss the EMC Counterclaim, but the District Court denied that motion on July 11, 2008. Finally, AHM Corp. moved to strike Union Federal and Waterfield's setoff and recoupment defenses, arguing that they were legally unavailable in this case. On July 11, 2008, the District Court denied AHM Corp.'s motion to strike those affirmative defenses, holding that it was premature to decide whether setoff and recoupment were available to Union Federal and Waterfield. As a result, the setoff and recoupment defenses remain in the case.

44

066585.1001

DB02:7418039.1

On August 8, 2008, AHM Corp. filed its answers to the Amended Counterclaims, generally denying the allegations and asserting certain affirmative defenses. Discovery began on August 28, 2008 with the exchange of initial disclosures by the parties. The District Court ordered that fact discovery be completed by February 28, 2009, and that any expert discovery be completed by May 22, 2009. Dispositive motions are due to be filed by June 26, 2009.

Union Federal and Waterfield have timely filed proofs of claim against the Debtors relating to their counterclaims, and the Bankruptcy Court has granted them limited relief from the automatic stay to prosecute, defend against, and/or settle new or existing claims in the District Court, with any enforcement or execution of any settlement, judgment, or other disposition of the Waterfield Litigation against property of AHM Corp.'s bankruptcy estate remaining subject to the automatic stay and further order of the Bankruptcy Court [Docket No. 1595].

> b.    *American Home Mortgage Securities Litigation*

Prior to the Petition Date, approximately eighteen securities class action complaints were filed in the United States District Court for the Eastern District of New York (the "District Court"), each alleging violations of certain federal securities laws, including Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (collectively, the "Securities Laws"), by AHM Investment and certain of its current and/or former officers, directors and underwriters and auditor (collectively, the "Non-Debtor Defendants"), based on allegedly false and misleading statements made prepetition concerning AHM Investment's financial results. From and after the Petition Date, these actions were stayed as against AHM Investment by operation of 11 U.S.C. § 362(a), but continued against the Non-Debtor Defendants.

On or about March 19, 2008, the District Court consolidated the various actions into a single proceeding entitled *In re American Home Mortgage Securities Litigation*, Case No. 07-MD-1898 (TCP) (the "Securities Litigation"), appointed the Teachers' Retirement System of Oklahoma and the Oklahoma Police Pension and Retirement System (collectively, the "Lead Plaintiffs") as lead plaintiffs on behalf of a putative class including all persons who purchased or otherwise acquired common or preferred shares of stock of AHM Investment on the open market during the period from July 19, 2005, to August 6, 2007, inclusive, and directed the Lead Plaintiffs to file an amended, consolidated complaint excluding AHM Investment as and proceeding only against the Non-Debtor Defendants. The Lead Plaintiffs filed their amended consolidated complaint on or about June 3, 2008, and the Securities Litigation is proceeding against the Non-Debtor Defendants only.

> c.    a. *WARN Act Adversary Proceeding*

On August 8, 2007, certain former employees of the Debtors, on their own behalf and on behalf of other similarly situated former employees, filed a complaint for damages on account of alleged violations of the Worker Adjustment Retraining Notification Act, 29 U.S.C. § 2101, et seq. (the "WARN Act"), resulting from the Debtors' August 3, 2007, reduction in workforce. On May 7, 2008, the plaintiffs amended their complaint to assert a claim under California's

45

066585.1001

version of the WARN Act, California Labor Code, Section 1400 et seq. On May 21, 2008, the Bankruptcy Court approved the parties' stipulated order [Adv. Docket No. 65] certifying a class comprising all employees terminated without cause within 30 days of August 3, 2007, at one of the Debtors' "Affected Facilities" (as defined in the order). The case will thus proceed as a certified class action. The Debtors have answered the plaintiffs' amended complaint and discovery is underway.

The WARN Act plaintiffs seek payment of up to 60 days' wages and benefits to class members as an administrative expense pursuant to § 503(b)(1) of the Bankruptcy Code or, alternatively, with priority under § 507(b)(4) and/or (5) of the Bankruptcy Code (with the balance not entitled to priority payable as a general unsecured claim). The WARN Act plaintiffs have asserted that the class they represent includes more than 4,000 members.

The Debtors contend that no WARN Act liability exists and dispute that any violation of the WARN Act (or the California version thereof) occurred; however, if the WARN Act plaintiffs were to prevail there would be a material impact on the estimated recoveries to creditors under the Plan as the WARN Act plaintiffs are asserting entitlement to more than $18 million in administrative and priority claims and over $10 million in unsecured claims.

d.    b. <em>Morgan Stanley Adversary Proceeding</em>

As discussed above, Morgan Stanley filed a complaint against the Debtors on August 15, 2007, seeking, among other things, declaratory and injunctive relief based on Morgan Stanley's assertion that the Debtors' servicing rights under a servicing agreement between Morgan Stanley and the Debtors were terminated prior to the Petition Date. Most counts of the complaint were withdrawn in connection with the August 24, 2007, stipulation between the parties approved by the Bankruptcy Court [Adv. Docket No. 14]. The remaining counts of the complaint were dismissed by agreement of the parties on or about June 4, 2008 [Adv. Docket No. 18].

e.    e. <em>CSFB, Bear Stearns and Calyon Adversary Proceedings</em>

As discussed above, actions were filed by CSFB, BS/EMC, and Calyon early in these Chapter 11 Cases, each similarly asserting that the Debtors' rights under mortgage loan servicing agreements had terminated prepetition, and that the Debtors were obligated to transfer the servicing of certain loans over to entities designated by CSFB, BS/EMC, and Calyon, respectively. The Debtors asserted certain counterclaims in the answers to these complaints. The adversary proceedings with CSFB and BS/EMC were settled in November 2007 [respective Adv. Docket Nos. 73 and 23]. The litigation with Calyon continued, however, and the Bankruptcy Court held a "Phase I Trial" in connection with that adversary proceeding.

The Bankruptcy Court entered an opinion and order on the Phase I Trial on January 15, 2008, in which it found, among other things, that the Master Repurchase Agreement between the parties had provided for the sale of mortgage loans to Calyon on a servicing-retained basis and that Calyon was not entitled to terminate the Debtors' servicing rights postpetition. Calyon filed a motion to alter or amend this opinion and order on January 25, 2008, which was denied on March 10, 2008.

46

Subsequently, Calyon filed an amended complaint on February 4, 2008, which the Debtors answered on March 3, 2008. On July 21, 2008, the parties reached a settlement (the "Calyon Settlement"), which was approved by the Bankruptcy Court on August 8, 2008 [Adv. Docket No. 148]. Among other things, the Calyon Settlement provides for the transfer of servicing of the Calyon loan portfolio to Calyon's designee and for the release of certain disputed funds to the Debtors.

f.    d. *Waldner's Adversary Proceeding*

On August 22, 2007, Waldner's Business Environments Inc. ("Waldner's") filed a complaint against AHM Corp. for reclamation of goods and immediate payment of an administrative expense claim for goods shipped to AHM Corp. prior to the Petition Date. In addition, three other parties have asserted demands for reclamation of goods shipped prior to the Petition Date. After substantial negotiations, the Debtors entered into a stipulation with Waldner's that was approved by order of the Bankruptcy Court dated January 11, 2008.

g.    e. *Bank of America, N.A. Adversary Proceeding*

On October 22, 2007, ~~certain of the Debtors~~ AHM SV (f/k/a American Home Mortgage Servicing, Inc.) and two non-debtor entities filed a complaint against Bank of America, N.A., asserting a breach of payment obligations under certain swap agreements entered into in connection with mortgage loan purchases. Bank of America, N.A. filed a motion to dismiss the amended complaint on grounds of lack of jurisdiction or, in the alternative, abstention. On June 27, 2008, the Bankruptcy Court entered an order granting in part and denying in part the motion, specifically denying the motion on the issue of jurisdiction (finding subject matter jurisdiction) but granting the motion to dismiss AHM SV (f/k/a American Home Mortgage Servicing, Inc.) as a plaintiff for lack of standing. By agreement with the remaining plaintiffs, Bank of America, N.A. has until November 5, 2008, to file its answer to the complaint.

h.    f. *Lehman Adversary Proceeding*

On October 24, 2007, AHM Investment filed a complaint against Lehman Brothers Inc. and Lehman Commercial Paper Inc. (collectively, "Lehman"), asserting that Lehman breached its contract with AHM Corp. when it sought to foreclose on certain private-label notes, and seeking the turnover of the notes as well as various declaratory relief. On November 26, 2007, Lehman filed a motion to partially dismiss the complaint. On May 23, 2008, the Bankruptcy Court entered an order granting Lehman's motion to partially dismiss the complaint [Docket No. 4203] (the "Lehman Order"). Pursuant to the Lehman Order, the Bankruptcy Court dismissed Counts I through IV of the complaint, as well as four of the five requests for declaratory judgment in Court V. By Order dated June 30, 2008, the Bankruptcy Court certified the Lehman Order as "final" for purposes of appeal. On July 11, 2008, AHM Investment filed a notice of appeal from the Lehman Order (as amended) and a request that the Bankruptcy Court certify its appeal directly to the United States Court of Appeals for the Third Circuit. The request was denied as moot after the appeal was docketed in the District Court.

On September 15 and 16, 2008, respectively, Lehman Brothers Holdings Inc. ("LBHI") and an affiliated entity, LB 745 LLC (collectively with LBHI, the "Lehman Debtors"), filed

066585.1001

petitions in the United States Bankruptcy Court for the Southern District of New York seeking relief under chapter 11 of the Bankruptcy Code.  The Debtors are currently evaluating the effect, if any, of the Lehman Debtors' bankruptcy filing on the prosecution of their appeal from the Lehman Order.

### i.    g. Wells Fargo Adversary Proceeding

On October 25, 2007, Wells Fargo Bank, N.A., in its capacity as Securities Administrator ("Wells"), filed an interpleader action, seeking a resolution of a dispute between the Debtors and BS/EMC regarding the rights to mortgage-backed certificates held by BS/EMC, as well as August 2007 principal and interest payments related to the mortgage-backed certificates.  On November 19, 2007, Wells filed an amended complaint, which the Debtors answered on December 11, 2007.  In July 2008, the parties filed cross-motions for summary judgment with respect to the interpleader complaint, and briefing closed on July 23, 2008.  The motions are under consideration by the Bankruptcy Court.

### i.    h. Triad Adversary Proceeding

On November 5, 2007, AHM Investment and AHM SV (f/k/a American Home Mortgage Servicing, Inc.) filed a complaint against Triad Guaranty Insurance Corp. ("Triad"), a private mortgage insurance company, asserting that Triad breached its insurance agreement by denying coverage for claims relating to certain defaulted mortgage loans that borrowers procured by fraud.  Triad filed its answer and counterclaim on December 6, 2007, and the Debtors filed an answer to the counterclaim on December 26, 2007.  Discovery is currently underway. Fact discovery is scheduled to be completed by September 10, 2008, and expert discovery is scheduled to be completed by November 8, 2008.

### i.    Waterfield Litigation

In September 2006, AHM Corp. filed a lawsuit (the "Waterfield Action") in the United States District Court for the Southern District of New York (the "Southern District Court") against Union Federal Bank of Indianapolis ("Union Federal") seeking damages of at least $29 million arising from Union Federal's breach of a Stock and Mortgage Loan Purchase Agreement (the "Purchase Agreement") whereby AHM Corp. purchased all the stock of Waterfield Financial Corp. ("Waterfield Financial") as well as certain mortgage loans from Union Federal.

The Purchase Agreement imposed certain obligations on Union Federal, including the obligation to pay to AHM Corp. a post-closing purchase price adjustment (the "Purchase Price Adjustment") calculated using agreed formulae set forth in the Purchase Agreement.  Union Federal also made certain representations and warranties to AHM Corp. in the Purchase Agreement regarding the accuracy of Waterfield Financial's financial statements and books and records, and agreed to indemnify AHM Corp. for any losses resulting from breaches of those representations and warranties.

The Purchase Agreement required that a portion of the purchase price be placed into an escrow account (the "Escrow") to provide a fund for (i) the Purchase Price Adjustment, if any, to

48

be paid by Union Federal to AHM Corp. and (ii) indemnity payments Union Federal is obligated to make to AHM Corp. The Escrow amount was $55 million.

Under the terms of the Escrow agreement, if AHM Corp. believed that it had claims that were payable out of the Escrow, AHM Corp. was required to deliver a Claim Notice and a Certificate of Instruction setting forth its claims to the Escrow agent prior to the Escrow termination date, which was September 30, 2006. AHM Corp. provided the required Claim Notice and Certificate of Instruction to both Union Federal and the Escrow agent by letter dated September 29, 2006. On the same date, AHM Corp. filed its complaint initiating the Waterfield Action (the "Complaint"), in which it asserted (i) a claim for a Purchase Price Adjustment and (ii) claims for indemnification based on Union Federal's breaches of certain representations and warranties in the Purchase Agreement relating to the accuracy of Waterfield Corp.'s financial statements and books and records. Because AHM Corp. was unable to definitively quantify the damages it sought from Union Federal prior to the Escrow termination date, in both the Claim Notice and the Complaint AHM Corp. estimated the Purchase Price Adjustment to be not less than $29 million and stated that the additional damages resulting from Union Federal's breaches of representations and warranties could not be determined prior to trial. In its Certificate of Instruction, AHM Corp. indicated that the combined claims, along with interest, could equal or exceed the entire $55 million Escrow amount.

On August 22, 2007, the Southern District Court denied, in part, Union Federal's motion to dismiss the claims asserted in the Complaint, and sustained AHM Corp.'s Purchase Price Adjustment and indemnification claims. In its answer to the Complaint, Union Federal asserted several counterclaims against AHM Corp., namely: (i) a claim that AHM Corp. failed to repurchase certain loans Union Federal asserts AHM Corp. was required to repurchase under the terms of the Purchase Agreement; (ii) a claim that AHM Corp. failed to assume control of certain litigation Union Federal asserts AHM Corp. was required to assume control of under the terms of the Purchase Agreement; and (iii) a claim that AHM Corp. improperly failed to release certain portions of the Escrow funds. Union Federal also asserted certain affirmative defenses, including an alleged right of setoff or recoupment against the Escrow with respect to any judgment against AHM Corp.

On December 20, 2007, AHM Corp. moved to strike Union Federal's setoff/recoupment defense on the grounds that only AHM Corp.'s claims, and not Union Federal's claims, are secured by the Escrow. Briefing on this motion is not yet complete.

On January 4, 2008, AHM Corp. moved to dismiss Union Federal's counterclaim relating to the Escrow. Briefing on this motion is not yet complete.

On January 11, 2008, the Southern District Court granted a motion by Waterfield Shareholder, LLC ("Waterfield LLC") to intervene in the lawsuit based on Waterfield LLC's assertion that it held a legal interest in the Escrow fund and that it had assumed certain obligations of Union Federal concerning Waterfield Financial's operations prior to the closing of the sale of Waterfield Financial to AHM Corp. On January 18, 2008, Waterfield LLC filed an answer to the Complaint, asserting counterclaims substantially identical to the counterclaims asserted by Union Federal, and an additional counterclaim seeking compensation for amounts

49

066585.1001

~~allegedly paid by Waterfield LLC to a Bear Stearns-related entity ("EMC") in settlement of certain repurchase claims by EMC relating to loans EMC had purchased from Union Federal or Waterfield Financial prior to the closing of AHM Corp.'s acquisition of Waterfield Financial.~~

~~On August 7, 2008, AHM Corp. filed its answer to Waterfield LLC's counterclaims. Discovery in the Waterfield Litigation is underway. AHM Corp. intends to vigorously pursue its claims against Union Federal and Waterfield LLC, and to vigorously defend the counterclaims asserted against it, and anticipates the Plan Trustee will do the same.~~

### 14.    Wells Fargo Stay Relief Litigation

On March 24, 2008, Wells Fargo Bank, N.A. ("Wells Fargo") filed the Motion for Relief From the Automatic Stay to Recover a Payment Made in Error to One of the Debtors Through Recoupment, Imposition of a Constructive Trust, and/or an Equitable Lien [Docket No. 3387] (the "Wells Fargo Stay Relief Motion"), by which it sought relief from the automatic stay to assert the equitable remedies of recoupment, constructive trust and equitable lien in order to recoup a $462,049.83 distribution Wells Fargo made on a certain note to the Debtors in March 2007 from future distributions to be made to the Debtors.

On April 8, 2008, the Debtors filed an objection to the Wells Fargo Stay Relief Motion (the "Wells Fargo Stay Relief Objection") arguing, among other things, that recoupment must be narrowly construed and that Wells Fargo failed to demonstrate that imposition of a constructive trust or an equitable lien was justified under the circumstances. On April 14, 2008, this Court held an evidentiary hearing on the matter, during which the Debtors presented witness testimony. On April 15, 2008, this Court enter an order denying the Wells Fargo Stay Relief Motion [Docket No. 3702] (the "Wells Fargo Stay Relief Order"). On April 25, 2008, Wells Fargo filed its Notice of Appeal of the Wells Fargo Stay Relief Order [Docket No. 3860], thereby appealing the Bankruptcy Court's decision with respect to certain of its alleged recoupment claims to the District Court.

### 15.    Bank of America Stay Relief Litigation

On February 22, 2008, BofA as Administrative Agent filed a Motion for Relief from Automatic Stay, Pursuant to 11 U.S.C. § 362(d), Allowing BofA as Administrative Agent to Exercise its Rights as a Secured Creditor [Docket No. 3054] (the "BofA Stay Relief Motion"), in which it sought authority to sell approximately $580 million in UPB of mortgage loans owned by the Debtors subject to BofA as Administrative Agent's security interest (the "BofA Portfolio"). On March 6, 2008, the Debtors filed their Preliminary Objection to the BofA Stay Relief Motion [Docket No. 3175] (the "Preliminary Objection"), which responded to certain allegations made in the BofA Stay Relief Motion concerning the Debtors' management of the BofA Portfolio and, further, argued that (i) BofA as Administrative Agent had failed to allege a *prima facie* case for "cause" under section 362(d)(1) of the Bankruptcy Code, (ii) BofA as Administrative Agent was entitled to adequate protection only from and after the date of the BofA Stay Relief Motion, (iii) BofA as Administrative Agent's interest in the BofA Portfolio was adequately protected, and (iv) the BofA Portfolio should not be sold into a down market. Thereafter, the Debtors and BofA

Administrative Agent engaged in extensive, expedited discovery (including expert witness discovery) and pretrial briefing.

While discovery was underway on the BofA Stay Motion, BofA as Administrative Agent and the Committee negotiated and executed the BofA/Committee Stipulation (as hereinafter defined) resolving all outstanding issues under the Cash Collateral Order between the Committee and BofA as Administrative Agent. Following approval of the BofA/Committee Stipulation (discussed below), and pursuant thereto, the Committee filed a Statement in Support of the BofA Stay Relief Motion [Docket No. 3618] on April 9, 2008.

BofA as Administrative Agent and the Debtors exchanged pretrial briefs on April 11, 2008 [Docket Nos. 3667 & 3668], and an evidentiary hearing was held on April 16 and 17, 2008. At the conclusion of BofA as Administrative Agent's case in chief, the Debtors moved to dismiss the BofA Stay Relief Motion for failure to establish a *prima facie* case, which dismissal was granted. By Order dated April 25, 2008 [Docket No. 3850], the Bankruptcy Court denied the BofA Stay Relief Motion _without prejudice_. The Bankruptcy Court extended the time for BofA as Administrative Agent to file an appeal of its ruling so as to provide the Debtors and BofA as Administrative Agent time to reach a consensual resolution of remaining issues without the need for further litigation.

### 16.  Committee and Bank of America 9019 Motion

On March 13, 2008, BofA as Administrative Agent and the Committee filed a motion to shorten notice [Docket No. 3279] (the "BofA/Committee Motion to Shorten") with respect to a joint motion, filed subsequently on March 14, 2008 [Docket No. 3318] (the "BofA/Committee 9019 Motion"), to approve a settlement stipulation (the "BofA/Committee Stipulation") resolving all remaining issues under the Cash Collateral Order. On March 17, 2008, the Debtors filed an objection [Docket No. 3322] to the BofA/Committee Motion to Shorten, ~~noting~~raising concerns with several ~~troubling~~ provisions of the BofA/Committee Stipulation and arguing it should go out on full notice to all creditors. By Order dated March 17, 2008 [Docket No. 3325], the Bankruptcy Court denied the BofA/Committee Motion to Shorten.

On April 7, 2008, the Debtors filed an objection [Docket No. 3542] to the BofA/Committee 9019 Motion, arguing, among other things, that the Committee had exceeded its authority under the Cash Collateral Order, that the BofA/Committee Stipulation provided illusory value to the Debtors' estates, and that the Committee's concessions to BofA as Administrative Agent were disproportionate to the value received. Objections were also filed by the Purchaser [Docket No. 3541] and the United States Trustee [Docket No. 3552]. At the conclusion of the April 14, 2008 hearing on the BofA/Committee 9019 Motion, the BofA/Committee Stipulation was approved, with some modifications, by order of the Bankruptcy Court [Docket No. 3699].

### 17.  The Purchaser's Administrative Expense Request

On May 23, 2008, the Purchaser filed a request for payment of an administrative expense (the "Servicing APA Claim") [Docket No. 4233] in the amount of approximately $12 million (not including other, as-yet unliquidated amounts) on account of alleged breaches of the

51

Servicing APA by the Debtors party thereto (collectively, the "Sellers"). The Debtors and the Committee object to the Servicing APA Claim on both legal and factual bases, and engaged the Purchaser informally following the filing of the Servicing APA Claim to express these objections and to obtain an extension of the Debtors' and the Committee's formal objection deadline. Following discussions with the Debtors, the Purchaser filed, then subsequently withdrew, a supplement to the Servicing APA Claim [Docket Nos. 4338 and 4359, respectively]. The Servicing APA Claim, and the Debtors' and Committee's objection deadline with respect thereto, have been continued by agreement of the parties to permit the Purchaser to review the factual underpinnings for its claims.

On August 18, 2008, the Purchaser filed an amended Servicing APA Claim [Docket No. 5495] seeking payment of $17,238,989, comprising:

(i) $5,127,162 on account of alleged shortfalls in custodial accounts resulting from acts or omissions of the Sellers occurring prior to the Initial Closing, which shortfalls the Purchaser asserts the Sellers are affirmatively required to remedy under the Servicing APA;

(ii) $4,592,887 of lender-paid mortgage insurance ("LPMI") premiums and prepayment penalties alleged to have been collected by the Sellers prior to the Initial Closing and to have been due and owing to the Purchaser at the Initial Closing;

(iii) $3,471,907 on account of funds allegedly misappropriated by the Sellers from accounts established for the benefit of the Purchaser post-Initial Closing and used to cure alleged shortfalls in custodial accounts resulting from acts or omissions of the Sellers prior to the Initial Closing;

(iv) $2,423,759 for reimbursement of amounts expended by the Purchaser to remedy an alleged pre-Initial Closing shortfall in the Sellers' payment clearing account;

(v) $834,648 on account of amounts allegedly withheld by the Sellers from borrowers' P&I payments prior to the Initial Closing to pay Fannie Mae guaranty fees falling due after the Initial Closing, which amounts were allegedly not paid to the Purchaser;

(vi) $757,426 of sale proceeds attributable to an agreement the Purchaser asserts did not transfer "servicing rights" as such term is understood within the industry and, accordingly, should have been excluded from the Servicing Sale; and

(vii) $31,200 in anticipated costs to transport servicing files and other books and records of the Servicing Business from the Sellers' New York headquarters to the Purchaser's place of business in Irving, Texas, which costs the Purchaser asserts are the Sellers' responsibility under the Servicing APA.

The Debtors filed a preliminary objection to the Servicing APA Claim on September 10, 2008 [Docket No. 5798], in which the Committee joined [Docket No. 5811]. In their objection, the Debtors asserted that approximately $9.2 million of the Servicing APA Claim (comprising

52

066585.1001

items items (i) and (iv)-(vii) in the foregoing list) should be disallowed as a matter of law.  The Debtors further asserted that the Purchaser's methodology for calculating its alleged LPMI deficiency was flawed and that the Servicing APA Claim should be reduced by the amount of deficiency was flawed and that the Servicing APA Claim should be reduced by the amount of $2.6 million on account of purported setoffs taken by the Purchaser against amounts it owed to AHM Corp. for certain corporate overhead and insurance costs it paid on behalf of the Servicing Business following the Initial Closing.  Finally, the Debtors reserve their rights to raise further objections (whether factual or legal) based on information obtained in discovery, which is currently underway.

The Debtors contend the Servicing APA Claim is without merit and that there is no net liability to the Purchaser for breaches of the Servicing APA or otherwise; however, if the Purchaser were to prevail on the Servicing APA Claim (or any portion thereof), there could be a material impact on the estimated recoveries to creditors under the Plan.

### 18.    Bank of America Global 9019 Motion

~~Immediately following~~Following dismissal of the BofA Stay Relief Motion as discussed above, the Debtors, the Committee, and BofA as Administrative Agent engaged in extensive settlement discussions concerning a global resolution of outstanding issues between the parties, including certain issues previously addressed by the BofA/Committee Stipulation. After several months of negotiation, the parties reached a mutually acceptable agreement and, on July 18, 2008, the Debtors filed a motion [Docket No. 5184] to approve a global settlement stipulation between the Debtors, BofA as Administrative Agent, and the Committee (the "BofA Global Settlement"), certain confidential provisions of which were permitted to be filed under seal per Order of the Bankruptcy Court [Docket No. 5309]. The Bankruptcy Court approved the BofA Global Settlement on August 5, 2008 [Docket No. 5308].

The BofA Global Settlement provides, among other things, that: (i) the BofA Syndicate Unsecured Claim ~~is capped~~against each of AHM SV, AHM Investment, AHM Corp. AHM Acceptance, and AHM Holdings is capped in each case at the lesser of $50 million or 50% of the actual amount of such claim, (ii) the remaining "benchmark" prepetition claim, as of July 2, 2008, is $468,128,691.58 (which confirms the remaining amount of the $1.082 billion prepetition claim after the ~~liquidation of collateral during these Chapter 11 Cases~~application of proceeds of and adequate protection payment paid to BofA as Administrative Agent from the proceeds of and adequate protection payment paid to BofA as Administrative Agent from the Petition Date through July 2, 2008) and provides for the sharing of cash receipts 50/50 between the Prepetition Lenders and the Debtors' Estates after ~~satisfaction~~indefeasible payment in full of the "benchmark" prepetition claim; (iii) the Debtors shall retain, free and clear, the first $2.6 million of the proceeds of the Calyon Settlement (described in Section III.G.19. below) and be entitled to use up to $1 million of additional proceeds to satisfy certain ancillary costs, if any, (iv) as originally provided in the BofA/Committee Stipulation, asserted liens in certain REO properties are released and the proceeds of such properties will be held in trust for the benefit of general unsecured creditors other than the ~~Prepetition Lenders,~~[33]BofA Syndicate,[29] (v) asserted

---

[33][29] Also on August 5, 2008, the Bankruptcy Court approved a stipulation between the Debtors and the Committee [Docket No. 5311] permitting the Debtors to use proceeds of these REO properties, as well as proceeds from compromise of the BofA Construction Loans, to pay ongoing operating expenses in these Chapter 11 Cases.

liens in approximately $6.9 million of cash in certain bank accounts are released, (vi) the Debtors shall retain, free and clear, approximately $250,000 related to repurchased servicing advances, (vii) ~~transfers~~ the costs of administering the remaining ~~BofA~~ collateral ~~to BofA as Administrative Agent~~of the BofA Syndicate will be paid from the proceeds of such collateral, with certain limited exceptions, and (viii) BofA as Administrative Agent, shall have complete dominion and control over and discretion with respect to the Mortgage Loans and related servicing rights, which ~~could~~may require ~~the Estates or the Plan Trust~~one or more Debtors to maintain ownership of the BofA Mortgage Loans and related servicing rights at no cost to the Debtors, the Estates or the Plan Trust.

### 19.    Calyon Settlements

In its capacity as administrative agent under the Repurchase Agreement dated November 21, 2006 (the "Calyon Repo"), Calyon has filed an adversary proceeding (as described above) and numerous motions and objections throughout the Debtors' Chapter 11 Cases. Many of the claims, issues and interests asserted by Calyon in various pleadings have been resolved by the following settlements: (a) the *Order Approving And Authorizing the Stipulation Between The Debtors And Calyon New York Branch, As Adminstrative Agent* [Docket No. 3918]; and (b) the *Order (I) Approving The Stipulation Between The Debtors And Calyon New York Branch, As Administrative Agent, And (II) Authorizing The Transfer Of Mortgage Servicing Rights Relating Thereto* [D.I. 5312]. The aforementioned settlements resolved complex disputes regarding over $12 million in funds to which Calyon asserted an entitlement, as well as an ongoing dispute as to the ownership of certain servicing rights and the payment of servicing fees. The settlements resulted in, among other things, approximately $10 million in funds returned to Calyon, servicing rights and the ownership thereof transferred to Calyon, payment to the Debtors of $5 million,[30] and the assignment by Calyon to the Debtors of rights in certain state bond loans and remaining funds and claims. The parties have not yet resolved , among other things, amounts owed to the Debtors' Estates in connection with the valuation and/or liquidation of the collateral retained by Calyon or certain disputes with respect to the amount, if any, of a deficiency claim of Calyon.

### 20.    JPM Stay Relief Litigation

On September 10, 2008, JPM filed a motion seeking relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code to foreclose on mortgage loan collateral

### 21.    ~~20.~~ Objections to Claims

As of the filing of this Disclosure Statement, the Debtors have filed ~~thirteen~~seventeen (~~13~~17) omnibus objections to Claims (the "Omnibus Objections") [Docket Nos. 3315, 3474, 3475, 3677, 3879, 3880, 4028, 4029, 4223, 4661, 4661, 5180, ~~5181~~]. ~~Eight~~5181, 5446, 5447, 5568, and 5569]. Ten of the Omnibus Objections were on non-substantive grounds, including, among others, that a particular Proof of Claim (a) is duplicative of another Proof of Claim filed

---

[30]  Proceeds in excess of $2.6 million were paid to BofA as Administrative Agent pursuant to the BofA Global Settlement Stipulation discussed in Section III.G.18 above.

066585.1001

against the same Debtor, (b) has been amended or superseded by a subsequently filed Proof of Claim, (c) is solely on account of shareholder interests in the Debtors, (d) asserts a claim against the wrong Debtor entity, (e) has been satisfied by the Debtors post-petition, (f) was filed after the applicable Bar Date, and/or (g) attaches no supporting documentation  The remaining Omnibus Objections were on substantive grounds, including, among others, that a particular Proof of Claim (a) asserts a liability not reflected in the Debtors' books and records, (b) was wrongly filed against multiple Debtor entities, (c) asserts amounts that are in excess of the amounts reflected as due and owing in the Debtors' books and records, (d) asserts a priority interest not reflected in the Debtors' books and records, and (e) asserts an undetermined value.

In total, through the Omnibus Objections, the Debtors have objected to approximately 5,680~~6,279~~ Proofs of Claim in the aggregate amount of approximately $~~2.64~~2.76 billion.  To date, 4416~~5087~~ Proofs of Claim have been reduced or disallowed by approximately $~~282~~364 million in the aggregate ~~[Docket Nos. 3696, 3945, 3946, 4027, 4291, 4295, 4289, 4526, 4527, and 4863]~~.

## 22.    ~~21.~~ Miscellaneous Contested Matters

In addition to efforts to obtain the relief necessary to stabilize operations, improve the financial condition of their businesses and to liquidate assets, the Debtors also spent significant time opposing relief requested by other parties when appropriate and in the best interests of their Estates.  For example, over twenty motions for relief from the automatic stay, certain of which are described above, have been filed by various parties in interest thus far in these Chapter 11 Cases.  While the Debtors have agreed to consensual resolutions of certain of these motions, or objected only on limited bases, the Debtors have litigated a number of such motions before the Bankruptcy Court.

By way of further example, the Debtors litigated three motions seeking, among other things, (i) production of documents and examinations of the Debtors pursuant to Bankruptcy Rule 2004; (ii) appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code, and (iii) appointment of a trustee or examiner pursuant to section 1104 of the Bankruptcy Code, to which the Office of the United States Trustee joined in part.

Responding to, resolving, and in some instances litigating miscellaneous contested matters has been a significant, albeit necessary, drain on the Debtors' financial and human resources, and has contributed to the overall costs of administration of these Chapter 11 Cases.

# IV.    PROPOSED INTERCOMPANY RESOLUTION EMBODIED IN THE PLAN

## A.    General Structure of the Plan

In early 2008, the Debtors and the Committee began discussions in earnest regarding the terms of a joint chapter 11 plan of liquidation for the Debtors.  One of the first matters discussed was whether the Debtors' Estates should be substantively consolidated.  Notwithstanding that the Debtors' Estates are being jointly administered by the Bankruptcy Court, each of the Debtors remains a separate legal entity.  As such, absent a party with standing convincing the Bankruptcy Court that the Estates should be substantively consolidated (which, as discussed below, requires

55

a particularly strong evidentiary showing), any plan to be confirmed for the Debtors must provide that the assets of each Debtor are to be used only to pay claims against that Debtor, and claims against a Debtor cannot be asserted against other Debtors (except to the extent such other Debtors are co-liable on particular claims).

Substantive consolidation is an equitable remedy that treats multiple estates as one. That is, claims against any individual estate are deemed to be claims against the consolidated entity, and the assets of any individual estate are deemed to be assets of one consolidated entity. Thus, if the Debtors were to substantively consolidate, creditors with claims against multiple Estates would be treated as if they had one claim against the consolidated Estate, Assets of each Estate would be treated as Assets of the consolidated Estate, and Intercompany Claims would be eliminated.

The discussions of the Debtors and the Committee with respect to substantive consolidation had two purposes: first, to determine whether it was possible under governing law to substantively consolidate one or more Debtors' estates (and, if so, whether proposing a consolidated versus de-consolidated plan was prudent); second, in the event the Debtors proposed a de-consolidated plan and some party in interest argued for substantive consolidation, to evaluate the merits of such position. Discussions regarding substantive consolidation occurred against the backdrop of the Third Circuit's decision in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), as to the circumstances under which substantive consolidation of debtor estates may be permitted. In *Owens Corning*, the Third Circuit stated that substantive consolidation is an "extreme" remedy to be used "sparingly" and ruled that, absent the consent of affected creditors, a proponent of substantive consolidation must prove either (i) that pre-bankruptcy, the entities to be consolidated "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity" or (ii) that after filing for bankruptcy, the entities' assets and liabilities "are so scrambled that separating them is prohibitive and hurts all creditors." 419 F.3d at 211.

Under the facts and circumstances of these Chapter 11 Cases, certain factors militate in favor of substantive consolidation. For instance, both before and during these Chapter 11 Cases, the Debtors utilized a central cash management system whereby AHM Corp. made payments on behalf of other Debtor entities and paid certain shared corporate overhead expenses (including professionals' fees and other expenses of administration of these Chapter 11 Cases) that were properly allocable between multiple Debtor entities. Not all payments on behalf of other Debtor entities prior to the Petition Date were properly recorded as intercompany transfers,[2431] and not all shared overhead expenses were in fact allocated between the responsible Debtors. As an example of the former, AHM Corp. paid a number of expenses in connection with AHM Holdings' acquisition of AH Bank prior to the Petition Date which could have been recorded as intercompany transfers to AHM Holdings giving rise to intercompany receivables in favor of AHM Corp. As an example of the latter, salaries of the Debtors' upper-level management were

---

[2431] In accordance with the Cash Management Order, the Debtors have, to the extent possible, kept complete and accurate records of payments made on behalf of other Debtor entities during these Chapter 11 Cases.

066585.1001

borne entirely by AHM Corp. even though portions of such salaries would have been properly chargeable to other Debtor entities.

Certain other factors militate against substantive consolidation. For instance, while the Debtors' books and records do not perfectly reflect the separateness of the Debtor entities (e.g., with respect to unrecorded intercompany transfers and unallocated corporate overhead discussed above), the fact that the Debtors maintained separate books and records for each entity demonstrates the Debtors did not "disregard" entity separateness. In addition, the existence of holding company-level guarantees for certain operating company indebtedness (e.g., in connection with the BofA Syndicate Warehouse Facility) demonstrates that the holders of such guarantees relied on entity separateness in extending credit to the Debtors. Moreover, the Debtors are unaware of any instances of creditors who relied on the lack of entity separateness in deciding whether to extend credit to the Debtors.

All told, the Debtors completed a seventeen-point assessment of common factors cutting in favor of and against substantive consolidation, and reviewed the findings on each point with the Committee.[32]

Under the facts and circumstances of these Chapter 11 Cases as they exist at the time of this Disclosure Statement, the ~~Plan Proponents~~Debtors believe that pursuing a de-consolidated plan is more prudent than pursuing a consolidated plan. While there may well be a basis in law and fact for substantively consolidating one or more Debtors' estates, the ~~Plan Proponents~~Debtors believe that the benefits to be gained by substantive consolidation are outweighed by the risks and expenses associated with establishing an evidentiary basis for substantive consolidation (including, potentially, the costs of revising and resoliciting the plan if an evidentiary basis for substantive consolidation is not established) and, even if the Plan were confirmed, the risk and attendant delay and expense in the event a party aggrieved by substantive consolidation appealed that element of the plan. Accordingly, the Plan as proposed separately classifies Claims against each Debtor and treats the Assets of each Debtor as the separate Assets of each entity.

The determination not to pursue substantive consolidation of the Debtors left open several key issues as to the structure of the Plan, including the resolution of Intercompany Claims and the proper allocation between the Debtors' Estates of the expenses of administering both these Chapter 11 Cases and the Plan. These issues, and the proposed resolution thereof in the form of the Stipulated Asset Allocation, are discussed below.

---

[32]  Factors considered included, without limitation, whether: overhead was shared between entities; there were intercompany guarantees on loans; the companies distinguished between property of each entity; corporate formalities were observed with respect to intercompany transfers; parent companies paid their subsidiaries' employees; subsidiaries were adequately capitalized; financial statements were separate or consolidated; subsidiaries were wholly owned; there was commonality of Boards of Directors; subsidiaries were by parent companies (or their affiliates); parent companies moved people on and off of subsidiaries' Boards of Directors; the subsidiaries had any business relationships outside the corporate family; parent companies referred to subsidiaries as "departments" or "divisions"; directors of subsidiaries took direction from the parent; and all entities acted from the same business location.

DB02:7418039.1

B.    **Settlement of Intercompany Claims**

Absent substantive consolidation, intercompany claims survive and necessarily place each debtor's estate and creditors in an adverse posture with other debtors' estates and creditors. Potential conflicts are numerous, and the resolution of each may ultimately affect creditor recoveries by altering the respective debtors' assets available for distribution to creditors (e.g., a dispute between estates as to the rightful ownership of an asset, or appropriate allocation of a shared asset) or aggregate liabilities (e.g., a dispute between estates as to whether an intercompany "debt" will be respected as such, or should be recharacterized as equity). As a result, any fiduciary acting on behalf of multiple estates and charged with maximizing recoveries for the creditors of each will necessarily encounter situations where the interests of one estate and its creditors are directly (or indirectly) adverse to the interests of another estate and its creditors. Presented with such a conflict of interest, the fiduciary will have little choice but to seek outside help, which may take the form of a successor fiduciary for one or more estate, conflict counsel to act on behalf of each estate, or interpleader or similar action whereby the matter will be submitted for judicial determination.

The potential for debilitating inter-estate conflicts in jointly-administered chapter 11 cases prior to plan confirmation is minimized by oversight of the debtors in possession by the creditors' committee (which is ordinarily selected from creditors of the various estates), the Office of the United States Trustee, and the bankruptcy court, as well as by the transparency of the bankruptcy process and ability for creditors or other parties in interest to intervene and be heard on any matter in which their rights may be adversely affected. Accordingly, during these Chapter 11 Cases, the Debtors have been able to focus largely on taking actions for their common benefit, leaving to another day the resolution of Intercompany Claims and other inter-Debtor disputes. While postponing resolution of inter-Estate conflicts has resulted in cost savings and increased efficiency during these Chapter 11 Cases, it is obviously not possible to postpone their resolution indefinitely. Accordingly, in connection with negotiating the terms of a possible joint plan of liquidation, the Debtors and the Committee discussed whether it would be prudent to attempt to resolve any or all potential inter-Estate conflicts through the Plan rather than leaving their resolution to the Plan administrator (or administrators) following confirmation.

There are several advantages to resolving inter-Estate disputes in connection with confirmation of the Plan, rather than deferring their resolution until administration of the Plan.

First, it permits administration of the Plan by a single fiduciary, free from potentially debilitating conflicts of interest, the resolution of which conflict could delay Plan administration and lead to increased administrative expenses, which would delay and reduce distributions to Creditors. In light of the anticipated recoveries to Creditors in these Chapter 11 Cases, the ~~Plan Proponents~~Debtors determined that the alternatives to settlement through a Plan—namely, appointing a separate fiduciary to liquidate the remaining Assets of each Debtor's Estate (including prosecution of Causes of Action), or appointing a single fiduciary retaining separate conflict counsel for matters pertaining to each Estate—would be prohibitively expensive and would swallow Creditor recoveries in certain of the Chapter 11 Cases. Creation of a unitary Plan Trust administered by a single Plan Trustee on behalf of all Estates (in consultation with a Plan Oversight Committee representative of the various Estates) would minimize the costs associated

58

with a multi-trust structure (including the payment of multiple trustees and professionals for each) for the benefit of all Estates. And creation of a Plan Trust free of potential conflicts of interest would further minimize the costs associated with resolution of inter-Estate issues (including, without limitation the retention of, and substantial duplication of efforts by, conflicts counsel on behalf of multiple Estates). Freeing the Plan Trustee from potential conflicts of interest should also help attract more qualified candidates to fill the office, insofar as the inability to offer indemnification against such conflicts[2533] may deter otherwise qualified candidates from acting as Plan Trustee.

Second, it provides transparency, an opportunity for Creditors and other parties in interest to be heard in opposition (whether by simply voting or by filing formal pleading), and finality. By way of contrast, piecemeal resolution of inter-Estate conflicts after the Effective Date, even if submitted to the Bankruptcy Court for ultimate approval, would necessarily lack the procedural protections of the plan confirmation process (e.g., disclosure and solicitation), and would essentially impose upon Creditors potentially affected by such resolution an ongoing duty to monitor the administration of the Plan to ensure their rights are not being affected.

Third, as with any negotiated compromise, it avoids the delay and expense of litigating inter-Estate conflicts to a judicial resolution. This is particularly important with respect to certain Intercompany Claims documented in the Debtors' books and records as "loan-level" transactions (e.g., servicing advances on account of particular mortgage loans on the Debtors' loan servicing platform), resulting in over a million individual book entries during the eighteen months immediately preceding the Petition Date. While general conclusions as to the accuracy and validity of such entries may be drawn, e.g., from statistical samplings, wholesale investigation and resolution of disputes concerning their accuracy and validity would be prohibitively expensive for all involved.

For the foregoing reasons, among others, the ~~Plan Proponents~~Debtors determined it was prudent to pursue a comprehensive settlement of potential inter-Estate disputes through the Plan, which disputes fall generally into the following categories:

(i) Booked Intercompany Claims: This category includes intercompany payables/receivables (pre- and post-Petition Date) arising in the ordinary course and reflected in the Debtors' books and records~~, which may.~~ While, in the main, the Debtors maintained the systems and procedures required to accurately reflect separate books and records of each legal entity, and routinely booked entries to reflect the transactions between those entities giving rise to valid intercompany obligations, there may be certain entries that could be subject to challenge as to validity and/or amount and, in certain instances, ~~may~~could be subject to recharacterization as equity. An example of a Booked Intercompany Claim would be a servicing advance made by AHM SV on a loan owned by AHM Corp. Pre-

---

[2533] Inter-Estate conflicts of interest raise "duty of loyalty" issues as distinct from "duty of care" issues (e.g., negligence, business judgment). As a general proposition, a fiduciary may be indemnified only against breaches of its duty of care, and not against breaches of its duty of loyalty.

petition Debtor-Debtor booked intercompany balances, as reflected in the most recent monthly operating reports ("MORs") are as follows:[34]

| | Entity Recievable (Payable) ($ in Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | AHM | AHMAC | AHMH | AHMIC | AHMV | AHMS | GOA | HSS |
| AHMAC | $ 585.8 | $ 0.0 | $ - | $ (485.8) | $ - | $ 52.9 | $ - | $ - |
| AHMIC | $ (1,304.3) | $ 485.8 | $ 74.0 | $ 0.0 | $ (0.1) | $ 10.1 | $ 0.0 | $ (8.2) |
| AHM | $ 0.0 | $ (586.4) | $ 59.1 | $ 1,304.3 | $ - | $ 97.6 | $ - | $ - |
| AHMV | $ 0.1 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| AHMH | $ (59.1) | $ - | $ - | $ (74.0) | $ - | $ (0.0) | $ - | $ - |
| AHMS | $ (97.6) | $ (52.9) | $ - | $ (10.1) | $ - | $ - | $ - | $ - |
| GOA | $ (0.6) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| HSS | $ 8.2 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

Post petition intercompany activity is addressed in "The Stipulated Asset Allocation" section below.

(ii)    Imputed Intercompany Claims: This category includes intercompany payables/receivables arising in the ordinary course which are not reflected in the Debtors' books and records, but could have been so reflected. Examples of Imputed Intercompany Claims include (i) AHM Corp.'s right to reimbursement from AHM Holdings for a portion of the costs of administering AH Bank, (ii) AHM SV's right to payment of market interest on P&I and T&I escrows held by AH Bank, and (iii) AHM Corp.'s right to reimbursement from other Debtors for administrative expenses (e.g., professionals' fees) of the Chapter 11 Cases paid by AHM Corp. on behalf of all Debtors. As part of the Plan's comprehensive settlement of potential Inter-Estate disputes, the Debtors' and the Committee's financial advisors agreed that the following adjustments should be made to pre-petition intercompany balances to more accurately reflect pre-petition business activity and related balances among the Debtors:

a.    Adjustment for the Allocation of Unallocated Overhead Expenses: This adjustment is to reflect the allocation of overhead expenses (Departments of: Human Resources, Information Technology, Policies and Procedures, Accounting, Finance, Legal, Facilities, Executive, and Miscellaneous Corporate Costs) incurred by AHM Corp. in the prepetition period that were not previously allocated to the other Debtor entities. Such costs have been allocated to each of the Debtors based on the gross dollar activity reflected on each Debtors income statements in the relative periods for which there was no previous allocation. The AHM Holdings entity's income statements have been modified to include activity relating to AH Bank, a wholly owned subsidiary of AHM Holdings. The adjustments made to pre-petition intercompany balances to account for the foregoing are as follows:

---

[34]    In the following chart, and others like it that follow in this section, the abbreviations used for the respective Debtors are as follows: "AHM" or "Corp" = AHM Corp.; "AHMAC" or "Acceptance" = AHM Acceptance; "AHMV" or "AHMH" or "Holdings" = AHM Holdings; "AHMIC" or "Investment" = AHM Investment; "AHMV" or "Ventures" = AHM Ventures; "AHMS" or "Servicing" = AHM SV; "GOA" = Great Oak; and "HSS" = Homegate.

60

066585.1001

| | Entity Recievable (Payable) ($ in Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | AHM | AHMAC | AHMH | AHMIC | AHMV | AHMS | GOA | HSS |
| AHM | $ 140.7 | $ (45.2) | $ (4.5) | $ (56.2) | $ (2.1) | $ (25.9) | $ (3.1) | $ (3.7) |

 **b.** <u>Adjustment for Homegate Transfer Pricing</u>: The following $8.2 million payable to Homegate from AHM Corp. arises solely from the intercompany business Homegate conducted with AHM Corp. and the related intercompany transfer pricing. Because it is not defensible that a business such as Homegate would be designed to operate at a loss, the Debtors' and Committee's financial advisors have agreed to adjust the intercompany balances to reflect break-even pricing for the Homegate entity operations. The related adjustment made to the prepetition balances are as follows:

| | Entity Recievable (Payable) ($ in Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | AHM | AHMAC | AHMH | AHMIC | AHMV | AHMS | GOA | HSS |
| AHM | $ (8.2) | - | - | - | - | - | - | 8.2 |

 (iii) <u>Intercompany Causes of Action</u>: This category includes potential actions of one Debtor against another, and may include Avoidance Actions under chapter 5 of the Bankruptcy Code. Because the Debtors are presumably "insiders" of one another under the Bankruptcy Code, any payments made or obligations incurred by one Debtor to another Debtor within the year preceding the Petition Date are potentially subject to avoidance as preferences or fraudulent transfers, to the extent the transferor/obligor Debtor was "insolvent" as of the date of such transfer(s), the other requirements of the applicable cause of action are established, and no defense to avoidance applies. This category also includes Intercompany Claims for contribution or reimbursement. All such Intercompany Causes of Action are settled in full through the Plan's comprehensive settlement of potential Inter-Estate conflicts embodied in the Stipulated Asset Allocation. However, because it is virtually impossible to predict which entity might receive economic benefit (or harm) from pursuing such Causes of Action, no specific adjustments are made to the intercompany balances to account for such settlement.

 (iv) <u>Allocation of Unpaid Claims/Expenses</u>: This category includes both unpaid prepetition Claims and unpaid Administrative Claims, to the extent such Claims are properly allocable between multiple Estates. Intercompany Claims for contribution or reimbursement that might otherwise arise from one Estate's payment of such allocable prepetition and Administrative are compromised in full as part of the Plan's comprehensive settlement of potential Inter-Estate disputes embodied in the Stipulated Asset Allocation described more fully below.

 (v) <u>Ownership of Shared Assets</u>: This category includes Assets in which more than one Debtor may assert an ownership interest, including Causes of Action for which more than one Debtor could be a plaintiff. An example of potentially shared Causes of Action are actions against Warehouse Lenders on account of prepetition margin calls against the American Home Mortgage loan origination entities, the aggregate effect of which margin calls, as described above, was to

61

066585.1001

create an enterprise-wide liquidity crisis that drove several non-origination entities into bankruptcy. Potentially competing claims to ownership of shared assets are compromised as part of the Plan's comprehensive settlement of potential inter-Estate disputes reflected in the Stipulated Asset Allocation.

(vi)    Allocation of Plan Trust Operating Expenses: This category includes the anticipated expenses of administering the Plan, which should be borne ratably in some proportion by each Debtor. Intercompany Claims for contribution or reimbursement that might otherwise arise from one Estate's payment of Plan Trust Operating Expenses properly allocable to multiple Estates are compromised in full as part of the Plan's comprehensive settlement of potential Inter-Estate disputes embodied in the Stipulated Asset Allocation described more fully below.

## C.    The Stipulated Asset Allocation

After considering various alternatives, the ~~Plan Proponents~~Debtors determined that the best mechanism for resolution of the inter-Estate conflicts would be a stipulated asset allocation, whereby the Plan Trustee would divide the proceeds of liquidation of any Plan Trust Asset between the respective Estates in accordance with a pre-set formula. The underlying premise of this asset allocation is that, so long as Estates agree upon and stipulate to (i) the residual value of the Assets being contributed to each Estate to the Plan Trust (i.e., gross Asset value net of S/A/P Claims payable by such Estate); and (ii) the percentage share of Plan Trust Operating Expenses that will be borne by each Estate, it is possible for the Estates to share in the proceeds of all Plan Trust Assets while at the same time respecting entity separateness.

The resulting Plan Trust would be analogous to a partnership whereby each partner contributes assets of a certain value (fixed by agreement of the partners), and agrees to be responsible for a fixed percentage of partnership expenses, in exchange for a right to share in any proceeds of partnership assets in an amount equal to the asset value contributed by such partner (net of that partner's share of partnership expenses) as a percentage of all asset value contributed by all partners (net of all partnership expenses). Legal distinctions between the partners are undisturbed by the partnership relationship and, assuming (i) the validity of the agreed-upon value assigned to the partnership assets by the partners at the inception of their partnership arrangement and (ii) that the agreed-upon allocation of partnership expenses fairly reflects the relative costs associated with preserving and liquidating the assets contributed by each partner, economic distinctions between assets contributed by one partner versus another partner are preserved by virtue of the agreed-upon allocation of proceeds of partnership assets. To illustrate, suppose four partners each contribute assets having a value of $100 to the partnership and agree to bear partnership expenses equally. Each partner would thereby be entitled to 25% ($100 / $400) of the net proceeds of liquidation of any partnership asset. Thus, both before and after joining the partnership, each partner is in essentially the same economic position—before joining, each partner had a right to 100% of the net proceeds of $100 worth of assets, and after joining, each partner has a right to 25% of the net proceeds of $400 worth of assets. And when entering into the partnership arrangement, each partner has a real economic incentive to ensure that (i) the assets contributed by the other partners are not overvalued and (ii) the allocation of partnership expenses between the partners fairly reflects the relative costs of liquidating the

62

assets contributed by each partner (e.g., so that a partner contributing primarily illiquid assets is allocated more expenses than a partner contributing more liquid assets).

The majority of inter-Estate conflicts sought to be resolved via the Stipulated Asset Allocation are relevant to determining the residual Asset value that will be contributed by each Debtor's Estate to the Plan Trust. To determine this value, the ~~Plan Proponents~~Debtors began with an assumption of gross non-litigation Asset value[2635] in each Estate as of the Petition Date, then made adjustments to each Estate's Asset value to reflect the settlement of prepetition intercompany payables/receivables (whether "booked" or "imputed")_as discussed above_. For purposes of these adjustments, receivables from each Debtor (as modified to reflect imputed ~~intercompany claims~~Intercompany Claims) were treated as Assets of the various payee-Debtors (and corresponding liabilities of the payor-Debtor), valued at an amount equal to the anticipated distribution to general unsecured creditors ~~in the payor-Debtor's estate.~~of the payor-Debtor's Estate. Additionally, for purposes of the settlement, each Estate's total contributed asset values were determined by looking at both value realized from the disposition of assets plus an estimated value relating to assets yet to be liquidated. Each Estate was credited for the value associated with the assets it owned. The books and records were relied upon as the primary source for determining such ownership rights with a separate review of asset ownership performed by the Debtors' accounting employees to verify the proper ownership assignment of those asset values. The matrix presented below reflects the major asset types contributing to the unencumbered value available for each Estate based on the ownership of such assets for assets that were liquidated at as of the filing of the Plan.

~~Adjusted gross Asset~~

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| | X | X | X | - | X | X | X | X |
| Cash and Equivalents | | X | | | X | | | |
| 3rd Party Settlements | | | X | X | X | X | X | X |
| A/R Deposits | | | X | X | X | | | |
| Sale Proceeds | X | X | X | | | | | |
| Construction Loan Buy Out | | X | X | | | | | |
| P&I Payment Cash Flows | | X | | | X | X | X | X |
| Estate Interests in Securitizations | X | X | X | X | X | | | |
| Deferred Compensation Plan Assets | | | | | X | | | |
| REO Settlement Agreement | | | | | X | | | |
| Sale to Indy Mac | | | | | X | | X | X |
| Other Office Sales | | X | | X | X | | | |
| FFE Auction Proceeds | | | | | | | X | X |
| Other Miscellaneous | | X | X | X | X | | | |

As of the filing of the Plan, the various Estates still had a number of assets to liquidate. The matrix presented below reflects the major asset types contributing to the estimated unencumbered value available for each Entity based on the ownership of such assets, for assets that were yet to be liquidated at the time of Plan filing.

---

[2635] As discussed further below, the ~~Plan Proponents~~Debtors believe that including litigation Asset value is not necessary given that any valuation of litigation Assets would be highly speculative.

63

066585.1001

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| | X | X | X | X | X | X | X | X |
| Construction Loan Buy Out | | | X | | X | | | |
| P&I Payment Cash Flows | | | X | | X | | | |
| Estate Interests in Securitizations | | | X | | X | | | |
| First lien Performing Loan Sale | | | X | | X | | | |
| First Lien Non-Performing Loan Sale | | | X | | X | | | |
| REO Dispositions | X | | | | X | | | |
| AH Bank | | | | | X | | | X |
| FFE Auction Proceeds | X | X | X | X | X | X | X | |
| REO Settlement Agreement | | | | | X | | | |
| Mt. Prospect Building Sale | | | | | X | | | |
| Melville Building Sale | | | | | X | | | |
| Other Miscellaneous | | | | | | | | |

In both the realized and yet-to-be-realized asset ownership tables above the value attributable to settlements reached with counterparties in relation to both REO and Construction Loan assets is shared among all the Debtor entities. This is due to the fact the Estates entered into these agreements for the benefit of all creditors. As such, realized and estimated proceeds are allocated to each Debtor based on estimated allowed general unsecured claims as of the time of Plan filing.

Based on the realized and estimated values associated with the asset ownership presented above, the resulting estimated "Adjusted Gross Non-Litigation Asset Value" for unencumbered value available for each Entity in the Stipulated Asset Allocation is as follows:



| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Unencumbered Value Estimate | $ 41.22 | $ 8.25 | $ 25.35 | $ 8.08 | $ 137.82 | $ 0.65 | $ 0.23 | $ 0.54 |

The next step in the methodology underlying the Stipulated Asset Allocation was to layer in the economic effect of the settlement of intercompany receivables and payables described above. Using the ultimate projected payouts of each Debtor's Estate, the gross unencumbered value estimate reported above was adjusted to reflect the agreed upon adjusted intercompany payable/receivable balances. That adjustment, which nets to zero, is as follows:



| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Intercompany Settlement Effect | 1.20 | 8.62 | (0.96) | 1.24 | (9.97) | (0.05) | (0.03) | (0.04) |

The adjusted unencumbered value by entity is then:

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Adjusted Gross Unencumbered Value | $ 42.41 | $ 16.88 | $ 24.39 | $ 9.31 | $ 127.85 | $ 0.61 | $ 0.21 | $ 0.50 |

Next in the allocation process, adjusted non-litigation asset values for each Estate were further reduced by the amount of any (i) "direct" administrative costs (both paid and unpaid) properly chargeable to each Estate (and not properly allocable between multiple Estates) during the Chapter 11 Cases, (ii) payment or other settlement of secured claims postpetition, and (iii) administrative costs (both paid and unpaid) allocable between multiple Estates (e.g., professional fees for services benefiting all Debtors), in the amount properly chargeable to such Estate. reduced by the amount of any:

(i)    "Direct" administrative costs (both paid and unpaid) properly chargeable to each Estate (and not properly allocable between multiple Estates) during the Chapter 11 Cases. For example, professional fees directly relating to the sale of the Servicing Business were deducted from each entity in accordance with its share of proceeds. The Debtors estimate that direct administrative costs are assignable as follows:

64

066585.1001

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Administrative Costs - Directly Assignable | $ - | $ - | $ (2.04) | $ (0.85) | $ (27.90) | $ - | $ - | $ - |

(ii)     Payment or other settlement of secured claims postpetition. This deduction did not impact the amount of unencumbered value available for distribution to unsecured creditors, but instead simply reflects the value received in relation to the disposition of a secured asset being paid to the secured party; and

(iii)     Administrative costs (both paid and unpaid) allocable between multiple Estates (e.g., professional fees for services benefiting all Debtors), in the amount properly chargeable to such Estate. For purposes of this allocation the Debtors looked at a number of various allocation bases and concluded that cost should be allocated based on (A) the adjusted unencumbered asset value described above; (B) a measure of the work effort related to the disposition and settlement of encumbered assets and (C) the estimated Allowed amount of general unsecured claims against each entity. Because the primary focus of the Debtors has been to preserve the value available for distribution to unsecured creditors it was determined that the primary driver for the allocation of costs associated with the preservation and realization of that value should be the estimated unencumbered value itself as described above. Further, to recognize that a part of the Debtors' efforts relate to the realization and distribution of value to secured creditors, the related book of those assets were used as a basis in allocating out the costs. The final component considered in allocating administrative costs among the Estates is the estimated Allowed general unsecured claim amount as estimated at the time of Plan filing. The Debtors believe this is rational for two reasons: first, because the post-petition actions of each Estate are for the ultimate benefit of general unsecured creditors of such Estate; second, because a portion of the post-petition costs relates to the dispute and ultimate settlement of the claims of such creditors. Based on the foregoing, the resulting indirect administrative costs are allocated between the Estates as follows:

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Administrative Costs - Allocable | $ (28.74) | $ (12.54) | $ (17.89) | $ (6.67) | $ (78.70) | $ (0.43) | $ (0.10) | $ (0.35) |

Adjusted Gross Asset valuesValues for each Estate were reduced further by each Estate's estimated exposure to filed S/A/P Claims. The resulting Asset values represent the residual value of non-litigation Assets that will be contributed to the Plan Trust by each Estate for the benefit of its Creditors. (By reference to the partnership hypothetical posited above, this value represents the $100 contributed to the partnership by each partner.) The use of non-litigation Asset value as opposed to combined litigation and non-litigation Asset value for purposes of determining the value of Assets being contributed to the Plan Trust by each Estate is deliberate, and is based on the Plan ProponentsDebtors' considered judgment that, to the extent this stipulated Asset value is the value from which each Estate will be deemed to have paid its S/A/P Claims, any reliance upon speculative valuation of litigation Assets for purposes of this calculation may call into question whether the Plan meets the Feasibility Test as to a given Debtor. The estimated S/A/P claim obligation by Entity is as follows:

65

066585.1001

DB02:7418039.1