| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Estimated SAP Claims | $ (0.72) | $ (0.02) | $ (0.05) | $ (1.10) | $ (7.00) | $ (0.00) | $ (0.07) | $ (0.01) |

The next step in arriving at the Stipulated Asset Allocation was the determination of the proper share of Plan Trust Operating Expenses that would be borne by each Estate. In making this determination, the ~~Plan Proponents~~Debtors considered a variety of factors, including the relative value, liquidity, and costs of maintaining and liquidating the Assets being contributed to the Plan Trust by each Estate and the anticipated simplicity or complexity of the Claim reconciliation process for each Estate. (By reference to the partnership hypothetical posited above, the resulting percentages represent each partner's fixed percentage responsibility for partnership expenses.) After determining each Estate's percentage share of Plan Trust Operating Expenses, the ~~Plan Proponents~~Debtors further adjusted the gross Asset value of each Estate to reflect its share of a $6 million stipulated initial funding requirement for the Plan Trust Operating Expense Reserve.[27]—The[36] Further, an additional contingency reserve ("Contingency Reserve") totaling $11 million was allocated to each of the entities on the same basis and in the same proportion that Plan Trust Operating Expense Reserve costs were allocated. The Contingency Rerserve is established to account for potential additional administrative or priority costs claimed against the Estates. The basis for the allocation of these two pieces was the net residual value at each Estate after consideration of each of the items discussed above. Each Estate's resulting share of funding the $6 million Plan Trust Operating Expense Reserve and the $11 million Contingency Reserve is as follows:

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Plan Trust and Contingency Reserve | $ (5.96) | $ (1.98) | $ (2.03) | $ (0.32) | $ (6.55) | $ (0.08) | $ (0.02) | $ (0.06) |

After accounting for the allocations described above, the resulting Asset values (see table below) represent the residual value of non-litigation Assets contributed to the Plan Trust by each Estate. The residual non-litigation Asset value of each Estate as a proportion of the total non-litigation Asset value of all Estates makes up the Stipulated Asset Allocation, namely:

- ~~AHM Holdings   35.051%~~
- ~~AHM Investment   11.663%~~
- ~~AHM Acceptance   11.919%~~
- ~~AHM SV   1.895%~~

---

[27]  ~~This funding requirement is the Plan Proponents' good-faith estimate of cost for the Plan Trustee to administer the Plan and carry out its duties under the Plan Trust Agreement. To the extent actual costs of administration are less than the reserved amount, any residual amount will be redistributed to the Estates pursuant to the Stipulated Asset Allocation. To the extent the actual costs of administration prove greater than the reserved amount, the Plan permits the Plan Trustee, with the approval of the Plan Oversight Committee, to fund the Plan Trust Operating Expense Reserve from the proceeds of Plan Trust Assets or to obtain funding from third-party sources.~~

[36]  This funding requirement is the Debtors' good-faith estimate of cost for the Plan Trustee to administer the Plan and carry out its duties under the Plan Trust Agreement. To the extent actual costs of administration are less than the reserved amount, any residual amount will be redistributed to the Estates pursuant to the Stipulated Asset Allocation. To the extent the actual costs of administration prove greater than the reserved amount, the Plan permits the Plan Trustee, with the approval of the Plan Oversight Committee, to fund the Plan Trust Operating Expense Reserve from the proceeds of Plan Trust Assets or to obtain funding from third-party sources.

066585.1001

DB02:7418039.1

~~• AHM Corp.   38.523%~~

~~• AHM Ventures   0.479%~~

~~• Homegate   0.091%~~

~~• Great Oak   0.379%~~

**Residual Value Percentage Share**

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| | | | | | $ 7.70 | $ 0.10 | $ 0.02 | $ 0.08 |
| | $ 7.00 | $ 2.33 | $ 2.38 | $ 0.38 | 38.523% | 0.479% | 0.091% | 0.379% |
| | 35.051% | 11.663% | 11.919% | 1.895% | | | | |

Given the uncertainty attendant in ascertaining the value of potential Causes of Action, and given that the Plan Trustee will ultimately determine the universe of Causes of Action that the Plan Trust will pursue, the ~~Plan Proponents~~Debtors determined that the proceeds of litigation Assets should be allocated in accordance with the Stipulated Asset Allocation. Among other things, including litigation Assets as well as non-litigation Assets under the ambit of the Stipulated Asset Allocation will further streamline administration of the Plan by obviating determinations as to the proper allocation of the proceeds of shared Causes of Action and by permitting the Plan Trustee to allocate the proceeds of all Plan Trust Assets using a single formula. Moreover, insofar as the Stipulated Asset Allocation includes an allocation of Plan Trust Operating Expenses, certain of which will be incurred prosecuting litigation on behalf of the respective Estates (or any combination thereof), allocating the proceeds of such litigation between the Estates in accordance with their respective contributions to the Plan Trust Operating Expense Reserve is, in the Debtors' considered business judgment, reasonable in consideration of the benefits to all Estates gained from global settlement of potential inter-Estate conflicts through the Plan.

As is apparent from the foregoing, the Stipulated Asset Allocation depends on a number of assumptions, including: (i) the amount of distributions to unsecured creditors of each Estate (for purposes of valuing prepetition receivables from each Debtor), (ii) the valuation of Assets of each Estate, (iii) each Estate's ultimate exposure to filed S/A/P Claims, and (iv) the sufficiency of the Plan Trust Operating Expense Reserve. By proposing the Stipulated Asset Allocation as an integral part of the Plan, the Debtors are obviously assuming the risk that these assumptions will turn out to be inaccurate, and to the extent they are, that the premises underlying the settlement of Intercompany Claims will be revealed (in hindsight) to have been inaccurate. In the Debtors' considered business judgment, these risks are significantly outweighed by the administrative efficiencies and cost savings possible in a unitary Plan Trust, single Plan Trustee structure where the Plan Trustee is freed from potentially debilitating conflicts of interest. Considering that the alternative to a global resolution of inter-Estate conflicts through a Plan settlement may be a structure whereby resolution of such conflicts would significantly erode Creditor recoveries, so much so that a Plan might not be confirmable as to all Debtors (resulting in conversion of certain Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code), the ~~Plan Proponents~~Debtors strongly urge Creditors to vote in favor of the Plan and the Stipulated Asset Allocation.

066585.1001

## V.   THE PLAN

The following summary of certain principal provisions of the Plan is qualified in its entirety by reference to the Plan, which is attached as Exhibit A to this Disclosure Statement. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.   In the event of any discrepancy between this Disclosure Statement, including the following summary description, and any provision of the Plan, the Plan or order confirming the Plan will control.

### A.   Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims (except for DIP Facility Claims, Administrative Claims, and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan.  As provided in § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article 3 of the Plan.

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| **AHM Holdings** | | |
| Class 1A | Priority Claims against AHM Holdings | Unimpaired - not entitled to vote |
| Classes 1B(1) *et seq.* | Miscellaneous Secured Claims against AHM Holdings | Impaired - entitled to vote |
| Class 1C(1) | Unsecured Claims against AHM Holdings other than the BofA Syndicate Unsecured Claim and Subordinated Trust Preferred Claims | Impaired - entitled to vote |
| Class 1C(2) | BofA Syndicate Unsecured Claim against AHM Holdings | Impaired - entitled to vote |
| Class 1DC(3) | Subordinated Trust Preferred Claims against AHM Holdings | Impaired - not entitled to vote |
| Class 1ED | Subordinated Claims against AHM Holdings | Impaired - not entitled to vote |
| Class 1FE | Interests in AHM Holdings | Impaired - not entitled to vote |
| **AHM Investment** | | |
| Class 2A | Priority Claims against AHM Investment | Unimpaired - not entitled to vote |

68

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Classes 2B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Investment | Impaired - entitled to vote |
| Class 2B(2) | BofA Syndicate Secured Claim against AHM Investment | Impaired - entitled to vote |
| ~~Class 2B(3)~~ | ~~JPM Secured Claim against AHM Investment~~ | ~~Impaired - entitled to vote~~ |
| Class 2C(1) | Unsecured Claims against AHM Investment other than the BofA Syndicate Unsecured Claim ~~and Subordinated Trust Preferred Claims~~ | Impaired - entitled to vote |
| Class 2C(2) | BofA Syndicate Unsecured Claim against AHM Investment | Impaired - entitled to vote |
| Class 2~~D~~C(3) | Subordinated Trust Preferred Claims against AHM Investment | Impaired - ~~not~~ entitled to vote |
| Class 2~~E~~D | Subordinated Claims against AHM Investment | Impaired - not entitled to vote |
| Class 2~~F~~E | Interests in AHM Investment | Impaired - not entitled to vote |

| **AHM Acceptance** | | |
|---|---|---|
| Class 3A | Priority Claims against AHM Acceptance | Unimpaired - not entitled to vote |
| Classes 3B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Acceptance | Impaired - entitled to vote |
| Class 3B(2) | BofA Syndicate Secured Claim against AHM Acceptance | Impaired - entitled to vote |
| ~~Class 3B(3)~~ | ~~JPM Secured Claim against AHM Acceptance~~ | ~~Impaired - entitled to vote~~ |
| Class 3B(4~~3~~) | Travelers Secured Claim against AHM Acceptance | Unimpaired - not entitled to vote |
| Class 3C(1) | Unsecured Claims against AHM Acceptance other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 3C(2) | BofA Syndicate Unsecured Claim against AHM Acceptance | Impaired - entitled to vote |
| Class 3D | Subordinated Claims against AHM Acceptance | Impaired - not entitled to vote |
| Class 3E | Interests in AHM Acceptance | Impaired - not entitled to vote |

69

066585.1001

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| **AHM SV (f/k/a American Home Mortgage Servicing, Inc.)** | | |
| Class 4A | Priority Claims against AHM SV | Unimpaired - not entitled to vote |
| Classes 4B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM SV | Impaired - entitled to vote |
| Class 4B(2) | BofA Syndicate Secured Claim against AHM SV | Impaired - entitled to vote |
| Class 4B(3) | Travelers Secured Claim against AHM SV | Unimpaired - not entitled to vote |
| Class 4C(1) | Unsecured Claims against AHM SV other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 4C(2) | BofA Syndicate Unsecured Claim against AHM SV | Impaired - entitled to vote |
| Class 4D | Subordinated Claims against AHM SV | Impaired - not entitled to vote |
| Class 4E | Interests in AHM SV | Impaired - not entitled to vote |
| **AHM Corp.** | | |
| Class 5A | Priority Claims against AHM Corp. | Unimpaired - not entitled to vote |
| Classes 5B(1)(a) *et seq.* | Miscellaneous Secured Claims against AHM Corp. | Impaired - entitled to vote |
| Class 5B(2) | PNB Secured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5B(3) | BofA Syndicate Secured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5B(4) | JPM Secured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5B(5) | Travelers Secured Claim against AHM Corp. | Unimpaired - not entitled to vote |
| Class 5C(1) | Unsecured Claims against AHM Corp. other than the BofA Syndicate Unsecured Claim | Impaired - entitled to vote |
| Class 5C(2) | BofA Syndicate Unsecured Claim against AHM Corp. | Impaired - entitled to vote |
| Class 5D | Subordinated Claims against AHM Corp. | Impaired - not entitled to |

70

066585.1001

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| | | vote |
| Class 5E | Interests in AHM Corp. | Impaired - not entitled to vote |
| **AHM Ventures** | | |
| Class 6A | Priority Claims against AHM Ventures | Unimpaired - not entitled to vote |
| Classes 6B(1) *et seq.* | Miscellaneous Secured Claims against AHM Ventures | Impaired - entitled to vote |
| Class 6C | Unsecured Claims against AHM Ventures | Impaired - entitled to vote |
| Class 6D | Subordinated Claims against AHM Ventures | Impaired - not entitled to vote |
| Class 6E | Interests in AHM Ventures | Impaired - not entitled to vote |
| **Homegate** | | |
| Class 7A | Priority Claims against Homegate | Unimpaired - not entitled to vote |
| Classes 7B(1) *et seq.* | Miscellaneous Secured Claims against Homegate | Impaired - entitled to vote |
| Class 7C | Unsecured Claims against Homegate | Impaired - entitled to vote |
| Class 7D | Subordinated Claims against Homegate | Impaired - not entitled to vote |
| Class 7E | Interests in Homegate | Impaired - not entitled to vote |
| **Great Oak** | | |
| Class 8A | Priority Claims against Great Oak | Unimpaired - not entitled to vote |
| Classes 8B(1) *et seq.* | Miscellaneous Secured Claims against Great Oak | Impaired - entitled to vote |
| Class 8C | Unsecured Claims against Great Oak | Impaired - entitled to vote |
| Class 8D | Subordinated Claims against Great Oak | Impaired - not entitled to vote |
| Class 8E | Interests in Great Oak | Impaired - not entitled to vote |

71

066585.1001

Consistent with § 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class. **THE PLAN DOES NOT EFFECT A SUBSTANTIVE CONSOLIDATION OF THE DEBTORS.**

### B.    Treatment of Claims and Interests

The treatment of Claims and Interests in the Plan set forth below is in full and complete satisfaction of the legal, contractual, and equitable rights that each Entity holding an Allowed Claim or an Allowed Interest may have in or against the applicable Debtor or its property. This treatment supersedes and replaces any agreements or rights those Entities have in or against the applicable Debtor or its property. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Interest in accordance with the terms of the Plan. **EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF (I) ANY CLAIM THAT IS NOT AN ALLOWED CLAIM OR (II) ANY INTEREST.**

ALLOWED CLAIMS AGAINST ANY ONE DEBTOR WILL BE SATISFIED SOLELY FROM THE ASSETS OF SUCH DEBTOR AND ITS ESTATE CONTRIBUTED TO THE PLAN TRUST, GIVING EFFECT TO THE STIPULATED ASSET ALLOCATION SET FORTH IN ARTICLE 6 OF THE PLAN.HEREOF.  NOTHING IN THE PLAN OR THIS DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ANY ONE OF THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST ANY OTHER DEBTOR.

A CLAIM AGAINST MULTIPLE DEBTORS CO-LIABLE ON SUCH CLAIM, TO THE EXTENT ALLOWED IN EACH DEBTOR'S CASE, WILL BE TREATED AS A SEPARATE CLAIM AGAINST EACH DEBTOR'S ESTATE FOR ALL PURPOSES (INCLUDING, BUT NOT LIMITED TO, VOTING AND DISTRIBUTION, PROVIDED, HOWEVER, THAT THERE SHALL BE ONLY A SINGLE RECOVERY ON ACCOUNT OF SUCH CLAIMSCLAIM AND ANY DISTRIBUTION FROM A DEBTORAN ESTATE ON ACCOUNT OF SUCH CLAIMSCLAIM SHALL TAKE INTO ACCOUNT THE LEGAL EFFECT, IF ANY, OF DISTRIBUTIONS MADE OR TO BE MADE BY OTHER DEBTORSESTATES ON ACCOUNT OF SUCH CLAIMSCLAIM PURSUANT TO THE PLAN), AND SUCH CLAIM WILL BE ADMINISTERED AND TREATED IN THE MANNER PROVIDED IN THE PLAN. NO HOLDER OF A CLAIM AGAINST MULTIPLE DEBTORS CO-LIABLE ON SUCH CLAIM SHALL RECEIVE MORE THAN 100% OF ACCOUNTTHE ALLOWED AMOUNT OF SUCH CLAIM.

### 1.    DIP Facility Claims

All Allowed DIP Facility Claims against the Debtors that are parties to the DIP Loan Agreement shall be satisfied (a) on or before the Effective Date in full in Cash, or in a manner otherwise permitted or required pursuant to the terms of the DIP Orders and the DIP Loan

066585.1001

Agreement, or (b) on such other terms as may be mutually agreed upon among (i) the Holders of the DIP Facility Claims and (ii) the Debtors or the Plan Trustee.

### 2.    Administrative Claims

Subject to (a) the bar date provisions in the Plan and (b) additional requirements for Professionals and certain other Entities set forth in the Plan, each Holder of an Allowed Administrative Claim against any of the Debtors shall receive, in full satisfaction, settlement, release and extinguishment of such Claim, as set forth in Article 9A(1), Cash equal to the Allowed amount of such Administrative Claim, unless the Holder agrees or shall have agreed to other treatment of such Claim no less favorable to the Debtors; provided, however, that any Administrative Claim (x) incurred postpetition by a Debtor in the ordinary course of its businesses or (y) arising pursuant to one or more postpetition agreements or transactions entered into by any Debtor with Bankruptcy Court approval, shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto, or as otherwise agreed by the applicable Debtor or the Plan Trustee, on the one hand, and the Holder of such Administrative Claim, on the other.    The Holder of an Allowed Administrative Claim shall not be entitled to, and shall not be paid, any interest, penalty, or premium thereon, and any interest, penalty, or premium asserted with respect to an Administrative Claim shall be deemed disallowed and expunged without the need for any further Order of the Bankruptcy Court.

#### a.    General Administrative Bar Date

The Plan requires that requests for payment of Administrative Claims other than Professional Claims be Filed and served on counsel for the Debtors, counsel for the Committee or the Plan Oversight Committee (as applicable), the Plan Trustee, and counsel for the Plan Trustee no later than (a) thirty (30) days after the Effective Date, or (b) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of such 30-day period. Holders of Administrative Claims (including, without limitation, the Holders of any Claims for federal, state or local taxes, but excluding Professional Claims) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Plan Trust or any of their property. Notwithstanding the foregoing, any bar dates established during the course of these Chapter 11 Cases shall remain in full force and effect.

All objections to allowance of Administrative Claims (excluding Professional Claims) must be filed by any parties in interest no later than ninety (90) days after the Administrative Claim Bar Date (the "Administrative Claim Objection Deadline"). The Administrative Claim Objection Deadline may be initially extended for an additional ninety (90) days at the sole discretion of the Plan Trustee upon the filing of a notice of the extended Administrative Claim Objection Deadline with the Bankruptcy Court. Thereafter, the Administrative Claim Objection Deadline may be further extended by an Order of the Bankruptcy Court, which Order may be granted without notice to any creditors. If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, as may be extended, such Administrative Claim will be deemed Allowed, subject to the Bankruptcy Court's discretion to

73

extend such bar date retroactively.

b.    *Professional Claim Bar Date*

The Plan requires all Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of §§ 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date (including, *inter alia*, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Cases) to File and serve on counsel for the Debtors or the Plan Trustee (as applicable) and counsel for the Committee or the Plan Oversight Committee (as applicable) an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Confirmation Date, no later than (a) sixty (60) days after the Effective Date or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 60-day period.

Objections to Professional Claims or Claims of other Persons for compensation or reimbursement of expenses must be Filed and served on counsel for the Debtors or the Plan Trustee (as applicable), counsel for the Committee or the Plan Oversight Committee (as applicable), and the Professionals or other Persons to whose application the objections are addressed on or before (a) twenty (20) days after the Professional Claims Bar Date or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 20-day period or upon agreement between the Debtors or the Plan Trustee, as applicable, and the affected Professional or other Person.

Any professional fees incurred by the Debtors or the Committee subsequent to the Confirmation Date may be paid by the Debtors or the Plan Trust without application to or Order of the Bankruptcy Court. The costs of the Plan Trust, including without limitation, the fees and expenses of the Plan Trustee and any Professionals retained by the Plan Trustee, shall be borne entirely by the Plan Trust.

3.    **Statutory Fees**

All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash from the S/A/P Claims Reserve. After the Effective Date, the Plan Trustee shall pay quarterly fees to the U.S. Trustee, in Cash from the Plan Trust Operating Expense Reserve, until the Chapter 11 Case for each applicable Debtor is (i) closed, and a final decree is entered, or (ii) converted to a case under chapter 7 of the Bankruptcy Code. In addition, the Plan Trust shall file post-Confirmation quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which will be deemed Administrative Claims against the applicable Debtors and their Estates.

4.    **Priority Tax Claims**

With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, at the sole option of the Plan Trustee, the Plan Trustee shall pay to each Holder of an Allowed Priority Tax Claim on account of such Allowed Priority Tax Claim, in full satisfaction,

settlement, and release of such Allowed Priority Tax Claim, in Cash from the S/A/P Claims Reserve, (a) in accordance with Bankruptcy Code section 1129(a)(9)(C) and (D), equal Cash payments made on or before the last Business Day of every ~~calendar year~~fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus simple interest on any outstanding balance of such Allowed Priority Tax Claim, calculated from the Effective Date at ~~the interest rate available on ninety (90)-day United States Treasuries on the Effective Date~~a rate to be determined pursuant to section 511 of the Bankruptcy Code; (b) such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtors or the Plan Trustee in writing, provided such treatment is no less favorable to the liable Debtor or the Plan Trust than the treatment set forth in clause (a) hereof, or (c) payment in full as set forth in Article 9A(1) of the Plan.

The Holder of an Allowed Priority Tax Claim shall not be entitled to assess any premium or penalty on such Claim and any asserted premium or penalty shall be deemed disallowed and expunged under the Plan without the need for a further order of the Bankruptcy Court. The Plan Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Claim, in accordance with the foregoing, at any time on or after the Effective Date, without premium or penalty of any kind.

### 5.    Other Priority Claims

Each of Classes 1A, 2A, 3A, 4A, 5A, 6A, 7A, and 8A, which are Unimpaired, consist of all Allowed Priority Claims against a particular Debtor. Unless the Holder of an Allowed Priority Claim and the Debtor against which such Claim is asserted (if prior to or on the Effective Date) or the Plan Trustee (if after the Effective Date) agree to a different treatment, the Plan Trustee shall pay each such Holder of an Allowed Priority Claim in full, in Cash, without interest, from the S/A/P Claims Reserve.

### 6.    Miscellaneous Secured Claims

Classes 1B(1) *et seq.*, 2B(1)(a) *et seq.*, 3B(1)(a) *et seq.*, 4B(1)(a) *et seq.*, 5B(1)(a) *et seq.*, 6B(1) *et seq.*, 7B(1) *et seq.*, and 8B(1) *et seq.*, which may be Impaired, comprise, respectively, all Allowed Miscellaneous Secured Claims against a particular Debtor. The Claims in these Classes are secured by Liens on miscellaneous Assets of the Debtors, including Cash, and may include tax Claims secured by Liens in REO (whether owned on the Petition Date or acquired post-petition).

On the later of the Effective Date (or as soon thereafter as practicable) and the date a Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), with respect to each Allowed Miscellaneous Secured Claim, at the sole option of the Plan Trustee: (i) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable, and contractual rights of the Holder of such Allowed Miscellaneous Secured Claim shall be reinstated in full as of the Effective Date and remain unaltered, or (ii) the Holder of such Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed

Miscellaneous Secured Claim, one or a combination of the following: (a) payment in Cash up to the amount of the Allowed Miscellaneous Secured Claim, (b) all or any portion of the Assets securing the Allowed Miscellaneous Secured Claim, (c) deferred Cash payments having a present value on the Effective Date equal to the amount of the Allowed Miscellaneous Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim, (d) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Miscellaneous Secured Claim, or (e) such other treatment as may be agreed by the Holder and the Debtor against which the Allowed Miscellaneous Secured Claim is asserted (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

To the extent there is sufficient value in the Assets securing any Allowed Miscellaneous Secured Claim as contemplated by section 506(b) of the Bankruptcy Code, such Allowed Miscellaneous Secured Claim shall include (a) if the Miscellaneous Secured Claim arises from a written agreement, interest accrued (i) from the Petition Date to the Maturity Date at the non-default rate of interest under such agreement and (ii) from the Maturity Date to the Effective Date at the lesser of (A) the non-default rate of interest under the agreement and (B) the federal judgment rate of interest; and (b) any reasonable fees, costs, or charges payable under the agreement, if any, giving rise to such Miscellaneous Secured Claim or otherwise pursuant to applicable law on account of such Miscellaneous Secured Claim, provided, however, that with respect to any Miscellaneous Secured Claim that is a tax claim, the proper interest rate shall be determined pursuant to section 511 of the Bankruptcy Code.

### 7.    BofA Syndicate Secured Claim

Classes 2B(2), 3B(2), 4B(2), and 5B(3), which are Impaired, consist of any Allowed BofA Syndicate Secured Claim against AHM Investment, AHM Acceptance, AHM SV, and AHM Corp., respectively. The BofA Syndicate Secured Claim is secured by Liens in certain Assets of AHM Investment, AHM Acceptance, AHM SV, and AHM Corp. pursuant to the BofA Syndicate Loan Documents and the Cash Collateral Order, as modified by the BofA/Committee Settlement Stipulation and the BofA Global Settlement Stipulation.

In full satisfaction, settlement, and release of, and in exchange for, each Allowed BofA Syndicate Secured Claim, the Holder of such Claim shall receive the treatment in accordance withset forth the BofA Global Settlement Stipulation.

### 8.    PNB Secured Claim

Class 5B(2), which may be Impaired, consists of any Allowed PNB Secured Claim against AHM Corp. The Class 5B(2) Claim is secured by a Lien in the Mt. Prospect Office Property and/or any Cash proceeds thereof.

On the later of the Effective Date (or as soon thereafter as practicable) and the date a PNB Secured Claim becomes an Allowed PNB Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), with respect to each Allowed PNB Secured Claim, at the sole option of the Plan Trustee: (i) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable, and contractual rights of the Holder of such Allowed PNB Secured Claim

76

shall be reinstated in full on the Effective Date and remain unaltered, or (ii) the Holder of such Allowed PNB Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed PNB Secured Claim, one or a combination of the following: (a) payment in Cash up to the amount of the Allowed PNB Secured Claim, (b) all or any portion of the Assets securing the Allowed PNB Secured Claim, (c) deferred Cash payments having a present value on the Effective Date equal to the amount of the Allowed PNB Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim, (d) such other treatment as would provide the Holder the indubitable equivalent of its Allowed PNB Secured Claim, or (e) such other treatment as may be agreed by the Holder and the Debtor against which the Allowed PNB Secured Claim is asserted (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

### 9.    Travelers Secured Claim

Classes 3B(4$\underline{3}$), 4B(3), and 5B(5), which are Unimpaired, consist of any Allowed Travelers Secured Claim against AHM Acceptance, AHM SV, or AHM Corp., respectively. The Travelers Secured Claim is secured by a Lien in Cash of AHM Acceptance, AHM SV, and/or AHM Corp.

Subject to the requirements of § 1124(2) of the Bankruptcy Code, with respect to each Allowed Travelers Secured Claim, the legal, equitable, and contractual rights of the Holder of such Allowed Travelers Secured Claim shall be reinstated in full on the Effective Date and remain unaltered in accordance with the Travelers Stipulation.

### 10.    JPM Secured Claim

Classes 3~~2~~$\underline{2}$B(3) and 5B(4), which are Impaired, consist of any Allowed JPM Secured Claim against AHM ~~Acceptance~~$\underline{Investment}$ and AHM Corp., respectively. The Class 3B(3) and 5B(4) Claims are secured by Liens in Assets of AHM Acceptance and AHM Corp., respectively, pursuant to the JPM Loan Documents.

On the later of the Effective Date (or as soon thereafter as practicable) and the date a JPM Secured Claim becomes an Allowed JPM Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), with respect to each JPM Secured Claim the Holder of such Allowed JPM Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed JPM Secured Claim, one or a combination of the following, at the sole option of the Plan Trustee:

a.    Payment in Cash up to the amount of such Allowed JPM Secured Claim;

b.    the proceeds from the sale or other disposition of all or any portion of the Assets securing the Allowed JPM Secured Claim, after deducting the reasonable, necessary costs and expenses of preserving and disposing of such Assets (including, without limitation, payment of Servicing Fees, Servicing Advances, and any ad valorem property taxes);

c.    all or any portion of the Assets securing such Allowed JPM

77

066585.1001

Secured Claim;

d.    a 5-year promissory note (the "JPM Plan Note") substantially in the form to be filed with the Supplemental Plan Documents, which shall be executed by the Plan Trustee in a principal amount equal to the amount of the Allowed JPM Secured Claim that was not previously satisfied by distributions of property prior to the Effective Date or otherwise under the terms of the Plan; provided that

(1)    the JPM Plan Note shall:

- be without recourse to the Plan Trust or any Plan Trust Assets other than the Assets securing the Allowed JPM Secured Claim;

- be payable in a single balloon payment of principal and accrued interest at the stated maturity date, provided, however, that from and after the Effective Date all principal and interest collected on account of the JPM Loan Portfolio (net of Servicing Fees and Servicing Advances) shall be paid to the Holder of such JPM Plan Note directly from the Servicer, which payments shall be applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note;

- bear interest monthly at such a rate that the net present value, as of the Effective Date, of the balloon payment due upon maturity of the JPM Plan Note is no less than the value of the property securing the Allowed JPM Secured Claim as of the Effective Date, as determined by the Bankruptcy Court in accordance with section 506 of the Bankruptcy Code;

- provide the Plan Trustee with the right to prepay the JPM Plan Note for its then present value at any time in whole or in part, which partial prepayments shall be applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note;

- provide the Plan Trustee with the right to surrender to the Holder of the JPM Plan Note all or any portion of the Assets securing such JPM Plan Note) shall be valued by the Bankruptcy Court and applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note; and

- provide that from and after the Effective Date all proceeds (net of Servicing Fees and Servicing Advances) of any sale or other disposition of all or any portion of the JPM Loan Portfolio shall be paid to the Holder of such JPM Plan Note, which payments shall be applied first to reduce accrued interest, then to reduce the outstanding principal of the JPM Plan Note;

provided further that

(2)    the Holder of the Allowed JPM Secured Claim shall retain its Lien in the Assets

78

066585.1001

securing such Claim until such Claim is satisfied in full, which Lien shall secure the JPM Plan Note until the JPM Plan Note is satisfied in full; and provided further that

(3)     the Servicing Rights for the JPM Loan Portfolio shall be surrendered to JPM, and the Mortgage Loans in the JPM Loan Portfolio may be sold on a servicing-released basis at any time, with or without the consent of the Servicer (whether the Servicer is JPM or its designee), upon payment of the market value of the Servicing Rights. The Bankruptcy Court shall value the Servicing Rights surrendered to JPM pursuant to the Plan, with such value to be applied to reduce the Allowed JPM Secured Claim prior to establishing the principal amount of the JPM Plan Note; or

e.     such other treatment as will provide the Holder of such Allowed JPM Secured Claim the indubitable equivalent of its Allowed JPM Secured Claim.

Except with respect to subsection 2(d) above, to the extent there is sufficient value in the Assets securing any Allowed JPM Secured Claim as contemplated by § 506(b) of the Bankruptcy Code, such Allowed JPM Secured Claim shall include (a) interest accrued (i) from the Petition Date to the Maturity Date at the non-default rate of interest under the JPM Loan Documents (ii) from the Maturity Date to the Effective Date at the lesser of (A) the non-default rate of interest under the JPM Loan Documents and (B) the federal judgment rate of interest and (b) any reasonable fees, costs, or charges payable under the JPM Loan Documents.

11.    ~~BofA Syndicate Unsecured Claim~~<u>Unsecured Claims Other than the BofA Syndicate Unsecured Claim and Subordinated Trust Preferred Claims</u>

~~Classes 1C(2), 2C(2), 3C(2), 4C(2), and 5C(2), which are Impaired, consist of BofA Syndicate Unsecured Claim against AHM Holdings, AHM Investment, AHM Acceptance, AHM SV, and AHM Corp., respectively.   Pursuant to the BofA Global Settlement Stipulation, proceeds of Designated REO Properties are to be held in trust for the benefit of Creditors other than the BofA Syndicate.~~

~~Subject to all relevant provisions of the BofA Global Settlement Stipulation (including, but not limited to, the sharing of Cash receipts on the BofA Syndicate Secured Claim and the cap on the BofA Syndicate Deficiency Claim), each Holder of an Allowed Class 1C(2), 2C(2), 3C(2), 4C(2), and 5C(2) Claim shall receive its Pro Rata share of the BofA Syndicate Net Distributable Assets of the applicable Estate in full satisfaction, settlement, and release of, and in exchange for, its Allowed Unsecured Claim.~~

12.    ~~Other Unsecured Claims~~

Classes 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C, which are Impaired, consist of all Allowed Unsecured Claims against each Debtor, respectively, other than BofA Syndicate Unsecured Claim<u> and Subordinated Trust Preferred Claims</u>.  Claims in Classes 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C may include<u>, without limitation, (i)</u> EPD Claims and Breach of Warranty Claims, which are subject to the EPD/Breach Claims Protocol set forth in Article 7

79

066585.1001

of the Plan, and (ii) Senior Unsecured Claims, which are subject to the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan (and discussed further below).

Each Holder of an Allowed Class 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C Claim shall receive its Pro Rata share of the Net Distributable Assets of the applicable Estate in full satisfaction, settlement, and release of, and in exchange for, its Allowed Unsecured Claim.

### 12. BofA Syndicate Unsecured Claim

Classes 1C(2), 2C(2), 3C(2), 4C(2), and 5C(2), which are Impaired, consist of BofA Syndicate Unsecured Claim against AHM Holdings, AHM Investment, AHM Acceptance, AHM SV, and AHM Corp., respectively. Pursuant to the BofA Global Settlement Stipulation, the Designated REO Assets are to be held in trust for the benefit of Creditors other than the BofA Syndicate.

Subject to the BofA Global Settlement Stipulation (including, but not limited to, provisions regarding the sharing of Cash receipts on the BofA Syndicate Secured Claim, the cap on the BofA Syndicate Deficiency Claim, and the treatment of the Designated REO Assets), each Holder of an Allowed Class 1C(2), 2C(2), 3C(2), 4C(2), and 5C(2) Claim shall receive its Pro Rata share of the BofA Syndicate Net Distributable Assets of the applicable Estate in full satisfaction, settlement, and release of, and in exchange for, its Allowed Unsecured Claim.

In addition to receiving the foregoing treatment, each Allowed Class 1C(2) or 2C(2) Claim (against AHM Holdings and AHM Investment, respectively) shall be deemed for all purposes to constitute a Senior Unsecured Claim entitled to participate in and receive the benefits of the Senior Unsecured Claim Procedure set forth in Article 4I(3) of the Plan (and discussed further below), without the necessity of the Holder of such Allowed Class 1C(2) or 2C(2) Claim filing a Subordination Statement.

### 13. Subordinated Trust Preferred Claims

Classes 1C(3) and 2C(3), which are Impaired, consist of all Allowed Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment. Claims in Classes 1C(3) and 2C(3) are subordinated in right of payment to "Senior Debt" or "Senior Indebtedness" (as applicable), which is generally defined in the applicable Subordinated Trust Preferred Indenture(s) to include all financing-related debt (e.g., the BofA Syndicate Unsecured Claim), whether incurred before or after execution of the Subordinated Trust Preferred Indenture. Under the Plan, Claims that would constitute "Senior Debt" or "Senior Indebtedness" under the applicable Subordinated Trust Preferred Indenture(s) are defined as "Senior Unsecured Claims." and Holders of such Senior Unsecured Claims are entitled to receive the benefits of subordination under the applicable Subordinated Trust Preferred Indenture(s). The Plan deems the BofA Syndicate Unsecured Claim a Senior Unsecured Claim and, as set forth below, affords any Holder of a Class 1C(1) or 2C(1) (general unsecured claims against AHM Holdings and AHM Investment, respectively) an opportunity to assert its Claim likewise constitutes a Senior Unsecured Claim.

80

066585.1001

Subject to Article 4I(3) of the Plan (the "Senior Unsecured Claim Proceure"), each Holder of an Allowed Class 1C(3) and 2C(3) Claim shall receive its Pro Rata share of the Net Distributable Assets of the applicable Estate in full satisfaction, settlement, and release of, and in exchange for, its Allowed Unsecured Claim.

a.     Subordination Statements.  Any Holder of a Class 1C(1) or 2C(1) Claim may assert that it holds a Senior Unsecured Claim and, therefore, is entitled to the benefits of subordination as set forth in the applicable Subordinated Trust Preferred Indenture(s) by filing with the Bankruptcy Court and serving upon the Plan Trustee and the applicable Indenture Trustee(s) for Subordinated Trust Preferred Claims against the applicable Estate(s) a Subordination Statement, no later than thirty (30) days after the Effective Date (the "Subordination Statement Bar Date").  Any Holder of a Class 1C(1) or 2C(1) Claim that fails to submit a Subordination Statement on or prior to the Subordination Statement Bar Date shall be deemed to have irrevocably waived, and shall be estopped from asserting, any right to obtain the benefits of subordination as set forth in the applicable Subordinated Trust Preferred Indenture(s).  Objections, if any, to any Subordination Statement shall be filed with the Bankruptcy Court and served on the party that filed such Subordination Statement, the Plan Trustee, and the applicable Indenture Trustee(s) for Subordinated Trust Preferred Claims against the applicable Estate(s), no later than thirty (30) days after filing and service of such Subordination Statement (the "Subordination Statement Objection Deadline"), except as otherwise agreed by the party that filed such Subordination Statement, the Plan Trustee, the applicable Indenture Trustee(s) for Subordinated Trust Preferred Claims against the applicable Estate(s), and the objecting party.  If no objection with respect to a Subordination Statement is filed by the Subordination Statement Objection Deadline, the Putative Senior Unsecured Claim shall be deemed to constitute a Senior Unsecured Claim to the extent such Claim is ultimately Allowed against the applicable Estate.

b.     Senior Unsecured Claims Reserves.  After the Effective Date, any distributions that would otherwise be made on account of Allowed Subordinated Trust Preferred Claims against AHM Holdings or AHM Investment shall be deposited by the Plan Trustee into reserve accounts for the benefit of Holders of Senior Unsecured Claims against AHM Holdings and AHM Investment, respectively, to be distributed in accordance with the Senior Unsecured Claim Procedure.

c.     Payment of Indenture Trustee Expenses.  The first (i) $254,451 deposited into the Senior Unsecured Claims Reserve of AHM Holdings and (ii) $245,549 deposited into the Senior Unsecured Claims Reserve of AHM Investment (each such amount, the "Indenture Trustee Expense Reserve" of the respective Estate) shall be reserved for the payment of Indenture Trustee Expenses.  Within thirty (30) days following the Effective Date, each Indenture Trustee shall submit to the Plan Trustee invoices for accrued but unpaid Indenture Trustee Expenses under the applicable Subordinated Trust Preferred Indenture(s) for the time period up to and including the Effective Date.  Upon full funding of the Indenture Trustee Expense Reserve of a given Estate, the Plan Trustee shall pay from the Indenture Trustee Expense Reserve the reasonable amounts of the invoiced Indenture Trustee Expenses assertable against such Estate.  To the extent the Indenture Trustee Expense Reserve of a given Estate is insufficient to pay the reasonable amounts of all invoiced Indenture Trustee Expenses assertable against such Estate, the Indenture Trustees shall share Pro Rata in the Indenture Trustee Expense

81

066585.1001

Reserve based on the Allowed Subordinated Trust Preferred Claims against such Estate represented by each Indenture Trustee. The balance, if any, remaining in the Indenture Trustee Expense Reserve of a given Estate after payment of the reasonable amounts of all invoiced Indenture Trustee Expenses assertable against such Estate, shall be reserved for the payment of post-Effective Date Indenture Trustee Expenses on a quarterly basis after submission of invoices from each Indenture Trustee. To the extent the Indenture Trustee Expense Reserve of a given Estate is insufficient to pay the reasonable amounts of all Indenture Trustee Expenses assertable against such Estate invoiced in a given quarter, the Indenture Trustees shall share Pro Rata in the Indenture Trustee Expense Reserve based on the Allowed Subordinated Trust Preferred Claims against such Estate represented by each Indenture Trustee.

  d.   Distributions from Senior Unsecured Claims Reserve. Except as provided in subsection (c) above, no distributions shall be made from the Senior Unsecured Claims Reserve of a given Estate until, with respect to each Putative Senior Unsecured Claim against such Estate, (i) the Bankruptcy Court has made a determination as to whether and to what extent the Holder of such Claim holds a Senior Unsecured Claim against such Estate, and such determination becomes a Final Order, (ii) the Holder of such Putative Senior Unsecured Claim has reached a settlement with all Holders of Allowed Subordinated Trust Preferred Claims against such Estate (or the Indenture Trustees, on their behalf) and obtained approval of such settlement in accordance with subsection (e) below, or (iii) the Holder of such Putative Senior Unsecured Claim has withdrawn its Subordination Statement. Upon the satisfaction of one or more of the foregoing conditions with respect to each Putative Senior Unsecured Claim against a given Estate, each Holder of a Senior Unsecured Claim against such Estate shall be entitled to receive Pro Rata distributions of any amounts in the Senior Unsecured Claims Reserve of such Estate in excess of the Indenture Trustee Fee Reserve, until such Senior Unsecured Claim is paid in full. If, and only if, all Holders of Senior Unsecured Claims against a given Estate have been paid in full on account of their Senior Unsecured Claims, then (i) the Plan Trustee shall pay the balance, if any, of the Senior Unsecured Claims Reserve to the Indenture Trustees for the account of Holders of Allowed Subordinated Trust Preferred Claims against such Estate, (ii) Allowed Subordinated Trust Preferred Claims against such Estate shall be entitled to receive Pro Rata distributions from the Net Distributable Assets of such Estate as provided in Article 4I(2) hereof, which distributions shall be made to the Indenture Trustees for the account of Holders of Allowed Subordinated Trust Preferred Claims against such Estate, and (iii) Holders of Allowed Subordinated Trust Preferred Claims against such Estate shall be subrogated to the rights of Holders of Senior Unsecured Claims against such Estate to the extent of any payments made on account of such Senior Unsecured Claims from the Senior Unsecured Claims Reserve.

  e.   Provisional Settlement of Putative Senior Unsecured Claims. If the Holders of Allowed Subordinated Trust Preferred Claims against a given Estate (or the applicable Indenture Trustee(s), on their behalf) and any Putative Senior Unsecured Claim against such Estate reach a settlement as to whether, and to what extent, the Putative Senior Unsecured Claim (to the extent such Claim is ultimately Allowed against the applicable Estate) constitutes a Senior Unsecured Claim, the Holders of Allowed Subordinated Trust Preferred Claims (or the applicable Indenture Trustee(s), on their behalf) shall file with the Bankruptcy Court and serve on the Plan Trustee a notice of such settlement that is executed by the Holders of Allowed Subordinated Trust Preferred Claims (or the applicable Indenture Trustee(s), on their

82

066585.1001

behalf) and Holder of such Putative Senior Unsecured Claim, which notice of settlement shall provide the proposed amount (if any) of such Putative Senior Unsecured Claim that shall be treated as a Senior Unsecured Claim. If no written objection to the notice of settlement is filed by a party in interest within 10 calendar days after the notice is filed and served upon the Plan Trustee, the Bankruptcy Court shall approve the settlement and the Putative Senior Unsecured Claim shall constitute a Senior Unsecured Claim to the extent, if any, provided in such settlement. The Indenture Trustees shall be authorized, but not required, to litigate and/or settle any Putative Senior Unsecured Claims on behalf of the Holders of Allowed Subordinated Trust Preferred Claims. The foregoing, however, shall not in any way limit or impair the rights of Holders of Allowed Subordinated Trust Preferred Claims to litigate and/or settle such Putative Senior Unsecured Claims on their own, with or without the participation of the Indenture Trustee(s).

f.    Notice to Indenture Trustees. All notices and other papers required to be provided to Indenture Trustees pursuant to the Senior Unsecured Claim Procedure shall be served upon the Indenture Trustees at the following addresses: (i) if to Wilmington Trust Company: Wilmington Trust Company, Attn: Patrick Healy, Vice President, Rodney Square North, 1100 North Market Street, Wilmington, DE 19890-0001; and (ii) if to Law Debenture Trust Company of New York: Law Debenture Trust Company of New York, Attn: James D. Heaney, Vice President, 400 Madison Avenue, 4th Floor, New York, NY 10017.

g.    Reservation of Rights to Object to Senior Unsecured Claims. For the avoidance of doubt, and notwithstanding anything to the contrary in Plan or this Disclosure Statement, the determination or deemed determination that a Claim against an Estate constitutes a Senior Unsecured Claim against such Estate (whether pursuant to Article 8H(3) of the Plan or subsections (a) or (e) of the Senior Unsecured Claim Procedure) in any amount shall not constitute a determination that such Claim constitutes an Allowed Claim against such Estate in any amount, and nothing in this section 3 shall condition, limit, or otherwise affect the Plan Trustee's rights with respect to determining whether all or any portion of any Senior Unsecured Claim against a given Estate constitutes an Allowed Claim against such Estate.

14.    13. Subordinated Trust Preferred Claims; Other
Subordinated Claims; and Interests

Each of Classes 2D, 1ED, 2ED, 3D, 4D, 5D, 6D, 7D, 8D, 1FE, 2FE, 3E, 4E, 5E, 6E, 7E, and 8E, which are Impaired, consist of Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment, Subordinated Claims against all of the Debtors, and or Interests in all of the Debtors. Holders of Claims or Interests in Classes 2D, 1ED, 2ED, 3D, 4D, 5D, 6D, 7D, 8D, 1FE, 2FE, 3E, 4E, 5E, 6E, 7E, and 8E shall receive no distribution or dividend on account of such Claims or Interests. The entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to the Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

83

066585.1001

C.     **Acceptance or Rejection of the Plan; Nonconsensual Confirmation**

1.     **Impaired Classes Entitled to Vote**

As set forth above, Classes 1A, 2A, 3A, 3B(4̲3̲), 4A, 4B(3), 5A, 5B(5), 6A, 7A, and 8A are Unimpaired by the Plan. Pursuant to § 1126(f) of the Bankruptcy Code, each of these Classes of Claims is conclusively presumed to have accepted the Plan, and the votes of Holders of Claims in such Classes therefore will not be solicited. If and to the extent any Class identified as being Unimpaired is Impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), the Holders of Claims in such Class shall be entitled to vote to accept or reject the Plan.

Classes 1B(1) *et seq.*, 1C(1), 1C(2), 1̲C̲(̲3̲)̲,̲ 2B(1)(a) *et seq.*, 2B(2), 2̲B̲(̲3̲)̲,̲ 2C(1), 2C(2), 2̲C̲(̲3̲)̲,̲ 3B(1)(a) *et seq.*, 3B(2), 3̲B̲(̲3̲)̲,̲ 3C(1), 3C(2), 4B(1)(a) *et seq.*, 4B(2), 4C(1), 4C(2), 5B(1)(a) *et seq.*, 5B(2), 5B(3), 5B(4), 5C(1), 5C(2), 6B(1) *et seq.*, 6C, 7B(1) *et seq.*, 7C, 8B(1) *et seq.*, and 8C are (or may be) Impaired by the Plan, and Holders of Claims in these Classes shall be entitled to vote to accept or reject the Plan.

Classes 1D, 1̲E̲,̲ 1̲F̲,̲ 2D, 2̲E̲,̲ 2̲F̲,̲ 3D, 3̲E̲,̲ 4D, 4̲E̲,̲ 5D, 5̲E̲,̲ 6D, 6̲E̲,̲ 7D, 8̲D̲,̲ 1̲E̲,̲ 2̲E̲,̲ 3̲E̲,̲ 4̲E̲,̲ 5̲E̲,̲ 6̲E̲,̲ 7E, 8̲D̲ and 8E are Impaired by the Plan, but Holders of Claims and Interests in these Classes are not expected to retain or receive any property under the Plan on account of such Claims and Interests. Pursuant to § 1126(g) of the Bankruptcy Code, these Classes are conclusively presumed to have rejected the Plan, and the votes of Holders of Claims or Interests in such Classes therefore will not be solicited.

2.     **Non-Consensual Confirmation**

As set forth in Article 15 of the Plan, if any Impaired Class fails to accept the Plan, the Plan Proponents̲D̲e̲b̲t̲o̲r̲s̲ intend to request that the Bankruptcy Court confirm the Plan as a Cramdown Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to such Class.

D.     **Settlement of Intercompany Claims; Stipulated Asset Allocation**

In consideration of the settlements and compromises embodied in the Stipulated Asset Allocation described above, all Intercompany Claims shall be deemed Unimpaired and satisfied in full on the Effective Date.

The Cash proceeds of any Plan Trust Asset, and any residual balance in the S/A/P Claims Reserve or the Plan Trust Operating Expense Reserve, shall be distributed to each Estate ratably in accordance with the Stipulated Asset Allocation.

As discussed above, the Stipulated Asset Allocation is an integral component of the Plan Proponents̲D̲e̲b̲t̲o̲r̲s̲' comprehensive compromise and settlement concerning Intercompany Claims̲p̲o̲t̲e̲n̲t̲i̲a̲l̲ ̲I̲n̲t̲e̲r̲-̲E̲s̲t̲a̲t̲e̲ ̲d̲i̲s̲p̲u̲t̲e̲s̲. The allocation percentages are a function of the net asset value that will be contributed by each Debtor to the Plan Trust for the benefit of its Creditors, as

84

066585.1001

determined in light of a number of factors, including: (i) the relative value of Assets under administration in each Estate from the Petition Date to the Effective Date; (ii) the validity and enforceability of Intercompany Claims that are reflected on the Debtors' books and records (certain of which claims might be inadequately documented and/or subject to recharacterization as equity contributions); (iii) possible Intercompany Claims that are not reflected as intercompany payables or receivables in the Debtors' books and records (e.g., resulting from one Debtor's payment in full of a shared expense properly allocable between multiple Debtors, or payment of more than its fair share of a joint-and-several liability to a third party); (iv) the reallocation of asset value between Estates that would result from allowance and payment of Intercompany Claims, in light of anticipated creditor recoveries in each of the Chapter 11 Cases; (v) the estimated exposure of each Estate to S/A/P Claims asserted but not paid as of the Effective Date, in light of possible Intercompany Claims for contribution or reimbursement that might result from one Estate's payment of S/A/P Claims that are properly allocable between multiple Estates; and (vi) the necessity of resolving any and all potential inter-Estate disputes via the Plan, so as to permit administration of multiple Estates by a single Plan Trustee unfettered by inter-Estate conflicts of interest.

E.    **Estimation and Allowance of EPD/Breach Claims**

As noted above, many of the agreements that the Debtors used to sell mortgage loans in the secondary market or to complete securitizations permitted the buyer (or its successor in interest) to "put" the loans back to the Debtors if the Debtors breached certain seller representations and warranties (relating, e.g., to the creditworthiness of the borrower, the completeness of the loan documentation, etc.), or if the borrower defaulted in payment within a specified period of time (usually 30-60-90 days) after sale of the loan. For purposes of the Plan, a "put" rights arising from (i) a breach of representation or warranty are called "Breach of Warranty Claims" and (ii)  early payment defaults (or "EPDs") are called "EPD Claims" (collectively with "Breach of Warranty Claims," "EPD/Breach Claims"). EPD/Breach Claims can potentially arise with respect to any of hundreds of thousands of mortgage loans sold by the Debtors in the secondary market.

The Plan ProponentsDebtors concluded that attempting to resolve these claims at the individual loan level would require both the loan owners and the Debtors' Estates to expend resources that would be grossly disproportionate to the amounts in controversy, which would deplete Assets of the Estates that would otherwise be available to make distributions to Creditors. Moreover, litigating EPD/Breach Claims on a loan-by-loan basis would significantly delay distributions to loan owners on account of such Claims. In addition, a review of the Proofs of Claim filed by Holders of Breach of Warranty Claims revealed that many of these Claims are contingent and/or unliquidated, and may not become liquidated for years to come. This is so because most loan buyers have no reason to try and determine whether the originator-seller of a loan has breached a representation or warranty unless and until the borrower on that loan defaults. Because loans have a life span of potentially thirty years, while the Plan contemplates a Plan Trust lasting approximately five years, the Plan must incorporate a mechanism for estimating and allowing contingent and/or unliquidated Breach of Warranty Claims.

85

066585.1001

The ~~Plan Proponents~~Debtors developed a streamlined protocol to deal fairly with the foregoing issues, patterned ~~closely~~generally after the protocol that was recently approved as part of the chapter 11 plan of *New Century TRS Holdings, Inc., et al.*, Docket No. 8596, Case No. 07-10416 (Bankr. D. Del. July 15, 2008). The EPD/Breach Protocol appearing in Article 7 of the Plan is the result.

The protocol differentiates between EPD Claims and Breach of Warranty Claims.

### 1.    EPD Claims

The universe of potential EPD Claims is ~~known~~determinable because the period for a borrower payment default that could be considered an EPD passed generally by October 2007, if not before (because the Debtors stopped selling loans in July 2007 and the EPD provisions in most loan sale contracts only covered borrower defaults during approximately ~~30-60~~-90 days after the loan sale closed). The allowable amount of a given EPD Claim (i.e., the damages flowing from the Debtors' inability to repurchase loans for which an EPD had occurred), however, is more difficult to assess. Because the claimant was unable to resell these loans to the Debtors, it suffered damages in some amount, but the ~~Plan Proponents~~Debtors assert that these damages are *not* simply equal to the face amount of the repurchase obligation (i.e., the UPB of the loans at the time of the repurchase demand), because the claimant retained the loans and they had some value to the claimant. If ~~such matters~~damages were to be litigated on a loan-by-loan ~~they~~basis, the litigation would involve such ~~factual and legal~~ issues as whether the amount of a "loss" realized by a claimant was the result of the Debtors' failure to repurchase loans or some combination of deteriorating market conditions, how the claimant dealt with the loan, ~~or~~the "value" of the loan at a historical moment in time, and any number of other ~~factors~~issues that are fact-intensive and legally complex.

After surveying a number of asserted EPD Claims, the ~~Plan Proponents~~Debtors determined that the major factors determining the likelihood and amount of loss for a loan were mortgage product type and the borrower's payment history. For example, if a loan was ~~at one point~~ in payment default at one point but the borrower had subsequently cured that default and was presently performing, the ~~loss resulting from~~likelihood of suffering a loss as a result of the Debtors' failure to repurchase the loan, and the amount of any such loss, would ~~likely be~~ *de minimis*be lower than if the loan were still delinquent. On the other hand, if the loan ~~purchaser~~ was in serious default (e.g., 90+ days delinquent), ~~the loss was likely to be more severe. The Plan Proponents analyzed the Debtors' history of losses incurred by them when they had repurchased loans, the amounts asserted in the proofs of claim for EPD Claims, and industry data to develop a model for liquidating damages associated with EPDs.~~ a loss would be more likely, and the amount of such loss would (presumably) be more substantial.

As a date certain from which to ~~determine the amount of damages, the Plan Proponents used July 31, 2008. The protocol for liquidating EPD Claims is then based on the following grid for loans subject to EPD Claims, with the Allowed amount of such Claims being a percentage of the UPB as of July 31, 2008.~~measure loans' delinquency status to determine the likelihood of suffering a loss as a result of the Debtors' failure to repurchase loans (hereinafter referred to as

86

066585.1001

the "loss frequency") and the presumed amount of any such losses (hereinafter referred to as the "loss severity"), the Debtors selected July 31, 2008 (the "Determination Date").

To arrive at reasonable estimates of loss frequency and loss severity based on delinquency status as of the Determination Date, the Debtors began by analyzing the actual, historical losses suffered by the Debtors when liquidating non-performing loans (e.g., loans repurchased from third-party buyers after suffering EPDs) between January 1, 2006 and January 31, 2008 (the "Sampling Period"). This analysis was completed on a product-by-product basis, because different types of mortgages can be expected to have different loss frequencies and loss severities.

a.     <em>Loss Frequency</em>

As a general proposition, the probability that a delinquent loan will ultimately be liquidated at a loss increases with the delinquency status, which is generally measured within the mortgage industry in 30-day increments. Accordingly, for purposes of estimating anticipated loss frequencies for loans as of the Determination Date, the Debtors grouped loans into delinquency "buckets" of 0-30 days, 31-60 days, 61-90 days, and 90+ days and, as an initial point of reference, looked to industry convention in assessing the risks of non-performing mortgage assets. Recognizing that loans that are not severely delinquent may cure at any given point in time, and that loans in any given delinquency "bucket" may change their status either by catching up on payments or falling farther behind, industry loss models used by rating agencies, investors, and Bloomberg (amongst others) use a methodology whereby the expected loss frequency for a given group of loans is adjusted according to delinquency "bucket". For example, the Bloomberg model assumes a 0% loss frequency for the 31-60 day delinquency bucket, 60% loss frequency for the 61-90 day delinquency bucket, and 90% loss frequency for the 90+ day delinquency bucket.

Given the current status of both the secondary mortgage market and the nationwide housing market, the Debtors anticipated that wholesale adoption of the Bloomberg model could lead to challenges by EPD claimants that the loss frequencies assumed by the model were too conservative and should be increased for purposes of the protocol, the resolution of which challenges would require complex litigation involving many of the very issues the Debtors hope to resolve through the protocol. Accordingly, for purposes of the protocol, the Debtors made the simplifying assumptions that the anticipated loss frequencies across all product types would be 50% for the 31-60 day delinquency bucket, 75% for the 61-90 day delinquency bucket, and 100% for the 90+ day delinquency bucket. Consistent with the Bloomberg model, however, the loss frequency of loans in the 0-30 day delinquency bucket is assumed to be 0%. In other words, if a loan that suffered an EPD over a year ago was current as of the Determination Date, it is presumed for purposes of the protocol that the loan is a performing asset and that the buyer of the loan from the Debtors will suffer no loss on account of the Debtors' failure to repurchase the loan.

b.     <em>Loss Severity</em>

87

066585.1001

To account for the time elapsed from the Sampling Period to the Determination Date, and in order to estimate conservatively the anticipated recoveries on loans buyers were unable to resell to the Debtors for purposes of the EPD/Breach Claims Protocol, the Debtors adjusted the Debtors' historical loss severities by product to reflect the current state of the housing market, using the 20-city S&P/Case-Shiller Home Price Index (the "Case-Shiller 20 Index"). Due to the nationwide decline in housing values since the Sampling Period, this resulted in significantly higher loss severities, which is in line with current market estimates for expected future loss severities by product type. The resulting adjusted loss severities by product type, as percentages of UPB as of the Determination Date, are as follows: 40% for Fixed-Rate Mortgages ("FRM"); 33% for Adjustable Rate Mortgages ("ARM"); 38% for Payment Option ARMs ("POA"); and 95% for Second-Lien ("2nd").[37]

      c.      *Allowance of Unliquidated EPD Claims*

Based on the foregoing assumptions as to loss frequencies and loss severities based on loan product type and delinquency buckets, valid EPD Claims that were unliquidated as of the Determination Date will be liquidated and allowed under the protocol in an amount equal to the UPB of the underlying loans as of the Determination Date, multiplied by the applicable percentage in the following table.

| Loan Product | Delinquency (days) | | | |
|---|---|---|---|---|
| | 0-30 | 31-60 | 61-90 | 90+ |
| Fixed-Rate Mortgage ("FRM") | 0% | 20% | 30% | 40% |
| Adjustable Rate Mortgage ("ARM") | 0% | 17% | 25% | 33% |
| Payment Option ARM ("POA") | 0% | 19% | 29% | 38% |
| Second Lien ("2nd") | 0% | 50% | 75% | 95% |

Each of the applicable percentages in the foregoing table is the product of (i) the applicable loss frequency based on the delinquency bucket and (ii) the applicable loss severity based on the loan product type and delinquency bucket. Thus, for example, an EPD Claim relating to an FRM that is 61-90 days delinquent as of the Determination Date will be allowed in an amount equal to the 75% assumed loss frequency percentage multiplied by the 40% assumed loss severity amount (75% x 40% = 30%), multiplied by the UPB of the FRM as of the Determination Date.

---

[37] By way of comparison, had the Debtors used the actual, historical loss severities as of the Petition Date, without adjustment with the Case-Shiller 20 Index, the severities would have been 20% for FRM, 14% for ARM, 12% for Option ARM, and 85% for second lien—significantly lower severities across almost all of the product lines.

066585.1001

d.    *Allowance of Liquidated EPD Claims*

With respect to any loan (or resulting REO) sold prior to ~~July 31, 2008,~~the Determination Date, the protocol will allow an EPD Claim in an amount equal to the UPB at the time of sale less the net proceeds realized from such sale (i.e., after deducting servicing advances, foreclosure costs, and the like). The use of UPB rather than UPB-plus-interest is appropriate because, had the Debtors repurchased the loan, the EPD claimant would not have been entitled to receive any further interest from the borrower (because the Debtors would have owned the loan following the repurchase date). Accordingly, it cannot be said that the non-payment of interest by borrowers constitutes an element of the EPD claimants' damages flowing from the Debtors' failure to repurchase the loans.

### 2.    Breach of Warranty Claims

Breach of Warranty Claims are more complicated than EPD Claims. Determining whether the Debtors breached ~~a representation or warranty~~non-EPD related representations or warranties in a loan sale agreement would entail a detailed loan-by-loan assessment of the specific ~~allegation and that often~~allegations, which would _necessarily_ entail a degree of subjectivity because some of the industry-standard representations and warranties are not susceptible to clear, objective assessment. In addition, many of the secondary loan buyers asserted in their proofs of claim that they would not be able to liquidate ~~such claims~~their Breach of Warranty Claims fully for years, since there often would be no reason to ~~ferret out a~~ ~~breach~~expend time and resources ferreting out potential breaches of representations and warranties on a given loan unless and until the borrower defaulted. And ~~after such assessments~~ ~~were made, it would be necessary to develop a methodology for~~even if it were possible to identify loans for which a breach of a representation or warranty occurred, assessing the damages that resulted from the Debtors' inability to repurchase the loans~~, as opposed to losses that the~~ ~~loan buyers suffered based on market and other conditions. The Plan Proponents analyzed~~ ~~substantial data and developed a protocol that takes into account reasonable assumptions as to~~ ~~the incidence~~ would entail the same difficulties identified above in connection with the liquidation of EPD Claims, e.g., whether the amount of a "loss" realized by a claimant was the result of the Debtors' failure to repurchase loans or some combination of deteriorating market conditions, how the claimant dealt with the loan, and the "value" of the loan at a historical moment in time. In developing a protocol for the estimation and allowance of Breach of Warranty Claims~~over the life of a pool of loans.~~ (These assumptions were necessary, the Debtors had to make assumptions as to (i) the likelihood there had been material breaches of representations or warranties in connection with a given sale of loans (hereinafter referred to as the "incidence of breach"), (ii) the likelihood a Breach of Warranty claimant would ultimately suffer a loss as a result of the Debtors' failure to repurchase loans for which there had been a material breach of representations or warranties (as above, referred to as the "loss frequency"); and (iii) the presumed amount of any such losses (as above, referred to as the "loss severity").

a.    *Incidence of Breach*

The Debtors have little historical data concerning the incidence of breach within a given pool of mortgage loans sold because, in the Debtors' experience prior to bankruptcy, Breach of

89

066585.1001

Warranty Claims were seldom, if ever, actually asserted by secondary buyers.) Accordingly, in addition to reviewing the Debtors' sparse historical data, the Debtors had to look to, and analyze, a substantial amount of outside data in order to arrive at reasonable assumptions as to the likely incidence of breach within pools of loans sold by the Debtors prepetition. Based on this data, the Debtors developed two methodologies in order to arrive at a principled estimate of the incidence of breach within a given loan pool.

The first methodology, which yielded a 0.18% incidence of breach, was based on loan-level breach-related repurchase demands submitted by all investors who purchased loans from the Debtors prior to the Petition Date—all of which loans happened to have been originated in 2006. The Debtors arrived at the 0.18% incidence level by dividing the UPB of the loans for which a breach was claimed (approximately $100 million) by the UPB of all loans sold to investors in 2006 (approximately $54 billion).

The second methodology, which yielded a 0.22% incidence of breach, was based on the actual Breach of Warranty Claims filed in these Chapter 11 Cases by five of the secondary loan buyers having the most transaction volume with the Debtors (such buyers, collectively, the "Breach Sampling "Sample Counterparties")[38] between June 1, 2006 and the Petition Date (the "Breach Sampling Period"). The Sample Counterparties are an ideal sampling of the potential universe of Breach of Warranty Claimants because, among other reasons: (i) they all submitted detailed information in support of their proofs of claim, which the Debtors were able to use in calculating the estimated incidence of breach; (ii) while the Debtors traded whole loans with over twenty counterparties, these five bought 40% of the total whole loans sold by the Debtors during the Breach Sampling Period; and (iii) they bought all of the product types that the Debtors originated. To arrive at an estimated incidence of breach based on the Sample Counterparties' filed Breach of Warranty Claims, the Debtors divided (i) the full, aggregate repurchase amounts asserted by the Sample Counterparties in their claims (without reduction to account for, e.g., loans for which a breach was asserted but could not be proved), by (ii) the aggregate UPB volume of whole loans sold to the Sample Counterparties during the Breach Sampling Period. While the breaches asserted by the Sample Counterparties in some instances extend to loans sold outside of the Breach Sampling Period, the Debtors nonetheless used the loan volume sold within the Breach Sampling Period as the "denominator" in the foregoing calculation because the vast majority of breaches would have been recognized in this most recent time period.

For example, the protocol assumes that the highest incidence of breach would likely be recognized relatively soon after a pool of loans is sold. Conversely, the protocol assumes that, after a pool of loans has been held by a buyer for a number of years, it is less likely that new breaches will come to light. In addition, the protocol assumes a measure of damages which is

---

[38]    The Sample Counterparties are Bear Stearns Mortgage Capital Corp., Morgan Stanley Mortgage Capital Holdings, Countrywide Bank, FSB, CitiGroup Global Markets Realty Corp., and J.P. Morgan Mortgage Acquisition Corp., and/or affiliated entities.  The Debtors continue to evaluate information submitted by the Sample Counterparties as well as other putative EPD/Breach of Warranty claimants and, to the extent appropriate, will incorporate such information into their analysis regarding the incidence of breach, the loss frequencies, and the loss severities for purposes of the EPD/Breach Claims Protocol.

90

066585.1001

DB02:7418039.1

integrally related with the assumptions as to the likelihood of breach based on the seasoning of a loan pool. The result is the following protocol. purposes of the protocol, the Debtors opted to use the latter of the two foregoing estimation methodologies because, among other reasons, it was based on a more robust sampling of data spanning a more comprehensive time period. Accordingly, the protocol assumes a 0.22% total incidence of breach in a given mortgage pool.[39]

After determining the assumed total incidence of breach, the Debtors adopted an underlying premise of the *New Century* breach protocol. namely: that the highest incidence of breach over the life of a given mortgage pool will be recognized in the months immediately following sale of the loans. and will taper off gradually over time due to the "seasoning" of loans. Using the implicit rate of decrease in incidence reflected in the *New Century* protocol as a proxy to estimate a decrease in incidence with respect to the Debtors' loans, the Debtors assumed that, with respect to loans sold immediately prepetition (i.e., second quarter of 2007). the full 0.22% incidence of breach would ultimately be recognized, but with respect to loans sold before the third quarter of 2003, no new breaches would come to light.

b.    <em>Loss Frequency and Loss Severity</em>

For the sake of simplicity, the protocol assumes that any loan on account of which a valid Breach of Warranty Claim is asserted will give rise to a loss in some amount (i.e., will have a 100% loss frequency).

Also for the sake of simplicity, as well as the reasons discussed above in connection with the EPD Claims, the protocol for Breach of Warranty Claims assumes the same loss severities by product type and delinquency bucket (determined as of the Determination Date) as were assumed in connection with the EPD Claims.

c.    <em>Allowance of Breach of Warranty Claims</em>

Under the protocol established in the Plan, a Breach of Warranty Claim with respect to a pool of currently outstanding loans owned by the claimant is calculated based upon the loan vintage (i.e., year and quarter of origination), loan type, and the estimations and simplifying assumptions discussed above that: (i) 0.22% of the loan amounts originated in the second quarter of 2007 will at some point give rise to valid Breach of Warranty Claims, (ii) as the age of the loans increases, the 0.22% incidence rate will decrease, tapering down to a zero incidence over time, and (iii) the damages resulting from the failure to repurchase a given loan will be a fixed percentage (equal to the loss severity percentages utilized for EPD Claims) of the UPB of the loan as of July 31, 2008; the Determination Date. based on the loan product type. A valid Breach of Warranty Claim shall be Allowed as an Unsecured Claim in an amount equal to the July 31, 2008, UPB of UPB as of the Determination Date of all loans purchased from the applicable Debtor, multiplied by the applicable percentage in the "Damages" column of the following table:

---

[39]  Implicit within this assumption are the further simplifying assumptions that (i) the incidence of breach will be the same among all loan product types, and (ii) the incidence of breach

91

| Year | Quarter | % Incidence | Damages as % of 7/31/08 UPB[38] | | | |
|------|---------|-------------|------|------|------|------|
| | | | FRM | ARM | POA | 2nd |
| 2007 | 2 | 0.22% | 0.09% | 0.07% | 0.08% | 0.21% |
| 2007 | 1 | 0.18% | 0.07% | 0.06% | 0.07% | 0.17% |
| 2006 | 4 | 0.14% | 0.06% | 0.05% | 0.05% | 0.13% |
| 2006 | 3 | 0.13% | 0.05% | 0.04% | 0.05% | 0.12% |
| 2006 | 2 | 0.10% | 0.04% | 0.03% | 0.04% | 0.09% |
| 2006 | 1 | 0.08% | 0.03% | 0.03% | 0.03% | 0.08% |
| 2005 | 4 | 0.06% | 0.02% | 0.02% | 0.02% | 0.06% |
| 2005 | 3 | 0.04% | 0.01% | 0.01% | 0.02% | 0.04% |
| 2005 | 2 | 0.02% | 0.0% | 0.01% | 0.01% | 0.02% |
| 2005 | 1 | 0.01% | 0.0% | 0.01% | 0.01% | 0.02% |
| 2004 | 4 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2004 | 3 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2004 | 2 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2004 | 1 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2003 | 4 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2003 | 3 | 0.01% | 0.0% | 0.0% | 0.0% | 0.01% |
| 2003 2nd Quarter and earlier | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

### 3.    Interaction Between EPD Claims and Breach of Warranty Claims.

An EPD Claim will take precedence over a Breach of Warranty Claim with respect to a given loan. Thus, to the extent a claimant asserts a valid EPD Claim for a loan, that loan's UPB will be subtracted from the UPB of the pool of loans for which Breach of Warranty Claims are computed.

### 4.    EPD/Breach Claims Questionnaire

In order to receive a Distribution under the Plan, each Holder of an EPD Claim and/or Breach of Warranty Claim must supply the Debtors with sufficient information from which to calculate the Allowed amount of such Claims in accordance with the EPD/Breach Claims Protocol and to ensure that multiple Creditors are not asserting duplicative EPD/Breach Claims. A request for such information shall be provided by the Debtors to each Creditor asserting an EPD Claim and/or Breach of Warranty Claim on or before the Effective Date, in the form of a

---

[38] To arrive at these amounts, the Plan Proponents multiplied the assumed incidence of Breach of Warranty Claims within a given vintage of loans by the following assumed loss severities for the various loan types: FRMs—40%; ARMs—33%; POAs—38%; and 2nds—100%).

066585.1001

questionnaire (the "EPD/Breach Claims Questionnaire") substantially in the form to be submitted as a Supplemental Plan Document. Each Creditor asserting an EPD Claim and/or Breach of Warranty Claim shall be required to complete the EPD/Breach Claims Questionnaire and return same to the Debtors or the Plan Trustee, as applicable, by the later of (i) sixty (60) days from the date of service thereof, (ii) such later date agreed upon by the Debtors or the Plan Trustee, as applicable, and the Creditor, or (iii) such other date as the Bankruptcy Court shall order upon application made prior to the end of the sixty (60)-day period set forth in Article 7D(i) of the Plan. **Holders of EPD Claims and/or Breach of Warranty Claims that are required, but fail, to return an EPD/Breach Claims Questionnaire by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Plan Trust, or any of their Assets.**

F.    **Means of Implementing the Plan**

1.    **Corporate Action; Dissolution of Debtors**

On the Effective Date, (i) the matters under the Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries. The and (ii) the officers and directors of the Debtors shall cease to serve immediately after the Effective Date and the Plan Trustee shall be deemed the sole director and officer of each of the Debtors for all purposes.

ImmediatelyOn and after the Effective Date, (i) the Plan Trustee shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to dissolve the Debtors and their subsidiaries under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation; provided, however, that (A) to the extent required by any agreement between the Debtors and BofA as Administrative Agent pursuant to the BofA Global Settlement Stipulation and Article 8E(2) of the Plan, the Plan Trustee shall take all actions necessary to continue the corporate existence of one or more Debtors (the costs of which shall be borne by BofA as Administrative Agent pursuant to the BofA Global Settlement Stipulation), and the Plan Trustee shall not dissolve such Debtors without the prior written consent of BofA as Administrative Agent, and (B) the Plan Trustee shall not be compelled to dissolve any Debtor or subsidiary thereof if to do so would unduly burden the Plan Trust or if such Debtor's or subsidiary's continued existence would aid the Plan Trustee in the Administration of the Plan Trust Assets or the discharge of its obligations under thethis Plan or the Plan Trust Agreement, provided further, however, that after the later of the time when all Distributions have been made to Holders of Allowed Claims against AHM Investment or a Final Decree is entered with respect to AHM Investment, the Plan Trustee shall file a certificate of dissolution in the state of incorporation for AHM Investment, and AHM Investment shall dissolve and cease to exist; and (ii) except as otherwise provided (A) by agreement between BofA as Administrative Agent and the Debtors

93

066585.1001

pursuant to the BofA Global Settlement Stipulation and Article 8E(2) of the Plan or (B) by subsequent amendment of the Plan pursuant to Article 14FD thereof, no AssetsAsset of the Estatesany Estate shall revest in the Debtorsany Debtor. The Plan Trustee shall have no liability for using itshis discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of thethis Plan from and after the Effective Date except as specifically provided otherwise in the Plan.

### 2.    Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Claims; (ii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iii) motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.

### 3.    The Plan Trust

On or prior to the Effective Date, the Plan Trust shall be formed. The Holders of Claims shall be the sole beneficiaries of the Plan Trust.

The Plan Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Plan Trustee and to ensure the treatment of the Plan Trust as a liquidating trust for federal income tax purposes. In the event a provision of the Plan or the Confirmation Order conflicts with a provision of the Plan Trust Agreement, the provision of the Plan Trust Agreement shall control.

#### a.    *The Plan Trustee*

No later than ten (10) days prior to the deadline to vote to accept or reject the Plan, the Plan ProponentsDebtors will file the Plan Trust Agreement with the Bankruptcy Court, which Plan Trust Agreement shall identify the Plan Trustee. The Plan Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving as the Plan Trustee on the Effective Date; provided, however, that the party appointed as Plan Trustee shall be permitted to act in accordance with the terms of the Plan Trust Agreement from the Confirmation Date (or such earlier date as authorized by the Committee) through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Plan Trust Agreement and the Plan.

94

The Plan Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan and the Plan Trust Agreement, including, without limitation, the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Plan Trust as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulation 301.7701-4(d).

**The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Plan Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Plan Trustee.**

The Plan Trustee shall at all times maintain a bond acceptable to the Plan Oversight Committee and approved by the Bankruptcy Court.

The Plan Trustee shall initially be compensated as set forth in the Plan Trust Agreement (which compensation may be revised by the Plan Trust with the consent of the Plan Oversight Committee) and shall not be required to file a fee application to receive compensation. The Plan Trustee's compensation shall, however, be subject to the review and, if appropriate, objection of the Plan Oversight Committee as set forth in the Plan Trust Agreement.

The Plan Trustee may be removed or replaced at any time by the Plan Oversight Committee in accordance with the procedures in the Plan Trust Agreement. In the event of the death or incompetency (in the case of a Plan Trustee that is a natural person), dissolution (in the case of a Plan Trustee that is a corporation or other entity), bankruptcy, insolvency, resignation, or removal of the Plan Trustee, the Plan Oversight Committee shall have the authority to appoint a successor trustee as set forth in the Plan Trust Agreement.

   b.   *Liquidation of Plan Trust Assets; Responsibilities of Plan Trustee*

The Plan Trustee shall be vested with the rights, powers and benefits set forth in the Plan Trust Agreement. The Plan Trust shall be subject to the directions of the Plan Oversight Committee as set forth in the Plan Trust Agreement. Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, any act by the Plan Trustee, including discretionary acts, will require the consent of or consultation with the Plan Oversight Committee in accordance with and to the extent of the terms of the Plan Trust Agreement. If there is any inconsistency or ambiguity between the Plan, Confirmation Order or the Plan Trust Agreement in respect of the Plan Oversight Committee's role in the Plan Trustee's authority to act, the provision of the Plan Trust Agreement shall control.

The Plan Trustee, in its reasonable business judgment and in an expeditious but orderly manner, shall liquidate and convert to Cash the Plan Trust Assets, make timely distributions and not unduly prolong the duration of the Plan Trust. The liquidation of the Plan Trust Assets may be accomplished either through the sale of Plan Trust Assets (in whole or in combination),

95

including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise. The Plan Trustee shall distribute the proceeds of liquidation of the Plan Trust Assets between the Estates in accordance with the Stipulated Asset Allocation.

The Plan Trustee shall be expressly authorized to do the following:

- prosecute, collect, compromise and settle any Causes of Action in accordance with the Plan and without further approval of or application to the Bankruptcy Court or the Plan Oversight Committee, except as otherwise provided in the Plan or Plan Trust Agreement;

- file, prosecute, compromise and settle objections to Claims without further approval of or application to the Bankruptcy Court or the Plan Oversight Committee, except as otherwise provided in the Plan or Plan Trust Agreement;

- open and maintain bank accounts in the name of the Plan Trust, draw checks and drafts thereon on the sole signature of the Plan Trustee, and terminate such accounts as the Plan Trustee deems appropriate;

- sell or liquidate any Plan Trust Asset, without further approval of or application to the Bankruptcy Court or the Plan Oversight Committee, except as otherwise provided in the Plan or Plan Trust Agreement;

- execute any documents, file any pleadings, and take any other actions related to, or in connection with, the liquidation of the Plan Trust Assets and the exercise of the Plan Trustee's powers granted herein, including the exercise of the Debtors' or the Committee's respective rights to conduct discovery and oral examination of any party under Rule 2004 of the Federal Rules of Bankruptcy Procedure;

- hold legal title to any and all rights of the beneficiaries in or arising from the Plan Trust Assets, including the right to vote any Claim or Interest in an unrelated case under the Bankruptcy Code and to receive any distribution thereon;

- protect and enforce the rights to the Plan Trust Assets by any method it deems appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

- deliver distributions as may be authorized by the Plan;

- file, if necessary, any and all tax returns with respect to the Plan Trust; pay taxes, if any, properly payable by the Plan Trust; and make distributions to the beneficiaries net of such taxes in accordance with the requirements of the Plan and Plan Trust Agreement;

96

- make all necessary filings in accordance with any applicable law, statute or regulation;

- determine and satisfy any and all liabilities created, incurred or assumed by the Plan Trust;

- invest moneys received by the Plan Trust or otherwise held by the Plan Trust in accordance with Article 8F(8) of the Plan;

- in the event that the Plan Trustee determines that the beneficiaries or the Plan Trust may, will or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences;

- utilize the Plan Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Plan Trustee, and the Plan Oversight Committee and its members;

- obtain unsecured or secured credit to fund Plan Trust administration, litigation or for any other purpose consistent with the Plan Trust Agreement;

- create one or more Entities for the purpose of holding or managing Plan Trust Assets, or in connection with the sale or other disposition thereof, or for any other purpose consistent with the Plan, Confirmation Order, and Plan Trust Agreement;

- except as otherwise provided in the Plan Trust Agreement, in its sole discretion and without the prior approval of the Plan Oversight Committee, compromise, settle, decline to object to, and/or allow any Disputed Claim asserted in an amount less than (i) $250,000 for an S/A/P Claim or (ii) $2,500,000 for an Unsecured Claim;

- except as otherwise provided in the Plan Trust Agreement, in its sole discretion and without the prior approval of the Plan Oversight Committee or the Bankruptcy Court, retain, abandon, and/or destroy files, records, and other documents of the Debtors subject only to (A) the provision of reasonable notice to the Plan Oversight Committee of any proposed abandonment or destruction, (B) applicable laws concerning the protection of confidential consumer information, and (C) any and all prior Orders of the Bankruptcy Court concerning the preservation and destruction of documents generally or with respect to certain third parties [including, without limitation, Docket Nos. 14, 610, 860, 1697, 2986, 3314, and 5171], which Orders shall be preserved and shall continue in effect against the Plan Trustee as successor to the Debtors;

- prepare and report telephonically, and if requested by the Plan Oversight Committee, in writing or in person, a quarterly report of the status of the process of winding down the Estates including Causes of Action.

97

066585.1001

The Plan Trustee may request an expedited determination of taxes of the Plan Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust.

c.    *Valuation of Assets*

As soon as possible after the Effective Date the Plan Trustee shall (i) determine the fair market value, as of the Effective Date, of the Plan Trust Assets based on its own good-faith determination, provided that nothing in the Plan shall be construed to prevent the Debtors (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) from seeking a judicial valuation of the Plan Trust Assets as of the Effective Date by the Bankruptcy Court, and (ii) apprise the Holders of Unsecured Claims in writing of such valuation (and indicate in such writing each Holder's percentage ownership interest in the Plan Trust based on each such Holder's relative beneficial interest in the Plan Trust or portion thereof as of the Effective Date). The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Plan Trustee, and Holders of Unsecured Claims) for all federal income tax purposes.

d.    *Payments by the Plan Trust; Investment Powers and Permitted Cash Expenditures*

The Plan Trust shall make Distributions to Holders of Allowed Claims in accordance with Article 9 of the Plan.

All funds held by the Plan Trustee shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Plan Trust Agreement; provided, however, that the right and power of the Plan Trustee to invest Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. The Plan Trustee may expend the Cash of the Plan Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Plan Trust during liquidation, (y) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trust) and (z) to satisfy other liabilities incurred by the Plan Trust in accordance with the Plan or the Plan Trust Agreement.

e.    *Reporting Duties*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), the Plan Trustee shall file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Plan Trustee shall also send to each holder of a beneficial interest in the Plan Trust an annual statement setting forth the holder's share of items of income, gain, loss, deduction or credit and provide to all such holders information for reporting such items on their federal income tax returns, as appropriate. The Plan Trustee shall

98

file (or cause to be filed) any other statements, returns or disclosures relating to the Plan Trust that are required by any Governmental Unit.

Allocations of Plan Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Plan Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the beneficial interests in the Plan Trust (treating any Holder of a Disputed Claim, for this purpose, as a current Holder of a beneficial interest in the Plan Trust entitled to distributions), taking into account all prior and concurrent distributions from the Plan Trust (including all distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Plan Trust Assets. For this purpose, the tax book value of the Plan Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Plan Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

The Plan Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Plan Trust that are required by any governmental unit.

    f.    *Registry of Beneficial Interests; Non-Transferability*

To evidence the beneficial interest in the Plan Trust of each Holder of such an interest, the Plan Trustee shall maintain a registry of such Holders.

Upon issuance, interests in the Plan Trust shall be non-transferable, except with respect to a transfer by will or under the laws of descent and distribution. Any such transfer, however, shall not be effective until and unless the Plan Trustee receives written notice of such transfer.

    g.    *Termination*

The Plan Trust shall terminate after its liquidation, administration and distribution of the Plan Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in its Plan Trust Agreement. The Plan Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, within a period of six (6) months prior to such termination date or any extended termination date, the Plan Trustee, with the consent of the Plan Oversight Committee, may extend the term of the Plan Trust if it is necessary to facilitate or complete the liquidation of the Plan Trust Assets administered by the Plan Trust; provided further, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Plan Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Plan Trust as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulations 301.7701-4(d).

    h.    *Purpose of the Plan Trust*

DB02:7418039.1

066585.1001

The Plan Trust shall be established for the sole purpose of liquidating and distributing the Plan Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Subject to definitive guidance from the IRS, all parties shall treat the Plan Trust as a liquidating trust for all federal income tax purposes. The Plan Trust shall not be deemed to be the same legal entity as any of the Debtors, but only the assignee of the assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. Neither the Plan Trust nor any portion thereof, nor any reserve, account or fund established by the Plan shall be treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9(b)(1).

### 4.    Vesting of Assets in Plan Trust; Assumption of Plan Obligations

Except as otherwise provided by agreement of the Debtors and BofA as Administrative pursuant to the BofA Global Settlement Stipulation as provided below, or by amendment to the Plan pursuant to Article 14FD thereof, on the Effective Date, all Assets of the Estates shall vest in, and constitute Assets of, the Plan Trust, and each Debtor shall be deemed for all purposes to have transferred legal and equitable title of all Assets of its Estate to the Plan Trust for the benefit of the Holders of Claims against its Estate, whether or not such Claims are Allowed Claims as of the Effective Date.

On the Effective Date, legal ownership of all BofA Mortgage Loans owned by the Debtors immediately prior to the Effective Date shall vest in, and constitute Assets of, one or more of the following entities, which entity or entities shall thereafter own the BofA Mortgage Loans subject to the terms of the BofA Global Settlement Stipulation (including, without limitation, the requirement that BofA as Administrative Agent bear the costs of ownership of the BofA Mortgage Loans): (i) AHM Acceptance, (ii) AHM Corp., (iii) any other Debtor entity, (iv) the Plan Trust, (v) BofA as Administrative Agent, or (vi) such other entity as may be agreed upon by the Debtors and BofA as Administrative Agent. The Debtors and BofA as Administrative Agent shall execute and file as a Supplemental Plan Document a stipulation (i) specifying the entity or entities in which the BofA Mortgage Loans will vest pursuant to this section and (ii) specifying and providing a mechanism for payment of the anticipated costs of ownership of the BofA Mortgage Loans that will be borne by BofA as Administrative Agent pursuant to the BofA Global Settlement Stipulation.

On the Effective Date or as soon as practicable thereafter, the Debtors shall take all actions reasonably necessary to transfer control of (i) the Plan Trust Assets to the Plan Trustee and (ii) all BofA Mortgage Loans in the Debtors' possession to the entity or entities agreed upon by the Debtors and BofA as Administrative pursuant to section 2 above. Upon the transfer of control of the Plan Trust Assets to the Plan Trustee and BofA Mortgage Loans in accordance with this section, the Debtors shall have no further interest in or with respect to the Plan Trust Assets or the Plan Trust, the Plan Trust, or the BofA Mortgage Loans (except as otherwise provided by agreement between the Debtors and BofA as Administrative Agent pursuant to the BofA Global Settlement Stipulation, as described above).

100

066585.1001

On the Effective Date, all of the Debtors' rights and obligations with respect to each and every S/A/P Claim, and all other rights and obligations of the Debtors under the Plan, shall be assigned to and assumed by the Plan Trust.

For federal income tax purposes, all parties (including the Debtors, the Plan Trustee, and the Holders of Claims) shall treat the transfer of the Plan Trust Assets to the Plan Trust in accordance with the terms of the Plan as a transfer to the Holders of the Claims that have a beneficial interest in the Plan Trust, with the Holders of Claims receiving an undivided interest in the Plan Trust Assets attributable to their respective Debtor, followed by a transfer of the Plan Trust Assets by such Holders to the Plan Trust, and the beneficiaries of the Plan Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Plan Trust.

**PRESERVATION OF BORROWER CLAIMS AND DEFENSES: Notwithstanding anything to the contrary in the Plan, in any exhibit to the Plan, in any Supplemental Plan Document, in this Disclosure Statement, or in any Order confirming this Plan, the transferees of any Mortgage Loans transferred under or in connection with the Plan (including, without limitation, the Plan Trustee) shall remain subject to all claims and defenses of any consumer borrowers under such Mortgage Loans to the same extent such transferees would be subject to such claims and defenses had they purchased such Mortgage Loans from the Debtors in a sale pursuant to § 363 of the Bankruptcy Code.**

### 5.    Plan Oversight Committee

On the Effective Date, the Plan Oversight Committee shall be deemed appointed and shall adopt bylaws to govern the actions of the Plan Oversight Committee.

#### a.    *Membership*

The Plan Oversight Committee shall consist of up to five (5) members of the Committee chosen from those members of the Committee that notify counsel to the Committee in writing no later than fifteen (15) days prior to the Confirmation Hearing of their intention to serve on the Plan Oversight Committee. In the event that less than five (5) of the members of the Committee notify counsel to the Committee of their intent to serve on the Plan Oversight Committee within fifteen (15) days prior to the Confirmation Hearing, then the Committee will choose from among the Holders of Unsecured Claims to fill any vacancy until five (5) members have been designated. Unless and until such vacancy is filled, the Plan Oversight Committee shall function with such reduced membership. In the event of the resignation of a member of the Plan Oversight Committee, the remaining members may, but need not, designate a successor from among the Holders of Unsecured Claims. Unless and until such vacancy is filled, the Plan Oversight Committee shall function with such reduced membership.

#### b.    *Rights and Duties*

The Plan Oversight Committee's role shall be to advise and approve the actions of the Plan Trustee as more particularly set forth in the Plan Trust Agreement. The fiduciary duties that applied to the Committee prior to the Effective Date shall apply to the Plan Oversight

DB02:7418039.1

066585.1001

Committee. The Plan Oversight Committee shall have the rights and duties set forth in the Plan Trust Agreement, including without limitation:

- to terminate the Plan Trustee with or without cause and upon such termination or upon the resignation, death, incapacity or removal of the Plan Trustee, to appoint a successor Plan Trustee; provided, that the Plan Oversight Committee shall file with the Bankruptcy Court a notice appointing such successor trustee;

- to approve any release or indemnity in favor of any third party granted or agreed to by the Plan Trustee, except with respect to any sales, liquidations, settlements or Claim allowances that are within the Plan Trustee's discretion under subsections 4(d),(e) and (f) below and other than as set forth in the Plan or the Plan Trust Agreement;

- to authorize the Plan Trustee to commence or continue to prosecute any Cause of Action;

- to approve the settlement of any Cause of Action if the amount sought to be recovered by the Plan Trustee in the complaint or other document initiating or evidencing such Cause of Action exceeds $1,000,000;

- to approve the allowance of any Disputed Claim if the asserted amount of such Claim exceeds (i) $250,000 for any S/A/P Claim, or (ii) $2,500,000 for any Unsecured Claim;

- to approve the sale or liquidation of any Plan Trust Assets by the Plan Trustee for an amount exceeding $1,000,000;

- with respect to each six-month period, to approve any budget for the Plan Trust Operating Expense Reserve prepared by the Plan Trustee in respect of the Plan Trust Operating Expenses and to approve any additional funding of the such reserve;

- to approve the making of distributions under the Plan, except as set forth therein or in the Plan Trust Agreement;

- to review and object to fees and expenses of Professionals retained by the Plan Trust; and

- to approve of any investment of Cash or other Plan Trust Assets pending distributions to Holders of the beneficial interests in the Plan Trust.

The duties and powers of the Plan Oversight Committee shall terminate upon the termination of the Plan Trust.

Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Plan Oversight Committee, including reasonable

DB02:7418039.1

066585.1001

attorneys fees subject to a cap to be established by the Plan Oversight Committee in its discretion, the members of the Plan Oversight Committee shall serve without compensation. Reasonable expenses, as ~~set forth~~discussed in ~~this~~ Article 8G(5) of the Plan, incurred by members of the Plan Oversight Committee may be paid by the Plan Trust without need for approval of the Bankruptcy Court.

### c. *Objection to Fees*

The Plan Oversight Committee shall have twenty (20) days, or such other period as determined by the Plan Oversight Committee and the Plan Trustee, from the delivery of a fee statement to object to the fees of any professional retained by either the Plan Trust or the Plan Oversight Committee by giving notice of any such objection to the professional seeking compensation or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees subject to the objection and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is made shall be submitted to the Bankruptcy Court for resolution. The uncontested portion of each invoice shall be paid within thirty (30) days after its delivery to the Plan Oversight Committee and the Plan Trustee.

### 6. Liability; Indemnification

**Neither the Plan Trustee, the Plan Oversight Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Plan Trustee or the Plan Oversight Committee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of such Plan Trustee or Plan Oversight Committee, nor shall such Plan Trustee, or any member of the Plan Oversight Committee, be liable for any act or omission taken or omitted to be taken in its capacity as Plan Trustee, or as a member of the Plan Oversight Committee, respectively, other than for specific acts or omissions resulting from such Plan Trustee's or such member's willful misconduct, gross negligence or fraud.**

The Plan Trustee and the Plan Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Trustee or the Plan Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Trustee or Plan Oversight Committee or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud.

The Plan Trust shall indemnify and hold harmless the Plan Trustee and Plan Oversight Committee and its members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including,

103

066585.1001

without limitation, reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud.

### 7.    Retention of Professionals

The Plan Trustee may retain professionals, including but not limited to, counsel, accountants, investment advisors, auditors and other agents on behalf of the Plan Trust as necessary or desirable to carry out the obligations of the Plan Trustee under the Plan and the Plan Trust Agreement. More specifically, the Plan Trustee may retain counsel in any matter related to administration of the Plan, including counsel that has acted as counsel for the Debtors, the Committee, or any of the individual members of the Committee in the Chapter 11 Cases.

Prior to the Effective Date, the Committee shall approve a budget for the six (6)-month period beginning on the Effective Date, on a professional-by-professional basis, for professional fees for services to be rendered to the Plan Trust, which budget may be altered from time to time by the Plan Oversight Committee in accordance with the Plan Trust Agreement, provided that any fees and expenses of professionals retained by the Plan Trust that have been incurred prior to the date of the modification of the budget shall constitute budgeted amounts. Except with respect to services rendered and expenses incurred in connection with Fee Applications pending on the Effective Date or filed after the Effective Date, the Professionals retained by the Debtors or the Committee shall only be entitled to compensation for services performed and expenses incurred after the Effective Date to the extent, if any, of the amount budgeted for each respective Professional. Following the Effective Date, the Plan Trustee may pay, without application to the Bankruptcy Court or any other court of competent jurisdiction, such professionals retained by the Plan Trust in accordance with agreements that the Plan Trustee determines to be reasonable. The Plan Oversight Committee shall approve in advance the Plan Trustee's retention of professionals and their compensation arrangements.

The Plan Oversight Committee shall have the right to retain counsel of its choice in the event of a dispute or conflict with the Plan Trustee or for other purposes set forth in the Plan Trust Agreement, and the reasonable fees and expenses of such counsel shall be paid by the Plan Trust.

### 8.    Trustee as Successor

The Plan Trust shall be the successor to the Debtors for the purposes of §§ 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation-related matters. The Plan Trust shall succeed to the attorney-client privilege of the Debtors with respect to all Causes of Action and other litigation-related matters, and the Plan

Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matter, or portion thereof, in the Plan Trustee's discretion.

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with § 1123(b) of the Bankruptcy Code, the Plan Trust shall be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors, the Estates, the Committee or the Plan Trust may have against any Person or other Entity. The Plan Trustee may pursue such retained claims or Causes of Action in accordance with the best interests of the creditors, the Estates, or the Plan Trust.

### G.    Distributions under the Plan

#### 1.    Timing of Distributions

##### a.    *S/A/P Claims*

The Plan Trustee shall pay any Allowed S/A/P Claim against the Debtors in Cash from the S/A/P Claims Reserve, except as otherwise provided in the Plan, as soon as practicable after the later of (a) the Effective Date, and (b) the date upon which any such Claim becomes an Allowed Claim.

##### b.    *Interim Distributions on Unsecured Claims*

Subject to approval of the Plan Oversight Committee as set forth in the Plan Trust Agreement, the Plan Trustee shall (a) make annual interim Distributions on account of Allowed Unsecured Claims from the Net Distributable Assets or BofA Syndicate Net Distributable Assets, as applicable, of the applicable Estate then available, provided that any such distribution is warranted, economical and not unduly burdensome to the Plan Trust, and (b) have the right to make more frequent interim distributions to Holders of Allowed Unsecured Claims if the Plan Trustee determines that such interim distributions are warranted, economical and not unduly burdensome to the Plan Trust; provided, however, that any such distribution(s) shall only be made if (i) the Plan Trust Operating Expense Reserve is fully funded and will remain fully funded after such interim distributions are made; (ii) the S/A/P Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; (iii) the Unsecured Claims Reserve of the applicable Estate is fully funded and will remain fully funded after such interim distributions are made; and (iv) the Plan Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Plan Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Plan Trust in accordance with the Plan or the Plan Trust Agreement. Interim distributions under the Plan shall be consistent with Revenue Procedure 94-45 § 3.10.

##### c.    *Final Distributions on Unsecured Claims*

Notwithstanding anything else in the Plan, after the settlement or satisfaction of all S/A/P Claims and Unsecured Claims, the prosecution, settlement, or abandonment of all Causes of Action, and the liquidation or abandonment of all other Plan Trust Assets, the Plan Trustee shall

105

distribute, as soon as practicable, all remaining Plan Trust Assets pursuant to the terms of the Plan.

### 2. Reserves

#### a. *Plan Trust Operating Expense Reserve*

On the Effective Date, the Plan Trustee shall establish the Plan Trust Operating Expense Reserve to fund administrative and all other miscellaneous needs of the Plan Trust pursuant to the Plan, Confirmation Order and Plan Trust Agreement. The initial amount of the Plan Trust Operating Expense Reserve shall be based on the Plan Trustee's good faith estimate of the amount necessary to complete the Plan Trust's obligations under the Plan and the Plan Trust Agreement. The Plan Trust shall pay all costs and expenses related to carrying out its obligations under the Plan and the Plan Trust Agreement from the Plan Trust Operating Expense Reserve and, in the Plan Trustee's discretion, and with approval of the Plan Oversight Committee, may add additional amounts to the Plan Trust Operating Expense Reserve for administration and other miscellaneous needs of the Plan Trust without further notice or motion in accordance with the terms of the Plan, Confirmation Order and Plan Trust Agreement.

#### b. *S/A/P Claims Reserve*

On the Effective Date, the Plan Trustee shall establish the S/A/P Claims Reserve for all Disputed S/A/P Claims and Allowed S/A/P Claims not paid prior to the Effective Date. The amount reserved for each Disputed Administrative Claim and each Allowed Administrative Claim not paid prior to the Effective Date shall be the lower of (i) the amount set forth in the request for payment of Administrative Claim filed by the Holder of such Claim, or, if no such request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10F of the Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be liable, the Plan Trustee shall contribute to the S/A/P Claims Reserve on account of only one such Claim.

The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Miscellaneous Secured Claim or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Miscellaneous Secured Claim that is not paid prior to the Effective Date shall be the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or, if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court pursuant to Article 10F of the Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be liable, the Plan Trustee shall contribute to the S/A/P Reserve on account of only one such Claim.

As soon as practicable after (and to the extent) that a Disputed S/A/P Claim becomes an Allowed S/A/P Claim, the Plan Trustee shall make a payment from the S/A/P Claims Reserve to the Holder of such Claim in the Allowed amount of such Claim, unless such Claim is an Allowed Miscellaneous Secured Claim for which the Plan Trustee elects an alternate treatment pursuant to

106

Article 4B of the Plan. After (and to the extent) a Disputed S/A/P Claim is determined not to be an Allowed S/A/P Claim, the portion of the S/A/P Claims Reserve reserved for such Claim shall be released from the S/A/P Claims Reserve and distributed to the Estates pursuant to the Stipulated Asset Allocation. Any amount remaining in the S/A/P Claims Reserve following the final disposition of all S/A/P Claims shall constitute a Plan Trust Asset and shall be released from the S/A/P Claims Reserve and distributed to the Estates pursuant to the Stipulated Asset Allocation. The S/A/P Claims Reserve shall be funded on the Effective Date from Plan Trust Assets consisting of Cash.

c.    *Unsecured Claims Reserves*

Prior to making any Distributions on account of Unsecured Claims, the Plan Trustee shall establish an Unsecured Claims Reserve on account of each applicable Debtor. With respect to any interim distribution made to Holders of Allowed Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court pursuant to Article 10F of the Plan.

As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against the applicable Debtor becomes an Allowed Unsecured Claim against such Debtor, the Plan Trustee shall make a payment from the applicable Unsecured Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Plan Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the applicable Unsecured Claims Reserve and distributed pursuant to the terms of the Plan. After (and to the extent) a Disputed Unsecured Claim against the applicable Debtor becomes a Disallowed Claim, the portion of the applicable Unsecured Claims Reserve reserved for such Claim shall be released from the applicable Unsecured Claims Reserve and distributed pursuant to the terms of the Plan. Any amount remaining in an Unsecured Claims Reserve following the final disposition of all Disputed Unsecured Claims against the applicable Debtor shall be released from the applicable Unsecured Claims Reserve and distributed pursuant to the terms of the Plan.

3.    **Distribution Calculations**

a.    *Net Distributable Assets and BofA Syndicate Net Distributable Assets*

The total gross Cash proceeds of Plan Trust Assets allocated to an Estate pursuant to the Stipulated Asset Allocation as of any date of determination, less the amount, if any, of Cash required to be (i) contributed to the Plan Trust Operating Expense Reserve as additional funding pursuant to Article 9B(1) of the Plan, and (ii) reserved for payment of Unsecured Claims

107

066585.1001

pursuant to Article 9B(3) of the Plan, shall constitute the "Net Distributable Assets" of such Estate as of such date.

The total gross Cash proceeds of Plan Trust Assets other than Designated REO Assets allocated to an Estate pursuant to the Stipulated Asset Allocations as of any date of determination, less the amount, if any, of Cash required to be (i) contributed to the Plan Trust Operating Expense Reserve as additional funding pursuant to Article 9B(1) of the Plan, and (ii) reserved for payment of Unsecured Claims pursuant to Article 9B(3) of the Plan, shall constitute the "BofA Syndicate Net Distributable Assets" of such Estate as of such date.

b.    *Interim Distributions*

The Plan Trustee may make an interim distribution (a) to Holders of Allowed Unsecured Claims (other than an Allowed BofA Syndicate Unsecured Claim) against a Debtor up to the amount of the Net Distributable Assets of the Debtor's Estate calculated as of the date of the interim distribution; and (b) to Holders of Allowed BofA Syndicate Unsecured Claims up to the amount of the BofA Syndicate Net Distributable Assets calculated as of the date of the interim distribution.

4.    **Payment in Full of Unsecured Claims**

a.    *Limitation on Distributions on Account of Allowed Unsecured Claims*

Any Allowed Unsecured Claim is paid in full under the Plan at such time as the Holder of such Allowed Unsecured Claim has been paid the allowed amount of such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court); provided, however, that where a Creditor holds Allowed Unsecured Claims for which more than one Debtor is liable, whether jointly, as co-obligor, pursuant to a Guaranty or otherwise, such Creditor is not entitled to receive distributions under the Plan in excess of the Allowed amount of such Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court), and the Creditor's Allowed Unsecured Claim for which more than one Debtor is liable shall be deemed paid in full at such time as the Creditor has been paid the Allowed amount of one such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court).

b.    *Payment of Interest on Allowed Unsecured Claims*

If, and only if, all Holders of Allowed Unsecured Claims against an applicable Debtor have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of such Debtor; provided, however; that with respect to Allowed Unsecured Claims for which more than one Debtor is liable, interest is payable on such Claims based on the allowed amount of the joint liability fixed by such Claims.

c.    *Payment in Full of Allowed Unsecured Claims for Which More*

108

066585.1001

*Than One Debtor is Liable*

To the extent a Holder of Allowed Unsecured Claims for which more than one Debtor is liable is paid 100% of the allowed amount of the joint liability fixed by such Claims through interim distributions, the Plan Trustee shall retain any further interim distributions that would be made on account of such Claims as if only one Debtor were liable for such Claim until the Plan Trustee makes a final distribution under the Plan. Prior to making a final distribution under the Plan, the Plan Trustee shall determine, with respect to every Allowed Unsecured Claim for which more than one Debtor is liable that has been paid 100% of the allowed amount of the joint liability fixed by such Claim, the amount of distributions in respect of such Claim made on account of such Debtor's Estate. The Plan Trustee shall reallocate the excess distributions, if any, that it has retained among the liable Estates in proportion to the amount of distributions made to Claims from such Estates on account of such joint liability.

### 5.    Manner of Distribution

Notwithstanding any other provisions of the Plan or the Plan Trust Agreement providing for a distribution or payment in Cash, at the option of the Plan Trustee, any distributions under the Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer, or by ACH. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Any Cash distributions or payments will be issued to Holders in whole cents (rounded to the nearest whole cent when and as necessary).

### 6.    *De Minimis* Distributions

All *De Minimis* Distributions will be held by the Plan Trust for the benefit of the Holders of Allowed Claims entitled to *De Minimis* Distributions. When the aggregate amount of *De Minimis* Distributions held by the Plan Trust for the benefit of a Creditor exceeds $100.00, the Plan Trust will distribute such *De Minimis* Distributions to such Creditor. If, at the time that the final distribution under the Plan is to be made, the *De Minimis* Distributions held by the Plan Trust for the benefit of a Creditor total less than $100.00, such funds shall not be distributed to such Creditor, but rather, shall constitute Plan Trust Assets to be allocated among the Estates in accordance with the Stipulated Asset Allocation.

### 7.    Delivery of Distributions; Undeliverable Distributions

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Debtors, if on the Effective Date, or the Plan Trustee, if after the Effective Date, (i) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or the Debtors or the Plan Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes filed with the Bankruptcy Court and served on the Plan Trustee after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and written notice of address change has not been filed with the Bankruptcy Court and served on the Plan Trustee.

066585.1001

If payment or distribution to the Holder of an Allowed Claim under the Plan is returned for lack of a current address for the Holder or otherwise, the Plan Trustee shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment. If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the Holder shall be distributed to the Holders of Allowed Claims in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied and released, with no recourse to the Plan Trust, the Plan Trustee or the Plan Trust Assets, to the same extent as if payment or distribution had been made to the Holder of the Allowed Claim.

### 8.    Setoffs and Recoupments

The Debtors, if before the Effective Date, or the Plan Trustee, if after the Effective Date, may, ~~pursuant to~~ to the extent permitted by §§ 502(h), 553, and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall ~~be entitled but~~ not be required to, set off against or recoup from any Claim on which payments are to be made pursuant to the Plan, any claims or Causes of Action of any nature whatsoever that the Debtors, the Estates, the Committee or the Plan Trust may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Estates, the Committee or the Plan Trust of any right of setoff or recoupment that the Debtors, the Committee, the Plan Trust or the Estates may have against the Holder of such Claim, nor of any other claim or Cause of Action.

### 9.    Distributions in Satisfaction; Allocation

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Debtors, the Plan Trust, the Plan Trust Assets and the Estates and the assets and properties of the Debtors, the Plan Trust, the Plan Trust Assets and the Estates, whether known or unknown, arising or existing prior to the Effective Date. Distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

### 10.    Cancellation of Notes and Instruments

As of the Effective Date, all notes, agreements and securities evidencing Claims or Interests and the rights thereunder of the Holders thereof shall, with respect to the Debtors, be canceled and deemed null and void and of no further force and effect, and the Holders thereof shall have no rights against the Debtors, the Plan Trust, the Plan Trust Assets or the Estates, and such instruments shall evidence no such rights, except the right to receive the distributions provided for in ~~the Plan~~ this Plan. As soon as practicable after the Effective Date, the Plan Trustee or its duly authorized representative shall file with the SEC an SEC Form 15 on behalf of AHM Investment terminating the duty to file reports pursuant to SEC Rule 12g-4(a)(1). Notwithstanding the foregoing and anything else contained in the Plan or this Disclosure Statement, the Subordinated Trust Preferred Indentures will continue in effect solely for the

110

purposes of (i) permitting an Indenture Trustee to maintain or assert any right pursuant to the terms of this Plan for payment of Indenture Trustee Expenses and to exercise any contractual right of priority or charging lien under any of the Subordinated Trust Preferred Indentures with respect to any distributions made by such Indenture Trustee to Holders of Subordinated Trust Preferred Claims; (ii) permitting an Indenture Trustee to maintain and enforce any right to indemnification, contribution or other Claim it may have under the applicable Subordinated Trust Preferred Indentures (provided, however, that any right to indemnification or contribution from, or Claim against, a Debtor entity arising under any Subordinated Trust Preferred Indenture, whether arising on, before, or after the Effective Date, shall constitute a Class 1C(1) or 2C(1) Claim, as applicable, and shall be Allowed or Disallowed in accordance with Article 10 of this Plan); and (iii) permitting an Indenture Trustee to exercise its rights and obligations relating to the the interests of the Holders of Subordinated Trust Preferred Claims and its relationship with the Holders of Subordinated Trust Preferred Claims pursuant to the applicable Subordinated Trust Preferred Indenture, including its right to appear and be heard in these Chapter 11 Cases.

### 11.    No Interest on Claims

Unless otherwise specifically provided in the Plan and except as set forth in Article 9 thereof, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a Holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes and Allowed Claim.

### 12.    Withholding Taxes

The Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date, shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan. As a condition to making any distribution under the Plan, the Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date, may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date, to comply with applicable tax reporting and withholding laws.

### 13.    Reports

From the Effective Date, until a Final Decree is entered, the Plan Trustee shall submit quarterly reports to the U.S. Trustee within thirty (30) days of the end of each fiscal quarter setting forth all receipts and disbursements of the Plan Trust as required by the U.S. Trustee guidelines.

066585.1001

DB02:7418039.1

### H.    Claims Administration; Disputed Claims

#### 1.    Reservation of Rights to Object to Claims

Unless a Claim or Interest is expressly described as an Allowed Claim or Allowed Interest pursuant to or under the Plan, or otherwise becomes an Allowed Claim or Allowed Interest prior to the Effective Date, upon the Effective Date, the Plan Trustee shall be deemed to have a reservation of any and all rights, interests and objections of the Debtors, the Committee or the Estates to any and all Claims or Interests and motions or requests for the payment of or on account of Claims or Interests, whether administrative expense, priority, secured or unsecured, including without limitation any and all rights, interests and objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, Subordinated Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' or the Plan Trustee's failure to object to any Claim or Interest in the Chapter 11 Cases shall be without prejudice to the Plan Trustee's rights to contest or otherwise defend against such Claim or Interest in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim or Interest.

#### 2.    Objections to Claims

Prior to the Effective Date, the Debtors shall be responsible for pursuing any objection to the allowance of any Claim or Interest. From and after the Effective Date, the Plan Trustee will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims and Interests (including those Claims or Interests that are subject to objection by the Debtors as of the Effective Date), subject to any approvals of the Plan Oversight Committee that may be required. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims or Interests by the Liquidating Trustee will be filed and served not later than 1 year after the later of (i) the Effective Date or (ii) the date such Claim is filed, provided that the Plan Trustee may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court without any requirement to provide notice to any party, based upon a reasonable exercise of the Plan Trustee's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

#### 3.    Service of Objections

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if the Plan Trustee effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.

066585.1001

DB02:7418039.1

### 4.    Determination of Claims

Except as otherwise agreed by the Debtors or the Plan Trustee, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties without the need for Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Plan Trustee on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in Article 10 of the Plan shall constitute or be deemed a waiver of any claims, rights, interests or Causes of Action that the Debtors or the Plan Trustee may have against any Person in connection with or arising out of any Claim or Claims, including without limitation any rights under 28 U.S.C. § 157.

Allowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

### 5.    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Plan Trustee may, in its discretion, make a distribution pursuant to the Plan on account of the portion of such Claim that becomes an Allowed Claim.

### 6.    Claim Estimation

In order to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Debtors (if on or prior to the Effective Date) and the Plan Trustee (if after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for claim allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court shall determine (i) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

113

I.    **Rejection of Executory Contracts, Unexpired Leases**

On the Effective Date, except for any Executory Contract (i) that was previously assumed or rejected by an Order of the Bankruptcy Court or otherwise pursuant to section 365 of the Bankruptcy Code or (ii) that is subject to a pending motion to assume or reject before the Bankruptcy Court, each Executory Contract entered into by the any of the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejection pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Confirmation Date.

a.    *D&O Obligations; Employee Benefit Plans*

Without limiting the generality of the foregoing, and solely for the avoidance of doubt, the obligations of the Debtors to indemnify any Person or Entity having served as one of their officers and directors, or currently serving as one of their directors, officers, or employees, by reason of such Person's or Entity's service in such capacity, to the extent provided in the Debtors' corporate governance documents or by a written agreement with the Debtors or by the applicable states' corporation law, each as applicable, shall be deemed and treated as Executory Contracts that are rejected by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.

Also without limiting the foregoing, and solely for the avoidance of doubt, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, retirees and non-employee directors and the employees and retirees of their subsidiaries, including all savings plans, retirement plans, pension plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, shall be deemed and treated as Executory Contracts that are rejected by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.

b.    *Rejection Damages Bar Date*

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, any Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under the Plan (including Claims under section 365(d)(3) of the Bankruptcy Code) must be sent by mail to American Home Mortgage Claims Processing, P.O. Box 5076, FDR Station, New York, NY 10150-5076 or by overnight courier or hand delivery to EPIQ Bankruptcy Solutions, LLC, Attn: American Home Mortgage Claims Processing, 757 Third Avenue, 3rd Floor, New York, NY 10017, and a copy served on counsel for the ~~Plan Proponents~~Debtors and the Plan Trustee, within thirty (30) days after the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Plan Trust, the Plan Trustee, their successors, their assigns, or their Assets. Any Allowed Claim arising from the rejection of an Executory Contract shall be treated

114

as a Claim in Class 1C(1), 2C(1), 3C(1), 4C(1), 5C(1), 6C, 7C, and 8C, as applicable. Nothing in the Plan extends or modifies any previously applicable Bar Date.

       c.    *Insurance Policies*

To the extent that any or all of the insurance policies to be set forth in ~~an Exhibit filed with the Plan Supplement Documents~~a Supplemental Plan Document (the "Designated Insurance Policies") are considered to be Executory Contracts, then notwithstanding anything contained in the Plan or this Disclosure Statement to the contrary, the Plan shall constitute a motion to assume the Designated Insurance Policies in connection with the Plan and to assign them to the Plan Trust. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each Designated Insurance Policy. To the extent that the Bankruptcy Court determines otherwise with respect to any Designated Insurance Policy, the ~~Plan Proponents~~Debtors reserve the right to seek rejection of such insurance policy or other available relief. The Plan shall not affect contracts that have been assumed and assigned by Order of the Bankruptcy Court prior to the Confirmation Date.

For the avoidance of doubt, ~~the certain insurance policies (including any insurance policies that are not Executory Contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on an Exhibit to be filed with the Plan Supplement Documents (the "Designated Non-Executory Insurance Policies") and all rights thereunder and~~all rights under any Designated Insurance Policy that is not considered to be an Executory Contract, and all rights under any other insurance policies under which the Debtors may be beneficiaries, (including the rights to make, amend, prosecute, and benefit from claims) ~~are retained and will be transferred to~~shall be preserved and shall vest in the Plan Trust pursuant to Article 8E(1) of the Plan and § 1123(a)(5)(B) of the Bankruptcy Code.

**INSURANCE NEUTRALITY: Nothing in the Plan, any exhibit to the Plan, any Supplemental Plan Document, this Disclosure Statement, or any Order confirming the Plan, shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses, if any, of insurers under their respective insurance policies or applicable non-bankruptcy law.**

    J.    **Plan Injunction ~~and Exculpation Provisions~~**

Except as otherwise expressly provided in the Plan, the documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons ~~and other Entities~~who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including but not limited to states and other governmental units, and any state official, employee, or

other entity acting in an individual or official capacity on behalf of any state or other governmental units) are permanently enjoined from, on account of such Claims or Interests: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Partythe Plan Trustee, the Estates, the Plan Trust, or the Plan Oversight Committee (collectively, the "Protected Parties") or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provisionsprovision of the Plan. Any Person or entity injured by any willful violation of such injunction shallmay recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. Nothing

Notwithstanding the foregoing, nothing contained in this Article 12 shall prohibitArticle 12 of the Plan (governing Plan injunction, continuation existing stays and injunctions, and exulpation) shall enjoin or prohibit (i) the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit(ii) the interpretation or enforcement by the Holder of such Disputed Claimany party in interest of any of the obligations of the Debtors, the Plan Trustee, or the Plan Trust under the Plan, or (iii) the borrower(s) under any Mortgage Loan against whom a foreclosure action is commenced by or on behalf of any Protected Party from asserting and prosecuting, in such action, any claims and defenses preserved under Article 8E(6) of the Plan. The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any claimClaim or causeCause of actionAction against any Protected Party or any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under Article 4 of the Plan have been made or are not yet due under Article 4 of thethis Plan.

K.     Continuation of Existing Injunctions and Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court, under §§sections 105 or 362 of the Bankruptcy Code, the Plan, by orders of the Bankruptcy Court, or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Plan Trust, provided, however, that on and after the Effective Date, the automatic stay under § 362 of the Bankruptcy Code shall be deemed lifted to the extent necessary to permit the borrower(s) under any Mortgage Loan against whom a foreclosure action is commenced from asserting and prosecuting, in such action, any claims and defenses preserved under Article 8E(6) of the Plan.

116

066585.1001

For the avoidance of doubt, the automatic stay as continued under the Plan is subject to all exceptions to the automatic stay (whether provided in § 362(b) of the Bankruptcy Code or otherwise) and is without prejudice to the right of any party in interest to seek relief from the automatic stay.

## L.    Exculpation

On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be~~is~~ released under the Plan from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall ~~form~~constitute an absolute defense to any such claim, cause of action, or liability.

Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of the~~the~~this Plan or the Disclosure Statement shall be deemed to act or release any claims, Causes of Action or liabilities that the Plan Trust ~~or,~~ the Estates, or any party in interest may have against or to any Person ~~or entity~~ for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases, nor shall any provision of the~~the~~this Plan be deemed to act to release any Avoidance Actions.

Exculpated Parties under the Plan are defined as (i) the Debtors, the Plan Trustee, the Estates, the Plan Trust, the Committee, the Plan Oversight Committee, and the Indenture Trustees, and (ii) the respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals of a party identified in the immediately preceding clause, other than David Friedman.

## M.    Binding Effect of the Plan

Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not the Holder has filed a Claim.  The rights, benefits and obligations of any Person named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir,

117

066585.1001

executor, administrator, successor or assign of such Person (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

**N.**    ~~K.~~ **Conditions Precedent to Effective Date; Revocation, Withdrawal, or Non-Consummation of the Plan**

The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full:

- The Bankruptcy Court shall have approved a disclosure statement to the Plan in form and substance acceptable to the ~~Plan Proponents~~Debtors in their sole and absolute discretion.

- The compromises and settlements contained in the Plan, including without limitation those set forth in Articles 4, 6, and 7 of the Plan, shall be approved without material modification by Final Order in accordance with Bankruptcy Rule 9019 and shall be binding and enforceable against all Holders of Claims and Interests under the terms of the Plan.

- The Confirmation Order shall be in form and substance acceptable to the ~~Plan Proponents~~Debtors in their sole and absolute discretion.

- The Confirmation Order (i) shall have been entered by the Bankruptcy Court, (ii) shall not be subject to any stay of effectiveness, and (iii) shall have become a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

- The Plan Trust shall have been formed, and all formation documents for such entities shall have been properly executed and filed as required by the Plan and applicable law.

- The appointment of the Plan Trustee shall have been confirmed by order of the Bankruptcy Court.

If after the Confirmation Order is entered, each of the conditions to effectiveness has not been satisfied or duly waived on or by ninety (90) days after the Confirmation Date, then upon motion by the ~~Plan Proponents~~Debtors, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. As used in the preceding sentence, a condition to effectiveness may only be waived by a writing executed by the ~~Plan Proponents~~Debtors. If the Confirmation Order is vacated pursuant to Article 13B of the Plan, the Plan shall be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, nor any pleadings filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against or Interests

118

in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors (iii) prejudice in any manner the rights of the ~~Plan Proponents~~Debtors in the Chapter 11 Cases, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any party prior to the Confirmation Date.

## O.    ~~L.~~ Miscellaneous Provisions

### 1.    Retention of Jurisdiction

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, on and after the Confirmation Date, the Bankruptcy Court shall retain jurisdiction to the fullest extent permitted by 28 U.S.C. §§ 1334 and 157 (i) to hear and determine the Chapter 11 Cases and all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Cases, and (ii) to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Cases, including, without limitation, matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Without limiting the generality of the foregoing, the Bankruptcy Court's post-Confirmation Date jurisdiction shall, to the fullest extent permitted by 28 U.S.C. §§ 1334 and 157, include jurisdiction:

- over all Causes of Action (including, without limitation, Designated Causes of Action and Avoidance Actions) and proceedings to recover Assets of the Estates or of the Plan Trust, wherever located;

- over motions to assume, reject, or assume and assign executory contracts or unexpired leases, and the allowance or disallowance of any Claims resulting therefrom;

- over disputes concerning the ownership of Claims or Interests;

- over disputes concerning the distribution or retention of consideration under the Plan;

- over objections to Claims and motions to estimate Claims;

- over proceedings to determine the extent, validity, and/or priority of any Lien asserted against property of the Debtors, the Estates, or the Plan Trust, or property abandoned or transferred by the Debtors, the Estates, or the Plan Trustee;

- over proceedings to determine the amount, if any, of interest to be paid to Holders of Allowed Unsecured Claims if any Allowed Unsecured Claims are paid in full pursuant to the terms of the Plan;

- over matters related to the assets of the Estates or of the Plan Trust, including, without limitation, liquidation of Plan Trust Assets; provided that the Plan Trustee shall have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer,

119

assignment or other disposition of Plan Trust Assets; and provided further that the Plan Trustee may seek orders of the Bankruptcy Court approving the sale, transfer, assignment or other disposition of Plan Trust Assets as appropriate to facilitate such transactions;

- over matters relating to the subordination of Claims or Interests;

- to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

- to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- to issue orders in aid of execution, implementation, or consummation of the Plan;

- over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

- over requests for allowance and/or payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code and any objections thereto;

- over all Fee Applications;

- over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- over conflicts and disputes between the Plan Trustee, the Plan Trust, the Plan Oversight Committee, and Holders of Claims or Interests;

- over disputes concerning the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- over matters concerning the Debtors' insurance policies, if any, including jurisdiction to re-impose the automatic stay or its applicable equivalent provided in the Plan;

- to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Debtors, the Estates or their property, the Committee, the Plan Trust or its property, the Plan Trustee, the Plan Oversight Committee, the Professionals, or the Confirmation Order;

DB02:7418039.1

066585.1001

- to enter a Final Decree closing the Chapter 11 Cases;

- to enforce all orders previously entered by the Bankruptcy Court; and

- over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan.

The preceding list is non-exhaustive, it being the intent of the ~~Plan Proponents~~Debtors as set forth in the Plan that the Bankruptcy Court retain subject-matter jurisdiction to the maximum extent permitted by applicable law, which will maximize the Plan Trustee's flexibility when choosing the forum for the liquidation of litigation assets. Retention of jurisdiction by the Bankruptcy Court will benefit all creditors of the Estates as to those litigation assets for which the Bankruptcy Court proves to be the most economical and/or efficient forum. In addition, with respect to controversies asserting common questions of law on which the Bankruptcy Court has already promulgated the law of the case and/or the United States District Court for the District of Delaware or the Third Circuit Court of Appeals has provided (or will provide) definitive guidance (e.g., in the appeal in the *Lehman* adversary proceeding), prosecution of Causes of Action in the Bankruptcy Court may provide certainty of outcome (and resulting reduction in litigation expenses) not attainable outside of the Bankruptcy Court in a jurisdiction that will consider previously settled questions of law anew.

<u>Designated Causes of Action</u>

<u>Prior to the Petition Date, one or more Debtors, as plaintiff(s), asserted Causes of Action against various defendants in a variety of state and federal jurisdictions within the United States, which Causes of Action include, without limitation, actions (i) for breach of an employment agreement with any Debtor, (ii) for breach of a non-compete agreement with any Debtor, (iii) against former employee to recover bonuses; (iv) to recover early payoffs, (v) against brokers, appraisers, and/or mortgagees for fraud, and (vi) to compel repurchase of defective mortgages. As of the Petition Date, litigation concerning several the foregoing claims was currently pending. The Debtors anticipate further investigation may reveal other Causes of Action on similar grounds, which Causes of Action (along with the Causes of Action pending as of the Petition Date) may be asserted in the Bankruptcy Court under the Plan's provisions regarding the retention of subject-matter jurisdiction.</u>

~~More specifically, the Plan Proponents~~<u>In addition to those Causes of Acton currently being litigated (or anticipated to be litigated) discussed above, the Debtors</u> anticipate there may viable Causes of Action against <u>the following parties, among others:</u>

<u>(i) any party that received a transfer of an interest in property of any Debtor, or in favor of whom any Debtor incurred an obligation, within four years prior to the Petition Date, or any mediate or immediate transferee of any such party;</u>

<u>(ii)</u> one or more Warehouse Lenders arising from ~~prepetition~~<u>pre- and/or post-</u>petition conduct, including but not limited to margin calls and the liquidation of mortgage

121

loans or RMBS held as collateral (or, in the case of Master Repurchase Agreements, ~~"owned"~~ subject to the Debtors' ~~"repurchase" obligations. In addition, and without prejudice to the retention of jurisdiction over any Cause of Action discovered by the Plan Proponents or the Plan Trustee after the date of this Disclosure Statement, the Plan Proponents believe there is a potential Cause of Action~~repurchase obligations);

(iii) any party that received an unauthorized transfer of an interest in property of any Debtor post-petition (including, without limitation, the beneficial owner of any custodial account into which the Debtors deposited funds after the Initial Closing), or any mediate or immediate transferee of any such party;

(iv) any officer or employee of the Servicing Business (including, but not limited to, David Friedman) that breached his or her fiduciary duty to the Debtors, their Estates, and/or creditors during the pendency of these Chapter 11 Cases (including, without limitation, by authorizing transactions that were in breach of the Servicing APA); and

(v) against JPM for, among other things, avoidance of its asserted lien in certain REO and for recovery of amounts expended by the Debtors' Estates maintaining, preserving, and liquidating JPM's mortgage loan collateral~~, which Cause of Action may be prosecuted in the Bankruptcy Court~~.

The enumeration of Causes of Action in the foregoing shall be without prejudice to the retention of jurisdiction over any Cause of Action discovered by the Debtors or the Plan Trustee after the date of this Disclosure Statement.

### 2.    Final Order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the ~~Plan Proponents~~Debtors (if prior to the Effective Date) or the Plan Trustee (if after the Effective Date) upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

### 3.    Amendments and Modifications

The ~~Plan Proponents~~Debtors may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of the Plan with respect to any Debtor, the ~~Plan Proponents~~Debtors, the Plan Oversight Committee, or the proposed Plan Trustee, as appropriate, may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 services list only, and the solicitation of all Creditors and other parties in interest shall not be required.

4.      **Tax Exemption**

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of any security, or the execution, delivery or recording of an instrument of transfer shall be deemed to be made pursuant to and under the Plan, including, without limitation, any such acts by the Debtors, if on the Effective Date, and the Plan Trustee, if after the Effective Date (including, without limitation, any subsequent transfers of property by the Plan Trust or the Plan Trustee), and shall not be taxed under any law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

5.      **Securities Exemption**

Any rights issued under, pursuant to or in effecting the Plan and the offering and issuance thereof by any party, including without limitation the Debtors or the Plan Trust, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code.

6.      **Non-Severability**

**Except as specifically provided in the Plan, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of those Articles may be stricken, altered, or invalidated.**

7.      **Revocation**

The ~~Plan Proponents~~Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date in whole or as to any one or more of the Debtors. If the ~~Plan Proponents~~Debtors revoke or withdraw the Plan, then the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, the Committee, or any other Person or to prejudice in any manner the rights of the Debtors, the Committee, or any Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors and/or the Committee, including with respect to the amount or allowability of any Claim or the value of any property of the Estates.

8.      **Governing Law**

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the

123

governing law of such agreements shall control) and, with respect to the Debtors incorporated in Delaware, corporate governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles. Corporate governance matters relating to any Debtor not incorporated in Delaware shall be governed by the law of the state of incorporation of the applicable Debtor.

### 9.    Filing of Additional Documents

On or before "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of the Plan, the ~~Plan  Proponents~~Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate and further evidence the terms and conditions of the Plan.

### P.    ~~M.~~ Cramdown and Bankruptcy Rule 9019 Requests

The ~~Plan  Proponents~~Debtors will request confirmation of the Plan as a Cramdown Plan with respect to any Impaired Class that does not accept the Plan or is deemed to have rejected the Plan. In addition, pursuant to Bankruptcy Rule 9019, the ~~Plan  Proponents~~Debtors will request approval of all compromises and settlements included in the Plan, including, without limitation, any compromises and settlements implicated by Article 4 (providing treatment of claims), Article 6 (providing for settlement of Intercompany Claims), and Article 7 (establishing the EPD/Breach Claims Protocol) of the Plan

## VI.    CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN

Holders of Claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A.    Risk Factors Regarding Bankruptcy Cases

#### 1.    Allowance of Claims

This Disclosure Statement has been prepared based on preliminary information and review of filed Claims and the Debtors' books and records. Upon completion of more detailed analysis of filed Claims, the actual amount of Allowed Claims may differ from the Debtors' current estimates.

As discussed above, approximately 10,444 Claims were filed against the Debtors asserting liquidated amounts of approximately $14.25 billion in the aggregate. While the Debtors have already filed thirteen Omnibus Objections to Claims, covering approximately 5,680 Claims (4,416 of which were reduced or disallowed by the Bankruptcy Court by approximately $282 million in the aggregate), the Debtors believe that they have valid objections to many more of the filed Claims and, thus, that the ultimate allowed amount of such Claims will be significantly less than the asserted amounts. Nevertheless, the amount of Disputed Claims in

124

these cases is expected to be material.  As a result, the ultimate amount of Allowed Claims in these cases could significantly exceed the Debtors' estimates in the development of the Plan as set forth in the Plan Summary Table.

DB02:7418039.1

066585.1001

The Debtors' estimate of recoveries for Holders of Allowed Unsecured Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C under the Plan are based on their estimates of the legitimate Secured, Administrative, Priority Tax, and Priority Claims (collectively, "S/A/P Claims"), including those asserted as of the date of this Disclosure Statement. There can be no assurance, however, that the Debtors' estimates of the likely aggregate allowed amount of such S/A/P Claims will prove to be accurate. In addition, S/A/P Claims may be allowed in amounts in excess of the Debtors' current expectations. If that occurs, the actual amount of Cash available for distribution to holders of Allowed Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C would be less than estimated, and the difference could be material.

### 2.    Objections to Classification of Claims Pursuant to § 1122 of the Bankruptcy Code

In evaluating whether the Plan meets the requirements for confirmation under § 1129 of the Bankruptcy Code, this Disclosure Statement assumes the validity of the Plan's classifications of claims and interests. If the Holder of a Claim or Interest were to object to the proposed classification of such Claim or Interest in the Plan pursuant to § 1122 of the Bankruptcy Code, and prevail in such objection, then the requirements for confirmation of the Plan may be different from what is set forth in this Disclosure Statement. This difference may or may not have a material effect on the confirmability of the Plan.

### 3.    Court Modification of Stipulated Asset Allocation or Other Elements of Proposed Compromise and Settlement of Intercompany Claims

As described above, the Plan assumes a compromise and settlement of Intercompany Claims resulting in the Stipulated Asset Allocation, which reflects, among other things, an allocation of the expenses of administering both these Chapter 11 Cases and the Plan. To the extent that the Bankruptcy Court determines that a different allocation of Plan Trust Assets between the Debtors' Estates is appropriate (whether resulting from a re-allocation of the expenses of administering the Chapter 11 Cases and/or the Plan), or otherwise modifies or conditions the proposed compromise and settlement of Intercompany Claims, the respective recovery percentages of the Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C may be altered, and such alteration may be material.

### 4.    Valuation Risk

As discussed above, the Plan assumes a compromise and settlement of Intercompany Claims resulting in the Stipulated Asset Allocation, which allocation assumes, among other things, values as of the Effective Date for the aggregate Assets contributed by each Debtor's Estate to the Plan Trust. To the extent the value actually realized by the Plan Trustee from Assets contributed by a particular Estate is more than the value of such Assets assumed in connection with the Stipulated Asset Allocation, the Stipulated Asset Allocation may provide a higher recovery to Creditors of other Estates at the expense of Creditors of the contributing Estate. Conversely, to the extent the value actually realized by the Plan Trustee from Assets contributed by a particular Estate is less than the value of such Assets assumed in connection

126

with the Stipulated Asset Allocation, the Stipulated Asset Allocation may provide a higher recovery to Creditors of the contributing Estate at the expense of Creditors of one or more other Estates. Accordingly, inaccuracy of assumed valuations may materially affect distributions to Creditors under the Plan. **While the ~~Plan Proponents~~Debtors believe that this risk is reasonable in light of the benefits to be gained from a global resolution of Intercompany Claims through the Plan as opposed to piecemeal resolution of Intercompany Claims (and potential disputes over allocation of proceeds of shared assets) by the Plan Trustee, Creditors should be cognizant of this risk and consider it when deciding whether to vote to accept or reject the Plan.**

### 5. Risk of Non-Confirmation of the Plan

Even if all Impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things: (a) that the Confirmation of the Plan not be followed by a need for further liquidation or reorganization; (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Debtors otherwise comply with the applicable provisions of the Bankruptcy Code. Although the ~~Plan Proponents~~Debtors believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 6. Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan as to a given Debtor if at least one Impaired Class of Claims against such Debtor has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each Impaired Class of Claims against or Interests in such Debtor that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Impaired Class.

The ~~Plan Proponents~~Debtors reserve the right to modify the terms of the Plan as necessary for Confirmation without the acceptance of all Impaired Classes. Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided by the Plan.

### 7. Delays of Confirmation and/or Effective Date

Any delay in Confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Claims. These or any other negative effects of delays in Confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

127

8.      **Plan Trust Operations**

The ultimate amount of Cash available to satisfy the allowed amount of Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C depends, in part, on the manner in which the Plan Trustee operates the Plan Trust and the expenses the Plan Trustee (and Plan Oversight Committee) incurs.  By virtue of the Plan Trustee's ability, with approval of the Plan Oversight Committee), to supplement the funding of the Plan Trust Operating Expense Reserve from Plan Trust Assets after the Effective Date, the expenses of the Plan Trustee (and Plan Oversight Committee) will have *de facto* priority over distributions to holders of Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C.  As a result, if the Plan Trustee and Plan Oversight Committee incur professional or other expenses in excess of current expectations, the amount of Cash remaining to satisfy Allowed Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C will be less than anticipated.

The ultimate amount of Cash available for distribution to holders of Allowed Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C also will be affected by the performance and relative success of the Plan Trustee in liquidating Plan Trust Assets, including the prosecution of Causes of Action against potential defendants. The less successful the Plan Trustee is in pursuing such matters, the less Cash there will be available for distribution to satisfy Allowed Claims.  For the avoidance of doubt, the ~~Plan Proponents~~Debtors have not assumed any recovery on account of such potential Causes of Action for purposes of (i) estimating recoveries on Allowed Claims under the Chapter 7 Liquidation Analysis or (ii) determining whether the Plan meets the Feasibility Test.

9.      **Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, even after confirmation of the Plan, the Plan Trustee will retain and may enforce any claims, demands, rights and Causes of Action that the Estates may have against any person or Entity, including claims for preference, fraudulent conveyance and setoff.  In pursuing any such claims, the Plan Trustee will act in the best interest of the Estates.  Accordingly, a Holder of a Claim may be subject to one or more such claims brought by the Plan Trustee, even if such Holder voted in favor of the Plan.

B.      **Risk Factors Relating to Securities Laws**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  To the extent that the rights to distributions from the Plan Trust are deemed to constitute securities issued in accordance with the Plan, the ~~Plan Proponents~~Debtors believe that such interests satisfy the

128

requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

### 1.    Non-Transferability

Holders of Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C also should be aware that their rights to distribution from the Plan Trust are not transferable. Therefore, there will not be any trading market for such rights, nor will those the rights be listed on any public exchange or other market. The lack of liquidity of the rights to distributions from the Plan Trust may have a negative impact on their value.

### 2.    Uncertainty of Value

In addition to the prohibition on the transfer of rights to distributions from the Plan Trust as discussed above, the value of such rights will depend on the various risks and uncertainties outlined above. The realizable value of Plan Trust Assets will vary depending upon the extent to which these risks materialize. In addition, the resolution of Causes of Action held by the Plan Trust and the reconciliation of Claims against the Debtors' Estates may require a substantial amount of time, during which time interest will not accrue on Allowed Claims in Classes 1C(1), 1C(2), 2C(1), 2C(2), 3C(1), 3C(2), 4C(1), 4C(2), 5C(1), 5C(2), 6C, 7C, and 8C. These delays could reduce the ultimate value of any recovery.

## VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    General

A description of the United States federal income tax consequences of the Plan is provided below. This description is based on the Internal Revenue Code, Treasury Regulations issued thereunder, judicial decisions and Internal Revenue Service and administrative determinations, all as in effect on the date of this Disclosure Statement and all subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below.

The United States federal income tax consequences of the Plan are complex and in important respects uncertain. No ruling has been requested from the Internal Revenue Service; no opinion has been requested from the Debtors' or Committee's counsel concerning any tax consequence of the Plan; and no tax opinion is given by this disclosure statement.

The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or Holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers nor does it address tax consequences to holders of Interests in the Debtors. In addition, the description does not discuss state, local or non-U.S. tax consequences.

129

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim or Interest.  Holders of Claims or Interests are urged to consult with their own tax advisors regarding the federal, state, local and non-U.S. tax consequences of the Plan.

**B.      United States Federal Income Tax Consequences of Payment of Allowed Claims Pursuant to Plan**

The United States federal income tax consequences of Plan implementation to the Holders of Allowed Claims will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives distributions under the Plan in more than one taxable year, whether the Holder's claim is allowed or disputed at the Effective Date, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

**1.      Recognition of Gain or Loss**

a.      *In General*

In general, a holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's basis in the Claim.  Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount.  If the holder realizes a capital loss, its deduction of the loss may be subject to limitation.  The holder's aggregate Tax basis for any property received under the Plan generally will equal the amount realized.  The holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.

b.      *Post-Effective Date Cash Distributions*

Because certain holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the subsequent distributions as imputed interest.  Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred.  All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their claims.

c.      *Bad Debt and/or Worthless Securities Deduction*

130

A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 2.    Pending Payments

Cash and other Plan Trust Assets that the Plan Trustee holds as a payment pending to the Holder of an Allowed Claim (a "Pending Payment") after the Effective Date should be deemed to have been paid to the Holder of the Claim entitled to receive such Pending Payment on the date that the Plan Trust received it and to have been contributed by such Holder to the Plan Trust as a grantor and beneficiary of the Plan Trust. Thus, the Holder should recognize gain or loss based upon the amount deemed received and contributed to the Plan Trust on the Effective Date, and any income subsequently realized by the Plan Trust with respect to such Pending Payment will be reported by the Plan Trustee as income of the grantor-beneficiary in the year realized, prior to the actual distribution of the Pending Payment to the Holder of the Allowed Claim. The actual receipt of the Pending Payments from the Plan Trust will not be a taxable event.

### 3.    Payments Other than Pending Payments

If any payment other than a Pending Payment is to be made from the Plan Trust, such payment will not be deemed to have been made to any recipient until, and to the extent that, the amount to which the payee is entitled has been determined and distributed. Any income realized by Plan Trust prior to such time will be reported by the Plan Trustee as income of and taxable to the Plan Trust.

### C.    Certain Other Tax Consequences for Holders of Claims

### 1.    Receipt of Pre-Effective Date Interest

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that all distributions to a Holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any prepetition accrued interest included in such Claim. There is no assurance, however, that the Internal Revenue Service will respect this treatment and will not determine that all or a portion of amounts distributed to Holders of Allowed Claims is properly allocable to prepetition interest. Each such Holder is urged to consult its tax advisor regarding the tax treatment of its

131

distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

### 2. Installment Method

A Holder of a Claim constituting an installment obligation for Tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of § 453B of the Internal Revenue Code.

### 3. Information Reporting and Withholding

Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### D. Tax Consequences of the Plan to the Debtors

The Debtors believe that they will have net operating losses ("NOLs") for taxable year 2007 and anticipate there will be additional NOLs with respect to taxable year 2008. These NOLs will be available to offset taxable income or gain that may arise as a result of consummation of the Plan. Accordingly, the Debtors do not expect to incur a substantial tax liability as a result of implementation of the Plan. It is noted, however, that the Debtors may incur tax liability with respect taxable "excess inclusion income" arising out of certain Debtors holding residual interests in real estate mortgage investment conduits ("REMICs"). Debtors that are characterized as REITs for federal income taxes may also have tax exposure for excess inclusion income as a result of characterization of the REIT or any part of the REIT as a taxable mortgage pool. Under the provisions of the Internal Revenue Code applicable to the calculation and taxation of excess inclusion income, NOLs cannot be used to offset excess inclusion income. The Debtors are continuing to analyze the extent to which they will be subject to income tax exposure for excess inclusion income arising as a result of holding residual interests in REMICs or as a result of any Debtor's characterization as a REIT or qualified REIT subsidiary.

### E. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain U.S. Federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The above discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a

132

holder's individual circumstances. **Accordingly, holders are urged to consult with their tax advisors about federal, state, local and non-U.S. tax consequences to the Plan.**

## VIII.   ALTERNATIVES TO CONFIRMATION OF THE PLAN

The ~~Plan Proponents~~Debtors believe that the Plan provides a recovery to creditors that is greater than or equal to the probable recoveries by creditors if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. **If the Plan is not confirmed because the requisite Classes did not vote to accept the Plan, then the Debtors will likely file a motion to convert the Chapter 11 Cases to cases under Chapter 7, in which event the** ~~Plan Proponents~~**Debtors believe that Creditor recoveries will be substantially diminished.**

## IX.   ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING REQUIREMENTS

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the ~~Plan Proponents~~Debtors have complied with applicable provisions of the Bankruptcy Code; (iv) the ~~Plan Proponents~~Debtors have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of Creditors or Interest Holders in each class (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by further financial restructuring of the Debtors; (viii) the Plan is in the "best interests" of all Holders of Claims or Interests in an Impaired class (see "Best Interests Test" below); and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date. The ~~Plan Proponents~~Debtors believe that the Plan satisfies all the requirements for confirmation.

### A.   Best Interests Test

Each Holder of a Claim or Interest in an Impaired class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to the Holders in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interests Test"). The ~~Plan Proponents~~Debtors believe that the Holders of Claims against and Interests in the Debtors will have an equal or greater recovery as a result of the liquidation of the Debtors' Assets by the Plan Trust as discussed herein and than could be realized in a Chapter 7 liquidation.

The Debtors are liquidating and therefore are not seeking to require Creditors to accept non-Cash consideration so that the Estates could pursue going concern value. Accordingly, the

133

only question is whether the Creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a Chapter 7 trustee.

DB02:7418039.1

066585.1001

To determine the value that a Holder of a Claim or Interest in an Impaired Class would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' Assets if the Debtors' Chapter 11 Cases had been converted to a Chapter 7 liquidation case and the Debtors' Assets were liquidated by a Chapter 7 trustee (the "Liquidation Value").    The Liquidation Value would consist of the net proceeds from distribution of the Debtors' Assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a Chapter 7 liquidation case that do not arise in a Chapter 11 case.

As explained below, the Liquidation Value available for satisfaction of Claims and Interests in the Debtors would be reduced by: (a) the costs, fees and expenses of the liquidation under Chapter 7, which would include disposition expenses and the compensation of one or more trustees and their counsel and other retained professionals, (b) the fees of the Chapter 7 trustee(s) and (c) certain other costs arising from conversion of the Chapter 11 Cases to Chapter 7.    A hypothetical chapter 7 liquidation analysis prepared by the ~~Plan Proponents~~Debtors (the "Liquidation Analysis") is attached to this Disclosure Statement as Exhibit C.

As is evident from the Liquidation Analysis, the ~~Plan Proponents~~Debtors believe that Creditors have and will continue to clearly benefit from the liquidation under chapter 11 of the Bankruptcy Code.    Had the Assets been liquidated by a Chapter 7 trustee, the ~~Plan Proponents~~Debtors project that the maximum recovery would have been substantially less. The Debtors have realized a greater return than a Chapter 7 trustee would have obtained on the sale of their Assets, specifically due to the Debtors' familiarity with the Assets and their ability to negotiate the highest and best price for the sale thereof. The Debtors have already reduced the significant majority of their Assets to Cash through auction or private sales approved by the Bankruptcy Court. Therefore, the Debtors have already established systems and protocols for the efficient disposition of the Assets of the Estates and are in the process of liquidating their limited remaining Assets.

In addition, converting the Chapter 11 Cases to a Chapter 7 liquidation at this stage of the wind-down would result in an immense waste of the Debtors' resources that were already expended in connection with the sale of the Assets and would delay converting the remaining Assets to Cash. It would also result in substantial additional claims against the Estates.

Moreover, under the Plan the Debtors will avoid the increased costs and expenses of a Chapter 7 liquidation, including the fees payable to the Chapter 7 trustee(s) and their professionals.  If the Plan is not confirmed, the settlement of Intercompany Claims will not be effective and any Chapter 7 trustee(s) will be saddled with inter-Estate litigation and/or significant conflict-of-interest issues and related litigation. This alone could erode any potential recoveries for Holders of Unsecured Claims.  In addition, although the Debtors have already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the statutory fee payable to the Chapter 7 trustee(s), which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the Chapter 7 trustee. Section 326(a) of the Bankruptcy Code permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors.  Professionals of the Chapter 7

trustee(s), including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtors. Moreover, these Chapter 7 trustee fees would reduce the Assets available for distribution to the Estates' Creditors from additional recoveries such as preferential payments, expunged administrative claims and the process of successful Estate litigation or settlement.

It is also anticipated that a Chapter 7 liquidation would result in a significant delay in payments being made to Creditors. Bankruptcy Rule 3002(c) provides that conversion of Chapter 11 cases to Chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be more than 90 days after the Chapter 11 cases convert. Not only would a Chapter 7 liquidation delay distribution to Creditors, but it is possible that additional Claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates. The Debtors have received and are analyzing late-filed Claims and may file additional claims objections in the near future. Reopening the Bar Dates in connection with conversion to Chapter 7 would provide these and other claimants an additional opportunity to timely file Claims against the Estates. Moreover, the Debtors would lose the benefit of having an established Administrative Claim Request Deadline.

For the reasons set forth above, the ~~Plan Proponents~~Debtors believe that the Plan provides a superior recovery for the Holders of Claims, and the Plan meets the requirements of the Best Interests Tape.

## B.    Financial Feasibility Test

In order to confirm a plan, the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "Feasibility Test"). Thus, for a plan to meet the Feasibility Test, the Bankruptcy Court must find that there is a reasonable likelihood that the reorganized debtor will possess the working capital and other resources necessary to meet its obligations under the plan. Because a form of liquidation is proposed in the Plan and no further financial reorganization of the Debtors will be possible, and because the Debtors will be able to satisfy all S/A/P Claims in accordance with the requirements of the Bankruptcy Code, the ~~Plan Proponents~~Debtors believe that the plan meets the feasibility requirement.

## C.    Acceptance by Impaired Classes

Section 1129(a) of the Bankruptcy Code requires that each class of claims or interests that is impaired under a plan accept the plan (subject to the "cramdown" exception contained in section 1129(b) of the Bankruptcy Code. Under section 1129(b) of the Bankruptcy Code, if at least one but not all impaired classes do not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if (i) the Plan meets all confirmation requirements except the requirement of section 1129(a)(8) of the Bankruptcy Code that the Plan be accepted by each class of claims or interests that is impaired and (ii) the

136

Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan, as referred to in section 1129(b) of the Bankruptcy Code and applicable case law.

A class of claims under a plan "accepts" the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated. Under the Plan, Classes 1A, 2A, 3A, 3B(4<u>3</u>), 4A, 4B(3), 5A, 5B(5), 6A, 7A, and 8A are not Impaired and are deemed to accept the Plan, while Classes 1D, 1E, 1F, 2D, 2E, 2F, 3D, 3E, 4D, 4E, 5D, 5E, 6D, 6E, 7D, 7E, 8D and 8E are not entitled to receive or retain any property under the Plan on account of Claims or Interests and are conclusively presumed to have rejected the Plan. All other Classes of Claims under the Plan are Impaired under the Plan and Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan.

The Plan provides fair and equitable treatment of impaired Claims, as either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed Claim or (b) the Holders of Claims and Interests that are junior to such Class of impaired claims will not receive or retain any property under the Plan, subject to the applicability of the judicial new value doctrine. Pursuant to the Plan, no Holders of any Claim or Interest junior to the Holders of such impaired Classes will receive or retain any property on account of such junior Claims.

As noted above, Holders of Claims and Interests in Claims and Interests in Classes 1D, 1E, 1F, 2D, 2E, 2F, 3D, 3E, 4D, 4E, 5D, 5E, 6D, 6E, 7D, 7E, 8D and 8E are receiving no property under the Plan and are therefore deemed to reject the Plan. However, the Plan provides fair and equitable treatment to these Holders because there are no Classes junior to these Classes and no Class senior to these Classes is being paid more than in full on its Allowed Claims.

If any Impaired Class fails to accept the Plan, the ~~Plan Proponents~~<u>Debtors</u> intend to request that he Bankruptcy Code confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to those Classes.

## D.    **Voting Procedures**

### 1.    **Ballots**

If voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class. Please

read the voting instructions on the reverse side of the Ballot for a thorough explanation of voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT EPIQ BANKRUPTCY SOLUTIONS, LLC AT (866) 493-7277 BETWEEN THE HOURS OF 9:00 AM. AND 6:00 P.M. (EASTERN TIME), MONDAY THROUGH FRIDAY. EPIQ BANKRUPTCY SOLUTIONS, LLC CANNOT PROVIDE YOU WITH LEGAL ADVICE.**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims or Interests in more than one Class and you are entitled to vote Claims or Interests in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class.

Unless otherwise directed in your solicitation package, mail your completed Ballot(s) to: EPIQ Bankruptcy Solutions, LLC, Attn: American Home Mortgage Ballots Processing, 757 Third Avenue, 3rd Floor, New York, NY 10017. **DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT.** A Ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one Ballot voting the same Claim before 4:00 p.m. (Eastern Time) on the voting deadline, the last Ballot received before the voting deadline will be deemed to reflect your intent and thus will supersede any prior Ballots. Additionally, you may not split your votes for your Claims within a particular Class under the Plan either to accept or reject the Plan. Therefore, a Ballot or a group of Ballots within a Plan Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

Unless the Bankruptcy Court permits you to do so after notice and hearing to determine whether sufficient cause exists to permit the change, you may not change your vote after the voting deadline passes. **DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER SECURITIES WITH YOUR BALLOT. FACSIMILE, EMAIL OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

**PLEASE PUT YOUR TAXPAYER IDENTIFICATION NUMBER ON YOUR BALLOT; THE DISBURSING AGENT MAY NOT BE ABLE TO MAKE DISTRIBUTIONS TO YOU WITHOUT IT.**

2.    **Deadline for Voting**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE <u>RECEIVED</u> BY 4:00 P.M. (EASTERN TIME) ON [_____], 2008.**

138

066585.1001

### 3.    Importance of Your Vote

Your vote is important.  The Bankruptcy Code defines acceptance by a Class of Claims as acceptance by Holders of at least two-thirds in amount and a majority in number of Allowed Claims in that Class that vote.  **ONLY THOSE CREDITORS WHO ACTUALLY VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS HAS VOTED TO ACCEPT THE PLAN.  YOUR FAILURE TO VOTE WILL LEAVE TO OTHERS THE DECISION TO ACCEPT OR REJECT THE PLAN.**

DB02:7418039.1

066585.1001

## X.    RECOMMENDATION AND CONCLUSION

THE ~~PLAN PROPONENTS~~DEBTORS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS AND THAT THE PLAN SHOULD BE CONFIRMED. THE ~~PLAN   PROPONENTS~~DEBTORS   STRONGLY   RECOMMEND   THAT   ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.

Dated: ~~August 15,~~September 30, 2008,

Respectfully submitted,

AMERICAN HOME MORTGAGE HOLDINGS, INC.
AMERICAN HOME MORTGAGE INVESTMENT CORP.
AMERICAN HOME MORTGAGE ACCEPTANCE, INC.
AHM SV, INC. (f/k/a American Home Mortgage Servicing, Inc.)
AMERICAN HOME MORTGAGE CORP.
AMERICAN HOME MORTGAGE VENTURES LLC
HOMEGATE SETTLEMENT SERVICES, INC.
GREAT OAK ABSTRACT CORP.

_____

By:  Kevin Nystrom
Their:  Chief Restructuring Officer

## EXHIBIT A

**The Joint Chapter 11 Plan of Liquidation**

**[FILED SEPARATELY]**

# EXHIBIT B

## The Disclosure Statement Order

### [TO BE PROVIDED]

## EXHIBIT C

### Chapter 7 Liquidation Analysis

[TO BE PROVIDED]

Document comparison done by Workshare DeltaView on Tuesday, September 30, 2008 11:29:53 AM

| Input: | |
|---|---|
| Document 1 | interwovenSite://wsdms/DB02/6842992/8 |
| Document 2 | interwovenSite://wsdms/DB02/7389989/4 |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 909 |
| Deletions | 550 |
| Moved from | 16 |
| Moved to | 16 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1491 |