**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation, | ) | Jointly Administered |
| et al., | ) | |
| Debtors. | ) | **Re: D.I. 5675** |
| | ) | |

**REPLY IN SUPPORT OF MOTION FOR ORDER APPOINTING**
**AN OFFICIAL COMMITTEE OF BORROWERS PURSUANT**
**TO SECTION 1102(2) OF THE BANKRUPTCY CODE**

The Movants[1] respectfully reply in support of their motion (the "Motion")[2] for the appointment of a Borrowers Committee and respond to the objections (the "Objections") filed by the Debtor and the Committee as follows:

## I.      INTRODUCTION

The fundamental flaw in the Objections is that they treat the borrowers as if they were sophisticated creditors with familiarity with the chapter 11 process and the resources to participate in it effectively. In fact, the borrowers are unsophisticated individuals who cannot afford to pay their mortgages, let alone retain experienced chapter 11 counsel, and although many borrowers have important monetary and non-monetary interests in the outcome of these cases, they are not capable of arguing or negotiating effectively on their own behalf.

The Debtors and Committee argue that borrowers could have requested the appointment of a Borrowers Committee earlier in these cases. Theoretically, that may be so, but there is no reason to believe that any of the borrowers engaged in strategic delay. Depriving them of a Borrowers Committee because of their failure to request a Borrowers Committee a year ago

---

[1] The Movants are Tilton Jack, Grace Mullins, Christopher and Mary Bilek, Paula Rush, Delena Lamacchia, and Sam Acquisto. They have been joined by Grace Graves, Florence Dandridge, Penny Montague, Mona Dobben, and John and Linda Culpepper.
[2] Terms not capitalized herein are ascribed the meanings given to such terms in the Motion.

1

would be tantamount to punishing them for the very lack of sophistication and resources that necessitates the appointment of a Borrowers Committee in the first place. With Disclosure Statement objections, Plan objections, and potential third-party and equitable subordination claims still unresolved, the Movants' request for a Borrowers Committee is still timely, as a Borrowers Committee would play a very useful and important role in the significant unfinished business remaining in these cases.

## II.    ARGUMENT

No reasonable person can conclude that American Home's borrowers have been adequately represented in these cases. With few exceptions, to the extent that borrowers have appeared at all, they have appeared *pro se*. With many important issues still to be addressed, the Court should exercise its discretion by ordering the appointment of a Borrowers Committee, thereby ensuring that borrowers will be adequately represented as the cases move forward.

### A.    The Debtors' and Committee's Arguments Confirm that Borrowers Are Not Adequately Represented in these Cases.

Representing themselves *pro se* over the past year, a handful of borrowers have managed to obtain a few concessions from the Debtors. Now that these cases have advanced to a more complicated phase, however, *pro se* borrowers will not be able to protect their own interests.

#### 1.    Hundreds (and perhaps thousands) of borrowers have claims, rights, and interests adverse to the interests of other unsecured creditors.

Neither Objection refutes one of the most important points made in Movants' opening brief: that borrowers have claims, rights, and interests that differ from those of other unsecured creditors. Some borrowers have asserted claims in stand-alone lawsuits. Others have asserted claims in response to foreclosure proceedings. The details vary from case to case, but the borrowers' claims all allege that the Debtors engaged in some form of illegal activity in the

1993032.1

origination or servicing of mortgages, and many of the claims include allegations that the Debtors broke the law in concert with other financial-institution creditors in these cases.

Nor do the Objections refute Movants' contention that a large group of borrowers have such claims. According to the Debtors, approximately 450 borrowers have claims similar to those asserted by Movants. It is possible that hundreds or thousands more would have filed claims had they received actual notice of the relevant bar dates. As interest rates continue to reset and the current mortgage owners and servicers continue to initiate foreclosure proceedings, many more borrower claims may emerge.

Although the Debtors and Committee concede that borrowers' claims exist, they have been hostile to many of the borrowers' positions. For example, when certain mortgagors requested relief from the automatic stay in the bankruptcy cases to pursue their claims against the Debtors, counsel for the Committee referred to them as "disgruntled borrowers" and, with virtually no information about the merits of their claims, argued that the borrowers themselves were to blame for their defaults and foreclosures.[3] The Debtors similarly have accused the borrowers of using the judicial system as a means to escape from their financial obligations.[4]

This chilly reception is easily explained by the fact that borrowers' interests often diverge from those of financial-institution creditors. Borrowers and financial institution creditors often disagree over the legality of mortgage terms, the appropriateness of particular interest rates and fees, and the availability of a rescission remedy with respect to particular mortgage contracts. Borrowers and financial-institution creditors also may disagree over the culpability of warehouse lenders, securitizers, and third-party servicers and the treatment of their claims, with borrowers

---

[3] *See* Hearing Tr. at 16:8-17:14 (Nov. 21, 2007) (D.I. 2664).
[4] *See* Debtors' Objection to Motion for Disclosure at 2 (Oct. 24, 2007) (D.I. 1656).

3

arguing for the application of an unclean-hands defense, an *in pari delicto* defense, or for equitable subordination. In some instances, a borrower's successful prosecution of a mortgage-related claim under state or federal consumer protection laws may warrant the denial of a corresponding claim by a financial institution relating to the same mortgage.

The Debtors and Committee point out that the goals of protecting borrowers' ability to stay in their homes, obtaining damages for illegal conduct by the Debtors and other parties, and ensuring that borrowers receive what they regard as fair and equitable treatment in these cases are goals that may conflict with the Debtors' and Committee's general goal of maximizing the value of the Debtors' estates. It is correct that borrowers generally want to protect their rights and interest to the extent inconsistent with the maximization of the dollars recovered from the estates. The Debtors are incorrect, however, when they conclude that borrowers' interests are purely "personal" interests.[5] The interests of a borrower are no more "personal" than the interests of a bondholder.

The Court is thus facing a situation very similar to that addressed in *In re Dow Corning Corporation*.[6] In *Dow Corning*, the debtor had to address several very distinct sources of unsecured claims. Bondholders and trade creditors asserted conventional unsecured claims. Tort claimants asserted product liability claims. Physicians who also had been sued by the tort claimants, asserted contribution claims. Aside from the creditors committee, a tort claimants committee was established "for the benefit of an entire class of creditors whose claims are all vigorously disputed."[7] Ten months after the start of the case, the Court appointed a separate physicians committee because the physicians were adverse to the tort claimants as well as the

---

[5] Debtors' Obj. at 15.
[6] *In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997).
[7] *Id.* at 145.

4

creditors committee. As the court explained, because "the posture of the physicians is so different from the other non-tort creditors, it is likely that any plan will treat the [physician] claims differently," and the creditors committee "is in no position to negotiate for the physicians' special treatment."[8] The court noted that "physicians will have a collective interest in the estimation and resolution of the tort claims and the formulation of a plan of reorganization" and that the creditors committee was "not at all well situated to defend those interests."[9]

### 2.    The Committee will not protect borrower interests.

Unless a Borrowers Committee is appointed, nobody will safeguard borrowers' rights in any systematic way in these cases. The Committee makes perfectly clear that it will continue to work to "maximize distributions to unsecured creditors," even if such efforts come at the expense of borrowers.[10] In this regard, the Debtors describe the Committee as "fulfilling its fiduciary obligations to maximize the value of the debtors' estates," and the Debtors applaud the Committee for refusing to support borrowers "in their personal endeavors."[11]

The Committee has shown no inclination to help borrowers and will not do so in the future. As the Objections concede, the Committee is dominated by the very types of financial institutions that have an interest in defeating borrower claims.[12] The two law firms representing the Committee are known, among other things, for their distinguished banking practices.[13] And

---

[8] *Id.* at 145-46.
[9] *Id.* at 146.
[10] Committee Obj. at 8-9 n.7.
[11] Debtors Obj. at 15.
[12] Defending the composition of the Committee, Debtors observe that "all of the Debtors' 40 largest unsecured creditors were large financial institutions, each asserting millions of dollars (some, billions) in claims against the Debtors' estates." Debtors Obj. at 14. But the problem is not that the Committee was improperly constituted. It is that a properly constituted Committee cannot adequately represent borrowers.
[13] Hahn & Hessen LLP is well known for its representation of banks. The firm's clients include "a myriad of financial institutions such as domestic and foreign banks, bank holding companies, investment banks, leasing companies, asset-based lenders and finance companies," and the firm represents lenders "in new financings from the structuring and proposal stage through closing, actively advises clients," as well as "loan workouts and restructurings, debtor-in-possession financings and Chapter 11 reorganizations." *See* Hahn & Hessen LLP Business

the Committee has already taken positions in these cases that cannot be reconciled with aggressive advocacy for borrowers.

For example, the Committee's Objection begins by mischaracterizing Movants' arguments: "Movants seek an official borrowers committee solely because they want a plan which provides that their particular mortgages, as well as mortgages for a myriad of unnamed borrowers, can be reformed, modified or rescinded because of alleged fraud."[14] The Committee then goes on to state that *such a plan is not legally possible.*"[15] In fact, the borrowers' criticisms of the Plan are more nuanced and far more extensive than what the Committee describes, as Movants' initial brief in support of the Motion makes plain.[16] Furthermore, the Debtors appear to disagree with the Committee over the possibility of addressing at least some of the Movants' concerns. Of course, modifying the Plan to comport with basic notions of due process is certainly "possible."[17]

The Committee also asserts that borrower claims "can be addressed through the claims process with valid claims entitling the claimants to distributions."[18] This argument is also unpersuasive on several levels. It says nothing about what this hypothetical claims process would be. (The Plan itself simply states that the claims may be "determined" by the Trustee.[19])

---

Finance Practice Group, http://www.hahnhessen.com/practices/finance.php (last visited Sept. 29, 2008). Similarly, Blank Rome LLP's "financial institution clients include thrifts, banks and their holding companies, finance companies, insurance companies, investment banks, private equity funds and private investors, mortgage banks, pension funds, publicly held and privately held financial institutions, and regional and national lenders," and the firm handles "loan transactions, securities, corporate, regulatory, and employment and benefit matters." *See* Blank Rome LLP Gain Interest: Financial Institutions, http://www.blankrome.com/index.cfm?contentID=13&itemID=44 (last visited September 29, 2008).

[14] Committee Obj. at 2.

[15] *Id.* (emphasis added).

[16] *See* Motion at 21-31.

[17] *See, e.g., In re Genesis Health Ventures, Inc.*, 266 B.R 591, 608-09 (Bankr. D. Del. 2001) (modifying and striking third-party releases from plan).

[18] Committee Obj. at 6.

[19] Chapter 11 Plan of Liquidation of the Debtors, dated as of August 15, 2008 (the "Plan") at 72.

1993032.1

It ignores the conflicts that the current Plan would inject into the claims process.[20] And it ignores the impediments to borrower claims imposed by the current Plan.[21]

Both the Debtors and the Committee suggest that no separate Borrowers Committee is needed unless the Movants establish that the Committee has breached its fiduciary duties toward borrowers.[22] Movants do not concede that the Committee is fulfilling its fiduciary duties to all creditors. After all, the Committee supports a Plan that would adversely affect borrowers. But, in any event, the question is not whether the Committee is performing its fiduciary duties, but whether the Committee adequately represents the interests of borrowers. Similarly, Movants need not prove that the Committee is hopelessly divided.[23] If a major creditor constituency is excluded from the Committee, as is the case here, then an additional committee may be justified.[24]

Whether the Committee is maximizing the value of the estates is irrelevant to whether the borrowers are adequately represented. The bankruptcy process – contrary to what the Debtors and Committee assume – involves more than merely maximizing the value of the Debtors' estates. Rather, the value of a debtor's estate should be maximized consistent with the rights of other parties, such as the tort claimants and physicians in the *Dow Corning* case, or the borrowers here. A debtor cannot expand its property rights simply by filing a chapter 11 bankruptcy case.[25] (To illustrate this fundamental point with an obvious example, a debtor

---

[20] *See* Motion at 23-24.
[21] *See* Motion at 28-32.
[22] *See* Debtors Obj. at 15; Committee Obj. at 7-8.
[23] *See* Debtors Obj. 15-16.
[24] *See, e.g., In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985) (finding inadequate representation because debenture holders were excluded from committee).
[25] *See Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997) (noting that a "trustee does not have greater rights in the property of the estate than the debtor had before filing for bankruptcy"); *see also* 5 Collier on Bankruptcy § 541.04 (15th ed. 2006) (stating that section 541 "is not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case").

7

generally cannot maximize the value of its estate by stealing someone else's property, or even by mistakenly taking someone else's property.[26])  The history of these cases as well as the Debtors' and Committee's stated positions make plain that a Borrowers Committee is needed to ensure that the Debtors and Committee do not try to maximize the value of the estates at the expense of borrowers' rights and interests.

### 3.    Borrower participation in these cases has been very limited.

The Committee notes that certain Movants "have in fact already exercised" their right to be heard,[27] and the Debtors go even further, arguing that "[b]orrowers have actively participated" in these cases.[28]  The truth is that no borrower has retained experienced chapter 11 counsel to play an active and ongoing role in the proceedings.  As a result, although *pro se* borrowers have filed motions and objections and attended hearings, the effect has been minimal.  Aside from obtaining relief from the automatic stay on a handful of occasions and the inclusion of language tracking section 363(o) in sale orders, the borrowers have been mostly unsuccessful in their efforts.  Moreover, both before and after the filing of the Motion, borrowers have been excluded from negotiations over the disclosure statement, the Plan, claims-resolution issues, and the potential prosecution of claims against third parties.  As these cases move forward, if individual borrowers are going to participate in the promulgation of a plan, the resolution of claims, or the prosecution of third-party claims, they will have to negotiate, prepare pleadings, and argue in this Court on a *pro se* basis, unless a Borrowers Committee is appointed.

---

[26] *In re Bake-Line Group, LLC*, 359 B.R. 566, 572 (Bankr. D. Del. 2007) (holding that debtor could not obtain property either through theft or through mistaken conversion).
[27] Committee Obj. at 9.
[28] Debtors Obj. at 20.

In arguing that the borrowers can look out for themselves, the Debtors rely primarily on Judge Kornreich's decision in *In re Garden Ridge Corp.*,[29] which denied the appointment of an official landlords committee. In that case, two out of forty-seven landlords already sat on the seven-member creditors committee.[30] The court noted that it was undisputed that the creditors committee was attempting to maximize recovery to general unsecured creditors and that each landlord, presumably represented by counsel, had a distinct relationship with the debtors.[31] The differences between these cases and *Garden Ridge* are stark. *Garden Ridge* involved 47 landlords, while approximately 450 borrower claims have been filed here, and many more undoubtedly exist. Also, unlike the landlords, who were commercially savvy and likely represented by counsel, the borrowers in these cases are unsophisticated and proceeding *pro se*. Finally, while each lease in *Garden Ridge* presented unique circumstances, the Plan's adverse effects on the rights of borrowers with respect to their claims, rights, and interests raise similar issues more properly addressed by a single entity.[32]

Accordingly, although both the Debtors and the Committee trumpet the aggressive role of borrowers in these cases, borrowers' participation has really been little more than a distraction, and there is no reasonable basis for concluding that this situation will change. Unless a Borrowers Committee is formed, borrowers will continue to go unrepresented.

---

[29] Case No. 04-10324 (DDS), 2005 Bankr. LEXIS 323 (Bankr. D. Del. Mar. 2, 2005).
[30] *Id.* at *2.
[31] *Id.* at *12-*13.
[32] The other recent mortgage cases in this District, *see* Debtors Obj. at 14-15, are irrelevant because no motion to appoint a separate committee for borrowers was made in those cases.

4. **Important issues affecting borrowers have not yet been addressed in these cases.**

a. **Plan negotiations are ongoing.**

According to the Debtors, "if individual borrowers wish to defend a foreclosure action on the basis that their mortgage terms were illegal (or any other basis), nothing in the Bankruptcy Code prohibits them from doing so."[33] That statement is correct. The Debtors then go on to assert that the Plan does "not affect a borrower's ability to assert joint liability against third parties."[34] That assertion, unfortunately, is incorrect. In Movants' opening brief, we identified eight different problems with the Plan that directly affect borrowers and likely render it unconfirmable. Among other things, we noted that the Plan would authorize a conflicted trustee to address and "determine" not only borrower claims but claims by and against third parties; that the Plan may preclude equitable subordination claims; that the Plan would hinder borrower claims against the Debtors and third parties; and that the Plan does not protect borrowers' claims and defenses with respect to loans transferred pursuant to the Plan or sold post-confirmation.

The Debtors do not respond directly to those points or any other points made by Movants' regarding the Plan. Instead, they argue, on the one hand, that Plan objections are not grounds for the appointment of a Borrowers Committee.[35] On the other hand, however, they state that they, "in consultation with the Committee and other parties in interest, are currently considering several amendments to the Plan and Disclosure Statement that are responsive to Movants' primary concerns."[36] The Debtors cannot have it both ways. If the Debtors are going to propose Plan amendments in an effort to eliminate the borrowers' potential Plan objections,

---

[33] Debtors Obj. at 17.
[34] *Id.*
[35] *Id.* at 18-19.
[36] *Id.* at 19.

1993032.1

then the borrowers surely need professional representation to negotiate over the adequacy of the proposed Plan amendments.

The Debtors apparently just now have filed their Plan and Disclosure Statement amendments. Plainly, there will need to be important plan-related negotiations in the near future. A sophisticated entity, such as a Borrowers Committee represented by experienced bankruptcy counsel, should be advocating for borrowers as a group with respect to these issues. (Of course, the Debtors would not be considering any changes to accommodate borrowers were it not for the filing of the Motion.)

### b.        The Debtors still own mortgages.

The Committee's arguments concerning potential amendments to the Plan differ from the Debtors' arguments. The Committee argues, bluntly, that the relief sought by borrower claimants is "not possible" to grant. The Committee bases this argument on the contention that the Debtors are no longer investors in any mortgages.[37] Yet the Debtors themselves acknowledge that they still own some mortgages.[38]

Although the Debtors argue that most (but not all) of their loans have been sold at this point, the Debtors do not describe the loans that remain with the Debtors. The 3400 mortgages being serviced by Bank of America are still owned by the Debtors. Those loans may represent the entirety of what remains to be distributed with respect to Bank of America's secured claim under the Plan (without any section 363(o) protections). To the extent that borrowers have related claims and rights against the Debtors and third parties with respect to these mortgages,

---

[37] Committee Obj. at 6.
[38] Debtors Obj. at 16-17.

1993032.1

such borrowers have an interest in ensuring the Plan does not adversely affect their claims and rights.

> **c.      Even though most American Home mortgages have been sold, the Plan and other proceedings in these cases may affect borrowers' claims against the Debtors and third parties.**

The Debtors and Committee do not dispute that the Plan and other proceedings in these cases may have an impact on various types of litigation relating to mortgages that are no longer owned or serviced by American Home.  Even as to mortgages that the Debtors have already sold, the Debtors still may be necessary or appropriate defendants in litigation involving borrowers rights under those mortgages.  By way of example only, a successful TILA claim against a loan originator may, in some circumstances, bind successor holders of the loan and result in the loan's rescission.[39]  At a minimum, the Debtors certainly would be important sources of discovery in many cases.  Yet the current Plan would allow the post-bankruptcy Trustee to destroy the Debtors' documents.[40]

The Plan's conflict-ridden structure also poses particularly serious problems for borrowers.  For instance, an impartial person should decide how to handle third-party claims against banks or other financial institutions based on their participation in illegal practices by the Debtors.  (Such claims can be very valuable, as evidence by the success of the litigation prosecuted by the borrowers committee in *In re First Alliance Mortgage Co.*[41])  An impartial person also should evaluate defenses to early-payment-default and breach-of-warranty claims – such as unclean hands, *in pari delicto*, or estoppel based on the financial institution's knowledge that the Debtors were originating improper loans that were not likely to be repaid.  Finally, with

---

[39] 15 U.S.C. § 1641(a)-(c).
[40] Plan at 50.
[41] 471 F.3d 977 (9th Cir. 2006).

1993032.1

different constituencies making claims on insurance assets, an impartial person should be making decisions about the disposition of insurance proceeds.[42]

## B. The Court Should Exercise Its Discretion To Appoint a Borrowers Committee.

The Debtors concede, as they must, that these chapter 11 cases are large and complex,[43] which is one discretionary factor considered by courts in deciding whether to appoint an additional committee of creditors.[44] Moreover, a Borrowers Committee would represent unsophisticated *pro se* litigants whose rights and claims bear not only on their personal finances but also on their ability to keep their homes. A Borrowers Committee would represent a previously excluded creditor constituency and could facilitate a resolution of these cases that protects their interests.

Nevertheless, the Debtors and the Committee collectively raise four arguments against the Court's discretionary appointment of a Borrowers Committee. First, they argue that the Motion was untimely. Second, the Debtors complain that appointment of a Borrowers Committee would lead to additional costs. Third, the Debtors and the Committee argue that the Motion was intended to disrupt plan confirmation and that appointment of a Borrowers Committee might delay plan confirmation. Fourth, they argue that individual borrowers can represent their interests and the interests of other borrowers without the need for a Borrowers Committee. Each of these arguments lacks merit under the circumstances.

---

[42] *See* Lead Plaintiff's Objection to Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with respect to the Chapter 11 Plan of Liquidation of the Debtors Dated as of August 15, 2009, at 8-12 (objection of plaintiffs group who seek access to the Debtors' directors and officers liability insurance policies) (D.I. 6119).
[43] Debtors Obj. at 22.
[44] Motion at 14-15 (citing cases).

1993032.1

1.      **The Motion is timely.**

The Committee and the Debtors argue that the Motion was untimely because it was filed thirteen months after the commencement of the chapter 11 cases.[45]  The fact that this case has been going on for over a year is not dispositive, however, especially given the tasks that still remain.  In *Dow Corning*, the bankruptcy court ordered the appointment of an official physicians committee even though the case had been going on for ten months.[46]  The Court concluded that the appointment was necessary to ensure that physicians would be formally represented in negotiations.  As the Court stated, the "behind-the-scenes work which is so essential to a successful chapter 11 case" would be "stymied by the physicians lack of official committee status."[47]

The Committee also attacks the Movants' motives.  For example, the Committee asserts that one of the seven Movants, Ms. Rush, who has been representing herself *pro se* since the beginning of these cases, "*deliberately* chose not to [file the Motion]."[48]  The Committee apparently assumes, incorrectly, that a *pro se* litigant, such as Ms. Rush, would have had knowledge of a somewhat obscure mechanism in the Bankruptcy Code authorizing the appointment of an additional committee of creditors.[49]

Similarly, but less directly, the Debtors argue that Movants have tried to deflect their own "culpability in the delay."[50]  The Debtors point to the news of the chapter 11 filing and the resulting acts of Ms. Rush and another borrower, a Mr. Horvath (who is not one of the Movants)

---

[45] Committee at Obj. 3; Debtors Obj. at 22-23.
[46] *Dow Corning*, 194 B.R. at 146.
[47] *Id.*
[48] Committee Obj. at 3 (emphasis added).
[49] No one will ever know for sure, but one can imagine that, if Movants actually had filed the Motion a year ago, the Debtors and Committee would have attacked the Motion as speculative.  At this point, given the structure and terms of the Plan, there is an immediate and concrete need for borrower representation.
[50] Debtors. Obj. at 23.

as proof that borrowers generally knew about the bankruptcy case.[51] The Debtors' assumptions also are mistaken. Perhaps American Home's chapter 11 filing was headline news on Wall Street, but news of the Debtors' troubles did not make the headlines on Main Street, at least outside of New York, where American Home had its principal place of business. Moreover, even if borrowers had read about the chapter 11 filing, they may not have connected it with the holder or originator of their particular mortgage loans, whether because of American Home's use of trade names or its transfer of the loans after origination. The fact that two borrowers (out of almost 200,000) promptly appeared in the chapter 11 cases is hardly evidence of widespread knowledge of the chapter 11 cases among borrowers.

Debtors note that they posted information about their bankruptcy case on their website, www.americanhm.com, which included a letter to customers dated August 13, 2007. Because the Debtors did not attach the letter to their pleading, we attach it as Exhibit A hereto. The letter did not mention claims asserted *by* borrowers, nor did it mention any bar dates or even the potential for bar dates. Most tellingly, the letter stated that "[t]he Chapter 11 filing and process should not directly impact you if you currently have a mortgage with American Home Mortgage." The letter was not actually mailed to customers, so it is not clear how many actually read it, but by announcing to borrowers that the chapter 11 cases would not "impact" them, the letter may have actually discouraged borrowers from monitoring these cases. This misleading letter is still on the Debtors' website.

The Debtors do not dispute that they failed to provide actual notice of the bar date to all borrowers, conceding that actual notice was sent only to those borrowers with pending or

---

[51] *Id.*

threatened litigation against the Debtors.[52]  Unfortunately, the Debtors' decision to limit notice was short-sighted.  After all, many borrowers may not have understood that they had claims against the Debtors until the interest rates on their loans increased or foreclosure actions were initiated.  Even if they knew about their claims at the time of the Bar Date, they may not have known how or against whom to assert those claims.

In an attempt to defend their failure to provide actual notice to borrowers, the Debtors argue that borrowers were not "known" creditors because the Debtors were not aware that borrowers generally might have claims against the estates,[53] but the Debtors fail to cite a single case that supports the notion that the borrowers could be treated as unknown creditors under these circumstances.  The Due Process Clause does not allow the Debtors to turn a blind eye to potential creditors with known addresses and then seek to bind them to a bar date and a plan.

The Debtors argue that, although they knew where each borrower lived, they had no reason to believe that each borrower had a claim against the estates.[54]  To be clear, the Motion does not assert that every borrower has a claim against the Debtors.  Nevertheless, while nobody knows precisely which borrowers have claims against the Debtors, the Debtors should have known that claims frequently arise from certain products, such as mortgages with low "teaser" rates that adjust upward after only a short period of time, and "payment option ARM" mortgages that result in negative amortization.

Even if the Debtors did not want to give notice to every single borrower – and there is no compelling reason why they did not give notices to every single borrower – the Debtors could have identified the borrowers with particularly notorious types of mortgages and could have

---

[52] *Id.* at 24.
[53] Debtors Obj. at 23-24.
[54] *Id.*

1993032.1

given actual notice to those borrowers. Similarly, the Debtors have known for some time that claims often arise in response to notices of default or the initiation of foreclosure proceedings. Again, the Debtors can identify many or most borrowers who have received notices of default or have become embroiled in foreclosure proceedings. Again, however, the Debtors never gave those individuals actual notice.

The Debtors also argue that publication notice in the national edition of the *New York Times* was sufficient publication notice and that, as a result, 450 borrower claims have been filed in these cases.[55] Not surprisingly, however, the Debtors do not reveal how many of the borrowers with filed claims received actual notice. Also, the Debtors do not attempt to explain why publication notice in the national edition of the *New York Times* was sufficient publication notice to reach borrowers in the states with the highest foreclosure rates, such as Ohio, Florida, California, Arizona, and Nevada.[56]

Finally, Debtors suggest that that there would be fewer borrower claims against the estates than in the *First Alliance* case because American Home mostly sold Alt-A and prime loans, as opposed to subprime loans.[57] The Debtors' suggestion misses the mark. A borrower's claim typically arises from actionable conduct in the origination or servicing of the loan, not the quality of the borrower's credit rating. American Home solicited and induced many borrowers with teaser interest rates and provided insufficient or misleading disclosures. That their target borrowers had a better credit rating than subprime borrowers is irrelevant.

---

[55] *Id.*

[56] Newspapers such as the *Los Angeles Times* and the *Chicago Tribune* did not carry news of American Home's demise on their front pages. Even the *New York Times*, on which the Debtors relied for publication of their bar date notices, did not carry the news of either American Home's closing or chapter 11 filing on its front page.

[57] Debtors Obj. at 24 n.9.

1993032.1

### 2.    The Balance of Hardships Favor the Appointment of a Borrowers Committee.

The Debtors and the Committee cite the costs of appointing a Borrowers Committee and the potential delay in plan confirmation as reasons for the Court not to appoint a Borrowers Committee.  Both of these concerns pale in comparison to the exclusion of an important creditor constituency in these cases.

### a.    A denial of adequate representation for borrowers cannot be justified by concerns over the costs of a Borrowers Committee.

The Debtors complain that the estates would incur substantial monetary costs from the appointment of a Borrowers Committee because its professionals would be required to "get up to speed."[58]  The Debtors' concern is overblown for several reasons.  First, the Debtors' and the Committee's professionals could assist counsel with its learning curve.  Second, since the Debtors' businesses are not operating, there are no ongoing operational issues to learn.  Representing borrowers in these cases would require, primarily, an understanding of the various asset sales and settlements that have been approved by the Court, and those transactions are all part of the written record.  Third, by working with the Committee to minimize overlap of responsibilities, a Borrowers Committee could focus its attention on the important matters affecting borrowers specifically, without focusing on tasks relating generally to maximization of the value of the estate.  Accordingly, there is no basis in fact for the Debtors' implication that professionals for a Borrowers Committee would incur fees on a similar order of magnitude to what the Committee's professionals have incurred in these cases.[59]

---

[58] *Id.* at 22.

[59] *See id.* at 22 n.8 (noting that the Committee's professionals had incurred nearly $4 million in fees through April 2008).

**b.** **A denial of adequate representation for borrowers cannot be justified by concerns over a delay of plan confirmation.**

The Debtors note that appointment of a Borrowers Committee could delay plan confirmation.[60] The Committee uses sharper language to make essentially the same point, arguing that the Motion should be denied because, according to the Committee, the Motion was filed "solely to frustrate confirmation."[61] Neither objection explains the importance of a quick confirmation hearing in these liquidating chapter 11 cases. After all, there is no reorganizing entity, so there are no operational, trade credit, or exit financing issues to address. Furthermore, postponement of the confirmation hearing is a small price to pay to ensure that the Plan will not affect borrowers' rights adversely.

In support of its position, the Committee relies on two inapposite decisions.[62] One of them, *Kavlar Microfilm*, was a preplanned bankruptcy in which the moving party had purchased preferred stock prior to the filing of the case, but after the debtor had begun publicized negotiations with creditors.[63] The other, *Interco*, was a case in which two committees already existed, but an ad hoc bondholder group wanted a third committee for classes of bondholders rejecting the plan.[64] Both courts determined that the moving parties could adequately represent their own interests in the proceedings.[65] In contrast, if the Motion is denied here, the rights of borrowers would not be adequately represented in the proceedings, notwithstanding the efforts of *pro se* litigants.

---

[60] *Id.* at 22.

[61] Committee Obj. at 4.

[62] *In re Kavlar Microfilm, Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Interco, Inc.*, 141 B.R. 422 (Bankr. E.D. Mo. 1992).

[63] *Kavlar Microfilm*, 195 B.R. at 601.

[64] *Interco*, 141 B.R. at 422-23.

[65] *See Kavlar Microfilm*, 195 B.R. at 601 (explaining that the moving party, as the holder of over 30% of the preferred stock, has a substantial stake and can continue to represent its own interest in the proceedings); *Interco*, 141 B.R. at 425 ("The Ad Hoc Group can effectively participate in the final stages of the reorganization proceedings without official committee representation.").

1993032.1

That the Debtors are liquidating and not reorganizing further highlights the hollowness of the Debtors' and Committee's arguments about delay. Indeed, *Kavlar Microfilm* and *Interco* were both reorganizing cases. In other similar legal contexts, it is not the length of time before a request is made that is dispositive. Instead, the key issue is the presence or absence of prejudice to those supporting and opposing the relief requested.[66] Here, there simply is no material prejudice that would occur if plan confirmation were delayed, and any delay would be more than justified by the need to ensure that a previously excluded creditor constituency will be heard. In a reorganization case, the claim of a creditor who lacks notice of the case is not discharged by the plan and that creditor can seek to assert the claim subsequently against the reorganized debtor. In contrast, in a liquidating case, that creditor is out of luck because there is no reorganized debtor against which to recover.[67] Accordingly, all creditors must be given a real opportunity in these liquidating cases to present their positions and protect their rights.

### c. Remedies short of appointment of an official Borrowers Committee would not suffice.

None of the alternatives to appointing a Borrowers Committee would actually be effective in protecting borrowers' interests.

Both the Debtors and the Committee identify the potential to recover expenses pursuant to section 503(b) of the Bankruptcy Code as a factor that militates against the appointment of a Borrowers Committee.[68] Yet substantial contribution under section 503(b) offers very little to borrowers. To date, no borrower has retained qualified counsel willing to litigate Disclosure

---

[66] *See, e.g., Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397-98 (1993) (focusing on the lack of prejudice to the debtor in finding excusable neglect); *Zenith Radio Corp. v. Hazeltine*, 401 U.S. 321, 330-31 (1971) (requiring the trial court to consider prejudice to the opposing party in considering pleading amendment); *Fike v. Ruger*, 752 A.2d 112, 113 (Del. 2000) (requiring prejudice to the defendant to sustain a laches defense for an unreasonable delay in asserting a claim).

[67] *Cf. In re Mayer-Myers v. Green Tree Servicing, LLC (In re Mayer-Myers)*, No. 05-12466, 2007 Bankr. LEXIS 908 (Bankr. D. Vt. Mar. 14, 2007).

[68] Debtors Obj. at 20; Committee Obj. at 8.

Statement and Plan objections in the hope that of receiving compensation at some point for making a substantial contribution. (Law firms are naturally reluctant to take on lengthy, complex and difficult litigation on what amounts to a contingent fee basis pursuant to which the law firm will receive normal hourly rates only if all contingencies are resolved in the law firm's favor.)

Nor has any "informal" borrowers committee emerged. The Debtors suggest that by banding together, numerous creditors can hire counsel, with each borrower paying only a small percentage of counsel's fees.[69] Quite frankly, this scenario is utterly unrealistic given the circumstances that face many American Home borrowers. Many, including the Movants, have fixed or low-incomes and are unable to make their escalated mortgage payments, let alone come up with additional money to hire lawyers. That is why many of them qualified for free legal aid lawyers on their underlying claims. Even if borrowers could be organized as the Committee suggests, few law firms would accept an engagement by hundreds of individual borrowers, due to the cost and uncertainty associated with collecting fees under such an arrangement.

Finally, adding a borrower or two to the existing Committee also would be an exercise in futility; not surprisingly the Debtors and Committee have not suggested such a remedy here. If one or two borrowers were added to the Committee, they would be consistently outvoted on issues affecting borrowers' rights by the financial institutions that dominate the committee.[70] Indeed, according to the Debtors, if a borrower were on the Committee and tried to pursue what the Debtors' regard as the borrowers' "personal interests," such a borrower arguably would be

---

[69] Debtors Obj. at 21.

[70] *Dow Corning*, 194 B.R. at 121 (a committee may not adequately represent a particular group of creditors "if the committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-making process"); *In re McClean Inds., Inc.*, 70 B.R. 852, 862 (Bankr. S.D.N.Y. 1987) ("it would seem to require no citation… to reason that a committee in a case involving conflicts among creditors should not be dominated by one or more particular faction").

21

"in breach of its fiduciary duty to committee constituents."[71]  This lesser remedy would not cure the existing lack of adequate representation for borrowers.  Even if a couple of borrowers were on the Committee, borrowers as a group would have no voice in these bankruptcy cases, and individual borrowers still would be forced to proceed *pro se* in order to be heard.

## III.    CONCLUSION

Because borrower interests are not adequately represented in these cases, and because many important issues affecting borrowers are still to be addressed in these cases, the Court should direct the United States Trustee to appoint an official Borrowers Committee.

Dated: Wilmington, Delaware
      September 30, 2008

      ZUCKERMAN SPAEDER LLP

      Thomas G. Macauley (ID No. 3411)
      919 Market Street, Suite 990
      Wilmington, DE 19801
      Telephone:  (302) 427-0400
      Facsimile:  (302) 427-8242
          - and -
      Linda Singer
      1800 M Street, NW, Suite 1000
      Washington, DC 20036
      Telephone:  (202) 778-1800
      Facsimile:  (202) 822-8106

          - and -

      GILBERT RANDOLPH LLP
      Stephen A. Weisbrod
      W. Hunter Winstead
      1100 New York Avenue, NW, Suite 700
      Washington, DC 20005
      Telephone:  (202) 772-1962
      Facsimile:  (202) 772-3962

      Attorneys for the Movants

---

[71] Debtors Obj. at 15.

1993032.1