# Exhibit 4

# EMPLOYMENT AGREEMENT

This Employment Agreement, dated as of February 16, 2006 (this "Agreement"), is by and between American Home Mortgage Holdings, Inc., a Delaware corporation having a place of business at 538 Broadhollow Road, Melville, NY 11747 (the "Company"), and Paul Parotti, currently residing at 1521 Miramar Drive, Newport Beach, CA 92661 (the "Executive").

Whereas the Company wishes to assure itself of the services of the Executive, and the Executive desires to be employed by the Company, upon the terms and conditions hereinafter set forth.

The Company and the Executive hereby agree as follows:

1. <u>Employment</u>. The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company during the term set forth in Section 2 and on the other terms and conditions of this Agreement.

2. <u>Term</u>. The term of this Agreement shall commence on February 16, 2006 (the "Commencement Date"), and shall continue until the Executive resigns or is discharged, in which case the Agreement shall terminate four weeks following the resignation or discharge date.

3. <u>Position, Duties and Responsibilities, Rights</u>.

(a) During the term of this Agreement, the Executive shall serve as and hold the office and title of Assistant Vice President, Product and Sales Support. The Executive shall have all of the powers and duties usually incident to the office described above, and shall at all times comply with all policies of the Company relating to the Executive's employment.

(b) During the term of this Agreement, the Executive agrees to devote substantially all the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker or arbitrator; provided, however, that the performance of the Executive's duties or responsibilities in any of such capacities does not materially interfere with the regular performance of the Executive's duties and responsibilities hereunder

4. <u>Place of Performance</u>. In connection with the Executive's employment by the Company, the Executive shall be based in Irvine, California, and shall not be required to be absent from there on travel status or otherwise for more than a reasonable time each year as necessary or appropriate for the performance of the Executive's duties hereunder.

5. <u>Compensation</u>

(a) For each month of employment during the term of the Executive's employment, the Executive shall be eligible to receive an override bonus (the "Override Bonus"). The Override Bonus shall be determined based on the aggregate closed loan production of Choice products, as determined by the Company from time to time, generated by the Company's western branch locations. The Override Bonus shall be paid in accordance with the following:

| Aggregate Closed Loan Production Choice Products | Override Bonus |
|---|---|
| $0 - $150,000,000 | .035% (3.5 basis points) |
| $150,000,001 - $200,000,000 | .0375% (3.75 basis points) |
| $200,000,001 + | .04% (4 basis points) |

The Executive must meet or exceed a 2.0 margin to receive the full amount of the monthly aggregate closed loan production. If the Executive fails to meet a 2.0 margin, the monthly closed loan production will be reduced and recalculated so that the 2.0 margin is achieved ("New Loan Amount"). The Executive will then be eligible to receive 110% of this New Loan Amount.

(b) For each month of employment with the Company, the Executive shall be eligible to receive commissions for the Executive's personal production. The Executive shall be eligible to receive .25% (25 basis points) on the first commissionable point and .25% (25 basis points) on overage from discount points and/or rebate pricing on all loans that are produced by the Executive in a given month.

(c) During the term of this Agreement, the Executive shall be entitled to fringe benefits, in each case at least equal to and on the same terms and conditions as those attached to the Executive's office on the date hereof, as the same may be improved from time to time during the term of this Agreement.

(d) During the term of this Agreement, the Executive shall be entitled to reimbursement, upon proper accounting, of all reasonable expenses and disbursements incurred by the Executive in the course of the Executive's duties.

6. <u>Employment At Will.</u> Employment hereunder shall be at all times "at will". The Company may discharge the Executive and terminate this Agreement at any time and for any reason, and the Executive may terminate the Executive's employment with the Company for any reason. If the Executive terminates the Executive's employment with the Company, the Executive shall provide the Company with notice of such termination pursuant to section 12 herein.

7. <u>Confidential and Proprietary Information; Company Property</u> For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing

programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, and cost and pricing policies. All Confidential Information disclosed or provided to the Executive by the Company, or developed or created by the Executive during the term of the Executive's employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company. The Executive agrees not to disclose the Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary in order for the Executive to perform the Executive's responsibilities as an executive of the Company. The Executive also agrees that the Executive will not use the Confidential Information for any purpose other than to fulfill the Executive's responsibilities as an executive of the Company.

The Executive acknowledges, understands, and agrees that the Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if the Executive breaches or threatens to breach any of the provisions of this Agreement relating to the Executive's use or disclosure of any of the Confidential Information.

The Executive further acknowledges that the Company may provide the Executive with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Executive agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time at the sole discretion of the Company. The Executive further agrees to promptly return in good working condition all Company Property in the Executive's possession upon termination of the Executive's employment with the Company for any reason, and shall be liable in damages, including but not limited to replacement cost, for any financial loss to the Company if Company Property is not returned in such manner.

The Executive agrees that this section shall survive the termination of this Agreement, and that all of the obligations of the Executive set forth in this section shall remain in full force and effect after this Agreement is terminated. The Executive further agrees that, upon termination of this Agreement, the Executive will return to the General Counsel all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Executive's possession or custody.

8. <u>Non-Solicitation; Non-Disparagement</u> The Executive agrees that during the term of the Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is voluntary or involuntary, with or without cause, the Executive shall not, directly or indirectly: (a) attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any

customers and/or potential customers of the Company which have been derived from leads and/or lists developed and provided to the Executive by the Company; (b) influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company; (c) influence or advise any person who is an employee of the Company, to leave the employment of the Company; and (d) employ any person who is an employee of the Company. The Executive agrees that during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers or business referral sources, including but not limited to realtors, builders and affinity organizations, joint venture partners, borrowers and loan applicants, obtained by, or whose contact information is stored in the records of, the Company. The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section.

The Company and the Executive agree that neither will disparage the other, and that their representatives will not disparage either party hereto.

The Executive's obligations as set forth in this section shall survive the termination of this Agreement.

9. <u>Non-Compete.</u> The Executive agrees that, during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company. The Executive expressly agrees that this section is fair and reasonable and that the Executive is being adequately compensated for agreeing to the terms of this section.

10. <u>Entire Agreement; Amendment.</u>

(a). This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties, their predecessors and affiliates.

(b) Any amendment of this Agreement shall not be binding unless in writing and signed by both (i) the Company's General Counsel and (ii) the Executive.

11. <u>Enforceability.</u> If any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

12. <u>Notices.</u> All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery, registered or certified mail, return receipt requested or overnight courier, if to the Executive at 1521 Miramar Drive, Newport Beach, CA 92661, and, if to the Company, to it at its principal

executive offices at 538 Broadhollow Road, Melville, NY 11747, Attention: Human Resources Director, with a copy to the Company's General Counsel, and shall be deemed given when sent. Either party may by like notice to the other party change the address at which it is to receive notices hereunder.

13. **Counterparts.** This Agreement can be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

14. **Facsimile Signatures.** A facsimile copy of either party's signature shall be deemed as legally binding as the original signature.

15. **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

American Home Mortgage Holdings, Inc.

By:_____
Name: Alan B. Horn
Title: Executive Vice President and General Counsel

_____
The Executive

_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_
Social Security Number

Compensation to the Paul Parotti, AVP, is based on total monthly Western Division AH Retail In-house Loan Volume at .00007 of 1 point. The maximum compensation to be paid will be based and divided out by not less than five (5) Associates of cost center 1003 (Choice Spectrum, Western Division).

For example, a $550,000,000 volume would yield an income pool of $38,500 (70% of 1 basis point) which will be used to pay the Associate. The monthly volume is multiplied by .00007 and then you are paid on a 38.89% share of that volume after $12,500 is deducted for Michael K. and Michael C.

Example: Volume of $550,000,000 X .00007 = $38,500

$38,500 − $12,500 = $26,000

$26,000 x 38.89% = $10,111.40

The cap for Paul Parotti is $168,000.

**Production Bonus:** Bonus Compensation is not limited by the above cap

Based on the annual Western Division AH Loan Volume up to $7,865,470,025, a discretionary bonus will be paid to all Choice Support West Associates which will be determined by the SVP and Executive Management and apportioned based upon merit, overall job performance, customer service and productivity.

If annual Western Division AH Loan Volume exceeds $7,865,470,025 a minimum bonus will be paid out at .0000040 over that amount up to the volume level of $8,652,017,027. The bonus will be split by all Choice Support West Associates which will be determined by the SVP and Executive Management and apportioned, based upon merit, overall job performance, customer service and productivity.

If annual Western Division AH Loan Volume exceeds $8,652,017,027 a minimum bonus will be paid out at .0000070 over that amount up to the volume level of $9,438,564,030. The bonus will be split by all Choice Support West Associates which will be determined by the SVP and Executive Management and based upon merit, overall job performance, customer service and productivity.

If annual Western Division AH Loan Volume exceeds $9,438,564,030 a bonus will be paid out at .00001 over that amount capped at $12,000,000,000. The bonus will be split by all Choice Support West Associates which will be determined by the SVP and Executive Management and based upon merit, overall job performance, customer service and productivity.

The bonus compensation will be divided by all Associates in the Division with the exception of the SVP.

Commissions on any loans originated by any Associates in cost center 1003 (Choice Spectrum Western Division) will be paid out on a 25% commission split to that individual. Commissions of loans originated are not limited by the above cap.

This agreement is in effect beginning on March 1, 2007 and ending on January 31, 2008. However compensation will be paid out based on West Division AH Loan Volume from Jan. 1, 2007 thu December 3

_____  3/13/07
Paul Parotti
AVP Choice Support West

_____
Steve Somerman
SVP Choice Support West

Minimum base compensation plus production bonuses for Paul Parotti will be $140,000 for the period from January 1, 2007 through December 31, 2007. This minimum base amount is exclusive of all commissions earned on individual loan production and all referral fees from recruiting and production from other loan officers.

_____ 3/13/07
Paul Parotti
AVP, Choice Support West

_____
Steve Somerman
SVP, Choice Support West