


## AMENDMENT OF EMPLOYMENT AGREEMENT

This Amendment of Employment Agreement ("Amendment"), which is made and entered into as of June 14, 2007 (the "Effective Date"), amends that certain Employment Agreement, dated as of March 13, 2007 (the "Agreement"), by and between American Home Mortgage Corp. (the "Company") and Sally Hamilton (the "Executive").

Whereas, the Company and Executive have agreed to amend the Agreement;

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, as of the Effective Date, hereby agree as follows:

1. Section 6(b) of the Agreement is hereby deleted in its entirety and shall be replaced with the following text:

    "(b)  In addition to those benefits available to the Executive pursuant to Exhibit A, the Company will pay for: (i) the Executive's reasonable temporary housing expenses for a period of up to 180 days, while the Executive transitions to permanent housing (such temporary housing shall be arranged and managed by the Company); (ii) the reasonable travel expenses associated with round-trip travel between the Melville, New York area and the Executive's current residence every second weekend for a period of up to 180 days while the Executive transitions to permanent housing; (iii) the reasonable cost associated with the rental of an automobile to be used by the Executive for a period of up to 180 days while the Executive is working in Melville, New York and before the Executive's current automobile is relocated to the Melville, New York area; and (iv) the reasonable travel expenses associated with the round-trip travel of the Executive's spouse between the Melville, New York area and the Executive's current residence on two occasions for the purpose of finding permanent housing in the Melville, New York area. The Company shall also reimburse the Executive, upon submission of documentation acceptable to the Company, for the cost incurred by the Executive in connection with: (i) the final three (3) months of rent, up to a maximum of $1,280.00 per month ($3,840.00 in total), payable by the Executive with respect to the property being rented by the Executive in Santa Ana, California; and (ii) the first three (3) months of rent, up to a maximum of $1,800.00 per month ($5,400.00 in total), payable by the Executive with respect to a property being rented by the Executive in Glen Cove, New York commencing on July 1, 2007. If the Executive terminates the Executive's employment with the Company within two (2) years of the Commencement Date, the Executive must immediately repay to the Company any amounts paid by the Company pursuant to this section 6(b)."

2. Exhibit A to the Agreement is hereby amended by deleting the following text:

    "If the Executive sells the Executive's home, if any, in Santa Ana, California within 12 months of the Commencement Date, the Company will reimburse the Executive, in connection with such sale: (a) the reasonable real estate broker's commissions up to a maximum of the lesser of 6% or $30,000.00; and (b) the customary and reasonable closing costs associated with the sale of the Executive's home, with attorneys' fees not to exceed $400. To qualify for such reimbursement, the Executive must work through a relocation vendor designated by the Company.".

3.      Except as herein modified, all terms and conditions of the Agreement shall remain in full force and effect, and by executing this Amendment, the parties hereto ratify and confirm the terms of the Agreement, as modified by the terms of this Amendment.

4.      This Amendment may be executed in counterparts, each of which shall be deemed an original and each of which shall together constitute one and the same document. Execution of this Amendment may be effected by delivery of facsimiles or electronic copies of signature pages and the parties waive any objection to the use of facsimile or electronic copies of signatures in lieu of their paper equivalents.

5.      This Amendment shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first written above.

AMERICAN HOME MORTGAGE CORP.

By: _____
   Alan B. Horn
   Executive Vice President
   and General Counsel


EXECUTIVE

_____
Sally Hamilton

2

Sally J. Hamilton
1601 W. MacArthur Blvd., #12H
Santa Ana, Ca 92704

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Kristie Szypula | Fax: | 516-336-2366 |
| From: | Sally Hamilton | Date: | 3/13/2007 |
| Re: | Employment Agreement | Pages: | 8 |
| Cc: | | | |

☐ Urgent    ☐ For review    ☐ Please comment    x Please reply    ☐ Please recycle

Hi Kristie;

And thank you again for your call this morning. Please find attached the executed Employment Agreement – please email me and confirm receipt at sllyhamilton@yahoo.com   I will follow up with Mary Ann if I have not heard from the relocation company by end of day tomorrow.

I look forward to working with you. If you need to reach me for any reason go ahead and use my cell# which is 714-328-4663. See you soon!

confidential

# EMPLOYMENT AGREEMENT

This Employment Agreement, dated as of __3-13__, 2007 (this "Agreement"), is by and between American Home Mortgage Corp., a New York corporation having a place of business at 538 Broadhollow Road, Melville, NY 11747 (the "Company"), and Sally J. Hamilton, currently residing at 1601 West Mac Arther Boulevard, Apartment 12H, Santa Ana, CA 92704 (the "Executive").

Whereas the Company wishes to assure itself of the services of the Executive, and the Executive desires to be employed by the Company, upon the terms and conditions hereinafter set forth.

The Company and the Executive hereby agree as follows:

1. <u>Employment</u>. The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company during the term set forth in Section 2 and on the other terms and conditions of this Agreement.

2. <u>Term</u>. The term of this Agreement shall commence on April 2, 2007 (the "Commencement Date"), and shall continue until the Executive resigns or is discharged, in which case the Agreement shall terminate four weeks following the resignation or discharge date.

3. <u>Position, Duties and Responsibilities, Rights</u>.

(a) During the term of this Agreement, the Executive shall serve as and hold the office and title of Senior Vice President, National Underwriting and Credit Policy Manager. The Executive shall have all of the powers and duties usually incident to the office described above, and shall at all times comply with all policies of the Company relating to the Executive's employment.

(b) During the term of this Agreement, the Executive agrees to devote substantially all the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker or arbitrator; provided, however, that the performance of the Executive's duties or responsibilities in any of such capacities does not materially interfere with the regular performance of the Executive's duties and responsibilities hereunder

4. <u>Place of Performance.</u> In connection with the Executive's employment by the Company, the Executive's place of performance shall be in Melville, New York, and the

Executive shall not be required to be absent from such location on travel status or otherwise for more than a reasonable time each year as necessary or appropriate for the performance of the Executive's duties hereunder.

5. <u>Compensation</u>

(a) During the term of this Agreement, the Company shall pay the Executive, and the Executive agrees to accept a base salary at the rate of not less than $160,000.00 per year (the annual base salary as increased from time to time during the term of this Agreement being hereinafter referred to as the "Base Salary"). The Base Salary shall be paid in installments no less frequently than monthly. Any increase in Base Salary or other compensation shall not limit or reduce any other obligation of the Company hereunder, and once established at an increased specified rate, the Executive's Base Salary hereunder shall not thereafter be reduced.

(b) (1) Subject to section 5(b)(2) below, thee Executive shall be eligible to receive a management evaluation bonus (the "Management Evaluation Bonus"), the amount of which will be determined by the Company based on an evaluation of the Executive's overall performance during the year, beginning with the Executive's performance. The targeted amount of the Management Evaluation Bonus will be 25% of the Executive's Base Salary, but the amount awarded, if any, may be less or greater than the targeted amount in the sole discretion of the Company. The Management Evaluation Bonus for a given year will be paid when such bonuses are generally paid by the Company in the succeeding year. To earn and receive a Management Evaluation Bonus, the Executive must be an employee of the Company as of the scheduled bonus payment date.

(2) Notwithstanding anything in section 5(b)(1) to the contrary, the Management Evaluation Bonus, for the period beginning with the Commencement Date through December 31, 2007 (the "2007 Employment Period"), shall be pro rated in proportion to the length of the Executive's employment during calendar year 2007 and shall be in an amount determined by the Company based on an evaluation of the Executive's overall performance during the 2007 Employment Period. The targeted amount of the Management Evaluation Bonus, pursuant to this section 5(b)(2), shall be $30,030.00, but the amount awarded, if any, may be less or greater than the targeted amount in the sole discretion of the Company. The Management Evaluation Bonus, pursuant to this section 5(b)(2), will be paid in or before March 2008. To earn and receive the Management Evaluation Bonus, pursuant to this section 5(b)(2), the Executive must be an employee of the Company as of the scheduled bonus payment date.

(c) During the term of this Agreement, the Executive shall be entitled to fringe benefits, in each case at least equal to and on the same terms and conditions as those attached to the Executive's office on the date hereof, as the same may be improved from time to time during the term of this Agreement.

(d) During the term of this Agreement, the Executive shall be entitled to reimbursement, upon proper accounting, of all reasonable expenses and disbursements incurred by the Executive in the course of the Executive's duties.

2

6. <u>Relocation and Related Travel Expenses.</u>

(a) The Executive shall permanently relocate from the Executive's present residence to the Melville, New York area within 180 days of the Commencement Date (the "Relocation Obligation"). Provided the Executive complies with the Relocation Obligation, the Executive shall be eligible to receive relocation benefits in accordance with the Employee Relocation Program attached hereto as Exhibit A.

(b) In addition to those benefits available to the Executive pursuant to Exhibit A, the Company will pay for: (i) the Executive's reasonable temporary housing expenses for a period of up to 180 days, while the Executive transitions to permanent housing (such temporary housing shall be arranged and managed by the Company); (ii) the reasonable travel expenses associated with round-trip travel between the Melville, New York area and the Executive's current residence every second weekend for a period of up to 180 days while the Executive transitions to permanent housing; (iii) the reasonable cost associated with the rental of an automobile to be used by the Executive for a period of up to 180 days while the Executive is working in Melville, New York and before the Executive's current automobile is relocated to the Melville, New York area; and (iv) the reasonable travel expenses associated with the round-trip travel of the Executive's spouse between the Melville, New York area and the Executive's current residence on two occasions for the purpose of finding permanent housing in the Melville, New York area. If the Executive terminates the Executive's employment with the Company within two (2) years of the Commencement Date, the Executive must immediately repay to the Company any amounts paid by the Company pursuant to this section 6(b).

7. <u>Employment At Will; Severance.</u>

(a) Employment hereunder shall be at all times "at will". The Company may discharge the Executive and terminate this Agreement at any time and for any reason, and the Executive may terminate the Executive's employment with the Company for any reason. If the Executive terminates the Executive's employment with the Company, the Executive shall provide the Company with notice of such termination pursuant to section 13 herein.

(b) The Executive shall be eligible to receive severance in an amount equal to three (3) months Base Salary (the "Severance") if, within the first 12 months of the Executive's employment with the Company, any person or entity other than, individually or collectively, the Board of Directors of American Home Mortgage Investment Corp. ("AHMIC") as constituted as of the date of this Agreement, obtains control of more than 50% of the voting securities of AHMIC, and the Executive is discharged as a result thereof, or the Executive's responsibilities are materially diminished as a result thereof and the Executive consequently resigns. To receive the Severance, the Executive shall execute and enter into an Agreement and General Release to be negotiated between the parties.

8. <u>Confidential and Proprietary Information; Company Property</u> For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files,

3

loan file documents, accounts, customer or client information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, and cost and pricing policies. All Confidential Information disclosed or provided to the Executive by the Company, or developed or created by the Executive during the term of the Executive's employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company. The Executive agrees not to disclose the Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary in order for the Executive to perform the Executive's responsibilities as an executive of the Company. The Executive also agrees that the Executive will not use the Confidential Information for any purpose other than to fulfill the Executive's responsibilities as an executive of the Company.

The Executive acknowledges, understands, and agrees that the Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if the Executive breaches or threatens to breach any of the provisions of this Agreement relating to the Executive's use or disclosure of any of the Confidential Information.

The Executive further acknowledges that the Company may provide the Executive with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Executive agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time at the sole discretion of the Company. The Executive further agrees to promptly return in good working condition all Company Property in the Executive's possession upon termination of the Executive's employment with the Company for any reason, and shall be liable in damages, including but not limited to replacement cost, for any financial loss to the Company if Company Property is not returned in such manner.

The Executive agrees that this section shall survive the termination of this Agreement, and that all of the obligations of the Executive set forth in this section shall remain in full force and effect after this Agreement is terminated. The Executive further agrees that, upon termination of this Agreement, the Executive will return to the General Counsel all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Executive's possession or custody.

9. **Non-Solicitation; Non-Disparagement** The Executive agrees that during the term of the Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is voluntary or involuntary, with or without cause, the Executive shall not, directly or indirectly: (a) attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers and/or potential customers of the Company which have been derived from leads

and/or lists developed and provided to the Executive by the Company; (b) influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company; (c) influence or advise any person who is an employee of the Company, to leave the employment of the Company; and (d) employ any person who is an employee of the Company. The Executive agrees that during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers or business referral sources, including but not limited to realtors, builders and affinity organizations, joint venture partners, borrowers and loan applicants, obtained by, or whose contact information is stored in the records of, the Company. The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section.

The Company and the Executive agree that neither will disparage the other, and that their representatives will not disparage either party hereto.

The Executive's obligations as set forth in this section shall survive the termination of this Agreement.

10. <u>Non-Compete.</u> The Executive agrees that, during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company. The Executive expressly agrees that this section is fair and reasonable and that the Executive is being adequately compensated for agreeing to the terms of this section.

11. <u>Entire Agreement; Amendment.</u>

(a) This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties, their predecessors and affiliates.

(b) Any amendment of this Agreement shall not be binding unless in writing and signed by both (i) the Company's General Counsel and (ii) the Executive.

12. <u>Enforceability.</u> If any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

13. <u>Notices.</u> All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery, registered or certified mail, return receipt requested or overnight courier, if to the Executive at the last known address of the Executive on record with the Company, and, if to the

5

Company, to it at its principal executive offices at 538 Broadhollow Road, Melville, NY 11747, Attention: Human Resources Director, with a copy to the Company's General Counsel, and shall be deemed given when sent. Either party may by like notice to the other party change the address at which it is to receive notices hereunder.

14. **Counterparts.** This Agreement can be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

15. **Facsimile Signatures.** A facsimile copy of either party's signature shall be deemed as legally binding as the original signature.

16. **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

American Home Mortgage Corp.

By:_____
Name: Alan B. Horn
Title:  Executive Vice President and General
        Counsel


_____
The Executive  Sally J Hamilton

_____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_____
Social Security Number

6

## EXHIBIT A

### American Home Mortgage
### Employee Relocation Program

The following represents the Company's Employee Relocation Program (the "Program"), which shall be made available to the Executive if the Executive relocates to the Melville, New York area within 180 days of the Commencement Date. The Executive will be eligible for expense reimbursement based on the criteria specified below:

If the Executive sells the Executive's home, if any, in Santa Ana, California within 12 months of the Commencement Date, the Company will reimburse the Executive, in connection with such sale: (a) the reasonable real estate broker's commissions up to a maximum of the lesser of 6% or $30,000.00; and (b) the customary and reasonable closing costs associated with the sale of the Executive's home, with attorneys' fees not to exceed $400. To qualify for such reimbursement, the Executive must work through a relocation vendor designated by the Company.

If the Executive purchases a new residence in the Melville, New York area within 12 months of the Commencement Date, the Company will reimburse the Executive for customary and reasonable closing costs associated with such purchase of a new residence, with attorneys' fees not to exceed $400. To qualify for such reimbursement, the Executive must work through a relocation vendor designated by the Company.

The Executive will be eligible for the Company's employee discount on the Executive's home mortgage which is a no fee/points/reduced interest rate mortgage. All fees will be reimbursed to the Executive, except that the Executive shall be responsible for customary third party fees.

The Company will secure for the Executive the services of a moving vendor to transfer the Executive's household goods and automobile. The Company will cover the reasonable cost of such move, up to a maximum of $20,000.00.

It is expressly agreed and understood that if, within two (2) years of the Commencement Date, the Executive terminates the Executive's employment with the Company, the Executive shall immediately repay to the Company any amounts paid by the Company under this Program.

ACKNOWLEDGED AND ACCEPTED:

_/s/ Sally L. Hamilton_
Sally L. Hamilton

_3-13-07_
Date

7

STATE OF NEW YORK   )
                    )   ss.:
COUNTY OF NASSAU    )

**KATHLEEN COLBERT**, being duly sworn says: I am not a party to the within action, am over 18 years of age and reside at Massapequa Park, New York.

On October 9, 2008, I served a true copy of the annexed

AFFIDAVIT IN RESPONSE TO OBJECTIONS

by mailing same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Attorneys for Debtors
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

_____
KATHLEEN COLBERT

Sworn to before me this
9th day of October, 2008.

_____
NOTARY PUBLIC

Thomas J. Stock, Esq.
Notary Public, State of New York
No. 4684523
Qualified in Suffolk County
Commission Expires April 30, 2010