UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
IN RE:                        )
                              )  Chapter 11
AMERICAN HOME MORTGAGE        )
HOLDINGS, INC.,               )
                              )  Case No.07-11047 (CSS)
                              )
                              )  September 15, 2008
                  Debtors     )
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            ROBERT S. BRADY, ESQUIRE
                           SEAN M. BEACH, ESQUIRE
                           NATHAN D. GROW, ESQUIRE
                           SHARON M. ZIEG, ESQUIRE
                           SCOTT HOLT, ESQUIRE
                           YOUNG, CONAWAY, STARGATT & TAYLOR
                           P.O. Box 391
                           Wilmington, DE 19899-0391

For the Committee:         MARK S. INDELICATO, ESQUIRE
                           HAHN & HESSEN, LLP
                           488 Madison Avenue
                           New York, NY 10022

For WLR Recovery Fund III: DANIEL P. WINIKKA, ESQUIRE
                           JONES DAY
                           2727 North Harwood Street
                           Dallas, TX 75201-1515


Audio Operator:            THERESA PULLAN


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-129
                           (856) 435-7172
                           FAX:  (856) 435-7124
                           Email:  Dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript

produced by transcription service.

(Appearances continued)

For the WARN Act Class:    JAMES E. HUGGETT, ESQUIRE
                           MARGOLIS, EDELSTEIN
                           570 South Madison Street
                           Suite 102
                           Wilmington, DE 19801


For the Plaintiff Class:   RENE' S. ROUPINIAN, ESQUIRE
                           OUTTEN & GOLDEN, LLP
                           3 Park Avenue
                           29th Floor
                           New York, NY 10016

For the Plaintiff Class:   MARY OLSEN, ESQUIRE
                           THE GARDNER FIRM
                           1119 Government Street
                           P.O. Drawer 3103
                           Mobile, Alabama  36652

3

1                    I N D E X

2                         PAGE

3      Review of Agenda items        18

                          Colloquy                          4

 1                    (Hearing in Session)

 2              THE CLERK:  All rise.

 3              THE COURT:  Please be seated.

 4              MR. BRADY:  Good morning, Your Honor.

 5              THE COURT:  Good morning, Mr. Brady.

 6              MR. BRADY:  Robert Brady on behalf of American Home

 7   Mortgage.  Your Honor, there were some in courtroom who

 8   believed it might be helpful if we started today with the

 9   status report the Court requested.

10              THE COURT:  Very good.

11              MR. BRADY:  That helps provide I think some context

12   for some of the matters that are on for today, but Your Honor

13   did request a 105(d) status conference at the last hearing.  So

14   I prepared a number of updates for the Court, and, of course,

15   we're available if the Court has specific questions in addition

16   to what I've put on the record today.

17              Beginning with the DIP, Your Honor, just a few weeks

18   ago, the balance under our DIP financing agreement was

19   $30.0 million.  We're please to report we have reduced that to

20   $4.0 million as we work to pay that off by its maturity date of

21   November 5th.  So we're on -- on schedule to pay off the DIP

22   prior to its maturity.

23              Your Honor asked what's left basically for the estate

24   to liquidate.  Running through the categories of assets, I

25   begin with the construction loans.  Your Honor may recall that

Colloquy                                                    5

1    the estate, in effect, purchased B of A's security interest in

2    certain construction loans with a UPB of $30.5 million.  I'm

3    pleased to report we've realized more than $19.0 million on

4    those sales to date, and we have approximately $7.9 in UPB

5    remaining, and certain of those loans have gone through the

6    foreclosure process and are now real estate owned, and that's

7    another category of asset that the estate is pursuing.

8              Loans, Your Honor, when we began the case, the UPB on

9    all of the warehouse lines and under certain repurchase

10   agreements of loans was $4.6 billion.  Presently, we have

11   approximately $201.0 million of loans that are currently in the

12   estate.  That does not count the B of A loans, which

13   technically are still in the estate, but pursuant to the

14   settlement agreement, are under the control of Bank of America.

15             The loans have been -- the loan number has been

16   reduced as a result of payoffs, refinancing, compromises,

17   sales, or other transfers through settlements of agreements

18   between the parties.  Those categories of loans, we have

19   approximately 32 loans out of 5,700 that are owned by

20   non-debtor affiliates.  Those are the Broadhollow Melville

21   loans.  We've sold the vast majority of those, but there are

22   still 32 remaining, and we're evaluating options with respect

23   to those.

24             The unencumbered loan portfolio is down now to 1,150

25   loans constituting approximately $112.5 million in UPB.  Those

Colloquy                                                          6

1    are first and second loans, primarily seconds now.  We've sold

2    the majority of the first loans.

3            There are the loans that are subject to the J.P.

4    Morgan security interest.  That is now the subject, Your Honor,

5    of a stay relief motion filed by J.P.M.  It's also -- those

6    loans are treated under the debtor's proposed Chapter 11 plan.

7    so the issue with respect to the J.P.M. loans will play -- play

8    out over the next couple months.

9            We did a performing loan sale to Vantium.  There are

10   ten loans remaining that did not go in that sale.  We're also

11   reconciling various hold backs.  Similarly, we completed a non-

12   performing loan sale to Beltway, and there is about $800,000 in

13   hold backs under that sale agreement that we're continuing to

14   reconcile.

15           One of the major assets that remains, Your Honor, is

16   the bank.  The bank is part of holdings.  We are in advanced

17   negotiations with a perspective purchaser.  As you can imagine,

18   the sale of a bank is a very highly regulated process.  We've

19   had a number of interested parties come through the process,

20   and after feedback from the OTS, the Office of Thrift

21   Supervision, those potential bidders have decided not to pursue

22   the purchase.  We are cautiously optimistic that the current

23   bidder will obtain the necessary regulatory approvals and will

24   complete the negotiations to have the bank sold.  That process,

25   however, will take at least another several months based on the

Colloquy                                              7

1    regulatory issues.

2            The debtors are working with the committee and

3    evaluating their options to extract value from the bank prior

4    to any closing of the sale as another means of getting assets

5    into the estate.

6            REO, Your Honor, under the Bank of America compromise

7    with the committee, approximately $16.9 million in UPB of REO

8    became property of the estate unencumbered.  So we'll work to

9    liquidate that REO.  The estate has unencumbered REO of

10   approximately 255 loans with a UPB of $31.9 million, and as

11   part of ongoing disputes with JPM, JPM, there were -- there was

12   REO in its portfolio that there has been a dispute over whether

13   JPM properly perfected in that REO.  So that is another

14   potential asset of the estate, but JPM disputes the debtor's

15   contention that they may not have a perfected security interest

16   in that REO.

17           Restricted accounts, Your Honor, there remain a few

18   restricted accounts, because there are numerous parties

19   claiming ownership in the funds.  We've resolved a number of

20   those claims of ownership.  Bank of America claimed an

21   interest.  That has been resolved.  Calyon claimed an interest.

22   That has been resolved.  Natixis claimed an interest.  That is

23   the subject of an agreement in principle that we're working on

24   papering.

25           So we are currently attempting to evaluate any

Colloquy                                                    8

1    remaining interest holders in those funds.  We know the debtors

2    and Broadhollow both have an interest in those funds.  So as we

3    clear that up, we hope that certain of those restrictive

4    accounts will come into the estate.

5           Real property and FF&E, the debtors still own two

6    buildings.  One is their headquarters in Melville, New York,

7    and the other is a building in MS. TOVROV:. Prospect, Illinois.

8    We're currently negotiating APA's for both.  As Your Honor can

9    understand, the real estate market has not been very robust

10   over the last several months.  So sales of these rather large

11   buildings have been difficult, but we are close to a deal that

12   we would like to notice up as a private sale for the

13   MS. TOVROV:. Prospect building, and we hope to file that motion

14   within the next 20 days, and we expect to file a motion for the

15   sale of Broadhollow in the next 45 days.

16          The debtor continues to have residual interest in

17   certain securitizations.  Some months, those cash flow.  Some

18   months, they do not, but the debtors at this point have been

19   maintaining their interest in those securitizations and

20   obtaining cash flows from those and are continuing to evaluate

21   whether there is any other value to be achieved from those

22   securitizations.

23          Obviously, causes of action, Your Honor, in

24   particular, the debtor's Waterfield litigation where the

25   debtors believe their claims could be as much as $55.0 million,

                        Colloquy                         9

1    that is the subject of a proceeding that's pending in the

2    Southern District of New York.  That's being handled by the

3    Cadwalader firm on behalf of the estate.

4              THE COURT:  All right.

5              MR. BRADY:  Obviously, Chapter 5 causes of action are

6    out there, but at this point, the debtor has not investigated

7    those.  There may be some funds from a reinsurance facility,

8    Your Honor.  The debtor would have an interest to the extent

9    that the claims against those funds is less than the amount in

10   those entities.  So there may be some recoveries from the

11   reinsurance.

12             THE COURT:  Who's the insurer?  Do you know?

13             MR. BRADY:  I do not know.

14             THE COURT:  Okay.

15             MR. BRADY:  I could probably find out.

16                       (Pause)

17             MR. BRADY:  We'll get that information --

18             THE COURT:  Okay.

19             MR. BRADY:  -- for Your Honor.  There is a

20   $5.0 million surety bond currently held by Travelers.  The

21   debtors are in the process of working to file a motion to set a

22   bar date by which parties who would claim or make claims

23   against any of the funds secured by that bond would do so

24   absent which we would ask for the money back from Travelers.

25             We are investigating whether we have any causes of

1    action or setoff claims dealing with some relationships with

2    the FHA and HUD that may result in assets to the estate, and as

3    Your Honor knows, we've done a number of MSR sales over the

4    course of the case.  In each of those, there has typically been

5    a hold back related primarily to the return of complete loan --

6    complete loan documentation.  So as we complete the process of

7    returning files, we expect to get some money back under those

8    sale agreements.

9            That takes us to the status of document destruction.

10   Your Honor asked specifically that we address that today.  The

11   good news is, Your Honor, that the ACRC facility is virtually

12   empty.  Files do trickle in from ACRC as they complete their

13   cleanup of the facility, but our space has been cleaned out.

14   The bad news is Melville is now full.  We've been using our

15   Melville facility as temporary storage space as well as

16   bringing in some trailers and pods so that we can complete the

17   sorting process.  What the debtor is doing now is taking these

18   loans, putting them in piles for those that have been requested

19   under the procedure Your Honor approved, those that the debtors

20   are obligated to return under either sale agreements or prior

21   settlement agreements, and, of course, those that then would be

22   slated for destruction if they don't fall into either of those

23   categories.

24           We expect to have that full re-inventorying process

25   complete in the next four to five weeks.  Obviously, with a

1    sale of Melville hopefully soon, we need to clear Melville out,

2    and we're preparing to do that.

3         We have either delivered or are scheduled to deliver

4    up to 22 truckloads of documents of the parties who requested

5    those loan files, and as we promised the Court, before any file

6    will be destroyed, we're reviewing it again a second time to

7    make sure that it doesn't belong in a different pile before

8    it's destroyed.

9         We have had some delays.  Some of the issues relate

10   to our work with the servicer, the party who purchased the --

11   the servicing business.  We now need to work with them to

12   obtain some information.  That cooperation hasn't gone as

13   smoothly as we would have liked, but we're working through

14   those issues with the servicer.

15        Dealing with lease rejections, Your Honor, the debtor

16   has filed ten motions seeking authority to reject leases.  This

17   has encompassed hundreds of leases and executory contracts.  We

18   believe that we have covered all the leases and contracts that

19   should be rejected.  However, the plan -- to the extent we've

20   missed any, the plan does provide unless otherwise assumed and

21   assigned, all other contracts will be rejected.  So we'll clean

22   that up as part of the plan.

23        Claim reconciliation, Your Honor, a monster task.

24   There were 10,444 claims filed.  There were 4,985 claims

25   scheduled and not superceded by a filed claim.  The total

1    amount claimed against the estates is $17.36 billion.  We have

2    filed 17 Omnibus objections to date.  We've objected to

3    approximately 6,000 claims.  To date, we've reduced claims by

4    over $292.0 million.  That's 7.5 million in secured, 1.5

5    million in administrative, 59.0 million in priority, and 227.0

6    million in general unsecured claims.

7             Litigation, Your Honor.  There is still a number of

8    litigations pending before the Court.  There is the WARN Act

9    adversary.  That's actually the subject of a scheduling status

10   conference today.  So Your Honor will hear more about that.

11   There is the Bank of America adversary proceeding.  This

12   involved Bank of America, the entity and not the agent under

13   the pre-petition secured facility.  There is --

14             THE COURT:  I think we have argument coming up in

15   that, if I remember correctly.

16             MR. BRADY:  I think at this point based on what I

17   have in my notes, Your Honor, Your Honor granted in part and

18   denied in part I guess the motion to dismiss, and now Bank of

19   America's answer deadline is November 5th.

20             THE COURT:  All right.  I'm misremembering that.

21   Okay.

22             MR. BRADY:  Lehman -- the Lehman adversary,

23   Your Honor, that is out there.  Your Honor issued a ruling in

24   that.  We have sought a direct appeal to the Third Circuit, and

25   that's working its way through the process.

1          THE COURT:  How will that be effect, if at all, by

2     Lehman's case?

3          MR. BRADY:  We -- we are evaluating that this

4     morning, Your Honor, in light of the Lehman filing.

5          THE COURT:  And, I'm sorry.  Has that been certified

6     to the Third Circuit yet, or is the motion pending in the

7     District Court?

8          MR. BRADY:  It's still pending, Your Honor.

9          THE COURT:  Who has the case?

10          MR. BRADY:  I believe it's Judge Farnan.

11          THE COURT:  Okay.  Is there -- well, there was an

12     agreement, if I remember correctly, to dismiss the remaining

13     sort of stub piece so the entire case is on appeal.

14          MR. BRADY:  That's -- that's --

15          THE COURT:  Ok.

16          MR. BRADY:  -- my understanding, Your Honor.  There

17     is the Wells Fargo Bank interpleading action that is the

18     subject of cross-motions for summary judgment.  There was also

19     the related stay relief aspect of that Your Honor denied, and

20     that has been appealed, and that is scheduled for mediation

21     actually next Wednesday on the 17th.

22          There is the Triad adversary, Your Honor.  I'm

23     informed -- I'm not personally familiar with that, but I'm

24     informed that there may be an agreement in principle on that.

25     So there may be more coming on Triad that resolves that, and

1    again, the Waterfield litigation not pending here, Your Honor,

2    but pending in the Southern District, and again, the debtors

3    believe their claims could be significant there.

4         Other more recent litigation, we have the motion to

5    compel payment of the administrative claim brought by the

6    purchaser of the servicing business.  That too is the subject

7    of a status and scheduling conference today.  So Your Honor

8    will hear a little more about that, and as I alluded to

9    earlier, JPM has recently filed a motion for relief from stay.

10   So we'll be addressing that shortly.

11        Your Honor, we have filed a Chapter 11 plan and a

12   disclosure statement.  The debtors and the committee have been

13   in negotiations and discussions about that plan in earnest

14   really since early 2008.  It is a deconsolidated plan.  It is

15   -- we are not seeking substantive consolidation.  It

16   contemplates the creation of a plan trust to administer the

17   remaining assets.  Basically, the plan trustee will take off

18   with the debtors -- take up where the debtors leave off in

19   liquidating any remaining assets and dealing with claims and

20   the litigation.

21        There will be a plan oversight committee under our

22   proposed plan.  That will be made up either of current members

23   of the Creditors Committee or other unsecured creditors of the

24   debtor's estate.

25        One of the key components of the proposed plan,

1   Your Honor, is a settlement of intercompany claims.  Obviously,

2   given that it is not a substantively consolidated plan, we had

3   to deal with all the interdebtor relationships and issues.

4        We have proposed a comprehensive settlement of those

5   issues.  It deals with booked intercompany claims, imputed

6   intercompany claims, intercompany causes of action, allocation

7   of unpaid claims and expenses, ownership of shared assets, and

8   allocation of the future plan trust operating expenses.  That

9   has been the subject of significant negotiations with the

10  Creditor's Committee.  We hope to have them on board as the

11  plan indicates as a plan component.

12       THE COURT:  Is that -- you hope to have them on

13  board.  I take it that's why the disclosure statement was

14  continued or --

15       MR. BRADY:  Partially, Your Honor.  We continue our

16  -- to finalize our negotiations with the committee, and there

17  were a number of objections filed, and we have a fair number of

18  continuances.  I think the agenda shows about 26 objections

19  filed.  There is probably another ten parties that we're

20  negotiating with.  So a short extension was requested both to

21  complete our negotiations with the committee and to try to

22  resolve as many of those disclosure statement objections as

23  possible.

24       THE COURT:  All right.

25       MR. BRADY:  As indicated, the -- the plan would

1    provide for a transfer of assets.  All of the assets of the

2    estate, unless specifically dealt with otherwise, would go to

3    this trust.

4              Another key component of the proposed plan is dealing

5    with the EPD and breach of warranty claims.  We have proposed a

6    protocol that is very similar to the protocol that was used in

7    the New Century case, and it's meant to create a more

8    streamline process to try to liquidate these potentially large

9    EPD and breach of warranty claims.  So the plan provides for

10   that.

11             Timing, Your Honor, we have asked that the disclosure

12   statement be pushed back to October 2nd.  We do expect to go

13   forward on October 2nd, the next Omnibus hearing in the case,

14   on the disclosure statement, and if approved, we would

15   anticipate seeking confirmation in November.  We have two

16   hearings in November currently.  Both are before Thanksgiving,

17   and that is our -- our timetable.  The debtors hope to have

18   plan confirmation considered and approved before Thanksgiving

19   in November.

20             So with that, Your Honor, that is in a nutshell

21   what's -- what the debtor has been working on, what the

22   Committee has been working on and what's left, and again, we're

23   hopeful that we'll be able to resolve the remaining issues and

24   get a plan confirmed before the end of the year, and again,

25   hopefully before Thanksgiving.

```
                        Colloquy                           17
```

1          THE COURT:  All right.  Is there any guesstimate at

2     this point as to return for unsecured creditors?

3          MR. BRADY:  The plan does provide, again, by estate a

4     anticipated recovery.  I can refresh my recollection if

5     Your Honor wants to see the numbers.  The numbers are without

6     litigation.  So these numbers really anticipate the recovery on

7     what I would call the hard assets that remain in the estate,

8     and estimating recoveries under those and then the wildcard

9     on --

10          THE COURT:  Claims.

11          MR. BRADY:  -- distribution will be causes of action.

12          THE COURT:  Okay.  So you had 17.0 billion in claims,

13     and you've eliminated a quarter of a billion.

14          MR. BRADY:  So far.  So the -- by estate, the

15     recoveries range from a high of 5.8 percent down to a low of

16     .11 would be the lowest, again, by estate and with the wildcard

17     being litigation out there.

18          THE COURT:  Okay.  Any of the -- anyone else wish to

19     be heard in connection with the status conference?  Committee?

20          MR. INDELICATO:  Your Honor, Mark Indelicato from

21     Hahn & Hessen on behalf of the Committee.  While not thrilled

22     to have to get up after hearing what the projected

23     distributions are going to be, we are working with the debtor,

24     Your Honor, to finalize the terms of the plan.  There are a lot

25     of intricacies related to some of the procedures put in place

Colloquy                                    18

1    including the allocation, including the EPD and breach protocol

2    (phonetic), that we just need time to work through the process.

3            We're working in tandem with the debtor.  Hopefully,

4    we will get there, what will be a joint plan, and our goal is

5    that these will be the floors under which distribution will be

6    made.  We think once you get through the claims, the claims, we

7    may be able to even reduce them further than the debtor

8    anticipates, which will increase the distribution, and we're

9    hoping that some of the assets in which we have some modest

10   recoveries will turn out to be better than that, increasing the

11   returns to creditors.

12           So we agree with everything Mr.  Brady says, and

13   we're working to hopefully meet the timetable that they set

14   forth, because it's important for a number of reasons,

15   including to reduce the administrative burden.

16           THE COURT:  All right.  Thank you.  Anyone else?

17                     (No verbal response)

18           THE COURT:  All right.  Thank you, Mr.  Brady.  I

19   truly appreciate it, and I think at this point, we just go

20   through the agenda.

21           MR. BRADY:  And, Your Honor, Mr.  Beach is going to

22   handle that with some of my other colleagues. If I may be

23   excused, I will try to stop that administrative --

24           THE COURT:  All right.  Thank you very much.  Yes.

25           MR. BEACH:  Good morning, Your Honor.

Colloquy                                                    19

1          THE COURT:  Good morning.

2          MR. BEACH:  May it please the Court, Sean Beach from

3    Young, Conaway on behalf of the debtors.  Your Honor, we just

4    went through the status conference, which is item number 33.

5    Items number 1 through 12 have been adjourned, most of them to

6    October 2nd, some until October 22nd.

7          Item number 13 is a motion to compel filed by GMAC,

8    which has been withdrawn.  Item number 14 and 15 are the

9    disclosure statement and solicitation procedures respectively,

10   and Mr. Brady indicated, we have adjourned those until

11   October 2nd.

12         Item number 16 is a complaint by the Community

13   Development District or Administration.  Item number 17 is a

14   complaint by Natixis.  Item number 18 is a complaint by

15   American -- well, by the debtors against American Brokers

16   Conduit.  All of those matters have been settled in principle

17   subject to documentation and the debtors expect to file 9019

18   motions in connection with those matters.

19         Item --

20         THE COURT:  Are there -- are there scheduling orders

21   in place or -- do you know?

22         MR. BEACH:  Your Honor, I do not believe that there

23   -- no.  There -- there haven't been scheduling orders put in

24   place on those cases, but --

25         THE COURT:  All right.  Well, let's get -- oh, you

Colloquy                                        20

1    have it adjourned.  Okay.  You have it continued to the next

2    date.  That's fine.

3              MR. BEACH:  Yes, Your Honor.  Items number 19 through

4    24, Your Honor, certificates of no objection have been filed in

5    connection with those, and item number 25 is the first lien

6    foreclosures.  I suspect that --

7              THE COURT:  I'm pretty sure I signed 19 through 24,

8    although they may not be on the docket yet, and I'm going to

9    spend some significant time signing item 25 when you're done.

10             MR. BEACH:  As you do most hearings, Your Honor.

11             THE COURT:  All right.

12             MR. BEACH:  Item number 26, Your Honor, is an interim

13   fee application that somehow was missed for the agenda for the

14   last hearing or two hearings ago rather, and it's with respect

15   to Phoenix Capital's interim fees from October -- August 6th,

16   the petition date, through the end of December.

17             Your Honor, no formal objections have been filed with

18   respect to that fee request.  The U.S. Trustee had some

19   informal concerns regarding expenses, and Phoenix has agreed to

20   reduce the requested expenses by I believe approximately

21   $1,600.  That was reflected in the certification of counsel

22   that was filed.

23             Unless Your Honor has any questions, I do have a form

24   of order in connection with that.

25             THE COURT:  All right.  I don't recall seeing that,

Colloquy                                     21

1   but I'll --

2             MR. BEACH:  I think the certification of counsel just

3   indicated the change, and it was meant to be brought to

4   Your Honor's attention at the last fee app.  hearing and never

5   was.

6             THE COURT:  All right.

7             MR. BEACH:  May I approach, Your Honor?

8             THE COURT:  Yes.  You have the cert with you as well?

9   Okay.  Let me see that, if I could.  I may have gotten it this

10  morning.  Hang on.  I got some stuff this morning.

11            MR. BEACH:  Your Honor, the cert was actually filed

12  May 6th, and it again --

13            THE COURT:  Oh.

14            MR. BEACH:  -- I think it just reflects the

15  settlement with the U.S. Trustee, but I'll bring it up to

16  Your Honor.

17            THE COURT:  Yes, please.  Thank you.  What was the

18  nature of the services?

19            MR. BEACH:  Phoenix Capital worked in tandem with

20  Milestone in connection with a number of loan sales.  They were

21  -- and servicing right sales early on in these bankruptcy

22  cases.  I don't believe that they are currently doing any work

23  for the debtors, but they did a significant amount of work in

24  connection with servicing sale to the Wilbur Ross entity as

25  well as some of the WARN Act servicing sales.

Colloquy                                                    22

1        THE COURT:  All right.  Does anyone have any

2    comments?

3                   (No verbal response)

4        THE COURT:  I'll sign the order approving the amended

5    amount.

6        MR. BEACH:  Thank you, Your Honor.  Your Honor, item

7    number 27th is the -- 27 is the debtor's fifth Omnibus

8    non-substantive objection to claims, and I'd like to cede the

9    podium to Mr. Grow to handle that matter.

10       THE COURT:  Okay.

11       MR. GROW:  Good morning, Your Honor.

12       THE COURT:  Good morning.

13       MR. GROW:  Nathan Grow from Young, Conaway, Stargatt

14   & Taylor on behalf of the debtors.  Before we get to item 27, I

15   have a quick cleanup item.  The 13th Omnibus objection to

16   claims which was heard at the last hearing, as part of that

17   objection, the debtors objected to a claim of AT&T on the basis

18   of insufficient documentation, and prior to the hearing on the

19   13th Omnibus objection, AT&T requested additional time to

20   submit some more documentation, and the debtors agreed to

21   adjourn, but it was inadvertently left out of the order.

22       So I have a second order, form of order here --

23       THE COURT:  Okay.

24       MR. GROW:  -- confirming the objection, sustaining

25   the objection.

                          Colloquy                              23

1            THE COURT:  The only change is continuing the AT&T
2    matter?  All right.  I'll sign the amended order.  Thank you.
3            MR. GROW:  Okay.  And then also jumping back to
4    matter number 21 on the amended agenda was the 14th Omnibus
5    non-substantive objection to claims.
6            THE COURT:  Uh-huh.
7            MR. GROW:  As of the objection deadline for this
8    objection, the response deadline I guess I should say, the
9    debtors have not received any responses and none had been
10   docketed.  So the debtors filed a certificate of no objection.
11   Subsequent to that, a response was docketed.  So we withdrew
12   the certificate of no objection, and I have a revised form of
13   order for the 14th Omnibus non-substantive objection that
14   reflects one change that we made in response to this response
15   that we received.
16           THE COURT:  All right.  Carving out Hoffman
17   appraisal, I take it?
18           MR. GROW:  That's right.  We withdrew the objection
19   with respect to the claim of Thomas P.  Hoffman.
20           THE COURT:  All right.
21           MR. GROW:  I have a revised form of order here and a
22   blackline that I can hand up if I may approach.
23           THE COURT:  Yes, please.  Thank you.
24           MR. GROW:  So the only change made is with respect to
25   Mr.  Hoffman.

1                          (Pause)

2            THE COURT:  All right.  I'll sign the order.

3            MR. GROW:  Okay.  Matter number 27 on the amended

4    agenda is the debtor's fifth Omnibus objection to claims.  In

5    this objection, the debtor has objected to a claim filed by Sam

6    Hage on the basis that it was filed late.

7            Matter number 28 on the amended agenda is a motion by

8    Mr. Hage for an order deeming his claim timely filed.  The

9    debtors have worked with Mr. Hage's counsel and come to an

10   agreement as to a form of order approving Mr. Hage's motion

11   whereby Mr. Hage's claim will be allowed in part in the amount

12   of $100,000, $10,950 of which would be a priority claim.

13           Mr. Hage's counsel is -- is in the courtroom and I

14   believe in agreement with this form of order.  The Committee as

15   well, and unless Mr. Hage's counsel has any comments, I'd like

16   to hand up this form of order regarding Mr. Hage's motion.

17           THE COURT:  All right.  Does anyone wish to be heard?

18                      (No verbal response)

19           THE COURT:  No?  All right.  Silence is golden.

20   Thank you.  I'll sign that order.

21           MR. GROW:  Okay.  That brings us to matter 29 on the

22   amended agenda, which is a motion of Gil Alvarez for an order

23   deeming his proof of claim timely filed.  This motion was

24   actually filed some time ago, I believe in March.  Mr. Alvarez

25   only recently sent a notice -- notice of the hearing, sent a

Colloquy                                          25

1    notice to the debtors.  I'm not sure if he sent a notice to the

2    Court, because no notice was ever docketed.

3           The debtors have -- the debtors do not agree with all

4    of the statements made in Mr. Alvarez's motion.  However, the

5    debtors have chosen not to oppose this motion.  The debtors

6    wish to reserve all rights and objections or defenses with

7    respect to his claim.

8           THE COURT:  Other than the fact that it was late

9    filed?

10          MR. GROW:  Correct.

11          THE COURT:  All right.

12          MR. GROW:  I'm not sure if Mr. Alvarez or his counsel

13   is in court today but I don't believe he submitted a form of

14   order with respect to his motion.

15          THE COURT:  Mr. Alvarez, are you here, sir?

16          MR. ALVAREZ:  Yes, I am, Your Honor.

17          THE COURT:  Will you please approach the podium?

18          MR. ALVAREZ:  Good morning, Your Honor.

19          THE COURT:  Good morning.  Mr. Alvarez, the debtors

20   don't oppose your motion.  So an order will be entered granting

21   it.  However, you made the time and effort to come here, and

22   obviously subject to the debtor's reservation that they won't

23   necessarily agree with what you say, if you would like to say

24   your piece, you're more than welcome to do so, and if you

25   don't, that's fine as well.  I'm happy to listen.  It's up to

1    you.

2            MR. ALVAREZ:  Thank you, Your Honor.  There was just

3    one question that I had.  Mr. Brady this morning said that

4    there were files that were being destroyed.  I heard him this

5    morning saying that there were some files being destroyed, and

6    being that the debtors don't agree with all my allegations, I'd

7    just like to request that Your Honor tell them to safeguard any

8    files dealing with my interaction with American Home Mortgage.

9            THE COURT:  Well, the files being destroyed are loan

10   origination files, and most of them are loans that never went

11   to closing or are owned by other parties.  So whoever owns your

12   loan today has the documentation that they need that deals with

13   your loan.  Any questions you have with how your load is being

14   serviced, you know, taking payments, et cetera, taxes, escrows,

15   whether they're properly applying your principal or interest,

16   those will be monitored and saved by the entity that is serving

17   your loan, which is in all likelihood someone associated with

18   WLR Recovery, which was the party that last year bought that

19   business.

20           So unless Mr. Grow has anything further to say, I --

21   my understanding is that those -- or Mr. Beach -- that those

22   documents will be fully preserved.

23           MR. GROW:  That is correct, Your Honor.  I don't

24   believe that there is anything that Mr. Alvarez needs to worry

25   about in connection with those.  They're either at -- whoever

Colloquy                                           27

1   owns the loan currently at the servicer, or the debtors are

2   taking the appropriate steps in accordance with the prior order

3   to preserve documents.

4           THE COURT:  Okay.

5           MR. ALVAREZ:  Okay.

6           THE COURT:  Since you're representing yourself pro

7   se, Mr. Grow, can I ask you to submit under certification of

8   counsel a form of order and to work with Mr. Alvarez --

9           MR. GROW:  Sure.

10           THE COURT:  -- preferably after the hearing to kind

11   of make sure that you have each other's contact information and

12   that the order can be submitted in a timely manner.

13           MR. GROW:  No problem.

14           THE COURT:  Okay.

15           MR. GROW:  We can talk --

16           THE COURT:  Mr. Alvarez, any questions?

17           MR. ALVAREZ:  No.  That's it, Your Honor.

18           THE COURT:  Okay.

19           MR. ALVAREZ:  Thank you.

20           THE COURT:  So if you'll stick around until the end

21   of the hearing, Mr. Grow or someone else from the debtor will

22   speak to you.

23           MR. ALVAREZ:  Thank you.

24           THE COURT:  All right.  You're welcome.

25           MR. GROW:  Okay.  Your Honor, matter 30 on the

Colloquy                                              28

1    amended agenda is the debtor's 15th Omnibus substantive

2    objection to claims, which at the Court's request has been

3    adjourned.

4          THE COURT:  I apologize, but I just didn't have an

5    opportunity to have someone go through those files.  I have a

6    new law clerk.  I can't -- it's just not fair to ask him to go

7    through three binders or so.  So continue that to October 2nd.

8    I expect we'll be in a position to deal with that at that time.

9          MR. GROW:  Not a problem.  Continuing on the agenda,

10   I'm going to turn the podium over to my colleague, Sharon Zieg.

11         MS. ZIEG:  Good morning, Your Honor.

12         THE COURT:  Good morning.

13         MS. ZIEG:  Sharon Zieg of Young, Conaway, Stargatt &

14   Taylor on behalf of the debtors.  Matter 31 on the agenda is

15   the amended motion of American Home Mortgage Servicing, Inc.

16   related to a order granting the allowance and payment of

17   administrative claim for breaches of certain of -- by certain

18   debtors of the asset purchase agreement.

19         Mr. Winikke is also here on behalf of American Home

20   Mortgage Servicing, Inc.  If I may, Your Honor, what the

21   parties have decided to do with your permission is to request a

22   hearing from you the first couple -- in the first couple of

23   weeks of December.  We estimate that a hearing on this matter

24   at the very most will be three days.  We thought it was -- out

25   of an abundance of caution, to ask for three days was the best

1     way for us to approach this matter.  We certainly hope that it

2     does not take three days, but if we could request three days of

3     your time some time in the first two weeks of December, once we

4     have that date from the Court, we would move backwards and try

5     to establish an agreed upon scheduling order that we would then

6     submit to the Court.

7              I also wanted to caution that although we all believe

8     we can get this matter resolved and ready for trial by the

9     first two weeks of December, there is a possibility that the

10    parties will come back and request a continuance of that

11    hearing.

12             THE COURT:  Okay.  Yes, sir.  This is the -- this is

13    the admin motion, 31.  Yeah.  Okay.

14             MR. WINIKKA:  Your Honor, Dan Winikka, Jones, Day on

15    behalf of American Home Mortgage Servicing, Inc., which was

16    formerly known as American Home Mortgage Acquisition Company

17    and the purchaser of the debtor's servicing business.  I just

18    wanted to add, Your Honor, just so you had just a little back

19    of background here.  You may or may not have had a chance to

20    look at the pleadings, but these are a variety of claims for

21    breach of the asset purchase agreement, and some of these

22    claims involve a substantial number of transactions.

23             For the most part, Your Honor, these claims were all

24    discovered after the final closing in connection with the

25    reconciliation of the cash flows of the business between the

1    initial economic closing and the final closing.  We have,

2    Your Honor, retained Alvarez & Marsal to evaluate the books and

3    records relating to certain of these claims and the

4    transactions and then to quantify and document those

5    transactions, and just one thing I wanted to make Your Honor

6    aware of is, you know, we believe that ultimately, the facts

7    underlying a lot of these transactions, at least we're hopeful

8    will be largely undisputed by the time we get to trial in this

9    matter, but because they involve such a substantial number of

10   transactions and documents, to kind of facilitate that process,

11   we -- we did reach an agreement with debtor's counsel and then

12   subsequently with the UCC's counsel to have Alvarez communicate

13   directly with the debtor's consultants at Kroll and also the

14   Committee's consultants, BDO Seidman, about these transactions,

15   walk them through what Alvarez has done and the supporting

16   documentation.

17         That process is underway, and we've agreed that all

18   those communications would be considered confidential

19   settlement communications with the idea that, you know, the

20   parties would work to see to the maximum extent what agreements

21   can be reached just with regard to the underlying -- underlying

22   facts.

23         So I wanted to make Your Honor aware of that as well,

24   and as Ms. Zieg mentioned, kind of, you know, the one caveat

25   here is because that process is not quite concluded yet, we

1    have received discovery requests from the debtors.  We've

2    agreed to get our discovery requests out to them this week, but

3    the discovery requests we receive are fairly broad, Your Honor,

4    and I think without some kind of an agreement to focus that, it

5    would be difficult to get that done, if not impossible, before

6    December, but we did have a conversation about that, and I

7    think we have some general understandings on how to focus that

8    so the parties can be prepared and get through this and ready

9    for December.  So I just wanted to mention that -- that caveat.

10          THE COURT:  All right.  Do we need -- do we need a

11   scheduling order, or do you think you can work through

12   discovery without it?

13          MS. ZIEG:  I think the idea was that once you

14   provided us with a trial date, that we would try to come up

15   with an agreed upon scheduling order --

16          THE COURT:  Okay.

17          MS. ZIEG:  -- and submit to you at the next hearing.

18          THE COURT:  All right.  Any days that don't work?

19          MS. ZIEG:  No, Your Honor.

20          THE COURT:  All right.

21          MS. ZIEG:  Considering we're asking for three days,

22   we're trying to be very, very flexible.

23                         (Pause)

24          THE COURT:  Yeah.  All right.  All right.  I'll give

25   you -- yeah, December 9th, 10th, and 11th.

Colloquy                                      32

1          MS. ZIEG:  Okay.

2          THE COURT:  I'll book the day.  There are some cases

3     scheduled for that day, but they're very inactive cases.  So I

4     don't expect that they'll be any issues with that.  We'll worry

5     about the exact timing of it when we get closer --

6          MS. ZIEG:  Okay.

7          THE COURT:  -- but I'll reserve the balance of the

8     day, and then I'd like a -- I am going to want a pretrial

9     statement which -- along the lines of what my standing pretrial

10    statement is in my adversary proceedings, and if I could get

11    that by December 1.  That would be end of the day December 1.

12    Well, let's see.  That's thanksgiving weekend.  December 2 will

13    be fine.  I don't want people to have to work over the weekend

14    unless they have to.

15         MS. ZIEG:  We will include that in the scheduling

16    order --

17         THE COURT:  Yeah.

18         MS. ZIEG:  -- and hopefully, we'll stay on target for

19    that date.

20         THE COURT:  Okay.

21         MS. ZIEG:  It would all -- it will all depend on how

22    many facts that we can agree on.

23         THE COURT:  Obviously, I'd appreciate knowing sooner

24    rather than later if you're going to have to slip, because I'm

25    sure I'll have people asking for dates as we get closer.

1             MS. ZIEG:  Okay.  Thank you, Your Honor.

2             THE COURT:  You're welcome.

3             MR. WINIKKA:  Thank you, Your Honor.

4             THE COURT:  And we have a pretrial conference in

5        Kotch, et al.

6             MR. GROW:  Yes, Your Honor.  The -- item number 32,

7        which is the last item on the agenda today is with respect to

8        the WARN litigation.  I'd like to cede the podium to Mr. Holt

9        to address that matter.

10             MR. HOLT:  Good morning, Your Honor.  Scott Holt on

11        behalf of American Home Mortgage.  Your Honor, this is the

12        adversary complaint that was brought by a number of former

13        employees of American Home Mortgage alleging violations of the

14        WARN Act.

15             There has been a class -- previously certified that

16        we estimate to be approximately 2,300 former employees in that

17        WARN -- under that WARN Act claim.  There was also an amended

18        complaint brought, Your Honor, back in May of this year under

19        the California Labor Code, such -- a mini WARN Act on behalf of

20        a number of employees of that one facility that were laid off

21        in that state.

22             THE COURT:  Uh-huh.

23             MR. HOLT:  The purpose of the hearing, Your Honor,

24        obviously was to -- to pick a trial date and to get a pretrial

25        conference date and to address other issues, and I believe that

1    plaintiff's counsel will be having a revised class

2    certification order which will essentially create the class for

3    the California claims.

4            Your Honor, the -- the debtors are -- believe it's

5    important to get a trial scheduled in this case sooner rather

6    than later, and as my colleague, Mr. Brady, had said before, I

7    believe it's the debtor's intentions to get a plan confirmed

8    some time prior to bankruptcy -- excuse me -- to Thanksgiving,

9    and although I'm not a bankruptcy lawyer, Your Honor, I'm an

10   employment attorney, my understanding is that the sooner that

11   we get that plan confirmed, the better it's going to be for

12   everybody involved, and this adversary --

13           THE COURT:  Well, resolution of this adversary

14   proceeding is not a condition to confirming the plan.

15           MR. HOLT:  And I understand that, Your Honor.

16           THE COURT:  All right.

17           MR. HOLT:  But it does present a fairly large

18   question mark, Your Honor, as far as liability for the estate.

19   obviously, the debtors take the position that we were not

20   required to give the 60 days advance notice to the employees,

21   that the layoffs were really a result of an unprecedented

22   meltdown of the industry and that we had acted in good faith.

23   Plaintiffs, of course, are taking the position that we should

24   have provided that 60 days advance notice back in June of 2007,

25   but with this large class of individuals, I mean, the liability

1    is anywhere between 0 and $30.0 million plus, and with that big

2    question mark, at stake, we believe it's important to try to

3    get a resolution of those issues prior to confirmation, if at

4    all possible.

5          Now, I know that the plaintiffs are going to in

6    addition to asking for a revised class certification or ask for

7    additional discovery time.  In this case, currently, the

8    discovery cutoff under the Court's amended scheduling order is

9    October 24th of this year, and the adversary has been pending,

10   Your Honor, for at least a year, and as I said, the Court has

11   already granted one extension, but the issue becomes I think

12   what the plaintiffs are saying is they had a lot of documents

13   to review in this case, and there has been a lot of dockets

14   reviewed pursuant to E-discovery.  The parties agreed on the E-

15   discovery plan, did a agreement on various search terms to

16   produce those documents.  We have now produced those documents

17   in response to those requests, and the plaintiffs are currently

18   going through those, but we would still say that the Court

19   should hold the current discovery deadline at October 24th for

20   now and look to schedule a two to three-day trial some time

21   prior to the intended confirmation, which would be -- we're

22   looking at a trial date some time in the second -- first or

23   second week of November.

24         THE COURT:  I've got to tell you that's not

25   happening, but let me hear from the plaintiff.  Just from a

1  scheduling standpoint, I don't think I have the time.

2  Mr. Huggett?

3            MR. HUGGETT:  Good morning, Your Honor.  Jim Huggett

4  with Margolis, Edelstein.  Our firm has been certified as class

5  counsel.  I have co-counsel in the room.

6            Two short issues for your attention.  The first is we

7  do indeed have an agreed upon revised class certification

8  order.  I have a copy in front of me and shared a copy with the

9  committee which had intervened, and, of course, we agreed upon

10  it with the debtors.

11           I could file it under cert of counsel.  It occurred

12  to me I might just approach and hand it to you, and it's very

13  short and simple.

14           THE COURT:  Okay.  You may approach.

15           MR. HUGGETT:  Thank you, Your Honor.

16           THE COURT:  And it is agreed, I understand.  Yes.

17  Okay.  I'll sign it.  It's in there somewhere, right?  Okay.

18  let me have a look.  And there is a hand interlineation, and

19  that's acceptable?

20           MR. HUGGETT:  Yes, and I wanted to make sure I put on

21  the record what that was.  On May 28th, Your Honor had entered

22  a class certification order in there setting forth the nature

23  of the class, defining it, and so on and so forth, all of the

24  standard stuff that you would put in there.

25           All that this order that I've handed to you does is

Colloquy                                              37

1    make a couple of minor modifications to that.  I could walk you

2    through them.

3                 THE COURT:  That's all right.  It's not necessary.

4                 MR. HUGGETT:  Okay.  As long as Your Honor sees the

5    hand delineations.

6                 THE COURT:  Yep.

7                 MR. HUGGETT:  We're changing a 25-day notice period

8    to a 7, and we're --

9                 THE COURT:  Signed the order.

10                MR. HUGGETT:  Okay.  Thank you, Your Honor.  The

11   second thing -- then I'm going to turn the -- Rene Rouopinian

12   from the Outten and Golden firm is here.  She's also class

13   counsel.  There is a minor, soon to be blooming discovery

14   dispute.  I guess Mr. Holt alluded to it, and I'm going to turn

15   the parties -- turn the podium over to her to address that.

16                THE COURT:  All right.  Thank you.  Ms. Roupinian.

17                MS. ROUPINIAN:  Good morning, Your Honor.  Rene

18   Roupinian of Outten & Golden appearing on behalf of the

19   certified class.  Also, I believe I have co-counsel on the

20   phone, Mary Olson from the Gardner firm calling in from Mobile,

21   Alabama.

22                MS. OLSON:  Yes, Your Honor.  Yes.

23                THE COURT:  Good morning.

24                MS. OLSON:  Good morning.

25                MS. ROUPINIAN:  Your Honor, plaintiff's counsels

1   served discovery back in February of this year.  We were on a

2   dual tangent of seeking to resolve class certification and also

3   pursuing discovery on liability.

4        In April, we received some document production from

5   debtors.  I think it amounted to around 114,000 pages or so,

6   and we were told that the anticipated production would far

7   exceed that, and so the parties worked at resolving a series of

8   search terms to limit that production.  We had received -- in

9   May apparently, we received about 114,000 pages of documents.

10  Prior to that, we were around 7,000.

11       Because we anticipated more documents would be

12  forthcoming, in May, the parties agreed to extend discovery

13  from an end of July date to the October 24th date, which is

14  what is presently the -- the discovery cutoff date.  However,

15  Your Honor, five weeks thereafter, we received a half a million

16  pages of documents from debtor's counsel, and two weeks ago,

17  another 330 pages of documents.

18       So presently, we are --

19       THE COURT:  330 or 330,000?

20       MS. ROUPINIAN:  330,000, Your Honor.  So presently,

21  we're faced with a review of nearly a million pages of

22  documents so that we can then take on the task of noticing up

23  depositions.  Those documents have been coded.  We're in the

24  process of coding them, putting them on case vault so that we

25  can review them throughly and then reach an agreement as to

1    what witnesses we seek to depose.

2          I just learned today from Mr. Holt that there will

3    not be anymore documents produced in response to our document

4    request made back in February, but we are still waiting for a

5    privilege log.  We also served third-party subpoenas seeking to

6    depose those individuals or entities that expressed some

7    interest apparently in possibly purchasing American Home

8    Mortgage, and those deposition dates have not been firmed up.

9    We chose unilateral dates, but those depositions will have to

10   take place as well.

11         So we thought it reasonable to ask the Court and ask

12   debtor's counsel for a 60-day extension of the current

13   discovery cutoff date.  It's my understanding in speaking to

14   Mr. Holt this morning that -- that the debtors are not inclined

15   to grant that request necessitating our filing of a motion, but

16   we wanted to bring the issue before the Court sooner rather

17   than later.  We anticipate at the conclusion of the document

18   review taking approximately eight to ten depositions, four of

19   which would be third-party depositions, and also, the two

20   expert witnesses, the one named by the debtors and one by class

21   counsel.

22         THE COURT:  And that would all happen by the end of

23   the 60 days you're asking for, or are you asking for 60 days

24   extension of written discovery?

25         MS. ROUPINIAN:  No.  We're asking for a 60-day

1    extension of the current October 24th cutoff so that we can

2    conclude the doc review and the taking of depositions.

3              THE COURT:  And when would you like to go to trial?

4              MS. ROUPINIAN:  We would -- we anticipate,

5    Your Honor, we'd be able to narrow some of the issues before

6    the Court by -- by motion practice.  So we'd ask for some time,

7    an extension of the -- of the summary judgment cutoff as well.

8              THE COURT:  And when is that?  Do you know?

9              MS. OLSON:  I believe the deadline for dispositive

10   motions, Your Honor, is the 22nd of December, Your Honor, this

11   year.

12             THE COURT:  Any other issues for today?

13             MS. ROUPINIAN:  Excuse me, Your Honor?

14             THE COURT:  Any -- I'm sorry.  I just -- anything

15   further?

16             MS. ROUPINIAN:  No, Your Honor.  We -- we will be --

17   we have agreed to a shorter time period to get out class

18   notice, and we anticipate doing that by Monday of next week

19   allowing the 34-days for the class to opt out, and then we

20   would present the Court with a affidavit indicating who has

21   taken that --

22             THE COURT:  All right.

23             MS. ROUPINIAN:  -- option of opting out, would have a

24   finite class some time in October --

25             THE COURT:  Okay.  Thank you.

1          MS. ROUPINIAN:  -- or November.

2          THE COURT:  Mr. Holt?  All right.  Anyone else?

3    Mr. Beach?

4          MR. BEACH:  Your Honor, Sean Beach again for the

5    debtors, if I may.  While this trial does not, as Your Honor

6    pointed out, need to occur for a confirmation to occur, we

7    believe that an estimation hearing would -- would be required

8    in connection with confirmation, and we believe the same issues

9    in connection with such an estimation would be the ones that

10   you would need to address at a trial, and we believe it would

11   be a lengthy estimation hearing to deal with that issue, and so

12   some of what we had discussed with the committee was seeing if

13   we could dispose of the dispositive motion deadline all

14   together and go straight to trial in as expedited of a manner

15   as we could, because we thought it would be more efficient to

16   have trial before confirmation if that was at all possible.

17         I understand Your Honor is saying that November is

18   not -- not going to happen, but the debtors still would like to

19   address these issues as quickly as possible.

20         THE COURT:  Well, look, you produced a million pages

21   of documents.  You still haven't produced a privilege log,

22   which I'm sure will be extensive.  Is it fair given the amount

23   of production and the timing of production to force them to

24   trial and forego the dispositive motions deadline --

25         MR. BEACH:  Well --

Colloquy                                                    42

1        THE COURT:  -- to confirm a plan that ultimately just

2   transfers everything to a liquidating trust, which is going to

3   keep on doing what the debtors are already doing?

4        MR. BEACH:  I understand the -- the concerns that

5   were expressed by plaintiff's counsel.  They do have three

6   firms involved in this case.  They do have plenty of resources

7   they are devoting to this case.  They are making very large --

8   very large claim allegations.

9        THE COURT:  Well, where is your privilege log?

10  What's your timing on that?  How big is it?

11       MR. HOLT:  Your Honor, we'll have that produced by

12  Monday of next week.

13       THE COURT:  Well, where has it been?

14       MR. HOLT:  We've just produced the other documents

15  several weeks ago, Your Honor.  We're working on it --

16       THE COURT:  330,000 pages that you want them to read.

17       MR. HOLT:  Your Honor -- they're actually documents,

18  Your Honor, and it's a lot of e-mail discovery.  So when you

19  look at the number of documents, we estimate it's about 80 --

20  80,000 to 90,000 documents total that's been produced, pages --

21  you have some with just one e-mail on it.

22       THE COURT:  All right.

23       MR. HOLT:  And again, Your Honor, we agreed on the --

24  the search terms for that.

25       THE COURT:  All right.  I'm going to extend discovery

                        Colloquy                          43

1   and the dispositive motion deadline by 60 days.  I'd like you

2   to submit a revised scheduling order under certification of

3   counsel, and we'll have another status conference after the

4   disposition motions deadline to schedule trial.

5            MS. ROUPINIAN:  Thank you, Your Honor.

6            COUNSEL:  May we be excused, Your Honor?

7            THE COURT:  Yes.

8            COUNSEL:  Thank you.

9            THE COURT:  I think that's the end of the agenda.

10           MR. BRADY:  That is the end of the agenda, Your

11  Honor.

12           THE COURT:  Ok.  Thank you.  Hearing is adjourned.

13           MS. OLSON:  Thank you, Your Honor.

14                   (Court Adjourned)

15                    * * * * *

16              C E R T I F I C A T I O N

17       I, Maureen Emmons, court approved transcriber,

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22  _____    Date:

23  MAUREEN EMMONS

24  DIANA DOMAN TRANSCRIBING