## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) Jointly Administered |
| et al., | ) |
| | ) Re: Docket Nos. 2403 & 3324 |
| Debtors. | ) |

### OPINION[1]

CONNOLLY BOVE LODGE &
HURTZ LLP
Jeffrey C. Wisler
Christina M. Thompson
P.O. Box 2207
Wilmington, DE  19899

Attorneys for Northwest Trustee
Services, Inc.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
James L. Patton, Jr.
Robert S. Brady
Matthew B. Lunn
Margaret B. Whiteman
10000 West Street, 17th  Floor
Wilmington, DE  19801

Attorneys for the Debtors and Debtors
in Possession

OFFICE OF THE UNITED
STATES TRUSTEE
Joseph J. McMahon, Jr., Esquire
844 King Street, Room 2207
Wilmington, DE  19801

Attorney for Roberta A.
DeAngelis, Acting United
States Trustee

BLANK ROME LLP
Bonnie Glantz Fatell
David W. Carickhoff, Jr.
1201 Market Street
Wilmington, DE  19801

- and -

HAHN & HESSEN LLP
Mark T. Power
Emmet Keary
488 Madison Avenue
New York, NY  10022

Attorneys for the Official
Committee of Unsecured
Creditors

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

Dated:  October 31, 2008

Sontchi, J. _____

## INTRODUCTION

The issue before the Court is whether a professional retained under Section 327(a) of the Bankruptcy Code can nonetheless be reimbursed for expenses incurred by third-party vendors.  The Court finds that the professional can recover those expenses, provided that the professional becomes obligated to pay the venders was incurred post-petition, i.e., the professional's obligation to pay the venders arose post-petition even if the work was performed pre-petition.

The category of things qualifying as "expenses" seems easily explainable when the word is considered in the context of its common, everyday use. However, the category of items that qualify as "expenses" is unclear within the context of the Bankruptcy Code.  The Bankruptcy Code consistently uses the term "expenses," but leaves it undefined.  Moreover, several provisions of the Bankruptcy Code use the phrase "claims and expenses" in such a way as to raise the issue of whether the terms are different or one and the same.

The legal issues before the Court are (i) whether the terms "expense" and "claim" (as defined in section 101(5) of the Bankruptcy Code) are interchangeable; (ii) the types of "actual, necessary expenses" that qualify for reimbursement under section 330(a)(1)(B); and (iii) whether a professional

retained under section 327(a) is able to recover pre-bankruptcy petition expenses incurred by third-party vendors.

The Court finds that the terms "expense" and "claim" are distinct and that, notwithstanding the ability of a party to have a claim for pre-petition expenses, the only "actual, necessary expenses" capable of reimbursement under section 330(a)(1)(B) are those expenses incurred post-petition. Thus, the Court finds that a retained professional is able to recover pre-bankruptcy petition expenses incurred by third-party vendors if the professional became obligated to pay the vendors after the petition was filed.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

## STATEMENT OF FACTS[2]

### I.  Factual Background

On August 6, 2007 (the "Petition Date"), American Home Mortgage and its affiliates (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Prior to the Petition Date, the Debtors were in the business of originating mortgage loans.  The Debtors serviced these mortgage loans through American Home Servicing, Inc. ("AHM Servicing").  In the ordinary course of its business, AHM Servicing's business was involved in

---

[2] The essential facts of this case are undisputed.

hundreds of foreclosure-related proceedings throughout the United States.  To prosecute these foreclosures and perform other related services, AHM Servicing hired various professionals.

Northwest Trustee Services, Inc. ("Northwest Trustee") was among the professionals AHM Servicing hired pre-petition to perform foreclosures and other services.  Northwest Trustee provides its services to AHM Servicing for a "flat fee" plus expenses.  The expenses incurred in prosecuting a foreclosure ("Foreclosure Expense") vary according to state law.  Foreclosure Expenses include, but are not limited to, title reports, mailing costs, recording costs, notice posting, service of process and publication.  Northwest Trustee does not perform these services; it hires third party vendors to do the work for it.

In the foreclosure services industry, the standard practice is that Foreclosure Expenses are due from Northwest Trustee to the vendor providing the services only after the resolution of a foreclosure matter.  A foreclosure matter is resolved upon a foreclosure sale, reinstatement, satisfaction, negotiated workout, termination by the servicer, or bankruptcy.[3]  As the foreclosure process may span several months, the time period between when an individual Foreclosure Expense is incurred by a vendor and the time when Northwest Trustee owes that vendor for the Foreclosure Expense (i.e., when the foreclosure is resolved) may span several months.  The resolution of a foreclosure matter also

---

[3] Mailing costs are an exception to this general industry practice.  Northwest Trustee is required to pay mailing costs within thirty days of a monthly invoice issued by the third party mailing vendor.

allows Northwest Trustee to invoice AHM Servicing for both Northwest Trustee's flat fee and the Foreclosure Expenses.

Finally, the Debtors are directly reimbursed for Northwest Trustee's flat fee and Foreclosure Expenses upon the resolution of a foreclosure matter. That is, upon the resolution of a foreclosure, the party in possession of the real property at the conclusion of the matter (e.g., the mortgagee, the winning bidder at auction, etc.) pays the Debtors the balance of the mortgage plus the fees and expenses associated with the foreclosure.

Post-petition, the Debtors instructed Northwest Trustee to proceed with "business as usual." The Debtors also sought to retain Northwest Trustee so that it could continue to provide foreclosure services for the Debtors. Northwest Trustee understood that the Court would have to approve its retention and, if it were retained, it would have to file fee applications with the Court in order to get paid. Furthermore, Northwest Trustee understood that if it wanted to recover any amounts it invoiced the Debtors pre-petition, it would have to file a proof of claim. With input from Northwest Trustee, Debtors' counsel prepared an application to retain Northwest Trustee as a professional pursuant to section 327(e) of the Bankruptcy Code ("Retention Application"). With the Retention Application, the Debtors included a supporting affidavit. This affidavit did not contain any waivers, and none were requested.[4]

---

[4] While not a waiver, the affidavit did state that Northwest Trustee was continuing to review the Debtors' list of creditors, and that to the extent that the affiant, Mr. Hendricks (a Northwest Trustee employee), became aware of any additional connections or relationships that might have

The Office of the United States Trustee ("OUST") raised an objection to the Retention Application.  Debtors' counsel informed Northwest Trustee that in order to resolve the objection Northwest Trustee would have to provide additional disclosures and waive its pre-petition claim.  Debtors' counsel, with input from Northwest Trustee, prepared and filed a supplemental affidavit, which included the following language:  "[a]s of August 6, 2007, the Debtors owed Northwest Trustee $92,847.67 for prepetition services and fees . . . .  Northwest Trustee hereby waives the Prepetition Fee against the Debtors."  The $92,847.67 constituted the total due under Northwest Trustee's invoices issued to the Debtors for foreclosure services prior to the Petition Date.  The OUST also requested that the Debtors retain Northwest Trustee under section 327(a) rather than section 327(e).  The Debtors complied with this request.  In mid-September, 2007, the Court approved the retention of Northwest Trustee.  In the retention order, the Court found that Northwest Trustee was a disinterested person, that the Debtors could retain Northwest Trustee under section 327(a), and that Northwest Trustee "shall be deemed to have waived any and all prepetition amounts owed to them by the Debtors."

Thereafter, Northwest Trustee submitted invoices to the Debtors for Debtors' counsel to incorporate into fee applications.  In early November, 2007, Northwest Trustee received a letter from Debtors' counsel that provided the

_____

been relevant to Northwest Trustee's services rendered on behalf of the Debtors, he would file a supplemental affidavit.

foreclosure professionals with guidelines on the fee application process. The following statements were highlighted in the letter: "Your prepetition course of dealing with the Debtors' [sic] determines the allocation and accrual of fees," and "Dates for expenses should be related to the dates in which your firm is entitled to reimbursement. Generally, this should be when your firm makes payment to third parties."

Subsequently, a disagreement arose between Debtors' counsel and Northwest Trustee over whether certain Foreclosure Expenses were prepetition claims. As a result, Northwest Trustee retained its own counsel to assist it with the fee application process.

## II.  Procedural Background

In mid-December 2007, pursuant to sections 330 and 331 of the Bankruptcy Code, Northwest Trustee filed monthly fee applications for August, 2007 through October, 2007 and a quarterly fee application covering the Petition Date through October 31, 2007. In mid-March 2008, Northwest Trustee filed monthly fee applications for November, 2007 through January, 2008, and a quarterly fee application for November 1, 2007 through January 31, 2008 (collectively, these applications constitute the "Fee Applications"). The Debtors filed limited objections to each Fee Application in which the Committee joined. These objections did not dispute the  reasonableness of the fees requested in the Fee Applications or dispute that the expenses requested therein were both actual

and necessary.   Rather, the objections disputed Northwest Trustee's right to be reimbursed for certain requested expenses ("Disputed Expenses").

In mid-April, 2008, the Court convened a hearing on Northwest Trustee's quarterly fee applications and the limited objections.   At the conclusion of that hearing, the Court took the matter under advisement and requested post-hearing briefing.   The requested briefing is complete and this matter is ripe for decision.

### LEGAL DISCUSSION

## I.  The Terms "Expense" and "Claim" (As Defined In Section 101(5) of the Bankruptcy Code) Are Distinct, Though It Is Possible For A Party To Have A Claim For Expenses

Section 330 of the Bankruptcy Code authorizes compensation for services and reimbursement of expenses for officers of the estate.[5]   It also prescribes the standards on which the amount of compensation is to be determined.[6]   The provision of section 330 relevant to the matter at hand is section 330(a)(1)(B), which reads:  "After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to . . . a professional person employed under section 327 . . . reimbursement for actual, necessary expenses."[7]

It is significant that this section does not contain the word "claim." "Congress certainly knew how to use the word claim"[8] and could have used it in

---

[5] H.R. Rep. No. 95-595, at 329-30 (1977).

[6] *Id.*

[7] 11 U.S.C. § 330(a)(1)(B).

[8] *In re R.H. Macy & Co., Inc.*, 152 B.R. 869, 873 (Bankr. S.D.N.Y. 1993).

section 330(a)(1)(B).  Moreover, the language of section 507(a) demonstrates an intention to distinguish between "claim" and "expense" because it provides that "[t]he following expenses *and* claims have priority in the following order. . . ."[9]  If Congress intended both words to mean the same thing, then it would have used one word or the other, not both.

"Expense" is not defined in section 101 of the Bankruptcy Code. According to the canons of construction, the word should therefore be interpreted as taking its ordinary, contemporary, common meaning.[10]  The Shorter Oxford English Dictionary defines "expense" as the "[b]urden of expenditure; the charge or cost involved or required for something; in [plural form], the charges etc. incurred by a person in the course of working for another or undertaking any enterprise; the amount paid in reimbursement."[11]  In contrast, the Bankruptcy Code defines "claim" as follows:

> (A) [a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B)  [a] right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[12]

---

[9] 11 U.S.C. § 507(a) (emphasis added).

[10] *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 184 (2004); *Perrin v. United States*, 444 U.S. 37, 42 (1979).

[11] 1 Shorter Oxford English Dictionary 899 (6th ed. 2007).

[12] 11 U.S.C. § 101(5).

The plain language of these definitions demonstrates there is a difference between the two terms. One can incur charges in the course of undertaking an enterprise without having a right to payment or an equitable remedy arise for breach of performance. Conversely, a right to payment or an equitable remedy can arise without it being about the charges or cost involved or required for something.

The Court also recognizes that a party in a bankruptcy case may hold a *claim for expenses*. The legislative history and case law have construed the term "claim" to be as broad as possible to allow "all legal obligations of the debtor, no matter how remote or contingent . . . to be dealt with in the bankruptcy case."[13] Furthermore, "claims arise when . . . services are performed."[14] If a business advances cash for a nearly insolvent client while performing services for that client, these expenses will be included within the "claim" the business may assert against the client's estate should the client file for bankruptcy. The business may only recover these expended funds by filing a proof of claim with the court.

The Court also notes that a party may be able to hold a claim for post-petition expenses. Section 101(5) does not say a "claim" must be for a pre-

---

[13] Senate Report at 22, 1978 U.S. Code Cong. & Admin. News 5787, 5808; *see, e.g., Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 588 (1990) (language of definition shows "Congress' broad rather than restrictive view of the class of obligations that qualify as a 'claim' giving rise to a 'debt.'"); *United States Trustee v. First Jersey Securities, Inc. (In re First Jersey Securities, Inc.)*, 180 F.3d 504, 510 (3d Cir. 1999) (citing legislative history to confirm that claim includes all legal obligation, no matter how remote or contingent).

[14] *First Jersey*, 180 F.3d at 511; *see also In re Florence Tanners, Inc.*, 209 B.R. 439, 447 (Bankr. E.D. Mich. 1997); *In re Investment Bankers, Inc.*, 136 B.R. 1008, 1018 (D. Colo. 1989), *aff'd*, 4 F.3d 1556 (10th Cir. 1993).

petition "right to payment."  Furthermore, if "claims arise when . . . services are performed,"[15] parties performing post-petition tasks for the Debtor can assert a "right to payment" against the estate for their post-petition services.  These parties may not be "creditors" as that term is defined in the Bankruptcy Code,[16] but they nevertheless have some sort of "claim" or argument that the debtor should pay them for their work.[17]  These parties may not have to file proofs of claim with the Court, but they must at least file requests for payment in order to be compensated and recover their expenses.[18]  Until the Court awards such payment, the party can only argue that they deserve to be paid for their expenses – and such an argument would be that they have a "right to payment," or a "claim" for their services and expenses.

The OUST disagrees with this analysis.  It argues that the Bankruptcy Code uses the terms "claim" and "expense" interchangeably.  By way of example, the OUST cites section 1129(a)(9)(A).  That section refers to a "claim of a kind specified in section 507(a)(2)."  Section 507(a)(2) in turn refers to "administrative expenses allowed under section 503(b)."  Included in section

---

[15] *First Jersey*, 180 F.3d at 511.

[16] *See* 11 U.S.C. § 101(10) ("The term 'creditor' means . . . [an] entity that has a claim against the debtor that arose *at the time of or before the order of relief concerning the debtor*; . . . [an] entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or . . . [an] entity that has a community claim.") (emphasis added).

[17] Whether or not courts choose to award these parties compensation and expenses is a different issue entirely, but this issue is not important to this analysis.  The important fact is that a "claim" or something similar to a "claim" may arise if a party (whether employed under the Bankruptcy Code or not) performs services for a debtor post-petition.

[18] Fed. R. Bankr. P. 2016(a).

503(b) are expenses for "compensation and reimbursement awarded under section 330(a)."

The OUST's analysis fails to note that a party may be able to hold a claim for post-petition expenses. This ability helps explain why section 1129(a)(9)(A)'s "claim of a kind" language refers to "administrative expenses" in section 507(a)(2). The section requires Chapter 11 plan proponents to demonstrate that the holders of administrative expense claims will be cashed out on the effective date of the plan or that the claims will be otherwise resolved on terms acceptable to the holder of the claim.[19] In some Chapter 11 cases, parties employed under section 327 seeking administrative expense status for their compensation and expenses will not get paid until the Court approves the reorganization plan. Until the plan is confirmed, these parties only have a "claim" or "right to payment" of their compensation and expenses. Administrative expenses have priority over most other claims,[20] so these claim holders must be paid in full or receive consideration that is sufficient to the claim holder. It is this administrative expense claim and not an intention to use the words "claim" and "expense" interchangeably that gives rise to section 1129(a)(9)(a)'s language.

---

[19] *See generally* 11 U.S.C. § 1129(a)(9)(A).

[20] *See generally* 11 U.S.C. § 507(a).

## II. The Only "Actual, Necessary Expenses" Qualifying For Reimbursement Under  Section 330(a)(1)(B) of the Bankruptcy Code Are Those Incurred Post-Petition

Section 330(a)(1)(B) permits courts to reimburse the "actual, necessary expenses" of "a professional person employed under section 327."[21]  Section 327 only allows the employment of professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons."[22] To become disinterested, professionals need to waive their rights to any pre-petition claims they might have against the Debtor – including claims for pre-petition expenses.  Therefore, disinterested professionals can only recover post-petition expenses under section 330(a)(1)(B).  As a result, section 330(a)(1)(B) contains a presumption that any professional seeking reimbursement under it will be doing so for post-petition expenses.

Section 503(b)(2) makes the same presumption.  The section allows for administrative expenses that include compensation and reimbursement awarded under section 330.[23]  Any professionals seeking an administrative expense allowance under it will have waived their rights to claims for pre-petition expenses.  They can only seek an administrative expense allowance for post-petition expenses.

---

[21] 11 U.S.C. § 330(a)(1).

[22] 11 U.S.C. § 327(a).

[23] 11 U.S.C. § 503(b)(2).

A result of this presumption is that section 507(a) distinguishes between pre-petition expense claims and post-petition expenses.  Section 507(a) lays out the order of priority for certain claims and expenses.[24]  The only "expenses" referred to in the section are the administrative expenses of a trustee allowed under paragraphs (1)(A), (2) and (6) of section 503(b)[25] and the administrative expenses allowed under section 503(b).[26]  All other provisions of section 507(a) refer to "claims" of one kind or another.[27]  If administrative expenses can only be sought for post-petition expenses, any expenses incurred pre-petition can only be recovered by filing a proof of claim.

Northwest Trustee argues, *inter alia*, that it is significant that Congress chose not to use qualifiers in section 330(a)(1)(B), such as those in sections 503(b)(1)(a)(i) and (ii), limiting recovery for wages, salaries, commissions, and benefits "rendered after the commencement of the case" or "attributable to any period of time after the commencement of the case."[28]  However, the analysis above demonstrates that professionals seeking administrative expense allowance under section 503(b)(2) may only do so for post-petition expenses.

Furthermore, Northwest Trustee is not attempting to seek reimbursement under sections 503(b)(1)(a)(i) and (ii).  These sections address situations where it

---

[24] *See generally* 11 U.S.C. § 507.

[25] 11 U.S.C. § 507(a)(1)(C).

[26] 11 U.S.C. § 507(a)(2).

[27] *See generally* 11 U.S.C. § 507.

[28] 11 U.S.C. § 503(b)(1)(a)(i)-(ii).

is necessary to pay the wages, salaries, commissions, and benefits of a Debtor's employees as part of "the actual, necessary costs and expenses of preserving the estate."[29]   Prior to bankruptcy, Debtors distribute wages and benefits to their employees on a continuous basis.   As such, it is necessary to include the language "rendered after the commencement of the case"[30] and "attributable to any period of time occurring after the commencement of the case"[31] in order to distinguish post-petition salary payments explicitly made for the estate's benefit from the type of pre-petition payments described above.[32]

Northwest Trustee also highlights that payment of a professional's pre-petition fees and expenses under section 503(b) is not "per se disallowed."[33] Northwest Trustee is correct, but it has expressly stated it is not seeking allowance of a claim under section 503(b)(1), or under any other section of the Bankruptcy Code.  Therefore, the Court need not further address this section.

## III. Northwest Trustee May Recover The Disputed Expenses Under Section 330(a)(1)(B) of the Bankruptcy Code

As discussed in the factual background above, the time period between when an individual Foreclosure Expense is incurred by a vendor and the point in

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] For example, this language could have been intended to prevent the Debtor from distributing wages it owed to its employees prior to the Petition Date.

[33] *See In re Trans World Airlines, Inc.*, 1993 WL 559245 (D. Del. 1993); *Lebron v. Mechem Financial*, 27 F.3d 937, 945 (3d Cir. 1994)); *see also Randolph v. Scruggs*, 190 U.S. 533 (1902); 124 CONG. REC. H 11,094-95 (Sept. 28, 1978); 124 CONG. REC. S 17,411 (Oct. 6, 1978).

time when Northwest Trustee owes that vendor for the Foreclosure Expense (i.e.,
the resolution of the foreclosure) may span several months. Northwest Trustee
follows the standard foreclosure industry practice of paying Foreclosure
Expenses to its vendors only after the resolution of a foreclosure matter.
Moreover, in accordance with industry terms, neither the flat fee nor the
Foreclosure Expenses are billed to, *due from*, or paid by the Debtors until the
foreclosure matter is resolved.

The foreclosures at issue were commenced pre-petition but resolved after
the Petition Date. It follows that the Debtors become obligated to pay Northwest
Trustee for its expenses post-petition. Only then did Northwest Trustee pay
money to its vendors that could be considered "expenses" for which the Debtors
were obligated to compensate Northwest Trustee. The vendors may have
completed their services pre-petition, but the Debtors did not become obligated
to compensate Northwest Trustee for its expenses prior to the Petition Date since
the foreclosures were incomplete. At the very least, the Debtors did not become
obligated to pay Northwest Trustee for its expenses until Northwest Trustee
actually made expenditures, i.e., until it paid its vendors.

The only party against whom a pre-petition claim arose is Northwest
Trustee. Northwest Trustee was the sole party in privity with the third party
vendors. As such, Northwest Trustee was the only party obligated to pay the
vendors upon the pre-petition completion of their assigned tasks. The Debtors
may have been beneficiaries of the contracts between the vendors and Northwest

Trustee, but their status as beneficiaries is not enough to give the vendors rights to a pre-petition claim against the Debtors.  The Debtors became obligated to pay Northwest Trustee only after the foreclosures were complete and the vendors were paid.  Because these events occurred post-petition, Northwest Trustee did not have a contingent or unmatured pre-petition right to be reimbursed for its foreclosure costs.  It had no pre-petition right to payment whatsoever.

A similar analysis was followed in the case of *In re Montgomery Ward Holding Corp.*[34]  In that case, the debtor was obligated under a non-residential lease to reimburse the landlord for all tax expenses attributable to the leased premises.  The obligation to pay that reimbursement did not mature under the terms of the lease until after the entry of the bankruptcy order, although the landlord's liability for the taxes accrued in large part prior to the order.  The landlord petitioned the bankruptcy court for payment in full of the Debtor's tax reimbursement obligations pursuant to the lease under section 365(d)(3) of the Bankruptcy Code.  The Debtor took the position that all taxes attributable to a pre-petition period constituted unsecured claims.  However, the Court held that an obligation arises under a lease for the purposes of Section 365(d)(3) when the legally enforceable duty to perform arises under that lease.  Even though the landlord became legally obligated to pay the taxes prior to the petition date, it

---

[34] *Montgomery Ward*, 268 F.3d 205 (3d Cir. 2001).

was not until the landlord submitted invoices to the Debtor that the Debtor became legally obligated to reimburse the landlord for the taxes. [35]

The *Montgomery Ward* court recognized that the landlord's legal obligations to the tax collector were separate from the Debtor's obligations to pay taxes to the landlord. The triggering of the tax collector's right to payment from the landlord did not obligate the Debtor to pay taxes to the landlord pre-petition. Instead, a subsequent event in connection with the lease agreement triggered this obligation. Similarly, the post-petition actions of Northwest Trustee triggered the Debtors' obligation to pay the foreclosure services firm.

The only Disputed Expenses of Northwest Trustee incurred pre-petition are (i) the mailing costs Northwest Trustee had to pay within thirty days of the monthly invoices issued by third party vendors, and (ii) the expenses "actually incurred" for those borrowers who reinstated their loans prior to the date of invoice to the Debtors. Since these expenses were paid pre-petition, they should be considered part of a pre-petition claim for expenses that Northwest Trustee could hypothetically assert against the Debtor. However, the Court finds that Northwest Trustee waived its right to these particular expenses, as will be discussed *infra*.

The Debtors disagree with this analysis. They argue that Northwest Trustee became obligated to reimburse the Disputed Expenses as of the dates

---

[35] *Id*. at 211. *See also R.H. Macy*, 152 B.R. at 873 (holding that, because "[t]here was no [tax] obligation for the Debtor to perform prior to the Petition Date," the "obligation" to pay taxes under section 365(d)(3) arose post-petition).

identified on Northwest Trustee's invoices.  Each date corresponds to days in which Northwest Trustee either ordered services or had services performed.  Each date is also pre-petition.  The Debtors also note that a witness for Northwest Trustee testified that the Debtors are required to pay for foreclosure expenses even in the event the Debtors replace Northwest Trustee prior to resolving a foreclosure matter.

The dates on Northwest Trustee's billing invoices are irrelevant. Even if the dates were published after "the vendor had done everything it needed to do in order to fulfill its obligations," with Northwest Trustee "only . . . wait[ing] until the foreclosure[s] 'complete[d]' to invoice the Debtors," the relevant parties to the contracts in question were Northwest Trustee and its third party vendors. There are no pre-petition claims the vendors can assert against the Debtors.

The fact that the Debtors were required to pay for the Disputed Expenses in the event the Debtors replaced Northwest Trustee prior to resolving a foreclosure matter is also irrelevant.  If Northwest Trustee had been replaced pre-petition, it would have needed to pay its vendors, and therefore the Debtors' obligation to pay would have arisen pre-petition.  But this is not what has happened.  Northwest Trustee is still employed by the Debtors and the foreclosures were completed post-petition.  Therefore, Northwest Trustee's expenses were incurred post-petition.

The Debtors also argue that the Court's position confuses the concept of when an obligation is incurred with the concept of when payment is due for such

an obligation.  To support this, the Debtors analogize to *In re Valley Media*[36] and *In re Jartran*.[37]

The *Valley Media* case does not support the Debtors' arguments.  In *Valley Media*, the Court found that a vendor was not entitled to an administrative claim when the goods that it provided to a debtor on consignment were sold post-petition.  The Court reasoned that the vendor completed its performance (delivery of goods) pre-petition and the vendor could not elevate its claim because the vendor's right to payment (the sale of goods) occurred post-petition.  However, the claimant in *Valley Media* completed all of its obligations to the debtor pre-petition.  Northwest Trustee completed its foreclosures post-petition.  The only parties that completed their obligations pre-petition were the third party vendors, and they are not seeking to elevate their claims to administrative expense status.

The *Jartran* case also provides no support for the Debtors' arguments. In *Jartran*, the debtor, through its agent, contracted with Donnelly to obtain national advertising placement from publishers of the Yellow Pages™.  The pertinent terms of the debtor's agreement with Donnelly were: (i) Donnelly would arrange for the placement of the debtor's ads with different publishers; (ii) at a time certain, but before publication of each ad, the placement would become irrevocable, and Donnelly would become solely liable to the individual

---

[36] *In re Valley Media, Inc.*, 279 B.R. 105 (Bankr. D. Del. 2002).

[37] *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984).

publishers (the "Closing Date"); and (iii) Donnelly would issue the debtor an invoice after the advertisements themselves were published and the debtor and its agent were liable to Donnelly for payment.

The relevant issue before the court was whether Donnelly was entitled to administrative expense status for the ads for which the Closing Date occurred pre-petition (and for which Donnelly had fulfilled its obligation vis-à-vis the placement) but for which the publication occurred post-petition (i.e., for which Donnelly had not issued an invoice) (the "Gap Invoices").  The Seventh Circuit affirmed both the Bankruptcy Court and District Court and held that the services underlying the Gap Invoices were completed, and Donnelly's liability fixed, pre-petition.  Therefore, Donnelly's claim for the Gap Invoices was a pre-petition general unsecured claim.

*Jartran* can be distinguished from the case at bar in several ways.  First, the relevant Bankruptcy Code provision was Section 503(b), not Section 330(a)(1)(B).  Second, the *Jartran* debtor had not retained Donnelly as a professional under Section 327(a).  Third, the *Jartran* court noted that Donnelly did not allege that "Jartran, after the filing of the petition, requested that [Donnelly] continue work on ads for which the closing date had passed."[38]  Here, the Debtors affirmatively instructed Northwest Trustee to proceed as "business as usual."  These statements were made post-petition, and as such were made by the debtor-in-possession rather than "AHM Servicing" as it existed prior to filing for

---

[38] *Jartran*, 732 F. 2d at 586.

bankruptcy.   As noted by the *Jartran* court, "inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor."[39]   The court went on to say that,

> "[T]he reason that *inducement* of the creditor's performance by the debtor-in-possession is crucial to a claim for administrative priority is rooted in the policies that gave rise to the creation of the priority. Thus, administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization."[40]

Here, the Debtors' statements induced Northwest Trustee to continue providing services to the Debtors that were necessary for its reorganization.   In the final analysis, *Jartran* actually ends up hindering rather than helping the Debtors' attempts to avoid paying Northwest Trustee's expenses.

Finally, it should be noted that the Debtors do not dispute Northwest Trustee's assertions that the Disputed Expenses meet the "actual" and "necessary" requirements of Section 330(a)(1)(B).   The Court therefore finds that this requirement is met and that the parties cannot deny the requested award of reimbursement on this legal basis.

---

[39] *Id.* at 587 (emphasis in original).

[40] *Id.* at 588.

**IV. Northwest Trustee Did Not Waive Its Rights To The Disputed Expenses, With Certain Exceptions**

In the order approving its retention, Northwest Trustee waived "any and all prepetition amounts owed to them by the Debtors. . . ."[41]  The majority of the Disputed Expenses are post-petition expenses that may be reimbursed under section 330(a)(1)(B).  It follows that the language of the waiver does not encompass these expenses and therefore Northwest Trustee could not have waived its rights to recover these expenses.

Nevertheless, the language of the waiver does include the mailing costs and the expenses "actually incurred" for those borrowers who reinstated their loans prior to the date of invoice to the Debtors.  As discussed above, these expenses were paid pre-petition and should be considered part of a pre-petition claim for expenses.  Since Northwest Trustee waived all pre-petition amounts owed to it by the Debtors, the Court finds that Northwest Trustee has waived its rights to these particular expenses.  The Court further finds that Northwest Trustee's waiver of these expenses eliminates its status as a "creditor" of the Debtors.

For these reasons, the OUST's argument for judicial estoppel is unavailing.  Judicial estoppel is available if it can be established that "first, the party in question must have adopted irreconcilably inconsistent positions; second, the party must have adopted these positions in 'bad faith,' and third,

---

[41] Indeed, such a waiver was necessary for the Court to find Northwest Trustee to be a "disinterested party person." 11 U.S.C. §101(14) ("The term disinterested person means a person that – (A) is not a creditor ..").

there must be a showing that judicial estoppel is tailored to address the harm and that no lesser sanction would be sufficient."[42]

Northwest Trustee has not adopted inconsistent positions. It can waive its rights to all pre-petition claims against the Debtor while simultaneously seeking repayment of its post-petition expenses. These positions were not adopted in bad faith because there is no evidence that Northwest Trustee's averments in its pleadings reveal its knowledge of a pre-petition claim. There also is no evidence of any attempts on Northwest Trustee's part to hide such pre-petition claims while applying to act as a professional under section 327. Finally, there is no harm resulting from Northwest Trustee's arguments or its position in the case.

## V. Equitable Relief Is Unnecessary In This Case Because The Disputed Expenses Are Post-Petition Expenses Capable Of Reimbursement

In its brief, Northwest Trustee argues that if the Court finds that the Disputed Expenses were incurred pre-petition, then the equitable circumstances of this case warrant an award of reimbursement of the Disputed Expenses. However, equitable relief is unnecessary in this case because the Disputed Expenses are post-petition expenses capable of reimbursement under Section 330(a)(1)(B). Moreover, Northwest Trustee has not waived these expenses. It is therefore unnecessary to use the Court's equitable powers under Section 105(a) to grant relief to Northwest Trustee.

---

[42] *Chao v. Roy's Constr. Inc.*, 517 F.3d 180, 186 (3d Cir. 2008).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the terms "expense" and "claim" are distinct and that, notwithstanding the ability of a party to have a claim for pre-bankruptcy petition expenses, the only "actual, necessary expenses" capable of reimbursement under section 330(a)(1)(B) are those incurred post-petition.  The Court finds that Northwest Trustee may recover the Disputed Expenses under section 330(a)(1)(B), with the exception of the mailing costs and the expenses "actually incurred" for those borrowers reinstating their loans prior to the date of invoice to the Debtors.

Counsel for Northwest Trustee is directed to submit an order under certification of counsel.