UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
AMERICAN HOME MORTGAGE             .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware         .
corporation, *et al.*,             .
                                    .    Oct. 8, 2008 (9:42 a.m.)
            Debtors.                .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE CLERK: All rise.

2           THE COURT: Please be seated.

3           MR. BRADY: Good morning, Your Honor.

4           THE COURT: Good morning.

5           MR. BRADY: Robert Brady -

6           THE COURT: Before we get started, we will have to

7    take what I hope will be a very, very short break, 10 - 10:15

8    to deal with my 10 o'clock which should be resolved, but go

9    ahead.

10          MR. BRADY: Very well, Your Honor.  Let me just

11   begin, Your Honor, by apologizing for the confusion on the

12   start time of today's hearing.  Our original agenda said

13   9:30.  I looked back at my notes from the teleconference

14   which reflected 9.  We tried to file an amended agenda, but

15   it did create confusion, but I think by starting later it's

16   always better than starting earlier.

17          THE COURT: Right, well, I thought we moved it to

18   9:30 to accommodate the New York attorneys, but I don't

19   actually recall exactly.

20          MR. BRADY: With that, Your Honor, I believe first

21   on the agenda today is the motion for the formation of a

22   Borrower Committee so I yield to Mr. McCauley.

23          THE COURT: Okay, thank you.  Mr. McCauley, good

24   morning.

25          MR. McCAULEY: Good morning, Your Honor.  Thomas

1    McCauley on behalf of 11 different individual borrowers in

2    this case.  I'm here with Stephen Weisbrod and, Your Honor,

3    we've divided the argument - effectively the parties agree

4    that there's effectively a two-part analysis, one is the

5    statutory requirement of adequate representation or lack

6    thereof, and then second is the discretionary factors that

7    the Court might consider in addressing whether to appoint a

8    committee, and Mr. Weisbrod's going to take the first part,

9    if that's okay.

10          THE COURT: Yes, fine, thank you.  Are we going to

11   have evidence?

12          MR. WEISBROD: There will not be evidence, Your

13   Honor.

14          THE COURT: Okay, thank you.

15          MR. WEISBROD: Thank you for having me this morning,

16   Your Honor.

17          THE COURT: Good morning.

18          MR. WEISBROD: Stephen Weisbrod on behalf of the

19   borrowers from Gilbert Randolph LLP.  I'm also here with Ms.

20   Paula Rush who is represented on this matter but not on the

21   disclosure statement and Hunter Winstead who is an associate

22   with my firm.  We're here this morning because borrowers'

23   interests in estate property have not been adequately

24   represented.  That's reflected in the plan, in the disclosure

25   statement, and in the way that the parties involved in the

1    case have addressed potential third-party claims and other

2    claims to date.  The debtors and the Committee -

3            THE COURT: Well, let me stop you right there.

4            MR. WEISBROD: Yes.

5            THE COURT: Can you put some meat on your statement

6    just there, borrowers' interest in estate property.  Can you

7    tell me what that is?

8            MR. WEISBROD: As Your Honor will recall, we noted

9    eight different problems with the plan.  Of those eight,

10   seven relate specifically to how estate property will be

11   distributed in one fashion or another.  The eighth, which is

12   the only one that the debtor has since addressed, is the only

13   one that dealt principally with claims by the borrowers

14   against other entities.  The other seven are still problems,

15   and they all relate to the borrowers' interests in estate

16   property, how borrowers' claims on estate property will be

17   handled, how estate property will be distributed.  Let me

18   begin by noting the notice problem in the bar date.

19           THE COURT: Well, wait a minute, wait a minute.

20   Let's back up again.  What are the interests -

21           MR. WEISBROD: The interests -

22           THE COURT:  - that borrowers have in estate

23   property.  I'd like you to articulate that.

24           MR. WEISBROD: The borrowers have claims on estate

25   property because they allege that they have been victimized

1    as a result of torts and statutory violations.  So they have

2    an interest in getting paid out of the estate.  That's a

3    fundamental interest in estate property.  Now, it goes beyond

4    that because there are non-monetary interests in how the

5    estate will be handled that also matter, but I think even on

6    the narrowest definition, and we don't completely agree with

7    the U.S. Trustee on this point or the Committee that there's

8    a distinction between claims on the one hand and interest in

9    the estate on the other.  We don't agree with that

10   distinction, but even on the narrowest possible definition,

11   will you get paid out of the estate, the borrowers have

12   interests that are being adversely affected by this plan.

13   They also, of course, have interest in voting and being

14   properly informed.  They have an interest in making sure that

15   their payments out of the estate are properly weighted

16   compared to other creditors, by which I mean that even if the

17   borrowers' claims were fully allowed, if other claims that

18   shouldn't be fully allowed are in fact allowed, that

19   adversely affects borrowers' interest in the estate property.

20           THE COURT: Okay.  You can proceed.  Thank you.

21           MR. WEISBROD: The first and most glaring issue was,

22   of course, the notice issue.  The debtor and the Committee

23   apparently agreed that newspaper notice was sufficient, and

24   the debtor asserts that it was okay because they didn't know

25   that these claims existed.  Well, number one, it was pretty

1  obvious that a lot of claims were going to result because of

2  the large number of foreclosure proceedings.  They didn't

3  give individual notice to people involved in foreclosure

4  proceedings.  They didn't give notice individually to people

5  who had particular types of loans that very frequently

6  spawned complaints.  There had been even with the deficient

7  notice, 450 claims, but those people didn't all necessarily

8  get notice of the bar dates and other events in the case, and

9  as to the thousands of other borrowers there's clearly a huge

10  problem, and the debtors don't have a very good explanation

11  for this given that they had the names and addresses of all

12  these potential claimants.  On top of that, and we didn't

13  even know this until we read the debtors' pleading, but there

14  is an open letter to all borrowers on the debtors' website,

15  which was still there as of last week, that says, You won't

16  be affected by the bankruptcy case.  So there's actually not

17  only a failure of notice but a misleading statement made to

18  the world on this point, and that affects, obviously, a

19  borrower's ability to collect from the estate.  If they never

20  submit a claim, they won't collect.  The second point we

21  raised with respect to the plan is that the plan would

22  establish a conflicted trustee, and I'd like to list them all

23  first, and then go back to some individually because that's a

24  complicated issue, Your Honor.  But the point briefly about

25  how the trustee issue and the trustee issue affects estate

1    distribution is that the trust is going to be able to

2    determine claims and going to be able to decide whether to

3    prosecute claims either against borrowers or against others,

4    which would affect ultimately how much borrowers recover and

5    would affect what positions the trust is taking as to things

6    like the legality of particular types of mortgages or

7    particular transactions.  The third issue is the

8    classification issue.  That's a classic issue of borrowers or

9    any creditor who asserts that he or she has been improperly

10   classified, has an interest in the estate, and classification

11   bears on that directly.  The next issue we identify relates

12   to the treatment of financial institution claims.  This has a

13   number of elements to it.  Number one, how will defenses to

14   financial institution claims against the estate be addressed?

15   As we pointed out in our pleadings, Your Honor, every time

16   there is a borrower, a mortgagor, who says my mortgage was

17   originated improperly, illegally, in violation of TILA

18   (phonetical), there is a corresponding issue with the

19   financial institution claim.  When the financial institution

20   claim says, American Home, you've reached your warranty to me

21   that the borrower would pay, if the borrower has a valid

22   defense based on TILA and the financial institution knew it,

23   then the borrower's claim is the claim that should be paid

24   and the financial institution's claim should not be paid or

25   should at least be discounted, I mean, I think in practice

1    all of these claims will be resolved through settlement,

2    almost all, but the point is that these are factors that have

3    to be considered.  There is a matrix which involves a claim

4    form that financial institutions will fill out to request

5    money from an estate, payment on these types of claims, early

6    payment default and breach of warranty claims.  We haven't

7    seen that.  We don't know whether it will reflect borrowers'

8    defenses, and we don't know, ultimately, how the claims of

9    the financial institutions will interplay with the borrowers'

10   claims, and there's a big tension between who's going to make

11   these decisions and borrowers' interest here because

12   financial institutions will be the dominant force on the POC

13   and the Trustee will answer to them.  The next issue we point

14   out as one of the basic issues is equitable subordination,

15   and that hasn't been addressed, as far as I can tell, in any

16   of the pleadings at all, but it's a classic issue of priority

17   here which bears on borrowers' interest in estate assets.  If

18   there are some financial institutions whose claims should be

19   subordinated, subordinated either to borrower claims or to

20   all other unsecured claims, then that's an issue that will

21   affect how much each gets paid.  And again, that's something

22   that ultimately might be worked out in a settlement, but it

23   doesn't appear to have been addressed, at least not with any

24   input from borrowers.  The substantive consolidation issue is

25   the second to the last one that they haven't addressed, and I

1  think that there is a gut reaction to that, that, Hey, this

2  is an issue that affects all creditors in exactly the same

3  way.  After all, everybody is going to be subject to a plan

4  that will not involve substantive consolidation and will

5  resolve contribution claims according to a formula.  But that

6  may affect different types of creditors very differently.

7  For a bank that gets cross-guarantees from every single

8  debtor it may not matter.  The bank even may get potentially,

9  I don't know the facts, but could conceivably get a hundred

10  cents on the dollar even if other creditors weren't going to

11  get that if the bank had sufficient cross-guarantees from a

12  large net number of debtors.  The plan provides that no one

13  can get more than a hundred cents on the dollar, but that's

14  the cap.  If you are a borrower and have a claim against only

15  one entity, one debtor, then you're affected significantly by

16  the absence of substantive consolidation because you only get

17  potentially from that one entity unless you can pierce the

18  corporate veil, which is complex litigation that most

19  individual borrowers can't undertake by themselves.  So this

20  is an issue that can have a dramatically different affect on

21  borrowers and their recoveries from the estates even though

22  it theoretically treats everybody, in quote, "the same way".

23  The last point, which has not been fully addressed, is that

24  the plan dramatically affects how borrowers will prosecute

25  their claims, and the plan contains inconsistent provisions

1   on this, but I think it's important to go through it and see

2   just how dramatic this is.  First, as I mentioned, there's

3   the bar date issue, but then the trust mechanism is

4   labyrinthian from the pont of view of borrowers.  The

5   Trustee, apparently, gets to determine the claims, at least

6   according to Article 8(f)(5) - I can't read my writing,

7   (b)(11), I think it is.  The Trustee also gets to compromise

8   them.  There's no clear provision that says that this Court

9   will have a role in that, but there's another provision that

10  says that certain claims can be prosecuted - not clear if

11  that includes borrower claims, but if they're going to be

12  prosecuted they must be prosecuted in the Bankruptcy Court.

13  That's very difficult for borrowers in Oregon, North

14  Carolina, Ohio, et cetera, and that's not what you ordinarily

15  see outside of bankruptcy.  On top of that, the injunctions,

16  both the continuation of the automatic stay and the so-called

17  plan injunction, can have a very significant effect on

18  borrowers, and let me go through this, because I think at

19  first glance it may look like the debtors actually solved

20  this problem, but they didn't, and it's very important to

21  note how they didn't.  The effects of these injunctions and

22  automatic stay are very different depending on whether the

23  mortgage is currently still held by the debtors or whether

24  it's held by a purchaser from the debtors, someone who may

25  have purchased the loan through a 363 sale.  If the loan has

1    already been sold, then the so-called plan injunction

2    applies.  Nobody can sue, and there's no provision in the

3    plan for getting that injunction lifted, by Your Honor or

4    anyone else.  It's just flat out, nobody can sue.  If you

5    look at the redline you'll see that there is an exception to

6    that injunction.  A borrower can sue if the borrower is

7    subject to a foreclosure proceeding and if the foreclosure

8    proceeding was brought by a so-called protected party, which

9    means one of the debtors or the plan trustee.  So if the

10   foreclosure proceeding was brought by any of the many banks

11   that have purchased loans, the plan injunction as currently

12   formulated, does not allow a borrower to sue the trust.  It's

13   flat out prohibited, as I read it.  Now, if the trust still

14   owns the mortgages or if one of the debtors still owns the

15   mortgages, then there is a presumptive - then there is an

16   exception, that's in the plan injunction, so the plan

17   injunction is no longer a factor.  There's still the

18   automatic stay, that also is presumptively lifted, but the

19   deemed lifted language actually is not written in English.

20   It's hard to say what it does and what it doesn't do.  I'm

21   sure that's just a scrivener's error, and it probably can be

22   fixed, but even if it's lifted, the action can only be filed

23   in the United States Bankruptcy Court for the District of

24   Delaware.  So you've still got the problem that we addressed

25   in our initial pleadings, which is that borrowers are running

1    to court in Oregon, North Carolina, Ohio, Illinois trying to

2    prevent foreclosures and they also have to sue here.  That's

3    hard.  Now, Your Honor, that is not, as I emphasized, just a

4    matter of protecting borrowers' rights because they are

5    trying in these contexts to get money out of the estate.

6    They're trying to get non-monetary relief from the estate or

7    from the trust in the form, potentially of recession of the

8    loans.  So it matters to them and it's an interest just like

9    any other interest in estate property in the functioning of

10   these companies.  There's another problem, Your Honor, with

11   how the debtors' interest in getting their distributions are

12   handled.  If you notice, Your Honor, the plan provides for

13   interim distributions and then a final distribution and the

14   Trustee is supposed to reserve for that.  The financial

15   institutions will, presumably, get interim distributions.  A

16   claimant only gets an interim distribution if it's been

17   allowed.  The borrower claims won't be.  The financial

18   institution claims, at least the early payment defaults and

19   so on, will be presumably processed efficiently.  That's

20   unfair right there.  In addition, the Trustee is the person

21   who decides, the plan Trustee is the person who decides

22   whether the reserve is sufficient.  It's got to be, quote,

23   "reasonable" under the plan, but there's no requirement of

24   any kind of finding that the reserve is reasonable.  There's

25   no provision anywhere that establishes a process by which

1    that reserving has to occur, and nobody knows whether any

2    reserving will be done at all for borrower claims or if so

3    how much it will be.  The net result is that the estate may

4    be substantially out of money before borrower claims are even

5    liquidated, and all of this will be decided by the biased

6    Trustee operating under the supervision of the POC.  The

7    problems that I mentioned are also evidenced in the

8    disclosure statement, Your Honor, and we listed a litany,

9    most of those actually were addressed by other creditors as

10   well.  I want to focus on the ones that uniquely apply to

11   borrowers.  First, How will their claims be handled?  The

12   disclosure statement doesn't clarify the plan in any way.  No

13   borrower could look at that disclosure statement and have any

14   comprehension of how his or her claims would be handled under

15   the plan.  Second, Where are the loans?  No borrower is

16   currently finding out where the loans are, and that affects

17   how their claims with respect to the loans are treated,

18   because as I explained, the injunctions apply differently to

19   loans depending on whether they are loans currently held by

20   debtors or loans that have already been sold by debtors.  You

21   can't find out even if you want to.  The issue of the claim

22   form still hasn't been disclosed, to my knowledge, unless it

23   was disclosed very recently, and there's nothing in the

24   disclosure statement that explains how defenses to financial

25   institution claims will be handled, which are critically

1   important to borrowers as well as the financial institutions.

2   I may be mistaken, but I haven't seen a liquidation analysis

3   of any kind let alone one that would differentiate among how

4   borrowers' claims are going to be handled versus other

5   claims, and that's a real difference given the different

6   mechanisms for resolving these claims.  The Trustee isn't

7   identified, which is important to borrowers, and the effect

8   of intercompany claims on borrower interest is not explained

9   - the effect of the resolution is not explained.  So those

10  are among the most important ways why borrowers' interests in

11  the estate are not being adequately protected now.  And I'd

12  like to turn to why the Committee and the debtor are not in a

13  position to make it better.  Now, you wouldn't necessarily

14  expect a debtor to completely look out for borrower claims in

15  these interests because after all the borrowers are suing or

16  are filing claims against the debtor, but a Committee, you

17  might in some cases, but this case is a lot like cases

18  involving asbestos, breast implants, medical malpractice

19  claims against hospitals, all of these are types of

20  situations where multiple unsecured creditors have the same

21  priority but they have very different interests in how estate

22  assets are going to be handled and distributed.  And that's

23  why you so commonly see special committees appointed to

24  represent asbestos claimants, breast implant recipients,

25  physicians who performed the breast implant procedures in Dow

1    Corning, or in many hospital bankruptcy cases, malpractice

2    claimants.  Their view of how the assets should be handled

3    are fundamentally different, and you can see that, that

4    difference in perspective has permeated in this case.  We

5    quoted a couple of the remarks of Committee counsel about how

6    borrower claims are just efforts to get out of their

7    financial obligations, which I don't think is a fair way to

8    describe these claims at all.  I mentioned that the law firms

9    representing the Committee while excellent firms, I have no

10   quarrel with their abilities, their morality, their ethics,

11   anything else, but they aren't bank firms.  There's no way

12   that a firm - Hahn & Hessen is one of the most prominent bank

13   firms in New York.  I mean I've just put on a program for the

14   New York City Bar Association where I invited somebody from

15   that firm to talk about the bank perspective.  They're well

16   known in that area.  They're not going to look out for

17   consumer interests.  And you can see this then on how

18   particular disputes are going to be coming up in this case

19   and how the perspectives will be radically different.  Were

20   the mortgage terms legal?  Were the interest rates too high?

21   Should the mortgages be rescinded?  Are any other entities

22   palpable for fraud or other misconduct by the debtors?  All

23   these issues are bound to come up if this case is handled

24   properly and have to be addressed with borrower input,

25   sophisticated, well-represented borrower input.  And that

1    applies, of course, to equitable subordination and other

2    types of claims, and you can see what a difference it can

3    make just by looking at the First Alliance case where a

4    Borrowers Committee was appointed and there was a successful

5    prosecution of an aiding and abetting case against a major

6    creditor of the debtor in that case, Lehman Brothers.  Your

7    Honor, I think it's also important to address head-on this

8    issue of, Are these claims just personal claims by a few

9    individuals or is this really a major constituency?  At a

10   minimum we have 450, that's what the debtors report, 450

11   claims.  There may be thousands more.  They are generally not

12   represented in these cases at all.  In their claims in their

13   state courts, they're represented usually by Legal Aid

14   lawyers or small firm lawyers.  These are not people

15   represented by large malpractice or asbestos tort claimants

16   firms.  They can't do it on their own.  Paula Rush has done a

17   fine job especially advocating for the insertion of 363(o)

18   language, but on these issues that I've just been talking

19   about, *pro se* litigants can't do it, and I, therefore,

20   disagree with the suggestion in the Committee's papers and in

21   the debtors' papers that there has been gamesmanship or

22   somebody waited until an opportune moment to file this

23   motion.  Well, that's not what happened at all.  I think the

24   Court should know how this all came about.  It's really quite

25   remarkable that these borrowers are here at all.  It's not

1    that somebody waited or conspired to interfere with the

2    process.   In most cases, the Court knows, no borrowers came

3    forward and asked for a Committee.   It's really almost

4    happenstance.   I and my colleagues at Gilbert & Randolph

5    represent a number of housing organizations.   Zuckerman

6    Spaeder represents a number of attorneys general and housing

7    organization on *pro bono* matters, and in the course of casual

8    conversations we realized that there was this issue out here,

9    and over the last few months, we mentioned it to them and

10   eventually borrowers came to us.   They got signed up.   They

11   came to us in August and engaged us in August and September

12   to do this.   They're represented by Legal Aid lawyers, many

13   of whom have no experience at all in Chapter 11 cases.

14   That's why this happened, and it almost didn't happen.   You

15   had to get law firms willing to do this *pro bono*.   You had to

16   get law firms who knew how to handle - knew something about

17   Chapter 11, and you had to get the individual borrowers from

18   around the country to sign up if they were interested, and as

19   you saw, a dozen did sign up.   There have actually been 450

20   claims files, but that's not a conspiracy to derail the case

21   or persecute these institutions or this debtor.   That's just

22   how it came about.   It should be a surprise that it happened

23   at all.   It shouldn't be something that is held against

24   unsophisticated borrowers.   Your Honor, since there's so much

25   else to be done in this case, we're not saying that Your

1   Honor has to agree with all our plan objections and finds

2   that they are valid now or that that Your Honor has to find

3   that particular subjects have to be addressed in the

4   disclosure statement or that Your Honor has to find that

5   there should be equitable subordination claims.  We're merely

6   saying that these are real issues.  They affect the

7   borrowers' interest in the estate as well as the borrowers'

8   other interests, but they really do affect the borrowers'

9   interest in the estate and that affects where they live,

10   whether they can stay in their homes, et cetera.  With so

11   much left to be done here, we respectfully ask Your Honor to

12   appoint a committee and my colleague, Mr. McCauley is now

13   going to address the discretionary factors, Your Honor.

14      THE COURT: Thank you.  Just a moment, Mr. McCauley.

15         (Whereupon at 9:47 a.m., a recess was taken in the

16   hearing in this matter.)

17         (Whereupon at 10:12 a.m., the hearing in this

18   matter reconvened and the following proceedings were had:)

19         THE COURT: Thank you for allowing me to take a

20   break.

21         MR. McCAULEY: Absolutely, Your Honor.  For the

22   record, Thomas McCauley.  Your Honor, the second part of the

23   analyses, the burden of proof shifts to the parties opposing

24   the motion to demonstrate that the Court should not exercise

25   its discretion to appoint a committee.  In our motion, we

1    cited the Dow Corning case.  It's actually the Becker

2    Industries case out of the Southern District at page 949

3    where the Court says, quote, "The burden shifts to the

4    opponent of the motion to show that the cost of the

5    additional committee sought significantly outweighs the

6    concern for adequate representation and can't be alleviated

7    in other ways."  That's at page 949.

8              THE COURT: Uh-huh.

9              MR. McCAULEY: The discretionary factors that the

10   parties have put forth effectively I would consider as, one,

11   being the size and complexity of the case; two, being the

12   cost of an additional committee; three, being the added

13   complexity from another committee; forth being the timing of

14   the motion; and fifth the other avenues or the lesser

15   remedies that could be undertaken aside from appointing a

16   committee.   The Dow Corning decision, however, does

17   emphasize that the discretionary factors are merely

18   considerations and should not prevent the appointment of an

19   additional committee if the appointment is justified on the

20   facts.  Now, no one disputes here the first factor, the size

21   and complexity of these cases.  So, that favors the

22   appointment of an additional committee.  The second point is

23   the added cost, and certainly there would be some extra cost,

24   Your Honor, but the question is whether the cost that would

25   be added would significantly outweigh the concern for

1    adequate representation.  We don't think that's the case

2    here.  To date the estate professionals have racked up

3    significant fees in this case.  Debtors' counsel through

4    August has submitted fees in excess of 12.6 million.

5    According to the July monthly operating report for American

6    Home Mortgage Corp., which I understand is the primary debtor

7    in this case, they've paid out 37.7 million in professionals

8    fees in this case.  So, also you have to look at where we are

9    in this case.  We're not at the beginning of the case.  We're

10   at the end of the case or in the plan stage.  So, given that

11   first of all we've got a Borrowers Committee with a

12   relatively narrow focus, we're not looking to - the Committee

13   is not looking to touch on all issues in the case, the

14   Creditors Committee is for that purpose.  The Borrowers

15   Committee would be simply to focus on issues relative to the

16   borrowers.  Secondly, like I said, where this case is, the

17   assets have mostly been liquidated.  There's a plan on the

18   table.  It's just a question of addressing the notice and

19   other problems that we've raised in our papers and getting

20   this case to the finish line.  In our reply papers, we've -

21          THE COURT: Your issues with the plan, at least as

22   articulated, are fundamental; aren't they?

23          MR. McCAULEY: They are fundamental, but, Your

24   Honor, this is a liquidating case; okay?  I mean, it's not

25   rocket science, I mean -

1          THE COURT: Well, my point is simply you're saying

2    it's not expensive.  You seem to imply it's not expensive

3    because all you want to do is tweak the plan, but you want to

4    go beyond tweaking the plan.

5          MR. McCAULEY: I'm not saying we're going to be

6    tweaking the plan, but in consideration of what has gone on

7    so far in this case versus what needs to be done to the plan,

8    I don't view that as being a - we're not doubling the length

9    of this case by any means.  And in our papers we noted some

10   suggestions that we had, you know, how a counsel for a

11   Borrowers Committee could get to speed quickly without having

12   to sort of incur a lot of costs.  I mean, I will say that, in

13   having to jump in, in this case at this point, we had to get

14   up to speed somewhat already.  Also, the debtors talk about

15   the fact that there's a projected small distribution under

16   the plan.  Well, that doesn't equate to the idea that there's

17   a small pool of assets available for general unsecured

18   creditors.  I mean, there's a projected distribution of

19   pennies on the dollar but the reason for that is, the total

20   universe of general unsecured claims is in terms of billions

21   of dollars.  I mean, the projection is that there will be a

22   fairly substantial amount of assets available for general

23   unsecured creditors, and a small amount of added costs to

24   represent borrowers is not going to appreciably diminish that

25   projected return.  It's a little bit of math, but I -

1          THE COURT: I've got it.

2          MR. McCAULEY: Okay.  The third factor is the added

3     complexity in the case.  A Borrowers Committee doesn't add

4     complexity that is not already present in this case, and we

5     think a Borrowers Committee would add value in a number of

6     ways.  First, the Committee can institute litigation that

7     will bring value to the estates.  <u>First Alliance</u> is a great

8     illustration of that.  Second, the Borrowers Committee can

9     speak with one voice for borrowers.  I think that's in terms

10    of judicial efficiency, if nothing else, because instead of

11    having different parties raise complaints either before or

12    after confirmation, you have one voice speaking for

13    borrowers.  One voice can sit at the table with the debtors

14    and the Committee to address the plan issue.  There's an

15    efficiency that's a Committee would be able to bring to bear.

16    Third, in addressing plan negotiations and the structural

17    deficiencies with noticing the plan, whether or not you grant

18    this motion today isn't going to affect those problems.

19    They're still there, and we think that appointing a committee

20    allows borrowers to be properly represented so the issues can

21    be addressed between the parties and if necessary put before

22    the Court so everyone can address them in an informed manner.

23    I mean, we have no interest in prolonging the process and if

24    you look at borrowers, I mean, they're facing foreclosure.

25    They want immediate relief.  They don't want anything to drag

1   out either.

2          THE COURT: Well, is there anything a Borrowers

3   Committee could reasonably do in the short term to prevent

4   foreclosures?

5          MR. McCAULEY: You mean individual foreclosures?

6          THE COURT: Right.

7          MR. McCAULEY: You know it sort of depends on the

8   particular situation given whether - I mean, I know in this

9   case there have been a number of lenders who have loans that

10  were sold by the debtors to other folks coming in seeking to

11  lift the stay.  There's that issue, but there's also issues

12  of where the debtors actually still own the loans and BofA is

13  servicing them or something else.  So, I know I'm not

14  answering your question, but I don't necessarily have an

15  answer because it sort of depends on - I mean, obviously, a

16  Borrowers Committee is not going to address specific borrower

17  issues, just like a Creditors Committee doesn't address

18  specific claims, but if there are general borrower interests

19  that can be addressed by a committee that can facilitate

20  whether it's general issues affecting borrowers and those who

21  are potentially facing foreclosure, then that's something

22  that a Borrowers Committee could do.

23          THE COURT: All right.

24          MR. McCAULEY: Your Honor, the fourth issue which

25  obviously folks have made and specifically the debtors and

1   the Committee have emphasized is the timing of the motion

2   here.  The concerns that they raise and the cases that they

3   cite just don't apply here.  The Committee talks about that

4   the motion was filed solely to frustrate confirmation.  Well,

5   that's not the case.  The Committee's filed it to protect

6   borrower interests and to prevent the plan from frustrating

7   their interests.  Now, they cited a couple of cases, the

8   Cathar (phonetical) case, the Interco case.  Those are

9   distinguishable, those were reorganization cases.  In those

10  cases the interests were seeking the appointment of an

11  additional committee to adequately represent themselves.  As

12  the U.S. Trustee has realistically set forth in its

13  statement, that's not the case here.  This timing issue,

14  also, is colored by two concerns that no one has really given

15  an answer for.  One, is the lack of notice.  There was no

16  actual notice given to all borrowers in this case.  The

17  second concern is, what's the prejudice from filing the

18  motion at this time?  I mean, the cases talk about delay, but

19  delay in a legal concept really means prejudice, and no one

20  has articulated a material prejudice here that should cause

21  the Court to not grant this motion.  Now, the debtors talk

22  about that they gave notice, they gave notice to actual

23  borrowers who had actual or pending threatened litigation at

24  the time or prior to the time that they served the bar date

25  notice.  They argue that all the other borrowers are unknown

1  creditors.  Well, under the case law that's not what the

2  courts look to.  I mean, debtors - it's undisputed that the

3  debtors had all the addresses and what they're saying is

4  that, Well, we didn't know that these other borrowers might

5  have claims.  Well, the fact that they knew where they could

6  find these creditors is what the cases look to.  It's not

7  whether the knew whether or not they had claims.  Now, on top

8  of that they should have known that there were other borrower

9  claims out there.  There's a number of borrowers who have

10 appeared in this courtroom.  There are borrowers who have

11 asserted claims in lawsuits against the debtors during this

12 case and outside the case.  The debtors pushed unconventional

13 mortgage products on unsophisticated borrowers.  They've got

14 to expect that they're going to get some claims whether

15 they're claims based on the teaser rate interest or on the

16 payment arm options, they should have known, and the fact

17 that they published notice in the New York Times that's not

18 exactly going to provide constructive notice to consumers in

19 New York let alone all over the country, maybe in the New

20 York Post.  Now, I think the lack of notice affects the

21 timing issue, but as well, it also affects how the debtors

22 are not protecting the borrowers' interest in estate

23 property.  Now, the second point, as I said, was the lack of

24 prejudice.  I've emphasized this is a liquidating case and if

25 a claim is not addressed by the plan, that borrower has no

1    remedy.  So, in contrast to the incrementally increasing

2    costs, there's no reason to exclude a constituency in this

3    case, and if you weigh the balance of hardships it's not even

4    close in this case.  Finally, we don't think that there's any

5    lesser remedy that exists in this case.  Substantial

6    contribution is not an option and an informal Borrowers

7    Committee is not an option, and neither is adding one or two

8    borrowers to the existing Committee.  So for these reasons we

9    think the discretionary factors actually support the

10    appointment of a Borrowers Committee.  They certainly don't

11    outweigh the lack of adequate representation in this case,

12    and for these reasons we ask that the Court direct the U.S.

13    Trustee to appoint a Borrowers Committee in this case.

14         THE COURT: Thank you, Mr. McCauley.  Is there

15    anyone else who wishes to be heard in favor of the motion,

16    either in person or on the telephone?  All right, thank you.

17    Mr. Brady.

18         MR. BRADY: Good morning again, Your Honor.  Robert

19    Brady for the record on behalf of the debtors.  Let me begin

20    with the legal standard and the burden here.  I think it's

21    well settled, everyone agrees, that § 1102(a)(2) places the

22    question of the appointment of an additional committee within

23    the sound discretion of this Court and the case law is clear.

24    Appointment of an additional committee is an extraordinary

25    remedy that courts are reluctant to grant.  We cite to that

1   proposition in the <u>Garden Ridge</u> case, which cites <u>Sharon</u>

2   <u>Steel</u>.  Now, as a practical matter, Your Honor, I think it is

3   fair to say that there is a presumption in this jurisdiction

4   for the appointment of only one committee, and a party

5   seeking the appointment of additional committees bears a very

6   heavy burden.

7          THE COURT: Well, yes and no, and you can certainly

8   have an argument to distinguish this from the asbestos cases,

9   which are in many ways quite different, but it's routine to

10  appoint an asbestos claimants individual and often sometimes

11  a property damage committee in those types of cases.

12         MR. BRADY: And there is a key distinction there,

13  Your Honor.  In the <u>Dow Corning</u> case, the asbestos cases, in

14  those cases -

15         THE COURT: They're mass tort cases.

16         MR. BRADY: - the product the debtor manufactured,

17  there's really no dispute as to liability.  The question went

18  to damages.  So, the parties assumed if there was damage,

19  there was liability.  Here there is no *per se* agreement that

20  the product that the debtor sold was defective.  The question

21  is, were borrowers mislead or fraudulent induced to enter

22  into mortgages they couldn't afford or didn't understand.

23  And that is a case-by-case factual inquiry.

24         THE COURT: Well, that I understand and certainly

25  that's probably the legal answer, but is that the practical

1    answer given the extra judicial non-evidence in front of the

2    Court about what's going on in the real world in this country

3    and in this economy, Countrywide, what was the settlement,

4    9.8 billion earlier this week.  Certainly the political

5    environment is less than positive, and I understand these

6    weren't subprime loans, these were all-day loans but should

7    the Court consider not necessarily the legal intricacies but

8    perhaps the more practical intricacies involved?

9          MR. BRADY: Your Honor, there was no evidence to

10   that.  I mean, one point I want to make clear at the

11   beginning is, the borrowers have put on no evidence, and the

12   statements of counsel are really just that, and we've heard a

13   number of things, there may be thousands of claimants or

14   borrowers who are claimants, that the debtors systematically

15   engaged in fraud and illegal conduct, speculation that word

16   of the bankruptcy may have reached Wall Street but not Main

17   Street.  There's just no evidence before the Court, there's

18   no record before the Court.  There is the press, Your Honor,

19   and reports in the press that right now mortgage companies

20   are under fire.  There's the subprime debacle that has led to

21   - some speculate the current financial problems and economic

22   problems, but there's no evidence in the record today that

23   the debtors engaged in this systematic fraud and illegal

24   conduct.  Whether this a case-by-case, an isolated incident,

25   or whether this was system wide in the debtors, and there's

1    been no evidence today.  There's been no judgment by a court.

2    There has been no fact presented to lead the Court to believe

3    that this isn't a case-by-case, individual-by-individual -

4              THE COURT: Well, isn't a reply to that, taking the

5    last point first, there's been no judgment because the

6    automatic stay has been in place, and you've had very limited

7    relief from the automatic stay in some isolated cases.  Ms.

8    Rush may be one of maybe four or five stay relief motions

9    that have been entered to assert these types of claims as

10   opposed to foreclosure stay relief, and second, doesn't that

11   go to the adequacy of the ability for these people to

12   represent themselves.  In other words, isn't a committee

13   necessary for the borrowers to be educated and represented in

14   connection with prosecuting or asserting these potential

15   rights and claims?

16             MR. BRADY: I don't think so, Your Honor, and I'll

17   give you two examples where alleged creditors of the estate

18   operate in a bankruptcy system without an official committee.

19   The first is the securities claimants.  Securities class

20   actions are brought all the time.  Counsel is retained to

21   represent a class, and they participate in the bankruptcy,

22   Mr. Etkin's here today to comment on the disclosure statement

23   and the plan and to make sure that the plan in no way impacts

24   their ability to pursue -

25             THE COURT: All right, but there's a distinction

1    there.  First of all, there's a class.  Second of all,

2    there's a sophisticated attorney representing that class's

3    interest.  Here there is no class and there is no lawyer.

4            MR. BRADY: Exactly, Your Honor.  The borrowers want

5    all the benefits of a class without having established for

6    the Court that there is a class, that this is system wide,

7    that all borrowers suffered fraud or the majority of

8    borrowers suffered from fraud and misleading conduct.  They

9    want all the benefits of the class action without having

10   satisfied the ability to certify a class, and the borrowers

11   do have sophisticated counsel today.  I was very interested

12   to hear how it came about from counsel's perspective and

13   perhaps if we had evidence, we might have learned more when

14   the borrowers first consulted with bankruptcy counsel, but I

15   think by their own admission it was August even though this

16   motion wasn't filed until -

17           THE COURT: Well, one of the implications or the

18   representations to the Court is that this was a lawyer idea

19   and not necessarily a client idea.

20           MR. BRADY: I agree, Your Honor, that was clearly

21   the implication I took, and again, it sounds very much like

22   the class action securities situation.  The other example is

23   the Warren Act, Your Honor.  Employees who are terminated

24   with little or no notice, obtain counsel as a group, and

25   counsel for those Warren Act claimants participate in these

1    bankruptcies.  They have an adversary in this bankruptcy.

2    That counsel has no assurance of payment.  That counsel has

3    no estate funded payment.  That counsel is pursuing the

4    claims of a group of creditors, taking the risk that the

5    counsel will get paid, and they are pursuing their individual

6    claims against this estate based on alleged Warren Act

7    violations.  So those are two examples where groups of

8    creditors who may not have independent financial resources to

9    protect themselves are able to operate within the system

10   without the appointment of an official committee.  We think

11   that the borrowers really want the benefits of guaranteed

12   payment from the estate, paid by the other creditors of the

13   estate, and the advantages of in effect a class action being

14   certified without having established that there is a class.

15          THE COURT: Well, let's go back to a case you had

16   R&I where we had a Creditors Committee and an Equity

17   Committee.  Now, there was no - I think there was, actually,

18   a securities class in that case, but I may be mistaken.  In

19   either, it didn't really matter because the Equity Committee

20   was formed partly because (a) equity was in all likelihood

21   going to be in the money and (b) because they had disparate

22   claims that needed to be represented, and that case really

23   came down to the Creditors Committee and the Equity Committee

24   arm wrestling for four or five months to finally reach a

25   result where they could figure out how to deal with the

1    different payments to the different entities, and that was

2    well within the Court's discretion.  Now, I think it was

3    Judge Walsh that appointed that committee.  I wasn't onboard

4    at that point, and I don't know if the debtor opposed it or

5    not, frankly, I don't.

6            MR. BRADY: Your Honor, I was somewhat involved -

7            THE COURT: That was Mr. Nestor, yeah, right.

8            MR. BRADY:  - but not involved, but I think Your

9    Honor identified the key distinction.  Equity was in the

10   money and these were two groups, the Creditors Committee and

11   Equity that had -

12           THE COURT: Disparate.

13           MR. BRADY:  - disparate positions.  Here if the

14   borrowers are able to establish claims against this estate,

15   they would be general unsecured claims.  I don't think

16   there's any dispute about that.  Not entitled to priority,

17   not administrative, they would be general unsecured claims.

18   They have not been able to establish, either by evidence

19   because there is none, or by argument that their general

20   unsecured claims are any different than the general unsecured

21   claims of other creditors in the case.

22           THE COURT: Now, but they are treated differently.

23   Perhaps not in distribution, but in procedure in the plan.

24           MR. BRADY: Your Honor, again, there is a procedure

25   for EPD breach claims, and that procedure is based really on

1    the historical records of the debtors of when typically the

2    percentages of loans that were sent in portfolios would

3    either be subject to such claims or, you know, either EPD

4    claims or breach claims.  Again, here, there is no concession

5    on liability.  Your Honor may recall that Katisha Cawthorn

6    (phonetical) stay relief motion where the debtors' testimony

7    was they had very little involvement in the origination in

8    that loan.  Basically they funded.  A third party broker met

9    with Ms. Cawthorn, sold the product to her.  A third party

10   settlement agent conducted the settlement, and when the

11   debtors received verification from those two parties that all

12   the documents were in order, it funded the loan.  Now, Ms.

13   Cawthorn contends that she was misled in connection with that

14   loan.  It's the debtors' position that they had virtually no

15   involvement other than funding the loan.

16          THE COURT: But she also raised allegations

17   basically, negligent supervision of your agent.

18          MR. BRADY: Absolutely, Your Honor, and those on a

19   case-by-case basis are very factually specific.  There has

20   been no evidence that there was widespread fraud or illegal

21   activity at American Home Mortgage in the origination of

22   mortgages, that AHM sent brokers out to mislead the public.

23   It's the implication of the borrower motion, but there's no

24   evidence.

25          THE COURT: Understood.

1          MR. BRADY: So, Your Honor, as indicated by counsel,

2     the first step is to determine whether the borrowers are

3     adequately represented by the existing statutory committee.

4     And again, assuming that a borrower can establish it has a

5     claim against these estates, that bar would be an unsecured

6     creditor and we submit aptly represented by the Official

7     Committee.  There's no allegation that this Committee is not

8     operating or functioning properly.  There's no evidence that

9     they're not adequately protecting the interests of all

10    unsecured creditors.  Every subgroup of creditors, Your

11    Honor, would much prefer to have its own official committee

12    funded by the other creditors, argue for their own specific

13    issues, but that is not how the system works.  The Official

14    Committee acts as a fiduciary generally for all unsecured

15    creditors, not the Committee members.  There's been much made

16    about the makeup of this Committee yet there's no allegation

17    that the Committee has in any way preferred the rights and

18    issues of just their members.

19          THE COURT: Well, isn't that - I mean, the statute

20    says - maybe I'm not right, but generally speaking, isn't -

21    Yeah, here we go (b)(1), 1103(b)(1), "Committee of creditors

22    appointed under subsection (a) of this section shall

23    ordinarily consist of the persons willing to serve that hold

24    the largest claims - the set of largest claims."  Is it not

25    surprising and perhaps - first of all, it's not surprising

1    that there are no borrowers on the Committee.  Second, is

2    this perhaps a structural problem in these kind of cases with

3    how the statute is set up, which is perhaps why you see again

4    in the asbestos and mastoid cases a distinction and a

5    formation of official committees for those people or persons

6    in those kind of cases.

7         MR. BRADY: Well, I think it's fair to say, Your

8    Honor, the discretion for the appointment of the committees

9    first lies with the U.S. Trustee's Office, and I think our

10   Trustee's Office has a track record of looking beyond just

11   the largest creditors and often attempting to include

12   creditors from different groups.  For instance -

13        THE COURT: I agree.

14        MR. BRADY:  - landlords who may at the time of

15   formation not have a claim but may be subject to future

16   rejection are often given a seat on the Committee.  Again, a

17   very different position a landlord might have from other

18   creditors.  Other creditors may want to liquidate the estate

19   and get the most money.  A landlord may want to keep the

20   estate alive and keep a tenant.  That may be more important

21   to them.  Those are inter-creditor issues that exist in every

22   case.  The fact that the borrowers may want something

23   slightly different than the other unsecured creditors does

24   not create the situation where you have to appoint a separate

25   committee.

```
1               THE COURT: Well, but again, I mean, generally
2      speaking you have a case with a large bond claim out there,
3      $600 million of bonds, $200 million of trade, maybe some
4      landlords, and in my experience, back when I used to actually
5      be actively involved in forming these committees or trying to
6      get these committees formed and trying to represent the
7      committee, you would often see, for instances, three
8      bondholders, an indenture trustee, and three trade creditors,
9      and the indenture trustee would be neutral on all votes that
10     mattered, and the bonds and the creditors would hammer out a
11     solution which was often difficult, the trade and the bonds,
12     and really what moved the case along, but here there's nobody
13     on this Committee to represent the borrowers.  There's nobody
14     to hammer this out on the Creditors Committee, and again, I'm
15     not being critical of counsel but isn't there a fundamental
16     difference in how this could - what issues were brought
17     before the Committee for the Committee to hammer out and deal
18     with in taking their positions?
19              MR. BRADY: Well, again, Your Honor, there's no -
20              THE COURT: Your response may be that the borrowers'
21     claims are not material - or maybe not.
22              MR. BRADY: Well, there's no evidence that they are.
23     In other words, the borrowers have not come forward and given
24     the Court some idea of how much the claims may be in relation
25     to the billions of dollars of claims.  So, to that extent,
```

1   you're right, Your Honor, there is no evidence before the

2   Court that the borrowers as a group would represent a

3   statistically large group of creditors to warrant their own

4   committee, but the borrowers chose not to put on any evidence

5   on that point, but there's also no evidence that the

6   borrowers have taken their issues to the Committee and were

7   rejected or rebuffed by the Committee.  There's no evidence

8   that the borrowers have attempted to get the Committee to

9   press issues for them, and the Committee has refused.  That's

10  simply not in the record.

11          THE COURT: Well, let me ask you, I mean, how many -

12  Who's in charge at your firm of taking calls from borrowers?

13  Who is the poor person that's been dealing with that?

14          MR. BRADY: It's been several different attorneys,

15  Your Honor, based on either the hotline that was set up or

16  calls that come in after pleadings are filed, but -

17          THE COURT: And how many calls have you taken?

18  Hundreds?  Thousands?

19          MR. BRADY: I think our papers say over 2,000 calls

20  have been addressed.

21          THE COURT: And isn't that significant?

22          MR. BRADY: Well, I'm not saying all those calls are

23  from borrowers.  I mean, we receive calls from all

24  constituencies in the case.  Shareholders asking about their

25  stock.  Borrowers asking about their mortgages, and not all

1   of the borrower calls we receive assert they have a claim.

2   They want to understand who's servicing their mortgage?  Is

3   there going to be any interruption in service?  How do they

4   get a payoff on their mortgage amounts so they can refinance?

5   The calls run the spectrum.

6           THE COURT: And the letter that was on the website I

7   assume was a servicing oriented letter.

8           MR. BRADY: Absolutely, Your Honor.  In fact the

9   second sentence which counsel did not put into the record

10  specifically addresses that the servicing of their mortgage

11  should be uninterrupted based on the filing.  It was an

12  effort.

13          THE COURT: We've had numerous hearings on that.

14          MR. BRADY: Yes.

15          THE COURT: And again, there's no evidence that

16  there has been any effect on servicing.

17          MR. BRADY: Correct, Your Honor, in fact the

18  evidence throughout the case was to the contrary, but

19  servicing operated without a blip during the bankruptcy.  The

20  loans were being serviced in accordance with the guidelines,

21  and there have been a few complaints, but again, we had 1.5

22  million loan files either originated by or serviced by the

23  debtors.  I would think that out of 1.5 million loan files

24  the fact that there are 450 claims that appear to be borrower

25  related claims, and again, they run the spectrum, they're not

1   all asserting fraud or illegal activity, is a pretty good

2   track record based on the debtors' performance I would think

3   pre-petition, out of 1.5 million if only 450 filed.

4           THE COURT: I do seem to remember we had some blips

5   in August and September on servicing, but I haven't heard

6   anything since, and I mean '07.

7           MR. BRADY: I believe that's right, Your Honor,

8   there were some blips in frozen accounts where certain tax

9   payments didn't get made out of escrows, and we did correct

10  that as quickly as possible of course.  Since we're on it,

11  Your Honor, I would like to take a moment to address the

12  noticing of the borrowers because the implication clearly

13  from the borrowers is that was some conscious effort on the

14  part of the debtors or the Committee to disenfranchise

15  borrowers by not serving the 1.5 million borrowers under the

16  loan files in the debtors' system.  Movants acknowledge, as

17  they must, that not all borrowers are claimants.  Not all

18  borrowers believe they are creditors of this estate.  Again,

19  we had 1.5 million loan files and I think the record is clear

20  from prior hearings the cost to serve them with a bar date

21  notice was in excess of $2 million.  But the real issue is,

22  Your Honor, the debtors had no reason to believe all of their

23  borrowers would assert claims against the estate.  As set

24  forth in our papers, the debtors consulted with their in-

25  house legal counsel and if someone had filed a claim, if

1   someone had threatened a claim, if someone had threatened

2   litigation, they received notice.  Those were known

3   creditors, potential creditors to the estate.  But just

4   because a borrower's address is known to the debtors or

5   reasonably ascertainable, does not make them known for

6   purposes of requiring that they receive notice.  The case

7   closest that we found on point is a case called Heavil vs.

8   NBR (phonetical).  It's a 1997 case out of the Northern

9   District of Illinois.  In that case, Your Honor, NBR had

10  filed for bankruptcy and emerged as a reorganized entity.

11  Subsequent to their reorganization a group of borrowers

12  brought a class action based on alleged unlawful escrow

13  activity.  NBR sought to dismiss that class action saying

14  that those claims arose prior to the filing of their

15  bankruptcy and therefore had been discharged.  The plaintiffs

16  argued they never received notice of the bankruptcy and

17  therefore those claims were not discharged.  The District

18  Court found that the fact that the identities of the

19  homeowners mortgagors may have been reasonably ascertainable

20  from the loan files was not sufficient to make them known

21  creditors.  In that case the Court found that NBR, the

22  debtor, could not have anticipated that the mortgagors would

23  bring a claim and therefore were not known creditors

24  requiring notice.  Again, the debtors believe that they did

25  an appropriate job of trying to ascertain from the 1.5

1  million loan files they have, the universe of potential

2  creditors, served them with actual notice and published the

3  notice of the bar date, I believe, in three newspapers, not

4  just the New York Times, but three newspapers.  Your Honor,

5  the fact that the borrowers have issues with our plan and

6  disclosure statement is not remarkable.  That is how the

7  process works.  Creditors come forward and raise issues with

8  a plan and disclosure statement, and those creditors aren't

9  entitled to the extraordinary relief of their own committee.

10 The debtors take very seriously all of the borrowers'

11 concerns that were raised in these pleadings.  In effect, the

12 motion and the reply filed by the movants formed the basis of

13 a very comprehensive objection to the disclosure statement

14 and to the plan, and in fact, Ms. Rush did adopt that as her

15 objection to the disclosure statement, and we have made

16 changes, and you'll hear more about them if we get to the

17 disclosure statement to address those just like we made

18 changes to the plan to address the issues raised by a variety

19 of creditor constituencies including the securities class

20 action plaintiffs.  Now, I'm happy to walk the Court through

21 how we addressed those but suffice it to say, Your Honor,

22 much of what counsel said is in the plan that he believes

23 impacts borrower claims against third parties or attempts to

24 require borrowers to come to Delaware to litigate all issues,

25 we have addressed.  That is not the goal of this plan.  The

1    goal of this plan is not to in any way impact the borrowers'

2    rights to assert what they believe are direct claims against

3    third parties.

4         THE COURT: So your point also may be that in effect

5    the point a Borrowers Committee has already been achieved.

6         MR. BRADY: In many respects, Your Honor.  They

7    raise really two borrower interests they want to protect.

8    The one was to keep people in their homes, and as Your Honor

9    indicated, what effectively could a Borrowers Committee do to

10   prevent individual foreclosure actions.  But as we indicated

11   and the Committee indicated, we sold the servicing business.

12   AHM is no longer servicing loans except for a small subset of

13   construction loans, and we have sold or transferred control

14   of the vast majority of the portfolio.  The loans are now

15   owned by third parties and now serviced by a third party.  So

16   the ability of a Borrowers Committee to in any way have an

17   impact now on keeping mortgagors in their homes, that has

18   passed.  Those actions lie with the servicer and the owners

19   of those loans.

20        THE COURT: And yet - I don't want to get too much

21   into the plan and disclosure statement, but and yet those

22   parties, at least the owners, are recipients or beneficiaries

23   of the injunction under the plan.

24        MR. BRADY: The owners of -

25        THE COURT: The current owners of mortgages the

1  debtors have sold.  That was my understanding from counsel's

2  argument.

3          MR. BRADY: Let me confirm that, Your Honor, but I

4  don't believe that's the case.

5          THE COURT: All right.  Well, again, I don't want to

6  get too much into the plan, but -

7          MR. BRADY: Again, all of the orders transferring

8  loans in this case have been -

9          THE COURT: 363.

10          MR. BRADY: 363(o), and we have added to the plan

11  and the disclosure statement a post-confirmation 363(o) for

12  protection.  In other words, any loans transferred out of the

13  trust -

14          THE COURT: Will have the same protection.

15          MR. BRADY:  - will have the same protections as

16  363(o) provides.  So, again, we have attempted to address

17  that.

18          THE COURT: Okay.

19          MR. BRADY: Your Honor, I think a key element I want

20  to come back to is really this - the argument comes down to

21  why they need a separate committee because they've

22  acknowledged they're unsecured creditors and we have an

23  Unsecured Creditors Committee, are really inter-creditor

24  disputes.  They argue that because borrowers may want to pay

25  less interest and lower fees on their mortgage -

1          THE COURT: Uh-huh.

2          MR. BRADY:  - other creditors may want the borrowers

3    to pay contractual fees and contractual interest. Those inter-

4    creditor disputes exist in every case.  If one creditor's

5    claim is disallowed in the case, it benefits the other

6    creditors because there are fewer claims to cover the funds

7    available.  We see it with preference actions.  Certain

8    creditors may have received a payment in the 90 days.  They

9    don't want to give that back.  The other creditors who didn't

10   receive payments in the 90 days would like those funds to come

11   back and to share in those.  Those are not the basis that form

12   a separate committee.  That's a dynamic that exists in all

13   Chapter 11 cases.  That is why the Creditors Committee must

14   look out and have a fiduciary duty for all creditors and leave

15   the individual creditors to pursue their own goals and

16   interests in the case, and I submit the borrowers have done

17   that.  The borrowers have participated in this proceeding.

18   I'll get to timing in a moment, Your Honor, but there's been

19   no answer to the timing question.  The borrowers have

20   participated.  The borrowers eventually did consult with

21   sophisticated bankruptcy counsel.  It sounds like that may

22   have come about by the sophisticated bankruptcy counsel

23   reaching out to the borrowers, but there's been no reason

24   given why that we were 13 months into the case when this was

25   filed, that now we're 14 months into the case and the fact

1   that this was filed has already caused a delay of the

2   disclosure statement hearing.  And, Your Honor, time is money.

3   There is a burn rate in this case.  There is a liquidity issue

4   in this case and that the estate has assets that will take

5   some time to liquidate and to turn into cash.  So there is a

6   very real harm caused to the estate, a very real prejudice

7   caused to the other creditors of the estate, but at this late

8   time in the case, the borrowers have emerged, through counsel,

9   and want to renegotiate the plan.  I think Your Honor knew my

10  argument coming up, and that is that the system is working.

11  The borrowers have put forth a very comprehensive objection.

12  The debtors in consultation with the Committee are taking

13  steps to address those where we can.  There are things that

14  the borrowers want that we can address, but that's not

15  unusual.

16          THE COURT: Well, let me address, I guess the delay

17  is really a cost issue when it comes right down to it because

18  - a little bit of a liquidity issue, of course, as well - or

19  maybe not a little bit, but a liquidity issue and a cost

20  issue, and on the cost side and also on the liquidity side, I

21  mean, the Court has the discretion to fashion a remedy.  So,

22  for example, in Federal Mogul, when Judge -

23          MR. BRADY: Fitzgerald?

24          THE COURT: No, before that.  Lyons, Judge Lyons

25  formed the Property Damages Committee, I believe, he limited

1   their fees to 250,000, some amount, and limited their time to

2   do what they wanted to do.  Now, I could fashion a remedy

3   where I appointed a committee of borrowers, limited their

4   compensation, and gave them a hard deadline to do what they

5   need to do.  I could continue the disclosure - and I'm just -

6   I'm not saying I'm going to do this, I'm exploring the options

7   with you.  I could delay the disclosure statement for 45 days,

8   give them $400,000 and say, Do what you can do, and if you

9   want to further delay, you'd better come in here with cause,

10  and that would limit - it wouldn't eliminate, but it would

11  limit the prejudice to the estate.

12        MR. BRADY: Potentially, Your Honor, but it would be

13  significant prejudice, and the prejudice is to the other

14  unsecured creditors.  That's additional money out of the

15  estate that would otherwise go to creditors.  The burn rate

16  increases for all the professionals.  It delays the ability to

17  start making distributions on people's claims, but Your Honor,

18  we should focus on the practical reality, it's not going to be

19  that easy to flip a switch and say, Now we have a Borrowers

20  Committee.  Who does the U.S. Trustee notice for a Borrowers

21  Committee?  All 1.5 million borrowers?  The 450 who filed

22  claims?  The movants and those who joined?  What's the

23  universe of borrowers that the United States Trustee would

24  canvass?  And then the U.S. Trustee must make the decision of

25  what - because they have very different claims, different

1    allegations.  Some borrowers believe their servicing wasn't

2    properly performed and that caused them a credit problem.

3    Other borrowers claim there was fraud or illegal activity.

4    The U.S. Trustee now must determine, What's the universe of

5    this borrower group and how do I insure that they're

6    adequately represented by a Borrowers Committee?  The fact is,

7    the borrower claims are very different.  Counsel tries very

8    hard to make Your Honor believe that the borrowers would speak

9    with one voice and one set of issues and all have a common

10   goal, but I would submit, Your Honor, the borrowers have very

11   different issues.  Those who believe the servicing wasn't

12   properly performed, they want their money.

13          THE COURT: Well, that's an issue of difficulty

14   intra-committee that you touched on earlier that most Creditor

15   Committees have, and we touched on earlier.  There's often

16   tensions in the committee.  So, that's really an argument that

17   it would be difficult to run the committee or maybe difficult

18   to form the committee but not necessarily whether the

19   appointment of a committee would be appropriate because of

20   lack of adequate representation.

21          MR. BRADY: Well, it really goes to delay too.

22          THE COURT: All right.

23          MR. BRADY: I'm simply pointing out to Your Honor -

24          THE COURT: The complexity.

25          MR. BRADY: The complexity and the delay of actually

1   getting a committee appointed and then having them choose

2   professionals.  You have to tack that on to what Your Honor

3   was suggesting, providing them 45 days to get up to speed and

4   to deal with their issues.  You have to tack on that process

5   of actually forming the committee, which could be substantial

6   if the U.S. Trustee has to go through all of those issues as

7   to how to get notice out, who gets notice, and what's the

8   universe of the borrower.

9        THE COURT: Well, again, the Court could fashion a

10  remedy on notice and approve newspaper or publication notice

11  for formation of the committee in nationally-wide publications

12  like USA Today or - as an example.

13       MR. BRADY: Right.

14       THE COURT: And authorize the U.S. Trustee to form

15  the committee based on written submissions as opposed to

16  holding an actual meeting, which is quite common in other

17  jurisdictions.  I think in the Southern District of New York

18  that's how all committees are formed.

19       MR. BRADY: It's true, Your Honor could fashion all

20  of those remedies.  Again, there's been no evidence that there

21  is a class, if you will, of borrowers with a common interest

22  and common set of claims, that the borrower claims are

23  individual claims and very fact specific.  Once they've

24  established they have those claims, they're unsecured

25  creditors of this estate and should receive a distribution

1   under the plan like any other unsecured creditor, but at this

2   point the borrowers have not done that.  They have not

3   established that they have allowed general unsecured claims,

4   and that's where the equitable subordination issue rings

5   hollow, I think, Your Honor.  510(c) speaks in terms of an

6   allowed claimant seeking to subordinate another allowed

7   claimant's claim.  No one has allowed claims yet in this

8   because the time to object still exists and the debtors are

9   continuing to conduct their claims administration.

10          THE COURT: Well, once the claim is filed it's deemed

11  allowed.

12          MR. BRADY: It's deemed allowed subject to an

13  objection period, and certainly claims that are subject to

14  litigation that are the subject of state court litigation here

15  where the stay's been lifted and is ongoing are certainly

16  disputed by the debtors, and the debtors could put their

17  objection on file quite quickly to confirm that.  It's trying

18  not to add additional costs to the borrowers.  In other words,

19  if those borrowers come back with a judgment from the state

20  court and amend their claim to include that judgment, the

21  debtors are not likely to further object to that claim unless

22  they assert a priority that's not appropriate.  So that

23  process will play itself out.  Counsel makes much of the fact

24  that the plan doesn't address how will borrowers' claims get

25  liquidated?  They'll get liquidated like every other general

1    unsecured claim.  Either they'll seek relief from stay to

2    liquidate their claim in a court of competent jurisdiction or

3    their claim will be addressed through the bankruptcy process.

4    It will either be objected or not, and it will become an

5    allowed claim if appropriate.  But that's the same for all

6    creditors.

7            THE COURT: Right, but isn't their response, that's

8    exactly the kind of thing that calls for a committee because

9    common sense tells us that's not fair or - fair is the wrong

10   word.  That's not really giving those claimants due process

11   based on their individual situations, based upon their

12   probable lack of ability in many cases to hire counsel to

13   bring these kind of claims, certainly, the inherent

14   difficulties with any *pro se* plaintiff in prosecuting claims,

15   and wouldn't a committee be appropriate to deal with whether

16   that is the correct procedure or whether some other procedure

17   for liquidating borrower claims would more appropriately deal

18   with the inherent due process problems with requiring *pro se*

19   plaintiffs to prosecute stay relief motions and litigation

20   either here or in any other appropriate jurisdiction?

21           MR. BRADY: Well, first, nothing requires that

22   borrowers act *pro se*.  For whatever reason the borrowers, if

23   they're unable to obtain counsel, it's because they're

24   pursuing claims against a bankrupt entity.  That often does

25   dissuade counsel from wanting to become involved, but again,

1   Your Honor, since this is an extreme remedy you must consider

2   other options to allow the borrowers to have a voice, and that

3   is, why should the borrowers not just take their movants and

4   create an Ad Hoc Committee.  The reason is, they want a

5   guarantee of payment.  They want to be guaranteed that counsel

6   will get paid, but the Warren Act claimants, their counsel

7   doesn't have a guarantee of payment.  The securities class

8   action lawyers don't have a guarantee of payment, but they're

9   operating within the bankruptcy as a group and without an

10  official committee.  Why should the borrowers have a different

11  treatment?  Why shouldn't this group form an Ad Hoc Committee,

12  press their issues, and seek a 503(b) -

13          THE COURT: Well, let's be realistic.  When we have

14  an Ad Hoc Committee of noteholders in a case, like a second

15  tier or a second tranche secured noteholders that's at least

16  partially out of the money, their counsel's getting paid, I

17  mean, usually by the agent, and the agent's getting paid by

18  the noteholders.  So, they don't face the same kind of risk

19  and that's the most common Ad Hoc Committees I see.

20          MR. BRADY: Well I would submit in today's

21  environment, there are a lot of second lien committees the

22  debtor formed on an ad hoc basis where there is no assurance

23  that the second liens will receive a distribution under the

24  plan.

25          THE COURT: Well, what about the lawyers?

1          MR. BRADY: Well, again, the lawyers would be paid by

2     the agent, but the agent would pay them through funds received

3     as a distribution to the noteholders.  I don't think the agent

4     has an independent obligation to go out and incur expenses of

5     counsel that it can't recover on.

6          THE COURT: Have you ever not been paid for an Ad Hoc

7     Committee of second lien lenders, or did you have really good

8     retainer letters?

9          MR. BRADY: I'm trying to think, Your Honor.  I

10    certainly know that my fees have been cut, but I do believe

11    I've always received at least some payment.  But again, Your

12    Honor, the process is working here.  The borrowers have

13    participated in this case.  The borrowers are here today.  If

14    I understood counsel correctly, because I think their paper

15    said they don't represent the movants individually on the

16    disclosure, but I think counsel indicated that his firm was

17    representing Ms. Rush today, and she has fully adopted the

18    borrowers' motion and their reply as her objection to the

19    disclosure statement.  So that, we think we've addressed as

20    much as we can.  The Committee will be heard on that as well.

21    There's the United States Trustee, and ultimately Your Honor

22    will make the decision whether the disclosure statement is

23    appropriate and whether the plan should be confirmed, and

24    whether it provides appropriate safeguards for the borrower

25    issues, but they're before the Court and they will be heard by

1   Your Honor, and Your Honor will get to ultimately make the

2   decision as to whether the borrower objections and comments

3   should be included in the plan.  So the system is working.

4   The question is, are the borrowers entitled to halt the

5   proceedings, form the extraordinary remedy of creating a

6   second official creditors committee of borrowers when there's

7   been no evidence that the existing Committee is not capable of

8   addressing their rights as general unsecured creditors and

9   incur that additional cost, that additional delay to the

10  detriment of all other creditors in the case or should the

11  borrowers proceed like the other creditors have, which is

12  raise issues with the plan and disclosure statement, either

13  attempt to resolve them or have the Court rule and we move

14  forward on confirmation of the plan.  Now, Your Honor, I've

15  had a long presentation here.  I think I've covered almost

16  everything during our process, and I won't start at the

17  beginning and walk through it all, so - But, if I may, Your

18  Honor, I may let Mr. Indelicato speak and if there's anything

19  I missed out of the presentation I wanted to bring to Your

20  Honor's attention maybe I could have a few moments after he's

21  completed.

22          THE COURT: Sure, we can definitely do that.  Let's

23  take a short recess though before Mr. Indelicato's argument.

24  So, we'll try to reconvene at 15 minutes after the hour.  All

25  right?

1        (Whereupon at 11:06 a.m., a recess was taken in the

2   hearing in this matter.)

3        (Whereupon at 11:20 a.m., the hearing in this matter

4   reconvened and the following proceedings were had:)

5        THE CLERK: All rise.

6        THE COURT: Please be seated.  Mr. Indelicato, good

7   morning.

8        MR. INDELICATO: Good morning, Your Honor.  Mark

9   Indelicato from Hahn & Hessen on behalf of the Committee.

10  Your Honor, I will try and make this brief because I think Mr.

11  Brady has addressed many of the issues that the Committee

12  has, but I think let me start first by assuring the Court and

13  the borrowers that the interest of the Unsecured Creditors

14  Committee is nothing more than maximizing creditors, all

15  unsecured creditors, and that includes the mega banks, that

16  includes the borrowers who have unsecured claims against the

17  estates.  This Committee was appointed by the U.S. Trustee's

18  Office, and as I've said in other cases, I think they did get

19  it right in here.  I do agree there is no borrower on the

20  Committee but there are two indenture trustees.  There are

21  three parties involved in the purchase of securitization of

22  the loans, and there were two trade creditors, and now we're

23  down to one trade creditor because their issue was resolved,

24  and I would point out, Your Honor, when people question the

25  integrity of this Committee they should be mindful, this is a

1  Committee that's supporting a plan in which there may likely

2  be no distribution to the two indenture trustees because of

3  inherent subordination provisions.  So, if people believe that

4  this Committee is not exercising their fiduciary duties, I

5  want to set that record straight.  Your Honor, I think what we

6  need to focus on and my comments from last November have come

7  back to haunt me yet again when we dealt with that relief stay

8  motion that the Committee opposed, and the Committee opposed

9  it for various reasons that we discussed at that hearing and

10  my comments, while I won't necessarily say being taken out of

11  context, indicated that the Committee was not interested in or

12  mindful of the plight of the individual borrowers, and I could

13  not foresee what was to happen over the next eight to ten

14  months, but now, Your Honor, we are representing the

15  liquidating trustee in the New Century case, and we are in

16  essence stepping into the debtors' role trying to deal with

17  the many issues raised by borrowers and in foreclosure

18  actions, and to say we've been somewhat humbled by what is

19  going out there, not only as it's affecting the broader

20  market, by how it's affecting the individuals, we do

21  understand the issues, and we understand the issues to be

22  several-fold.  First, Your Honor, to the extent the borrowers

23  have claims against American Home, unfortunately for the

24  borrowers, given the posture of this case where all of the

25  loans have been sold and/or otherwise dealt with particular in

1    the BofA settlement, the debtor is not in a position to either

2    agree or negotiate recessions, modifications, or amendments to

3    those loan documentation, and that is their primary relief

4    their seeking.  To the extent they might otherwise be entitled

5    to that relief, Your Honor, they will have claims against this

6    estate and that will be an unsecured claim and it will share

7    *pari passu* with all other unsecured claims.  This plan and

8    nothing in this plan eliminates their rights to assert claims

9    against third parties.  If there is an entity that purchased a

10   loan from the debtor and that loan has infirmities, the

11   borrower may have the rights to sue those third parties and/or

12   defend in any foreclosure actions.  So, Your Honor, the relief

13   they're seeking, unfortunately, is not available through a

14   committee or any other means in this bankruptcy proceeding.  I

15   understand the Court's concern that the borrowers are not

16   being addressed individually as a group as the EPD claimants

17   may be, for example.  Your Honor, with respect to the EPD and

18   breached protocol, the borrowers are looking at that as a

19   blessing to the EPD and breached claimants as an easy

20   streamlined process to resolve their claims.  I will tell you,

21   and I think you may have noticed in the objections to the

22   disclosure statements, I don't believe the EPD and breach

23   claimants believe it's a blessing at all.  They believe we're

24   artificially deflating their claims, limiting their claims,

25   and not giving them their proper due.  So, Your Honor, it's

1   the old proverbial, the grass is always greener on the other

2   side.  We will deal with the claims of the borrowers in an

3   appropriate manner.  Whoever ultimately is appointed as the

4   liquidating trustee will review them on an individual basis,

5   deal with the merits of the claim, and to the extent it's

6   appropriate, will object to the claim and if not the claim

7   will be allowed.  But I think the liquidating trustee will

8   have to deal with them on an individual basis.  There's no

9   methodology, at least that I've been able to come up with,

10  whether there was a Borrowers Committee in place or not, where

11  you could waive a magic wand and say all of the borrower

12  issues would be dealt with in one way, shape, or form.  There

13  are, as Mr. Brady said, potentially 1.5 million borrowers out

14  there and some of them may have claims and some of them may

15  not.  The borrowers will be protecting both those who got the

16  benefit of their bargain and those that did not.  There's an

17  inherent conflict and the Court pointed out that that could be

18  an intra-committee issue among various creditors, but I think

19  it goes more, Your Honor, to point out that each individual

20  borrower's claims are individual to themselves.  Whether they

21  were defrauded or not, whether they had issues with the title

22  company that didn't release a escrow, whether they've never

23  gotten the information they wanted regarding whether their

24  real estate taxes were paid or not, whether the service had

25  failed to pay their real estate taxes and the result of that,

1   there was a tax foreclosure, whether there were issues with

2   respect to the agents or whether there were issues with

3   respect to all of that.  Those are going to be individual

4   claims, Your Honor, that each - unfortunately, each borrower

5   is going to have to address itself.  I'm not sure even

6   appointing a Borrowers Committee is going to address those

7   issues.  Your Honor, there are issues about equitable

8   subordination and whether or not the liquidating trustee would

9   properly investigate those.  I can assure this Court, as we've

10  done in other cases, to the extent this Committee has any say

11  in the documents that are being proposed, and we do, that the

12  liquidating trustee and who the liquidating trustee will be,

13  that liquidating trustee will be charged with investigating

14  all claims, and I can assure the Court that I believe he will

15  to the extent he or she will.  To the extent there are

16  appropriate claims against financial institutions that will

17  bring benefits to the estate, those will be pursued.  If the

18  borrowers believe they have a right to equitably subordinate

19  an individual lender or other party who dealt with the debtor,

20  I'm not even exactly sure in the context of the bankruptcy how

21  it would be dealt with.  Really, what they'll be looking for

22  is to get benefits for themselves or their individual

23  mortgages, and in and of itself, it doesn't seem to be a

24  result that is conducive to the bankruptcy process.  Your

25  Honor, I don't want to belabor the timing issue, and for

1    whatever reason it was, they did make the motion thirteen

2    months after the case filed, but I think the Court needs to

3    focus on - and as they said, Where we are today.  And where we

4    are today, Your Honor, is on the precipice of presenting a

5    disclosure statement to this Court and hopefully getting a

6    plan confirmed.  I do not want to minimize the liquidity

7    issues that this debtor is facing.  On a conference call of

8    the Committee in order to break what was otherwise a tense

9    call, I made a comment that, Let's see which one of you is

10   left after this call it over.  Believe me nobody laughed at

11   the end of the call, but what it points out, Your Honor, is

12   these assets are very volatile, and the quicker we can

13   reorganize and begin the process of getting a liquidating

14   trustee in there, the better off we're going to be.  The

15   opportunities to sell the buildings that existed a year ago,

16   don't exist today.  The opportunities to sell the mortgages

17   that were a year ago, don't exist today.  We have a bank that

18   we thought was golden, and who knows what its value is in

19   today's market.  So, Your Honor, it is important that this

20   process start and conclude.  Even 45 days could have a

21   significant impact on the ultimate result of the recoveries in

22   this estate.  Your Honor, I think I just want to close by

23   again adopting many of the comments made by Mr. Brady, by

24   assuring this Court and the borrowers that this Committee

25   really is truly out there looking at the interests of all

1    creditors whether they be the borrowers or the big investment

2    bankers, and that we are doing everything to maximize the

3    recovery to creditors.  Unfortunately, these borrowers have

4    only unsecured claims against the estate which are being

5    represented by my group.  To the extent they have other

6    claims, those claims are against third parties, and if their

7    objection did anything and helped clarify in the plan that

8    those claims are not being waived, then sobeit, but I think

9    Your Honor, that is the best they were able to get out of

10   this.  They have their rights against third parties, and their

11   rights as unsecured creditors are being protected by this

12   Committee.  Thank you.

13             THE COURT: Mr. McMahon?

14             MR. McMAHON: Your Honor, good morning.  Joseph

15   McMahon for the United States Trustee.  I think we come before

16   the Court today, Your Honor, in a position to what an *amicus*

17   would do basically.  We're not, to be clear, I know you're

18   hearing from two parties who oppose the relief requested.  We

19   are not in such a position.  I think we are coming before this

20   Court as a friend in a neutral position.  We wanted to hear

21   what the borrowers had to say and what the opposing parties

22   had to say here today before speaking.  I think our statement

23   in light of the argument that we heard today, I think really

24   cuts to the core of the way we see the issue which is, you

25   have the adequate representation argument, and Your Honor

1  heard the competing arguments on the adequate representation

2  issue, and the competing arguments that the Court heard with

3  respect to that.  With respect to the formation of the

4  Committee, Your Honor, Your Honor is well aware of the

5  logistics, meaning that we are given a list, a list of the top

6  twenty or top thirty, normally, that's attached to a petition.

7  Your Honor is correct.  I can assure Your Honor that there

8  were no borrowers on that list at the time that we solicited

9  for the formation of an official committee.  To the extent

10 that a borrower heard of the bankruptcy case and asked for a

11 questionnaire, we certainly would have sent it, but my

12 recollection is that I don't believe any borrowers stepped

13 forward for consideration for the Committee.  But, with

14 respect to that issue, Your Honor, I think that the record, I

15 guess, outlines competing arguments with respect to adequate

16 representation, and I think that that issue can probably be

17 addressed without casting aspersions on the work that the

18 Committee has done to date.  We don't - based upon the record,

19 I don't think there's any factual basis for concluding that

20 the official Committee has not been diligently representing

21 the interests of general unsecured creditors as a general

22 matter.  But, that being said, Your Honor, I think the point

23 the borrowers are essentially making is that there's this

24 class of plan and disclosure statement related issues that we

25 - Well, first, we're not on the Committee, and second, that

1   are distinct to our interests, our constituency, and we need

2   to be heard on those and absent the official committee

3   vehicle, we're just not going to get there.  That's really the

4   point at which I think we're at in this hearing, and a few - a

5   couple of other things, Your Honor.  We do agree that there

6   has to be a recognition of, to the extent that the Court were

7   to appoint a committee, what the purpose of it would be.  We

8   appreciate the fact that the borrowers have their own distinct

9   individual claims and that obviously the official committee

10  vehicle would not be used as a purpose for, say, prosecuting

11  their own personal property interests or addressing those

12  interests viz-a-viz the estate.  I think the critical point

13  that the borrowers are making with respect to the purpose of

14  the committee and the one we think is worthy of this Court's

15  consideration is, the issues relating to the plan and

16  disclosure statement.  Your Honor, in colloquy with Mr. Brady,

17  I think, touched on some points that are noteworthy.  First,

18  with respect to fashioning a remedy, we absolutely agree that

19  the Court under Federal Mogul a Third Circuit decision has the

20  ability to condition payment of professional fees and the like

21  to the extent that you were to go in that direction.  With

22  respect to notice, Your Honor, Mr. Brady raised the issue of,

23  Well, how are we going to get from point A to point B when we

24  have a potential pull of 1.5 million people, and logistically,

25  I'd just like to speak to that point.  I know it's a secondary

1    issue and we talk about it later, more, but in every Chapter

2    11 case you get a list of 20 or 30 entities that are

3    presumably the largest claims.  We have a case here where

4    regardless of the dispute about notice, the claims bar date

5    has passed.  Presumably, it would  not be difficult to get a

6    list of asserted homeowner claims from the debtors, the claims

7    agent, whoever, and I guess address notice with respect to a

8    committee in that direction.  I could also speak with

9    borrowers' counsel to the extent that, again, we get to that

10   point, but I don't think that, and obviously I would defer to

11   the Court on this, but there's a way of getting or addressing

12   that point short of publication notice in the short term.  I

13   don't know if the Court has any questions for me, but I think

14   -

15            THE COURT: Well, assuming arguendo, and again, it's

16   an assumption, that the Court were to direct the appointment

17   of a Borrowers Committee, we cut through the notice issues,

18   what kind of time frame do you think you could act under,

19   reasonably.

20            MR. McMAHON: Well, assuming that the Court agreed

21   with our view regarding notice, I get the list within a day or

22   two, I think that we could probably address that issue within

23   10 days, 10 to 14 days would be - 14 days being the outlier.

24            THE COURT: Okay.  That's all, thank you.

25            MR. McMAHON: Thank you, Your Honor.

1          THE COURT: Hang on before you speak.  Is there

2     anyone else who wishes to speak in connection with the motion?

3     Okay, I'll hear a reply.

4          MR. WEISBROD: Thank you, Your Honor.  Stephen

5     Weisbrod for the borrowers.  Debtors' counsel emphasized

6     several times that in his view there was no evidence, his

7     word, of material claims on the part of the borrowers.  The

8     Court can take judicial notice and the debtors have admitted

9     that there are at least 450, approximately, claims by owners.

10    Those claims are, obviously, material at least to the

11    borrowers if not to the debtor.  Many times they're seeking

12    recision of mortgages that can make the difference between

13    keeping their homes or not, and I'm going to get to below the

14    question of whether recision is really at issue here.  They

15    have setoff claims.  The damages may be low in these cases,

16    they may settle for next to nothing compared to a big

17    securities case, but $10,000 or $20,000 is a lot of money to

18    somebody who is three months behind on his or her mortgage

19    payment.  These claims are very material to the people who are

20    seeking the appointment of a committee.  Now, the debtors'

21    counsel also stated that in his understanding in the other

22    cases involving lots of tort claims, and I don't want to get

23    into a debate about whether 450 is mass tort or just many

24    torts, but in lots of cases he says, If there's an

25    acknowledgment, there's liability.  Actually, in Burns & Row

1   (phonetical), which is pending, I represent the asbestos

2   claimants as insurance counsel there, there's never been a

3   verdict against Burns & Roe.   Federal Mogul, Armstrong, et

4   cetera, they always argue that they should not be liable, and

5   in most of these cases, there's no allegation that every

6   product that the debtor sold contained asbestos or that every

7   person who bought the product injured somebody.  In all of

8   these cases, same with the hospital cases, where some patients

9   assert malpractice claims, most don't, you're dealing with a

10  subset of people who claim that the debtor's liable for some

11  wrongful conduct.  Now, that's the case here, whether or not

12  there's actually been a verdict.  It's true that there's no

13  uniformity among the plaintiffs, but you don't need that in

14  order to form a committee.  Now, it's also been observed that

15  there's no class.  I think Your Honor is correct that you

16  don't need a class under Federal Rule of Civile Procedure 23

17  in order to find that people have sufficiently similar

18  interests in order to have a committee formed.  In fact, in

19  most tort cases, there is not a class.  There are a lot of

20  individual claims.  Sometimes people lose sight of that

21  because, say, in asbestos you can have one lawyer representing

22  thousands of claimants.  That's not the case here, but they

23  still have similar interests.  Now, we - and I want to repeat

24  this, we do not impugn the integrity of committee members or

25  the committee law firms, and we are not saying that they have

1  breached their fiduciary duties.  We're not taking a position

2  at all on how well they've done their job.  We're not going to

3  try to go back and look at everything they've done in their

4  efforts to generally maximize the value of the estate.  We

5  have no reason to doubt it.  Our point is simply that in terms

6  of protecting the interests of borrowers, the interest of

7  borrowers in estate assets, and the interest of borrowers on

8  how the estate is administrated, they're not getting the job

9  done.  These borrowers may all be of the same priority as

10  other unsecured creditors, but they can't be treated exactly

11  the same way and that's why a different committee is needed

12  here.  Now, I've heard a few times that we, according to

13  debtors' counsel and committee counsel, there really are only

14  two issues, and I'm never quite sure what those two issues are

15  supposed to be, but let me make this absolutely clear.  On the

16  plan alone we asserted eight different problems, and only one

17  of those has been addressed properly.  One of them has been

18  addressed improperly, and I want to answer the Court's

19  question about the injunction.  The parties protected under

20  the plan injunction, as we understood it, were a narrow group:

21  the debtors, the plan trustee, the POC, the trust.  But, if a

22  mortgage is still held by one of those - sorry, if the

23  mortgage is not still held by one of those, if the mortgage

24  has been sold and some other servicer is seeking to foreclose,

25  a borrower is precluded under the current version of the plan

1   from suing the trust or any of the other protected parties.

2   So, if Citibank, say, held the loan and Citibank was servicing

3   the loan and tried to foreclose, a borrower, it is correct,

4   Mr. Brady is right, could still bring Citibank into Court.

5   What the borrower couldn't do is bring the trust into Court.

6   That's what I was intending to convey to Your Honor this

7   morning.  Now, we have repeatedly pointed out that it is

8   almost impossible for a borrower to know how his or her claim

9   would be treated.  Mr. Brady said up here that a borrower upon

10  getting relief from stay, which would be generally deemed to

11  have occurred, could sue in a court of competent jurisdiction.

12  That's not what the plan actually says.  It says that the

13  claim has to be brought in the Bankruptcy Court.  The claim

14  would be allowed under an order by Your Honor or another

15  bankruptcy judge.  Maybe that is what Mr. Brady intended, that

16  anybody could sue in any court of competent jurisdiction, but

17  the plan doesn't say that right now.  I want to emphasize why

18  this matters and why recision really is an issue and the other

19  non-monetary relief really is an issue.  Number one, the

20  debtor still owns many mortgages.  So as to those, it's

21  clearly an issue.  As to the mortgages that have been sold,

22  and most have, under TILA, and we write this in every brief

23  and opposing counsels ignore it, a finding of some TILA

24  violations against the originator is binding on the successor

25  owners.  So, it matters.  A borrower actually can get recision

1    that applies to the successor owners by defeating the trust in

2    court on TILA issues.  It matters, and the fact that the plan,

3    even after our motion continues to allow the trustee to

4    destroy any documents, that means in its discretion, makes

5    this doubly problematic because the evidence that a borrower

6    would try to marshal in such a case could well disappear.  On

7    the notice issue, Your Honor, we've got a false dichotomy

8    going on in this Court between all borrowers on the one hand

9    and the narrow set of borrowers who said at the time the

10   petition was filed that they wanted to sue.  The debtor could

11   have given notice to all borrowers who were subject to

12   foreclosure proceedings; it didn't.  The debtor could have

13   given notice to all borrowers who got teaser rates; and they

14   didn't.  The debtors could have given notice to all borrowers

15   who had payment option arms; and they didn't.  Now, there's no

16   dispute that the debtor sold these types of products which

17   often result in tort claims.  There's no dispute about that.

18   They definitely and they have admitted this, sold payment

19   option arm products and products with teaser rates, and the

20   Court can take judicial notice of that, having presiding over

21   these cases.  Your Honor made a comment which is actually

22   accurate that the motion - I don't mean to suggest that others

23   weren't, but I just want to make clear that we're not hiding

24   the fact that the idea of appointing a Borrowers Committee is

25   a lawyer idea, and in fact, I mentioned it in a casual

1  conversation with somebody at a public interest organization.

2  I don't think Tilton Jack or Paula Rush or any of the other

3  dozen borrowers should be faulted with not being familiar with

4     § 1102.  When you're dealing in particular with consumer

5  advocacy issues, it's usually public interest organizations or

6  law firms acting *pro bono* that take the lead on these things,

7  that try to come up with a strategy because we're not dealing

8  with sophisticated people who can do it themselves.  And so,

9  we're not embarrassed at all about the fact that actually

10 Zuckerman Spaeder and we each independently have been talking

11 to consumer organizations, and we know each other anyway, and

12 at that point the consumer organizations ran with it.  So we

13 never actually solicited any borrowers.  They came to us

14 through legal aid offices, but that's how it happened.

15 There's nothing to hide about that.  That's a good thing.

16 That's what separates this case from, say, New Century where

17 there aren't 363(o) provisions, no one asked for a Borrowers

18 Committee.

19          THE COURT: That's nothing different is it than the

20 cattle call show we have at every Creditors Committee

21 formation meeting when you've got 40 groups of lawyers in

22 there in effect soliciting business from a newly created

23 entity that isn't required to hire an attorney.

24          MR. WEISBROD: There is some similarity and I think

25 that, you know, I work for a for-profit law firm so I don't

1   disparage people who go out and try to generate business, and

2   in fact we would be seeking payment if we were appointed as

3   counsel for a Borrowers Committee here, but I do want to

4   stress that when you're dealing with public interest

5   organizations, the impetus for this is even more important.

6   Lawyers have to be creative and proactive in this regard

7   because the people they protect won't do it themselves.

8          THE COURT: Right.

9          MR. WEISBROD: And, Your Honor, I want to talk about

10  the limited role that the Borrowers Committee would have in

11  our view if we went forward with a Borrowers Committee.  The

12  Borrowers Committee would not be seeking to do all the things

13  that you normally have a committee look into, preference

14  actions, that sort of thing, but there are some issues on

15  which borrower interests and interest of general unsecured

16  creditors diverge, and on those issues, a Borrowers Committee

17  would be active, that would principally focus, I think, on the

18  plan and the disclosure statement in the event that there were

19  some kind of third party claim that no other entity could

20  pursue due to conflicts, a Borrowers Committee conceivably can

21  be asked to do that.  That's what happened in First Alliance.

22  But, the suggestion that a Borrowers Committee's role should

23  be narrow is one that the borrowers completely understand and

24  accept, and we think it would be appropriate to go forward on

25  that basis.  If the Court has any questions, I'd be happy to

1   answer them.

2          THE COURT: No, I don't.  Mr. Brady, yeah -

3          MR. BRADY: Just a couple of points.

4          THE COURT: Sure, I'll keep it going, that's fine.

5          MR. BRADY: Just a couple of points, Your Honor.

6   One, we can't stress enough that there's no evidence before

7   the Court in counsel's presentation.  I ask Your Honor to take

8   judicial notice of a number of things, but typically that's

9   the result of having failed to put on a case and evidence, and

10  the movants have failed to do that here.  The reference was

11  made to Federal Mogul and Dow and how in those instances there

12  has not been a judgment necessarily with respect to liability.

13  Your Honor, <u>Federal Mogul</u> and <u>Dow</u> filed bankruptcy because of

14  the claims being asserted against them, because of the tort

15  claims.  American Home did not file bankruptcy because of

16  borrower claims against it.  It filed bankruptcy for a host of

17  reasons I don't need to go into now, but the claims of

18  borrowers against American Home did not drive this filing.

19  Recision, Your Honor, much has been made about whether the

20  Borrower Committee, if appointed, could in some way impact the

21  ability of borrowers to obtain recision.  Again, Your Honor,

22  virtually all of the loans are sold or in the case of the Bank

23  of America collateral, control's been turned over to Bank of

24  America, pursuant to a settlement approved by the Court.  The

25  debtor would have no ability to address those.  Really, the

1    only pool of loans that remains are in connection with the JPM

2    facility and that's the subject of a motion for relief from

3    stay.  Counsel indicated that a TILA finding by a court, a

4    violation of TILA could be binding on a successor.  Well,

5    again, nothing that's happened in the bankruptcy or in the

6    plan would impact that.  The 363(o) protections were in the

7    orders entered by this Court and they've now been added to the

8    plan.  With respect to destruction of documents, a number of

9    hearings have been held before this Court where the debtor has

10   taken great pains and at great expense protected and preserved

11   the files that needed to remain.  We have changed the plan to

12   indicate that the Trustee no longer has the unilateral right

13   to destroy documents.  That must be on notice and a hearing

14   before this Court.  Counsel indicates that AHM could have

15   served all borrowers who had teaser rates or all borrowers who

16   had option arms because, their position is, those often

17   resulted in tort claims.  There is no evidence, Your Honor,

18   before the Court that borrowers who were the subject of teaser

19   rates or who purchased option arms that the generation of

20   claims from those products was higher than any other product.

21   There's just no evidence before the Court.  Again, we've

22   removed the debtors from the injunction.  We have clarified

23   the exculpation provisions to provide that we are not in any

24   way attempting by this plan to impact borrowers' rights with

25   respect to third parties.  And with respect to the liquidation

1    of their claims, they really have an option, Your Honor.  A

2    number have come forward and sought relief from stay.  Your

3    Honor has granted it in each and every instance.  I expect

4    Your Honor would continue to grant borrowers' requests for

5    relief from stay.  So the borrower may litigate their claims

6    in a court of competent jurisdiction or if they choose, they

7    can attempt to litigate their claims in effect through the

8    claims administration process here.  The borrowers have those

9    options, but the fact is, if a borrower wants to have their

10   claim litigated and resolved in a court of competent

11   jurisdiction that may be more convenient to them, that option

12   exists, and Your Honor, I'm sure, would prefer to have those

13   litigated elsewhere.  So, the plan does not do anything to

14   prevent a borrower from being able to exercise their rights

15   both against the debtors to liquidate their claims and against

16   third parties.

17            THE COURT: Thank you, Mr. Brady.  Anyone else?  Mr.

18   Indelicato?

19            MR. INDELICATO: Yes, Your Honor, very briefly.  I

20   just want to address one other thing, and this I would like to

21   just inject a little bit of reality into the proceeding

22   because we are counsel to the liquidating trust in New

23   Century, and as they mentioned, if there is a TILA violation

24   asserted against a trust, it can be binding on the successor.

25   Your Honor, in every case in which we are representing the

1   post-confirmation committee or trustee in a subprime mortgage

2   or all-day mortgage lender, we worked hard to alleviate from

3   the Court and the system the foreclosure proceedings.  So both

4   in New Century and Resume in which we're counsel and I think

5   one other, we've had submitted to the Court orders for blanket

6   relief from the stay so that there no longer needs to be

7   relief from the stay to proceed with foreclosure proceedings,

8   and we've assured both the borrowers and the owners of the

9   mortgages that that will be dealt with in a court of competent

10  jurisdiction outside the jurisdiction of the Bankruptcy Court

11  and all rights are preserved.

12          THE COURT: Have you granted blanket release from the

13  automatic stay for borrower claims against the estate?

14          MR. INDELICATO: Well, Your Honor, they're subject to

15  the claims resolution process -

16          THE COURT: So, no.

17          MR. INDELICATO: So the answer is no, we're dealing

18  with them in a claims resolution process.

19          THE COURT: Well, how is that at all relevant to the

20  formation of a Borrowers Committee?

21          MR. INDELICATO: Well, Your Honor -

22          THE COURT: If you've helped the banks?

23          MR. INDELICATO: I'm just dealing with the issue that

24  they raised about the need for recision and the ability to sue

25  the trustee.  What you would be creating is a potential where

1    the liquidating trustee is going to be sued throughout the

2    country and you're going to increase enormously the costs of

3    the post-confirmation estate.  That's the only point I want to

4    raise.  It goes into the reality of the relief they're seeking

5    in the plan, which is what I said before is, they have

6    unsecured claims and they have rights against third parties.

7    Those rights against third parties cannot be adjudicated in

8    this proceeding.

9        THE COURT: Well, you basically want me to prejudge

10    the points that they're raising as a basis.

11        MR. INDELICATO: I'm only responding to their

12    argument, Your Honor.  I didn't raise an - I'm just putting a

13    counter argument to why they need the Borrowers Committee to

14    negotiate that in the plan.

15        THE COURT: All right.

16        MR. INDELICATO: I'm not asking the Court to prejudge

17    anything.

18        THE COURT: All right, so your point is, it's not a

19    valid basis for forming a committee because in all likelihood

20    - Well, it would be incredibly expensive.

21        MR. INDELICATO: That's correct, Your Honor.  Thank

22    you.

23        THE COURT: Thank you.  Anything further by any

24    party?  Just give me a moment.  All right.  Well, I appreciate

25    the argument.  I am somewhat troubled by the lack of evidence,

1   but I think the Court can make a decision one way or the other

2   based on, frankly, its experience in this case and the facts

3   and circumstances that have come to the Court's attention over

4   the last 14 months.  I'm going to stress that I think the

5   movants have said several times that they were not in any way

6   criticizing counsel for the Committee or the Committee itself

7   and that they simply were taking a position that the Committee

8   in effect was inherently conflicted or did not have

9   sufficiently in front of it the issues that were unique to the

10  borrowers and as a result, not because the Committee wasn't

11  doing their job but because of inherent difficulties, they

12  weren't adequately representing the borrowers.  I agree.  And

13  again, with no personal or professional criticism of anybody

14  involved on behalf of the Committee.  I don't believe that the

15  borrowers who are asserting claims against the debtor in this

16  estate are adequately represented by the Creditors Committee

17  or by themselves.  Based on the unique nature of a number of

18  the borrower claims that are different, obviously since

19  they're unique, but to be specific, different from the general

20  nature of the claims of most of the unsecured creditors, most

21  of whom are financial institutions, I think there are

22  fundamental distinctions between those claims.  The numerosity

23  of the claimants, even 450, is a large number of claimants,

24  and I think, frankly, that the universe of claims may be

25  larger, but I don't think I need to get into that because I

 1    think 450 claims is a lot of claims, a lot of claimants, and

 2    frankly, I think the majority of these people are appearing

 3    *pro se*.  It is extremely difficult for any person to appear

 4    *pro se* in court.  Ms. Rush, in particular, has done a very

 5    good job doing her best to navigate the complexities of the

 6    Bankruptcy Code.  I've seen attorneys with 20 years experience

 7    in other fields come into Bankruptcy Court and not do as good

 8    a job because this is a complex and often byzantine to what my

 9    old law firm used to call the real lawyers, but it is a very

10    specialized area of the law and a *pro se* person with a

11    sophisticated issue is inherently at a disadvantage, and I

12    think it's just common sense that the vast majority of these

13    people are financially unable to hire counsel, and we're

14    talking about people who are on the verge of losing their

15    homes, and I think the Court can take notice of that, both the

16    increase in home ownership rates in the last five years from

17    something like 62 to 69 percent and the inherent problems that

18    have resulted from that.  Going through the discretionary

19    matters, I think, frankly, all of them except maybe for a few

20    support formation of the Committee.  Clearly this is a

21    sophisticated large complex case.  I don't find the motion at

22    all untimely based on the facts and circumstances of this

23    case.  I'm cognizant of how delay would be expensive and

24    requiring additional interaction with a committee that is

25    formed will increase the claims of Mr. Brady's firm, of Mr.

1   Indelicato's firm and other firms that are getting paid from

2   the estate, but I think I have to balance that against the

3   potential upside, and I think the Court, as I indicated, can

4   fashion a remedy that would, while not eliminating that

5   expense, hopefully limit it significantly.  Yes, it will

6   result in a delay in confirmation.  Now, we're 14 months into

7   a liquidating case. I'm not moved by delaying confirmation

8   whatsoever other than the issue of a continued expense, which

9   I just dealt with.  Again, I don't feel that by virtue of the

10  way it was formed and the uniqueness of the borrowers' claims

11  that the Committee adequately can represent these interests

12  and the individuals are not in a position to represent their

13  own interests, and again, I think, there may be - and this

14  goes to this issue about the Committee being able to represent

15  these people, I think there are a potential for unique

16  remedies on behalf of the borrowers, and, you know, the

17  disclosure statement and plan are complex, not just the case,

18  but the issues in front of borrowers are complex, and they

19  have to be because it's a complex company and it's a complex

20  plan, but it inherently makes it difficult for unsophisticated

21  people familiar with the Bankruptcy Code to figure out what's

22  going on.  I've read plans.  I'm not saying it's this plan.

23  I've read plans and when I get to the seventh cross-indexed

24  definition I don't know what's going on any more, not that I'm

25  brilliant, but I've been doing this for awhile.  All right, so

1    here's what I'm going to do.  I'm going to direct Mr.

2    McMahon's office to appoint a trustee - excuse me, to appoint

3    a committee of borrowers.  The U.S. Trustee always has

4    discretion in forming a committee both in how it does it and

5    who it puts on it, and I want to emphasize that I think this

6    case presents probably the most challenging committee

7    formation meeting in my experience, and I understand that.

8    I'm going to give the U.S. Trustee's Office very, very broad

9    discretion.  Certainly, I don't feel that serving 1.5 million

10   people with notice of a borrower formation meeting would be

11   appropriate or required.  I'll leave it to you, Mr. McMahon,

12   and your office whether it's filed borrower claims, the

13   current claims of 450 people, publication notice at the

14   debtors' expense, however you want to work with the debtor to

15   figure it out.  I'm going to give your office the broadest

16   possible discretion in how you do that.  And again, I mean the

17   way that works is, if somebody's got an issue with it, they

18   can bring it to the Court's attention and we'll deal with it

19   then.  I'm not at this time going to reschedule the disclosure

20   statement, and I am not at this time going to put any

21   limitations on counsel to a Borrowers Committee, not because I

22   may not do that, but because until we have counsel to that -

23   until we have a Committee and the Committee can have proposed

24   counsel, I'm really not in a position to deal adequately with

25   what the limitations might be.  So, we have a hearing in this

1   matter two weeks from today at 10 a.m.  At that time I'm going

2   to hold a status conference in connection with the formation

3   of the Borrowers Committee.  I would hope that a Committee is

4   formed and has proposed counsel by then.  Even if they don't,

5   I will deal with the issues of scope of work, possible

6   limitations on fees and timing.  I will schedule a disclosure

7   statement hearing on the 22nd, and I will not move it again

8   without the consent of the primary parties.  This case does

9   need to move forward, but I think a Borrowers Committee needs

10  sufficient funds and sufficient time to have a reasonable say

11  in what appears before the Court.  So, I'd ask counsel who

12  filed the motion simply to enter a fairly bland order

13  directing the Office of the U.S. Trustee to appoint a

14  committee of borrowers pursuant to - for the reasons set forth

15  on the record at the hearing.  I think that's all we need.

16  Any questions?  Obviously, the disclosure statement is

17  adjourned without date but a date will be set in two weeks, on

18  the 22nd of October.  I think we have a 10 a.m. hearing that

19  day.  At least that's what my schedule shows.  It's an

20  omnibus.  Is that right?  Okay, that's right.  Any questions.

21  All right, thank you very much.  I appreciate the -

22          MS. ROMERO (TELEPHONIC): Your Honor, I have a

23  clarification question.  This is Martha Romero on the phone

24  representing the California taxing authorities.

25          THE COURT: Yes, ma'am.

1          MS. ROMERO (TELEPHONIC): The scheduled hearing that

2    you just mentioned on October 22nd at 10 a.m. is just for the

3    purpose of setting a new date for the disclosure hearing?

4          THE COURT: It will not -

5          MS. ROMERO (TELEPHONIC): I mean, one of the matters

6    is to schedule a new date for the disclosure hearing?

7          THE COURT: Yes.  The disclosure hearing itself will

8    not go forward on October 22nd.

9          MS. ROMERO (TELEPHONIC):  Okay, and that hearing's

10   at 10 a.m.

11         THE COURT: Ten a.m. Eastern, yes, ma'am.

12         MS. ROMERO (TELEPHONIC): Okay, thank you so much.

13         THE COURT: You're welcome.  Any other questions?

14   Okay, thank you, the hearing's adjourned.

15         (Whereupon at 12:06 p.m., the hearing in this matter

16   was concluded for this date.)

17

18         I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                      October 13, 2008
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221