# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| AMERICAN HOME MORTGAGE ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation, ) | Jointly Administered |
| et al., ) | |
| ) | Hearing Date: 11/25/08 @ 10:00 a.m. |
| Debtors. ) | Objections Due: 11/20/08 @ 5:00 p.m. |
| ) | (for Borrowers Committee) |

## OBJECTION OF OFFICIAL COMMITTEE OF BORROWERS TO ADEQUACY OF DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

The Official Committee of Borrowers (the "Borrowers Committee") hereby objects to the adequacy of the Debtors' proposed disclosure statement, dated as of October 8, 2008 ("the Disclosure Statement" or cited as "DS at ___") as follows:

## BACKGROUND

1. On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

3. On October 21, 2008, the United States Trustee for the District of Delaware appointed the Borrowers Committee. The Borrowers Committee subsequently convened and engaged undersigned counsel.

1

2046250.2

4.  At a hearing the very next day, the Court set a hearing on approval of the Disclosure Statement for November 25, 2008.

## OBJECTION

The Disclosure Statement does not contain adequate information. The goal of a disclosure statement is to ensure that all voters have the opportunity to make an informed decision about whether to accept or reject a proposed plan. *See* 11 U.S.C. § 1125(a). Accordingly, the Court may approve a disclosure statement only if it provides voting parties with "adequate information" upon which to base their respective votes:

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of claims or interest of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

Although there is no talismanic list of items that must be included in a disclosure statement, numerous courts have considered the following factors relevant to any evaluation of the adequacy of a disclosure statement:

(1) The events which led to the filing of bankruptcy;
(2) A description of the available assets and their value;
(3) The anticipated future of the company;
(4) The source of information stated in the disclosure statement;
(5) A disclaimer;
(6) The present condition of the debtor while in Chapter 11;
(7) The scheduled claims;
(8) The estimated return to creditors under a Chapter 7 liquidation;
(9) The accounting method utilized to produce financial information and the name of the accountants responsible for such information;
(10) The future management of the debtor;
(11) The Chapter 11 plan or a summary thereof;
(12) The estimated administrative expenses, including attorneys' and accountants' fees;

(13) The collectability of accounts receivable;
(14) Financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
(15) Information relevant to the risks posed to creditors under the plan;
(16) The actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;
(17) Litigation likely to arise in a non-bankruptcy context;
(18) The tax attributes of the debtor; and
(19) The relationship of the debtor with affiliates.[1]

To the extent these items are known or readily ascertainable, a plan proponent should include them in any disclosure statement submitted to creditors.[2] Such information is necessary because creditors rely heavily on a disclosure statement in determining whether to approve a proposed reorganization plan.[3]

### A.   The Disclosure Statement Is Not Readable by Borrowers.

As an initial matter, the Disclosure Statement's information is set forth with such opacity that only sophisticated financial institutions and experienced bankruptcy lawyers can understand it. Unfortunately, the audience who will read the Disclosure Statement is considerably broader and includes unsophisticated borrowers, albeit those who were fortunate enough to receive notice and file proofs of claim in these cases. Given the audience, the Court should instruct the Debtors to make the Disclosure Statement readable to consumers and to use plain English.

### B.   The Disclosure Statement Is Silent on Borrower Issues.

The Disclosure Statement contains no discussion of borrower claims or the appointment of the Borrower Committee. Nor does the Disclosure Statement contain any information useful

---

[1] *See In re Metrocraft Publishing Servs.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); *see also In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (listing factors); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988) (listing factors); *In re Dakota Rail, Inc.*, 104 B.R. 138 (Bankr. D. Minn. 1989); *In re Jeppson*, 66 B.R. 269 (Bankr. D. Utah 1986); *In re S.E.T. Income Properties, III*, 83 B.R. 791, 792 (Bankr. N.D. Okl. 1988) (listing factors); *In re Malek*, 35 B.R. 443, 443-44 (Bankr. E.D. Mich. 1984) (listing factors).
[2] *See In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) ("Information to be provided should be comprised of all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan.").
[3] *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

to borrowers with claims arising from the origination or servicing of their loans. For instance, borrowers are left in the dark as to how they might liquidate their claims against the Debtors, how to obtain loan files, or even the most basic information about their loans. Likewise, there is no discussion of how the various restrictions on litigation against the Trust, such as the extension of the automatic stay and the requirement that litigation be brought in Delaware, could affect borrowers. Borrowers should be made to understand how the Plan would affect their claims against the Debtors and third parties. The Borrowers Committee is currently working to ensure that the Plan's provisions do not affect or cut off the rights of borrowers in connection with their mortgage loans.

There is no discussion that the Debtors failed to provide actual notice of the bar date to borrowers other than to those who had instituted or threatened litigation by the time that the notices were mailed. The risk factors do not assess the possibility that large numbers of borrowers without notice may have claims against the Debtors and may seek relief from enforcement of the Plan's provisions to pursue litigation against the Debtors and third parties.

## C.     The Disclosure Statement Does Not List Estimated Claims by Class.

At the beginning of the Disclosure Statement, a chart lists the classes set forth in the Plan and the proposed distribution to claims contained in each class. DS at 5-9. This information is of limited utility because it omits a listing of the aggregate number and value of claims contained in each class.

## D.     Important Parties Are Not Identified.

The relatively short description of the Debtors' business and indebtedness[4] describe a number of parties who had dealings with the Debtors without ever identifying those parties. For

---

[4] Part III of the Disclosure Statement entitled, Background of the Debtors and the Chapter 11 Cases, extends for 40 pages; however, less than 8-1/2 pages address the Debtors' business, its products, debt, and relationships prior to the

4

2046250.2

instance, the Disclosure Statement mentions several "Warehouse Lenders" and "Master Repurchase Agreements" without identification by name. The Disclosure Statement also notes that the Debtors sold loans to securitization trusts without identifying them and whether they were affiliated with the Debtors.

### E.     The Description of the Loan Business Is Misleading.

The Disclosure Statement's gleaming description of the Debtors' loan business begs the obvious question: how did such a top-flight mortgage business fail? The answer is that the Debtors' loan business was much more unsavory than the Disclosure Statement would lead one to believe. There were serious problems with the loans, and those problems are important here both because they give rise to claims by borrowers and because they give rise to defenses to claims asserted by financial institution creditors who knew about the problems but bought them anyway.

Several pages into the Disclosure Statement, the Debtors acknowledge that their mortgage products varied from one another in important respects. They divide their loan products between fixed-rate mortgages ("FRMs"), adjustable-rate mortgages ("ARMs"), pay-option ARMs ("POAs"), and second-lien mortgages ("2nds"). *See* DS at 85. The description of the Debtors' loan originations at the beginning of the Disclosure Statement, however, would never suggest to the reader that the Debtors originated notorious POAs.[5] *See, e.g.*, DS at 17 n.15

---

commencement of the chapter 11 cases. The remaining background addresses the events occurring during the chapter 11 cases, much of which is a matter of public record.

[5] POAs are highly complex loans that allow borrowers to make minimum payments that result in negative amortization of the loans. The loans often provide for an introductory teaser interest rate that lasts for only a short time, e.g., one month. POAs should have been sold only to sophisticated borrowers with irregular income. Instead, the Debtors induced borrowers (including a majority of the members of the Borrowers Committee) to refinance their homes with such loans. The borrower can continue to make the minimum payment – since the typical three-year prepayment penalty would dissuade the borrower from further refinancing – but when the amount of the loan increases to 115% to 125% of the original loan amount, the loan automatically recasts and requires monthly amortizing payments. *See "Option" ARMs Can Easily Confuse*, L.A. TIMES at C1 (May 27, 2007) (annexed as Ex. 1 hereto).

(listing the Debtors' product lines but making no mention of POAs). POA's are particularly troubling mortgages because they often have – and often qualify borrowers on – very low and very short-term introductory interest rates and non-amortizing payment options, which result in negative amortization and result in borrowers owing more than their homes are worth. In addition, these mortgages contain re-set provisions that trigger sudden payment escalations that borrowers typically did not expect and cannot afford. In fact, the Debtors originated $5.4 billion in POAs in third quarter 2006, making the Debtors the No. 7 originator of POAs. *See A Farewell to ARMs? Not Quite Yet*, BUSINESS WEEK (Dec. 11, 2006) (annexed as Ex. 2 hereto).

The Disclosure Statement states that the Debtors' primary goal in determining whether to originate the loan is whether the loan "conformed to the expectations and underwriting standards of the secondary mortgage market." *See* DS at 17-18. A few paragraphs earlier, however, the text suggests that the Debtors intended to invest in loans that they originated. The Disclosure Statement would lead one to believe that the Debtors voluntarily chose to invest in loans that they originated, when in fact most loans held by the Debtors were loans that they could not sell on the secondary market because of significant problems with the loans' underwriting and performance. Also, the Disclosure Statement does not disclose the effect on the Debtors of holding onto loans, namely that the failure to sell such loans decreased the Debtors' credit under their warehouse lines of credit.

The Disclosure Statement gives other mistaken impressions about the loans that the Debtors originated. For instance, one could surmise that the Debtors required full documentation for their loans, *see* DS at 18, even though many of the loans originated by the Debtors were with little or no documentation. Also, the Disclosure Statement suggests that the Debtors required borrowers with good credit ratings, *see* DS at 17 (noting weighted average FICO score of 716),

but there is no discussion of the Debtors' "Choice" line of loans, which, upon information and belief, involved subprime borrowers, nor is there discussion of the Debtors' issuance of POAs to borrowers with lower credit scores.

Finally, the Disclosure Statement's description of the events leading up to the filing of these cases is misleading and fails to consider other causes of the Debtors' precipitous collapse. Although the section addresses the Debtors' ultimate inability to satisfy margin calls, it fails to note the Debtors' inability to sell many of its loans that it was originating and the corresponding effect on their warehouse lines of credit, which in turn adversely affected the Debtors' ability to satisfy margin calls.

If the Debtors sold assets outside the ordinary course of business to meet margin calls, the Disclosure Statement should provide information about such transactions so that creditors can scrutinize them to determine whether the transactions involved dealings with insiders of the Debtors and whether the Debtors received fair consideration.

### F.    The Disclosure of Available Assets and Their Values Is Insufficient.

Although the Disclosure Statement reflects that "[a]s of October 3, 2008, the Debtors had cash on hand of approximately $7.80 million plus $10.03 million in collections and refinancing proceeds relating to the BofA Construction loans," DS at 52, the Disclosure Statement does not identify any other assets which have not yet been liquidated. Nevertheless, the Disclosure Statement implies that there are additional assets and causes of action which will be transferred to the Plan Trust and administered post-confirmation. The Disclosure Statement should identify the nature and value of the remaining yet-to-be liquidated assets.

Likewise, there is no discussion in the Disclosure Statement about available insurance that may be available to cover claims and whether any claims have been made against available insurance. Nor is there any discussion of mortgage insurance. Presumably, at least some

mortgage insurance should be available to the estates. Even if the estates cannot access all of the insurance originally purchased by the Debtors – because the Debtors subsequently have sold the loans to other parties – mortgage insurance should provide a significant source of funds for EPD and breach of warranty claimants, who should be obligated to satisfy their claims against such insurance rather than to assert inflated and unsubstantiated claims against the estates.

### G. There Are No Disclosures About Defenses to EPD and Breach of Warranty Claims.

The Disclosure Statement sets forth a complicated matrix to address EPD and Breach of Warranty Claims. Yet there is no discussion in the Disclosure Statement of the Plan Trustee's equitable and other available defenses to such claims. Nor is there any discussion of the claimants' duty to mitigate their claims, for instance, through pursuit of available mortgage insurance. The Disclosure Statement leaves the impression that the Plan Trustee will give such claimants a free pass. Even if that impression is false, creditors should be informed about how the Plan Trustee will take various defenses into account. Indeed, the Debtors have not directed any of their 23 omnibus claims objections to date against EPD or Breach of Warranty Claims.

### H. The Disclosure Statement's Source of Information Is a Mystery.

The Disclosure Statement merely states that the Debtors prepared the information used therein and that the Debtor is solely responsible for the information. Yet, the bulk of the Debtors' officers and employees have been dismissed. If the Disclosure Statement was merely assembled by lawyers, it would be material to the reader to know.

### I. Future Management Is Not Disclosed.

The Disclosure Statement provides for the designation of the Plan Trustee within ten days *after* the voting deadline has passed. It is a matter of fundamental fairness that the parties being asked to vote on the Plan be advised of the identity of the person with whom implementation of the Plan will rest. At this point in time, the Debtors or the Committee must have *some* idea

2046250.2

regarding the identity of the proposed Plan Trustee, or at least a few of the possible candidates. Sharing that information with those whose rights will be effected by the Plan is only fair. Even if the identity has not yet been determined, the Debtor must at least have some qualifications for the Plan trustee in mind while it conducts its search. Disclosure of these qualifications would be a minimal effort at providing the parties in interest with information regarding the person charged with handling estate assets post-confirmation.

### J.   The Estimation of Administrative Expenses Is Incomplete.

The Disclosure Statement states that there is an aggregate of approximately $2.55 million of General Administrative Claims, but that amount excludes Professional Claims, APA Claims and WARN Act Claims. Although there some vague information relating to these excluded items, it is not included with the discussion of General Administrative Claims and is therefore misleading. Rather, in order to assess the true extent of administrative expenses, a party in interest must review the Disclosure Statement and attempt to glean the missing details from other sections.

Even if one were to try to assemble such information, the information in the Disclosure Statement is insufficient. For example, there is no clear estimate of the aggregate professional fees to be paid in these cases. There is a line item in the Summary of Cash Flow forecast used for the Plan which projects that Restructuring Professionals will receive $48.20 million between August 2007 and December 2008. DS at 53. No information is provided regarding what portion, if any, of the $48.20 million has been paid to date. Moreover, the Disclosure Statement notes that the WARN Act plaintiffs seek $18 million in administrative expenses and priority claims, but it does not allocate between the administrative and priority portion of the $18 million in potential exposure.

9

### K.  There Is No Disclosure of Actual or Projected Realizable Value from the Recovery of Preferential or Otherwise Avoidable Transfers.

Although the Disclosure Statement states that the Plan Trustee will retain any causes of action that the estates may have, there is utterly no information regarding the nature and extent of such claims. This failure to provide information regarding potential avoidance actions is further compounded by the Debtor's failure to provide critical information regarding transactions made on the very eve of the Petition Date. Providing information regarding the aggregate amount of pre-petition transfers which may be the subject of an avoidance action is at a minimum crucial for the proper evaluation of the Plan.

### L.  The Discussion of Substantive Consolidation Raises Questions.

The Disclosure Statement discusses the pros and cons of substantive consolidation, but the discussion raises more questions than it answers. *See* DS at 54-56. For instance, there is no discussion of the massive booked intercompany claims and from what do they arise. *See id.* at 58 (listing booked claims). Nor is there any discussion of the extent of cross-corporate guaranties, which may support substantive consolidation. Incredibly, the only discussion of such guaranties actually states that they militate against substantive consolidation because they purportedly demonstrate reliance on separate entities. The very next sentence then notes that the Debtors are unaware of any creditors who, in deciding to provide credit, relied not on the credit of a particular entity – a typical defense to substantive consolidation – but rather on the lack of entity separateness.

If the Debtors were intending to provide an objective view of the pros and cons of substantive consolidation, the Disclosure Statement should be modified to do just that. The existing discussion is simply misleading.

2046250.2

### M. The Underpinnings of the Plan's Settlements Are Not Disclosed.

The Plan contains settlements concerning intercompany claims and the stipulated asset allocation, but the Disclosure Statement does not disclose the parties' positions, who was pushing them prior to the described settlements and what negotiations ensued. If the Plan confirmation is to seek approval of the settlements, the Disclosure Statement should set forth the information required by Bankruptcy Rule 9019.

### N. The Settlement of Intercompany Claims Does Not Address Recharacterization.

In the settlement of intercompany claims, it does not appear that potential recharacterization of the claims was considered. Yet, parent AHM Investment has an intercompany claim exceeding $1.3 billion against AHM Corp. that apparently is considered in the Stipulated Asset Allocation. It is hard to imagine that such a huge and otherwise undescribed claim between parent and subsidiary should be treated as debt without asking any questions.

### CONCLUSION

For the foregoing reasons, the Court should decline to approve the Disclosure Statement unless it is modified to provide the information set forth above in a clear, unambiguous and easy-to-read manner.

Dated: Wilmington, Delaware
November 20, 2008

ZUCKERMAN SPAEDER LLP

Thomas G. Macauley (ID No. 3411)
Virginia Whitehill Guldi (ID No. 2792)
919 Market Street, Suite 990
Wilmington, DE 19801
Telephone: (302) 427-0400
Facsimile: (302) 427-8242

- and -

2046250.2

GILBERT OSHINSKY LLP
Stephen A. Weisbrod
W. Hunter Winstead
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Telephone: (202) 772-1962
Facsimile: (202) 772-3962

Proposed Attorneys for the Official
Committee of Borrowers

2046250.2