UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
AMERICAN HOME MORTGAGE              .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware          .    (Jointly Administered)
corporation, *et al.*,              .
                                    .    November 25, 2008
                                    .    10:00 a.m.
            Debtors.                .    (Wilmington)
                                    .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Good morning.

3          MR. BEACH: Good morning, Your Honor.  May it please

4    the Court, Sean Beach from Young Conaway on behalf of the

5    Debtors.  Your Honor, quickly running through the beginning

6    of the agenda, the first five items have been adjourned.  The

7    sixth item is the Debtors' motion to extend the solicitation

8    period, which order Your Honor has entered.  The seventh

9    item, the motion by American Lien Fund has been adjourned by

10   agreement of the parties until the 10th.  Which brings us to

11   items no. 8 and 9 on the agenda, which are the Debtors'

12   disclosure statement and solicitation procedures.  Your

13   Honor, originally the Debtors filed this plan and disclosure

14   statement on August 15th, 2008.  We also filed amended

15   versions on September 30th and October 8th.  And the latest

16   version was filed on November 21st.  I do have a few revisions

17   that were made from the 21st version until today based on

18   discussions we've been having with, mainly based on

19   discussions we've been having with the Borrowers Committee

20   and some cleanup items.  I thought it might be helpful if I

21   can just hand up that version.  I'll mainly use the November

22   21st version for today, but I may make some references to

23   that.

24          THE COURT: Okay.

25          MR. BEACH: And then also to hand up to Your Honor a

1    black line of the solicitation procedures order.

2              THE COURT: Very good.

3              MR. BEACH: May I approach?

4              THE COURT: Yes.  Thank you.

5              MR. BEACH: Your Honor, just briefly at the outset I

6    wanted to give Your Honor a status update in terms of where

7    we stand generally on objections.  By my count, Your Honor,

8    there were 38 objections to the disclosure statement, 4

9    objections to the solicitation procedures.  The agenda we

10   filed reflected a number of resolutions, but I'm pleased to

11   report we now have resolutions, I believe, on 36 of the 38

12   disclosure statement objections, and on all of the

13   solicitation procedure objections.  And that calculation is

14   subject to confirmation that we have resolved the Borrowers

15   Committee objection, and we may need to take a break to get

16   that confirmation later in the hearing.  Which would leave

17   us, Your Honor, with, again, by my count, the CitiMortgage

18   objection and an objection by the California Taxing

19   Authority.  On that California Taxing Authority objection, I

20   believe that we are mostly resolved.  There may just be one

21   or, one or two clarification points.  Prior to addressing the

22   objections, Your Honor, I'd like to provide the Court with a

23   very brief summary of some, some features of this plan.  As

24   Your Honor is aware, this is a liquidating Chapter 11 plan.

25   But based on the size and complexity of these cases, there

1    are eight estates, and there are some complexities in, in

2    this plan.  In general, it is a typical liquidating plan with

3    certain features that I want to point out to Your Honor.  We

4    have what we call a stipulated asset allocation, which I'll

5    explain a little bit.  And we also have an EPD and breach of

6    claims protocol.  Both of which the primary reason for those

7    provisions are to build in efficiencies into the plan with

8    the stipulated asset allocation.  One of the primary reasons

9    for that is to prevent what we feel would be debilitating

10   conflicts of interest in, in the, in one plan trust or one

11   plan trustee trying to administer those assets with the

12   significant disputes that would arise in connection with

13   inter-company claims and other inter company litigation.

14   Your Honor, as you know, these cases have been very active

15   with plenty of constituencies, including secured lenders,

16   repurchase agreement, counter parties, securitization

17   trustees, trade creditors, and borrowers.  But throughout the

18   course of these cases, the Debtors have been successful at

19   working through many of these competing interests, oftentimes

20   in the same assets, and have been successful in marshaling,

21   for lack of a better word, billions of dollars in assets.

22   Since late 2007, the Debtors have been working very closely

23   with the main unsecured creditor constituency remaining in

24   this case, which is the Official Committee of Unsecured

25   Creditors, and we are seeking approval today to solicit a

1    plan that has the support of the Official Committee of

2    Unsecured Creditors.  And like I said, Your Honor, we started

3    those discussions in late 2007.  Those discussions continued

4    through August, and even after the initial filing of the

5    plan.  And ultimately, the Committee is supporting the plan.

6    Under this plan, Your Honor, it anticipates paying all

7    secured, administrative, and priority claims in full.  It

8    also anticipates, unfortunately, modest distributions to

9    unsecured creditors, but we do believe that those

10   distributions would be, would far exceed what creditors would

11   receive under a Chapter 7 liquidation.  At the high end,

12   we're looking at just north of a 5% distribution to unsecured

13   creditors in the AHM Holdings estate, and on the low end,

14   under 1% distribution to unsecured creditors.  Subordinated

15   claims, other than subordinated trust preferred claims and

16   equity claims, are not anticipated to receive any

17   distributions under this plan.  Your Honor, as I mentioned

18   before, some of the, the features of the plan are the

19   stipulated asset allocation.  And again, this is meant to

20   resolve some significant inter-company claims that the, that

21   the company would have.  The Debtors and the Committee first

22   discussed the idea of substantive consolidation, but in

23   considering those options and the Owens Corning decision, and

24   the effect on certain creditors, we believed that it was more

25   prudent to pursue a plan that was a de-consolidated plan, but

1   which built in efficiencies that would respect the entity

2   separateness, but would also be able to provide for a unitary

3   trust post-confirmation system.  Your Honor, the, I think the

4   stipulated asset allocation, the underlying premise of that

5   is that as long as the estates agree to stipulate to the

6   residual value of their assets, of the assets that each

7   estate is contributing to the plan trust, and the percentage

8   share of the plan trust operating expenses born by each

9   estate is agreed upon, then it's possible for each of those

10  estates to share in the proceeds.  And so what we've done

11  with the stipulated asset allocation is come up with

12  percentages after running through the formula that we

13  described in the disclosure statement to come up with that

14  allocation.  As I mentioned earlier, Your Honor, we also have

15  an EPD breach protocol.  Some of the larger creditors in the

16  case have asserted significant EPD breach claims and they

17  span the gamut.  Some of these claimants have filed claims

18  based on the total EPD of the total pool of loans, for

19  instance in a securitization, others have filed a complete

20  unliquidated claim, and haven't given the information to

21  support that.  Others have attempted to do some loan level

22  analysis.  But at the end of the day, in order for the

23  parties to, to liquidate these claims, both the Debtors and

24  the counter-parties would have to do a loan level analysis of

25  each of the EPD's, the underlying documentation, and

1    determine one, if there was an actual early payment default,

2    and determine if there was a breach of warranty under these.

3    And so the EPD breach claim protocol is based on, largely on

4    the Debtors' historical damages and incidence rates of EPD

5    and breaches.  And it is also based on information that we've

6    received from creditors throughout the course of these cases.

7    With that, Your Honor, the Debtors believe that the

8    disclosure statement contains adequate information as defined

9    in 1125(a)(1) and that the disclosure statement should be

10   approved.  As I indicated before, Your Honor, I believe that

11   the vast majority of the objections are resolved.  There are

12   a vast majority of those creditors who wanted to make it

13   clear that their objections to the plan confirmation are

14   reserved.  So I want to make it clear to all those parties

15   that there's no intent here to compromise those potential

16   plan objections.  But certainly we hope to work through those

17   with the parties up through the plan process.  With that,

18   Your Honor, I can run through each of the objections or I can

19   invite any creditors that, other than CitiMortgage and the

20   California Taxing Authority to come up if they don't believe

21   that their objections are resolved.  And again, I reserve on

22   the Borrowers Committee, and hopefully we can take a break

23   and get that objection resolved.

24           THE COURT: Okay.

25           MR. BEACH: With that, Your Honor, I assume that - -

1          THE COURT: I'm sure they're coming.  They're all

2     being shy.

3          MR. BOONE (Telephonic): Your Honor, if I might.

4     This is Bill Boone of Alston & Bird on behalf of LaSalle

5     Bank, National Association.  We did resolve the objections,

6     but there was a representation by Debtors' counsel that they

7     would make a clarifying statement with respect to an issue we

8     had related to one vote per each trust that LaSalle acts for

9     in its capacity as a trustee for various securitizations.

10          THE COURT: Mr. Beach.

11          MR. BEACH: Yes, that's correct.  The Debtors and

12     LaSalle have discussed the issue of certain securitization,

13     or certain trustees for securitizations filing proof of

14     claims where they listed a number of trusts where they act as

15     trustee in one proof of claim.  And we did confirm with

16     LaSalle that if they are acting in the legal capacity as

17     trustee for securitizations on several different trusts, then

18     they will have the ability to vote for numerosity and amount

19     purposes with respect to each of those claims.

20          THE COURT: Okay.

21          MR. BOONE (Telephonic): Thank you, Your Honor.

22          THE COURT: You're welcome.  Anyone else - - tell

23     you what, anyone else on the phone before we turn to the

24     people in Court?

25          MS. ROMERO (Telephonic): Your Honor, I represent

1    the California Taxing Authority.  This is Martha Romero.  And

2    I just had one, I was, had been communicating with

3    representatives of Debtors' counsel and I was hoping that,

4    that we could have a minor clarification in all of the

5    language that they have proposed to settle the disclosure

6    statement.  And the minor clarification that I wanted was

7    that the Trustee has several options in paying the taxing

8    authority's claims.  And one of the options is to pay the

9    claim over time.  And all I wanted was the Debtor to insert a

10   sentence or a phrase after that that would say when the

11   payments would commence, that it would include statutory

12   interest, and whether they would be quarterly, annually, or

13   monthly.  And we didn't get, we didn't get any further than

14   that, becuase I was out of the office yesterday at court.  So

15   we kind of left that part hanging.

16            THE COURT: Mr. Beach.

17            MR. BEACH: Yeah.  Your Honor, just for some, on

18   these type of claims that Ms. Romero is talking about,

19   they're not priority tax claims, they're secured tax claims,

20   and they relate to property taxes on REO property for the

21   most part.  At the end of the day, Your Honor, I don't

22   believe these are going to be issues, because at the time it

23   turns into REO, I suspect the taxes are going to be paid, or

24   certainly when the REO is liquidated they'll be paid, or

25   they'll be paid as servicing advances.  So I don't anticipate

1    these being issues.  What the plan says is that these are

2    categorized as miscellaneous secured claims under the plan.

3    And one of the options to deal with miscellaneous secured

4    claims is to pay those claims over time.  Now it essentially

5    reserves the issue of exactly how that mechanic would work in

6    the context, you know, of the confirmation or effective date

7    in terms of what will be chosen.  And you know, I think

8    what's implicit is that the, to the extend that that process

9    is chosen to pay those secured claims over time, which I

10   don't expect to be the case, then there would have to be some

11   kind of a note that the Debtors would give in connection with

12   paying that over time, or there would have to be, I guess,

13   some additional clarity for that secured creditor at the

14   time.  So I don't believe that there needs to be any clarity

15   in the disclosure statement in terms of how, generally,

16   miscellaneous secured claims would be dealt with.

17            THE COURT: Well, let me just - - it sounds like Ms.

18   Romero is basically trying to, not to be pejorative, but pin

19   you down on exactly how that structure would work in the

20   event you chose that way to proceed.  And what I'm hearing

21   from you is first of all, you don't think in all likelihood

22   that will be what happens in any event, but if you do decide,

23   or the Trustee decides to pursue that course, you're simply

24   not in a position at this time to know whether quarterly or

25   semi-annually or whatnot would be what you would prefer.  I

1    assume applicable non, I assume applicable non-Federal law

2    would apply, for instance, to the accrual of interest,

3    including statutory interest as well as any, as any

4    California rules regarding timing of payment.

5         MR. BEACH: That's right, Your Honor.  And you know

6    - -

7         THE COURT: Can we - -

8         MR. BEACH:  - - frankly I - -

9         THE COURT: I mean, does it make sense to add

10   pursuant to - -

11        MS. ROMERO (Telephonic): Well, the reason we'd like

12   it to be added is because obviously with the economy, the

13   counties out here, and I'm sure other counties, are

14   experiencing a crisis in that when the case originally

15   started there were maybe just a handful of REO properties.

16   Now there are hundreds and hundreds of REO properties that

17   have either, you know, have changed prior to the bankruptcy

18   or right after.  So some counties have gone to maybe five to

19   now 250 or 350.  And the counties, you know, as you can all

20   imagine, you know, rely on the property tax.  So this small

21   phrase, if it's not going to be an issue, I'm not

22   understanding why they just can't put in the, you know, the

23   terms of if they choose that election, how it will be paid

24   over time.

25        MR. BEACH: Well, Your Honor, I - -

1          THE COURT: What page are we talking about?

2          MR. BEACH: I think if we limit this to secured

3   priority tax claims, or secured tax claims related to REO, we

4   can probably deal with, state in the plan that they'll be

5   dealt with essentially the same as priority tax claims if we

6   choose to pay them over time.  So they'd be paid over the

7   five year period of time on a quarterly basis in accordance

8   with §511 in terms of the interest rate calculation.  If that

9   would be acceptable.

10          THE COURT: So what I'm hearing is you, you'd like

11   to make it a confirmation issue on a further, perhaps a

12   further amendment of the plan to address the issues, and not

13   make it a disclosure statement issue.  At least for today's

14   purposes?

15          MR. BEACH: Yeah, I - -

16          THE COURT: And reserve everyone's rights?

17          MR. BEACH: I think, that's what the Debtors would

18   prefer, Your Honor.  At the end of the day I think it is a

19   confirmation issue, and I think we can resolve with Ms.

20   Romero upon, on similar terms as how we would deal with

21   priority tax claims.

22          THE COURT: Can you show me what page we're talking

23   about here?  Ms. Romero, do you know?

24          MS. ROMERO (Telephonic): Your Honor, we've talked

25   about inserting entire paragraphs into the disclosure

1    statement, and so I haven't received a, since we've been

2    talking about this the last week and a half or so, they've

3    not sent me a document with, you know, all of these new

4    paragraphs.

5         THE COURT: Tell you what.  Let's - -

6         MS. ROMERO (Telephonic): When I did receive the

7    last version, it had, it wasn't in there yet.  So, I don't

8    know, I have no idea what version it is in, Your Honor.

9         MR. BEACH: Your Honor, if you look on the black

10   line that I handed you up, the November 25th version on page

11   81.  Like I said, we have been in discussions with Ms.

12   Romero.  I did understand that the language on this page,

13   particularly where it talks about the illustration, is I

14   think part of what Ms. Romero asked for.  And I believe that

15   she's asking for the clarification to be made at the end of

16   this illustration.

17        THE COURT: All right.  Let me look real fast.  And

18   I understand you haven't seen it, Ms. Romero, but let me see

19   if I - -

20        MS. ROMERO (Telephonic): That's page 81, Your

21   Honor?  Just for my notes.

22        THE COURT: And it's not black lined, so it should

23   be identical to the November 21 draft.

24        MR. BEACH: Right.

25        THE COURT: So just let me, if you give me a moment,

1    I'll read it.  All right.  So I, it appears that the

2    controversial, for lack of a better word, language involves

3    paying the tax claim in full, open paren, either in a lump

4    sum on the effective date, comma - - and here's the issue, I

5    take it - - or over time with interest.  And then it goes on

6    to say, If the plan Trustee chooses to pay the tax claim over

7    time, the tax lien will continue in the property until the

8    claim is paid in full.  Ms. Romero, I take it that your issue

9    is with the payment over time, you want to know how much

10   time, how specifically it will be paid, whether state law

11   interest will be applicable?  Is that correct?

12        MS. ROMERO (Telephonic): Yes, Your Honor.  Even

13   though I understand that their position is it will probably

14   just be paid as the REO process goes on.  You know, I

15   understand that, but - -

16        THE COURT: Well - -

17        MS. ROMERO (Telephonic):  - - when they include

18   other options, then I want to be sure, just like Your Honor

19   said, the time.

20        THE COURT: All right.  I'm not going to require

21   that change in the plan at this time.  You certainly have the

22   right to, and it's completely reserved, to raise the issue at

23   confirmation if you don't believe that payment over time is

24   specific enough to comply with the Bankruptcy Code or

25   California law.  And I don't think, I think the illustration

1    is clear at this point as to what the current status of the

2    plan is.  So I believe the plan contains, excuse me, the

3    disclosure statement contains adequate information.  And to

4    the extent that's an outstanding objection that hasn't been

5    resolved, I will overrule it.

6              MR. BEACH: Thank you, Your Honor.

7              MS. ROMERO (Telephonic): Thank you, Your Honor.

8              THE COURT: You're welcome, Ms. Romero.  Anyone else

9    on the phone?  All right.  Hearing none, yes sir.

10             MR. ETKIN: Good morning, Your Honor.  Michael

11   Etkin, Lowenstein Sandler, on behalf of the Oklahoma Pension

12   Funds that are lead plaintiffs in the securities litigation.

13             THE COURT: Right.

14             MR. ETKIN: And Mr. Beach is correct.  The pure,

15   what I would characterize as the pure disclosure statement

16   issues have been resolved and dealt with in the disclosure

17   statement.  Your Honor, you heard the anticipated

18   distribution in the case.  So with respect to my

19   constituency, my focus has been aspects of the plan that

20   could impede or interfere with the pursuit of the securities

21   litigation outside of this court going forward.  And with

22   respect to those issues, as Mr. Beach has indicated, we're

23   reserving those objections for confirmation so that the

24   process can continue.  There have been attempts to deal with

25   the language relating to document retention and preservation.

1    The Debtor has come some, some distance with respect to that,

2    but I don't, from our perspective at least, we're not all the

3    way there.  We'll deal with that at confirmation.  And

4    certainly issues regarding the stay and the, the releases,

5    and the ability of the lead plaintiffs to pursue insurance

6    post-confirmation, are issues that we'll deal with at

7    confirmation.  One item that Mr. Beach did not bring up that

8    we agreed to place on the record this morning is that the

9    timing of the filing of the plan supplements, which would

10   include the trust agreement and other documents, would

11   preclude one who objected to confirmation from looking at

12   those documents and filing a timely confirmation objection.

13   So we have agreed, and I'll place on the record, if Mr. Beach

14   disagrees, he can certainly let us know, but that to the

15   extent that any aspect of those documents, when they are

16   served and made available, present any other issues that we

17   believe should be brought to the Court's attention from the

18   standpoint of confirmation, that we will not be precluded by

19   the current anticipated deadline for confirmation objections.

20   To the extent we want to supplement our objection by virtue

21   of issues that we find with respect to those documents.

22           THE COURT: All right.  Mr. Beach.

23           MR. BEACH: Your Honor, that's correct.  And that's

24   correct for all creditors.  To the extent, the objection

25   deadline is what, whatever Your Honor orders today, but I

1    believe it's right around the time that the plan supplement

2    documents are due.  So if those plan supplement documents are

3    filed in a time frame where the initial objection can't

4    address them, then we certainly are not going to suggest that

5    parties' rights are prejudiced to supplement that objection

6    within a reasonable time.

7         THE COURT: All right.  Mr. Etkin?  Yup?  Okay.

8    Thank you.  Anyone else in court?  Okay.  Seeing none, Mr.

9    Beach.

10        MR. BEACH: Your Honor, I think that leaves us, in

11   terms of objections, with the CitiMortgage objection.  Your

12   Honor, the Debtors filed, with their initial agenda, a chart

13   with our description of what the general objections were.

14   And, and you know, what we believe the Debtors had done to

15   address those objections.  Either, you know, because it was

16   already in the disclosure statement, or what we added as a

17   result of some of the objections from parties.  And I, I

18   think probably that's a good illustration or a good starting

19   point in terms of having satisfied the adequate information

20   issues that CitiMortgage raised.  The first issue that they

21   raised I think is clearly resolved.  They raised an issue

22   that we hadn't disclosed, the current cash on hand.  That's

23   now included in the amended disclosure statement at

24   §3(g)(24).  On the black line it's page 59.  Well, 59 through

25   61.  And that's, the black line I'm referring to is the, the

1   version on the 21st, Your Honor.

2            THE COURT: I'm sorry.  Are you looking at the 21st?

3            MR. BEACH: Yes, Your Honor.

4            THE COURT: 3(g)(24), is that correct?

5            MR. BEACH: Yes.

6            THE COURT: Which is cash position and estimated

7   distribution percentages?

8            MR. BEACH: Yes.  That's right, Your Honor.

9            THE COURT: Um-hum.  Where is the current cash on

10   hand?  Oh, it's right there.  8.17 million plus approximately

11   12.2 in collections, and approximately 600 thousand in funds

12   for REO compromise.  Correct?

13            MR. BEACH: That's right, Your Honor.

14            THE COURT: All right.

15            MR. BEACH: The second issue that they raised were

16   the estimated and actual payments or distributions to secured

17   creditors and administrative claimants, or estimated

18   distributions to unsecured creditors.  Your Honor, we've

19   included a significant amount of information on this stuff.

20   The specific issue with respect to distributions to unsecured

21   creditors, or to secured creditors and repo counter parties

22   in many cases can't be quantified.  And I'll give you a for

23   instance.  With respect to BofA, as you know, our settlement

24   agreement with BofA, agreed to give them the loans back.  And

25   those loans, as I understand it, have not been fully

1   liquidated yet.  Now we've got an agreement with them which

2   caps the overall deficiency claim.  But at this point, we

3   don't know what that deficiency claim is.  We don't know what

4   the value of the collateral is.  There are other creditors

5   where, or repurchase counter parties where we have, you know,

6   no agreement in terms of the discretion to liquidate that

7   collateral, and the Debtors are reserving their rights, and

8   the plan Trustee's rights to object to how these counter

9   parties ultimately liquidate the collateral, and that it

10  wasn't done in a commercially reasonable manner.  So there's

11  no way of putting numbers on that at this point.  What we did

12  do, Your Honor, is include in the amended disclosure

13  statement, section, well it's on page 6 through 10 of the

14  black line, the table of estimated distribution percentages

15  to each class?

16          THE COURT: Um-hum.

17          MR. BEACH:  §3(g)(24) on page 61, a table of

18  estimated dollar amounts for distribution and distribution

19  percentage to unsecured creditors of each estate.  And §4(c)

20  in the black line page 71 through 73, a discussion of the

21  stipulated asset allocation, the administrative costs to

22  date.  Estimated secured administrative and priority claims.

23  Estimated residual value available for distribution to

24  unsecured creditors.  And Your Honor, I believe that with

25  those additions their objections should be satisfied.  The

1    next objection they raise is with respect to the substantive

2    consolidation analysis and the discussion of the data

3    underlying the stipulated asset allocation.  Your Honor, with

4    respect to these issues, I think it would be helpful to run

5    through the, what the Debtors have done in connection with

6    the stipulated asset allocation.  These descriptions are

7    found from page 61 to 73, and it starts essentially with the

8    general, the general background of how the Debtors came to

9    the stipulated asset allocation.  And that first discussion

10   starts out with substantive consolidation.  So what the

11   Debtors did is on page 61 they described their consideration

12   of substantive consolidation and our determination that with

13   the, with our negotiations with the Unsecured Creditors

14   Committee, that it wasn't the most prudent course to take

15   given the Owens Corning decision and the position of these

16   estates.  On page 63, beginning, the beginning of its

17   description on inter-company claims and the benefits of

18   resolving such disputes in the plan.  So we discuss our

19   rationale for wanting to resolve inter-company claims, and

20   how we think, the best method of resolving those claims in

21   the plan would be.  On page 65 there's general descriptions

22   of the types of inter-company disputes, including a chart

23   listing the booked inter-company payables and receivables,

24   the imputed inter-company payables and receivables, and other

25   adjustments and considerations the Debtors made in connection

1  with the inter-company claims.  On page 68 the Debtors

2  described the rationale for settling inter-company claim

3  disputes through the stipulated asset allocation.  On page 69

4  the Debtors described and put several charts in of the

5  liquidated and unliquidated asset categories by Debtor.  On

6  page 70, the disclosure statement walks through the estimated

7  adjusted gross asset value by charting, by Debtor entity, the

8  unencumbered values, the effect of layering in the inter-

9  company claims, the adjusted gross unencumbered asset value,

10  reductions of directly assignable administrative claims,

11  allocable administrative claims, estimated secured

12  administrative and priority claims by estate and plan trust

13  reserves.  Essentially walking through the calculation for

14  the stipulated asset allocation.  And on page 72, it results

15  in the residual value and the percentages that we've

16  attributed to the stipulated asset allocation.  So I think,

17  as Your Honor can see, we have walked through, in very

18  specific detail, the basis for the allocation and the reasons

19  why and the data that we used to get to that allocation.  And

20  as such, Your Honor, we think the information is adequate on

21  that point.

22          THE COURT: All right.

23          MR. BEACH: And then the last point they raise is

24  the value of the Debtors' assets, both liquid and illiquid.

25  Or a liquidation analysis.  I guess when they filed this

1    objection, the liquidation analysis had not been filed.  It

2    has now been filed.  We updated it with the November 21st

3    version to make it easily readable for creditors.  And the

4    intent of that was to put side-by-side a view of what the

5    recoveries would look like in a Chapter 11 versus a Chapter

6    7.  And to also try to get the numbers to comport more

7    closely with the information that's reflected in the

8    disclosure statement related to the stipulated asset

9    allocation so it was easier to compare apples to apples in

10   that regard.  One of the reasons why the Debtors didn't give

11   a specific asset value with respect to some of the assets

12   that have not been liquidated yet, for instance the bank, is

13   because we are currently in negotiations with parties, and we

14   don't want to impair the value of that asset by coming out

15   with some estimate of what's - -

16        THE COURT: I'm sorry.  Start that sentence over

17   again.  Why didn't you?

18        MR. BEACH: With respect to, we have certain assets

19   that are not liquidated yet, like the bank.  Now, we didn't

20   want to give a specific asset value or estimate for the bank

21   because we're currently in negotiations with a party over a

22   stock purchase agreement.  And those negotiations, we've been

23   in negotiations with parties for this bank for over a year

24   now, and those negotiations are very difficult.  We don't

25   want to potentially impair the value by putting some estimate

1    in the disclosure statement that could give a party a sign

2    that they may want to renegotiate the contract or be more

3    difficult in the terms that they might demand for that asset.

4    Now what we did do, Your Honor, is we have given asset level

5    descriptions, as I mentioned before, by Debtor in terms of

6    the assets that are in the estates, both what's liquidated

7    and what's unliquidated.  What we've also done is we have

8    given estimated asset values in the aggregate under the

9    liquidation analysis, and I believe in the disclosure

10   statement itself, by Debtor, what the aggregate asset values

11   are.  But we felt that it would potentially impair the value

12   that we would ultimately get in marketing these assets if we

13   put an asset-by-asset estimation for those assets that have

14   not been liquidated yet.

15            THE COURT: Did you treat those assets basically

16   identically in the regular part of the disclosure statement?

17            MR. BEACH: Yes, Your Honor.

18            THE COURT: So the treatment is consistent between

19   the liquidation analysis and the going concern analysis.

20            MR. BEACH: Yes.  And that was one of the concerns

21   expressed by creditors in the first liquidation analysis we

22   filed and the disclosure statement.  We've now done the best

23   we can to make those consistent.

24            THE COURT: Apples to apples.  Right.

25            MR. BEACH: Yeah.

1            THE COURT: Okay.

2            MR. BEACH: Your Honor, I have spoken with counsel

3    for CitiMortgage.  I'm referring to the objections that they

4    raised.  We have exchanged some emails and had some

5    conversations.  So I believe what they filed in their

6    objection is resolved.  I'm not sure if the, if CitiMortgage

7    wishes to bring any other issues up today.

8            THE COURT: Mr. Petrie.

9            MR. PETRIE: Thank you, Your Honor.  Excuse me.  I

10    guess if I may, Mr. Beach, have a little starting off point

11    by way of background, and perhaps I should advise the Court

12    of sort of the context - -

13            THE COURT: Sure.

14            MR. PETRIE: - - in which CitiMortgage was looking

15    at this plan.  We have a Chapter 11 liquidation in which, as

16    near as we can tell, over $40 million of professional fees

17    have been expended.  Obviously there's been a significant

18    amount of work, and good work, that has resulted from that

19    expenditure.  But the net net, as we sit here today, is that

20    - - and this is stated in the disclosure statement - - that

21    the majority of the assets have already been liquidated.  As

22    I understand it, the remaining assets essentially boil out to

23    be some smaller groupings of loans, some of which are

24    currently sort of in mid-process of having proposed

25    liquidations approved by the Court, the real estate, the two

1    properties, the Mount Prospect and the Melville property, and

2    then the AH Bank.  And so for a creditor like CitiMortgage,

3    and our stake, so to speak, Your Honor, is we were a

4    purchaser of loans.  We do not have a problem with the EPD

5    and the breach protocol.  We were part of New Century.  We

6    understand that, and we've, they, the Debtors agreed to a

7    minor tweak on some verbiage in there, and we're fine with

8    that.  But what happens is we get a UPB number that gets run

9    through that protocol and obviously as you can see from the

10   percentages, it's very significantly reduced, and then that

11   number is in turn the number that becomes multiplied by a

12   percentage recovery.  So at the end of the day, we are

13   looking at a very large UPB number that's get whittled down

14   to, relatively speaking, a very, compared to the one we

15   started with, a very small claim number.  And so from my

16   client's perspective, the principle foci of its view on the

17   plan, or on the disclosure statement, excuse me, is do we,

18   are we better served going forward with a liquidation 11 or

19   should we just go to 7?  Take our licks, get our money now,

20   and get on with other things, so to speak.  And of course, we

21   filed our objection some time ago in the process.  The

22   disclosure statement has been modified, and some of the

23   modifications have been very helpful, but some of them are

24   also incomplete.  So, at least from CitiMortgage's

25   perspective.  And I think, there was a word Mr. Beach used

1    that perhaps described best, I can use as a generic, to

2    describe what CitiMortgage's objection is, and that's when he

3    talked about aggregate.  Because all of the information is

4    aggregated.  It's kind, it's done on a survey basis and

5    there's no drop-down giving us anything specific that we can

6    look at.  And perhaps, I think AH Bank is, I'm going to use

7    it as sort of the poster child for where CitiMortgage's

8    objections lie.  AH Bank is currently listed as being an

9    asset of AH Holdings.  At the same time, however, there are

10   notations throughout the disclosure statement that AH Corp.,

11   who is the particular Debtor against whom, or against which

12   CitiMortgage's claims lie, advanced funds.  Advanced funds

13   to help Holdings in the acquisition of that asset, advanced

14   funds to cover expenses in the operation of that asset.  And

15   as the Debtor acknowledged, at some point in the disclosure

16   statement on page 91 - - and this is, again, going back to

17   the, the earlier version, not the one we received today - -

18   that there are some inter-company claims that could be re-

19   characterized as equity.  So one of the first questions that

20   came up from CitiMortgage is how come the bank gets lumped

21   into the Holdings category versus the Corp. category?  And

22   that sort of, to use a term imprecisely, Your Honor, is the,

23   the reason why CitiMortgage kind of feels a standing to

24   discuss that issue with the Court.  This is an asset that the

25   Debtor has said all along is one of its most significant

1   unencumbered assets remaining.  They have since, in the most

2   - - I'm sorry.  In the November 21st iteration have now taken

3   out the phrasing that said it was their expectation that this

4   would provide considerable value on sale or liquidation, but

5   they haven't, at the same time said, it will provide no

6   value.  The only thing we can tell about the value of this

7   asset is that we have an aggregate.  The total amount of

8   assets in the liquidation analysis for AH Holdings.  Which

9   presumably includes its interest in the bank.  But the number

10  we have is, at least in liquidation analysis, is 160 million,

11  816 thousand, for all of the assets of that entity.  Nothing

12  about the bank.  There's nothing, again, because we just get

13  an, a generic description.  We get something that says, Corp.

14  paid money to assist Holdings with the bank.  There's nothing

15  about the amounts, when those payments were made, and nothing

16  with which we can assess whether we should be, Corp. should

17  properly have an equity stake in that significant asset.  Or

18  whether it should be treated as an inter-company claim.  And

19  then we get to the whole inter-company claim structure which

20  is similarly aggregated.  It says, Here are groupings of

21  claims.  Here are the amounts we assigned to them.  Here are

22  groupings of other claims.  Here are amounts - - and the

23  pages Mr. Beach referred to in his comments.  But what we're

24  left with is an inability to assess the allocation as those

25  claims are being dropped down through the formula that leads

 1   to the result of residual value and percentage allocation.

 2   That percentage allocation is the allocation that's going to

 3   drive everything in this plan.  It's going to be applicable,

 4   obviously, to the hard assets and initial distributions, and

 5   of course it proposes to carry on through all the litigation

 6   assets.  The litigation assets are not discussed at all under

 7   the rubric that it's, it's speculative to talk about them,

 8   and there is, at least in some respects, a commentary about

 9   not wanting to flip over too many cards if one is going to

10   bring a law suit.  I have, as Mr. Beach indicated, had

11   several conversations with him about this, and one of the

12   things that we talked about was at the very least what you

13   need to do is start providing information about avoidable

14   transfers.  Those are, at least at some level, in a different

15   category.  And information you can provide.  I do note, in

16   fairness, that in the, today's version of the disclosure

17   statement, there is an additional, or new, addended portion

18   that talks about transfers within 90 days giving number of

19   transfers, aggregate numbers of claims, and broken up by

20   Debtor.  And that's taken from the original statements and

21   schedules that the Debtors filed.  But one of the points that

22   we've made is that if you're going to provide meaningful

23   analysis, those aren't the only transfers.  You've got both

24   the insider transfers, where again we just have aggregates,

25   the inter-company transfers.  And you've got external claims.

1    You've got your 544 and your 548 claims that aren't even

2    broached in any of this.  So we don't have a good feel for

3    those assets either.  The, and really the driver here

4    becomes, because all of these things sort of funnel down to

5    the stipulated asset allocation, the Debtors have

6    acknowledged that's a key part of their plan.  And we think

7    we're entitled to more detail to assess the fairness of that

8    allocation that we're entitled to it in the disclosure

9    statement context.  And one of the rejoinders we've heard is,

10   Well that's something you can pick up in discovery if you're

11   going to have an objection to, or in terms of contemplating

12   whether you will object to confirmation.  And as a creditor,

13   our view is that this is information the Debtors have.

14   They've clearly accumulated it, becuase at least they're

15   presenting stuff on a, sort of a survey level.  And that's

16   information that should be property included in the

17   disclosure statement so we can make an independent assessment

18   of whether those allocations seem fair, and with that

19   disclosed information, can then make an informed decision

20   about how we want to vote on the plan.  There is, Your Honor,

21   I noted too that very recently, in these most recent

22   iterations of the plan, we now have the borrower claims added

23   in.  There are classes added in throughout the various

24   constituencies.  There is a disclaimer that the Debtor has

25   that says it believes that if there are valid borrower

1   claims, not conceding that there are, but if there are, that

2   they would lie against Acceptance, Corp., or SV, because

3   those are the three entities that would be involved in

4   origination, sale, and servicing.  But there's an addition of

5   those claims, but no discussion of how those claims are going

6   to impact projected payouts and how they'd, how they mesh, so

7   to speak, in either of the here's what's going to happen

8   under our proposed plan, or here's what happens if we go to

9   liquidation.  As a matter of fact, the liquidation analysis

10  has lagged a little behind.  I noted, after I confirmed with

11  the Debtor, I can't remember if it was on the weekend or

12  yesterday, that the liquidation analysis remained the same,

13  that it is still pegged to the 1.06% recovery that has since

14  been superceded.  Now our predicted recovery is supposed to

15  be 1.30.  And so the whole, the whole analysis is lagging a

16  little behind and needs some tweaking.  But right now, the

17  principle focus for my client is once again trying to figure

18  out, in liquidation, are we better served by just going to

19  the Chapter 7, paying the fees, getting what we can get now,

20  and going on a more accelerated basis, or to go down this

21  path where we have $6 million set aside, and professional

22  fees on top of that, and go forward down the path of the

23  proposed trust liquidation?  And I, to finish, Your Honor, I

24  think that what we're really talking about is getting

25  adequate information for the types of creditors that are

1    involved in this process.  That, and this is not - -

2    obviously CitiMortgage is a sophisticated entity.  Most of

3    the financial participants are sophisticated entities.

4    They're used to crunching numbers, and not being presented

5    with stuff on a survey level.  The Debtors clearly have the

6    numbers, because they had to, well, I assume that there is a

7    rational and financial basis for the summaries that they've

8    presented in the plan.  And we don't believe it's something

9    that we should be required, nor should the Debtor be

10   required, to go through discovery in the context of a

11   relatively short window between approval of a disclosure

12   statement and the confirmation hearing to obtain that

13   information.  It should be part of the disclosure process to

14   provide adequate information in this context.  Thank you.

15           THE COURT: Thank you.  Response.

16           MR. BEACH: Your Honor, for the record Sean Beach

17   for the Debtors.  Your Honor, I'll just start by saying that

18   this disclosure statement is nearly 150 pages long.  It's

19   sufficient to all the other many creditors that had initially

20   objected to the plan.  We've worked very closely with

21   creditors.  CitiMortgage is the outlier here.  And for some

22   reason they can't seem to get satisfied with the information

23   contained in this disclosure statement.  And I will point out

24   that, you know, at most the adequate information standard is

25   what would be contained in an SEC filing, and contrary to

1    what Mr. Petrie indicates, those SEC filings present survey

2    information.  It gives a party enough information to know

3    whether they need to dig deeper.  To know whether, in this

4    case, they need to file an objection to the disclosure, to

5    the plan and conduct additional discovery.  In addition,

6    there were, I'm not sure if Mr. Petrie was looking at the

7    wrong liquidation analysis, but the liquidation analysis

8    attached to the November 21st version of the disclosure

9    statement is accurate and it does reflect the numbers in the

10   stipulated asset allocation and in the plan.  Another

11   clarification is in terms of AH Bank Mr. Petrie had mentioned

12   that there was a reference in the disclosure statement to AH

13   Mortgage Corp. paying some of the acquisition cost of AH

14   Bank.  We have amended the disclosure statement, I believe

15   it's on page 61 in the November 25th version, to say that

16   those are administration costs, because I think that the

17   acquisition cost was not an accurate reflection, and perhaps

18   gave CitiMortgage a different impression in terms of the role

19   that Corp. played in that transaction.  Those administration

20   costs are, you know, more in terms of fees related to

21   regulatory filings and that kind of thing.  In addition, Your

22   Honor, in terms of information, I walked through earlier what

23   we have on the stipulated asset allocation, and I walked

24   through not only what our rationale was in determining that

25   it was appropriate to use a stipulated asset allocation, but

1   why we did that.  And analysis of the steps we went through

2   in assessing inter-company claims and then actually walking

3   through how the calculation would work under the stipulated

4   asset allocation.  With respect to the inter-company claims

5   themselves, there were over a million book entries within the

6   18 months prior to the petition date, and it would be

7   impossible for us to try to even put a portion of that

8   information in the disclosure statement or even as an

9   attachment.  And frankly, I don't think it would be all that

10  helpful for creditors in any event.  So Your Honor, I would

11  ask that you overrule the CitiMortgage objection to the

12  disclosure statement.  Again, we do believe that there is

13  adequate information and that this disclosure statement

14  should be approved.

15          THE COURT: All right.  I'm going to overrule the

16  objection.  I think what CitiMortgage is basically asking for

17  is consolidating information as opposed to consolidated

18  information.  And I don't think for purposes of the

19  disclosure statement, especially in a case like this, that

20  the consolidating information is either required or

21  practical.  I think Mr. Beach raises a significant issue as

22  to the fact that this thing is already a telephone book, and

23  it doesn't need to be a five volume set.  You can have so

24  much information that actually the information becomes

25  inadequate by its complexity and weight.  Indeed that was one

1    of the issues the Borrowers Committee had.  There are a

2    variety of people who look at these.  Certainly sophisticated

3    investors like CitiBank have, in effect, one standard.

4    Perhaps a more diligent standard.  But nonetheless, I think

5    the information provided is adequate.  It becomes a slippery

6    slope, but at some point you, you're looking at almost audit-

7    like information where you'd have literally drawer after

8    drawer of banker's box after banker's box.  And that is

9    certainly not required.  And I think the, in effect,

10   consolidated information that reflects the settlement as it

11   exists is sufficient in order for CitiBank to have adequate

12   information for voting purposes.  And if they feel that they

13   need more information, this is a contested matter, and they

14   have a right to discovery.  And they can pursue that.  And if

15   they don't have time to get that done by confirmation,

16   they're free to ask the Court for further time, and we'll

17   take it up at that time.  And frankly, I think that would be

18   a more efficient use of the Debtors' resources than having to

19   address one specific concern or set of concerns than having

20   to do this globally.  So I'll overrule the objection.

21          MR. BEACH: Thank you, Your Honor.  Your Honor, I

22   believe that leaves us with the Borrower Committee objection.

23   Is it possible that we can get a brief recess to discuss

24   those issues with the Borrowers Committee?

25          THE COURT: It's not only possible, it's - -

1          UNIDENTIFIED SPEAKER: (Microphone not recording.)

2          UNIDENTIFIED SPEAKER: I think a couple minutes

3    would be useful.

4          THE COURT: Yeah.  Well, I'm taking a break no

5    matter what, because I have an 11 o'clock with Archway

6    Cookies that should be short.  And I'm not sure about the

7    report for the Leisure Fitness matter at 11:30.  So let's - -

8          MS. HARRIS: Your Honor, it will be very quick.  We

9    resolved everything.

10          THE COURT: All right.  Thank you, Ms. Harris.  All

11    right.  We're going to - - I love this.  This is great.  Man,

12    recesses are a good idea.  Okay.  We'll take a short recess.

13    I'll hear Archway Cookies, I'll hear Leisure Fitness, and

14    then I'll hear American Home.  All right?

15          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

16      (Whereupon at 11:19 a.m. a recess was taken in the

17    hearing in this matter.)

18      (Whereupon at 11:51 a.m. the hearing in this matter

19    reconvened and the following proceedings were had:)

20          THE COURT: Please be seated.  Mr. Beach.  I, do we

21    have people on the phone?

22          THE CLERK: Yes.

23          THE COURT: Okay.  Mr. Beach.

24          MR. BEACH: Thank you, Your Honor.  For the record

25    Sean Beach for the Debtors.  Your Honor, I am pleased to

1  report that we do have a resolution with respect to the

2  disclosure statement with the Borrowers Committee.  I know

3  that they want to stand up and make some reservations.  But I

4  also wanted to indicate that we have agreed to make some

5  changes, language changes on footnote 16, also another

6  paragraph, part 5, (b)(14), and then to add a sentence

7  regarding, related to an insurance proviso, we need to make a

8  call after this hearing and just double check that

9  information.  I can read the first two into the record, if

10 Your Honor wishes.

11         THE COURT: No.  When you send it over - -

12         MR. BEACH: We can black line it.

13         THE COURT:  - - black line it, yeah.

14         MR. BEACH: Yeah.  And - -

15         THE COURT: And not cumulative.  Black line it from

16 what I'm looking at here.

17         MR. BEACH: Yes, Your Honor.  I'll do that.  Which

18 leads me to my next question, which is we have the November

19 25th version black lined.  I can point Your Honor to some of

20 the sections that changed.  It mainly changed related to

21 discussions with the Borrowers Committee.  I can point you to

22 some of those provisions unless Your Honor has had the

23 opportunity to take a look at those.

24         THE COURT: Well let's - - no, I have not, actually.

25 So let's go through that.

1          MR. BEACH: Okay.

2          THE COURT: Other than what we discussed in court

3    today.

4          MR. BEACH: Yeah.  And I'll try to focus on what I

5    think are the more substantive changes.

6          THE COURT: That's fine.

7          MR. BEACH: On page 17, at the Borrowers Committee

8    request, we added a sentence regarding the pay option arms.

9          THE COURT: Okay.

10         MR. BEACH: On page 18 there were certain provisions

11   - - well, we added some footnotes to represent who the

12   counter parties are to the master repurchase agreements.

13   There are similar changes in a couple of other areas to add

14   parties to MOPSA's and parties to securitizations.  Just

15   footnotes indicating who they are.

16         THE COURT: Um-hum.

17         MR. BEACH: There is, on page 19, a change to add

18   that the Debtors, in 2006 - -

19         THE COURT: Yeah.  I see it.

20         MR. BEACH:  - - originated a small portion of non-

21   prime - -

22         THE COURT: Um-hum.

23         MR. BEACH:  - - loans.  Page 20 are a couple more

24   of those footnotes that I referenced.

25         THE COURT: Okay.

1          MR. BEACH:  Page 28 is just an update on the filing

2     of the Borrower Committee retention fee for - -

3          THE COURT: All right.

4          MR. BEACH:  - - for counsel retention papers.  39

5     is a clarification on the bar dates.

6          THE COURT: Okay.

7          MR. BEACH: Page 59 is a proviso on insurance assets

8     and they've asked us to add a sentence.  Unfortunately I

9     don't have that with me.  But that's one of the areas that

10    we're going to add a sentence on.

11         THE COURT: Okay.

12         MR. BEACH: Page 89, it says, it's an illustration.

13    This is where we're going to make some revisions in the

14    context of a plain English summary of, you know, kind of

15    directed to borrowers to make it easier for them to

16    understand some of the issues related to the plan.  And I

17    believe that is all of the - -

18         THE COURT: Okay.

19         MR. BEACH:  - - changes that I would characterize

20    as more substantive.

21         THE COURT: Any comments from anyone?  Mr. Macauley,

22    do you want to make any statements?

23         MR. MACAULEY: Your Honor, Thomas Macauley on behalf

24    of the Borrowers Committee.  I really don't have anything to

25    say further with respect to the disclosure statement.  I'd

1  like to make a statement with respect to the solicitation

2  procedures, but we can - -

3          THE COURT: Okay.

4          MR. MACAULEY:  - - that will be the next item.

5  Thank you.

6          THE COURT: All right.  Any other comments in

7  connection with the disclosure statement?  Mr. Indelicato.

8          MR. INDELICATO: Thank you, Your Honor.

9          THE COURT: Good morning.

10         MR. INDELICATO: Mark Indelicato from Hahn & Hessen.

11 Your Honor, just so the record is clear, and you'll see at

12 the end of the solicitation proceudres order, there is a

13 proposed letter on behalf of the Committee supporting the

14 plan.  I won't go through a lot of the detail, which I would

15 have done in response to the CitiMortgage objections, since

16 the Court overruled it.  But suffice it to say the Committee

17 has worked hard to ensure that there will be a distribution

18 to creditors.  We are not happy, obviously, with the low

19 recovery, but we are working to maximize the recovery of what

20 assets remain, and this is the best plan that is available

21 out there.  We believe the disclosure statement adequately

22 describes the main issues, or the main issues of contention,

23 which are the asset allocations and the EPD breach issues, as

24 well as the issues related to the Borrowers Committee.  So

25 for those reasons, Your Honor, we would support approval of

1    the disclosure statement.

2          THE COURT: All right.  Thank you.  All right.

3    Absent any other comments, I find that the disclosure

4    statement contains adequate information, satisfies the

5    criteria for approval.  You can move on to the procedures

6    motion.

7          MR. BEACH: Thank you, Your Honor.  As I indicated,

8    we had four objections to the solicitation procedures.  All

9    of those have been resolved.  I made an earlier

10   representation with respect to LaSalle's concern on the

11   solicitation procedures, and what I'd like to do is just run

12   through the dates that the Debtors propose in terms of

13   solicitation and confirmation.  The Debtors propose that the

14   record date be today, November 25th.  That service of the

15   solicitation package for voting parties be completed by

16   December 8th.  That we serve non-voting parties with a notice

17   and do the publication notice by December 10th.  That the

18   deadline to supply information under the EPD breach

19   questionnaire be December 19th.  The deadline for the Debtors

20   to file an EPD breach protocol schedule be January 7th.  And

21   I'll explain what those are in just a moment, Your Honor.

22   The deadline to file objections to claims that impact voting,

23   for the Debtors to file objections to claims be January 9th.

24   Voting deadline of January 14th.  Also on January 14th, the

25   deadline for claims to object to amounts of the EPD breach

1    protocol schedule.  The deadline to object to confirmation.

2    On January 16th, we propose that that be the deadline for the

3    Debtors to file a determination motion, essentially a 3018-

4    type motion.  And that that also be the deadline for

5    creditors to file claims estimation motions.  On January 23rd,

6    assuming the determination hearing is on the same date as the

7    confirmation hearing, that would be the deadline to file a

8    response to the determination motion.  And the Debtors

9    propose a confirmation hearing date on January 28th.  Your

10   Honor, I spoke with your clerk regarding dates for

11   confirmation, and we received January 27th and 28th.  Giving

12   the timing that we're proposing, we're proposing that we do

13   confirmation on the 28th.  Hopefully we can get done in that,

14   on that date.  To the extent we can't, you know, we can work

15   on additional dates or times at that time.  So I just wanted

16   to make that clarification that we had the 27th and 28th kind

17   of set aside for confirmation.  We're asking that that date

18   be the 28th.  Your Honor, in terms of the solicitation

19   procedures, they include a section regarding estimating EPD

20   breach claims for voting purposes in a, kind of a truncated

21   process to the protocol that's set forth in the plan, and

22   that's for a number of reasons.  One is to reduce claims that

23   were filed in aggregate UPB amounts that should more

24   accurately reflect what the EPD and breach claims are.  And

25   then to also give some voting amount to parties that filed

1    EPD breach claims in complete unliquidated amounts, among

2    other reasons.  And so that's what some of those dates are

3    that I just read in terms of when a questionnaire needs to be

4    provided.  And then when the Debtors need to file a schedule

5    based on that information of what they estimate those EPD

6    breach claims for, and then parties have an opportunity to

7    object to the Debtors' numbers in that determination, and

8    ultimately it would have to be decided by the Court if the

9    parties can't stipulate if an objection is filed.  Your

10   Honor, in the black line that I submitted to you, there are a

11   couple of other changes that I'll highlight.  One is that we

12   propose to attach the letter in support of the plan from the

13   Official Committee of Unsecured Creditors.  That should have

14   been attached to the, to the full version of the order that I

15   handed Your Honor, which includes the ballots and the other

16   document attachments.  It includes the dates I just ran

17   through with Your Honor.  It includes some additional changes

18   on, in paragraph 12.  Primarily the change I'd like to

19   highlight is in subsection (c), where we provided that the

20   amount temporarily allowed for voting purposes in accordance

21   with the EPD breach claim tabulation rules, or by stipulation

22   with the Debtors.  I anticipate that there will be a number

23   of parties that we wish to stipulate for voting purposes as

24   to the right amounts, and I think the most efficient process

25   is simply just to put that on the record - -

1          THE COURT: Um-hum.

2          MR. BEACH:  - - with a signed stipulation with that

3    counter party.  And other than date changes, Your Honor, I

4    don't believe that there are any other substantive changes to

5    the filed version of the motion.  We added the Borrowers

6    Committee counsel into the notice provisions for objections.

7          THE COURT: Okay.  Anyone wish to be heard?

8          MR. SCHNABEL: Good morning, Your Honor.

9          THE COURT: Good morning.

10          MR. SCHNABEL: For the record, Eric Lopez Schnabel,

11    Dorsey & Whitney, on behalf of US Bank.  Your Honor, we,

12    along with the other trustees, had numerous conversations

13    with the Debtors regarding the protocol and the questionnaire

14    and so forth.  I only stand to put one piece of that on the

15    record.  We do have a side letter agreement or email

16    clarifying some issues and questions we with the

17    questionnaire, and so we're obviously resolved on that.  We

18    also were happy to see the date moved for the deadline for

19    the questionnaire, which is now December 19th.  And I just

20    wanted to get on the record that, you know, US Bank as a

21    trustee to the securitizations, has to go to the master

22    servicer for information, and we've heard from some of our

23    master servicers that they actually have to go to the buyer,

24    to Wilbur Ross, to get some of that information.  So and a

25    lot of times we're kind of at the mercy of other people in

1    terms of whether we can comply with the deadline.  And the

2    Debtors have told us that, we'll make every effort,

3    obviously, to meet that December 19th deadline, but they have

4    said they will work with us to the extent we run into

5    problems, and we appreciate that.  Other than that, we have

6    no issues, Your Honor.

7            THE COURT: All right.

8            MR. SCHNABEL: Thank you.

9            THE COURT: Thank you.  Anyone else?  Mr. Macauley?

10            MR. MACAULEY: Good morning, Your Honor.  Thomas

11    Macauley for the Borrowers Committee.  Two points.  The

12    Borrowers Committee did not object to the solicitation

13    procedures motion.  For clarification, with respect to the

14    point raised in 12(c), I just want to make sure that that

15    would not preclude, you know, that that could be potentially

16    applied to people who obviously did not file an EPD claim, or

17    also to people who did not file a claim.  It's, the Debtors

18    have the discretion to stipulate to, for voting purposes with

19    respect to the plan.  And - -

20            THE COURT: Mr. Beach.

21            MR. BEACH: That was our intent with that provision,

22    Your Honor.

23            THE COURT: Okay.

24            MR. MACAULEY: Your Honor, the second point, just

25    generally, as I said, we didn't object to the solicitation

1    procedures.  As you know, the Borrowers Committee has an

2    issue with the notice that occurred in this case, and how

3    we're going to address that.  Our view is that the

4    solicitation procedures is really a procedural mechanism for,

5    you know, serving the plan on the various parties of

6    interest.  Our notice objection is fully preserved.  You

7    know, we view the solicitation procedures as really a

8    procedural issue.  How the plan may be binding on parties in

9    interest is really a substantive issue that is to be

10   addressed more appropriately at confirmation.  The Borrowers

11   Committee has had discussions with the Debtors, as well as

12   the Creditors Committee.  We're looking, it's, we're trying

13   to come up with a practical solution.  The parties are going

14   to put their heads together in the next time prior to the

15   confirmation and see what we can do.  But obviously we, we

16   have a, we are reserving our confirmation objections.

17            THE COURT: All right.  Thank you.

18            MR. MACAULEY: Thank you.

19            THE COURT: Anyone else?  All right.  How should we

20   proceed procedurally?

21            MR. BEACH: Well Your Honor, I did provide you with

22   a clean copy of the order.  That, that will not change.  We

23   do need to make some slight modifications to the disclosure

24   statement.  The plan from the November 21st version hasn't

25   changed other than a, essentially a typo that we found, and I

1  will, I propose that we submit those two items to Your Honor

2  under certification of counsel.  We can file them and then

3  submit the black lines under - - well, actually, we can file

4  the clean and black lines and then submit those under

5  certification of counsel.  The ones that we file we would

6  propose be the ones that are being approved today with this

7  order.

8        THE COURT: Uh-huh.

9        MR. BEACH: So I don't know if Your Honor wants to

10  reserve signing that order until you see those, those

11  documents.

12        THE COURT: Well I don't have any issue with the

13  order, but the documents that are attached, they'll change.

14  I should probably look at the documents - -

15        MR. BEACH: Yeah.  I don't think the - -

16        THE COURT:  - - before I sign the order.

17        MR. BEACH: I don't - -

18        THE COURT: So why don't you amend the disclosure

19  statement and plan as appropriate, file black lines, send

20  over a package with a new order to sign all put together.  On

21  the black lines, I only need the pages you black line.  I

22  don't need the whole stack, okay?

23        MR. BEACH: Sure.

24        THE COURT: If that's okay.  And, and then I'll have

25  a look at it, and assuming it's fine, which I expect, fully

1   expect is, I'll sign it.  Do you need it docketed today?  Is

2   there an issue with timing?

3           MR. BEACH: That would be helpful, Your Honor.

4           THE COURT: Okay.

5           MR. BEACH: We will - -

6           THE COURT: Well, we'll do our best.

7           MR. BEACH:  - - endeavor to get it over to you as

8   quickly as possible.

9           THE COURT: Okay.  That's fine.  Okay.  Anything

10  further?

11          MR. BEACH: There is one other item that was not on

12  the agenda, Your Honor.  It was, it's with respect to the

13  motion to lift the automatic stay filed by JP Morgan Chase to

14  have the ability to foreclose on some of the mortgage loans

15  that the Debtors own that JP Morgan has a security interest

16  in.  The parties have come to a resolution with respect to

17  that stay relief motion.  We have a stipulation that the

18  parties just need to go back and review one more time and

19  make sure that it's in final form.  I can give you the

20  highlights of that stipulation today, but what the parties

21  were hoping to do was submit that under certification of

22  counsel.  Some of the - -

23          THE COURT: I'll look at it when it comes in.

24  That's fine.  I mean, you don't need to go - - not to

25  interrupt you.  I don't need to have the substance of it on

1   the record.  But - -

2            MR. BEACH: Right.

3            THE COURT:  - - I'm sorry I interrupted.

4            MR. BEACH: No, that's fine.  I was just going to

5   say some of the reasons we wanted to submit it that way was

6   because it proposes to do a mediation on some other issues on

7   a pretty quick time frame.  And so that's why we proposed to

8   submit it under certification of counsel, and we're hoping to

9   get it entered as quickly as possible.

10           THE COURT: All right.  Do I need to appoint a

11  mediator, or are the parties going to agree on one.

12           MR. BEACH: The parties are going to discuss that.

13  Currently in the stipulation it says November 28th is the

14  deadline for the parties to agree on a mediator, and I

15  believe if we don't agree on a mediator by that date, then,

16  you know, we request that the Court appoint one.  We were

17  talking about possibly moving that date out slightly in the

18  version that we send over later, but I don't recall the exact

19  language.

20           THE COURT: Okay.  All right.

21           MR. BEACH: Thank you, Your Honor.

22           THE COURT: Anything else?  Oh, I had a question.  I

23  wanted to make sure I don't have anything under advisement

24  that affects confirmation as far as you know.  I don't think

25  I have anything under advisement in American Home, but we do

1   have, are we affected by the pending remand?  No?

2          MR. BEACH: Your Honor, if you would just give me

3   one moment?

4          THE COURT: Sure.

5          MR. BEACH: Your Honor, I don't believe that the

6   remand affects our confirmation time frame, and I don't

7   recall any other issues that would, at this point that are

8   under advisement.

9          THE COURT: Okay.  Anything else?  All right.  Thank

10  you very much.

11         MR. BEACH: Thank you, Your Honor.

12         THE COURT: Have a good afternoon.  Hearing

13  adjourned.

14         MR. BEACH: Thank you.

15     (Whereupon at 12:10 p.m. the hearing in this matter was

16  concluded for this date.)

17

18         I, Jennifer Ryan Enslen, approved transcriber for

19  the United States Courts, certify that the foregoing is a

20  correct transcript from the electronic sound recording of the

21  proceedings in the above entitled matter.

22

23   _/s/Jennifer Ryan Enslen_                    _December 7, 2008_
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905