## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| AMERICAN HOME MORTGAGE | § | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation, | § | |
| et al., | § | (Jointly Administered) |
| | § | |
| | § | **Objection Deadline: January 21, 2009 (extended for JPMC)** |
| | § | **Hearing Date: January 28, 2009 at 10:00 a.m.** |
| Debtors. | § | |
| | | **Docket Ref. No. 6626** |

### LIMITED OBJECTION OF JPMORGAN CHASE BANK, NATIONAL ASSOCIATION TO CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION

JPMorgan Chase Bank, National Association ("JPMC"), by and through its undersigned counsel, submits its limited objection (the "Objection") to the confirmation of the Debtors' *Amended Chapter 11 Plan of Liquidation Dated as of November 25, 2008* [Docket No. 6626] (the "Plan") and in support of its Objection respectfully represents as follows:

### BACKGROUND

1.      On August 6, 2007 (the "Petition Date"), American Home Mortgage Investment Corp. ("AHMIC") and certain of its affiliates and subsidiaries (collectively, the "Debtors" and, individually, a "Debtor") commenced voluntary cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Bankruptcy Cases"). Through the Bankruptcy Cases, the Debtors have liquidated much of their property, and remain in possession of what remains as they continue their liquidation. No Chapter 11 trustee has been appointed in the Bankruptcy Cases as of the date of this Motion. On August 14, 2007, an official committee of unsecured creditors was appointed to represent the interests of the general unsecured creditors in these Bankruptcy Cases.

2.      JPMC is one of the Debtors' warehouse lenders.  As explained in further detail below, JPMC was both administrative agent and lender under a warehouse facility with the Debtors and also participates as a lender in another syndicated facility in which Bank of America, N.A. acts as agent (the "BoA Facility"). As of the Petition Date, the Debtors owed JPMC over $225 million (not including accrued interest, fees and other expenses) with respect to these two facilities. In addition, JPMC is a participant in a conduit repurchase facility in which Calyon New York Branch acts as the agent (the "Calyon Facility"), which has been the subject of litigation and certain compromises before this Court.

**The 1/06 $200 Million Warehouse Facility**

3.      AHMIC and AHM Corp.[1] entered into a $150 million senior, secured revolving warehouse facility dated January 24, 2006 (the "Warehouse Facility") with JPMC (as Administrative Agent and sole Lender), pursuant to that certain 1/06 SENIOR SECURED CREDIT AGREEMENT (as subsequently amended, supplemented and extended) (the "1/06 Credit Agreement").  In connection with the 1/06 Credit Agreement, AHMIC and AHM executed that certain $150,000,000 1/06 JPMORGAN CHASE BANK SENIOR CREDIT NOTE dated January 24, 2006 in favor of JPMC (the "1/06 Senior Note"). [2]

4.      Pursuant to Article VII of the 1/06 Credit Agreement, AHMIC and AHM granted to JPMC a first-priority lien and security interest in, among other things, the pledged residential loans upon which the financing under the Warehouse Facility was to be extended, the underlying

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2] AHMIC, AHM and JPMC amended the 1/06 Credit Agreement four (4) separate times (collectively, the "1/06 Credit Amendments") including, without limitation, the 5/07 AMENDMENT TO SENIOR SECURED CREDIT AGREEMENT, dated May 14, 2007 (the "5/07 Amendment").  Among other things, the 5/07 Amendment extended the 1/06 Credit Agreement's maturity date to May 12, 2008 and increased the Maximum Aggregate Commitment to $200,000,000.  In conjunction with the 5/07 Amendment, AHMIC and AHM executed the "$200,000,000 5/07 JPMORGAN CHASE BANK SENIOR CREDIT NOTE" (the "5/07 Senior Note"), which is the currently effective note in favor of JPMC under the Warehouse Facility. (The 1/06 Credit Agreement, as amended by the 1/06 Credit Amendments, together with any accompanying financing statements, and all other related documents are sometimes collectively referred to herein as the "Warehouse Facility Documents".)

chattel paper and other loan documentation evidencing those loans, and all proceeds, accessions or other rights of any kind related to these loans (collectively, the "Warehouse Facility Collateral"). The Warehouse Facility Collateral includes, but is not limited to, Single-family Collateral, Manufactured Home Loan Collateral, Construction/Permanent Loan Collateral and Underperforming Collateral, and, under the terms of the Warehouse Facility Documents, may also include Residential Lot Loan Collateral and Subprime Loan Collateral. JPMC has, as Administrative Agent for the Warehouse Facility, perfected the liens and security interests granted to it in and against the Warehouse Facility Collateral.

**Proceedings with Respect to the Warehouse Facility Collateral**

5.     On January 4, 2008, the Court entered the Order Granting Motion for Relief from Automatic Stay of JPMorgan Chase Bank, National Association to Foreclose on and Preserve Collateral Consisting of Outstanding Construction/Permanent Loans on Single Family Residences (the "C/P Stay Relief Order) (Docket No. 2585).

6.     On March 14, 2008, the Court entered that certain Order (I) Authorizing the Sale of JPM Non-Performing Loans and REO Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Sale Agreement Thereto; (III) Authorizing the Distribution of the Proceeds; and (IV) Granting Related Relief (the "Sale Order") (Docket No. 3283). Pursuant to the Sale Order, the Debtors deposited $5,775,405.45 in escrow (the "Disputed REO Escrow") pending resolution of disputes in connection with JPMC's entitlement to such funds, which have been alleged to have been collected by the Debtors in connection with certain properties alleged to be real estate owned (all such property alleged to be real estate owned referred to collectively as the "REO Property").

7.      On December 1, 2008, the Court entered an order approving that certain Stipulation Settling Motion of JPMorgan Chase Bank, N.A. for Relief From the Automatic Stay and Providing for Mediation of Certain Disputes [Docket No.6643] (the "NP Loan Stay Relief Stipulation").   Under the NP Loan Stay Relief Stipulation, the Debtors agreed to transfer ownership of certain mortgage loans pledged to JPMC under the Credit Agreement (as defined below) to JPMC within a time certain.   The parties have scheduled a mediation for February 3, 2009 to address certain disputes that remain with respect to the Warehouse Facility, including entitlement to the REO Properties and the Disputed REO Escrow.

**JPMC's Proofs of Claim**

8.      On January 8, 2008, JPMC or its affiliated entities timely filed the following proofs of claim against the Debtors:

> Claim No. 8262 against American Home Mortgage Investment Corp., asserting a secured claim for amounts owing as of the Petition Date under the 1/06 Credit Agreement, including, *inter alia*, advances in the amount of $158,514,313.90; accrued and unpaid interest in the amount of $1,121,017.37; and fees and disbursements of $66,995.45;

> Claim No. 8258 against American Home Mortgage Corp, asserting a secured claim for amounts owing as of the Petition Date under the 1/06 Credit Agreement, including, *inter alia*, advances in the amount of $158,514,313.90; accrued and unpaid interest in the amount of $1,121,017.37; and fees and disbursements of $66,995.45;

> Claim No. 8397 against American Home Mortgage Corp., asserting a secured claim in the amount of $160,600.00 for amounts owing under that certain Standby Letter of Credit dated August 16, 2006;

> Claim No. 7969 against American Home Mortgage Investment Corp., asserting a general unsecured claim in the amount of $88,174.79 for fees and costs related to the October 10, 2006 retention of J.P. Morgan Securities, Inc.;

> Claim No. 8261 against American Home Mortgage Corp., asserting a general unsecured claim in the amount of $96,844,421.32 in connection

with various breaches of that certain Mortgage Loan Sale Agreement (the "MLSA"), dated April 1, 2006;

Claim No. 8396 against American Home Mortgage Servicing, Inc., asserting a general unsecured claim in the amount of $20,233.38 in connection with insurance and tax related costs arising from the MLSA;

Claim No. 8399 against American Home Mortgage Corp., asserting a general unsecured claim in the amount of $308,000.00 in connection with breaches of representations and warranties in the MLSA;

Claim No. 8248 against Homegate Settlement Services, Inc., asserting a general unsecured claim in the amount of $413,567.00 in connection with checks returned NSF;

Claim No. 8383 against American Home Mortgage Corp., asserting a general unsecured claim in the amount of $32,728.38 in connection with depository account fees[5]; and

Claim No. 8398 against American Home Mortgage Investment Corp., asserting a general unsecured claim in the amount of $1,397,266 in connection with losses incurred by J.P. Morgan Securities Inc. on behalf of the Debtors.

(the foregoing proofs of claim, collectively, the "JPMC POC's").  The Debtors have not objected to the JPMC POC's.[6]

**The Plan**

9.      On November 25, 2008, the Debtors filed the Plan.  Generally, the Plan provides for the non-substantive consolidation of the Debtors' estates and the administration of post-petition claim reconciliation and distribution to creditor by a plan trustee (the "Plan Trustee").

---

[5] Consistent with the Court's Order Pursuant to Sections 105(a), 345, and 503(b)(1) of the Bankruptcy Code (I) Authorizing Debtors to Maintain and Use Existing Bank Accounts and Business Forms, (II) Authorizing the Debtors to Maintain and Use Existing Cash Management System, and (III) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code, entered August 7, 2007 (Docket No. 66), the Debtors paid JPMC the account fees in the amount of $30,722.83 on March 13, 2008.  The portion of Claim No. 8383 in the amount of $2,005.55 for the returned check remains.

[6] On April 25, 2008, JPMC's affiliate J.P. Morgan Acceptance Corporation I ("JPMAC") filed Claim No. 10275 against American Home Mortgage Corp. (the "JPMAC POC").  In addition, prior to the merger between The Bear Stearns Companies Inc. ("Bear Stearns") and JPMorgan Chase & Co., certain affiliates of Bear Stearns had filed proofs of claim against various of the Debtors (collectively, the "Bear Stearns POCs").

10.    The Plan also provides for the approval of a protocol to determine and liquidate EPD and Warranty Claims (defined below) and the exculpation and release of claims against certain third-parties (the "Releases") by claimants of the Debtors' estates.

## LIMITED OBJECTION TO PLAN CONFIRMATION

11.    JPMC has voted in favor of the Plan in 9 of 10 classes in which it is entitled to vote.  Nevertheless, JPMC objects to (1) the proposed treatment of EPD and Warranty Claims and (2) the release and exculpation of certain third parties under the Plan.

A.    Treatment of EPD/Warranty Claims.

12.    Although the Plan provides for the treatment of claims arising from early payment defaults ("EPD Claims") and the Debtors' breach of warranties ("Warranty Claims") related to the Debtors obligations under various mortgage purchase agreements, the protocols contained in the Plan vastly underestimate these EPD and Warranty Claims.  These protocols allow the Debtors to reduce EPD and Warranty Claims by as much as 95% of the outstanding UPB without any evidentiary showing by the Debtors.  Indeed, the loss severity calculations utilized in Article 7 of the Plan would reduce the EPD Claims and Warranty Claims to amounts substantially below what is appropriate for the pools of loans sold by the Debtors.  The loss severities for EPD Claims are summarized by the Debtors as follows:

| LOAN PRODUCT | DELINQUENCY (DAYS) | | | |
|---|---|---|---|---|
| | 0-30 | 31-60 | 61-90 | 90+ |
| Fixed-Rate Mortgage ("FRM") | 5% | 20% | 30% | 40% |
| Adjustable Rate Mortgage ("ARM") | 4.1% | 17% | 25% | 33% |
| Payment Option ARM ("POA") | 4.8% | 19% | 29% | 38% |
| Second-Lien ("2nd") | 11.9% | 50% | 75% | 95% |

13.    JPMC submits that the following loss severities are more appropriate for those pools of loans:

| LOAN PRODUCT | DELINQUENCY (DAYS) | | | |
|---|---|---|---|---|
| | 0-30 | 31-60 | 61-90 | 91+ |
| Fixed-Rate Mortgage ("FRM") | 15% | 30% | 40% | 50% |
| Adjustable Rate Mortgage ("ARM") | 13% | 27% | 35% | 43% |
| Payment Option ARM ("POA") | 14% | 29% | 39% | 48% |
| Second-Lien ("2nd") | 38% | 60% | 85% | 98% |

14.     JPMC submits that the Debtors' proposed protocol to estimate Warranty Claims similarly is inappropriate for the pools of loans sold by the Debtors.

15.     JPMC POC's 8261 and 8399 in the amounts of $96,844,421.32 and $308,000.00, respectively, relate to EPD and Warranty Claims under the MLSA.   Under the protocols proposed by the Debtors, the full amount of JPMC's EPD and Warranty Claims has been reduced to approximately $17 million based on an arbitrary system designed solely to reduce claims without any evidentiary proof.  The Debtors have not attempted to justify these reductions and cannot meet their burden of proof to arbitrarily reduce JPMC's EPD and Warranty Claims without specific evidence at the hearing to consider confirmation of the Plan.   Absent such a showing, holders of EPD and Warranty Claims should be permitted to have allowed the full value of their otherwise *prima facie* valid EPD and Warranty Claims recognized.  *See* 11 U.S.C. § 502; *In re Oakwood Homes Corp.*, 449 F.3d 588, 600 (3d. Cir. 2006) (acknowledging that a filed proof of claim is prima facie evidence that a claim is valid unless a party objects).

B.   The  Non-Consensual  Exculpation  and  Releases  of  Third-Parties  are Inappropriate

16.     Under the guise of "exculpation", the Plan provides for a full release of creditors' claims against non-Debtor third parties.  Specifically, Article 12(C) of the Plan provides:

> **EXCULPATION.**   On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and *each Exculpated Party is hereby released from, any claim, cause of action or liability* to any other Exculpated Party, *to any Holder of a Claim* or Interest, or to any other party in interest, *for any act or omission that occurred during the Chapter 11 Cases or in connection*

> *with the preparation and filing of the Chapter 11 Cases, the formulation,*
> *negotiation, and/or pursuit of confirmation of this Plan, the consummation of this*
> *Plan, and/or the administration of this Plan and/or the property to be distributed*
> *under this Plan*, except for claims, causes of action or liabilities arising from the
> gross negligence, willful misconduct or fraud of any Exculpated Party, in each
> case subject to determination of such by final order of a court of competent
> jurisdiction and provided that any Exculpated Party shall be entitled to reasonably
> rely upon the advice of counsel with respect to its duties and responsibilities (if
> any) under this Plan and such reasonable reliance shall constitute an absolute
> defense to any such claim, cause of action, or liability.  Without limiting the
> generality of the foregoing, each Exculpated Party shall be entitled to and granted
> the protections and benefits of section 1125(e) of the Bankruptcy Code.  No
> provision of this Plan or the Disclosure Statement shall be deemed to act upon or
> release any claims, Causes of Action or liabilities that the Plan Trust, the Estates,
> or any party in interest may have against or to any Person for any act, omission, or
> failure to act that occurred prior to the Petition Date other than in connection with
> the preparation and filing of the Chapter 11 Cases, nor shall any provision of this
> Plan be deemed to act to release any Avoidance Actions. (emphasis added)

17.    The Plan sweeps non-Debtor parties into the definition of *"Exculpated Parties"*

who include, "collectively, (i) the Debtors, the Plan Trustee, the Estates, the Plan Trust, the

Creditors Committee, the Borrowers Committee, the Plan Oversight Committee, and the

Indenture Trustees, and (ii) *the respective officers, directors, employees, members, attorneys,*

*crisis managers, financial advisors, and professionals of a party identified in the immediately*

*preceding clause,* other than David Friedman." (emphasis added).  Notwithstanding the Debtors'

characterization of the Releases as an "Exculpation", the language of Article 12(c) and the

definition of "Exculpated Parties" is clear: the Plan provides for the wholesale release of claims

by claimants of the Debtors' estate against third-parties.

18.    The threshold standard in evaluating the validity of third party releases was set

forth by the Third Circuit Court of Appeals in *Gillman v. Continental Airlines (In re Continental*

*Airlines),* 203 F.3d 203 (3d Cir. 2000).  Under the *Continental* standard, the Debtors must show

that the release in question is fair and necessary to the Debtors' reorganization.  *Id.* at 214.  In

*Continental*, the court declined an opportunity to set for a clear rule regarding the permissibility

of non-consensual third party release, noting that fairness and necessity were the "hallmarks" of any such analysis. *Id.* With regard to the fairness prong of the analysis, the court noted that the party who is being released from a third party claim must "provide adequate consideration to a claimholder being forced to release claims against non-debtors." *Id.* at 213. In order for the releases to be considered necessary to the debtors' reorganization, the "success of the reorganization … [must bear] a relationship to the release." *Id.* at 215.

19.     Recently, the Bankruptcy Court in this District has applied the reasoning of the Third Circuit in *Continental* as guidance for determining the permissibility of certain non-consensual third party releases. *See In re Freedom Rings LLC*, Case No. 05-14268 (Bankr. D. Del. Apr. 20, 2006) Confirmation Hearing Transcript, p. 113 (discussing *Continental* and upholding the releases in the debtor's plan, "Thus, notwithstanding its refusal to establish a rule, the 3rd Circuit appears to provide the rough outlines of what an appropriate rule would be, were they in fact to adopt one"); *In re Metalforming Technologies, Inc.*, Case No. 05-11697 (Bankr. D. Del. Apr. 11, 2006) Confirmation Hearing Transcript, pp. 16-17 (in approving the non-consensual third party releases provided for in the debtors' plan, stating "[b]ut, I think in Continental Airlines the Third Circuit didn't state that - - didn't adopt the most narrow version of - - or most narrow of the minority decisions which held that you could only have a release if there was an affirmative agreement by the specific creditor. I think the Third Circuit goes a little broader than that. It has to show you have to have evidence that it's justified.").

20.     In these cases, the releases are not fair and necessary to the success of the Plan. First, the non-Debtor party beneficiaries of the Releases have provided no consideration to the creditors whose claims are being released. Moreover, the Debtors have provided no evidence that each individual recipient of a Release has made a substantial contribution to the formulation

and execution of the Plan. To the contrary, the Releases are designed to release third-party claims against, amongst others, former directors and officers of the Debtors as well as the Debtors' various financial advisors. JPMC may hold significant claims against certain of those third parties relating to the matters that remain in dispute in connection with the Warehouse Facility. Finally, the Debtors have not demonstrated that the Releases are necessary for the confirmation and/or success of the Plan. This Plan is a liquidating plan. The parties to be released will have no ongoing relationship with the Debtors or their estates after confirmation of the Plan. The Plan's confirmation and success does not depend on the Releases offered to the non-Debtor third-parties.

21.      The Releases are simply not fair to the claimholders against whom the Releases would be applied. The Debtors cannot prove that, if not for the granting of the Releases, the Plan would not have been formulated in its current form. As such, the Releases are not fair, reasonable or necessary to the Debtors' Plan.

**RESERVATION OF RIGHTS**

22.      JPMC reserves the right to supplement or amend this Objection, including supplementation or amendment to allege that any obligations owed to JPMC by any one or more of the Debtors are duties or obligations owed by any other or all Debtors to JPMC (individually or in any combination

## CONCLUSION

WHEREFORE, JPMC respectfully requests that the Court deny confirmation of the Plan, or in the alternative, confirm the Plan only with amendments sufficient to resolve the foregoing objections.

Dated:  January 21, 2009

LANDIS RATH & COBB LLP

_____

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, DE  19801
(302) 467-4400


*COUNSEL TO JPMORGAN CHASE BANK, N.A.*