**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| ————————————————————x | Hon. Christopher S. Sontchi |
| In re: | : | Chapter 11 |
|  | : |  |
| AMERICAN HOME MORTGAGE HOLDINGS, INC. | : | Case No. 07-11047 |
| AMERICAN HOME MORTGAGE INVESTMENT CORP. | : | Case No. 07-11048 |
| AMERICAN HOME MORTGAGE ACCEPTANCE, INC. | : | Case No. 07-11049 |
| AHMSV, INC.(f/k/a American Home Mortgage Servicing, Inc.) | : | Case No. 07-11050 |
| AMERICAN HOME MORTGAGE CORP. | : | Case No. 07-11051 |
| AMERICAN HOME MORTGAGE VENTURES LLC | : | Case No. 07-11052 |
| HOMEGATE SETTLEMENT SERVICES, INC. | : | Case No. 07-11053 |
| GREAT OAK ABSTRACT CORP. | : | Case No. 07-11054 |
|  | : |  |
| Debtors. | : | Jointly Administered |
| ————————————————————x |

**Report of**
**Margot Saunders**
**National Consumer Law Center**

## I.  Assignment

I have been asked by Counsel for the Borrowers' Committee in the bankruptcy proceeding of the above-named mortgage lenders and affiliates to provide –

- An explanation of how the loans provided by Debtors to borrower-homeowners may lead to losses for these borrowers;
- The theories of legal liability available to these borrowers in state and federal courts to redress their losses;
- An explanation of when borrowers become aware that they may have these legal claims; and
- Illustrations of successful resolution of these claims.

## II.  Summary of Findings.

In this report, I explain how the payment option ARM loans made by Debtors typically lead to significant problems for borrowers. First, I outline the nature of payment option ARM loans and explain why they are so damaging for borrowers. I explain how, because of the complex nature of these loan transactions, these problems only become apparent to most borrowers several years after consummation. It is only when the loan payments reach double or triple the initial amount and the borrowers face the catastrophic loss of their home that most borrowers seek legal counsel. Because they have not yet sought counsel, the majority of these borrowers are likely to be  currently unaware of either the extent of the difficulties that will face them in the future because of these loans, or the fact that there are valid and valuable legal theories to redress their losses.

The loan documents provided to me by Counsel for the Borrowers' Committee are indicative of problems well documented in the academic and regulatory literature regarding payment option ARM loans. These loan documents also illustrate the availability of several types of legal claims that these borrowers – and others like them – generally have to redress the problems flowing from these loans.

I outline the types of legal claims that can be brought to challenge the problematic nature of both the specific loans I have been provided, as well as most payment option ARM loans. Finally, at the end of this report, I have provided examples of several types of successful litigation providing substantial redress to borrowers with these types of loans.


## III.  Qualifications

National Consumer Law Center Inc.

The National Consumer Law Center, Inc. (NCLC) is a non-profit Massachusetts Corporation, founded in 1969, specializing in low-income consumer issues, with an emphasis on consumer credit. On a daily basis, NCLC provides legal and technical consulting and assistance on consumer law issues to legal services, government, and private attorneys representing low-income consumers across the country. NCLC publishes a series of eighteen practice treatises and annual supplements on consumer credit laws, including *Truth In Lending,* (6th ed. 2007) and *Cost of Credit: Regulation, Preemption, and Industry Abuses* (3d ed. 2005) and *Foreclosures* (2d ed. 2007), as well as bimonthly newsletters on a range of topics related to consumer credit issues and low-income consumers.

NCLC attorneys have written and advocated extensively on all aspects of consumer law affecting low-income people, conducted trainings for thousands of legal services and private attorneys on the law and litigation strategies to deal with predatory lending and other consumer law problems, and provided extensive oral and written testimony to numerous Congressional committees, as well as federal and state agencies.

Margot Saunders.

Currently I am Of Counsel to  NCLC, after serving as Managing Attorney of NCLC's Washington, D.C. office for fourteen years.

One of my primary duties at NCLC is to serve as a resource to legal services attorneys, attorneys engaged in private practice, as well as federal and state regulators, on complex consumer law issues. I regularly review legal files that include the loan related documents for homeowner-borrowers dealing with predatory mortgages who are facing the loss of their home through foreclosure. The spectrum of my involvement in these cases runs from a simple analysis of the claims based on a description of the facts by the borrower's attorney, to an analysis of the loan documents for common law and state and federal statutory claims, to a full blown evaluation of all the documents in the case – including those from the broker, lender and investors' files – to prepare an expert report, or as a consultant for the attorneys. I have performed these tasks in dozens of cases, for legal services and private attorneys from all over the country, as well as federal and state regulators, including a recent analysis of approximately fifty separate loan files for the FTC in a case pending in

the Northern District of Illinois against a predatory lender and its affiliates.

My duties at the National Consumer Law Center also include policy analysis in the areas of predatory lending, credit reporting, debt collection, electronic commerce and electronic benefits transfer, preservation of homeownership, and other consumer credit issues.

During the past seventeen years I have regularly provided testimony to the House Financial Services Committee and the Senate Banking and Housing Committee (in addition to other Congressional Committees) regarding credit related issues facing low-income households in America.  My responsibilities also have required frequent appearances before, and meetings with, federal regulators.  In this capacity, I have testified on numerous occasions before Congress on the meaning of, the causes for, and recommended solutions to, predatory mortgage lending.  For example, I was the lead lawyer representing consumers in the extensive negotiations surrounding the passage of the Home Ownership and Equity Protection Act in 1993, as well as during the Congressional discussions of the changes to the Truth in Lending Act in 1995.

I have been a primary resource for members and Congressional staff in the discussions in recent years regarding proposed changes to the law to address predatory lending and other consumer credit issues. For example, in the past 15 months, I have testified before the House Financial Services Committee on HUD's proposed changes to the Real Estate Settlement Services Act, and before both the House Ways and Means Committee and the Senate Finance Committee on the effect on the elderly of garnishing Social Security and other exempt benefits. Additionally, I provide substantial input to the testimony of other staff at NCLC, just as in my own policy work I am always counseled and guided by the other consumer law experts at the Center.

My work also includes writing analytical books and articles on issues relating to low-income consumers; providing training and expert testimony on issues affecting low income consumers; and providing analysis and assistance on credit math questions. I have authored or co-authored numerous articles in law reviews and other publications on consumer law, including, for example *The Credit Card Market and Regulation: In Need of Repair*, 10 N.C. Banking Inst. 23, University of North Carolina School of Law Banking Institute, 2006; and *Regulation of Consumer Credit: The Cause or the Cure for Predatory Lending?* Joint Center for Housing Studies, Harvard University, BABC, March 2004.

I am co-author of several of NCLC's practice treatises, including all editions of *Banking and Payments Law* (3rd Ed. 2005 and Supplements, 2006, 2007, 2008), and the original and second editions of *Access to Utility Service*, (2nd Ed. 2000). I have been a contributing author to other NCLC manuals, including *The Cost of Credit: Regulation and Legal Challenges* (2004, 2005 Supplements) and the 2006 and 2007 Supplements to *Foreclosures – Defenses, Workouts, and Mortgage Servicing* (1st Ed. 2005).

**IV. Overview of How Debtors' Mortgage Products Lead to Claims By Homeowners**

According to the information provided to me by Counsel, Debtors made a substantial number of payment option ARM loans. The vast majority of these were made in 2006 and 2007. Specifically, in their responses to discovery requests, the following information about the number of these outstanding loans was provided:

| | |
|------|--------|
| 2005 | 317 |
| 2006 | 43,628 |
| 2007 | 14,996 |

Additionally, information has been provided to me by Counsel in which it appears that Debtors made loans for which full documentation of income or assets was often not required.[1] These loans are known in the industry as either "stated income" loans, or "no doc" or "low doc" loans.

Quite often both of these loan characteristics are combined in the same loans: payment option ARM loans are also stated income loans.

Payment option ARM (POA) loans have been the subject of extensive litigation in the past year.[2] Indeed, because the problems inherent in these loans do not generally materialize until several years after origination, many consumer advocates believe that the number of challenges to these mortgages will explode in the coming two years.

In the past few years, payment option ARM loans became a popular type of mortgage offered to many homeowners. Like the adjustable rate mortgages that were common in the subprime market since the early part of this decade, POAs include a variable rate component as part of a systematic shifting of risk from lenders to borrowers. The signal factor in POA loans is a set period of time during which the minimum payment is fixed – such as one to several years – but the interest rate varies, which leads to negative amortization and a steady increase in the principal owed on the loan.

Under a payment option ARM a borrower has, in theory, a choice of three payments: a minimum payment based on an initial, low teaser interest rate; an interest only payment that covers the actual interest accruing; and a fully amortizing payment. Three-quarters of all borrowers pay only the minimum payment.[3] The minimum payment is generally sold as a "fixed rate" payment, although the interest rate is usually not fixed for more than a month and may be fixed for only a day.[4] Given the low initial teaser rates (1% to 2%), negative amortization occurs whenever minimum payments are

---

[1]This information was included in the American Home Mortgage Assets Trust 2006-4, Prospectus supplement dated August 29, 2006 (to prospectus dated April 21, 2006).

[2]See the discussion of pending litigation in Section VI, *infra*.

[3]Joint Ctr. for Hous. Studies, State of the Nation's Housing 2007, at 17.

[4]*See, e.g.*, Andrews v. Chevy Chase, 240 F.R.D. 612 (E.D. Wis. 2007) (describing payment option ARM sold as "fixed rate" when interest only fixed for one month, although payments fixed for a year).

made beyond the initial fixed rate period and the rate becomes adjustable.  Most payment option ARM loans limit the negative amortization that can accrue to an amount between 110% and 125% of the original principal.  Once the negative amortization cap is reached, the monthly payments regime is completely changed. There is no longer a choice of payments. Now the borrower must pay an amount sufficient to pay off the loan in the remaining time of the loan term.  This means that if the original loan term was 30 years, and the remaining term is now twenty-five years, the – now swollen –  principal will be amortized over the remaining twenty-five years of the loan. The combination of negative amortization and low teaser rates results in significant payment shock, often a doubling or tripling of the borrower's payment obligations thirty to sixty months after loan consummation, generally with no more than thirty days notice.

Payment option ARM loans are very problematic for borrowers. They are complex, involve concepts that are unfamiliar and confusing to most, even fairly sophisticated,  homeowners.[5] They combine a number of inter-related but counter-intuitive features:

•    Sold based on low teaser rate, typically for one month, and low-fixed payments for a year;
•    Payments do not increase in the first year, and only slightly increase in the subsequent 3 to 4 years;
•    The interest rate is decoupled from the payments;
•    The interest rate increases as early as the second day of the loan term;
•    While the increase in payments is generally capped, the increase in interest rate is not – until the loan ceiling is reached;
•    Payments do not cover the interest earned on the loan;
•    The principal of the loan immediately begins to increase, rather than decrease as it does in most home mortgages;
•    When the principal increases to 110 or 125% of the original amount borrowed, the loan converts to a fully amortizing loan over a much smaller term;
•    The transition from payments which do not even cover the outstanding interest to fully amortizing payments over a reduced term (usually only 25 to 27 years) causes *significant payment shock*.

For example,[6] consider the terms of Debtors' loan to Ms. Florence Dandridge of Staten Island, New York. She took out a POA loan in September, 2006 for $281,250. The initial payments, based an interest rate of 1.9% which applied for less than half a month, were for $837. After 28 months, the payments are scheduled to be $2,060. Ms. Dandridge's payments will almost triple in less than three years.

Payment option ARMs routinely include prepayment penalties that can be quite significant: as much as six months' interest. This means that even those borrowers who may realize the dangers of their

---

[5] *See e.g.* Consumer Fed'n of Am. press release, Lower-Income and Minority Consumers Most Likely to Prefer and Underestimate Risks of Adjustable Mortgages 3, July 26, 2004,  (consumers cannot calculate the increase in the payment in an adjustable rate mortgage and minimize the interest rate risk by understating the increase in the payment) available at  http:// www.consumerfederation.org/releases.cfm#Consumer%20Literacy.

[6] Information about this loan was provided to me by Counsel to the Borrowers' Committee.

loan  early in the loan term, may be unable to refinance out into a safer mortgage. As a result, most of the homeowners who currently have these loans will deal with the big increases in payments in the fourth or fifth year of their mortgages.

Brokers and lenders can easily take advantage of the complex nature of the products and the lack of specific guidance in the regulations governing disclosures to mislead consumers and make abusive loans.[7] Commentators have noted that even where lenders have purported to provide all required disclosures, consumers are still confused.[8] For example, the Truth in Lending Act ("TILA") requires information regarding the amount financed, the finance charge, the annual percentage rate, and the payment schedule, as well as other information, to be disclosed clearly and conspicuously and in a specific manner. Yet, the regulations guiding compliance with TILA do not specifically require an explanation of how a payment option ARM loan works. Some courts have held that the failure to provide information more clearly about the nature of  POA loans nevertheless is illegal.[9]

Numerous analyses of the problems in the mortgage market have found that no doc or low doc loans (these are loans where less than full documentation of income and assets is required by the lender) are significantly more risky than fully documented loans, that they facilitate lender fraud, and lead to increased defaults and foreclosures.[10]  Moreover, other standard features of payment option ARM loans, including prepayment penalties, balloon payments, low or no documentation, and variable interest rates, particularly in combination, have also been shown to increase the risk of

---

[7]Fed. Trade Comm'n v. Chase Financial Funding, Inc., No. SACV04-549, Complaint at 4 (C.D. Cal. May 12, 2004), available at www.ftc.gov/os/caselist/0223287/040602comp0223287.pdf  (describing payment option ARM); Gov't Accountability Office, GAO No. 06-1021, Alternative Mortgage Products:  Impact on Defaults Remains Unclear, but Disclosure of Risks to Borrowers Could Be Improved 22 (2006) (describing advertisement for payment option ARM that promised 45% reduction in monthly mortgage payments and interest rate of 1.25%, yet interest rate of 1.25% only applied for first month, and this fact disclosed in "much smaller print" on second page), available at www.gao.gov/new.items/d061021.pdf.

[8]*See e.g.* Patricia A. McCoy, Rethinking Disclosure in a World of Risk-Based Pricing, 44 Harv. J. on Legis. 123, 133-34 (2007) ("The New York Times recently advised borrowers with exotic adjustable-rate mortgages to figure out their maximum monthly payments by consulting 'mortgage payment calculators on the Web – not their TILA disclosures."), and  at 143-44 (discussing limitations of variable rate disclosures in detail).

[9] See Section VI C, *infra*.

[10]Seventy percent of subprime loan pools rated by Standard and Poors in the first half of 2005 had less-than-full documentation.  *See* Ruth Simon, James R. Hagerty & James T. Areddy, Housing Bubble Doesn't Scare Off Foreigners, Wall St. J., Aug. 24, 2005, at 1, 7.  California v. Ameriquest, (Cal. Super. Ct. Alameda County Mar. 21, 2006) (complaint, 10H) (Ameriquest fabricated income and assets), available at http://ag.ca.gov/newsalerts/cms06/06-005_0a.pdf; McGlawn v. Pa. Human Relations Comm'n, 891 A.2d 757 (Pa. Commw. Ct. 2006) (broker created false income information for low-income borrowers).  *See also* Ellen Schloemer, Wei Li, Keith Ernst & Kathleen Keest, Ctr. for Responsible Lending, Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners 21 (Dec. 2006) (loans originated with less than full documentation in 2003 had a 63.7% higher risk of foreclosure), available at www.responsiblelending.org /pdfs/foreclosure-paper-report -2-17.pdf. Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609, 58,614 (Oct. 4, 2006) (discussing and cautioning against increasing reliance on "reduced documentation"); Susan E. Barnes, Patrice Jordan, Victoria Wagner & David Wyss, Standard & Poor's, *Standard & Poor's Weighs in on the U.S. Subprime Mortgage Market* 12 (Apr. 5, 2007) (20-30% of pools rated by Standard & Poors contain subprime loans with no documentation and piggyback loans), available at  www2.standardandpoors.com /spf/pdf/media/TranscriptSubprime_040507.pdf.

foreclosure.[11]

As a result of their inherent risks – and the deceptions that appear to routinely accompany these loans – it has been shown that loans with adjustable rates foreclose at far higher rates than fixed rate mortgages.[12]  The dangers of adjustable rate loans for borrowers is considerably exacerbated by additional characteristics on these loans which add to the problems, the risk, and the likely litigation relating to these loans. The most serious additional risk factor is reduced verification of the borrowers' ability to repay the loan.[13]  As more risk factors are piled into the same loans – adjustable rates plus reduced documentation – unsurprisingly, the likelihood of foreclosure rises as well.[14] It is well recognized that particularly the failure to adequately underwrite mortgage loans leads to increased foreclosures – creating legal claims for the harmed homeowner-borrowers and significant losses for investors.[15]

---

[11]*See, e.g.,* Morgan J. Rose, Predatory Lending Practices and Subprime Foreclosures--Distinguishing Impacts by Loan Category 45 (Dec. 2006) (prepayment penalties and balloon notes combined on a fixed rate refinance subprime loan increase the rate of foreclosure 227%), available at www.chicagofed.org/cedric /2007_res_con_papers/car_62_morgan_j_rose_foreclosures_draft.pdf;

[12]*See, e.g.,* Ellen Schloemer, Wei Li, Keith Ernst & Kathleen Keest, Ctr. for Responsible Lending, Losing Ground:  Foreclosures in the Subprime Market and Their Cost to Homeowners 21 (Dec. 2006), available at www.responsiblelending.org/pdfs /foreclosure-paper-report-2-17.pdf; Roberto Quercia, et al. The Impact of Predatory Loan Terms on Subprime Foreclosures:  The Special Case of Prepayment Penalties and Balloon Payments 28-29 (Jan. 2005) (subprime refinance ARMs are 50% more likely than fixed rate subprime refinance loans to result in foreclosure), available at www.kenan-flagler.unc.edu/assets/documents/foreclosurepaper.pdf; Cf. Keith Ernst, Ctr. for Responsible Lending, Case Study in Subprime Hybrid ARM Refinance Outcomes (Feb. 21, 2007) (less than three years out, 8.5% of 106 hybrid subprime ARMS made by Option One in 2004 had been foreclosed on), available at www.responsiblelending.org/issues/mortgage/briefs /page.jsp?itemID=31730766. Cf. Subprime and Predatory Mortgage Lending: New Regulatory Guidance, Current Market Conditions and Effects on Regulated Financial Institutions:  Hearing Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. On Financial Services, 110th Cong., 1st Sess. (2007) (testimony of Alex J. Pollock, Resident Fellow, American Enterprise Institute) ("Subprime ARMs have 50% higher serious delinquencies than subprime fixed rate loans (9% vs. 6%). Subprime ARMs have six times the serious delinquencies of prime ARMs (9% vs. 1.45%). Prime ARMs have twice the serious delinquencies of prime fixed rate loans (1.45% vs. 0.7%)."), available at www.house.gov/apps/list/hearing/financialsvcs_dem /htpollock032707.pdf.

[13]*See* Gov't Accountability Office, GAO No. 06-1021, Alternative Mortgage Products:  Impact on Defaults Remains Unclear, but Disclosure of Risks to Borrowers Could Be Improved 3 (2006), available at www.gao.gov/new.items/d061021.pdf.

[14]See Susan E. Barnes, Patrice Jordan, Victoria Wagner & David Wyss, Standard & Poor's, Standard & Poor's Weighs in on the U.S. Subprime Mortgage Market 12 (Apr. 5, 2007) (increase in early payment defaults within four months of origination, particularly for loans with low documentation and a piggyback loan), available at www2.standardandpoors.com/spf/pdf/media/TranscriptSubprime_040507.pdf. Thus, balloon payments and ARMs appear to be markers for lack of loan affordability and consequent default risk rather than the cause of default in themselves.

[15]See, e.g., M. Diane Pendley, Glenn Costello & Mary Kelsch, Fitch Ratings, The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS Performance (Nov. 28, 2007), available at www.fitchratings.com/corporate/reports/report_frame.cfm?rpt_id=356624 (noting the absence of adequate underwriting contributed significantly to the elevated default rates in 2007).

In 2006 and 2007, federal regulators issued guidance and statements addressing the widespread failure of underwriting in POA loans and other adjustable rate loans.[16]  These five federal banking regulators specifically challenged the practice of substituting rate increases for underwriting.[17] They identified three main failures of underwriting typical of these loans:

- the failure to take into account future rate adjustments and negative amortization in determining ability to repay,
- the failure to include tax and insurance payments in determining ability to repay, and
- the widespread prevalence of stated income loans.  (A stated income loan, also referred to a "no doc loan," requires no verification of the borrower's income. A related product is the "low doc loan," which reduces the traditional requirements for verification.[18])

For example, the 2006 Interagency Guidance on Nontraditional Mortgage Products issued by these five federal banking regulators focused on the payment shock occasioned by rate resets and periods of negative amortization.[19]  The guidance urges lenders to underwrite loans to the fully indexed rate, as opposed to an initial teaser rate.  The fully indexed rate is the interest rate that would be in effect at the time of origination, based upon the index identified in the loan note plus the listed margin, absent a teaser rate. Even the fully indexed rate does not reflect the possible risk that interest rates will increase; it is not the maximum rate that can be charged under the note.  It is only the rate that would be charged on the note had the interest rate calculations under the note been imposed at the outset.  This focus on the fully indexed rate was a large step forward from the practices of many lenders – and one which was vigorously objected to by the mortgage industry.[20]

These statements by regulators have considerably strengthened claims against lenders, assignees, and

---

[16]Statement on Subprime Lending, 72 Fed. Reg. 37,569 (July 10, 2007); Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609 (Oct. 4, 2006).

[17]71 Fed. Reg. 58,609, 58,614 (Oct. 4, 2006) ("While higher pricing is often used to address elevated risk levels, it does not replace the need for sound underwriting.").

[18]Traditionally no doc or low doc loans were created for the convenience of high income, high asset borrowers who were unquestionably credit worthy and *chose* to pay a higher interest rate in return for the convenience of a reduced requirement to document their income and assets. These loans make no sense for borrowers who are on fixed incomes who are still required to provide documentation of the *source* of their income.

[19]71 Fed. Reg. 58,609, 58,613-58,614 (Oct. 4, 2006).

[20]*See, e.g.*, Aames Mortgage Trust 2001-1 Mortgage Pass-Through Certificates, Series 2001-1, Aames Capital Corporation as Sponsor, Countrywide Home Loans, Inc. as Servicer, Prospectus Supplement to Prospectus dated March 13, 2001, S-10 (stating that no underwriting was done on the fully indexed payment levels of the adjustable rate mortgages in the pool); Subprime Mortgage Market Turmoil: Examining the Role of Securitization, Hearings Before the S. Comm. on Banking, Hous., & Urban Dev., 110th Cong. (2007) (statement of Sandor Samuels, Executive Managing Dir., Countrywide Fin. Corp.) (60% of borrowers from Countrywide could not qualify at the fully indexed rate), available at http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=256; Steven Sloan & Joe Adler, How Freddie Cutbacks in Hybrids May Reverberate, Am. Banker, Feb. 28, 2007 (quoting Wright Andrews, a lobbyist for nonbank lending institutions, as saying that most subprime borrowers cannot afford the fully indexed rate and requiring underwriting to the fully indexed rate would prevent adjustable rate mortgages from being made).

others for improvident lending.[21]

The bottom line is that POA loans pose a real danger to homeowners for a number of reasons:

1. Homeowners will experience a dramatic increase in their home loan payments – often *tripling* in amount in when the reset occurs.
2. This danger is often very difficult, if not impossible to discern from the documents provided both at closing and throughout the loan terms (for an example of this difficulty see the discussion of Mr. Jack Tilton's loan below).[22]
3. Given the increase in the principal resulting from the negative amortization, the amortizing payment for the last 25 years of the loan will be substantially higher than the initial payments.
4. As these loans often include prepayment penalties, borrowers are locked into them, and cannot escape the dangers – even if they are aware of them – without significant cost.

The significant payment increase comes when the loan is required to become fully amortizing – when the principal reaches from 110% to 125% (depending upon the specific terms of the contract). The exact date of this is not known ahead of time, and indeed cannot be determined until all of the interest rates applicable to each month of the loan term can be ascertained. POAs generally have an outside date of sixty months for requiring this reset, such that if the negatively amortized interest has not caused the principal to reach the trigger before the end of the five years after consummation, the loan will reset regardless on the 60 month anniversary of the first payment. *It is only when this payment increase is triggered – three to five years after consummation – that most borrowers will become fully aware of the dangers inherent in POA loans, and only then that most will seek legal counsel to help them avoid default and foreclosure.*

## V. Dangers Apparent in American Home Mortgages

I have reviewed specific documents for several loans provided to me by Counsel for the Borrowers' Committee. Additionally, in my own work for the National Consumer Law Center I have had many occasions to review POA loans as well as to discuss the details of these loans with other attorneys.

Two American Home loans for which I have been provided information illustrate these problems.

---

[21] For example, Mountain State Justice, a legal services program in Charleston, West Virginia, routinely raises claims of unconscionability for lenders' failure to adequately underwrite the loans, citing these regulatory statements as a basis for minimum standards of underwriting in the industry. Settlements on these claims range from a loan modification with significantly reduced principal, and low interest rate, to a voiding of the loan plus damages paid to the consumer. Attorneys' fees and court costs are routinely included.

[22] Brian Bucks & Karen Pence, Do Homeowners Know Their House Values and Mortgage Terms? 18-22 (Fed. Res. Bd. of Governors Fin. & Econ. Discussion Series Working Paper No. 2006-3) (borrowers, particularly low-income borrowers, underestimate caps on life time interest rates), available at http://www.federlreserve.gov/pubs/feds/2006/200603/200603pap.pdf.

In both loans the initial payments for the first year are based on an interest rate which is less than 2%. In both loans, the interest rate changes within days, yet the minimum payments remain the same for the first year. In both loans, the projected payments once the loan becomes fully amortizing is well over twice the initial payment. Both loans were made in the second half of 2006. The huge payment increases were not set to occur until over two years later – in 2008 and 2009.

| Borrower | Date of Loan | Initial Payment Rate | Applicable Interest Rate | Projected Reset Date | Initial Payment | Projected Payment *After* Reset | Prepayment Penalty |
|----------|--------------|----------------------|--------------------------|----------------------|-----------------|------------------|---------------------|
| Jack | 7/26/06 | 1% | 8.132% after 1 day | 12/1/08 | $1103 | $2859 | 6 months interest |
| Dandridge | 9/11/06 | 1.9% | 5.514% after ½ month | 3/1/09 | $837 | $2060 | 6 months interest |

As the majority of the American Home POA loans were made in 2006 and 2007 (43,628 in 2006 and 14,996 in 2007), *the majority of these loans have probably not reset to the fully amortizing payment even at this time, in January, 2009.*

There is a proto-typical fact scenario associated with these loan products. I personally have spoken to dozens of attorneys in states all across the nation who – while seeking assistance framing legal claims to help their clients avert foreclosure – provide fact patterns that involve a similar same set of promises, deceptions, and confusing and incorrect documents. The cases involving POA loans also generally involve a similar set of state and federal law claims. While some of these claims are fact specific and require the testimony of the borrowers to prove the claims, most often there are substantial and highly remunerative legal claims that can be proven simply from the documents. This typical fact pattern is well illustrated in the case of *Tilton Jack v. American Brokers Conduit, Inc. et al.*[23]

According to the complaint filed in his case, Tilton Jack is an elderly, African-American widower who owns his home in Brooklyn, New York.[24]  In 2006 he contacted a mortgage broker in response to a brochure he received. The mortgage broker told Mr. Jack that he qualified for a loan with a 1% annual interest rate, which would reduce his monthly mortgage payments by $700. The mortgage broker also told Mr. Jack that the amount of money he owed on his mortgage loan would not increase so long as he made simply one additional payment of $1100 per year.

At the time, Mr. Jack had a fixed pension and social security income of $2,400 per month. The mortgage broker collected documents verifying the income and asset information from Mr. Jack, including his bank statements, social security payment and pension information.

---

[23]This case is currently pending in the U.S. District Court for the Eastern District of New York. Civil Action No.: 07-CV-3088. I understand that those defendants in this case that are Debtors in the instant bankruptcy case have been dismissed because of the pending bankruptcy.

[24]The information provided in this section of the report is based on the Amended Complaint filed in Mr. Jack's case.

Mr. Jack's loan payment on his existing first mortgage had been $1,800 per month, plus taxes and insurance. This loan – from Ameriquest Mortgage Company – had a fixed interest rate of approximately 7.4%. The broker promised Mr. Jack that the new loan issued by American Brokers Conduit would be at an interest rate of 1%, and that it would enable Mr. Jack to pay off all his debts and lower his monthly payments to about $1,100.  During the extensive conversations back and forth between Mr. Jack and the loan broker about whether Mr. Jack should take out this loan, Mr. Jack expressed concern about the possibility that the loan principal would rise. The mortgage broker repeatedly assured him that so long as he made the single additional payment of $1,100 a year, the principal would not increase.[25]

The broker also promised that after one or two years he would help Mr. Jack refinance into an even better loan without his having to pay any closing fees. He said this would be possible because this loan would pay off all of Mr. Jack's credit cards, causing his credit score to improve substantially. Relying on the express promises of the mortgage broker, Mr. Jack agreed to close the loan. When he began making monthly payments, Mr. Jack included an additional $114.70 each month to cover the extra $1,100 needed to prevent the principal from growing.

Documents relating to Mr. Jack's mortgage reveal that the terms of the loan he received from American Brokers Conduit, Inc., were considerably different from both the terms described by the broker in their conversations, and the terms reflected in the documents that had been mailed to him before the loan was consummated. The loan that Mr. Jack actually signed stripped tens of thousands of dollars in equity from his home; that would cost him, over the life of the loan, almost two and a half times more than had been promised. The monthly payments on this loan would quickly rise above his ability to pay, exposing him to significant risk of foreclosure.

Under the terms of the loan provided to Mr. Jack on July 26, 2006, the 1% interest rate he was promised would last for only *one day*. On the second day of the loan, the interest rate increased to 8.132%. Mr. Jack's minimum *monthly payment* was computed on the basis of the 1% interest rate, and that payment amount was fixed for one year. However, because the *interest rate* increased drastically and immediately, the monthly payments failed to cover even the interest that accumulated each month. For example:

| Interest rate on which payment is calculated | 1% |
|---|---|
| Interest rate actually applicable to loan after 1st day | **8.132%** |
| Minimum monthly payment amount for first year | $1,103 |
| Interest earned for first month | **$2,324** |
| Amount principal of loan increased in first month, *after the payment was made* | $1221 |

---

[25]One fact in the Tilton Jack case which is not typical is the fact that he tried repeatedly to rescind the transaction within the first three days after the loan was consummated. This is not particularly germane to the standard legal claims that are successfully made in these cases, so I have not discussed it here.

| | |
|---|---|
| Interest earned in the 10th month[26] | $2,579 |
| Amount principal of loan increased in the **10th** month, *after the payment was made* | $1,576 |

Under the terms of this loan, the minimum monthly payment amount is recomputed once each year in order to account for the changes in the interest rate, but the new minimum payment amount cannot differ from the previous one by more than 7.5%. As of September, 2007, Mr. Jack's minimum payment was $1,468 each month – still not sufficient to pay any of the principal. At the time the Complaint in Mr. Jack's case was filed – August, 2007 – the principal on Mr. Jack's loan had climbed from $343,000 to more than $356,000. The monthly *accumulation* of interest was in excess of $2,500 a month.

The loan provides that once the principal reaches 110% of the amount that was originated, or $377,300, Mr. Jack will no longer have the same minimum payment option and will be required to make the monthly payments in the fully amortizing amount, which was estimated to be approximately $3,300 a month (including taxes and insurance). That is more than double Mr. Jack's monthly income – which was documented on his loan application.

This loan also includes a significant prepayment penalty for the first three years, should Mr. Jack try to escape the terms of this loan: six months interest – estimated by Mr. Jack's attorneys to be more than $12,500.

The reason this loan is called a payment *option* ARM is because the borrowers are provided statements which set out in tiny type an explanation that they can choose which of four payments they would like to make each month.

Consider the monthly billing statement provided to Mr. Jack by American Home Mortgage Servicing for the payment due June 11, 2007.[27] In a box which appears to be designed to tell the reader the essential information, the **"Principal and Interest Payment"** is listed as $1,103.22. Yet, a very careful analysis of all of the information on the monthly statement reveals that this payment not only does not provide any principal repayment, but it also means that the interest accruing each month on the loan is not even being repaid.

The four payment options are described as follows (except that on the actual statement, the size of the font used to describe these options is quite small) –

---

[26]This information comes from the servicing statement provided to Mr. Jack for the payment due 6/11/07, OBC 323.

[27]This document is Bates Stamped OBC 0323 in the materials provided by Counsel for the Borrowers' Committee.

| Option 1: | **Minimum Payment:** This amount pays the interest and if applicable, principal that is currently due under your loan note. The amount may not be sufficient to pay all of the accrued interest for the previous month or to pay the loan in full over the remaining scheduled term. Negative amortization may result, which means that any unpaid interest will be added to the principal loan balances and will accrue additional interest. |
|---|---|
| Option 2: | **Interest Only Payment:** this amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment. However, no portion of the payment will be applied to reduce the principal balance of your loan. |
| Option 3: | **Full Principal and Interest Payment:**(based on the remaining term of your loan: This amount pays all of the accrued interest for the previous month(including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on the remaining scheduled term under your loan documents. |
| Option 4: | **Full Principal and Interest Payment:**(based on a 15 year term: This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on a 15-year term. |

The Minimum Payment is the **Least** amount you must pay. One or more of the options may not be available, the payment amounts in those options will always be equal to or greater than the Minimum Payment. The payment amount shown for each available option, as applicable, also includes an escrow payment, and fees for any optional products.

The HUD 1 on Mr. Jack's loan reveals over $28,000 in loan charges, which is an extraordinary amount. The account of Mr. Jack's loan, his exchanges with his broker, the deceptions he alleges by his broker, the confusing loan documents, the misleading servicing statements are all similar to those told by other borrowers who have received payment option ARMs.

## VI.  Summary of Legal Claims

As is typical in cases involving payment option ARMs, in the complaint filed on his behalf, Mr. Jack has alleged a number of state and federal claims relating to this loan, including:

1.    Truth in Lending Act – failure to properly disclose material terms of the loan
2.    Deceptive practices
3.    Fraud
4.    Civil Conspiracy
5.    Real Estate Settlement Services Act

In other cases challenging POAs – both in New York as well as other states – claims are also included for –

6.      Unfair trade practices
7.      Unconscionability
8.      Breach of good faith and fair dealing
9.      Breach of contract

### A.      Factual Basis for Many State Claims – Lender's Failure to Determine Borrower's Ability to Repay the Loan

#### 1. Explanation of Potential Claim.

The crux of many cases challenging both POA loans – as well as other adjustable rate mortgages – is the lender's failure to determine the borrowers' ability to repay the loans: a failure of underwriting. This failure often is used as the factual basis for claims of deception, unfair trade practices, breach of good faith and fair dealing, and unconscionability.

Increasingly, courts regard lending when there is no ability to repay as a *per se* unfair and deceptive act or practice.[28]  In a landmark case, the Massachusetts attorney general sought to enjoin foreclosures brought by a major subprime lender and servicer, Fremont, until the Attorney General had a chance to review the underlying loans to determine if there was an alternative to foreclosure. The state Supreme Court reiterated that, for years, the law had made clear to mortgage lenders:

> that, even if they were in compliance with banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices."[29]

The court specifically pointed out that even before the 2006 Guidance by federal regulators, those same regulators had for years required "that loans made to borrowers on terms that showed they would be unable to pay and therefore were likely to lead to default, were unsafe and unsound, and probably unfair."[30] As a result, the court rejected Fremont's claim that the Guidance's underwriting requirements were somehow new. Recently, a Massachusetts trial court issued another injunction along similar grounds against another lender for its adjustable, teaser rate loans.[31]

---

[28]See, e.g., Commonwealth v. Fremont Inv. & Loan,  2008 WL 517279 (Mass. Super. Ct. Feb. 25, 2008), aff'd, No. 08-J-118 (Mass. App. Ct. May 2, 2008), available at www.consumerlaw.org/unreported; Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827 (N.D. Ill. 2007) ("Martinez is stuck in a loan he did not want and may not be able to pay.").

[29]Com. v. Fremont Investment & Loan, 452 Mass. 733, 897 N.E.2d 548 at 556 (Mass.,2008).

[30]The Court noted "an interagency Federal guidance published January 31, 2001, jointly by the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, [which] stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, *as structured,* from sources other than the collateral pledged are generally considered unsafe and unsound" (emphasis supplied). *Id.* at 557.

[31] *See,* Commonwealth of Massachusetts v. H&R Block, Inc., Superior Court, Civil Action No. 08-2474-BLS 1.

Increasingly, industry observers note that lenders did not appropriately underwrite stated-income loans.[32] In many cases, lenders failed to even check applications and credit reports for internal consistency.[33] Other courts have recognized that falsified applications may have more to do with collusion between the broker and the lender than the borrower's participation in the fraud.[34]

The Federal Reserve Board has recognized that stated-income loans harm consumers because the practice:[35]

- Presents the opportunity for originators to mislead consumers who could easily document their incomes into paying a premium for a stated-income loan--making the loan unnecessarily expensive;
- Provides originators with incentives as well as opportunities to inflate the applicant's income, by rewarding the originator for providing a stated-income loan with a higher premium;
- Allows originators to hide the inflated income in the rush and confusion of the loan application and closing process;
- Results in loans to consumers with payments that are unaffordable, leading to default, foreclosure, loss of the home and home equity; and
- Causes increases in foreclosures which in turn harms neighborhoods, communities and cities.[36]

Claims based on the lender's failure to adequately underwrite the loan can often be proven through the documents alone – as the tell-tale signs of the lender's deliberate ignorance are often quite evident from the loan documents.[37]

## 2. Application of Claims to Debtors' Loans

I have not been asked to give an opinion as to the likelihood that Mr. Jack or Ms. Dandridge would prevail on a claim challenging the lenders' failure to determine their ability to repay the loans. However, there are indications in the complaint filed on Mr. Jack's behalf that this claim certainly exists – the amount that mortgage payment is scheduled to increase to once the loan becomes fully

---

[32]See, e.g., BasePoint Analytics, White Paper: Early Payment Default--Links To Fraud and Impact on Mortgage Lenders and Investment Banks (2007); M. Diane Pendley, Glenn Costello & Mary Kelsch, Fitch Ratings, The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS Performance (Nov. 28, 2007), available at www.fitchratings.com/corporate/reports/report_frame.cfm?rpt_id=356624. However, the Fremont court specifically refused to find that stated income loans are *per se* unfair.

[33]*Id.*

[34]*See, e.g.*, Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827 (N.D. Ill. 2007).

[35]73 Fed. Reg.1,672, 1691 (Jan. 9, 2008).

[36]73 Fed. Reg. 1,672, 1,691 (Jan. 9, 2008).

[37]This fact is something I know from my own work as an expert witness and consultant on many cases involving the lenders' failure to determine the borrower's ability to repay the loan.

amortizing ($2,859) is more than his monthly income of $2,400. These types of facts support a claim under state law for breach of good faith and fair dealing, unconscionability, and breach of state consumer protection laws that require the determination of the borrower's ability to repay, and potentially fraud. Typically these claims may be proven from the documents through an evaluation of the materials in the files of the lender and the broker. For example, there will generally be several iterations of the Loan Application, often showing different incomes, proof of the borrower's actual income and assets is generally in the file, but ignored by both. There is generally an underwriter analysis which often shows what questions were asked and what answers were provided.

### 3. Examples of Other Cases Challenging Failure to Determine Ability to Repay

Recent massive settlements between numerous state Attorneys General (including California, Illinois and Florida) and Countrywide and Bank of America were premised largely on Countrywide's repeated failures to determine the borrowers' ability to repay the loans provided by Countrywide. The complaints in these cases, as well as the settlements, specifically targeted this practice in POA loans. Bank of America has pledged over $8.4 billion to redress the extensive wrongs to over 400,000 borrowers caused by this and other failures in underwriting in the making of Countrywide loans.[38]

### B. Fraud or Deception

### 1. Explanation of Potential Claim

Fraud and deception is often the root of many cases challenging POA loans, as it appears that most homeowners who took out these loans seriously misunderstood their terms, and they routinely allege that they were deceived into doing so. Indeed, these claims are so widespread that quite often one case is proven through the testimony – or proffered testimony – of other victims. In 2007, the FTC recognized the ongoing fraud (and concomitant violations of TILA) in widespread media advertisements about these products. It issued a press release along with letters to over 200 national and local advertisers warning them "about the potentially deceptive advertising, with guidance on screening ads for questionable claims."[39]

According to the FTC press release about these warning letters –

> [T]he agency is advising more than 200 advertisers and media outlets that some mortgage ads are potentially deceptive or in violation of the Truth in Lending Act. The ads, including some in Spanish, were identified in June during a nationwide review focused on claims for very low monthly payment amounts or interest rates, without adequate disclosure of other important loan terms. For example, some ads

---

[38]*See* Ruth Simon, *Bank of America in Settlement Worth Over $8 Billion,* Wall Street Journal, Oct. 6, 2008, available at http://online.wsj.com/article/SB122326958041707133.html?mod=testMod.

[39]FTC Warns Mortgage Advertisers and Media That Ads May Be Deceptive, Press Release, September 11, 2007, available at http://www.ftc.gov/opa/2007/09/mortsurf.shtm.

touted rates as low as "1%" but failed to disclose adequately:

- that the stated rate was a "payment rate" – not the interest rate – that applied only during the loan's initial period;
- that low advertised payments applied for only a short period; and
- the loan's Annual Percentage Rate, the uniform measure of the cost of credit that enables consumers to shop for and compare mortgage offerings.[40]

## 2. Case Examples of Successful POA cases premised on Fraud and/or Deception[41]

1. *Kanawha County, West Virginia.* After the defendants rested in a jury trial in 2007 challenging the deceptive practices of the broker and the lender in the marketing of a POA loan, in which the plaintiff's primary claim was based on the promise of a reduced rate (1%) for five years, the lender and broker settled by paying the homeowner $300,000, including attorney's fees. *Pauley v. Chevy Chase Bank and Allied Home Mortgage Capital Corp.*

2. *Berkeley County, West Virginia.* In three similar cases, each alleging the borrowers were unconscionably induced by consistent reassurance to refinance their fixed, low rate 30 year mortgages into 1% POAs, the lenders and brokers jointly paid each set of borrowers $100,000, $95,000, and $85,000, respectively. *Banks v. Allied Home Mortgage Capital Corp. & Bank United; Reeser v. Allied Home Mortgage Capital Corp. & Bank United; Palmer v. Allied Home Mortgage Capital Corp. & Bank United.*

3. *Brooklyn, New York.* A complaint was filed alleging that the borrower was fraudulently induced into refinancing out of a fixed rated loan into a payment option ARM loan in July, 2006, and told that he would be provided an interest rate of one percent.  The borrower was not told that his payments would not cover the interest earned on the loan. In addition, borrower was unknowingly given a low-doc loan. Although he submitted his income information to broker, either the broker or the lender blacked out all his income information so that there would be no record of his actual earnings in the loan file.  The loan contained a significant three-year prepayment penalty.  Borrower could not afford the loan at the fully amortizing amount. Complaint included TILA, unfair and deceptive practices and fraud. Borrower reached a *confidential settlement* that will enable him to remain in his home.

4. *Multiple cases in Mid-Atlantic state.*  A private attorney has filed litigation on behalf of about sixty borrowers with payment option ARM loans who asserted violations of the state Consumer Fraud act, common law fraud, breach of contract and TILA violations.  Almost all of these loans were refinancings of previous loans, often fixed rate, fully amortizing mortgages. Many of these homeowners asserted that their mortgage brokers defrauded them by  misrepresenting to them that their mortgages carried low fixed interest rates for between three and five years.  In many of these cases, these claims were substantiated by the "early" TILA Disclosure statements which reflected

---

[40]*Id.*

[41]Information in this section was provided by the attorneys of record in these cases.

much lower interest rates than the borrowers would ultimately receive. Frequently, these early TILA disclosures reflected the teaser rate, but the borrowers were told that the teaser rate (sometimes as low as 1%)  was good for 1 year, 5 years or even the life of the loan.  In actuality, these borrowers were provided mortgages with low teaser rate mortgages only good for one month, or mortgages that set payment rates based on rates below the actual interest rate being charged to them.  Two dozen cases are still pending, but in dozens of other cases judgments or settlements have been obtained for the benefit of these homeowners. The range of settlements and judgments has varied from between $7,500. to $55,000. All of the resolved cases were ultimately the subject of *confidentiality agreements.*


## C. Truth in Lending Act Claims

### 1. Explanation of Potential Claims

A series of challenges to POA loans have successfully been mounted using the Truth in Lending Act ("TILA") as the primary vehicle. One such case is the 2007 case from a Federal District Court in Wisconsin, *Andrews v. Chevy Chase Bank, FSB.*[42] The court held that in its disclosures for a POA loan, the lender had violated TILA in three ways: 1) its disclosure of the payment schedule, 2) its disclosure of the cost of the mortgage loan as an annual percentage rate (APR), and 3) its disclosure of the variable interest rate feature of the loan. The court held that the TILA remedy of rescission was available for each or any of these violations of TILA, and that this remedy could be used by the class of borrowers represented by the named plaintiffs. Subsequently, the 7th Circuit Court of Appeals overruled only the last aspect of this decision, stating that the remedy of rescission is not available to a class of homeowners.[43] The Court of Appeals did not address the substantive findings of the district court.

More typical TILA disclosure violations, involving an understatement of the finance charge, may also be present. Any failure to provide a material TILA disclosure will lead to statutory damages and rescission for a non-purchase money home secured loan. If the loan was used to purchase the home, only the statutory damages (plus actual damages – which are difficult to prove) are available. In all cases under TILA, attorneys's fees and court costs are awarded to a prevailing consumer.[44]

Under TILA, prevailing consumers are entitled to one recovery of $4,000 for the failure to make any of the disclosures clearly and conspicuously.[45]  Multiple disclosure violations result in only one award of statutory damages. The failure to properly provide the TILA disclosures also triggers rescission

---

[42]240 F.R.D. 612 (E.D.Wis.,2007).

[43]Andrews v. Chevy Chase Bank, 545 F.3d 570 (7th Cir.(Wis.) Sep 24, 2008) (NO. 07-1326), rehearing and rehearing en banc denied (Oct 31, 2008).

[44]15 U.S.C. § 1640(a)(3).

[45]15 U.S.C. § 1640(a)(2)(A).

rights under 15 U.S.C. § 1635(a).  A homeowner whose non-purchase money loan includes material violations of TILA can rescind the loan for up to 3 years from the consummation of the law. Rescission is fully applicable to assignees of the loan.[46]

Once the loan is rescinded, the lender's security interest in the loan is wiped out. The homeowner does have the duty to repay the lender, but the amount due the lender – called the "tender amount" is substantially reduced.

Rescission is a powerful remedy, worth a substantial amount of money to homeowners for whom it is available.  This right is much more powerful than common-law rescission, although it shares the goal of common law rescission of restoring the *status quo ante*.[47] Rescission voids the security interest in the property, leaving the lender with an unsecured debt.[48]  Rescission also strips away the costs, fees, and interest associated with the loan.  The borrower's debt is reduced to the real proceeds of the loan:  monies paid to the borrower or paid to third party creditors of the borrower. Taxes and insurance are included in the real proceeds; closing costs are not.  Finance charges, interest, and legitimate third party fees, like appraisals and credit reports and filing fees, paid by the borrower directly or paid from the loan proceeds are all subtracted from the amount due.[49]  All payments made by the borrower are credited dollar-for-dollar against the remaining principal.[50] If borrowers have paid a significant amount of funds to the lender, the result can be the complete elimination of the debt or even an overpayment to the lender, which must be refunded.[51]

To illustrate the powerful, and highly remunerative, remedy of TILA rescission, let us assume that Ms. Dandridge's loan from the Debtors were rescinded, and that she had made payments through December, 2008 on the loan. The amount she would owe the current holder would be reduced by the all of the finance charges and costs she has paid on the loan. In certain situations, that sum can be further reduced by statutory damages under TILA:

---

[46] 15 U.S.C. § 1641(c).

[47] See, e.g., Williams v. Saxon Mortgage, 2008 WL 45739 (S.D. Ala. Jan. 2, 2008); Cornerstone v. Ponzar, 254 S.W.3d 221 (Mo. Ct. App. 2008); Johnson v. GMAC Mortgage Co., 162 S.W.3d 110, 120-21 (Mo. Ct. App. 2005).

[48] 15 U.S.C. § 1635(b); Regulation Z §226.23(d)(1).

[49] 15 U.S.C. § 1635(b); Regulation Z §226.23(d)(1); Official Staff Commentary § 226.23(d)(2)-1; see also Moore v. Cycon Enter., Inc., 2007 WL475202 (W.D. Mich. Feb. 9, 2007).

[50] 15 U.S.C. § 1635(b); Regulation Z §226.23(d)(2).

[51] *See, e.g.,* Stuart v. Decision One Mortgage Co. (In re Stuart), 2007 WL 1032261 (Bankr. E.D. Pa. Apr. 6, 2007).

**Reduction of Amount Due After TILA Rescission**
Amount projected to be owed on March 1, 2009 by lender through TILA disclosures
provided at closing: **$310,035.00.**

Effect of Rescission:

| | |
|---|---|
| Original Loan Amount - | $281,850.00 |
| minus all Settlement Charges - | 14,955.30 |
| minus all payments made to date | |
| $836.97 x 14- | 11,717.58 |
| Statutory damages - | 4,000.00 |
| Net amount due – | $251,177.12 |

The value of the rescission claim under TILA would be worth as much as **$58,857.88.**

This amount can be further reduced by damages owed as the result of other claims.

TILA claims are complex, but they are generally litigated entirely on the documents, so they rarely
involve jury trials.

### 2. Application of TILA claims to Debtors' Loans

It appears from both the Jack and the Dandridge files that at least two of the TILA violations
upheld by the *Andrews* court may exist:

1)  the failure to clearly and conspicuously disclose the annual  percentage rate –
    because of the confusion resulting from the fact that the same words ("yearly rate")
    were used to describe the composite APR and the teaser rate applicable for the short
    teaser period – (1 day in the Jack's case and 15 days in the Dandridge case); and

2)  the failure to conspicuously disclose the fact that a variable rate is applicable to the
    loan – because even the Schedule of Payments does not reveal that the variable rate
    applies in the first month, and instead makes it appear to the reviewer that the
    variable rate only applies several years later.

Moreover, a class action complaint involving the Debtors' payment option ARM loans is currently
pending in federal court in California. The complaint in this case alleges *Andrews'* type violations  of
TILA, along with state law claims based on deception, fraud, breach of contract and breach of the
covenant of good faith and fair dealing. This action, *Valenzuela v. American Home Mortgage Investment
Trust 2005-2,* which seeks nationwide class relief,[52] will come on for a hearing on motions to dismiss
on March 9, 2009.

### 3.  Successful POA Case Examples Based on TILA

---

[52] 2008cv01179 (E.D. Cal. Aug. 12, 2008).

1. *Chicago, Illinois.* Harold Ray v. WaMu, 06 C 7063 (N.D. Ill). The court denied the defendants' motion to dismiss claims for TILA rescission, as well as fraud. A confidential settlement with the lender provided fixed favorable loan terms, as well as substantial contributions from other defendants to pay down the principal.

2. *Chicago, Illinois.* Delores King v. Bank United. Ms. King testified before the U.S. Senate Banking Committee about her payment option ARM loan. Before a complaint was filed – but after the testimony to the Senate Banking Committee in which a TILA violation supporting a rescission claim was outlined in her attorney's testimony – this case settled without litigation, allowing Ms. King to stay in her home with an affordable mortgage. (See Attachment 1, for a copy of her testimony, note how the facts of this case are so similar to those of Mr. Tilton Jack's, as outlined above).

3. *Multiple TILA challenges pending in California.* Currently there are well over fifty national class actions pending in California challenging POA loans. The claims in these actions include TILA, breach of contract, and deceptive practices. These cases have been in litigation in federal court for over a year. In the past year alone, in over a dozen reported decisions, the courts have refused to dismiss these cases, allowing the litigation to proceed. Some examples include:

- *Amparan v. Plaza Home Mortg., Inc.*, 2008 WL 5245497 (N.D.Cal. December 17, 2008) (statute of limitations for TILA claims tolled based on plaintiff's ignorance of potential claims; lack of clarity between note and TILA disclosure may be basis for violation; confusion between the APR and the temporary 1% rate used to calculate required payments states a claim for failure to clearly and conspicuously disclose the cost of the loan, among other TILA violations; refusing to dismiss fraudulent concealment claim; dismissing other state claims.).
- *Pham v. T.J. Financial,* 2008 WL 3485589 (C.D.Cal.,August 11, 2008) (claims stated that POA loan disclosures may have violated TILA for failing to clearly and conspicuously disclose the APR, failing to disclose that the note negatively amortized, that the note was initially discounted, and the composite rate was correctly disclosed).
- *Plascencia v. Lending 1st Mortg.*, 583 F.Supp.2d 1090 (N.D.Cal. 2008) (claims stated that purchaser of loan could be subjected to liability under California's Unfair Competition Law (UCL) for aiding and abetting lender's UCL violations; question of whether equitable tolling applies to TILA case sent to jury, other claims dismissed.)
- *Quezada v. Loan Center of California, Inc.*, 2008 WL 5100241, (E.D.Cal. Nov. 26, 2008) (assignee of loan – a trust – not dismissed, TILA does not preempt state unfair trade practice claims, assignees of loan may be vicariously liable for TILA violations, fraudulent omissions claims not dismissed, other claims dismissed.).
- Also see –
  - *Avila v. Stearns Lending, Inc.*, 2008 WL 1378231 (C.D.Cal. April 07, 2008);
  - *Reyes v. Downey Savings and Loan Ass'n, F.A.*, 541 F.Supp.2d 1108 (C.D.Cal. 2008);
  - *Monaco v. Bear Stearns Residential Mortg. Corp.*, 554 F.Supp.2d 1034, 1036 (C.D.Cal. 2008);
  - *Quezada v. Loan Center of California, Inc.*, 2008 WL 5100241 (E.D.Cal. Nov. 26, 2008).

**Conclusion**

Most POA loans do not reset to the higher payments until several years after they are consummated. To the extent that borrowers may be able to discern that the minimum payments do not cover even the interest charged on the loan, they are still stuck in these loans because of the massive prepayment penalty for three years. The majority of borrowers will keep paying what they can, generally the minimum payment, as long as they can to avoid foreclosure. They will not seek legal assistance until faced with foreclosure – which is unlikely to occur before the payments adjust to become fully amortizing – which can be as long as five years after consummation. As a result:  the majority of borrowers on Debtors' POA loans are unlikely to be aware, even now, of the power and value of their legal claims against Debtors. Nevertheless, if the Debtors hold the loan,  these legal claims are often all they will have avert foreclosure and the loss of their homes.

Attachment 1

Ms. Delores King
11114 S. Normal Av.
Chicago, Illinois 60628

TESTIMONY BEFORE SENATE BANKING COMMITTEE
February, 2007

Thank you for the opportunity to testify here today about my mortgage. My name is Delores King, and I live on the South Side of Chicago in a home I have owned for 36 years – it will be 36 years this August. I am a retired office administrator after 28 years on the job in the offices of the Illinois College of Optometry.

Over the years, I have refinanced several mortgages on my property, in order to make repairs and various improvements. In 2004, my mortgage balance was $140,000, and I was paying $798 per month on my mortgage.

In 2004, unfortunately, I was the victim of an identity theft phony check scam that cost me about $3,000.   I decided to refinance my mortgage in order to borrow the money I owed as a result of the scam. What happened next is that I was defrauded into a horrible mortgage that is so bad I could lose my home.

Around February, 2005, I received a telemarketing call from Chad, a mortgage broker with a company called Advantage Mortgage Consulting. Chad told me that he could get a loan for me approved fast. He said that he would get me a good loan for my situation. So, I applied for a loan with Chad. I told Chad that my monthly income was about $950 per month from Social Security. My only other income is a one–time–a–year retirement payment from a Teachers pension from the optometry school, in

the amount of $2,657 - once a year.  This pension will actually stop in a few more years.   Currently, I have a part-time job as a Foster Grandparent at a grade school where I make $2.65 per hour.

Chad took copies of my Social Security and pension benefits statements, and a few weeks later he told me I was approved.  He brought the loan papers to my house and asked me to sign - many, many pages of documents.  He rushed me through the signing and did not really explain anything.  He certainly did not say this was an "exotic" loan or unusual in any way.   He didn't even give me copies of the papers I signed -- I had to call and get them from the title company much later.

When I agreed to the loan, Chad said it was an adjustable rate, but the starting interest rate was only 1.45%.  He said the regular rate would be around 6%, and the payments would be around $800 per month.  I believed that the starting rate would last at least six months or a year before adjusting.  I had heard about mortgages that adjust once a year.  I knew that the payment could go up little by little, but I had no idea it would explode the way it has in just two years.   I also did not know that $800 per month was less than all of the interest due, and that my balance would go up and up with unpaid interest.  So now I have a mortgage that's thousands of dollars more than I started with, and my payments have nearly doubled in two years.  I have refinanced  before, but I've never seen anything like this.

The payment started out as $832 a month, including taxes and insurance.  The monthly payment as of now is $1,488 per month.  This is more than my entire monthly income!  I have been scraping by with the help of family and friends to get my mortgage paid every month, but I am now at the point where it is just impossible to continue.  Last month, I could only send in $1,200.  I will end up out on the street if something doesn't change soon.

I've never heard of a ''no doc'' loan or an Aoption@ loan before all this happened.  I never knew you could get a mortgage and pay Ainterest only@ or even less than all the interest owed each month.  I surely did not know that a Bank would make a loan to someone without checking to see if the person could afford the loan.  This loan is just not right for someone like me.  If the bank had looked at my information, my income, they knew I could never afford this loan.  The bank knew, but I did not know, that the monthly payment could go higher than my entire monthly income, my fixed income.   It should be against the law for a bank to make a loan knowing that it will be impossible for the person to pay it back and they will lose their home.