## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                                          :   Chapter 11
                                                :
AMERICAN HOME MORTGAGE HOLDINGS, INC., :   Case No. 07-11047 (CSS)
a Delaware corporation, et al.,[1]              :
                                                :   Jointly Administered
                                                :
                                                :   **Objection Deadline: February 9, 2009 at 11:30 a.m. (ET)**
          Debtors.                              :   **Hearing Date: February 9, 2009 at 11:30 a.m. (ET)**

---------------------------------------------------------------- x

## DEBTORS' MOTION IN LIMINE TO EXCLUDE
## EXPERT TESTIMONY AND REPORT OF MARGOT SAUNDERS

The above captioned debtors and debtors in possession (collectively, "American Home"

or the "Debtors") respectfully move to exclude from evidence the testimony of Margot Saunders,

the proposed expert witness retained by the Official Committee of Borrowers (the "Borrowers

Committee") in connection with the hearing to consider confirmation (the "Confirmation

Hearing") of the *Amended Chapter 11 Plan of Liquidation of the Debtors dated as of November

25, 2008* [Docket No. 6626] (as may be amended, supplemented and/or modified, the "Plan"). In

support of their motion (the "Motion"), the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

1.      The Court should exclude Ms. Saunders's expert testimony for four

reasons: (1) her testimony offers only inadmissible legal opinions; (2) her testimony fails to meet

the reliability criteria of Federal Rule of Evidence 702; (3) her testimony otherwise offers no

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp. , a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

guidance or assistance to the Court in resolving or deciding the Borrowers Committee's objections; and (4) in violation of Federal Rule of Civil Procedure 26, Ms. Saunders refuses to disclose certain materials that she considered and relied upon in forming her opinions. For these reasons, and the reasons discussed below, the Court should grant American Home's motion.

## FACTUAL BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), American Home and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in this Court. Each Debtor is continuing to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the United States Bankruptcy Court for the District of Delaware.  On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors.  No trustee or examiner has been appointed.

4.      The Court set general and supplemental bar dates for January 11, 2008, and March 14, 2008, respectively.  The Confirmation Hearing with respect to the Debtors' Plan is scheduled for February 9, 2009.

A.      The Borrowers' Committee is Formed

5.      On September 9, 2008, certain individuals who entered into mortgage loans with American Home sought appointment of an official committee of borrowers.  The movants, Tilton Jack, Grace Mullins, Christopher and Mary Bilek, Sam Acquisto, Delena Lamacchia, and Paula Rush, were later joined by several other mortgage borrowers: Penny D. Montague, Florence Dandridge, Gracie Graves, Mona Dobben, and Johnny and Linda

Culpepper.  After an October 8, 2008, hearing, this Court granted the motion and constituted the Borrowers Committee.

6.      On or about January 22, 2009, the Borrowers Committee filed its objection (the "Objection") to confirmation of the Plan, asserting, among other things, inadequate notice of the bar dates to borrowers.  (*See* D.I. 6883).  By the Objection, the Borrowers Committee argues (i) that the borrowers must be provided actual, written notice merely because the Debtors had names and addresses of the borrowers, and (ii) that Debtors "should have known" of potential claims from borrowers due to (a) the "widespread allegations" regarding their loan origination and servicing practices, (b) the high rate of foreclosures resulting from resetting mortgage interest rates, and (c) allegations that the borrowers had, prior to the bankruptcy case, originated the "riskiest" types of loans.

B.      The Borrowers Committee Offers Ms. Saunders as an Expert on Consumer Law

7.      In support of their Objection, the Borrowers Committee proposes to offer Margot Saunders as an expert on consumer law relating to payment-option ARM loans.  An attorney with the National Consumer Law Center, Ms. Saunders produced a report to American Home on January 28, 2009.  In her report, Ms. Saunders explains that she has been asked to provide:

      a.      An explanation of how the loans provided by Debtors to borrowers-homeowners may lead to losses for these borrowers;

      b.      The theories of legal liability available to these borrowers in state and federal courts to redress their losses;

      c.      An explanation of when borrowers become aware that they may have these legal claims; and

      d.      Illustrations of successful resolution of these claims.

(Report of Margot Saunders, National Consumer Law Center (Jan. 28, 2009), at 1 ("Saunders Report") (Exhibit A)). In her report, Ms. Saunders also gave an overview of the payment-option ARM mortgages (Saunders Report at 4-9), the alleged "dangers apparent" in several American Home-issued loans (*id.* at 9-13), and a summary of legal claims available to homeowners allegedly aggrieved by the terms of a payment-option ARM allegedly including: violations of the federal Truth in Lending Act, common-law fraud and deception, and an action based on "lender's failure to determine borrower's ability to repay loan" (*id.* at 14-22).

C.    The Saunders Deposition

8.    On February 2, 2009, American Home took Ms. Saunders's deposition. (Transcript of Deposition of Margot Saunders, Feb. 2, 2009 (hereinafter "Saunders _:_") (Exhibit B)). As part of its questioning, American Home inquired into the factual basis for Ms. Saunders' opinions. She testified she was an expert in the field of "consumer law" and her expertise was based upon her work as a consumer lawyer. She further explained that her opinions on the various common-law fraud and statutory truth-in-lending cases, for example, were based on email exchanges and telephone conversations with plaintiffs' attorneys throughout the country. Over the Borrowers Committee's objections, American Home asked for copies of those emails as part of Ms. Saunders' preparation materials as well as materials used and relied upon to form her opinions. To date, the Borrowers Committee has not produced the requested emails.

**ARGUMENT**

9.    As discussed below, the Court should exclude Ms. Saunders's report because it: (1) offers only inadmissible legal opinions; (2) fails to meet the reliability criteria of Federal Rule of Evidence 702; (3) otherwise offers no guidance or assistance to the Court in resolving or deciding the Borrowers Committee's objections; and (4) in violation of Federal Rule

of Civil Procedure 26, Ms. Saunders has failed to disclose and provide to American Home's

counsel all of the materials that she relied upon in forming her opinions.

## I.   THE PROPOSED REPORT IS INADMISSIBLE BECAUSE IT OFFERS LEGAL EXPERT TESTIMONY

10.    Ms. Saunders's report contains three pages of summary and qualifications,

followed by nineteen pages of purely legal opinion. It is well-established that expert reports may

be stricken for providing legal opinions. As the Third Circuit has noted, "it is not permissible for

a witness to testify as to the governing law." *United States v. Leo*, 941 F.2d 181, 196 (3d Cir.

1991). That principle has been applied in this district. *See Vanderbilt University v. ICOS Corp.*,

C.A. No. 05-506-SLR (D. Del. Dec. 20, 2007) (Mem. Order), slip op. at 1 ("[H]aving considered

the issue of whether the court will entertain the testimony of legal experts at trial; it is ordered

that such testimony shall not be permitted. I have concluded . . . that testimony to explain (or

explain away) such law is neither needed nor appropriate.") (Exhibit C).  Expert testimony is

properly admissible, not to provide legal opinions, but to "assist the trier of fact or to determine a

fact in issue." F.R.E. 702; *see also In re: Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61,

64 (S.D.N.Y. 2001) (describing rule as an "axiomatic principle").

11.    Ms. Saunders is the prototypical legal expert: she considers herself to be

an expert in consumer law, has no technical or scientific expertise (other than self-taught "credit

math"), and was asked by the Borrowers Committee to opine on whether homeowners' claims, in

general, are viable as a matter of law.   (Saunders 4:08-11; 26:25-27:06; 27:15-18; 29:22).

Instead of analyzing facts, her opinions on the legitimacy of homeowner claims under TILA and

state law, the availability of damages, and the allegedly improper structure of some of the loans

at issue in this case are nothing but testimony about a federal statute and the scope of the

common law. (Saunders Report at 14-22). As courts have held, the federal judiciary is already

well-equipped to handle questions of liability and remedy without the need for expert testimony. *See Burkhart v. Washington Metro Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (noting that rule against allowing experts to offer legal opinions exists because "[e]ach courtroom comes equipped with a 'legal expert,' called a judge"). Because Ms. Saunders offers nothing but improper legal opinions, the Court should exclude her report and testimony.

## II.    THE PROPOSED REPORT IS INADMISSIBLE UNDER F.R.E. 702

12.    Federal Rule of Evidence 702 permits "an expert by knowledge, skill, experience, training, or education" to testify to "scientific, technical, or other specialized knowledge" only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." F.R.E. 702; *see also Izumi Prods. Co. v. Koninlijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 600 (D. Del. 2004) (stating that Rule 702 sets forth three specific requirements: "qualifications," "reliability," and "fit"). Accordingly, the Court has a "gatekeeper function" under Rule 702 to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "[T]he proponent must prove by a preponderance of the evidence that the testimony is reliable." *Eaton Corp. v. Parker-Hannifin Corp.*, 292 F. Supp. 2d 555, 567 (D. Del. 2003). For the reasons discussed below, the Saunders Report satisfies none of these criteria.

### A.    The Saunders Report is Not Based on Sufficient Facts or Data

13.    First, Ms. Saunders' opinion rests on insufficient facts and data to warrant her qualification as an expert in this case. Of nearly one million borrowers purportedly represented by the Borrowers Committee, Ms. Saunders only reviewed three loan files. On one of these three, in turn, she could not perform any analysis at all. (Saunders 18:19-24 ("[T]here

were not sufficient documents in the Graves loan that allowed me to do even the analysis, the limited analysis that I did on the Dandridge and Tilton Jack loan, so I did not do that.")).

14.    The case law Ms. Saunders relies on in connection with her opinions is equally attenuated.  Of the mortgage-related fraud cases cited in her report, Ms. Saunders is unaware of any that resulted in a judgment. (Saunders 41:10-14).  She cannot point to any award of monetary damages in her cited fraud cases.  (*Id.* 41:15-23).  Instead, these cases all settled out of court.  (*Id.*)  Because Ms. Saunders does not know the terms of these settlements, she cannot say what claims were actually being settled (*Id.* 42:13-21).  Indeed, although she devotes two pages of her report to "fraud and deception," Ms. Saunders cannot identify a specific case that raised a common-law deception claim.  (*Id.* 64:03-08; *see also id.* 63:15-22 ("These cases are fairly new.  There's not a large body of law developed on how to litigate complex litigation relating to payment-option ARMS.  So what attorneys in most states do is put everything they can think of in the complaint and then see how the claims sort themselves out based on the responses from the defendants and the Court's rulings.")).  Of the truth-in-lending cases on which she opines, Ms. Saunders similarly admitted that actual damages are "very hard to obtain . . . , so [she is] referring to statutory damages" in her report.  (*Id.* 74:19-23).

15.    Finally, the foundation for her opinions on mortgage-related causes of action are based solely on anecdotal correspondence with plaintiffs' attorneys (no defense counsel were ever contacted), not on firsthand knowledge or experience.  (Saunders 55:22-56:03 ("I did an email to a couple dozen attorneys, I think, or more, asking for information about settlements or verdicts or decisions relating to payment-option ARM cases because I was doing this testimony.  And I got some responses.")).  As part of this correspondence, the attorneys (some of whom Ms. Saunders to this date refuses to identify) gave Ms. Saunders some kinds of

information, but not all the information relating to those cases. For example, although she is "not generally told the specific terms of the settlements," Ms. Saunders is told that the "borrowers are satisfied, the homeowners are satisfied." (*Id.* 42:04-07). Ms. Saunders's reliance on the partial experience of unidentified plaintiffs' attorneys, coupled with her incomplete analysis of only a microscopic portion of the allegedly aggrieved homeowners' loan files, renders her report and testimony devoid of any sufficient facts or data.

B.     The Saunders Report is Not the Product of Reliable Principles and Methods

16.     Similarly, Ms. Saunders failed to apply reliable principles or methods in formulating her legal opinions on potential borrower claims. Her examination of past borrower cases, for example, was confined to discussions with plaintiffs' attorneys, the identity of some of which she refused to provide. (Saunders 60:05-24). Ms. Saunders failed to discuss these cases with any of the defense attorneys involved. (*Id.* 54:08-11). Moreover, of the fraud and TILA cases that she actually examined, Ms. Saunders testified that all settled out of court; she was unaware of a single case that awarded monetary damages or proceeded to judgment. (*Id.* 41:10-23; 61:11-15). When asked about the "failure to determine ability to repay loan" cause of action, Ms. Saunders admitted she did not attend the trial of the decision she cites in her report. (*Id.* 52:16-19; Saunders Report at 14). Nor did she review any of that case's transcripts in preparing her opinion. (*Id.* 53:16-18).

17.     Under Rule 702, the Court's "gatekeeping function requires more than simply 'taking the expert's word for it.'" F.R.E. 702, Adv. Comm. Notes (2000 Amendments). Here, Ms. Saunders has failed to demonstrate any systematic methodology (or any methodology at all) for analyzing the potential legal claims that payment-option ARM borrowers may have beyond the anecdotal evidence provided to her by a select number of plaintiffs' attorneys. The

foundational principles involved are equally suspect: whether an individual borrower was misled by an independent mortgage broker selected and hired by the borrowers is unrelated to American Home's role as the originator of the loans. As a result, Ms. Saunders cannot satisfy the requirement that her opinions are the product of any reliable principles and methods.

### C. Ms. Saunders Failed to Apply the Principles and Methods Reliably to the Facts of This Case

18. Finally, as the United States Supreme Court has held, expert testimony must be "sufficiently tied to the facts of the case." *Daubert*, 509 U.S. at 591. Throughout her deposition, Ms. Saunders demonstrated the disconnect between her "expertise" and the American Home bankruptcy. Instead of examining borrowers' potential claims based on their individual loan files, Ms. Saunders based her opinion on thirty years of experience working with unspecified "legal aid, . . . private attorneys representing borrowers, . . . and homeowners or [mortgage] debtors directly." (Saunders 20:09-16). Rather than create an actual nexus for her opinions to the individual homeowners and borrowers in this case, Ms. Saunders has offered only a random sampling of plaintiffs' cases, some of which she admitted have no bearing on this case (or is unaware whether the same facts apply to the present matter). (*Id.* 43:12-44:02 (admitting that the fact that American Home no longer owns the subject loans eliminates the possibility of injunctive relief (such as rescission) ordered in cited deceptive trade practices case); 48:15-49:05 (admitting that she does not know who owns the loans in the Bank of America settlement cited in her report)). Even if Ms. Saunders's methodology were sound, her inability to factually connect any past borrower claims (especially of lenders unaffiliated or unconnected with American Home) with the present case illustrates the unfitness of the proposed report and testimony under Rule 702.

### III.  THE PROPOSED REPORT AND TESTIMONY IS UNHELPFUL TO THE FACTFINDER

19.    The Court should also exclude the proposed report and testimony as unhelpful to the trier of fact.  Even if the Court were to take Ms. Saunders' assertions at face value, the proposed report and testimony would not aid the Court in determining whether and how American Home should be noticing specific, individual borrowers that have not asserted any claims against American Home.

20.    The fact that certain holders of payment-option ARMs have complained about their mortgages does nothing to establish that those loans are somehow *per se* illegal. Borrowers might pursue legal action against a loan originator for a variety of reasons, including statements made by parties unaffiliated and unconnected with the mortgage company itself. Similarly, as Ms. Saunders acknowledged at her deposition, these cases might settle for reasons unrelated to any alleged impropriety.  (Saunders 65:09-23).  The "fact" that mortgage-related causes of action exist, a fundamental premise of Ms. Saunders's proposed report, does nothing to further the Court's role in resolving the Borrowers Committee's notice-related objections.

21.    Even if the Court were to consider authorizing Ms. Saunders to give a lay opinion, the report and testimony would still be inadmissible.  Under Federal Rule of Evidence 701, a lay opinion may be admitted only if based on personal knowledge.  F.R.E. 701 (lay opinion must be "rationally based on the perception of the witness"); *see also Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 225 (3d Cir. 2008) ("[A] lay opinion must be rationally based on the witness's perception and firsthand knowledge of the factual predicates that form the basis for the opinion.") (internal quotation marks and citation omitted).  As explained above, Ms. Saunders formed her conclusions by relying on the anecdotal evidence of plaintiffs' attorneys, not firsthand contact or experience with payment-option ARM cases.  That Ms. Saunders is a

representative of a consumer advocacy group – a group the Borrowers Committee is also compensating for Ms. Saunders's efforts (Saunders 11:15-18) – only compounds the suspicious nature of her one-sided claims. *Cf.* F.R.E. 701, Adv. Comm. Notes (1972) ("If . . .attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the Rule."). Because Ms. Saunders' opinions neither assist the Court in adjudicating the Borrowers Committee's objections, nor constitute proper lay opinion, the Court should exclude the proposed report and testimony as unhelpful.

## IV.   MS. SAUNDERS'S FAILURE TO PRODUCE THE DOCUMENTS RELIED ON IN FORMING HER OPINIONS WARRANTS EXCLUSION OF THE PROPOSED REPORT AND TESTIMONY

22.     At her deposition, Ms. Saunders testified that she relied on emails and phone conversations with various plaintiffs' lawyers in forming her conclusions and deriving her opinions about potential claims borrowers may have against American Home. (Saunders 55:19-56:03). Based on this statement, American Home requested the emails identified (and relied upon) by Ms. Saunders. (*Id.* 56:16-19). Ms. Saunders refused, citing confidentiality concerns and her promise to the plaintiffs' lawyers that she would not reveal their correspondence, and, in some cases, even their identities. (*Id.* 56:20-57:06). The Borrowers Committee equivocated, first offering to produce redacted versions, then asserting that the correspondence was privileged. (*Id.* 57:07-09; 57:22-58:04). American Home reiterated its request for full production. To date, American Home has received none of the emails that Ms. Saunders testified that she relied on to form her opinions.

23.     Under Federal Rule of Civil Procedure 26, the failure to provide the data or information underlying an expert report warrants the "self-executing" sanction of exclusion. *See* FED. R. CIV. P. 26(a)(2)(B)(ii) (expert must provide "data or other information considered"

in forming opinion); *Heron v. CSX Transp. Inc.*, 2009 U.S. Dist. LEXIS 7326, at *11 (N.D. Ind.

Feb. 2, 2009) (excluding portion of expert report and noting that exclusion is self-executing

sanction imposed without need for motion).   That Ms. Saunders represented to her sources that

their correspondence would remain confidential does not alter her obligations of production

under the rules.   *See* FED. R. CIV. P. 26, Adv. Comm. Notes (1993 Amendments) ("Given this

obligation of disclosure, litigants should no longer be able to argue that materials furnished to

their experts to be used informing their opinions . . . are privileged or otherwise protected from

disclosure when such persons are testifying . . . ."); *Dyson Tech. v. Maytag Corp.*, 241 F.R.D.

247, 251 (D. Del. 2007) (ordering production of all materials considered by expert, "regardless

of . . . claims of attorney-client or work-product privilege").   As a proposed testifying expert

witness, all materials Ms. Saunders used to form her opinions are discoverable in full.   Because

she has failed to produce these materials, the Court should exclude her report and testimony in

this matter.

## CONCLUSION

For these reasons, the Court should grant Debtors' Motion, exclude the testimony and

Expert Report of Margot Saunders, and grant such other relief as appropriate.

Dated: Wilmington, Delaware
      February 5, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Margaret W Greecher*

John T. Dorsey (No. 2988)
Sean M. Beach (No. 4070)
Margaret Whiteman Greecher (No. 4652)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
*Counsel for Debtors and Debtors in
Possession*

## Exhibit A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | x | Hon. Christopher S. Sontchi |
| In re: | : | Chapter 11 |
| | : | |
| AMERICAN HOME MORTGAGE HOLDINGS, INC. | : | Case No. 07-11047 |
| AMERICAN HOME MORTGAGE INVESTMENT CORP. | : | Case No. 07-11048 |
| AMERICAN HOME MORTGAGE ACCEPTANCE, INC. | : | Case No. 07-11049 |
| AHMSV, INC.(f/k/a American Home Mortgage Servicing, Inc.) | : | Case No. 07-11050 |
| AMERICAN HOME MORTGAGE CORP. | : | Case No. 07-11051 |
| AMERICAN HOME MORTGAGE VENTURES LLC | : | Case No. 07-11052 |
| HOMEGATE SETTLEMENT SERVICES, INC. | : | Case No. 07-11053 |
| GREAT OAK ABSTRACT CORP. | : | Case No. 07-11054 |
| | : | |
| Debtors. | : | Jointly Administered |
| | x | |

## Report of
### Margot Saunders
### National Consumer Law Center

## I. Assignment

I have been asked by Counsel for the Borrowers' Committee in the bankruptcy proceeding of the above-named mortgage lenders and affiliates to provide –

- An explanation of how the loans provided by Debtors to borrower-homeowners may lead to losses for these borrowers;
- The theories of legal liability available to these borrowers in state and federal courts to redress their losses;
- An explanation of when borrowers become aware that they may have these legal claims; and
- Illustrations of successful resolution of these claims.

## II. Summary of Findings.

In this report, I explain how the payment option ARM loans made by Debtors typically lead to significant problems for borrowers. First, I outline the nature of payment option ARM loans and explain why they are so damaging for borrowers. I explain how, because of the complex nature of these loan transactions, these problems only become apparent to most borrowers several years after consummation. It is only when the loan payments reach double or triple the initial amount and the borrowers face the catastrophic loss of their home that most borrowers seek legal counsel. Because they have not yet sought counsel, the majority of these borrowers are likely to be  currently unaware of either the extent of the difficulties that will face them in the future because of these loans, or the fact that there are valid and valuable legal theories to redress their losses.

The loan documents provided to me by Counsel for the Borrowers' Committee are indicative of problems well documented in the academic and regulatory literature regarding payment option ARM loans. These loan documents also illustrate the availability of several types of legal claims that these borrowers – and others like them – generally have to redress the problems flowing from these loans.

I outline the types of legal claims that can be brought to challenge the problematic nature of both the specific loans I have been provided, as well as most payment option ARM loans. Finally, at the end of this report, I have provided examples of several types of successful litigation providing substantial redress to borrowers with these types of loans.

## III. Qualifications

National Consumer Law Center Inc.

The National Consumer Law Center, Inc. (NCLC) is a non-profit Massachusetts Corporation, founded in 1969, specializing in low-income consumer issues, with an emphasis on consumer credit. On a daily basis, NCLC provides legal and technical consulting and assistance on consumer law issues to legal services, government, and private attorneys representing low-income consumers across the country. NCLC publishes a series of eighteen practice treatises and annual supplements on consumer credit laws, including *Truth In Lending*, (6th ed. 2007) and *Cost of Credit: Regulation, Preemption, and Industry Abuses* (3d ed. 2005) and *Foreclosures* (2d ed. 2007), as well as bimonthly newsletters on a range of topics related to consumer credit issues and low-income consumers.

NCLC attorneys have written and advocated extensively on all aspects of consumer law affecting low-income people, conducted trainings for thousands of legal services and private attorneys on the law and litigation strategies to deal with predatory lending and other consumer law problems, and provided extensive oral and written testimony to numerous Congressional committees, as well as federal and state agencies.

Margot Saunders.

Currently I am Of Counsel to NCLC, after serving as Managing Attorney of NCLC's Washington, D.C. office for fourteen years.

One of my primary duties at NCLC is to serve as a resource to legal services attorneys, attorneys engaged in private practice, as well as federal and state regulators, on complex consumer law issues. I regularly review legal files that include the loan related documents for homeowner-borrowers dealing with predatory mortgages who are facing the loss of their home through foreclosure. The spectrum of my involvement in these cases runs from a simple analysis of the claims based on a description of the facts by the borrower's attorney, to an analysis of the loan documents for common law and state and federal statutory claims, to a full blown evaluation of all the documents in the case – including those from the broker, lender and investors' files – to prepare an expert report, or as a consultant for the attorneys. I have performed these tasks in dozens of cases, for legal services and private attorneys from all over the country, as well as federal and state regulators, including a recent analysis of approximately fifty separate loan files for the FTC in a case pending in

the Northern District of Illinois against a predatory lender and its affiliates.

My duties at the National Consumer Law Center also include policy analysis in the areas of predatory lending, credit reporting, debt collection, electronic commerce and electronic benefits transfer, preservation of homeownership, and other consumer credit issues.

During the past seventeen years I have regularly provided testimony to the House Financial Services Committee and the Senate Banking and Housing Committee (in addition to other Congressional Committees) regarding credit related issues facing low-income households in America. My responsibilities also have required frequent appearances before, and meetings with, federal regulators. In this capacity, I have testified on numerous occasions before Congress on the meaning of, the causes for, and recommended solutions to, predatory mortgage lending. For example, I was the lead lawyer representing consumers in the extensive negotiations surrounding the passage of the Home Ownership and Equity Protection Act in 1993, as well as during the Congressional discussions of the changes to the Truth in Lending Act in 1995.

I have been a primary resource for members and Congressional staff in the discussions in recent years regarding proposed changes to the law to address predatory lending and other consumer credit issues. For example, in the past 15 months, I have testified before the House Financial Services Committee on HUD's proposed changes to the Real Estate Settlement Services Act, and before both the House Ways and Means Committee and the Senate Finance Committee on the effect on the elderly of garnishing Social Security and other exempt benefits. Additionally, I provide substantial input to the testimony of other staff at NCLC, just as in my own policy work I am always counseled and guided by the other consumer law experts at the Center.

My work also includes writing analytical books and articles on issues relating to low-income consumers; providing training and expert testimony on issues affecting low income consumers; and providing analysis and assistance on credit math questions. I have authored or co-authored numerous articles in law reviews and other publications on consumer law, including, for example *The Credit Card Market and Regulation: In Need of Repair*, 10 N.C. Banking Inst. 23, University of North Carolina School of Law Banking Institute, 2006; and *Regulation of Consumer Credit: The Cause or the Cure for Predatory Lending?* Joint Center for Housing Studies, Harvard University, BABC, March 2004.

I am co-author of several of NCLC's practice treatises, including all editions of *Banking and Payments Law* (3rd Ed. 2005 and Supplements, 2006, 2007, 2008), and the original and second editions of *Access to Utility Service*, (2nd Ed. 2000). I have been a contributing author to other NCLC manuals, including *The Cost of Credit: Regulation and Legal Challenges* (2004, 2005 Supplements) and the 2006 and 2007 Supplements to *Foreclosures – Defenses, Workouts, and Mortgage Servicing* (1st Ed. 2005).

## IV. Overview of How Debtors' Mortgage Products Lead to Claims By Homeowners

According to the information provided to me by Counsel, Debtors made a substantial number of payment option ARM loans. The vast majority of these were made in 2006 and 2007. Specifically, in their responses to discovery requests, the following information about the number of these outstanding loans was provided:

| | |
|---|---|
| 2005 | 317 |
| 2006 | 43,628 |
| 2007 | 14,996 |

Additionally, information has been provided to me by Counsel in which it appears that Debtors made loans for which full documentation of income or assets was often not required.[1] These loans are known in the industry as either "stated income" loans, or "no doc" or "low doc" loans.

Quite often both of these loan characteristics are combined in the same loans: payment option ARM loans are also stated income loans.

Payment option ARM (POA) loans have been the subject of extensive litigation in the past year.[2] Indeed, because the problems inherent in these loans do not generally materialize until several years after origination, many consumer advocates believe that the number of challenges to these mortgages will explode in the coming two years.

In the past few years, payment option ARM loans became a popular type of mortgage offered to many homeowners. Like the adjustable rate mortgages that were common in the subprime market since the early part of this decade, POAs include a variable rate component as part of a systematic shifting of risk from lenders to borrowers. The signal factor in POA loans is a set period of time during which the minimum payment is fixed – such as one to several years – but the interest rate varies, which leads to negative amortization and a steady increase in the principal owed on the loan.

Under a payment option ARM a borrower has, in theory, a choice of three payments: a minimum payment based on an initial, low teaser interest rate; an interest only payment that covers the actual interest accruing; and a fully amortizing payment. Three-quarters of all borrowers pay only the minimum payment.[3] The minimum payment is generally sold as a "fixed rate" payment, although the interest rate is usually not fixed for more than a month and may be fixed for only a day.[4] Given the low initial teaser rates (1% to 2%), negative amortization occurs whenever minimum payments are

---

[1] This information was included in the American Home Mortgage Assets Trust 2006-4, Prospectus supplement dated August 29, 2006 (to prospectus dated April 21, 2006).

[2] See the discussion of pending litigation in Section VI, *infra*.

[3] Joint Ctr. for Hous. Studies, State of the Nation's Housing 2007, at 17.

[4] *See, e.g.,* Andrews v. Chevy Chase, 240 F.R.D. 612 (E.D. Wis. 2007) (describing payment option ARM sold as "fixed rate" when interest only fixed for one month, although payments fixed for a year).

made beyond the initial fixed rate period and the rate becomes adjustable. Most payment option ARM loans limit the negative amortization that can accrue to an amount between 110% and 125% of the original principal. Once the negative amortization cap is reached, the monthly payments regime is completely changed. There is no longer a choice of payments. Now the borrower must pay an amount sufficient to pay off the loan in the remaining time of the loan term. This means that if the original loan term was 30 years, and the remaining term is now twenty-five years, the – now swollen – principal will be amortized over the remaining twenty-five years of the loan. The combination of negative amortization and low teaser rates results in significant payment shock, often a doubling or tripling of the borrower's payment obligations thirty to sixty months after loan consummation, generally with no more than thirty days notice.

Payment option ARM loans are very problematic for borrowers. They are complex, involve concepts that are unfamiliar and confusing to most, even fairly sophisticated, homeowners.[5] They combine a number of inter-related but counter-intuitive features:

- Sold based on low teaser rate, typically for one month, and low-fixed payments for a year;
- Payments do not increase in the first year, and only slightly increase in the subsequent 3 to 4 years;
- The interest rate is decoupled from the payments;
- The interest rate increases as early as the second day of the loan term;
- While the increase in payments is generally capped, the increase in interest rate is not – until the loan ceiling is reached;
- Payments do not cover the interest earned on the loan;
- The principal of the loan immediately begins to increase, rather than decrease as it does in most home mortgages;
- When the principal increases to 110 or 125% of the original amount borrowed, the loan converts to a fully amortizing loan over a much smaller term;
- The transition from payments which do not even cover the outstanding interest to fully amortizing payments over a reduced term (usually only 25 to 27 years) causes *significant payment shock*.

For example,[6] consider the terms of Debtors' loan to Ms. Florence Dandridge of Staten Island, New York. She took out a POA loan in September, 2006 for $281,250. The initial payments, based an interest rate of 1.9% which applied for less than half a month, were for $837. After 28 months, the payments are scheduled to be $2,060. Ms. Dandridge's payments will almost triple in less than three years.

Payment option ARMs routinely include prepayment penalties that can be quite significant: as much as six months' interest. This means that even those borrowers who may realize the dangers of their

---

[5] *See e.g.* Consumer Fed'n of Am. press release, Lower-Income and Minority Consumers Most Likely to Prefer and Underestimate Risks of Adjustable Mortgages 3, July 26, 2004, (consumers cannot calculate the increase in the payment in an adjustable rate mortgage and minimize the interest rate risk by understating the increase in the payment) available at http://www.consumerfederation.org/releases.cfm#Consumer%20Literacy.

[6] Information about this loan was provided to me by Counsel to the Borrowers' Committee.

loan early in the loan term, may be unable to refinance out into a safer mortgage. As a result, most of the homeowners who currently have these loans will deal with the big increases in payments in the fourth or fifth year of their mortgages.

Brokers and lenders can easily take advantage of the complex nature of the products and the lack of specific guidance in the regulations governing disclosures to mislead consumers and make abusive loans.[7] Commentators have noted that even where lenders have purported to provide all required disclosures, consumers are still confused.[8] For example, the Truth in Lending Act ("TILA") requires information regarding the amount financed, the finance charge, the annual percentage rate, and the payment schedule, as well as other information, to be disclosed clearly and conspicuously and in a specific manner. Yet, the regulations guiding compliance with TILA do not specifically require an explanation of how a payment option ARM loan works. Some courts have held that the failure to provide information more clearly about the nature of POA loans nevertheless is illegal.[9]

Numerous analyses of the problems in the mortgage market have found that no doc or low doc loans (these are loans where less than full documentation of income and assets is required by the lender) are significantly more risky than fully documented loans, that they facilitate lender fraud, and lead to increased defaults and foreclosures.[10] Moreover, other standard features of payment option ARM loans, including prepayment penalties, balloon payments, low or no documentation, and variable interest rates, particularly in combination, have also been shown to increase the risk of

---

[7]Fed. Trade Comm'n v. Chase Financial Funding, Inc., No. SACV04-549, Complaint at 4 (C.D. Cal. May 12, 2004), available at www.ftc.gov/os/caselist/0223287/040602comp0223287.pdf (describing payment option ARM); Gov't Accountability Office, GAO No. 06-1021, Alternative Mortgage Products: Impact on Defaults Remains Unclear, but Disclosure of Risks to Borrowers Could Be Improved 22 (2006) (describing advertisement for payment option ARM that promised 45% reduction in monthly mortgage payments and interest rate of 1.25%, yet interest rate of 1.25% only applied for first month, and this fact disclosed in "much smaller print" on second page), available at www.gao.gov/new.items/d061021.pdf.

[8]See e.g. Patricia A. McCoy, Rethinking Disclosure in a World of Risk-Based Pricing, 44 Harv. J. on Legis. 123, 133-34 (2007) ("The New York Times recently advised borrowers with exotic adjustable-rate mortgages to figure out their maximum monthly payments by consulting 'mortgage payment calculators on the Web – not their TILA disclosures."), and at 143-44 (discussing limitations of variable rate disclosures in detail).

[9] See Section VI C, infra.

[10]Seventy percent of subprime loan pools rated by Standard and Poors in the first half of 2005 had less-than-full documentation. See Ruth Simon, James R. Hagerty & James T. Areddy, Housing Bubble Doesn't Scare Off Foreigners, Wall St. J., Aug. 24, 2005, at 1, 7. California v. Ameriquest, (Cal. Super. Ct. Alameda County Mar. 21, 2006) (complaint, 10H) (Ameriquest fabricated income and assets), available at http://ag.ca.gov/newsalerts/cms06/06-005_0a.pdf; McGlawn v. Pa. Human Relations Comm'n, 891 A.2d 757 (Pa. Commw. Ct. 2006) (broker created false income information for low-income borrowers). See also Ellen Schloemer, Wei Li, Keith Ernst & Kathleen Keest, Ctr. for Responsible Lending, Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners 21 (Dec. 2006) (loans originated with less than full documentation in 2003 had a 63.7% higher risk of foreclosure), available at www.responsiblelending.org/pdfs/foreclosure-paper-report -2-17.pdf. Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609, 58,614 (Oct. 4, 2006) (discussing and cautioning against increasing reliance on "reduced documentation"); Susan E. Barnes, Patrice Jordan, Victoria Wagner & David Wyss, Standard & Poor's, Standard & Poor's Weighs in on the U.S. Subprime Mortgage Market 12 (Apr. 5, 2007) (20-30% of pools rated by Standard & Poors contain subprime loans with no documentation and piggyback loans), available at www2.standardandpoors.com /spf/pdf/media/TranscriptSubprime_040507.pdf.

foreclosure.[11]

As a result of their inherent risks – and the deceptions that appear to routinely accompany these loans – it has been shown that loans with adjustable rates foreclose at far higher rates than fixed rate mortgages.[12] The dangers of adjustable rate loans for borrowers is considerably exacerbated by additional characteristics on these loans which add to the problems, the risk, and the likely litigation relating to these loans. The most serious additional risk factor is reduced verification of the borrowers' ability to repay the loan.[13] As more risk factors are piled into the same loans – adjustable rates plus reduced documentation – unsurprisingly, the likelihood of foreclosure rises as well.[14] It is well recognized that particularly the failure to adequately underwrite mortgage loans leads to increased foreclosures – creating legal claims for the harmed homeowner-borrowers and significant losses for investors.[15]

---

[11]*See, e.g.*, Morgan J. Rose, Predatory Lending Practices and Subprime Foreclosures--Distinguishing Impacts by Loan Category 45 (Dec. 2006) (prepayment penalties and balloon notes combined on a fixed rate refinance subprime loan increase the rate of foreclosure 227%), available at www.chicagofed.org/cedric /2007_res_con_papers/car_62_morgan_j_rose_foreclosures_draft.pdf;

[12]*See, e.g.*, Ellen Schloemer, Wei Li, Keith Ernst & Kathleen Keest, Ctr. for Responsible Lending, Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners 21 (Dec. 2006), available at www.responsiblelending.org/pdfs /foreclosure-paper-report-2-17.pdf; Roberto Quercia, et al. The Impact of Predatory Loan Terms on Subprime Foreclosures: The Special Case of Prepayment Penalties and Balloon Payments 28-29 (Jan. 2005) (subprime refinance ARMs are 50% more likely than fixed rate subprime refinance loans to result in foreclosure), available at www.kenan-flagler.unc.edu/assets/documents/foreclosurepaper.pdf; Cf. Keith Ernst, Ctr. for Responsible Lending, Case Study in Subprime Hybrid ARM Refinance Outcomes (Feb. 21, 2007) (less than three years out, 8.5% of 106 hybrid subprime ARMS made by Option One in 2004 had been foreclosed on), available at www.responsiblelending.org/issues/mortgage/briefs /page.jsp?itemID=31730766. Cf. Subprime and Predatory Mortgage Lending: New Regulatory Guidance, Current Market Conditions and Effects on Regulated Financial Institutions: Hearing Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. On Financial Services, 110th Cong., 1st Sess. (2007) (testimony of Alex J. Pollock, Resident Fellow, American Enterprise Institute) ("Subprime ARMs have 50% higher serious delinquencies than subprime fixed rate loans (9% vs. 6%). Subprime ARMs have six times the serious delinquencies of prime ARMs (9% vs. 1.45%). Prime ARMs have twice the serious delinquencies of prime fixed rate loans (1.45% vs. 0.7%)."), available at www.house.gov/apps/list/hearing/financialsvcs_dem /htpollock032707.pdf.

[13]*See* Gov't Accountability Office, GAO No. 06-1021, Alternative Mortgage Products: Impact on Defaults Remains Unclear, but Disclosure of Risks to Borrowers Could Be Improved 3 (2006), available at www.gao.gov/new.items/d061021.pdf.

[14]See Susan E. Barnes, Patrice Jordan, Victoria Wagner & David Wyss, Standard & Poor's, Standard & Poor's Weighs in on the U.S. Subprime Mortgage Market 12 (Apr. 5, 2007) (increase in early payment defaults within four months of origination, particularly for loans with low documentation and a piggyback loan), available at www2.standardandpoors.com/spf/pdf/media/TranscriptSubprime_040507.pdf. Thus, balloon payments and ARMs appear to be markers for lack of loan affordability and consequent default risk rather than the cause of default in themselves.

[15]See, e.g., M. Diane Pendley, Glenn Costello & Mary Kelsch, Fitch Ratings, The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS Performance (Nov. 28, 2007), available at www.fitchratings.com/corporate/reports/report_frame.cfm?rpt_id=356624 (noting the absence of adequate underwriting contributed significantly to the elevated default rates in 2007).

In 2006 and 2007, federal regulators issued guidance and statements addressing the widespread failure of underwriting in POA loans and other adjustable rate loans.[16] These five federal banking regulators specifically challenged the practice of substituting rate increases for underwriting.[17] They identified three main failures of underwriting typical of these loans:

- the failure to take into account future rate adjustments and negative amortization in determining ability to repay,
- the failure to include tax and insurance payments in determining ability to repay, and
- the widespread prevalence of stated income loans. (A stated income loan, also referred to a "no doc loan," requires no verification of the borrower's income. A related product is the "low doc loan," which reduces the traditional requirements for verification.[18])

For example, the 2006 Interagency Guidance on Nontraditional Mortgage Products issued by these five federal banking regulators focused on the payment shock occasioned by rate resets and periods of negative amortization.[19]  The guidance urges lenders to underwrite loans to the fully indexed rate, as opposed to an initial teaser rate.  The fully indexed rate is the interest rate that would be in effect at the time of origination, based upon the index identified in the loan note plus the listed margin, absent a teaser rate. Even the fully indexed rate does not reflect the possible risk that interest rates will increase; it is not the maximum rate that can be charged under the note.  It is only the rate that would be charged on the note had the interest rate calculations under the note been imposed at the outset.  This focus on the fully indexed rate was a large step forward from the practices of many lenders – and one which was vigorously objected to by the mortgage industry.[20]

These statements by regulators have considerably strengthened claims against lenders, assignees, and

---

[16]Statement on Subprime Lending, 72 Fed. Reg. 37,569 (July 10, 2007); Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609 (Oct. 4, 2006).

[17]71 Fed. Reg. 58,609, 58,614 (Oct. 4, 2006) ("While higher pricing is often used to address elevated risk levels, it does not replace the need for sound underwriting.").

[18]Traditionally no doc or low doc loans were created for the convenience of high income, high asset borrowers who were unquestionably credit worthy and *chose* to pay a higher interest rate in return for the convenience of a reduced requirement to document their income and assets. These loans make no sense for borrowers who are on fixed incomes who are still required to provide documentation of the *source* of their income.

[19]71 Fed. Reg. 58,609, 58,613-58,614 (Oct. 4, 2006).

[20]*See, e.g.,* Aames Mortgage Trust 2001-1 Mortgage Pass-Through Certificates, Series 2001-1, Aames Capital Corporation as Sponsor, Countrywide Home Loans, Inc. as Servicer, Prospectus Supplement to Prospectus dated March 13, 2001, S-10 (stating that no underwriting was done on the fully indexed payment levels of the adjustable rate mortgages in the pool); Subprime Mortgage Market Turmoil: Examining the Role of Securitization, Hearings Before the S. Comm. on Banking, Hous., & Urban Dev., 110th Cong. (2007) (statement of Sandor Samuels, Executive Managing Dir., Countrywide Fin. Corp.) (60% of borrowers from Countrywide could not qualify at the fully indexed rate), available at http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=256; Steven Sloan & Joe Adler, How Freddie Cutbacks in Hybrids May Reverberate, Am. Banker, Feb. 28, 2007 (quoting Wright Andrews, a lobbyist for nonbank lending institutions, as saying that most subprime borrowers cannot afford the fully indexed rate and requiring underwriting to the fully indexed rate would prevent adjustable rate mortgages from being made).

others for improvident lending.[21]

The bottom line is that POA loans pose a real danger to homeowners for a number of reasons:

1.   Homeowners will experience a dramatic increase in their home loan payments –
     often *tripling* in amount in when the reset occurs.

2.   This danger is often very difficult, if not impossible to discern from the documents
     provided both at closing and throughout the loan terms (for an example of this
     difficulty see the discussion of Mr. Jack Tilton's loan below).[22]

3.   Given the increase in the principal resulting from the negative amortization, the
     amortizing payment for the last 25 years of the loan will be substantially higher than
     the initial payments.

4.   As these loans often include prepayment penalties, borrowers are locked into them,
     and cannot escape the dangers – even if they are aware of them – without significant
     cost.

The significant payment increase comes when the loan is required to become fully amortizing –
when the principal reaches from 110% to 125% (depending upon the specific terms of the contract).
The exact date of this is not known ahead of time, and indeed cannot be determined until all of the
interest rates applicable to each month of the loan term can be ascertained. POAs generally have an
outside date of sixty months for requiring this reset, such that if the negatively amortized interest has
not caused the principal to reach the trigger before the end of the five years after consummation, the
loan will reset regardless on the 60 month anniversary of the first payment. *It is only when this payment
increase is triggered – three to five years after consummation – that most borrowers will become fully aware of the
dangers inherent in POA loans, and only then that most will seek legal counsel to help them avoid default and
foreclosure.*

## V.  Dangers Apparent in American Home Mortgages

I have reviewed specific documents for several loans provided to me by Counsel for the Borrowers'
Committee. Additionally, in my own work for the National Consumer Law Center I have had many
occasions to review POA loans as well as to discuss the details of these loans with other attorneys.

Two American Home loans for which I have been provided information illustrate these problems.

---

[21] For example, Mountain State Justice, a legal services program in Charleston, West Virginia, routinely raises
claims of unconscionability for lenders' failure to adequately underwrite the loans, citing these regulatory statements as a
basis for minimum standards of underwriting in the industry. Settlements on these claims range from a loan modification
with significantly reduced principal, and low interest rate, to a voiding of the loan plus damages paid to the consumer.
Attorneys' fees and court costs are routinely included.

[22] Brian Bucks & Karen Pence, Do Homeowners Know Their House Values and Mortgage Terms? 18-22 (Fed.
Res. Bd. of Governors Fin. & Econ. Discussion Series Working Paper No. 2006-3) (borrowers, particularly low-income
borrowers, underestimate caps on life time interest rates), available at
http://www.federlreserve.gov/pubs/feds/2006/200603/200603pap.pdf.

In both loans the initial payments for the first year are based on an interest rate which is less than 2%. In both loans, the interest rate changes within days, yet the minimum payments remain the same for the first year. In both loans, the projected payments once the loan becomes fully amortizing is well over twice the initial payment. Both loans were made in the second half of 2006. The huge payment increases were not set to occur until over two years later – in 2008 and 2009.

| Borrower | Date of Loan | Initial Payment Rate | Applicable Interest Rate | Projected Reset Date | Initial Payment | Projected Payment *After* Reset | Prepayment Penalty |
|---|---|---|---|---|---|---|---|
| Jack | 7/26/06 | 1% | 8.132% after 1 day | 12/1/08 | $1103 | $2859 | 6 months interest |
| Dandridge | 9/11/06 | 1.9% | 5.514% after ½ month | 3/1/09 | $837 | $2060 | 6 months interest |

As the majority of the American Home POA loans were made in 2006 and 2007 (43,628 in 2006 and 14,996 in 2007), *the majority of these loans have probably not reset to the fully amortizing payment even at this time, in January, 2009.*

There is a proto-typical fact scenario associated with these loan products. I personally have spoken to dozens of attorneys in states all across the nation who – while seeking assistance framing legal claims to help their clients avert foreclosure – provide fact patterns that involve a similar same set of promises, deceptions, and incorrect documents. The cases involving POA loans also generally involve a similar set of state and federal law claims. While some of these claims are fact specific and require the testimony of the borrowers to prove the claims, most often there are substantial and highly remunerative legal claims that can be proven simply from the documents. This typical fact pattern is well illustrated in the case of *Tilton Jack v. American Brokers Conduit, Inc. et al.*[23]

According to the complaint filed in his case, Tilton Jack is an elderly, African-American widower who owns his home in Brooklyn, New York.[24] In 2006 he contacted a mortgage broker in response to a brochure he received. The mortgage broker told Mr. Jack that he qualified for a loan with a 1% annual interest rate, which would reduce his monthly mortgage payments by $700. The mortgage broker also told Mr. Jack that the amount of money he owed on his mortgage loan would not increase so long as he made simply one additional payment of $1100 per year.

At the time, Mr. Jack had a fixed pension and social security income of $2,400 per month. The mortgage broker collected documents verifying the income and asset information from Mr. Jack, including his bank statements, social security payment and pension information.

---

[23]This case is currently pending in the U.S. District Court for the Eastern District of New York. Civil Action No.: 07-CV-3088. I understand that those defendants in this case that are Debtors in the instant bankruptcy case have been dismissed because of the pending bankruptcy.

[24]The information provided in this section of the report is based on the Amended Complaint filed in Mr. Jack's case.

Mr. Jack's loan payment on his existing first mortgage had been $1,800 per month, plus taxes and insurance. This loan – from Ameriquest Mortgage Company – had a fixed interest rate of approximately 7.4%. The broker promised Mr. Jack that the new loan issued by American Brokers Conduit would be at an interest rate of 1%, and that it would enable Mr. Jack to pay off all his debts and lower his monthly payments to about $1,100.  During the extensive conversations back and forth between Mr. Jack and the loan broker about whether Mr. Jack should take out this loan, Mr. Jack expressed concern about the possibility that the loan principal would rise. The mortgage broker repeatedly assured him that so long as he made the single additional payment of $1,100 a year, the principal would not increase.[25]

The broker also promised that after one or two years he would help Mr. Jack refinance into an even better loan without his having to pay any closing fees. He said this would be possible because this loan would pay off all of Mr. Jack's credit cards, causing his credit score to improve substantially. Relying on the express promises of the mortgage broker, Mr. Jack agreed to close the loan. When he began making monthly payments, Mr. Jack included an additional $114.70 each month to cover the extra $1,100 needed to prevent the principal from growing.

Documents relating to Mr. Jack's mortgage reveal that the terms of the loan he received from American Brokers Conduit, Inc., were considerably different from both the terms described by the broker in their conversations, and the terms reflected in the documents that had been mailed to him before the loan was consummated. The loan that Mr. Jack actually signed stripped tens of thousands of dollars in equity from his home; that would cost him, over the life of the loan, almost two and a half times more than had been promised. The monthly payments on this loan would quickly rise above his ability to pay, exposing him to significant risk of foreclosure.

Under the terms of the loan provided to Mr. Jack on July 26, 2006, the 1% interest rate he was promised would last for only *one day*. On the second day of the loan, the interest rate increased to 8.132%. Mr. Jack's minimum *monthly payment* was computed on the basis of the 1% interest rate, and that payment amount was fixed for one year. However, because the *interest rate* increased drastically and immediately, the monthly payments failed to cover even the interest that accumulated each month. For example:

| | |
|---|---|
| Interest rate on which payment is calculated | 1% |
| Interest rate actually applicable to loan after 1st day | **8.132%** |
| Minimum monthly payment amount for first year | $1,103 |
| Interest earned for first month | **$2,324** |
| Amount principal of loan increased in first month, *after the payment was made* | $1221 |

---

[25]One fact in the Tilton Jack case which is not typical is the fact that he tried repeatedly to rescind the transaction within the first three days after the loan was consummated. This is not particularly germane to the standard legal claims that are successfully made in these cases, so I have not discussed it here.

| Interest earned in the 10th month[26] | $2,579 |
|---|---|
| Amount principal of loan increased in the **10th** month, *after the payment was made* | $1,576 |

Under the terms of this loan, the minimum monthly payment amount is recomputed once each year in order to account for the changes in the interest rate, but the new minimum payment amount cannot differ from the previous one by more than 7.5%. As of September, 2007, Mr. Jack's minimum payment was $1,468 each month – still not sufficient to pay any of the principal. At the time the Complaint in Mr. Jack's case was filed – August, 2007 – the principal on Mr. Jack's loan had climbed from $343,000 to more than $356,000. The monthly *accumulation* of interest was in excess of $2,500 a month.

The loan provides that once the principal reaches 110% of the amount that was originated, or $377,300, Mr. Jack will no longer have the same minimum payment option and will be required to make the monthly payments in the fully amortizing amount, which was estimated to be approximately $3,300 a month (including taxes and insurance). That is more than double Mr. Jack's monthly income – which was documented on his loan application.

This loan also includes a significant prepayment penalty for the first three years, should Mr. Jack try to escape the terms of this loan: six months interest – estimated by Mr. Jack's attorneys to be more than $12,500.

The reason this loan is called a payment *option* ARM is because the borrowers are provided statements which set out in tiny type an explanation that they can choose which of four payments they would like to make each month.

Consider the monthly billing statement provided to Mr. Jack by American Home Mortgage Servicing for the payment due June 11, 2007.[27] In a box which appears to be designed to tell the reader the essential information, the **"Principal and Interest Payment"** is listed as $1,103.22. Yet, a very careful analysis of all of the information on the monthly statement reveals that this payment not only does not provide any principal repayment, but it also means that the interest accruing each month on the loan is not even being repaid.

The four payment options are described as follows (except that on the actual statement, the size of the font used to describe these options is quite small) –

---

[26]This information comes from the servicing statement provided to Mr. Jack for the payment due 6/11/07, OBC 323.

[27]This document is Bates Stamped OBC 0323 in the materials provided by Counsel for the Borrowers' Committee.

| | |
|---|---|
| Option 1: | **Minimum Payment:** This amount pays the interest and if applicable, principal that is currently due under your loan note. The amount may not be sufficient to pay all of the accrued interest for the previous month or to pay the loan in full over the remaining scheduled term. Negative amortization may result, which means that any unpaid interest will be added to the principal loan balances and will accrue additional interest. |
| Option 2: | **Interest Only Payment:** this amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment. However, no portion of the payment will be applied to reduce the principal balance of your loan. |
| Option 3: | **Full Principal and Interest Payment:**(based on the remaining term of your loan: This amount pays all of the accrued interest for the previous month(including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on the remaining scheduled term under your loan documents. |
| Option 4: | **Full Principal and Interest Payment:**(based on a 15 year term: This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on a 15-year term. |

The Minimum Payment is the **Least** amount you must pay. One or more of the options may not be available, the payment amounts in those options will always be equal to or greater than the Minimum Payment. The payment amount shown for each available option, as applicable, also includes an escrow payment, and fees for any optional products.

The HUD 1 on Mr. Jack's loan reveals over $28,000 in loan charges, which is an extraordinary amount. The account of Mr. Jack's loan, his exchanges with his broker, the deceptions he alleges by his broker, the confusing loan documents, the misleading servicing statements are all similar to those told by other borrowers who have received payment option ARMs.

## VI. Summary of Legal Claims

As is typical in cases involving payment option ARMs, in the complaint filed on his behalf, Mr. Jack has alleged a number of state and federal claims relating to this loan, including:

1.      Truth in Lending Act — failure to properly disclose material terms of the loan
2.      Deceptive practices
3.      Fraud
4.      Civil Conspiracy
5.      Real Estate Settlement Services Act

In other cases challenging POAs — both in New York as well as other states — claims are also included for —

6.      Unfair trade practices
7.      Unconscionability
8.      Breach of good faith and fair dealing
9.      Breach of contract

### A.      Factual Basis for Many State Claims – Lender's Failure to Determine Borrower's Ability to Repay the Loan

#### 1. Explanation of Potential Claim.

The crux of many cases challenging both POA loans – as well as other adjustable rate mortgages – is the lender's failure to determine the borrowers' ability to repay the loans: a failure of underwriting. This failure often is used as the factual basis for claims of deception, unfair trade practices, breach of good faith and fair dealing, and unconscionability.

Increasingly, courts regard lending when there is no ability to repay as a *per se* unfair and deceptive act or practice.[28] In a landmark case, the Massachusetts attorney general sought to enjoin foreclosures brought by a major subprime lender and servicer, Fremont, until the Attorney General had a chance to review the underlying loans to determine if there was an alternative to foreclosure. The state Supreme Court reiterated that, for years, the law had made clear to mortgage lenders:

> that, even if they were in compliance with banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices."[29]

The court specifically pointed out that even before the 2006 Guidance by federal regulators, those same regulators had for years required "that loans made to borrowers on terms that showed they would be unable to pay and therefore were likely to lead to default, were unsafe and unsound, and probably unfair."[30] As a result, the court rejected Fremont's claim that the Guidance's underwriting requirements were somehow new. Recently, a Massachusetts trial court issued another injunction along similar grounds against another lender for its adjustable, teaser rate loans.[31]

---

[28]See, e.g., Commonwealth v. Fremont Inv. & Loan,  2008 WL 517279 (Mass. Super. Ct. Feb. 25, 2008), aff'd, No. 08-J-118 (Mass. App. Ct. May 2, 2008), available at www.consumerlaw.org/unreported; Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827 (N.D. Ill. 2007) ("Martinez is stuck in a loan he did not want and may not be able to pay.").

[29]Com. v. Fremont Investment & Loan, 452 Mass. 733, 897 N.E.2d 548 at 556 (Mass.,2008).

[30]The Court noted "an interagency Federal guidance published January 31, 2001, jointly by the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, [which] stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, *as structured,* from sources other than the collateral pledged are generally considered unsafe and unsound" (emphasis supplied). *Id.* at 557.

[31] *See,* Commonwealth of Massachusetts v. H&R Block, Inc., Superior Court, Civil Action No. 08-2474-BLS 1.

Increasingly, industry observers note that lenders did not appropriately underwrite stated-income loans.[32] In many cases, lenders failed to even check applications and credit reports for internal consistency.[33] Other courts have recognized that falsified applications may have more to do with collusion between the broker and the lender than the borrower's participation in the fraud.[34]

The Federal Reserve Board has recognized that stated-income loans harm consumers because the practice:[35]

- Presents the opportunity for originators to mislead consumers who could easily document their incomes into paying a premium for a stated-income loan--making the loan unnecessarily expensive;
- Provides originators with incentives as well as opportunities to inflate the applicant's income, by rewarding the originator for providing a stated-income loan with a higher premium;
- Allows originators to hide the inflated income in the rush and confusion of the loan application and closing process;
- Results in loans to consumers with payments that are unaffordable, leading to default, foreclosure, loss of the home and home equity; and
- Causes increases in foreclosures which in turn harms neighborhoods, communities and cities.[36]

Claims based on the lender's failure to adequately underwrite the loan can often be proven through the documents alone – as the tell-tale signs of the lender's deliberate ignorance are often quite evident from the loan documents.[37]

## 2. Application of Claims to Debtors' Loans

I have not been asked to give an opinion as to the likelihood that Mr. Jack or Ms. Dandridge would prevail on a claim challenging the lenders' failure to determine their ability to repay the loans. However, there are indications in the complaint filed on Mr. Jack's behalf that this claim certainly exists – the amount that mortgage payment is scheduled to increase to once the loan becomes fully

---

[32]See, e.g., BasePoint Analytics, White Paper: Early Payment Default--Links To Fraud and Impact on Mortgage Lenders and Investment Banks (2007); M. Diane Pendley, Glenn Costello & Mary Kelsch, Fitch Ratings, The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS Performance (Nov. 28, 2007), available at www.fitchratings.com/corporate/reports/report_frame.cfm?rpt_id=356624. However, the Fremont court specifically refused to find that stated income loans are *per se* unfair.

[33]*Id.*

[34]*See, e.g.,* Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827 (N.D. Ill. 2007).

[35]73 Fed. Reg.1,672, 1691 (Jan. 9, 2008).

[36]73 Fed. Reg. 1,672, 1,691 (Jan. 9, 2008).

[37]This fact is something I know from my own work as an expert witness and consultant on many cases involving the lenders' failure to determine the borrower's ability to repay the loan.

amortizing ($2,859) is more than his monthly income of $2,400. These types of facts support a claim under state law for breach of good faith and fair dealing, unconscionability, and breach of state consumer protection laws that require the determination of the borrower's ability to repay, and potentially fraud. Typically these claims may be proven from the documents through an evaluation of the materials in the files of the lender and the broker. For example, there will generally be several iterations of the Loan Application, often showing different incomes, proof of the borrower's actual income and assets is generally in the file, but ignored by both. There is generally an underwriter analysis which often shows what questions were asked and what answers were provided.

### 3. Examples of Other Cases Challenging Failure to Determine Ability to Repay

Recent massive settlements between numerous state Attorneys General (including California, Illinois and Florida) and Countrywide and Bank of America were premised largely on Countrywide's repeated failures to determine the borrowers' ability to repay the loans provided by Countrywide. The complaints in these cases, as well as the settlements, specifically targeted this practice in POA loans. Bank of America has pledged over $8.4 billion to redress the extensive wrongs to over 400,000 borrowers caused by this and other failures in underwriting in the making of Countrywide loans.[38]

### B. Fraud or Deception

#### 1. Explanation of Potential Claim

Fraud and deception is often the root of many cases challenging POA loans, as it appears that most homeowners who took out these loans seriously misunderstood their terms, and they routinely allege that they were deceived into doing so. Indeed, these claims are so widespread that quite often one case is proven through the testimony – or proffered testimony – of other victims. In 2007, the FTC recognized the ongoing fraud (and concomitant violations of TILA) in widespread media advertisements about these products. It issued a press release along with letters to over 200 national and local advertisers warning them "about the potentially deceptive advertising, with guidance on screening ads for questionable claims."[39]

According to the FTC press release about these warning letters –

> [T]he agency is advising more than 200 advertisers and media outlets that some mortgage ads are potentially deceptive or in violation of the Truth in Lending Act. The ads, including some in Spanish, were identified in June during a nationwide review focused on claims for very low monthly payment amounts or interest rates, without adequate disclosure of other important loan terms. For example, some ads

---

[38] *See* Ruth Simon, *Bank of America in Settlement Worth Over $8 Billion,* Wall Street Journal, Oct. 6, 2008, available at http://online.wsj.com/article/SB122326958041707133.html?mod=testMod.

[39] FTC Warns Mortgage Advertisers and Media That Ads May Be Deceptive, Press Release, September 11, 2007, available at http://www.ftc.gov/opa/2007/09/mortsurf.shtm.

touted rates as low as "1%" but failed to disclose adequately:

- that the stated rate was a "payment rate" – not the interest rate – that applied only during the loan's initial period;
- that low advertised payments applied for only a short period; and
- the loan's Annual Percentage Rate, the uniform measure of the cost of credit that enables consumers to shop for and compare mortgage offerings.[40]

**2. Case Examples of Successful POA cases premised on Fraud and/or Deception[41]**

1. *Kanawha County, West Virginia*. After the defendants rested in a jury trial in 2007 challenging the deceptive practices of the broker and the lender in the marketing of a POA loan, in which the plaintiff's primary claim was based on the promise of a reduced rate (1%) for five years, the lender and broker settled by paying the homeowner $300,000, including attorney's fees. *Pauley v. Chevy Chase Bank and Allied Home Mortgage Capital Corp.*

2. *Berkeley County, West Virginia*. In three similar cases, each alleging the borrowers were unconscionably induced by consistent reassurance to refinance their fixed, low rate 30 year mortgages into 1% POAs, the lenders and brokers jointly paid each set of borrowers $100,000, $95,000, and $85,000, respectively. *Banks v. Allied Home Mortgage Capital Corp. & Bank United; Reeser v. Allied Home Mortgage Capital Corp. & Bank United; Palmer v. Allied Home Mortgage Capital Corp. & Bank United.*

3. *Brooklyn, New York*. A complaint was filed alleging that the borrower was fraudulently induced into refinancing out of a fixed rated loan into a payment option ARM loan in July, 2006, and told that he would be provided an interest rate of one percent. The borrower was not told that his payments would not cover the interest earned on the loan. In addition, borrower was unknowingly given a low-doc loan. Although he submitted his income information to broker, either the broker or the lender blacked out all his income information so that there would be no record of his actual earnings in the loan file. The loan contained a significant three-year prepayment penalty. Borrower could not afford the loan at the fully amortizing amount. Complaint included TILA, unfair and deceptive practices and fraud. Borrower reached a *confidential settlement* that will enable him to remain in his home.

4. *Multiple cases in Mid-Atlantic state*. A private attorney has filed litigation on behalf of about sixty borrowers with payment option ARM loans who asserted violations of the state Consumer Fraud act, common law fraud, breach of contract and TILA violations. Almost all of these loans were refinancings of previous loans, often fixed rate, fully amortizing mortgages. Many of these homeowners asserted that their mortgage brokers defrauded them by misrepresenting to them that their mortgages carried low fixed interest rates for between three and five years. In many of these cases, these claims were substantiated by the "early" TILA Disclosure statements which reflected

---

[40]*Id.*

[41]Information in this section was provided by the attorneys of record in these cases.

much lower interest rates than the borrowers would ultimately receive. Frequently, these early TILA disclosures reflected the teaser rate, but the borrowers were told that the teaser rate (sometimes as low as 1%) was good for 1 year, 5 years or even the life of the loan.  In actuality, these borrowers were provided mortgages with low teaser rate mortgages only good for one month, or mortgages that set payment rates based on rates below the actual interest rate being charged to them.  Two dozen cases are still pending, but in dozens of other cases judgments or settlements have been obtained for the benefit of these homeowners. The range of settlements and judgments has varied from between $7,500. to $55,000. All of the resolved cases were ultimately the subject of *confidentiality agreements.*

### C. Truth in Lending Act Claims

#### 1. Explanation of Potential Claims

A series of challenges to POA loans have successfully been mounted using the Truth in Lending Act ("TILA") as the primary vehicle. One such case is the 2007 case from a Federal District Court in Wisconsin, *Andrews v. Chevy Chase Bank, FSB.*[42] The court held that in its disclosures for a POA loan, the lender had violated TILA in three ways: 1) its disclosure of the payment schedule, 2) its disclosure of the cost of the mortgage loan as an annual percentage rate (APR), and 3) its disclosure of the variable interest rate feature of the loan. The court held that the TILA remedy of rescission was available for each or any of these violations of TILA, and that this remedy could be used by the class of borrowers represented by the named plaintiffs. Subsequently, the 7th Circuit Court of Appeals overruled only the last aspect of this decision, stating that the remedy of rescission is not available to a class of homeowners.[43] The Court of Appeals did not address the substantive findings of the district court.

More typical TILA disclosure violations, involving an understatement of the finance charge, may also be present. Any failure to provide a material TILA disclosure will lead to statutory damages and rescission for a non-purchase money home secured loan. If the loan was used to purchase the home, only the statutory damages (plus actual damages – which are difficult to prove) are available. In all cases under TILA, attorneys's fees and court costs are awarded to a prevailing consumer.[44]

Under TILA, prevailing consumers are entitled to one recovery of $4,000 for the failure to make any of the disclosures clearly and conspicuously.[45]  Multiple disclosure violations result in only one award of statutory damages. The failure to properly provide the TILA disclosures also triggers rescission

---

[42]240 F.R.D. 612 (E.D.Wis.,2007).

[43]Andrews v. Chevy Chase Bank, 545 F.3d 570 (7th Cir.(Wis.) Sep 24, 2008) (NO. 07-1326), rehearing and rehearing en banc denied (Oct 31, 2008).

[44]15 U.S.C. § 1640(a)(3).

[45]15 U.S.C. § 1640(a)(2)(A).

rights under 15 U.S.C. § 1635(a). A homeowner whose non-purchase money loan includes material violations of TILA can rescind the loan for up to 3 years from the consummation of the law. Rescission is fully applicable to assignees of the loan.[46]

Once the loan is rescinded, the lender's security interest in the loan is wiped out. The homeowner does have the duty to repay the lender, but the amount due the lender – called the "tender amount" is substantially reduced.

Rescission is a powerful remedy, worth a substantial amount of money to homeowners for whom it is available. This right is much more powerful than common-law rescission, although it shares the goal of common law rescission of restoring the *status quo ante*.[47] Rescission voids the security interest in the property, leaving the lender with an unsecured debt.[48] Rescission also strips away the costs, fees, and interest associated with the loan. The borrower's debt is reduced to the real proceeds of the loan: monies paid to the borrower or paid to third party creditors of the borrower. Taxes and insurance are included in the real proceeds; closing costs are not. Finance charges, interest, and legitimate third party fees, like appraisals and credit reports and filing fees, paid by the borrower directly or paid from the loan proceeds are all subtracted from the amount due.[49] All payments made by the borrower are credited dollar-for-dollar against the remaining principal.[50] If borrowers have paid a significant amount of funds to the lender, the result can be the complete elimination of the debt or even an overpayment to the lender, which must be refunded.[51]

To illustrate the powerful, and highly remunerative, remedy of TILA rescission, let us assume that Ms. Dandridge's loan from the Debtors were rescinded, and that she had made payments through December, 2008 on the loan. The amount she would owe the current holder would be reduced by the all of the finance charges and costs she has paid on the loan. In certain situations, that sum can be further reduced by statutory damages under TILA:

---

[46]15 U.S.C. § 1641(c).

[47] See, e.g., Williams v. Saxon Mortgage, 2008 WL 45739 (S.D. Ala. Jan. 2, 2008); Cornerstone v. Ponzar, 254 S.W.3d 221 (Mo. Ct. App. 2008); Johnson v. GMAC Mortgage Co., 162 S.W.3d 110, 120-21 (Mo. Ct. App. 2005).

[48]15 U.S.C. § 1635(b); Regulation Z §226.23(d)(1).

[49] 15 U.S.C. § 1635(b); Regulation Z §226.23(d)(1); Official Staff Commentary § 226.23(d)(2)-1; see also Moore v. Cycon Enter., Inc., 2007 WL475202 (W.D. Mich. Feb. 9, 2007).

[50]15 U.S.C. § 1635(b); Regulation Z §226.23(d)(2).

[51]*See, e.g.*, Stuart v. Decision One Mortgage Co. (In re Stuart), 2007 WL 1032261 (Bankr. E.D. Pa. Apr. 6, 2007).

**Reduction of Amount Due After TILA Rescission**
Amount projected to be owed on March 1, 2009 by lender through TILA disclosures provided at closing: **$310,035.00.**

| | |
|---|---|
| Effect of Rescission: | |
| Original Loan Amount - | $281,850.00 |
| minus all Settlement Charges - | 14,955.30 |
| minus all payments made to date | |
| $836.97 x 14- | 11,717.58 |
| Statutory damages - | 4,000.00 |
| Net amount due — | $251,177.12 |

The value of the rescission claim under TILA would be worth as much as **$58,857.88.**

This amount can be further reduced by damages owed as the result of other claims.

TILA claims are complex, but they are generally litigated entirely on the documents, so they rarely involve jury trials.

## 2. Application of TILA claims to Debtors' Loans

It appears from both the Jack and the Dandridge files that at least two of the TILA violations upheld by the *Andrews* court may exist:

1)  the failure to clearly and conspicuously disclose the annual  percentage rate – because of the confusion resulting from the fact that the same words ("yearly rate") were used to describe the composite APR and the teaser rate applicable for the short teaser period – (1 day in the Jack's case and 15 days in the Dandridge case); and

2)  the failure to conspicuously disclose the fact that a variable rate is applicable to the loan – because even the Schedule of Payments does not reveal that the variable rate applies in the first month, and instead makes it appear to the reviewer that the variable rate only applies several years later.

Moreover, a class action complaint involving the Debtors' payment option ARM loans is currently pending in federal court in California. The complaint in this case alleges *Andrews'* type violations  of TILA, along with state law claims based on deception, fraud, breach of contract and breach of the covenant of good faith and fair dealing. This action, *Valenzuela v. American Home Mortgage Investment Trust 2005-2,* which seeks nationwide class relief,[52] will come on for a hearing on motions to dismiss on March 9, 2009.

## 3. Successful POA Case Examples Based on TILA

---

[52] 2008cv01179 (E.D. Cal. Aug. 12, 2008).

1. *Chicago, Illinois.* Harold Ray v. WaMu, 06 C 7063 (N.D. Ill). The court denied the defendants' motion to dismiss claims for TILA rescission, as well as fraud. A confidential settlement with the lender provided fixed favorable loan terms, as well as substantial contributions from other defendants to pay down the principal.

2. *Chicago, Illinois.* Delores King v. Bank United. Ms. King testified before the U.S. Senate Banking Committee about her payment option ARM loan. Before a complaint was filed – but after the testimony to the Senate Banking Committee in which a TILA violation supporting a rescission claim was outlined in her attorney's testimony – this case settled without litigation, allowing Ms. King to stay in her home with an affordable mortgage. (See Attachment 1, for a copy of her testimony, note how the facts of this case are so similar to those of Mr. Tilton Jack's, as outlined above).

3. *Multiple TILA challenges pending in California.* Currently there are well over fifty national class actions pending in California challenging POA loans. The claims in these actions include TILA, breach of contract, and deceptive practices. These cases have been in litigation in federal court for over a year. In the past year alone, in over a dozen reported decisions, the courts have refused to dismiss these cases, allowing the litigation to proceed. Some examples include:

- *Amparan v. Plaza Home Mortg., Inc.,* 2008 WL 5245497 (N.D.Cal. December 17, 2008) (statute of limitations for TILA claims tolled based on plaintiff's ignorance of potential claims; lack of clarity between note and TILA disclosure may be basis for violation; confusion between the APR and the temporary 1% rate used to calculate required payments states a claim for failure to clearly and conspicuously disclose the cost of the loan, among other TILA violations; refusing to dismiss fraudulent concealment claim; dismissing other state claims.).
- *Pham v. T.J. Financial,* 2008 WL 3485589 (C.D.Cal.,August 11, 2008) (claims stated that POA loan disclosures may have violated TILA for failing to clearly and conspicuously disclose the APR, failing to disclose that the note negatively amortized, that the note was initially discounted, and the composite rate was correctly disclosed.).
- *Plascencia v. Lending 1st Mortg.,* 583 F.Supp.2d 1090 (N.D.Cal. 2008) (claims stated that purchaser of loan could be subjected to liability under California's Unfair Competition Law (UCL) for aiding and abetting lender's UCL violations; question of whether equitable tolling applies to TILA case sent to jury, other claims dismissed.)
- *Quezada v. Loan Center of California, Inc.,* 2008 WL 5100241, (E.D.Cal. Nov. 26, 2008) (assignee of loan – a trust – not dismissed, TILA does not preempt state unfair trade practice claims, assignees of loan may be vicariously liable for TILA violations, fraudulent omissions claims not dismissed, other claims dismissed.).
- Also see –
  - *Avila v. Stearns Lending, Inc.,* 2008 WL 1378231 (C.D.Cal. April 07, 2008);
  - *Reyes v. Downey Savings and Loan Ass'n, F.A.,* 541 F.Supp.2d 1108 (C.D.Cal. 2008);
  - *Monaco v. Bear Stearns Residential Mortg. Corp.,* 554 F.Supp.2d 1034, 1036 (C.D.Cal. 2008);
  - *Quezada v. Loan Center of California, Inc.,* 2008 WL 5100241 (E.D.Cal. Nov. 26, 2008).

**Conclusion**

Most POA loans do not reset to the higher payments until several years after they are consummated. To the extent that borrowers may be able to discern that the minimum payments do not cover even the interest charged on the loan, they are still stuck in these loans because of the massive prepayment penalty for three years. The majority of borrowers will keep paying what they can, generally the minimum payment, as long as they can to avoid foreclosure. They will not seek legal assistance until faced with foreclosure – which is unlikely to occur before the payments adjust to become fully amortizing – which can be as long as five years after consummation. As a result: the majority of borrowers on Debtors' POA loans are unlikely to be aware, even now, of the power and value of their legal claims against Debtors. Nevertheless, if the Debtors hold the loan, these legal claims are often all they will have avert foreclosure and the loss of their homes.

Attachment 1

Ms. Delores King
11114 S. Normal Av.
Chicago, Illinois 60628

TESTIMONY BEFORE SENATE BANKING COMMITTEE
February, 2007

Thank you for the opportunity to testify here today about my mortgage. My name is Delores King, and I live on the South Side of Chicago in a home I have owned for 36 years – it will be 36 years this August. I am a retired office administrator after 28 years on the job in the offices of the Illinois College of Optometry.

Over the years, I have refinanced several mortgages on my property, in order to make repairs and various improvements. In 2004, my mortgage balance was $140,000, and I was paying $798 per month on my mortgage.

In 2004, unfortunately, I was the victim of an identity theft phony check scam that cost me about $3,000. I decided to refinance my mortgage in order to borrow the money I owed as a result of the scam. What happened next is that I was defrauded into a horrible mortgage that is so bad I could lose my home.

Around February, 2005, I received a telemarketing call from Chad, a mortgage broker with a company called Advantage Mortgage Consulting. Chad told me that he could get a loan for me approved fast. He said that he would get me a good loan for my situation. So, I applied for a loan with Chad. I told Chad that my monthly income was about $950 per month from Social Security. My only other income is a one-time-a-year retirement payment from a Teachers pension from the optometry school, in

the amount of $2,657 – once a year.  This pension will actually stop in a few more years.   Currently, I have a part-time job as a Foster Grandparent at a grade school where I make $2.65 per hour.

Chad took copies of my Social Security and pension benefits statements, and a few weeks later he told me I was approved.  He brought the loan papers to my house and asked me to sign – many, many pages of documents.  He rushed me through the signing and did not really explain anything.  He certainly did not say this was an "exotic" loan or unusual in any way.   He didn't even give me copies of the papers I signed -- I had to call and get them from the title company much later.

When I agreed to the loan, Chad said it was an adjustable rate, but the starting interest rate was only 1.45%.  He said the regular rate would be around 6%, and the payments would be around $800 per month.  I believed that the starting rate would last at least six months or a year before adjusting.  I had heard about mortgages that adjust once a year.  I knew that the payment could go up little by little, but I had no idea it would explode the way it has in just two years.   I also did not know that $800 per month was less than all of the interest due, and that my balance would go up and up with unpaid interest.  So now I have a mortgage that's thousands of dollars more than I started with, and my payments have nearly doubled in two years.  I have refinanced  before, but I've never seen anything like this.

The payment started out as $832 a month, including taxes and insurance.  The monthly payment as of now is $1,488 per month.  This is more than my entire monthly income!  I have been scraping by with the help of family and friends to get my mortgage paid every month, but I am now at the point where it is just impossible to continue.  Last month, I could only send in $1,200.  I will end up out on the street if something doesn't change soon.

I've never heard of a "no doc" loan or an Aoption@ loan before all this happened. I never knew you could get a mortgage and pay Ainterest only@ or even less than all the interest owed each month. I surely did not know that a Bank would make a loan to someone without checking to see if the person could afford the loan. This loan is just not right for someone like me. If the bank had looked at my information, my income, they knew I could never afford this loan. The bank knew, but I did not know, that the monthly payment could go higher than my entire monthly income, my fixed income. It should be against the law for a bank to make a loan knowing that it will be impossible for the person to pay it back and they will lose their home.

*Margot Saunders*
**National Consumer Law Center**

1001 Connecticut Ave, NW
Washington, D. C. 20036

1503 Clintwood Road
Charleston, W.V. 25314

## Professional Experience

**National Consumer Law Center.** 1991 -- present. Policy analysis in areas of predatory lending, credit reporting, debt collection, electronic commerce and electronic benefits transfer, preservation of homeownership, utility costs for low income households, and other consumer credit issues. Duties include writing analytical books and articles on issues relating to low-income consumers; providing trainings and expert testimony on issues effecting low income consumers and the impact of pending Congressional proposals; and providing analysis and assistance on credit math questions. Through June 2005, Managing Attorney of Washington, D.C. office of the Center, currently Of Counsel.

**North Carolina Legal Services Resource Center.** 1983 -- 1991. Consumer specialist in the state support office for the legal services field programs in North Carolina. Responsibilities included providing information to N.C. General Assembly regarding effect of proposals on low income clients on consumer, preservation of homeownership, utility and domestic law matters; training; supervising appellate work on consumer credit and foreclosure issues; and providing assistance on complex consumer issues.

Private practice in Raleigh, N.C. 1982-1983.
Governor's Advocacy Council for Children and Youth, Raleigh, N.C. 1981- 1982..
Legal Aid Society of Northwest North Carolina, Winston-Salem, N.C. 1978 - 1980

## Education

University of North Carolina School of Law, J.D. 1978
Brandeis University, B.A. 1975
Chapel Hill High School, Chapel Hill, N.C. 1971.

## Professional Activities

**Member Board of Advisors UNC School of Law Center for Banking and Finance,** 2002 to present.

**Member of the Federal Reserve Board's Consumer Advisory Council,** 1996 - 1998 (Co-Chair of Consumer Credit Committee, Chair of Depository Institutions Committee.)

**Member of the American Water Works Association Policy Advisory Forum,** 1996 - 1998.

**Witness to Congressional Committees on numerous occasions regarding consumer credit issues, examples include –**

Senate Banking Committee regarding the *Consumer Impact of Regulatory Relief Proposals Affecting Banks, Thrifts, and Credit Unions (*March 1, 2006).

House Subcommittee on Financial Institutions and Consumer Credit regarding *"Helping Consumers Obtain the Credit They Deserve"* (May 12, 2005).

House Committee on Veterans' Affairs regarding *Protecting the Rights of Those Who Protects Us: Public Sector Compliance with the Uniformed Services Employment and Reemployment Rights Act (USERRA) and Improvements to the Servicemembers Civil Relief Act (SCRA)* (June 23, 2004).

Senate Committee on Banking, Housing and Urban Affairs regarding *All Current Proposals for Legislation on Financial Services Reform* (June 22, 2004).

House Subcommittee on Housing and Community Opportunity and Subcommittee on Financial Institutions and Consumer Credit regarding *Protecting Homeowners: Preventing Abusive Lending While Preserving Access to Credit* (November 5, 2003).

Senate Committee on Banking, Housing and Urban Affairs Committee regarding the *Impact of the Proposed RESPA Rule on Small Businesses and Consumers* (April 2003).

House Financial Services Committee Subcommittee on Housing and Community Opportunity regarding *Simplifying the Home Buying Process: HUD's Proposal to Reform RESPA* (February 2003).

Senate Committee on Banking, Housing and Urban Affairs regarding the *Increase in Predatory Lending and Appropriate Remedial Actions* (July 27, 2001).

House Committee on Financial Services, Subcommittee on Financial Institutions & Consumer Credit, regarding *Regulation of Rent To Own Transactions* (July 12, 2001).

House Committee on Financial Services, Subcommittee on Domestic Monetary Policy, Technology and Economic Growth, regarding the *Consumer Consent Provisions, in the Electronic Signatures in Global and National Commerce Act (E-Sign),* Public Law No. 106-229 (June 26, 2001).

House Committee on Financial Services Subcommittee on Oversight and Investigations, regarding the *EFT Requirements of the Debt Collection Improvements Act of 1996, and the Use of ETAs,* (June 20, 2001).

House Banking Committee on *Employer Investigations of Employee Misconduct under the Fair Credit Reporting Act* (May 2000).

House Judiciary Committee on *Electronic Signature Bill,* September 30, 1999.

House Subcommittees on Housing & Community Opportunity and Financial Institutions & Consumer Credit regarding the *Rewrite of Truth in Lending Act and Real Estate Settlement Procedures Act* (September 16, 1998).

**Presenter and trainer on predatory mortgage lending, payday lending, interest calculation methods, and other consumer credit issues on numerous occasions sponsored by the following private associations and government agencies, among others --**

Federal Trade Commission
Federal Reserve Board
Federal Deposit Insurance Corporation
National Telecommunication and Information Administration

American Bar Association, Business Law Section

American Bar Association, Science and Technology Section
National Association of Attorneys General
Mortgage Bankers Association
America's Community Bankers
National Association of Mortgage Brokers
National Association of Hispanic Real Estate Professionals
Real Estate Settlement Professionals Organization (RESPRO)
Center for Democracy and Technology
Consumer Federation of America
National Community Reinvestment Coalition
Neighborhood Reinvestment Corporation
National Consumer Law Center
National Association of Consumer Advocates
Conference on Computers, Freedom and Privacy
National Academy of Sciences

## Publications

**BOOKS –**

Co-author, *Consumer Banking and Payments Law*, National Consumer Law Center
3rd Edition, 2005
Annual Supplements, 2003, 2004, 2006, 2007 (pending)
2nd edition 2002

Contributor, *Foreclosures*, National Consumer Law Center, 2006 Supplement and 2007 (pending) revised edition (chapters on servicing abuses and foreclosure rescue scams)

Contributor, *The Cost of Credit: Regulation and Legal Challenges*, National Consumer Law Center 2004, Supplement (author of new section on Daily Accrual Accounting) Co-author,

Contributor, *Stop Predatory Lending, A Guide for Legal Advocates*, National Consumer Law Center 2002

Editor and Co-author, *Access to Utility Service*, National Consumer Law Center
1st Edition, 1996
Annual Supplements, 1997, 1998, 1999
2nd Edition, 2000

Editor and Co-author, *Manual on Water Affordability Programs*, American Water Works Association Research Foundation, 1998.

Co-author, *Energy and the Poor - The Crisis Continues*, National Consumer Law Center, 1995.

Co-author, *Tenants' Rights to Utility Service*, National Consumer Law Center, 1994.

*The Poor and the Elderly: Drowning in the High Cost of Water*, AARP, 1993.

**ARTICLES –**

Co-author, *The Credit Card Market and Regulation: In Need of Repair*, 10 N.C. Banking Inst. 23, University of North Carolina School of Law Banking Institute, 2006.

Co-author, *Federal Regulation of Consumer Credit: The Cause or the Cure for Predatory Lending?* Joint Center for Housing Studies, Harvard University, BABC, March 2004.

*The Increase in Predatory Lending and Appropriate Remedial Actions*, 6 N.C. Banking Inst. 111, University of North Carolina School of Law Banking Institute, 2002.

*A Case Study of the Challenge of Designing Effective Electronic Consumer Credit Disclosures: The Interim Rule for the Truth in Lending Act*, 7 N.C. Banking Inst. 39, University of North Carolina School of Law Banking Institute, 2003.

*E-Sign and UETA: What Should States Do Now*, Cyberspace Magazine, January, 2001.

*The Safe Drinking Water Act -- Dilemmas for the Poor*, 26 Clearinghouse Review 12 April, 1993.

Co-author, *Strategies for Keeping the Lights On*, 25 Clearinghouse Review 16 August, 1992.

Co-author, *Merging Energy Considerations with New Housing Initiatives*, 1992-1993 Curr Mun Problems - 172 (Vol 19, Number 2, 1992); 25 Clearinghouse Review 12, April, 1992.

Co-author, *Energy Assistance Plans: Alternative Distribution Methods for LIHEAP Benefits*, 25 Clearinghouse Review 10, February, 1992.

*Consumer Law In North Carolina*, N.C. Bar Association Poverty Law Manual Series, June 1991.

*Legislative Update: How the General Assembly Dealt With Consumer Matters*, 10 Notes Bearing Interest 2, N.C. Bar Association January 1990.

*How Can a 25-Inch TV Cost $1100?* 10 N.C. Insight 4 June, 1988.

*The Consumer Credit Committee: A Unique Opportunity*, 8 Notes Bearing Interest 3, N.C. Bar Association, September 1988.

*A Consumer Advocate's View of Appliance Rentals*, 4 Notes Bearing Interest 1, N.C. Bar Association, April, 1984.

*Acting on Behalf of Endangered Children*, Governor's Advocacy Council on Children and Youth, Raleigh, N.C., June, 1983.

*Legal Rights and Responsibilities of Teenage Parents*, Governor's Advocacy Council on Children and Youth, Raleigh, N.C., February, 1982.

**Cases in which I have been retained as an expert witness since August, 2005**
As of August, 2008

1. Min Hong v. David Henson, et al, No. 03-5705, United States DistrictCourt Eastern District of PA.

2. Mary Jones v. Aames Funding Corporation et al, Civil Action No.04-4799, UnitedStates District Court Eastern District of PA.

3. Lisa G. Lucas v. Home Loan Corp., et al, No. 05-C-1129, Circuit Courtof Kanawha County, WV.

4. Ralph C. Cronin & Mary Jo Cronin v. Saxon Mortgage Services, Inc. & Emmanuel Byron Loucas, Civil Action #: 04-C-141(M), Circuit Court of Marshall County, WV.

5. Marsha Saye & Ricky Saye v. ABN Amro Mortgage Group, et al, No.05-C-2496, Circuit Court of Kanawha County, WV.

6. Carter W. Stump & Sharon L. Stump v. Citifinancial Mortgage Company, et al, No.05-C-1781, Circuit Court of Kanawha County, WV.

7. Standard Federal Bank c/o ABN AMRO Mortgage Group, Inc. v. Gary Neff, CivilAction No. 02-CV-240, Belmont County, Ohio.

8. Johnnie I. Elswick, et al v. EquiFirst Corporation, et al., Civil Action No. 05-C-180, Circuit Court of Boone County, West Virginia.

9. Ameriquest Mortgage Company v. Eugene E. Brown and Debra A. Brown, Civil Action No. 03-C-471G, Circuit Court of Ohio County, West Virginia.

10. William Tillery & Rebecca Tillery v. Harry Borden and John J. Harrison Company, Inc., Case No.: CAE - 07-05512, Prince Georges County, Maryland.

11. Wilbur Hurley & Doris Hurley and Philis Hurley v. Harry Borden, et al., Case No.: C-06-1332, Calvert County, Maryland.

12. Mitchell v. Residential Funding Corp., et al., 03-CV-220489, Jackson County, Missouri.

13. Washington Mutual Bank, et al. v. Diane Mills, et al., Case No. CA05-515, Johns County, Florida.

14. Deutsche Bank National Trust Company v. Glenn V. Pevarski and Nanetta L. Pevarski, Case No.: 06FR531, Washington County, Ohio.

15. Lourie Brown and Monique Brown v. Quicken Loans Inc. et al. In the Circuit Court of Ohio County, West Virginia, Civil Action No. 08-C-36.

Additionally, I provided an affidavit to the U.S. District Court in the Western District of PA on complex Truth in Lending questions in the Multi-District litigation in In Re: Community Bank of Northern Virginia Mortgage Lending Practices Litigation, MDL No. 1674, Case No. 02-cv-01201.

**Expert Witness Services**
*Margot Saunders*
**Of Counsel**
**National Consumer Law Center**

Professional Fees

1)    $300 per hour for time spent on research, analysis, report writing, preparations, deposition, or at trial; plus

2)    $500 appearance fee (to be paid by the Defendant 10 days before the appearance), for testimony at depositions or trial.

Additionally, while all depositions should occur in Charleston, West Virginia, unless otherwise agreed to in advance, in the event travel is necessary either to a deposition or trial:

3)    $175 per hour for time spent traveling to and from depositions or trial, from portal to portal, including all time spent waiting; and

4)    Reasonable out of pocket expenses actually incurred for travel, including, for example, meals, hotel, parking, transportation expenses, etc.

Billing and Payment

A retainer equal to the fee for 10 hours of professional services, or as otherwise agreed, is to be paid contemporaneously with sending the initial case material to review.  Cases will be handled in the order in which the retainer is received.

Refunds will be made for any unused portion of the retainer, less a fee for one hour's time to cover administrative costs, when the total fee paid is less than would be charged for five hours.

Prior to appearing for a deposition, payment for both the appearance fee and the hourly rate for the time anticipated for the deposition must be delivered to NCLC's Boston office.

Itemized bills for services will be provided on a quarterly basis, or otherwise, as agreed. Payment should be made upon receipt to:

National Consumer Law Center
Attention: Margaret Kohler
77 Summer Street
10th Floor
Boston, Ma.  02110

June 20, 2007

**<u>Exhibit B</u>**

Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT

2                FOR THE DISTRICT OF DELAWARE

3         Hon. Christopher S. Sontchi - Chapter 11

4              Case Nos. 07-11047 - 11054

5        _____

6    In re:                                      )

7    AMERICAN HOME MORTGAGE HOLDINGS, INC.;   )

8    AMERICAN HOME MORTGAGE INVESTMENT CORP.,)

9    AMERICAN HOME MORTGAGE ACCEPTANCE, INC.,)

10   AHMSV, INC., (f/k/a American Home           )

11   Mortgage Servicing, Inc.); AMERICAN        )

12   HOME MORTGAGE CORP., AMERICAN HOME         )

13   MORTGAGE VENTURES LLC; HOMEGATE            )

14   SETTLEMENT SERVICES, INC., GREAT OAK       )

15   ABSTRACT CORP.,                            )

16                Debtors.                       )

17   _____  )

18

19          DEPOSITION OF MARGOT SAUNDERS

20                Washington, D.C.

21          Monday, February 2, 2009

22

23   Reported by:

24   MARY ANN PAYONK, CRR-RDR, CPC, CCB, CLR

25   JOB NO. 20846

Page 2

```
 1
 2
 3
 4
 5              Monday, February 2, 2009
 6                  11:00 a.m.
 7
 8      Deposition of MARGOT SAUNDERS, held at the
 9  offices of Gilbert Oshinsky LLP, 1100 New York
10  Avenue, N.W., Suite 700, Washington, D.C.,
11  pursuant to Notice before Mary Ann Payonk,
12  Certified Realtime Reporter and notary public of
13  the District of Columbia.
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    (877) 702-9580

Page 3

```
 1  APPEARANCES:
 2  ON BEHALF OF DEBTORS:
 3      JOHN T. DORSEY, ESQUIRE
 4      KAREN E. KELLER, ESQUIRE
 5      YOUNG CONAWAY STARGATT & TAYLOR LLP
 6      The Brandywine Building
 7      1000 West Street, 17th Floor
 8      Wilmington, DE 19801
 9
10  ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED
11  CREDITORS:
12      EDWARD L. SCHNITZER, ESQUIRE
13      HAHN & HESSEN LLP
14      488 Madison Avenue
15      New York, NY 10022
16
17  ON BEHALF OF THE BORROWERS COMMITTEE:
18      STEPHEN A. WEISBROD, ESQUIRE
19      GILBERT OSHINSKY LLP
20      1100 New York Avenue, N.W.
21      Washington, DC 20005
22
23
24
25
```

TSG Reporting - Worldwide    (877) 702-9580

Page 4

```
 1              M. Saunders
 2  M A R G O T   S A U N D E R S,
 3      called as a witness, having been duly
 4      sworn, was examined and testified as
 5      follows:
 6              EXAMINATION
 7  BY MR. DORSEY:
 8      Q.   Good morning, Ms. Saunders. Could
 9  you tell me in what field you consider yourself
10  to be an expert.
11      A.   Consumer law.
12      Q.   And what do you believe qualifies you
13  as an expert in consumer law?
14      A.   I have been practicing consumer law
15  since 19 -- essentially since 1978.
16      Q.   Anything else?
17      A.   In that -- in that -- during those
18  years, I have evaluated situations, credit
19  situations, loans, academic studies, industry
20  studies. I have provided testimony and reports,
21  assistance to attorneys, state and federal
22  administrators, and Congress.
23      Q.   Any other field in which you consider
24  yourself to be an expert?
25      A.   No.
```

TSG Reporting - Worldwide    (877) 702-9580

Page 5

```
 1              M. Saunders
 2      Q.   When were you first contacted by the
 3  Borrowers Committee in this case to provide
 4  expert testimony?
 5      A.   I'd say approximately two weeks ago.
 6  Would you -- if you want a more exact date, I
 7  need to look it up in my day planner.
 8      Q.   That's fine. Approximate is fine.
 9  And how were you contacted?
10      A.   I received an e-mail from one of my
11  colleagues that the Borrowers Committee was
12  looking for an attorney, and the question was
13  asked which one of us might be available to help.
14      Q.   Do you know who the e-mail was from?
15      A.   I think it was either from Diane
16  Thompson or Carolyn Carter.
17      Q.   And did that person tell you how they
18  came to understand that the Borrowers Committee
19  was looking for an expert?
20      A.   I think -- if it was from -- evident
21  in the e-mail was the information that I believe
22  Steve Weisbrod had contacted Diane Thompson.
23      Q.   And following that e-mail, what
24  happened? Did you respond that you were
25  available?
```

TSG Reporting - Worldwide    (877) 702-9580

Page 6

1          M. Saunders
2     A.    Well, there was a flurry of e-mails
3 around among us, and Diane said she could not do
4 it, and I said that I thought I could.
5     Q.    When was the first time you had
6 direct contact with anyone from the Borrowers
7 Committee?
8     A.    Within a few days after that first
9 e-mail.
10    Q.    Who did you contact?
11    A.    I think Diane contacted Steve and
12 told her -- told him that I could -- that I might
13 be able to do it, and he e-mailed me and said he
14 wanted to talk to me. And I do not recall who
15 called who first.
16    Q.    But at some point, you had a
17 conversation with Mr. Weisbrod?
18    A.    Yes.
19    Q.    And when did that conversation take
20 place?
21    A.    Within a few days after the first
22 contact that you requested information about.
23    Q.    And can you summarize for me the gist
24 of that conversation you had with Mr. Weisbrod.
25    A.    He explained to me what was needed.
TSG Reporting - Worldwide    (877) 702-9580

Page 7

1          M. Saunders
2 I asked a lot of questions about the status of
3 the bankruptcy, the ability of homeowners to
4 obtain relief. He asked me some questions, I
5 think, about my qualifications and about what I
6 might write about.
7     Q.    Anything else that you can recall?
8     A.    I think that -- I mean, that's a
9 summary. I'm not giving you every detail because
10 I don't recall every detail.
11    Q.    Sure. What did Mr. Weisbrod tell you
12 about the status of the bankruptcy case?
13    A.    What I recall was that he said that
14 there was an issue regarding homeowners making
15 claims, whether or not enough homeowners had been
16 given the opportunity to make claims, and my job
17 would be to describe what potential claims these
18 homeowners might have and whether or not they
19 might have them -- might become aware of them
20 after the claim date had passed.
21    Q.    And what did he tell you about the
22 ability of the homeowners to obtain relief?
23    A.    In the bankruptcy?
24    Q.    Yes.
25    A.    You know, I'm sure he answered that
TSG Reporting - Worldwide    (877) 702-9580

Page 8

1          M. Saunders
2 question, but I'm not quite sure I understood the
3 answer, so I'm not sure I can relay it to you
4 now.
5     Q.    Okay. What's your understanding as
6 you sit here today about the ability of the
7 homeowners or the borrowers, as the case may be,
8 to obtain relief within the bankruptcy?
9     A.    Under the current status?
10    Q.    Yes.
11    A.    My understanding is that unless
12 things change, if the borrowers have not already
13 filed a claim, that they will not be able to
14 obtain relief relating to their particular claims
15 against the debtors.
16    Q.    And did Mr. Weisbrod explain to you
17 the opinions that he was wanting you to provide
18 in this case?
19    A.    No, he did not.
20    Q.    What did he tell you about the
21 testimony that he was trying to elicit?
22    A.    I think I just described that. He --
23 he said he wanted testimony -- he asked whether I
24 could provide testimony that would describe
25 claims that borrowers have that they may not have
TSG Reporting - Worldwide    (877) 702-9580

Page 9

1          M. Saunders
2 become aware of as of the claims bar date and
3 whether or not these claims would be viable,
4 might result in some compensation to the
5 borrowers.
6     Q.    And when you say that they were
7 viable and might result in compensation to the
8 borrowers, is that within the context of the
9 bankruptcy proceeding?
10    A.    I think not, because I'm not an
11 expert in bankruptcy.
12    Q.    So your opinion was limited to
13 looking at the broader picture if a borrower was
14 to bring a claim in either state or federal court
15 outside the bankruptcy?
16    A.    Yes.
17    Q.    And if we can -- we might as well --
18 I see you have it in front of you, so you might
19 as well take a look at your report. We can mark
20 that as Saunders Exhibit Number 1.
21    (Saunders Exhibit 1 was marked for
22    identification.)
23 BY MR. DORSEY:
24    Q.    And can you take a look at what's
25 been marked for us as Saunders Exhibit Number 1,
TSG Reporting - Worldwide    (877) 702-9580

Page 10

M. Saunders

1  please, and let us know if that is your report
2  that you prepared in connection with your
3  engagement by the Borrowers Committee?
4  A.    Yes, it is my report. It -- I think
5  this particular pile of paper also includes my
6  resume and a list of cases in which -- which I
7  prepared and gave to Mr. Weisbrod and which is a
8  list of cases that I've been retained as an
9  expert witness in and the statement that
10  describes National -- the National Consumers Law
11  Center's terms for hiring me as an expert
12  witness.
13  Q.    After your initial conversation with
14  Mr. Weisbrod, did you have any further
15  conversations with him about your expert opinion?
16  A.    Yes.
17  Q.    When did those conversations take
18  place?
19  A.    Well, in the ensuing days after the
20  initial one. He said he would get back to me,
21  and I think the first conversation was on a
22  Friday, and he -- we eventually spoke again early
23  the following week, which would be -- let's see,
24  today's Monday, so it would be about two weeks

Page 11

M. Saunders

1  ago today, approximately. And that's what I
2  recall.
3  Q.    And what were the nature of those
4  conversations that you had with Mr. Weisbrod?
5  A.    He told me that he was going to -- he
6  wanted -- that they wanted to hire me, and the
7  question was how I would be compensated, how NCLC
8  would be compensated for my services. And there
9  was some discussion back and forth about that,
10  and then eventually he told me to -- that he'd
11  received a -- an order from the court, I believe,
12  that allowed some money to be set aside to pay
13  for our -- for my testimony.
14  Q.    Are you being paid personally, or is
15  this going through the National Consumer Law
16  Center?
17  A.    The latter.
18  Q.    And how are you being compensated?
19  Is it on an hourly basis?
20  A.    It's an hourly basis.
21  Q.    Did you provide any drafts of your
22  report to Mr. Weisbrod?
23  A.    I did provide a draft a week ago
24  today.

Page 12

M. Saunders

1  Q.    Did he provide any comments on that
2  draft?
3  A.    Yes, he did. Mostly, he noted a lot
4  of typos.
5  Q.    Did he --
6  A.    I had essentially only two days, two
7  and a half days to prepare the whole report, so
8  there were quite a bit -- quite a few typos.
9  Q.    Did he make any substantive comments
10  about the content of the report?
11  A.    Not -- not any major comments. There
12  were grammatical problems and the -- it was a
13  draft, and there were comments made, as I
14  requested them to be made, to help clean it up.
15  Q.    Other than grammatical or
16  typographical errors, did he suggest any other
17  changes to your report?
18  A.    Not -- nothing substantial.
19  Q.    What did he suggest beyond
20  typographical and grammatical?
21  A.    I've just described it as best I can.
22  Q.    So I think we missed each other on
23  that question. My question was: Other than
24  grammatical and typographical errors, did he

Page 13

M. Saunders

1  suggest any other changes? You said, nothing
2  substantial.
3  So my question was, what is it that
4  was nothing substantial other than the
5  grammatical and typographical errors?
6  A.    There were comments here and there
7  about perhaps that some points were not as clear
8  as they could have been. There was no request to
9  change major sections, to change the order, to
10  change the points that I was making. There were
11  some suggestions that some points could be made
12  more clearer -- more clearly and that's --
13  Q.    Do you recall which points those
14  were?
15  A.    The only thing I really recall that
16  we had any substantial conversation about was a
17  section in which I had not clearly articulated
18  that there were Truth in Lending violations that
19  resulted even when Truth in Lending appeared to
20  be complied with.
21  Q.    Anything else that you can recall?
22  A.    That's all I recall.
23  Q.    Did he provide you any written
24  comments on your draft report?

M. Saunders

1          M. Saunders
2      A.   No, he did not.
3      Q.   Were there any other drafts other
4  than the first one that we talked about?
5      A.   There were many drafts, all of which
6  were overwritten every time I wrote, but I've --
7  typically, I write and rewrite and rewrite.  And
8  had I had more time, I would have rewritten
9  again.
10      Q.   Did he -- strike that.
11          Did you send a copy of your draft
12  report to Mr. Weisbrod?
13      A.   Yes.
14      Q.   And was it just one or was it more
15  than one draft?
16      A.   Just one draft.
17          MR. DORSEY:  I call for the
18      production of that draft report.
19      Q.   I may have asked this question, but
20  just to make sure, did he provide you with any
21  written comments on the draft?
22      A.   No, he did not.
23      Q.   If we look at your report, you
24  have -- Section 1 is assignment, and this is what
25  you are -- this is the request that came from the

TSG Reporting - Worldwide   (877) 702-9580

M. Saunders

1          M. Saunders
2  Borrowers Committee in terms of what they wanted
3  you to do for your expert report?
4      A.   Yes.
5      Q.   And you have four bullet points here.
6  The first is an explanation of how the loans
7  provided by debtors to borrower homeowners may
8  lead to losses for these borrowers.  Do you see
9  that?
10      A.   Yes.
11      Q.   And when you say "losses for these
12  borrowers," what are you referring to?
13      A.   Financial losses.
14      Q.   And when you refer to
15  borrowers/homeowners, who are you referring to?
16      A.   The people who took out loans from
17  the debtors.
18      Q.   Was it all of the people who took out
19  loans from the debtors?
20      A.   It -- all -- it's -- I think by
21  borrower/homeowners, I mean borrower/homeowners
22  who I am later describing in this report who are
23  homeowners who took out payment-option ARM loans.
24      Q.   Did you understand that American Home
25  Mortgage was a lender in other types of mortgage

TSG Reporting - Worldwide   (877) 702-9580

M. Saunders

1          M. Saunders
2  products as well?
3      A.   I did.
4      Q.   But you aren't providing an opinion
5  with regard to any of those other products?
6      A.   No, because I was --
7          MR. WEISBROD:  Objection to form.
8      I'm not sure if I missed something, but
9      I'm not sure we know which other
10      products you're talking about.
11          MR. DORSEY:  Well, she said she
12      understood that there were other
13      products.
14      Q.   So whatever you understood those
15  products to be.
16      A.   I understood that there were other
17  products.  I did not know what those other
18  products were, so I focused on the products that
19  I understood were clearly made, which were
20  payment-option ARMs.
21      Q.   And was that something that was
22  brought to your attention by the Borrowers
23  Committee, the payment-option ARM product?
24      A.   Yes.
25      Q.   And on your second bullet point is

TSG Reporting - Worldwide   (877) 702-9580

M. Saunders

1          M. Saunders
2  the theories of legal liability available to
3  these borrowers in state and federal court to
4  redress their losses.  Those are theories of
5  recovery that you've discussed in your report
6  here; is that correct?
7      A.   Yes.
8      Q.   Other than the theories that you
9  specifically discuss in Section 5 -- excuse me --
10  6 of your report, are there other potential
11  theories of recovery that a borrower may have
12  under payment-option --
13      A.   There may be.  Not that I'm aware of.
14      Q.   Did the Borrowers Committee provide
15  you with any documents in connection with your
16  work on the report?
17      A.   Yes.
18      Q.   What documents did they provide you
19  with?
20      A.   They provided me with the loan
21  documents of four borrowers and as well as some
22  bankruptcy proceeding material.
23      Q.   What were the -- excuse me.  Who were
24  the four borrowers that they provided you files
25  for?

TSG Reporting - Worldwide   (877) 702-9580

Page 18

M. Saunders

1        M. Saunders
2    A.    One was Tilton Jack, one was
3  Miss Dandridge, one was Gray -- Graves, and one
4  was another, which I was -- did not find to be
5  relevant, because it wasn't an American Home
6  Mortgage borrower, so I didn't review -- I
7  don't -- I have the materials to refer to if
8  you'd like me to, but I don't even remember the
9  name of that borrower.
10    Q.    So were you able to determine by
11  looking at the loan files that it wasn't an
12  American Home Mortgage product?
13    A.    It appeared not to be, that's right.
14  American Home was instead a servicer.
15    Q.    And what were the records that they
16  provided you with regard to the three other
17  borrowers that you referred to, Mr. Jack,
18  Miss Dandridge, and Miss Graves?
19    A.    The Graves loan was not -- the
20  words -- there were not sufficient documents in
21  the Graves loan that allowed me to do even the
22  analysis, the limited analysis that I did on the
23  Dandridge and Tilton Jack loan, so I did not do
24  that.
25        I -- I believe there was not a Truth

TSG Reporting - Worldwide    (877) 702-9580

Page 19

M. Saunders

1        M. Saunders
2  in Lending included in that.  I'm not positive,
3  but I remember I was unable to do the analysis.
4  On the Dandridge and the Tilton Jack loan, I had
5  least the note and the deed -- the Truth in
6  Lending disclosure.  I think on the Dandridge
7  loan I also had an addendum to the note.  On the
8  Tilton Jack loan, I had many other materials.
9        On the Dandridge loan I believe I
10  also had a servicing document.  On the Tilton
11  Jack loan I had several servicing documents as
12  well as a complaint, which gave me a lot of
13  information on which I relied for the report.
14    Q.    Other than those three loans, have
15  you reviewed any other location documents
16  relating to AHM products?
17    A.    Not -- particular loan documents,
18  meaning the documents provided to the borrowers?
19    Q.    Yes.
20    A.    Not that I'm aware of.  Not that I
21  recall.
22    Q.    Have you ever been involved in a
23  lawsuit where AHM was a defendant?
24    A.    Not that I recall.
25    Q.    Going back to your report, the third

TSG Reporting - Worldwide    (877) 702-9580

Page 20

M. Saunders

1        M. Saunders
2  bullet point is, you say, an explanation of when
3  borrowers become aware that they may have these
4  legal claims, and that relates to your statements
5  in the report that they generally don't become
6  aware of them until after the loan resets; is
7  that correct?
8    A.    Yes.
9    Q.    And that's based upon what?
10    A.    That's based upon the work that I
11  have been doing for the last 30 years with Legal
12  Aid and private attorneys representing borrows,
13  consumers in mortgage loans, and just -- as well
14  as the work that I did before I joined NCLC when
15  I was representing borrowers directly, homeowners
16  or debtors directly.
17    Q.    Okay.  And -- strike that.
18        Have you ever testified as an expert
19  witness before in court?
20    A.    I've never testified in court.
21    Q.    So you've never been qualified as an
22  expert witness by a court?
23    A.    No.
24    Q.    Have you ever been retained as an
25  expert for the purposes of testifying in court

TSG Reporting - Worldwide    (877) 702-9580

Page 21

M. Saunders

1        M. Saunders
2  other than this one?
3    A.    Yes.
4    Q.    And how many times?
5    A.    Not counting this one?
6    Q.    Correct.
7    A.    Fifteen times.  Well, no.  This
8  doesn't have -- this does not have a -- one -- 16
9  times.
10    Q.    There's one other one that's not on
11  the list here?
12    A.    There's one that just -- just was
13  added within the last few weeks that did not make
14  it on this list.
15    Q.    Do you recall the name of that case?
16    A.    I was afraid you were going to ask
17  that.  I can get you that after lunch, but I just
18  don't remember.  I can give you the defendant's
19  name.  The defendant is City Mortgage.  It's a
20  West Virginia case.
21    Q.    And have you ever been denied by a
22  court the opportunity to appear and testify as an
23  expert witness?
24    A.    Yes.
25    Q.    And how many times has that occurred?

TSG Reporting - Worldwide    (877) 702-9580

Page 22

```
1           M. Saunders
2    A.    Once.
3    Q.    Which case was that?
4    A.    Mitchell versus Residential Funding
5    Corp.
6    Q.    That's number 12 on the list that you
7    provided?
8    A.    Number 12 on the list, yes.
9    Q.    And why did the Court in that case
10   deny you the ability to appear and testify as an
11   expert?
12   A.    I had not seen the order, but my
13   understanding was that I was denied for two
14   reasons. One was that the testimony that I was
15   asked to give was a matter -- question that went
16   to the law, and the second was that the -- the
17   other part of the testimony had not been
18   provided -- I had not been -- the plaintiffs had
19   not been -- had not notified the defense that
20   they wanted to -- me to testify as to that point
21   in the proper format or in the proper time.
22   Q.    And what was the opinion that you
23   were intending to give in that case?
24   A.    I had been asked by the attorneys in
25   that case to provide information on the purpose
```
          TSG Reporting - Worldwide    (877) 702-9580

Page 23

```
1           M. Saunders
2    of the Homeowner's Equity -- Home Ownership
3    Equity Protection Act of 1995 and how it related
4    to the obligation of assignees on the loans to do
5    their -- to do due diligence and ensure that
6    there were no problems with the underlying --
7    legal problems with the underlying loans.
8           I had told the counsel that I thought
9    this was a problem, and they nevertheless thought
10   that my testimony would be admitted, so --
11   Q.    And the remaining cases that you have
12   been retained as an expert witness where you did
13   not give testimony in court, why did you not
14   testify in court?
15   A.    All but -- well, all through 11 all
16   settled. Number 13 settled. 14 is currently on
17   appeal. 15 is pending, and that's scheduled for
18   trial in June, I think. So the opportunity has
19   not arisen.
20   Q.    In any of these cases, have you
21   provided an opinion similar to the opinion that
22   you've been asked to give in this case?
23   A.    No. The -- all of these cases --
24   well, I provided an expert opinion in most of
25   these cases, not every single one, but in most of
```
          TSG Reporting - Worldwide    (877) 702-9580

Page 24

```
1           M. Saunders
2    them. And when I did provide an opinion, it was
3    related to the specific facts of that case.
4           It wasn't a summary analysis of
5    potential claims. It was more an analysis of how
6    the particular loan may have violated industry
7    standards.
8    Q.    Each of these cases was an individual
9    suing for some violation, they believe, of law
10   relating to their mortgage loan? Let me strike
11   that and ask you an easier question.
12          Were any of these a class action
13   lawsuit?
14   A.    Mitchell versus Residential Funding
15   was a class action lawsuit.
16   Q.    That's the one where you were denied?
17   A.    Yes. I don't think any of the others
18   were class actions, the -- any of the others in
19   which I have been retained as an expert. You'll
20   note at the bottom that I provided an affidavit
21   in this case pending in the Third Circuit, and
22   that was a class action. I was technically hired
23   as a consultant to provide that affidavit.
24   Q.    And do you know whether that
25   affidavit was admitted into evidence in that
```
          TSG Reporting - Worldwide    (877) 702-9580

Page 25

```
1           M. Saunders
2    proceeding?
3    A.    I do not know. I also --
4    Q.    What was the date of that case?
5    There's no date on it that you have listed here.
6    A.    Oh, I'm sorry. I think it was two
7    years ago that I provided the affidavit, 2007.
8    If you want a more exact -- if you want me to be
9    sure, I can check and get back to you.
10   Q.    And I'm sorry I cut you off. You
11   were going to say --
12   A.    I also provided -- I'm not sure it
13   was called -- it was not an affidavit, but a
14   report to the court, to the Federal District
15   Court in the Northern District of Illinois, that
16   was neither called an expert report nor an
17   affidavit, but it was a report prepared for the
18   FTC in a case that they are litigating relating
19   to mortgage loans.
20   Q.    Is that case referred to anywhere in
21   your report?
22   A.    I think I put it -- I described it,
23   actually, yes. It's described at the bottom of
24   page 2 and the top of page 3.
25   Q.    And what was the nature of the report
```
          TSG Reporting - Worldwide    (877) 702-9580

## Page 26

M. Saunders

2 that you provided in that case?

3    A.   They had approximately 50 loans that

4 were the subject matter of their case, and they

5 wanted a fairly complex numerical analysis of the

6 loans along with an assessment of what -- of how

7 these loans might have violated specifically

8 federal Truth in Lending law and the Home

9 Ownership Equity Protection Act, and how those

10 claims would have resulted in damages, and how

11 much those damages would have resulted -- would

12 have been -- what -- or -- the proper tense is

13 "are," not "were."

14    Q.   Do you know if that case has been

15 resolved?

16    A.   I think not. I'm not sure.

17    Q.   Going back to your assignment,

18 Section 1 of your report again, the last bullet

19 point is illustrations of successful resolution

20 of your claims. That's where you describe cases

21 where courts have made rulings about the

22 potential causes of action that a borrower might

23 have against a lender; correct?

24    A.   Yes.

25    Q.   In any of these four opinions that

TSG Reporting - Worldwide   (877) 702-9580

## Page 27

M. Saunders

2 you are giving, is there any scientific knowledge

3 that you applied to coming up with these

4 opinions?

5    A.   Scientific knowledge? Do I use

6 chemistry, biology, that kind of science? No. I

7 think that my analysis is careful and based on

8 evaluation of the data and reasonable conclusions

9 from that data.

10    Q.   And when you say "data," what data

11 are you referring to?

12    A.   The data that I refer to in the

13 report, which is both the -- well, it depends on

14 what conclusion you're talking about. But --

15    Q.   Okay. Did you perform any

16 statistical analysis with regard to this report?

17    A.   I personally did not perform any

18 statistical analysis.

19    Q.   Is there any technical knowledge that

20 you applied in coming up with your opinions in

21 this report?

22      MR. WEISBROD: Objection to form,

23    ambiguous.

24    Q.   You can answer.

25    A.   Yes. I think that the analysis of

TSG Reporting - Worldwide   (877) 702-9580

## Page 28

M. Saunders

2 documents to determine Truth in Lending

3 compliance has long been considered in a legal

4 profession fairly technical, so I would say that

5 my analysis is somewhat technical.

6    Q.   So the -- the analysis of documents,

7 what documents are you referring to? The loan

8 files?

9    A.   The loan files.

10    Q.   Is it not true that a court could

11 look at a loan document and determine whether or

12 not there's violations of law?

13    A.   There's no doubt that a court could.

14 But as I've noted, I've been hired several times

15 to do that for the courts because of the

16 complexity of both understanding what these

17 documents -- what loan documents mean and

18 applying a very complicated law to those

19 documents, as well as the -- doing the credit

20 math to determine how these loans work.

21    Q.   Did you do any credit math to

22 determine how the loans work for in this -- for

23 these purposes of these opinions?

24    A.   I have done credit math on

25 payment-option ARM loans several times, and I

TSG Reporting - Worldwide   (877) 702-9580

## Page 29

M. Saunders

2 relied on that experience to -- for my opinions

3 and articulate my responses to these -- to this

4 assignment.

5    Q.   You've done credit math on

6 payment-option ARMs as it relates to the opinions

7 that you're providing in this case?

8    A.   Yes.

9    Q.   And what math did you perform?

10    A.   It's very complicated to figure out

11 exactly how a payment-option ARM will evolve when

12 you -- and it's very complicated to figure out

13 how a Truth in Lending -- whether a Truth in

14 Lending disclosure is proper.

15      I did not do in this case a Truth in

16 Lending analysis -- a credit math analysis for

17 the Truth in Lending disclosures, because I

18 didn't have sufficient information. But I have

19 done that in payment-option ARM loans with terms

20 much like these in this -- much like the American

21 Home Mortgage loans. So I understand how to do

22 it and I can describe it. It is complex.

23    Q.   Do you have a -- any specific

24 training in mathematics?

25    A.   I have trained myself. I write

TSG Reporting - Worldwide   (877) 702-9580

Page 30

1          M. Saunders
2    several credit math sections for our manuals.  I
3    teach credit math at numerous conferences.  I
4    routinely provide credit math analyses for
5    lawyers.  I have met with and provide credit math
6    analyses for the Federal Reserve Board and for
7    Congress.
8        Q.    But my question was, do you have any
9    specific training in mathematics?
10       A.    Other than that which I trained
11   myself, I don't have a degree in mathematics.
12       Q.    I believe you mentioned that you've
13   on different occasions provided reports to the
14   courts or for the benefit of the courts on the
15   potential types of claims that might be
16   available.  Have you ever been retained as an
17   expert by a court of law as opposed to by a
18   litigant in a case?
19       A.    No.
20       Q.    So when you say you're providing
21   reports for the benefit of the court, you're
22   doing that really on behalf of one of the
23   litigants to the case who asked you to provide
24   that report; correct?
25       A.    Yes.

TSG Reporting - Worldwide    (877) 702-9580

Page 31

1          M. Saunders
2        Q.    I'd like to look at the very last
3    sentence of your report, in the conclusion
4    section on page 22.  And you state there,
5    "Nevertheless, if the debtors hold the loan,
6    these legal claims are often all they," meaning
7    the borrowers, "will have," and I think you meant
8    to include "to avert foreclosure and the loss of
9    their homes."  Is that correct?
10       A.    That's what it says.
11       Q.    Okay.  If the debtors don't hold
12   these loans, would that change your opinions in
13   this case?
14           MR. WEISBROD:  Objection to form.
15       Which opinions?
16           MR. DORSEY:  All of them.
17       A.    The legal claims are also
18   available -- the legal claims can also be brought
19   against the assignees.  They are harder to prove
20   and there are other issues that need to be
21   overcome, but that's what I was alluding to.
22       Q.    How would it change your opinion
23   about whether these kinds of claims could be
24   brought against the debtors if the debtors don't
25   actually hold any of these loans?

TSG Reporting - Worldwide    (877) 702-9580

Page 32

1          M. Saunders
2        A.    I don't understand the question.
3        Q.    You understand that the debtors, in
4    fact, do not hold any loans; correct?
5        A.    I did not know that.
6        Q.    The fact that they do not hold any
7    loans, they've sold them all off, does that
8    affect the ability of a claimant to bring an
9    action against the debtor?
10       A.    Does the fact that the debtor doesn't
11   hold the loan affect the borrower's ability to
12   bring the action against the lender -- against
13   the debtor?
14       Q.    Yes.
15       A.    No.  The fact that the debtor doesn't
16   hold the loan when the debtor is in bankruptcy
17   means that there -- let me turn that -- I'm
18   trying to say too many things at once.
19           If the debtor holds the loan and the
20   debtor is in bankruptcy, there is no one else to
21   answer for the losses to the homeowners.
22           If the debtor does not hold the loan
23   and an assignee holds the loan, then the borrower
24   can potentially sue both the debtor and the
25   assignee for the claims that the borrower would

TSG Reporting - Worldwide    (877) 702-9580

Page 33

1          M. Saunders
2    have against the debtor.
3           If the borrower sues the assignee,
4    there are legal challenges that the borrower has
5    to overcome as against the assignee, because most
6    assignees have holder in due course status or
7    will at least assert that status, which relieves
8    them of some liability for the claims that the
9    borrowers might have against the debtors.
10       Q.    What about a claim for rescission
11   against the asset?
12       A.    Truth in Lending provides that
13   assignees are liable for rescission claims.
14       Q.    And that is not a claim that a
15   borrower would bring against a debtor in this
16   case if they don't own the loan; correct?
17   They'd bring it against the assignee?
18       A.    One problem that homeowner/borrowers
19   typically have is they don't know who owns the
20   loan, so attorneys representing borrowers will
21   try to bring claims against as many in the chain
22   as possible so as not to be thrown out of court
23   because they fail to include the proper one.
24           (Discussion held off the record.)
25       Q.    My question, though, was if, in fact,

TSG Reporting - Worldwide    (877) 702-9580

Page 34

```
1              M. Saunders
2    the debtors don't own a particular loan and the
3    borrower wants to bring an action regardless of
4    whether the borrower's attorney might try to
5    bring that action, would a claim for rescission
6    against the borrowers be something that would
7    stand up to a legal challenge?
8            MR. WEISBROD:  I think you
9        misspoke, so I object to form.  You mean
10       a claim for rescission against the
11       debtors.
12           MR. DORSEY:  Yes.
13       A.   I'm still unclear.  So the -- can you
14   walk me through your question one more time,
15   please.
16       Q.   Sure.  American Home Mortgage
17   originated a loan, let's say.
18       A.   Uh-huh.
19       Q.   A payment-option ARM loan.  Either
20   prior to the bankruptcy or after the filing of
21   the bankruptcy, the debtors sold that loan to
22   somebody else.
23       A.   All right.
24       Q.   And the borrower now wants to bring a
25   claim for rescission.  Are they going to sue
```
TSG Reporting - Worldwide    (877) 702-9580

Page 35

```
1              M. Saunders
2    the -- is the borrower going to sue the debtor or
3    the assignee in order to rescind the loan?
4        A.   The borrower will sue -- probably sue
5    the debtor, the servicer, and the assignee
6    because the borrower won't -- the borrower's
7    attorney won't know who will own the loan at any
8    one time.  Quite often when the lawsuit is
9    brought, the assignee sends the loan back to the
10   originator.  So to be careful, most attorneys
11   bring the case against all the parties.
12       Q.   I understand that's what they might
13   do, but my question is:  Will that stand up to a
14   legal challenge if the debtors don't own the
15   loan?
16       A.   I don't -- that's where I'm confused.
17   I don't understand the legal challenge.  The
18   question -- if the sole issue is whether the
19   rescission by the homeowner is proper, then as to
20   whether or not the debtor -- excuse me, the
21   American Home Mortgage in this situation is
22   liable for the rescission, the question will be
23   no, they're not liable.
24           But the issue is not going to be
25   who's liable, the issue is going to be whether or
```
TSG Reporting - Worldwide    (877) 702-9580

Page 36

```
1              M. Saunders
2    not the rescission is valid.  So that's my
3    confusion.  It's -- a legal challenge as to
4    rescission against the debtor doesn't really make
5    sense.
6        Q.   Let me try it this way.  And I think
7    you've answered my question, but if there was a
8    claim against the debtor for rescission and they
9    didn't own the loan, there's no relief that the
10   borrower could obtain from the debtor; correct?
11       A.   If they didn't own the loan and the
12   sole issue was rescission, that's probably true.
13       Q.   Okay.  If the debtor doesn't own the
14   loan and the borrower wants to bring a claim
15   other than rescission, what kind of claims could
16   the borrower bring against the debtor?
17       A.   Well, generally, most of the
18   origination claims, most of the claims relating
19   to problems in the origination are brought
20   against the debtor, brought against the
21   originating lender.
22           And whether or not those claims are
23   also able to be mounted against the assignee is a
24   much more complicated question.  The assignees
25   will generally say we're not responsible for the
```
TSG Reporting - Worldwide    (877) 702-9580

Page 37

```
1              M. Saunders
2    mistakes or for the violations of law that the
3    originating lender made.  We're a holder in due
4    course.  We don't have to answer for those
5    claims.
6        Q.   And what specifically would be those
7    types of claims that you're referring to?
8        A.   Fraud, deception, breach of contract,
9    breach of good faith and fair dealing,
10   misrepresentation.  There are state law -- there
11   are state laws that require certain behavior
12   during origination that may be alleged that the
13   debtor violated.
14       Q.   What about Truth in Lending Act
15   claims?
16       A.   Truth in Lending claims are -- other
17   than rescission, do you mean?
18       Q.   Yes.
19       A.   Truth in Lending claims can be
20   mounted successfully against the assignee so long
21   as they are apparent on the face of the document.
22   Most of those -- most Truth in Lending claims
23   should be available against assignees, not all of
24   them.
25       Q.   What ones wouldn't be available?
```
TSG Reporting - Worldwide    (877) 702-9580

M. Saunders

1               M. Saunders
2    A.   To the extent that someone is
3 claiming that the actual facts surrounding the
4 closing of the loan indicate that the charges
5 were not -- were not accurately disclosed on the
6 HUD-1 such that they were not accurately
7 reflected in the Truth in Lending disclosure,
8 that would be a Truth in Lending claim that
9 would -- could be brought that would -- would
10 fall outside -- that would not be able to be
11 successfully pursued against an assignee because
12 the assignee could defend and say we couldn't
13 tell from the documents that this Truth in
14 Lending claim existed.
15    Q.   Let's turn to page 13 of your report.
16 And this is Section 6 is what I'm referring to,
17 the summary of legal claims.
18    A.   Yes.
19    Q.   And you outline nine different
20 potential claims that could be brought on behalf
21 of a borrower against a lender relating to
22 payment-option ARMS; correct?
23    A.   Yes.
24    Q.   And in the subsequent portion of this
25 report you discuss in detail three of those

1               M. Saunders
2 potential claims: the failure to determine the
3 borrower's ability to repay the loan, fraud and
4 deception, and Truth in Lending Act claims;
5 correct?
6    A.   Yes.
7    Q.   Is there a reason you didn't discuss
8 the other six potential causes of action?
9    A.   Time limits. I ended up writing this
10 whole report in about two days.
11    Q.   And if we look at the section on
12 lender's failure to determine borrower's ability
13 to repay the loan, what is the basis for that
14 claim? The legal basis. Is it statutory? Is it
15 common law?
16    A.   In some states it's statutory and
17 some states it's common law.
18    Q.   So it varies from state to state?
19    A.   Yes.
20    Q.   What's the remedy available to the
21 borrower for that kind of a claim?
22    A.   It depends on the state and the
23 court. As you can see, in Massachusetts the
24 remedy was designed specifically by the court in
25 conjunction with the Attorney General to be

1               M. Saunders
2 injunctive and essentially to say that because,
3 in this case, this lender was found to routinely
4 make loans that -- without determining the
5 ability of the borrower to repay, they were not
6 going to allow any foreclosures to proceed unless
7 they fit within certain parameters.
8    Q.   What are the other potential types of
9 recoveries or remedies?
10    A.   In West Virginia I know that there
11 are -- the claims are based -- these claims are
12 based in unconscionability, and the remedy is
13 voiding the loan.
14    Q.   Anything else?
15    A.   In other states the claims can be the
16 basis for damages, reducing the loan amount.
17    Q.   Are you aware of any cases where a
18 court has awarded damages under this theory of
19 liability?
20    A.   I'm aware of a number of cases that
21 have been brought, many cases that have been
22 brought using this theory of liability that have
23 been settled. And unfortunately, most of those
24 settlements are confidential settlements.
25        But they are -- this is a standard

1               M. Saunders
2 theory of liability that is used by attorneys
3 dealing with these loans in particular, as well
4 as other kinds of loans that have led to losses,
5 foreclosures.
6    Q.   And what's the basis for your
7 knowledge that in these -- in cases where -- let
8 me strike that to make sure I understand your
9 testimony first.
10        Are you saying the cases that you're
11 aware of where there were actual damages awarded,
12 are you talking about settlements or judgments
13 against --
14    A.   Settlements.
15    Q.   Settlements. Are there any cases
16 you're aware of where a court has entered a
17 judgment awarding damages for this particular
18 theory of liability, that the lender failed to
19 determine the borrower's ability to repay the
20 loan?
21    A.   I am not aware at this time of cases
22 in which courts have awarded damages, but I am
23 aware of numerous settlements.
24    Q.   And in the cases that have settled,
25 are they specifically settling for a damage

1          M. Saunders
2   amount, this particular cause of action, the
3   lender's failure to determine --
4        A.   I am not -- I am not generally told
5   the specific terms of the settlements other than
6   the fact that they are -- that the borrowers are
7   satisfied, the homeowners are satisfied.
8        Q.   And in those cases that you're aware
9   of, were there claims other than just the
10  lender's failure to determine borrower's ability
11  to repay that were included in those?
12       A.   Typically, yes.
13       Q.   As you sit here today, you can't tell
14  whether the lender in those cases was settling
15  this particular claim or some other claim?
16       MR. WEISBROD:  Objection to form.
17       A.   I think I've answered that already.
18  The settlements are confidential, so I don't know
19  exactly what the terms of settlements are.  I can
20  conjecture, but I can't tell you that I know for
21  sure.
22       Q.   In your report, you -- and you've
23  made mention of this, the Massachusetts case
24  where the State Attorney General brought suit
25  under state law theories of liability for

1          M. Saunders
2   deceptive or unfair trade practices.  Correct?
3        A.   Yes.
4        Q.   And in that case, the Court ordered
5   an injunction that precluded the lender from
6   foreclosing on the properties without first
7   trying to work it out with the lender -- or,
8   excuse me, with the borrower and then going
9   through the Attorney General's office for
10  permission; correct?
11       A.   Yes.
12       Q.   And in this particular case, again,
13  if the borrowers don't own any of these loans,
14  there would be no injunction that could be
15  entered to prevent the debtors from foreclosing
16  on those loans because they wouldn't be the ones
17  doing the foreclosing; correct?
18       A.   That's right.  However, they would
19  be -- their practices in making the loans would
20  be very relevant in determining whether or not
21  these claims applied.  And if they're not
22  available to be brought into court, it's much
23  more difficult for everybody to prove whether
24  these practices actually existed.  The absent
25  chair or the empty chair causes a significant

1          M. Saunders
2   problem in litigation in cases like this.
3        Q.   So the -- American Home would have to
4   be brought in as a defendant simply for the
5   purposes of proving or disproving the practices
6   that they engaged in?
7        A.   Of being available to answer the
8   questions of whether or not -- of how these loans
9   were made.  But the -- the -- the specific
10  underwriting criteria and practices would be
11  relevant, very relevant.
12       Q.   In the Massachusetts case that you
13  referred to in your report, that was decided on a
14  motion for preliminary injunction; correct?
15       A.   Yes.  I think so.
16       Q.   And specifically, the Court looked at
17  the loan documents and determined that loans that
18  had four particular characteristics would be
19  considered unfair under Massachusetts law;
20  correct?
21       A.   I don't know what exactly the Court
22  looked at.
23       Q.   Does it describe in the opinion what
24  the Court looked at?
25       A.   Yes, but I do -- I do not know that

1          M. Saunders
2   the Court did not also look at other documents.
3   I know that in -- generally, when cases are
4   litigated where this is claimed, the underwriting
5   criteria of the lender is very relevant, as is
6   the loan documents that are in the lender's
7   files.  And --
8        Q.   Well, you state in your report on
9   that page, page 14, under Section A1, second
10  paragraph, "Increasingly, courts regard lending
11  when there is no ability to repay as per se
12  unfair and deceptive act or practice."
13       A.   Uh-huh.
14       Q.   Correct?  So "per se" would be on its
15  face; right?
16       A.   Yes.  Well, actually, I forgot about
17  the Martinez case.
18       Q.   What about the Martinez case?
19       A.   I believe that the issue in the
20  Martinez -- I don't remember that case
21  specifically, but I believe that the issue in the
22  Martinez case was the lender's failure to
23  determine the borrower's ability to repay.
24  Again, if I can -- if you will allow me to
25  refresh my memory, I will answer that more fully.

Page 46

1              M. Saunders
2      Q.    Martinez case was an opinion based on
3  a motion to dismiss the complaint under Rule
4  12(b)(6)?
5      A.   Right.
6      Q.    And a Court denied that motion?
7      A.   Right. And then, of course, there
8  are also the settlements between states'
9  attorneys general and Countrywide and Bank of
10  America, which is premised on Countrywide's
11  failure to determine the ability to repay
12  routinely.
13      Q.    And that was an out-of-court
14  settlement; correct?
15      A.   Yes, it was.
16      Q.    And you make reference to that Bank
17  of America settlement on page 16 of your report
18  and under Section 3, examples of other cases
19  challenging failure to determine ability to
20  repay.
21          And you say in the last sentence of
22  that section, "Bank of America has pledged over
23  $8.4 billion to address the extensive wrongs to
24  over 400,000 borrowers," etc. Correct?
25      A.   Yes.

Page 47

1              M. Saunders
2      Q.    That $8.4 billion, was that a pot of
3  money that Bank of America has put up to pay
4  these people settlements?
5      A.   That's my understanding.
6      Q.    Have you read the news reports about
7  what that settlement actually entails?
8      A.   I have.
9      Q.    Are you aware, then, that part of it
10  is that the Bank of America has agreed to seek to
11  work out with those homeowners resolutions so
12  that they can remain in their homes?
13      A.   Yes.
14      Q.    As a part of that, it would be
15  reducing the interest rate and --
16      A.   And they have assigned a monetary
17  cost to that, all of which adds up to
18  $8.4 billion. They're not paying -- it's not
19  writing checks to homeowners.
20      Q.    That was my question initially.
21      A.   Yes.
22      Q.    That it wasn't a pot of money,
23  it's --
24      A.   Yes, it's -- it is a pot of money,
25  but it's to be distributed in ways in addition to

Page 48

1              M. Saunders
2  writing checks to homeowners.
3      Q.    Which would result in a write-down by
4  Bank of America as opposed to them actually
5  sending a check out to somebody?
6      A.   That's right. I believe there are
7  some -- I believe that there are some cases
8  brought by attorneys general against Bank of
9  America and Countrywide for this behavior that
10  have not yet settled. Specifically in West
11  Virginia, I don't think that case has settled.
12  It may have, but that was premised on
13  Countrywide's failure to determine the ability to
14  repay.
15      Q.    And those, the cases where Bank of
16  America has settled or the settlement that it
17  entered into with the numerous attorneys general
18  from California, Illinois, and Florida, those
19  were based on loans that were originated by
20  Countrywide; correct?
21      A.   Yes.
22      Q.    And Countrywide still owns those
23  loans that are at issue; correct?
24      A.   I don't know. I think they're -- I
25  don't think that statement's true, because I know

Page 49

1              M. Saunders
2  that there have been some lawsuits by investors
3  against Countrywide and -- or Bank of America
4  relating to this settlement, and the investors
5  would then be the owners.
6          (A luncheon recess was taken from 12:07 p.m.
7          through 12:49 p.m.)
8          - AFTERNOON SESSION -
9  BY MR. DORSEY:
10      Q.    Ms. Saunders, I'd like to go back to
11  your report, if we could, page 16, Subsection B,
12  fraud or deception.
13      A.   Yes.
14      Q.    You make a statement in the second
15  sentence of the opening paragraph that says,
16  "Indeed, these claims are so widespread that
17  quite often one case is proven through the
18  testimony or proffered testimony of other
19  victims."
20      A.   Yes.
21      Q.    Do you see that? What cases are you
22  referring to where a court has entered a judgment
23  based on the testimony of other victims?
24      A.   The Kanawha County, West Virginia
25  case that appears on the next page, Pauley versus

Page 50

1          M. Saunders
2    Chevy Chase Bank and Allied Home Mortgage. That
3    was a jury trial that a number of witnesses that
4    are called pattern witnesses were put on the
5    stand to testify about the typicality of the
6    deception. These witnesses testified to that,
7    and then the case settled right before the jury
8    came back, on very favorable terms.
9          The other witnesses were then -- each
10   had a case brought by them again where there was
11   numerous witnesses willing to testify, and they
12   all settled on very favorable terms. These cases
13   were not subject to a confidentiality order, and
14   I think I -- yes, I did. I stated the amounts
15   that they settled for in paragraph labeled number
16   2 on page 17.
17   Q.    And which case was this? Oh, let me
18   back up a minute. You mentioned a couple of
19   cases. One, you mentioned the Kanawha County,
20   West Virginia case. That's what you have listed
21   as item number 1 on Section 2 on page 17.
22   A.    Kanawha County, yes.
23   Q.    Kanawha, County. And that was a case
24   for claiming that the marketing of the loans was
25   improper, correct?

Page 51

1          M. Saunders
2    A.    And the loan itself. The loan -- the
3    case was brought against both the lender and the
4    broker, and I believe there were separate
5    settlements with both parties.
6    Q.    And do you know how much the
7    settlement was as between the two parties?
8    A.    I do not.
9    Q.    Do you recall what the allegations
10   were that were made in the complaint?
11   A.    I think general fraud, deception,
12   unconscionability. I cannot be sure I have seen
13   that complaint, but it's been a while. If you'd
14   like, I can get back to that on that.
15   Q.    So it went beyond just the marketing
16   of the loans; correct?
17   A.    I think so, yes.
18   Q.    And the other case that you referred
19   to was which one?
20   A.    Next one down. Those are actually
21   three separate cases that I lumped together.
22   Q.    And this again was the borrowers and
23   the -- or, excuse me, the broker and the lender
24   were settling with the borrowers?
25   A.    Yes.

Page 52

1          M. Saunders
2    Q.    Do you know how much respectively was
3    paid by each party?
4    A.    I do not. I -- I believe they are
5    joint tortfeasors so that both parties are wholly
6    liable for the entire amount required to be paid,
7    but it was a settlement, and I did not ask the
8    attorney for the specific amounts.
9    Q.    Okay. Going back to the Pauley
10   versus Chevy Chase Bank case, number 1 you have
11   listed there, you say, "The lender and the broker
12   settled by paying the homeowner $300,000." Was
13   this a single homeowner, or was this a class
14   action?
15   A.    Single homeowner.
16   Q.    And what specifically was the
17   testimony of other parties that substantiated the
18   claim of fraud or deception?
19   A.    I was not at the trial. I am just
20   repeating to you what I was told by the attorney.
21   And what I was told was that he had several other
22   witnesses, all of whom were borrowers from, I
23   think in this case, the broker, who articulated
24   the marketing and other practices relating to the
25   deception that went into getting this loan or

Page 53

1          M. Saunders
2    being sold these loans.
3    Q.    Did the homeowner in that case
4    testify as well?
5    A.    Yes.
6    Q.    So as you sit here today, you can't
7    tell me that the homeowner in that case
8    substantiated his claim by proffering the
9    testimony of other --
10   A.    Yes, I can. That's exactly what I'm
11   saying.
12   Q.    And that's based on a conversation
13   that you had with the plaintiff's attorney in
14   that case; correct?
15   A.    Yes.
16   Q.    Did you review the transcripts of
17   that hearing?
18   A.    No. I prepared for this report by
19   contacting attorneys that I knew who had these
20   cases. I have no doubt that the -- that what
21   I've put down here is true, though.
22   Q.    Was that a confidential settlement?
23   A.    No, it was not.
24   Q.    And in the next case. The Berkeley
25   County, case number 2 --

## Page 54

M. Saunders

1
2  A.   Yes.
3  Q.   -- that was also -- your
4  understanding of that is based on your
5  conversation with the plaintiff's attorney in
6  that case?
7  A.   Yes.
8  Q.   Did you contact the defense attorneys
9  in either of those cases to get their take on the
10  case?
11  A.   No, I did not. But I have no doubt
12  that the plaintiff's attorney wouldn't have told
13  me there was a settlement, as I have articulated
14  it, if there was not a settlement.
15  Q.   But you don't know what claims in
16  particular the parties were settling?
17  A.   I think they were settling all of the
18  claims, fraud, deception, unconscionability.
19  Q.   Did you review the complaints in
20  those cases?
21  A.   As I said, I think I saw the
22  complaint in the Pauley case. I did not -- I
23  don't believe I saw the other claims -- or the
24  other complaints, excuse me.
25  Q.   The third entry on that page, page 17

TSG Reporting - Worldwide    (877) 702-9580

## Page 55

M. Saunders

1
2  of your report, the Brooklyn, New York, case.
3  A.   Yes.
4  Q.   You make mention that a complaint was
5  filed, but you don't say what the name of that
6  case was. What case is that?
7  A.   This statement here is verbatim what
8  I received from the attorney, and I put it in.
9  The entire settlement was confidential, so I am
10  not -- I was not even permitted to know the name
11  of the case, as -- as is the next statement.
12  Most attorneys in these cases find
13  themselves pushed to settle confidentially. The
14  attorney in West Virginia is one of the rare ones
15  who doesn't.
16  Q.   If the -- how did you know to go to
17  this attorney in New York if you didn't know the
18  name of the case?
19  A.   I -- as I've said several times
20  before, I'm in touch with a lot of attorneys all
21  over the country who handle these and similar
22  cases. I did an e-mail to a couple dozen
23  attorneys, I think, or more, asking for
24  information about settlements or verdicts or
25  decisions relating to payment-option ARM cases

TSG Reporting - Worldwide    (877) 702-9580

## Page 56

M. Saunders

1
2  because I was doing this testimony. And I got
3  some responses.
4  Q.   And are the ones you have listed here
5  all of the responses that you received?
6  A.   I think not. I think I received some
7  responses that weren't relevant. I didn't
8  receive any responses that said no good claims or
9  anything like that, but I -- I got a lot of
10  responses, how are you doing, Margot? It's good
11  to hear from you kind of thing. These are all
12  the relevant ones.
13  Q.   And those were all by e-mail?
14  A.   Yes. I think I did have some phone
15  conversations to follow up.
16  MR. DORSEY: I would ask for the
17  production of her e-mail and the
18  responses that were received in
19  connection with her preparation.
20  A.   I cannot respond -- I cannot give you
21  the e-mails from the lawyers who were -- who
22  provided confidential settlements, information
23  about confidential -- because they specifically
24  asked that they be kept confidential.
25  I'm happy to provide you with my

TSG Reporting - Worldwide    (877) 702-9580

## Page 57

M. Saunders

1
2  e-mail, but I -- I admitted to these attorneys,
3  some of whom were particularly frightened to have
4  me use their information, that I wouldn't even
5  use -- particularly number 4, that I would not
6  use their name.
7  MR. WEISBROD: We can produce
8  something in redacted form is what we
9  can do.
10  THE WITNESS: I can do that.
11  MR. DORSEY: Yeah. I don't know
12  if that's going to do it. I mean, we
13  have the right to see everything that
14  she referred to in formulating her
15  opinions. If they provided her with
16  confidential information in breach of
17  whatever confidentiality agreement they
18  may have had, then there's already been
19  a breach, and we would call for the
20  production of unredacted versions of all
21  the e-mails that she received.
22  MR. WEISBROD: We will see what
23  we can do. The problem is, because of
24  her position, they can share
25  confidential information within the

TSG Reporting - Worldwide    (877) 702-9580

Page 58

```
1           M. Saunders
2    National Consumer Law Center without
3    breaching confidentiality because of the
4    consulting rule that NCLC has.
5        MR. DORSEY: Not when she's
6    acting as an expert witness in a case, I
7    don't believe so.
8        THE WITNESS: Well, I can't
9    breach my confidential relationship with
10   those attorneys.
11       MR. DORSEY: We will have to move
12   to strike her as a witness if we can't
13   get all the information.
14       MR. WEISBROD: You can do that.
15   BY MR. DORSEY:
16   Q.   So you have e-mails relating to each
17   of the four cases that you refer to beginning on
18   page 17?
19   A.   I don't have e-mails relating to 1
20   and 2. Those were phone conversations. Those
21   were actual conversations.
22   Q.   Did anyone respond with substantive
23   response to your e-mail beyond just asking you
24   how you were, for example, that related to their
25   cases that you did not include in your report?
     TSG Reporting - Worldwide   (877) 702-9580
```

Page 59

```
1           M. Saunders
2    A.   There was an e-mail -- as I said,
3    there was an e-mail from -- that was not
4    relevant. There was an e-mail from the attorney,
5    let's see, the attorney who represented
6    Mrs. King, whose testimony in Congress I provided
7    you where she talked about another case, two
8    other cases, I think, one which she just didn't
9    give me enough information to put in here, and
10   the other wasn't even a payment-option ARM, it
11   was a -- another mortgage that was a closure
12   rescue scam. So she was just bringing that up
13   for another reason.
14   Q.   How many attorneys actually responded
15   to your e-mail other than by just asking you how
16   you were?
17   A.   Probably about a half a dozen.
18   Q.   Are they referred to anywhere in the
19   report?
20   A.   The names of the attorneys?
21   Q.   Or the cases that they responded
22   with.
23   A.   The cases are all referred to in
24   here, yeah. I'll just -- I can give you the
25   names of some of these attorneys, and I can --
     TSG Reporting - Worldwide   (877) 702-9580
```

Page 60

```
1           M. Saunders
2    the ones who had confidential settlements where
3    they didn't give me the names of the cases, I
4    cannot. Do you want the names of the attorneys?
5    Q.   Yes, if you have them off the top of
6    your head, or we can do it later.
7    A.   I have them off the top of my head.
8    Of the number 1 and 2 are -- is Dan Hedges,
9    Mountain State Justice, Charleston, West
10   Virginia. Number 3 was -- that -- I'm not -- I
11   don't feel at liberty to provide you with. It's
12   a legal services attorney in New York.
13       Number 4 is a private attorney in a
14   state in the mid-Atlantic. He was afraid for me
15   even to put the state's name in there because of
16   the massive nature of these settlements.
17       The next was Michelle Weinberg of
18   Legal Aid. I think she's with Legal Aid
19   Foundation of Chicago in Chicago, Illinois, and
20   she provided me number 1 and 2 on pages 21 --
21   page 21. And the multiple TILA challenges in --
22   pending in California was provided to me by
23   Jeffrey Burns, an attorney who represents -- who
24   is primary counsel on all of these cases.
25   Q.   All of -- when you say "all these
     TSG Reporting - Worldwide   (877) 702-9580
```

Page 61

```
1           M. Saunders
2    cases," are you referring to the ones referred to
3    in that paragraph 3?
4    A.   Yes. And I can provide you with a
5    redacted version of number 2 and number -- excuse
6    me, number 3 and number 4 on page 17.
7        MR. DORSEY: I'll renew my
8    request for an unredacted version, and
9    we will just have to deal with that
10   later.
11   Q.   Are you aware of any cases where a
12   fraud or deception claim was made that went to a
13   judgment as opposed to a settlement?
14   A.   I am not, other than -- well, no, I
15   am not.
16   Q.   And in a fraud and deception case,
17   that requires -- strike that.
18       If a borrower is claiming that they
19   were defrauded into believing they were getting a
20   loan that they didn't actually end up getting,
21   lower interest rate or different terms, whatever
22   the case may be, that requires a pleading of
23   fraud with particularity as required by the rules
24   in federal jurisdiction and in every state that
25   I'm aware of. Correct?
     TSG Reporting - Worldwide   (877) 702-9580
```

Page 62

1        M. Saunders
2     A.    If the claim is fraud, it is as you
3  describe.  If the claim is deception, the
4  requirements to prove the claim are much less
5  strenuous.
6     Q.    And a claim of deception is a claim
7  under common or statutory law?
8     A.    Both.
9     Q.    What is the common law claim for
10 deception?
11    A.    Simply that one has been deceived,
12 but generally, it's a claim of deception under a
13 statutory unfair deceptive trade practice
14 statute.  I think -- I believe that most of the
15 cases that are listed on page 21 under the
16 multiple TILA challenges also include
17 deception-type claims.
18        As you can see, fraudulent omissions.
19 Let's see, in the first bulleted case, Amparan
20 versus Plaza Home Mortgage, refusing to dismiss
21 fraudulent concealment claim, dismissing other
22 state claims, Plascencia, the third bulleted one,
23 claim stated that purchaser of loan could be
24 subject to liability under California's Unfair
25 Competition Act for aiding and abetting UCL
   TSG Reporting - Worldwide    (877) 702-9580

Page 63

1        M. Saunders
2  violations.  I am not sure what the UCL
3  violations in that case were, but sometimes these
4  cases allege deception as the UCL, uniform --
5  Unfair Competition Act, rather.  So deception has
6  been alleged in these cases as a matter of state
7  law.
8     Q.    Under a statutory unfair trade
9  practices?
10    A.    Yes, I think.
11    Q.    Are you aware of any case where a
12 borrower has brought a claim under common law for
13 deception as it relates to a mortgage loan?
14    A.    Let me answer your question this way.
15 These cases are fairly new.  There's not a large
16 body of law developed on how to litigate complex
17 litigation relating to payment-option ARMS.
18        So what attorneys in most states do
19 is put everything they can think of in the
20 complaint and then see how the claims sort
21 themselves out based on the responses from the
22 defendants and the Court's rulings.
23        So I don't know of everything that
24 everybody has been claimed.  If deception -- if
25 the facts support a claim of deception, it will
   TSG Reporting - Worldwide    (877) 702-9580

Page 64

1        M. Saunders
2  probably be in there.
3     Q.    But as you sit here today, you're not
4  aware of any specific case where a common law
5  deception claim was raised?
6     A.    The -- I think most of these cases
7  have deception raised.  Whether they're common
8  law or statutory, I don't know the answer.
9     Q.    And you said that plaintiff's lawyer
10 is relatively new, so they're throwing everything
11 they can think of into the complaint.
12    A.    Right.
13    Q.    When a party settles that complaint,
14 they're not necessarily settling because of all
15 the various causes of action that have been
16 raised; correct?
17    A.    Well, generally, when a party
18 settles, it's because they find that the
19 potential settlement is better than the risks of
20 going forward.  Obviously, some claims have more
21 value than others.
22        The problem is in this context that
23 most homeowners are in a desperate situation.
24 Most homeowners are facing the loss of their
25 home.  So if they're offered a deal by which they
   TSG Reporting - Worldwide    (877) 702-9580

Page 65

1        M. Saunders
2  are afford to keep their house, they're not going
3  to be inclined to roll the dice and potentially
4  get more money by -- after going to a jury trial,
5  because the consequences of losing are so
6  devastating.  So they will take a less attractive
7  deal than they may be able to gain if they were
8  able to go all the way.
9     Q.    My question more is a defendant might
10 look at the claims that have been raised against
11 them and say, you know, the claim for rescission
12 is the one that we're most worried about, so
13 let's settle this case because we don't want to
14 have to go to a verdict and have a rescission
15 entered against us.  And -- but we think the
16 other claims for fraud, deception, TILA
17 violations, we think we'd win on those.  They
18 might pick one claim to settle on; correct?
19    A.    Certainly.
20    Q.    And they might settle even though
21 they believe they have good defenses to all the
22 claims; right?
23    A.    They might.  But generally, the
24 resources available to both parties are so uneven
25 that if there are no potential claims of value to
   TSG Reporting - Worldwide    (877) 702-9580

Page 66

1            M. Saunders
2    the homeowners, there's unlikely to be an early
3    settlement.
4        Q.    You make reference to a number of
5    settlements in the mid-Atlantic region state that
6    you referred to on --
7        A.    Yes.
8        Q.    -- that ranged between 7500 and
9    55,000; correct?
10       A.    Yes.
11       Q.    And that could be a defendant saying
12   it's a lot cheaper for me to pay $7,500 or even
13   $55,000 than to pay my lawyers to fight through a
14   jury verdict; right?
15       A.    Actually, in that case, I happen to
16   know that some of the defendants were subject to
17   an FDIC-required settlement. I've misspoke.
18   They were -- some of those settlements were
19   reduced because the FDIC took over the lender in
20   the midst of the settlement process.
21       Q.    And how do you know that?
22       A.    The attorney told me.
23       Q.    And that was in the e-mail that he
24   sent to you about these cases?
25       A.    No, that was in prior conversations.
     TSG Reporting - Worldwide    (877) 702-9580

Page 67

1            M. Saunders
2        Q.    And why did the settlement get
3    reduced once the FDIC took over the loan?
4        A.    Well, when the FDIC takes over a
5    bank, the entire process of resolving claims
6    changes. So the value of the claims go way down,
7    because in order to get any money out of a failed
8    bank, you have to generally go through the claims
9    process and then stand in line.
10       Q.    That sounds similar to what happens
11   in a bankruptcy case. Correct?
12       A.    I think it's somewhat different.
13       Q.    How is it different?
14       A.    First of all, I'm familiar with the
15   FDIC claims process. I'm not familiar with
16   bankruptcy process. But these claims in this
17   case were in the midst of settling when -- so the
18   claims had been made, the claims had been
19   determined to be of value, and there had been a
20   settlement offered in many of these cases that
21   had just -- and the checks hadn't been written or
22   the papers hadn't been signed. But the --
23   between the lawyers, the deal had been made.
24       I don't know how it works in
25   bankruptcy.
     TSG Reporting - Worldwide    (877) 702-9580

Page 68

1            M. Saunders
2        Q.    Well, if the FDIC had taken over the
3    bank before the claims had been made, would that
4    have affected the value of the claims in the eyes
5    of the plaintiff's attorney?
6        A.    The -- it would have affected the
7    ability of the plaintiff's attorney to get any
8    money prospectively from -- I mean affirmatively
9    to get cash from the claims. It's still very much
10   a matter of dispute up in the air as claims --
11   affirmative claims against lenders who have been
12   taken over by the FDIC will be dealt with as
13   defenses or setoff to the loans.
14       That issue is -- has not been
15   resolved at all, and that's a very different
16   matter, I believe, than the way the bankruptcy
17   issue would be resolved.
18       Q.    In the context of a bankruptcy, if
19   the borrowers had asserted claims against the
20   debtors in this case, and the plaintiff's
21   attorneys for those borrowers knew that at best
22   they were going to get 1 or 2 cents on the dollar
23   for any claim that they could prove, would that
24   affect the settlement value of those claims?
25       A.    I would think so --
     TSG Reporting - Worldwide    (877) 702-9580

Page 69

1            M. Saunders
2        Q.    And would, in fact, a number of
3    plaintiff's lawyers simply forgo the opportunity
4    to sue the debtor because there just wasn't much
5    there to be had?
6        A.    Well, I think the question is not
7    only whether there's any money to be had, but
8    also whether they're a relevant party to the
9    litigation as against other parties if the main
10   wrongdoer is not in the room, even if it may be
11   harder to prove the claims against everyone else.
12       Q.    In the context of a bankruptcy, where
13   the debtor is going to get a discharge after the
14   plan is approved --
15       MR. WEISBROD: Objection.
16       Q.    -- how would they go about getting
17   the debtor into the courtroom?
18       MR. WEISBROD: There's no
19   discharge in this case.
20       Q.    You can answer the question.
21       A.    I --
22       MR. WEISBROD: I'm instructing
23   the witness not to answer. It's
24   speculative and based on an incorrect
25   factual assumption.
     TSG Reporting - Worldwide    (877) 702-9580

Page 70

```
1           M. Saunders
2           MR. DORSEY: Well, one, she's an
3    expert --
4           MR. WEISBROD: Not on bankruptcy.
5           MR. DORSEY: -- so she can answer
6    hypothetical questions. Well, I'm
7    testing what her knowledge is.
8    A.    I admit my knowledge is very thin in
9    bankruptcy.
10          MR. DORSEY: Could you read back
11   my original question?
12   (The reporter read from the record.)
13          MR. DORSEY: You're still going
14   to instruct her not to answer?
15          MR. WEISBROD: You know, I object
16   to form. You're misleading the witness
17   by incorrectly stating a factual premise
18   that is just -- bears no relationship to
19   this case, and you're asking a
20   hypothetical question based on a
21   field -- about a field that she has said
22   she doesn't have expertise in.
23          If you can answer the question,
24   go ahead.
25   A.    I don't know.
```

Page 71

```
1           M. Saunders
2    BY MR. DORSEY:
3    Q.    Have you ever been involved in a case
4    where a -- or are aware of a case where one of
5    the potential defendants for a borrower claim was
6    a bankrupt company?
7    A.    Have I ever been aware of a case?
8    Q.    Yes.
9    A.    Where one of the defense -- potential
10   defendants is --
11   Q.    A bankrupt company.
12   A.    I certainly have been aware of cases.
13   Q.    And how were the debtor entities
14   handled in those situations by the borrower's
15   counsel?
16          MR. WEISBROD: Objection to form.
17   Go ahead if you can.
18   A.    I think it's a very broad question,
19   and I would have to think about it a while to
20   give you a thoroughly comprehensive answer. But
21   my answer -- my best answer is that I think it
22   has been a problem where the primary originator,
23   who is the focus of the bad acts or who is the
24   person, the party, who is deemed responsible for
25   the bad acts, is not at the table.
```

Page 72

```
1           M. Saunders
2           And it's more difficult for
3    homeowners to prove their case where they are
4    unable to get access to the lender -- the
5    original lender's loan files and the original
6    lender's practices to prove their case.
7    Q.    Is it necessary for the originator to
8    be a defendant or simply to be a third-party
9    witness?
10   A.    We are so far out on the hypothetical
11   limb, I'm not really -- I'm sort of falling. Do
12   you want to give me a more concrete example of
13   what you're looking for?
14   Q.    Well, in this case, for example, the
15   debtors have sold off or will sell off all of
16   their assets. There will be no employees left.
17   A trustee will be appointed to administer the
18   estate after the plan of reorganization is
19   confirmed by the court.
20          How practically is a borrower going
21   to pursue a claim against these third parties
22   that you've referred to, an assignee, for
23   example, if there's nobody available to come and
24   testify or sit at a table as a defendant because
25   there's nobody left in the company?
```

Page 73

```
1           M. Saunders
2    A.    I think that's a problem.
3    Q.    And is it possible that the
4    borrower's counsel could subpoena records, for
5    example, from American Home Mortgage and use
6    those for trial?
7    A.    I would ask you that question. I
8    don't know the answer. Is -- is it possible? I
9    do not understand bankruptcy.
10   Q.    Okay. Going back to your report,
11   page 18, the last paragraph there before you go
12   to Section C, so the first paragraph on the page,
13   you in the second-to-last sentence, you say, "The
14   range of settlements and judgments has varied
15   from between 7500 to 55,000."
16          How many of those were judgments as
17   opposed to settlements?
18   A.    I don't know. Again, this is a --
19   this was the result of correspondence with this
20   attorney. He did put settlements and judgments,
21   I believe. And so that's what I copied down.
22   Q.    So you're not actually aware, other
23   than what he told you, that there were judgments
24   entered into these cases?
25   A.    That's right. But I would find it
```

Page 74

1          M. Saunders
2   hard to believe he lied. But maybe he was
3   mistaken. I don't know.
4       Q.    Going to the next section of your
5   report, under the Truth in Lending Act claims,
6   and we've already talked about the possibility of
7   rescission of the Truth in Lending Act. I'd like
8   to ask you, what are the other types of potential
9   recoveries or remedies that are available to a
10  borrower under Truth in Lending Act?
11      A.    Affirmatively, you have potentially
12  three. You have a damage -- damages for
13  statutory violations, which would be disclosure
14  violations. You have the right of rescission.
15  And then you have the -- a statutory damage --
16  statutory damages for failure to comply with the
17  rescission when it has been processed, when a
18  rescission has been made.
19      Q.    First one you mentioned was damage.
20  Are you talking about actual damages?
21      A.    Actual damages are very hard to
22  obtain in Truth in Lending cases, so I'm
23  referring to statutory damages.
24      Q.    Is it the general rule, then, that
25  plaintiff's attorneys, representing borrowers,

TSG Reporting - Worldwide    (877) 702-9580

Page 75

1          M. Saunders
2   don't bring claims for actual damages?
3       A.    They generally put it in their
4   complaint, but it's rare to recover it.
5       Q.    Why is it rare?
6       A.    Because you have to show reliance.
7       Q.    And the statutory damages, what do
8   those entail?
9       A.    Statutory damages are automatic upon
10  a showing of a disclosure -- the lender's failure
11  to make a material disclosure. So if there is
12  any one of a long list of required disclosures
13  that have not been made properly, that leads to
14  statutory damages.
15          If you make one disclosure violation
16  or if you make 10, you still -- the borrower is
17  still only entitled to one statutory penalty,
18  however.
19      Q.    And what is the amount of the
20  statutory penalty?
21      A.    It was 2,000. It's now $4,000 for
22  home-related claims.
23      Q.    Is that the maximum, or is there a
24  range?
25      A.    That's the -- it's -- it's 200 to

TSG Reporting - Worldwide    (877) 702-9580

Page 76

1          M. Saunders
2   2,000 or twice the finance charge. It's twice
3   the finance charge with a minimum of 200, maximum
4   of 2,000, or 400 to 4,000.
5          Since the finance charge in a home
6   mortgage case is going to be a lot more than
7   $2,000, we're always talking about the maximum
8   amount of that.
9       Q.    Is it possible to bring that class
10  action suit under the Truth in Lending Act?
11      A.    It is.
12      Q.    Is there a cap on damages for class
13  actions?
14      A.    There's a cap on statutory penalties.
15      Q.    Do you know what that cap is?
16      A.    Half a million dollars.
17      Q.    Or 1 percent of the net worth of the
18  company?
19      A.    Right.
20      Q.    It's the lesser of those two?
21      A.    Right.
22      Q.    So if you had a company with a zero
23  net worth, there would be no damages; right?
24      A.    That's right.
25      Q.    And the third category you talked

TSG Reporting - Worldwide    (877) 702-9580

Page 77

1          M. Saunders
2   about, was that related to where a rescission is
3   ordered and the lender fails to comply with the
4   rescission?
5       A.    A rescission is not required to be
6   ordered. Under Truth in Lending, a borrower can
7   rescind at any time within three days after the
8   material violations -- the material disclosures
9   have not been provided up to three years from the
10  date of the loan.
11          The rescission itself is simply
12  notice of rescission from the borrower to the
13  lender. At that time, Truth in Lending requires
14  the lender to do something to cancel the security
15  interest and return the -- certain funds to the
16  borrower. If the lender fails to do that, the
17  lender's violated the Truth in Lending Act, and
18  that failure by itself leads to statutory
19  damages.
20      Q.    And what the lender has to return are
21  the costs, fees, and interest associated with the
22  loan up to the point of rescission?
23      A.    Right.
24      Q.    What's the allegation of the
25  homeowner?

TSG Reporting - Worldwide    (877) 702-9580

Page 78

```
1              M. Saunders
2      A.    The homeowner's then required to
3  tender everything else that's owed.
4      Q.    And when you say that, that means
5  they took out a $100,000 loan on their home and
6  the lender was required to return $10,000 worth
7  of fees, costs, and interest.  The homeowner
8  would have to then pay the lender the remaining
9  $90,000?
10     A.    That's exactly right.
11     Q.    On page 20 of your report, under
12 Section 2, you talk about the application of TILA
13 to the claims relating to the debtor's loans.
14 And these relate to the -- two of the loan files
15 that you've reviewed, the Jack file and the
16 Dandridge file; correct?
17     A.    Yes.
18     Q.    You say that based on your review of
19 those files, there are at least two potential
20 TILA violations that were -- had been upheld by
21 the Andrews Court that may exist.
22     A.    Yes.
23     Q.    The Andrews Court also held those
24 particular types of disclosures were not subject
25 to statutory damages; correct?
```

Page 79

```
1              M. Saunders
2      A.    I don't recall that.  That may be.  I
3  just don't recall.
4      (Saunders Exhibit 2 was marked for
5      identification.)
6  BY MR. DORSEY:
7      Q.    Feel free to review any portions of
8  the opinion that you'd like, but I'm going to
9  call your attention to page number 11 at the very
10 top there, top left-hand corner of the page
11 numbers.
12     A.    Page 11?
13     Q.    At the top.  Do you have that?
14     MR. WEISBROD:  It only goes to
15     page 9.
16     Q.    Look under subsection C1, statutory
17 damages.
18     MR. WEISBROD:  I think you have a
19     different document.
20     (Saunders Exhibit 3 was marked for
21     identification.)
22 BY MR. DORSEY:
23     Q.    And if you would refer to what the
24 court reporter has marked for us as Sandridge
25 [sic] Exhibit Number 3, this is the opinion from
```

Page 80

```
1              M. Saunders
2  the district court in Andrews versus Chevy Chase
3  Bank; correct?
4      A.    Uh-huh, yes.
5      Q.    And if you would turn to page 11 that
6  I referred to earlier, top right-hand corner,
7  that first full paragraph that begins "as
8  previously discussed."  Do you see that?
9      A.    Yes.
10     Q.    And then the Court goes on to say
11 that defendant violated certain provisions of the
12 Truth in Lending Act, and then in the last
13 sentence -- second-to-last sentence says,
14 "Neither violations of Section 1632 or Section
15 1638B are among the TILA violations enumerated in
16 Section 1640A for which statutory damages are
17 available."
18     A.    Yes.
19     Q.    Correct?
20     Does that refresh your recollection
21 about whether the Andrews court --
22     A.    Yes.
23     Q.    -- held that statutory damages were
24 not available?
25     A.    Yes.  Thank you.
```

Page 81

```
1              M. Saunders
2      Q.    And just since we already have it
3  marked, if you could take a look at Andrews [sic]
4  Exhibit -- or, excuse me, Sanders [sic] Number 2.
5      A.    Are you referring to me?  My name is
6  Saunders.
7      Q.    Sorry.  I'm getting Andrews and
8  Sanders --
9      A.    That's okay.
10     Q.    Exhibit Number 2.  It is the
11 appellate decision from the Seventh Circuit
12 relating to the Andrews case.
13     A.    Yes.
14     Q.    And in that opinion, the court
15 reversed the lower court's finding that class
16 action certification is available for rescission
17 damages; correct?
18     MR. WEISBROD:  I object to the
19     form.  I think you misspoke.
20     A.    The lower court held that the class
21 could go forward on rescission.
22     Q.    Right.
23     A.    The Seventh Circuit said rescission
24 was not available.  That also actually agrees
25 with the First Circuit opinion.  Rescission is
```

Page 82

```
1              M. Saunders
2    fairly uniformly now considered to not be
3    available for class actions.
4        Q.   Correct.
5        A.   That does not mean that rescission is
6    not available for the violations that are
7    articulated by the Andrews court in the
8    individual cases.
9        Q.   That was not what I was trying to
10   say.  If I said that, I misspoke.  What I was
11   saying, the Seventh Circuit Court held that
12   rescission was not available for a class action
13   situation.
14       A.   Yes.
15       Q.   Has to go on an individualized basis.
16       A.   Right.  Did I allude in some way in
17   my report to say that --
18       Q.   No.  I just wanted to clarify that.
19       A.   I did not mean to indicate that it
20   was available.
21       Q.   Going back to your report, page 20
22   again, you make reference to class action
23   complaints involving the debtor's payment-option
24   ARMs; correct?
25       A.   Right.
```

Page 83

```
1              M. Saunders
2        Q.   And that's the Valenzuela versus
3    American Home Mortgage Investment Trust, 2005-2;
4    correct?
5        A.   I'm sorry.  Where are you?
6        Q.   Page 20 of your report, last
7    paragraph on the page.
8        A.   Yes.
9        Q.   And in that case, that is a case
10   against an investment trust, not against the
11   debtors in this case; correct?
12       A.   Yes.
13       Q.   And are you aware that the --
14            MR. WEISBROD:  That says the
15   final?
16            THE WITNESS:  Yes.
17       Q.   Are you aware that the Valenzuela was
18   brought as a class action?
19       A.   Yes.
20       Q.   And are you aware that the Valenzuela
21   plaintiffs filed a class action proof of claim in
22   the bankruptcy cases?
23       A.   I heard that.  I'm also told that it
24   was denied.
25       Q.   What was denied?
```

Page 84

```
1              M. Saunders
2        A.   The class action claim, because
3    that --
4        Q.   Who told you that?
5        A.   Jeffrey Burns.
6        Q.   Who is Jeffrey Burns?
7        A.   He's the attorney in this case.
8        Q.   He told you that they had moved for
9    class certification of their claim in the
10   bankruptcy court?
11       A.   I thought he said that they were not
12   permitted to litigate as a class in the
13   bankruptcy case, that they were not permitted to
14   file a class proof of claim.
15       Q.   Did he say why they weren't
16   permitted?
17       A.   If he did, I don't recall.
18       Q.   But he did tell you they, in fact,
19   did file a class proof of claim?
20       A.   I think so, yes.
21       Q.   Can we take another short -- I'm
22   sorry, go ahead.
23       A.   On this point, I think a number of
24   these cases have been litigated on both Truth in
25   Lending and violation of state law, and the state
```

Page 85

```
1              M. Saunders
2    law violations are premised on deception and
3    Truth in Lending, from what I can see.
4            So even if Truth in Lending
5    rescission were not available by class, I think
6    that there at least will be an attempt to
7    litigate classwide relief based on
8    rescission-type remedies, and the courts have not
9    foreclosed that in these opinions.
10       Q.   Rescission-type remedies based on
11   state law --
12       A.   Yes.
13       Q.   -- causes of action?
14       A.   Yes.
15       Q.   But we've already determined that
16   since the debtors don't own any of these loans, a
17   rescission wouldn't be helpful to the borrower
18   vis-a-vis the debtors in this case; correct?
19       A.   I'm not quite sure what you said.  I
20   think if you said that the -- the debtors in this
21   case would not be parties to that action, then
22   that might be true.
23       Q.   Or even if they were a party, they
24   would -- no relief that the borrower could obtain
25   against the debtors for rescission because they
```

## Page 86

1        M. Saunders
2 don't own the loans anymore?
3     A.    If rescission was the sole remedy
4 they were seeking, the debtors would not be
5 relevant.  But if some other part of the remedy
6 were damages -- rescission generally is such a
7 drastic remedy that if other parties are somewhat
8 to blame for the behavior that causes of the
9 rescission, then other -- generally the assignees
10 will look to the originators for some
11 contribution.
12     Q.    And are you aware of any cases where
13 the assignee has filed claims against the
14 originator where the originator is now in
15 bankruptcy?
16     A.    Off the top of my head, I cannot tell
17 you any.
18        MR. DORSEY:  Off the record.
19 (Discussion held off the record.)
20        MR. DORSEY:  I have no further
21    questions.  I don't know if Committee
22    counsel wanted to review his notes to
23    see if he had any questions; otherwise,
24    I think we're done.
25        MR. SCHNITZER:  I have no

TSG Reporting - Worldwide    (877) 702-9580

## Page 87

1        M. Saunders
2 questions today.
3        MR. WEISBROD:  No questions here.
4 Time noted:  1:45 p.m.
5
6        _____
7        MARGOT SAUNDERS
8
9 Subscribed and sworn to before me
10 this      day of      , 2009.
11        _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    (877) 702-9580

## Page 88

1        M. Saunders
2        C E R T I F I C A T E
3 DISTRICT OF COLUMBIA:
4
5     I, MARY ANN PAYONK, a Notary Public, do
6 hereby certify:
7     That the witness whose deposition is
8 hereinbefore set forth was duly sworn, and that
9 such deposition is a true record of the testimony
10 given by such witness.
11     I further certify that I am not related to
12 any of the parties to this action by blood or
13 marriage, and that I am in no way interested in
14 the outcome of this matter.
15     IN WITNESS WHEREOF, I have hereunto set my
16 hand this 3rd day of February, 2009.
17
18        _____
19        MARY ANN PAYONK, CRR-RDR, CBC, CCP, CLR
20        Shorthand Reporter
21
22
23
24
25

TSG Reporting - Worldwide    (877) 702-9580

## Page 89

1        M. Saunders
2 -------------- I N D E X ----------------
3 WITNESS       EXAMINATION BY       PAGE
4 MARGOT SAUNDERS
5     Examination by Mr. Dorsey      4
6
7 -------------- E X H I B I T S -----------
8
9 NO.        DESCRIPTION       PAGE
10
11 Exhibit 1 ...............   9
12 Exhibit 2 ...............  79
13 Exhibit 3 ...............  79
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    (877) 702-9580

Page 90

```
 1          M. Saunders
 2   NAME OF CASE:  American Home Mortgage Bankruptcy
 3   DATE OF DEPOSITION:  February 2, 2009
 4       1. To clarify the record.
         2. To conform to the facts.
 5       3. To correct transcription error.
 6
     Page _____ Line _____ Reason _____
 7   From _____ to _____
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
19
20   _____ MARGOT SAUNDERS
21   SUBSCRIBED AND SWORN TO BEFORE ME
22   THIS _____ DAY OF _____, 2009.
23   _____
24   (Notary Public)
25   My Commission expires: _____
```

TSG Reporting - Worldwide    (877) 702-9580

**Exhibit C**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VANDERBILT UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-506-SLR |
| | ) | |
| ICOS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 20th day of December, 2007, having considered the issue of

whether the court will entertain the testimony of legal experts at trial;

IT IS ORDERED that such testimony shall not be permitted.  I have reviewed the

case law cited by the parties in the pretrial order and have concluded that testimony to

explain (or explain away) such law is neither needed nor appropriate.  I further

conclude, however, that plaintiff need not pay the costs of the expert discovery, since

defendant (prior to the pretrial conference) had not stipulated to the process undertaken

by the PTO in reviewing inventorship.[1]

IT IS FURTHER ORDERED that the bench trial in the above captioned case

shall commence on Monday, January 7, 2008 and end on Wednesday, January 16,

---

[1]I understand that defendant will so stipulate for purposes of trial; otherwise, I
may reconsider the above decision.

2008.  Each party shall have 23 hours in which to present its evidence.


_____
United States District Judge