# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------- x

In re:                  :    Chapter 11

                       :

AMERICAN HOME MORTGAGE HOLDINGS, INC.,   :    Case No. 07-11047 (CSS)

a Delaware corporation, et al., [1]        :

                       :    Jointly Administered

                       :

       Debtors.                 :    Ref. Docket No. 6626

------------------------------------------------------------------------- x


## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS DATED AS OF FEBRUARY 5, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988)
Sean M. Beach (No. 4070)
Margaret Whiteman Greecher (No. 4652)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp. , a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

## TABLE OF CONTENTS

I.  BACKGROUND ................................................................................................. 1

   A.  General Background of the Chapter 11 Cases ................................................ 1

   B.  Solicitation of the Plan........................................................................................ 2

   C.  Ballot Tabulation ................................................................................................ 3

   D.  Objections to the Plan ........................................................................................ 4

   E.  Highlights of the Plan ........................................................................................ 5

II.  ARGUMENT .................................................................................................... 5

   A.  The Plan Complies with Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(1) ............................................................................................ 6

      1.  The Plan Designates Classes of Claims and Interests and Such Classification is Proper (Sections 1122 and 1123(a)(1)).................................................................. 7

      2.  Specification of Unimpaired Classes (Section 1123(a)(2)) ........................... 8

      3.  Treatment of Impaired Classes (Section 1123(a)(3))..................................... 8

      4.  Equal Treatment Within Classes (Section 1123(a)(4)) .................................. 9

      5.  Means for Implementation (Section 1123(a)(5)) ........................................... 9

      6.  Charter Provisions (Section 1123(a)(6))...................................................... 10

      7.  Selections for Certain Positions (Section 1123(a)(7)) ................................. 10

   B.  The Permissive Provisions Contained in the Plan Are Appropriate ................ 11

      1.  The Plan's Treatment of Executory Contracts ............................................. 11

      2.  The Plan's Provisions Regarding Retention, Enforcement and Settlement of Claims Held by the Debtors and Retention of Jurisdiction.................................... 11

      3.  The Plan's Provisions Regarding Modification of the Rights of Holders of Claims ............................................................................................................... 12

      4.  The Stipulated Asset Allocation and Resolution of Intercompany Claims ................. 12

      5.  The EPD/Breach Claims Protocol ............................................................... 12

      6.  The Exculpation and Injunctive Provisions ................................................. 12

   C.  The Proponents of the Plan Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2))................................................................... 13

   D.  The Plan was Proposed in Good Faith (Section 1129(a)(3)) ........................... 14

   E.  Payments for Services or Costs and Expenses (Section 1129(a)(4))................ 15

   F.  Service of Certain Individuals (Section 1129(a)(5))........................................ 15

   G.  Rate Changes (Section 1129(a)(6))................................................................. 16

H.    The Plan Satisfies the "Best Interests" Test (Section 1129(a)(7)) ..................................... 16

I.    Acceptance of the Plan by Each Impaired Class (Section 1129(a)(8)).............................. 17

J.    The Plan Satisfies the "Cram Down" Requirements with Respect to the
Non-Accepting Classes ............................................................................................................ 18

K.    Treatment of Priority Claims (Section 1129(a)(9)) ........................................................ 20

L.    Acceptance of at Least One Impaired Class (Section 1129(a)(10)) ................................ 20

M.    Feasibility (Section 1129(a)(11)) ..................................................................................... 21

N.    Payment of Certain Fees (Section 1129(a)(12)) ............................................................. 22

O.    Satisfaction of Retiree Benefits (Section 1129(a)(13))................................................... 22

P.    Only One Plan (Section 1129(c))...................................................................................... 22

Q.    Principal Purpose of the Plan (Section 1129(d))............................................................. 23

R.    Satisfaction of Bankruptcy Rule 3016(a)......................................................................... 23

S.    Satisfaction of Bankruptcy Rule 3016(c)......................................................................... 23

III.    RESOLUTIONS OF, OR RESPONSE TO, OBJECTIONS ......................................... 24

A.    Debtors' Responsiveness to Borrower Issues .................................................................. 24

B.    The Borrowers Committee Objection................................................................................ 25

1.    Notice of the Bar Date Was Adequate and Should Not Affect
Confirmation of the Debtors' Plan.......................................................................... 26

2.    The Settlement of Intercompany Claims through the Stipulated Asset Allocation
Satisfies the Standard of Bankruptcy Rule 9019 and Does Not Prejudice Borrowers ......... 36

a.    **The Methodology Underlying the Stipulated Asset Allocation** ........................... 38

b.    **Standard for Approval of the Stipulated Asset Allocation** .................................. 42

c.    **The Borrowers Committee's Objection is Speculative and
Ignores the 9019 Standard Applicable to the Stipulated Asset Allocation** ............... 44

3.    The Plan Does Not Result in Lower Recoveries Than Would Be Obtained in a
Chapter 7 Liquidation .............................................................................................. 45

4.    The EPD/Breach Claims Protocol Is a Reasonable Settlement Pursuant to
Bankruptcy Rule 9019 and Bankruptcy Code 502(c) and Does Not Provide
More Favorable Treatment to EPD/Breach Claims Than to Borrower Claims .................... 46

a.    **Background Regarding EPD/Breach Claims** ....................................................... 46

b.    **Proposed Treatment of EPD Claims and Reasons Therefor** ............................... 47

c.    **Proposed Treatment of Breach of Warranty Claims  and the Reasons Therefor**
52

d.    **EPD/Breach Claims Questionnaire** ..................................................................... 56

e.    **Standard for Approving the EPD/Breach Claims Protocol** ................................. 56

2

f.    **The EPD/Breach Claims Protocol Will Not Allow Claims  Without a Showing of *Prima Facie* Validity** ................................................................. 58

g.    **The EPD/Breach Claims Protocol Will Not Allow EPD/Breach Claims at "Inflated Values"** ................................................................................................. 60

h.    **All Borrower Claims Are Treated Equally Under the Plan; Even if Borrower Claims Were Classified Along with EPD/Breach Claims, the EPD/Breach Claims Protocol Would Not Run Afoul of Section 1123(a)(4)** ................................................. 62

5.    The Exculpation Provisions are Permissible............................................................. 63

6.    Extension of the Automatic Stay Is Appropriate and Does Not Impair Borrowers ........................................................................................................... 67

IV.    CONCLUSION............................................................................................................... 68

DB02:7737098.5                                                                                                   066585.1001

## MEMORANDUM

The above-captioned debtors and debtors in possession (the "Debtors") hereby submit this memorandum of law in support of confirmation of the *Amended Chapter 11 Plan of Liquidation of the Debtors dated as of February 5, 2009* [D.I. 6942] (as may be amended, supplemented and/or modified, the "Plan") and in response to any objections filed in opposition to the Plan.[2] As provided in detail below, the Plan satisfies the requirements for confirmation set forth in section 1129 of title 11 of the United States Code (the "Bankruptcy Code") and is overwhelmingly supported by the Debtors' creditor constituencies. Accordingly, the Debtors submit that the Plan should be confirmed.

## I.      BACKGROUND

### A.      General Background of the Chapter 11 Cases

On August 6, 2007 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court. On August 14, 2007, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (as such committee may be composed from time to time, the "Creditors Committee"). On October 21, 2008, the U.S. Trustee appointed an Official Committee of Borrowers (the "Borrowers Committee"). No trustee or examiner has been appointed.

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Plan.

On August 15, 2008, the Debtors filed the first iteration of the Plan and the disclosure statement concerning the same.  The Debtors have since filed amendments to the Plan and related disclosure statement, including the disclosure statement dated November 25, 2008 [D.I. 6627] (the "Disclosure Statement").  By Order entered December 1, 2008 [D.I. 6644] (the "Disclosure Statement Order"), the Court approved the Disclosure Statement and certain solicitation procedures.

**B.      Solicitation of the Plan**

On August 28, 2008, the Debtors filed the *Debtors' Motion for Order (I) Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, Including (A) Approving Form and Manner of Solicitation Procedures, (B) Approving the Form and Notice of the Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing Deadline for Receipt of Ballots, and (F) Approving Procedures for Vote Tabulations; (III) Establishing Deadline and Procedures for Filing Objections to Confirmation of the Plan, and (IV) Granting Related Relief* [D.I. 5554] (the "Solicitation Procedures Motion").  By the Disclosure Statement Order, the Court approved the Solicitation Procedures Motion.  As required by the Disclosure Statement Order, on or before December 8, 2008, the Debtors, through their noticing and claims agent, Epiq Bankruptcy Solutions ("Epiq") timely mailed to holders of claims entitled to vote on the Plan, a solicitation package containing: (a) written notice of (i) the Court's approval of the Disclosure Statement, (ii) the deadline for voting on the Plan, (iii) the date of the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), and (iv) the deadline and procedures for filing objections to the confirmation of the Plan; (b) the Plan in pdf format on a CD-Rom; (c) the Disclosure

2

Statement in pdf format on a CD-Rom; (d) the appropriate ballot along with a return envelope; and (e) a letter from the Committee supporting the Plan [D.I. 6777].

In addition, notice of the Confirmation Hearing was published in the The Wall Street Journal on December 5, 2008 [D.I. 6857]. Pursuant to the Disclosure Statement Order, ballots were required to be submitted to Epiq no later than 4:00 p.m., prevailing Eastern Time, on January 14, 2009 (the "Voting Deadline"), unless extended by the Debtors.

C.    **Ballot Tabulation**

As described more fully in the Declaration of James Katchadurian of Epiq Bankrutpcy Solutions, LLC Certifying the Ballots Accepting or Rejecting the Debtors' Plan of Liquidation of the Debtors Dated November 25, 2008 (the "Voting Certification"), the Plan has been accepted by Classes Classes 1B(1) *et seq.*, except to the extent set forth below, 1C(1), 1C(2), 1C(3), 2B(1)(a) *et seq.*, except to the extent set forth below, 2B(2), 2B(3), 2C(1), 2C(2), 2C(3), 2C(4), 3B(1)(a) *et seq.*, except to the extent set forth below, 3B(2), 3B(3), 3C(1), 3C(2), 3C(3), 4B(1)(a) *et seq.*, except to the extent set forth below, 4B(2), 4C(1), 4C(2), 4C(3), 5B(1)(a) *et seq.*, except to the extent set forth below, 5B(3), 5B(4), 5C(1), 5C(2), 5C(3), 6B(1) *et seq.*, except to the extent set forth below, 6C(1), 6C(2), 7B(1), *et seq.*, except to the extent set forth below, 7C(1), 7C(2), 8B(1) *et seq.*, except to the extent set forth below, 8C(1), 8C(2) are impaired by the Plan and each Class has voted to accept the Plan.

With respect to the secured classes, the Holders of the sole Claims in Classes 1B(1)(n) and 1B(1)(q) in the AHM Holdings case, and 5B1(o), 5B1(p), and 5B(2) in the AHM Corp. case, (collectively, the "Rejecting Secured Classes") voted to reject the Plan. Additionally, because, under the Plan, each holder of a Miscellaneous Secured Claim is provided its own subclass, holders of Miscellaneous Secured Claims who did not vote to accept or reject the Plan are each deemed to be non-accepting classes (collectively with the Rejecting Secured Classes,

3

the "Non-Accepting Secured Classes").  With respect to the unsecured classes, one claimant

having more than 33% of the voting amount in Class 1C(4) in the AHM Holdings case voted to

reject the Plan, which resulted in rejection by the entire class.   Because the holders of Class

1D,1E, 2D, 2E, 3D, 3E, 4D, 4E, 5D, 5E, 6D, 6E, 7D, 7E, 8D, and 8E Claims and Interests

(together with Class 1C(4) and the Non-Accepting Secured Classes, the "Non-Accepting

Classes") will not receive or retain any property on account of such Claims or Interests, pursuant

to section 1126(g) of the Bankruptcy Code, these Classes are deemed not to have accepted the

Plan.

       **D.**     **Objections to the Plan**

       The Disclosure Statement Order additionally required that any objections to

confirmation of the Plan be in writing, filed with the Court and served upon various interested

parties by 4:00 p.m., prevailing Eastern Time, on January 14, 2009.   The Debtors received

objections to confirmation of the Plan from Travis County [D.I. 6708, withdrawn by D.I. 6920],

Iron Mountain Information Management, Inc. [D.I. 6778], Adorno & Yoss LLP [D.I. 6842],

Lead Plaintiffs in that certain securities litigation identified more fully in their objection [D.I.

6843 & 6930], the United States (Internal Revenue Service) [D.I. 6844]; Local Texas Tax

Authorities [D.I. 6848]; DB Structured Products, Inc. [D.I. 6853]; California Taxing Authorities

[D.I. 6867]; Federal Home Mortgage Loan Mortgage Corporation [D.I. 6867]; JPMorgan Chase

Bank, National Association [D.I. 6874], the Official Committee of Borrowers [D.I. 6883];

Morgan Stanley Mortgage Capital Holdings, LLC [D.I. 6889]; and the U.S. Securities and

Exchange Commission [D.I. 6893].   To the extent not resolved or withdrawn prior to the

Confirmation Hearing, the Debtors submit that all objections to the Plan should be overruled for

the reasons more fully set forth herein.

                                                     

E.      **Highlights of the Plan**

The Plan is the product of extensive negotiations by and among the Debtors, the

Creditors Committee, certain of the Debtors' creditors, and a number of other parties in interest,

including the Borrowers Committee.  The Plan is a non-substantively consolidated plan of

liquidation, pursuant to which the net proceeds from the sale or other disposition of the Debtors'

Assets are being distributed to holders of Allowed Claims in accordance with the priorities of the

Bankruptcy Code and the terms of the Plan.

The Plan contemplates that, on the Effective Date, the Debtors will transfer all of

their Assets to the Plan Trust, which will manage and direct the liquidation of the Assets and

distribute the consideration to be distributed to the Holders of Claims against each of the Debtors

pursuant to the terms of the Plan.  The Plan further contemplates that the Creditors Committee, in

consultation with the Debtors, shall appoint a Plan Trustee to, among other things, prosecute or

settle objections to Disputed Claims against each of the Debtors and prosecute or settle Causes of

Action for the benefit of Creditors of each of the Debtors.

The Plan contains a comprehensive settlement of inter-debtor claims and disputes

through a Stipulated Asset Allocation, which will permit the administration of the Debtors'

estates by a unitary Plan Trust free of inter-Estate conflicts of interest that might otherwise

hamper the joint administration of non-substantively consolidated Estates.

The Plan also contains a protocol for the estimation and allowance of EPD/Breach

Claims which will minimize litigation costs and streamline administration of the Debtors' Assets

for the benefit of all Unsecured Creditors.

## II.    ARGUMENT

As the Plan proponents, the Debtors bear the burden of proof on all elements

necessary for confirmation of the Plan.  In re Richard Buick, Inc., 126 B.R. 840, 851 (Bankr.

E.D. Pa. 1991).  To satisfy this burden, the Debtors will show by a preponderance of the

evidence that the Plan complies with the applicable provisions of the Bankruptcy Code.

Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II), 994

F.2d 1160, 1165 (5th Cir. 1993) (concluding that "preponderance of the evidence is the debtor's

appropriate standard of proof both under § 1129(a) and in a cramdown"), cert. denied, 510 U.S.

992 (1993); In re Union Meeting Partners, 165 B.R. 553, 574 n.17 (Bankr. E.D. Pa. 1994)

(adopting preponderance standard with respect to requirements of Bankruptcy Code section

1129), aff'd mem., 52 F.3d 317 (3d Cir. 1995).

Section 1129(a) of the Bankruptcy Code provides that a court shall confirm a

chapter 11 plan if all of the requirements of sections 1129(a)(1) through (a)(13) of the

Bankruptcy Code are satisfied.  11 U.S.C. § 1129(a).  Here, the Plan should be confirmed

because the Debtors have satisfied (or will satisfy, at the Confirmation Hearing) each of the

requirements of section 1129(a) of the Bankruptcy Code.

A.    **The Plan Complies with Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(1)**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the

"applicable provisions" of the Bankruptcy Code.  In determining whether the Plan complies with

section 1129(a)(1), the court must consider section 1123(a) of the Bankruptcy Code, which sets

forth certain elements that a plan must contain, and section 1122 of the Bankruptcy Code, which

governs the classification of claims.  Federal Home Loan Mortgage Corp. v. Bugg (In re Bugg),

172 B.R. 781, 783 (E.D. Pa. 1994); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep.

No. 989, 95th Cong., 2d Sess. 126 (1978).

6

### 1.    The Plan Designates Classes of Claims and Interests and Such Classification is Proper (Sections 1122 and 1123(a)(1))

Section 1123(a)(1) of the Bankruptcy Code requires that a plan classify all claims (with the exception of certain administrative and priority claims) and all interests, and that such classification comply with section 1122 of the Bankruptcy Code.  11 U.S.C. § 1123(a)(1).  With the exception of DIP Facility Claims, Administrative Claims and Priority Tax Claims against all applicable Debtors, which are not required to be classified, Article 4 of the Plan designates Classes of Claims and Interests.[3]

A plan proponent has significant flexibility in classifying claims under section 1122 of the Bankruptcy Code.  Courts also are afforded broad discretion in approving a plan proponent's classification scheme and should consider the specific facts of each case when making such a determination.  John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 158 (3d. Cir. 1993) (stating that "the classification of claims of interests must be reasonable"); In re Jersey City Med. Ctr., 817 F.2d 1055, 1060-61 (3d Cir. 1987) (observing tha "Congress intended to afford bankruptcy judges broad discretion [under section 1122] to decide the propriety of plans in light of the facts of each case"); Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 586 (6th Cir. 1986) (noting the "broad discretion" courts are given to determine proper classifications).

Courts have routinely upheld separate classifications of various groups of claims and interests where there is a reasonable basis for such separation.  In so doing, they have emphasized that the Bankruptcy Code prohibits only the identical classification of dissimilar claims, and nowhere requires the same classification for claims that may share some attributes.  Jersey City Med. Ctr., 817 F.2d at 1060 (noting that "[t]he express language of this statute

---

[3] The classes, which include all Claims and Interests that are required to be classified, are summarized in Article 2A of the Plan.

explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes"); Briscoe Enters., 994 F.2d at 1167 (permitting separate classification of similar claims where there were "good business reasons"); U.S. Truck Co., 800 F.2d at 587 (permitting separate classification of similar claims); In re Ionosphere Clubs, Inc., 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) (stating "a debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class").

Here, the Plan's classification scheme meets these standards. The Plan's classification scheme is factually and legally reasonable, necessary to implement the Plan, and in accordance with section 1122(a) of the Bankruptcy Code. Each Class of Claims or Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1122 of the Bankruptcy Code.

## 2.    Specification of Unimpaired Classes (Section 1123(a)(2))

Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). The classes, which include all Claims and Interests that are required to be classified, are summarized in Article 2A of the Plan. More specifically, Article 4 of the Plan identifies all classes of Claims and Interests that are unimpaired and sets forth the applicable treatment afforded to them under the Plan and consistent with the provisions of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(a)(2).

## 3.    Treatment of Impaired Classes (Section 1123(a)(3))

Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C.

8

§ 1123(a)(3). Article 4 of the Plan specifies the treatment of Claims and Interests that are

impaired. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the

Bankruptcy Code.

### 4.    Equal Treatment Within Classes (Section 1123(a)(4))

Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the

same treatment for each claim or interest of a particular class, unless the holder of a particular

claim or interest agrees to a less favorable treatment of such particular claim or interest." 11

U.S.C. § 1123(a)(4). Article 4 of the Plan satisfies this requirement in that all Holders of Claims

and Interests within a particular class are receiving identical treatment under the Plan, unless any

such Holder has agreed to accept less favorable treatment. Thus, the Plan complies with this

section of Bankruptcy Code.

### 5.    Means for Implementation (Section 1123(a)(5))

Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide

"adequate means" for its implementation. 11 U.S.C. § 1123(a)(5). Articles 6, 7, and 8 of the

Plan, along with various other provisions, provide adequate means for implementing the Plan,

including, among other things: (i) approval of the settlement of Intercompany Claims and the

Stipulated Asset Allocation; (ii) approval of the EPD/Breach Claims Protocol; (iii) appointment

of the Plan Trustee; (iv) appointment of a Plan Oversight Committee; (v) preservation of all

Causes of Action; (vi) the vesting of the BofA Mortgage Loans in an entity to be determined in

accordance with the BofA Global Settlement Stipulation; (vii) the vesting of all other property of

the Debtors in the Plan Trust; and (viii) establishment of the Plan Trust Operating Expense

Reserve, S/A/P Claims Reserve and Unsecured Claims Reserve. The Debtors will have, upon

the Effective Date of the Plan, sufficient Cash to make all payments required to be made

9

pursuant to the terms of the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

**6.      Charter Provisions (Section 1123(a)(6))**

Section 1123(a)(6) of the Bankruptcy Code requires that the Plan provide for the inclusion in a debtor's charter specific provisions (i) prohibiting the issuance of nonvoting equity securities and (ii) providing for an "appropriate distribution" of voting power among the securities possessing voting power. 11 U.S.C. § 1123(a)(6). No non-voting equity securities will be issued pursuant to the Plan or at any time in the future with respect to the Debtors. Following the Effective Date, all Interests in the Debtors, including any securities possessing voting power will be cancelled, and the Plan Trust shall be deemed the sole capital stockholder, shareholder, or managing member, as applicable, of each of the Debtors. Accordingly, the Plan satisfies the requirement of section 1123(a)(6) of the Bankruptcy Code.

**7.      Selections for Certain Positions (Section 1123(a)(7))**

Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions with respect to the manner of selection of any officer, director or trustee, or any successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1123(a)(7). Pursuant to and in accordance with Article 8F of the Plan, the Plan Trustee and its duties and responsibilities are designated in the Plan and the Plan Trust Agreement, as well as on the record of the Confirmation Hearing. Pursuant to and in accordance with Article 8G of the Plan, the Plan Oversight Committee and its duties are designated in the Plan, as well as on the record of the Confirmation Hearing. The manner of selection of the Plan Trustee and Plan Oversight Committee membership is consistent with the interests of the Debtors' Creditors and Interest holders and with public policy. Other than the Plan Trustee and Plan Oversight Committee, no other officers, directors or members has been or need be

10

appointed.  Therefore, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy

Code.

**B.      The Permissive Provisions Contained in the Plan Are Appropriate**

Section 1123(b)(6) provides that a plan may "include any other appropriate

provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6).

Among other things, this subsection provides the authority to include in a plan provisions beyond

the list of examples of mandatory and permissive provisions set forth in sections 1123(a) and

1123(b).  The Plan contains a number of these provisions, each of which is consistent with the

applicable provisions of the Bankruptcy Code.

**1.      The Plan's Treatment of Executory Contracts**

Consistent with section 1123(b)(2) of the Bankruptcy Code, Article 11 of the Plan

provides for the rejection of executory contracts and unexpired leases of the Debtors that have

not been previously assumed or rejected pursuant to section 365 of the Bankruptcy Code and

appropriate authorizing orders of this Court.

**2.      The Plan's Provisions Regarding Retention, Enforcement and
Settlement of Claims Held by the Debtors and Retention of
Jurisdiction**

Consistent with section 1123(b)(3) of the Bankruptcy Code, Articles 6, 7 and 10

of the Plan provide for the settlement or adjustment of claims belonging to the Debtors or their

estates.  In addition, pursuant to Article 14A of the Plan, the Court will generally retain

jurisdiction as to all matters involving the Plan, including, among other things, allowance of

Claims, determination of tax liability under section 505 of the Bankruptcy Code, resolution of

Plan-related controversies, and approval of matters related to the assumption or rejection of

executory contracts or unexpired leases.  Significantly, the above matters are matters that the

Court would otherwise have jurisdiction over during the pendency of the Chapter 11 Cases.  See

DB02:7737098.5                                                                                                          066585.1001

28 U.S.C. §§ 157 and 1334.  This retention of jurisdiction by the Court post-confirmation is

permitted by the Bankruptcy Code.  In re Johns-Manville Corp., 97 B.R. 174, 180 (Bankr.

S.D.N.Y. 1989).

> **3.    The Plan's Provisions Regarding Modification of the Rights of Holders of Claims**

Consistent with section 1123(b)(2) of the Bankruptcy Code, Articles 3 and 4 of

the Plan modify or leave unaffected, as the case may be, the rights of Holders of Claims and

Interests within each class and, therefore, the Plan satisfies section 1123(b)(5) of the Bankruptcy

Code.

> **4.    The Stipulated Asset Allocation and Resolution of Intercompany Claims**

As discussed more fully below, the Stipulated Asset Allocation is a reasonable

settlement of inter-Debtors Claims and other issues by and among the Debtors' Estates, which

satisfies the standards of Bankruptcy Rule 9019(a) and, accordingly, should be approved.

> **5.    The EPD/Breach Claims Protocol**

As discussed more fully below, the EPD/Breach Claims Protocol establishes a

fair, streamlined process for estimating EPD/Breach Claims pursuant to section 502(c) of the

Bankruptcy Code, and is a reasonable compromise and settlement of a class of controversies

which meets the standards of Bankruptcy Rule 9019(a) and (b).  Accordingly, the EPD/Breach

Claims Protocol should be approved.

> **6.    The Exculpation and Injunctive Provisions**

As discussed more fully below, the Plan's exculpation and injunctive provisions

are necessary and appropriate for the implementation of the Plan and are otherwise consistent

with the Bankruptcy Code and Third Circuit precedent.  Accordingly, the exculpation and

injunctive provisions should be approved.

12

**C.    The Proponents of the Plan Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2))**

Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply with the applicable provisions of title 11. 11 U.S.C. § 1129(a)(2). The principal purpose of this section is to ensure that a plan proponent has complied with the requirements of section 1125 in the solicitation of acceptances of the plan. In re Resorts Int'l Inc., 145 B.R. 412, 468-69 (Bankr. D.N.J. 1990); see also H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368.

Here, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules. On December 1, 2008, the Court entered the Disclosure Statement Order. The Disclosure Statement, the Plan, the Disclosure Statement Order, appropriate ballots, notices, and all other related documents were distributed to all parties in accordance with the Disclosure Statement Order. Similarly, the date and time of the Voting Deadline and the Confirmation Hearing were timely published in the The Wall Street Journal on December 5, 2008. [See D.I. 6857.] The Debtors have filed affidavits and certificates of service demonstrating compliance with section 1125 of the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order with respect to the transmittal of the Disclosure Statement, the Plan, and all related solicitation materials. [See D.I. 6777.] Furthermore, the Debtors have complied with all other orders of the Court entered during the pendency of these chapter 11 cases and with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules with respect to postpetition disclosure and solicitation of acceptances of the Plan. Accordingly, the Debtors have fully complied with all the provisions of title 11 and, in particular, with the provisions of section 1125 of the

13

Bankruptcy Code.  Consequently, the Debtors have satisfied the requirements of section

1129(a)(2) of the Bankruptcy Code.

    **D.**       **The Plan was Proposed in Good Faith (Section 1129(a)(3))**

        Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Although not

defined in the Bankruptcy Code, "good faith" has been interpreted by the courts to include:

(i) the debtor's "legitimate and honest purpose" in proposing the plan and "reasonable hope of

success," In re Century Glove, Inc., No. Civ. A. 90-400-SLR, 1993 U.S. Dist. LEXIS 2286, at

*15 (D. Del. Feb. 10, 1993); (ii) a showing that the plan was proposed with "honesty and good

intentions," Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (citations omitted);

and (iii) the existence of "a reasonable likelihood that the plan will achieve a result consistent

with the objectives and purposes of the Bankruptcy Code," In re Madison Hotel Assoc., 749 F.2d

410, 425 (7th Cir. 1984) (citations omitted).  The Court must also consider the totality of the

circumstances surrounding a plan to determine if it has been proposed in good faith.  In re New

Valley Corp., 168 B.R. 73, 81 (Bankr. D.N.J. 1994).

        The Plan was negotiated in good faith and is the result of arm's length

negotiations among the Debtors, the Creditors Committee, certain of the Debtors' creditors, and

a number of other parties in interest, including the Borrowers Committee.  Over the course of

these chapter 11 cases, the Debtors have realized substantial proceeds (and satisfied or otherwise

eliminated significant liabilities) from the various Court-approved sales of substantially all of

their Assets.  The Plan allows Holders of Allowed Claims to realize the highest possible recovery

from liquidation of the Assets under the circumstances.  As such, the Plan was proposed with the

legitimate and honest purpose providing the greatest possible distribution to the Debtors'

Creditors.  Additionally, the Plan has been proposed in compliance with all applicable laws, rules

DB02:7737098.5                                                         066585.1001

and regulations.  Clearly, the Plan has been conceived and proposed with the "honest purpose"

and "reasonable hopes of success" by which "good faith" under section 1129(a)(3) of the

Bankruptcy Code is measured.  Brite v. Sun Country Dev., Inc. (In re Sun County Dev., Inc.),

764 F.2d 406, 408 (5th Cir. 1985).  Accordingly, the Plan satisfies the requirements of section

1129(a)(3) of the Bankruptcy Code.

>    **E.**    **Payments for Services or Costs and Expenses (Section 1129(a)(4))**

Section 1129(a)(4) of the Bankruptcy Code requires that any payments by a

debtor "for services or for costs and expenses in or in connection with the case, or in connection

with the plan and incident to the case," either be approved by the Court as reasonable or subject

to approval of the Court as reasonable.  11 U.S.C. § 1129(a)(4).  To date, all such payments have

been approved by this Court or are subject to the approval of the Court.  The procedures for the

Court's review and ultimate determination of the fees, costs and expenses to be paid by the

Debtors satisfy the requirements of section 1129(a)(4) of the Bankruptcy Code.  Resorts Int'l,

145 B.R. at 475-76 (stating that as long as fees, costs and expenses are subject to final approval

of the court, section 1129(a)(4) of the Bankruptcy Code is satisfied).

>    **F.**    **Service of Certain Individuals (Section 1129(a)(5))**

Sections 1129(a)(5)(A)(i) and (ii) of the Bankruptcy Code require that the plan

proponent disclose the "identity and affiliations of any individual proposed to serve, after

confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or  successor to

the debtor under the plan," and require a finding that the "appointment to, or continuance in,

such office of such individual, is consistent with the interests of creditors and equity security

holders and with public policy."  11 U.S.C. § 1129(a)(5)(A)(i)-(ii).

The Debtors have disclosed in the Plan Trust Agreement and/or will disclose on

the record at the Confirmation Hearing the identity and affiliations of the individuals or Entities

proposed to serve as the Plan Trustee and the members of the Plan Oversight Committee members after the Effective Date, including the compensation of any insiders, and the appointment to, or continuation in such offices of each such individual is consistent with the interests of Creditors and with public policy. No officers, directors or managers, other than the Plan Trustee, have been or need to be appointed at this time.[4] As a result, the Plan satisfies section 1129(a)(5)(A) of the Bankruptcy Code.

G.      **Rate Changes (Section 1129(a)(6))**

Section 1129(a)(6) of the Bankruptcy Code requires any governmental regulatory commission having jurisdiction over the rates charged by the post-confirmation debtor in the operation of its business to approve any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6). Because no governmental regulatory commission will have jurisdiction over the Debtors (or the Plan Trust) after confirmation of the Plan, the provisions of section 1129(a)(6) of the Bankruptcy Code are not applicable to the Plan and, consequently, should be deemed satisfied.

H.      **The Plan Satisfies the "Best Interests" Test (Section 1129(a)(7))**

The Bankruptcy Code protects creditors and equity holders who are impaired by the Plan and have not voted to accept the Plan through the "best interests" test of section 1129(a)(7). The "best interests" test requires that holders of impaired claims or interests who do not vote to accept the plan "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on

---

[4] As amended, the Plan provides for the employment by the Plan Trust of a disinterested person to act as Borrower Information Ombudsperson. While the Borrower Information Ombudsperson has not yet been selected, the Borrower Information Ombudsperson will not be a "director, officer, or voting trustee" or an "insider" and, accordingly, does not implicate section 1129(a)(5).

16

such date." 11 U.S.C. § 1129(a)(7)(A).  If the Court finds that each non-consenting member of

an impaired class will receive at least as much under the Plan as it would receive in a chapter 7

liquidation, the plan satisfies the best interests test.  Century Glove, 1993 U.S. Dist. LEXIS 2286,

at *23.

        The Debtors submit that, with respect to each impaired Class of Claims or

Interests, each Holder of a Claim or Interest in such impaired Class (i) has accepted the Plan; (ii)

will receive or retain under the Plan on account of such Claim or Interest property of a value, as

of the Effective Date, that is not less than the amount that such holder would receive or retain if

the Debtor entity was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date;

or (iii) has agreed to receive less favorable treatment.  Therefore, the Plan satisfies the

requirements of section 1129(a)(7) of the Bankruptcy Code.

**I.      Acceptance of the Plan by Each Impaired Class (Section 1129(a)(8))**

        Classes 1B(1) *et seq.*, except to the extent set forth below, 1C(1), 1C(2), 1C(3),

2B(1)(a) *et seq.*, except to the extent set forth below, 2B(2), 2B(3), 2C(1), 2C(2), 2C(3), 2C(4),

3B(1)(a) *et seq.*, except to the extent set forth below, 3B(2), 3B(3), 3C(1), 3C(2), 3C(3), 4B(1)(a)

*et seq.*, except to the extent set forth below, 4B(2), 4C(1), 4C(2), 4C(3), 5B(1)(a) *et seq.*, except

to the extent set forth below, 5B(3), 5B(4), 5C(1), 5C(2), 5C(3), 6B(1) *et seq.*, except to the

extent set forth below, 6C(1), 6C(2), 7B(1), *et seq.,* except to the extent set forth below, 7C(1),

7C(2), 8B(1) *et seq.*, except to the extent set forth below,8C(1), 8C(2) are impaired by the Plan

and each Class has voted to accept the Plan.

        With respect to the secured classes, the Holders of the sole Claims in Classes

1B(1)(n) and 1B(1)(q) in the AHM Holdings case, and 5B1(o), 5B1(p), and 5B(2) in the AHM

Corp. case, (collectively, the "Rejecting Secured Classes") voted to reject the Plan.  Additionally,

because, under the Plan, each holder of a Miscellaneous Secured Claim is provided its own

17

subclass, holders of Miscellaneous Secured Claims who did not vote to accept or reject the Plan are each deemed to be non-accepting classes (collectively with the Rejecting Secured Classes, the "Non-Accepting Secured Classes").  With respect to the unsecured classes, one claimant having more than 33% of the voting amount in Class 1C(4) in the AHM Holdings case voted to reject the Plan, which resulted in rejection by the entire class.   Because the holders of Class 1D,1E, 2D, 2E, 3D, 3E, 4D, 4E, 5D, 5E, 6D, 6E, 7D, 7E, 8D, and 8E Claims and Interests (together with Class 1C(4) and the Non-Accepting Secured Classes, the "Non-Accepting Classes") will not receive or retain any property on account of such Claims or Interests, pursuant to section 1126(g) of the Bankruptcy Code, these Classes are deemed not to have accepted the Plan.  Notwithstanding the lack of compliance with section 1129(a)(8) of the Bankruptcy Code with respect to these Classes, the Plan is confirmable because, as described below, the Plan satisfies the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to the Non-Accepting Classes.

**J.**      **The Plan Satisfies the "Cram Down" Requirements with Respect to the Non-Accepting Classes**

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan when the plan is not accepted by all impaired classes of claims or interests. Specifically, section 1129(b) provides, in pertinent part:

> [I]f all of the applicable requirements of subsection (a) of [section 1129] other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b).

18

This section essentially provides two requirements for "cramdown" of a plan on a dissenting impaired class: (i) that the plan does not discriminate unfairly, and (ii) that it be fair and equitable, with respect to such class. 11 U.S.C. § 1129(b)(1). Section 1129(b) of the Bankruptcy Code does not prohibit discrimination between classes, but only discrimination that is unfair. In re 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990). The weight of judicial authority holds that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar claims are treated differently without a reasonable basis for the disparate treatment. In re Kennedy, 158 B.R. 589, 599 (Bankr. D.N.J. 1993); In re Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990). Thus, with respect the Non-Accepting Classes, there is no unfair discrimination if (i) the classes comprise dissimilar claims or interests, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment. In re Johns-Manville Corp., 68 B.R 618, 636 (Bankr. S.D.N.Y. 1986); Buttonwood Partners, 111 B.R. at 63; In re Rivera Echevarria, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding the fact that the Non-Accepting Classes are impaired and either voted to reject, or are deemed not to have accepted the Plan. Other than the failure to satisfy the requirement in section 1129(a)(8) of the Bankruptcy Code with respect to the Non-Accepting Classes, all of the requirements of section 1129(a) of the Bankruptcy Code have been met. The Plan does not discriminate unfairly and is fair and equitable with respect to the Non-Accepting Classes.

With respect to the Non-Accepting Secured Classes, the Plan provides, among other things, for the realization by such holders of the indubitable equivalent of such claims and,

19

accordingly, satisfies section 1129(b)(2)(A) of the Bankruptcy Code. Moreover, the Plan is fair

and equitable with respect to the unsecured classes because no holders of Claims or Interests

junior to the Claims and Interests in the Non-Accepting Classes will receive or retain any

property under the Plan on account of their respective Claims or Interests. Moreover, as

evidenced by the estimates contained in the Disclosure Statement and by the evidence in the

record, no holders of Claims or Interests senior to the Non-Accepting Classes are receiving more

than full payment on account of such senior Interests. Therefore, the "cramdown" provisions of

sections 1129(b)(2)(B) and 1129(b)(2)(C) are also met and the Plan is confirmable

notwithstanding the Non-Accepting Classes.

K.    **Treatment of Priority Claims (Section 1129(a)(9))**

Section 1129(a)(9) of the Bankruptcy Code states that holders of certain types of

priority claims must receive specific treatment dependent upon the circumstances of such claims,

unless the holders of such claims have agreed to different treatment. 11 U.S.C. § 1129(a)(9).

Except to the extent that the holder of a particular Allowed Claim has agreed to a different

treatment of such Claim, the Plan provides that Allowed DIP Facility Claims, Administrative

Claims, Priority Tax Claims and Priority Claims Against All Debtors will be treated in

accordance with section 1129(a)(9) of the Bankruptcy Code. Therefore, the Plan satisfies the

requirements of section 1129(a)(9) of the Bankruptcy Code.

L.    **Acceptance of at Least One Impaired Class (Section 1129(a)(10))**

If a plan has one or more impaired classes of claims, section 1129(a)(10) of the

Bankruptcy Code requires that at least one such class vote to accept the plan, determined without

including any acceptance of the plan by any insider. 11 U.S.C. § 1129(a)(10). At least one of

the Classes of Claims for each of the Debtors that is impaired under the Plan has voted to accept

20

the Plan, which acceptance has been determined without including any acceptance of the Plan by any insider of the Debtors. Thus, the Plan meets the requirements of this section.

**M.    Feasibility (Section 1129(a)(11))**

Section 1129(a)(11) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement, commonly known as the "feasibility" standard, usually encompasses two interrelated determinations: (i) the debtor's ability to consummate the provisions of the plan, and (ii) the debtor's ability to reorganize as a viable entity. In re Lakeside Global II, Ltd., 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (stating that the definition of feasibility "has been slightly broadened and contemplates whether [a] debtor can realistically carry out its Plan . . . and [b] whether the Plan offers a reasonable prospect of success and is workable").

Since the Plan expressly provides for the liquidation of the Debtors, section 1129(a)(11) of the Bankruptcy Code is satisfied. In re Revco, 131 B.R. 615, 622 (Bankr. N.D. Ohio 1990) (holding that "[s]ection 1129(a)(11) is satisfied as the plan provides that the property of [the] Debtors shall be liquidated"). The Debtors will have Cash in an amount necessary to ensure that the holders of Allowed Claims receive the distributions required under the Plan. Additionally, Section 9B(2) of the Plan provides for the creation of a S/A/P Claims Reserve and Unsecured Claims Reserve, which will consist of Cash held in reserve, from and after the Effective Date, from the Plan Trust Assets, for the benefit of the holders of Disputed Claims. Accordingly, confirmation of the Plan is not likely to be followed by the liquidation, or the need

21

for further financial reorganization, of the Debtors, except as contemplated by the Plan.

Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

N.    **Payment of Certain Fees (Section 1129(a)(12))**

Section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under

28 U.S.C. § 1930 be paid or that the plan provide for their payment on the effective date of the

plan. 11 U.S.C. § 1129(a)(12). Section 3C of the Plan provides that all fees due and payable

pursuant to 28 U.S.C. § 1930 shall be paid on the Effective Date or by the Plan Trustee when

otherwise due out of the Plan Trust Operating Expense Reserve. Therefore, the Plan satisfies the

requirements of section 1129(a)(12) of the Bankruptcy Code.

O.    **Satisfaction of Retiree Benefits (Section 1129(a)(13))**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the

continuation of retiree benefits at levels established pursuant to section 1114 of the Bankruptcy

Code for the duration of the period that the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13). The Debtors do not have any "retiree benefits" programs, as such term

is defined in section 1114 of the Bankruptcy Code, and therefore section 1129(a)(13) of the

Bankruptcy Code is inapplicable to the Plan.

P.    **Only One Plan (Section 1129(c))**

Section 1129(c) of the Bankruptcy Code provides that "the court may confirm

only one plan, unless the order of confirmation in the case has been revoked under section 1144"

of the Bankruptcy Code. Other than the Plan (including previous versions thereof), no plan has

been filed in these Chapter 11 Cases. Accordingly, the requirements of section 1129(c) of the

Bankruptcy Code have been satisfied.

DB02:7737098.5    066585.1001

Q.    **Principal Purpose of the Plan (Section 1129(d))**

Section 1129(d) of the Bankruptcy Code provides that "Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933." No governmental unit has requested that the Plan not be confirmed on the grounds that the primary purpose of the Plan is the avoidance of taxes or the avoidance of application of Section 5 of the Securities Act of 1933, and the primary purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933. Therefore, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

R.    **Satisfaction of Bankruptcy Rule 3016(a)**

Bankruptcy Rule 3016(a) provides that "Every proposed plan and any modification thereof shall be dated and, in a chapter 11 case, identified with the name of the entity or entities submitting or filing it." The Plan is dated and identifies the Debtors as the entities submitting the Plan, and therefore complies with Bankruptcy Rule 3016(a).

S.    **Satisfaction of Bankruptcy Rule 3016(c)**

Bankruptcy Rule 3016(c) provides that "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." In accordance with Bankruptcy Rule 3016(c), Article 12 of the Plan describes in specific and conspicuous language all acts to be enjoined and identifies the entities that would be subject to the injunction.

## III.    RESOLUTIONS OF, OR RESPONSE TO, OBJECTIONS

As noted in Section 1.D above, the Debtors have received various objections to confirmation of the Plan, a number of which have been resolved.  The status of, and responses to, the majority these objections are set forth in the attached <u>Exhibit A</u>.  The objection of the Borrowers Committee is addressed below and includes, as appropriate, responses to certain other objections to the permissive provisions of the Plan.

### A.    Debtors' Responsiveness to Borrower Issues

With respect to Plan issues, the Debtors continued to work with individual borrowers, the Creditors Committee and the United States Trustee, as well as the recently-appointed Borrowers Committee.  More specifically, the Debtors have already answered questions and addressed a number of borrower-related concerns with respect to the Plan by:

- Providing prospective relief from the Plan's injunctive and stay provisions to permit borrowers to assert counterclaims and defenses in foreclosure actions brought by or on behalf of the Plan Trust;

- Providing prospective relief from the Plan's injunctive and stay provisions for borrowers under loans originated or serviced by one or more of the Debtors to (a) commence or continue any action against the Debtors nominally for the purpose of obtaining relief against a non-Debtor party, (b) seeking third-party discovery from the Debtors or the Plan Trust in connection with litigation with a non-Debtor party, and/or (c) with the prior written consent of the Plan Trustee, commence or continue any action against the Debtors for the purpose of liquidating a Borrower Claim against the Debtors;

- Expressly preserving borrowers' rights (i) to assert defenses to payment of amounts due on loans owned by the Debtors; (ii) to assert nonmonetary remedies (including rescission under the Truth in Lending Act) against the Plan Trust; and (iii) to set off or recoup Borrower Claims against amounts owing on loans owned or contributed to the Plan Trust by the Debtors;

- Requiring the Plan Trust to employ a disinterested person as a borrower information ombudsperson to respond to borrowers' information requests and inquiries regarding borrowers' rights and treatment of Borrower

DB02:7737098.5                                                                    066585.1001

Claims under the Plan, and set aside $50,000 from the Plan Trust Operating Expense Reserve to pay for it;

- Requiring the Plan Trustee to provide the Borrower Information Ombudsperson with the Debtors' electronic records regarding loan files and loan sales/servicing transfers, and authorizing the Borrower Information Ombudsperson to disclose to borrowers (i) the identity of the purchaser of their loan from the Debtors and (ii) the identity of the servicer to whom the Debtors initially transferred servicing of the loan.

- For loans owned by the Plan Trust, requiring the Plan Trustee to confer with the borrower (or direct the loan servicer to confer with the borrower) within thirty (30) days regarding a written request for loan modification or, in the event they do not have the power to modify the loan, forwarding the modification request to the appropriate party (if known);

- Requiring the Plan Trustee to use reasonable efforts to contact a borrower-claimant to obtain information regarding the asserted claim and to make a reasonable offer of settlement prior to objecting to a Borrower Claim;

- Requiring objections to Borrower Claims to include a certification regarding the reasonable efforts taken and settlement offer provided and instructions to the borrowers regarding the court's telephonic appearance procedures;

- Clarifying that nothing in the Plan precludes a borrower's right to seek relief from any applicable Bar Date pursuant to Bankruptcy Rule 9006(b) to obtain Allowance of, or distribution upon, a Borrower Claim against any Debtor;

- Expressly providing that, with the exception of the Exculpated Parties, nothing in the Plan affects the rights of the borrowers as against third parties (including the current owners of their loans), including the ability to seek equitable subordination of any third party's claim;

- Reformatting the Plan so that borrower-specific provisions appear in a separate article for ease of reference.

**B.    The Borrowers Committee Objection**

Despite the Debtors' responsiveness to and attempts to safeguard the unique, primarily non-monetary interests of borrowers under the Plan (which interests were identified in motion to appoint the Borrowers Committee as the principal reason for affording borrowers

representation apart from the Creditors Committee), the Borrowers Committee raises objections (the "BC Obj") to plan confirmation based on (i) notice of the Bar Date, (ii) the settlement of intercompany claims through the Stipulated Asset Allocation, as it impacts Creditors of AHM Corp., (iii) the best-interests-of-creditors test with respect to Creditors of AHM Corp., (iv) the EPD/Breach Claims Protocol, (v) hypothetical conflicts of interest for Plan Trustee and advance exculpation, and (vi) the extension of the automatic stay, each of which are addressed in turn.

> ## 1.  Notice of the Bar Date Was Adequate and Should Not Affect Confirmation of the Debtors' Plan
>
> ### (i)  The Borrowers, As a Whole, Are Not Entitled to Actual Notice of the Bar Date

An elementary and fundamental requirement of due process in any proceeding is providing notice that is reasonably calculated, <u>under all the circumstances</u>, to apprise interested parties of the pendency of the action. <u>See</u> <u>Mullane v. Central Hanover Bank</u>, 339 U.S. 306, 314 (1950) (emphasis added). In the bankruptcy circumstance, this requirement is balanced with the fundamental principal purpose of bankruptcy law: to secure, within a limited period, the prompt and effectual administration and settlement of the debtor' estate. <u>Chemetron Corp. v. Jones</u>, 72 F.3d 341, 346 (3d Cir. 1995). In the context of bar dates, courts have balanced these two principals by providing that "known" creditors are entitled to actual notice of a debtors' bar date while publication notice is sufficient for "unknown" creditors.

Known creditors are those creditors whose identities are "reasonably ascertainable by the debtors." <u>Id.</u>; <u>Lousiana Dept. of Environmental Quality v. Crystal Oil Co. (In re Crystal Oil Co.)</u>, 158 F.3d 291, 297 (5th Cir. 1998). For a claim to be reasonably ascertainable, "the debtor must have in his possession, at the very least, some <u>specific</u> information that reasonably suggests <u>both</u> the claim for which the debtor may be liable and the entity to whom he would be liable." <u>Crystal Oil Co.</u>, 159 F.3d at 297 (emphasis added). While debtors have a duty to

26

perform reasonable diligence of their own books and records to ascertain known creditors, such

diligence neither requires "impracticable and extended searches in the name of due process" nor

raises a "duty to search out each conceivable or possible creditor and urge that person or entity to

make a claim against it." Chemetron, 72 F.3d at 346. On the other hand, unknown creditors are

creditors whose "interests are either conjectural or future or, although they could be discovered

upon investigation, do not in due course of business come to the knowledge of the debtor." Id.

(citing Mullane, 339 U.S. at 317); see also NVR v. Hebell v. NVR, Inc., Case No. 97-C-4000,

1997 U.S. Dist. LEXIS 10786, *5 (N.D. Ill. July 21, 1997) (holding that claims of homeowner-

mortgagors were "merely speculative" and, thus, the debtors were not required to give actual

notice to such parties despite having availability of their addresses through servicing records).[5]

Here, in accordance with the terms of the Bar Date Order, the Debtors mailed

notices of the General Bar Date to, among others, all known entities holding potential prepetition

claims, including borrowers or their counsel (if known) who had commenced or threatened to

commence litigation against the Debtors. [See D.I. 2439, 2460, 2461, 2604, 2749, 2751, 2752,

& 2800.] Additionally, the Debtors ascertained that borrowers of home equity lines of creditor

and/or construction loans are "known creditors" because the Debtors knew they potentially had

additional, unsatisfied obligations under these loans post-closing (i.e., depending on the

applicable contract and the borrowers satisfying certain conditions precedent, the Debtors were

potentially required to extend additional sums consistent with the home equity lines of credit or

construction draws) which may give rise to a claim against the Debtors' estates. Accordingly,

the Debtors requested, and received, a subsequent bar date (the "Borrowers Bar Date") for

borrowers under home equity and construction loans to ensure that each applicable borrower was

given adequate notice of his or her right to file a proof of claim in these cases. The Debtors

---

[5] A copy of the decision is attached hereto as Exhibit B.

mailed notices of the Borrowers Bar Date to all known borrowers under home equity and

construction loans.[6] [D.I. 3239]. All other borrowers received notice of the applicable bar dates

through publication. [See D.I. 3284, 3285, 3286 & 5999.]

    Despite these efforts by the Debtors, the Borrowers Committee seeks to eviscerate

the General Bar Date, thereby further delaying the administration of the chapter 11 cases. As an

initial matter, the Borrowers Committee submits that the borrowers must be provided actual

notice merely because the Debtors had names and addresses of the borrowers.[7] (BC Obj., p. 3.)

Simply put, this is not the applicable standard. See Crystal Oil Co., 159 F.3d at 297 (requiring

knowledge of both identity and a potential claim). Indeed, the only apparent court to have

addressed this particular fact issue has expressly rejected the argument that homeowner-

mortgagees are "reasonably ascertainable" by the mere fact that the servicer had addresses of

such parties. See Hebell, 1997 U.S. Dist. LEXIS 10786, *5. In Hebell, class action plaintiffs

commenced litigation asserting an unlawful and systematic maintenance of deposits in plaintiffs'

escrow accounts above limits set forth in their mortgage contracts. Id. at *1. The complaint was

filed against the discharged debtor-servicer and its successor in interest. The court determined

that, although the debtor-servicers' records included the names and addresses of the

homeowners, the records:

> did not indicate that the Hebells or any potential class members
> were or would file suit in the future, thereby becoming claimants.
> At the time, the Hebells' claims were merely speculative. [The
> debtor] could not have been expected to anticipate that the Hebells
> would bring this claim. Thus, the Hebell's [sic] and their putative

---

[6] The Debtors also published notice of the Borrowers Bar Date in the national edition of the *New York Times*. [D.I. 5999]

[7] The Debtors do not agree with this allegation. As established by the record of the case, the Debtors' loan products were frequently sold on the secondary market, many of which were sold on a servicing-released basis. After sale, the Debtors were not obligated to update their records and, therefore, are uncertain whether the names and addresses in their databases accurately reflect the current addresses of the borrowers. Moreover, mortgaged properties are not necessarily primary residences as the Borrowers Committee alleges, but may have been purchased as investment or rental properties.

class are considered "unknown" creditors, as such, publication
notice was sufficient.

Id. at *5.

The Borrowers Committee next argues that Debtors "should have known" of

potential claims from borrowers due to (i) the "widespread allegations" regarding their loan

origination and servicing practices, (ii) the high rate of foreclosures resulting from resetting

mortgage interest rates, and (iii) allegations that the borrowers originated the "riskiest" types of

loans. Not only is this argument based on unfounded, sweeping allegations, but it also holds the

Debtors to a "reasonably foreseeable" test, which has been flatly rejected in this Circuit. See

Chemetron Corp. v. Jones, 72 F.3d 341, 347 (3d Cir. 1995) (bankruptcy court committed clear

error when it "crafted a 'reasonably foreseeable' test").

Since its appointment, the Borrowers Committee has made broad allegations

against the Debtors regarding their loan origination and servicing practices. To date, the

Borrowers Committee has not substantiated these claims on a systemic level or otherwise,[8] but

instead, highlights a miniscule number of purported borrower claimants and uses these limited

stories in an attempt to create a mountain out of a molehill. First, by the Objection, the

Borrowers Committee identifies five (5) persons who have supposedly asserted pre-petition

lawsuits against the Debtors on bases similar to the claims asserted in class action lawsuits

against other lenders. Of these five (5) individuals, three (3) were served with actual notice of

the General Bar Date.[9] With respect to the two (2) individuals not served, one timely filed a

proof of claim (and commenced an action against the Debtors in violation of the automatic stay

---

[8] In their Objection, the Borrowers Committee continues to argue upon information and belief, and notes that one of
the Debtors' loan products "appears" to have the same characteristics as loans determined to be presumptively unfair
in Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d 554 (Mass. 2008).

[9] Mr. Tilton Jack, Mr. Christopher Bilek and Ms. Paula Rush were served actual notice of the General Bar Date. See
D.I. 2439. Only Mr. Bilek, who is represented by counsel, did not file a proof of claim.

in August of 2008)[10] and the other individual does not appear in the Debtors' records, but rather

appears to have a claim against CBSK Financial Group, Inc. d/b/a "American Home Loans," an

entity wholly unaffiliated with the Debtors.[11]  The Borrowers Committee has indicated that they

intend to call two additional borrowers as witnesses at the Confirmation Hearing regarding their

loans.  The inclusion of two additional stories does not amount to evidence of a systemic fraud.

Indeed, the proposed testimony will support the Debtors' position that issues regarding whether

borrowers were known or unknown creditors should be handled on an individual basis. [12]

        Second, the Borrowers Committee is inappropriately using the current economic

climate to imply that the Debtors "should have known" that the borrowers had claims against the

Debtors. (BC Obj, p. 7-8, 14.)  Indeed, the Borrowers Committee cites to a number of national

class actions lawsuits being filed against other mortgage lenders to bolster its argument.  (BC

Obj, p. 7.)  However, suits against other lenders are not evidence of the Debtors' actions.

Moreover, the Debtors' loan products were in compliance with regulatory guidelines and clearly

were not *per se* predatory or unfair.  In any event, the proper place for such accusations is in the

claims reconciliation process, not in an argument against plan confirmation.[13]  The Debtors do

not deny a potential for isolated incidents of broker fraud or TILA omission; however, these

isolated incidents are not tantamount to a systemic scheme to defraud customers, and they are not

---

[10] The Objection references a Complaint in the Florida Circuit Court filed on April 3, 2007.  Following a review of the Florida Circuit Court's records, the Debtors were unable to locate any such filing.  Additionally, the Verified Complaint of the Acquistos, which is attached to the Objection as Exhibit F, does not reference any actions taken in April 2007.

[11] See Exhibit D to the Objection (Ms. Mullins' Memorandum in Support of Motion), p.6 (referencing CBSK Financial Group, Inc. dba American Home Loans, Case No. 2006-9993357).

[12] See Dandridge Dep. Tr. p. 12-13 (testifying that she never made the Debtors aware in writing that the loan she received was different than the loan she thought she was obtaining); Graves Dep. Tr., p. 24 (testifying that, other than the complaint filed in March of 2008, she had not sent anything in writing to the Debtors setting forth that the loan she has was not what she thought she was getting).  Copies of the relevant pages of the depositions are attached as Exhibits C and D, respectively.

[13] The Debtors expressly reserve the right to argue that these issues are beyond the scope of the Court's order authorizing the appointment of the Borrowers Committee and that any fees and expenses incurred by the Borrowers Committee relating to these arguments are unreasonable.

30

readily ascertainable from the Debtors' records. To the extent the borrowers made these incidents known to the Debtors through commencing or otherwise threatening litigation, such borrowers were served with notice of the Bar Date. Questions as to whether the Debtors had knowledge of a particular borrowers' assertions of potential claims should be handled on a case-by-case basis.

Moreover, many of the cases cited by the Borrowers Committee to support their argument that the claims were "reasonably foreseeable" (again, the improper standard) were not commenced, and none of them were decided, until 2008 after the Court approved and the Debtors served the Bar Date Notice. Even if these class actions are evidence of the potential for borrowers claims, such evidence was neither available to the Debtors in October 2007 when notice of the General Bar Date was being served (or even by the General Bar Date in January of 2008) nor are they relevant to the Borrowers Committee's argument. Whether the Debtors "should have known" that many borrowers may have claims against the Debtors is simply not the standard. Chemetron, 72 F.3d at 347. In Chemetron, the Third Circuit determined the bankruptcy court's application of a "reasonably foreseeable" test was clearly erroneous. Id. (rejecting courts' finding that debtor should have known it could suffer claims from individuals living near the debtors' uranium landfill); see also Crystal Oil, 158 F.3d at 297 (dispensing "easily" with the argument that debtors should have contemplated a claim from a state environmental agency simply because the debtor was involved in the oil business and had dealt with other environmental agencies). Here, as was the case in Hebell, the borrowers did not make the Debtors aware of the potential claims until after the applicable bar date and, thus, remained "unknown creditors" for purposes of the bar date notices. 1997 U.S. Dist. LEXIS 1076, at *5.

31

### (ii) Because Borrowers Were Not "Known" Creditors, Publication Notice Was Sufficient

It is well established that, in providing notice to unknown creditors, constructive notice of bar dates by publication satisfies the requirements of due process. Chemetron Corp. v. Jones, 72 F.3d 341, 348 (3d Cir. 1995) (citing City of New York v. New York, N.H & H.R. Co., 344 U.S, 293, 296 (1953)). The Borrowers Committee argues that publication in the national edition of the *New York Times*, and two regional papers for Dallas and St. Louis is "not an appropriate way to reach all borrowers in all parts of the country with claims relating to American Home mortgages." (BC Obj., p. 16.) However, the Borrowers Committee fails to recognize that publication in national newspapers, such as the *New York Times*, is regularly deemed sufficient notice to unknown creditors. Id. at 348-49 ("It is impracticable . . . to expect a debtor to publish notice in every newspaper a possible unknown creditor may read.") (internal citations omitted).

The *New York Times* has the third largest newspaper circulation in the nation with an average daily circulation of over 1 million papers. Moreover, the *New York Times* has been deemed sufficient publication in numerous chapter 11 cases in this district. See, e.g., In re National Dry Cleaners, Inc., Case No. 08-11382 (CSS) (Bankr. D. Del. Sept. 9, 2008); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. May 12, 2008); In re Premium Papers Holdco, LLC, Case No. 06-10269 (CSS) (Bankr. D. Del. June 12, 2006); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. Apr. 11, 2006); In re Metalforming Technologies, Inc., Case no. 05-11697 (MFW) (Bankr. D. Del. Sept. 8, 2005); In re Pharmaceutical Formulations, Inc., Case No. 05-11910 (MFW) (Bankr. D. Del. Aug. 25, 2005).

32

One-time publication in the same or similar newspapers has also been deemed sufficient in other mortgage cases in this district.  See, e.g., In re Homebanc Mortgage Corp., Case No. 07-11079 (KJC) (Bankr. D. Del. Oct. 15, 2007) (publication in *New York Times*); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. June 28, 2007) (publication in *Wall Street Journal*).

Additionally, the Debtors published in two regional papers, including the *Dallas Morning Star*, a paper whose general circulation is in location where the Debtors' servicing business operated.  See Chemetron, 72 F.3d at 349 (publication notice sufficient "especially where supplemented, as here, with notice in papers of general circulation in locations where the debtor is conducting business").

For the foregoing reasons, the Court-approved method of publication for unknown creditors was sufficient.

### (iii) Assuming *Arguendo* That Borrowers Were "Known" Creditors, Notice by Publication Is Appropriate Under the Circumstances

Notice by publication may be "entirely appropriate when potential claimants are numerous, unknown, or have small claims (whether nominally or, . . . . realistically) – all circumstances that singly or in combination may make the cost of ascertaining the claimants' names and addresses and mailing each one a notice of the bar date and processing the responses consume a disproportionate share of the assets of the debtor's estate."  Fogel v. Zell, 221 F.3d 955, 963 (7th Cir. 2000).  As noted by the Seventh Circuit Court of Appeals, the sheer number of potential creditors in relation to the size of their claims may make it excessively costly to provide direct notice to all of them, "especially when the claims are discounted to reflect their actual value."  Id. (publication notice may be sufficient where direct notice "might eat up the debtor's estate").

33

Here, the Debtors originated over 950,000 loans between the years of 1999 and 2007. Even assuming that the Debtors had last-known addresses for these borrowers in a readily accessible file to provide to the claims agent, mailing individual notice of the bar date to 950,000 borrowers would cost nearly $900,000. As noted above, the Debtors' loans (i) were frequently sold on the secondary market, (ii) may have been paid off, modified, refinanced or otherwise disposed, and (iii) were not necessarily purchased as a primary residence. Accordingly, the borrower names and addresses set forth in the Debtors' records are likely not up-to-date and do not necessarily constitute names and addresses of parties who have actual or potential claims against the Debtors. The cost to review individual borrowers' files to investigate whether they may have potential claims—which is far beyond what is required under applicable Third Circuit law—would devour a substantial portion of the remaining asset value available for distribution to Unsecured Creditors in these cases.

In contrast, the main statutory damages for individual borrowers under TILA are limited to $4,000 or rescission. 15 U.S.C. § 1640. Because the Debtors sold (or returned as collateral) a vast majority of the loans they originated, rescission is not an available remedy against the Debtors. This remedy, however, is available against the current owner of the loan, and the Debtors, through the various sale orders and Plan provisions have expressly reserved the borrowers' rights in accordance with section 363(o) of the Bankruptcy Code.[14] Thus, the claims remaining against the Debtors are damages statutorily capped of $4,000.[15] Given that the estimated recovery in these cases for which the borrowers are likely to have claims (i.e., AHM

---

[14] Section 363(o) of the Bankruptcy Code provides, in pertinent part, that "if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract . . ., and if such interest is purchased through a sale under [§ 363], then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section." 11 U.S.C. § 363(o).

[15] Many of the allegations regarding TILA violations made by the Borrowers Committee, however, do not provide for statutory damages.

Acceptance, AHM SV, and AHM Corp.) are between 0.19% and 1.30% (Disclosure Statement,

p. 9), recovery on borrowers' claims would range from approximately $7.60 to $52. Due to the

*de minimis* nature of these recoveries, most of these claimants would not even be entitled to a

distribution under the Plan. (See Plan Art. 9.F (setting $50 as the threshold minimum payout).)

### (iv) Assuming *Arguendo* that Notice of the Bar Date Was Insufficient, Such Deficiency Does Not Affect Confirmation of the Plan

In the event that this Court does determine that notice of the Bar Date is

insufficient, such deficiency does not affect confirmation of the Plan. Here, the Classes relating

to Borrower Claims for all but one the Debtors' estates have overwhelmingly voted to accept the

Plan.[16] There is no evidence that the holders of any additional Borrower Claims would vote

differently. More importantly, even assuming that the Classes of Borrower Claims voted to

reject the Plan, the Plan would still be confirmed pursuant to section 1129(b) of the Bankruptcy

Code.

As noted above, section 1129(b) of the Bankruptcy Code essentially provides two

requirements for "cramdown" of a plan on a dissenting impaired class: (i) that the plan does not

discriminate unfairly, and (ii) that it be fair and equitable, with respect to such class. 11 U.S.C. §

1129(b)(1). Section 1129(b) of the Bankruptcy Code does not prohibit discrimination between

classes, but only discrimination that is unfair. In re 11,111, Inc., 117 B.R. 471, 478 (Bankr. D.

Minn. 1990).

Here, no holders of Claims or Interests junior to the Borrower Claims will receive

or retain any property under the Plan on account of their respective Claims or Interests.

Moreover, as evidenced by the estimates contained in the Disclosure Statement and by the

evidence in the record, no holders of Claims or Interests senior to the Borrower Claims are

---

[16] The only Class of Borrower Claims who did not vote in favor of the Plan is Class 1C(4) against AHM Holdings. One claimant, with a claim amount of over 50% of the amounts voting, voted to reject the Plan.

receiving more than full payment on account of such senior Claims.  Therefore, the "cramdown"

provisions of section 1129(b) are met and the Plan is confirmable notwithstanding the potential

of a rejecting Class of Borrower Claims.

Notably, this Court appointed the Borrowers Committee to raise concerns about

the Plan on behalf of all borrowers.  Accordingly, borrowers' rights with respect to the Plan have

not been prejudiced.

2.    **The Settlement of Intercompany Claims through the Stipulated Asset Allocation Satisfies the Standard of Bankruptcy Rule 9019 and Does Not Prejudice Borrowers**

The existence of intercompany claims in jointly administered cases necessarily

places each debtor's estate and creditors in an adverse posture with other debtors' estates and

creditors.  Potential conflicts are numerous, and the resolution of each may ultimately affect

creditor recoveries by altering the respective debtors' assets available for distribution to creditors

or aggregate liabilities.  Prior to plan confirmation, the possibility of debilitating inter-estate

conflicts of interest is minimized by oversight of the debtors in possession by the creditors'

committee, the U.S. Trustee, and the bankruptcy court, as well as by the transparency of the

bankruptcy process and ability for creditors or other parties in interest to intervene and be heard

on any matter in which their rights may be adversely affected.  Accordingly, during these

Chapter 11 Cases, the Debtors have been able to focus largely on taking actions for their

common benefit, leaving to another day the resolution of Intercompany Claims and other inter-

Debtor disputes.

While postponing resolution of inter-Estate conflicts has resulted in cost savings

and increased efficiency during these Chapter 11 Cases, the Debtors, in consultation with the

Creditors' Committee, determined it was advisable to attempt to resolve inter-Estate conflicts

through the Plan so as to permit the post-confirmation administration of these Chapter 11 Cases

36

by a unitary Plan Trust freed from inter-Estate conflicts of interest.  Resolving inter-Estate conflicts through the Plan also provided transparency, an opportunity for Creditors and other parties in interest to be heard in opposition (whether by simply voting or by filing formal pleading), and finality.  By way of contrast, piecemeal resolution of inter-Estate conflicts after the Effective Date, even if submitted to the Bankruptcy Court for ultimate approval, would necessarily lack the procedural protections of the plan confirmation process (i.e., disclosure and solicitation), and would essentially impose upon Creditors potentially affected by such resolution an ongoing duty to monitor the administration of the Plan to ensure their rights were not being affected.

After considering various alternatives, the Debtors determined that the best mechanism for resolution of the inter-Estate conflicts would be a stipulated asset allocation, whereby the Plan Trustee would divide the proceeds of liquidation of any Plan Trust Asset between the respective Estates in accordance with a pre-set formula.  The underlying premise of this asset allocation is that, so long as Estates agree upon and stipulate to (i) the residual value of the Assets being contributed to each Estate to the Plan Trust (i.e., gross Asset value net of S/A/P Claims payable by such Estate); and (ii) the percentage share of Plan Trust Operating Expenses that will be borne by each Estate, it is possible for the Estates to share in the proceeds of all Plan Trust Assets while at the same time respecting entity separateness.[17]

---

[17] As discussed in the Disclosure Statement, the resulting Plan Trust would be analogous to a partnership whereby each partner contributes assets of a certain value (fixed by agreement of the partners), and agrees to be responsible for a fixed percentage of partnership expenses, in exchange for a right to share in any proceeds of partnership assets in an amount equal to the asset value contributed by such partner (net of that partner's share of partnership expenses) as a percentage of all asset value contributed by all partners (net of all partnership expenses).  Legal distinctions between the partners are undisturbed by the partnership relationship and, assuming (i) the validity of the agreed-upon value assigned to the partnership assets by the partners at the inception of their partnership arrangement and (ii) that the agreed-upon allocation of partnership expenses fairly reflects the relative costs associated with preserving and liquidating the assets contributed by each partner, economic distinctions between assets contributed by one partner versus another partner are preserved by virtue of the agreed-upon allocation of proceeds of partnership assets.

a.    **The Methodology Underlying the Stipulated Asset Allocation**

The majority of inter-Estate conflicts sought to be resolved via the Stipulated Asset Allocation are relevant to determining the residual Asset value that will be contributed by each Debtor's Estate to the Plan Trust. To determine this value, the Debtors began with an assumption of gross non-litigation Asset value[18] in each Estate as of the Petition Date, then made adjustments to each Estate's Asset value to reflect the settlement of prepetition intercompany payables/receivables. For purposes of these adjustments, receivables from each Debtor were treated as Assets of the various payee-Debtors and corresponding liabilities of the payor-Debtor, valued at an amount equal to the anticipated distribution to general unsecured creditors of the payor-Debtor's Estate.

For purposes of the Stipulated Asset Allocation, each Estate's total contributed asset values were determined by looking at both value realized from the disposition of assets plus an estimated value relating to assets yet to be liquidated. Each Estate was credited for the value associated with the assets it owned. The books and records were relied upon as the primary source for determining such ownership rights with a separate review of asset ownership performed by the Debtors' accounting employees to verify the proper ownership assignment of those asset values. Ownership of the economic benefits of settlements reached in these Chapter 11 Cases regarding REO and Construction Loan assets was allocated among all the Debtor entities in proportion to estimated allowed general unsecured claims against them because the Debtors entered into these settlements post-petition for the benefit of all creditors.

Based on the realized and estimated values associated with the asset ownership presented above, the resulting estimated "Adjusted Gross Non-Litigation Asset Value" for

---

[18]    As discussed further below, the Debtors believed that any valuation of litigation Assets would be highly speculative.

unencumbered value available for each Entity in the Stipulated Asset Allocation is as follows ($ amounts in millions):



| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Unencumbered Value Estimate | $ 36.07 | $ 11.02 | $ 28.31 | $ 9.52 | $ 149.57 | $ 0.60 | $ 0.26 | $ 0.54 |

The next step in the methodology underlying the Stipulated Asset Allocation was to layer in the economic effect of the settlement of intercompany receivables and payables described above. Using the ultimate projected payouts of each Debtor's Estate, the gross unencumbered value estimate reported above was adjusted to reflect the agreed upon adjusted intercompany payable/receivable balances. That adjustment, which nets to zero, is as follows:



| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Intercompany Settlement Effect | $ 1.44 | $ 10.59 | $ (0.80) | $ 1.46 | $ (12.60) | $ (0.03) | $ (0.03) | $ (0.03) |

The adjusted unencumbered value by entity is then:



| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Adjusted Gross Unencumbered Value | $ 37.51 | $ 21.60 | $ 27.51 | $ 10.98 | $ 136.98 | $ 0.57 | $ 0.23 | $ 0.51 |

Next in the allocation process, adjusted non-litigation asset values for each Estate were reduced by the amount of any:

(i)  "Direct" administrative costs (both paid and unpaid) properly chargeable to each Estate (and not properly allocable between multiple Estates) during the Chapter 11 Cases. For example, professional fees directly relating to the sale of the Servicing Business were deducted from each entity in accordance with its share of proceeds. The Debtors estimate that direct administrative costs are assignable as follows:



| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Administrative Costs - Directly Assignable | $ (0.05) | (0.05) | $ (4.60) | $ (0.85) | $ (42.34) | $ (0.00) | $ (0.00) | (0.00) |

(ii)  Payment or other settlement of secured claims postpetition (note that this deduction did not impact the amount of unencumbered value available for distribution to unsecured creditors, but instead simply reflects the value received in relation to the disposition of a secured asset being paid to the secured party); and

(iii)  Administrative costs (both paid and unpaid) allocable between multiple Estates (e.g., professional fees paid by AHM Corp. for services benefiting all Debtors), in the amount properly chargeable to such Estate, resulting in indirect administrative costs are allocated between the Estates as follows:

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Administrative Costs - Allocable | $ (25.20) | (15.59) | $ (17.89) | $ (7.76) | $ (73.28) | $ (0.41) | $ (0.12) | (0.36) |

39

Values for each Estate were reduced further by each Estate's estimated exposure to filed S/A/P Claims. The resulting Asset values represent the residual value of non-litigation Assets that will be contributed to the Plan Trust by each Estate for the benefit of its Creditors. The use of non-litigation Asset value as opposed to combined litigation and non-litigation Asset value for purposes of determining the value of Assets being contributed to the Plan Trust by each Estate is deliberate, and is based, among other reasons, on the Debtors' considered judgment that, to the extent this stipulated Asset value is the value from which each Estate will be deemed to have paid its S/A/P Claims, any reliance upon speculative valuation of litigation Assets for purposes of this calculation may call into question whether the Plan meets the Feasibility Test as to a given Debtor. The estimated S/A/P claim obligation by Entity is as follows:

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Estimated SAP Claims | $  (0.47) | $  (0.12) | $  (0.15) | $  (1.11) | $  (7.03) | $  (0.00) | $  (0.07) | $  (0.00) |

The next step in arriving at the Stipulated Asset Allocation was the determination of the proper share of Plan Trust Operating Expenses that would be borne by each Estate. In making this determination, the Debtors considered a variety of factors, including the relative value, liquidity, and costs of maintaining and liquidating the Assets being contributed to the Plan Trust by each Estate and the anticipated simplicity or complexity of the Claim reconciliation process for each Estate. After determining each Estate's percentage share of Plan Trust Operating Expenses, the Debtors further adjusted the gross Asset value of each Estate to reflect its share of a $6 million stipulated initial funding requirement for the Plan Trust Operating Expense Reserve.[19] Further, an additional contingency reserve ("Contingency Reserve") totaling $11 million was allocated to each of the entities on the same basis and in the same proportion

---

[19] This funding requirement is the Debtors' good-faith estimate of cost for the Plan Trustee to administer the Plan and carry out its duties under the Plan Trust Agreement. To the extent actual costs of administration are less than the reserved amount, any residual amount will be redistributed to the Estates pursuant to the Stipulated Asset Allocation. To the extent the actual costs of administration prove greater than the reserved amount, the Plan permits the Plan Trustee, with the approval of the Plan Oversight Committee, to fund the Plan Trust Operating Expense Reserve from the proceeds of Plan Trust Assets or to obtain funding from third-party sources.

that Plan Trust Operating Expense Reserve costs were allocated.  The Contingency Reserve is established to account for potential additional administrative or priority costs claimed against the Estates.  The basis for the allocation of these two pieces was the net residual value at each Estate after consideration of each of the items discussed above.  The Debtors believe the Plan Trust Operating Expense Reserve and the Contingency Reserve will ensure, among other things, that the Plan Trust has sufficient resources to prosecute any pending or future Causes of Action to their conclusion.  Each Estate's resulting share of funding the $6 million Plan Trust Operating Expense Reserve and the $11 million Contingency Reserve is as follows:



| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Plan Trust and Contingency Reserve | $ (5.21) | $ (2.58) | $ (2.15) | $ (0.56) | $ (6.34) | $ (0.07) | $ (0.02) | $ (0.06) |

After accounting for the allocations described above, the resulting Asset values (see table below) represent the residual value of non-litigation Assets contributed to the Plan Trust by each Estate.  The residual non-litigation Asset value of each Estate as a proportion of the total non-litigation Asset value of all Estates makes up the Stipulated Asset Allocation, namely:

| | Holdings | Investment | Acceptance | Servicing | Corp | Ventures | Homegate | Great Oak |
|---|---|---|---|---|---|---|---|---|
| Residual Value | $ 6.57 | $ 3.25 | $ 2.72 | $ 0.70 | $ 8.00 | $ 0.09 | $ 0.02 | $ 0.08 |
| Percentage Share of Residual Value | 30.67% | 15.16% | 12.68% | 3.27% | 37.30% | 0.43% | 0.11% | 0.37% |

Given the uncertainty attendant in ascertaining the value of potential Causes of Action, and given that the Plan Trustee will ultimately determine the universe of Causes of Action that the Plan Trust will pursue, the Debtors determined that the proceeds of litigation Assets should be allocated in accordance with the Stipulated Asset Allocation.  The Debtors determined that including litigation Assets as well as non-litigation Assets under the ambit of the Stipulated Asset Allocation would, among other things, further streamline administration of the Plan by obviating determinations as to the proper allocation of the proceeds of shared Causes of Action and by permitting the Plan Trustee to allocate the proceeds of all Plan Trust Assets using

41

a single formula.  Moreover, insofar as the Stipulated Asset Allocation includes an allocation of

Plan Trust Operating Expenses, certain of which will be incurred prosecuting litigation on behalf

of the respective Estates (or any combination thereof), allocating the proceeds of such litigation

between the Estates in accordance with their respective contributions to the Plan Trust Operating

Expense Reserve was, in the Debtors' considered business judgment, reasonable in consideration

of the benefits to all Estates gained from global settlement of potential inter-Estate conflicts

through the Plan.

     b.  **Standard for Approval of the Stipulated Asset Allocation**

    As a settlement of Intercompany Claims and potential inter-Estate disputes as to

the proper allocation of the costs of administering these Chapter 11 Cases, the Stipulated Asset

Allocation is subject to approval under Bankruptcy Rule 9019(a).  Settlements are favored in

bankruptcy, and will generally be approved so long as they are "fair and equitable".  See

Wheeler v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006).  To

determine whether a proposed settlement, the Court must evaluate the settlement in light of the

following four criteria: "(1) the probability of success in litigation; (2) the likely difficulties in

collection; (3) the complexity of the litigation involved, and the expense, inconvenience and

delay necessarily attending it; and (4) the paramount interest of the creditors."  See id. (quoting

Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996)).

    In evaluating the merits of the potential litigation in the context of a plan

settlement, the Court's task is not to decide the numerous questions of law and fact raised

therein, but rather to "canvass the issues to see whether the settlement falls below the lowest

point in the range of reasonableness."  In re New Century TRS Holdings, Inc., 390 B.R. 140, 168

(Bankr. D. Del. 2008).  Notwithstanding the Borrowers Committee's attack on the Debtors'

decision not to use speculative valuations of potential litigation Assets as a basis for the

                        

Stipulated Asset Allocation (which, the Borrowers Committee argues, has an adverse affect on borrower-creditors of AHM Corp.), which is discussed below, the Debtors submit that the compromises embodied in the Stipulated Asset Allocation are within the reasonable settlement range for each of the Debtors party to the Plan, and they will provide evidence and argument to that effect at the Confirmation Hearing.

  As noted by the Nutraquest court, it is axiomatic that settlement will reduce the complexity and inconvenience of litigation. 434 F.3d at 646. And here, given the complexity and interrelatedness of the Debtors' business operations, their utilization of a centralized cash management system, and the sheer volume of inter-company transactions (both in number and amount), it is obvious that a litigated resolution of Intercompany Claims (e.g., by separate chapter 7 trustees in the event these Chapter 11 Cases were converted) would be time-consuming and costly, and that the cost of such litigation "would fall upon the unsecured creditors, both in terms of a significant reduction in assets available for distribution and a delay in receiving that distribution." New Century, 390 B.R. at 168-69. Accordingly, the second Martin factor supports approval of the EPD/Breach Claims Protocol.

  Finally, with respect to the paramount interest of creditors, it is noteworthy that here, as in New Century, "[t]he voting results show vividly that the Plan is supported by a diverse creditor body," 390 B.R. at 169, unsecured classes entitled to vote on the Plan voting overwhelmingly in both number and amount to accept (including, notably, 7 of 8 borrower classes—and within the lone dissenting borrower class, 8 of 9 claimants). The Debtors submit— and creditors other than the Borrowers Committee appear to agree—that the interests of all creditors are much better served by the administration of the Plan by a unitary Plan Trust, freed from potentially debilitating inter-Estate conflicts of interest by virtue of the Stipulated Asset

43

Allocation, than by forging ahead without a global resolution of inter-Estate disputes and having to devote the Estates' limited resources to infighting over Intercompany Claims and the proper allocation of the expenses of administering these Chapter 11 Cases.

> **c.      The Borrowers Committee's Objection is Speculative and Ignores the 9019 Standard Applicable to the Stipulated Asset Allocation**

Of the myriad assumptions, determinations, and compromises embodied within the Stipulated Asset Allocation, the Borrowers Committee takes issue with only one: the exclusion of non-litigation Asset value as speculative.  Viewed in light of the Rule 9019 standard applicable to the Stipulated Asset Allocation, the Borrowers Committee's argument appears to be that it is below the lowest point of reasonableness for AHM Corp. to agree to an asset allocation that does not take into account the potential value of litigation assets because AHM Corp. made 22,488 transfers aggregating over $20 billion during the preference period prepetition.  The Borrowers Committee does not suggest how much they think AHM Corp.'s litigation assets are worth, or what value the Debtors should have attributed to them in the Stipulated Asset Allocation methodology.    Rather, the Borrowers Committee accuses the Debtors of "failing to consider" litigation recoveries and baldly asserts that this "severely impacts" potential distributions on Borrower Claims against AHM Corp.  This is simply not the case.

The Debtors specifically considered litigation asset value and decided to exclude it from the Stipulated Asset Allocation because they determined there was no non-speculative basis upon which to value the respective Estates' litigation assets.  They explained this decision in the Disclosure Statement (p. 73), stated that the valuation of each Estate's Assets was a material assumption underlying the Stipulated Asset Allocation (id.), and specifically identified the risk that "the value actually realized by the Plan Trustee from Assets contributed by a

44

particular Estate [would be] more than the value of such Assets assumed in connection with the Stipulated Asset Allocation, [in which case] the Stipulated Asset Allocation may provide a higher recovery to Creditors of other Estates at the expense of Creditors of the contributing Estate," (p. 134 (section entitled "Valuation Risk")).  The creditors who voted overwhelmingly in favor of the Plan (including all classes of unsecured claims against AHM Corp., incidentally), after a full and fair disclosure of the risks and benefits attendant to the Stipulated Asset Allocation, do not appear to have been troubled by it.  Nevertheless, the Debtors will produce evidence at the Confirmation Hearing that will demonstrate conclusively that the compromises embodied in the Stipulated Asset Allocation are well within the reasonable settlement range for all Estates, including AHM Corp.

### 3.    The Plan Does Not Result in Lower Recoveries Than Would Be Obtained in a Chapter 7 Liquidation

As set forth in the Debtors' liquidation analysis, the Plan does not result in recoveries lower than what parties would receive in a Chapter 7.  The Borrowers Committee's objection on "best interests" grounds is essentially the same as its attack on the Stipulated Asset Allocation, and is based upon rudimentary comparison of the sheer volume of transfers made by the various Debtor entities (BC Obj., p 28-30) that does not consider, among other things (i) the Debtors' centralized cash management system, (ii) that transfers were made on behalf of non-debtor entities and thus, were transfers of non-estate property, (iii) that transfers were made in the ordinary course in the Debtors' operations prepetition, and (iv) that non-ordinary course transfers may yet be insulated from avoidance by the various safe harbor provisions of the Bankruptcy Code.  The Debtors will present evidence at the Confirmation Hearing sufficient to establish that the Creditors of each Estate do as well under the Plan as they would in a chapter 7 liquidation.

DB02:7737098.5                                    066585.1001

4.    **The EPD/Breach Claims Protocol Is a Reasonable Settlement Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code 502(c) and Does Not Provide More Favorable Treatment to EPD/Breach Claims Than to Borrower Claims**

The EPD/Breach Claims Protocol, which was patterned closely after the protocol

approved as part of the chapter 11 plan in In re New Century TRS Holdings, Inc., 07-10416

(KJC) (Bankr. D. Del. July 15, 2008), is an innovative and appropriate means of dealing with

claims arising under whole loan purchase agreements and loan securitizations, which is fully

consistent with he requirements of Bankruptcy Rule 9019(b) (permitting settlement and

compromise of a class of controversies) and Bankruptcy Code section 502(c) (permitting

estimation of claims for allowance purposes).  As discussed more fully in the Disclosure

Statement, the protocol is designed to avoid protracted litigation over the amount of EPD/Breach

Claims that would otherwise threaten to consume a substantial period of time and substantial

resources, both of the Debtors' estates and of the EPD/Breach Claimants.  The Debtors

developed the protocol working closely with the Creditors Committee and the major holders of

EPD/Breach Claims, and the result is a streamlined adjudication process that will substantially

improve (and speed) distributions to creditors by avoiding the incurrence of administrative costs

that otherwise would be incurred if EPD/Breach Claims were liquidated in the ordinary claim

reconciliation process.

a.    **Background Regarding EPD/Breach Claims**

Many of the agreements that the Debtors used to sell mortgage loans in the

secondary market or to complete securitizations permitted the buyer (or its successor in interest)

to "put" the loans back to the Debtors if the Debtors breached certain seller representations and

warranties (relating, e.g., to the creditworthiness of the borrower, the completeness of the loan

documentation), or if the borrower defaulted in payment within a specified period of time

46

(usually 60-90 days) after sale of the loan.  For purposes of the Plan, "put" rights arising from

(i) a breach of representation or warranty are called "Breach of Warranty Claims" and (ii) early

payment defaults (or "EPDs") are called "EPD Claims".[20]

EPD/Breach Claims can potentially arise with respect to any of hundreds of

thousands of mortgage loans sold by the Debtors in the secondary market.  The Debtors

concluded that attempting to resolve these claims at the individual loan level would require both

the loan owners and the Debtors' Estates to expend resources that would be grossly

disproportionate to the amounts in controversy, which would deplete Assets of the Estates that

would otherwise be available to make distributions to Creditors.  Moreover, litigating

EPD/Breach Claims on a loan-by-loan basis would significantly delay distributions on account of

such Claims.  In addition, a review of the Proofs of Claim filed by Holders of Breach of

Warranty Claims revealed that many of these Claims are contingent and/or unliquidated, and

may not become liquidated for years to come.  Because loans have a potential life span of thirty

years or more, while the Plan contemplates a Plan Trust lasting approximately five years, the

Debtors determined the Plan must incorporate a mechanism for estimating and allowing

contingent and/or unliquidated Breach of Warranty Claims.

        b.      **Proposed Treatment of EPD Claims and Reasons Therefor**

The universe of potential EPD Claims is objectively determinable because the

period for a borrower payment default that could be considered an EPD passed generally by

October 2007, if not before (because the Debtors stopped selling loans in July 2007 and the EPD

provisions in most loan sale contracts only covered borrower defaults during approximately 60-

---

[20]  Under the Plan as amended, the latter category also encompasses Securitization EPD Representation Claims, which are Claims asserted by or on behalf of a securitization trust, arising from the breach of any representation in a loan purchase agreement that obligated a Debtor to repurchase a loan if the loan was in payment default at or prior to the time it was sold to the trust (for such time periods as are specified in the relevant securitization documents).

DB02:7737098.5                                                   066585.1001

90 days after the loan sale closed). The validity of putative EPD Claims is also objectively

determinable, insofar as the only information needed to establish the existence of an EPD-related

repurchase obligation under the loan purchase agreement is the existence of a borrower payment

default within he relevant time period. However, the allowable amount of a given EPD Claim

(i.e., the damages flowing from the Debtors' inability to repurchase loans for which an EPD had

occurred) is more difficult to assess. Because the Debtors failed to honor their contractual

repurchase obligations for EPD loans, purchasers of such loans from the Debtors have likely

suffered damages in some amount; however, the Debtors assert that these damages are *not*

simply equal to the repurchase price determined under the loan purchase agreement (which is the

measure of damages used by the majority of EPD Claimants in their proofs of claim[21]), because

the claimant retained the loans and they had some value to the claimant. If damages were to be

litigated on a loan-by-loan basis, the litigation could involve such issues as whether the amount

of any "loss" realized by an EPD claimant was the result of the Debtors' failure to repurchase

loans or some combination of deteriorating market conditions, how the claimant dealt with the

loan, the "value" of the loan at a historical moment in time,[22] and any number of other issues that

are fact-intensive and legally complex.

---

[21] For example, the proofs of claim of J.P. Morgan Mortgage Acquisition Corp. ("JPM") and Morgan Stanley Mortgage Capital Holdings, Inc. ("Morgan Stanley"), which are attached hereto as Exhibits E and F, respectively, assert claims equal to the repurchase amounts without regard for the underlying value of the loans. JPM and Morgan Stanley have objected to the EPD/Breach Claims Protocol to the extent it would reduce their asserted EPD/Breach Claims without an evidentiary showing sufficient to rebut the *prima facie* validity of their proofs of claim. The Debtors submit that the measure of damages used in JPM's and Morgan Stanley's proofs of claim is defective as a matter of law and, accordingly, that only a minimal evidentiary showing is required to overcome the *prima facie* validity of JPM's and Morgan Stanley's proofs of claim. The Debtors intend to make a more than adequate evidentiary showing at the Confirmation Hearing.

[22] Section 502(b) requires the bankruptcy court to "determine the amount of [a] claim in lawful currency of the United States as of the date of the filing of the petition" for allowance purposes, 11 U.S.C. § 502(b). Thus, where the Holder of an EPD Claim had a valid repurchase right as of the Petition Date but did not liquidate the loan (and thus, its claim) until some time later, there would be principled arguments to be made on both sides of the issue regarding the date of determination of damages (i.e., should the Court take the "actual" loss number or conduct a historical valuation of the loan as of the Petition Date?).

After surveying a number of asserted EPD Claims, the Debtors determined that the major factors determining the likelihood and amount of loss for a loan were mortgage product type and the borrower's payment history.  For example, if a loan was in payment default at one point but the borrower had subsequently cured that default and was presently performing, the likelihood of suffering a loss as a result of the Debtors' failure to repurchase the loan, and the amount of any such loss, would be lower than if the loan were still delinquent.  On the other hand, if the loan was in serious default (e.g., 90+ days delinquent), a loss would be more likely, and the amount of such loss would (presumably) be more substantial.

As a date certain from which to measure loans' delinquency status to determine the likelihood of suffering a loss as a result of the Debtors' failure to repurchase loans (the "loss frequency") and the presumed amount of any such losses (the "loss severity"), the Debtors selected July 31, 2008 (the "EPD Determination Date").  With respect to any EPD loan (or resulting REO) sold prior to the EPD Determination Date in a commercially reasonable manner, the Plan will allow an EPD Claim in an amount equal to the UPB at the time of sale less the net proceeds realized from such sale.  For EPD loans (or resulting REO) that remained unliquidated as of the EPD Determination Date, the Plan utilizes fixed damages percentages tied to estimated loss frequencies and loss severities.

To arrive at reasonable estimates of loss frequency and loss severity based on delinquency status as of the EPD Determination Date, the Debtors began by analyzing the actual, historical losses which were suffered by the Debtors when liquidating non-performing loans (including, but not limited to, loans repurchased from third-party buyers after suffering EPDs) between January 1, 2006 and January 31, 2008 (the "Sampling Period").  This analysis was

DB02:7737098.5                                                  066585.1001

completed on a product-by-product basis, because different types of mortgages can be expected to have different loss severities.

(1)    *Loss Frequency*

As a general proposition, the probability that a delinquent loan will ultimately be liquidated at a loss increases with the delinquency status, which is generally measured within the mortgage industry in 30-day increments.  Accordingly, for purposes of estimating anticipated loss frequencies for loans as of the EPD Determination Date, the Debtors grouped loans into delinquency "buckets" of 0-30 days, 31-60 days, 61-90 days, and 90+ days and, as an initial point of reference, looked to industry convention in assessing the risks of non-performing mortgage assets.  Recognizing that all but the most severely delinquent loans may well cure at any given point in time, and that loans in any given delinquency "bucket" may change their status either by catching up on payments or falling farther behind, industry loss models used by rating agencies, investors, and Bloomberg (amongst others) use a methodology whereby the expected loss frequency for a given group of loans is adjusted according to delinquency "bucket".  For example, the Bloomberg model assumes a 0% loss frequency for the 31-60 day delinquency bucket, 60% loss frequency for the 61-90 day delinquency bucket, and 90% loss frequency for the 90+ day delinquency bucket.

Given the current status of both the secondary mortgage market and the nationwide housing market, the Debtors anticipated that wholesale adoption of the Bloomberg model could lead to challenges by EPD claimants that the loss frequencies assumed by the model were too conservative unrealistic, and should be increased for purposes of the protocol, the resolution of which challenges would require complex litigation involving many of the very issues the Debtors hope to resolve through the protocol.  Accordingly, for purposes of the protocol, the Debtors made the simplifying assumptions that the anticipated loss frequencies

50

across all product types would be 12.5% for the 0-30 day delinquency bucket, 50% for the 31-60

day delinquency bucket, 75% for the 61-90 day delinquency bucket, and 100% for the 90+ day

delinquency bucket.

(2)    *Loss Severity*

To account for the time elapsed from the Sampling Period to the EPD

Determination Date and to more fairly reflect anticipated recoveries on loans which buyers were

unable to resell to the Debtors, the Debtors adjusted their historical loss severities by product

type to reflect the current state of the housing market, using the 20-city S&P/Case-Shiller Home

Price Index (the "Case-Shiller 20 Index").  Due to the nationwide decline in housing values since

the Sampling Period, this resulted in significantly higher loss severities, which is in line with

current market estimates for expected future loss severities by product type.  The resulting

adjusted loss severities by product type, as percentages of UPB as of the EPD Determination

Date, are as follows: 40% for Fixed-Rate Mortgages ("FRMs"); 33% for Adjustable Rate

Mortgages ("ARMs"); 38% for Payment Option ARMs ("POAs"); and 95% for Second-Lien

("2nds").

(3)    *Estimation and Allowance of EPD Claims*

Based on the foregoing assumptions as to loss frequencies and loss severities

based on loan product type and delinquency buckets, valid EPD Claims that were unliquidated as

of the EPD Determination Date will be liquidated and allowed under the protocol in an amount

equal to the UPB of the underlying loans as of the EPD Determination Date, multiplied by a

percentage that is itself a product of (i) the applicable loss frequency based on the delinquency

bucket and (ii) the applicable loss severity based on the loan product type.  Thus, for example, an

EPD Claim relating to an FRM that is 61-90 days delinquent as of the EPD Determination Date

will be allowed in an amount equal to the 75% assumed loss frequency percentage multiplied by

51

the 40% assumed loss severity amount (75% x 40% = 30%), multiplied by the UPB of the FRM

as of the EPD Determination Date.

c.      **Proposed Treatment of Breach of Warranty Claims
and the Reasons Therefor**

Breach of Warranty Claims are more complicated than EPD Claims. Determining

whether the Debtors breached non-EPD related representations or warranties in a loan sale

agreement would entail a detailed loan-by-loan assessment of the specific allegations, which

would necessarily entail a degree of subjectivity because some of the industry-standard

representations and warranties are not susceptible to clear, objective assessment. In addition,

many of the secondary loan buyers asserted in their proofs of claim that they would not be able

to liquidate their Breach of Warranty Claims fully for years, since there often would be no reason

to expend time and resources ferreting out potential breaches of representations and warranties

on a given loan unless and until the borrower defaulted. And even if it were possible to identify

loans for which a breach of a representation or warranty occurred, assessing the damages that

resulted from the Debtors' inability to repurchase the loans would entail the same difficulties

identified above in connection with the liquidation of EPD Claims, e.g., whether the amount of a

"loss" realized by a claimant was the result of the Debtors' failure to repurchase loans or some

combination of deteriorating market conditions, how the claimant dealt with the loan, and the

"value" of the loan at a historical moment in time. In developing a protocol for the estimation

and allowance of Breach of Warranty Claims, the Debtors had to make assumptions as to (i) the

likelihood there had been material breaches of representations or warranties in connection with a

given sale of loans (the "incidence of breach"), (ii) the likelihood a Breach of Warranty claimant

would ultimately suffer a loss as a result of the Debtors' failure to repurchase loans for which

there had been a material breach of representations or warranties (as above, referred to as the

52

"loss frequency"); and (iii) the presumed amount of any such losses (as above, referred to as the "loss severity").

### (1)    *Incidence of Breach*

The Debtors have little historical data concerning the incidence of breach within a given pool of mortgage loans sold because, in the Debtors' experience prior to bankruptcy, Breach of Warranty Claims were seldom actually asserted by secondary buyers. Accordingly, in addition to reviewing the Debtors' sparse historical data, the Debtors had to look to, and analyze, a substantial amount of outside data in order to arrive at reasonable assumptions as to the likely incidence of breach within pools of loans sold by the Debtors prepetition. Based on this data, the Debtors developed two methodologies in order to arrive at a principled estimate of the incidence of breach within a given loan pool.

The first methodology, which yielded a 0.18% incidence of breach, was based on loan-level breach-related (i.e., non-EPD) repurchase demands submitted by all investors who purchased loans from the Debtors prior to the Petition Date—all of which loans happened to have been originated in 2006. The Debtors arrived at the 0.18% incidence level by dividing the UPB of the loans for which a breach was claimed (approximately $100 million) by the UPB of all loans sold to investors in 2006 (approximately $54 billion).

The second methodology, which yielded a 0.22% incidence of breach, was based on the actual Breach of Warranty Claims filed in these Chapter 11 Cases by five of the secondary loan buyers having the most transaction volume with the Debtors (such buyers, collectively, the "Sample Counterparties")[23] between June 1, 2006 and the Petition Date (the "Breach Sampling Period"). The Sample Counterparties were an ideal sampling of the potential universe of Breach

---

[23] The Sample Counterparties are Bear Stearns Mortgage Capital Corp., Morgan Stanley, Countrywide Bank, FSB/Countrywide Home Loans, Inc., CitiGroup Global Markets Realty Corp., and JPM.

of Warranty Claimants because, among other reasons: (i) they all submitted detailed information in support of their proofs of claim, which the Debtors were able to use in calculating the estimated incidence of breach; (ii) collectively, they bought 40% of the total whole loans sold by the Debtors during the Breach Sampling Period; and (iii) they each bought all of the product types that the Debtors originated.  To arrive at an estimated incidence of breach based on the Sample Counterparties' filed Breach of Warranty Claims, the Debtors divided the aggregate repurchase amounts asserted by the Sample Counterparties in their claims by the aggregate UPB of whole loans sold to the Sample Counterparties during the Breach Sampling Period.

For purposes of the protocol, the Debtors opted to use the latter of the two foregoing estimation methodologies because, among other reasons, it was based on a more robust sampling of data spanning a more comprehensive time period.  Accordingly, the protocol assumes a 0.22% total incidence of breach in a given mortgage pool, with the further simplifying assumptions that (i) the incidence of breach will be the same among all loan product types, and (ii) the *total* incidence of breach will not vary by loan vintage.  After determining the assumed total incidence of breach for any given loan pool, the Debtors adopted an underlying premise of the *New Century* breach protocol, namely: that the highest incidence of breach over the life of a given loan pool will be recognized in the months immediately following sale of the loans, and will taper off gradually over time due to the "seasoning" of loans.  Using the implicit rate of decrease in incidence reflected in the *New Century* protocol as a proxy to estimate a decrease in incidence with respect to the Debtors' loans, the Debtors assumed that, with respect to loans sold immediately prepetition (i.e., second quarter of 2007), the full 0.22% incidence of breach would ultimately be recognized, but with respect to loans sold before the third quarter of 2003, no new breaches would come to light.

(2)    *Loss Frequency and Loss Severity*

For the sake of simplicity, the protocol assumes that any loan on account of which a valid Breach of Warranty Claim is asserted would have given rise to a loss in some amount (i.e., will have a 100% loss frequency).  This assumption is consistent with the Debtors' historical experience, insofar as loan purchase counterparties generally do not have an economic incentive to ferret out a breach of representation or warranty with respect to a given loan unless and until a loss is sustained with respect to the loan.

Also for the sake of simplicity, as well as the reasons discussed above in connection with the EPD Claims, the protocol for Breach of Warranty Claims assumes the same loss severities by product type (based on the 90+ day delinquency bucket) as were assumed in connection with the EPD Claims.

(3)    *Estimation and Allowance of Breach of Warranty Claims*

Under the Plan, a Breach of Warranty Claim with respect to a pool of currently outstanding loans owned by the claimant is calculated based upon the loan vintage (i.e., year and quarter of origination), loan type, and the estimations and simplifying assumptions discussed above that: (i) 0.22% of the loan amounts originated in the second quarter of 2007 will at some point give rise to valid Breach of Warranty Claims, (ii) due to the "seasoning" of loans, this percentage incidence of Breach of Warranty Claims will be spread over the life of the loan pool with the heaviest incidence in the quarters immediately following origination, tapering down to a zero incidence over time, and (iii) the damages resulting from the failure to repurchase loans within a given loan pool will be a fixed percentage of the UPB of the loan pool as of the Breach Determination Date, based on the loan type.  As defined in the Plan, the Breach Determination Date for a given pool of loans is (a) the date such loans were purchased from the Debtors or (b) for loans purchased from a non-Debtor entity (e.g., by a securitization trust), the date the

55

claimant obtained rights to enforce the Debtors' sale representations and warranties with respect

to such pool of loans (e.g., the date of settlement of the securitization). Under the Plan, a Breach

of Warranty Claim is Allowed as an Unsecured Claim in an amount equal to UPB as of the

Breach Determination Date of all loans purchased from the applicable Debtor (other than loans

on account of which EPD Claims were asserted), multiplied by a percentage that is itself a

product of (i) the incidence of breach for the particular loan vintage and the applicable loss

severity based on the loan product type.

### d.    EPD/Breach Claims Questionnaire

While most proofs of claim asserting EPD/Breach Claims appear to meet the

formal and informational requirements of Federal Rule of Bankruptcy Procedure 3001, the

overwhelming majority contain insufficient information from which the Debtors can calculate

the Allowed amount of such Claims in accordance with the EPD/Breach Claims Protocol and

ensure that multiple Creditors are not asserting duplicative Claims with respect to the same

loans. Accordingly, in order to receive a Distribution under the Plan, each Holder of an EPD

Claim and/or Breach of Warranty Claim must supply the Debtors with sufficient information

from which to calculate the Allowed amount of such Claims in accordance with the EPD/Breach

Claims Protocol and to ensure that multiple Creditors are not asserting duplicative EPD/Breach

Claims. A request for such information will be provided by the Debtors to each Creditor

asserting an EPD Claim and/or Breach of Warranty Claim in the form of a questionnaire (the

"EPD/Breach Claims Questionnaire") substantially in the form filed with the Court as a

Supplemental Plan Document.

### e.    Standard for Approving the EPD/Breach Claims Protocol

The Debtors submit that the EPD/Breach Claims Protocol constitutes a

prospective compromise and settlement of a class of controversies (i.e., EPD/Breach Claims),

which is subject to approval under Bankruptcy Rule 9019(a) and (b).  As discussed above,

settlements are favored in bankruptcy, and will generally be approved so long as they are "fair

and equitable".  See Nutraquest, 434 F.3d at 644.  To determine whether the proposed settlement

of a claim *against* a debtor is fair and equitable, the Court uses only three of the four Martin

criteria, namely: (1) the probability of success in litigation; (2) the complexity of the litigation

involved, and the expense, inconvenience and delay necessarily attending it; and (3) the

paramount interest of the creditors.  See Nutraquest, 434 F.3d at 646 (acknowledging that the

Martin criterion regarding ease of collection is not relevant vis-à-vis settlement of claim against a

debtor).

   As discussed above, in evaluating the merits of the potential litigation the Court

must "canvass the issues to see whether the settlement falls below the lowest point in the range

of reasonableness."  New Century, 390 B.R. at 168.  The Debtors submit that the compromises

embodied in the EPD/Breach Claims Protocol are within a reasonable settlement range, and they

will provide evidence and argument to that effect at the Confirmation Hearing.  As noted by the

Nutraquest court, it is axiomatic that settlement will reduce the complexity and inconvenience of

litigation.  434 F.3d at 646.  And here, as in New Century, the size and complexity of

EPD/Breach Claims "would certainly lead to lengthy, expensive trials" and the "'cost' of such

litigation would fall upon the unsecured creditors, both in terms of a significant reduction in

assets available for distribution and a delay in receiving that distribution."  390 B.R. at 168-69.

Finally, with respect to the paramount interest of creditors, it is noteworthy that here, as in New

Century, "[t]he voting results show vividly that the Plan is supported by a diverse creditor body,"

390 B.R. at 169.  The Debtors submit that the interests of all creditors are much better served by

the adoption of a streamlined protocol to deal with EPD/Breach Claims in the aggregate than by

litigating EPD/Breach Claims on a claimant-by-claimant, loan-by-loan basis. Accordingly, the Martin factors supports approval of the EPD/Breach Claims Protocol.

In addition to meeting the standards of Bankruptcy Rule 9019, the EPD/Breach Claims Protocol is consistent with section 502(c) of the Bankruptcy Code, which provides for the estimation for allowance purposes of

> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

> (2) any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. § 502(c). In estimating a claim, the Court may use whatever method is best suited for the particular circumstances; there are no congressionally-mandated limitations on the Court's authority to estimate claims. See Bittner v. Borne Chem. Co., 691 F.2d 134, 136 (3d Cir. 1982) ("Section 502(c)(1) of the Code embodies Congress' determination that the bankruptcy courts are better equipped to evaluate the evidence supporting a particular claim within the context of a particular bankruptcy proceeding."). The Debtors submit that the EPD/Breach Claims Protocol establishes a fair and reasonable method for estimating EPD/Breach Claims in a manner that respects the EPD/Breach Claimants' rights under their contracts with the Debtors and the *prima facie* validity of their proofs of claim (as discussed below).

f.    **The EPD/Breach Claims Protocol Will Not Allow Claims Without a Showing of *Prima Facie* Validity**

The Borrowers Committee's argument that the EPD/Breach Claims Questionnaire allows claimants to recover without establishing the *prima facie* validity of their claims is specious. The only parties who will receive an EPD/Breach Claims Questionnaire are those who have properly filed timely proofs of claim, which are (i) signed under penalty of fine and/or imprisonment for presenting a fraudulent claim, see 18 U.S.C. §§ 152 and 3571; Official

58

Bankruptcy Form 101, and (ii) *prima facie* valid by operation of Bankruptcy Rule 3001(f). If EPD/Breach Claims were to be liquidated in the ordinary course in the absence of the EPD/Breach Claims Protocol, claimants would <u>not</u> have the burden of proving affirmatively that their claims were timely under applicable statutes of limitation[24] and were not susceptible to defenses based on scienter or equitable doctrines such as *in pari delicto* or unclean hands. EPD/Breach Claims are contract claims, and the *prima facie* case breach of contract is simply (i) the existence of a contract, (ii) a breach thereof, and (iii) damages. See, e.g., Profilet v. Cambridge Fin. Corp., 231 B.R. 373, 382 (S.D. Fla. 1999). Any defenses that do not go to these *prima facie* elements for breach of contract are properly characterized as affirmative defenses, on which the Debtors would have the burden of proof in litigation.[25]

As the Debtors do not generally dispute the existence or validity of the loan purchase agreements that were central to their operations prepetition, the EPD/Breach Claims Protocol appropriately focuses on the remaining *prima facie* elements of the EPD/Breach Claims, namely: breach of contract and damages. On the breach-of-contract side, the EPD/Breach Claims Questionnaire requires EPD claimants to submit payment history which will permit the Debtors (or the Plan Trustee, as applicable) to evaluate whether a valid EPD occurred, triggering a loan repurchase obligation the Debtors were unable to fulfill. For Breach of Warranty claimants, the EPD/Breach Claims Protocol utilizes an assumed, pool-level incidence

---

[24] Based on a review of the documentation submitted by EPD/Breach Claimants in response to preliminary informational questionnaires disseminated in connection with the solicitation of the Plan, the Debtors have no reason to believe any of the EPD/Breach Claims are untimely.

[25] The Borrowers Committee cites Nat'l City Bank v. Hill (In re Hill), A.P. No. 07-4106 AT, 2008 Bankr. LEXIS 1668 (Bankr. N.D. Cal. May 23, 2008), a case decided under section 523(a)(2)(B) of the Bankruptcy Code, to suggest a creditor claiming a breach of representation must prove its objectively reasonable reliance on the representation. Given the Bankruptcy Code's strong policy favoring a "fresh start" for individual debtors, and the corresponding policy of crafting and construing exceptions to discharge narrowly, it is unremarkable that "reasonable reliance" on a consumer debtor's written statements concerning his or her financial condition is a *prima facie* element of a statutory nondischargeability action. But this has nothing to do with the enforceability of bargained-for representations and warranties between sophisticated commercial entities such as the EPD/Breach Claimants and the Debtors.

percentage which will obviate costly loan-by-loan litigation for years to come; accordingly, the EPD/Breach Claims Questionnaire requires only pool-level information regarding the UPB and vintage of non-EPD loans.

On the damages side, the EPD/Breach Claims Questionnaire requires EPD Claimants to specify (i) the UPB and the net liquidation proceeds (including insurance recoveries) for any loans liquidated prior to July 31, 2008, and (ii) the UPB and delinquency status for any loan not liquidated prior to July 31, 2008, which is used to generate an estimated damages figure based on the Debtors' historical loss severities across different types of loans. For Breach of Warranty Claims, the EPD/Breach Claims Questionnaire requires claimants to provide the UPB, which is used to generate an estimated pool-wide damages figure based on (i) the incidence of breach within the given loan vintage and (ii) the Debtors' historical loss severities across different types of loans.

In sum, the EPD/Breach Claims Questionnaire, in combination with the official proof of claim form, will elicit more than sufficient information to establish the *prima facie* validity of the EPD/Breach Claims.

g.     **The EPD/Breach Claims Protocol Will Not Allow EPD/Breach Claims at "Inflated Values"**

The Borrowers' Committee's contention that the EPD/Breach Claims Protocol provides for payment at levels that are "plainly too high" is entirely speculative and ignores the applicable standard under Bankruptcy Rule 9019.

As amended, the Plan now makes explicit that insurance recoveries on account of a mortgage loan (or resulting REO) reduce the damages assertable by EPD Claimants on account

of mortgage loans sold prior to July 31, 2008. (See Plan Art. 7.A.)[26] And as solicited, the Plan

contains a "commercial reasonableness" standard with respect to EPD loans (or resulting REO)

liquidated prior to July 31, 2008, which militates against any suggestion that malingering EPD

Claimants will be able to inflate their claims by failing to mitigate their damages with respect to

a given loan. Moreover, with respect to EPD Claims for loans that were not liquidated as of July

31, 2008, and Breach of Warranty Claims, the mitigation of damages is built into the estimated

loss severities utilized by the EPD/Breach Claims Protocol, which are based on the Debtors' own

historical loss experience liquidating repurchased loans. Thus, the Borrowers Committee's

arguments premised on mitigation of damages are misplaced.

       Equally misplaced are the Borrowers Committee's arguments based on the "loss

frequencies" for various loan types. Loss frequency (a.k.a. the "frequency roll") represents the

percentage chance that a loan of a particular type and delinquency status will result in a loss to

the owner of the loan. The Debtors' historical experience liquidating non-performing loans did

not provide them an adequate data set from which to make a principled estimate of loss

frequencies across loan product types. Accordingly, for purposes of the EPD/Breach Claims

Protocol, the Debtors made a simplifying assumption that the loss frequency would be the same

across all loan product types having a particular delinquency status (i.e., 0-30 days, 31-60 days,

61-90 days, and 90+ days delinquent). The Borrowers Committee attacks this assumption on the

basis that the Debtors' 30(b)(6) witness had never seen any supporting data suggesting the loss

frequency is in fact the same for all loan product types of a particular delinquency status. Of

course, the Borrowers Committee cites no evidence suggesting that loss frequency is different

---

[26] As a practical matter, it is likely that mortgage insurance recoveries were already included in the loss data
supplied by EPD Claimants for liquidated loans, insofar as this data would have been obtained from the loan
servicers, who typically exhaust all avenues of recovery with respect to a given loan before upstreaming the loss to
the investor. Accordingly, this change to the Plan was immaterial.

across loan product types of a particular delinquency status. And even if such evidence were forthcoming, it would not be fatal to the EPD/Breach Claims Protocol because the Debtors were entitled to use simplifying assumptions in connection with their global settlement and estimation of EPD/Breach Claims under Bankruptcy Rule 9019 and Bankruptcy Code § 502(c).

The Borrowers Committee goes on to argue that the EPD/Breach Claims Protocol "remarkably" and "inexplicably" applies a 100% loss frequency for Breach of Warranty Claims. This argument misapprehends the nature of the "incidence of breach" utilized by the protocol for Breach of Warranty Claims, and it fails to take into account the very real differences between EPD Claims and Breach of Warranty Claims. As discussed above, Breach of Warranty Claims are typically asserted only after a loss has been realized, because prior to realization of a loss there is little economic incentive to ferret out a breach of a representation or warranty. EPDs, on the other hand, are readily discernible based on the borrower's payment history and, accordingly, EPD Claims are often asserted before any loss is realized on the loan. Thus, there is nothing remarkable or inexplicable about assuming a 100% loss frequency for the .22% (or less) population of loans presumed to have suffered from material breaches of warranty, while at the same time assuming lower loss frequencies for EPD loans.

>     h.      **All Borrower Claims Are Treated Equally Under the Plan;
>             Even if Borrower Claims Were Classified Along with
>             EPD/Breach Claims, the EPD/Breach Claims Protocol Would
>             Not Run Afoul of Section 1123(a)(4)**

The Borrowers Committee argues that the Plan treats EPD/Breach Claims more favorably than Borrower Claims in violation of section 1123(a)(4) of the Bankruptcy Code. This argument fails as a simple matter of statutory construction, insofar as 1123(a)(4) only applies to claims "of a particular class" and Borrower Claims are not in the same "class" as EPD/Breach

62

Claims.[27]  The Borrowers Committee suggests a broad reading of section 1123(a)(4) based on

the "many similarities" between borrower claims and EPD/Breach Claims.  The Debtors dispute

there are any similarities between borrower claims and EPD/Breach Claims (or for that matter,

similarities between different borrower claims) that would justify the Debtors in establishing a

protocol for liquidation of borrower claims separate and apart from the ordinary claim

reconciliation process.  The suggestion that, in the absence of a protocol, borrowers will be "left

to hope their claims were determined fairly . . . using whatever methods the [Plan] Trustee and

POC deem appropriate" is ridiculous.  Nothing in the Plan purports to empower the Plan Trustee

to reduce or disallow proofs of claim other than through a formal claim objection, wherein the

Court will be the final arbiter of any disputes.

### 5.    The Exculpation Provisions are Permissible

It is well established that pursuant to section 105(a) of the Bankruptcy Code,

bankruptcy courts may approve exculpations in situations where, as here, such exculpations are

integral to the plan, confer material benefits on the debtor's estate, and will enable the plan to be

consummated as intended.  Here, the Plan provides for the exculpation (the "Exculpations") of

the following Exculpated Parties: (i) the Debtors, the Plan Trustee, the Estates, the Plan Trust,

the Creditors Committee, the Borrowers Committee, the Plan Oversight Committee, and the

Indenture Trustees, and (ii) the respective officers, directors, employees, members, attorneys,

crisis managers, financial advisors, and professionals of a party identified in the immediately

preceding clause, other than David Friedman.  (Plan Art. 12.C.)

The Exculpations are permitted under section 1123(b)(3)(A) of the Bankruptcy

Code, which provides that "a plan may provide for the settlement or adjustment of any claim or

---

[27]  The Court may recall that, in the motion to appoint an official committee of borrowers [D.I. 5675, at pp. 25-26], counsel for the movants (now counsel for the Borrowers Committee) argued that "borrowers' claims are not substantially similar to other general unsecured claims and must be classified separately" under the Plan.

interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). Where a

compromise or settlement is part of a plan, the court has a duty to determine if the proposed

compromise is "fair and equitable." In re Coram Healthcare Corp., 315 B.R. at 334. "The

standards for approval of a settlement under section 1123 are generally the same as those under

[Bankruptcy] Rule 9019." Id. In In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000), the

Third Circuit approved an exculpation provision[28] substantially similar to the one provided here.

[29] Because the Exculpations contained in Article 12C of the Plan are consistent with the

exculpation provision contained in the Plan under PWS in every material respect, the

---

[28] The exculpation provision in PWS provided as follows:

> None of the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their duties nad responsibilities under the [P]lan.

In re PWS Holding Corp., 228 F.3d at 246.

[29] Article 12C of the Plan provides, in relevant part, as follows:

> On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, and/or the administration of this Plan and/or the property to be distributed under this Plan, except for claims, causes of action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under this Plan and such reasonable reliance shall constitute an absolute defense to any such claim, cause of action, or liability. Without limiting the generality of the foregoing, the Debtors, the Estates, the Creditors Committee, and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals, shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of this Plan or the Disclosure Statement shall be deemed to act upon or release any claims, Causes of Action or liabilities that the Plan Trust, the Estates, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases, nor shall any provision of this Plan be deemed to act to release any Avoidance Actions.

(Plan Art. 12C.)

DB02:7737098.5                                                    066585.1001

Exculpations are appropriate and should be approved pursuant to the controlling law in this Circuit.

More specifically, the Exculpations described and contained in Article 12C of the Plan are fair and necessary to the effective liquidation of the Debtors, and the parties receiving the benefit of the Exculpations either have made, or will make, substantial contributions toward the liquidation of the Debtors or have had substantial contributions made on their behalf, which are integral to the effectuation of the Plan and the consummation of the transactions contemplated therein. As noted by the Third Circuit, exculpation provisions are "commonplace in chapter 11 plans" and do not violate the Bankruptcy Code where, as is the case here, the provisions merely establish a standard of liability. In re PWS Holding Corp., 228 F.3d at 245. Indeed, the Exculpations provide the framework for post-confirmation entities to be held personally accountable for their actions, not for providing such parties wholesale releases. Providing this framework is crucial for debtors to obtain parties willing to implement the Plan. Without such Exculpations, it would be exceedingly difficult to find qualified individuals to serve as Plan Trustee or members of the Plan Oversight Committee.

Although the Exculpations are clearly permissible under the Bankruptcy Code and the authorities cited above, certain parties, including the Borrowers Committee, have raised the following arguments regarding these provisions: (i) the "advance exculpation" of the Plan Trust, Plan Trustee, and Plan Oversight Committee should be overruled; (ii) the Exculpations are overly broad and in contravention of section 524(e) of the Bankruptcy Code; and (iii) the Exculpations provide releases of individual claims against non-Debtor third parties. Because each of these objections is without merit, the Debtors respectfully request that they be overruled.

65

First, because the Exculpations set forth liability standards of gross negligence, willful misconduct, fraud, and breach of the duty of loyalty, the Exculpations, including the Exculpations for the Plan Trustee, Plan Oversight Committee and their members, designees, professionals, agents and/or representatives, is entirely in sync with the Bankruptcy Code and applicable law.  Id. at 246 (permitting exculpation for reorganized debtors and differentiating language in current plan with earlier rulings because the language set forth the applicability standard of liability); see also In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. July 15, 2008) (approving nearly identical exculpation provision which provided exculpation to, among others, the liquidating trustee, the liquidating trust and the plan advisory committee and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors and professionals); see also 1/18/2006 Hr'g Tr. at 24-28, In re aaiPharma Inc., Case No. 05-11341 (PJW) (Bankr. D. Del. 2005) (approving advance exculpation by the debtor of third parties where the provision set forth standard of liability").[30]

Moreover, because the Exculpations provide this standard of liability, rather than eliminating it altogether, the Exculpations do not run afoul of section 524(e) of the Bankruptcy Code.  Indeed, when PWS Court approved the substantially similar exculpations, it noted that section 524 was not violated:

> Nothing in our recent opinion in Continental II is to the contrary.  In that case, we held that a plan that enjoined plaintiffs' actions against Continental's directors and officers violated § 524(e).  The release in question here differs from that in Continental II in a fundamental way: it sets forth the applicable standard of liability under § 1103(c) rather than eliminating it altogether. . . We did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties.  Because of the differences between the releases in the two cases, Continental II does not compel the conclusion that this release is impermissible.  Indeed, because this release does not affect the liability of third parties, but rather sets forth the appropriate

---

[30] The relevant portions of the transcript are annexed hereto as Exhibit G.

standard of liability, we believe this release is outside the scope of §
524(e).

228 F.3d at 247 (distinguishing In re Continental Airlines, 203 F.3d 203, 210 (3d Cir.

2000)).

Finally, the Exculpations do not provide third party releases against Non-Debtors

for individual actions, but rather provides for the Debtors' exculpation of the Exculpated Parties

for their work in relation to these Chapter 11 Cases.  To the extent that individuals seek to assert

liability against the Exculpated Parties for the parties' involvement in these Chapter 11 Cases,

any recoveries for claims set forth in the Exculpations would be the result of "generalized" or

"derivative" claims of the Debtors and would be property of the Debtors' estates.  See CBS Inc.

v. Folks, 211 B.R. 378, 387 (B.A.P. 9th Cir. 1997) (when the injury affects all creditors and the

corporation, rather than just one particular creditor, it is a general injury); Alpert v. Nat'l Assoc.

of Securities Deadlines, LLC, 801 N.Y.S.2d 229 (N.Y. Sup. Ct. 2004) ("[U]nder both New York

and Delaware law, plaintiffs' individual claims must allege harm independent from the alleged

injury suffered by the corporation.").

For the foregoing reasons, the Exculpations are fair and equitable and in the best

interests of the Debtors and their Estates.

6.    **Extension of the Automatic Stay Is Appropriate and Does Not
      Prejudice Borrowers**

The Borrowers Committee's concern with the extension of the automatic stay is

mooted by the provisions of the Plan, as amended, which provide borrowers prospective relief

from the Plan's injunctive and stay provisions to do anything and everything short of prosecuting

and enforcing a claim for money damages from the Debtors, which should be handled in the

claim reconciliation process.  Nevertheless, to the extent necessary at the Confirmation Hearing,

DB02:7737098.5                                          066585.1001

the Debtors will an evidentiary foundation for the extension of the automatic stay as

contemplated by Article 12 of the Plan.

## IV.    CONCLUSION

For all the foregoing reasons, all objections to confirmation should be overruled,

and the Plan should be confirmed pursuant to section 1129 of the Bankruptcy Code.

Dated: Wilmington, Delaware
       February 5, 2009

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988)
Sean M. Beach (No. 4070)
Margaret Whiteman Greecher (No. 4652)
Patrick A. Jackson (No. 4976)
Nathan D. Grow (No. 5014)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**Counsel for the Debtors and
Debtors in Possession**

DB02:7737098.5                                                      066585.1001