## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| In re: | : |  |
|  | : | Case No. 07-11047 (CSS) |
| American Home Mortgage Holdings, Inc. *et al,*[1] | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |
|  | : | Re: D.I. 6942 |

---------------------------------------------------------------- x

## BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## IN SUPPORT OF CONFIRMATION OF THE AMENDED
## <u>CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS</u>

---

[1]  The Debtors are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; American Home Mortgage Servicing, Inc.; American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc; and Great Oak Abstract Corp.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

BACKGROUND .......................................................................................................... 1

I.    STATEMENT IN SUPPORT OF CONFIRMATION ........................................... 2

II.   REPLY TO OBJECTION OF BORROWERS COMMITTEE .............................. 4

      A.    Notice of the Bar Date was Sufficient and Proper under the
            Circumstances ............................................................................................ 4

      B.    The Protocol for Treating Early Payment Default and Breach of
            Warranty Claims is in the Best Interests of All of the Estates'
            Creditors .................................................................................................... 9

            1.    The Plan Requires Holders of EPD/Breach Claims to
                   Demonstrate That Their Claims are Valid                           11

            2.    The Plan Does Not Allow EPD/Breach Claims at Inflated
                   Values                                                              12

      C.    The Plan Does Not Improperly Extend the Automatic Stay ...................... 13

      D.    The Plan Neither Creates an Inherent Conflict for the Plan Trustee
            nor Provides Improper Authority to the Plan Oversight Committee ......... 14

      E.    The Settlement of Inter-Debtor Claims Through the Stipulated
            Asset Allocation is Fair and Equitable to all of the Estates'
            Creditors .................................................................................................... 16

      F.    The Plan Satisfies the Best Interests Test ................................................. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Charter Co.,*
125 B.R. 650 (M.D. Fla. 1991) ...................................................................5

*Chemetron Corp. v. Jones*,
72 F.3d 341 (3d. Cir. 1995).......................................................................4

*In re Coram Healthcare, Inc.*,
315 B.R. 321 (Bankr. D. Del. 2004) .........................................................16

*In re Delta Financial Corp.*,
Case No. 07-11880 (CSS) (Bankr. D. Del. 2007, December 12, 2008) ......................11

*In re Exide Technologies, Inc.*,
303 B.R. 48 (Bankr. D. Del. 2003) ...........................................................17

*Fogel v. Zell*,
221 F.3d 955 (7th Cir. 2000) .................................................................7, 8

*Hebell v. NVR, Inc.*,
1997 U.S. Dist. LEXIS 10786 (N.D. Ill. July 21, 1997)...........................................4, 6

*In re Key3Media Group, Inc.*,
336 B.R. 87 (Bankr. D. Del. 2005) ...........................................................16

*Mennonite Board of Missions v. Adams*,
462 U.S. 791 (1983)............................................................................5, 6

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)............................................................................5, 6

*In re Musicland Holding Corp., et al.*,
Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. 2008, January 18, 2008)................13, 15

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d. Cir. 1996).................................................................16, 17

*In re New Century TRS Holdings, Inc.*,
390 B.R. 140 (Bankr. D. Del. 2008) .......................................................11, 15, 17, 18

*In re Pillowtex Corp., et al.*,
Case No. 03-12339 (PJW) (Bankr. D. Del. 2007, February 13, 2007)........................14

*In re PWS Holding Corp.*,
   228 F.3d 244 (3d. Cir. 2000) ......................................................................15

*Protective Committee for Independent Stockholders of*
*TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)....................................................................................17

*In re ResMAE Mortgage Corp., et al.*,
   Case No. 07-10177 (KJC) (Bankr. D. Del 2007, June 5, 2007). ..........................13, 15

*Suncruz Casinos, LLC*,
   298 B.R. 821 (Bankr. S.D. Fla. 2003) ........................................................15

*In Telegraph-Net Hawaii, Inc.*,
   105 B.R. 594 (Bankr. D. Ha. 1989) ...........................................................14

*In Texaco, Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988)..........................................................17

*In re Thompson McKinnon Securities Inc.*,
   130 B.R. 717 (S.D.N.Y. 1991)................................................................7, 8

*Trump Taj Mahal Associates v. O'Hara* (*In re Trump Taj Mahal Assocs.*),
   1993 U.S. Dist. LEXIS 17827 (D.N.J. December 13, 1993).........................................6

*Tulsa Professional Collection Serv., Inc. v. Pope*,
   485 U.S. 478 (1988)....................................................................................5

## FEDERAL STATUTES

11 U.S.C. § 105............................................................................................13

## FEDERAL RULES

FED. R. BANKR. P. 9019 ................................................................................16

FED. R. BANKR. P. 9024 .................................................................................9

FED. R. CIV. P. 60.........................................................................................9

The Official Committee of Unsecured Creditors (the "*Creditors Committee*") of

American Home Mortgage Holdings, Inc., *et al.* (the "*Debtors*"), by its co-counsel, Hahn &

Hessen LLP and Blank Rome LLP, hereby files this *Brief of the Official Committee of*

*Unsecured Creditors in Support of Confirmation of the Amended Chapter 11 Plan of Liquidation*

*of the Debtors*, and in support thereof respectfully states as follows:

## BACKGROUND

On August 6, 2007 (the "*Petition Date*"), the Debtors commenced voluntary cases (the

"*Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") with

this Court. Since the Petition Date, the Debtors have continued in the operation of their

businesses and the management of their properties as debtors-in-possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these

Cases.

On August 14, 2007, the Office of the United States Trustee (the "*U.S. Trustee*")

appointed seven of the largest unsecured creditors to serve as members of the Creditors

Committee.

On October 10, 2008, this Court entered an order directing the appointment of an official

committee of borrowers (the "*Borrowers Committee*") [Docket No. 6220]. On October 21, 2008,

the U.S. Trustee appointed seven borrowers to serve as members of the Borrowers Committee.

On August 15, 2008, the Debtors filed their Chapter 11 Plan of Liquidation of the

Debtors (as amended, the "*Plan*") [Docket No. 5450] [2] and Disclosure Statement Pursuant to

Section 1125 of the Bankruptcy Code with Respect to the Chapter 11 Plan of Liquidation of the

Debtors (as amended, the "*Disclosure Statement*") [Docket No. 5451]. On November 25, 2008,

---

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

the Disclosure Statement was approved and confirmation of the Plan has been scheduled for

February 9, 2009 (the "*Confirmation Hearing*").

I.      **STATEMENT IN SUPPORT OF CONFIRMATION**

The Creditors Committee and the Debtors have invested a substantial amount of time and

effort collaborating on the formulation and refinement of a chapter 11 plan which provides *all*

creditors, including borrowers, with the best opportunity for maximizing the distribution on their

claims.  The plan proposed by the Debtors, incorporating certain necessary compromises similar

to those already approved by courts in other cases within this District, achieves this very goal

and, as it meets the requisite statutory standard, warrants confirmation.

The Plan was formulated in light of certain stark realities which are facing all creditors.

*First*, these Cases are liquidating chapter 11 cases with a finite number of assets remaining to be

liquidated and unfortunately, given the size of the claims pool, the projected distributions to

creditors are very modest.  *Second*, the Debtors' estates are incurring significant administrative

costs as these Cases continue in bankruptcy without a confirmed plan and expedited

confirmation and claims resolution will result in a significant and immediate reduction in this on-

going administrative burden. *Third*, significant portions of the claims asserted against the Debtors'

estates are of a similar nature and type, such as EPD/Breach Claims (defined hereinafter)

asserted by the whole loan purchasers and trustees of securitization trusts as well as deficiency

claims asserted by the repurchase counter-parties under their repurchase agreements or

warehouse lenders under their credit agreements.  Consequently, as modifications to the

proposed treatment of those classes of claims are made, the tide of claims is likely to rise or fall

in unison, resulting in such creditors not receiving a significantly different benefit vis-à-vis

similarly situated creditors in the class.

The Plan, which provides the best prospect for maximizing distributions to creditors, creates a streamlined process to resolve highly complex disputes over alleged breaches of representations and warranties and damages resulting from the sale or transfer of hundreds of thousands of loans with unpaid principal balances in the tens of billions of dollars.  The Plan also resolves numerous intercompany disputes between Debtor entities including administrative, priority and unsecured claims.  The asset allocation methodology contained in the Plan provides for the recharacterization of intercompany claims to reflect the economic reality of the transactions.  These issues are complex and difficult and would be extremely expensive and time-consuming for the individual Debtors' estates and their respective creditors to resolve.  In fact, since many of the issues involve matters of first impression, it is possible that if litigated these issues might necessitate appellate review before ultimately resolved.  In its present form, the Plan represents the best process for providing creditors with the highest potential distribution on their claims in an efficient, timely and fair manner.

The Creditors Committee hereby adopts and incorporates the arguments and assertions set forth in the *Debtors' Memorandum of Law in Support of Confirmation of the Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 5, 2009* (the "*Debtors' Memorandum*") [Docket No. 6953] and reserves all rights to be heard before this Court with regard thereto.  As set forth in the Debtors' Memorandum, the Plan meets, by a preponderance of the evidence, the requisite standard for confirmation set forth in section 1129 of the Bankruptcy Code and, as such, warrants confirmation by this Court.  For purposes of brevity, the Creditors Committee will not repeat each of the arguments raised in the Debtors' Memorandum, but will instead focus on and provide additional support for the Debtors' arguments in opposition to the objection of the Borrowers Committee.

## II.    **REPLY TO OBJECTION OF BORROWERS COMMITTEE**

On January 22, 2009, the Borrowers Committee filed an objection to confirmation of the Plan (the "Borrowers' Objection") [Docket No. 6883] asserting that the Plan:  (i) gives effect to bar dates of which borrowers were not given proper notice, (ii) provides for an EPD/Breach Claim protocol which allows such claims (a) at inflated values, (b) without requiring the claimant to establish the *prima facie* validity of such claims, and (c) to receive disparate treatment in comparison to claims of similarly situated creditors, (iii) contains global settlements which unfairly disadvantage borrowers, (iv) fails the "best interest test" by providing for recoveries to borrowers that is less than they would otherwise receive in a chapter 7 liquidation, (v) provides for the improper exculpation of a conflicted Plan Trustee and Plan Committee, and (vi) improperly extends the automatic stay.  The Borrowers Committee is mistaken on all counts. Further, the Borrowers' Objection exhibits an alarming misunderstanding of the Plan coupled with an improper application of the facts and circumstances of these Cases to well-established law.  There also seems to be a fundamental disconnect between the Borrowers Committee and its constituency since its constituency has voted overwhelmingly in support of confirmation of the Plan.[3]

### A.    *Notice of the Bar Date was Sufficient and Proper under the Circumstances*

In arguing that borrowers were entitled to individual written notice of the Bar Date, the Borrowers Committee questions the Debtors' treatment of the parties that did business with the Debtors in the ordinary course in the past but never commenced an action against the Debtors, as unknown creditors.  However, the Third Circuit is very clear in defining "unknown creditors". *See Chemetron Corp. v. Jones*, 72 F.3d 341 (3d. Cir. 1995).  In fact, the Debtors' analysis is in

accordance with established law. *See Hebell v. NVR, Inc.*, 1997 U.S. Dist. LEXIS 10786 (N.D. Ill. July 21, 1997) (while identities and addresses of borrowers may have been evident from the debtor's records, those records "did not indicate that the [borrowers] … were or would file suit in the future" and thus the borrowers were unknown creditors as their claims "were merely speculative").

The *Chemetron* court analyzed Supreme Court precedent and laid out the ground work for determining who is a known creditor and entitled to receive individual written notice in the bankruptcy proceeding, versus who is an unknown creditor for which notice by publication is proper.  The Supreme Court defines a "known" creditor as one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Professional Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988).  The Supreme Court defined the term "reasonably ascertainable" to mean whether a creditor can be identified through "reasonably diligent efforts." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983).  Reasonable diligence does not require "impracticable and extended searches . . . in the name of due process." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950).  A debtor does not have a "duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *In re Charter Co.*, 125 B.R. 650, 654 (M.D. Fla. 1991).  An "unknown" creditor, on the other hand, is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Mullane*, 339 U.S. at 317.

The Debtors' service of the bar date notice complied with applicable Third Circuit and Supreme Court precedent.  The Debtors provided individual written notice to all known

---

[3]    At the time of the filing of these papers, 97.16% (or 101 of 104) of borrowers casting ballots have voted in *favor* of Plan confirmation.

creditors, including all known borrower creditors, i.e. those who had either filed suit or threatened litigation in writing.  As that determination was based on "reasonably diligent efforts," it was appropriate.  *Mennonite Bd. of Missions*, 462 U.S. at 798 n.4.

On the other hand, all unknown creditors received notice of the bar date by publication notice.  Unknown creditors included all borrowers who failed to file suit or threaten litigation in writing against the debtors.  The Debtors are not required to speculate about which of the over 900,000 borrowers that it did business with over the years might assert a claim against the Debtors.  Such borrowers, even assuming *arguendo* that they possess claims against the Debtors, were unknown creditors not entitled to individual written notice because their claims are "speculative" and did not, in the course of the Debtors' business, come to the knowledge of the Debtors as creditors.  *Trump Taj Mahal Assocs. v. O'Hara (In re Trump Taj Mahal Assocs.)*, 1993 U.S. Dist. LEXIS 17827 at * 9 (D.N.J. Dec. 13, 1993) (explaining that "those creditors who hold only conceivable, conjectural or speculative claims" are unknown); s*ee Mullane*, 339 U.S. at 317.

While the Borrowers Committee argues that the Debtors should be required to determine which parties "had the riskiest types of loans and which borrowers were in default or subject to foreclosure proceedings" and provide them individual written notice of the bankruptcy, any such borrowers' potential unasserted claims are 'conjectural' and 'speculative' at best.  In this regard, the Illinois District Court's decision in *Hebell v. NVR, Inc.* is instructive.  In holding that a homeowner was not a known creditor of a servicer who filed for bankruptcy protection, the court explained that:

> [t]he fact that the identities of the homeowner-mortgagors or the [plaintiffs] themselves may have been "reasonably ascertainable" from the loan servicer's records it is not sufficient to make them "known." These records did not indicate that the [plaintiffs] or any

> potential class members were or would file suit in the future,
> thereby becoming claimants. At the time, the [plaintiffs'] claims
> were merely speculative. In this case, [Debtors] could not have
> been expected to anticipate that the [plaintiffs] would bring this
> claim. Thus, the [plaintiff's] and their putative class are considered
> "unknown" creditors, as such, publication notice was sufficient.

*Hebell v. NVR, Inc.*, 1997 U.S. Dist. LEXIS 10786, *5 (N.D. Ill. July 21, 1997).  So while the

Debtors may have possessed contact information of certain borrowers, any claims on behalf of

such borrowers that have yet to be filed are entirely 'speculative' and not 'reasonably

ascertainable' since the Debtors do not have any indication that claims will, in fact, ever be filed

against them.  On the other hand, the Debtors ensured that proper notice was provided to all

borrowers who had filed suit or had threatened litigation in writing.  To place upon the Debtors

the burden of speculating who among the parties it did business with in the ordinary course of

business would not only be unrealistic from a practical perspective but inconsistent with their

legal obligation.  The Supreme Court and Third Circuit only require individual written notice to

those known claimants who arise in the ordinary course of the Debtors' business, beyond such

known claimants, notice by publication, as appropriately approved by this Court, suffices.

The cases to which the Borrowers Committee cites for the proposition that potential

borrower claimants are known creditors are inapposite and distinguishable from the facts present

in these Cases.  In both *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000) and *In re Thompson*

*McKinnon Securities Inc.*, 130 B.R. 717 (S.D.N.Y. 1991), each court addressed situations where

the respective debtors were aware that the specific creditors would have claims against the

debtors, but yet chose not to provide individual written notice.  *See Fogel*, 221 F.3d at 963

(publication notice was not appropriate where creditor was a very large purchaser of defective

piping and debtor knew that it had sold creditor a large quantity of defective piping); *In re*

*Thompson McKinnon Securities Inc.*, 130 B.R. at 719 (where the debtor took the creditor's funds

and was aware that it did not deliver the purchased securities to the creditor, the creditor was a known creditor entitled to individual written notice).  In the instant case, unlike *Fogel* or *Thompson McKinnon*, it is not clear that the Debtors were aware of any act that would give rise to claims be a certain group of creditors, nor is there any evidence that the Debtors committed any wrongful acts.  Accordingly, any such unasserted claims are unknown and notice by publication is sufficient for those potential claimants under prevailing case law.

The Borrowers Committee highlights the case of Ms. Florence Danridge, the recipient of a Payment Option ARM loan in 2006, as an exemplar of a borrower who allegedly did not receive proper notice of the Bar Date and thus did not file a claim.  However, the facts demonstrate otherwise.  Despite believing that she had a claim against American Home shortly after receiving her loan and realizing it was not on the terms that she believed she had agreed, Ms. Dandridge did not file a claim or send anything in writing to American Home to indicate she had a claim.  Even after she became a member of the Borrowers Committee and must have been informed of the Debtors' and Creditors Committee's position that any borrower that failed to file a proof of claim by the Bar Date may be precluded from receiving any recovery from the Debtors' estates, she still did not file a claim.  It is unclear how any different noticing procedure would have changed this result.

The Borrowers Committee also questions the sufficiency of the publication notice that was provided by the Debtors, asserting that publication in "three newspapers published in New York, St. Louis and Dallas" is "patently deficient" notice.  This argument is unavailing.  This Court considered the Debtors' proposed notice and publication notice and appropriately approved both the form of notice and the periodicals chosen for publication. *See Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing*

*Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 1708].

Pursuant to Rule 60(c) of the Federal Rules of Civil Procedure, made applicable to these

proceedings pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure, that Order

would not be subject to challenge as it was entered more than one year ago.  Furthermore, the

periodicals within which notice was published, the national edition of *The New York Times*, and

the regional editions of *The Dallas Morning News* and *The St. Louis Post-Dispatch* reach, on an

aggregate basis, approximately 1.6 million readers daily, a reader base that, contrary to the

Borrowers Committee's claims, extends well beyond those periodicals' immediate geographical

publication area.

> **B.     The Protocol for Treating Early Payment Default and Breach of
> Warranty Claims is in the Best Interests of All of the Estates'
> Creditors**

The protocol for treating early payment default ("*EPD*") and breach of warranty claims

("*Breach*" and collectively with EPD, "*EPD/Breach Claims*") provides a streamlined method for

resolving substantially unliquidated and in most cases contingent claims asserted by the whole

loan purchasers, servicers and trustees of securitization trusts.  This protocol is an integral part of

the Plan and, as discussed further below, one designed to generate substantial savings both in

terms of cost and delay for the Debtors' estates which will inure to the benefit of all of the

estates' creditors, *including* borrowers.

There are two principal reasons why the EPD/Breach Claims protocol embodied in the

Plan is appropriate in these Cases.  *First*, after filing for bankruptcy, the key issue for purposes of

determining the amount of an EPD/Breach Claim was the true damages that the creditor suffered

– i.e., the fair market value of the loan that is the subject of the Breach or EPD compared to the

unpaid principal balance (the "*UPB*") of the loan.  Determining damages for the thousands of

individual loans in question would be an extremely very time-consuming and expensive

proposition, involving a factual investigation and analysis on a loan-by-loan basis. The cost of doing so would substantially diminish the assets of the estates, potentially costing more than such claims were even worth (in real distribution dollars).

*Second*, many of the secondary loan buyers and securitization trustees asserted that the amount of their Breach Claims was presently unliquidated and could not be liquidated for years to come. They assert that unless and until a borrower defaults on a loan, the servicer (and, therefore, the trustee) has no reason to investigate whether a breach of the seller's representation and warranty has occurred. If the Trustees were compelled to litigate an estimated amount for their Breach Claims, they would utilize expert witnesses and statistical analyses based on historical data from the pools of thousands of loans. This would be extremely costly and time-consuming for both sides.[4]    In addition, determining the validity of Breach Claims, whether liquidated or unliquidated, inherently involves many subjective and difficult determinations, as many of the representations and warranties contained in loan sales contracts are not objective and the process employed to liquidate a defaulted loan, including whether it was liquidated in a commercially reasonable manner, may be subject to challenge.

Absent the protocol, the Debtors' estates (as well as individual creditors) would incur millions of dollars of expenses and time-consuming delays litigating issues concerning whether the alleged breaches actually qualify as breaches under the operative documents, and, if so, whether the damages asserted are appropriate. In addition, the substantial cost and anticipated delay in trying to litigate estimation hearings before the Bankruptcy Court to determine each creditor's allowed claim amount for existing but unknown breaches based on pools of thousands of loans would be prohibitive for all parties involved. On the other hand, the EPD/Breach

Claims protocol, which was developed by the Debtors in close consultation with the Creditors

Committee, based on the Debtors' historical information and other data, provides for a

streamlined, efficient process for estimating these claims based that would be applied uniformly

to all holders of such claims.

Clearly, these efficiencies will substantially improve distributions to *all* creditors,

including borrowers, by avoiding substantial administrative costs that would be otherwise be

incurred by all creditors.  In fact, a similar protocol was implemented and confirmed as an

integral part of the plan in the *New Century* bankruptcy proceedings for these very reasons.  *See*

*In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 153 (Bankr. D. Del. 2008).[5]

1.      **The Plan Requires Holders of EPD/Breach Claims to Demonstrate That Their Claims are Valid**

The Borrowers Committee asserts that the Plan would allow holders of EPD/Breach

Claims to collect on their claims without establishing the *prima facie* validity of these claims.

They are mistaken.  Each holder of an EPD/Breach Claims has filed a proof of claim in these

Cases.  Pursuant to the Rule 3001(f) of the Federal Rules of Bankruptcy Procedure, a properly

filed proof of claim is "*prima facie* evidence of the validity and amount of the claim."

Moreover, the EPD/Breach Claims questionnaire that is required to be filed by holders of

EPD/Breach Claims is a sworn affidavit providing data necessary to evaluate the validity of the

asserted EPD/Breach claim.  The combination of the submission of the proof of claim and the

---

[4]     The protocol, applying a statistical measure derived from analyses of historical data to arrive at a damage calculation, was specifically designed to reconcile these claims without the cost and delay attendant to such claims litigation.

[5]     A similar version of the EPD/Breach Claim protocol was contained in the plan of liquidation overwhelmingly approved by creditors and confirmed by this Court in *In re Delta Financial Corp.*, Case No. 07-11880 (CSS) in December 2008. *See* Docket No 701.

EPD/Breach Questionnaire provides sufficient information to establish the *prima facie* validity of the asserted EPD/Breach Claims.[6]

Engaging, as the Borrowers Committee advocates, in a detailed loan-by-loan analysis to determine whether any defenses exist with respect to one individual loan or another in pools of thousands of loans would be prohibitive both in cost and time and in direct conflict with the duty held by all fiduciaries in ensuring the maximum value of the Debtors' estates.

2.      **The Plan Does Not Allow EPD/Breach Claims at Inflated Values**

The Debtors strived to develop an EPD/Breach Claims protocol based on its review of substantial historical data, but also sufficiently simple that its administration would not delay the calculations or distributions to holders of EPD/Breach Claims.  There was also significant input from and negotiations with many of the holders of EPD/Breach Claims.

The EPD/Breach Claim Protocol contained in the Plan is a carefully crafted balance of competing interests to insure that those claims were estimated based on reality.  To achieve this objective the protocol differentiates between EPD Claims and Breach Claims and for each type of claim applies a statistical measure, derived from an analysis of the data supplied by the Creditors, the industry, and the Debtors, to arrive at a damage calculation.  The data used in the Plan reflects the most comprehensive and best statistical analysis available to value these EPD/Breach Claims.  Additionally, the protocol takes into account recoveries that would be

---

[6]     The Borrowers Committee also objects to the EPD/Breach Claims protocol on the basis that the EPD/Breach Claims Questionnaire does not require a claimant to prove that their claims are (i) not susceptible to defenses or (ii) timely under applicable statutes of limitations.  However, in the normal claims reconciliation process, claimants do not have the burden of affirmatively proving such conditions.  Moreover, at least with respect to the latter, a cursory read of the protocol makes clear that dated claims (commencing with the second quarter of 2003) are effectively disallowed as they are valued at zero.

made through primary mortgage insurance.[7]  As such, the protocol contains the proper balance

and does not allow for inflated recoveries on EPD/Breach Claims.

### C.        *The Plan Does Not Improperly Extend the Automatic Stay*

The Plan provides that

> unless other provided herein or in the Confirmation Order, all
> injunctions or stays provided for in the Chapter 11 Cases under
> sections 105 or 362 of the Bankruptcy Code, this Plan, by orders of
> the Bankruptcy Court, or otherwise, and extant on the
> Confirmation Date, shall remain in full force and effect until the
> later of (i) entry of the Final Decree or (ii) the dissolution of the
> Plan Trust, *provided*, *however*, that on and after the Effective Date,
> the automatic stay under § 362 of the Bankruptcy Code shall be
> deemed lifted to the extent necessary to permit the borrower(s)
> under any Mortgage Loan against whom a foreclosure action is
> commenced from asserting and prosecuting, in such action, any
> claims and defenses preserved under Article 8E(6) of this Plan.

Plan, Art. 12.B.

The continuation of existing stays and injunctions as provided for by the Plan is a proper

exercise of this Court's power to "issue any order, process, or judgment that is necessary or

appropriate" and is in no way controversial.  11 U.S.C. § 105(a).  Indeed, courts in this and other

districts routinely grant such extensions. *See, e.g., In re ResMAE Mortgage Corp., et al.,* Bankr.

D. Del. Case No. 07-10177, *Findings of Fact, Conclusions of Law, and Order Under U.S.C. §*

*1129(a) and (b) and Fed. R. Bankr. P. 3020 Confirming the Second Amended Plan of*

*Reorganization of the Debtor Proposed by the Debtor and Sponsored by RMC Mortgage*

*Holdings LLC Dated June 5, 2007* [Docket No. 491] ("*ResMAE Confirmation Order*", at Ex. A,

Art. 15.3 ("shall remain in full force and effect until the Effective Date"); *In re Musicland*

*Holding Corp., et al.*, Bankr. S.D.N.Y. Case No. 06-10064 (SMB), *Order Confirming Debtors'*

*Second Amended Joint Plan of Liquidation* [Docket No. 1905] ("*Musicland Confirmation*

---

[7]    *See* Disclosure Statement at 93.

*Order*", at Ex. A, Art. 10.D. ("shall remain in full force and effect until the closing of the Chapter 11 Cases"); *In re Pillowtex Corp., et al.*, Bankr. D. Del. Case No. 03-12339 (PJW), *Order Confirming the Joint Plan of Liquidation Proposed by the Debtors and the Creditors Committee* [Docket No. 2807] ("*Pillowtex Confirmation Order*"), at Ex. A, Article 13.3; ("shall remain in full force and effect until the closing of the Chapter 11 Cases").

Moreover, the continuation of existing injunctions and stays embodied in the Plan have been specifically crafted to ensure that that borrowers have explicit relief from the stay to assert and prosecute any claims and any defenses that may be available in the event that a foreclosure action is commenced against such borrower.

### D.    The Plan Neither Creates an Inherent Conflict for the Plan Trustee nor Provides Improper Authority to the Plan Oversight Committee

The Borrowers Committee's objection to the appointment of the Plan Trustee is based on the flawed supposition that either, individually or collectively, the Plan Trustee and/or the Plan Oversight Committee will not fulfill their duties as appointed fiduciaries of the Debtors' estates. Yet, with the exception of baseless, self-serving innuendo, the Borrowers Committee has provided no basis to support its inappropriate assertion that the appointed Plan Trustee or the members of the Plan Oversight Committee would do anything other than continue to serve in a manner that promotes the best interests of the estate and all creditors. *See* Plan, Art. 8.G. ("The fiduciary duties that applied to the Creditors Committee prior to the Effective Date shall apply to the Plan Oversight Committee.")

Each case cited in the Borrowers' Objection is unavailing as they address situations where a conflict *had already occurred* and the fiduciaries *had failed to act*. *See In Tel-Net Hawaii, Inc*., 105 B.R. 594, 595 (Bankr. D. Ha. 1989) (court appointed an independent trustee to replace a debtor-in-possession for refusing to assert a preference action against its controlling

shareholder); *Suncruz Casinos*, *LLC*, 298 B.R. 821, 832 (Bankr. S.D. Fla. 2003) (court appointed an independent trustee to replace a debtor-in-possession for its failure to timely pursue claims against a founding shareholder or timely respond to an objection to the debtors' claim asserted against the founding shareholder).  Here, there is no basis to believe that either the Plan Trustee or the Plan Oversight Committee would fail to act in the best interests of the Debtors' estates and their creditors.  Indeed, their record of service suggests otherwise.

Moreover, contrary to the Borrowers Committee's mischaracterization, the Plan provides for a system of checks and balances where the Plan Trustee is given the freedom to act autonomously within certain parameters under the supervision of the Plan Oversight Committee and, to the extent that a party-in-interest believes that either the Plan Trustee or the Plan Oversight Committee fails to act in a manner consistent with their fiduciary duties, their actions are subject to the oversight of this Court. *See* Plan, Art. 14.A. (providing for the Bankruptcy Court's continued jurisdiction over the Cases).

Lastly, the exculpations provided to the Plan Trustee and the Plan Oversight Committee are properly limited to those acts or omissions resulting from the Plan Trustee's or Plan Oversight Committee's "willful misconduct, gross negligence, fraud or the breach of the fiduciary duty of loyalty."  Plan, Art. 8.H.  The scope of the exculpation is consistent with binding Third Circuit case law, *see In re PWS Holding Corp.*, 228 F.3d 244 (3d Cir. 2000), as well as case law in this and other districts.  *See, e.g.*, *ResMAE Confirmation Order*, Ex. A, Art. 15.6 ("unless the act or omission constituted gross negligence or willful misconduct"); *Musicland Confirmation Order*, Ex. A, Art. 10.B ("except for their willful misconduct or gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases").

### E.    *The Settlement of Inter-Debtor Claims Through the Stipulated Asset Allocation is Fair and Equitable to all of the Estates' Creditors*

The Borrowers Committee argues that the compromise embodied in the Stipulated Asset Allocation fails to meet the requisite standard for approval.  They are mistaken as the compromise falls well within the range of reasonableness, and is fair and equitable to all creditors.  *See In re New Century TRS Holdings, Inc.*, 390 B.R. 140 (Bankr. Del. 2008) (court approved plan provisions which operated as a global settlement of intercompany and intercreditor disputes as fair and equitable to all creditors).

In order to minimize litigation and expedite the administration of a bankruptcy estate, "compromises are favored in bankruptcy."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  The "authority to approve a compromise settlement is within the sound discretion of the bankruptcy court."  *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005); *see* FED. R. BANKR. P. 9019.  When exercising such discretion, the bankruptcy court must determine whether the compromise is "fair, reasonable, and in the best interests of the estate." *Id*. at 92.  A bankruptcy court is not required to determine that the proposed settlement is the best possible compromise. *Id*. at 93-94.  Rather, the settlement should be approved as long as it "falls within the reasonable range of litigation possibilities."  *In re Coram Healthcare, Inc.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004).  In this respect, it is unnecessary for a court to consider the information necessary to resolve the factual dispute, nor is it necessary for the bankruptcy court to "conclusively determine claims subject to a compromise."  *In re Key3Media Group*, 336 B.R. at 92.

Courts should consider the following four factors when determining whether a settlement is in the best interests of the estate: (1) the probability of success in the litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attendant thereto; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable opinions.  *See e.g., Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Martin*, 91 F.3d at 393; *In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 167 (Bankr. D. Del. 2008).  In the context of a plan of reorganization, courts have also considered: (1) the balance of success should the case go to trial vis-à-vis the concrete benefits of the settlement without the expense and delay of trial; (2) the likelihood of complex and protracted litigation if the settlement is not approved; (3) the proportion of class members who do not object or who affirmatively support the proposed settlement; (4) the competency and experience of counsel who support the settlement; (5) the relative benefits to be received by individuals or groups within the class; (6) the nature and breath of the releases to be obtained by the directors and officers as a result of the settlement; and (7) the extent to which the settlement is the product of "arms-length bargaining", and not of fraud or collusion.  *See, e.g., In re Exide Technologies*, 303 B.R. 48, 67-68 (Bankr. D. Del. 2003) (citing *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

The Stipulated Asset Allocation is an integral component of the Plan reflecting a comprehensive compromise and settlement concerning Intercompany Claims and an analysis of the *Martin* factors weighs in favor of its approval.  As discussed in the Plan, the allocation percentages in the Stipulated Asset Allocation were determined in light of a numerous factors, including: (i) the relative value of Assets under administration in each Estate from the Petition Date to the Effective Date; (ii) the validity and enforceability of Intercompany Claims that are reflected on the Debtors' books and records (certain of which claims might be inadequately documented and/or subject to recharacterization as equity contributions); (iii) possible

Intercompany Claims that are not reflected as intercompany payables or receivables in the Debtors' books and records (*e.g.*, resulting from one Debtor's payment in full of a shared expense properly allocable between multiple Debtors, or payment of more than its fair share of a joint-and-several liability to a third party); (iv) the reallocation of asset value between Estates that would result from allowance and payment of Intercompany Claims, in light of anticipated creditor recoveries in each of the Chapter 11 Cases; (v) the estimated exposure of each Estate to S/A/P Claims asserted but not paid as of the Effective Date, in light of possible Intercompany Claims for contribution or reimbursement that might result from one Estate's payment of S/A/P Claims that are properly allocable between multiple Estates; and (vi) the necessity of resolving any and all potential inter-Estate disputes via the Plan, so as to permit administration of multiple Estates by a single Plan Trustee unfettered by inter-Estate conflicts of interest.

As to the first *Martin* factor, the probability of success in litigation regarding the validity and enforceability of Intercompany Claims is uncertain. The underlying disputes would be fact-intensive and there would likely be disagreement as to whether or not certain claims might be adequately documented, subject to recharacterization as equity contributions, arise from one Debtor's payment in full of a shared expense properly allocable between multiple Debtors, or payment of more than its fair share of a joint-and-several liability to a third party.

As to the second *Martin* factor, the litigation regarding the validity and enforceability of Intercompany Claims and possible Intercompany Claims would be factually complex and require extensive discovery and testimony. The costs of litigating these matters, therefore, could easily outweigh any potential benefit that the Debtors' estates would derive from such litigation. Moreover, the Stipulated Asset Allocation, developed by the Debtors with significant input of the Creditors Committee, achieves a reasonable compromise which the parties believes fall well

within the range of likely outcomes should these matters be fully litigated before the Court and was attained without the prohibitive cost and delay attendant to any such litigation.

As to the third *Martin* factor, collection with respect to the Intercompany Claims would not be at issue.

As to the fourth *Martin* factor, the paramount interest of creditors, the settlements embodied in the Plan ensure certainty and that distributions be made expeditiously and have been overwhelmingly approved by most classes, including the borrowers.[8]  In approving a similar compromise in *New Century*, Judge Carey found that the paramount interest of creditors weighed heavily in favor of approval where, as here, "voting results showed vividly that the Plan is supported broadly by a diverse creditor body."  *In re New Century TRS Holdings, Inc.*, 390 B.R. at 169.  Despite one of the voting classes in *New Century* rejecting the plan, Judge Carey nonetheless found that the settlements were "fair and equitable and provide[d] benefits to the *entire* creditor body." *Id*. (emphasis added).  The Creditors Committee respectfully submits that this Court should find the same in these Cases.

Similarly, viewing the settlement in light of the *Texaco* factors supports its approval. *First*, the settlement provides for a substantial concrete benefit to all creditors as the outcome of litigation is uncertain and the cost and attendant delay of trial and subsequent appellate procedures would likely far exceed any benefit derived from such litigation, substantially reducing already modest distributions.  *Second*, litigation is likely to be complex and protracted. *Third*, the settlement has been overwhelmingly affirmatively supported by all creditors, including the borrowers.  *Fourth*, competent and experienced bankruptcy counsel are present on both sides of the issue. *Fifth*, the settlement benefits all of the estates' creditors by providing for

---

[8]    At the time of this report, approximately 75% of the claimants, holding 94% of the outstanding debt, voted in favor of Plan.

increased and quicker distributions by avoiding costly and protracted litigation that is not likely result in a net gain for the estates. *Sixth*, the releases provided for are reasonable under the circumstances. *Seventh*, the settlement was the product of "arms-length" good-faith bargaining between the Debtors and the Creditors Committee.

In criticizing the allocations with respect to recoveries from litigation, *i.e.*, that certain Debtors' speculative recoveries would be greater than those of other Debtors and that the Stipulated Asset Allocation does not reflect the percentage of the speculated disparity, the Borrowers Committee fails to recognize that the Stipulated Asset Allocation is a compromise that addresses many Intercompany Claims in an efficient manner to the benefit of all the estates' creditors. For the foregoing reasons, it falls well above the lowest level in the range of reasonableness and should be approved by Plan confirmation.

### F.       *The Plan Satisfies the Best Interests Test*

The Plan satisfies the best interests test enumerated under section 1129(a)(7) of the Bankruptcy Code because, as illustrated by the Liquidation Analysis submitted by the Debtors, all claims, including borrowers' claims, will receive distributions that are greater under the Plan than they would otherwise receive under a chapter 7 liquidation.

The Borrowers Committee attempts to discredit the Debtors' Liquidation Analysis by asserting that it fails to account for substantial potential recoveries with respect to preferential transfers. The Borrowers Committee asserts that should these transfers be recovered by the estates against which the borrowers have asserted claims, then borrowers would receive more in a chapter 7 liquidation. Their analysis of potential preference recoveries, however, is overly simplistic and grossly overstated in that they fail to take into account:

> (i)     estate assets were shared, thereby providing certain cash-poor estates with funds to pursue litigations that they would otherwise not be able to pursue;

(ii)    while a transfer may have been made by one Debtor, the underlying funds may have belonged to another Debtor(s) such that any avoidance claim belongs to the true owner of the funds, not necessarily the transferring Debtor,

(iii)   while any preferences recovered by AHM Corp. must be shared with the other Debtors, AHM Corp. will likewise share in the recoveries from actions belonging to other Debtors (i.e., the Waterfield litigation, any Directors & Officers litigation, any litigation with JPMorgan Chase);

(iv)    a substantial portion of the 90-day payments appear to be merely pass-through payments that never became property of the Debtors' estates (i.e., principal and interest payments, as well as tax and insurance payments, which passed through the Debtors before going to the appropriate trusts),

(v)     while a detailed preference analysis has not yet been performed,

(a)    only a small percentage of the 90-day payments relate to trade creditors, while the substantial majority relates to margin or settlement payments that are potentially protected under the safe harbor protections afforded such transfers under section 546 of the Bankruptcy Code, and

(b)    given the Debtors' sudden and unpredicted demise, it is likely that a significant amount of the non-safe harbored 90-day payments are protected ordinary course payments under section 547 of the Bankruptcy Code; and

(vi)    the fact that a majority of the Creditors Committee members have claims against AHM Corp. belies the Borrowers Committee's theory that the Plan developed and supported by the Creditors Committee was designed solely to benefit AHM Holdings creditors at the expense of AHM Corp. creditors.

As illustrated by the Debtors' Liquidation Analysis, the Plan provides creditors with a greater distribution than they would otherwise receive in a chapter 7 liquidation, as such, it meets the best interests test and warrants confirmation.

**WHEREFORE**, for the reasons set forth above and for those to be presented at the Confirmation Hearing, the Creditors Committee respectfully requests that the Court:  (i) overrule any objection to confirmation of the Plan not previously withdrawn or resolved; (ii) enter an order confirming the Plan; and (iii) grant such other and further relief as the Court deems to be just and proper.

Dated: February 6, 2009

**BLANK ROME LLP**


By:     */s/ David W. Carickhoff*
        Bonnie Glantz Fatell (No. 3809)
        David W. Carickhoff (No. 3715)
        1201 Market Street, Suite 800
        Wilmington, Delaware  19801
        (302) 425-6400 - Telephone
        (302) 425-6464 - Facsimile

        - and -

**HAHN & HESSEN LLP**
488 Madison Avenue
New York, New York 10022
(212) 478-7200 - Telephone
(212) 478-7400 - Facsimile
Attn:   Mark S. Indelicato
        Mark T. Power
        Edward L. Schnitzer
        Jeffrey Zawadzki
        Joseph Orbach

*Co-Counsel to the Official Committee of Unsecured Creditors of American Home Mortgage Holdings, Inc., et al.*