## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------------------------ x | | Chapter 11 |
| In re: : | | |
| : | | Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE : | | |
| HOLDINGS, INC., a Delaware corporation, et al., : | | Jointly Administered |
| : | | |
| Debtors. : | | **Re: Docket No. 6824** |
| ------------------------------------------------------------------ | | |

### RESPONSE TO THE DEBTORS' OBJECTION TO CLAIMS OF CALYON NEW YORK BRANCH, AS ADMINISTRATIVE AGENT PURSUANT TO REPURCHASE AGREEMENT

Calyon New York Branch, as Administrative Agent Pursuant to Repurchase Agreement ("Calyon") hereby responds to the Debtors' Objection to Claims of Calyon New York Branch, as Administrative Agent Pursuant to Repurchase Agreement [D.I. 6824] (the "Claims Objection"). In support of this response, Calyon states as follows:

### I.     Preliminary Statement

1.     The above-referenced debtors and debtors-in-possession (collectively, the "Debtors") seek to expunge and disallow the deficiency claim portions of Calyon's Repurchase Agreement Claims (as defined herein) in the Claims Objection based on section 562 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"). Specifically, the Debtors argue that the deficiency claim portions of the Repurchase Agreement Claims should be valued as of August 1, 2007 under section 562 because the Debtors allege that on August 1, 2007 commercially reasonable determinants of value existed for the Mortgage Loans (as defined herein).

2. The Debtors' argument, however seeks to turn section 562 and the term commercially reasonable determinants of value on their heads. Section 562 and the term commercially reasonable determinants of value are focused on determining the value that could be obtained by the owner in liquidating the relevant assets. Here, because of the Debtors' own actions, it was not possible for Calyon to liquidate the Mortgage Loans in a commercially reasonable manner prior to August 15, 2008.

3. Moreover, as of August 1, 2007, among other things, (i) Calyon was not receiving the Proceeds (as defined herein) of the Mortgage Loans; (ii) Calyon did not have, and the Debtors were not providing to Calyon, complete and accurate copies of the Mortgage Files (as defined herein) or the Monthly Reports (as defined herein); (iii) the Debtors took the position that they owned the Mortgage Loans, the Proceeds and the MSRs (as defined herein); and (iv) MERS reflected the Counter-Party Debtors (as defined herein) as the owners of the Mortgage Loans on its electronic mortgage recording system.

4. In light of these facts, there is no basis whatsoever to suggest that commercially reasonable determinants of value existed for the Mortgage Loans as of August 1, 2007 because Calyon would not have been able to sell the Mortgage Loans in a commercially reasonable manner on August 1, 2007. In fact, if Calyon had attempted to sell the Mortgage Loans on August 1, 2007 in a manner that was not commercially reasonable, the bare-bones, cents on the dollar prices Calyon would have received would have resulted in much larger deficiency claims than the deficiency claims Calyon currently asserts.

5. Moreover, there were no commercially reasonable determinants of value for the Mortgage Loans until August 15, 2008, because until that time, among other things, a

final non-appealable order had not been entered regarding the ownership of the Mortgage Loans and the Counter-Party Debtors had not waived their right to appeal the issue of the ownership of the Mortgage Loans.

6. As a result, in accordance with section 562, the value of the Mortgage Loans must be determined as of August 15, 2008 because no commercially reasonable determinants of value existed for Calyon's potential liquidation of the Mortgage Loans before that date. Calyon intends to present evidence at the hearing on the Claims Objection to establish, among other things, the value of the Mortgage Loans as of August 15, 2008, and thus the amount of the deficiency claim portions of the Repurchase Agreement Claims.

## II. Background

### A. The Repurchase Agreement

7. Calyon and Debtors American Home Mortgage Corp. ("AHM"), AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("Servicing"),[1] American Home Mortgage Acceptance, Inc. ("Acceptance"), and American Home Mortgage Investment Corp. ("Investment"; together with AHM, Servicing and Acceptance, the "Counter-Party Debtors") are parties to that certain Repurchase Agreement dated November 21, 2006 (the "Repurchase Agreement").[2]

---

[1] Debtor AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), changed its name from American Home Servicing, Inc. to AHM SV, Inc., on April 14, 2008.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Repurchase Agreement.

8. Pursuant to the Repurchase Agreement, Calyon was requested to purchase and did purchase, from time to time, certain mortgage loans (the "Mortgage Loans").

9. Pursuant to the Repurchase Agreement, Servicing was initially appointed Servicer of all of the Mortgage Loans. As Servicer, Servicing was responsible for administering the Mortgage Loans, including, without limitation, collecting monthly mortgage payments of principal and interest, monitoring past-due accounts, and reporting on defaulted loans.

10. As of August 1, 2007, the Counter-Party Debtors had defaulted on certain obligations under the Repurchase Agreement.

11. On August 1, 2007, Calyon delivered to the Counter-Party Debtors a Notice of Event of Default of Sellers ("Notice of Sellers' Default").

12. The Notice of Sellers' Default served as notice to the Counter-Party Debtors of defaults under the Repurchase Agreement and accelerated all amounts due under the Repurchase Agreement.

13. As a result of the acceleration of the Repurchase Agreement, as of August 1, 2007, the Counter-Party Debtors were obligated to repurchase the Mortgage Loans.

14. Prior to the Petition Date (as defined herein) the Debtors did not respond to the Notice of Sellers' Default or repurchase the Mortgage Loans.

15. On August 1, 2007, Calyon delivered to Servicing the Notice of Event of Default to Servicer (the "Notice of Servicer's Default"). Among other things, the Notice of Servicer's Default stated that Calyon designated JPMorgan Chase Bank, N.A. ("Chase") as the new servicer for all of the Mortgage Loans other than the Mortgage Loans that constituted purchaser option adjustable rate Mortgage Loans (the "Purchaser Option Loans") and demanded

4

that Servicing take all actions necessary to transfer the servicing of the Mortgage Loans, other than the Purchaser Option Loans, to Chase. The Notice of Servicer's Default also stated that Calyon designated Servicing as the interim servicer for the Purchaser Option Loans for the one week period ending on August 8, 2007.

16. Prior to the Petition Date, the Debtors did not respond to the Notice of Servicer's Default.

17. A notice to Servicing from Calyon dated August 6, 2007, stated that Calyon designated Servicing as the interim servicer for the Purchaser Option Loans for the one week period ending on August 15, 2007.

18. A notice to Servicing from Calyon dated August 13, 2007, stated that Calyon designated Servicing as the interim servicer for the Purchaser Option Loans for the one week period ending on August 22, 2007.

19. A notice to Servicing from Calyon dated August 20, 2007, stated that Calyon designated Servicing as the interim servicer for the Purchaser Option Loans for the one week period ending on August 29, 2007.

20. A notice to Servicing from Calyon dated August 28, 2007, stated that Calyon designated Cenlar as the servicer for the Purchaser Option Loans and demanded that Servicing take all actions necessary to transfer the servicing of the Purchase Option Loans to Chase.

B. **The Debtors' Bankruptcy Cases**

21. On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.

22. On August 28, 2007, Calyon commenced Adversary Proceeding No. 07-51704 against the Counter-Party Debtors (the "Adversary Proceeding").

23. On September 9, 2007, the Court entered the Stipulation and Order between Calyon and the Counter-Party Defendants (the "September Stipulation"). The September Stipulation provides, among other things, that the Counter-Party Debtors agreed to segregate from other funds in their possession all funds and collections of every type received with respect to the Mortgage Loans on or after August 6, 2007 (the account in which such funds were kept will be referred to herein as the "Segregated Account").

24. In early November 2007, the Court conducted the Phase I Trial in the Adversary Proceeding.

25. On January 10, 2008, Calyon timely filed Proof of Claim Number 8044 against Servicing (the "Servicing Claim"). A true and correct copy of the Servicing Claim is attached as Exhibit A and is incorporated herein by reference.

26. On January 10, 2008, Calyon timely filed Proof of Claim Number 8045 against Acceptance (the "Acceptance Claim"). A true and correct copy of the Acceptance Claim is attached as Exhibit B and is incorporated herein by reference.

27. On January 10, 2008, Calyon timely filed Proof of Claim Number 8046 against AHM (the "AHM Claim"). A true and correct copy of the AHM Claim is attached as Exhibit C and is incorporated herein by reference.

28. On January 10, 2008, Calyon timely filed Proof of Claim Number 8047 against Investment (the "Investment Claim"; together with the Servicing Claim, the Acceptance

Claim and the AHM Claim, the "Repurchase Agreement Claims"). A true and correct copy of the Investment Claim is attached as <u>Exhibit D</u> and is incorporated herein by reference.

29. In the Repurchase Agreement Claims, Calyon asserts claims under the Repurchase Agreement and the other Transaction Documents, including, without limitation (a) claims for the repurchase of the Mortgage Loans at the Repurchase Price, plus interest thereon, as provided in the Repurchase Agreement; (b) claims for all costs and expenses, including attorneys' fees, other professional services and disbursements, as provided in the Repurchase Agreement; and (iii) claims based on the Counter-Party Debtors' breaches, and failure to comply with the terms, of the Repurchase Agreement and the other Transaction Documents.

30. On January 4, 2008, the Court entered the Opinion regarding the Phase I Trial.

31. On January 15, 2008, the Court entered the Order on Phase I Trial.

32. On January 25, 2008, the Court entered the Stipulation and Order Regarding Mortgage Funds and Mortgage Files (the "January Stipulation").

33. The January Stipulation provides, among other things, that except for the reserve described in Paragraph 8 of the January Stipulation (the "Reserve"), the Counter-Party Debtors agreed to turn over all the funds in the Segregated Account to Calyon on a monthly basis beginning on January 28, 2008, and continuing on the twentieth (20th) day of each month thereafter beginning on February 20, 2008.

34. The Counter-Party Debtors had not provided any of the funds, collections and payments of any type received by Servicing with respect to the Mortgage Loans (the "Proceeds") to Calyon prior to the January Stipulation. In addition, prior to the January

<s>7</s>

Stipulation, the Counter-Party Debtors took the position that they did not need to transfer the Proceeds of the Mortgage Loans to Calyon.

35. Further, prior to the January Stipulation, the Counter-Party Debtors took the position that they owned the Mortgage Loans and the rights to service the Mortgage Loans (the "MSRs"). In addition, prior to the January Stipulation, the Counter-Party Debtors had not provided to Calyon, and Calyon did not have, complete and accurate copies of (i) the mortgage files related to the Mortgage Loans (the "Mortgage Files") or (ii) monthly tapes, monthly reports and monthly records of Proceeds received by Servicing, in each case, related to the Mortgage Loans (collectively, the "Monthly Reports") for the months of July, August, September, October, November and December of 2007 and January of 2008.

36. On August 5, 2008, the Court entered the Order (I) Approving the Stipulation Between the Debtors and Calyon New York Branch, as Administrative Agent, and (II) Authorizing the Transfer of Service Mortgage Servicing Rights Relating Thereto (the "August Order").

37. As of August 15, 2008, in accordance with the August Order, the Counter-Party Debtors no longer took the position that they owned the Mortgage Loans or the MSRs. In addition, as of August 15, 2008, no one filed a Notice of Appeal with respect to the August Order and the August Order became a final, non-appealable order.

### III. The Claims Objection

38. On January 9, 2009, the Debtors filed the Claims Objection.

39. In the Claims Objection the Debtors seek to disallow and expunge the Repurchase Agreement Claims based on Bankruptcy Code section 562. *See* Claims Objection,

¶ 37. Specifically, in the Claims Objection the Debtors assert that the deficiency damages in the Repurchase Agreement Claims should be measured as of August 1, 2007, because the Debtors assert that commercially reasonable determinants of value existed on that date. *See id*. ¶¶ 38-43. The Debtors also assert that based on their preliminary analysis, as of August 1, 2007, the value of the Mortgage Loans along with other cash held by Calyon regarding the Repurchase Agreement exceeded the amount the Counter-Party Debtors owed to Calyon under the Repurchase Agreement. *See id*. ¶ 42.

## IV.    Response

40.     The Claims Objection is based on an erroneous interpretation of section 562 and the term commercially reasonable determinants of value. Specifically, the Debtors appear to argue that the term commercially reasonable determinants of value ***should not take into account what value the owners of the assets in question could receive in a commercially reasonable sale.*** This, however, is *exactly* what the term commercially reasonable determinants of value means.

41.     Although the Bankruptcy Code contains no definition of the term commercially reasonable determinants of value, and Calyon is not aware of any cases that have interpreted the meaning of the term or section 562, a leading treatise has stated as follows:

> It is possible that, on the measurement date specified by operation of section 562(a), no commercially reasonable determinant of value is available. For example, if the debtor is a hedge fund that became insolvent as a result of volatile market activity in certain securities, and if a Protected Counterparty terminates its securities contracts and/or repurchase agreements involving such securities promptly following the debtor's commencement of a Bankruptcy Code case, the market for securities could be quite disorderly. In such circumstances, ***it might not be possible for the Protected Counterparty to obtain bids for the securities*** that fairly reflect their value or a meaningful quote from a generally recognized market pricing source.

9

If no commercially reasonable determinant of value is available on the date specified by operation of section 562(a), the measurement date is deferred by section 562(b) to the first subsequent date or dates on which there are commercially reasonable determinants of value."

Collier, ¶ 562.03 (emphasis added).

42. The treatise focuses on whether the Protected Counterparty could obtain a meaningful bid for the securities at issue because ***the purpose of the safe harbor provisions of the Bankruptcy Code are to preserve liquidity***. As this Court has noted, "since 1982, Congress has enacted a number of amendments to the Bankruptcy Code that work in concert to preserve the liquidity of the repo market by exempting repurchase agreements from significant provisions such as the automatic stay." *Calyon New York Branch v. American Home Mortgage Corp. (In re American Home Mortgage, Inc.)*, 379 B.R. 503, 512 (Bankr. D. Del. 2008); *see also* H.R. Rep. 109-31, pt. 1, at 133 (2005) (providing that Congress "intended that the normal business practice in the event of a default of a party based on bankruptcy or insolvency is to terminate, liquidate and accelerate … repurchase agreements with the bankruptcy or insolvent party.").

43. Determining whether commercially reasonable determinants of value existed based on whether the owner of the assets in question could liquidate the assets in a commercially reasonable manner also is consistent with the legislative history of section 562, which provides in part that,

> Section 910 of the Act adds a new section 562 to the Bankruptcy Code providing that damages under any swap agreement, securities contract, forward contract, commodity contract, repurchase agreement or master netting agreement will be calculated as of the earlier of: (i) the date of rejection of such agreement by a trustee, or (ii) the date or dates of liquidation, termination or acceleration of such contract or agreement.
>
> Section 562 provides an exception to the rules in (i) and (ii) if there are no commercially reasonable determinants of value as of such date or dates, in which case damages are to be measured as of the earliest subsequent date or dates on

> which there are commercially reasonable determinants of value. Although it is expected that in most circumstances damages would be measured as of the date or dates of either rejection or liquidation, termination or acceleration, in certain unusual circumstances, such as dysfunctional markets *or liquidation of very large portfolios*, *there may be no commercially reasonable determinants of value of liquidating any such agreements or contracts or for liquidating all such agreements and contracts in a large portfolio on a single day*. It is expected that measuring damages as of a date or dates before the date of liquidation, termination, or acceleration will occur only in very unusual circumstances."

H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 20, 134-35 (2005), *reprinted in* App. Pt. 10(b) *infra.* (emphasis added). By discussing the liquidation of large portfolios, the legislative history confirms that the appropriate analysis to determine whether commercially reasonable determinants of value exist is not whether a functioning market existed for a certain type of securities on a given date, but that instead the appropriate analysis is whether *the particular securities in a given transaction* could have been sold on a given date in a commercially reasonable manner. Otherwise, the legislative history only would have discussed dysfunctional markets in general.

44. Thus, the term commercially reasonable determinants of value necessarily means whether the owner of the assets in question could liquidate the assets in a commercially reasonable manner.

45. Here, as a result of the Debtors' actions, Calyon was unable to liquidate the Mortgage Loans in a commercially reasonable manner prior to August 15, 2008. Accordingly, Calyon also was unable to liquidate its damages under the Repurchase Agreement in accordance with section 562 prior to that date.

46. Specifically, prior to August 15, 2008, among other things, no final non-appealable order had been entered regarding the ownership of the Mortgage Loans and the

11

Counter-Party Debtors had not waived their right to appeal the issue of the ownership of the Mortgage Loans.

47. Moreover, without question there were no commercially reasonable determinants of value prior to January 30, 2008, because prior to the January Stipulation (i) Calyon was not receiving the Proceeds of the Mortgage Loans; (ii) Calyon did not have, and the Debtors were not providing to Calyon, complete and accurate copies of the Mortgage Files or the Monthly Reports; (iii) the Debtors took the position that they owned the Mortgage Loans, the Proceeds and the MSRs; and (iv) MERS reflected the Counter-Party Debtors as the owners of the Mortgage Loans on its electronic mortgage recording system. Thus, as a result of, among other things, not receiving the principal and interest payments or complete and accurate information about the Mortgage Loans and the ongoing dispute over the ownership of the Mortgage Loans, there is no basis in law or fact for asserting that Calyon could have liquidated the Mortgage Loans in a commercially reasonable manner prior to January 30, 2008.

48. In fact, this Court noted the need to receive Proceeds and obtain information about the Mortgage Loans in order to sell the Mortgage Loans in an exchange with counsel to the Debtors at the January 17, 2008 hearing regarding the Mortgage Loans:

> Mr. Tecce: Right. Your Honor, in response to that, I would say there's absolutely nothing stopping them from selling the loans.
>
> The Court: ***Well, who's going to buy a loan that the servicer won't forward the proceeds on?***
>
> Mr. Tecce: Because the loan can be sold on a servicing retained or release basis.
>
> The Court: I understand that. I mean, we talked about that a lot in the opinion.
>
> Mr. Tecce: Right.

> The Court: ***But if you're not actually - even if you're the servicer and you're servicing -***
>
> Mr. Tecce: We are.
>
> The Court: ***- but you're not forwarding the proceeds, why would anybody buy that.***

January 17, 2008 Transcript, at 14:17 - 15:6 (emphasis added).

> The Court: It would have been in the - maybe in the Credit Suisse case, but the whole point I'm raising is, there is - to sort of legitimize Mr. Ackerly's point, which is, there is, if I remember correctly - ***nobody's going to buy a portfolio of a billion dollars worth of subprime mortgages or Alt A or whatever the heck they are without knowing some rudimentary information, and usually there's like 120 days' settlement look-back period, if I remember correctly, and are the debtors providing that information to Calyon?*** I take it from Ackerly's comment, he wants the files but has he gotten the tape?

*Id*. at 19:14-19:24 (emphasis added).

49. As a result, there is no basis in law or fact to suggest that commercially reasonable determinants of value existed prior to January 30, 2008, including on August 1, 2007 as the Debtors suggest.

50. In addition, to hold that commercially reasonable determinants of value existed as of August 1, 2007, would sanction the Debtors' actions that prevented Calyon from liquidating the Mortgage Loans. Specifically, such a holding would allow the Debtors to calculate the deficiency damages under the Repurchase Agreement Claims as if Calyon had been able to liquidate the Mortgage Loans in a commercially reasonable manner as of August 1, 2007, even though it was the Debtors' own actions that prevented Calyon from doing so. The Debtors should not be able to avoid the consequences of their actions in this manner and such an inequitable result should not be countenanced. Instead, the deficiency claims under the

13

Repurchase Agreement Claims should be valued as of when Calyon could liquidate the Mortgage Loans in a commercially reasonable manner.

51.  Further, if Calyon had attempted to sell the Mortgage Loans on August 1, 2007 in a manner that was not commercially reasonable, the bare-bones, cents on the dollar prices Calyon would have received would have resulted in much larger deficiency claims than the deficiency claims Calyon currently asserts.  Not only would this have resulted in larger claims against the Debtors' estates, but it likely would have resulted in the Debtors objecting to such claims precisely because such a liquidation would not have been commercially reasonable. Bankruptcy Code section 562 and the term commercially reasonable determinants of value should not be interpreted to allow the Debtors to place Calyon in such a Catch-22 situation.

52.  Thus, Calyon respectfully submits that the Claims Objection should be denied.

53.  Calyon intends to submit appropriate evidence at the hearing on the Claims Objection to establish, among other things, the amounts of the deficiency claim portions of the Repurchase Agreement Claims based on the first commercially reasonable determinants of value occurring on August 15, 2008, or even on January 30, 2008 to the extent the Court concludes that commercially reasonable determinants of value existed on that date.

WHEREFORE, Calyon respectfully requests that the Court enter an order (a) denying the Claims Objection; (b) allowing the deficiency claim portion of the Repurchase Agreement Claims in the amount Calyon establishes at the hearing on the Claims Objection; and (c) granting Calyon such other and further relief as is just and appropriate.

Dated: February 6, 2009

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

__/s/ Michael G. Busenkell_
Michael G. Busenkell (DE No. 3933)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: 302.252.4324
Facsimile: 302.252.4330

-and-

Benjamin C. Ackerly
Jason W. Harbour (DE No. 4176)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218

-and-

Peter S. Partee
Scott H. Bernstein
200 Park Avenue, 53rd Floor
New York, New York 10016-0136
Telephone: (212) 309-1000
Facsimile: (212) 309-1100

*Counsel to Calyon New York Branch*