IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDING, INC., a Delaware corporation, | ) | Jointly Administered |
| et al., | ) | |
| | ) | **REDACTED** |
| Debtors. | ) | |
| | ) | |

**REPLY OF THE OFFICIAL COMMITTEE OF BORROWERS
TO THE BRIEFS IN SUPPORT OF CONFIRMATION OF THE
DEBTORS' AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

The Official Committee of Borrowers ("Borrowers Committee") respectfully submits this Reply Memorandum in support of its objections to the Amended Chapter 11 Plan of Liquidation of the Debtors dated as of February 5, 2009 (the "Plan"). This Reply is necessitated by developments occurring after the filing of the Borrowers Committee's objections on January 22, 2009, and addresses arguments made by the Debtors and Official Committee of Unsecured Creditors (the "UCC") (together, the "Plan Supporters") on three points: (1) the adequacy of notice to borrowers concerning potentially applicable bar dates; (2) the need to preserve and make available to borrowers information about their loans; and (3) the fact that most of the borrowers who voted on the Plan voted in favor of it.

**I.      CLAIMS BASED ON PAYMENT OPTION ADJUSTIBLE RATE MORTGAGES
SHOULD BE TREATED AS "KNOWN CLAIMS," BUT EVEN IF THEY ARE
NOT, THE NOTICE PROVIDED BY THE DEBTORS TO DATE HAS FAILED
TO COMPORT WITH DUE PROCESS.**

Whether their claims are treated as "known" or "unknown," borrowers have not received adequate notice.

## A.    Borrower Claims Involving Payment Option ARMs Were and Are "Known."

The Debtors and the Creditors Committee argue that borrowers were not entitled to actual notice because claims arising from the Debtors' origination of pay option ARMs ("POAs") were not reasonably ascertainable from the Debtors' books and records.[1]  The premise of their argument is that, in general, POAs were a good product, and that borrower claims involving POAs were the exception rather than the rule.  The premise of their argument is incorrect.  Even before they went into bankruptcy, the Debtors knew that their POAs were a calamity.  Large numbers of claims by POA borrowers were simply inevitable.

This past Friday, following the Borrowers Committee's filing of a motion to compel, the Debtors finally produced a few of the documents that the Debtors previously had produced to the SEC.  Included in this last-minute production was a memorandum indicating that AHM senior staff knew, months before its bankruptcy filing, ███████████████████████████████ ███████████████████████[2]  In other words, ███████████████████████████ ███████████████████████████████████  As many commentators have observed, negative amortization is often disastrous for borrowers because, in the words of federal government regulators, it leads to "payment shock"[3] when, years after loan origination, the borrower's payment obligations suddenly spike upwards.  ███████████████ ███████████████████████ mass defaults and foreclosures were (and are) going to

---

[1] *See* Debtors' Memorandum of Law in Support of Confirmation of the Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 5, 2009, at 30-31.

[2] *See* document titled "Senior Staff Meeting, February 1, 2007" at the page bearing the bates label AHM 018964, annexed as Exhibit A hereto.  This document has been designated as "Confidential" by the Debtors.  Pursuant to the terms of the Confidentiality Agreement between the Borrowers Committee and the Debtors, therefore, the filed version of this reply is redacted and Exhibit A has not been filed on the docket.

[3] Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609; 58,613-58,614 (Oct. 4, 2006).

2122008.1

occur. The *Wall Street Journal* recently reported that Goldman Sachs now estimates for the mortgage industry as a whole that 61% of payment option ARMs eventually will default.[4]

Borrower claims go hand-in-hand with borrower defaults and foreclosures. Even before AHM went into bankruptcy, borrowers had filed suits against lenders that had originated POAs.[5] Today, such suits are more common,[6] as more POAs have been recast. The potential for recovery on such suits is quite apparent. For example, Bank of America recently entered into a settlement that will require it to modify approximately 400,000 Countrywide mortgages (at a projected cost of approximately eight billion dollars) and to pay hundreds of millions in compensation (i.e., damages) to injured borrowers.[7]

Thus, even at the time of the Debtors' bankruptcy filing, POA borrowers were "known creditors." They certainly are known creditors *now*, which should be the relevant time period because the Plan Supporters are *now* trying to obtain confirmation of a Plan that would bar most borrowers from recovering from their estates. The Debtors may not have known (and still may not know) precisely which borrowers would sue, but by late 2007 there was no question that, within a readily identifiable group of borrowers whose names and addresses were known, a large number would have claims. Thus, the publication of the bar date notice in three newspapers failed to satisfy the requirements of due process.

---

[4] Ruth Simon, *Option ARMs Seeing Rising Defaults*, Wall Street Journal, Jan. 30, 2009, at C1.
[5] *See, e.g., Andrews v. Chevy Chase Bank NSB*, 240 F.R.D. 612, 613 (E.D. Wis. 2007).
[6] *See, e.g., Amparan v. Plaza Home Mortgage*, 07-4498, 2008 WL 5245497 (N.D. Cal. Dec. 17, 2008); *Mincey v. World Sav. Bank, FSB*, 07-03762, 2008 WL 3845438, (D.S.C. Aug. 15, 2008); *Avila v. Stearns Lending, Inc.*, 08-0419, 2008 WL 1378231 (C.D. Cal. Apr. 7, 2008); *Mandrigues v. World Sav., Inc.*, 07-04497, 2008 WL 1701948 (N.D. Cal. Apr. 9, 2008); *Plascencia v. Lending 1st Mortgage*, 583 F. Supp. 2d 1090 (N.D. Cal. 2008); *Monaco v. Bear Stearns Residential Mortgages*, 554 F. Supp. 2d 1034 (C.D. Cal. 2008); *Sellers v. Fed. Deposit Ins. Corp.*, 07-00615 (C.D. Cal.); *Bristol County Retirement Sys. v. Wachovia Corp.*, 08-02844 (N.D. Cal.).
[7] Ruth Simon, *Bank of America in Settlement Worth Over $8 Billion*, Wall Street Journal, Oct. 6, 2008, at C1; Multistate Settlement Term Sheet, http://www.ct.gov/ag/consumers/finalmultistatecfcsettlementtermsheet.pdf. (last visited February 8, 2009).

This case is far more similar to *Fogel v. Zell*[8] and *In re Arch Wireless*,[9] where publication notice to potential claimants was deemed insufficient, than it is to the authorities on which the Plan Supporters rely. In *Fogel*, the Seventh Circuit held that publication notice of a bar date was insufficient for a known purchaser of defective pipes from a debtor, where the defective pipes had given rise to similar pre-petition claims.[10] In *Arch Wireless*, the First Circuit held that publication notice of a bar date was insufficient for a known entity that had written to the debtor pre-petition and alleged damages resulting from billing errors and product defects.[11]

By contrast, in *Chemetron Corp. v. Jones*,[12] the court approved publication notice to individuals who potentially had been exposed to harmful substances released from environmentally contaminated sites previously owned by the debtor.[13] Unlike the borrowers in this case, the identities and addresses of the potential claimants in that case were not ascertainable from the debtor's books and records.[14]

The Plan Supporters' reliance on *Hebell v. NVR, Inc.*[15] is also misplaced. As an initial matter, *Hebell* is unpublished and was issued by a lower court in the Seventh Circuit prior to *Fogel*. *Hebell* involved plaintiffs attempting to sue a debtor after plan confirmation for mismanagement of escrow accounts.[16] The court held that publication notice had been sufficient because the debtors had no reason to "expect or anticipate" that such claims would be filed.[17] Here, by contrast, the Debtors have no confirmed plan, theories of liability with respect to POAs

---

[8] *Fogel v. Zell*, 221 F.3d 955, 961-64 (7th Cir. 2000).
[9] *In re Arch Wireless*, 534 F.3d 76, 80-82 (1st Cir. 2008).
[10] *Fogel*, 221 F.3d at 961-64.
[11] *Arch Wireless*, 534 F.3d at 80-82.
[12] 72 F.3d 341 (3d Cir. 1995).
[13] *Chemetron Corp.*, 72 F.3d at 344-45.
[14] *Id.* at 345-47.
[15] No. 97 C 4000, 1997 U.S. Dist. LEXIS 10786 (N.D. Ill. July 21, 1997).
[16] *Id.* at *3-5.
[17] *Id.* at *5.

had been asserted by borrowers and regulators before the applicable bar dates,[18] some claims against lenders selling the same products had been upheld before the bar dates,[19] and management was aware of ███████████████████████████[20] And, unlike in *Hebell*, the Debtors were named as defendants in hundreds of borrower lawsuits. The other authorities relied upon by the Debtors and the UCC involve factually distinct circumstances that do not warrant a similar outcome in this case.

**B.    The Publication Notice Employed by the Debtors Was Insufficient Given Most Borrowers' Lack of Sophistication.**

The Plan Supporters also ignore the fact that most borrowers were unsophisticated individuals. The purpose of providing notice is to actually notify creditors and not simply to be able to say "we gave notice." Several courts have recognized that the standard of notice a debtor is obligated to provide varies depending on the level of sophistication of the creditor. For example, the Ninth Circuit has held that Bankruptcy Rule 4007(c), which requires at least 30 days advance notice to creditors of an impending bar date, provides merely "a guide to the minimum time within which it is reasonable to expect a creditor to act at penalty of default," noting that "30 days notice may not be enough if truly extraordinary circumstances are presented, as when an unsophisticated creditor, not represented by counsel, receives only the most sketchy notice that a bankruptcy has been filed."[21]

---

[18] *See Andrews v. Chevy Chase Bank NSB*, 240 F.R.D. 612, 613 (E.D. Wis. 2007). A copy of the Massachusetts Attorney General's press release announcing the filing of a complaint against Fremont Investment and Loan on October 5, 2007, is attached hereto as Exhibit B.
[19] *See, e.g., Andrews v. Chevy Chase Bank NSB*, 240 F.R.D. 612, 613 (E.D. Wis. 2007).
[20] *See* Exhibit A at AHM 018964.
[21] *In re Dewalt*, 961 F.2d 848, 851 (9th Cir. 1992); *see also In re Sieban & Byrnes, Inc.*, 291 F. Supp. 315, 316-17 (S.D.N.Y. 1968) (court allowed late filed claims of bankruptcy claimants who received no notice of the first creditors' meeting, who could not be "expected to know the intricacies of the bankruptcy statute," and where the denial of their claims would constitute a "manifest injustice"); Del. Bankr. LR 3007-1(e)(v) (requiring notice to each claim holder whose rights are affected by an omnibus claims objection to receive notice that specifies the effect of the objection on the claim and the reason for the objection to the claim).

Courts in non-bankruptcy contexts have likewise recognized that notice requirements may be heightened depending on the level of sophistication of the intended recipient. For example, in *Memphis Light, Gas & Water Division v. Craft*, the Supreme Court held that due process required a utility to give clear and explicit notice to consumers of the availability of mechanisms for redress if they wished to challenge charges on their bills.[22]  Similarly, the notice requirements under the Fair Debt Collections Practices Act are analyzed from the vantage point of an "unsophisticated consumer."[23]  Likewise, in the consumer class action context, courts require that pursuant to Federal Rule of Civil Procedure 23(b)(3) members of a class receive "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort."[24]

For most borrowers, the gist of their claims against the Debtors include allegations that they did not understand the complicated legalistic documents put before them.  Even if some form of publication notice were sufficient under the circumstances – and it is not – the Court should not conclude that borrowers received adequate notice in these cases.  The notice published by the debtors was almost as complicated and legalistic as the mortgage contracts giving rise to the claims.[25]  (For example, few borrowers would think of themselves as "entities," and few would know how to cross-reference capitalized terms in a definitions section.)  Given that the Debtors' own website included a seemingly straightforward statement assuring

---

[22] 436 U.S. 1, 11 (1978).
[23] *Owens v. Hellmuth & Johnson*, 550 F. Supp. 2d 1060, 1064 (D. Minn. 2008).
[24] *See* Fed. R. Civ. P. 23(c)(2).  In that regard, we note that a proof of claim has been filed in this case by members of a putative class action based on the deceptive nature of POAs.  A copy of this proof of claim is attached hereto as Exhibit C.
[25] A copy of the bar date notice that was published is attached as Exhibit D hereto.

borrowers that the AHM bankruptcy would not "directly impact" them,[26] the publication notice employed by the Debtors was far from adequate.

## II.   THE PROPOSED PLAN DOES NOT ADEQUATELY ENSURE THE PRESERVATION AND DISSEMINATION OF BORROWER-RELATED INFORMATION.

Unfortunately, while the Borrowers Committee had hoped to resolve all disputes with the Debtors relating to the preservation and dissemination of borrower-related information, the parties have not been able to agree to terms. The Debtors trumpet the appointment of a disinterested person as a "borrower information ombudsman" to respond to borrower information requests as an example of an appropriate resolution of a borrower concern. But the Plan would impose limitations on the ombudsman and on the Plan Trustee's document-preservation obligations that renders the value of the ombudsman illusory.

*First*, under the Plan, the fees and expenses of the ombudsman are limited to $50,000. This paltry amount is mostly likely insufficient, given the number of borrowers and the difficulty many of them have had and will continue to have in determining the identity of the holder of their loans. The insufficient funding of the ombudsman would be particularly prejudicial to borrowers in these cases since many negatively amortizing POAs will not reset for several years.

*Second*, although there is a Borrowers Committee, the Borrowers Committee has nothing to do with the selection of the ombudsman. It would make sense for the Borrowers Committee to choose the person who would handle borrower information requests going forward.

*Third*, the Debtors have refused to commit to the preservation of borrowers' loan files, now or in the future. Currently, the Borrowers Committee has no means of determining which

---

[26] A copy of this August 13, 2007 letter is attached as Exhibit E hereto.

2122008.1

files will be preserved and which may be destroyed under the Plan and "prior orders" of the Court.

Thus, the means of implementing the Plan are not adequate, in violation of 11 U.S.C. § 1129(a)(11), the borrowers as a class would not be treated fairly under the Plan, in violation of 11 U.S.C. § 1123(a)(4), and the Plan potentially would trample borrowers' federal and state law rights to obtain their loan files and other information about their loans.

## III.    THE VOTE TABULATION RESULTS CITED BY THE PLAN PROPONENTS ARE MISLEADING.

The UCC's contention that "97.16% of borrowers casting ballots have voted in favor of Plan confirmation" is grossly misleading because most borrowers were not given notice of the Bar Date.  The Borrowers Committee continues to review the voting results certified only this past Thursday – notwithstanding that the confirmation hearing had previously been scheduled for January 28 – and reserves its rights to challenge any and all aspect of the voting results.

## IV.    CONCLUSION

For the reasons set forth above and in the Borrowers' Committee's objections, the Plan cannot be confirmed.

Dated:  Wilmington, Delaware
        February 9, 2009

                                        ZUCKERMAN SPAEDER LLP

                                        Thomas G. Macauley (ID No. 3411)
                                        919 Market Street, Suite 990
                                        Wilmington, DE 19801
                                        Telephone:  (302) 427-0400
                                        Facsimile:  (302) 427-8242

                                             - and -

2122008 1

GILBERT OSHINSKY LLP
Stephen A. Weisbrod
W. Hunter Winstead
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Telephone: (202) 772-1962
Facsimile: (202) 772-3962

Attorneys for the Official Committee
of Borrowers