IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation, | ) | Jointly Administered |
| et al.,[1] | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

**OFFICIAL COMMITTEE OF BORROWERS' MOTION *IN LIMINE*
TO EXCLUDE CERTAIN WITNESSES' LAY OPINION TESTIMONY**

Pursuant to Rule 602, 701 and 702 of the Federal Rules of Evidence, the Official Committee of Borrowers ("Borrowers Committee") moves, *in limine*, to exclude certain analytical and/or opinion testimony of Bret Fernandes, Damian Pasternak, and Michele Michaelis, witnesses offered by the above captioned debtors and debtors-in-possession (collectively, the "Debtors" or "AHM") and the Official Committee of Unsecured Creditors (the "Creditors Committee," and, together with the Debtors, the "Plan Supporters") in connection with the upcoming hearing over confirmation of the Debtors' proposed Plan of Liquidation (the "Plan").

This motion is being filed shortly before the Plan Confirmation hearing because two of the three witnesses at issue were identified by the Plan Supporters only recently and were deposed only within the past few days. On Friday, February 6, at the conclusion of the last deposition, Counsel for the Borrowers Committee informed counsel for the Plan Supporters that this Motion would be filed.

---

[1] The Debtors in these cases are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc; and Great Oak Abstract Corp.

1

1241/001/974044.8

2121683.1

I.  **PRELIMINARY STATEMENT**

The Plan Supporters should not be permitted to introduce what amounts to unreliable expert testimony through unqualified lay witnesses. The Federal Rules of Evidence prohibit lay witnesses from offering expert testimony: Federal Rule of Evidence 701 provides that if "a witness is not testifying as an expert," i.e., if the witness is a lay witness – then the witness may not offer "testimony in the form of opinions or inferences" if it such testimony is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 702, in turn, applies to testimony concerning "scientific, technical, or other specialized knowledge." It requires that a witness presenting such testimony be qualified based on "knowledge, skill, experience, training, or education," and further requires that the testimony be "based upon sufficient facts or data," that it be "the product of reliable principles and methods," and that the witness have "applied the principles and methods reliably to the facts of the case."

Notwithstanding those fundamental rules, the Plan Supporters are likely to seek to introduce expert testimony Mr. Fernandes, Mr. Pasternak, and Ms. Michaelis, each of whom has been designated as a fact witness. (None of them has produced an expert report as experts are required to do under Rule 26(a)(2).) Specifically, they are expect to testify in support of: (1) the reasonableness of the protocols for allowing Early Payment Default ("EPD") Claims and Breach of Warranty Claims, (2) the reasonableness of the Stipulated Asset Allocation resolving inter-Debtor claims, and (3) the comparative recoveries that borrowers would receive under the Plan and under a chapter 7 liquidation. To prove the foregoing, the Plan Supporters will necessarily require highly technical and specialized testimony to explain to the Court the data and models on which they relied, why certain methodologies, valuations, and assumptions were reasonable, and

how these factors relate to the ultimate formulas and protocols utilized in the Plan. In other words, they will need testimony under Rule 702.

While Mr. Fernandes, Mr. Pasternak, and Ms. Michaelis can testify about what they did in connection with the Plan, the Court should not permit them to testify about the wisdom or the reasonableness of their actions and decisions. Those are not topics that lay witnesses can address. Competent testimony about those subjects requires specialized knowledge, including expertise about the mortgage markets and other financial matters that the three witnesses proffered by the Plan Supporters simply do not have. (And, even if they had it, the Debtors still would have had to produce far more information in discovery than they did.)

## II. BACKGROUND

### *EPD Claims Protocol*

The Plan creates a mechanism that resolves all EPD Claims.[2] EPD Claims are asserted by institutional creditors against the Debtors' estate for borrower defaults that occur within 90 days of the close of the loan sale.[3] The Debtors have stated that, to create this protocol, they surveyed historical EPD Claims and "determined that the major factors determining the likelihood and amount of loss for a loan were mortgage product type and the borrower's payment history."[4] The Debtors then decided that loss frequency and loss severity would be the governing factors.[5] To arrive at estimates of loss frequency and severity, the Debtors analyzed their historical losses on a product-by-product basis.[6] Lacking meaningful data regarding loss frequency, the Debtors looked to industry loss models used by ratings agencies, investors, and

---

[2] Plan at 48-50.
[3] Disclosure Statement at 93.
[4] *Id.* at 93.
[5] *Id.*
[6] *Id.* at 93-94.

Bloomberg.[7] Then, the Debtors upwardly adjusted the loss model's loss frequency rates in favor of the EPD claimants.[8] To estimate loss severity, the Debtors initially relied on the Debtors' "historical" loss severity data, and they then "adjusted" their numbers to more closely reflect numbers in the 20-city S&P/Case-Shiller Home Price Index.[9] The Debtors have explained that they made these adjustments in an attempt to reflect the current state of the housing market, but they have not explained why they chose the S&P/Case-Shiller Home Price Index, which relies heavily on data from some of the country's most overheated housing markets. A similar index prepared by the Office of Federal Housing Enterprise Oversight shows significantly smaller declines in home prices.[10]

### *Breach of Warranty Claims Protocol*

The Plan also creates a mechanism that resolves all Breach of Warranty Claims.[11] Breach of Warranty Claims are contingent and non-contingent claims for a breach of a representation or warranty arising under any provision of a loan purchase agreement.[12] The Debtors acknowledge that these claims are more complicated than EPD Claims because "[d]etermining whether the Debtors breached non-EPD related representations or warranties in a loan sale agreement would entail a detailed loan-by-loan assessment of the specific allegations,

---

[7] *Id.* at 84. The Bloomberg model assumes a 0% loss frequency for the 0-30 day "delinquency bucket," a 0% loss frequency for the 31-60 day "delinquency bucket," 60% loss frequency for the 61-90 day "delinquency bucket," and a 90% loss frequency for the 90+ day "delinquency bucket."
[8] *Id.* The Plan assures a 12.5% loss frequency of the 0-30 day "delinquency bucket," 50% loss frequency for the 31-60 "delinquency bucket," 75% loss frequency for the 61-90 day loss bucket and a 100% frequency for the 90+ day "delinquency bucket."
[9] *Id.* at 93, 94-95 (noting Debtors' use of the 20-city S&P/Case-Shiller Home Price Index).
[10] *Compare* Federal Housing Finance Agency, *Home Prices Slide Further in Summer Months; Few States Show Price Gains* 4 (Nov. 25, 2008), *available at* http://www.ofheo.gov/media/pdf/3q08hpi.pdf (a copy of the reprint is attached hereto as Exhibit A) *with* Standard & Poor's, *S&P/Case-Shiller Home Price Indices; 2008, A Year In Review* 11 (Jan. 13, 2009), *available at* http://www2.standardandpoors.com/spf/pdf/index/Case-Shiller_Housing_Whitepaper_YearinReview.pdf (a copy of the index is attached hereto as Exhibit B).
[11] Plan at 48-50.
[12] *Id.* at 8-9.

which would necessarily entail a degree of subjectivity because some of the industry-standard representations and warranties are not susceptible to clear, objective assessment."[13] When creating this protocol, the Debtors made assumptions as to

> "(1) the likelihood that there had been material breaches of representations or warranties in connection with a given sale of loan (hereinafter referred to as the 'incidence of breach'), (2) the likelihood a Breach of Warranty claimant would ultimately suffer a loss as a result of the Debtors' failure to repurchase loans for which there had been a material breach of representations or warranties (as above, referred to as the 'loss frequency'), and (3) the presumed amount of any such loss (as above, referred to as the 'loss severity')."[14]

To develop the incidence of breach assumption, the Debtors reviewed some of their own historical loss data and a "substantial amount of outside data" to arrive at two methodologies, one derived from the Debtors' pre-petition loss data and the other derived from post-petition claims asserted by five creditors.[15] The Debtors then, as with the EPD Claims Protocol, chose the methodology that yielded a higher payout to the Breach of Warranty claimants. Then, the Debtors assumed a 100% loss frequency for all loan types – in other words, they "assumed" that every single breach resulted in a loss – and adopted the same loss severity percentages used in the EPD Claims Protocol.[16] By contrast, they assumed with EPD claims that the loss frequency could be as low as 12.5% depending on various factors.[17]

### *Stipulated Asset Allocation*

The Plan incorporates the Stipulated Asset Allocation as a means to distribute assets to creditors of the various Debtors. First, remaining liquidated and unliquidated assets are allocated back to

---

[13] Disclosure Statement at 96.
[14] Id.
[15] Id. at 97.
[16] Id.
[17] Id. at 94 n.48 (estimating a 12.5% loss frequency).

5

1241/001/974044.8

2121683.1

the original, contributing Debtors.[18] Assets belonging to multiple debtors, such as REO and Construction Loan assets, are allocated based upon each Debtor's estimated ratio of allowed general unsecured claims.[19] Then, each estate's value is adjusted to reflect the settlement of intercompany receivables and payables.[20] Those values then are reduced for (1) administrative costs directly attributable to certain Debtors, (2) settlement of secured claims, and (3) and allocation of general administrative costs through a formula that somehow factors (a) each estate's value before adjustment, (b) the measure of work related to the disposition of assets allocable to each Debtor, and (c) the estimate of the amount of allowed general unsecured claims against each Debtor.[21] Each estate's value is then reduced by its estimated exposure to secured, administrative, and priority claims. Finally, each estate's value further is reduced by the allocation of the liquidation trust's projected operating expenses.[22]

Each step of this allocation involves data analysis, valuations, and assumptions that the Plan Supporters have not explained fully, if at all. The return of assets to each Debtor involves the valuation of unliquidated assets; the Debtors have not disclosed the valuation methodology and explained how that methodology is appropriate. Several steps in the allocation factor in each Debtor's share of estimated allowed general unsecured claims at the time of the Plan filing; the Debtors have not explained how they developed this estimate and why it is fair and appropriate. To date, Debtors have not provided the Borrowers' Committee with data that underlies their assumptions nor justified the assumptions. Nor have the Plan Supporters explained their decision to value the various litigation assets of the Debtors at zero dollars.

---

[18] Disclosure Statement at 69-70.
[19] *Id.*
[20] *Id.* at 66-67, 70.
[21] *Id.* at 70-71.
[22] *Id.*

### *Best Interests Test*

The Plan Supporters apparently intend to call one or more of Mr. Fernandes, Mr. Pasternak, or Ms. Michaelis to establish that the Plan satisfies the best interest test with respect to borrowers. Those witnesses therefore will have to testify about highly technical subjects, including, among others, the fees incurred and recoveries likely to be obtained in hypothetical chapter 7 cases and the potential recoveries from litigation claims owned by the Debtors which have been excluded from the Liquidation Analysis.

### *Bret Fernandes*

Mr. Fernandes was deposed on January 15, 2009, at a deposition conducted pursuant to Federal Rule of Civil Procedure 30(b)(6). He does not appear to have the particularized knowledge that would permit him to testify about the specialized mortgage-related analyses and valuations undertaken by the Debtors. His experience in the field of restructuring is substantial, but his experience dealing with EPD Claims, Breach of Warranty Claims, and valuation of the types of assets and liabilities at issue here is very limited.

Mr. Fernandes is a senior director at Zolfo Cooper Kroll ("Zolfo"). He began working on this case in September 2007.[23] He initially worked in the Debtors' servicing operations and began helping to develop the Plan mechanisms in early 2008.[24] Since July 1, 2008, Mr. Fernandes has served as the Chief Restructuring Officer for the Debtors.[25] On January 6, 2009, the Borrowers Committee requested that the Debtors designate representatives to testify on a number of topics, including the EPD/Breach Claims Protocol, the Stipulated Asset Allocation

---

[23] Deposition of Bret Fernandes at 136:11-13 (Jan. 15, 2009) ("Fernandes Tr.") (a redacted copy of the deposition transcript is attached hereto as Exhibit C).
[24] *Id.* at 137:3-15.
[25] *Id.* at 137:16-18.

and the Liquidation Analysis. It is expected that the Debtors will call upon Mr. Fernandes to testify about these mechanisms at the confirmation hearing.

Mr. Fernandes's testimony revealed that he cannot describe the underlying data, models, assumptions, and methodologies and correlate those to the EPD/Breach Claims Protocols. During his deposition, Mr. Fernandes was asked several times about the different data and methodologies used to create the Plan's protocols and formulas. When asked about whether the real-world loss frequency for payment option adjustable rate mortgages was in fact the same as the loss frequencies for fixed rate mortgages, Mr. Fernandes could not answer.[26] When asked about the data that demonstrated that the loss frequency for all product types, Mr. Fernandes replied that he had never seen that data and could not identify who had seen it.[27] When asked about what kinds of breaches and what kinds of warranties were involved, Mr. Fernandes stated that he did not know the details and specifics and was not the person to discuss that subject.[28]

When asked about the methodology behind the Debtors' loss frequency assumptions, Mr. Fernandes stated that these assumptions were based on the Bloomberg model,[29] but he did not indicate why he thought it was reasonable to use the Bloomberg model or why it was reasonable to deviate from that model. More strikingly, when asked about an assumption that helped yield a 0.22% incidence breach, Mr. Fernandes stated that there was no data or math that was built into that assumption.[30]

---

[26] *Id.* at 114:17-20.
[27] *Id.* at 115:15-24.
[28] *Id.* at 124:17-125:14.
[29] *Id.* at 113:8-19.
[30] *Id.* at 126:1-16.

### *Damian Pasternak*

Mr. Pasternak was deposed on February 6, 2009, as the Debtors first disclosed their intention to call him as a witness only after the Borrowers Committee filed its Plan Objections. He does not have personal, particularized knowledge about models and assumptions developed by persons not employed by the Debtors, and thus he cannot testify from personal knowledge as to their reasonableness.

Mr. Pasternak was a whole loan trader in the Debtors' capital markets group.[31] He has been employed by the Debtors since April 2006.[32] Prior to working for the Debtors, Mr. Pasternak was an accountant for Barnes & Noble and a financial analyst for Sleepy's, a mattress retailer.[33] Before these bankruptcy proceedings, Mr. Pasternak had no involvement with EPD/Breach Claims; those matters were handled by AHM's repurchase group.[34]

Mr. Pasternak's deposition testimony revealed that, although he has extensive knowledge of the development of the EPD/Breach Claims Protocol, he has no personal, particularized knowledge of the models and assumptions underlying the Protocol. Indeed, some of the key models and assumptions were the work of unidentified persons who were not employed the Debtors or their consultants. Mr. Pasternak testified that the EPD/Breach Claims protocol is principally derived from the model used in the New Century liquidation,[35] but he testified that he had no involvement in the creation of the New Century protocols, nor does he know anyone who was so involved.[36] Significantly, Mr. Pasternak noted that New Century differed from AHM in

---

[31] Deposition of Damian Pasternak at 3:13-18 (Feb. 6, 2009) ("Pasternak Tr.") (a copy of the deposition transcript is attached hereto as Exhibit D).
[32] *Id.* at 3:23.
[33] *Id.* at 4:15-23.
[34] *Id.* at 11:17-19.
[35] *Id.* 18:12-23.
[36] *Id.*

important respects: New Century was more active than AHM in the subprime market and therefore sold different kinds of products, which were sold to different types of borrowers.[37]

Mr. Pasternak's testimony revealed that he has no personal, particularized knowledge of certain models incorporated into the EPD Claims Protocol's loss frequency and severity factors. Mr. Pasternak testified that the EPD Claims Protocol's loss severity factor incorporated the 20-city S&P/Case-Shiller Home Price Index.[38] He stated that he did not actually make the adjustments, nor had ever done this kind of work before.[39] Further, he was unaware of whether the index was used in New Century's protocols.[40] Likewise, Mr. Pasternak testified that the EPD Claims Protocol's loss frequency factor incorporated the Bloomberg model.[41] He testified that the Bloomberg model projects the price of a bond with assumptions that loans in certain servicing buckets will go further into default and foreclose or experience a loss.[42] Further, the Bloomberg model is based on industry-wide data, not AHM-specific data.[43] Mr. Pasternak testified that he was unsure of what type of data the Bloomberg model specifically included, or how the Bloomberg model derived its numbers.[44] He also testified that he adjusted the Bloomberg model to increase the loss frequency based upon undocumented "industry standards."[45] Similarly, Mr. Pasternak stated that the Breach of Warranty Claims Protocol derived from the one used by New Century,[46] a model that he did not help develop. Again, he did not know anyone who did.[47]

---

[37] *Id.* at 42:4-13.
[38] *Id.* at 21:6-8.
[39] *Id.* at 21:12-19.
[40] *Id.* at 24:10-12.
[41] *Id.* at 25:17-21.
[42] *Id.* at 26:1-7.
[43] *Id.* at 26: 11-16.
[44] *Id.* at 26:17 – 27:5.
[45] *Id.* at 27:19 – 29:9.
[46] *Id.* at 40:8 – 17.
[47] *Id.* at 18:15-23..

1241/001/974044.8

2121683.1

*Michele Michaelis*

Ms. Michaelis was deposed on February 4, 2009, as the Debtors first disclosed their intention to call her as a witness only after the Borrowers Committee filed its Plan Objections. Ms. Michaelis is not an employee of the Debtors. Nor does she have personal, particularized knowledge about the data, assumptions underlying the Stipulated Asset Allocation and Liquidation analysis, and thus she cannot testify from personal knowledge as to their reasonableness.

Ms. Michaelis is a director in the restructuring services practice at BDO Consulting ("BDO"), which is the financial advisor to the Committee of Unsecured Creditors.[48] According to Ms. Michaelis, BDO has "taken part in reviewing projections, the asset sales[,] been involved in the [] creation of the agreement with Bank of America [,]evaluated the [] current operations overall[, and] reported on the historic operations of the company. . . ."[49]

Ms. Michaelis's testimony revealed that, beyond providing comments to the Debtors or to the Committee of Unsecured Creditors, she had little involvement with the creation of the Liquidation Analysis.[50] Indeed, Ms. Michaelis demonstrated that much of what she intends to testify about does not derive from her own personal efforts or particularized knowledge, rather, it appears that her testimony derives from Zolfo's efforts. As Ms. Michaelis admitted, Zolfo created the allocation methodology and the accompanying analysis,[51] Zolfo analyzed the data

---

[48] Deposition of Michele Michaelis at 4:13-6:23 ("Michaelis Tr.") (a copy of the deposition transcript is attached hereto as Exhibit E).
[49] *Id.* at 7:11-21.
[50] *Id.* at 16:11-25.
[51] *Id.* at 37:4-12.

underlying the intercompany claims,[52] Zolfo examined the information underlying the allocation of costs among the Debtors,[53] and Zolfo prepared the initial liquidation analysis.[54]

Further, Ms. Michaelis's testimony reveals that the proper analyses required before allocating the litigation assets is incomplete. After acknowledging the importance of litigation recoveries when the distribution to the general unsecured creditors is expected to be small – as is the case here – Ms. Michaelis testified that the analysis of potential litigation recoveries is incomplete.[55]

### III. ARGUMENT

Rule 701 prohibits lay witnesses from providing opinion testimony where the testimony is based on scientific, technical, or other specialized knowledge within the scope of Rule 702. This prohibition is intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."[56] Here, a significant portion of the testimony to be elicited from Mr. Fernandes, Mr. Pasternak, and Ms. Michaelis relates to technical and specialized subjects. As such, much of their testimony falls within the scope of Rule 702, and is therefore inadmissible under Rule 701.

The Plan Supporters are likely to argue that the opinion testimony they seek to elicit is permissible lay opinion from business people about their own businesses. Such an argument would be off base. To be admissible, lay opinion testimony by a business person must stem from "the particularized knowledge that the witness has by virtue of his or her position in the

---

[52] *Id.* at 43:21-45:25.
[53] *Id.* 48:24-49:4.
[54] *Id.* at 17:14-16.
[55] *Id.* at 23:6-24:10.
[56] *See* Fed. R. Evid. 701 advisory committee's notes. *See also Bank of China, New York Branch v. NBM LLC*, 359 F.3d 208, 224-25 (2d Cir. 2004) (holding that testimony based upon bank employee's specialized knowledge was impermissible expert testimony).

12

business."[57] For example, in the context of lay opinion testimony concerning complex financial matters, the testimony of the owner of employee of a business regarding the business's lost profit is a frequent topic. Courts allow a business owner to testify about the value of his business or lost profits only when the owner has particularized knowledge of their business and the factors on which they relied to come to the opinion.[58]

The fact that business people are permitted to offer limited opinions about their own businesses does not give the Plan Supporters *carte blanche* to introduce any opinions they want through Mr. Fernandes, Mr. Pasternak, and Ms. Michaelis. Courts do not permit lay opinion witnesses to testify about such matters where the business person does not have personal knowledge of the factors involved with the particular calculation.[59] When the proposed testimony involves complex financial matters, a lay witness can offer opinions only if the witness demonstrates a particularized, personal knowledge of the underlying assumptions, models, and methodologies that underlie the ultimate conclusion.

Several decisions illustrate the dividing line between permissible fact testimony and permissible lay opinion testimony, on the one hand, and impermissible, unqualified technical testimony, on the other. For example, in *LifeWise Master Funding v. Telebank*, the court would have permitted the president of the company to testify as to the company's lost profits as long as that testimony derived from "conventional methods based on LifeWise's actual operating

---

[57] *See* Fed. R. Evid. 701 advisory committee's notes.
[58] *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993 (permitting sole owner of company to testify as to lost profits where the owner knowledge and participation in the day-to-day affairs of his business). Although the business owner relied on a report prepared by an accountant, that reliance was not fatal because the owner had personally participated in the making of that report. *Id.*
[59] *See Eichorn v. AT&T Corp.*, 484 F.3d 644, 649-50 (3d Cir. 2007) (refusing employee's testimony regarding damages where the witness did not have personal knowledge of the underlying facts). *See also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, No. 04-08, 2006 WL 5242377, at *8 (D. Nev. Mar. 6, 2006) (refusing to admit general partner's testimony of projected revenue losses where it was not established that the witness had "personal knowledge of all of the data underlying the projected revenue losses [or had] personal knowledge of how that data is combined to calculate Plaintiff's projected revenue losses.")

13

1241/001/974044.8

2121683.1

history.[60] The court refused to allow the president's testimony to move beyond his own particularized knowledge and instead "enter[] into a real of rolling averages, S-curves, and compound growth rates that appear to be an amalgam of logic, hope, and economic jargon."[61] Similarly, in *Autoforge v. American Axle and Manufacturing, Inc.*, the court deemed inadmissible a sole shareholder's testimony as to his company's lost profits where that testimony relied on unsupported estimates, speculation, outside research, and other outside materials.[62]

Consistent with applicable precedents, the Borrowers Committee does not deny that Mr. Fernandes and Mr. Pasternak may testify about certain aspects of the EPD/Breach Claims Protocol. But because they lack particularized knowledge of New Century model, S&P/Case-Shiller index, the Bloomberg Model, or similar models and assumptions any testimony by them about the reasonableness of the protocols or the methods used to create them is inadmissible. Similarly, none of the witnesses has demonstrated expertise in asset valuation, let alone valuation of mortgages or litigation assets. Accordingly, none should be permitted to opinion on the reasonableness of the Stipulated Asset Allocation or the effect that they would have on the best interests analysis.

---

[60] *See LifeWise Master Funding v. Telebank*, 374 F.3d 917, 930 (10th Cir. 2004).
[61] *Id.*
[62] No. 01-1265, 2008 WL 65603, at *8 (W.D. Pa. Jan. 4, 2008).

## IV. CONCLUSION

For the foregoing reasons, the Court should exclude portions of the testimony of Bret Fernandes, Damian Pasternak, and Michele Michaelis relating to their opinions regarding EPD/Breach Protocol, the Stipulated Asset Allocation, and the best interests analysis as applied to borrower claims, as well as any opinions regarding the methodologies employed by the Plan Supporters in addressing those matters.

Dated: Wilmington, Delaware
February 8, 2009

ZUCKERMAN SPAEDER LLP

_____
Thomas G. Macauley (ID No. 3411)
919 Market Street, Suite 990
Wilmington, DE 19801
Telephone: (302) 427-0400
Facsimile: (302) 427-8242

- and -

GILBERT OSHINSKY LLP
Stephen A. Weisbrod
W. Hunter Winstead
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Telephone: (202) 772-1962
Facsimile: (202) 772-3962

Attorneys for the Official Committee
of Borrowers

1241/001/974044.8

2121683.1