# EXHIBIT C



**WILCOX & FETZER LTD.**

# CONFIDENTIAL

### In The Matter Of:

# American Home Mortgage Holdings, Inc., et al.

## Case No. 07-11047 (CSS)

---

### Bret W. Fernandes

### January 15, 2009

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

American Home Mortgage Holdings, Inc., et al.

Page 1

1                IN THE UNITED STATES BANKRUPTCY COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4      In re:                          ) CONFIDENTIAL
                                       ) Pages 175-176
5      AMERICAN HOME MORTGAGE          )
       HOLDINGS, INC., a Delaware      )
6      Corporation, et al.,            ) Chapter 11
                                       )
7           Debtors.                   ) Case No. 07-11047 (CSS)

8

9            Deposition of BRET W. FERNANDES, taken
       pursuant to notice at the law offices of
10     Zuckerman Spaeder LLP, 919 Market Street,
       Suite 990, Wilmington, Delaware, beginning at
11     2:00 p.m., on Thursday, January 15, 2009, before
       Terry Barbano Burke, RMR-CRR and Notary Public.

12     APPEARANCES:

13          JOHN T. DORSEY, ESQUIRE
            PATRICK A. JACKSON, ESQUIRE
14          Young Conaway Stargatt & Taylor, LLP
              The Brandywine Building
15            1000 West Street, 17th Floor
              Wilmington, Delaware  19801
16            For the Debtors

17          EDWARD L. SCHNITZER, ESQUIRE
            HAHN & HESSEN, LLP
18            488 Madison Avenue
              New York, New York  10022
19            For the Creditors' Committee

20

21

22                  WILCOX & FETZER
          1330 King Street - Wilmington Delaware  19801
23                    (302) 655-0477
                      www.wilfet.com
24

OBC 00505

Electronically signed by Terry Burke (301-319-005-7649)        e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.

Page 2

1  APPEARANCES (cont'd):
2      THOMAS G. MACAULEY, ESQUIRE
       ZUCKERMAN SPAEDER LLP
3      919 Market Street, Suite 990
       Wilmington, Delaware 19899
4      -and-
       STEPHEN A. WEISBROD, ESQUIRE
5      H. HUNTER WINSTEAD, ESQUIRE
       GILBERT OSHINSKY LLP
6      1100 New York Avenue, NW, Suite 1700
       Washington, DC 20005
7      For the Borrowers' Committee
8

9                - - -
10           BRET W. FERNANDES,
11      the deponent herein, having first been
12      duly sworn on oath, was examined and
13      testified as follows:
14           MR. WEISBROD: Why don't we identify
15  everyone for the record.
16           I'm Stephen Weisbrod. I'm co-counsel
17  for the borrowers' committee. I am with the law
18  firm Gilbert Oshinsky in Washington, DC.
19           MR. WINSTEAD: Hunter Winstead of
20  Gilbert Oshinsky for the borrowers' committee.
21           MR. MACAULEY: Thomas Macauley,
22  Zuckerman Spaeder, borrowers' committee.
23           MR. JACKSON: Patrick Jackson, Young
24  Conaway Stargatt & Taylor, for the debtors.

Page 3

1           MR. SCHNITZER: Edward Schnitzer,
2  Hahn & Hessen, for the creditors' committee.
3           MR. DORSEY: John Dorsey, Young
4  Conaway, for the debtors.
5           THE WITNESS: Bret Fernandes.
6           (Fernandes-1 was marked for
7  identification.)
8  BY MR. WEISBROD:
9      Q. Mr. Fernandes, do you see before you
10  Fernandes Exhibit 1, the Amended Notice of
11  Deposition?
12      A. Yes.
13      Q. Have you seen this before?
14      A. Yes, I believe so.
15      Q. This is a deposition notice pursuant to
16  Bankruptcy Rule 7030(b)(6) and Federal Rule of
17  Civil Procedure 30(b)(6) that requires the
18  debtors to designate a witness on various topics
19  listed on Exhibit A.
20           Have you seen Exhibit A before?
21      A. I have.
22      Q. Have you been designated by the debtors?
23      A. I have.
24           MR. DORSEY: For the record, I'll

Page 4

1  note we did file a designation and objection
2  indicating Mr. Fernandes was designated as the
3  witness.
4           MR. WEISBROD: You filed it?
5           MR. DORSEY: Well, we served it. We
6  did not file it.
7           MR. WEISBROD: On us?
8           MR. JACKSON: It should have been by
9  e-mail. I can send you the non-executed version
10  of it for content. I apologize for that.
11  BY MR. WEISBROD:
12      Q. Mr. Fernandes, let's start with questions
13  about any possible estimates of borrower claims
14  that you may be aware of.
15           Who at the debtors currently keeps
16  track of borrower claims at or for the debtors?
17      A. There are multiple people involved in the
18  claims tracking and review process. The debtors,
19  as well as some of the debtors' professionals,
20  including colleagues of mine. Depending on the
21  nature of the claim, it would fall into a
22  different person's category.
23      Q. You mentioned colleagues of yours. What
24  firm are you with?

Page 5

1      A. I'm with Zolfo Cooper.
2      Q. What kind of firm is that?
3      A. Bankruptcy -- advisory firm. We largely
4  do bankruptcy-related work, turnarounds,
5  restructurings.
6      Q. Who do you typically represent?
7      A. Usually debtors' side representation. We
8  have some creditors' side clients as well, but
9  the majority of our business is on the company
10  side.
11      Q. Creditor side, including representation
12  of banks?
13      A. On occasion, yes.
14      Q. Any banks that are creditors in this
15  case?
16      A. I don't know. I'd have to go look.
17      Q. Focusing specifically on borrower claims
18  based on allegedly illegal loan origination, who
19  keeps track of that?
20           MR. DORSEY: Objection to the form.
21  BY MR. WEISBROD:
22      Q. You can answer.
23      A. I don't have the specific name at the
24  company.

2 (Pages 2 to 5)

OBC 00506

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 6

1    Q. But someone at Zolco?
2    A. At Zolfo Cooper?
3    Q. Zolfo?
4    A. It's part of the claims process. They
5    are involved in the claims process, as are a
6    number of AHM's employees, direct employees of
7    AHM.
8    Q. Do you know any names?
9    A. Yes, and the group of people has changed
10   over time as we continue to wind down the estate.
11       I believe Laura Ogden had been
12   involved in reviewing some of those claims at
13   some point, and I believe some of her
14   subordinates were also involved in it. And there
15   are likely other people. I don't have the names
16   with me.
17   Q. Who's Laura Ogden?
18   A. She is now a part-time employee of
19   American Home Mortgage, and she's familiar with
20   the loan process, or certain aspects of the loan
21   process, I should say. I couldn't tell you
22   exactly which aspects.
23   Q. Who is in charge of keeping track of
24   borrower claims before the bankruptcy, do you

Page 7

1    know?
2    A. I don't know. I believe the legal
3    department would have maintained the tracking of
4    that.
5    Q. What's your understanding of the types of
6    bases or alleged bases for borrower claims?
7        MR. DORSEY: Are you talking about
8    existing claims, claims that have already been
9    made?
10   BY MR. WEISBROD:
11   Q. I'm talking about reasons why borrowers
12   sue American Home.
13   A. Honestly, I haven't looked at any of the
14   claims specifically. I understand, based on
15   conversations with counsel and people at AHM and
16   my colleagues, that there would be a number of
17   reasons or underlying issues related to the
18   borrower claims that exist.
19   Q. When I ask you questions just in the
20   future, a couple of things. First, if you don't
21   understand, feel free to ask me to clarify --
22   A. Okay.
23   Q. -- if I was unclear or mumbled or
24   whatever.

Page 8

1        Second, I'm not going to ask you what
2    your lawyers told you. That's privileged. You
3    can tell me, because you are the designee, what
4    your understanding is, but don't relate what your
5    lawyers tell me. At least don't think that I'm
6    asking you to do that --
7    A. Okay.
8    Q. -- I guess, is a better way to say it.
9    A. Understood.
10   Q. I'm not asking you to waive privilege.
11       So you understand that some borrowers
12   claim that their legal rights were violated as a
13   result of allegedly illegal loan origination
14   practices; right?
15   A. I do understand that.
16   Q. And you understand that other borrowers,
17   or sometimes the same borrowers might allege
18   illegal servicing practices; right?
19   A. I am aware of that.
20   Q. And you know that some borrowers allege
21   that the disclosures given by AHM or its agents
22   in the origination process have been criticized
23   by some borrowers as being unclear?
24       MR. DORSEY: Objection to the form.

Page 9

1    BY MR. WEISBROD:
2    Q. I'll rephrase that.
3        You understand that some borrower
4    claims are based on the allegation that the
5    disclosures associated with the mortgage
6    origination were unclear?
7    A. It is my understanding that they are
8    based on those allegations, yes.
9    Q. As a bankruptcy professional, you
10   understand what the concept is of veil piercing;
11   right?
12   A. Yes.
13   Q. Corporate veil piercing?
14   A. Generally, yes.
15   Q. You understand some borrowers who dealt
16   with, say, American Home Mortgage Acceptance
17   might assert a veil piercing claim against other
18   American Home entities?
19       MR. DORSEY: Objection to form.
20       THE WITNESS: Yeah. I'm not an
21   attorney. I don't know that.
22   BY MR. WEISBROD:
23   Q. You don't know that they have or you
24   don't know that they might assert such a claim?

3 (Pages 6 to 9)

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 10

1    A. I don't know that they have or might.
2    Q. But you're familiar generally with the
3  concept of a claimant asserting a veil piercing
4  claim against a company and its parent?
5          MR. DORSEY: Objection to form. It
6  calls for a legal conclusion.
7  BY MR. WEISBROD:
8    Q. Well, you have seen claims like that;
9  right?
10    A. I have.
11    Q. And you understand that there are various
12  sources of law on which borrowers might rely to
13  assert claims?
14          MR. DORSEY: Objection to form.
15  BY MR. WEISBROD:
16    Q. Did you understand the question?
17    A. I did understand the question. I suppose
18  there could be basis of law or other bases on
19  which someone might assert a claim, so I'm not
20  sure --
21    Q. Okay. You know that some borrowers might
22  assert Federal law claims based on the Truth in
23  Lending Act, for example?
24    A. They may.

Page 11

1    Q. And some borrowers might assert state law
2  claims?
3    A. They may.
4    Q. Some might assert fraud claims?
5    A. They may.
6    Q. Some might assert claims based on state
7  consumer protection statutes?
8    A. Yes.
9    Q. They might assert claims based on other
10  Federal statutes governing the lending process;
11  right?
12    A. Okay.
13    Q. You agree that that kind of claim might
14  be asserted?
15    A. Sure.
16    Q. Do you have any familiarity with what
17  kind of events in the lives of borrowers tend to
18  prompt them to assert claims?
19          MR. DORSEY: Objection. Calls for
20  speculation.
21          THE WITNESS: I'm not sure what
22  you're asking.
23  BY MR. WEISBROD:
24    Q. Have you encountered situations where

Page 12

1  borrowers are subject to foreclosure proceedings
2  and then assert claims against American Home?
3    A. I do believe some of the borrower claims
4  are parties or some of those borrowers are
5  parties to foreclosure, but I'm not sure I'm
6  answering your question.
7    Q. Well, I'm actually focused in part on the
8  timing relationship, in other words, the
9  foreclosure issue arises and then the borrower
10  starts to look for people from whom to seek
11  relief and so sues American Home.
12          Have you seen that?
13    A. Again, I haven't looked at the borrower
14  claims specifically to know that.
15    Q. You understand that many American Home
16  Mortgage loans involve interest rates that can be
17  reset; correct?
18    A. Yes.
19    Q. Is it your experience that sometimes
20  borrower claims are prompted by a resetting of an
21  interest rate?
22    A. Again, I haven't looked at any of the
23  specifics on any of the borrower claims to
24  analyze that.

Page 13

1    Q. Have you noticed that some American Home
2  Mortgage products are more likely than others to
3  result in borrower claims?
4          MR. DORSEY: Objection to form.
5          THE WITNESS: I have not done that
6  analysis. I can't answer that. I don't know the
7  answer to that.
8  BY MR. WEISBROD:
9    Q. Do you have any impressions at all on
10  whether some types of mortgages are more likely
11  to result in borrower claims than other types of
12  mortgages?
13          MR. DORSEY: Objection to form.
14          THE WITNESS: Again, I haven't looked
15  at it. I don't know the answer.
16  BY MR. WEISBROD:
17    Q. Have you ever heard the expression
18  payment option ARM?
19    A. Yes.
20    Q. Do you know what that is?
21    A. Yes.
22    Q. Can you explain what that is?
23    A. Generally, it's where the borrower has
24  the option of making a different payment rate

4 (Pages 10 to 13)

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 14

1  early on in the loan, and then later on in the
2  loan there's mechanisms to true up and get it
3  back onto a normal amortization course, if you
4  will.
5      Q. Did you say true up? I wasn't sure what
6  word you used.
7      A. I did say true up. I'm not sure that's
8  the right word.
9          But to get the payment back to a term
10 such that it can amortize over whatever the term
11 of the loan is.
12     Q. So initially in a payment option ARM, one
13 of the payment options is to pay less than the
14 total amount of interest due that month and then
15 that interest becomes part of the principal; is
16 that right?
17     A. That's my understanding, yes.
18     Q. And then eventually if the principal
19 reaches a certain level, the interest rate will
20 adjust upward so that the borrower will be
21 essentially put on a new schedule so that there
22 is hope that if the borrower complies with that
23 schedule, the loan will be paid off in a timely
24 fashion?

Page 15

1      A. Yeah. I'm not sure on the interest
2  component of it. I think you said the interest
3  rate would reset. I don't know that it
4  necessarily does, but I do believe that, yes,
5  once a certain amount of principal has been
6  accrued, that the payment schedule will change.
7      Q. And is that what you meant by truing up?
8      A. Yes. I was thinking of true up in the
9  longer term, so that over the term of the loan,
10 the loan gets paid off in full.
11     Q. Has it ever been suggested to you that --
12 and I'm not talking about attorney-client
13 privilege here -- but has it ever been suggested
14 to you that payment option ARM mortgages are more
15 likely to result in borrower claims than fixed
16 rate mortgages?
17         MR. DORSEY: Objection to the form.
18         THE WITNESS: Suggested to me by --
19 no, I don't think it has.
20 BY MR. WEISBROD:
21     Q. Has that thought ever occurred to you?
22     A. It has.
23     Q. Do you think it's probably true that
24 payment option ARM mortgages are more likely to

Page 16

1  result in borrower claims than fixed rate
2  mortgages?
3      A. I think it would depend on the
4  environment. The general economic environment
5  and housing industry.
6      Q. How about the current environment?
7      A. In the current environment, yeah -- I
8  don't know, these loans are designed differently.
9  On an interest reset, interest rates are very low
10 now. If I'm just resetting an interest rate, I
11 don't know that it would cause a default.
12     Q. What about in 2008, does it seem to you
13 that, say, in the middle of 2008 payment option
14 ARM mortgages were more likely to result in
15 borrower claims than fixed rate mortgages?
16     A. Yeah.
17         MR. DORSEY: Objection to form.
18         THE WITNESS: I wouldn't be surprised
19 by that.
20 BY MR. WEISBROD:
21     Q. Do you know what a teaser rate is?
22     A. I believe you all have defined it and
23 I've looked at that definition. I may need to
24 look again.

Page 17

1      Q. Feel free. You're going to look at the
2  definitions of Fernandes Exhibit 1, rather.
3      A. All right.
4          Okay.
5      Q. Why don't you read into the record how we
6  defined teaser rate?
7      A. Teaser rate mortgage means a mortgage
8  loan with an adjustable introductory interest
9  rate that increases by at least three percentage
10 points within the first year following its
11 origination.
12     Q. Had you heard the phrase "teaser rate"
13 before you got our deposition notice?
14     A. I had heard the term.
15     Q. Is the definition that we included in the
16 deposition notice consistent with your
17 understanding of what a teaser rate was before
18 you got the deposition notice?
19     A. I didn't have it so precisely defined.
20 More conceptually.
21     Q. What was your general concept before you
22 got the deposition notice of what a teaser rate
23 was?
24     A. A teaser rate I conceptualize as being a

5 (Pages 14 to 17)

OBC 00509

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 18

1 low introductory rate that is subject to
2 adjustment in a future period.
3     Q. From what you have seen, how low can
4 introductory teaser rates be?
5     A. You know, I haven't looked at that. I
6 don't know.
7     Q. Was it your impression that in mid-2008
8 loans with teaser rates were more likely to
9 result in borrower claims than fixed rate
10 mortgages with no teaser rates?
11         MR. DORSEY:  Objection to form.
12         THE WITNESS:  Again, having -- are we
13 speaking specific to AHM or in general?
14 BY MR. WEISBROD:
15     Q. I was speaking about AHM.
16     A. I haven't looked at the data to know
17 that.
18     Q. How about generally?  I'm sorry, I cut
19 you off.  Why don't you finish your answer.
20     A. I was done.
21     Q. Generally, though?
22     A. Generally there's been a lot of press
23 about these things, so it does lead me to believe
24 that it would be a more frequent occurrence or

Page 19

1 these would be more of an issue.
2     Q. Borrower claims would be more likely to
3 result from loans about teaser rates than loans
4 without teaser rates; correct?
5     A. Based on, yeah, based on press over the
6 past year, I think that's fair.
7         But again, I have done nothing to
8 validate that.
9         MR. WEISBROD:  Fernandes-2.
10        (Fernandes-2 was marked for
11 identification.)
12 BY MR. WEISBROD:
13     Q. Fernandes Exhibit 2 is a First Amended
14 Complaint filed by Tilton Jack, the plaintiff,
15 against American Brokers Conduit, Inc., and
16 other defendants, including American Home
17 Mortgage Servicing, Inc.
18        Have you ever seen this document
19 before?
20     A. No, I have not.
21     Q. What is American Brokers Conduit, Inc.,
22 do you know?
23     A. I believe it is a predecessor to -- I
24 don't know.  I'm guessing.

Page 20

1     Q. Does it have some connection to any of
2 the debtors?
3     A. I believe it did.  I can't say exactly
4 what that connection is.  I believe it was a
5 predecessor to, but I'm not certain.
6     Q. I actually don't represent Mr. Jack on
7 his underlying claim and I'm not that familiar
8 with it either, but I'd like to look with you
9 briefly at the exhibits attached to his
10 complaint.
11        If you go about two-thirds of the way
12 through, you'll see something Exhibit A.
13        Can you turn to the first page of
14 Exhibit A.
15        That says Adjustable Rate Note.  Do
16 you see that?
17     A. Yes, I do.
18     Q. It's dated July 26th, 2006.  Do you see
19 that?
20     A. Yes, I do.
21     Q. Have you ever seen a note like this
22 before?
23        MR. DORSEY:  Take your time and look
24 through the whole thing before you answer.

Page 21

1         THE WITNESS:  I have not.  I'm not
2 going to say one has never passed in front of me,
3 but I have not studied a note like this before.
4 BY MR. WEISBROD:
5     Q. Have you seen adjustable rate notes
6 issued by American Home entities?
7     A. Again, no, I haven't.
8     Q. Let's take a look at the paragraph
9 numbered 2, "interest."
10        Do you see that?
11     A. Yes.
12     Q. And this is on the page that says 1 of 6
13 of the adjustable rate note.
14        Do you see that?
15     A. Yes.
16     Q. It says, "Interest will be charged on
17 unpaid principal until the full amount has been
18 paid.  I will pay interest at a yearly rate of
19 1.0 percent until July 31st, 2006, and the
20 initial monthly payment provided for in Section
21 3(B) of this note will be based on this rate, the
22 initial rate.  Commencing August 1st, 2006, I
23 will pay the interest at a yearly rate of 8.132
24 percent, the subsequent rate."

6 (Pages 18 to 21)

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 22

1        Do you see that?
2        A.  Yes, I do.
3        Q.  The one percent indicated here is the
4    initial interest rate that the borrower had to
5    pay; right?
6        MR. DORSEY:  Objection to the form.
7        THE WITNESS:  Yes, I presume.
8    BY MR. WEISBROD:
9        Q.  The one percent is what we referred to
10    before in our discussion as a teaser rate; right?
11        MR. DORSEY:  Objection to form.
12        THE WITNESS:  I believe so.
13    BY MR. WEISBROD:
14        Q.  And the teaser rate here lasted from
15    July 26th through July 31st, 2006; right?
16        MR. DORSEY:  Objection.  The document
17    speaks for itself.
18    BY MR. WEISBROD:
19        Q.  Is that what you understand what it
20    appears?
21        A.  With this brief look, yes, that's what it
22    appears to be.
23        Q.  And then it jumped up by 7.132 percent on
24    August 1st, 2006; right?

Page 23

1        A.  Again, that's what appears to be stated
2    here.
3        Q.  Could you look at Exhibit B of that
4    document.  It looks like this.
5        A.  Okay.
6        Q.  This is something that says at the top,
7    "American Home Mortgage Servicing Monthly Billing
8    Statement."
9        Do you see that?
10        A.  Yes.
11        Q.  And it has a statement date?
12        A.  Yes.
13        Q.  And according to this document, that was
14    September 13th, '06, is what someone with better
15    eyesight than I have says.
16        Does that look like the statement
17    date to you?
18        A.  I'm not sure of your eyesight because I
19    can't read it either, but okay.
20        Q.  You can see that there is a box
21    called "Item Description" at the top on the
22    right-hand side?
23        A.  Yes.
24        Q.  And it lists balances.  Do you see that?

Page 24

1        A.  I do.
2        Q.  And then there's a principal balance.  Do
3    you see that?
4        A.  Yes.
5        Q.  The principal balance listed here is
6    $344,106.
7        Do you see that?
8        A.  Yes.
9        Q.  Then at the bottom there are four payment
10    options listed.  Do you see that?
11        A.  I do.
12        Q.  Option 1 is the lowest.  Do you see that?
13        A.  Yes.
14        Q.  And it's $1,385.30; right?
15        A.  Yes.
16        Q.  Then it says the total amount due is that
17    number, Option 1's number; right?
18        A.  Yes.
19        Q.  Now, Option 2 is more, $2,651.54; right?
20        A.  Yes.
21        Q.  And Option 3 is more than that, $2,000 --
22    it looks like -- 872.03; right?
23        A.  Yes.
24        Q.  And Option 4 is more than that, it's

Page 25

1    $3,632.46; right?
2        A.  It appears to be, yes.
3        Q.  But you could pay the low one, Option 1,
4    $1,385.30 without being in default on this loan
5    at this time; right?
6        MR. DORSEY:  Objection to form.
7        THE WITNESS:  I certainly presume so,
8    yes.
9    BY MR. WEISBROD:
10        Q.  Do you have any understanding of what
11    happens to your principal amount if you choose
12    Option 1?
13        MR. DORSEY:  Objection to form.
14        THE WITNESS:  Well, yeah, based on
15    the note here on the face it says, it explains
16    what could happen in Option 1, that the principal
17    amount could grow.
18    BY MR. WEISBROD:
19        Q.  Let's look at Exhibit C.  Exhibit C is
20    called a Truth-in-Lending Disclosure Statement.
21        Do you see that at the top?
22        A.  I do.
23        Q.  And the borrower is Tilton O. Jack?
24        A.  Yes.

7 (Pages 22 to 25)

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 26

1    Q. Middle initial O, last name Jack?
2    A. Yes.
3    Q. Do you see that there it lists an annual
4  percentage rate of 8.718?
5    A. I see that, yes.
6    Q. Now, let's look at the payment schedule.
7        It says "number of payments, 12,
8  $1,103.22." Do you see that?
9    A. Yes.
10   Q. As we discussed, if you actually make
11 that payment, choose that option, your principal
12 is going to go up; right?
13   A. I believe so.
14   Q. Now let's look at Exhibit F.
15       This is another monthly billing
16 statement; right?
17   A. Yes, it appears to be.
18   Q. It's dated June 11th, '07; correct?
19   A. Yes.
20   Q. And it's got a principal balance of
21 $356,110.95; right?
22   A. I see that, yes.
23   Q. That principal balance has risen compared
24 to the principal balance from Exhibit B; right?

Page 27

1    A. Yes, it has.
2    Q. It's gone up by $12,000, roughly?
3    A. Approximately, yes.
4    Q. Let's look on the bottom of Exhibit F,
5  the various payment options.
6        Do you see that?
7    A. Yes.
8    Q. Option 1 is still $1,385.30; right?
9    A. Yes.
10   Q. But the other three options have all gone
11 up since Exhibit B; right?
12   A. Yes.
13   Q. So, for example, Option 4 has become
14 $3,939.14; right?
15   A. Yes.
16   Q. Whereas at Exhibit B, Option 4 was
17 $3,632.46; right?
18   A. It appears. I am having trouble seeing
19 if that's a 36 or a 38, but assuming it's a 6,
20 then yes.
21   Q. Let's look at Exhibit A again. This is
22 the note.
23       Could you look at Page 3 of 6 of the
24 note, there's a paragraph that says, "H, limit on

Page 28

1  my unpaid principal, increased monthly payment."
2        Do you see that?
3    A. I see that paragraph, yes.
4    Q. The first sentence says, "My unpaid
5  principal can never exceed a maximum amount equal
6  to 110 percent of the principal amount originally
7  borrowed. In the event my unpaid principal would
8  otherwise exceed that 110 percent limitation, I
9  will begin paying a new monthly payment until the
10 next payment change date, notwithstanding the 7
11 and a half percent annual payment increase
12 limitation."
13       Do you see that?
14   A. Yes.
15   Q. So your interest rate can jump way up
16 once your negative amortization has resulted in a
17 principal being equal to 110 percent of what it
18 started out as; right?
19       MR. DORSEY: Objection to form.
20       THE WITNESS: What was the question?
21 BY MR. WEISBROD:
22   Q. I'll rephrase it since there was an
23 objection to form.
24       Let's break it up into a few pieces.

Page 29

1        Negative amortization can result in
2  the principal increasing; right?
3    A. Yes.
4    Q. And the principal can increase up to 110
5  percent of the original principal; right?
6    A. That's how I read this, yes.
7    Q. And once that happens, the borrower's
8  interest rate can jump up even more than seven
9  and a half percent; right?
10       MR. DORSEY: Objection to form.
11       THE WITNESS: I don't know that I see
12 that here.
13 BY MR. WEISBROD:
14   Q. Do you have any understanding of the
15 second sentence in H?
16       MR. DORSEY: Objection to form. The
17 document speaks for itself. It calls for a legal
18 conclusion.
19 BY MR. WEISBROD:
20   Q. Well, as just a business person who's
21 involved in restructuring a mortgage company,
22 what's your understanding of how much a
23 borrowers' interest rate can jump up once you get
24 to 110 percent?

8 (Pages 26 to 29)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 30

1    A. I have to look at this further.
2         MR. DORSEY: If you have to refer to
3    other sections, you can do that too.
4    BY MR. WEISBROD:
5    Q. Take all the time you need.
6    A. (Pause.)
7         Maybe I'm missing it. Sorry. You
8    keep asking if -- I read this as the payment
9    going up, but I don't know what piece of that new
10   payment is interest versus principal. Maybe I'm
11   missing it.
12   Q. Can you tell how much the payment could
13   go up?
14   A. No, I can't, based on this information.
15   Q. This is kind of confusing, isn't it?
16        MR. DORSEY: Objection to form.
17        THE WITNESS: I don't know that it's
18   confusing.
19   BY MR. WEISBROD:
20   Q. Can you tell how much your payment could
21   go up if this was you?
22   A. Not on its face, but I would presume,
23   reading the whole thing, you could do the math
24   and figure it out.

Page 31

1    Q. Do you have an MBA?
2    A. I do not.
3    Q. Do you have a bachelor's degree?
4    A. I do.
5    Q. What's it in?
6    A. Business economics.
7    Q. How old are you?
8    A. I'm 39 years old.
9    Q. Where did you go to college?
10   A. University of California Santa Barbara.
11   Q. Did you earn any other degrees?
12   A. No.
13   Q. And how long have you worked at Zolfo?
14   A. Nine years.
15   Q. So you have a lot of experience working
16   with interest rates?
17   A. A fair amount.
18   Q. Is this the only mortgage company you
19   have worked on?
20   A. No, it's not.
21   Q. How many others?
22   A. One other.
23   Q. What was that?
24   A. It's actually a confidential matter.

Page 32

1    Q. That's fine.
2         You don't have any reason to believe
3    that Tilton Jack's loan is structured in an
4    unusual way compared to other payment option ARMs
5    issued by American Home Mortgage, do you?
6    A. What was the question? Do I --
7    Q. You don't have any reason to believe that
8    Mr. Jack's payment option ARM was structured in
9    an unusual way compared to other payment option
10   ARMs sold by American Home, do you?
11   A. I have no reason to believe that, but I
12   certainly can't say that this is the common form
13   or regular case.
14   Q. Can you tell from looking at that how
15   long it would take before a borrower might get to
16   the 110 percent threshold if paying the minimum?
17        MR. DORSEY: Objection to form.
18        Do you need a calculator?
19        THE WITNESS: Yes. I'm sure.
20        MR. DORSEY: Do you really want him
21   to sit here and do math?
22        THE WITNESS: I'm sure it can be
23   calculated.
24        MR. DORSEY: Or ask him fact

Page 33

1    questions.
2    BY MR. WEISBROD:
3    Q. You can't tell looking at the face of the
4    document, you'll agree with me on that; right?
5    A. I do, based on the pieces of it I have
6    looked at, I agree.
7    Q. You might be able to figure it out with a
8    calculator, though; right?
9    A. Right.
10   Q. Now, do you know how many proofs of claim
11   have been filed by borrower claimants in these
12   cases?
13   A. I believe it's in the mid-400's.
14   Q. About 450, roughly?
15   A. That's my understanding.
16   Q. Are you aware of any estimate by anyone
17   of the total value of those 450 claims?
18   A. Yes, in that in building the -- well,
19   yes, I am.
20   Q. Tell me about the estimate.
21   A. As part of the plan, the asset allocation
22   model, we developed a claim denominator to map
23   into that model and that denominator would have
24   included presumably some amount that flowed

9 (Pages 30 to 33)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 34

1   through relating to these claims.
2            Now, I didn't look at the specific
3   claims. I don't know that they actually have
4   some amount that flows through, but the general
5   process was to look at filed claims, especially
6   where liquidated there was a protocol and the
7   thresholds for where we would evaluate those,
8   meaning which ones were material enough to even
9   look at, versus immaterial claims that may have
10  just flown through to the denominator base
11  without being even cursory reviewed, so.
12       Q. Are you aware of any borrower claims that
13  have already been liquidated at a specific value
14  in the individual borrower claims?
15       A. I'm not aware of any. I'm not aware of
16  any.
17       Q. Are you aware of any estimate for the
18  total value of the submitted borrower claims, the
19  450?
20       A. Well, again, whatever the result of the
21  mechanism I just described is, but I don't know
22  what the number is.
23       Q. Do you believe there is a number
24  associated with the value of borrower claims?

Page 35

1        A. I believe there is probably something
2   that flows through, but I would have to verify
3   that with the detail behind the model.
4            MR. WEISBROD: I'd ask that that be
5   provided to us, because that was straight down
6   the middle of the plate one of our topics here
7   today.
8            MR. JACKSON: I think it's covered in
9   your document request and/or the interrogatories.
10           THE WITNESS: Yes, I believe it is
11  being provided.
12           MR. WEISBROD: Okay.
13  BY MR. WEISBROD:
14       Q. Has anybody estimated the total value of
15  borrower claims, including claims of borrowers
16  who did not timely file proof of claim forms?
17           MR. DORSEY: Objection. Could you
18  read that question back.
19  BY MR. WEISBROD:
20       Q. Has anybody estimated the total value of
21  borrower claims, including borrower claims of
22  borrowers who have not timely filed proof of
23  claim forms?
24           MR. DORSEY: Objection to form.

Page 36

1            THE WITNESS: I'm not aware of any
2   such effort or estimate.
3   BY MR. WEISBROD:
4        Q. Did anyone ever try to value or estimate
5   borrower claims before the debtors went into
6   bankruptcy?
7        A. I don't know.
8        Q. How many estimates or valuations of
9   borrower claims are you aware of?
10           MR. DORSEY: Objection to form.
11           THE WITNESS: If there were 450
12  borrower claims, somewhere in the process of
13  building the asset allocation model and the
14  related denominator base, those would have been
15  assessed or included in that process or somehow
16  considered.
17  BY MR. WEISBROD:
18       Q. So just one, just one estimate that
19  you're aware of?
20       A. Well, one per claim? The exercise was
21  done on a per claim basis, and people may have
22  taken multiple looks at claims. I just don't
23  know.
24       Q. Who was involved in the process you're

Page 37

1   describing?
2        A. Again, it would have been, of course
3   circling back to where we started on, it was
4   Laura Ogden and people in her group and then some
5   other names, which I think are also being
6   produced for you. I don't have them, that
7   knowledge.
8        Q. Has the unsecured creditors' committee
9   ever shared with the debtors any estimate of the
10  value of borrower claims?
11           MR. DORSEY: You can answer that
12  question yes or no.
13           THE WITNESS: No.
14  BY MR. WEISBROD:
15       Q. I want to make sure I asked it right. As
16  far as you know, the unsecured creditors'
17  committee has never shared any estimate of the
18  value of borrower claims with any representative
19  of the debtors; correct?
20       A. As far as I know, that's correct.
21       Q. Has anyone ever estimated the total
22  number as opposed to value, the total number of
23  borrower claims, whether the subject of proof of
24  claim forms or not?

10 (Pages 34 to 37)

Electronically signed by Terry Burke (301-319-005-7649)                                        e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 38

1    MR. DORSEY: Objection to form.
2    THE WITNESS: The 450 is the only
3  number I'm aware of.
4  BY MR. WEISBROD:
5    Q. Has anyone ever estimated the propensity
6  of borrowers with particular types of mortgages
7  to file claims?
8    A. Not that I'm aware of.
9    Q. I want to now turn to the issue of
10  notice, in particular notice to borrowers.
11    What is your understanding of the
12  methods that the debtors used to give borrowers,
13  or at least some, notice of the case and bar
14  date?
15    A. I was not directly involved with this
16  case at all in the early stages, but my
17  understanding is that notice was provided to
18  known potential claimants via either a notice
19  mailed to them or in publications, newspapers, in
20  terms of the notice of the case.
21    Q. Let's break that down. What did you
22  understand or what do you understand the known
23  claimants to include, who do you understand the
24  known claimants' category to include?

Page 39

1    A. Again, I wasn't directly involved. I
2  don't know who built that population and targeted
3  it. I don't know.
4    Q. Do you have any understanding at all
5  about how that process was supposed to work?
6    MR. DORSEY: Objection to form.
7    THE WITNESS: Again, I wasn't there.
8  I have asked people at the company. No one who
9  remains at the company was involved in that
10  notice process early on. I speculate it was --
11  well, I don't know. I don't know that anyone
12  left. I'm fairly certain that anyone left there
13  didn't play a role in determining any of the
14  notice issues.
15  BY MR. WEISBROD:
16    Q. Did anyone ever estimate how much it
17  would cost to give all known borrowers actual
18  direct notice through the mail?
19    A. I have never seen that estimate.
20    Q. Has anyone ever estimated how much it
21  would cost to give all known payment option ARM
22  borrowers direct notice?
23    A. I have never seen an estimate.
24    Q. Are you aware of such an estimate?

Page 40

1    A. I am not.
2    Q. Is it your testimony that the debtors do
3  not have such an estimate?
4    A. Again, not that I'm aware of.
5    Q. So I want to make sure the record's
6  clear. I'm not trying to badger you. There's no
7  estimate of the total cost that would have been
8  incurred to give direct notice to payment option
9  ARM borrowers; correct?
10    A. No estimate that I have seen.
11    Q. And there's no estimate of the total cost
12  that would have been incurred to give all
13  American Home borrowers notice; correct?
14    A. Again, no estimate that I have seen or am
15  aware of.
16    Q. There was also publication notice in
17  newspapers; right?
18    A. There was, that's my understanding, yes.
19    Q. Do you know how many ads there were in
20  the newspapers?
21    A. I don't.
22    Q. I've heard New York Times, Dallas
23  Morning --
24    A. Star, I think.

Page 41

1    Q. -- Star and Saint Louis Post-Dispatch.
2    Do you know of any other newspapers
3  where there were ads?
4    A. No, I don't, and in fact, I can't even
5  validate those. When I said "Star," I believe
6  that's the name of the paper. I can't even
7  attest that there was notice there.
8    Q. Do you know how many times the ads ran in
9  those newspapers?
10    A. No, I don't.
11    Q. Do you know how those newspapers were
12  chosen?
13    A. No, I don't.
14    Q. Does it strike you as rational to choose
15  those three newspapers?
16    MR. DORSEY: Objection to form.
17    THE WITNESS: Rational. Can you be
18  more specific with the question?
19  BY MR. WEISBROD:
20    Q. Does it strike you as a good way to give
21  notice to all borrowers to publish notice in the
22  New York Times and newspapers in Dallas and Saint
23  Louis?
24    MR. DORSEY: Objection to form.

11 (Pages 38 to 41)

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 42

1    THE WITNESS: Presupposing that you
2  are vying to reach every borrower? I don't know,
3  I guess, what I'm basing that on.
4        Is that what you're asking me, if I
5  was trying to reach every borrower for which
6  AHM -- I don't really know what you're asking.
7  BY MR. WEISBROD:
8    Q. If you were trying to reach all the
9  borrowers who might have claims against AHM, does
10  it strike you as a sensible way to do it, putting
11  an ad in each of those three newspapers?
12    MR. DORSEY: Objection to form.
13    THE WITNESS: It's my understanding
14  that borrowers with claims were noticed directly,
15  so I have trouble even putting the question in
16  context.
17  BY MR. WEISBROD:
18    Q. It's your understanding that borrowers
19  who had filed claims in the form of lawsuits or
20  counterclaims got notice directly; right?
21    A. Yes.
22    Q. You don't have any reason to believe that
23  other borrowers got direct notice, do you?
24    A. No, I don't.

Page 43

1    Q. If you wanted to reach borrowers
2  nationwide, would it make sense to pick those
3  three newspapers?
4    A. I can't say. I don't know their
5  readership and subscriber base.
6    Q. Are there any states in the United States
7  in which American Home did not sell mortgages?
8    A. I don't think so.
9    Q. American Home actually owned or rented
10  office space in 47 states; right?
11    A. I believe that's correct.
12    Q. So American Home was in the business of
13  selling mortgages in, at a minimum, 47 states;
14  right?
15    A. I would agree with that, yes.
16    Q. And it might have been 50 states; right?
17    A. It may have been.
18    Q. Would you agree with me that it's not
19  very likely that people in California read the
20  daily newspapers from Dallas or Saint Louis?
21    MR. DORSEY: Objection to form.
22    THE WITNESS: Well, yes, I would
23  agree.
24  BY MR. WEISBROD:

Page 44

1    Q. Do you have any idea how many borrowers
2  read the New York Times?
3    MR. DORSEY: Objection to form.
4    THE WITNESS: No, I have no idea.
5  BY MR. WEISBROD:
6    Q. Do you subscribe to the New York Times?
7    A. I do not.
8    Q. Have you ever priced it?
9    A. No, I haven't.
10    Q. Do you have any impression about whether
11  the New York Times is a more expensive newspaper
12  or less expensive newspaper than average?
13    A. I have no impression.
14    Q. None at all?
15    A. (Witness nods.)
16    MR. DORSEY: You need to say no for
17  the record.
18    THE WITNESS: No.
19  BY MR. WEISBROD:
20    Q. Does the New York Times strike you as
21  more of a highbrow newspaper than some other
22  newspapers, like, say, USA Today?
23    MR. DORSEY: Objection to form.
24    THE WITNESS: Define highbrow for me.

Page 45

1  I stay at hotels, I read whatever they put at my
2  doorstep.
3  BY MR. WEISBROD:
4    Q. Does the New York Times strike you as a
5  newspaper that appeals to wealthier and better
6  educated readership than, say, USA Today?
7    A. It could strike me as that.
8    Q. You would agree; right?
9    A. I would.
10        But I have no basis for that, but it
11  does strike me.
12    Q. You have read both newspapers; right?
13    A. Uh-huh.
14    Q. Yes?
15    A. Yes.
16    Q. Do you have any idea who was involved in
17  the decision to give notice in the fashion we've
18  discussed?
19    A. I don't know.
20    Q. Do you have any idea how much the notice
21  cost?
22    A. I don't. It is something I could look
23  at. It's an actual cost that has been incurred,
24  so I could look at it, but I have not looked at

12 (Pages 42 to 45)

OBC 00516

Electronically signed by Terry Burke (301-319-005-7649)        e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 46

1    it.
2        Q.  Why did the debtors choose to give notice
3    in this fashion?
4        A.  I don't know.  I wasn't participating at
5    that time.
6        Q.  But you have been designated to testify
7    on behalf of the debtors on this topic; right?
8        A.  Yes.  And I have inquired as to the
9    remaining employees as to what their views on it
10   were, and no one remaining was a participant in
11   this effort.
12       Q.  Do you know if any members of the
13   unsecured creditors' committee participated in
14   the decision regarding how to give notice?
15       A.  I don't know.
16       Q.  Do you know if any other entities
17   participated in the decision?
18       A.  I don't know.
19       Q.  How was the January 2008 bar date
20   selected?
21       A.  I don't know.
22       Q.  Do you know why that date was chosen?
23       A.  I do not.
24           MR. WEISBROD:  Let's take a break so

Page 47

1    we can deal with the beeping.
2            (Recess.)
3    BY MR. WEISBROD:
4        Q.  Mr. Fernandes, you understand that
5    borrower claimants come from all over the United
6    States?
7        A.  It doesn't surprise me.
8        Q.  You know that members of the borrowers'
9    committee alone come from Oregon, Florida, North
10   Carolina, DC, Maryland, New York and Chicago?
11       A.  I didn't realize that, but --
12       Q.  It doesn't surprise you, though?
13       A.  No, it doesn't.
14       Q.  And you know there are claimants from all
15   regions of the country?
16       A.  It wouldn't surprise me.
17           MR. DORSEY:  Objection to form.
18   BY MR. WEISBROD:
19       Q.  It would not surprise you; correct?
20       A.  Yes, with 450, 400 claims, that doesn't
21   surprise me.
22       Q.  You do not know why the January 2008 bar
23   date was selected; right?
24       A.  I do not.

Page 48

1        Q.  Do you know who chose that date?
2        A.  I do not.
3        Q.  There was also what was called,
4    ironically, a borrower bar date.
5            You're aware of that?
6        A.  I am.
7            MR. WEISBROD:  Let's mark these two
8    bar dates.
9            This will be Fernandes-3.  This will
10   be Fernandes-4.
11           I'll say it on the record again to
12   make sure we have 3 and 4 right.
13           Fernandes-3 is Order Pursuant to
14   Bankruptcy Rule 3003(c)(3) and Local Rule
15   2002-1(e) Establishing Bar Dates For Filing
16   Proofs of Claim and Approving the Form and Manner
17   of Notice Thereof.
18           Fernandes-4 is Order Pursuant to
19   Bankruptcy Rule 3003(c)(3) and Local Rule
20   2002-1(e) Establishing a Bar Date for Filing
21   Proofs of Claim by Construction Loan and HELOC
22   Borrowers and Approving the Form and Manner of
23   Notice Thereof.
24           (Fernandes-3 and Fernandes-4 were

Page 49

1    marked for identification.)
2    BY MR. WEISBROD:
3        Q.  Let's look at Fernandes-3.
4            On Page 3, Paragraph 5, it
5    established a bar date of January 11th, 2008.
6            Do you see that?
7        A.  Yes.
8        Q.  And that's called a general bar date?
9        A.  Uh-huh.
10       Q.  Yes?
11       A.  Yes.
12       Q.  And on Page 9, Paragraph 19, the order
13   says, "The debtors shall cause the publication
14   notice attached hereto as Exhibit C to be
15   published in the Dallas Morning Star, the Saint
16   Louis Post-Dispatch and the national edition of
17   The Wall Street Journal or the national edition
18   of The New York Times."
19           Do you see that?
20       A.  Yes.
21       Q.  Fernandes-4 is a more specialized bar
22   date order, and it deals with what are called
23   construction loan and HELOC borrowers.
24           Do you see that?

13 (Pages 46 to 49)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 50

1    A. Yes.
2    Q. HELOC is home equity line of credit;
3  right?
4    A. Correct.
5    Q. Why was a separate date chosen for these
6  type of creditors?
7    A. I don't know why there was a separate
8  date.
9    Q. Do you know who was involved in that
10  decision?
11    A. I do not.
12    Q. If you look at Page 5 of Exhibit 4, on
13  Paragraph 13 you'll see that publication had to
14  be in the national edition of the The Wall Street
15  Journal or The New York Times, or the national
16  edition of The New York Times.
17        Do you see that, Paragraph 13?
18    A. I do.
19    Q. That omits reference to the Dallas
20  newspaper and the Saint Louis newspaper.
21        Do you see that?
22    A. Yes.
23    Q. Do you have any idea why the debtors
24  decided to request publication notice in only the

Page 51

1  national edition of The Wall Street Journal or
2  New York Times for this type of claim?
3    A. No, I don't.
4        MR. WEISBROD: Let's take a look at
5  Exhibit 5.
6        (Fernandes-5 was marked for
7  identification.)
8  BY MR. WEISBROD:
9    Q. I'm showing you what we're marking as
10  Fernandes Exhibit 5.
11        Fernandes Exhibit 5 is a letter dated
12  August 13, 2007, on American Home Mortgage
13  letterhead that begins, "Dear American Home
14  Mortgage customer," and it's signed, "Sincerely,
15  Alan Horn, EVP and General Counsel."
16        Do you see that?
17    A. Yes, I do.
18    Q. Had you seen this letter before?
19    A. No, I don't believe I have.
20    Q. Would it surprise you to learn that this
21  letter was posted on the American Home website?
22    A. No, it would not surprise me.
23    Q. Would it surprise you to learn that this
24  was still on the American Home website as of at

Page 52

1  least this past fall, 2008?
2    A. No, it would not surprise me.
3    Q. You'll see in the first paragraph it
4  alerts customers to the fact that American Home
5  Mortgage filed voluntary bankruptcy petitions;
6  right?
7    A. Yes.
8    Q. The third paragraph states, "The Chapter
9  11 filing and process should not directly impact
10  you if you currently have a mortgage with
11  American Home Mortgage."
12        Do you see that?
13    A. Yes.
14    Q. Does that strike you as accurate?
15        MR. DORSEY: Objection to form. It
16  calls for a legal conclusion.
17        THE WITNESS: Yes, it does strike me
18  as accurate.
19  BY MR. WEISBROD:
20    Q. What about the bar date?
21        MR. DORSEY: Objection to form. What
22  about the bar date?
23  BY MR. WEISBROD:
24    Q. The bar date could directly impact a

Page 53

1  borrower if the borrower currently has a mortgage
2  with American Home Mortgage; right?
3        MR. DORSEY: Objection to form.
4        THE WITNESS: Was there a question?
5  BY MR. WEISBROD:
6    Q. Isn't it a fact that the bar date is
7  intended to impact directly borrowers who
8  currently have mortgages with American Home
9  Mortgage?
10        MR. DORSEY: Objection to form.
11        THE WITNESS: I don't believe so.
12  BY MR. WEISBROD:
13    Q. Well, if they don't submit a claim
14  pursuant to the bar date, what happens?
15    A. I assume the bar date is pertinent to
16  claimants, not borrowers.
17    Q. But some borrowers can be claimants;
18  right?
19    A. Some are.
20    Q. And if a borrower claimant fails to
21  submit a claim prior to the bar date, that claim
22  could be time barred, according to the debtors;
23  right?
24        MR. DORSEY: Objection to form.

14 (Pages 50 to 53)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 54

1  Calls for a legal conclusion.
2          THE WITNESS: I don't know.
3  Presumably, but I'm not counsel, I don't know.
4  BY MR. WEISBROD:
5      Q. Do you have any idea what the point of a
6  bar date is?
7      A. To set a date for quantifying all the
8  claims. For at least identifying the population
9  of claimants and being able to proceed with the
10 case.
11     Q. So if you failed to submit the form to be
12 included in that population, according to the
13 debtors, that could affect you; right?
14         MR. DORSEY: Objection. Calls for a
15 legal conclusion.
16         THE WITNESS: What's the question?
17 Are we still referring to language here or are we
18 off this page?
19 BY MR. WEISBROD:
20     Q. We are going to refer back to it, but I
21 just want to make clear that you and I are on the
22 same wavelength here about the impact of the
23 bankruptcy case.
24     A. Uh-huh.

Page 55

1      Q. One feature of the bankruptcy case is the
2  imposition of a bar date order; right?
3      A. Yes.
4      Q. And one purpose of the bar date order,
5  you have acknowledged, is to establish the
6  population of claimants who will make claims
7  against the estate; right?
8      A. Yes.
9      Q. And that applies to borrower claimants;
10 right?
11     A. Yes.
12     Q. And so if a borrower claimant does not
13 submit a borrower claim prior to the bar date,
14 the debtor's position is that that borrower
15 claimant's claim could be disallowed; right?
16         MR. DORSEY: Objection. Calls for a
17 legal conclusion.
18         THE WITNESS: Again, I am breaking
19 down somewhere with the notion of a borrower
20 claimant. Can you try a different angle?
21 BY MR. WEISBROD:
22     Q. Sure. A borrower claimant could be
23 someone with a truth-in-lending claim or a fraud
24 claim or any of the other claims we talked about

Page 56

1  at the beginning of the deposition. So someone
2  with a claim like that who fails to submit a
3  timely proof of claim. According to the debtors,
4  that person may be prevented from collecting from
5  the estate; right?
6          MR. DORSEY: Same objection.
7          THE WITNESS: If the question is that
8  a late filed claim might not be allowed, then
9  generally I agree with that.
10 BY MR. WEISBROD:
11     Q. So it's just wrong, isn't it, to say the
12 Chapter 11 filing and process should not directly
13 impact you if you currently have a mortgage with
14 American Home Mortgage?
15         MR. DORSEY: Objection to form.
16         THE WITNESS: No, I don't think it is
17 wrong.
18 BY MR. WEISBROD:
19     Q. What if you have an American Home
20 Mortgage and a borrower claim, don't you have,
21 according to debtors, some obligation to file
22 your proof of claim?
23         MR. DORSEY: Objection. Asked and
24 answered.

Page 57

1          THE WITNESS: I don't know how to
2  answer. I don't think if you have -- I don't
3  think it's an accurate statement.
4  BY MR. WEISBROD:
5      Q. How could it be accurate if you lose your
6  claim?
7          MR. DORSEY: Objection.
8  Argumentative. You've already asked the question
9  several times. Let's move on, counsel. You're
10 wasting too much time. The document says what it
11 says. If you want to make an argument to the
12 judge that this is inaccurate based on what you
13 believe this document says, then make the
14 argument. But it doesn't matter what this
15 witness thinks.
16 BY MR. WEISBROD:
17     Q. I just want to hear, in your own words --
18 I'm going to ask it as open ended as possible,
19 use whatever language you want -- sir, how can it
20 be true both that you have to comply with the bar
21 date and that your rights will not be affected by
22 the Chapter 11 filing?
23         MR. DORSEY: Objection. Asked and
24 answered. Calls for speculation. Misstates the

15 (Pages 54 to 57)

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 58

1  document itself. Don't answer the question. Ask
2  an accurate question and he can answer it.
3       MR. WEISBROD: I'm not going to give
4  up until you answer.
5       MR. DORSEY: He did answer it, so
6  let's move on. He's not going to answer it
7  again.
8  BY MR. WEISBROD:
9       Q. This says, "The Chapter 11 filing and
10 process should not directly impact you if you
11 currently have a mortgage with American Home
12 Mortgage."
13      You see that; right?
14      A. I do.
15      Q. Are bar dates things that impact
16 creditors?
17      MR. DORSEY: Objection. Asked and
18 answered.
19      THE WITNESS: Yes, bar dates are.
20 BY MR. WEISBROD:
21      Q. I'm going to move on to the topic of
22 sales manuals and scripts. Were you designated
23 to testify about the search for sales manual and
24 scripts?

Page 59

1       A. I was designated.
2       Q. How did the debtors go about searching
3  for sales manuals and scripts when the sales
4  borrowers' committee asked for them?
5       A. We asked all remaining senior employees,
6  which include Damian Voulo, Chris Cavaco, Carlo
7  Colagiacomo, and a number of other people, a
8  couple of other people -- there's not that many
9  that remain -- what they were aware of, what
10 existed out there. And they produced everything,
11 or they said that they produced everything that
12 they were aware of.
13      Q. Do you know how they searched for
14 documents?
15      A. I do not. Chris Colagiacomo, I know, is
16 a senior vice president of IT. I presume he had
17 some system searches he could do. Other than
18 that, I don't know what techniques they used to
19 produce.
20      Q. Did anybody search through hard copies of
21 documents?
22      A. I presume they did. I have not verified
23 that, but I certainly asked that people did.
24      Q. You asked them to do that?

Page 60

1       A. I had asked them to look at all sources,
2  yes.
3       Q. Was there a sales department at one time?
4       A. Yes.
5       Q. What happened to the sales department?
6       A. I don't know that it was called the sales
7  department but, yes, it was.
8       Q. What was the department called?
9       A. I don't know.
10      Q. Marketing or sales or something like
11 that?
12      A. Perhaps. I'm not certain.
13      But yeah, there was a department or
14 function related to that.
15      Q. What happened to the documents from that
16 department?
17      A. I don't know.
18      Q. Does anybody know?
19      A. I don't know what someone else might
20 know.
21      MR. WEISBROD: Let's show the sales
22 manual we got. This is 6.
23      (Fernandes-6 was marked for
24 identification.)

Page 61

1  BY MR. WEISBROD:
2       Q. This is a document that on its cover
3  says "Power ARM Selling Skills (PASS) Developed
4  for American Home Mortgage Sales by Training and
5  Performance Improvement."
6       Do you see that?
7       A. I do.
8       Q. What is American Home Mortgage sales?
9       A. I don't know.
10      Q. Was there a department called American
11 Home Mortgage Sales?
12      A. There may have been.
13      Q. There may have been?
14      A. There may have been. I don't know.
15      Q. Had you heard of that before?
16      A. I'm not familiar with that exact term or
17 department. It is not familiar to me.
18      Q. How about training and performance
19 improvement, have you ever heard of that?
20      A. No.
21      Q. Have you ever seen this document before?
22      A. I don't believe so.
23      Q. Did anyone ever ask you to review a sales
24 manual provided by the borrowers' committee?

16 (Pages 58 to 61)

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 62

1    A. No.
2    Q. How would one go about trying to
3  determine who, if anyone, within American Home
4  had access to this document?
5    A. I'm not certain.
6    Q. You don't know if --
7    A. Just --
8    Q. Go ahead.
9    A. Just by asking around and perhaps a
10  system search, looking for the title of the
11  document. That would make sense to me.
12    Q. Let's look through the document briefly.
13      Could you look at Page 3 of the
14  document. It says Power ARM Misconceptions at
15  the top.
16      Do you see that?
17    A. Yes, I do.
18    Q. Do you know what a Power ARM is?
19    A. No, actually.
20    Q. Is it a form of payment option ARM?
21      MR. DORSEY: He just said he doesn't
22  know what it is.
23  BY MR. WEISBROD:
24    Q. Is it a form of payment option ARM?

Page 63

1      MR. DORSEY: Objection to form.
2      THE WITNESS: I don't know. The
3  reference to ARM is there. I'm not familiar with
4  the tag "power."
5  BY MR. WEISBROD:
6    Q. You do know that American Home sold
7  various payment option ARMs with various
8  tradenames; right?
9    A. Yes.
10    Q. Let's look at Page 4, and this is still
11  in the Power ARM misconception section. Do you
12  see in top it says in quotes, "This product is
13  only for the well-to-do"?
14      That's in quotes; right?
15    A. Yes.
16    Q. And then there is not in quotes
17  additional information about who might benefit
18  from the Power ARM product; right?
19    A. Yes.
20    Q. And it says, "This product can be
21  appreciated by any income level. Listed below
22  are types of people that can benefit from the
23  Power ARM."
24      Do you see that?

Page 64

1    A. Yes.
2    Q. It includes a long list of people.
3    A. Yeah. I mean that's what I answered
4  previously. I wasn't suggesting that I think
5  these people benefit, but I read that, okay.
6    Q. I'm not asking you to endorse this
7  statement. Do you see that retired people are on
8  the list?
9    A. I do.
10    Q. And active stock market investors are on
11  the list, do you see that?
12    A. I do.
13    Q. Why did you make that comment, I'm not
14  suggesting that I think this is appropriate for
15  all these people, or whatever it is you said?
16    A. Because I felt like you asked the
17  question three times and I didn't want to
18  misunderstand you in what I answered on the first
19  round.
20    Q. Do you think that actually payment option
21  ARMs are not necessarily appropriate for some of
22  these types of people?
23    A. I don't think that.
24    Q. Do you have an opinion about whether

Page 65

1  payment option ARMs --
2    A. I don't have an opinion on that.
3    Q. Let's look at Page 57.
4      Do you have 57 in your copies?
5    A. I do.
6    Q. Page 57 has a heading "overcoming
7  objections."
8      Do you see that?
9    A. Yes.
10    Q. And it says, "Borrowers can have
11  objections to this new product. The table below
12  displays some common objections heard from
13  borrowers and some responses to help the
14  borrowers overcome their objections."
15      Do you see that?
16    A. Yes.
17    Q. One objection listed in the second row of
18  this table is, "This could result in negative
19  amortization."
20      Do you see that?
21    A. Yes.
22    Q. And then there's a column with responses
23  to the objections.
24      Do you see the column?

17 (Pages 62 to 65)

Electronically signed by Terry Burke (301-319-005-7649)    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 66

1    A. Yes.
2    Q. And the response to that objection
3  was, "I think of this as deferred interest rather
4  than negative amortization."
5      Do you see that?
6    A. I do.
7    Q. And it goes on.
8      Can you read that whole response?
9    A. Aloud?
10    Q. No. Just to yourself.
11    A. (Pause.)
12      Okay.
13    Q. If someone in your family were getting a
14  sales pitch for a payment option ARM, how would
15  you react if the sales person said, "I think of
16  this as deferred interest rather than negative
17  amortization"?
18      MR. DORSEY: Objection. Outside the
19  scope of the 30(b)(6). Your notice was for
20  documents.
21      MR. WEISBROD: That's fine.
22      MR. DORSEY: Not his interpretation
23  of those documents.
24      MR. WEISBROD: That's fine.

Page 67

1  BY MR. WEISBROD:
2    Q. Have you seen any documents with sales
3  pitches regarding payment option ARMs?
4    A. No, I have not. Not in -- no.
5    Q. Other than this one?
6    A. Other than this one and what was
7  otherwise produced, but I didn't look in any
8  detail at them at all.
9    Q. Have you seen any documents that list the
10  types of borrowers to whom American Home
11  employees should try to sell payment option ARMs,
12  other than this document?
13    A. No, I haven't.
14    Q. Is there anything else that you think
15  that you or your team might do to try to locate
16  sales manuals or sales pitches?
17    A. Nothing comes to mind, and I'm open to
18  suggestions if someone has one. We certainly
19  tried to find all that we could.
20    Q. Are there any former employees who you
21  think might be more familiar than the existing
22  employees are with the sales manuals and sales
23  scripts?
24    A. Undoubtedly there are.

Page 68

1    Q. Who?
2    A. I'm not sure who those people would be.
3  As part of the production request, I know there
4  was a list of names for people from various
5  departments, and those are being pulled together,
6  so that might be more telling than anything I
7  could share with you.
8    Q. How are you collecting the information
9  about the former employees who may have
10  knowledge?
11    A. Again, it's the gentleman who, Paul
12  Moran, who has inherited the payroll function,
13  who now has the employees records and related org
14  charts, et cetera. He's pulling them. Chris
15  Cavaco, the gentleman on the IT front, is working
16  with him to help identify those.
17    Q. Anyone else?
18    A. I don't believe so.
19    Q. Do you recall the names of any particular
20  individual who might have greater knowledge about
21  sales practices?
22    A. I don't.
23    Q. Topic No. 4 was generally about knowledge
24  of illegal practices? Do you remember that

Page 69

1  topic?
2    A. To the extent I read this, yes.
3    Q. Have you been designated on that topic?
4    A. I have.
5    Q. Have you ever seen a document that
6  troubled you in the sense that it made you think
7  American Home might have been engaged in improper
8  loan origination practices?
9    A. No, I have not.
10      MR. DORSEY: Objection to form.
11  BY MR. WEISBROD:
12    Q. You have never seen one?
13    A. No, I haven't.
14    Q. Have you ever seen a document that caused
15  you to think American Home might have been
16  engaged in illegal servicing practices?
17      MR. DORSEY: Objection to form.
18      THE WITNESS: No, I haven't.
19  BY MR. WEISBROD:
20    Q. Have you ever heard anyone other than me
21  suggest that American Home may have been engaged
22  in illegal origination or servicing practices?
23    A. Only by way of people referencing some of
24  the borrower claims that were filed, but nothing

18 (Pages 66 to 69)

Wilcox and Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

OBC 00522

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 70

1 beyond that.
2 Q. Are you aware of any whistleblowers
3 within the company who have asserted that the
4 company engaged in illegal practices?
5 A. I am not.
6 Q. You're not aware of a single
7 whistleblower?
8 A. That's correct.
9 Q. What do you understand a whistleblower to
10 be, generally, just so we are consistent on
11 terminology?
12 A. Within the company, if someone is aware
13 of an improper activity, somebody who makes an
14 outside party aware of that.
15 Q. Are you aware of any whistleblowers who
16 have asserted that the company had internal
17 information suggesting that defaults were more
18 likely than was disclosed in public statements?
19 MR. DORSEY: Objection to form.
20 THE WITNESS: I am not aware of that.
21 BY MR. WEISBROD:
22 Q. Since there was an objection to form, I
23 want to make sure I say the question right.
24 A. Okay.

Page 71

1 Q. So I'll break it up a little bit.
2 You're aware of the fact that
3 American Home from time to time made public
4 statements about the likelihood of defaults on
5 the mortgages it originated; right?
6 A. I believe they did. I'm not familiar
7 with those statements necessarily, but.
8 Q. One example would be an SEC filing;
9 correct?
10 A. Correct.
11 Q. Are you aware of any whistleblowers who
12 have asserted that American Home had internal
13 information suggesting a greater default rate
14 than was publicly disclosed?
15 A. I'm not aware of that.
16 Q. Are you aware of any violations of any
17 federal or state laws in connection with American
18 Home Mortgage originations?
19 MR. DORSEY: Objection to form.
20 THE WITNESS: I am not.
21 BY MR. WEISBROD:
22 Q. Is the company aware of such violations
23 of federal or state law?
24 MR. DORSEY: Objection to form.

Page 72

1 THE WITNESS: Not that they made me
2 aware of.
3 BY MR. WEISBROD:
4 Q. Have there been any settlements of any
5 borrower claims, to your knowledge?
6 MR. DORSEY: Pre-petition or post?
7 BY MR. WEISBROD:
8 Q. At any time.
9 A. I don't know for certain, but it wouldn't
10 surprise me if there had been settlements
11 historically.
12 Q. Do you know if there have ever been any
13 adjudications, like an issuance of summary
14 judgment by a judge or a jury verdict against
15 American Home with respect to mortgage
16 origination or servicing allegations?
17 A. I don't know.
18 Q. You don't know one way or the other?
19 A. Correct.
20 MR. WEISBROD: Fernandes-7.
21 (Fernandes-7 was marked for
22 identification.)
23 BY MR. WEISBROD:
24 Q. Fernandes Exhibit 7 is an e-mail chain.

Page 73

1 At the top it says "Sean Beach." I think that
2 means that Sean Beach printed it. And it's from
3 Robert Love to Scott Martinez and some other
4 names, and you are copied on it.
5 Do you see that?
6 A. I do.
7 Q. Let's review the names. Who is Robert
8 Love?
9 A. He is an employee at the servicing
10 operation that was formerly part of AHM and is
11 now part of Wilbur Ross's operation.
12 Q. Part of Wilbur Ross?
13 A. Yes, it's owned by one of his funds.
14 Q. What does "ahmsi3" mean in his e-mail
15 address, do you know?
16 A. That's their e-mail address for the
17 company, for the servicing company.
18 Q. Who are the other names on that?
19 A. Scott Martinez is a colleague of mine.
20 Kevin Bartulewicz works for Bobby Love. Jane
21 Larkin works for servicing. Parag works for
22 servicing. I'm listed there as a cc, and then
23 Sean Beach, counsel.
24 Q. When you referred to individuals who

19 (Pages 70 to 73)

OBC 00523

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 74

1  worked for servicing, they work for the entity
2  now owned by Wilbur Ross; right?
3      A.  That's correct.
4      Q.  As you can see in the first e-mail in the
5  chain, Scott Martinez from your firm was letting
6  people know that the borrowers' committee wanted
7  to know loans originated by AHM and what were the
8  rates of foreclosure by product for various
9  years.
10          Do you see that?
11      A.  I do.
12      Q.  Did you get a response to this request
13  for information?
14      A.  Not that I recall seeing.
15      Q.  Is Wilbur Ross cooperating with you in
16  giving you information of this nature?
17      A.  Relationships have been hit and miss with
18  the servicing operation, so they have been
19  difficult on some fronts.  I didn't have any
20  conversations with them specific to this request.
21      Q.  Has anyone followed up on this request
22  since November?
23      A.  I don't know.
24          MR. WEISBROD:  This is Exhibit 8.

Page 75

1          (Fernandes-8 was marked for
2  identification.)
3  BY MR. WEISBROD:
4      Q.  Fernandes Exhibit 8 is a table.  It bears
5  the heading "American Home Mortgage, Mortgages
6  Sold by Product Type, Time period 1999 to
7  Bankruptcy."
8          Do you see that?
9      A.  I do.
10      Q.  Have you seen this document before?
11      A.  It's possible, but it certainly doesn't
12  look familiar to me.
13      Q.  If I told you we got it from Young
14  Conaway recently, would that help you?
15      A.  No, I still -- I don't recall seeing it
16  previously.
17      Q.  This has three columns, product group in
18  Column 1, number of loans in Column 2 and percent
19  of total in Column 3.
20          Do you see that?
21      A.  Yes.
22      Q.  The bottom three rows are bolded.
23          Do you see that?
24      A.  I do.

Page 76

1      Q.  Each of the bottom three rows bears an
2  annotation "Neg Am products."
3          Do you see that?
4      A.  I do.
5      Q.  That appears to refer to products that
6  can result in negative amortization; right?
7      A.  Yes.
8      Q.  I know you're not a human calculator, but
9  it appears from looking at the three rows that
10  there are approximately, give or take a thousand,
11  90,000 negative am products listed; right?
12      A.  I agree, yes.
13          Or maybe products.
14      Q.  Mortgages?
15      A.  Yes, yes.
16      Q.  Better word, because more than one
17  mortgage may be the same product; is that right?
18      A.  That is right.
19      Q.  Is it accurate to say that American Home
20  Mortgage stopped originating mortgages shortly
21  before its bankruptcy filing?
22      A.  Yes, I believe that's right.
23      Q.  Is it also accurate to say that American
24  Home Mortgage increased negative amortization

Page 77

1  products as a percentage of total loan
2  originations in the years closer to the
3  bankruptcy filing?  In other words, if you
4  started looking at their loan originations in
5  1999 and stopped in 2007, in the years 2007,
6  2006, 2005, there would be more negative
7  amortization-type products than there were in the
8  earlier years?
9      A.  In terms of sheer volume, I certainly
10  agree.  In terms of percentage mix of business,
11  I'm not certain.  But in sheer volume, yeah, I
12  think that's accurate.
13          MR. WEISBROD:  Fernandes-9.
14          (Fernandes-9 was marked for
15  identification.)
16  BY MR. WEISBROD:
17      Q.  This is Fernandes Exhibit 9.
18          I hate to ask questions this way, but
19  I'm at a loss here.
20          What is Fernandes-9?
21      A.  I'm not sure.
22          MR. DORSEY:  Off the record.
23          (A discussion was held off the
24  record.)

20 (Pages 74 to 77)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 78

1    MR. DORSEY: Exhibit 9 is a document
2  that was produced in response to the borrowers'
3  committee request for information regarding
4  securitizations, and it lists the various
5  securitizations with the bank counterparty to
6  those securitizations.
7  BY MR. WEISBROD:
8    Q. You're aware of the fact that the
9  proposed plan in these Chapter 11 cases is a plan
10 of liquidation; right?
11   A. Yes.
12   Q. The plan will result in the creation of
13 what's called a plan trust; right?
14   A. Yes.
15   Q. And the plan trust will be administered
16 by a plan trustee; right?
17   A. Yes.
18   Q. The plan trustee will be overseen by a
19 plan oversight committee; right?
20   A. That's my understanding, yes.
21   Q. Do you know who the plan trustee is?
22   A. I have seen a name that was submitted.
23   Q. What name was that?
24   A. I believe it's -- hold on a second.

Page 79

1    Off the record for a second.
2    (A discussion was held off the
3  record.)
4  BY MR. WEISBROD:
5    Q. We mentioned that the plan trustee would
6  be overseen by a plan oversight committee; right?
7    A. Yes.
8    Q. Do you know who will be on the plan
9  oversight committee?
10   A. I do not.
11   Q. The plan oversight committee is likely to
12 be made up of entities that are currently on the
13 unsecured creditors' committee; right?
14   A. I believe so.
15   Q. I'd like you to walk us through generally
16 how borrower claims will be liquidated. And
17 borrower claims in this question refers to claims
18 by borrowers alleging that loan originations or
19 loan servicing practices violated state or
20 federal law.
21   A. Well, I'm not sure I know the precise
22 steps involved, but as a general matter, I think
23 the debtor, in working with counsel, will review
24 claims and the validity thereof and the

Page 80

1  liquidated nature of that claim and decide
2  whether to dispute those claims or not.
3    If they are disputed -- well, let's
4  start with if they are not disputed, if it
5  appears to be an allowable claim and an amount
6  that agrees with the debtor's books and records,
7  they would be treated in accordance with the plan
8  and paid out under that mechanism.
9    And if they are disputed, I presume
10 they will be objected to in the court and I would
11 imagine each claim, borrower or not, will have
12 its own set of facts and circumstances and be
13 handled independently.
14   Q. In your answer you referred to the debtor
15 reviewing the claims. Could you explain the role
16 of the debtor versus the role of the plan trustee
17 in this process?
18   A. I used debtor generically, which post
19 confirmation in my mind, would include the term
20 debtor. The term debtor as I use it generically
21 would include the plan trustee.
22   Q. Is it your understanding that there will
23 be both a plan trustee and a continuing debtor
24 doing something or will the --

Page 81

1    A. I presume the plan trustee will want to
2  employ the services of some of the remaining AHM
3  employees. Certainly I would expect to help
4  continue to look at claims issues with which
5  those employees are familiar with, and also
6  wind down and dissolve the companies and file the
7  final tax forms, et cetera.
8    Q. Let's say that a borrower files a claim
9  and it's filed next week, so it's after the bar
10 date.
11   Can you explain the process in that
12 situation?
13   A. I cannot.
14   Q. Do you have any reason to think that the
15 trust or the debtors would be amenable to just
16 allowing these late filed claims to be processed
17 as if they were timely filed?
18   MR. DORSEY: Objection to form.
19   THE WITNESS: No, I have no reason to
20 believe that.
21 BY MR. WEISBROD:
22   Q. How will discovery be responded to?
23 First of all, will there be an opportunity for
24 discovery in this situation, if a borrower has a

21 (Pages 78 to 81)

Electronically signed by Terry Burke (301-319-005-7649)        e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 82

1  claim against AHM?
2          MR. DORSEY: I object to the form.
3  What situation?
4          THE WITNESS: I'm out in space here.
5  BY MR. WEISBROD:
6      Q. We'll talk about it as a timely filed
7  claim right now. So a borrower alleges that
8  there were violations of state and federal law in
9  connection with loan origination, and it's one of
10  the 450, so it was timely filed.
11          Will that borrower have an
12  opportunity to take discovery against the debtors
13  or the trust?
14      A. I'm not a counsel, but again, I believe
15  there's a court-established protocol for
16  disputing claims, and that would be followed.
17      Q. Who would look for the documents, if
18  there were document requests?
19      A. The remaining employees of the debtors in
20  today's world.
21      Q. Do you have any understanding of which
22  forum these cases would be litigated in? In
23  other words, would an Oregon plaintiff be
24  litigating against the trust in Oregon or in

Page 83

1  bankruptcy court here in Wilmington, or some
2  other place?
3      A. I don't know.
4      Q. Who would have settlement authority? To
5  clarify my question, your first answer talked
6  about a situation where the trust agreed that the
7  claim should be allowed. Let's talk about a
8  situation where the trust doesn't agree that the
9  claim is valid, but doesn't want to litigate it
10  either and would prefer to settle.
11          Who would have settlement authority
12  in that context?
13      A. In what period of time?
14      Q. Post bankruptcy.
15      A. Post bankruptcy?
16      Q. Yes.
17      A. Post trust?
18      Q. The trust is created, I guess. Post
19  effective date?
20      A. Post effective date.
21      Q. Yes. Post effective date?
22      A. Thank you.
23          I presume the trustee in consultation
24  with the oversight committee would have the --

Page 84

1  design the parameters by which they could settle
2  or review the specifics in determining whether it
3  was a reasonable settlement.
4      Q. Is it your understanding that the plan is
5  not supposed to affect borrowers' claims against
6  third parties, meaning non-debtors?
7      A. Yes, that is my understanding.
8      Q. If a borrower suing a third-party wants
9  to take discovery of the debtors, will the trust
10  be in a position to produce documents or
11  witnesses?
12          MR. DORSEY: Objection to form.
13  BY MR. WEISBROD:
14      Q. Let's start with document. If a borrower
15  is suing a third-party, like Deutsche Bank, or
16  somebody else, would the trust be in a position
17  to produce documents for that litigation?
18      A. I don't know.
19      Q. Would the trust be in a position to make
20  witnesses available for that litigation?
21      A. Again, I don't know. It would be
22  case-by-case specific, I think, and I don't know.
23      Q. What's the current status of individual
24  loan files that reflect the mortgage originations

Page 85

1  of American Home?
2      A. Can you be more specific?
3      Q. When American Home originated a mortgage,
4  there would be a file on each mortgage; right?
5      A. Uh-huh.
6      Q. Is that right?
7      A. Yes.
8      Q. Typically that would be a paper file, a
9  hard copy file, right, at least originally?
10      A. Originally, yes.
11      Q. What has become of those hard copy files
12  since the bankruptcy filing?
13      A. We've continued to image some of those
14  files. We sorted some of those files. I believe
15  we have delivered and continue to deliver some of
16  those files to the owners of the loan who have
17  requested them.
18          And then for the hard copy files, we
19  have sought to destroy those files in the
20  bankruptcy court, with bankruptcy court approval
21  and are moving on that path.
22      Q. Have any hard copy files been destroyed
23  without being imaged?
24      A. I couldn't say.

22 (Pages 82 to 85)

Wilcox and Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

OBC 00526

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 86

1    Q. You just don't know one way or the other?
2    A. Yeah, I just don't know.
3    Q. Do you know if there's an index of the
4    images?
5    A. I believe there is. I believe that was
6    part of the effort in the file -- I'll call it
7    the file effort. I believe the intent was to
8    create an index. I don't know that it's fully
9    built out and complete.
10   Q. Who's building the index?
11   A. Chris Cavaco is the AHM employee who's
12   been charged with oversight on that effort.
13   Q. Where is that taking place?
14   A. Largely in Melville, Melville, New York.
15   Q. Do you know what kind of database is
16   maintained?
17   A. I believe.
18   Q. Are you familiar with database names like
19   Concordance, Access, that sort of thing?
20   A. Certain of those databases, but I'm not
21   familiar with which one he is using and, yeah, I
22   don't know.
23   Q. Do you know if there's an index of the
24   hard copies?

Page 87

1    A. I don't know. I think there is in part.
2    I don't know if it's complete. But I think some
3    of the hard copies, I believe, are indexed.
4    Q. To review the current status as of today
5    of the hard copies, is it correct that some have
6    been destroyed and some still exist in Melville?
7    A. Yes, that's right.
8    Q. Do any exist elsewhere?
9    A. I'm not sure. I don't know.
10   Q. Do you have any sense of which documents
11   were destroyed versus which still exist?
12   A. Yeah. I believe we have a record. I
13   couldn't tell you off the top of my head, but I
14   believe there's a record certainly of what
15   exists, and I believe you could back into what
16   was destroyed.
17   Q. Are there any particular types of
18   documents that were specifically retained or
19   specifically destroyed?
20   A. Well, again, where there was a
21   third-party who had requested the original hard
22   copy documents, those were retained. And where
23   the court may have ordered either above or
24   beyond. I am not sure if they did. If there was

Page 88

1    a court order to retain things above and beyond
2    what was requested, we would have done that as
3    well, I'm certain.
4        MR. WEISBROD: I just want to take a
5    quick break.
6        (Recess, 3:55 p.m.)
7        MR. WEISBROD: Fernandes-10.
8        (Fernandes-10 was marked for
9    identification.)
10   BY MR. WEISBROD:
11   Q. Mr. Fernandes, Fernandes Exhibit 10 is
12   what I have been calling the EPD breach
13   questionnaire. You can see at the heading it
14   says, "In re, American Home Mortgage Holdings,
15   Inc., et al., Case No. 07-11047 (CSS), Jointly
16   Administered, Preliminary Informational
17   Questionnaire for Parties Asserting EPD/Breach
18   Claims."
19       Do you see that?
20   A. Yes.
21   Q. EPD claim is what?
22   A. An early payment default claim.
23   Q. Can you explain what that is?
24   A. It's my understanding there's a

Page 89

1    contractual-based window at the front end of the
2    loan that if a loan, if there's a payment default
3    in that window, I think it's generally 60 to 90
4    days on a loan that's been sold to a third-party,
5    that that party has the right to put the loan
6    back to the seller.
7    Q. This questionnaire is also used for
8    breach of warranty claims; correct?
9    A. Yes.
10   Q. What is a breach of warranty claim?
11   A. It is where the standards of the loan
12   that were sold to the buyer didn't meet the
13   criteria that were agreed to on front end
14   generally.
15   Q. Who created this form?
16   A. This was created by the debtors, I
17   believe, in consultation with counsel, and with
18   the borrower's committee -- I'm sorry, with the
19   creditor's committee, I believe. I believe they
20   had input into the development of this as well.
21   Q. Did you personally participate?
22   A. Other than looking at it as it was
23   developed, no.
24   Q. Do you remember the individuals who did

23 (Pages 86 to 89)

Electronically signed by Terry Burke (301-319-005-7649)        e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 90

1  participate?
2      A. Yes. At least some of them.
3          Damian Pasternak, Mike Labuskas.
4  Those are the two that come to mind from AHM.
5      Q. Who from the unsecured creditors'
6  committee?
7      A. I should have said from the committee's
8  advisors.
9          I don't know. I couldn't give you a
10 specific name. I believe it was reviewed, but
11 I'm not certain, so.
12     Q. You have read the form before?
13     A. I have.
14     Q. Is this the form that debtors intend to
15 use?
16     A. Yeah. It appears to be, yes.
17     Q. Have you heard any talk of filing an
18 amended form in the near future?
19     A. No, I don't believe so.
20     Q. Let's talk about the information that a
21 claimant has to submit. This is the form that a
22 buyer of mortgages from American Home would use
23 to establish that buyer's claim against the
24 estate for early payment default or breach of

Page 91

1  warranty; is that right?
2      A. Yes.
3      Q. Does this form anywhere require the buyer
4  to establish that the buyer has suffered a loss?
5          MR. DORSEY: Objection to form.
6          THE WITNESS: In part and in
7  conjunction with other data, not on the face of
8  the form, yes.
9          In terms of EPD demonstrating where
10 actual losses are being claimed, the protocol in
11 conjunction with the form does demonstrate an
12 actual loss.
13 BY MR. WEISBROD:
14     Q. How does the claimant have to prove loss,
15 where do you see that in the plan or here? Would
16 you like me to mark the plan? Would that be
17 helpful to your answer?
18     A. Sure.
19         MR. WEISBROD: Why don't we do that.
20 11.
21         (Fernandes-11 was marked for
22 identification.)
23 BY MR. WEISBROD:
24     Q. So take the time you need and just tell

Page 92

1  me where in the questionnaire or in the plan
2  itself there is a requirement that the EPD or
3  breach claimant prove that the claimant has
4  suffered a loss?
5          MR. DORSEY: Objection to form.
6          THE WITNESS: And again, my answer
7  was specific to EPD's that have liquidated
8  damages. Is that understood?
9  BY MR. WEISBROD:
10     Q. No. I don't understand that answer,
11 actually. What do you mean by liquidated
12 damages?
13     A. If the claimant can demonstrate that
14 there was an EPD event and that they subsequently
15 foreclosed on the property, sold it, recovered
16 net proceeds against that loan, they can thereby
17 liquidate the damages and claim actual damages on
18 that EPD claim. So that is part of this process.
19     Q. Let me stop you right there just to make
20 sure you don't get too far ahead of me.
21     A. Okay.
22     Q. The process you're talking about is if
23 you've established the early payment default in
24 the foreclosure, there is a protocol that

Page 93

1  generates a value for the loss, that the debtors
2  will acknowledge as a liquidated measure of the
3  loss; right?
4      A. Well, that protocol is an actual damage,
5  though, for that specific loan that I'm talking
6  about.
7      Q. It is for that loan?
8      A. Yes.
9      Q. It's not a proxy; it's the actual --
10     A. It's an actual. Part of this, part of
11 this protocol allows for actual damages incurred
12 on EPD claims to the extent those damages have
13 been liquidated.
14     Q. Okay. Does this form ask for that?
15     A. That's what I said, in conjunction with
16 the protocol. I do think that in the form here,
17 there's -- let me orient myself. I do believe
18 there is a request, at least, for -- in Part 3,
19 the last bullet, status of the loan, July 31st,
20 2008, or if you sold the loan or related real
21 estate prior to July 31st. So that's where it's
22 seeking to show that you've actually liquidated
23 it and then can demonstrate a loss.
24     Q. I see the bullet. Where on that bullet

24 (Pages 90 to 93)