American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 94

1  does it require anyone to prove a loss?
2          MR. DORSEY:  Objection to form.
3          THE WITNESS:  It might be in the
4  description of the protocol.  I'm going to have
5  to dig around to piece it together for you.
6          I don't want to waste anyone's time.
7  Are we on point here?  It sounds like you're not
8  familiar with the concept of the actual damages
9  or you don't believe that --
10  BY MR. WEISBROD:
11      Q.  I'll give you a chance to look at the
12  other documents during a break that may help you
13  answer this, but I personally have not seen
14  anything on the questionnaire that requires a
15  claimant to prove a loss or damages.  But if you
16  can show me that I'm misreading it, I'm open to
17  that.
18      A.  Apparently Section 2.
19          On the second half of the page, the
20  fifth bullet down.
21      Q.  So the fifth bullet down says, it's part
22  of a list, "For each loan included in this
23  population of loans purchased, provide the
24  following."  The fifth bullet is, "If the loan

Page 95

1  was foreclosed or sold or if REO was sold."
2          REO is real estate -- what's the O
3  stand for?
4          MR. JACKSON:  Owned.
5  BY MR. WEISBROD:
6      Q.  "Real estate owned was sold, the date of
7  such sale foreclosure and the amount of any net
8  sale foreclosure proceeds received; right?
9      A.  Yes.
10      Q.  Where in this list of bullets is the
11  requirement that the claimant demonstrate damages
12  or a loss?
13          MR. DORSEY:  Objection to form.
14          THE WITNESS:  In order for the
15  claimant to get an allowed claim for actual
16  damages, they need to demonstrate that.
17  BY MR. WEISBROD:
18      Q.  Does it say that here?
19      A.  No.  Again, I have to go into the
20  narrative of the plan.
21          On Page 48, paragraph -- well,
22  Section A.  The paragraph under the table.
23      Q.  Yes.
24      A.  "The EPD claim shall be allowed" -- I'm

Page 96

1  picking up mid sentence here -- "The EPD claim
2  shall be allowed in an amount equal to the UPB at
3  the time of the sale less the net proceeds
4  realized from such sale."
5      Q.  That sentence does not take into account
6  private mortgage insurance, does it?
7      A.  It should in that the net proceeds
8  received would include payments from private
9  mortgage insurance.
10      Q.  The net proceeds realized from the sale
11  includes private mortgage insurance?
12      A.  Yes.  Well, maybe I shouldn't say from
13  the sale.  But certainly the measurement, the
14  intent contemplates, including all recoveries
15  against that, that loan, as amounts realized as
16  part of the sale.  You can't claim the PMI in
17  most instances, I believe, until you've
18  quantified the initial loss, and then you can
19  recover on that.  But certainly what's been
20  contemplated and discussed is that all sources of
21  recoveries would be netted out of the EPD.
22      Q.  Okay, let's break down what you just
23  said.
24          The process for collecting on private

Page 97

1  mortgage insurance is that the current holder of
2  the mortgage has to attempt to sell the house and
3  then figure out what the difference is between
4  the sale price and what was owed; right?  You
5  have to do that before you collect on the private
6  mortgage insurance?
7      A.  Generally that's how it works, is my
8  understanding.
9      Q.  Now, this provision, which is in Article
10  7 A that you read says, "The EPD claim shall be
11  allowed in an amount equal to the UPB," which is
12  unpaid principal balance, "at the time of the
13  sale less the net proceeds realized from such
14  sale"; right?
15      A.  Right.
16      Q.  That's the number that we just agreed you
17  send to the private mortgage insurer to make a
18  claim on insurance; right?
19      A.  Yes.
20      Q.  So the amount that the EPD claim is
21  allowed at is equal to the amount that you send
22  to the private mortgage insurer to make a claim
23  on the private mortgage insurance; right?
24      A.  I think, my understanding of the intent

25 (Pages 94 to 97)

Electronically signed by Terry Burke (301-319-005-7649)                                            e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 98

1  was that the proceeds from sale would include the
2  sale process, the net proceeds received, and then
3  part of the sale process would be then to file
4  the claim with the carrier and the proceeds
5  received in conjunction with that. That's my
6  understanding of how it works.
7        It doesn't read exactly like that
8  there, but that's my understanding of the
9  protocol.
10       Q. Is there anything in the questionnaire
11  that requires a claimant to warrant that the
12  claimant is seeking to mitigate damages?
13       A. In terms of which type of claim?
14       Q. Either EPD or breach of warranty. Does
15  any EPD or breach-in-warranty claimant have to
16  warrant that the claimant is seeking to mitigate
17  the claimant's damages?
18       A. I don't think they have to warrant that,
19  but it would be upsidedown for them not to. I
20  think the motivation exists separate and apart
21  from any plan.
22       Q. Do you know what a statute of limitations
23  is?
24       A. Generally, yes.

Page 99

1        Q. It is sort of like a bar date for legal
2  claims; right?
3        A. Yes.
4        Q. Is there anything in this questionnaire
5  that requires a claimant to submit evidence
6  proving that the claimant has submitted the claim
7  within the applicable statutes of limitations?
8        A. I don't know.
9           Can you try again at that? Ask
10  again.
11       Q. Is there anything in here that requires a
12  claimant to prove that the claim has been
13  submitted within the statute of limitations
14  period? In other words, that the claim is
15  timely?
16       A. I'm not aware of anything embedded in
17  here, but it's my understanding you don't even
18  get to this stage of the game if you didn't file
19  a timely claim.
20       Q. You have to file a proof of claim timely;
21  right?
22       A. Right.
23       Q. What about the applicable statute of
24  limitations under state law, is there anything

Page 100

1  that requires somebody to prove that the claim
2  was timely under state law?
3        A. I don't know what you're referring to. I
4  don't know how to answer.
5        Q. Let's say the claim is six years old but
6  you submitted the proof of claim form prior to
7  the bar date. So you have met the bar date
8  requirement, but if the statute of limitations
9  was five years in your state, it might be time
10  barred under state law.
11          Is there anything in here that would
12  catch that kind of claim?
13       MR. DORSEY: Other than providing the
14  date it was foreclosed, the date it was
15  purchased, the date it was sold?
16       THE WITNESS: Yeah, again, can we at
17  least flip these into EPD's and breaches?
18  BY MR. WEISBROD:
19       Q. Sure, if the answer is different.
20       A. I'm not sure that it is, but can you --
21       Q. An EPD claim, is there anything that
22  gives the trust the ability to weed out claims
23  that were late and time barred under the
24  applicable statute of limitations?

Page 101

1        A. It's my understanding that EPD claims are
2  asserted real time. There's not a backlog of
3  EPD's coming in. There's just that window right
4  around the filing date; otherwise, if there had
5  been an EPD breach a year prior to filing, it
6  would have been, it would have already walked
7  through the system. It would have been claimed
8  and rectified, I think.
9        Q. For breach of warranty claims, is there
10  anything in the questionnaire that requires the
11  claimant to establish the claimant relied on the
12  warranty?
13       MR. DORSEY: Objection to form.
14       THE WITNESS: I'm not sure I
15  understand. By buying the loan, didn't they rely
16  on the warranty?
17  BY MR. WEISBROD:
18       Q. I don't know.
19       A. I'm not sure I understand the question.
20       Q. They may say so. Is there anything that
21  requires them to certify that they relied on a
22  warranty in order to establish the breach of
23  warranty claim and get it allowed?
24       A. Well, the loans were sold with the reps

26 (Pages 98 to 101)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 102

1 and warrants and were priced as such. I'm not
2 following. If they were sold without reps and
3 warrants, things sell at a discount. So these
4 did not sell at a discount. In my mind, it's
5 implicit that they relied on the reps and
6 warrants. Unless I'm not understanding your
7 question.
8    Q. I think we are. So I guess your answer
9 is there's no explicit requirement, but there
10 shouldn't have to be?
11       MR. DORSEY: Objection to form.
12       THE WITNESS: Yes, I think that's
13 accurate.
14 BY MR. WEISBROD:
15    Q. Now, you know that many borrowers and
16 their attorneys say that the people and companies
17 that bought these mortgages understood that there
18 was a problem. I'm not asking you to agree with
19 that assertion. But you understand that there
20 is, in some literature, an allegation that these
21 entities that were securitizers actually knew
22 when they bought the mortgages that there were
23 likely to be very large numbers of defaults due
24 to the nature of the products and the loan

Page 103

1 origination practices employed?
2       MR. DORSEY: Objection to form.
3       THE WITNESS: I'm not sure I'm
4 understanding or in agreement with that.
5 BY MR. WEISBROD:
6    Q. I'm not asking you to agree with the
7 proposition of fact. I'm just saying that you
8 know that there are some people who say that when
9 a securitizer buys a pool of these payment option
10 ARM mortgages, the securitizer knows that there's
11 a significant risk of very large numbers of
12 defaults?
13       MR. DORSEY: Objection to form.
14       THE WITNESS: I don't know who says
15 that.
16 BY MR. WEISBROD:
17    Q. You don't know anybody who says that?
18    A. No.
19    Q. Is there any requirement in this
20 questionnaire that requires a breach of warranty
21 claimant or an early payment default claimant to
22 warrant that the claimant didn't know that the
23 mortgages at issue were likely to result in
24 defaults?

Page 104

1       MR. DORSEY: Could you read that
2 question back.
3       (The pending question was then read
4 back by the reporter.)
5       MR. DORSEY: Objection to form.
6 BY MR. WEISBROD:
7    Q. Do you understand the question? I'll
8 rephrase it if you don't.
9    A. Please do.
10    Q. Okay.
11       For early payment default claims, is
12 there any requirement in the form that the
13 claimant warrant that the claimant didn't know
14 that the mortgage was likely to result in an
15 early payment default?
16       MR. DORSEY: Objection to form.
17       THE WITNESS: I don't believe there's
18 a place in the form for that.
19 BY MR. WEISBROD:
20    Q. In fact, if the claimant actually did
21 know that there was a significant likelihood of
22 an early payment default, the claimant still can
23 collect under this protocol; right?
24       MR. DORSEY: Objection. Calls for

Page 105

1 speculation.
2       THE WITNESS: Again, I struggle with
3 the concept in that you're suggesting someone
4 would buy a known faulty product for the chance
5 to recover a low recovery. But I agree there's
6 no explicit line on the form that addresses that,
7 but otherwise I don't think I'm following.
8 BY MR. WEISBROD:
9    Q. I think you are. I think you just think
10 it wouldn't be economically rational. Is it fair
11 to say that you think there is no requirement
12 that a person prove or a claimant prove that the
13 claimant didn't know the bad facts about the
14 borrowers or the mortgage, but there doesn't have
15 to be such a warranty in this, is that your view?
16       MR. DORSEY: Objection to form.
17       THE WITNESS: I believe that is my
18 view, but I want to take one more pass at this to
19 make sure I'm not missing a nuance.
20       Can you try again?
21 BY MR. WEISBROD:
22    Q. Sure.
23       MR. DORSEY: You're asking if there's
24 anything in the form that requires a person who

27 (Pages 102 to 105)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 106

1    bought a mortgage to prove the negative, that
2    they didn't know that there was a problem with
3    the mortgage?
4         MR. WEISBROD:  Right.
5         MR. DORSEY:  And do you know any
6    court of law where it's required to prove a
7    negative?  I don't think so.  You can answer the
8    question.
9         MR. WEISBROD:  Yes.  Actually a lot.
10   If you litigate these out, you can't collect if
11   you knew.
12   BY MR. WEISBROD:
13       Q.  I'm not testifying.
14       A.  I think I'm done with that one.  I don't
15   know what else to say.
16       Q.  I think that I understand your position.
17   I just want to make sure that my phrasing didn't
18   confuse anything.
19            You agree with me that no claimant
20   has to prove anything about what the claimant
21   knew or didn't know about the mortgages in order
22   to collect under this protocol?
23       MR. DORSEY:  And I'll object to the
24   form.

Page 107

1            THE WITNESS:  I guess that's right,
2    if I'm understanding.
3    BY MR. WEISBROD:
4        Q.  Have you ever heard of something called
5    the unclean hands defense to a claim?
6        A.  No, I'm not familiar with that term.
7        Q.  In its whole history, did American Home
8    Mortgage ever assert any defenses to breach of
9    warranty claims or EPD claims?
10       MR. DORSEY:  Objection.  Outside the
11   scope of the 30(b)(6).
12       MR. WEISBROD:  I don't think it is.
13   It relates to this.
14       MR. DORSEY:  Which one?  Let me read
15   it.
16           "The extent to which the EPD/Breach
17   Claims Protocol in the plan addresses potential
18   defenses to EPD claims or breach of warranty
19   claims, prevents purported EPD claimants and
20   breach of warranty claimants from obtaining
21   double recoveries, and prevents purported EPD
22   claimants and breach of warranty claimants from
23   inflating their claims."
24           I see nothing in there that talks

Page 108

1    about the history of AHM and how they handled
2    breach of warranty and EPD claims.
3        MR. WEISBROD:  I'll lay the
4    foundation.
5    BY MR. WEISBORD:
6        Q.  The breach of warranty protocol was based
7    in part on age and historical experiences; right?
8        A.  It was referenced against that, yes.
9        Q.  And the EPD protocol was also based in
10   part on historical experience of age; right?
11       A.  Yes.
12       Q.  In AHM's historical experience, did AHM
13   ever assert a defense to a breach of warranty
14   claim?
15       MR. DORSEY:  Same objection.  Outside
16   the scope.  You can answer if you can.
17       THE WITNESS:  Yes, I believe they
18   did.
19   BY MR. WEISBROD:
20       Q.  What kind of defenses?
21       A.  I think that is akin to curing a default,
22   if you will.  If the assertion was that there was
23   a missing document, that maybe the missing
24   document was produced and cured the issue.  In a

Page 109

1    generic sense.
2        Q.  Do you know if AHM ever asserted a
3    defense against a breach of warranty or EPD claim
4    based on the claimant's knowledge at the time of
5    the transaction?
6        A.  I don't know.
7        MR. DORSEY:  Objection to the form.
8        THE WITNESS:  I don't know.
9        MR. WEISBROD:  Let's mark the
10   disclosure statement, please.
11           (Fernandes-12 was marked for
12   identification.)
13   BY MR. WEISBROD:
14       Q.  Actually, I still have a question about
15   the questionnaire.  On breach of warranty, is
16   there anyplace where the claimant has to list the
17   alleged warranty?
18       A.  I'm not sure I understand.  The nature of
19   the protocol was a settlement to help shortcut
20   some of the time and cost associated with, one,
21   on the claimant's side, asserting those, being
22   specific about those assertions; and on the
23   debtor's side, trying to defend them and/or
24   research them.

28 (Pages 106 to 109)

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 110

1       So, no, by design that's not part of
2   the protocol.
3       Q. Fernandes-12 is the Disclosure Statement
4   Pursuant to Section 1125 of the Bankruptcy Code
5   with Respect to the Amended Chapter 11 Plan of
6   Liquidation of the Debtors Dated as of
7   November 25th, 2008.
8       Do you see that?
9       A. Yes.
10      Q. You have seen that before; right?
11      A. Yes.
12      Q. Let's start by looking at the section
13  concerning the estimation and allowance of EPD
14  breach claims on Page 92.
15      At the end of the first paragraph
16  under E, it says, "EPD breach claims can
17  potentially arise with respect to any of hundreds
18  of thousands of mortgage loans sold by the
19  debtors in the secondary market."
20      Do you see that?
21      MR. DORSEY:  I'm sorry, where are
22  you?
23      MR. WEISBROD:  It's the end of the
24  first paragraph under E on Page 92.  The last

Page 111

1   full sentence.
2       MR. DORSEY:  Okay.
3   BY MR. WEISBROD:
4       Q. Do you see that?
5       A. I do.
6       Q. You agree with that sentence?
7       A. Yeah.
8       Q. The same could be said about borrower
9   claims, right, that borrower claims potentially
10  could arise with respect to any of hundreds of
11  thousand of mortgage loans sold by the debtors in
12  the secondary market?
13      A. I don't know.
14      Q. Could you turn to the next page, Page 93.
15  There's a heading that says, "One, EPD claims."
16      Do you see that on Page 93?
17      A. Yes.
18      Q. The second paragraph says, "After
19  surveying a number of asserted EPD claims, the
20  debtors determined that the major factors
21  determining the likelihood and amount of loss for
22  a loan were mortgage product type and the
23  borrowers' payment history."
24      Do you see that?

Page 112

1       A. Yes.
2       Q. This is part of a longer explanation of
3   how the protocol was developed; right?
4       A. It is.
5       Q. What is meant there by "mortgage product
6   type"?
7       A. The various product types as identified
8   in the table back on Page 95.
9       Q. So one product type would be a fixed rate
10  mortgage; right?
11      A. Yes.
12      Q. Another would be an adjustable rate
13  mortgage?
14      A. Yes.
15      Q. Another would be payment option
16  adjustable rate mortgage, POA?
17      A. Yes.
18      Q. And second lien mortgage?
19      A. Correct.
20      Q. Now, Page 94 shows how loss frequency and
21  loss severity were factored into the formula used
22  in this protocol; right?
23      A. Yes.
24      Q. Do you see a section called, "(a) loss

Page 113

1   frequency" on Page 94?
2       A. Yes, I do.
3       Q. There are references to industry
4   conventions and industry loss models in that
5   paragraph.  Take a minute to read that paragraph.
6       A. (Pause.)
7           Okay.
8       Q. Did you ever see these industry
9   conventions or models?
10      A. I did see the Blumberg models in the
11  context of a different effort.
12      Q. What is the Blumberg model?
13      A. It's Blumberg software-based model, and
14  there are various, multiple models, as I
15  understand it -- I'm certainly no expert -- that
16  can be used to project cash flow on certain loan
17  product types.  You put your variables in there
18  and it does various functions for you, one of
19  which is project out cash flows related to that.
20      Q. When you talk about product type, you're
21  talking about the product types akin to what we
22  saw listed on Page 95?
23      A. Yes.
24      Q. Do you see on Page 94 the paragraph that

29 (Pages 110 to 113)

Electronically signed by Terry Burke (301-319-005-7649)        e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 114

1  begins, "Given the current status"?
2      A. Yes.
3      Q. At the end of that paragraph, the
4  disclosure explains that for the purposes of the
5  protocol, "The debtors made the simplifying
6  assumptions that the anticipated loss frequencies
7  across all product types would be 12.5 percent
8  for the zero to 30-day delinquency bucket, 50
9  percent for the 31 to 60-day delinquency bucket,
10  75 percent for the 61 to 90-day delinquency
11  bucket, and 100 percent for the 90-plus day
12  delinquency bucket."
13          Do you see that?
14      A. Yes.
15      Q. Is that in fact what the debtors did?
16      A. Yes.
17      Q. Is it in fact the case that the loss
18  frequency for payment option ARMs are the same as
19  the loss frequencies for fixed rate mortgages?
20      A. I don't know.
21      Q. Do you have any reason to believe they
22  are the same?
23          MR. DORSEY: Objection to form.
24          THE WITNESS: I don't know.

Page 115

1  BY MR. WEISBROD:
2      Q. When we talk about loss frequency here,
3  we're talking about how frequent in a group of a
4  particular type of loans the holder of the loan
5  will sustain a loss of any magnitude, whether
6  it's a dollar or $100,000; right?
7      A. That's the general notion, yes.
8      Q. And then loss severity tells you whether
9  it is more likely to be $1 or $100 or $100,000;
10  right?
11      A. Yes.
12      Q. So there are two categories here, loss
13  frequency and loss severity; right?
14      A. Correct.
15      Q. And the debtors assumed that loss
16  frequency was the same for all product types;
17  right?
18      A. Yes.
19      Q. Have you ever seen the back-up data that
20  reveals whether loss frequency is in fact the
21  same for all product types?
22      A. I have not.
23      Q. Do you know who has?
24      A. No.

Page 116

1      Q. Section B on the bottom of 94 spilling
2  over to 95 talks about loss severity; right?
3      A. Yes.
4      Q. For loss severity, unlike loss frequency,
5  the debtor did distinguish among the four types
6  of loans, fixed rate, adjustable rate, payment
7  option and second lien; right?
8      A. Correct.
9      Q. Why did the debtors make that distinction
10  here in Section B but not in Section A on
11  frequency?
12      A. I believe it's because the debtors had
13  the data to allow them to do that on severity and
14  did not have that data related to frequency, and
15  that's why the simplified assumption was used.
16      Q. They just don't have the data of how
17  frequent it is to have a loss on the different
18  types of loans for A?
19      A. Correct.
20      Q. What's your basis for saying that?
21      A. Just my recollection of developing the
22  protocol is that information wasn't available.  I
23  don't recall talking about any available data
24  that we could use.  We based it on Blumberg

Page 117

1  numbers as a starting point, which obviously we
2  didn't use exactly because they don't seem
3  realistic.  But, yeah, I don't recall any
4  conversations of that information being
5  available.
6      Q. Can you explain a little bit how the
7  debtor decided to use Blumberg numbers as opposed
8  to debtor numbers and how it decided to use
9  debtor numbers as opposed to Blumberg numbers?
10  Maybe "how" is wrong.  It might be "when."
11      A. The debtor didn't have the information.
12  They didn't track this, the loss frequency.  It
13  would be a rolling sort of schedule you'd have to
14  track, and the debtors don't have the ability to
15  do that.
16      Q. But they did have the ability to track
17  loss severity on that basis?
18      A. They got that information from servicing,
19  I believe.  And I believe they requested
20  frequency data from servicing.  I just don't know
21  that anything meaningful or anything was ever
22  produced.
23      Q. When you say servicing, are you referring
24  to the debtor American Home Mortgage servicing or

Wilcox and Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

OBC 00534

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 118

1  Wilbur Ross, which now goes by that name?
2      A. I think it spanned over both periods. It
3  was, my recollection is requests for this
4  information were initiated during the interim
5  ownership period where Wilbur Ross had the
6  economic interests in the servicing operations
7  and then the effort spilled into when he reached
8  his final close.
9          But from a practical matter from my
10  perspective, anyway, the debtors were not
11  operating on a day-to-day basis the servicing
12  operations and did not always get the data that
13  they wanted.
14      Q. Would it be surprising to you if the loss
15  frequency for fixed rate mortgages was the same
16  as the loss frequency for payment option ARMs?
17          MR. DORSEY: I object to the form.
18          THE WITNESS: I don't know. It's
19  dependent on a number of things, I would think.
20  So I don't know how to begin to guess.
21  BY MR. WEISBROD:
22      Q. How does the breach of warranty protocol
23  prevent purported breach claimants from obtaining
24  double recoveries?

Page 119

1          MR. DORSEY: Objection to form.
2          THE WITNESS: Can you ask again,
3  please?
4  BY MR. WEISBROD:
5      Q. Sure.
6          How does the breach of warranty
7  protocol prevent a breach of warranty claimant
8  from obtaining a double recovery?
9          MR. DORSEY: Objection to form.
10          THE WITNESS: Can you define that
11  further?
12  BY MR. WEISBROD:
13      Q. Collecting more than 100 percent of the
14  claimant's loss, that's what I mean by double
15  recovery.
16      A. From what sources?
17      Q. Multiple sources. The borrower, the
18  mortgage insurer, the debtor, brokers who might
19  be sued.
20      A. On a -- I'm sorry, can you ask one more
21  time?
22      Q. Sure. The premise of my question is that
23  a breach of warranty claimant might have recourse
24  against a couple of different sources, like a

Page 120

1  private mortgage insurer, a broker, the borrower,
2  him or herself, as well as the debtors. How does
3  the protocol ensure that the breach of warranty
4  claimant doesn't double recover, meaning get more
5  than 100 percent of the damages incurred by the
6  breach of warranty claimant?
7      A. A couple of factors there.
8          One, in the measurement of severity,
9  the historical data we looked at included
10  recoveries for mortgage insurance, so it would
11  mitigate the damage, the severity would be less,
12  and so that math is being applied across the
13  board on all of these.
14          If you're asking the hypothetical
15  that on one particular loan could someone recover
16  more than 100 percent, theoretically I think that
17  could happen, but this protocol which was done,
18  again, to be an economically feasible solution
19  for all parties involved to get to an agreed upon
20  solution would have offsets going the other way.
21          An example being where you did have
22  an EPD that never came back current, you never
23  got a mortgage insurance payment, you never
24  recovered on another source, you're actually

Page 121

1  understating your claim here because the severity
2  we used was assumed that there was some piece of
3  mortgage insurance recovery there. So there are
4  puts and takes in there, but it was, we believe,
5  a reasonable solution to net to the right outcome
6  on the whole.
7      Q. Your answer would be the same whether
8  it's an EPD claim or a breach of warranty claim
9  there; right?
10      A. They rely on the same severity
11  calculations, so in that regard, yes.
12      Q. How do you prevent EPD or breach of
13  warranty claimants from inflating their claims?
14          MR. DORSEY: Objection to form.
15          THE WITNESS: Can you define
16  inflating their claim?
17  BY MR. WEISBROD:
18      Q. Alleging or recovering more damages than
19  they would be entitled to if they played it out
20  in the tort system?
21          MR. JACKSON: The tort system?
22  Contract? Sorry.
23          THE WITNESS: I'm not understanding.
24          MR. WEISBROD: I guess it is

31 (Pages 118 to 121)

OBC 00535

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 122

1  contract.
2  BY MR. WEISBROD:
3      Q.  How do you prevent them by manipulating
4  the form, overstating their losses and therefore
5  collecting more?
6      A.  Well, again, on the EPD's that are actual
7  losses, where the protocol seeks to receive that
8  data, and then demonstrate that data, so it can
9  be validated by the debtors, the trustee,
10  whoever.  And then the questionnaire itself,
11  which provides for the global amount of
12  transactions to which the protocol gets applied
13  is data that should be able to be verified and
14  vetted as well.
15          Are you suggesting that if someone
16  did $100 million of loan deals with the debtors,
17  that we believe the EPD breached protocol would
18  be applied so that they would somehow file a
19  claim for 150 million?  I'm not really
20  understanding what you mean by inflating the
21  claim.  I don't see how we're getting there or
22  what you're thinking.
23      Q.  Well, that's a possibility that I hadn't
24  been thinking about.  What I was thinking of was

Page 123

1  more they don't tell you about PMI, they don't
2  tell you about any loss mitigation that they have
3  done.
4      A.  Oh.
5      Q.  How do you make sure that they don't
6  inflate their loss?
7      A.  Well, I think there are -- aren't there
8  legal devices for that?  I mean the filing of the
9  proof of claim says that you're doing it
10  accurately and by penalty of jail time.
11          Similarly there are, I believe
12  there's the questionnaire, it has an affidavit
13  associated with it.  I think those are the
14  controls around that, if that's what you're
15  asking.
16      Q.  We went through on Pages 93 through 95
17  the EPD protocol.  There's a slightly different
18  breach of warranty protocol that's addressed on
19  Page 96 with a disclosure statement which is
20  Fernandes-12.
21          Will you look at that, please.
22          There's a long paragraph under No. 2.
23  Do you see that?
24      A.  Yes.

Page 124

1      Q.  It begins, "Breach of warranty claims are
2  more complicated"?
3      A.  Yes.
4      Q.  About three-quarters of the way down, it
5  says that, "In developing a protocol for the
6  estimation and allowance of breach of warranty
7  claims, the debtors had to make assumptions as
8  to, one, the likelihood there had been material
9  breaches of representations of warranties in
10  connection with the given sale of loans; and two,
11  the likelihood that a breach of warranty claimant
12  ultimately would suffer a loss; and three, the
13  presumed amount of such losses."
14          So this adds a step, really it's Step
15  1, that didn't exist in the EPD side; right?
16      A.  That's correct.
17      Q.  And we're talking about whether there was
18  a breach of a warranty.
19          Now, why did the debtors assume that
20  there was a warranty that was breached?
21      A.  Historical experience showed that it did
22  occur in high volume of loan sales here, so
23  historically there had been instances of breach
24  that the debtor had cured.

Page 125

1      Q.  What kind of breach of what kind of
2  warranty are you talking about?
3      A.  I don't know.  I'm not going to know the
4  details and specifics on that.
5      Q.  How would we find out?
6      A.  I guess I'd have to dig around and figure
7  out who the right person was and get you that
8  name to talk to or have them describe it.  Some
9  sort of written statements where they could tell.
10  I don't know.  There's a number of ways to get
11  you the information.
12          But I don't know who that correct
13  person to talk to is today.  I'd have to do some
14  hunting.
15      Q.  Could you look at Footnote 51, which is
16  on Page 97.
17          Footnote 51 says, "Any defenses to
18  establishing a breach of a representation or
19  warranty is subsumed within this presumed pool
20  level incidence of breach."
21          So you got this presumption that .22
22  percent of the time there's going to be a breach;
23  right?
24      A.  For that specific vintage, yes.

32 (Pages 122 to 125)

OBC 00536

Electronically signed by Terry Burke (301-319-005-7649)          e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 126

1　　Q. And then somehow this says that the .22
2　subsumes defenses, right, the .22 percent
3　subsumes defenses; right?
4　　A. That's the assumption, yes.
5　　Q. How does it do that?
6　　A. Again, it's an assumption. I'm not aware
7　of any math necessarily build into that, but I do
8　know that the counterparties claimed that the
9　rate is higher than that.
10　　So in terms of negotiating with them,
11　getting them down to a lower rate, we made the
12　point that there are defenses to some of these
13　and these are considered or should be considered
14　and that's why the lower number is justified.
15　But I don't think there's specific math behind
16　that.
17　　Q. Do you know if there were specific
18　defenses discussed during the course of that
19　negotiation?
20　　A. I don't know.
21　　Q. Look at Page 98. On Paragraph B it
22　says, "For the sake of simplicity, the protocol
23　assumes that any loan on account of which a valid
24　breach of warranty claim is asserted will give

Page 127

1　rise to a loss in some amount, i.e., will have a
2　100 percent loss frequency."
3　　Do you see that?
4　　A. Yes.
5　　Q. Why is that a reasonable assumption?
6　　A. I believe what it's saying, it is a
7　little foggy to me now, but is that embedded
8　within the .22 is the assumption that anything
9　that would have cured itself is washed out ahead
10　of that and the .2 is the residual piece that
11　would actually incur a loss. And so 100 percent
12　of that .22 for that vintage in question.
13　　Q. You'll recall with me that for the early
14　payment default claims you assumed 12.5 percent
15　loss frequency. In other words, in only less
16　than 13 out of 100 situations where there was an
17　early payment default was there even a dollar's
18　worth of loss?
19　　A. That's right.
20　　Q. So here you're saying 100 percent of the
21　situations where there's a breach of warranty
22　there's a loss?
23　　A. I think we're saying the math to whittle
24　down to the frequency is embedded in the .22. So

Page 128

1　once you get to the .22, there's no additional
2　need to haircut that number.
3　　Certainly we're not saying 100
4　percent of the loans have breaches. We're well
5　below our percentage here.
6　　Q. You're below one percent on whether
7　there's a breach. But you're saying whenever
8　there is a breach there's got to be a loss or
9　you're going to assume that there's going to be a
10　loss; right?
11　　A. Based on the incidence of breach that
12　were developed, those were -- yeah, that was
13　based, designed to determine breaches where there
14　were a loss. So once you get down to that point,
15　all of the related UPB is deemed to be the
16　frequency.
17　　Q. The warranties we're talking about are
18　warranties like, we warrant that these are good
19　borrowers who are going to pay for at least six
20　months, or something like that; right?
21　　A. I think it's much broader than that, but
22　I'm not familiar with all the --
23　　Q. Can you give me an example of any
24　warranty?

Page 129

1　　A. I really couldn't. I'd be guessing. I
2　mean I have my ideas as to what they might be,
3　but I'd be guessing, so no, I can't.
4　　Q. Is the trust going to have a mechanism
5　for going back and reviewing the evidence that
6　accompanies these things, these questionnaires?
7　　A. I think that's up to the trustee and how
8　the trustee runs the operation, but the data
9　currently is available and I presume someone
10　would preserve that data and be able to vet these
11　claims to a certain degree, anyway.
12　　MR. WEISBROD: Fernandes-13.
13　　(Fernandes-13 was marked for
14　identification.)
15　BY MR. WEISBROD:
16　　Q. Fernandes-13 is a table that was provided
17　to me by counsel from Young Conaway, and I just
18　want to verify that as far as you know this table
19　is accurate. It purports to be a table listing
20　on Pages 1 and 2 and part of 3 the debtor's
21　warehouse borrowing facilities.
22　　Do you see that?
23　　A. Yes, I see it. I'm not sure I can attest
24　to its accuracy. In fact, I'm certain I can't.

33 (Pages 126 to 129)

Electronically signed by Terry Burke (301-319-005-7649)　　e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 130

1    Q. Is there anything about it that looks
2  inaccurate to you?
3    A. No, I'm not aware of anything that's
4  misstated. I'm just not familiar with all the
5  data points.
6    Q. Do you know what a gestation facility is?
7  That's the kind of facility listed on the last
8  page.
9    A. No, I would need my memory refreshed on
10  that, honestly.
11       MR. WEISBROD: Fernandes-14.
12       (Fernandes-14 was marked for
13  identification.)
14  BY MR. WEISBROD:
15    Q. Fernandes-14 is a list of repurchase
16  agreement counterparties. Do you see that?
17       Have you ever seen that document
18  before?
19    A. I may have seen this listing before.
20  Again, I can't attest to the accuracy of the
21  data. Again, nothing -- I don't see anything
22  that I know to be inaccurate.
23       MR. WEISBROD: 15.
24       (Fernandes-15 was marked for

Page 131

1  identification.)
2  BY MR. WEISBROD:
3    Q. Fernandes-15 is a pleading that was filed
4  by the debtors called, Notice of Filing Schedule
5  of EPD/Breach Claim Voting Amounts."
6       Do you see that?
7    A. Yes.
8    Q. Let's the go through the columns. One
9  column is "Claim Counterparty Name"; right?
10    A. Yes.
11    Q. So that's the name of the EPD or breach
12  of warranty claimant; right? Correct?
13    A. Yeah, that's my understanding.
14    Q. And the next column is "Securitization
15  Name"; right?
16    A. Yes.
17    Q. And that's basically the securitized pool
18  in which individual mortgages are kept by the
19  claimant; right?
20    A. Yes.
21    Q. If you have a different way of expressing
22  that.
23    A. No, that's fair.
24    Q. Now, could you tell us what the next

Page 132

1  three columns represent. Those three columns are
2  breach estimate, EPD estimate and questionnaire
3  status.
4    A. Well, under the protocol, these were the
5  estimates that were developed for breaches and
6  EPD's, and then the questionnaire status column
7  indicates whether the counterparty had submitted
8  the questionnaire data to be able to generate
9  these estimates. Where it's not completed they
10  may have been partially relied upon, but
11  otherwise I believe it was internal records were
12  relied upon to develop these estimates.
13    Q. Let's look at the first one, Aurora Loan
14  Services, LLC. Aurora Loan Services, LLC, is a
15  subsidiary of Lehman Brothers, right, or an
16  affiliate or something?
17    A. Yes.
18    Q. They completed their questionnaire;
19  right?
20    A. It appears so.
21    Q. The breach estimate there is $3,356,781;
22  is that right?
23    A. That's what I read, yes.
24    Q. So that means that the debtors have run

Page 133

1  information about the number and type of loan and
2  the length of delinquencies of Aurora's loans
3  that it got from American Home and that the
4  protocol resulted in that amount, which would
5  reflect the allowed amount for the EPD claims;
6  right?
7    A. That's my understanding of this. I
8  didn't work on the claim level detail on this,
9  but yes, that's how I would interpret this.
10    Q. So this is saying that Aurora has
11  $3,356,781 in breached claim and then $4,171,722
12  for an EPD claim?
13    A. Yeah, for voting purposes, yes.
14    Q. Now, Aurora may say that this understates
15  the correct value of its claim; right?
16    A. They may.
17    Q. Is it the debtor's position that this is
18  the value at which the debtor would allow the
19  claim?
20    A. I don't know, but I do know that the
21  vetting process behind all the submitted detail
22  is not complete, so I can speculate that -- well,
23  I don't know the answer. It might be, it might
24  not be. My homework's not done.

34 (Pages 130 to 133)

OBC 00538

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 134

1    Q. Can you look at the last page?
2    A. Sure.
3    Q. The debtor's rough estimate of the
4    amounts they would allow all breach claims is
5    $104,118,672; right?
6        MR. DORSEY: Objection. Misstates
7    the document.
8        THE WITNESS: This is for voting
9    purposes.
10   BY MR. WEISBROD:
11   Q. If the borrowers' committee wants to
12   figure out how much are these EPD and breach of
13   warranty claims worth, is there any better number
14   in the world that you know of than the number at
15   the bottom of the third page here for breach?
16   A. I am aware of a different source. As I
17   said, all the homework's not done. I don't know
18   at the end of the day which is going to be better
19   or more closer to the final outcome under this
20   protocol. But I am aware of a different source
21   of estimates that exists.
22   Q. What's that source?
23   A. It's the old claim estimation process
24   that went into the plan allocation model.

Page 135

1    Q. The same one that we talked about for
2    borrower claims, there's a corresponding set of
3    entries for the EPD and breach claims?
4    A. There are. And in fact, I believe that's
5    been updated beyond the point from which the
6    model is built.
7    Q. Do you know which numbers came out
8    higher?
9    A. I don't know.
10   Q. Realizing that this isn't binding on
11   anything other than voting, is it fair to say
12   that the debtors endeavored to calculate these
13   numbers using the method that the plan proposes
14   to use for actually allowing claims?
15   A. Let me read this and see if it's
16   described. My inclination is to say yes, but I
17   may be missing something where we relied on
18   certain filed amounts. Let me see if anything's
19   described in here and refresh myself.
20       (Pause.)
21       I can't answer because honestly I'm
22   not sure if -- I just don't know, I don't know
23   the answer to your question.
24       MR. WEISBROD: I think I'm done. I'm

Page 136

1    going to talk to Tom and Hunter and then Tom has
2    two topics left. So the committee, the
3    borrower's committee is not done.
4        (Recess.)
5    BY MR. MACAULEY:
6    Q. Mr. Fernandes, hi. Tom Macauley.
7        We talked briefly about your
8    background sort of bits and pieces, and I figured
9    it would just make sense to kind of wrap that up
10   a little bit.
11       What's your position at Zolfo?
12   A. I'm a senior director.
13   Q. Can you briefly describe your work
14   experience prior to joining Zolfo?
15   A. Sure. Again, I have been at Zolfo for
16   nine years. Prior to that I was at
17   PriceWaterhouse for two years.
18       Prior it that, I was with a
19   healthcare consulting firm based out of the West
20   Coast called Carlson Price Foss, and was there
21   for about four or five years.
22   Q. What were you doing at PWC?
23   A. I was doing consulting for them mostly in
24   the healthcare arena.

Page 137

1    Q. And what's your experience with the
2    American Home case?
3    A. I joined the case in September '07 down
4    in the servicing operation in Irving, Texas, and
5    working with them to help move forward on the
6    sale to Wilbur and get all the pieces in place to
7    push that through.
8        When we went through our initial
9    close with them in November 2007, I then
10   transitioned up to corporate headquarters in New
11   York in early 2008 and started working at the
12   corporate side there on a variety of issues, on
13   plan-related stuff, the building of the plan
14   mechanism in terms of the asset allocation
15   proposal. And a variety of items.
16       And then in June, I guess July 1st,
17   2008, became the director of restructuring for
18   American Home Mortgage.
19   Q. Over the course of your tenure working on
20   American Home, what's the percentage of time that
21   you've spent on the case, of your time?
22   A. It's varied. It's been largely full
23   time. Over the past couple months it's been part
24   time, up until the past couple weeks. Preparing

35 (Pages 134 to 137)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 138

1  for confirmation, it's picked up again.
2       And when I say part time, it varied
3  from week to week.  Some weeks were 75 percent,
4  some weeks were 25 percent.
5       Q.  Now, you mentioned the stipulated asset
6  allocation, and that's in the plan?
7       A.  It is.
8       Q.  My understanding is it doesn't come into
9  play until all the, what I guess you call the
10  SAP, secured administrative priority, claims are
11  paid?
12       A.  The asset allocation actually
13  contemplates the payment of the SAP claims.  So
14  it's embedded in there.  But if you're talking
15  about the residual distributions to general and
16  secureds and how that's factored, yeah, it's net,
17  or after those payments are made.
18       Q.  And the purpose of the allocation is to
19  divide up the residual assets and distribute them
20  to the general and secured creditors?
21       A.  Yes.  Assets, it's assigning assets and
22  costs to the various debtors and generating a
23  resulting participation, if you will, in the
24  residual assets to be paid out to the creditors.

Page 139

1       Q.  So, for instance, if there is $100 in net
2  residual assets and under the percentages 30.67
3  percent goes to AHM Holdings, would it be fair to
4  say that $30.67 of that $100 would go to AHM
5  Holdings?
6       A.  Yes, assuming everything above the line
7  had been satisfied, yes, that's the gist of it.
8       Q.  Exhibit 12, can you take a look at that
9  and go to Page 68.
10       This is where the discussion starts
11  of The Stipulated Asset Allocation; right?
12       A.  Yes.
13       Q.  Have you reviewed this portion?
14       A.  Oh, certainly.
15       Q.  I guess if you look at this first
16  paragraph, this seems to sort of summarize the
17  stipulated asset allocation; is that right?
18       A.  Yes.
19       Q.  So the estates contribute their assets to
20  the plan trust under the plan?
21       A.  Yes.
22       Q.  And the plan trust then distributes the
23  plan trust assets to creditors of each debtor
24  based on this preset formula after payment of all

Page 140

1  the claims up above and payment of expenses?
2       A.  Yeah, the residual assets would be spread
3  amongst the debtors in accordance with, or
4  amongst the entities in accordance with the
5  results of the formula here.  And then would be
6  paid pro rata presumably on the general and
7  secured claims.
8       Q.  It looks like five pages it goes on,
9  there's a discussion, it goes on to about Page 73
10  of about the stipulated asset allocation.
11       On Page 70, in the middle of the
12  page, it refers to an Adjusted Gross
13  Non-Litigation Asset Value.
14       Do you see where it says that?
15       A.  Yes, I do.
16       Q.  And then there's some numbers beneath it
17  with a line item that says Unencumbered Value
18  Estimate, and it lists the eight debtor entities
19  with a number beneath it.
20       A.  Yes.
21       Q.  What do these numbers represent?
22       A.  These represent the value either realized
23  or expected to be realized from each entity's
24  assets that they held and/or hold.  Most of the

Page 141

1  assets have been liquidated at the time this was
2  developed, so there were actual numbers to drive
3  the math here.  Where there weren't realized
4  amounts, we used estimates.
5       Q.  Do these particular numbers refer to
6  anything in particular?  Is it an actual dollar
7  amount?
8       A.  It's a dollar amount.
9       Q.  And is it in --
10       A.  Millions.
11       Q.  This is in terms of millions?
12       A.  Yes, yes.
13       Q.  Okay, I didn't see that.  That's helpful.
14       Now this number, it's a
15  non-litigation asset value, so this does not
16  include any litigation recoveries?
17       A.  That's correct, unless they had been
18  realized at this point, but I'm not aware of any
19  that had been realized.
20       Q.  And there's a footnote on the previous
21  page, Footnote 44 on Page 69, which I think
22  supports what you just said.
23       A.  Yes.
24       Q.  Now, with the chart on the top of Page

36 (Pages 138 to 141)

OBC 00540

Electronically signed by Terry Burke (301-319-005-7649)            e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 142

1  70, there are a number of headings on the
2  left-hand portion of that chart, and the second
3  from the bottom talks of Dispute Resolution
4  Proceeds.
5       Do you see that?
6   A. I do.
7   Q. And there's a checkmark under investment,
8  but not under any of the other entities.
9       Can you tell me what that relates to?
10  A. I'm drawing a blank. I'd have to go
11  look. I certainly have the information available
12  to me, but I just can't recall at the moment.
13  Q. We talked about the adjusted gross
14  non-litigation asset value. Then we talked about
15  intercompany receivables and payables in the next
16  paragraph.
17  A. Correct.
18  Q. And there's a listing of what's called
19  the Intercompany Settlement Effect.
20       How do these numbers compare to the
21  actual intercompany claims?
22  A. I believe the intercompany claims are
23  stated a few pages earlier.
24       Yeah, if you look on Page 66, that's

Page 143

1  kind of the starting point, and then on Page 67
2  there's a couple of adjustments that were made to
3  those balances to correct what we believed were
4  deficiencies in the existing balances. And then
5  the resulting balances from Pages 66 and 67 were
6  multiplied by the estimated payouts in the
7  allocation model to arrive at the dollar effect
8  of the intercompany settlement, and that's what
9  is presented in this section.
10  Q. Let me see if I understand that.
11       On Page 66 you've got a listing of
12  all the intercompany receivables and payables,
13  and then you have some adjustments on 67, it
14  looks like?
15  A. Really just two adjustments, yes.
16  Q. So if you aggregate those numbers and
17  then you apply the percentages from the
18  stipulated asset allocation, you come up with
19  these numbers?
20  A. We should. That's the way it's supposed
21  to work.
22       Yes. The table that shows the
23  estimated payout percentages, if you applied
24  those payout percentages to the adjusted

Page 144

1  intercompany balances, that is, that's how you
2  derive these numbers, the 144, 1059, et cetera.
3  Q. So aside from the application of the
4  percentages under the stipulated asset allocation
5  to the intercompany claims, there is no other
6  resolution or reduction of them, aside from
7  aggregating them?
8  A. I'm not sure.
9  Q. Let me rephrase that.
10       We have the actual intercompany
11  claims with the two adjustments, and then we
12  apply the stipulated asset allocation percentages
13  to them to get to the number for intercompany
14  settlement effect?
15  A. Yes. And when you say the asset
16  allocation percentages, are you referring to the
17  estimated distribution percentages, not the
18  sharing percentages, so not the 30, whatever we
19  said it was at Corp, but rather Corp's payout of
20  5.01 percent.
21  Q. So let's take an example. American Home
22  Corp, which is AHM, if you look on Page 66, it's
23  in the first column, so you add up those numbers,
24  which is going to be a negative number?

Page 145

1  A. Correct.
2  Q. And you apply the effect of the two
3  adjustments on that number? I guess let me end
4  my question there and say, correct?
5  A. Correct.
6  Q. And then you multiply that number by the
7  estimated distribution number, which I believe is
8  1.30 percent?
9  A. I believe that's right, yeah.
10  Q. Then we go on on Page 70 to talk about
11  direct administrative costs at the bottom of the
12  page, and my understanding of direct
13  administrative costs are costs where the
14  administrative costs apply only to one or more
15  than one, but less than all the entities?
16  A. Yes. It was those costs that could be
17  linked to specific tasks that were performed for
18  the benefit of specific entities and it was
19  assigned back just to those.
20  Q. Aside from the sale of the servicing
21  business, is there anything else that would come
22  under that category?
23  A. Yes, there was fairly significant costs
24  in preserving the collateral value, if you will,

37 (Pages 142 to 145)

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 146

1  by making advances on loans and paying servicing
2  fees on loans, and not all of the entities are
3  holders of loans. So just those entities. So
4  it's really the corporate acceptance that holds
5  the loans, they were assigned those costs.
6          And there's a couple other types too.
7  I think there were five or six types that were
8  assigned out.
9      Q. So if you look on top of 71, which is the
10  effect of the direct administrative costs, it's
11  primarily affecting Corp. and Acceptance?
12      A. Yes. And largely because Corp. holds the
13  vast majority of the loan portfolio, is in their
14  name. And a lot of the costs related to the
15  preservation of that portfolio.
16      Q. What about the servicing business, that
17  was servicing, really, wasn't it?
18      A. What's the question?
19      Q. I'm sorry. The sale of the servicing
20  business and the resulting proceeds that came in
21  from that sale, those proceeds went to benefit
22  servicing, or were there other entities that
23  benefited?
24      A. They actually went to benefit BFA. I

Page 147

1  mean, in all sincerity, it was their collateral.
2  It's not factored into the unencumbered value
3  that's available for distribution. It's not a
4  driver in the pieces we've looked at so far.
5          There were direct costs associated
6  with that sale. They were paid from the proceeds
7  of that sale. So in the model it's an
8  in-and-out.
9      Q. And then you move on to the allocable
10  administrative costs.
11      A. Yes.
12      Q. There are three factors, it looks like,
13  A, B, and C in that paragraph that reflect how
14  the allocable administrative costs are divvied up
15  between the estates.
16      A. Correct.
17      Q. It's three factors; it's not simply one
18  factor. So my question is, how do the factors
19  interplay?
20      A. Each factor was weighted to a weight to
21  100 percent. The bulk of the weighting was
22  certainly on the unencumbered asset value, and
23  I'm not going to remember the specific breakouts,
24  but obviously you can go chase this down. But

Page 148

1  the vast majority of it was based on the
2  unencumbered asset value as the notion was that
3  that's what we're all doing here, trying to
4  preserve unencumbered value for distribution.
5  And so that carried the weight of the allocation
6  basis.
7          We also did look at, though, the
8  encumbered assets, which we had to deal with as
9  well, and then the claims effort was based on the
10  estimated allowed claims.
11          So all three factors were weighted,
12  and the resulting weighting was used to spread
13  the non-assignable costs.
14      Q. And then the next step was the reduction
15  of the estimated exposure to secured
16  administrative priority claims?
17      A. Yes.
18      Q. And that result is at the top of Page 72?
19      A. Yes.
20      Q. And then you divided up the plan trust
21  operating expenses by entity?
22      A. The plan trust and contingency reserve
23  line item, is that the --
24      Q. Uh-huh.

Page 149

1      A. Yes. If you do the math for the pieces
2  above, the values less the cost, you get a
3  resulting net value, and these costs were spread
4  pro rata based on that net value.
5      Q. So it was pro rata based on what was your
6  result after payment of the, or I should say
7  reduction of the SAP claims per entity?
8      A. Yeah. It was after all these steps that
9  are above it. SAP claims, the assignable, the
10  allocable costs, all those pieces come out and
11  the residual value is the basis for spreading the
12  cost of the plan trust and contingency reserves.
13      Q. Then toward the bottom of 72 you get to
14  the residual value row for each entity, and that,
15  again, is in millions?
16      A. Yes.
17      Q. And the percentages derived below are
18  taking one of those numbers and dividing it by
19  the sum of all eight numbers?
20      A. That's correct.
21      Q. Now, the plan trust assets as defined
22  under the plan, they include recoveries from
23  causes of action; is that correct?
24      A. That's my recollection.

38 (Pages 146 to 149)

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 150

1    Q. To the extent that there are net
2  recoveries from causes of action, they would be
3  paid out pursuant to the stipulated asset
4  allocation formula?
5    A. Yes, that's what's contemplated here, I
6  believe.
7    Q. So just like with any other asset, $100,
8  30 percent goes to whatever entity?
9    A. That's correct.
10       MR. WEISBROD: Here is my exhibit.
11       (Fernandes-16 was marked for
12  identification.)
13  BY MR. WEISBROD:
14    Q. Mr. Fernandes, I handed you Exhibit
15  No. 16. Do you recognize this?
16    A. Yes, I do.
17    Q. What is it?
18    A. It is the Chapter 7 liquidation analysis.
19    Q. Did you prepare this?
20    A. I did not.
21    Q. Did you have a hand in its preparation?
22    A. Yes, I had a review function in its
23  preparation, yes.
24    Q. Who would have prepared it?

Page 151

1    A. Scott Martinez, a colleague of mine.
2    Q. At Zolfo?
3    A. Yes.
4    Q. Have you prepared liquidation analyses in
5  the past?
6    A. I have.
7    Q. In other cases?
8    A. Yes.
9    Q. Fairly frequently?
10    A. A few.
11    Q. Do you have an understanding of when this
12  was prepared?
13    A. Yes.
14    Q. When?
15    A. It was prepared over the course of, say,
16  late summer to some time in November. It sort of
17  evolved and changed as the case changed.
18    Q. And a copy of this was attached to the
19  disclosure statement that was sent out to
20  creditors?
21    A. Yes.
22    Q. Have there been any changes to the
23  document since that solicitation?
24    A. No, I don't believe so.

Page 152

1    Q. Aside from the cover page, I see 14
2  pages, there's a first page, it looks like
3  there's five pages of footnotes, and then eight
4  single page charts, one for each of the debtor
5  entities.
6       Is that a fair characterization?
7    A. I think I have six pages of notes.
8       I'm sorry. The lead-in page and then
9  five pages of notes.
10    Q. Let's look at the first page, C-1.
11    A. Okay.
12    Q. This talks about a liquidation date in
13  the second paragraph; correct?
14    A. Yes.
15    Q. What is the liquidation date?
16    A. The theoretical date from which the case
17  would convert from a liquidating 11 to a
18  liquidating 7.
19    Q. The assumption here, it's March 1, 2009?
20    A. Yes.
21    Q. Also I guess the second paragraph of that
22  states that the liquidation analysis is based on
23  projected book value, unless otherwise stated, as
24  of that date?

Page 153

1    A. Yes.
2    Q. And then down at the bottom it says that,
3  and I'm looking at the last sentence in the
4  penultimate paragraph, it says that the
5  liquidation analysis does not include recoveries
6  resulting from any potential preference,
7  fraudulent transfer or other litigation or
8  avoidance actions.
9       Is that correct?
10    A. Yes.
11    Q. And why is that?
12    A. They are unknown, unquantifiable and may
13  not be realized.
14       Actually, probably a meaningful point
15  to keep it consistent with the methodology and
16  the asset allocation.
17    Q. Let's look at the page for American Home
18  Corp., to pick one. I think that's four pages
19  from the end.
20    A. Okay.
21    Q. You have done this for all eight
22  entities?
23    A. Yes.
24    Q. Do you want to just tell me in your words

39 (Pages 150 to 153)

OBC 00543

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 154

1    what this represents?
2        A. It represents the estimated general and
3    secured recoveries or payouts in the Chapter 7
4    scenario compared to the Chapter 11 plan
5    scenario.
6        Q. So it's a side-by-side analysis in the
7    recoveries in an 11 and a 7, and then at the
8    bottom it calculates what those shows as a 1.30
9    percent distribution to unsecured claim in an 11,
10   versus a 1.05 percent distribution in a 7, is
11   that a fair characterization of that?
12       A. Yes.
13       Q. Now, at the top here, you've got the
14   total assets, and that's in thousands.
15       A. Correct.
16       Q. And there's a reference on the left-hand
17   side to footnotes, I believe; is that correct?
18       A. Yes, you are right.
19       Q. So Footnote 1 through 12 relate to total
20   assets?
21       A. Yes.
22       Q. And then there's different categories
23   between expenses and then distributions deducting
24   from the asset number to give you a net

Page 155

1    distributable value to general and secured
2    creditors?
3        A. Correct.
4        Q. Let's look at the footnotes. Start on
5    Page C-2.
6            Actually, before I get there, the
7    total assets, 1 through 12, do you have a
8    breakdown of what the total assets would be 1
9    through 12 for each entity?
10           MR. DORSEY: Objection to form. I'm
11   not sure what you're referring to.
12   BY MR. MACAULEY:
13       Q. Let's go back to the Corp. page.
14           So in 11 it talks about 2 billion in
15   assets plus, and it refers to Footnotes 1 through
16   12.
17       A. Right.
18       Q. And Footnotes 1 through 12 talk about
19   different types of assets; right? Presumably to
20   get to the number you have at the top here,
21   you've added what would be the result from
22   Footnote 1 through Footnote 12 in terms of
23   assets?
24       A. Generally, yes.

Page 156

1        Q. Let's go through the footnotes. We can
2    come back to that.
3            Footnote 1 speaks to cash and cash
4    equivalents. Does each entity have its own bank
5    account?
6        A. No, it does not.
7        Q. So there's a single, or how many bank
8    accounts are there?
9        A. There's scores of bank accounts, but the
10   bulk of them are in the name of either corporate
11   or investment corp.
12       Q. And there's a cash management system in
13   operation at the debtors?
14       A. There is.
15       Q. So the cash amounts that you have used
16   are based on the cash management system?
17       A. Yes.
18       Q. Are those current amounts or are those
19   projected amounts?
20       A. On --
21       Q. For the cash?
22       A. On the detailed pages?
23       Q. What was used to get to the total assets?
24       A. Total amounts.

Page 157

1        Q. So you could figure out what numbers were
2    used for which entities that went into the total
3    asset amounts at the top of each page?
4        A. Yes.
5        Q. And who controls the, you said it was in
6    the name of investment and what was the other
7    one?
8        A. Corp. Investment Corp. and Corp. have
9    owned the bulk of the bank accounts, but other
10   entities have accounts as well.
11       Q. The Footnote 2 restricted cash, what I
12   read here is there's really no number here that
13   factors into any of the total asset numbers?
14       A. That's right.
15       Q. Footnote 3 is accounts receivable. Are
16   there any accounts receivable left at this point?
17       A. There might be some odds and ends, but
18   nothing that I'm aware of that would have value
19   associated with it.
20       Q. The next page, Footnote 4 is intercompany
21   receivables.
22           Now, do you recall what number is
23   used to calculate the intercompany receivable
24   balance that went into the total asset number?

40 (Pages 154 to 157)

Electronically signed by Terry Burke (301-319-005-7649)                                   e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 158

1    A.  I'm not sure I follow.
2    Q.  Well, we just obviously went through sort
3  of an aggregation and then a reduction of the
4  intercompany number based on the stipulated asset
5  allocation.
6        So what my question is, is with
7  respect to the portion of the total asset numbers
8  that comprise the intercompany receivables, what
9  number went into that?
10       MR. DORSEY:  Objection to form.
11       THE WITNESS:  I'm not sure of the
12  question still.
13  BY MR. MACAULEY:
14    Q.  Let me try and approach it another way.
15    A.  It's obviously not described in the
16  Footnote 4, which is what I think I hear you
17  asking.  So I'm not sure I know where you're
18  going, because my answer would mirror the
19  footnote there.
20    Q.  Let me ask it this way:  There was the
21  number that we got to in the stipulated asset
22  allocation discussion that we had.
23    A.  Right.
24    Q.  Where you took the aggregate number and

Page 159

1  then you applied the percentage distribution,
2  estimated distribution, and you came up with a
3  number.
4        Is that the number that goes in here?
5    A.  The aggregate number should be the same.
6  The net distribution number should be different
7  because of the different payout in the Chapter 7
8  analysis.  But on each debtor where that
9  receivable or payable hits, what line item, it
10  varies whether it is a receivable or a payable.
11    Q.  Because Footnote 21 deals with
12  intercompany claims.  So what I'm trying to
13  figure out is, how do Footnotes 4 and Footnotes
14  21 interrelate?
15    A.  I think they are the same.  One's got a
16  payable, one's got a receivable.  So it was done
17  to match what was done in the plan, same
18  methodology to arrive at the gross
19  payable/receivable for each entity.
20        The difference would be the value
21  that flows around associated with that
22  payable/receivable is based on the Chapter 7
23  distribution percentages rather than the 11
24  distribution percentages.

Page 160

1    Q.  Let's look at it this way:  The
2  intercompany claim effect that was set forth in
3  the disclosure statement, either as a positive or
4  a negative, based on the different entity.
5    A.  Yes.
6    Q.  So is it fair to say that for an entity
7  that has a positive, that would factor into
8  No. 4?
9    A.  Yes.
10    Q.  But that someone who has a negative would
11  have a zero for No. 4?
12    A.  Right, that's correct.
13    Q.  Footnote 5 talks to securities.  Are
14  there any securities that any of the debtors have
15  at this point?
16    A.  There are a couple of residuals we still
17  hold.
18    Q.  Which entities?
19    A.  I don't know.  Probably Investment Corp.
20  I'm not certain, but.
21    Q.  Do they have any value?
22    A.  They may.  We had tried to sell them in
23  the course of the case and failed to get any
24  interest in them.  But just the other day a party

Page 161

1  reached out to us that may have some interest,
2  but it would -- we're not talking about a
3  material amount here.  The party just needs them
4  to complete the stack of equity so that they'd be
5  able to trade them.
6    Q.  Are these like mortgage-backed
7  securities?
8    A.  Yes.
9    Q.  Footnote 6 is mortgage loans.  What's
10  still held by the debtors?
11    A.  We still have a few hundred loans, some
12  performing, largely non-performing.  A lot of
13  seconds left at this point.  And we're in the
14  process of selling them and selling the
15  liquidation analysis.  Let's assume that the
16  sale, the proceeds from the sales are realized,
17  and so there's no value ascribed to that line
18  item in here.  It would have been reflected in
19  the cash line item.
20    Q.  The value would have been at Corp. and
21  Acceptance?
22    A.  That's right, that's right.
23    Q.  Footnote 7 is derivative assets.
24        Is there anything of value held by

41 (Pages 158 to 161)

OBC 00545

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 162

1   the debtors?
2       A. I don't believe so.
3       Q. Footnote 8 is mortgage servicing rights,
4   MSR's.
5           Is there anything that the debtors
6   still hold that would come under this category?
7       A. I don't believe so. I don't believe the
8   debtors hold any more mortgage servicing rights
9   that they are selling. I guess the loan sales
10  that we have remaining would come with servicing
11  rights, but there's no pool of rights that we
12  have that we're trying to sell.
13      Q. So the sale of the servicing business,
14  you didn't sell all of the MSR's?
15      A. Prior to the sale of the servicing
16  business, we had done a couple of deals to sell
17  off discrete MSR's related to certain
18  securitization or loan sales.
19          The bulk of the remaining MSR's were
20  sold as part of the servicing sale. I think one
21  piece of that is still in dispute, but I think
22  it's relatively immaterial, and the result of
23  that dispute as to whether Wilbur bought those
24  rights or not would not impact the debtor's value

Page 163

1   scenario. The value goes to BOA who had the lien
2   on it, I believe. I believe that's how it would
3   work.
4       Q. Is it fair to say that the MSR's the
5   debtors still have are the MSR's relating to the
6   mortgage loans that the debtors still have?
7       A. Yes. I believe each of the loans that
8   remain that we're selling are servicing released,
9   meaning whoever buys them can have them serviced
10  as they deem appropriate.
11      Q. Footnote 9 is other real estate net.
12          Which entity holds the real estate?
13      A. The Mount Prospect building, I believe,
14  is held by Corp. What was this? Let me
15  double-check.
16          And then the Broad Hollow building is
17  actually held by a non-debtor entity, but I
18  believe Corp. is the beneficial owner
19  essentially, but we've defaulted on payment
20  there. There's not estimated to be any value on
21  that.
22      Q. This also talks about other real estate,
23  the last sentence.
24          Is there any other real estate that

Page 164

1   you're aware of?
2       A. That as opposed to the remaining mortgage
3   loans, some of them have been foreclosed upon and
4   are REO properties, so that would be real estate
5   that the debtors still own.
6       Q. Who holds the REO's?
7       A. I think Corporate Acceptance, depending
8   upon whose loan was foreclosed upon.
9       Q. What's the amount of the Mount Prospect
10  loan?
11      A. I think there's about 750,000 outstanding
12  on that note.
13      Q. How about Melville?
14      A. 25 million outstanding.
15      Q. Footnote 10 talks to premises and
16  equipment net, and is it fair to say that the
17  FF&E relates to the real estate?
18      A. Well, I don't know. The sales of FF&E
19  have been distinct from real estate transactions.
20  They are separable, and we have sold FF&E out of
21  the building and continue to do that. But
22  there's not a lot left.
23      Q. I guess the way I should have phrased the
24  question is, is the FF&E being held by the same

Page 165

1   entities that hold the buildings?
2       A. No, not necessarily.
3       Q. Who owns the FF&E?
4       A. I think Corp. is the owner of most of the
5   furniture. I believe they bought it.
6       Q. Do you have a sense of what the value is
7   remaining?
8       A. The remaining value rounds out to
9   nothing. There's -- we have done a couple of
10  actions. I'd have to go refresh my memory as to
11  what we got from the proceeds of FF&E sales. We
12  had some auctions, but it was nothing material.
13      Q. Footnote 11 is investment in
14  subsidiaries.
15          Are we talking about non-debtor
16  subsidiaries only?
17      A. I think it was all encompassing . I
18  think certain of the debtors did have other
19  debtors as subs, but there's no equity value
20  assumed to be there.
21      Q. Is there any value in the subsidiaries at
22  this point?
23      A. None that I'm aware of.
24          I'll restate that, if I can.

42 (Pages 162 to 165)

OBC 00546

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 166

1    There may be, there may be some value
2 associated with one of the reinsurance entities
3 and we're exploring that. That entity is -- I'd
4 have to go look at who owns it.
5    Q. Is there any value in the various trusts
6 that are non-debtor entities?
7    A. Such as?
8       MR. DORSEY: What trust are you
9 referring to?
10       MR. MACAULEY: I won't try and
11 remember.
12 BY MR. MACAULEY:
13    Q. In the disclosure statement, for
14 instance, on Pages 16 and 17, where under AHM
15 Investment there's Baylis trust, AHM Capital
16 Trust 1, and then Footnote 12 on Page 17 lists a
17 number of other trusts.
18    A. I don't believe there's any value in
19 those, in those trusts. Yeah, I don't think
20 there's any value there at all.
21    Q. What was the purpose of those trusts?
22    A. They were created to -- I'm not sure.
23 I'd have to go back. My recollection is that
24 they were, it was part of a capital raise that

Page 167

1 they were set up to be the entities that
2 channeled the money into the enterprise. I just
3 forget what the linkage was, which entities, how
4 the money flowed around that circle.
5    Q. Did they have anything to do with the
6 securitizations?
7    A. The loan securitizations? No.
8    Q. Are there non-debtor affiliates that are
9 related to the loan securitizations?
10       MR. DORSEY: Related to?
11       THE WITNESS: What do you mean by
12 related to?
13 BY MR. MACAULEY:
14    Q. That were involved in the loan
15 securitizations?
16    A. Not that I'm aware of. Say for maybe one
17 of these reinsurance deals, you know, have some
18 reinsurance covering some loans in a
19 securitization. I don't know. But outside of
20 that, I'm not aware of any relationship between
21 the securitizations and the non-debtors.
22    Q. Going back to the notes, 12 is other
23 assets.
24    Aside from the bank, are there any

Page 168

1 other assets to speak of?
2    A. Again, this was projected as of
3 March 1st. So the assumption was that some of
4 the remaining assets had been liquidated by that
5 point in time. So to answer your question,
6 today, yeah, there are some other assets.
7 There's still some loans and some REO that we
8 have that we would contemplate selling, as well
9 as we're still trying to sell the Mount Prospect
10 building, so those still exist.
11    In terms of the liquidation scenario,
12 the only remaining asset that wasn't assumed to
13 be liquidated at March 1st was the bank and the
14 buildings, but under 7 we assumed we couldn't
15 even sell the buildings, so there was no value
16 associated with them.
17    Q. The text of the note here says that you
18 gave a 20 percent discount to the sale of the
19 bank in the 7.
20    A. Yes.
21    Q. What's the reason for that?
22    A. That we wouldn't be able to consummate a
23 sale with a buyer of the thrift and would have to
24 then liquidate the bank and would take a hit on

Page 169

1 the assets it holds in doing that.
2    Q. What's the reason that in a 7 you
3 wouldn't be able to sell it as a whole?
4    A. Just that the 7 would imply that, you
5 know, all organization around a liquidating 11
6 would have been lost and that no buyer would have
7 an interest in participating in that. And that
8 the OTS at that point would mandate a liquidation
9 of the bank.
10    The OTS is the oversight regulatory
11 body, and we believe if this converted to a 7
12 they would certainly mandate that.
13    Q. Turn to the next page, C-4. Note 13,
14 parties in interest paydown/settlement.
15    Can you explain this to me?
16    A. This is the same issue you asked about on
17 the plan side, and I'd have to go refresh my
18 memory as to what this related to.
19    Q. Okay. I think we can come back to this
20 one, because I think I know how to do that.
21    And 14 is administrative costs, which
22 was the discussion we went through on the direct
23 administrative costs and the allocation?
24    A. That's right. Same methodology. I think

43 (Pages 166 to 169)

OBC 00547

e511e62c-ad65-4055-822a-91979ecc1cc4

Electronically signed by Terry Burke (301-319-005-7649)

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 170

1  the resulting spread is slightly different
2  because the numbers driving the allocation are
3  slightly different under this scenario. So,
4  yeah, if you compare the two numbers, they'll be
5  slightly different.
6      Q. The next page, Page C-5.
7          These are Chapter 7 liquidation
8  expenses, so the idea obviously is that they
9  don't apply in an 11 situation; correct?
10     A. Correct.
11     Q. Actually dropping down to Footnote 16
12 first, the Chapter 7 trustee fees.
13         This is based on the cap under the
14 statute; is that correct?
15     A. I believe that's right.
16     Q. So this would be the maximum the trustee
17 fees could be?
18     A. I believe that's right.
19     Q. Is the thought here that in a Chapter 7
20 scenario there would be more than one Chapter 7
21 trustee?
22     A. I think that risk exists. I don't think
23 that scenario's necessarily embedded in here.
24     Q. In your practice, have you ever seen a

Page 171

1  situation or have you seen routinely situations
2  where a company with multiple entities converts
3  to a 7? Do you have a situation --
4      A. Fortunately I haven't worked on a lot of
5  7's, but.
6      Q. There you go. That's a good experience.
7      A. So I don't know how to answer. I'm not
8  familiar with the frequency of it.
9      Q. Then looking at 15, the inter-debtor
10 dispute costs, this assumes $900,000 total in
11 resolving intercompany claims between the
12 debtors, and I get there by multiplying 150 times
13 5 and 50 times 3 and adding them?
14     A. Correct.
15     Q. And I think that's summarized somewhere
16 else in here.
17         Is that assuming multiple trustees?
18     A. Not necessarily trustees, but it's
19 assuming that each debtor or the creditors of
20 each debtor would be interested in defending
21 their intercompany positions, defending and/or
22 pursuing intercompany positions independently,
23 independent from other debtors.
24         So certainly they would hire their

Page 172

1  own advisors. Someone would be conflicted from
2  working on two sides of the equation, so the
3  assumption is that everyone would have to defend
4  or pursue their own cause of action related to
5  the intercompany piece, and that would be costly.
6      Q. But I think that's based on the
7  assumption that there is a specific entity or
8  entities on behalf of each debtor entity in a 7;
9  is that correct?
10     A. Can you ask again?
11     Q. Sure.
12         If there's one Chapter 7 trustee for
13 all eight entities in a Chapter 7, are you going
14 to incur $900,000 in costs resolving the
15 intercompany disputes?
16     A. I think you could, yes.
17     Q. Let's go to the next page, C-6. Note 17,
18 secured claims.
19         The first item is the DIP term loan,
20 which has been paid back in full; correct?
21     A. It has been, that's correct.
22     Q. There's still some interest issues or
23 other expense issues?
24     A. It's all resolved, paid out and cleaned

Page 173

1  up.
2      Q. The second item is the Bank of America
3  facility, and is it fair to say that pursuant to
4  the settlement that was approved by the court,
5  there's nothing left here?
6      A. What do you mean by that?
7      Q. I mean that Bank of America, after
8  getting control of the mortgage loans, has
9  nothing else supporting a secured claim against
10 the debtors?
11     A. I guess generally that's right. I don't
12 know that there's any -- I think that's correct
13 in terms of the secured claim.
14     Q. The last one is with JP Morgan.
15         Given that pursuant to the settlement
16 and the loans being given back to JP Morgan, is
17 it fair to say that JP Morgan no longer has a
18 secured claim against the debtors?
19     A. I don't think we've resolved all issues
20 with JP Morgan, so they potentially could have a
21 secured interest or claim a secured interest in
22 something.
23     Q. That's right. They could potentially
24 have a secured claim in the REO?

44 (Pages 170 to 173)

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 174

1     A.  Potentially, yes.
2     Q.  Note 18, administrative and priority
3   claims.  We're talking about administrative
4   claims other than professional fees; is that
5   correct?
6     A.  That is correct.
7     Q.  Professional fees are dealt with in the
8   Footnote 14, which we talked about earlier?
9     A.  Let me check that.
10        Yes, that's right.
11    Q.  Footnote 19, other contingencies, what
12  does this cover?
13    A.  Is any of this confidential?
14        MR. JACKSON:  We have a
15  confidentiality agreement in place, so if you
16  feel it's confidential and you'd like to
17  designate it as confidential, does that work for
18  you guys?
19        MR. MACAULEY:  That's fair.
20        MR. DORSEY:  Why don't we step out
21  and you tell me what it is.  We can figure it
22  out.
23        (Pause.)
24        MR. DORSEY:  There is the

Page 176

1
2
3
4          **MATERIAL**
5          **REDACTED**
6
7
8
9
10
11        COURT REPORTER:  Now we're off the
12  confidential portion?
13        MR. MACAULEY:  Yes.
14        MR. DORSEY:  Yes.
15  BY MR. MACAULEY:
16    Q.  Note 20, there's an assumption here that
17  the liquidation expenses would be 50 percent
18  lower in a Chapter 7; is that correct?
19    A.  Yes.
20    Q.  And then Note 21 is the intercompany
21  claims, which we discussed before?
22    A.  Yes.
23    Q.  And 22 is the general and secured claims,
24  other than intercompany claims.

Page 175

1   confidentiality issue, so we'll designate his
2   answer to this question as confidential.
3         THE WITNESS:
4
5
6
7
8
9
10         **MATERIAL**
11         **REDACTED**
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 177

1         What's the estimate of general and
2   secured claims based on?
3     A.  The company has taken all filed claims
4   and all scheduled claims, grouped those out by
5   type, the nature of claim, if you will, and
6   assigned those out to groups or people within the
7   debtor to analyze those claims and see, one,
8   whether they think it's a valid claim and, two,
9   if they do think it's a valid claim, to estimate
10  an amount that they believe to be a valid
11  estimate of what that claim might actually
12  liquidate at.  That was the process.
13    Q.  So this is effectively the company's best
14  guess at the time this was prepared of what the
15  claims would come out to be?
16    A.  That's right.
17    Q.  Let's go back to the Corp. page.
18        Let me see if I can get back to the
19  question I was trying to ask earlier.  Total
20  assets refers to Footnotes 1 through 12, right,
21  and there's a total number of 2 billion
22  400 million and change.
23    A.  Right.
24    Q.  That number is the aggregate of the

45 (Pages 174 to 177)

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 178

1  assets that we looked at 1 through 12; is that
2  right?
3      A. Yes.
4      Q. Then we go to parties in interest
5  paydown/settlement, and there's a number.
6          Can you tell me what that number
7  relates to?
8      A. Yeah, and this goes back to Footnote 13,
9  and I think I misstated something earlier when I
10  said that footnote related to what we had looked
11  at in the plan. I no longer think those are
12  related.
13      Q. Okay.
14      A. This is where the debtor turned over
15  collateral largely to secured parties to satisfy
16  their claims, at least in part. So, for
17  instance, the Calyon repo, which was 1.1 billion,
18  a UPB, was returned to Calyon. So items of that
19  nature would be embedded in here.
20      Q. So would the total asset number relate to
21  what each debtor had as of petition date?
22      A. It should approximate those assets.
23          I think they would be valued at
24  different points in time. The 2.4 wasn't

Page 179

1  necessarily what it was valued at at the filing
2  date.
3      Q. Now, I notice there's a difference of a
4  couple million dollars between the assets in the
5  11 and the assets in the 7 for Corp.
6          Do you have any idea what that is a
7  result of?
8      A. I think it's -- what line are you looking
9  at?
10      Q. I'm looking at the first line, total
11  assets, one number in the 11 and one number in
12  the 7, and it looks to be about $2 million
13  difference.
14      A. Right. Just looking up above, it looks
15  like the administrative cost burden is heavier in
16  the 7.
17      Q. That was going to be my next question.
18      A. Meaning that Corp.'s relative share of
19  value in the 7 is greater than its relative share
20  in the 11, so therefore it got a relatively
21  greater share of costs in 7.
22      Q. Well, that answers my second question, so
23  I appreciate that, which is why the allocable
24  administrative costs were higher in the 7 than in

Page 180

1  the 11.
2          But I wasn't -- but going back to my
3  initial question why the assets in the 11 are
4  higher than the assets in the 7?
5      A. On the total asset line?
6      Q. Total asset line.
7      A. I think that's the Mount Prospect
8  building that Corp. owns. I think in 11 we had
9  recoveries mapped to them and in the 7 we assumed
10  we couldn't sell that building.
11      Q. But I thought under Footnote 9 you
12  assumed that those properties aren't going to be
13  sold for any value?
14      A. Yeah, that's I think what I just said.
15  In the 7 we assumed there's no value, but in the
16  11 we did assign value to that.
17      Q. Chapter 7 liquidation expenses, we have
18  the 150 for the inter-debtor dispute costs and
19  a million 37 in trustee fees, and I'm assuming
20  that's three percent of some number.
21          Do you know which number?
22      A. I'm not certain, but it looks to be about
23  three percent of the 34553 on the total asset
24  value post petition costs.

Page 181

1      Q. Just sort of dropping down, you have the
2  title "distributions" on the left-hand side?
3      A. Yes.
4      Q. And you deal with all distributions to
5  claims, but you've got the liquidation operating
6  expenses under that.
7          Is there a reason for that?
8      A. Where are you?
9      Q. It would be Footnote 20.
10      A. Oh, the plan trust?
11      Q. Yes.
12      A. I think the concept is just that in the
13  plan, under the 11, we had a budget of actual
14  costs that go out and then we truncate that when
15  the plan trust gets funded, and all costs are
16  then deemed to be embedded in that funding. And
17  that's all this is saying, that the costs going
18  forward and liquidating the estate is captured in
19  that line item.
20      Q. My question, and I understand that, my
21  question is why is it under distributions?
22      A. I don't know. I guess it could have been
23  under Chapter 7 liquidation expenses above. I'm
24  not sure why it ended up down there.

46 (Pages 178 to 181)

OBC 00550

Electronically signed by Terry Burke (301-319-005-7649)

e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

1  Q. So if you look at the secured claims,
2  there's nothing factored in under either
3  scenario; correct?
4  A. That's correct.
5  Q. The ad min and priority claims are the
6  same under both scenario?
7  A. That's correct.
8  Q. The liquidating operating expenses are
9  approximately 50 percent lower in the 7?
10  A. Yes. In the total I know they were cut
11  in half, and each entity got its pro rata share,
12  so.
13  Q. Now, if you go down to intercompany
14  claims, there's a listing of the intercompany
15  claims, the general and secured claims, and then
16  a total number of claims, of unsecured claims, I
17  should say.
18      There is a distribution proposed
19  intercompany claims. What's the reason for that?
20  A. Because it was assumed that the plan
21  compromise goes away in terms of the intercompany
22  settlement, this just shows how the value flows
23  around the system.
24  Q. But under the plan, the intercompany

1  claims are not proposed to be paid?
2  A. Yeah, they are not really paid here
3  either. It's just, it's a circular reference.
4  It goes from Corp. to another entity and out to
5  that entity's creditors. There's no value left
6  at any of the debtors in this model.
7  Q. So this is sort of a factor of the
8  stipulated asset allocation?
9  A. Yeah. It's treated a little different in
10  the 7 scenario, but the gist is the same, yes.
11  It's shifting value from one debtor to the other
12  based on their pre-petition intercompany claim
13  position.
14  Q. Well, how is it treated in the 7? That
15  was my next question.
16  A. That actually linked, so behind the
17  payable, you'll see the debtor entities that have
18  the receivables, and each one of those
19  receivables will get its pro rata share of the
20  1.05 payout that's coming there. And then it
21  will trickle down, it will go to pay their costs
22  and ultimately go out to their general and
23  secured claims.
24  Q. Does substantive consolation apply in the

1  7 scenario?
2  A. I'm not an attorney, but I think for
3  purposes of developing a Chapter 7 scenario, you
4  do it on a like basis to your 11, your 11
5  scenario, so you have comparables to look at to
6  determine if it's in the best interest of the
7  creditors.
8  Q. And the recoveries from the avoidance
9  actions aren't listed in the assets or anywhere
10  on here?
11  A. That's correct.
12  Q. And the stipulated asset allocation
13  obviously wouldn't apply in the 7?
14  A. Arguably it wouldn't, but, again, to get
15  to a like basis, we did embed the theory of the
16  allocation on the treatment in the 7 scenario.
17  So it was a concept of allocating out costs that
18  is captured in the 7 as well.
19  Q. Is that because the thought is that there
20  would have to be some settlement of intercompany
21  claims on the 7?
22  A. There would have to be some intercompany
23  claims and other disputes over, I guess, who
24  would bear what share of costs, but we just

1  assumed that it would fall out similar to the 11
2  scenario. I guess you could spend millions of
3  dollars fighting about it, but I don't think that
4  benefits anyone.
5  Q. Now, under the 7, if you had recoveries
6  from avoidance actions, they would inure to the
7  benefit of the particular entity that made the
8  transfer; is that correct?
9  A. Barring any sort of sharing agreement, I
10  presume that's correct.
11  Q. And in the 11, as we discussed, the
12  recoveries would be pursuant to the stipulated
13  asset allocation?
14  A. Yes.
15      MR. MACAULEY: Off the record.
16      (A discussion was held off the
17  record.)
18      MR. MACAULEY: This concludes our
19  questions at this time. We would reserve our
20  right to ask further questions should the need
21  arise given the scheduling, but we do appreciate
22  your time.
23      MR. DORSEY: We have no questions.
24      COURT REPORTER: Reading and signing?

OBC 00551

Electronically signed by Terry Burke (301-319-005-7649)                    e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 186

1    MR. DORSEY:  Yes, please.
2    (Witness excused.)
3    (The deposition concluded at 7:05 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 188

1        E X H I B I T S (cont'd)
2    FERNANDES EXHIBITS                    MARKED
3
      10   Preliminary Informational         88
4         Questionnaire for Parties Asserting
          EPD/Breach Claims
5
      11   Amended Chapter 11 Plan of        91
6         Liquidation of the Debtors Dated as
          of November 25, 2008
7
      12   Disclosure Statement Pursuant to   109
8         Section 1125 of the Bankruptcy Code
          With Respect to the Amended Chapter
9         11 Plan of Liquidation of the Debtors
          Dated as of November 25, 2008
10
      13   Warehouse/Borrowing Facilities    129
11
      14   American Home Mortgage BMA Repurchase 130
12        Agreement Counterparties
13    15   Notice of Filing Schedule of       130
          EPD/Breach Claim Voting Amounts
14
15    16   Chapter C, Chapter 7 Liquidation   150
          Analysis
16
17    ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 188

      CERTIFICATE OF REPORTER                 PAGE 189
18
19
20
21
22
23
24

Page 187

1         I N D E X
2    DEPONENT: BRET W. FERNANDES         PAGE
3       Examination by Mr. Weisbrod        3
        Examination by Mr. Macauley       135
4
           E X H I B I T S
5
     FERNANDES EXHIBITS            MARKED
6
      1   Amended Notice of Deposition       3
7
      2   First Amended Complaint           19
8
      3   Order Pursuant to Bankruptcy Rule  48
9        3003(c)(3) and Local Rule 2002-1(e)
         Establishing Bar Dates for Filing
10       Proofs of Claim and Approving the
         Form and manner of Notice Thereof
11
      4   Order Pursuant to Bankruptcy Rule  48
12       3003(c)(3) and Local Rule 2002-1(e)
         Establishing a Bar Date for Filing
13       Proofs of Claim by Construction Loan
         and HELOC Borrowers and Approving
14       the Form and Manner of Notice Thereof
15    5   Letter dated August 13, 2007, from  51
         Alan Horn to "Dear American Home
16       Mortgage Customer," with attachment
17    6   Power Selling Skills              60
18    7   E-mail string                     72
19    8   American Home Mortgage, Mortgages  74
         Sold by Product Type, Time Period:
20       1999 to Bankruptcy
21    9   List of various securitizations with  77
         the bank counterparty to those
22       securitizations
23
24

Page 189

1
2
3
4
5         REPLACE THIS PAGE
6      WITH THE ERRATA SHEET
7       AFTER IT HAS BEEN
8     COMPLETED AND SIGNED
9        BY THE DEPONENT
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Wilcox and Fetzer, Ltd.              Registered Professional Reporters              302-655-0477

OBC 00552

Electronically signed by Terry Burke (301-319-005-7649)                                e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.

Page 190

```
 1   State of Delaware )
                      )
 2   New Castle County )

 3           CERTIFICATE OF REPORTER

 4        I, Terry B. Burke, RMR-CRR and Notary
     Public, do hereby certify that there came before
 5   me on Thursday, January 15, 2009, the deponent
     herein, BRET W. FERNANDES, who was duly
 6   sworn by me and thereafter examined by
     counsel for the respective parties; that the
 7   questions asked of said deponent and the answers
     given were taken down by me in Stenotype notes
 8   and thereafter transcribed by use of
     computer-aided transcription and computer printer
 9   under my direction.

10
          I further certify that the foregoing is a
11   true and correct transcript of the testimony
     given at said examination of said witness.
12
          I further certify that reading and signing
13   of the deposition were waived by the deponent and
     counsel.
14
          I further certify that I am not counsel,
15   attorney, or relative of either party, or
     otherwise interested in the event of this suit.
16
17
18
          Terry Barbano Burke, RMR-CRR
19        Certification No. 233-RPR
          (Expires January 31, 2011)
20
     DATED:
21
22
23
24
```

Wilcox and Fetzer, Ltd.                Registered Professional Reporters                302-655-0477

OBC 00553

Electronically signed by Terry Burke (301-319-005-7649)

e511e62c-ad65-4055-822a-91979ecc1cc4