# EXHIBIT D



**WILCOX & FETZER LTD.**

In The Matter Of:

# American Home Mortgage Holdings, Inc., et al.

Case No. 07-11047 (CSS)

_____

## Damian Pasternak

February 6, 2009

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

American Home Mortgage Holdings, Inc., et al.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                    ) Chapter 11
                          )
AMERICAN HOME MORTGAGE    )
HOLDINGS, INC., a Delaware )
Corporation, et al.,      )
                          )
        Debtors.          ) Case No. 07-11047 (CSS)


        Deposition of DAMIAN PASTERNAK, taken
pursuant to notice at the law offices of Young
Conaway Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 10:50 a.m., on
Friday, February 6, 2009, before Terry Barbano
Burke, RMR-CRR and Notary Public.

APPEARANCES:

        JOHN T. DORSEY, ESQUIRE
        KAREN E. KELLER, ESQUIRE
        Young Conaway Stargatt & Taylor, LLP
         The Brandywine Building
         1000 West Street, 17th Floor
         Wilmington, Delaware  19801
         For the Debtors

        EDWARD L. SCHNITZER, ESQUIRE
        HAHN & HESSEN, LLP
         488 Madison Avenue
         New York, New York  10022
         For the Creditors' Committee


            WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801
            (302) 655-0477
            www.wilfet.com


Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

American Home Mortgage Holdings, Inc., et al.

Page 2

1   APPEARANCES (cont'd):
2       STEPHEN A. WEISBROD, ESQUIRE
        GILBERT OSHINSKY LLP
3       1100 New York Avenue, NW, Suite 1700
        Washington, DC  20005
4       For the Borrowers' Committee
5               -  -  -
6           DAMIAN PASTERNAK,
7       the deponent herein, having first been
8       duly sworn on oath, was examined and
9       testified as follows:
10  BY MR. WEISBROD:
11      Q.  Good morning, Mr. Pasternak.  My name is
12  Steve Weisbrod.  I'm with Gilbert Oshinsky, LLC,
13  in Washington.  I represent the official
14  committee of borrowers.
15          As a preliminary matter, if you need
16  a break for any reason, either to talk about a
17  privilege issue or just because you're
18  uncomfortable or need to use the rest room or
19  anything else, just go ahead and ask me.
20          I'm going to ask you a series of
21  questions.  If you don't understand a question,
22  by all means, feel free to ask me to clarify it.
23          I'll assume that if you answer it,
24  you at least think you understood my question.

Page 3

1       A.  Right.
2       Q.  Do you agree that that makes sense?
3       A.  That makes sense.
4       Q.  Have you ever been deposed before?
5       A.  No.
6       Q.  Have you ever been designated as an
7   expert witness by anyone?
8       A.  No.
9       Q.  Have you ever been hired as an expert
10  witness by anyone?
11      A.  No.
12      Q.  What is your current position?
13      A.  I am a whole loan trader in the capital
14  markets group.
15      Q.  Of what?
16      A.  Of mortgages, whole loans.
17      Q.  Who is your employer?
18      A.  American Home Mortgage.
19      Q.  How long have you worked for American
20  Home Mortgage?
21      A.  Almost three years.
22      Q.  So you started in 2006?
23      A.  Yes.  April 2006.
24      Q.  Where were you based?

Page 4

1       A.  Melville, New York.
2       Q.  Melville, New York?
3       A.  Yes.
4       Q.  Could you describe your educational
5   background.
6       A.  I have an undergraduate degree from
7   Towson University in finance, and I have an MBA
8   degree from Hofstra University also in finance,
9   and I am also a chartered financial analyst.
10      Q.  Could you say the last thing again?
11      A.  CFA, chartered financial analyst.  It's a
12  designation known on Wall Street.
13      Q.  Can you describe your professional
14  background before you started at AHM?
15      A.  Right from college, I worked for Barnes &
16  Noble as an accountant for about two years.
17          After that, I worked as a financial
18  analyst for Sleepy's.  After that -- about six to
19  eight months.
20          And after that, I went to American
21  Home Mortgage.
22      Q.  What is Sleepy's?
23      A.  Sleepy's is a retailer of mattresses.
24      Q.  Barnes and Noble is a bookstore?

Page 5

1       A.  Yes.
2       Q.  When was the first time you worked in the
3   mortgage industry?
4       A.  At the American Home Mortgage.
5       Q.  You've continued to be employed by
6   American Home Mortgage continuously since 2006?
7       A.  Correct.
8       Q.  Who hired you?
9       A.  You mean the person?
10      Q.  Yes.
11      A.  Damian Voulo.
12      Q.  Can you say that name again?
13      A.  Damian, D-A-M-I-A-N, V-O-U-L-O.
14      Q.  Your name is also Damian?
15      A.  Yes, my name is also Damian.  That is
16  rare.
17      Q.  What was your original title?
18      A.  Junior trader.
19      Q.  Were you ever promoted?
20      A.  Yes, to a trader position.  Unofficially.
21  Never signed any paperwork saying I'm being
22  promoted, but given more responsibilities.
23      Q.  What does a trader do?
24      A.  Trader sells home loans that American

Wilcox and Fetzer, Ltd.     Registered Professional Reporters          302-655-0477

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

1   Home Mortgage originated to third parties, Wall
2   Street banks, conduits.  And at the same time
3   hedges the interest rate risk of the mortgage
4   pipeline.
5       Q.  Were you involved in the marketing of
6   mortgages to borrowers?
7       A.  No.
8       Q.  Did you ever see marketing materials?
9       A.  No.
10      Q.  Who are your counterparties in these
11  trades of the mortgages?
12      A.  Do you want me to name them?  I can name
13  them.
14      Q.  Describe them generally and then give
15  examples.
16      A.  Wall Street banks, JP Morgan, Bank of
17  America, Citigroup, Lehman Brothers, Merrill
18  Lynch and also what we call conduits, Wells
19  Fargo, Country Wide and City Mortgage.
20      Q.  Why do you call them conduits?
21      A.  I'm not really sure --
22      Q.  What's the difference --
23      A.  -- to be honest.
24      Q.  -- between the first group you described

1   and the second?
2       A.  The first group are more investment
3   banks.  The second group it seems to be more like
4   originators of mortgages as the primary business.
5   That may be converted to doing some investments.
6       Q.  Can you describe in more detail the
7   transactions that you did?  What exactly are you
8   selling, a mortgage at a time, a group of
9   mortgages, how is it delineated?
10      A.  Typically, we sell groups of mortgages to
11  get pools of mortgages at a time in different
12  sizes.
13      Q.  What would be a smallish pool?
14          MR. DORSEY:  Objection to form.
15  BY MR. WEISBROD:
16      Q.  How many mortgages might be included in a
17  smaller than average pool?
18      A.  It would actually vary from as low as ten
19  mortgages to hundreds.
20      Q.  How were the loan sales documented?
21      A.  There is a trail starting with e-mail
22  going out to investors with the bid tape that
23  contains all the mortgage information.  I would
24  say all important information for pricing.

1       Q.  You referred to a kind of tape.  What was
2   that?
3       A.  It's a bid tape.  It's an Excel
4   spreadsheet.  It contains loan numbers, balances
5   of loans and other mortgage information.
6       Q.  Can you spell the word that you're using
7   before tape, is it B-I-D?
8       A.  B-I-D.
9       Q.  When the other side has agreed to buy
10  what you want to sell, how do you document the
11  sale?
12      A.  They send us a trade confirmation.
13      Q.  How many pages is the trade confirmation
14  typically?
15      A.  One to two pages.
16      Q.  What kind of information is included in a
17  trade confirmation?
18      A.  It would be what the purchaser is buying,
19  how many loans, what types of loans and some of
20  the stipulations of the trade.
21      Q.  What kind of stipulations?
22      A.  For example, percentage of due diligence
23  that would be performed on the pool of loans,
24  closing dates, price.

1       Q.  Are there any other contracts associated
2   with these sales beside the confirmation that you
3   just described?
4       A.  Yes.  To my understanding, there is a
5   mortgage loan purchasing agreement signed prior,
6   prior to the conclusion of the trade, which is
7   the lengthy document expressing all the details.
8       Q.  Have you ever seen that?
9       A.  Yes.
10      Q.  Is there a separate loan purchase
11  agreement for each counterparty?
12      A.  Yes.
13      Q.  Do you still have access to those?
14      A.  Yes.
15      Q.  What, if anything, is stated in the
16  contracts that you've seen about early payment
17  defaults?
18      A.  I do not recall.  Not specifically.
19      Q.  What, if anything, is stated in the
20  contracts that you have seen in terms of
21  warranties by American Home?
22      A.  It explains what reps and warrants are,
23  which are included in an LPA.
24      Q.  Do you recall any reps or warranties?

3 (Pages 6 to 9)

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 10

1    A. Yes. Some of them would be that the loan
2    has to be underwritten to AHM guidelines. It has
3    complete documentation. Appraisal, income of the
4    borrower is correct. And it's a lengthy, it goes
5    on and on, a couple pages of descriptions.
6        Q. Who is your current boss?
7        A. I guess I report to Damian Voulo.
8        Q. Who is his boss?
9        A. I guess we treat our boss as Zoloft
10   Cooper. It would be Bret Fernandes.
11       Q. Do you still go to work every day in
12   Melville, New York?
13       A. Yes.
14       Q. Do you have access to individual loan
15   files?
16       A. Can you explain your question more?
17       Q. If you wanted to look up a loan by
18   borrower name, could you do that?
19       A. I could do it in our proprietary system,
20   software system.
21       Q. And you could also look up pools of loans
22   by purchaser of pool?
23       A. No, that I cannot do.
24       Q. If somebody got in touch with you and

Page 11

1    said we've got a breach of warranty claim by a
2    particular bank, could you find the contract and
3    see what warranties were included in the
4    contract?
5        A. If we still have the contract, yes.
6        Q. Why might you not have the contract?
7        A. I have a database of, I mentioned,
8    mortgage loan purchasing agreements, which do not
9    contain all of the investors that we did business
10   with.
11       Q. Do you have any idea what happened to the
12   missing ones?
13       A. They are filed. You know, we had to
14   clean out, clean out the offices and we boxed the
15   contracts, so I would imagine they are being
16   stored somewhere.
17       Q. Who is in charge of keeping track at AHM
18   of early payment default or EPD claims?
19       A. It was a repurchase group.
20       Q. Was the concept of an EPD claim familiar
21   to you --
22       A. Yes.
23       Q. -- before American Home Mortgage went
24   into bankruptcy?

Page 12

1        A. Yes.
2        Q. When's the first time you heard about an
3    EPD claim?
4        A. Can you explain your question?
5        Q. When's the first time you heard about an
6    investor making an EPD claim against American
7    Home?
8        A. I would say probably some time in 2007.
9        Q. Was that before or after American Home
10   went into bankruptcy?
11       A. Before.
12       Q. Roughly how many EPD claims had you heard
13   about before AHM went into bankruptcy?
14       A. I heard the number being in hundreds of
15   millions.
16       Q. Of dollars?
17       A. Dollars.
18       Q. How did you hear that?
19       A. Just through conversations with
20   co-workers. Not an official document. So you
21   could say a rumor, whatever, whatever you want to
22   call it.
23       Q. Did there seem to you to be more in 2007
24   than there had been previously?

Page 13

1        A. I have not heard previously, so the first
2    time I heard was 2007, so I can't really answer
3    that question if it's more.
4        Q. Did you hear that EPD claims were
5    resulting from any particular types of loans?
6        A. Yes.
7        Q. What type of loans?
8        A. We called them Choice A types of loans.
9    The industry calls them Alt-A, A-L-T - A.
10       Q. Are Choice A loans payment option ARMs?
11       A. No.
12       Q. What is a Choice A loan?
13       A. Choice A loan is a loan given to a
14   borrower that has credit, their credit is a
15   little bit better than a subprime borrower. So
16   it fits right between subprime and a prime
17   borrower.
18       Q. Do you know what a payment option ARM is?
19       A. I do.
20       Q. When is the first time you heard about
21   AHM selling payment option ARMs?
22       A. 2006.
23       Q. When is the first time you heard about,
24   if ever, AHM receiving an early payment default

4 (Pages 10 to 13)

Electronically signed by Terry Burke (301-319-005-7649)                          82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 14

1  claim as a result of an investor's purchasing a
2  pool of payment option ARMs?
3      A. Never.
4      Q. You never have?
5      A. Never.
6      Q. Do you know whether there are any?
7          MR. DORSEY: Are any what?
8  BY MR. WEISBROD:
9      Q. Do you know whether there are now any EPD
10  claims based on payment option ARMs?
11     A. There are a few based on the
12  questionnaire.
13     Q. When is the first time you heard about a
14  breach of warranty claim brought by an investor
15  against AHM?
16     A. That would be post-bankruptcy.
17     Q. Do you know now whether prior to the
18  bankruptcy filing anyone ever filed a breach of
19  warranty claim or wrote to AHM asserting a breach
20  of warranty claim?
21     A. I don't know.
22     Q. Who keeps track of borrower claims
23  against AHM?
24     A. I don't know.

Page 15

1      Q. Had you ever heard about a borrower claim
2  against AHM, let's start with before this
3  deposition?
4          MR. DORSEY: Do you want to define
5  borrower claim?
6          MR. WEISBROD: Sure.
7  BY MR. WEISBROD:
8      Q. When I say borrower claim, I mean a claim
9  by a homeowner who had a mortgage that was
10  originated or serviced by AHM.
11     A. I heard the name borrower claim, but not
12  any specifics behind it. It would be just in
13  terms of we have borrower claims against the
14  company. That would be the subject.
15     Q. When's the first time you heard about
16  those types of claims, borrower claims against
17  the company?
18     A. Post-bankruptcy.
19         MR. DORSEY: Wait until he finishes
20  his question.
21  BY MR. WEISBROD:
22     Q. I appreciate your help on this, but if
23  you could just wait until I finish because the
24  court reporter has trouble --

Page 16

1      A. I thought you were finished. I'm sorry.
2      Q. What was the context in which you first
3  heard about borrower claims?
4      A. I don't remember.
5      Q. Do you know what year it was?
6      A. 2008.
7      Q. Did you play any role in American Home
8  Mortgage's issuing a notice of a bar date in this
9  case?
10     A. I did not.
11     Q. Do you read the New York Times?
12     A. Occasionally.
13     Q. Do you recall ever seeing an ad about
14  American Home imposing a claim bar date in the
15  New York Times?
16     A. No.
17     Q. First, I apologize for jumping around,
18  but second, I apologize if I asked this: Do you
19  know now whether there were, in fact, breach of
20  warranty claims asserted against American Home
21  prior to the bankruptcy filing?
22     A. No, I don't know.
23     Q. You just don't know one way or the other;
24  correct?

Page 17

1      A. Correct.
2      Q. Have you ever actually read one of the
3  questionnaires asserting a breach of warranty
4  claim?
5      A. Can you ask me the question again?
6      Q. You now know that investors fill out
7  questionnaires stating whether they have breach
8  of warranty or EPD claims; right?
9      A. Correct.
10     Q. Have you ever read one of those
11  questionnaires?
12     A. Yes.
13     Q. How did you come to read the
14  questionnaire?
15     A. The questionnaire was sent to me
16  electronically.
17     Q. By whom?
18     A. By our counsel.
19     Q. I'm not going to ask you for any
20  communications between yourself and your counsel,
21  so if you're not sure how to answer, you can ask
22  Mr. Dorsey. I'm not asking you to disclose
23  privileged information.
24         Was it the practice of AHM to send

5 (Pages 14 to 17)

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 18

1 all of the questionnaires to you listing EPD or
2 breach of warranty claims?
3    A. Yes.
4    Q. How did you get that job?
5    A. I was involved in building the plan
6 protocol that involved EPD and breach claims.
7    Q. Can you describe your involvement in that
8 process of building the protocol?
9    A. Working with the group, we had a few
10 other AHM employees involved in building this
11 protocol.
12       We used New Century's model as a
13 building block to this protocol and implemented
14 our own data into the plan.
15    Q. What is New Century?
16    A. I believe it was a subprime loan
17 originator.
18    Q. Have you had any involvement in creating
19 New Century's protocol for handling EPD or breach
20 of warranty claims?
21    A. No.
22    Q. Do you know who did?
23    A. No.
24    Q. So can you describe the process?  You've

Page 19

1 got an example from New Century.  Then what do
2 you do?
3    A. First we needed to calculate the severity
4 numbers that would be used in the plan.
5    Q. As we go through this, it might be easier
6 for us to do EPD first and then breach of
7 warranty.
8    A. Okay.
9    Q. So I'm going to assume for now that all
10 of our discussion about what you did relates to
11 EPD.
12    A. Uh-huh.
13    Q. And then we will go to breach of
14 warranty.
15    A. Okay.
16    Q. So you had to calculate severity numbers
17 for EPD; is that correct?
18    A. That's correct.
19    Q. How do you do that?
20    A. We looked at our historical liquidations
21 that were done by our servicing company.  Based
22 on those losses during liquidations, we will
23 calculate severity number.  We used the weighted
24 average severity number.

Page 20

1    Q. So when you talk about liquidations
2 there, you're talking about selling homes; is
3 that right?
4    A. That's correct.
5    Q. The financial results that AHM got were
6 when AHM itself was selling homes on AHM
7 mortgages; is that right?
8    A. Can you repeat your statement?
9    Q. It probably wasn't very well phrased.
10 I'll start again.
11       When you talk about AHM's experience,
12 you're talking about the proceeds that AHM got
13 when AHM sold foreclosed houses following
14 defaults on AHM mortgages?
15    A. Correct.
16    Q. What number does that analysis elicit?
17    A. Can you rephrase the question?
18    Q. How does the information that we just
19 talked about play into your creation of the
20 protocol?
21    A. The severity numbers that we calculated
22 using historical data on losses are being used in
23 the plan protocol to estimate EPD claims.
24    Q. Did you use any other severity numbers or

Page 21

1 just AHM historical numbers?
2    A. Just AHM historical numbers.
3    Q. So you didn't, for the purpose of
4 determining severity, look at any other indices
5 prepared by Bloomberg or anybody else?
6    A. I know what you mean.  No, we adjusted
7 the severity numbers using the Case-Shiller index
8 of 20 metropolitan areas.
9    Q. What is that?
10    A. It's an index that shows appreciation and
11 depreciation in home values in those regions.
12    Q. Did you actually, did you Damian
13 Pasternak do the adjustments?
14    A. With another team member.
15    Q. Who else?
16    A. Mike Labuskas.
17    Q. Had you ever done this kind of work
18 before?
19    A. I have not.
20    Q. Can you describe the process of making an
21 adjustment?
22    A. I can maybe give you an example.
23       Let's say if we liquidated a
24 particular loan in January 2008 and we were

6 (Pages 18 to 21)

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 22

1    looking at, in putting this plan together, I
2    believe it was around July 2008, we wanted to
3    reflect the current market conditions in our
4    severity numbers.  So using the Case-Shiller
5    index, we added the additional loss, because at
6    that time the market was declining.  So, for
7    example, from January 2008 to May 2008, there's
8    an additional decline in the home values that we
9    reflected in our severity numbers.
10           So if one was to liquidate a loan
11   July 31st, 2008, he would experience the
12   severities we presented in our plan.
13       Q.  So when you say adjust, do you mean
14   change pursuant to an algebraic formula or do you
15   mean substitute a new number?
16       A.  Can you repeat your question?
17       Q.  Sure.  How does the adjusting work?  I
18   understand that you've got historic data that was
19   old.
20       A.  Right.
21       Q.  Okay, you've got AHM data which you think
22   is old; correct?  I'm talking about in July 2008,
23   you've already got AHM data; right?
24       A.  Yes.

Page 23

1    Q.  And you are concerned in July 2008 that
2    the AHM data you have may be stale or old, not
3    reflecting current markets conditions; right?
4        A.  Correct.
5        Q.  And then you've got Case-Shiller data
6    that you can consult in July 2008; right?
7        A.  Correct.
8        Q.  What do you literally do with the
9    numbers?  You've got AHM data in one pile and
10   Case-Shiller data in another pile and you see the
11   Case-Shiller data showing the losses might be
12   even bigger in Orange County, California, or
13   Las Vegas or Broward County, Florida, or
14   something.  So what do you do?
15           MR. DORSEY:  Objection to form.  You
16   can answer.
17   BY MR. WEISBROD:
18       Q.  I'm not going to make you answer that
19   question because there was an objection to form.
20   I'll just say what do you do when you've got the
21   Case-Shiller data on the one hand and the AHM
22   data on the other hand?
23       A.  I guess I didn't explain before.  The
24   additional decline in value shown by the

Page 24

1    Case-Shiller index -- I'm just going to make an
2    example because I think it's easier to explain --
3    for that period could be five percent.  We took
4    the five percent decline, multiplied it times the
5    loan amount.
6            For example, if the loan was
7    $100,000, we had five percent, so we added a
8    $5,000 loan on top of that to that historical
9    loss for that loan.
10       Q.  Do you know whether anybody did that in
11   New Century?
12       A.  I do not.
13       Q.  Who was it who told you about the
14   Case-Shiller data?
15       A.  I don't understand your question.
16       Q.  How did you find out that the
17   Case-Shiller data existed?
18       A.  Oh, just through ordinary business.
19       Q.  Is that data that you had used before?
20       A.  I used it for my own knowledge what is
21   happening in the markets.
22       Q.  When did you start using Case-Shiller
23   data?
24       A.  Since 2006.

Page 25

1    Q.  Whose idea was it to adjust the AHM
2    historical data to reflect Case-Shiller data?
3        A.  Your question -- can you rephrase your
4    question?
5        Q.  Was it your idea to make the adjustment
6    you just described?
7        A.  I believe it was a group effort.
8        Q.  Who was in the group?
9        A.  Myself, Michael Labuskas.
10       Q.  That's it?
11       A.  There were other people working the
12   protocol, but for the purpose of coming up with
13   severity numbers, it was only the two of us.
14       Q.  So one component of the formula is loss
15   severity.  Is another component loss frequency?
16       A.  Yes.
17       Q.  Can you describe how you came up with
18   loss frequency numbers?
19       A.  We looked at the Bloomberg model, which
20   has those numbers projected, and we applied those
21   numbers with some modifications for the plan.
22       Q.  What does Bloomberg project?  Can you
23   describe the Bloomberg numbers that you were
24   talking about?

7 (Pages 22 to 25)

Electronically signed by Terry Burke (301-319-005-7649)                                                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

Case 07-11047-CSS   Doc 6966-6   Filed 02/09/09   Page 10 of 39

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 26

1    A. Bloomberg has many, it's a national
2  software, data, news, all the various models,
3  valuations, valuation tools. One of these tools
4  is to project the price of a bond with
5  assumptions that loans in certain servicing
6  buckets will go, will go further into default and
7  therefore foreclose or experience a loss.
8    Q. When you talk about a bond, are you
9  talking about a mortgage-backed bond?
10   A. Yes.
11   Q. When you look at the Bloomberg numbers,
12  are those based specifically on AHM pools or
13  something else?
14   A. It's consistent across all
15  mortgage-backed securities. They are
16  assumptions.
17   Q. So you're looking at the type of loan
18  and the age of the loan in the pools without
19  regard to whether it's Country Wide or IndyMac or
20  AHM or New Century or somebody else who
21  originated; is that right?
22   A. I don't know what they're looking at, to
23  be honest.
24   Q. So you do know that the Bloomberg numbers

Page 27

1  are not AHM specific; right?
2    A. Correct.
3    Q. Do you know anything at all other than
4  that about how Bloomberg derives its numbers?
5    A. No.
6    Q. Now, as I understand it, for EPD claims,
7  the matrix assumed different loss frequencies
8  depending on the length of time that the mortgage
9  was delinquent; is that right?
10   A. That's correct.
11   Q. How did you go about doing that?
12   A. Can you repeat your question?
13   Q. Can you explain the process that you and
14  your colleagues used to come up with loss
15  frequency estimates?
16   A. We looked at the Bloomberg model and made
17  modifications that we thought are reasonable and
18  applied it towards our plan.
19   Q. Can you elaborate on what you had when
20  you started with the Bloomberg model and what you
21  modified it to?
22   A. Yes. For example, we had a, prior to our
23  adjustments, we had a loan that breached the EPD
24  violation, meaning it was in default during the

Page 28

1  first 90 days after the sale, but since then, it
2  turned current. And using the Bloomberg model,
3  the loss on that loan would be zero.
4    However, industry standards say there
5  is a loss on this loan, because historically it
6  had spotty payments, missed a payment. Therefore
7  we make the adjustments to the Bloomberg model
8  that if someone had that type of loan that is
9  current, but did breach the EPD violation, is
10  allowed to appropriate number claims.
11   Q. Let's stick with your example. You got
12  somebody who owns a mortgage where the borrower
13  missed one payment but then caught up. That was
14  your example; right?
15   A. It could have been two payments. It
16  could be he missed the first three payments.
17  When they provided us the data, is current,
18  caught up, eventually caught up.
19   Q. What is the loss there?
20   A. To my understanding, the loss is if the
21  third-party wants to sell that particular loan,
22  will not receive full value for it because of the
23  missed payment.
24   Q. You referred to an industry standard in

Page 29

1  your answer. What industry standard are you
2  referring to?
3    A. Even when I was selling loans to third
4  parties, if the example I just mentioned to you
5  happened, a lot of the buyers would not purchase
6  that loan because they had missed a payment.
7    Q. Is the standard you're referring to
8  written down anywhere?
9    A. No.
10   Q. Can you state what the standard is that
11  you're referring to in the sentence?
12   A. Okay, if a loan missed a payment or
13  missed a couple payments and presently is
14  current, to my understanding, one would not
15  receive the full value when selling that loan,
16  because it's shown in the past as, just proved to
17  be risky.
18   Q. Now, you have had a chance to look at the
19  loss frequency estimates that are included in the
20  EPD protocol, haven't you?
21   A. Yes.
22      MR. WEISBROD: I'm going to mark
23  these as Pasternak-1 and 2.
24      (Pasternak-1 and 2 were marked for

8 (Pages 26 to 29)

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

1   identification.)
2          MR. WEISBROD:  1 will be the claim
3   and 2 will be the blackline.
4   BY MR. WEISBROD:
5      Q.  I'd like you to look at Exhibit 1,
6   Page 46.
7          This is the actual protocol that
8   we're talking about; right?
9      A.  Correct.
10     Q.  Under Article 7 A, EPD claims?
11     A.  Yes.
12     Q.  The two numbers that we've talked about
13  so far, loss frequency and loss severity, those
14  are multiplied by each other to come up with the
15  numbers in these boxes; is that right?
16     A.  That is correct.
17         MR. WEISBROD:  This is a courtesy
18  copy.  This is a collection of the Fernandes
19  exhibits.  I am just going to be pulling them
20  out.
21         MR. DORSEY:  You are going to be
22  referring to them?
23         MR. WEISBROD:  Yes.
24         Exhibit 3 is the Disclosure Statement

1   Pursuant to Section 1125 of the Bankruptcy Code
2   with Respect to the Amended Chapter 11 Plan of
3   Liquidation of the Debtors dated as of
4   November 25th, 2008.  It was previously marked as
5   Fernandes-12.
6          (Pasternak-3 was marked for
7   identification.)
8   BY MR. WEISBROD:
9      Q.  I'd also like you to look at Exhibit 2,
10  and this is the blackline version, and I'd like
11  you to look at Pages 49 and 50.
12         You can see those are Article 7 A on
13  those pages, and I just want you to confirm for
14  me that there's no blacklining on those pages?
15     A.  No.
16     Q.  So the changes to the plan since
17  November 25th have not included any changes to
18  Article 7 A; right?
19         MR. DORSEY:  Objection to form.
20  BY MR. WEISBROD:
21     Q.  As far as you can see, isn't that true?
22     A.  As far as I can see, that's true.
23     Q.  Fernandes-12, which is also Pasternak-3,
24  let's find the section that discusses EPD breach.

1   It starts on 92.
2      A.  The disclosure statement, that's what
3   we're looking at?
4      Q.  Yes.
5          Now, I'd like you to focus on
6   Page 94, the Section (a), Loss Frequency, and I'm
7   actually focused on the last sentence of that
8   section.  I just want to make sure we agree on
9   the numbers you used for loss frequency.
10     A.  Starting with "accordingly for purpose of
11  the protocol"?
12     Q.  Yes.
13     A.  Yes.
14     Q.  This says that you assumed a loss
15  frequency that was the same for all product
16  types; right?
17     A.  Correct.
18     Q.  In your experience, are the loss
19  frequencies actually the same for all product
20  types?
21     A.  I haven't seen any data to prove it
22  otherwise.
23     Q.  So you don't have any reason to believe
24  that loss frequencies are greater for payment

1   option ARMs than for other types of mortgages; is
2   that correct?
3      A.  That's correct.
4      Q.  You assumed, in creating the protocol,
5   that the loss frequency for each type of loan was
6   12.5 percent for the zero to 30-day delinquency
7   bucket; correct?
8      A.  Correct.
9      Q.  50 percent for the 31-day to 60-day
10  delinquency bucket; correct?
11     A.  Correct.
12     Q.  75 percent for the 61 to 90-day
13  delinquency bucket; correct?
14     A.  Yes.
15     Q.  And 100 percent for the 90 or greater day
16  delinquency bucket; correct?
17     A.  Yes.
18         MR. WEISBROD:  I'd like to mark this
19  as Exhibit 4.
20         (Pasternak-4 was marked for
21  identification.)
22  BY MR. WEISBROD:
23     Q.  Exhibit 4 is an article from the Wall
24  Street Journal dated January 30th, 2009.  It's

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 34

1  written by Ruth Simon with a headline "Option
2  ARMs See Rising defaults."
3      Take a minute to look at it.
4      A. Do you want me to read it?
5      Q. Let me ask, have you ever read it before?
6      A. No.
7      Q. Did you see this headline before?
8      A. No.
9      Q. Yes, why don't you take a minute to read
10  it. Take as much time as you need.
11      A. Okay.
12      (Pause.)
13      Okay.
14      Q. So referring again to the Wall Street
15  Journal article, the second to the last paragraph
16  says that nearly 61 percent of option ARMs
17  originated in 2007 will eventually default.
18      Do you see that?
19      A. Yes.
20      Q. Is that consistent with your experience
21  at AHM?
22      A. No, I have not done research like this.
23      Q. Have you ever thought about the question
24  of whether payment option ARMs were more likely

Page 35

1  to default than other types of mortgages?
2      A. Yes, and I don't think they have a higher
3  chance of defaulting than the other mortgages.
4      Q. You do not think that they do?
5      A. I do not.
6      Q. What is that based on?
7      A. Based on that it's not the product. It's
8  the borrower who makes the loan go into default.
9      Q. Why do you think that's the case?
10      A. Because I have not seen any other
11  research otherwise.
12      Q. Have you seen any research on the subject
13  of the likelihood of defaults by various loan
14  categories?
15      MR. DORSEY: Objection to form.
16  BY MR. WEISBROD:
17      Q. Do you understand my question?
18      A. Can you rephrase it?
19      Q. Have you yourself seen any research on
20  the subject of whether some types of loans are
21  more likely to result in default than other types
22  of loans?
23      A. I have not seen it.
24      Let me go back. Yes, but I mean in

Page 36

1  terms of categories like subprime or prime. To
2  my understanding, subprime will have a greater
3  chance of defaulting than prime loans.
4      Q. Are there prime payment option ARM loans?
5      A. I don't think they can be described in
6  that sense. I think AHM was known to be an Alt-A
7  originator.
8      Q. So you're not aware of anybody selling
9  prime payment option ARMs; correct?
10      A. I don't know. I don't know.
11      Q. By the way, do you know what percentage
12  of loans approximately that AHM sold in the last
13  two years of its life as an ongoing company were
14  payment option ARMs?
15      A. I do not know off the top of my head.
16      Q. More than half?
17      A. I would be speculating if I answered the
18  question.
19      Q. I am going to read a sentence to you from
20  the Debtors' Memorandum of Law in Support of
21  Confirmation of the Amended Chapter 11 Plan of
22  Liquidation of the Debtors dated as of
23  February 5th, 2009.
24      I don't have a copy of it, but I

Page 37

1  don't think this is very confusing anyway. Let
2  me know if you need me to read it twice. This is
3  in the section on EPD claims.
4      It says, "Because loans have a
5  potential life span of 30 years or more, while
6  the plan contemplates a plan trust lasting
7  approximately five years, the debtor has
8  determined that the plan must incorporate a
9  mechanism for estimating and allowing contingent
10  and/or unliquidated breach of warranty claims."
11      Did you understand the sentence as I
12  read it?
13      A. Yes.
14      Q. Can you explain how breach of warranty
15  claims could arise in the future?
16      A. Yes. If, for example, current loan in
17  ten years goes into a default and the purchaser
18  of that loan finds that during origination there
19  was an issue, that they have the right to
20  possibly put it back to the originator.
21      Q. So if they find out that there was a
22  misstatement of some sort, they could ask the
23  originator, in this case AHM, to buy the loan
24  back, is that what you're saying?

10 (Pages 34 to 37)

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 38

1    A. Yes.
2    Q. As far as you know, is there any
3  particular time limit within which that must
4  happen?
5    A. I don't know of any time limits.
6    Q. Do you recall anybody discussing the
7  possibility of time limits during the creation of
8  the breach of warranty protocol?
9    A. No.
10    Q. By the way, before I said going forward
11  we would talk about the EPD. I have now switched
12  to breach of warranty. So unless I say
13  specifically that I'm talking about something
14  else, I'll be talking about breach of warranty.
15        MR. DORSEY: Is this a good point to
16  take a break?
17        MR. WEISBROD: Yes.
18        (Lunch recess, 11:55 a.m.)
19        (Resumed, 12:35 p.m.)
20  BY MR. WEISBROD:
21    Q. Mr. Pasternak, we were discussing the
22  methods that you used to devise the breach of
23  warranty protocol.
24        Do you recall that?

Page 39

1    A. Yes.
2    Q. For the next several questions, unless I
3  say otherwise, we are talking about breach of
4  warranty as opposed to EPD; okay?
5    A. Uh-huh.
6    Q. Yes?
7    A. Yes.
8    Q. Why don't you describe how you went about
9  creating breach of warranty protocol?
10    A. We looked at proof of claims from
11  investors that we received claiming us for
12  breaches in reps and warrants, and then we looked
13  at the population of loans that we sold to those
14  specific counterparties. To come up with an
15  incidence percentage, we calculated those breach
16  numbers from their claims by numbers of loans we
17  sold to them.
18    Q. What kind of warranties are we talking
19  about?
20    A. We are talking about anything that is not
21  an EPD violation, which I think we mentioned that
22  before. It could be a missing document, a loan
23  that was underwritten outside of the guidelines.
24  Many more examples, which I can go on.

Page 40

1    Q. Are the warranties about the pool or
2  about the individual loans in the pool, or both?
3    A. To my knowledge, I believe it's
4  individual loan.
5    Q. Could you look at Exhibit 3, please.
6  That's the disclosure statement.
7    A. What page?
8    Q. Page 98. There's a reference on the top
9  of Page 98 to the New Century Protocol.
10        How did you use the New Century
11  protocol in connection with the breach of
12  warranty protocol for AHM?
13    A. Basically we adopted the same format that
14  you see here in this exhibit, and another item we
15  adopted from them is the decrease, the rate of
16  decrease in the percentage of incidence, as you
17  can see varying from different vantages.
18    Q. So you're referring to the table that's
19  on Page 99 of the disclosure statement?
20    A. Yes.
21    Q. So that table talks about percentage
22  incidence, with the top year being 2007 and the
23  bottom year being 2003 second quarter and
24  earlier; right?

Page 41

1    A. Yes.
2    Q. Apart from the design of the table, what
3  did you get from New Century?
4    A. I already said, the rate of decrease that
5  changes, changes the percent of incidence as we
6  changed the years and quarters.
7    Q. Why did you assume that the New Century
8  rate of incidence changes would be comparable to
9  AHM's?
10    A. We didn't really have any other ways of
11  calculating this rate of change, and we decided
12  to go with the New Century model.
13    Q. Let me make sure I understand what you
14  mean by the rate of change.
15        2007 was the most recent year, and
16  that was 0.22 percent, and then it changes
17  downward, from the second quarter of 2007 it goes
18  from 0.22, to the first quarter of 2007 it goes
19  to 0.18, and then you get all the way down to
20  2005 where it becomes 0.01 percent, right, and
21  everything older than 2005 is 0.01 percent;
22  right?
23    A. Correct.
24    Q. So when you talk about the rate of

11 (Pages 38 to 41)

Electronically signed by Terry Burke (301-319-005-7649)                                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 42

1  change, you're talking about how quickly you get
2  from 0.22 to 0.01?
3      A. Correct.
4      Q. Did New Century sell the same kind of
5  products?
6      A. They did not sell the same kind of
7  product.
8      Q. Did New Century market to the same kind
9  of borrowers?
10     A. No.
11     Q. How did the products differ?
12     A. Based on my understanding, New Century
13  originated subprime mortgages.
14     Q. And it's your understanding that defaults
15  are more common for subprime than for Alt-A; is
16  that correct?
17     A. That's my understanding.
18     Q. The incidence of breach of warranty,
19  according to you, is influenced by how many times
20  there's a default; right?
21         MR. DORSEY: Objection to form.
22  Misstates his testimony.
23  BY MR. WEISBROD:
24     Q. Do you agree that the incidence of a

Page 43

1  breach of warranty claim reflects the -- let me
2  start over.
3         Do you agree that there is a strong
4  correlation between the occurrence of a default
5  on the one hand and the assertion by the investor
6  of a breach of warranty claim on the other hand?
7      A. Yes.
8      Q. So the more defaults there are, the more
9  breach of warranty incidences there should be;
10  right?
11     A. I can't answer that question. There's
12  too many variables that go into that assumption.
13     Q. What variables do you see?
14     A. I see that loan could default without
15  breaching any reps and warrants violations, just
16  default because it's defaulting. Not necessarily
17  increasing the rate of incidence.
18     Q. Could you tell me all the sources of data
19  that you considered in estimating the incidence
20  frequency for breach of warranty claims?
21     A. Sources was, we used the investors'
22  claims, proof of claims. We used our own
23  internal database that showed us how many loans
24  we sold to each counterparty.

Page 44

1         For that .22 percent, that's all we
2  did.
3      Q. You assumed a loss frequency of 100
4  percent; correct?
5      A. Yes.
6      Q. You assumed a loss frequency for early
7  statement default claims of 100 percent only if
8  there was a default longer than 90 days; right?
9      A. Correct.
10     Q. So for early payment defaults for where
11  the default lasted zero to 30 days, you assumed a
12  loss frequency of, for example, only 12 and a
13  half percent; right?
14     A. Correct.
15     Q. How do you justify assuming that 100
16  percent loss frequency for breach of warranty
17  claims?
18     A. We assume that investors only claimed
19  reps and warrant violations if a loan suffered
20  the loss, otherwise they would have not bothered
21  claiming us if the loan kept performing was
22  current.
23         For that reason, we assumed that
24  whatever loans are being claimed based on the

Page 45

1  reps and warrants violations experienced a loss.
2      Q. You're not aware of any actual breach of
3  warranty claims occurring before the bankruptcy
4  filing; correct?
5      A. Let me see if I understand your question.
6         Are you asking me when I was working
7  or post-bankruptcy?
8      Q. I see what you mean. Today, are you
9  aware of any pre-bankruptcy breach of warranty
10  claims?
11     A. Yes.
12     Q. Were they paid?
13     A. I do not know that.
14     Q. How did you become aware of
15  pre-bankruptcy breach of warranty claims?
16     A. Through claims asserted by the investors.
17     Q. Claim forms submitted in the bankruptcy
18  case?
19     A. Correct, proof of claims.
20     Q. Did you ever check to see whether anybody
21  paid on those claims pre-bankruptcy?
22     A. No.
23     Q. Before the bankruptcy actually occurred,
24  you were not aware of breach of warranty claims

12 (Pages 42 to 45)

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 46

1  against the company; correct?  So I'm asking for
2  your state of mind before the bankruptcy.
3      A.  Correct.
4      Q.  Why do you make a different assumption
5  about somebody bothering to submit a claim when
6  it's an EPD claim as opposed to a breach of
7  warranty claim?
8      A.  What do you mean, assumption in terms
9  of --
10      Q.  Well, let me start again.
11          You say we assume if somebody is
12  making a breach of warranty claim that they
13  actually have suffered a loss; right?
14      A.  I was out of it.  Did you say breach of
15  warrants -- can you just repeat your question?
16      Q.  Sure.
17          As I understand it, AHM is assuming
18  that anyone who would bother to make a breach of
19  warranty claim would do so only if there was an
20  actual loss; is that right?
21      A.  That's correct.
22      Q.  Why do you make that assumption as to
23  breach of warranty claims but make a different
24  assumption as to EPD?

Page 47

1      A.  Because to my understanding, that's why
2  we haven't seen any claims of breaching reps and
3  warrants violations prior to bankruptcy because
4  the loans were performing and nobody really
5  checked, checked for that.  So as the loan goes
6  into default, the buyer does their due diligence
7  to find out if there's any way they can put that
8  loan back to the originator.
9          So when we see those claims, we look
10  at it that the loan experienced some kind of
11  default or a loss, therefore, the claimant is
12  putting that loan back to us.
13      Q.  Do you know, by the way, what caused AHM
14  to need to file for bankruptcy?
15      A.  As to my understanding is that our credit
16  was shut down.
17      Q.  Why did that happen?
18      A.  Because of the market conditions, loans
19  experienced substantial loss in the valuations;
20  therefore, the credit facilities they were on
21  required additional funds to cover the margin
22  calls.
23      Q.  Why did the loans suffer reduced
24  valuations?

Page 48

1      A.  That would be just my -- I would
2  speculate if I had to answer that.
3      Q.  Were defaults increasing among the loans
4  in your loan pools at that time?
5      A.  I do not -- I don't know the answer to
6  that.
7      Q.  Could you please look at Exhibit 1 again.
8  I ask you to turn to Page 46.
9      A.  Yes.
10      Q.  Article 7 A states that the allowed
11  amount of an EPD claim is the applicable
12  percentage of the UPB of the loan as of the EPD
13  determination date.
14          Do you see that?
15      A.  Yes, I do.
16      Q.  And we discussed this before, the
17  percentages that are applicable are found in the
18  table right below that sentence; right?  Correct?
19      A.  Above, yes.
20      Q.  Okay, I was reading --
21      A.  I see, okay.
22      Q.  -- the paragraph above.
23          Let's be clear, the paragraph above
24  the table is the general rule, and the paragraph

Page 49

1  below is the rule when the EPD claim is based on
2  real estate that has been sold; right?
3      A.  Can you repeat that again?
4      Q.  I guess I said it wrong.  The paragraph
5  above is the general rule for all EPD claims and
6  the paragraph below is the rule for loans that
7  have been sold in a commercially reasonable
8  manner before the EPD determination date; right?
9      A.  Yes.
10      Q.  UPB is the difference between the amount
11  owed on the loan and the amount recovered in the
12  sale; right?
13      A.  No.  UPB is the unpaid principal balance.
14      Q.  What is that?
15      A.  It is the current loan balance.  It is
16  the current loan balance of a mortgage at a
17  specific date.
18      Q.  I see.
19          Let's look at the paragraph below the
20  table.  This is the one that relates to real
21  estate that's been sold.
22      A.  Yep.
23      Q.  It says, "The claim will be allowed in an
24  amount equal to the UPB at the time of the sale,

13 (Pages 46 to 49)

Electronically signed by Terry Burke (301-319-005-7649)                          82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 50

1   less net proceeds realized from such sale."
2           Do you see that?
3       A.  Yes, I do.
4       Q.  Does that sentence take into account the
5   availability of private mortgage insurance?
6       A.  Yes.
7       Q.  How?
8       A.  To my understanding, when a loan is being
9   liquidated, it is being done by the servicer,
10  which claims the mortgage insurance, submits a
11  claim, and after adding all the costs to
12  liquidate alone, subtracting the proceeds that
13  came in, they come to a net proceeds from the
14  liquidation, which they will pass to the
15  investors.
16      Q.  So net proceeds means including mortgage
17  insurance?
18      A.  We did not specify that in the plan, but
19  to my understanding, net proceeds will include
20  mortgage insurance recoveries.
21      Q.  When you submit a claim to a mortgage
22  insurer, isn't the amount you submit the UPB at
23  the time of the sale, less net proceeds realized
24  from such sale?

Page 51

1       A.  I'm not sure if that's how it works 100
2   percent.
3       Q.  EPD claims are calculated on a
4   loan-by-loan basis; right?
5       A.  Yes.
6       Q.  Breach of warranty claims are calculated
7   on a pool-by-pool basis; right?
8       A.  Correct.
9       Q.  Why the difference?
10      A.  EPD's can be -- are already quantified
11  because our window for them was 90 days after the
12  sale, so therefore there should not be any more
13  EPD's after 90 days after the last sale, which I
14  think the last sale was some time in July.
15          And they are -- we have a certain way
16  of verifying if an EPD is a valid EPD, which will
17  be allowed in a claim, by checking -- looking at
18  payment history of the loan.  We can, with 100
19  percent certainty, say that this loan is an EPD
20  violation or not, and that is something we cannot
21  do with a breach of reps and warrant violation.
22      Q.  And why is that that you can do it for
23  EPD but not for breach?
24      A.  In order to do that kind of work, it

Page 52

1   would just require a tremendous amount of time
2   and resources that we don't even have right now
3   and the volume of the loans.  There would be
4   hundreds and thousands of loans for us to review
5   and verify, verifying the claim.
6       Q.  What is it about the EPD claim that
7   allows you to verify it without looking at the
8   loan file, but doesn't allow you to do that for a
9   breach of warranty claim?
10      A.  On the EPD side, we are just looking at
11  payment histories, which it's a concrete yes or
12  no.  With breaches, it's not as clear as that,
13  because many items that could have breached would
14  need detailed research to verify that looking at
15  the underwriting guidelines and the applications
16  and so forth.
17      Q.  Does every single loan sale contract
18  provide for the originators purchase back of an
19  early payment default mortgage?
20      A.  I don't know that.
21      Q.  So some may and some may not; correct?
22      A.  I don't know.
23      Q.  Does every single mortgage sale agreement
24  include warranties with respect to the

Page 53

1   origination and underwriting guidelines followed?
2       A.  I don't know if it's every single one of
3   them.  But to my understanding, yes.
4       Q.  What's that understanding based on?
5       A.  Reviewing purchasing agreements.
6       Q.  When did you do that?
7       A.  When I was -- when we were still in
8   business.
9       Q.  How do you calculate the UPB of a loan
10  pool as opposed to the UPB of a loan?  So you
11  know what I'm talking about, that phrase comes up
12  in Article 7 B, which you can read in Exhibit 1.
13      A.  The UPB of a loan and UPB of a pool, you
14  are just adding all the UPB's of multiple loans
15  to come up with a UPB of a pool.
16      Q.  How do you get the information about the
17  UPB's of all the loans?
18      A.  From our database.
19      Q.  Do you keep that up to date?
20      A.  It's a historical database that it does
21  not reflect current balances.  There's a cutoff
22  when we stopped working with the servicing, it
23  cuts off at that point.
24      Q.  So this is the UPB as of the breach

14 (Pages 50 to 53)

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 54

1  determination date.  When is the breach
2  determination date?
3      A.  That would be time of sale, the trade
4  date, sale date, sold date.
5      Q.  So it varies from loan pool to loan pool?
6      A.  Yes.
7      Q.  You have available from your database the
8  UPB for each loan pool as of the breach
9  determination date for that loan pool?
10     A.  Correct.
11     Q.  Could you look at Page 48 of Exhibit 1.
12 This is Article 7 C, Interaction Between UPB
13 Claims and Breach of Warranty Claims.
14     A.  Yes.
15     Q.  Could you read the first sentence to
16 yourself.
17     A.  (Pause.)
18         Yes.
19     Q.  And then the second sentence.  I'm sorry.
20 It begins "thus."
21         I'll read it into the record.  "EPD
22 claims will take precedence over breach of
23 warranties claims.  Thus, to the extent that a
24 creditor established a valid EPD claim for a

Page 55

1  loan, that loan's UPB as of the breach
2  determination date will be subtracted from the
3  pool of loans for which breach of warranty claims
4  are computed."
5          Do you see that?
6      A.  Yes.
7      Q.  Is that sentence accurate about how this
8  will be done?
9      A.  Correct.
10     Q.  Why isn't the loan's UPB subtracted from
11 the UPB of the pool of loans?
12     A.  It is.
13     Q.  It is?  It doesn't say that.
14         MR. DORSEY:  Objection to the form.
15 The document speaks for itself.  You can read it
16 again, if you'd like.
17 BY MR. WEISBROD:
18     Q.  Okay.  Where does it say that?
19     A.  Can I read it?
20     Q.  Yes.
21     A.  "The loan's UPB as of the breach
22 determination date will be subtracted from the
23 pool of loans."
24     Q.  Should it be subtracted from the pool or

Page 56

1  from the UPB of the pool?
2      A.  It's one in the same.
3          MR. WEISBROD:  This was Fernandes
4  Exhibit 15.  Mark this Pasternak-5.
5          (Pasternak-5 was marked for
6  identification.)
7          MR. WEISBROD:  It's called Notice of
8  Filing Schedule of EPD/Breach Claim Voting
9  Amounts.
10 BY MR. WEISBROD:
11     Q.  Have you seen this document before?
12     A.  Yes, I have.
13     Q.  I'm focused on the last page, which is
14 Bates numbered OBC 1467.
15     A.  Okay.
16     Q.  The bottom numerical row says "total,"
17 and then under "breach estimate 104,118,672" and
18 "EPD estimate 168,615,382."
19         Do you see that?
20     A.  Correct, I see it.
21     Q.  What are those numbers?
22     A.  Starting with the EPD estimate, this
23 represents the number of -- it speaks for itself.
24 It is the EPD estimate based on the data that

Page 57

1  investor -- creditors provided in their
2  questionnaire.
3      Q.  So these numbers reflect the amounts at
4  which you expect the EPD and breach of warranty
5  claims to be liquidated before they're paid
6  pursuant to the protocol?
7          MR. DORSEY:  Objection to the form.
8          THE WITNESS:  No.
9  BY MR. WEISBROD:
10     Q.  What are they?
11     A.  The EPD estimate, this would be the worst
12 case scenario, as many of the creditors in their
13 questionnaire did not fully provide the required
14 information.  So for the purpose of this
15 estimate, we did a worst case scenario.
16     Q.  That's for EPD?
17     A.  Yes.
18         And on the breach estimate, the
19 breach estimate includes duplicative claims as
20 there were multiple parties, for example, Wells
21 Fargo, servicer, and Deutsche Bank, the trustee,
22 have claimed the same pools of loans.  For this
23 purpose, for the voting purpose, we allowed them,
24 we calculated the estimate for them knowing that

15 (Pages 54 to 57)

Electronically signed by Terry Burke (301-319-005-7649)                                82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 58

1  these are duplicates and, you know, when the plan
2  gets approved, when this would come to become an
3  actual claim, we would take out the duplicates.
4      Q. How would you decide which entity got
5  paid?
6      A. I believe it's in the plan that we
7  required them to prove who has the rights to the
8  claim.
9      Q. Do you have any way of figuring out which
10  of these breach of warranty claimants have
11  previously been paid?
12     A. I do not.
13     Q. I mean previously paid on breach of
14  warranty claims?
15     A. Yeah. I do not.
16     Q. Do you have any way of figuring out the
17  age of the pool that leads to the particular
18  breach estimate?
19     A. Yes.
20     Q. Is that available electronically?
21     A. That is available electrically.
22         MR. WEISBROD: I'd ask for that. It
23  is responsive to our prior request.
24         MR. DORSEY: We will take it under

Page 59

1  advisement and take a look at it.
2          MR. WEISBROD: Thanks.
3  BY MR. WEISBROD:
4      Q. Mr. Pasternak, if you look at Exhibit 5,
5  each row represents a different loan pool; right?
6      A. Yes.
7      Q. And you have in your database a field
8  that indicates what year each loan pool listed
9  here corresponds to; right?
10     A. Correct.
11     Q. So if we wanted to know which year from
12  the table on Page 47 of the plan applied to each
13  particular pool, you could generate a spreadsheet
14  that had that field in it; right?
15     A. Yes, I could. Some difficulties on the
16  securitizations as, like I said, the
17  counterparties have not provided some of the
18  required information. We had to make some
19  assumptions on the estimates.
20     Q. And your database reflects whatever
21  assumption you made --
22     A. Yes.
23     Q. -- for each particular securitization or
24  pool?

Page 60

1      A. Correct.
2          MR. WEISBROD: That is what I'm
3  asking for.
4          MR. WEISBROD: This is Pasternak-6.
5          (Pasternak-6 was marked for
6  identification.)
7          MR. DORSEY: You have more than one
8  thing here.
9          MR. WEISBROD: Three pages, Bates
10  number 1868, and the second two pages aren't
11  Bates numbered but they were attached.
12         This doesn't belong.
13         Thank you.
14  BY MR. WEISBROD:
15     Q. Mr. Pasternak, Exhibit 6 is an e-mail
16  from you to Puneet Agrawal dated November 10th,
17  2008, and it includes two pages of attachments.
18         Do you see that?
19     A. Yes, I do.
20     Q. Could you explain what this table is
21  that's attached?
22     A. It is pretty much the same table that we
23  talked about prior, except at a different time,
24  which we have had different information available

Page 61

1  to us.
2      Q. So this is an earlier version of what
3  ended up in Exhibit 5; is that correct?
4      A. It's a buildup to that, so yes.
5      Q. Why did the numbers end up changing?
6      A. Many reasons. I believe on EPD's we
7  probably got more information, more loan level
8  information that we could apply in the model.
9          And on the breach side, I believe
10  this does not include the securitization trusts.
11  That's why the other number is higher, which,
12  like I said, the other number is duplicative, so
13  in the end, there's only one pool of loans that
14  we originated that we will be calculating the
15  breach numbers, which is a whole. Other than
16  that, it would be pieces going to the trustee or
17  the other purchasers.
18     Q. So between November 10th, when you sent
19  this e-mail, and January 7th when the debtors
20  filed Exhibit 5, the estimated EPD went down from
21  almost 230 million to about 167 million; is that
22  correct?
23     A. That's correct.
24     Q. But during that same period, the debtors'

16 (Pages 58 to 61)

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

Case 07-11047-CSS    Doc 6966-6    Filed 02/09/09    Page 19 of 39

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 62

1 estimate of the breach of warranty claims rose
2 from about 56 million to a little over
3 104 million; right?
4    A.  Yeah, that's correct.
5           MR. DORSEY:  Objection to form.
6 BY MR. WEISBROD:
7    Q.  Is that right?
8    A.  Yes.  Do you want me to explain why?
9    Q.  Yes.
10    A.  Okay.  Because, like I said, the first
11 estimate does not include securitizations, which
12 the second does.  And I mentioned before, that on
13 the multiple securitizations, the servicer, the
14 master servicer, as well as the trustee, have
15 claimed us for, which we have given them
16 allowance for the voting purpose.  So that is
17 duplicating the breach estimate right there.  And
18 I think that's the reason behind it.
19           MR. WEISBROD:  This is Pasternak-7.
20           (Pasternak-7 was marked for
21 identification.)
22 BY MR. WEISBROD:
23    Q.  This is an e-mail from Vadim Rubinstein
24 to himself, Damian Voulo, you, and Lance Jurich.

Page 63

1           Do you see that?
2    A.  Yes, I do.
3    Q.  You and Lance Jurich were cc'd?
4    A.  Yes.
5    Q.  Why did you find yourself corresponding
6 with Vadim Rubinstein?
7    A.  It was not me, as you might have got
8 confused with the two Damians.  It was Damian
9 Voulo.
10    Q.  Why was AHM corresponding with him?
11    A.  To get the information for us to estimate
12 their claims.
13    Q.  And do you know what he is referring to
14 when he talks about the discrepancy with your
15 figures?
16    A.  I do not recall the details of that.
17    Q.  There's a reference in this exhibit to
18 the time period March 1 through August 31.
19           Do you know what that refers to?
20    A.  Yes.  This refers to the accrued interest
21 of the EPD.  Because in typical business days,
22 when we would repurchase a loan, we would have to
23 pay for accrued interest up to that specific date
24 which we were not doing in the plan.

Page 64

1           This communication is prior to the
2 establishing of the plan, so this was being done
3 just to, you know, resolve the claim.
4           MR. WEISBROD:  Pasternak-8.
5           (Pasternak-8 was marked for
6 identification.)
7 BY MR. WEISBROD:
8    Q.  Pasternak-8 is the first e-mail in that
9 chain.
10           I'd like you to look at the table
11 that Mr. Rubinstein sent.
12    A.  Uh-huh.
13    Q.  Do you know who Mr. Rubinstein
14 represented?
15    A.  I do not.  I can take a look at your
16 e-mail.  It says Merrill Lynch.
17    Q.  Does this table mean anything to you?
18    A.  Yes.  This is their proof of claim.
19    Q.  What do the fund date and invoice column
20 dates represent, if you know?
21    A.  Which column are you looking at?
22    Q.  These are Columns F and G.
23    A.  I would have to verify, I would have to
24 verify.  To me, fund date is the sold date, so it

Page 65

1 could be the sale date.
2    Q.  If you look at the next page, Columns M,
3 N, O and P are respectively Repurchase Amount
4 9-10-07, Funding Price Percent - Sale to S&D
5 9-10-07, Funding Price Dollars - Sale to S&D
6 9-10-07, and finally Loss Amount.
7           Do those columns mean anything to
8 you?
9    A.  Yes.
10    Q.  Could you explain that?
11    A.  To me Column M represents the repurchase
12 demand that we will be obligated to if we were in
13 business.
14           And Column P represents the loss
15 investor took on these four loans.
16    Q.  Do you know what N and O are?
17    A.  N and O look to me to be scratch and dent
18 prices in Column N, and O are the proceeds of
19 that.
20    Q.  What does scratch and dent mean?
21    A.  Scratch and dent means where bad loans
22 go.  It's a place for bad loans, such as
23 delinquent, non-performing, or loans with
24 violations of underwriting.

17 (Pages 62 to 65)

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

1  Q.  Does the funding price in the sale to
2  scratch and dent plus the loss amount equal the
3  repurchase price?
4  A.  I would have to do the math, but.
5  If I did the quick math here, yes,
6  that's what it's equal to.
7  Q.  So this basically indicates what they got
8  in a foreclosure sale; is that right?
9  A.  No.  It looks like they, instead of doing
10  a foreclosure, they sold their defaulted loans to
11  a third-party, which is the scratch and dent
12  purchaser and experienced a loss that way.
13  Q.  How does that kind of sale work, does the
14  holder of the mortgage put the loan up for
15  auction or --
16  A.  It's not really clear how they did it
17  here, so I will be speculating as to what they
18  did.
19  Q.  And what is sold in that context, the
20  loan or the house?
21  A.  It could be both.  It could be REO
22  property or still a non-performing loan which
23  very soon will be ours.
24  MR. WEISBROD:  This is 9.

1  (Pasternak-9 was marked for
2  identification.)
3  BY MR. WEISBROD:
4  Q.  Let me just cut this short, perhaps.
5  Does this e-mail exchange between
6  your office and Vadim Rubinstein have anything to
7  do with how the EPD and breach claims will now be
8  calculated?
9  A.  No, not -- I mean I have to look at the
10  entire document to answer that question.  We have
11  a protocol that the purpose of the protocol is so
12  we don't have to do this on a loan-by-loan level,
13  an investigation, which this is a perfect
14  example.
15  MR. WEISBROD:  This is 10.
16  (Pasternak-10 was marked for
17  identification.)
18  BY MR. WEISBROD:
19  Q.  Exhibit 10 is an e-mail chain, the top
20  e-mail is from Patrick Jackson to Damian
21  Pasternak and others, dated November 18th, 2008.
22  Can you explain what this e-mail is
23  about?
24  A.  It looks like this is a conversation

1  about the questionnaire.
2  Q.  Does the table on the last page mean
3  anything to you?
4  MR. DORSEY:  Can we go off the record
5  for a second.
6  MR. WEISBROD:  Sure.
7  (A discussion was held off the
8  record.)
9  MR. WEISBROD:  Let's take a break.
10  (Recess.)
11  BY MR. WEISBROD:
12  Q.  We will make this 10.  Contrary to what I
13  said before, 10 is an e-mail from Patrick Jackson
14  to Damian Pasternak and others, November 18th,
15  2008, 2:04 p.m.
16  A.  Uh-huh.
17  Q.  It appears that most of this document is
18  an e-mail exchange between Sarah Lightdale from
19  Latham & Watkins to Patrick.
20  My question is, what is this?
21  A.  This is a response to a questionnaire.
22  Q.  And can you explain how the table works?
23  A.  Yeah.  The table provides the loan
24  number, borrowers' last name, address, city,

1  state, zip.
2  There is a loan issue column that
3  defines if it's going to be EPD or breach.  It
4  has a UPB as of 7-31.
5  Q.  What column is that?
6  A.  "R".
7  That's pretty much it.
8  Then there's a column with net
9  proceeds from a liquidation.
10  Q.  What does the "by ID" column represent,
11  that's K?
12  A.  I don't know, but everybody has their own
13  internal, internal ways of naming trades.  This
14  could be one of their ways.
15  Q.  What does the investor column represent?
16  That's Column V.
17  A.  Column what?
18  Q.  V, as in Victor.
19  A.  This looks like to me that's where Lehman
20  sold those loans into.
21  Q.  How would that work, that sale?
22  A.  They would buy loans from us, and then
23  use the loans from our purchase we originated and
24  create their own securitizations with those

18 (Pages 66 to 69)

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 70

1  loans.
2          MR. WEISBROD:  11 is what I
3  understand to be the current version of the
4  questionnaire.  12 is a blackline of that.
5          (Pasternak-11 and 12 were marked for
6  identification.)
7  BY MR. WEISBROD:
8      Q.  Have you had a chance to look at these
9  documents?
10     A.  Yes, I have.
11     Q.  If you look at the redline, which is 12,
12  on the second page there are several circular
13  bullets.  The fourth circular bullet down
14  includes some crossed out language.
15         Do you see that?
16     A.  Yes.
17     Q.  Crossed out are the words, "Including,
18  for the avoidance of doubt, any recoveries on
19  private mortgage insurance with respect to such
20  loan."
21         Do you see that?
22     A.  Yes.
23     Q.  Why is that crossed out?
24     A.  It's privileged.  Can I use that?

Page 71

1  Because that's how I learned about the reason why
2  it's being crossed out.
3      Q.  Do you see anything on this
4  questionnaire -- take your time -- that requires
5  an EPD or breach of warranty claimant to provide
6  information about private mortgage insurance
7  proceeds?
8      A.  No, I do not.
9      Q.  Have any EPD or breach of warranty
10  claimants objected to any suggestion that they
11  are required to factor private mortgage insurance
12  into their loss calculation?
13     A.  I'm not aware of any.
14     Q.  Based on the documents you have seen, how
15  would a breach of warranty or EPD claimant know
16  that it was supposed to factor private mortgage
17  insurance proceeds into loss calculations?
18     A.  I think we're asking for net proceeds or
19  net loss, which typically when you mean net, you
20  mean anything that increases or decreases that
21  your number should be taken out or included.
22     Q.  EPD and breach claimants are not required
23  to list the contractual provisions that they say
24  were violated, are they?

Page 72

1      A.  No, I think they are, if you look at
2  Page 3 of this.  Would the third bullet cover
3  that?
4      Q.  That says you've got to attach the loan
5  purchase agreement.
6          Do you see anything that requires you
7  to state that a particular warranty was breached
8  for a breach of warranty claim?
9      A.  It looks like Page 2, we ask for a copy
10  of the master loan purchasing agreement.
11     Q.  But no claimant has to say I believe a
12  particular warranty has been violated; correct?
13         MR. DORSEY:  Objection to form.
14         THE WITNESS:  I can answer, right?
15         MR. DORSEY:  Yes.
16         THE WITNESS:  Yes, the purpose of
17  this question on the breach side is not to find
18  out which loans breached reps and warrants,
19  because our assumption in the .22 percent
20  incidence level does that.  So we're asking here
21  to provide what loans are purchased from us.
22  BY MR. WEISBROD:
23     Q.  So anybody who has a purchase agreement
24  from AHM can submit a breach of warranty claim,

Page 73

1  and if that person attaches the purchase
2  agreement, that person does not have to assert
3  that particular warranty was breached; correct?
4      A.  Can you repeat that?
5      Q.  I'll do it again.
6      A.  Yeah.
7      Q.  At AHM there were many investors who
8  purchased mortgages; correct?
9      A.  Correct.
10     Q.  It's your understanding that those
11  purchases were made pursuant to purchase
12  agreements; correct?
13     A.  Yes.
14     Q.  To submit a properly filled out EPD
15  breach questionnaire, you're supposed to attach
16  the purchase agreement; correct?
17     A.  I think it asks for that, yes.
18     Q.  Or I guess you have to identify it; is
19  that right?
20     A.  Yeah, you have to identify the loans.
21     Q.  And the purchase agreement?
22     A.  Right.  And provide the other information
23  that we ask for.
24     Q.  If a purported breach of warranty

19 (Pages 70 to 73)

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 74

1 claimant attaches a purchase agreement, does the
2 claimant have to specify a particular warranty
3 that it claims was breached?
4     A.  No.
5     Q.  If an EPD claimant attaches a purchase
6 agreement, does the EPD claimant have to
7 demonstrate that the agreement contains a
8 provision requiring AHM to buy back mortgages
9 that were subject to early payment defaults?
10     A.  Whatever's in the questionnaire, by your
11 definition No. 3 fits in that category, then
12 that's what we were asking them to provide.
13     Q.  Part 3?
14     A.  Bullet No. 3.
15     Q.  In which part?
16     A.  EPD.  Part 3, Bullet No. 3.
17     Q.  And that says, Identification of loan
18 purchase agreement and a copy of the relevant
19 provisions; right?
20     A.  Right.
21         MR. DORSEY:  Read the rest of that
22 into the record.  "Establishing the right to
23 payment from AHM."
24 BY MR. WEISBROD:

Page 75

1     Q.  That got chopped up, so I'll read the
2 whole thing into the record.  "Identification of
3 loan purchase agreement pursuant to which the
4 loan was sold by AHM with a copy of the relevant
5 provisions establishing the right to payment from
6 AHM."  That's the whole bullet; right?
7     A.  Yes.
8     Q.  If a claimant attaches the entire
9 purchase agreement, the claimant doesn't have to
10 specify which clauses allegedly were violated,
11 does the claimant?
12     A.  I guess we don't specifically ask them to
13 mark the section; however, on the EPD side, it
14 was our -- it was both, but let me just explain
15 what I'm trying to say.
16         When we did trades, it was our
17 stipulation that we are giving the purchasers a
18 90-day EPD window.  So each trade I was sending
19 out, I wrote, you have a 90-day EPD window.
20     Q.  You wrote that on each trade?
21     A.  On each trade, right.
22     Q.  Where did you write that?
23     A.  Just in the body of the e-mail that went
24 out to investors to purchase loans.

Page 76

1     Q.  You did that every single time?
2     A.  Every single time.
3     Q.  I forgot to ask.  Over lunch, did you
4 talk about your testimony at all?
5     A.  No.
6         MR. WEISBROD:  Pasternak-13.
7         Pasternak-13 was marked for
8 identification.)
9 BY MR. WEISBROD:
10     Q.  Exhibit 13 is a document entitled
11 Responses and Objections of Debtors to the
12 Official Committee of Borrowers' First Set of
13 Interrogatories and First Request for Production
14 to the Debtors.  It does not include every
15 attachment that was provided.  I have eliminated
16 from this copy the attachments that were
17 designated as confidential.  I don't have any
18 questions about them.
19         If you need it, I have it.
20         MR. DORSEY:  No, that's all right.
21 BY MR. WEISBROD:
22     Q.  I'd like you to look at the last page,
23 very last page.
24     A.  Okay.

Page 77

1     Q.  That is a table.  Do you see that?
2     A.  Yes, I do.
3     Q.  Have you seen it before?
4     A.  I might have glanced at it.  Never
5 studied it.
6     Q.  Do you see there is a section of the
7 table called "number of loans"?
8     A.  Yes.
9     Q.  And it indicates that in 2007 there were
10 14,996 payment option ARMs, do you see that?
11     A.  Yes.
12     Q.  And in 2006 there were 43,628 payment
13 option ARMs, do you see that?
14     A.  Yes.
15     Q.  There were 317 of those in 2005?
16     A.  Yes.
17     Q.  And in 2004 there were seven, do you see
18 that?
19     A.  I do.
20     Q.  Do you have any idea how this table was
21 assembled?
22     A.  Yes.  It was pulled out of our internal
23 database that is created, that extrapolates loan
24 information from our main, main loan software.

Wilcox and Fetzer, Ltd.      Registered Professional Reporters          302-655-0477

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 78

1  So this is like, this came out of access
2  database, which allows us to provide this data
3  out of our software, which is called Unify, which
4  keeps all of loans that we originated, like a
5  main database, our software.
6      Q. Do you have any reason to believe that
7  AHM originated any payment option ARMs prior to
8  2002?
9      A. No, I do not.
10         MR. WEISBROD: Exhibit 14 was
11  previously marked as Fernandes-8.
12         (Pasternak-14 was marked for
13  identification.)
14  BY MR. WEISBROD:
15      Q. Exhibit 14, previously marked as
16  Fernandes-8, is also a table. Do you see that at
17  the bottom it has a row called POA?
18      A. Yes, I do.
19      Q. Let's talk about the bottom three
20  columns, not talking about -- sorry, the bottom
21  three rows, not talking about the grand total
22  row.
23      A. Uh-huh.
24      Q. Do you know what those three mortgage

Page 79

1  types are?
2      A. Yes.
3      Q. Can you explain what they are?
4      A. The first is what we call the power fixed
5  mortgage. The second is power ARM, which is a
6  hybrid payment option ARM. The third is our
7  payment option ARM, also called the MTA product.
8      Q. Could you explain the differences among
9  each of those three?
10      A. I'm not a product expert, and I wasn't
11  trading these specific products. I was
12  responsible for something else. But I can tell
13  you based on my understanding the difference
14  between the payment option ARM and the hybrid
15  option ARM is the fixed payment period.
16      Q. What does that mean?
17      A. I believe in the payment option ARMs, the
18  initial pay rate is only for a few days, and then
19  it resets to an index plus margin rate.
20         On the hybrid payment option ARM,
21  which is the power ARM, that period is longer.
22  It could be as long as 3, 5, 7, or 10 years.
23      Q. Who traded payment option ARM products
24  within AHM?

Page 80

1      A. Do you want names?
2      Q. Yes.
3      A. Bob Johnson, Josh Buckley and Dan
4  Doherty. I don't remember the spelling of
5  Doherty.
6      Q. Doherty?
7      A. Yeah. I think he was a basketball
8  player, the same spelling.
9      Q. What kind of products did you trade?
10      A. I traded pretty much everything else.
11      Q. Why did some people not trade payment
12  option ARMs?
13      A. Because these trades typically were over
14  a billion dollars at a time. So it required just
15  a different set of skills to trade these products
16  because it's such a huge volume that were done at
17  a time. And a lot of them were negotiated into
18  different structures. There was a couple of ways
19  of trading those products.
20      Q. What do you mean by different structures?
21      A. You could just sell them as a whole loan?
22  You could sell them as a whole loan with the
23  parties relating to securitize them and you play
24  a role in that securitization. So from what I

Page 81

1  know, there's a couple of ways of trading them.
2      Q. Were they ever sold in smaller pools?
3      A. The pay option ARMs, no. The hybrid pay
4  option ARMs, yes, because they were a newer
5  product, so we didn't have that many, so they
6  were sold in sizes of maybe 300 million.
7      Q. Could you look at the last page of
8  Exhibit 13 and put it side-by-side with
9  Exhibit 14.
10      A. Yes.
11      Q. You'll notice that if you add up just
12  2006 and 2007, you get over 58,000 payment option
13  ARMs, if you look at Exhibit 13. Do you see
14  that?
15      A. I see that.
16      Q. But if you look at Exhibit 14, you get
17  85,000 at least. Do you see that?
18      A. I see that.
19      Q. Basically, if you add up all the years
20  for Exhibit 13, you're not going to approach
21  85,000; right?
22      A. No.
23      Q. Why is there a discrepancy between these
24  two tables, do you know?

21 (Pages 78 to 81)

Electronically signed by Terry Burke (301-319-005-7649)                                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 82

1    A. Yes, I do. Table Exhibit No. 14 is being
2 pulled out of the main database, which is called
3 Unify, which contains all historical data.
4       And I believe Exhibit No. 13, data
5 was pulled out of a different database, what we
6 called sempars, which extrapolates the data out
7 of Unify, but I believe only can hold maximum
8 number of records. So it looks like, if you look
9 at, I would assume that 2005, it looks like it's
10 being, it's not in that database any more. Maybe
11 the data was too big or it's just not there.
12       I didn't produce this report. I
13 actually produced Exhibit No. 14, but that would
14 be my assumption why the numbers are different.
15       It's just what we have available.
16    Q. So the database loses earlier records?
17    A. Yes.
18    Q. So when you look at Exhibit 13, it
19 appears to you that some records from 2005 should
20 have been included but were not; correct?
21    A. Yeah. To me, it looks like it's just a
22 problem with the data base, because it has some
23 2003 records, but then doesn't have all of 2005.
24 I would assume it has to do with the size.

Page 83

1    Q. So you believe that Exhibit 14 contains
2 more trustworthy numbers?
3    A. Yes.
4    Q. If you notice on Exhibit 13, it says for
5 2004 that there were seven payment option ARMs.
6    A. Correct.
7    Q. Could that number be accurate or do you
8 think that's understated too?
9    A. I don't have any basis to answer your
10 question.
11    Q. But you're pretty sure that 2005 is
12 significantly understated?
13       MR. DORSEY: Objection to form.
14       THE WITNESS: By my judgment, yes.
15 BY MR. WEISBROD:
16    Q. As a current employee of AHM, where would
17 you go now if you wanted to get copies of
18 marketing materials, where would you look?
19    A. I actually don't know.
20    Q. Was there a marketing office?
21    A. I believe we had a marketing department.
22    Q. Was that separate from a sales department
23 or was that the same thing?
24    A. I don't know.

Page 84

1       MR. WEISBROD: Our next exhibit was
2 previously Fernandes-6.
3       (Pasternak-15 was marked for
4 identification.)
5       MR. WEISBROD: Exhibit 15 was
6 previously marked as Fernandes-6. It states on
7 the top "Selling, Developed for American Home
8 Mortgage Sales by Training and Performance
9 Improvement.
10 BY MR. WEISBROD:
11    Q. Have you ever seen this document before?
12 Take a minute and look at it.
13    A. I have not.
14    Q. Have you ever seen any documents that
15 look like sales manuals?
16    A. No, I have not.
17    Q. Did you know people at AHM who were
18 engaged in the sale of AHM mortgages to borrowers
19 before AHM shut down its operations?
20    A. No.
21    Q. You just didn't know any?
22    A. I didn't know any. Not even a single
23 one.
24    Q. Where was your office?

Page 85

1    A. In Melville.
2    Q. How big is the building?
3    A. Square footage?
4    Q. How many floors is it?
5    A. Four floors.
6    Q. Do you know where the salespeople work?
7    A. I do not.
8    Q. Do you even know the name of anyone who
9 was involved in sales?
10    A. I do not.
11    Q. If you wanted to figure out who saw this
12 document, what would you do? Who, if anyone, at
13 AHM saw this document? I'll ask the question
14 over.
15       If you wanted to figure out who at
16 AHM, if anyone, saw this document, what would you
17 do?
18       MR. DORSEY: Objection to the form.
19       THE WITNESS: Contact my marketing
20 group.
21 BY MR. WEISBROD:
22    Q. Would you know how to do that now?
23    A. How to contact my marketing group?
24    Q. Yes.

22 (Pages 82 to 85)

Electronically signed by Terry Burke (301-319-005-7649)                        82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 86

1    A.  You mean just physically e-mail them or
2  call them?
3    Q.  Today, could you do that?
4    A.  There isn't a marketing group today.
5    Q.  So if you wanted to figure out who at
6  AHM, if anyone, saw that document, what would you
7  do today?
8    A.  I really don't know.
9    Q.  Do you have any familiarity with what
10  documents were left at AHM?
11    A.  To some extent.
12    Q.  Do you know if marketing materials are
13  left?
14    A.  I don't know.
15    Q.  When you sold loans as part of pools, did
16  the investors ever want to see the marketing
17  materials?
18    A.  Not that I'm aware of.
19    Q.  What kind of due diligence was typical in
20  those sales, due diligence by the investors?
21    A.  I think typical due diligence included
22  looking at loan documents, looking at if it was
23  underwritten to the guidelines, looking if
24  anything is misstated.

Page 87

1    It was a complete due diligence.  I'm
2  not really exactly sure what else they do to do
3  the due diligence other than what I just
4  mentioned.
5    Q.  Did you ever see representatives of
6  investors come to Melville to review loan files
7  to do diligence?
8    A.  No.
9    Q.  How did they physically complete the due
10  diligence?
11    A.  They received data on the CD's.
12    Q.  What kind of information would be on CD's
13  typically?
14    A.  Just all of loan information,
15  obligations, titles, mortgage notes.
16    Q.  So they would get electronic copies of
17  the loan files?
18    A.  That's my understanding, yes.
19    Q.  Did most investors actually request those
20  CD's?
21    MR. DORSEY:  I object to form.
22    THE WITNESS:  Does that mean I don't
23  have to answer?
24    MR. DORSEY:  You can answer to the

Page 88

1  best you can, but I think the question is pretty
2  vague.
3    THE WITNESS:  To my understanding,
4  they all did due diligence.
5  BY MR. WEISBROD:
6    Q.  Do you know what the stipulated asset
7  allocation is?
8    A.  It's privileged what I learned.
9    Q.  Have you ever read the plan of
10  liquidation?
11    A.  Yes.
12    Q.  And you read about it there?
13    A.  Yes.
14    Q.  Did you have any role in the formulation
15  of the stipulated asset allocation?
16    A.  No.
17    Q.  When you were at AHM, did you play any
18  role on the warehouse loan side of the business?
19    A.  No.
20    Q.  Did you know people who did?
21    A.  Yes.
22    Q.  Were some of the investors with whom you
23  did business also warehouse lenders?
24    A.  Yes.

Page 89

1    Q.  Which ones?
2    A.  JP Morgan, Bank of America.  Maybe
3  Lehman.  I wasn't aware of it at that time, but I
4  know post-bankruptcy that there were.
5    Q.  Do you know if the same individuals at
6  those companies participated in the warehouse
7  loan side and in the purchase of mortgage side?
8    A.  I don't know, but I would think it's a
9  completely different department.
10    Q.  Which entity employed you, American Home
11  Corp., American Home Acceptance?
12    A.  Let me look at the list.  I'm not really
13  sure.  I guess Corp.  If I would guess, I would
14  say American Home Mortgage Corp.
15    Q.  When investors purchased loan pools, who
16  got the money?
17    A.  Which debtor, you mean?
18    Q.  Yes.
19    A.  I don't know.
20    Q.  How were the payments made?
21    A.  Wire transfer.
22    Q.  Do you know to which account?
23    A.  I don't recall the account numbers, no.
24    Q.  Do you recall who the account holder was?

23 (Pages 86 to 89)

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 90

1     A. No, I don't.
2     Q. Were you aware, while you were working at
3  AHM, before bankruptcy, of any margin payments
4  paid out by AHM to any lenders?
5     A. No.
6     Q. Are you now aware of that?
7     A. Just from what I heard, that we, either
8  we made the payments or we did not.
9     Q. When we began, you said that part of your
10 job involved hedging.
11    A. Yes.
12    Q. In addition to selling mortgages, you
13 also engaged in hedging transactions; is that
14 right?
15    A. Hedging is a term, I guess to use
16 interest rate, risk management.
17    Q. Could you describe what that meant?
18    A. When interest rates go up and down, our
19 assets, which were mortgages, would gain or lose
20 value accordingly. So my job as a trader was to
21 make sure that the loss in a value of a mortgage
22 is offset by some kind of instrument that I can
23 buy or sell, so at the end there was no loss.
24    Q. What kind of instruments were you buying?

Page 91

1     A. I was buying TBA securities,
2  mortgage-backed TBA securities, buy and selling.
3     Q. TBA securities?
4     A. Yes.
5     Q. What does the "T" stand for?
6     A. It's "to be announced." TBA means to be
7  announced.
8     Q. What is that product?
9     A. It's a mortgage product that -- first of
10 all, it's a government agency product, Fannie
11 Mae, Fannie, Freddie, or Genie, that one can sell
12 or buy that specific, I guess I would call it for
13 this situation, a mortgage bond without knowing
14 what exact loans would be in that bond until
15 there is a delivery date and settlement dates.
16 That's when the loans get filled into that bond.
17 So based on some, based on the models, that's one
18 of the securities we use to hedge our risk.
19        MR. WEISBROD: Pasternak-16.
20        (Pasternak-16 was marked for
21 identification.)
22        MR. WEISBROD: Exhibit 16 was
23 previously marked as Fernandes-2. This is a
24 complaint filed by a man named Tilton Jack

Page 92

1  against American Brokers Conduit and other
2  entities. It includes some attachments.
3  BY MR. WEISBROD:
4     Q. First, what was American Brokers Conduit?
5     A. I think it was a division of American
6  Home Mortgage.
7     Q. I'd like you to look at Exhibit A to the
8  Exhibit 16.
9     A. What page? Do you have a page number?
10    Q. OBC 01053. It's the first page with
11 text. The previous page says Exhibit A.
12    A. 91.
13    Q. 01053.
14    A. Okay.
15    Q. Have you ever seen this document before?
16    A. Not this specific, but I have seen the
17 mortgage note before.
18    Q. Have you seen a payment option ARM
19 mortgage note before?
20    A. Yes.
21    Q. Where?
22    A. At work.
23    Q. When's the first time you saw one?
24    A. I don't recall. It's between 2006 and

Page 93

1  now.
2     Q. I'm sorry, I was coughing when you
3  answered.
4     A. I don't remember what date I saw it
5  first.
6     Q. Do you know if it was before the
7  bankruptcy filing?
8     A. It was before the bankruptcy filing.
9     Q. Did it look, in terms of the basic
10 format, like this document?
11    A. Yeah, I think this is a standard note.
12    Q. Could you look at Section 2 on
13 Page 01053.
14    A. Yes.
15    Q. The second sentence says, "I will pay
16 interest at a yearly rate of one percent until
17 July 31st, 2006, and the initial monthly payment
18 provided for in Section 3 B of this note will be
19 based on this rate, the initial rate."
20    A. Yes.
21    Q. "Commencing on August 1st, 2006, I will
22 pay interest at a yearly rate of 8.132 percent,
23 the subsequent rate."
24        Do you see that?

24 (Pages 90 to 93)

Electronically signed by Terry Burke (301-319-005-7649)                    82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

1    A.  Yes.
2    Q.  How long does the one percent rate last?
3        MR. DORSEY:  Objection to form.  The
4    document speaks for itself.  The witness
5    testified he has never seen this note before.
6    BY MR. WEISBROD:
7    Q.  You can answer.
8    A.  What do you think?
9    Q.  Would you agree with me if I said it
10   lasts one day?
11   A.  I would disagree with you.
12   Q.  How many days are between July 31st,
13   2006, and August 1st, 2006?
14   A.  I'm looking at the closing date of
15   July 26th.
16   Q.  Okay, I'm sorry.
17   A.  So to me that would be five days.
18   Q.  Five days, you are probably right.
19       And then after five days, the
20   interest rate rises; is that right?
21       MR. DORSEY:  I have a continuing
22   objection to questions about this document the
23   witness has testified he has never seen before.
24   The document speaks for itself.

1    BY MR. WEISBROD:
2    Q.  Is that right?
3    A.  What was your question?
4    Q.  The interest rate rises after five days;
5    is that right?
6    A.  It's in the document, yes.
7    Q.  From one percent to 8.132 percent; right?
8    A.  Correct.
9    Q.  What is the point of having a one percent
10   interest rate for five days?
11       MR. DORSEY:  Objection to form.
12       THE WITNESS:  To my best knowledge, I
13   guess I can say, that it helps, it would help the
14   borrower at a closing because -- this is
15   speculating because I'm not a homeowner -- but I
16   believe when you close the house, you have to pay
17   the first month's interest up front.  So I
18   believe this is one of the methods that would
19   help out the borrower in doing that.
20   Q.  If you look at Paragraph 3 B on
21   Page 01054, there's an initial monthly payment
22   listed.  Do you see that?
23   A.  Yes.
24   Q.  That's $1,103.22.  Do you see that?

1    A.  Yes.
2    Q.  Take as much time as you need.  Can you
3    tell me how long you get to pay that amount?
4        MR. DORSEY:  Objection.  Don't answer
5    that question.  He's not here to interpret a
6    document he has never seen before.  The document
7    speaks for itself.  If you want someone to
8    testify about it, you better bring someone in who
9    can testify about it.  He's not going to testify
10   about it and the judge isn't going to make him
11   testify about it, I guarantee you.
12       So don't answer the question.
13   BY MR. WEISBROD:
14   Q.  Look at Paragraph H that's on Page 01055.
15   It says, "My unpaid principal can never exceed a
16   maximum amount equal to 110 percent of the
17   principal amount originally borrowed."
18       Do you see that?
19   A.  Yes.
20   Q.  Do you have any understanding of how
21   unpaid principal can rise under this product?
22       MR. DORSEY:  Objection.  Don't answer
23   the question.
24       MR. WEISBROD:  What's your basis?

1        MR. DORSEY:  He's not going to sit
2    here and interpret a document he's never seen
3    before.  He's not an expert witness.  He's not
4    going to testify as an expert witness.  He wasn't
5    involved in mortgage loan sales.  He has only
6    seen samples of these documents before, and,
7    again, I guarantee you Judge Sontchi is not going
8    to make him testify about this at the hearing, so
9    move on.  You're just wasting time.  That's my
10   basis, that you're wasting time, you're harassing
11   the witness.  Move on.
12       MR. WEISBROD:  Are you going to
13   instruct him as to all exhibits on the Tilton
14   Jack complaint?
15       MR. DORSEY:  If you're going to go
16   through them all, because he has never seen them
17   before, yes.
18   BY MR. WEISBROD:
19   Q.  Are you going to follow your lawyer's
20   instructions not to answer?
21   A.  He is right, I am not the expert to talk
22   about this.
23       MR. WEISBROD:  Can I take a
24   ten-minute break?

25 (Pages 94 to 97)

American Home Mortgage Holdings, Inc., et al.
Damian Pasternak

Page 98

1      MR. DORSEY: Sure.
2          (Short recess.)
3  BY MR. WEISBROD:
4      Q. Mr. Pasternak, are you available of any
5  evidence from the court system of how much EPD
6  claims are worth?
7      A. Can you ask again, please?
8      Q. Yes. Are you aware of any information
9  from the court system involving investors who
10 sued originators that sheds light on how much EPD
11 claims are worth?
12     A. No.
13     Q. Are you aware of any information from the
14 court system that involves breach of warranty
15 claims suing originators that sheds light on how
16 much breach of warranty claims are worth?
17     A. No.
18     Q. In the debtors' brief that I mentioned
19 before, there is a sentence that says, "The
20 debtors' historical experience liquidating
21 non-performing loans did not provide them an
22 adequate data set from which to make a principal
23 estimate of loss frequencies across loan product
24 types."

Page 99

1          And this is in the section talking
2  about the borrowers' committee objection to the
3  assumption that 100 percent of loans would result
4  in losses.
5      A. Yes.
6      Q. For breach of warranty claims. So it
7  says, "The debtors' historical experience
8  liquidating non-performing loans did not provide
9  them an adequate data set from which to make a
10 principal estimate of loss frequencies across
11 loan product types."
12         Do you agree with that statement?
13     A. Yes. We don't have this kind of data.
14 We never tracked it.
15     Q. The brief says, "Breach of warranty
16 claims are typically asserted only after a loss
17 has been realized because prior to realization of
18 loss there is little economic incentive to ferret
19 out a breach of representation of warranty."
20         Do you have any data to back up that
21 statement?
22     A. Not that I am familiar with, no, not data
23 to back that up.
24     Q. Do you have any information at all about

Page 100

1  breach of warranty claims that backs up that
2  statement?
3      A. No. It would be somebody else you have
4  to ask those questions.
5      Q. Who else?
6      A. In the repurchase group that is no longer
7  here with the debtor who was involved in
8  looking at breach for purchase requests.
9      Q. Have you talked to anybody from the
10 repurchase group?
11     A. Like I said, they are not here any more.
12     Q. When did they leave the debtor?
13     A. Prior, before bankruptcy, August 4th.
14     Q. So the repurchase group was gone before
15 the bankrupt filing; is that right?
16     A. Let me rephrase that. Few people stayed
17 on until later on from the repurchase group.
18     Q. Did anyone from the repurchase group work
19 on the EPD or breach protocol?
20     A. No.
21         MR. WEISBROD: I have no other
22 questions. Thanks.
23         MR. DORSEY: No questions.
24         COURT REPORTER: Read and sign?

Page 101

1          MR. DORSEY: Yes.
2          (Witness excused.)
3          (The deposition concluded at 2:50
4  p.m.)

Electronically signed by Terry Burke (301-319-005-7649)                                        82e944c5-81d1-4a93-9ffe-a34e165b42e1

American Home Mortgage Holdings, Inc., et al.

Page 102

INDEX

1
2  DEPONENT: DAMIAN PASTERNAK         PAGE
3     Examination by Mr. Weisbrod      2
4         E X H I B I T S
   PASTERNAK DEPOSITION EXHIBITS      MARKED
5  Pasternak-1  Amended Chapter 11 Plan of    29
              Liquidation of the Debtors
6
7             Dated as of February 5, 2009
8  Pasternak-2  Amended Chapter 11 Plan of    29
              Liquidation of the Debtors
9             dated as of February 5, 2009
              blackline copy
10
   Pasternak-3  Disclosure Statement Pursuant 31
11            to Section 1125 of the
              Bankruptcy Code with Respect
12            to the Amended Chapter 11 Plan
              of Liquidation of the Debtors
13            dated as of November 25, 2008
14 Pasternak-4  Article from The Wall Street  33
              Journal, "Option ARMs See
15            Rising Defaults
16 Pasternak-5  Notice of Filing Schedule of  56
              EPD/Breach Claim Voting Amounts,
17            OBC 01462 through OBC 01467
18 Pasternak-6  E-mail, AHM0001868, with      60
              two-page attachment
19
   Pasternak-7  E-mail, AHM0010034            62
20
   Pasternak-8  E-mail, with attachments,     64
21            AHM0010035 through AHM0010038
22 Pasternak-9  E-mail string, with           67
              attachments, AHM0010044
23            through AHM0010052
24

Page 104

1
2
3      REPLACE THIS PAGE
4      WITH THE ERRATA SHEET
5      AFTER IT HAS BEEN
6      COMPLETED AND SIGNED
7      BY THE DEPONENT
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 103

1      E X H I B I T S (cont'd):
2  PASTERNAK DEPOSITION EXHIBITS      MARKED
3
   Pasternak-10  E-mail string, with          67
4             attachments, AHM0010259
              through AHM0010272
5
   Pasternak-11  Questionnaire                 70
6
   Pasternak-12  Blackline Questionnaire       70
7
   Pasternak-13  Responses and Objections of   76
8             Debtors to the Official
              Committee of Borrowers' First
9             Set of Interrogatories and
              First Request for Production
10            to the Debtors
11 Pasternak-14  AHM Mortgages Sold by Product 78
              Type, Time Period: 1999 to
12            Bankruptcy, OBC 01182
13 Pasternak-15  Selling, developed for        84
              American Home Mortgage Sales
14            by Training Performance
              Improvement, OBC 01119 through
15            OBC 01180
16 Pasternak-16  First Amended Complaint,      91
              Tilton Jack v. American
17            Brokers Conduit v. American
18 ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 104
19 CERTIFICATE OF REPORTER          PAGE 105
20
21
22
23
24

Page 105

1  State of Delaware )
                     )
2  New Castle County )
3
4         CERTIFICATE OF REPORTER
5
6     I, Terry Barbano Burke, RMR-CRR and Notary
   Public, do hereby certify that there came before
7  me on Friday, February 6, 2009, the deponent
   herein, DAMIAN PASTERNAK, who was duly sworn by
8  me and thereafter examined by counsel for the
   respective parties; that the questions asked of
9  said deponent and the answers given were taken
   down by me in Stenotype notes and thereafter
10 transcribed by use of computer-aided
   transcription and computer printer under my
11 direction.
12     I further certify that the foregoing is a
   true and correct transcript of the testimony
13 given at said examination of said witness.
14     I further certify that I am not counsel,
   attorney, or relative of either party, or
15 otherwise interested in the event of this suit.
16
17
18
   Terry Barbano Burke, RMR-CRR
19 Certification No. 233-RPR
   (Expires January 31, 2011)
20
21 DATED:
22
23
24

Wilcox and Fetzer, Ltd.      Registered Professional Reporters      302-655-0477

Electronically signed by Terry Burke (301-319-005-7649)      82e944c5-81d1-4a93-9ffe-a34e165b42e1



**WILCOX & FETZER LTD.**

In The Matter Of:

# American Home Mortgage Holdings, Inc., et al.

Case No. 07-11047 (CSS)

———————————————————————

## Damian Pasternak

`

February 6, 2009

————————————————————————

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

## A

**Acceptance** 89:11
**access** 9:13 10:14 78:1
**account** 50:4 89:22,23,24
**accountant** 4:16
**accrued** 63:20,23
**accurate** 55:7 83:7
**actual** 30:7 45:2 46:20 58:3
**ad** 16:13
**add** 81:11,19
**added** 22:5 24:7
**adding** 50:11 53:14
**addition** 90:12
**additional** 22:5,8 23:24
  47:21
**address** 68:24
**adequate** 98:22 99:9
**adjust** 22:13 25:1
**adjusted** 21:6
**adjusting** 22:17
**adjustment** 21:21 25:5
**adjustments** 21:13 27:23
  28:7
**adopted** 40:13,15
**advisement** 59:1
**age** 26:18 58:17
**agency** 91:10
**Agrawal** 60:16
**agree** 3:2 32:8 42:24 43:3
  94:9 99:12
**agreed** 8:9
**agreement** 9:5,11 52:23
  72:5,10,23 73:2,16,21
  74:1,6,7,18 75:3,9
  73:12
**agreements** 11:8 53:5
  73:12
**ahead** 2:19
**AHM** 4:14 10:2 11:17
  12:13 13:21,24 14:15,19
  14:23 15:2,10 17:24
  18:10 20:5,6,6,12,13,14
  21:1,2 22:21,23 23:2,9,21
  25:1 26:12,20 27:1 34:21
  36:6,12 37:23 40:12
  46:17 47:13 63:10 72:24
  73:7 74:8,23 75:4,6 78:7
  79:24 83:16 84:17,18,19
  85:13,16 86:6,10 88:17
  90:3,4 103:11
**AHM's** 20:11 41:9
**AHM0001868** 102:18
**AHM0010034** 102:19
**AHM0010035** 102:21
**AHM0010038** 102:21
**AHM0010044** 102:22
**AHM0010052** 102:23
**AHM0010259** 103:4
**AHM0010272** 103:4

**al** 1:7 103:17
**algebraic** 22:14
**allegedly** 75:10
**allocation** 88:7,15
**allow** 52:8
**allowance** 62:16
**allowed** 28:10 48:10 49:23
  51:17 57:23
**allowing** 37:9
**allows** 52:7 78:2
**Alt-A** 13:9 36:6 42:15
**Amended** 31:2 36:21 102:6
  102:8,12 103:16
**America** 6:17 89:2
**American** 1:6 3:18,19 4:20
  5:4,6,24 9:21 11:23 12:6
  12:9 16:7,14,20 84:7
  89:10,11,14 92:1,4,5
  103:13,16
**amount** 24:5 48:11 49:10
  49:11,24 50:22 52:1 65:3
  65:6 66:2 96:3,16,17
**amounts** 56:9 57:3 102:16
**analysis** 20:16
**analyst** 4:9,11,18
**and/or** 37:10
**announced** 91:6,7
**answer** 2:23 13:2 17:21
  23:16,18 29:1 43:11 48:2
  48:5 67:10 72:14 83:9
  87:23,24 94:7 96:4,12,22
  97:20
**answered** 36:17 93:3
**answers** 105:8
**anybody** 21:5 24:10 36:8
  38:6 45:20 72:23 100:9
**anyway** 37:1
**Apart** 41:2
**apologize** 16:17,18
**APPEARANCES** 1:13 2:1
**appears** 68:17 82:19
**applicable** 48:11,17
**applications** 52:15
**applied** 25:20 27:18 59:12
**apply** 61:8
**Appraisal** 10:3
**appreciate** 15:22
**appreciation** 21:10
**approach** 81:20
**appropriate** 28:10
**approved** 58:2
**approximately** 36:12 37:7
**April** 3:23
**areas** 21:8
**ARM** 13:18 36:4 79:5,6,7
  79:14,15,20,21,23 92:18
**ARMs** 13:10,21 14:2,10
  33:1 34:2,16,24 36:9,14

77:10,13 78:7 79:17
  80:12 81:3,4,13 83:5
  102:14
**article** 30:10 31:12,18
  33:23 34:15 48:10 53:12
  54:12 102:14
**asked** 16:18 105:8
**asking** 17:22 45:6 46:1
  60:3 71:18 72:20 74:12
**asks** 73:17
**assembled** 77:21
**assert** 73:2
**asserted** 16:20 45:16 99:16
**asserting** 14:19 17:3
**assertion** 43:5
**asset** 88:6,15
**assets** 90:19
**associated** 9:1
**assume** 2:23 19:9 41:7
  44:18 46:11 82:9,24
**assumed** 27:7 32:14 33:4
  44:3,6,11,23
**assuming** 44:15 46:17
**assumption** 43:12 46:4,8
  46:22,24 59:21 72:19
  82:14 99:3
**assumptions** 26:5,16
  59:19
**attach** 72:4 73:15
**attached** 60:11,21
**attaches** 73:1 74:1,5 75:8
**attachment** 76:15 102:18
**attachments** 60:17 76:16
  92:2 102:20,22 103:4
**attorney** 105:14
**auction** 66:15
**August** 63:18 93:21 94:13
  100:13
**availability** 50:5
**available** 54:7 58:20,21
  60:24 82:15 98:4
**Avenue** 1:19 2:3
**average** 7:17 19:24
**avoidance** 70:18
**aware** 36:8 45:2,9,14,24
  71:13 86:18 89:3 90:2,6
  98:8,13

## B

**B** 53:12 93:18 95:20 102:4
  103:1
**back** 35:24 37:20,24 47:8
  47:12 52:18 74:8 99:20
  99:23
**background** 4:5,14
**backs** 100:1

**bad** 65:21,22
**balance** 49:13,15,16
**balances** 8:4 53:21
**bank** 6:16 11:2 57:21 89:2
**bankrupt** 100:15
**bankruptcy** 1:2 11:24
  12:10,13 14:18 16:21
  31:1 45:3,17,23 46:2 47:3
  47:14 90:3 93:7,8 100:13
  102:11 103:12
**banks** 6:2,16 7:3
**bar** 16:8,14
**Barbano** 1:12 105:5,18
**Barnes** 4:15,24
**base** 82:22
**based** 3:24 14:10,11 19:21
  26:12 35:6,7 42:12 44:24
  49:1 53:4 56:24 71:14
  79:13 91:17,17 93:19
**basic** 93:9
**basically** 40:13 66:7 81:19
**basis** 51:4,7 83:9 96:24
  97:10
**basketball** 80:7
**Bates** 56:14 60:9,11
**began** 90:9
**beginning** 1:11
**begins** 54:20
**believe`** 18:16 22:2 25:7
  32:23 40:3 58:6 61:6,9
  72:11 78:6 79:17 82:4,7
  83:1,21 95:16,18
**belong** 60:12
**best** 88:1 95:12
**better** 13:15 96:8
**bid** 7:22 8:3
**big** 82:11 85:2
**bigger** 23:12
**billion** 80:14
**bit** 13:15
**blackline** 30:3 31:10 70:4
  102:9 103:6
**blacklining** 31:14
**block** 18:13
**Bloomberg** 21:5 25:19,22
  25:23 26:1,11,24 27:4,16
  27:20 28:2,7
**Bob** 80:3
**body** 75:23
**bond** 26:4,8,9 91:13,14,16
**bookstore** 4:24
**borrowed** 96:17
**borrower** 10:4,18 13:14,15
  13:17 14:22 15:1,5,8,11
  15:13,16 16:3 28:12 35:8
  95:14,19
**borrowers** 2:4,14 6:6 42:9
  68:24 76:12 84:18 99:2

103:8
**boss** 10:6,8,9
**bother** 46:18
**bothered** 44:20
**bothering** 46:5
**bottom** 40:23 56:16 78:17
  78:19,20
**boxed** 11:14
**boxes** 30:15
**Brandywine** 1:10,16
**breach** 11:1 14:14,18,19
  16:19 17:3,7 18:2,6,19
  19:6,13 28:9 31:24 37:10
  37:14 38:8,12,14,22 39:3
  39:9,15 40:11 42:18 43:1
  43:6,9,20 44:16 45:2,9,15
  45:24 46:6,12,14,18,23
  51:6,21,23 52:9 53:24
  54:1,8,13,22 55:1,3,21
  56:17 57:4,18,19 58:10
  58:13,18 61:9,15 62:1,17
  67:7 69:3 71:5,9,15,22
  72:8,17,24 73:5,15,24
  98:14,16 99:6,15,19
  100:1,8,19
**breached** 27:23 52:13 72:7
  72:18 73:3 74:3
**breaches** 39:12 52:12
**breaching** 43:15 47:2
**break** 2:16 38:16 68:9
  97:24
**Bret** 10:10
**brief** 98:18 99:15
**bring** 96:8
**Brokers** 92:1,4 103:17
**Brothers** 6:17
**brought** 14:14
**Broward** 23:13
**bucket** 33:7,10,13,16
**buckets** 26:6
**Buckley** 80:3
**building** 1:11,16 18:5,8,10
  18:13 85:2
**buildup** 61:4
**bullet** 70:13 72:2 74:14,16
  75:6
**bullets** 70:13
**Burke** 1:12 105:5,18
**business** 7:4 11:9 24:18
  53:8 63:21 65:13 88:18
  88:23
**buy** 8:9 37:23 69:22 74:8
  90:23 91:2,12
**buyer** 47:6
**buyers** 29:5
**buying** 8:18 90:24 91:1
**B-I-D** 8:7,8

**C**

**C** 54:12
**calculate** 19:3,16,23 53:9
**calculated** 20:21 39:15
51:3,6 57:24 67:8
**calculating** 41:11 61:14
**calculation** 71:12
**calculations** 71:17
**California** 23:12
**call** 6:18,20 12:22 79:4
86:2 91:12
**called** 13:8 56:7 77:7 78:3
78:17 79:7 82:2,6
**calls** 13:9 47:22
**capital** 3:13
**case** 1:8 16:9 35:9 37:23
45:18 57:12,15
**Case-Shiller** 21:7 22:4
23:5,10,11,21 24:1,14,17
24:22 25:2
**Castle** 105:2
**categories** 35:14 36:1
**category** 74:11
**caught** 28:13,18,18
**caused** 47:13
**cc'd** 63:3
**CD's** 87:11,12,20
**Century** 18:15 19:1 24:11
26:20 40:9,10 41:3,7,12
42:4,8,12
**Century's** 18:12,19
**certain** 26:5 51:15
**certainty** 51:19
**CERTIFICATE** 103:19
105:4
**Certification** 105:19
**certify** 105:6,11,13
**CFA** 4:11
**chain** 64:9 67:19
**chance** 29:18 35:3 36:3
70:8
**change** 22:14 41:11,14
42:1
**changed** 41:6
**changes** 31:16,17 41:5,5,8
41:16
**changing** 61:5
**Chapter** 1:5 31:2 36:21
102:6,8,12
**charge** 11:17
**chartered** 4:9,11
**check** 45:20
**checked** 47:5,5
**checking** 51:17
**Choice** 13:8,10,12,13
**chopped** 75:1
**circular** 70:12,13
**Citigroup** 6:17

**city** 6:19 68:24
**claim** 11:1,20 12:3,6 14:1
14:14,19,20 15:1,5,8,8,11
16:14 17:4 30:2 43:1,6
45:17 46:5,6,7,12,19
48:11 49:1,23 50:11,21
51:17 52:5,6,9 54:24 56:8
58:3,8 64:3,18 72:8,24
102:16
**claimant** 47:11 71:5,15
72:11 74:1,2,5,6 75:8,9
75:11
**claimants** 58:10 71:10,22
**claimed** 44:18,24 57:22
62:15
**claiming** 39:11 44:21
**claims** 11:18 12:12 13:4
14:10,22 15:13,16,16
16:3,20 17:8 18:2,6,20
20:23 27:6 28:10 30:10
37:3,10,15 39:10,16
43:20,22,22 44:7,17 45:3
45:10,15,16,19,21,24
46:23 47:2,9 49:5 50:10
51:3,6 54:13,13,22,23
55:3 57:5,19 58:14 62:1
63:12 67:7 74:3 98:6,11
98:15,16 99:6,16 100:1
**clarify** 2:22
**clauses** 75:10
**clean** 11:14,14
**clear** 48:23 52:12 66:16
**close** 95:16
**closing** 8:24 94:14 95:14
**Code** 31:1 102:11
**colleagues** 27:14
**collection** 30:18
**college** 4:15
**column** 64:19,21 65:11,14
65:18 69:2,5,8,10,15,16
69:17
**columns** 64:22 65:2,7
78:20
**come** 17:13 27:14 30:14
39:14 50:13 53:15 58:2
87:6
**comes** 53:11
**coming** 25:12
**Commencing** 93:21
**commercially** 49:7
**committee** 1:20 2:4,14
76:12 99:2 103:8
**common** 42:15
**communication** 64:1
**communications** 17:20
**companies** 89:6
**company** 15:14,17 19:21
36:13 46:1

**comparable** 41:8
**complaint** 91:24 97:14
103:16
**complete** 10:3 87:1,9
**COMPLETED** 104:6
**completely** 89:9
**component** 25:14,15
**computed** 55:4
**computer** 105:10
**computer-aided** 105:9
**Conaway** 1:10,15
**concept** 11:20
**concerned** 23:1
**concluded** 101:3
**conclusion** 9:6
**concrete** 52:11
**conditions** 22:3 23:3 47:18
**Conduit** 92:1,4 103:17
**conduits** 6:2,18,20
**confidential** 76:17
**confirm** 31:13
**confirmation** 8:12,13,17
9:2 36:21
**confused** 63:8
**confusing** 37:1
**connection** 40:11
**considered** 43:19
**consistent** 26:14 34:20
**consult** 23:6
**contact** 85:19,23
**contain** 11:9
**contains** 7:23 8:4 74:7 82:3
83:1
**contemplates** 37:6
**context** 16:2 66:19
**contingent** 37:9
**continued** 5:5
**continuing** 94:21
**continuously** 5:6
**contract** 11:2,4,5,6 52:17
**contracts** 9:1,16,20 11:15
**contractual** 71:23
**Contrary** 68:12
**cont'd** 2:1 103:1
**conversation** 67:24
**conversations** 12:19
**converted** 7:5
**Cooper** 10:10
**copies** 83:17 87:16
**copy** 30:18 36:24 72:9
74:18 75:4 76:16 102:9
**Corp** 89:11,13,14
**Corporation** 1:7
**correct** 5:7 10:4 16:24 17:1
17:9 19:17,18 20:4,15
22:22 23:4,7 27:2,10 30:9
30:16 32:17 33:2,3,7,8,10
33:11,13,16 36:9 41:23

42:3,16 44:4,9,14 45:4,19
46:1,3,21 48:18 51:8
52:21 54:10 55:9 56:20
59:10 60:1 61:3,22,23
62:4 72:12 73:3,8,9,12,16
82:20 83:6 95:8 105:12
**correlation** 43:4
**corresponding** 63:5,10
**corresponds** 59:9
**costs** 50:11
**coughing** 93:2
**counsel** 17:18,20 105:7,13
**counterparties** 6:10 39:14
59:17
**counterparty** 9:11 43:24
**Country** 6:19 26:19
**County** 23:12,13 105:2
**couple** 10:5 29:13 80:18
81:1
**court** 1:2 15:24 98:5,9,14
100:24
**courtesy** 30:17
**cover** 47:21 72:2
**co-workers** 12:20
**create** 69:24
**created** 77:23
**creating** 18:18 33:4 39:9
**creation** 20:19 38:7
**credit** 13:14,14 47:15,20
**creditor** 54:24
**creditors** 1:20 57:1,12
**crossed** 70:14,17,23 71:2
**CSS** 1:8
**current** 3:12 10:6 22:3
23:3 28:2,9,17 29:14
37:16 44:22 49:15,16
53:21 70:3 83:16
**cut** 67:4
**cutoff** 53:21
**cuts** 53:23

**D**

**D** 102:1
**Damian** 1:9 2:6 5:11,13,14
5:15 10:7 21:12 62:24
63:8 67:20 68:14 102:2
105:7
**Damians** 63:8
**Dan** 80:3
**data** 18:14 20:22 22:18,21
22:23 23:2,5,9,10,11,21
23:22 24:14,17,19,23
25:2,2 26:2 28:17 32:21
43:18 56:24 78:22 83:3,4,6
82:11,22 87:11 98:22
99:9,13,20,22
**database** 11:7 43:23 53:18
53:20 54:7 59:7,20 77:23

**78**:2,5 82:2,5,10,16
**date** 16:8,14 48:13 49:8,17
53:19 54:1,2,4,4,4,9 55:2
55:22 63:23 64:19,24,24
65:1 91:15 93:4 94:14
**dated** 31:3 33:24 36:22
60:16 67:21 102:7,9,13
105:21
**dates** 8:24 64:20 91:15
**day** 10:11 33:15 94:10
**days** 28:1 44:8,11 51:11,13
63:21 79:18 94:12,17,18
94:19 95:4,10
**DC** 2:3
**debtor** 37:7 89:17 100:7,12
**debtors** 1:8,17 31:3 36:20
36:22 61:19,24 76:11,14
98:18,20 99:7 102:6,8,12
103:8,10
**decide** 58:4
**decided** 41:11
**decline** 22:8 23:24 24:4
**declining** 22:6
**decrease** 40:15,16 41:4
**decreases** 71:20
**default** 11:18 13:24 26:6
27:24 34:17 35:1,8,21
37:17 42:20 43:4,14,16
44:7,8,11 47:6,11 52:19
**defaulted** 66:10
**defaulting** 35:3 36:3 43:16
**defaults** 9:17 20:14 34:2
35:13 42:14 43:8 44:10
48:3 74:9 102:15
**define** 15:4
**defines** 69:3
**definition** 74:11
**degree** 4:6,8
**Delaware** 1:3 6,11,17,22
105:1
**delineated** 7:9
**delinquency** 33:6,10,13,16
**delinquent** 27:9 65:23
**delivery** 91:15
**demand** 65:12
**demonstrate** 74:7
**dent** 65:17,20,21 66:2,11
**department** 83:21,22 89:9
**depending** 27:8
**deponent** 2:7 102:2 104:7
105:6,8
**deposed** 3:4
**deposition** 1:9 15:3 101:3
102:5 103:2
**depreciation** 21:11
**derives** 27:4
**describe** 4:4,13 6:14 7:6
18:7,24 21:20 25:17,23

39:8 90:17
**described** 6:24 9:3 25:6 36:5
**descriptions** 10:5
**design** 41:2
**designated** 3:6 76:17
**designation** 4:12
**detail** 7:6
**detailed** 52:14
**details** 9:7 63:16
**determination** 48:13 49:8 54:1,2,9 55:2,22
**determined** 37:8
**determining** 21:4
**Deutsche** 57:21
**developed** 84:7 103:13
**devise** 38:22
**differ** 42:11
**difference** 6:22 49:10 51:9 79:13
**differences** 79:8
**different** 7:11 27:7 40:17 46:4,23 59:5 60:23,24 80:15,18,20 82:5,14 89:9
**difficulties** 59:15
**diligence** 8:22 47:6 86:19 86:20,21 87:1,3,7,10 88:4
**direction** 105:10
**disagree** 94:11
**disclose** 17:22
**disclosure** 30:24 32:2 40:6 40:19 102:10
**discrepancy** 63:14 81:23
**discussed** 48:16
**discusses** 31:24
**discussing** 38:6,21
**discussion** 19:10 68:7
**DISTRICT** 1:3
**division** 92:5
**document** 8:10 9:7 12:20 39:22 55:15 56:11 67:10 68:17 76:10 84:11 85:12 85:13,16 86:6 92:15 93:10 94:4,22,24 95:6 96:6,6 97:2
**documentation** 10:3
**documented** 7:20
**documents** 70:9 71:14 84:14 86:10,22 97:6
**Doherty** 80:4,5,6
**doing** 7:5 27:11 63:24 66:9 95:19
**dollars** 12:16,17 65:5 80:14
**Dorsey** 1:14 7:14 14:7 15:4 15:19 17:22 23:15 30:21 31:19 35:15 38:15 42:21 55:14 57:7 58:24 60:7

62:5 68:4 72:13,15 74:21 76:20 83:13 85:18 87:21 87:24 94:3,21 95:11 96:4 96:22 97:1,15 98:1 100:23 101:1
**doubt** 70:18
**downward** 41:17
**due** 8:22 47:6 86:19,20,21 87:1,3,9 88:4
**duly** 2:8 105:7
**duplicates** 58:1,3
**duplicating** 62:17
**duplicative** 57:19 61:12
**D-A-M-I-A-N** 5:13

E

**E** 1:15 102:1,4 103:1
**earlier** 40:24 61:2 82:16
**early** 9:16 11:18 13:24 44:6 44:10 52:19 74:9
**easier** 19:5 24:2
**economic** 99:18
**educational** 4:4
**EDWARD** 1:18
**effort** 25:7
**eight** 4:19
**either** 2:16 90:7 105:14
**elaborate** 27:19
**electrically** 58:21
**electronic** 87:16
**electronically** 17:16 58:20
**elicit** 20:16
**eliminated** 76:15
**employed** 5:5 89:10
**employee** 83:16
**employees** 18:10
**employer** 3:17
**ended** 61:3
**engaged** 84:18 90:13
**entire** 67:10 75:8
**entities** 92:2
**entitled** 76:10
**entity** 58:4 89:10
**EPD** 11:18,20 12:3,6,12 13:4 14:9 17:8 18:1,6,19 19:6,11,17 20:23 27:6,23 28:9 29:20 30:10 31:24 37:3 38:11 39:4,21 46:6 46:24 48:11,12 49:1,5,8 51:3,16,16,19,23 52:6,10 54:21,24 56:18,22,24 57:4,11,16 61:20 63:21 67:7 69:3 71:5,9,15,22 73:14 74:5,6,16 75:13,18 75:19 98:5,10 100:19
**EPD's** 51:10,13 61:6
**EPD/Breach** 56:8 102:16
**equal** 49:24 66:2,6 96:16

**ERRATA** 103:18 104:4
**ESQUIRE** 1:14,15,18 2:2
**established** 54:24
**establishing** 64:2 74:22 75:5
**estate** 49:2,21
**estimate** 20:23 56:17,18,22 56:24 57:11,15,18,19,24 58:18 62:1,11,17 63:11 98:23 99:10
**estimated** 61:20
**estimates** 27:15 29:19 59:19
**estimating** 37:9 43:19
**et** 1:7 103:17
**event** 105:14
**eventually** 28:18 34:17
**everybody** 69:12
**evidence** 98:5
**exact** 91:14
**exactly** 7:7 87:2
**examination** 102:3 105:12
**examined** 2:8 105:7
**example** 8:22 19:1 21:22 22:7 24:2,6 27:22 28:11 28:14 29:4 37:16 44:12 57:20 67:14
**examples** 6:15 39:24
**exceed** 96:15
**Excel** 8:3
**exchange** 67:5 68:18
**excused** 101:2
**exhibit** 30:5,24 31:9 33:19 33:23 40:5,14 48:7 53:12 54:11 56:4 59:4 60:15 61:3,20 63:17 67:19 76:10 78:10,15 81:8,9,13 81:16,20 82:1,4,13,18 83:1,4 84:1,5 91:22 92:7 92:8,11
**exhibits** 30:19 97:13 102:5 103:2
**existed** 24:17
**expect** 57:4
**experience** 20:11 22:11 26:7 32:18 34:20 98:20 99:7
**experienced** 45:1 47:10,19 66:12
**expert** 3:7,9 79:10 97:3,4 97:21
**Expires** 105:19
**explain** 10:16 12:4 23:23 24:2 27:13 37:14 60:20 62:8 65:10 67:22 68:22 75:14 79:3,8
**explains** 9:22
**expressing** 9:7

**extent** 54:23 86:11
**extrapolates** 77:23 82:6
**e-mail** 7:21 60:15 61:19 62:23 64:8,16 67:5,19,20 67:22 68:13,18 75:23 86:1 102:18,19,20,22 103:3

F

**F** 64:22
**facilities** 47:20
**fact** 16:19
**factor** 71:11,16
**familiar** 11:20 99:22
**familiarity** 86:9
**Fannie** 91:10,11
**far** 30:13 31:21,22 38:2
**Fargo** 6:19 57:21
**February** 1:12 36:23 102:7 102:9 105:6
**feel** 2:22
**Fernandes** 10:10 30:18 56:3
**Fernandes-12** 31:5,23
**Fernandes-2** 91:23
**Fernandes-6** 84:2,6
**Fernandes-8** 78:11,16
**ferret** 99:18
**FETZER** 1:22
**field** 59:7,14
**figure** 85:11,15 86:5
**figures** 63:15
**figuring** 58:9,16
**file** 47:14 52:8
**filed** 11:13 14:18 61:20 91:24
**files** 10:15 87:6,17
**filing** 14:18 16:21 45:4 56:8 93:7,8 100:15 102:16
**fill** 17:6
**filled** 73:14 91:16
**finally** 65:6
**finance** 4,7,8
**financial** 4:9,11,17 20:5
**find** 11:2 24:16 31:24 37:21 47:7 63:5 72:17
**finds** 37:18
**finish** 15:23
**finished** 16:1
**finishes** 15:19
**first** 2:7 5:2 6:24 7:2 12:2,5 13:1,20,23 14:13 15:15 16:2,17 19:3,8 41:18 54:15 62:10 64:8 76:12,13 79:4 91:9 92:4 92:10,23 93:5 95:17 103:8,9,16

**fits** 13:16 74:11
**five** 24:3,4,7 37:7 94:17,18 94:19 95:4,10
**fixed** 79:4,15
**Floor** 1:11,16
**floors** 85:4,5
**Florida** 23:13
**focus** 32:5
**focused** 32:7 56:13
**follow** 97:19
**followed** 53:1
**following** 20:13
**follows** 2:9
**footage** 85:3
**foreclose** 26:7
**foreclosed** 20:13
**foreclosure** 66:8,10
**foregoing** 105:11
**forgot** 76:3
**form** 7:14 23:15,19 31:19 35:15 42:21 55:14 57:7 62:5 72:13 83:13 85:18 87:21 94:3 95:11
**format** 40:13 93:10
**forms** 45:17
**formula** 22:14 25:14
**formulation** 88:14
**forth** 52:16
**forward** 38:10
**found** 48:17
**four** 65:15 85:5
**fourth** 70:13
**Freddie** 91:11
**free** 2:22
**frequencies** 27:7 32:19,24 98:23 99:10
**frequency** 25:15,18 27:15 29:19 30:13 32:6,9,15 33:5 43:20 44:3,6,12,16
**Friday** 1:12 105:6
**front** 95:17
**full** 28:22 29:15
**fully** 57:13
**fund** 64:19,24
**funding** 65:4,5 66:1
**funds** 47:21
**further** 26:6 105:11,13
**future** 37:15

G

**G** 64:22
**gain** 90:19
**general** 48:24 49:5
**generally** 6:14
**generate** 59:13
**Genie** 91:11
**Gilbert** 2:2,12
**give** 6:14 21:22

American Home Mortgage Holdings, Inc., et al.

**given** 5:22 13:13 62:15
  105:8,12
**giving** 75:17
**glanced** 77:4
**go** 2:19 10:11 19:5,13 26:6
  26:6 27:11 35:8,24 39:24
  41:12 43:12 65:22 68:4
  83:17 90:18 97:15
**goes** 10:4 37:17 41:17,18
  47:5
**going** 2:20 7:22 17:19 19:9
  23:18 24:1 29:22 30:9
  30:21 36:19 38:10 61:16
  69:3 81:20 96:9,10 97:1,4
  97:7,12,15,19
**good** 2:11 38:15
**government** 91:10
**grand** 78:21
**greater** 32:24 33:15 36:2
**group** 3:14 6:24 7:2,3,8
  11:19 18:9 25:7,8 85:20
  85:23 86:4 100:6,10,14
  100:17,18
**groups** 7:10
**guarantee** 96:11 97:7
**guess** 10:7,9 23:23 49:4
  73:18 75:12 89:13,13
  90:15 91:12 95:13
**guidelines** 10:2 39:23
  52:15 53:1 86:23

**H**

**H** 96:14 102:4 103:1
**HAHN** 1:19
**half** 36:16 44:13
**hand** 23:21,22 43:5,6
**handling** 18:19
**happen** 38:4 47:17
**happened** 11:11 29:5
**happening** 24:21
**harassing** 97:10
**head** 36:15
**headline** 34:1,7
**hear** 12:18 13:4
**heard** 12:2,5,12,14 13:1,2
  13:20,23 14:13 15:1,11
  15:15 16:3 90:7
**hearing** 97:8
**hedge** 91:18
**hedges** 6:3
**hedging** 90:10,13,15
**held** 68:7
**help** 15:22 95:13,19
**helps** 95:13
**HESSEN** 1:19
**higher** 35:2 61:11
**hired** 3:9 5:8
**historic** 22:18

**historical** 19:20 20:22
  21:1,2 24:8 25:2 53:20
  82:3 98:20 99:7
**historically** 28:5
**histories** 52:11
**history** 51:18
**Hofstra** 4:8
**hold** 82:7
**holder** 66:14 89:24
**HOLDINGS** 1:6
**home** 1:6 3:18,20 4:21 5:4
  5:6,24 6:1 9:21 11:23
  12:7,9 16:7,14,20 21:11
  22:8 84:7 89:10,11,14
  92:6 103:13
**homeowner** 15:9 95:15
**homes** 20:2,6
**honest** 6:23 26:23
**house** 66:20 95:16
**houses** 20:13
**huge** 80:16
**hundreds** 7:19 12:14 52:4
**hybrid** 79:6,14,20 81:3

**I**

**ID** 69:10
**idea** 11:11 25:1,5 77:20
**identification** 30:1 31:7
  33:21 56:6 60:6 62:21
  64:6 67:2,17 70:6 74:17
  75:2 76:8 78:13 84:4
  91:21
**identify** 73:18,20
**imagine** 11:15
**implemented** 18:13
**important** 7:24
**imposing** 16:14
**Improvement** 84:9 103:14
**incentive** 99:18
**incidence** 39:15 40:16,22
  41:5,8 42:18,24 43:17,19
  72:20
**incidences** 43:9
**include** 50:19 52:24 61:10
  62:11 76:14
**included** 7:16 8:16 9:23
  11:3 29:19 31:17 71:21
  82:20 86:21
**includes** 57:19 60:17 70:14
  92:2
**including** 50:16 70:17
**income** 10:3
**incorporate** 37:8
**increases** 71:20
**increasing** 43:17 48:3
**index** 21:7,10 22:5 24:1
  79:19
**indicates** 59:8 66:7 77:9

**indices** 21:4
**individual** 10:14 40:2,4
**individuals** 89:5
**industry** 5:3 13:9 28:4,24
  29:1
**IndyMac** 26:19
**influenced** 42:19
**information** 7:23,24 8:5,16
  17:23 20:18 53:16 57:14
  59:18 60:24 61:7,8 63:11
  71:6 73:22 77:24 87:12
  87:14 98:8,13 99:24
**initial** 79:18 93:17,19
  95:21
**instruct** 97:13
**instructions** 97:20
**instrument** 90:22
**instruments** 90:24
**insurance** 50:5,10,17,20
  70:19 71:6,11,17
**insurer** 50:22
**Interaction** 54:12
**interest** 6:3 63:20,23 90:16
  90:18 93:16,22 94:20
  95:4,10,17
**interested** 105:14
**internal** 43:23 69:13,13
  77:22
**interpret** 96:5 97:2
**Interrogatories** 76:13
  103:9
**investigation** 67:13
**investment** 7:2
**investments** 7:5
**investor** 12:6 14:14 43:5
  57:1 65:15 69:15
**investors** 7:22 11:9 17:6
  39:11 43:21 44:18 45:16
  50:15 73:7 75:24 86:16
  86:20 87:6,19 88:22
  89:15 98:9
**investor's** 14:1
**invoice** 64:19
**involved** 6:5 18:5,6,10 85:9
  90:10 97:5 100:7
**involvement** 18:7,18
**involves** 98:14
**involving** 98:9
**issue** 2:17 37:19 69:2
**issuing** 16:8
**item** 40:14
**items** 52:13

**J**

**Jack** 91:24 97:14 103:16
**Jackson** 67:20 68:13
**January** 21:24 22:7 33:24
  61:19 105:19

**job** 18:4 90:10,20
**JOHN** 1:14
**Johnson** 80:3
**Josh** 80:3
**Journal** 33:24 34:15
  102:14
**JP** 6:16 89:2
**judge** 96:10 97:7
**judgment** 83:14
**July** 22:2,11,22 23:1,6
  51:14 93:17 94:12,15
**jumping** 16:17
**Junior** 5:18
**Jurich** 62:24 63:3
**justify** 44:15

**K**

**K** 69:11
**KAREN** 1:15
**keep** 53:19
**keeping** 11:17
**keeps** 14:22 78:4
**KELLER** 1:15
**kept** 44:21
**kind** 8:1,16,21 21:17 39:18
  42:4,6,8 47:10 51:24
  66:13 80:9 86:19 87:12
  90:22,24 99:13
**King** 1:22
**know** 11:13 13:18 14:6,9
  14:17,21,24 16:5,19,22
  16:23 17:6 18:22 21:6
  24:10 26:22,24 27:3
  36:10,10,11,15 37:2 38:2
  38:5 45:13 47:13 48:5
  52:20,22 53:2,11 58:1
  59:11 63:13,19 64:3,13
  64:20 65:16 69:12 71:15
  78:24 81:1,24 83:19,24
  84:17,21,22 85:6,8,22
  86:8,12,14 88:6,20 89:4,5
  89:8,19,22 93:6
**knowing** 57:24 91:13
**knowledge** 24:20 40:3
  95:12
**known** 4:12 36:6

**L**

**L** 1:18
**Labuskas** 21:16 25:9
**Lance** 62:24 63:3
**language** 70:14
**Las** 23:13
**lasted** 44:11
**lasting** 37:6
**lasts** 94:10
**Latham** 68:19
**law** 1:10 36:20
**lawyer's** 97:19

**leads** 58:17
**learned** 71:1 88:8
**leave** 100:12
**left** 86:10,13
**Lehman** 6:17 69:19 89:3
**lenders** 88:23 90:4
**length** 27:8
**lengthy** 9:7 10:4
**let's** 15:2 21:23 28:11
  31:24 48:23 49:19 68:9
  78:19
**level** 61:7 67:12 72:20
**life** 36:13 37:5
**light** 98:10,15
**Lightdale** 68:18
**likelihood** 35:13
**limit** 38:3
**limits** 38:5,7
**liquidate** 22:10 50:12
**liquidated** 21:23 50:9 57:5
**liquidating** 98:20 99:8
**liquidation** 31:3 36:22
  50:14 69:9 88:10 102:6,8
  102:12
**liquidations** 19:20,22 20:1
**list** 71:23 89:12
**listed** 59:8 95:22
**listing** 18:1
**literally** 23:8
**little** 13:15 62:2 99:18
**LLC** 2:12
**LLP** 1:10,15,19 2:2
**loan** 3:13 7:20 8:4 9:5,10
  10:1,14,17 11:8 13:12,13
  13:13 18:16 21:24 22:10
  24:5,6,8,9 26:17,18 27:23
  28:3,5,8,21 29:6,12,15
  33:5 35:8,13 37:16,18,23
  39:22 40:4 43:14 44:19
  44:21 47:5,8,10,12 48:4
  48:12 49:11,15,16 50:8
  51:18,19 52:8,17 53:9,10
  53:13 54:5,5,8,9 55:1
  59:5,8 61:7 63:22 66:14
  66:20,22 68:23 69:2
  70:20 72:4,10 74:17 75:3
  75:4 77:23,24 80:21,22
  86:22 87:6,14,17 88:18
  89:7,15 97:9 98:22 99:11
**loans** 3:16 5:24 8:5,19,19
  8:23 10:21 13:5,7,8,10
  26:5 29:3 35:20,22 36:3,4
  36:12 37:4 39:13,16 40:2
  43:23 44:24 47:4,18,23
  48:3 49:6 52:3,4 53:14,17
  55:3,11,23 57:22 61:13
  65:15,21,22,23 66:10
  69:20,22,23 70:1 72:18

72:21 73:20 75:24 77:7
78:4 86:15 91:14,16
98:21 99:3,8
**loan's** 55:1,10,21
**loan-by-loan** 51:4 67:12
**long** 3:19 79:22 94:2 96:3
**longer** 44:8 79:21 100:6
**look** 10:17,21 21:4 26:11
29:18 30:5 31:9,11 34:3
40:5 47:9 48:7 49:19
54:11 59:1,4 64:10,15
65:2,17 67:9 70:8,11 72:1
76:22 81:7,13,16 82:8,18
83:18 84:12,15 89:12
92:7 93:9,12 95:20 96:14
**looked** 19:20 25:19 27:16
39:10,12
**looking** 22:1 26:17,22 32:3
51:17 52:7,10,14 64:21
86:22,22,23 94:14 100:8
**looks** 66:9 67:24 69:19
72:9 82:8,9,21
**lose** 90:19
**loses** 82:16
**loss** 22:5 24:9 25:14,15,18
26:7 27:7,14 28:3,5,19,20
29:19 30:13,13 32:6,9,14
32:18,24 33:5 44:3,6,12
44:16,20 45:1 46:13,20
47:11,19 65:6,14 66:2,12
71:12,17,19 90:21,23
98:23 99:10,16,18
**losses** 19:22 20:22 23:11
99:4
**lot** 29:5 80:17
**low** 7:18
**LPA** 9:23
**lunch** 38:18 76:3
**Lynch** 6:18 64:16

**M**

**M** 65:2,11
**Madison** 1:19
**Mae** 91:11
**main** 77:24,24 78:5 82:2
**making** 12:6 21:20 46:12
**man** 91:24
**management** 90:16
**manner** 49:8
**manuals** 84:15
**March** 63:18
**margin** 47:21 79:19 90:3
**mark** 29:22 33:18 56:4
75:13
**marked** 29:24 31:4,6 33:20
56:5 60:5 62:20 64:5 67:1
67:16 70:5 76:7 78:11,12
78:15 84:3,6 91:20,23

102:5 103:2
**market** 22:3,6 42:8 47:18
**marketing** 6:5,8 83:18,20
83:21 85:19,23 86:4,12
86:16
**markets** 3:14 23:3 24:21
**master** 62:14 72:10
**materials** 6:8 83:18 86:12
86:17
**math** 66:4,5
**matrix** 27:7
**matter** 21:23
**mattresses** 4:23
**maximum** 82:7 96:16
**MBA** 4:7
**mean** 5:9 15:8 21:6 22:13
22:15 35:24 41:14 45:8
46:8 58:13 64:17 65:7,20
67:9 68:2 71:19,20 79:16
80:20 86:1 87:22 89:17
**meaning** 27:24
**means** 2:22 50:16 65:21
91:6
**meant** 90:17
**mechanism** 37:9
**Melville** 4:1,2 10:12 85:1
87:6
**member** 21:14
**Memorandum** 36:20
**mentioned** 11:7 29:4 39:21
62:12 87:4 98:18
**Merrill** 6:17 64:16
**methods** 38:2 95:18
**metropolitan** 21:8
**Michael** 25:9
**Mike** 21:16
**million** 61:21,21 62:2,3
81:6
**millions** 12:15
**mind** 46:2
**minute** 34:3,9 84:12
**missed** 28:6,13,16,23 29:6
29:12,13
**missing** 11:12 39:22
**misstated** 86:24
**misstatement** 37:22
**Misstates** 42:22
**model** 18:12 25:19 27:16
27:20 28:2,7 41:12 61:8
**models** 26:2 91:17
**modifications** 25:21 27:17
**modified** 27:21
**money** 89:16
**monthly** 93:17 95:21
**months** 4:19
**month's** 95:17
**Morgan** 6:16 89:2
**morning** 2:11

**mortgage** 1:6 3:18,20 4:21
5:3,4,6 6:1,3,19 7:8,23
8:5 9:5 11:8,23 15:9 27:8
28:12 49:16 50:5,10,16
50:20,21 52:19,23 66:14
70:19 71:6,11,16 78:24
79:5 84:8 87:15 89:7,14
90:21 91:9,13 92:6,17,19
97:5 103:13
**mortgages** 3:16 6:6,11 7:4
7:9,10,11,16,19 20:7,14
33:1 35:1,3 42:13 73:8
74:8 84:18 90:12,19
103:11
**Mortgage's** 16:8
**mortgage-backed** 26:9,15
91:2
**move** 97:9,11
**MTA** 79:7
**multiple** 53:14 57:20 62:13
**multiplied** 24:4 30:14

**N**

**N** 65:3,16,17,18 102:1
**name** 2:11 5:12,14,15 6:12
6:12 10:18 15:11 68:24
85:8
**named** 91:24
**names** 80:1
**naming** 69:13
**national** 26:1
**nearly** 34:16
**necessarily** 43:16
**need** 2:15,18 34:10 37:2
47:14 52:14 76:19 96:2
**needed** 19:3
**negotiated** 80:17
**net** 50:1,13,16,19,23 69:8
71:18,19,19
**never** 5:21 14:3,4,5 77:4
94:5,23 96:6,15 97:2,16
99:14
**new** 1:20,20 2:3 4:1,2 10:12
16:11,15 18:12,15,19
19:1 22:15 24:11 26:20
40:9,10 41:3,7,12 42:4,8
42:12 105:2
**newer** 81:4
**news** 26:2
**Noble** 4:16,24
**non-performing** 65:23
66:22 98:21 99:8
**Notary** 1:12 105:5
**note** 92:17,19 93:11,18
94:5
**notes** 87:15 105:9
**notice** 1:10 16:8 56:7 81:11
83:4 102:16

**November** 31:4,17 60:16
61:18 67:21 68:14 102:13
**number** 12:14 19:23,24
20:16 22:15 28:10 56:23
60:10 61:11,12 68:24
71:21 77:7 82:8 83:7 92:9
**numbered** 56:14 60:11
**numbers** 8:4 19:4,16 20:21
20:24 21:1,2,7 22:4,9
23:9 25:13,18,20,21,23
26:11,24 27:4 30:12,15
32:9 39:16,16 56:21 57:3
61:5,15 82:14 83:2 89:23
**numerical** 56:16
**NW** 2:3

**O**

**O** 65:3,16,17,18
**oath** 2:8
**OBC** 56:14 92:10 102:17
102:17 103:12,14,15
**object** 87:21
**objected** 71:10
**objection** 7:14 23:15,19
31:19 35:15 42:21 55:14
57:7 62:5 72:13 83:13
85:18 94:3,22 95:11 96:4
96:22 99:2
**Objections** 76:11 103:7
**obligated** 65:12
**obligations** 87:15
**Occasionally** 16:12
**occurred** 45:23
**occurrence** 43:4
**occurring** 45:3
**office** 67:6 83:20 84:24
**offices** 1:10 11:14
**official** 2:13 12:20 76:12
103:8
**offset** 90:22
**Oh** 24:18
**okay** 19:8,15 22:21 29:12
34:11,13 39:4 48:20,21
55:18 56:15 62:10 76:24
92:14 94:16
**old** 22:19,22 23:2
**older** 41:21
**ones** 11:12 89:1
**ongoing** 36:13
**operations** 84:19
**opposed** 39:4 46:6 53:10
**option** 13:10,18,21 14:2,10
33:1 34:1,16,24 36:4,9,14
77:10,13 78:7 79:6,7,14
79:15,17,20,23 80:12
81:3,4,12 83:5 92:18
102:14
**Orange** 23:12

**order** 51:24
**ordinary** 24:18
**original** 5:17
**originally** 96:17
**originated** 6:1 15:10 26:21
34:17 42:13 61:14 69:23
78:4,7
**origination** 37:18 53:1
**originator** 18:17 36:7
37:20,23 47:8
**originators** 7:4 52:18
98:10,15
**Oshinsky** 2:2,12
**outside** 39:23
**owed** 49:11
**owns** 28:12

**P**

**P** 65:3,14
**page** 30:6 32:6 40:7,8,9,19
48:8 54:11 56:13 59:12
65:2 68:2 70:12 72:2,9
76:22,23 81:7 92:9,9,10
92:11 93:13 95:21 96:14
102:2 103:18,19 104:3
**pages** 8:13,15 10:5 31:11
31:13,14 60:9,10,17
**paid** 45:12,21 57:5 58:5,11
58:13 90:4
**paperwork** 5:21
**paragraph** 34:15 48:22,23
48:24 49:4,6,19 95:20
96:14
**part** 74:13,15,16 86:15 90:9
**participated** 89:6
**particular** 11:2 13:5 21:24
28:21 38:3 58:17 59:13
59:23 72:7,12 73:3 74:2
**parties** 6:1 29:4 57:20
80:23 105:8
**party** 105:14
**pass** 50:14
**Pasternak** 1:9 2:6,11
21:13 38:21 59:4 60:15
67:21 68:14 98:4 102:2,5
103:2 105:7
**Pasternak-1** 29:23,24
102:6
**Pasternak-10** 67:16 103:3
**Pasternak-11** 70:5 103:5
**Pasternak-12** 103:6
**Pasternak-13** 76:6,7
103:7
**Pasternak-14** 78:12
103:11
**Pasternak-15** 84:3 103:13
**Pasternak-16** 91:19,20
103:16

**Pasternak-2** 102:8
**Pasternak-3** 31:6,23
102:10
**Pasternak-4** 33:20 102:14
**Pasternak-5** 56:4,5
102:16
**Pasternak-6** 60:4,5
102:18
**Pasternak-7** 62:19,20
102:19
**Pasternak-8** 64:4,5,8
102:20
**Pasternak-9** 67:1 102:22
**Patrick** 67:20 68:13,19
**Pause** 34:12 54:17
**pay** 63:23 79:18 81:3,3
93:15,22 95:16 96:3
**payment** 9:16 11:18 13:10
13:18,21,24 14:2,10 28:6
28:13,23 29:6,12 32:24
34:24 36:4,9,14 44:10
51:18 52:11,19 74:9,23
75:5 77:10,12 78:7 79:6,7
79:14,15,17,20,23 80:11
81:12 83:5 92:18 93:17
95:21
**payments** 28:6,15,16 29:13
89:20 90:3,8
**people** 25:11 80:11 84:17
88:20 100:16
**percent** 24:3,4,7 33:6,9,12
33:15 34:16 41:5,16,20
41:21 44:1,4,7,13,16 51:2
51:19 65:4 72:19 93:16
93:22 94:2 95:7,7,9 96:16
99:3
**percentage** 8:22 36:11
39:15 40:16,21 48:12
**percentages** 48:17
**perfect** 67:13
**Performance** 84:8 103:14
**performed** 8:23
**performing** 44:21 47:4
**period** 24:3 61:24 63:18
79:15,21 103:11
**person** 5:9 73:1,2
**phrase** 53:11
**phrased** 20:9
**physically** 86:1 87:9
**pieces** 61:16
**pile** 23:9,10
**pipeline** 6:4
**place** 65:22
**plan** 18:5,14 19:4 20:23
22:1,12 25:21 27:18 31:2
31:16 36:21 37:6,6,8
50:18 58:1,6 59:12 63:24
64:2 88:9 102:6,8,12

**play** 16:7 20:19 80:23 88:17
**player** 80:8
**please** 40:5 48:7 98:7
**plus** 66:2 79:19
**POA** 78:17
**point** 38:15 53:23 95:9
**pool** 7:13,17 8:23 10:22
14:2 40:1,2 53:10,13,15
54:5,5,8,9 55:3,11,23,24
56:1 58:17 59:5,8,13,24
61:13
**pools** 7:11 10:21 26:12,18
48:4 57:22 81:2 86:15
89:15
**pool-by-pool** 51:7
**population** 39:13
**position** 3:12 5:20
**possibility** 38:7
**possibly** 37:20
**post-bankruptcy** 14:16
15:18 45:7 89:4
**potential** 37:5
**power** 79:4,5,21
**practice** 17:24
**precedence** 54:22
**preliminary** 2:15
**prepared** 21:5
**presented** 22:12
**presently** 29:13
**pretty** 60:22 69:7 80:10
83:11 88:1
**previous** 92:11
**previously** 12:24 13:1 31:4
58:11,13 78:11,15 84:2,6
91:23
**pre-bankruptcy** 45:9,15
45:21
**price** 8:24 26:4 65:4,5 66:1
66:3
**prices** 65:18
**pricing** 7:24
**primary** 7:4
**prime** 13:16 36:1,3,4,9
**principal** 49:12 96:15,17
96:21 98:22 99:10
**printer** 105:10
**prior** 9:5,6 14:17 16:21
27:22 47:3 58:23 60:23
64:1 78:7 99:17 100:13
**private** 50:5 70:19 71:6,11
71:16
**privilege** 2:17
**privileged** 17:23 70:24
88:8
**probably** 12:8 20:9 61:7
94:18
**problem** 82:22
**proceeds** 20:12 50:1,12,13

50:16,19,23 65:18 69:9
71:7,17,18
**process** 18:8,24 21:20
27:13
**produce** 82:12
**produced** 82:13
**product** 32:15,19 35:7 42:7
79:7,10 81:5 91:8,9,10
96:21 98:23 99:11 103:11
**Production** 76:13 103:9
**products** 42:5,11 79:11,23
80:9,15,19
**professional** 4:13
**project** 25:22 26:4
**projected** 25:20
**promoted** 5:19,22
**proof** 39:10 43:22 45:19
64:18
**properly** 73:14
**property** 66:22
**proprietary** 10:19
**protocol** 18:6,8,11,13,19
20:20,23 25:12 29:20
30:7 32:11 33:4 38:8,23
39:9 40:9,11,12 57:6
67:11,11 100:19
**prove** 32:21 58:7
**proved** 29:16
**provide** 52:18 57:13 71:5
72:21 73:22 74:12 78:2
98:21 99:8
**provided** 28:17 57:1 59:17
76:15 93:18
**provides** 68:23
**provision** 74:8
**provisions** 71:23 74:19
75:5
**Public** 1:12 105:6
**pulled** 77:22 82:2,5
**pulling** 30:19
**Puneet** 60:16
**purchase** 9:10 29:5 52:18
69:23 72:5,23 73:1,11,16
73:21 74:1,5,18 75:3,9,24
89:7 100:8
**purchased** 72:21 73:8
89:15
**purchaser** 8:18 10:22
37:17 66:12
**purchasers** 61:17 75:17
**purchases** 73:11
**purchasing** 9:5 11:8 14:1
53:5 72:10
**purported** 73:24
**purpose** 21:3 25:12 32:10
57:14,23,23 62:16 67:11
72:16
**pursuant** 1:10 22:14 31:1

57:6 73:11 75:3 102:10
**put** 37:20 47:7 66:14 81:8
**putting** 22:1 47:12
**p.m** 38:19 68:15 101:4

**Q**

**quantified** 51:10
**quarter** 40:23 41:17,18
**quarters** 41:6
**question** 2:21,24 10:16
12:4 13:3 15:20 17:5
20:17 22:16 23:19 24:15
25:3,4 27:12 34:23 35:17
36:18 43:11 45:5 46:15
67:10 68:20 72:17 83:10
85:13 88:1 95:3 96:5,12
96:23
**questionnaire** 14:12 17:14
17:15 57:2,13 68:1,21
70:4 71:4 73:15 74:10
103:5,6
**questionnaires** 17:3,7,11
18:1
**questions** 2:21 39:2 76:18
94:22 100:4,22,23 105:8
**quick** 66:5
**quickly** 42:1

**R**

**R** 69:6
**rare** 5:16
**rate** 6:3 40:15 41:4,8,11,14
41:24 43:17 79:18,19
90:16 93:16,19,19,22,23
94:2,20 95:4,10
**rates** 90:18
**read** 16:11 17:2,10,13 34:4
34:5,9 36:19 37:2,12
53:12 54:15,21 55:15,19
74:21 75:1 88:9,12
100:24
**reading** 48:20
**real** 49:2,20
**realization** 99:17
**realized** 50:1,23 99:17
**really** 6:21 13:2 41:10 47:4
66:16 86:8 87:2 89:12
**reason** 2:16 32:23 44:23
62:18 71:1 78:6
**reasonable** 27:17 49:7
**reasons** 61:6
**recall** 9:18,24 16:13 38:6
38:24 63:16 89:23,24
92:24
**receive** 28:22 29:15
**received** 39:11 87:11
**receiving** 13:24
**recess** 38:18 68:10 98:2
**record** 54:21 68:4,8 74:22

75:2
**records** 82:8,16,19,23
**recovered** 49:11
**recoveries** 50:20 70:18
**redline** 70:11
**reduced** 47:23
**reference** 40:8 63:17
**referred** 8:1 28:24
**referring** 29:2,7,11 30:22
34:14 40:18 63:13
**refers** 63:19,20
**reflect** 22:3 25:2 53:21
57:3
**reflected** 22:9
**reflecting** 23:3
**reflects** 43:1 59:20
**regard** 26:19
**regions** 21:11
**relates** 19:10 49:20
**relating** 80:23
**relative** 105:14
**relevant** 74:18 75:4
**remember** 16:4 80:4 93:4
**REO** 66:21
**repeat** 20:8 22:16 27:12
46:15 49:3 73:4
**rephrase** 20:17 25:3 35:18
100:16
**REPLACE** 104:3
**report** 10:7 82:12
**reporter** 15:24 100:24
103:19 105:4
**represent** 2:13 64:20
69:10,15
**representation** 99:19
**representatives** 87:5
**represented** 64:14
**represents** 56:23 59:5
65:11,14
**reps** 9:22,24 39:12 43:15
44:19 45:1 47:2 51:21
72:18
**repurchase** 11:19 63:22
65:3,11 66:3 100:6,10,14
100:17,18
**request** 58:23 76:13 87:19
103:9
**requests** 100:8
**require** 52:1
**required** 47:21 57:13 58:7
59:18 71:11,22 80:14
**requires** 71:4 72:6
**requiring** 74:8
**research** 34:22 35:11,12
35:19 52:14
**resets** 79:19
**resolve** 64:3
**resources** 52:2

respect 31:2 52:24 70:19 102:11
respective 105:8
respectively 65:3
response 68:21
Responses 76:11 103:7
responsibilities 5:22
responsible 79:12
responsive 58:23
rest 2:18 74:21
result 14:1 35:21 99:3
resulting 13:5
results 20:5
Resumed 38:19
retailer 4:23
review 52:4 87:6
Reviewing 53:5
right 3:1 4:15 13:16 17:8
  20:3,7 22:20,23 23:3,6
  26:21 27:1,9 28:14 30:8
  30:15 31:18 32:16 37:19
  40:24 41:20,22 42:20
  43:10 44:8,13 46:13,20
  48:18,18 49:2,8,12 51:4,7
  52:2 59:5,9,14 62:3,7,17
  66:8 72:14 73:19,22
  74:19,20,22 75:5,6,21
  76:20 81:21 90:14 94:18
  94:20 95:2,5,7 97:21
  100:15
rights 58:7
rise 96:21
rises 94:20 95:4
Rising 34:2 102:15
risk 6:3 90:16 91:18
risky 29:17
RMR-CRR 1:12 105:5,18
role 16:7 80:24 88:14,18
room 2:18
rose 62:1
Roughly 12:12
row 56:16 59:5 78:17,22
rows 78:21
Rubinstein 62:23 63:6
  64:11,13 67:6
rule 48:24 49:1,5,6
rumor 12:21
Ruth 34:1

**S**

S 102:4 103:1
sale 8:11 28:1 49:12,24
  50:1,23,24 51:12,13,14
  52:17,23 54:3,4 65:1,4,5
  66:1,8,13 69:21 84:18
sales 7:20 9:2 83:22 84:8
  84:15 85:9 86:20 97:5
  103:13

salespeople 85:6
samples 97:6
Sarah 68:18
saw 85:11,13,16 86:6 92:23
  93:4
saying 5:21 37:24
says 32:14 34:16 37:4
  49:23 56:16 64:16 72:4
  74:17 83:4 92:11 93:15
  96:15 98:19 99:7,15
scenario 57:12,15
Schedule 56:8 102:16
SCHNITZER 1:18
scratch 65:17,20,21 66:2
  66:11
second 7:1,3 16:18 34:15
  40:23 41:17 54:19 60:10
  62:12 68:5 70:12 79:5
  93:15
section 31:1,24 32:6,8 37:3
  75:13 77:6 93:12,18 99:1
  102:11
securities 26:15 91:1,2,3
  91:18
securitization 59:23 61:10
  80:24
securitizations 59:16
  62:11,13 69:24
securitize 80:23
see 6:8 11:3 23:10 31:12,21
  31:22 34:2,7,18 41:4,17
  43:13,14 45:5,8,20 47:9
  48:14,21 49:18 50:2 55:5
  56:19,20 60:18 63:1
  70:15,21 71:3 72:6 77:1,6
  77:10,13,17 78:16 81:13
  81:15,17,18 86:16 87:5
  93:24 95:22,24 96:18
  102:14
seeing 16:13
seen 9:8,16,20 32:21 35:10
  35:12,19,23 47:2 56:11
  71:14 77:3 84:11,14
  92:15,16,18 94:5,23 96:6
  97:2,6,16
sell 7:10 8:10 28:21 42:4,6
  80:21,22 90:23 91:11
selling 7:8 13:21 20:2,6
  29:3,15 36:8 84:7 90:12
  91:2 103:13
sells 5:24
sempars 82:6
send 8:12 17:24
sending 75:18
sense 3:2,3 36:6
sent 17:15 61:18 64:11
sentence 29:11 32:7 36:19
  37:11 48:18 50:4 54:15

54:19 55:7 93:15 98:19
separate 9:10 83:22
series 2:20
serviced 15:10
servicer 50:9 57:21 62:13
  62:14
servicing 19:21 26:5 53:22
set 76:12 80:15 98:22 99:9
  103:9
settlement 91:15
seven 77:17 83:5
severities 22:12
severity 19:3,16,23,24
  20:21,24 21:4,7 22:4,9
  25:13,15 30:13
sheds 98:10,15
SHEET 104:4
SHEET/DEPONENT'S
  103:18
short 67:4 98:2
showed 43:23
showing 23:11
shown 23:24 29:16
shows 21:10
shut 47:16 84:19
side 8:9 52:10 61:9 72:17
  75:13 88:18 89:7,7
side-by-side 81:8
sign 100:24
SIGNATURE 103:18
signed 5:21 9:5 104:6
significantly 83:12
Simon 34:1
single 52:17,23 53:2 76:1,2
  84:22
sit 97:1
situation 91:13
six 4:18
size 82:24
sizes 7:12 81:6
skills 80:15
Sleepy's 4:18,22,23
smaller 7:17 81:2
smallish 7:13
software 10:20 26:2 77:24
  78:3,5
sold 20:13 36:12 39:13,17
  43:24 49:2,7,21 54:4
  64:24 66:10,19 69:20
  75:4 81:2,6 86:15 103:11
somebody 10:24 26:20
  28:12 46:5,11 100:3
Sontchi 97:7
soon 66:23
sorry 16:1 54:19 78:20
  93:2 94:16
sort 37:22
sources 43:18,21

span 37:5
speaks 55:15 56:23 94:4
  94:24 96:7
specific 27:1 39:14 49:17
  63:23 79:11 91:12 92:16
specifically 9:18 26:12
  38:13 75:12
specifics 15:12
specify 50:18 74:2 75:10
speculate 48:2
speculating 36:17 66:17
  95:15
spell 8:6
spelling 80:4,8
spotty 28:6
spreadsheet 8:4 59:13
Square 85:3
stale 23:2
stand 91:5
standard 28:24 29:1,7,10
  93:11
standards 28:4
Stargatt 1:10,15
start 15:2 20:10 24:22 43:2
  46:10
started 3:22 4:14 27:20
starting 7:21 32:10 56:22
starts 32:1
state 29:10 46:2 69:1 72:7
  105:1
stated 9:15,19
statement 20:8 30:24 32:2
  40:6,19 44:7 99:12,21
  100:2 102:10
states 1:2 48:10 84:6
stating 17:7
stayed 100:16
Stenotype 105:9
STEPHEN 2:2
Steve 2:12
stick 28:11
stipulated 88:6,15
stipulation 75:17
stipulations 8:20,21
stopped 53:22
stored 11:16
Street 1:11,16,22 4:12 6:2
  6:16 33:24 34:14 102:14
string 102:22 103:3
strong 43:3
structures 80:18,20
studied 77:5
subject 15:14 35:12,20
  74:9
submit 46:5 50:21,22 72:24
  73:14
submits 50:10
submitted 45:17

subprime 13:15,16 18:16
  36:1,2 42:13,15
subsequent 93:23
substantial 47:19
substitute 22:15
subtracted 55:2,10,22,24
subtracting 50:12
sued 98:10
suffer 47:23
suffered 44:19 46:13
suggestion 71:10
suing 98:15
suit 105:14
Suite 2:3
Support 36:20
supposed 71:16 73:15
sure 6:21 15:6 17:21 22:17
  32:8 41:13 46:16 51:1
  68:6 83:11 87:2 89:13
  90:21 98:1
switched 38:11
sworn 2:8 105:7
system 10:19,20 98:5,9,14
S&D 65:4,5

**T**

T 1:14 91:5 102:4 103:1
table 40:18,21 41:2 48:18
  48:24 49:20 59:12 60:20
  60:22 64:10,17 68:2,22
  68:23 77:1,7,20 78:16
  82:1
tables 81:24
take 34:3,9,10 38:16 50:4
  54:22 58:3,24 59:1 64:15
  68:9 71:4 84:12 96:2
  97:23
taken 1:9 71:21 105:8
talk 2:16 20:1,11 26:8
  38:11 41:24 76:4 78:19
  97:21
talked 20:19 30:12 60:23
  100:9
talking 20:2,12 22:22
  25:24 26:9 30:8 38:13,14
  39:3,18,20 42:1 53:11
  78:20,21 99:1
talks 40:21 63:14
tape 7:22 8:1,3,7
Taylor 1:10,15
TBA 91:1,2,3,6
team 21:14
tell 43:18 79:12 96:3
ten 7:17 31:12
ten-minute 97:24
term 90:15
terms 9:20 15:13 36:1 46:8
  93:9

**Terry** 1:12 105:5,18
**testified** 2:9 94:5,23
**testify** 96:8,9,9,11 97:4,8
**testimony** 42:22 76:4
    105:12
**text** 92:11
**Thank** 60:13
**Thanks** 59:2 100:22
**thing** 4:10 60:8 75:2 83:23
**think** 2:24 22:21 24:2 35:2
    35:4,9 36:5,6 37:1 39:21
    51:14 62:18 71:18 72:1
    73:17 80:7 83:8 86:21
    88:1 89:8 92:5 93:11 94:8
**third** 6:1 29:3 72:2 79:9
**third-party** 28:21 66:11
**thought** 16:1 27:17 34:23
**thousands** 52:4
**three** 3:21 28:16 60:9
    78:19,21,24 79:9
**Tilton** 91:24 97:13 103:16
**time** 5:2 6:2 7:8,11 12:2,5,8
    13:2,20,23 14:13 15:15
    22:6 27:8 34:10 38:3,5,7
    48:4 49:24 50:23 51:14
    52:1 54:3 60:23 63:18
    71:4 76:1,2 80:14,17 89:3
    92:23 96:2 97:9,10
    103:11
**times** 16:11,15 24:4 42:19
**title** 5:17
**titles** 87:15
**today** 45:8 86:3,4,7
**told** 24:13
**tools** 26:3,3
**top** 24:8 36:15 40:8,22
    67:19 84:7
**total** 56:16 78:21
**touch** 10:24
**Towson** 4:7
**track** 11:17 14:22
**tracked** 99:14
**trade** 8:12,13,17,20 9:6
    54:3 75:18,20,21 80:9,11
    80:15
**traded** 79:23 80:10
**trader** 3:13 5:18,20,23,24
    90:20
**trades** 6:1 69:13 75:16
    80:13
**trading** 79:11 80:19 81:1
**trail** 7:21
**Training** 84:8 103:14
**transactions** 7:7 90:13
**transcribed** 105:9
**transcript** 105:12
**transcription** 105:10
**transfer** 89:21

**treat** 10:9
**tremendous** 52:1
**trouble** 15:24
**true** 31:21,22 105:12
**trust** 37:6
**trustee** 57:21 61:16 62:14
**trusts** 61:10
**trustworthy** 83:2
**trying** 75:15
**turn** 48:8
**turned** 28:2
**twice** 37:2
**two** 4:16 8:15 25:13 28:15
    30:12 36:13 60:10,17
    63:8 81:24
**two-page** 102:18
**type** 13:7 26:17 28:8 33:5
    103:11
**types** 8:19 13:5,8 15:16
    32:16,20 33:1 35:1,20,21
    79:1 98:24 99:11
**typical** 63:21 86:19,21
**typically** 7:10 8:14 71:19
    80:13 87:13 99:16

---
**U**

**Uh-huh** 19:12 39:5 64:12
    68:16 78:23
**uncomfortable** 2:18
**undergraduate** 4:6
**understand** 2:21 22:18
    24:15 27:6 35:17 37:11
    41:13 45:5 46:17 70:3
**understanding** 9:4 28:20
    29:14 36:2 42:12,14,17
    47:1,15 50:8,19 53:3,4
    73:10 79:13 87:18 88:3
    96:20
**understated** 83:8,12
**understood** 2:24
**underwriting** 52:15 53:1
    65:24
**underwritten** 10:2 39:23
    86:23
**Unify** 78:3 82:3,7
**UNITED** 1:2
**University** 4:7,8
**unliquidated** 37:10
**Unofficially** 5:20
**unpaid** 49:13 96:15,21
**UPB** 48:12 49:10,13,24
    50:22 53:9,10,13,13,15
    53:24 54:8,12 55:1,10,11
    55:21 56:1 69:4
**UPB's** 53:14,17
**use** 2:18 20:24 40:10 69:23
    70:24 90:15 91:18 105:9

---
**V**

**v69:**16,18 103:16
**Vadim** 62:23 63:6 67:6
**vague** 88:2
**valid** 51:16 54:24
**valuation** 26:3
**valuations** 26:3 47:19,24
**value** 23:24 28:22 29:15
    90:20,21
**values** 21:11 22:8
**vantages** 40:17
**variables** 43:12,13
**varies** 54:5
**various** 26:2 35:13
**vary** 7:18
**varying** 40:17
**Vegas** 23:13
**verify** 52:5,7,14 64:23,24
**verifying** 51:16 52:5
**version** 31:10 61:2 70:3
**Victor** 69:18
**violated** 71:24 72:12 75:10
**violation** 27:24 28:9 39:21
    51:20,21
**violations** 43:15 44:19 45:1
    47:3 65:24
**volume** 52:3 80:16
**voting** 56:8 57:23 62:16
    102:16
**Voulo** 5:11 10:7 62:24 63:9
**V-O-U-L-O** 5:13

---
**W**

**wait** 15:19,23
**Wall** 4:12 6:1,16 33:23
    34:14 102:14
**want** 6:12 8:10 12:21 15:4
    31:13 32:8 34:4 62:8 80:1
    86:16 96:7
**wanted** 10:17 22:2 59:11
    83:17 85:11,15 86:5
**wants** 28:21
**warehouse** 88:18,23 89:6
**warrant** 44:19 51:21
**warranties** 9:21,24 11:3
    39:18 40:1 52:24 54:23
**warrants** 9:22 39:12 43:15
    45:1 46:15 47:3 72:18
**warranty** 11:1 14:14,19,20
    16:20 17:3,8 18:22,20 19:7
    19:14 37:10,14 38:8,12
    38:14,23 39:4,9 40:12
    42:18 43:1,6,9,20 44:16
    45:3,9,15,24 46:7,12,19
    46:23 51:6 52:9 54:13
    55:3 57:4 58:10,14 62:1
    71:5,9,15 72:7,8,12,24
    73:3,24 74:2 98:14,16
    99:6,15,19 100:1

---
**Washington** 2:3,13
**wasn't** 20:9 79:10 89:3
    97:4
**wasting** 97:9,10
**Watkins** 68:19
**way** 16:23 36:11 38:10
    41:19 47:7,13 51:15 58:9
    58:16 66:12
**ways** 41:10 69:13,14 80:18
    81:1
**weighted** 19:23
**Weisbrod** 2:2,10,12 7:15
    14:8 15:6,7,21 23:17
    29:22 30:2,4,17,23 31:8
    31:20 33:18,22 35:16
    38:17,20 42:23 55:17
    56:3,7,10 57:9 58:22 59:2
    59:3 60:2,4,9,14 62:6,19
    62:22 64:4,7 66:24 67:3
    67:15,18 68:6,9,11 70:2,7
    72:22 74:24 76:6,9,21
    78:10,14 83:15 84:1,5,10
    85:21 88:5 91:19,22 92:3
    94:6 95:1 96:13,24 97:12
    97:18,23 98:3 100:21
    102:3
**Wells** 6:18 57:20
**went** 4:20 11:23 12:10,13
    39:8 61:20 75:23
**West** 1:11,16
**we're** 30:8 32:3 71:18
    72:20
**we've** 11:1 30:12
**Whatever's** 74:10
**When's** 12:2,5 15:15 92:23
**Wide** 6:19 26:19
**WILCOX** 1:22
**Wilmington** 1:11,17,22
**window** 51:11 75:18,19
**Wire** 89:21
**witness** 3:7,10 57:8 72:14
    72:16 83:14 85:19 87:22
    88:3 94:4,23 95:12 97:3,4
    97:11 101:2 105:12
**word** 8:6
**words** 70:17
**work** 10:11 21:17 22:17
    51:24 66:13 69:21 85:6
    92:22 100:18
**worked** 3:19 4:15,17 5:2
**working** 18:9 25:11 45:6
    53:22 90:2
**works** 51:1 68:22
**worst** 57:11,15
**worth** 98:6,11,16
**write** 75:22
**written** 29:8 34:1
**wrong** 49:4

**wrote** 14:19 75:19,20
**www.wilfet.com** 1:23

---
**X**

**X** 102:1,4 103:1

---
**Y**

**Yeah** 58:15 62:4 68:23 73:6
    73:20 80:7 82:21 93:11
**year** 16:5 40:22,23 41:15
    59:8,11
**yearly** 93:16,22
**years** 3:21 4:16 36:13 37:5
    37:7,17 41:6 79:22 81:19
**Yep** 49:22
**York** 1:20,20 2:3 4:1,2
    10:12 16:11,15
**Young** 1:10,15

---
**Z**

**zero** 28:3 33:6 44:11
**zip** 69:1
**Zoloft** 10:9

---
**$**

**$1,103.22** 95:24
**$100,000** 24:7
**$5,000** 24:8

---
**0**

**0.01** 41:20,21 42:2
**0.18** 41:19
**0.22** 41:16,18 42:2
**01053** 92:10,13 93:13
**01054** 95:21
**01055** 96:14
**01119** 103:14
**01180** 103:15
**01182** 103:12
**01462** 102:17
**01467** 102:17
**07-11047** 1:8

---
**1**

**1** 30:2,5 48:7 53:12 54:11
    63:18
**1st** 93:21 94:13
**10** 67:15,19 68:12,13 79:22
**10th** 60:16 61:18
**10:50** 1:11
**100** 33:15 44:3,7,15 51:1
    51:18 99:3
**1000** 1:11,16
**10022** 1:20
**104** 62:3 103:18
**104,118,672** 56:17
**105** 103:19
**11** 1:5 31:2 36:21 70:2
    102:6,8,12

**11:55** 38:18
**110** 96:16
**1100** 2:3
**1125** 31:1 102:11
**12** 44:12 70:4,5,11
**12.5** 33:6
**12:35** 38:19
**13** 76:10 81:8,13,20 82:4
  82:18 83:4
**1330** 1:22
**14** 78:10,15 81:9,16 82:1
  82:13 83:1
**14,996** 77:10
**1467** 56:14
**15** 56:4 84:5
**16** 91:22 92:8
**167** 61:21
**168,615,382** 56:18
**17th** 1:11,16
**1700** 2:3
**18th** 67:21 68:14
**1868** 60:10
**19801** 1:17,22
**1999** 103:11

---
**2**
---
**2** 29:23,24 30:3 31:9 72:9
  93:12 102:3
**2:04** 68:15
**2:50** 101:3
**20** 21:8
**20005** 2:3
**2002** 78:8
**2003** 40:23 82:23
**2004** 77:17 83:5
**2005** 41:20,21 77:15 82:9
  82:19,23 83:11
**2006** 3:22,23 5:6 13:22
  24:24 77:12 81:12 92:24
  93:17,21 94:13,13
**2007** 12:8,23 13:2 34:17
  40:22 41:15,17,18 77:9
  81:12
**2008** 16:6 21:24 22:2,7,7
  22:11,22 23:1,6 31:4
  60:17 67:21 68:15 102:13
**2009** 1:12 33:24 36:23
  102:7,9 105:6
**2011** 105:19
**22** 44:1 72:19
**230** 61:21
**233-RPR** 105:19
**25** 102:13
**25th** 31:4,17
**26th** 94:15
**29** 102:6,8

---
**3**
---
**3** 30:24 40:5 72:2 74:11,13

**74:**14,16,16 79:22 93:18
  95:20
**30** 37:5 44:11
**30th** 33:24
**30-day** 33:6
**300** 81:6
**302** 1:23
**31** 63:18 102:10 105:19
**31st** 22:11 93:17 94:12
**31-day** 33:9
**317** 77:15
**33** 102:14

---
**4**
---
**4** 33:19,23
**4th** 100:13
**43,628** 77:12
**46** 30:6 48:8
**47** 59:12
**48** 54:11
**488** 1:19
**49** 31:11

---
**5**
---
**5** 59:4 61:3,20 79:22 102:7
  102:9
**5th** 36:23
**50** 31:11 33:9
**56** 62:2 102:16
**58,000** 81:12

---
**6**
---
**6** 1:12 60:15 105:6
**60** 102:18
**60-day** 33:9
**61** 33:12 34:16
**62** 102:19
**64** 102:20
**655-0477** 1:23
**67** 102:22 103:3

---
**7**
---
**7** 30:10 31:12,18 48:10
  53:12 54:12 79:22
**7th** 61:19
**7-31** 69:4
**70** 103:5,6
**75** 33:12
**76** 103:7
**78** 103:11

---
**8**
---
**8.132** 93:22 95:7
**84** 103:13
**85,000** 81:17,21

---
**9**
---
**9** 66:24
**9-10-07** 65:4,5,6

**90** 28:1 33:15 44:8 51:11
  51:13
**90-day** 33:12 75:18,19
**91** 92:12 103:16
**92** 32:1
**94** 32:6
**98** 40:8,9
**99** 40:19