# EXHIBIT E



**1**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re                        )
                             ) Chapter 11
AMERICAN HOME MORTGAGE       ) Case No.
HOLDINGS, INC., a Delaware   ) 07-11047
corporation, et al.,         ) (CSS)
                             )
            Debtors.         )
-----------------------------)

DEPOSITION OF MICHELE MICHAELIS
New York, New York
Wednesday, February 4, 2009

Reported by:
TAMI H. TAKAHASHI, RPR, CSR
JOB NO. 56094

**3**

1
2    A P P E A R A N C E S :
3
4    ZUCKERMAN SPAEDER LLP
5    Attorneys for Official Committee of
6    Borrowers
7       919 Market Street, SUITE 990
8       Wilmington, Delaware  19899-1028
9    BY:  THOMAS G. MACAULEY, ESQ.
10
11
12   HAHN & HESSEN LLP
13   Attorneys for Creditors Committee
14      488 Madison Avenue
15      New York, New York  10022
16   BY:  EDWARD L. SCHNITZER, ESQ.
17
18
19   YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
20   Attorneys for Debtors
21      1000 West Street, 17th Floor
22      Wilmington, DE  19899-0391
23   BY:  KAREN KELLER, ESQ.
24      (Via telephone.)
25

**2**

1
2          February 4, 2009
3          11:03 a.m.
4
5       Deposition of MICHELE MICHAELIS,
6    held at the offices of Hahn & Hessen, 488
7    Madison Avenue, New York, New York, pursuant
8    to Notice, before TAMI H. TAKAHASHI, RPR and
9    a Notary Public of the State of New York.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1
2    M I C H E L E   M I C H A E L I S,  called
3       as a witness, having been duly sworn by a
4       Notary Public, was examined and
5       testified as follows:
6    EXAMINATION BY
7    MR. MACAULEY:
8       Q.   Good morning.
9       A.   Good morning.
10      Q.   Can you state your name for the
11   record, please.
12      A.   Michele Michaelis.
13      Q.   And, Ms. Michaelis, where are you
14   employed?
15      A.   BDO Consulting.
16      Q.   And what's your position there?
17      A.   I'm a director in the restructuring
18   services practice.
19      Q.   And how long have you been there?
20      A.   With BDO Seidman, the parent of, 15
21   years.
22      Q.   Okay.  And have you been in the
23   restructuring section the whole time?
24      A.   About 11 years.
25      Q.   And can you just briefly summarize

5

Michaelis

1  your education for me.
2      A.  I have a Bachelor of Science in
3  accounting from Alfred University.  And an
4  MBA in finance from Zicklin School of
5  Business at Baruch College.
6      Q.  And when did you -- when did you
7  receive your MBA?
8      A.  Roughly, 2002.  Sorry.
9      Q.  Okay.  And when did you graduate
10 from college?
11     A.  '93.
12     Q.  '93.
13         And have you been employed by BDO
14 since you came out of college?
15     A.  Yes.
16     Q.  Okay.  What did you do in the four
17 years prior to getting to the restructuring
18 section?
19     A.  I was in the auto practice.
20     Q.  Now, when you say you're a
21 director, let's -- how -- how -- what is that
22 in BDO parlance?
23     A.  We have staffs, seniors, managers,
24 senior managers, directors and partners.

6

Michaelis

1      Q.  So, you've been -- all right.
2  You've been in the restructuring section
3  since '98.
4         What -- what other cases have you
5  been involved in?
6      A.  Petrie Retail, WarnerCo, several
7  healthcare hospitals.  Parkway Hospital in
8  Queens.  Several jewelry clients.  It -- do
9  you want me to just go through a list of
10 names?
11     Q.  That's fine for now.
12         What -- what has -- what has your
13 role in these cases been?
14     A.  Generally, financial advisor for
15 the unsecured creditors committee.  Parkway
16 Hospital, we were the debtors' financial
17 advisors.  And in some of the jewelry cases,
18 I worked as -- doing forensic investigations.
19     Q.  What -- what's your role in this --
20 in this particular case?
21     A.  BDO is the financial advisor for
22 the unsecured creditors committee.
23     Q.  How is BDO staffing this case?
24     A.  We have a dedicated partner, myself

7

Michaelis

1  and anywhere from one to three dedicated
2  staff.
3      Q.  Okay.  And is it fair to say that
4  the staff reports to --
5      A.  Me.
6      Q.  -- you?
7      A.  Yes.
8      Q.  And you report to the partner?
9      A.  Yes.
10     Q.  What -- in your role as financial
11 advisor to the committee, what -- what tasks
12 have BDO -- has BDO undertaken in the case?
13     A.  We've taken part in reviewing
14 projections, the asset sales.  We've been
15 involved in the agreement -- the creation of
16 an agreement with Bank of America.  We've
17 evaluated the -- just the current operations
18 overall.  We've reported on the historic
19 operations of the company that we were able
20 to ascertain from interviews, et cetera.
21     Q.  Going back -- going back to your
22 other case assignments, is there any -- are
23 there any particular areas, industry areas
24 that you've been involved with in particular?

8

Michaelis

1      A.  My general industry experience in
2  the past has been with retail manufacturing,
3  healthcare and jewelry.
4      Q.  Any Chapter 7 trustee experience?
5      A.  I believe we've represented the
6  Chapter 7 -- or we assisted the Chapter 7
7  trustee in one to two retail cases.  I can't
8  recall off the top of my head which ones.
9      Q.  When you say "assist," were you --
10     A.  Do you mean personally or do you
11 mean for the firm?
12     Q.  Let's say -- let's say personally.
13     A.  Yeah, one to two Chapter 7.
14     Q.  Were those cases where you
15 represented the committee in the 11 and the
16 case converted?
17     A.  The firm or the group did.  I
18 didn't.
19     Q.  Right.
20     A.  Yes.
21     Q.  Okay.  Has -- have you been
22 involved in any cases where the Chapter 7
23 trustee has actually retained BDO?
24     A.  Yes.

9

Michaelis

1
2    Q.   Okay.  And those are the one or two
3  retail cases you were talking about?
4    A.   Yes.  Although now that I think
5  about it, I think we -- I represented a
6  trustee in a commodities brokerage, but that
7  was almost a decade ago.
8    Q.   Do -- does BDO -- do you
9  participate in creditors committee meetings
10 or calls?
11   A.   Yes.
12   Q.   How often do they occur?
13   A.   Are you referring to American Home
14 specifically?
15   Q.   Yes.  I'm switching back to
16 American Home.  Sorry.
17   A.   Weekly.
18   Q.   All right.  Who -- who is the
19 chairman?
20   A.   I thought it was Steve Sass, but I
21 could be wrong now.  I can't recall now
22 which -- I can't recall now actually which
23 one is the chairman.
24   Q.   Okay.  Is there a particular
25 creditor that's the chairman of the

10

Michaelis

1
2  committee?
3    A.   Yes.
4    Q.   Who is that?
5    A.   As I said, I believe it's -- or
6  who -- Steve Sass, I believe, is the chairman
7  of the committee, but I could be wrong just
8  because he's local.
9    Q.   Right.  But who -- who -- if it's
10 Steve Sass or whoever it is, do you know
11 which creditor holds the chairmanship of the
12 committee?
13       MR. SCHNITZER:  He's asking you, if
14       you believe it's Steve Sass, do you know
15       who Steve Sass is representing in his
16       capacity on the committee, if you know?
17   A.   I can't be sure.  I have an idea
18 who I think it is, but I'm not positive.  So,
19 I don't know if I should just take that guess
20 and say I believe it was -- I believed it was
21 Deutsche Bank, but I could be wrong.
22 BY MR. MACAULEY:
23   Q.   Now, Aside from committee meetings, have
24 you had contacts personally or through --
25 actually, let's take it personally -- with

11

Michaelis

1
2  members of the committee?
3    A.   Outside of seeing them at a
4  function?
5    Q.   Yes.
6    A.   No.
7    Q.   Have you had contact in this case
8  with members of the debtors?
9    A.   Yes.
10   Q.   Who would that be?
11   A.   I have dealt with both the advisors
12 for the debtors as well as several employees
13 at the debtors.  Bob Johnson, Paul Moran, a
14 young woman in the payable/Human Resources
15 area, former assistant controller.  I don't
16 recall all their names.
17   Q.   And what about the advisors, who
18 have you -- who have you dealt with?
19   A.   Kevin Nystrom, Bret Fernandez,
20 Scott Martinez, Puneet Agrawal.  No idea how
21 to spell it.  For the most part, those --
22 those specific individuals.
23   Q.   Okay.  And they're all at Zolfo?
24   A.   Yes.
25   Q.   Have you had any contact with

12

Michaelis

1
2  counsel for the debtors?
3    A.   Yes.
4    Q.   Who -- who have you had contact
5  with?
6    A.   Sean Beach, Scott Holtz, Mary
7  Beth -- I lose her last name.  There have
8  been several other Conaway attorneys on
9  different calls that I just -- if I'm not
10 speaking directly to them, I don't -- I
11 haven't paid attention.
12   Q.   Okay.  What percentage of your work
13 have you spent on American Home?
14       MR. SCHNITZER:  Objection.  Do you
15       have a time frame in mind?
16 BY MR. MACAULEY:
17   Q.   Let's take the whole length of the
18 case generally and we can break it down.
19   A.   80 to 90 percent of my time.
20   Q.   Has that been pretty consistent
21 throughout?
22   A.   Some ebbs and flows, but yes.
23   Q.   Now, you mentioned some interviews
24 of debtor employees that occurred.  Can you
25 tell me more about that?

13

Michaelis

1
2    A.   Early into the case, we had
3    discussions with employees regarding the cash
4    management system.  I had discussions with
5    the employees regarding the intercompany
6    transactions.  Rob Bernstein is another
7    employee that I dealt with quite a bit.
8         The -- the accounting records of
9    each of the entities, how they interrelated,
10   general asset questions.  And, you know,
11   where assets lay, where expenses were to get
12   an understanding of the operations of the
13   entity overall.
14        Q.   Were all the interviews of
15   employees who were, at the time, employed by
16   the debtors?
17        A.   Yes.
18        Q.   Have you had any interviews since
19   then?
20        A.   After they left the debtors?
21        Q.   Well, since -- since early in the
22   case, I should say.
23        A.   Yes.
24        Q.   Who have you interviewed?
25        A.   I've had discussions with, again,

14

Michaelis

1
2    Rob Bernstein, Paul Moran most recently and a
3    woman in the accounts payable department, but
4    her name fails me.
5         Q.   And these are all people still
6    employed by the debtor?
7         A.   Currently, yes.
8         Q.   You haven't had any discussions
9    with any of the -- any of the former
10   employees of American Home who did
11   origination?
12        A.   Not that I know of.
13        Q.   Has anyone at BDO?
14        A.   Not that I know of.
15        Q.   Were you doing the interview --
16   were you doing the interviewing or was
17   someone else doing the interviewing?
18        A.   I was doing part of them.  My staff
19   was doing part of them depending on what --
20   what area we were looking at and what we were
21   trying to find out.
22        Q.   Have you ever had the pleasure of
23   being deposed before?
24        A.   Yes.
25        Q.   How many times?

15

Michaelis

1
2    A.   Once.
3    Q.   Oh, when was that?
4    A.   2005.
5    Q.   What -- what case?
6    A.   I can't disclose the name.  It had
7    to do with a -- a litigation of a -- of a
8    jewelry entity.
9         Q.   Okay.  Have you ever given any
10   trial testimony before?
11        A.   No.
12        Q.   What did you do to prepare for this
13   deposition?
14        A.   I reviewed the asset allocation
15   model that I understand was being questioned
16   as part of the plan.  I reviewed the
17   disclosure statement in the plan for the
18   asset allocation model and the liquidation
19   analysis.  And I reviewed the liquidation
20   analysis.
21        Q.   Did you have any discussions with
22   others about your deposition?
23        A.   Yes.
24        Q.   Who?
25        A.   Counsel.

16

Michaelis

1
2    Q.   Anyone else?
3    A.   David Berliner, the partner.
4    Q.   At BDO?
5    A.   At BDO.
6    Q.   What has been -- what was your
7    familiarity and -- let me rephrase that.
8         With respect to the plan, what
9    was -- what was BDO's role with respect to
10   the plan?
11        A.   We reviewed it.  Could you be more
12   specific as to --
13        Q.   Sure.  The particular sections that
14   you reviewed?
15        A.   We read the sections on the
16   breakdown of claims, of the -- again, the
17   asset allocation, liquidation analysis, the
18   general plan itself or what was being
19   presented.
20        Q.   Did you give comments on the plan
21   to anyone?
22        A.   We discussed issues we had on -- on
23   the asset allocation and liquidation analysis
24   primarily, global comments just on, you know,
25   sections or how things were worded.

17

Michaelis

1
2  Q.  Could you give me a little history
3  about how the plan was formulated?
4  A.  I wasn't directly involved with the
5  formulation of the plan.
6  Q.  What -- what are you aware of?
7  A.  Primarily, the asset allocation
8  model and the liquidation analysis that was
9  presented.
10  Q.  Well, let's take the liquidation
11  analysis.  What -- when did you first see the
12  liquidation analysis?
13  A.  Probably around the spring of '08.
14  Q.  And who -- and who -- who initially
15  prepared that?
16  A.  Zolfo.
17  Q.  And did you provide comments to
18  Zolfo at that time?
19  A.  Yes.
20  Q.  And I presume there were drafts,
21  and you provided different comments?
22  A.  Yes.
23  Q.  Any sense of how many rounds of
24  comments you provided?
25  A.  Probably three to four.

18

Michaelis

1
2  Q.  What about with the disclosure
3  statement, what sections did you -- did you
4  all review with respect to the disclosure
5  statement?
6  A.  Primarily, the same sections as --
7  personally, primarily the same sections as in
8  the plan.
9  Q.  Were there -- did you review the
10  revisions to the disclosure statement?
11  A.  Not all of them.
12  Q.  Were there other people at BDO who
13  did?
14  A.  We received several drafts,
15  black-lined versions, but -- and
16  David Berliner may have read more than I did,
17  but I can't be sure.
18  Q.  Has BDO undertaken any analysis of
19  the transfers made by American Home in the 90
20  days prior to the petition date?
21  A.  We have taken a -- yes.
22  Q.  What -- what have you looked at?
23  A.  We've reviewed the transfers by
24  entity that were listed in the 90-day
25  payments to get at least a preliminary

19

Michaelis

1
2  understanding of the -- the amount of
3  transfers that were made and to whom and what
4  they might relate to.
5  Q.  Have you looked at any of the
6  underlying documentation?
7  MR. SCHNITZER:  Objection.
8  Underlying documentation related --
9  MR. MACAULEY:  I'll rephrase that.
10  BY MR. MACAULEY:
11  Q.  Have you looked at any of the
12  documents setting forth the basis for the
13  transfers?  That wasn't much better.
14  MR. SCHNITZER:  Do you mean, like,
15  the actual transfers, or do you mean,
16  like, any sort of underlying invoices?
17  MR. MACAULEY:  Now, let's --
18  let's -- let's -- let's break this down.
19  BY MR. MACAULEY:
20  Q.  Have you looked at the statement of
21  financial affairs?
22  A.  Yes.
23  Q.  Okay.  Have you looked -- for a
24  particular transfer that's listed in the
25  statement of financial affairs, have you

20

Michaelis

1
2  looked -- what documents have you looked at
3  in general?
4  A.  General ledgers, disbursement
5  reports, trial balances on a -- on a, you
6  know, consolidated or entity -- on an entity
7  level.
8  Q.  And have you reached any
9  conclusions regarding those -- these
10  transfers?
11  A.  Based on those documents alone
12  or --
13  Q.  Based on the review that you've
14  taken to date.
15  A.  The majority of the transfers
16  appear to be related to -- fall under the
17  categories that we reviewed during the -- we
18  were looking at the cash management system.
19  Everything flows through corporate
20  predominantly, although a good portion of
21  those transfers are not -- are the conduits
22  or pass-throughs for other types of payments.
23  So, they're not necessarily the debtors'
24  assets.
25  Q.  Now, you spoke about trans -- is it

21

Michaelis

1 your view that a lot of these transfers do
2 not represent transfers of the debtors'
3 assets?
4     A.   Specific assets of the debtors',
5 no.
6     Q.   Do the transfers represent
7 transfers of properties of the estate?
8     A.   No.
9     Q.   Can you explain to me why not?
10     A.   For example, the majority of
11 transfers that were made out of servicing
12 would likely relate to payments that they
13 received on principal that then have to get
14 paid to the underlying holders that are owed
15 that amount.
16     So, it's not cash of theirs.  It's
17 not that strip portion of, you know, their
18 percentage of advances or any -- or interest.
19 It's purely a pass-through for principal
20 payments or T&I payments flowed through
21 corporate.
22     So, therefore, it's merely the
23 receipt of cash from a holder -- a mortgage
24 holder to pay their mortgage which then gets
25

22

Michaelis

1 passed on to a securitization, et cetera.
2 So, it's not actually the cash of the debtor.
3     Q.   Did you do any analysis as to
4 whether the debtors exercised dominion or
5 control over that cash?
6     A.   Can you rephrase?
7     MR. SCHNITZER:  I'm going to
8     object.  I think it's a legal
9     terminology you're using, which -- if
10     you understand it, you can answer,
11     but --
12 BY MR. MACAULEY:
13     Q.   All right.  Let me -- well, do you
14 understand -- do you want me to --
15     A.   Yeah, could you rephrase.
16     Q.   Sure.
17     Did you do any analysis as to
18 whether, with respect to these transfers, the
19 debtors could have decided not to make them?
20     MR. SCHNITZER:  Just so the record
21     is clear, by "the transfer" you mean the
22     ones she just referred to, correct?
23     MR. MACAULEY:  Yes.
24     A.   Not specifically.
25

23

Michaelis

1 BY MR. MACAULEY:
2     Q.   You didn't undertake that analysis,
3 you looked at the documents?
4     A.   Correct.
5     Q.   When did you undertake this
6 analysis?
7     A.   The 90-day specific or the cash
8 management system?
9     Q.   The 90-day.
10     A.   Periodically, since probably
11 towards the end of last year when the final
12 schedule of 90-day payments -- when the
13 schedule of 90-day payments was finalized,
14 probably sometime last year we started.
15     Q.   So, 2008?
16     A.   2008, yes.
17     Q.   Have you done any of this recently?
18     A.   We've been looking further into it.
19 So, it's still being investigated down to a
20 more granular level.
21     Q.   Do you have someone on-site at
22 American Home looking at these documents?
23     A.   Not presently.
24     Q.   Has -- has -- have BDO people been
25

24

Michaelis

1 there?
2     A.   Yes.
3     Q.   Who is doing the analysis?
4     A.   Of the -- the breakdown of the
5 preference payments?
6     Q.   Yes.
7     A.   I have staff compiling information
8 and sorting it.  And then I'm working with my
9 staff on it.
10     Q.   You're aware that the confirmation
11 hearing is scheduled for Monday?
12     A.   Yes.
13     Q.   And are you planning to testify?
14     A.   Yes.
15     Q.   When did you find out?
16     A.   That I specifically was testifying?
17     Q.   When did you find out that you
18 might be testifying?
19     A.   Two or three weeks ago.
20     Q.   On what topics do you plan on
21 testifying?
22     A.   The asset allocation model and the
23 liquidation analysis.
24     Q.   What do you plan to say about the
25

25

Michaelis
1
2  liquidation analysis?
3      A.  That depends on what I'm asked
4  about it.
5      Q.  You haven't discussed your
6  testimony, at this point, with anyone?
7      A.  I don't understand what you mean by
8  discuss my testimony.
9      Q.  You haven't -- you haven't
10 discussed your testimony -- your proposed
11 testimony on Monday with anyone?
12     A.  I've discussed with counsel what
13 areas that they said I would be a fact
14 witness for.  And what specific parts of the
15 liquidation analysis I would have to be able
16 to discuss.  I don't -- I don't understand if
17 you -- what you mean beyond that.
18     Q.  Have you seen a copy of the
19 deposition transcript for Mr. Fernandez?
20     A.  Yes, yes.
21     Q.  Have you reviewed it?
22     A.  I've read through it to see what
23 was being discussed, you know, what was being
24 questioned.  I apologize, I didn't mention
25 that earlier when you said preparing for the

26

Michaelis
1
2  deposition.
3      Q.  No, that's okay.
4          Did you review his comments about
5  the stipulated asset allocation?
6      A.  Overall, yes.
7      Q.  Did you agree with it?
8          MR. SCHNITZER:  Objection.  Unless
9      there's a specific comment you can refer
10     to, I object to the form.
11         You can answer.
12     A.  What do you mean by do I agree with
13 him?  On what --
14 BY MR. MACAULEY:
15     Q.  Was there something -- did what he
16 say -- did you agree with what he said?
17         MR. SCHNITZER:  Objection as to
18     form.
19         You can answer.
20     A.  He seemed to give a broad-brushed
21 stroke of it that seemed relatively accurate,
22 yes.
23 BY MR. MACAULEY:
24     Q.  Is there anything that comes to
25 mind that you would have supplemented?

27

Michaelis
1
2          MR. SCHNITZER:  Objection as to
3      form.
4          But you can answer.
5      A.  How do you mean "supplemented"?
6  BY MR. MACAULEY:
7      Q.  Did he leave something out?
8      A.  I believe he could have gone likely
9  into a little bit more detail into what went
10 into creating it.  But, other than that, the
11 -- the overall premise of it seemed to have
12 come through.
13     Q.  How about with respect to the
14 liquidation analysis, did you agree with
15 his -- his comments on the liquidation
16 analysis?
17         MR. SCHNITZER:  Objection again as
18     to form.
19         But you can answer.
20     A.  From what I recall of his comments,
21 they seemed accurate.
22 BY MR. MACAULEY:
23     Q.  Was there anything that he left out
24 that comes to mind?
25     A.  Nothing that comes specifically to

28

Michaelis
1
2  mind, no.
3      Q.  Have you seen the objection to
4  client confirmation filed by my client?
5      A.  The borrower's committee?
6      Q.  Yes.
7      A.  Yes.
8      Q.  Did you see the section with
9  respect to liquidation analysis?
10     A.  Yes.
11     Q.  Did you have any comments about
12 that?
13     A.  I honestly can't recall the
14 specific -- specific objections.
15     Q.  How about with respect to the
16 stipulated asset allocation?
17         MR. SCHNITZER:  Objection.  To the
18     extent you're asking her to testify as
19     to, perhaps, comments she gave to
20     counsel, I'm going to object and
21     instruct her not to answer.
22         If you want to ask her about a
23     specific section in it, what her
24     thoughts of it are sitting here now
25     today, I'm fine with that.

29

Michaelis

1
2    But if this goes into comments she
3    made counsel, then I'm not going to --
4        MR. MACAULEY:  I agree.  But to the
5    extent that, you know, there were
6    comments that she had when she reviewed
7    the document, I think it's -- I think
8    it's fair.
9    BY MR. MACAULEY:
10       Q.  So, I guess my -- just to rephrase
11   and refresh on the question, in reviewing the
12   objection and its specific objections with
13   respect to the stipulated asset allocation,
14   did you have any reaction to the objection?
15       A.  Yes.
16       Q.  And what was that?
17       A.  From what I recall, one of the main
18   issues was the treatment of the transfer
19   made -- transfers made out of the company
20   and their allocation among the whole model
21   amongst the debtors.
22       And I didn't think that it was -- I
23   didn't think it was as simple as the
24   objection seemed to think it was.
25       Q.  And why is that?

30

Michaelis

1
2        A.  As I said, the number's a very
3    large number, but it's not necessarily the
4    debtors' cash that was being -- $20 billion
5    of the debtors' cash that was being spent.
6        Q.  Were there any particularly large
7    transfers made by the debtors within the 90
8    days?
9        A.  Yes.
10       Q.  Were there particular singular
11   transactions of a very large amount as
12   relative to the other transfers that have
13   been made?
14       A.  I can't think of anything specific.
15       Q.  Were there margin payments?
16       A.  Yes.
17       Q.  To whom?
18       A.  To various of the lenders.
19       Q.  When you say "lenders," can you be
20   a little more specific?
21       A.  I can't recall how many different
22   banks had received -- had made margin calls.
23   I'm thinking more just in terms of the
24   numbers.
25       Q.  I guess what I meant by my question

31

Michaelis

1
2    is when you say "lenders," what are you
3    specifically referring to?
4        A.  I'm referring to the financial
5    institutions.  I just -- in my mind, I
6    consider them all lenders.
7        Q.  So, you don't differentiate between
8    warehouse lenders or securitizers or repo
9    participants?
10       A.  I'm not when I'm -- again, I'm just
11   thinking of the numbers.
12       Q.  Do you have any sense of the
13   background with respect to these transfers
14   that you were saying that were made without
15   the debtors' money?
16       A.  How do you mean "the background"?
17       Q.  Can you generally explain who these
18   transfers were made to?
19       A.  Not on a specific transaction
20   basis.  Purely from my understanding of how
21   the cash management system worked.
22       Q.  So, are you -- are you reaching
23   this conclusion that is not the debtors'
24   money based on your review of the cash
25   management system?

32

Michaelis

1
2        A.  In part, yes.
3        Q.  Well, I mean, can you -- can you
4    give me an example of a particular
5    transaction where this would have occurred,
6    in your mind?
7        A.  All P&I payments that were received
8    in went through a general corporate account.
9    The general corporate account transferred
10   those P&I payments then to either a
11   securitized line or warehouse line.
12       And from there, based on the loan
13   data information that came in with the --
14   with whatever the P&I payment was.  And then
15   if a portion was meant to be sent back to
16   another entity for advances, for example,
17   then that would have been done all during
18   that -- during that process.
19       I can't identify right now a
20   payment in the 90 days for that, if that's
21   what you're asking.
22       Q.  All right.  So, let's take a P&I
23   payment.  It comes into the cash management
24   system from someone from the outside?
25       A.  Um-hum.

Michele Michaelis                                              February 4, 2009

---

33

Michaelis

1
2    Q.   And presumably a payment is made
3    from the debtors to another -- to an -- to an
4    insurance company or some other receipt --
5    some other party who is going to receive that
6    payment?
7    A.   True.
8    Q.   How was it directed to that party?
9    A.   Based on the data that accompanied
10   the payment itself.
11   Q.   Right.  But how did the debtors
12   direct that payment to the party who was
13   supposed to receive the P&I?
14   A.   The -- the receipt would be
15   recorded based on the loan.  And the required
16   accounts would be funded based on that loan
17   document through journal entries.
18       And then it would be paid out of
19   another operating account -- or it would be
20   paid to a securitization account as would be
21   required by that payment.
22   Q.   Who at the debtors would have been
23   responsible for that payment, for making sure
24   that payment was supposed to go where it was
25   supposed to go?

---

34

Michaelis

1
2    A.   Initial data entry would be at the
3    servicing level.  I can't give a specific
4    person.  And then it would be reviewed by the
5    accounting department, treasury department,
6    one of the two.
7    Q.   So, the payment would have been
8    received by someone at the debtors, the
9    initial -- the initial person in the
10   servicing department --
11   A.   Um-hum.
12   Q.   -- correct?
13   A.   I would assume so, yes.
14   Q.   And they would have arranged for
15   the deposit of that check?
16   A.   I believe the check went to
17   lockboxes.  Data was then -- from those --
18   things were communicated through the -- that
19   computer system.  And then the servicing
20   person would likely be keying in other
21   information that would be necessary.
22   Q.   Was it a Bank of America lockbox?
23   A.   I would be guessing.  I don't
24   recall actually writing down the lockbox
25   name.

---

35

Michaelis

1
2    Q.   And the P&I payments would show up
3    in the transfers made by servicing; is that
4    correct?
5    A.   No.
6    Q.   Where do they show up?
7    A.   Corporate.  All cash went into
8    corporate.
9    Q.   Right.  But in terms --
10   A.   For the most part.
11   Q.   Right.  But in terms of the
12   payments showing up on the statement --
13   statements of financial affairs, where would
14   they show up?
15   A.   Corporate.
16   Q.   So, it was corporate who was making
17   the transfer?
18   A.   For the majority of all payments.
19   I believe that -- I believe P&I and T&I went
20   through corporate, but some taxes may have
21   gone through -- one of the two may have gone,
22   in part, through servicing.  I can't recall
23   now which -- what the breakdown was.  T&I may
24   have gone to servicing.  P&I may have gone to
25   corporate.

---

36

Michaelis

1
2    Q.   So -- and if someone was paying
3    taxes, the debtors would collect the taxes
4    and remit them to the taxing authority?
5    A.   Yes.
6    Q.   And that would be someone in
7    accounting who would make that transfer?
8    A.   What specific transfer?
9    Q.   To the taxing authority.
10   A.   I believe it was an automatic from
11   the -- from the system based on the number of
12   loans that are in any specific area.
13   Q.   You said it's going to be automatic
14   from the system?
15   A.   The -- I believe it's -- the LSAMS
16   system tracks the states to which payments
17   would be due.  So, I think there may have
18   been a mechanism for certain payments to be
19   made to the appropriate taxing authority as
20   required by law.
21       MR. MACAULEY:  Can I have that
22   marked as Exhibit 1.
23       (Michaelis' Exhibit 1, American
24   Home Mortgage Proposed Plan Allocation
25   Methodology - Summary Page, marked for

37

Michaelis

1      identification as of this date.)
2  BY MR. MACAULEY:
3      Q.  I've handed you a copy of a
4  document -- I'm not sure how many pages.  But
5  have you seen this before?
6      A.  Yes.
7      Q.  What is it?
8      A.  It is the allocation methodology
9  summary and support.
10      Q.  Who prepared this?
11      A.  Zolfo.
12      Q.  And there's a date at the bottom
13  left of the first page.  Is this -- does this
14  correspond to when this document was
15  prepared?
16      A.  I believe so.
17      Q.  How did you receive this document?
18      A.  Directly from Kroll -- I mean,
19  Zolfo.  Pardon me.  Different company, name
20  change.
21      Q.  Is -- now, at the top right, it
22  says "Confidential - Draft For Discussion
23  Purposes Only."
24      A.  Yes.

38

Michaelis

1      Q.  Was there a final copy of this?
2      A.  No.
3      Q.  Were there previous copies of this?
4      A.  Yes.
5      Q.  Do you recall how many versions?
6      A.  Less than 10, more than 3.
7      Q.  On the bottom left, there are some
8  letters, A through M.
9      A.  Yes.
10      Q.  Do they stand for anything?
11      A.  They are the different pieces of
12  the final calculation, and they reflect back
13  to other pages of -- where other information
14  may be coming from to get either A, plus B,
15  minus C, plus D would equal kind of trail.
16      Q.  So, presumably -- is there -- this
17  is a summary page --
18      A.  Yes.
19      Q.  -- the first page.  And presumably
20  there's a page for each of those letters
21  following it?
22      A.  Not necessarily for each of them.
23      Q.  Now, I guess, is it fair to say
24  that a fair amount of -- fair number of these

39

Michaelis

1  numbers are in the disclosure statement from
2  the first page?
3      A.  Yes.
4      Q.  And this calculation, sort of A
5  through M, is what's laid out in the
6  disclosure statement on pages 68 to 73?
7      A.  Yes.
8      Q.  Okay.  Let's turn the page, if you
9  will.  There are no page numbers on this, but
10  I'm just looking at the second page right
11  now.  Can you tell me what this is?
12      A.  The administrative cost allocation
13  weighted formula.  It was the formula that
14  was used to allocate costs that were not
15  directly assignable to the individual
16  entities.
17      Q.  The disclosure statement, if you
18  recall, lists three factors in determining
19  how to allocate administrative costs?
20      A.  Yes.
21      Q.  It doesn't list the weight, though?
22      A.  No.
23      Q.  So, this is the weight for those
24  three factors --

40

Michaelis

1      A.  Yes.
2      Q.  -- is that correct?
3      I notice under "Encumbered Value
4  Allocation" only three of the entities show
5  up as having values.  Or I should say the
6  only -- the allocation is only for three of
7  the entities?
8      A.  Yes.
9      Q.  And that's Acceptance, Servicing
10  and Corp.?
11      A.  Yes.
12      Q.  Why is that?
13      A.  That is where the secured debt for
14  the -- those assets that were liquidated sat.
15      Q.  And what was that secured debt?
16      A.  The majority of it was the B of A
17  amounts.  And then there are some others.  I
18  believe the Calyon settlement may have been
19  in there.  There were some other specific
20  secured debt that was liquidated that fell
21  into those categories.  That's where the
22  assets and their offsetting liabilities fell.
23      Q.  Now, is this number based on the
24  secured claims against the debtor entities?

---

41

Michaelis
1
2  Well, let me rephrase because I was about to
3  ask a compound question.
4         Do these numbers reflect the
5  collateral held by these three entities?
6     A.  Yes.
7     Q.  So, it reflects the collateral
8  which were mortgage loans, primarily?
9     A.  For the most part, yes.
10    Q.  And this is not based on the
11  settlement of secured claims?
12    A.  How do you mean the "settlement of
13  secured claims"?
14    Q.  I mean, the B of A was the only
15  secured creditor.  And they had a $100,000
16  claim, secured claim --
17    A.  Um-hum.
18    Q.  -- against these three entities in
19  the amounts apportioned here.  And that claim
20  was resolved through the settlement with B of
21  A.  That's not what this is showing, is it?
22        THE WITNESS:  I'm sorry.  Can you
23  read me back the question.
24        (Record read.)
25    A.  No.

---

42

Michaelis
1
2  BY MR. MACAULEY:
3     Q.  And what was the collateral that's
4  represented here?
5     A.  In the encumbered value allocation?
6     Q.  Right.
7     A.  A portion of it is -- a portion of
8  it are the B of A loans.  A portion was the
9  sale of the servicing business.  Again, other
10  loans that were transferred back or in some
11  way were settled out that were unsecured
12  debt, this is where the -- this is where
13  those assets that were liquidated to -- to
14  pay back or pay off that -- that collateral
15  was based on is coming -- is coming out of.
16    Q.  And when we talk about
17  "administrative costs," are we assuming
18  administrative costs between the petition
19  date and the confirmation date?
20    A.  Yes.
21    Q.  If you could turn the page.  What
22  is this, page 3?
23    A.  This is the support for the final
24  intercompany settlement and the adjustment
25  that's listed on page 1 -- on the summary

---

43

Michaelis
1
2  page.
3     Q.  So, this is the settlement of
4  intercompany claims, right?
5     A.  Yes.
6     Q.  Now, the first chart, this is the
7  chart that's also included in the disclosure
8  statement which lists all the intercompany
9  claims between the various entities?
10    A.  I believe so.
11    Q.  On the -- at the bottom of that,
12  it's -- there's an "Adj to zero out."  Do you
13  see that?
14    A.  Yes.
15    Q.  What is that?
16    A.  It was a net adjustment between all
17  the -- the entities.  I don't recall what --
18  if it was a historical -- historical balance
19  running forward that had to be allocated out
20  or not.
21    Q.  Well, shouldn't this all equal
22  zero?
23    A.  It does.
24    Q.  Well, with this 530,000 -- is it a
25  $530,000 adjustment?

---

44

Michaelis
1
2     A.  Yes.
3     Q.  But shouldn't they all equal zero
4  without that?
5     A.  In theory.
6     Q.  Have you looked at the basis
7  into -- let me resay that.
8         Have you looked into the basis for
9  these claims?
10    A.  What are you referring to when you
11  say "basis"?
12    Q.  Have you looked at documents with
13  respect to these claims?
14    A.  Yes.
15    Q.  What documents?
16    A.  The -- the general ledger and
17  journal entries for a period of time.
18    Q.  Do you know why these claims exist?
19    A.  For multiples of reasons of the
20  sale of -- the transferring of loans to the
21  warehouse lines.  Although they're on
22  different entities, the transferring of loans
23  held for sale among entities.  The payment of
24  expenses on behalf of an entity.  It's --
25  it's multiples of reasons over several years.

45

Michaelis

1
2    Q.   Aside from journal entries and
3  general ledger entries, are there any
4  documents supporting these claims?
5    A.   There are documents related to the
6  transfer of loans held for sale, for example.
7    Q.   So, when you say "transfer of
8  loans," loans were being transferred between
9  companies?
10    A.   Yes.
11    Q.   Below that first chart, it says,
12  "Corp. Allocation Adjustment."
13    A.   Yes.
14    Q.   What's that?
15    A.   It is an adjusting entry to, in
16  essence, give creditors -- American Home
17  Corp., the corporate entity, for expenses it
18  paid on behalf of -- and costs it incurred on
19  behalf of the other debtors.
20    Q.   How was that figure reached?
21    A.   Zolfo and the company went back
22  through two years' worth of activity to
23  identify expenses that should have been
24  shared among all the entities that were on --
25  that were just reported on the books of Corp.

46

Michaelis

1
2    Q.   Now, the next chart down --
3    A.   Yes.
4    Q.   -- on the far left, it says,
5  "Entity To" and it lists the entities, but
6  there's a -- either a QRS or TRS in front of
7  that.  Do you know what that stands for?
8    A.   The QRSs are the qualified REITs.
9  The TRSs are the taxable REITs.
10    Q.   And what's CNI?
11    A.   I believe it was one of the
12  reinsurance entities.
13    Q.   Do you know -- that's not a debtor
14  company, is it?
15    A.   No.
16    Q.   Who -- was that a subsidiary of a
17  debtor?
18    A.   Yes.
19    Q.   Of which debtor?
20    A.   I don't recall.
21    Q.   Would that have been CNI Title
22  Services, LLC?
23    A.   It could have been.
24    Q.   So, explain to me the effect of
25  this second chart here; is this the

47

Michaelis

1
2  application of the corporate allocation
3  adjustment and the transfer pricing
4  adjustment to the numbers up above?
5    A.   Yes.
6    Q.   And how was the corporate
7  allocation adjustment applied between
8  entities?
9    A.   Excuse me?  Can you --
10    Q.   Sure.  If you look at the very
11  first entry at the far left under AHM --
12    A.   Yes.
13    Q.   -- it stands for acceptance, right?
14    A.   AHM -- oh, you mean AHMAC?
15    Q.   Right.
16    A.   Yes, AHMAC is acceptance.
17    Q.   Okay.  So, up above, there's a
18  $585 million number?
19    A.   Yes.
20    Q.   And down below, there's a
21  $631 million number?
22    A.   Yes.
23    Q.   So, is it fair to say that part of
24  the corporate allocation adjustment was added
25  to the second number?

48

Michaelis

1
2    A.   Was added to get to the second
3  number.
4    Q.   Right.
5    A.   Yes.
6    Q.   And, similarly, would the second
7  entry, which is for investment, on the far
8  left --
9    A.   Um-hum.
10    Q.   -- there's a 1 -- $1.3 billion
11  number on the -- on the top as a payable.
12  And down below it's a $1.248 billion number?
13    A.   Yes.
14    Q.   So, my question is:  How is it
15  determined to add 56 million of the corporate
16  allocation adjustment to investment?
17    A.   If you look four columns over on
18  the top column -- under the top, that 56 is
19  what's netting out to the new 1248.
20    Q.   Do you know how that number was
21  arrived at?
22    A.   The 56?
23    Q.   Yes.
24    A.   It's the reallocation of expenses
25  across all the debtors.

Michele Michaelis                                    February 4, 2009

---

49

Michaelis

1
2    Q.   So, in the two you looked back at
3    that Zolfo did to get -- to get to the
4    $140 million adjustment --
5    A.   Um-hum.
6    Q.   -- they figured that 56 million --
7    A.   Should be allocated to investment.
8    Q.   Now, CNI is not listed up above in
9    the first chart, right?
10   A.   No.
11   Q.   But it is listed in the second
12   chart?
13   A.   Yes.
14   Q.   So, where do the numbers in the
15   second chart come from?
16   A.   They're derived from the first
17   chart. I would have to redo the math to tell
18   you which -- if it's -- what other line item
19   it's buried under.
20   Q.   The next chart, the third chart
21   down --
22   A.   Yes.
23   Q.   -- what's this?
24   A.   This is the application of the
25   payout percentage by debtor to the either

---

50

Michaelis

1    receivable or payable.
2    Basically, the entity with the
3    payable has its estimated payout percentage
4    applied to it to get to a balance that will
5    be included as the adjustment to value the
6    actual intercompany receivable that another
7    debtor entity has.
8    Q.   So, for instance, the first one
9    where we're talking about Corp. --
10   A.   Yes.
11   Q.   -- these are just the -- these are
12   just Corp.'s payables?
13   A.   Yes.
14   Q.   So, then, all the way down at the
15   bottom -- not all the way, but --
16   A.   Almost.
17   Q.   -- where it says "Value Out" and
18   "Value In" --
19   A.   Um-hum.
20   Q.   -- if you go to Corp. halfway down
21   the page --
22   A.   Yes.
23   Q.   -- that's the same $17 million
24   number that's up in the third chart?

---

51

Michaelis

1
2    A.   Yes.  That's its payable.
3    Q.   And the "value in" is the
4    receivable?
5    A.   Yes.
6    Q.   And so, the result is the net?
7    A.   Yes.
8    Q.   If you look at the next page --
9    A.   Yes.
10   Q.   -- what is this?
11   A.   This is the encumbered assets,
12   recoveries and settlements.
13   Q.   So, this is a detailed breakdown of
14   the percentages that are on the second page;
15   is that correct?
16   A.   Of that second line?
17   Q.   Right.
18   A.   Presumably, yes.
19   Q.   Now, at the bottom of the page,
20   close to the bottom --
21   A.   Um-hum.
22   Q.   -- where it says "WL Ross" --
23   A.   Yes.
24   Q.   -- is that the allocation of the
25   sale proceeds to the three entities?

---

52

Michaelis

1
2    A.   Yes.
3    Q.   Okay.  Let's go one more page.
4    What's this?
5    A.   This is the direct administrative
6    costs that could be identified on a
7    debtor-by-debtor level.
8    Q.   So, for instance, the first line,
9    the servicing sale of professional fees --
10   A.   Um-hum.
11   Q.   -- presumably the number at the --
12   on the far right, the $4.1 million number, is
13   the total number of professional fees
14   relating to servicing sales?
15   A.   Yes.
16   Q.   And it's allocated between Corp.,
17   Servicing and Acceptance?
18   A.   Yes.
19   Q.   And is that the same percentage as
20   what we looked at on the previous page,
21   presumably, or --
22   A.   It -- I don't know if the sale
23   agreement itself had broken out -- the asset
24   purchase agreement had broken out certain
25   costs to certain entities.  I'm -- in terms

Michele Michaelis                                                    February 4, 2009

---

53

Michaelis

1
2  of whether it's the platform or the MSRs,
3  et cetera.
4      Q.  And can you tell me what the
5  assignable costs are on the left-hand side?
6  Because there's abbreviations, and I'm not
7  quite sure I understand them.
8      A.  The service and sale professional
9  fees.
10         The excluded learned servicing
11  advances.  So, the advances that were made on
12  the loans that were excluded on the servicing
13  sale that we still have to pay servicing
14  costs on because they weren't sold.
15         LPMI costs, which I believe are on
16  the loan portfolios that we still -- that the
17  debtor still held.
18         Servicing fees on the loans that
19  were not transferred under any of the
20  agreements that are still on the books of the
21  debtor.
22         Prepetition P&I distribution, I
23  don't recall specifically if that was a
24  correction of P&I funds that had gotten
25  frozen at the filing date.  I think that's

---

54

Michaelis

1
2  what they related to.
3         Other costs are just general costs
4  that we could specifically identify to either
5  a loan pool or an asset sale or something
6  that occurred at one of the -- at one of the
7  entities specifically.
8         Interpleader is the cost related to
9  the settlement or the negotiations on the
10  interpleader litigation with which I think DB
11  was one of them.  I'm not sure.
12         And "other" is just other costs
13  that were specifically identified that
14  related to -- that we could trace back
15  directly to a specific entity or a specific
16  entity's assets and their related costs.
17      Q.  Going to number 3, LPMI costs --
18      A.  Um-hum.
19      Q.  -- that's lender PMI insurance
20  that's paid by the debtor during the
21  administrative period?
22      A.  Yes.
23      Q.  And that relates to loans still
24  held by the debtors?
25      A.  I'm a little fuzzy on if it's held

---

55

Michaelis

1
2  by the debtors or they're loans that are
3  still being -- whether there are still
4  disputes on it and they still have to keep
5  the cost current -- keep the loan current.
6      Q.  Down in "Other," do you see there's
7  a $47 million number -- sorry -- 47,000 --
8      A.  Um-hum.
9      Q.  -- number at the beginning under
10  "Holdings."
11         Do you know what that relates to?
12      A.  I don't recall specifically.
13      Q.  Okay.  All right.  Skip two pages
14  to a page entitled, "Proposed Plan Allocation
15  - Methodology Allocable Cost Summary."
16         Is it fair to say this is a summary
17  of the total administrative costs that are --
18  have been incurred, plus projected through
19  February of '09?
20      A.  It does not include those that are
21  already directly assignable.
22      Q.  Oh, I see.  These are just the
23  allocated --
24      A.  Yes.
25      Q.  -- administrative costs?

---

56

Michaelis

1
2         Let's skip two more pages to the
3  "Allocation of Construction Loan and Reo
4  Compromise Values."
5      A.  Yes.
6      Q.  Okay.  What is this page?
7      A.  Oh, sorry.  I was looking at the
8  wrong page.
9         This is for the loans -- the
10  construction loans and the REO loans that
11  were to be used for the general -- whose
12  proceeds were to be carved out for the
13  general unsecured claims -- general unsecured
14  creditors.  And it allocates them among the
15  entities.
16      Q.  Where it says "GUC estimate
17  percentage" --
18      A.  Um-hum.
19      Q.  -- what number does that refer to?
20      A.  For the general unsecured claim
21  pool?
22      Q.  Right.  What do those percentages
23  represent?
24      A.  Where the claims lie, which debtor.
25  So, 7.3 percent of all those claims lie in

Michele Michaelis                                                February 4, 2009

---

57

Michaelis

1  holdings.  34 percent lie in Corp.  Only 2
2  percent -- .2 percent lie in Homegate.
3      Q.  And so, the REO -- the REO values
4  are split among the debtor entities based on
5  the estimated general unsecured claims
6  against each entity?
7      A.  Yes.
8      Q.  Okay.  Let's go to the next page,
9  please.  Is it fair to say that this is a
10 listing back in June of '08 of what loans the
11 debtor still held?
12     A.  Yes.
13     Q.  And I see a reference to
14 "Acceptance" and a reference to "American
15 Home."
16     A.  Yes.
17     Q.  Are those the only two entities who
18 held those loans?
19     A.  Based on this.
20     Q.  Is that your understanding?
21     A.  That's my understanding.
22     Q.  Let's look at the last page, if you
23 would.  Can you tell me what this is?  Is
24 this -- well, let me see if I can

---

58

Michaelis

1  characterize what this is.
2      Is this a reallocation of general
3  unsecured claims to the debtor entities for
4  the claims where they're not asserted against
5  a particular entity?
6      A.  Yes, the second column is.
7      Q.  All right.  And the percentages in
8  the far-right column correspond to the
9  percentages that we saw two pages earlier
10 where we discussed GUC estimate?
11     A.  Yes.
12     Q.  All right.  Let's go back to the
13 front page.  Let's look in the projected
14 column.  And it speaks, down toward the
15 bottom, of the real estate still owned by the
16 debtor, correct?  I'm speaking specifically
17 of Mount Prospect and Melville.
18     A.  Yes.
19     Q.  And it's attributing a $400,000
20 value to Mount Prospect?
21     A.  Yes.
22     Q.  And a zero value to Melville?
23     A.  Yes.
24     Q.  Now, if you go up to the top of the

---

59

Michaelis

1  projected columns, still in the projected
2  column, it speaks of construction loans and B
3  of A REO compromise.
4      Do you see that?
5      A.  Yes.
6      Q.  Now, the REO compromise across the
7  columns for the different entities presumably
8  correspond to the page in the back that we
9  just looked at that discussed how the REO was
10 allocated between entities?
11     A.  The page labeled "Allocation of
12 Construction Loan and Reo Compromise Values."
13     Q.  Right.
14     A.  Presumably, yes.
15     Q.  Well, I guess that page that we had
16 looked at is a combined -- combination of
17 both construction loans and the REO
18 compromise values?
19     A.  Yes.
20     Q.  So, on the front page, it breaks it
21 out between the two?
22     A.  Yes.
23     Q.  Aside from Corporate and
24 Acceptance, did any of the other debtors own

---

60

Michaelis

1  loans?
2      A.  What types of loans?
3      Q.  Any types of loans.
4      A.  Presumably, investment may have.
5      Q.  What loans would they have owned?
6      A.  They would possibly have -- they
7  were the holders in the mortgage-backed
8  securities.  So, I can't say specifically,
9  but they could have owned loans as well.
10     Q.  Any other entities would have owned
11 loans?
12         MR. SCHNITZER:  I assume you mean
13 historically, right?  Not today, right?
14         MR. MACAULEY:  Historically.
15     A.  My understanding would be most
16 likely not.
17 BY MR. MACAULEY:
18     Q.  So, Acceptance and Corporate owned
19 all the construction loans?
20     A.  Based on the information that I've
21 seen, yes.
22     Q.  And all the home equity loans?
23     A.  As far as I know.
24     Q.  Let's go back to the first page, if

61

Michaelis

1  you would.  Let's go down to letter D,
2  "Administrative Costs - Directly Assignable."
3       Now, this presumably is a summary
4  of the -- well, not a summary, but this is
5  the result of a bottom line on page, I
6  believe, 5; is that your sense?
7       A.  Yes.
8       Q.  Now, I notice holdings has directly
9  assignable costs of 50,000, roughly?
10      A.  47,000.
11      Q.  47,000.  I rounded it up to 50,000.
12           The bank hasn't been sold, has it?
13      A.  Not yet.
14      Q.  Is the expectation the bank would
15  be sold prior to the end of February?
16      A.  No.
17      Q.  What costs have been undertaken to
18  sell the bank?  What administrative costs
19  have been undertaken to sell the bank?
20      A.  There's been time spent by Zolfo in
21  reviewing purchasers or offers, discussions
22  recovering the OTS.  There's been some time
23  from Milestone investment banker, who is
24  trying to sell the bank.  You know, counsel

62

Michaelis

1  for both the debtor and the committee has
2  discussed it.
3       Q.  So, is there an investment banker
4  retained to sell the bank?
5       A.  There's an investment banker who
6  is -- part of their work is on the bank, yes.
7       Q.  Okay.  Who is that?
8       A.  Milestone.
9       Q.  Milestone, okay.
10           MR. SCHNITZER:  Off the record.
11           (Discussion off the record.)
12           (Time noted:  12:42 p.m.)

63

Michaelis

1  A F T E R N O O N   S E S S I O N
2       (Time noted:  1:25 p.m.)
3  M I C H E L E   M I C H A E L I S,   having
4    been  previously duly sworn, was examined
5    and testified further as follows:
6  EXAMINATION BY (continued)
7  MR. MACAULEY:
8       Q.  We're back from lunch.
9           Just to go back to Exhibit 1
10  briefly --
11      A.  Okay.
12      Q.  -- if I may.
13           On page 2, we had talked about the
14  encumbered value allocation previously.
15      A.  Um-hum, yes.
16      Q.  And we talked about the claim
17  allocation, the line below that on a
18  different page.
19      A.  Yes.
20      Q.  Okay.  We didn't really talk about
21  the unencumbered value allocation.
22           Where does that number come --
23  where do these percentages come from?
24      A.  They should come from the line

64

Michaelis

1  saying "Subtotal Recoveries on Unencumbered
2  Assets."
3       Q.  On the first page?
4       A.  On the first page.
5       Q.  Okay.  Good.  We -- I think that
6  would be good for that.
7       A.  Okay.
8       Q.  We talked briefly before about the
9  90-day transfers.  And you had said that you
10  had done -- or BDO had done at least an
11  initial analysis.
12           Has BDO arrived at any estimate of
13  what the value of those transfers might be in
14  terms of recoveries to the estate?
15      A.  No.
16      Q.  Has BDO looked at other transfers
17  outside the 90-day period which may be
18  avoidable and recoverable by the estate?
19      A.  Not specifically, no.
20      Q.  How about with respect to potential
21  causes of action that one or more of the
22  debtor entities might have, not relating to a
23  transfer, but other potential litigation, has
24  BDO done any sort of analysis on litigation

| 65 | 67 |
|---|---|

Michaelis

1  recoveries?
2      A.   We've reviewed documents and
3  information regarding some litigations that
4  have -- that are either in process.  Or we've
5  been involved in conversations where they --
6  the debtor discussed what they felt were, you
7  know, potential -- Zolfo discussed what they
8  thought were potential litigations.
9      Q.   Are these litigations that are
10  currently pending, or are they litigations
11  that have not been commenced?
12      A.   I believe the majority of them are
13  currently pending.
14      Q.   Now, is it fair to say that -- that
15  the stipulated asset allocation does not
16  consider litigation recoveries?
17      A.   Litigation recoveries would be
18  treated as any other asset under the
19  allocation model.
20      Q.   Thank you.  That was a poor
21  question and a good answer.  Sorry.  So, let
22  me rephrase that.
23          Any recoveries, litigation
24  recoveries, would be treated under the

Michaelis

1  not take into account recovery -- litigation
2  recoveries?
3      A.   No.
4      Q.   Okay.  Now, in a lot of the
5  chapter -- Chapter 11 or Chapter 7
6  representations that you've been involved in,
7  as you said retail, jewelry, is recoveries
8  from litigation a large component of what the
9  unsecured creditors ultimately receive?
10          MR. SCHNITZER:  Objection as to
11      form, and I think outside the scope.
12          But you can answer.
13      A.   That depends on -- on the specific
14  case.
15  BY MR. MACAULEY:
16      Q.   Is it fair to say that, in a case
17  where there's a substantial recovery to
18  general unsecured creditors, litigation
19  recoveries may not be so important?
20      A.   Yes.
21      Q.   And is it -- is vice versa the
22  truth, in a case that's thin or expected
23  distribution to general unsecured creditors
24  are small, that litigation recoveries may

| 66 | 68 |
|---|---|

Michaelis

1  stipulated asset allocation.  So, for
2  instance, whatever percentage is supposed to
3  go to Corp., that percentage of the net
4  recovery would go to Corp.?
5      A.   Correct.
6      Q.   But in calculating the stipulated
7  asset allocation, litigation recoveries were
8  not taken into account; is that correct?
9      A.   Correct.
10      Q.   Did the stipulated asset allocation
11  take into account the Waterfield litigation?
12      A.   Not specifically.
13      Q.   So, it doesn't take -- it doesn't
14  take the possibilities of recovery in the
15  Waterfield litigation into -- let me withdraw
16  that.
17          The stipulated asset allocation
18  doesn't consider a possible recovery from the
19  Waterfield litigation reaching the
20  percentages that it reached for the
21  different --
22      A.   No.
23      Q.   -- debtor entities?
24          The liquidation analysis also does

Michaelis

1  play a larger part?
2      A.   Yes.
3      Q.   In a Chapter 7 case, if American
4  Home went Chapter 7, the stipulated asset
5  allocation would not apply, correct?
6      A.   Correct.
7          MR. SCHNITZER:  Objection.
8  BY MR. MACAULEY:
9      Q.   Do you have a sense of the
10  percentage of 90-day transfers that you
11  believe were not transfers of the debtors'
12  estate?
13      A.   I couldn't hazard a guess.
14      Q.   Has that analysis been done?
15      A.   An analysis was done to look at the
16  types of transfers, but it hasn't been broken
17  down to that -- it's in the process of being
18  broken down to granular level of what each
19  transfer looked -- irrespective of the
20  recipient, it is based on.
21      Q.   Have you ever prepared a
22  liquidation analysis?
23      A.   Yes.
24      Q.   How many times?



69

Michaelis

1
2    A.   Over the course of my career?
3    Q.   Um-hum.
4    A.   Several.
5    Q.   Are litigation recoveries usually
6  considered by litigation -- by liquidation
7  analysis?
8         MR. SCHNITZER:  Objection as to
9  form.
10        You can answer.
11   A.   Depends on the case and the
12 likelihood of a recovery.
13        MR. MACAULEY:  I have no further
14 questions.  Thank you.
15        MR. SCHNITZER:  None.  Thank you.
16        MS. KELLER:  None.
17        MR. SCHNITZER:  Karen, do you want
18 a separate transcript, or do you want me
19 to get you one?
20        MS. KELLER:  If you can just get us
21 one, that's great.
22        MR. SCHNITZER:  Okay.  We'll take
23 care of it.
24        MS. KELLER:  Thanks.
25        MR. SCHNITZER:  Okay.  I'll shut

70

Michaelis

1
2  off the speakerphone now, okay.
3        MS. KELLER:  See you later.
4        MR. SCHNITZER:  Bye-bye.
5        (Time noted:  1:40 p.m.)
6
7
8         _____
9         MICHELE MICHAELIS
10
11 Subscribed and sworn to before me
12 this_____ day of _____, 2009.
13
14 _____
15
16
17
18
19
20
21
22
23
24
25

71

1
2       C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                : ss.
5  COUNTY OF NEW YORK  )
6
7        I, TAMI H. TAKAHASHI, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10       That MICHELE MICHAELIS, the witness
11 whose deposition is hereinbefore set
12 forth, was duly sworn by me and that
13 such deposition is a true record of the
14 testimony given by the witness.
15       I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I
18 am in no way interested in the outcome
19 of this matter.
20       IN WITNESS WHEREOF, I have hereunto
21 set my hand this 4th day of February
22 2009.
23
24        _____
25        TAMI H. TAKAHASHI

72

1
2  ---------------- I N D E X ----------------
3  WITNESS        EXAMINATION BY      PAGE
4  MICHELE MICHAELIS  MR. MACAULEY        4
5
6  ---------- INFORMATION REQUESTS ----------
7  DIRECTIONS:
8  RULINGS:
9  TO BE FURNISHED: (None)
10 REQUESTS:
11 MOTIONS:
12 ----------------- EXHIBITS ----------------
13 MICHAELIS'              FOR ID.
14 Michaelis' Exhibit 1, American Home  36
   Mortgage Proposed Plan Allocation
15 Methodology - Summary Page
16
17
18
19
20
21
22
23
24
25

Michele Michaelis

73

```
1
2      STATE OF NEW YORK  )
                        ss:
3      COUNTY OF NEW YORK  )
            I wish to make the following changes, for
4      the following reasons:
5      PAGE LINE _____
                  CHANGE FROM:_____
6             CHANGE TO:  _____
       REASON:
7      _____
            _____CHANGE FROM:_____
8             CHANGE TO:  _____
       REASON:
9      _____
            _____CHANGE FROM:_____
10            CHANGE TO:  _____
       REASON:
11     _____
            _____CHANGE FROM:_____
12            CHANGE TO:  _____
       REASON:
13     _____
            _____CHANGE FROM:_____
14            CHANGE TO:  _____
       REASON:
15     _____
            _____CHANGE FROM:_____
16            CHANGE TO:  _____
       REASON:
17     _____
            _____CHANGE FROM:_____
18            CHANGE TO:  _____
       REASON:
19     _____
            _____CHANGE FROM:_____
20            CHANGE TO:  _____
       REASON:
21     _____
22     _____
            MICHELE MICHAELIS
23     Subscribed and sworn to before me
       this _____ day of _____, 2009.
24     _____
25
```

Michele Michaelis                                    February 4, 2009

## A

**abbreviations** 53:6
**able** 7:20 25:15
**acceptance** 40:10 47:13,16 52:17 57:15 59:25 60:19
**accompanied** 33:9
**account** 32:8,9 33:19,20 66:9 66:12 67:2
**accounting** 5:4 13:8 34:5 36:7
**accounts** 14:3 33:16
**accurate** 26:21 27:21
**action** 64:22 71:17
**activity** 45:22
**actual** 19:15 50:7
**add** 48:15
**added** 47:24 48:2
**adjusting** 45:15
**adjustment** 42:24 43:16,25 45:12 47:3,4,7,24 48:16 49:4 50:6
**administrative** 39:13,20 42:17 42:18 52:5 54:21 55:17,25 61:3,19
**advances** 21:19 32:16 53:11,11
**advisor** 6:15,22 7:12
**advisors** 6:18 11:11,17
**affairs** 19:21,25 35:13
**ago** 9:7 24:20
**Agrawal** 11:20
**agree** 26:7,12,16 27:14 29:4
**agreement** 7:16,17 52:23,24
**agreements** 53:20
**AHM** 47:11,14
**AHMAC** 47:14,16
**al** 1:9
**Alfred** 5:4

**Allocable** 55:15
**allocate** 39:15,20
**allocated** 43:19 49:7 52:16 55:23 59:11
**allocates** 56:14
**allocation** 15:14 15:18 16:17,23 17:7 24:23 26:5 28:16 29:13,20 36:24 37:9 39:13 40:5,7 42:5 45:12 47:2 47:7,24 48:16 51:24 55:14 56:3 59:12 63:15,18,22 65:16,20 66:2,8 66:11,18 68:6 72:14
**America** 7:17 34:22
**American** 1:7 9:13 9:16 12:13 14:10 18:19 23:23 36:23 45:16 57:15 68:4 72:14
**amount** 19:2 21:16 30:11 38:25
**amounts** 40:18 41:19
**analysis** 15:19,20 16:17,23 17:8 17:11,12 18:18 22:4,18 23:3,7 24:4,24 25:2,15 27:14,16 28:9 64:12,25 66:25 68:15,16,23 69:7
**answer** 22:11 26:11,19 27:4 27:19 28:21 65:22 67:13 69:10
**apologize** 25:24
**appear** 20:16
**application** 47:2 49:24
**applied** 47:7 50:5
**apply** 68:6
**apportioned** 41:19

**appropriate** 36:19
**area** 11:15 14:20 36:12
**areas** 7:24,24 25:13
**arranged** 34:14
**arrived** 48:21 64:13
**ascertain** 7:21
**Aside** 10:23 45:2 59:24
**asked** 25:3
**asking** 10:13 28:18 32:21
**asserted** 58:5
**asset** 7:15 13:10 15:14,18 16:17 16:23 17:7 24:23 26:5 28:16 29:13 52:23 54:5 65:16,19 66:2,8 66:11,18 68:5
**assets** 13:11 20:24 21:4,5 40:15,23 42:13 51:11 54:16 64:3
**assignable** 39:16 53:5 55:21 61:3 61:10
**assignments** 7:23
**assist** 8:10
**assistant** 11:15
**assisted** 8:7
**assume** 34:13 60:13
**assuming** 42:17
**attention** 12:11
**attorneys** 3:5,13 3:20 12:8
**attributing** 58:20
**authority** 36:4,9 36:19
**auto** 5:20
**automatic** 36:10 36:13
**Avenue** 2:7 3:14
**avoidable** 64:19
**aware** 17:6 24:11
**a.m** 2:3

## B

**B** 38:15 40:17 41:14,20 42:8 59:3
**Bachelor** 5:3
**back** 7:22,22 9:15 32:15 38:13 41:23 42:10,14 45:21 49:2 54:14 57:11 58:13 59:9 60:25 63:9,10
**background** 31:13 31:16
**balance** 43:18 50:5
**balances** 20:5
**bank** 7:17 10:21 34:22 61:13,15 61:19,20,25 62:5,7
**banker** 61:24 62:4 62:6
**BANKRUPTCY** 1:2
**banks** 30:22
**Baruch** 5:6
**based** 20:11,13 31:24 32:12 33:9,15,16 36:11 40:24 41:10 42:15 57:5,20 60:21 68:21
**Basically** 50:3
**basis** 19:12 31:20 44:6,8,11
**BDO** 4:15,20 5:14 5:23 6:22,24 7:13,13 8:24 9:8 14:13 16:4 16:5 18:12,18 23:25 64:11,13 64:17,25
**BDO's** 16:9
**Beach** 12:6
**beginning** 55:9
**behalf** 44:24 45:18,19
**believe** 8:6 10:5 10:6,14,20 27:8 34:16 35:19,19 36:10,15 37:17 40:19 43:10 46:11 53:15

**61:7 65:13 68:12**
**believed** 10:20
**Berliner** 16:3 18:16
**Bernstein** 13:6 14:2
**Beth** 12:7
**better** 19:13
**beyond** 25:17
**billion** 30:4 48:10,12
**bit** 13:7 27:9
**black-lined** 18:15
**blood** 71:17
**Bob** 11:13
**books** 45:25 53:20
**Borrowers** 3:6
**borrower's** 28:5
**bottom** 37:13 38:8 43:11 50:16 51:19,20 58:16 61:6
**break** 12:18 19:18
**breakdown** 16:16 24:5 35:23 51:13
**breaks** 59:21
**Bret** 11:19
**briefly** 4:25 63:11 64:9
**broad-brushed** 26:20
**broken** 52:23,24 68:17,19
**brokerage** 9:6
**buried** 49:19
**business** 5:6 42:9 70:4
**Bye-bye** 70:4

## C

**C** 3:2 4:2,2 38:16 63:4,4 71:2,2
**calculating** 66:7
**calculation** 38:13 39:5
**called** 4:2
**calls** 9:10 12:9 30:22
**Calyon** 40:19
**capacity** 10:16
**care** 69:23
**career** 69:2

Michele Michaelis

**carved** 56:12
**case** 1:7 6:21,24
  7:13,23 8:17
  11:7 12:18 13:2
  13:22 15:5
  67:15,17,23
  68:4 69:11
**cases** 6:5,14,18
  8:8,15,23 9:3
**cash** 13:3 20:18
  21:17,24 22:3,6
  23:8 30:4,5
  31:21,24 32:23
  35:7
**categories** 20:17
  40:22
**causes** 64:22
**certain** 36:18
  52:24,25
**certify** 71:9,15
**cetera** 7:21 22:2
  53:3
**chairman** 9:19,23
  9:25 10:6
**chairmanship**
  10:11
**change** 37:21 73:5
  73:6,7,8,9,10
  73:11,12,13,14
  73:15,16,17,18
  73:19,20
**changes** 73:3
**chapter** 1:6 8:5,7
  8:7,14,23 67:6
  67:6,6 68:4,5
**characterize** 58:2
**chart** 43:6,7
  45:11 46:2,25
  49:9,12,15,17
  49:20,20 50:25
**check** 34:15,16
**claim** 41:16,16,19
  56:20 63:17
**claims** 16:16
  40:25 41:11,13
  43:4,9 44:9,13
  44:18 45:4
  56:13,24,25
  57:6 58:4,5
**clear** 22:22
**client** 28:4,4
**clients** 6:9
**close** 51:20

**CNI** 46:10,21 49:8
**collateral** 41:5,7
  42:3,14
**collect** 36:3
**college** 5:6,11,15
**column** 48:18 58:7
  58:9,15 59:3
**columns** 48:17
  59:2,8
**combination** 59:17
**combined** 59:17
**come** 27:12 49:15
  63:23,24,25
**comes** 26:24 27:24
  27:25 32:23
**coming** 38:15
  42:15,15
**commenced** 65:12
**comment** 26:9
**comments** 16:20,24
  17:17,21,24
  26:4 27:15,20
  28:11,19 29:2,6
**committee** 3:5,13
  6:16,23 7:12
  8:16 9:9 10:2,7
  10:12,16,23
  11:2 28:5 62:2
**commodities** 9:6
**communicated**
  34:18
**companies** 45:9
**company** 7:20
  29:19 33:4
  37:20 45:21
  46:14
**compiling** 24:8
**component** 67:9
**compound** 41:3
**compromise** 56:4
  59:4,7,13,19
**computer** 34:19
**Conaway** 3:19 12:8
**conclusion** 31:23
**conclusions** 20:9
**conduits** 20:21
**Confidential**
  37:23
**confirmation**
  24:11 28:4
  42:19
**consider** 31:6
  65:17 66:19

**considered** 69:6
**consistent** 12:20
**consolidated** 20:6
**construction** 56:3
  56:10 59:3,13
  59:18 60:20
**Consulting** 4:15
**contact** 11:7,25
  12:4
**contacts** 10:24
**continued** 63:7
**control** 22:6
**controller** 11:15
**conversations**
  65:6
**converted** 8:17
**copies** 38:4
**copy** 25:18 37:4
  38:2
**Corp** 40:11 45:12
  45:17,25 50:10
  50:13,21 52:16
  57:2 66:4,5
**corporate** 20:19
  21:22 32:8,9
  35:7,8,15,16,20
  35:25 45:17
  47:2,6,24 48:15
  59:24 60:19
**corporation** 1:9
**correct** 22:23
  23:5 34:12 35:4
  40:3 51:15
  58:17 66:6,9,10
  68:6,7
**correction** 53:24
**correspond** 37:15
  58:9 59:9
**cost** 39:13 54:8
  55:5,15
**costs** 39:15,20
  42:17,18 45:18
  52:6,25 53:5,14
  53:15 54:3,3,12
  54:16,17 55:17
  55:25 61:3,10
  61:18,19
**counsel** 12:2
  15:25 25:12
  28:20 29:3
  61:25
**COUNTY** 71:5 73:3
**course** 69:2

**COURT** 1:2
**creating** 27:10
**creation** 7:16
**creditor** 9:25
  10:11 41:15
**creditors** 3:13
  6:16,23 9:9
  45:16 56:14
  67:10,19,24
**CSR** 1:24
**CSS** 1:9
**current** 7:18 55:5
  55:5
**currently** 14:7
  65:11,14

─────────────

**D**

**D** 38:16 61:2 72:2
**data** 32:13 33:9
  34:2,17
**date** 18:20 20:14
  37:2,13 42:19
  42:19 53:25
**David** 16:3 18:16
**day** 70:12 71:21
  73:23
**days** 18:20 30:8
  32:20
**DB** 54:10
**DE** 3:22
**dealt** 11:11,18
  13:7
**debt** 40:14,16,21
  42:12
**debtor** 12:24 14:6
  22:3 40:25
  46:13,17,19
  49:25 50:8
  53:17,21 54:20
  56:24 57:5,12
  58:4,17 62:2
  64:23 65:7
  66:24
**debtors** 1:11 3:20
  6:17 11:8,12,13
  12:2 13:16,20
  20:23 21:3,5
  22:5,20 29:21
  30:4,5,7 31:15
  31:23 33:3,11
  33:22 34:8 36:3
  45:19 48:25
  54:24 55:2

**59:25 68:12
  debtor-by-debtor**
  52:7
**decade** 9:7
**decided** 22:20
**dedicated** 6:25
  7:2
**Delaware** 1:3,8
  3:8
**department** 14:3
  34:5,5,10
**depending** 14:19
**depends** 25:3
  67:14 69:11
**deposed** 14:23
**deposit** 34:15
**deposition** 1:14
  2:5 15:13,22
  25:19 26:2
  71:11,13
**derived** 49:16
**detail** 27:9
**detailed** 51:13
**determined** 48:15
**determining** 39:19
**Deutsche** 10:21
**different** 12:9
  17:21 30:21
  37:20 38:12
  44:22 59:8
  63:19 66:22
**differentiate**
  31:7
**direct** 33:12 52:5
**directed** 33:8
**DIRECTIONS** 72:7
**directly** 12:10
  17:4 37:19
  39:16 54:15
  55:21 61:3,9
**director** 4:17
  5:22
**directors** 5:25
**disbursement** 20:4
**disclose** 15:6
**disclosure** 15:17
  18:2,4,10 39:2
  39:7,18 43:7
**discuss** 25:8,16
**discussed** 16:22
  25:5,10,12,23
  58:11 59:10
  62:3 65:7,8

Michele Michaelis

February 4, 2009

3

**Discussion** 37:23
62:12
**discussions** 13:3
13:4,25 14:8
15:21 61:22
**disputes** 55:4
**distribution**
53:22 67:24
**DISTRICT** 1:3
**document** 29:7
33:17 37:5,15
37:18
**documentation**
19:6,8
**documents** 19:12
20:2,11 23:4,23
44:12,15 45:4,5
65:3
**doing** 6:19 14:15
14:16,17,18,19
24:4
**dominion** 22:5
**Draft** 37:23
**drafts** 17:20
18:14
**due** 36:17
**duly** 4:3 63:5
71:12

**E**
**E** 3:2,2 4:2,2,2
63:2,2,4,4,4
71:2,2 72:2
**earlier** 25:25
58:10
**early** 13:2,21
**ebbs** 12:22
**education** 5:2
**EDWARD** 3:16
**effect** 46:24
**either** 32:10
38:15 46:6
49:25 54:4 65:5
**employed** 4:14
5:14 13:15 14:6
**employee** 13:7
**employees** 11:12
12:24 13:3,5,15
14:10
**encumbered** 40:4
42:5 51:11
63:15
**entities** 13:9

39:17 40:5,8,25
41:5,18 43:9,17
44:22,23 45:24
46:5,12 47:8
51:25 52:25
54:7 56:15 57:5
57:18 58:4 59:8
59:11 60:11
64:23 66:24
**entitled** 55:14
**entity** 13:13 15:8
18:24 20:6,6
32:16 44:24
45:17 46:5 50:3
50:8 54:15 57:7
58:6
**entity's** 54:16
**entries** 33:17
44:17 45:2,3
**entry** 34:2 45:15
47:11 48:7
**equal** 38:16 43:21
44:3
**equity** 60:23
**ESQ** 3:9,16,23
**essence** 45:16
**estate** 21:8 58:16
64:15,19 68:13
**estimate** 56:16
58:11 64:13
**estimated** 50:4
57:6
**et** 1:9 7:21 22:2
53:3
**evaluated** 7:18
**EXAMINATION** 4:6
63:7 72:3
**examined** 4:4 63:5
**example** 21:11
32:4,16 45:6
**excluded** 53:10,12
**Excuse** 47:9
**exercised** 22:5
**Exhibit** 36:22,23
63:10 72:14
**EXHIBITS** 72:12
**exist** 44:18
**expectation** 61:15
**expected** 67:23
**expenses** 13:11
44:24 45:17,23
48:24
**experience** 8:2,5

**explain** 21:10
31:17 46:24
**extent** 28:18 29:5

**F**
**F** 63:2 71:2
**fact** 25:13
**factors** 39:19,25
**fails** 14:4
**fair** 7:4 29:8
38:24,25,25
47:23 55:16
57:10 65:15
67:17
**fall** 20:16
**familiarity** 16:7
**far** 46:4 47:11
48:7 52:12
60:24
**far-right** 58:9
**February** 1:16 2:2
55:19 61:16
71:21
**fees** 52:9,13 53:9
53:18
**fell** 40:21,23
**felt** 65:7
**Fernandez** 11:19
25:19
**figure** 45:20
**figured** 49:6
**filed** 28:4
**filing** 53:25
**final** 23:12 38:2
38:13 42:23
**finalized** 23:14
**finance** 5:5
**financial** 6:15,17
6:22 7:11 19:21
19:25 31:4
35:13
**find** 14:21 24:16
24:18
**fine** 6:12 28:25
**firm** 8:12,18
**first** 17:11 37:14
38:20 39:3 43:6
45:11 47:11
49:9,16 50:9
52:8 60:25 64:4
64:5
**Floor** 3:21
**flowed** 21:21

**flows** 12:22 20:19
**following** 38:22
73:3,4
**follows** 4:5 63:6
**forensic** 6:19
**form** 26:10,18
27:3,18 67:12
69:9
**former** 11:15 14:9
**formula** 39:14,14
**formulated** 17:3
**formulation** 17:5
**forth** 19:12 71:12
**forward** 43:19
**four** 5:17 17:25
48:17
**frame** 12:15
**front** 46:6 58:14
59:21
**frozen** 53:25
**function** 11:4
**funded** 33:16
**funds** 53:24
**FURNISHED** 72:9
**further** 23:19
63:6 69:13
71:15
**fuzzy** 54:25

**.**

**G**
**G** 3:9
**general** 8:2 13:10
16:18 20:3,4
32:8,9 44:16
45:3 54:3 56:11
56:13,13,20
57:6 58:3 67:19
67:24
**generally** 6:15
12:18 31:17
**getting** 5:18
**give** 16:20 17:2
26:20 32:4 34:3
45:16
**given** 15:9 71:14
**global** 16:24
**go** 6:10 33:24,25
50:21 52:3 57:9
58:13,25 60:25
61:2 63:10 66:4
66:5
**goes** 29:2
**going** 7:22,22

22:8 28:20 29:3
33:5 36:13
54:17
**good** 4:8,9 20:20
64:6,7 65:22
**gotten** 53:24
**graduate** 5:10
**granular** 23:21
68:19
**great** 69:21
**group** 8:18
**GUC** 56:16 58:11
**guess** 10:19 29:10
30:25 38:24
59:16 68:14
**guessing** 34:23

**H**
**H** 1:24 2:8 4:2,2
63:4,4 71:7,25
**Hahn** 2:6 3:12
**halfway** 50:21
**hand** 71:21
**handed** 37:4
**hazard** 68:14
**head** 8:9
**healthcare** 6:8
8:4
**hearing** 24:12
**held** 2:6 41:5
44:23 45:6
53:17 54:24,25
57:12,19
**hereinbefore**
71:11
**hereunto** 71:20
**Hessen** 2:6 3:12
**historic** 7:19
**historical** 43:18
43:18
**historically**
60:14,15
**history** 17:2
**holder** 21:24,25
**holders** 21:15
60:8
**holdings** 1:8
55:10 57:2 61:9
**holds** 10:11
**Holtz** 12:6
**home** 1:7 9:13,16
12:13 14:10
18:19 23:23

Michele Michaelis                                    February 4, 2009

4

36:24 45:16
57:16 60:23
68:5 72:14
**Homegate** 57:3
**honestly** 28:13
**Hospital** 6:8,17
**hospitals** 6:8

---
**I**

**ID** 72:13
**idea** 10:17 11:20
**identification**
37:2
**identified** 52:6
54:13
**identify** 32:19
45:23 54:4
**important** 67:20
**include** 55:20
**included** 43:7
50:6
**incurred** 45:18
55:18
**individual** 39:16
**individuals** 11:22
**industry** 7:24 8:2
**information** 24:8
32:13 34:21
38:14 60:21
65:4 72:6
**initial** 34:2,9,9
64:12
**initially** 17:14
**instance** 50:9
52:8 66:3
**institutions** 31:5
**instruct** 28:21
**insurance** 33:4
54:19
**intercompany** 13:5
42:24 43:4,8
50:7
**interest** 21:19
**interested** 71:18
**interpleader** 54:8
54:10
**interrelated** 13:9
**interview** 14:15
**interviewed** 13:24
**interviewing**
14:16,17
**interviews** 7:21
12:23 13:14,18

**investigated**
23:20
**investigations**
6:19
**investment** 48:7
48:16 49:7 60:5
61:24 62:4,6
**invoices** 19:16
**involved** 6:6 7:16
7:25 8:23 17:4
65:6 67:7
**irrespective**
68:20
**issues** 16:22
29:18
**item** 49:18

---
**J**

**jewelry** 6:9,18
8:4 15:8 67:8
**JOB** 1:25
**Johnson** 11:13
**journal** 33:17
44:17 45:2
**June** 57:11

---
**K**

**Karen** 3:23 69:17
**keep** 55:4,5
**KELLER** 3:23 69:16
69:20,24 70:3
**Kevin** 11:19
**keying** 34:20
**kind** 38:16
**know** 10:10,14,16
10:19 13:10
14:12,14 16:24
20:6 21:18
25:23 29:5
44:18 46:7,13
48:20 52:22
55:11 60:24
61:25 65:8
**Kroll** 37:19

---
**L**

**L** 3:16 4:2,2 63:4
63:4
**labeled** 59:12
**laid** 39:6
**large** 30:3,6,11
67:9
**larger** 68:2
**law** 36:20

**lay** 13:11
**learned** 53:10
**leave** 27:7
**ledger** 44:16 45:3
**ledgers** 20:4
**left** 13:20 27:23
37:14 38:8 46:4
47:11 48:8
**left-hand** 53:5
**legal** 22:9
**lender** 54:19
**lenders** 30:18,19
31:2,6,8
**length** 12:17
**letter** 61:2
**letters** 38:9,21
**let's** 5:22 8:13
8:13 10:25
12:17 17:10
19:17,18,18,18
32:22 39:9 52:3
56:2 57:9,23
58:13,14 60:25
61:2
**level** 20:7 23:21
34:3 52:7 68:19
**liabilities** 40:23
**lie** 56:24,25 57:2
57:3
**likelihood** 69:12
**line** 32:11,11
49:18 51:16
52:8 61:6 63:18
63:25 73:5
**lines** 44:21
**liquidated** 40:15
40:21 42:13
**liquidation** 15:18
15:19 16:17,23
17:8,10,12
24:24 25:2,15
27:14,15 28:9
66:25 68:23
69:6
**list** 6:10 39:22
**listed** 18:24
19:24 42:25
49:8,11
**listing** 57:11
**lists** 39:19 43:8
46:5
**litigation** 15:7
54:10 64:24,25

65:17,18,24
66:8,12,16,20
67:2,9,19,25
69:5,6
**litigations** 65:4
65:9,10,11
**little** 17:2 27:9
30:20 54:25
**LLC** 46:22
**LLP** 3:4,12,19
**loan** 32:12 33:15
33:16 53:16
54:5 55:5 56:3
59:13
**loans** 36:12 41:8
42:8,10 44:20
44:22 45:6,8,8
53:12,18 54:23
55:2 56:9,10,10
57:11,19 59:3
59:18 60:2,3,4
60:6,10,12,20
60:23
**local** 10:8
**lockbox** 34:22,24
**lockboxes** 34:17
**long** 4:19
**look** 47:10 48:17
51:8 57:23
58:14 68:16
**looked** 18:22 19:5
19:11,20,23
20:2,2 23:4
44:6,8,12 49:2
52:20 59:10,17
64:17 68:20
**looking** 14:20
20:18 23:19,23
39:11 56:7
**lose** 12:7
**lot** 21:2 67:5
**LPMI** 53:15 54:17
**LSAMS** 36:15
**lunch** 63:9

---
**M**

**M** 4:2,2 38:9 39:6
63:4,4
**MACAULEY** 3:9 4:7
10:22 12:16
19:9,10,17,19
22:13,24 23:2
26:14,23 27:6

27:22 29:4,9
36:21 37:3 42:2
60:15,18 63:8
67:16 68:9
69:13 72:4
**Madison** 2:7 3:14
**main** 29:17
**majority** 20:15
21:11 35:18
40:17 65:13
**making** 33:23
35:16
**management** 13:4
20:18 23:9
31:21,25 32:23
**managers** 5:24,25
**manufacturing** 8:3
**margin** 30:15,22
**marked** 36:22,25
**Market** 3:7
**marriage** 71:17
**Martinez** 11:20
**Mary** 12:6
**math** 49:17
**matter** 71:19
**MBA** 5:5,8
**mean** 8:11,12
19:14,15 22:22
25:7,17 26:12
27:5 31:16 32:3
37:19 41:12,14
47:14 60:13
**meant** 30:25 32:15
**mechanism** 36:18
**meetings** 9:9
10:23
**Melville** 58:18,23
**members** 11:2,8
**mention** 25:24
**mentioned** 12:23
**merely** 21:23
**methodology** 36:25
37:9 55:15
72:15
**Michaelis** 1:14
2:5 4:12,13 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1

28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
36:23 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1,9
71:10 72:4,13
72:14 73:22
**Michele** 1:14 2:5
4:12 70:9 71:10
72:4 73:22
**Milestone** 61:24
62:9,10
**million** 47:18,21
48:15 49:4,6
50:24 52:12
55:7
**mind** 12:15 26:25
27:24 28:2 31:5
32:6
**minus** 38:16
**model** 15:15,18
17:8 24:23
29:20 65:20
**Monday** 24:12
25:11
**money** 31:15,24
**Moran** 11:13 14:2
**morning** 4:8,9
**mortgage** 1:7
21:24,25 36:24
41:8 72:14
**mortgage-backed**
60:8
**MOTIONS** 72:11
**Mount** 58:18,21
**MSRs** 53:2
**multiples** 44:19
44:25

_____
**N**

**N** 3:2 63:2,2,2
72:2
**name** 4:10 12:7

14:4 15:6 34:25
37:20
**names** 6:11 11:16
**necessarily** 20:23
30:3 38:23
**necessary** 34:21
**negotiations** 54:9
**net** 43:16 51:6
66:4
**netting** 48:19
**new** 1:15,15 2:7,7
2:9 3:15,15
48:19 71:3,5,8
73:2,3
**Notary** 2:9 4:4
71:7
**noted** 62:13 63:3
70:5
**notice** 2:8 40:4
61:9
**number** 30:3 36:11
38:25 40:24
47:18,21,25
48:3,11,12,20
50:25 52:11,12
52:13 54:17
55:7,9 56:19
63:23
**numbers** 30:24
31:11 39:2,10
41:4 47:4 49:14
**number's** 30:2
**Nystrom** 11:19

_____
**O**

**O** 63:2,2,2
**object** 22:9 26:10
28:20
**objection** 12:14
19:7 26:8,17
27:2,17 28:3,17
29:12,14,24
67:11 68:8 69:8
**objections** 28:14
29:12
**occur** 9:12
**occurred** 12:24
32:5 54:6
**offers** 61:22
**offices** 2:6
**Official** 3:5
**offsetting** 40:23
**oh** 15:3 47:14

55:22 56:7
**okay** 4:22 5:10,17
7:4 8:22 9:2,24
11:23 12:12
15:9 19:23 26:3
39:9 47:17 52:3
55:13 56:6 57:9
62:8,10 63:12
63:21 64:6,8
67:5 69:22,25
70:2
**Once** 15:2
**ones** 8:9 22:23
**on-site** 23:22
**operating** 33:19
**operations** 7:18
7:20 13:12
**origination** 14:11
**OTS** 61:23
**outcome** 71:18
**outside** 11:3
32:24 64:18
67:12
**overall** 7:19
13:13 26:6
27:11
**owed** 21:15
**owned** 58:16 60:6
60:10,11,19

_____
**P**

**P** 3:2,2
**page** 36:25 37:14
38:18,20,21
39:3,9,10,11
42:21,22,25
43:2 50:22 51:8
51:14,19 52:3
52:20 55:14
56:6,8 57:9,23
58:14 59:9,12
59:16,21 60:25
61:6 63:14,19
64:4,5 72:3,15
73:5
**pages** 37:5 38:14
39:7 55:13 56:2
58:10
**paid** 12:11 21:15
33:18,20 45:18
54:20
**Pardon** 37:20
**parent** 4:20

**Parkway** 6:8,16
**parlance** 5:23
**part** 7:14 11:21
14:18,19 15:16
32:2 35:10,22
41:9 47:23 62:7
68:2
**participants** 31:9
**participate** 9:9
**particular** 6:21
7:24,25 9:24
16:13 19:24
30:10 32:4 58:6
**particularly** 30:6
**parties** 71:16
**partner** 6:25 7:9
16:3
**partners** 5:25
**parts** 25:14
**party** 33:5,8,12
**passed** 22:2
**pass-through**
21:20
**pass-throughs**
20:22
**Paul** 11:13 14:2
**pay** 21:25 42:14
42:14 53:13
**payable** 14:3
48:11 50:2,4
51:2
**payables** 50:13
**payable/Human**
11:14
**paying** 36:2
**payment** 32:14,20
32:23 33:2,6,10
33:12,21,23,24
34:7 44:23
**payments** 18:25
20:22 21:13,21
21:21 23:13,14
24:6 30:15 32:7
32:10 35:2,12
35:18 36:16,18
**payout** 49:25 50:4
**pending** 65:11,14
**people** 14:5 18:12
23:25
**percent** 12:19
56:25 57:2,3,3
**percentage** 12:12
21:19 49:25

**50:4 52:19
56:17 66:3,4
68:11
**percentages** 51:14
56:22 58:8,10
63:24 66:21
**period** 44:17
54:21 64:18
**Periodically**
23:11
**person** 34:4,9,20
**personally** 8:11
8:13 10:24,25
18:7
**petition** 18:20
42:18
**Petrie** 6:7
**pieces** 38:12
**plan** 15:16,17
16:8,10,18,20
17:3,5 18:8
24:21,25 36:24
55:14 72:14
**planning** 24:14
**platform** 53:2
**play** 68:2
**please** 4:11 57:10
**pleasure** 14:22
**plus** 38:15,16
55:18
**PMI** 54:19
**point** 25:6
**pool** 54:5 56:21
**poor** 65:21
**portfolios** 53:16
**portion** 20:20
21:18 32:15
42:7,7,8
**position** 4:16
**positive** 10:18
**possibilities**
66:15
**possible** 66:19
**possibly** 60:7
**potential** 64:21
64:24 65:8,9
**practice** 4:18
5:20
**predominantly**
20:20
**preference** 24:6
**preliminary** 18:25
**premise** 27:11

Michele Michaelis                                    February 4, 2009

6

**prepare** 15:12
**prepared** 17:15
  37:11,16 68:22
**preparing** 25:25
**Prepetition** 53:22
**presented** 16:19
  17:9
**presently** 23:24
**presumably** 33:2
  38:17,20 51:18
  52:11,21 59:8
  59:15 60:5 61:4
**presume** 17:20
**pretty** 12:20
**previous** 38:4
  52:20
**previously** 63:5
  63:15
**pricing** 47:3
**primarily** 16:24
  17:7 18:6,7
  41:8
**principal** 21:14
  21:20
**prior** 5:18 18:20
  61:16
**probably** 17:13,25
  23:11,15
**proceeds** 51:25
  56:12
**process** 32:18
  65:5 68:18
**professional** 52:9
  52:13 53:8
**projected** 55:18
  58:14 59:2,2
**projections** 7:15
**properties** 21:8
**proposed** 25:10
  36:24 55:14
  72:14
**Prospect** 58:18,21
**provide** 17:17
**provided** 17:21,24
  71:8
**Puneet** 11:20
**purchase** 52:24
**purchasers** 61:22
**purely** 21:20
  31:20
**Purposes** 37:24
**pursuant** 2:7

**P&I** 32:7,10,14,22
  33:13 35:2,19
  35:24 53:22,24
**p.m** 62:13 63:3
  70:5

**Q**

**QRS** 46:6
**QRSs** 46:8
**qualified** 46:8
**Queens** 6:9
**question** 29:11
  30:25 41:3,23
  48:14 65:22
**questioned** 15:15
  25:24
**questions** 13:10
  69:14
**quite** 13:7 53:7

**R**

**R** 3:2 63:2 71:2
**reached** 20:8
  45:20 66:21
**reaching** 31:22
  66:20
**reaction** 29:14
**read** 16:15 18:16
  25:22 41:23,24
**real** 58:16
**reallocation**
  48:24 58:3
**really** 63:21
**REASON** 73:6,8,10
  73:12,14,16,18
  73:20
**reasons** 44:19,25
  73:4
**recall** 8:9 9:21
  9:22 11:16
  27:20 28:13
  29:17 30:21
  34:24 35:22
  38:6 39:19
  43:17 46:20
  53:23 55:12
**receipt** 21:24
  33:4,14
**receivable** 50:2,7
  51:4
**receive** 5:8 33:5
  33:13 37:18
  67:10
**received** 18:14

  21:14 30:22
  32:7 34:8
**recipient** 68:21
**record** 4:11 22:21
  41:24 62:11,12
  71:13
**recorded** 33:15
**records** 13:8
**recoverable** 64:19
**recoveries** 51:12
  64:2,15 65:2,17
  65:18,24,25
  66:8 67:3,8,20
  67:25 69:5
**recovering** 61:23
**recovery** 66:5,15
  66:19 67:2,18
  69:12
**redo** 49:17
**refer** 26:9 56:19
**reference** 57:14
  57:15
**referred** 22:23
**referring** 9:13
  31:3,4 44:10
**reflect** 38:13
  41:4
**reflects** 41:7
**refresh** 29:11
**regarding** 13:3,5
  20:9 65:4
**reinsurance** 46:12
**REITs** 46:8,9
**relate** 19:4 21:13
**related** 19:8
  20:16 45:5 54:2
  54:8,14,16
  71:16
**relates** 54:23
  55:11
**relating** 52:14
  64:23
**relative** 30:12
**relatively** 26:21
**remit** 36:4
**Reo** 56:3,10 57:4
  57:4 59:4,7,10
  59:13,18
**rephrase** 16:7
  19:9 22:7,16
  29:10 41:2
  65:23
**repo** 31:8

**report** 7:9
**reported** 1:24
  7:19 45:25
**reports** 7:5 20:5
**represent** 21:3,7
  56:23
**representations**
  67:7
**represented** 8:6
  8:16 9:5 42:4
**representing**
  10:15
**REQUESTS** 72:6,10
**required** 33:15,21
  36:20
**resay** 44:7
**resolved** 41:20
**Resources** 11:14
**respect** 16:8,9
  18:4 22:19
  27:13 28:9,15
  29:13 31:13
  44:13 64:21
**responsible** 33:23
**restructuring**
  4:17,23 5:18
  6:3
**result** 51:6 61:6
**retail** 6:7 8:3,8
  9:3 67:8
**retained** 8:24
  62:5
**review** 18:4,9
  20:13 26:4
  31:24
**reviewed** 15:14,16
  15:19 16:11,14
  18:23 20:17
  25:21 29:6 34:4
  65:3
**reviewing** 7:14
  29:11 61:22
**revisions** 18:10
**right** 6:2 8:20
  9:18 10:9 22:14
  32:19,22 33:11
  35:9,11 37:22
  39:11 42:6 43:4
  47:13,15 48:4
  49:9 51:17
  52:12 55:13
  56:22 58:8,13
  59:14 60:14,14

**Rob** 13:6 14:2
**role** 6:14,20 7:11
  16:9
**Ross** 51:22
**roughly** 5:9 61:10
**rounded** 61:12
**rounds** 17:23
**RPR** 1:24 2:8
**RULINGS** 72:8
**running** 43:19

**S**

**s** 3:2 4:2 50:13
  63:2,2,2,4
**sale** 42:9 44:20
  44:23 45:6
  51:25 52:9,22
  53:8,13 54:5
**sales** 7:15 52:14
**Sass** 9:20 10:6,10
  10:14,15
**sat** 40:15
**saw** 58:10
**saying** 31:14 64:2
**says** 37:23 45:11
  46:4 50:18
  51:22 56:16
**schedule** 23:13,14
**scheduled** 24:12
**SCHNITZER** 3:16
  10:13 12:14
  19:7,14 22:8,21
  26:8,17 27:2,17
  28:17 60:13
  62:11 67:11
  68:8 69:8,15,17
  69:22,25 70:4
**School** 5:5
**Science** 5:3
**scope** 67:12
**Scott** 11:20 12:6
**Sean** 12:6
**second** 39:11
  46:25 47:25
  48:2,6 49:11,15
  51:14,16 58:7
**section** 4:23 5:19
  6:3 28:8,23
**sections** 16:13,15
  16:25 18:3,6,7
**secured** 40:14,16
  40:21,25 41:11
  41:13,15,16

Michele Michaelis

February 4, 2009

7

**securities** 60:9
**securitization** 22:2 33:20
**securitized** 32:11
**securitizers** 31:8
**see** 17:11 25:22 28:8 43:13 55:6 55:22 57:14,25 59:5 70:3
**seeing** 11:3
**seen** 25:18 28:3 37:6 60:22
**Seidman** 4:20
**sell** 61:19,20,25 62:5
**senior** 5:25
**seniors** 5:24
**sense** 17:23 31:12 61:7 68:10
**sent** 32:15
**separate** 69:18
**service** 53:8
**services** 4:18 46:22
**servicing** 21:12 34:3,10,19 35:3 35:22,24 40:10 42:9 52:9,14,17 53:10,12,13,18
**set** 71:11,21
**setting** 19:12
**settled** 42:11
**settlement** 40:19 41:11,12,20 42:24 43:3 54:9
**settlements** 51:12
**shared** 45:24
**show** 35:2,6,14 40:5
**showing** 35:12 41:21
**shut** 69:25
**side** 53:5
**similarly** 48:6
**simple** 29:23
**singular** 30:10
**sitting** 28:24
**skip** 55:13 56:2
**small** 67:25
**sold** 53:14 61:13 61:16
**sorry** 5:9 9:16 41:22 55:7 56:7

65:22
**sort** 19:16 39:5 64:25
**sorting** 24:9
**SPAEDER** 3:4
**speakerphone** 70:2
**speaking** 12:10 58:17
**speaks** 58:15 59:3
**specific** 11:22 16:12 21:5 23:8 25:14 26:9 28:14,14,23 29:12 30:14,20 31:19 34:3 36:8 36:12 40:20 54:15,15 67:14
**specifically** 9:14 22:25 24:17 27:25 31:3 53:23 54:4,7,13 55:12 58:17 60:9 64:20 66:13
**spell** 11:21
**spent** 12:13 30:5 61:21
**split** 57:5
**spoke** 20:25
**spring** 17:13
**ss** 71:4 73:2
**staff** 7:3,5 14:18 24:8,10
**staffing** 6:24
**staffs** 5:24
**stand** 38:11
**stands** 46:7 47:13
**STARGATT** 3:19
**started** 23:15
**state** 2:9 4:10 71:3,8 73:2
**statement** 15:17 18:3,5,10 19:20 19:25 35:12 39:2,7,18 43:8
**statements** 35:13
**states** 1:2 36:16
**Steve** 9:20 10:6 10:10,14,15
**stipulated** 26:5 28:16 29:13 65:16 66:2,7,11 66:18 68:5

**Street** 3:7,21
**strip** 21:18
**stroke** 26:21
**Subscribed** 70:11 73:23
**subsidiary** 46:16
**substantial** 67:18
**Subtotal** 64:2
**SUITE** 3:7
**summarize** 4:25
**summary** 36:25 37:10 38:18 42:25 55:15,16 61:4,5 72:15
**supplemented** 26:25 27:5
**support** 37:10 42:23
**supporting** 45:4
**supposed** 33:13,24 33:25 66:3
**sure** 10:17 16:13 18:17 22:17 33:23 37:5 47:10 53:7 54:11
**switching** 9:15
**sworn** 4:3 63:5 70:11 71:12 73:23
**system** 13:4 20:18 23:9 31:21,25 32:24 34:19 36:11,14,16

———————
**T**
———————
**T** 63:2 71:2,2
**TAKAHASHI** 1:24 2:8 71:7,25
**take** 10:19,25 12:17 17:10 32:22 66:12,14 66:15 67:2 69:22
**taken** 7:14 18:21 20:14 66:9
**talk** 42:16 63:21
**talked** 63:14,17 64:9
**talking** 9:3 50:10
**TAMI** 1:24 2:8 71:7,25
**tasks** 7:12

**taxable** 46:9
**taxes** 35:20 36:3 36:3
**taxing** 36:4,9,19
**TAYLOR** 3:19
**telephone** 3:24
**tell** 12:25 39:12 49:17 53:4 57:24
**terminology** 22:10
**terms** 30:23 35:9 35:11 52:25 64:15
**testified** 4:5 63:6
**testify** 24:14 28:18
**testifying** 24:17 24:19,22
**testimony** 15:10 25:6,8,10,11 71:14
**Thank** 65:21 69:14 69:15
**Thanks** 69:24
**theirs** 21:17
**theory** 44:5
**thin** 67:23
**things** 16:25 34:18
**think** 9:4,5 10:18 22:9 29:7,7,22 29:23,24 30:14 36:17 53:25 54:10 64:6 67:12
**thinking** 30:23 31:11
**third** 49:20 50:25
**THOMAS** 3:9
**thought** 9:20 65:9
**thoughts** 28:24
**three** 7:2 17:25 24:20 39:19,25 40:5,7 41:5,18 51:25
**time** 4:23 12:15 12:19 13:15 17:18 44:17 61:21,23 62:13 63:3 70:5
**times** 14:25 68:25
**Title** 46:21

**today** 28:25 60:14
**top** 8:9 37:22 48:11,18,18 58:25
**topics** 24:21
**total** 52:13 55:17
**trace** 54:14
**tracks** 36:16
**trail** 38:16
**trans** 20:25
**transaction** 31:19 32:5
**transactions** 13:6 30:11
**transcript** 25:19 69:18
**transfer** 19:24 22:22 29:18 35:17 36:7,8 45:6,7 47:3 64:24 68:20
**transferred** 32:9 42:10 45:8 53:19
**transferring** 44:20,22
**transfers** 18:19 18:23 19:3,13 19:15 20:10,15 20:21 21:2,3,7 21:8,12 22:19 29:19 30:7,12 31:13,18 35:3 64:10,14,17 68:11,12,17
**treasury** 34:5
**treated** 65:19,25
**treatment** 29:18
**trial** 15:10 20:5
**TRS** 46:6
**TRSs** 46:9
**true** 33:7 71:13
**trustee** 8:5,8,24 9:6
**truth** 67:23
**trying** 14:21 61:25
**turn** 39:9 42:21
**two** 8:8,14 9:2 24:20 34:6 35:21 45:22 49:2 55:13 56:2 57:18 58:10

Michele Michaelis

February 4, 2009

8

59:22
**types** 20:22 60:3
   60:4 68:17
**T&I** 21:21 35:19
   35:23

---
**U**

**ultimately** 67:10
**Um-hum** 32:25
   34:11 41:17
   48:9 49:5 50:20
   51:21 52:10
   54:18 55:8
   56:18 63:16
   69:3
**underlying** 19:6,8
   19:16 21:15
**understand** 15:15
   22:11,15 25:7
   25:16 53:7
**understanding**
   13:12 19:2
   31:20 57:21,22
   60:16
**undertake** 23:3,6
**undertaken** 7:13
   18:18 61:18,20
**unencumbered**
   63:22 64:2
**UNITED** 1:2
**University** 5:4
**unsecured** 6:16,23
   42:11 56:13,13
   56:20 57:6 58:4
   67:10,19,24
**usually** 69:5

---
**V**

**value** 40:4 42:5
   50:6,18,19 51:3
   58:21,23 63:15
   63:22 64:14
**values** 40:6 56:4
   57:4 59:13,19
**various** 30:18
   43:9
**versa** 67:22
**versions** 18:15
   38:6
**vice** 67:22
**view** 21:2

---
**W**

**want** 6:10 22:15

28:22 69:17,18
**warehouse** 31:8
   32:11 44:21
**WarnerCo** 6:7
**wasn't** 17:4 19:13
**Waterfield** 66:12
   66:16,20
**way** 42:11 50:15
   50:16 71:18
**Wednesday** 1:16
**Weekly** 9:17
**weeks** 24:20
**weight** 39:22,24
**weighted** 39:14
**went** 27:9 32:8
   34:16 35:7,19
   45:21 68:5
**weren't** 53:14
**West** 3:21
**We'll** 69:22
**we're** 50:10 63:9
**we've** 7:14,15,17
   7:19 8:6 18:23
   23:19 65:3,5
**WHEREOF** 71:20
**Wilmington** 3:8,22
**wish** 73:3
**withdraw** 66:16
**witness** 4:3 25:14
   41:22 71:10,14
   71:20 72:3
**WL** 51:22
**woman** 11:14 14:3
**worded** 16:25
**work** 12:12 62:7
**worked** 6:19 31:21
**working** 24:9
**worth** 45:22
**writing** 34:24
**wrong** 9:21 10:7
   10:21 56:8

---
**X**

**X** 72:2

---
**Y**

**Yeah** 8:14 22:16
**year** 23:12,15
**years** 4:21,24
   5:18 44:25
   45:22
**York** 1:15,15 2:7
   2:7,9 3:15,15
   71:3,5,9 73:2,3

**young** 3:19 11:14

---
**Z**

**zero** 43:12,22
   44:3 58:23
**Zicklin** 5:5
**Zolfo** 11:23 17:16
   17:18 37:12,20
   45:21 49:3
   61:21 65:8
**ZUCKERMAN** 3:4

---
**$**

**$1.248** 48:12
**$1.3** 48:10
**$100,000** 41:15
**$140** 49:4
**$17** 50:24
**$20** 30:4
**$4.1** 52:12
**$400,000** 58:20
**$47** 55:7
**$530,000** 43:25
**$585** 47:18
**$631** 47:21

---
**0**

**07-11047** 1:8
**08** 17:13 57:11
**09** 55:19

---
**1**

**1** 36:22,23 42:25
   48:10 63:10
   72:14
**1:25** 63:3
**1:40** 70:5
**10** 38:7
**1000** 3:21
**10022** 3:15
**11** 1:6 4:24 8:16
   67:6
**11:03** 2:3
**12:42** 62:13
**1248** 48:19
**15** 4:20
**17th** 3:21
**19899-0391** 3:22
**19899-1028** 3:8

---
**2**

**2** 57:2,3 63:14
**2002** 5:9
**2005** 15:4

**2008** 23:16,17
**2009** 1:16 2:2
   70:12 71:22
   73:23

---
**3**

**3** 38:7 42:22
   54:17
**34** 57:2
**36** 72:14

---
**4**

**4** 1:16 2:2 72:4
**4th** 71:21
**47,000** 55:7 61:11
   61:12
**488** 2:6 3:14

---
**5**

**5** 61:7
**50,000** 61:10,12
**530,000** 43:24
**56** 48:15,18,22
   49:6
**56094** 1:25

---
**6**

**68** 39:7

---
**7**

**7** 8:5,7,7,14,23
   67:6 68:4,5
**7.3** 56:25
**73** 39:7

---
**8**

**80** 12:19

---
**9**

**90** 12:19 18:19
   30:7 32:20
**90-day** 18:24 23:8
   23:10,13,14
   64:10,18 68:11
**919** 3:7
**935** 5:12,13
**98** 6:4
**990** 3:7