IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDING, INC., a Delaware corporation, | ) | Jointly Administered |
| et al.,[1] | ) | |
| | ) | |
| Debtors. | ) | **Re: D.I. 6946** |
| | ) | |

## OPPOSITION TO DEBTORS' MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY AND REPORT OF MARGO SAUNDERS

The Official Committee of Borrowers (the "Borrowers Committee") respectfully opposes the Motion *In Limine* (the "Motion") of above-captioned debtors and debtors-in-possession (the "Debtors" or "AHM") to exclude the expert testimony and report of Margot Saunders.

### I. PRELIMINARY STATEMENT

One of the most important disputed issues in this case is whether the Debtors have failed to give adequate notice of these proceedings to borrowers who had not filed claims against the Debtors as of the Petition Date but nevertheless may have such claims, now or in the future. The Borrowers Committee contends that such borrowers are "known" claimants and that they were and are entitled to actual notice. The Debtors contend that such borrowers are "unknown" claimants and that the Debtors therefore satisfied their duties to give notice to them by publishing three newspaper advertisements.

To help demonstrate that borrower claims against the Debtors were and are "known," the Borrowers Committee intends to elicit the testimony of Margot Saunders, a senior attorney with the National Consumer Law Center ("NCLC") in Washington, D.C. Although Ms. Saunders is

---

[1] The Debtors in these cases are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc.; American Home Mortgage Ventures LLC; American Home Mortgage Corp.; Homegate Settlement Services, Inc; and Great Oak Abstract Corp.

an attorney and is quite familiar with state and federal laws relating to mortgage lending, the Borrowers Committee does not intend to elicit legal opinions from her. Rather, she will testify on four topics relating to borrowers' propensity to make claims against lenders, such as the Debtors, that sold "payment option" adjustable rate mortgages ("POAs"):

1. How POAs result in major problems and financial losses for many borrowers;
2. Theories of liability such borrowers may assert in claims against lenders;
3. How and when most borrowers become aware of the claims they may have against their lenders; and
4. Illustrations of successful resolutions of claims against lenders by and on behalf of borrowers.

Ms. Saunders' testimony is admissible under the Federal Rules of Evidence 702 and 703. Her testimony would "assist the trier of fact" by helping the Court understand evidence relating to complex mortgage products and helping the Court evaluate the propensity of borrowers to sue and recover from the Debtors. Ms. Saunders is extremely well qualified as an expert by virtue of knowledge, skill, experience, and training obtained over three decades of working on consumer protection issues and consulting with consumer attorneys from across the country. And, as she will demonstrate, her testimony is based on "sufficient facts or data," it is "the product of reliable principles and methods," and she "has applied the principles and methods reliably" to the facts of the Debtors' cases. The information on which she relied – including government reports, published statistics, court pleadings, information supplied by consumer attorneys, and her own impressions and experiences over many years – is precisely the type of information on which an expert opining on the subjects at issue should rely.

## II.   BACKGROUND

Ms. Saunders is one of the nation's preeminent consumer advocates in the area of mortgage lending. She has considerable experience in this field: she has been involved with legal services and consumer protection issues for over 25 years, and has served in senior roles for the NCLC for the last 14 years.[2] She has provided expert testimony several times.[3] She regularly consults with private practice and public interest lawyers as well as federal and state regulators.[4] She also has testified before Congress at least fifteen times.[5] In addition to her legal and policy advocacy work, Ms. Saunders publishes on mortgage issues on a regular basis. She has co-authored or contributed to nine books, including four related to consumer lending.[6] (Not surprisingly, Debtors do not actually contest Ms. Saunders qualification to testify as an expert about consumer lending.)

To summarize, and as indicated in her report, Ms. Saunders would offer the following opinions at the upcoming hearing:

- POAs are often very harmful to borrowers
    - they feature low "teaser" rates for the first few days or weeks of the loan
    - they feature initial minimum payment obligations that last only for a few years, after which the minimum payment rises significantly
    - the initial minimum monthly payment obligation is not tied to the interest being charged

---

[2] Expert Report of Margot Saunders, Curriculum Vitae (2009) [hereinafter "Saunders Report"] (a copy of the Saunders Report is attached as Exhibit A to the Motion).
[3] *Id.* Curriculum Vitae.
[4] *Id.* at 2-3.
[5] *Id.* Curriculum Vitae.
[6] *Id.*

- if the borrower chooses the "option" of making the minimum monthly payment required under the loan, significant amounts of interest will go unpaid and be added to principal, a phenomenon known as "negative amortization"
- negative amortization often leads to "payment shock" when borrowers suddenly realize they have to make significantly higher monthly payments
- negative amortization often leads to home foreclosures

- Borrowers (and others acting on their behalf) have sued originators of POAs under many theories
    - borrowers assert federal statutory causes of action
    - borrowers assert state common law and statutory causes of action
    - borrowers may make claims for rescission
    - borrowers may make claims for damages (actual or statutory)
    - various state and federal agencies have questioned lending practices relating to POAs, and some have filed enforcement actions
    - claims may be based on the structure of the mortgage products themselves
    - claims may be based on the lender's underwriting practices, as poor underwriting harms borrowers who are told they are qualified for loans that they cannot afford

- claims may be based on other deceptive or fraudulent sales practices
- borrowers and regulators have been asserting claims for several years
- Many borrowers do not realize they have claims at the time of loan origination
    - borrowers may not realize they have claims until after their payment obligations shoot upwards
    - payment obligations may not rise until several years after the inception of the mortgage
- Many borrower claims have resulted in successful rulings or resolutions
    - Bank of America has committed billions to resolve Countrywide claims
    - Many borrower claims, including class actions, have survived motions to dismiss
    - Many individual claims result in settlements

Ms. Saunders illustrated the problems associated with payment option ARMs by referring to certain loan documents relating to two AHM borrowers, Tilton Jack and Florence Dandridge.[7] Using their documents, she demonstrated how the principal amounts they owed dramatically

---

[7] Saunders Report at 9-13.

1241/001/980973.1

5

2122009.1

rose, even as they made every required payment.[8] An AHM employee, Damian Pasternak, has testified that Mr. Jack's loan utilized a "standard note."[9]

In addition, to illustrate her points about the claims asserted and successes achieved by or on behalf of borrowers, Ms. Saunders cited government enforcement actions and statements, articles and reports, court decisions, and several settlements, some of which are confidential.[10] During her deposition, the Debtors requested copies of all communications she received about those settlements.[11] Counsel for the Borrowers Committee agreed to produce documents Ms. Saunders received for the purpose of performing her assignment for the Borrowers Committee, but noted that some documents might have to be redacted because of client confidentiality or privilege concerns.[12]

As Ms. Saunders will testify, she regularly consults with lawyers handling consumer claims and learns about settlements in this fashion. These consultations are conducted in the course of Ms. Saunders official NCLC duties, and they are privileged and confidential. After her engagement by the Borrowers Committee, Ms. Saunders contacted several of the lawyers with whom already had a professional consulting relationship to obtain additional details about recent settlements. The Borrowers Committee produced the emails reflecting these communications within three days of receiving the Debtors' request for them (but, as it happens, after the Debtors filed their Motion in limine). At the insistence of the attorneys with whom Ms. Saunders

---

[8] *Id.*
[9] Deposition of Damian Pasternak at 91:22 – 93:11 (Feb. 6, 2009) ("Pasternak Tr.") (a copy of the Pasternak deposition is attached as Exhibit D to the Borrowers Committee's motion in limine to exclude certain witnesses' lay opinion testimony (filed contemporaneously herewith) (the "Borrowers Committee's Motion").
[10] Saunders Report at 17-10, 21.
[11] Deposition of Margot Saunders at 56:16-19 (Feb. 2, 2009) ("Saunders Tr.") (a copy of the Saunders deposition is attached as Exhibit B to the Motion).
[12] *Id.* at 57:22-58:4.

consults, a small number of the produced emails contain minor redactions necessary to preserve client confidences.

## III. ARGUMENT

The Debtors would have this Court believe that Ms. Saunders intends to pontificate on "purely legal" issues and share a "random sampling" of loan documents, court cases, and "anecdotal correspondence" with plaintiffs attorneys. In fact, Ms. Saunders will not opine on what the law is, or the merits of any legal argument. At the upcoming hearing, she will describe borrower claims – what leads to them, how they are asserted, when they are asserted, and whether they can result in recoveries. Furthermore, she is one of the most qualified individuals in the country to opine on these subjects, and her opinions are based on far more than the documents and emails she received from counsel and colleagues over the past two weeks. She is providing a considered opinion based on years of experience dealing with hundreds of attorneys and government officials from across the country. The Debtors may disagree with some of her conclusions, and they may have arguments that bear on the weight that the Court should give her testimony, but her testimony is plainly admissible.

### A. Rule 702 Permits Non-Scientific Expert Testimony from Persons With Specialized Knowledge Gained from Their Professional Experience.

Rule 702 of the Federal Rules of Evidence permits a person qualified by "knowledge, skill, experience, training, or education" to provide specialized testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court provided a list of

non-exclusive factors to consider when determining the reliability of scientific evidence.[13] The Supreme Court applied Rule 702's reliability requirement to testimony derived from other technical or specialized knowledge in *Kumho Tire Co. v. Carmichael*.[14] Reemphasizing that *Daubert*'s factors were not exclusive, the Court stated that the test for reliability depends on the "nature of the issue, the expert's particular expertise, and the subject matter of his testimony."[15] Indeed, the Court noted that in some cases "the relevant reliability concerns may focus upon personal knowledge or experience."[16] In the wake of those precedents, courts have recognized that when considering the reliability of non-scientific testimony, the "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."[17]

When a witness relies primarily on experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is sufficient basis for the opinion, and how that experience is reliability applied to the facts."[18] The witness must still testify about their principals and methods, but the required demonstration of those principals and methods differs from scientific or technical evidence.

> For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations.[19]

---

[13] 409 U.S. 579, 591-98 (1993).
[14] 526 U.S. 137 (1999).
[15] *Id.* at 150.
[16] *Id.*
[17] *Living Designs, Inc. v. E.I. DuPont de Nemours and Co.*, 431 F.3d 353, 369 (9th Cir. 2005).
[18] Fed. R. Evid. 702 advisory committee's notes.
[19] *Id.*

"So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted."[20]

### B. The Fact that Ms. Saunders is a Lawyer Does Not Render Her Testimony Inadmissible.

Several courts have allowed attorneys to testify as experts about the legal system and the legal process. This type of attorney testimony is needed, for example, when the litigated dispute turns on questions about how claims are handled in the legal system. Such disputes often arise in mass tort bankruptcy cases. For example, in one well known case, *In re Dow Corning Corp.*, the bankruptcy court relied on the testimony of an expert in comparative law methodology.[21] Certain tort claimants challenged Dow Corning's bankruptcy plan on the ground that claimants in the United States were treated differently under the bankruptcy plan than claimants from other countries.[22] The court relied on the comparative law expert who testified to legal, economic and cultural factors relating to the plan's differing treatment of foreign and United States claimants.[23] The expert testified about several aspects of the legal systems of the United States and the other countries at issue, including various jurisdictions' use of judges as opposed to juries, the availability of punitive damages, the availability of contingency fees, and limitations on strict liability doctrines.[24]

Expert testimony by attorneys also is common in disputes involving attorney compensation and attorney malpractice. For example, in *Primrose Operating Co. v. National American Insurance Co.*,[25] the court allowed an attorney to testify as to the reasonableness of

---

[20] *Id.*; *see also U.S. v. Wilson*, 484 F.3d 267 (4th Cir. 2007) (same).
[21] *In re Dow Corning Corp.*, 280 F.3d 648, 662 (6th Cir. 2002).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] 382 F.3d 546, 562 (5th Cir. 2004) (citing Fed. R. Evid. 703).

attorney's fees.[26] The court observed that "fair and reasonable compensation for the professional services of a lawyer can certainly be ascertained by the opinion of members of the bar who have become familiar through experience and practices with the character of such services."[27] The court found that the expert was qualified to give his opinion both "from his own general knowledge in the practice area, as well as from his personal experience relating to the nature and extent of the services rendered in this particular litigation."[28] Several states actually require the use of expert testimony from attorneys in legal malpractice cases. For example, as the Third Circuit explained in *Lentino v. Fringe Employee Plans, Inc*, Pennsylvania law requires expert testimony in legal malpractice cases, except when the matter under investigation is "so simple, and the lack of skill so obvious, as to be within the range of the ordinary experience and comprehension of non-professional persons."[29]

In disputes involving complex or ambiguous contracts, attorneys also may opine on industry practices and conventions.[30] In *Ji v. Bose Corp.*, for example, a model sued the purchaser of photographs for false endorsement. The model sought to call an entertainment attorney as an expert witness to offer testimony about the effect of certain contractual releases.[31] Noting that the contract language was ambiguous, the court admitted the attorney as an expert and permitted him to testify about industry practice.[32]

---

[26] *Id.*
[27] *Id.*
[28] *Id.* at 563.
[29] 611 F.2d 474, 480 (3d Cir. 1979).
[30] *See Ji v. Bose Corp.*, 538 F. Supp. 2d 354 (D. Mass. 2008) (the court also observed, when addressing the standard for the admissibility of expert testimony, that the *Daubert* factors for the evaluation of scientific experts "do not always apply cleanly to non-scientific experts and the trial court's discretion in such matters is broad.").
[31] *Id.* at 356.
[32] *Id.* at 360.

In each of these situations, courts admitted attorneys as expert witnesses to offer opinions on aspects of the legal system or an industry not generally known to lay people. Ms. Saunders is doing exactly the same here.

### C. The Debtors Have Acknowledged that Non-Experts Have Difficulty Understanding and Testifying About Payment Option ARMs.

The need for expert testimony about POAs is easily demonstrated simply by reading the deposition testimony of two witnesses employed by the Debtors: Bret W. Frenandes and Damian Pasternak.

The Debtors designated Mr. Fernandes as their Rule 30(b)(6) witness.[33] At his deposition, Mr. Fernandes was asked a series of questions about the payment-option ARM of Mr. Tilton Jack. He had some difficulty deciphering the loan documents, and could not calculate basic aspects of Mr. Jack's loan from his examination of the paperwork.[34] For example, when asked if he could tell from looking at Mr. Jack's loan documents how long it would take before a borrower would no longer be permitted to take advantage of the minimum payment option, Mr. Fernandes replied that he would need a calculator.[35] He acknowledged that the information requested could not be discerned from the face of the document.[36] (Mr. Fernandes, unlike Mr. Jack, has a bachelor's degree in business economics from the University of California Santa Barbara.[37])

Damian Pasternak worked for the Debtors, principally in the area of mortgage trading.[38] He has an undergraduate degree in finance, and an MBA from Hofstra University also in

---

[33] Deposition of Bret W. Fernandes at 3:15-23 (Jan. 15, 2009) ("Fernandes Tr.") (a copy of the Fernandes deposition is attached as Exhibit C to the Borrowers Committee's Motion).
[34] *Id.* at 29:20-30:24.
[35] *Id.* at 32:14-19.
[36] *Id.* at 32:14-33:9.
[37] *Id.* at 31:3-10.
[38] Pasternak Tr. at 3:12-18.

finance.[39] Several days after Mr. Fernandes was deposed, Mr. Pasternak was deposed. When asked to explain aspects of Tilton Jack's loan terms, counsel for the debtor objected vociferously, stating, "He's not going to sit here and interpret a document he's never seen before. He's not an expert witness. He's not going to testify as an expert witness. He wasn't involved in mortgage loan sales."[40] Counsel instructed Mr. Pasternak not to answer any questions about Mr. Jack's loan documents.[41]

### D.  Ms. Saunders Considered Sufficient and Appropriate Information.

Ms. Saunders relies on several sources of information: her own experience; publications in her field; information provided over the years by attorneys with whom she consults; and some documents specific to AHM provided by counsel for the Borrowers Committee, including documents relating to several POAs issued to individual borrowers, as well as an SEC filing made by AHM in which it described its lending and underwriting practices. As Mr. Saunders will explain, POAs are a fairly standardized mortgage product, and most are structured the same way. Her testimony on this point is consistent with that of Mr. Pasternak, who testified that Mr. Tilton Jack's payment option ARM utilized the Debtors' standard form.[42] Moreover, other evidence will establish conclusively that negative amortization was an almost universal consequence of the Debtors' POA originations.

Ms. Saunders does illustrate her points with anecdotes, but there is nothing wrong with that. Her anecdotes clarify her opinions, and anecdotal evidence is admissible when it comports

---

[39] *Id.* at 4:6-9.
[40] *Id.* at 94:2-97:22.
[41] *Id.* at 97:12-17.
[42] *Id.* at 93:9-11.

1241/001/980973.1                                     12                                              2122009.1

with the expert's general experience.[43] For example, in *Cantrel v. GAF Corp.*, the Sixth Circuit held that a doctor testifying about anecdotal evidence did not make his opinion unreliable when that anecdotal evidence merely provided additional support for his opinion.[44] Furthermore, the admissibility of testimony relying on anecdotal evidence depends upon the purpose for which that testimony is being provided. In *Tyler ex rel. Tyler v. Sterling Drug, Inc.*, the court permitted the introduction of anecdotal case reports when the purpose of that evidence was to demonstrate notice and the state of medical knowledge at a particular time.[45] It is thus perfectly appropriate for Ms. Saunders to note that there were a few court decisions over the past few years that upheld borrower claims, and that a few lenders have settled borrower claims.

Like many experts, Ms. Saunders has gained knowledge from experiences that she is not at liberty to describe in complete detail. When an attorney testifies as an expert, and offers opinions based on the attorney's career experiences, the attorney does not waive the privileges attached to every single client interaction that contributed to the attorney's opinions. (Similarly, when a doctor testifies as an expert, the doctor need not disclose the medical records of every patient.) As an NCLC attorney, Ms. Saunders often consults with lawyers about their cases. She has a professional, confidential relationship with these lawyers. When they do not agree to permit disclosures about their dealings, she is ethically prohibited from identifying them or their cases. Nevertheless, she has divulged all communications with them on which she relied in formulating her report, redacting only very limited, and irrelevant, identifying information.[46]

---

[43] *Nucor Corp. v. Bell*, No. 06-2972, 2008 WL 4442571, at *7-8 (D.S.C. Jan. 11, 2008) (expert's use of evidence that strayed from his methodology was not fatal because the evidence was merely indicative findings, not the basis for his findings).
[44] 999 F.2d 1007, 1113-14 (6th Cir. 1993).
[45] 19 F. Supp. 2d 1239, 1241 (N.D. Okla. 1998).
[46] Even if the privileged and confidential information had been provided to Ms. Saunders by the Borrowers Committee as opposed to counsel with whom Ms. Saunders has a preexisting professional relationship, expert

## IV.  CONCLUSION

Ms. Saunders is an eminently qualified expert whose opinions are based on reliable information.  Her testimony would aid the Court substantially.  The Debtors' motion to exclude her testimony should be denied.

Dated: Wilmington, Delaware
       February 8, 2009

ZUCKERMAN SPAEDER LLP

Thomas G. Macauley (ID No. 3411)
919 Market Street, Suite 990
Wilmington, DE 19801
Telephone: (302) 427-0400
Facsimile: (302) 427-8242

- and -

GILBERT OSHINSKY LLP
Stephen A. Weisbrod
W. Hunter Winstead
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Telephone: (202) 772-1962
Facsimile: (202) 772-3962

Attorneys for the Official Committee
of Borrower

---

discovery rules would not necessarily require the disclosure of the privileged information. *See In re Teleglobe Commc'ns Corp.*, 392 B.R. 561, 576-77 (Bankr. D. Del. 2008).