1

UNITED STATES BANKRUPTCY COURT

DELAWARE DISTRICT OF DELAWARE

Case No. 07-11047-CSS

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


AMERICAN HOME MORTGAGE HOLDINGS, INC.,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                824 North Market Street

                Wilmington, Delaware


                February 10, 2009

                11:08 AM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

2

1

2    A P P E A R A N C E S :

3    YOUNG CONAWAY STARGATT & TAYLOR LLP

4         Attorneys for Debtors

5         1000 West Street

6         Wilmington, DE 19899

7

8    BY:   SEAN M. BEACH, ESQ.

9          PATRICK A. JACKSON, ESQ.

10         JOHN T. DORSEY, ESQ.

11         MARGARET WHITEMAN GREECHER, ESQ.

12

13

14   POTTER ANDERSON & CORROON LLP

15        Attorneys for Bank of America

16        1313 N. Market Street

17        Wilmington, DE 19899

18

19   BY:   GABRIEL R. MACCONAILL, ESQ.

20

21

22

23

24

25

3

1

2    PRYOR CASHMAN LLP

3         Attorneys for Low Debenture

4         410 Park Avenue

5         New York, NY 10022

6

7    BY:   SEAN M. CONNERY, ESQ.

8

9

10   COVINGTON & BURLING LLP

11        Attorneys for Wilmington Trust Company

12        The New York Times Building

13        New York, NY 10018

14

15   BY:   SUSAN POWER JOHNSTON, ESQ.

16

17

18   LANDIS, RATH & COBB, LLP

19        Attorneys for JPMorgan

20        919 Market Street

21        Wilmington, DE 19899

22

23   BY:   MATTHEW B. MCGUIRE, ESQ.

24

25

4

1

2    HAHN & HESSEN LLP

3           Attorneys for Creditors' Committee

4           488 Madison Avenue

5           New York, NY 10022

6

7    BY:   EDWARD L. SCHNITZER, ESQ.

8           MARK T. POWER, ESQ.

9           MARK S. INDELICATO, ESQ.

10

11

12   BLANK ROME LLP

13          Attorneys for Creditors' Committee

14          1201 Market Street

15          Wilmington, DE 19801

16

17   BY:   ELIZABETH A. SLOAN, ESQ.

18

19

20   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

21          Attorneys for Union Federal

22          One Rodney Square

23          Wilmington, DE 19899

24

25   BY:   ERIC M. DAVIS, ESQ.

5

1

2    KAYE SCHOLER LLP

3         Attorneys for Bank of America

4         425 Park Avenue

5         New York, NY 10022

6

7    BY:   ANA M. ALFONSO, ESQ.

8

9

10   ZUCKERMAN SPAEDER LLP

11        Attorneys for Borrowers' Committee

12        919 Market Street

13        Wilmington, DE 19801

14

15   BY:   THOMAS G. MACAULEY, ESQ.

16

17

18   GILBERT OSHINSKY LLP

19        Attorneys for Borrowers' Committee

20        1100 New York Avenue, NW

21        Washington, DC 20005

22

23   BY:   STEPHEN A. WEISBROD, ESQ.

24        W. HUNTER WINSTEAD, ESQ.

25

6

1

2    REED SMITH LLP

3          Attorneys for Freddie Mac

4          1201 Market Street

5          Wilmington, DE 19801

6

7    BY:   J. CORY FALGOWSKI, ESQ.

8

9

10   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

11         222 Delaware Avenue

12         Wilmington, DE 19801

13

14   BY:   KEVIN J. MANGAN, ESQ.

15

16

17   ASHBY & GEDDES, P.A.

18         Attorneys for Morgan Stanley Mortgage Capital Holding,

19            PB Structured Products, Inc.

20         500 Delaware Avenue

21         Wilmington, DE 19899

22

23   BY:   AMANDA M. WINFREE, ESQ.

24

25

7

1

2   DORSEY & WHITNEY LLP

3        Attorneys for US Bank as Trustee

4        1106 North Market Street

5        Wilmington, DE 19801

6

7   BY:   ROBERT W. MALLARD, ESQ.

8

9

10   ALSTON & BIRD LLP

11        Attorneys for LaSalle Bank

12        1201 West Peachtree Street

13        Atlanta, GA 30309

14

15   BY:   BESS M. PARRISH, ESQ.

16        (TELEPHONICALLY)

17

18

19   BINGHAM MCCUTCHEN LLP

20        Attorneys for DB Capital Structures

21        399 Park Avenue

22        New York, NY 10022

23

24   BY:   STEVEN WILAMOWSKY, ESQ.

25        (TELEPHONICALLY)

8

1                   P R O C E E D I N G S

2           THE CLERK:  All rise.

3           THE COURT:  Please be seated.  Good morning.

4           MR. BEACH:  Good morning, Your Honor.  May it please

5     the Court, Sean Beach from Young Conaway on behalf of the

6     debtors.

7           Your Honor, I'm pleased to report we've got a couple

8     other resolutions with parties and I believe it will leave us

9     only with the borrower committee objection.  With the Office of

10    the United States Trustee we were able to talk to Mr. McMahon

11    about what his remaining issues were and agreed to make some

12    changes to the plan.  I can read those on the record but I

13    don't have a black line, unfortunately, for you, at this point,

14    Your Honor.

15          THE COURT:  Okay.

16          MR. BEACH:  The first change is on page 82 of the

17    black line plan, Section J, entitled Distributions and

18    Satisfaction Allocation.

19        (Pause)

20          MR. BEACH:  And starting on the second line, starting

21    on page 83 we're going to strike debtors so it'll read

22    obligations of and interest in the plan trust and the plan

23    trust assets.  And then we're going to strike and the estates

24    and the assets and properties of the debtors, the plan trust

25    assets and the estates.  And then continue on with whether

9

1    known or unknown.

2         This is just to clean up an issue that Mr. McMahon

3    raised regarding discharge.  He wanted to, kind of, clean up

4    the back door of that or a potential back door on that issue.

5    So that's what that change relates to.

6         In the plan injunction section, on my black line on

7    page 93, ten lines down we're going to strike the words or

8    recoupment in that injunction provision.

9         And in the exculpation provision, page 95, it is four

10   lines down, we're going to strike the words and such reasonable

11   reliance shall constitute an absolute defense to any such

12   claim, cause of action or reliability relating to the advice of

13   counsel.  Obviously the plan trustee is able to rely on the

14   advice of counsel but Mr. McMahon didn't want the absolute

15   defense language in there.  And that would resolve the

16   remaining issues with the office of the United States Trustee.

17        With respect to JPMorgan -- well first, with respect

18   to DB, Bank of America has signed off on that agreement that

19   Mr. Jackson referenced yesterday, I believe.  Ms. Alfonso will

20   be in here later on and she can confirm that on the record but

21   I just wanted to inform Your Honor that that issue has been

22   resolved.

23        In connection with JPMorgan, JPMorgan -- as Your

24   Honor may recall, on the record yesterday Mr. Pasternak

25   testified that out of the ninety-two million in UPB on the EPD

1   breached proof of claim that JPMorgan filed, they had only

2   provided, pursuant to the voting questionnaire, they had only

3   provided fifty-one million UPB of backup data.  They've now

4   provided additional data to the debtors and based on those

5   numbers the EPD breach claim for JPMorgan is 27.3 million

6   dollars.

7           The agreement with JPMorgan is to put that into the

8   confirmation order and make it clear that it's still subject to

9   verification of the actual EPDs because the debtors didn't have

10  time to verify that prior to the hearing today.  And it's also

11  without prejudice to any of the rights of the parties in

12  connection with any other litigation that JPMorgan and the

13  debtors may be involved in.  And I believe that's the

14  resolution there.

15          Your Honor, the debtor's position is that the joinder

16  of Morgan Stanley falls away as a result of the withdrawal of

17  the JPMorgan objection.  JPMorgan's counsel with withdraw that

18  and I understand Morgan Stanley doesn't have any objection to

19  that as well.  And I believe that is the remainder of the

20  issues.  I think JPMorgan's counsel may want to get up and

21  confirm that.

22          MR. MCGUIRE:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          MR. MCGUIRE:  Matthew McGuire, Landis Rath & Cobb on

25  behalf of JPMorgan and I can confirm that our objection has

1     been withdrawn.

2              THE COURT:  All right.  Thank you.

3              MR. MCGUIRE:  Thank you.

4          (Pause)

5              MR. BEACH:  Thank you, Your Honor.  With that, I

6     think, I'll cede the podium to the committee.  I believe the

7     next item will be to have the testimony of Ms. Michaelis BDO.

8              THE COURT:  All right.

9              MR. POWER:  Thank you, Your Honor.  Mark Power from

10    Hahn & Hessen, counsel to the committee.  Your Honor, the

11    committee calls Ms. Michelle Michaelis to the stand.

12             THE COURT:  All right.  Please take the stand.

13         (Pause)

14         (Witness is Duly Sworn)

15             THE CLERK:  Please state and spell your last name for

16    the record.

17             THE WITNESS:  My name is Michelle Michaelis,

18    M-I-C-H-A-E-L-I-S.

19    DIRECT EXAMINATION

20    BY MR. POWER:

21    Q.   Ms. Michaelis, with whom are you currently employed?

22    A.   BDO Consulting, BDO Seidman.

23    Q.   And what is BDO's role in this case?

24    A.   We are the financial advisors to the unsecured creditors

25    committee.

1    Q.    What is your personal involvement on behalf of BDO as

2    financial advisors?  What role do you play in the engagement?

3    A.    I am -- I am one of the team of the financial advisors for

4    the UCC in the case.

5    Q.    Briefly describe your educational background for us.

6    A.    I have a BS in accounting from Alpin (ph.) University and

7    an MBA in finance from Zicklin School of Business at Baruch

8    College.

9    Q.    In terms of professional background, could you describe to

10   the Court, briefly, what your professional background is?

11   A.    I have been with BDO for fifteen years.  I worked for five

12   years doing audit practice and then for a little over ten years

13   now in the restructuring services group.

14   Q.    And as part of that servicing for BDO, what have you

15   primarily worked on?

16   A.    Primarily I've been the financial advisor for unsecured

17   creditors' committees.  I've represented debtors in certain

18   cases.  I've done forensic investigations and litigation

19   support work.

20   Q.    Approximately how many engagements in your career have you

21   worked on in connection with Chapter 11 cases?

22   A.    Probably about twenty.

23   Q.    Have you worked with any Chapter 7 trustees before?

24   A.    Yes.

25   Q.    Approximately how many Chapter 7 case have you been

13

1    involved with?

2    A.    Roughly three, I think.

3    Q.    And what's your role, just briefly and just generally, in

4    terms of those engagements -- what do you generally -- what

5    kind of tasks do you perform?

6    A.    With a Chapter 7 generally it's been to verify the

7    remaining assets in an estate that are being liquidated to

8    assist in the final claim process of paying out whichever

9    claimants were still getting anything or liquidating of assets.

10   Q.    Now in terms of this case, would you briefly describe for

11   the Court what assignments you've worked with --

12             MR. POWER:  I'm sorry, strike that.

13   Q.    When did you first get involved in the engagement with the

14   American Home case?

15   A.    Late August of 2007.

16   Q.    And was that when the committee was formed?

17   A.    Yes.

18   Q.    Can you briefly describe what your role has been in

19   connection with the engagement for American Home?

20   A.    I have been, basically, the day-to-day person overseeing

21   the case, reporting to the partner in the engagement.  I've

22   worked with the debtors on -- on budgeting.  I've dealt with

23   the reviewing of the asset sales, the B of A settlement

24   agreement.  I worked with counsel on any aspect that we were

25   looking into, dealt with the asset allocation model that was

14

1    being prepared, reviewed the liquidation analysis.

2    Q.    Okay.  Let's step to a different issue.  Are you familiar

3    with who the members of the creditors' committee currently are?

4    A.    Yes.

5    Q.    Okay.  Could you briefly go through each of the members?

6    A.    The chair of the committee is Wilmington Trust.  They have

7    claims against holdings, servicing and investment.  We have Law

8    Debenture who has holdings against Corp, Acceptance and

9    Servicing.  DB has filed claims against eight entities.

10   Q.    And when you say DB --

11   A.    Deutsche Bank National Trust.

12   Q.    National Trust --

13   A.    National Trust.

14   Q.    -- not Specialty Products, is that correct?

15   A.    Yes.

16   Q.    So you were saying?  I'm sorry I interrupted you.

17   A.    They have claims against all -- they filed claims, at

18   least, against all eight of the debtors.  Primarily their

19   claims sit, though, with Acceptance, Investment, Corp and

20   likely servicing.

21   Q.    Okay.  That's three.  What about the other committee

22   members?

23   A.    There is Nemora who are -- who have claims against

24   Corporate.  Impac who has claims against Corporate and UPS who

25   have claims against Corporate.

15

1   Q.   So they're six members currently on the committee?

2   A.   Yes.

3   Q.   And the majority of committee members have claims against

4   which entity?  What's the most common?

5   A.   Corporate.

6   Q.   Corporate is.  Are you aware of any committee members who

7   have --

8            MR. POWER:  Strike that.

9   Q.   Are you familiar with the term that we've been talking

10   about yesterday, EPD and breach claims?

11   A.   Yes.

12   Q.   Based on that understanding, are you aware if any

13   committee members have EPD breach claims that would be subject

14   to the protocol that's in the plan?

15   A.   As far as I know there are two and that's Deutsche Bank

16   National Trust and Nemora.

17   Q.   Are you aware of any of the other four members, if they

18   have EPD breach claims?

19   A.   Not that I know of.

20   Q.   Are you aware of where most of the borrower claims have

21   been filed in this case, against which entity those claims are

22   asserted?

23   A.   I believe they're mainly filed against corporate although

24   there may be some claims against acceptance or servicing.

25   Q.   Part of your engagement, on behalf of the committee, did

16

1    there come a time when you started considering a plan of

2    liquidation on behalf of the committee?

3    A.    Yes.

4    Q.    When was that, approximately?

5    A.    We've been -- through each revision of budgets, etcetera,

6    we've always kept in our mind what a -- what a liquidation

7    value would be.

8    Q.    When did the process start?

9    A.    Most likely early 2008.

10    Q.    Approximately a year ago?

11    A.    Approximately a year ago.

12    Q.    And then, would you briefly describe the process -- well,

13    let me step back.  What was your involvement in the plan

14    process and developing this plan, if any?

15    A.    My main involvement was working with the debtor on their

16    asset allocation model and their determination of -- through

17    discussions of substantial consolidation versus maintaining a

18    deconsolidated group of debtors, I guess.

19    Q.    Describe for the Court, basically, the process from the

20    beginning when you first started looking a construct of a plan

21    liquidation to where we are today with the final plan.  Can you

22    briefly describe what that process entailed and what your

23    involvement was?

24    A.    Well, mainly my involvement had been, from early on in the

25    case, we had looked at what each of the eight entities did,

1    what assets would be there, what claims would likely be against

2    them and started evaluating the intercompany transactions to

3    the extent of understanding what intercompany transactions

4    would be there.

5         And then, from that point, the asset allocation level, the

6    plan started getting prepared and the determination was made to

7    not substantively consolidated.  We looked at how the debtor

8    was outlining where the assets lie versus where claims may lie.

9    And then I work closely with Bret Fernandes discussing the

10   whole asset allocation, intercompany adjustment to reallocate

11   intercompany expenses across the different asset pools, pardon

12   me, debtor pools and then the assets.

13   Q.   So when you looked at intercompany claims, what

14   specifically did you look at?

15   A.   The general ledgers primarily.

16   Q.   Of the debtors?

17   A.   The general ledgers of the debtors.  And then, obviously,

18   I had discussions with people in corporate accounting, the

19   controller and assistant controller, Robert Bernstein and

20   Richard Yublanski (ph.) mainly.

21   Q.   Do you recall what the initial construct of the plan was

22   in connection with the allocation of Chapter 11 expenses that

23   the debtor proposed?

24   A.   The initial --

25   Q.   The initial proposal done by the debtor in terms of

18

1    allocating Chapter 11 expenses.

2            MR. POWER:  Strike that.

3    Q.   Do you know which debtor the debtor originally proposed to

4    allocate most of the Chapter 11 expenses?

5    A.   As far as I can recall, the majority were against

6    corporate.

7    Q.   And was there an explanation as to why that occurred?

8    A.   That's where most of the operations seemed to have

9    occurred.

10   Q.   Did you do anything in response to that allocation?

11   A.   Yes, that's when we went back to the -- the issue of

12   although it appears that almost all the activity occurs at

13   corporate, corporate was really maintaining the -- was

14   maintaining the operations for so many of the other entities

15   that it was being unfairly burdened historically with expenses

16   and costs that were not necessarily its expenses or costs which

17   then led into the reallocation of historical expenses and

18   adjustments to the intercompany payable balance.

19   Q.   Did the committee instruct you to do anything in

20   connection with those expense allocations that the debtor

21   proposed?

22   A.   In terms of the --

23   Q.   You testified that most of the expenses originally were on

24   the books of corporate.

25   A.   Correct.

1    Q.   All right.  And then did the committee doing anything to

2    basically try to address that issue?

3    A.   Well, yes.  They had -- after discussing the issue with

4    the committee the committee had stated that they felt that it

5    would probably be in the best interest of every -- of all the

6    debtors to more fairly allocate expenses that belonged on other

7    debtor entities to those entities to not make corporate bear

8    the burden of all the operations to date and then going

9    forward.

10   Q.   So how was that process done?  How did you try to allocate

11   things more fairly?

12   A.   We looked back over roughly a two year period of expenses

13   on each of the debtor entities.  There were certain

14   intercompany allocations that had been previously done so we

15   removed those from the pool.  And then we outlined what we felt

16   would be those expenses that should be shared across all

17   debtors, professional and legal, audit fees, corporate

18   executive management payroll related or anything else that may

19   fall into the corporate overhead category that hadn't been

20   previously allocated.

21        We identified what those would be, again roughly over a

22   two year period and then going debtor by debtor tried to

23   reallocate those based on -- I believe our primary driver was

24   the activity at each of those debtor entities to help

25   allocate -- reallocate costs among the entities.  And then a --

1    as was shown likely in the -- as was in the plan there's a

2    calculation that was then derived that adjusted down the

3    payable balances per each debtor.

4    Q.   Were you instructed to try to move any expenses to a

5    specific debtor versus another debtor as part of this?

6    A.   No.

7              MR. POWER:  Your Honor, are the exhibits from

8    yesterday still up there?

9              THE COURT:  Yes, they should be.

10             MR. POWER:  Okay.

11   Q.   There should be in front of you Exhibit 1, I think it's

12   the debtor's exhibit 1.

13             THE COURT:  It's in a slim notebook.

14        (Pause)

15             THE WITNESS:  Fernanze's examination binder.

16             MR. POWER:  Yes.

17             THE WITNESS:  Okay.

18             THE COURT:  You know what, I'm sorry.  Theresa there

19   should be a notebook over there.  Mr. Dorsey, do you mind?  I

20   think I gave it -- yeah.  Thank you, sir.

21   Q.   Ms. Michaelis, you have before you, hopefully, Exhibit 1.

22   Do you have that in front of you?

23   A.   Yes.

24   Q.   Do you recognize that document?

25   A.   Yes.

1    Q.    What is that document?

2    A.    It is the plan allocation methodology, the summary pages

3    is what I have open.

4    Q.    And is this a document that you're familiar with?

5    A.    Yes.

6    Q.    And in what way are you familiar with this document?

7    A.    I have reviewed various drafts of it and I was involved

8    with discussions as to how it was formulated and where our

9    percentages came from or where the percentages the debtor used

10   came from, etcetera.

11   Q.    Is this version in front of you the final version or one

12   of the draft versions, do you know?

13   A.    As far as I know it's the final version.

14   Q.    Approximately how many variations of this document were

15   created in part of your work?

16   A.    Several.  Roughly -- I've responded previously in my

17   deposition, more than three, less than ten.  I couldn't say

18   exactly how many though.

19   Q.    How long a period of time are these variations performed?

20   A.    A few months, probably three months.

21   Q.    If you turn to the third page of that Exhibit 1, do you

22   have that in front of you?

23   A.    I think so.

24   Q.    It says on the top Prepetition Intercompany Settlement

25   Summary.

22

1    A.    Yes.

2    Q.    Do you have that?  Are you familiar with this page?

3    A.    Yes, I am.

4    Q.    When you were testifying previously about the intercompany

5    balances and looking back two years, how does that

6    investigation relate to this page if at all?

7    A.    The adjustments that you see under the corporate

8    allocation adjustment line is the -- was the result of those

9    reallocations of expenses.  Namely, it was the reduction or the

10    hitting of each of these debtor entities with an expense and

11    then the crediting of American Home Mortgage Corp for those

12    expenses that should have been allocated previously.

13    Q.    Are you familiar with what the intercompany balances were

14    vis-a-vis Corp and the other debtors prior to this allocation

15    chart, before you started your investigation?

16    A.    Do you mean the allocation that had already been done or

17    just overall the intercompany payable balance?

18    Q.    Overall.  When you first got involved what did the

19    intercompany balances show?

20    A.    I have a rough idea of what all the intercompany balances

21    would show, mainly activity between each of the debtors, be it

22    the transfer of loans from the originator entity being Corp,

23    for example, up to, perhaps, acceptance where it might have

24    been securitized.  Or, if it went up to investment for -- if it

25    was transferred over, you know, loans were transferred among

23

1    the debtors.

2    Q.   And to your knowledge, when the adjustments were done to

3    the intercompany balances what was the overall effect to any

4    specific debtor?  Do you have any sense of what that was?

5    A.   Do you mean the corporate allocation adjustment?

6    Q.   Yes.

7    A.   It increased, basically, the expenses or the payable to

8    each of seven of the debtor entities and it decreased the

9    payable balance by 141 million, approximately, on corporate.

10   Q.   So after you had done the two year investigation was there

11   anything else that you think should have been done to make the

12   intercompany accounts track the activity of the various

13   debtors?

14   A.   There was nothing else I thought we could do.

15   Q.   If you turn two more pages, I think the fifth page in that

16   exhibit, it's entitled Assignment of Direct Administrative

17   Costs.

18   A.   Yes.

19   Q.   Are you familiar with this page?

20   A.   Yes, I am.

21   Q.   What does this page represent, to your knowledge?

22   A.   This page represents the application of costs that had

23   been incurred postpetition to the debtors to which they could

24   be specifically applied.  For example, if it was a -- if the

25   transaction -- if there was a transaction fee on a specific

24

1    loan and we could trace where that loan was sold from it was

2    tracked it was included on this page.

3    Q.    Were you involved in reviewing the numbers that went into

4    this chart?

5    A.    Yes.

6    Q.    And was there discussion -- did you have a discussion with

7    the debtor about whether so many allocations were appropriate?

8    A.    Yes.  We went back and forth as to what the -- the

9    underlying expenses may have been that fell into each of these

10   categories.

11   Q.    And to you knowledge was the committee satisfied that the

12   direct expenses had been allocated properly?

13   A.    Yes.

14   Q.    Turn to the next page --

15              MR. POWER:  Sorry, Your Honor.

16   Q.    Well let me just ask the question because I don't see --

17   are you familiar with certain costs of the Chapter 11 that

18   could not be directly assigned to a specific debtor?

19   A.    Yes.

20   Q.    And what happened to those costs and to part of the

21   stipulated asset allocation?

22   A.    They were allocated out among each of the debtor entities

23   based on a formula presented earlier in this -- in this plan

24   schedule.

25   Q.    And is that the second page of Exhibit 1?

25

1    A.    Yes.

2    Q.    When you say they were allocated among the debtors, under

3    what basis were they allocated?

4    A.    The -- if you see on the second page there is a weighting

5    allocation for unencumbered value, encumbered value and the

6    claims.  And this is calculated out among each of the debtor

7    entities to come to a weighted average allocation percentage to

8    be applied for those expenses, to layer those expenses on to

9    each one of the debtor entities, based on this seventeen

10   percent for example to holdings, 11.1 percent to investment.

11   Q.    Do you know why those, I'll call them, indirect expenses

12   were allocated this way versus another possible way in this

13   formula?

14   A.    We had gone back and forth as to how to allocate it and

15   discussions between the debtors and the committee's financial

16   advisors determined that the best way to allocate it would be

17   on some kind of weighting of the asset values and, you know,

18   giving some weight to claims, etcetera.  And then since the

19   whole point of the allocable costs were to preserve the value

20   of the estate as a whole.

21   Q.    Are you familiar with the liquidation analysis that's part

22   of the exhibit to the plan in this case?

23   A.    Yes.

24   Q.    Okay.  To your knowledge, what's the relationship of the

25   liquidation analysis with this Exhibit 1, if any?

1    A.    The liquidation analysis is built off of Exhibit 1.   To

2    the extent that the assets are -- the primary difference is the

3    assets are lower, based on their recoveries -- participated

4    recoveries under a liquidation.   And then there are certain

5    costs that are not extended out.   For example, there's a lower

6    plan trust, I believe, on the liquidation analysis versus the

7    allocation model and the liquidation analysis has layered in

8    other costs for trustee fees on an entity by entity level and

9    fees related to the settlement of intercompany claims.

10   Q.    And is there an assumption in the liquidation analysis

11   that the inner claims aren't settled or if the EPD/breach

12   protocol isn't approved that the cost of litigating those

13   issues will be higher in a 7 scenario?

14   A.    I'm sorry; could you repeat the question?

15   Q.    Is there an assumption in the liquidation that you're

16   aware of where if the stipulated asset allocation is not

17   approved as part of the plan and the EPD protocol is not

18   approved as part of the plan that the litigation type expenses

19   of the Chapter 7 will be higher than in an 11 and under this

20   plan?

21   A.    I believe so.   I believe that's what's buried into the

22   cost of determining the intercompanies and the trustee costs.

23   Q.    Now, did there come a time when the committee was

24   presented with the final version of the plan that's before the

25   Court today?

27

1    A.    Yes.

2    Q.    Did the committee -- do you know if the committee voted on

3    whether to approve the plan and support it or not?

4    A.    I believe it was supported by the committee, yes.

5    Q.    Are you familiar with how litigation recoveries are

6    treated under the stipulated asset allocation?

7    A.    Yes.

8    Q.    How are litigation recoveries treated?

9    A.    They would be applied in the same fashion as the value

10   allocation listed on line M of the summary page of Exhibit 1.

11   Q.    Now, when they were determining the weighted averages for

12   allocating expenses associated with the estate, were

13   hypothetical litigation recoveries included --

14   A.    No.

15   Q.    -- in those asset recoveries?

16   A.    No.

17   Q.    So the expenses that were incurred to date, do you know

18   approximately how much Chapter 11 expenses have been incurred

19   in this estate to date?

20   A.    Honestly, I -- I don't know off the top of my head.

21   Q.    Within the tens of millions, do you know?

22   A.    Of?

23   Q.    Expenses, administrative expenses.

24   A.    It's in the millions.  I don't know if it's reached over

25   tens of millions.

28

1   Q.   Okay.  We'll live with that.  Under the weighted average

2   formula of allocating those administrative expenses -- again, I

3   think I've asked this but I just want to clarify.  To your

4   knowledge were potential litigation recoveries included?

5   A.   No, potential litigation recoveries were not included per

6   se as an asset value, is that what you're asking?  Yes?  Then

7   no, they weren't.

8   Q.   Now, when looking at how they would divide the

9   distributions among the various estates, based on the asset

10  allocation formula, were potential litigation recoveries

11  included in that analysis to reach the line M that you

12  testified about?

13  A.   No.  No.  Litigation recoveries were not included as an

14  asset value in this model.

15  Q.   What, if anything, did the committee have you look at to

16  determine whether that was appropriate or not?

17  A.   Well, we were asked about if we could state the likelihood

18  and estimate what those recoveries would be and we could not.

19  Q.   Why couldn't you?

20  A.   Well, in part we -- although there are several litigations

21  that are running we have no way of really estimating those

22  recoveries.  And to attempt to -- and the case is not been one

23  that has shown that recoveries are necessarily predictable.

24  And since they aren't predictable and we couldn't estimate them

25  appropriately, to include them on any given entity would really

1   unfairly overweight that entity, potentially, with expenses to

2   carry those costs.  It's far too speculative.  And it may -- by

3   assigning a value to something that we couldn't, in theory,

4   value under FASB 5.  If we were looking at it from a purely

5   accounting point of view then you might be hitting a debtor

6   entity with additional administrative and other costs that

7   would make it almost infeasible to --

8   Q.   When you say FASB 5, could you briefly explain that?

9   A.   FASB 5 is an accounting pronouncement that basically

10  states that you cannot include a revenue if it's not likely,

11  estimateable and predict -- estimateable and probable.

12  Q.   And litigation -- you found that litigation in this case

13  fell within that --

14  A.   Yes.

15  Q.   -- parameter?  Now, there's been talk, yesterday, about

16  avoidance claims, are you familiar with the term avoidance

17  claims?

18  A.   Yes.

19  Q.   Particularly preference claims, are you familiar with

20  that?

21  A.   Yes.

22  Q.   Did the committee ask you to consider or look at any

23  potential preference claims and whether those should be

24  included in this formula?

25  A.   We looked at the payments within the ninety days, which is

1    generally the preference period that -- that one would look at.

2    And although high in dollar number, we felt that we couldn't

3    properly estimate what a preference claim could be in this case

4    due to the nature of the cash management system and the fact

5    that almost all payments ran through corporate, irrespective of

6    whose assets they might relate to or if they were -- if it was

7    a funding of a loan to -- if it was funding to the settlement

8    agent to pay out on the loan origination that was to occur,

9    which might then be reimbursed and put onto a warehouse line,

10   we might see that going out twice.  Or if it was the transfer

11   of -- from one warehouse line to another of a certain debt we

12   would see it being paid down to one warehouse but you wouldn't

13   see it coming in from the other warehouse.

14        So we just felt that it was too speculative to try to take

15   those numbers for potential preferences at this point.  They're

16   being reviewed on a more granular level or will be reviewed on

17   a more granular level.

18   Q.   Now approximately what's the --

19             THE COURT:  What's a granular level?

20             THE WITNESS:  I'm sorry; on a more line by line.  The

21   details gone further.  The debtor's currently trying to analyze

22   the detail a bit further --

23             THE COURT:  All right.

24             THE WITNESS:  -- to break those numbers down.

25   Q.   Describe the volume of these transfers, say in the ninety

31

1  days.

2  A.   Roughly 68,000.

3  Q.   68,000 dollars or sixty-eight --

4  A.   68,000 payments were made in the ninety days.

5  Q.   And do you know the dollar value?

6  A.   Across all the entities, roughly twenty billion.

7  Q.   In your initial analysis of these transfers, did you

8  discover any characteristics regarding the types of transfers

9  that occurred?

10  A.   Well, as I said, a lot of the transfers seemed to be the

11  funding of loan originations.  So the funding to a settlement

12  agent for the loan originations and then the drawing of costs

13  coming in or the transfer of possibly the margin calls that

14  were made that would have been assets of another entity but

15  we're not seeing those intercompany balances.

16  Q.   So when you say margin calls, are you familiar that the

17  debtor made a lot of margin payments to institutions pre-

18  bankruptcy?

19  A.   Yes.

20  Q.   Do you know where the funds were raised to make those

21  margin payments?

22  A.   As far as I know they would have come from investment.

23  Q.   Did investment have cash?

24  A.   Investment was the holder of the securities that they

25  would have had to liquidate.  Or possibly acceptance as well,

1    they may have had some securitizations that they liquidated in

2    order to pay off the margin calls.

3    Q.   Could you describe for the Court the way it works in terms

4    of investment liquidation asset gets cashed and the money gets

5    paid to an institution as a margin; how does that flow through

6    the debtors?

7    A.   Well all funds really flew through the corporate accounts

8    and intercompany receivables and payables were created based on

9    the flow of those funds.  So if investment liquidated something

10   the funds would have been paid out of corporate, wouldn't have

11   been paid out of the investment accounts per se.

12   Q.   Are you aware of the servicing business that the debtor

13   had?

14   A.   Yes.

15   Q.   The payments from servicing, the monies that servicing

16   collected monthly from the homeowners, are you aware of how

17   that money was flowed through the debtors' accounts?

18   A.   From what I recall, servicing deposits would be made to

19   lockboxes.  Then the LSAM or the servicings computer system

20   would allocate out based on loan number or account number.  If

21   it's a P&I, principal and interest payment or a taxes and

22   interest or taxes and insurance payment, funds would be, then,

23   paid out to the specific parties if it's on the securitized

24   line or swept up into corporate to then be paid out to

25   warehouse ones.

33

1    Q.   So to your knowledge -- I guess look at it like a river

2    that all the little account flow into Corporate's central

3    operating account?

4    A.   Yes.

5    Q.   And then they flowed back out?

6    A.   And then from corporate it would be broken out to

7    warehouse lines or pay down the -- you know, if it's -- I

8    believe that principal and interest that were unsecured were

9    going directly from servicing but everything else was flowing

10   into corporate.

11   Q.   So when you talk about twenty billion dollars of

12   transfers, is that the global number including all these -- the

13   P&I payments and the loan--

14   A.   Yes.  Yes, it would be the P&I, taxes, insurance, payments

15   to, you know, margin calls.  Again, payments that may have been

16   a transfer from one warehouse lender to another warehouse

17   lender.  If it was the sale or purchase of loans from -- from,

18   you know, between the two parties be it investment acceptance

19   or acceptance to corp.

20           MR. POWER:  Your Honor, could I just have one moment,

21   please?

22       (Pause)

23           MR. POWER:  Your Honor, no further questions.

24           THE COURT:  All right.  Mr. Dorsey?

25           MR. DORSEY:  No questions.

34

1          THE COURT:  Cross, Mr. Macauley.

2   CROSS EXAMINATION

3   BY MR. MACAULEY:

4   **Q.   Good morning Ms. Michaelis, nice to see you again.**

5   **A.   Good morning.  Nice to see you as well.**

6   **Q.   Thomas Macauley on behalf of the borrowers' committee.**

7   **You said that you worked intensively in connection with the**

8   **stipulated asset allocation, is that correct?**

9   **A.   Yes.**

10  **Q.   That was a primary part of your role at BDO in the**

11  **American Home case?**

12  **A.   Well at one point, yes.**

13  **Q.   Who were your discussions with?**

14  **(Alarm Sounds)**

15          THE COURT:  I told you not to ask that question.

16  (Pause)

17          THE COURT:  Okay.

18          MR. MACAULEY:  I thought I asked an improper

19  question.

20  **Q.   Who were your discussions with?**

21  **A.   They were primarily with --**

22  **(Alarm Sounds)**

23          THE COURT:  Hang on.  Theresa, can you see what's

24  going on?

25          (Pause)

35

1    THE COURT:  They let us know when there's supposed to

2    be a test.

3        (Pause)

4        THE WITNESS:  I wasn't going to lie, it's not like a

5    lie detector, you know.

6        (Pause)

7        THE COURT:  They're trying to figure it out.  Let's

8    take a short recess.  If it's a true emergency the CSOs will

9    inform you to evacuate the building.  All right.  During the

10   recess, ma'am, you cannot discuss the substance of your

11   testimony with counsel.

12       (Recess from 11:48 until 11:54 AM)

13       THE CLERK:  All rise.

14       THE COURT:  Please be seated.  I apologize for the

15   interruption.  Mr. Macauley, before I hit my button to overrule

16   your question you were on the line of questioning.

17   BY MR. MACAULEY:

18   **Q.   My pending question was who did you discuss the stipulated**

19   **asset allocation with?**

20   **A.   I spoke with Brett Fernandez and Scott Martinez, mainly**

21   **with ZOLFO and Robert Bernstein from the company.**

22   **Q.   Did you have any discussions with anyone outside of**

23   **professionals or employees of the debtors and professionals and**

24   **employees -- professionals or members of the creditors'**

25   **committee?**

36

1    A.   Not that I can recall.

2    Q.   You didn't have any discussions with Bank of America?

3    A.   I did not have any discussions with Bank of America on the

4    asset allocation model, no.

5    Q.   Were you aware that Bank of America was having discussions

6    with the debtors or the stipulated asset allocation?

7    A.   I wasn't specifically aware of that, no.

8    Q.   Did you hear Mr. Fernandes' testimony yesterday on this

9    point?

10   A.   I was in the courtroom.  He may have said that.  I don't

11   really recall him mentioning that, no.

12   Q.   Okay.  You had listed in your direct the claims by the

13   various members of the committee.

14   A.   Yes or which debtor they had claims against, alleged

15   claims against.

16   Q.   Do you know the amounts of those claims?

17   A.   Not off the top of my head.  No.

18   Q.   Do you know whether those claims have been included in the

19   estimated analysis by the debtors of general unsecured claims?

20   A.   A portion of them have.  I don't know if it's -- to what

21   extent, though.

22   Q.   Do you know against which entities?

23   A.   Against?

24   Q.   Which entities have been included in the analysis?

25   A.   I believe the entities that I named off they have listed

37

1    as -- for an amount to be included against those entities.  I

2    don't know.  Several -- the claims schedule that I had seen had

3    several things that, you know, were either under investigation

4    or, you know, certain parts that may have been allowed are

5    under investigation, still.  So I couldn't say what the

6    balances would be against any individual entity or if it's

7    still being investigated against those entities.

8    Q.   Did you have any role in the settlement, litigation

9    settlement with B of A?

10   A.   The committee had discussed settlement proposals with B of

11   A quite some time ago, prior to the debtor entering into a

12   settlement.

13   Q.   Are you familiar, generally, with the terms of the

14   settlement?

15   A.   I think I have a rough sketch idea of the settlement.

16   Q.   Well let me ask you this, are you familiar that out of the

17   settlement B of A would have a deficiency claim against the

18   debtors?

19   A.   Yes, which is capped I believe.

20   Q.   Can you tell us what that claim would be?

21   A.   I -- a dollar number?  I don't understand what you mean

22   what that claim would be.

23   Q.   What would be B of A's deficiency claim against the

24   estates under the settlement?

25   A.   I believe that they would have a -- a deficiency claim

38

1    capped at, and I could be wrong, I thought it was fifty million

2    but I'm not sure if I've got that number just stuck in my head,

3    that that's wrong.  But -- and it's capped against the various

4    debtors because I believe they're cross collateralized with all

5    the debtors.

6    Q.   And if I were to tell you that the claim is the lesser of

7    the cap versus the actual deficiency claim, does that make

8    sense to you?

9    A.   Yes.

10   Q.   And given the current mortgage market and times, is it

11   fair to say that you would expect that the cap would come into

12   effect?

13            MR. POWER:  Your Honor, I'm going to object to that.

14   This witness is not qualified to opine as to what the value of

15   the collateral is, which is what the question is.

16            THE COURT:  Well, I just heard extensive testimony

17   how she was involved in the asset allocation.

18            MR. POWER:  She was, Your Honor, but this question

19   relates to what's the current market value of the approximately

20   500 million dollars of loans that B of A has on its line and

21   what the deficiency claim is.  And I don't believe her direct

22   testimony --

23            THE COURT:  Well, I'm going to overrule it for

24   current purpose.  You can certainly explore it in redirect,

25   what the basis -- if she can answer what the basis of that is,

39

1    but -- given her familiarity with the case over the last year

2    and a half I think she has a basis.  So I'll overrule the

3    objection.

4            THE WITNESS:  Could you just repeat the question,

5    now?

6            THE COURT:  The question was, given the current state

7    of the mortgage market, do you think it's likely that the cap

8    will come into play on the deficiency claim?

9            THE WITNESS:  It could very well.

10   BY MR. MACAULEY:

11   **Q.   So in that scenario B of A would have a fifty million**

12   **dollar deficiency claim against the estates, right?**

13   **A.   Yes.**

14   **Q.   And that would be treated as a general unsecured claim,**

15   **correct?**

16   **A.   To my knowledge, yes.**

17   **Q.   And against which entities would that claim be asserted?**

18   **A.   I believe it could be asserted against all of them,**

19   **although I don't know if there's Home Gate or Great Oak or one**

20   **of the smaller ones may be excluded from that cross**

21   **collateralization that they had.**

22   **Q.   If I were to tell you that the claim is asserted against**

23   **five of the eight debtors, would that makes sense to you?**

24   **A.   It would be reasonable.**

25       **(Pause)**

1    **Q.   And actually, if I were to tell you that the claim was**

2    **agreed against Corp, Investment, Servicing, Acceptance and**

3    **Holdings would you agree with that statement?**

4    **A.   I couldn't really agree.  If you said that that's what it**

5    **was against then that might be what they're against.**

6              THE COURT:  Mr. Macauley, where are you going with

7    this line of questioning?  It seems to me like you're basically

8    asking this witness to verify the elements of a settlement that

9    are a matter of record and on the public docket.  So I'm not

10   quite sure what this is set to accomplish.

11             MR. MACAULEY:  Your Honor, I am but I'm trying to

12   actually speed up the process because I want to go beyond that.

13             THE COURT:  All right.

14             MR. MACAULEY:  Actually --

15             THE COURT:  Well, I'm not sure we're speeding up

16   anything but --

17        (Pause)

18             MR. MACAULEY:  Your Honor, probably the easiest

19   thing -- it's in the disclosure statement but I think we're all

20   in agreement that the five entities that B of A would have an

21   unsecured claim against would be Corp, Acceptance, Investment,

22   Servicing and Holdings.  So without having to try and --

23             THE COURT:  Is that all right with the committee and

24   the debtor?  Mr. Power, you stipulate to that?

25             MR. POWER:  Your Honor, one moment.

41

1          MR. JACKSON:  Your Honor, Patrick Jackson for the

2    debtors.  We agree those are where the unsecured claims lie.

3          THE COURT:  Thank you.  Mr. Power?

4          MR. POWER:  Yes, Your Honor, we agree.

5          THE COURT:  All right.

6    BY MR. MACAULEY:

7    Q.   Ms. Michaelis, can you turn to Exhibit 1, please?

8    A.   Yes.

9    Q.   And the general unsecured claims analysis of the debtors

10   is set forth in a couple places here.

11      (Pause)

12   Q.   Probably on the claims estimate summary page and that is

13   the fourth page from the end.

14      (Pause)

15   A.   The claims estimate -- okay.  Did you say that the

16   unsecured's not on here, is that what you were referring to?

17   Q.   No.  You have that page, right?

18   A.   Yes.

19   Q.   Okay.

20   A.   Okay.

21   Q.   And the bottom of that page is the total amount -- the

22   first line is the --

23   A.   I see.

24   Q.   -- total amount --

25   A.   Uh-huh.

42

1   Q.   -- of estimated claims against each debtor, correct?

2   A.   Uh-huh.

3   Q.   And the second line is the percentage of the total claims?

4   A.   Yes.

5   Q.   Total unsecured claims.  Now, if you look at the estimated

6   allowed claims for each debtor --

7   A.   Yes.

8   Q.   Corp has a number of 616 million, all right?

9   A.   Yes.

10  Q.   Servicing is over 300 million, Acceptance is over 300

11  million, Investment is over 300 million, is that correct?

12  A.   Yes.

13  Q.   Holdings has about 131 million, is that correct?

14  A.   Yes.

15  Q.   Was the -- are the B of A claims included in these

16  numbers?

17  A.   I can't specifically recall.  I would assume they are but

18  I can't specifically recall now if they are included in each

19  one of them or at a balance -- what balance.

20  Q.   So if B of A has a fifty million dollar claim against

21  holdings, that would be roughly forty percent of the total

22  claims against Holdings, is that correct?

23  A.   In theory, yes.

24  Q.   Now, the main value to Holdings is the bank, right?

25  A.   Yes.

43

1    Q.    Have you ever valued a bank?

2    A.    Have I?  No.

3    Q.    Would you know how to value a bank?

4    A.    No.

5    Q.    Is there an investment banker who knows something about

6    the bank?

7    A.    Yes.

8    Q.    What's their name?

9    A.    Milestone.

10         THE COURT:  I'm sorry?

11         THE WITNESS:  Milestone.

12         THE COURT:  Milestone.

13   Q.    And is it fair to say that the bank's value in the

14   stipulated -- let me rephrase that.  Is it fair to say that the

15   value given to the bank in the stipulated asset allocation is

16   comprises the vast majority of the value given to Holdings?

17   A.    I'm sorry; can -- that confused me.

18   Q.    Sure.  If you're looking at Exhibit 1 on the summary

19   page --

20   A.    Yes.

21   Q.    -- under Line A.

22   A.    Yes.

23   Q.    That's a total estimate of non-litigation asset values for

24   each of the debtors, right?

25   A.    Correct.

44

1   Q.   Is the value given to the bank, in the stipulated asset

2   allocation, the vast majority, the number assigned to Holdings

3   on that line?

4   A.   Yes.

5        (Pause)

6   Q.   The stipulated asset allocation doesn't address any

7   litigation values in reaching the percentages that are to be

8   distributed under the plan to each --

9        MR. MACAULEY:  Let me withdraw that.

10  Q.   Litigation values aren't considered in the stipulated

11  asset allocation in reaching the percentages, is that correct?

12  A.   No, not in reaching the percentages.

13  Q.   And they're not considered in the liquidation analysis

14  either, right?

15  A.   No.

16  Q.   Now you mentioned FASB 5 with respect to --

17  A.   Yes.

18  Q.   -- whether you decide to include the litigation values,

19  right?

20  A.   Well, it wasn't a specific -- because of FASB 5 we can't

21  include but it's -- it's under -- it's the same premise.

22  Q.   And you know in a Chapter 7 hypothetical liquidation, you

23  realize that a Court is not bound by any accounting rules?

24  A.   Yes.

25  Q.   Now you're aware that the disclosure statement lists over

1    twenty billion dollars in transfers made by the debtors in the

2    ninety days prior to the filing?

3    A.    Yes.

4    Q.    And indeed over sixteen billion by Corp alone?

5    A.    I believe so, yes.

6    Q.    And not a single transfer by Holdings?

7    A.    Perhaps not, I can't tell you right now the breakdown of

8    the twenty billion.

9    Q.    Let's say, for instance, the plan trust, after

10   confirmation, sues someone to recover a four million dollar

11   preference and the transfer was made by Corp.

12   A.    Yes.

13   Q.    Now, that money that went out the door during the ninety

14   days was not included in the stipulated asset allocation, was

15   it?

16   A.    The four million dollar value?

17   Q.    Right.

18   A.    No.

19   Q.    I mean, had the transfer not gone out the door it might

20   have been part of the cash, for instance, that would have been

21   included.

22   A.    Possibly.

23   Q.    And as a result it may have some effect on the ultimate

24   percentage that was decided in reaching the stipulated asset

25   allocation?

46

1   A.   You mean if we had not -- if it hadn't gone out the door

2   and it was in cash?

3   Q.   Right.

4   A.   Yes.

5   Q.   So for instance, it's 37.3 percent, I believe, roughly, is

6   the percentage for Corp under the stipulated asset allocation.

7   A.   Yes.

8   Q.   So that might have some effect on that percentage,

9   correct?

10  A.   Yes.

11  Q.   Now, if the trust brings a preference claim for four

12  million dollars and recovers twenty-five percent on that, that

13  would be a one million dollar recovery, right?

14  A.   Uh-huh.  Yes.

15  Q.   Now, under that scenario under the stipulated asset

16  allocation 373,000 would be -- would go to unsecured creditors

17  of Corp?

18  A.   Correct.

19  Q.   And about 300,000 would go to unsecured creditors of

20  holdings, right?

21  A.   Based on the percentage, yes.

22  Q.   And the resulting claim by the defendant would be a one

23  million dollar claim against Corp, is that correct?

24          MR. POWER:  Objection, Your Honor, it calls for a

25  legal conclusion.

1      THE COURT:  Overruled.

2    A.   I have no idea.

3    Q.   But if it did it would increase Corps -- the general

4    secured claims against Corp, right?

5          MR. POWER:  Objection, Your Honor, answered.  The

6    witness indicated she has no idea.

7          THE COURT:  Overruled.

8    A.   I don't -- if it was determined that that's where the

9    claim ended up -- I don't know where the claim would

10   necessarily end up.  But if it did end up there then yes, I

11   suppose it would add to that pool.

12   Q.   Do you have experience in preference litigation?

13   A.   I've done preference analysis in support of litigations.

14   Q.   And you're familiar that when a transfer is avoided the

15   defendant is left with an unsecured claim?

16   A.   Yes.

17   Q.   Now, the resulting recovery to Holdings would not increase

18   the general unsecured claims for holdings, would it?

19         MR. POWER:  Objection, Your Honor, again the

20   witness -- that question assumes that the claim is not

21   allocated.

22   Q.   Sustained.  I think you've established -- look, let's cut

23   to the chase.  If Corp gets a 350,000 dollar recovery and its

24   claims pool increases by a million they're obviously worse off,

25   in general.  It reduces the pro rata distribution to the

48

1    general unsecured claims of Corp.  I understand that.

2    Q.   You haven't completed any preference analysis with respect

3    to the transfers made here, have you?

4    A.   No.

5    Q.   And you can't say whether the debtors could have decided

6    not to make the transfers that you characterize as transfers

7    made by other entities, can you?

8            THE COURT:  I'm sorry; I didn't follow.

9            MR. MACAULEY:  All right, let me --

10   Q.   On your direct you spoke about some transfers, for

11   instance, by servicing with respect to payments made by

12   mortgage holders that would go through the cash management

13   system and ultimately go out the door.

14   A.   Correct.

15   Q.   But you haven't made any analysis as to whether the

16   debtors could have decided not to make those payments?

17   A.   No, I don't know if they could legally not make those

18   payments.

19   Q.   And you have no idea what is the percentage of those

20   payments vis-a-vis the total gross amount of transfers made in

21   the ninety days prior to the petition date, do you?

22   A.   Of all those different types of transfers, no, not at this

23   point.

24   Q.   And you can't estimate the value of potential preference

25   recoveries at this point, can you?

49

1    A.    I don't believe so.  No.

2    Q.    Or the value of recoveries from other litigation?

3    A.    No.

4    Q.    Thank you.

5              MR. MACAULEY:  I have no further questions.

6              THE COURT:  All right, redirect.

7              MR. POWER:  Just a few questions, Your Honor.

8    REDIRECT EXAMINATION

9    BY MR. POWER:

10   Q.    Ms. Michaelis, when you were asked on cross examination

11   about whether you know how to value a bank, are you aware of

12   some of the transactions that the debtor has been involved with

13   the bank in this case?

14   A.    Yes.

15   Q.    And are you aware -- do you have any knowledge of what the

16   perspective values to receive from those offers have been and

17   the range?

18   A.    Yes.

19   Q.    What are they?

20   A.    I've seen offers that have come through and the valuation

21   that was used was based on basically the balance sheet

22   valuation.  So I've reviewed those balance sheets and what

23   Milestone has prepared but I have not personally valued the

24   bank.

25   Q.    Okay.  When you're talking about balancing valuations, are

50

1    there two different ways to realize cash from this case, to

2    your knowledge?

3    A.    Well, the bank could be sold or the bank, obviously, could

4    be liquidated.

5    Q.    It's not so obvious.  What would happen if you liquidate

6    the bank?

7    A.    Well, if you liquidated the bank you would first and

8    foremost use whatever cash and the most marketable securities

9    would have to be liquidated in order to pay off any depositors

10   that are there, any of the current outstanding debt.  And then

11   you would have claims against the bank if you were to

12   liquidated for contracts, etcetera, that would have to be paid

13   out in terms of its liquidation.

14   Q.    And are you aware if any liquidation analysis had been

15   done to look at what the liquidation value would be if the bank

16   was --

17   A.    Yes, one was prepared.

18   Q.    And what did that show, approximately?

19   A.    In terms of --

20   Q.    Range of values.

21   A.    The range of values was less than the values under the

22   plan asset allocation.

23   Q.    Is there an approximate number that would be the worst

24   case scenario to collect from the bank, to your knowledge, in a

25   liquidation scenario?

51

1    A.    Under a liquidation scenario, the -- the numbers that were

2    looked at where anywhere from twenty-five to twenty-eight,

3    twenty-nine million.

4    Q.    So that's the worst case scenario of recoveries?

5    A.    As of right now that I've seen, yes.

6    Q.    Would you turn to Exhibit 1?

7    A.    Certainly.

8    Q.    The first page?

9    A.    Yes.

10   Q.    I asked you on direct, and it was briefly touched upon,

11   you didn't recall exactly how much the level of Chapter 11

12   expenses were, do you recall that?  You weren't sure whether it

13   was millions or tens of millions?

14   A.    Right.

15   Q.    Okay.  So I think we both understand that.  Would you look

16   at the total, estimated total column?

17   A.    Yes.

18   Q.    Okay.  Now look at lines D, E and F, do you see that?

19   A.    Yes.

20   Q.    Okay.  What do those lines represent on the total column?

21   A.    Those are all the direct administrative and then the

22   allocable paid and allocable unpaid or future allocable costs.

23   Q.    So just to summarize your testimony, what is the projected

24   total Chapter 11 expenses through the effective date of this

25   case incurred by the debtors, both past and going forward?

52

1    A.    Slightly below 200 million.

2    Q.    And just to reflect, the way the stipulated asset

3    allocation is run, how are those expenses allocated among the

4    various debtors?

5    A.    The stipulated -- under this allocation it's allocated

6    based on a weighted average applied from the third page to each

7    of those costs, if they aren't directly assignable.

8    Q.    So Holding Company which has the bank, what's its share of

9    those expenses?

10   A.    Roughly twenty-five million.

11             MR. POWER:  No further questions, Your Honor.

12             THE COURT:  All right.  Thank you.  You may step

13   down.

14             THE WITNESS:  Thank you.

15             THE COURT:  Any further witnesses by the debtor or

16   the committee?

17             MR. POWER:  No further witness, Your Honor.  The

18   debtors rest.

19             THE COURT:  All right.  The committee rests,

20   Mr. Power?  Mr. Power?  Mr. Power does the committee rest?

21             MR. POWER:  Yes, Your Honor.

22             MR. BEACH:  Your Honor, if I may, there's just one

23   other plan supplement document that was filed yesterday.  I

24   talked to Mr. Macauley about stipulating to the admission of

25   that.

53

1          THE COURT:  All right.

2          MR. BEACH:  A plan supplement document.  It's docket

3    number 6965.

4          THE COURT:  Any objection to the admission of docket

5    item 6965, is that correct?

6          MR. BEACH:  That's correct, Your Honor.

7        THE COURT:  And the testimony?

8          MR. MACAULEY:  No objection.

9          THE COURT:  All right, it's admitted without

10   objection.  All right.  That'll close the case in support of

11   confirmation, obviously subject to the right to introduce a

12   rebuttal case if necessary.  Mr. Macauley how many witnesses --

13   who are your witnesses.  I understand it looks like

14   Mr. Weisbrod isn't here.

15         MR. MACAULEY:  I actually expected by entourage to

16   arrive but they're not here yet.  So I would like to just take

17   a short break.  What we anticipate is Ms. Gracie Graves and

18   (Plan Supplement Document Docket No. 6965 was admitted, as of

19   this date.)

20   Ms. Margot Saunders, two witnesses, wedged in between we would

21   need to deal with Mr. Dorsey's motion in limine.

22         THE COURT:  Okay.

23         UNIDENTIFIED ATTORNEY:  I take that to mean, Your

24   Honor, that we're doing Ms. Graves, first?

25         THE COURT:  Yes.  Okay.  All right.  Do you need

54

1    something?

2            UNIDENTIFIED ATTORNEY:  Yes, Your Honor.  Can we take

3    one moment?

4            THE COURT:  All right.  Tell you what, we'll take the

5    recess and we'll deal with your issue, if necessary, when we

6    reconvene and then we'll turn it over to Mr. Macauley.  And

7    Mr. Macauley, just let us know when you're ready to proceed.

8            MR. MACAULEY:  Thank you, Your Honor.

9            UNIDENTIFIED ATTORNEY:  Thank you.

10       (Recess from 12:22 until 12:44 PM)

11           THE CLERK:  All rise.

12           THE COURT:  Please be seated.  Hello.

13           MS. SLOAN:  Good afternoon, Your Honor.  Elizabeth

14   Sloan of Blank Rome on behalf of the creditors' committee.

15           Before we begin I'd like to orally move for the

16   admission of Edward Schnitzer of Hahn & Hessen, also on behalf

17   of the creditors' committee.  I don't believe that his pro hac

18   papers have been filed at this point but will be filed later

19   today.  Mr. Schnitzer is a member of the bar of the State of

20   New York and is in good standing.

21           THE COURT:  Okay.

22           MS. SLOAN:  Thank you.

23           THE COURT:  He'll be admitted.

24           MR. SCHNITZER:  Thank you, Your Honor.

25           THE COURT:  Welcome.  You're welcome.  Mr. Macauley,

55

1    are you ready to proceed?

2            MR. MACAULEY:  Your Honor, we have filed a pro hac

3    motion early this morning for Hunter Winstead who's here.  And

4    he's going to be handling the direct examination of Ms. Graves.

5    I ask that he be allowed to proceed.

6            THE COURT:  Yes, it's granted.  Mr. Winstead.

7            MR. MACAULEY:  Your Honor, we're ready to proceed.

8    We'll call Ms. Gracie Graves as the first witness.

9            THE COURT:  All right.  Thank you.  Ms. Graves,

10   please take the stand.

11           MS. GRAVES:  Hi.

12           THE COURT:  Hi.  Please remain standing for just a --

13       (Witness is Duly Sworn)

14           THE CLERK:  Could you please state and spell your

15   name.

16           THE WITNESS:  My name is Gracie Marie Graves,  G-R --

17   my initial?

18           THE COURT:  Just your last name, ma'am.

19           THE WITNESS:  Graves, G-R-A-V-E-S.

20           THE COURT:  Thank you.  Ms. Graves, if you could

21   lower the microphone so we'll be able to hear you.  All right.

22   There you go.  Thank you so much.

23           THE WITNESS:  Thank you.

24   DIRECT EXAMINATION

25   BY MR. WINSTEAD:

56

1  Q.   Good afternoon, Ms. Graves.

2  A.   Good afternoon.

3  Q.   Ms. Graves, I'd like to take a moment to introduce the

4  Court to your attorney, Mr. Andrews who is with the AARP, legal

5  counsel for the elderly.

6        MR. ANDREWS:  Good afternoon, Your Honor.

7        THE COURT:  Welcome.

8  Q.   And Ms. Graves, you of course know me.  My name is Hunter

9  Winstead.

10  A.   Yeah.

11  Q.   I am counsel to the Official Committee of Borrowers in

12  this case.

13  A.   Yes.

14  Q.   And first off, are you a member of the Official Committee

15  of Borrowers?

16  A.   Yes.

17  Q.   Where do you live?

18  A.   I live at 406 Division Avenue, NE, Washington, DC 20019.

19  Q.   Thank you.  How long have you lived at that address?

20  A.   Since '72.

21  Q.   Do you live there by yourself?

22  A.   Since May '04.  My husband died May 4th, May 4th this

23  year.

24  Q.   Did your husband --

25  A.   Last year.  Yes.

57

1   Q.   Sorry.  Did your husband live with you before his passing,

2   in that residence?

3   A.   Yes, he did.

4   Q.   Do you have a mortgage on your Division Avenue home?

5   A.   Yes, I do.

6   Q.   When did you obtain your mortgage on your Division Avenue

7   home?

8   A.   It was in January of 2007.

9   Q.   This mortgage, was it a new mortgage origination or was it

10  a refinancing?

11  A.   A refinance.

12  Q.   Okay.  Why did you refinance, Ms. Graves?

13  A.   To lower my house note, my mortgage.  To get a lower

14  mortgage.

15  Q.   Do you mean a lower monthly payment?

16  A.   Monthly payment, yes.

17  Q.   Okay.  Just want it to be clear, Ms. Graves.

18  A.   Thank you.

19  Q.   Now you said that this was a refinance transaction, what

20  kind of loan was the mortgage loan that you previously had?

21  And when I say what kind, I mean was it a fixed rate, an

22  adjustable rate, some other kind?

23  A.   It was a fixed rate.

24  Q.   Okay.  And just so we're on the same page, what do you

25  understand a fixed rate mortgage to mean?

58

**A.   Well, to me a fixed rate means that you pay the same thing every month until the thirty years is up or until you finish paying.**

**Q.   Okay.  Now under your old mortgage, before the one you got in January of 2007, did you ever miss a payment?**

**A.   No, I never missed a payment in my life.**

MR. WINSTEAD:  Okay.  I'd like to introduce what's Official Borrowers' Committee Exhibit 13.  May I approach, Your Honor?

THE COURT:  Yes.

(Pause)

THE COURT:  May I have a copy, please?

(Pause)

THE COURT:  Thank you.

**Q.   Now, Ms. Graves --**

THE COURT:  Hang on.  Are we going to admit this into evidence at some point?  And here's why, it has personal identifiable information.  So before I -- including social security numbers which I'm required, under the Code to protect. It's also a really good idea.  So if we're going to admit it into evidence we are going to need to redact any personal, identifiable information.

MR. WINSTEAD:  We will redact this document and submit it per your request, Your Honor.

THE COURT:  All right.

1  Q.   Now Ms. Graves, do you see at the top of this document

2  where it says Uniform Residential Loan Application?

3  A.   Yes.

4  Q.   Okay.  And there is a set of initials next to borrower at

5  the bottom of the first page, do you see that?

6  A.   Yes, I do.

7  Q.   Are those your initials?

8  A.   Yes.

9  Q.   Okay.  Now, going back to the top part of the page, do you

10  see a heading that says type of mortgage and terms of loan?  Do

11  you see that?

12       (Pause)

13  A.   Top of -- yes.

14  Q.   Okay.  And there's a series of columns, the first column

15  on the left says amount, do you see that?

16  A.   The two -- 200,200 -- 227,250 dollars?

17  Q.   Yes, do you see that?

18  A.   Yes.

19  Q.   And to the right of that is a column that says interest

20  rate, what is the interest rate listed in that column?

21  A.   It says 1.250.

22  Q.   And is that reflected as a percentage?

23  A.   Yes.

24  Q.   And in the column next to the right that says number of

25  months, what does it say in that column?

60

1   A.   4848.

2   Q.   Do you mean 480/480?

3   A.   480-480.

4   Q.   And to the right of that there are a series of boxes with

5   one box checked off, do you see that?

6   A.   Yes, I do.

7   Q.   What does the box that's been checked off say?

8   A.   It's rate.

9   Q.   And again, what is your understanding of a fixed rate

10  mortgage?

11  A.   A fixed rate mortgage is where you pay -- payment doesn't

12  adjust back and forth, up and down, it just stays the same.

13  Q.   Okay.  And Ms. Graves, let's go to the second page of this

14  document.  Are you there?

15  A.   Yes.

16  Q.   And there is a series of columns at the bottom of the page

17  under a heading that says monthly income and combined housing

18  expense information.  Do you see that?

19  A.   Yes.

20  Q.   And there's a total number that says 5,400 dollars, do you

21  see that?

22  A.   Yes, I do.

23  Q.   Ms. Graves, what was your income when you applied for this

24  loan?

25  A.   My income and my husband's income was 1,600 dollars.

61

1    Q.    And what was --

2    A.    Social Security.

3    Q.    What was that income from?

4    A.    Social Security.

5    Q.    And did you have, between you and your husband, any

6    additional income besides your roughly 1,600 dollars a month in

7    Social Security?

8    A.    Yes.

9    Q.    What was that income?

10   A.    He had 300 and some dollars for his retirement check.

11   Q.    And when you say he, you mean your husband?

12   A.    My husband, Herman Graves.

13   Q.    Okay.  When you were applying for this loan Ms. Graves,

14   did you and your husband ever tell anyone that your income was

15   5,400 dollars per month?

16   A.    No.

17   Q.    When you were applying for this loan Ms. Graves, did you

18   ever provide documents to a broker reflecting what your monthly

19   income was?

20   A.    No.

21   Q.    Okay.  Let's turn to page 4, Ms. Graves.  Do you see a

22   signature on that page, Ms. Graves?

23   A.    Yes, I do.

24   Q.    Is that your signature?

25   A.    Yes, it is.

62

1    **Q.   And what is the date of your signature?**

2    **(Pause)**

3    **Q.   Can you read the date of your signature?**

4    **A.   I don't see --**

5    THE COURT:  Let the record reflect it's dated

6    December 18, 2006.

7    MR. WINSTEAD:  Thank you, Your Honor.

8    **Q.   You can put that away, Ms. Graves.  I have no further**

9    **questions about that document.**

10    MR. WINSTEAD:  I'd like to show Ms. Graves another

11    document.  It's going to be Official Borrowers Committee 14.

12    I'll bring a copy to Your Honor, may I approach?

13    THE COURT:  Yes.

14    (Pause)

15    THE COURT:  Thank you.

16    (Pause)

17    **Q.   And as with this document and all of the documents I'll be**

18    **talking with you about, Ms. Graves, I'd like the record to**

19    **reflect that copies are being distributed to counsel for the**

20    **Official Committee of Unsecured Creditors and the debtors.**

21    **Now Ms. Graves, do you see at the top of that document**

22    **where it says Truth In Lending Disclosure Statement?**

23    **A.   Yes.**

24    **Q.   Is that your signature at the bottom --**

25    **A.   Yes, it is.**

63

1  Q.   -- of the page?  What is the date of your signature?

2  A.   That's the 12/18/06.

3  Q.   Okay.  And do you see in the upper left-hand corner where

4  it says annual percentage rate?

5  A.   Yes.

6  Q.   What is the annual percentage rate reflected in this

7  statement, Ms. Graves?

8  A.   It's $225,397.64

9  Q.   Well actually, Ms. Graves, could you look at the left-hand

10  corner?  There's a box that says annual percentage rate, do you

11  see that?

12  A.   Yes.

13  Q.   And what is the percentage reflected for the annual

14  percentage rate?

15  A.   1.292 percent.

16  Q.   And on the far right hand of that series of columns

17  there's a column that says total of payments, do you see that

18  Ms. Graves?

19  A.   Total payments is 200 and -- $288,893.23.

20  Q.   Okay.

21          THE COURT:  Good enough.

22  Q.   I think it's twenty cents, just for the record to be

23  clear.  Would you agree, Ms. Graves?

24  A.   Twenty cents, I'm sorry.

25  Q.   Okay.  We're done with that document.  You can put that

64

1  away.  Official Borrowers' Committee Exhibit 15, and again

2  these documents will all be submitted in redacted form for

3  consideration for admission.

4          MR. WINSTEAD:  May I approach, Your Honor?

5          THE COURT:  Yes.

6      (Pause)

7          THE COURT:  Thank you.

8  Q.   Now Ms. Graves, this is another document that reads at the

9  top Uniform Residential Loan Application, do you see that?

10 A.   Yes.

11 Q.   Is that your signature at the top of that page?

12 A.   Yes.

13 Q.   Okay.  And like the other document we looked at a moment

14 ago there's a series of columns further down the page.  It

15 starts with one that says amount.

16 A.   Excuse me?

17 Q.   Do you see a column further down the page that says

18 amount?

19 A.   Yes.

20 Q.   And then do you -- what do you see as the amount reflected

21 on that page?  Can you read that?

22 A.   $247,200.

23 Q.   Okay.  To the right of that do you see a column that says

24 interest rate?

25 A.   Yes, I do.

1   Q.   What is the interest rate listed in this document?

2   A.   1.000, just that.

3   Q.   Okay.  And let's go to the far right-hand column.  Do you

4   see, again, a series of boxes with one box checked off?  Do you

5   see that?

6   A.   One box -- is that 480 --

7            THE COURT:  Next one, ma'am.

8   Q.   One more over, Ms. Graves.

9   A.   Yes, I do.  I see it.

10  Q.   Is the box that's checked off, did that read ARM type five

11  year fixed?

12  A.   Yes.

13  Q.   What does ARM type five year fixed mean?

14  A.   I don't know.

15  Q.   Okay.  Now let's go to page 4 of this document, Ms.

16  Graves.

17       (Pause)

18  Q.   Do you see a signature on that page?

19  A.   Yes, I do.

20  Q.   Is that your signature?

21  A.   Yes.

22  Q.   Now what is the date of your signature on this page?

23  A.   1/24/07.

24  Q.   Okay.  I think we're done with that one, Ms. Graves.

25  Thank you.  Official Borrowers' Committee Exhibit 16.

1        MR. WINSTEAD:  May I approach, Your Honor.

2        THE COURT:  Yes.

3        (Pause)

4   Q.   Now Ms. Graves, do you see at the top of this document

5   where it says Truth In Lending Disclosure Statement?

6   A.   Yes.

7   Q.   And at the bottom of that page, is that your signature?

8   A.   Yes, it is.

9   Q.   And what is the date of your signature at the bottom of

10  the page?

11  A.   1/24/07.

12  Q.   One meaning January?

13  A.   Uh-huh.  Yes.  I'm sorry.

14  Q.   Now again, let's look at the annual percentage rate box at

15  the top left-hand corner of the document, do you see that?

16  A.   What's the annual appraise --

17  Q.   Annual percentage rate.

18  A.   Yes, I do.

19  Q.   What is the annual percentage rate reflected in this

20  document?

21  A.   8.685.

22  Q.   Okay.  And let's go to the far right-hand column that says

23  Total of Payments, the amount you will have paid after you have

24  made all payments as scheduled.  Do you see that?

25  A.   Yes, I do.

1    Q.    What is the amount listed there?

2    A.    1,035,9 --

3    Q.    Let me help you out, Ms. Graves.

4    A.    Please do because I can't say it.

5    Q.    Is it 1,035,973.33?

6    A.    Right.   Right.   That's it.

7    Q.    Does that sound right to you?

8    A.    That sounds right to me.

9    Q.    Okay.   Now Ms. Graves, a moment ago we looked at a series

10   of document, Truth in Lending Act Disclosure Statement and a

11   loan application from December of 2007, do you recall that?

12   A.    Yes.

13   Q.    And now we're looking at the Truth in Lending Act

14   Disclosure Statement and the loan application in January of

15   2007, do you see that?   We looked at the December of 2006

16   documents before, excuse me, and now we're looking at the

17   January 2007 documents, is that correct?

18         (Pause)

19   A.    Yes.

20   Q.    Between December of 2006 and January of 2007 did you and

21   your husband change your mind as to what type of loan you

22   wanted?

23   A.    No.

24   Q.    When you took out this loan in January of 2007, what kind

25   of loan did you want?

68

1    A.    I wanted fixed rate.

2    Q.    Okay.  I'd like to look at Official Borrowers' Committee

3    Exhibit 17.

4         MR. WINSTEAD:  May I approach, Your Honor.

5         THE COURT:  Yes.

6    (Pause)

7         THE COURT:  Thank you.

8         MR. WINSTEAD:  Thank you.

9    (Pause)

10   Q.    Now Ms. Graves, this document at the top says American

11   Brokers Conduit Loan Closing Instructions, do you see that?

12   A.    Yes.

13   Q.    And there's a date at the top of that document, do you see

14   that date?

15   A.    Yes.

16   Q.    What is the date?

17   A.    January 23, 2007.

18   Q.    Okay.  And there's -- two lines down there's a reference

19   to the applicants, do you see that?

20   A.    Yes.

21   Q.    Who's the applicant referred to in this document?

22   A.    Where are you?

23   Q.    There's a -- two lines down from where it says date

24   there's a line item that says applicant and then a name after

25   that, do you see that?

69

1      THE COURT:  You may approach.

2      MR. WINSTEAD:  Thanks.

3   Q.   See there's the date and then you go down to applicant.

4   A.   Yes.

5   Q.   And then we'll be talking about those things shortly.

6   A.   Okay.  Thank you.

7   Q.   Do you see that, Ms. Graves?

8   A.   Yes, I do.

9   Q.   Who is the applicant?

10  A.   Gracie M. Graves.

11  Q.   Is that you?

12  A.   That's me.  Yes.

13  Q.   Okay.  Now under the paragraph numbered one, Loan Terms, a

14  few lines down there's a reference to loan type and it says

15  MTA, do you see that?

16  A.   Yes.

17  Q.   What does MTA mean?

18  A.   I don't know.

19  Q.   Okay.  Two lines down from that there's a reference to an

20  interest rate, do you see that?

21     (Pause)

22      MR. WINSTEAD:  May I approach, sir?

23      THE COURT:  Yes, why don't you give him the mike?

24      THE WITNESS:  I see -- I see it.

25      THE COURT:  Okay.

70

1   Q.   And what is the interest rate reflected on that line item,

2   Ms. Graves?

3   A.   It says 01000.

4   Q.   Is that 01.000?

5   A.   Yes.

6   Q.   And then two lines further down from where you're reading

7   there's a line item that says Ryder and then ARM, do you see

8   that?

9   A.   Yes.  Yes, I do.

10  Q.   What does ARM or A-R-M stand for?

11  A.   I don't know.

12  Q.   Do you know what an ARM loan is?

13  A.   No, I don't.

14  Q.   Okay.  Ms. Graves, who was the lender for your loan?

15  A.   American Home Mortgage.

16  Q.   Okay.  I'd like to look at one more paragraph in this

17  document.  If you could go to paragraph 17, Ms. Graves, which

18  is on the fourth page of the document you have.

19       (Pause)

20  Q.   Are you there?

21  A.   I think so.  You want 17, you said?

22  Q.   Yeah.  And let me read it to you, so I know we're looking

23  at the same thing.

24  A.   Wait a minute.  No, I'm not --

25  Q.   It says "Title insurance coverage must equal 125 percent

71

1   of the original mortgage amount to reflect potential negative

2   amortization."  Do you see that?

3   A.   Where are we, on 4?

4   Q.   At the top of page 4.

5   A.   Yes.

6   Q.   Why did the title insurance coverage under your loan need

7   to equal 125 percent of the original mortgage amount?

8   A.   I don't know.

9   Q.   Okay.  I think we're done with that one, Ms. Graves.

10  Let's go to Official Borrowers' Committee Exhibit 18.

11          MR. WINSTEAD:  May I approach, Your Honor?

12          THE COURT:  Yes.

13      (Pause)

14          THE COURT:  Thank you.

15      (Pause)

16  Q.   Now Ms. Graves, this document is titled Adjustable Rate

17  Note at the top, do you see that?

18  A.   Yes, I do.

19  Q.   Now let's go to the sixth page.

20  A.   The sixth page?

21  Q.   The last page in the packet, the sixth.

22      (Pause)

23  A.   Yes.

24  Q.   Is that your signature?

25  A.   Yes, it is.

72

1    Q.    Okay.  I'd like to ask you about a few provisions in this

2    document, Ms. Graves.  First of all, let me ask you what is the

3    interest rate on your loan?

4    A.    I don't know.

5    Q.    I should clarify that, what is the current interest rate

6    on  your loan?

7    A.    I don't know.

8    Q.    Okay.  Well, let's look at page 2 of your mortgage.

9                MR. WINSTEAD:  And may I approach, Your Honor, just

10   to help --

11               THE COURT:  Yes.

12               MR. WINSTEAD:  -- guide.

13               THE COURT:  Hang on.  Theresa, can you give him the

14   mike.

15               THE WITNESS:  Page 2?

16               THE COURT:  Any objection to him staying at the

17   witness box?

18               UNIDENTIFIED ATTORNEY:  No objection.

19               THE COURT:  All right.  You can just stay up there.

20               MR. WINSTEAD:  Thanks.  Never wanted to do this

21   either.

22               THE COURT:  All right.

23   BY MR. WINSTEAD:

24   A.    You said page 2?

25   Q.    Yes.  So we're looking at page 2, right there.  There is a

1    paragraph that's numbered 4 that says, "Interest rate and

2    monthly payment changes."  Do you see that?

3    A.    Yes.

4    Q.    Okay.  And down -- there's an A, a B and a C and C right

5    there says "Calculation of changes," do you see that?

6    A.    Yes, I do.

7    Q.    Okay.  Could you please read that paragraph to yourself,

8    I'd like to read it aloud into the record if the Court will

9    permit, while Ms. Graves reads it to herself.

10          THE COURT:  That's fine.

11   Q.    "Before each change date, the noteholder will calculate my

12   new interest rate by adding three and 650,000 percentage

13   points, 3.65 percent margin, to the current index.  The

14   noteholder will then round the result of this addition to the

15   nearest one thousandth of one percentage point subject to the

16   limits stated in Section 4(d) below.  This rounded amount will

17   be my new interest rate until the next change date.  In the

18   event a new index is selected pursuant to paragraph 4(b), a new

19   margin will be determined.  The new margin will be the

20   difference between the average of the old index for the most

21   recent three year period which ends on the last date the index

22   is available plus the margin on the last date the old index was

23   available and the average of the new index for the most recent

24   three year period which ends on that date.  Or if not available

25   for such three year period, for such time as is available.  The

74

1    difference will be rounded to the next higher one-eighth of a

2    percentage."

3         Ms. Graves, have you had a chance to read that paragraph?

4    A.    Yes, I did.

5    Q.    Ms. Graves, using the language in that paragraph, can you

6    figure out what your interest rate is under your loan now?

7    A.    No.

8    Q.    Okay.  Let's look at two more provisions in this document,

9    Ms. Graves.  Why don't you flip over to the next page?  And if

10   you would look at paragraph (h) --

11   A.    H?

12   Q.    "Limit on my unpaid principal in-trade monthly amount."

13   Do you see that?

14   A.    Yes, I do.

15   Q.    Okay.  Now, Ms. Graves, does the amount you pay under your

16   mortgage change from month to month?  Do you know?

17   A.    What I'm paying -- no.  What I'm paying now, no.

18   Q.    Okay.  Has it changed during the roughly thirteen months

19   since you took out -- or excuse me -- twenty-five months since

20   you took out this mortgage?

21   A.    No.

22   Q.    Okay.  Do you know if it can change?

23   A.    Yes, it did.

24   Q.    Okay.  Well, do you know what it can change to?

25   A.    At first they said 100 -- 1,500 dollars and 1,900 dollars.

75

1    Q.   Well, you're getting a little ahead of me, Ms. Graves.

2    Let's talk about --

3    A.   Oh, I'm sorry.

4    Q.   -- the minimum monthly payment under your mortgage and the

5    other payment options.  Let's look at paragraph (h).  And I'd

6    like for you to read that to yourself while I read it into the

7    record if the Court will permit.

8              THE COURT:  Okay.

9    Q.   Okay.  "Limit on my unpaid principal increased monthly

10   payment.  My unpaid principal can never exceed a maximum amount

11   equal to 125 percent of the principal amount originally

12   borrowed.  In the event my unpaid principal would otherwise

13   exceed that 125 percent limitation, I will begin paying a new

14   monthly payment until the next payment change date

15   notwithstanding the seven and one-half percent annual payment

16   increase limitation.  The new monthly payment will be an amount

17   which will be sufficient to repay my then unpaid principal in

18   full on the maturity at the interest in effect one month prior

19   to the payment date in substantially equal payments."

20        Have you had a chance to read that, Ms. Graves?

21   A.   Yes.  Yes.

22   Q.   What do you understand this paragraph to mean with respect

23   to your monthly payments under this agreement, under this note?

24   A.   I don't know.

25   Q.   Okay.  Let's look at one more provision, Ms. Graves.

76

1    Paragraph (g), "Changes in my Unpaid Principal Due to Negative

2    Amortization or Accelerated Amortization".  And let me ask you

3    first, Ms. Graves, how much of your monthly payment goes

4    towards paying interest on your loan?

5    A.    Repeat that, please.

6    Q.    How much of the monthly payment you make on your mortgage

7    goes toward paying for interest?

8    A.    739 dollars.

9    Q.    Goes towards paying for interest.  Meaning --

10   A.    I don't -- that's all I pay a month.  That's all I pay is

11   739.

12   Q.    And of that 739, how much of it pays for interest, if you

13   know?

14   A.    I don't know.

15   Q.    How much of that 739 goes to paying for principal?

16   A.    I don't know.

17   Q.    Okay.  Well, let's take a look at paragraph (g) and this

18   will be the last one we look at.  I'd like to read that in

19   while you read it to yourself if the Court will allow.

20   A.    Okay.

21   Q.    "Changes in My Unpaid Principal Due to Negative

22   Amortization or Accelerated Amortization.  Since my initial

23   monthly payment will be based on the initial rate, which may be

24   different than the subsequent rate, my initial monthly payment

25   could be less or greater than the amount of the interest

1   portion of the monthly principal and interest payment that

2   would be sufficient to repay the unpaid principal I owe in full

3   on the maturity in substantially equal payments.

4       "Additionally, since my payment amount changes less

5   frequently than the interest rate and since the monthly payment

6   is subject to the payment limitations described in Section

7   4(f), my monthly payment could be less or greater than the

8   amount of the interest portion.  For each month that the

9   monthly payment is less than the interest portion, the

10  noteholder will subtract the monthly payment from the amount of

11  the interest portion and will add the difference to my unpaid

12  principal and interest will accrue on the amount of the

13  difference at the current interest rate.  For each month that

14  the monthly payment is greater than the interest portion, the

15  noteholder will apply the excess towards the principal

16  reduction of the note."

17      Ms. Graves, have you had a chance to read that paragraph?

18  A.   Yes.

19  Q.   Having read that paragraph, do you now understand how much

20  of your monthly payment goes towards paying for principal and

21  how much goes towards paying for interest?

22  A.   No.

23  Q.   Okay.  Do you understand what negative amortization is?

24  A.   No, I don't.

25  Q.   Do you know what accelerated amortization is?

78

1    A.   No, I don't.

2    Q.   Okay.  I think we're done with this, Ms. Graves.

3         MR. WINSTEAD:  And I think we're probably done with

4    the microphone portion.

5         THE COURT:  All right.

6    Q.   Now, Ms. Graves, I'd like to look at only two more

7    documents with you, Official Borrowers' Committee Exhibit 18.

8         MR. WINSTEAD:  May I approach, Your Honor?

9         THE COURT:  Um-hmm.

10        MR. DORSEY:  Exhibit 19.

11        THE WITNESS:  19?

12        THE COURT:  Thank you.

13   BY MR. WINSTEAD:

14   Q.   Now, Ms. Graves, this is a document marked American Home

15   Mortgage Servicing DIP monthly billing statement and it's

16   addressed to you.  Is this a copy of the monthly statement or

17   one of them that you get from American Home?

18   A.   Yes, it is.

19   Q.   Okay.  At the bottom of that page, there's a special

20   message.  And it says "Your loan is an adjustable rate mortgage

21   with payment options.  You may choose one of the four payment

22   options."  Do you see that?

23   A.   Yes, I do.

24   Q.   And there are four options listed.  And they read minimum

25   payment with a description, interest only payment with a

79

1    description, full principal and interest payment with a

2    description following and full principal and interest payment,

3    again, with a description following.  Do you see that?

4    A.   Yes.

5    Q.   Ms. Graves, do you know what the amounts are of these four

6    options?

7    A.   This is -- yeah.  The top one is 250 thous -- $256,690.61.

8    Q.   Maybe I didn't ask that clearly.  Let me try again.  Ms.

9    Graves, how much do you pay per month under your mortgage?

10   A.   739.

11   Q.   And are there other amounts based on the options we see

12   described in this document that you could pay under your

13   mortgage?

14   A.   No, I cannot.

15   Q.   Do you see that there's an option 1, 2, 3 and 4 listed?

16   A.   I see that.

17   Q.   And you said that you pay 739?

18   A.   Yes.

19   Q.   Could you pay other amounts under your mortgage not could

20   you actually pay but does the company ask you to pay other

21   amounts?

22   A.   No, they have not.

23   Q.   Let's -- Ms. Graves, what is your current monthly income?

24   A.   About 1600 dollars a month.

25   Q.   Okay.  Now are you working?

80

1   A.   No, I'm not.

2   Q.   Are you retired?

3   A.   I'm retired.

4   Q.   And is that income what you would consider a fixed income

5   or does it vary from month to month?

6   A.   Yes, social security.

7   Q.   Okay.  And did you say you pay 739 dollars per month under

8   your mortgage?

9   A.   Yes.

10  Q.   Okay.  And we looked at that document and did it look like

11  there were other payment options under your mortgage besides

12  the 739?  Other amounts?

13  A.   No.

14  Q.   Not from looking at the document but do you know whether

15  there are other numbers you could pay?

16  A.   That I could pay?

17  Q.   Yeah.  Not that you could you actually pay but that under

18  the loan --

19       THE COURT:  Not that you can afford, ma'am, but which

20  you would be allowed to pay.  Do you understand the

21  distinction?

22       THE WITNESS:  Yeah.  Well, they say -- yeah.  They

23  say I could pay more.

24  Q.   What are the --

25  A.   But I can't --

81

1    Q.   What are the other amounts that they said you could pay

2    under your mortgage, Ms. Graves?

3    A.   The first one is 1500.

4    Q.   Okay.

5    A.   Yes.

6    Q.   What's the second one?

7    A.   1900.

8    Q.   What's the third one?

9    A.   They never gave me a third one.  There's only three

10   options, they told me.

11   Q.   Okay.  But you always pay -- do you always pay the 739 per

12   month?

13   A.   I've always paid the 739.

14   Q.   Have you ever missed a payment under this loan?

15   A.   I never missed a payment in my life.

16   Q.   Okay.  Have you ever paid any other amount under your

17   loan?

18   A.   No.

19   Q.   Okay.  Why not?

20   A.   I can't afford it.

21   Q.   Okay.  Now when you receive your monthly statement, if you

22   look at the top of your document you have in hand, there's a

23   line item that says principal balance.  Do you see that?

24   A.   Yes.

25   Q.   And is it representative to say that it's 256,690.61?

82

1    A.   How much?

2    Q.   $256,690.61.  Do you see that?

3    A.   Yes.

4    Q.   Since you took out this loan in January of 2007, Ms.

5    Graves, and you've made your 739 dollar monthly payment, has

6    your balance under your loan gone up or gone down?

7    A.   Up.

8    Q.   Have you ever sought to modify Your American Home

9    mortgage, Ms. Graves?

10   A.   Yes.

11   Q.   How did you seek to modify your American Home mortgage?

12   A.   I called American Home Mortgage to give me a fixed rate

13   and refinance.

14   Q.   I was just going to ask why did you want to modify the

15   terms of your mortgage?

16   A.   To refinance.

17   Q.   Okay.  So when you called the company, who did you speak

18   with?

19   A.   I don't know who it was.

20   Q.   Okay.  Did American Home, in response to your request, did

21   it modify the terms of your loan?

22   A.   No.

23   Q.   Did American Home do anything in response to your request

24   to modify the terms of your loan?

25   A.   No.

83

1    Q.    Okay.  Now, Ms. Graves, do you have a pending lawsuit

2    against American Home, pending as of today, against American

3    Home and a number of other defendants related to the loan we've

4    been talking about today?

5    A.    Yes.

6    Q.    Okay.  When was that lawsuit filed?

7    A.    2008.

8    Q.    Okay.  Have you threatened to file lawsuits against

9    American Home before 2008?

10   A.    No, I haven't.

11   Q.    And do you remember more specifically when in 2008 you

12   filed this suit?

13   A.    Must have been around May, I think.  Sometime around May,

14   I think.

15   Q.    Okay.  Sitting here today, are you aware that American

16   Home is in bankruptcy?

17   A.    I am now.

18   Q.    Okay.  How did you find this out?

19   A.    I called to refinance and that's -- two or three times and

20   finally they told me that they could not refinance me 'cause

21   they were bankrupted.  They never told me -- I didn't know they

22   were bankrupted.

23   Q.    Now to be clear, when you say "they", who are you

24   referring to?

25   A.    Well, I talked to two people there, two employees --

84

1    Q.    Are you --

2    A.    -- at American Home Mortgage.

3    Q.    Okay.  Did you ever receive any written notice that

4    American Home either was in bankruptcy or going to file a

5    bankruptcy?

6    A.    No, I did not.

7    Q.    Okay.  Did you ever read about American Home's bankruptcy

8    case in a newspaper?

9    A.    No, I did not.

10   Q.    Do you regularly read a newspaper, Ms. Graves?

11   A.    Sometimes.

12   Q.    When you do, what newspaper do you read?

13   A.    The Washington Post.

14   Q.    Do you ever read the Dallas Morning News?

15   A.    No, I don't.  No, I haven't.

16   Q.    Do you ever read the New York Times?

17   A.    No.

18   Q.    Do you ever read the St. Louis Post?

19   A.    No.

20   Q.    Have you ever heard anything about American Home's

21   bankruptcy case on television?

22   A.    No, I haven't.

23   Q.    Okay.  Have you ever heard anything about American Home's

24   bankruptcy case on the radio?

25   A.    No, I haven't.

1    Q.    Okay.   Ms. Graves, do you know what a bar date is?

2    A.    No, I don't.

3    Q.    Okay.   Have you ever received written notice that there is

4    something called a bar date in American Home's bankruptcy case?

5    A.    No, I have not.

6    Q.    Okay.   Have you ever read in any newspaper that there is

7    something called a bar date in American Home's bankruptcy case?

8    A.    No.

9    Q.    Okay.   I'd like to look at one more document with you, Ms.

10   Graves.

11   A.    Okay.

12   Q.    It's going to be Borrowers' Committee 20.

13           MR. WINSTEAD:  May I approach, Your Honor?

14           THE COURT:  Yes.   Thank you.

15   Q.    Now, Ms. Graves, I've handed you a document that at the

16   top reads "United States Bankruptcy Court District of Delaware

17   Proof of Claim".  Do you see that?

18   A.    Yes, I do.

19   Q.    Okay.   Have you ever filled out a form like this before?

20   A.    No, I have not.

21   Q.    Do you know whether you need to submit a form like this

22   related to any claim you have against American Home and this

23   bankruptcy case?

24   A.    Repeat that.

25   Q.    Do you know whether you need to submit a claim like -- a

1    form like this with information about your claim against

2    American Home in this bankruptcy case?

3    A.    I don't know.  I don't know.

4    Q.    Okay.  Before January of 2008, did you authorize an

5    attorney, Mr. Andrews or anyone else, to file a document that

6    looks like this on your behalf in this bankruptcy case?

7    A.    No.

8    Q.    Why not?

9    A.    I -- I don't know.  I never thought of -- you know.  I've

10   never seen anything like this.

11              MR. WINSTEAD:  Okay.  I don't have anything further

12   for you, Ms. Graves.  Thank you very much.

13              THE WITNESS:  Thank you.

14              THE COURT:  Mr. Andrews, any questions?

15              MR. ANDREWS:  No, Your Honor.  But I would like to

16   make a comment before the Court if that could be permitted.

17              THE COURT:  Mr. Dorsey?

18              MR. DORSEY:  I'm sorry, Your Honor?

19              THE COURT:  I asked Mr. Andrews if he wanted to ask

20   any questions and he said he'd like to make a comment before

21   the Court.  Do you have an objection?

22              MR. DORSEY:  No objection, Your Honor.

23              THE COURT:  All right.  Mr. Andrews?

24              MR. POWER:  Actually, Your Honor, can we finish the

25   witness first?

1          MR. ANDREWS: I'm happy either way --

2          THE COURT:  Well, I was assuming it was -- all right.

3     We can finish the witness first.  That's fine.  Any cross-

4     examination?

5          MR. POWER:  Could we take a short break, Your Honor?

6     Just two minutes?

7          THE COURT:  Yes, of course.  Ms. Graves, we're going

8     to take a recess.

9          THE WITNESS:  Okay.

10         THE COURT:  You're free to walk around.  And the one

11    thing you cannot due is talk about your testimony with counsel.

12         THE WITNESS:  I know.  I know.

13         THE COURT:  All right.  Thank you very much.  We're

14    in recess.

15         THE WITNESS:  Thank you.

16       (Recess from 1:23 until 1:35 PM)

17         THE CLERK:  All rise.

18         THE COURT:  Please be seated.

19         MR. SCHNITZER:  Your Honor, Edward Schnitzer from

20    Hahn & Hessen on behalf of the creditors' committee.

21    CROSS-EXAMINATION

22    BY MR. SCHNITZER:

23    **Q.   Good afternoon, Ms. Graves.**

24    **A.   Hi.  Good afternoon.**

25         THE COURT:  Ms. Graves, I'm sorry.  Can you move that

1    microphone a little closer?  You can sit back, that's fine.

2    Just move the microphone a little closer and push it down maybe

3    a little bit there.  Great.  Thank you so much.

4            THE WITNESS:  Hear me now?

5            THE COURT:  There you go.

6    Q.   Mrs. Graves, do you believe you have a claim against

7    American Home?

8    A.   Did I know I had a claim?

9    Q.   Do you believe you have a claim?

10   A.   Yes, I do.

11   Q.   Have you ever filed a claim against American Home?

12   A.   No.

13   Q.   Why not?

14   A.   Well, I did when I found out they had adjust -- I had

15   adjustable rate.  I thought I had a fixed rate.

16   Q.   Have you ever filed a claim against American Home in the

17   bankruptcy?

18   A.   No.  I didn't -- no.

19   Q.   Do you know why you haven't filed a claim in the

20   bankruptcy?

21   A.   Why I haven't filed a claim?  I have a claim now.  But

22   before then I hadn't -- I didn't file one, no.  I waited a

23   while until around May.

24   Q.   And that was when you filed the lawsuit?

25   A.   Right.

89

1    Q.   Okay.  Other than filing the lawsuit, have you done

2    anything else or have an attorney do anything else in writing

3    to American Home to indicate --

4    A.   No.

5    Q.   -- that you believe you had a claim?

6    A.   No.

7    Q.   Did you ever discuss filing a proof of claim with anybody?

8    A.   No, I didn't.

9    Q.   Was filing a proof of claim ever explained to you by

10   anybody?

11   A.   No.

12   Q.   I know you mentioned May.  Would it refresh your

13   recollection if I told you that the complaint which was filed

14   in your name was filed in March of '08?  Is it possible that it

15   was March as opposed to May?

16   A.   It could've been March, yes.  It could've been.  I lost my

17   husband in May so I don't know -- you know.  It could've been.

18   It could've been May.

19   Q.   Do you recall what specific entities were sued in that

20   lawsuit?

21   A.   No, I don't.

22   Q.   Okay.  Is it correct that you also sued your mortgage

23   broker?

24   A.   No.

25        MR. SCHNITZER:  Your Honor, may I approach to hand

1    her an exhibit?

2         THE COURT:  Yes.  Not quite sure the point of this.

3         (Pause)

4    Q.   Ms. Graves, I've handed you what's been marked Creditors'

5    Committee 1.  I want to direct your attention to -- if you can

6    flip a few pages in until it says at the top "Page 6 of 37".

7    A.   6?

8    Q.   Let me know when you get to that page?

9         THE COURT:  Why don't you approach and show you where

10   you want 'cause I don't know where you want.

11   Q.   You see the caption on that page, Ms. Graves, that lists

12   your name and your husband's name?

13   A.   Yes, I do.

14   Q.   And do you see the parties listed below under the V?

15   A.   American Brooklyn Conduct?

16   Q.   Yes.  And you see the other ones listed below?

17   A.   American Home Mortgage Company.

18   Q.   Okay.  Do you see the next one?  Who's Premier Financial

19   Co.

20   A.   I don't know.

21   Q.   Wasn't that your mortgage brokers on the loan that you

22   obtained from American Home?

23   A.   I don't know.

24   Q.   Do you recall at your deposition we discussed a man named

25   Ryan, is that correct?

91

1    A.    Yes.  He was the one that got me with American Home

2    Mortgage.

3    Q.    Do you know if Ryan worked for Premier Financial Co.

4    A.    No.

5    Q.    Do you know that when your lawyer filed this lawsuit, he

6    sued Premier Financial Co. in addition to American Home?

7    A.    No.

8    Q.    And do you know who any of the other entities are below

9    either IndyMac Bank or First Mortgage?

10   A.    No.

11   Q.    Can you put that exhibit to the side?  Can you take out

12   Borrowers' Committee 13?  It's one of the exhibits your

13   attorney handed you.

14   A.    Excuse me.

15              THE COURT:  Help her find it.

16   Q.    Ms. Graves, we're looking at Borrowers' Committee

17   Exhibit 13 and we're on page 4 of that exhibit which was a copy

18   of a Uniform Residential Loan application.  Do you see on the

19   bottom where it says -- bottom right where it says Premier

20   Financial Company?

21   A.    On the bottom right?

22   Q.    Yes.

23   A.    Yes.

24   Q.    And do you see to the left where it has a person's name

25   written, Ryan Van Sciver?

92

1    A.    Yes.

2    Q.    Do you know who Mr. Van Sciver was?

3    A.    Yeah.  He's the one that I called about lowering my house

4    note.

5    Q.    And was he the person who arranged for your refinancing of

6    your mortgage?

7    A.    No, I don't.

8              THE COURT:  No, you don't what, ma'am?  I'm sorry.

9    What was the answer?  What was the --

10             THE WITNESS:  No.  I said no.

11             THE COURT:  No, he did not get you the loan?

12             THE WITNESS:  Ryan?

13             THE COURT:  Yeah.

14             THE WITNESS:  Ryan was the one that I called to lower

15   my house note.

16             THE COURT:  Okay.

17             THE WITNESS:  To lower my, you know, mortgage.

18             THE COURT:  Yes.

19             THE WITNESS:  And he was the one that I talked to and

20   he sent someone out there.

21             THE COURT:  Okay.  Thank you.

22             THE WITNESS:  Thank you.

23   BY MR. SCHNITZER:

24   Q.    Do you know if your lawsuit with respect to Premier

25   Financial Co. has been settled?

93

1    A.    I don't even know what you're talking about.

2    Q.    Do you know if your lawyer has filed any documents on your

3    behalf settling the lawsuit against your former mortgage

4    broker?

5    A.    No.

6         MR. SCHNITZER:  Can I just have one minute?  Your

7    Honor, we have no further questions.

8         THE COURT:  Thank you.  Mr. Dorsey?

9         MR. DORSEY:  No questions, Your Honor.

10         THE COURT:  Thank you.  Redirect?

11         MR. POWER:  Very briefly, Your Honor.

12   REDIRECT EXAMINATION

13   BY MR. POWER:

14   Q.    Ms. Graves, Mr. Schnitzer asked you a question about Ryan.

15   And you said that you had contacted Ryan, is that right?

16   A.    Yes, I did.

17   Q.    Why did you call Ryan?

18   A.    A card came in the mail where -- that said they could

19   lower your house note.  And I called him and that's what he

20   told me he could do for me.

21         MR. POWER:  Nothing further from me, Your Honor.

22         THE COURT:  Thank you.

23         MR. POWER:  But Mr. Andrews would like to make a

24   brief statement.

25         THE COURT:  That's fine.  Do we need Ms. Graves still

94

1    on the witness stand?

2            MR. SCHNITZER:  No, Your Honor.

3            THE COURT:  Ms. Graves, thank you.

4            THE WITNESS:  Thank you so much.

5            THE COURT:  You may step down.  Yes, sir,

6    Mr. Andrews.  You may proceed.

7            MR. ANDREWS:  Your Honor, if it please the Court,

8    Walt Andrews, the managing attorney of AARP's legal counsel for

9    the elderly.  Having heard the testimony and having an

10   opportunity to speak with counsel of the borrowers' committee,

11   we feel we owe the Court an apology.  We have looked at the

12   timeline.  I'm not comfortable as it relates to American

13   Brokers conduit but at least as it relates to American Home

14   Mortgage Corp., there was a bar date violation by the filing of

15   that lawsuit.  And we do apologize to all interested in light

16   of that fact.

17           The other issue that is material to that matter, Your

18   Honor, and I believe we should bring to the Court, in light of

19   IndyMac's failure, Judge Emmet Sullivan of the United States

20   District Court for the District of Columbia has frozen the

21   entire lawsuit.  We have not made any claims or demands on the

22   debtor since that was done.  And as a matter of fact, I'm not

23   even comfortable at this date if I were to file a 362 motion

24   that wouldn't be a violation of Judge Sullivan's order having

25   frozen the entire proceeding.  It is our plan at the earliest

95

1    time to collect this record by asking for stay relief as well

2    as to file any other documents that are required under the

3    Bankruptcy Code.

4              THE COURT:  Okay.  Thank you, Mr. Andrews.

5              MR. ANDREWS:  Thank you very much, Your Honor.

6              THE COURT:  Next witness.

7              MR. WEISBROD:  Your Honor, Stephen Weisbrod for the

8    borrowers' committee.  Our next witness is Margo Saunders.

9    There is a pending motion regarding Ms. Saunders.  We have

10   narrowed the issues for the Court to resolve concerning the

11   motion in limine with respect to Ms. Saunders.  It is not our

12   intention to seek to introduce into evidence Ms. Saunders'

13   report.  We do, of course, still seek to elicit her testimony.

14             Her report included a description of a number of

15   settlements.  Except for the Bank of America countrywide

16   settlement which was addressed in numerous news accounts and

17   the Court actually took judicial notice of it at a prior

18   hearing, it is not our intention to elicit on direct

19   examination testimony regarding specific settlements and

20   specific cases.  Nevertheless, I understand that Mr. Dorsey

21   does wish to go forward with his motion in limine.  And so I

22   think that what I should do at this point is yield the podium

23   to him and then respond.

24             THE COURT:  Okay.  Mr. Dorsey?

25             MR. DORSEY:  I'm not sure quite what it means to say

96

1    we've narrowed the issues down to only discussion of one

2    settlement, Your Honor, which is the Bank of America

3    settlement.  And I'm not sure what possible relevance that

4    settlement would have to this Court's determination of the

5    confirmation of this plan.  I don't know what the intent to

6    elicit from her on direct examination even though they aren't

7    seeking to introduce her report.  But we would make our motion

8    in limine to exclude her from testifying since -- she has -- we

9    have taken her deposition on February 2nd.  She did prepare a

10   report that we've reviewed and we've discussed with her at that

11   deposition.  There was -- the first question I asked her in her

12   deposition was what is your field of expertise.  And she said

13   I'm a consumer law expert.  And I asked is there any other

14   field in which you consider yourself to be an expert and she

15   said no.  I asked her if she had any expertise in bankruptcy.

16   She said no.  I asked her if she was asked to apply her

17   analysis of potential claims that borrowers may have in the

18   context of the bankruptcy.  She said no.  It's simply based on

19   insufficient data.  It's not the kind of an expert report that

20   this Court -- or expert testimony that this Court should listen

21   to.  The only thing she's going to opine about are legal

22   issues.  And this Court is fully qualified to make those

23   decisions on its own without Ms. Saunders getting up to testify

24   about it.

25        The other issues, Your Honor, are that she doesn't

97

1   rely on reliable data for information in coming to her opinion.

2   She testified that -- I asked her what the basis for her

3   opinions were and she said her thirty years of experience as a

4   lawyer in consumer law.  She did make mention of some e-mails

5   that she sent out -- an e-mail that she sent out to plaintiff

6   lawyers asking them for information about cases that they have

7   pending.  And at first, we were told we weren't going to get

8   those e-mails.  They subsequently produced them.  And I'd like

9   to read to the Court the actual e-mail that Ms. Saunders sent

10   out.  The e-mail says "Sorry to bother you but I'm trying to

11   gather information to support the efforts of the borrowers'

12   committee in the American Home Mortgage bankruptcy case next

13   week.  The committee is trying to convince the Court that

14   unless the claimed bar date is extended many homeowners' valid

15   claims will be lost.  Can you give me any example of a

16   successful resolution of a payment option ARM case?  Either a

17   verdict, a court decision or a good settlement for the borrower

18   would do."

19        That's not the kind of e-mail an expert sends out,

20   Your Honor.  That's the kind of e-mail an advocate sends out.

21   And Ms. Saunders is nothing more than another lawyer

22   representing the borrowers' committee in this case.  She has no

23   business testifying as an expert.  We don't think her opinions

24   are going to be relevant to this case or be helpful to the

25   Court in understand the facts that's at issue.

98

1      She doesn't establish in her expert opinion that the

2    loans that were issued by the debtors in this case -- and she

3    only, by the way, limits it to payment-option ARMs.  Even

4    though there were over a million loans issued by American Home

5    Mortgage during its existence, they have asked her to consider

6    only those 90,000 -- approximately 90,000 payment-option ARMs

7    which makes me wonder what is the scope of the borrowers'

8    committee's representation here.  Apparently, they're only

9    concerned with one potential borrower, type of borrower.

10     She doesn't establish that the loans are per se

11   illegal.  And again, it's not a testimony that's going to be

12   helpful to this Court.  I suppose what they want to try to

13   elicit from her is that in her experience, these types of

14   borrowers are not aware that they have a claim and therefore

15   they wouldn't have a brought a claim until the time that their

16   payment option ARM loan resets.

17     We just heard testimony from Ms. Graves.  And she

18   testified she knew before her loan resets that she didn't like

19   the loan that she had received, that she thought she had a

20   claim, she consulted a lawyer and she brought a lawsuit.

21   Completely contradicts the testimony of their expert witness.

22     Just bottom line, Your Honor, there's nothing here

23   that she's going to testify to that will be helpful to the

24   Court.

25     I'd like to address a few things in their response to

1    our motion in limine.  They state in there that we don't

2    contest her expertise as a -- in consumer lending.  We

3    certainly do.  She has not established any expertise in

4    consumer lending.  She says herself she was an expert in

5    consumer law not consumer lending.  They cite the cases saying

6    that a lawyer can testify as an expert.  The cases that they

7    cite to are cases where's there's an issue of foreign law where

8    there's a question of attorney compensation or malpractice or

9    where an ambiguous contract and a lawyer testifies about the

10   standards and conventions in the industry.  All of those cases

11   are inapposite to the case here, Your Honor.  This Court is

12   fully capable of understanding, based on the payment-option

13   ARMs, whether or not borrowers have or should have claims,

14   whether they could or couldn't bring the option or understand

15   that they had a cause of action and bring that case.

16            They also state in their papers that -- and I want to

17   clarify this.  They state in their response that she has

18   testified several times as an expert.  She's never testified as

19   an expert, Your Honor.  She told me in her deposition she's

20   never testified in court as an expert witness.  Now, she's

21   testified before Congress about legislative issues which is

22   probably appropriate given her field of expertise.  And, in

23   fact, she was denied the opportunity to testify as an expert in

24   one case, she told me in her deposition, because the judge said

25   you're only going to give me opinions on law and I don't need

1    you to give me those opinions.

2         So, Your Honor, for those reasons, we would ask the

3    Court to exclude Ms. Saunders as a witness and let us conclude

4    this case and move forward.

5         THE COURT:  Okay.

6         MR. SCHNITZER:  Your Honor, Edward Schnitzer for the

7    creditors' committee.  Without repeating verbatim what the

8    debtors' counsel just said, we join in their application.

9    Fundamentally, our points are the same, just that Ms. Saunders

10   won't add anything to this case that isn't for you to

11   determine.  There has been this prior exclusion that

12   Mr. Dorsey's referred to which is virtually the same

13   circumstances as here and treat a -- once again, her experience

14   with respect to American Home is virtually nothing.  She

15   testified she reviewed four files one of which didn't have to

16   do with American Home, one of the four she said she didn't have

17   information so she was down to reviewing two loan files one of

18   which it's our understanding has actually been settled.  So her

19   knowledge of American Home private citizen loans is essentially

20   null.  And for those reasons and what debtors' counsel

21   mentioned as well as in their papers, Your Honor, we believe

22   her testimony should be excluded.

23        MR. WEISBROD:  Your Honor, in evaluating whether Ms.

24   Saunders would help the Court, I think it's important to begin

25   by talking about what the issues are before the Court.  And we

1   are offering Ms. Saunders to help the Court and evaluate our

2   objections based on lack of notice of borrowers which have two

3   components.  One, that there should have been actual notice to

4   many borrowers because they were known claimants.  And second,

5   that the notice should have gone out even if there was going to

6   be publication notice in a matter that was comprehensible to

7   all borrowers.

8           Ms. Saunders is offering nonlegal opinion to assist

9   in addressing those issues.  I think, right off the bat, we

10  have to talk about --

11          THE COURT:  Well, let me stop you there for a second

12  and ask you to put a little meat on that statement, nonlegal

13  testimony in support of -- or in connection with those issues.

14  What type and be a little more specific about the testimony

15  you're going to elicit on those issues.

16          MR. WEISBROD:  Yes.  We are going to -- it's

17  basically four components, Your Honor.  The first component is

18  explaining how the loans work.

19          THE COURT:  Okay.

20          MR. WEISBROD:  And as someone who has been involved

21  in consumer protection issues for about thirty years, she is in

22  an excellent position to know.  She's much like the lawyer in

23  the case called something v. Bowes, the First Circuit case

24  where actually parts of his testimony were found not to be

25  admissible and parts were.  Where he said this is what the

1    contract means or this is what the law is, his testimony was

2    found not to be admissible.  When he was asked how do the

3    contracts get applied in the industry, his testimony was found

4    to be admissible.

5              THE COURT:  All right.

6              MR. WEISBROD:  This is similar to that.  We're going

7    to go through in some detail how the payment-option ARMs works

8    and there was actually a somewhat mocking reference to credit

9    math in the debtors' pleadings.  But we're going to explain how

10   with simple arithmetic you can actually figure out what happens

11   these payment-option ARMs.

12             THE COURT:  Okay.

13             MR. WEISBROD:  So that is part 1.  That's plainly not

14   legal testimony.  And as to whether she's qualified, the answer

15   is yes because she's been dealing with these types of contracts

16   and doing these calculations for many, many years and, in fact,

17   is often paid to consult on these issues.

18             The next issue is what types of claims do borrowers

19   assert against loan originators and other based on payment-

20   option ARMs.  Now occasionally, there may be an answer or two

21   in the deposition that suggests that Ms. Saunders has an

22   opinion about the validity of such claims.  And she is a

23   consumer advocate and I'm sure she does have personal opinions

24   about them but we don't intend to elicit those.  Our point is

25   empirical that when borrowers encounter problems with payment-

1    option ARMs, they often go to lawyers and they often file suit

2    against originators of payment-option ARMs.  Whether those

3    suits are meritorious or not is not the subject of Ms.

4    Saunders' opinion.

5         So that immediately puts us in a very different

6    category, Your Honor, from all of the cases cited by the

7    debtors.  And I'll just explain them very briefly, one sentence

8    each.  The first case was U.S. v. Leo and that was about

9    whether the DC Transit Authority, WMATA, had violated the

10   Americans with Disabilities Act.  And the expert was proffered

11   to say that what the Transit Authority was doing violated the

12   ADA and the Court said no.

13        There was the case called In re Initial Public

14   Offering Securities Litigation.  The two experts, one for each

15   side, were both barred in that case, each was going to opine on

16   whether the judge was required to recuse himself under the

17   Canons of Judicial Ethics in 28 U.S.B. 455.

18        THE COURT:  Well, let me back you up a minute.

19        MR. WEISBROD:  Yes.

20        THE COURT:  That was item 2.  What types of claims do

21   borrowers assert against payment-option ARMs?  Isn't that

22   another way of saying applying the law to the facts in this --

23   applying the law to the facts of how a payment-option ARM works

24   gives rise to the following legal claims?  Isn't that a

25   conclusion -- that's what lawyers are trained to do, right?

104

1    Apply the law to the facts and figure out what happens.

2            MR. WEISBROD:  Lawyers are trained to do that.  And

3    it's in part, based on Ms. Saunders' training, that she has

4    come to the place where she is today where she watches what

5    happens across the entire country.  So our evidence is going to

6    be empirical.

7            THE COURT:  So it's not these are the facts, these

8    are the causes of action that exist.  It's these are the facts,

9    these are the types of causes of action that have been

10   asserted.

11           MR. WEISBROD:  Exactly.

12           THE COURT:  Okay.  And that was the second.  What was

13   the third and fourth type?  I'm sorry.  Unless I'm getting

14   ahead of you.

15           MR. WEISBROD:  No, you're not.  I just want to add or

16   may be it's asserted.  But again, it's empirical.  It's not

17   this is right --

18           THE COURT:  Well, they may be asserted?  Now, wait a

19   minute.  Isn't that different?

20           MR. WEISBROD:  Well, let me explain that, Your Honor.

21   And I'll give you a very concrete example.  In Massachusetts,

22   the attorney general just won a lawsuit saying that payment-

23   option ARMs are presumptively invalid.  The lawsuit was brought

24   by the attorney general not by a borrower.  But a borrower may

25   cite that.  Nobody knows whether the borrower is going to win.

105

1    Ms. Saunders is not going to --

2           THE COURT:  Oh, I see.  So you're saying based on

3    developments, there may be causes of action that could arise in

4    the future that have not yet existed?

5           MR. WEISBROD:  That's --

6           THE COURT:  Congress is looking at some of these

7    issues as well, I believe.  Maybe --

8           MR. WEISBROD:  Yeah.  Congress may be looking at

9    these issues.  But I mention that just the Coakley example is

10   really the one that led do mine when I said may be asserted in

11   the future where that is -- Attorney General Coakley filed that

12   suit almost -- I think it was the same month that the debtors

13   here went into bankruptcy.  And people have been following it

14   and talking about how it may or may not become more prevalent.

15   And it looks like it probably will.

16          The third area, Your Honor, is how and when most

17   borrowers become aware of the claims that they have against

18   them.  And Mr. Dorsey noted that Ms. Saunders has opined that

19   many borrowers do not immediately become aware and, in fact,

20   may not become aware until their payments go up.  I don't think

21   that Ms. Saunders is expected to opine that one hundred percent

22   of borrowers are oblivious to their potential claims until

23   their payments go up.  But she will talk about why they might

24   not realize that they have claims to assert.

25          And the fourth is illustrations or discussion of

1    successful resolution.  Now, as I said, we have scaled back

2    what we propose to do on this.  It is no longer our intention

3    to go through examples of individual borrower settlements that

4    are confidential.  We still would make note of the countrywide

5    settlement which was an eight billion settlement including a

6    220 million dollar damages component.  But we're not going to

7    go through the others.  And rather, we'll just go through

8    generally her understanding, based on years of experience, of

9    how these claims get settled.

10         I do need to --

11         THE COURT:  So what's the point of that?  The point

12   is, I take it, that, okay, these are the types of claims that

13   are asserted and this last category is really meant to show not

14   only are they asserted but they are occasionally --

15         MR. WEISBROD:  Occasionally --

16         THE COURT:  -- successful and give rise to liability

17   to somebody.

18         MR. WEISBROD:  Yes.  Liability or payment

19   obligations --

20         THE COURT:  Right.

21         MR. WEISBROD:  -- in the case of a settlement, yes.

22         THE COURT:  And those are your four categories?

23         MR. WEISBROD:  Those are our four categories.  And on

24   the last, I do need to correct a misconception.  It is true

25   that Ms. Saunders sent out the e-mail described.  We're not

1   going to elicit testimony about the responses received.  But

2   Ms. Saunders sent that e-mail to lawyers with whom she has a

3   consulting relationship.  She consults, as she'll testify, to

4   lawyers -- lawyers call four or five times a week asking Ms.

5   Saunders to assist them.  And so she knows a lot of lawyers and

6   has fairly direct access to what's going on across the entire

7   country.  She herself has not represented borrowers in

8   litigation since before 1991.  Since she went to the National

9   Consumer Law Center, her role has been more advisory,

10  counseling, testifying before Congress, etcetera --

11              THE COURT:  All right.

12              MR. WEISBROD:  -- but she still has her finger on the

13  pulse of what's going on in these consumer cases all across the

14  country.  And one of the reasons she does, but not the only

15  reason, is that she regularly consults to lawyers across the

16  country as well as government agencies, including the FTC and

17  several state regulators.

18              THE COURT:  All right.  I'm going to deny the motion

19  in limine and allow testimony to be elicited on these four

20  categories only.  All right?  If you get beyond the scope of

21  that, Mr. Dorsey, I'll hear an objection that it's beyond the

22  scope of what the Court has allowed.  In addition, I'm making

23  no finding as to whether your witness qualifies as an expert.

24  They may need to put her on and allow Mr. Dorsey to voir dire

25  on whether she is qualified as an expert.  And if she is not,

1   obviously, she won't be allowed to testify.

2         If you go beyond the scope of these four categories,

3   I will not allow the testimony.  I will, of course, Mr. Dorsey

4   to explore issues such as the e-mail in connection with -- I

5   was going to say probity but that's not -- believability as a

6   witness, for lack of a better word, or whether the witness is

7   biased, whether the witness is an expert or an advocate.  Of

8   course, all experts are advocates that are at least in -- some

9   point.  But whether the line has been crossed -- and of course,

10  if he opens that door on cross, you'll have the opportunity to

11  explain to me context on redirect.

12         MR. WEISBROD:  Thank you.

13         THE COURT:  All right.  So based on that ruling, you

14  may call your witness.  And let's start with qualifications.

15         MR. WEISBROD:  Yes.

16         THE COURT:  And then when we're done, you'll make a

17  motion and we'll allow Mr. Dorsey to voir dire.

18         MR. WEISBROD:  Thank you, Your Honor.  We call to the

19  stand Margo Saunders.

20      (Witness duly sworn)

21         THE CLERK:  Now can you please state and spell your

22  name for the record, your last name?

23         THE WITNESS:  Saunders, S-A-U-N-D-E-R-S.

24         THE COURT:  All right.  If you'd adjust the

25  microphone, please.  Thank you.

1    DIRECT EXAMINATION

2    BY MR. WEISBROD:

3    Q.    Good afternoon.

4    A.    Good afternoon.

5    Q.    Ms. Saunders, could you please introduce yourself to Judge

6    Sontchi.

7    A.    Judge, I'm Margo Saunders from the National Consumer Law

8    Center.

9    Q.    Could you please describe your educational background

10   beginning with college?

11   A.    I went to Brandeis University and I got a B.A. in American

12   Studies and then to the University of North Carolina where I

13   got a J.D.

14   Q.    Could you describe your employment following law school?

15   A.    Immediately after law school in 1978, I joined the Legal

16   Aids Society in Winston-Salem, North Carolina.  Then I worked

17   as a volunteer for a little while in Raleigh, North Carolina as

18   legal aid.  I worked at the Governor's Advocacy Council for

19   Children and Youth for a year.  I was in private practice for a

20   year.  And then in 1983, I joined the North Carolina Legal

21   Services Resource Center as the consumer specialist.  In 1991,

22   I moved to Washington, D.C. and was -- became a part of the

23   National Consumer Law Center.

24   Q.    Before we go on to the National Consumer Law Center, can

25   you describe any background you had in credit related

1    litigation when you were in North Carolina?

2    A.    In North Carolina, throughout my tenure except when I was

3    working for the governor, I handled a number of consumer cases

4    from trial through the appellate court.  I represented

5    homeowners in mortgage cases and other consumer -- in other

6    consumer related cases as well until I moved to Washington in

7    1991.

8         During the period 1983 to 1991, I was co-counsel or at

9    least supervising attorney on almost every complex consumer

10   case brought by a Legal Aid attorney in the state.

11   Q.    Could you describe what you've done or what your positions

12   have been at the National Consumer Law Center?

13   A.    My positions?

14   Q.    Yes.

15   A.    In 1991, when I joined National Consumer Law Center, I

16   became the managing attorney of the Washington, D.C. office.

17   In 2005, for personal reasons, I left Washington, D.C. and

18   moved out of state and I became of counsel.

19   Q.    Could you describe for Judge Sontchi what the National

20   Consumer Law Center is?

21   A.    We are a non-profit legal services program that was

22   designed originally and still continues to be a backup center

23   for lawyers representing low income consumers.

24   Q.    How do you go about doing that at the NCLC?

25   A.    Well, we write extensive manuals that we provide to legal

1   services and private attorneys who represent consumers.

2   They're also purchased by the industry.  We do extensive

3   consult -- consultations with legal services and private

4   attorneys and government attorneys as well.  We train -- we

5   provide a lot of training to attorneys and housing counselors.

6   And we do advocacy on a national level and occasionally on a

7   state level in pursuit of the interests of low income

8   consumers.  And I do a lot of expert witness work and expert

9   consulting since I've moved to Wa -- I moved out of -- moved

10  away from Washington.

11  Q.   Could you describe the kinds of policy advocacy or

12  analysis work that you do?

13  A.   Since 1991, when I joined the National Consumer Law

14  Center, I have been a resource to federal agencies and Congress

15  on issues relating to the application of proposed laws or

16  actual laws to the lives of low income consumers.  We provide

17  testimony.  We are often the draftsmen of particular bills or

18  amendments as we are requested to do by members of Congress,

19  generally, the banking committees.  And we also work

20  extensively with the federal agencies.

21  Q.   Can you describe some of your congressional testimony?

22  A.   Well, in the last eighteen months, I have testified three

23  times.  The most recent time was before the House Financial

24  Services Committee on the application of HUD's proposed rules

25  under the Real Estate Settlement Procedures Act on consumers.

112

1    I've also testified twice before committees in Congress

2    relating to problems consumers have with banks allowing

3    garnishments against their exempt funds.  I can go on.

4    Q.   Yes.

5    A.   I think I have testified over fifteen times in the last

6    seventeen years.  I -- I don't have exact count but I testified

7    back in 1993 several times regarding the proposed changes to

8    the Truth and Lending Act and how they should be drafted to

9    best protect homeowners.  I testified repeatedly over the next

10   few years throughout the nineties on the need for Congress to

11   address predatory lending and, particularly, the appropriate

12   ways those laws should be crafted.  And responded as well to

13   the proposals that were on the table at the time.

14   Q.   NCLC and you also do consulting work, is that right?

15   A.   Yes.

16   Q.   Can you describe the consulting work that you do?

17   A.   My consulting work for attorneys covers a range.  We are

18   on -- all the attorneys -- we have about twenty attorneys.

19   We're all on intake one day -- one or two days a month.  Intake

20   may involve simply responding to people who call and try to

21   answer their questions within the ability of that context.  We

22   also have funds to provide more in-depth assistance to

23   attorneys who have mortgage -- predatory mortgage cases.  That

24   assistance can run from half an hour to six hours.  We also

25   routinely provide assistance to attorneys who represent elderly

113

1    people in the same way.  I also have been hired a number of

2    times in the last four or five years by attorneys representing

3    consumers in particular complex, all mortgage cases where I

4    just help them.

5    Q.    Let me clarify.  When you work with other attorneys, where

6    do these attorneys come from geographically?

7    A.    All of over the country.

8    Q.    Do you actually litigate on behalf of those attorneys'

9    clients?

10   A.    No.

11   Q.    Are you a consultant?

12   A.    Yes.

13   Q.    Okay.  One of the terms that's been bandied about is

14   credit math.  Can you explain what, if anything, you do in the

15   area of credit calculations or credit math?

16   A.    Well, yes.  It's very difficult to determine whether or

17   not a truth and lending statement, for example, as provided to

18   Mrs. Graves in this case is correct because there's a lot of

19   calculations that one has to do to figure out if those

20   disclosures are correct.  I know how to do that and I routinely

21   do that for attorneys.

22   Q.    And when you say "that", do you mean the calculations?

23   A.    I mean the calculations which I -- we have a spreadsheet

24   that I designed that I input the information and then I see if

25   it matches the disclosures.

114

1    Q.    Does that require any special mathematical training?

2    A.    The math used is very rudimentary algebra.  The complexity

3    is figuring out what the contract means, finding the

4    appropriate and correct information on the internet and

5    applying it correctly.

6    Q.    What do you mean by the correct information?

7    A.    Well, for example, in these -- in the American Home cases,

8    the interest rate at any one time is determined by averaging

9    Treasury -- the price for Treasury bills in the twelve previous

10   months.

11          MR. DORSEY:  Objection, Your Honor.  We're beyond the

12   scope of qualifications.  She's now testifying about facts.

13          MR. WEISBROD:  Okay.

14          THE COURT:  Sustained.

15   Q.    Without talking about American Home then --

16   A.    Sorry.

17          MR. WEISBROD:  I'll rephrase it, Your Honor.

18   Q.    Until you've been qualified, let's limit our answers to

19   generically what you do with regard to lending.

20   A.    Sorry.

21   Q.    So what kind of information would you have to look at on

22   the internet?

23   A.    So I would look up on -- the Federal Reserve Board has a

24   website in which it provides information on the price of

25   Treasury securities every month going back to the mid-1950s.  I

115

1    would look that up.  I would take the appropriate numbers and

2    plug it into the spreadsheet, do the math, which is simply

3    adding up twelve numbers and dividing by twelve to see what the

4    average is.  And that becomes the interest -- the applicable

5    interest rate for that term in the mortgage -- in the note.

6    Q.    Do you do this kind of work for any clients other than

7    lawyers representing individual borrowers?

8    A.    No.

9    Q.    Do you any other kind of consulting for any type of

10   clients?

11   A.    No.  I work for National Consumer Law Center full time.

12   Q.    Do you do any consulting for government agencies?

13   A.    Oh, yes.  We've done extensive consulting for the FTC and

14   several attorney -- state attorneys general, state banking

15   agencies and other -- other state agencies.

16   Q.    And does that consulting also relate to mortgages?

17   A.    Quite often, yes.

18   Q.    Can you just very generally describe the kind of

19   consulting you do for governments?

20   A.    Well, I was -- recently completed consultation with the

21   FTC in which we did a -- an analysis of fifty predatory loans.

22   We did credit math on the fifty loans to determine for the FTC

23   to what extent they -- these loans had problems with them.  And

24   we provided a report.  I wrote the report.

25   Q.    In connection with your consulting work, do you ever

116

1    testify either in depositions or trial in individual cases?

2    A.    When I testify it's pursuant to expert witness work not

3    the consulting work.

4    Q.    Can you describe your expert witness work?

5    A.    I've been hired approximately fifteen times to perform an

6    analysis on loan documents and then write a report in most of

7    those cases, not all of them, and I've been deposed in most of

8    those cases.

9    Q.    Have you ever testified at a trial before?

10   A.    No.

11   Q.    Have you ever been offered as a testimonial witness at a

12   trial?

13   A.    Yes.

14   Q.    As a testimonial expert witness?

15   A.    Yes, I have.

16   Q.    And were you excluded in that case?

17   A.    Yes.

18   Q.    Could you describe the topic that you were asked to

19   testify on or topics?

20   A.    The topic for which I was hired to testify was to explain

21   the intent of Congress in passing the Homeownership Equity

22   Protection Act so as to support the claim that assignees were

23   to be more diligent when they were buying mortgage loans.

24   Q.    And as I understand it, the Court concluded that that was

25   a legal opinion?

117

1    A.    Yes.

2    Q.    Did you agree that that was a legal opinion?

3    A.    I had agreed all along and was quite concerned about that.

4    Q.    Okay.  Was there any other topic that you were proffered

5    on in that case?

6    A.    I was also proffered after the deposition to be an expert

7    on a credit math question.  And the Court excluded that

8    testimony, I believe, because there had -- the Court found

9    there had not been adequate notice about that testimony.

10   Q.    Do you do any work for banks?

11   A.    No.

12   Q.    Do you do any work for nonbank lenders?

13   A.    No.

14   Q.    NCLC publishes manuals, you said?

15   A.    Yes.

16   Q.    Do you play any role in putting together the manuals?

17   A.    Yes.  I'm co-author of one of our manuals and I have co-

18   authored several of the other manuals, one of the other manuals

19   and I contribute regularly to others of our manuals.

20   Q.    Are you involved in any other publications?

21   A.    I have written law review articles as well as other

22   publications that have been published in various media in the

23   past.

24   Q.    And do any of those involve mortgages?

25   A.    Yes.

118

1    Q.   And do any of the manuals involve mortgages?

2    A.   Yes.  The manuals are extensive about mortgages.  We have

3    a -- do you want --

4    Q.   Yes.

5    A.   -- examples?  We have a thousand page treatise on the

6    Truth and Lending Act, a thousand page manual on cost of

7    credit.  My manual is on banking and payments law.  We have a

8    manual that I contribute to regularly on foreclosures.

9    Q.   Do you have any "How to" guides?

10   A.   Yes.  Well, we have a couns -- we have some publications

11   that we have written that we don't count as manuals that are

12   more "How to" guides.  We have a counseling manual for --

13   called Foreclosure Prevention that's provided to housing

14   counselors to -- in their efforts to prevent foreclosures.

15   Q.   What is a housing counselor?

16   A.   A housing counselor is a non-lawyer, generally provided by

17   a non-profit.

18   Q.   And what does a housing counselor do?

19   A.   Counsel homeowners both before they buy the home and now

20   more often as they're trying to avoid foreclosure.

21   Q.   What is your practice regarding just generally following

22   the literature in the area of mortgage and predatory lending --

23   mortgages and predatory lending?

24   A.   I read some industry publications regularly.  But

25   generally, there are many of us at NCLC who are experts in this

1    field and we tend to pass around what's most relevant so that

2    we don't have to each read every publication.

3    Q.   Looking at it, say, by week about how frequently or how

4    many times a week do you come into --

5          MR. WEISBROD:  Let me start that question over.

6    Q.   About how many times a week would you estimate you talk to

7    consumer attorneys dealing with mortgage issues?

8    A.   I estimate that I receive phone calls from consumer

9    attorneys dealing with mortgage issues three to five times a

10   week.

11   Q.   Are you the only NCLC lawyer who fields such inquiries?

12   A.   No.  There are several of us.

13   Q.   Do you ever meet with the other NCLC attorneys to compare

14   notes?

15   A.   We have both regular meetings and ad hoc meetings where we

16   meet to decide -- to discuss new problems, to decide how to

17   deal with problems, how to -- and to figure out -- figure out

18   complicated questions.  We talk all the time.  We're a very

19   close staff.

20   Q.   Do you have experience dealing with payment-option ARM

21   issues?

22   A.   Yes.

23   Q.   What is the source of your experience on payment-option

24   ARM issues?

25   A.   I have received numerous calls from attorneys with these

120

1    cases.  I have reviewed the fi -- their files.  I have

2    discussed with them what the files reveal about the problems

3    with the loans.  I have done training and provided further

4    assistance to attorneys.  I --

5    Q.    Do you have any experience with what you might call

6    inadequate underwriting issues relating to mortgages?

7    A.    In my work as an expert witness, one of the things I'm

8    primarily called upon to do is to review all of the loan files,

9    to pull out the evidence that there was quite often, not

10   always, but quite often that had adequate underwriting

11   performed on the loan file, it would have -- this loan would

12   not have been made on those terms.

13   Q.    You know, it occurred to me that I didn't ask these

14   questions in a good sequence.  Could you explain what you mean

15   by "inadequate underwriting", what you're talking about when

16   you're talking about it from a consumer perspective?

17   A.    Well, this is not my idea of it.  I did not come up with

18   this idea.  I think the industry generally has articulated

19   inadequate underwriting to mean the failure to review the

20   information that's in the loan file that would reveal problems

21   such that -- that show that the loan should not be made on the

22   terms that it is made.  So "inadequate underwriting" is a term

23   of art that I think is generally used in the industry.

24   Q.    Do you make it a practice to follow government guidances

25   on underwriting standards?

121

A.   Yes.

Q.   Do you make it a practice to follow government comments on underwriting standards with respect to payment-option ARMs?

A.   Yes.

         MR. DORSEY:  Objection, Your Honor.  We're again beyond qualifications here.  We're talking about specific fact issues.

         THE COURT:  Well, no, I disagree.  I think he's establishing what she does that may support a finding that she's up to date on issues, etcetera, that would qualify her as an expert.  So I'll overrule the objection.

         MR. WEISBROD:  Your Honor, based on the sequence that Mr. Dorsey suggested I'm not going to get into at this time a discussion of specific aids and materials that Ms. Saunders has reviewed because I imagine that that's not necessary, as I understand it at least, to the question of whether she is generally qualified as an expert in this area.  Some judges prefer lawyers to combine the what did you review question with the general qualifications questions.  Other judges don't think you should.  I can do it either way.

         THE COURT:  Well, I think we -- well, I leave it to you.  But I think I -- well, let me back up.  I don't want to get into what she reviewed in connection with the opinions she's going to offer.  If what you're going into is what she routinely does that may qualify her as an expert, that's fine.

1    But if we're being specific to this case and the specific

2    opinions, I don't want to get into that until Mr. Dorsey has

3    had an opportunity to voir dire the witness.

4              MR. WEISBROD:  That's fine with me, Your Honor.

5              THE COURT:  All right.

6              MR. WEISBROD:  That's what I thought we were doing.

7    I've just been taken by surprise of the bad way in other cases

8    and so wanted to make sure we were all following the same

9    procedure.

10             Your Honor, Ms. Saunders, based on this testimony, is

11   qualified on, among other things, how payment-option ARMs lead

12   to losses for borrowers, theories and bases that Ms. -- well,

13   actually, let ask a few more questions.

14             THE COURT:  All right.

15   BY MR. WEISBROD:

16   **Q.   Ms. Saunders, based on the work you do, have you had**

17   **opportunity to evaluate generally, not with respect to AHM, how**

18   **payment-option ARM mortgages may lead to losses to borrowers?**

19   **A.   Yes.**

20   **Q.   And how have you gone about learning that type of**

21   **information?**

22   **A.   I have spent extensive time looking at different loan**

23   **files, evaluating the numbers, the payments, the information**

24   **that's revealed in the loan files as well as discussing the**

25   **cases with the attorneys.**

123

1    Q.    And have you followed any literature on these subjects?

2    A.    I routinely read the publications by the Federal Reserve

3    Board and other federal agencies that -- often cases relating

4    to these claims and more and more Wall Street articulations of

5    the problems with these and other mortgages.

6    Q.    Do you follow statements by ratings agencies, for example,

7    that address these issues?

8    A.    Yes.

9    Q.    In the course of your work, have you become familiar with

10   theories of liability that borrowers have asserted against loan

11   originators that issued payment-option ARMs?

12   A.    Yes.

13   Q.    How have you done that?

14   A.    Again, by speaking to the attorneys, reading the cases.

15   Q.    And reading anything else?

16   A.    Newspaper articles and publications of the industry.

17   Q.    In the course of your work, have you generally become

18   familiar with factual issues as to how borrowers become aware

19   of claims they may have against payment-option ARM originators?

20   A.    Yes.

21   Q.    How have you done that?

22   A.    Again, that's -- through talking to a lot of attorneys

23   over the course of several years, one begins to see rhythms.

24   Also, speaking to my colleagues who are also doing the same

25   thing, we coalesce our information and try to ascertain what's

124

1    going on around the country.

2    Q.    And the last three questions I asked you were all specific

3    to payment-option ARMs.  When did payment-option ARMs become

4    popular in the United States?

5    A.    My understanding is they first came out in the mid-2000 --

6    around 2005 and bloomed 2006, 2007.

7    Q.    Before 2005 and 2006, were you familiar with theories of

8    liability that borrowers had asserted against other -- with

9    respect to other types of loans against lenders?

10   A.    Yes.

11   Q.    And from the same types of sources you've described?

12   A.    Yes.

13   Q.    Okay.  Are you generally aware of resolutions of claims by

14   borrowers against lenders with respect to payment-option ARMs?

15   A.    Yes.

16   Q.    How have you become aware of those resolutions?

17   A.    Through discussions with these same attorneys.  And I

18   should have said before, my knowledge also is based on -- and

19   the publications of the National Consumer Law Center.  To the

20   ex -- to the extent that I am not the author, I generally read

21   what others have written.

22   Q.    Are you ever made aware of confidential settlements?

23   A.    Yes.

24   Q.    How does that come to pass that you've become aware of

25   confidential settlements?

125

A.   Well, specifically, the attorneys with whom I'm working

tell me what's happened in general terms and then they can't

tell -- and then they say but we can't give you the specifics

because they're confidential.

Q.   Is there any geographic limitation to the types of

attorneys or loans that you've become familiar with on these

various issues?

A.   Only that I don't help anybody outside the United States.

          MR. WEISBROD:  Your Honor, with that, I suggest that

Ms. Saunders is qualified on the issues we've discussed.

          THE COURT:  Okay.  Mr. Dorsey, voir dire the witness?

VOIR DIRE EXAMINATION

BY MR. DORSEY:

Q.   Ms. Saunders, when you took the stand, you brought a

number of papers with you.  What were those papers that you

took with you?

A.   I brought with me my report and it has at the back my

resume in case you were to ask me some dates that I didn't

remember.  I also have two spreadsheets that I think we were

going to discuss.

Q.   Do you have any notes or writing on any of the -- of your

resume or the report that you prepared?

A.   I have some small notes about what different cases held or

different ones of the publications that I had based the report

on simply because I use so many that I wasn't sure I could

1    recall each one easily.

2            MR. DORSEY:  If the witness is allowed to testify,

3    Your Honor, I would ask to see a copy of what she has with her.

4            THE COURT:  Okay.

5            MR. WEISBROD:  No objection.

6    Q.   Ms. Saunders, your counsel -- or counsel for the

7    borrowers' committee has indicated that one of the things that

8    you're going to give expert opinion about is how these

9    particular payment-option ARMs work, is that correct?

10   A.   Yes.

11   Q.   And that is based upon your experience with having

12   reviewing a number of these documents, correct?

13   A.   Yes.

14   Q.   That is something that is based on your experience as a

15   lawyer, correct?

16   A.   That my job at the National Consumer Law Center is as an

17   attorney.  And in that job, I do those reviews.

18   Q.   And lawyers in this country regularly interpret documents,

19   don't they?

20   A.   Yes.  I know one expert who's not a lawyer who does this

21   work quite well.

22   Q.   And when you've looked at that document to determine how

23   it works, you're just reading the words on the page and based

24   on your understanding of the law, you can then put together how

25   that particular payment-option ARM works, correct?

127

A.   No, sir.  It's really an application of the wording of the
document to the numbers.  It's nothing -- it rarely has
anything to do with the law.

Q.   So you're only looking -- when you look at these documents
to determine how they work, you're only looking at the numbers
as to when the payment-option ARM is going to reset, is that
correct?

A.   I'm -- I do several things.  I'm not sure which you're
asking about, I'm sorry.  When I -- one of the things that we
do is an analysis of the numbers in the document.  We've come
up with a spreadsheet that would -- that will show us whether
or not the truth and lending disclosures are correct.  That is
a legal analysis.  We also come up with an analysis of whether
or not the recast period -- or what the recast period will be,
when the payments will be -- will go up.

Q.   And just so the Court understands, when you say "recast"
under a payment-option ARM, if, for example, a person makes
only the minimum payment, they're not paying the entire
interest which is going to be added to the principal amount of
the loan.  And therefore, at some point, that loan is going to
reset and is going to become a regular thirty-year fixed rate
mortgage, correct?

A.   Well, that's sort of correct.  It actually never becomes a
regular thirty-year fixed rate mortgage.  Do you want me to
explain how --

1    Q.    The payments that have to be made is if it was, correct?

2    A.    Well, as of when the payments recast, then they are --

3    they are, by definition, amortizing for the rest of the term,

4    which is generally not thirty years.  It's twenty-six --

5    twenty-five, twenty-six or twenty-seven.  But those payments do

6    change because the interest rate changes.  So it -- it's never

7    like a thirty-year fixed rate mortgage.

8    Q.    And you testified that a lot of your experience comes from

9    having conversations with consumer attorneys on a regular

10    basis, correct?

11    A.    Yes.

12    Q.    And you said that was three to five times a week where you

13    talk to consumer attorneys about mortgages?

14    A.    On average, yes.

15    Q.    And when you're talking to those attorneys, are you

16    providing them legal advice about how to represent their

17    clients?

18    A.    Sometimes, yes.

19    Q.    What else do you talk to them about other than legal

20    advice?

21    A.    Well, I do this numerical analysis which is not really

22    legal.

23    Q.    And you do that for them over the phone or do you do that

24    in writing?  How do you do that?

25    A.    Sometimes I do it for them over the phone.  Sometimes I

129

1    explain to them how to do it.

2    Q.    You also indicated that you have reviewed a number of

3    files on behalf of attorneys, is that right?

4    A.    Yes.

5    Q.    How many files have you reviewed?

6    A.    In what time period?

7    Q.    Well, let's limit it to payment-option ARM files.    How

8    many of those have you reviewed at any time in your career?

9    A.    Full files that I have reviewed, I would say two to three

10   dozen.    I've probably looked at or spoken to attorneys about

11   fifty or sixty.    And two to three dozen, when I say full files,

12   I mean, looking at the note and discussing the note and the

13   truth and lending disclosures with the attorney.

14   Q.    And how many different lenders were represented by those

15   twenty-four to thirty-six loan files?

16   A.    I really can't be sure.    Perhaps eight or nine?    Ten?

17   Q.    Were any of those American Home Mortgages?

18   A.    Prior -- prior to this --

19   Q.    Prior to this --

20   A.    Prior to my involvement in this case?    No, not that I

21   recall.

22   Q.    You mentioned that you write manuals or co-author manuals

23   on behalf of the NCLC, correct?

24   A.    Yes.

25   Q.    And those are -- I was trying to write them down as you

130

1    were saying them but I couldn't get them all down.  But they

2    all relate to legal issues, correct?

3    A.    Yes.

4    Q.    And you testified on direct that your basis for

5    determining how borrowers become aware of claims is by this

6    talking to attorneys over the years, is that right?

7    A.    Yes, sir.

8    Q.    Does it relate to reviewing these files as well?

9    A.    Well, I think the basis is simply by noting when the

10   clients tend to most often come to see an attorney.  It's just

11   -- I can tell you from my experience what situations clients

12   tend to be in when they walk into a Legal Aid or a private

13   attorney's office.  It's --

14   Q.    So when you talk -- I'm sorry.

15   A.    It's not the -- I'm sorry.

16   Q.    I didn't mean to cut you off.  Go ahead.

17   A.    It's not the review of the cl -- of the files themselves

18   that gives us this information.  It's the context of the case.

19   Q.    So it's just the conversation you have with the attorney

20   about when their client came to them with their situation?

21   A.    Well, it's the whole situation that the case presents.

22   Q.    How many of the cases that you've had conversations with

23   attorneys did they say that the client didn't come to them

24   until their mortgage notes had reset?

25   A.    Not many payment-option ARM loans have reset to date.  So

131

1    most of the payment-option ARM loans that I have seen are

2    problems that have resulted from the payments before the

3    recast.  But we know from the literature that we have only seen

4    the type of -- the tip of the iceberg.  I know from my

5    experience with other loans that most borrowers come in to see

6    lawyers only when they're facing foreclosure.  We just don't

7    see too many -- across the spectrum of the clients that walk

8    into Legal Aid and private attorneys' offices, a smaller

9    perc -- a small percentage of them come in because they're

10   concerned about their mortgage.  The vast majority of them come

11   in because they're facing something devastating like the loss

12   of their home.

13   Q.   But limiting it to the payment-option ARMs, you testified

14   just now that in those situations, it is usually the consumer

15   has figured out there's a problem with the payment before the

16   loan actually resets, right?

17   A.   Yes.  On some of -- yes.  Those are the clients that we've

18   seen so far mostly.

19   Q.   And that would be similar to Ms. Graves who testified

20   earlier.  You were in the courtroom when she testified, right?

21   A.   Yes, sir.

22   Q.   And she testified basically that she figured it out pretty

23   quickly that she had a problem with this mortgage and contacted

24   an attorney, correct?

25   A.   I did not say that.  I'm -- I'm just -- I'm not sure.  She

1    probably did but I did not hear that.  May I add something?

2    Q.    Sure.

3    A.    Just that the literature about these loans is full of the

4    anticipation of exploding problems.  So I am not alone when I

5    say we are anticipating many more problems that will result

6    from these loans.  This is not just Margo speaking.  It's

7    fairly routine analysis by Moodys and Goldman Sachs and others

8    who are looking at the potential losses that will result.

9    Q.    And that based on the fact that these payment-option ARMs

10    haven't actually reset yet so they don't anticipate seeing

11    these filings until sometime into the future, correct?

12    A.    That's right.

13          MR. DORSEY:  I don't have anything else, Your Honor.

14    I would renew my motion but the UCC's counsel may have some

15    questions before I do that.

16          THE COURT:  Any questions by the attorney?  Actually,

17    if you have questions, let's take a -- if we may, take a short

18    recess before we hear from the committee.  All right.  During

19    our break, ma'am, you cannot discuss the substance of your

20    testimony with borrowers' committee's counsel, all right?

21      (Recess from 2:45 until 3:03 PM)

22          THE CLERK:  All rise.

23          THE COURT:  Please be seated.  Thank you for the

24    recess.  You may proceed.

25          MR. SCHNITZER:  Your Honor, I just have some brief

133

1    follow-up.

2              THE COURT:  Very good.

3    VOIR DIRE EXAMINATION

4    BY MR. SCHNITZER:

5    Q.    Ed Schnitzer for the creditors' committee.  Ms. Saunders,

6    have you performed any statistical analysis on borrower's

7    claims in general?

8    A.    I'm sorry.  I don't understand what you mean.

9    Q.    With respect to -- I believe your testimony about dealing

10   with borrowers in general, have you performed any statistical

11   analysis or mathematical analysis as to borrowers' claims in

12   general?

13   A.    The borrowers' in this case?

14   Q.    No, in general.  Borrowers, I believe you testified, in

15   the U.S.

16   A.    Statistical analysis in a particular individual loan or

17   borrowers across the board?

18   Q.    Borrowers across the board.

19   A.    No, I don't think I have.  I'm not a statistician.

20   Q.    Have you performed any sort of analysis with regard to

21   specifically power-option ARM loans?

22   A.    I'm sorry.  I don't understand.  Other than what I've

23   testified to before?

24   Q.    Correct.  And again, I mean, across the board.  Like, have

25   you looked at power-option ARMs in general across the U.S. and

134

1   performed any sort of analysis as to claims that those

2   generate?

3            MR. WEISBROD:  I object to the form.

4            THE COURT:  Overruled.

5   A.   I have not performed a statistical analysis.  I have not

6   performed a -- an analysis of -- other than what I've tried to

7   articulated here, I have looked at many payment-option ARMs and

8   have provided assistance to attorneys in relation to those

9   loans that I was looking at.  I have not -- I'm sorry.  I don't

10  understand what else you're asking for.

11  Q.   That's fine.  Have you performed any sort of analysis on

12  borrowers in general in terms of when borrowers file claims

13  with respect to power-option ARM loans?

14  A.   Have I perf -- I have not performed a statistical

15  analysis.  I have provided in my report and -- a description of

16  when I believe that is most likely to occur based on my

17  experience as an attorney with consumers and as an attorney

18  consulting with other attorneys who consult -- who see

19  consumers in crisis.

20  Q.   Is it fair to say that that's not based upon a

21  mathematical analysis?

22  A.   Yes.

23  Q.   It's just based upon your experience.

24  A.   Yes, that's correct.

25  Q.   Now, I believe before you've testified as to your belief

135

1    **of when power-option loans in general are going to recast.**

2    **Have you performed any sort of mathematical analysis as to when**

3    **these recasts will happen?**

4    **A.    No, but I have read the literature that -- about those**

5    **questions.  I just -- there's new -- number of industry**

6    **publications on that question.  And I have read those.**

7              MR. SCHNITZER:  Nothing further, Your Honor.

8              THE COURT:  Thank you.  Any redirect on voir dire?

9              MR. WEISBROD:  No, Your Honor.

10             THE COURT:  Okay.  Mr. Dorsey?

11             MR. DORSEY:  Your Honor, I would renew the debtors'

12   motion to exclude this witness as a testifying expert.  The

13   Supreme Court in Daubert made it very clear that trial courts

14   are to preclude the testimony of persons offered as experts

15   when they don't meet the qualifications.  And I don't think --

16   one, I would renew the motion based on her purported testimony

17   that she's going to provide with the four issues, how the loans

18   work, the legal issues, the types of claims asserted, legal

19   analysis, how most become aware of their claims.  She has no --

20   other than her conversations with some other plaintiffs'

21   lawyers, she has no basis in fact.  There simply is no

22   methodology here whatsoever, Your Honor, which is required for

23   an expert witness to testify.  Her testimony is based on

24   insufficient fact.  It's not based on any methodology

25   whatsoever.  And there's no attempt to fit the methodology to

1    this case.  Her expertise --

2         THE COURT:  Well, wait a minute.  If I had a case

3    about injury resulting from someone incorrectly cutting down a

4    tree and someone getting injured, and somebody brought in a

5    thirty-year experienced lumberjack to testify to me about

6    what's the right way to cut down a tree, that's an expert.  And

7    I don't need to have performed a statistical analysis of how to

8    cut down trees or who gets hurt which way.  He knows because

9    he's been in the business for thirty years of cutting down

10   trees.  And the witness here isn't a lumberjack but isn't it

11   possible to say -- you know, she can testify with some

12   authority as an expert based on -- I don't want to do the math

13   wrong -- oh, thirty years, thirty years experience as a

14   consumer lawyer with a number of good bit of experience in

15   consumer law to tell me not what the law is but to give an

16   opinion as to the sort of things she's working -- it'd be like

17   if I had Mr. Beach on -- to testify as to how the proof of

18   claims process works.

19        MR. DORSEY:  I think that would be inappropriate,

20   too, Your Honor.  No offense to Mr. Beach.

21        THE COURT:  I'll have Mr. Growe (ph.) testify.  He's

22   much more aware of it.  I don't know.  Certainly, if he was

23   going to get up there and testify to me about what the -- who

24   has the burden of proof, where the presumption arises.  But if

25   it's simply this is how we prepare omnibus objections, this is

1   how we serve omnibus objections and these are the type of

2   responses we get to omnibus objections, you don't think that

3   would be proper expert testimony?

4          MR. DORSEY:  I do not, Your Honor.  I mean, that

5   would be -- going back to your analogy of the lumberjack.  That

6   requires some scientific understanding of how a tree will fall.

7   And based on that lumberjack's experience in cutting down trees

8   over thirty years, he can give you -- he can tell you how

9   scientifically, the way you cut the tree is going to determine

10  the direction that tree is going to fall.  That's entirely

11  different than a lawyer testifying about how a process works,

12  what a document says, a contract -- a legal interpretation of a

13  contract is a legal question.  It's not a question based on

14  scientific knowledge.  It's based on legal interpretation.  The

15  same goes for the types of claims that might be asserted.  If

16  they're asserted, they're asserted.  They're in the tort

17  system.  It's something that can be looked up by any lawyer.

18  You don't need to be a consumer lawyer for thirty years to go

19  look and see what kinds of cases, what kinds of claims have

20  been asserted against lenders and brokers and whatever.

21         THE COURT:  Well, it's one thing for me to say look,

22  to judge the merits of a TILA claim is a legal question for the

23  Court.  To know how many TILA claims have been filed, that's

24  not a legal question.  There's no way for me to know that.  I

25  mean, I can look up case law and tell you how the claims come

138

1   out.  I can look at statutes and tell you what the criteria

2   are.  But I don't know how many of them filed.  I don't know

3   when they're filed.

4        Until they work their way through the legal system

5   and actually produce some law, I'm not in a position -- I mean,

6   I guess Westlaw lets me look at complaints and a lot more

7   documents than it used to.  That assumes I know how to use

8   that.  But that's different from knowing just to say look,

9   these are -- I'm aware of -- generally speaking, I'm aware that

10  payment option ARM plaintiffs raise the following four causes

11  of action.  Isn't that helpful to the Court?

12        MR. DORSEY:  It may be, Your Honor.  But I don't

13  think this witness is qualified to testify about that, because

14  she's -- her only qualification is conversations with other

15  plaintiffs' lawyers who have told her what their claims are

16  based on confidential settlement agreements that she can't even

17  testify about.

18        THE COURT:  Well, that's outcome, that's a second

19  issue.  That's how they've been -- what the outcome is as

20  opposed to what they've asserted.

21        MR. DORSEY:  And she hasn't shown any expertise to be

22  able to say how many TILA violations are filed in the United

23  States on a yearly basis.  You could bring in an expert to do

24  that.  You could bring in a statistician who could look at case

25  filings.  You could do a proper research of that issue and

1    determine how many TILA violations have been filed in the

2    United States in the past five years and how many of those are

3    related to payment option ARMs.  She didn't do that.  She's

4    relying completely on anecdotal evidence.  And it's not a

5    complete anecdotal evidence.  It's only her conversations with

6    plaintiffs' lawyers.  She hasn't even talked to defense lawyers

7    to say how many got kicked out, how many got dismissed on a

8    motion to dismiss.  It's completely unhelpful to the Court.

9              THE COURT:  Okay --

10             MR. DORSEY:  That's all I have, Your Honor.

11             THE COURT:  -- all right.  Thank you.  Committee?

12   Mr. Schnitzer?

13             MR. SCHNITZER:  Your Honor, we rely on Mr. Dorsey.

14             THE COURT:  All right.  Very good.  Response?

15             MR. WEISBROD:  Your Honor, I was not going to use the

16   example of lumberjack, I was going to use the example of a

17   police gang expert, because that's the one in the case we

18   cited.  But it's the same point.  Mr. Dorsey's quarrel is

19   really not with Ms. Saunders it's with the Supreme Court and

20   other courts' rulings that say you can have nonstatistical

21   experts.  And the answer is you can.  And you can qualify them

22   based on years of experience, and we now have.

23             The rest of Mr. Dorsey's points go to the weight of

24   the testimony, and we believe it will be persuasive.  But at

25   the end of the day, there's no question that Ms. Saunders,

140

1   compared to many of the cases that have been put before the

2   Court, is eminently qualified to testify.  Although she is a

3   lawyer, she's not testifying as to legal opinions, she's

4   testifying to things she knows, having dealt with plaintiffs

5   and their lawyers for three decades.

6          THE COURT:  All right.  Well, I'm going to overrule

7   and grant the motion, each in part.  I find that Ms. Saunders

8   is qualified as an expert to testify on how payment option ARM

9   loans work, what types of claims borrowers assert or may assert

10  in the future in connection with payment option ARMs, and how

11  and when borrowers generally become aware of potential claims

12  they may be able to assert.

13         I am not going to allow her to testify on

14  illustrations or discussions of successful resolutions of those

15  claims.  I do not find that she is sufficiently directly

16  involved or has done sufficient work in the area or has

17  sufficient experience in that specific issue of the area to

18  qualify as an expert on those points.  I think, frankly, she'd

19  simply be passing on anecdotal hearsay as opposed to being able

20  to provide any analysis.  So for the three categories

21  enumerated, I will qualify her as an expert and allow you to

22  elicit testimony on those issues.

23         MR. WEISBROD:  Thank you, Your Honor.  May I have a

24  moment to confer with my colleagues?

25         THE COURT:  Yes.

141

1    (Pause)

2         MR. WEISBROD:  Your Honor, I completely understand

3    the ruling and intend to abide by it.  I just wanted to let

4    Your Honor know what we're doing as to one point, and inquire

5    about how that fits in.  As I mentioned at the beginning, we

6    were not going to talk about the details of any settlements

7    other than Countrywide, which is publically available.  I would

8    like to ask Ms. Saunders about that.  The actual settlement

9    term sheet was published on the Connecticut Attorney General's

10   website, and Ms. Saunders has seen that.  And I would like

11   permission to ask about that.

12        MR. DORSEY:  I would object to that, Your Honor.  I

13   think it's the same thing --

14        THE COURT:  Right.

15        MR. DORSEY:  -- it's giving an example of a case.

16        THE COURT:  Overruled -- or sustained.  I'll sustain

17   the objection.  If you've got it, give it to me.  I'll look at

18   it.

19        MR. WEISBROD:  Very well, then.  Thank you.

20        THE COURT:  I don't need her to explain what's on a

21   piece of paper.

22        MR. WEISBROD:  We will do that.  Thank you.

23        THE COURT:  Before you start.  I understand there was

24   some issue with the exhibits yesterday?

25        MR. WEISBROD:  No, there's no issue with the

142

1    exhibits.  There's an issue with our exhibit list.  We have an

2    incomplete list of our own exhibits, so that I was asking the

3    court reporter if she had a list of our own exhibits so that

4    when it came time to move exhibits into evidence, we could

5    state what each was.

6              THE COURT:  Oh, no.  I don't keep that.  But they

7    should all be up there.

8              MR. WEISBROD:  Okay.

9              THE COURT:  So at an appropriate time, you can check

10   them out.

11             MR. WEISBROD:  Thank you.  That was the only issue.

12             THE COURT:  All right.

13             MR. WEISBROD:  And we'll --

14             MR. DORSEY:  If not, Your Honor, I have copies of all

15   of them.

16             MR. WEISBROD:  Thank you.  And then we, of course,

17   are going to redact the Gracie Graves.

18             THE COURT:  Yes, virtually all of those exhibits need

19   to be redacted.  And that would include bank account numbers,

20   Social Security, anything that could be used for identity

21   theft.

22             MR. WEISBROD:  Yes, sir.

23   DIRECT EXAMINATION BY

24   MR. WEISBROD:

25   **Q.   Ms. Saunders, could you please explain what a payment**

143

1    option ARM is, focusing on each of the following categories:

2    the payment requirements, the interest, principal, and the

3    terms or rules in the contract under which the payments are

4    calculated?  Let's start with payments.  How do payments work

5    under a payment option ARM?

6    A.    What makes a payment option ARM loan different than most

7    other mortgage loans is that all of those terms, the payment,

8    the interest rate, the principal and the terms, are not

9    directly connected with each other throughout the term of the

10   loan.  And that's what makes them confusing.  The payments

11   themselves are set based on an initial teaser rate that may

12   last anywhere from a day to a month.  And then the payments

13   generally are increased by seven and a half percent per year

14   until the recast date, which is not determined based on

15   anything other than what's happened to the interest and the

16   principal.  And that the recast date is at the latest five

17   years after origination.  It can fall sooner than that.

18   Q.    Does the payment initially fluctuate from month to month?

19   A.    The payment stays the same for a year, and after one year,

20   it increases by seven and a half percent.  After the second

21   year, it increases by seven and a half percent, until the

22   recast date.  When it recasts, the servicer looks to see the

23   remaining term on the loan.  So if the original loan was thirty

24   years, the servicer deducts the number of years -- the months

25   that have passed, and then amortizes the remaining amount due

1    over the remaining term of the loan.

2    Q.   Could you explain what the term amortizes means?

3    A.   The term amortizes means that a loan has a reduction of

4    principal over the term based on a formula that uses the

5    original term, the principal amount of the loan and the

6    applicable interest rate as well as a regularly scheduled

7    payment.  So that when a loan is reamortized, that formula is

8    reapplied every time there's a reamortization.

9    Q.   So the schedule at which the principal will be reduced

10   over time is changed.  Is that what reamortized means?

11   A.   Yes.  In payment option ARM we have payments and we have

12   an interest rate that's applicable.  The interest rate has

13   nothing to do with the payments until after the recast date.

14   The interest rate is based on an index, generally, a monthly

15   Treasury average of twelve months of the yearly Treasury

16   security previous to the date of origination.  Those twelve

17   monthly prices are averaged and that results in a particular

18   number which is then added to the margin.  And those two

19   numbers produce the applicable interest rate.  In a payment

20   option ARM, that interest rate is recalculated every single

21   month.

22           THE COURT:  So it's an adjustable rate that

23   recalculates every month?

24           THE WITNESS:  Based on the previous twelve months --

25   an average of the previous twelve months.

1          THE COURT:  Plus the margin?

2          THE WITNESS:  Plus the margin, yes.

3    Q.    Now --

4    A.    I'm not sure I had answered your question.  I was trying

5    to build up to it --

6    Q.    Go ahead.

7    A.    -- but you --

8    Q.    Finish answering.

9    A.    So you have the payments and then you have the interest

10   rate and then you have the principal.  In an ordinary loan,

11   which is even an ordinary adjustable rate loan, the principal

12   starts at a number and the payments reduce the principal at a

13   regular pace designed so that at the end of the term, there

14   will be nothing left owed, and only the payments -- the

15   regularly scheduled payments will have been made in the same

16   amount throughout the term.

17        On a payment option ARM, because the minimum payments do

18   not cover the interest, the principal climbs.  So we have

19   payments that are made for up to five years that do not cover

20   the interest.  The principal goes up at an irregular rate every

21   month until the recast.

22        THE COURT:  So the unpaid interest is capitalized?

23        THE WITNESS:  Right, for up to five years.

24   Q.    What does the phrase negative amortization refer to?

25   A.    It means that the payments do not cover the interest, so

146

1    the unpaid interest goes into the principal.  It's negatively

2    amortizing rather than positively amortizing.

3    Q.   Now, the payment option ARM has the word option in it.

4    Can you explain the options?

5    A.   Well, purportedly, these loans are -- provide the borrower

6    to make a number of different payments.  And on the servicer's

7    statements there are traditionally three options that are

8    outlined:  the minimum payment, which as I've described, has

9    nothing to do with the amount needed to amortize the loan or

10   even doesn't even have anything to do with the amount of

11   interest that was charged the previous month.  So the minimum

12   payment is one option.  The interest only is generally another

13   option.  And the fully amortizing payment is a third option.

14   In some loans, there is also another option offered based on a

15   fully amortizing payment at a reduced term, fifteen years, for

16   example.

17        The option -- the idea is that the homeowner has the

18   option of making any one of these payments.  It's really not

19   much of an option, because in most conventional loans -- in

20   almost all conventional loans, the homeowner always has the

21   option of paying more.

22   Q.   Is there any relationship between -- can you explain

23   again, if you haven't, what a teaser rate is?

24   A.   A teaser rate is a rate offered -- provided on a mortgage

25   loan which is different than the rate that will apply after the

1    teaser is done.  So on a loan just as I've described, the

2    contract requires that the interest be calculated based on an

3    index plus a margin.  A teaser rate will be something less than

4    that index plus a margin, and will only last for a certain

5    amount of time.

6    Q.   How short can the teaser rate be?

7    A.   I think I've seen one loan that it really only applies one

8    day.  It's generally in payment option ARMs, a month.

9    Q.   How can a borrower figure out how long the borrower has to

10   pay the minimum payment?

11   A.   Well, the borrower -- nobody can really figure that out,

12   not even a very sophisticated person can figure out how long

13   the minimum payment is going to be available when the loan is

14   made, because it's entirely based on not only what payments are

15   made, but also what the interest rate will be in the future.

16   The Truth in Lending Disclosure provides some information based

17   on how long -- that shows how long the minimum payment can be

18   made.  But even that information is dependent on the assumption

19   that the interest rate will not change.

20   Q.   What interest rate is typically put on the so-called TILA

21   disclosure form for a payment option ARM?

22   A.   The TILA disclosure form requires what's called a

23   composite interest rate which is derived by combining all the

24   actual -- by combining the interest rate that's charged for the

25   teaser period and the interest rate that will be charged

148

1    throughout the rest of the loan, assuming the adjustable rate

2    never adjusts.  Assuming that the index remains exactly what it

3    is on the day the loan is made.

4    Q.    Did you say a combination of those two rates?

5    A.    The word I used was a composite rate.  That's the --

6    Q.    And what is a composite rate?

7    A.    It's a combination of all of the actual rates that will

8    apply to the loan based on what the index is at the time the

9    loan is made.  So in a payment option ARM loan, you have the

10   application of several different interest rates.  You have the

11   teaser rate that applies for up to one month, and then you have

12   what we call the fully -- what is called in the industry, the

13   fully indexed rate, which is the index as determined when the

14   loan is originated, plus the margin.  And that is applied to

15   the loan differently based on the terms of the loan.  So the

16   composite rate is a combination of all of these different

17   calculations.

18   Q.    And on the typical TILA, does each interest rate get shown

19   or is there some single rate that is a composite of all of

20   them?

21   A.    On a typical TILA there's only one interest rate that's

22   shown and it's referred to as the annual percentage rate or APR

23   and described as the rate -- interest rate -- it's described as

24   the rate -- may I refer to my materials?  It's described as the

25   rate that applies to your -- to the principal of your loan on a

149

1    yearly basis.

2    Q.    Now, have you ever heard -- well let me ask you this.

3    Have you become familiar in the course of your work with

4    approaches to underwriting payment option ARMs that lenders

5    employ?

6    A.    Yes.

7    Q.    And in particular, have you become familiar with standards

8    employed by lenders in qualifying borrowers for payment option

9    ARMs?

10    A.    Yes.

11    Q.    Could you explain different alternative borrower

12    qualification approaches that lenders can employ with respect

13    to payment option ARMs?

14            MR. DORSEY:  Objection.  Lack of foundation.

15            MR. WEISBROD:  It's the same foundation.

16            MR. DORSEY:  All she said was yes in response to his

17    leading questions about whether she's familiar.  She hasn't

18    established how she's familiar with it.

19            THE COURT:  Sustained.

20    Q.    How have you become familiar with different underwriting

21    possibilities that lenders may employ in qualifying borrowers?

22    A.    I've looked at extensive loan files.  I've read literature

23    about the underwriting criteria.  I've read extensive

24    discussions and guidances issued by federal agencies as well as

25    law review and other academic discussions on problems evident

150

1    in various underwriting criteria, including as recently --

2    including Moody's and Standard & Poor's and other industry

3    commentators.

4    Q.   With respect to the loan files, do you ever see

5    underwriting related documents in the loan files?

6    A.   Yes.  I quite often see the lender's loan file which

7    includes the lender's underwriting criteria and the lender's

8    own underwriting evaluation and results.  I also often see

9    lenders' manuals and their standards as applicable to loan

10   underwriting.

11   Q.   Have you became familiar with the term stated income?

12   A.   Yes.

13   Q.   What is that?

14   A.   It's a word -- it's a term that applies to a type of

15   underwriting where you simply write down -- where the

16   originator simply writes down what the homeowner has as income,

17   and there's no verification of the income at all.

18   Q.   When you look at a loan file, including any lender

19   documents in it, are you able to see the income on which the

20   lender deemed the borrower qualified?

21   A.   In many -- in most loan files that I've looked at, even

22   those which are limited doc or no doc, otherwise known as

23   stated income loans, there is almost always a requirement that

24   the source of the income be proven, so that even when there's a

25   stated income loan, the underwriting requires that the

1    homeowner show where they get the income from.  So the stated

2    income loan might say X amount of income, but the underwriter

3    file itself will reveal the exact amount of income because the

4    source of income has been used to prove -- because there has

5    been some document submitted to show source of income, and that

6    document often shows the amount of income.

7        And the underwriting problem comes in that these two

8    numbers are never meshed.  And if in a review of the files it

9    becomes evident that had anyone actually looked at the file,

10   the amount of stated income would not have been substantiated,

11   that actually the income was much less.

12   Q.   Let's look at our first document, because I think this may

13   be clearer in context.

14       (Pause)

15   Q.   I'm showing you what has been marked as OBC Exhibit 21.

16   It is a prospectus supplement dated August 29, 2006 to a

17   prospectus dated April 21, 2006.  It's issued by American Home

18   Mortgage Assets Trust 2006-04.  And I believe it says on here

19   somewhere that it was filed with the SEC.  I'd like you to look

20   at the page Bates numbered OBC-00784.  And I'd like you to look

21   at the first full paragraph on that page.

22              THE COURT:  What page?  I'm sorry?

23              MR. WEISBROD:  It's Bates numbered OBC-00784.

24              THE COURT:  784.

25   A.   Yes, sir.

152

Q.   And normally I would read, but what I would like you to do
is read that paragraph and explain the paragraph beginning,
"The primary considerations in underwriting a mortgage."

A.   "The primary considerations in underwriting a mortgage
loan are the mortgagor's employment stability and whether the
mortgagor has sufficient monthly income available:  1) to meet
the mortgagor's monthly obligation on the proposed mortgage
loan (generally determined on the basis of the monthly payments
due in the year of origination) and other expenses related to
the home (including property taxes and hazard insurance); and
2) to meet monthly housing expenses and other financial
obligations and monthly living expenses.  However, the loan to
value ratio of the mortgage loan is another critical factor.
In addition, a mortgagor's credit history and repayment ability
as well as the type and use of the mortgaged property are also
considerations."

Q.   Okay.  Now, what is the significance of referring to the
borrower's ability to pay based on the first year after
origination?

A.   Well, as I've explained, in payment option ARMs the
monthly payments go up considerably.  The second year, they're
seven and a half percent above the first year's.  The third
year they're fifteen percent above the first year's.  And in
the fourth or fifth year, they can often be two or three times
what they were in the first years.  So this indicates that

153

1    there's an underwriting only of the mortgagor's -- the

2    homeowner's ability to make the first year's payment, which may

3    indicate a serious problem with the homeowner's ability to make

4    payments after the first year.

5    Q.   Could you please look at OBC-00885?

6         THE COURT:  885?

7         MR. WEISBROD:  Yes.

8    Q.   Could you, again, Ms. Saunders, review and read aloud the

9    paragraph, "With respect to some mortgage loans"?

10   A.   "With respect to some mortgage loans in a mortgage pool,

11   the mortgage rate at origination may be below the rate that

12   would result if the index and margin relating thereto were

13   applied at origination.  Under the applicable underwriting

14   standards, the mortgagor, under each mortgage loan generally

15   will be qualified or the mortgage loan otherwise approved on

16   the basis of the mortgage rate in effect at origination."

17        MR. DORSEY:  I'm sorry, Your Honor, I did not get

18   that page where we're reading from?

19        THE COURT:  885.

20   A.   "The repayment of the," -- should I go on?

21   Q.   Yes, please.

22        THE COURT:  Give Mr. Dorsey a moment.

23        THE WITNESS:  Sorry.

24        MR. WEISBROD:  OBC-885 is the Bates number.

25        THE COURT:  All right.  You may proceed.

154

1   A.    "The repayment of the mortgage loan may thus be dependent

2   on the ability of the mortgagor to make larger level monthly

3   payments following the adjustment of the mortgage rate.  In

4   addition, the periodic increase in the amount paid by the

5   mortgagor of a buy-down mortgage loan during or at the end of

6   the applicable buy-down period may create a greater financial

7   burden for the mortgagor, who may not have otherwise qualified

8   for a mortgage under applicable underwriting guidelines and may

9   accordingly increase the risk of default with respect to the

10  related mortgage loan."

11  Q.    This is a document that relates to a trust of mortgages.

12  What is it disclosing here regarding -- what is the

13  significance of the disclosure regarding the underwriting

14  practices here?

15          MR. DORSEY:  Objection, Your Honor.  One, he just

16  testified as to what this document is, not the witness.  I

17  don't think that's appropriate.  Number two, this is beyond the

18  scope of the three opinions that the Court allowed this witness

19  to testify about.

20          THE COURT:  How is this in line with the three

21  opinions we discussed?

22          MR. WEISBROD:  This relates to opinion one and

23  opinion two, Your Honor, in that -- and ultimately it may

24  relate to three as well.  It relates to opinion one because it

25  explains how the underwriting of payment option ARMs can lead

1     to defaults.  It then will tie into opinion two because

2     Ms. Saunders is going to testify about borrower claims based on

3     faulty underwriting.  And it may also bear on opinion three,

4     because it may bear on the timing that AHM borrowers assert

5     claims under.

6            THE COURT:  All right.  Well, I'll allow the line of

7     inquiry, but maybe you could lay a foundation --

8            MR. DORSEY:  Your Honor --

9            THE COURT:  -- for the next question.

10           MR. DORSEY:  -- I'm going to renew my objection.

11    There was no understanding that she was giving opinions about

12    underwriting standards and how they applied.  That was not one

13    of the ones that was disclosed in the report.  It was nothing

14    that I had the opportunity to depose her about.  It was not

15    discussed this morning.  It's completely outside the scope of

16    what this witness was proffered for.

17           MR. WEISBROD:  I have to disagree, Your Honor.  This

18    very document was cited in the report.  This was described in

19    the report and in the pleading that I filed in opposition to

20    the motion in limine summarizing the opinions we actually

21    intended to elicit, and noting that underwriting practices and

22    claims based thereon would be a point under the categories.

23    And the categories were done in bullets and sub-bullets

24    corresponding exactly to the categories that I've just laid out

25    for the Court.

1          MR. DORSEY:  I disagree, Your Honor.  I think I've

2     been sandbagged, but I've made my objection.  And if we have

3     to, we'll take it up later.

4          THE COURT:  All right.  I'll allow the testimony and

5     overrule the objection and ask you to lay a foundation for the

6     question you had previously asked.  So I'll sustain that

7     objection as to, in effect, lack of foundation.

8     BY MR. WEISBROD:

9     Q.   Okay.  Let's go about it this way.  Do you have any

10    sources of information about AHM's underwriting practices?

11    A.   My sources of information are this prospectus and

12    specifically as to AHM's underwriting practices and generally

13    as the literature which I can cite and have cited in my report,

14    relating to underwriting practices of lenders of payment option

15    ARMs.

16    Q.   Now --

17    A.   Excuse me.  As well as the extensive discussions about

18    underwriting practices by federal agencies.

19    Q.   Okay.  Would you elaborate on what you mean by that?

20    A.   Well, the underwriting practices of lenders of payment

21    option ARMs has been a subject of discussion in Washington for

22    over two years now.  The -- it started -- there has been

23    extensive conversations and publications by the federal

24    regulators about the problematic underwriting practices of

25    lenders of payment option ARMs that has been the subject of

1   several official issuances, a guidance and a regulatory

2   statement as well as a number of proposed rules and ongoing

3   discussions in Congress as well as the agencies.

4   Q.   What do you mean by a guidance?

5   A.   A guidance was issued by the five federal banking

6   regulators:  the Federal Reserve Board, the Federal Deposit

7   Insurance Corporation, the Office of Comptroller of the

8   Currency, the Office of Thrift Supervision and the National

9   Credit Unit Administrator, in early -- in 2006, that

10  essentially set out what was a reiteration of underwriting

11  requirements for lenders that they were governing -- that they

12  governed, of payment option ARMs.  And the guidance

13  specifically said we are recommending strongly that all

14  underwriting of payment option ARMs be to the fully indexed

15  rate, which would be calculating the amount of the payment as

16  if there were no teaser rate.  The full index and the full

17  margin would then be required to be determined as affordable

18  for homeowners.

19  Q.   Did the guidance address whether failure to do that

20  affected borrowers?

21  A.   The guidance straddled the line between the need to

22  protect both borrowers and investors.  They -- the guidance

23  discussed the need to do that for safety and soundness reasons

24  as well as consumer protection reasons.

25  Q.   Why is it a consumer --

158

1          MR. DORSEY:  Objection, Your Honor.  We're way

2     outside the scope of her --

3          THE COURT:  Yes.

4          MR. DORSEY:  -- opinions here.  And --

5          THE COURT:  Sustained.  And frankly, that was a legal

6     opinion, and I'm going to strike the answer.  She just told me

7     the purpose of the law.  I'm not going to let her testify --

8          MR. WEISBROD:  I'm sorry, Your Honor.

9          THE COURT:  -- as to the what the purpose of the law

10    is.

11         MR. WEISBROD:  Okay.

12    Q.   Let me ask you this question.  Does the guidance -- when

13    was the guidance issued?

14    A.   2006.

15    Q.   Okay.  And does the guidance address whether

16    underwriting -- failure to underwrite to the higher rate

17    affects borrowers as opposed to simply affecting people with an

18    interest in the payment stream of borrowers?

19    A.   Yes.

20    Q.   Okay.

21    A.   The guidance --

22         THE COURT:  Just leave it at yes.

23    Q.   Ms. Saunders I'm showing you OBC Exhibit 22.  Is that the

24    guidance to which you referred?

25    A.   Yes.

1    Q.   Okay.  Now how, if at all, does -- I'm not going to ask

2    you more questions about the guidance, Ms. Saunders, I'm just

3    going to ask you generally.  How, does, if at all, qualifying a

4    borrower at the first year rate payment level as opposed to a

5    subsequent year payment level potentially harm borrowers?

6    A.   The first -- the payments that are due for the first year

7    are based on the teaser rate.  So for example, a payment option

8    ARM would have a teaser -- generally has a teaser rate of

9    between one and two percent.  The payments are calculated based

10   on one percent applied to the original principal divided by

11   twelve.  So that interest rate, that effective interest rate is

12   then amortized and that's the -- that's how the payment for the

13   first year is calculated.  But the fully indexed rate, which

14   kicks in at least after the first month, is a much higher rate

15   and will cause the payments to be much higher.  If the

16   underwriting is only done for the first year, then there

17   appears to be no consideration of the borrower's ability to

18   repay the second year's rate payments let alone the fully

19   indexed payments.

20   Q.   And how does that impact borrowers, potentially?

21   A.   If borrowers are provided loans which they cannot afford

22   to repay, they will default and either be forced to refinance

23   or sell their house or will be foreclosed upon, which is very

24   damaging to them, obviously.  And if they are not -- if there's

25   no determination by the lender of the borrower's ability to

160

1    repay a payment that is much higher than the initial payment,

2    the lenders -- the borrower is not always going to be able to

3    do that determination themselves.

4    Q.    And from public documents, do you have any information

5    about how AHM did its underwriting for payment option ARMs?

6    A.    Yes.

7    Q.    And what is your information?

8    A.    This --

9         MR. DORSEY:   Renew my objection, Your Honor, that the

10   underwriting standards of AHM were not a part of what her

11   opinion was supposed to be.

12        MR. WEISBROD:   Your Honor, we've now -- well, let me

13   just say at the outset that Mr. Dorsey actually asked a lot of

14   questions about this at the deposition and asked, for example,

15   how many poor underwriting claims have you ever seen and all

16   that sort of stuff.   So this is not sandbagging at all.   This

17   document was cited in the expert report.   It was produced to

18   the other side as such.   And we have explained that what we're

19   doing here in the three parts that we're allowed to pursue is

20   going through how payment option ARMs work and affect

21   borrowers, then going through the claims that borrowers may

22   assert based on those effects, and then the timing issue.

23        THE COURT:   So why is -- those all are general

24   industry -- I took it to be general industry type issues and

25   discussions.   So why are AHM's specific underwriting guidelines

1    relevant?

2              MR. WEISBROD:  Oh, because I think that we need -- we

3    anticipate that we're going to show that AHM mortgages did work

4    in the same way that Ms. Saunders --

5              THE COURT:  All right.

6              MR. WEISBROD:  -- understands they work in the

7    industry as a whole.

8              THE COURT:  All right.  I'll overrule the objection.

9              MR. WEISBROD:  Thank you, Your Honor.

10   BY MR. WEISBROD:

11   **Q.   Now, let's talk for a minute about what you've seen with**

12   **respect to AHM loans in particular.  Have you seen any actual**

13   **AHM loan files?**

14   **A.   Yes.**

15   **Q.   Do you recall which those were?**

16   **A.   I saw a loan file from Tilton Jack, Ms. Gracie Graves and**

17   **a Ms. Dandrich.  I did not see a complete file of Ms. Graves.**

18   **Q.   And did I ask you to assume that the  Tilden Jack note was**

19   **the "standard note" for AHM?**

20   **A.   Yes, you did.**

21   **Q.   And have you also learned that AHM issued approximately**

22   **90,000 payment option ARM loans from 2005 through 2007, and**

23   **assumed that.**

24   **A.   Yes.**

25   **Q.   Apart from what we just talked about, the information from**

162

1    the SEC filing and those loans, are you relying on other

2    information about AHM specific loans?

3    A.    Those are the only loans that I've reviewed relating to

4    AHM.

5         (Pause)

6         MR. WEISBROD:  I've given to the witness, Your Honor,

7    Exhibits 22 and 23.  Exhibit 22 is a first amended complaint,

8    Tilton Jack v. American Brokers Conduit Inc. filed in the U.S.

9    District Court for the Eastern District of New York, with

10   exhibits.  It bears Bates numbers OBC-277 through 329.  And

11   Exhibit 23 is two spreadsheets that Ms. Saunders herself

12   prepared and will describe in more detail.

13        UNIDENTIFIED ATTORNEY:  Actually, I think, Your

14   Honor, these should be Exhibits 23 and 24, not 22 and 23.

15        MR. WEISBROD:  Oh, they're 23 and 24.  I miswrote it.

16        THE COURT:  Thank you.

17   Q.    Now, Ms. Saunders, can you look at the Jack exhibits to

18   the complaint?  Look at the note.

19   A.    Yes.

20   Q.    And explain, looking at his particular note, how the

21   concepts that you've described were, and where appropriate,

22   refer to your Exhibit 24.  And let me ask, before we go further

23   on Exhibit 24, could you describe for the Court what Exhibit 24

24   is?

25   A.    Well, I did a very quick and dirty analysis of Mr. Jack's

1    loan.  And the second page of this exhibit is meant to

2    reproduce approximately the analysis that would have to have

3    been done when the loan was originated to determine what the

4    payments would be for Mr. Jack.  And the assumptions made in

5    that analysis that I made as well as the lender made were that

6    the interest rate would never change -- the effective interest

7    rate would never change.  The -- do you want me to describe how

8    I came to these calculations?

9         MR. DORSEY:  I have an objection, Your Honor.  They

10   haven't established a foundation for this document.  They

11   haven't authenticated this document.  It's hearsay.  A

12   complaint is hearsay.

13        MR. WEISBROD:  Your Honor, it's the type of

14   information on which an expert would reasonably rely.  You've

15   got to get a document from somewhere.  This is a purported

16   American Home Mortgage note.  Damien Pasternak (ph.) has stated

17   that it's the standard note.

18        MR. DORSEY:  Nobody has testified this is the

19   standard note, Your Honor.  It's still hearsay.  They didn't

20   get this document from the debtors.  If they wanted a note from

21   the debtors, they could have asked for one.  They didn't.  They

22   do actually have Ms. Graves' note.  They've had it for a while.

23   And this other exhibit, Your Honor, Exhibit 24, this was

24   produced to us this morning while I was sitting here in court.

25   This was prepared by the witness after I took her deposition,

1   and it's totally inappropriate and completely prejudicial and

2   unfair to allow the witness to testify about an exhibit that

3   was produced after the trial started.

4        MR. WEISBROD:  Your Honor --

5        THE COURT:  I want to hear a response to that latter

6   point.

7        MR. WEISBROD:  -- Your Honor, actually I think it's a

8   fair point.  The reason we originally created this and

9   introduced it is just to illustrate what credit math is, not to

10  go through the actual numbers.  And we offer it only for that

11  purpose.

12       THE COURT:  Objection sustained.  The Court will not

13  accept the OBC-24 into evidence.  You can take it back.

14       MR. WEISBROD:  That's fine.

15       THE COURT:  Thank you.

16       MR. WEISBROD:  I do have to point out, Your Honor,

17  that no expert reports are required.  But anyway --

18       MR. DORSEY:  No expert report is required, Your

19  Honor, but you still have to provide me with copies of the

20  documents you intend to introduce before the hearing actually

21  starts.

22       MR. WEISBROD:  In any case, we had intended purely to

23  illustrate what credit math is.

24       THE COURT:  I've ruled.  I don't know what you guys

25  are talking about.

165

1          MR. WEISBROD:  Your Honor, I'll address only Exhibit

2    23, then.

3          MR. DORSEY:  I still have an objection to this one,

4    too, Your Honor, as being hearsay.

5          MR. WEISBROD:  And I want to address that.

6          THE COURT:  Okay.

7          MR. WEISBROD:  Your Honor, this is an exhibit that

8    every witness in this case has been looking at on the other

9    side.  And Mr. Damien Pasternak testified at his deposition,

10   and therefore it's a party admission that it's a "standard

11   note."  And based on that, it is clearly, at a minimum,

12   something on which an expert reasonably could rely.

13         MR. DORSEY:  Mr. Pasternak is not an officer of the

14   company, Your Honor.  So even if he did testify that this was a

15   standard note, it's not binding on the company.  He didn't

16   establish a foundation when he asked Mr. Pasternak about this

17   document.  There's no basis to get this document into evidence.

18   It's complete hearsay and it shouldn't be allowed -- the

19   witness shouldn't be allowed to testify about it, let alone

20   letting into evidence.

21         MR. WEISBROD:  Your Honor, it doesn't have to be an

22   officer of the company to be an admission of the company, and

23   it doesn't change the fact that this is a document on which

24   someone reasonably would rely.  And the other point, Your

25   Honor, is that we're not offering it into evidence right now.

1    We're just trying to get Ms. Saunders an opportunity to explain

2    how payment option ARMs work.

3              THE COURT:  I'll overrule the objection.

4    BY MR. WEISBROD:

5    Q.   Ms. Saunders, could you use these documents to illustrate

6    what a teaser rate is?

7    A.   Yes.  The -- according to this note, which this loan was

8    closed on July 26th, the teaser rate stated in paragraph 2,

9    "Interest will be charged on unpaid principal until the full

10   amount has been paid, and will pay interest at a yearly rate of

11   one percent until July 31, 2006," etcetera.  So the teaser rate

12   is one percent.  It --

13   Q.   Go ahead.

14   A.   -- it applied, as I calculate it, for only one day,

15   because the loan would have funded actually only on July 30th,

16   because of -- the Truth in Lending right of rescission

17   generally requires a delay of the funding of a loan.  So there

18   would have only been one day on which one percent would have

19   applied.

20   Q.   And can you find in these documents what the initial

21   payment obligation was, meaning the initial monthly payment?

22   A.   Well, the next part of that same sentence in paragraph 2

23   says, "and the initial monthly payment provided for in section

24   3(b) of this note will be based on this rate", the one percent

25   rate.

1    Q.    And could you say where you find the initial monthly

2    payment and explain what that is?

3    A.    The initial monthly payment is stated on page 2 in

4    paragraph 3(b), "Amount of my initial monthly payments.  Each

5    of my monthly payments until the first payment change date will

6    be in the amount of $1,103.22."  So the initial monthly payment

7    was based on the application of one percent per year times the

8    original amount borrowed, divided by -- assuming that that one

9    percent was going to be applicable for the remaining thirty

10   years of the loan.  And that's the math that determined how

11   that 1,103 dollar payment was arrived at.

12   Q.    In your experience, do teaser rates benefit borrowers?

13   A.    Very, very rarely.  Only very sophisticated borrowers, but

14   not -- certainly not in payment option ARM loans.

15   Q.    Can you explain, using these documents, how the payment

16   options work?

17   A.    Well, this -- the payment that's described in paragraph 3

18   is the minimum payment that's required for the first year.  As

19   paragraph 2 goes on to explain, after the teaser rate expires,

20   the applicable interest rate, 8.132 percent, applies for the

21   rest -- for that entire month.  And then paragraph 4 describes

22   how the interest rates will be calculated from then on.

23   Q.    Could you take a look at -- is there a cap on interest?

24   A.    Yes.

25   Q.    Where do you find that?

168

1    A.    In paragraph 4(d), 9.95 percent.

2    Q.    And could you look at the following page, paragraphs g and

3    h, and explain what those are?

4    A.    What happens under this loan, as in all payment option

5    ARMs, there is a cap on the amount that negative amortization

6    can add to the principal of 110 percent, in this case.    In

7    Ms. Graves' case it was 125 percent.    So as the payments are

8    made each month and interest is owed which is not paid, that

9    interest goes into the principal.    So the principal climbs each

10   month.    When the principal reaches 110 percent of the original

11   amount, the loan is recast.    Or if negative amortization

12   doesn't occur for one of several reasons within the first five

13   years, the loan is recast anyway -- excuse me.    I said that

14   wrong.

15        If the principal doesn't reach 110 percent, regardless of

16   whether negative amortization occurred within the first five

17   years, the sixtieth month is the last -- on the sixtieth month,

18   the payments have to be recast no matter what.    That's what

19   this paragraph 4(h) -- 4(g) and 4(h) refer to.

20   Q.    And what is 4(i)?

21   A.    4(i) explains that after the fifth anniversary date, if

22   the principal has not reached 110 percent, then that's the date

23   upon which the monthly payment must become fully amortizing.

24   So on that date, the servicer will calculate what is owed, will

25   apply the applicable interest rate determined from paragraph

1    4(d) -- oh, no, excuse me -- determined from paragraph 4(a),

2    (b) and (c), and will amortize the loan for, at that point, 300

3    payments.  And the resulting payment will be due that month.

4    The following month, the same analysis will be done.

5    Q.    Could you take a look at -- were you finished?

6    A.    Yes.

7    Q.    Okay.  Could you take a look at the monthly statements

8    shown in E and F?  So that's OBC-0314 and OBC-0323.

9    A.    Yes.

10   Q.    And could you explain how some numbers change and some

11   don't between the two, based on how the loan is operating?

12   A.    On this monthly billing statement, in the box at the top,

13   the principal balance is stated, and then the payment factors

14   are stated.  Principal and interest, which is inherently

15   misleading, because most people would read that statement

16   principal and interest 1,103 dollars to mean that some part of

17   1,103 dollars is going to principal, when, in fact, none of

18   it's going to principal.  So principal and interest, 1,103, and

19   then escrow payment 282.  And the total payment is 1,388.

20   That's the minimum payment that's required for the first year

21   under this loan that is derived from the calculation that we

22   described by applying the teaser rate.

23       The options that you're talking about are described in the

24   special messages in the middle, sort of sixty percent down the

25   page, where there's four options that are described.  And then

1    under -- at the bottom of the page where it says "Payment

2    coupon, Option 1, Option 2", there's four option numbers that

3    apply.  Option 1 is the minimum payment that's described up in

4    the monthly billing statement, plus escrow.  Option 2 is the

5    amount of interest that's due on the loan that month.  And

6    that -- since the minimum payment doesn't cover interest, the

7    principal is climbing every month, the Option 2 payment of

8    interest will go up every month.  Option 3 is the amortized

9    fifteen-year payment -- excuse me, thirty-year payment.  That

10   payment will also change, because the principal changes each

11   month.  And Option 4 is the amortized fifteen-year payment.

12   Q.   And --

13   A.   Oh, excuse me.  Each of those payments, Option 1, 2, 3 and

14   4, is the amount of the payment plus escrow.

15   Q.   Okay.  Now, if you look at F, can you explain how some of

16   the numbers have changed and some have remained the same?

17   A.   F?

18   Q.   This is Exhibit F to Mr. Jack's complaint.  It's OBC-323.

19   A.   Oh.  Well, the first billing statement was issued in

20   September 2006 to apply to the October bill payment that needs

21   to be made.  And this billing statement is about ten months --

22   eight months later for June 2007.  As you can see, in the box

23   up at the top the principal balance owed in September was

24   344,000.  By June, after Mr. Jack had been making the minimum

25   payments, the principal balance has climbed by over 12,000

1    dollars, and it's now 356,000 plus.

2        All of the options described in the payment coupon are

3    different except for the Option 1.  In other words, the first

4    option that is determined based on the interest, Option 2, is

5    now 200 dollars more.  The Option 3, which is the amortizing

6    payment for thirty years, is now about 200 dollars more, and

7    the same with Option 4, which is the amortizing payment for a

8    fifteen-year term.

9    Q.    Okay.  Could you look at page 316, which is the Truth in

10   Lending Disclosure Statement?  And can you point out which of

11   the terms that you describe are shown in here and which are

12   not -- the numerical terms that you described?

13   A.    The minimum -- this Truth in Lending Disclosure Statement

14   shows the minimum payments only for the first payments until

15   you get to number of payments 332, first due December 1st.  And

16   the payments that are due on December -- beginning December 1st

17   is the fully amortizing payment for the remaining term.

18   Because they -- that originator has calculated that if the

19   fully indexed rate is in ex -- is applicable to this loan for

20   twenty-eight months, then at that time, the 110 percent cap

21   will have been reached and the remaining payments will have to

22   be fully amortizing.

23   Q.    In your experience, is there typically any explicit

24   reference to negative amortization in Truth in Lending

25   Disclosure Statements?

172

1   A.   No.

2   Q.   And --

3   A.   And there's nothing on this statement.

4   Q.   -- how does the change in principal get reflected, if at

5   all, in Truth in Lending Disclosure Statements?

6   A.   It's not reflected here, and nor is it generally

7   reflected.

8   Q.   Based on your knowledge of the industry as a whole, how

9   frequent is an occurrence is negative amortization with payment

10  option ARMs?

11  A.   It's a standard provision with payment option ARMs.

12  Q.   Okay.  And how often does the process of negatively

13  amortizing the principal actually occur?

14  A.   I've seen statistics from a variety of studies that show

15  it's between sixty-seven and seventy-five percent if not more

16  of all homeowners who have payment option ARMs, negatively

17  amortize.

18  Q.   Is there a connection between negative amortization and

19  defaults?

20  A.   According to the ratings agencies, they are anticipating

21  significant defaults resulting from the payment shock that they

22  see will happen when there is a recast resulting from negative

23  amortization.

24  Q.   Which rating agencies are you thinking of?

25  A.   There was just a report by Moody's that articulated the

173

**increased rates of default and the increased -- that they**

**expect, and the increased -- because of the negative**

**amortization and payment shock for payment option ARM loans.**

MR. DORSEY:  I'm going to object and move to strike,

Your Honor.  Her testimony is based on a Moody's report that is

not in evidence, that is certainly not a part of the expertise

that she purportedly established in her voir dire of thirty

years' experience as a consumer lawyer.

THE COURT:  Well, I draw a distinction between an

expert providing an opinion based on hearsay and an expert

testifying to hearsay.  I took that -- you didn't ask her what

her opinion was, you asked her what the hearsay was.

MR. WEISBROD:  Very well.

THE COURT:  It may be a fine distinction, but it's a

distinction that I'm going to uphold, so I'll sustain the

objection.  Strike the whole line of questioning.  I think it

goes back four or five questions.

**Q.   Okay.  Do people in your field attempting to determine how**

**often there is negative amortization rely on published reports?**

**A.   Yes.**

MR. DORSEY:  Objection, Your Honor.  She hasn't

established a foundation that in her field people would have

any interest whatsoever in how often, in the industry, negative

amortization results in a loss.

THE COURT:  I don't think that's fair.  Overruled.

174

1    MR. WEISBROD:  Okay.

2    THE COURT:  The answer was yes.

3    MR. WEISBROD:  Well, let me clarify.

4  Q.    When I talk about your field, I'm talking about the

5  consumer protection field.  Why do consumer protection

6  advocates care about how frequently negative amortization

7  occurs?

8  A.    Because when negative amortization occurs, it is very

9  likely there will be -- well, when negative amortization

10  occurs, it is very, very likely that there will be payment

11  shock.  And when there's payment shock, that is a predictor of

12  default and foreclosure, because the homeowner is not generally

13  evaluated for their ability to repay the much increased

14  payment, and won't be able -- if they can't repay it, they

15  won't be able to -- they will have to refinance and sell.  And

16  if they can't refinance, they will not be able to -- it's

17  likely they won't be able to sell even to cover the loan, and

18  they're facing foreclosure.  And people in my industry care a

19  lot about that.

20  Q.    What sources of information do you have that corroborate

21  the opinion you just expressed?

22  A.    I am relying on industry analyses of the number of

23  homeowners who have payment option ARM loans who negatively

24  amortize.  I do not -- I do not personally have a way of

25  determining how many negatively amortize.  I can just tell you

1   what happens typically when they do.  But the industry

2   information is that a lot of people, sixty-seven to seventy-

3   five percent, negatively amortize.

4            MR. DORSEY:  Renew my -- I'll move again to strike,

5   Your Honor.  She just said she doesn't have a way of

6   determining it other than looking at what other people in a

7   completely different industry, which is Moody's rating agencies

8   and so forth, have to say about it.  It has nothing to do with

9   consumer law.

10           THE COURT:  I disagree.  I'll overrule the objection.

11  I think she was simply testifying as to the basis for her

12  previous opinion.

13           MR. WEISBROD:  Thank you, Your Honor.

14  Q.   And is your opinion also based in any way in your

15  experience at NCLC?  And I'm talking about the opinion of

16  between -- of a connection between negative amortization and

17  defaults.

18  A.   Yes.  My opinion about negative amortization and defaults

19  is informed by my repeated analysis of loan files and review of

20  various prospectuses and other information about the

21  underwriting practices of lenders who make payment option ARM

22  loans.

23  Q.   Now, I'd like to move on to the second topic we said we'd

24  address, Ms. Saunders.  Do borrowers ever make claims --

25  empirically, do they ever make claims against originators of

1    payment option ARMs?

2    A.    Yes.

3    Q.    How do you know that?

4    A.    A lot of borrowers have come into legal aid offices and

5    private attorneys' offices to make these claims.  Let me

6    rephrase that.  People come into attorneys' offices when

7    they're generally facing a crisis or see themselves facing a

8    crisis in the future, and the attorneys figure out what the

9    claims are if there are any.

10   Q.    And in your experience, how do these claims typically come

11   to pass?  What's the sequence of events?

12   A.    Well, unfortunately, especially in the low income

13   community, quite often people wait till the last minute.  They

14   hope that things will get better or that something will happen

15   that will enable to avert a foreclo -- a disaster.  And too

16   often we see homeowners facing foreclosure and default when

17   they come in rather than anticipating in the future that there

18   may be a problem or that there will be a problem and coming in

19   before that.

20         Sometimes we see people come in when the sheriff's at

21   their door having -- the foreclosure sale having been completed

22   and the eviction is about to start.  Most of our clients around

23   the country, unfortunately, seem to come in at the back end

24   rather than the front end.

25   Q.    What federal claims have you seen borrowers assert with

1    respect to payment option ARMs?

2    A.    I have seen borrowers assert Truth in Lending claims,

3    mostly, as the primary federal claim.

4    Q.    Can you explain what a Truth in Lending claim is?

5    A.    Truth in Lending claim is based on the failure of the

6    lender to comply with Truth in Lending's disclosure

7    requirements.  And there can be a number of sources of that

8    failure.  The disclosure itself could be misleading or not be

9    provided in a clear and conspicuous -- the required disclosures

10   are not provided in a clear and conspicuous manner, or the

11   numbers themselves are incorrect.  Those are the two primary

12   bases for Truth in Lending violations claims.

13   Q.    Can borrowers get damages for a Truth in Lending claim?

14   A.    Yes.

15   Q.    Are there different kinds of damages?

16   A.    Borrowers can get actual damages and statutory damages of

17   up to 4,000 dollars when there are disclosure violations, plus

18   attorneys' fees.

19   Q.    Now, can you explain the difference between two kinds of

20   allegations regarding disclosure violations, an allegation

21   there has been not disclosure at all, versus an allegation that

22   there was disclosure but it wasn't sufficiently clear?

23   A.    Truth --

24   Q.    And how that bears on statutory damages.

25   A.    -- Truth in Lending allows -- Truth in Lending claims have

178

1    been made when the disclosures are made, even when the

2    numerical numbers are correct, but they have been made based on

3    the idea that the information provided is not sufficiently

4    clear.  So that in some situations, the totality of the

5    circumstances fail to provide the critically required -- the

6    material information required to the consumer.

7    Q.   Okay.  Are you familiar with any Truth in Lending claims

8    that were brought regarding payment option ARMs prior to

9    American Home Mortgage's bankruptcy filing?

10   A.   I'm familiar with -- yes, I am.

11   Q.   Was one of those Andrews v. Chevy Chase Bank?

12   A.   Yes.

13           THE COURT:  We can mark this OBC-24, since the

14   previous 24 was stricken.  Or we can go straight with 25.  It's

15   probably easier if we go with 25.  All right.  OBC-25.

16   (Document re Andrews v. Chevy Chase Bank was hereby marked as

17   OBC's Exhibit 25 for identification, as of this date.)

18   Q.   Without opinion on whether you think the Court got any

19   issues correct or incorrect, can you describe the type of cause

20   of action that was made in the Andrews v. Chevy Chase Bank

21   case?

22   A.   The homeowners in this case complained about several

23   things on the loan documents.  Firstly, they complained that

24   the payment schedule didn't adequately make clear that the

25   payments were due monthly.  And secondly, they talked about how

1    the disclosure of the annual percentage rate, which says the

2    cost of your credit as a yearly rate, was the same -- were the

3    same words that were used to describe the teaser rate.  If you

4    look at the note -- if I might go back to look at Mr. Jack's

5    note --

6              MR. DORSEY:  Objection, Your Honor.  She's now trying

7    to apply a case law to --

8              THE COURT:  Agreed.

9              THE WITNESS:  Well, I'm just trying to explain, under

10   the case --

11   Q.   Let's not talk about the holdings of the case.

12   A.   Okay.

13   Q.   Let's just talk about --

14   A.   Sorry.

15   Q.   -- what was the allegation.

16   A.   I'm sorry.

17   Q.   Let's just say it as this.  Was there an allegation that

18   payment option ARM disclosures were inadequate under TILA?

19             MR. DORSEY:  Objection, leading.

20   A.   There were --

21             THE COURT:  Sustained.  Don't lead the witness.

22             MR. WEISBROD:  Okay.  Let's not talk about the

23   holding --

24             THE COURT:  There's no pending question.

25   Q.   Can you describe the basic allegations in summary detail

180

1    in this case?

2    A.    The homeowners complained that the Truth in Lending

3    disclosure was not sufficiently clear and that they -- that it

4    didn't provide the required information.

5    Q.    Okay.  And did it involve payment options?

6    A.    Yes, this case involved payment option ARMs.

7    Q.    Did the U.S. District Court uphold any of the allegations

8    regarding the payment option disclosures?

9    A.    Yes.  The Court found that there were a number of Truth in

10   Lending violations on -- in this loan -- in these loans.

11   Q.    Was the Court, if you recall, ever asked to rule on the

12   availability of actual damages in this case?

13   A.    I do not think that the actual damages were requested in

14   this case.

15   Q.    Was the Court asked to rule on the availability of

16   statutory damages?

17   A.    I think that they -- that it was, and the Court disallowed

18   statutory damages in this case.

19   Q.    Was the district court asked to rule on whether class

20   action proceedings were available for this type of claim?

21   A.    Yes.  The --

22   Q.    And do you know whether it certified a class or declined

23   to certify a class?

24   A.    It certified a class.

25   Q.    Was that class certification decision subsequently

1    overruled?

2    A.    Yes.

3    Q.    Okay.  Are you generally aware of any other class actions

4    involving payment option ARMs?

5    A.    Yes.

6    Q.    Where are those pending?

7            MR. DORSEY:  Objection, Your Honor, she was not

8    supposed to testify about related cases and describe successful

9    outcomes.

10           THE COURT:  Yeah, can we -- look --

11           MR. WEISBROD:  I thought this was within the scope,

12   but it's not an important point.

13           THE COURT:  The point is, I'm sorry, my feeling of --

14   well, the scope that I'm going to allow is this.  What kind of

15   payment option ARM claims are they?  They are TILA claims.

16   What's a TILA claim?  Not clear and conspicuous, amounts

17   incorrect.  Okay.  Have payment option ARM claimants asserted

18   those type of claims?  Yes.

19           MR. WEISBROD:  Okay.

20           THE COURT:  We're done.  Okay?  I don't want to get

21   into too much more.  Have people asserted class actions based

22   on X, Y, and Z claims?  Yes.  All right.  Let's move on.

23           MR. WEISBROD:  Okay.  That's fine, Your Honor.  I

24   understand better the parameters.

25   BY MR. WEISBROD:

182

1    Q.   Are there any state laws --

2            THE COURT:  I'm sorry.  I'm tired, so let's take a

3    little bit of a break.  How much longer do you have?

4            MR. WEISBROD:  I think that I have about, probably,

5    in light of the ruling, ten or fifteen minutes on direct.

6            THE COURT:  All right, so twenty.  Twenty or thirty,

7    right?

8            MR. WEISBROD:  No, no.  Well, you know, Mr. Dorsey

9    sort of helps me decide how much time I have.

10           THE COURT:  Well, but see that's -- I did it too.

11   But lawyers are always -- it's like the rule of two.  You

12   double what they say.

13           MR. DORSEY:  I have three hours of cross, Your Honor.

14           THE COURT:  Well, we can discuss that later.  I'm not

15   sure we're going to get to cross today.  All right.  Let's take

16   a recess.

17           MR. WEISBROD:  Thank you, Your Honor.

18       (Recess from 4:32 to 4:43 PMK)

19           THE CLERK:  All rise.

20           THE COURT:  Be seated.  Mr. Weisbrod?

21   BY MR. WEISBROD:

22   Q.   Could you describe for the Court please, Ms. Saunders,

23   state causes of action that borrowers have asserted with

24   respect to payment option ARMs?

25   A.   Fraud, unfair and deceptive acts and practices, breach of

183

1    fiduciary duty, deceit -- excuse me -- deception, breach of

2    contract, unconscionability, civil conspiracy.

3    Q.   And for deceptive practices, are you aware of any

4    government enforcement actions undertaken in any states?

5    A.   The -- a number of states' Attorneys' General have brought

6    an action -- yes, is the answer.

7    Q.   Okay.  I would like to ask you about one brought by the

8    Massachusetts Attorney General.

9             MR. DORSEY:  Again, Your Honor, they're asking her to

10   testify about a case that the Court has --

11            THE COURT:  Well, we'll see where it goes.

12   Q.   In 2007, did Attorney General Coakley in Massachusetts

13   assert any action with respect to payment option ARM practices?

14   A.   The Attorney General, so far as I understand it, asserted

15   broad actions against originators who had made loans with many

16   of the characteristics that payment option ARM loans have.

17   Q.   I see.  And are we talking about the Freemont action?

18   A.   Yes.

19   Q.   Okay.  And is the press release that you see a press

20   release relating to the Freemont action?

21   A.   Yes.

22   Q.   And can you explain in greater detail typical allegations

23   made in states regarding deceptive practices claims?

24            THE COURT:  Are you talking about by states'

25   attorneys general, or private?

184

1          MR. WEISBROD:  Not necessarily, just any deceptive

2     practice cause of action.

3     Q.   Can you describe what's typically involved?

4     A.   A complaint is made that the homeowner was deceived about

5     the terms of the loan.  These complaints are quite typical.

6     There has been complaints brought in state and federal courts

7     relating to the deception that homeowners were under when

8     they -- were subjected to when they were obtaining payment

9     option ARM loans.

10    Q.   Can you describe in terms of what they plead, now

11    plaintiff's allegations in fraud cases may differ from

12    plaintiffs' allegations in deceptive practices cases?

13    A.   Fraud.  In fraud cases, there are allegations that there

14    were an intent to mislead and actual deception, reliance on

15    that deception to the harm of the borrower.  In deception

16    cases, the allegations generally are only that the homeowner

17    was deceived.

18    Q.   I think I left this out when we were talking about TILA.

19    Could you explain briefly what a rescission claim is?

20    A.   A rescission claim is -- rescission is the primary and

21    most powerful claim that homeowners can bring to save their

22    home.  And that's because it requires an unwinding of the loan

23    back to before the loan was made.  In a rescission claim,

24    technically, the homeowner rescinds the loan and the lender is

25    then supposed to release the security interest, return all the

185

1    money the homeowners paid, and the homeowner then is required

2    to pay the amount that he or she still owes back to the lender.

3    That can result in a substantial reduction in the amount owed.

4    Q.    Do borrowers ever base these types of claims that you've

5    been describing over the last half hour purely on the nature of

6    the products as opposed to, say, representations by a broker or

7    some additional factor?

8            MR. DORSEY:  Objection, foundation.

9            THE COURT:  Overruled.

10   A.    Yes.  There have been a number of cases which are brought

11   purely on the paper where the paper itself, the note and the

12   Truth in Lending documents themselves were the basis of the

13   claims of deception or Truth in Lending.

14   Q.    Do borrowers ever make claims based on the originator's

15   underwriting practices?

16   A.    Yes.  They do.

17   Q.    Can you describe those claims that are alleged?

18   A.    There is a longstanding idea of improvident extension of

19   credit.  And homeowners have been bringing claims based on this

20   theory more recently, that a lender who lent money without

21   adequately determining the home -- the borrower's ability to

22   repay, violated some standard of care.  Homeowners typically

23   bring claims against lenders when they can show that the

24   lenders didn't evaluate the -- their ability to repay even the

25   scheduled payments without an increase in an adjustable rate.

1   Q.   Is that a new theory?  How long has that theory been

2   asserted by borrowers?

3   A.   Well the improvident extension of credit is a very old

4   theory.  The failure to underwrite adequately, the failure to

5   determine the ability to repay, is fairly new as a theory, but

6   is often being brought under older, more established common law

7   and statutory claims.

8   Q.   What standards such as federal or state standards or

9   anything do borrowers invoke when asserting claims based on

10  faulty underwriting?

11  A.   Generally borrowers articulate the repeated statements in

12  agency guidelines as well as Fanny Mae and Freddie Mac

13  requirements governing conventional loans to show -- as a way

14  of showing that the failure to underwrite was improper and

15  should be declared illegal.

16  Q.   When borrowers assert all the different kinds of claims

17  that you've been describing, do they typically choose just one

18  remedy, like just damages or just rescission, or do they

19  typically assert requests for multiple remedies?

20  A.   These are new and complex cases, so lawyers generally

21  bring claims based on a variety of theories, not sure which --

22  as they are not sure which ones will prevail.  Because there's

23  not a lot of case law on these theories, but there's a lot of

24  need among their clients to find some theory that will work to

25  bring redress.

1    Q.   And do you ever see rescission and damages claims in the

2    same complaint?

3    A.   Yes, generally.

4    Q.   It's common?

5    A.   It's common.

6    Q.   Do you ever see complaints that name both the loan

7    originator and, if the loan has been sold, the current holder

8    of the loan?

9    A.   That's common as well.

10   Q.   And how far after the date of loan origination do you

11   typically see these types of borrower claims?

12            MR. DORSEY:  Are we talking about claims related to

13   payment option ARMs, Your Honor, or all kinds of loans?

14   Q.   Well, let's start with all kinds of mortgage claims.  How

15   far after a loan origination do you typically see them?

16   A.   We see a lot of claims right after origination, within the

17   first year or so.  And then we -- then generally, the claims

18   result from people who are having trouble making the increased

19   payments on adjustable rate loans.  So we see them often --

20   what triggers people walking in the door is the increase in

21   payments, generally.

22   Q.   Do you have any opinions about the likelihood that more

23   payment option ARM related borrower claims will arise as more

24   payment option ARMs reset?

25   A.   Yes.

1   Q.    What is your opinion?

2   A.    When you look at what's happening in the real estate

3   market and you combine the reduction in home values with the

4   increase in principal and escalating payments, I think many,

5   many, if not a majority of homeowners who are currently

6   negatively amortizing on their payment option ARMs will be

7   facing foreclosure, because they won't have any other options.

8   Q.    Do you ever see claims involving payment option ARMs that

9   include allegations based on the lack of sophistication of the

10  borrower?

11  A.    Yes.  But I'm not sure that you need to show the lack of

12  sophistication of the borrower.  I've seen claims -- successful

13  claims based on -- made based on -- excuse me.  I have seen

14  successful claims relating to fraud and deceit, even with

15  sophisticated borrowers.  The more unsophisticated the

16  borrower, the more likely there will be claims, but you don't

17  need unsophistication to be confused in these loans

18  Q.    Do you personally find -- or did you personally find

19  payment option ARMs confusing when you first read them?

20  A.    Yes.

21            MR. DORSEY:  Objection, irrelevant, Your Honor.

22            THE COURT:  Sustained.  Answer stricken.

23            MR. WEISBROD:  I have no other questions, Your Honor.

24            THE COURT:  All right.  Thank you.  Mr. Dorsey, how

25  long do you have?  I've got to tell you, I'm pretty tired.

1          MR. DORSEY:  With that, Your Honor, I can wait till

2     tomorrow, if you want.

3          THE COURT:  Yes, I --

4          MR. DORSEY:  I don't think I have a whole lot of

5     time, but I would like some time to --

6          THE COURT:  Well, there's that issue as well.

7          MR. DORSEY:  -- with you, and I also would like to

8     see the notes that the witness took to the stand with her.

9          THE COURT:  Yes.  There's no point in proceeding if I

10    am too -- if I'm unable to understand what's going on.

11         MR. WEISBROD:  Agreed, Your Honor.

12         THE COURT:  I have time tomorrow.  Let me look here.

13    Ma'am, you can step down.  I have all morning tomorrow, so tell

14    me when you want to start.

15         MR. WEISBROD:  We'll be ready as early as anybody

16    needs.  Ms. Saunders is eager to get home.

17         THE COURT:  I'm sure she is.  Mr. Dorsey?

18         MR. WEISBROD:  I guess, I would propose 9.

19         MR. DORSEY:  9 is fine with the debtors, Your Honor.

20         THE COURT:  Okay, 9 o'clock.  We'll commence with the

21    cross examination of Ms. Saunders and then any redirect.  Are

22    there any additional witnesses?

23         MR. WEISBROD:  There are no additional witnesses.  We

24    will have a number of evidentiary issues as we try to introduce

25    deposition testimony and some other admissions and some other

190

1    public documents.

2           THE COURT:  All right.  So we'll talk about that.

3    Mr. Dorsey or Mr. Power, are you currently anticipating any

4    rebuttal witnesses?

5           MR. DORSEY:  Not at this time, Your Honor.

6           MR. POWER:  No, Your Honor.

7           THE COURT:  Okay.  Then we should be prepared at the

8    close of evidence tomorrow to go into argument as to the

9    objection and what the evidence supports or doesn't support.

10   Okay?

11          MR. WEISBROD:  Well, be ready.

12          THE COURT:  Okay.  Again, you can leave everything.

13   You can even leave your papers on the table today, if you wish.

14   Again, I'd ask you to please generally neaten up and clean up.

15   And we're recessed until tomorrow at 9.  And your client --

16   excuse me, your expert is currently under oath, so you may not

17   discuss the substance of her testimony over the evening recess.

18          MR. WEISBROD:  Yes, Your Honor.

19          THE COURT:  Okay.

20          (Proceedings concluded at 4:59 PM)

21

22

23

24

25

191

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| Michelle Michaelis | Mr. Power | 11 |
| Michelle Michaelis | Mr. Macauley | 34 |
| Michelle Michaelis | Mr. Power | 49 |
| Gracie Graves | Mr. Winstead | 56 |
| Gracie Graves | Mr. Schnitzer | 88 |
| Gracie Graves | Mr. Power | 93 |
| Margo Saunders | Mr. Weisbrod | 109 |
| Margo Saunders | Mr. Dorsey (Voir Dire) | 125 |
| Margo Saunders | Mr. Schnitzer | 133 |
| (Voir Dire) | | |
| Margo Saunders | Mr. Weisbrod | 142 |

E X H I B I T S

| OTHER'S | DESCRIPTION | PAGE |
|---------|-------------|------|
| Docket No. 6965 | Plan Supplement Document | 53 |
| OBC-25 | Document Re Andrews v. Chevy Chase Bank | 178 |

192

1                    I N D E X (cont.)

2

3                    R U L I N G S

4    DESCRIPTION                        PAGE        LINE

5    Debtors' Motion in Limine, Denied  107         18

6    Objection to Ms. Saunders as Expert  140        7

7    Overruled.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

193

1

2                       C E R T I F I C A T I O N

3

4        I, Pnina Eilberg, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Pnina Eilberg

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:   February 18, 2009

16

17

18

19

20

21

22

23

24

25