1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 07-11047

- - - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


AMERICAN HOME MORTGAGE HOLDINGS, INC., ET AL.,


                    Debtors.


- - - - - - - - - - - - - - - - - - - - - - -x


                    U.S. Bankruptcy Court

                    824 North Market Street

                    Wilmington, Delaware


                    February 9, 2009

                    11:41 a.m.


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

2

1   MOTION of Mortgage Electronic Registration Systems, Inc. and

2   MERSCORP, Inc. for Entry of an Order Compelling Assumption or

3   Rejection of Debtors' Executory Contract or Modifying the

4   Automatic Stay and Compelling Payment of Administrative

5   Expenses

6

7   SECOND MOTION of Iron Mountain Information Management, Inc. to

8   Compel Payment of Administrative Expenses

9

10  CONFIRMATION Hearing for Amended Chapter 11 Plan of Liquidation

11  of the Debtors

12

13  MOTION in Limine of Debtors to Exclude Expert Testimony and

14  Report of Margot Saunders

15

16

17

18

19

20

21

22

23

24  Transcribed By:  Esther Accardi

25

3

APPEARANCES:

YOUNG CONAWAY STARGATT & TAYLOR, LLP

      Attorneys for Debtors

      1000 West Street

      Wilmington, Delaware 19801


BY:   SEAN BEACH, ESQ.

      MARGARET WHITEMAN GREECHER, ESQ.

      PATRICK JACKSON, ESQ.

      JOHN DORSEY, ESQ.



LOWENSTEIN SANDLER, PC

      Attorneys for Lead Plaintiffs in Securities Litigation

      65 Livingston Avenue

      Roseland, New Jersey 07068


BY:   IRA M. LEVEE, ESQ.

4

```
 1    A P P E A R A N C E S : (continued)

 2    BINGHAM MCCUTCHEN, LLP

 3         Attorneys for DB Structured Products, Inc.

 4         399 Park Avenue

 5         New York, New York 10022

 6

 7    BY:   STEVEN WILAMOWSKY, ESQ.

 8

 9

10    KAYE SCHOLER, LLP

11         Attorneys for Bank of America

12         425 Park Avenue

13         New York, New York 10022

14

15    BY:   ANA ALFONSO, ESQ.

16

17

18    HAHN & HESSEN, LLP

19         Attorneys for Creditors' Committee

20         488 Madison Avenue

21         New York, New York 10022

22

23    BY:   MARK S. INDELICATO, ESQ.

24         MARK T. POWER, ESQ.

25         EDWARD L. SCHNITZER, ESQ.
```

5

1    A P P E A R A N C E S : (continued)

2    POTTER ANDERSON & CORROON, LLP

3         Attorneys for Bank of America

4         1313 N. Market Street

5         Wilmington, Delaware 19899

6

7    BY:   LAURIE SELBER SILVERSTEIN, ESQ.

8         GABRIEL MACCONAILL, ESQ.

9

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

12        Attorneys for Waterfield and Union Federal

13        One Rodney Square

14        Wilmington, Delaware 19899

15

16   BY:   ERIC M. DAVIS, ESQ.

17

18

19   GILBERT OSHINSKY, LLP

20        Attorneys for Borrowers' Committee

21        1100 New York Avenue

22        Washington, D.C. 20005

23

24   BY:   STEPHEN A. WEISBROD, ESQ.

25        W. HUNTER WINSTEAD, ESQ.

6

1    A P P E A R A N C E S : (continued)

2    ZUCKERMAN SPAEDER, LLP

3         Attorneys for Borrowers' committee

4         919 Market Street

5         Wilmington, Delaware 19801

6

7    BY:   THOMAS G. MACAULEY, ESQ.

8

9

10   DORSEY & WHITNEY, LLP

11        Attorneys for U.S. Bank as Trustee

12        1105 North Market Street

13        Wilmington, Delaware 19801

14

15   BY:   ROBERT W. MALLARD, ESQ.

16

17

18   COVINGTON & BURLING, LLP

19        Attorneys for Wilmington Trust Company

20        620 Eighth Avenue

21        New York, New York 10018

22

23   BY:   SUSAN JOHNSTON, ESQ.

24

25

7

1    A P P E A R A N C E S : (continued)

2    PRYOR CASHMAN, LLP

3          Attorneys for Law Debenture Trust Co. of NY

4          410 Park Avenue

5          New York, New York 10022

6

7    BY:   TINA N. MOSS, ESQ.

8

9

10   WOMBLE CARLYLE SANDRIDGE & RICE,

11         Attorneys for Triad Guaranty Trust

12         222 Delaware Avenue

13         Wilmington, Delaware 19801

14

15   BY:   KEVIN J. MANGAN, ESQ.

16

17

18   BIFFERATO GENTILOTTI

19         Conflicts Counsel for Creditors' Committee

20         800 North King Street

21         Wilmington, Delaware 19899

22

23   BY:   GARVAN F. MCDANIEL, ESQ.

24

25

8

1    A P P E A R A N C E S : (continued)

2    GREENBERG TRAURIG, LLP

3        Attorneys for WLR

4        1007 North Orange Street

5        Wilmington, Delaware 19801

6

7    BY:   VICTORIA W. COUNIHAN, ESQ.

8

9

10   LANDIS RATH & COBB, LLP

11       Attorneys for JPMorgan

12       919 Market Street

13       Wilmington, Delaware 19899

14

15   BY:   MATTHEW B. MCGUIRE, ESQ.

16

17

18   REED SMITH, LLP

19       Attorneys for Freddie Mac

20       1201 Market Street

21       Wilmington, Delaware 19801

22

23   BY:   J. CORY FALGOWSKI, ESQ.

24

25

9

1    A P P E A R A N C E S : (continued)

2    BLANK ROME, LLP

3         Attorneys for Creditors' Committee

4         1201 Market Street

5         Wilmington, Delaware 19801

6

7    BY:   DALE R. DUBE, ESQ.

8

9

10   ASHBY & GEDDES, PA

11        Attorneys for Morgan Stanley Mortgage Capital

12        500 Delaware Avenue

13        Wilmington, Delaware 19899

14

15   BY:   AMANDA M. WINFREE, ESQ.

16

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19   OFFICE OF THE UNITED STATES TRUSTEE

20        844 King Street

21        Wilmington, Delaware 19899

22

23   BY:   JOSEPH MCMAHON, ESQ.

24

25

1   A P P E A R A N C E S : (continued)

2   MILBANK TWEED HADLEY & MCCLOY, LLP

3        Attorneys for ABN AMRO Bank

4

5   BY:   ROBERT MOORE, ESQ.

6        FRED NEUFELD, ESQ.

7        (Telephonically)

8

9   ROMERO LAW FIRM

10        Attorneys for California Taxing Authority

11

12   BY:   MARTHA E. ROMERO, ESQ.

13        (Telephonically)

14

15   ALSTON & BIRD

16        Attorneys for LaSale Bank

17

18   BY:   BESS PARRISH, ESQ.

19        (Telephonically)

20

21   ADORNO & YOSS

22        Attorneys for American Home Mortgage

23

24   BY:   GREGG S. AHRENS, ESQ.

25        (Telephonically)

11

P R O C E E D I N G S

1

2     THE CLERK:  All rise.

3     THE COURT:  Please be seated.

4     MR. BEACH:  Good morning, Your Honor.  May it please

5  the Court.  Sean Beach from Young Conaway Stargatt & Taylor on

6  behalf of the debtors.

7     Your Honor, the first item on the agenda today is the

8  motion of Mortgage Electronic Registration Systems for entry of

9  an order compelling assumption or rejection of their executory

10  contract.  That item has been adjourned till February 17th.

11     As has the second item, a motion by Iron Mountain to

12  compel payment of admin expenses.  That has also been adjourned

13  till the 17th.

14     Which brings us to the main event today, which is a

15  confirmation of the debtors' plan of liquidation.  As Your

16  Honor is aware this has been a long process for the debtors.

17  And if you'll indulge me for a minute, I'd like to recognize

18  Patrick Johnson and Maggie Greecher for their significant

19  efforts in connection with getting us to the place we are here

20  today.  And that's not to exclude all the efforts of the

21  committee members and other members, as well.  But it has been

22  an extraordinary effort and I did want to recognize them.

23     Your Honor, I'd also like to point out that the

24  debtors' witnesses, Mr. Bret Fernandes and Mr. Damian Pasternak

25  are here today.  Bret Fernandes is the director of

12

1    restructuring of the debtors and also a director of Zolfo

2    Cooper.  And Mr. Damian Pasternak is an employee of the

3    debtors.

4         Your Honor, the debtors, the official committee of

5    unsecured creditors, and the borrowers' committee have

6    consulted regarding a process for the hearing today.  So I'd

7    like to make a suggestion in terms of how we proceed.  We do

8    believe that this will be a two-day confirmation hearing, given

9    the number of witnesses and other issues that have been raised.

10   And I believe Your Honor has allotted the time for a two-day

11   confirmation hearing.

12        What we had talked about in terms of process if to

13   walk Your Honor through, first of all, some of the preliminary

14   matters, like the voting results, the resolved objections, and

15   the withdrawn objections, so that some of those parties will

16   not need to sit through the two days here.  And I am pleased to

17   report that a majority of the objections have been resolved,

18   many of which resulted in some additional inclusions in the

19   confirmation order.

20        And, then, what we would recommend, Your Honor, is to

21   proceed to argue the motions in limine.  I did hear this

22   morning from counsel for the borrowers' committee, that they

23   would prefer to hear the debtors' motion in limine tomorrow.

24   The debtors do want to hear that motion today, and we can

25   address that issue at the appropriate time.

1          And, then, Your Honor, the debtors would proceed with

2     their case in chief.  The debtors have, as I said, two

3     witnesses, which we believe we can get through today.  And the

4     committee has one witness, Ms. Michelle McCallis (ph.) from

5     BDO.  And that, Your Honor, I think would bring us to the end

6     of the day.

7          I can also, as a preliminary matter, walk Your Honor

8     through what I believe are the outstanding issues so that Your

9     Honor can focus on those particular issues.  So if that process

10    is acceptable to Your Honor I think we'll proceed in that

11    manner.

12         THE COURT:  All right.  Any objection?  We'll proceed

13    in that manner.

14         MR. BEACH:  Your Honor, with respect to the voting

15    results we are pleased to report that despite the very complex

16    and contested bankruptcy cases, the debtors received

17    overwhelming support for the plan.  As Your Honor can

18    appreciate this was no easy task and entailed a protracted arms

19    length negotiations with the creditors committee, the

20    borrowers' committee, and certain secured lenders, such as Bank

21    of America and many other creditors in these bankruptcy cases,

22    to culminate ultimately in the plan that we're presenting to

23    Your Honor today.

24         Epiq Bankruptcy Solutions LLC was appointed to act as

25    the balloting agent in these cases.  The sworn declaration of

1  James Katchadurian of Epiq Bankruptcy Solutions certifying the

2  ballots is found at docket number 6952.  I'll not restate all

3  of the voting results for Your Honor, but I do think it's

4  worthwhile highlighting some of the voting results in that

5  report.

6          First, there were between two and four general

7  unsecured classes in each of the debtors' estates.  General

8  unsecured claim class, Bank of America unsecured claim class,

9  subordinated trust preferred claim class, and a borrower claim

10  class.

11          The general unsecured claim classes and the borrower

12  classes of each estate received the same distribution under the

13  plan, but based on some provisions that the debtors negotiated

14  with the borrowers' committee there are certain other non-

15  monetary relief that has been inserted into the revised plan of

16  liquidation.  The borrower claims are separately classified

17  partially based on the borrower committee's demand and

18  suggestion that those were unique claims.

19          B of A unsecured claims are separately classified,

20  because as Your Honor may recall, pursuant to the settlement

21  agreement with the committee, Bank of America does not share in

22  certain of the proceeds of REO property based on that

23  settlement, so they have a slightly different distribution.

24          With respect to the subordinated trust preferred

25  claims, Your Honor, these are contractually subordinated to

1    certain other unsecured creditors.  And a mechanism to handle

2    that subordination is built into the plan.

3         The vast majority based on amount and number of the

4    unsecured classes are the general unsecured claim class, that's

5    the largest unsecured claim class that we have.  And in this

6    class in all eight estates the general unsecured creditors

7    voted overwhelmingly in favor of the plan.  In fact, the lowest

8    accepting amount in any estate was 96.76 percent.  And the

9    lowest accepting numbers was 93.25 percent.

10        With respect to the B of A classes, all those classes

11   accepted for the plan, the subordinated trust preferred classes

12   accepted the plan, and seven of the eight borrower classes have

13   voted to accept the plan.  Most notably, the classes that the

14   borrowers' committee indicate are the most likely, and the

15   debtors agree, are the most likely estates where borrower

16   claims would exist, which are AHM Corp., AHM Acceptance and AHM

17   Servicing.  All of those classes overwhelmingly accepted the

18   plan.  AHM Acceptance approved the plan 100 percent in amount

19   and 100 percent in number.  AHM Corp. borrowers voted 99.83

20   percent in amount and 93.7 percent in number.  And AHM

21   Servicing or AHMSP the borrowers voted 100 percent in amount

22   and 100 percent in number to accept the plan.

23        Your Honor, there were a small number of the

24   miscellaneous secured class and one other secured class that

25   voted to reject the plan.  And with respect to that one

16

1   unsecured class and these secured classes, the debtors propose

2   to cram those classes down pursuant to 1129(b) of the

3   Bankruptcy Code.

4        Your Honor, I'd like to walk through the resolved

5   objections and get those out of the way for now.  The first

6   objection that is reflected on the agenda is the objection of

7   Travis County, and that objection has been withdrawn.

8        THE COURT:  Okay.

9        MR. BEACH:  The next objection is an objection by

10  Iron Mountain Information Management Inc.  They have asserted

11  an administrative claim.  The debtors have pointed out that

12  there's a secured administrative and priority claim reserve

13  under the plan, and that was acceptable to Iron Mountain.

14       THE COURT:  Okay.

15       MR. BEACH:  With respect to Adorno & Yoss, we did

16  make a -- inserted a new paragraph to the confirmation order.

17  Your Honor, I think this might be the appropriate time to hand

18  up a slightly modified confirmation order, if I may approach?

19       THE COURT:  Yes.  Thank you.

20  (Pause)

21       MR. BEACH:  Your Honor, the paragraph dealing with

22  Adorno & Yoss has been added to the confirmation order that I

23  just submitted to Your Honor.  And it's at paragraph 56, page

24  42 of the blackline.  Adorno & Yoss is an ordinary course

25  professional in the case of foreclosure professional, to be

1    specific.  They have received approximately 1.6 million dollars

2    in the bankruptcy case so far.  But for reasons that the

3    debtors are still trying to work through, there's approximately

4    283,000 dollars that was not paid.  As Your Honor may recall,

5    there was an agreement in principle with the AHM Servicing

6    entity, that they would pay those claims, and the parties

7    reserve their rights to say that the debtors owe that amount.

8    AHM Servicing has not paid these claims.  We're not quite sure

9    what the reason is, but in terms of the debtors' obligations,

10   we have agreed with Adorno & Yoss that we would pay half of

11   that amount within forty-eight hours of the confirmation order

12   being approved.  And the rest of it within thirty days.  The

13   reason for that is so that we have some time because we believe

14   what the situation is that these -- the servicing rights for

15   these loans may have been moved off of AHM Servicing.  And so

16   AHM Servicing is saying that it's not their obligation to pay

17   these advances, and so there's probably a third party servicer

18   that's dealing with these.  And so the debtors have -- are

19   working with Adorno & Yoss to try to get invoices out to those

20   third party servicers to try to recoup some of that money.

21            THE COURT:  Okay.

22            MR. BEACH:  The next item is Item E on the agenda,

23   it's the objection of the IRS.  The debtors added paragraph 55,

24   which his also on the --

25            THE COURT:  What happened to D, the securities class

18

1    action?  Are you just doing the resolved ones?

2         MR. BEACH:  I'm just doing the resolved ones, Your

3    Honor.

4         THE COURT:  Okay.

5         MR. BEACH:  Your Honor, that one is not resolved,

6    although I think we have narrowed the issues on that one.

7         THE COURT:  All right.

8         MR. BEACH:  And I can address that in a moment.

9         In paragraph 55, Your Honor, we made some

10   clarifications for the IRS.  Their primary concern was they

11   didn't want to be stretched out over a six-year period of time.

12   We were okay in this circumstance, agreeing that the IRS would

13   be paid after the claim is allowed within four months or within

14   two weeks after the claim is allowed.  There are some setoff

15   issues that we're dealing with with the IRS.  We may be able to

16   setoff some of the HUD claims that are owed to the debtors.

17   And so the parties are going to work together, but have

18   resolved the confirmation issues through those insertions in

19   paragraph 55.

20        The next objections are the local Texas taxing

21   authorities and the California taxing authorities.

22        THE COURT:  Let me just back up.  One is DB

23   Structured Products.  I was told to stop work on that.  I

24   stopped work on that, Mr. Jackson.

25        MR. JACKSON:  Your Honor, Patrick Johnson for the

1    debtors.

2              The parties are in the midst of discussing a global

3    resolution of all the issues on appeal.  The issue currently

4    before Your Honor is whether the contract is executory or not.

5    And the objection is kind of premised and related to that.

6              We were hoping to present a global resolution today.

7    We're not quite ready to do that.  But we were in discussions

8    and we may be able to stipulate around this particular plan

9    objection.

10             THE COURT:  Okay.  I'm sorry, where were you?

11             MR. BEACH:  The local Texas taxing authorities and

12   California taxing authorities, F and H on the agenda.

13   Paragraphs 50 and 51 of on the confirmation order resolve those

14   objections.  There primary issues are that have secured tax

15   claims with respect to REO, that is owned by the debtors.  And

16   as the debtors intend to do, they want to be paid in the

17   ordinary course.  There are a few other issues that are

18   addressed in a confirmation order in terms of payment of

19   interest at the statutory rate, but those issues are resolved

20   with those changes to the confirmation order.

21             THE COURT:  Okay.

22             MS. ROMERO:  Your Honor, this is Martha Romero for

23   the California taxing authorities.

24             And I just want to make sure that debtors got the

25   entire language changed.  We were still e-mailing on Friday and

20

1    I didn't send it back to Mr. Beach until 5:32 p.m. Pacific

2    time.  So I just want to make sure that they got all of the

3    language because I haven't gotten a confirmation that he

4    received it or that the last minute language was acceptable.

5              MR. BEACH:  I can confirm, Ms. Romero, that we

6    inserted the entirety of the language that we had agreed to by

7    our e-mails.

8              THE COURT:  To the entirety of the language you

9    received at 8:30 our time on Friday, as in the order?

10             MR. BEACH:  I sent language to Ms. Romero, she

11   confirmed back that that language was acceptable.  And that's

12   the language that's inserted in the confirmation order.  I

13   don't remember exactly when I sent that e-mail to Ms. Romero.

14             MS. ROMERO:  Okay.  Thank you, Your Honor.

15             THE COURT:  Okay.  It's all a blur, isn't it, Mr.

16   Beach.

17             MR. BEACH:  That it is, Your Honor.

18             THE COURT:  Okay.

19             MR. BEACH:  The next objection is an objection by

20   Freddie Mac of the Federal Home Mortgage Corp.

21             Your Honor, the debtors agree to language.  This

22   related to an issue in the Bank of America settlement.  The

23   Bank of America was to direct the debtors to abandon the

24   Freddie Mac servicing rights and the confirmation order

25   provision effectuates that provision of the settlement

1 agreement.  And so that's what that change is, it's in

2 paragraph 49.

3   The objection of the SEC has been resolved.  The SEC

4 was concerned about the exculpation provision.  Their specific

5 concern was that the exculpation provision exculpated the

6 protective parties during the Chapter 11 cases and they were

7 concerned that that wasn't focused on -- in connection with the

8 Chapter 11 cases.  And so we added "and in connection with the

9 Chapter 11 cases."  That is reflected in the exculpation

10 provision of the confirmation order.  As Your Honor knows, the

11 confirmation order will -- well, as reflected in the

12 confirmation order, the confirmation order trumps the plans.

13 And so that language is inserted in the confirmation order.

14   I can get Your Honor a paragraph.  I believe it's

15 paragraph 9 or 10.

16   THE COURT:  I don't have a blackline, though.

17   MR. BEACH:  It might have --

18   THE COURT:  Oh, "and in connection with."  I see it.

19   MR. BEACH:  Okay.  Your Honor, we received an

20 information objection from Waterfield, it's at item Q on the

21 agenda.  That has been resolved in addition in paragraph 53 in

22 the confirmation order, which is essentially a reservation of

23 rights of the parties in that litigation that's pending in New

24 York.  And, in particular, Waterfield wanted to make sure that

25 they maintained their ability to assert setoff rights that were

22

1   asserted in counterclaims in that New York litigation.  And it

2   is also specifically reflected in the stay relief order that

3   was entered with respect to Waterfield.  So it essentially just

4   confirms that issue.

5           I'm not sure if I mentioned, it's paragraph 53 of the

6   confirmation order.

7           THE COURT:  Okay.

8       (Pause)

9           THE COURT:  Okay.

10          MR. BEACH:  The next change is with respect to an

11  informal objection of the securitization trustees.  The debtors

12  added paragraph 48 into the confirmation order.  The debtors

13  have agreed to file a response to the DB Structured Products

14  objection to the cure notice.  The issue with the

15  securitization trustees is that they are concerned about and

16  want some finality to the payment of their cure amounts.  The

17  primary obstacle to that is that DB Structured Products

18  asserted a -- I believe a twenty-eight million dollar claim.

19  That cure escrow is capped at ten million dollars.  And so

20  until that issue is resolved we can't determine whether or not

21  there's going to be pro rata distributions from the cure escrow

22  or other distributions.  So under the paragraph that we

23  inserted into the plan it gives the debtors a deadline to file

24  an objection to these DB Structured Products  secured claim.

25          Item S on the agenda is the informal objection of

23

1    Triad Insurance Company.  Paragraph 54 of the confirmation

2    order reflects that resolution.  And it's a reservation of

3    rights.  To the extent that a cause of action exists that Triad

4    may want to assert, that is preserved in the confirmation

5    order.

6              Your Honor, the U.S. Trustee's Office had provided

7    some informal comments.  I don't see Mr. McMahon in the

8    courtroom today.  I believe we've addressed most of those

9    comments, although I don't know if his comments -- well, if he

10    has any standing objection.

11              THE COURT:  Okay.

12              MR. BEACH:  Your Honor, I do want to point out in

13    the -- I wouldn't characterize it as a --

14              THE COURT:  Mr. McMahon just entered.

15              MR. BEACH:  I'll give him a few minutes to settle in

16    and get --

17              THE COURT:  All right.

18              MR. BEACH:  -- back to that.  Your Honor, one issue I

19    did want to highlight.  I wouldn't characterize it as an

20    informal objection, but we had discussions with Bank of America

21    in terms of putting language in the plan and confirmation order

22    to implement the global settlement agreement with Bank of

23    America.  One of the changes that we made, that was filed with

24    the original confirmation order and not reflected in the

25    blackline, but one that I wanted to point out to Your Honor, is

1    in paragraph 9, I believe, the injunction provision.

2            And Bank of America has chosen to leave the Bank of

3    America Mortgage loans in two of the debtors, AHM Mortgage

4    Corp. and HM Acceptance.  And as Your Honor will recall, under

5    that global settlement agreement, Bank of America has total

6    dominion and control over those mortgage loans, the debtors.

7    And Bank of America is also obligated to pay any costs

8    associated with respect to the debtors continued ownership of

9    those mortgage loans.  But in terms of effectuating that

10   settlement agreement we have included the B of A mortgage loan

11   specifically in the injunction provision.  And that's reflected

12   in a couple of location.  At first, it's at Roman net I.

13           THE COURT:  All right.

14           MR. BEACH:  The language is "any property of any

15   protected party or the B of A mortgage loans nominally held by

16   AHM Corp. and AHM Acceptance pursuant to the terms of the B of

17   A global settlement agreement defined as B of A Mortgage Loan

18   Property."  And then used in Roman net II, Roman net III, and

19   Roman net IV in that provision.

20           THE COURT:  I see it.  That resolves their issues?

21           MR. BEACH:  I believe it does, Your Honor.

22           THE COURT:  Thank you.

23           MR. BEACH:  With respect to the objection of JPMorgan

24   Chase.  The issue has not been resolved yet, but JPMorgan Chase

25   is going to provide the debtors with additional information as

1    Your Honor may have read.  Their objection primarily relates to

2    the EPD breach protocol.  And JPMorgan has indicated that they

3    think the severity rates in particular in the EPD breach

4    protocol are too low and don't reflect the appropriate amount

5    that they should receive when liquidating their claim.

6            JPMorgan is going to get us some additional

7    information that we're going to run through the protocol and

8    that -- once that information is received it may resolve their

9    objection.  So while the objection is not resolved, we expect

10   to get that information today, run it through the protocol,

11   have discussions with JPMorgan.  If it's acceptable to Your

12   Honor, what we've agreed to with JPMorgan is that they would

13   have the ability to cross examine our witness, Mr. Pasternak,

14   tomorrow, even though we expect and hope that Mr. Pasternak

15   will testify today.  So if it's acceptable to Your Honor for

16   JPMorgan to hold any cross examination and do that tomorrow, if

17   the objection's not resolved, that is what we agreed subject to

18   Your Honor's consent to how to handle that objection.

19           THE COURT:  Is there any objection to that procedure?

20           MR. WEISBROD:  No objection, Your Honor, from the

21   borrowers' committee.  I do know that we've asked JPMorgan to

22   provide a copy.  And we reserve our rights (inaudible - not

23   speaking into microphone).

24           THE COURT:  Okay.  All right, that's fine.

25           MR. BEACH:  Thank you, Your Honor.  Morgan Stanley

26

1    filed a joinder to the JPMorgan objection.  I would suggest to

2    Your Honor if the JPMorgan objection is withdrawn then that

3    joinder would fall away as well.  Although, we have not been

4    able to have any conversations with Morgan Stanley in terms of

5    what exactly their issues may be.  They did file a joinder in

6    connection with the EPD breach protocol, not fairly reflecting

7    their claim.

8         Your Honor, I'll just move back to the U.S. Trustee

9    for a moment, if Mr. McMahon is settled in.  We did, as I

10   mentioned, received an informal response from the Office of the

11   United States Trustee.  I believe we've dealt with those issues

12   or explained certain of those issues I hope for the

13   satisfaction of the Office of the U.S. Trustee, but this might

14   be the right moment to find out if there are any outstanding

15   issues with respect to the Office of the U.S. Trustee.

16        THE COURT:  Okay.  Mr. McMahon.

17        MR. MCMAHON:  Good afternoon.  Joseph McMahon for the

18   Acting United States Trustee.

19        Your Honor, there are some -- I went down the

20   checklist of items that I gave to the debtors.  A number of

21   them have been resolved.  There may be a few items that I need

22   to talk to the committee and the debtors about.  With the

23   Court's permission, I'd just like to refer that to the close of

24   the hearing.

25        THE COURT:  Very good.

1          MR. MCMAHON:  Thank you, Your Honor.

2          THE COURT:  Thank you, sir.

3          MR. BEACH:  Your Honor, with respect to the objection

4     of the securities class action plaintiffs.  The committee has

5     had some conversations with counsel for the securities class

6     action plaintiffs this morning.  So I may not characterize

7     exactly how -- we haven't fully resolved the issues, but I

8     understand the issues have been narrowed somewhat.  Part of the

9     narrowing of those issues relates to representations that I'll

10    make in a moment to Your Honor, but it's with respect to the

11    document destruction provisions in the plan and the plan trust

12    agreement.  The securities class action plaintiffs I believe

13    will be satisfied with a representation that the only document

14    destruction orders that will survive following the effected

15    date are the three that have been entered by the Court at

16    docket number 23952888, and docket number 4387.  The language

17    in the confirmation order regarding preservation of documents

18    and destruction of documents indicates that we can continue to

19    comply with orders of the Court.  It relates to those three

20    document destruction orders, which are the only ones that

21    exist.  As well as certain sale orders that have been approved

22    by the Court where the debtors may be required to return

23    certain mortgage loan files to other parties.  So I believe

24    that representation deals with the document portion of the lead

25    plaintiff's objection.

28

1          I may be getting this wrong, but I believe the only

2   outstanding portion of their objections is with respect to the

3   ability to get, essentially, relief from the Court to proceed

4   against the D&O insurance proceedings.  I believe that issue

5   has not been resolved.  And I'm not aware of what other

6   outstanding issues there may be.  So if I may cede the podium

7   to counsel for the securities class action, maybe we can hear

8   what those issues are.

9          THE COURT:  All right.  Mr. Levee or Leevey.

10          MR. LEVY:  Levee.

11          THE COURT:  Levee.

12          MR. LEVEE:  Ira Levee, Lowenstein Sandler for the

13   lead plaintiffs in the securities litigation.

14          With respect to the document preservation we're

15   satisfied that as long as those destruction orders are limited

16   to the three that are identified already, that part of the

17   objection is resolved.  I had some discussions today with

18   counsel for the committee about some additional language that

19   we had suggested in our objection other than addressing the

20   destruction orders.  And I thought -- and if I'm wrong the

21   committee counsel can correct me, we had requested that

22   language that the records of the debtor -- that "the debtors

23   transfer to the plan trust shall include, but not be limited,

24   to all such documents and electronic data identified for

25   retention in connection with any investigation by the debtors'

1    board of directors, or any committee of the debtors' board of

2    directors, or produced to the SEC, the United States Attorney's

3    Office, or any other governmental agency."

4         I just want to ensure that the documents that are

5    transferred to the plan trust are documents that have been

6    produced or set aside by the debtor for other investigations.

7    And that those will be part of the preservation and nothing

8    will happen to them.

9         MR. INDELICATO:  Good morning, Your Honor.  Mark

10   Indelicato from Hahn & Hessen.  We have no objection to the

11   language, the committee will work it out with the debtor to

12   make sure it fits exactly how we're categorizing it.  But we

13   agree as to whatever documents will be turned over to the

14   liquidating trust will be preserved.

15        THE CLERK:  I'm sorry, I can't hear you.

16        MR. INDELICATO:  Your Honor, we agree with Mr. Levee

17   that we will work to get that language acceptable to him.  We

18   just want to make sure as he's categorized the documents as the

19   debtor has preserved as they identified, they said the

20   documents were going to be turned over to the SEC or identified

21   in specific preservation by the debtor, it will be turned over

22   to the liquidating trustee and preserved until further order of

23   this Court.

24        THE COURT:  All right, thank you.

25        MR. LEVEE:  Our second objection dealt with the

1    extension of the extension of the stays and injunction under

2    the plan.  And I think that -- I spoke with Mr. Indelicato

3    earlier and we talked about some language that had been

4    included in another matter that was similar to this one.  And

5    that we should be able to come up with similar, or

6    substantially similar language, that was used in the New

7    Century order that would address preserving the documents or

8    preserving our rights as to lead plaintiffs to proceed to serve

9    discovery on the plan trustee once we get relief from the PSLRA

10   stay in the securities litigation.

11          THE COURT:  All right.

12          MR. INDELICATO:  Your Honor, that's correct.  We did

13   agree to include some language in the confirmation order.  The

14   litigation issues we reserve the rights for the lead plaintiffs

15   to file and serve discovery on the liquidating trustee.  We

16   will preserve the rights of the liquidating trustee to defend

17   against any such discovery that's appropriate.

18          THE COURT:  Okay.

19          MR. LEVEE:  That's correct, Your Honor.

20          THE COURT:  Would that resolve all your issues?

21          MR. LEVEE:  No.

22          THE COURT:  Okay.

23          MR. LEVEE:  I have two other issues.  And I don't

24   think that these are resolved.

25          The third one I believe Mr. Beach alluded to is our

1    right to pursue claims against the debtor solely to the extent

2    of available D&O insurance.  In the response that the debtors

3    filed, I think they ignored the fact that this is a liquidating

4    Chapter 11 case and the debtors are not entitled to a

5    discharge.  And, also, that there's been no determination of

6    the D&O policies are property of the estate.  That

7    determination has not been made in this case.  And if it's

8    requested to be made it would be required that there be a full

9    hearing with an opportunity to brief the issues, and an

10   opportunity to be heard by the parties.

11            MR. BEACH:  If I just may make a suggestion.  We're

12   trying to narrow the issues here.  My proposal is to leave the

13   outstanding objection for argument at the end of the case.  I

14   certainly didn't make that clear to Mr. Levee.

15            MR. LEVEE:  Okay.

16            MR. BEACH:  But I think that as a matter of process

17   would probably make the most sense.

18            MR. LEVEE:  That's fine, Your Honor.

19            THE COURT:  If you could identify the issues for me.

20   I understand that issue, you had another one?

21            MR. LEVEE:  Yeah.  The other one had to do with the

22   leases and injunctions to the extend they impact the claims of

23   the lead plaintiffs against non-debtors.

24            THE COURT:  Okay.  That should be easy to work out.

25            MR. LEVEE:  With suggested language, I think it

32

1    should be.

2                 THE COURT:  Okay.

3                 MR. LEVEE:  Thank you.

4                 MR. INDELICATO:  Your Honor, just to address on that

5    point.  Mark Indelicato here.  I think we're all on the same

6    page.  At least in our discretion we want to make sure that no

7    pre-petition third parties are concerned about the use of the

8    word non-debtor, giving the liquidating trustees non-debtor.

9    And there were all those parties who may entitled to relief of

10   the non-debtors.  So we seemed to narrow that, and I don't

11   think we're far off on resolving this issue.

12                THE COURT:  All right.  It sounds like a language

13   issue.

14                MR. LEVEE:  We can define non-debtors to 1115.

15                THE COURT:  Okay.  Thank you, sir.

16                MR. BEACH:  And, Your Honor, I believe that brings us

17   to what is remaining.

18                THE COURT:  So with the DB Structured parties, Mr.

19   Jackson, you're going to continue to negotiate or --

20                MR. JACKSON:  That's correct, Your Honor.

21                THE COURT:  Okay.

22                MR. JACKSON:  When we break today.  I'm hoping to be

23   able to present a resolution after that.

24                THE COURT:  Very good, thank you.

25                MR. BEACH:  I've indicated the issues are JPMorgan

33

1    and Morgan Stanley which leaves us with the borrowers'

2    committee objection, Your Honor.  And prior to the hearing, the

3    borrowers' committee brought to our attention what I would

4    characterize as clarifying issues.  One is that the provisions

5    that were added to Article 17 of the plan they'd like in the

6    confirmation order.  The debtors have no objection to doing

7    that.  And then the other issue that they had raised is they

8    wanted to make sure it was clear to the extent it wasn't clear

9    that the 363(o) provisions would be applicable to the Bank of

10   America loans.  I have not talked to Ms. Alfonso about that,

11   but the debtors certainly did not intend to transfer those

12   loans or to hole those loans outside of the provisions of

13   363(o).

14          And, Your Honor, other than that, as Your Honor can

15   clearly see from the docket and all the pleadings filed this

16   morning, the issues with the borrowers' committee have not been

17   resolved and that is the primary objection that the debtors

18   will need to address during this confirmation hearing.  At

19   least, it's the only objection that I would characterize, Your

20   Honor, as an objection structured to blow up the plan.

21          Your Honor, what I'd like to do next is just walk

22   very quickly through some of the key provisions of the plan

23   that do relate to some extent to the borrower committee

24   objection.  At first I would point out to Your Honor, as

25   Article 6 of the plan, is a comprehensive resolution of

34

1    significant intercompany claims and other disputes that the

2    parties may have.  In evaluating the situation that the debtors

3    were facing and developing a plan, the debtors determined that

4    the only way to create an efficient liquidating plan and to

5    avoid the debilitating and expensive conflicts that a plan

6    trustee would be subject to upon going effective, the debtors

7    determined that a settlement of these intercompany claims was a

8    critical component of the plan.  And Article 6 reflects that

9    intercompany claim settlement.  The debtors' brief in support

10   of confirmation also goes through in detail about that.  And

11   the disclosure statement has, I believe, approximately ten

12   pages describing that complex settlement and all the

13   transactions related to that settlement.

14          Article 7 of the plan, Your Honor, is related to an

15   early payment default claim or breach of warranty claim

16   protocol.  I believe Your Honor has dealt with a similar type

17   of protocols in the Delta Financial case.  The protocol is

18   meant to streamline what would otherwise be extremely difficult

19   claims to liquidate.  It would entail a case-by-case or a loan-

20   by-loan analysis.  And, frankly, would rain a significant

21   amount of the assets of the estate.  And so the debtors, with

22   significant assistance by Mr. Power, who's got experience in

23   this area, have developed an EPD breach protocol that we

24   believe is fair and appropriately liquidates these claims in a

25   way that creates an efficiency to benefit all creditors in the

1    case.

2         As Your Honor has seen, both, the stipulated asset

3    allocation and EPD breach protocol are being challenged by the

4    borrowers' committee.  Debtors submit that the appropriate

5    standard for approval of both of these is under 9019 of the

6    Bankruptcy Code.  And with respect of the EPD breach protocol

7    to the extent we go through with a contested proceeding with

8    JPMorgan or Morgan Stanley.  We believe that those claims can

9    be estimated under 502(c) and are appropriately estimated under

10   502(c) using the EPD breach protocol itself.

11        Next, Your Honor, and the last article that I'll

12   point out is the Article 17 that was added to the amended plan

13   that was filed on February 5th.  Your Honor, this article is

14   devoted entirely to borrower issues.  And I would submit to

15   Your Honor provides a significant amount concessions to

16   borrowers that the debtors believe are appropriate to be able

17   to address some of the concerns that have been raise over the

18   course of this case and by the borrowers committee.

19        And the first of that is the prospective relief with

20   respect to the stay and injunction provisions with respect to

21   counterclaims and defenses in foreclosure actions.  Your Honor

22   may recall there was some discussion about that around the time

23   of the appointment of the borrowers' committee.  No motion I

24   think was ever filed for that.  The plan will implement that

25   provision.

1          In addition, it provides for a prospective relief

2     from the plan's injunction and stay provisions for borrowers

3     under loans originated or serviced by the debtors to commence

4     or continue actions against the debtors nominally for the

5     purpose of obtaining relief against non-debtor parties seeking

6     third party discovery from the debtors or the plan trust in

7     connection with a non-debtor litigation, and providing that

8     with a written consent by the debtors the debtors can consent

9     to stay relief for parties to proceed against -- borrower

10    parties to proceed against the debtors.

11         It expressly preserves borrowers' rights to assert

12    defenses to the payment of amount due on loans owned by the

13    debtors.  To a certain non-monetary remedies, including

14    rescission under the Truth and Lending Act against the plan

15    trust.  And to set off a recoup borrower claims against amounts

16    owing to -- on loans owned or contributed to the plan trust by

17    the debtors.  Requiring the plan trust to employ a

18    disinterested person as a borrower information ombudsman.

19    This, Your Honor, I think is a key provision that's been

20    inserted into the plan.  It's that the plan trustee will employ

21    a borrower information ombudsman to help address borrower

22    concerns and borrower calls.  That borrower ombudsman will have

23    access to electronic and mortgage loan files and other data of

24    the debtors.  And the debtors believe that a 50,000 dollar cap

25    for the work that that borrower information ombudsman would do

1    is appropriate.  Certainly given the volume of calls that the

2    debtors have received throughout the course of this case, we

3    believe it's appropriate to cap that at 50,000 dollars.  But

4    more importantly, it is a person dedicated to addressing

5    concerns of borrowers in the post-effective date period.

6         For loans owned by the plan trust it requires that

7    the plan trustee confer with the borrower or direct the loan

8    servicer to confer with the borrower within thirty days

9    regarding our written request for loan modification, or in the

10   event they do not have the power to modify the loan forwarding

11   the modification request to the appropriate party.  Requires

12   the plan trustee to use reasonable efforts to contact the

13   borrower to obtain information regarding any asserted claim

14   prior to filing an objection to that claim.  It also requires

15   the plan trustee or the debtors prior to the effective date to

16   reach out to borrowers and propose a reasonable settlement on

17   that borrower claim.  And, third, it provides a requirement for

18   the debtors to inform the borrowers of the ability to appear

19   telephonically at hearings on claim objections.

20        Next, it clarifies that there's nothing in the plan

21   that limits the ability of a claimant to argue excusable

22   neglect in filing a late claim if a party chooses to do that,

23   or the debtors' ability to consent to the filing of a late

24   claim.

25        And then, last, it expressly provides that with the

38

1   exception of the exculpated parties, nothing in the plan

2   affects the rights of borrowers as against third parties,

3   including the ability to seek equitable subordination.  Your

4   Honor, we don't believe that the plan ever affected those

5   parties, but that was a concern expressed to make it clear, in

6   the plan, that it doesn't affect borrowers' claims as against

7   third parties.

8          Your Honor, I think those are the key provisions that

9   I want to highlight on the plan.  Next, we have had discussions

10  with the borrowers' committee and the official committee of

11  creditors about getting -- stipulating to the admission of some

12  documents into evidence.  Those documents are all documents

13  that are on the Court's docket.  If I may, Your Honor, I'd like

14  to move for the admission of those documents now.  I can hand

15  Your Honor a list of what those documents are, with docket

16  numbers, and then walk through those briefly.  But I think it

17  would help streamline the process overall.

18          THE COURT:  Very good.

19          MR. BEACH:  May I approach?

20          THE COURT:  Yes.

21      (Pause)

22          THE COURT:  Thank you.

23          MR. BEACH:  Your Honor, just so the record is clear,

24  the items that we are moving for the admission on a stipulated

25  basis are docket number 1373, which is the motion to establish

39

1    the original bar date.  Docket number 1708, which is the order

2    approving that bar date motion.  Docket number 1758, which is

3    the affidavit and declaration of service regarding the bar

4    date.  Docket number 2439, which is additional affidavit and

5    declaration regarding service of the bar date.  Docket numbers

6    3284, 3285 and 3286, which are certificates of publication

7    regarding the notice of bar date.  Docket number 2848, which is

8    the motion to establish a deadline to file proof of claims with

9    respect to construction loans and HELOC borrowers.  And docket

10   number 2987, which is the order establishing the bar date for

11   filing proofs of claim for those same construction loans and

12   HELOC borrowers.  Docket number 3239, which is the affidavit

13   and declaration of service of that bar date.  Docket number

14   5999, which is a certificate of publication in the New York

15   Times.  Docket number 5308, which is the order authorizing the

16   stipulation of settlement among the debtors, Bank of America

17   and the Official Committee of Unsecured Creditors.  Docket

18   number 6604, the disclosure statement filed on November 21st.

19   Docket number 6626, which is the amended plan filed on November

20   25th.  Docket number 6627, the disclosure statement filed on

21   November 25, 2008.  Docket number 6644, which is the order

22   approving the disclosure statement and solicitation procedures.

23   Docket number 6868, which is the notice of filing appendix of

24   supplemental plan documents.  Docket number 6942, which is the

25   amended plan filed on February 5th.  Docket number 6943, which

40

1    is the amended plan blackline filed on February 5th.  Docket

2    number 6952, which is the declaration of James Katchadurian of

3    Epiq Bankruptcy Solutions certifying ballots, accepting or

4    rejecting the plan.  Docket number 6944, which is the amended

5    plan supplement.  Docket number 6945, which is the declaration

6    of Bret Fernandes in support of confirmation of the debtors'

7    amended Chapter 11 plan of liquidation.

8           With respect to that final item, Your Honor, Mr.

9    Fernandes does still intend to take the stand, but we wanted to

10   limit some of the standard issues that weren't controversial

11   for the purposes of today.  And we have talked to the

12   borrowers' committee and, obviously, Mr. Fernandes will be

13   available for cross examination.

14          THE COURT:  All right.  Any objection to the

15   admission of those documents?

16          MR. WEISBROD:  Not from the borrowers' committee,

17   Your Honor.

18          THE COURT:  All right, very good.  Documents 1373,

19   1708, 1758, 2439, 3284 through 3286, 2848, 2897, 3239, 5999,

20   5308, 6604, 6626, 6627, 6644, 6868, 6942, 6943, 6952, 6944, and

21   6945 are admitted into evidence without objection.

22   (1373, 1708, 1758, 2439, 3284-3286, 2848, 2897, 3239, 5999,

23   5308, 6604, 6626, 6627, 6644, 6868, 6942, 6943, 6952, 6944,

24   6945 were hereby received into evidence, as of this date.)

25          MR. BEACH:  Thank you, Your Honor.

1          Your Honor, I think this is also probably an

2    appropriate time to ask the Court to take judicial notice of

3    the orders, and other settlement agreements, and affidavits of

4    service related to those in the docket in the case, as well.

5    So I would ask Your Honor to take judicial notice of some of

6    those items.

7          THE COURT:  Well, that's awfully vague.  I'm not

8    quite sure what you're asking.  The substance or the fact that

9    they exist?

10         MR. BEACH:  The fact that they exist.  I think there

11   are certain settlements that the plan --

12         THE COURT:  I'll take judicial notice that everything

13   that's on the docket exists.

14         MR. BEACH:  Okay, Your Honor.

15         THE COURT:  Any objection to that?  I don't think so.

16   All right.

17         MR. BEACH:  Your Honor, I think that brings us to the

18   point where we deal with I guess some of the pleadings filed

19   this morning as well as the motions in limine.

20         Your Honor, as a preliminary matter I think one of

21   the primary issues that the borrowers' committee is seeking to

22   deal with in the confirmation is essentially a reconsideration

23   of the bar date order.  Your Honor, I was going to wait until

24   we argued this at the end of the case, but it seems like every

25   pleading we get deals with notice to -- in particular, pay

42

1    option arm claimants.  And, Your Honor, I submit that this is

2    beyond the scope of the borrowers' committee's retention to

3    deal with the notice issue.  They characterize it as a due

4    process issue in connection with the confirmation process.  But

5    Your Honor approved the bar date order as well as the

6    solicitation procedures order.  The debtors solicited the plan

7    pursuant to the claims that were filed in these bankruptcy

8    cases as well as the schedules.  And under Rule 60 -- the bar

9    date order was entered over a year ago and under Rule 60 that

10   can't be reconsidered at this point.  So it's difficult for me

11   to assess really what the borrowers' committee is attempting to

12   do in terms of trying to get the Court to reconsider the bar

13   date notice in connection with the confirmation order.  To the

14   extent that there's an issue with the bar date, I believe the

15   borrowers' committee can address that by filing a motion with

16   Your Honor to change the scope of their retention and to deal

17   with that issue in a separate proceeding if Your Honor is

18   inclined to --

19        THE COURT:  I read their objections.  I believe its

20   consistent with -- they are consistent with the scope of their

21   retention.  I don't believe they're -- well, it may be in part

22   they're doing what you say they're doing, but I think the

23   issues are broader and they go more to affect and mechanisms

24   and those affects on confirmation.  And so to the extent that's

25   a motion to exclude their ability to prosecute any of their

43

1   objection it's overruled.

2        MR. BEACH:  Thank you, Your Honor.  Then I believe

3   that brings us to the motions in limine.  As I mentioned to

4   Your Honor, the debtors do intend to proceed with their motion

5   in limine that was filed.  The borrowers' committee, I believe

6   will suggest that we move that motion until tomorrow.  But what

7   I'd like to do is cede the podium to my colleague John Dorsey

8   to address that motion.

9        THE COURT:  Well, let me hear why it should move and

10  then let me hear why it shouldn't.  Or let me hear why it

11  shouldn't and then -- I don't care.  Let me hear about whether

12  we're going to hear it first.  Mr. Dorsey, good afternoon.

13       MR. DORSEY:  I think the very simple reason why it

14  shouldn't move, Your Honor, if the Court rules that the expert

15  cannot testify we can save the estate a lot of time and money

16  in having this expert witness travel here tomorrow from West

17  Virginia, prepare for her testimony tonight, and counsel's time

18  in preparing her for that testimony.

19       THE COURT:  Okay.

20       MR. DORSEY:  So it seems to make more sense, Your

21  Honor.

22       THE COURT:  Okay, sir?

23       MS. WEISBROD:  Your Honor, Stephen Weisbrod from

24  Gilbert Oshinsky in Washington D.C. for the borrowers'

25  committee.  I should have identified myself earlier.

44

1           THE COURT:  That's all right.

2           MR. WEISBROD:  Your Honor, we generally agree with

3    Mr. Beach's description of what's going to be at issue here.  I

4    can address Mr. Dorsey's specific point first or I can address

5    the broader issues, which I'd like to have an opportunity to

6    address for just a minute or two at some point this morning.

7           THE COURT:  Well, let's deal with Mr. Dorsey's point

8    and then I'll let you backtrack depending on what I decide.

9           MR. WEISBROD:  Ms. Saunders has already left West

10   Virginia, she will arrive here in a few hours and check into

11   her hotel.  And we are scheduled to meet here late afternoon or

12   early this evening.  I believe that it's important that she be

13   here for the discussion of the motion to bar her testimony for

14   a number of reasons.

15          First, she herself, has a significant interest in the

16   outcome of the motion.  This motion has actually already been

17   published on the Wall Street Journal online.  You can actually

18   read what Mr. Dorsey wrote about here.  The headline of the

19   article was something like "what does she know."  And so it's

20   important to her, professionally, that she be here.

21          It's also important, frankly, Your Honor, to the

22   borrowers' committee that she be here for it because we need

23   her assistance in refuting it.

24          I also suspect, Your Honor, that Your Honor will find

25   her testimony probative on the very issues raised in the motion

45

1    in limine.  If this had been a jury trial, what we would most

2    likely do is call her to the stand outside of the presence of

3    the jury and ask here a few questions to see if Mr. Dorsey got

4    it right.  Your Honor may know from reading the exhibits that

5    we did not ask any questions at the deposition, we were not

6    required to.

7              And so the record right now is not complete.  It may

8    appear from the deposition that Ms. Saunders doesn't know what

9    she's talking about.  I didn't get that impression, but one

10   might since I never asked any questions and she never had an

11   opportunity to explain her background or what she did.  But she

12   should have that opportunity before the Court issues an order

13   on whether she is qualified and whether she followed proper

14   procedures in preparing her report.

15             THE COURT:  Mr. Dorsey?

16             MR. DORSEY:  The Supreme Court made very clear in

17   Daubert, Your Honor, that the Court has a gate keeping

18   function.  That gate keeping function is based on the law, not

19   on the testimony of the actual witness.

20             It's clear from her deposition that she has no

21   business testifying in front of this Court.  Her only testimony

22   is as a legal expert.  That was the first question I asked her

23   in her deposition, in what field do you consider yourself an

24   expert?  Her response was consumer law.  I said anything else?

25   No.  So the only thing she's going to testify about is consumer

1    law.  And the Court -- courts all over the country, including

2    this Court, have held time and time again that the only expert

3    in the courtroom on legal issues is the judge, that's you, Your

4    Honor.

5         And I think this issue can be resolved based on the

6    deposition.  If they had a believe during the deposition that

7    she didn't have a full opportunity to express herself on her

8    opinions, they could have asked those questions at the

9    deposition, they chose not to do so.  It's merely just causing

10   the estate more time and money, Your Honor, it is unnecessary.

11        THE COURT:  Why isn't your witness here?

12        MR. WEISBROD:  Your Honor, we agreed with the debtors

13   last week that all of our witnesses would testify tomorrow.

14        THE COURT:  Was that before you got the motion in

15   limine?

16        MR. WEISBROD:  Yes.  And so --

17        THE COURT:  All right.  I'll hear this tomorrow.

18        MR. WEISBROD:  Thank you, Your Honor.  Your Honor,

19   would this be a good time for me, briefly, to summarize our

20   view of what these issues are?

21        THE COURT:  Yes.

22        MR. WEISBROD:  Thank you.  Mr. Beach is absolutely

23   correct that we did make significant progress since the

24   borrowers' committee was appointed, and that's reflected in the

25   plan.  But the progress had limits.

1          Essentially, what we were able to get by way of

2     concessions were concessions related to the preservation of

3     borrower rights against third parties, concessions that

4     probably will cost the estate almost no money or 50,000 dollars

5     if the ombudsman is put in place and the limit is upheld.

6     Where we ran into trouble, Your Honor, is issues related to

7     borrowers' ability to recover from the estates themselves,

8     number one.  And, number 2, borrowers' abilities to get the

9     estates' assistance in terms of getting information from the

10    estates so that they can pursue the people who now hold the

11    loans.

12         I think that Mr. Beach is essentially right that

13    expect for a couple of drafting issues, we're probably okay on

14    the other issues.  But we're far from okay on the issues of

15    whether the borrowers are being treated fairly under this plan.

16    The notice issue is, of course, the biggest issue.  You're

17    going to hear, Your Honor, that literally apart from Pacer, the

18    borrowers got no notice.  And I do mean no notice.  I don't

19    mean just newspaper notice.  If you look at the ads that were

20    published, and you may need a magnifying glass to do it, you'll

21    see that they are addressed only to entities.  The ads are

22    addressed to entities, not to individuals.  And there's no even

23    definition in the ads as opposed to in the order on Pacer that

24    explains that entity means under the Bankruptcy Code

25    individuals.  So unless a borrower were to register for Pacer

1    and pay, they borrower would not know that -- and were to

2    understand what entities meant and how to read a definition

3    section, the borrower would have no notice.  On top of that

4    there was the issue, Your Honor, that we have already alerted

5    the Court to, which is there has been, ever since this

6    bankruptcy filing, a notice on the AHM website saying that

7    borrowers will not be impacted.  And we can debate what that

8    means or have borrowers reconstrue it.

9         But we have a huge notice issue, and Your Honor's

10   absolutely right that when we talk about notice we're not

11   trying to revisit a bar date order, we are talking about

12   whether a plan will go into affect pursuant to a court order in

13   the future that would preclude borrowers from recovering from

14   these estates, from asserting claims against these estates.

15   And we do not think it should be allowed to do it.

16        The second, I would say most prominent issue, in this

17   case, which is one that actually Mr. Macauley will handle most

18   of the evidentiary work on, relates to the best interest test

19   and what has happened with respect to the stipulated asset

20   allocation.  We agree, of course, that the stipulated asset

21   allocation is a settlement.  But the fact that a settlement may

22   appear reasonable in the aggregate, and we don't believe it is

23   reasonable, but even if it does, that doesn't alter the best

24   interest test.  And so if the result of the settlement,

25   reasonable or not, is to render borrowers with claims against

49

1    AHM Corp. or AHM Acceptance worse off than they would be in a

2    litigation.  And we believe that the evidence will show that's

3    the case.  Then the claims cannot be confirmed.

4           There are a number of other issues that I will just

5    touch on very briefly.  We don't agree that the trust

6    mechanism, as set up, is sufficient.  Particularly, in light of

7    the exculpation clause to ensure that borrowers will be treated

8    fairly.  We continue to disagree with the effect of the

9    automatic stay on borrower claims.  And as Mr. Beach noted,

10   there's still a disagreement about the EPD breach protocol and

11   whether that may overstate claims by the financial institutions

12   that invested in AHM originated securities.

13          I do, finally, want to -- and, in addition, there are

14   voting issues that Mr. Macauley will address momentarily.  He's

15   been handling that as well.  We've basically divided up the

16   issues, and so I have not been closely following voting.

17          I think this is mostly drafting issues and so I don't

18   expect to have a lot of argument or testimony on this.  But as

19   Mr. Beach alluded to there is some question about how some of

20   the new language will work in connection with Bank of America

21   loans.  And so we are just ironing out those wrinkles.  I think

22   there is not going to be a disagreement on that, but we want to

23   make sure that all of the protections afforded to borrowers,

24   are afforded to borrowers whose loans have to be included in

25   that group of loans.

50

1          And, as I noted, as well, there are disagreements

2     about the ombudsman and whether the debtors or the plan trust

3     will be in a specific position to answer inquiries from

4     borrowers, respond to third party discovery requests, and

5     generally produce documents that are necessary for borrowers to

6     pursue their claims, whether against the debtors or the plan

7     trust as successor, or against other parties.

8          Thank you, Your Honor.

9          THE COURT:  You're welcome.  Let's turn to your

10    motion in limine.

11         MR. WEISBROD:  Our motion in limine?

12         THE COURT:  Right.  I assume the next thing is to

13    call witnesses?  Well, let's turn to your motion in limine.

14         MR. WEISBROD:  Your Honor, our motion in limine is

15    not one that would preclude any witness from taking the stand.

16    Essentially, our point is the simple one that while all of the

17    witnesses can testify about what they did, on some matters

18    relating to the plan what they did was conduct very

19    sophisticated analyses or adopt very sophisticated analyses.

20    And these witnesses we expect will not be able to demonstrate

21    that they understood what went into those analyses or how they

22    worked.  In addition, some of these analyses actually just

23    should have been presented in the form of expert reports and we

24    have not gotten discovery on what was done.

25         THE COURT:  Well, why is there a requirement for an

51

1    expert report?  The way I read 10014, says right here that

2    Federal Rule 26(a)(2), disclosures regarding expert testimony,

3    did not apply to contest the matters.

4                MR. WEISBROD:  I thought --

5                THE COURT:  Unless you had some sort of deal.

6                MR. WEISBROD:  You've caught me by surprise, Your

7    Honor, I will --

8                THE COURT:  Okay.

9                MR. WEISBROD:  -- concede.  So, with that -- you

10   know, I don't know whether we were entitled to an expert

11   report.  We got no discovery on it, though.  We did request --

12               THE COURT:  Well, to the extent --

13               MR. WEISBROD:  -- backgrounds --

14               THE COURT:  And your point there is it's only to the

15   extent they're not lay witnesses, to the extent they're actual

16   witnesses.  Because I'm pretty sure I have to look again, but -

17   -

18               MR. WEISBROD:  Lay witness opinion does not require

19   an expert report, Your Honor.

20               THE COURT:  Okay.

21               MR. WEISBROD:  That is correct.  And I believe that

22   also the BDO witness would be in a different situation than an

23   employee of the company, where more disclosures would be

24   required about her.  Mr. Macauley actually is the one that

25   deposed her and would be handling the specific objections as to

52

1    her.

2            But whether discovery was satisfied, and I have to

3    stress that we did not get the work papers or anything relating

4    to the stuff, there are still fundamental issues of

5    admissibility.  You cannot introduce to a lay witness expert

6    testimony that's not qualified.  We propose to take this on a

7    question by question basis, as we go through the hearing.

8            THE COURT:  All right.  Mr. Dorsey, you have a

9    response?

10           MR. DORSEY:  I think Your Honor's absolutely correct

11   on the 9014 fact.  I think I've used that provision before Your

12   Honor in the past and the Court has agreed that in the

13   contested matter, a party is not required to produce an expert

14   report.  And, in addition, Your Honor, to the extent -- this

15   whole thing is premature, I mean we should put the witnesses on

16   and let them testify.

17           THE COURT:  And at the end I think that's what the

18   borrowers' committee counsel just said.  So maybe I jumped the

19   gun there.

20           MR. DORSEY:  I do think it's important, Your Honor,

21   to keep an eye on a few things, though.  That even as a lay

22   witness giving opinion testimony, there's, again, no

23   requirement for a report.  And what the borrowers' committee

24   wants this Court to do is say you always have to have an expert

25   witness.  What this Court has repeatedly said -- for example in

1    the case of a CFO who's coming in to talk about the financial

2    condition of the debtor, does he have to be an expert, do you

3    have to have an expert report to produce all the information

4    that you would for an expert?  No, you don't have to.  And this

5    Court has held that in, for example, In re TW Inc., 2005 Bankr.

6    LEXIS, it's an unrecorded and -- I actually do have a bench

7    memo on this, Your Honor.  It doesn't specifically address the

8    motion that they filed, because we prepared it in anticipation

9    that they might do something like this.  And if Your Honor

10   would like I can hand up a copy of that with these citations in

11   it.

12          THE COURT:  Okay.  Judge Walrath in that case

13   rejected the notion that a witness called to testify about

14   industry standards and the debtors' practices during a

15   preference period must be considered an expert under Rule 126,

16   and allow that person to testify to lay opinion testimony.

17          I think the one case, Your Honor, that is most

18   important here that we don't have cited in our papers because

19   we didn't know exactly what the borrowers' committee was going

20   to do here is Connolly v. NEC, 281 B.R. 535 at 537.  I'm sorry,

21   that's not the one I wanted to refer to, but I'll refer to that

22   one anyway.  The Court in that case said "the pretrial report

23   requirement does not apply to fact witnesses who qualify to

24   give expert opinions that are offered in the limited context of

25   their direct personal knowledge as actors or viewers of the

54

1    facts of a particular case."  That's what the witnesses here

2    are going to testify about, Your Honor.  Their involvement in

3    the development of these protocols that resulted in a

4    settlement between the UCC and the debtors as reflected in this

5    plan of reorganization.  Excuse me, liquidating plan.

6         The case we don't have in our bench memo, Your Honor,

7    is Sentinel Management Group Inc., 398 B.R. 281, it's a

8    bankruptcy case out of the Eastern District of Illinois, just

9    released in December of 2008.  The court in that case held that

10   the testimony of a trustee, along with the liquidation analysis

11   attached in the plan, was sufficient to meet the requirements

12   of 1129(a)(7), did not require bringing in an expert witness to

13   testify about the liquidation.  And I'd like to quote -- it's

14   an extensive quote, but I think it's important.  The quote went

15   on in that case to state that the calculation at issue was "an

16   extricable part of the global compromise embodied in the plan.

17   Accordingly, the plan proponents do not necessarily need to

18   demonstrate by a preponderance of the evidence, that the claims

19   calculation methodology satisfies the best interest of the

20   creditors' tests.  Rather, the court must find that as a part

21   of the settlement embedded in the plan the claims calculation

22   proposed by the plan proponents is fair and equitable and in

23   the best interests of the bankruptcy estate."  And I have a

24   copy of that opinion for you, Your Honor, if you'd like.

25        But bottom line, I agree we should allow these

55

1  witnesses to testify.  If they want to interpose any objections

2  they can.  But I think the bottom line, their motion in limine

3  is simply off the mark, Your Honor.

4          THE COURT:  I don't think any reply is necessary.

5  We'll take this item by item as it comes up.  And probably the

6  first time it comes up we'll discuss it a lot.  And depending

7  on what the ruling is, maybe subsequent discussions will be

8  shorter, I don't know.

9          So, Mr. Beach, I guess your next step is to call your

10 witness.  We're going to take like five minutes.

11         Mr. Dorsey, you have the bench memo.  Any objection?

12         MR. WEISBROD:  I have no objection to calling the

13 witness or to the Court having the bench memo.  I'd like a copy

14 of the bench memo and essential case.  Thank you.

15         THE COURT:  Okay.

16         MR. DORSEY:  May I approach, Your Honor?

17         THE COURT:  Yes.  All right.  Before we turn to the

18 witnesses, let's take about a five-minute recess and get

19 ourselves ready.

20     (Recess from 12:56 p.m. until 1:05 p.m.)

21         THE CLERK:  All rise.

22         THE COURT:  Please be seated.  Call your witness, Mr.

23 Dorsey.

24         MR. DORSEY:  Thank you, Your Honor.  The debtors call

25 Bret Fernandes to the stand.

56

1        THE COURT:  Mr. Wilamowsky, you can remain seated for

2    objections.  Oh, did I get the name wrong?  Yes, I did.  I'm

3    sorry.

4            Mr. Weisbrod.

5            MR. WEISBROD:  Stephen Weisbrod.

6            THE COURT:  Weisbrod, I'm sorry.  You may remain

7    seated for objections, just go into the mic it will be a little

8    easier.

9        (Witness is sworn)

10           THE CLERK:  Please state and spell your name for the

11   record.

12           THE WITNESS:  Bret Fernandes, B-R-E-T, F-E-R-N-A-N-D-

13   E-S.

14   DIRECT EXAMINATION

15   BY MR. DORSEY:

16   Q.   Good afternoon, Mr. Fernandes.  You need to speak into the

17   mic so we can make sure everybody can hear you.  So if you

18   could make sure that's pulled up close to you there.

19        Could you tell us how you are currently employed?

20   A.   Yes.  I'm a senior director with Zolfo Cooper.  Zolfo

21   Cooper is an advisory firm that works with troubled companies,

22   and turnaround situations, and bankruptcies.  I have been there

23   for a little over nine years now.  And have worked on a number

24   of different bankruptcy situations, variety of debtors, various

25   industries over that nine-year period.

57

1    Q.    Did you say what your position was there?

2    A.    Senior director.

3    Q.    How long have you held that position?

4    A.    Just over a month now.

5    Q.    And what position did you hold prior to that?

6    A.    A director.

7    Q.    Do you currently hold any positions with American Home

8    debtors?

9    A.    I'm the director of restructuring for American Home

10    Mortgage.

11    Q.    How long have you been the director of restructuring?

12    A.    Since July of 2008.

13    Q.    Prior to July of 2008 did you do work with the debtors in

14    connection with these bankruptcy cases?

15    A.    I did, as far back as September of 2007.

16    Q.    Can you describe for the Court the kinds of

17    responsibilities that you have had with regard to these cases

18    since you began working on them?

19    A.    Initially my focus was on the servicing sale transaction

20    and transitioning that entity over to the purchaser, which was

21    a fund owned by Wilbur Roth.  Beginning in early 2008 I began

22    working at the corporate headquarter in Melville where I was

23    tasked with day-to-day oversight of a number of issues,

24    including the disposition of remaining assets, development of a

25    plan of liquidation, various projections and forecasts, and

58

1    budget matters.

2    Q.    Could you describe for the Court your educational

3    background, beginning after high school?

4    A.    I graduated with a Bachelor's in Business Economics from

5    the University of California at Santa Barbara in 1991.

6    Q.    And prior to joining Zolfo Cooper what positions have you

7    held in the past?

8    A.    Prior to Zolfo Cooper I was at Pricewaterhouse for a

9    period of two years in one of their audit groups out of their

10   Los Angeles office, where I worked, again, on a number of

11   different clients and industries.  And prior to that I was with

12   a regional consulting firm out of the West Coast.

13   Q.    What kind of consulting firm?

14   A.    It mostly focused on health care, clients, companies,

15   corporations.

16   Q.    And what kind of work did you do in that capacity?

17   A.    Advisory work relating mostly to cost reductions and

18   revenue enhancement.

19   Q.    You mentioned earlier that you have worked on a number of

20   bankruptcy cases since joining Zolfo Cooper, could you tell the

21   Court a few of those cases that you worked on?

22   A.    Yes.  Some of the larger ones have been ICG

23   Communications, which was a HELOC based out of the Denver area.

24   Hundreds of millions of dollars of revenue and debt.  And there

25   I lead the effort to develop the plan of distribution, it was a

59

1    plan of reorganization there.  And I developed a model to

2    convert    the -- distribute the assets to the creditors.  As

3    well as develop the liquidation analysis in conjunction with

4    other people on that matter.  But I was involved in that

5    process as well.  Subsequent to that I was at Enron

6    Corporation, multi-billion dollar company.  I was involved with

7    the development of their model -- their distribution model,

8    which, again, took the asset values and closed it around the

9    myriad of companies that they had.  I believe they had 180

10    debtors there.  And ultimately determined the distributions to

11    go to the creditors in that matter.  And, also, contributed to

12    the effort to develop their liquidation analysis.

13    Q.    Any other cases?

14    A.    Collins & Aikman, which is an auto parts supplier.  Again,

15    a billion dollar company -- multi-billion dollar company.  And

16    a similar fact pattern there.  I went there to develop their

17    distribution model and to work on their liquidation analysis as

18    well.

19    Q.    Any other cases that you've worked on?

20    A.    There were some smaller ones, but those are the notables

21    ones that probably accounts for eight of my nine years of

22    employment with Zolfo Cooper.  A couple of smaller firms out in

23    California, tasks generally similar to what I've described.

24          MR. DORSEY:  Your Honor, may I approach the witness

25    just to provide him with a copy of the plan and disclosure

1   statement, in case he needs to refer to it during his

2   testimony?

3           THE COURT:  Any objection?  Yes, you may.

4       (Pause)

5   Q.   Mr. Fernandes, were you involved in the preparation of the

6   debtors' plan and the related plan documents that are reflected

7   in the plan of liquidation that has been presented to the Court

8   today?

9   A.   Yes, I was.

10  Q.   Could you describe to the Court your involvement in that

11  process?

12  A.   Certainly.  I was involved on a number of different

13  fronts.  I participated in negotiations with various parties-

14  in-interest, including the advisors to the creditors'

15  committee, certain individual creditors, and even to some

16  extent the borrowers' committee.  And helped design some of the

17  mechanisms in here that streamlined the plan mechanics and

18  allow for the contribution of the assets to a trust that can be

19  overseen by a single trustee, free of inherent conflicts or

20  potential conflicts.  Helped design those mechanisms as well as

21  participated in some of the other mechanisms that helped save

22  costs and maximize recoveries for creditors.  Also negotiated

23  part of the negotiations with -- relating to creditors.  A lot

24  of those were secured creditors, which were sometimes painful

25  and lengthy negotiations to reach consensual agreement on how

61

1   we might resolve some of those issues that are embodied in

2   these documents.  That's the general gist of it.  I also -- I

3   participated in some of the forecasts that derived some of the

4   numbers here.

5   Q.   You mentioned earlier in some of the other cases that

6   you've worked on that you were involved in the preparation of

7   the liquidation analysis in those cases.  Did you do that in

8   this case as well?

9   A.   I was involved in the process, yes.

10  Q.   And this plan of reorganization also contains a stipulated

11  asset allocation, were you involved in that process as well?

12  A.   I was.  And that's what I was trying to refer to in my

13  earlier comments about some of the mechanisms that streamline

14  the plan and, I believe, make it implementable.

15  Q.   In very brief terms, can you just kind of describe for the

16  Court what this plan of liquidation is intended to do?

17  A.   Sure.  The plan is the result of the arms length

18  negotiations that we undertook with the various parties-in-

19  interest.  It is a non-consolidated plan of liquidation that

20  allows for the distribution of the remaining existing assets to

21  be distributed to the creditors with a mechanism that allows

22  for that to be done in an organized streamlined fashion, I

23  believe, free of inherent -- what would otherwise be inherent

24  conflicts amongst the debtors.  The stipulated asset allocation

25  in large part resolves those issues, both, preexisting issues

1   and potential issues in the future.  It was a compromise to

2   settle those.

3   Q.   What happens to all the remaining assets and liabilities

4   once -- if this plan is approved and goes affective?

5   A.   They are contributed to a trust and a plan trustee and

6   plan oversight committee will be appointed to oversee that

7   trust and follow the mechanisms of the plan to distribute the

8   value through that trust.

9   Q.   Can you just briefly remind the Court -- you've asserted a

10  lot of this testimony in the past and other hearings.  But if

11  you could remind the Court what the business of American Home

12  was prior to the petition date?

13  A.   Sure.  American Home was involved in the origination of

14  residential mortgage loans.  Beyond origination they also help

15  loans for investment, securitize loans.  And sold those

16  interest in those securities off or held residuals in those

17  securitizations.  They also held whole loans for their

18  investments and did whole loan sales as well.  They also

19  operated a servicing business, as I previously mentioned, to

20  service the loans that they had originated.  And in conjunction

21  with the aforementioned activities, they also were involved in

22  various hedging activity to mitigate the risk of interest rate

23  and price risks associated with those assets.  They were a

24  significant player in the market.  In 2006 they were identified

25  as the tenth largest mortgage originator in the United States.

63

1    In 2006 they originated approximately sixty billion dollars in

2    loans.  They're fairly complex business model, it was

3    vertically integrated.  And it was run through a centralized

4    cash management systems.  Operations were channeled through a

5    centralized cash management system for all the debtors.  They

6    conducted business with virtually every significant financial

7    institution.  They funded much of their day to day activities

8    of loan funding with warehouse lenders.  And, I believe, at the

9    filing date, they hand in excess of four billion dollars

10   outstanding on the various warehouse and other credit

11   facilities that they had.  In terms of corporate structure, the

12   ultimate parent of the debtors is American Home Investment

13   Corp.  It was a publicly traded company, it operated as a for

14   federal income tax purposes.  And it was the direct parent of

15   Acceptance -- American Home Acceptance as well as American Home

16   Holdings.  American Home Acceptance is a debtor that, prior to

17   bankruptcy, originated a number of the AHM loans.  I believe it

18   was those that they intended to hold or invest in.  And

19   American Home Holdings, as the name would imply, is a holding

20   company that held three debtors.  Those were Servicing --

21   American Home Servicing, American Home Ventures, and American

22   Home Corp.  The Servicing business was a substantial business

23   based out of Irving, Texas.  They serviced, at the time of

24   sale, to Wilbur Roth.  They serviced in excess of approximately

25   200,000 loans with a UPB of approximately fifty billion

1    dollars.  The Ventures Entity was a smaller entity that was in

2    mortgage brokerage services.  And then Corp. -- I'll also

3    mention that it held one significant non-debtor.  So Holdings

4    holds a significant non-debtor which is AH Bank, which is a

5    remaining asset of the estate.  The most significant remaining

6    asset of the estate.  So that is directly held by Holdings,

7    who's the sole shareholder in that entity.  And then it holds

8    Corp.  Corp., again, was a significant originator of loans for

9    AHM.  And Corp. is the direct parent over a number of other

10   entities, including Home Gate Settlement, which was a smaller

11   business related to Bender Management, I believe.  And also it

12   held Great Oak Abstract, which was a title search company.  And

13   I believe I'm leaving one off, but that was the general

14   structure of the debtors and one notable non-debtor.

15   Q.   You mentioned a centralized cash management system, could

16   you tell the Court what refers to?

17   A.   Yes.  Generally, for the receipts and disbursements

18   relating to the business of each of the entities.  The cash was

19   all funneled through a consolidated system which was a series

20   of mini bank accounts that were ultimately owned by Corp.,

21   American Home Mortgage Corp.  And so as Corp. transacted on

22   behalf of other entities, intercompany balances would be

23   generated in the system and recorded.  But the bulk of the

24   activity was -- flows through the centralized cash management

25   system.

1  Q.   All the debtor entities -- all of their transactions went

2  through one centralized cash management system, is that

3  correct?

4  A.   Yes.  I'm sure there was some other accounts that certain

5  entities had the ability to write direct checks from.  But the

6  bulk -- the vast majority of the activity was done through the

7  centralized cash management system.

8          MR. DORSEY:  Your Honor, I have two exhibits that I'd

9  like to mark as Debtors' Exhibits 1 and 2.  I have copies for

10  Your Honor and for the borrowers' committee.  If I may

11  approach, Your Honor?

12          THE COURT:  Yes.

13      (Pause)

14          THE COURT:  Thank you.

15          MR. DORSEY:  Your Honor, Exhibit 1 in this binder is

16  the stipulated asset allocation methodology.  A copy of this

17  was provided to the borrowers' committee in an unredacted

18  version.  The reason we have redacted out a portion of this

19  document is because it refers to potential recoveries for

20  assets that have not yet been liquidated.  And we didn't want

21  to make those potential recoveries public and, therefore, set a

22  sealing for bidding -- or a floor for bidding, whatever the

23  case may be.

24          The second one is the liquidation analysis.  And that

25  is the first one that I would like to refer Mr. Fernandes to.

1          THE COURT:  All right.

2          MR. DORSEY:  The liquidation analysis, Your Honor, is

3    also contained in the disclosure -- exhibit to the disclosure

4    statement.  We simply pulled it out to make it a little easier

5    for everybody to look at.

6    BY MR. DORSEY:

7    Q.   Mr. Fernandes, you previously testified that you were

8    involved in a development of this liquidation analysis, can you

9    tell the Court the extent of your involvement in that process?

10   A.   Sure.  I instructed a colleague of mine -- oversaw a

11   colleague of mine in his development of the detail underlying

12   the analysis, and reviewed the product as he produced it.  And,

13   also, worked in conjunction with the committee advisors in

14   reviewing this and discussing certain issues in the development

15   of this.

16   Q.   Who all was involved in the process, specifically?

17   A.   In putting together the schedules from the debtors' side,

18   it was myself and Scott Martinez, a colleague from Zolfo

19   Cooper, who's also working on American Home Mortgage.  And from

20   the UCC advisors side and BDO, Michelle McCallis and David

21   Stewart were the significant players who reviewed this and

22   negotiated it.

23   Q.   Can you describe for the Court the basic methodology that

24   you utilized in coming up with this analysis?

25   A.   Yes.  The analysis largely mirrors the mechanics assumed

1    in the plan, the eleven plan, to get the money comparable basis

2    so you can do a comparison to determine under which scenario

3    the creditors do better.  The major distinctions between the

4    two are the remaining assets slightly impaired and the

5    liquidation analysis to account for the fire sale nature of a

6    Chapter 7 liquidation.  Those two assets really being American

7    Home Bank and a property the debtors own in the Chicago area.

8    Those two assets were impaired.  The other changes from the

9    plan version is that statutory trustee fees -- Chapter 7

10   trustee fees were layered in as an additional expense.  And

11   there was also an additional expense layered in to account for

12   what would undoubtedly be costs associated with the dispute

13   amongst the debtors as to inter-debtor rights and claims.  The

14   notable changes that we reduced the funding of the plan trust

15   in the liquidation analysis substantially to reflect a skimming

16   down version of the effort post-confirmation and the likelihood

17   that the plan trustee would just liquidate what exists there

18   wrap things up without, perhaps, pursuing some of the

19   litigation or seeing -- incurring the costs associated with

20   seeing the bank through to the conclusion of its disposition.

21   Otherwise, the mechanics -- the theory behind the value flow is

22   generally the same as reflected in an 11 plan.

23   Q.   If you look at the charts that are attached to Exhibit

24   Number 2, can you describe for the Court what those charts

25   represent?

1    A.    Sure.   I'm looking at the American Home Mortgage Holdings

2    Inc. page.  And this is essentially a side-by-side comparison

3    of the Chapter 11 plan that's presented here in the debtors'

4    plan versus the outcome of the Chapter 7 liquidation analysis.

5    Q.    Can you describe for the Court, utilizing that one entity,

6    American Home Mortgage Holdings, the different and the total

7    asset values between the Chapter 11 liquidation recovery and

8    the Chapter 7 liquidation recovery?

9    A.    Yes.   That's the -- largely a result of the assumption on

10   the impairment on the bank value under Chapter 7.   The numbers

11   also impaired or modified by the effect of the payout on

12   intercompany claims amongst the debtors.

13   Q.    Have you reviewed the potential intercompany claims

14   amongst the debtors in connection with preparing this analysis?

15   A.    No, I did not review specific claims.   We relied in both

16   instances on the books and records as reported by the debtors.

17   The volume is staggering on the intercompany transactions.   In

18   the eighteen months prior to filing, I believe there were over

19   1.5 million entries reflecting tens of billions of dollars of

20   transactions that the -- we did try to look at it.   The systems

21   don't allow for easy review and summarization of the types of

22   transactions.  And it was deemed a very significant task that

23   would not prove economically beneficial to the estate, was our

24   belief.

25   Q.    Going back to the chart relating to American Holdings, AHM

69

1    Holdings, there's line number 14, administrative costs,

2    allocable paid, and there's a difference between the Chapter 11

3    and the Chapter 7, what accounts for that difference?

4    A.    In accordance with the Chapter 11 plan, those costs are

5    assigned to the debtors, in the 7 plan, as well, on a --

6    largely an asset driven allocation basis.  So because the

7    assets -- the asset basis has gone down here on the page we're

8    looking at, the allocation of those total administrative costs

9    have gone down for this entity.

10    Q.    The next section of the chart refers to Chapter 7

11    liquidation expenses, can you describe what that refers to?

12    A.    Yes.  Line 15, the interdebtor dispute costs is the

13    assumed costs associated with the assumption that the plan

14    agreement goes away and its efficiencies are lost.  And that

15    each debtor would have to incur costs to pursue and defend its

16    position against other debtors in relation to a myriad of

17    issues that could arise.  The sixteenth line, the Chapter 7

18    trustee fees, is just the statutory allowable fee that a

19    Chapter 7 trustee can assign, or could charge.

20    Q.    And there's no reflective cost under the Chapter 11

21    because there would be no fees associated with that, correct?

22    A.    On line 15 there's no costs because the asset allocation

23    methodology -- stipulated asset allocation relieves the need

24    for those disputes and the related costs.  And on the Chapter 7

25    trustee fees there's no need for that, there's no trustee

70

1    appointed.

2    Q.   Dropping down to the next section of the chart,

3    distributions.  The first section there is titled "loss secured

4    claims," what does that refer to?

5    A.   I believe it says "less secured claims," just to note the

6    deduction of the bad or secured claims.  Basically, there are

7    none on either scenario in this entity.

8    Q.   And the next section is "remaining distributable value,"

9    and there's, again, a difference between the Chapter 11 and the

10   Chapter 7, what accounts for that difference?

11   A.   The numbers above actually drive the resulting number

12   there.

13   Q.   And then the next section "less Chapter 11 admin and

14   priority claims," those are the same under both scenarios?

15   A.   Yes, they are.

16   Q.   And why is that?

17   A.   It was a simplifying assumption we used.  Arguably, if you

18   convert to a 7 I guess you could have additional -- you could

19   trigger additional administrative claims.  But just as a

20   simplifying assumption and to keep it level we held it

21   constant.

22   Q.   And then the next line remaining "distributable value," is

23   just taking simple subtraction?

24   A.   It's the math, yes.

25   Q.   And the next section is "less trust funding and

71

1   contingencies," do you see that?

2   A.   I do.

3   Q.   And there are differences between these two scenarios,

4   between lines 19 and 20, can you describe why there's a

5   difference in those two?

6   A.   Yes.  On line 19 -- again, the total across all debtors is

7   held constant in each 7 scenarios compared to the 11 scenario.

8   Again, this is a result of the way those costs are allocated

9   out based on available value.  The 7 scenario -- this entity in

10  the 7 scenario incurs a smaller portion of those total costs.

11  On line 20 the assumption of plan trust and funding was cut in

12  half, as I mentioned earlier, for the liquidating scenario,

13  from six million down to three million, I believe is the total

14  of the costs in the Chapter 7 scenario.

15  Q.   And that results in a difference between the total trust

16  funding and contingencies between a Chapter 11 and a Chapter 7,

17  correct?

18  A.   Yes.

19  Q.   And then the remaining distributable value is, again, just

20  simple subtraction, correct?

21  A.   Correct.

22  Q.   And then the next section is less intercompany and general

23  unsecured claims.  Can you describe for the Court what that

24  section represents?

25  A.   This represents the distribution of the remaining

1    distributable values, which parties participate and at what

2    levels, and gives the relative payout percentages in the 11

3    versus the 7.

4    Q.    And what is the results between -- given your analysis of

5    the difference in potential recoveries under this plan versus a

6    Chapter 7 plan?

7    A.    The Chapter 11 plan has higher recoveries, better

8    recoveries for general unsecured creditors.  And the Chapter 7

9    plan does under each of the debtors.

10              MR. WEISBROD:  Your Honor, I have a limited

11   objection.  I don't object to the fact that this was done, I

12   know that one of the factors for the confirmation process since

13   your lender is gone, so I think it's admissible to prove that

14   it was done.  But I object to the conclusion at this point the

15   author has demonstrated it inaccurate.  In other words, Mr.

16   Fernandes is actually right as recoveries for debtor because a

17   foundation has been laid for the valuations or for the ability

18   of if he did the valuations.

19              THE COURT:  Mr. Dorsey?

20              MR. DORSEY:  He has the right to cross examine this

21   witness once we're done and elicit whatever testimony he thinks

22   he can on whether this is a correct analysis or not.

23              THE COURT:  I agree.

24              MR. DORSEY:  I'll also point out that the borrowers'

25   committee did not retain an expert on this area.

73

1      THE COURT:  Well, I agree that I think I understand

2   the objection, I consider it more a reservation of rights.  You

3   certainly have an opportunity to cross examine the witness as

4   to whether his conclusions are the basis therefore are sound.

5   BY MR. DORSEY:

6   **Q.   Did you perform the same liquidation analysis, Mr.**

7   **Fernandes, for each of the debtor entities?**

8   **A.   Yes, I did.**

9   **Q.   And are those analyses reflected in the remaining charts**

10  **that are presented in this exhibit?**

11  **A.   Yes, they are.**

12  **Q.   And what is the result for each of the debtors as between**

13  **the potential recoveries in this Chapter 11 versus a Chapter 7**

14  **for each of the debtors?**

15  **A.   Each of the debtors the recoveries are lower in the**

16  **Chapter 7 scenario than they are in the Chapter 11 scenario.**

17      MR. WEISBROD:  Your Honor, same objection.

18      THE COURT:  Okay.  Again, overruled for present

19  purposes.  You can examine that during cross examination.

20  **Q.   Mr. Fernandes, have the debtors projected secured**

21  **administrative and priority claims that will either need to be**

22  **satisfied or reserved for as of the effective date if this plan**

23  **is approved?**

24  **A.   Yes, they have.**

25  **Q.   And have the debtors projected the cash available to pay**

74

1    those claims as of the effective date if this plan is approved?

2    A.    Yes, they have.

3    Q.    And what do those projections show?

4    A.    That at the effective date the debtors will have adequate

5    cash to pay and/or reserve for secured administrative and

6    priority claims.

7    Q.    I'd like to turn now to Exhibit Number 1 that you have in

8    the book in front of you.  And can you tell the Court what this

9    exhibit represents?

10   A.    Yes.  This is the model that reflects the stipulated asset

11   allocation.

12   Q.    Were you involved in the development of the stipulated

13   asset allocation?

14   A.    Very much so.

15   Q.    Could you describe for the Court what your involvement

16   was?

17   A.    I helped develop a methodology.  I helped track down many

18   of the inputs and worked with the debtors and the creditors in

19   looking at alternatives.  And building out the structure of

20   this model.

21   Q.    Why did the debtors want to settle intercompany claims and

22   disputes of this case?

23   A.    If -- absent the settlements of intercompany disputes and

24   claims -- settlement imbedded within this mechanism, I think a

25   substantial, if not devastating remaining portion of the assets

1    that are left for these debtors can be consumed disputing these

2    intercompany matters, ultimately to no one's benefit.

3    Q.   And you previously testified about the centralized cash

4    management system and the millions of transactions and billions

5    of dollars in funds going back and forth, is that what you're

6    referring to in trying to sort out those transactions?

7    A.   Yes.  Yes, to dig through those and other potential

8    disputes that may arise in the future.  This methodology

9    streamlines that and locks down a percentage and mechanism for

10   distributing value amongst the entities to avoid those

11   conflicts and the associated costs.

12   Q.   What are the potential intercompany claims and disputes

13   that are being resolved through this stipulated asset

14   allocation?

15   A.   The existing intercompany balances are being accepted

16   through this mechanism here and otherwise could be reviewed at

17   a very costly undertaking, I believe.  But could be reviewed on

18   a very detailed level to ascertain if any of those balances

19   might be recharacterized as debt or equity or from debt to

20   equity in any of these scenarios.  The compromise also layers

21   in an adjustment for what was notably absent intercompany

22   activity in the debtors' pre-petition activity.  Additionally,

23   and substantially, the mechanism here in the stipulated asset

24   allocation resolves any disputes on the assignment of post-

25   petition costs incurred by each debtor.

76

1    Q.   How does this particular settlement work?

2    A.   It's an asset driven model that looks to the assets that

3    each entity held and had legal title to at the filing date.

4    And assigns values to those assets based on amounts actually

5    received in liquidation or projections where those assets have

6    not yet been liquidated.  And then adjusts that value for the

7    intercompany issues that I mentioned.  And from there it backs

8    out the other costs associated with the case, the

9    administrative costs, the secured administrative and priority

10   costs, and the plan trust funding costs as well, to net down to

11   the ultimate allocation percentages.

12   Q.   Is the asset reallocation line B?

13   A.   I'm sorry, the asset reallocation?

14   Q.   Yeah.

15   A.   Line B is the result of the settlement of the

16   intercompany -- the debtor/debtor intercompany balances.

17   Q.   Right.  So it's positive that entity's receiving more

18   value than in line A, and if it's a negative you're taking away

19   value from line A?

20   A.   That's correct.

21   Q.   Okay, thank you.  Turning to that exhibit, could you just

22   kind of walk the Court through the methodology that you used in

23   coming up with this proposed settlement?

24   A.   Sure.  The subtotal recoveries on unencumbered assets are

25   non-litigation assets that were now pledges of security on any

1    of the debtors' debtor.  You can see that total there is 235.9.

2    That represents the either realized value or expected value of

3    the assets held by each of those entities, based on the

4    entities that actually held those assets.  Held rights to those

5    assets.  The line below that layers in a recovery settlement on

6    encumbered assets to the tune of 2.6 billion dollars to get you

7    to a total estimated non-litigation asset value of 2.8 billion

8    dollars.  From there we reallocate the -- some of the value

9    amongst the debtors based on the intercompany balances as

10   adjusted to account for some deficiencies in those balances, on

11   line B.  Line C then reflects the payout for satisfaction of

12   the secured debt, pay downs or settlements.  Not all of those

13   are cash payments.   Some of them were the return of collateral

14   to secured lenders.  Essentially, in and an out on this report.

15   And then line D has the directly assignable administrative

16   costs, which were costs that the debtors were able to quantify

17   in relation to specific transactions or efforts they had

18   undertaken, and which entities those transactions related to.

19   A good example is the sale of the servicing business to Wilbur

20   Roth.  I think there was approximately four million dollars of

21   professional fees and related transaction costs associated with

22   that.  That amount was assigned to the appropriate entities and

23   they're being charged for that there.  The administrative costs

24   E and F, lines E and F, are both costs that are allocated out

25   amongst the debtors.  And these are general costs such as

78

1    perhaps -- well, certainly my fees -- a large portion of my

2    fees that weren't directly assignable would have been captured

3    in here.  And other costs, such as rent for the buildings,

4    etcetera.  Or the note on the buildings, I should say, the

5    mortgage payment on the buildings.

6              THE COURT:  I'm sorry, what's the basis for the

7    allocation?

8              THE WITNESS:  It's based on a number of factors.  It

9    has a -- it's a waited factor --

10             THE COURT:  Am I getting ahead, Mr. Dorsey?

11             MR. DORSEY:  A little bit, Your Honor, but that's --

12             THE COURT:  No, no.  I'll let you take me through it.

13   Go ahead.  Keep running through the chart, that's fine.

14   A.   Okay.  Those are assigned out, or allocated out on a

15   waited average basis that we can look at further.  And that

16   gets you down to a residual value for the estates before

17   consideration of any secured administrative or priority claims

18   that will need to be paid out.  And these are miscellaneous

19   secured claims, I should note.  And line H reflects the

20   estimated allowed filed secured administrative and priority

21   claims on a debtor-by-debtor basis.  The debtors undertook a

22   vigorous review of the filed claims to determine which entities

23   they relate to and what they believe the ultimate allowable

24   amounts would likely be.  And that's what drives this line

25   here.  Backing that out, then that leaves you with the

79

1    available value by debtor before funding of the plan trust or

2    any contingency funding.  The plan trust funding you can see is

3    contemplated at six million dollars, and a contingency reserve

4    of eleven million.  And those are allocated out, as well, to

5    the entities, based on the available value.  Driver as well.

6    Net of all those costs is the post-trust funding residual

7    value, that's line L, that is contemplated to be the value

8    available for distributions to general unsecured claims.  And

9    then towards the bottom of the page you can see an estimate of

10   those allowed claims and the implied recovery associated with

11   that.

12   Q.   Can you describe for the Court or answer the Court's

13   question about how you came up with the allocable percentages

14   between the various entities?

15   A.   Yeah, certainly.  And I just summarized what was -- I

16   don't know how many hundreds of hours of work.  This was a

17   significant effort to populate this with all this data and

18   check it, and vet it with the committee, and get all parties

19   comfortable that we were doing this appropriately.  So I don't

20   mean to make it sound like a ten-minute exercise.

21        The page behind that summary page answers your question,

22   Your Honor, as to how the administrative costs were allocated

23   out.  And you see it's on a waited basis, with the bulk of the

24   waiting going toward the unencumbered value allocation, eighty-

25   five percent of it.  And the theory there was the costs that

1   we're talking about here, such as my costs, really relate to

2   the effort to preserve value for general unsecured claims, and

3   to distribute that value to those general unsecured claimants.

4   We also gave consideration to the level of effort around the

5   encumbered value allocation, because -- or the encumbered value

6   resolution of issues, because that was also a significant

7   effort in a number of instances.  And then ultimately we took

8   at portion of the estimated allowed claim  allocation and

9   waited a factor for that too, in recognition that the -- well,

10  when there's claims work being done on all the debtors and to

11  ultimately all this effort is for the benefit of the claimants.

12  So that's how the allocable costs were waited.

13           THE COURT:  So, for instance, unencumbered value

14  allocation eighty-five percent, you're multiplying that time

15  what?  Eighty-five percent times what Holdings to get 20.7

16  percent?

17           THE WITNESS:  May it makes sense to look at the

18  bottom line, the waited percentage allocation.

19           THE COURT:  Okay.

20           THE WITNESS:  So you can see looking at Holdings the

21  unencumbered value allocation is twenty percent of the total.

22  Out to the right you see the total, so the Holdings was

23  accountable to twenty percent of the unencumbered value.

24  However, that's being weighted down by a factor of eighty-five

25  percent.  So you would multiply that out.  And if you take the

81

1   waiting of each of those lines and sum them up, you get to the

2   waited allocation percentage, see what I mean?

3            THE COURT:  I got that.  What's the -- to get the

4   20.7 percent of the unencumbered value allocation is

5   attributable to Holdings, how do you make that determination?

6            THE WITNESS:  If you go back to the summary page it

7   was --

8            THE COURT:  Is there a line item for that?

9            THE WITNESS:  There's not, actually, it's a series of

10  line items.  It is the sum of lines A, B, C and D.

11           THE COURT:  Okay, I got you.  So if that gets you a

12  wrong number you multiply that by eighty-five percent to get Y

13  and then you look at Y is what percent of the total value of

14  those lines?  In other words, all right --

15           THE WITNESS:  Right.

16           THE COURT:  Okay, yes, I got you.

17  BY MR. DORSEY:

18  **A.     The next page in the exhibit shows the summary of the pre-**

19  **petition intercompany settlement here.  In claims it shows the**

20  **existing balances on the books and records at the filing date.**

21  **And then it shows the adjustments -- below that are two**

22  **adjustments we made.  One to reflect the fact that Corporate**

23  **had not allocated out all of its overhead costs historically.**

24  **And so we worked very diligently with BDO on this matter to**

25  **identify all the company costs that had not been allocated out.**

1    And then allocated those out based on underlying assets and

2    liabilities of the debtors.  The allocation basis, driving that

3    information is not imbedded in the summary pages, it was

4    substantial.  And didn't lend itself to being captured on here.

5    But this is the net result of allocating back to Corp. the 140

6    million that we believe they were under allocated in pre-

7    petition period.  And then the transfer pricing adjustment, it

8    really reflects an adjustment to get the Homegate business to a

9    break even point.  That seems counterintuitive or illogical to

10   us that Homegate would be established as a business solely to

11   do intercompany business and would set that business up at a

12   loss.  So this adjustment reflects a pricing change to get

13   Homegate to a break even operating level thereby eliminating

14   the payable they had generated by operating at a loss pre-

15   petition.  Does that make sense to you?

16   Q.   Sure.

17   A.   The adjusted balances, the rows below that are just the

18   math, the top plus the adjustments that we talked about.  And

19   then the valuation kind of twists the table and presents it as

20   the balance payable for each of the entities, the estimated

21   payout of those entities and the estimated value then

22   associated with those payout percentages.  And identifies the

23   entity with the receivable.  So if you look at -- for Corp. the

24   17.8 million dollar payout and -- I tripped myself up.

25            THE COURT:  I don't see that.

1          THE WITNESS:  I'm sorry, I'm down at the bottom now.

2          THE COURT:  Okay.

3          THE WITNESS:  "Net value allocation adjustment."

4          THE COURT:  Yes.

5          THE WITNESS:  It's a value in and a value out?

6          THE COURT:  Yes.

7          THE WITNESS:  The first line is 17.8 out.

8          THE COURT:  Right.

9          THE WITNESS:  And the line below that is value in, so

10   5.2, so it nets to a 12.6 out.

11          THE COURT:  Okay.

12          THE WITNESS:  That number flows through to the

13   summary schedule and that's the amount that was adjusted at

14   Corp.  And, likewise, every other entity received the same sort

15   of treatment.

16          THE COURT:  Okay.  It's 12.6 on the summary page,

17   because that's in millions?

18          THE WITNESS:  That's right.

19          THE COURT:  Okay.

20   BY MR. DORSEY:

21   A.   The next page in the analysis shows a summary of the

22   activity related to the encumbered assets.  And those are the

23   brief system descriptions that describe the relief for each of

24   those liabilities from the debtors' books.

25       The page behind that is a summary of the direct claims,

84

1    the directly assignable claims.  So -- I'm sorry, costs.  These

2    costs were carved out of the costs pool and directly assigned

3    to entities and then the remainder was subject to the

4    allocation we talked about.  And as I mentioned, the first line

5    on here is the servicing sale professional fees and totaling

6    4.1 million dollars, assigned out to various entities that

7    purchased.

8         The next page is really a cash budget -- cash budgeting

9    forecast that we use to tie back to the model and make sure

10   that everything reconciles and is accounted for, in that the

11   distribution model, the assets -- stipulated asset allocation

12   model agrees with her actual cash budget.

13          THE COURT:  All right.  So you're testifying your

14   hypothesis?

15          THE WITNESS:  Yes.

16     (Pause)

17   BY MR. DORSEY:

18   A.   And the next page shows a summary of the allocable costs,

19   how we arrive at the allocable costs that we looked at, the 140

20   million dollars in totals.  And then they retie that back to

21   the total in the cash forecast as well.

22        The next page shows priority miscellaneous secured, and

23   administrative claim estimates by debtor.  And this analysis

24   was done by AHM employees looking at the specific terms,

25   understanding them, estimating, ultimate liabilities that might

85

1    be associated with those claims and assigning them to the

2    appropriate legal entity.  This was the net result.

3        (Pause)

4    A.    The next page accounts for two of the settlements that the

5    debtors entered into in these cases.  And the assignment of

6    value associated with those settlements to the various

7    entities.  I'm sure you can recall the construction loans that

8    the debtors purchased from B of A.  This mechanism here takes

9    the upside that the debtors receive from that deal and assigns

10   it out to the various entities based on -- estimated that the

11   lab general unsecured claims, the theory being that when AHM

12   made the decision to invest in those claims all the entities

13   took the risk, but that cash would never come back.  And,

14   additionally, had AHM not done that -- made that investment,

15   the other buyer, the proceeds from that would have gone

16   directly to B of A to satisfy a piece of their secured claim.

17   And so we felt that everyone should participate in the upside

18   here, and this is the mechanism for allocated that out.  And a

19   similar treatment for the compromise with B of A on REO

20   proceedings relating to certain of their loans.

21        THE COURT:  And was allocated by percentage of

22   general unsecured claims?

23        THE WITNESS:  Estimated allowed general secured

24   claims pro rata.

25        THE COURT:  Got it.

1    A.   The next page captures -- to the table and some summary

2    data that the loan portfolio that the debtors held in spring of

3    2008.  And this was used as a basis for allocating out some

4    proceedings and loan and costs associated with loans that were

5    either -- more homes for sale.

6         The entities that own the loans are American Home Corp.

7    and Acceptance.  And so this generally allows us -- we use this

8    to allocate costs for the proceeds, from, say, loan sales

9    accordingly, or according to this schedule here.  So, for

10   example, if we -- on the bottom half of the page allocation

11   percentages, the first two lines under there, it shows that the

12   portfolios of current loans, performing loans, are 34.7 -- or

13   .8 million dollars are split out.  5.2 of it was held by

14   Acceptance and the balance held by American Home Corp.  So we

15   use that to split out the proceeds from the sale, we use those

16   percentages to allocate out the proceeds from the sale.

17             THE COURT:  Okay.

18             THE WITNESS:  The next page is a summary -- again, to

19   the table of a very large database of claims that show the

20   debtors' estimate of ultimate allowable claims against each of

21   the entities.  And, as mentioned, these percentages drive some

22   of the allocations in the model.

23             THE COURT:  And what's the basis for reallocating

24   some?

25             THE WITNESS:  The last line item above the total, no

87

1    case asserted.

2              THE COURT:  Oh, all right.

3              THE WITNESS:  That amount was just spread back pro

4    rata against all the others.

5              THE COURT:  Thank you.

6              THE WITNESS:  Just an account for the estimated

7    allowed amount.

8              MR. DORSEY:  Thank you, Mr. Fernandes.

9    BY MR. DORSEY:

10   Q.   Who was involved in the developing of this settlement?

11   A.   Certainly the debtors and the debtors' advisors, as well

12   as a number of claimants and the UCC, as well.

13   Q.   Was this subject to negotiations?

14   A.   Yeah, certainly.  This was not our first pass at it.  And

15   this was -- we had lengthy and painful negotiations over a

16   period of months with various counterparties, with gives and

17   takes by both sides to arrive at what you see before you here.

18   Q.   Did the debtors undertake to make a determination as to

19   whether all of the claims, or potential claims and disputes

20   between the various debtors were valid claims?

21   A.   No.  Again, the volume and shear size of the transaction,

22   the complexity of the concentrated cash management system

23   didn't lend itself to that.  So that's why we decided that the

24   compromise made wonderful sense.

25   Q.   Did you include values for any potential causes of actions

88

1    that the debtors may have?

2    A.   No, we did not.

3    Q.   Why did you do that?

4    A.   We looked at the issue, and, again -- well, a couple of

5    comments.  It appears the vast majority of -- let me back up.

6    We looked at the potential for causes of actions amongst the

7    debtors, but determined that we did not -- we were not able to

8    determine the likelihood or amount of any such causes of

9    action.  We have pending litigation with third parties that's

10   just --

11              MR. WEISBROD:  Your Honor, before we go on I'd like

12   to object to the we as leading to hearsay.  It may be leading

13   to hearsay and may be leading to other problems.

14              THE COURT:  Very good.  Be a little more specific as

15   to who you're referring to.

16              THE WITNESS:  Okay.

17              THE COURT:  When you say "we."

18              THE WITNESS:  The debtors and the debtor advisors.

19   Zolfo Cooper, the debtors and the committee.

20              MR. WEISBROD:  Same objection.

21              THE COURT:  Overruled.

22   A.   Looked at these matters and the pending litigation.   We

23   don't have clear answers as to likelihood about amounts.  And

24   similarly on the interdebtor or the preference-type actions the

25   vast majority of activity relates to what I would characterize

89

1    as normal course operations, funding of loans, etcetera.  And

2    we didn't see any material glaring issues that we felt

3    warranted a separate valuation at all.

4    Q.   I think you've already done this, but can you kind of

5    summarize for the Court the benefits to the debtors based on

6    this stipulated asset allocation?

7    A.   I think at the end of the day the benefit is there's a

8    plan with distributions.  I believe that without a stipulated

9    asset allocation if you -- if you endeavor to litigate some of

10   these interdebtor disputes I think that erodes what little

11   value is left of some of these estates, and the picture's quite

12   dire.

13   Q.   I'd like to turn now to the EPD breach of warranty claims

14   against the debtors.  Can you describe for the Court what an

15   EPD claim is?

16   A.   And EPD claim is an early payment default claim where the

17   borrower misses a payment and a window of time that the

18   agreement -- the loan sale agreement designates as a period of

19   time under which if a borrower does  miss a payment, that the

20   buyer of that loan to put that loan back.  That was a pretty

21   convoluted answer there, should I try again.

22   Q.   Not necessary.

23   A.   Thank you.

24   Q.   Could you describe what a breach of warranty claim is?

25   A.   Generally, my understanding is that a breach of warranty

1    claim is where a buyer of a loan finds some sort of default or

2    defect with the loan they purchased, underwriting standards,

3    etcetera, that give that buyer the right to put that loan back

4    to the debtors.

5    Q.    Do these types of claims exist against the debtors?

6    A.    Yes, they do.  And they're significant in terms of volume

7    and dollars.

8    Q.    How does the plan propose to deal with those types of

9    claims?

10   A.    The plan contemplates implementing a protocol to

11   streamline the adjudication process on these -- the ultimate

12   benefit of saving time and significant dollars.  Otherwise

13   disputing these until sometime well out in the future.  It was

14   a plan -- a protocol that's modeled after protocols that we've

15   seen in other cases, not an exact replication of those other

16   plans but -- those other protocols, but conceptually it models

17   itself after that.  But it's driven off of American Home

18   Mortgage data -- historical data and claim data, etcetera.  And

19   I believe it's applicable to -- on the EPD side I think claims

20   asserted 3,000 loans -- are estimated at 3,000 loans with 600

21   million dollars UPB.  And on the breach side pools of loans

22   that were sold -- hundreds of thousands of loans with hundreds

23   of billions of dollars of UPB.

24   Q.    Who was involved in the process of developing the

25   protocols under the plan?

1    A.   The protocol was negotiated with a number of parties,

2    including the debtors.  Namely, Damian Pasternak was charged

3    with heading up the effort for the debtors.  He worked in

4    conjunction with some of my colleagues.  They also worked very

5    closely with the various claimants on these issues as the

6    negotiations went on what the right protocol should look like.

7    There were numerous calls and lengthy discussions about what

8    the right numbers were and whether they should -- the protocol

9    should fall out.  And the UCC - it purchased -- paid in some of

10   those discussions as well in the development of that.

11   Q.   How would you describe the negotiations over the protocol?

12   A.   They have been quite painful and have lasted a period of

13   time, a lot of back and forth, gives and takes.  It was an

14   arduous process.

15            MR. DORSEY:  May I have one moment, Your Honor?

16        (Pause)

17            MR. DORSEY:  I have no further questions of the

18   witness, Your Honor.  I would move into evidence Debtors'

19   Exhibits 1 and 2.

20            MR. WEISBROD:  Objection.

21            THE COURT:  Let's hold that to the end of the

22   examination, after cross and redirect.

23            MR. DORSEY:  Thank you.

24            THE COURT:  And then I'll take that.  Mr. Power,

25   questions?

92

1      MR. POWER:  Yes, Your Honor, just a couple.

2  DIRECT EXAMINATION

3  BY MR. POWER:

4  Q.   Good afternoon, Mr. Fernandes.  My name is Mark Power, I'm

5  one of the attorneys for the committee.

6      You were testifying before about litigations and how you

7  looked at those, do you know generally where -- which estate

8  holds certain litigations that are currently pending?

9  A.   I'm not certain who holds each of the litigations that are

10 pending.

11 Q.   Are you familiar with the Waterfield litigation?

12 A.   The what?

13 Q.   The Waterfield litigation?

14 A.   Generally, yes.

15 Q.   And do you know which estate holds that claim?

16 A.   I believe the transaction on the Waterfield related to the

17 Waterfield litigation was done by -- was a corporate

18 transaction, HM Corporate transaction.  But I don't know where

19 the funds for that original transaction were derived from.  If

20 they were borrowed from Investment Corp. or which entity's cash

21 was used to do that transaction.  But I believe it's Corp.

22 that's filed the -- that's involved in the action.

23 Q.   And are you aware of potential claims against JPMorgan

24 Chase that the committee and the debtors --

25 A.   I am.

93

1    Q.   And do you know where those claims -- which estate has

2    asserted those claims?

3    A.   I don't know.  But given that they relate to loans there

4    was Acceptance and Corp. that owned the loans, generally.

5              MR. POWER:  Your Honor, no further questions.

6              THE COURT:  Okay.  Cross?  Would you like a break?

7              MR. WEISBROD:  Can we have a break?

8              THE COURT:  Yes, of course.

9              MR. WEISBROD:  I just want to let the Court know that

10   this isn't the way we have been dividing up the work in this

11   case.  We would like to divide it on cross so Mr. Macauley who

12   worked on the stipulated asset allocation.  Mr. Dorsey, he

13   didn't object to that.

14             THE COURT:  No objection, Mr. Dorsey?

15             MR. DORSEY:  I don't have an objection.

16             THE COURT:  All right.  That will be fine.  We'll

17   take a recess to allow you to get organized, which is fine.

18   Just let us know when you're ready.  Sir, during the break

19   you're still under your affirmation.  You may not discuss the

20   substance of your testimony with counsel during the break.

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  We're in recess.

23        (Recess from 2:13 p.m. until 2:29 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  Please be seated.

94

1          MR. BEACH:  Your Honor, for the record, Sean Beach

2     for the debtors.

3          I just wanted to take a moment.  We had the

4     opportunity to speak with the lead plaintiffs for the

5     securities class action and do have a settlement in principle

6     with respect to their confirmation objection, subject to

7     documentation.  I know Mr. Levee was interested in not spending

8     the rest of the day here, so we were hoping just to announce

9     that we do have that settlement in principle, we're going to

10    work on the documentation.  But I expect that that's wholly

11    resolved.

12         THE COURT:  Mr. Levee, any comment?

13         MR. LEVEE:  Thank you, Your Honor.  Ira Levee,

14    Lowenstein Sandler.  I concur we reached an agreement in

15    principle.  And I would request that I can be excused.

16         THE COURT:  Oh, of course, yes.

17         MR. LEVEE:  Thank you.

18         THE COURT:  You want to take me with you.  All right.

19    Anything else?  Come on, Mr. Jackson, we're my settlement.

20         MR. JACKSON:  We're working on it.

21         THE COURT:  All right.  Okay.  Cross examination.

22         MR. MACAULEY:  Good afternoon, Mr. Fernandes.  For

23    the record, Thomas Macauley for the borrowers' committee.

24    CROSS EXAMINATION

25    BY MR. MACAULEY:

1   Q.   Is it fair to say that you have had very little experience

2   with Chapter 7 cases?

3   A.   Yes.  In terms of actually being an advisor and working on

4   one, yeah.  There's been limited experience, but I have

5   substantial experience, I think, in performing the liquidation

6   analyses, the best interest tests.

7   Q.   You've done more than just a few liquidation analyses?

8   A.   Well, I think I described them on the front end maybe four

9   or five, but they were significant sizable clients with complex

10  issues.

11  Q.   You didn't prepare the liquidation analysis here, did you?

12  A.   No, I supervised the process, and participated in review,

13  and I gave input but I wasn't doing the development -- the day-

14  to-day development of it.

15  Q.   Why don't we take a look at the liquidation analysis, it's

16  Exhibit 2.  Now, you had focused on a page with Mr. Dorsey

17  regarding Holdings, is that correct?

18  A.   Yes.

19  Q.   And the primary asset and holdings is the bank, right?

20  A.   The primary third party asset is the bank.  They also have

21  intercom -- significant intercompany receivables.

22  Q.   Now, Holdings doesn't actually hold the bank, right?

23  A.   They're the sole shareholder of the bank.

24  Q.   Right.  I mean, they own -- they're the sole shareholder

25  of the bank, that's fine.  Thank you.  What sort of -- what

1    have the debtors done to try and sell the bank?

2    A.    We hired an investment banker at the beginning of the case

3    and have been working with that banker in trying to market and

4    sell the property, or the entity, since November -- maybe even

5    before that.  In 2007 we had many interested parties come to

6    the table, and had fairly long negotiations with those

7    counterparties.  And for a number of reasons, as the -- as you

8    might imagine over the tumultuous past fourteen/sixteen months,

9    some of those deals fell through.

10   Q.    Have you ever sold a bank before?

11   A.    I have not.

12   Q.    Have you ever valued a bank before?

13   A.    I have not.  And in this instance I'm relying on the

14   values and estimates by the investment bankers.

15   Q.    Have you ever been involved in a mortgage case before?

16   A.    I have worked on another mortgage case.

17   Q.    And you've -- you have -- you've worked on a number of

18   health care cases, is that right?

19   A.    I had health care clients when I was with

20   PricewaterhouseCoopers.  I have had a healthcare client as well

21   with -- I'm sorry, I had numerous healthcare clients when I was

22   with Pricewaterhouse.  At Zolfo Cooper I did have one -- one

23   healthcare client.

24   Q.    Now, going back to the bank, you were saying you got an

25   investment banker involved, are there other professionals that

1   have been involved with this, other than you?

2   A.   Involved in what?

3   Q.   in trying to sell the bank?

4   A.   I'm not sure I fully understand.  But, yeah, there's been

5   a number of professionals, I guess, who have looked at certain

6   issues related to the bank and the disposition of the bank.

7   Q.   Would that include counsel?

8   A.   Certainly counsel has been involved in looking at

9   regulatory issues in association with the disposition of the

10  bank.

11  Q.   How about the creditors' committee?

12  A.   I'm sorry, what's the question about the creditors'

13  committee?

14  Q.   Would the creditors' committee counsel have been involved

15  in any event with the bank?

16  A.   Involved in what context?

17  Q.   Have they spent any time on it?

18  A.   They certainly reviewed the status of the -- the sale

19  efforts that we had with various counterparties.  And reviewed

20  maybe terms associated with draft agreements and the -- you

21  talk about the economics associated with the deal.  So to that

22  extent, yes.

23  Q.   How does the investment bank get paid for the sale of the

24  bank?

25  A.   I believe they get a fixed fee per month.  And should the

98

1    recovery exceed a certain level I believe there's a bonus

2    payment available to them.

3    Q.    At this point the bank hasn't been sold?

4    A.    That's correct.

5    Q.    Now, under the liquidation analysis you have a liquidation

6    of March 1, 2009, is that correct?

7    A.    Yes.

8    Q.    Is it contemplated under the liquidation analysis that the

9    bank will be sold by the liquidation date?

10   A.    No.

11   Q.    So it's contemplated that the bank will be sold after that

12   date?

13   A.    That's correct.  By liquidation date, you mean March

14   1st --

15   Q.    Yes.

16   A.    -- 2009?  Yes.

17   Q.    If you can flip over three pages to the sheet on Corp.

18   I'm sorry, that would be four pages.  Do you have that?

19   A.    I do.

20   Q.    Now, I noticed at the top there's a difference in total

21   assets between a Chapter 11 scenario and a Chapter 7 scenario,

22   do you see that?

23   A.    I do.

24   Q.    And is it your view that the difference there is because

25   of the potential difference in sale of the Mt. Prospect

1   property in a Chapter 11 versus a Chapter 7?

2   A.   I think that's the biggest driver.  That number is also

3   impacted by the receivables -- the intercompany receivables

4   that Corp. holds.  So to the extent another debtor pays out

5   changes in one scenario to the next, the value flowing through

6   to that line would change as well.

7   Q.   And the Mt. Prospect building is a -- it's an office

8   building?

9   A.   Yes, it is.

10   Q.   It's in Illinois?

11   A.   Yes.

12   Q.   And there's no ongoing business at that building?

13   A.   I believe there are a couple of tenants in there that

14   occupy space.

15   Q.   But the debtors don't actually occupy space in the

16   building?

17   A.   That's correct.

18   Q.   They're not using that building?

19   A.   That's my understanding.

20   Q.   And you don't presently have a buyer for that building, do

21   you?

22   A.   No.  We're negotiating with counterparties but there's no

23   buyer at the moment.

24   Q.   Is it fair to say that most of Corp.'s non-liquidation

25   assets -- non -- I'm sorry.  Is it fair to say that most of

100

1    Corp.'s non-litigation assets have been liquidated at this

2    point?

3    A.    Yes.

4    Q.    And aside from the real estate, Mt. Prospect and Melville,

5    and aside from potentially some loans, what other assets would

6    still need to be liquidated aside from liquidation?

7    A.    I think that's it in the resolution of intercompany

8    claims.

9         (Pause)

10   Q.    Now, if you look further down on the Chapter 7 side, where

11   it says Chapter 7 liquidation expenses, do you see that?

12   A.    Yes, I do.

13   Q.    And for interdebtor dispute costs you have 150,000

14   dollars?

15   A.    Correct.

16   Q.    And over all eight of the debtors you have a total of

17   900,000 dollars for interdebtor dispute costs, is that correct?

18   A.    That is correct.

19   Q.    And under Chapter 7 trustee fees for Corp. you've got one

20   million thirty-seven thousand, right?

21   A.    Yes.

22   Q.    And that's based on the maximum trustee fees allowable

23   under the 326 cap, isn't that right?

24   A.    I believe that's what it's based on.

25   Q.    Now, these assets don't include any recoveries from

101

1   preferences, right?

2   A.   That's correct.

3   Q.   They don't include any recoveries from any other avoidance

4   actions?

5   A.   Correct.

6   Q.   They don't include any recovery from the Waterfield

7   litigation?

8   A.   Correct.

9   Q.   They don't include any recoveries on behalf of any other

10  litigation on behalf of Corp.?

11  A.   There may have been litigation that's concluded that might

12  be imbedded in the cash balance.  But, yeah, generally, you're

13  right, there's no valuation for those.

14  Q.   It doesn't include any potential or currently pending

15  litigation?

16  A.   Correct.

17  Q.   Okay.  Let's turn over to Exhibit 1, if you would.

18  A.   Okay.

19  Q.   Now, at the bottom left-hand corner of the first page,

20  there's a reference to a date, do you see it?

21  A.   Yes.

22  Q.   What is that date?

23  A.   November 19, 2008, the date that the file was saved.

24  Q.   And is that when this file was finalized in its current

25  state?

102

1    A.    Yes.

2    Q.    Do you remember having a deposition in my office on

3    January 15th of this year?

4    A.    Yes.

5    Q.    Do you recall if this document was produced prior to your

6    deposition?

7    A.    I don't recall looking at it at the deposition.

8    Q.    I didn't ask you any questions about this at the

9    deposition, did I?

10   A.    I don't know, there may have been some questions about the

11   stipulated asset allocation.  But this document was not there.

12   Q.    This was not an exhibit to your deposition?

13   A.    That's right.

14   Q.    And that's because your counsel didn't produce it until

15   the end of this month -- end of last month?

16   A.    Are you asking me?

17   Q.    I'm asking you.

18   A.    Yeah.  I don't know.  Honestly, I don't know why it

19   wasn't.

20   Q.    Now, you said that this document was negotiated between a

21   number of different parties on your direct examination?

22   A.    Yes.

23   Q.    And you mentioned the debtors, the debtors' advisors,

24   including yourself, and the creditors' committee.  You also

25   mention some claimants, what claimant?

1    A.    I believe that some of the ideas and concepts in here were

2    passed by and discussed with B of A in relation to the

3    treatment of their claims in this mechanism, as an example.

4    There may have been others as well, but this is the first one

5    that comes to mind.

6    Q.    Now, stipulated asset allocation effectively allocates the

7    assets of the debtors by percentage, is that a fair statement?

8    A.    I don't -- it's not how I would characterize it exactly.

9    I don't -- I don't see the assets as being allocated in the

10   main.  I think the assets are assigned to the entities that

11   hold the legal title to those assets.  Their value associated

12   with those assets is assigned to those entities.  And that

13   asset assignment -- that asset value drives many of the

14   allocations, at least in part.  But the assets, themselves, are

15   generally not allocated.

16   Q.    I think mine was somewhat of unintelligible question.

17   First of all, the debtors are contributing their assets

18   effectively to this allocation, this settlement?

19   A.    Yes.

20   Q.    And there are claims that must be paid before the

21   settlement effectively comes into effect?  For instance,

22   secured claims, administrative claims, priority claims?

23   A.    Before it comes into effect?

24   Q.    Let me take it this way.  The percentages that you reached

25   for each debtor is -- those are the percentages that a dollar

104

1    in the estates, after payment of secured administrative and

2    priority claims, would be divvied up between the eight debtors?

3    A.    If you're referring to line M, value allocation, those

4    percentages, yes.  Once the SAP and all the other items above

5    were either paid or reserved for, then, yes, that dollar would

6    be split in that -- in that ratio.

7    Q.    So, effectively, for recoveries or assets that are

8    available to general secured creditors, if you had 100 bucks it

9    would be distributed to the creditors of each particular debtor

10   based on that percentage listed in the -- at the bottom of that

11   page?

12   A.    Yes, that's the idea.  That it would be allocated based on

13   those agreed upon percentages.  So that a -- the plan trustee

14   could administer the plan and make distributions accordingly.

15   Q.    Now, in reaching the percentages it only considers non-

16   litigation assets and it doesn't -- it doesn't include

17   litigation assets, is that correct?

18   A.    That is correct.

19   Q.    So you look at non-litigation assets under line A?

20   A.    Yes.

21   Q.    And then you have adjustments to reach your final

22   percentage down at the bottom?

23   A.    Yes.

24   Q.    It also considers all the administrative costs projected

25   to being incurred between the petition date and the

105

1   confirmation date, is that correct?

2   A.   Yes.

3   Q.   Now, it allocates it in different ways, but that's the

4   universe of administrative costs we're considering under lines

5   D through F?

6   A.   Yes, that's correct.   That was the intent.

7   Q.   Let's look at the page second to the end.   It's fair to

8   say that this is a listing of loans that are held by the

9   debtors historically, or at least, I should say, as of June

10  2008?

11  A.   It's a listing of the loans -- I'd say summary of the

12  loans held.

13          THE COURT:  I'm sorry, what page are we on?

14          MR. MACAULEY:  Second to the end, Your Honor.

15          THE COURT:  What's it titled?

16          MR. MACAULEY:  It says "June 2008 book of loans for

17  allocations of value."

18          THE COURT:  Okay, thank you.  I'm sorry, the question

19  was what?

20          MR. MACAULEY:  That this is the loans that the

21  debtors held in June of 2008.

22          THE COURT:  The answer?

23          THE WITNESS:  Yeah.  This is a summary of the loans

24  that were held at that time.

25          THE COURT:  Okay, thank you.

106

1    Q.    So at this point some of the loans had been sold?

2    A.    Yes.

3    Q.    And some of the loans have been given back to different

4    secured creditors?

5    A.    Yes.

6    Q.    And some of the loans still remain with the debtors?

7    A.    Yes.

8    Q.    Now, I only see Acceptance and American Home listed as the

9    owners of these loans on this page, is that correct?

10   A.    That is correct.

11   Q.    And American Home is Corp., right?

12   A.    Yes.

13   Q.    And is it your understanding that the loans -- the loans

14   held by the debtors historically were Corp. and Acceptance?

15   A.    That is my understanding.

16   Q.    All right.  Let's go -- unfortunately, this is not

17   numbered.  If you go back to the beginning and you go to the

18   fifth page entitled "assignment of direct administrative

19   costs."  You there?

20   A.    Yes.

21   Q.    Now, this is a listing of administrative costs directly

22   assigned to a particular debtor entity, right?

23   A.    That's correct.

24   Q.    The ones that you could assign?

25   A.    Yes.

1  Q.   The ones you could assign to a direct entity, directly to

2  an entity?

3  A.   That was the intent.

4  Q.   Now, I see that most of the costs here are assigned to

5  Acceptance and Corp., is that correct?

6  A.   That is correct.

7  Q.   And it seems like many of these direct costs relate to

8  loans, right?

9  A.   They do.

10  Q.   I mean, for instance, the LPMI costs, 13.9 million,

11  that's -- that's payment of insurance relating to loans,

12  correct?

13  A.   It is.

14  Q.   And the -- and that one below that, servicing fees on

15  loans, the 3.1 million, that relates to loans, as well?

16  A.   Correct.

17  Q.   And the next one, the pre-petition P&I distribution, as

18  well?

19  A.   That's correct.   That's my recollection.

20  Q.   And then there's some other costs that are also assigned

21  to Corp. and Acceptance, correct?

22  A.   Yes.

23  Q.   Would that include costs to prosecute the Waterfield

24  litigation?

25  A.   No, it would not.   No, these are loans, specific costs,

1    fundings, etcetera, expenses related to loans that came out of

2    the debtors' financial systems identified as being loan

3    related.  We reviewed the detail with the assistant treasurer

4    to help identify these as being loan related.  And so the total

5    costs was then allocated based in some fashion on the page we

6    looked at previously.

7    Q.    Where would the costs for the Waterfield litigation be?

8    A.    To the extent -- it should be in the pool of

9    administrative costs that are allocated out to all debtors.

10   Q.    Doesn't the cause of action belong to Corp.?

11   A.    I don't know.

12   Q.    Would this include any litigation costs relating to

13   JPMorgan?

14   A.    Would what include?

15   Q.    The other costs?

16   A.    No.  These, again, were system generated costs identified

17   as loan specific fundings or fees, etcetera.  Not general

18   expenses incurred -- you know, not salaries -- not related to

19   salaries or professional fees allocated here.

20   Q.    And down on the other line I see a number of 47,000

21   attributed to Holdings, do you know what that is?

22   A.    I do not recall specifically what that was.  But, again,

23   as part of the effort of reviewing the system data that assign

24   these costs or identified what these costs were, we reviewed

25   those with the assistant treasurer and whatever that issue was

1    related to something in Holdings, is how that would have got

2    there.  But I don't recall the nature of it.

3    Q.   So that's not the costs that the estate has incurred to

4    try and sell the bank, is it?

5    A.   You know, I'm not sure.  Now that you ask, I don't know if

6    someone -- if that's an estimate that was put in there.  I just

7    don't know the answer to that.  It seems like a odd number that

8    someone would estimate.  But I can't say with certainty.

9    Q.   All right.  Let's go to the third to last page, entitled

10   allocation of construction loan and REO compromise values.

11   Okay.  On direct you said this was the distribution of assets

12   based on the construction or REO settlements long various

13   debtors, correct?

14   A.   This is the allocation of proceeds from the settlements

15   allocated out to the various debtors based on estimated allowed

16   general unsecured claims.

17   Q.   Right.  And it's divvied up based on the estimate of

18   general unsecured claims that the debtors have prepared?

19   A.   Yes.

20   Q.   Even though the loans were owned by Acceptance and Corp.?

21   A.   Well, the loans were owned by Acceptance and Corp.  But

22   I'm not sure if you're familiar with the history of the

23   transactions, but specific to the construction loans those were

24   put out to bid.  A third party bidder came in with a number

25   approximately nine million dollars that the estate could have

1    taken and given the proceeds to B of A who was secured by these

2    loans.  And in lieu of doing that the estate decided to invest

3    in these loans and try to get a return on it for the benefit of

4    all creditors.  Again, had the sale been done to a third party

5    no general unsecured creditor would have benefited from that,

6    except for a reduction in the B of A general unsecured claim.

7    But the estate made a decision to invest in these loans and put

8    that risk, then that nine million dollars for all the estates,

9    because of the centralized cash management system, and the join

10   administration of this plan.  So all the debtors were at risk

11   for the loss of that investment that the estate made above this

12   third party bidder, or for the total amount of that deal.  And

13   so we believe that we appropriately allocated out to all those

14   entities.

15   Q.   Based on the general secured claims filed against each

16   entity?

17   A.   Yes.  Again, the deals were done for the benefit of

18   general unsecured creditors as a whole.

19   Q.   You didn't work on this case at its outset, did you?

20   A.   I started working on this case about a month after the

21   filing date.  And at that time, my effort was working with the

22   Servicing business to help with that sale transaction.  I began

23   working out of the corporate headquarters in February of 2008.

24   Q.   Is it your understanding that the debtors' loan

25   origination business collapsed prior to the petition date?

1   A.   Yes.

2   Q.   And those employees were let go at that point?

3   A.   Yes, that's my understanding.

4   Q.   So you haven't had any contact with those employees?

5   A.   No.

6   Q.   There's no one at the debtors who was originally in the

7   origination business, right?

8   A.   Certainly, not that I'm aware of.  And there's only a

9   handful of people left at the debtors.  So I don't believe so.

10  Q.   On direct you testified that you didn't include values for

11  causes of action in the stipulated asset allocation, because

12  there were no clear answers, do you remember that testimony?

13  A.   Yes, I do.

14  Q.   And that's because you haven't done a preference analysis

15  of potential transfers?

16  A.   That's right.  I have not done that.  We looked at the

17  systems and volume of data that would be involved in doing that

18  and it's substantial and it's -- because of the centralized

19  cash management system it doesn't lend itself to a clean easy

20  answer just by seeing who made a payment.  It's not clear who

21  had the antecedent debt, etcetera.

22  Q.   And you haven't done any -- just general litigation

23  analysis of potential causes of action?

24  A.   Again, we considered it.  We -- maybe I should clarify

25  when I say we.  Generally I'm referring to American Home

1    Mortgage employees, Zolfo Cooper and efforts with the UCC

2    advisors, mostly BDO on this front, to look at what information

3    was out there and how useful that information could be to this

4    exercise.  And it struck us as being highly expensive and cost

5    prohibitive and not yielding any clear answers up front.  And,

6    absent that, seeing a fair compromise was to use the allocated

7    asset basis for all assets at the end of the day.  Since -- in

8    fact, that is what would be funding the trust and the pursuit

9    of any of those actions.  Those costs are spread amongst all

10   the entities.

11   Q.   Now -- I guess I'm not done with this Exhibit 1.  If you

12   look at page 3, which is the pre-petition intercompany

13   settlement summary.

14   A.   Yes.

15   Q.   The top chart here lists all the intercompany claims

16   between the different debtors, payables and receivables, right?

17   A.   The top chart is the intercompany balances at the filing

18   date.

19   Q.   And you haven't looked at the underlying bases for these

20   transactions, have you?

21   A.   Certainly not on a specific transaction basis.  Again,

22   this was where there was over one and a half million

23   transactions in the eighteen months leading up to bankruptcy.

24   We did have discussions with AHM accounting about the nature of

25   transactions and what gives rise to these balances amongst the

113

1    entities.  And that is how we -- again here it was mostly BDO

2    that identified that the corporate allocation of overhead piece

3    was missing, and so we adjusted for that.  But there was an

4    effort to look at the books and records and talk to management

5    to get an understanding of these balances, what would give rise

6    to these balances.  And largely it's the centralized cash

7    management system.

8    Q.   For instance, you didn't delve deeply into figuring out

9    why Investment has a 1.3 billion dollar claim against Corp.?

10   A.   I did not -- I described the process we went through.

11   Again, it was described as being related to the concentrated

12   cash management system and loan transfers amongst the entities,

13   is what seemed to drive the bulk of the dollars.

14   Q.   Investment is the ultimate parent of these debtors, right?

15   A.   That's correct.

16   Q.   So Corp. is a subsidiary?

17   A.   Yes.  And down below, once you factor in the effect of the

18   proposed distribution under the plan, you get to, as you

19   discuss on your direct, the value out and the value in

20   portions, correct?

21   Q.   So this is the actual effect on the analysis that

22   ultimately resulted in the percentages set forth in the

23   stipulated allocation?

24   A.   Yes.  If I understand your question, I believe that's

25   correct.

114

1    Q.    The number underneath the value in and value out is the

2    number that was on the front page, which was one of the

3    adjustments to the original non-litigation asset values?

4    A.    Correct.

5    Q.    So, for instance, here the effect on Corp. is a negative

6    4.6 million, right?

7    A.    That's right.

8    Q.    And the effect on Investment is a positive 10.6 million,

9    roughly?

10   A.    That's right.

11   Q.    Now, you also said on direct that without the stipulated

12   asset allocation it was your believe that there would be no

13   distribution in Chapter 7, is that correct?

14   A.    I don't know that I limited it to Chapter 7.  But I do

15   think there's a probability that many of the estates,

16   potentially all, would not have value available for

17   distribution.  Depending on the costliness of litigating

18   intercompany issues.

19   Q.    But the analysis that you did in Holdings under the

20   liquidation analysis, flipping back to Exhibit 2, sets forth a

21   projected 3.5 percent distribution in a Chapter 7 case, is that

22   correct?

23   A.    I'm sorry, what was the number -- what was the reference?

24   Q.    The Chapter 7 scenario for Holdings in the liquidation

25   analysis, 3.45 percent?

115

1    A.   Yes.

2    Q.   And, likewise, Corp. has a projected distribution of 1.05

3    percent, is that correct?

4    A.   That's correct.

5    Q.   Now, as we said --

6    A.   If --

7    Q.   Go ahead.

8    A.   Was the question was to bridge back to my last comment

9    about the fact that value might not exist for distribution.  If

10   that was the effort, I think substantially more costs could be

11   incurred than what's reflected here.  And, also, what's not

12   reflected in this liquidation analysis are the efficiencies or

13   the lost efficiencies of the EPD breach protocol.  You know,

14   that wasn't even contemplated as an extra cost.  But,

15   presumably, in a 7 that protocol would go away and there'd be

16   incremental costs there, too.  So, I think the 7 scenario could

17   be substantially worse than what's reflected here.

18   Q.   Now, you're familiar with the disclosure statement where

19   it lists the transfers made by the debtors in the ninety days

20   prior to the petition date, right?

21   A.   I am.

22   Q.   And it lists roughly twenty billion in transfer by Corp.,

23   Acceptance and Servicing in the nine days prior to the petition

24   date, right?

25   A.   I believe that's right.

116

1    Q.    And under the Chapter 11 plan that has been proposed a

2    recovery on a transfer -- the avoidance of a transfer made by

3    Corp. would benefit all the debtors, right?

4    A.    It would.

5    Q.    It would be split up along the debtors under the

6    percentages set forth in the stipulated asset allocation,

7    right?

8    A.    That's true of a recovery that would be made by any

9    entity.

10    Q.    Right.  So if the cause of action belonged to Servicing it

11    would be the same result?

12    A.    Correct.

13    Q.    Now, in a Chapter 7 case if a transfer was avoided and

14    recovered by Corp. that transfer would benefit solely the

15    creditors of Corp., correct?

16    A.    If you're assuming that it's Corp.'s cause of action and

17    it was their antecedent debt and the make the distribution were

18    able to recover it, then that would make sense to me.  But I

19    don't think the entity level presentation in the plan reflects

20    the disbursements on an entity level basis.  In reality,

21    because of the centralized cash management system.  But in your

22    scenario if Corp. truly held the action and they hadn't made a

23    payment on behalf of one of the other entities, then, yes, I

24    would -- absent the stipulated asset allocation, I guess in

25    your scenario, that would be the case.

117

1       MR. MACAULEY:  I'm going to pass the baton, if I may.

2       THE COURT:  All right.  Well, I have a question

3   first.  Under the settlement the proceeds of an avoided

4   transfer are shared under the protocol amongst all.  It goes

5   into the pot and it gets distributed among the percentages?

6       THE WITNESS:  That's correct.

7       THE COURT:  Now, when you avoid a transfer you create

8   a claim, what happens to the claim?  In other words, you got a

9   million dollars, I avoid it, I get my million dollars back, but

10  you now have a million dollar claim.  Do the claims stick with

11  the entity or do the claims get distributed pro rata?

12      THE WITNESS:  I don't know that that's defined in the

13  plan, but it would seem to me they should be distributed pro

14  rate to whoever recovered -- benefited from the recovery.

15      THE COURT:  Mr. Macauley, I don't know if my question

16  gave rise to questions that you had or not.  It didn't have to

17  I just want to give you a fair opportunity.

18  **Q.   So, Mr. Fernandes, is it your view that if a thousand**

19  **dollars is brought back into the estate and would be**

20  **distributed to all the eight creditors pursuant to the**

21  **percentages in the stipulated asset allocation that the**

22  **creditor -- or I should say the preference defendant would have**

23  **a claim against all the different debtors based on the**

24  **percentages in the stipulated asset allocation?**

25  **A.   Again, I don't think that's defined in the plan.  That was**

118

1    **my knee-jerk reaction to the question.**

2            MR. MACAULEY:  Nothing further.

3            MR. WEISBROD:  Your Honor, Stephen Weisbrod for the

4    borrowers' committee.  I'd like to introduce Hunter Winstead,

5    who is an associate with our firm.  He's going to be assisting

6    me with the documents.

7            THE COURT:  Hello.

8            MR. WINSTEAD:  Hello, Your Honor.

9            MR. WEISBROD:  So there are no surprises, I intend to

10   take the debtors up on their offer about cross examining on the

11   documents that we stipulated to through Mr. Fernandes.

12           THE COURT:  Okay.

13           MR. WEISBROD:  That is, cross examine through Mr.

14   Fernandes the documents that we stipulated to being admitted.

15           MR. DORSEY:  I'm not sure what documents he's talking

16   about, Your Honor.

17           MR. WEISBROD:  Well --

18           THE COURT:  The docket entry?

19           MR. WEISBROD:  The docket entries.  I assume that's

20   what we're agreeing, to cross examine somebody about it when we

21   do that.  But -- and, in addition, we have, as Mr. Beach noted,

22   agreed that we would be able to cross examine on the

23   declaration.

24           MR. DORSEY:  I think that's correct, Your Honor.

25           THE COURT:  Okay.

119

1    CROSS EXAMINATION

2    BY MR. WEISBROD:

3    **Q.   Mr. Fernandes, you were one of a number of people who**

4    **participated in the creation of the EPD breach protocol,**

5    **correct?**

6    **A.   Correct.**

7    **Q.   The EPD breach protocol is found in Article 7 of the plan,**

8    **correct?**

9    **A.   I believe that's correct.**

10           MR. WEISBROD:  Could you please mark the plan as --

11           THE COURT:  I think he has the plan.

12           MR. WEISBROD:  I do.  We haven't been numbering

13   exhibits yet, but we'll mark this as OBC-1, if that's okay.

14           THE COURT:  Okay.  That's fine.

15           MR. WEISBROD:  OBC stands for official borrowers'

16   committee.

17           THE COURT:  Very good.  The amended Chapter 11 plan,

18   docket item 6942?

19           MR. WEISBROD:  The plan dated as of February 5th,

20   2009.  I don't have the docket entry written on my copy.

21           THE COURT:  That's it.  So OBC-1 will be --

22           MR. WEISBROD:  Okay.

23           THE COURT:  We'll refer to this as OBC-1, but it's

24   docket item 6942, for the record.

25   (The amended Chapter 11 plan dated 2/5/09 [Docket Item 6942]

120

1   was hereby marked for identification as Exhibit OBC-1 as of

2   this date.)

3   Q.   The EPD breach protocol provides for the payment of

4   creditors who assert EPD breach claims, right?

5   A.   I'm sorry.  Can you say that again?  I was --

6   Q.   The protocol provides for the payment of creditors who

7   assert EPD or breach claims, right?

8   A.   Yeah, who assert claims that can be validated.

9   Q.   Well, you have a matrix that establishes formula for how

10  much those claims will be valued at, right?

11  A.   Yes.  There are multiple schedules.  If you're looking at

12  page 48, that's for the unliquidated EPD claim calculation.

13  Q.   I'm actually looking at page 46.  Let's make sure we're

14  looking at the same document.  Article 7A.

15  A.   See, I'm in 7A, but mine's page 48.

16         MR. DORSEY:  May I approach the witness, Your Honor,

17  and make sure that --

18         THE COURT:  Yes, Mr. Dorsey.

19         MR. DORSEY:  -- he has the right --

20         THE COURT:  Page 46?

21         MR. DORSEY:  He was referring to the --

22         THE COURT:  Disclosure statement.

23         MR. DORSEY:  -- the original plan.

24         THE COURT:  Oh, oh, okay.

25         MR. WEISBROD:  Oh, excuse me.

121

1          THE COURT:  Very good.  Thank you, Mr. Dorsey.

2          THE WITNESS:  Thank you.

3     Q.   All right.  Sorry about that.  I'm there now.  Yeah, I'm

4     on page 46 of the plan and at Article 7, paragraph A.  You see

5     that?

6     A.   Yes.

7     Q.   Okay.  And this is the section that explains how EPD

8     claims are valued, right?

9     A.   Nonliquidated EPD claims, yes.

10    Q.   Right.  At the bottom of Section A, there is an

11    explanation for how what you just described as liquidated EPD

12    claims are valued, correct?

13    A.   That is correct.

14    Q.   Okay, and the difference between nonliquidated and

15    liquidated in your vernacular is that nonliquidated means the

16    home had not yet been sold, essentially, right?  The home or

17    the mortgage loan had not been sold, right?

18    A.   The loss had not yet been passed to the investor.

19    Q.   Okay.  Now, there is a little table here in Section A.

20    You see the table?

21         THE COURT:  Oh, I see.  Right.

22    Q.   And it lists loan products in one column and then zero to

23    thirty, thirty-one to sixty, sixty-one to ninety, and ninety-

24    plus in the following columns, right?

25    A.   Yes.

1    Q.    Okay.  There are four loan products total, right?

2    A.    Yes.

3    Q.    Okay.  And basically what an EPD claimant would do is say

4    we have lost money on a loan and the unpaid principal balance

5    of the loan as of the EPD determination date was X.  That's a

6    step in this process, right?

7    A.    I believe so.

8    Q.    And they provide this information along with other

9    information on an EPD breach questionnaire, right?

10   A.    Yes.

11   Q.    Okay.  Now, assuming the questionnaire has been properly

12   filled out, what the claimant does then to calculate -- or what

13   the trustee will do then to calculate the value or the

14   claimant's claim is to multiply the unpaid principal balance of

15   the loan as of the EPD date times one of the numbers shown in

16   this table, right?

17   A.    Yes.

18   Q.    Okay.  These numbers were negotiated, right, in the table?

19   A.    The --

20   Q.    And I'm talking about percentages.

21   A.    Yeah, those percentages are actually a product of two

22   factors, and one --

23   Q.    Okay.  Those factors are --

24          MR. DORSEY:  Objection, Your Honor.  Will you let him

25   finish his ans --

1          THE COURT:  Don't interrupt the witness, all right?

2          MR. WEISBROD:  Sorry.

3          THE COURT:  Let him answer the question.

4     A.    So -- so, yeah, the presented numbers were negotiated.

5     There's a component of them that were negotiated, yes.

6     Q.    Okay.  There's actually two components that were

7     negotiated, right?

8     A.    Again, I was involved with the process, but I was not the

9     engine behind all of this.  So I don't know that both were

10    negotiated.  One of the factors might have been based on AHM

11    historical data or actual data; I'm not certain.

12    Q.    Let's talk about what those two factors are, to be clear,

13    for the record.  We're talking about loss frequency and loss

14    severity, right?

15    A.    Yes.

16    Q.    Okay.  And to come up with these percentages, you multiply

17    loss frequency times loss severity, right?

18    A.    That's my understanding.

19    Q.    Did you participate in the process of negotiating these?

20    A.    I was involved in pieces of it.  I wouldn't say I was a

21    major player in this effort.

22    Q.    Now, for loss frequency, are you aware of the fact that

23    the debtor supposedly used Bloomberg data?

24    A.    I don't know that the debtor used Bloomberg data.  I know

25    they referenced it, or I believe they referenced it, but I'm

124

1    not aware that they used it.  It was a reference; that's my

2    understanding.

3    Q.   So you personally don't know how the debtors referenced or

4    used or applied anything from Bloomberg, correct?

5    A.   I know that the Bloomberg reported numbers were not what

6    was used in developing the percentages you see here.  How --

7    the steps they got from one to the next I didn't participate in

8    fully, so I probably can't describe accurately.

9    Q.   So if Bloomberg was actually, in the end, used at all, you

10   can't say, correct?

11   A.   It was just used as a reference point.

12   Q.   But you don't know how it was used as a reference point,

13   correct?

14   A.   It was used a reference point relative to whatever numbers

15   were finally used here for frequency.  I think it was checked

16   against those.

17   Q.   You didn't do the checking, did you?

18   A.   After the fact, I did.  I mean, I saw the difference

19   between the numbers after the fact --

20   Q.   So you --

21   A.   -- after the amount had been settled.

22   Q.   You saw the difference between what numbers and what

23   numbers?

24   A.   The numbers -- the frequency numbers around delinquencies

25   on the Bloomberg database as compared to what drives the

125

1    numbers in our plan.

2    Q.   And you say that what drives the numbers in your plan is

3    what exactly?

4    A.   That on the frequency number, I -- that was a negotiated

5    number, I believe.  And, again, I wasn't instrumental to

6    those -- the development of that number, so I can't tell you

7    how we arrived there.  If you're asking for the numbers, I

8    think I recall what they were, but --

9    Q.   You mean you recall the specific numbers that you

10   negotiated?

11   A.   I think I recall the final outcome numbers that are

12   imbedded in here 'cause I looked at it after the fact.

13   Q.   Okay.  We'll get to that and the disclosure statement.  I

14   just want to stick on the methodology for now.  Loss severity

15   numbers were also used.  The other factor you described is loss

16   severity, correct?

17   A.   That's correct.

18   Q.   Okay.  Loss severity depended, in part, on the Case-

19   Shiller index, correct?

20   A.   That's my understanding.

21   Q.   Okay.  You play no role in creating the Case-Shiller

22   index, do you?

23   A.   That's correct.

24   Q.   Case and Shiller are professors at universities, right?

25   A.   I believe they were.  I'm not sure if they still are, but,

126

1   yes.

2   Q.   Okay.  You didn't play any role in the decision to use

3   Case-Shiller as opposed to any other index, did you?

4   A.   I played no role in that.

5   Q.   Now, the debtors decided to use Case-Shiller instead of

6   their own historical data, correct?

7   A.   No.  That's not exactly how I characterize it.

8   Q.   How do you characterize it?

9   A.   I believe, in looking at severities, the debtors did look

10  at their own historical data, which was pulled from various

11  points in time, and the Case-Shiller index was used to roll

12  those severities forward to reflect the further deterioration

13  in the housing market.  So I do think the actual historical

14  data was used.

15  Q.   You say "roll forward."  You mean from when to when?

16  A.   Well, the historical liquidations were over a period of

17  time, so for any given incident it would have been a different

18  roll-forward period.  That's my understanding of how it worked.

19  Q.   So the last historical data used by the debtors that

20  involved the debtors' own experiences was pre-petition, right?

21  A.   I don't know.  My recollection is that the data went --

22  the actual damage data, liquidation data, went into the post-

23  petition period, but I couldn't say with certainty, though.

24  Q.   But at some point you decided you should no longer use the

25  debtors' data, you should use Case-Shiller data, right?

1    A.    Well, again, I don't characterize it that way.  I look at

2    it as using -- the debtors using and adjusting it with Case-

3    Shiller to roll it to a point in time.

4    Q.    Can you look, for me, at the bottom of Section A in

5    Article 7?  It says, "Notwithstanding the foregoing with

6    respect to any loan or resulting REO sold in a commercially

7    reasonable manner prior to the EPD determination date, the EPD

8    claim shall be allowed in an amount equal to the UPB at the

9    time of sale less the net proceeds realized from such sale."

10   You see that?

11   A.    I do.

12   Q.    Okay.  UPB means unpaid principal balance, right?

13   A.    Yes.

14   Q.    Okay.  Net proceeds realized from sale means what?

15   A.    It -- I read it to say the net proceeds realized from the

16   sale of the REO property.  But mechanically I don't believe

17   that's how the claim is reported to the debtor.  And I think we

18   tried to add clarifying language to the questionnaire to

19   compensate for this.  But, again, Damian Pasternak may be able

20   to testify better than I can on this matter.

21   Q.    Okay.  I'll hold off.

22         MR. WEISBROD:  Let's mark the questionnaire.  That

23   will be OBC-2.

24   (The claims questionnaire was hereby marked for identification

25   as Exhibit OBC-2 as of this date.)

1    MR. WEISBROD:  And actually let's mark the redline as

2    well, OBC-3.

3    (The redlined claims questionnaire was hereby marked for

4    identification as Exhibit OBC-3 as of this date.)

5    **Q.   Are you looking at it in your courtesy copies?**

6    MR. DORSEY:  I do not have copies of those exhibits.

7    MR. WEISBROD:  I'll hand it up.  May I approach the

8    witness, Your Honor?

9    THE COURT:  Oh, yeah.  And I need one too.  Thank

10   you.  Thank you, sir.

11   THE WITNESS:  Both of them?

12   MR. WEISBROD:  I'm showing the marked ones to the

13   Court.

14   THE COURT:  Okay.

15   THE WITNESS:  Thank you.

16   **Q.   So, Mr. Fernandes, OBC-2 is the claims questionnaire that**

17   **you just referenced, correct?**

18   **A.   I believe so.**

19   **Q.   You've seen it before, haven't you?**

20   **A.   Well, there are multiple versions of this, so --**

21   **Q.   Okay.**

22   **A.   -- so I'm not sure if it's the most recent.**

23   **Q.   Now, you're aware of the fact that one of the issues that**

24   **concerned the borrowers' committee was whether the phrase**

25   **"unpaid principal balance at the time of sale less the net**

1    proceeds realized from such sale" took into account private

2    mortgage insurance, right?

3    A.    I am aware of that.

4    Q.    Okay.  And when you just referred to an effort to clarify

5    the form, you were referring in part to an effort to deal with

6    that concern, right?

7    A.    In part to deal with that concern, albeit, from my

8    understanding of the mechanics, that concern is somewhat mooted

9    by the way the data's actually reported on a claim anyway.  And

10    I can describe, if you like.

11    Q.    Go ahead.

12    A.    I believe for the investor to claim on a loss on an EPD

13    that is liquidated, they can only do so after they've had that

14    loss reported to them by the servicer.  And I think it's

15    incumbent upon the servicer to look to all sources of recovery

16    in liquidating, selling the loan and recovering on related

17    insurances so that the net loss that should come through and be

18    reported on the EPD protocol here should be net of all those

19    recoveries anyway.

20    Q.    Now, UPB at the time of sale less net proceeds realized

21    from such sale is actually what current holders of the loan

22    typically report to their mortgage insurers, right?

23    A.    I don't know.  I -- yeah.

24    Q.    Let's take a look at Exhibit 3.  Could you look at the

25    second page of Exhibit 3, which is the questionnaire but in

130

1   blackline form?

2   A.   Okay.

3   Q.   Could you look at the bullet point that is one, two,

4   three -- four down in the group of about eight bullets?

5   A.   On part 2 where you --

6   Q.   Yes.

7   A.   Okay.

8   Q.   You see there that the words "including, for the avoidance

9   of doubt, any recoveries on private mortgage insurance with

10  respect to such loan" have been blackened out, right?

11  A.   I do.

12  Q.   Okay.  Now, this list of bullets here is a list of items

13  that the EPD breach claimant is supposed to provide, right?

14  A.   Yes.

15  Q.   And so the form used to say, "If the loan was foreclosed

16  or sold or if real estate-owned, REO, was sold, the date of

17  such sale foreclosure and the amount of any sale foreclosure

18  proceeds, including private mortgage insurance," right?

19  A.   Right.

20  Q.   And it no longer says, "including private mortgage

21  insurance," right?

22  A.   According to this, yes.

23  Q.   That's the most recent version, right?

24  A.   Again, there have been multiple versions, and I haven't

25  been the hands-on day-to-day person on this issue.  And it very

1    **well could be and I was just unaware of the latest change that**

2    **went through.**

3                    MR. WEISBROD:  Now, I'd like to mark as Exhibit 4 the

4    disclosure statement pursuant to Section 1125 of the plan --

5    sorry, of the Bankruptcy Code with respect to the amended

6    Chapter 11 plan of liquidation of the debtors dated as of

7    November 21, 2008.  I'm not sure, again, what docket number

8    that it is.  I think it's the most recent disclosure statement.

9                    THE COURT:  The most recent disclosure statement?

10                   MR. WEISBROD:  Sorry, I thought this was it.

11                   THE COURT:  November 25th?  It should be dated

12   November 25th.

13                   MR. WEISBROD:  Oh.  I'm sorry.  We've messed up.

14   Well, I'll just mark it for identification.  I think that this

15   hasn't changed.  And we probably -- I won't introduce it

16   into --

17   (Disclosure statement dated as of 11/25/08 was hereby marked

18   for identification as Exhibit OBC-4 as of this date.)

19                   THE COURT:  Okay.  You're going to show him the

20   November 8th docket?

21                   MR. WEISBROD:  I'm going to show him November 21,

22   which is the only one I have.  And I'll provide courtesy copies

23   to everyone else as well.

24                   THE COURT:  Oh.  Oh, okay.

25                   THE WITNESS:  Thank you.

132

```
 1            THE COURT:  I don't have it.  Yeah, okay.
 2   BY MR. WEISBROD:
 3   Q.   Mr. Fernandes, you mentioned -- I'd like you to look at
 4   page 89 and 90 of Exhibit 4, OBC-4.
 5   A.   Okay.
 6   Q.   If you look at page 90, under letter A, "Loss Frequency,"
 7   you'll see a paragraph that says, "Given the current status."
 8   Do you see that?
 9   A.   Yes.
10   Q.   And then at the end of that paragraph, it says, "For the
11   purposes of the protocol, the debtors made the simplifying
12   assumptions that the anticipated loss frequencies across all
13   product types would be 12.5 percent for the zero to thirty-day
14   delinquency bucket, fifty percent for the thirty-one to sixty-
15   day delinquency bucket, seventy-five percent for the sixty-one
16   to ninety-day delinquency bucket, and one hundred percent for
17   the ninety plus-day delinquency bucket."  Do you see that?
18   A.   Yes, I do.
19   Q.   Are those the numbers that you said you recalled?
20   A.   Yes, they are.
21   Q.   You don't have any data underlying the assumption that the
22   loss frequencies for all product types is the same, do you?
23   A.   I never saw frequencies reported by product type.
24   Q.   So you don't have any data that supports that assumption,
25   do you?
```

133

1    A.   Or refutes it, that's correct.

2    Q.   Could you turn the page to 91?  You see letter B, "Loss

3    Severity"?

4    A.   Yes.

5    Q.   In the middle of that paragraph, there is a sentence

6    saying that "[t]he resulting adjusted loss severities by

7    product type as percentages of UPB as of the EPD determination

8    date are as follows:  forty percent for fixed rate mortgages,

9    thirty-three percent for adjustable rate mortgages, thirty-

10   eight percent for payment option ARMs and ninety-five percent

11   for second lien."  See that?

12   A.   Yes.

13   Q.   Is that consistent with your recollection of the loss

14   severity percentages that you used?

15   A.   Yes, it is.

16          THE COURT:  Just so I understand, the -- and I'm

17   looking at the footnote, the comparison, the issue there is the

18   market's gone down significantly, so the loss severity's gone

19   up?

20          THE WITNESS:  Yes.

21   Q.   Let's talk about breach of warranty claims, Mr. Fernandes.

22   There's also a protocol for breach of warranty claims, right?

23   A.   Yes, there is.

24   Q.   Okay.  And if you look at the plan, you can find that on

25   page 46.

134

1    A.    Okay.

2    Q.    The breach of warranty protocol assumes that claims will

3    be filed by pool rather than by loan, right?

4    A.    It's designed to be applied to pools rather than loan-

5    specific.

6    Q.    Fair enough.  And the distinction you're drawing is that

7    if somebody has EPD and breach of warranty claims, they will

8    list the EPD claims by loan but the breach of warranty claims

9    by pool, right?

10   A.    That wasn't what I was highlighting, but I believe that's

11   correct.

12   Q.    Okay.  What were you highlighting?

13   A.    Can you repeat your question?

14   Q.    I said originally, I believe, that the breach of warranty

15   protocol applies by pool rather than by loan.  That's correct,

16   isn't it?

17   A.    I thought you asked something about being filed by pool

18   rather than loan, and it's designed to accommodate a pool

19   basis, not a loan-level filing basis.  I thought you had

20   implied that a breach claim could only be filed by pool, and

21   that's where I was trying to distinguish, I think.

22   Q.    Is there any provision in the plan for filing a breach

23   claim by loan rather than pool?

24   A.    No.  I wasn't referring to the protocol in the plan.  I

25   thought you were, just in general -- I think we're just talking

1    past each other here.  I think we're on the same page.

2    Q.   Okay, so under this plan, if somebody's going to file a

3    breach of warranty claim, it's going to be filed by pool,

4    correct?

5    A.   Yes.

6    Q.   Now, page 47 lists a table for handling breach of warranty

7    claims, right?

8    A.   Yes, it does.

9    Q.   Okay.  And the calculation of breach of warranty claims

10   involves another step as compared to EPD claims, right?

11   A.   Can you describe the step you're contemplating?

12   Q.   Okay.  Let me do it this way.  The claim starts with a

13   statement of an amount of loss, right?

14   A.   I'm sorry, what are you referring to?

15   Q.   I'm just trying to walk through how this process works.

16   A.   How the breach protocol gets applied?

17   Q.   Yes.

18   A.   I believe it's for the pool of loans that were sold

19   relative to the quarter identified.  After backing out any EPD

20   claims, these percentages get applied to the remaining pool.

21   Q.   Okay.  So what you -- what they get applied to actually is

22   the UPB of the remaining pool, right?

23   A.   Yes.

24   Q.   Okay.  So you start with the UPB of the remaining pool and

25   then you multiply it by some numbers, right?

1    A.    By these numbers, yes.

2    Q.    And you start out by looking to figure out what year the

3    pool was issued in, right?

4    A.    What quarter, what year, yes.

5    Q.    And it could be as old -- or as recent as 2007, right?

6    A.    That's correct.

7    Q.    And it could be second quarter 2003 or earlier, right?

8    A.    I think third quarter 2003 and subsequent months are the

9    ones that are subject to claims.

10   Q.    Okay.  You then multiply that number by what's called

11   percentage incidents, right?

12   A.    You could, or you could just multiply it by the columns

13   out to the right there by product type.

14   Q.    Oh, I'm sorry.  Okay.  Well, let's go -- let's talk about

15   the components that go into these last four columns, and I'm

16   talking about the columns labeled FRM, ARM, POA and Second.

17   See that there's numbers there?

18   A.    Yes.

19   Q.    Three factors make up each of those numbers, right, those

20   factors being percentage incidents, loss severity and loss

21   frequency, right?

22   A.    I don't think about it that way.  I envision the frequency

23   as being imbedded in the percent incidents.  So, in my mind,

24   that's just the incidents percentage multiplied by the

25   severity.

1    Q.    Could you look again at the disclosure statement, Exhibit

2    4?  And now please take a look at the discussion of breach of

3    warranty claims on pages 92 to 95.  I'm going to ask you about

4    the paragraphs under B on page 94.

5    A.    I'm sorry, what page did you say?

6    Q.    Well, the discussion of breach of warranty claims is 92

7    through 95, and I'm going to ask you about the paragraphs that

8    are on page 94 under Section B, Loss Frequency and Loss

9    Severity.

10   A.    Okay.

11   Q.    But I wanted to give you a chance to look at the context.

12   Let me know when I can ask you a question.

13   A.    Okay.

14   Q.    All right.  The disclosure statement said that "[f]or the

15   sake of simplicity," this is on page 94, "the protocol assumes

16   that any loan on account of which a valid breach of warranty

17   claim is asserted will give rise to a loss in some amount,

18   i.e., will have a one hundred percent loss frequency."  You see

19   that?

20   A.    I do.  I think that's consistent with how I described, I

21   think, the mechanism, but --

22   Q.    Because you don't have to do the multiplication while

23   you're multiplying by one, right?

24   A.    Right.

25   Q.    But you actually did make an assumption here about loss

138

1    frequency, right?

2    A.   Yes.

3    Q.   And that assumption was that there would always be loss

4    frequency, right?

5    A.   Yes.

6    Q.   Whereas for EPD claims, you did not assume that there

7    would always be loss frequency, right?

8    A.   That's correct, but I think it's apples and oranges there.

9    Q.   You've worked for one other mortgage case, right?

10   A.   That's right, in a nonbankruptcy matter.

11   Q.   And are you actually working for the mortgage company?

12   A.   No.  We're working for a creditor.

13   Q.   And that's confidential?

14   A.   It is.

15   Q.   So you're not at liberty to disclose the name?

16   A.   No, I am not.

17   Q.   Okay.  And does that confirm your understanding about any

18   of this --

19   A.   The --

20   Q.   -- the way the mortgages work, or anything?

21          MR. DORSEY:  Objection.  Vague.  I'm not sure --

22   A.   Yeah, I don't --

23          MR. DORSEY:  -- what that question is.

24   A.   -- I don't know what you're asking.

25   Q.   All right.  The only experience that you have dealing with

139

1    mortgage companies is American Home and the confidential

2    matter, right?

3    A.    That's correct --

4    Q.    Now --

5    A.    -- and the loan I took out on my house, I guess.

6    Q.    You said that these were negotiated numbers in the

7    protocols, right?

8    A.    That's correct.

9    Q.    Did any borrowers participate in the negotiations?

10    A.    Not that I'm aware of.

11    Q.    I'm going to change topics to --

12          MR. DORSEY:  Your Honor --

13    Q.    -- your declaration.

14          MR. DORSEY:  I'm sorry, Your Honor.  If this is a

15    good breaking point, would it be okay if we took a short

16    recess?

17          THE COURT:  Absolutely.  Let's take a five-minute

18    recess or so.  Is that all right?

19          MR. WEISBROD:  That's fine.

20          THE COURT:  Okay.  Again, please, you can't discuss

21    the substance of your testimony.

22          THE WITNESS:  Thank you.

23       (Recess from 4:02 p.m. until 4:19 p.m.)

24          THE CLERK:  All rise.

25          THE COURT:  Just for scheduling purposes, we can --

140

1   well, it's up to you, of course, but we can go till 7ish,

2   between 7 and 8 tonight.  I have time -- I hesitate to say

3   this.  I have time Wednesday, if necessary.  That's not an

4   invitation.  It's just a statement.  You may proceed.

5          MR. WEISBROD:  Thank you, Your Honor.

6   BY MR. WEISBROD:

7   Q.   Mr. Fernandes, most employees of AHM are now gone,

8   correct?

9   A.   Yes.

10  Q.   Employees responsible for sales have left the company,

11  right?

12  A.   For sales --

13  Q.   Sales of mortgages to borrowers.  Marketing --

14  A.   Yes.

15  Q.   -- mortgages to borrowers?

16  A.   Yes.

17  Q.   There's at least one employee who sold originated

18  mortgages to investors who's still left, right?

19  A.   Who -- yeah.

20  Q.   That's in the past?

21  A.   That's whole loan sales, and, yes, that --

22  Q.   I interrupted you, I'm sorry.

23  A.   There are employees who were involved in whole loan sales

24  and securitization sales to institutional investors.

25  Q.   They are left?

141

1    A.    There are a couple who are left.

2    Q.    But the people who were involved in marketing to borrowers

3    are all gone?

4    A.    That's correct.

5    Q.    The people who were responsible for repos are all gone,

6    right?

7              THE COURT:  For what?

8              MR. WEISBROD:  Repos.

9              THE COURT:  Oh.

10   A.    Who were responsible --

11             THE COURT:  I'm familiar with the --

12   A.    I don't -- I don't know --

13   Q.    There was a re --

14   A.    -- what aspect of the repurchase --

15   Q.    Was there a repo department?

16   A.    Can you define repo for me?

17   Q.    Well --

18   A.    Are you talking about the lending facilities or --

19   Q.    Let's start with -- let's talk about different kinds of

20   repos and see who is left and who's gone.  Repo lending

21   facilities:  Is anybody left?

22   A.    I mean, there were a multitude of parties who touched them

23   in some ways in looking at amounts that were borrowed against

24   the repo facilities and including people in treasury.  Andy

25   Dokas (ph.) is still there on a part-time basis, and he may

142

1   have had some involvement with the repayment on repurchased

2   loans or those warehouse loans that were repurchase agreements.

3   Q.   Was there a department that handled that?

4   A.   I don't believe so.

5   Q.   Was there a department that handled a different kind of

6   repurchase, which is repurchasing mortgages that were subject

7   to, say, EPD claims?

8   A.   I don't know if there was a department specific to that.

9   Q.   Is there anybody left at the company who was engaged in

10  repurchasing mortgages from investors that were subject to EPD

11  claims?

12  A.   I'm not aware of anyone, but I couldn't say with

13  certainty.

14  Q.   Okay.  But you know there was a group of people who were

15  responsible for sales and marketing to borrowers, right?

16  A.   That's my understanding.

17  Q.   Okay.  And those people are gone, right?

18  A.   Yes.

19  Q.   And you don't know where their files are, do you?

20  A.   Where their files are --

21  Q.   Right.

22  A.   I'm not sure -- I'm not sure I understand the question.  I

23  guess, no, I don't know where their files are.

24  Q.   Do you know if there were filing cabinets once upon a time

25  in their offices?

143

1  A.    I don't know.  I don't even know who these people are.  I

2  don't know if there were remote locations that are -- I mean, I

3  just don't know.  I don't know how they're structured and who

4  those people were.

5  Q.    Now, another kind of file that the company maintained was

6  loan files, right?

7  A.    Yes.

8  Q.    If someone now wants to figure out whether his or her loan

9  file has been destroyed, how do you do it?

10              MR. DORSEY:  Objection.  Destroyed by whom?

11              THE COURT:  Sustained.

12  Q.    If someone now wants to find out where or whether the

13  company's existing files include the loan file, how would you

14  do it?

15  A.    The company has the ability to look at which files it has

16  copies of, either imaged and/or hard copies.  I'm not sure that

17  all of the hard copy files are identifiable at this point,

18  but --

19  Q.    Some are not indexed, is that right?

20  A.    That may be the case.

21  Q.    If somebody wanted to figure out whether his or her loan

22  file were subject to one of the document destruction orders

23  that have been entered in the case, how would you do it?

24  A.    I suppose you'd have to look at the order and then look at

25  the respondents to the order who requested the files, the

144

1    preserved and shipped, I should say, to the investor.

2    Q.   So if a borrower knows that the borrower was not one of

3    the respondents, can the borrower figure out if his or her loan

4    file is subject to the document destruction order?

5    A.   Independently, probably not.

6    Q.   Are you familiar with the ombudsman provisions in the

7    plan?

8    A.   Generally, yes.

9    Q.   Okay.  I'd like you to look at page -- well, actually, we

10   don't need to look at a page.  You know that the current amount

11   to be spent on the ombudsman is capped at 50,000 dollars,

12   right?

13   A.   Yes.

14   Q.   How is that figure calculated?

15   A.   I'm not sure how that amount was derived.

16   Q.   Do you know the compensation structure that will be

17   employed for the ombudsman?

18   A.   I do not.

19   Q.   Do you know who the ombudsman will be?

20   A.   I do not.

21   Q.   The ombudsman will exist only for as long as the trust

22   exists, right?

23   A.   That's my understanding.

24   Q.   Now, the trust will not exist longer than five years,

25   right, unless extended?

145

1   A.   That's what -- yeah, that's what's contemplated, yes.

2   Q.   And the trust cannot be terminated any sooner than six

3   months, right?

4   A.   I believe that's right.

5   Q.   Because there has to be six months' notice, right?

6   A.   I'm not sure what drives the requirements.

7   Q.   So are you aware of anything that would ensure that the

8   ombudsman would continue to function a year after plan

9   confirmation?

10  A.   I'm not sure I follow.  I would envision a contract being

11  a place with whoever that party was that would define the term

12  of their engagement.

13  Q.   Okay.  And what if the 50,000 dollars is used up?

14  A.   I don't know.

15  Q.   You are aware, aren't you, that some borrower claims have

16  been filed in this case?

17  A.   Yes.

18  Q.   You personally don't keep track of borrower claims, do

19  you?

20  A.   I do not.

21  Q.   You personally don't know if particular products sold by

22  AHM are correlated with borrower claims, do you?

23  A.   I do not.

24  Q.   You're not aware of any estimate of the total number of

25  borrowers in the country who might want to assert claims

146

1    against AHM, are you?

2    A.    No.

3    Q.    And you're not aware of any estimate of the total value of

4    the claims that people across the country might want to assert

5    against AHM, are you?

6    A.    Yeah.  No, not even sure what the reference is to, but --

7    so I'm not aware of any amount.

8    Q.    The only estimates of borrower claims in terms of value

9    that you're aware of are estimated values of the roughly 450

10   who actually filed proofs of claim, right?

11   A.    That's right.  And my recollection was that those were

12   very preliminary estimates.  But you're right.

13   Q.    You know what a payment option ARM is?

14   A.    I do.

15   Q.    Can you explain what a payment option ARM is?

16   A.    Sure.  It's my understanding that it's a loan structure

17   that gives the borrower an option of paying a -- one of a

18   variety of amounts each month, and based on what that borrower

19   selects to pay, the remaining term and terms of the loan will

20   vary.

21   Q.    AHM issued a total of about 90,000 payment option ARMs,

22   right?

23   A.    I have seen that reported, yes.  I believe that sounds

24   correct.

25   Q.    Payment option ARMs are typically sold as thirty-year

1    mortgages, right?

2    A.    I'm not certain.

3    Q.    Well, AHM typically sold them as thirty-year ARMs, right?

4    A.    I'm not familiar with the product to that level.

5    Q.    Well, let me confirm that you at least know this:  If you

6    choose the lowest monthly required payment, your payment will

7    not cover the full interest being assessed on the loan,

8    correct?

9           MR. DORSEY:  Objection, Your Honor.  We're now beyond

10   the scope of direct examination.  I'm not going to object on

11   the grounds that it's beyond the scope, but it is now in a

12   position where the borrowers' counsel is going to have to

13   establish a foundation before he asks these questions.

14          THE COURT:  Let's -- where are you headed with this?

15          MR. WEISBROD:  I actually am headed with the point

16   that Mr. Fernandes, who is employed by AHM as chief

17   restructuring officer and has years of experience, is not fully

18   able to explain the products that were the principal products

19   sold by the company that he is restructuring --

20          THE COURT:  And why is that --

21          MR. WEISBROD:  -- which I believe will be relevant,

22   Your Honor.

23          THE COURT:  Okay.  To what point?

24          MR. WEISBROD:  To the point that they were very

25   difficult-to-understand products.

148

1          MR. DORSEY:  I don't see the relevance to his

2    understanding of what those products were to whether or not

3    these were difficult-to-understand products.  There's a

4    disconnect there, Your Honor.

5          THE COURT:  All right, I'll overrule the objection,

6    but let's --

7          MR. WEISBROD:  I don't --

8          THE COURT:  -- not delve too deeply into this

9    because --

10         MR. WEISBROD:  I don't --

11         THE COURT:  -- it is well beyond the scope of direct,

12   so --

13         MR. WEISBROD:  Yeah.  And to let the Court know, I

14   had discussed with Mr. Dorsey whether he would object to my

15   going beyond the scope of direct on any subjects, and he said

16   no.  He, of course, reserved relevance objections, but we both

17   agreed that it would make more sense for us to conclude our

18   examination today, if possible, rather than have to bring the

19   witness back.  Now --

20         MR. DORSEY:  But that doesn't --

21         THE COURT:  I mean, maybe we can get a thousand

22   questions, and what -- do you have any greater understanding of

23   payment option ARMs other than what you've described in

24   connection with the question of what a payment option ARM is?

25         THE WITNESS:  No, I really don't.

149

1          THE COURT:  Okay.  I think that does it.

2          MR. WEISBROD:  Very well, Your Honor.

3          THE WITNESS:  But to clarify, I think you listed me

4     as the chief restructuring officer.  I'm actually director of

5     restructuring.  And I would note that we weren't -- the debtor

6     wasn't originating or selling any loans at the time of my

7     engagement.

8          MR. WEISBROD:  Your Honor, I don't intend to do this

9     in any detail, but I would just like to ask a couple more

10    questions.

11         THE COURT:  Okay.

12         MR. WEISBROD:  And I don't think it'd take much time,

13    and the Court can decide whether it's probative.

14         THE COURT:  All right.

15    BY MR. WEISBROD:

16    Q.   Mr. Fernandes, you and I talked about payment option ARMs

17    two weeks ago at your deposition, right?

18    A.   Yeah.  Three weeks ago, yeah.

19    Q.   And I showed you a payment option ARM that had been issued

20    to a man named Tilton Jack, right?

21    A.   That's correct.

22    Q.   And you, at that time, noted that you had never actually

23    reviewed a document like that before, right?

24    A.   That's correct.

25    Q.   And I asked you if you could tell from the face of the

150

1    document how long Mr. Jack could continue to make his minimum

2    monthly payment.  You remember that?

3    A.    That -- yes.

4    Q.    And you responded that you could probably figure it out

5    with a calculator, right?

6    A.    I believe that's right.

7    Q.    But at the time, you could not tell from looking at the

8    document how long a period Mr. Jack would have under the terms

9    of the note to continue to make his minimum monthly payment,

10   right?

11   A.    That's my recollection, yes.

12   Q.    Now, you are aware of the fact, aren't you, that some

13   class actions have been filed involving payment option ARMs?

14   A.    In these matters?  I'm not aware.

15   Q.    In the world, some class actions have been filed, right?

16            MR. DORSEY:  Objection.  Relevancy, Your Honor?

17            THE COURT:  No, that's overruled.  I think I know

18   where he's going.  Maybe we could limit it to the United States

19   of America.

20   A.    No.  I'm actually not aware of any class action lawsuit

21   relative to that.

22   Q.    Were you aware of the fact that a class -- a purported

23   class action proof of claim was filed against American Home?

24   A.    No, I don't believe I was.

25            MR. WEISBROD:  May I approach, Your Honor?

1          THE COURT:  Yes.

2          MR. DORSEY:  Your Honor, in an effort to move this

3    along, the debtors will stipulate that the proof of claim that

4    he is showing the witness was filed in these cases.

5          THE COURT:  Very good.

6          MR. WEISBROD:  Your Honor, that being the case and to

7    move it along, I don't think I'm going to have very many

8    questions about this for Mr. Fernandes.

9    **Q.    But Exhibit 5 is a proof of claim.  Do you see that?**

10   **A.    Yes.**

11   **Q.    And it was filed by Elvin Valenzuela and Phyllis**

12   **Valenzuela.  Do you see that?**

13   **A.    I do.**

14   **Q.    Had you ever seen it before?**

15   **A.    I don't believe so.**

16         MR. WEISBROD:  Your Honor, Exhibit 6 and 7 are the

17   two notice orders relating to the two bar dates.  I don't have

18   the docket entries.  I'll provide courtesy copies.

19         THE COURT:  All right.  Well, do you know what day

20   they're dated?  One should be October 30, '07, and the other

21   should be maybe February 15th, '08.

22         MR. WEISBROD:  One is February 14th, '08.

23         THE COURT:  Okay.  Which exhibit?

24         MR. WEISBROD:  And the other's October 30th.

25         THE COURT:  Okay.

152

1        MR. WEISBROD:  And --

2        THE COURT:  Which exhibit's which?

3        MR. WEISBROD:  The earlier one is 6.

4        THE COURT:  All right.  That's docket 1708, for the

5   record.  And Exhibit 7 is docket 2987, for the record.

6   (Notice order dated 10/30/07 [Docket Item 1708] was hereby

7   marked for identification as OBC-6 as of this date.)

8   (Notice order dated 2/14/08 [Docket Item 2987] was hereby

9   marked for identification as OBC-7 as of this date.)

10       THE COURT:  Do you have any extras?

11       MR. WEISBROD:  I do, yes.  Do you need it, Your

12  Honor?

13       THE COURT:  Yes.

14       MR. WEISBROD:  I'm sorry, I thought you had it in

15  front of you because you were reading from it.

16       THE COURT:  No, no, I'm looking at the chart.  Thank

17  you.

18  BY MR. WEISBROD:

19  Q.   Mr. Fernandes, you have seen these two court orders

20  before?

21  A.   I have.

22  Q.   OBC-6 establishes a general bar date, correct?

23  A.   Yes.

24  Q.   And OBC-7 establishes what has been known as the

25  borrowers' bar date, right?

153

1    A.    Yes.

2    Q.    Now, it's referred to, the second one, as the borrowers'

3    bar date but it actually applies only to home equity loan and

4    construction borrowers, right?

5    A.    That's correct.

6    Q.    All other creditors -- all other unsecured creditors were

7    subject to the earlier bar date, right?

8              MR. DORSEY:  Objection.  Calls for a legal

9    conclusion.  The document --

10             THE COURT:  Sustained.

11   Q.    Now, do you have any understanding as to which bar date

12   has been used to determine the timeliness of borrower claims

13   asserted by payment option ARM borrowers?

14   A.    Assuming you cannot get a payment option ARM HELOC or

15   construction loan, then I would say the general bar date, yeah.

16   Q.    Now, the general bar date, Exhibit 6, that includes

17   several exhibits as attachments to the order, correct?

18   A.    I'm sorry.  Can you ask that again?

19   Q.    OBC-6 itself includes several attachments, correct?

20   A.    It does.

21   Q.    Now, attachment A says "Notice of bar dates for filing of

22   proofs of claim."  You see that?

23   A.    Yes, I do.

24   Q.    And it's addressed to all creditors and equity interest

25   holders, you see that?

154

1   A.   Yes.

2   Q.   And you see there's a section called Key Definitions?

3   A.   Yes.

4   Q.   Now, I'd like you to look at -- I'm sorry, under Key

5   Definitions, the first definition given is of the term

6   "entity," right?

7   A.   Yes.

8   Q.   And it says that "[e]ntity includes all persons

9   (individuals, partnerships and corporations), estates, trusts,

10   governmental units and the United States Trustee."  Do you see

11   that?

12   A.   I do.

13   Q.   Okay.  Now, I'd like you to look at Exhibit C.

14        MR. DORSEY:  Your Honor, are we just going to walk

15   through this exhibit and have him confirm what's in there?  The

16   exhibit is in.  We'll admit -- we'll agree that this can be

17   admitted into evidence.  We don't need the witness to confirm

18   what it says.

19        MR. WEISBROD:  There's going to be factual issues

20   here, Your Honor.

21        THE COURT:  All right.  I'll overrule.

22   Q.   Could you take a look at Exhibit C?

23   A.   Yes.

24   Q.   Okay.  So this is Exhibit C, part of OBC-6.  That also

25   says on it "notice of bar dates for filing proofs of claim,"

155

1    you see that?

2    A.   I do.

3    Q.   And that's addressed to all creditors, do you see that?

4    A.   Yes.

5    Q.   Could you look at the third sentence in the first

6    paragraph?  It says, "Except as described below, the bar date

7    order requires all entities, other than governmental units that

8    have or assert any pre-petition claims against the debtors, to

9    file proofs of claim with Epiq Bankruptcy Solutions, LLC

10   ('Epiq') so that their proofs of claim are received by Epiq on

11   or before 4 p.m. Eastern Time on January 11, 2008."  Do you see

12   that?

13   A.   I do.

14   Q.   Now, I assume the debtors will stipulate, in the interest

15   of time, that the word "entities" is not defined in Exhibit C.

16        MR. DORSEY:  The document speaks for itself, Your

17   Honor.  I don't have time to sit here and read it.

18        THE COURT:  It says what it says.

19        MR. WEISBROD:  I'd like to mark as Exhibit 8 --

20        MR. DORSEY:  Just for the record, Your Honor, I note

21   there was actually no fact question whatsoever with these

22   documents.  We're just wasting time here.

23        MR. WEISBROD:  There will be, Your Honor.  Could we

24   mark that Exhibit 8?

25        THE CLERK:  Exhibit 6 and 7?

1    MR. WEISBROD:  I thought we had 6 and 7.  So were at

2    8, right?

3    (E-mail from Sandra Dee Volel to Kara Hammond Coyle was hereby

4    marked for identification as Exhibit OBC-8 as of this date.)

5    **Q.   Mr. Fernandes, Exhibit 8 is an e-mail from Sandra Dee**

6    **Volel of Epiq Systems to Kara Hammond Coyle of Young Conaway.**

7    **Do you know Sandra Dee Volel?**

8    **A.   No, I don't.**

9    **Q.   Do you know Kara Hammond Coyle?**

10   **A.   No.**

11   **Q.   Okay.  This document -- have you ever seen either the**

12   **e-mail or the attachment to the e-mail?**

13   **A.   No, I have not.**

14   **Q.   Can you read the print on the attachment to the e-mail?**

15   **A.   Yes, I can.  Well, I'll say I can the read the bulk of it.**

16   **Q.   Some if it is too small or unclear to read, correct?**

17   **A.   On this copy, yes.  For my eyes, it is.**

18   **Q.   Can you tell whether the first paragraph on this e-mail is**

19   **the same -- on this attachment is the same as Exhibit C of**

20   **OBC-6?**

21   MR. DORSEY:  Again, Your Honor, the document speaks

22   for itself.  We really don't need to have the witness go

23   through and confirm what this document says or doesn't say.

24   THE COURT:  Isn't this more appropriate for oral

25   argument at the end?  I mean --

157

1      MR. WEISBROD:  I'm just trying to establish my

2    evidentiary record, Your Honor.  I'm not sure what the debtors

3    are stipulating to.  If necessary -- if they will stipulate to

4    that, that's fine, that it's the same.

5      MR. DORSEY:  I'm not sure what I'm stipulating to,

6    Your Honor.  The document speaks for itself.  If they want to

7    have the Court review the published bar date notice as compared

8    to the order providing for the publication of that notice,

9    they're certainly free to do that.

10      THE COURT:  Looks the same to me.

11      MR. WEISBROD:  Now me too, Your Honor, except smaller

12    and on one page.

13      THE COURT:  Well, it's a copy.

14      MR. DORSEY:  Your Honor, I'm not sure what the

15    relevancy of an attachment to an e-mail, which we have not even

16    established that this was the actual size of the published

17    notice, has any relevancy whatsoever.  If they wanted to see

18    how this was published in the newspaper, they should have gone

19    to one of the newspapers where it was published and gotten a

20    copy of it.

21      MR. WEISBROD:  Your Honor, we asked for copies from

22    the debtor and were given this.

23      MR. DORSEY:  It's a public document, Your Honor.  We

24    don't have to produce publicly available documents.  Go to the

25    newspaper and get a copy of it.

158

1          MR. WEISBROD:  Your Honor, they have to produce

2     anything that they have that's responsive.  And when we ask for

3     the documents that showed the actual ads, this is what we got,

4     and that is why I'm asking questions about this.

5          THE COURT:  All right.  Let's go.  Let's move on.

6          MR. WEISBROD:  I apologize, Your Honor.

7     BY MR. WEISBROD:

8     Q.   Now, Mr. Fernandes, it's your understanding, isn't it,

9     that the ad was published in three newspapers, correct?

10    A.   That's my understanding, yes.

11    Q.   Those three newspapers are The New York Times, the St.

12    Louis Post-Dispatch and The Dallas Morning News, right?

13    A.   I believe that's correct.

14    Q.   Of those three, only The New York Times purports to have

15    national circulation, right?

16    A.   I don't know.

17    Q.   You don't know why those newspapers were chosen, do you?

18    A.   No.  Again, I didn't arrive at AHM corporate headquarters

19    and get involved with anything but the servicing sale until

20    February of 2008.  I believe this all predates that.

21    Q.   You don't know why the January bar date was chosen as the

22    general bar date, do you?

23    A.   I believe it would have been driven by statutory timing

24    requirements in relation to notice; it would be my guess as to

25    what drives that date.

1    Q.   You didn't participate in any discussions about selecting

2    the date, right?

3    A.   I did not.

4    Q.   Okay.  You know that AHM had offices in forty-seven

5    states, right?

6    A.   I believe that to be true, yeah.

7    Q.   And you believe that it may have done business in as many

8    as fifty states, right?

9    A.   It may have.

10   Q.   You have no reason to believe it didn't, do you?

11   A.   No, I don't.

12   Q.   And it did business in at least forty-seven, right?

13   A.   Presumably.

14   Q.   Now, you have never seen an ad anywhere in any newspaper

15   that is addressed to borrowers, have you?

16             MR. DORSEY:  Objection.  Relevancy.

17             THE COURT:  Overruled.

18             MR. WEISBROD:  I'll rephrase it.

19             THE COURT:  Overruled.

20   Q.   And I mean an ad about AHM's bankruptcy addressed to

21   borrowers.  You've never seen that, have you?

22   A.   I have not.

23   Q.   You've never actually seen an ad in any newspaper about

24   AHM's bankruptcy addressed -- concerning the bar date that is

25   addressed to anyone other than creditors who are entities, have

160

1   you?

2           MR. DORSEY:  Objection.  He just said he's never seen

3   a published notice, Your Honor, so he certainly hasn't seen one

4   that was addressed to any specific class of people.

5           THE COURT:  Asked and answered.

6           MR. WEISBROD:  Okay.

7           THE COURT:  Sustained.

8   Q.   Mr. Fernandes, Borrowers' Committee Exhibit 9 is a letter

9   dated August 13th, 2007.  You see that?

10  A.   I do.

11  Q.   It says, "Dear American Home Mortgage Customer," and it's

12  signed "Alan Horn, EVP and General Counsel."  Do you see that?

13  A.   I do.

14  Q.   You've seen this letter at least once before, right?

15  A.   That's correct.

16  Q.   And that was at your deposition?

17  A.   Yes.

18  Q.   Have you seen it at any other time?

19  A.   No, I don't believe so.

20  Q.   Now, this letter says, in the third paragraph, "The

21  Chapter 11 filing and process should not directly impact you if

22  you currently have a mortgage with American Home Mortgage."  Do

23  you see that?

24  A.   I do.

25  Q.   And I told you at your deposition that I thought it was

161

1    still on the website, remember that?

2    A.   I do.

3    Q.   Have you looked at the website since then?

4    A.   I have not.

5         MR. WEISBROD:  May I have a moment to confer with my

6    co-counsel, Your Honor?

7         THE COURT:  Yes.

8    Q.   Now, it is your understanding, isn't it, sir, that a bar

9    date can have an impact on a borrower?

10        MR. DORSEY:  Objection.  Vague and calls for a legal

11   conclusion.

12        THE COURT:  Overruled.

13   A.   Can you be more specific, I guess?  I --

14   Q.   Well --

15   A.   It could not have an impact on a borrower, I guess, is

16   what it -- so I guess a -- well, can you ask the question

17   again?

18   Q.   Sure.  If a borrower files a proof of claim after a bar

19   date, then the bar date may have an impact on that borrower,

20   correct?

21   A.   I agree with that, yes.

22        MR. WEISBROD:  Those are all my questions for Mr.

23   Fernandes.

24        THE COURT:  All right.  Thank you.

25        MR. WEISBROD:  We reserve our right if JPMorgan asks

162

1    more questions.  I don't know if that's for Fernandes or

2    Pasternak.

3              THE COURT:  All right.

4              MR. WEISBROD:  Thank you.

5              THE COURT:  Understood.  Ms. Rushy (ph.), you don't

6    have a pending objection, ma'am.  And you're a member of the

7    committee, correct?

8              MS. RUSHY:  Yes.

9              THE COURT:  All right.  I'm not going to permit you

10   to cross examine the witness.  You don't have a pending

11   objection before the Court, and you're a member of the

12   committee represented by counsel, and so you have no standing

13   to be heard.

14             MS. RUSHY:  I have my personal case statement filed.

15             THE COURT:  Yes, but you don't have an objection to

16   this plan.  You --

17             MS. RUSHY:  We did file an objection.

18             THE COURT:  But you didn't file an objection to the

19   plan.

20             MS. RUSHY:  I've got an objection filed.

21             THE COURT:  To this plan?

22             MR. WEISBROD:  Your Honor, may I approach?

23             THE COURT:  May approach who?

24             MR. WEISBROD:  You.

25             THE COURT:  For what purpose?

1      MR. WEISBROD:  Well, no, I'll say it in open court,

2    then.  May I speak on this?

3      THE COURT:  Yes.

4      MR. WEISBROD:  We did not ask every question proposed

5    by every committee member in our examination.  It might make

6    sense for me to take a minute to ask a couple of questions just

7    to resolve this issue.

8      THE COURT:  All right.  Do you need a moment with

9    your committee member, or --

10      MR. WEISBROD:  Yes.

11      THE COURT:  All right.  That's fine.

12      (Pause)

13      MR. WEISBROD:  May I approach the witness, Your

14    Honor?

15      THE COURT:  Yes.

16    BY MR. WEISBROD:

17    **Q.   Mr. Fernandes, I'm showing you what has been marked as OBC**

18    **Exhibit 10.  And I am sorry to hover, but I have only one copy.**

19    **This is labeled Goldman Sachs --**

20      THE COURT:  Are you getting him?  I'm sorry.

21      UNIDENTIFIED SPEAKER:  No.  You can ask somebody

22    here.

23      MR. WEISBROD:  I apologize.  Thank you.

24      THE COURT:  Do you have the portable?

25      UNIDENTIFIED SPEAKER:  Yeah.

164

1            THE COURT:  Would you give him the portable mic

2      there?

3      Q.    You hear me?

4      A.    Yes.

5            MR. WEISBROD:  I have actually never wanted to do

6      this, Your Honor.  A lot of people say they always have; I

7      never have.

8            THE COURT:  No, it's --

9      Q.    Mr. Fernandes, this is labeled Goldman Sachs Static Pool

10     Information, Delinquency Loss and Pre-Payment Information,

11     Option ARM.  Do you see that?

12     A.    I see that label, yes.

13     Q.    Are you aware of the fact that Goldman Sachs is one of the

14     entities that invested in AHM mortgages?

15     A.    Yes, I believe that's right.

16     Q.    Have you ever seen this particular document before?

17     A.    I don't believe so.

18            MR. WEISBROD:  I'll have a few more questions,

19     nevertheless.

20     Q.    Mr. Fernandes --

21     A.    Yes.

22     Q.    -- could you explain how, if at all, the EPD breach

23     protocol ensures that EPD breach claimants do not recover

24     twice, once from insurers and once from the debtors?

25     A.    As I had described earlier, I believe the mechanic for

165

1    reporting a loss on a liquidated EPD ensures that any

2    recoveries from insurance payments are imbedded in that

3    calculation from the servicer to the investor.  In terms of

4    unliquidated EPDs, I believe the calculations imbedded in the

5    plan in the protocol looked at historical severities, which

6    included recoveries from mortgage insurance.  And that's -- I

7    guess that's my answer.  Did I get to the --

8    Q.   What about if you're looking at it on a pool basis?  Is it

9    possible that a breach of warranty claim on a pool might be

10   overstated because the pool had some form of insurance?

11   A.   Well, again, the -- in the mechanism, the -- in the

12   protocol in our plan, the severities imbedded in the breach

13   protocol reflect mortgage insurance recoveries, historical

14   mortgage insurance recoveries.  But the question doesn't line

15   up quite right in my mind in that the protocol is a streamlined

16   process to liquidate a claim at a reasonable amount to save

17   resources, time and money on behalf of the debtors and the

18   creditors involved in those, and I believe it gets to a

19   reasonable settlement point in doing that.  So I'm not sure

20   that the question even lines up with the protocol necessarily.

21   Q.   Now --

22   A.   That's how I think about it.

23   Q.   I cut you off.  You said that's not how you think about

24   it?

25   A.   I said at least that's how -- as to how I think about it.

1    Q.   Okay.  Because it's a streamlined process, there's no

2    mechanism in the review process for reviewing any particular

3    claimant's financial statements, correct?

4    A.   I'm sorry.  What's the question?

5    Q.   The review process with the EPD breach protocol does not

6    provide a mechanism for the trust to review a claimant's

7    financial statements, right?

8    A.   I'm not aware of a mechanism for that.

9    Q.   So if there were an SEC filing as to a pool that showed a

10   zero loss and the claimant did not submit that SEC filing,

11   there's no mechanism in the plan for the plan trustee to locate

12   that SEC filing and ask follow-up questions, is there?

13   A.   Oh, I see what you're asking now.  No, there's not.

14   Again, this is a compromise to be applied to tens of thousands

15   of loans and hundreds of billions of dollars of UPB.  So I

16   think inherent in the settlement of that compromise is I think

17   what you're suggesting is potential winners and losers in that,

18   and I think that is an aspect of the compromise.

19   Q.   So if a EPD or breach claimant has SEC filings that state

20   loss amounts that are inconsistent with the loss amounts

21   claimed on their questionnaires that they submit to the

22   debtors, the debtors are unlikely to pick that up, correct?

23   A.   Yeah.  You know, I would say yeah, they're unlikely to

24   pick that up.  I don't know in what fashion that would be

25   reported and interpreted anyway.  I don't know how you would

1   make that link from one to the other.  I suspect that's not an

2   easy task given that these counterparties transacted with

3   scores of mortgage loan originators, not just AHM.  And so --

4   Q.   And even if a claimant under the EPD breach protocol has

5   SEC filings that showed that the losses were hypothetically

6   zero, that might not get picked up under the process, correct?

7   A.   Well, I guess I struggle again in the EP side.  They have

8   to demonstrate that it's a valid EPD.  On a loan level basis,

9   the protocol requires that they demonstrate that the loan went

10  delinquent in the EPD window and to validate that, as we've

11  discussed.  And then on the breach side, I mean, if you had a

12  filing today -- I don't know.  It wouldn't necessarily capture

13  the concept that the protocol encompasses, which is to

14  liquidate all the claims today.

15  Q.   So I think the short answer is even if the SEC filing said

16  zero, if the questionnaire on its face looked valid, it would

17  probably get accepted under the protocol, right?

18  A.   I believe that's a likely outcome of the compromise.

19  Again -- yeah, I believe that's a likely outcome.

20  Q.   Thank you, Mr. Fernandes.

21          MR. WEISBROD:  Thank you, Your Honor, for letting me

22  ask additional questions.

23          THE COURT:  Certainly.  Redirect?

24          MR. DORSEY:  Just a couple of questions, Mr.

25  Fernandes.

168

1    THE WITNESS:  Before we go, can I clarify my last

2    answer?

3    THE COURT:  Yes --

4    THE WITNESS:  Or am I --

5    THE COURT:  -- although you might get more questions.

6    THE WITNESS:  Okay.  I just think I'd finish by

7    saying I think that's a likely outcome.  I just want to say

8    that I don't think the scenario's a likely outcome.  I think

9    it's highly improbable.  But my reference to a likely outcome

10   will be in the instance where there was a filing showing no

11   losses.  I don't believe that the debtors would necessarily

12   catch it.

13   THE COURT:  All right.  Any further questions?

14   MR. WEISBROD:  No, Your Honor.  Thank you.

15   THE COURT:  Okay.  Thank you.  Redirect.

16   MR. DORSEY:  Thank you, Your Honor.

17   REDIRECT EXAMINATION

18   BY MR. DORSEY:

19   Q.   Just a couple questions, Mr. Fernandes.  Based on our work

20   with the debtors since you started working with AHM, did you

21   become aware as to whether the debtors had to liquidate any

22   assets in order to make margin call payments pre-petition?

23   A.   Yes, I believe they did have to liquidate assets in order

24   to generate cash and make margin call -- satisfy margin calls.

25   Q.   And do you know what those assets were that they

169

1    liquidated?

2    A.    Generally, they liquidated the securitizations that they

3    held in their investment portfolio, I believe, at Investment

4    Corp.

5    Q.    And that was my next question you anticipated.  Who held

6    those assets?

7    A.    I believe those securities were held by American Home

8    Mortgage Investment Corp.

9    Q.    Thank you.

10              MR. DORSEY:  That's all I have, Your Honor.

11              THE COURT:  Okay.  Thank you.  You may step down.

12              THE WITNESS:  Thank you.

13              THE COURT:  You're welcome.  You have another

14    witness, Mr. Dorsey?

15              MR. DORSEY:  Yes.

16              THE COURT:  Okay.  Take your time.

17              Just leave that there, sir.

18              THE WITNESS:  Shall I leave it here?

19              THE COURT:  Yes, please.  Thank you.

20              THE WITNESS:  Thank you.

21              MR. DORSEY:  I guess before we move on to the next

22    witness, Your Honor, I would at this point move to introduce

23    Debtors' Exhibits number 1 and 2 that were previously marked.

24              THE COURT:  Objection?

25              MR. WEISBROD:  We do object, Your Honor.  The

170

1    foundation has not been laid.  There was a lot of discussion on

2    the EPD breach side.

3            THE COURT:  You can go with Mr. Dorsey.  He won't

4    bite you.

5            MR. DORSEY:  I'll share, Your Honor.

6            MR. WEISBROD:  I've seen him out of court.  Your

7    Honor, we do object.  On the EPD breach side, there were

8    references to Bloomberg, etcetera.  And while the references

9    were not as explicit on the liquidation side, they are implicit

10   in that they were valuations of a host of different types of

11   assets, some of which presumably require expertise.  And we

12   have received no data, let alone confirmation, that the

13   witness, or witnesses to the extent he relied on hearsay, have

14   the necessary expertise to conduct the valuations at issue.

15   What we got instead was a lot of vague explanations of the

16   document, which themselves were, at least on direct, fairly

17   comprehensible.  But what we don't have is an assurance based

18   on the testimony that you've heard that this witness knew how

19   to do all these valuations or knew the processes even if he

20   theoretically has the training for some of them, that he was

21   familiar with the processes that actually were undertaken.

22           THE COURT:  Um-hum.  Mr. Dorsey?

23           MR. DORSEY:  Your Honor, I think what the borrowers'

24   committee is proposing is that any time you have someone come

25   in to testify on behalf of a debtor where there was a large

1    effort on behalf of a lot of people to put together a

2    liquidation analysis or an asset allocation agreement, you'd

3    have to have every single person who was involved in that

4    process come in and testify.  Mr. Fernandes testified very

5    clearly where the information came from, that it was a team

6    effort, that -- in fact, on cross examination he said most of

7    the asset's already been liquidated, it's cash, doesn't have

8    to -- doesn't require much to value cash.  The only assets

9    remaining were the bank, another property in Chicago and some

10   mortgage loans that still haven't been liquidated.

11        Mr. Fernandes walked through those analyses without

12   objection.  He explained every single line to the Court.  And

13   there's no reason why those exhibits cannot be admitted into

14   evidence.

15        MR. WEISBROD:  Just briefly, Your Honor, as to one of

16   the major unliquidated assets, the bank, he basically admitted

17   that another entity did the valuation.  And there are also a

18   lot of assets that were given values of zero where they've done

19   no analysis.  So I think that this goes beyond the weight of

20   the document.  This goes to, as Mr. Dorsey himself described

21   it, the gatekeeping role of the Court.  Now, I know the Court

22   doesn't have to keep evidence from itself in the same way that

23   the Court has to keep evidence from a jury, but the Court

24   fundamentally does not have the foundation necessary to admit

25   this document.

1       THE COURT:  I disagree.  I think the foundation is

2   sufficiently laid to admit the document into evidence.  I think

3   your arguments go, as you mentioned, to weight.  The document

4   doesn't need to be bulletproof.  The foundation of the document

5   doesn't need to be bulletproof in order to be admitted into

6   evidence.  So I'll overrule the objection, and Exhibits 1 and

7   2, Debtors' Exhibit 1 and 2, are admitted into evidence.

8   (Stipulated Asset Allocation Methodology was hereby admitted

9   into evidence as Debtors' Exhibit 1 as of this date.)

10  (Liquidation Analysis was hereby admitted into evidence as

11  Debtors' Exhibit 2 as of this date.)

12      MR. DORSEY:  Your Honor, Ms. Whiteman, who's much

13  smarter than I am, recognized that I failed to mark those

14  exhibits with tags.  If I could do so now?

15      THE COURT:  Yes, you may.  You may approach.  And

16  then unless we're going to reference them again, you can give

17  them to the ECRO.

18      MR. DORSEY:  Thank you.

19      THE COURT:  You're welcome.

20      MR. DORSEY:  Your Honor, I was going to call Mr.

21  Pasternak but he has to use the restroom, if that's okay --

22      THE COURT:  All right.

23      MR. DORSEY:  -- before we start.

24      THE COURT:  We'll take a very short recess.  Timing

25  is everything.

173

1          (Recess from 5:12 p.m. until 5:20 p.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Please be seated.

4                MR. DORSEY:  Your Honor, the debtors call Damian

5     Pasternak to the stand.

6                THE COURT:  All right.

7          (Witness is sworn)

8                THE CLERK:  Please state and spell your name for the

9     record.

10               THE WITNESS:  Damian Pasternak, D-A-M-I-A-N,

11    P-A-S-T-E-R-N-A-K.

12               THE CLERK:  Thank you.  Please be seated.

13    DIRECT EXAMINATION

14    BY MR. DORSEY:

15    Q.    I'm not sure if it's evening or still afternoon, but

16    hello, Mr. Pasternak.  By whom are you currently employed?

17    A.    American Home Mortgage.

18    Q.    How long have you been an employee of American Home?

19    A.    Since 2006.

20    Q.    Prior to the bankruptcy petition, what position did you

21    hold at American Home?

22    A.    I was a whole loan trader.

23    Q.    Can you describe for the court what a whole loan trader

24    is?

25    A.    Yes.  I was working in the capital markets group, being

1    responsible for trading whole loans to investors as well as, at

2    the same time, managing the interest rate risk of my pipeline,

3    which are mortgages.

4    Q.   Would you briefly describe your educational background?

5    A.   I have an undergraduate degree in finance from Towson

6    University.  I have an MBA degree from Hofstra University.  And

7    I hold a CFA designation, which is a -- I'm not sure, maybe I

8    can explain to the Court.  It's a --

9    Q.   Sure.

10   A.   -- it's a respected designation on Wall Street.  It kind

11   of sets standards in integrity and your knowledge of -- in the

12   financial field, investments, mortgages.

13   Q.   After the bankruptcy filing, did your responsibilities at

14   American Home change?

15   A.   Yes, as we no longer had to manage the interest rate

16   exposure.

17   Q.   What has been your day-to-day work at American Home since

18   the bankruptcy filing?

19   A.   Yeah, I'm involved in the liquidation of our assets, which

20   are mortgages, as well as working with creditors on their

21   claims, estimating with the protocol and helping out with the

22   day-to-day operations.

23   Q.   And you testified that you were involved in the sale of

24   loans originated by AHM prior to the bankruptcy, correct?

25   A.   Yes.

1   Q.   Could you briefly describe for the Court what a typical

2   loan transaction -- loan sale transaction would entail?

3   A.   Yes.  I was responsible for selling whole loans.  I think

4   in my career I must have sold over, if I were to estimate,

5   close to probably thirty billion dollars of loans.  So

6   typically I would -- I had a trading schedule 'cause I would

7   trade separate products on different days.  So, for example, on

8   Tuesday, if I decided to sell jumbo fixed rate mortgages, my

9   team would create a bid tape, and that bid tape would include

10  loans that we're selling in that specific pool with all the

11  important information for pricing purpose.  And I would send

12  out to the potential investors two days ahead of my bid date

13  deadline.

14  Q.   Can you describe in more specificity what would be

15  included in a bid tape?

16  A.   It's probably close to, I would say, maybe twenty fields;

17  starts with a loan number, address of the property.  It would

18  go into -- it would say the interest rate, the loan balance,

19  the current UPB, property type.  I would see the credit score.

20  It would have everything that the investor would need to price

21  that specific pool.

22  Q.   And once the investor received that information, what

23  would happen next?

24  A.   They would, you know, price that specific pool.  And when

25  the bid deadline was due, they would call in or e-mail their

1    bids for that specific pool.

2    Q.   Did they conduct due diligence in connection with those

3    sales?

4    A.   Not prior to winning.  So let me explain.  When we chose

5    the highest bidder, then we start the conversation on due

6    diligence and the settlement process.  So we typically -- and

7    actually I had this in the memo of the e-mail that went out to

8    investors that we -- our stipulation was given ten percent due

9    diligence.  So, prior -- when they were submitting the price,

10   they would tell me no, my price is par, so, like, 5 with 10

11   percent due diligence.

12   Q.   What do you mean by ten percent due diligence?

13   A.   Due diligence is -- it's a industry standard, review of

14   credit files, collateral files.  It goes into reviews,

15   compliance, evaluations, as well as any misrepresentations.

16   Q.   What did you mean by a ten percent due diligence?  That

17   the buyer would --

18   A.   So we --

19   Q.   Well, wait, wait, wait till I finish the question.

20   A.   Sorry.

21   Q.   So a buyer says we want to do a ten percent due diligence

22   as a stipulation to the purchase.  What would that mean?

23   A.   It -- 'cause -- that we had potential other buyers that

24   would have submitted a similar price but maybe saying I want to

25   do twenty percent due diligence.  So due diligence was a

1  **negotiation point that we could negotiate with counterparties.**

2          THE COURT:  Does that mean --

3  **Q.   I guess what I'm --**

4          THE COURT:  Does that mean -- ten percent due

5  diligence, that means they're going to look at ten percent of

6  the loans and do due diligence only on ten percent, and if

7  that's okay they're going to assume they're all all right?

8          THE WITNESS:  Correct.

9          THE COURT:  All right.

10          THE WITNESS:  The sample due diligence.

11          MR. DORSEY:  Thank you, Your Honor.

12          THE COURT:  Took me a while to get that, but I think

13  I got it.

14          MR. DORSEY:  That's what I was trying to get at, Your

15  Honor.  I didn't ask it as artfully as you did.

16  **Q.   And what was the typical due diligence percentage that --**

17  **A.   A --**

18  **Q.   -- please let me ask the question -- the typical due**

19  **diligence percentage that investors would ask for?**

20  **A.   Ten percent.**

21  **Q.   Okay.  And what would happen if a buyer found a defective**

22  **loan in the process of doing that due diligence?**

23  **A.   They come back.  They come back to us with their due**

24  **diligence findings.  We have a period of time to review their**

25  **findings and submit any rebuttals to their findings.  Some of**

1    them were maybe they just didn't like the appraisal evaluation

2    that was in the appraisal report.  So that something like that

3    we can evaluate and research for their end.  If we actually

4    agreed with their findings, we had a couple options; that was

5    pending the market conditions that could substitute the loan,

6    give them a substituted loan for that, for the one that was

7    defective.  Or we'd just take it out of the pool and sell some

8    at minus, so the entire pool minus those loans that were

9    defective.

10   Q.   So you would either fix the deficiency that they found by

11   providing additional information or take the loan back out of

12   the pool and substitute it with a new loan?

13   A.   That's correct.

14   Q.   Okay.  Did AHM provide any representations and warranties

15   with respect to the loans that it sold?

16   A.   They did.

17   Q.   What -- did you negotiate those loan reps and warranties?

18   A.   The reps and warrants are stated.  You can answer it the

19   long way that it's stated in the MLPA, which is a typical

20   purchasing agreement.  However, the reps and warrants differ

21   from investor to investor.  And typically those contracts are

22   negotiated between the counsel, our counsel and their counsel.

23   But, however, we -- they did receive feedback from our group in

24   terms of business warrants they had questions on.

25   Q.   So a purchaser would have an MLPA that they've negotiated

1    with AHM that would contain reps and warrants that would be

2    subject to the loans that you were selling to that particular

3    investor, is that correct?

4            MR. WEISBROD:  Objection.  Leading.

5            MR. DORSEY:  Background information, Your Honor.

6            THE COURT:  Overruled.  I think it summarizes

7    basically what has already been testified to.  So, overruled.

8    You can answer.

9    A.    Yes.

10   Q.    Can you give a few examples of common types of reps and

11   warranties that might appear in an MLPA?

12   A.    Yes.  I mean, and they go back.  It's a lengthy rep and

13   warrant list.  So in a summary I can maybe tell you -- like,

14   give you some specifics.  They kind of entail the parts of the

15   due diligence I mentioned to you:  creditor, collateral,

16   compliance, most representations.  So in the specifics, it

17   talks about the loan file.  The loan has to have complete loan

18   documents.  There cannot be any misrepresentations.  Some are

19   as even as specific as the purchaser said that they would not

20   buy any loans with debt-to-income ratios greater than sixty

21   percent.  So it kind of varies from investor to investor.

22   Q.    Prior to the bankruptcy filing, what would happen if a

23   loan failed to live up to one of the reps and warranties?

24   A.    The investor would have requested the repurchase demand

25   based on their findings and would come back to AHM.  And if we

1    agreed with their findings, we would repurchase the loan back

2    from the investor.

3    Q.   Are you familiar with the term "early payment default," or

4    EPD?

5    A.   Yes.

6    Q.   The Court already heard this from Mr. Fernandes, but can

7    you tell the Court your understanding of what an EPD is?

8    A.   EPD stands for early payment default, as mentioned.  Maybe

9    I can give you a more -- you know, answer from my trading point

10   of view.  Even, as I mentioned, on the due diligence part, what

11   I was saying on the bid tapes, I put in the front of the -- in

12   the memo that we're giving, we ask them for ten percent due

13   diligence.  I did the same thing with EPD.  I -- we wrote on

14   the memo that we are assuring ninety days EPD window.  What

15   that means to the investor, that if they buy a loan from us, we

16   are guaranteeing that that loan will not miss a payment for the

17   first ninety days.  If it does, we have to repurchase that loan

18   back.

19   Q.   And I believe you've answered this in your question, but

20   did AHM provide EPD warranties in connection with loan sales?

21   A.   Yes.

22   Q.   Prior to the bankruptcy, did investors put back loans to

23   AHM on account of EPDs and breaches of reps and warranties?

24   A.   Yes, they did.

25   Q.   Who handled that process?

181

1    A.    The repurchase group.

2    Q.    And what was the repurchase group's responsibility?

3    A.    I think I'd give the example what they did with the

4    breaches.  They would do the same thing on the EPD side.  If a

5    EPD repurchase demand came from investors, they would have

6    investigated it, looked at pay histories to confirm if this is

7    really a valid EPD.  And if it was, they'd repurchase the loan

8    back.

9    Q.    How were EPD-related repurchase demands generally handled

10   pre-petition?

11   A.    I think, just -- didn't I just answer that?  But it's --

12   the loan would -- the repurchase amount would come back from

13   the investor.  The repurchase group would have looked at the

14   specific loan, would look into the pay histories, look in the

15   reasons why you had defaulted.  And if agreed with the

16   investor, it was really -- it's a clear yes or no.  It's a

17   ninety-day window you're looking at if the loan is three

18   payments.

19   Q.    And how about non-EPD-type breaches of reps and

20   warranties?  How were those handled pre-petition?

21   A.    By the same group.  However, they were just a little bit

22   more complicated.  There's, like I mentioned, the rep and

23   warrant language.  It's a lengthy agreement, and it -- so it

24   involves -- it takes longer to research the specific loan if

25   you breach the rep and warrant.  And it involves many more

1   people looking at it because it could be the -- maybe the

2   underwriting issues, so, therefore, the underwriter has to look

3   at it.  It could be misrepresentation.  Then you probably --

4   you have to talk to whoever's taking applications, see where is

5   the misrepresentation coming from.

6   Q.    What did AHM do with loans that it repurchased as a result

7   of EPD and non-EPD breaches of reps and warranties pre-

8   petition?

9   A.    When we repurchase loans, some of them may end up being

10  curable, meaning that we repurchase the loan for some

11  compliance issue that we could resolve.  We would then try to

12  sell that loan again to investors.  Or if a EPD breach

13  repurchased loan came to us and then we couldn't cure it, we

14  would sell those loans at a discount, and it's just scratch-

15  and-dent securitizations.

16  Q.    And what's a scratch-and-dent securitization?

17  A.    A scratch-and-dent does -- really, the name really

18  explains what happens there because scratch-and-dent deals are

19  done with loans that are either nonperforming or, with this

20  example, are -- contain breaches of reps and warrants.

21  However, the purchaser knows that ahead of time he's buying.

22  That's why he's obviously giving us the discount in price.

23  Q.    Are you familiar with the EPD breached claims protocol Mr.

24  Fernandes testified about earlier?

25  A.    Yes.

1  Q.   How are you -- how did you become familiar with that

2  protocol?

3  A.   I was part of the team assigned to complete the protocol.

4  Q.   Who else was working with you on that protocol?

5  A.   My colleague from AHM, Michael Labuskes.  Another person

6  involved was from Zolfo Cooper:  Agrawal, Puneet.  And now we

7  also discuss it with the creditors' committee and all the

8  creditors.

9  Q.   Can you walk the Court through your involvement in the

10  creation of the protocol?

11  A.   Yes.  We -- I want to say we use the New Century model

12  because we just basically took their idea to come up with a

13  protocol.  And so one of the ways we -- all we had to do was

14  calculate our own severity numbers so we can apply them to the

15  EPD and breach side of the protocol.

16       So in order to come up with severity numbers, which were a

17  huge part of the protocol, we looked at AHM's historical

18  liquidation data provided from our servicer.  By looking at

19  those numbers, we could calculate our losses historically, that

20  data.  And that, I believe, is of January 31st, 2008.

21       So by looking at information they provided, we were able

22  to calculate the severities at that time.  But when we were

23  doing the protocol, it was, I believe, July or August 2008.  So

24  those severity numbers -- I mean, better yield to investors in

25  July.  Everybody's more, really, interest in knowing what is my

1    severity right now.

2        So in order to do that, we adjusted the historical losses

3    using the S&P/Case-Shiller index to reflect the addition

4    depreciation in the housing values.  And if -- let me go back.

5    What's a S&P/Case-Shiller index?  I think, as you've talked

6    about it before --

7    Q.    You're anticipating my questions.

8    A.    I just -- maybe I can just speak and you guys listen.

9    Q.    It's okay.  Take your time.  We've got till 8 o'clock, the

10   judge said.  Can you tell the Court a little bit more about the

11   Case-Shiller 20 index and how you used it to adjust the

12   severity numbers?

13   A.    Yes.  Case-Shiller index, I think, these days is becoming

14   more and more aware to even a regular -- I don't say investors

15   but more people get to -- are aware of the S&P/Case-Shiller

16   index because of the current crisis in the housing market.  So

17   whenever that index comes out, it's big news, in the markets at

18   least.

19   Q.    Did you use the Case-Shiller index prior to the bankruptcy

20   filing in your normal course of work?

21   A.    Yes.  Like I said, it's -- I think it comes up on every

22   Tuesday, and so it's a major economic indicator as to what is

23   happening in the markets.  So, yeah, I would -- obviously,

24   every time it came out, it was -- you know, I would pay

25   attention to it.

1   Q.   Just to help the Court understand what you did, can you

2   give an example of how you would use the Case-Shiller index to

3   adjust a loss on a particular loan reflected in the July 2008

4   housing prices?

5   A.   Yeah.  I think an example would be the best way of showing

6   this.  So first we looked at our historical data.  Let me give

7   you an example.  Let's say in December 2007 we liquidated a

8   loan that -- as an REO sale and somebody paid 100,000 dollars

9   on that REO property.  However, as we were the holders, it took

10  us estimate -- I can maybe estimate 30,000 dollars to liquidate

11  that specific property.  And if my loan amount or UPB is also

12  100,000 dollars -- I'm just doing this for examples -- I sold

13  the REO property for 100,000 dollars.  However, I needed to

14  spend 30,000 in order to liquidate it.  So there's -- that's

15  the thirty percent severity number and the loss on that

16  specific loan.

17       So that was in -- my example is that was in December.  So

18  we wanted to do is show what kind of loss would have happened

19  in July.  So we looked at that change in the S&P/Case-Shiller

20  index from December to July.  So -- and then make an easy

21  example, let's say in December it was at a hundred, and then

22  July at ninety-five.  By taking the difference and calculating

23  the percentage change, that's a five-percent decline in the

24  housing values from December to July.

25       So if I wanted to calculate the updated severity numbers,

1    obviously I can no longer sell the REO for 100,000 dollars.

2    The new price would be 95,000 dollars using the S&P/Case-

3    Shiller index as an adjustment.  So, therefore, my new severity

4    number is the 30,000 it took me to liquidate it plus the 5,000

5    dollars additional loss on the value of the property, which is

6    the new 35 percent severity number.

7    Q.    And why did you have to adjust for the severity?

8    A.    Like I said, we historic -- we have historical severity

9    numbers, which -- you know, to investors, and this had to do

10   with negotiations, talking with them.  Doesn't really do them

11   any good if they know the severity was in the end of 2007,

12   right, or the beginning of 2008 was thirty-five percent.  They

13   really wanted to know what is it now if they want to liquidate

14   a property.

15   Q.    Other than the loss severities that you've talked about,

16   was there anything else that you considered in developing the

17   EPD side of the protocol?

18   A.    Yes.  We had to look at loss frequencies.

19   Q.    What is the loss frequency?

20   A.    This is also industry standard that loans are -- you know,

21   loans are put into servicing buckets based on their

22   performance.  So there is a bucket for current loans.  There is

23   a bucket for thirty-one to sixty days in default loans, and

24   then sixty-one to ninety, ninety plus and so foreclosure REO.

25        So given that any point in time a specific loan in any

1    bucket can go further into delinquency or it can even cure, we

2    needed to apply that towards the plan.  And the thing is we, at

3    American Home Mortgage, did not track that specific

4    information.  So we looked towards other ways to getting this

5    information.  And we looked at the Bloomberg loss model.

6    Q.   Okay, before we go too far down the road, what -- you said

7    AHM did not have sufficient historical data.  What did you mean

8    by that?

9    A.   Like I said, for -- on the EPD -- on the severity

10   calculations, we received net losses on loans that we

11   liquidated.  For something like -- we're looking at calculating

12   loss frequencies, needs to be specific statistical data that

13   you can calculate what percentage of loans, like I said,

14   correspond at sixty to a ninety-day bucket to a foreclosure and

15   REO, or even from that specific bucket to a current.  So that

16   information was not available to us.

17   Q.   And what, then, did you do after looking at AHM historical

18   data to come up with the loss frequency number?

19   A.   Yeah, like I said, we didn't have any historical data.

20   But we look at the Bloomberg model.  Their assumptions are for

21   a loan that's -- for a current loan, it's a zero percent chance

22   of defaulting; for, I think, really, to sixty to ninety days,

23   it's a sixty percent; and for anything ninety plus, it's a

24   ninety percent chance of defaulting.

25   Q.   What is the Bloomberg model exactly?

188

1   A.   Bloomberg, it's a industry-known software, financial

2   software that provides data, news, valuation tools, pricing

3   tools.  I think it's used by -- pretty much everyone on Wall

4   Street needs to know how to use Bloomberg and use their models

5   and data that's available.

6   Q.   What assumption -- did you describe the assumption they

7   use?  Is that the thirty, sixty and ninety days and the loss

8   severities?

9   A.   That's their assumptions, correct.

10   Q.   Okay.  And did the debtors make any adjustments to the

11   Bloomberg model in coming up with the protocol in this case?

12   A.   Yes, we did.  Looking at their -- using Bloomberg model,

13   we would have plugged that in into our EPD protocol and the

14   severity numbers.  It would have shown that for any loan that

15   defaulted during the first ninety days after the sale and it

16   came back current, that loan is -- you know, didn't suffer any

17   losses.

18       So we had lot of challenges under different creditors as

19   their point was that look, this loan obviously was a EPD

20   default 'cause I can prove it to you.  And because of that,

21   because of historical missed payments to investors, that that

22   shows additional risk.  And risk means lower price.  So, and

23   you connect to us that there's no way you're going to be able

24   to sell the same loan that missed a payment for the same price

25   you can sell any loans that never defaulted.

1    So we made -- talking with them, we made the adjustments

2    that are reflected in the plan.

3    Q.    Do you have a binder there in front of you?

4    A.    I do.

5    Q.    Can you turn to the plan, which should be the third tab in

6    that binder?  Now, if you'd turn to page 46, which is Article

7    7.

8    A.    Okay.

9    Q.    Do you have that in front of you?

10   A.    I do.

11   Q.    Is this the EPD claims protocol that was developed for

12   purposes of the liquidating plan of the debtors?

13   A.    Yes, it is.

14   Q.    Can you describe how this protocol would be applied to a

15   claim from an investor for an EPD claim?

16   A.    Okay.  Make an example, we just -- let's say one investor

17   has one EPD loan on their claim, and it happened to be a fixed

18   rate mortgage and it's in the sixty-one to ninety days

19   delinquency bucket.  First, what we would do with that loan is

20   obviously validate:  You know, did we sell it to that

21   counterparty?  Yes, we did.  Then we would look at -- obviously

22   confirm the product it was.  And then we also look at the

23   payment histories that we are asking them to provide and the

24   questionnaire that they are required to fill.  And if we, based

25   on the pay histories that they provided, we can, with hundred

1    percent certainty, say yes, this loan is EPD, it will get a

2    thirty-percent severity number.  Or it's not an EPD and doesn't

3    get anything.

4    Q.    Just as an example, if you had an investor who said they

5    had one EPD claim for --

6    A.    Yeah.

7    Q.    -- with a loan that had liquidated with a 100,000-dollar

8    UPB, how would you calculate the claim -- the liquidation of

9    that claim under this?

10   A.    Did you mean -- you said liquidated.  Did you mean to say

11   that?

12   Q.    Unliquidated, I'm sorry.

13   A.    Yeah.  What bucket it was in?

14   Q.    Say it was thirty-one to sixty days delinquent.

15   A.    Right.  So it's a 100,000-dollar UPB.  We would apply the

16   appropriate product and the severity.  And the chart in here

17   already calculated the loss frequencies with severities.  But

18   we would apply the loss frequency and the loss severity to that

19   specific loan for 100,000 dollars in that 31 to 60-day bucket

20   at 20 percent severity.  So they would get a payment of 20,000

21   dollars.

22   Q.    If you -- let's turn now to the other side of the

23   protocol, the breach of warranty -- non-EPD breach of warranty

24   claims.  Can you walk the Court through your involvement in the

25   creation of that protocol?

1    A.    You know, same thing.  We looked at the New Century

2    protocol.  And by looking at it, obviously we found out that we

3    have to calculate our own incident percentage.  But what I mean

4    percentage of incidents is where is the probability that

5    American Home Loans will violate the rep and warrant breach,

6    will breach the rep and warrant violation?  So we had very

7    little historical data in order to calculate that number.

8    Q.    Why did you have little historical data?  And by

9    histori --

10   A.    Pri --

11   Q.    I'm sorry.  By historical data, you mean AHM historical

12   data?

13   A.    AHM historical data, yeah.

14   Q.    Why did AHM have little historical data?

15   A.    Prior to bankruptcy, most of our repurchase demands were

16   EPD repurchase demands.  What I mean "most of," I believe I've

17   seen some numbers as high as eighty-five percent of repurchase

18   demands is EPD versus fifteen.

19   Q.    So how did you then go about determining the protocol

20   without having the historical data?

21   A.    Another way we can do it, so we looked at proof of claims

22   filed by investors that are framing us for violations of reps

23   and warrants.  So we looked at five specific investors -- I

24   think it's listed in the plan -- and their proof of claims and

25   their amounts that they're claiming for breaches.  And we

192

1  divided that claim amount, breach claim amount, by the dollar

2  amount of whole loans we sold to them in the last five months.

3  And by doing so, we could come up with a weighted average of

4  .22 percent of incidents.

5  Q.   Did you calculate a loss severity number using the

6  historical data?

7  A.   Did you say loss severity?

8  Q.   I'm sorry, the incidence rate.  I'm sorry.

9  A.   Yes.  We did that to kind of double-check ourselves.  And

10  using what kind of little information we had available to us,

11  we found out in 2006, just using the repurchase demands from

12  loans that were originated in 2006, that using historical data,

13  the breach incidents was at .18 percent.

14  Q.   .18 percent?

15  A.   Percent, correct.

16  Q.   And using the data and proofs of claim from the five

17  purchasers who filed those claims post-petition, you came up

18  with .22 percent?

19  A.   Correct.

20  Q.   And which one did you use for purposes of the protocol?

21  A.   We used .22 percent.

22  Q.   Why'd you use the .22 instead of the .18?

23  A.   That was also because of active negotiations with the

24  creditors.  And looking at the current housing environment,

25  there's definitely more foreclosures.  It's not a secret;

1    everybody knows that.  And we decided to go with .22 percent.

2    It's also -- one of the other reasons was that we thought that

3    that was just a little better set of data to work with and

4    because those five investors purchased almost, I believe it

5    was, forty percent of our product during that second period.

6    And between all five of them, they bought all of our products

7    that we originated.

8    Q.    And turning back to the plan that you have in front of

9    you, Article 7, at the bottom of page 46 there's the breach of

10   warranty claims section for the protocol, is that correct?

11   A.    Yes.

12   Q.    And can you describe for the Court how a claimant would --

13   A.    Um-hum.

14   Q.    -- be paid or would have their claim liquidated pursuant

15   to this provision of the plan?

16   A.    Yes.  We're asking the claimant to -- claimants to fill

17   out a questionnaire in which they will be required to provide a

18   list of loans they have purchased from us.  That's really all

19   they need to do because we still have the capability of --

20   you're looking at the UPBs and looking at what product it is

21   and whenever you sold it to them.  So if the investor provides

22   me a pool of loans they purchased from us on their list of

23   loans, I can put it in a specific bucket that it goes with in

24   the breach protocol.  So it's a -- one of the investors

25   provides us with a pool of loans of 200 million dollars, and 50

194

1    million was sold to them in second quarter of 2007, and that 50

2    million happened to be fixed rate mortgages.  They will get .09

3    percent as their payout on that pool of loans.  And so forth,

4    so forth for the remaining of the pool.

5              MR. DORSEY:  Can I have one moment, Your Honor?

6              THE COURT:  Um-hum.

7         (Pause)

8    Q.   Would you turn to the disclosure statement?  That should

9    be tab 2 in that binder you have in front of you.

10   A.   What page?

11   Q.   Let's take a look at page 98.

12   A.   Okay.

13   Q.   And I want to draw your attention to subsection B, Loss

14   Frequency and Loss Severity.  Do you see that?

15   A.   Yes.

16   Q.   And on his cross examination, borrowers' committee counsel

17   asked Mr. Fernandes about the first sentence of that section,

18   which states, "For the sake of simplicity, the protocol assumes

19   that any loan on account of which a valid breach of warranty

20   claim is asserted will give rise to a loss in some amount,

21   i.e., will have a one hundred percent loss frequency."  Do you

22   see that?

23   A.   Yes.

24   Q.   What does -- what is your understanding of what that

25   means?

1    A.    It means that for the purpose of this plan, we assume that

2    all loans that would have breached the reps and warrant

3    violation would have suffered the loss.    What I mean by that

4    is -- this is also industry standard -- that an investor would

5    not look for violations of reps and warrants if a loan is

6    current or has not suffered any loss 'cause some other reasons.

7    It costs money to do diligence of huge sizes of pools.    We sold

8    over nine -- I believe close to a million dollars of loans

9    to -- throughout American Home's life.    So the only time an

10   investor will put a loan that violated the reps and warrants

11   language to us, if it defaulted or suffered the loss.    I guess

12   that there is no need to look for any violations if a loan is

13   performing.

14   Q.    Okay.    The non-EPD breach of warranty protocol, that's

15   applied on a poolwide basis, correct?

16   A.    Can you ask the question again?

17   Q.    Yeah.    The protocol for breaches of non-EPD breach of

18   warranty claims is done on a poolwide basis, correct?

19   A.    Correct.

20   Q.    How -- can you explain to the Court how that works?

21   A.    Yeah.    What we mean by pool is that we're going to

22   group -- we have four product types that we're talking about

23   here:  fixed rate mortgage, ARMs, option ARM or second.    An

24   investor provides us with their questionnaire of loans.    We

25   will group those loans they provided to us into pools of loans

1    by a sale year and a quarter and obviously apply the

2    appropriate numbers to that pool.

3    Q.    Going back to the plan, page 47, if you can open that up?

4    A.    Okay.

5    Q.    If an investor submits a claim for a pool of loans that

6    was originated in or sold in the, let's pick one, the third

7    quarter --

8    A.    Um-hum.

9    Q.    -- of 2006, and it was a pool of ARM loans, how would you

10   calculate the liquidation value of their claim?

11   A.    Um-hum.  If I would just add all the pool UPBs together,

12   and I would simply apply the incident rate for that pool.  Did

13   you say 2006, quarter 3 for this example?

14   Q.    Yes.

15   A.    Okay.  I would apply .13 percent incidence rate times the

16   appropriate severity, which, for the purpose of this plan, it's

17   already calculated into the comps under the product type.

18   Q.    And can you explain that a little bit more for the Court,

19   how that -- how you would do that?  Walk him through an

20   analysis --

21            THE COURT:  Wait a minute.  Would you -- would -- I'm

22   confused.

23            THE WITNESS:  Um-hum.

24            THE COURT:  If you multiply one hundred thou -- say

25   it's a 100,000 dollar unpaid principal --

197

1          THE WITNESS:  Okay.

2          THE COURT:  -- which, of course, it would never be.

3  Would you multiply that by .13 percent and then .04 percent, or

4  just .04 percent?

5          THE WITNESS:  Just .04 percent.

6          THE COURT:  Okay.

7          MR. DORSEY:  I'm sorry, Your Honor.  One moment.

8          THE COURT:  It's all right.

9          (Pause)

10  Q.    Mr. Pasternak, are you aware of proofs of claim filed by

11  JPMorgan in these cases?

12  A.    Yes, I am.

13          MR. DORSEY:  May I approach the witness, Your Honor?

14          THE COURT:  Yes.  Thank you.

15  Q.    If you would turn to tab 1 of the binder that I handed to

16  you, please?

17  A.    Yes.

18  Q.    Now, can you tell you the Court what this -- these

19  documents are?  There's actually more than --

20  A.    You're asking me about the proof of claim?

21  Q.    Yes.

22  A.    Yeah, this is a proof of claim submitted by investor

23  JPMorgan claiming it's for violations of EPD and breach.

24  Q.    And there's actually two proofs of claim, correct?

25  A.    There are.

1   Q.   Okay.  Did you review these proofs of claim when they were

2   submitted by JPMorgan?

3   A.   Yes, I did.

4   Q.   Is it possible for you to discern from the information

5   provided in these proofs of claim which specific loans are

6   claimed as EPDs or breaches of warranties?

7   A.   No.  I can't say what specific loans are in their claim.

8   Q.   Why can't you make that determination?

9   A.   It's -- they're just listing -- I'm going to read this.

10  They're just saying every claim in default, and they have a

11  ninety-two million dollar number next to it.  Obviously, that's

12  a pool of loans.

13  Q.   Did JPMorgan submit additional information to the debtors

14  in connection with this particular -- these two particular

15  proofs of claim?

16  A.   They did.

17  Q.   What additional information did they submit?

18  A.   They answered our questionnaire with information on their

19  EPD loans.

20  Q.   And did you review that questionnaire submitted by

21  JPMorgan?

22  A.   I sure did.  And it turns out that they only submitted

23  fifty-one million dollars of -- out of their ninety-two million

24  dollars as a proof of claim.

25  Q.   Based on -- comparing the questionnaire to the proof of

199

1    claim, they only submitted backup for how much?

2    A.    Fifty-one out of ninety-two.

3    Q.    And were you able to determine, based on a review of the

4    questionnaire, which specific loans they were claiming for an

5    EPD?

6    A.    Yes, I was.

7    Q.    Okay.  And based on the questionnaire, were you able to

8    determine the dollar amount claimed in the proof of claim,

9    whether the dollar amount claimed in the proof of claim

10   represents actual versus estimated losses by JPM on those

11   loans?

12   A.    It had both.  JPM liquidated 9 out of those, I believe it

13   was, close to 150 loans.  They liquidated 9 loans out of the

14   150 that they provided us with loan-level information.  The

15   rest were just claiming us for full face amount of the loan at

16   the time.

17   Q.    With respect of the loans that JPM had liquidated, were

18   you able to determine the severity of the loss suffered by JPM?

19   A.    Yes, I was.  They provided net proceeds on their

20   liquidations.  By that, I could obviously calculate net losses,

21   which turn out to be -- we did this as a weighted average, so

22   the weighted average severity on those nine loans was at

23   thirty-three percent.

24   Q.    And did you also apply the protocol in the plan to those

25   loans being claimed by JPM to determine the weighted average

200

1    loss?

2    A.   Yes, we did.  As mostly I was personally involved in the

3    plan, I was actually curious myself how our severities would

4    have lined up with their severities.  So we put the loans

5    through our protocol, and the nine loans that we liquidated

6    using our protocol and our severities would be a weighted

7    average severity of thirty-four percent.

8    Q.   One percent higher than --

9    A.   One percent higher.

10          THE COURT:  Were these EPD or breach of warrant?

11          THE WITNESS:  EPDs.

12          THE COURT:  EPDs.

13   Q.   And if you would turn to tab 2 in the binder that you have

14   in front of you.  Can you tell the Court what these documents

15   are?

16   A.   Tab number 2 is a proof of claim for Morgan Stanley.

17   Q.   And, again, there are two proofs of claim here, correct?

18   A.   Yes.

19   Q.   And from reviewing these proofs of claim, were you able to

20   determine, from the information provided, whether -- or the

21   specific loans that were being claimed as EPDs or breaches of

22   warranty?

23   A.   In this situation, yes, they provided the specific loans

24   as to the proof of claim.

25   Q.   And was it possible for you to discern, from the

1    information provided, the dollar amount being claimed for

2    estimated versus actual losses by Morgan Stanley?

3    A.    Yeah, this was a combination of both.  They have here --

4    they're claiming us majority of the -- of this claim is --

5    they're using a full face amount of loans, which is at twenty-

6    seven million and, according to this information here, the

7    liquidated 1.4 million dollars of loans.

8    Q.    And were you able to determine the loss severity -- the

9    weighted loss severity of the EPD claims being asserted by

10   Morgan Stanley based on this proof of claim?

11   A.    Yes, I was.  They also provided a questionnaire with

12   their -- you know, so obviously they had this in an Excel

13   spreadsheet.  And since then, as I said, you have some loans

14   that liquidated.  But since then, nine more loans liquidated.

15   So I think it's even as a total of close to twenty-two loans

16   that were liquidated by Morgan Stanley prior to January 31st,

17   2008.  Those weighted average severities were at sixty-one

18   percent.

19   Q.    And did you do the same process here and run Morgan

20   Stanley's claim through the protocol for the EPD claims?

21   A.    Yes, I did.  I did the same thing.  I substituted our

22   severities.  Instead of their net losses, I used our severity

23   numbers.  And that weighted average was at fifty-nine percent.

24            MR. DORSEY:  No further questions, Your Honor.

25            THE COURT:  All right.  Mr. Power?

202

1          MR. POWER:  Thank you, Your Honor.

2    DIRECT EXAMINATION

3    BY MR. POWER:

4    Q.   Mr. Pasternak, I'm Mark Power, counsel for the committee.

5    I just have a couple of follow-up -- a couple of questions.

6    When you sold loans -- you were talking about you previously

7    sold about thirty billion dollars of loans in your career at

8    American Home.  Was the price -- what was the price typically?

9    Was it more than a hundred percent of UPB?

10   A.   Above par.

11   Q.   Above par.  So how many percentage points typically?

12   A.   If I were to guess a weighted average, maybe close to

13   101 1/2, 101.

14   Q.   So, hypothetically, if you sold a 100,000 dollar UPB loan,

15   a common number in these discussions --

16   A.   Yeah.

17   Q.   -- then you would sell that for 101 to 102,000, is that --

18   A.   Correct.

19   Q.   Now, in the protocol, does the protocol take into account

20   the price increment increase above UPB?

21   A.   You're talking about premium.  It does not take into

22   account the premium.

23   Q.   So have you heard investors complain that, in fact, they

24   suffered more because they paid more for the loan than the UPB

25   amount?

203

1   A.   Actually, personally, I have not heard the issues.

2   Q.   But --

3   A.   It's understandable, but --

4   Q.   That's fine.  All right.  Are you familiar with how long

5   it typically takes to liquidate a loan that's in default?

6   A.   You know, actually, it varies by state by state.  The

7   United States are backed up with liquidations and foreclosures.

8   So definitely greater than six months is not -- to a year.

9   Q.   Six month to a year?

10  A.   Yeah.

11  Q.   Now, if you were asked --

12  A.   I mean, obviously -- I'm sorry to --

13  Q.   That's all right.  Go ahead.

14  A.   -- interrupt, but --

15  Q.   I may have stepped on your answer.  Go ahead.

16  A.   Yeah.  I mean, even looking at our loans that we

17  originate, we still hold them in a portfolio.  It's taking over

18  even some loans even over two years to liquidate.  It really --

19  you know, just case by case.

20  Q.   So if you were asked now to estimate the amount of

21  perceived damage of loan that's currently in default but hasn't

22  been sold yet, what would you look at to estimate that damage

23  claim, to liquidate it to come up with an estimate of what the

24  damage is?

25  A.   You mean outside of the protocol or --

204

1    Q.   Outside of the protocol.  Just assume there's no protocol.

2    A.   Can you ask me again please?

3    Q.   If you were to estimate a damage incurred by an investor

4    based on a defaulted loan that either was a breach or an EPD

5    that hasn't been liquidated yet, what would you look at to

6    estimate that damage number?

7    A.   Yeah, I would definitely look at -- I would have to look

8    at the price of the property at a time and estimate loss.

9    Actually, a lot of things go into it.  As a servicer servicing

10   loans, the servicer builds corporate advances, which then have

11   to be repaid by the investor to the servicer.  So those are

12   additional losses that loan will --

13   Q.   And what would you look at for the severity issues in

14   terms of the percentage loss?  Would you look at the Case-

15   Shiller?

16   A.   You know, I would look at the Case-Shiller as an

17   indication where the market is right now, what that home is

18   worth right now.  So, yes, that would give me the insight into

19   the severity number.

20   Q.   If you can turn to the plan and the protocol.  Do you have

21   that in front of you?

22   A.   What page?

23   Q.   Well, I have a different plan.  I think it's 47, maybe.  I

24   have a different -- what's that?  46.

25   A.   Okay.

205

1    Q.    Thank you.

2    A.    Okay.

3    Q.    Okay.  For the breach, for the grid for the breach

4    plans -- do you see that in front of you?

5    A.    Yes, I do.

6    Q.    Okay.  Now, just so it's clear, when you look at the pool

7    of loans in a breach, have the EPD claims been taken out of

8    that pool under this protocol?

9    A.    Yes, they are.

10    Q.    Okay.

11    A.    So -- can I explain?

12    Q.    Yeah, sure.  Go ahead.

13    A.    Right, so that's why the reason -- one of the reasons we

14    ask them for loan-level information provided by the claimants,

15    so that we can eliminate any duplicates that are being claimed.

16    Q.    Now, on the -- just to clarify that point, on an EPD

17    claim, are you actually determining whether it actually

18    constitutes a payment default?

19    A.    Yes.

20    Q.    So you're actually looking at the claim and figuring out

21    if that qualifies?

22    A.    We are looking, yes, to determine with hundred percent

23    confidence that --

24    Q.    And --

25    A.    -- we are not EPD.

1    Q.   But the severity number, then, is an estimate of the

2    damage if you had to liquidate that claim?

3    A.   Yes.

4    Q.   Okay.  Now, on the breach side, I just want to understand

5    what this means, these percentages under incident.

6    A.   Yes.

7    Q.   Okay.  Just put it in plain English.  If you were to sell

8    a thousand dollars to an investor --

9    A.   Um-hum.

10   Q.   -- and let's say you sold them in 2006, third quarter,

11   what is the assumption for how many of those 1,000 loans

12   actually were bad, constituted breach loans?

13   A.   If I do my math correctly, I believe that's 1.3 loan per a

14   thousand loans sold to the investor.

15   Q.   So of every thousand dollars, you're assuming 1.3 is bad

16   and unable to be purchased?

17   A.   Exactly.  Bad.

18   Q.   Now, do you know why the incident rates go from a higher

19   number in 2007 down to 0, or .01, I guess, in '03?

20   A.   Yes.  We're factoring in the season, in fact, when

21   loans -- obviously, all the loans will have a tendency to

22   prepay, and that also if you look at -- you go back to the

23   forty year, so it will give claimants plenty of time to come --

24   breaches to come to life.  And if there's a loan originated in

25   2003, an investor had plenty of time to claim us for that

1   specific breach, if they found one.

2   Q.   So it's another way -- like, they discover the breach and

3   then claim?

4   A.   Exactly.  So that population is smaller now because of

5   that.

6   Q.   Okay.  So moving over to the payment option ARM

7   category --

8   A.   Yes.

9   Q.   All right.  Now, if you -- well, I guess what you're doing

10  there is multiplying the incident percentage, which is how many

11  loans of the pool you think are going bad --

12  A.   Yep.

13  Q.   -- times the severity?

14  A.   Yeah.

15  Q.   And then that's the percentage.  So that number gets

16  diluted significantly, right?  You take a fraction of the

17  incident?

18  A.   Correct.

19  Q.   So when you were saying 1.3 loan per thousand, then you're

20  allowing a claim if you go all the way across of, what, .5

21  loans, a half a loan per a thousand?  Is that correctly how you

22  read that?  Actually, that's -- I misstated that.

23          MR. POWER:  I'll strike that, Your Honor.

24  Q.   If you take 2006, third quarter --

25  A.   Okay.

208

1    Q.   -- all right, and you're assuming 1.3 loan in every

2    thousand is a breach loan --

3    A.   Um-hum.

4    Q.   -- then how do you calculate the damages based on that

5    loan?

6    A.   Right.  We apply the severity number to that one loan.

7    Q.   And that equals the .05 percent?

8    A.   No, the .05 percent is a product of severity times the

9    incident rate.

10    Q.   So can you translate that into, of a thousand loans sold,

11    how much of damage claim are you actually allowing for those

12    thousand loans?

13    A.   Yeah.  I mean, let's say that -- you know, you have to

14    look at it mathematically.  Of the thousand loans, we are --

15    actually only one loan will get paid out of that 1,000 loans,

16    and it will get paid at our severity number based on the

17    product.

18    Q.   Now, when you say paid, you mean have a claim?

19    A.   Have a claim, I'm sorry.

20    Q.   Not actually get paid?

21    A.   No.  Right, have a claim.

22    Q.   Okay, just so we're clear.

23    A.   So can I give a little summary?

24    Q.   Do you have --

25    A.   No, 'cause we --

209

1    THE COURT:  Do you regret putting the incident column

2    in yet?

3    A.   I was going to say we -- originally over close to a

4    billion dollars of loans.  And if you really apply the incident

5    rate, it's only 2,000 loans that are an issue here.

6    Q.   Are you familiar -- you talked about the JPMorgan Chase,

7    and I think you said initially when it was filed it was

8    unliquidated, it was a gross number?

9    A.   Yes.

10   Q.   And that by gross you mean that's the UPB of the entire

11   number of loans?

12   A.   Correct.

13   Q.   Okay.  Are you familiar with whether a lot of claims are

14   filed that way in this case?

15   A.   Yeah, I think most of them are filed that way.

16   Q.   And so they're unliquidated?

17   A.   Unliquidated, correct.

18   Q.   Okay.  Are you aware of any claims that were filed based

19   on future breaches?

20   A.   Yes.

21   Q.   And describe briefly what those claims entail.

22   A.   Yeah, like I said, most of the claims also have language

23   for contingent unliquidated breaches that will arise in the

24   future.

25   Q.   And why can't they be -- why don't they arise now?

210

1    A.    Because I mentioned that actually an investor will have to

2    spend money to find those violations of reps and warrants,

3    which, on an average 500 dollars a loan for due diligence, is a

4    lot of money where you might not find any violations of reps

5    and warrants.  So they, by, kind of, common sense, they wait

6    until there is an actual loss on the loan; then they will

7    investigate it and see if they can find any violations.

8            MR. POWER:  No further questions, Your Honor.

9            THE COURT:  Thank you.  Any other questions in

10   support before we turn over to cross?  All right.  Cross?

11   CROSS EXAMINATION

12   BY MR. WEISBROD:

13   Q.    Stephen Weisbrod for the borrowers' committee.  Good

14   afternoon, or evening, Mr. Pasternak.  Do you still have the

15   pile of documents that Mr. Fernandes had there with OBC

16   stickers?

17   A.    Ends with the number 8.

18   Q.    You've got OBC stickers on there?

19   A.    Yes.

20   Q.    Okay.  Thank you.  Nobody from -- no borrower participated

21   in the negotiation over the EPD or breach protocol, is that

22   correct?

23   A.    That's correct.

24   Q.    And the borrowers' committee did not participate, is that

25   correct?

```
1    A.    That's correct.

2    Q.    You have explained just now that, as to the breach

3    protocol, the claims are evaluated by pool, correct?

4    A.    Yes.

5    Q.    And as a result of that, you can calculate a number that

6    takes into account future claims as well as present claims,

7    right?

8    A.    That is the purpose.

9    Q.    So you are compensating investors in AHM mortgages for

10   claims that you believe may arise but they don't even know

11   necessarily will arise, correct?

12            MR. DORSEY:  Objection.

13   A.    I want to say --

14            MR. DORSEY:  Objection, Your Honor.

15            THE COURT:  Oh, I'm sorry.

16            MR. DORSEY:  I think that question was --

17            THE COURT:  I didn't hear you.

18            MR. DORSEY:  I think that question was vague.  I have

19   no idea what the question was.

20            THE COURT:  Mr. Pasternak, do you understand the

21   question?

22   A.    Can you rephrase your question?

23   Q.    You are compensating -- I'll rephrase it.  You are

24   compensating investors for claims that they themselves do not

25   assert have happened yet, correct?
```

212

1          MR. POWER:  Objection.

2          MR. DORSEY:  Objection.  Calls for a legal

3  conclusion, Your Honor.

4          THE COURT:  No.  Overruled on the legal conclusion.

5  Mr. Power?

6          MR. POWER:  I'm not sure what compensated means.  I

7  think what he's referring is to allowed claims.  You're

8  allowing cl -- okay.

9          THE COURT:  Okay.

10          MR. POWER:  The question is vague, I think.  The

11  problem is --

12          THE COURT:  All right.  I understand, and I think

13  we're fine.  Overruled.

14          You can answer, if you can.

15  **A.    Yeah, I think I can.  No, I wouldn't really agree with you**

16  **because, based on our model, which looks at statistical**

17  **information, the number we calculated at percent of incidents**

18  **is a historical as well as looking-forward number, sort of**

19  **that's what the investor is getting.  They are --**

20  **Q.    To be clear, they're going to submit one form now, right?**

21  **A.    What do you mean by "form"?**

22  **Q.    Questionnaire.  They're going to submit one questionnaire**

23  **now, right?**

24          THE COURT:  Are we talking about breach of warranty

25  or EPD?  Just so I'm clear.

213

1    Q.   Well, the breach of warranty and EPD questionnaire is the

2    same questionnaire, right?

3    A.   I mean, it's a different questionnaire, but it's the same

4    document.  It's a three-page document.

5    Q.   For breach of warranty, a claimant will submit one

6    questionnaire now, correct?

7    A.   Yes.

8    Q.   And that questionnaire will, if properly completed,

9    entitle the claimant to an allowance of a claim, right?

10   A.   Yes.

11   Q.   And that allowance will reflect the value of future breach

12   of warranty incidences as well as past breach of warranty

13   incidences, correct?

14   A.   That's correct.

15   Q.   Okay.  Now, you assumed, with respect to breach of

16   warranty, that there was a one hundred percent loss frequency,

17   correct?

18   A.   Yes.

19   Q.   If there's an incident, you assume there is a loss, right?

20   A.   Yes.

21   Q.   Okay.  Now, we mentioned the questionnaire.  Could you

22   please look at OBC Exhibit number 2?

23   A.   Okay.  Have it.

24   Q.   And that is the questionnaire, right?

25   A.   That is the question -- is this the latest version?  There

1    were some changes.  If it is, then this is the questionnaire.

2    Q.    Well, this is -- to elaborate on what this is, it is

3    labeled as Pasternak-11.  So this is the same one -- a copy of

4    the same one that we looked at at your deposition on Friday.

5    A.    Okay.

6    Q.    And as far as you know, is that the latest one?

7    A.    Yes.

8    Q.    Now, the questionnaire requires EPD and breach claimants

9    to submit certain documents, right?

10    A.    Correct.

11    Q.    And one of those documents is the loan purchase agreement

12    pursuant to which the loan was sold by AHM, with a copy of the

13    relevant provisions establishing the right to payment from AHM.

14    That's on page 3.  Can you confirm that that's there?

15    A.    Yes, we ask them to provide purchasing agreement.

16    Q.    And they have to include the relevant provisions

17    establishing the right to payment, right?

18    A.    I lost you.  What page are you on?

19    Q.    Part 3, which is also on page 3.

20    A.    Part 3, okay.  I see it.

21    Q.    Third bullet down.

22    A.    Yes.

23    Q.    Okay.  So if you want to properly fill out this

24    questionnaire, you have to attach some documents, right?

25    A.    Not some.  We ask them for a purchasing agreement.

1    Q.    And if they don't attach the purchasing agreement, they

2    may be found to have not completed this satisfactorily, right?

3    A.    I can't understand that question.   I'm not sure if that's

4    written on the plan.

5    Q.    Okay.   But the questionnaire does not actually ask anybody

6    who's filling out the questionnaire to specify particular

7    warranties that have been breached, does it?

8    A.    Not -- yeah, if they put loans in the EPD questionnaire,

9    obviously they are saying those loans breached the EPD

10   violation.

11   Q.    So -- I'm not sure I understand your answer.   Is there

12   anyplace on the form that requires a person to specify a

13   warranty that has been breached to identify the particular

14   warranty?

15   A.    Let me read it again real quick.

16       (Pause)

17   A.    I -- no, it doesn't look like we ask them specifically to

18   state that it's a EPD violation.

19   Q.    Now, you have explained that one of the reasons -- or the

20   main reason why you assume one hundred percent loss frequency

21   for breach of warranty claims is that nobody would bother to do

22   the investigation if they didn't have a loss, right?

23   A.    Correct.

24   Q.    And outside of bankruptcy, before AHM filed, if somebody

25   were to submit one of -- a breach of warranty claim, they would

216

1    have to specify a warranty, right?

2    A.    That is correct.

3    Q.    But now they don't, do they?

4    A.    Because we would have to look at a million loans and

5    proof -- look at every single one of them if they violate a rep

6    or warrant or not.

7    Q.    Okay.  So to streamline the process, you no longer require

8    claimants to specify which warranty was breached, right?

9    A.    That's correct.

10    Q.    And also to specify the process, they no longer have to

11    identify a contract provision on EPD claims that says we are

12    entitled to sell back the loan if there's been an early payment

13    default, right?

14    A.    Can you repeat that?

15    Q.    Sure.  For an EPD claim, you don't actually have to

16    specify a contract provision that says we're entitled to sell

17    back the loan for an EPD, do you?

18    A.    I think it -- I don't know, maybe I'm misunderstanding

19    bullet number 3.  It says, if I finish the sentence, "with a

20    copy of the relevant provisions establishing the right to

21    payments from AHM."

22    Q.    But nobody actually has to specify or warrant in the

23    application here, in the questionnaire, that there is a

24    provision that says I am entitled to sell back an EPD loan,

25    right?

217

1          MR. DORSEY:  Objection.  Asked and answered, Your

2     Honor.

3          THE COURT:  Sustained.

4     Q.   Now, for EPD claims -- why don't you look at Article 7,

5     Section A on EPD claims?  We've had a couple --

6     A.   Okay.

7     Q.   -- different page numbers.

8     A.   Is that 46?

9     Q.   Yeah.

10    A.   Okay.

11         MR. WEISBROD:  And on OBC Exhibit 1, that's page 46.

12    Q.   And you explained that in order to calculate the allowed

13    amount for an unliquidated claim, what you do is you first

14    figure out the unpaid principal balance of the loan, right?

15    A.   It doesn't have to be figured out if it's a stated --

16    Q.   Okay.

17    A.   -- number.

18    Q.   And then if the claim involves REO or a liquidated loss,

19    the number you start with is the UPB at the time of the sale

20    less net proceeds realized from such sale, right?

21    A.   Correct.

22    Q.   Now, this provision in Section A doesn't refer to mortgage

23    insurance, does it?

24    A.   It's not explained.

25    Q.   Okay.  And you have seen the questionnaire, right?

218

1   A.   Yes.

2   Q.   And you know that there was a reference to mortgage

3   insurance in the questionnaire that's been deleted, right?

4   A.   Yes.

5   Q.   Okay.  Now, for EPD claims, you multiply the unpaid

6   principal balance by a number that you have negotiated, right?

7   A.   Calculated.

8   Q.   That you have calculated.  The number that you multiply

9   the unpaid principal balance by itself is calculated using two

10  factors, right, loss frequency and loss severity?

11  A.   Yes.

12  Q.   For loss frequency, you adjusted AHM's historical data,

13  right?

14  A.   Can you -- 'cause I lost you.  Did you say frequency or

15  severity?

16  Q.   Frequency.

17  A.   No, we did not have any historical data on frequency.

18  Q.   Oh, sorry.  You relied principally on Bloomberg data for

19  that, right?

20  A.   Their model, yes.

21  Q.   Okay.  Now, you commented in your direct examination that

22  everybody on Wall Street uses Bloomberg, right?

23  A.   To my knowledge, yes.

24  Q.   You were referring to the computer system as a whole,

25  right?

219

1    A.    Correct.

2    Q.    Okay.  You did not create the Bloomberg model that you

3    employed in this process, did you?

4    A.    I do not work for Bloomberg, so no.

5    Q.    And you don't know what data Bloomberg utilized to create

6    its model, do you?

7    A.    They used mortgage loans, but I don't know which ones.

8    Q.    You don't know the people at Bloomberg who compiled the

9    data, do you?

10    A.    No.

11    Q.    You don't know the people at Bloomberg who devised the

12    model, do you?

13    A.    No.

14    Q.    Okay.  Now, for loss severity, you relied on Case-Shiller,

15    right?

16    A.    As an adjustment to our historical severities.

17    Q.    Okay.  And you don't know Case or Shiller, do you?

18    A.    I do not.

19    Q.    Okay.  And you don't know what data they used, right?

20    A.    Yes, I do.

21    Q.    Have you ever seen the data they used?

22    A.    I have not seen the data, but it's described in their

23    index what data they were using.

24    Q.    Meaning losses from twenty cities?

25    A.    Prices from twenty cities.

220

1    Q.   Okay.  Before you worked for the debtors, you worked as an

2    accountant, right?

3    A.   Yes, for a period of time.

4    Q.   At Sleepy's?

5    A.   No.  At Barnes & Noble.

6    Q.   Okay.  Was there a job between Barnes & Noble and working

7    at the --

8    A.   I was a financial analyst at Sleepy's.

9    Q.   Okay.  So you --

10             THE COURT:  What was -- I'm sorry.

11             THE WITNESS:  Financial analyst.

12   Q.   Okay.  So neither the Barnes & Noble job nor the Sleepy's

13   job involved mortgages, right?

14   A.   No.

15   Q.   That's correct?

16   A.   That's correct.

17   Q.   Okay.  And your job at the debtors was as a mortgage --

18   whole mortgage trader, right?

19   A.   Yes.

20   Q.   There was a different group of individuals responsible for

21   repurchasing mortgages if there was an EPD or breach claim,

22   right?

23   A.   It was a big company with different departments.  Separate

24   group.

25   Q.   And you did not work in that other group, right?

221

1   A.   No.

2   Q.   And everybody in that other group was gone from the

3   company by the time you put together this protocol, right?

4   A.   Yeah, I think they were gone by end of 2007.

5   Q.   And apart from your experience putting together the

6   protocol in this case, you've never put together a EPD protocol

7   before, have you?

8   A.   No.

9   Q.   And you never put together a breach of warranty protocol

10  before, have you?

11  A.   No.

12  Q.   There's no manual for how to do these, is there?

13  A.   No.

14  Q.   Now, you did have a model, which was New Century, right?

15  A.   We -- yeah, we used that as an example.

16  Q.   You didn't participate in New Century, did you?

17  A.   I did not work for New Century.

18  Q.   And you didn't participate in it either, right?

19  A.   No.

20  Q.   In the course of your work for the debtors, you have

21  estimated the total number of -- or, sorry, the total value of

22  EPD claims, haven't you?

23  A.   Can you ask me that again?

24  Q.   In the course of doing your work for the debtors, you have

25  estimated the total value of EPD claims that will be allowed

222

1    under the protocol, right?

2    A.   Yeah, we did some kind of worst-case scenario analysis.

3    Q.   What was your estimate for EPD?

4    A.   I forget.  Can you show me that spreadsheet we talked

5    about during our deposition?

6    Q.   Sure.

7              MR. WEISBROD:  I have this marked as OBC-5.  I think

8    you should have that on your table there.  I'm sorry.  I was

9    mistaken.  We have to mark a new exhibit.

10             THE COURT:  It should be 10, I believe.

11             MR. WEISBROD:  Oh, this is 11 because of the document

12   that Ms. Rushy gave.

13             THE COURT:  Oh, yeah.  Okay.  Thank you.

14   (Schedule of EPD Breach Claim Voting Amounts was hereby marked

15   for identification as Exhibit OBC-11 as of this date.)

16   Q.   Are you now -- did you now have an opportunity to review

17   OBC Exhibit 11, Notice of Filing, Schedule of EPD Breach Claim

18   Voting Amounts?

19   A.   Yes, I have.

20   Q.   Okay.  My question to you was what is your estimate of the

21   EPD claims that would be allowed under the protocol?

22   A.   Our worst-case scenario is 168 million dollars.

23   Q.   And what is your estimate of breach of warranty claims

24   that would be allowed under the protocol?

25   A.   I believe you can't really use this document to say this,

223

1    but it's going to be somewhere around fifty million dollars.

2    Q.   Now, you referred to scratch-and-dent pools on your

3    direct.

4    A.   Yes.

5    Q.   Does the protocol pay claimants with scratch-and-dent

6    mortgages any differently from any other claimants?

7    A.   No.

8    Q.   Okay.  For breach of warranty, the protocol will pay

9    claimants on pools, some as old as 2003, correct?

10   A.   Only on the second liens, but you're correct.

11   Q.   And it will pay on all types of mortgages for pools

12   originated as long ago as 2005, right?

13   A.   Correct.

14   Q.   And some people have already asserted breach of warranty

15   claims in the past, right?

16   A.   Yes.

17   Q.   The questionnaire doesn't do anything to eliminate or take

18   into account pre-petition payments on breach of warranty or EPD

19   claims, does it?

20   A.   No.

21   Q.   That's correct?  My statement was correct, right?

22   A.   You were correct.

23        THE COURT:  I'm a little confused -- do you mind if

24   I -- on how the breach of warranty --

25        THE WITNESS:  Yeah.

224

1           THE COURT:  -- claims work.  You've got a pool of a

2   thousand loans.

3           THE WITNESS:  Yes.

4           THE COURT:  Okay.  Someone asserts a breach of

5   warranty claim.  Do they get paid pursuant to the percentages

6   on the unpaid balance for all the thousand loans in the pool,

7   or if they only identified ten loans in that pool that were

8   breach of warranty they'd get paid on those ten?

9           THE WITNESS:  The -- no.  They'd get paid on --

10          THE COURT:  Well, that was an either/or question and

11  the answer is no.  Now I'm in trouble.

12          THE WITNESS:  They'd get paid on the pool.

13          THE COURT:  On the pool.  Pool amount?

14          THE WITNESS:  Correct, because doing --

15          THE COURT:  So, if -- go ahead.  I'm sorry.

16          THE WITNESS:  -- doing what we did here, we are

17  eliminating the need for the claimants --

18          THE COURT:  To identify.

19          THE WITNESS:  -- to send us -- yeah, you know,

20  hundreds of thousands of loans saying -- example, Deutsche Bank

21  claimed us for thirteen billion dollars of reps breaches and

22  warranties.  That's 60,000 loans that would actually go through

23  and then say which one is breached or not.  So we are using

24  this analysis and our assumptions and the statistical models.

25  We are using that for the life of a pool.  You will only get

225

1    .22 percent as your payout.

2         THE COURT:  Okay.  So you're eliminating the need to

3    go one by one?

4         THE WITNESS:  Correct.

5         THE COURT:  Okay.  So all you have to do to get --

6    I'm running a pool of payment ARMs, payment option ARMs.  All I

7    have to do to get a claim allowed for my pool is complete a

8    questionnaire and send it in?

9         THE WITNESS:  No.  First you needed to file the proof

10   of claim --

11        THE COURT:  All right.

12        THE WITNESS:  -- on time.  Then if that proof of

13   claim included breach violations --

14        THE COURT:  Okay.

15        THE WITNESS:  -- then you will be counted in the

16   protocol.

17        THE COURT:  All right.  And all I have to do is send

18   that in and sign it.  Of course, when I file my proof of claim,

19   I verified it.  And it's got a verification page?

20        THE WITNESS:  Right.  I think if it's legal, right,

21   to file.

22        THE COURT:  Okay.  All right.  I'm sorry I was

23   confused.  Thank you.

24        THE WITNESS:  No, but that's a good question.

25        THE COURT:  I'm sorry to interrupt.  Well, I'm glad.

226

1    That's good.  Phew.  If I ask a bad question, don't tell me.

2    BY MR. WEISBROD:

3    Q.   Mr. Pasternak, speaking of payment option ARMs, the

4    debtors originated roughly 90,000 of them, right?

5    A.   Correct.

6    Q.   And almost all of those were 2005, 2006 or 2007, correct?

7    A.   To my knowledge, yes.

8    Q.   And you've actually had access to the database that

9    answers this question, right?

10   A.   Yes.

11   Q.   And there are some glitches in the database resulting in

12   inconsistent reports on this?

13   A.   It's -- we have a couple databases that we use.  One is

14   used for certain things; the other is used for other, more

15   complicated data pools.

16   Q.   And you have access to all of those different databases

17   that you just mentioned?

18   A.   I do.

19   Q.   And based on your familiarity with both and the

20   idiosyncrasies of them, you believe that the best number is

21   roughly 90,000?

22   A.   I do.

23   Q.   And that almost all of that is 2005 through 2007?

24   A.   Yes.

25   Q.   As a whole loan trader, you are familiar with various loan

227

1    products?

2    A.   Yes.

3    Q.   Do you know what MTA refers to?

4    A.   Yes.

5    Q.   What?

6    A.   It's monthly treasury average.

7    Q.   What does I/O refer to?

8    A.   Interest only.

9            THE COURT:  Interest only?

10           THE WITNESS:  Interest only.

11   Q.   And were you aware that regular senior management meetings

12   were held at AHM?

13   A.   I would assume they should be held at AHM, but --

14   Q.   Did you personally attend regular senior management

15   meetings?

16   A.   Did not.

17   Q.   Did you ever see them going on?

18   A.   Did not.

19   Q.   Do you know who did attend regular senior management

20   meetings?

21   A.   What do you mean by senior management?  Executives?

22   Q.   Yes.

23   A.   Then I would assume all executives.

24           MR. WEISBROD:  So the Court knows what I'm doing

25   now -- I discussed this with Mr. Dorsey.  We have a document

228

1    that has been designated as confidential, and I'd like to show

2    it to the witness.  We don't want to publish it.  I'm not sure

3    what we're going to do if we seek to admit it.  But we're

4    trying to play this by ear, depending on what the answers are.

5           Is that fair to say, Mr. Dorsey?

6           MR. DORSEY:  Yes, Your Honor.  Just so you, the

7    Court, is aware, the document was one of the documents that was

8    produced to the SEC.  And in connection with that production,

9    it was agreed between the debtors and the SEC that that entire

10   production will remain confidential.  The document is marked on

11   its face as confidential.  And I've indicated that he can show

12   it to the witness, ask him about it.  I don't know whether he's

13   ever seen it before or will be able to authenticate it or tell

14   us anything about it, but he's free to show it to him at this

15   time.

16          THE COURT:  Okay.  Just let me -- the record will

17   remain open, so just be cautious about that.  I'm not going to

18   clear the courtroom.  I'm not going to seal the record.  The

19   record will remain open.  If documents need to be admitted

20   under seal, that's a different issue.  But I will not close the

21   record.

22          MR. WEISBROD:  Okay.

23   BY MR. WEISBROD:

24   Q.   I'm showing you --

25          THE COURT:  Okay, I'm sorry, Mr. Pasternak, I'd ask

1    you to limit your responses to the questions as much as

2    possible in order to preserve the confidentiality of the

3    document.

4            THE WITNESS:  No problem.

5    Q.   I'm showing you a document marked OBC-12.

6            MR. WEISBROD:  And I assume there's no problem just

7    reading the label on the first page, Mr. Dorsey --

8            MR. DORSEY:  No.

9            MR. WEISBROD:  -- so we can identify it?

10           MR. DORSEY:  No objection.

11   Q.   It says, "Senior Staff Meeting, February 1st, 2007."  Do

12   you see that?

13   A.   Yes.

14   Q.   Have you ever seen the document before?

15   A.   No.

16   Q.   Okay.  I'd like you to turn to the page bearing Bates

17   number AHM-018934.

18   A.   Okay.

19   Q.   Have you ever seen that table or something similar to it

20   before?

21   A.   I have not.

22   Q.   I don't want to go through most of the data on it.

23   There's just one sentence on it that I -- well, I'm not going

24   to talk about it at all.  Let me ask you this.  Is it

25   consistent with your understanding of AHM's business that

230

1    fifty-one percent of its business was done in California,

2    Florida, Illinois, Arizona and North Carolina?

3              THE COURT:  Yes or no, sir.

4    A.   Oh.

5              THE COURT:  Or I don't know.

6    A.   It's, like, in between.  I was aware of some, not the

7    other states.

8    Q.   Which states did you have the impression were the

9    predominant states in which AHM did business?

10   A.   California.

11   Q.   Any others?

12   A.   Florida.

13   Q.   Any others?

14   A.   No.  That's it.

15   Q.   Could you look at the last page of the document, which

16   bears AHM-018964?  Bears Bates number AHM-018964.

17   A.   Okay.  I see it.

18   Q.   Have you ever seen a chart that looks anything like that?

19   A.   No, I have not.

20   Q.   Did you ever hear, at any time while you were at AHM, that

21   AHM payment option ARMs were negatively amortizing at a rate of

22   about eighty-seven percent?

23   A.   I did not.

24   Q.   Do you have any familiarity with AHM's business records

25   retention practices?

1          MR. DORSEY:  I'm sorry, Your Honor.  Could I hear

2     that question again?  I missed it.

3          THE COURT:  Do you have any familiarity with American

4     Home Mortgage's business retention -- business records

5     retention policies?

6          MR. DORSEY:  Are we talking about pre-petition or

7     post-petition, Your Honor?

8          THE COURT:  He didn't specify.

9     **A.   Well, sorry, I was reading.  Can you ask me that question**

10    **again?**

11    **Q.   Let's put away the document.  I'm through with the**

12    **document.**

13    **A.   Okay.**

14         MR. DORSEY:  Just for the record, Your Honor, I would

15    note that the cover page of this document has a Bates stamp of

16    AHM-018839, and then it jumps to AHM-018843 and 44 and then

17    goes 45 and then back to 018929.  I'm not even sure if this is

18    an entire document.  I don't know if this -- I would just move

19    to strike the entire testimony based on this.  I mean, there's

20    no indication where this document came from, and the witness

21    has never seen it before.  And I think it's inappropriate to

22    use a document that the witness cannot authenticate to

23    establish testimony.

24         MR. WEISBROD:  Your Honor, this is a problem that has

25    been plaguing us in this case.  One of the things that happens

232

1   when you are litigating with a company that has fired almost

2   all of its employees or laid them off is that you have trouble

3   finding people to authenticate things.  And we still have to

4   answer questions.  The testimony here was pretty innocuous.

5   Mr. Pasternak was a mortgage trader who would have had access

6   to mortgages originated in a variety of states and developed

7   impressions.  I think we should reserve for a separate time

8   what to do about this document.  But in terms of striking the

9   testimony, there's nothing here that should be stricken.

10              THE COURT:  I agree.  I don't know if the document

11  will be admitted into evidence or not.  I certainly would have

12  concerns with the way it's put together.  But I think that the

13  actual testimony elicited was based on information in the

14  document but not document-specific.  So I won't strike the

15  answers.  No one's moved to admit the document yet, so I'll

16  reserve judgment on that.

17  BY MR. WEISBROD:

18  **Q.   Do you know if AHM currently has a collection of documents**

19  **relating to the activities of senior management?**

20  **A.   I do not.**

21              MR. WEISBROD:  May I have a moment to confer with my

22  co-counsel, Your Honor?

23              THE COURT:  Yes, of course.

24       (Pause)

25              MR. WEISBROD:  I don't have any other questions, Your

233

1    Honor.  Thank you.

2              THE COURT:  Thank you.  Redirect?

3              MR. DORSEY:  Can I confer with committee counsel for

4    one moment?

5              THE COURT:  Yes, of course.  Should we take a break

6    or --

7              MR. DORSEY:  That would be good.

8              THE COURT:  All right.  Let's take a recess.

9              Sir, during the recess, you can't talk about the

10   substance of your testimony with counsel, all right?

11             We're in recess.

12             MR. DORSEY:  Thank you, Your Honor.

13        (Recess from 6:53 p.m. until 7:08 p.m.)

14             THE CLERK:  All rise.

15             THE COURT:  Please be seated.  Mr. Dorsey?

16             MR. DORSEY:  Thank you, Your Honor.  Just a few

17   questions of Mr. Pasternak.

18   REDIRECT EXAMINATION

19   BY MR. DORSEY:

20   **Q.   Do you recall in your cross examination you were asked**

21   **about pre-petition breach of warranty claims and whether they**

22   **were accounted for in the protocol?  Do you recall that?**

23   **A.   I recall that.**

24   **Q.   How were breach of warranty claims handled pre-petition?**

25   **A.   They were researched, making sure that breach, repurchase**

234

1    demand, you know --

2    Q.   Let me ask you a different question.  If it was researched

3    and it was determined that it was a valid breach of warranty

4    claim, what would AHM do with --

5           MR. WEISBROD:  Objection.  Lack of foundation and

6    possibly hearsay.  Mr. Pasternak wasn't in the department.

7           MR. DORSEY:  He cross examined him on this, Your

8    Honor.

9           THE COURT:  Yeah.  Overruled.

10   A.   The loan would have been repurchased.

11   Q.   So it would be repurchased.  And would a new loan be put

12   into the pool?

13   A.   No.

14   Q.   So it would just be repurchased and taken out of the pool

15   completely?

16   A.   Correct.

17   Q.   And you were also asked about scratch-and-dent loan pools,

18   do you recall that?

19   A.   Yes.

20   Q.   What is the -- what percentage of the loan pools that AHM

21   originated make up the scratch-and-dent portfolio?

22   A.   Maybe you can do the math for me.  It's -- scratch-and-

23   dent deals, I think we did three deals, close to a million

24   (sic) dollars out of 195 billion dollars that we originated.

25   Q.   So one million dollars?

235

1   A.   No, I'm sorry, one billion.

2   Q.   One billion out of a hundred ninety --

3   A.   Less than that, yes.

4   Q.   Out of 195 billion that were originated?

5   A.   Correct.

6   Q.   And when these loan pools were being sold, you testified

7   on cross that there would be -- they would lower the price on

8   those pools.  Was there something else that was done other than

9   just lowering the price in order to adjust for the fact that it

10  was a scratch-and-dent pool?

11  A.   Yeah.  It actually varied by deal by deal.  Some loans

12  could have included some -- what's called in our business as

13  overcollateralization, meaning you just put in -- you know,

14  say, a pool is worth a hundred million but actually put in 125

15  million to kind of offset the losses.

16  Q.   So rather than lowering the price, it would

17  overcollateralize the pool?

18  A.   Correct.

19          MR. DORSEY:  That's all I have, Your Honor.  Thank

20  you.

21          THE COURT:  All right.

22          Thank you, sir.

23          Oh, I'm sorry.  Mr. Power?

24          MR. POWER:  No, Your Honor.

25          THE COURT:  All right, thank you.

236

1           You may step down.

2           THE WITNESS:  Thank you.

3           THE COURT:  Well, that's going to be it for today.

4           MR. POWER:  Yes, Your Honor.  I was going to

5    suggest -- we have one more witness, which is Ms. Mataylis

6    (ph.), but I don't think she'll be that long.  And we suggest

7    we start tomorrow morning.

8           THE COURT:  Well, we're set for 11, but we could

9    start earlier, if you wish.  I mean, we could start at -- I

10   have a 10:30; I'm not quite sure how long it's going to last.

11   It's a Chapter 7, but it's a corporate 7.  We could start at

12   9:30.  Not trying to jam you up.  I mean, you're set for 11.

13   If you want 11, that's fine.  If you want 9:30, that's fine.

14          MR. POWER:  Can we confer just one moment?

15          THE COURT:  Yes.

16     (Pause)

17          MR. POWER:  Your Honor, we were trying to -- Mark

18   Power from Hahn.  We were trying to get a sense of how long

19   we'd be tomorrow, and we -- I think the last witness for the

20   proponents would be about an hour, and then the borrowers'

21   committee thinks about three hours total for their case.  About

22   four hours.  So if Your Honor had from 11 till -- we don't know

23   when Your Honor planned to stop tomorrow, but if we could fit

24   it in, then we'd rather start at 11.

25          THE COURT:  That's fine.  I have the rest of the day.

1       MR. POWER:  Okay.  Then we'd start at 11, then, Your

2  Honor.

3       THE COURT:  Very good.  That's fine.  You need the

4  morning to prepare, I expect, which I understand.

5       MR. DORSEY:  Just one last thing, Your Honor.  I

6  neglected to move into evidence Debtors' Exhibits 3 and 4,

7  which were the JPM and Morgan Stanley proofs of claim.

8       THE COURT:  Any objection?

9       MR. WEISBROD:  No objection.

10       THE COURT:  Admitted without objection.

11  (JPMorgan proof of claim was hereby admitted into evidence as

12  Debtors' Exhibit 3 as of this date.)

13  (Morgan Stanley proof of claim was hereby admitted into

14  evidence as Debtors' Exhibit 4 as of this date.)

15       MR. JACKSON:  And, Your Honor, Patrick Jackson for

16  the debtors.  One last, last thing.  We believe we have a

17  resolution of the DB structure, the plan objection.  The only

18  thing it's contingent on is, since the debtors are in

19  consultation with B of A with respect to the appeal, its final

20  approval of B of A, which we expect to get.  So Mr. Wilamowsky

21  can speak for DB structure.  But I believe the deal is that,

22  for purposes of the remand that's currently before you, the

23  debtors are willing to stipulate that the MLPSA at issue is a

24  nonexecutory contract and, with that threshold determination,

25  the Court is free to proceed with the remand.  And then in

238

1   consideration of that DB structure, we'll withdraw the plan

2   objection, which was 365-based.  And we'll also withdraw the

3   cure claim that they've put against the servicing cure reserve.

4   So Mr. Wilamowsky can confirm.

5           MR. WILAMOWSKY:  Good evening, Your Honor.  Steven

6   Wilamowsky, Bingham McCutchen LLP.  Withdraw the objection to

7   the, I think, the cure -- withdraw the claim against the

8   reserve, obviously to the extent, which we don't think it would

9   ever happen, that the contract would be assumed and assigned,

10  or assigned notwithstanding a cure obligation, obviously.  A

11  cure obligation would be what it would be, but -- I think I

12  just complicated things.  But, yes, the point is, Your Honor --

13          THE COURT:  You did.

14          MR. WILAMOWSKY:  -- we are -- the point is we're

15  willing to let the cure reserve go out the door, but that

16  doesn't mean that, because we've essentially agreed that

17  they're never going to, that we'll never --

18          THE COURT:  You can't assume and assign it.

19          MR. WILAMOWSKY:  -- that we'll never be in a

20  situation where they're going to assign it to us and say okay,

21  now we're entitled to a cure.  In other words, if they win,

22  then they could assign it through us and not pay us any cure

23  because it's effectively been separated out.  And if they lose,

24  then they're not going to try to assign it through us and pay

25  us a cure.  They're just not going to assign it through us.

1    So --

2            THE COURT:  Understood.

3            MR. WILAMOWSKY:  So --

4            THE COURT:  There you go.

5            MR. WILAMOWSKY:  -- and then --

6            THE COURT:  I got it.

7            MR. WILAMOWSKY:  -- with respect to the -- I think we

8    also have a resolution in principle with respect to the amount

9    of our claim, but I think we're still exchanging underlying

10   data.  So I think that's all we could say about that now

11   because we still need to share data.

12           THE COURT:  Okay.

13           MR. JACKSON:  Your Honor, Patrick Jackson again.

14   There was a reservation of rights with respect to the EPD

15   breach protocol that was also included in their plan objection

16   but they're not pressing it based on our resolution and

17   principal of the claim.

18           THE COURT:  Okay.

19           MR. JACKSON:  Thank you, Your Honor.

20           THE COURT:  Excellent.  Thank you.  All right, you

21   may leave everything.  I'd ask you simply to:  (a) clean up

22   after yourselves, and (b) clear the tables for my next hearing.

23   But -- and we'll just leave the witness stuff there.  We'll

24   deal with it tomorrow if we have witnesses.  We'll clear it out

25   in my other matter.  I don't think we will.  So if you would

240

1    just clear the tables, clean up your garbage, and you can leave

2    everything else, and I'll see you tomorrow at 11.  All right,

3    we're in recess till 11.

4         (Proceedings concluded at 7:16 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

241

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Bret Fernandes | Mr. Dorsey | 56, 168 |
| Bret Fernandes | Mr. Power | 92 |
| Bret Fernandes | Mr. MacCauley | 94 |
| Bret Fernandes | Mr. Weisbrod | 118 |
| Damian Pasternak | Mr. Dorsey | 173, 233 |
| Damian Pasternak | Mr. Power | 202 |
| Damian Pasternak | Mr. Weisbrod | 210 |

EXHIBITS

| DEBTOR'S | ID. | EVID. |
|---|---|---|
| 1373, 1708, 1758, 2439, 3284-3286, 2848, | | 40 |
| 2897, 3239, 5999, 5308, 6604, 6626, 6627, | | |
| 6644, 6868, 6942, 6943, 6952, 6944, 6945 | | |
| 1 Stipulated Asset Allocation Methodology | | 172 |
| 2 Liquidation Analysis | | 172 |
| 3 JPMorgan proof of claim | | 237 |
| 4 Morgan Stanley proof of claim | | 237 |

242

1

2                          I N D E X

3                         (continued)

4

5                        E X H I B I T S

6    OFFICIAL BORROWERS' COMMITTEE                 ID.   EVID.

7    OBC-1 Amended Chapter 11 plan dated 2/5/09    119

8    OBC-2 Claims questionnaire                    127

9    OBC-3 Redlined claims questionnaire           128

10   OBC-4 Disclosure statement Dated 11/25/08     131

11   OBC-6 Notice order dated 10/30/07             152

12   OBC-7 Notice order dated 2/14/08              152

13   OBC-8 E-mail from Sandra Dee Volel to         156

14          Kara Hammond Coyle

15   OBC-11 Schedule of EPD breach claim voting    222

16          amounts

17

18

19

20

21

22

23

24

25

243

1

2                        C E R T I F I C A T I O N

3

4       I, Esther Accardi, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       ESTHER ACCARDI

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, New York 11501

14

15      Date: February 18, 2009

16

17

18

19

20

21

22

23

24

25