UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .      Case No.  07-11047-CSS
                                .
                                .
AMERICAN HOME MORTGAGE          .
HOLDINGS, INC., et al.,         .      824 Market Street
                                .      Wilmington, Delaware  19801
              Debtors.          .
                                .      February 11, 2009
. . . . . . . . . . . . ..              9:11 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Young Conaway Stargatt & Taylor LLP
                         By:  SEAN M. BEACH, ESQ.
                              JOHN T. DORSEY, ESQ.
                              PATRICK A. JACKSON, ESQ.
                              MARGARET WHITEMAN GREECHER, ESQ.
                         The Brandywine Building
                         1000 West Street, 17th Floor
                         Wilmington, DE  19899


For the Borrowers'       Zuckerman Spaeder LLP
Committee:               By:  THOMAS G. MACAULEY, ESQ.
                         1800 M Street, N.W., Suite 1000
                         Washington, D.C.  20036-5802


For the Borrowers'       Gilbert Oshinsky LLP
Committee:               By:  STEPHEN A. WEISBROD, ESQ.
                              W. HUNTER WINSTEAD, ESQ.
                         1100 New York Avenue, Suite 1700
                         Washington, DC


Audio Operator:          Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (CONT'D):

For Triad:                    Womble Carlyle Sandridge & Rice
                              By:  KEVIN J. MANGAN, ESQ.
                              222 Delaware Avenue, Suite 150
                              Wilmington, DE  19801

For the Creditors'           Hahn & Hessen LLP
Committee:                   By:  MARK S. INDELICATO, ESQ.
                                  EDWARD C. SCHNITZER, ESQ.
                                  MARK T. POWER, ESQ.
                              488 Madison Avenue, 14th & 15th Fl.
                              New York, NY  10022
                              (Telephonic appearance for Mr.
                               Indelicato)

For the Creditors'           Blank Rome LLP
Committee:                   By:  ELIZABETH A. SLOAN, ESQ.
                              Chase Manhattan Centre
                              1201 Market Street, Suite 800
                              Wilmington, DE  19801

For Bank of America:         Kaye Scholer LLP
                              By:  ANA M. ALFONSO, ESQ.
                              425 Park Avenue
                              New York, NY  10018
                              (Telephonic appearance)

For Wilmington Trust         Covington & Burling LLP
Company:                     By:  SUSAN JOHNSTON, ESQ.
                              The New York Times Building
                              626 Eighth Avenue
                              New York, NY  10018
                              (Telephonic appearance)

Financial Advisors as        BDO Seidman
Unsecured Creditors:         By:  DAVID BERLINER
                              (Telephonic appearance)

For Union Federal            Skadden, Arps, Slate, Meagher &
Waterfield:                     Flom LLP
                              By:  ERIC M. DAVIS, ESQ.
                              One Rodney Square
                              Wilmington, DE  19899

For Freddie Mac:             Reed Smith LLP
                              By:  J. CORY FALGOWSKI, ESQ.
                              1201 Market Street
                              Suite 1500
                              Wilmington, DE  19801

3

APPEARANCES (CONT'D):


For Bank of America:        Potter, Anderson & Corroon LLP
                           By:  GABRIEL R. MacCONAILL, ESQ.
                           Hercules Plaza
                           1313 N. Market Street
                           Wilmington, DE  19899

For Law Debenture          Pryor Cashman LLP
Trust Co. of NY:           By:  TINA N. MOSS, ESQ.
                           1800 M Street, N.W.
                           Suite 1000
                           Washington, DC  20036-5802

For U.S. Bank:             Dorsey & Whitney LLP
                           By:  ROBERT W. MALLARD, ESQ.
                           1105 North Market Street
                           Suite 1600
                           Wilmington, DE  19899

For JP Morgan Chase:       Landis Rath & Cobb
                           By:  JAMES S. GREEN, JR., ESQ.
                           919 Market Street, Suite 1800
                           Wilmington, DE  19801

# **I N D E X**

                                                        **PAGE**
**WITNESSES**
MARGOT SAUNDERS
      Continued Cross Examination by Mr. Dorsey         5
      Cross Examination by Mr. Schnitzer                6


**EXHIBITS**                                    **ID.**    **EVD.**
OBC-1    2/5/09 Amended Plan                            23
OBC-2    EPD Questionnaire                              23
OBC-3    EPD Questionnaire w/red lining                23
OBC-4    11/21/08 Disclosure Statement                 23
OBC-5    Valenzuela Proof of Claim                     23
OBC-6    Bar Date Order                                23
OBC-7    Home Equity Loan Bar Date Order               23
OBC-8    E-Mail and Attachment                         23
OBC-9    8/13/07 Letter to Borrowers                   23
OBC-10   Document Provided by Mr. Rush                 23
OBC-11   Schedule - EPD Breach Claim Voting            23
OBC-12   Copy of Folder from Meeting (Under Seal)      23
OBC-13   Gracie Graves Loan Application  (Redacted)    23
OBC-14   Graves TILA Disclosure Statement              23
OBC-15   Graves Loan Application - 1/24/07 (Redacted)  23
OBC-16   Graves TILA Disclosure Statement -
           1/24/07                                     23
OBC-17   Graves Loan Closure Instructions              23
OBC-18   Graves Adjustable Rate Note                   28
OBC-19   Graves Monthly Statement 10/11/08             28
OBC-20   Blank Proof of Claim Form                     28
OBC-21   AHM Prospectus Supplement                     28
OBC-22   Inter-agency dated 10/4/06                    28
OBC-23   OBC-23, Tilton Jack complaint                 23
OBC-25   Andrews v. Chevy Chase Bank Case              28
OBC-27   May 2007 Senior Staff Meeting (Under Seal)    28
OBC-28   Summary of AHM Mortgages                      28
OBC-29   Term Sheet                                    27
OBC-30   Interrogatories                               28
OBC-31   Commonwealth v. Fremont Case                  28
OC-2     Reversal of Decision                          28

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Good morning.  Every

3   day the crowd dwindles.  All right.  Mr. Dorsey, I think we're

4   at cross examination of Ms. Saunders.

5          MR. DORSEY:  Correct, Your Honor.

6          THE COURT:  All right.  Ms. Saunders, would you

7   please take the stand?  Your oath from yesterday is still in

8   place -- excuse me, your affirmation.

9          MARGOT SAUNDERS, WITNESS, PREVIOUSLY SWORN

10                    CROSS EXAMINATION

11  BY MR. DORSEY:

12  Q    Good morning, Ms. Saunders.

13  A    Good morning.

14  Q    Yesterday, during your direct testimony you were

15  describing the types of remedies that were available to

16  borrowers for an alleged TILA violation.  Do you recall that?

17  A    Yes.

18  Q    And you testified that there were the possibility of

19  recovering actual damages, statutory damages, and rescission,

20  correct?

21  A    Yes.

22  Q    With actual damages it's required under TILA that the

23  borrower prove reliance on the alleged violation, correct?

24  A    The Courts have held that, yes.

25  Q    And as a result of that most borrowers either don't bring

1  that claim, or if they do bring it, don't press it, correct?

2  A     That's correct.

3  Q     And for rescission, the remedy of rescission, you

4  recognized yesterday that that was the most powerful and

5  primary claim brought by homeowners, correct?

6  A     Yes.

7  Q     And rescission is a remedy that is brought against the

8  holder of the loan, correct?

9  A     Yes.

10 Q     So, if an originator originated a loan and then sold it to

11 a third party, the remedy of rescission would go against the

12 third party, not the originator, correct?

13 A     Yes.

14            MR. DORSEY:  That's all I have, Your Honor.  Thank

15 you.

16            THE COURT:  All right.  Redirect?

17            MR. WEISBROD:  No.  Thank you, Your Honor.

18            THE COURT:  All right.  Very good.  Ma'am, you may

19 step down.

20            MR. SCHNITZER:  Your Honor, the committee also --

21            THE COURT:  Oh.  I beg your pardon.  I'm sorry.

22 Obviously this will reserve your right for further redirect.

23            MR. SCHNITZER:  Edward Schnitzer from Hahn & Hessen.

24                     CROSS EXAMINATION

25 BY MR. SCHNITZER:

1  Q    Ms. Saunders, with respect to American Home in particular,

2  you reviewed one prospectus and four loan files.  Is that

3  correct?

4  A    Yes.

5  Q    And of the four loan files you concluded that one did not

6  relate to American Home.  Is that also correct?

7  A    Yes.

8  Q    The remaining three loan files were the Jack file, the

9  Dandridge file, and the Graves file.  Is that correct?

10 A    Yes.  But may I add something?

11 Q    Yes.

12 A    What the -- the loan files that are reviewed of American

13 Home were very typical of the loan files that I had seen made

14 by other lenders for payment option on loans.  There was little

15 difference, if any, between American Home's payment option on

16 loans that I reviewed and the typical payment option on loans.

17 Indeed, there are generally few differences between the loans,

18 both the stories that the homeowners provide and the terms of

19 the loans themselves, as well as the Truth in Lending

20 disclosures are fairly typical across the board.

21 Q    Just to clarify, is it correct that with respect to

22 American Home, with respect to American Home Borrowers, you

23 only reviewed three files, correct?

24 A    Yes.  That's true.

25 Q    And of those three files, all three borrowers became aware

1  of potential claims against American Home prior to the recast?

2  Is that also correct?

3  A    Yes.

4       MR. SCHNITZER:  Thank you.

5            THE COURT:  Redirect?

6            MR. WEISBROD:  No.  Thank you, Your Honor.  We have

7  no questions.

8            THE COURT:  Ms. Saunders, Thank you.  You're excused.

9            THE WITNESS:  Thank you.

10           THE COURT:  Any further witnesses from the borrowers'

11 committee?

12           MR. SCHNITZER:  No further witnesses, Your Honor.  We

13 have some documents.

14           THE COURT:  Yes.

15                      (Pause)

16           THE COURT:  My memory is that at this point none of

17 the OBC exhibits have been admitted into Evidence.

18           MR. WEISBROD:  That's right.

19           THE COURT:  Okay.

20           MR. WEISBROD:  Your Honor, we are -- the paralegal is

21 en route with the additional documents.

22           THE COURT:  Somewhat surprised by the length of

23 cross?

24           MR. WEISBROD:  There is one that I think we can talk

25 about now productively, though.  Mr. Dorsey and I have been

1  going back and forth on this behind the scenes, and I think we

2  all have copies of it here.  We contend that Damian Pasternak's

3  (phonetic) statement at his deposition last week in which he

4  stated that the Tilton Jack note was the standard note is a

5  party admission and is therefore admissible under the hearsay

6  rule.  And I'll let Mr. Dorsey speak for himself, but I'll just

7  point out that that rule allowing party admissions applies to

8  agents or servants of companies or parties, and with that I

9  understand that Mr. Dorsey will object.  At least that was his

10 position last time I spoke with him, and so I'll cede the

11 microphone to him.

12          THE COURT:  Mr. Dorsey?

13          MR. DORSEY:  Without conceding whether or not Mr.

14 Pasternak's statement in his deposition was or was not a party

15 admission, Rule 32 of the Federal Rules of Civil Procedure is

16 very clear, Your Honor, on the use of depositions at trial.  It

17 not only has to be otherwise admissible under the Federal Rules

18 of Evidence, so even assuming Mr. Pasternak's testimony would

19 constitute an admission by a party, it still must also meet one

20 of the requirements under 32(a)(2) through (8).  None of those

21 apply in this case.  It was not used for impeachment.  Mr.

22 Pasternak was here.  He testified.  He was open for cross

23 examination.  He was, in fact, cross examined.  Mr. Pasternak

24 is not a party.  He's not an agent or a designee of the party.

25 He's not an officer, director, managing agent of the debtors.

1  He was not designated as a 30(b)(6) witness, and therefore Rule

2  32 would preclude the use -- introduction of his deposition

3  testimony before Your Honor.

4        THE COURT:  Okay. I believe, also, Mr. Dorsey, Mr.

5  Pasternak was -- he's not in Court right now, but he was in

6  Court all day yesterday.  Is that correct?

7        MR. DORSEY:  That's correct, Your Honor.

8        MR. WEISBROD:  Your Honor, Mr. Pasternak qualifies as

9  a managing agent.  He's the guy who was in charge of developing

10  the EPD breach protocol, number one.  And number two, there are

11  no officers left, as far as we can tell.  Even Mr. Fernandez

12  said I'm not an officer, I am just the one who runs the

13  restructuring.  So, under these circumstances we have to allow

14  it.  Independently, this came up, of course, when we were

15  examining Ms. Saunders.

16        THE COURT:  Well, even if he's an officer or agent,

17  or managing agent, he wasn't designated under 30(b)(6).

18        MR. WEISBROD:  That is -- let's see what 31(a)(4) is.

19  I'm sorry, Your Honor.

20        THE COURT:  That's okay.  But it says deposition of a

21  party who at the time of taking it was an officer, director, or

22  managing agent -- oh, okay, or a person designated under

23  30(b)(6).  All right.  So, if he's a managing agent it can be

24  used.

25        MR. WEISBROD:  And the other point, Your Honor, is

1  that whatever he was, his statement was reasonably relied upon

2  by Margot Saunders, and it's admissible that way.

3              THE COURT:  Hang on.  Let me --

4              MR. DORSEY:  May I respond, Your Honor?

5              THE COURT:  Yes.  Let me find it -- let me make sure

6  I have the current version.

7              MR. WEISBROD:  And there's one last point I need to

8  make, Your Honor, which is that we're not using the deposition

9  to cross.  His statement is still an admission.  Any statement

10 anywhere -- it can't be that if he had made the statement on

11 the street it would be admissible, but if he made the statement

12 under oath at a deposition, it's not.

13             THE COURT:  Well, I disagree, but -- otherwise Rule

14 32 doesn't mean anything.  At a hearing or trial or part of a

15 deposition may be used against a party on these conditions.

16 The party was present and represented.  Okay.  We have that.

17 Used to the extent it would be admissible.  All right.  We've

18 -- without prejudice we're assuming arguendo that it's

19 admissible as a party admission, and allowed under 32(a)(2)

20 through (8).  Of course, the distinction and the importance

21 here is the deposition is taken under oath.  The statement on

22 the street is not.  And as a result, there are greater

23 consequences available both to the witness and also greater

24 probity available because -- to the Court for those statements

25 because they're under oath.  So then we look at (a)(2) through

1  (8), impeachment.  All right.  So it says here under (3), and

2  maybe this -- Mr. Dorsey can respond to this -- my reading of

3  (a)(2)(3) -- excuse me -- (a)(3), an adverse party may use for

4  any purpose the deposition of a party or anyone who, when

5  deposed, was the party's officer, director, managing agent, or

6  designee under 30(b)(6).  Why isn't Mr. Pasternak a managing

7  agent?

8         MR. DORSEY:  The fact that he was utilized in helping

9  to develop the EPD breach protocol does not make him a managing

10 agent, Your Honor.  A managing agent is someone who has

11 management responsibility of the company.  He didn't testify

12 that he had any management responsibility whatsoever.  He did

13 not supervise any employees.  He did not have any employees

14 that reported to him.  He was an employee himself.  He

15 testified that his job was as a trader.  That is not a managing

16 agent, Your Honor.

17        THE COURT:  Well, but he hasn't -- there's no trading

18 to be done since August of '07, so he's doing something else.

19        MR. DORSEY:  He's working basically as a consultant,

20 Your Honor, for the debtors, to help them put together the EPD

21 breach protocols.  He did it because he was -- he had the

22 specialized knowledge in order to do that.  He did it at the

23 direction of other people.  That does not make him a managing

24 agent, Your Honor.

25        THE COURT:  Okay.  Response to that point?

1          MR. WEISBROD:  Your Honor, I think that when there

2     are only a half dozen or a dozen people left and he's clearly a

3     person --

4          THE COURT:  Well, Mr. Fernandez is clearly a managing

5     agent, and he's director of restructuring --

6          MR. WEISBROD:  Yes.  But this rule doesn't say you

7     have to be the top person at the company to use the deposition.

8     He was clearly managing a big project for --

9          THE COURT:  Well, I'm not sure it doesn't.  It says

10    was the party's managing agent.  I think the way that's written

11    implies perhaps exactly what you're talking about.  There's no

12    formal director.  There's no former officer.  But there's

13    somebody at the entity who is charge.

14         MR. WEISBROD:  Yes.  I read the -- it's amazing to me

15    how many times Delaware Courts have argued about what the the

16    means in different courtrooms, but I believe that that the the

17    refers to the party, not to the managing agent, implying that

18    there's only one.  But --

19         THE COURT:  All right.

20         MR. WEISBROD:  -- Your Honor, even if the Court does

21    not attach to the statement the significance associated with

22    oath, I reiterate the point that it would make no sense if he

23    just remarked this on the street, across the street, that we

24    would get it in, but since he actually took an oath to tell the

25    truth, the whole truth, and nothing but the truth, we can't get

1  it in.  That makes no sense.  And in addition, the debtors have

2  not addressed the point that Ms. Saunders reasonably relied on

3  the statement.

4        THE COURT:  Well, if you think the rule doesn't make

5  any sense, this isn't the place to make that argument.  You can

6  call Congress, you can call the Judicial Conference.

7        MR. WEISBROD:  My point is not that the rule makes no

8  sense.  It's that the interpretation proffered by the debtors

9  makes no sense, Your Honor.

10        THE COURT:  Well, I think their interpretation is

11  based on the plain meaning of the rule.  I disagree.  Mr.

12  Macauley?  I'll hear you.

13        MR. MACAULEY:  Your Honor, may I just say something?

14  I think it's pretty clear, on evidentiary matters the Federal

15  Rules of Evidence supercede the Federal Rules of Civil

16  Procedure.

17        THE COURT:  But not when the Federal Rules of Civil

18  Procedure incorporate the Federal Rules of Evidence.  I mean --

19  do you have 32 in front of you?

20        MR. MACAULEY:  Yes.  Right here.

21        THE COURT:  Yes.  (a), (b) and (c).  Okay?  Federal

22  Rules of Evidence, so it's admissible, so, okay, that trumps,

23  and use allowed under this rule.  You guys want to read out

24  (a)(1)(c), or you want to turn the and into an or.  So, I agree

25  with Mr. Dorsey.  I don't see any application under 32(a), and

1  I will not allow, or not consider the statement of Mr.

2  Pasternak on this issue.

3          MR. WEISBROD:  May I ask if Mr. Pasternak is still

4  available?

5          THE COURT:  You've closed your case.

6          MR. WEISBROD:  I --

7          THE COURT:  I just asked you if you had any more

8  witnesses.

9          MR. WEISBROD:  That's true.  We did -- we have not

10  closed our case.  We were about to submit documents --

11          THE COURT:  No.  That's true.  Very good.  Is Mr.

12  Pasternak still available?

13          MR. DORSEY:  Mr. Pasternak, as with Mr. Fernandez,

14  thought this was going to be a two-day hearing, Your Honor.  He

15  went home last night to be with his family.  I saw no reason

16  after counsel had told me he had no further witnesses to make

17  him stay here.

18          MR. WEISBROD:  Well, then, we're not going to call

19  Mr. Pasternak, Your Honor.  We still submit that Ms. Saunders

20  reasonably relied on his statement.

21          MR. DORSEY:  Well, I can address that, Your Honor,

22  because the fact that an expert witness relies on hearsay

23  testimony doesn't make it admissible, and I'm going to have

24  some objections to that on some of their other documents that

25  they're going to try to get in.

1            THE COURT:  Well, I understand.  My ruling stands.

2  Do we need -- I mean, I have (a) through -- I have -- however

3  you want to proceed.  You tell me.

4            MR. WEISBROD:  I'd ask for a short break so we can

5  get all our exhibits together and proffer them at once.

6            THE COURT:  Okay.  And to the extent you can agree,

7  obviously I'm sure you will attempt it, and --

8            MR. WEISBROD:  Yes.

9            THE COURT:  Okay.  Very good.

10            MR. WEISBROD:  Thank you, Your Honor.

11            THE COURT:  All right.  We'll take a recess.  Please

12  let us know when you would like to proceed.

13            MR. WEISBROD:  Thank you.  I think it will be about

14  15 minutes.

15            THE COURT:  Very good.

16                      (Recess)

17            THE CLERK:  All rise.

18            THE COURT:  Please be seated.  Thank you, Your Honor.

19  Stephen Weisbrod from the borrowers' committee.  I propose to

20  go through the list of exhibits that we would like the Court to

21  admit into Evidence, and we'll note as we go through it briefly

22  whether there's an objection, and then circle back, if that's

23  okay.

24            THE COURT:  If there's?

25            MR. WEISBROD:  If there is an objection --

1          THE COURT:  Oh.

2          MR. WEISBROD:  -- we'll circle back.

3          THE COURT:  Very good.

4          MR. WEISBROD:  We move to admit the following

5  exhibits, OBC-1, which is the February 5th, 2009 amended plan,

6  OBC-2, which is the EPD questionnaire, OBC-3, which is the EPD

7  questionnaire with red lining.

8          THE COURT:  Okay.  Hang on.  I've got the wrong

9  numbers here.  See, I messed up, too.

10          MR. WEISBROD:  I'm sorry?

11          THE COURT:  I messed up, too --

12          MR. WEISBROD:  Oh, okay.

13          THE COURT:  -- on what was what.  Just give me a sec.

14  Just give me a sec.

15                          (Pause)

16          THE COURT:  All right.  I'm sorry.  So, OBC-1, 2 and

17  3?

18          MR. WEISBROD:  Yes.  1, 2 and 3.  OBC-4 is the

19  disclosure statement dated November 21, 2008.  OBC-5, and there

20  is an objection to this, is the Valenzuela (phonetic) proof of

21  claim.  OBC-6 is the bar date order.  OBC-7 is the home equity

22  loan construction loan bar date order.  OBC-8 is the e-mail and

23  attachment with the proof of notice of bar date.  OBC-9 is the

24  letter to borrowers dated August 13th, 2007 from American

25  Home's web site.  We are not offering OBC-10, which was the

document that Ms. Rush provided, but that Mr. Fernandez could
not discuss.  OBC-11 is the schedule of EPD breach claim voting
amounts.  OBC-12 is a copy of a folder from a senior staff
meeting, February 1st, 2007.  We have agreed with the debtors
that that can be submitted into Evidence, but it has to be
under seal.  OBC-13 is the Gracie Graves loan application,
December 18th, 2006.  We have a redacted version of that, Your
Honor.  OBC-14 is the Graves TILA disclosure statement dated
December 18th, 2006.  OBC-15 is the Graves Loan application
dated January 24th, 2007.  We have a redacted version of that.
OBC-16 is the Graves TILA disclosure statement dated January
24th, 2007.  OBC-17 is the American Brokers' Conduit Loan
Closing Instructions for Ms. Graves.  OBC-18 is the Graves
adjustable rate note.  OBC-19 is the Graves monthly statement
dated October 11th, 2008.  OBC-20 is a blank proof of claim
form.  OBC-21 is the AHM prospectus supplement.  OBC-22 is the
inter-agency guidance on non-traditional mortgage products
dated October 4th, 2006.  OBC-23, and there is an objection to
this, is the Tilton Jack complaint with exhibits.  OBC-24 the
Court has already ruled will not be admitted.  OBC-25 is a copy
of a Court case, Andrews v. Chevy Chase Bank from the Eastern
District of Wisconsin in 2007.  There's no objection to OBC-25.
OBC-26 there is an objection, and it is the press release from
the Massachusetts Attorney General's Office regarding the
filing of the complaint in Commonwealth v. Fremont (phonetic).

1          Now we have a few additional documents which I'd like

2   to hand up, and some of these are subject to objection.

3          THE COURT:  Thank you.

4          MR. WEISBROD:  Your Honor, the pile I just handed to

5   you includes some previously marked ones that we have redacted

6   or otherwise are putting in.  And I'm now starting at OBC-27,

7   which is an additional senior staff meeting from May 2007.

8   There's no objection to its admission provided that we file it

9   under seal.  OBC-28 is a one-page document provided by the

10  debtors summarizing American Home Mortgages by mortgage type.

11  There's no objection to that.  OBC-29 there is an objection to.

12  It's the term sheet between various states -- of the settlement

13  agreement between various states, attorneys general, and Bank

14  of America regarding Countrywide.  It's the actual term sheet

15  as opposed to the document which we were proposing to use

16  yesterday, which was a Wall Street Journal article.  OBC-30 is

17  a Court case, Commonwealth of Massachusetts v. --

18          THE COURT:  Yes -- no.  30 is interrogatory

19  responses.

20          MR. WEISBROD:  Oh.  Okay.  30 is -- my list is wrong.

21  30 is interrogatory responses.  And I hope, then, that 31 is

22  the Commonwealth v. Fremont --

23          THE COURT:  It is.

24          MR. WEISBROD:  Thank you.

25          THE COURT:  Any objection to 30 or 31?  Just --

1          MR. WEISBROD:  My understanding is that there's not

2     an objection, but that there may be discussion about how they

3     can be used.

4          THE COURT:  Okay.  Anything further?

5          MR. WEISBROD:  Well, at this point I think that Mr.

6     Dorsey should explain it.  We should go through them, and Mr.

7     Dorsey should state his objections, and then we should respond.

8          THE COURT:  All right.  That's fine.  Mr. Dorsey?

9          MR. DORSEY:  I'll begin, Your Honor, with OBC-5,

10    which is the Valenzuela proof of claim.  That clearly is

11    hearsay.  There's been no testimony about the content of that

12    proof of claim here before the Court.  There's no exception to

13    the hearsay rule that would apply.  And therefore it should not

14    be admitted as Evidence in these proceedings.  The same for

15    OBC-23 and 26, Your Honor, the Tilton Jack complaint, and the

16    press release from the Connecticut Attorney General's Office.

17    Those are also hearsay.  The fact that Ms. Saunders may have

18    relied upon those documents in formulating her opinion does not

19    otherwise overcome the hearsay requirement to get those

20    documents into actual evidence before the Court, and therefore

21    they should also be excluded.  OBC-29, the Countrywide term

22    sheet, Your Honor had already ruled previously that you were

23    not going to consider settlements in other cases.  That is a

24    settlement agreement.  The document is not authenticated.

25    There's been no evidence of where it came from.  And frankly, I

1  have a bit of a concern about it because on its face it's

2  marked as confidential, for settlement purposes only.  For OBC-

3  30, Your Honor, the interrogatories, our interrogatories and

4  response requests for production of document were included in

5  one document.  Obviously interrogatories can be introduced and

6  used against a party.  The document responses cannot, so we

7  would ask the Court simply not to consider the document

8  responses as a part of that exhibit.  That's all I have, Your

9  Honor.

10          THE COURT:  All right.  Response?

11          MR. WEISBROD:  Yes, Your Honor.

12          THE COURT:  Just take them seriatim.

13          MR. DORSEY:  Your Honor, I neglected -- I had a deal

14  with the committee counsel to say that the committee agrees

15  with my position on these documents, so he doesn't have to

16  stand up.

17          THE COURT:  All right.  Very good.  Thank you.

18          MR. WEISBROD:  Your Honor, with respect to the two

19  proofs of claim, we are not offering them for the truth.  We

20  are offering them for two purposes.  One, to prove the fact

21  that the claims were asserted against AHM.  So, one of them is

22  that Tilton Jack made certain types of allegations about a loan

23  that he alleges he got.  And for Valenzuela, we're not even

24  going to that level of detail, frankly.  We're just offering it

25  to prove that prior to today AHM was put on notice that there

1  was a class of people with claims against AHM.  So, again,

2  we're offering it for the proof of the matter asserted.  We're

3  not asking the Court to consider whether anything said in those

4  is truthful.  In --

5          THE COURT:  Mr. Dorsey, can we stipulate to those

6  facts?

7          MR. DORSEY:  We can certainly stipulate as to the

8  Valenzuela proof of claim.  In fact, I think Your Honor has

9  already taken judicial notice that everything in the docket is

10  in the docket that's been filed.

11          THE COURT:  Actually, proofs of claim don't -- aren't

12  technically in the docket.

13          MR. DORSEY:  I can stipulate that it was filed, that

14  it was filed after the bar date, and --

15          THE COURT:  That it asserts claims and purports to

16  have a class?

17          MR. DORSEY:  Yes, Your Honor.  For the Tilton Jack

18  claim, however, Your Honor, that's not in a -- that wasn't the

19  proof of claim that they've actually submitted to the Court.

20  That's the complaint itself.

21          MR. WEISBROD:  The -- not quite right.  That's a

22  portion of the proof of claim.

23          THE COURT:  It's an exhibit to a proof of claim?

24          MR. WEISBROD:  Yes.

25          MR. DORSEY:  That is not admissible, Your Honor.

1 It's hearsay.

2          THE COURT:  All right.

3          MR. WEISBROD:  Again, we're offering it for two

4 purposes, Your Honor.  One, that it has been asserted against

5 AHM.  We would have no objection to adding the entire proof of

6 claim if it's necessary for context, but it doesn't seem

7 necessary to me.  And it's also something on which an expert

8 reasonably would rely.  Ms. Saunders relied on it in discussing

9 her opinions about claims that could be asserted by borrowers

10 against AHM.

11          THE COURT:  All right.  Well, the latter point first.

12 I don't think that gets around the hearsay rule.  I am going to

13 draw a distinction between allowing opinions based on hearsay

14 evidence, but not allowing hearsay evidence in that is the

15 basis for that opinion.  It's one thing to rely on hearsay for

16 an opinion.  Clearly allowed.  It's another thing to say having

17 relied on it it is otherwise admissible.  So, I'll overrule

18 that response.  I will allow Exhibit 5 and 23 to be admitted

19 solely for the purpose of saying that they were, in fact -- let

20 me say it right.  I'll allow the exhibits to be admitted solely

21 for the purpose of attempting to establish that those persons

22 have asserted claims against the debtor arising from home

23 mortgages issued by the debtor, including the fact that the

24 Valenzuelas purport to assert a class action claim.  And that

25 will be the limit of the admission.  And when I say originated

1  by the debtors, any one or more of the debtors originated the

2  loans.  With that limitation, I'll admit the exhibits.

3          MR. WEISBROD:  That brings us, I believe, Your Honor,

4  to the objection to OBC-26, which is the press release.  We

5  offer that to prove not that the allegations in the press

6  release were accurate, but that they were made prior to the

7  petition date, or around the petition date, rather.  And they

8  are admissible under Rule -- I always get my numbers mixed up

9  -- public records, 803(8), because this comes right off the

10 Massachusetts Attorney General web site.  But again, we're not

11 offering it to prove the truth of anything other than that it

12 was asserted, so we don't even need to get to that hearsay

13 rule.  All of these documents that we're talking about I

14 believe are being offered to prove that they were in the world

15 at the time.

16         THE COURT:  Response?

17         MR. DORSEY:  Your Honor, what they're trying to get

18 this in for is to support the testimony of their expert

19 witness.  Again, it's hearsay.  She can rely upon hearsay in

20 formulating her opinions, but that doesn't mean that that

21 hearsay can then come into Evidence.

22         THE COURT:  I -- well, I'm concerned, and I draw a

23 distinction, as well, from a complaint filed, a proof of claim

24 filed, and a press release.  I think you run into probity

25 issues, and also you run into reliability issues, which are at

1  the heart of the hearsay rules.  And I don't find that it fits

2  the exception in -- see, now I lost my place -- 803(a)(8),

3  which is a -- it's not a record report, statement, or data

4  compilation.  It's a press release.  So, I will sustain that

5  objection, and OB-26 will not be admitted.

6          MR. WEISBROD:  Your Honor, I believe we're now up to

7  29, which is the Countrywide Settlement term sheet.  The Court

8  previously took judicial notice of the existence of that

9  settlement in the hearing on the appointment of the borrower's

10  committee.  Yesterday we were not able to introduce a related

11  document, which was a <u>Wall Street Journal</u> article on which Ms.

12  Saunders had relied.  We noted at the time that the actual

13  terms of the agreement were publicly available.  To be clear,

14  we did not get this document from any confidential source.  We

15  had downloaded it from multiple attorney general's web sites.

16  It's available on the Connecticut, and I understand Iowa web

17  sites.  We are offering it to prove -- and clearly that's a

18  government record because it's documenting what the government

19  agreed to, two different governments.  And we're offering it to

20  prove the fact that governments have announced a settlement

21  with damages funds totaling $220 million.  And that's all we're

22  offering it to prove, and one can debate whether that's

23  relevant or not.  But it's plainly admissible.

24          THE COURT:  Mr. Dorsey?

25          MR. DORSEY:  Again, Your Honor, there was no

1  testimony authenticating this document.  There's nothing on the

2  face of it that indicates where it came from, and it is marked

3  as confidential.  And I have no doubt Mr. Weisbrod downloaded

4  it from some Attorney General's web site, but without evidence

5  to show that it's an authentic document, that this is the final

6  one, because it also says it's a draft, and the fact that it is

7  still full of hearsay makes it inadmissible, Your Honor.

8          MR. WEISBROD:  I would like to respond, Your Honor,

9  to a few points.  First, there's no hearsay in the document

10  because it's a contract.  So, in that sense we're talking about

11  what was stated, not the truth of any matter asserted.  So,

12  right off the bat this is not what you ordinarily talk about as

13  hearsay.  We're not -- and if there are any preambles that say

14  whereas Countrywide did this, that, or the other thing, that's

15  no the point of it and we're not offering it for that point.

16  We're offering it for the point that it is a publicly available

17  document that describes $220 million worth of damages.  And on

18  that, as an officer of the Court, I am representing that I have

19  downloaded it from the Connecticut Attorney General's web site

20  and teammates of mine have downloaded it from others.  In

21  addition, we were not able to elicit the testimony yesterday

22  that Ms. Saunders also downloaded it.  So, at that time the

23  Court said, well, hand it up if you can get it off the web

24  site, and that's what we're doing.

25          Under the circumstances, Your Honor, since it doesn't

1 even meet the definition of hearsay, and if it did it would be

2 a public record exception to it, we think it should be admitted

3 for the purpose of showing that there is a publicly available

4 settlement showing damages of $220 million based on those

5 allegations.

6     THE COURT:  All right.  I'll --

7     MR. DORSEY:  Just --

8     THE COURT:  Oh, yes.  Go ahead.

9     MR. DORSEY:  Just for the record, Your Honor, I did

10 say that -- I was mixing up my documents.  This one does not

11 say draft.  I was thinking of a different document.  This one

12 does actually say it's a final draft.

13     THE COURT:  Okay.  Very good.  I will overrule the

14 objection and admit it for the purposes set forth by counsel,

15 that the settlement exists, that these are the terms of the

16 settlement, and that will be the range of the purpose.

17     MR. WEISBROD:  I think we've now gone through all the

18 objections, haven't we?

19     THE COURT:  Exhibit 30, will you agree that only the

20 interrogatories are being admitted?

21     MR. WEISBROD:  Yes.  We are admitting -- seeking to

22 admit it only for that purpose.

23     THE COURT:  Okay.  Let me see -- make sure I got it

24 right.  Official Borrower Committee Exhibits 1, 2, 3, 4, 5, 6,

25 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,

1   27, 28, 29, 30 and 31 are admitted into Evidence.  Exhibit 12

2   is admitted under seal.  Exhibit 27 is admitted under seal.

3   Exhibit 12 -- excuse me -- Exhibit 13 and 15 are admitted in

4   the redacted form only.  And Exhibit 30 is admitted solely with

5   regard to the interrogatory responses.

6           MR. WEISBROD:  Yes.  I think Your Honor didn't

7   mention 25, as to which there was no objection.

8           THE COURT:  To the extent I did not, Exhibit 25 is

9   admitted without objection.

10          MR. WEISBROD:  Thank you, Your Honor.

11          THE COURT:  Any -- yes, Mr. Power?

12          MR. POWER:  Your Honor, the one issue we have is

13  Exhibit 25.  That decision was actually reversed.  It's not

14  usual to have published decisions by Courts as admitted into

15  Evidence, but if Your Honor is going to take that as evidence,

16  we think you should take the full case.  And we can supply the

17  Court with a copy, but since that decision was reversed by --

18          THE COURT:  All right.  Mark the reversal at your

19  convenience as -- I think it's Official Committee Exhibit 2.

20  You only had one, right?

21          MR. POWER:  That would be correct, Your Honor.

22          THE COURT:  Okay.  And the Court will admit that into

23  Evidence.

24          MR. POWER:  Thank you, Your Honor.

25          THE COURT:  And has Committee Exhibit 1 been

1  admitted?

2          MR. SCHNITZER:  No, Your Honor.  At this time we're

3  not going to move it.

4          THE COURT:  You're not going to move its admission?

5  All right.  And does the debtor have everything in it wants?

6          MR. DORSEY:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. WEISBROD:  And there's no objection to what just

9  happened.  I just wanted to clarify that the overruling that

10 was just mentioned of that was what Ms. Saunders talked about

11 that the Seventh Circuit ruled that there could not be class

12 certification through rescission.  It wasn't entirely

13 overruled.

14         THE COURT:  All right.  It's very unusual -- Mr.

15 Powers is correct.  It's very unusual to admit opinions into

16 Evidence.  So, I will admit them, but obviously they have the

17 legal effect they have, and I leave it to myself to interpret

18 that based upon argument presented by counsel.

19         MR. WEISBROD:  Yes.  We will actually not be arguing

20 that they have any legal effect.

21         THE COURT:  Okay.

22         MR. WEISBROD:  We're offering them to prove that they

23 were issued.

24         THE COURT:  Okay.

25         MR. WEISBROD:  Thank you, Your Honor.

1          THE COURT:  Any further evidence by any party in

2    interest?  All right.  Hearing none, that will close the

3    evidentiary record on confirmation of the debtors' plan of

4    liquidation.  The only remaining objection, Mr. Beach, I

5    believe, is the official borrower committee objection?

6          MR. BEACH:  That's right, Your Honor.  I do want to

7    note one thing.  We have had some e-mails back and forth.  I

8    represented yesterday that we've resolved with the lead

9    plaintiffs in the securities class action.  We had some e-mails

10   back and forth this morning regarding the exculpation provision

11   and I expect that we'll be able to resolve that issue, but it

12   appeared from the e-mails that there may still be a disconnect

13   there, so other than that I believe every objection is

14   resolved, some subject to documentation in the confirmation

15   order.

16         THE COURT:  Okay.  Is there anyone here on behalf of

17   the lead plaintiffs?  All right.  Seeing none, I'll represent

18   -- I'll accept Mr. Beach's representation.

19         MR. BEACH:  Thank you, Your Honor.

20         THE COURT:  So, I think that leaves us with argument

21   on the merits of the objection.  I don't want to -- we don't

22   need to go through the confirmation standards.  I've read the

23   brief.  I've read the declarations.  I'd like to focus on the

24   issues raised by the Official Borrowers' Committee.  I don't

25   know if it makes sense to have them sort of lay those out

1 first, or -- you're at the podium, so it looks to me like you

2 want to start, and it is your plan.

3       MR. BEACH:  Your Honor, it may make sens just to have

4 them at least lay out what their remaining issues are at this

5 point, since they have now heard the evidence, and we can walk

6 down that list and address that list.

7       THE COURT:  Are we ready to proceed?  Mr. Macauley?

8       MR. MACAULEY:  Your Honor, we had raised a number of

9 issues in our objection to confirmation.  We had added to that

10 in our reply that we submitted on the morning of the -- Monday

11 morning.  All those issues remain in play.  Also, with respect

12 to the voting, Mr. Beach made some comments Monday morning

13 about the vote, and I was going to get up and reply, and as it

14 turned out we sort of headed straight into the witnesses.  I

15 didn't get a chance to reply.  I can do that in my substantive

16 comments.  I can do that now.

17       THE COURT:  You can do it as you wish.  We'll have

18 that out there.

19       MR. MACAULEY:  All right.  Well, the debtors and the

20 creditors' committee have proclaimed that all the creditors,

21 including the borrowers, have overwhelmingly voted in favor of

22 the plan.  I think it's important there, obviously, that the

23 vast majority of borrowers, in our view, did not receive a

24 ballot or notice of the plan, and therefore did not cast votes.

25 That's the primary reason we're here.  Also, none of the

1  members of the borrowers' committee or the individuals who were

2  part of the original motion to appoint the borrowers' committee

3  had ballots counted.  One reason is that many of those

4  individuals did not receive ballots.  Indeed, when the U.S.

5  Trustee appointed the borrowers' committee, a majority of the

6  members were -- had not filed a proof of claim.

7          Prior to the disclosure statement hearing the debtors

8  had agreed to allow the claims of any borrower members who had

9  not filed claims in the amount of $1 for voting purposes.  No

10 such stipulation was ever signed up, but I think it's pretty

11 obvious, based on our position and the committee's position,

12 that those votes were not in favor of the plan.

13         Also, when you review the vote from the tally of the

14 eight borrower classes that were created prior to the

15 disclosure statement hearing, and are set forth in the voting

16 declaration, one is struck by the number of repeating names.

17 Many claimants -- many borrower -- who are listed as borrower

18 claimants filed multiple claims received -- they filed multiple

19 claims.  They received and they submitted multiple ballots.

20 So, although the voting certification shows 96 votes by

21 borrowers, there are only actually 43 borrowers who cast votes.

22 Of those 43 borrowers, 40 accepted the plan.  However, 13 of

23 them were borrowers under home equity or construction loans,

24 and as the Court knows, those loans were modified by the

25 debtors during the course of these Chapter 11 cases.  15 of

1  those votes were by small claimants relating to things like

2  escrow, application fees, late fees, overpayment, and are not

3  the type of claims that frankly we've been discussing over the

4  last three days.

5          Also, the voting certification lists two rejecting

6  ballots that would have affected the voting but were not

7  counted.  One was a claim by Herman Jones for $423,000 against

8  Corp.  That ballot was late filed according to the voting

9  certification.  A second one was a ballot by Shereen Hughes for

10 1.45 million against Holdings.  That ballot was not counted

11 because five days before the voting deadline the debtors

12 objected to Ms. Phillips' claims on substantive grounds,

13 leaving her with very little time to file a Rule 3018 motion if

14 she so desired.  So, just -- it's -- I think the

15 characterization of the overwhelming vote is somewhat illusory.

16         With respect -- so, with respect to the issues that

17 we have in play, we have the stipulated asset allocation issue,

18 the liquidation analysis, the continuation of the automatic

19 stay, which I will address ultimately, as well as, of course,

20 the notice issue and the binding effect of the plan on

21 claimants who did not receive notice, the -- what I would call

22 the conflict of interest issues between the plan trustee and

23 the exculpatory issues, as well as the EPD breach claims

24 protocol issue, and then in our reply we raised the destruction

25 of documents issue, as well.

1            THE COURT:  Okay.

2            MR. MACAULEY:  And with that, I'm happy to let Mr.

3   Beach proceed.

4            THE COURT:  All right.  So, the issues are voting,

5   asset allocation.  Does that include claim allocation?

6            MR. MACAULEY:  It's the -- it's the fair and

7   equitable -- it's whether the --

8            THE COURT:  It's flip side of the same point?

9            MR. MACAULEY:  Yes.  Whether the settlement is fair

10  and equitable.

11           THE COURT:  Liquidation analysis?

12           MR. MACAULEY:  Best interest test.

13           THE COURT:  Automatic stay continuation. The notice

14  issues, both actual and constructive.  The conflict issues

15  between the trustee -- with the trustee based on the

16  exculpatory language?  Maybe you can flesh that out for me a

17  little more.

18           MR. MACAULEY:  Sure.  It's the -- one is the

19  appointment of the plan trustee, and the structure of the

20  oversight committee, as in, you know, whether the plan trustee

21  can actually go forward and represent the interests of

22  borrowers.

23           THE COURT:  Okay.

24           MR. MACAULEY:  And then also the plan's --

25  exculpation of the plan trustee, even though that hasn't -- the

1 plan trustee hasn't actually come into place yet.

2          THE COURT:  So, forward exculpation?

3          MR. MACAULEY:  Correct.

4          THE COURT:  And the EPD and breach of warranty

5 protocol, and the destruction of documents?

6          MR. MACAULEY:  Yes.

7          THE COURT:  That's the universe?

8          MR. MACAULEY:  That's the universe.

9          THE COURT:  All right.  Mr. Beach?  Thank you, Mr.

10 Macauley.

11          MR. MACAULEY:  Thank you.

12          MR. BEACH:  For the record, Your Honor, Sean Beach

13 from Young, Conaway on behalf of the debtors.  Your Honor, the

14 first issue I'd like to address is I didn't take the comments

15 by counsel regarding voting as an objection to the plan, just

16 he thinks my characterization of the borrowers overwhelmingly

17 supporting the plan as in his view not being accurate?

18          THE COURT:  Mr. Macauley?

19          MR. BEACH:  I just wanted to get a clarification on

20 that part.

21          THE COURT:  Are you challenging the votes for

22 purposes of confirmation?

23          MR. MACAULEY:  Your Honor, we're not challenging the

24 votes for purposes of confirmation.  I think it's -- my

25 presentation was more to give the Court an assessment that, you

1  know, it's not such an overwhelming acceptance of the plan.

2          THE COURT:  Understood.  All right.

3          MR. BEACH:  Your Honor, next what I'd like to do,

4  it's not directly related to one of the objections, and I'm not

5  going to run through all the 1129 standards, but I do want to

6  make it clear to the Court that we do have a finding in the

7  confirmation order that we can cram down the few classes that

8  voted to reject the plan.  There are a few miscellaneous

9  secured classes, one secured creditor who holds the mortgage in

10  the Illinois property, and the one borrower class of unsecured

11  creditors.  So, Your Honor, I don't believe there's any

12  objection to the cram down, but I wanted to make it clear to

13  the Court that we do believe that the debtors have provided

14  sufficient evidence to show that it's appropriate to cram down

15  those classes in this case.

16          With that, Your Honor, I would propose that we deal

17  with some of the, I believe, straight legal issues first, for

18  instance, the extension of the -- or, the continuation of the

19  automatic stay.  So, unless Your Honor has any view in terms of

20  what order we should take these in --

21          THE COURT:  No, no.  Just whatever presentation

22  you've prepared is fine.  Just --

23          MR. BEACH:  Okay.  Your Honor, with respect to the

24  continuation of the automatic stay, as you probably noted from

25  the plan, the debtors are not included in the injunction.

1 There were concerns raised by parties prior to the disclosure

2 statement that they didn't want the injunction to be read as a

3 discharge injunction.  We've got a case here where we've got

4 over 16,000 claims filed, and obviously an active creditor

5 body.  The continuation of the automatic stay is critical in

6 these cases to make sure, at the very least, that we've got

7 some gate keeping mechanism in place, and the suggestion that

8 362(c) can be read as a deemed denial of the discharge

9 injunction, and thus the termination of the automatic stay is

10 an inappropriate reading of that statute in our view.  362(c)

11 states that the stay will continue until the earlier of the

12 closing of the cases, the dismissal of the cases, or when a

13 discharge is approved or denied.  As I've indicated to Your

14 Honor, we have not sought the approval or denial of a

15 discharge.  1141 is very clear that you can't get a discharge

16 in a liquidating 11 case, and so, Your Honor, I would say that,

17 you know, just on the plain meaning of the statute you can't

18 read into the statute that there's a deemed denial of the

19 discharge simply --

20         THE COURT:  The focus of continuing the automatic

21 stay is to ensure that the claims process continues to work --

22         MR. BEACH:  Absolutely, Your Honor.

23         THE COURT:  And that if someone wants to assert a

24 claim they need to come here, file a motion, assert either a

25 Fifth Amendment or excusable neglect basis, and the Court will

1  be in a position to control the claim body for purposes of --

2  for purposes of administering the plan.

3       MR. BEACH:  That's right, Your Honor.  And frankly,

4  out of all of the creditors in this case the borrowers are the

5  least affected by this because of Article 17 that we've added

6  to the plan, where for actions like rescission -- I can't

7  remember them all offhand, but there are certain agreements

8  that the debtors have already made in the plan to sufficiently

9  deal with concerns of borrowers, including in dealing with the

10 claims process what the debtors have agreed to is that we would

11 reach out to claimants prior to objecting to that claim and

12 make a reasonable settlement with them.  If we can't come to a

13 settlement we'll also advise them of the telephonic procedures

14 for claims objections in the Court.  So, with that, Your Honor,

15 I don't know that it's worth me giving you any additional

16 points on this --

17      THE COURT:  Not at all.

18      MR. BEACH:  -- but I'll certainly respond to the --

19      THE COURT:  Okay.

20      MR. BEACH:  -- committee.

21      THE COURT:  Are we going to take them seriatim, or --

22 is that what you want to do?

23      MR. BEACH:  However you'd prefer, Your Honor.

24      THE COURT:  Well, no, it's --

25      MR. BEACH:  I thought that probably made the most

1 sense.

2         THE COURT:  Okay.  We can do it -- is seriatim all

3 right?  Some of them kind of blend together, but --

4         MR. BEACH:  Yes.  I think, Your Honor, I was thinking

5 with respect to the stipulated asset allocation, EPD breach

6 protocol, and the liquidation analysis we would take those as

7 one item.  And there may be some others that bleed together a

8 little bit.  I think in the objection with respect to the

9 alleged conflicts of the plan trust and the exculpation

10 provision probably are a together item, as well.

11         THE COURT:  Mr. Weisbrod?

12         MR. WEISBROD:  We thought it would make more sense to

13 hear everything Mr. Beach had to say.  We think there's a lot

14 of bleeding among issues --

15         THE COURT:  Okay.  I -- I wasn't going to interfere,

16 but I actually agree.

17         MR. BEACH:  Okay.

18         THE COURT:  Let's go through it, and -- now, if we're

19 going to go item by item and the committee wants to chime in at

20 that time, that probably makes the most sense.  So, Mr. Power,

21 did you have anything on the automatic stay?

22         MR. POWER:  Your Honor, I'll be brief, because Mr.

23 Beach, I think, summed up pretty much what I would say, as

24 well.  I will point the Court out -- we, actually in the case

25 in this -- in Delaware currently, ResMae, was one of the first

1   sub prime cases.  And committee counsel actually maybe made a

2   mistake, people could argue, but in that case the stay wasn't

3   extended, and we ended up in a situation where there were

4   claims filed throughout the country dealing with borrowers, and

5   we had to basically try to manage that process, and it is

6   extremely difficult and extremely time consuming.  One of the

7   reasons this provision is in here is it is not designed to

8   prevent people from pursuing their rights.  It's to keep this

9   Court as the gatekeeper to control this process.  There are

10  potentially hundreds, maybe thousands of claims out there, and

11  the notion of everybody being able to pursue them across the

12  country, first of all, it would bankrupt this estate

13  potentially, and second of all, it is one of the primary

14  functions of this Court to act as that gatekeeper.  Your Honor

15  will make a decision on a case-by-case going forward, and tat's

16  the way we think it should be dealt with.  I would emphasize,

17  we've done this in other cases, as well, we are very sensitive

18  to the borrowers and the ability -- the inability to retain

19  counsel out of state and all those issues, and so the debtor

20  has included in the plan, and we actually encourage that, a

21  streamlined process to make sure that those people get adequate

22  representation.  And we do know that Your Honor would basically

23  insist on that as part of a claims resolution process, as well.

24  So, we think that provision is appropriate.

25              MR. BEACH:  Your Honor, the next item I'd like to

1  address is in connection with the alleged conflicts of the plan

2  trust, and the plan trustee, and the forward exculpation

3  provision.  Your Honor, this is a very typical liquidating plan

4  in terms of the -- the appointment of a plan trustee and a plan

5  oversight committee in many respects, and one of the main

6  features of this plan, as Your Honor is well aware, is the

7  stipulated asset allocation and all of the efficiencies that

8  brings to the estate and the ability to have one plan trustee

9  and one plan oversight committee.

10       The exculpation provision simply sets a standard of

11  liability with respect to the plan trustee and the plan

12  oversight committee, and, Your Honor, I would submit we have

13  difficulty finding anyone to take those jobs if we didn't have

14  some standard of liability that was set for the plan trustee

15  and the plan oversight committee.  And so, I think in terms of

16  the exculpation it's completely consistent with the Third

17  Circuit's decision in PWS and appropriate under the

18  circumstances in this case.  Setting a standard of liability

19  doesn't vitiate fiduciary duties of a plan trustee and the plan

20  oversight committee.  The plan oversight committee is going to

21  be subject to those duties.  In fact, the plan specifically

22  says that the plan oversight committee is subject to the same

23  fiduciary duties as the committee is during these cases.  So,

24  Your Honor, I would submit that -- I think the suggestion of

25  the Official Committee of Borrowers is that somehow they would

1  not comply with their duties of loyalty in particular, and,

2  Your Honor, that is a -- I'll just point out in the exculpation

3  provision we've specifically referenced the duty of loyalty, as

4  well as willful misconduct, gross negligence.  I believe those

5  are the -- and fraud, Your Honor.  So, those are already carved

6  out of the exculpation provision.  And with that, Your Honor,

7  the plan oversight committee is going to be subject to those

8  duties.

9          Now, we do have a situation in this case where there

10 were two committees appointed.  But we have made accommodations

11 under the plan to deal with the borrower committee concerns and

12 the ability for borrowers to be adequately represented in this

13 case.  There's no -- there can be no suggestion that the plan

14 oversight committee is not going to be able to comply with

15 those obligations post effective date.  So, Your Honor, I would

16 submit that there are no conflicts in connection with the plan

17 trustee and the plan oversight committee.  The exculpation

18 provision is narrow.  It's in line with PWS.  And, in fact,

19 additionally adds the carve out of the breach of the duty of

20 loyalty.  And the plan specifically indicates that the plan

21 oversight committee is under the same fiduciary duties as the

22 committee is in these cases.

23          THE COURT:  Mr. Power?

24          MR. POWER:  Your Honor, Mark Power from Hahn &

25 Hessen, counsel for the committee.  Just to point out a couple

1 further things.  I mean, Your Honor has confirmed and reviewed

2 in this Court multiple plan liquidation agreements, and

3 virtually every one has a plan advisory committee because the

4 creditors who have a monetary stake in the results of the

5 trustee's work are the ones who should be making decisions and

6 recommendations about when to settle things, when it's

7 appropriate to spend a dollar to try to get more dollars, when

8 you should throw in the cards because it's not worth the

9 attempt to litigate the issue.  It's the creditors' money at

10 stake, and those creditors who are acting in a volunteer

11 capacity are typically the largest creditors in the case, and

12 they are fiduciaries for all creditors, including borrowers.

13 And Your Honor will note, and we'll argue about it in a little

14 bit, this plan doesn't distinguish between a borrower and any

15 other creditor.  Borrowers are treated the exact same way as

16 every other creditor in the case.  There's no differentiating.

17 They share pro rata.  Everything the committee does and the

18 trustee does will benefit borrowers with allowed claims just as

19 much as anybody else.  The notion, the theory is that we are

20 afraid that people will not act rationally, that people will

21 not act in the best interests and consistent with their

22 fiduciary duties, so please find that in advance.  And, Your

23 Honor, we submit this provision, which simply permits --

24 basically carves out anything that's egregious, willful

25 misconduct, breach of this loyalty, fraud, or gross negligence,

1  which is very standard, Your Honor has approved retention of

2  professionals in this case with the same carve out

3  requirements.  Everyone but the lawyers basically has that same

4  indemnity right against the estate except for the traditional

5  carve outs that the U.S. Trustee has worked out.  This is

6  consistent with that line of doctrine and consistent with this

7  Court's prior acts.

8         The way the plan works is if there is a conflict that

9  arises either because a borrower thinks the trustee has not

10  acted in the best interests of the borrower, or there is a

11  conflict between what the trustee wants to do and the plan

12  wants to do, this Court is here to hear those issues and here

13  to resolve those issues.  The borrower -- the trustee can

14  resign, the trustee can seek relief from this Court.  This

15  Court is always here to make sure that those duties are

16  properly met.  And the notion that we should anticipate the

17  professionals who basically are hired to act as fiduciaries

18  should somehow breach their duty of loyalty and deal with it in

19  advance I think is inappropriate.  There is nothing unusual in

20  this plan.  It is typical in virtually every liquidating case

21  Your Honor sees, and every other Judge in this Court sees, and

22  we think this is inappropriate to approve.

23         THE COURT:  Okay.  Thank you.  Mr. Beach?

24         MR. BEACH:  Your Honor, the next item I'd like to

25  tackle is the destruction of documents.  And I have to admit

1  I'm not fully sure what their issue is with that.  But if their

2  issue is that they want to have the three destruction orders

3  that Your Honor heard extensive testimony on when we had trials

4  earlier on them in the case, then, Your Honor, I would say it's

5  completely inappropriate at this time to revisit those orders.

6       THE COURT:  Is there anything in this plan that goes

7  beyond those previous orders?

8       MR. BEACH:  No, Your Honor.  The document destruction

9  retention provision provides that those orders stay in place as

10 well as other orders of the Court.  The other orders of the

11 Court simply relate to sale orders and other orders, or

12 settlement stipulations where the debtors are required to hand

13 over documents in connection with those prior orders of the

14 Court.  Otherwise, the debtors are maintaining their electronic

15 files, the SEC files, and other documents that were required to

16 be preserved in those orders, as Your Honor will remember.

17      THE COURT:  Yes.  Is the paper destruction process at

18 the Melville facility/transfer to other facilities complete, or

19 on-going?

20      MR. BEACH:  My understanding is that it is on-going.

21 I believe it's substantially complete, but that it's on-going.

22 It has taken longer than expected, but the debtor is being very

23 careful about making sure that we comply with the order, and

24 separating out the documents and returning documents as

25 required.  We also have an issue with certain D.B. documents in

1 that they filed a notice indicating that they wanted the return

2 of that.  It wasn't -- it didn't comply with the order.  We've

3 separated those documents out, but we can't get a commitment

4 either way on that.  So, there are issues like that that we are

5 still addressing.

6          THE COURT:  That's the D.B., Deutsche Bank?

7          MR. BEACH:  Yes.

8          THE COURT:  All right.

9          MR. BEACH:  D.B.N.T, I believe.

10          THE COURT:  Mr. Power, anything on destruction of

11 documents?

12          MR. POWER:  No, Your Honor.  I did confirm that I

13 believe the plan -- this issue is not affected by the plan

14 whatsoever.  And it's one of the -- the trustee clearly

15 understands that this is a big issue, huge expense, and he has

16 to deal with it.  But right now there is no authorization to do

17 anything beyond what this Court has already authorized.

18          THE COURT:  Okay.

19          MR. POWER:  Your Honor, there is one other point.

20 The plan has a mechanism in Article 17 which also provides

21 streamlined procedures for borrowers to get copies of their

22 files, which I should mention in connection with this, there is

23 a provision specifically, because one of the issues the

24 borrowers' committee raised was whether -- you know, how can we

25 streamline the process to make it easier for borrowers to get

1 their files if they needed it, and if they had a problem with

2 the servicer in getting those files.  So, Article 17 does have

3 a mechanism to streamline that process and make it less -- you

4 know, easier for the borrower to do that.  The ombudsman that's

5 in there, it is one of the tasks specifically to facilitate

6 that process and have access to the electronic records.

7          THE COURT:  Okay.

8          MR. BEACH:  With that, Your Honor, I'm going to cede

9 the podium to Mr. Jackson to address the stipulated asset

10 allocation, the EPD breach protocol, and the liquidation

11 analysis.  I think it makes sense to save the notice issue as

12 the final matter, and I'll be addressing that at the end.

13          THE COURT:  Okay.

14          MR. JACKSON:  Your Honor, for the record, Patrick

15 Jackson for the debtors.  Now, this -- these three issues I'm

16 going to address are kind of mixed issues of fact and law, and

17 I think it's worthwhile to lay out the evidentiary standards to

18 begin with, as we have to meet a preponderance of the evidence.

19 I would point out that in the borrowers' committee's case the

20 evidence that was presented was focused solely on the issue of

21 notice, so really all the evidence of record before you is the

22 debtor's evidence, and I suppose whatever inroads borrowers'

23 committee counsel may have made during cross examination.  So,

24 I would submit that, you know, through all three of these

25 issues what we're really looking at is whether the debtors have

1  made their prima facie case.  And with that I just wanted to

2  lay that out there so the Court keeps that in mind.  And what

3  I'd like to do, and stipulate asset allocation, is just

4  summarize the record, as was laid out to the Court, that I

5  believe satisfies the debtor's prima facie case, and then I'd

6  like to, you know, reserve the ability to respond to the

7  specific objections that are raised.

8          THE COURT:  Okay.

9          MR. JACKSON:  The stipulated asset allocation, as the

10  testimony revealed, and as the disclosure statement states, and

11  I think as is obvious from it, is a 9019 settlement embodied in

12  the plan.  It's a settlement between the estates of --

13  comprehensive settlement of inter-debtor issues, inter-company

14  balances, potential conflicts of interest that may arise in the

15  future.  The standard for approval of the settlement, of

16  course, is that it must be fair and equitable under Bankruptcy

17  Rule 9019.  To determine the fairness and equitableness there

18  are the four factors that are familiar to the Court,

19  probability of success in litigation, difficulties in

20  collection on claims, complexity of litigation and the expense

21  and delay attending it, and in the paramount interest of

22  creditors.

23          Now, turning to those, I think really most of the

24  action in this case is going to be under the first, the

25  probability of success in litigation, at least as I understand

1  the objections that have been raised.  And on this first

2  factor, again, this Court is familiar, the purpose is not to

3  decide all of the issues of law that are presented that could

4  possibly come up in the absence of a settlement, but it's

5  merely to canvas the various issues and to assure that the

6  proposed resolution of these issues is somewhere above the

7  lowest point of reasonableness from the perspective of the

8  debtors entering into the settlement.

9           Now, to canvas the issues as I see them that are

10 wrapped up in the stipulation asset allocation, we have had

11 testimony about this from both Mr. Fernandez and Ms. Mikelaus

12 (phonetic).  It's -- and these issues are also, it should be

13 noted, laid out in the disclosure statement in largely the

14 order that I'm going to be presenting them, 66 to 68 of the

15 disclosure statement that was approved by the Court as

16 containing adequate information.

17          The first is the issue of inter-company balances.

18 There were books and records between the companies.  They used

19 a centralized cash management system, so they recorded a

20 variety of inter-company transfers, even though money was going

21 out of AHM Corp. they reflected it on their books.  There were

22 pre-petition booked amounts that in the course of settling

23 inter-company claims would have to be looked at and assigned

24 some sort of value.  The way that the debtors dealt with this

25 in the stipulated asset allocation, as Mr. Fernandez testified,

1  was the booked amounts were essentially allowed at face value

2  as claims against various debtors, and then there were

3  adjustments that were made, largely due to the input of BDO on

4  the creditors' committee side.  For unallocated corporate

5  overhead, some expenses that H.M. Corp had historically been

6  bearing that would have been appropriately allocated to the

7  various entities, and here was also a particular issue relating

8  to Home Gate Settlement Services that you heard testimony

9  about, it was an inter-company pricing issue where there was a

10  pricing adjustment that was made after the fact to adjust the

11  inter-company prices up to reflect what a market transaction

12  would have been had the companies been dealing with each other

13  at arm's length.  Mr. Fernandez testified about those.

14          The second issue was the allocation of the post-

15  petition expenses of running the case.  The debtors had used

16  the cash management system post-petition pursuant to the cash

17  management order entered after the first day hearing, and at

18  some point are going to, whether we do it now, in the plan,

19  which we propose, or at some future date, are going to need to

20  true up because AHM Corp. largely has been, as it had in the

21  past, paying the expenses of operating the case.  And we're

22  going to need to figure -- it's been overpaying to the extent

23  it's been carrying the water for all of the estates.  So,

24  there's a mechanism built in there, and what we did, as Mr.

25  Fernandez testified, was we attempted to assign the direct

1  costs of administration for particular assets and particular

2  transactions to the entity that it would be appropriate to

3  assign them to based on who owned the asset and such.  We also

4  then took non-assignable costs.  Mr. Fernandez testified this

5  included the cost of retaining Zolfo Cooper, for example.  And

6  they assigned these costs to the various debtors using a

7  mechanism that was tied primarily to unencumbered asset value.

8  And this is unencumbered non-litigation asset value, as I'm

9  sure we'll discuss later.  85 percent of that number relates to

10  unencumbered asset value, ten percent to encumbered asset

11  value, and then five percent to the total amount of estimated

12  unsecured claims.  And the reasoning behind that, again, as Mr.

13  Fernandez testified, was that the purpose of the cases overall

14  was to preserve unencumbered asset value for the distribution

15  to general unsecured creditors, so it made sense, then, that

16  the general costs of administering these bankruptcy cases would

17  be allocated on a basis that weighted that very heavily.

18          Another issue that's embodied in this settlement, the

19  ownership of shared assets.  And there was one in particular

20  Mr. Fernandez testified about, it was the B of A construction

21  loan compromise.  Now, these were loans where essentially B of

22  A had a buyer.  The debtors didn't think that the buyer's price

23  that was being offered was the best way to realize value, so

24  they essentially amended the debt facility, which they were all

25  jointly and severally liable under.  They put estate money at

1  risk, all estate money.  They essentially purchased the loans

2  free and clear of B of A's liens, and then they proceeded to

3  realize value on these loans by working them out with the

4  borrowers and facilitating refinancing.  Now, the proceeds of

5  that endeavor, for example, were allocated among the various

6  estates using the estimated claims of each estate.  All estates

7  put the money in, all estates put that money at risk, they

8  should -- for the benefit of unsecured creditors.  They're

9  going to get it back in proportion to their unsecured claims.

10        There's another issue, the allocation of costs going

11 forward.  Even if we were able to deal with the costs of

12 administering the case up until this point there's still the

13 issue of what happens post-effective date, which estate is

14 going to bear the freight for the plan trust?  Now, there the

15 compromise that was reached was to allocate the expenses of

16 operating the trust in proportion to the unencumbered value

17 that was going to be contributed to the trust by the various

18 estates.  And I think, you know, these are all the issues that

19 had a monetary value assigned to them in the settlement.  As it

20 is a comprehensive settlement of inter-company issues there are

21 also, you know, inter-company causes of action.  For example,

22 to the extent there were inter-company avoidance actions they

23 would be subsumed in the settlement but they were not assigned

24 an economic value for purposes of the settlement.  And so, I'm

25 just trying to illustrate, there was quite a bit wrapped up in

1 here, and the goal was to be able to, you know, go into the

2 plan process as separate entities jointly administered, to come

3 out of the plan process a non-substantively consolidated estate

4 because we did not determine that was appropriate to go that

5 route in this case, but to nonetheless be able to build in the

6 efficiencies of a unitary plan trust that would be freed of any

7 of these inter-company issues.  And we thought doing it through

8 the plan made sense for the sake of disclosure, participation

9 by creditors in the process, and what we've presented, I think,

10 as a fairly comprehensive settlement.

11        And I guess turning to the second 9019 factor, the

12 difficulties in collecting, I think this one -- I don't think

13 there's a dispute on this one, but I just wanted to tag the

14 base, essentially.  To the extent inter-company claims were to

15 be resolved in some other fashion, each of the debtors is

16 bankrupt.  Whether it's going to be post-confirmation of a plan

17 or post-conversion to a Chapter 7, at some point in the future

18 if the estates were going to duke it out on their own, I think

19 they would have some issues with resolving some of these

20 things.  I don't think there's a reasonable dispute as to that

21 there would be difficulties in them collecting on their claims.

22        The third factor, complexity of litigation expense

23 and delay.  Again, just to summarize Mr. Fernandez' testimony

24 on this point, there was a centralized cash management system

25 utilized pre and post-petition.  There was an incredible volume

of transaction pre-petition, Mr. Fernandez testified over a

million booked inter-company transactions in the 18 months

leading up to the bankruptcy.  He testified, and I believe Ms.

Mikelaus testified that in consultation, the debtors in

consultation with the unsecured creditors' committee, made a

determination that based on the volume of pre-petition

transactions, if you were to engage in a line item by line item

analysis, it would be prohibitively expensive and it would be

of dubious value.  Pursuant to the cash management order, as I

mentioned, the debtors continued to utilize the centralized

cash management system post-petition.  This resulted in AHM

Corp. making payments on behalf of all of the estates.  There's

a necessity at some point in some mechanism to true that up.

Mr. Fernandez testified that in the absence of a comprehensive

true up in the form of a stipulated asset allocation in the

plan, a substantial portion of the -- of all estate's assets

could be tied up and eroded in dealing with inter-company

disputes.

He also pointed out, practically speaking, that the

plan wouldn't work.  Now, in -- the stipulated asset allocation

is essentially the engine of the plan, and I don't know that he

went into this detail here, but if you look at the summary of

the analysis, which I believe was Debtors' Exhibit 2, a lot of

what's going on here, I'm just referring generally now, a lot

of what's going on here is you have estates that have liquid

1  assets in cash.  You have an estate -- holdings that has an

2  extremely illiquid asset, the bank, as its primary asset.

3  You've got AHM Corp., which currently has all the

4  administrative expenses sitting at it.  So, you have asset

5  value there among the various estates.  You also have liability

6  at certain estates, but you have a requirement to go effective

7  that you've got to pony up the cash.  You've got to have the

8  cash for the admin expenses.  Well, to some extent the

9  stipulated asset allocation helps.  The entities that have the

10  cash are essentially providing the cash on behalf of all the

11  entities, the entities that have the illiquid assets are

12  ultimately going to be contributing those assets through this

13  allocation mechanism to the plan trust.  But this mechanism

14  will allow this plan to go effective.  If we had -- otherwise,

15  if Holdings were go to it alone, Holdings would quite possibly

16  have to liquidate the bank prior to being able to go effective,

17  for example.  And I think that's what Mr. Fernandez meant when

18  he said that in the absence of this settlement the plan would

19  be very difficult to confirm, and for particular debtors they

20  may not be able to confirm, or at any rate, if they had enough

21  cash to confirm, to go effective, they may not have anything

22  available to pursue litigation post-effective date.  And all

23  that is wrapped up in here.

24          And I think -- I don't think it's disputable that

25  there would be expenses associated with this deal falling

1  apart, and, you know, to the extent that that is something

2  that's at issue, I would like to respond to it.  But I don't

3  think -- I think it's fairly clear that this would, as far as

4  the litigation cost and delay factor of the 9019 standard, I

5  think it's met.

6        Now, I guess the fourth factor, paramount interest of

7  creditors, now, this one I mentioned the first factor would be

8  the main event.  I think this will be a close second here.  As

9  I described, the allocation is the engine of the plan.  The

10  plan doesn't work without it.  The plan and the allocation were

11  negotiated at arm's length, and there's evidence of this.  Mr.

12  Fernandez, Ms. Mikelaus' testimony, at arm's length between the

13  debtors and the duly appointed representative of creditors, the

14  creditors' committee.  Over the course of several months plan

15  -- the process began in early 2008.  There were at least ten

16  iterations of the stipulated asset allocation that went back

17  and forth.  There have been several iterations of the plan

18  since then.  We originally filed the plan on August 15th of

19  '08, and here we are today.

20        Mr. Fernandez and Ms. Mikelaus testified to the

21  parties' collaboration, some of the back and forth, some of the

22  suggestions that BDO provided to the allocation mechanism.  And

23  the disclosure statement ultimately laid all of this out.  It

24  was -- again, it was approved by the Court as containing

25  adequate information.  There were 12 pages -- ultimately there

1 ended up being 12 pages.  We kept adding more and more

2 information about this allocation in particular.  Discussion of

3 the origin and mechanics of this settlement.  The disclosure

4 statement, we cite these provisions in our papers, the

5 disclosure statement also contained some fairly candid

6 disclosures that said that this is a very central part of the

7 plan, but it relies on a number of assumptions.  One of the

8 assumptions is asset value.  It's value driven.  We disclosed

9 that.  We said that it may turn out that if the projections are

10 not in hindsight in line with reality, some estates could

11 benefit, some estates could lose.  We said that several places

12 in the disclosure statement, as it would be appropriate to say.

13         As in New Century, you know, here the voting results

14 have come in, and as we said in our papers, you know, 22 of 23

15 unsecured classes -- let's put the borrower classes to the one

16 side, you know, for a moment, in light of Mr. Macauley's

17 comments.  That's all unsecured -- all non-borrower unsecured

18 classes have voted in favor of this plan, and they've accepted

19 it by a margin of 99.7 percent or more in amount, and 93.25

20 percent more in number.  Now, I think the borrowers' classes,

21 the acceptance by the borrowers' classes, it is what it is.  I

22 understand the central point of the borrowers' committee's

23 argument is that not all borrowers in the universe were

24 provided with ballots, or, you know, bar date notice, but the

25 ones who were, you know, the population of folks who were

1  around, and this does include several people with very small

2  claims relating to servicing, I don't think that makes them any

3  less of a borrower just because they don't have a payment

4  action ARM, or they're not asserting a payment action ARM TILA

5  claim, you know, the folks who were borrowers who had proofs of

6  claim in by the bar date who had not been subject to the claim

7  objection process, and therefore received a ballot in

8  accordance with the disclosure statement order solicitation

9  procedures, voted overwhelmingly in favor of the plan.  Now, it

10  is a small population of people, but it is what it is.

11          And I think it's more telling that the unsecured

12  creditors have voted in favor of the plan, because I think what

13  you're going to hear from the borrowers' committee is -- the

14  attacks that they're going to lodge against the stipulated

15  asset allocation have to do primarily with it unfairly

16  disadvantaging AHM Corp.  And we heard testimony that the most

17  common creditor -- the most common debtor that members of the

18  creditors' committee have claims against is Corp.  The -- Corp.

19  got the most votes, had the most number of creditors who

20  actually participated in the voting process.  I think this is

21  all very telling, and I think largely what you're going to be

22  hearing from the borrowers' committee on the stipulated asset

23  allocation, the liquidation analysis, and the EPD breach

24  protocol are creditor issues.  These aren't the borrower issues

25  that I believe were the primary motivation for creating the

1 borrowers' committee.  These are creditor issues that the
2 creditors' committee has been working on, you know -- working
3 very closely with the debtors on.
4        THE COURT:  All right.  Let's move on to liquidation
5 analysis.
6        MR. JACKSON:  Okay.  Liquidation analysis, Your
7 Honor, I think this is very simple.  We have the liquidation
8 analysis attached to the disclosure statement.  That's in
9 Evidence.  We had Mr. Fernandez and Ms. Mikelaus testify about
10 the various assumptions that went into it.  And in the absence
11 of rebuttal testimony I think that stands.  And, you know, I
12 would reserve, you know, once we hear -- I think what the
13 issues are going to be there is obviously the valuation of
14 litigation assets.  Ms. Mikelaus testified that it's perfectly
15 in accordance with accounting standards that you wouldn't value
16 a litigation asset.  And we have our reasons, and we've
17 explained our reasons for not valuing those, and I think
18 they're valid.  And I think the other issue that may come up is
19 a question about the expenses associated with a Chapter 7.  And
20 again, these were -- you know, Mr. Fernandez testified of the
21 basis of assuming that there would be additional inter-company
22 dispute costs associated with a seven.  They talked about
23 impairment in the value of the bank as a result of a seven.
24 And there's no -- and additionally, the issue of the EPD breach
25 protocol and the efficiency built in there.  That's not

1  reflected in the liquidation analysis attached to the

2  disclosure statement, but would be an obvious efficiency of the

3  11 process over the seven process.  And in the absence of

4  evidence as to why -- what our witnesses have said, is of zero

5  -- is either wrong, or in the absence of cross examination that

6  establishes it's of zero probative value, I think we've met our

7  burden there, and I would just respond, you know, to specific

8  issues as they may arise.

9          On the EPD breach protocol, Your Honor, again, this

10  is a 9019 standard certainly vis-a-vis the borrowers'

11  committee, since they're attacking essentially the merits, the

12  probability of success.  As I understand all of their

13  objections, it's that various elements of the protocol -- you

14  know, we could have thought of something, or we didn't

15  adequately think of something, something could have come out

16  another way.  We testified to the reason -- you know, we have

17  testimony from Mr. Pasternak (phonetic) and Mr. Fernandez of

18  the structure.  They walked you through it.  I'm not going to

19  walk Your Honor through it unless you'd like to, but the

20  various assumptions that went into the protocol were

21  principled.  They were based on data to the extent the data was

22  available.  To the extent data was not available they were made

23  by reference to industry standard estimates of the various

24  variables, such as the Bloomberg Index, for example, for

25  determining loss frequency.  We referenced that.  We didn't

1  adopt it, we referenced it, and I think that was appropriate.

2          So, I think the probability of success in litigation,

3  I mean, what would happen without the protocol is we'd have

4  claim by claim litigation.  Here are the issues that would

5  arise.  You know, first, is there a valid repurchase

6  obligation?  Well, it's easy -- it's pretty easy with EPD's --

7  our protocol reflects that you just need to look at the payment

8  histories.  What about breach of warranty?  Well, it's more

9  subjective.  It would require additional diligence to figure

10 out exactly which of the four pages of reps and warranties were

11 breached.  Our protocol, therefore, utilizes assumptions as to

12 a pool-wide incidence that a valid breach for a purchase

13 obligation would arise.  There's testimony supporting that.  I

14 think the assumption is reasonable under the circumstances.

15 It's been used in -- at least in -- well, two other cases that

16 have been approved, New Century and Delta.

17         Another issue would be the measure of damages, and

18 this is really the primary issue that the protocol tackles.

19 How much are you damaged if the debtor fails to repurchase your

20 loan?  Most of the claimants think it's the face repurchase

21 amount.  We don't think so.  We think you have to take into

22 account the value of the loan.  But if you do that what value

23 do you use?  Market value?  Cash flow value?  When do you

24 determine the value?  Petition date?  The liquidation date?

25 some other date?  These are all wrapped in there, Your Honor.

1 The compromise ended up, we did a hybrid.  We allowed them to

2 submit actual, on the A.P. side, I would just submit, actual

3 loss information up until a cutoff date of July 31st, '08,

4 which was the end of the month preceding the initial plan.  And

5 then, after that, for loans that they had held for over a year

6 after the petition date we utilized some assumptions as to what

7 their loss rate would be.  I think it's reasonable under the

8 circumstances.  The only alternative is to wait however many

9 years before they actually liquidate every one of those loans

10 and then fight about whether we should use that or the petition

11 date value.

12        I think this kind of bleeds into the complexity of

13 the litigation and expense.  I think -- you know, the couple of

14 valuation trials that have been tee'd up and may be pending

15 before Your Honor, we had a valuation issue of B of A on a stay

16 relief motion early in the case.  It was very complex, very

17 expensive, and we have essentially a valuation issue coming up

18 with Callion (phonetic) on the valuation of loans and the

19 timing of damages.  These are matters of first impression.  It

20 would not be easy to go this in absence of the protocol.

21        And I think the paramount interest to creditors here,

22 again, I point to the voting results.  I don't understand how

23 the fact that a borrower wasn't at the table negotiating the

24 protocol taints the protocol in any way.  I think the creditors

25 who were primarily affected by the protocol would be the

1  creditors of the entities against which P.D. claims would be

2  asserted, and those are essentially Acceptance Corp. and

3  Servicing.  Creditors in the general unsecured classes of those

4  debtors voted overwhelming in, you know, accepting the plan.

5  This is something that a lot of the creditors are familiar

6  with.  It's a lot of the same faces from New Century, as Mr.

7  Power can likely attest to.  A lot of the same, you know,

8  actors from Delta.  They were familiar with this and they

9  understood that it made sense.  And ultimately there was a

10 process -- there was a negotiating process, and it just

11 concluded yesterday when we wrapped up JPM and Morgan Stanley.

12 So, I think it's in everybody's interest, everybody sees that.

13 And again, I'd just like to respond to the specific issues

14 raised by borrowers' committee counsel on that.  But I think

15 we've met our burden, our prima facie burden on stipulate asset

16 allocation, liquidation analysis, and EPD breach protocol.

17            THE COURT:  Okay.

18            MR. POWER:  Your Honor, I'll definitely limit my

19 comments and try to just highlight a few things, rely on debtor

20 counsel's arguments.  I'm not going to go through the Martin

21 standards.  I would point out a couple of things on the

22 standards, just in addition with the evidence.  The Exide

23 decision by Judge Carey in this case cites to the Texaco

24 decision out of New York, which adds some additional criteria

25 Your Honor should look at to decide whether settlements and

1  compromises are appropriate.  And those are clearly met in this

2  case.  One of them is whether the parties negotiating the

3  settlement are adequately represented and whether there is an

4  arm's length negotiation, and Ms. McCarra (phonetic) has

5  testified two things, Your Honor, which were basically not

6  refuted.  One is that the majority of creditors on the

7  committee are creditors of Corp., so they stand side by side,

8  shoulder to shoulder with the borrowers, and they are in a

9  position where they are negotiating for the best interests of

10  Corp. creditors.

11         In addition to that, two of the six members are EPD

12  breach claimants.  The other four are not.  But the committee

13  worked on and worked on a protocol and four out of the six

14  creditors approved the protocol even though, in fact, they were

15  actually standing with the borrowers and not the beneficiaries

16  of those protocol.  So, the committee, if you look at New

17  Century and Judge Carey's decision there, Judge Carey pointed

18  out that the committee was a diverse group, represented a broad

19  range of creditors in the case, and they basically showed no

20  conflict.  They were trying to do what's in the best interests

21  of all creditors.  I submit, Your Honor, that the evidence here

22  says the exact same thing.  The committee is a diverse group

23  with creditors against multiple debtors, but primarily a

24  majority are corporate creditors who the borrowers' committee

25  is arguing are disenfranchised or harmed by this case, and the

1 committee members, most of who are trying to benefit Corp.

2 creditors more than others, basically support the plan because

3 they understand how complex and how intricate this whole issue

4 is.  That -- so, I think the Texaco standards are met.

5      Let me touch briefly on the voting, Your Honor.  I

6 guess -- I look at evidence, not counsel's argument.  The only

7 evidence that's before Your Honor is a certification which

8 indicates what the voting is.  And the voting is clear it's

9 overwhelming.  And what counsel thinks is the reasons why

10 people didn't vote, or whatever, isn't in Evidence, and

11 basically shouldn't be considered by this Court.  But I think

12 more important than that is just look at the numbers.  If Your

13 Honor just looks at the certification and just takes a glance

14 at the creditors of every major debtor, the dollar numbers are

15 overwhelming.  Take Corp., which is the real issue here, and

16 somewhat Acceptance.  I Corp., the unsecured creditors voted

17 approximately $523 million in favor of the plan, roughly 97

18 percent.  B of A also voted $36 million.  In addition to that,

19 the borrower claims, we had approximately $1.2 million of

20 creditors vote in favor of the plan.  So, of the total

21 creditors 30 voted in favor, two holding approximately $2,000

22 in claims voted against.

23      If Your Honor looks at Acceptance Corp., it's a very

24 similar statistic, and overwhelming.  Hundreds of millions of

25 dollars of creditors actually voted in favor of this plan,

1  including the majority of borrowers who actually voted,

2  including a million dollars of claims by borrowers.

3           Now, I think this case has to be looked at

4  practically.  I mean, Your Honor, this is -- we're distributing

5  pennies here.  I mean, we have enormous claims, over a billion

6  dollars in claims.  The testimony was approximately $1.6

7  billion, $1.8 billion dollars of claims.  We have tens of

8  millions of dollars, we hope, to distribute to creditors.  And

9  yet we have creditor support of a plan that is basically

10 overwhelmingly in favor of it despite that small return.  And

11 the reason is because reality is where we are we are.  This

12 plan is designed to basically get through this process,

13 eliminate a lot of the Chapter 11 expenses that are on-going,

14 and get to the next step.  And creditors recognize that,

15 including the borrowers, as far as I'm concerned, because

16 they're the ones who voted in favor of the plan.  They

17 recognized the benefits of trying to move this case forward,

18 and that's why we're here today.  And so, as far as the

19 evidence is concerned, Your Honor, there's no choice but for

20 Your Honor to conclude that the creditors overwhelmingly

21 support every component of the plan.

22          Stipulated asset allocation, Your Honor, I want to

23 point to a couple of things.  It is -- Your Honor alluded to

24 something.  It's a flip side of a coin here.  And Ms. Mikelaus

25 and Mr. Fernandez, both who testified about their experience,

1  which was tremendous, Mr. Fernandez had worked on several major

2  cases, I think four or five, and over a decade of experience.

3  Ms. Mikelaus had basically been doing this since she graduated.

4  She had a degree in accounting and a Master's in business

5  administration.  They both testified that this was a very

6  similar process that they've used in many cases.  They both

7  testified that this was one way of doing it.  There were other

8  ways to do it.  And it is a compromise to basically decide

9  what's the best way to work?

10        Ms. Mikelaus pointed out to Your Honor that, you

11  know, if you look at the administrative debt, administrative

12  claims paid by these debtors, and mostly Corp., it's close to

13  $200 million.  Just on Exhibit 1, it shows the approximate

14  amount, including the future debt.  So, the professionals in

15  this case, and the committee and the debtor are in a decision

16  where they have to figure out -- on debtor primarily paid most

17  of that $200 million, and you have to figure out, all right,

18  what's a fair mechanism for allocating that expense?  Now, the

19  borrowers' committee will argue, well, you didn't include

20  litigation, and if you had, Corp.'s numbers percentages would

21  have gone up.  But as Ms. Mikelaus testified, the litigation

22  was hypothetical and very hard to value.  But what I want Your

23  Honor to come away from this is you understand, based on Mr.

24  Fernandez and Ms. Mikelaus's testimony is, if you increase

25  hypothetical values for litigation, and increase those estates'

1 share of expenses, so you're trading hypothetical potential

2 recoveries of unknown amounts that you don't have the funds to

3 pursue, and you're putting in a plug number for that value,

4 result in Corp. now having to pay a greater share of dollars

5 out of expenses.

6         And the witnesses -- both witnesses' testimony was

7 that was something they weren't comfortable doing.  They were

8 not comfortable basically making guesses based on the

9 information they had as to what the hypothetical value of this

10 litigation would be.  And they described to Your Honor how

11 complex that would be, 60,000 transfers in the 90 days, 20

12 billion.  Ms. Mikelaus and Mr. Fernandez both testified that

13 most of those transfers were pass throughs.  Most of them

14 related to the funding of loans from the warehouse lender to

15 the home borrower and back up to pay off the warehouse line.  A

16 lot of them related to P&I payments, and tax payments, and

17 insurance payments that pass through the system.  And, you

18 know, as Your Honor noticed, those are not recoverable

19 preference claims that we can bring.

20         Mr. Fernandez testified that a lot of the margin

21 payments that were paid to this case, which would be -- we

22 would love to be able to go after.  It  would frankly make the

23 committee -- any committee lawyer happy to go after hundreds of

24 millions of dollars of payments to secured creditors.  The way

25 they funded those was to liquidate residual interest that were

1  held in investment.  Investment had those assets, the parent

2  company.  Liquidated those.  Monies went through, as Ms.

3  Mikelaus testified, through the corporate accounts, and were

4  paid out to those lenders, and hundreds of millions of dollars.

5  Those are claims that the estates are preserving.

6        But Your Honor has already found in this case, in the

7  Lehman decision, that a lot of the transactions to warehouse

8  lenders were repo transactions, under valid repurchase

9  agreements.  And as Your Honor knows, the Bankruptcy Code has

10  safe harbor provisions that were instituted within less than a

11  year of this case being filed, and a lot of the transfers in

12  connection with either securities contracts or repurchase

13  agreements are safe harbored.  So, when you're trying to

14  evaluate claims you have to keep into account what the

15  potential defenses are and whether those claims are valid.  And

16  the two witnesses, and the only evidence that Your Honor heard

17  was those two seasoned professionals did not feel comfortable

18  in evaluating and coming up with hypothetical estimates of what

19  litigation might result in to include them in this model.

20        And as Ms. Mikelaus said, you know, she was not

21  directed to come up with any result.  She was not directed by

22  anybody to try to make this an end result.  She was basically

23  trying to come up with what she thought was the fairest result

24  for all creditors.  And initially, when she got the debtors'

25  initial proposal, if you recall her testimony, she said they

1  originally proposed that Corp. would pay all the admin

2  expenses, but we didn't think that was right, and we made them

3  reallocate those expenses into a different model, and that's

4  the genesis of this stipulated asset allocation.  So, I think,

5  Your Honor, the testimony, when you look at the actual

6  evidence, that both professionals, the only ones who testified

7  basically in their professional view, and based on accounting

8  standards and FASB 5, did not feel comfortable coming up with

9  hypothetical valuations, and that's why they felt the

10  stipulated asset allocation was appropriate.

11       Your Honor, the EPD breach protocol, this one I

12  personally have an interest in.  I will tell you, in ResMae we

13  did not, the first sub prime case to confirm there was no

14  protocol, and our firm had the pleasure of representing the

15  trustee post confirmation, and that worked.  And we attempted

16  to basically try to litigate those claims and try to resolve

17  those claims.  And those claims involved hundreds of loans, a

18  few cases thousands of loans, not tens of thousands of loans

19  and hundreds of thousands of loans.  And we learned our lesson

20  in that case because at the end of the day we were facing a

21  state with limited cash, litigated with multiple parties, and

22  spending the Court's time, and probably years of litigation,

23  and we were trying to come up with solutions.  What we did in

24  that case is we came up with a global settlement, and we got

25  all the claimants to basically agree on a global compromise to

1  resolve those claims.

2       We next come into <u>New Century</u>, which is a very large

3  sub prime case, probably the largest to file, one of the top

4  largest, 60 billion a year in originations.  And there we're

5  facing the same thing we faced in this case, which is hundreds

6  of thousands of loans that were originated, breaches of

7  representation claims that could go throughout all those loans

8  for a long period of time, and EPD claims in the tens of

9  thousands.  And the protocol was developed, in that case, as a

10 matter -- and Judge Carey supported the protocol in that case.

11 It is, in essence, Your Honor, a 502(c) mechanism.  And if you

12 recall the witness's testimony, Mr. Pasternak said when I asked

13 him specifically, what would you look at if you were just asked

14 to estimate this claim and what it's worth, what the likelihood

15 of liquidating a repurchased loan would be?  He said exactly

16 what we do in the protocol.  He said I'd look at Kaye Scholer

17 analysis, I might look at the Bloomberg analysis.  I might look

18 at the historical information the company had.  I would look at

19 what I had looked at to create this protocol.  And the way we

20 look at the protocol is it's a 506(c) streamlined mechanism for

21 estimating claims.  And now, Your Honor, there is no issue that

22 it is not perfect.  It is not an exact science.  It is rough

23 justice.  It is designed to basically take a very large number

24 of claims.  If you, recall Mr. Fernandez testified Deutsche

25 Bank, the largest trustee in this case, 66,000 loans, $13

1 billion of UPB was just Deutsche's claim itself.  So, Mr.

2 Fernandez -- I'm sorry, Mr. Pasternak said, Mr. Pasternak

3 testified that, Your Honor, it would take a very long time and

4 a lot of expense to try to go through that -- those loans and

5 determine which constitute breaches and which don't.  Most of

6 the time the witness testified you don't discover the breach

7 until a default occurs and you start entering the collection

8 phase, and that's when the servicer discovers that actually

9 there was a breach.

10       In our view basically there is very little basis.

11 You can nitpick about the protocol.  There's no issue.  There

12 are components that basically -- someone could claim it was too

13 high, too low.  But I think the question is does it need to

14 stand as a martin that's before this Court?  And if Your Honor

15 looks at the standards, I think Your Honor will feel

16 comfortable that the protocol is a good way of estimating

17 claims, understanding that we have an estate with billions of

18 dollars of unliquidated claims, and limited resources, and

19 where we're distributing less than ten cents.

20       So, Your Honor, on a practical basis you have to

21 figure out a way to try to streamline the case and move this

22 forward to get money to creditors.  Truthfully, the

23 professionals on this side would make a lot more money if we

24 litigated these claims for several years, and we would all be

25 happy to do that.  But at the end of the day what would happen

1  is the estates would go bankrupt, I mean administratively

2  insolvent, and the creditors would get nothing anyway.  So,

3  this mechanism is really designed to streamline it and estimate

4  it.

5           THE COURT:  Okay.

6           MR. POWER:  Your Honor, I think that's it.  Thank

7  you.

8           THE COURT:  Okay.  Thank you, Mr. Power.  Mr. Beach,

9  you'll talk about notice?

10           MR. BEACH:  Yes.  That brings us to the last issue on

11  the borrowers' committee's list, which is notice.  It's a due

12  process issue, as they've articulated it.  Your Honor, due

13  process under the Supreme Court's decision in Mallain

14  (phonetic) requires reasonably calculated notice, reasonably

15  calculated under the circumstances to apprize interested

16  parties of the pendency of an action.  In bankruptcy, under the

17  Third Circuit's decision in Chemitron, the Court made it clear

18  that the requirement is balanced with the fundamental

19  principles of bankruptcy, which is to secure within a limited

20  period the prompt and effectual administration and settlement

21  of the debtors' estate.

22           In the bar date context, the Third Circuit has

23  articulated that Courts balance these two principles by giving

24  actual notice to known creditors and constructive or

25  publication notice to unknown creditors, which is precisely

1  what we've done in this case.

2       Known creditors, under the longstanding Supreme Court

3  and Third Circuit precedent, are those creditors whose

4  identities are reasonably ascertainable by the debtors in this

5  case in October of 2007 by reviewing the debtors' books and

6  records.  Instead of putting on any evidentiary record with

7  respect to this burden, the Third Circuit's burden, what the

8  official committee of borrowers decided to do was to focus on

9  the current scrutiny of the mortgage industry as a whole

10  instead of the burden that they need to meet in these cases.

11  For a claim to be reasonably ascertainable, not reasonably

12  foreseeable, which is what the borrowers' committee is

13  essentially arguing, reasonably ascertainable, the debtor must

14  have in his possession, at the very least, some specific

15  information that reasonably suggests both the claim for which

16  the debtor may be liable and the entity to whom that claim

17  would be liable, in other words, the creditor, the specific

18  creditor.  Your Honor, in this particular --

19       THE COURT:  Well, their -- hang on.  Their response

20  would be, to that point -- hang on. Let me finish making my

21  note here --

22           (Pause)

23       THE COURT:  -- otherwise I'll forget it.  Their

24  response to that would be that the product -- payment option

25  arm product was so inherently disadvantageous to borrowers by

1 its very structure that the debtors should have known as of

2 October 2007, or perhaps even a the time of origination, when

3 they were selling these products, that the borrowers of those

4 products were, in the vast majority of cases, inevitably not

5 going to be able to make the payments, and would face perhaps a

6 default, a foreclosure, and would assert claims.  And to not,

7 at least, I take it that their position will be, that at the

8 very least actual notice to payment ARM option lent borrowers

9 needed to be provided because they were known creditors.  I

10 think that's their argument.  I'll let them make their

11 argument.  But maybe you can -- why is that wrong?  Why is that

12 -- well, I'm assuming you're not going to say that's right.

13          MR. BEACH:  Yes.  I mean --

14          THE COURT:  Why is that wrong?

15          MR. BEACH:  Your Honor, I believe the answer to that

16 is pretty simple.  The Third Circuit's decision in _Chemitron_

17 specifically rejected a reasonably foreseeable standard.  And

18 they used the exact same words Your Honor just used there.

19 Should have known.  They rejected that standard because they

20 said it would put the debtor to an unrealistic and, you know,

21 insurmountable burden with respect to bar dates.  It would turn

22 the bar date mechanism in bankruptcy cases on its head.  And

23 the Third Circuit was very clear that a should have known

24 standard is not appropriate in these circumstances.

25          And in the _Chemitron_ case there was a situation where

1  there was depleted uranium on a site.  There were significant

2  news articles about that prior to the bankruptcy.  And after

3  the bankruptcy a bar date was put in place, and plaintiffs,

4  after the bar date, tried to come back and suggest that the

5  debtor should have known it was using depleted uranium, that it

6  was going to lead to injuries, or potential injuries to those

7  parties.

8          THE COURT:  So, your argument would be that if I were

9  to re-set the bar date as of today, you still wouldn't have to

10  provide notice, actual notice to the vast majority -- I mean,

11  overwhelming majority of the borrowers, including the

12  overwhelming majority of payment option ARM borrowers, even

13  though from October 2007 to February 2009 the issues related to

14  payment option ARMs have deteriorated significantly?  And I

15  won't just say payment option ARMs, home mortgages have

16  deteriorated significantly, have been in the press daily, and

17  the subject of government -- extensive government debate and

18  perhaps action, that you still wouldn't have to give notice to

19  these people, other than people who have actual notice, other

20  than people who have asserted either informally or formally a

21  desire to pursue a claim under Chemitron?

22          MR. BEACH:  That's right, Your Honor.  With respect

23  to borrowers in general, there's no evidence on the record,

24  other than with respect to payment option ARMs.

25          THE COURT:  Now, if I -- help me out here.  If I'm in

1    a mass tort case, and I know that there are special rules

2    dealing with some of these issues, but in a mass tort case

3    would the debtors, for example -- let me try this for the fifth

4    time, and maybe that's the _Chemitron_ case, because you had

5    depleted uranium that was causing -- potentially causing damage

6    to hundreds, thousands -- I don't know the numbers --

7          MR. BEACH:  I believe the number of parties that

8    brought suit was 21 or 23.  It was the individuals --

9          THE COURT:  Okay.

10         MR. BEACH:  -- who lived in the neighborhood --

11         THE COURT:  Neighborhood of where -- all right.  That

12   even in a mass tort case all you have to do is provide notice,

13   generally speaking, to actual claimants.  Now, they don't even

14   do that.  I know they don't even do that because they don't

15   want to be flooded with hundreds of thousands of claims like

16   they had in that case in Louisiana.  I can't remember the name.

17   so, there's a different mechanism put in place to deal with the

18   fact that you'd be buried under an avalanche.  But that deals

19   with actual claimants.  Is that correct?  Maybe I'm wrong.

20         MR. BEACH:  I'm sorry, Your Honor.  I think I might

21   have missed your point.

22         THE COURT:  Well, there may not be one in there.  Let

23   me try it for the -- we need Mr. Patton here, because he's the

24   expert on mass tort.  My point is, even in a mass tort case,

25   asbestos, we know people are going to get sick.  We know

1  there's going to be liability.  We know people -- some people

2  are going to get really sick, and die.  But we still don't

3  require the debtor to do some active investigation to provide

4  actual notice to potential parties who have been exposed to

5  asbestos but have not yet asserted claims.  Now, I know there's

6  a -- we get around that a little bit in that situation because

7  there's a future claimants' trust created, and that's the

8  channeling injunction, so I understand it.  But at the time of

9  the bar date we don't send out a notice to all potential

10 claimants, even in those type of cases, I believe.

11         MR. BEACH:  I believe that's right, Your Honor, and,

12 you know, that is -- that was 524(g).  It is a very different

13 --

14         THE COURT:  It's different.

15         MR. BEACH:  -- situation.  But --

16         THE COURT:  So, it's a bad question.

17         MR. BEACH:  Well, I mean, to some extent it does

18 represent the point.  You wouldn't have to give actual notice.

19 In the Chemitron case to the individuals who lived around the

20 neighborhood, when you're using depleted uranium, which I think

21 everyone would understand is a very toxic chemical, and --

22 let's talk about the evidence that we have in this case.  We --

23 if you talk about the asbestos cases in particular, we know now

24 that those will lead to injuries and claims if someone was

25 sufficiently exposed to asbestos.  In this case, Your Honor, we

1  have the expert witness's testimony that -- and I'll

2  paraphrase, that these are -- these cases that are being

3  brought are new and complex cases.  There's not a lot of case

4  law on the theories, even, and that the plaintiffs are putting

5  numerous causes of action in the complaints until they find a

6  theory that works.  I understand, Your Honor, there's a lot of

7  scrutiny about these loans, and I suspect there's going to be a

8  lot of changes to the industry overall.  But the fact of the

9  matter is the evidence that they've tried to put on the record

10 was to try to suggest that based on the underwriting these

11 particular loans, and again, I think we're only focusing on the

12 payment option ARMs, would lead to defaults, and then they

13 would lead to foreclosures, and then they would lead to claims

14 by borrowers.  But that's not the standard.  That's a

15 reasonably foreseeable standard.  They have no evidence on the

16 record that would suggest that it was reasonably ascertainable

17 for the debtors, in looking at their books and records, and

18 having some actual notice of a claim and an individual that

19 they had a claim against, and we served all those parties that

20 we knew that there were threatened litigation, and in addition

21 to that, Your Honor, we served another bar date on HELOC and

22 construction loan borrowers when we knew we weren't funding

23 those loans, and it was -- there was a potential for claims to

24 be brought in that situation.

25          THE COURT:  Well, and this is a loaded question, and

1  it's really more for borrowers' committee counsel, but

2  obviously the situation has arisen that it has become very

3  difficult for borrowers under payment option ARMs as of

4  February 2009 to deal with or alleviate the stress and effect

5  of the reset date, which will increase, especially in a

6  negative amortization situation, significantly increase the

7  payments that are due.  But one of the reasons, other than the

8  inherent problem, one could argue, with the loan product in

9  general, the perfect storm is -- has been a massive, I think

10 arguably at least by a lot of people, unpredicted decline in

11 home values, unprecedented, by the way, in my lifetime, and I

12 would argue within everyone else's lifetime, as well as, again

13 an unprecedented freezing of the credit market that I don't

14 know one person who predicted.  The result being your mortgage

15 re-sets, what are your options?  Sell your house, pay off the

16 mortgage.  In order to do that most people would need to buy

17 another house and refinance, but even if you went into a

18 rental, sell the house, pay off the mortgage, or refinance.

19 Arguably you could say the benefits of the payment option ARM

20 is having successfully made payments for five years you're in a

21 position where it's more likely you'll be able to get a more

22 reasonable mortgage product with your good credit for those

23 five years.  But in any event, refinance, sell, default.  The

24 problem is, in February 2009, as a result of the fact that you

25 can't get credit, and the price has gone down materially,

1   frankly I don't think I could refinance my house today, good

2   thing I'm not going anywhere, that people are in a very, very

3   -- and I'm not making light of it, this is a national crisis.

4   But was it predictable in August 2007?  Was it predictable in

5   October of 2007?  In October 2007 the Dow Jones was at a

6   historical high.  It's not there anymore.  So, the other thing

7   is, even in this situation treasury rates are -- what are they?

8   Zero?  Close to zero?  So, although the re-sets are high, the

9   margins have declined.

10          MR. BEACH:  To that point, Your Honor, I think

11  there's been some recent press that the re-sets haven't caused

12  the shock that people anticipated because the rates are so low.

13          THE COURT:  Right.  My only point -- I haven't asked

14  a question yet, have I?  I guess my only point is

15  predictability, and that's why it's a loaded question.  It's

16  really a question for the borrowers' committee.  I'm getting

17  ahead of myself, because I'm asking you a softball -- don't you

18  agree with everything I said?

19                        (Laughter)

20          THE COURT:  Aren't I right?  And what I mean is,

21  predictability.  It goes, again, back to the Chemitron.  It's

22  so hard to figure out whether claims would actually exist or

23  not.  And is the time we decide whether claims should exist or

24  not now, or is it October 2007?  Is it August 2007?  You know,

25  what does the case law say on that?

1          MR. BEACH:  your Honor, I think it's very clear that

2   it's -- you know, what was reasonably ascertainable at the time

3   the debtor served the bar date notice out.  And again, this

4   goes to the very principle of bankruptcy law, and <u>Chemitron</u>

5   addresses this, which is to be able to efficiently and quickly

6   administer a case.  And, you know, some of the -- the other

7   notes in <u>Chemitron</u>, they said quite simply to do a reasonably

8   foreseeable test.  And Your Honor is suggesting the

9   predictability issue.  I agree with you, none of us would have

10  predicted what's going on in the market in October of 2007, and

11  the debtor is sympathetic, and we all have friends and

12  neighbors that are significantly affected by this crisis, but,

13  Your Honor, the Third Circuit specifically said that put simply

14  such a test would place an impossible burden on debtors, and

15  that's essentially what the borrowers are asking us to do here,

16  is to go revisit a bar date at a time, and to apply your

17  reasonably foreseeable standard, and I would suggest, Your

18  Honor, that this predictability issue is really a reasonable

19  foreseeable standard.  But that is simply not the Third

20  Circuit's standing.  Reasonably ascertainable by looking at the

21  debtors' books and records is a very different standard than

22  reasonably foreseeable.  Reasonably foreseeable would open up a

23  whole host of issues.  You'd have every bar date challenge from

24  this case forward if that were the standard.  And the Third

25  Circuit recognized that and addressed that issue.

1              THE COURT:  All right.  Let's talk about constructive

2  -- or, publication notice.  And the issue there, I think, is

3  both the quality of the notice, i.e., very, perhaps, dense

4  legal small print document with a defect in the definition of

5  who it affects by saying entity and not making it clear it

6  includes individuals, and then the issue of <u>New York Times</u>, <u>St.</u>

7  <u>Louis Post Dispatch</u>, <u>Dallas Morning News</u> being insufficient.

8              MR. BEACH:  Your Honor, if you'll indulge me, I just

9  want to make two very quick points --

10             THE COURT:  Oh.  I'm --

11             MR. BEACH:  -- on the known issue.  One is just

12 simply to point out the only case that is really on point in

13 the mortgage industry, and that's the <u>Hebble</u> (phonetic) case,

14 where the Court says that the claims were speculative.  In this

15 case it was the class actions plaintiffs commenced litigation

16 asserting an unlawful and systematic maintenance of deposits in

17 the plaintiff's escrow account.  It was a servicer issue.  And

18 the complaint was filed against the discharged debtor servicer.

19 The Court determined that although the debtor servicer's

20 records included the names and addresses of those individuals,

21 homeowners, at the time, and again, that goes to the timing

22 issue, at the time those claims were merely speculative.  The

23 debtor could not have been expected to anticipate that the

24 Hebbles would bring the claim, and thus the Hebbles and their

25 putative class are considered unknown creditors and publication

1  notice was sufficient in that case.

2          And the only other point I would make, Your Honor, is

3  that it's impossible to read a per se -- or, it's

4  inappropriate, I would suggest, to read a per se predatory

5  lending or unfair practices standard into the bar date notice

6  in this situation.  There is no -- the borrowers' committee is

7  going to suggest that there is a Massachusetts Court that

8  entered an injunction against a mortgage lender for having

9  provided payment option ARM products.  They haven't established

10 that those products are the same as the debtors, or have

11 similar -- or have the same exact features.  I think there were

12 four features in that case.  And in addition to that, the Judge

13 in that Massachusetts case made it very clear that in

14 connection with claims, that it was going to be done on a case-

15 by-case basis.  And, Your Honor, the evidence, or at least the

16 argument by borrowers' counsel was that there were several

17 attempts at class actions with respect to payment option ARMs,

18 and that those classes were not certified.  So, again, this is

19 a case-by-case situation, and if the debtors can't reasonably

20 ascertain, on a case-by-case basis that there's a claim, it

21 doesn't meet the standards under the Third Circuit law.

22         Now I'll get to the publication notice.  Your Honor,

23 obviously publication notice is appropriate, and it goes to

24 this, so I'll focus on the issues that you highlighted.  The

25 appropriateness of notice in those three papers.  <u>Chemitron</u>

1 specifically deals with this issue.  It says that publication

2 in a national newspaper is appropriate publication notice, and

3 when it's supplemented by publication notice in areas where the

4 company does business, then it is an extra step, not a

5 necessary extra step, but it certainly shows that publication

6 notice, in general, is sufficient to give notice to unknown

7 creditors in that circumstance, and that's what we did here,

8 Your Honor.

9         With respect to the issues of the size of the

10 article, and the -- using the term entity, Your Honor, I --

11 first of all, we have no evidence, as I understand it, as to

12 exactly what the size of the article was because we don't have

13 the page of the article here in the courtroom today, and the

14 borrowers' committee certainly could have gotten that from The

15 New York Times and the other papers if they had chosen to.  But

16 assuming, arguendo, that the size of the article is similar to

17 what's on the affidavit of publication on the docket, Your

18 Honor, I would submit that this issue, in my experience, has

19 never come up.  This is what is done in every case.  I don't

20 think there's a requirement to publish a full page article in a

21 national edition of a paper.  I think that putting a standard

22 like that on a debtor would be, you know, overly costly in this

23 situation.  I don't know what a full page article goes for, but

24 I imagine it's exceedingly expense for a party to be able to

25 put that publication notice in.  And there weren't any

1  requirements on the size of that publication notice, nor would

2  I submit would it effect the ability of an unknown creditor to

3  get sufficient notice in that circumstance.  Chemitron doesn't

4  directly address that issue, but I would -- well, I'm not going

5  to speculate as to what the size of the article was in that

6  case.  I don't know what more to say about that issue, Your

7  Honor.  I don't believe we have any requirement to publish that

8  article in a particular size, and that article was sufficient

9  --

10       THE COURT:  What about this entity issue, that it

11  says it's applicable to an entity?  I know that's a defined

12  term, but it didn't say, you know, borrower, it didn't say

13  individual.

14       MR. BEACH:  You're right, Your Honor.  It didn't.

15  And we have had plenty of borrowers that did file claims.  We

16  had plenty of employees that filed claims.  Perhaps that was by

17  actual notice.  I suspect it was.  But entity, if you look in

18  any dictionary, is going to mean a being in existence.  So, I

19  don't know that it creates the ambiguity that the borrowers'

20  committee suggests anyway.  A being in existence is, certainly

21  in my mind, construed as an individual, a person.  And I think

22  it is completely appropriate --

23       THE COURT:  If I told you you were a good looking

24  entity, that's bizarre.  You'd look at me -- well, first of

25  all, I'm not sure you're good looking, but -- you would look at

1 me cross eyed.  That's -- you know, generally speaking, you

2 know, I love my wife, she's a wonderful entity.  You know?

3 It's kind of existentialist to say that we're all entities.  I

4 mean, I guess technically correct, but not a common usage of

5 that term.

6          MR. BEACH:  I wouldn't disagree with that, Your

7 Honor, in terms of describing --

8          THE COURT:  But it's a legal notice.

9          MR. BEACH:  It is a legal notice, and -- I'll make

10 another point.  This was a highly publicized case early on, as

11 you know.  It was in major newspapers all over the country.

12 And I would submit that --

13          THE COURT:  Well, but their response to that was --

14 would be you sent out -- the debtor published a notice, or

15 letter that said -- kind of lulled people into not worrying too

16 much about it because it said you'll be unaffected.  Now, what

17 you meant was keep making your payments, your mortgage is still

18 good, and, you know, contact your servicer if you have issues.

19 No one is going to foreclose just because of the bankruptcy.

20 But they would say that may have been what you meant, but

21 that's not what you said.

22          MR. BEACH:  Well, right.  But I -- to your point,

23 Your Honor, the next sentence in that letter, I believe you

24 were referring to the letter, I was distracted for a moment,

25 but the next sentence in that letter specifically refers to the

1  servicing of the mortgage loan.  So, I don't believe that that

2  letter is misleading, or would suggest to a creditor that they

3  wouldn't have to file a claim in the case.  And there were

4  other tabs on that web site.  There was -- I forget the name of

5  it offhand.  Maybe I can find it.

6                              (Pause)

7          MR. BEACH:  There was a customer's tab on that, and

8  under the customer's tab it had a link to Epiq's system.  so, I

9  believe there was -- if someone is going to look at that web

10 site -- excuse me, Your Honor.

11                             (Pause)

12         MR. BEACH:  I'm sorry, Your Honor.  I mis-spoke.  The

13 customer's tab goes to this letter.  The on-line bankruptcy

14 information is another tab on the web site, and that goes to

15 the Epiq web site and identifies where a party can go to file a

16 claim in the case.  So, I would agree with you, Your Honor,

17 that the letter is not a model of clarity, but I think it's

18 clear enough to show that it deals with the servicing of a

19 mortgage loan, and there are other sufficient provisions -- or,

20 other sufficient information on this web site that would show a

21 creditor where they can go and file a claim.

22         THE COURT:  Okay.  Anything further?

23         MR. BEACH:  No, Your Honor.  I'll respond to the

24 borrowers' committee once they address the issue.

25         THE COURT:  Mr. Power?

1          MR. POWER:  Your Honor, I'll again defer to debtor's

2    counsel and adopt those arguments.  A couple of points I'd like

3    to add.  I think Your Honor is sitting here today and has to

4    apply the evidence Your Honor heard to the facts.  And I would

5    -- I believe that the evidence, not the argument and not the

6    theory, the evidence about American Home's loan products is

7    insufficient for this Court to determine that those products in

8    any way are per se likely to lead to claims from borrowers.

9    The testimony related almost substantially to industry issues,

10   industry problems.  Every -- if Your Honor recalls, the

11   originators all varied.  If you'd just look at some of the --

12   Massachusetts, for example, that wasn't American Home, even

13   though American Home sold loans in that state.  That was

14   Fremont.  There were many other originators that had issues and

15   problems with their loan products who had many facets that

16   weren't part of American Home products, and there is very --

17   there is no evidence in the record that demonstrates that

18   American Home's products were of such a deficient level that

19   the debtor should have known -- it was reasonably ascertainable

20   that those products would lead to claims from customers.

21   There's just no evidence in the record that American Home is

22   that way.  And I would caution the Court of the notion of

23   somehow concluding that option ARMs are somehow per se bad.

24   There were three Circuit Courts -- Courts that have considered

25   that issue, and all three have said no, I am not going to find

1  that they are per se bad.  I'm going to find this is an

2  individual issue, and it's going to be done on a case-by-case

3  basis.

4          THE COURT:  Did I say they --

5          MR. POWER:  No, but I -- I know Your Honor did not,

6  but I -- the conclusion you're leading to on the notice is that

7  option ARMs are bad, or likely to default, which is likely to

8  lead to claims, I think the first -- the initial conclusion

9  that American Home option ARMs are bad, there's nothing in the

10 record to demonstrate that.  And most of the Courts that have

11 considered option ARMs to date have said that we have to look

12 at this from an individual, case-by-case basis.  An we're not

13 going to conclude that these loans were of such a heinous

14 nature that they are per se bad.  And that is the case law that

15 exists in three circuits, and they've all looked at that issue.

16 And I think that should apply here, as well.

17         And if there was evidence about American Home

18 products, then Your Honor should be considering that.  But

19 there is no evidence showing that American Home and the way its

20 products were structured, the way it originated those products,

21 the way it sold it to customers, created claims that made it

22 reasonable ascertainable that claims existed in those products,

23 and that's what we look in this case.

24         Your Honor, on the notice issue, it's interesting.

25 This is a hypothetical discussion about whether a claimant in

1  the future, an unknown claimant can come in and argue that

2  didn't get proper notice.  Normally, Your Honor, when it

3  considers this issue, and you've done it in this case

4  previously, you look at facts.  A claimants comes before Your

5  Honor and says I didn't get notice, I didn't get actual notice,

6  and I didn't know about the bankruptcy, and I may have seen a

7  letter, but I thought this.  We had one case, if Your Honor

8  recalls, and you ruled against the committee, and you said no,

9  I'm going to allow this in because the lawyer knew about the

10  bankruptcy but just -- the papers didn't go out the way it

11  should.  That's the way most of these cases work.  And I submit

12  to you the proper way to deal with this issue that when

13  claimants come before this Court, and there are late claims

14  with borrowers, we will deal with that on a case by case basis,

15  because every one depends on the specific facts.  If Your Honor

16  recalls Mrs. Graves, she knew that American -- well, she didn't

17  recall a lot, but her -- the complaint that was filed said

18  American Home is in bankruptcy.  All three of the homeowners

19  who the expert relied on, or looked at, knew that American Home

20  was in bankruptcy.  Some of them haven't even filed claims

21  today.  But that doesn't mean they won't file claims, and it

22  doesn't mean we won't deal with that in the claims process, and

23  it doesn't mean that we won't try to deal with that fairly.

24  But the standard, what we dealt with then, and Your Honor will

25  consider all the facts then.  I think for Your Honor to go back

1 and look a whether I'm going to basically vacate an order I

2 entered over a year ago that found that this notice was proper

3 and sufficient based on the motion that was filed and served on

4 all parties, I think is inappropriate in this context.  I think

5 Your Honor should look at it in a case by case basis to

6 determine whether those creditors have claims, what's the

7 reasons, and whether it's an appropriate situation.  And again,

8 the plan we filed has a streamlined procedure to assist

9 borrowers in that mechanism, to basically -- not make them come

10 to Delaware, hire a lawyer to go through those hoops to try to

11 streamline this process.  And we -- the trustee intends, and I

12 know, when trying to facilitate that process, but at the end of

13 the day it really depends on a case by case analysis.  In this

14 case I think there is sufficient -- the Court already found

15 that the notice that was provided was adequate in your prior

16 order.

17        I also think that we could debate forever what

18 newspaper should be used, and how it should be published, and

19 whether the notice was appropriate and whether the column in

20 the newspaper should have been bigger, six inches or two.  The

21 fact is that notice was provided, it was publicized, and it was

22 approved, and it was done in multiple circulations in a

23 national edition in two major metropolitan areas where the

24 debtor had business.

25        The debtor did business in 50 states, and the

1  requirements under the law is not that the debtor publicize

2  notice in 50 states in 50 different newspapers.  The question

3  was was it sufficient to provide notice?  And we believe in

4  this case it was.  On the entity issue, Your Honor, I agree

5  with you.  I would note, though, to me the issue is is a party

6  who may have a potential claim alerted that there's a

7  bankruptcy and there may be a reason to inquire further.  If

8  Your Honor looks into the <u>Pioneer</u> decision of the Supreme

9  Court, were you aware of the bankruptcy?  Did you take any

10  steps to do anything further?  Regardless of whether that

11  notice to that entity or individual, it clearly identified that

12  American Home was in bankruptcy in addition to dozens, if not

13  hundreds of newspaper articles identifying American Home in

14  bankruptcy.

15        When Ms. Graves testified, she also talked to the

16  servicer, and they identified American Home was in bankruptcy.

17  So, people who are dealing with their servicer are also finding

18  notice.  So, I think -- at least I advocate on this point, we

19  should do it on a loan by loan basis.  If a creditor comes in,

20  we can deal with it then, but I don't think it's appropriate,

21  and I would advocate Your Honor not revisit the prior order.

22  Thank you.

23        THE COURT:  That's it from the proponents' side.  I'd

24  like to take a recess before I hear a response.  Should we take

25  lunch?  Would you -- yes, let's do that.  You guys can eat

1 lunch once out of three days.

2                    (Laughter)

3          THE COURT:  We'll reconvene at 1:15, and then we'll

4 -- I can hear the response.  All right.  We're in recess until

5 1:15.

6          MR. WEISBROD:  Excuse me, Your Honor.  I think I gave

7 you every single copy I had of Exhibit 27.

8                    (Pause)

9          MR. WEISBROD:  Thank you.

10                    (Recess)

11          THE CLERK:  All rise.

12          THE COURT:  Please be seated.  Mr. Weisbrod?

13          MR. WEISBROD:  Thank you, Your Honor.  So far this

14 bankruptcy process has failed most of the borrowers who took

15 out loans through AHM.  There were almost a million borrowers,

16 and about 90,000 payment option ARM borrowers.  Except for

17 about 450 borrowers who had actually sued, or filed demand

18 letter pre-petition, none of those people got direct notice.

19 And there was no direct notice, there was no publication

20 notice, even.  There was just no notice for all of those

21 people.

22          Now, of course, as we've already discussed today, the

23 debtors allege that there was publication notice, and we

24 strongly disagree.  This is, in effect, what they're saying

25 about how a borrower might have gotten notice who hadn't

1   already sued before the petition date.  Let's take, as an

2   example, a borrower from Los Angeles, California.  You've heard

3   that California was the number one state in which AHM did

4   business, and as we will show you through one of the newly

5   admitted documents, it was one of -- actually none of the five

6   states that were in the top five that accounted for 50 percent

7   were New York, Missouri, or Texas.  So, let's take, as an

8   example, someone in California, in Los Angeles.  He walks out

9   the door on the morning that these newspaper ads were

10  published, and I guess they're assuming he's picked up his copy

11  of the St. Louis Post Dispatch, or The New York Times, or The

12  Dallas Morning News, and he goes to the legal notice.  And

13  you've reviewed the ad, Your Honor, and as you've pointed out,

14  it's in tiny print.  The only evidence we have of what it

15  looked like is the evidence that the debtors provided.  We

16  asked for copies, that's what they gave us.

17          As you noted, there's no mention of borrowers or

18  individuals, there's no definition section.  There's mention of

19  creditors and entities, and my wife, I would never call her a

20  beautiful entity, Your Honor.  Capital E in entities, but what

21  does that tell a borrower?  This is not supposed to be just a

22  legal document, Your Honor.  Under Mallain it's supposed to be

23  reasonably calculated to let the individual who receives it

24  know about the proceedings and know how to respond, and that

25  was not the case for this.  Nobody is ever going to go their

1  study in their house that they've mortgaged with one of these

2  and go get their Bankruptcy Code and look up entity.  When we

3  return to reality, what we've got is there's no real notice.

4          It's not just the _Mallain_ case that sheds light on

5  this, Your Honor.  We also cited to the Court the precedent

6  from the _Memphis Light & Gas_ case, which goes into detail in a

7  non-bankruptcy context to be sure, but it goes into detail

8  about the importance of making sure that when you're giving

9  notices to consumers that the notices are clear.  There was a

10 dissent who said it would have been obvious from the notice

11 that said your lights might get shut off that there was an

12 opportunity to protest but the Supreme Court majority said no,

13 that's not good enough.  You've got to explain what's happening

14 to people in clear English.

15         Now, as you noted, or as you correctly predicted, we

16 do also emphasize the letter dated October -- August 13th,

17 2007, which is still up as of this weekend on AHM's web site.

18 And that said the bankruptcy will have no impact on you.  That

19 is pretty clear English.  These borrowers got no notice of

20 anything in the case, not the bar date, not the opportunity to

21 vote, not the plan itself.  This whole process marred, is

22 defective by that fact.

23         We also submit, Your Honor, that there were known

24 creditors who should have gotten actual notice.  Not all,

25 900,000 or a million, but at a minimum, everybody who go a

1 payment option ARM.  I think we all basically agree on what the

2 legal standard is supposed to be.  Actual notice is required if

3 the claimant's identity is reasonably ascertainable.  Now, we

4 suggest, Your Honor, that since we're talking about confirming

5 a plan today, and the plan has a variety of effects on

6 borrowers, that they need notice today, and we have to look at

7 what is reasonably ascertainable today.  The plan does much

8 more than just put into effect a bar date, and all of these

9 creditors need to have notice.

10          I also strongly disagree with Mr. Beach, who said he

11 was quite certain that all of these precedents tell you you

12 have to look at the bar date as opposed to the confirmation

13 date.  The precedence that I have found and that they have

14 cited were all post confirmation decisions.  All of us have

15 been looking at the same range of precedence which involve

16 putative plaintiffs who tried to sue after a plan has been

17 confirmed, and the Courts say either you can because there's a

18 due process violation, or you cannot because there was no due

19 process violation, but none of these cases asked -- none of

20 those Courts were asked the question that Your Honor asked Mr.

21 Beach, that we now are confronted with, which is what is the

22 timing?  And we believe that the answer flows from due process.

23 If the Court is going to confirm an order in an order now a

24 plan that effects people, they need notice of it now, and this

25 is the time to give them notice.

1          Now, <u>Chemitron</u> involved a mass tort case.  It was an
2    environmental exposure case.  None of the plaintiffs who were
3    seeking to sue in <u>Chemitron</u> still lived in the vicinity of the
4    sites at issue, not one.  So, if you look at this readily
5    ascertainable inquiry, and you say are the individuals
6    ascertainable, and is the cause of action ascertainable?  You
7    can see that the individuals there were not ascertainable.  You
8    could not look at Chemitron's records and figure out who these
9    people were, or where they were.  The flip side of this problem
10   is <u>Hebble</u>, where the debtor could ascertain who and where the
11   potential plaintiffs were, but Judge Zindel (phonetic) said
12   there was no reason to think they would sue.

13          In a few minutes I'm going to go through in some
14   detail why that precedent doesn't apply here, especially when
15   we're dealing with these toxic products, payment option ARM.

16          The Court asked Mr. Beach a few questions about the
17   asbestos cases and other mass tort cases, and I'd like to share
18   my impression of that.  In all of the asbestos cases I have
19   worked on, and there have been several in this district, and
20   elsewhere, there was no bar date imposed for the asbestos
21   plaintiffs.  There were bar dates imposed for other types of
22   creditors.  Now, the reason for that, the reason that every
23   other creditor could live with that is that there was a
24   separate trust.  I don't necessarily suggest that if there
25   isn't a separate trust that resolution should apply here, but I

1  just want to point out that there isn't typically a mass

2  notice, but there also typically is not a bar date.  And in

3  addition there is often a separate asbestos creditors'

4  committee from the beginning, and there is a well funded

5  plaintiff's bar that is attending all of these cases.  And

6  another distinction, of course, that nobody knows where the

7  asbestos plaintiffs live most of the time.

8          THE COURT:  Well, they've -- I mean, we've had cases

9  where they did a bar date, and one of the reasons they don't do

10 them anymore is it was a disaster.  Right?  I mean, you've got

11 hundreds of thousands of claims.

12         MR. WEISBROD:  Right.  And what happens is the trusts

13 end up getting established -- in all the ones I've done -- I've

14 only worked on them since 1993, Your Honor, but in all the ones

15 I've done the trusts are set up, and then claims come in for

16 years, or decades.

17         Now, if Mr. Beach were right and the inquiry were

18 whether these claims were ascertainable as of August 2007, the

19 answer would be that they are, the claims and the claimants.

20 The claimants is not really disputed.  Their names were known,

21 their addresses were known, as were the loan types.  AHM has

22 the files, at least it had them then.  We'll get to the

23 document destruction issue.  But at that time, at least, they

24 had those.  They also knew the underwriting practices and the

25 basis on which individual borrowers were qualified, whether it

1  was the first year or subsequent years.

2        So, the real question, the real dispute is not are

3  the claimants ascertainable?  Plainly they were.  It was the

4  fact that they were likely to sue ascertainable?  And the

5  answer is yes.  In early 2007 the evidence shows, and it's one

6  of the exhibits we introduced today, 87 percent of AHM payment

7  option ARMs were already negatively amortizing.  That's far

8  worse than the industry average as you've heard about from Ms.

9  Saunders.  Those numbers don't go down, Your Honor.  More loans

10 may be negatively amortizing now.  But then 87 percent.  And I

11 can give you the Bates number of the page, Your Honor.  It's

12 AHM018964.  It's from Exhibit 12.

13        THE COURT:  Exhibit what?

14        MR. WEISBROD:  12.  And that is the same exhibit that

15 states that the top production states were California, Florida,

16 Illinois, Arizona and North Carolina.  That's California,

17 Florida, Illinois, Arizona and North Carolina, which

18 represented 51 percent of all originations.  And it's on Page

19 018934. So, months before this bankruptcy they knew 87 percent

20 were in negative amortization.

21        In addition, Your Honor, in May of '07, before the

22 bankruptcy, as you'll see from Exhibit 27 I think it is, yes,

23 on Page 19308 there was already a discussion of changing the

24 structure of the payment option ARMs to allow for an additional

25 five year interest only period after the loan re-set,

1 suggesting, again, cognizance of the problem.

2          I'm not aware of anybody testifying that these

3 products are still sold on the market by anybody in the

4 country.  I don't believe they are.  And I'm not sure whether

5 Ms. Saunders testified one way or the other on that, but

6 there's no evidence that they're still on the market.

7          THE COURT:  She did not.  There's no evidence either

8 way.

9          MR. WEISBROD:  Right.  Your Honor, before the

10 petition date Chevy Chase Bank already had lost the Andrews

11 case on the TILA issue.  And before the bar date the

12 Massachusetts Attorney General already had stated her position

13 publicly.  Now, we suggest, Your Honor, that this case isn't

14 like Chemitron.  This isn't really like Hebble.  Chemitron it's

15 not alike because the claimants' whereabouts are known.  If

16 Your Honor needs a minute to look at that, I'll stop.

17          THE COURT:  Yes.  I'm sorry.  I wanted to look at the

18 exhibits you referenced, and I've left them in chambers.  I was

19 looking at them over lunch.

20                         (Pause)

21          THE COURT:  Oh.  I see.  MTA programs allow for five

22 year IO period after loan hits the negative amort cap or after

23 five year at recast?  Is that what you're discussing?

24          MR. WEISBROD:  Yes.

25          THE COURT:  Okay.  I'm sorry.  You may proceed.

1          MR. WEISBROD:  Thank you, Your Honor.  This case is

2   most like the <u>Fogel</u> case.  Now, again, all of these cases

3   involve plaintiffs who are suing after the bankruptcies are

4   concluded, but <u>Fogel</u> was the Seventh Circuit's decision where

5   it said that if you know that your pipes are defective and you

6   know you sold them to somebody, then you should give notice to

7   somebody if you've got that person's address.  And that's what

8   we've got here.  We've got a lot more negatively amortizing

9   loans, I suspect, than they had exploding pipes.  It's also

10  somewhat like <u>Thompson McKinnon</u>, which we cite in our original

11  objection, which involved the plaintiff who learned that there

12  were errors in the processing of the securities transactions.

13  Securities had not been transferred as appropriate.  The

14  records indicating that failure on the part of the debtor were

15  in the debtor's possession.

16          What else did the debtor know?  Well, they knew about

17  the inter-agency guidance.  They knew that Tilton Jack had

18  sued.  They knew that others had sued.  And what do we know

19  now?  We know a lot more now.  It's only a year later, but we

20  now know to a much greater extent the breadth of this calamity,

21  that the debtors participated in.  There are now several class

22  actions pending.  We have cited them in our briefs.  There was

23  a proof of claim filed on behalf of a purported class.  You've

24  heard testimony that the majority of all payment option ARMs

25  are likely to default.  That is not an AHM specific data point,

1 but an industry-wide data point.

2        Now, we have heard several times from the debtors and

3 the committee, the unsecured creditors' committee that you may

4 not really need to worry about this because there's this late

5 claims process.  It is true that there is a late claims

6 process, but it's also true that any suggestion that we've made

7 that the late claims process include a provision that says if

8 you didn't get actual notice and you're a borrower you can make

9 a claim, that's been rejected.  They're going to cite these

10 cases.  They're going to cite <u>Chemitron</u> and so forth to Gracie

11 Graves and everybody else.  At least we have no assurance that

12 they won't.  And the same principles that apply today, in this

13 hearing, are the principles that would apply there.  And I have

14 no doubt that if the Court were to find today that the

15 publication notice or the other notices were adequate, that

16 would be cited against the Gracie Graves of the world, and

17 everybody else that comes forward.  That's the whole point of

18 all these decisions that the debtors have been citing to you.

19        THE COURT:  But that's not the inquiry under the

20 excusable neglect standard.

21        MR. WEISBROD:  It's not clear to me how the cases

22 that have been cited to you and the excusable neglect standard

23 interact, but their initial position is that the bar date was

24 effective and comported with due process.

25        THE COURT:  Well, that's the -- in this jurisdiction

1  the <u>Grand Union</u> Fifth Amendment issue, which is you can't use a

2  bar date against a known creditor if you don't provide notice.

3  So, their position is, and I think it would be law of the case,

4  if I support their decision, is that none of these million

5  borrowers were entitled to actual notice.  So, if someone can

6  show they were -- they had sued or sent a demand letter, I

7  think the issue would be pretty cut and dried.  If they can't,

8  we would be in an excusable neglect standard, which posits you

9  received notice, but nonetheless failed to respond, and you

10 need to make a showing of why that fits that standard, and

11 that's Supreme Court precedent in <u>Pioneer</u>.

12          MR. WEISBROD:  And that's a higher burden --

13          THE COURT:  Yes, it is.

14          MR. WEISBROD:  -- a significantly higher burden.

15          THE COURT:  Yes, it is.

16          MR. WEISBROD:  And, you know, I didn't litigate any

17 of the cases that we've been citing to you, and I wasn't in the

18 case when people came after the bar date here, so I don't

19 exactly know how this all plays out, but the initial position

20 reorganized debtors or trusts in the situation we're imagining

21 now is generally you're done, too late.  And when you look at

22 these products, that's a real problem.  We've heard the

23 testimony about how the teaser rates work, and how the payment

24 options work.  And just to illustrate how significant this can

25 be to a person of modest means, if you assume a house with a

1  $400,000 mortgage, if the cap on a negative amortization were

2  110 percent, that would be a $40,000 transfer of equity from

3  that person to the -- from the homeowner to whoever holds the

4  loan, or the people who held the loan.  If it's a 125 percent,

5  like Gracie Graves was, then we're talking about $110,000

6  transfer of her equity over her lifetime, since 1972, to the

7  holders of these loans.  And, you know, you've heard from the

8  trust documents how, at least for some loans, AHM was

9  underwriting.  They were underwriting and qualifying buyers

10  based on what they could -- whether they could afford the first

11  year payment.  Well, that doesn't tell you that much if the

12  payment is going to double or triple in three years.  And

13  you've heard, Your Honor, that people don't -- often do not

14  understand what's happening to them with these loans until

15  months or possibly years later, and if the bar date is upheld,

16  then it's too late for the vast majority of the 90,000 people

17  who got payment option ARMs, and it's going to be too late for

18  many other people who are suffering other consequences, whether

19  it's servicing related problems, or other problems.

20        Now, it's true that we don't know how many Gracie

21  Graves are out there exactly, and we don't know exactly which

22  ones of the 90,000 payment option ARM plaintiffs will someday

23  want to sue.  But there's very little doubt that in that group

24  of 90,000 there's going to be a heck of a lot based on what's

25  happening to them.  And that's the point here, and that's why

1  they are readily ascertainable.

2          Now, the debtors have made a few other points through

3  the course of this hearing about these potential claims.  They

4  suggest, well, there's no real claims.  The only thing that's

5  really of value here that's significant is rescission.  Well,

6  that's not true.  You've heard testimony that borrowers assert

7  rescission and damages claims together, and they can assert

8  claims against brokers, and originators, and current holders

9  together, and they don't have to go after just one, or pick

10  just one.  They can try to hold them all liable for everything.

11  And what do they say about this idea that you're too late?

12  Well, basically -- not that you're too late, but that the

13  borrowers are too late?  Well, basically they just say I'm

14  sorry, but that's the way it works.

15          THE COURT:  Well, this bar date doesn't apply to

16  asserting claims against brokers.

17          MR. WEISBROD:  No, it does not.  That is correct.  We

18  have actually achieved success with the debtors in most

19  respects on preserving third party claims.  That has been one

20  of the real benefits of the negotiation over the last three

21  months.

22          THE COURT:  Well, let me -- assume someone has filed

23  a claim in a timely manner against the debtor, and they seek

24  rescission of the loan.  Now, my understanding is that's

25  basically an undoing of the entire process.  So, to the extent

1 they made the payments to the debtor they would have a claim

2 that will get paid five, ten cents on the dollar.  Doesn't that

3 make rescission in the vast majority of cases an empty remedy

4 because no one will be able to afford to ask for rescission

5 when they won't be able to get any money back?  And how do they

6 -- at that point how do they refinance their mortgage?

7          MR. WEISBROD:  I, unlike Ms. Saunders, am not an

8 expert on how rescission claims are playing out in the current

9 market.  I don't know that she has exactly answered that

10 question.

11          THE COURT:  You have to unscramble the egg, and

12 there's only one way to do that.  Everybody goes to their ex

13 post ante situation and, you know, payments get undone, but --

14 you know, now maybe the payments get paid by the holder.  I

15 mean, maybe the holder isn't the one who makes the payments, so

16 that may answer that question.

17          MR. WEISBROD:  There are a variety of ways that you

18 deal with this.  Mr. Macauley can fill in after I give my best

19 effort based on my understanding plus the evidence.  First of

20 all, most rescission claims end up getting settled.  Now, you

21 saw one example, and I think only one in this case of that,

22 which is Countrywide, where there's a mass modification

23 program, but that is going to eliminate a lot of rescission

24 claims.  So, that's one step.  Most of these cases, whether

25 they're done on a mass modification basis or individual don't

1 actually end up rescinding.  They end up with a different

2 outcome, negotiated.  The second point is that when there are

3 holes to fill in you can go against multiple sources.  Damages

4 may include punitive damages, etcetera, so if you don't have

5 enough money to make the rescission work, if you just rescind

6 against the current holder, you may have other sources like the

7 broker, or the originator, or the securitizer, or whoever.  So,

8 that also may help fill it in.  I don't know if Mr. Macauley

9 has more answers that than I do.

10        Now -- and I think the record is clear on this, and I

11 think Your Honor assumed that, but in case not, very few

12 rescission claims at this point would be asserted against the

13 debtors because they don't hold very many mortgages.

14        THE COURT:  Well, that's why I said --

15        MR. WEISBROD:  Yes.

16        THE COURT:  -- the answer may be that it's the

17 holder.

18        MR. WEISBROD:  Well, the holder would be potentially

19 vulnerable to the rescission.  That's what Margot Saunders

20 testified to, and the debtors, to the extent that they no

21 longer hold, would be vulnerable to a damages claim.  And it

22 might be a statutory damages claim, it might be an actual

23 damages claim, or both, depending on what the plaintiff shows.

24        Have I answered Your Honor's questions on that?

25        THE COURT:  Yes.  Well, one more -- does this plan

1 seek to enjoin the ability of borrowers to seek rescission

2 against current holders that are not debtors?

3        MR. WEISBROD:  No, it does not.  There are some

4 quirks in the language about Bank of America that we're going

5 to work out, but I don't anticipate a problem on that.  And the

6 general principle is one of the things that we've accomplished

7 in the last three months --

8        THE COURT:  Okay.

9        MR. WEISBROD:  -- to make sure that's okay.  The only

10 way, and I was actually about to get to this as I moved on to

11 the trust issues, the way in which the plan nevertheless does

12 affect rescission claims and other claims against third parties

13 is by failing to preserve documents.  And so, as we discussed

14 when I talked about the -- how we should present the argument,

15 I think that the issues relating to the trustee implicate a lot

16 of different plan objections, but it's really just a fairly

17 concise discussion of what the trustee is going to do.

18        The trustee has been chosen by the unsecured

19 creditors' committee.  The trustee will be overseen by a plan

20 oversight committee, which is basically a subset of the

21 unsecured creditors' committee, and my understanding, and Mr.

22 Powers can correct me if I'm wrong, is that the subset is

23 likely to be all the current members minus the indenture

24 trustees, so we'll have United Parcel Service plus investors in

25 mortgages, people in the mortgage industry.  That's who will be

1 the plan oversight committee.  And they're going to make a lot

2 of decisions about, you know, claims negotiation, claims

3 resolution, at least whether to settle the claims, which

4 litigation to pursue, who to pursue, former officers of the

5 company, counter parties to various transactions, that sort of

6 thing.  All those decisions will be made by this trust.  And

7 one problematic feature that we have called to your attention

8 is the advance exculpation.  It provides very little comfort to

9 borrowers that we have a trust set up when no one can sue the

10 trustee for most breaches of traditional trustee duties.  Now,

11 to their credit they added, in response to our objection, that

12 a breach of the duty of loyalty is now a basis to sue, but most

13 trustee duties are not.  They're excluded now.  Failure to

14 report information, that's not a duty on which you can assert a

15 cause of action anymore.  Failure to employ a proper duty of

16 care, that's explicitly eliminated.  Using the care, skill,

17 diligence -- I can't read my own handwriting, but those sorts

18 of things, there are all these rules about what trustees are

19 supposed to do, that's eliminated.  And here's the one that is

20 potentially of the greatest concern to borrowers, the duty of

21 impartiality is eliminated.  So, now, if they intentionally

22 breached some duty, then maybe they can still get sued, but

23 that's not what a trustee is supposed to be subject to.  That's

24 not the standard.  This is sort of like saying they must put

25 the creditors' jewelry in a safety deposit box but they won't

1  be liable if they accidently leave the key on the subway, or if

2  they leave it unlocked.  I mean, we don't really have a trust

3  here.  We don't have a trustee.  What we have is sort of an

4  individual with some hodgepodge of duties.  And that's

5  profoundly important to borrowers because they can be affected

6  by all kinds of decisions, and then they can't sue if he

7  breaches traditional trustee duties.

8          Now, why do they have that?  Well, they say they need

9  it.  No one will take the job, they say.  That was testimony

10  from lawyers.  There has been no evidence in the record that

11  this exculpation is needed, no evidence at all.  Nobody

12  testified on the subject that I recall.  So, I suggest that you

13  can't include the exculpation provision.

14          Now, there is the <u>PWS</u> decision, and I've been trying

15  to figure out if there's just an irreconcilable conflict

16  between the various decisions on advance exculpation, or if

17  there is a rationalizing principle.  I'm not sure I'm smart

18  enough to come up with the rationalizing principle, but one

19  that occurs to me is that it looks like <u>PWS</u> is looking

20  backwards, and it looks like some of the other decisions --

21  some of them look backwards, but some of them seem to be

22  looking forwards and say you can't just prospectively excuse

23  people for malfeasance on their job, or misfeasance, or

24  whatever you want to call it, for making significant errors on

25  their job.  So, the advance exculpation is a major problem and

1  a basis for our plan objections.

2         another problem that we've talked about, Your Honor,

3  is that the trust could terminate in six months.  That's not

4  likely, but borrower claims are going to be coming in for

5  years.  We've heard that these loans may not even finish re-

6  setting until 2010, 2011, and so, if the trust is gone, that's

7  a big problem for borrowers for the obvious reason that there's

8  nobody to pay them.  It's also a problem because there won't be

9  an ombudsman to give them their loans, and their loan files.  I

10 mean, it's really -- the debtors have duties now to preserve

11 evidence, you know, as part of third party discovery processes

12 and all kinds of things, and this isn't going to enable them to

13 satisfy those duties.

14         The document destruction orders in this regard have

15 been a real quandary for us because we can't figure out what is

16 being destroyed and what's being preserved, and we can't figure

17 out what the operating principles are.  And we keep asking for

18 clarifications and we get these not very helpful responses.

19 Well, if you made a request pursuant to the orders, in

20 compliance with the orders, then your documents will be

21 preserved.  So, I mean, if I look at this from the perspective

22 of my borrower in Los Angeles, my hypothetical borrower, what I

23 get is -- and they can correct me on this position, but I think

24 it is if you, who got no notice of this document destruction

25 issue, made a request pursuant to the document destruction

1  order that you never received, to preserve your loan documents

2  that you don't know need to be preserved, then they will be

3  preserved, but otherwise they might not be.  And that does not

4  provide great assurance to most borrowers.

5          THE COURT:  No, that's not what the order says.

6          MR. WEISBROD:  I can't figure out how it -- what the

7  interplay is between what they're going to destroy and document

8  preservation issues.  I mean, we've now got --

9          THE COURT:  Well, if they're in compliance with the

10 order, they can only destroy documents if there's an electronic

11 record of those documents, microfiche or what have you.  There

12 has to be a complete loan file copy.  The request goes to

13 wanting the files back, the hard files back, it doesn't go to

14 preservation of the 3electronic copies.  If they're violating

15 the Court order, they're violating the Court order, but I would

16 assume not.

17         MR. WEISBROD:  I have no evidence that they are or

18 they're not.  I haven't been able to figure out what's going

19 on, honestly.  And it's not that we haven't asked, but --

20         THE COURT:  Mr. Beach?  You seem like you want to say

21 something.

22         MR. BEACH:  Yes.  I do just want to make a

23 clarification.  The first document destruction order that Your

24 Honor entered was solely with respect to documents where we had

25 electronic copies.  The subsequent document destruction orders

1 expressly provided that we would be able to destroy hard copy

2 loan files, and in some of those instances we have electronic

3 files from some period in 2005 forward, but from prior to that

4 we did not have hard copy loan files.  But the evidence in the

5 record shows that, you know, the servicer has those files --

6           THE COURT:  Right.

7           MR. BEACH:  -- and AHM Servicing obviously got those

8 files in connection with the sale, or they went back to the

9 current owners of the loans, most of which already had copies

10 of those, as well.  I don't recall what the full evidentiary

11 record was on those issues, but --

12           THE COURT:  My memory is that -- sorry -- that many

13 of the files that were authorized to be destroyed were loans

14 that never went to closing, and applications.

15           MR. BEACH:  That's correct, Your Honor.

16           THE COURT:  Is there a situation where the debtors

17 are allowed to destroy a file if it has not been returned to

18 the owner, or the servicer doesn't have it?

19           MR. BEACH:  I don't think under the orders we were

20 required to --

21           THE COURT:  Check.

22           MR. BEACH:  -- check on that.  As Your Honor may

23 recall, you know, these were documents in a gigantic warehouse,

24 and I think there was about 1.5 or 1.6 million files, and it

25 was an enormous task.  We had a warehouse that was going under,

1  so we were under time constraints to figure out how to deal

2  with a very difficult situation.  But AHM Servicing, under that

3  sale order, did require those documents, and like I said, I

4  think the owners of the loans either have copies, requested

5  copies, and they were segregated out pursuant those orders, and

6  those copies have been sent to the current owners of the loans,

7  so --

8          THE COURT:  I understand.  Thank you.  Thank you for

9  the clarification.  So, I was partially right, partially wrong.

10         MR. WEISBROD:  I'm not sure -- it sounds to me like

11  from the perspective of an individual borrower they have no

12  idea still, and that is part of our problem, and maybe the

13  ombudsperson who will be paid $50,000 total, and may be fired

14  after $50,000 is up, will be able to help them figure that out.

15  But right now, from the point of view of an individual

16  borrower, we don't have an answer about what's going on with

17  their documents.  I understand the general procedure.  It

18  sounds pretty good, but it also sounds like there's no

19  mechanism for verifying that individual borrower's loans aren't

20  falling through the cracks.  And so, that is a problem of great

21  concern to borrowers who need these loans to be able to

22  authenticate the background documents when they go to challenge

23  their mortgages.

24         MR. BEACH:  Your Honor, just for the record, Ms.

25  Greecher clarified for me that from September 2005 on we have

1 the electronic files, and those are being preserved under the

2 order.

3          MR. WEISBROD:  I'm sorry.  Could you say that again?

4          MR. BEACH:  September 2005 forward.

5          THE COURT:  Okay.

6          MR. WEISBROD:  Your Honor, if I may, I'll turn to the

7 EPD breach issue next.  I want to make sure that our position

8 on the EPD breach issue is clear.  We're not saying that EPD

9 breach protocols are always bad, or that there should be no EPD

10 breach protocol.  The borrowers, like everybody else, have an

11 interest in ensuring efficient resolution of claims.  But this

12 resolution of claims is defective, and the way that the debtors

13 have gone about creating it and presenting it here really

14 illustrates the utterly inconsistent approach that has been

15 taken with respect to borrower claims as opposed to other

16 claims.

17          As an evidentiary matter, we heard it's fine for Mr.

18 Fernandez and Mr. Pasternak to rely, for example, on Bloomberg,

19 and the S&P Kaye Scholer statistics on loss frequency and

20 severity, but as an evidentiary matter we're hearing that the

21 Court should completely disregard Moody's and Goldman on

22 negative amortization and default rates.  And, you know, that's

23 not a plan objection, it's just an observation about how one

24 should consider the evidence.  And, you know, we understand

25 that the Court is accepting S&P Kaye Scholer and is accepting

1 Bloomberg, and that's fine, and we're not objecting further on

2 that, but I think that the Court should also give weight

3 therefore to the Moody's, and Goldman, and other data that

4 you've heard experts typically rely on.

5        Now, one of the things that they didn't do, though,

6 is give any consideration to the value of EPD or breach claims

7 when those claims are actually defended in the Court system.

8 That's just not there.  And the protocol ends up allowing

9 overstated claims.  It ignores defenses, unclean hands,

10 etcetera, that might naturally result from the due diligence

11 process about which Mr. Pasternak testified.  It allows for

12 double recovery in some instances.  It allows -- such as, for

13 example, when private mortgage insurance is paid.  And it

14 allows people to collect when there's no prima facie case, when

15 they just attach a loan document but don't show that there's

16 actually been a breach of any provision, whether it's an EPD

17 provision or another type of warranty.  And this is a

18 significant issue.  I does dilute borrower claims because 150

19 to $200 million worth of claims are likely to be allowed

20 pursuant to these.

21        There's another way -- and by the way, there's no

22 comparable protocol for borrower claims.  You're not allowed to

23 submit a claim that says I got a payment option ARM, and here

24 was the rate, and here's the term, and here's my damage.  You

25 can't do that if you're a borrower.  There's not even -- you

1  know, there's no estimation, there's nothing.  So, that is an

2  inconsistency.  And the inconsistency here is really stark when

3  you look at breach of warranty.  It's really profound because

4  the debtors decided to take into account future borrower

5  defaults when paying the breach of warranty claimants, so all

6  those people you heard Ms. Saunders testify about who are going

7  to default two or three years from now, their defaults are

8  being estimated and the losses that the banks and other

9  investors sustained because of those losses they're getting

10 paid at least pennies on the dollar.  They're getting paid.

11 They're getting estimated.  But that's not true for the

12 borrowers who lose money in the future.  Those same defaults

13 that we're talking about that they're estimating that they're

14 paying, when the borrowers actually come and say I almost lost

15 my house, or I realize I just lost $100,000 in capital in my

16 house, in equity in my house that I didn't know I was losing,

17 they don't get paid anything.  The debtors say good luck to

18 you.  We hope you, you know, get a new subscription to The New

19 York Times National Edition, or the St. Louis Post Dispatch.

20 This process really is not fair to the borrowers in that

21 regard.

22        We suggest that there are a lot of other borrowers

23 who do need a chance to file their claims, and to vote, and to

24 object to the plan.  And so, if the Court is convinced in any

25 way by what I've been saying, and what we've been putting on

1   and saying in writing regarding notice, we would ask that the

2   Court refrain from ruling on the other issues in the plan to

3   ensure that the due process rights of any additional borrower

4   claimants are respected.  Thank you, Your Honor.  Oh.  May I

5   have one minute to -- oh, yes.  As we mentioned, we divided up

6   the issues, and Tom Macauley is going to be addressing the

7   remainder of our plan objection.

8           THE COURT:  Very good.

9           MR. MACAULEY:  Good afternoon, Your Honor.  Thomas

10  Macauley on behalf of the borrowers' committee.  Taking the

11  best interest test first, according to the disclosure statement

12  the borrowers have claims against Corp., Acceptance and

13  Servicing, which makes sense because Corp. and Acceptance had

14  the loans, Servicing serviced them.  Under the best interest

15  test individual dissenting creditors may object to the plan on

16  the basis that the plan provides for a recovery less than one

17  would receive in Chapter 7.

18          Now, opposing counsel has noted that they've put

19  forth a liquidation analysis, they've put forth two witnesses,

20  and that we have not put forth any witnesses or any affirmative

21  evidence.  But they have the burden of proof, and in this case

22  they haven't met it.  The reason is that the Court's job is to

23  look at the -- at a hypothetical Chapter 7, what a hypothetical

24  Chapter 7 would be in this particular case.  Well, one of the

25  things that the Court would look at is what would be the

1  potential litigation recoveries, particularly in a case like

2  this, which is somewhat thin.  The -- both witnesses testified

3  that the liquidation analysis did not consider litigation

4  recoveries, and as someone who has seen a number of liquidation

5  analysis over the years, and I'm sure Your Honor has seen them

6  as well, that's not all that surprising.  I can't remember

7  seeing a liquidation analysis that's contained a valuation of

8  litigation recoveries.  And the reason for that is pretty

9  simple.  Typically it's a wash.  You either -- in your Chapter

10 11 case you go after -- your liquidating trust goes after your

11 litigation recoveries, or your Chapter 7 Trustee goes after

12 your litigation recoveries.  There's no need to value them

13 because they're a wash.  In this case, however, you're using

14 the stipulated asset allocation.  Now that, in and of itself,

15 doesn't require the valuation of litigation recoveries if the

16 potential causes of action were spread along the various

17 debtors because you can't really tell who is going to recover

18 what, and everything is sort of a wash.  But here, all the

19 transfers are congregated into three entities, Corp.,

20 Acceptance, and Servicing, $20 billion.  That's a huge number.

21 I've never -- I don't remember a case having that type of gross

22 transfers made in the 90 days prior to the petition date.

23         Now, if you apply the stipulation asset allocation

24 analysis in this instance, it is going to prejudice the

25 unsecured creditors.  It is going to prejudice the borrower

1 claims.

2      Now, if you focus on the liquidation analysis

3 pertaining to Corp., there's a relatively small difference,

4 about 1.5 million, between the projected distributions to

5 unsecured creditors under the plan, and unsecured creditors in

6 the Chapter 7 case.  But when you consider the net litigation

7 recoveries, the general unsecured creditors of Corp. are

8 receiving -- in a Chapter 7 case they would receive 100 percent

9 of the recoveries.  Under the plan they would receive only 37.3

10 percent of the recoveries.  And moreover, as Your Honor pointed

11 out, the preference defendants would receive general unsecured

12 claims against Corp. under 502(h) for the full amount of their

13 claim in either case.  That claim is not reduced just because

14 Corp. effectively contributes 62.3 percent of its recoveries to

15 the other debtors under the stipulated asset allocation.

16      Now, the testimony was crystal clear that neither the

17 debtors or the creditor's committee had valued potential

18 recoveries from preferences, other avoidances, and other

19 litigation, and so, there is no way -- there is no proof, there

20 is no way for the debtors to prove at this point that the

21 general unsecured claimants of Corp. are at least as well off

22 under the plan as compared to a Chapter 7 case.

23      Now, there were a few other points more minor that we

24 raised in relation to the liquidation analysis.  We think the

25 $900,000 in costs associated with resolving inter-debtor

1 disputes, 150,000 of which is assigned to Corp., is

2 unrealistically high.  I mean, if the Chapter 7 Trustee came in

3 in a case that's as thin as this, they're not going to be

4 spending $900,000 to resolve inter-debtor disputes.

5         I think another point is also the Chapter 7 Trustee

6 fees.  Most of the assets, as the testimony has shown, have

7 been liquidated, at least the non-litigation assets.  And for a

8 Chapter 7 Trustee to have to spend over a million -- to receive

9 over a million dollars just in the Corp. case, because that's

10 the maximum allowed under the 326 cap, is not -- it's just not

11 reasonable.  And so, for those reasons the plan fails the best

12 interest test.

13         Now, let me turn to the automatic stay.  Our argument

14 was pretty simple.  The stay -- there's no authority -- and

15 actually -- the authority under the Code under 362(c)(2) is

16 that you can't extend the stay past confirmation, especially in

17 a liquidating plan.

18         The debtors have not offered any evidence.  They've

19 offered three arguments, effectively.  They make a legal

20 argument to say that that's not what 362 really says.  But if

21 you look at the statute and you look at 362(c)(2)(C), if the

22 time under a case under Chapter 11, discharge is granted or

23 denied, well, that's the time of confirmation.  And 1141

24 confirms that.  And if you look at 1141, for instance

25 1141(d)(3), specifically states that a liquidating plan does

1 not discharge a debtor.  So, that time is as of confirmation.

2          We offered a decision, authority out of the Eastern

3 District of Pennsylvania, which is on all fours.  The debtors

4 have not offered any authority whatsoever for their view.

5          The second point that they raised is that there's a

6 need to have a stay continue post-confirmation.  Well, there's

7 nothing in the record that they've offered to suggest that

8 there is a need.  This is simply legal argument.  Also, the

9 fact of the matter is is there isn't a need.  The assets are

10 here.  This Court controls the assets.  There may be suits

11 filed against the debtors in cases across the country, but the

12 debtors don't have to defend them.  The only way for those

13 borrowers to collect is to come here.  So, there's no need for

14 a stay.  The stay, as we all know, the purpose of the stay is a

15 breathing spell to help the debtor reorganize.  The stay isn't

16 usually even applied in a liquidating case pre-confirmation.

17 It certainly shouldn't be applied post-confirmation.

18          Finally, the last argument that they make, they touch

19 on is effectively by adding Article 17 to the plan, you know,

20 this argument is moot.  Well, Your Honor, if you look at

21 Article 17 in the plan, I'm looking particularly at Page 102 of

22 the clean -- 17E, which is entitled Modification of Injunctions

23 and Stays for Borrowers.  And it sets forth four subsections

24 that apply particularly to borrowers.  Now, number one applies

25 to any mortgage loan capitalized, which we don't know if

1  there's really much of anything left in the debtors' estate.

2  Those are non B of A loans currently -- that are in the estate

3  on and after the effective date.  So, that's against whom a

4  foreclosure is commenced by or on behalf of the plan trust.  I

5  don't think that's really going to apply to the majority of

6  borrowers who are faced in the situations that we've discussed

7  during this trial.  The second point is borrowers under any

8  mortgage loans serviced or originated by one or more debtors to

9  commence, or committing of an action, or cross planned against

10 such debtors nominally for the purpose of obtaining relief

11 against the non-debtor party.  Well, that's actually a very

12 well conceived provision.  The problem is is, I mean, as you

13 saw Ms. Graves' attorney was here.  I mean, he filed suit

14 against all these different entities, including American Home.

15 I don't know if most legal aid lawyers are going to know how to

16 do a complaint to sue someone nominally, even if they were to

17 have actually read the plan before filing suit.  So, while it's

18 a good concept, it doesn't -- it's not practical.

19        The third point is that they can seek third party

20 discoveries from the debtor.  Well, the automatic stay doesn't

21 preclude third party discovery.  The automatic stay precludes

22 an action to compel enforcement of a subpoena.  That's not

23 addressed here.  And then finally, the fourth one is

24 effectively what is the current law or consent of the plan

25 trustee.  So, the fact of the matter is this doesn't address

1 the issues that we have raised and we don't think that our

2 objection is moot.

3         Finally, Your Honor, I'd like to turn to the

4 stipulated asset allocation.  And as we cited in our brief, the

5 standard in the Third Circuit is that it must be fair and

6 equitable, and particularly to parties who do not participate

7 in the settlement.  It's our view that the stipulated asset

8 allocation is not fair and equitable to borrowers.  We've spent

9 a lot of time with Exhibit 1, Debtors' Exhibit 1, which was the

10 breakdown of all the numbers to get to the stipulated asset

11 allocation, and we saw that the date on which it was created

12 was November 19th, 2008, which was about a month-and-a-half

13 after the hearing at which Your Honor orally ruled from the

14 bench that we were going to appoint a borrowers' committee.

15 The debtors had input in this document.  The creditors'

16 committee had input in this document.  Bank of America

17 apparently had input in this document.  The borrowers'

18 committee did not.

19         Now, again, like the liquidation analysis, this

20 document is flawed because it doesn't address these litigation

21 recoveries.  Now, Mr. Fernandez, on direct, specifically said

22 that we don't -- we didn't include these because there's no

23 clear answers with respect to litigation recoveries.  Well,

24 that may be true, but there are no clear answers with respect

25 to a lot of the other numbers that are actually in the

1  analysis.  Now, substantial value was given for the bank, for

2  instance, but no one knows what is the value of the bank.

3  There was no testimony here, no one here could value a bank.

4  No one here could give us any clue of what the value of the

5  bank was.  Substantial value was assigned to these huge inter-

6  company claims, but there was no proof that they were valid, or

7  that they couldn't be re-characterized as equity.  You would

8  think a $1.3 billion claim from a parent to a sub is likely

9  going to be looked at as equity.  And in many other cases where

10 you've got a group of debtors like this, typically the

11 resolution is that huge inter-company claims are eliminated.

12 Well, that's not -- that didn't happen here.  Instead they were

13 given value, the litigation recoveries were not.

14        Now, if you look at Holdings, Holdings fares best

15 under the stipulated asset allocation, and that's because its

16 projected distribution to unsecured creditors exceeds five

17 percent.  The next largest projected distribution is 1.35

18 percent.  Now, based on the debtors' estimate of allowed

19 general unsecured claims against Holdings, there are about $130

20 million worth.  $50 million, apparently are held by Bank of

21 America based on its deficiency claim.  Now, a $50 million

22 claim against Holdings with a five percent distribution comes

23 out to about $2.5 million.  That excludes the other deficiency

24 claims against the other four debtors, Corporate, Acceptance,

25 Investment and Servicing.  It also excludes the litigation

1 recoveries paid out to general unsecured creditors of Holdings

2 under the stipulated asset allocation, because if you remember,

3 Holdings didn't make a single transfer during the preference

4 period, and yet, for every $100 of net recoveries to the

5 estate, Holdings creditors are going to get $30, 30 percent,

6 and no additional claims to dilute the recoveries.

7        Now, Holdings' value, according to Mr. Fernandez, was

8 based on two things.  One was the bank, one was inter-company

9 receivables.  There were also the settlement, the construction

10 HELOC settlements, as well.  But the bank does not have any

11 value until it's actually sold.  And as Mr. Fernandez

12 confirmed, it's not anticipated to be sold until after

13 confirmation.  But the costs necessary to sell the bank

14 apparently have not been directly assigned to Holdings.  As you

15 saw, there was only $47,000 of costs assigned to Holdings with

16 an investment bank involved, and attorneys, and a number of

17 attorneys, and the evidence was that none of that $47,000

18 related to Holdings.

19        THE COURT:  My memory is that investment banker was

20 retained by a non-debtor entity.  Is that correct, Mr. Beach?

21        MR. BEACH:  Milestone was retained by the debtors.

22 It's possible that they were also retained by the non-debtor

23 entity.  I don't recall.

24        THE COURT:  Wasn't there -- Mr. Power, wasn't there

25 an entity in connection with marketing the bank, a professional

1  that was -- was it the real estate owned by the bank?  Or am

2  thinking of the real estate owned by one of the Melville

3  entities?

4         MR. POWER:  I think, Your Honor, you're thinking of

5  Melville.  In this case the bank is not a debtor, but Milestone

6  was retained, though, in the case, and was given a lot of work.

7  One of the assignments is --

8         THE COURT:  You can't be -- well, we never have

9  debtor banks.

10        MR. POWER:  Right.  The fee, though -- well, we can

11 argue later, but the fee -- there's a success piece of the fee

12 in the bank sale that hasn't occurred yet.  That's what --

13        THE COURT:  Okay.  Are they getting -- is Milestone

14 getting a minimum?

15        MR. POWER:  They've got a minimum, and we've reduced

16 that in negotiations, Your Honor.  After they sold a lot of the

17 loans, and some of the stuff, and so the fees dropped -- I

18 recall 100,000 a month now.  Is that correct?

19        UNIDENTIFIED ATTORNEY:  I believe that's right.

20        THE COURT:  All right.  Thank you.

21        MR. MACAULEY:  Now, if you recall, the administrative

22 costs projected under the stipulated asset allocation were

23 projections between the petition date and the confirmation

24 date.  It doesn't include post-confirmation.  So, Holdings is

25 getting the value of the bank, which hasn't been sold, but it's

1  not getting any administrative costs assigned to it because

2  those costs either haven't been allocated -- either haven't

3  been assigned to holdings, or they're going to occur post

4  confirmation.  It seems like they're getting their money but

5  they're not paying for it.

6         So, for these reasons, Your Honor, we don't think the

7  stipulated asset allocation is fair and equitable to the

8  borrowers.  Thank you.

9         THE COURT:  You're welcome.  Any reply?

10        MR. BEACH:  Your Honor, can I have a moment to talk

11 to Mr. Power?

12        THE COURT:  Sure.

13                    (Pause)

14        MR. BEACH:  Your Honor, we do have a few comments.

15 We'll try not to -- well, we won't go point for point.

16        THE COURT:  All right.

17        MR. BEACH:  I'll start off with the stay issues, Your

18 Honor, and point out that -- you know, Mr. Macauley suggested

19 1141(d)(3), you know, doesn't allow discharge for a liquidating

20 debtor, nor does it say that discharge is denied on

21 confirmation.  It's -- reading something else into the statute

22 that it was deemed denied is inappropriate, I think.  And I'd

23 also point out Mr. Macauley, you know, asked -- says it's

24 inappropriate in a liquidating 11.  My understanding is that in

25 a Chapter 7 the stay would continue until that case was fully

1  resolved.  Obviously, you know, a liquidating situation very

2  similar to what we have here.

3          And finally he asked what authority we rely on, and

4  we rely on the Bankruptcy Code, and the cases cited by the

5  committee in their brief, and, you know, many other cases in

6  this jurisdiction that find it appropriate to continue the

7  stay.  And again, Your Honor, we think it's an appropriate gate

8  keeping matter.  Mr. Macauley pointed out Section 17.  I'm not

9  going to -- or, Article 17 of the plan and some of the relief

10 that borrowers do get under the plan.  I won't go point by

11 point, but Article 17 also has other relief that should satisfy

12 some of those borrowers' concerns in connection with the stay.

13          With respect to the exculpation provisions, what the

14 borrowers' committee suggests is a higher standard than what

15 the current committee is subject to, and frankly it would be

16 difficult, as I indicated earlier, for us to get anyone to take

17 this job without some sense of what the limitation on liability

18 would be, and like I said, we've added to the exculpation

19 provision in addition to gross negligence and willful

20 misconduct, which is in the PWS case, we also added fraud and

21 duty of loyalty.  Duty of loyalty Mr. Weisbrod talked about

22 impartiality.  Duty of loyalty is going to cover that.

23          With respect to the notice issue, Your Honor, the due

24 process issue, again, I would reiterate to Your Honor that

25 counsel has argued nothing beyond a foreseeable standard.  He

1  simply tries to -- he keeps using the word ascertainable to the

2  debtors, but it's really a foreseeable standard that he's

3  asking this Court to uphold at this point, and we think it's

4  very clear under the Third Circuit law that the standard is to

5  be reasonably ascertainable in October in this case of 2007,

6  and that to the extent -- and it has to be something that --

7  the debtors have to have something in their books and records,

8  in their possession that would indicate that there is a claim

9  and who the claimant may be.  In this case that's -- there's

10  nothing in the record.  The committee -- the borrowers'

11  committee cites to the <u>Fogel</u> case.  In that case, Your Honor,

12  it's -- the company realized that its pipes were sold and were

13  defective prior to the petition date.  It then tried to take

14  assets out of the company, very clearly understanding because

15  they were multi-million dollar lawsuits that were launched

16  against the company prior to the petition date, and they left

17  the company as a shell, filed for bankruptcy, and the Court

18  held that those were known creditors because the -- it was very

19  clear by the actions of the company and the fact that these

20  multi-million dollar lawsuits existed prior to the petition

21  date, that they should have known that the -- well, I'm sorry

22  -- I shouldn't use they should have known, that they did know

23  at the time that the bar date went out that these were

24  potential creditors of the company.

25          There was also some dialogue on excusable neglect,

1  Your Honor.  Your Honor has heard what evidence the borrowers'

2  committee could proffer in connection with the confirmation

3  hearing.  I'm sure Your Honor is going to recall that testimony

4  in connection with excusable neglect arguments that we may get

5  in the future.  And, Your Honor, they would have to meet that

6  standard.  The debtor are certainly maintaining any defenses

7  that they have under that standard, but there is a record, and

8  there is some benefit derived from the testimony for those

9  borrowers in any future litigation on excusable neglect.

10       With respect to the <u>Chevy Chase</u> matter they

11 mentioned, there's a TILA carve out -- TILA claims are carved

12 out under this plan.  Rescission claims are carved out under

13 this plan except for damages that might result.  And you heard

14 the expert testify that it's highly unlikely to get damages in

15 these situations.

16       And as Your Honor pointed out, or asked borrower

17 committee counsel as to whether this plan affects claims the

18 borrowers might have on third parties, this plan never, from

19 the time it was first drafted, affected the claims of borrowers

20 against third parties, and it doesn't now.

21       Your Honor, unless you have any specific questions

22 about the issues raised from the borrowers' committee, I will

23 cede the podium to Mr. Jackson to address the stipulated asset

24 allocation, and he could do breach protocol unless Your Honor

25 doesn't need to hear any reply in connection with those.

1          THE COURT:  Well, it's up to you.

2          MR. BEACH:  Okay.

3          THE COURT:  But thank you, Mr. Beach.

4          MR. JACKSON:  Your Honor, for the record, Patrick

5    Jackson for the debtors.  As with Mr. Beach, I don't want to do

6    a point by point response.  I'm happy to answer any questions

7    the Court may have about any of the points that were raised,

8    but there were a couple things I would like to address.

9          I guess we'll start with the stipulated asset

10   allocation.  As I mentioned, that's really the engine of the

11   plan.  And I think what we saw there in argument is, you know,

12   kind of a generalized fair and equitable argument.  Borrowers

13   weren't at the table.  Again, I don't understand where

14   borrowers fit in here specifically as borrowers.  you know, I

15   think it's clear on the stipulated asset allocation, EPD breach

16   protocol, liquidation analysis, Mr. Macauley and Mr. Weisbrod

17   are standing before you as representatives of a certain subset

18   of creditors pressing creditor issues.  The stipulated asset

19   allocation was hammered out between the professionals

20   representing the body that represents creditors, and the

21   debtors.  And it was hammered out largely between their

22   financial advisors.  Your Honor did not authorize the

23   borrowers' committee to retain a financial advisor in this

24   case.  We -- they've been aware of the stipulated asset

25   allocation, and we've talked about their various issues with

1 them.  But as far as making any changes to it after they came

2 in, we made some changes to it in November of 2008, but the

3 stipulated asset allocation itself had been around since August

4 when we filed our first plan.  So, I don't think that's a

5 meaningful point, and I don't think that there was anything

6 unfair to them process-wise.

7          Now, as far as the specific points in there, you

8 know, we've said -- we came right out and said we didn't value

9 inter-company claims.  We accepted booked inter-company

10 balances at face value.  That was a decision that was made

11 because it wouldn't have made sense to go look at them.  A $1.3

12 billion payable between Corp. and Investment is an aggregate

13 figure.  I mean, I personally don't know how many transactions

14 that embodies, but all of the figures on that table are

15 aggregates.  So, I can't say, just by looking at -- that there

16 was an aggregate inter-company balance of $1.3 billion, that

17 that means that you should take judicial notice that there's a

18 re-characterization issue there.  I don't think that you can do

19 that on this record.

20          Likewise with litigation values, we said why we

21 didn't value them.  There was a high level analysis that was

22 done.  Mr. Fernandez testified to those.  He concluded that

23 given that the nature of the debtors' business was that cash

24 was their inventory, essentially, and the originating and

25 selling loans, lots of cash traded hands, $20 billion, 60,000

transfers in the 90 days.  That doesn't mean that that's worth

anything.  And I guess what the borrowers' committee is asking

you to do is say, come on, Judge, look at the number, it's got

to be worth something.  Well, what is it worth?  There's no

evidence of that, only that we concluded that it wasn't worth

the time and expense necessary to go in and make that

determination and to propose a valuation.  Now, had we done

that, had we provided a value, Mr. Power touched on this

earlier.  If you look at the page of our allocation analysis

that talks about the administrative cost allocation formula,

let's suppose we assume that AHM Corp.'s litigation recoveries

would bring in $10 million of value so that for purposes of our

protocol we used all asset value, including litigation values.

Well, under our cost allocation weighting formula, which is

based primarily on unencumbered asset value, that would have

resulted in the allocation of more of the Chapter 11

administrative expenses to AHM Corp. against potential

recoveries if we were wrong.  And AHM Corp. did not realize $10

million of value from the litigation, it nonetheless, under the

way that this was all set up, would have resulted in AHM Corp.

being allocated real costs of the Chapter 11.  In the business

judgment of the debtors and the committee it didn't make sense

to make that kind of an adjustment.  I mean, this is a very

complex model, and you can't just take out one piece of it

without it having an effect on the overall structure.  And I

1  think, you know, the fact that we didn't have any evidence in

2  the Court today from -- or over the last couple days from

3  Milestone saying what the bank is worth is beside the point.

4  The debtors and the committee have the valuations of the bank.

5  They don't have valuations of litigation.  So -- and the value

6  of the bank isn't the issue, it's the reasonableness of the

7  settlement.

8          And I think -- on the best interest test, likewise,

9  it's an issue of -- and I'm probably -- let me grab this case

10  --

11                         (Pause)

12          MR. JACKSON:  I mean, I have very little to add on

13  this point other than that we didn't value the litigation

14  assets.  There's been no alternative value to zero that's been

15  suggested other than oh, come on, Judge, there's got to be

16  something there.  I think that's inappropriate.  We have a

17  case, Sentinel Management Group, Inc., a recent case, the

18  Northern District of Illinois, 398 B.R. 281, and the Court

19  there decided on a very similar record.  There was evidence

20  before it on liquidation analysis was the disclosure statement

21  analysis, the testimony of in that case the trustee, and there

22  was no rebuttal testimony put on, and the Court concluded that

23  considering that's all the evidence that's before the Court,

24  that the debtors had met their prima facie burden of

25  establishing that it was a -- the best interest test was met.

1 | And I'd submit a similar result should attain here.

2 |      And on the EPD breach protocol, and I think -- again,

3 | I fail to see how this a borrower issue, and I guess let me

4 | address the one, why don't borrowers have a claims protocol?

5 | Your Honor, I don't know how we would come up with that, to be

6 | honest with you.  I mean, even if we were to entertain it, I

7 | don't think Ms. Saunders had any idea, or would have had any

8 | idea, or would have been able to opine how you would go about

9 | saying -- when did you -- you know, did -- did Ryan, the

10 | broker, get you into this loan?  Okay.  Well then, you go in

11 | this column.  Did -- you know, what else happened?  Were you

12 | told this?  Did your disclosure say that?  There's a multitude

13 | of causes of action that are asserted in these actions.  It's

14 | untested in the law where they're coming out in terms of the

15 | success.  I really -- there's nothing that would allow us to do

16 | a borrower protocol, and the dollar values at stake might not

17 | justify the effort from the debtors' perspective, whereas with

18 | the EPD breach claims we've got a body of claims that they may

19 | well be allowed at 200 million or so under our protocol, but

20 | they were asserted at nearly a billion dollars.  So, you know,

21 | over the course of five months since our first plan was filed,

22 | we've been hammering out essentially a deal with these

23 | claimants, working arm in arm with the creditors' committee as

24 | the representative of other general creditors to reach an

25 | accommodation where we're bringing that number down to about

1  $200 million using a process that now everybody appears

2  comfortable with, just as of yesterday, with JPM and Morgan

3  Stanley withdrawing.  And I think the absence of a protocol for

4  borrowers I don't think is a plan issue.  You know, as we

5  argued in our papers, to the extent it's characterized as a

6  discriminatory treatment issue, it's irrelevant because there's

7  different classes here.  This isn't discriminatory treatment.

8  Everybody is receiving the same payout on their claim.  This is

9  just a process for estimating certain claims.  And as for the

10 specifics of the protocol, that it ignores defenses, I don't

11 know what value we should have assigned to the defenses that

12 we're talking about.  Unclean hands?  It's case by case.  I

13 don't know how you'd build that into a protocol.

14         THE COURT:  Okay.

15         MR. JACKSON:  You know -- I'm sorry.  I don't want to

16 belabor the point, but if Your Honor has any questions, I'd be

17 happy to answer them.

18         THE COURT:  I don't.  Thank you.  Mr. Power, any

19 comments?

20         MR. POWER:  Your Honor, I will be brief -- I will try

21 to be brief.  Your Honor, first of all, there are a couple of

22 facts that are just wrong on the legal argument that I just

23 want to make sure Your Honor is attuned to, because what

24 counsel said is not actually the reality of the situation.

25         Let me deal with the last issue first, which is the

1 one Mr. Jackson was mentioning about borrowers' protocol.  We

2 cannot solve all issues in this case in one plan.  This plan

3 cannot wrap up every single issue in this case.  We will have

4 many issues to deal with going forward to try to resolve, many

5 complicated issues.  We have WARN Act litigation, class action.

6 We have a class action proof of claim by borrowers.  We have

7 litigation with numerous parties.  We will resolve those issues

8 in time.  The borrowers' protocol, while it may be possible and

9 appropriate, and I personally have done protocols with senior

10 citizens on cruise lines, 18,000 passengers, I had to deal with

11 that in a case in this Court --

12           THE COURT:  <u>American Classic</u>?

13           MR. POWER:  <u>American Classic Voyages</u>, 18,000 senior

14 citizens who mostly paid up front for their cruises and never

15 got their cruises.  And in the plan -- there was a plan of

16 liquidation, and we confirmed it.  We had to cut down expense.

17 We had to basically get it to a point.  We came up with a

18 protocol and a system later on that worked, and we have

19 actually followed that system, and the Judges were very

20 concerned about the senior citizens, and making sure that we

21 did that.  This is -- the fact that we are trying to confirm a

22 plan of liquidation before Your Honor today does not mean that

23 we won't try to deal with these claims in an efficient and

24 appropriate manner going forward.  It's just -- we cannot solve

25 all evils today.  We can't solve all issues, and this is one we

1 couldn't solve, because when you're dealing with borrower

2 claims, there's about 400 currently on file.  There may be some

3 late ones that come.  A lot of them are sui generis, and have

4 separate issues, and have to be dealt with separately, so you

5 have to evaluate those claims, make a decision, make an

6 economic rational decision about what you can do.

7           THE COURT:  All right.  I think we're getting pretty

8 far afield here.

9           MR. POWER:  Yes, Your Honor.  I want to point out a

10 couple of issues just in terms of what was said.  Mr. Macauley

11 is simply mistaken about what Holdings does, and whether

12 Holdings has benefitted.  If Your Honor looks at the exhibit

13 with the stipulated asset allocation, in excess of $20 million

14 of claims are being allocated to Holdings, the administrative

15 share of expenses.  So, Exhibit 1, and I can just simply read,

16 if you recall, Ms. Mikelaus confirmed this when we asked her

17 specifically, under Holdings there's three lines where the

18 administrative expenses are allocated.  One is $50,000, the

19 other is over $20 million, and the third is, I think, 4.7

20 million.  The 4.7 is anticipated costs, which are anticipated

21 to be the direct costs associated with the sale or the

22 liquidation of the bank.  So, the direct costs, Mr. Macauley is

23 incorrect when he tells Your Honor that the costs of the bank

24 aren't going to be even charged against Holdings.  They are.

25 That's the way this protocol works.  In addition to that,

1 general expenses in excess of 20 million are paid by the

2 Holdings estate.  So, as we emphasize in the testimony, this

3 stipulation deals with expenses and claims, and you can't

4 simply take the claims and forget the expense side.  And when

5 we look at, it we think it's overall fair that way, because $20

6 million of expenses were picked up by this entity, and other

7 entities had to bear less expense, particularly Corp., and we

8 think that's an important fact, and that's really the evidence

9 that's before Your Honor.

10        Your Honor, the issue on the claims, and I have to

11 admit, Mr. Macauley says that the plan -- implies the plan says

12 if a preference defendant pays back a preference, it gets a

13 claim against Corp. if that's where it originally got it, and

14 as Your Honor recalls in the testimony, the plan doesn't deal

15 with that issue.  Maybe it was an admission on our part, but

16 the plan does not specifically say if a preference defendant,

17 you know, puts back the recovery where it goes, and as far as

18 we're concerned, I think the debtor is concerned, we can have

19 it go -- truthfully, Your Honor, most of those claims will be

20 settled and released as part of any settlement, but if they're

21 not, they can -- the claims can be allocated pursuant to where

22 the recoveries go as far as we're concerned, and we can make

23 that amendment to the plan and deal with that if Your Honor

24 wants.  It's just not addressed.

25        Your Honor, briefly on the EPD breach claim, I think

1  there's a misunderstanding about the way the insurance works.

2  First of all, the insurance of the mortgagee, the mortgagor,

3  they also have underwriting standards, the debtor has entered

4  into contracts in connection with those.  The insurance company

5  doesn't automatically accept a default.  They look into whether

6  there's a reason to reject the claim.  So, there are claims

7  that are rejected with the insurance.

8          In addition to that, as there was testimony -- the

9  only testimony on this was that that insurance is netted out as

10  part of the servicing claims process.

11          The third issue is a legal issue, Your Honor.

12  Insurance companies have subrogation rights, and the fact that

13  a claimant, an investor if you will, or a loan purchaser really

14  is what we're talking about, or a trustee -- has a claim,

15  insurance carriers still have a right to assert subrogation

16  rights to the extent that they have actually satisfied that

17  claim and stepped into the shoes of the holder of that

18  mortgage.  So, I distinctly disagree with the notion that

19  somehow this allows claims or allows double recovery.  It does

20  not.  One creditor, one claim is what we have here.

21          The statement that there is no prima facie showing

22  that these claims exist is simply wrong.  The testimony was

23  clear, you have to have a proof of claim on file.  You have to

24  certify on the questionnaire that you have these -- made these

25  loans.  And in both instances the claimant has to certify they

1  have a claim.  The prima facie showing is made.  The debtor,

2  then, just will calculate those numbers, verify the EPD exists.

3          THE COURT:  Filing the proof of claim by operation of

4  law creates a prima facie claim.

5          MR. POWER:  Yes, Your Honor.  And as the testimony

6  was clear, we don't know how many claims that were filed.

7  That's the first instance.  Two other points.  Stay injunction.

8  I don't want to belabor this point, but -- it's kind of funny

9  because normally what we would have done, what we wanted to do

10 is put the injunction in the plan as to the -- pursuing the

11 debtor and make claimants come here to -- relief -- injunction,

12 because the U.S. Trustee and certain other parties asked us not

13 to do that because the standard is higher for an injunction.

14 To keep it the same standard as a stay, we were asked to

15 basically make the stay extend.  Now we've got the borrowers

16 saying that's unfair because the stay shouldn't extend.  Your

17 Honor, either way we think it is appropriate to have this Court

18 be the repository, the gate keeper of these claims.  And Mr.

19 Macauley is simply wrong when he says that it's okay to have

20 parties all over the country litigate claims because they've

21 got to come over here to get recoveries.  Because once those

22 claims are determined by a Court elsewhere, we have issues

23 regarding judicial estoppel, and all other issues, and we think

24 that the only way to run this case is to keep this Court as the

25 central repository of the claims.

1           THE COURT:  All right.

2           MR. POWER:  Last issue is the notice issue, Your

3    Honor, and I'm not going to belabor the point.  I agree with

4    Mr. Beach, and all.  The record in this hearing is pretty

5    clear, and Your Honor can take judicial notice, when claimants

6    come before Your Honor later down the road, the record in terms

7    of notice and what the issues are, and the pay option ARMs,

8    it's part of the record and Your Honor's decisions will be part

9    of that.  We will deal with those claims when they -- if and

10   when they come.  I mean, we'll deal with it as part of the

11   claim process.  In terms of notice, there is no evidence that

12   American Home was aware that its loan products created

13   liability to homeowners because they were of such in nature

14   that they were kind of per se, created liability.  There's just

15   no evidence as to American Home's practices, its loan products,

16   and the way it went out of business.  So, I don't think the

17   record is sufficient in this case for Your Honor to determine

18   that this debtor could ascertain that its product, per se,

19   created a liability that required giving notice to all

20   customers.

21           THE COURT:  All right.

22           MR. POWER:  Thank you, Your Honor.

23           THE COURT:  All right.  I'm going to take until three

24   o'clock to think through some things, check some of the cites,

25   and I will return to the bench at three and issue a ruling.

1          MR. POWER:  Your Honor, I have an appeal of the case

2   that was reversed.

3          THE COURT:  Oh.  Thank you.

4          MR. POWER:  May I approach?

5          THE COURT:  Yes.

6                    (Recess)

7          THE COURT:  Please be seated.  Get yourself

8   comfortable, because this could take a little while.  All

9   right.  I'm going to start with some preliminary comments that

10  I think are important because they touch on the issues in front

11  of the Court, specifically -- I think most significantly in

12  connection with the noticing issues and the payment ARM --

13  payment option ARM products.

14          First, just to be clear for the record, as a Judge my

15  job is not to make the law, it's to apply the evidence to the

16  law.  And in this case specifically apply the evidence to

17  determine whether the debtors have satisfied the confirmation

18  standards in the Bankruptcy Code.

19          I think that's important because a good bit of the

20  borrowers' committee's case and objection is a critique of

21  payment option ARM loans, the product -- the inherent

22  difficulties with the product and the way it was marketed, and

23  to whom it was marketed.  I don't -- at least unless I talk

24  about it more specifically later, I don't offer comment on that

25  other than to say I think that that is a position that

1 certainly may have merit.  But I think that that may sort of be

2 neither here nor there for purposes of today unless -- except

3 that would impact some specific issues.

4         A lot of the issues that we're dealing with today

5 result from the fact that bankruptcy cases take time.  Ideally

6 they would take no time, it would be an instantaneous

7 collection of the estate's assets and distribution of those

8 assets based on the liabilities.  But, of course, that is

9 unrealistic.

10        The other thing is bankruptcy is expensive because it

11 requires a great deal of effort by professionals, as well as

12 the debtor to maximize the estate, figure out how it's to be

13 distributed, and distribute on the liabilities.  It's important

14 -- one of the primary issues, the reason it works, is that that

15 entire process happens in one place, in the Bankruptcy Court

16 that has the case.  And the whole point, again, is to maximize

17 the value of assets and distribute on the claims.  All of that

18 requires a constant cost benefit analysis by the litigants and

19 by the Court.  At some point the music has to stop because the

20 marginal utility of administering the case is so significantly

21 declined that there simply is no further value to be achieved

22 by continuing to go forward.  That leads us into the notice

23 issues because I think that the due process rules also require,

24 in effect, a cost benefit analysis.

25        The notice -- well, let me back up for a minute.

1  Known creditors must receive actual notice.  That's based on

2  fundamental issues of fairness that arise from our Constitution

3  that basically say I don't care what it costs, the benefit is

4  too important.  But in order for a claim to be known, the claim

5  must be reasonably foreseeable.  That's the law of the Third

6  Circuit.  That makes us -- basically that's where the rubber

7  hits the road in this case.  Were claims by borrowers of

8  payment option ARM mortgages that had not yet indicated to the

9  debtors that they wanted to pursue some claim, were those

10  claims reasonably foreseeable?  Are they reasonably foreseeable

11  today?  And I find that they are not.

12          First, I think that what the borrowers' committee is

13  asking me to do is in effect find that these products are per

14  se defective, or per se give rise to claims.  The case, for

15  instance, they cite to, you know your pipes are defective,

16  you've got to give notice to the people who bought your pipes.

17  I don't think it's fair in this case to say that the debtors

18  knew payment option ARMs were defective.  Clearly they are

19  exotic, complicated loan products.  They contain a number of

20  elements that have existed for some time, but not necessarily

21  all in the same unit.  For instance, negative amortization.  I

22  see negative amortization quite a bit on a corporate debtor

23  business in this Court.  It's one way of providing pick

24  interest.  The government, in student loans, allows for

25  negative amortization by capitalizing interest during periods

1   when you get a break from payment.  Personally, my wife and I

2   negatively amortized her medical school loans when she was in

3   residency.  The adjustable rates have been in place for quite

4   some time.  Balloon payments have been in place and part of

5   lending for quite some time.  The issue, of course, is you put

6   them all together and you may have a very dangerous product for

7   a consumer to buy.  But again in this case I don't think even

8   today that it would be prudent or reasonable for the Court to

9   find that those products are per se going to give rise to a

10  significant number of claims, and I don't think Ms. Saunders'

11  testimony got us there.

12          So, you didn't have to give actual notice to the

13  borrowers, or more specifically, the payment option ARM

14  borrowers, so then the issue becomes publication notice.  And

15  again, there's a reasonableness test to apply.  Clearly the

16  publication notice in this case was not perfect.  It is a

17  standard legal notice.  The largest defect, I find -- not

18  defect, but the largest issue I find was the -- was not

19  specifying what entity meant.  Ideally it would have been

20  specific to individuals.  But publishing it in a nationwide

21  paper is all that's required by the law, and frankly,

22  publication notice is of very limited utility, no matter where

23  it's published.  And I think the Court recognizes that in

24  setting the standards for it.  It's also expensive.  It was

25  somewhere between 40 and $60,000 to publish in three

1   newspapers.  To do it in the top 20 largest mortgage markets in

2   America would have arguably cost eight, $900,000, and probably

3   in my estimation would not have significantly increased the

4   number of claims actually filed.

5        So, I'm going to overrule the objection in connection

6   with the notice issues.  That turns us to the more traditional

7   confirmation issues that are in play in this case, and I'll

8   take them in no particular order.  The automatic stay.  I

9   disagree with the borrowers' committee's reading of 362(c)(2)

10  and 1141(d)(3) to mean that upon entry of a confirmation order

11  that does not contain a discharge provision, the discharge has

12  been denied, and thus the automatic stay may not be continued.

13  I think it's important to note that 362 applies to all cases,

14  7's, 13's, etcetera, and the discharge litigation in Chapter 7

15  cases and the basis for denying discharge in Chapter 7 are much

16  -- there's much more numerous, much more complicated, and much

17  more common, frankly.  That's where you see a denial of

18  discharge.  You really don't see it in your Chapter 11 cases.

19  I think it's wholly appropriate that this Court continue to

20  exercise a gate keeping function, although it would certainly,

21  to a certain extent, be easier if I didn't do that, but I think

22  it's appropriate.  That goes to the fundamental issue that this

23  system works because it's one-stop shopping for figuring out

24  the assets and liabilities and distributing them.

25        I think Article 17 as drafted has had a significant

1  effect on lessening the burden of the continuation of the

2  automatic stay in this case on borrowers, and I think absent

3  the -- and I find absent the stay continuing this case that the

4  case would simply be not manageable and administrative costs

5  would spin out of control.

6         With regard to the trustee issues, the appointment of

7  the plan trustee, the oversight committee, and the exculpation

8  provisions, first of all I think and I find that this is a

9  standard type of trustee trust provision.  The plan trustee and

10 the oversight committee will continue to have fiduciary duties

11 to exercise in running the plan trust.  The exculpation

12 provision is consistent with the law in this district, and as

13 Mr. Beach said sets the standard of liability.  Now, I agree

14 and I acknowledge that that is somewhat different than your

15 typical trust fiduciary duties, but given the differences, I

16 think, and the bankruptcy specific differences in place here,

17 that it's appropriate under the case law and under the facts of

18 this case to limit that to duty of loyalty, gross negligence,

19 fraud, willful misconduct being the exceptions.

20        I think that will capture virtually any potential

21 claim that could be asserted by any creditor in connection with

22 the operation of the trust.  And I don't believe that there is

23 an inherent conflict in having one trustee deal with all -- is

24 it seven or eight estates?  I can't -- seven or eight debtors?

25        MR. JACKSON:  Eight.

1              THE COURT:  Eight debtors.  Basically because of --

2  we'll get to this in a minute, but basically because of the

3  asset allocation model.  The destruction of documents point I

4  really don't think applies to confirmation whatsoever.  That's

5  an issue as to previous orders of this Court.  I assume that

6  the debtors are complying with it.  There is some processes

7  available in Article 17 that deal with helping borrowers get

8  access to information.  Borrowers always had the ability to try

9  to work through their services although I understand that is a

10 very imperfect way to get information.

11             I'll turn to the asset allocation model, and the EPD

12 and the breach of warranty protocol.  I -- just as a bankruptcy

13 geek, I've found this model very interesting because I think

14 it's a reaction in many ways, maybe I'm wrong, a reaction in

15 many ways to the Third Circuit's pronouncement that deemed

16 consolidation is not generally an available remedy, and it's

17 very, very difficult to achieve substantive consolidation under

18 the law.  The complicated nature of this allocation and the

19 protocols is evidence of why people -- why litigants tried to

20 get deemed consolidation claims through the Court system.  So,

21 the debtors were put in a difficult position of how do you

22 manage an estate with so many different entities and so many

23 different inter-company claims?  And I agree that the asset

24 allocation, the EPD breach protocols are all, in effect,

25 settlements of inter-company claims and other claims, and the

1  resolution process, and thus I'm going to look at it under the

2  reasonableness standard, which really comes down to whether

3  it's going to be fair and equitable to all parties, and I find

4  that it is not perfect, but again, that's not the standard.  I

5  think that it will avoid a massive amount of costs in

6  connection with litigation.  Those litigation costs are driven

7  by the complex nature of this company's structure and the use

8  of a centralized cash management system.  The running of the

9  estates for basically the benefit of all creditors, and trying

10 to figure out which claims apply to which debtors, and again,

11 these claims are $200 million, these administrative claims.

12 This is not a small amount of claims.  Similarly, with the EPD

13 and the breach warranty protocol, the system in place, although

14 not perfect, will have substantial cost savings and will allow

15 the estate to actually have an orderly liquidation and payment

16 of claims.  In a way I think it makes abundant sense.  It

17 really feeds into the liquidation analysis because I think the

18 borrowers' committee's main flaw with the liquidation analysis,

19 complaint that they have is that they massively underestimate

20 the additional costs that would be associated with a Chapter 7

21 case.  And frankly I think the debtors' expenses are probably

22 light.  If there is no asset allocation settlement, there is no

23 EDP protocol, there is no breach protocol, the expenses

24 associated with managing this estate in an 11 or a 7 will be

25 much, much higher, and they've been high enough -- I'm not

1  being critical, but they've been high enough as it is.

2        Also I think it's appropriate to exclude from both

3  the asset allocation model and the litigation analysis the

4  value of potential litigation claims.  First of all, I'm not

5  sure there's much value there.  Based on my experience in this

6  case, some decisions in connection with what's a repurchase

7  agreement and what effect that has, the <u>Lehman</u> decision that I

8  issued, which dealt with a pre-petition margin call, it's one

9  of Mr. Dorsey's favorite decisions, I think, you know, it had

10 the effect, I certainly didn't go out of my way to do that, but

11 it had the effect of severely limiting what potential

12 litigation recoveries there are.  But they are -- litigation

13 recoveries in liquidating plans, you know, one time out of ten,

14 two times out of ten they're met.  Virtually in every case they

15 end up falling short.  Defendants are able to defend.

16 Prosecuting claims is expensive.  Prosecuting litigation is

17 expensive.  So, I don't really see a smoking gun, or, you know,

18 golden lining here on some giant recovery that I think would

19 justify putting this case -- putting litigation recoveries in

20 the liquidation analysis or in the asset allocation.

21        I think that addressed the issues.  I'll overrule the

22 borrowers' committee's objection in toto, and I will approve --

23 I otherwise find, based on the declaration and other evidence

24 before the Court that the debtors have met the confirmation

25 standards, and I will approve confirmation of the plan and

154

1  enter the order proposed as modified to reflect on-going

2  settlement negotiations.

3          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor. With

4  that, we do anticipate working on the confirmation order this

5  afternoon, and we'll submit it under certification of counsel

6  with a black line from the prior version filed as quickly as we

7  can.

8          THE COURT:  Very good.  Anything further for today?

9          UNIDENTIFIED ATTORNEY:  No.

10         THE COURT:  Thank you much.  The hearing is

11 adjourned.

12         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

13                   *  *  *  *  *

14         **C E R T I F I C A T I O N**

15         I, TAMMY DeRISI, court approved transcriber, certify

16 that the foregoing is a correct transcript from the official

17 electronic sound recording of the proceedings in the above-

18 entitled matter.

19

/s/ Tammy DeRisi                Date:  February 25, 2009

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.