# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE
--------------------------------------x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, et al.,

        Debtors,

--------------------------------------x


        200 Park Avenue
        New York, New York


        February 25, 2009
        9:57 a.m.



    DEPOSITION of SIMON SAKAMOTO, before

Michele Moskowitz, a Notary Public of the

State of New York.




ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF:  89677A

```
 1      A P P E A R A N C E S:

 2

 3      YOUNG CONAWAY STARGATT & TAYLOR, LLP

 4      Attorneys for Debtors

 5           The Brandywine Building

 6           1000 West Street, 17th Floor

 7           Wilmington, Delaware   19801

 8      BY:  CURTIS J. CROWTHER, ESQ.

 9           PHONE 302-571-6755

10           E-MAIL ccrowther@ycst.com

11

12

13      HUNTON & WILLIAMS

14      Attorneys for Calyon

15           951 East Byrd Street

16           Richmond, Virginia  23219

17      BY:  JASON W. HARBOUR, ESQ.

18             - AND -

19           BENJAMIN C. ACKERLY, ESQ.

20           PHONE 804-788-8479

21           E-MAIL jharbour@hunton.com

22

23

24

25
```

1    -------------------- I N D E X --------------------

2    WITNESS                    EXAMINATION BY           PAGE

3    SIMON SAKAMOTO             MR. HARBOUR                 4

4

5

6    ---------------- E X H I B I T S ----------------

7    SAKAMOTO       DESCRIPTION                         PAGE

8    Exhibit 1      Document: "Securitization
               Based Pricing of MTA Arms"            23

9

       Exhibit 2      Document: "Performing"               23

10

       Exhibit 3      Declaration of Michael
11              Strauss in Support of the
               Debtors' Chapter 11 Petitions
12              First Day Relief                      37

13    Exhibit 4      Document: "Performing"               64

14

15

16              (EXHIBITS TO BE PRODUCED)

17

18

19

20

21

22

23

24

25

1    S I M O N   S A K A M O T O , after

2        having first been duly sworn by a Notary

3        Public of the State of New York, was

4        examined and testified as follows:

5

6    EXAMINATION BY

7    MR. HARBOUR:

8        Q.    Please state your name for the

9    record.

10       A.    Simon Sakamoto

11       Q.    Good morning, Mr. Sakamoto.  My

12   name is Jason Harbour.  I represent Calyon

13   New York Branch as administrative agent and

14   we're here to ask you some questions today.

15            Are you on any medication or is

16   there any other reason why you wouldn't be

17   able to testify truthfully today?

18       A.    No.

19       Q.    Have you ever been deposed?

20       A.    Yes.

21       Q.    When were you deposed previously?

22       A.    I believe -- I don't know the

23   exact date, but sometime last year.

24       Q.    So did it deal with American Home

25   Mortgage?

1                         SAKAMOTO

2         A.      Yes.

3         Q.      What was it related to?

4         A.      Another case that I was working

5    on.

6         Q.      Which case?

7                 THE WITNESS:  Is that relevant?

8                 MR. CROWTHER:  You can answer.

9         A.      It's the Wells Fargo

10   interpleader.

11        Q.      Just generally, what's the

12   general topic of that?

13        A.      Well, it's contested funds.

14        Q.      Okay.  And what's it contested

15   based on?  I'm just trying to get a general

16   feel of what it is and what your testimony

17   dealt with.

18        A.      It required gathering the facts

19   around the transaction.

20        Q.      Were you testifying about value?

21        A.      Let me think about it.  No.

22        Q.      Just the general facts of what

23   happened in the transaction?

24        A.      Yeah.

25        Q.      Have you ever testified before?

1                           SAKAMOTO

2          A.      In what circumstance?

3          Q.      In court?

4          A.      Yes.

5          Q.      When?

6          A.      Related to American Home?

7          Q.      Sure, first.

8          A.      Three times.

9          Q.      When did you testify?  And not

10   exact dates, just generally if you don't know

11   exactly.

12         A.      Once in 2007 and twice in 2008.

13         Q.      Do you recall what the testimony

14   dealt with on each of those occasions?

15         A.      Well, they're regarding the

16   disputed transactions.

17         Q.      With whom?  Were they all Wells

18   Fargo or --

19         A.      No.  They involved other creditor

20   counterparties.

21         Q.      Who did they involve?

22         A.      One was with Deutsche Bank, the

23   second one was with Wells Fargo's securities

24   admin, the third was with Wells Fargo and

25   Bear Stearns.

SAKAMOTO

1

2       Q.      Other than in connection with the

3    bankruptcy proceeding, have you ever

4    testified in court before?

5       A.      I don't recall really.

6       Q.      Since you've done all this

7    testimony, you know it's important that you

8    answer the questions verbally so that the

9    court reporter can pick everything up, and

10   please, if for any reason you don't

11   understand a question I ask, please let me

12   know so that we can communicate effectively.

13      A.      Okay.

14      Q.      What's your home address?

15      A.      7692 Albany Post Road, Red Hook,

16   New York 12571.

17      Q.      Who is your employer?

18      A.      American Home Mortgage.

19      Q.      What is your employer's address?

20      A.      538 Broadhollow Road, Melville,

21   New York 11747.

22      Q.      What's your title at American

23   Home?

24      A.      Senior vice president.

25      Q.      How long have you had that title?

1                         SAKAMOTO

2        A.      Since 2003.

3        Q.      What did you do to prepare for

4    this deposition?

5        A.      I reviewed the circumstances

6    around this case.

7        Q.      When you say "this case," what do

8    you mean?

9        A.      The Calyon vs. American Home

10   case.

11       Q.      Did you talk with anyone?

12       A.      With our bankruptcy counsel and

13   also with our restructuring advisor, Kroll.

14       Q.      What did you discuss with Kroll?

15               MR. CROWTHER:  Objection.

16       Privileged.  You're not to answer the

17       question.  Those discussions were with

18       me as well.

19       Q.      You said you reviewed documents

20   concerning the case.  What documents did you

21   review?

22       A.      The claim, the Calyon claim.

23   Let's see.  What else?  Just in general the

24   loans in question.

25       Q.      Are you familiar with the

SAKAMOTO

1

2  30(b)(6) topics that Calyon identified?

3       A.      Yes.

4       Q.      Are you aware of the topics for

5  which the debtors identified you as a

6  responsive representative?

7       A.      Yes.

8       Q.      What post high school degrees do

9  you have?

10       A.      I have a bachelor of science from

11  MIT and a master of business administration

12  from Columbia University.

13       Q.      When did you receive those

14  degrees?

15       A.      1981 and 1986.

16       Q.      What did you do between those two

17  degrees?  Did you work?

18       A.      I worked as a system engineer for

19  IBM.

20       Q.      And after you received the second

21  degree?

22       A.      I worked for three employers.

23  First was First Boston Corp., second was

24  Lehman Brothers, and the third continues to

25  be American Home.

1                          SAKAMOTO

2           Q.      When did you start working for

3    First Boston?

4           A.      1986.

5           Q.      How long did you work there?

6           A.      Until 1990.

7           Q.      What was your job there?   What

8    was your title?

9           A.      Vice president.

10          Q.      What were your responsibilities?

11          A.      Trading mortgage-backed

12   securities, collateralized mortgage

13   obligations, overseeing those and other MBS

14   products.

15          Q.      By MBS you mean --

16          A.      Mortgage-backed securities.

17          Q.      When did you work for Lehman?

18          A.      1990 to 2003.

19          Q.      What was your title there?

20          A.      Starting from vice president,

21   ending at senior vice president.

22          Q.      What were your responsibilities?

23          A.      I had various functions.   The

24   first was a product business manager for MBS

25   products and trading manager, second was a

1                       SAKAMOTO

2    portfolio manager within their asset

3    management division, and third would be a

4    business manager for their hedge fund/PE

5    products.

6         Q.      What's PE?

7         A.      Private equity.

8         Q.      Did all of those responsibilities

9    in some way touch in the mortgage industry?

10        A.      Absolutely.  The first one was

11   primarily mortgage and asset backs.  The

12   second one was managing a portfolio of

13   mortgage backs.  The third one was unrelated

14   to mortgage backs.

15        Q.      You've worked for AHM since 2003?

16        A.      Correct.

17        Q.      What's your title -- you're

18   senior VP.  What are your responsibilities

19   there?

20        A.      Head of the portfolio management

21   of the investment mandates at American Home.

22   So managing the REIT portfolio, the MSR

23   hedging program, and the bank portfolio.  I

24   manage the team of analysts and portfolio

25   managers.

1                    SAKAMOTO

2        Q.      For American Home's

3   mortgage-related --

4        A.      Correct.

5        Q.      -- products and assets?  You've

6   done that or you had done that from 2003 on?

7        A.      Correct.

8        Q.      Do you have any idea how many

9   mortgage loan sales you've been involved with

10  or seen happen in your roles at these various

11  companies?

12               MR. CROWTHER:  Objection to form.

13       You can answer.

14       A.      I've been involved in the

15  purchase side of mortgages primarily, but of

16  course that requires an understanding of

17  valuation of those instruments.  I've been an

18  observer of the sales activity since our

19  department worked closely with the secondary

20  department, which was responsible for selling

21  the mortgages.  We're in the same room.

22               So as an observer, I -- I have a

23  pretty good understanding of the sales

24  process and the valuation process.

25       Q.      For secondary sales?

1                         SAKAMOTO

2          A.      Yes.  And the third is since

3    being involved in bankruptcy, I've been on

4    the management committee.  So yes, I observed

5    sales, but not, again, directly involved.

6          Q.      But you generally understand the

7    secondary mortgage market?

8          A.      Yes.

9          Q.      By that we mean the sale of pools

10   of mortgage loans?

11         A.      Unsecuritized whole loans.  But a

12   direct function is to actually acquire whole

13   loans for our REIT portfolio.

14         Q.      And that's because your

15   department didn't actually do the selling of

16   the whole loans?

17         A.      Right.  But we purchased loans

18   for investment.

19         Q.      In the secondary market?

20         A.      From internal and external

21   channels, so yes.  Probably a smaller

22   percentage.

23         Q.      Are you generally familiar with

24   the Calyon repurchase agreement?

25         A.      Yes.

1                        SAKAMOTO

2          Q.      So when I say repurchase

3    agreement today, that's what I'll mean, the

4    Calyon repurchase agreement.  There are

5    probably some other terms that it might make

6    sense we just agree what we mean, so we can

7    cut down on a little time.

8               When I refer to the debtors, I'll

9    mean the American Home Mortgage debtors.

10   When I say petition date, that will mean

11   August 6, 2007.  You're aware that that's

12   when the debtors filed the bankruptcy

13   petition?

14         A.      Yes.

15         Q.      Calyon means Calyon New York

16   Branch as Administrative Agent under the

17   repurchase agreement.  Mortgage files means

18   the records, files, other documents

19   concerning mortgage loans under the

20   repurchase agreement, including payment

21   history regarding those mortgage loans, paper

22   copies, electronic copies.

23              Original mortgage loan documents

24   means the original loan documents, the

25   security documents that are part of the

1                         SAKAMOTO

2    mortgage file regarding the mortgage loans

3    under the repurchase agreement.

4               Proceeds means any and all funds

5    and collections of every type received

6    concerning the mortgage loans under the

7    repurchase agreement.  MSRs means the right

8    to service mortgage loans under the

9    repurchase agreement.

10        Q.     What steps did the debtors take

11   to respond to Calyon's interrogatories?

12        A.     You know, we have our counsel

13   prepare the responses.

14        Q.     Did you do anything in connection

15   with responding to those interrogatories?

16        A.     I'm not sure whether it was

17   directly part of the response, but I was

18   asked to work on the valuation of those

19   underlying loans.

20        Q.     When did that take place, your

21   work on the valuation?

22               MR. CROWTHER:  Objection to form.

23        You can answer.

24        A.     I believe we worked on it maybe

25   late last year or early this year.

1          SAKAMOTO

2          Q.      What were the debtors' document

3     retention policies from August 1, 2007,

4     through the present with respect to the

5     mortgage files?

6               MR. CROWTHER:  Objection.  Beyond

7          the scope, but you can answer if you

8          know.

9          A.      Well, I think in general the

10    original documents are kept at the custodian

11    and to the extent that we had copies, whether

12    paper or imagined, we kept them at American

13    Home.

14         Q.      What were the debtors' document

15    retention policies with respect to documents

16    that were related to the repurchase agreement

17    or the mortgage loans in general --

18              MR. CROWTHER:  Objection to form.

19         Q.      -- under the repurchase

20    agreement?

21              MR. CROWTHER:  Objection to form

22         and beyond the scope.  You can answer.

23         A.      Specific to the Calyon loans, you

24    mean?

25         Q.      Yes.

1          SAKAMOTO

2          MR. CROWTHER:  Same objections.

3      A.    I don't know what our internal

4  policy is, but I assume that if we made

5  copies of the loans, that we probably would

6  have copies at American Home and the

7  originals are at the custodian.

8      Q.    Again, when I say original

9  mortgage loan documents, I mean the original

10 documents for the repurchase agreement

11 mortgage loans.  Are you familiar with --

12          MR. CROWTHER:  I'm going to

13      register an objection to any question

14      that incorporates that definition as

15      being vague and ambiguous and I'll

16      object to any question on a form basis.

17          MR. HARBOUR:  There you go.

18          MR. CROWTHER:  Thanks.

19     Q.    Are you familiar with the status

20 of the original mortgage loan documents from

21 August 1, 2007, through August 15, 2008?

22     A.    No, I'm not familiar with the

23 status.

24     Q.    Do you know whether the debtors

25 had complete and accurate copies of the

1                       SAKAMOTO

2    original mortgage loan documents as of August

3    1, 2007?

4         A.      Whether we had what, copies?

5         Q.      Complete and accurate copies.

6         A.      I don't know the answer.  That's

7    not an area that I was responsible for.

8         Q.      So you don't know how many

9    exceptions there were at any point in time

10   between August 1, 2007, and August 15, 2008?

11              MR. CROWTHER:  Objection to form.

12        A.      I don't know the answer.

13        Q.      Do you know whether the debtors

14   worked with Calyon in February and March 2008

15   to resolve exceptions to the original

16   mortgage loan documents?

17              MR. CROWTHER:  Objection to form,

18        beyond the scope.

19        A.      Again, it was not something I was

20   involved in, so I don't know the answer.

21              MR. ACKERLY:  Give us two

22        minutes.

23              (A brief recess was taken.)

24        Q.      Do you know whether the debtors

25   had provided Calyon with a mortgage loan tape

1                       SAKAMOTO

2    as of December 31, 2007, during January 2008?

3                   MR. CROWTHER:  Objection to form

4        and beyond the scope.

5        A.      I don't know the answer because

6    again, I'm not responsible for that area.

7        Q.      You indicated that you were asked

8    to work on a valuation of the underlying

9    mortgage loans.  What did you do to prepare

10   that valuation?

11       A.      We looked for similar comparable

12   sales around the time, and I gathered all the

13   trades that happened within American Home

14   around the time of the valuation date.  And

15   once we got that information and consolidated

16   the loans by type and then put a price on

17   each loan group and then aggregated that --

18   the loans to come up with a total loan value

19   plus the cash collateral to determine if the

20   total assets was higher than the repurchase

21   amount and the answer was yes.

22                   The value of the loans plus the

23   cash collateral exceeded the repurchase

24   amount as of August 1, '07.

25       Q.      You said that the valuation was

1                          SAKAMOTO

2      as of August 1, 2007.  Did you do valuation

3      as of any other date?

4           A.      We did one as of September 11,

5      '07.  Since we were familiar with the sale of

6      a large number of loans when liquidating

7      Broadhollow Trust.  And we took those data

8      points and came up with a value.

9                     Now, those are values, I would

10     argue, that were sold under distressed

11     conditions since it was a mandatory sale, so

12     I would not say that it would be a fair

13     comparison.  But nevertheless, we wanted to

14     have an understanding what the value would

15     have been if we sold under distressed

16     conditions.

17          Q.      What was the value for the

18     September 11, 2007, valuation?

19                  MR. CROWTHER:  Objection to form.

20          A.      I believe the value at that point

21     would have put the value of the loans plus

22     cash collateral below the repurchase amount.

23     Again, based on a distressed sale comp.

24          Q.      Do you know how much below?

25          A.      About 100 million.

1          SAKAMOTO

2          Q.      So based on those comparisons,

3     there was a $100 million deficiency?

4          A.      If you believe the Broadhollow

5     sale comp is a fair comp.  And those sale

6     prices were under distressed sale conditions

7     since the seller had to be a mandatory seller

8     under any price.

9          Q.      What was the cash collateral that

10    you considered for the valuations?

11         A.      I was told to use 34 million by

12    Kroll.

13         Q.      Do you know what that is based

14    on?

15         A.      I believe it's based on whatever

16    we had sent over to Calyon on prior margin

17    calls.  But again, that's just my belief, not

18    necessarily actually executed the cash

19    transfers.

20         Q.      Was that amount -- is it your

21    understanding that amount was based on cash

22    transfers made after August 1, 2007?

23         A.      I don't know the answer.

24         Q.      You don't know whether cash

25    transfers --

1                        SAKAMOTO

2          A.      I don't know whether -- I was

3     told by Kroll to use that number.

4          Q.      What were the comparable sales

5     that you used for the August 1, 2007,

6     valuation?

7                        THE WITNESS:  Did we send the

8          report?

9          A.      I believe you have the report.

10    You received a report.  These were prior

11    trades that occurred around August 1st,

12    internal trades that American Home back

13    secured by product type.

14         Q.      Did you take into consideration

15    any other factors related to the Calyon

16    repurchase agreement mortgage loans?

17                        MR. CROWTHER:  Objection to form.

18         A.      No.  I mean, just we used comps

19    plus the cash collateral.

20         Q.      The comparables were all trades

21    of AHM mortgage loans on or around the

22    valuation date?

23         A.      Correct.

24         Q.      I'm going to hand you two pieces

25    of paper.  The first is titled at the very

1                          SAKAMOTO

2      top "Securitization Based Pricing of MTA

3      Arms."

4                     MR. HARBOUR:  And we'll mark that

5              as Sakamoto 1, I guess.

6                     (Document entitled

7              "Securitization Based Pricing of MTA

8              Arms" was marked Sakamoto Exhibit 1 for

9              identification, as of this date.)

10                    MR. HARBOUR:  And the second is

11             titled at the top "Performing."  We'll

12             mark that as Sakamoto 2.

13                    (Document entitled at the top

14             "Performing" was marked Sakamoto Exhibit

15             2 for identification, as of this date.)

16             Q.     I can tell you that these were

17     produced in the document production.  The

18     entire file, which also contained a huge

19     spreadsheet, was marked as AHM 006453.  Are

20     you familiar with these documents?

21             A.     Yeah.  I believe I asked our

22     secondary people to produce comps for all the

23     trades against what they thought was the best

24     comp for each loan type within the Calyon

25     portfolio.

1                       SAKAMOTO

2              The MTA is the only one that I

3    actually produced an alternative valuation.

4    Since we also on the portfolio side

5    securitized our own loans, I am intimately

6    familiar with the securities-based valuation.

7    So that's why I used the MTA price in lieu of

8    what our secondary desk provided.

9              Q.     What do you mean by MTA price?

10             A.     MTA are option arms.

11             Q.     There's a column here in Sakamoto

12   1, which again is the MTA arm document, that

13   says "Percent of Deal."  What does that

14   column reflect?

15             A.     This is a rough percentage of if

16   you did a securitization at that time, what

17   type of rated bonds you could create.  So for

18   example, the AAAs would represent

19   collectively, if you add the three pieces, I

20   guess about, I don't know, maybe 90 percent

21   of the securitization and the rest are lower

22   rated and the residual.

23             Q.     How did you come up with that

24   percentage, 90 percent of the loans that

25   you're identifying here?

1                    SAKAMOTO

2        A.      This is where the market -- in a

3    securitization, this is where the rating

4    agencies would allocate the rated bonds.

5        Q.      Based on these sales or, I guess,

6    these securitizations?

7        A.      Well, based on this loan type.

8        Q.      What do you mean based on this

9    loan type?

10       A.      Well, the option arms.

11       Q.      Are each of these comps option

12   arms?

13       A.      Yes.

14       Q.      Are all of the mortgage loans --

15   the repurchase agreement mortgage loans

16   option arms?

17       A.      The MTA part of it are, yes.

18       Q.      So looking at Sakamoto 2, could

19   you describe what's identified in the product

20   column?

21       A.      Which one are we looking at?

22              MR. CROWTHER:  Do you want to go

23       through each item?

24       Q.      It's the performing spreadsheet.

25   I just want to know what -- I mean it says

1                          SAKAMOTO

2    product.   What do -- what are all of those

3    things?

4          A.       These are different loan types --

5          Q.       Are these the different loan

6    types that make up --

7          A.       -- within the Calyon portfolio.

8          Q.       And the UPB column is the amount

9    outstanding as of August 1st under the Calyon

10   portfolio for each of these types of loans?

11         A.       I believe so.

12         Q.       For the next two columns, it's a

13   trade number and trade date?

14         A.       Okay.

15         Q.       Do those columns relate to the

16   Calyon mortgage loans themselves or do those

17   deal with what you're asserting are

18   comparable loan sales?

19         A.       These are the comp data.   The

20   trade number is the internal AHM trade number

21   and the trade date is the date that we

22   executed the trade, comp -- comparable loans.

23         Q.       It looks like the largest number

24   here is the MTA date?

25         A.       Yes.

1                         SAKAMOTO

2          Q.     And that is 647 million based on

3     a June 13th trade date?

4          A.     Yes.

5          Q.     The other trade dates except for

6     the CW/Wells/Citi owned 7/31, they're all

7     July 24th or before, correct?

8          A.     Correct.  That's why we did a

9     security based pricing around August 1st, to

10    get a more accurate comp.  So rather than

11    using the 6/13/07 price, we used the

12    securities based pricing as of 8/1 and even

13    using the more conservative price, the total

14    valuation shows that the value of the loans

15    plus the cash collaterals exceeded the

16    repurchase amount.

17         Q.     Does this valuation take

18    into -- does Sakamoto 2 take into account the

19    dispute regarding the ownership of the

20    mortgage loans?

21         A.     Does it take -- I'm just doing

22    the valuation.

23         Q.     Does this valuation take into

24    account the fact that Calyon and American

25    Home as of August 1st disputed who owned the

1                          SAKAMOTO

2    mortgage loans?

3          A.      The only thing I did was the

4    valuation based on comps.

5          Q.      Did any of these comps involve

6    mortgage loans where the ownership was in

7    dispute?

8          A.      The comps are real trades where

9    there's no ownership dispute.

10         Q.      So none of the comps involve

11   mortgage loan sales where there was an

12   ownership dispute?

13         A.      The answer is yes.

14         Q.      It's yes, they do not involve

15   mortgage loans in dispute?

16         A.      Correct.

17         Q.      Referring to Sakamoto 1, did you

18   prepare that document?

19         A.      This one was done by our

20   secondary group.

21         Q.      Who's in the secondary group?

22         A.      It would be Damian.  He's in

23   charge of it.

24         Q.      Did you prepare Sakamoto 2?

25         A.      Yes.

1                    SAKAMOTO

2          Q.      When we refer to the comps, it's

3     the comps identified on Sakamoto 2?

4          A.      Yes.

5          Q.      You testified that the

6     comparables identified on Sakamoto 2 did not

7     involve mortgage loans where the ownership of

8     the mortgage loans was in dispute, correct?

9          A.      Yes.

10         Q.      Do the comparables identified on

11    Sakamoto 2 involve sales of mortgage loans

12    where there was a dispute about who was

13    entitled to proceeds of the mortgage loans?

14         A.      No.

15         Q.      Did they involve a sale -- do any

16    of them involve the sale of mortgage loans

17    where the seller was not receiving the

18    proceeds of the mortgage loans?

19         A.      No.

20         Q.      Did they involve -- did any of

21    them -- "them," of course, is the comparables

22    on Sakamoto 2 -- involve the sale of mortgage

23    loans where the seller did not have complete

24    and accurate original mortgage loan documents

25    for the mortgage loans?

1                         SAKAMOTO

2          A.      No.

3          Q.      Did any of them involve -- and

4   again, "them" is the comparables on Sakamoto

5   2.  Did any of those involve sales where the

6   seller did not have complete and accurate

7   information about the payment of proceeds

8   under the mortgage loans?

9          A.      No.

10         Q.      Did any of the comparables

11  identified on Sakamoto 2 involve mortgage

12  loans where there was a dispute about who

13  owned the MSRs?

14         A.      No.

15         Q.      In light of all of those

16  differences, these really aren't comparable

17  to the Calyon situation, are they?

18                 MR. CROWTHER:  Objection to form.

19         A.      Of course they are absolutely

20  comparable because we're trying to value the

21  value of the loans.

22         Q.      Does your value of the loans

23  reflect what a purchaser would have paid for

24  these loans on August 1st?

25         A.      If they were available for sale,

1                        SAKAMOTO

2      yes.

3           Q.     So if Calyon had tried to sell

4      these mortgage loans despite the fact there

5      was a dispute about the purchase price, this

6      is the type of pricing that someone would

7      have offered to pay for them?

8                MR. CROWTHER:  Objection to form.

9           A.     I believe if Calyon worked with

10     American Home to sell the loans, we could

11     have sold these loans probably at similar

12     levels, if you had sold the loans around that

13     time.

14          Q.     Well, if Calyon had attempted to

15     sell the loans and American Home had

16     objected, could these levels have been

17     achieved?

18          A.     You're hypothetically speaking.

19     I mean, of course if you can't get both sides

20     to sell the loans, then you wouldn't be able

21     to sell them.

22          Q.     As a general matter, if there's a

23     dispute over the mortgage loans, that's going

24     to affect the price a purchaser would pay,

25     correct?

1               SAKAMOTO

2          MR. CROWTHER:  Objection to form.

3     A.     I believe both sides could have

4  worked together to sell the loans and then

5  put the proceeds into some escrow and then

6  decide later on how to -- who to pay.

7          MR. HARBOUR:  Could you read back

8     the question, please?

9          MR. CROWTHER:  Are you posing the

10    same question again?

11         MR. HARBOUR:  I don't think he

12    answered.

13         MR. CROWTHER:  Same objection.

14  Objection to form.

15    A.     You're asking me a hypothetical

16  question, which means that if you try to sell

17  it and, I mean, Home objected to it, then it

18  probably would have -- what do you call it --

19  would have hindered your sales process.

20    Q.     As a general matter, if there's a

21  dispute over the ownership of mortgage loans,

22  will that affect the ability to maximize the

23  price in a sale?

24    A.     Hypothetically speaking, if there

25  were a dispute where you require both sides

1                        SAKAMOTO

2    to work together to sell the loans, then it

3    may or may not have -- I don't know the

4    answer.  I mean, it's sort of an obvious

5    question.

6         Q.      I'm looking for an obvious

7    answer.  Generally, based on your wealth of

8    experience in the mortgage loan industry --

9         A.      We never had a loan sale

10   involving disputed --

11        Q.      In all of your years of

12   experience, you've never seen a mortgage loan

13   sale occur where the ownership of the

14   mortgage loans was disputed?

15        A.      Correct.  At least my dealings.

16        Q.      Is that because a purchaser might

17   not want to buy mortgage loans that were in

18   dispute because they wouldn't know what

19   they're getting?

20             MR. CROWTHER:  Objection to form.

21        A.      Well, I think a purchaser, if

22   they're buying something, they want to know

23   that they're actually going to get it if they

24   pay for it, so I don't think it's unique to

25   loan sales.

1                              SAKAMOTO

2          Q.      Fair enough.  Referring again to

3    Sakamoto 1 and Sakamoto 2, are these the

4    documents that you referred to that identify

5    your valuation of the Calyon repurchase

6    agreement mortgage loans?

7          A.      Well, these were inputs into the

8    final valuation.

9          Q.      There's another document that's

10   the final valuation?

11         A.      Yes.  Do you not have them?

12         Q.      Are the numbers different?

13         A.      The only thing different is the

14   MTA price.  We used a more recent comparable

15   around August 1st.

16         Q.      Based on that recent comparable,

17   the number's lower in that valuation?

18         A.      Yes.  But nevertheless, the value

19   of the loans plus the cash collateral

20   exceeded the repurchase amount.

21         Q.      You are familiar with the market

22   for the sale of mortgage loans generally,

23   correct?

24         A.      Yes.

25         Q.      That market changes, doesn't it?

1                          SAKAMOTO

2              MR. CROWTHER:  Objection to form.

3        A.       Yeah.  I mean, market price on

4    any instrument changes every day.  That's --

5    you know, that's like a -- it's like gravity.

6    It exists.

7        Q.       How has the mortgage loan market

8    changed from August 1, 2007, to August 15,

9    2008?

10             MR. CROWTHER:  Objection to form.

11       A.       I believe around August 1, '07,

12   there were still some comps available to make

13   a reasonable determination of value.  As we

14   progressed further in this mortgage crisis,

15   particularly perhaps after September '07,

16   there were fewer and fewer comps.  So -- I'm

17   sorry, what was the question again?

18       Q.       How has the market changed from

19   August '07 to August '08?

20             MR. CROWTHER:  Objection to form.

21       A.       Well, the market conditions

22   probably in general has gotten worse as we

23   progressed.

24       Q.       So purchasers are likely to pay

25   less for mortgage loans in August '08 than in

1                          SAKAMOTO

2    August '07.

3                MR. CROWTHER:  Objection to form.

4         A.      Most likely, yes.

5         Q.      Is it the debtors' contention

6    that the market for mortgage loans were

7    disrupted on or about August 1, 2007, to the

8    point of dysfunction?

9                MR. CROWTHER:  Objection to form.

10        A.      On August 1st?

11        Q.      Yes.  On or about August 1st?

12               MR. CROWTHER:  Same objection.

13        A.      You're saying whether the

14   market's dysfunctional?

15        Q.      Yes.

16               MR. CROWTHER:  Same objection.

17        A.      I don't think so.  I don't think

18   around August 1, '07 the market was

19   dysfunctional.

20        Q.      Do you think the market became

21   dysfunctional?

22        A.      Over time, yes.

23        Q.      When would you say it was

24   dysfunctional?

25        A.      Well, I think dysfunctional is

SAKAMOTO

1

2     not a black and white term.  It is more of a

3     degree of dysfunctionalness, so can you be

4     more specific as to what you're asking me?

5          Q.     What was the degree of

6     dysfunction on August 1st?

7          A.     Which August 1st?  '07?

8          Q.     '07.

9          A.     I think the market was stressed

10    at that time, but certainly there were still

11    trades occurring, so I would believe that

12    there would still be comps available.  As we

13    progress into later '07, early '08, it became

14    less functional, so I don't believe real

15    comps existed as we get into '08, '09.

16         Q.     I'll hand you a document that's

17    the Declaration of Michael Strauss in Support

18    of the debtors' Chapter 11 Petitions First

19    Day Relief.

20              MR. HARBOUR:  Can you mark that

21         as Sakamoto 3, please?

22              (Declaration of Michael Strauss

23         in Support of the Debtors' Chapter 11

24         Petitions First Day Relief was marked

25         Sakamoto Exhibit 3 for identification,

1                       SAKAMOTO

2          as of this date.)

3          Q.     Would you please turn to

4    paragraph 27?

5               MR. CROWTHER:  Beyond the scope.

6          Objection.  He's not answering the

7          questions.

8               MR. ACKERLY:  Are you instructing

9          him not to answer?

10              MR. CROWTHER:  It's beyond the

11         scope.  If you want to cruise down,

12         we'll just seek a protective order.

13         I've already told you, Jason, we

14         objected to this topic.  We did not

15         designate anyone for it.  I told you

16         orally we weren't designating anyone for

17         it.

18              MR. HARBOUR:  To the Strauss

19         declaration?

20              MR. CROWTHER:  That's correct.

21              MR. HARBOUR:  I don't think we

22         discussed this.  We discussed some other

23         things.  Can we go off the record?

24              MR. CROWTHER:  We can stay on the

25         record.  The objection stands.  He's not

1                          SAKAMOTO

2          designated for it.  It's beyond the

3          scope.  Any questions down this line are

4          just harassing.  We will seek a

5          protective order if you proceed.

6                    MR. HARBOUR:  Can we have a

7          minute, please?

8                    (A brief recess was taken.)

9          Q.        The document that we asked to be

10    marked as Sakamoto 3 was the Declaration of

11    Michael Strauss in Support of the Debtors'

12    Chapter 11 Petitions First Day Relief, have

13    you ever seen this document before?

14         A.        No.

15         Q.        Were you involved in the

16    preparation of the document?

17         A.        No.

18         Q.        How large of a portfolio is the

19    Calyon repurchase agreement portfolio?

20                   MR. CROWTHER:  Objection to form.

21         A.        The repurchase portfolio?

22         Q.        Yes.

23                   MR. CROWTHER:  Same objection.

24         A.        I think it's -- you know, from

25    the numbers I can see, it's about a billion

Page 40

1                    SAKAMOTO

2      plus.

3          Q.     How long does it take to sell a

4      portfolio of that size?

5                    MR. CROWTHER:  Objection to form.

6          A.     Well, I think size is probably

7      less important than the type of loans.  You

8      could probably sell it, you know, within a

9      reasonable time.  Again, I'm not the expert

10     on loan sales.  I'm more of an observer.

11         Q.     What would be a reasonable period

12     of time?

13         A.     This is not an expert opinion,

14     but depends on the market condition.  In a

15     functioning market, if you wanted to sell a

16     billion, probably, you know, 30 days maybe.

17         Q.     What about the market as it

18     existed on August 1, 2007?

19         A.     Again, I'm not the expert on the

20     loan sales side, but my guess as an observer

21     may be again -- I don't think on August 1,

22     '07, the market would have been that

23     materially different from, say, June, end of

24     June '07.  So my guess is maybe it would take

25     the same amount of time.

1                          SAKAMOTO

2       Q.      30 days?

3       A.      Yeah.

4       Q.      So your testimony is that there

5    wasn't a substantial change in the mortgage

6    loan market from late June 2007 to August 1,

7    2007?

8               MR. CROWTHER:  Objection.

9       Mischaracterizes his statement.  You may

10      answer.

11      A.      I don't think it's materially

12   different.

13      Q.      Getting back to your expertise in

14   purchasing mortgage loans, how long would it

15   have taken you to buy a billion-dollar

16   portfolio of mortgage loans?

17      A.      That's a hypothetical question.

18   First of all, I didn't have the authority to

19   buy that kind of size.  Number two, it wasn't

20   within our investment strategy to purchase

21   that kind of size.  We purchased only small

22   portfolios.  At most, say, 5 million to 10

23   million.

24      Q.      Based on your experience in the

25   mortgage loan industry, how long do you think

Page 42

1                         SAKAMOTO

2     it would take to buy a portfolio of that

3     size?

4          A.      Well, that all depends.  If all

5     one bill is available, then you could, you

6     know, do it within 30 days.  If you had to

7     buy from multiple buyers, then obviously it

8     would take longer.

9          Q.      Did American Home find it more

10    difficult to sell its mortgage loans in

11    August 2007 than in June 2007?

12              MR. CROWTHER:  Objection.  Beyond

13         the scope.

14         A.      Again, I'm not the expert on the

15    sale side.  My guess is probably the market

16    conditions was less favorable if you compared

17    those two dates.  So as a nonqualified

18    opinion -- as a nonexpert opinion, my guess

19    is maybe a little more difficult, but not

20    substantially more difficult.

21         Q.      Were purchasers paying less for

22    mortgage loans on August 1, 2007, than they

23    were in June 2007?

24              MR. CROWTHER:  Objection.  Beyond

25         the scope and objection to form.

1                          SAKAMOTO

2          A.      I didn't see any comps on August

3    1, so I -- I don't know the answer.

4          Q.      Based on your general knowledge

5    of the industry, were people paying less on

6    or about August 1st than they were in June

7    2007?

8                  MR. CROWTHER:  Objection to form

9          and objection beyond the scope.

10         A.      Well, hypothetically speaking,

11   the securities markets -- securitized loans

12   were worth -- were trading at a lower value,

13   so I would -- you can deduce that the loans

14   probably would also be worthless, but not

15   substantially so.

16         Q.      As of the petition date, did the

17   debtors contend that the market for mortgage

18   loans was dysfunctional?

19                 MR. CROWTHER:  Objection to form

20         and beyond the scope.

21         A.      I don't -- I don't know the

22   answer to that.  I believe some loan sales --

23   as a -- an observer, I believe some loan

24   sales occurred on or about August 1st.

25         Q.      Was the market normal on August

Page 44

1                      SAKAMOTO

2    1st?

3                MR. CROWTHER:  Objection to form

4        and beyond the scope.

5        A.      Well, I think it was functioning

6    still.  Probably more stressed, but still

7    functioning.  That was probably an observer's

8    comment.

9        Q.      Were you buying mortgage loans on

10   or about August 1st?

11       A.      No.

12       Q.      Why not?

13       A.      I believe we were having

14   liquidity issues, so we weren't buying

15   assets.  When I say "we," just American Home.

16       Q.      What was the reason for those

17   liquidity issues?

18                MR. CROWTHER:  Objection to form,

19       beyond the scope.

20       A.      Simple.  I mean, most of our repo

21   counterparties gave us big margin calls at

22   once.

23       Q.      Do you know the reason for those

24   margin calls?

25                MR. CROWTHER:  Objection to form,

Page 45

1          SAKAMOTO

2      beyond the scope.

3      A.     I -- again, it's my observation.

4  I think those were pre-emptive margin calls.

5      Q.     Were the margin calls based on

6  devaluation of mortgage loan assets?

7                MR. CROWTHER:  Objection to form,

8      beyond the scope.

9      A.     Well, I think the margin calls

10 were based on the creditors thought we might

11 have financial difficulties, so they wanted

12 to get an extra amount of cash to protect

13 themselves, not necessarily based on a

14 justified decrease in value of the loans or

15 securities.

16     Q.     So the margin calls -- is it fair

17 to say that the margin calls were based on an

18 alleged devaluation of the mortgage loans?

19                MR. CROWTHER:  Objection to form,

20     beyond the scope.  You can answer.

21     A.     No.  I believe the mar -- I

22 believe my opinion as a witness that the

23 margin calls were based on the creditors

24 wanting to take extra -- let me restate it.

25 I believe the margin calls were based on the

1                           SAKAMOTO

2    creditors wanting to get extra collateral

3    because we were having financial

4    difficulties.  Not necessarily because the

5    underlying assets were decreasing in a

6    significant way.

7        Q.      In light of the dispute regarding

8    the ownership of the mortgage loans, is it

9    the debtors' contention that Calyon could

10   have sold the mortgage loans under the

11   repurchase agreement in a commercially

12   reasonable manner on August 1, 2007?

13                MR. CROWTHER:  Objection to form,

14       beyond the scope.

15       A.      I believe it was reasonable and

16   also possible to sell the loans around August

17   1st.  Calyon could have worked with the

18   debtors to jointly sell the assets and then

19   to put the proceeds into some kind of an

20   escrow account and then decide at a later

21   time as to who the proceeds should go to.  So

22   the answer is yes.

23       Q.      Do you know whether the debtors

24   took the position -- took a position about

25   whether the assets should be sold?

Page 47

1                          SAKAMOTO

2         A.      I don't know the answer.

3         Q.      You don't know whether the

4   debtors advised Calyon that the assets should

5   not be sold?

6                  MR. CROWTHER:  Objection to form,

7             beyond the scope.

8         A.      I wasn't involved in that process

9   at that point in time, so I don't know the

10  answer.

11        Q.      Do you know whether the debtors

12  told Calyon in September 2007 that the

13  repurchase agreement mortgage loans should

14  not be sold?

15                 MR. CROWTHER:  Objection to form,

16            beyond the scope.

17        A.      Again, I'm not -- I wasn't part

18  of that -- it was outside the scope of my

19  responsibilities at that time, so I don't

20  know the answer.

21        Q.      Do you know whether the debtors

22  told Calyon that the debtors believed the

23  repurchase agreement mortgage loans should

24  not be sold in October, November, December

25  2007?

Page 48

1                          SAKAMOTO

2        A.      Again --

3                MR. CROWTHER:  Objection to form,

4        beyond the scope.

5        A.      Again, I don't know the answer.

6        Q.      Did the debtors -- do you know

7    whether the debtors told Calyon that the

8    debtors believed the repurchase agreement

9    mortgage loans should not be sold in January

10   or February 2008?

11               MR. CROWTHER:  Objection to form

12       and beyond the scope.

13       A.      Again, I don't know the answer

14   since I wasn't involved in those discussions.

15       Q.      Do you know whether the debtors

16   told Calyon that it wouldn't be commercially

17   reasonable to sell the mortgage loans in any

18   of the months between August 2007 and

19   February 2008?

20               MR. CROWTHER:  Objection to form

21       and beyond the scope.

22       A.      I don't know the answer, again,

23   because I was not involved in those

24   discussions.

25       Q.      If the debtors had objected to a

1                              SAKAMOTO

2       potential sale, what type of purchase price

3       could Calyon have obtained for the repurchase

4       agreement loans?

5            A.      The question that you're asking

6       me is a hypothetical one, and I'm going to

7       give you a hypothetical answer.  If we did

8       object to it, hypothetically speaking, then

9       chances are the buyer probably would have

10      insisted on some arrangement; for example,

11      perhaps escrowing the funds until the

12      ownership was resolved.  So will it -- what

13      was the question again?  Does it change the

14      value?

15                  MR. HARBOUR:  Can you read it

16           back?

17                  (The record is read back by the

18           reporter.)

19           A.      Okay.  So let me restart the

20      answer.  You're asking me a hypothetical

21      question.  I'm going to give you a

22      hypothetical answer.  So if we had

23      hypothetically objected to the sale, then the

24      buyer may not have purchased it or they might

25      have required the proceeds to be escrowed and

1                          SAKAMOTO

2      it may or may not have impacted the value if

3      the buyer knew that they were eventually

4      going to get the loans.

5          Q.      How long have you worked in the

6      mortgage industry?

7          A.      Since 1986.

8          Q.      So since 1986 have you ever seen

9      a sale of a pool of mortgage loans where the

10     ownership was contested?

11         A.      No.

12         Q.      If Calyon attempted to sell the

13     mortgage loans on August 1st over the

14     debtors' objection, it's possible that there

15     would have been no purchasers for the

16     mortgage loans?

17                 MR. CROWTHER:  Objection to form.

18         A.      You're asking me a hypothetical

19     question again.  Again, if the --

20     hypothetically speaking, if the ownership was

21     in dispute, a buyer may or may not have

22     wanted to purchase it or a buyer would have

23     made alternative arrangements to make sure

24     the proceeds were escrowed until the

25     ownership dispute was resolved.

1                      SAKAMOTO

2          Q.      Have you ever -- in your

3     experience in the mortgage loan industry,

4     have you ever seen a sale of mortgage loans

5     with that type of escrow arrangement?

6                      MR. CROWTHER:   Objection to form.

7          A.      I have not seen a loan sale

8     with -- with an arrangement where you're

9     escrowing the proceeds; however, there are

10    other types of transactions where if there's

11    a disputed amount or ownership, that escrows

12    are commonly used in that fashion.

13         Q.      What types of transactions?

14         A.      Well, transactions involving

15    where the contours of the assets at sale is

16    still not a hundred percent defined, but for

17    the most part the general description of the

18    asset is available.  Again, I don't know

19    specifically, but I think escrows in general

20    are used in that fashion.

21         Q.      Could you give me an example of

22    the type of transaction you're talking about?

23         A.      I'd have to think about it, but

24    I -- I'm sure I could think of an example.

25         Q.      But you can't think of one now,

Page 52

SAKAMOTO

1

2 can you?

3     A.     Not offhand.  Well, I guess, you

4 know, one clear example is when you're

5 selling a mortgage asset where there's some

6 liabilities associated with it, then a buyer

7 might demand some kind of an escrow until

8 those liability -- risk has been either

9 resolved or defined.

10     Q.     What type --

11     A.     Well, for example, if you have a

12 loan that has high-cost loans, there are

13 issues involving where the state could

14 actually bring legal action against the

15 buyer.  So in those circumstances, a buyer

16 might require some kind of an escrow until

17 that issue has been resolved.

18     So in very analogous fashion, if

19 the loans are in dispute, the ownership that

20 is, then the buyer might still be interested

21 in buying it, but they may escrow the

22 proceeds until that issue has been resolved.

23 Again, I'm giving you examples, hypothetical

24 ones.

25     But this issue of the high-cost

1                         SAKAMOTO

2    loan is -- I believe is not a hypothetical.

3    I think we may have had instances where we

4    actually had to escrow the seller -- the

5    entire escrowed funds until those issues had

6    been resolved.  So the whole notion of

7    escrowing is a very commonly used idea

8    between buyers and sellers.

9         Q.    But you've never seen it used for

10   a sale of disputed mortgage loans?

11             MR. CROWTHER:  Objection to form.

12        A.    Yes, I have not seen it in a

13   disputed loan sale.

14        Q.    Based on your experience in the

15   mortgage loan industry, would the dispute

16   about the ownership of the repurchase

17   agreement mortgage loans have affected the

18   value Calyon could have obtained in the sale

19   of the mortgage loans?

20             MR. CROWTHER:  Objection to form

21        and beyond the scope.

22        A.    I'm sorry, can you restate that

23   question again?

24        Q.    Would the value Calyon could

25   obtain in a sale of the repurchase agreement

Page 54

1                          SAKAMOTO

2     mortgage loans be affected by the dispute of

3     ownership?

4                MR. CROWTHER:  Same objections.

5          A.      The value -- again, it's

6     hypothetically speaking.  The value probably

7     would have been affected only to the extent

8     that if some escrow arrangement was possible,

9     that the buyer would ultimately receive the

10    assets at a future point in time, so

11    therefore you would have to discount the

12    asset, present value, the value of the asset

13    to today.  So yes, it would have reduced the

14    value for that reason.

15         Q.      Would the fact that Calyon was

16    not receiving the proceeds of the repurchase

17    agreement mortgage loans have reduced the

18    price purchasers would have paid for them?

19               MR. CROWTHER:  Objection to form,

20         beyond the scope.

21         A.      Well, I mean, certainly would

22    have reduced the value if the buyer thought

23    that those cash flow proceeds were not

24    recoverable.

25         Q.      Would the lack of clarity in

1                         SAKAMOTO

2     general about the ability to receive the

3     proceeds have reduced the value?

4               MR. CROWTHER:  Objection to form

5          and beyond the scope.

6          A.     No.  Because you could always set

7     up an escrow arrangement.  If -- if those

8     cash flow proceeds were permanently

9     unavailable, yes, it would reduce the price.

10    If they were determined at a future point in

11    time that they actually belonged to the

12    buyer, then, again, an escrow arrangement

13    would facilitate that kind of transaction,

14    which ultimately would not reduce the price

15    of the sale other than the present value

16    calculation.

17         Q.     So other than the present value

18    calculation, you don't think a purchaser

19    would reduce the price that they would pay

20    for the mortgage loans in light of the

21    dispute and the lack of clarity related

22    thereto?

23              MR. CROWTHER:  Objection to form

24         and beyond the scope.

25         A.     Again, it's hypothetical.  You're

1                         SAKAMOTO

2      asking me a question -- the buyer may or may

3      not reduce the price.

4          Q.      Would a purchaser, a potential

5      purchaser, of the Calyon repurchase agreement

6      mortgage loans have paid less because Calyon

7      didn't have complete and accurate original

8      mortgage loan documents?

9                     MR. CROWTHER:  Objection to form

10         and beyond the scope.

11         A.      Calyon would have had access to

12     the original loan documents through the

13     custodian.

14         Q.      Do you know if American Home ever

15     instructed the custodian not to provide

16     documents to Calyon?

17                    MR. CROWTHER:  Objection to form

18         and beyond the scope.

19         A.      I was not involved in the Calyon

20     discussions at the time, so I don't know the

21     answer.

22         Q.      Do you know whether original loan

23     documents were provided to Calyon?

24         A.      Again --

25                    MR. CROWTHER:  Objection to form

1                         SAKAMOTO

2          and beyond the scope.

3          A.      Again, I was not involved in the

4   Calyon discussions at the time, so I don't

5   know the answer.

6          Q.      Would a potential purchaser have

7   paid less for the repurchase agreement

8   mortgage loans because they didn't know the

9   amounts of proceeds that were being received

10  on the mortgage loans?

11                 MR. CROWTHER:  Objection to form

12         and beyond the scope.

13         A.      Again, hypothetically speaking, a

14  purchaser would discount the lack of cash

15  flows.  But again, that could be resolved by

16  using escrow arrangements.

17         Q.      Would the debtors' financial

18  condition on August 1, 2007, have affected

19  the value Calyon could obtain in the sale of

20  the repurchase agreement mortgage loans?

21                 MR. CROWTHER:  Objection to form

22         and beyond the scope.

23         A.      I don't believe so.  These are

24  assets.  These are assets pledged to the repo

25  and have nothing to do with the -- American

1               SAKAMOTO

2     Home's financial conditions.

3          Q.     Would the repo agreement mortgage

4     loans be identified as AHM mortgage loans?

5               MR. CROWTHER:  Objection to form,

6          beyond the scope.

7          A.     I don't know the specifics at the

8     time what was pledged, whether they're AHM

9     loans or loans that were purchased from other

10    sources.

11         Q.     As a general matter, does a

12    financial condition of mortgage loan

13    originators affect the purchase price of

14    mortgage loans?

15              MR. CROWTHER:  Objection to form

16         and beyond the scope.

17         A.     No.

18         Q.     So when you were buying mortgage

19    loans, you would pay the same amount for

20    mortgage loans that had been originated by a

21    solvent company and those that had been

22    originated by a company in bankruptcy?

23              MR. CROWTHER:  Objection to form.

24         A.     What matters is the type of

25    assets you're buying, not who the

1                       SAKAMOTO

2    originator -- so you could place -- you could

3    have assets that are of bad quality

4    originated by highly solvent financial

5    institutions.  You could buy good assets that

6    were originated by distressed originators.

7         Q.     When you purchased mortgage

8    loans, were there reps and warrantees

9    regarding those mortgage loans generally?

10                  MR. CROWTHER:  Objection to form

11           and beyond the scope.

12        A.     Yes.

13        Q.     Would some of those reps and

14   warrantees be made by the mortgage loan

15   originators?

16                  MR. CROWTHER:  Objection to form

17           and beyond the scope.

18        A.     Yes.

19        Q.     So if a bankrupt mortgage loan

20   originator couldn't fulfill its reps and

21   warrantees, wouldn't that have made you pay

22   less for it?

23                  MR. CROWTHER:  Objection to form

24           and beyond the scope.

25        A.     Of course the value of the loans

1                           SAKAMOTO

2      without the rep's warrantees would be worth

3      less, all else being equal.

4           Q.      How much?

5                   MR. CROWTHER:  Objection to form,

6           beyond the scope.

7           A.      There's no dollar value assigned

8      to it.  I think you have to look at the

9      quality of the loans.

10          Q.      How long would it take to look at

11     the quality of the loans under the Calyon

12     repurchase agreement?

13                  MR. CROWTHER:  Objection to form,

14          beyond the scope.

15          A.      What, all the loans?

16          Q.      In the pool, yes.

17                  MR. CROWTHER:  Same objections.

18          A.      Well, I mean, you know,

19     evaluating the loans -- there's a degree of

20     evaluation.  For what purpose?  For selling

21     or buying?

22          Q.      Either.

23                  MR. CROWTHER:  Same objections.

24          A.      I never purchased that size of a

25     pool, so I -- I don't know how long it would

1                         SAKAMOTO

2    take me, quite honestly.

3         Q.      Do you have an estimate?

4              MR. CROWTHER:  Same objections.

5         A.      I don't know how long it -- I've

6    never done this kind of a purchase activity

7    of this size, so I don't know the answer.  It

8    would be in -- it would be -- I would not be

9    giving you a truthful answer since I don't

10   have the experience of buying this size of

11   loans in one shot.

12        Q.      What was the general size of

13   mortgage loan pools that you would buy?

14             MR. CROWTHER:  Objection to form

15        and beyond the scope.

16        A.      Say between 3 to 10 million.

17        Q.      How long did it take you to

18   analyze those mortgage loans?

19             MR. CROWTHER:  Same objections.

20        Q.      Those pools rather.

21             MR. CROWTHER:  Same objections.

22        A.      I believe maybe a half a day.

23   But that's assuming that we -- you know, we

24   had a smaller infrastructure to analyze those

25   pools.  Since we were geared toward buying

1                          SAKAMOTO

2      smaller pool sizes, we wouldn't have the

3      staff -- the same kind of staff if you were

4      buying a billion dollars worth of loans.

5          Q.      When you did that analysis of

6      mortgage loan pools, what did you do?

7                  MR. CROWTHER:  Beyond the scope,

8          objection.

9          A.      Well, we generally analyzed the

10     type of loans that we were potentially

11     buying, instrument type, quality of the

12     borrower, et cetera, the value of the

13     underlying real estate, and then we would run

14     return on equity analysis, if we were to buy

15     these loans and hold it to maturity with some

16     kind of a financing structure.  That's pretty

17     much it.  And then do sensitivities around

18     base-case analysis.

19         Q.      What do you mean sensitivities

20     around base-case analysis?

21         A.      With respect to prepayment

22     assumptions and default analysis.

23         Q.      Did your analysis include

24     determining whether the original mortgage

25     loan files were complete and accurate?

Page 63

1      SAKAMOTO
2            MR. CROWTHER:  Objection to form
3      and beyond the scope.
4      A.     We assume that we're buying loans
5   with all the documents.
6      Q.     So you didn't analyze that factor
7   specifically?
8            MR. CROWTHER:  Same objections.
9      A.     No.  Because we were buying loans
10  from sellers that would provide us with all
11  the documents.
12     Q.     Were there ever occasions in
13  mortgage loan sales when after the sale you
14  learned that some of the documents hadn't
15  been provided?
16           MR. CROWTHER:  Objection to form
17     and beyond the scope.
18     A.     I don't actually remember since
19  the purchase of third-party loans was a very
20  small portion of my activity.
21     Q.     If buying the mortgage loans from
22  third parties was a small part of your
23  activity, what was the larger part of your
24  activity or larger parts?
25     A.     You know, internal purchase of

1                         SAKAMOTO

2      our self-originated loans and hedging them

3      from an interest rate perspective and then

4      worked with the securitization team to put a

5      permanent financing structure.  That was one

6      part of my function.

7                   Another part is to manage the

8      third-party AAA/agency MBS portfolio.

9      Another function is to manage the bank

10     portfolio, the AHM affiliated bank portfolio.

11     And the fourth was to -- to execute the MSR

12     hedging for our MSR position.  I had people

13     working for me, obviously, to do all those,

14     but I was responsible for managing the

15     overall process.

16          Q.     I'm going to hand you a document

17     that I'd like to have marked as Sakamoto 4.

18                 (Document entitled "Performing"

19          was marked Sakamoto Exhibit 4 for

20          identification, as of this date.)

21          Q.     This document appears similar to

22     Sakamoto 2, doesn't it?

23          A.     Yes.

24          Q.     Could you explain the

25     differences?

1                          SAKAMOTO

2        A.      Yeah.  I believe we adjusted the

3    price on the MTA loans since we wanted to get

4    a comparable sale around August 1st.  So you

5    could see the price that we used -- instead

6    of using 103.06, we used 98.61.  I believe

7    that's really the major difference.

8        Q.      You used the 98.61 in Sakamoto 2?

9        A.      Yeah.  No, no.  I didn't use it

10   on -- right.  So this is the backup as to how

11   I arrived at the 98.61.

12       Q.      When you say "this is the

13   backup," you're pointing at Sakamoto 1?

14       A.      Right.  So what was the question?

15              MR. CROWTHER:  For the record,

16       he's not looking at marked copies, so he

17       doesn't know what they're numbered.

18              MR. HARBOUR:  Understood.

19              MR. CROWTHER:  That's what the

20       confusion is.  We all know to refer to

21       it by reference number, but he doesn't

22       know.

23       A.      So can you start over?

24       Q.      Sure.  I just handed you No. 4,

25   and that is generally similar to No. 2?

1                           SAKAMOTO

2        A.        Right.

3        Q.        You indicated the major

4   difference was in the MTA row.

5        A.        Okay.  Right.  It looks like the

6   UPB is a little bit larger on the Exhibit 4.

7        Q.        Do you mean the UPB's smaller on

8   Exhibit 4?

9        A.        Yeah.  The UPB for Exhibit 2 is

10  smaller for Exhibit 2 than for Exhibit 4.  I

11  believe on the Exhibit 4 the UPBs were

12  adjusted back so it was the UPB that existed

13  around August 1st.  So that would explain why

14  the UPB is larger for Exhibit 4 than for

15  Exhibit 2.

16       Q.        When I look at Exhibit 4 -- and

17  this is just to clarify it.  I want to make

18  sure we're talking about the same numbers.

19       A.        Okay.

20       Q.        The subtotal performing and UPB

21  for Exhibit 4 is 1,135,000,000?

22       A.        Right.

23       Q.        And the subtotal performing on

24  No. 2 is 1,158,000,000?

25       A.        1 billion --

1        SAKAMOTO
2             MR. CROWTHER:  I think you have
3        it backwards, Jason.  Let's go off the
4        record for a second if you don't mind.
5             MR. HARBOUR:  Thank you.
6             (A discussion was held off the
7        record.)
8        Q.      The document you were just handed
9    that's been labeled Sakamoto 4 was part of
10   the spreadsheet that was AHM 006453.  The
11   document that you were handed earlier,
12   mistakenly because they're so similar, is
13   marked as Sakamoto 2 was AHM 006454.  Just
14   for the record to clarify that because I
15   think that was misstated earlier.
16             The UPB in Sakamoto 4 is higher
17   than the UPB in Sakamoto 2, correct?
18        A.      Yes.
19        Q.      And that's because the UPB in
20   Sakamoto 2 reflects the UPB closer to, say,
21   September 30th?
22        A.      30th, yeah.  I believe that's
23   what it was.
24        Q.      Whereas the UPB in Sakamoto 4
25   reflects the UPB as of August 1st?

SAKAMOTO

1

2       A.      Right.  But apart from those

3   differences, right, the only difference in

4   price is the MTA price.  We used the lower

5   price because we wanted to make sure that

6   the -- we had a comp that's closer to the

7   August 1st date.  So the 98.61 is based on

8   the Exhibit 1 comp.

9       Q.      And in Sakamoto 2, the trade

10  price of 103.06 is based simply on that

11  trade?

12      A.      Correct.

13      Q.      Trade No. 14745 on June 13, 2007?

14      A.      Correct.  Since the MTA was a

15  large portion of this portfolio, we wanted to

16  make sure we got a more accurate and more

17  contemporaneous comp.  So that's what I've

18  done here.

19      Q.      The comparable sales that you

20  used in Sakamoto 2 for the September 30th

21  valuation, those are all June and July

22  trades, correct?

23      A.      We didn't do a September 30th

24  valuation.

25      Q.      Then what does Sakamoto 2

1              SAKAMOTO

2    represent?

3         A.      This represents the valuation --

4    it's a hypothetical valuation with a

5    September -- I believe September 30th UPB

6    with the same trade prices.  I don't think

7    Exhibit 2 is a meaningful piece of exhibit.

8              What we really should be doing is

9    looking at Exhibit 4 for the purpose of our

10   valuation as of August 1st because it --

11   it -- first of all, the UPB is what we

12   believe to be the UPB around August 1st, and

13   secondly, the prices are close to the August

14   1st valuation date.

15        Q.      Along with the valuation

16   identified in Exhibit No. 4, what other, if

17   any, valuations have you done for the

18   repurchase agreement mortgage loans?

19        A.      Well, we did one as of 9/11/07

20   because we identified a large sale, the

21   Broadhollow liquidation trades.  So we just

22   wanted to create sort of a hypothetical comp,

23   if you'll call it.

24              And I say hypothetical because

25   those loans were sold under distressed,

1                    SAKAMOTO

2  forced, mandatory sale conditions.  So

3  nevertheless, we had an actual trade price on

4  American Home Mortgage loans, so we used

5  those prices to see what the value would be

6  under those circumstances.  And that's what

7  we produced, the valuation as of September

8  11th using the UPB as of 9/30, but also

9  adding two cash flow payments, the August and

10 September cash flow payments.  And I believe

11 that valuation shows, hypothetically

12 speaking, that the deficiency would have

13 risen to about 100 million.

14        Q.     You said the Broadhollow sale was

15 a distressed, forced, mandatory sale.  Why

16 was that?

17               MR. CROWTHER:  Objection to form.

18        A.     Because the program documents

19 required the sale be conducted in auction and

20 it had to be sold in an auction.  The buyers

21 knew that it was a distressed sale because it

22 was a forced seller.  So if you have a forced

23 seller, then you would get a distressed

24 price.  And also the Broadhollow sale was a

25 here as/where as sale.  In other words, it

SAKAMOTO

1    didn't have any reps or warrantees.

2         Q.    Did you attend the Broadhollow
3    sale?

4         A.    No.

5         Q.    Do you know if there were
6    multiple bids?

7         A.    What do you mean "multiple bids"?

8         Q.    At the Broadhollow sale for the
9    various loans?

10        A.    Yeah.  There were more than one
11   bidders, if you're asking.

12        Q.    Yes.

13        A.    Yes.

14        Q.    Again, you said that the
15   Broadhollow sale was distressed, forced,
16   mandatory.  Did American Home want to go
17   through with the Broadhollow sale?

18             MR. CROWTHER:  Objection to form
19        and beyond the scope.

20        A.    Actually, since I wasn't part of
21   the auction process, but I had knowledge of
22   it, I don't know the answer to that question.
23   I assume that it was conducted under the
24   auspices of the bankruptcy court.

1                          SAKAMOTO

2          Q.        In addition to the August 1st and

3    September 11, 2007, valuations, did you do

4    any other valuations of the Calyon repurchase

5    agreement mortgage loans?

6          A.        No, I did not.

7          Q.        Did anyone at AHM?

8          A.        I don't believe so.

9          Q.        So the debtors haven't performed

10   a valuation themselves of the mortgage loans

11   as of January 30, 2008?

12         A.        Correct.

13         Q.        Or as of August 15, 2008?

14         A.        Which dates again?

15         Q.        January 30, 2008.

16         A.        Okay.

17         Q.        Or August 15, 2008.

18         A.        No.  We didn't do one internally.

19         Q.        So do you know what the value of

20   the mortgage loans would be in a sale of the

21   mortgage loan assets or the mortgage loans,

22   rather, on January 30, 2008?

23         A.        No, I don't know.

24         Q.        Do you know what the sale price

25   would be for the sale of the mortgage loan

1                           SAKAMOTO

2    assets on August 15, 2008?

3           A.      I don't know.

4                   MR. HARBOUR:   Can we take a short

5           break?

6                   (A brief recess was taken.)

7           Q.      You said the debtors have not

8    performed a valuation of the repurchase

9    agreement mortgage loans as of January 30,

10   2008, correct?

11          A.      Yes.

12          Q.      And the debtors don't have a

13   valuation as of August 15, 2008?

14          A.      Correct.

15          Q.      You indicated that you were asked

16   to do the valuations as of August 1st and

17   September 11, 2007?

18          A.      Yeah.

19          Q.      Who asked you to do that?

20          A.      Kroll asked me to do it, our

21   restructuring advisor.

22          Q.      Who at Kroll?

23          A.      Bret.

24                  MR. ACKERLY:   Fernandes.

25          A.      Yeah.   I assumed you knew who he

1                        SAKAMOTO

2    was.

3         Q.     Bret Fernandes?

4         A.     Yeah.

5         Q.     What was that discussion like?

6    What was discussed?

7         A.     Well, the reason why they asked

8    me is to determine if the claim that was

9    filed by Calyon on the repo deficiency claim

10   was legitimate.  So for that reason, I

11   conducted the valuation as of August 1, '07.

12        Q.     Are performing valuations of

13   pools of mortgage loans part of your duties

14   at American Home?

15        A.     Only the ones that we actually

16   purchased.

17        Q.     How regularly would you perform

18   valuations?

19        A.     We do it on a monthly basis.

20        Q.     How many would you do in a month?

21        A.     Well, I think at some point we

22   may have had an inventory of, you know,

23   several thousand loans.

24        Q.     So a lot?

25        A.     Yeah.  Well, I was the manager

1                          SAKAMOTO

2    responsible for it, so I personally may not

3    have done it, but I've actually supervised

4    the valuation process.  So I was intimately

5    familiar with the actual process since I

6    actually created the process, the pricing

7    process.

8          Q.     You created the pricing process?

9          A.     Yes.  For our internally owned

10   loans.

11         Q.     What went into that process?

12         A.     Various factors.  We looked at

13   certainly comps that were available from the

14   secondary desk.  We also looked at

15   securities-based pricing for a certain type

16   of loans.

17         Q.     Do you know why you were not

18   asked to value the mortgage loans for January

19   or August 2008?

20              MR. CROWTHER:  Objection to form

21         and beyond the scope.

22         A.     I think it's because I believe

23   that those dates were irrelevant.  The

24   repurchase was terminated around August 1st,

25   so the valuation is on -- close to the

1                          SAKAMOTO

2      termination date.

3           Q.       You indicated that the September

4      11th valuation is based on the Broadhollow

5      sale?

6           A.       Yes.

7           Q.       Did the loans in the Broadhollow

8      sale -- are the loans -- were the loans in

9      the Broadhollow sale similar to the loans in

10     the Calyon repurchase agreement?

11          A.       They may have been similar, but

12     the relative composition of the various loan

13     types may or may not be similar.

14          Q.       Do you recall the differences?

15          A.       We didn't analyze the

16     differences.

17          Q.       Do you know what type of loans

18     made up the Broadhollow loan pool?

19          A.       Probably -- the loans that were

20     in Broadhollow were probably similar to

21     what's in the Calyon -- maybe the composition

22     of types might be different.  And the

23     Broadhollow loans didn't have second liens.

24          Q.       All the Broadhollow loans were

25     first liens?

1                        SAKAMOTO

2       A.      First liens.  Performing,

3   nonperforming.

4       Q.      You indicated that you got the

5   $34 million cash collateral number from

6   Kroll?

7       A.      Yes.

8       Q.      You don't know what that number

9   was based on?

10      A.      Well, I believe it's based on

11  prior cash collateral that AHM may have sent

12  to Calyon on the repo line.

13      Q.      But you don't know the specifics

14  about what money was sent --

15      A.      I don't know the specifics, no.

16      Q.      -- when?  If that number was

17  incorrect or if that number instead of 34

18  million was $2 million, how would that affect

19  your valuation?

20      A.      Well, certainly the valuation of

21  the collateral would be less by the

22  difference.

23      Q.      Dollar-for-dollar dollar

24  reduction?

25      A.      Yes.

1               SAKAMOTO

2     Q.      Or increase?

3     A.      Right.  Cash is cash.  It's worth

4  100 percent.

5     Q.      We hope.  Is it the debtors'

6  contention that multiple determinants of

7  value for the mortgage loans existed on

8  August 1, 2007?

9               MR. CROWTHER:  Objection to form,

10          beyond the scope.  You're not to answer.

11          We did not designate somebody for this

12          topic.

13               MR. HARBOUR:  I think you did.

14          Let me -- can we go off the record?

15               (A discussion was held off the

16          record.)

17     Q.      Is it the debtors' contention

18  that multiple determinants of value for the

19  mortgage loans existed on August 1, 2007?

20               MR. CROWTHER:  Objection to form.

21     A.      I don't know the answer to that

22  question.  Hypothetically speaking, of

23  course, there are multiple ways of valuing

24  assets, but since a comp market existed, you

25  know, you use a comp for that date.  It seems

1                     SAKAMOTO

2  reasonable, so that's what we used to come up

3  with the August 1, '07, valuation.

4       Q.    And it's the debtors' contention

5  that the comparable trades on Sakamoto 4 --

6  that those are the comparable trades you're

7  referring to?

8       A.    Correct.

9            MR. CROWTHER:  Objection to form.

10      A.    Yes.

11      Q.    Did the debtor have any ongoing

12 market analysis in the ordinary course of the

13 debtors' business on or about August 1, 2007,

14 regarding the value of mortgage loans?

15           MR. CROWTHER:  Objection to form.

16      You can answer.

17      A.    I actually don't know the answer

18 since by that time we didn't have that many

19 unsecuritized whole loans.  At least in my

20 business area, we didn't analyze loan prices

21 much beyond August 1, '07.  Or at least I

22 personally didn't do it.  I don't know what

23 other -- what other departments may have done

24 or not have done.

25      Q.    Did you do market analysis as of

1                        SAKAMOTO

2     August 1, '07 or just the period before that?

3                    MR. CROWTHER:  Objection to form.

4          A.       For which loans?

5          Q.       Mortgage loans in general.

6                    MR. CROWTHER:  Same objection.

7          A.       Well, we -- to the extent that we

8     had unsecuritized whole loans in our

9     inventory, then we marked them every month.

10         Q.       I'm sorry, I didn't hear you.

11         A.       We priced them every month.

12         Q.       At the beginning of the month?

13         A.       End of the month.

14         Q.       So there would have been a

15    pricing as of July 31st?

16         A.       For our loans that I was

17    responsible for.

18         Q.       How would that pricing change

19    from June 30th to July 31st?

20                    MR. CROWTHER:  Objection to form.

21         A.       I don't actually remember the two

22    price valuations, but, you know, it would be

23    whatever the market conditions were at those

24    two different points in time.

25         Q.       Do you recall whether it went up

1                          SAKAMOTO

2     or down from June to July?

3          A.     I don't remember the specifics.

4          Q.     You don't remember whether it

5     went up or down?

6          A.     On the loan portfolio, no.

7          Q.     Did the debtors do any other

8     market analysis concerning mortgage loans

9     other than the ones you just identified?

10                MR. CROWTHER:  Objection to form.

11         A.     Well, again, I speak only for my

12    area.  We didn't do any valuation beyond July

13    31st for any whole loans that we may have

14    owned in our portfolio.

15         Q.     Do you know whether the debtors

16    did any other market analyses?

17                MR. CROWTHER:  Objection to form.

18         A.     I don't know.  Actually, we did

19    do market analysis for other litigation

20    cases.

21         Q.     When?

22         A.     I believe probably the second

23    half of 2008.

24         Q.     For what litigation cases did you

25    perform those market analyses?

1                      SAKAMOTO

2       A.       BofA warehouse loans.

3       Q.       So for the litigation involving

4   Bank of America?

5       A.       Yeah.

6       Q.       But that was performed in 2008?

7       A.       Yeah.  I believe so.  We did a

8   discounted cash flow valuation analysis

9   because we thought that was a relevant

10  methodology as opposed to a market comp.

11      Q.       For the BofA portfolio?

12      A.       Yes.

13      Q.       Are you aware that debtors have

14  taken the position that Calyon's proofs of

15  claim regarding the repurchase agreement

16  should be disallowed?

17      A.       Yes.

18      Q.       What's the basis for the debtors'

19  contention?

20               MR. CROWTHER:  Objection to form.

21      A.       Well, my analysis as of August 1,

22  '07, shows that the value of the mortgage

23  loans based on the comp analysis plus the

24  cash collateral exceeded the value of the

25  repurchase claim -- or the repurchase amount.

1                    SAKAMOTO

2          MR. HARBOUR:  Can we have a

3    minute?

4          (A brief recess was taken.)

5          MR. HARBOUR:  Thank you for your

6    time.  That's it.

7          MR. CROWTHER:  We'll read and

8    sign.

9                (Time noted:  12:18 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           A C K N O W L E D G E M E N T

2

3    STATE OF NEW YORK     )

4                          :

5    COUNTY OF             )

6

7           I, SIMON SAKAMOTO, hereby certify

8    that I have read the transcript of my

9    testimony taken under oath in my deposition

10   of February 25, 2009; that the transcript is

11   a true, complete and correct record of my

12   testimony, and that the answers on the record

13   as given by me are true and correct.

14

15                          _____

                            SIMON SAKAMOTO
16

17

     Signed and Subscribed to
18   before me, this _____ day

19   of _____, 2009

20

21   _____

     Notary Public, State of New York
22

23

24

25

Page 85

1                     C E R T I F I C A T E

2

3      STATE OF NEW YORK   )

4                                    :

5      COUNTY OF NEW YORK )

6

7           I, MICHELE MOSKOWITZ, a Shorthand

8      Reporter and Notary Public within and for the

9      State of New York, do hereby certify:

10          That SIMON SAKAMOTO, the witness whose

11     examination is hereinbefore set forth, was

12     duly sworn by me and that this transcript of

13     such examination is a true record of the

14     testimony given by such witness.

15          I further certify that I am not related

16     to any of the parties to this action by blood

17     or marriage and that I am in no way

18     interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto set

20     my hand this 26th day of February, 2009.

21

21

22

                                   _____

23                                 MICHELE MOSKOWITZ

25

1

\*\*\*ERRATA SHEET\*\*\*

2

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor

3

New York, New York 10022
212-750-6434

4

5

NAME OF CASE:  IN RE:  AMERICAN HOME MORTGAGE
DATE OF DEPOSITION:  FEBRUARY 25, 2009

6

NAME OF WITNESS:  SIMON SAKAMOTO

7

PAGE   LINE      FROM        TO        REASON

8

\_\_\_\_|_____|_____|_____|_____|_____

9

\_\_\_\_|_____|_____|_____|_____|_____

10

\_\_\_\_|_____|_____|_____|_____|_____

11

\_\_\_\_|_____|_____|_____|_____|_____

12

\_\_\_\_|_____|_____|_____|_____|_____

13

\_\_\_\_|_____|_____|_____|_____|_____

14

\_\_\_\_|_____|_____|_____|_____|_____

15

\_\_\_\_|_____|_____|_____|_____|_____

16

\_\_\_\_|_____|_____|_____|_____|_____

17

\_\_\_\_|_____|_____|_____|_____|_____

18

\_\_\_\_|_____|_____|_____|_____|_____

19

\_\_\_\_|_____|_____|_____|_____|_____

20

21

_____

22

Subscribed and sworn before me
this \_\_\_\_ day of _____, 2009.

23

24

_____    _____
      Notary Public          My Commission Expires

25