# **EXHIBIT C**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------------x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, et al.,

               Debtors,

-------------------------------------x


                200 Park Avenue
                New York, New York


                February 25, 2009
                1:32 p.m.


     DEPOSITION of DAMIAN VOULO, before

Michele Moskowitz, a Notary Public of the

State of New York.

    ELLEN GRAUER COURT REPORTING CO. LLC
     126 East 56th Street, Fifth Floor
       New York, New York 10022
          212-750-6434
          REF: 89677B

1    A P P E A R A N C E S:

2

3    YOUNG CONAWAY STARGATT & TAYLOR, LLP

4    Attorneys for Debtors

5         The Brandywine Building

6         1000 West Street, 17th Floor

7         Wilmington, Delaware   19801

8    BY:  CURTIS J. CROWTHER, ESQ.

9         PHONE 302-571-6755

10        E-MAIL ccrowther@ycst.com

11

12

13    HUNTON & WILLIAMS

14    Attorneys for Calyon

15        951 East Byrd Street

16        Richmond, Virginia   23219

17    BY:  JASON W. HARBOUR, ESQ.

18             - AND -

19        BENJAMIN C. ACKERLY, ESQ.

20        PHONE 804-788-8479

21        E-MAIL jharbour@hunton.com

22

23

24

25

Page 3

```
 1   -------------------- I N D E X --------------------
 2   WITNESS                  EXAMINATION BY          PAGE
 3   DAMIAN VOULO             MR. HARBOUR                4
 4
 5
 6   ---------------- E X H I B I T S ----------------
 7   VOULO            DESCRIPTION                     PAGE
 8   Exhibit 1    String of e-mails                    16
 9
10
11               (EXHIBIT TO BE PRODUCED)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3cf58e79-60b4-40d3-b323-7966d9a0cd07

1    D A M I A N   V O U L O , after having

2          first been duly sworn by a Notary Public

3          of the State of New York, was examined

4          and testified as follows:

5

6    EXAMINATION BY

7    MR. HARBOUR:

8          Q.       Please state your name for the

9    record.

10         A.       Damian Voulo.

11         Q.       Good afternoon, Mr. Voulo.  My

12   name is Jason Harbour.  I represent Calyon

13   New York Branch as administrative agent, and

14   we're just here to ask you some questions

15   today.

16              Are you on any medication or is

17   there any other reason that would inhibit

18   your ability to answer questions truthfully

19   today?

20         A.       No.

21         Q.       Have you ever been deposed?

22         A.       No.

23         Q.       Have you ever testified at trial?

24         A.       Yes.

25         Q.       When have you testified?

1          VOULO

2          A.      What date did I testify or when?

3    During the American Home bankruptcy case.

4    I've been down in court five separate times.

5    I've been on the stand once.

6          Q.      What were you on the stand about?

7          A.      About the importance of expense

8    reimbursements during due diligence process

9    getting that approved.

10         Q.      Could you describe that a little

11   more clearly.  What due diligence process?

12         A.      When -- post bankruptcy when we

13   were marketing loans to sell, we offer

14   expense reimbursement -- potential expense

15   reimbursements to investors who are

16   interested in purchasing or bidding on our

17   loans, and I had to testify why that was an

18   important factor that would sway an investor

19   coming to the table versus not coming to the

20   table.

21         Q.      What was your general testimony?

22   Why was it important?

23         A.      It gives them -- if they're

24   reimbursed to do the work, they'll come to

25   the table to do a more in-depth due diligence

1               VOULO

2   and quite likely put a bid in on a given

3   portfolio of loans versus spending their own

4   money and not -- and, you know, going through

5   the riggers.

6           Q.      You testified at trial, but just

7   to remind you, please answer all questions

8   verbally so the court reporter can pick

9   everything up.  If for any reason you don't

10  understand a question I ask, please let me

11  know so we can communicate effectively.

12          A.      Sure.

13          Q.      What's your home address?

14          A.      It's 11 James Monroe Lane, East

15  Setauket, New York.

16          Q.      Who's your employer?

17          A.      American Home Mortgage.

18          Q.      What's your employer's address?

19          A.      538 Broadhollow Road, Melville,

20  New York.

21          Q.      What's your title with American

22  Home Mortgage?

23          A.      Senior vice president of risk

24  management.

25          Q.      How long have you had that title?

1                    VOULO

2      A.      Since November 3, 2005.

3      Q.      Is that when you started with

4  American Home?

5      A.      Correct.

6              MR. CROWTHER:  Can we go off the

7      record for a second?

8              (A discussion was held off the

9      record.)

10      Q.      What did you do to prepare for

11  this deposition?

12      A.      I spoke with counsel and just

13  reviewed some notes.

14      Q.      What notes did you review?

15      A.      Just prior, you know, documents I

16  provided or data I provided for this.

17      Q.      What kind of data and documents?

18  What did they relate to generally?

19      A.      To the valuation done by Simon,

20  the stuff that I provided to Simon.

21      Q.      What documents did you provide to

22  Simon?

23      A.      Loan data documents, loan data,

24  Excel spreadsheet of loan data.

25      Q.      And that was loan data about the

1          VOULO

2    American Home Mortgage Calyon repurchase

3    agreement --

4          A.      Correct.

5          Q.      -- mortgage loans?

6          A.      Yes.

7          Q.      Are you familiar with the

8    30(b)(6) topics that Calyon identified?

9          A.      Yes.

10         Q.      Are you aware of the topics for

11   which the debtors identified you as their

12   responsive representative?

13         A.      Yes.

14         Q.      What post high school degrees do

15   you have?

16         A.      I went to college, St. John's

17   University in 1982.  Bachelor of science,

18   finance.  That's it.

19         Q.      Where did you work after that?

20   I'm just trying to get a history of your

21   employment.

22         A.      Right out of college I started

23   with Chase Manhattan Bank at the time in

24   August of 1986.

25         Q.      What was your position there?

1                          VOULO

2          A.        Financial analyst.

3          Q.        What type of assets or what --

4          A.        I worked in the broker-dealer

5    division.  You're really going to jog my

6    memory now with what I did 23 years ago, but

7    basically financial analyst position

8    analyzing P&L for the products offered

9    through the broker-dealer division.

10         Q.        Were they mortgage-related

11   products?

12         A.        They were not.

13         Q.        How long were you at Chase?

14         A.        For 19 and a half years.  In six

15   different -- five or six different positions.

16         Q.        Tell me as best you can, what

17   were your positions and the general time

18   frame?

19         A.        I went from broker-dealer

20   operations like two and a half years to

21   security operations for about three years.  I

22   went to corporate treasury for about three

23   years.  Then that brought me to March of 1996

24   when Chase and Chemical merged.

25                   I took a position in New Jersey

1                    VOULO

2   with the mortgage company and I worked in the

3   mortgage company from March of 1996 to

4   October 2005 when I left.

5        Q.      What was your title with the

6   mortgage company?

7        A.      My last title was senior vice

8   president in capital markets.

9        Q.      What were your general

10  responsibilities?

11       A.      I provided -- I oversaw the

12  analytical group that supported the secondary

13  marketing trade group.

14       Q.      Could you describe secondary

15  marketing trade group?

16       A.      Secondary marketing trade group

17  is basically when the originator will

18  originate the loans and sell them to the

19  secondary market, the secondary marketing

20  trading group will handle that function.

21       Q.      In 2005 you began to work for

22  American Home?

23       A.      Right.  That's correct.  I took

24  the job actually running the trade desk for,

25  you know, capital markets.  So my

1                          VOULO

2    responsibilities included the trade desk, as

3    well as the analytical group, a small

4    operations group, and some IT folks.

5        Q.      At American Home?

6        A.      Correct.

7        Q.      Do you know how many mortgage

8    loan pool sales you oversaw in that capacity

9    either at the mortgage -- together at the

10   mortgage company and at Chase?  Or at

11   American Home Mortgage, I misspoke.

12              MR. CROWTHER:  Objection to form.

13       Go ahead.

14       A.      The number of pools or like the

15   UPB -- I mean, I would just be guessing if I

16   gave you a number.

17       Q.      Hundreds?

18       A.      About 70 billion worth maybe.

19       Q.      Of pools, okay.  70 or 700?

20       A.      70 billion.

21       Q.      Other than your time with the

22   mortgage company and AHM, did you have any

23   other experience in the mortgage loan

24   industry?

25       A.      No.

1                      VOULO

2        Q.      Are you familiar with the Calyon

3    repurchase agreement?

4        A.      I am.

5        Q.      You know what I'm talking about

6    when I say the Calyon repurchase agreement?

7        A.      Yes.

8        Q.      When I say repurchase agreement,

9    that's what we'll be talking about today.  It

10   may make sense to define some other terms so

11   we know what you're talking about beforehand.

12   When I say debtors, that will mean the

13   American Home Mortgage debtors, obviously.

14            The petition date means August 6,

15   2007.  That's when they filed for bankruptcy.

16   Calyon means Calyon New York Branch as

17   administrative agent under the repurchase

18   agreement.

19            Mortgage files means records,

20   files, and other documents concerning the

21   mortgage loans under the repurchase agreement

22   and payments on such mortgage loans including

23   paper copies, electronic copies, anything

24   like that.

25            Original mortgage loan documents

1                         VOULO

2    means the original mortgage loan files, the

3    original loan, the original security

4    documents, other original documents.

5              Proceeds means any and all funds

6    and collections of any type received

7    concerning the mortgage loans under the

8    repurchase agreement.  MSRs means the right

9    to service the mortgage loans.

10             MR. CROWTHER:  And I'll interpose

11       the objection on the basis of the form

12       of the question to any question that

13       incorporates the definitions stated just

14       now on the record.

15        Q.      Do you know the debtors' general

16   document retention policies from August 1,

17   2007, through the present with respect to the

18   mortgage files?

19             MR. CROWTHER:  Objection to form

20       and beyond the scope.

21        Q.      You can answer.

22        A.      I was not -- that was not part of

23   my responsibility, so I -- I don't know.

24        Q.      So you don't know what the

25   debtor's document retention policies were

1                    VOULO

2    from August 1, 2007, through the present with

3    respect to other documents that might be

4    related to the mortgage loans other than the

5    mortgage files themselves?

6             MR. CROWTHER:  Objection to form

7        and beyond the scope.

8        A.    I don't know what the formal

9    policy is.  I know what documents were

10   retained in terms of the mortgage files, if

11   that's what you're asking.

12       Q.    What documents were retained?

13       A.    We -- for the mortgage documents

14   we imaged the credit and compliance files on

15   our imaging system.  Over 90 percent of

16   documents were imaged.  So that was all done

17   in-house by a separate group.  And mortgage

18   collateral -- files -- original files were

19   held at the custodian.

20       Q.    You mentioned the original

21   mortgage loan files were held at the

22   custodian.  Are you familiar with the status

23   of the original mortgage loan documents from

24   August 1, 2007, through August 15, 2008?

25            MR. CROWTHER:  Objection.

1               VOULO

2      Mischaracterizes his testimony.

3      Objection to form and objection, beyond

4      the scope.

5      A.    The original collateral files,

6  like I said, were held at the custodian.

7      Q.    As of August 1, 2007, did the

8  debtors have complete and accurate copies of

9  the original collateral files?

10     A.    To the best of my knowledge they

11  did.  I didn't review them so --

12     Q.    Do you know if there were any --

13  or how many exceptions there were to those

14  mortgage loan files?

15     A.    I don't.

16     Q.    You don't know.  So you don't how

17  many exceptions there are at any point in

18  time from August 1, 2007, to August 152007?

19          MR. CROWTHER:  Objection to form.

20     A.    I do not.

21     Q.    Do you know whether the debtors

22  worked with Calyon in February 2008 to

23  continue to resolve exceptions to the --

24          MR. CROWTHER:  Objection to form

25      and beyond the scope.

1                           VOULO

2      Q.      -- original loan documents?

3              MR. CROWTHER:  Same objections.

4      A.      I'm not qualified to answer that.

5      Q.      You don't know?

6      A.      I don't know.

7      Q.      Do you know when the debtors

8  provided Calyon with a mortgage loan tape

9  dated as of December 31, 2007?

10             MR. CROWTHER:  Objection to form.

11     Beyond the scope.

12     A.      I know they did provide it.  I'm

13  not -- I don't know when they provided it.

14     Q.      You don't know if it was January

15  or February?

16             MR. CROWTHER:  Same objections.

17     A.      I'm not -- I do not know the

18  exact date.

19     Q.      I'm going to hand you a string of

20  e-mails that we will mark as Voulo 1.

21             (String of e-mails was marked

22     Voulo Exhibit 1 for identification, as

23     of this date.)

24             MR. CROWTHER:  Counsel, for the

25     record, I assume you're going to ask him

1                      VOULO

2        about the e-mail that has him on it as

3        opposed to any other e-mail that does

4        not have him on it?

5               MR. HARBOUR:  That is correct.

6               MR. CROWTHER:  Okay.  Thank you.

7               MR. HARBOUR:  For clarity, I may

8        ask him about e-mails that were below

9        that may have been attached.  So he

10       would have received them even though he

11       hadn't received the initial e-mail.

12              MR. CROWTHER:  That's fine.

13       Thank you.

14       Q.      Do you see at the bottom of the

15       first page of Voulo 1 a request from -- an

16       e-mail from Mark Linbury?

17       A.      Yes.

18       Q.      And you're identified on that?

19       A.      Mm-hmm.

20       Q.      Do you recall receiving this

21       e-mail?  Could you please answer --

22       A.      Yes.  Sorry.  Yes.  Do I remember

23       seeing this?  Vaguely.  I get a lot of

24       e-mails that I'm copied on.

25       Q.      Based on this e-mail, does this

1               VOULO

2    jog your recollection at all about when the

3    mortgage loan tape for 12/31/07 was provided

4    to Calyon?

5               MR. CROWTHER:  Objection to form.

6        A.     I guess it's here, yes.

7        Q.     You don't have any reason to

8    believe that it wasn't provided -- well, was

9    it provided after this?

10              MR. CROWTHER:  Objection to form.

11       A.     Like I said, I don't know the

12   exact date.  I'm copied, and the reason why

13   I'm copied is Bob Johnson was my boss.  At

14   the time there was only three of us, so if

15   he's not around, I'm next in charge.  Doesn't

16   mean I'm responsible for it.

17       Q.     Were you the one that acquired

18   the tape for them and provided it to Calyon?

19       A.     Acquired the --

20       Q.     The mortgage loan tape or ran the

21   tape?

22       A.     I provided the loan numbers and

23   some information.  I didn't provide a MIAC

24   tape.  I don't know what a MIAC tape is.  I'm

25   assuming they're asking that, you know, for

1             VOULO

2    format purposes.  But I provided the loan

3    number, the balances, and all the key

4    information for -- that is pulled out of our

5    system.  When I say me, it could be me or the

6    other Damian that works for me because

7    there's only two of us.

8         Q.      Stepping back a minute, you don't

9    know what a MIAC tape is?

10        A.      In context of what he's talking

11   about here, I had no dealings with MIAC from

12   a MIAC tape perspective in my job at American

13   Home.  So I'm assuming since it came through

14   Craig Pino and Bob Johnson, this was a

15   treasury function that dealt with MIAC, but

16   they were looking for a format of a tape.

17        Q.      What information would be on the

18   tape that they were providing?  You

19   identified loan number, balance --

20        A.      Loan number, balances, FICO, LTV,

21   DTI.  Just general basic loan information.

22   You want me to go through them again?

23        Q.      Please.

24        A.      UPB or unpaid principal balance,

25   note rate, LTV --

1                    VOULO

2       Q.      What's LTV?

3       A.      Loan to value ratio.  CLTV, which

4   is combined loan to value ratio.  If it's a

5   first and second lien, it would be combined.

6   DTI, debt to income ratio.

7       Q.      FICO?

8       A.      It's a Fair Isaac Credit Score.

9   That's -- there would be servicing data if we

10  had it, which would give us the current

11  status of the loan, which -- whether it was

12  current, delinquent, REO.

13      Q.      REO is?

14      A.      Real estate owned.

15      Q.      Would that servicing data include

16  what proceeds have been paid by the

17  borrowers?

18              MR. CROWTHER:  Objection.  Beyond

19          the scope.  Yeah, we're done.  So if

20          you're going to keep going down this

21          path, we're just going to stop it again.

22          You can ask him about the e-mails that

23          he's on, but he's not designated for any

24          of these topics.  So I'm going to stop

25          it.  You're just wasting all of our

1                          VOULO

2      time.

3                  MR. HARBOUR:  Well, I would

4      disagree just because information that's

5      on a loan tape may be very relevant to

6      value.

7                  MR. CROWTHER:  He's here as a

8      30(b)(6) witness.

9                  MR. HARBOUR:  And he's been

10     identified for value and information

11     that someone looks at in determining

12     information about mortgage loans seems

13     to be relevant to value.

14                 MR. CROWTHER:  I'm sorry,

15     counsel, but that's a stretch.

16                 MR. ACKERLY:  Okay.  We're going

17     to ask the questions.  You can instruct

18     him not to answer, okay.

19                 MR. CROWTHER:  I just did.

20                 MR. ACKERLY:  We'll take it up

21     with the judge.  Keep asking questions.

22     You keep instructing him not to answer.

23     Q.       What other information would be

24  on a mortgage loan tape?

25                 MR. CROWTHER:  Objection.  Beyond

1                        VOULO

2       the scope.  Don't answer the question.

3       Q.      Would servicing data include

4   proceeds that were paid on the mortgage

5   loans?

6               MR. CROWTHER:  Objection.  Beyond

7       the scope.  Don't answer the question.

8       We're done.  He's --

9               MR. ACKERLY:  You're walking out?

10              MR. CROWTHER:  I'm going to seek

11      a protective order.

12              MR. HARBOUR:  Curtis, we're just

13      making a record.

14              MR. ACKERLY:  Curtis, relax a

15      bit.

16              MR. CROWTHER:  Let's go.  We're

17      done.  I told you if we keep going,

18      we're stopping.

19              MR. HARBOUR:  These questions --

20      these questions are just basic -- very

21      basic questions.  And I would think that

22      after the last two days, you'd know

23      we're not wasting anyone's time.  We've

24      moved through all these depositions

25      quickly and we'll continue to do so.

1                        VOULO

2          MR. ACKERLY:  You'll call the

3     judge?

4          MR. CROWTHER:  We're leaving.

5          (Counsel and the witness left the

6     room.)

7               (Time noted:  1:44 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      A C K N O W L E D G E M E N T

2

3    STATE OF NEW YORK     )

4                          :

5    COUNTY OF             )

6

7         I, DAMIAN VOULO, hereby certify

8    that I have read the transcript of my

9    testimony taken under oath in my deposition

10   of February 25, 2009; that the transcript is

11   a true, complete and correct record of my

12   testimony, and that the answers on the record

13   as given by me are true and correct.

14

15                        _____

                          DAMIAN VOULO
16

17

     Signed and Subscribed to
18   before me, this _____ day

19   of _____, 2009

20

21   _____

     Notary Public, State of New York
22

23

24

25

C E R T I F I C A T E

STATE OF NEW YORK  )

                   :

COUNTY OF NEW YORK )

    I, MICHELE MOSKOWITZ, a Shorthand
Reporter and Notary Public within and for the
State of New York, do hereby certify:

    That DAMIAN VOULO, the witness whose
examination is hereinbefore set forth, was
duly sworn by me and that this transcript of
such examination is a true record of the
testimony given by such witness.

    I further certify that I am not related
to any of the parties to this action by blood
or marriage and that I am in no way
interested in the outcome of this matter.

    IN WITNESS WHEREOF, I have hereunto set
my hand this 26th day of February, 2009.

                    _____
                    MICHELE MOSKOWITZ

1          ***ERRATA SHEET***

2      ELLEN GRAUER COURT REPORTING CO. LLC
         126 East 56th Street, Fifth Floor
3            New York, New York 10022
                  212-750-6434

4

5   NAME OF CASE:  IN RE:  AMERICAN HOME MORTGAGE
    DATE OF DEPOSITION:  FEBRUARY 25, 2009
6   NAME OF WITNESS:  DAMIAN VOULO

7   PAGE   LINE      FROM       TO          REASON

8   ____|_____|_____|_____|_____

9   ____|_____|_____|_____|_____

10  ____|_____|_____|_____|_____

11  ____|_____|_____|_____|_____

12  ____|_____|_____|_____|_____

13  ____|_____|_____|_____|_____

14  ____|_____|_____|_____|_____

15  ____|_____|_____|_____|_____

16  ____|_____|_____|_____|_____

17  ____|_____|_____|_____|_____

18  ____|_____|_____|_____|_____

19  ____|_____|_____|_____|_____

20

21                  _____

22  Subscribed and sworn before me
    this _____ day of _____, 2009.
23

24  _____    _____
      Notary Public         My Commission Expires
25