## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x    Chapter 11

In re:    :

    :    Case No. 07-11047 (CSS)

AMERICAN HOME MORTGAGE    :

HOLDINGS, INC., a Delaware corporation, <u>et al.</u>,    :    Jointly Administered

    :

Debtors.    :    **Re: Docket No. 7063**
    **Hearing Date: March 13, 2009**
    **at 11:30 a.m.**
    **Objection Deadline: March 12, 2009**
    **at 4:00 p.m.**

## OBJECTION OF CALYON NEW YORK BRANCH TO
## THE DEBTORS' MOTION FOR PROTECTIVE ORDER

    Calyon New York Branch, as Administrative Agent Pursuant to Repurchase Agreement ("Calyon") hereby objects to the *Debtors' Motion for Protective Order* [D.I. 7063] (the "Motion"). In support of this objection, Calyon states as follows:

### I.    <u>Preliminary Statement</u>

    1.    The Motion arises out of a deposition taken in connection with the *Debtors' Objection to Claims of Calyon New York Branch as Administrative Agent Pursuant to Repurchase Agreement* [D.I. 6824] (the "Claim Objection") filed by the above-referenced debtors and debtors-in-possession (collectively, the "Debtors") which seeks to expunge and disallow the deficiency claim portions of Calyon's Repurchase Agreement Claims[1] based on Bankruptcy Code section 562. Specifically, the parties' dispute involves whether "commercially reasonable determinants of value," as the term is used in section 562, existed for the Mortgage

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the *Response to the Debtors' Objection to Claims of Calyon New York Branch as Administrative Agent Pursuant to Repurchase Agreement* [D.I. 6963] (the "Response").

Loans on August 1, 2007, and if commercially reasonable determinants of value did not exist for the Mortgage Loans on August 1, 2007, when commercially reasonable determinants of value first existed and the value of the Mortgage Loans at such time.

2.      The Debtors fail to meet their burden of proving that cause exists to grant the Motion because *the questions at the deposition that form the alleged basis for the Motion relate to the value of the Mortgage Loans and the Debtors designated the deponent in question to testify about the value of the Mortgage Loans*.  As such, the questions at issue were reasonably calculated to lead to the discovery of admissible evidence.  Thus, the Debtors fail to meet their burden of proving that the questions at the deposition were irrelevant and the Motion should be denied.

## II.      Background

3.      Calyon refers the Court to its Response for a description of the general background related to this contested matter.

4.      On February 24 and 25, 2009, Calyon took the depositions of the Debtors' 30(b)(6) witnesses.

5.      On the afternoon of February 24, 2009, from 1:04 p.m. until 3:03 p.m., Calyon took the deposition of the Debtors' first 30(b)(6) witness, Brett Fernandes.

### A.      The Sakamoto Deposition

6.      On February 24, 2009, at 9:57 a.m., Calyon began the deposition of the Debtors' second 30(b)(6) witness, Simon Sakamoto.  *See* Sakamoto Transcript, at 1.  A copy of the Sakamoto Transcript is attached to the Motion as Exhibit B.  As the Debtors alluded to in the Motion, during the deposition of Mr. Sakamoto, counsel to the Debtors instructed Mr. Sakamoto

not to answer certain questions. *See* Motion, at 4; Sakamoto Transcript, at 37:20-39:7. Contrary

to the Debtors' suggestion in the Motion, however, the questions at issue related to the value of

the Mortgage Loans. Further, the Debtors designated Mr. Sakamoto to testify about value in

paragraphs 8-11 of the Debtors' Objections and Designations in Response to Calyon's Notice of

30(b)(6) Deposition of Debtors (the "Designations").[2]  A copy of the Designations is attached to

the Motion as Exhibit A.

---

[2]      The topics and responses in paragraphs 8-11 of the Designations are as follows:

8. The facts and circumstances concerning the value of the Mortgage Loans on or about August 1, 2007.

RESPONSE:  Debtors object to this topic to the extent it requires expert testimony.  Debtors further object to this topic as being vague, ambiguous and overly broad.  Without waiving these objections, Debtors designate Simon Sakamoto and Damian Voulo to testify relating to this topic.

9. The facts and circumstances concerning the value of the Mortgage Loans on or about September 30, 2007.

RESPONSE:  Debtors object to this topic to the extent it requires expert testimony.  Debtors further object to this topic as being vague, ambiguous and overly broad.  Without waiving these objections, Debtors designate Simon Sakamoto and Damian Voulo to testify relating to this topic.

10. The facts and circumstances concerning the value of the Mortgage Loans on or about January 30, 2008.

RESPONSE:  Debtors object to this topic to the extent it requires expert testimony.  Debtors further object to this topic as being vague, ambiguous and overly broad.  Without waiving these objections, Debtors designate Simon Sakamoto and Damian Voulo to testify relating to this topic.

11. The facts and circumstances concerning the value of the Mortgage Loans on or about August 15, 2008.

RESPONSE:  Debtors object to this topic to the extent it requires expert testimony.  Debtors further object to this topic as being vague, ambiguous and overly broad.  Without waiving these objections, Debtors designate Simon Sakamoto and Damian Voulo to testify relating to this topic.

7.    Specifically, following Calyon's questions about whether the market for mortgage loans was dysfunctional on August 1, 2007, and Mr. Sakamoto's testimony that he did not think that the market was dysfunctional at that time, Calyon asked Mr. Sakamoto to refer to paragraph 27 of the *Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"). *See* Sakamoto Transcript, at 36:5-38:4. At this point, counsel to the Debtors instructed Mr. Sakamoto not to answer any questions about the First Day Declaration as beyond the scope and indicated that the Debtors would seek a protective order if Calyon asked any further questions on the topic. *See* Sakamoto Transcript, at 38:5-39:7.

8.    Paragraph 27 of the First Day Declaration is highly relevant to the value of the Mortgage Loans on August 1, 2007, and to Mr. Sakamoto's suggestion that the market for mortgage loans was not dysfunctional at that time. Specifically, in paragraph 27 of the First Day Declaration, Mr. Strauss stated under the penalty of perjury that "[t]he downward pressure on loan and security values accelerated as more and more borrowers were forced to sell securities and loans in an effort to meet margin calls, such *that for the last two weeks the markets for these assets has been disrupted to the point of dysfunction*." Strauss Declaration, ¶ 27.

9.    Accordingly, paragraph 27 of the First Day Declaration is highly relevant to the value of the Mortgage Loans because it contains the Debtors' statement that the mortgage loan market was dysfunctional on August 1, 2007. Paragraph 27 of the First Day Declaration also is highly relevant because it appears to contradict Mr. Sakamoto's 30(b)(6) testimony that he did not think the mortgage loan market was dysfunctional at that time. In light of the

---

Designations, ¶¶ 8-11.

obstructionist position being taken by the Debtors, however, in an effort to move Mr. Sakamoto's deposition forward in an expeditious manner, Calyon decided to forgo further questions about the Debtors' prior statement concerning the dysfunctional mortgage loan market in August 1, 2007.

10.    Although there were subsequently numerous objections to questions that related to the value of the Mortgage Loans as being beyond the scope, Mr. Sakamoto answered the questions and the deposition concluded on February 25, 2009 at 12:18 p.m., less than two and a half hours after the deposition began. *See* Sakamoto Transcript, at 42:9-44:8, 53:14-60:9, and 83:9.

**B.    The Voulo Deposition**

11.    On February 25, 2009, at 1:32 p.m., Calyon began the deposition of the Debtors' third 30(b)(6) witness, Damian Voulo. *See* Voulo Transcript, at 1. A copy of the Voulo Transcript is attached to the Motion as Exhibit C. Counsel to the Debtors ended the deposition of Mr. Voulo at 1:44 p.m., ***less than 15 minutes into the deposition***. *See* Voulo Transcript, at 23.

12.    At the deposition Mr. Voulo testified that he provided loan data documents, loan data and an excel spreadsheet of loan data to Mr. Sakamoto for the valuation of the mortgage loans done by Mr. Sakamoto. *See* Voulo Transcript, 7:15-24.

13.    Based on, among other things, Mr. Voulo's testimony that he provided underlying information about the Mortgage Loans to Mr. Sakamoto for the valuation of the Mortgage Loans, and the Debtors' designation of Mr. Voulo as a 30(b)(6) representative to

testify about the value of the Mortgage Loans in paragraphs 8 through 11 of the Designations, Calyon asked Mr. Voulo questions about underlying information regarding the Mortgage Loans.

14.    Calyon asked about the status of the files regarding the Mortgage Loans. Voulo Transcript, at 13:24-16:6.  In response, among other things, Mr. Voulo testified that he knew what documents the Debtors retained in terms of the mortgage files.  *Id.* at 14:9-11.

15.    Calyon then asked Mr. Voulo about whether the Debtors provided Calyon with a mortgage loan tape dated as of December 31, 2007, including about a string of emails that indicated that Mr. Voulo was aware of the Debtors providing the mortgage loan tape to Calyon in February 2008. *See id*. 16:7-18:16.  These questions are relevant to the value of the Mortgage Loans on January 30, 2008 because, *inter alia*, whether Calyon had up to date information about the Mortgage Loans is highly relevant to Calyon's ability to sell the Mortgage Loans and the price that could be received in such a sale.  Moreover, the information on a mortgage loan tape is relevant to value because the information consists of facts about the Mortgage Loans that may affect the value of the Mortgage Loans.

16.    Calyon then asked Mr. Voulo about the mortgage loan tape that was provided to Calyon, and Mr. Voulo responded, as follows:

Q.    Were you the one that acquired the tape for them and provided it to Calyon?

A.    Acquired the --

Q.    The mortgage loan tape or ran the tape?

A.    ***I provided the loan numbers and some information.***  I didn't provide a MIAC tape.  I don't know what a MIAC tape is.  I'm assuming they're asking that, you know, for format purposes.  ***But I provided the loan number, the balances, and all the key information for -- that is pulled out of our system.***  When I say me, it could be me or the other Damian that works for me because there's only two of us.

*Id.* at 18:17-19:7 (emphasis added). Calyon then asked Mr. Voulo about what a "MIAC" tape is,

which is how the mortgage loan tape was identified in the email string. *See id.* at 19:8-9. Mr.

Voulo responded

> In the context of what he's talking about here, I had no dealings with MIAC from a
> MIAC tape perspective in my job at American Home. So I'm assuming since it came
> through Craig Pino and Bob Johnson, this was a treasury function that dealt with MIAC,
> but they were looking for a format of a tape.

*Id.* at 19:10-16.

      17.     Thus, Mr. Voulo testified that the reference to MIAC was related to format

and that *he provided information from the Debtors' system for the mortgage loan tape* that was

provided to Calyon regarding the Mortgage Loans as of December 31, 2007.

      18.     Calyon then asked the following questions, Mr. Voulo responded and the

following exchange occurred:

> Q:     What information would be on the tape that they were providing? You
> identified loan number, balance --
>
> A:     Loan number, balances, FICO, LTV, DTI. Just general basic loan
> information. You want me to go through them again?
>
> Q:     Please.
>
> A.     UPB or unpaid principal balance, note rate, LTV --
>
> Q.     What's LTV?
>
> A.     Loan to value ratio. CLTV, which is combined loan to value ratio. If it's
> a first and second lien, it would be combined. DTI, debt to income ratio.
>
> Q.     FICO?
>
> A.     It's a Fair Isaac Credit Score. That's -- there would be servicing data if we
> had it, which would give us the current status of the loan, which -- whether it was
> current, delinquent, REO.
>
> Q.     REO is?

A.    Real Estate owned.

Q.    Would that servicing data include what proceeds have been paid by the borrowers?

Mr. Crowther:  Objection.  Beyond the scope.  Yeah, we're done.  So if you're going to keep going down this path, we're just going to stop it again.  You can ask him about the e-mails that he's on, but he's not designated for any of these topics.  So I'm going to stop it.  You're just wasting all of our time.

Mr. Harbour:  Well, I would disagree just because information that's on a loan tape may be very relevant to value.

Mr. Crowther:  He's here as a 30(b)(6) witness.

Mr. Harbour:  And he's been identified for value and information that someone looks at in determining information about mortgage loans seems to be relevant to value.

Mr. Crowther:  I'm sorry, counsel, but that's a stretch.

Mr. Ackerly:  Okay.  We're going to ask the questions.  You can instruct him not to answer okay.

Mr. Crowther:  I just did.

Mr. Ackerly:  We'll take it up with the judge.  Keep asking questions.  You keep instructing him not to answer.

Q.    What other information would be on a mortgage loan tape?

Mr. Crowther:  Objection.  Beyond the scope.  Don't answer the question.

Q.    Would servicing data include proceeds that were paid on the mortgage loans?

Mr. Crowther:  Objection.  Beyond the scope.  Don't answer the question.  We're done.  He's --

Mr. Ackerly:  You're walking out?

Mr. Crowther:  I'm going to seek a protective order.

Mr. Harbour:  Curtis, we're just making a record.

Mr. Ackerly:  Curtis, relax a bit.

Mr. Crowther:  Let's go.  We're done.  I told you if we keep going, we're stopping.

Mr. Harbour:   These questions -- these question are just basic -- very basic questions.  And I would think that after the last two days, you'd know we're not wasting anyone's time.  We've moved through all these depositions quickly and we'll continue to do so.

Mr. Ackerly:  You'll call the judge?

Mr. Crowther:  We're leaving.

*Id*. at 19:17-23:4.  At this point, Counsel to the Debtors and Mr. Voulo left the deposition.

19.    Accordingly, each of Calyon's questions addressed the information that Mr. Voulo provided and that was on the mortgage loan tape that the Debtors provided to Calyon. Following Calyon's question regarding the servicing data, ***which Mr. Voulo testified was information about the current status of the Mortgage Loans and would have been on the tape if the Debtors had the information***, counsel to the Debtors objected and ultimately ended the deposition.

**B.    The Motion**

20.    In the Motion, the Debtors seek a protective order based on the Debtors' allegations that the questions at the deposition were irrelevant, a waste of time, outside the scope of the topics on which Mr. Voulo was designated to testify and dealt with topics for which Mr. Voulo did not have knowledge.  *See* Motion, at 5-8.

**III.    Objection**

21.    The Motion should be denied.  The Debtors fail to meet their burden of proving that cause exists to grant the Motion because the deposition questions at issue relate to the value of the Mortgage Loans and were reasonably calculated to lead to the discovery of admissible evidence.  Moreover, Mr. Voulo was designated to answer questions related to the value of the Mortgage Loans and knew the answers to the questions at issue.

9

A.      **Legal Standard**

22.     In order to obtain a protective order, the Debtors must prove that good cause exists to enter the requested protective order. *See McCurdy v. Wedgewood Capital Management Co., Inc.*, 1998 U.S. Dist LEXIS 20628, at *5 (E.D. Pa. 1998) (citing *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir. 1995)). In fact, the Debtors must provide a "particular and specific demonstration of fact, as distinguished from a stereotyped and conclusory statement." *Fidelity and Deposit Company of Maryland v. Mulhern (In re Mulhern)*, 45 B.R. 621, 624 (Bankr. E.D. Pa. 1985) (quoting *United States v. Purdome, 30 F.R.D. 338, 341 (W.D.Mo. 1962))*. Further "[t]he determination of whether good cause does or does not exist must be based on appropriate testimony and other factual data, not the unsupported contentions and conclusions of counsel." *Mulhern*, 45 B.R. at 624 (citing *Apco Oil Corp. v. Certified Transportation, Inc., 46 F.R.D. 428, 432 (D.C.Mo. 1969))*.

23.     In addition, although a protective order may be obtained if the information sought is irrelevant information, the Debtors have the burden of proving that the information at issue is irrelevant. *See McCurdy*, 1998 U.S. Dist LEXIS 20628, at *7 (citing *In re Bell Atlantic Securities Litig.*, 1993 WL 514408 (E.D.Pa. 1993)).

24.     Black letter law provides that relevance "is to be broadly construed and is not limited to the precise issues set out in the pleadings or to the merits of the case." *McCurdy*, 1998 U.S. Dist LEXIS 20628. at *7(citing *Oppenheimer Fund Inc. v. Sanders,* 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978)). "Instead, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action." *McCurdy*, 1998 U.S. Dist LEXIS 20628. at *7(citing *Oppenheimer Fund Inc. v. Sanders,* 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978)). Moreover, the

relevance standard set forth in Federal Rule 26(b) provides that "information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

**B.      Calyon's Questions Were Reasonably Calculated to Lead to the Discovery of Admissible Evidence**

25.      Calyon's questions to Mr. Voulo about the information that Mr. Voulo gathered, and that was on the mortgage loan tape provided to Calyon, were reasonably calculated to lead to the discovery of admissible evidence.

26.      Specifically, one of the facts at issue in this matter is the value of the Mortgage Loans, including the value of the Mortgage Loans on January 30, 2008. Calyon's questions to Mr. Voulo regarding the mortgage loan tape related to the information the Debtors provided to Calyon about the Mortgage Loans as of December 31, 2007. Questions concerning the information the Debtors provided to Calyon regarding the Mortgage Loans is highly relevant because, *inter alia*, whether Calyon had up to date information, including information about the proceeds received on the Mortgage Loans, affected Calyon's ability to sell the Mortgage Loans, the price that could be obtained in such a sale, and thus the value of the Mortgage Loans.[3] Further, the information on a mortgage loan tape is relevant to value because the information consists of facts about mortgage loans that may affect their value.

27.      In addition, the Debtors designated Mr. Voulo to testify about the value of the Mortgage Loans as of January 30, 2008 in paragraph 10 of the Designations. Moreover, Mr.

---

[3]      As the Court will recall, prior to the Stipulation and Order Regarding Mortgage Funds and Mortgage Files entered on January 25, 2008, Calyon was not receiving the proceeds of the Mortgage Loans, which the Court noted at the January 17, 2008 hearing would affect whether anyone would buy the Mortgage Loans from Calyon. *See* January 17, 2008 Transcript, at 14:17-15:6, 19:14-19:24

Voulo testified competently about the information that was on the tape that the Debtors provided to Calyon. *See supra* ¶ 18; Voulo Transcript, at 19:17-20:17.

28. As a result, the questions immediately preceding the exchange that led the Debtors to end Mr. Voulo's deposition and to file the Motion were related to the value of the Mortgage Loans and thus (i) involved a topic for which Mr. Voulo was designated and (ii) were relevant and reasonably calculated to lead to the discovery of admissible evidence. In addition, based on Mr. Voulo's responses and his testimony that he gathered the information, Mr. Voulo knew the answers to the questions at issue.

29. The Debtors conclusory statements to the contrary in the Motion are not supported by the record. For example, in the Motion the Debtors selectively quote from the questions and answers regarding the "MIAC" issue and then characterize the entire line of questioning by stating that Mr. Voulo "had no interaction with or responsibilities concerning the MIAC tape." Motion, at 6. Mr. Voulo's testimony on this topic refutes this statement. Although Mr. Voulo was not certain what a "MIAC" tape was, Mr. Voulo testified that the reference to "MIAC" was to formatting, and that he provided the information for the mortgage loan tape that was provided to the Debtors. The exchange in question is below:

Q. Were you the one that acquired the tape for them and provided it to Calyon?

A. Acquired the --

Q. The mortgage loan tape or ran the tape?

A. *I provided the loan numbers and some information.* I didn't provide a MIAC tape. I don't know what a MIAC tape is. I'm assuming they're asking that, you know, for format purposes. *But I provided the loan number, the balances, and all the key information for -- that is pulled out of our system.* When I say me, it could be me or the other Damian that works for me because there's only two of us.

Q.    Stepping back a minute, you don't know what a MIAC tape is?

A.    In the context of what he's talking about here, I had no dealings with MIAC from a MIAC tape perspective in my job at American Home. So I'm assuming since it came through Craig Pino and Bob Johnson, this was a treasury function that dealt with MIAC, but they were looking for a format of a tape.

Voulo Transcript, at 18:17-19:16 (emphasis added).

30.    Thus, Mr. Voulo testified that while the reference to MIAC was related to format, *he provided information from the Debtors' system for the mortgage loan tape* that was provided to Calyon regarding the Mortgage Loans as of December 31, 2007.

31.    In the Motion the Debtors also state that "[g]iven the dearth of comprehension on Mr. Voulo's part, Calyon's continuous attempts to obtain testimony beyond the scope of Mr. Voulo's knowledge, outside the scope of any topic for which Mr. Voulo was designated by the Debtors and outside the scope of any 30(b)(6) topics generally, could serve no use in the case and hence were improper." Motion, at 6-7. This conclusory statement is wrong on each point. First, Mr. Voulo's testimony demonstrates that he understood the questions and knew the answers to Calyon's questions about the mortgage loan tape. *See supra*, ¶ 18, Voulo Transcript, at 19:17-20:17. In fact, Mr. Voulo never indicated that he did not know the answers to the questions at issue. Second, Mr. Voulo was designated to testify as to value and questions about the information the Debtors provided to Calyon relate to value. *See* Designation, ¶¶ 8-11, supra, ¶ 26. Third, because the questions relate to the value of the Mortgage Loans, they are relevant and reasonably calculated to lead to the discovery of admissible evidence, and therefore are proper.

13

32.    Therefore, the Debtors have not met their burden of proving that good cause exists to grant the Motion or that the questions at issue were not reasonably calculated to lead to the discovery of admissible evidence.

### C.    The Debtors' Other Arguments Do Not Support Entering a Protective Order

33.    As discussed above, the questions that led the Debtors to end Mr. Voulo's deposition and to seek a protective order relate to the value of the Mortgage Loans.  Specifically, the questions relate to the information the Debtors provided to Calyon regarding the Mortgage Loans, which relates to the value of the Mortgage Loans because whether Calyon had up to date information, including information about the proceeds received on the Mortgage Loans, affects Calyon's ability to sell the Mortgage Loans and thus the price that could be obtained in such a sale.  The information the Debtors provided to Calyon also is relevant because the information consists of underlying facts regarding the mortgage loans that may affect their value.

34.    The Debtors' suggestion in the Motion that Calyon's questions were beyond the scope of Mr. Voulo's 30(b)(6) designation and a waste of time are wrong.  *See* Motion, at 7.  Mr. Voulo was designated to testify as to value, including the value of the Mortgage Loans as of January 30, 2008.  *See* Designations, ¶¶ 8-11.  Further, Mr. Voulo testified that he provided the information for the mortgage loan tape that the Debtors provided to Calyon. *See supra* ¶ 29; Voulo Transcript, at 18:17-19:16.  In fact, Mr. Voulo testified that he provided loan data documents, loan data and an excel spreadsheet of loan data to Mr. Sakamoto for the valuation of the mortgage loans done by Mr. Sakamoto.  *See* Voulo Transcript, 7:15-24.  Thus, not only was Mr. Voulo designated to testify as to the value issues raised by the questions in dispute, but Mr. Voulo testified that he was the person who provided loan data for the Debtors' mortgage loan valuations.  As a result, Calyon was well within its rights to ask Mr. Voulo the

questions in dispute.  Moreover, given the fact that Mr. Voulo's deposition ended less than 15

minutes after it began, the Debtors' suggestion that Calyon's questions were a waste of time also

is wrong.

35.    The Debtors also wrongly suggest that somehow because the Debtors had

not conducted a valuation as of January 30, 2008, that "Calyon's line of questioning is nothing

but a naked attempt to evade the witness' 30(b)(6) designations."  Motion, at 7.  Similarly, the

Debtors wrongly suggest that the questions in dispute were inappropriate because Mr. Sakamoto

asked Mr. Voulo to perform only a specific task in preparing Mr. Sakamoto's valuations.  *Id.*

Whether or not the Debtors conducted a valuation as of January 30, 2008, and the extent to

which Mr. Voulo participated in the valuations, do not make the questions in dispute

inappropriate.  The questions in dispute relate to the value of the Mortgage Loans regardless of

whether the Debtors conducted a valuation as of January 30, 2008 or the extent to which Mr.

Voulo participated in the valuations.  Thus, the questions are within the scope of the issues on

which Mr. Voulo was designated to testify.  Therefore, the questions are appropriate and the

Debtors' suggestion to the contrary in the Motion does not support a finding that cause exists to

enter a protective order.

36.    Similarly, the Debtors suggest that the questions in dispute are

inappropriate because "Mr. Voulo testified that he was unaware of what a MIAC tape would be

used for."  *Id.*  As discussed above, Mr. Voulo testified that the reference to "MIAC" was for

formatting purposes and that *he provided information from the Debtors' system for the*

*mortgage loan tape* that was provided to Calyon regarding the Mortgage Loans as of December

31, 2007.  *See supra* ¶ 29, Voulo Transcript, at 18:17-19:16.  Thus, the questions in dispute relate

15

to information about which Mr. Voulo was particularly familiar, as was evidenced by Mr.

Voulo's responses to Calyon's questions before the Debtors ended Mr. Voulo's deposition.

37.    Finally, the Debtors' suggestions that Calyon's questions related to

servicing topics, and were inappropriate, also are wrong. *See* Motion, at 7.  Specifically, in the

Motion the Debtors state "[g]iven that Mr. Voulo was not offered for servicing topics (and there

were not servicing topics in the 30(b)(6) notice), Calyon's attempts to ask about these topics, and

hence unilaterally expand the scope of the deposition, could serve no purpose other than to

harass or oppress the witness."  *Id*.  The question at issue arose from Mr. Voulo's testimony

about the information contained in the mortgage loan tape.   Specifically, the questions and

answers at issue that used the word "servicing" are as follows:

    Q.    FICO?

    A.    It's a Fair Isaac Credit Score.  That's -- there would be servicing data if we
    had it, which would give us the current status of the loan, which -- whether it was
    current, delinquent, REO.

    Q.    REO is?

    A.    Real Estate owned.

    Q.    Would that servicing data include what proceeds have been paid by the
    borrowers?

*Id*. at 20:7-20:17.

    Q.    Would servicing data include proceeds that were paid on the mortgage
    loans?

*Id*. at 22:3-5.

    38.    The transcript of Mr. Voulo's deposition leaves no doubt that the

questions that used the word "servicing" were related to the mortgage loan information that was

provided to Calyon.  Thus, the questions relate to the value of the Mortgage Loans, a topic for

which Mr. Voulo was designated. Moreover, Mr. Voulo's responses indicate he was knowledgeable to testify about these topics. Thus, the Debtors' suggestion that Calyon asked questions about "servicing" also does not support a finding that cause exists enter a protective order.

## IV.    Conclusion

39.    The Debtors have failed to meet their burden of proving that cause exists to grant the Motion and enter a protective order. The reasons the Debtors identify to support the entry of a protective order either are not based on Mr. Voulo's testimony or fail to take into account the fact that the questions in dispute relate to the value of the Mortgage Loans. Thus, the Debtors are left with only unsupported, conclusory allegations that are insufficient to support the entry of a protective order. In sum, the questions in dispute were reasonably calculated to lead to the discovery of admissible evidence, Mr. Voulo was designated to answer questions related to the value of the Mortgage Loans and Mr. Voulo knew the answers to the questions at issue.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, Calyon respectfully requests that the Court enter an order (a) denying the Motion; (b) compelling the Debtors to produce Mr. Voulo at a mutually agreeable time and place to continue his deposition, including by answering the questions in dispute; and (c) granting Calyon such other and further relief as is just and appropriate.

Dated: March 12, 2009

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

Michael G. Busenkell (DE No. 3933)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: 302.252.4324
Facsimile: 302.252.4330

-and-

Benjamin C. Ackerly
Jason W. Harbour (DE No. 4176)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218

-and-

Peter S. Partee
Scott H. Bernstein
200 Park Avenue, 53rd Floor
New York, New York 10016-0136
Telephone: (212) 309-1000
Facsimile: (212) 309-1100

*Counsel to Calyon New York Branch*