# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------- x
```

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMERICAN HOME MORTGAGE | : | Bankruptcy Case No. 07-11047(CSS) |
| HOLDINGS, INC., a Delaware | : | Jointly Administered |
| Corporation, et al., | : | |
| | : | |
| Debtors. | : | Ref. Docket No. 6281 |

```
----------------------------------------- x
```

| | | |
|---|---|---|
| DB STRUCTURED PRODUCTS, INC., | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | Dist. Ct. Civ. Act. No. 07-0773-JJF |
| | : | |
| AMERICAN HOME MORTGAGE | : | |
| HOLDINGS, INC., a Delaware | : | |
| Corporation, et al., | : | |
| | : | |
| Appellees. | : | |

```
----------------------------------------- x
```

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER ON REMAND[1]**

Upon the Order of the United States District Court for the District of Delaware

dated October 16, 2008, remanding the above-captioned action to this Court for consideration of

the issues raise on appeal; and the Court having reviewed the parties' appellate briefs, the

transcript of the oral argument before the District Court, and other relevant portions of the record

on remand submitted to chambers on October 30, 2008 (the "Record on Remand")[2]; and after due

deliberation, and good cause appearing therefor, for the reasons set forth herein, the Court hereby

---

[1]  This Order constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy
Procedure 7052.

[2]  Citations to the record herein shall be in the form "(R-[Tab #] at [pinpoint])".

ratifies in its entirety the *Order Pursuant to Sections 105, 363, 364, 365, and 503(b) of the Bankruptcy Code, and Rules 2002, 4001, 6004, 6006, 7062, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Approving (i) the Sale of the Debtors' Mortgage Servicing Business Free and Clear of Liens, Claims and Interests, (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (B) Granting Certain Related Relief* [D.I. 1711] entered October 30, 2007 (the "Sale Order").

## BACKGROUND

### Debtors' Loan Origination and Servicing Businesses

       1.      Prior to bankruptcy, American Home Mortgage Corp. ("AHM Corp."), AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), and their affiliated debtors and debtors in possession (collectively, the "Debtors"), were in the business of originating, selling, and servicing residential mortgage loans. Loans were typically originated and sold by AHM Corp. and serviced by AHM SV.

       2.      The Debtors sold loans to investors on either a "servicing-retained" or "servicing-released" basis. In servicing-retained sales, the Debtors sold the loans but retained the right to service the service the loans in exchange for a servicing fee equal to a fixed percentage of the principal and interest ("P&I") payments collected from borrowers over the life of the loan. In servicing-released or "whole loan" sales, the Debtors sold the loans as well as the servicing rights and serviced the loans on an interim basis only, until the purchaser designated a successor servicer. All other things held equal, loans sold on a servicing-released basis would command a higher price than loans sold on a servicing-retained basis. For a given pool of mortgages, the Debtors would generally solicit both servicing-released and servicing-retained bids, then compare

the servicing-released premium being offered by the market with their own internal valuation of the servicing rights when deciding whether to retain servicing or sell the loans servicing-released.

      3.     Where the Debtors and an investor anticipated multiple loan sales over time they would typically enter into a "Mortgage Loan Purchase and Interim Servicing Agreement" or "MLPISA" (for servicing-released sales) or a "Mortgage Loan Purchase and Servicing Agreement" or "MLPSA" (for servicing-retained sales), as applicable, which established the terms common to each transaction (e.g., representations and warranties, remedies, servicing provisions). The parties would then execute particular loan trades pursuant to the MLPISA/MLPSA by side agreement identifying the loans and the purchase price.

      4.     Loans were generally sold by AHM Corp. subject to certain warranties, two of which are particularly relevant to these proceedings. The first is that the loans sold will not suffer an "early payment default" or "EPD" (usually defined as a borrower payment default within 60-90 days after purchase of the loan). Upon the occurrence of an EPD, the purchaser under an MLPISA/MLPSA would have the right to require AHM Corp. to repurchase the defaulting loan (such right, an "EPD Claim"). The second is a warranty that the loans sold will not prepay within a certain time, often one year. As an early payoff would deprive the purchaser under an MLPISA/MLPSA of certain economic benefits of the transaction (i.e., the anticipated stream of interest payments), the purchaser would ordinarily be entitled to a refund of the premium (i.e., the amount over the "par" value of the loan) paid for the loan at the time of purchase (the right to such refund, a "Premium Recapture Claim").

      5.     Loans purchased from the Debtors were often pooled and securitized by the purchasers. In addition to the loans themselves, the purchaser would typically assign to the trustee of the securitization trust all its rights to the Debtors' continuing warranties under the MLPISA or

MLPSA, as applicable.  In securitizations spun off of MLPSAs (i.e., where the Debtors retained the right to service the loans on behalf of the securitization trust), the purchaser, AHM SV, and the trustee of the securitization trust would typically execute a separate Assignment, Assumption, and Recognition Agreement ("AAR") that made the trustee an obligee of AHM SV's continuing servicing obligations under the MLPSA.

### The Master Agreement

6.     AHM Corp., as Seller, AHM SV, as Servicer, and DB Structured Products, Inc. ("DBSP"), as Initial Purchaser, are parties to a Master Mortgage Loan Purchase and Servicing Agreement dated May 1, 2006 (the "Master Agreement", R-37).  The Master Agreement is an MLPSA pursuant to which DBSP purchased loans from time to time from AHM Corp. on a servicing-retained basis, with AHM SV performing the servicing function.  DBSP frequently securitized the loans purchased from AHM Corp., and in connection therewith utilized AARs to transfer the benefit of AHM SV's servicing obligations to the securitization trustee.

7.     The Master Agreement was drafted by DBSP's counsel and is an adaptation of a prior MLPISA between the parties, whereby DBSP had purchased loans from AHM Corp. from time to time on a servicing-released basis.  One of the principal changes made to get from the MLPISA to the Master Agreement was to include a 22-page "Servicing Addendum" setting forth AHM SV's essential rights and obligations with respect to the servicing of the purchased loans.

8.     DBSP currently owns a portfolio (the "DBSP Portfolio") of international taxpayer identification number or "ITIN" loans, which it purchased from AHM Corp. pursuant to the Master Agreement.  DBSP has asserted substantial EPD Claims and Premium Recapture Claims in connection with the DBSP Portfolio.

***Sale of the Debtors' Servicing Business***

9.      On August 6, 2007 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. The Debtors also filed an emergency motion (the "Sale Motion," R-1) seeking, among other things, to approve the sale of the assets used in the Debtors' mortgage loan servicing business free and clear of liens, claims, encumbrances and other, interests.

10.     On August 17, 2007, DBSP filed a motion (R-55) seeking relief from the automatic stay imposed by § 362 of the Bankruptcy Code for "cause" under § 362(d)(1), so as to permit termination of AHM SV's rights under the Master Agreement on the basis of alleged defaults. The Debtors objected to this motion (R-57), and the Court held an evidentiary hearing on September 17, 2007 (the "Stay Relief Hearing"), at which it concluded any default under the MLPSA had been cured and denied the relief requested by DBSP. The Court takes judicial notice of the evidence adduced and the arguments made at the Stay Relief Hearing. (R-59.)

11.     On September 25, 2007, the Debtors filed an executed stalking horse asset purchase agreement (R-11) (as amended, the "APA") with AH Mortgage Acquisition Corp. (the "Buyer"), which contemplated that the Buyer would acquire the *servicing* rights and assume *servicing*-related liabilities under certain MLPSAs, including the Master Agreement, but would not assume any *non*-servicing related liabilities such as EPD or Premium Recapture Claims.

12.     DBSP objected to the Sale Motion and the proposed sale to the Buyer, and there was extensive briefing by DBSP and the Debtors. The Court held a five-day evidentiary hearing on the Sale Motion from October 15-19, 2007 (the "Sale Hearing"), at which it heard testimony from four fact witnesses and one expert witness for the Debtors, and one fact witness from DBSP, in addition to extensive oral argument by counsel for the Debtors and DBSP. On

October 23, 2007, the Bankruptcy Court issued its bench ruling approving the APA and

authorizing the sale of the Debtors' servicing business to the Buyer.  (R-52.)  The Court entered

the Sale Order on October 30, 2007.

**ISSUES ON APPEAL**

13.    The Debtors' rights under the Master Agreement are property of the

bankruptcy estate under section 541 of the Bankruptcy Code.  Because a contract right is a type of

property, many of the rules governing its transfer are similar to the rules of property law

governing the sale of land and chattels or personal property.  However, unlike land and chattels, a

contract right is a type of intangible property.  Under the common law of contracts, there is a

distinction between the assignment of rights under a contract, the delegation of duties under a

contract, and the transfer of rights and obligations under a contract.

14.    Under the Bankruptcy Code, if a contract is not executory, a debtor may

assign, delegate, or transfer rights and/or obligations under section 363 of the Bankruptcy Code,

provided that the criteria of that section are satisfied.  If a contract is executory, the debtor must

also comply with section 365 of the Bankruptcy Code, which provides special rules governing the

transfer of rights and obligations under a contract.

15.    DBSP and the Debtors have stipulated that the Master Agreement is non-

executory for purposes of this appeal.  In other words, the parties agree that DBSP has no

material, unperformed obligations under the Master Agreement the non-performance of which

would constitute a material breach excusing AHM Corp.'s or AHM SV's further performance.

**I.    Severability of Master Agreement; Transfer of Loan Servicing Agreement
"Free and Clear" of Claims under Loan Sale Agreement**

16.    DBSP's third, fourth, fifth, sixth, and seventh assignments of error all

concern, to a greater or lesser degree, the following two findings underlying the Sale Order: first,

6

that the Master Agreement is severable into two agreements, one for the origination and sale of mortgage loans (the "Loan Sale Agreement"), and the other for the servicing of mortgage loans (the "Loan Servicing Agreement"); and second, that the rights and obligations of the Debtors under the Loan Servicing Agreement can be transferred free and clear of claims arising under the Loan Sale Agreement pursuant to section 363(f) of the Bankruptcy Code. These two findings are interrelated, because if the Master Agreement is severable into a Loan Sale Agreement and a Loan Servicing Agreement, then it follows that, pursuant to section 363(f)(5) of the Bankruptcy Code and the Third Circuit's decision in *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252 (3d Cir. 2000), the Debtors can transfer the Loan Servicing Agreement free and clear of claims arising under the Loan Sale Agreement.

17.     *Folger Adam* involved chapter 11 debtors' sale of "accounts receivable" relating to certain construction equipment previously sold to a contractor pursuant to two contracts. The debtors had fully performed under the contracts by the time they filed their bankruptcy petitions, but the contractor had withheld payment on the basis of alleged breaches of the contracts. In their chapter 11 cases, the debtors sold their rights under the non-executory contracts to a purchaser free and clear of "interests" pursuant to section 363(f). The purchaser sued the contractor to collect, and in response the contractor asserted affirmative defenses of (i) recoupment on account of the debtors' alleged breaches of the contracts at issue and (ii) setoff with respect to the debtors' alleged breaches of other contracts with the contractor. The trial court granted summary judgment for the purchaser, holding that the free-and-clear sale of the non-executory contract rights had eliminated any defenses the contractor could assert vis-à-vis the purchaser.

18.     The Third Circuit reversed, holding that a recoupment defense did not constitute an "interest" in property for purposes of section 363(f).  In reaching this conclusion, the court distinguished between "claims" and "defenses," noting that the former sought affirmative recovery whereas the latter sought only to diminish or defeat a recovery, not to share in it. Surveying the case law, the court found that "claims" were generally held to be "interests" for purposes of 363(f), and sales free and clear of claims were permitted under section 363(f)(5) because a claimant, by definition, could be compelled in a legal or equitable proceeding to accept a money satisfaction of its claim.  However, the court found no authority suggesting a "defense" could be extinguished as a result of a free and clear sale.  Unlike setoff, recoupment is considered a "defense" rather than a "claim," because it permits a creditor to assert that mutual claims under the same transaction with the debtor extinguish one another, but it does not permit the creditor to obtain affirmative recovery from the debtor.  Accordingly, the debtors' sale of non-executory contract rights free and clear of "interests" did not extinguish the contractor's recoupment rights under the contracts.

19.     The Third Circuit found further support for its holding in the oft-cited *cum onere* principle, noting: "Bankruptcy law generally does not permit a debtor . . . to assume the benefits of a contract and reject the unfavorable aspects of the same contract.  Yet, allowing the Debtors to recharacterize their contract rights as accounts receivable and sell them free and clear of the corresponding obligations yields that very result." *Folger Adam*, 209 F.3d at 264.

20.     The Court reads *Folger Adam* to stand for the two propositions of particular importance to these proceedings: <u>first</u>, that section 363 of the Bankruptcy Code permits a debtor to transfer its rights and obligations under a non-executory contract; <u>second,</u> that section 363(f)(5) permits the rights and obligations under one non-executory contract to be transferred free and

clear of claims arising under other contracts.  The APA and Sale Order provide for the transfer of

all the Debtors' rights and obligations under the Loan Servicing Agreement, as distinct from the

Loan Sale Agreement.  Accordingly, if the Master Agreement is indeed severable into two distinct

contracts, then the rights and obligations of the Debtors under one contract may be transferred to

the Buyer free and clear of claims arising under the other contract.

   21. The Master Agreement is governed by New York law.  (R-37 at § 22.)

"There is no formulaic test under New York law for determining whether a contract is severable.

Rather, as with all contract interpretation, severability 'is a question of the parties' intent, to be

determined from the language employed by the parties, viewed in light of the circumstances

surrounding them at the time they contracted.'  More specifically, though, under New York law, a

contract is severable 'when by its terms, nature and purpose, it is susceptible of division and

apportionment.'"  *Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg.*

*Holdings, Inc.)*, 379 B.R. 503, 521 (Bankr. D. Del.) (citations omitted), *reconsideration denied*,

383 B.R. 585 (Bankr. D. Del. 2008).

   22. Although decided under Florida law rather than New York law, the

Eleventh Circuit's decision in *In re Gardinier, Inc.*, 831 F.2d 974 (11th Cir. 1987), is also

instructive.

   23. *Gardinier* involved a three-party contract whereby a seller promised to sell

real property to a buyer and to pay a broker a commission for his services.  The contract stated

that if the buyer failed to perform, the seller and the broker would divide the deposit, and if the

seller failed to perform, he was responsible for the full commission to the broker.  The seller filed

for bankruptcy and sought to assume the contract. The bankruptcy court approved the seller's

assumption of the contract and sale of the real property to the buyer, but blocked the commission,

holding that the seller's agreement with the broker was a separate, fully executed agreement. Affirming the bankruptcy court, the Eleventh Circuit identified the following factors that supported the bankruptcy court's holding:

> First, *the nature and purpose of the agreements are different*. One agreement addresses the sale of property and the other contemplates an employment contract related to the sale of the property. Second, *the consideration for each agreement is separate and distinct*. [The buyer] agreed to pay [the seller] in excess of $ 5 million in consideration for the [property]. [The seller] separately agreed to pay [the broker] a commission as consideration for services rendered in making the sale of the property. There was no consideration flowing between [the broker] and [the buyer]. Finally, *the obligations of each party to the instrument are not interrelated*.

*Gardinier*, 831 F.2d at 976 (emphasis added, citations omitted).

24.    The parties agree that the *Gardinier* analysis, viewed against the backdrop of New York state contract law, is appropriate in determining whether the Master Agreement is severable into a distinct Loan Servicing Agreement and Loan Sale Agreement.

25.    On the first *Gardinier* factor, the Court previously found that the nature and purpose of the loan servicing and loan sale provisions of the Master Agreement were different. DBSP contests this finding, citing parol testimony of Robert Johnson and Peter Principato for the proposition that the Debtors and DBSP viewed the Master Agreement as comprising a single deal in which loans are sold and servicing is retained. This argument is unavailing, because it would swallow the *Gardinier* rule—that is, if a "single deal" were enough, then the real estate purchase contract in *Gardinier* would have come out the other way. More fundamentally, absent some ambiguity, the intent of contracting parties in New York (as elsewhere) is gleaned from the four corners of the document. *Bailey v. Fish & Neave*, 8 N.Y. 3d 523, 528 (2007). The Court specifically ruled at the Sale Hearing that the language of the MLPSA was clear and unambiguous and, accordingly, that the testimony of Mr. Principato was inadmissible to establish DBSP's subjective intent concerning the agreement. (R-52 at 23:6-10.) Testimony of Mr. Johnson

highlighted by DBSP for the same purpose falls within the spirit of this ruling, which DBSP has not appealed.

      26.    In *Calyon*, which was decided subsequent to the Sale Hearing, this Court considered whether loan sale/repurchase provisions and loan servicing provisions contained in a master repurchase agreement were severable under New York law. The Court concluded that the loan sale/repurchase provisions and the servicing provisions of the repo agreement were different because

> [t]he sale and repurchase of mortgage loans concerns the Debtors obtaining financing through the repo market for the origination of mortgage loans and the Purchasers providing that financing in a manner that preserves the liquidity of their investment. Servicing a mortgage loan, on the other hand, encompasses collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over the collection and default mitigation processes. Importantly, regardless of whether a mortgage loan is owned by the loan originator, a party to a repurchase agreement, a securitization trust or a private investor, the loan requires servicing.

*Calyon*, 379 B.R. at 521. The Court also found it significant that the repo agreement itself distinguished the ownership of the mortgage loans from the right to designate the servicer of the mortgage loans: "This is, in and of itself, strong evidence of the parties' intent to sever the servicing or the right to designate the servicer from the sale and repurchase of the mortgage loans." *Id.* The *Calyon* reasoning applies with equal force to the Master Agreement, the structure and terms of which (including, most notably, the 22-page "Servicing Addendum") clearly distinguish between the sale of loans by AHM Corp. and the servicing of loans by AHM SV. Accordingly, the Court finds, that the nature and purpose of the servicing provisions and the loan sale provisions of the Master Agreement are different.

      27.    On the second *Gardinier* factor, the Court previously found that the consideration underlying the loan sale provisions and loan servicing provisions of the Master Agreement was separate and distinct. DBSP contests this finding, arguing that the "Waterfall

11

Provisions" of the Master Agreement, which subordinate AHM SV's right to reimbursement for certain servicing advances to certain repurchase obligations, prove that the consideration for the sale and the servicing of the loans is interrelated. (*See* R-37 at Exh. 8 §§ 11.09(ii) & (v).) Additionally, DBSP asserts that its right to terminate AHM SV for failure to make "any payment" due under the Master Agreement supports a finding of interrelated consideration. (*See* R-37 at § 14.01(i).)

        28.     The Court finds it obvious that the consideration supporting the servicing of mortgage loans under the Master Agreement is the *servicing fee* (from which the servicer derives its operating profit), as opposed to the right to be reimbursed for servicing advances. *See Calyon*, 379 B.R. at 521. (R-37 at Exh. 8 § 11.25 ("Servicing Compensation").) In addition, the Court finds it obvious that the consideration supporting the purchase and sale of mortgage loans under the Master Agreement is the purchase price paid for the loans (from AHM Corp.'s perspective), together with any ongoing representations and warranties with respect to such loans (from DBSP's perspective). *See Calyon*, 379 B.R. at 521 (finding that consideration underlying loan sale/repurchase provisions was the differential between the sale price and the repurchase price). (R-37 at § 1 (definition of "Purchase Price"), § 7.01(xiv) (referencing "consideration received by the seller").) Thus, while repurchase obligations certainly constitute a *portion* of the consideration underlying the sale and purchase of mortgage loans, a contractual provision tying the right to be reimbursed for servicing advances to the payment of repurchase obligations does not conclusively establish the interrelatedness of the consideration under the agreement. If anything, the fact that the Waterfall Provisions prioritize certain payment entitlements under the Master Agreement over others suggests that there are various, distinct forms of consideration flowing under the contract.

29.    With respect to what DBSP refers to as the "Default Provision," the Court previously questioned whether the language referencing a "failure by the Servicer to remit . . . any payment required to be made under the terms of this Agreement" (R-37 at § 14.01(i)) reasonably encompassed the payment of EPD and Premium Recapture Claims where the obligation to pay such claims rests with AHM Corp. and not the Servicer.  (R-45 at 113:17-114:7.)  For purposes of its severability ruling at the Sale Hearing, the Court read the Default Provision in the light most favorable to DBSP.

30.    Upon further review of the Default Provision in the context of the Master Agreement as a whole, the Court finds that the phrase "payment required to be made under the terms of this Agreement" in the Default Provision refers to obligations of AHM SV and does not include obligations of AHM Corp. such as EPD and Premium Recapture Claims.[3]  Nevertheless, even if the Court were to adopt DBSP's reading of the Default Provision, it would still find that the consideration underlying the loan sale and loan servicing provisions of the Master Agreement is separate and distinct in light of other, more prominent provisions of the Master Agreement that clearly distinguish the consideration flowing between the parties.  (*See* R-37 at §§ 1, 4, 9(xiv) (seller's consideration); §§ 1, 14.01(vii), 15, and Exh. 8 §§ 11.09 (iii) and 11.25 (servicer's consideration).)

---

[3]  Similarly, the Court notes that the Waterfall Provisions in Exhibit 8, section 11.01(ii) of the Master Agreement refers to situations "where the Servicer is required to repurchase a Mortgage Loan".  At the Sale Hearing, the Court read this provision in the light most favorable to DBSP and concluded, for purposes of the severability ruling, that the Waterfall Provisions would have subordinated AHM SV's right to reimbursement for servicing advances to any unpaid EPD Claims.  Upon further review of the Waterfall Provisions in the context of the Master Agreement as a whole, the Court finds that there would never be a situation where the "Servicer" is required to repurchase a mortgage loan.  At best, there could be situations where the Servicer is required to indemnify DBSP from losses resulting from AHM Corp.'s failure to repurchase.  (*See* R-37 at § 13.01, discussed below.)  However, indemnification and repurchase are distinct obligations.

13

31.    On the final *Gardinier* factor, the Court previously ruled that the obligations of AHM Corp. with respect to the sale of mortgage loans and the obligations of AHM SV with respect to the servicing of mortgage loans under the Master Agreement were not interrelated, and that the only provisions of the Master Agreement that suggested a contrary conclusion were (i) the Waterfall Provisions discussed above and (ii) section 13.01 of the Master Agreement (the "Indemnity Provision"), which requires AHM Corp. and AHM SV to indemnify DBSP from any losses relating to AHM Corp.'s failure to perform its obligations under the agreement. The Court concluded that, under the well-established "cross-default rule" discussed in *Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.)*, 350 B.R. 166 (Bankr. D. Del. 2006), the Waterfall and Indemnity Provisions were insufficient to integrate the loan sale and loan servicing provisions of the Master Agreement because those provisions were not otherwise "economically interdependent".

32.    DBSP contests this finding, arguing that that the Indemnity Provision, by requiring the Servicer to indemnify DBSP from the failures of AHM Corp., establishes that the obligations of the Servicer and AHM Corp. are one in the same and, therefore, "interrelated" for purposes of the final *Gardinier* factor. DBSP argues further that the cross-default rule is inapplicable to the Master Agreement because (i) it is premised entirely upon § 365(f)(3) of the Bankruptcy Code and the *de facto* anti-assignment doctrine and, accordingly, is inapplicable to the transfer of contractual rights under § 363, (ii) applying the rule to agreements contained within a single document begs the question presented, because it requires one to assume at the outset that the agreements are severable, and (iii) the Indemnity Provision conclusively establishes that the loan sale and loan servicing provisions of the Master Agreement are "economically interdependent".

14

33.    The Court finds that the cross-default rule, while certainly complementary

of the *de facto* anti-assignment doctrine, is not dependent upon it.  While it is true the *Shaw Group*

court cited § 365(f)(3) as the basis for its application of the cross-default rule, 350 B.R. at 179,

and that this Court quoted extensively from the *Shaw Group* opinion in its oral ruling at the Sale

Hearing, the Court specifically held that the cross-default rule was equally applicable to transfers

of rights and obligations under non-executory contracts pursuant to section 363 of the Bankruptcy

Code.  This is consistent with Judge Wedoff's explication of the rule in *United Air Lines, Inc. v.*

*U.S. Bankr. Trust Nat'l Ass'n (In re UAL Corp.)*, 346 B.R. 456 (Bankr. N.D. Ill. 2006), after

evaluating the various justifications cited by the courts when invalidating cross-default provisions:

> [T]he best understanding of the cross-default rule is that it, like the *cum onere* rule,
> defines the scope of the 'executory contract or unexpired lease' subject to
> assumption or rejection under § 365(a).  Just as the *cum onere* rule prevents the
> estate from avoiding obligations that are an integral part of an assumed agreement,
> so the cross-default rule prevents the nondebtor party from imposing on the estate
> the costs of substantially unrelated agreements.

*Id.* at 468 n.11.

34.    As is evident from *Folger Adam*, the *cum onere* principle applies equally to

the transfer of rights and obligations under a non-executory contract pursuant to § 363 of the

Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365.

*See* 209 F.3d at 252.  Thus, in the § 363 context, the cross-default rule is properly viewed as

defining the scope of those rights and obligations under a non-executory contract that must be sold

*cum onere*.  Framed in terms of the recoupment/setoff dichotomy explored by the Third Circuit in

*Folger Adam*, the central inquiry under the cross-default rule for section 363 purposes is whether

the cross-defaulted agreements are part of a single, integrated transaction.  If so, the *cum onere*

principle will require the rights and obligations under the agreements to be transferred together, if

at all. If not, the rights and obligations under one agreement may be sold "free and clear" of claims arising under the other agreement pursuant to section 363(f)(5).

35.     To the extent application of the cross-default rule in this case does depend upon statutory authority akin to that found in section 365(f)(3) of the Bankruptcy Code, the Court finds that section 363(l) would provide a basis for invalidating the Indemnity Provision under the circumstances of this case. Section 363(l) provides, in pertinent part:

> the [debtor in possession] may use, sell, or lease property ... notwithstanding any provision in a contract ... that is *conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking of possession by a trustee* in a case under this title or a custodian, *and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.*

11 U.S.C. § 363(l). The "property interest" at issue in this dispute is, of course, AHM SV's rights under the Master Agreement. And there can be no doubt that the Indemnity Provision, if enforceable, would provide DBSP "an option to effect[] a forfeiture, modification, or termination" of AHM SV's rights under the Master Agreement. *Cf. Shaw Group*, 350 B.R. at 179 (provision was a "cross-default" provision where it triggered the loss of substantial rights under one agreement upon breach of another). Thus, to the extent the Indemnity Provision is "conditioned on the insolvency or financial condition of the debtor" or "on the commencement of a [bankruptcy] case" (so-called "*ipso facto*" conditions) and interfere with AHM SV's "use" or "sale" of its rights under the Master Agreement, they are expressly invalidated by § 363(l).

36.     Against this backdrop, DBSP's candid explanation in its Opening Brief of the "benefit of its bargain" vis-à-vis the Indemnity Provision (which tracks the testimony of DBSP's witness at the Sale Hearing) is telling:

> Pursuant to the [Master Agreement], the Servicer retains and controls custodial accounts in trust for DBSP that contain all of the [P&I] payments collected on the mortgage loans owned by DBSP. *Failure of [AHM Corp.] or the Servicer to make EPD or Premium Recapture payments under the MLPSA would be an indicator*

16

*that the Debtors' business enterprise was in financial distress.* Given that, under the MLPSA, the Debtors acted as a collection agent and custodian of DBSP's money, *it makes sense that DBSP would want the ability to terminate servicing, and thereby move its money out of the Debtors' control, at the first sign of financial distress. Accordingly, DBSP bargained for a contract that inexorably linked the Debtors' right to service the mortgage loans with their obligations to satisfy DBSP's claims* relating to the representations and warranties contained in the MLPSA.

(Op. Br. at 22 (emphasis added); *see* R-50 at 220:3-221:20 (Principato testimony); R-52 at 27:22-28:6 (finding Principato testimony supported finding of severability).) Of course, if any of the foregoing were memorialized in the Master Agreement itself, section 363(l) would obviously apply. DBSP appears to believe that the lack of an *express* reference to any *ipso facto* condition in the Indemnity Provision insulates those provisions from scrutiny under section 363(l). Courts have rejected this in the analogous § 365(f) context, however, and have interpreted the statute's reference to contractual provisions "condition[ing] the assignment of [a] contract" broadly to include *de facto* as well as express conditions. *See, e.g., In re Rickel Home Ctrs.,* 240 B.R. 826, 831-832 (D. Del. 1998) (Farnan, J.), *appeal dismissed,* 209 F.3d 291 (3d Cir. 2000). Given that the admitted purpose of the Indemnity Provision was to serve as an early warning of the Debtors' financial condition and to permit DBSP to seize valuable servicing rights (for which it did not pay a servicing-released premium) at the first sign of trouble, it would elevate form over substance not to include these provisions within the fold of *ipso facto* provisions invalidated by § 363(l).

37.    The Court rejects DBSP's assertion that application of the cross-default rule to the Master Agreement involves circular reasoning, and notes that one of the seminal "cross-default rule" decisions involved a single, master lease agreement covering multiple commercial properties. *In re Convenience USA, Inc.,* Case No. 01-81478, 2002 Bankr. LEXIS 348 (Bankr. M.D.N.C. Feb. 12, 2002). Like this Court in its oral ruling at the Sale Hearing, the *Convenience USA* court analyzed the lease agreement at issue under applicable state law and concluded that the

only factor weighing against a finding of severability was a provision permitting the termination

of the entire lease upon default of the lessee's obligations as to any one of the leasehold

properties. *Id.* at*16-17. Construing this termination provision in light of what would otherwise

constitute an aggregation of individual lease agreements, the court concluded the provision was, in

effect, a cross-default clause. Applying the "cross-default rule" line of cases, the court found that

the cross-default provision was insufficient on its own to compel a finding that the master lease

was unitary and indivisible. *Id.* at *22-23.

        38.     Properly understood, the cross-default rule is not an exercise in question-

begging that presupposes the outcome of the severability analysis; rather, it is *part and parcel of*

*the severability analysis.* Just as multiple, separately documented agreements may constitute a

single, integrated transaction, *e.g., Kopel v. Campanile (In re Kopel)*, 232 B.R. 57 (Bankr.

E.D.N.Y. 1999), so too may a single transaction document contain multiple, divisible agreements,

*e.g., Convenience USA*, 2002 Bankr. LEXIS 348.

        39.     Under the cross-default rule, the Indemnity Provision is insufficient to

integrate the loan sale and loan servicing provisions of the Master Agreement unless those

provisions are otherwise "economically interdependent". DBSP's argument that the Indemnity

Provision conclusively establishes "economic interdependence" misses the fundamental point of

the inquiry under the cross-default rule. "Economic interdependence" is not established whenever

the payment obligations under one contract are tied to the receipt of economic benefits under the

other contract—if it were, then *every* cross-default clause, by its very definition, would render the

cross-defaulted contracts economically interdependent. Rather, contracts are economically

interdependent when the consideration underlying each contract supports *the other* contract, such

that non-performance under one contract would constitute a failure of the consideration

underlying *the other* contract. *United Air Lines*, 346 B.R. at 469 (discussing *Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.)*, 304 F.3d 410, 444-45 (5th Cir. 2002); *Kopel*, 232 B.R. 57). Thus, to establish the economic interdependence of the loan sale and loan servicing portions of the Master Agreement, DBSP needed to establish that AHM Corp.'s failure to live up to its *seller* obligations deprived DBSP of the essential benefit of AHM SV's *servicing* obligations. *See id.* DBSP did not do this. At best, DBSP established a tautology, i.e., that AHM Corp.'s failure to live up to its seller obligations has deprived DBSP of the essential benefit of AHM Corp.'s seller obligations. But the fact that DBSP currently owns some loans it wishes it could sell back to AHM Corp. has nothing to do with the quality or value of AHM SV's servicing of the loans DBSP does own.

40.    The Court finds that the loan sale and loan servicing provisions of the Master Agreement are not "economically interdependent" so as to preclude application of the cross-default rule to the Indemnity Provision. Accordingly, the Court finds that the loan servicing and loan sale provisions of the Master Agreement are not "interrelated" for purposes of the final *Gardinier* factor, and the Master Agreement is thus severable into a Loan Sale Agreement and a Loan Servicing Agreement. The Debtors' rights and obligations under the Loan Servicing Agreement may be transferred, *cum onere*, to the Buyer as contemplated by the APA and Sale Order, which is free and clear of claims under the Loan Sale Agreement.

**II.    Assignment of Loan Servicing Agreement without DBSP's Consent**

41.    DBSP's first and fifth assignments of error concern the Court's finding that AHM SV's rights and obligations under the Loan Servicing Agreement could be transferred pursuant to section 363 of the Bankruptcy Code notwithstanding section 13.05 of the Master Agreement, which provides:

19

> The Servicer acknowledges that the Purchaser has acted in reliance upon the Servicer's adequacy of its servicing facilities, plan, personnel, records and procedures, its integrity, reputation and financial standing and the continuance thereof. Without in any way limiting the generality of this Section, the Servicer shall not either assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion thereof, or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written approval of the Purchaser, which consent shall not unreasonably be withheld.

Attempted assignment in violation of this provision constitutes an event of default under the

Master Agreement. (R-37 at § 14.01(vii).)

42.    As a threshold matter, the Court finds it was unreasonable for DBSP to withhold its consent to transfer of the Loan Servicing Agreement to the Buyer. Having purchased the AHM SV's entire mortgage servicing platform, the Buyer succeeded to the "servicing facilities, plan, personnel, records and procedures" of AHM SV, as well as its "integrity" and "reputation," all of are expressly identified in the Master Agreement as considerations relevant to DBSP's consent to assignment. Moreover, AHM SV is insolvent and liquidating in bankruptcy while the evidence adduced at the Sale Hearing established the Buyer was a fully capitalized entity backstopped by approximately $4 billion in private equity capital (R-48 at 18:23-19:18). Apart from the Buyer's lack of Freddie Mac qualification (which, as discussed below, is immaterial), the only reason articulated by DBSP for withholding its consent to the transfer of the Loan Servicing Agreement is that the Buyer will not assume liability for DBSP's EPD and Premium Recapture Claims. But DBSP's witness conceded at the Sale Hearing that, were DBSP to terminate the Loan Servicing Agreement and transfer servicing to its designee, that entity would *not* assume any liability for AHM Corp.'s EPD or Premium Recapture Claims. Thus, with or without the proposed transfer of the Loan Servicing Agreement to the Buyer, DBSP would be in essentially the same place, holding general unsecured claims against the Debtors. DBSP will not be harmed as a result of the proposed transfer.

20

43.    Even if DBSP's withholding its consent to the transfer of the Loan Servicing Agreement were reasonable, it would not necessarily follow that the "anti-assignment provision" of the Master Agreement precludes the transfer.  In New York, as elsewhere, there is a common law presumption in favor of the alienability of contract rights.  Accordingly, provisions restraining alienability are narrowly construed, such that,

> [f]or a contractual clause forbidding or restricting an assignment of rights thereunder to reveal the intent necessary to *preclude* the power to assign, or cause an assignment violative of contractual provisions to be wholly *void*, such clause *must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way.*  Such must specifically eliminate the *power* as well as the *right* to assign the contract in violation of its bar or restrictions, *otherwise the original obligor is given only the right to damages for its breach, but does not [sic] render the assignment ineffective.*

*Univ. Mews Assocs. v. Jeanmarie*, 471 N.Y.S.2d 457, 461 (N.Y. Sup. Ct. 1983) (emphasis added, citations omitted).

44.    Under this standard, it is clear that the Master Agreement's "anti-assignment provision" speaks not to AHM SV's *power* to assign its servicing rights, but rather to its *right* to assign.  Under New York law, DBSP could be compelled, in lieu of enforcement of its right to consent to assignment of the servicing rights, to accept money satisfaction of any damages resulting from an assignment without its consent.  Pursuant to section 363(f)(5) of the Bankruptcy Code, the Debtors can sell "free and clear" of any claim for such damages.  *See* 11 U.S.C. § 363(f)(5); *Folger Adam*, 209 F.3d at 259-60.  This free and clear sale would trigger DBSP's right under section 363(e) to adequate protection of its damages claim, which could require that the claim attach to the sale proceeds.  However, the Court disagrees with DBSP's assertion that adequate protection of its "anti-assignment rights" would also require its EPD and Premium Recapture Claims to attach to the sale proceeds, insofar as EPD and Premium Recapture Claims against AHM Corp. arose under the Loan Sale Agreement, and are completely independent from

21

any damages resulting from AHM SV's transfer of the Loan Servicing Agreement without DBSP's consent. As noted above, as DBSP does not appear to be harmed by the transfer, any damages claim that would attach to the sale proceeds would likely be nominal.

45.    DBSP cites *Folger Adam* for the proposition that any transfer of the Loan Servicing Agreement under § 363 of the Bankruptcy Code would remain subject to all "defenses" of DBSP under the contract, including DBSP's so-called "anti-assignment rights". DBSP fails to explain, however, how any right it may have under the Loan Servicing Agreement could fairly be described as a "defense" for purposes of the *Folger Adam* analysis, where DBSP does not have any material performance obligations under the non-executory Loan Servicing Agreement that could give rise to a "claim" against it. The Court finds that DBSP's "anti-assignment rights," such as they are, are not in the nature of a "defense" but, rather, are in the nature of a "claim" that is subject to sale "free and clear" under section 363(f)(5) and *Folger Adam*.

46.    DBSP cites *Integrated Solutions, Inc. v. Service Support Specialities, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997), for the proposition that the Third Circuit "expressly rejected that anti-assignment rights can be invalidated in relation to transfers of property pursuant to section 363."

47.    DBSP overstates the holding of *Integrated Solutions*, which did not involve contractual "anti-assignment rights" and was not decided under § 363(l). In that case, a purchaser obtained prejudgment tort claims through a § 363 sale from a chapter 7 bankruptcy trustee and then sued on the claims. The defendants moved to dismiss for lack of standing, arguing that applicable state law prohibited the assignment of prejudgment tort claims and, accordingly, that the trustee was the only party with standing to bring the claims. The purchaser argued that 11 U.S.C. §§ 704(1) (requiring trustee to expeditiously collect and reduce to money property of the

22

estate) and 363(b)(1) (permitting trustee to sell property outside the ordinary course of business)

pre-empted state-law restrictions on the transfer of the tort claims, which constituted property of

the bankruptcy estate.  The bankruptcy court disagreed with the purchaser and granted the

defendants' motion to dismiss.  On appeal, the Third Circuit considered the following, narrow

question: "Did Congress intend to preempt state law restrictions on the assignability of tort claims

under federal bankruptcy law?"  *Integrated Solutions*, 124 F.3d at 490.  The court found nothing

in §§ 704(1) or 363(b)(1) expressly authorizing the trustee to sell property free of state-law

restrictions and nothing in the legislative history indicating Congress intended such a result.  This

was underscored by the fact that other provisions of the Bankruptcy Code, including § 363(l),

expressly displaced otherwise applicable law.  Accordingly, the court concluded that "neither

§ 363(b)(1) nor § 704(1) indicates a specific congressional intent to preempt state laws limiting

the assignability of tort claims belonging to the estate."  *Integrated Solutions*, 124 F.3d at 494.  It

is evident from this narrow holding that the court might reach a different result under different

circumstances—e.g., if state law restricted assignment of prejudgment tort claims *by a bankruptcy*

*trustee* specifically, which would implicate § 363(l) of the Bankruptcy Code.

        48.     DBSP cites two other cases adopting the *Integrated Solutions* reasoning

with respect to interests in structured settlement/annuity contracts, which, like the prejudgment

tort claims at issue in *Integrated Solutions*, are inherently non-assignable under applicable state

law.  *See Grochocinski v. Crossman (In re Crossman)*, 259 B.R. 301, 306-08 (Bankr. N.D. Ill.

2001); *In re Paul*, 355 B.R. 64, 68 (Bankr. N.D. Ill. 2001).  DBSP also cites *Chicago Board of*

*Trade v. Johnson*, 264 U.S. 1 (1927), a pre-Bankruptcy Code case holding invalid a bankruptcy

trustee's transfer of a debtor's membership in the Chicago Board of Trade where the Board's

23

governance documents and applicable state law prohibited the transfer of membership interests without an affirmative vote of the other members.

49.     The Court finds that none of the cases relied upon by DBSP, which involved transfers of property rights that were *prohibited* by applicable state law, are implicated by or conflict with the Court's conclusions that (i) the Debtors may transfer contract rights where applicable state law provides them the power to do so, subject to DBSP's right to assert a damages claim for violation of its consent rights, and (ii) the Debtors may sell free and clear of this damages claim pursuant to section 363(f)(5).

50.     The Court finds in the alternative that, even if a provision of the Master Agreement *prohibited* assignment of the Loan Servicing Agreement without DBSP's consent, such provision would, as discussed above, be invalidated by section 363(l) of the Bankruptcy Code to the extent DBSP's enforcement of such provision would effect a forfeiture based solely on the Debtors' financial condition.

III.    **Buyer's Lack of Freddie Mac Qualification**

51.     DBSP's second assignment of error concerns the Court's finding that the Debtors' rights under the Master Agreement could be sold pursuant to section 363 of the Bankruptcy Code without the need for the buyer to comply with the provisions of the agreement requiring that the "Servicer" under the agreement meet the qualifications of a Freddie Mac servicer.  DBSP argues that the Freddie Mac qualification requirement was an "integral part" of the Master Agreement and that nothing in § 363 provides a basis for invalidating this requirement vis-à-vis the Buyer.

52.     As a threshold matter, the Court notes that nothing in section 363 of the Bankruptcy Code requires the Debtors or the Buyer, as a precondition to the transfer of rights and

24

obligations under a non-executory contract, to provide assurance (adequate or otherwise) of future compliance with any provision of the contract  "Adequate assurance of future performance" is a requirement uniquely applicable to executory contracts and unexpired leases subject to section 365 of the Bankruptcy Code.  And section 365 does not apply here because the parties have stipulated that the Loan Servicing Agreement is non-executory.

53.    More fundamentally, DBSP's assertion that Freddie Mac qualification is "integral" to the Loan Servicing Agreement is contrary to the weight of the evidence adduced at the Sale Hearing, which established: (i) that there had been no impairment of the loan servicing function during the bankruptcy case, (ii) that the Buyer had the wherewithal and the business and human resources to continue servicing operations uninterrupted, and (iii) that the requirement of Freddie Mac qualification is contractual boilerplate included in most MLPSAs as a proxy for monitoring the financial wherewithal of the servicer.  While it is possible that a servicer's lack of Freddie Mac qualification could prevent the owner of a loan from selling that loan to Freddie Mac, the evidence adduced at the Stay Relief Hearing established that the DBSP Portfolio consisted of ITIN loans, which are not "agency eligible" (i.e., eligible for purchase by Fannie Mae or Freddie Mac).

54.    Because the requirement for Freddie Mac qualification is an immaterial term of the Loan Servicing Agreement, the Court may excuse its performance to the extent necessary to prevent a forfeiture and/or to facilitate transfer of the Loan Servicing Agreement. *See In re Fleming Cos.*, 499 F.3d 300, 305 (3d Cir. 2007) ("[T]he bankruptcy court has discretion to excise or waive a bargained-for element of a contract."); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1490 (11th Cir. 1983) ("[I]t is elementary that the mere breach of an agreement which causes no loss will not sustain a suit for damages, much less rescission." (quotations omitted));

Restatement 2d of Contracts § 229 (Excuse of a Condition to Avoid Forfeiture: "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.").

## ORDER

FOR THE FOREGOING REASONS, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

A.    The Sale Order is hereby RATIFIED in its entirety, effective as of its original date of entry, and the Debtors and the Buyer are authorized to consummate the transactions contemplated thereby and by the APA;

B.    This Order shall become effective immediately notwithstanding any stay otherwise applicable under Federal Rule of Bankruptcy Procedure 6004(h).

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Date: March 13, 2009

26