02/13/07  13:17 FAX 9735355962          CIT                              ☎002

## EMPLOYMENT AGREEMENT

This Employment Agreement, dated as of February 13, 2007 (this "Agreement"), is by and between American Home Mortgage Corp., a New York corporation having a place of business at 538 Broadhollow Road, Melville, NY 11747 (the "Company"), and Michael Surowiec, currently residing at 1714 Pershing Place, South Plainfield, NJ 07080 (the "Executive").

Whereas the Company wishes to assure itself of the services of the Executive, and the Executive desires to be employed by the Company, upon the terms and conditions hereinafter set forth.

The Company and the Executive hereby agree as follows:

1.    Employment. The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company during the term set forth in Section 2 and on the other terms and conditions of this Agreement.

2.    Term. The term of this Agreement shall commence on March 5, 2007 (the "Commencement Date"), and shall continue until the Executive resigns or is discharged, in which case the Agreement shall terminate four weeks following the resignation or discharge date.

3.    Position, Duties and Responsibilities, Rights.

(a)    During the term of this Agreement, the Executive shall serve as and hold the office and title of Vice President, Transaction Manager. The Executive shall have all of the powers and duties usually incident to the office described above, and shall at all times comply with all policies of the Company relating to the Executive's employment.

(b)    During the term of this Agreement, the Executive agrees to devote substantially all the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker or arbitrator; provided, however, that the performance of the Executive's duties or responsibilities in any of such capacities does not materially interfere with the regular performance of the Executive's duties and responsibilities hereunder

4.    Place of Performance. In connection with the Executive's employment by the Company, the Executive's place of performance shall be in Melville, New York, and the Executive shall not be required to be absent from such location on travel status or otherwise for

more than a reasonable time each year as necessary or appropriate for the performance of the Executive's duties hereunder.

    5.    <u>Compensation</u>

    (a)    During the term of this Agreement, the Company shall pay the Executive, and the Executive agrees to accept a base salary at the rate of not less than ▓▓▓▓▓▓▓ per year (the annual base salary as increased from time to time during the term of this Agreement being hereinafter referred to as the "Base Salary"). The Base Salary shall be paid in installments no less frequently than monthly. Any increase in Base Salary or other compensation shall not limit or reduce any other obligation of the Company hereunder, and once established at an increased specified rate, the Executive's Base Salary hereunder shall not thereafter be reduced.

    (b)    (1)    Subject to section 5(b)(2) below, the Executive shall be eligible to receive a quarterly performance bonus (the "Quarterly Performance Bonus"), the targeted amount of which will be $18,750.00 (the "Target Amount"), but the amount awarded, if any, may be less or greater than the Target Amount in accordance with the following matrix (the "Matrix"):

Whole Loan Sale Performance Matrix

| On-Time Percentage | | | | | |
|---|---|---|---|---|---|
| | 0 | 0 | 0 | 0 | 0 |
| | 0 | 25% | 40% | 55% | 70% |
| | 0 | 50% | 65% | 80% | 95% |
| | 0 | 60% | 75% | 90% | 105% |
| | 0 | 65% | 80% | 95% | 110% |
| | 0 | 70% | 85% | 100% | 115% |
| | 0 | 75% | 90% | 110% | 120% |

To determine the actual amount of the Quarterly Performance Bonus, the Target shall be multiplied by the percentage establish in the Matrix, when comparing the Pull-Through Percentage and the On-Time Percentage. The Pull-Through Percentage and the On-Time Percentage shall be determined in the Company's sole discretion in accordance with the methodologies, policies, and procedures of the Company in effect from time to time. The Quarterly Performance Bonus for a given calendar quarter will be paid when such bonuses are generally paid by the Company in the succeeding quarter. The Executive will not earn or be entitled to receive a Quarterly Performance Bonus if the Executive is no longer an employee of the Company as of the scheduled bonus payment date.

    (2)    Notwithstanding anything in section 5(b)(1) to the contrary, the Quarterly Performance Bonus for the first calendar quarter of 2007, shall be pro rated in proportion to the length of the Executive's employment during calendar quarter 2007. The targeted amount of the Quarterly Performance Bonus, pursuant to this section 5(b)(2), shall be $6,460.00, but the amount awarded, if any, may be less or greater than such targeted amount in accordance with the Matrix above. The Quarterly Performance Bonus, pursuant to this section

5(b)(2), will be paid when such bonuses are generally paid in the second quarter of 2007. To earn and be entitled to receive a Quarterly Performance Bonus, pursuant to this section 5(b)(2), the Executive must be an employee of the Company as of the scheduled bonus payment date.

(c)     During the term of this Agreement, the Executive shall be entitled to fringe benefits, in each case at least equal to and on the same terms and conditions as those attached to the Executive's office on the date hereof, as the same may be improved from time to time during the term of this Agreement.

(d)     During the term of this Agreement, the Executive shall be entitled to reimbursement, upon proper accounting, of all reasonable expenses and disbursements incurred by the Executive in the course of the Executive's duties.

6.     Relocation and Related Travel Expenses.

(a)     The Executive shall permanently relocate from the Executive's present residence to the Melville, New York area within four (4) months of the Commencement Date (the "Relocation Obligation"). Provided the Executive complies with the Relocation Obligation, the Executive shall be eligible to receive relocation benefits in accordance with the Employee Relocation Program attached hereto as Exhibit A.

(b)     In addition to those benefits available to the Executive pursuant to Exhibit A, the Company will pay for the Executive's reasonable temporary housing expenses for a period of up to four (4) months, while the Executive transitions to permanent housing (such temporary housing shall be arranged and managed by the Company). If the Executive terminates the Executive's employment with the Company within two (2) years of the Commencement Date, the Executive must immediately repay to the Company any amounts paid by the Company pursuant to this section 6(b).

7.     Employment At Will.   Employment hereunder shall be at all times "at will". The Company may discharge the Executive and terminate this Agreement at any time and for any reason, and the Executive may terminate the Executive's employment with the Company for any reason. If the Executive terminates the Executive's employment with the Company, the Executive shall provide the Company with notice of such termination pursuant to section 13 herein.

8.     Confidential and Proprietary Information; Company Property   For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, and cost and pricing policies. All Confidential Information disclosed or provided to the Executive by the Company, or developed or created by the Executive during the term of the Executive's employment with the Company, is, shall become, and shall at all times remain,

3

the sole and exclusive property of the Company. The Executive agrees not to disclose the Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary in order for the Executive to perform the Executive's responsibilities as an executive of the Company. The Executive also agrees that the Executive will not use the Confidential Information for any purpose other than to fulfill the Executive's responsibilities as an executive of the Company.

The Executive acknowledges, understands, and agrees that the Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if the Executive breaches or threatens to breach any of the provisions of this Agreement relating to the Executive's use or disclosure of any of the Confidential Information.

The Executive further acknowledges that the Company may provide the Executive with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Executive agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time at the sole discretion of the Company. The Executive further agrees to promptly return in good working condition all Company Property in the Executive's possession upon termination of the Executive's employment with the Company for any reason, and shall be liable in damages, including but not limited to replacement cost, for any financial loss to the Company if Company Property is not returned in such manner.

The Executive agrees that this section shall survive the termination of this Agreement, and that all of the obligations of the Executive set forth in this section shall remain in full force and effect after this Agreement is terminated. The Executive further agrees that, upon termination of this Agreement, the Executive will return to the General Counsel all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Executive's possession or custody.

9.      Non-Solicitation; Non-Disparagement  The Executive agrees that during the term of the Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is voluntary or involuntary, with or without cause, the Executive shall not, directly or indirectly: (a) attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers and/or potential customers of the Company which have been derived from leads and/or lists developed and provided to the Executive by the Company; (b) influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company; (c) influence or advise any person who is an employee of the Company, to leave the employment of the Company; and (d) employ any person who is an employee of the Company. The Executive agrees that during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, attempt to divert any of the business of the Company,

4

or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customer or business referral sources, including but not limited to realtors, builders and affinity organizations, joint venture partners, borrowers and loan applicants, obtained by, or whose contact information is stored in the records of, the Company. The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section.

The Company and the Executive agree that neither will disparage the other, and that their representatives will not disparage either party hereto.

The Executive's obligations as set forth in this section shall survive the termination of this Agreement.

10.    Non-Compete.  The Executive agrees that, during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company. The Executive expressly agrees that this section is fair and reasonable and that the Executive is being adequately compensated for agreeing to the terms of this section.

11.    Entire Agreement; Amendment.

(a)    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties, their predecessors and affiliates.

(b)    Any amendment of this Agreement shall not be binding unless in writing and signed by both (i) the Company's General Counsel and (ii) the Executive.

12.    Enforceability. If any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

13.    Notices. All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery, registered or certified mail, return receipt requested or overnight courier, if to the Executive at the last known address of the Executive on record with the Company, and, if to the Company, to it at its principal executive offices at 538 Broadhollow Road, Melville, NY 11747, Attention: Human Resources Director, with a copy to the Company's General Counsel, and shall be deemed given when sent. Either party may by like notice to the other party change the address at which it is to receive notices hereunder.

14.    Counterparts. This Agreement can be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

15.    Facsimile Signatures. A facsimile copy of either party's signature shall be deemed as legally binding as the original signature.

16.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

American Home Mortgage Corp.

By: _____

Name: Alan B. Horn

Title:  Executive Vice President and General
        Counsel

Michael Strowiec

151·74·1390

Social Security Number

6

## EXHIBIT A

### American Home Mortgage
### Employee Relocation Program

The following represents the Company's Employee Relocation Program (the "Program"), which shall be made available to the Executive if the Executive relocates to the Melville, New York area within four (4) months of the Commencement Date. The Executive will be eligible for expense reimbursement based on the criteria specified below:

If the Executive relocates and establishes a primary residence in the Melville, New York area, the Company will cover reasonable real estate broker's commissions up to a maximum of the lesser of 6% or $30,000.00.

The Company will also reimburse the Executive for customary and reasonable closing costs associated with the sale of the Executive's home, if any, in South Plainfield, New Jersey and the Executive's purchase of a new residence in the Melville, New York area, with attorneys' fees not to exceed $400. To qualify for such reimbursement, the Executive must work through a relocation vendor designated by the Company.

The Executive will be eligible for the Company's employee discount on the Executive's home mortgage which is a no fee/points/reduced interest rate mortgage. All fees will be reimbursed to the Executive, except that the Executive shall be responsible for customary third party fees.

The Company will secure for the Executive the services of a moving vendor through the Company's relocation service resource. The Company will cover the reasonable cost of such move, up to a maximum of $20,000.00.

It is expressly agreed and understood that if, within two (2) years of the Commencement Date, the Executive terminates the Executive's employment with the Company, the Executive shall immediately repay to the Company any amounts paid by the Company under this Program.

ACKNOWLEDGED AND ACCEPTED:

_____
Michael Surgeviec

_____
Date    February 13, 2007

7

IMPORTANT SEE TERMS ON THE REVERSE SIDE



Feb 19 2008 10:35AM   GWW&R LLC                 2013438869               P.3

UNITED VAN LINES, LLC
32984 NETWORK PLACE
CHICAGO, IL  60673-1223

FED. ID #43-1881477

CRYE-LEIKE RELOCATION MNGT
ATTN: CAROL WILLIAMS
8325 QUAIL HOLLOW
MEMPHIS, TN  38120

United Van Lines, LLC
One United Drive
Fenton, MO 63026-1350
636-326-3100

FOR CUSTOMER: CRYE-LEIKE RELOCATION MNGT

| INVOICE NUMBER | | DATE |
|---|---|---|
| 0191 98269 7 | 01 | 07/13/07 |

| MICHAEL & SANDY SUROWIEC | S PLAINFIELD | NJ | W ISLIP | NY |
|---|---|---|---|---|

| Tariff No. | | | | TRANSPORTATION | | 12054.92 |
|---|---|---|---|---|---|---|
| 29 | DISH PACKS | | 95.96 | | 2771.24 | |
| 54 | CARTON 1 1/2 CU. FT. | | 22.88 | | 1235.52 | |
| 137 | CARTONS 3 CU. FT. | | 34.09 | | 4729.22 | |
| 45 | CARTONS 4 1/2 CU FT. | | 42.19 | | 1898.55 | |
| 38 | CARTONS 6 CU. FT. | | 48.30 | | 1835.40 | |
| 20 | WARDROBE CTN | | 46.90 | | 931.80 | |
| 1 | CRIB MATTRESS CTN | | 24.20 | | 24.20 | |
| 1 | TWIN MATTRESS CTN | | 60.10 | | 168.50 | |
| 1 | QUEEN/KING MATTRESS | | 66.20 | | 66.20 | |
| 21 | CORR MIRROR CTN | | 83.12 | | 1745.52 | |
| 4 | CUBIC FOOT CRATES | | 24.60 | | 98.40 | |
| | TOTAL PACKING | | | | | 15512.31 |
| 1 | CRIB MATTRESS CTN | | 6.05 | | 6.05 | |
| 4 | TWIN MATTRESS CTN | | 10.05 | | 40.20 | |
| 1 | QUEEN/KING MATTRESS | | 15.05 | | | |
| 4 | CUBIC FOOT CRATES | | | | | 97.40 |
| | TOTAL UNPACKING | | | | | |
| 1 | TV | 40 | | | | |
| 1 | ORIG SERVICE CHRGS | | | | | |
| 1 | DEST SERV CHRG. | 20900 LBS | 7.97/CWT | | 1990.91 | |
| | TOTAL | | | | | 4162.37 |
| 5278.52 | FUEL SURCHG-TRANS | 6.0000% | | | 916.23 | |
| 5278.52 | INS. RELATED REVENUE | 2.00% | | | 105.41 | |
| | 3RD PARTIES AT ORIG | | | | | |
| | ADV 3RD PARTY CHRGS | | | | 378.00 | |
| | 3RD PARTIES AT DEST | | | | | |

* * * CONTINUED NEXT PAGE * * *

$14,970.21

Rec'd $ _____ If payment postmarked by _____

Rec'd $ _____ If payment postmarked after _____

TO INSURE PROPER CREDIT, PLEASE RETURN THIS STUB WITH PAYMENT

| INVOICE NO. | |
|---|---|
| NET DUE | |
| | 1991 |
| | 1991 |
| LATE CHARGE | |
| TOTAL CHARGES | 6300-01 |



UNITED VAN LINES, LLC
22304 NETWORK PLACE
CHICAGO, IL  60673-1223

CRYE-LEIKE RELOCATION MNGT
ATTN: CAROL WILLIAMS
6525 QUAIL HOLLOW
MEMPHIS, TN  38120

FED. ID 43-1581477

United Van Lines, LLC
One United Drive
Fenton, MO 63026-1350
636-326-3100

FOR CUSTOMER: CRYE-LEIKE RELOCATION MNGT

| | | |
|---|---|---|
| 0191 00259 7 | 01 | 07/13/07 |

MICHAEL & SANDY SURONIEC    S PLAINFIELD  NJ    W ISLIP  NY

Tariff No.

ADV 3RD PARTY CHRGS        598.00
FULL VALUE                 199.63

SERVICES EXCLUDED FROM DISC              1,497.24

SUBTOTAL: SERVICES SUBJECT TO BTM LINE DISCOUNT   13,817.00
LESS:  25.00 % BOTTOM LINE DISCOUNT               10,245.33
++ SERVICES EXCLUDED FROM DISCOUNTING              1,497.24

NET TOTAL:                                        14,970.21

14970.21

14970.21

| INVOICE NO. | |
|---|---|
| 0191 00259 | 01 MATL |
| NET DUE | |
| 14970.21 | 1911 |
| | 1911 |
| LATE CHARGE | |
| 149.70 | 6300-01 |
| TOTAL CHARGES | |

CRYE-LEIKE RELOCATION MNGT
ATTN: CAROL WILLIAMS
6525 QUAIL HOLLOW
MEMPHIS, TN  38120

Feb 19 2008 10:37AM   GWW&A LLC                2013438869                    P.5

# PROFESSIONAL MOVERS

1st Revised Title Page (See Note on Page 1)

## NATIONWIDE COMMERCIAL HOUSEHOLD GOODS

## RELOCATION TARIFF STB HGB 400-N

(Cancels STB HGB 400-M; refer to Item 1 herein)



Naming local, joint, distance and commodity rates on
Household Goods Shipments as defined in Item 100

Between points in the United States, including Alaska (but excluding Hawaii),
and between points in the United States (excluding Hawaii)
and Canada as specified in Item 1 herein.

For governing publications, refer to Item 18.

**ISSUED: April 15, 2003**                     **EFFECTIVE: May 15, 2003**

Issued by:
Joe Harrison, Secretary
Household Goods Carriers' Bureau Committee, Agent
1611 Duke Street
Alexandria Virginia 22314-3482

**WWW.PROMOVER.ORG**

The provisions herein incorporate Exception ("HGB 104-series) rates and provisions published in Tariff HGB 104-series applicable for the account of United Van Lines, LLC

**Page 1 of 3**

### UNITED VAN LINES, LLC
MC-07234 / U.S. DOT No. 077949
#### Exceptions to General Application Tariff HGB 400-Series

**C ITEM 1306**                                         **(Effective: 04/01/06)**

#### Contract Terms and Conditions

In lieu of Contract Terms and Conditions published in Item 43 (Bill of Lading — Contract Terms and Conditions of Uniform Household Goods Bill of Lading) of Tariff HGB 400-series, the following provisions will apply:

### CONTRACT TERMS and CONDITIONS of UNIFORM HOUSEHOLD GOODS BILL of LADING

**Notice of Availability of Published Tariff**

Carrier publishes tariffs, which set forth the terms, conditions and prices for the transportation services it provides. The applicable tariff provisions are incorporated herein by reference. Incorporated provisions include, but are not limited to: (1) Establishing the limitation of carrier's liability, the principal features of which are described in the Valuation section of this Bill of Lading; (2) Setting the time period for filing claims, the principal features of which are described in Section 6 hereof; and (3) Reserving the carrier's right to assess additional charges for additional services performed and, on non-binding estimates, to base charges on the exact weight of the goods transported. For more information, please see the terms and conditions printed herein and the carrier's booklet "Your Rights and Responsibilities When You Move" and the "Ready To Move" brochure. The tariff is available for inspection at the offices of carrier or, on request, carrier will furnish a copy of any tariff provision containing carrier's rates, rules or charges governing the shipment and is also available for inspection at the offices of the Household Goods Carriers' Bureau Committee / American Moving & Storage Association, 1611 Duke Street, Alexandria, VA 22314.

Carrier's currently effective applicable tariffs, all inventories prepared in conjunction with the Bill of Lading, any applicable National Account Contract Agreements and the Estimate/Order for Service prepared in advance of shipment are hereby incorporated by reference. These documents, together with this Bill of Lading constitute the contractual documents governing shipper's move, and include but are not limited to the terms and conditions set forth below. In the event of any conflict between the terms of the Estimate/Order for Service and Bill of Lading, the Bill of Lading shall control. Any specific terms set forth in a National Account Contract Agreement shall supersede any inconsistent terms in the other documents.

This contract is subject to all the rules, regulations, rates and charges in carrier's currently effective applicable tariffs including, but not limited to, the following terms and conditions:

**SECTION 1:** The carrier or party in possession shall be liable for physical loss of or damage to any articles from external cause while being carried or held in storage-in-transit EXCEPT loss, damage or delay caused by or resulting:

(a) From an act, omission or order of shipper;

(b) From defect or inherent vice of the article, including susceptibility to damage because of atmospheric conditions such as temperature and humidity or changes therein;

(c) From (1) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack (A) by any government or sovereign power, or by any authority maintaining or using military, naval or air forces; or (B) by military, naval or air forces; or (C) by an agent of any such government, power, authority or forces; (2) any weapon of war employing atomic fission or radioactive force whether in time of peace or war; (3) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence; (4) seizure or destruction under quarantine or customs regulations; (5) confiscation by order of any government or public authority; or (6) risks of contraband or illegal transportation or trade;

(d) From terrorist activity, including action in hindering or defending against an actual or expected terrorist activity. Such loss or damage is excluded regardless of any other cause or event that constitutes concurrently or in any sequence to the loss. The term "terrorist activity" means any activity which is unlawful under the laws of the United States or any State and which involves any of the following: (1) the high jacking or sabotage of any conveyance (including an aircraft, vessel, cab, truck, van, trailer, container or vehicle) or warehouse or other building; (2) the seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained; (3) an assassination; (4) the use of any (A) biological agent, chemical agent, or nuclear weapon or device, or (B) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; or (5) a threat, attempt, or conspiracy to do any of the foregoing;

(Item 1306 continued on next page)

United Van Lines, LLC
1 United Drive
Fenton, MO 63026
636-326-3100
www.unitedvanlines.com

The provisions herein incorporate Exception ("HGB 104-series) rates and provisions published in Tariff HGB 104-series applicable for the account of United Van Lines, LLC

Page 3 of 3

**UNITED VAN LINES, LLC**
MC-67234 / U.S. DOT No. 077949
**Exceptions to General Application Tariff HGB 400-Series**

A ITEM 1306(Cont.)                                                                        (Effective: 03/18/07)

## Contract Terms and Conditions

(e) From delay caused by strikes, lockouts, labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrence or disorder, and from loss or damage when carrier, after notice to shipper or consignee of a potential risk of loss or damage to the shipment from such causes, is instructed by the shipper to proceed with such transportation and/or delivery, notwithstanding such risk;

(f) From Acts of God.

SUBJECT, in addition to the foregoing, to the further following limitations on the carrier's or the party's in possession liability:

The carrier's or the party's in possession maximum liability shall be either:

(1) The lump sum value declared by shipper, which may not be less than $5,000 or $6.00 per pound multiplied by the actual weight of the shipment, in pounds, whichever is greater; or

(2) The actual loss or damage not exceeding sixty (60) cents per pound of the weight of any lost or damaged article when the shipper has waived lump sum value liability and released the shipment to the carrier, in writing, with liability limited to sixty (60) cents per pound per article.

(3) Further, a shipper's failure to notify the carrier in writing that an article or articles having a value that exceeds $100 per pound will be included in the shipment will restrict the carrier's maximum liability to $100 per pound of any lost or damaged article (based on actual weight), NOT to exceed the declared value of the entire shipment.

Such valuation is extended carrier liability under published tariffs and is **not** insurance, as that term is used under the McCarran-Ferguson Act, 15 U.S.C. 1011-1015.

**SECTION 2:** The carrier shall not be liable for delay caused by highway obstruction, or faulty or impassable highways, or lack of capacity of any highway, bridge or ferry; or caused by breakdown or mechanical defect of vehicles or equipment, or from any cause other than negligence of the carrier; nor shall the carrier be bound to transport by any particular schedule, means, vehicle or otherwise than with reasonable dispatch. Every carrier shall have the right in case of physical necessity to forward said property by any carrier or route between the point of shipment and the point of destination.

**SECTION 3:** Shipper's, consignee's and/or consignor's liability to carrier shall include the following:

(a) The shipper, (individual or commercial) and consignor upon tender of the shipment to carrier, and the consignee, upon acceptance of delivery of shipment from carrier, shall be liable, jointly and severally, for all unpaid charges payable on account of a shipment in accordance with applicable tariffs including, but not limited to, sums advanced or disbursed by a carrier on account of such shipment. The extension of credit to either shipper, consignor and/or consignee for such unpaid charges shall not thereby discharge the obligation of the other party to pay such charges in the event the party to whom credit has been extended shall fail to pay such charges. The joint and several liability of the shipper and consignee as set forth in this Section 3 (a) is absolute, and no prior or subsequent course of dealing among the shipper, carrier and/or consignee (including, but not limited to, the course of dealing pertaining to billing and collection of shipping charges) shall be construed as limiting, impairing, waiving or discharging such joint and several liability.

(b) Shipper and/or consignor represent that no explosives and/or dangerous articles or goods shall be contained in shipment. However, the shipper and/or consignor shall indemnify carrier against any loss or damage caused by the negligent or intentional inclusion in the shipment of explosives or dangerous articles or goods therein.

**SECTION 4:** If for any reason other than the fault of carrier, delivery cannot be made at address shown on the face hereof, or at any changed address of which carrier has been notified, carrier, at its option, may cause articles contained in shipment to be stored in a warehouse selected by it at the point of delivery, or at other available points, at the cost of the owner, and subject to a lien for all accrued tariff, contract and other lawful charges.

(Item 1306 concluded on next page)

The provisions herein incorporate Exception ("HGB 104-series) rates and provisions published in Tariff HGB 104-series applicable for the account of United Van Lines, LLC

Page 3 of 3

## UNITED VAN LINES, LLC
MC-87234 / U.S. DOT No. 077949
### Exceptions to General Application Tariff HGB 400-Series

C ITEM 1306(Conc.)                                      (Effective: 01/01/08)

### Contract Terms and Conditions

SECTION 5: If shipment is refused by consignee at destination, or if shipper, consignee or owner of property fails to receive or claim it within fifteen (15) days after written notice by United States mail addressed to shipper and consignee at post office addresses shown on face hereof, or if shipper fails or refuses to pay lawfully applicable charges in accordance with carrier's applicable tariff, carrier may sell the property at its option, either (a) upon notice in the manner authorized by law, or (b) at public auction to highest bidder for cash at a public sale to be held at a time and place named by carrier, thirty (30) days notice of which sale shall have been given in writing to shipper and consignee, and there shall have been published at least once a week for two consecutive weeks in a newspaper of general circulation at or near the place of sale, a notice thereof containing a description of the property as described in the bill of lading, and the names of the consignor and consignee. The proceeds of any sale shall be applied toward payment of lawful tariff charges applicable to shipment and toward expenses of notice, advertising and sale, and of storing, caring for and maintaining property prior to sale, and the balance if any shall be paid to owner of property; PROVIDED that any perishable articles contained in said shipment may be sold at public or private sale without such notice, if, in the opinion of carrier, such action is necessary to prevent deterioration or further deterioration.

SECTION 6: As a condition precedent to recovery, a claim for any loss or damage, injury or delay, must be filed in writing with carrier within nine (9) months after delivery to consignee as shown on face hereof, or in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed; and suit must be instituted against carrier within two (2) years and one (1) day from the date when notice in writing is given by carrier to the claimant that carrier has disallowed the claim or any part or parts thereof specified in the notice. Where a claim is not filed or suit is not instituted thereon in accordance with the foregoing provisions, carrier shall not be liable and such claim will not be paid.

United Van Lines, LLC
1 United Drive
Fenton, MO 63026
636-326-3100
www.unitedvanlines.com

**United Van Lines, LLC**
1 United Drive, Fenton, MO 63026
(636) 326-3100
U.S. DOT No. 077949

**ADDITIONAL SERVICES PERFORMED**
(OTHER THAN THOSE SERVICES INCLUDED IN LINEHAUL TRANSPORTATION CHARGE)

ORDER NUMBER

U 191 269 7

Customer: *M. Surowiec*    Date Performed *6/24 - 6/25*

Services Performed at: ☐ Origin ☐ Destination    By *Allied U/L*    Agent Code *U 88*

☐ Other

**IF NATIONAL ACCOUNT (BILLED) MOVE, AGENT/VAN OPERATOR MUST COMPLETE BELOW:**

Booking Agent # _____ Contacted . . . . . . . . . . . . ☐ YES    ☐ NO

Additional Services checked below **APPROVED** by _____ @ Booking Agent
(First & Last Name)

**PARTY RESPONSIBLE FOR PAYMENT OF "APPROVED" ADDITIONAL SERVICES CHECKED (✓) IS AS FOLLOWS:**

| NATIONAL ACCOUNT | INDIVIDUAL SHIPPER (C.O.D. for services performed) |
|---|---|
| ☐1 ☐2 ☐3 ☐4 ☐5 ☐6 ☐7 ☐8 ☐9 ☐10 ☐11 ☐12 ☐13 ☐14 ☐15 | ☐1 ☐2 ☐3 ☐4 ☐5 ☐6 ☐7 ☐8 ☐9 ☐10 ☐11 ☐12 ☐13 ☐14 ☐15 |

CUSTOMER NOTE: SOME ADDITIONAL SERVICES PERFORMED REQUIRE ASSESSMENT OF EXTRA CHARGES. SEE REVERSE SIDE OF THIS FORM FOR ADDITIONAL INFORMATION. BE CERTAIN TO INITIAL PROPER BLOCKS OR SERVICES PERFORMED & MARK "X" IN EACH BOX FOR SERVICES NOT PERFORMED BEFORE SIGNING FORM. SEPARATE FORM MUST BE USED FOR ORIGIN AND DESTINATION SERVICES IF YOU WISH.

**1. CONTAINERS/PACKING/UNPACKING**

| DESCRIPTION | NUMBER OF CONTAINERS | | |
|---|---|---|---|
| | FURNISHED | PACKED | UNPACKED |
| Dish-pack: Drum: Barrel | 29 | 29 | |
| **CARTONS** 1½ cubic feet | 54 | 54 | |
| 3 cubic feet | 137 | 137 | |
| 4½ cubic feet | 45 | 45 | |
| 6 cubic feet | 38 | 38 | |
| 6½ cubic feet | | | |
| Wardrobe Carton | 20 | 20 | |
| **MATTRESS CARTONS** Crib | 1 | 1 | |
| SINGLE/TWIN (To 39" X 75") | 4 | 4 | |
| Double (To 54" X 75") | | | |
| QUEEN/KING (Over 54" X 75") | 1 | 1 | |
| Mattress Cover | | | |
| CORRUGATED MIRROR CONTAINERS | 21 | 21 | |
| Crates & Containers (Specify Gross Measurement) | 1 | 1 | |

NOTE: An additional charge will be assessed for disposal of packing materials from items unpacked by customer or carrier on a date other than at delivery time.

**2. APPLIANCE SERVICE or UNSERVICE**

☐ By Agent _____
☐ By Driver _____
☐ 3rd Party    ☐ INVOICE ATTACHED    ☐ INVOICE TO FOLLOW

List appliances serviced: _____

**3. EXTRA PICKUP or DELIVERY (Show Address)**

_____

Weight _____ Lbs.

**4. STAIR CARRY or ELEVATOR CARRY**

No. of flights _____ Inside _____ Outside _____
Elevator Used ☐ Yes    ☐ No

**CUSTOMER IS TO INITIAL BOXES SHOWN BELOW FOR SERVICES PERFORMED AND CROSS OUT ALL OTHER BOXES**

| | |
|---|---|
| CONTAINERS PKG./UNPKG. | |
| APPL. SERV./UNSERV. 2. | |
| EXTRA PU/DEL 3. | |
| ELEV./STAIRS 4. | |
| PIANO/ORGAN 5. | |
| LONG CARRY 6. | |
| BULKY ARTICLE 7. | |
| REWEIGH 8. | |
| WAITING TIME 9. | |
| EXTRA LABOR 10. | |
| AUX. SERV. 11. | |
| O/T PKG./UNPKG. 12. | |
| O/T LDG./UNLDG. 13. | |
| SELF-STORAGE P.D. 14. | |
| DAY CERTAIN LOAD 15. | |

**5. PIANO or ORGAN CARRY**

Number shipped _____
No. of flights _____ Inside _____ Outside _____

**6. LONG CARRY (Excessive Distance)**

BETWEEN VEHICLE AND ENTRANCE _____ FEET
BETWEEN ENTRANCE AND APT/OFFICE _____ FEET
SINGLE-FAMILY DWELLING ☐ YES    ☐ NO

**7. BULKY ARTICLE or WEIGHT ADDITIVE** (e.g., Auto, Camper, Farm Equipment, etc.)

☐ BOAT    ☐ TRAILER _____ FEET
☐ OTHER *58 "7V*

**8. REWEIGH**

REQUESTED    ☐ YES

**9. WAITING TIME (Show Times and Dates)**

Time Arrived _____ Date _____
Time Loading Began _____ Date _____
Time Unloading Began _____ Date _____

**10. EXTRA LABOR**

No. Men _____
No. Regular Hours Each _____ Start Time _____ AM/PM End Time _____ AM/PM
No. O.T. Hours Each _____ Start Time _____ AM/PM End Time _____ AM/PM
PURPOSE: _____

NOTE: Articles disassembled by and for customer convenience will be reassembled at no charge if requested.

**11. AUXILIARY SERVICE (Shuttle)**

Shipment Weight _____ Lbs. & Miles _____
OR No. Vehicles _____ & No. Hours _____

**12. OVERTIME PACKING or UNPACKING**

Requested ☐ Yes

**13. OVERTIME LOADING or UNLOADING**

Requested ☐ Yes _____ Lbs.

**14. SELF-STORAGE PICKUP or DELIVERY (Mini-Warehouse)**

Weight _____ Lbs.

**15. DAY CERTAIN LOAD**

Requested ☐ Yes

CUSTOMER HAS BEEN GIVEN COPY OF THIS COMPLETED FORM INITIALED AND MARKED TO INDICATE SERVICES PERFORMED.

Van No. *603088*    Driver ID *8823*

SIGNATURE *UBP* (DRIVER/PACKER/UNPACKER)    AGENT CODE

I HAVE RECEIVED A COPY OF THIS FORM INITIALED BY ME TO SPECIFY SERVICES ORDERED. IF CREDIT IS EXTENDED ON THE BASIS THAT PAYMENT WILL BE MADE BY EMPLOYER OR OTHERS, I ACKNOWLEDGE MY PRIMARY LIABILITY FOR PAYMENT OF ALL CHARGES OR ANY PART OF CHARGES WHICH PROVE TO BE UNCOLLECTIBLE.

CUSTOMER SIGNATURE _____ *6/25/07*

UVL-92 (REV. 5/06)

2. TO CARRIER

# EXPLANATION OF SERVICES

### APPLIANCE SERVICE or CARSERVICE

### EXTRA PICKUP or DELIVERY

### STAIR CARRY or ELEVATOR CARRY

### PIANO or ORGAN CARRY

### LONG CARRY (Excessive Distance)

### WEIGHT

### 9. WAITING TIME

### 10. EXTRA LABOR

### 11. AUXILIARY SERVICE (Shuttle)

### 12. OVERTIME UNLOADING

### 13. OVERTIME LOADING or UNLOADING

### 14. SELF-STORAGE PICKUP or DELIVERY
(Mini-Warehouse)

### 15. DAY CERTAIN LOAD