IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                          :    Chapter 11
                                                                :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                          :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,*                                :
                                                                :    Jointly Administered
        Debtors.                                                :
                                                                :    **Ref. Dkt. Nos. 1711, 2166, 2235, 2504,**
                                                                :    **and 3849**
                                                                :
                                                                :    **Hearing Date: May 8, 2009 at 11:30**
---------------------------------------------------------------- x    **a.m. (ET)**

## DEBTORS' OBJECTION TO CURE CLAIMS ASSERTED BY THE BANK OF NEW YORK MELLON IN CONNECTION WITH THE ASSUMPTION AND ASSIGNMENT OF CERTAIN LOAN SERVICING AGREEMENTS TO AMERICAN HOME MORTGAGE SERVICING, INC. (F/K/A AH MORTGAGE ACQUISITION CO., INC.)

AHM Holdings and its affiliated debtors and debtors in possession in the above-

captioned cases (collectively, the "Debtors"), hereby object and respond, as applicable (the

"Objection") to (i) the *Proof of Cure Claim and Estimate of Transfer Cost Claim of the Bank of*

*New York, in Various Capacities* filed November 29, 2007 [D.I. 2235] (the "Initial Cure Claim"),

(ii) the *Limited Objection if the Bank of New York, in Various Capacities, to Notice of Cure*

*Interim Cure Claim Schedule* filed December 26, 2007 [D.I. 2504] (the "Interim Cure Claim"),

and (iii) the *Proof of Transfer Cost Claim of the Bank of New York, in Various Capacities* filed

on April 24, 2008 [D.I. 3849] (the "Transfer Cost Claim"); and in support thereof, the Debtors

respectfully represent as follows:

---

* The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

**BACKGROUND**

I.     **The Servicing Sale and Cure Escrow**

1.     On August 6, 2007 (the "<u>Petition Date</u>"), the Debtors filed an emergency motion [D.I. 11] (the "<u>Sale Motion</u>") to authorize the sale of the assets used in their mortgage loan servicing business (the "<u>Servicing Business</u>"), including the assumption and assignment of certain executory contracts.

2.     On August 27, 2007, the Debtors filed a notice of potential executory contracts to be assumed and assigned in connection with the sale of the Servicing Business [D.I. 403] (as subsequently modified and supplemented, the "<u>Initial Cure Notice</u>").  Among the contracts identified in the Initial Cure Notice were contracts relating to the servicing or subservicing of home equity lines of credit ("<u>HELOCs</u>") owned by certain securitization trusts (the "<u>HELOC Servicing Agreements</u>") and contracts relating to the servicing or subservicing of non-HELOC mortgage loans owned by certain securitization trusts (the "<u>Loan Servicing Agreements</u>").  In the Initial Cure Notice, the Debtors estimated a $0 cure amount for each of the HELOC Servicing Agreements and Loan Servicing Agreements.

3.     On September 20, 2007, The Bank of New York Mellon (f/k/a The Bank of New York) ("<u>BNY</u>"), in its capacity as Indenture Trustee, Master Servicer, Securities Administrator, and/or Custodian entitled to enforce the Debtors' obligations under certain of the HELOC Servicing Agreements and Loan Servicing Agreements, filed a limited objection [D.I. 826] to the Sale Motion and the Initial Cure Notice (the "<u>Sale Objection</u>") disputing the Debtors' proposed cure amount for certain HELOC Servicing Agreements and reserving rights with respect to adequate assurance of future performance by the as-yet-unidentified assignee.

4.     On September 25, 2007, the Debtors filed an executed Asset Purchase Agreement [D.I. 931] (as subsequently amended, the "<u>APA</u>") by and among AHM Investment,

AHM Corp., and AHM SV (the "Sellers") and American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage Acquisition Co., Inc.) (the "Purchaser").  The APA contemplated a two-step closing: first, an "economic" close, at which the Purchaser would tender the purchase price and after which the Debtors would continue to operate the Servicing Business in the ordinary course for the benefit and risk of the Purchaser, using working capital to be provided by the Purchaser (the "Initial Closing"); and second, a "legal" close, at which legal title to the assets of the Servicing Business would vest in the Purchaser and which would be the effective date of assumption and assignment of any executory contracts and unexpired leases (the "Final Closing").

5.      The Court held a five-day evidentiary hearing (the "Sale Hearing") on October 15-19, 2007, to consider approval of the Sale Motion and the APA.  At the beginning of the Sale Hearing, counsel for the Debtors announced that HELOC Servicing Agreements would be excluded from the contracts to be assumed and assigned to the Purchaser,[1] thus mooting certain objections to the Sale Motion, the Initial Cure Notice, and the APA.  At the Sale Hearing the Debtors adduced evidence (i) in support of the $0 proposed cure amounts set forth in the Initial Cure Notice, and (ii) of adequate assurance of future performance by the Purchaser.

6.      Prior to the conclusion of the Sale Hearing, the Debtors (in consultation with the Official Committee of Unsecured Creditors (the "Committee"), Bank of America, N.A., as Administrative Agent ("BofA"), and the Purchaser) and BNY resolved the Sale Objection by agreement in principle upon certain language to be included in the proposed sale order, including a stipulation that the Loan Servicing Agreements in which BNY had an interest were executory

---

[1]  This change was memorialized in the First Amendment to the APA, which was approved as part of the Sale Order (as hereinafter defined).

contracts assumed and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code.[2]

7.    On October 23, 2007, the Court issued a bench ruling approving the Sale Motion and APA.  Among other things, the Court found that the Final Closing could only occur when the Purchaser was duly licensed by applicable authorities to operate the Servicing Business and that the Debtors had "clearly established" that the Purchaser had more than sufficient capital to operate the Servicing Business and intended to maintain as much of the then-current management as possible, which was "more than enough to establish adequate assurance of future performance".  (10/23/07 Hr'g Tr., D.I. 1664 at 6:1-7:15.)  At a follow-up hearing to consider the proposed form of order approving the sale, the Court ruled further that the evidence at the Sale Hearing was "overwhelming" that there had been "no material change in the actual performance of the [Servicing Business]" during the bankruptcy cases.  (10/25/07 Hr'g Tr. 86:1-5, 17-19.)

8.    The Court entered an order [D.I. 1711] (the "Sale Order") approving the Sale Motion and the APA on October 30, 2007.  The Sale Order provided that the Loan Servicing Agreements in which "Certain Objectors" (including, but not limited to, BNY) had an interest were executory contracts subject to assumption and assignment pursuant to section 365 of the Bankruptcy Code.  (Sale Ord. at 4.)  The Sale Order provided further that a reserve of $10 million (the "Cure Escrow") would be established for the payment of the "Sellers' Cure Amount," which includes (i) the Initial Cure Amount, (ii) the Interim Cure Amount, and (iii) any reasonable out-of-pocket costs and expenses (a) incurred by a counterparty to an Assumed Contract as a result of the assumption and assignment of such contract to the Purchaser *and* (b) chargeable under the Assumed Contract (such costs/expenses, "Transfer Costs").  (Id. ¶¶ 32-

---

[2]  One of the legal issues in dispute at the Sale Hearing was whether the Loan Servicing Agreements were executory contracts subject to section 365 of the Bankruptcy Code (which BNY had asserted) or non-executory contracts subject only to section 363 of the Bankruptcy Code (which the Debtors had asserted).

39.) The Sale Order expressly reserved the rights of the Debtors, the Committee, and BofA to object to any Sellers' Cure Amount (id. ¶ 35) and, more particularly, to object to any claim for Transfer Costs "on any grounds whatsoever, including that such costs and expenses constitute an unenforceable restraint on assignment under applicable provisions of the Bankruptcy Code" (id. ¶ 39).

9.      The Initial Closing under the APA occurred on November 16, 2007, at or about which time the Cure Escrow was established and funded as required by the Sale Order. The Final Closing occurred on April 11, 2008.

10.     In accordance with the Sale Order, BNY timely filed its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim, which are summarized in the table below:

|  | Initial Cure | Interim Cure | Transfer Cost |
|---|---|---|---|
| **Attorneys' Fees** | $482,139 | - | $48,212 |
| **Default Administration Fees** | $23,905 | - | - |
| **Other** | $72,159.17 | - | $3,561.29 |

## II.     The Purchaser's Administrative Claim

11.     On May 23, 2008, the Purchaser filed a motion for allowance of an administrative expense claim for alleged breaches of the APA [D.I. 4233] (as amended, the "Purchaser's Administrative Claim").  In its motion, the Purchaser alleged that, during the period between the Initial Closing and the Final Closing when the Sellers were operating the Servicing Business for the Purchaser's risk and benefit, the Sellers used funds from accounts established for the benefit of the Purchaser to remedy shortfalls in unidentified investors' custodial accounts that had resulted from pre-Initial Closing acts or omissions of the Sellers.  The Purchaser asserted this violated the APA because account shortfalls relating to pre-Initial Closing acts or omissions were "Retained Liabilities" of the Sellers which were not authorized to be paid out of the Purchaser's accounts.

12.     On August 18, 2008, the Purchaser amended its administrative expense request [D.I. 5495].  In its amended request, the Purchaser, among other things, (i) reasserted its claims for reimbursement of amounts allegedly paid by the Sellers from the Purchaser's accounts to remedy alleged pre-Initial Closing shortfalls in certain unidentified investors' custodial accounts (such claims, the "Misappropriation Claims") and (ii) asserted claims for reimbursement of amounts necessary to remedy alleged shortfalls in certain unidentified investors' custodial accounts resulting from alleged acts or omissions of the Sellers prior to the Initial Closing (such claims, the "Uncured Shortfall Claims").

13.     On September 10, 2008, the Debtors filed a preliminary objection to the Purchaser's Administrative Claim [D.I. 5798] in which they reserved the right to seek discovery on the Purchaser's factual allegations, but asserted, with respect to the Uncured Shortfall Claims of approximately $5.1 million, that

    (a)     pursuant to the Sale Order, any claim against the Sellers arising under an Assumed Contract with respect to pre-Initial Closing acts or omissions of the Sellers (including, but not limited to, any claim of an investor resulting from a shortfall in its custodial account) had been satisfied in full by the establishment of the Cure Escrow;

    (b)     by operation of the injunctive provisions in the Sale Order, any such claim could only be asserted against the Cure Escrow, and could not be asserted against the Debtors[3] or against the Purchaser;

    (c)     the Purchaser did not have standing to assert claims against the Cure Escrow; and

    (d)     the Uncured Shortfall Claims were duplicative of claims already asserted against the Cure Escrow or, to the extent not asserted, time-barred and unenforceable under the Sale Order.

---

[3] A limited exception under the Sale Order is that, if the actual claims ultimately allowed as Sellers' Cure Amounts exceed $10 million, then such claims will be paid *pro rata* from the Cure Escrow, and "the right of a Counterparty to an Assumed Contract to assert a general unsecured claim against the Debtors (but not against the Purchaser) with respect to the difference between the pro rata Sellers' Cure Amount . . . and the allowed Sellers' Cure Amount with respect to such Assumed Contract is preserved".  (Sale Ord. ¶ 35.)

With respect to the Misappropriation Claims of approximately $3.5 million asserted in the Purchaser's Admin Claim, the Debtors reserved their rights, *inter alia*, to bring avoidance actions to recover any amounts transferred to or for the benefit of investors to the extent such transfers violated the APA (and, by extension, the Sale Order).

14.     Discovery on the Purchaser's Admin Claim is currently underway.  On information and belief, the Misappropriation Claims and Uncured Shortfall Claims asserted in the Purchaser's Admin Claim may implicate one or more custodial accounts in which BNY has an interest as Indenture Trustee, Master Servicer, Securities Administrator, and/or Custodian of the respective securitization trust(s).

## III.    The Plan

15.     On February 23, 2009, the Court entered its order [D.I. 7042] (the "Confirmation Order") confirming the Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009.  Paragraph 54 of the Confirmation Order establishes the date hereof as the deadline (the "Payment/Objection Deadline") by which the Debtors must either (a) cause the Sellers' Cure Amounts asserted by BNY to be paid from the Cure Escrow or (b) file and serve a written objection to the Sellers' Cure Amounts asserted by BNY, stating with specificity the amount subject to, and the legal and factual basis for, such objection.

16.     The Debtors file this Objection in accordance with the Confirmation Order, and hereby object to the Initial Cure Claim, the Interim Cure Claim, and the Transfer Cost Claim *in toto* for the reasons set forth below.

## OBJECTION

17.     Section 365 of the Bankruptcy Code generally requires a debtor, as a prerequisite to assumption and assignment of an executory contract, to cure any defaults under

such contract and compensate the counterparty to such contract for any pecuniary losses resulting from such defaults. 11 U.S.C. § 365(b)(1)(A) & (B), (f)(2)(A). The cure requirement is excused with respect to so-called "*ipso facto*" defaults, i.e., under contractual provisions relating to the debtor's financial condition, the commencement of a bankruptcy case, or the debtor's status as a debtor in possession. 11 U.S.C. § 365(b)(2)(A)-(C). (<u>Accord</u> Sale Ord. ¶ 40 (providing that, for purposes of determining the Sellers' Cure Amount, "no effect shall be given to any default of the type set forth in section 365(b)(2) of the Bankruptcy Code").) This is consistent with the general invalidation of contractual *ipso facto* provisions elsewhere in the Bankruptcy Code. <u>See</u> 11 U.S.C. § 365(e)(1) (rights/obligations under an executory contract cannot be modified post-petition solely because of an *ipso facto* provision in the contract), 363(l) (debtor may use, sell, or lease property of the estate notwithstanding any contractual provision that effects or gives an option to effect a modification of the debtor's interest in such property based on an *ipso facto* condition); 541(c)(1) (property of the debtor becomes property of the estate notwithstanding any contractual provision that effects or gives an option to effect a modification of the debtor's property interest).

18.     Unlike proofs of claim filed pursuant to section 501 of the Bankruptcy Code, cure claims asserted pursuant to section 365(b)(1) of the Bankruptcy Code are accorded no initial presumption of validity. <u>In re Joshua Slocum, Ltd.</u>, 103 B.R. 601, 605-06 (Bankr. E.D. Pa. 1989). Thus, like a plaintiff in a lawsuit, the party asserting a cure claim pursuant to section 365(b)(1) must prove every element of its entitlement to a cure claim by a preponderance of the evidence. <u>Id.</u> Holding cure claimants to the same burden of production and persuasion as an ordinary civil plaintiff is appropriate in light of the fact that cure claims are afforded *de facto* administrative expense priority. <u>Cf.</u> <u>Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group,</u>

Inc.), 350 B.R. 166, 178-79 (Bankr. D. Del. 2006) (noting that cure claims are *de facto* priority

claims because they are paid dollar-for-dollar from assets that would otherwise be available to

the bankruptcy estate for distribution to creditors); In re Bernard Techs., Inc., 342 B.R. 174, 177

(Bankr. D. Del. 2006) (holding that an applicant seeking reimbursement of expenses as an

administrative priority claim "must prove his entitlement to the requested . . . expense

reimbursement by a preponderance of the evidence").

## I.    Attorneys' Fees

19.    In its Initial Cure Claim, BNY asserts an entitlement to reimbursement of

$482,138.73 in attorneys' fees accrued between August and October 2007.  In its Transfer Cost

Claim, BNY asserts an entitlement to reimbursement of (i) $21,420 in attorneys' fees related to

the Purchaser's motion to compel the Final Closing [D.I. 3557] (the "Purchaser's Motion to

Compel") filed on April 8, 2008, and BNY's diligence regarding the satisfaction of the

conditions precedent to assumption and assignment of the Loan Servicing Agreements in

connection therewith, and (ii) $26,791.50 in attorneys' fees related to the *Debtors' Motion to*

*Authorize the (I) Abandonment and Destruction of Certain Duplicate Mortgage Loan Files or*

*(II) Return of Mortgage Loan Files to the Owner of such Loans Upon Payment of Reasonable*

*Costs and Expenses* [D.I. 2395] (the "Document Destruction/Return Motion") filed on December

14, 2007, and BNY's diligence regarding the appropriate transfer of loan files to the Purchaser as

the new servicer in connection therewith.

20.    Attorneys' fees are recoverable as part of a cure claim only if the contract

specifically requires their payment.  In re Crown Books Corp., 269 B.R. 12, 15 (Bankr. D. Del.

2001).  (Accord Sale Ord. ¶ 39 (limiting "Transfer Costs" to those costs/expenses that are

"chargeable under the Assumed Contracts").)  In addition, the attorneys' fees must be

reasonable.  <u>Crown Books</u>, 269 B.R. at 18.  (<u>Accord</u> Sale Ord. ¶ 39 (limiting "Transfer Costs" to "reasonable" costs/expenses).)

21.    BNY has provided the Debtors with detailed (albeit, redacted) invoices in support of the attorneys' fees included in its Initial Cure Claim and Transfer Cost Claim.  While the redactions make it difficult at times to determine the nature and scope of the particular work performed, the Debtors do not dispute the reasonableness of the attorneys' fees at issue. However, the Debtors do dispute (i) whether there is a contractual basis for payment of the requested attorneys' fees in the relevant Loan Servicing Agreements, and (ii) even assuming a contractual basis for reimbursement, whether the attorneys' fees sought in the Initial Cure Claim relate solely to the Loan Servicing Agreements assumed and assigned to the Purchaser, as opposed to HELOC Servicing Agreements that were not assumed or assigned.

### A.    Contractual Basis for Payment

22.    Whether a contract requires payment of attorneys' fees is a question of applicable state law, subject to any qualifying or contrary provisions of the Bankruptcy Code. <u>Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co.</u>, 549 U.S. 443, 1204 (2007). The Loan Servicing Agreements in which BNY has an interest[4] are governed by New York law. (2004-4 Serv. Agmt. § 7.02; 2006-6 and 2006-9 Serv. Agmts. § 20.)

23.    Under New York law, contractual indemnity provisions are strictly construed to avoid reading into them duties which the parties did not intend to be assumed.  <u>In re Hooper Assocs., Ltd. v. AGS Computers, Inc.</u>, 548 N.E.2d 903, 905 (N.Y. 1989) ("Inasmuch as a promise by one party to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorneys'

---

[4]  The agreements are voluminous, and will be filed in an appendix and provided to the Court prior to the hearing on this Objection.

fees, the court should not infer a party's intention to waive the benefit of the rule unless the

intention to do so is *unmistakably clear* from the language of the promise." (emphasis added).)

24.    BNY cites sections 5.06 and 6.01 of the 2004-4 Servicing Agreement and

section 12.01 of the 2006-6 and 2006-9 Servicing Agreements as the basis for reimbursement of

its attorneys' fees.  Under the strict construction of these provisions required by New York law,

however, it is not "unmistakably clear" that the Debtors are required to indemnify BNY for its

attorneys' fees.

25.    Section 5.06 of the 2004-4 Servicing Agreement provides as follows:

> The RMBS Master Servicer agrees to indemnify [BNY] for, and to hold [BNY]
> harmless against, any claim, tax, penalty, loss, liability or expense of any kind
> whatsoever, incurred without negligence (gross negligence in the case of the
> Owner Trustee) or willful misconduct on its part, *arising out of, or in connection
> with, the failure by the RMBS Master Servicer to perform its duties in compliance
> with this Servicing Agreement*, including the costs and expenses (including
> reasonable legal fees and expenses) of defending against any claim in connection
> with the exercise or performance of any of its powers or duties under any Basic
> Document, provided that:
>
>> (i) with respect to any such claim, [BNY] shall have given the RMBS
>> Master Servicer written notice thereof promptly after [BNY] shall have
>> actual knowledge thereof, it being understood that failure to give such
>> notice shall not relieve the RMBS Master Servicer of its indemnification
>> obligations hereunder;
>>
>> (ii) while maintaining control over its own defense, [BNY] shall cooperate
>> and consult fully with the RMBS Master Servicer in preparing such
>> defense; and
>>
>> (iii) notwithstanding anything in this Servicing Agreement to the contrary,
>> the RMBS Master Servicer shall not be liable for settlement of any claim
>> by [BNY] entered into without the prior consent of the RMBS Master
>> Servicer, which consent shall not be unreasonably withheld.

(2004-4 Serv. Agr. § 5.06 (emphasis added).)  As a threshold matter, this language is essentially

identical to the language at issue in Hooper Associates, which the New York Court of Appeals

held to encompass only attorneys' fees incurred defending third-party claims, and not attorneys'

fees incurred in litigation between the parties relating to the contract. 548 N.E.2d at 492-93.

More importantly, however, a condition precedent to application of this provision is a "failure by

the RMBS Master Servicer to perform its duties in compliance with this Servicing Agreement".

BNY does not allege that there was any such failure, and as the Court itself noted, the evidence

at the Sale Hearing was "overwhelming" that there had been no material change in the Servicing

Business's actual performance of its servicing functions during these bankruptcy cases.

Accordingly, section 5.06 of the 2004-4 Servicing Agreement does not provide a basis for BNY

to recover attorneys' fees as part of its cure claim.

26.    Section 12.01 of the 2006-6 and 2006-9 Servicing Agreements is an

indemnification provision similar to that in the 2004-4 Servicing Agreement. It provides, in

pertinent part:

> The Servicer agrees to indemnify and hold the Purchaser and any Successor
> Servicer and their respective present and former directors, officers, employees and
> agents harmless from any and all claims, losses, damages, penalties, fines,
> forfeitures, legal fees and expenses (including, without limitation, any reasonable
> legal fees and expenses, judgments or expenses relating to such liability, claim,
> loss or damage) and related costs, judgments, and any other costs, fees and
> expenses that such parties may sustain *in any way related to the Servicer's
> failure*:
>
> (a) to observe and perform any or all of Servicer's duties, obligations,
> covenants, agreements, warranties or representations contained in this Agreement
> or in the related Purchase Price and Terms Agreement; or
>
> (b) to comply with all applicable requirements contained in this
> Agreement or the related Purchase Price and Terms Agreement with respect to the
> servicing of the Mortgage Loan and the transfer of Servicing Rights.

(2006-6 and 2006-9 Serv. Agmts. § 12.01 (emphasis added).) As with the indemnity provision

in the 2004-4 Servicing Agreement, a condition precedent to application of this indemnity

provision is a "failure" by the Servicer to comply with some contractual obligation, but BNY

does not specify what this failure was.[5]  Accordingly, section 12.01 of the 2006-6 and 2006-9

Servicing Agreements does not provide a basis BNY to recover attorneys' fees as part of its cure

claim.

          27.     Section 6.01 of the 2004-4 Servicing Agreement, provides that, in the

event of certain enumerated "Servicing Defaults," the rights and obligations of the RMBS Master

Servicer as servicer under the agreement may be terminated and, upon such termination, BNY or

its designee will be installed as "successor RMBS Master Servicer."  (2004-4 Serv. Agmt.

§ 6.01.)  The section concludes: "All reasonable costs and expenses (including, but not limited

to, attorneys' fees and disbursements) incurred by [BNY] or a successor RMBS Master Servicer

in connection with *its* succession as RMBS Master Servicer *pursuant to this Section 6.01* shall be

paid by the predecessor RMBS Master Servicer . . . upon presentation of reasonable

documentation of such costs and expenses . . . ."  (Id. (emphasis added).)  In its Transfer Cost

Claim (p. 2, n.3), BNY quotes only this last sentence, and changes the phrase "its succession as

RMBS Master Servicer" to "[the] succession as RMBS Master Servicer"—a distinction with a

difference, to be sure.  In context, the reimbursement provisions of section 6.01 of the 2004-4

Servicing Agreement apply only to situations where (i) the RMBS Master Servicer is terminated

on account of a Servicing Default and (ii) servicing is transferred to BNY or its designee.  The

assumption and assignment of the 2004-4 Servicing Agreement to the Purchaser is not such a

situation.  Accordingly, section 6.01 of the 2004-4 Servicing Agreement provides no basis for

BNY to recover attorneys' fees as part of its cure claim.

---

[5]  To the extent the alleged "failure" relates to the manner in which the Debtors transferred their servicing rights to
the Purchaser, the Debtors submit that this was excused by section 365(f)(1) of the Bankruptcy Code, which
invalidates contractual conditions on the assignment of an executory contract, whether such conditions take the form
of express prohibitions or *de facto* restrictions on the Debtors' ability to realize the full value of its assets.  See 11
U.S.C. § 365(f)(1); In re Rickel Home Ctrs., 240 B.R. 826, 831-832 (D. Del. 1998) (discussing *de facto* anti-
assignment doctrine), appeal dismissed, 209 F.3d 291 (3d Cir. 2000).

28.    Absent some basis in the relevant Loan Servicing Agreements for payment of BNY's attorneys' fees by the Debtors, BNY's claim for such fees should be disallowed *in toto*.  See <u>Crown Books</u>, 269 B.R. at 15.

**B.    Attorneys' Fees Related to HELOC Servicing Agreements**

29.    Even if there were a contractual basis for recovering attorneys' fees under one or more of the provisions of the relevant Loan Servicing Agreements cited (or to be cited) by BNY, there would be no basis for recovering attorneys' fees relating to the HELOC Servicing Agreements that were not assumed and assigned to the Purchaser.  See <u>Shaw Group</u>, 350 B.R. at 177 ("[I]n order to assume a particular executory contract . . . the debtor is only required to perform under that discrete contract . . . , not under other, substantially unrelated agreements." (internal quotations, citation omitted).).  Reviewing the time detail provided by BNY with respect to attorneys' fees included in its Initial Transfer Claim, it appears that BNY is claiming reimbursement for all of its attorneys' fees incurred between August and October 2007, without making any attempt to (i) exclude those fees specifically related to the HELOC Servicing Agreements and (ii) with respect to fees related to general services provided to BNY in connection with the Debtors' bankruptcy cases, allocating some portion of those fees to the HELOC Servicing Agreements.

30.    Given that it is BNY's burden to prove its entitlement to the attorneys' fees requested as a cure claim, and given that BNY is in the best position to determine the relative time spent by its attorneys on the various tasks they performed (if only because it has access to unredacted billing detail), the Debtors respectfully submit that it is BNY's responsibility to propose some basis for allocating its attorneys' fees between the Loan Servicing Agreements and the HELOC Servicing Agreements.  However, in light of the Debtors' global

objection to the allowance of attorneys' fees as part of BNY's cure claim, and in the interest of

avoiding unnecessary costs to BNY, the Debtors would be amenable to adjourning their

Objection on this particular point until such time as the Court rules on the global objection.

## II.    Default Administration Fees

31.    In its Initial Cure Claim, BNY asserts an entitlement to payment of

$23,905 in "default administration fees" accruing between August and October 2007 pursuant to

the same contractual provisions cited in connection with its request for attorneys' fees.

Presumably, the default administration fees represent the hourly fees *charged by BNY* to the

respective securitization trusts for which it acts as Indenture Trustee, Master Servicer, Securities

Administrator, and/or Custodian pursuant to agreements that were not referenced in the Initial

Cure Claim (i.e., for extraordinary time spent by BNY's principals), as opposed to fees *incurred*

*by BNY* and reimburseable under the indemnification and transfer cost provisions of the Loan

Servicing Agreements cited by BNY.  Accordingly, it does not appear that there is a contractual

basis for asserting the default administration fees as a cure claim relating to the Loan Servicing

Agreements.  The claim for default administration fees should, therefore, be disallowed *in toto*.

32.    To the extent the provisions of the Loan Servicing Agreements cited by

BNY could be construed to provide a basis for payment of BNY's default administration fees,

the Debtors incorporate by reference their arguments set forth in I.A. and B. above, namely:

(a)    there was no "failure" of the Debtors to perform servicing
obligations (or, with respect to the 2004-4 Servicing Agreement, a default termination of
the RMBS Master Servicer and a related transfer of servicing to BNY or its designee)
that would trigger an indemnification or reimbursement obligation and, accordingly, the
claim for default administration fees should be disallowed *in toto*; and

(b)    BNY does not appear to account for time relating to HELOC
Servicing Agreements that were not assumed and assigned to the Purchaser, but has the
burden of doing so.

As above, in light of the Debtors' global objections to the allowance of default administration fees as part of BNY's cure claim, and in the interest of avoiding unnecessary costs to BNY, the Debtors would be amenable to adjourning their Objection on the latter particular point until such time as the Court rules on the more global objections.

## III.    Other Amounts

33.    In its Initial Cure Claim, BNY asserted a claim for $72,159.17 on account of an unexplained discrepancy in the custodial accounts for the 2006-6 Certificates (as defined in the Initial Cure Claim).  Counsel for BNY has represented to counsel for the Debtors that this discrepancy has been resolved and will be withdrawn from the Initial Cure Claim, but was unable to provide any additional detail.  The Debtors note that the existence of a discrepancy in a custodial account at the time of the Initial Cure Notice which was subsequently resolved is potentially consistent with the factual allegations in the Purchaser's Admin Claim concerning the Misappropriation Claims.  In the event the Debtors are liable to the Purchaser in any way relating to the account discrepancy identified by BNY (whether as a Misappropriation Claim or otherwise), the Debtors reserve any and all rights they may have against BNY, the GSAA 2006-6 Trust, or any other third party relating to such liability (including, without limitation, the right to seek avoidance and recovery of amounts pursuant to sections 549 and 550 of the Bankruptcy Code).

34.    In its Transfer Cost Claim, BNY asserted an entitlement to reimbursement of $3,561.21 in out of pocket expenses incurred on a trip to the Debtors' offices in Texas in August 2007 to conduct due diligence related to the sale of the Servicing Business.  To the extent the alleged contractual basis for such reimbursement is one or more of the provisions of the Loan Servicing Agreements cited by BNY in connection with its claim for attorneys' fees and default

administration fees, the Debtors incorporate by reference the argument set forth in I.A. above, namely that there was no "failure" of the Debtors to perform servicing obligations (or, with respect to the 2004-4 Servicing Agreement, a default termination of the RMBS Master Servicer and a related transfer of servicing to BNY or its designee) that would trigger an indemnification or reimbursement obligation.

35.    BNY reserved the right to amend or supplement its Initial Cure Claim and Transfer Cost Claim in any respect.  The Debtors hereby object to any unidentified, contingent, and/or unliquidated claims preserved (or intended to be preserved) by BNY's reservation of rights on the basis that BNY has not met its burden of establishing any right to payment of such claims (if any).

36.    The Debtors reserve the right to supplement or amend this Objection in response to any amendment or supplementation of the Initial Cure Claim or Transfer Cost Claim whereby BNY asserts additional claims, or additional bases for payment of existing claims, as Sellers' Cure Amounts.  Without limiting the generality of the foregoing, the Debtors, on behalf of themselves, the Committee, and BofA, reserve the right to object on any grounds whatsoever to any claims that may be asserted by BNY which are duplicative of claims asserted in the Purchaser's Admin Claim, including, without limitation, on the grounds that such claims are time-barred by operation of the Sale Order and/or the Objection/Payment Deadline.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order

disallowing the Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim asserted by

BNY and granting the Debtors such other and further relief as is just and proper.


Dated:     Wilmington, Delaware
           March 25, 2009


                           YOUNG CONAWAY STARGATT & TAYLOR, LLP

                             /s/ Patrick A. Jackson
                           _____
                           Sean M. Beach (No. 4070)
                           Patrick A. Jackson (No. 4976)
                           The Brandywine Building
                           1000 West Street, 17th Floor
                           Wilmington, Delaware 19801
                           Telephone: (302) 571-6600
                           Facsimile: (302) 571-1253

                           Counsel for Debtors and Debtors in Possession