IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, <u>et al.</u>,* | Case No. 07-11047 (CSS) |
| | Jointly Administered |
| Debtors. | **Ref. Dkt. Nos. 1711, 2166, 2230, 2485 and 3972** |
| | **Hearing Date: May 8, 2009 at 11:30 a.m. (ET)** |

---------------------------------------------------------------- x

## DEBTORS' OBJECTION TO CURE CLAIMS ASSERTED BY CITIBANK, N.A., AS TRUSTEE, IN CONNECTION WITH THE ASSUMPTION AND ASSIGNMENT OF CERTAIN LOAN SERVICING AGREEMENTS TO AMERICAN HOME MORTGAGE SERVICING, INC. (F/K/A AH MORTGAGE ACQUISITION CO., INC.)

AHM Holdings and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby object and respond, as applicable (the "<u>Objection</u>") to (i) the *Initial Cure Amount and Transfer Cost Estimate of Citibank, N.A., as Trustee* filed November 29, 2007 [D.I. 2230] (the "<u>Initial Cure Claim</u>"), (ii) the *Objection and Interim Cure Amount of Citibank, N.A. to Debtors' Interim Period Cure Schedule* filed December 21, 2007 [D.I. 2585] (the "<u>Interim Cure Claim</u>"), and (iii) the *Final Cure Amount of Citibank, N.A.* filed on May 7, 2008 [D.I. 3972] (the "<u>Transfer Cost Claim</u>"); and in support thereof, the Debtors respectfully represent as follows:

---

* The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("<u>AHM SV</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

**BACKGROUND**

**I.    The Servicing Sale and Cure Escrow**

1.    On August 6, 2007 (the "Petition Date"), the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") to authorize the sale of the assets used in their mortgage loan servicing business (the "Servicing Business"), including the assumption and assignment of certain executory contracts.

2.    On August 27, 2007, the Debtors filed a notice of potential executory contracts to be assumed and assigned in connection with the sale of the Servicing Business [D.I. 403] (as subsequently modified and supplemented, the "Initial Cure Notice").  Among the contracts identified in the Initial Cure Notice were contracts relating to the servicing or subservicing of residential mortgage loans owned by certain securitization trusts (the "Loan Servicing Agreements").  In the Initial Cure Notice, the Debtors estimated a $0 cure amount for each of the Loan Servicing Agreements.

3.    On September 13, 2007, Citibank, N.A., in its capacity as Indenture Trustee, Trustee, Securities Administrator, Paying Agent, and/or Registrar entitled to enforce the Debtors' obligations under certain of the Loan Servicing Agreements, filed objections [D.I. 723 & 724] to the Sale Motion and the Initial Cure Notice (collectively, as supplemented, the "Sale Objection") disputing the Debtors' proposed cure amounts and reserving rights with respect to adequate assurance of future performance by the as-yet-unidentified assignee.

4.    On September 25, 2007, the Debtors filed an executed Asset Purchase Agreement [D.I. 931] (as subsequently amended, the "APA") by and among AHM Investment, AHM Corp., and AHM SV (the "Sellers") and American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage Acquisition Co., Inc.) (the "Purchaser").  The APA contemplated a two-step closing: first, an "economic" close, at which the Purchaser would tender the purchase price and

after which the Debtors would continue to operate the Servicing Business in the ordinary course for the benefit and risk of the Purchaser, using working capital to be provided by the Purchaser (the "Initial Closing"); and second, a "legal" close, at which legal title to the assets of the Servicing Business would vest in the Purchaser and which would be the effective date of assumption and assignment of any executory contracts and unexpired leases (the "Final Closing").  The APA further contemplated that, as between the Sellers and the Purchaser: (i) the aggregate amount necessary under section 365 of the Bankruptcy Code (a) to cure any defaults under Assumed Contracts (as defined in the APA) arising prior to entry of the Sale Approval Order (as defined in the APA) (such amount, the "Initial Cure Amount") and (b) to cure any defaults under Assumed Contracts arising after entry of the Sale Approval Order but before the Initial Closing (such amount, the "Interim Cure Amount"), would be the responsibility of the Sellers; and (ii) the amount, if any, necessary under section 365 of the Bankruptcy Code to cure any defaults arising under the Assumed Contracts between the Initial Closing and the Final Closing (such amount, the "Purchaser's Cure Amount") would be the responsibility of the Purchaser.

　　　　5.　　　The Court held a five-day evidentiary hearing (the "Sale Hearing") on October 15-19, 2007, to consider approval of the Sale Motion and the APA.  At the Sale Hearing the Debtors adduced evidence (i) in support of the $0 proposed cure amounts set forth in the Initial Cure Notice, and (ii) of adequate assurance of future performance by the Purchaser.

　　　　6.　　　Prior to the conclusion of the Sale Hearing, the Debtors (in consultation with the Official Committee of Unsecured Creditors (the "Committee"), Bank of America, N.A., as Administrative Agent ("BofA"), and the Purchaser) and Citibank resolved the Sale Objection by agreement in principle upon certain language to be included in the proposed sale order,

including a stipulation that the Loan Servicing Agreements in which Citibank had an interest were executory contracts assumed and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code.[1]

7.    On October 23, 2007, the Court issued a bench ruling approving the Sale Motion and APA.  Among other things, the Court found that the Final Closing could only occur when the Purchaser was duly licensed by applicable authorities to operate the Servicing Business and that the Debtors had "clearly established" that the Purchaser had more than sufficient capital to operate the Servicing Business and intended to maintain as much of the then-current management as possible, which was "more than enough to establish adequate assurance of future performance".  (10/23/07 Hr'g Tr., D.I. 1664 at 6:1-7:15.)  At a follow-up hearing to consider the proposed form of order approving the sale, the Court ruled further that the evidence at the Sale Hearing was "overwhelming" that there had been "no material change in the actual performance of the [Servicing Business]" during the bankruptcy cases.  (10/25/07 Hr'g Tr. 86:1-5, 17-19.)

8.    The Court entered an order [D.I. 1711] (the "Sale Order") approving the Sale Motion and the APA on October 30, 2007.  The Sale Order provided that the Loan Servicing Agreements in which "Certain Objectors" (including, but not limited to, Citibank) had an interest were executory contracts subject to assumption and assignment pursuant to section 365 of the Bankruptcy Code.  (Sale Ord. at 4.)  The Sale Order provided further that a reserve of $10 million (the "Cure Escrow") would be established for the payment of the "Sellers' Cure Amount," which includes (i) the Initial Cure Amount, (ii) the Interim Cure Amount, and (iii) any reasonable out-of-pocket costs and expenses (a) incurred by a counterparty to an Assumed Contract as a result of the assumption and assignment of such contract to the Purchaser *and*

---

[1]  One of the legal issues in dispute at the Sale Hearing was whether the Loan Servicing Agreements were executory contracts subject to section 365 of the Bankruptcy Code (which Citibank had asserted) or non-executory contracts subject only to section 363 of the Bankruptcy Code (which the Debtors had asserted).

(b) chargeable under the Assumed Contract (such costs/expenses, "Transfer Costs").  (Id. ¶¶ 32-39.)  The Sale Order expressly reserved the rights of the Debtors, the Committee, and BofA to object to any Sellers' Cure Amount (id. ¶ 35) and, more particularly, to object to any claim for Transfer Costs "on any grounds whatsoever, including that such costs and expenses constitute an unenforceable restraint on assignment under applicable provisions of the Bankruptcy Code" (id. ¶ 39).

9.    The Initial Closing under the APA occurred on November 16, 2007, at or about which time the Cure Escrow was established and funded as required by the Sale Order. The Final Closing occurred on April 11, 2008.

10.    In accordance with the Sale Order, Citibank timely filed its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim, which are summarized in the table below:

| | Initial Cure | Interim Cure | Transfer Cost[2] |
|---|---|---|---|
| **Attorneys' Fees** | $733,706 | $52,509 | $88,697 |
| **Default Administration Fees** | $34,950 | $6,975 | $18,525 |

## II.    The Purchaser's Administrative Claim

11.    On May 23, 2008, the Purchaser filed a motion for allowance of an administrative expense claim for alleged breaches of the APA [D.I. 4233] (as amended, the "Purchaser's Administrative Claim").  In its motion, the Purchaser alleged that, during the period between the Initial Closing and the Final Closing when the Sellers were operating the Servicing Business for the Purchaser's risk and benefit, the Sellers used funds from accounts established for the benefit of the Purchaser to remedy shortfalls in unidentified investors' custodial accounts that had resulted from pre-Initial Closing acts or omissions of the Sellers.  The Purchaser asserted this violated the APA because account shortfalls relating to pre-Initial Closing acts or

---

[2]  As defined in the Sale Order, Transfer Costs could include Initial and Interim Cure Amounts to the extent such amounts otherwise met the criteria for a "Transfer Cost".  For purposes of this table, amounts (if any) that are clearly duplicative of Initial and/or Interim Cure Amounts are excluded.

omissions were "Retained Liabilities" of the Sellers which were not authorized to be paid out of the Purchaser's accounts.

12.    On August 18, 2008, the Purchaser amended its administrative expense request [D.I. 5495]. In its amended request, the Purchaser, among other things, (i) reasserted its claims for reimbursement of amounts allegedly paid by the Sellers from the Purchaser's accounts to remedy alleged pre-Initial Closing shortfalls in certain unidentified investors' custodial accounts (such claims, the "Misappropriation Claims") and (ii) asserted claims for reimbursement of amounts necessary to remedy alleged shortfalls in certain unidentified investors' custodial accounts resulting from alleged acts or omissions of the Sellers prior to the Initial Closing (such claims, the "Uncured Shortfall Claims").

13.    On September 10, 2008, the Debtors filed a preliminary objection to the Purchaser's Administrative Claim [D.I. 5798] in which they reserved the right to seek discovery on the Purchaser's factual allegations, but asserted, with respect to the Uncured Shortfall Claims of approximately $5.1 million, that

> (a)    pursuant to the Sale Order, any claim against the Sellers arising under an Assumed Contract with respect to pre-Initial Closing acts or omissions of the Sellers (including, but not limited to, any claim of an investor resulting from a shortfall in its custodial account) had been satisfied in full by the establishment of the Cure Escrow;

> (b)    by operation of the injunctive provisions in the Sale Order, any such claim could only be asserted against the Cure Escrow, and could not be asserted against the Debtors[3] or against the Purchaser;

> (c)    the Purchaser did not have standing to assert claims against the Cure Escrow; and

---

[3] A limited exception under the Sale Order is that, if the actual claims ultimately allowed as Sellers' Cure Amounts exceed $10 million, then such claims will be paid *pro rata* from the Cure Escrow, and "the right of a Counterparty to an Assumed Contract to assert a general unsecured claim against the Debtors (but not against the Purchaser) with respect to the difference between the pro rata Sellers' Cure Amount . . . and the allowed Sellers' Cure Amount with respect to such Assumed Contract is preserved". (Sale Ord. ¶ 35.)

(d)     the Uncured Shortfall Claims were duplicative of claims already asserted against the Cure Escrow or, to the extent not asserted, time-barred and unenforceable under the Sale Order.

With respect to the Misappropriation Claims of approximately $3.5 million asserted in the Purchaser's Admin Claim, the Debtors reserved their rights, *inter alia*, to bring avoidance actions to recover any amounts transferred to or for the benefit of investors to the extent such transfers violated the APA (and, by extension, the Sale Order).

14.     Discovery on the Purchaser's Admin Claim is currently underway.  On information and belief, the Misappropriation Claims and Uncured Shortfall Claims asserted in the Purchaser's Admin Claim may implicate one or more custodial accounts in which Citibank has an interest as Indenture Trustee, Trustee, Securities Administrator, Paying Agent, and/or Registrar of the respective securitization trust(s).

## III.     The Plan

15.     On February 23, 2009, the Court entered its order [D.I. 7042] (the "Confirmation Order") confirming the Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009.  Paragraph 54 of the Confirmation Order establishes the date hereof as the deadline (the "Payment/Objection Deadline") by which the Debtors must either (a) cause the Sellers' Cure Amounts asserted by Citibank to be paid from the Cure Escrow or (b) file and serve a written objection to the Sellers' Cure Amounts asserted by Citibank, stating with specificity the amount subject to, and the legal and factual basis for, such objection.

16.     The Debtors file this Objection in accordance with the Confirmation Order, and hereby object to the Initial Cure Claim, the Interim Cure Claim, and the Transfer Cost Claim *in toto* for the reasons set forth below.

**OBJECTION**

17.     Section 365 of the Bankruptcy Code generally requires a debtor, as a prerequisite to assumption and assignment of an executory contract, to cure any defaults under such contract and compensate the counterparty to such contract for any pecuniary losses resulting from such defaults.  11 U.S.C. § 365(b)(1)(A) & (B), (f)(2)(A).  The cure requirement is excused with respect to so-called "*ipso facto*" defaults, i.e., under contractual provisions relating to the debtor's financial condition, the commencement of a bankruptcy case, or the debtor's status as a debtor in possession.  11 U.S.C. § 365(b)(2)(A)-(C).  (Accord Sale Ord. ¶ 40 (providing that, for purposes of determining the Sellers' Cure Amount, "no effect shall be given to any default of the type set forth in section 365(b)(2) of the Bankruptcy Code").)  This is consistent with the general invalidation of contractual *ipso facto* provisions elsewhere in the Bankruptcy Code.  See 11 U.S.C. § 365(e)(1) (rights/obligations under an executory contract cannot be modified post-petition solely because of an *ipso facto* provision in the contract), 363(l) (debtor may use, sell, or lease property of the estate notwithstanding any contractual provision that effects or gives an option to effect a modification of the debtor's interest in such property based on an *ipso facto* condition); 541(c)(1) (property of the debtor becomes property of the estate notwithstanding any contractual provision that effects or gives an option to effect a modification of the debtor's property interest).

18.     Unlike proofs of claim filed pursuant to section 501 of the Bankruptcy Code, cure claims asserted pursuant to section 365(b)(1) of the Bankruptcy Code are accorded no initial presumption of validity.  In re Joshua Slocum, Ltd., 103 B.R. 601, 605-06 (Bankr. E.D. Pa. 1989).  Thus, like a plaintiff in a lawsuit, the party asserting a cure claim pursuant to section 365(b)(1) must prove every element of its entitlement to a cure claim by a preponderance of the

evidence.  Id.  Holding cure claimants to the same burden of production and persuasion as an

ordinary civil plaintiff is appropriate in light of the fact that cure claims are afforded *de facto*

administrative expense priority.  Cf. Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group,

Inc.), 350 B.R. 166, 178-79 (Bankr. D. Del. 2006) (noting that cure claims are *de facto* priority

claims because they are paid dollar-for-dollar from assets that would otherwise be available to

the bankruptcy estate for distribution to creditors); In re Bernard Techs., Inc., 342 B.R. 174, 177

(Bankr. D. Del. 2006) (holding that an applicant seeking reimbursement of expenses as an

administrative priority claim "must prove his entitlement to the requested . . . expense

reimbursement by a preponderance of the evidence").

## I.       Attorneys' Fees

19.      In its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim,

Citibank asserts an entitlement to reimbursement of $875,212.03 in attorneys' fees accrued

through the Final Closing.

20.      Attorneys' fees are recoverable as part of a cure claim only if the contract

specifically requires their payment.  In re Crown Books Corp., 269 B.R. 12, 15 (Bankr. D. Del.

2001).  (Accord Sale Ord. ¶ 39 (limiting "Transfer Costs" to those costs/expenses that are

"chargeable under the Assumed Contracts").)  In addition, the attorneys' fees must be

reasonable.  Crown Books, 269 B.R. at 18.  (Accord Sale Ord. ¶ 39 (limiting "Transfer Costs" to

"reasonable" costs/expenses).)

21.      Citibank has provided the Debtors with detailed (albeit, redacted) invoices

in support of the attorneys' fees included in its Initial Cure Claim, Interim Cure Claim, and

Transfer Cost Claim.  While the redactions make it difficult at times to determine the nature and

scope of the particular work performed, the Debtors do not dispute the reasonableness of the

attorneys' fees at issue.  However, the Debtors do dispute whether there is a contractual basis for payment of the requested attorneys' fees in the relevant Loan Servicing Agreements.

22.    Whether a contract requires payment of attorneys' fees is a question of applicable state law, subject to any qualifying or contrary provisions of the Bankruptcy Code. Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co., 549 U.S. 443, 1204 (2007). On information and belief, the Loan Servicing Agreements in which Citibank has an interest[4] are governed by New York law.  Under New York law, contractual indemnity provisions are strictly construed to avoid reading into them duties which the parties did not intend to be assumed.  In re Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989) ("Inasmuch as a promise by one party to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorneys' fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is *unmistakably clear* from the language of the promise." (emphasis added).)

23.    Citibank does not specify in its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim which provisions of the relevant Loan Servicing Agreements Citibank relies upon for its entitlement to attorneys' fees.  Citibank states only that AHM SV, as Servicer or Master Servicer under the relevant Loan Servicing Agreements generally agreed to indemnify Citibank for (i) AHM SV's failure to perform under the Loan Servicing Agreements, (ii) Citibank's performance of its duties under the securitization-related documents, and (iii) certain SEC reporting requirements.  Citibank asserts further that AHM SV also agreed to pay Citibank for all fees and expenses, including the fees and expenses of counsel, relating to a transition of servicing.

---

[4]  The agreements are voluminous, and will be filed in an appendix and provided to the Court prior to the hearing on this Objection.

24.    Notably, Citibank acknowledges the Debtors' position (and this Court's ruling based on the "overwhelming" evidence adduced at the Sale Hearing) that there has been no default or other failure to perform under the Loan Servicing Agreements.  Accordingly, it is unclear how an obligation to indemnify Citibank for AHM SV's failure to perform its servicing duties, even if present in the Loan Servicing Agreements, would provide a basis for the payment of all of Citibank's attorneys' fees incurred through the Final Closing.

25.    The Debtors dispute that AHM SV agreed to reimburse Citibank for all fees and expenses relating to a transition of servicing.  On information and belief, the servicing transfer reimbursement provisions of the Loan Servicing Agreements relate to transfers of servicing following a default termination of the Master Servicer or Servicer and do not extend to situations where, as here, there is a Court-approved assumption and assignment of Loan Servicing Agreements pursuant to section 365 of the Bankruptcy Code.

26.    Absent a specific basis in the relevant Loan Servicing Agreements for payment of Citibank's attorneys' fees by the Debtors, Citibank's claim for such fees should be disallowed *in toto*.  See Crown Books, 269 B.R. at 15.

## II.    Default Administration Fees

27.    In its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim, Citibank asserts an entitlement to payment of $60,450 in "bank default administration fees and expenses" accruing through April 11, 2008.  Presumably, the default administration fees represent the hourly fees *charged by Citibank* to the respective securitization trusts for which it acts as Indenture Trustee, Trustee, Securities Administrator, Paying Agent, and/or Registrar pursuant to agreements other than the Loan Servicing Agreements at issue (i.e., for extraordinary time spent by Citibank's employees), as opposed to fees *incurred by Citibank* and reimburseable

under the indemnification and transfer cost provisions (if any) of the Loan Servicing

Agreements.

28.     The Debtors dispute that AHM SV agreed to pay Citibank's default

administration fees in the Loan Servicing Agreements assumed and assigned to the Purchaser.

Absent a specific basis in the relevant Loan Servicing Agreements for payment of Citibank's

default administration fees and expenses by the Debtors, Citibank's claim for such fees should be

disallowed *in toto*.

**III.     Claims Asserted as Both Transfer Cost Claims and Purchaser's Cure Amounts**

29.     On information and belief, amounts sought by Citibank in its Transfer

Cost Claim are duplicative of amounts sought by Citibank in its *Objection of Citibank, N.A. to*

*Proposed Purchaser's Cure Amount* [D.I. 5280] (the "Purchaser's Cure Amount Claim") filed

July 31, 2008.  Under the Sale Order, Sellers' Cure Amounts and Purchaser's Cure Amounts are

mutually exclusive, and only the former are payable from the Cure Escrow.  The Purchaser has

yet to respond to the Purchaser's Cure Amount Claim, rendering it difficult for the Debtors to

respond fully to the Transfer Cost Claim.  Accordingly, the Debtors hereby object to the Transfer

Cost Claim on the grounds that it is duplicative of the Purchaser's Cure Amount Claim, and

reserve all rights with respect to any objection or response filed by the Purchaser in connection

with the Purchaser's Cure Amount Claim.

**IV.     Contingent, Unliquidated Amounts**

30.     Citibank reserved the right to amend or supplement its Initial Cure Claim,

Interim Cure Claim, and Transfer Cost Claim "to the extent it becomes aware of additional

information concerning claims against the Servicer."  The Debtors hereby object to any

unidentified, contingent, and/or unliquidated claims preserved (or intended to be preserved) by

Citibank's reservation of rights on the basis that Citibank has not met its burden of establishing any right to payment of such claims (if any).

31.     The Debtors reserve the right to supplement or amend this Objection in response to any amendment or supplementation of the Initial Cure Claim, Interim Cure Claim, or Transfer Cost Claim whereby Citibank asserts additional claims, or additional bases for payment of existing claims, as Sellers' Cure Amounts.  Without limiting the generality of the foregoing, the Debtors, on behalf of themselves, the Committee, and BofA, reserve the right to object on any grounds whatsoever to any claims that may be asserted by Citibank which are duplicative of claims asserted in the Purchaser's Admin Claim, including, without limitation, on the grounds that such claims are time-barred by operation of the Sale Order and/or the Objection/Payment Deadline.

## V.     Citibank's Administrative Expense Request

32.     Citibank asserts its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim alternatively as an administrative expense pursuant to section 503(b) of the Bankruptcy Code.  Although the Debtors do not believe the Payment/Objection Deadline requires the Debtors to object to the administrative expense claim asserted by Citibank at this time (as general administrative expense claims are not payable from the Cure Escrow), to the extent an objection is required, the Debtors object on the basis that Citibank has not met its burden of establishing its entitlement to an administrative expense request.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order disallowing the Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim asserted by Citibank and granting the Debtors such other and further relief as is just and proper.

Dated:      Wilmington, Delaware
            March 25, 2009

                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        /s/ Patrick A. Jackson
                        _____
                        Sean M. Beach (No. 4070)
                        Patrick A. Jackson (No. 4976)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Counsel for Debtors and Debtors in Possession