IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------- x

In re:                                                       : Chapter 11
                                                             :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,    : Case No. 07-11047 (CSS)
a Delaware corporation, et al.,*                     :
                                                             : Jointly Administered
          Debtors.                                      :
                                                             : **Ref. Dkt. Nos. 1711, 2166, 2223, 2225,**
                                                             : **and 3973**
                                                             :
                                                             : **Hearing Date: May 8, 2009 at 11:30**
------------------------------------------------------------------- x  **a.m. (ET)**

**DEBTORS' OBJECTION TO CURE CLAIMS ASSERTED BY DEUTSCHE BANK
NATIONAL TRUST CO., IN CONNECTION WITH THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN LOAN SERVICING AGREEMENTS TO
AMERICAN HOME MORTGAGE SERVICING, INC. (F/K/A AH MORTGAGE
ACQUISITION CO., INC.)**

AHM Holdings and its affiliated debtors and debtors in possession in the above-

captioned cases (collectively, the "Debtors"), hereby object and respond, as applicable (the

"Objection") to (i) the *Initial Omnibus Cure Claim of Deutsche Bank National Trust Co. as Trust

Administrator and/or Indenture Trustee Against Cure Escrow* [D.I. 2223] (as supplemented, the

"Initial Cure Claim"), and (ii) the *Proof of Transfer Cost Claim of Deutsche Bank National Trust

Company, in Various Capacities* [D.I. 3973] (the "Transfer Cost Claim"); and in support thereof,

the Debtors respectfully represent as follows:

---

* The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

**BACKGROUND**

I.    **The Servicing Sale and Cure Escrow**

      1.      On August 6, 2007 (the "Petition Date"), the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") to authorize the sale of the assets used in their mortgage loan servicing business (the "Servicing Business"), including the assumption and assignment of certain executory contracts.

      2.      On August 27, 2007, the Debtors filed a notice of potential executory contracts to be assumed and assigned in connection with the sale of the Servicing Business [D.I. 403] (as subsequently modified and supplemented, the "Initial Cure Notice").  Among the contracts identified in the Initial Cure Notice were contracts relating to the servicing or subservicing of home equity lines of credit ("HELOCs") owned by certain securitization trusts (the "HELOC Servicing Agreements") and contracts relating to the servicing or subservicing of non-HELOC mortgage loans owned by certain securitization trusts (the "Loan Servicing Agreements").  In the Initial Cure Notice, the Debtors estimated a $0 cure amount for each of the HELOC Servicing Agreements and Loan Servicing Agreements.

      3.      On September 19 and 20, 2007, Deutsche Bank National Trust Co. filed joinders [D.I. 800 and 832, respectively] to certain objections to the Sale Motion and the Initial Cure Notice (such joinders, collectively, the "Sale Objection") disputing the Debtors' proposed cure amounts and reserving rights with respect to adequate assurance of future performance by the as-yet-unidentified assignee.

      4.      On September 25, 2007, the Debtors filed an executed Asset Purchase Agreement [D.I. 931] (as subsequently amended, the "APA") by and among AHM Investment, AHM Corp., and AHM SV (the "Sellers") and American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage Acquisition Co., Inc.) (the "Purchaser").  The APA contemplated a two-step

closing: <u>first</u>, an "economic" close, at which the Purchaser would tender the purchase price and after which the Debtors would continue to operate the Servicing Business in the ordinary course for the benefit and risk of the Purchaser, using working capital to be provided by the Purchaser (the "<u>Initial Closing</u>"); and <u>second</u>, a "legal" close, at which legal title to the assets of the Servicing Business would vest in the Purchaser and which would be the effective date of assumption and assignment of any executory contracts and unexpired leases (the "<u>Final Closing</u>").  The APA further contemplated that, as between the Sellers and the Purchaser: (i) the aggregate amount necessary under section 365 of the Bankruptcy Code (a) to cure any defaults under Assumed Contracts (as defined in the APA) arising prior to entry of the Sale Approval Order (as defined in the APA) (such amount, the "<u>Initial Cure Amount</u>") and (b) to cure any defaults under Assumed Contracts arising after entry of the Sale Approval Order but before the Initial Closing (such amount, the "<u>Interim Cure Amount</u>"), would be the responsibility of the Sellers; and (ii) the amount, if any, necessary under section 365 of the Bankruptcy Code to cure any defaults arising under the Assumed Contracts between the Initial Closing and the Final Closing (such amount, the "<u>Purchaser's Cure Amount</u>") would be the responsibility of the Purchaser.

   5.  The Court held a five-day evidentiary hearing (the "<u>Sale Hearing</u>") on October 15-19, 2007, to consider approval of the Sale Motion and the APA.  At the beginning of the Sale Hearing, counsel for the Debtors announced that HELOC Servicing Agreements would be excluded from the contracts to be assumed and assigned to the Purchaser,[1] thus mooting certain objections to the Sale Motion, the Initial Cure Notice, and the APA.  At the Sale Hearing

---

[1]  This change was memorialized in the First Amendment to the APA, which was approved as part of the Sale Order (as hereinafter defined).

the Debtors adduced evidence (i) in support of the $0 proposed cure amounts set forth in the

Initial Cure Notice, and (ii) of adequate assurance of future performance by the Purchaser.

6.     Prior to the conclusion of the Sale Hearing, the Debtors (in consultation

with the Official Committee of Unsecured Creditors (the "Committee"), Bank of America, N.A.,

as Administrative Agent ("BofA"), and the Purchaser) and Deutsche Bank resolved the Sale

Objection by agreement in principle upon certain language to be included in the proposed sale

order, including a stipulation that the Loan Servicing Agreements in which Deutsche Bank had

an interest were executory contracts assumed and assigned to the Purchaser pursuant to section

365 of the Bankruptcy Code.[2]

7.     On October 23, 2007, the Court issued a bench ruling approving the Sale

Motion and APA.  Among other things, the Court found that the Final Closing could only occur

when the Purchaser was duly licensed by applicable authorities to operate the Servicing Business

and that the Debtors had "clearly established" that the Purchaser had more than sufficient capital

to operate the Servicing Business and intended to maintain as much of the then-current

management as possible, which was "more than enough to establish adequate assurance of future

performance".  (10/23/07 Hr'g Tr., D.I. 1664 at 6:1-7:15.)  At a follow-up hearing to consider the

proposed form of order approving the sale, the Court ruled further that the evidence at the Sale

Hearing was "overwhelming" that there had been "no material change in the actual performance

of the [Servicing Business]" during the bankruptcy cases.  (10/25/07 Hr'g Tr. 86:1-5, 17-19.)

8.     The Court entered an order [D.I. 1711] (the "Sale Order") approving the

Sale Motion and the APA on October 30, 2007.  The Sale Order provided that the Loan

Servicing Agreements in which "Certain Objectors" (including, but not limited to, Deutsche

---

[2]  One of the legal issues in dispute at the Sale Hearing was whether the Loan Servicing Agreements were executory
contracts subject to section 365 of the Bankruptcy Code (which Deutsche Bank had asserted) or non-executory
contracts subject only to section 363 of the Bankruptcy Code (which the Debtors had asserted).

Bank) had an interest were executory contracts subject to assumption and assignment pursuant to section 365 of the Bankruptcy Code.  (Sale Ord. at 4.)  The Sale Order provided further that a reserve of $10 million (the "Cure Escrow") would be established for the payment of the "Sellers' Cure Amount," which includes (i) the Initial Cure Amount, (ii) the Interim Cure Amount, and (iii) any reasonable out-of-pocket costs and expenses (a) incurred by a counterparty to an Assumed Contract as a result of the assumption and assignment of such contract to the Purchaser *and* (b) chargeable under the Assumed Contract (such costs/expenses, "Transfer Costs").  (Id. ¶¶ 32-39.)  The Sale Order expressly reserved the rights of the Debtors, the Committee, and BofA to object to any Sellers' Cure Amount (id. ¶ 35) and, more particularly, to object to any claim for Transfer Costs "on any grounds whatsoever, including that such costs and expenses constitute an unenforceable restraint on assignment under applicable provisions of the Bankruptcy Code" (id. ¶ 39).

9.    The Initial Closing under the APA occurred on November 16, 2007, at or about which time the Cure Escrow was established and funded as required by the Sale Order. The Final Closing occurred on April 11, 2008.

10.    In accordance with the Sale Order, Deutsche timely filed its Initial Cure Claim and Transfer Cost Claim.

## II.    The Purchaser's Administrative Claim

11.    On May 23, 2008, the Purchaser filed a motion for allowance of an administrative expense claim for alleged breaches of the APA [D.I. 4233] (as amended, the "Purchaser's Administrative Claim").  In its motion, the Purchaser alleged that, during the period between the Initial Closing and the Final Closing when the Sellers were operating the Servicing Business for the Purchaser's risk and benefit, the Sellers used funds from accounts established

for the benefit of the Purchaser to remedy shortfalls in unidentified investors' custodial accounts that had resulted from pre-Initial Closing acts or omissions of the Sellers.  The Purchaser asserted this violated the APA because account shortfalls relating to pre-Initial Closing acts or omissions were "Retained Liabilities" of the Sellers which were not authorized to be paid out of the Purchaser's accounts.

12.    On August 18, 2008, the Purchaser amended its administrative expense request [D.I. 5495].  In its amended request, the Purchaser, among other things, (i) reasserted its claims for reimbursement of amounts allegedly paid by the Sellers from the Purchaser's accounts to remedy alleged pre-Initial Closing shortfalls in certain unidentified investors' custodial accounts (such claims, the "Misappropriation Claims") and (ii) asserted claims for reimbursement of amounts necessary to remedy alleged shortfalls in certain unidentified investors' custodial accounts resulting from alleged acts or omissions of the Sellers prior to the Initial Closing (such claims, the "Uncured Shortfall Claims").

13.    On September 10, 2008, the Debtors filed a preliminary objection to the Purchaser's Administrative Claim [D.I. 5798] in which they reserved the right to seek discovery on the Purchaser's factual allegations, but asserted, with respect to the Uncured Shortfall Claims of approximately $5.1 million, that

(a)    pursuant to the Sale Order, any claim against the Sellers arising under an Assumed Contract with respect to pre-Initial Closing acts or omissions of the Sellers (including, but not limited to, any claim of an investor resulting from a shortfall in its custodial account) had been satisfied in full by the establishment of the Cure Escrow;

(b)    by operation of the injunctive provisions in the Sale Order, any such claim could only be asserted against the Cure Escrow, and could not be asserted against the Debtors[3] or against the Purchaser;

---

[3] A limited exception under the Sale Order is that, if the actual claims ultimately allowed as Sellers' Cure Amounts exceed $10 million, then such claims will be paid *pro rata* from the Cure Escrow, and "the right of a Counterparty to an Assumed Contract to assert a general unsecured claim against the Debtors (but not against the Purchaser) with

(c)    the Purchaser did not have standing to assert claims against the Cure Escrow; and

(d)    the Uncured Shortfall Claims were duplicative of claims already asserted against the Cure Escrow or, to the extent not asserted, time-barred and unenforceable under the Sale Order.

With respect to the Misappropriation Claims of approximately $3.5 million asserted in the Purchaser's Admin Claim, the Debtors reserved their rights, *inter alia*, to bring avoidance actions to recover any amounts transferred to or for the benefit of investors to the extent such transfers violated the APA (and, by extension, the Sale Order).

14.    Discovery on the Purchaser's Admin Claim is currently underway.  On information and belief, the Misappropriation Claims and Uncured Shortfall Claims asserted in the Purchaser's Admin Claim may implicate one or more custodial accounts in which Deutsche Bank has an interest as Trust Administrator and/or Indenture Trustee of the respective securitization trust(s).

**III.    The Plan**

15.    On February 23, 2009, the Court entered its order [D.I. 7042] (the "Confirmation Order") confirming the Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009.  Paragraph 54 of the Confirmation Order establishes the date hereof as the deadline (the "Payment/Objection Deadline") by which the Debtors must either (a) cause the Sellers' Cure Amounts asserted by Deutsche Bank to be paid from the Cure Escrow or (b) file and serve a written objection to the Sellers' Cure Amounts asserted by Deutsche Bank, stating with specificity the amount subject to, and the legal and factual basis for, such objection.

---

respect to the difference between the pro rata Sellers' Cure Amount . . . and the allowed Sellers' Cure Amount with respect to such Assumed Contract is preserved".  (Sale Ord. ¶ 35.)

16.     The Debtors file this Objection in accordance with the Confirmation Order, and hereby object to the Initial Cure Claim and the Transfer Cost Claim *in toto* for the reasons set forth below.

**<u>OBJECTION</u>**

17.     Section 365 of the Bankruptcy Code generally requires a debtor, as a prerequisite to assumption and assignment of an executory contract, to cure any defaults under such contract and compensate the counterparty to such contract for any pecuniary losses resulting from such defaults.  11 U.S.C. § 365(b)(1)(A) & (B), (f)(2)(A).  The cure requirement is excused with respect to so-called "*ipso facto*" defaults, i.e., under contractual provisions relating to the debtor's financial condition, the commencement of a bankruptcy case, or the debtor's status as a debtor in possession.  11 U.S.C. § 365(b)(2)(A)-(C).  (<u>Accord</u> Sale Ord. ¶ 40 (providing that, for purposes of determining the Sellers' Cure Amount, "no effect shall be given to any default of the type set forth in section 365(b)(2) of the Bankruptcy Code").)  This is consistent with the general invalidation of contractual *ipso facto* provisions elsewhere in the Bankruptcy Code.  <u>See</u> 11 U.S.C. § 365(e)(1) (rights/obligations under an executory contract cannot be modified post-petition solely because of an *ipso facto* provision in the contract), 363(l) (debtor may use, sell, or lease property of the estate notwithstanding any contractual provision that effects or gives an option to effect a modification of the debtor's interest in such property based on an *ipso facto* condition); 541(c)(1) (property of the debtor becomes property of the estate notwithstanding any contractual provision that effects or gives an option to effect a modification of the debtor's property interest).

18.     Unlike proofs of claim filed pursuant to section 501 of the Bankruptcy Code, cure claims asserted pursuant to section 365(b)(1) of the Bankruptcy Code are accorded no

initial presumption of validity.  In re Joshua Slocum, Ltd., 103 B.R. 601, 605-06 (Bankr. E.D. Pa. 1989).  Thus, like a plaintiff in a lawsuit, the party asserting a cure claim pursuant to section 365(b)(1) must prove every element of its entitlement to a cure claim by a preponderance of the evidence.  Id.  Holding cure claimants to the same burden of production and persuasion as an ordinary civil plaintiff is appropriate in light of the fact that cure claims are afforded *de facto* administrative expense priority.  Cf. Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.), 350 B.R. 166, 178-79 (Bankr. D. Del. 2006) (noting that cure claims are *de facto* priority claims because they are paid dollar-for-dollar from assets that would otherwise be available to the bankruptcy estate for distribution to creditors); In re Bernard Techs., Inc., 342 B.R. 174, 177 (Bankr. D. Del. 2006) (holding that an applicant seeking reimbursement of expenses as an administrative priority claim "must prove his entitlement to the requested . . . expense reimbursement by a preponderance of the evidence").

## I.    Attorneys' Fees

19.    In its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim, Deutsche Bank asserts an entitlement to reimbursement of attorneys' fees accrued through the Final Closing.

20.    Attorneys' fees are recoverable as part of a cure claim only if the contract specifically requires their payment.  In re Crown Books Corp., 269 B.R. 12, 15 (Bankr. D. Del. 2001).  (Accord Sale Ord. ¶ 39 (limiting "Transfer Costs" to those costs/expenses that are "chargeable under the Assumed Contracts").)  In addition, the attorneys' fees must be reasonable.  Crown Books, 269 B.R. at 18.  (Accord Sale Ord. ¶ 39 (limiting "Transfer Costs" to "reasonable" costs/expenses).)

21.     Deutsche Bank has not provided the Debtors time detail for the attorneys' fees from which the Debtors can make a determination as to whether such fees are reasonable. The Debtors reserve all rights with respect to the reasonableness of the attorneys' fees, but irrespective of their reasonableness, the Debtors dispute (i) whether there is a contractual basis for payment of the requested attorneys' fees in the relevant Loan Servicing Agreements, and (ii) even assuming a contractual basis for reimbursement, whether the attorneys' fees sought in the Initial Cure Claim relate solely to the Loan Servicing Agreements assumed and assigned to the Purchaser, as opposed to HELOC Servicing Agreements that were not assumed or assigned.

**A.     Contractual Basis for Payment**

22.     Whether a contract requires payment of attorneys' fees is a question of applicable state law, subject to any qualifying or contrary provisions of the Bankruptcy Code. Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co., 549 U.S. 443, 1204 (2007). On information and belief, the Loan Servicing Agreements in which Deutsche Bank has an interest[4] are governed by New York law.  Under New York law, contractual indemnity provisions are strictly construed to avoid reading into them duties which the parties did not intend to be assumed.  In re Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989) ("Inasmuch as a promise by one party to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorneys' fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is *unmistakably clear* from the language of the promise." (emphasis added).)

---

[4]  The agreements are voluminous, and will be filed in an appendix and provided to the Court prior to the hearing on this Objection.

23.     Deutsche Bank cites only to section 5.06 of the 2005-3 Servicing

Agreement as support for its entitlement to attorneys' fees.  That section provides as follows:

> The RMBS Master Servicer agrees to indemnify [Deutsche Bank] for, and to hold [Deutsche Bank] harmless against, any claim, tax, penalty, loss, liability or expense of any kind whatsoever, incurred without negligence . . . or willful misconduct on its part, *arising out of, or in connection with, the failure by the RMBS Master Servicer to perform its duties in compliance with this Servicing Agreement*, including the costs and expenses (including reasonable legal fees and expenses) of defending against any claim in connection with the exercise or performance of any of its powers or duties under any Basic Document, provided that:
>
> > (i) with respect to any such claim, [Deutsche Bank] shall have given the RMBS Master Servicer written notice thereof promptly after [Deutsche Bank] shall have actual knowledge thereof, it being understood that failure to give such notice shall not relieve the RMBS Master Servicer of its indemnification obligations hereunder;
> >
> > (ii) while maintaining control over its own defense, [Deutsche Bank] shall cooperate and consult fully with the RMBS Master Servicer in preparing such defense; and
> >
> > (iii) notwithstanding anything in this Servicing Agreement to the contrary, the RMBS Master Servicer shall not be liable for settlement of any claim by [Deutsche Bank] entered into without the prior consent of the RMBS Master Servicer, which consent shall not be unreasonably withheld.

(2004-4 Serv. Agr. § 5.06 (emphasis added).)  As a threshold matter, this language is essentially

identical to the language at issue in Hooper Associates, which the New York Court of Appeals

held to encompass only attorneys' fees incurred defending third-party claims, and not attorneys'

fees incurred in litigation between the parties relating to the contract.  548 N.E.2d at 492-93.

More importantly, however, a condition precedent to application of this provision is a "failure by

the RMBS Master Servicer to perform its duties in compliance with this Servicing Agreement".

Deutsche Bank does not allege that there was any such failure, and as the Court itself noted, the

evidence at the Sale Hearing was "overwhelming" that there had been no material change in the

Servicing Business's actual performance of its servicing functions during these bankruptcy cases.

Accordingly, section 5.06 of the 2005-3 Servicing Agreement does not provide a basis for

Deutsche Bank to recover attorneys' fees as part of its cure claim.

24.    Absent a specific basis in the relevant Loan Servicing Agreements for

payment of Deutsche Bank's attorneys' fees by the Debtors, Deutsche Bank's claim for such fees

should be disallowed *in toto*.  See Crown Books, 269 B.R. at 15.

**B.    Attorneys' Fees Related to HELOC Servicing Agreements**

25.    Even if there were a contractual basis for recovering attorneys' fees under

one or more of the provisions of the relevant Loan Servicing Agreements, there would be no

basis for recovering attorneys' fees relating to the HELOC Servicing Agreements that were not

assumed and assigned to the Purchaser.  See Shaw Group, 350 B.R. at 177 ("[I]n order to assume

a particular executory contract . . . the debtor is only required to perform under that discrete

contract . . . , not under other, substantially unrelated agreements." (internal quotations, citation

omitted).).  In the absence of any time detail provided by Deutsche Bank, it is impossible for the

Debtors to determine whether Deutsche Bank has made any attempt to (i) exclude those fees

specifically related to the HELOC Servicing Agreements and (ii) with respect to fees related to

general services provided to Deutsche Bank in connection with the Debtors' bankruptcy cases,

allocating some portion of those fees to the HELOC Servicing Agreements.

26.    Given that it is Deutsche Bank's burden to prove its entitlement to the

attorneys' fees requested as a cure claim, and given that Deutsche Bank is in the best position to

determine the relative time spent by its attorneys on the various tasks they performed, the

Debtors respectfully submit that it is Deutsche Bank's responsibility to propose some basis for

allocating its attorneys' fees between the Loan Servicing Agreements and the HELOC Servicing

Agreements.  However, in light of the Debtors' global objection to the allowance of attorneys'

fees as part of Deutsche Bank's cure claim, and in the interest of avoiding unnecessary costs to

Deutsche Bank, the Debtors would be amenable to adjourning their Objection on this particular

point until such time as the Court rules on the global objection.

## II.    Default Administration Fees

27.    In its Initial Cure Claim, Deutsche Bank asserts an entitlement to payment

of "default administration fees" accrued between August 2007 and October 2007 through the

Final Closing.  Presumably, the default administration fees represent the hourly fees *charged by*

*Deutsche Bank* to the respective securitization trusts for which it acts as Trust Administrator

and/or Indenture Trustee pursuant to agreements other than the Loan Servicing Agreements at

issue, as opposed to fees *incurred by Deutsche Bank* and reimburseable under the

indemnification provisions (if any) of the Loan Servicing Agreements.

28.    Absent a specific basis in the relevant Loan Servicing Agreements for

payment of Deutsche Bank's default administration fees and expenses by the Debtors, Deutsche

Bank's claim for such fees should be disallowed *in toto*.

29.    To the extent the provisions of the relevant Loan Servicing Agreements

could be construed to provide a basis for payment of Deutsche Bank's default administration

fees, the Debtors incorporate by reference their arguments set forth in I.B. above, namely, that it

is unclear whether Deutsche Bank has accounted for time relating to HELOC Servicing

Agreements that were not assumed and assigned to the Purchaser, although it has the burden of

doing so.  As above, in light of the Debtors' global objections to the allowance of default

administration fees as part of Deutsche Bank's cure claim, and in the interest of avoiding

unnecessary costs to Deutsche Bank, the Debtors would be amenable to adjourning their

Objection on the latter particular point until such time as the Court rules on the more global objection.

### III.    Reimbursement of FGIC Relating to HELOC Servicing Agreements

30.    In its Initial Cure Claim, Deutsche Bank asserts a right of reimbursement of certain amounts invoiced to Deutsche Bank by Financial Guaranty Insurance Corp. ("FGIC") on account of attorneys' fees incurred by FGIC in connection with certain HELOC Servicing Agreements.  Even if there were a contractual basis under the HELOC Servicing Agreements to require the Debtors to reimburse Deutsche Bank for the FGIC invoice (which the Debtors do not concede), the HELOC Servicing Agreements were not assumed and assigned to the Purchaser and thus, amounts due under those agreements may not be asserted as cure claims with respect to the Loan Servicing Agreements.

### III.    Contingent, Unliquidated Amounts

31.    Deutsche Bank reserved the right to amend or supplement its Initial Cure Claim and Transfer Cost Claim to specify and quantify other charges or claims.  The Debtors hereby object to any unidentified, contingent, and/or unliquidated claims preserved (or intended to be preserved) by Deutsche Bank's reservation of rights on the basis that Deutsche Bank has not met its burden of establishing any right to payment of such claims (if any).

32.    The Debtors reserve the right to supplement or amend this Objection in response to any amendment or supplementation of the Initial Cure Claim or the Transfer Cost Claim whereby Deutsche Bank asserts additional claims, or additional bases for payment of existing claims, as Sellers' Cure Amounts.  Without limiting the generality of the foregoing, the Debtors, on behalf of themselves, the Committee, and BofA, reserve the right to object on any grounds whatsoever to any claims that may be asserted by Deutsche Bank which are duplicative

of claims asserted in the Purchaser's Admin Claim, including, without limitation, on the grounds

that such claims are time-barred by operation of the Sale Order and/or the Objection/Payment

Deadline.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order

disallowing the Initial Cure Claim and Transfer Cost Claim asserted by Deutsche Bank and

granting the Debtors such other and further relief as is just and proper.


Dated:      Wilmington, Delaware
            March 25, 2009

                                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                        /s/ Patrick A. Jackson
                                    _____
                                        Sean M. Beach (No. 4070)
                                        Patrick A. Jackson (No. 4976)
                                        The Brandywine Building
                                        1000 West Street, 17th Floor
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571-6600
                                        Facsimile: (302) 571-1253

                                        Counsel for Debtors and Debtors in Possession