1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 07-11047

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


AMERICAN HOME MORTGAGE HOLDINGS, INC., ET AL.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                824 Market Street

                Wilmington, Delaware


                March 13, 2009

                11:35 AM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  AL LUGANO

2

1

2    Hearing re: Order Authorizing the Employment and Retention of

3    Margot Saunders as Testifying Expert for the Official Committee

4    of Borrowers Nunc Pro Tunc

5

6    Hearing re:  Debtors' Motion for Protective Order

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Hana Copperman

25

3

1

2    A P P E A R A N C E S :

3    MARGARET WHITEMAN GREECHER, ESQ.

4    CURTIS CROWDER, ESQ.

5    YOUNG CONAWAY STARGATT & TAYLOR, LLP

6    REPRESENTING:  Debtors

7

8    THOMAS G. MACAULEY

9    ZUCKERMAN SPAEDER LLP

10   REPRESENTING:  Borrowers' Committee

11

12   GABRIEL R. MACCONAILL, ESQ.

13   POTTER ANDERSON & CORROON LLP

14   REPRESENTING:  Bank of America

15

16   ANA M. ALFONSO, ESQ. (BY TELEPHONE)

17   KAYE SCHOLER LLP

18   REPRESENTING:  Bank of America

19

20   JASON W. HARBOUR

21   HUNTON & WILLIAMS LLP

22   REPRESENTING:  Calyon New York Branch

23

24

25

4

1

2   MICHAEL BUSENKELL, ESQ.

3   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

4   REPRESENTING:  Calyon New York Branch

5

6   ELIZABETH SLOAN, ESQ.

7   BLANK ROME LLP

8   REPRESENTING:  Creditors' Committee

9

10   EDWARD L. SCHNITZER, ESQ.

11   HAHN & HESSEN LLP

12   REPRESENTING:  Official Committee of Unsecured Creditors

13

14   ROBERT J. MOORE, ESQ.

15   FRED NEUFELD, ESQ.

16   MILBANK, TWEED, HADLEY & MCCLOY LLP

17   REPRESENTING:  ABN AMRO Bank

18

19

20

21

22

23

24

25

5

P R O C E E D I N G S

1
2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.

4          MS. GREECHER:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MS. GREECHER:  Margaret Whiteman Greecher on behalf

7     of the debtors.  We actually have a fairly light agenda today,

8     which is in contrast to the long hearings we've been having in

9     this case.  Matters 1 through 27 have been adjourned or

10    resolved, and unless you have any questions we'd go straight to

11    matter 27, which is --

12         THE COURT:  I don't know.  Did I sign?  I think I

13    signed the order on 27.

14         MS. GREECHER:  It was not entered on the docket when

15    I left, but if you have no questions with that and you believe

16    you signed the order we can move on.

17         THE COURT:  I did.  I've been on the bench a lot,

18    so -- but, no, I signed that.

19         MS. GREECHER:  Okay.  Your Honor, I left a voice mail

20    with your chambers yesterday.

21         THE COURT:  I got it.

22         MS. GREECHER:  But 28 and 29 have been adjourned upon

23    agreement of the parties, which leaves us with matters number

24    30 and 31.  Matter number 30 I can defer to the borrowers'

25    committee.

1          THE COURT:  Very good.

2          MS. GREECHER:  It's the application of Margot

3     Saunders and Tom McCauley is here.

4          THE COURT:  Mr. McCauley, good morning.

5          MR. MCCAULEY:  Good morning, Your Honor.  For the

6     record, Thomas McCauley on behalf of the borrowers' committee.

7     Your Honor, in connection with the confirmation hearing we

8     filed an application to retain an expert, as the Court had

9     requested.  This is the application.  We had received informal

10    comments from the committee and from the debtors.  Basically,

11    all we did was just added a parenthetical in the order just to

12    reference the previous cap that the Court had put on Ms.

13    Saunders' fees.  I have a copy of the revised order.  May I

14    approach?

15         THE COURT:  Yes, you may.  Does anyone wish to be

16    heard?  All right.  Let me just look at it real quick.  All

17    right.  I'll sign it as revised.

18         MR. MCCAULEY:  Thank you, Your Honor.

19         THE COURT:  I expect you don't care about this next

20    matter, so if not you may be excused.

21         MR. MCCAULEY:  Thank you.

22         MS. GREECHER:  Your Honor, the next matter is matter

23    number 31, which is the motion for protective order by the

24    debtors.  Curtis Crowder will be handling that matter.

25         THE COURT:  Thank you.  Good morning, Mr. Crowder.  I

1    have read the papers and the response.

2           MR. CROWDER:   Thank you, Your Honor.   For the record,

3    Curtis Crowder on behalf of the debtors.   Your Honor, to put

4    this matter into a little bit of context, Your Honor signed a

5    stipulated scheduling order with respect to this contested

6    matter involving a claim objection.   That stipulated scheduling

7    order required a number of things.   One, it required the

8    parties to exchange 30(b)(6) topics at a certain time and to

9    schedule those depositions at a certain time.   It also required

10   the parties to designate expert witnesses and to provide expert

11   reports within a certain period of time.   At the time the

12   depositions were taking place all of that had occurred.

13          The debtors designated five people in response to the

14   thirty-nine topics in the 30(b)(6) notice of topics issued by

15   Calyon in this matter.   Ten of those topics involve both

16   Mr. Sakamoto as well as Mr. Voulo, who the motion for

17   protective order is a directive relating to.   Mr. Sakamoto's

18   deposition, or his aspect of the single 30(b)(6) deposition,

19   was the second one to take place on the same day that

20   Mr. Voulo's was scheduled for later in the afternoon.   All of

21   the topics that both Mr. Sakamoto and Mr. Voulo were designated

22   for concerned the debtors' valuation of the portfolio of

23   Calyon.

24          Mr. Sakamoto testified without waiver, without

25   question, that the debtor did not conduct any valuations of the

8

1    Calyon portfolio after September 11th of 2007.  Calyon asked

2    those questions and got those responses.  Mr. Sakamoto also

3    testified that he was the one who did the valuations.  He also

4    testified that Mr. Voulo provided him, at his request, certain

5    comps with respect to some part -- actually, it was one part --

6    of the Calyon portfolio.  Mr. Voulo was in the secondary

7    market, which Your Honor may know is the securitization aspects

8    of mortgages.  So Mr. Sakamoto testified that he asked

9    Mr. Voulo for comps with respect to securitizations in order to

10   adjust his valuations.

11        All of that was already on the record, done and over

12   at the time Mr. Voulo's deposition commenced.  I say

13   Mr. Voulo's deposition.  Really, it's not Mr. Voulo's

14   deposition, it's a single 30(b)(6) of the debtor.  This is not

15   a separate 30(b)(1) deposition of Mr. Voulo.  It concerns only

16   the topics for which he was designated.

17        Calyon proceeded down a path that Mr. Voulo himself

18   said he doesn't know about, doesn't understand, wasn't

19   involved, and Calyon continued down that path, over the

20   objection that it was not something he was designated for and

21   it was not, you know, essentially it was just harassing and

22   wasting everyone's time.  After all, all that information is

23   already on the record from Mr. Sakamoto's deposition, just

24   earlier in that day.

25        If you continue to ask the same questions it's simply

1   cumulative, harassing, oppressive, and, basically, a colossal

2   waste of everyone's time to be sitting there on matters that

3   have already been asked, answered, or that Mr. Voulo has no

4   knowledge of or has not been designated with respect to.

5          The explanation given by Calyon is it goes to

6   valuation.  Well, the time period they were looking at was

7   January of '08, a time period they already know that AHM did

8   not do any valuations of the Calyon portfolio.  Moreover, there

9   is no one from the company that's designated as an expert

10  witness to testify as to the value of the Calyon portfolio at

11  any time, and the debtors were not relying upon any valuations

12  that were done by the company.

13         Calyon, as it sat there, knew that.  It knew that

14  there was a separate expert witness that was going to testify

15  as to all the data points with respect to valuation on all of

16  the relevant days.  The reason Mr. Sakamoto and Mr. Voulo were

17  designated was because they specifically asked about the

18  company's valuations, and those are what they testified to.

19  But they already knew Mr. Voulo did not do them.  They already

20  knew Mr. Voulo had a very discrete, small part in that, and it

21  was all at Mr. Sakamoto's request, and that Mr. Sakamoto

22  testified about already.  That is all that Mr. Voulo was there

23  for, and that was made clear.

24         To continue down a path about servicing information,

25  proceeds, that is not what Mr. Sakamoto is there for.  He is

10

1    there for a very limited wall, was a 30(b)(6) witness.  To

2    expand that out to just any topic that he may have knowledge

3    of, or that he even doesn't have knowledge of to ask his

4    opinion or his viewpoint of it, is not proper for a 30(b)(6)

5    and not proper when the witness himself says he doesn't know

6    what that means or what it's for or what the format is.  And

7    it's not proper when he's not designated for that topic or that

8    that topic is not even part of the 30(b)(6) list.

9            We would ask then, Your Honor, to grant the motion

10    for protective order to end that deposition, meaning the

11    30(b)(6) deposition, specifically the last part of it with

12    Mr. Voulo.  Everything is already on the record.  It's already

13    done, and just to keep rehashing it is just a real huge

14    annoyance, harassment and a waste of time.

15            Ultimately, Calyon had its opportunity to take

16    Mr. Voulo's deposition.  They were warned that if they

17    continued down a path that was not within scope that a motion

18    for protective order would be sought.  We quoted the line from

19    Mr. Ackerly, who was not even taking the deposition, that,

20    essentially, we can sit there, let them ask the questions and

21    just object.

22            Well, Your Honor, that's what a motion for protective

23    order is, to stop having to do that.  We pointed to the fact we

24    had to do that for over twenty pages in Mr. Sakamoto's

25    deposition, because they were asking hypotheticals that he was

1    not even designated for beyond the scope.  It was just never

2    ending.  That was a colossal waste of time.  We gave them that

3    opportunity once with the person who did the valuations.  We

4    gave them that latitude.  But to do it again, it's not only

5    cumulative, it's not only harassing, it's not only annoying,

6    but it is a waste of time.

7           THE COURT:  Mr. Harbour, good morning.

8           MR. HARBOUR:  Good morning, Your Honor.  May it

9    please the Court, for the record, Jason Harbour of Hunton &

10   Williams on behalf of Calyon New York Branch, the

11   administrative agent for the repurchase agreement in question.

12   Your Honor, it seems like the place to start here is the legal

13   standard and the burden of proof.  As Your Honor is well aware,

14   the legal standard here is that the movant, the debtors, have

15   to prove that cause exists to grant the protective order.

16   Specifically, they have to prove that the questions at issue

17   are not reasonably calculated to lead to the discovery of

18   admissible evidence.  And we submit that they certainly are.

19           To understand whether they are reasonably calculated,

20   though, we need to talk a little bit about the contested matter

21   at hand.  The contested matter at hand deals with Calyon's four

22   repurchase agreement deficiency claims.  Your Honor will

23   certainly remember that in November of 2007 we conducted a

24   trial here on whether or not the repurchase agreement was a

25   repurchase agreement.  In January Your Honor issued an opinion,

12

1    an opinion stating that it was, in fact, a repurchase

2    agreement.  Subsequently, after that, in the spring and in the

3    summer of 2008 there was a trial scheduled for what we had

4    referred to as the phase 2 litigation.  That litigation was to

5    address whether the pre-petition acts had affected the

6    ownership of the servicing and who owned the servicing as a

7    result of those pre-petition acts, because that hadn't been

8    addressed in the phase 1 trial in the prior November.  The

9    parties were able to reach a settlement on that, and in early

10   August, 2008 Your Honor entered an order approving that.

11          So that brings us to today, where the dispute

12   remaining between the parties is whether and how much Calyon's

13   deficiency claims under the repurchase agreement are.  Now,

14   Your Honor is probably also well aware that that's going to be

15   determined based on new Bankruptcy Code Section 562, or new as

16   of BAPCPA, anyway.  And that provides that the valuation of the

17   mortgage loans is to occur on the first date on which there's a

18   commercially reasonable determinate of value.  Specifically, I

19   think, the statute provides that it's supposed to be the

20   acceleration date of the loans with the termination date, and

21   the acceleration date here would be August 1, 2007 unless

22   there's no commercially reasonable determinate of value for the

23   assets in question on that date, in which case the value will

24   be determined on the first date there is a commercially

25   reasonable determinate of value, and the issue will be on that

13

1   date what was the value of the loans, what was owed, and you

2   subtract and then we get the value of Calyon's claims.  So

3   that's what we're going to be dealing with in May.  I think we

4   just got the hearing date earlier this week for May 19th and

5   20th and that's what we'll address there.

6          And the debtors and Calyon, I think, have worked very

7   well together to narrow some of those issues for Your Honor,

8   and we plan to have a stipulation of facts as well so that when

9   we present everything there are some limited issues to decide.

10  The issues that we can't agree on yet though, Your Honor, are

11  when did commercially reasonable determinates of value first

12  arise.  We've narrowed them down to four dates.  The dates will

13  be August 1, 2007, September 30, 2007, January 30, 2008 or

14  August 15, 2008, for reasons that we can talk about some other

15  day.  But those will be the dates, and those are the values

16  that are really at issue here.

17         As a result of that, four of the topics we identified

18  to the debtors were topics 8 through 11 in the topics and their

19  responses to them, and the topics were the facts and

20  circumstances concerning the value of the mortgage loans on or

21  about each of the relevant dates.  And that's identified in the

22  response in footnote 2 on page 3.  So, contrary to the

23  assertion of counsel to the debtors, we weren't looking simply

24  for the valuation conducted by the debtors.  The topics we

25  wanted information about were the value of the mortgage loans.

14

1    Regardless of whether or not the debtors ever performed a

2    valuation we want to know the facts and circumstances about the

3    value of the mortgage loans.

4          So that leads us to the depositions.  The first

5    30(b)(6) deposition took place on February 24th.  It lasted a

6    little under two hours.  That was of Bret Fernandes.  He was

7    not designated for value.  The second deposition, which

8    Mr. Crowder spoke about, was Mr. Sakamoto's deposition.  That

9    deposition lasted just under two and a half hours, so I would

10   take a little bit of umbrage with the fact that any part of it

11   was never ending if it was only less than two and a half hours.

12   And also note that although there were many objections to

13   things being outside the scope there were not objections with

14   the direction that the witness not answer.  The witness did

15   answer those questions.  We moved through it, and we got it

16   done quickly.

17         Which moves us on to Mr. Voulo's deposition and the

18   reason we're here today.  Now, Mr. Voulo himself testified at

19   the beginning of the deposition that he had provided the

20   information to Mr. Sakamoto, and I think he testified that it

21   was loan data documents, loan data Excel spreadsheets of loan

22   data for Mr. Sakamoto's valuation.  We also had in our

23   possession an e-mail from February, 2008, which discussed a

24   mortgage loan tape of the Calyon repurchase agreement mortgage

25   loans as of December 31, 2007, and the questions about that

15

1   mortgage loan tape are identified in the response.  They're in

2   paragraphs 18 and 20, and after those questions everything

3   ended.

4          Simply put, though, what Mr. Voulo testified about

5   was that okay, here was a request for a MIAC tape.  Now, MIAC,

6   so Your Honor knows, is Mortgage Industry Advisory Corporation.

7   It's a company which, among other things, performs valuations

8   for mortgage loans.  I don't know if Mr. Voulo knows that, but

9   he did say what they were looking for when they referred to

10  MIAC was just a format.  He also testified that he provided the

11  information for the tape that was provided to Calyon.  In fact,

12  he testified that he provided the loan number, the balances,

13  and all the key information that is pulled out of our system

14  for that loan tape.  So, based on that, and the fact that he

15  had pulled together the information regarding the mortgage

16  loans, we asked him, or I asked him, rather, well, what was the

17  information?  And he proceeded to very knowledgeably answer

18  what that key information was.  And then it stopped.  And it

19  was unclear to us why exactly it stopped.

20         It's our position, Your Honor, that the questions

21  were reasonably calculated to lead to the discovery of

22  admissible evidence.  First, information, underlying

23  information about mortgage loans, certainly can be relevant to

24  their value.  The dated issue of the tape in question was

25  December 31, 2007.  That's the tape in question that will

16

1    probably be used by anyone that talks about the --

2         THE COURT:  I'm sorry.  Is the issue the value?  The

3    issue is the value of the mortgages in the second market, what

4    you can sell them for?

5         MR. HARBOUR:  That's absolutely our position, Your

6    Honor.  That is --

7         THE COURT:  Okay.

8         MR. HARBOUR:  I don't believe it's the position being

9    taken by the debtors, but, in fairness --

10        THE COURT:  Okay.  Just so I know your position.

11   Okay.  Go ahead.

12        MR. HARBOUR:  That's absolutely our position, Your

13   Honor.  So the underlying information is certainly relevant to

14   what that value may be.  In addition, Your Honor, whether

15   Calyon had that information and when Calyon had that

16   information is relevant to whether Calyon could sell them at

17   all and relevant to what Calyon would receive in such a sale,

18   so it's also relevant to value for that reason.

19        And the third issue is the question that actually led

20   to the objection.  The exchange that ended everything dealt

21   with servicing data.  And Mr. Voulo had testified that the

22   information would have contained some servicing data so I asked

23   him about servicing data.  Would that include proceeds?

24   Proceeds, in particular, Your Honor, seem to be exceptionally

25   relevant to the value of mortgage loans in a secondary market.

17

1     If borrowers aren't paying, or if they are paying, or to what

2     extent they're paying, it all seems extremely relevant.

3             THE COURT:  Okay.

4             MR. HARBOUR:  As is Calyon's knowledge.  The debtors'

5     suggestions, Your Honor, that these questions aren't

6     appropriate, simply don't meet the debtors' burden of proof

7     here.  It's their burden.  They've got to prove it.  They

8     haven't met it.  The suggestion that it's not a 30(b)(6),

9     that's it not a 30(b)(6) topic, I think I've just explained

10    that they all relate to value.  The suggestion that it's a

11    waste of time, the deposition wasn't fifteen minutes old so I

12    don't think that could be a waste of time and certainly not

13    when the questions are reasonably calculated to lead to the

14    discovery of admissible evidence.

15            THE COURT:  I'm sorry.  What date did the deposition

16    occur?

17            MR. HARBOUR:  February 25th.

18            THE COURT:  That's a Friday, Thursday, something like

19    that?  Does anybody -- my calendar --

20            MR. HARBOUR:  Middle of the week.  Thursday, maybe.

21    Or Wednesday.

22            UNIDENTIFIED SPEAKER:  I believe it was a Thursday,

23    Your Honor.

24            THE COURT:  Okay.  I'm sorry.  My calendar is broken,

25    so --

1      MR. HARBOUR:  That's okay.  The one in my head's not

2  all that accurate right now, either.

3      THE COURT:  That's fine.

4      MR. HARBOUR:  The suggestions both in the papers and

5  here today that the questions are outside the topic because the

6  debtors have performed a valuation don't seem to hold water,

7  because, as I mentioned at the beginning, the issue isn't

8  whether Mr. Voulo knew about the debtors' valuation.  The issue

9  is whether Mr. Voulo's information and the topic for which he

10  was designated is the value of the mortgage loans and whether

11  this information related to the value of the mortgage loans.

12  And clearly our position is that it has to.  Also the

13  suggestion that somehow this is a servicing related question

14  doesn't seem to hold water either, because it related to value.

15  Just because the word servicing was used doesn't mean that it

16  didn't relate to value.

17      The debtors indicated that they would be having an

18  expert and that is true.  We will have an expert as well.  We

19  will depose them.  But that doesn't change the fact that we're

20  entitled to ask the debtors questions about value, the value of

21  the mortgage loans.

22      In sum, Your Honor, and just to conclude, it's the

23  debtors' burden of proof that the questions were not reasonably

24  calculated to lead to the discovery of admissible evidence and

25  they haven't met that burden.  We respectfully request that you

1   order the debtors to produce Mr. Voulo, at a mutually agreeable

2   time, so we can complete the deposition, including answering

3   the questions at issue today.

4           THE COURT:  Okay.

5           MR. HARBOUR:  Thank you.

6           THE COURT:  All right.  Mr. Crowder, any reply?

7           MR. CROWDER:  The data that Mr. Voulo provided, the

8   spreadsheets that he referenced, they have.  They didn't ask

9   him about them.  They had everything.  They didn't ask him

10  about them.  They started asking about what the borrowers paid.

11  That's servicing data.  That's not what Mr. Voulo testified he

12  did.  In fact, they started asking him again about the MIAC

13  tape, something he had already told them he didn't know what

14  exactly the format or what they wanted was.  He knew what he

15  provided.  But they already had that.  And he also told them he

16  had the unpaid principal balance of each mortgage.  There's

17  nothing real complicated about that, Your Honor.

18          Did they ask him that?  No.  Did they show him a

19  spreadsheet and say is this what you gave him?  No.  They

20  started asking about servicing data and whether or not the

21  payments were made by the borrowers and whether or not payments

22  were made to Calyon.  Stuff that he was not involved in at all.

23  Stuff that he's not designated for.

24          To kind of slice this down the middle and say well,

25  anything we ask may relate to valuation, yes, but, I guess,

1    what time of day it is could relate to valuation, at least in

2    some way, shape or form.  But the fact here is that there is

3    nothing that's in dispute about the company's valuation in a

4    time period they were focusing on.  Absolutely nothing.  And

5    they knew that.  They knew it specifically just a couple of

6    hours earlier on multiple questions and answers.  They knew

7    specifically everything Mr. Voulo did.  Not only did they have

8    the documents, but he then testified what he gave.  They

9    actually reviewed the document that he gave to Mr. Sakamoto as

10   Exhibit 2 in the Sakamoto deposition.

11          We did object to the scope of the topics as well,

12   because they were just so broad in general.  But this goes

13   beyond the valuation.  And, again, this is not an expert

14   witness testifying as to what the value is, how to calculate

15   the value, what is used for the value.  This was a guy who did

16   securitization transactions that provided comps for

17   Mr. Sakamoto to do valuations.  Comps that Mr. Sakamoto did not

18   select.  Comps that Mr. Sakamoto could not testify as to how

19   they were obtained, where they were obtained, and how he got

20   them.

21          That is where we were.  And, again, this is not a

22   30(b)(1) deposition of Mr. Voulo's personal knowledge.  And you

23   can't keep asking the same questions of different 30(b)(6)

24   witnesses.  That sort of is antithetical to the whole approach

25   of a 30(b)(6).  If the approach of a 30(b)(6) is supposed to

21

1   bind the debtors to a position, if you ask Mr. Sakamoto about

2   it, and the debtor is then bound by his answer, why are you

3   asking a different witness the same questions, potentially

4   getting a different answer. Well --

5           THE COURT:  For credibility, Mr. Crowder.

6           MR. CROWDER:  If the answer is bad then we're already

7   locked in.  And that was already done.  But Mr. Sakamoto is the

8   one who had the direct involvement.  It's not like there was a

9   great mystery here.  It's not as if people were hiding the

10  ball.  It was very straightforward.  Very preplanned with

11  respect to what was out there and why.  We'd already exchanged

12  documents.  This was just the next step in the process.  To

13  spend the entire deposition asking hypotheticals and

14  speculative questions, and then going way off scope to see what

15  this person may know about that has nothing to do with what

16  they've been designated for, is wasteful.  And when we're

17  actually threatened that they're going to continue to ask those

18  questions over the objection.  We can just sit there and

19  object.  That just screams we're about to waste your time, and

20  we don't know how long it's going to be.

21          THE COURT:  Okay.  Thank you.  I have to say that I

22  believe the debtors' position is completely and utterly without

23  merit.  It boggles my understanding of the record, and I've

24  reviewed the entire record here, how they could take this

25  position.  This witness was clearly designated to testify on

22

1     the topics that were being explored by counsel.  It's not

2     counsel for Calyon's fault that the debtor chose to choose more

3     than one person on those issues.  There was no distinction in

4     the designation of any difference between Sakamoto and Voulo.

5     Calyon is not required to rely on the credibility or testimony

6     of Mr. Sakamoto, nor are they required to rely on the

7     representations of counsel as to the facts.  They are allowed

8     to explore the knowledge and basis of knowledge of each of the

9     witnesses for purposes of a) perhaps leading to the discovery

10    of admissible evidence; b) testing the credibility and

11    consistency of the testimony of the witness.

12          This is discovery.  Part of it is an educational

13    process to figure out the transactions, to figure out the other

14    side's position, to prepare for trial and to find evidence.  As

15    a result, Calyon is entitled to a decent amount of latitude in

16    doing that.  I don't think they even came close to going beyond

17    the latitude they're given under the rules.

18          The record is also clear, as you're working on your

19    third deposition at 1:30 in the afternoon, that no time is

20    being wasted, that Calyon was proceeding in an expeditious

21    manner.  Clearly the briefing and argument on this matter has

22    wasted more time than would have been wasted, if any, by

23    finishing the deposition.

24          I think the debtors have acted improperly.  It just

25    boggles my imagination.  I don't think there's any merit to the

23

1    position of the debtors, with all due respect, Mr. Crowder.

2    You certainly haven't met the burden of proof of cause.  I'm

3    going to deny the motion, require that the deposition be

4    finished at a reasonable time and place upon agreement of

5    parties, and if you can't agree you call me and I'll set a date

6    and time.  Mr. Harbour, you submit an order, please.

7             MR. HARBOUR:  Yes, Your Honor.

8             THE COURT:  All right.  Anything further?

9             MS. GREECHER:  No, Your Honor.  That's everything.

10            THE COURT:  Hearing adjourned.

11       (Proceedings concluded at 12:02 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

```
 1
 2                      I N D E X
 3
 4                       RULINGS
 5                   Page      Line
 6   Granting of Order    6       17
 7   Authorizing the
 8   Employment and Retention
 9   of Margot Saunders as
10   Testifying Expert for
11   the Borrowers' Committee
12
13   Denial of Debtors' Motion 23      3
14   for Protective Order
15
16
17
18
19
20
21
22
23
24
25
```

25

1

2                    C E R T I F I C A T I O N

3

4       I, Hana Copperman, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       HANA COPPERMAN

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  March 25, 2009

16

17

18

19

20

21

22

23

24

25