United States Bankruptcy Court
For the District of Delaware
824 Market Street
3rd Floor
Wilmington Delaware 19801

FILED

2009 MAR 30  AM 10: 16

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

And

Young Conaway Stargatt & Taylor, LLP
Counsel to the Debtors and Debtors in Possession
Nathan D. Grow (No. 5014)
The Brandywine Building
1000 West Street
17th Floor
Wilmington Delaware 19801

March 25, 2009

RE:    Case No 07-11047
       Debtors Thirty First Omnibus (Substantive) Objection to Claims
       Claim Number 305
       Claim Amount $20,000.00
       By and For = Randall J. Barwick, Prior Employee of American Home Mortgage

Gentlemen,

In response to the recent filed objection to the above claim, the following is my official
answer:

**I am including in this response, a copy of the original support documentation from
when the claim was originally filed. It clearly states that under the terms of my
contract, I was eligible for a new branch commencement bonus of $20,000.00 for the
commencement of a new branch in Madison Wisconsin which opened in prior to
February 28, 2007.**

**The requirements for said bonus were met with the documented recruitment and
acquisition of 3 qualified loan officers.**

**Per the approval of 2 different officers of American Home Mortgage, said bonus
was to be paid by the end of July 2007, a period during which I was employed.**

**Verification of the requirements for said bonus can be obtained from debtor's
records, ie, HR records for new hires for Madison Wisconsin Branch and New office
lease and internal Branch accounting records for when the new branch opened.**

In addition to the above, I am attaching a copy of the notice of permanent leave effective august 3, 2007 which shows that I was still employed at the end of July when the bonus should have been paid as well as a document called "frequently asked questions for terminated employees" This document states that a claim may be filed for unpaid incentive and monthly/quarterly bonus payments.

The employment contract clearly states that I earned the compensation and that was to be paid anytime after 30 days of meeting the requirements.

Obviously, I had no control over my employment status after August 3, 2007 when the decision was made to terminate everyone's employment without advance notice.

I would welcome a "by telephone" opportunity to offer personal comments in support of my claim during the hearing scheduled on April 6, 2009 at 2:00 PM EST.

I can be reached by phone at 414-840-3596 or by email at
randy@randybarwick.com

Sincerely,

Randall J. Barwick
408 Ryan Avenue
Burlington Wisconsin 53105
414-840-3596
262-534-5839

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )<br>) **Chapter 11**<br>) |
| AMERICAN HOME MORTGAGE<br>HOLDINGS, INC., Delaware corporation, <u>et al.</u>, | )<br>) **Case No. 07-11047 (CSS)**<br>) |
| Debtors. | )<br>) **Jointly Administered**<br>) |
| | ) **Response Deadline: March 30, 2009 at 4:00 p.m. (ET)**<br>) **Hearing Date: April 6, 2009 at 2:00 p.m. (ET)** |

AHM OB31 3/6/2009 (merge2.txnum2) 4000000304 EPIQ Use - 37

BARWICK, RANDAL J.
408 RYAN AVE
BURLINGTON, WI 53105

## NOTICE OF DEBTORS' THIRTY-FIRST OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS PURSUANT TO SECTION 502(b) OF THE BANKRUPTCY CODE, <u>BANKRUPTCY RULES 3003 AND 3007, AND LOCAL RULE 3007-1</u>

TO:  BARWICK, RANDAL J.
      408 RYAN AVE
      BURLINGTON, WI 53105

**Basis For Objection:**   No Liability Claim: Debtors' books and records show no liability on account of this claim

| | Claim Number | Claim Amount |
|---|---|---|
| Claim to be Expunged | 305 | $20,000.00 |

No amounts are due per Debtors' books and records. Per contract, employee needs to be employed on payment date to receive bonus

    The above-captioned debtors and debtors in possession (the "Debtors") have filed the **Debtors' Thirty-First Omnibus (Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007, and Local Rule 3007-1** (the "Objection"), a copy of which is attached hereto.  The Debtors seek by this Objection to disallow the claim listed above because the Debtors have determined, after review of their books and records, that they have no record of any liability on account of this claim.  The Objection seeks to alter your rights by disallowing the claim listed above in the "Expunged Claim" row.

    Responses to the Objection, if any, must be filed on or before **March 30, 2009 at 4:00 p.m. (ET)** (the "Response Deadline") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.  At the same time, you must also serve a copy of the response upon the counsel to the Debtors listed below so that the response is received on or before the Response Deadline.

    A HEARING ON THE OBJECTION WILL BE HELD ON **APRIL 6, 2009 AT 2:00 P.M. (ET)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DE 19801.

    IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: March 6, 2009
    Wilmington, Delaware

                                    **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
                                      Nathan D. Grow (No. 5014)
                                      The Brandywine Building
                                      1000 West Street, 17th Floor
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 571-6756
                                      Facsimile: (302) 571-1253

                                      Counsel to the Debtors and Debtors in Possession

**American Home Mortgage**

## Frequently Asked Questions for Terminated Employees

**AHM EQUIPMENT**
Q.    I currently have equipment (Laptop; cell phone; blackberry). What do I do with the equipment?
A.    Equipment should be **packaged properly** and returned to AHM via **UPS. The Account number is Av1102 and the mailing address is the following:**

American Home Mortgage
Attention: Asset Return
538 Broadhollow Rd
Melville NY 11747

**Property including but not limited to company computers or files may not be destroyed or altered in any way. Destruction of property may result in civil or criminal penalties against you.**

Q.    Can I keep the equipment to cover my vacation and any other money that I believe I'm owed?
A.    No. The equipment is considered property of American Home Mortgage's bankruptcy estate. Keeping the equipment is a violation of the Bankruptcy Code, and you may be liable for damages, attorneys' fees, and penalties associated with the Debtors' attempts to collect this property from you.

**COMPENSATION**
Q.    Will I be paid for my unused vacation time?
A.    You may file a claim for unused vacation pay.

Q.    Will I be paid for my unused sick/personal time?
      If you live in a state where payment of personal time is mandated by state law, you may file a claim.

Q.    Will I receive my monthly/quarterly bonus? When will it be paid?
A.    If you did not receive your incentive payment, you may file a claim for such payment.

Q.    Can I get unemployment? What is our Employer ID number?
A.    Yes. Contact your state's Department of Labor and they will provide you with information on how to apply for your state unemployment benefit. When filing for unemployment, you do not need to provide the Employer State ID Number; you will be able to file your claim without it.

Q.    What reason do I use when filing for unemployment?
A.    Permanent layoff/reduction in force.

Q.    Where do I go for employment verifications?
A.    Email verification requests to mary.stadelman@americanhm.com or fax to #631-622-2954.

Q.    Can I get references if needed?
A.    Per company policy, we will provide verification of employment upon receipt of a written request with the authorization of the employee to release information.

Q.    Will I still receive my guarantee/draw?
A.    No, because guarantees/draws are only applicable if an employee is actively working.

**401(k)**
Q.    Is my account safe? Will I lose all the money that I have contributed, along with matching contributions?
A.    The benefits in the 401(k) Plan are not assets of the bankruptcy estate and cannot be used to pay the creditors of AHM. All 401(k) plans are subject to federal compliance regulations, and your benefits in the 401(k) plan can be paid only to you, your beneficiaries, or a roll over account designated by you. You will be receiving distribution information from Charles Schwab.

Q.    Am I fully vested?
A.    You were always 100% vested in your salary deferral contributions. If you participated in the 401(k) plan, you will become fully vested in the employer contributions (to include matching contribution) in your plan account balance, effective on your termination date.

**American Home Mortgage**

## Frequently Asked Questions for Terminated Employees

Q.   Now that I am no longer with the company, can I withdraw my account balance?
A.   Yes. Instructions will be provided by Charles Schwab.

Q.   Who should I contact to request distribution of my account?
A.   Charles Schwab will send a distribution package to you at the home address listed on your account record. You should request your distribution by October 31, 2007. Charles Schwab and Company can be reached at 1-800-724-7526 or at www.schwabplan.com.

Q.   How soon will I receive the check once I request distribution?
A.   Distribution checks are usually processed between 5-10 business days after Charles Schwab receives a distribution request.

Q.   May I rollover the money to an IRA or existing 401(k) Plan?
A.   Yes, you may request a distribution to yourself or rollover to an IRA or existing 401(k) Plan.
     Please note that if you request a distribution to yourself, you will be subject to a mandatory 20% federal tax, and if you are under the age of 59½, it may also be subject to a 10% penalty tax which is assessed when you file your federal income tax form. Charles Schwab will be providing to you a detailed government prescribe notice concerning the tax effects of taking distributions from the 401(k) Plan.

Q.   How do I pay the outstanding balance on my 401(k) Loan?
A.   Contact Charles Schwab and Company at 800-724-7526 to pay the outstanding balance of your loan before you receive a distribution on your benefits from the 401(k) Plan. If you do not pay the outstanding balance, it becomes subject to ordinary income tax and will be reported to the IRS as a distribution.

Q.   Will my account still accumulate interest until the distribution is processed?
A.   Yes. Your account will be invested in the mutual funds you have selected until the distribution occurs.

## DEFERRED COMPENSATION

Q.   Is my account safe? Will I lose all the money that I have contributed?
A.   Deferred Compensation Plan funds are deposited into a trust. The trust is held as an asset of the company, and the disposition of all such assets is subject to judicial review. After that review, a decision concerning the disposition of the Deferred Compensation Plan assets will be made.

Q.   Now that I am no longer with the company, can I withdraw my account balance?
A.   No. Under the provisions of the trust, benefit distributions were frozen when the company filed its petition in bankruptcy. Therefore, distributions from the Deferred Compensation Plan are not permitted at this time.

Q.   May I request to receive a "hardship distribution" from the Deferred Compensation Plan?
A.   No. Distributions from the Deferred Compensation Plan are not permitted at this time.

Q.   When will I be able to request distribution from the Deferred Compensation Plan?
A.   We do not know at this time. If funds become available for withdrawal, you will be contacted.

Q.   Will my account continue to accumulate interest?
A.   Deferred Compensation Plan accounts are valued as of the last day of each month. Your account will be valued as of the last day of the month in which you were employed.

## BENEFITS

Q.   When do my health benefits end?
A.   Your health benefits ended on the last day of employment.

Q.   Why were health care deductions (medical, dental, vision, etc.) taken from the check that was paid on August 7th, and will they be taken again with the paycheck of August 8th?
A.   Employees are paid in arrears and health care benefit contributions are also taken in arrears. Accordingly, the amount taken from your paycheck was for benefits already provided to you.

Q.   Will I get COBRA?

**American Home Mortgage**

### Frequently Asked Questions for Terminated Employees

A.    Yes. COBRA packages are expected to be mailed to home addresses on file at the time of termination within the time periods set forth in the COBRA statute by our service provider, ADP COBRA Services during the week of August 27. Eligible former employees can also enroll online www.benedirect.adp.com once ADP has loaded their eligibility data.

Q.    Can I convert my supplemental life insurance policy?
A.    Yes. Please contact High Mark life Insurance Company at 800-833-1115, and they will provide you with an application. Return the completed application to High Mark Life within 30 days of your termination date. High Mark Life will contact the Benefits department to obtain employer information.

Q.    What about the Flexible Spending Accounts?
A.    The FSA will terminate as of your termination date. **Any expenses incurred while you were employed will be reimbursed up to the amount you contributed.** You have until October 31, 2007 to submit those claims.

If you are eligible for COBRA under the healthcare FSA, you can continue to contribute into your healthcare FSA account on a post-tax basis after your employment terminates and for the rest of 2007. If you elect to continue your healthcare FSA account through COBRA, you **must pay the post-tax COBRA premiums directly to ADP.** You will be eligible to use the money in the account for services you incur after your termination date through the month that your healthcare FSA COBRA coverage terminates. If you are eligible for COBRA from the healthcare FSA, you will be receiving a separate COBRA notification for the healthcare FSA. You will be eligible for COBRA under the healthcare FSA if the amount of the COBRA premiums that you will be required to pay for COBRA coverage in the healthcare FSA for the rest of 2007 (including the 2% administrative charge) is less than the amount of the benefits that you can receive from the healthcare FSA for the balance of 2007.

Q.    What happens to disability?
A.    Short-term and long-term disability coverage will end on the last day of employment. These plans are not convertible or portable. Disability questions/claims can be directed to Karen Ullman and Courtney Dwyer or email HR Benefits@americanhm.com

Q.    Can I still use the Employee Assistance Program (EAP)?
A.    Terminated employees and their family members may use Employee Assistance Program services through August 31, 2007. Contact the EAP at **800-865-1044.**

**BUSINESS EXPENSES**
Q.    How do I get reimbursed for Travel and Entertainment related expenses?
A.    Unpaid business expenses will become part of your overall employee claim, of which $10,950 receives priority status under bankruptcy rules. To submit your expenses to be validated by the company and included as part of your overall claim, you should follow the steps below:
1) All requests must utilize the Expense Reimbursement form [click here for the form].You no longer can access the Expense eXpert system for this purpose.
2) All submissions need to include all receipts for expenditures of $25 and greater along with relevant business descriptions.
3) Reports and receipts should be faxed to "T/E Administrator" at 516.495.5882. You should keep copies of all receipts and reports you send to AHM.
4) Your report will be reviewed and validated for claim purposes. AHM reserves the right to allow your claim only for those expenses deemed to be in the normal course of business and consistent with AHM T/E policy in place as of the Petition Date. Only eligible documented business expenses will be considered for your claim.
5) Employees with American Express Corporate Cards are reminded that they are responsible for all personal expenses charged to the cards.
Please refer to the Bankruptcy Claims Process section for additional information.

**POTENTIAL CLASS ACTIONS**
Q.    I have been contacted about joining a class action against AHM involving the WARN Act. What is this about?
A.    The Worker Adjustment and Retraining Notification Act (WARN) Act is a federal law that requires employers in certain circumstances to provide notification 60 calendar days in advance of plant closings and mass layoffs. Under certain situations, an employer is permitted to provide less than 60 days notice, such as when the layoffs are caused by business circumstances that were not reasonably foreseeable at the time the notice normally would be required. The Company believes its layoffs were conducted in accordance with the law. Several former employees, however, have filed a complaint on their own behalf and on behalf of others alleging that their layoff was a violation of the WARN Act. If you were laid off you may be contacted about joining this lawsuit, but you are under no obligation at this point to join. If you believe your layoff was not in accordance with the WARN Act you may file a claim.

**American Home Mortgage**

## Frequently Asked Questions for Terminated Employees

**BANKRUPTCY CLAIMS PROCESS**

Q.    What is the process for filing a claim?

A.    Claim forms and filings instructions are available in the <u>Online Bankruptcy Information</u> section of AHM's restructuring site on www.americanhm.com. However, you may not need to file a claim. In the next few weeks, American Home Mortgage will be filing a list of debts with the bankruptcy court called the Debtor's Schedules of Assets and Liabilities. Access to these schedules will be available through the Americanhm.com website, via the 'Online Bankruptcy Information' link. If you are owed money by AHM, you should be listed by name in the schedules, with an amount that AHM believes is owed to you. American Home Mortgage will then send to you a pre-printed, customized Proof of Claim Form that ties to the debtor's schedules of liabilities. If you agree with the claim amount in the schedule of liabilities, you most likely will not need to file a claim. If you are not listed or disagree with the amount listed, you will need to file a claim form.

Q.    How much will I be paid?

A.    The amount of payment on any claim will depend on the amount of remaining assets of the company which will be divided among the various claimants as required by the Bankruptcy Code. American Home Mortgage is required to file a chapter 11 plan in which it will propose to pay creditors a certain percentage of their claims in accordance with the Bankruptcy Code. The chapter 11 plan must be approved by the Bankruptcy Court before distributions will be made.

Your claim amount will be based on the amount scheduled by the company or the amount in the Proof of Claim you file. You will be notified of any changes to your claim amount or if your claim is rejected. In that instance, you will receive a Notice of Objection to your claim. You may wish to seek the representation of an attorney if this occurs.

The Bankruptcy Code allows up to $10,950 of an employee's unsecured claim to be classified as a priority claim, which typically would receive recovery before any recovery to unsecured claims. Distribution on priority claims may not take place until the Bankruptcy Court approves American Home Mortgage's chapter 11 plan. You will receive a copy of the chapter 11 plan when it is filed.

Former Employees will not receive interest on the claim amount.

Q.    When will I get paid?

A.    Claims are paid after the chapter 11 plan is approved by the Court and the Plan becomes effective. Priority claims are paid in full soon after the Plan becomes effective. In contrast, holders of general unsecured claims are likely to receive only partial payment of their claims and their distributions will be made on a more extended timeframe. At this time, we are not able to provide you an estimate of the expected length of time it will take to resolve claims.

The timing for payments varies and will be set forth in the Plan. Again, you may monitor the following website for this information: <u>http://www.americanhm.com</u>.

## For all other HR related inquiries, please contact our HR Hotline at #888-474-2461.

### 2007 Benefit Plan Administrators

| Plan | Group Number | Customer Service | Website |
|------|--------------|------------------|---------|
| **Medical** | | | |
| Empire BCBS<br><br>Maternity Care Program | 295801 | 1-866-407-6469<br>1-800-537-7371<br>Mon-Fri 8:30a-8:00p est | www.empireblue.com/ahm |
| Kaiser Permanente<br>   Southern California<br>   Northern California | 121159<br><br>600845 | 1-800-464-4000<br>Mon-Fri 7:00a-7:00p pst<br>Sat-Sun 7:00a-3:00p pst | www.kaiserpermanente.org |

 American Home Mortgage

## Frequently Asked Questions for Terminated Employees

| Prescription (Anthem Prescription M | | | |
|---|---|---|---|
| Retail Pharmacy Benefits<br><br>Mail Order Prescriptions | 295801 | 1-866-407-6469<br>1-800-281-5994<br>Mon-Fri 8:30a-8:00p est | www.empireblue.com/ahm |
| **Dental** | | | |
| Aetna PPO<br>Aetna DMO | 885917<br>885917 | 1-877-238-6200<br>Mon-Fri 8:00a-6:00p est | www.aetna.com |
| MetLife PPO | 122132 | 1-800-474-7371<br>Mon-Fri 8:30a-11:00p est | www.metlife.com |
| **Vision** | | | |
| EyeMed Access H Plan | 9689746 | 1-866-939-3633<br>Mon-Fri 8:00a-11:00p est | www.enrollwitheyemedcom |
| EyeMed Access C Plan | 9689753 | 1-866-939-3633<br>Mon-Fri 8:00a-11:00p est | www.enrollwitheyemed.com |
| **ADP Benefit Services** | | | |
| COBRA / FSA | | COBRA – 1-800-526-2720<br>FSA -  1-800-654-6695 | COBRA - www.benedirect.adp.com<br>FSA - www.flexdirect.adp.com |
| **Life Insurance** | | | |
| HM Life Insurance Co. of NY | 893298-A | 1-800-235-6753 | www.highmark.com |
| **Disability** | | | |
| First Reliance Standard –<br>Disability  Claims Hotline | | 1-866-533-3438<br>Mon-Fri 8:00a-8:00p est | www.matrixefiling.com |
| **Employee Assistance Program** | | | |
| Anthem Employee Assistance<br>Program (EAP) | | 1-800-865-1044<br>Mon-Sun 24 hours a day | www.anthemEAP.com<br>Log on:  American Home Mortgage |
| **401(k)** | | | |
| Charles Schwab & Co. | | 1-800-724-7526<br>Mon-Fri 7:00a-11:00p est | www.schwabplan.com |

  

Re: <u>**NOTICE OF PERMANENT LAYOFF**</u>

Dear Employee:

This is to inform you that due to circumstances beyond its control American Home Mortgage is conducting layoffs at its facility located at 538 Broadhollow Road; Melville, NY 11747. As a result of these layoffs, your employment must be terminated effective today, August 3, 2007. The Company expects your layoff to be permanent and that no bumping rights will exist.

The decision to conduct layoffs and our inability to provide advance notice was the result of a number of sudden and unanticipated events, including the unprecedented disruption in the credit markets which resulted in major write-downs of the company's loan and security portfolios. This event, unfortunately, resulted in margin calls with respect to the company's loans and left us unable to obtain financing to originate loans. In addition, the recent exercise of remedies by the warehouse lenders have left the company in a severe liquidity crisis.

We regret having to take this action because of its impact on you and the local community. Should you have any questions, please contact Karen Ullman; Martin Gennusa; Karen Cooper; Courtney Dwyer or Rob Neves at 538 Broadhollow Road; Melville, NY 11747 or by Telephone at (888) 474-2461.

Sincerely,

American Home Mortgage

MaryAnn Munson
SVP, Human Resources

United States Bankruptcy Court for the District of Delaware
American Home Mortgage Claims Processing Center
FDR Station, P.O. Box 5076
New York, NY 10150-5076

08/24/2007

RE:        Randall J. Barwick = Creditor
           Claim for services performed 01/01/2007 to 02/28/2007

Good morning,

I was an Area Manager for American Home Mortgage in Wisconsin since late 2005. The contract that I signed in December 2005 allowed for 3 New Branch Commencement Bonus' (contract attached, page 2 of 3, addendum A).

The Branch Commencement Bonus for Office #1 was earned and paid in early 2006 and the Branch Commencement Bonus for Office #2 was earned and paid in mid 2006.

In February 2007, I opened a new branch in Madison Wisconsin (AHM Branch #2932) and by staffing that branch with 3 Loan Officers with documented production of $25,000,000 per year or more (Paul Brooks = $12,600,000 in 2006, Kelli Ezzell = $14,300,000 in 2006 and Rhonda Clayton = $14,800,000 in 2006), I was due the third and final Branch Commencement Bonus.

My income at the time was such that I would not need the bonus paid until the July 25, 2007 payroll when I would need to pay tuition for my daughters first year of college.

After a discussion with Dave Braakman (Illinois/Wisconsin District Manager) and Mike Axelrood (Midwest Regional Manager), it was agreed that this bonus be paid at the end of July 2007.

This bonus was not paid on the July 25, 2007 payroll and after several telephone discussions, I was told that the bonus was approved and submitted for payment.

The attached Proof of Claim form has been completed as best I could. It looked as though the maximum claim under section #7, Unsecured Priority Claim is $10,950.00 so I put the balance of the $20,000.00 in section #6, Unsecured Non priority Claim.

I am responsible for a wife and 6 children and would hate for this claim to be delayed due to my not completing the form properly.

Thank you,

Randall J. Barwick
408 Ryan Avenue
Burlington Wisconsin 53105
414-840-3596
Randy@randybarwick.com

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE<br>American Home Mortgage Claims Processing Center<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **PROOF OF CLAIM** |
|---|---|

| In Re:<br>American Home Mortgage Holdings, Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 07-11047 (CSS)<br>Jointly Administered |
|---|---|

Name of Debtor Against Which Claim is Held | Case No of Debtor

**AMERICAN HOME MTG.** 07-~~NOXXXX~~ 11051

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

THIS SPACE IS FOR COURT USE ONLY

**Name and address of Creditor:** (and name and address where notices should be sent if different from Creditor)

RANDALL J. BARWICK
408 RYAN AVE.
BURLINGTON, WI. 53105
414-840-3596

Telephone number:
Email Address: randy@randybarwick.com

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Account or other number by which creditor identifies debtor:

Check here if this claim:
☐ replaces          ☐ amends a previously filed claim, dated: _____

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other_____ (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☒ Wages, salaries, and compensation (fill out below)
Last Four Digits of your SS#: **3 5 7 5**
Unpaid compensation for services performed
from **01-01-07** to **02-28-07**
        (date)          (date)

**2. Date debt was incurred:**
**02-28-07**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ **9,050.00** (unsecured nonpriority) + _____ (secured) + **10,950.00** (unsecured priority) = **20,000.00** (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $_____
Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim:** $ **9,050.00**
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☒ Check this box if you have an unsecured priority claim
Amount entitled to priority $ **10,950.00**
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☒ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
**DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10 Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

Date
**082407**

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any.)
_Randall J. Barwick_

_Penalty for presenting fraudulent claim:_ Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## DEFINITIONS

**Debtor**
The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

**Creditor**
A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

**Proof of Claim**
A form filed with the clerk of the bankruptcy court where the bankruptcy case was filed, to tell the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed

**Secured Claim**
A claim is a secured claim if the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began. In some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. *(See also Unsecured Claim)*

**Unsecured Claim**
If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Priority Claim**
Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

## Items to be completed in Proof of Claim form (if not already filled in)

**Name of Debtor and Case Number:**
   Fill in the name of the debtor in the bankruptcy case, and the bankruptcy case number.

| | |
|---|---|
| American Home Morgage Holdings, Inc | 07-11047 |
| American Home Morgage Investment Corp | 07-11048 |
| American Home Mortgage Acceptance, Inc | 07-11049 |
| American Home Mortgage Servicing, Inc | 07-11050 |
| American Home Mortgage Corp | 07-11051 |
| American Home Mortgage Ventures LLC | 07-11052 |
| Homegate Settlement Services, Inc. | 07-11053 |
| Great Oak Abstract Corp | 07-11054 |

**Information about Creditor:**
   Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

1. **Basis for Claim:**
   Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2. **Date Debt Incurred:**
   Fill in the date when the debt first was owed by the debtor.

3. **Court Judgments:**
   If you have a court judgment for this debt, state the date the court entered the judgment.

4. **Total Amount of Claim at Time Case Filed:**
   Fill in the applicable amounts, including the total amount of the entire claim. If interest or other charges in addition to the principal amount of claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5. **Secured Claim:**
   Check the appropriate place if the claim is a secured claim. You must state the type and value of the property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

6. **Unsecured Nonpriority Claim:**
   Check the appropriate place if you have an unsecured nonpriority claim, sometimes referred to as a "general unsecured claim". (See DEFINITIONS, above.) If your claim is partly secured and partly unsecured, state here the amount that is unsecured. If part of your claim is entitled to priority, state here the amount **not** entitled to priority.

7. **Unsecured Priority Claim:**
   Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

8. **Credits:**
   By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

9. **Supporting Documents:**
   You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

JAN 03 2006 11:37 FR AMERICAN HOME MORTGAG 12625510348 TO 18665862441      P.04/09

## BRANCH MANAGER EMPLOYMENT AGREEMENT

This **BRANCH MANAGER EMPLOYMENT AGREEMENT** ("Agreement") is made and entered into as of 12/20, 2005 (the "Effective Date"), by and between AMERICAN HOME MORTGAGE CORP., a New York corporation having a place of business at 538 Broadhollow Road, Melville, NY 11747 (the "Company") and Randy Barwick (the "Executive").

### THE COMPANY AND EXECUTIVE AGREE AS FOLLOWS:

1.       **Employment.** The Executive agrees to enter into the employment of the Company as an Assistant Vice President and Branch Manager as of the Effective Date, and the Company agrees to employ and compensate the Executive as an Assistant Vice President and Branch Manager in accordance with the terms and conditions set forth in this Agreement. The Executive understands and agrees that during the term of the Executive's employment with the Company:  (a) The Executive may assist only the Company in the performance of activities contemplated by this Agreement; and (b) The Executive may not engage, participate or become interested, either directly or indirectly, in any business in competition with the Company, in any capacity.

The Executive's employment with the Company is contingent upon the satisfactory completion of a background and credit investigation as determined solely in the discretion of the Company. It is understood that any investigation found unsatisfactory to the Company, may result in immediate termination of employment.

2.       **At Will.** The Executive understands and agrees that the Executive's employment with the Company shall be at all times "at will" employment. The Company reserves the right to terminate the Executive's employment with the Company at any time for any reason whatsoever, with or without cause. Likewise, the Executive may resign from the Company at any time for any reason. The term of this Agreement shall begin on the Effective Date and shall end on the date it is terminated by either the Company or the Executive.

3.       **Duties and Responsibilities.** The Executive's branch is hereby defined as the Company's retail business in Brookfield, WI principally developed by the Executive subsequent to the Effective Date (hereinafter referred to as the "Branch"). Without limiting the foregoing, the Executive is responsible for managing the financial performance of the Branch, the personnel working in the Branch, the selling and marketing of the Company's products within the Branch, and profitable growth of the Branch. It is mutually agreed that the Company may, at any time, change the make-up and size of the Branch in its sole discretion, including adding or deleting territory to or from the Branch.

4.       **Duty of Loyalty.** The Executive agrees that, during the term of the Executive's employment with the Company, the Executive shall devote the Executive's full business time, attention, best efforts, skill, and ability exclusively to the business of the Company. The Executive agrees to do the Executive's utmost to further the interests of the Company, and agrees not to take any action intended to harm the Company.

The Executive also agrees that, during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm, corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company. The Executive expressly agrees that this section is fair and reasonable and that the Executive is being adequately compensated for agreeing to the terms of this section.

Initials

JAN 03 2006 11:37 FR AMERICAN HOME MORTGAG 12625510348 TO 18665052441         P.05/09

5.      **Compensation.** The Company will pay the Executive a percentage of the principal amount of loans closed by the Branch (hereinafter referred to as an "Override Bonus"), and a percentage of the profit earned by the Branch, all subject to certain limitations as set forth below. The Executive may also earn commission on loans produced by the Executive in accordance with the terms set forth below. All computations pursuant to this Agreement shall be made solely by the Company, in accordance with methodologies, policies and procedures which may be in effect from time to time, and which may be changed by the Company at any time in its sole discretion. The Executive acknowledges that the Executive's compensation will be reported to the Internal Revenue Service on a Form W-2, and the Company will withhold taxes from the Executive's pay as required by law. The Executive acknowledges that the Executive is not entitled to extra pay for absences from work, including holidays and sick days, or for overtime, but will be entirely compensated pursuant to the provisions of this section.

(a) For each month during the term of this Agreement, the Company will pay the Executive an Override Bonus, pursuant to the terms of Addendum A of this Agreement. The terms of Addendum A used to calculate the Override Bonus may be changed by the Company in its sole discretion upon thirty (30) days written notice to the Executive.

(b) Beginning with the Effective Date, the Company will pay the Executive a percentage of the annual profit of the Branch, in accordance with Addendum A of this Agreement (the "NOI Bonus"). The terms of Addendum A used to calculate the NOI Bonus may be changed by the Company in its sole discretion upon thirty (30) days written notice to the Executive.

(c) The Executive may earn a commission on loans which the Executive originates in accordance with the schedule set forth in Addendum A, which may be changed by the Company in its sole discretion at any time.

Notwithstanding the terms of this section, the Executive shall not be entitled to any unpaid bonuses if the Executive is no longer employed by the Company as of the payment date.

6.      **Compliance with Company Policies.** The Executive agrees to comply fully with, and be subject to, all of the Company's policies and procedures, including amendments to such policies and procedures adopted by the Company in its sole discretion prior to, on, or subsequent to the Effective Date of this Agreement.

7.      **Compliance with Directives.** The Executive agrees that the Executive will comply fully with all lawful instructions, directives, and orders given by the Executive's District Manager, Regional Manager, an Executive Vice President of the Company, a Division President of the Company, or the President of the Company. The Executive further agrees that the Executive will cooperate at all times with other Company personnel.

8.      **Compliance with Laws & Regulations.** The Executive agrees that the Executive will comply with all federal, state, and local laws and regulations applicable to mortgage lending and brokering activities undertaken by the Company and the Executive.

9.      **Prohibition against Inaccurate Applications and False Information.** The Executive agrees to not submit loan applications to the Company, or to facilitate in any way, the making of loan applications that are inaccurate or misleading. In addition, the Executive agrees not to create or assist in the creation or submission to the Company of any false information in connection with loan applicants or in connection with real property, including the ownership and value thereof. The Executive agrees to reimburse the Company for

Initials 

any damages it suffers as a result of the Executive's breach of this section . The obligations of the Executive and the rights of the Company with respect to the preceding sentence, shall survive the termination of this Agreement.

    10.    **Benefits**. The Executive is eligible to participate in such benefit programs that the Company may from time to time maintain for employees of the Executive's level. The Company reserves the right to modify, substitute, or eliminate such benefits at any time and in its sole discretion. Benefits available to the Executive will be based on the Executive's tenure at the Company, position at the Company, state and county of residence and other factors determined by the Company. The Executive acknowledges that certain of the Company's optional benefits programs may require the Executive to pay for some or all of the cost of those benefits. The Executive agrees to pay such costs in accordance with the Company's policies.

    The Executive shall be reimbursed 75% for the costs of COBRA, not to exceed one (1) month, incurred by the Executive prior to the eligibility of the Company's medical benefits.

    11.    **Right of Setoff; Executive's Agreement to Pay Amounts Owed to the Company.** The Executive hereby grants the Company an unconditional right of setoff and authorizes the Company to deduct any amounts owed by the Executive to the Company from compensation and other amounts due the Executive from the Company. Notwithstanding the foregoing, the Company reserves the right to demand, for immediate payment, any amount due the Company from the Executive. Nothing in this section shall constitute a waiver or limitation of the Company's rights to collect sums due and owing from the Executive through any and all legal means available to the Company. This section shall survive the termination of this Agreement.

    12.    **Confidential and Proprietary Information; Company Property.** For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information, including names and contact information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, personal employee information, and cost and pricing policies. All Confidential Information disclosed or provided to the Executive by the Company, or developed or created by the Executive during the term of the Executive's employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company. The Executive agrees not to disclose Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary in order for the Executive to perform the Executive's responsibilities as an Assistant Vice President and Branch Manager of the Company. The Executive also agrees that he or she will not use Confidential Information for any purpose other than to fulfill the Executive's responsibilities as an Assistant Vice President and Branch Manager of the Company.

    The Executive acknowledges, understands, and agrees that Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if Executive breaches or threatens to breach any of the provisions of this Agreement relating to Executive's use or disclosure of any Confidential Information.

    The Executive further acknowledges that the Company may provide the Executive with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Executive agrees to

Initials

abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time at the sole discretion of the Company. The Executive further agrees to promptly return in good working condition all Company Property in the Executive's possession upon termination of the Executive's employment with the Company for any reason, and shall be liable for damages, including but not limited to replacement cost, for any financial loss resulting to the Company if Company Property is not returned in such manner.

The Executive agrees that this section shall survive the termination of this Agreement, and that all of the obligations of the Executive set forth in this section shall remain in full force and effect after this Agreement is terminated. The Executive further agrees that, upon termination of this Agreement, he or she will return to the Executive's District Manager, or if such District Manager is not available, to the Company's General Counsel, all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Executive's possession or custody.

13.     **Non-Solicitation; Non-Disparagement.**    The Executive agrees that during the term of Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is voluntary or involuntary, or with or without cause, the Executive shall not, directly or indirectly, influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company; shall not, directly or indirectly, influence or advise any employee of the Company to leave the employment of the Company; and shall not employ, on behalf of any business venture other than the Company, any person who is an employee of the Company.

The Executive agrees that during the term of Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is voluntary or involuntary, or with or without cause, the Executive shall not, directly or indirectly, attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers or business referral sources, including but not limited to realtors, builders and affinity organizations, joint venture partners, borrowers and loan applicants, whether such customers or business referral sources were obtained by the Executive on behalf of the Company, or were otherwise obtained by, or whose contact information is stored in the records of, the Company.

The Company and the Executive agree that each will not disparage the other, and that their representatives will not disparage either of the parties to this Agreement.

The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section. The Executive's obligations as set forth in this section shall survive the termination of this Agreement.

14.     **Power of Attorney.**    The Executive hereby irrevocably appoints the Company, or any of its authorized agents, as the Executive's attorney-in-fact to act for the Executive and in the Executive's name (in any way the Executive could act in person) with respect to the following powers: (a) to open and review all any and all correspondence, envelopes or packages addressed to the Executive and delivered via the United States Mail or other means to the Company's offices, and to take for itself any currency, checks, drafts, money orders, or other forms of payment enclosed therein to which the Company is or may be entitled; or (b) to deposit any currency and endorse and negotiate any and all checks, drafts, money orders or other forms of payment made payable to the Executive which are the property of the Company.

Initials

JAN 03 2006 11:39 FR AMERICAN HOME MORTGAG 12625510348 TO 18665852441       P.08/09

15.    **Insurance.** The Executive agrees that during the term of the Executive's employment with the Company, the Executive will maintain in effect on any and all motor vehicles used by the Executive in the conduct of the Company's business a minimum of $250,000.00 in combined single-limit bodily injury/property damage liability insurance. Executive further agrees to defend, indemnify and hold the Company harmless from and against any and all claims against the Company for injuries or damages caused, or alleged to have been caused, by the Executive while operating any motor vehicle in the course and scope of the Executive's employment with the Company.

16.    **Claims or Actions against the Company.** If any civil or criminal complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance is filed, commenced, asserted, issued to, or made against the Company on account of or as a result of any act or omission by the Executive in violation of any of the Company's policies as amended, instructions, directives, or orders, or on account of any act of dishonesty committed by the Executive, the Executive agrees to defend, indemnify, and hold the Company harmless from and against any loss, liability, damages, fines, penalties, costs, or expenses (including reasonable attorneys' fees) incurred by the Company in connection with any such lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance, including any settlement thereof, regardless of whether (a) the Executive is named as a party in any such complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance; (b) the Executive is employed by the Company at the time the loss, liability, damages, cost, or expenses (including reasonable attorneys' fees) is incurred by the Company; or (c) the Company ultimately prevails in, or successfully defends against, the complaint, lawsuit, regulatory action, investigation, subpoena, claim, charge or grievance. This section shall survive the termination of this Agreement.

17.    **Acknowledgement.** The Executive represents and warrants that the Executive is not subject to any agreement, order, judgment, or decree of any kind which would prevent the Executive from entering into this Agreement or performing fully the Executive's obligations hereunder. The Executive acknowledges that: (a) it is the Company's policy not to seek access to or make use of trade secrets or confidential business information belonging to other persons or organizations, including but not limited to, competitors or former employers; and (b) the Executive should not, under any circumstances, reveal to the Company or any of its affiliates or make use of trade secrets or confidential business information belonging to any other person or organization. The Executive represents and warrants that the Executive has not violated and shall not violate such instructions.

18.    **Waiver of Jury Trial.** The Employee waives any right to a trial by jury in any action to enforce or defend any right under this Agreement or any amendment, instrument, document or agreement delivered or to be delivered in connection with this Agreement or arising from any relationship existing in connection with this Agreement, and agrees that any action shall be tried before a court and not before a jury.

19.    **Construction.** The titles or headings of the sections of this Agreement are intended for convenience of reference only and are not intended to change, limit, or otherwise affect the meaning or construction of the terms of this Agreement. The term "person" shall include an individual, corporation, partnership, association, or other legal entity. The term "Employer" or "the Company" shall include any affiliate, parent, subsidiary or related company of the Company.

20.    **Governing Law.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

21.    **Entire Agreement.** This Agreement, together with the any schedules and Addenda attached hereto, as may be amended or modified from time to time in the Company's sole discretion, constitutes the

Initials

entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements, discussions, negotiations, or understandings, whether oral or written, between the parties relating to the matters addressed herein.

22.    **Severability.**   Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement, or any portion of any provision of this Agreement, is found to be unlawful or invalid or otherwise unenforceable, all valid and enforceable provisions of this Agreement shall remain in full force and effect.

23.    **Binding Effect.**   This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto and their respective heirs, estates, legal representatives, executors, successors, and assigns.

24.    **Attorney Fees.**   The Executive agrees to pay the reasonable costs and attorney fees incurred by the Company resulting from the Company's successful enforcement of the terms and provisions of this Agreement.

25.    **Waiver.**   No waiver, or alleged waiver, by the Company of any term, condition, or provision of this Agreement shall be effective for any purpose whatsoever unless such waiver is in writing and signed by a Division President or the President of the Company. No express waiver by the Company of a breach of this Agreement by the Executive shall operate or be construed as a waiver of any subsequent breach of this Agreement by the Executive.

26.    **Notices.**   All notices required or permitted under this Agreement shall be sufficient if in writing and mailed through the United States Postal Service to the Executive at such residence address on file with the Company, and to the Company, at 538 Broadhollow Road, Melville, New York 11747, Attn: General Counsel.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date.

**American Home Mortgage Corp.**

By:

General Counsel

Executive

Social Security Number

Initials

JAN 03 2006 11:36 FR AMERICAN HOME MORTGAG 12625510348 TO 18665852441    P.01/09

---
### BRANCH MANAGER EMPLOYMENT AGREEMENT
### Addendum A
---

The following sets forth ADDENDUM A to the BRANCH MANAGER EMPLOYMENT AGREEMENT (the "Agreement") by and between AMERICAN HOME MORTGAGE CORP. (the "Company") and Randy Barwick (the "Executive") dated as of  *12/20/05*  (the "Effective Date").

THE COMPANY AND EXECUTIVE AGREE AS FOLLOWS:

1.  **Terms and Conditions.** Terms and conditions herein shall be defined by, and are subject to, the Agreement, unless otherwise specifically set forth in this Addendum A.

2.  **Compensation.** Section 5 of the Agreement provides that the Company shall compensate the Executive pursuant to this Addendum A. The Executive's total compensation is set forth in this Addendum A.

3.  **Term.** The term of this Addendum A shall begin on the Effective Date and shall end on the date that the Executive's employment terminates, pursuant to the Agreement.

4.  **Override Bonus.** Commencing July 1, 2006, for each month of employment during the term of the Executive's employment, the Executive shall be eligible to receive an override bonus (the "Override Bonus"). The Override Bonus shall be in an amount equal to .05% (5 basis points) of the aggregate principal amount of loans closed within the Branch beginning on July 1, 2006, as determined by the Company in its sole discretion. The Override Bonus for a given month will be paid when such bonuses are generally paid by the Company in the succeeding month. The Override Bonus shall not apply to loans originated by the Executive for which the Executive is paid a commission, as set forth below, or loans that are brokered to other lenders.

5.  **NOI Bonus.** Commencing July 1, 2006, the Executive shall be eligible to receive an NOI bonus (the "NOI Bonus"), in amount equal to five percent (5%) (hereafter referred to as the "NOI Percentage") of the profit of the Branch, as calculated by the Company. The Company will calculate the Branch's net operating financial results at the end of each calendar quarter, and will maintain an account, referred to hereafter as the "NOI Bonus Account", for the Executive. If the Branch realizes a profit for a calendar quarter, the Executive's NOI Bonus Account will earn a credit in the amount of the NOI Percentage times the profit of the Branch. If the Branch has a loss for a calendar quarter, the Executive's NOI Bonus Account will be charged the NOI Percentage times the loss of the Branch. The Executive will be eligible for a draw of 50% of the NOI Bonus Account balance at the end of each of the first three quarters in a calendar year, which, if available to the Executive, shall be advanced within 45 days of the end of the calendar quarter (an "NOI Bonus Draw"). NOI Bonus Draws will be charged to the NOI Bonus Account. Within 90 days of the end of a calendar year, the Company will determine the final balance of the Executive's NOI Bonus Account (the "Final Balance"). If the Executive is determined by the Company to have a positive Final Balance, such positive Final Balance will be paid to the Executive when such bonuses are generally paid by the Company. If the Executive is determined by the Company to have a negative Final Balance, such negative Final Balance will be carried forward by the Company and applied to the Executive's future profit bonus calculations.

6.  **Commissions.** Compensation shall be based solely on the Executive's Net Closed Commissions for the month.

Initials

JAN 03 2006 11:36 FR AMERICAN HOME MORTGAG 12625510348 TO 18665852441   P.02/09

"Net Closed Commission" ("NCC") on a loan shall equal the Gross Closed Commission earned on the loan, *less* any loan –related fees or costs that are waived or otherwise not collected from the borrower(s), including, but not limited to lock fees, commitment fees, document preparation or processing fees, underwriting fees, property inspection fees, title service fees, water certification fees, tax service fees, messenger or courier fees, or recording fees (collectively, "Uncollected Fees").

"Gross Closed Commission" ("GCC") for any given loan shall be calculated by multiplying the amount of the loan by the sum of the following (each of which shall be expressed as a percentage): (i) the retail mark-up on the loan, plus (ii) any origination points and/or discount fees.

Commencing the fourth month of employment, the Executive shall be eligible to receive 60% of the gross profit of the aggregate internal closed loan production for each month of employment.

7. **Base Salary.** In addition to the Recruitment Bonus, below, the Executive shall be eligible to receive $17,000.00 per month for the first three (3) months of employment ("Base Salary"). In addition to sections four and six, above, the Executive shall be eligible to receive Base Salary of $15,000.00 per month for the fourth, fifth and sixth months of employment.

8. **Recruitment Bonus.** Beginning with the sixth loan officer hired by the Company, the Executive shall be eligible to receive $1,000.00 ("Recruitment Bonus") for each loan officer ("Recruits") hired by the Company, in January, 2006, primarily due to the recruiting efforts of the Executive. The Executive must be employed on the payment date to receive the Recruitment Bonus.

9. **Branch Commencement Bonus.** The Executive shall be eligible to receive bonuses if the Executive is responsible for opening offices ("Branch Commencement Bonus") during the Executive's employment with the Company. Each office opened by the Executive must have three (3) loan officers with a minimum of $25 million of verified annual production. Furthermore, each office must be opened for a minimum of thirty (30) days prior to the Executive's eligibility for the Branch Commencement Bonus. The Executive must be employed on the payment date to receive the Branch Commencement Bonus. The Branch Commencement Bonus shall be paid as follows:

| Office #1: | Branch Commencement Bonus |
| --- | --- |
| Opened before 4/30/06 | $15,000.00 |
| Opened after 5/1/06 | $10,000.00 |
| Opened after 7/1/06 | $5,000.00 |

| Office #2: | |
| --- | --- |
| Opened before 8/31/06 | $15,000.00 |
| Opened after 9/1/06 | $10,000.00 |
| Opened after 11/1/06 | $5,000.00 |

| Office #3: | |
| --- | --- |
| Opened before 2/28/07 | $20,000.00 |
| Opened after 3/1/07 | $15,000.00 |
| Opened after 5/1/07 | $10,000.00 |

Initials

JAN 03 2006 11:37 FR AMERICAN HOME MORTGAG 12625510348 TO 18665852441    P.03/09

10. **Calculation of Addendum A Amounts Due.**   All calculations required pursuant to this Addendum A shall be made in the sole discretion of the Company in accordance with methodologies, policies and procedures of the Company which may be in effect from time to time and which may be changed by the Company at any time in its sole discretion.

11. **Non-Payment of Bonuses.**  Notwithstanding anything to the contrary in this Addendum A, the Executive shall not earn or be entitled to receive any unpaid bonuses if the Executive is no longer employed by the Company as of the payment date.

**IN WITNESS WHEREOF,** the parties have executed this Addendum A as of the Effective Date.

**American Home Mortgage Corp.**

By: _____
    **General Counsel**

**EXECUTIVE**

Initials _____



From:   Origin ID: MKEA   (414)270-7800
Randall Barwick, 050-CB704
National City Corporation
411 E Wisconsin Avenue

**Milwaukee, WI 53202**

Ship Date: 27MAR09
ActWgt: 1 LB
CAD: 5699827/WBUS0200
Account#: S *********

**FedEx**
Express

Delivery Address Bar Code

SHIP TO: (302)571-6756          BILL SENDER
**Young Conaway Stargatt & Taylor**
**Nathan Grow (No. 5014)**
**The Brandywine Building**
**1000 West Street, 17th Floor**
**Wilmington, DE 19801**

Ref #      20016861778
Invoice #
PO #
Dept #

TRK#  7901 6787 0855
0201

**MON - 30MAR      A1**
**PRIORITY OVERNIGHT**

**19801**
DE-US
PHL

**XB ZWIA**

*Also Sent Copy To*

## FEDEX SHIPPING LABEL

**Legal Terms and Conditions**

Tendering packages by using this system constitutes your agreement to the service conditions for the transportation of your shipments as found in the applicable FedEx Service Guide, available upon request. FedEx will not be responsible for any claim in excess of the applicable declared value, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the applicable FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see applicable FedEx Service Guide. FedEx will not be liable for loss or damage to prohibited items in any event or for your acts or omissions, including, without limitation, improper or insufficient packaging, securing, marking or addressing, or the acts or omissions of the recipient or anyone else with an interest in the package. See the applicable FedEx Service Guide for complete terms and conditions. To obtain information regarding how to file a claim or to obtain a Service Guide, please call 1-800-GO-FEDEX (1-800-463-3339).