# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------x  Chapter 11
In re:                                                    :
                                                          :  Case No.  07-11047 (CSS)
AMERICAN HOME MORTGAGE                                     :
HOLDINGS, INC., a Delaware corporation, et al.,           :  Jointly Administered
                                                          :
                       Debtors.                           :  Sales Procedures Motion:
                                                          :  Obj. Deadline:  April 14, 2009 at 4:00 p.m. (ET)
                                                          :  Hearing Date:  April 21, 2009 at 2:00 p.m. (ET)
                                                          :
                                                          :  Sale Motion:
----------------------------------------------------------x  Obj. Deadline:  May 8, 2009 at 4:00 p.m. (ET)
                                                             Hearing Date:  May 15, 2009 at 1:00 p.m. (ET)
```

## MOTION OF THE DEBTORS FOR ORDERS:
### (A)(I) APPROVING SALE PROCEDURES WITH RESPECT TO THE SALE OF THE DEBTORS' SHARES IN AMERICAN HOME BANK STOCK, (II) APPROVING A BREAK-UP FEE FOR THE BANCORP, INC. (III) SCHEDULING A HEARING TO CONSIDER THE SALE OF THE SHARES, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (V) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF DEBTORS' SHARES IN AMERICAN HOME BANK STOCK FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) AUTHORIZING AND APPROVING PROPOSED STOCK PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF

American Home Mortgage Holdings, Inc.  ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors-in-possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit

this motion (the "Motion"), pursuant to §§ 105(a), 363, 503, 507 and 1146(a) of title 11 of the

United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of two

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc., a Delaware corporation (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

orders as follows:

(a) "Sale Procedures Order" (substantially in the form annexed hereto as Exhibit A):

(i) Approving sale procedures (the "Sale Procedures," substantially in the form annexed as Exhibit 1 to the Sale Procedures Order) in connection with the Debtors' solicitation of higher or better bids than the bid reflected in the Stock Purchase Agreement dated as of April 1, 2009 (the "SPA," annexed hereto as Exhibit C) by and among The Bancorp, Inc. ("Bancorp" or the "Purchaser"), AHM Holdings and American Home Bank, a federal savings association organized under the laws of the United States of America (the "Bank");

(ii) Approving the break-up fee described in the SPA (the "Break-Up Fee");

(iii) Scheduling a hearing to consider the sale of the Shares (the "Sale Hearing");

(iv) Approving the form and manner of notice thereof; and

(v) Granting related relief; and

(b) "Sale Approval Order" (substantially in the form annexed hereto as Exhibit B)

(i) Authorizing the sale of 10,000 shares of common stock, par value $1.00 per share, of the Bank owned by AHM Holdings which constitute all of the issued and outstanding shares of capital stock of the Bank (the "Shares") free and clear of liens, claims encumbrances, and other interests;

(ii) Authorizing and approving the SPA; and

(iii) Granting Related Relief

In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this

Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

for the relief requested herein are §§ 105(a), 363, 503, 507 and 1146(a) of the Bankruptcy Code

and Bankruptcy Rules 2002, 6004, and 9014.

## GENERAL BACKGROUND

2.        On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this

Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the

"Bankruptcy Code").  Each Debtor is continuing to operate its business and manage its properties

as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        The Debtors' cases have been consolidated for procedural purposes only and

are being jointly administered pursuant to an order of this Court.

4.        On August 14, 2007, the United States Trustee for the District of Delaware

(the "US Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").

On October 21, 2008, the US Trustee appointed an Official Committee of Borrowers (the

"Borrowers Committee").  No trustee or examiner has been appointed.

5.        The Amended Chapter 11 Plan Of Liquidation Of The Debtors Dated As Of

February 18, 2009 (the "Plan") was confirmed under section 1129 of the Bankruptcy Code on

February 23, 2009 [D.I. 7042].  The Plan has not yet gone effective.

6.        In the weeks prior to the Petition Date, an unprecedented disruption in the

credit markets caused major write-downs of the Debtors' loan and security portfolios and

consequently resulted in margin calls for hundreds of millions of dollars with respect to the

3

Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

       7.     These events forced the Debtors to discontinue their retail and indirect loan origination business. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND AND MARKETING

       8.     American Home Bank was established in October 2006 when AHM Holdings purchased Flower Bank FSB, a one branch, Federal Deposit Insurance Corporation ("FDIC") and the Office of Thrift Supervision ("OTS") regulated federal savings bank founded in 1987. The Bank is a one branch bank headquartered in Chicago, Illinois and is wholly owned by AHM Holdings. The current management team developed a strategic business plan, which utilizes a direct-to-consumer banking model that blends web-based self-service (account opening, online banking) with live agent support. This combination provides a high-touch customer experience when requested, while leveraging the cost efficiencies of direct marketing account acquisition and servicing. The Bank holds mortgages, consumer loans and securities and cash deposits. As of February 28, 2009, the Bank had approximately $111 million in total assets, and $22 million in total deposits.

       9.     Since the Petition Date, the Debtors, through their investment banker Milestone Advisors, LLC ("Milestone"), have been marketing the Bank for sale, and have received significant interest from third parties wishing to acquire the bank. Interested purchasers have

                                              

proposed both an acquisition of the Bank's assets and the purchase of the outstanding shares in the

Bank.  Regulators have expressed a strong preference for a stock sale to both potential purchasers

and the Debtors.  The marketing efforts entailed several phases of marketing and negotiations as

reflected in the following summary:

### Phase I: Initial Marketing and Negotiations

(a)    Milestone began marketing the Bank in October 2007.

(b)    During the initial marketing period, Milestone contacted 148 different parties, of which 121 were financial buyers and 27 were strategic buyers.

(c)    Confidentiality agreements were sent to 48 of the contacted parties.

(d)    37 parties were provided with the confidential information memorandum ("CIM").

(e)    Of the interested parties, three had conversations with the Bank's management, including two who visited the Bank at its headquarters in Chicago.

(f)    In February 2008, Milestone began the process of negotiating a stalking horse bid with a potential purchaser.  Milestone presented a summary of the potential transaction to the Committee on March 5, 2008.  The negotiations broke down and did not result in a firm stalking horse bid.

### Phase II: Remarketing and Negotiations

(g)    Milestone began the re-marketing of the Bank in March 2008.

(h)    During the remarketing period, Milestone reached out to 33 different parties, of which 20 were financial/strategic buyers and 13 were institutions applying for a thrift charter ("De Novo").

(i)    Confidentiality agreements were sent to 19 of the contacted parties.

(j)    16 parties were provided with the CIM as well as an updated financial package.

(k)    Of the interested parties, five visited the Bank at its headquarters in Chicago to meet with management and four performed due diligence on the Bank.

5

(l)     Milestone received five initial bids, of which three were invited to a final bidding round.

(m)    In July 2008, Milestone began the process of negotiating a stalking horse bid with another potential purchaser.  On August 7, 2008, the negotiations broke down and did not result in a firm stalking horse bid..

Phase III: Negotiations with Another Potential Stalking Horse

(n)     Milestone contacted eight parties after the negotiations failed to result in a firm bid with the last potential purchaser.

(o)     On September 30, 2008, AHM Holdings, the Bank, and another potential purchaser entered into a 45 day exclusivity period to enter into a definitive agreement.

(p)     The potential purchaser had completed due diligence and was in the process of negotiating the stock purchase agreement when negotiations broke down in November 2008.

Phase III: Negotiations with The Bancorp

(q)     Milestone contacted another fifteen parties.

(r)     On March 12, 2009, AHM Holdings, the Bank, and The Bancorp entered into a 10 day exclusivity period to enter into a definitive agreement.

(s)     Thereafter, Bancorp completed its due diligence and on April 1, 2009 executed the SPA.

A.     **The Proposed Transaction**[2]

10.     Pursuant to the terms of the SPA, the Debtors propose to sell to Purchaser, or such other bidder who provides a higher or otherwise better offer realized through a Court-supervised auction process, the Shares free and clear of all Liens and Liabilities (as such terms are defined in the SPA), within the meaning of § 363(f) of the Bankruptcy Code (the "Sale").  Any such Liens and Liabilities will attach to the proceeds of the Sale in the order of priority and with

---

[2]  Discussion of the SPA in this Motion is by way of summary only.  To the extent that this summary differs in any way from the terms of the SPA, the latter shall control.

6

the same validity, force, and effect that such interest may now have against the Shares. The SPA is subject to the Court's approval and to the auction and bidding procedures annexed to the Sale Procedures Order.

          11.    As set forth in the SPA, the material economic terms of the transaction are as follows:[3]

> Purchased Assets:  10,000 shares of common stock, par value $1.00 per share, of the Bank owned by AHM Holdings which constitute all of the issued and outstanding shares of capital stock of the Bank.

> Purchase Price:  The Debtors estimate that the net proceeds from the Sale will be approximately $40,461,961.00 (estimate based on February 28, 2009 book value, less certain deductions).

> The purchase price shall equal the sum of (i) the Closing Tangible Net Book Value (means the Tangible Net Book Value as of the close of business on the Business Day immediately prior to the Closing Date)[4], less (ii) in the event that the Closing takes place prior to July 31, 2009 (or in the event that all closing conditions have been satisfied prior to such date but the parties have mutually agreed pursuant to Section 3.1, at the request of Parent, to close following such date), $1,000,000 (as adjusted pursuant to this Article II or pursuant to Section 8.2, the "Purchase Price") less (iii) the Escrow Amount, if any.

> "Tangible Net Book Value" means (i) stated book value minus (ii) goodwill (each of (i) and (ii) as determined in accordance with GAAP on a basis and using accounting principles and methodology consistent with the existing principles and methodologies of the Bank used in the Audited Financial Statements), after accruing for or paying all fees or expenses incurred by the Bank or on behalf of the Bank in connection with the Sale and as adjusted as follows:

> 1. Decreased by $2,296,000 as an additional loan loss reserve;
> 2. Decreased by $750,000 to account for a 60% discount with respect to the FHLB stock;
> 3. Decreased by $900,000 as an adjustment with respect to the Metavante contract;

---

[3] Unless otherwise defined, capitalized terms contained in this section shall have the meaning ascribed to them in the SPA. The following description of the terms of the SPA is meant as a summary only. Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in the SPA. To the extent that this summary differs in any way from the SPA, the SPA shall control.

[4] "Closing Tangible Net Book Value" means the Tangible Net Book Value as of the close of business on the Business Day immediately prior to the Closing Date.

          

4. Decreased by $97,541 to account for a 60% discount to the Book Value of CRA Investments;

5. Decreased by $768,053 to account for a 60% discount to the Book Value of Umbrella Service Corporation; and

6. Decreased by the full amount of the Deferred Tax Asset, less $250,000.

Auction Protections:  The Break Up Fee of $400,000 will be due and payable upon the approval by the Bankruptcy Court of a Competing Transaction.

Closing and Closing Conditions:  Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the transaction contemplated hereby shall take place following the satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature can be satisfied only at the Closing but subject to the fulfillment or waiver of those conditions), provided, that unless the parties shall mutually agree otherwise, the Closing shall take place within 30 days following the satisfaction of the condition set forth in Section 7.1(c) hereof.

Governmental Consents and Approvals:  The following are required: (a) Consents of, and declarations, filings and registrations with, the Bankruptcy Court; (b) the Consent of the Office of Thrift Supervision to the change of domicile of the Bank and for any capital distributions by the Bank prior to Closing; (c) the Consent of the Federal Reserve and/or the Federal Deposit Insurance Corporation (as applicable) to the transfer of the Shares; and (d) Consents, declarations, filings and registrations the failure to have which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Termination:  The Termination Date is September 30, 2009 (unless extended pursuant to Section 8.2).

The SPA may be terminated and the transactions contemplated therein abandoned at any time on or prior to the Closing Date as a result of, among other reasons:  (a) by mutual written consent; (b) if the Sale Approval Order is not entered by the Bankruptcy Court by June 15, 2009; (c) if required approvals from Governmental Entities for the transfer of the Shares to the Purchaser are not obtained and in effect by June 30, 2009; (d) if the Closing Date shall not have occurred on or before September 30, 2009; or (e) a Government Entity issues an Order or takes action permanently preventing the SPA transactions.

In the event that the closing condition set forth in Section 7.1(c) shall not have been satisfied on or before the then current Termination Date, Purchaser shall have the right to elect to extend the Termination Date for a period of 30 additional days (an "Extension Period") by delivering written notice to Parent together with a non-refundable deposit by wire transfer of immediately available funds in the amount of $1,000,000 (the "Extension Payment") no later than three Business Days prior to the then current Termination Date.  In the event that the Closing Date occurs during an Extension Period, the Purchase Price due on such Closing

8

Date shall be reduced by one-half of the amount of all Extension Payments paid pursuant to this Section 8.2. Purchaser shall have the right to make up to three Extension Period elections under this Agreement, in each case upon delivery of written notice and payment of an Extension Payment in accordance with this Section 8.2.

## RELIEF REQUESTED

12.    By this Motion, the Debtors seek entry of (A) the Sales Procedures Order, annexed hereto as Exhibit A, (i) approving sale procedures with respect to the Shares, (ii) authorizing and approving the Break-Up Fee in accordance with the terms of the SPA, (iii) scheduling the Sale Hearing, and (iv) approving the form and manner of notice of the Auction, and (v) granting related relief; and (B) the Sale Order, annexed hereto as Exhibit B, (i) authorizing the sale of the Shares free and clear of liens, claims encumbrances, and other interests, (ii) authorizing and approving the SPA, and (iii)  granting related relief.

## A.    Sales Procedures

13.    The Debtors are proposing the Sale Procedures, substantially in the form annexed to the Sales Procedures Order as Exhibit 1, in an attempt to maximize the realizable value of the Shares, whereby interested parties may bid on the Shares.

14.    The Sale Procedures Order and the Sale Procedures contemplate an Auction process pursuant to which bids will be subject to higher or better offers.  As described below, and more fully in the Sale Procedures, only Qualified Bidders[5] who timely submit Qualified Bids may

---

[5]  A "Qualified Bidder" is a Potential Bidder whose Financials or other information demonstrate the financial capability to consummate and perform obligations in connection with the Sale and that the Debtors, in consultation with the Committee, determine is reasonably likely to make a bona fide offer that may lead to a higher or otherwise better value than the value being received for the benefit of the Debtors' creditors under the SPA.  The Debtors, in consultation with the Committee, will promptly advise the Potential Bidder in writing of the Debtors' determination whether or not the Potential Bidder is a Qualified Bidder.  For purposes of the Sale Procedures, the Purchaser is deemed a Qualified Bidder.

be eligible to participate in the Auction.  Specifically, the Sale Procedures Order and the Sale

Procedures provide, in relevant part, as follows:[6]

> (a) <u>Access to Information</u>: The Debtors shall provide each Qualified Bidder reasonable due diligence information as requested.  Site access shall be provided upon reasonable request to the Debtors at the discretion of the Debtors within their reasonable business judgment.  The due diligence period will end on the Bid Deadline (as such term is defined below).  The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

> (b) <u>Qualified Bid</u>.  A Bid received from a Qualified Bidder and that meets the requirements set forth below will be considered a "<u>Qualified Bid</u>" if the Debtors believe, in consultation with the Committee, that such Bid would be consummated if selected as a Successful Bid (as defined herein).  A Bid (other than the SPA) must be a written irrevocable offer from a Qualified Bidder and:

>> (i)  State that the Qualified Bidder offers to consummate the Sale pursuant to an agreement that has been marked to show amendments and modifications to the SPA, including price and terms, that are being proposed by the Qualified Bidder, as applicable, (the "<u>Marked Purchase Agreement</u>");

>> (ii)  The value of such Bid must be higher or otherwise better, as determined by the Debtors in consultation with the Committee, than the value of (a) the Purchase Price (as defined in the SPA), (b) the amount of the Break-Up Fee (as defined in the SPA) which, for purposes of determining this calculation, shall be deemed to equal $400,000, and (c) $500,000;

>> (iii)  Attach a proposed business plan for the Bank that, in the Debtors' discretion after consultation with the Committee, is likely to be accepted by the OTS;

>> (iv)  Confirm that the offer shall remain open and irrevocable until the entry of a final non-appealable order by the Bankruptcy Court approving the Sale to the Successful Bidder;

---

[6] The following description of the Sale Procedures Order and Sale Procedures is meant as a summary only. Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in the Sale Procedures Order and Sale Procedures.  To the extent that this summary differs in any way, the Sale Procedures Order shall control.

(v) Enclose a copy of the proposed Marked Purchase Agreement;

(vi) Be accompanied with a certified or bank check or wire transfer in an amount equal to $1 million as a minimum good faith deposit (the "<u>Minimum Deposit</u>"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the Bid;

(vii) Be on terms that are not materially more burdensome to the Debtors or conditional than the terms of the SPA;

(viii) Not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder;

(ix) Not request or entitle the Qualified Bidder to any break-up fee or similar type of payment; and

(x) Fully disclose the identity of each entity that will be bidding for the Shares or otherwise participating in connection with such Bid, and the complete terms of any such participation.

(c) <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder shall be **May 8, 2009 at 4:00 p.m. (prevailing Eastern Time)**.

(d) <u>Auction</u>. If the Debtors receive a Qualified Bid from a Qualified Bidder (other than the SPA) by the Bid Deadline, an auction (the "<u>Auction</u>") with respect to the Sale will take place on **May 12, 2009 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, or such later time and place as the Debtors may provide so long as such change is communicated reasonably in advance by the Debtors to all Qualified Bidders, and other invitees. If, however, no such Qualified Bid other than the SPA is received by the Bid Deadline, the Auction will be deemed canceled, the SPA will be deemed the Successful Bid, and the Debtors will seek authority from the Bankruptcy Court to consummate the Sale contemplated by the SPA.

(e) <u>Auction Rules</u>. After the Bid Deadline, and after consulting with the Committee, the Debtors shall determine which Qualified Bid represents the then-highest or otherwise best bid (the "<u>Initial Bid</u>"). Prior to the commencement of the Auction, the Debtors shall distribute copies of the Initial Bid to each Qualified Bidder.

(i) Only a Qualified Bidder who has submitted a Qualified Bid by the Bid Deadline will be eligible to participate at the Auction. Only the authorized representatives of the Qualified Bidders that submitted a Qualified Bid, the Committee and the Debtors shall be permitted to attend the Auction.

(ii) At the Auction, Qualified Bidders will be permitted to increase their Qualified Bids. The bidding at the Auction shall start at the value of the highest or otherwise best Initial Bid, as determined by the Debtors in consultation with the Committee, and then continue in value increments of at least $250,000. The Debtors, in consultation with the Committee, reserve the right to increase or decrease the bid increment at their discretion.

(iii) Each Qualified Bidder will be permitted a fair, but limited, amount of time (no more than one half hour, unless otherwise agreed by the Debtors in consultation with the Committee) to respond to the previous bid at the Auction. Bidding at the Auction will continue until such time as the highest or otherwise best offer is determined in accordance with these Sale Procedures.

(iv) The Debtors will, from time to time, in an open forum, advise Qualified Bidders participating in the Auction of the then highest or otherwise best bid(s).

(v) The Auction may be adjourned by the Debtors, in consultation with the Committee. Reasonable notice of the time and place for the resumption of the Auction will be given to all Qualified Bidders, the Committee and other invited parties.

(vi) Immediately prior to concluding the Auction, the Debtors, in consultation with the Committee, shall (a) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Debtors' estates and creditors; (b) determine and identify the highest or otherwise best Qualified Bid (the "Successful Bid") and the Qualified Bidder submitting such bid (the "Successful Bidder"); and (c) have the right to reject any and all bids.

(vii) Within one business day of the completion of the Auction, the Successful Bidder shall complete and execute all agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

(f)  Sale Hearing. A hearing to consider approval of the Sale to the Successful Bidder (or to approve the SPA if no Auction is held) will take place on **May 15, 2009 at 1:00 p.m. (prevailing Eastern Time)**. The Debtors will present the results of the Auction to the Bankruptcy Court at the Sale Hearing (as defined below).

(g)  Acceptance of the Sale: If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction and (ii) definitive documentation has been

executed in respect thereof. Such acceptance is conditioned upon approval
by the Bankruptcy Court of the Successful Bid and the entry of an Order
approving such Successful Bid.

(h)     Return of Minimum Deposit. Except as otherwise provided in this
        paragraph with respect to any Successful Bidder, the Minimum Deposits of
        all Qualified Bidders required to submit such a deposit under the Sale
        Procedures shall be returned upon or within three (3) business days after
        entry of a final non-appealable order approving the Sale by the Bankruptcy
        Court. The Minimum Deposit of the Successful Bidder shall be held until
        the closing of the Sale and applied in accordance with the Successful Bid.

B.     Notice of Auction and Sale Hearing

       15.     The Debtors, in consultation with their financial advisors, have developed a

list of parties (each, individually, a "Contact Party", and collectively, the "Contact Parties")

known to have expressed a bona fide interest in acquiring the Shares and whom the Debtors

reasonably believe would have the financial resources to consummate a purchase of the Shares.

Within three (3) business days of the entry of the Sales Procedure Order, the Debtors and their

advisors will send notice of the proposed Sale, the process for obtaining diligence materials, the

process for qualifying as a bidder, the due date for bids and the proposed time and date of the

Auction (as defined below) to Contact Parties and other parties in interest..

       16.     On or before three (3) business days after the entry of this Sale Procedures

Order, the Debtors will serve copies of the Sale Notice, the SPA, the Sale Procedures Order, and

the proposed form of Sale Approval Order by first class mail, postage prepaid, to (a) all entities

known to have expressed a bona fide interest in acquiring the Shares; (b) counsel to the Bank of

America, N.A., as administrative agent; (c) counsel to the Committee; (d) counsel to the Purchaser;

(e) the Office of the United States Trustee for the District of Delaware; (f) the Office of Thrift

Supervision; (g) the Federal Deposit Insurance Corporation; (h) the Internal Revenue Service; (i)

the U.S. Securities and Exchange Commission; (j) all parties who are known to possess or assert a

secured claim; and (k) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as

of the date prior to the entry of this Sale Procedures Order.  Not later than three (3) business days

after entry of this Sale Procedures Order, the Debtors will serve copies of the Sale Notice by first

class mail, postage prepaid to all known creditors of the Debtors.

       17.    Not later than five (5) business days after entry of the Sale Procedures

Order, the Debtors will publish the Sale Notice in the national edition of *The Wall Street Journal*.

## AUTHORITY FOR REQUESTED RELIEF

A.    The Sale is Within the Sound Business Judgment of the Debtors and Should be Approved

       18.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this

Circuit and others have required that the decision to sell assets outside the ordinary course of

business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.,

(In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

       19.    The "sound business judgment" test requires a debtor to establish four

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course

of business, (b) that adequate and reasonable notice has been provided to interested persons, (c)

that the debtors have obtained a fair and reasonable price, and (d) good faith. Abbotts Dairies, 788

14

F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

In this case, the Debtors submit that the decision to proceed with the Sale of the Shares pursuant to

the SPA or such other successful bid determined at the Auction and the related Sale Procedures are

based upon their sound business judgment and should be approved. A debtor's showing of a sound

business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify

the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888,

906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a

transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071;

Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance

program; business purpose requirement fulfilled because stabilizing turnover rate and increasing

morale were necessary to successful reorganization).

      20.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy

court with broad powers in the administration of a case under the Bankruptcy Code. Section

105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided

that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated

by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics

Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R.

303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or

decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v.

Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the

power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the

Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

21.     The Debtors submit that more than ample business justification exists to sell the Shares to the Purchaser (or Successful Bidder) pursuant to the Sale Procedures.  For the reasons identified more fully below, the Debtors believe that it is essential to sell the Shares.  The Debtors believe that a targeted sale process (particularly in light of the extensive marketing efforts already conducted, as set forth above) involving a stalking horse bidder and interested parties is most likely to achieve the highest and best price for the assets.  Accordingly, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of their stakeholders.

22.     The notice described herein and the Sale Procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Shares.  Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

23.     The Sale Procedures with respect to the Shares are designed to maximize the value received for the Shares.  The process proposed by the Debtors allows for a timely auction process while providing bidders and consultants with ample time and information to submit a timely bid.  The Sale Procedures are designed to ensure that the Shares will be sold for the highest or otherwise best possible purchase price.  The Debtors are subjecting the value of the Shares to market testing and permitting prospective purchasers to bid on the Shares.  The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-

supervised Auction process as set forth in the Sale Procedures. Accordingly, the Debtors and all

parties-in-interest can be assured that the consideration received for the Shares will be fair and

reasonable, and the third prong of the <u>Abbotts Dairies</u> standard is satisfied. As discussed below,

the "good faith" prong of the <u>Abbotts Dairies</u> standard is also satisfied here.

B.      The Sale is Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code

24.      The Debtors request that the Court find that the Purchaser (or Successful

Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy

Code in connection with the Sale.

25.      Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an entity
> that purchased . . . such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization
> and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets

sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

Shares if the order allowing the sale is reversed on appeal.

26.      As required by section 363(m) of the Bankruptcy Code, the Sale Procedures

have been proposed in good faith and provide for both the Debtors and the potential purchaser to

act in good faith in negotiating the sale of the Shares. Although the Bankruptcy Code does not

define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy

Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'."

<u>Abbotts Dairies</u>, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection

with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or

the trustee or an attempt to take grossly unfair advantage of other bidders." <u>Id.</u> (citing <u>In re Rock</u>

17

Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).  See also In re Bedford Springs Hotel,

Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J.

1995).  Due to the absence of a bright line test for good faith, the determination is based on the

facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale

proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock

Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

      27.    Here, the sale of the Shares is proposed in good faith.  There is no evidence

of fraud or collusion in the terms of the Sale.  To the contrary, as discussed throughout this Motion,

and as will be further demonstrated at the Sale Hearing, the sale agreement will be the culmination

of a solicitation and negotiation process in which all parties will be represented by sophisticated

counsel and financial advisors.  No known potential bidder is an insider of the Debtors, as that term

is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will

continue to be conducted on an arms length, good faith basis.  With respect to the potential bidders,

the Sale Procedures are designed to ensure that no party is able to exert undue influence over the

process.  Under the circumstances, the Purchaser (or Successful Bidder) should be afforded the

protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

Furthermore, the Sale Procedures are designed to prevent the Debtors or the Purchaser (or

Successful Bidder) from engaging in any conduct that would cause or permit the SPA, or the Sale

of the Shares to the Successful Bidder pursuant thereto and hereto, to be avoided under section

363(n) of the Bankruptcy Code.

      28.    All creditors and parties in interest will receive notice of the Sale and will be

provided with an opportunity to be heard.  The Debtors submit that such notice is adequate for

entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) of the Bankruptcy Code.

C.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code

29.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Because the Debtors expect that they will satisfy the second and fifth of these requirements, if not others as well, approving the sale of the Shares free and clear of all adverse interests is warranted.  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

D.    The Break-Up Fee is Reasonable and Appropriate

30.    Approval of the Break-Up Fee is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d

19

Cir. 1999) ("In re O'Brien").  In In re O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  In re O'Brien, 181 F.3d at 535.  Here, the Break-Up Fee should be approved because it will provide a benefit to the Debtors' estates.

31.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, a break-up fee may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second:

> if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.

Id.

32.    In In re O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee:  (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate;

(7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the

benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the

break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee."

See In re O'Brien, 181 F.3d at 536.

      33.     After considering the reasonableness of bidding incentives, courts have

approved a range of break-up fees as a percentage of the purchase price as being appropriate under

the facts and circumstances of the case. See In re Chi-Chi's Inc., Case No. 03-13063 (Bankr. D.

Del. November 4, 2003) (fee of 5.1% permitted); In re Riverstone Networks, Case No. 06-10110

(Bankr. D. Del. February 24, 2006) (fee of 3% permitted); In re Radnor Holdings, Case No. 06-

10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3%

permitted); Tama Beef Packing, Inc., 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that

typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); In re

Great Northern Paper, Inc., Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4%

plus reimbursement of expenses upheld); Integrated Resources, 147 B.R. 650, 662 (S.D.N.Y. 1992)

(break-up fee representing up to 3.2% of bidder's out-of-pocket expenses or 1.6% of the proposed

purchase price; expert testified that outside of bankruptcy break-up fees average 3.3%); In re

Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. February 17, 1998)

(fee of 4.0% upheld); In re Hechinger Investment Company Inc., Case No. 99-2261 (PJW) (Bankr.

D. Del. October 1, 1999) (fee of 3.0% upheld); In re FSC Corp., Case No. 00-B-04659 (Bankr.

N.D. Ill. February 28, 2000) (break-up fee of 3.4% plus reimbursement of expenses is reasonable).

34.     Whether evaluated under the "business judgment rule" applied by many

courts[7] or the Third Circuit's "administrative expense" standard, the Break-up Fee should be

approved because it is necessary to preserve the full value of the Debtors' estates.  First, all

negotiations between the Debtors and the Purchaser have been conducted on a good faith, arm's-

length basis and in consultation with counsel and advisors.  Second, based on the Debtors' pre-

Auction solicitation process, the Debtors have determined that the Break-up Fee is necessary to

retain the Purchaser as the stalking horse bidder.  Specifically, the initial expressions of interest

received by the Debtors from parties interested in purchasing the Shares, including the Purchaser,

indicated that parties would not be willing to act as a stalking horse without some form of bid

protection in the event the Debtors determine to sell the Shares to another bidder.  The Debtors'

ability to continue to seek a higher or better offers without risk of losing a "bird-in-the-hand"

would be eliminated if the Debtors could not secure a stalking horse bidder.  Therefore, absent

authorization of the payment of the Break-up Fee, the Debtors may lose the opportunity to obtain

the highest and best available offer for the Shares.

35.     Moreover, the promise of a Break-up Fee will ensure that the Debtors'

receive serious Qualified Bids.  The Break-up Fee will provide the incentive needed to induce a

bidder to increase its bid prior to the Auction.  Further, the proposed SPA will establish a bid

standard or minimum for other bidders, further ensuring that during the Auction the Debtors

receive the highest or best bid possible for the Shares.  Thus, if the Purchaser is not ultimately the

successful bidder at the Auction, the Debtors will still have benefited from the higher floor

established by the improved bid and thereby increase the likelihood that the price at which the

---

[7] See Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

22

Shares will be sold will reflect its true worth. For similar reasons, the efforts expended by the Purchaser in performing due diligence in connection with the Sale, as well as formulating and negotiating the SPA, provide a valuable basis against which the Debtors will be able to compare subsequent bids at the Auction. Accordingly, to maximize value for the Shares, the Debtors must have authority to offer the Break-Up Fee.

36.     Not only is the proposed Break-up Fee necessary, they are fair and reasonable in amount. First, paying the Break-up Fee of $400,000 (which the Debtors anticipate to be an amount equal to approximately 1% of the net proceeds to be received from the Sale) on account of the Purchaser's risk of being overbid at the Auction and not ultimately acquiring the Shares is reasonable and customary in this type of transaction. Second, payment of the Break-up Fee is not likely to diminish the Debtors' estates. The Debtors will incur the obligation to pay the Break-up Fee only following an agreement to sell the Shares in an alternative transaction with an alternative bidder for a purchase price that, because of the overbid provisions of the Motion and SPA, will necessarily exceed the sum of Bancorp's purchase price and the Break-up Fee by at least $500,000. In light of the benefit to the Debtors' estates to be realized by having an executed SPA which will enable the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Break-up Fee.

37.     The Debtors' payment of the Break-up Fee to the Purchaser under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtors' estates; (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Purchaser even though the proposed Sale is subject to higher or better offers; and (iv) necessary to

23

ensure that the Purchaser will continue to pursue its proposed acquisition of the Shares at the agreed upon purchase price.

38.    The Debtors have demonstrated a sound business justification for authorizing the Break-up Fee and its clear necessity and benefit to these estates. Thus, the Debtors request that this Court approve and authorize the Break-up Fee, including but not limited to the payment of the Break-up Fee pursuant to the terms and conditions of the SPA.

E.    Authorizing the Exemption of the Sale from Stamp and Similar Taxes is Appropriate

39.    Under section 1146(a) of the Bankruptcy Code, the "transfer. . . or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a). In Florida Department of Revenue v. Piccadilly Cafeterias, Inc., the Supreme Court concluded that section 1146(a) is to be interpreted as setting forth a simple, bright-line rule: "'If a debtor is able to develop a Chapter 11 reorganization and obtain confirmation, then the debtor is to be afforded relief from certain taxation to facilitate the implementation of the reorganization plan.'" 128 S. Ct. 2326 (U.S. 2008) (quoting NVR Homes, Inc. v. Clerks of the Circuit Courts (In re NVR, L.P.), 189 F.3d 442, 458 (4th Cir. Va. 1999). Here, the Debtors clearly satisfy this rule. This Court has already confirmed the Plan in these cases, which contemplates the liquidation of all of the Debtors' assets; in addition, the Sale will occur post-confirmation. Therefore, the Sale is precisely the type of transfer for which section 1146(a) provides. Accordingly, the Sale should be approved free and clear of stamp and similar taxes.

F.    Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004(h) is Appropriate

40.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the

court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rule 6004(h) is waived.

41.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u> The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h).

<b><u>NOTICE</u></b>

42.     Notice of this Motion has been provided to: (a) all entities known to have expressed a bona fide interest in acquiring the Shares; (b) counsel to the Bank of America, N.A., as administrative agent; (c) counsel to the Committee; (d) counsel to the Purchaser; (e) the Office of the United States Trustee for the District of Delaware; (f) the Office of Thrift Supervision; (g) the Federal Deposit Insurance Corporation; (h) the Internal Revenue Service; (i) the U.S. Securities and Exchange Commission; (j) all parties who are known to possess or assert a secured claim; and (k) all parties that have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

25

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Sale

Procedures Order, substantially in the form annexed hereto as <u>Exhibit A</u>, (ii) entry of the proposed

Sale Approval Order, substantially in the form annexed hereto as <u>Exhibit B</u>, and (C) granting such

further relief as the Court deems just and proper.

Dated: April 1, 2009          YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                /s/ Sean M. Beach
                James L. Patton, Jr. (No. 2202)
                Pauline K. Morgan (No. 3650)
                Sean M. Beach (No. 4070)
                The Brandywine Building
                1000 West Street, 17th Floor
                Wilmington, Delaware 19801
                (302) 571-6600

                Counsel for the Debtors and Debtors-in-Possession

DB02:7973020.1          066585.1001