IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------- x
In re:                                              :   Chapter 11
                                                    :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,              :   Case No. 07-11047 (CSS)
a Delaware corporation, et al.,*                    :
                                                    :   Jointly Administered
        Debtors.                                    :
                                                    :   Ref. Dkt. Nos. 1711, 2166, 2231, 2503,
                                                    :   and 3975
                                                    :
                                                    :   Hearing Date: May 8, 2009 at 11:30
-------------------------------------------------------------- x   a.m. (ET)
```

## DEBTORS' OBJECTION TO CURE CLAIMS ASSERTED BY U.S. BANK NATIONAL ASSOCIATION IN CONNECTION WITH THE ASSUMPTION AND ASSIGNMENT OF CERTAIN LOAN SERVICING AGREEMENTS TO AMERICAN HOME MORTGAGE SERVICING, INC. (F/K/A AH MORTGAGE ACQUISITION CO., INC.)

AHM Holdings and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby object and respond, as applicable (the "Objection") to (i) the *Initial Cure Amount and Transfer Cost Claim Estimate of U.S. Bank, National Association, as Trustee* filed November 29, 2007 [D.I. 2231] (the "Initial Cure Claim") and (ii) the *Interim Period Cure Claim, Objection to the Debtors' Interim Period Cure Schedule, and Amendment to Initial Claim of U.S. Bank National Association, as Trustee* filed December 26, 2007 [D.I. 2503] (the "Interim Cure Claim"), and (iii) the *Transfer Cost Claim of U.S. Bank National Association, as Trustee* filed on May 7, 2008 [D.I. 3975] (the "Transfer Cost Claim"); and in support thereof, the Debtors respectfully represent as follows:

---

*     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

**BACKGROUND**

I.    **The Servicing Sale and Cure Escrow**

1.    On August 6, 2007 (the "Petition Date"), the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") to authorize the sale of the assets used in their mortgage loan servicing business (the "Servicing Business"), including the assumption and assignment of certain executory contracts.

2.    On August 27, 2007, the Debtors filed a notice of potential executory contracts to be assumed and assigned in connection with the sale of the Servicing Business [D.I. 403] (as subsequently modified and supplemented, the "Initial Cure Notice").  Among the contracts identified in the Initial Cure Notice were contracts relating to the servicing or subservicing of home equity lines of credit ("HELOCs") owned by certain securitization trusts (the "HELOC Servicing Agreements") and contracts relating to the servicing or subservicing of non-HELOC mortgage loans owned by certain securitization trusts (the "Loan Servicing Agreements").  In the Initial Cure Notice, the Debtors estimated a $0 cure amount for each of the HELOC Servicing Agreements and Loan Servicing Agreements.

3.    On September 20, 2007, U.S. Bank National Association ("U.S. Bank"), in its capacity as Trustee entitled to enforce the Debtors' obligations under certain of the HELOC Servicing Agreements and Loan Servicing Agreements, filed a limited objection [D.I. 836] to the Sale Motion and the Initial Cure Notice (as supplemented, the "Sale Objection"), joining in certain other objections and arguing, among other things, that (i) the Debtors' rights under certain HELOC Servicing Agreements had been terminated prepetition, (ii) the proposed $0 cure amounts for the HELOC Servicing Agreements were inadequate, (iii) a cure reserve should be established so that parties to Loan Servicing Agreements would have a reasonable opportunity to

2

investigate whether defaults exist, and (iv) U.S. Bank had not been provided adequate assurance of future performance by the as-yet-unidentified assignee.

4.     On September 25, 2007, the Debtors filed an executed Asset Purchase Agreement [D.I. 931] (as subsequently amended, the "APA") by and among AHM Investment, AHM Corp., and AHM SV (the "Sellers") and American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage Acquisition Co., Inc.) (the "Purchaser").  The APA contemplated a two-step closing: first, an "economic" close, at which the Purchaser would tender the purchase price and after which the Debtors would continue to operate the Servicing Business in the ordinary course for the benefit and risk of the Purchaser, using working capital to be provided by the Purchaser (the "Initial Closing"); and second, a "legal" close, at which legal title to the assets of the Servicing Business would vest in the Purchaser and which would be the effective date of assumption and assignment of any executory contracts and unexpired leases (the "Final Closing").

5.     The Court held a five-day evidentiary hearing (the "Sale Hearing") on October 15-19, 2007, to consider approval of the Sale Motion and the APA.  At the beginning of the Sale Hearing, counsel for the Debtors announced that HELOC Servicing Agreements would be excluded from the contracts to be assumed and assigned to the Purchaser,[1] thus mooting certain objections to the Sale Motion, the Initial Cure Notice, and the APA.  At the Sale Hearing the Debtors adduced evidence (i) in support of the $0 proposed cure amounts set forth in the Initial Cure Notice, and (ii) of adequate assurance of future performance by the Purchaser.

6.     Prior to the conclusion of the Sale Hearing, the Debtors (in consultation with the Official Committee of Unsecured Creditors (the "Committee"), Bank of America, N.A.,

---

[1]  This change was memorialized in the First Amendment to the APA, which was approved as part of the Sale Order (as hereinafter defined).

as Administrative Agent ("BofA"), and the Purchaser) and U.S. Bank resolved the Sale

Objection by agreement in principle upon certain language to be included in the proposed sale

order, including a stipulation that the Loan Servicing Agreements in which U.S. Bank had an

interest were executory contracts assumed and assigned to the Purchaser pursuant to section 365

of the Bankruptcy Code.[2]

7.    On October 23, 2007, the Court issued a bench ruling approving the Sale

Motion and APA. Among other things, the Court found that the Final Closing could only occur

when the Purchaser was duly licensed by applicable authorities to operate the Servicing Business

and that the Debtors had "clearly established" that the Purchaser had more than sufficient capital

to operate the Servicing Business and intended to maintain as much of the then-current

management as possible, which was "more than enough to establish adequate assurance of future

performance". (10/23/07 Hr'g Tr., D.I. 1664 at 6:1-7:15.) At a follow-up hearing to consider the

proposed form of order approving the sale, the Court ruled further that the evidence at the Sale

Hearing was "overwhelming" that there had been "no material change in the actual performance

of the [Servicing Business]" during the bankruptcy cases. (10/25/07 Hr'g Tr., D.I. 1793 at 86:1-

5, 17-19.)

8.    The Court entered an order [D.I. 1711] (the "Sale Order") approving the

Sale Motion and the APA on October 30, 2007. The Sale Order provided that the Loan

Servicing Agreements in which "Certain Objectors" (including, but not limited to, U.S. Bank)

had an interest were executory contracts subject to assumption and assignment pursuant to

section 365 of the Bankruptcy Code. (Sale Ord. at 4.) The Sale Order provided further that a

reserve of $10 million (the "Cure Escrow") would be established for the payment of the "Sellers'

---

[2] One of the legal issues in dispute at the Sale Hearing was whether the Loan Servicing Agreements were executory contracts subject to section 365 of the Bankruptcy Code (which U.S. Bank had asserted) or non-executory contracts subject only to section 363 of the Bankruptcy Code (which the Debtors had asserted).

Cure Amount," which includes (i) the Initial Cure Amount, (ii) the Interim Cure Amount, and (iii) any reasonable out-of-pocket costs and expenses (a) incurred by a counterparty to an Assumed Contract as a result of the assumption and assignment of such contract to the Purchaser *and* (b) chargeable under the Assumed Contract (such costs/expenses, "Transfer Costs"). (Id. ¶¶ 32-39.) The Sale Order expressly reserved the rights of the Debtors, the Committee, and BofA to object to any Sellers' Cure Amount (id. ¶ 35) and, more particularly, to object to any claim for Transfer Costs "on any grounds whatsoever, including that such costs and expenses constitute an unenforceable restraint on assignment under applicable provisions of the Bankruptcy Code" (id. ¶ 39).

   9.  The Initial Closing under the APA occurred on November 16, 2007, at or about which time the Cure Escrow was established and funded as required by the Sale Order. The Final Closing occurred on April 11, 2008. In accordance with the Sale Order, U.S. Bank timely filed its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim, which are summarized in the table below:

|  | Initial Cure | Interim Cure | Transfer Cost[3] |
|---|---|---|---|
| **Attorneys' Fees** | $298,008 | $23,914 | $74,166 |
| **Default Administration Fees** | $64,588 | $11,842 | $39,209 |
| **Other** | - | $252,833 | - |

## II.  The Purchaser's Administrative Claim

   10.  On May 23, 2008, the Purchaser filed a motion for allowance of an administrative expense claim for alleged breaches of the APA [D.I. 4233] (as amended, the "Purchaser's Administrative Claim"). In its motion, the Purchaser alleged that, during the period between the Initial Closing and the Final Closing when the Sellers were operating the Servicing

---

[3] As defined in the Sale Order, Transfer Costs could include Initial and Interim Cure Amounts to the extent such amounts otherwise met the criteria for a "Transfer Cost". For purposes of this table, Transfer Cost amounts that are duplicative of Initial and/or Interim Cure Amounts are excluded.

Business for the Purchaser's risk and benefit, the Sellers used funds from accounts established

for the benefit of the Purchaser to remedy shortfalls in unidentified investors' custodial accounts

that had resulted from pre-Initial Closing acts or omissions of the Sellers.  The Purchaser

asserted this violated the APA because account shortfalls relating to pre-Initial Closing acts or

omissions were "Retained Liabilities" of the Sellers which were not authorized to be paid out of

the Purchaser's accounts.

      11.    On August 18, 2008, the Purchaser amended its administrative expense

request [D.I. 5495].  In its amended request, the Purchaser, among other things, (i) reasserted its

claims for reimbursement of amounts allegedly paid by the Sellers from the Purchaser's accounts

to remedy alleged pre-Initial Closing shortfalls in certain unidentified investors' custodial

accounts (such claims, the "Misappropriation Claims") and (ii) asserted claims for

reimbursement of amounts necessary to remedy alleged shortfalls in certain unidentified

investors' custodial accounts resulting from alleged acts or omissions of the Sellers prior to the

Initial Closing (such claims, the "Uncured Shortfall Claims").

      12.    On September 10, 2008, the Debtors filed a preliminary objection to the

Purchaser's Administrative Claim [D.I. 5798] in which they reserved the right to seek discovery

on the Purchaser's factual allegations, but asserted, with respect to the Uncured Shortfall Claims

of approximately $5.1 million, that

> (a)    pursuant to the Sale Order, any claim against the Sellers arising
> under an Assumed Contract with respect to pre-Initial Closing acts or omissions of the
> Sellers (including, but not limited to, any claim of an investor resulting from a shortfall in
> its custodial account) had been satisfied in full by the establishment of the Cure Escrow;

(b)    by operation of the injunctive provisions in the Sale Order, any such claim could only be asserted against the Cure Escrow, and could not be asserted against the Debtors[4] or against the Purchaser;

(c)    the Purchaser did not have standing to assert claims against the Cure Escrow; and

(d)    the Uncured Shortfall Claims were duplicative of claims already asserted against the Cure Escrow or, to the extent not asserted, time-barred and unenforceable under the Sale Order.

With respect to the Misappropriation Claims of approximately $3.5 million asserted in the Purchaser's Admin Claim, the Debtors reserved their rights, *inter alia*, to bring avoidance actions to recover any amounts transferred to or for the benefit of investors to the extent such transfers violated the APA (and, by extension, the Sale Order).

13.    Discovery on the Purchaser's Admin Claim is currently underway.  On information and belief, the Misappropriation Claims and Uncured Shortfall Claims asserted in the Purchaser's Admin Claim may implicate one or more custodial accounts in which U.S. Bank has an interest as Trustee of the respective securitization trust(s).

## III.    The Plan

14.    On February 23, 2009, the Court entered its order [D.I. 7042] (the "Confirmation Order") confirming the Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009.  Paragraph 54 of the Confirmation Order establishes a deadline (the "Payment/Objection Deadline") by which the Debtors must either (a) cause the Sellers' Cure Amounts asserted by U.S. Bank to be paid from the Cure Escrow or (b) file and serve a written objection to the Sellers' Cure Amounts asserted by U.S. Bank, stating with specificity the

---

[4] A limited exception under the Sale Order is that, if the actual claims ultimately allowed as Sellers' Cure Amounts exceed $10 million, then such claims will be paid *pro rata* from the Cure Escrow, and "the right of a Counterparty to an Assumed Contract to assert a general unsecured claim against the Debtors (but not against the Purchaser) with respect to the difference between the pro rata Sellers' Cure Amount . . . and the allowed Sellers' Cure Amount with respect to such Assumed Contract is preserved".  (Sale Ord. ¶ 35.)

amount subject to, and the legal and factual basis for, such objection. The Payment/Objection

Deadline was extended by agreement of the Debtors and U.S. Bank to the date hereof.

15.     The Debtors file this Objection in accordance with the Confirmation

Order, and hereby object to the Initial Cure Claim, the Interim Cure Claim, and the Transfer Cost

Claim *in toto* for the reasons set forth below.

## **OBJECTION**

16.     Section 365 of the Bankruptcy Code generally requires a debtor, as a

prerequisite to assumption and assignment of an executory contract, to cure any defaults under

such contract and compensate the counterparty to such contract for any pecuniary losses

resulting from such defaults. 11 U.S.C. § 365(b)(1)(A) & (B), (f)(2)(A). The cure requirement

is excused with respect to so-called "*ipso facto*" defaults, i.e., under contractual provisions

relating to the debtor's financial condition, the commencement of a bankruptcy case, or the

debtor's status as a debtor in possession. 11 U.S.C. § 365(b)(2)(A)-(C). (Accord Sale Ord. ¶ 40

(providing that, for purposes of determining the Sellers' Cure Amount, "no effect shall be given

to any default of the type set forth in section 365(b)(2) of the Bankruptcy Code").) This is

consistent with the general invalidation of contractual *ipso facto* provisions elsewhere in the

Bankruptcy Code. See 11 U.S.C. § 365(e)(1) (rights/obligations under an executory contract

cannot be modified post-petition solely because of an *ipso facto* provision in the contract), 363(l)

(debtor may use, sell, or lease property of the estate notwithstanding any contractual provision

that effects or gives an option to effect a modification of the debtor's interest in such property

based on an *ipso facto* condition); 541(c)(1) (property of the debtor becomes property of the

estate notwithstanding any contractual provision that effects or gives an option to effect a

modification of the debtor's property interest).

17.     Unlike proofs of claim filed pursuant to section 501 of the Bankruptcy Code, cure claims asserted pursuant to section 365(b)(1) of the Bankruptcy Code are accorded no initial presumption of validity.  In re Joshua Slocum, Ltd., 103 B.R. 601, 605-06 (Bankr. E.D. Pa. 1989).  Thus, like a plaintiff in a lawsuit, the party asserting a cure claim pursuant to section 365(b)(1) must prove every element of its entitlement to a cure claim by a preponderance of the evidence.  Id.  Holding cure claimants to the same burden of production and persuasion as an ordinary civil plaintiff is appropriate in light of the fact that cure claims are afforded *de facto* administrative expense priority.  Cf. Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.), 350 B.R. 166, 178-79 (Bankr. D. Del. 2006) (noting that cure claims are *de facto* priority claims because they are paid dollar-for-dollar from assets that would otherwise be available to the bankruptcy estate for distribution to creditors); In re Bernard Techs., Inc., 342 B.R. 174, 177 (Bankr. D. Del. 2006) (holding that an applicant seeking reimbursement of expenses as an administrative priority claim "must prove his entitlement to the requested . . . expense reimbursement by a preponderance of the evidence").

## I.     Attorneys' Fees

18.     In its Initial Cure Claim, U.S. Bank asserts an entitlement to reimbursement of $362,596.00 in attorneys' fees accrued through October 29, 2007.  In its Interim Cure Claim, U.S. Bank asserts an entitlement to reimbursement of $23,914.43 in attorneys' fees accrued between October 29, 2007, and the Initial Closing.  In its Transfer Cost Claim, U.S. Bank asserts an entitlement to reimbursement of these prior amounts, plus an additional $74,166, which presumably represents attorneys' fees accrued between the Initial Closing and the Final Closing.

19.    Attorneys' fees are recoverable as part of a cure claim only if the contract specifically requires their payment. In re Crown Books Corp., 269 B.R. 12, 15 (Bankr. D. Del. 2001). (Accord Sale Ord. ¶ 39 (limiting "Transfer Costs" to those costs/expenses that are "chargeable under the Assumed Contracts").) In addition, the attorneys' fees must be reasonable. Crown Books, 269 B.R. at 18. (Accord Sale Ord. ¶ 39 (limiting "Transfer Costs" to "reasonable" costs/expenses).)

20.    U.S. Bank has provided the Debtors with detailed (albeit, redacted) invoices in support of the attorneys' fees included in its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim. While the redactions make it difficult at times to determine the nature and scope of the particular work performed, the Debtors do not dispute the reasonableness of the attorneys' fees at issue. However, the Debtors do dispute (i) whether there is a contractual basis for payment of the requested attorneys' fees in the relevant Loan Servicing Agreements, and (ii) even assuming a contractual basis for reimbursement, whether the attorneys' fees sought as Sellers' Cure Amount relate solely to the Loan Servicing Agreements assumed and assigned to the Purchaser, as opposed to HELOC Servicing Agreements that were not assumed or assigned.

A.    **Contractual Basis for Payment**

21.    Whether a contract requires payment of attorneys' fees is a question of applicable state law, subject to any qualifying or contrary provisions of the Bankruptcy Code. Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co., 549 U.S. 443, 1204 (2007). On information and belief, the Loan Servicing Agreements in which U.S. Bank has an interest[5] are governed by New York law.

---

[5] The agreements are voluminous, and will be filed in an appendix and provided to the Court prior to the hearing on this Objection.

22.     Under New York law, contractual indemnity provisions are strictly construed to avoid reading into them duties which the parties did not intend to be assumed.  In re Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989) ("Inasmuch as a promise by one party to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorneys' fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is *unmistakably clear* from the language of the promise." (emphasis added).)

23.     U.S. Bank does not specify in its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim which provisions of the relevant Loan Servicing Agreements U.S. Bank relies upon for its entitlement to attorneys' fees.  U.S. Bank states only that, under the terms of the relevant Loan Servicing Agreements, certain of the Debtors have agreed to indemnify U.S. Bank for (i) AHM SV's failure to perform under the Loan Servicing Agreements and related transaction documents (the "Transaction Documents"), (ii) U.S. Bank's performance of certain duties under the Transaction Documents, and (iii) certain reporting requirements of the Securities and Exchange Commission.  U.S. Bank also asserts that AHM SV generally agreed to pay U.S. Bank for all of its fees and expenses, including the fees and expenses of counsel, including those relating to a transition of servicing.

24.     The Debtors dispute that they agreed generally in the relevant Loan Servicing Agreements to reimburse U.S. Bank for all of its attorneys' fees incurred in connection with these bankruptcy cases.  On information and belief, the servicing transfer reimbursement provisions of the Loan Servicing Agreements relate to transfers of servicing following a default termination of AHM SV as servicer and do not extend to situations where, as here, there is a Court-approved assumption and assignment of Loan Servicing Agreements pursuant to section

365 of the Bankruptcy Code. And as U.S. Bank seems to acknowledge, the general

indemnification provisions in the Loan Servicing Agreements are triggered by a failure of AHM

SV to perform its contractual obligations. But U.S. Bank cites no such failure here—to the

contrary, it states that, in preparing its cure claims, it "has relied on the Debtors' representations

that there are no defaults under the U.S. Bank Servicing Agreements". (Initial Cure Claim ¶ 22;

Interim Cure Claim ¶ 23.)

   25. Absent a specific basis in the relevant Loan Servicing Agreements for

payment of U.S. Bank's attorneys' fees by the Debtors, U.S. Bank's claim for such fees should

be disallowed *in toto*. See Crown Books, 269 B.R. at 15.

  **B.** **Attorneys' Fees Related to HELOC Servicing Agreements**

   26. Even if there were a contractual basis for recovering attorneys' fees under

one or more of the provisions of the relevant Loan Servicing Agreements, there would be no

basis for recovering attorneys' fees relating to the HELOC Servicing Agreements that were not

assumed and assigned to the Purchaser. See Shaw Group, 350 B.R. at 177 ("[I]n order to assume

a particular executory contract . . . the debtor is only required to perform under that discrete

contract . . . , not under other, substantially unrelated agreements." (internal quotations, citation

omitted).). Reviewing the time detail provided by U.S. Bank with respect to its attorneys' fees, it

appears that U.S. Bank is claiming reimbursement for all of its attorneys' fees incurred through

the Final Closing, without making any attempt to (i) exclude those fees specifically related to the

HELOC Servicing Agreements and (ii) with respect to fees related to general services provided

to U.S. Bank in connection with the Debtors' bankruptcy cases, allocating some portion of those

fees to the HELOC Servicing Agreements.

27.    Given that it is U.S. Bank's burden to prove its entitlement to the attorneys' fees requested as a cure claim, and given that U.S. Bank is in the best position to determine the relative time spent by its attorneys on the various tasks they performed (if only because it has access to unredacted billing detail), the Debtors respectfully submit that it is U.S. Bank's responsibility to propose some basis for allocating its attorneys' fees between the Loan Servicing Agreements and the HELOC Servicing Agreements.  However, in light of the Debtors' global objection to the allowance of attorneys' fees as part of U.S. Bank's cure claim, and in the interest of avoiding unnecessary costs to U.S. Bank, the Debtors would be amenable to adjourning their Objection on this particular point until such time as the Court rules on the global objection.

## II.    Administration Fees/Expenses

28.    In its Initial Cure Claim, U.S. Bank asserts an entitlement to payment of "administrative fees" and reimbursement of expenses aggregating $64,588.00, which were accrued through October 29, 2007.  In its Interim Cure Claim, U.S. Bank asserts an entitlement to payment/reimbursement of $11,842.50 in administrative fees/expenses accrued between October 29, 2007, and the Initial Closing.  In its Transfer Cost Claim, U.S. Bank asserts an entitlement to payment/reimbursement of these prior amounts, plus an additional $39,209, which presumably represents amounts accrued between the Initial Closing and the Final Closing.

29.    Presumably, the administration fees represent the hourly fees *charged by U.S. Bank* to the respective securitization trusts for which it acts as Trustee pursuant to unidentified "Transaction Documents" (i.e., for extraordinary time spent by U.S. Bank's officers and employees), as opposed to fees *incurred by U.S. Bank* and reimbursable under the indemnification and transfer cost provisions of the Loan Servicing Agreements in which U.S.

Bank has an interest.  Accordingly, it does not appear that there is a contractual basis for

asserting the default administration fees as a cure claim relating to the Loan Servicing

Agreements.  As for U.S. Bank's expenses, as stated in I.A. above, the Debtors deny that they

were obligated to reimburse any expenses of U.S. Bank in the absence of any failure of AHM SV

to live up to its servicing obligations.  In the absence of a specific contractual basis in the Loan

Servicing Agreements for payment of administrative fees and related expenses of U.S. Bank,

U.S. Bank's claim for payment of such amounts should be disallowed *in toto*.

        30.     To the extent the provisions of the Loan Servicing Agreements in which

U.S. Bank has an interest could be construed to provide a basis for payment of U.S. Bank's

administration fees and related expenses in the absence of a default, the Debtors incorporate by

reference their argument set forth in I.B. above, namely that U.S. Bank does not appear to

account for time relating to HELOC Servicing Agreements that were not assumed and assigned

to the Purchaser, but has the burden of doing so.

        31.     As above, in light of the Debtors' global objection to the allowance of

administration fees and related expenses as part of U.S. Bank's cure claim, and in the interest of

avoiding unnecessary costs to U.S. Bank, the Debtors would be amenable to adjourning their

Objection on the latter particular point until such time as the Court rules on the more global

objection.

**III.    Reimbursement of FGIC Relating to HELOC Servicing Agreements**

        32.     In its Interim Cure Claim, U.S. Bank asserts a right of reimbursement of

$252,833 invoiced to U.S. Bank by Financial Guaranty Insurance Corp. ("FGIC") on account of

attorneys' fees incurred by FGIC in connection with certain HELOC Servicing Agreements.

Even if there were a contractual basis under the HELOC Servicing Agreements to require the

Debtors to reimburse U.S. Bank for the FGIC invoice (which the Debtors do not concede), the HELOC Servicing Agreements were not assumed and assigned to the Purchaser and thus, amounts due under those agreements may not be asserted as cure claims with respect to the Loan Servicing Agreements.

**IV.    Claims Asserted as Both Transfer Cost Claims and Purchaser's Cure Amounts**

33.    On information and belief, amounts sought by U.S. Bank in its Transfer Cost Claim are duplicative of amounts sought by U.S. Bank in its *Objection to the Debtors' Proposed Purchaser's Cure Amount* [D.I. 5287] (the "Purchaser's Cure Amount Claim") filed July 31, 2008.  Under the Sale Order, Sellers' Cure Amounts and Purchaser's Cure Amounts are mutually exclusive, and only the former are payable from the Cure Escrow.  The Purchaser has yet to respond to the Purchaser's Cure Amount Claim, rendering it difficult for the Debtors to respond fully to the Transfer Cost Claim.  Accordingly, the Debtors hereby object to the Transfer Cost Claim to the extent that it is duplicative of the Purchaser's Cure Amount Claim, and reserve all rights with respect to any objection or response filed by the Purchaser in connection with the Purchaser's Cure Amount Claim.

**V.    Contingent, Unliquidated Amounts**

34.    U.S. Bank reserved the right to amend or supplement its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim to the extent it becomes aware of additional information concerning claims against AHM SV.  The Debtors hereby object to any unidentified, contingent, and/or unliquidated claims preserved (or intended to be preserved) by U.S. Bank's reservation of rights on the basis that U.S. Bank has not met its burden of establishing any right to payment of such claims (if any).

35.     The Debtors reserve the right to supplement or amend this Objection in response to any amendment or supplementation of the Initial Cure Claim, Interim Cure Claim, or Transfer Cost Claim whereby U.S. Bank asserts additional claims, or additional bases for payment of existing claims, as Sellers' Cure Amounts.  Without limiting the generality of the foregoing, the Debtors, on behalf of themselves, the Committee, and BofA, reserve the right to object on any grounds whatsoever to any claims that may be asserted by U.S. Bank which are duplicative of claims asserted in the Purchaser's Admin Claim, including, without limitation, on the grounds that such claims are time-barred by operation of the Sale Order and/or the Objection/Payment Deadline.

## VI.     U.S. Bank's Administrative Expense Request

36.     U.S. Bank asserts its Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim alternatively as an administrative expense pursuant to section 503(b) of the Bankruptcy Code.  Although the Debtors do not believe the Payment/Objection Deadline requires the Debtors to object to the administrative expense claim asserted by U.S. Bank at this time (as general administrative expense claims are not payable from the Cure Escrow), to the extent an objection is required, the Debtors object on the basis that U.S. Bank has not met its burden of establishing its entitlement to an administrative expense request.

37.     To establish its entitlement to an administrative expense, U.S. Bank relies on the *Order Pursuant to Sections 105(a), 345, and 503(b)(1) of the Bankruptcy Code (I) Authorizing the Debtors to Maintain and Use Existing Bank Accounts and Business Forms, (II) Authorizing the Debtors to Maintain and Use Existing Cash Management System, and (III) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code* [D.I. 66] (the "Cash Management Order") dated August 7, 2007, which

(a)    directs the Debtors to perform their "Securitization Servicing Functions *in accordance with the terms of* the Securitization Documents" and authorizes and direct the Debtors "to perform indemnification obligations *as provided under* the Securitization Documents" (Cash Management Ord. at 6 (emphasis added));

(b)    provides that "[t]he reasonable costs of . . . trustee monitoring efforts shall be considered a reasonable expense of administration of the securitization trust reimbursable *under the indemnification provisions* of the Securitization Documents or, alternatively, such expenses shall be afforded administrative expense priority under section 502(b)(1)(A) and 507(a)(2) *to the extent provided in* the relevant Securitization Documents" (id. at 7-8 (emphasis added)).

However, it is clear from the highlighted provisions of the Cash Management Order, as well as from the record of the first-day hearing in these chapter 11 cases, that the Cash Management Order does not create a free-standing right to reimbursement of trustees' attorneys' fees for all case-related activity, but rather is limited to such reimbursement as is provided in the governing documents.[6]  As discussed above, U.S. Bank has not articulated a basis in the governing documents for payment of the amounts asserted in its Initial Cure Claim, Interim Cure Claim, or Transfer Cost Claim.  Accordingly, any request for payment of such amounts as an administrative expense must likewise be denied.

---

[6]  Presenting the form of order, counsel for the Debtors stated, "[W]hat we are agreeing to do is only what is in accordance with the securitization documents and otherwise these expenses are afforded administrative expense priority to the extent provided again in the relevant securitization documents." (8/7/07 Hr'g Tr., D.I. 149 at 40:20-25.)  Several parties sought clarification of the order from the Court, in response to which counsel for the Debtors' stated, repeatedly, that the Debtors intended only to comply with whatever the contracts require, subject to the Debtors' right to disagree with a counterparty as to interpretation of the contract.  The Court stated to one of the parties seeking clarification, "[I]t's not that complicated.  They're authorized to continue to operate, and if they think they have defenses, they have them, and if they don't, they don't, and they're going to comply with the order." (Id. at 51:17-20.)

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order disallowing the Initial Cure Claim, Interim Cure Claim, and Transfer Cost Claim asserted by U.S. Bank and granting the Debtors such other and further relief as is just and proper.

Dated:    Wilmington, Delaware
          April 2, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sean M. Beach (No. 4070)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession