## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| **AMERICAN HOME MORTGAGE** | : | Case No. 07-11047 (CSS) |
| **HOLDINGS, INC., a Delaware** | : | |
| **corporation, <u>et al.</u>,**[1] | : | **Jointly Administered** |
| | : | |
| Debtors. | : | Hearing Date: May 8, 2009 @ 11:30 a.m. |
| | : | Related to Docket No. 4738 |
| | x | |

### REPLY OF AMERICAN HOME MORTGAGE SERVICING, INC.
### TO CITIMORTGAGE INC.'S COMBINED: (1) STATEMENT OF CURE AMOUNT
### FOR PERIOD BETWEEN INITIAL CLOSING AND FINAL CLOSING; AND
### <u>(2) OBJECTION TO DEBTORS' PROPOSED PURCHASER'S CURE AMOUNT</u>

American Home Mortgage Servicing, Inc., a Delaware corporation formerly known as AH Mortgage Acquisition Co., Inc. (the "<u>Purchaser</u>"), through its undersigned counsel, hereby submits its reply to the Objection of CitiMortgage, Inc. ("<u>CMI</u>") to Proposed Purchaser's Cure Amount [Docket No. 4738] (the "<u>Third CMI Cure Objection</u>"), filed by CMI on June 20, 2008. In support of this Reply, the Purchaser respectfully represents as follows:

### <u>Preliminary Statement</u>

1.     Pursuant to the order approving the sale of the Debtors' mortgage servicing business to the Purchaser (the "<u>Sale Order</u>"), both the Debtors and the Purchaser have certain responsibilities with respect to curing defaults under contracts to be assumed and assigned in

---

[1]     The above-captioned debtors and debtors in possession in these cases (collectively, the "<u>Debtors</u>"), along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc., a Maryland corporation, formerly known as American Home Mortgage Servicing, Inc. (7267); American Home Mortgage Corp., a New York Corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

connection with the sale.   Specifically, paragraph 36 of the Sale Order provides that the Purchaser shall fund and be liable to the Debtors for all amounts owed, if any, with respect to "defaults arising under the Assumed Contracts with respect to acts or omissions occurring during the period from the Initial Closing to the Final Closing."

2.      CMI has filed three cure objections, alleging in all three that it is entitled to legal fees and expenses incurred as a result of the Debtors' alleged default under the Veterans Land Board Veterans Housing Assistance Program Application (the "VLB Application") and the HALO 2007-ARI Master Loan Purchase and Sale Agreement (the "HALO Agreement").

3.      Under the plain language of the Sale Order, although the Purchaser is responsible for funding certain cure amounts due under the Assumed Contracts, that funding requirement is triggered only when the cure amount due results from a default with respect to acts or omissions that occurred after the initial closing of the sale on November 16, 2007.  Because CMI's claim for legal fees and expenses relate to the Debtors' default under the VLB Application pre-petition, the Purchaser is in no way responsible for funding any portion of the resulting cure amount that CMI alleges it is owed.   Accordingly, the Third CMI Cure Objection should be denied.

### Background

4.      On October 30, 2007, the Court entered an Order [Docket No. 1711], approving the sale of the Debtors' mortgage loan servicing business to the Purchaser, pursuant to the terms of an Asset Purchase Agreement among certain of the Debtors and the Purchaser dated as of September 25, 2007, as amended.  The Sale Order, among other things, authorized the Debtors to assume and assign and/or transfer to the Purchaser certain contracts (collectively, the "Assumed Contracts"), including, among other things, the VLB Application and the HALO Agreement (collectively, the "CMI Servicing Agreements").

5.    The Sale Order further apportioned the cure amounts related to the Assumed Contracts among the Debtors and the Purchaser such that the Debtors are responsible for all cure amounts (the "Debtors' Cure Amounts") arising from defaults based on acts or omissions occurring prior to the initial closing of the sale on November 16, 2007 (the "Initial Closing"), and the Purchaser is responsible for funding cure amounts (the "Purchaser's Cure Amounts") arising from defaults based on acts or omissions occurring during the period from the Initial Closing to the final closing of the sale on April 11, 2008 (the "Final Closing"). (Sale Order ¶¶ 35, 36). The Sale Order Includes a schedule (Schedule I), that lists the proposed Debtors' Cure amounts due as of October 30, 2007 for each Assumed Contract. With respect to the CMI Servicing Agreements, Schedule I lists the amount due as $0.

6.    On November 29, 2007, CMI filed the Initial Cure Objection [Docket No. 2226] ("First CMI Objection"), pursuant to which CMI objects to the proposed Debtors' Cure Amount for the CMI Servicing Agreements. The First Objection asserts that the appropriate Debtors' Cure Amount is $113,745.67, based on attorneys fees and expenses incurred as a result of the Debtors' alleged default under the CMI Servicing Agreements.

7.    The Initial Closing occurred on November 16, 2007. After the Initial Closing, the Debtors filed the Notice of Interim Period Cure Schedule [Docket No. 2166]. For each of the CMI Servicing Agreements, Exhibit A to the Notice indicates that the Debtors' proposed Interim Cure Amount is $0. On December 21, 2007, CMI filed its Second Objection to the Interim Period Cure Amount (the "Second CMI Objection") [Docket No. 2466], pursuant to which CMI asserts that the appropriate Debtors' Cure Amount is $5,392.48, based on attorneys fees and expenses incurred as a result of the Debtors' alleged default under the CMI Servicing Agreements.

8.    On May 19, 2008, the Debtors filed the Notice of (i) Debtors' Proposed Purchaser's Cure Amounts and (ii) Deadline for Filing Objections to the Proposed Purchaser's Cure Amounts [Docket No. 4084] (the "Purchaser's Cure Notice"), pursuant to which the Debtors notified the counterparties to the Assumed Contracts of the proposed amounts necessary to cure defaults under those contracts arising from acts or omissions that occurred after the Initial Closing through and including the Final Closing (the "Interim Period"). Exhibit A to the Purchaser's Cure Notice lists the proposed Purchaser's Cure Amount Due in connection with the CMI Servicing Agreements as $0.

9.    On June 20, 2008, CMI filed the Third CMI Cure Objection, pursuant to which CMI objects to the proposed Purchaser's Cure Amount for the CMI Servicing Agreements. The Third CMI Cure Objection asserts that the appropriate Purchaser's Cure Amount is $111,582.85 based on attorneys fees and expenses incurred as a result of the Debtors' alleged default under the CMI Servicing Agreements.

## CMI's Cure Objection Should Be Denied

10.    As an initial matter, the Sale Order makes clear that it is the Debtors – and *not* the Purchaser – that are obligated to make cure payments in connection with the Debtors' assumption of the Assumed Contracts. (Sale Order ¶ 36). With respect to the Purchaser's Cure Amounts, the Sale Order states that the Purchaser "shall fund and be liable to the Debtors for all amounts owed, if any, with respect to *defaults arising under the Assumed Contracts with respect to acts or omissions occurring during the period from the Initial Closing until the Final Closing . . .*" (Sale Order ¶ 36 (emphasis added)). Accordingly, the cure amount due to CMI for the Debtors' assumption of the CMI Servicing Agreements, if any, must be paid by the Debtors from the Cure Escrow, and the Purchaser is obligated to fund or reimburse the Debtors only for

those cure amounts, if any, that relate to defaults under the CMI Servicing Agreements arising from acts or omissions that occurred after the Initial Closing.

11.    CMI, in all three of its Cure Objections, asserts a Cure Amount for legal fees and expenses relating to the Debtors' default under both CMI Servicing Agreements.  Under the VLB Application, CMI alleges that it is liable for attorneys fees incurred as a result of the Debtors' failure to provide CMI with written notice of the significant changes in its financial position, as required under the VLB Guidelines.  However, in all three of CMI's Cure Objections, CMI admits that the "Debtors did not comply [with this provision] *pre-petition*." Thus, as CMI itself concedes, the date of the act or omission that gives rise to the alleged default under the VLB Application is pre-petition and CMI has failed to point to any act or omission occurring after the Initial Closing that caused a default.  According to the plain language of the Sale Order, because the alleged default under the VLB Application occurred before the Initial Closing, the Debtors are responsible for curing that default in its entirety, and the Purchaser has no obligation to fund or reimburse the Debtors for the cure payment that CMI is owed.

12.    Even assuming, arguendo, that a default under the VLB occurred after the Initial Closing, under the plain terms of the VLB Application, the Purchaser is not liable for related attorneys fees and expenses *until* it is "determined in a judicial proceeding that [the Purchaser] has failed to perform under the provision of the Guide."  Since there has been no judicial determination of the Purchaser's default, the Purchaser can not be liable for any attorneys fees.

13.     Moreover, to the extent  CMI seeks legal fees under the Halo Agreement, CMI

wholly fails to describe any act or omission occurring during the Interim Period that resulted in a

default under the Halo Agreement.[2]  The Halo Agreement provides, in relevant part,  that:

> [T]he Seller or the Interim Servicer . . . shall indemnify the Initial Purchaser
> against any and all claims, losses, damages, penalties, fines, forfeitures,
> reasonable and necessary legal fees and related costs  . . that the Purchaser
> may sustain arising out of or based on the failure of the Seller or Interim
> Servicer to perform its obligations under this Agreement . . .

(Halo 2007-AR1 Agreement at 48-49).  While CMI asserts a claim for legal fees, it fails to assert

any act or omission on the part of the Purchaser during the Interim Period that resulted in the

Purchaser's failure to perform its obligations under the Halo Agreement.

14.     Thus, to the extent that CMI is owed the $111,582.85 cure amount it asserts, the

entire amount is properly included in the Debtors' Cure Amounts, not the Purchaser's Cure

Amounts.

WHEREFORE, the Purchaser respectfully requests that the Court enter an order denying

CMI's Third Cure Objection.

## Reservation of Rights

15.     The Purchaser reserves the right to object further to the Third CMI Cure

Objection on any and all additional factual or legal grounds.[3]  Without limiting the generality of

---

[2]     To the extent that CMI asserts that the Debtors' bankruptcy filing or financial condition resulted in a
default under the CMI Servicing Agreements, the Bankruptcy Code makes clear that the cure requirement
is excused with respect to so-called *"ipso facto"* defaults.  11 U.S.C. § 365(b)(2)(A) - (C).

[3]     In addition, CMI seeks to preserve its rights to assert an administrative claim in respect of its purported
indemnification rights, pursuant to the Order Pursuant to Sections 105(a), 345, and 503(b)(1) of the
Bankruptcy Code (i) Authorizing the Debtors to Maintain and Use Existing Bank Accounts and Business
Forms, (ii) Authorizing the Debtors to Maintain and Use Existing Cash Management System, and
(iii) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code [Docket No. 66]
(the "Cash Management Order").    The Cash Management Order requires the Debtors "to perform
indemnification obligations as provided under the Securitization Documents" and provides administrative
expense status for certain trustee monitoring efforts that are "reimbursable under the indemnification
provisions of the Securitization Documents . . . ." (Cash Management Order at 6 (emphasis added).)  Thus,
the Cash Management Order preserves only those rights CMI would otherwise have under the CMI

the foregoing, the Purchaser specifically reserves the right to amend this Reply, file additional

papers in support of this Reply or take other appropriate actions to (a) respond to any allegation

or defense that may be raised in a response filed by or on behalf of CMI or other interested

parties, (b) further object to the Cure Claim to the extent CMI provides (or attempts to provide)

additional documentation or substantiation or (c) further object to the Cure Claim based on

additional information that may be discovered upon further review by the Purchaser or through

discovery pursuant to the applicable provisions of Part VII of the Bankruptcy Rules.

Dated: April 8, 2009

**SAUL EWING LLP**

By: _____

Mark Minuti (No. 2659)
Lucian B. Murley (No. 4892)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840

*Counsel to American Home Mortgage Servicing,*
*Inc., fka AH Mortgage Acquisition Co., Inc.*

---

Servicing Agreements. As discussed above, CMI has failed to demonstrate any such right. CMI also argues that the Cash Management Order confers administrative expense status on the trustees' monitoring efforts. The "monitoring efforts" referred to in the Cash Management Order, however, are described as "reasonable access . . . to the Debtors' facilities, personnel and record-keeping systems in order to allow them to monitor the Debtors' compliance with the Securitization Servicing Functions and to make contingency plans in the event the Debtors seek to reject any of the Securitization Documents [that] may be executory contracts," as well as "electronic access to view and monitor transactions and balances in [accounts established pursuant to, or in implementation of, the Securitization Documents]." (Cash Management Order at 7-8.) This description simply provides the trustees with the right to monitor the Debtors' servicing functions and obtain reimbursement for such monitoring efforts (to the extent provided under the applicable servicing agreements) and is in no way broad enough encompass legal fees for monitoring the Debtors' bankruptcy cases generally. Moreover, to the extent the fees asserted in the Cure Claim are properly reimbursable to CMI, the Purchaser has the obligation to reimburse the Debtors for such amounts only to the extent such fees relate to defaults resulting from acts or omissions occurring after the Initial Closing. As discussed above, the fees and expenses CMI seeks in its Cure Claim directly relate to actions taken by the Debtors prior to the Initial Closing. Accordingly, the Purchaser would have no obligation to reimburse the Debtors for such amounts.