UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                                          :    Chapter 11
                                                :
AMERICAN HOME MORTGAGE                          :    Case No. 07-11047 (CSS)
HOLDINGS, INC.,                                 :
a Delaware corporation, et al.,                 :    Jointly Administered
                                                :
                                                :    **Sale Procedures Hearing Date: April 21, 2009 at 2:00 p.m.**
    Debtors.                                    :    **Sale Procedures Objection Deadline: April 20, 2009 at 12:00 p.m.**
                                                :    **Sale Motion Hearing Date: May 15, 2009 at 1:00 p.m.**
                                                :    **Sale Motion Objection Deadline: May 8, 2009 at 4:00 p.m.**

------------------------------------------------------- x

## MOTION OF THE DEBTORS FOR ORDERS:
### (A)(I) APPROVING SALE PROCEDURES; (II) APPROVING PAYMENT OF EXPENSE REIMBURSEMENTS; (III) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN MORTGAGE LOANS AND REO PROPERTIES; (IV) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (V) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF MORTGAGE LOANS AND REO PROPERTIES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING SALE AGREEMENTS THERETO; AND (III) GRANTING RELATED RELIEF

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors

in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this

motion (the "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code,

11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of two orders: (a) one,

substantially in the form annexed hereto as Exhibit A (the "Sale Procedures Order"): (i) approving

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc.  ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp.  ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.  ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp.  ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

066585.1001

the procedures (the "Sale Procedures") substantially in the form annexed hereto as Exhibit B with respect to the proposed sales (each sale, a "Sale") of four (4) pools (each pool, an "Asset Pool") of certain mortgage loans (as defined in greater detail below, the "Mortgage Loans") and real estate owned properties (as defined in greater detail below, the "REO Properties") pursuant to the Loan Sale and Interim Servicing Agreements, by and between Vantium Capital Markets, L.P. ("Vantium") as the stalking horse bidder (the "Stalking Horse Bidder"), AHM Corp., AHM Acceptance and American Home Mortgage Servicing, Inc. (the "Interim Servicer")(each, a "Sale Agreement") attached as Exhibits 1, 2, 3 and 4 to the Sale Procedures, (ii) approving the Expense Reimbursements (as defined below), (iii) scheduling a hearing (the "Sale Hearing") on the Sales and setting objection and bidding deadlines for the Sales, (iv) approving the form and manner of notice of auction (the "Auction") for each Asset Pool, and (v) granting related relief; and (b) the other, substantially in the form annexed hereto as Exhibit C (the "Sale Order"): (i) authorizing the Sale of each Asset Pool free and clear of liens, claims, encumbrances, and interests, pursuant to the applicable Sale Agreement, (ii) authorizing and approving each Sale Agreement, and (iii) granting related relief. In support of this Motion, the Debtors respectfully represent:

## JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, along with Bankruptcy Rules 6004 and 9014.

DB02:7772423.8                                                                066585.1001

## BACKGROUND

**A.    General Background**

2.    On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007, and an official committee of borrowers (the "Borrowers Committee") was appointed on October 21, 2008. No trustee or examiner has been appointed.

4.    The Debtors filed an Amended Chapter 11 Plan of Liquidation (as amended, supplemented and/or modified, the "Plan") with the Court on November 25, 2008. The Court confirmed the Plan on February 23, 2009, but the Plan is not yet effective.

**B.    ABN Loans and Related Stipulations**

5.    Certain of the Debtors (the "ABN MRA Debtors") and ABN AMRO Bank N.V. ("ABN") are parties to a Master Repurchase Agreement, dated as of February 28, 2007 (the "Master Repurchase Agreement") in respect of certain loans (each an "ABN Mortgage Loan," and collectively "ABN Mortgage Loans"). Specifically, seven of the ABN Mortgage Loans are REO property, meaning that title to the property that is the collateral for the mortgage loan has previously been transferred from the mortgage loan borrower to Sellers or the Interim Servicer. Approximately seven of the ABN Mortgage Loans are not REO property, but remain part of the First Lien Loans Asset Pool (as described below).

6.    An additional number of ABN Mortgage Loans are performing and non-performing mortgage loans issued to finance the construction of housing secured by a first priority security interest in the real property ("ABN First Lien Construction Loans"); however, due to

DB02:7772423.8                                                                                    066585.1001

ABN's decision to pull these loans from the Debtors' overall pool of similar loans, the Debtors have determined not to sell such loan types at this time. Each ABN Mortgage Loan currently is being serviced by Interim Servicer with the consent of ABN.

      7.    ABN Mortgage Loans are also the subject of the following stipulations and orders entered in the Bankruptcy Cases and approved by the Bankruptcy Court: (a) Stipulation Between Certain Debtors and ABN AMRO Bank N.V.; Order Thereon, approved by Bankruptcy Court order on August 22, 2007 [D.I. 284]; (b) Stipulation Between Certain Debtors and ABN AMRO Bank N.V. Regarding Marketing and Sale of Certain Construction Loans and Servicing Rights; and Order Thereon, approved by Bankruptcy Court orders entered on October 4, 2007 [D.I. 1175 and 1176]; (c) Second Stipulation Between Certain Debtors and ABN AMRO Bank N.V. Regarding Post-Petition Advances and Sale of Construction Loan Portfolio; Order Thereon, approved by Bankruptcy Court order entered on December 3, 2007 [D.I. 2355]; (d) Third Stipulation Between Certain Debtors and ABN AMRO Bank, N.V. Regarding: (1) Post-Petition Advances; (2) Servicing Payments; and (3) Mortgage Loan Refinancings, approved by Bankruptcy Court order on February 28, 2008 [D.I. 3115]; (e) Fourth Stipulation Between Certain Debtors and ABN AMRO Bank, N.V. Amending and Supplementing the Third Stipulation Regarding: (1) Post-Petition Advances; (2) Servicing Payments; and (3) Mortgage Loan Refinancings, approved by Bankruptcy Court order on June 9, 2008 [D.I. 4484] ((a) through (e) collectively, the "Bankruptcy Court Orders").

      8.    The Bankruptcy Court Orders provide, in relevant part, that the ABN MRA Debtors and ABN agreed to extend the deadline for conveying certain mortgage loans, a group of which the ABN Mortgage Loans were a part, from the ABN MRA Debtors to ABN.

DB02:7772423.8

066585.1001

9.    The Debtors and ABN have agreed to market the ABN Mortgage Loans in connection with the marketing and sale of the relevant Asset Pools, in exchange for a marketing fee (the "Marketing Fee") of $100,000.00. The Marketing Fee is fully payable upon the closing of the sale of any or all of the ABN Mortgage Loans.

10.    To the extent that ABN Mortgage Loans are included in a particular Asset Pool, ABN has agreed to execute an appropriate consent form for the sale of such loans free and clear of any and all of ABN's right, title and interest in the ABN Mortgage Loans (the "ABN Consents," attached as exhibits to the Sale Agreements related to the REO Properties and First Lien Loan Asset Pools).

11.    The proceeds from the sale of each Asset Pool shall be delivered to the Debtors by the purchaser of such Asset Pool. Debtors shall turn over the proceeds attributable to the ABN Mortgage Loans to ABN after deducting and retaining the Marketing Fee.

**PROPOSED SALE OF THE MORTGAGE LOANS AND REO PROPERTIES**

12.    Pursuant to the Sale Agreements, the Debtors propose to sell, assign and transfer each Asset Pool to a Successful Bidder or Second Best Bidder,[2] free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), other than those expressly assumed by the Successful Bidder or Second Best Bidder. Any and all Liens will attach to proceeds of any sale received by the Debtors with the same validity, priority, force and effect such Liens had on the Mortgage Loans or REO Properties immediately prior to the Sale. Each Sale is subject to the Court's approval.

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Sale Procedures annexed hereto as Exhibit B.

DB02:7772423.8

066585.1001

13.    Specifically, the Debtors propose to pool and sell the Mortgage Loans and REO Properties on an "as-is, where-is" basis, as follows:

(a)    <u>Second Lien Performing Loans Asset Pool</u>. Home equity lines of credit or other mortgage loan products secured by a junior interest in real property where the mortgagor is current or less than thirty (30) days delinquent in its payment obligations as of March 31, 2009. The Debtors seek to sell approximately 131 of the Performing Second Lien Loans, none of which are ABN Mortgage Loans, with a total unpaid principal balance ("<u>UPB</u>") of approximately $6,709,327.

(b)    <u>Second Lien Non-Performing Loans Asset Pool</u>. Home equity lines of credit or other mortgage loan products secured by a junior interest in real property where the mortgagor is more than thirty (30) days delinquent in its payment obligations as of March 31, 2009. The Debtors seek to sell approximately 44 of the Non-Performing Second Lien Loans, none of which are ABN Mortgage Loans, with a total UPB of approximately $2,435,865.

(c)    <u>REO Properties Asset Pool</u>. Properties owned by the Debtors through foreclosure. The Debtors seek to sell approximately 26 REO Properties, of which approximately 7 are ABN Mortgage Loans, with a total UPB of approximately $7,559,970.

(d)    <u>First Lien Loans Asset Pool</u>. Mortgage loans issued for purposes other than to finance the construction of housing secured by a first priority security interest in the real property. The Debtors seek to sell approximately 19 First Lien Loans, of which approximately 7 are ABN Mortgage Loans, with a total UPB of approximately $3,828,721.

The number of Mortgage Loans that the Debtors propose to sell may decrease as a result of, for instance, mortgagors satisfying their loan obligations. The Debtors, after significant deliberation, have concluded that pooling the Mortgage Loans and REO Properties as set forth above creates the greatest likelihood of obtaining the maximum return for the estates.

14.    The Debtors have identified Vantium as the Stalking Horse Bidder, who submitted formal, binding, unconditional, irrevocable bids (each, a "<u>Stalking Horse Bid</u>") for each of the four Asset Pools. The following paragraphs in this section summarize key provisions of the Stalking Horse Bids as set forth in the Sale Agreements attached to the Sale Procedures as <u>Exhibits</u>

066585.1001

1, 2, 3 and 4.[3]  These summaries are qualified in their entirety by reference to the actual Sale

Agreements.

    (a)    Second Lien Performing Loans

        (i)  Purchase Price.  The Purchase Price for this Asset Pool is approximately $628,538, or 9.177% of the UPB of the Asset Pool.

        (ii)  Deposit.  Vantium shall provide a deposit in the amount of $50,000 for this Bid.

        (iii)  Reduction for Non-Performing.  If any Mortgage Loan in the Asset Pool are non-performing as of the Closing Date, the Purchaser may specify an alterative purchase price for that Mortgage Loan.

    (b)    Second Lien Non-Performing Loans

        (i)  Purchase Price.  The Purchase Price for this Asset Pool is approximately $6,960, or 0.2952% of the UPB of the Asset Pool.

        (ii)  Deposit.  Vantium shall provide a deposit in the amount of $5,000 for this Bid.

    (c)    REO Properties

        (i)  Purchase Price.  The Purchase Price for this Asset Pool is approximately $2,335,496 (UPB at time of foreclosure was approximately $9.8 million).  Approximately $808,066 of the Purchase Price proceeds will be paid to ABN.

        (ii)  Deposit.  Vantium shall provide a deposit in the amount of $300,000 for this Bid.

        (iii)  Removal for Properties Under Contract.  Debtors reserve the right to remove any properties from the Asset Pool that are under contract prior to the Closing Date.

---

[3] The prices referenced in the Sale Agreements and in this Motion are based on a Cut-off Date prior to March 31, 2009.  Updated pricing will be provided when received by the Debtors.

    (d)   <u>First Lien Loans</u>

        (i) <u>Purchase Price</u>. The Purchase Price for this Asset Pool is approximately $1,193,782, or 31.35% of the UPB of the Asset Pool. Approximately $376,456 of the Purchase Price proceeds will be paid to ABN.

        (ii) <u>Deposit</u>. Vantium shall provide a deposit in the amount of $100,000 for this Bid.

        (iii) <u>Reduction for Non-Performing</u>. If any Mortgage Loan in the Asset Pool are non-performing as of the Closing Date, the Purchaser may specify an alterative purchase price for that Mortgage Loan.

15.    The Debtors, with the assistance of their financial advisors have determined that the sale of the Asset Pools pursuant to the Sale Procedures is a reasonable exercise of their sound business judgment, is consistent with their fiduciary duties to these estates, and will maximize the value of these assets for creditors of these estates.

## RELIEF REQUESTED

16.    By this Motion, the Debtors seek the entry of two orders of this Court: (a) the Sale Procedures Order (i) approving the Sale Procedures, (ii) approving the Expense Reimbursements, (iii) scheduling the Sale Hearing, (iv) approving the form and manner of the Sale Procedures, including the Auction and Sale Hearing, (v) granting such other and further relief as is just and proper; and (b) the Sale Order (i) authorizing the Sale of the Asset Pools free and clear of Liens to the highest or otherwise best bid received at each Auction; (ii) authorizing and approving the form of Sale Agreement for each Asset Pool; and (iii) granting related relief. It is anticipated that the Asset Pools may be sold to multiple buyers. The Debtors seek approval of the Sale of each Asset Pool through separate Sale Agreements with different purchasers; provided that the Debtors reserve the right to seek approval of a combination bid in the event that a bid for a combination of the Asset Pools is determined by the Debtors to obtain the highest value for such Asset Pools.

DB02:7772423.8      066585.1001

**B.**    **Sale Procedures**

17.    The Debtors are proposing the Sale Procedures, in the form annexed hereto as Exhibit B and which are incorporated herein by reference, in an attempt to maximize the realizable value of the Mortgage Loans and REO Properties being sold for the benefit of the Debtors' estates, creditors and other interested parties. The Sale Procedures contemplate an Auction process for each Asset Pool, pursuant to which bids for each Asset Pool will be subject to higher or better offers. As described more fully in the Sale Procedures, only Qualified Bidders who timely submit Qualified Bids for a particular Asset Pool may be eligible to participate in the Auction for that Asset Pool.

18.    The following paragraphs in this section summarize key provisions of the Sale Procedures, but are qualified in their entirety by reference to the actual Sale Procedures.

(a)    Participation Requirements. Each bidder participating must not engage in any collusion and consent to the transcribing of the Auction, if any.

(b)    Qualified Bid. A Qualified Bid must contain (1) an executed version of the Sale Agreement for each Asset Pool on which the bidder wishes to bid, (2) a blacklined version of each Sale Agreement submitted against the form to show changes, (3) a letter setting forth the identity of the bidder, its counsel, and contact information for both, (4) a check or wire transfer as a good faith deposit, (5) written evidence of the bidder's financial ability to pay cash to consummate the Sale, (6) written acknowledgement that the Bid is unconditional and irrevocable, and (7) written evidence that the bidder has the requisite corporate authority to consummate the Sale.

(c)    Bid Deadline. Qualified Bids must be received by 5:00 p.m. ET on May 11, 2009.

(d)    Auction. With respect to any Asset Pool, if more than one Qualified Bid is received, there shall be an Auction for such Asset Pool on May 13, 2009 at 10:00 a.m. ET at the offices of Debtor's counsel. Only bidders who had submitted a Qualified Bid for that Asset Pool will be permitted to participate, but participation may be in person or through telephone. Bidding will begin with the highest Qualified

Bid received for that Asset Pool and will continue until the highest and best bid is received.

(e) <u>Sale Hearing</u>. The Sale Hearing will be held on May 15, 2009 to approve the Sale of the Asset Pools to the highest and best offers received for each Asset Pool (or in the case where there is only one Qualified Bidder for the Asset Pool, to the Qualified Bidder).

(f) <u>Due Diligence</u>. The due diligence period will take place from March 31, 2009 to May 11, 2009.

(g) <u>Closing and Other Deadlines</u>. Closing of the Sales for all the Asset Pools will take place on May 18, 2009.

19.    The Debtors, with the reasonable consent of the Committee, expressly reserve the right to modify the relief requested herein. Moreover, the Debtors, with the reasonable consent of the Committee, reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Asset Pools, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional terms and conditions with respect to any or all potential bidders, (c) extend the deadlines set forth herein, (d) cancel the sale of the Asset Pools and/or Sale Hearing in open court without further notice; and (e) amend the Sale Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

**C.    Notice of Auction**

20.    The Debtors seek to have the Auction scheduled for May 13, 2009 at 10:00 a.m. (ET) and the Sale Hearing scheduled for May 15, 2009 at 2:00 p.m. (ET), with an objection deadline of May 8, 2009 at 4:00 p.m. (ET).

21.    The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sales: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (c) be filed with the Clerk of the United States Bankruptcy Court for

066585.1001

the District of Delaware (the "Bankruptcy Court"), 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, by 4:00 p.m. (ET) on May 8, 2009; and (d) be served so as to be received by such date and time on: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Committee; (iv) the Office of the United States Trustee; and (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b).

22.    Not later than two business days after the entry of the Sale Procedures Order, the Debtors will serve copies of the Notice of Auction, substantially in the form attached hereto as Exhibit D, by mail, postage prepaid to: (i) all entities known to have expressed a *bona fide* interest in acquiring the any of the Asset Pools; (ii) counsel to the Committee; (iii) the Office of the United States Trustee for the District of Delaware; (iv) taxing authorities whose rights may be affected by a sale of one or more Asset Pools; (v) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; (vi) all parties who may assert a security or ownership interest in any of the Mortgage Loans or REO Properties; and (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Sale Procedures Order.

23.    Not later than five business days after entry of the Sale Procedures Order, the Debtors will publish the Notice of Auction, substantially in the form attached hereto as Exhibit D in the national edition of *The Wall Street Journal*. Additionally, the Debtors will use their best efforts to cause the Notice of Auction to be posted on the Bloomberg newswire service.

**D.    Expense Reimbursements**

24.    The Debtors seek to reimburse the certain parties for reasonable costs and expenses incurred in connection with the due diligence process (each, an "Expense Reimbursement"). Specifically, the Debtors propose to reimburse Vantium in the amount of $250 for each Mortgage Loan or REO Property, as applicable, for which Vantium is acting as a Stalking

11

Horse Bidder – approximately $57,000 (the "Stalking Horse Expense Reimbursement").  The

Stalking Horse Expense Reimbursement shall be payable out of the proceeds received from the

Sales.  In addition, the Debtors shall not be entitled to pay the Stalking Horse Expense

Reimbursement if Vantium is determined to be the Successful Bidder (as defined in the Sale

Procedures).

      25.     The Debtors also seek authority to pay reasonable costs and expenses, not to

exceed $100,000 in the aggregate, in connection with the due diligence process of potential bidders

(excluding Vantium) designated by the Debtors, subject to the criteria below and in consultation

with the Committee (the "Bidder Expense Reimbursement").  The Bidder Expense Reimbursement

shall be paid to one or more potential bidders and in such amounts, not to exceed $100,000 in the

aggregate, that the Debtors determine in their discretion and with the consent of the Committee.

Notwithstanding the foregoing, if a potential bidder is notified that they shall be entitled to a

portion of the Bidder Expense Reimbursement, such Bidder Expense Reimbursement shall only be

payable to the extent such bidder submits a Qualified Bid (as defined in the Sale Procedures).  The

Bidder Expense Reimbursement shall be payable only out of the proceeds received from the Sales.

In addition, the Debtors shall not be entitled to pay the Bidder Expense Reimbursement to a bidder,

if that bidder is determined to be the Successful Bidder (as defined in the Sale Procedures).

      26.     Additionally, the Debtors seek an Expense Reimbursement (the "Restoration

Expense Reimbursement") for Restoration Capital, RC5, LLC ("Restoration") in the amount of

$5,946.52 to compensate for due diligence costs related to the First Lien Construction Loans Asset

Pool, which has been removed from the Asset Pools to be sold pursuant to these Sale Procedures.

Restoration had initially agreed to act as stalking horse bidder for the First Lien Construction

Loans Asset Pool and the Debtors, in consultation with the Committee, had agreed to seek an

12

expense reimbursement for Restoration for its willingness to act as the stalking horse bidder. ABN

subsequently decided to withdraw their loans from the First Lien Construction Loans Asset Pool,

materially changing the contents and value of the pool. Restoration expended $5,946.52 prior to

the withdrawal of the ABN Mortgage Loans from the First Lien Construction Loans Asset Pool

and the Debtors' decision not to sell the First Lien Construction Loans Asset Pool pursuant to these

Sale Procedures.

**AUTHORITY FOR REQUESTED RELIEF**

**A.      The Sale is Within the Sound Business
         Judgment of the Debtors and Should be Approved**

27.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this

Circuit and others have required that the decision to sell assets outside the ordinary course of

business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.,

(In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

28.      The "sound business judgment" test requires a debtor to establish four

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course

13

of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the Sale of the Asset Pools and the Sale Procedures related thereto are based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

29.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v.

Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

30.     The Debtors submit that more than ample business justification exists to sell the Asset Pools to the Successful Bidders (or Second Best Bidders) pursuant to the Sale Procedures.  The Debtors believe that, because there is a limited market for the Mortgage Loans and REO Properties and that the Bids of the Stalking Horse Bidders are being subject to a market test through the Auction process, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.  Additionally, the Notice of Auction is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Mortgage Loans and REO Properties.  Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

31.     Moreover, the Sale Procedures are designed to maximize the value received for the Asset Pools.  The process proposed by the Debtors allows for a timely and efficient auction process, given the circumstances facing the Debtors, while providing bidders and consultants with ample time and information to submit a timely bid.  The Sale Procedures are designed to ensure that the Mortgage Loans and REO Properties will be sold for the highest or otherwise best possible purchase price.  The Debtors have already subjected the Asset Pools to market testing by permitting prospective purchasers to bid on such Asset Pools.  Moreover, the solicitation of

competing bids in a court-supervised auction process, as set forth in the Sale Procedures, will further ensure that the Bids of the Stalking Horse Bidders are subject to an appropriate market valuation. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for each Asset Pool will be fair and reasonable, and, therefore, the third prong of the Abbotts Dairies standard is satisfied. As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

**B.    The Sale is Proposed in "Good Faith"**
**Under Section 363(m) of the Bankruptcy Code**

   32. The Debtors request that the Court find that each Successful Bidder (or Second Best Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

   33. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

   34. Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the assets in each Asset Pool.

   35. As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Debtors and the potential purchasers to act in good faith in negotiating each of the Sales. Although the Bankruptcy Code does not define

066585.1001

"good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147.  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).  See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

36.       Here, the Sales proposed herein are in good faith.  There is no evidence of fraud or collusion in the terms of the Sale.  To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, each Sale Agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by sophisticated counsel and financial advisors.  No known potential bidder is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations will be conducted on an arm's length, good faith basis.  With respect to the potential bidders, the Sale Procedures are designed to ensure that no party is able to exert undue influence over the process.  Under the circumstances, each Successful Bidder (or Second Best Bidder) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.  Furthermore, the Sale Procedures are designed to prevent the Debtors or the Successful

17

Bidder (or Second Best Bidder) from engaging in any conduct that would cause or permit the applicable Sale Agreement or the Sale to be avoided under section 363(n) of the Bankruptcy Code.

37.     All creditors and parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) of the Bankruptcy Code.

**C.    The Sale Satisfies the Requirements
of Section 363(f) of the Bankruptcy Code**

38.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Because the Debtors expect that they will satisfy, at minimum, the second and fifth of these requirements, if not others as well, approving the sale of each Asset Pool free and clear of all adverse interests is warranted.  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D.

Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White

Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**D.      The Expense Reimbursements are Reasonable and Appropriate**

39.      Section 363(b) of the Bankruptcy Code provides that a trustee, and through

the application of section 1107(a) of the Bankruptcy Code, a debtor-in-possession, "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). Moreover, section 105(a) of the Bankruptcy Code states that "the

Court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."

40.      Court authorization pursuant to section 363(b) is appropriate where there

exists a sound business justification for the proposed transaction. See, e.g., Meyers v. Martin (In re

Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a

trustee's judgment concerning use of property under section 363(b) when there is a legitimate

business justification); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (same); In re Del. &

Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound

business judgment" test for use of property under section 363). For example, courts look to

whether the sale was negotiated in "good faith," whether the transaction is "fair and equitable," and

whether the sale is "in the best interest of the estate." See, e.g., In re Phoenix Steel Corp., 82 B.R.

334 (Bankr. D. Del. 1987); WBQ P'ship v. Commonwealth of Virginia, 189 B.R. 97 (Bankr. E.D.

Va. 1995).

41.      Under these circumstances, there is a sound business justification for

approving the Expense Reimbursements, because they are necessary to obtain the maximum return

for the Asset Pools.

42.     The Bidder Expense Reimbursement bring potential bidders into the Sale process, and allows such bidders to conduct due diligence and be compensated for the costs of such due diligence, but only if a Qualified bid is ultimately made.  The Debtors believe that this will help build momentum in the Sale process, which is critical in this competitive and harsh market. In the current economic environment it is unlikely that potential bidders would be willing to both submit significant bids, in addition to being responsible for the due diligence costs associated with evaluating the loans.  Accordingly, absent authorization of the payment of the Bidder Expense Reimbursement, the Debtors may lose the opportunity to obtain the highest and best available Successful Bids for each Asset Pool.

43.     Moreover, as the Stalking Horse Expense Reimbursements is designed to maximize value to the Debtors' estates by ensuring that the highest and best price for the Mortgage Loans will be obtained and providing a catalyst for other parties to submit competing Qualified Bids.  Thus, even if a Stalking Horse Bidder is offered the Stalking Horse Expense Reimbursement, but is ultimately not the Successful Bidder, the Debtors will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Asset Pools will be sold will reflect their true worth.  Without the Stalking Horse Expense Reimbursement, the Debtors may not be able to achieve the optimal Successful Bid. Moreover, the Stalking Horse Expense Reimbursement is not in the nature of a fee for prospective liquidated damages, but is designed solely to reimburse the Stalking Horse Bidder for its actual, out-of-pocket expenses, and not to provide it with a windfall.

44.     Similarly, payment of the Restoration Expense Reimbursement is in the best interests of the Debtors, their estates and creditors.  In reliance upon the agreement to seek expense reimbursement for Restoration's willingness to act as the stalking horse bidder for the First Lien

Construction Loans Asset Pool, Restoration incurred actual, out-of-pocket expenses of $5,946.52 for due diligence costs. But for ABN's withdrawal of its applicable ABN Mortgage Loans from the First Lien Construction Loans Asset Pool, Restoration's bid would have provided an appropriate "floor" for the pool and acted as a catalyst for other parties to submit competing Qualified Bids within the pool. The Debtors believe that they will ultimately benefit from Restoration's due diligence efforts during the sale of such constructions loans in a subsequent auction process or the sale of one-off loans consistent with this Court's order regarding miscellaneous loan sales.

45. Lastly, the Debtors believe that the Expense Reimbursements are fair and reasonable for several reasons. The aggregate amount of requested Expense Reimbursements is approximately 3% of the aggregate Stalking Horse Bid for all four Asset Pools. Given that the Bidder Expense Reimbursements cannot be given unless the potential bidder submits a Qualified Bid, including the required overbid, the Expense Reimbursement percentage is further reduced. Finally, the Stalking Horse Expense Reimbursement and Bidder Expense Reimbursement shall be payable only (i) if the bidder is not the Successful Bidder and (ii) from the proceeds received from the Sale of the applicable Asset Pool and from no other source.

46. The Debtors have demonstrated a sound business justification for authorizing the Expense Reimbursements. Accordingly, this Court should approve and authorize payment of the Expense Reimbursements.

**E.    Relief from the Ten Day Waiting Periods
        Under Bankruptcy Rules 6004(h) is Appropriate**

47. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the

21

court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) is waived.

48.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id</u>.

49.     The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h).

<u>**NOTICE**</u>

50.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) all parties who are known to possess or assert a secured claim or ownership interest against any Asset Pool; (iv) the Internal Revenue Service; (v) the U.S. Securities and Exchange Commission; and (vi) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

066585.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Sale Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (ii) entry of the proposed Sale Order, substantially in the form attached hereto as <u>Exhibit C</u>, and (iii) such other and further relief as the Court deems just and proper.

Dated: April __10__, 2009
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Margaret W G*

James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Margaret Whiteman Greecher (No. 4652)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Counsel for the Debtors and Debtors in Possession

DB02:7772423.8

066585.1001