# <u>EXHIBIT B</u>

Execution Copy

ASIC/SGIC#_____

## COMPLIANCE PLUS℠ INSURANCE
## ADMINISTRATION AGREEMENT

This Agreement is made between AMERICAN SECURITY INSURANCE COMPANY and STANDARD GUARANTY INSURANCE COMPANY, both Delaware corporations, having principal offices located at 260 Interstate North Circle, N.W., Atlanta, Georgia 30339 (collectively "Company"); and AMERICAN HOME MORTGAGE SERVICING, INC., a Maryland corporation, with its principal office located at 7142 Columbia Gateway Drive, Columbia, Maryland ("Servicer"), effective as of April 1, 2005.

## RECITALS

Servicer is engaged in the business of purchasing and/or servicing mortgage loans secured by real property; and

Servicer desires that such real property, where required, be insured against flood losses; and

Company is an insurance carrier and able to provide Flood Insurance for real properties; and

The Flood Disaster Protection Act of 1973, as amended (the "Act") requires Servicer to place flood insurance coverage in amounts required under the "Act" (as hereinafter defined) on any improved real estate or manufactured housing securing a loan serviced by Servicer and located in a "Flood Zone" (as hereinafter defined) in the event at any time during the term of the Mortgage Loan the Mortgagor thereof fails to respond adequately within forty-five (45) days to a notice of a mandatory flood insurance purchase requirement; and

Company agrees to provide its Compliance PLUS insurance ("Compliance PLUS") program ("the Program") to Servicer, and Servicer agrees to accept such Program and to pay all premiums, pursuant to the terms and conditions of this Agreement.

In consideration of the mutual promises made in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

## ARTICLE I - DEFINITIONS

As used in this Agreement, the following terms, when capitalized, shall have the meanings ascribed to them in this Article. Words in the singular shall, as the context requires, denote the plural, and vice versa. Terms not specifically defined in this Article or elsewhere in this Agreement shall have the meanings commonly ascribed to them.

A.    "Acceptable Flood Insurance" means Flood Insurance naming Servicer as mortgagee, meeting Servicer's standards, and those of the Act and the National Flood Insurance

Execution Copy

Program ("NFIP").   Acceptable Flood Insurance shall include coverage amounts as required by the Act and NFIP.

B.    "Compliance PLUS Policy" means (1) an individual Compliance PLUS insurance policy issued by Company, or (2) a master policy and additional insured endorsement thereunder issued by Company providing non-underwritten flood coverage on Eligible Property.

C.    "Eligible Property" means residential and commercial real property (including condominiums and manufactured housing) in which Servicer has a valid and enforceable security interest under a Mortgage Loan.   This term includes residential properties repossessed by Servicer after foreclosure whether on its own behalf or on behalf of any other person ("REO Eligible Property").

D.    "Flood Insurance" means an insurance policy providing coverage for flood losses on Eligible Property, other than that provided by Company under this Agreement.

E.    "Flood Zone" means NFIP-designated flood zones A, AE, AH, AO, AR, A1-30, A99, V, VE, or V1-30, as the same may from time to time be amended by FEMA.

F.    "Inception Date" means the date on which any Compliance PLUS Policy shall be effective with respect to Eligible Property.   The Inception Date for any Compliance PLUS Policies issued under this Agreement shall be either the effective date of the "master" policy(ies), or the date the request for a Compliance PLUS Policy is received by Company, whichever date is later in time. The master policy effective date shall be November 3, 2003.

G.    "Insurance Documents" means Flood Insurance policies, declaration pages, binders, certificates, cover notes, memoranda of insurance and any other documents received by Servicer or its servicing agent which relate to the status of Acceptable Flood Insurance on Eligible Property.

H.    "Mortgage Loan" means an obligation or a liability of any kind secured by a primary lien on Eligible Property and due from, owing or incurred by a Mortgagor to Servicer on account of a loan, an advance, a note, a guarantee or otherwise and regardless of whether Servicer escrows or impounds property insurance premium and real estate taxes. This term does not include any mortgage secured by a junior lien or any "home equity" loan or similar mortgage.

I.    "Mortgagor" means the individual and/or entity obligated on a Mortgage loan.

## ARTICLE II - RESPONSIBILITIES OF SERVICER

A.    As soon as practicable after Company's request, Servicer shall provide or cause its servicing agent to provide Company with an extract tape ("Extract Tape") or list

containing Servicer's current Mortgage Loan data files in a format mutually agreed to by the parties.

B.    On a predetermined periodic basis, and at other times as mutually agreed, Servicer shall provide or cause its servicing agent to provide all available Company requested information regarding all Eligible Properties which are necessary to Company's performance of its obligations under this Agreement.    Servicer shall in no event be required to disclose or provide any information where such disclosure would, in Servicer's reasonable judgment, be prohibited by any applicable law.

C.    Servicer may waive any Mortgagor's obligation to provide evidence of Flood Insurance. Such waiver may exist (1) in a writing, signed by Servicer or in a format such that a permanent record exists, and such waiver is received by Company, or (2) where Servicer has elected not to place the Mortgage Loan on the Extract Tape or list to be sent to Company, or (3) where Servicer has intentionally entered inaccurate data in its Mortgage Loan data files that prevents transmission of the Mortgage Loan data on its Extract Tape, or (4) where Servicer has relied upon verbal confirmation of a Mortgagor's Acceptable Flood Insurance being in effect and such information later proves to have been inaccurate, or (5) where Servicer elects not to pay all premiums due in accordance with Article II, Paragraph D below.    To the extent that Flood Insurance is so waived, no Flood Policy coverage whatsoever shall be afforded Servicer or any Mortgagor.

D.    Servicer shall pay to Company or its designee all premiums due within thirty (30) calendar days after receipt of Company's premium billing report. Failure to remit premium within sixty (60) calendar days shall be deemed a waiver of coverage on those Eligible Properties for which premium has not been received.    Servicer shall pay premiums due in accordance with the premium rates, credits and surcharges imposed by Company.

E.    Servicer represents and warrants that it has the requisite authority to obtain the insurance policies, covering each Eligible Property, which contain the types and amounts of coverages requested by Servicer, whether by virtue of contract, statutory or regulatory law, or otherwise.  Servicer also represents and warrants that it has the requisite authority to act on behalf of Mortgagors, and with respect to Mortgage Loans serviced by Servicer to act on behalf of other mortgagees, in all matters pertaining to the activities of Servicer under this Agreement.  Servicer shall indemnify and hold Company, its agents, servants, successors, assigns and insurers harmless from and against any and all actions, causes of action, claims, demands, damages and costs, including without limitation reasonable attorney's fees, which may be brought against Company, or incurred or suffered by Company on account of or in any way arising out of any material inaccuracy (whether existing on the date of the execution of this Agreement or at any time before or after that date) with respect to Servicer's representations and warranties contained in this Paragraph. Servicer understands and agrees that its obligation to ascertain and monitor its authority to obtain the insurance policies covering Eligible Properties, which contain the types and amounts of coverages as requested by Servicer, is a continuing obligation. This Paragraph shall survive the termination of this Agreement.

Execution Copy

F.   Servicer shall be fully responsible for the payment of all premiums due and payable under this Agreement and for its methods of collection of such premiums from and crediting or remitting any and all refunds to its Mortgagors.   Servicer consents to Company's offset of funds it owes Servicer on account of cancellations, and other refunds, claim payments or otherwise against amounts Servicer owes Company.

G.   During the term of this Agreement and after termination thereof, all Compliance PLUS Policies shall be allowed to naturally expire to their full policy term and Servicer will not take any action to terminate, replace or aid, directly or indirectly, through any person or entity not a party to this Agreement, in the termination or replacement of the Compliance PLUS Policies, or to prevent the Compliance PLUS Policies from naturally expiring, or take steps to cancel or "waive" the Compliance PLUS Policies "en mass" to avoid the spirit or intent of this Agreement or to abrogate or circumvent the provisions of this Agreement. A transfer or sale of a portfolio of Mortgage Loans by Servicer to a non-affiliated entity shall not be considered a breach of this provision.

H.   Servicer shall bear its own costs and expenses, including without limitation, its costs for equipment, data lines, personnel and programming, for the performance of its obligations under this Agreement.

I.   Servicer represents and warrants that (i) this Agreement has been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation; and (ii) the execution, delivery and performance of this Agreement by it does not and will not violate any applicable law, rule or regulation, and does not require the consent or approval of any governmental or other regulatory body; (iii) it has obtained all licenses, permits, approvals as may be required to perform the services under this Agreement, and (iii) it will comply with all laws, rules, and regulations applicable to the provision of services hereunder.

## <u>ARTICLE III</u> - <u>RESPONSIBILITIES OF COMPANY</u>

A.   Company shall have the following responsibilities with respect to the monitoring of Acceptable Flood Insurance for Eligible Properties:

1.   Based on the Mortgage Loan and Flood Insurance information provided by Servicer or its servicing agent, Company shall provide insurance monitoring services throughout the term of this Agreement, which services are intended to monitor the existence of Acceptable Flood Insurance with respect to each Eligible Property.

2.   With respect to Flood Insurance on each Eligible Property, Company shall provide periodic reports to Servicer to inform Servicer as to the status of Flood Insurance on each Eligible Property, Compliance PLUS Policies and binders issued and cancelled, new and exposed Mortgage Loans, premium transactions, premium

Execution Copy

billings, renewals and pending transactions and such other reports as are available under Company's insurance monitoring system.

3.    Maintain and provide Servicer, upon Servicer's request, with copies of Insurance Documents and related correspondence to Mortgagors.

B.    Based on the information provided by Servicer or its servicing agent, Company shall issue, renew and cancel Compliance PLUS Policies and provide the services enumerated in this Agreement with respect to all Compliance PLUS Policies delivered pursuant to this Agreement in accordance with Company's standards and procedures (as amended from time to time). It is agreed and understood that if Flood Insurance is in force for any Eligible Property, Company shall have no obligation to then insure such Eligible Property, even if the coverage limits are inadequate or deductibles are excessive. Compliance PLUS Policies will be placed only in the event of absence of Flood Insurance.

C.    Except as otherwise provided in this Paragraph, Company shall be obligated to issue Compliance PLUS Policies only with respect to Mortgage Loans in Servicer's portfolio as of the effective date of this Agreement and Mortgage Loans thereafter made by Servicer in the ordinary course of Servicer's business. Subject to the conditions stated below, obligations acquired by Servicer by assignment from or consent of any other person or entity, not directly affiliated with Servicer (collectively referred to as "Acquired Mortgages") shall not be considered "Mortgage Loans" under Paragraph E of Article I and Company shall have no responsibility under this Agreement with respect to such Acquired Mortgages unless and until all required information regarding such Acquired Mortgages is made available to Company in the ordinary course of performance under this Agreement within forty-five (45) days of such acquisition. As of the date that all of the above events have occurred, such Acquired Mortgages shall be deemed Mortgage Loans under this Agreement, however, no coverage shall be provided for any loss, damage or claim to the Eligible Property securing such Acquired Mortgages occurring prior to the date such Mortgage Loans were acquired. However, once Acquired Mortgages are accepted by Company as Mortgage Loans, all subsequent insurance coverages issued shall be effective as of the acquisition date or the date such Mortgage Loans became uninsured, whichever date is later in time.

D.    Company will use its best efforts to prevent the loss, destruction or unauthorized alteration of Servicer's files, data and such other information provided by Servicer under this Agreement. Each party shall maintain back-up files, data and other information submitted for processing and its resultant output in the case of loss, destruction or alteration to ensure uninterrupted service under this Agreement. Company will maintain a disaster recovery plan designed to provide back-up in the event of damage or destruction of systems used for the provision of services under this Agreement. Company agrees to review a summary of its disaster recovery plan with Servicer, upon Servicer's reasonable request.

Execution Copy

E.   Company shall be responsible for the adjustment of all claims on Compliance PLUS Policies issued pursuant to this Agreement in accordance with Company's standards. Such claims adjustment shall be handled through Company's own personnel or through a designated independent adjusting service. Servicer shall have no authority whatsoever to adjust any claims on Compliance PLUS Policies issued pursuant to this Agreement. Servicer shall promptly refer all claims to Company.

F.   Company shall bear its own costs and expenses, including without limitation, its costs for equipment, data lines, personnel and programming, for the performance of its obligations under this Agreement.

G.   Company represents and warrants that (i) this Agreement has been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation; and (ii) the execution, delivery and performance of this Agreement by it does not and will not violate any applicable law, rule or regulation, and does not require the consent or approval of any governmental or other regulatory body; (iii) it has obtained all licenses, permits, approvals as may be required to perform the services under this Agreement, and (iv) it will comply with all laws, rules, and regulations applicable to the provision of services hereunder.

H.   Company agrees to allow Servicer, including such Servicer's internal or external auditors and any regulatory examining authority having jurisdiction over Servicer, reasonable inspection rights in connection with the performance of Company's obligations under this Agreement. Such audit shall be, at the sole cost and expense of Servicer. In connection with any such audit or examination, Company shall make available for examination or interview any records relating to the provision of services under of this Agreement. Each Party shall use its respective commercially reasonable efforts to ensure that any such audit or examination and any such cooperation or interview only occur upon reasonable advance notice, during normal business hours and in a manner intended to minimize any disruption to Company's business and affairs.

I.   Company agrees that it shall obtain, not less than annually, an external auditor's report concerning its internal controls, including, without limitation, a SAS 70 Type II or similar report, or a report prepared by or for a regulatory authority. Company shall promptly advise Servicer as to the existence of such report and provide a copy of such report to Servicer without charge.

J.   During the term of this Agreement, Company will make available to Servicer, upon Servicer's request, but not more than once annually, copies of financial statements, balance sheets and other financial information as Servicer may reasonably request, prepared in accordance with generally accepted accounting principles.

K.   At least annually, Company will provide Servicer, the financial strength ratings and full reports about Company from the major rating agencies, including A.M. Best, Fitch, Moody's, and Standard & Poor's, and any other sources which the Company may deem appropriate or which Servicer may request.

Execution Copy

## ARTICLE IV – CONFIDENTIALITY

Company and Servicer hereby adopt and reaffirm the terms of the Confidentiality Agreement entered into by them as of even date, as if that agreement were fully set forth herein, and agree that such Confidentiality Agreement shall continue to be in full force and effect for a period of three (3) years after the expiration of the Term. During the performance of services in this Agreement, any information provided to Company relating to Mortgagors that are "consumers", shall be deemed "non-public personal information," as those terms are defined under the Gramm Leach Bliley Act (15 USC §§ 6801-6809) (16 C.F.R. §§ 313.3(e) and 313.15(a)(6)), as such act and its implementing regulations may be amended from time to time. The Company agrees to maintain physical, electronic, and procedural safeguards designed to protect such nonpublic personal information, in accordance with the Interagency Guidelines Establishing Safeguards for the Protection of Customer Information.

## ARTICLE V - INDEMNIFICATION

A.  Each party (the "Indemnifying Party") shall indemnify and hold harmless the other party, its parents, subsidiaries, affiliates, directors, officers, employees, agents and sub-contractors (any such party seeking indemnification, the "Indemnified Party"), from and against any and all liabilities, losses claims, damages and expenses (including reasonable attorney fees and expenses) arising from or relating to (i) any breach of this Agreement by the Indemnifying Party, (ii) any gross negligence or willful misconduct on the part of the Indemnifying Party, or (iii) any bona fide defense, dispute, offset, claim or counterclaim made by any third party arising out of the operations or activities of the Indemnifying Party, in connection with this Agreement. The Indemnified Party shall notify the Indemnifying Party in a reasonably prompt manner of any legal claim, demand, right or cause of action asserted, instituted or threatened against the Indemnified Party (a "Claim") for which the Indemnified Party is seeking indemnification pursuant to this Paragraph. The Indemnifying Party may thereafter assume control of such Claim, provided that the Indemnified Party shall have the right to participate in the defense or settlement of such Claim. Neither the Indemnifying Party nor the Indemnified Party may settle such Claim or consent to any judgment with respect thereto without the written consent of the other party (which consent may not be unreasonable withheld or delayed). The Indemnified Party agrees to provide the Indemnifying Party with reasonable amount of assistance in connection with defending or settling any such Claim. In no event shall either party hereto be liable to the other for any special, indirect, incidental, consequential or exemplary damages, even if such party shall have been advised of the possibility of such damages, such as, but not limited to, loss of revenue or anticipated profits or lost business.

B.  Company's liability under this Agreement and the Flood Policies shall be limited to that stated in this Agreement and such Flood Policies.

C.  All information as to whether the location of an Eligible Property is or is not in or near a Flood Zone is based on information obtained from Servicer, FEMA and the mortgagor.

7

Execution Copy

The information is intended solely for the purpose of compliance by Servicer with the Flood Disaster Protection Act of 1973. The information has not been and will not be verified for accuracy, completeness or currentness. The information is not a substitute for a complete survey of each Eligible Property or obtaining expert opinions as to whether it is in a Flood Zone or as to the advisability of securing Flood Insurance for it. Notwithstanding the foregoing, Company will use its best efforts to integrate with Servicer's life of loan flood determination vendor to update coverage requirements for Eligible Properties.

## **ARTICLE VI - TERM**

A.    This Agreement shall commence as of the date indicated on the first page and shall continue in effect for a period of three (3) years thereafter ("Minimum Term"), unless terminated earlier as provided in Paragraphs B or C of this Article. During the Minimum Term, and thereafter so long as this Agreement remains in effect, Servicer shall use Company as its sole and exclusive provider of lender-placed Flood Insurance for real property.  Upon expiration of the Minimum Term, either party may terminate this Agreement by sending thirty (30) days advance written notice to the other party of its intent to terminate this Agreement.

B.    This Agreement may be terminated immediately upon written notice should either party fail to reasonably discharge any of its duties or obligations or breach any material term or condition of this Agreement if, after receiving written notice of failure to discharge duties or obligations or breach, such failure or breach is not cured to the reasonable satisfaction of the aggrieved party within sixty (60) calendar days of the date of such notice. This Agreement shall terminate automatically, without notice, upon the termination of all the Compliance PLUS Policies.

C.    This Agreement shall terminate concurrently with the termination by any regulatory authority of either party's authority to act in accordance with this Agreement, provided the affected party must provide prompt written notice to the other party of such action. This Agreement may also terminate immediately in the event that Company is subject to any material change in its financial condition, or in the event that Company's financial condition or ratings are determined to be unsatisfactory or otherwise non-qualifying by any rating agency, mortgage investor, secondary mortgage market participant, or regulator having supervision of Servicer.

D.    Upon the termination of this Agreement, the insurance protection provided by the Compliance PLUS Policies will remain effective only as to Eligible Properties for which a Compliance PLUS Policy is then in force, subject to policy provisions, including without limitation those regarding term and scope of coverage.  Servicer's duties under Paragraph F of Article II shall continue after termination.

E.    Upon the termination of this Agreement, each party shall return all materials, data and information forwarded to it by the other party for use in connection with the Program or otherwise as directed within ten (10) days after termination date.

F.      Servicer agrees that upon the termination of this Agreement, Company shall have no responsibility for providing any insurance placement service for any Mortgage Loan or coverage or any Compliance PLUS Policy-related service with respect to any Mortgage Loans and Eligible Property not then insured under the Program.

## ARTICLE VII - CLAIM DRAFTS

A.      Under authority conferred upon Servicer under its various mortgage agreements and subject to the procedures set forth in the Procedures Manual mutually established by the parties, Company shall issue claim drafts for foreclosure properties and REO Eligible Properties under its Compliance PLUS Program: (a) to "Servicer for the account of the Mortgagor" for properties in foreclosure; and (b) to "Servicer" only for REO Eligible Properties.

B.      Servicer hereby authorizes Company to conclusively presume that properties are in foreclosure or are REO Eligible Properties (as the case may be) upon oral or written notification by Servicer irrespective of such loans' status identification on the most recent loan Extract Tape. In any event, Servicer will use its best efforts to provide such notification in writing as soon as practicable. Company and Servicer agree that any claim draft issued as described above shall be deemed to have been so issued at Servicer's direction.

C.      In consideration of the Company's agreement to make such claim payments and in exchange for each payment so made for covered losses of and/or damage to foreclosure properties and REO Eligible Properties, Servicer agrees to indemnify and hold harmless Company and its officers, directors, employees, agents, legal representatives, successors and assigns from and against any and all claims, demands, actions and causes of action threatened and/or brought against them or any of them and/or Servicer by any person(s) arising out of or in any way related to: (a) Company's method of claim payment as authorized by this Agreement; and/or (b) Servicer's application of such claim proceeds.

## ARTICLE VIII - ARBITRATION

A.      If any disputes or controversies shall arise between the parties with regard to the interpretation of this Agreement, any such dispute or controversy shall be resolved by binding arbitration before a single arbitrator. All arbitrations shall be administered by the American Arbitration Association ("AAA") in accordance with its Expedited Procedures of the Commercial Arbitration Rules of the AAA in effect at the time the notice of arbitration is filed. The terms of this Arbitration Provision shall control any inconsistency between the AAA's Rules and this Arbitration Provision. The arbitrator shall apply relevant substantive federal and state law and applicable statutes of limitations and shall provide written, reasoned findings of fact and conclusions of law. This Arbitration Provision is part of a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* If any portion of this Arbitration Provision is deemed invalid or unenforceable, it shall not invalidate the remaining portions of the Arbitration Provision. For the purpose of this Arbitration

Execution Copy

Provision, each party hereto shall be deemed to include all of its affiliates, successors and assigns, their respective principals, partners, officers and directors and all of the dealers, licensees, agents, and employees of any of the foregoing entities. This Arbitration Provision shall inure to the benefit of and be binding on each party and the aforementioned persons and entities. This Arbitration Provision shall continue in full force and effect subsequent to and notwithstanding the expiration of termination of this Agreement.

B.   Each Party Understands and agrees that because of this Arbitration Provision neither party will have the right to go to court except as provided above, or to have a jury trial.

C.   Any such arbitration filed by Servicer shall take place in Atlanta, Georgia. Any such arbitration filed by Company shall take place in Melville, New York.

## <u>ARTICLE IX - MISCELLANEOUS</u>

A.   No waiver or modification of this Agreement or any covenant, condition, or limitation contained in it shall be valid unless agreed to in writing by both parties. No evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this Agreement, or the rights or obligations of any party under it, unless such waiver or modification is in writing and duly executed as aforesaid.

B.   The final determination by an arbitration panel of the invalidity or unenforceability of any provision or clause of this Agreement, in whole or in part, shall in no way impair or affect the validity or enforceability of any other provision of this Agreement, all of which shall remain fully effective.

C.   The failure to insist upon strict compliance with any of the terms, covenants or conditions of this Agreement by Company with respect to the Compliance PLUS Policies shall not be deemed a waiver of such terms, covenants or conditions. No waiver or relinquishment of any right or power by either party under this Agreement or by Company under the Compliance PLUS Policies issued hereunder, at any one or more times, shall be deemed a waiver or relinquishment of such right or power at any other time or times.

D.   This Agreement embodies the entire understanding with regard to Flood Insurance between the parties. All prior and contemporaneous correspondence, conversations and memoranda are merged in, replaced by and without effect on this Agreement. This Agreement shall neither impair nor affect any rights of either party under the Compliance PLUS Policies.

E.   This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors, representatives, and assigns. Neither this Agreement nor any rights provided by it may be assigned by either party without the prior consent in writing of the other; provided however, that without the prior written consent of Company, Servicer may from time to time assign some or all of its rights to receive payment and

Execution Copy

some or all rights incident thereto under this Agreement and the Compliance PLUS Policies and all endorsements thereto to any person to whom Servicer has sold, transferred, assigned, conveyed or pledged all or a portion of its right, title and interest in and to any Mortgage Loan. Servicer agrees that it will provide information relating to any permitted assignments of this Agreement or of some or all of its right of payment under such Compliance PLUS Policies and all endorsements thereto in this Agreement prior to or contemporaneous with such assignment and as Company may reasonably request from time to time. Receipt of such notice by Company shall be a condition precedent to the operation of the exception provided by this Paragraph. Notwithstanding the foregoing, either party may assign this agreement to one of its financially sound affiliates or subsidiaries without the consent of the other party.

F.    Any delay or error by either party or its servicing agent shall excuse performance by the other party under this Agreement to the extent performance has been prevented or delayed by each delay(s) or error(s). Upon the removal of such delay or cure of such error, performance shall be resumed at the specified rate.

G.    Any notices required or permitted under this Agreement shall be in writing and be given by personal delivery or sent by a nationally recognized overnight mail service or United States first-class mail (except notice of termination which shall be sent by a nationally recognized overnight mail service that obtains evidence of delivery or by United States certified mail), postage prepaid, addressed to the party for whom it is intended at its address as follows:

|             |                                              |
|-------------|----------------------------------------------|
| To Company: | American Security Insurance Company          |
|             | Standard Guaranty Insurance Company          |
|             | 260 Interstate North Circle, N.W.            |
|             | Atlanta, Georgia 30339                       |
|             | Attention: Hazard PLUS Product Manager       |
| To Servicer: | American Home Mortgage Servicing, Inc.      |
|             | 7142 Columbia Gateway Drive                  |
|             | Columbia, Maryland 21046                     |
|             | Attention: David Friedman                    |
| With a copy to: | American Home Mortgage Servicing, Inc.   |
|             | Legal Department                             |
|             | 538 Broadhollow Road                         |
|             | Melville, New York 11747                     |
|             | Attn:  General Counsel                       |

H.    This Agreement is entered into and shall be governed by the laws of the State of Delaware.

I.    This Agreement may be executed in one or more counterparts, all of which shall together constitute one and the same instrument and shall become effective when one or more

Execution Copy

counterparts hereof have been signed by Company and delivered to Servicer and one or more counterparts hereof have been signed by Servicer and delivered to Company.

IN WITNESS WHEREOF, the parties have executed this Agreement, in duplicate, effective as of the date indicated on the first page.

ATTEST:

AMERICAN SECURITY INSURANCE COMPANY
STANDARD GUARANTY INSURANCE COMPANY

Title) *Vice President*

By: _____
Title: *Vice President*

ATTEST:

AMERICAN HOME MORTGAGE SERVICING, INC.

Title: *SVP*

By: _____
Title: *EVP*

12