# EXHIBIT C

Execution Copy

ASIC/SGIC# _____

## HAZARD PLUS AND COMPLIANCE PLUS
## OUTSOURCING
## AGREEMENT

This Agreement is made among AMERICAN SECURITY INSURANCE Company and STANDARD GUARANTY INSURANCE Company, both Delaware Corporations having principal offices located at 260 Interstate North Circle, N.W., Atlanta, Georgia 30339 (collectively "Company"); and AMERICAN HOME MORTGAGE SERVICING, INC., a Maryland corporation, with its principal office located at 7142 Columbia Gateway Drive, Columbia, Maryland 21046 ("Servicer"), effective as of April 1, 2005.

## RECITALS

Servicer is engaged in the business of purchasing and/or servicing mortgage loans secured by real property; and

In accordance with the terms of its mortgage agreements with Mortgagors, Servicer requires all Mortgagors to maintain Acceptable Hazard Insurance protecting the real property securing the Mortgage Loans originated, purchased and/or serviced by Servicer; and

In accordance with the Flood Disaster Protection Act of 1973, as amended (the "Act"), Servicer requires those Mortgagors subject to the Act to maintain Acceptable Flood Insurance protecting the real property securing the Mortgage Loans originated, purchased and/or serviced by Servicer; and

Servicer desires that its Mortgage Loans be constantly monitored to verify that Acceptable Hazard Insurance, and Acceptable Flood Insurance when required by the Act, are in force; and

Servicer further desires that should Acceptable Hazard Insurance or Acceptable Flood Insurance, as to any Mortgage Loan, non-renew or cancel for any reason, that proper notification be sent to the affected Mortgagor stating that lender-placed Acceptable Hazard Insurance and/or Acceptable Flood Insurance will be obtained upon the failure of the Mortgagor to promptly provide evidence of other Acceptable Hazard Insurance and/or Acceptable Flood Insurance; and

Company is engaged in the business of providing such insurance monitoring services to financial institutions such as Servicer; and

Servicer desires to obtain the monitoring services of Company, and Company agrees to provide such monitoring services to Servicer, pursuant to the terms and conditions of this Agreement.

In consideration of the mutual promises made in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

## ARTICLE I - DEFINITIONS

1

Execution Copy

As used in this Agreement, the following terms, when capitalized, shall have the meanings ascribed to them in this Article. Words in the singular shall, as the context requires, denote the plural, and vice versa. Terms not specifically defined in this Article or elsewhere in this Agreement shall have the meanings commonly ascribed to them.

A.    "Acceptable Flood Insurance" means Food Insurance naming Servicer as mortgagee, meeting Servicer's standards, and those of the Act and those of the National Flood Insurance Program ("NFIP").

B.    "Acceptable Hazard Insurance" means Hazard Insurance naming Servicer as mortgagee, with coverage limits at least equal to those required by Servicer and meeting Servicer's deductible requirements.

C.    "Acceptable Insurance" means Acceptable Hazard Insurance and/or Acceptable Flood Insurance.

D.    "Eligible Property" means residential and commercial real property in which Servicer has a valid and enforceable security interest under a Mortgage Loan. This term includes residential properties repossessed by Servicer after foreclosure whether on its own behalf or on behalf of any other person ("REO Eligible Property").

E.    "Flood Insurance" means an insurance policy providing coverage for flood losses on Eligible Property, other than that provided by Company under the Agreement.

F.    "Hazard Insurance" means an insurance policy providing at least fire and extended coverage on Eligible Property, other than that provided by Company under this Agreement.

G.    "Insurance Documents" means Hazard Insurance and/or Flood Insurance policies, declaration pages, binders, certificates, cover notes, memoranda of insurance and any other documents received by Servicer or its servicing agent which relate to the status of Acceptable Insurance on Eligible Property.

H.    "Mortgage Loan" means an obligation or a liability of any kind secured by a primary lien on Eligible Property and due from, owing or incurred by a Mortgagor to Servicer on account of a loan, an advance, a note, a guarantee or otherwise and regardless of whether Servicer escrows or impounds property and/or flood insurance premium and real estate taxes. References to "Mortgage Loan" include similar obligations serviced by Servicer on behalf of a mortgagee other than Servicer. This term does not include any mortgage secured by a junior lien or any "home equity" loan or similar mortgage.

I.    "Mortgagor" means the individual and/or entity obligated on a Mortgage Loan.

Execution Copy

## ARTICLE II - RESPONSIBILITIES OF SERVICER

A.    On or before the effective date of this Agreement, Servicer shall, at no expense to Company, provide Company with access to Servicer's current Mortgage Loan data files in the Servicer's loan servicing system. As of the effective date of this Agreement, Servicer shall forward, or cause to be forwarded, all Insurance Documents it receives pertaining to the Mortgage Loans to Company on a daily basis and Company shall have the ongoing responsibility for sorting, identifying, and inputting relevant data into its data files as described below. Provided Servicer performs its responsibilities enumerated above, including without limitation sending Insurance Documents to Company daily and providing access to Servicer's loan servicing system on an ongoing basis, Company shall maintain the service standards mutually agreed to by the parties during the term of the Agreement.

B.    In exchange for the monitoring services performed by Company hereunder, Servicer shall pay to Company a monitoring fee equal to sixteen and one-half cents ($0.165) per Mortgage Loan per month. Servicer agrees to pay such monitoring fee to Company within thirty (30) days after receipt of Company's billing statement.

C.    No more than once during any twelve (12) month period after the effective date, Company may, by giving Servicer thirty (30) days advance written notice, increase the charges for the services contracted for herein, by a percentage by which the CPI (defined below) as of that time is higher than the CPI as of (i) for the first adjustment, the effective date of this Agreement, and (ii) thereafter, the previous time that Company adjusted its charges to Servicer pursuant to this Paragraph. Company agrees that no single increase in the monitoring fee shall exceed five percent (5%) of the monitoring fee being charged immediately prior to the current increase. These increased charges will remain in effect until Company adjusts them again pursuant to this Paragraph. "CPI" is the Consumer Price Index for All Urban Consumers, U.S. City Average, for All Items (1982-1984 = 100) as published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the Bureau of Labor Statistics stops publishing the CPI, the parties will substitute another comparable measure published by a mutually agreeable source. However, if such change is merely to redefine the base period for the CPI from 1982-1984 to some other period, the parties will continue to use the CPI but will, if necessary, convert the two CPI's being compared to the same basis by multiplying them by the appropriate conversion factor.

D.    In the event Servicer elects to change loan-servicing systems, Servicer shall reimburse Company for the cost of making any necessary modifications to Company's computer system and programs in order to accommodate such change. This reimbursement may be limited to an amount agreed to by the parties prior to such servicing change.

E.    Servicer acknowledges and agrees that all notices to Mortgagors that are generated from the acquisition of new Mortgage Loans such as, but not limited to, notices to Mortgagors notifying them of the change in the mortgagee clause, shall be the responsibility of the Servicer.

3

Execution Copy

F.   Servicer acknowledges that Company relies upon certain third party providers to provide its products, services, and personnel in Company's performance under this Agreement, and that certain expenses including, but not limited to, tariffs, surcharges, miscellaneous service fees and use fees may at such third party's option, increase or decrease over time. Such increases and decreases shall become effective under this Agreement upon implementation by such third party providers.

G.   Servicer represents and warrants that (i) this Agreement has been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation; and (ii) the execution, delivery and performance of this Agreement by it does not and will not violate any applicable law, rule or regulation, and does not require the consent or approval of any governmental or other regulatory body; (iii) it has obtained all licenses, permits, approvals as may be required to perform the services under this Agreement, and (iii) it will comply with all laws, rules, and regulations applicable to the provision of services hereunder.

## ARTICLE III - RESPONSIBILITIES OF COMPANY

A.   Company shall provide for Servicer an automated service for the monitoring of Acceptable Insurance for Eligible Properties and the processing of Insurance Documents covering Mortgage Loans to determine whether Mortgagors have obtained and are continuing to maintain Acceptable Insurance as required. A general description of the services to be provided by Company to Servicer is as follows:

1.   Correctly interpret, and accurately enter into Company's insurance monitoring system, data from Insurance Documents pertaining to Mortgage Loans on a timely basis. Such data entry shall substantially conform to policies and procedures established and mutually agreed to in writing by Servicer and Company.

2.   Monitor Acceptable Insurance coverage for all Mortgage Loans, accurately reported to Company, to ascertain the existence of Acceptable Insurance on Mortgage Loans.

3.   Issue written notices to Mortgagors reminding them of their obligation to maintain Acceptable Insurance. The form and content of such notices shall have been previously reviewed and approved by Servicer. Company shall be obligated to send such notices upon expiration or termination of the relevant insurance policy to those Mortgagors who have failed to furnish proof of Acceptable Insurance.

4.   Provide periodic reports to Servicer on the status of Acceptable Insurance on all Mortgage Loans including insurance binders and policies issued and cancelled, premium transactions, premium billings, renewals and pending transactions.

5.   Company shall be responsible for the handling of all Mortgagor inquiries regarding the subject matter of this Agreement.

Execution Copy

B.     Attached to this Agreement and incorporated herein is Exhibit A – "Outsourcing Services Processing Standards," which represent the standards that Company and Servicer have initially agreed shall be complied with under this Agreement. Company and Servicer will, however, diligently work together to develop Servicer's Procedures Manual ("Manual"), which will incorporate, in greater detail, the services to be performed by the parties and any additional processing standards that will apply to the services performed. Company and Servicer shall each appoint an individual of their choosing who will have the authority to agree upon future amendments to the Manual. All such amendments to the Manual shall be dated as to their effective date and signed by such appointed individuals representing each party before any change to the Manual shall become effective. Each party may appoint more than one individual who is authorized to amend the Manual and any such appointment may be revoked or new appointments made by a party upon timely written notification to the other party.    The Manual is hereby incorporated into this Agreement as if fully set forth herein. If any conflict shall arise between the services and standards set forth in this Agreement, and the services and standards set forth in the Manual, the Manual shall prevail. The parties will diligently and in good faith pursue completing the Manual within thirty (30) days of the execution of this Agreement.

C.     Company will use its best efforts to prevent the loss, destruction or unauthorized alteration of Servicer's files, data and such other information provided by Servicer under this Agreement.    Each party shall maintain back-up files, data and other information submitted for processing and its resultant output in the case of loss, destruction or alteration to ensure uninterrupted service under this Agreement. Company will maintain a disaster recovery plan designed to provide back-up in the event of damage or destruction of systems used for the provision of services under this Agreement.  Company agrees to review a summary of its disaster recovery plan with Servicer, upon Servicer's reasonable request.

D.     Company represents and warrants that (i) this Agreement has been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation; and (ii) the execution, delivery and performance of this Agreement by it does not and will not violate any applicable law, rule or regulation, and does not require the consent or approval of any governmental or other regulatory body; (iii) it has obtained all licenses, permits, approvals as may be required to perform the services under this Agreement, and (iv) it will comply with all laws, rules, and regulations applicable to the provision of services hereunder.

E.     Company agrees to allow Servicer, including such Servicer's internal or external auditors and any regulatory examining authority having jurisdiction over Servicer, reasonable inspection rights in connection with the performance of Company's obligations under this Agreement.    Such audit shall be, at the sole cost and expense of Servicer.  In connection with any such audit or examination, Company shall make available for examination or interview any records relating to the provision of services under of this Agreement. Each Party shall use its respective commercially reasonable efforts to ensure that any such audit or examination and any such cooperation or interview only occur upon reasonable

5

advance notice, during normal business hours and in a manner intended to minimize any disruption to Company's business and affairs.

F.      Company agrees that it shall obtain, not less than annually, an external auditor's report concerning its internal controls, including, without limitation, a SAS 70 Type II or similar report, or a report prepared by or for a regulatory authority. Company shall promptly advise Servicer as to the existence of such report and provide a copy of such report to Servicer without charge.

G.      During the term of this Agreement, Company will make available to Servicer, upon Servicer's request, but not more than once annually, copies of financial statements, balance sheets and other financial information as Servicer may reasonably request, prepared in accordance with generally accepted accounting principles.

H.      At least annually, Company will provide Servicer, the financial strength ratings and full reports about Company from the major rating agencies, including A.M. Best, Fitch, Moody's, and Standard & Poor's, and any other sources which the Company may deem appropriate or which Servicer may request.

## ARTICLE IV – CONFIDENTIALITY

Company and Servicer hereby adopt and reaffirm the terms of the Confidentiality Agreement entered into by them as of even date, as if that agreement were fully set forth herein, and agree that such Confidentiality Agreement shall continue to be in full force and effect for a period of three (3) years after the expiration of the Term. During the performance of services in this Agreement, any information provided to Company relating to Mortgagors that are "consumers", shall be deemed "non-public personal information," as those terms are defined under the Gramm Leach Bliley Act (15 USC §§ 6801-6809) (16 C.F.R. §§ 313.3(e) and 313.15(a)(6)), as such act and its implementing regulations may be amended from time to time. The Company agrees to maintain physical, electronic, and procedural safeguards designed to protect such nonpublic personal information, in accordance with the Interagency Guidelines Establishing Safeguards for the Protection of Customer Information.

## ARTICLE V - INDEMNIFICATION

A.      Each party (the "Indemnifying Party") shall indemnify and hold harmless the other party, its parents, subsidiaries, affiliates, directors, officers, employees, agents and sub-contractors (any such party seeking indemnification, the "Indemnified Party"), from and against any and all liabilities, losses claims, damages and expenses (including reasonable attorney fees and expenses) arising from or relating to (i) any breach of this Agreement by the Indemnifying Party, (ii) any gross negligence or willful misconduct on the part of the Indemnifying Party, or (iii) any bona fide defense, dispute, offset, claim or counterclaim made by any third party arising out of the operations or activities of the Indemnifying Party, in connection with this Agreement. The Indemnified Party shall notify the Indemnifying Party in a reasonably prompt manner of any legal claim, demand, right or cause of action asserted, instituted or threatened against the Indemnified Party (a

Execution Copy

"Claim") for which the Indemnified Party is seeking indemnification pursuant to this Paragraph. The Indemnifying Party may thereafter assume control of such Claim, provided that the Indemnified Party shall have the right to participate in the defense or settlement of such Claim. Neither the Indemnifying Party nor the Indemnified Party may settle such Claim or consent to any judgment with respect thereto without the written consent of the other party (which consent may not be unreasonable withheld or delayed). The Indemnified Party agrees to provide the Indemnifying Party with reasonable amount of assistance in connection with defending or settling any such Claim. IN NO EVENT SHALL EITHER PARTY HERETO BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, EVEN IF SUCH PARTY SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

B.     Company's liability under this Agreement shall be limited to that stated in this Agreement.

C.     In the event (i) Company receives a premium notice for Acceptable Insurance from a Mortgagor's hazard or flood insurer in a timely manner, and (ii) Company fails to timely notify Servicer that such premium is due, and (iii) the Mortgagor's hazard or flood insurer cancels the Mortgagor's Acceptable Insurance policy solely due to the non-payment of the premium, and (iv) the Mortgagor's real property securing the Mortgage Loan subsequently suffers a loss that would have otherwise been covered by the cancelled Acceptable Insurance policy, then Company shall be obligated to pay any such loss as would have been covered if Mortgagor's Acceptable Insurance Policy had been in place.

## ARTICLE VI - TERM

A.     This Agreement shall commence as of the date indicated on the first page and shall continue in effect for a period of three (3) years thereafter ("Minimum Term"), unless terminated earlier as provided in Paragraphs B or C of this Article. Upon expiration of the Minimum Term, either party may terminate this Agreement by sending ninety (90) calendar days advance written notice to the other party of its intent to terminate this Agreement.

B.     This Agreement may be terminated immediately upon written notice should either party fail to reasonably discharge any of its duties or obligations or breach any material term or condition of this Agreement if, after receiving written notice of failure to discharge duties or obligations or breach, such failure or breach is not cured to the reasonable satisfaction of the aggrieved party within sixty (60) days of the date of such notice, except for non-payment, in which case this Agreement may be terminated immediately upon written notice. This Agreement shall terminate automatically, without notice, upon the termination of the Hazard PLUS Insurance Administration Agreement between the parties hereto.

C.     This Agreement shall terminate concurrently with the termination by any regulatory authority of either party's authority to act in accordance with this Agreement, provided

Execution Copy

the affected party must provide prompt written notice to the other party of such action. This Agreement may also terminate immediately in the event that Company is subject to any material change in its financial condition, or in the event that Company's financial condition or ratings are determined to be unsatisfactory or otherwise non-qualifying by any rating agency, mortgage investor, secondary mortgage market participant, or regulator having supervision of Servicer.

D.    Upon the termination of this Agreement, each party shall return all materials, data and information forwarded to it by the other party for use in connection with the Program or otherwise as directed within ten (10) days after the termination date.

E.    Servicer agrees that upon the termination of this Agreement, Company shall have no further responsibility for providing insurance monitoring services with respect to any Mortgage Loan or Eligible Property.

## ARTICLE VII - <u>ARBITRATION</u>

A.    If any disputes or controversies shall arise between the parties with regard to the interpretation of this Agreement, any such dispute or controversy shall be resolved by binding arbitration before a single arbitrator. All arbitrations shall be administered by the American Arbitration Association ("AAA") in accordance with its Expedited Procedures of the Commercial Arbitration Rules of the AAA in effect at the time the notice of arbitration is filed.   The terms of this Arbitration Provision shall control any inconsistency between the AAA's Rules and this Arbitration Provision. The arbitrator shall apply relevant substantive federal and state law and applicable statutes of limitations and shall provide written, reasoned findings of fact and conclusions of law.   This Arbitration Provision is part of a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*  If any portion of this Arbitration Provision is deemed invalid or unenforceable, it shall not invalidate the remaining portions of the Arbitration Provision.  For the purpose of this Arbitration Provision, each party hereto shall be deemed to include all of its affiliates, successors and assigns, their respective principals, partners, officers and directors and all of the dealers, licensees, agents, and employees of any of the foregoing entities.   This Arbitration Provision shall inure to the benefit of and be binding on each party and the aforementioned persons and entities.  This Arbitration Provision shall continue in full force and effect subsequent to and notwithstanding the expiration of termination of this Agreement.

B.    Each Party understands and agrees that because of this Arbitration Provision neither party will have the right to go to court except as provided above, or to have a jury trial.

C.    Any such arbitration filed by Servicer shall take place in Atlanta, Georgia.  Any such arbitration filed by Company shall take place in Melville, New York.

## ARTICLE VIII - <u>MISCELLANEOUS</u>

A.    No waiver or modification of this Agreement or any covenant, condition, or limitation contained in it shall be valid unless agreed to in writing by both parties.  No evidence of

8

Execution Copy

any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this Agreement, or the rights or obligations of any party under it, unless such waiver or modification is in writing and duly executed as aforesaid.

B.      The final determination by an arbitration panel of the invalidity or unenforceability of any provision or clause of this Agreement, in whole or in part, shall in no way impair or affect the validity or enforceability of any other provision of this Agreement, all of which shall remain fully effective.

C.      The failure to insist upon strict compliance with any of the terms, covenants or conditions of this Agreement by either party shall not be deemed a waiver of such terms, covenants or conditions. No waiver or relinquishment of any right or power by either party under this Agreement at any one or more times, shall be deemed a waiver or relinquishment of such right or power at any other time or times.

D.      This Agreement embodies the entire understanding between the parties with regard to the subject matter hereof. All prior and contemporaneous correspondence, conversations and memoranda are merged in, replaced by and without effect on this Agreement.

E.      This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors, representatives, and assigns. Neither this Agreement nor any rights provided by it may be assigned by either party without the prior consent in writing of the other. Notwithstanding the foregoing, either party may assign this agreement to on of its financially sound affiliates or subsidiaries without the consent of the other party.

F.      Any delay or error by either party or its servicing agent shall excuse performance by the other party under this Agreement to the extent performance has been prevented or delayed by each delay(s) or error(s). Upon the removal of such delay or cure of such error, performance shall be resumed at the specified rate.

G.      Any notices required or permitted under this Agreement shall be in writing and be given by personal delivery or sent by a nationally recognized overnight mail service or United States first-class mail (except notice of termination which shall be sent by a nationally recognized overnight mail service that obtains evidence of delivery or by United States certified mail), postage prepaid, addressed to the party for whom it is intended at its address as follows:

> To Company:          American Security Insurance Company
>                      Standard Guaranty Insurance Company
>                      260 Interstate North Circle, N.W.
>                      Atlanta, Georgia 30339
>                      Attention: Hazard/Flood Product Manager

Execution Copy

| | |
|---|---|
| To Servicer: | American Home Mortgage Servicing, Inc.<br>7142 Columbia Gateway Drive<br>Columbia, Maryland 21046<br>Attention: David Friedman |
| With a copy to: | American Home Mortgage Servicing, Inc.<br>Legal Department<br>538 Broadhollow Road<br>Melville, New York 11747<br>Attn:  General Counsel |

H.    Servicer shall, upon the delivery of a three-day prior written notice, have the right to cause an audit to be made, at their own expense, of the Company's records pertaining to this Agreement, at any time during the regular office hours of the Company. Such right of audit shall continue for one (1) year following the termination of the Agreement.

I.    This Agreement is entered into and shall be governed by the laws of the State of Delaware.

J.    This Agreement may be executed in one or more counterparts, all of which shall together constitute one and the same instrument and shall become effective when one or more counterparts hereof have been signed by Company and delivered to Servicer and one or more counterparts hereof have been signed by Servicer and delivered to Company.

IN WITNESS WHEREOF, the parties have executed this Agreement, in duplicate, effective as of the date indicated on the first page.

ATTEST:

Title: Vice President

ATTEST:

Title: SVP.

AMERICAN SECURITY INSURANCE Company
STANDARD GUARANTY INSURANCE Company

By:

Title: Vice President

AMERICAN HOME MORTGAGE SERVICING, INC.

By:

Title:

Execution Copy

## Exhibit A
## Outsourcing Services Processing Standards

| Process | Standard |
|---------|----------|
| Open Mail | 1 business day after receipt |
| Sort Mail | 1 business day after opened |
| Loan Number Identification | 2 business days after opened |
| UTL's | Account search on day 1 and 30 then purge |
| Misdirected Items | Returned by second day delivery within 2 business days of receipt |
| Renewals | Process renewals within 5 business days after identification |
| Maintenance | 5 business days after identification |
| Faxes | 2 business days after identification |
| Refund Checks | 5 business days after identification |
| Return Checks | 2 business days after identification |
| Tasks | *98% or better processed within time frames of individual task headers |
| Cancellations | 5 business days after identification |
| Reinstatements | 2 business days after identification |
| Open Items | Attempt to make calls on as many loans as necessary to insure an open items rate not to exceed 0.50% of the portfolio loan count as set forth in the Procedures Manual. |
| Customer Service | ASA of 30 or less with an 80% Service Level and an abandonment rate not to exceed 3% |
| New Loan Setup | 10 business days after identification |
| Loss Drafts | For losses less than $10,000 endorse and checks to homeowners within two business days. For losses of $10,000 or more, varies depending on the nature and severity of the loss. |
| Accuracy Rate of Transactions | *98% or better as determined based on audits and review of System Generated edit reports. |

* For the first twelve months after Company begins the actual performance of the outsourcing services, the percentage standards for "Tasks" and "Accuracy Rate of Transactions" shall be 95%. After the twelve-month period has ended, such percentage standards shall be increased to 98%.

11