Exhibit 3

**VANTIUM REO CAPITAL MARKETS, L.P.**

**Purchaser**

**AMERICAN HOME MORTGAGE CORP.**

**and**

**AMERICAN HOME MORTGAGE ACCEPTANCE, INC.**

**Sellers**

**and**

**AMERICAN HOME MORTGAGE SERVICING INC.**

**Interim Servicer**

**REO PROPERTY SALE AND INTERIM SERVICING AGREEMENT**

**Dated as of March 31, 2009**

**REO PROPERTY POOL**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................................................1

    Section 1.01.  Definitions.................................................................................................1

ARTICLE II AGREEMENT TO PURCHASE; CONVEYANCE OF REO PROPERTY;
           PURCHASE PRICE; BOOKS AND RECORDS; CLOSING CONDITIONS;
           COSTS ...........................................................................................................................4

    Section 2.01.  Agreement to Purchase; Conveyance of REO Property; Purchase Price. ...4

    Section 2.02.  Books and Records. ..................................................................................5

    Section 2.03.  Closing Conditions....................................................................................5

    Section 2.04.  Costs..........................................................................................................6

    Section 2.05.  "As Is Where Is" Transaction. ..................................................................7

ARTICLE III REPRESENTATIONS AND WARRANTIES..........................................................7

    Section 3.01.  Sellers Representations and Warranties.....................................................7

    Section 3.02.  Interim Servicer Representations and Warranties.......................................8

    Section 3.03.  Purchaser Representations and Warranties.................................................9

ARTICLE IV TRANSFER OF SERVICING...............................................................................10

    Section 4.01.  Assumption of Responsibilities at Transfer Date. .....................................10

ARTICLE V SELLERS TO COOPERATE..................................................................................11

    Section 5.01.  Provision of Information; Right to Examine Sellers Records. ...................11

ARTICLE VI MISCELLANEOUS PROVISIONS ......................................................................12

    Section 6.01.  No Recourse.............................................................................................12

    Section 6.02.  Amendment..............................................................................................12

    Section 6.03.  Survival....................................................................................................12

    Section 6.04.  Governing Law. .......................................................................................12

    Section 6.05.  Venue and Retention of Jurisdiction.........................................................13

    Section 6.06.  Notices. ....................................................................................................14

DB02:7785590.12                                                                                                 066585.1001

# TABLE OF CONTENTS

Page

Section 6.07.  Severability of Provisions. .........................................................................15

Section 6.08.  Relationship of Parties. ...............................................................................15

Section 6.09.  Successors and Assigns................................................................................15

Section 6.10.  Further Agreements. ....................................................................................15

Section 6.11.  Confidential Information. ............................................................................15

Section 6.12.  Information Security and Privacy. ..............................................................17

Section 6.13.  Counterparts................................................................................................18

Section 6.14.  Exhibits. ......................................................................................................18

Section 6.15.  General Interpretive Principles. .................................................................18

Section 6.16.  Reproduction of Documents. ......................................................................19

## EXHIBITS

Exhibit A     REO PROPERTY
Exhibit B     ABN CONSENT

REO PROPERTY SALE AND INTERIM SERVICING AGREEMENT

This is a REO Property Sale and Interim Servicing Agreement for residential property, dated and effective as of March 31, 2009, by and among (i) American Home Mortgage Corp., a New York corporation, and American Home Mortgage Acceptance, Inc., a Maryland corporation, as sellers (each, individually, a "Seller" and, collectively, the "Sellers"), (ii) American Home Mortgage Servicing Inc., a Delaware corporation as interim servicer (the "Interim Servicer"), and (iii) Vantium REO Capital Markets, a Cayman Islands limited partnership, as purchaser (the "Purchaser" and collectively with the Sellers, and the Interim Servicer, collectively, the "Parties").

## W I T N E S S E T H

WHEREAS, on August 6, 2007, the Filing Entities (as defined herein) filed voluntary petitions for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction with respect to the Bankruptcy Cases, the "Bankruptcy Court");

WHEREAS, the Sellers are selling ABN Mortgage Loans as part of the pool of REO Properties being sold under this Agreement, pursuant to the terms provided in Exhibit B and as provided in the Sale Motion;

WHEREAS, the Purchaser has agreed to purchase from the Sellers and the Sellers have agreed to sell to the Purchaser certain REO Property (as defined herein); and

WHEREAS, the Purchaser, the Sellers, and the Interim Servicer wish to prescribe the manner of purchase of the REO Property and the conveyance and interim servicing of the REO Property.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Purchaser and the Sellers agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.    Definitions.    Whenever used herein, the following words and phrases, unless the content otherwise requires, shall have the following meanings:

ABN Mortgage Loans:  As defined in Exhibit B.

Agreement:    This REO Propety Sale and Interim Servicing Agreement and all amendments hereof and supplements hereto.

Bankruptcy Cases:  As defined in the Recitals.

1

Bankruptcy Code: As defined in the Recitals.

Bankruptcy Court: As defined in the Recitals.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking or savings and loan institutions in the State of New York or the state in which the Interim Servicer's servicing operations are located are authorized or obligated by law or executive order to be closed.

Closing Date: Within 5 Business Days after receipt of the Sale Order by Sellers, or such other date that the Parties agree to in writing.

Confidential Information: As defined in Section 6.11(b).

Customer Information: As defined in Section 6.11(c).

Cut-off Date: With respect to each Mortgage Loan, the close of business on March 31, 2009.

Discloser: As defined in Section 6.11(b).

Filing Entities: American Home Mortgage Holdings, Inc., a Delaware corporation, American Home Mortgage Investment Corp., a Maryland corporation, American Home Mortgage Acceptance, Inc., a Maryland corporation, AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation, American Home Mortgage Corp., a New York corporation, American Home Mortgage Ventures LLC, a Delaware limited liability company, Homegate Settlement Services, Inc., a New York corporation, and Great Oak Abstract Corp., a New York corporation.

GAAP: Generally accepted accounting principles, consistently applied.

Interim Servicer: American Home Mortgage Servicing Inc.

Interim Servicing Fee: With respect to each REO Property, a non-refundable, non-pro-ratable servicing fee in the amount of $75 per month.

MERS: MERSCORP, Inc., its successors and assigns.

Mortgage Loan: Each mortgage loan owned by Sellers pursuant to which Sellers' foreclosure resulted in Sellers' acquisition of REO Property.

OCC: The Office of the Comptroller of the Currency.

Parties: As defined in the introductory paragraph.

Permitted Encumbrances: With respect to any REO Property, any and all covenants of record, rights of way of record, easements of record, conditions of record, and other restrictions of record.

2

Person:    Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

Privacy Laws: As defined in Section 6.11.

Purchase Price: The purchase price paid by Purchaser for the REO Property listed on Exhibit A.

Purchaser: As defined in the introductory paragraph, and any Person succeeding thereto in accordance with the provisions of this Agreement.

Quitclaim Deed: A deed in recordable form sufficient under the laws of the jurisdiction wherein the related REO Property is located to reflect the sale and conveyance of the REO Property to the Purchaser.

Recipient: As defined in Section 6.10(b).

REO Property: Each residential property acquired by a Seller through foreclosure, acceptance of a deed in lieu of foreclosure, or otherwise in connection with the default or imminent default of a Mortgage Loan.

Sale Motion:    The motion filed with the Bankruptcy Court to have the procedures approved for the sale of the Mortgage Loans pursuant to this Agreement.

Sellers: As defined in the introductory paragraph, and any Person succeeding thereto in accordance with the provisions of this Agreement.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by Interim Servicer of its servicing obligations in connection with the REO Property.

Servicing File: With respect to each Mortgage Loan, any file in a Seller's possession relating to the servicing and administration of such Mortgage Loan.

Servicing Transfer Date: The date on which the responsibility for the servicing of the REO Property transfers from the Interim Servicer to the successor servicer, which date shall be the Closing Date, unless otherwise agreed to between the Interim Servicer and the Purchaser as provided in Section 4.01.

3

## ARTICLE II

## AGREEMENT TO PURCHASE; CONVEYANCE OF REO PROPERTY; PURCHASE PRICE; BOOKS AND RECORDS; CLOSING CONDITIONS; COSTS

Section 2.01.     Agreement to Purchase: Conveyance of REO Property; Purchase Price.

(a)     Agreement to Purchase: Conveyance of REO Property

In exchange for the payment of the Purchase Price on the Closing Date, the Sellers agree to sell and the Purchaser agrees to purchase, without recourse, but subject to the terms of this Agreement, on a servicing released basis, all of the right, title and interest of the Sellers in and to the REO Property listed on Exhibit A. The Sellers shall deliver to the Purchaser a sheriff's deed and a Quitclaim Deed for each REO Property on the Closing Date. The Purchase Price for the REO Properties being purchased by Purchaser shall be Two Million Three Hundred Thirty-Five Thousand Four Hundred Ninety-Six Dollars ($2,335,496) and shall be allocated among the REO Properties as set forth on Exhibit A. If at any time prior to the Closing Date any REO Property listed on Exhibit A becomes subject to a contract for sale, the Sellers shall have the right to remove such REO Property from the pool of REO Properties being sold pursuant to this Agreement, and upon removal of such REO Property from the pool, the Purchase Price shall be reduced by the purchase price of the removed REO Property, as set forth on Exhibit A.

(b)     Maintenance of Servicing Files

The contents of each Servicing File are and shall be held in trust by the Interim Servicer, for the benefit of the Purchaser as the owner thereof as of the Cut-off Date. The Interim Servicer shall maintain the Servicing File substantially as it exists on the date of this Agreement, in accordance with this Agreement; provided, however, that the Sellers, to the extent resources are available for such purposes, shall use commercially reasonable efforts to ensure that the documents to be included in the Servicing File are complete. To the extent there is a cost associated with the Sellers' attempted recovery of missing documents, the Sellers shall provide the Purchaser with an estimate of such cost, and if the Purchaser directs the Sellers to pursue the recovery, the Purchaser shall advance or promptly reimburse the Sellers for the actual cost. Retention and possession of the Servicing File by the Interim Servicer is in a custodial capacity only. Upon the sale of the REO Properties, for each REO Property, the ownership of each Servicing File shall vest immediately in the Purchaser. As of the Closing Date, each of the Sellers and the Interim Servicer shall release their respective custody of the contents of any Servicing File only in accordance with written instructions from the Purchaser or in connection with the transfer of servicing pursuant to Section 4.01. Servicing Files for the REO Property shall be delivered to the successor servicer on or before the Servicing Transfer Date.

(c)     Flood Zone Service Contract and Tax Service Contract; Hazard Insurance Claims.

With respect to each REO Property, the Sellers shall assign or cause to be assigned to the Purchaser any Flood Zone Service Contract with First American Corporation in Sellers'

4

possession, and assign or cause to be assigned to the Purchaser any existing life of loan Tax Service Contract in Sellers' possession. With respect to each REO Property that suffers material damage after the Cut-off Date, the Sellers will assign to the Purchaser any hazard insurance claims that Sellers have against any applicable hazard insurer, and the Sellers shall deliver to the Purchaser any amounts which are delivered to Sellers under such insurance; provided, however, that the Sellers shall have no obligation to assign any hazard insurance claims for which the proceeds thereof have already been used for the repair or restoration of any material damage related to such hazard insurance claim with respect to such REO Property.

      Section 2.02.      Books and Records.

The sale of each REO Property owned by a Seller shall be reflected on each Seller's balance sheet and other financial statements, tax returns and business records as a sale of assets by such Seller.

      Section 2.03.      Closing Conditions.

The closing for the purchase and sale of the REO Property shall take place on the Closing Date. The closing shall be either: by telephone, confirmed by letter or wire as the parties shall agree; or conducted in person, at such place as the parties may agree.

The closing for each REO Property shall be subject to the satisfaction of each of the following conditions:

(a)      with respect to the Purchaser's obligations to close:

      (i)      the Sellers shall have delivered to the Purchaser a Quitclaim Deed and a sheriff's deed for each REO Property;

      (ii)      all of the representations and warranties of the Sellers under this Agreement shall be true and correct as of the Closing Date (or such other date specified herein) in all material respects;

      (iii)      Sellers shall have delivered to Purchaser a copy of the master listing agreement for the REO Properties (the "Master Listing Agreement");

      (iv)      there are no liens on the REO Property;

      (v)      all other terms and conditions of this Agreement to be satisfied by the Sellers shall have been complied with in all material respects; and

      (vi)      the Purchaser shall have received a copy of an order of the Bankruptcy Court approving the sale of the REO Property to Purchaser.

(b)      with respect to the Sellers' obligations to close:

5

(i) all of the representations and warranties of the Purchaser under this Agreement shall be true and correct as of the Closing Date (or such other date specified herein) in all material respects;

(ii) all terms and conditions of this Agreement to be satisfied by the Purchaser shall have been complied with in all material respects;

(iii) the REO Property is not subject to a contract for sale that entitles a broker to a commission under the Master Listing Agreement; and

(iv) the Sellers shall have received an order of the Bankruptcy Court approving the sale.

(c) The Purchaser and the Sellers acknowledge that (i) the Sellers may be unable to deliver a sheriff's deed for an REO Property and (ii) REO Property may become subject to a lien prior to the Closing Date (each such REO Property, other than an ABN Mortgage Loan, satisfying the criteria in either subparagraph (i) or (ii), a "Withdrawn REO Property"). The Sellers acknowledge that an event described in either subparagraph (i) or (ii) would be grounds for the Purchaser to refuse to purchase such Withdrawn REO Property. The Purchaser hereby agrees to purchase each Withdrawn REO Property nevertheless at a price mutually agreed to by Purchaser and the Sellers. If Purchaser and the Sellers cannot mutually agree to a price for a Withdrawn REO Property, Purchaser shall have no obligation to purchase such Withdrawn REO Property.

(d) Upon satisfaction of the foregoing conditions, the Purchaser shall pay to the Sellers on the Closing Date the Purchase Price for the REO Property, together with any fees payable by Purchaser that are contemplated by this Agreement by wire transfer of immediately available funds to an account or accounts designated by the Sellers in writing to the Purchaser.

Section 2.04.    Costs.

Each Seller shall pay any commissions due its salesmen, and the legal fees and expenses of its attorneys associated with the sale of the REO Property. Additionally, to the extent any taxes are due on the REO Property and have not been paid by the Interim Servicer through Servicing Advances, and provided that the Purchaser has provided to the Sellers a request for such payment on a loan-level basis prior to the Closing Date, the Sellers shall be responsible for paying to the Purchaser on the Closing Date the amount of such real estate taxes due. All other costs and expenses specified herein or incurred in connection with the transfer and delivery of the REO Property, including, without limitation, recording fees, deboarding fees charged by the Interim Servicer, Servicing Advances, fees for preparing and recording Quitclaim Deeds, realty transfer taxes, all outstanding or assessed property or other taxes with respect to any REO Property, fees for title policy endorsements and continuations, fees for recording Quitclaim Deeds, and the Purchaser's attorney's fees, shall be paid by the Purchaser.

The Interim Servicer may delegate its duties with one or more vendors (including any affiliate of the Interim Servicer) to perform a portion of the servicing functions on behalf of the Interim Servicer; provided, that the Interim Servicer shall remain obligated and be liable for servicing and administering the REO Properties in accordance with this Agreement without

6

diminution of such obligation and liability by virtue of the delegation of such duties, to the same extent and under the same terms and conditions as if the Interim Servicer alone were servicing and administering the REO Properties. The fees and expenses of any vendor, subcontractor or subservicer that the Interim Servicer has delegated duties thereto shall be agreed between the Interim Servicer and such vendor, and neither the Purchaser nor the Sellers will have any responsibility therefor whatsoever. All actions of a vendor taken pursuant to such delegation of duties will be taken as agent of the Interim Servicer with the same force and effect as though performed by the Interim Servicer.

Section 2.05.     "As Is Where Is" Transaction.

Purchaser hereby acknowledges and agrees that, notwithstanding anything to the contrary herein, except as expressly set forth in this Agreement, the Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the REO Property. Without in any way limiting the foregoing, the Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the REO Property. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the REO Property and all such other matters relating to or affecting REO Property as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the REO Property, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, except as expressly set forth in the Agreement, Purchaser will accept the REO Property on the Closing Date "AS IS" and "WHERE IS."

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01.     Sellers Representations and Warranties.

The Sellers represent and warrant to Purchaser as of the date hereof and as of the Closing Date as follows:

(a)     Status, Authority, Authorization. Except as a result of the commencement of the Bankruptcy Cases, each Seller (i) has been duly incorporated and is validly existing in good standing as a corporation under the laws of its jurisdiction of incorporation, (ii) subject to the rights of ABN as provided in Exhibit B and in the Sale Motion, has the corporate power and authority to execute and deliver, and perform its obligations under, this Agreement, and (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement.

(b)     No Prohibitions or Violations. Each Seller's execution and delivery of, and performance of its obligations under, this Agreement, are not prohibited by and do not violate (i) such Seller's certificate of incorporation or bylaws, or (ii) any judgment or order entered against such Seller in an action or proceeding to which such Seller is a party by any court or administrative agency.

7

(c)    No Litigation Pending. Excepting any action, suit, proceeding or investigation related to the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending or, to the Sellers' knowledge, threatened against Sellers that, if determined adversely to such Seller either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or that Seller's ability to perform its obligations under this Agreement.

(d)    No Consent Required. Subject to the rights of ABN as provided in Exhibit B and in the Sale Motion, no consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for each Seller's execution, delivery and performance of their obligations under this Agreement, other than the approval of the Bankruptcy Court.

(e)    Right to Transfer. As to each REO Property, the Sellers hereby represent and warrant to the Purchaser that, subject to and upon the approval of the Bankruptcy Court of this Agreement, and subject to the rights of ABN as provided in Exhibit B and in the Sale Motion, upon payment of the Purchase Price to the Sellers in accordance with this Agreement, the Sellers shall have full right to transfer and sell such REO Property to Purchaser free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest other than Permitted Encumbrances with respect to any REO Property.

(f)    No Leases. None of the REO Properties are subject to an existing lease agreement.

Section 3.02.    Interim Servicer Representations and Warranties.

The Interim Servicer represents and warrants to Purchaser as of the date hereof and as of the Closing Date as follows:

(a)    Status, Authority, Authorization; Licensing. The Interim Servicer (i) has been duly incorporated and is validly existing in good standing as a corporation under the laws of its jurisdiction of incorporation, (ii) has the corporate power and authority to execute and deliver, and perform its obligations under, this Agreement, (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement, (iv) is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it (after taking into account its duties hereunder) or properties owned, or leased or serviced by it requires such qualification (except where there is an applicable statutory exemption applicable to the Servicer), and (v) has all material licenses necessary to carry on its business as now being conducted (after taking into account its duties hereunder) and to perform all of its obligations hereunder and is in material compliance with state laws requiring licensing to the extent necessary to permit the servicing of the REO Property in accordance with this Agreement.

(b)    No Prohibitions or Violations; Due Execution. The Interim Servicer's execution and delivery of, and performance of its obligations under, this Agreement are not prohibited by and do not violate (i) the Interim Servicer's certificate or articles of incorporation or bylaws or (ii) any judgment or order entered against the Interim Servicer in an action or proceeding to which the Interim Servicer is a party by any court or administrative agency, and (iii) shall not

8

constitute a breach of any mortgage, indenture, contract or other agreement to which the Interim Servicer is a party or by which the Interim Servicer may be bound. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Interim Servicer enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

(c)    No Litigation Pending. There is no action, suit, proceeding or investigation pending or, to the Interim Servicer's knowledge, threatened against the Interim Servicer that, if determined adversely to the Interim Servicer either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or the Interim Servicer's ability to perform its obligations under this Agreement.

(d)    No Consent Required. No consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for the Interim Servicer's execution, delivery and performance of their obligations under this Agreement, other than the approval of the Bankruptcy Court.

(e)    Ordinary Course of Business. The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Interim Servicer.

(f)    Ability to Service. The Interim Servicer has the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the REO Property.

Section 3.03.    Purchaser Representations and Warranties.

Purchaser represents and warrants to the Sellers as of the date hereof and as of the Closing Date as follows:

(a)    Status, Authority, Authorization. Purchaser (i) has been duly incorporated or formed and is validly existing in good standing under the laws of its jurisdiction of incorporation or formation, (ii) has the power and authority to execute and deliver, and perform its obligations under, this Agreement, and (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement.

(b)    No Prohibitions or Violations. Purchaser's execution and delivery of, and performance of its obligations under, this Agreement, are not prohibited by and do not violate (i) Purchaser's certificate of incorporation or bylaws, certificate of formation, limited liability company agreement, or other organic documents, as applicable, or (ii) any judgment or order entered against Purchaser in an action or proceeding to which Purchaser is a party by any court or administrative agency.

(c)    No Litigation Pending. There is no action, suit, proceeding or investigation pending or, to the best of Purchaser's knowledge, threatened against Purchaser that, if determined adversely to Purchaser either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or Purchaser's ability to perform its obligations under this Agreement.

9

(d)    No Consent Required.  No consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for the Purchaser's execution, delivery and performance of its obligations under this Agreement.

(e)    Funding.  Purchaser has all funds in cash necessary to consummate the Sale.

## ARTICLE IV

## TRANSFER OF SERVICING

Section 4.01.    Assumption of Responsibilities at Transfer Date.

On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to, and the Interim Servicer will cease all servicing responsibilities (except as expressly set forth herein) related to, the REO Property. On or prior to the Servicing Transfer Date (or in the case of (b) below, within three (3) Business Days from and after the Servicing Transfer Date or by such other date as may be specified in this Agreement or as may be otherwise agreed), the Interim Servicer will take such steps in accordance with Accepted Practices as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the REO Property to the Purchaser, or its designee, including but not limited to the following:

(a)    Notice to Insurance Companies.  The Interim Servicer shall transmit to the applicable insurance companies and/or their agents, notification of the transfer of the servicing of the REO Property to the Purchaser, or its designee, and instructions to deliver all insurance statements to the Purchaser, or its designee, from and after the Servicing Transfer Date.  The Interim Servicer shall provide the Purchaser with copies of all such notifications no later than fifteen (15) calendar days from and after the Servicing Transfer Date.

(b)    Delivery of Servicing Records.  The Interim Servicer shall forward to the Purchaser, or its designee, all servicing records and the Servicing Files in the Interim Servicer's possession relating to each REO Property and related Mortgage Loan, and shall make any such records available to the Purchaser, or its designee, during normal business hours.

(c)    IRS Forms.  The Interim Servicer shall file all IRS forms each is required to file in relation to the servicing and/or ownership of the REO Property on or before the Servicing Transfer Date.

(d)    Insurance Policies.  For thirty (30) calendar days after the Servicing Transfer Date, the Interim Servicer shall deliver such insurance policies or renewals and invoices as it may receive with respect to the REO Property to Purchaser within five (5) Business Days of its receipt of same, and thereafter the Interim Servicer shall exercise commercially reasonable efforts to deliver such insurance policies or renewals and invoices as it may receive with respect to the REO Property to Purchaser within a reasonable time of its receipt of same.

(e)    Transfer of Servicing.  On the Servicing Transfer Date, the Interim Servicer shall transfer servicing of the related REO Property to the Purchaser or its designee pursuant to the

10

terms of this Agreement and the procedures reasonably agreed to by the Interim Servicer, the Sellers, the Purchaser and the Purchaser's designee, if any.

(f)    Termination of Listing Agreement.  On the Servicing Transfer Date, the Interim Servicer shall terminate any listings of REO Property pursuant to the terms of the Master Listing Agreement without any cost to the Purchaser.

(g)    Reimbursement for Servicing Advances.  Following the Servicing Transfer Date, the Interim Servicer shall be reimbursed by the Purchaser for any unreimbursed and properly made Servicing Advances made or incurred (including, without limitation, professional fees that have been incurred for services rendered but not yet billed for) after the Cut-off Date with respect to any related REO Property; provided that the Purchaser shall not be liable for any such Servicing Advances to the extent the Interim Servicer's invoice (and detail of such Servicing Advances) is received by the Purchaser more than sixty (60) calendar days following the Servicing Transfer Date.  Such reimbursement shall be paid by the Purchaser or its designee to the Interim Servicer following the delivery to the Purchaser of invoice(s), in form and substance in accordance with Accepted Practices, including, but not limited to, reasonable detail of the Servicing Advances or other evidence of such amounts.  For the avoidance of doubt, Purchaser shall not be required to make any reimbursements or any other type of payment whatsoever in respect of Servicing Advances that were made or incurred on or prior to the Cut-off Date.  The Sellers are responsible for reimbursing the Interim Servicer for any unreimbursed Servicing Advances made or incurred (including, without limitation, professional fees that have been incurred for services rendered but not yet billed for) prior to or on the Cut-off Date with respect to any related REO Property.  Such reimbursement shall be paid by the Sellers to the Interim Servicer following the delivery to the Sellers of invoice(s), in form and substance in accordance with Accepted Practices, including, but not limited to, reasonable detail of the Servicing Advances or other evidence of such amounts.  The Interim Servicer is not obligated to make any Servicing Advances, and shall make Servicing Advances only to the extent it reasonably believes that it will be promptly reimbursed for such Servicing Advances.  Any Servicing Advances made by the Interim Servicer shall be restricted to such minimal Servicing Advances as are necessary for preserving and administering the REO Property on a temporary basis, it being agreed and understood that the servicing of the REO Property is intended to be transferred to the Purchaser or the Purchaser's designee on or before the Servicing Transfer Date. This paragraph shall survive the termination of this Agreement.

## ARTICLE V

## SELLERS TO COOPERATE

Section 5.01.    Provision of Information; Right to Examine Sellers Records.

During the term of this Agreement, the Sellers shall furnish to the Purchaser such periodic, special, or other reports or information as the Purchaser may reasonably request, and copies or originals of any documents contained in the Servicing File for each REO Property provided for herein. All periodic, special or other reports or information not provided for in this Agreement as shall be necessary, reasonable, or appropriate with respect to the Purchaser or any regulatory agency will be provided at the Purchaser's expense after delivery to Purchaser of

11

invoices with reasonable detail or other evidence of such amounts. All such reports, documents or information shall be provided by and in accordance with all reasonable instructions and directions that the Purchaser may give. In addition, during the term of this Agreement, the appropriate Seller shall provide to the OCC and to comparable regulatory authorities supervising the Purchaser or any of Purchaser's assigns and the examiners and supervisory agents of the OCC and such other authorities, access to the documentation required by applicable regulations of the OCC and other authorities with respect to the REO Property or related Mortgage Loans. Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices designated by the Sellers.

Each Seller shall execute and deliver all such instruments and take all such action as the Purchaser may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.01.    No Recourse.    The Purchaser agrees that the obligations of the Sellers and the Interim Servicer to the Purchaser under this Agreement are non-recourse obligations of the Sellers and the Interim Servicer and, except to the extent set forth in this Article VI, the Purchaser shall have no recourse to the Sellers or to the Interim Servicer for any obligations of the Sellers or the Interim Servicer under this Agreement.

Section 6.02.    Amendment.

This Agreement may be amended from time to time by written agreement signed by the Sellers, the Interim Servicer and the Purchaser.

Section 6.03.    Survival.

The respective representations and warranties of the Parties contained herein and in any other agreement, certificate, instrument or other document associated therewith or herewith shall not survive and shall expire upon the closing on the Closing Date, except for the representations and warranties of the Interim Servicer in Section 3.02, which shall expire on the Servicing Transfer Date.

Section 6.04.    Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK) AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 6.05.  <u>Venue and Retention of Jurisdiction.</u>

(a)    WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, (I) THE BANKRUPTCY COURT SHALL RETAIN EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND TO DECIDE ANY CLAIMS OR DISPUTES THAT MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT, ANY BREACH OR DEFAULT HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND (II) ANY AND ALL PROCEEDINGS RELATED TO THE FOREGOING SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO AND SUBMIT TO THE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT AND SHALL RECEIVE NOTICES AT SUCH LOCATIONS AS INDICATED IN SECTION 6.06 HEREOF; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY CASES HAVE CLOSED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE SITTING IN NEW CASTLE COUNTY OR THE STATE COURTS OF THE STATE OF DELAWARE SITTING IN NEW CASTLE COUNTY AND ANY APPELLATE COURT FROM ANY COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE.  THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.  EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    EACH OF THE PARTIES HERETO HEREBY CONSENTS TO PROCESS BEING SERVED BY ANY PARTY OF THIS AGREEMENT IN ANY SUIT, ACTION OR PROCEEDING BY DELIVERY OF A COPY THEREOF IN ACCORDANCE WITH THE PROVISIONS OF SECTION 6.06 HEREOF.

(c)    EACH OF THE SELLERS, THE INTERIM SERVICER AND THE PURCHASER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OR ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE SELLERS OR THE PURCHASER.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PURCHASER TO ENTER INTO THIS AGREEMENT.

13

Section 6.06.    Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or delivered by overnight courier as follows:

(a)    if to the Sellers:

c/o American Home Mortgage Corp.
538 Broadhollow Road
Melville, New York 11747
Attention: Damian Voulo
Phone: (631) 663-3273
Fax: (206) 339-2781

or such other address as may hereafter be furnished to the Purchaser and the Interim Servicer in writing by the Sellers in accordance with this Section 6.06;

(b)    if to the Interim Servicer:

American Home Mortgage Servicing Inc.
4600 Regent Blvd, Suite 200
Irving, TX 75063
Attention: Robert J. Love
Phone: (214) 260-6804
Fax: (877) 718-7805

or such other address as may hereafter be furnished to the Purchaser and the Sellers in writing by the Interim Servicer in accordance with this Section 6.06;

(c)    if to the Purchaser:

Vantium REO Capital Markets,  L.P.
c/o Vantium Management, L.P.
9 W. 57th Street, 37th Floor
Attention: Mike Nocco
Phone: (212) 822-0631
Fax: (917) 591-2920

14

066585.1001

with a copy to:

Acqura Loan Services, a Vantium Capital, Inc. Company
6500 International Parkway, Suite 1500
Plano, Texas 75093
Attention: Ron Bendalin
Telephone: (972) 715-1019
Email: Ron@vantiumcapital.com

or such other address as may hereafter be furnished to the Sellers and the Interim Servicer in writing by the Purchaser in accordance with this Section 6.06.

Section 6.07.    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 6.08.    Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture among the parties hereto and the services of the Sellers and the Interim Servicer shall be rendered as an independent contractor and not as agent for the Purchaser.

Section 6.09.    Successors and Assigns.

This Agreement shall bind and inure to the benefit of and be enforceable by the Sellers, Interim Servicer and the Purchaser and the respective permitted successors and assigns of the Sellers, the Interim Servicer and the Purchaser. After the Closing Date, this Agreement shall not be assigned, pledged or hypothecated by any of the Purchaser, the Sellers, or the Interim Servicer to a third party without the prior written consent of the Purchaser, the Sellers, or the Interim Servicer, as applicable, which consent may be withheld by the Purchaser in its sole discretion.

Section 6.10.    Further Agreements.

The Purchaser, the Sellers, and the Interim Servicer each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 6.11.    Confidential Information.

(a)    The Purchaser, the Sellers, and the Interim Servicer hereby acknowledge that certain information including, without limitation, the Mortgage Loans, is confidential, sensitive, or proprietary in nature. Any of the Purchaser, the Sellers, or the Interim Servicer may also designate information disclosed in connection with the transaction contemplated by this Agreement as "Confidential Information" by written notice to the other party at the time of initial

15

disclosure of such information. Each of the Purchaser, the Sellers, and the Interim Servicer agrees that it shall use such Confidential Information solely for the purpose of fulfilling the terms and conditions of this Agreement and shall disclose such Confidential Information only to its affiliates and its affiliates' directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), controlling persons (collectively, its "Representatives") to the extent reasonably necessary or expedient for the performance of its obligations under this Agreement. Such Representatives shall use commercially reasonable safeguards to maintain the confidentiality of such Confidential Information and to prevent its disclosure to any person not authorized to receive such information.

(b) The term "Confidential Information" shall mean this Agreement and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever that: (a) a party hereto ("Discloser") discloses, in writing, to the other party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement, and that (b) relates to: (i) a party hereto or its customers, or (ii) third-party vendors or licensors who have made confidential or proprietary information available to a party hereto. Confidential Information shall include Customer Information (as defined below).

(c) The Sellers and the Interim Servicer acknowledge that the Purchaser has a responsibility to its customers to keep information about its customers and their accounts ("Customer Information") strictly confidential. In addition to the other requirements set forth in this Section 6.11 regarding Confidential Information, Customer Information shall also be subject to the additional restrictions set forth in this Subsection. The Sellers and the Interim Servicer shall not disclose or use Customer Information other than to carry out the purposes for which such Customer Information has been disclosed to the Sellers or the Interim Servicer. The Sellers and the Interim Servicer shall not disclose any Customer Information other than on a "need to know" basis and then only to: (a) affiliates of the Purchaser; (b) its and its affiliates' Representatives; (c) affiliates of the Sellers and the Interim Servicer provided that such affiliates shall be restricted in use and redisclosure of the Customer Information to the same extent as the Sellers or the Interim Servicer; (d) to subcontractors provided that such subcontractors shall have entered into a confidentiality agreement no less restrictive than the terms hereof; (e) to independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section; or (f) pursuant to the exceptions set forth in 15 U.S.C. § 6802(e) and accompanying regulations that disclosures are made in the ordinary course of business. In addition, each party further agrees that any Customer Information transmitted electronically by either party must be encrypted. The restrictions set forth herein shall apply during the term and after the termination of this Agreement.

(d) Each of the Purchaser, the Sellers and the Interim Servicer, as the Recipient, hereby agrees on behalf of itself and its employees, officers, affiliates and subcontractors that it will not disclose Confidential Information to any person for any reason whatsoever, other than on a "need to know basis" and then only to: (a) its employees and officers; (b) subcontractors and other third parties specifically permitted under this Agreement, provided that all such persons agree to the provisions of this Agreement applicable to such persons or are subject to a

16

confidentiality agreement that shall be no less restrictive than the provisions of this Section 6.11; (c) independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section 6.11; and (d) as required by law or regulation, including in connection with the Bankruptcy Cases, or as otherwise permitted by this Agreement, either during the term of this Agreement or after the termination or expiration of this Agreement. Prior to any disclosure of Confidential Information as required by law or regulation, the party making such disclosure (except as may be prohibited by law or regulations) shall use its commercially reasonable efforts to: (i) notify the other party of any actual or threatened legal compulsion of such disclosure, and any actual or asserted legal obligation of disclosure promptly upon learning thereof, and (ii) cooperate with the other party's (and at the other party's sole expense) reasonable, lawful efforts to resist, limit or delay disclosure.

(e)     Upon the termination or expiration of this Agreement, the Recipient shall (except as may be required to be maintained by law or regulation) as promptly as practicable destroy or return, in its sole discretion, all Confidential Information, including Customer Information, in the possession of the Recipient or in the possession of any third party over which Recipient has or may exercise control to the extent such Confidential Information is not required for legal and compliance, audit or record keeping purposes, including compliance with any bona fide records retention policy; provided that Customer Information that is also Customer Information of the Recipient (independent of the transactions contemplated by this Agreement) shall not be required to be returned or destroyed.

(f)     With the exception of the obligations related to Customer Information, the obligations of confidentiality in this Section 6.11 shall not apply to any information that any of the Purchaser, the Sellers, or the Interim Servicer rightfully has in its possession when disclosed to it by the other party, information that any of the Purchaser, the Sellers or the Interim Servicer independently develops, information that is or becomes known to the public other than by breach of this Section 6.11, or information rightfully received by any of the Purchaser, the Sellers or the Interim Servicer from a third party without the obligation of confidentiality.

(g)     None of the Purchaser, the Sellers, nor the Interim Servicer shall issue any media releases, public announcements and public disclosures relating to this Agreement or use the name or logo of the other party, including, without limitation, for or in connection with any promotional or marketing material, or customer lists; provided, however, that this restriction shall not apply to any disclosure required in connection with the Bankruptcy Cases or by legal, accounting or regulatory requirements beyond the reasonable control of such party.

(h)     Notwithstanding anything set forth to the contrary in this Agreement, subject to Applicable Law, the provisions of Section 6.11 (other than Section 6.11(g)) shall expire and be of no further force and effect on the Closing Date.

Section 6.12.     Information Security and Privacy.

The Sellers and the Interim Servicer acknowledge that the Purchaser is required to comply with the information security standards required by the Gramm-Leach-Bliley Act (15 U.S.C. 6801, 6805(b)(1)), as amended, and the regulations issued thereunder (12 C.F.R. Part 40)

17

(collectively, the "GLB Act") and with other statutory and regulatory requirements (collectively, "Privacy Laws") as well as its internal information security program for information protection. If applicable, the Sellers and the Interim Servicer shall make commercially reasonable efforts to assist the Purchaser to so comply and to conform to its own policies for information protection with applicable Privacy Laws, as amended from time to time. At the Purchaser's request, the Sellers and the Interim Servicer shall make commercially reasonable modifications to their information security program or to the procedures and practices thereunder to conform to the Purchaser's security requirements as they exist from time to time.

(a)      Within thirty (30) calendar days of the Purchaser's written request, the Sellers and the Interim Servicer shall deliver to the Purchaser's information protection department a copy of its written information security program. The program shall be designed to:

(i)      Ensure the security, integrity and confidentiality of Confidential Information;

(ii)      Protect against any anticipated threats or hazards to the security or integrity of such Confidential Information;

(iii)      Protect against unauthorized access to or use of such Confidential Information that could result in substantial harm or inconvenience to the person that is the subject of such information; and

(iv)      Ensure the proper disposal of such Confidential Information.

Section 6.13.      Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 6.14.      Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 6.15.      General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)      the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)      accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

18

(c)     references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 6.16.     Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

19

IN WITNESS WHEREOF, the Sellers, the Purchaser, and the Interim Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**VANTIUM REO CAPITAL MARKETS, L.P.**
Purchaser

**AMERICAN HOME MORTGAGE CORP.**
Seller

**By: VANTIUM MANAGEMENT, L.P., its Manager**

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

**AMERICAN HOME MORTGAGE SERVICING, INC.**
Interim Servicer

**AMERICAN HOME MORTGAGE ACCEPTANCE, INC.**
Seller

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

# EXHIBIT A

## REO PROPERTY

| Mortgage Loan Number | Purchase Price |
|---|---|
| 1019250 | $39,152 |
| 1062047 | $20,759 |
| 1070480 | $35,190 |
| 1073050 | $30,135 |
| 1075660 | $43,564 |
| 1082066 | $172,458 |
| 1132566 | $96,259 |
| 1134130 | $65,601 |
| 1134137 | $62,965 |
| 1181204 | $101,768 |
| 1184819 | $10 |
| 1267885 | $217,397 |
| 1289129 | $111,162 |
| 1316776 | $220,100 |
| 1334754 | $52,129 |
| 1360059 | $59,301 |
| 1386958 | $104,531 |
| 1395860 | $159,969 |
| 1419394 | $27,012 |
| 1454409 | $82,489 |
| 1475837 | $112,592 |
| 1522817 | $165,131 |
| 1589092 | $63,922 |
| 1599023 | $53,353 |
| 1692736 | $49,656 |
| 1773856 | $188,891 |

# EXHIBIT B

## ABN CONSENT

CONSENT OF ABN AMRO BANK N.V. (the "ABN Consent")

1.      Sellers and ABN AMRO Bank N.V. ("ABN") are parties to a Master Repurchase Agreement, dated as of February 28, 2007 (the "Master Repurchase Agreement") in respect of the loans numbered 1 through 14 on attached Exhibit 1 (each an "ABN Mortgage Loan," and collectively "ABN Mortgage Loans 1-14").  ABN Mortgage Loans 1 through 7 are REO property, meaning that title to the property that is the collateral for the mortgage loan has previously been transferred from the mortgage loan borrower to Sellers or the Interim Servicer. ABN Mortgage Loans 8 through 14 are not REO property.  Each ABN Mortgage Loan currently is being serviced by Interim Servicer with the consent of ABN.

2.      ABN Mortgage Loans 1-14 are also the subject of the following stipulations and orders entered in the Bankruptcy Cases and approved by the Bankruptcy Court:  (a) Stipulation Between Certain Debtors and ABN AMRO Bank N.V.; Order Thereon, approved by Bankruptcy Court order on August 22, 2007 [D.I. 284]; (b) Stipulation Between Certain Debtors and ABN AMRO Bank N.V. Regarding Marketing and Sale of Certain Construction Loans and Servicing Rights; and Order Thereon, approved by Bankruptcy Court orders entered on October 4, 2007 [D.I. 1175 and 1176]; (c) Second Stipulation Between Certain Debtors and ABN AMRO Bank N.V. Regarding Post-Petition Advances and Sale of Construction Loan Portfolio; Order Thereon, approved by Bankruptcy Court order entered on December 3, 2007 [D.I. 2355]; (d) Third Stipulation Between Certain Debtors and ABN AMRO Bank, N.V. Regarding: (1) Post-Petition Advances; (2) Servicing Payments; and (3) Mortgage Loan Refinancings, approved by Bankruptcy Court order on February 28, 2008 [D.I. 3115]; (e) Fourth Stipulation Between Certain Debtors and ABN AMRO Bank, N.V. Amending and Supplementing the Third Stipulation Regarding: (1) Post-Petition Advances; (2) Servicing Payments; and (3) Mortgage

Loan Refinancings, approved by Bankruptcy Court order on June 9, 2008 [D.I. 4484] ((a) through (e) collectively, the "Bankruptcy Court Orders").

3.     The Bankruptcy Court Orders provide, in relevant part, that the Sellers and ABN agreed to extend the deadline for conveying certain mortgage loans, of which the ABN Mortgage Loans 1-14 were a part, from Sellers to ABN.  Sellers and ABN hereby agree that Sellers have not conveyed ABN Mortgage Loans 1-14 to ABN, but they remain subject to ABN's rights under the Master Repurchase Agreement and the Bankruptcy Court Orders.

4.     ABN acknowledges that Sellers seek to sell ABN Mortgage Loans 1-14 pursuant to the Sale Procedures attached as Exhibit 2 (the "Sale Procedures").  Except as provided in paragraph 5 below, ABN, by its signature below, hereby releases to the Successful Bidder,[1] or in the event the Successful Bidder fails to close as provided in the Sale Procedures, to Second Best Bidder, all of its right, title and interest in and to each of ABN Mortgage Loans 1-14, including ABN's rights in and to each of ABN Mortgage Loans 1-14 under the Master Repurchase Agreement and under the Bankruptcy Court Orders, subject to the occurrence or performance as the case may be of conditions (a) and (b) for ABN Mortgage Loans 1-14:

(a)  entry of an order of the Bankruptcy Court approving the transaction that is the subject of the sale agreement ("Sale Agreement") that incorporates this ABN Consent, and the closing of such sale; and

(b)  the amounts received for all ABN Mortgage Loans transferred to the Successful Bidder, or the Second Best Bidder, as the case may be, is equal to or exceeds the aggregate sum of the amounts bid for each such ABN Mortgage Loan by Vantium

---

[1] All terms not otherwise defined herein are to be given the meanings ascribed to them in the Sale Procedures.

2

Capital Markets, L.P. ("Vantium") as stalking horse bidder, as each such amount is indicated on Exhibit 1 hereto.

5.      ABN Mortgage Loans 2, 3, 5, and 7 are currently the subject of pending sales to third parties.  In the REO Property Sale Agreement, Debtors have reserved the right to remove any REO Property from the sale process that becomes subject to a pending sale.  ABN likewise reserves the right to withdraw from the sale process any such ABN Mortgage Loan that is subject to a pending sale at any time prior to (A) one business day before the date of the Auction, as such date may be continued by the Debtors pursuant to the Sale Procedures, or (B) if there is no Auction for the REO Property Asset Pool, the commencement of the Sale Hearing.

6.      The inclusion of this ABN Consent into the Sale Agreement constitutes the agreement of the parties to such Sale Agreement (Sellers, Vantium and Interim Servicer) to each of the terms and conditions of this ABN Consent, and their further agreement that no terms of the Sale Agreement apply to or are binding in any way on ABN other than the terms of this ABN Consent; provided, however, nothing in this paragraph shall limit any provision in the sale order issued by the Bankruptcy Court approving the Sale as long as such provisions are materially consistent with the terms of this Consent.

*{Signature Page Follows}*

IN WITNESS WHEREOF, ABN and the Sellers have caused their names to be signed hereto by their respective officers thereunto duly authorized as of March ___, 2009.

**ABN AMRO BANK, N.V.**

By: _____

Name: David W. Stack
 _____ Senior Vice President _____

Title: _____

By: _____

Name: NEIL J. BIVONA
 _____ SENIOR VICE PRESIDENT _____

Title: _____


**AMERICAN HOME MORTGAGE ACCEPTANCE, INC.**
Seller

By: _____

Name: _____

Title: _____

**AMERICAN HOME MORTGAGE CORP.**
Seller

By: _____

Name: _____

Title: _____

4

IN WITNESS WHEREOF, ABN and the Sellers have caused their names to be signed hereto by their respective officers thereunto duly authorized as of March ___, 2009.

**ABN AMRO BANK, N.V.**

By: _____

Name: David W. Stack
       Senior Vice President

Title: _____

By: _____

Name: NEIL J. BIVONA
       SENIOR VICE PRESIDENT

Title: _____


**AMERICAN HOME MORTGAGE ACCEPTANCE, INC.**
Seller

By: _____

Name: Damian Voulo

Title: SVP

**AMERICAN HOME MORTGAGE CORP.**
Seller

By: _____

Name: Damian Voulo

Title: SVP

4

Exhibit 1

| ABN Mortgage Loan | Loan Number | Address of Property | Vantium Bid |
|---|---|---|---|
| 1 | 1184819 | 1354 Pennsylvania Avenue SE, Washington, DC 20003 | $10 |
| 2 | 1267885 | 2301 Killdeer Street, New Orleans, LA 70122 | $217,397 |
| 3 | 1395860 | 1932 West Iron Horse Boulevard, Bluffdale, UT 84065 | $159,969 |
| 4 | 1419394 | Wilshire Road, Munger MI 48747 | $27,012 |
| 5 | 1522817 | 151 North 3375 West, Layton, UT 84040 | $165,131 |
| 6 | 1692736 | 329 Iron Horse Court, Grand Junction, CO 81503 | $49,656 |
| 7 | 1773856 | 14451 South Long Ridge Drive, Herriman, UT 84065 | $188,891 |
| 8 | 1725182 | Kinsman & Farmer Roads, Seneca, IL 61360 | $115,871 |
| 9 | 1610181 | 48 Quashnet Way, East Falmouth, MA 02536 | $120,857 |
| 10 | 1555301 | 107 East Valley Road, Smethport, PA 16749 | $560 |
| 11 | 1535325 | 156 Gage School House Road, Cherry Valley, NY 13320 | $14,852 |
| 12 | 1503507 | SW 178th Street, Ocala, FL 34473 | $41,880 |
| 13 | 1431361 | 123 North Greenfield Road, Porter Cors, NY 12859 | $40,527 |
| 14 | 1398185 | SW 170th Loop, Ocala, FL 34473 | $41,906 |

006685.1001

DB02.7940872.3

## Exhibit 2

Sale Procedure

(OMITTED)

Exhibit 4

**VANTIUM CAPITAL MARKETS, L.P.**

**Purchaser,**

**AMERICAN HOME MORTGAGE CORP.**

**and**

**AMERICAN HOME MORTGAGE ACCEPTANCE, INC.,**

**Sellers,**

**and**

**AMERICAN HOME MORTGAGE SERVICING INC.**

**Interim Servicer**

**LOAN SALE AND INTERIM SERVICING AGREEMENT**

**Dated as of March 31, 2009**

**1ST LIEN NON-CONSTRUCTION LOAN POOL**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..........................................................................................1

    Section 1.01.  Definitions..........................................................................................1

ARTICLE II AGREEMENT TO PURCHASE; CONVEYANCE OF MORTGAGE LOANS;
        PURCHASE PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE
        OF SERVICING FILES; BOOKS AND RECORDS; DELIVERY OF
        DOCUMENTS; CLOSING CONDITIONS; COSTS ............................................8

    Section 2.01.  Agreement to Purchase; Conveyance of Mortgage Loans; Purchase Price;
        Possession of Mortgage Files; Maintenance of Servicing Files. .................8

    Section 2.02.  Books and Records; Transfers of Mortgage Loans.....................................10

    Section 2.03.  Delivery of Documents. .............................................................................10

    Section 2.04.  Closing Conditions....................................................................................11

    Section 2.05.  Costs...........................................................................................................13

    Section 2.06.  "As Is Where Is" Transaction. ...................................................................13

    Section 2.07.  Purchase Price Adjustment. .......................................................................14

ARTICLE III REPRESENTATIONS AND WARRANTIES.........................................................14

    Section 3.01.  Sellers Representations and Warranties......................................................14

    Section 3.02.  Interim Servicer Representations and Warranties.......................................15

    Section 3.03.  Purchaser Representations and Warranties. ................................................16

ARTICLE IV ADMINISTRATION AND SERVICING OF MORTGAGE LOANS DURING
        THE INTERIM SERVICING PERIOD ................................................................16

    Section 4.01.  Interim Servicer to Act as Servicer.............................................................16

    Section 4.02.  Collection of Mortgage Loan Payments. ....................................................17

    Section 4.03.  Disbursement of Mortgage Loan Proceeds.................................................17

ARTICLE V TRANSFER OF SERVICING..............................................................................18

    Section 5.01.  Assumption of Responsibilities at Transfer Date. ......................................18

ARTICLE VI SELLERS TO COOPERATE..............................................................................20

    Section 6.01.  Provision of Information; Right to Examine Sellers Records. ....................20

# TABLE OF CONTENTS

**Page**

ARTICLE VII MISCELLANEOUS PROVISIONS ....................................................................21

    Section 7.01.  No Recourse. ................................................................................................21

    Section 7.02.  Amendment. ...............................................................................................21

    Section 7.03.  Survival. ....................................................................................................21

    Section 7.04.  Governing Law. .........................................................................................21

    Section 7.05.  Venue and Retention of Jurisdiction. .........................................................22

    Section 7.06.  Notices. ......................................................................................................23

    Section 7.07.  Severability of Provisions. ........................................................................24

    Section 7.08.  Relationship of Parties. .............................................................................24

    Section 7.09.  Successors and Assigns. ............................................................................24

    Section 7.10.  Further Agreements. ..................................................................................24

    Section 7.11.  Confidential Information. ..........................................................................24

    Section 7.12.  Information Security and Privacy. .............................................................26

    Section 7.13.  Counterparts. .............................................................................................27

    Section 7.14.  Exhibits. ....................................................................................................27

    Section 7.15.  General Interpretive Principles. ................................................................27

    Section 7.16.  Reproduction of Documents. .....................................................................28

## EXHIBITS

Exhibit A    CONTENTS OF MORTGAGE FILES
Exhibit B    FORM OF MEMORANDUM OF SALE
Exhibit C    LITIGATION DISCLOSURE OF THE INTERIM SERVICER
Exhibit D    PURCHASE PRICE PERCENTAGE
Exhibit E    ABN CONSENT

MORTGAGE LOAN SALE AND INTERIM SERVICING AGREEMENT

This is a Mortgage Loan Sale and Interim Servicing Agreement for adjustable and fixed rate first lien mortgage loans, dated and effective as of March 31, 2009, by and among (i) American Home Mortgage Corp., a New York corporation, and American Home Mortgage Acceptance, Inc., a Maryland corporation, as sellers (each, individually, a "Seller" and, collectively, the "Sellers"), (ii) American Home Mortgage Servicing Inc., a Delaware corporation as interim servicer (the "Interim Servicer") and (iii) Vantium Capital Markets, L.P., a Cayman Islands limited partnership, as purchaser (the "Purchaser" and together with the Sellers and the Interim Servicer, collectively, the "Parties").

W I T N E S S E T H

WHEREAS, on August 6, 2007, the Filing Entities (as defined herein) filed voluntary petitions for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction with respect to the Bankruptcy Cases, the "Bankruptcy Court");

WHEREAS, the Sellers are selling ABN Mortgage Loans as part of the Mortgage Loan Package pursuant to the terms provided in Exhibit E and as provided in the Sale Motion;

WHEREAS, the Purchaser has agreed to purchase from the Sellers and the Sellers have agreed to sell to the Purchaser certain Mortgage Loans (as defined herein), together with the servicing rights associated with such Mortgage Loans;

WHEREAS, each of the Mortgage Loans as of the Closing Date will be secured by a mortgage, deed of trust or other security instrument creating a lien on real estate in the jurisdiction indicated on the Mortgage Loan Schedule (as defined herein) for the Mortgage Loan Package (as defined herein) that will be annexed to the Memorandum of Sale (as defined herein) on the Closing Date; and

WHEREAS, the Purchaser, the Sellers, and the Interim Servicer wish to prescribe the manner of purchase of the Mortgage Loans and the conveyance, interim servicing and control of the Mortgage Loans.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Purchaser, the Sellers, and the Interim Servicer agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.  Definitions.  Whenever used herein, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

ABN Mortgage Loan:  As defined in Exhibit E.

1

Accepted Practices:  Procedures (including collection procedures) that comply with Applicable Laws and that are customarily employed and exercised in servicing and administering Mortgage Loans in its servicing portfolio, which procedures are in accordance with the terms of the Mortgage, the Mortgage Loan Note and accepted mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as the Mortgage Loans in the jurisdictions where the related Mortgage Property is located.

Adjustment Period:  As defined in Section 2.01(c)(i).

Agreement:  This Mortgage Loan Sale and Interim Servicing Agreement and all amendments hereof and supplements hereto.

Ancillary Income:  All ancillary income with respect to the Mortgage Loans serviced hereunder, including, without limitation, fees, expenses, charges, penalties or other moneys with respect to which the Interim Servicer receives, collects or retains.

Applicable Laws:  All legal and regulatory requirements (including statutes, rules, regulations and ordinances) of federal, state and local governmental agencies, boards, commissions, instrumentalities or other governmental bodies to which any Mortgage Loan, any previous or current party (including the servicer) to any Mortgage Loan is subject.

Appraisal:  A written appraisal of a Mortgaged Property made by a Qualified Appraiser, which appraisal must be written, in form and substance meeting any applicable Fannie Mae and Freddie Mac standards, and satisfying the requirements of Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 and the regulations promulgated thereunder, in effect as of the date of the appraisal.

Appraised Value:  With respect to any Mortgage Loan, the lesser of (i) the value set forth on the Appraisal made in connection with the origination of the related Mortgage Loan as the value of the related Mortgaged Property, and (ii) the price paid to purchase the Mortgaged Property, provided, however, that in the case of a refinanced Mortgage Loan, such value shall be based solely on the Appraisal made in connection with the origination of such Mortgage Loan.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

Bankruptcy Cases:  As defined in the Recitals.

Bankruptcy Code:  As defined in the Recitals.

Bankruptcy Court:  As defined in the Recitals.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking or savings and loan institutions in the State of New York or the state in which the Interim Servicer's servicing operations are located are authorized or obligated by law or executive order to be closed.

2

Closing Date:  Within 5 Business Days after receipt of the Sale Order by Sellers, or such other date that the Parties agree to in writing.

Confidential Information:  As defined in Section 7.11(b).

Customer Information:  As defined in Section 7.11(c).

Cut-off Date:  With respect to each Mortgage Loan, the close of business on March 31, 2009.

Defaulted Mortgage Loan:  As of any date of determination, a Mortgage Loan that is 60 days or more delinquent in accordance with the OTS method of calculating delinquencies.

Discloser:  As defined in Section 7.11(b).

Fannie Mae:  Federal National Mortgage Association (FNMA), or any successor thereto.

Filing Entities:  American Home Mortgage Holdings, Inc., a Delaware corporation, American Home Mortgage Investment Corp., a Maryland corporation, American Home Mortgage Acceptance, Inc., a Maryland corporation, AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation, American Home Mortgage Corp., a New York corporation, American Home Mortgage Ventures LLC, a Delaware limited liability company, Homegate Settlement Services, Inc., a New York corporation, and Great Oak Abstract Corp., a New York corporation.

Flood Zone Service Contract:  A transferable contract maintained for the Mortgaged Property with a flood zone service provider acceptable to the Purchaser for the purpose of obtaining the current flood zone relating to such Mortgaged Property.

Freddie Mac:  Federal Home Loan Mortgage Corporation (FHLMC), or any successor thereto.

GAAP:  Generally accepted accounting principles, consistently applied.

Interim Servicer:  American Home Mortgage Servicing Inc.

Interim Servicing Period:  With respect to each Mortgage Loan Package, the period of time from and including the Closing Date to, but not including, the Servicing Transfer Date.

Interim Servicing Fee:  With respect to each Mortgage Loan, a non-refundable, non-pro-ratable servicing fee in the amount of (A)(x) $25 per month per Mortgage Loan if such Mortgage Loan is not a Defaulted Mortgage Loan or (y) $75 per month if such Mortgage Loan is a Defaulted Mortgage Loan not described in (B) below; or (B) $0 per month for all Mortgage Loans that (i) are 180 days or more delinquent in accordance with the OTS method of calculating delinquencies, (ii) have a Loan-to-Value Ratio in excess of one hundred percent (100%) and (iii) have been charged-off in accordance with Accepted Practices.

3

Investor:  With respect to each MERS Designated Mortgage Loan, the Person named on the MERS System as the investor pursuant to the MERS Procedures Manual.

Loan-to-Value Ratio:    With respect to any Mortgage Loan as of any date of determination, the ratio on such date of (i) the outstanding principal amount of the Mortgage Loan (unless otherwise indicated) to (ii) the Appraised Value of the Mortgaged Property as reduced by the outstanding principal amount of any other mortgage on the Mortgage Property that is senior to the Mortgage Loan.

Memorandum of Sale:  With respect to the Mortgage Loan Package, the memorandum of sale, substantially in the form of Exhibit B attached hereto, confirming the sale by the Sellers and the purchase by the Purchaser of the Mortgage Loan Package on the Closing Date.

MERS:  MERSCORP, Inc., its successors and assigns.

MERS Designated Mortgage Loan:  A Mortgage Loan for which (a) a Seller has designated or will designate MERS as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for such Seller, in accordance with the MERS Procedure Manual and (b) a Seller has designated or will designate the Purchaser or its designee as the Investor on the MERS System.

MERS Procedures Manual:  Collectively, the policies and procedures manuals published by MERS, including without limitation, the MERS Procedures Manual and the MERS Quality Assurance Procedures Manual, in each case, as it may be amended, supplemented or otherwise modified from time to time and as available from the MERS website.

MERS System:    MERS mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

MOM Mortgage Loan:  A Mortgage Loan that was registered on the MERS System at the time of origination thereof and for which MERS appears as the record mortgagee or beneficiary on the related Mortgage.

Monthly Payment:  With respect to any Mortgage Loan, the scheduled monthly payment of principal and/or interest on a Mortgage Loan.

Mortgage:  With respect to any Mortgage Loan, the mortgage, deed of trust or other instrument securing a Mortgage Loan Note that creates a first lien on the Mortgaged Property securing the Mortgage Loan Note.

Mortgage File:  With respect to each Mortgage Loan (i) item 1 set forth in Exhibit A; (ii) to the extent such items are in Sellers' possession, the other items referred to in Exhibit A; and (iii) all documents in the Sellers' possession generated or collected in connection with the application for, underwriting of, and agreement to extend credit pursuant to, and rights and obligations of the lender and borrower with respect to each Mortgage Loan.

Mortgage Loan:  Each first lien residential mortgage loan sold, assigned, and transferred to the Purchaser pursuant to this Agreement and identified on the Mortgage Loan Schedule

4

annexed to the Memorandum of Sale, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, servicing rights, liquidation proceeds, condemnation proceeds, insurance proceeds and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents:  With respect to each Mortgage Loan, all documents in the Sellers' possession evidencing the Sellers' obligation to fund, the borrower's obligation to repay, and guarantees of the borrower's obligations, and any mortgage or security documents related thereto, including without limitation the Mortgage Loan Note and any other documents in the corresponding Mortgage File.

Mortgage Loan Interest Rate:  The annual rate of interest borne on a Mortgage Loan Note in accordance with the provisions of the Mortgage Loan Note.

Mortgage Loan Note:  The adjustable or fixed-rate promissory note evidencing the indebtedness of a Mortgagor secured by a Mortgage.

Mortgage Loan Package:  The pool of Mortgage Loans purchased on the Closing Date, on a servicing released basis, as described in the Mortgage Loan Schedule annexed to the Memorandum of Sale.

Mortgage Loan Schedule:  With respect to the Mortgage Loan Package, the schedule of Mortgage Loans annexed to the Memorandum of Sale.

Mortgaged Property:  With respect to each Mortgage Loan, the Mortgagor's real property or leasehold interest, including any improvements, securing repayment of the debt evidenced by a related Mortgage Loan Note, consisting of an unsubordinated estate in fee simple or, with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, a leasehold estate, in a single parcel or multiple parcels of real property improved or to be improved by a residential dwelling.

Mortgagor:  The obligor on a Mortgage Loan Note.

OCC:  The Office of the Comptroller of the Currency.

Officer's Certificate:  A certificate signed by a duly elected and authorized officer of a Seller.

Originator:  With respect to any Mortgage Loan, the entity that closed or funded such Mortgage Loan.

Parties:  As defined in the introductory paragraph.

Person:  Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

Privacy Laws:  As defined in Section 7.12.

5

Purchase Price: The price specified in Section 2.01(b) and paid on the Closing Date for the Mortgage Loans included in the Mortgage Loan Schedule, as calculated and adjusted as set forth in this Agreement. The Purchase Price shall not include accrued interest on the Mortgage Loans.

Purchase Price Adjustment: As defined in Section 2.01(c)(i).

Purchaser: As defined in the introductory paragraph, and any Person succeeding thereto in accordance with the provisions of this Agreement.

Qualified Appraiser: An appraiser, duly appointed by a Seller, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof at the time at which the appraisal was made, and whose compensation was not affected by the approval or disapproval of the Mortgage Loan, and such appraiser and the appraisal made by such appraiser both satisfied the requirements of Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 and the regulations promulgated thereunder, all as in effect on the date of the appraisal.

Recipient: As defined in Section 7.10(b).

Sale Motion: The motion filed with the Bankruptcy Court to have the procedures approved for the sale of the Mortgage Loans pursuant to this Agreement.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Sellers: As defined in the introductory paragraph, and any Person succeeding thereto in accordance with the provisions of this Agreement.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance of the Interim Servicer's servicing obligations in connection with the Mortgage Loans.

Servicing Fees: The sum of (i) the Interim Servicing Fees (excluding Ancillary Income) payable to the Interim Servicer for the Mortgage Loans and (ii) any Ancillary Income.

Servicing File: With respect to each Mortgage Loan, any file (including imaged files) in the Interim Servicer's or the Seller's possession relating to the servicing and administration of such Mortgage Loan.

Servicing Transfer Date: The date on which the responsibility for the servicing of the Mortgage Loans included in the Mortgage Loan Package transfers from the Interim Servicer to the successor servicer, which date shall be the date that is thirty (30) calendar days after the

6

Closing Date, unless otherwise agreed to between the Interim Servicer and the Purchaser as provided in Section 4.01.

Stated Principal Balance:  As to each Mortgage Loan, the actual principal balance of the Mortgage Loan at the Sellers' close of business on the Cut-off Date.

Tax Service Contract:  A transferable contract maintained for the Mortgaged Property with a tax service provider for the purpose of obtaining current information from local taxing authorities relating to such Mortgaged Property.

Title Insurance Policy:    With respect to each Mortgage, the original lender's or mortgagee policy of title insurance insuring the same, including all endorsements thereto, or, if such policy has not been issued, the preliminary report or irrevocable binder or commitment to issue the same.

DB02:7794647 066585.1001

## ARTICLE II

## AGREEMENT TO PURCHASE; CONVEYANCE OF MORTGAGE LOANS; PURCHASE PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE OF SERVICING FILES; BOOKS AND RECORDS; DELIVERY OF DOCUMENTS; CLOSING CONDITIONS; COSTS

Section 2.01.  Agreement to Purchase; Conveyance of Mortgage Loans; Purchase Price; Possession of Mortgage Files; Maintenance of Servicing Files.

(a)     Agreement to Purchase; Conveyance of Mortgage Loans

In exchange for the payment of the Purchase Price on the Closing Date, the Sellers agree to sell and the Purchaser agrees to purchase, without recourse, but subject to the terms of this Agreement, on a servicing released basis, all of the right, title and interest of the Sellers in and to the Mortgage Loans in the Mortgage Loan Package.  The Sellers shall (i) use commercially reasonable efforts to deliver to the Purchaser a computer readable file in a format reasonably acceptable to the Purchaser containing all information in the Sellers' possession or control necessary for the Purchaser to board the Mortgage Loans on its servicing system and (ii) deliver the Mortgage Files to the Purchaser on the Closing Date.

(b)     Purchase Price

Subject to Section 2.05, the Purchase Price based on a blended rate for all Mortgage Loans listed on the Mortgage Loan Schedule shall be Thirty-One and Thirty-Five Hundredths Percent (31.35%) (subject to adjustment as set forth in Section 2.01(c)(iii)) multiplied by the cumulative Stated Principal Balance (subject to adjustment as provided herein) as of the Cut-off Date.  With respect to any Mortgage Loan that is not 30 days or more delinquent in accordance with the MBA method of calculating delinquencies as of the Cut-off Date (such Mortgage Loan, a "Delinquent Mortgage Loan"), the Purchaser shall pay to the Seller on the Closing Date, up to twenty-nine (29) days of accrued and, as of the Closing Date, unpaid interest at the Mortgage Loan Interest Rate on the Stated Principal Balance for each Mortgage Loan.  For the avoidance of doubt, for any Mortgage Loan that is a Delinquent Mortgage Loan as of the Cut-off Date, Purchaser shall have no obligation to pay accrued interest on such Mortgage Loans.

(c)     Purchase Price Adjustment

(i)     The period of time after the Cut-off Date but prior to the Closing Date shall be referred to as the "Adjustment Period."  The Purchase Price shall be adjusted by reducing the Purchase Price by the amount of (i) any partial principal payments received and retained by a Seller during the Adjustment Period multiplied by 31.35% (provided, however, that this clause (i) shall not apply to any Mortgage Loan to which clause (ii) is applicable), and (ii) the purchase price (as defined in Section 2.01(c)(iii)) for any Mortgage Loans paid off in full during the Adjustment Period, which paid-in-full Mortgage Loans shall be deleted and excluded from the Mortgage Loan Package (the aggregate total of such adjustments, the "Purchase Price Adjustment").  Except as provided in Section 2.04(c) with respect to the purchase price for each

8

Withdrawn Loan, the Purchaser shall pay the Purchase Price to the Sellers on the Closing Date, provided that the amount payable by Purchaser on the Closing Date shall be reduced by an amount equal to the Purchase Price Adjustment, if any.

(ii)    Except for principal received and retained by a Seller resulting in a Purchase Price Adjustment described in Section 2.01(c)(i) above, with respect to each Mortgage Loan purchased, the Purchaser shall own and be entitled to receive: (a) the principal portion of all Monthly Payments received after the Cut-off Date and (b) all other payments and recoveries of principal collected on or after the Cut-off Date. Subject to the foregoing, with respect to each Mortgage Loan purchased, the Purchaser shall own and be entitled to receive all payments, whether of principal, interest, or otherwise, collected on or after the Closing Date and all payments of interest on the Mortgage Loans that are accrued and unpaid as of the Closing Date.

(iii)    Purchaser and Sellers acknowledge that certain Mortgage Loans in the Mortgage Loan Package are not Delinquent Mortgage Loans as of the Cut-off Date. Purchaser and Sellers recognize that this Agreement is being entered into by Purchase as a stalking horse bidder and that the Closing Date will not occur for over a month from the time this Agreement is signed. Purchaser and Sellers further recognize that as of the Closing Date, some of the Mortgage Loans that were not Delinquent Mortgage Loans as of the Cut-off Date may have become Delinquent Mortgage Loans. Accordingly, Purchaser and Sellers agree that the Purchase Price listed in Section 2.01(b)(i) is equal to the sum of the product of the appropriate Purchase Price Percentage for each Mortgage Loan, as stated on Exhibit D, as of the Cut-off Date multiplied by that Mortgage Loan's Stated Principal Balance (such product, the "purchase price" for a Mortgage Loan), and that, to the extent that Purchaser is purchasing a Delinquent Mortgage Loan as of the Closing Date that was not a Delinquent Mortgage Loan as of the Cut-off Date, the Purchase Price may be adjusted by utilizing the Purchase Price Percentage for Delinquent Mortgage Loans for such Mortgage Loan, as stated on Exhibit D.

(d)    Possession of Mortgage Files; Maintenance of Servicing Files

The contents of each Servicing File in the possession of the Interim Servicer are and shall be held in trust by the Interim Servicer, for the benefit of the Purchaser as the owner thereof as of the Cut-off Date. The Interim Servicer shall maintain the Servicing File substantially as it exists on the date of this Agreement, in accordance with this Agreement; provided, however, that the Sellers, to the extent resources are available for such purposes, shall use commercially reasonable efforts to ensure that the documents to be included in the Servicing File are complete. To the extent there is a cost associated with the Sellers' attempted recovery of missing documents, the Sellers shall provide the Purchaser with an estimate of such cost, and if the Purchaser directs the Sellers to pursue the recovery, the Purchaser shall advance or promptly reimburse the Sellers for the actual cost. Possession of each Servicing File by the Interim Servicer is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan during the Interim Servicing Period, and such retention and possession by the Interim Servicer is in a custodial capacity only. Upon the sale of the Mortgage Loans, for each Mortgage Loan, the ownership of the Mortgage Loan Documents and the related Mortgage Files and Servicing Files shall vest immediately in the Purchaser, and the ownership of all records and documents with respect to the related Mortgage Loans prepared by or that come into the possession of the Sellers or the Interim Servicer shall vest immediately in the Purchaser and shall

9

be retained and maintained by the Sellers or the Interim Servicer, in trust, at the will of the Purchaser and only in such custodial capacity. Each of the Sellers and the Interim Servicer shall appropriately mark in its books and records the Purchaser's ownership of the Mortgage Loan and the related Mortgage Files and Servicing Files. As of the Closing Date, each of the Sellers and the Interim Servicer shall release their respective custody of the contents of any Servicing File only in accordance with written instructions from the Purchaser or in connection with the transfer of servicing pursuant to Section 5.01. Servicing Files for the Mortgage Loans shall be delivered to the successor servicer on or before the Servicing Transfer Date.

(e)     Flood Zone Service Contract and Tax Service Contract

With respect to each Mortgage Loan, the Sellers shall assign or cause to be assigned to the Purchaser any existing Flood Zone Service Contract with First American Corporation, and assign or cause to be assigned to the Purchaser any existing life of loan Tax Service Contract.

(f)     Home Mortgage Disclosure Act

The Sellers shall provide to the Purchaser all data and information in their possession (in form and substance reasonably acceptable to the Purchaser) required to be collected by the Originator or owner of mortgage loans under the Home Mortgage Disclosure Act, to the extent applicable.

Section 2.02.   Books and Records; Transfers of Mortgage Loans.

The sale of each Mortgage Loan shall be reflected on each Seller's balance sheet and other financial statements, tax returns and business records as a sale of assets by such Seller. Until the Closing Date, the Sellers shall be responsible for maintaining, and shall maintain, a complete set of books and records, to the extent a complete set exists, for each Mortgage Loan that shall be marked clearly to reflect the ownership of each Mortgage Loan by the Purchaser from and after the Cut-off Date.

For the purposes of this Agreement, the Sellers shall be under no obligation to deal with any person with respect to this Agreement or the Mortgage Loans unless the books and records show such person as the owner of the Mortgage Loan. The Purchaser may, subject to the terms of this Agreement, sell and transfer one or more of the Mortgage Loans. With respect to any transfer of a Mortgage Loan prior to the Servicing Transfer Date, the Purchaser also shall advise the Sellers and the Interim Servicer of the transfer. Upon receipt of notice of the transfer from Purchaser, the Sellers and the Interim Servicer shall mark its books and records to reflect the ownership of the Mortgage Loans of such assignee.

Section 2.03.   Delivery of Documents.

On the Closing Date, the Seller will, with respect to each Mortgage Loan, deliver and release the Mortgage Loan Documents to the Purchaser or its designee in accordance with this Agreement. In addition, in connection with the assignment of any MERS Designated Mortgage Loan, each Seller agrees that on or prior to the Closing Date it will cause the MERS System to indicate that the related Mortgage Loans have been assigned by such Seller to the Purchaser.

10

Each Seller further agrees that it will not alter the information referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement.

The Purchaser shall be responsible for preparing, tendering to the Sellers for execution, and recording the Assignments of Mortgage, other than for MOM Mortgage Loans.  All recording fees and other costs associated with the preparation and recording of Assignments of Mortgage, and other relevant documents with respect to transfers to the Purchaser or its designee will be borne by the Purchaser.

Except as otherwise provided in this Section 2.03, upon receipt of any document to be included in a Mortgage File, the receiving Seller shall deliver such document to the Purchaser or its designee.  In the event that a representative of Sellers provided a report to Purchaser indicating that a document to be included in a Mortgage File was available for delivery to Purchaser on the Closing Date, and such document is not delivered to Purchaser on the Closing Date, Sellers will use commercially reasonable efforts to deliver such document; provided, however, that if Sellers have exercised commercially reasonable efforts to deliver such document, Sellers shall not be liable to Purchaser for failure to deliver the document.

Section 2.04.  Closing Conditions.

The closing for the purchase and sale of the Mortgage Loan Package shall take place on the Closing Date.  The closing shall be either: by telephone, confirmed by letter or wire as the parties shall agree; or conducted in person, at such place as the parties may agree.

The closing for the Mortgage Loan Package shall be subject to the satisfaction of each of the following conditions:

(a)    with respect to the Purchaser's obligations to close:

(i)    the Sellers shall have delivered to the Purchaser or its designee the Mortgage Loan Schedule and an electronic data file containing information on a loan-level basis;

(ii)    all of the representations and warranties of the Sellers under this Agreement shall be true and correct as of the Closing Date (or such other date specified herein) in all material respects;

(iii)    the Sellers shall deliver to the Purchaser or Purchaser's designee (as Purchaser shall direct) each original Mortgage Loan Note, endorsed and signed in the name of the appropriate Seller by an authorized officer as follows:  "Pay to the order of _____, without recourse;" or, in the case of a Mortgage Loan Note acquired by a Seller in a merger, such signature shall be in substantially the form:  "[Seller], successor by merger to [name of predecessor];" or, in the case of a Mortgage Loan Note acquired or originated by a Seller while doing business under another name, such signature shall be in substantially the following form: "[Seller], formerly known as [previous name]."  In the event a Seller does not have the original of any Mortgage Loan Note in its possession, such Seller shall deliver to the Purchaser or the Purchaser's designee (as Purchaser shall

11

direct) a certified copy of such Mortgage Loan Note (endorsed as provided above) together with a lost note affidavit;

(iv)    the first priority lien on the real property securing a Mortgage Loan has not become subject to a lien of higher priority;

(v)    the Purchaser shall have received copies (provided that original executed copies shall be delivered to the Purchaser within a reasonable time after the Closing Date) of the Memorandum of Sale duly executed on behalf of Sellers;

(vi)    all other terms and conditions of this Agreement and the Memorandum of Sale to be satisfied by the Sellers shall have been complied with in all material respects; and

(vii)    the Purchaser shall have received an order of the Bankruptcy Court approving the sale (the "Sale Order").

(b)    with respect to the Sellers' obligations to close:

(i)    all of the representations and warranties of the Purchaser under this Agreement shall be true and correct as of the Closing Date (or such other date specified herein) in all material respects;

(ii)    the Sellers shall have received copies (provided that original executed copies shall be delivered to the Sellers within a reasonable time after the Closing Date) of the Memorandum of Sale duly executed on behalf of the Purchaser;

(iii)    all terms and conditions of this Agreement and the Memorandum of Sale to be satisfied by the Purchaser shall have been complied with in all material respects; and

(iv)    the Sellers shall have received the Sale Order.

(c)    The Purchaser and the Sellers acknowledge that (i) the Sellers may not be able to deliver on the Closing Date item 1 set forth in Exhibit A (a "Required Document") for each Mortgage Loan and (ii) the first priority lien on the real property securing a Mortgage Loan may become subject to a lien of higher priority prior to the Closing Date (each such Mortgage Loan, other than an ABN Mortgage Loan, satisfying the criteria in either subparagraph (i) or (ii), a "Withdrawn Loan"). The Sellers acknowledge that an event described in either subparagraph (i) or (ii) would be grounds for the Purchaser to refuse to purchase such Withdrawn Loan. The Purchaser hereby agrees to purchase each Withdrawn Loan nevertheless at a price mutually agreed to by Purchaser and the Sellers. If Purchaser and the Sellers of the Mortgage Loan cannot mutually agree to a price for a Withdrawn Loan, Purchaser shall have no obligation to purchase such Withdrawn Loan.

(d)    Upon satisfaction of the foregoing conditions, the Purchaser shall pay to the Sellers on the Closing Date the Purchase Price for the Mortgage Loan Package, together with any fees payable by Purchaser that are contemplated by this Agreement by wire transfer of

12

immediately available funds to an account or accounts designated by the Sellers in writing to the Purchaser, in accordance with provisions of the Sale Order.

Section 2.05.  Costs.

Each Seller shall pay any commissions due its salesmen, and the legal fees and expenses of its attorneys associated with the sale of the Mortgage Loans in the Mortgage Loan Package. Additionally, to the extent any taxes are due on the real estate securing a Mortgage Loan and have not been paid by the Interim Servicer through Servicing Advances, and provided that the Purchaser has provided to the Sellers a request for such payment on a loan-level basis prior to the Closing Date, the Sellers shall be responsible for paying to the Purchaser on the Closing Date the amount of such real estate taxes due.  All other costs, fees, and expenses specified herein or incurred in connection with the transfer and delivery of the Mortgage Loans and the transactions contemplated herein, including without limitation recording fees, MERS costs and fees, deboarding fees charged by the Interim Servicer in the amount of $25 per Mortgage Loan that has not already been deboarded, realty transfer taxes, fees for title policy endorsements and continuations, fees for recording Assignments of Mortgage, if any, and the Purchaser's attorney's fees, shall be paid by the Purchaser.

The Interim Servicer may delegate its duties with one or more vendors (including any affiliate of the Interim Servicer) to perform a portion of the servicing functions on behalf of the Interim Servicer; provided, that the Interim Servicer shall remain obligated and be liable for servicing and administering the Mortgage Loans in accordance with this Agreement without diminution of such obligation and liability by virtue of the delegation of such duties, to the same extent and under the same terms and conditions as if the Interim Servicer alone were servicing and administering the Mortgage Loans.  The fees and expenses of any vendor, subcontractor or subservicer that the Interim Servicer has delegated duties thereto shall be agreed between the Interim Servicer and such vendor, and neither the Purchaser nor the Sellers will have any responsibility therefor whatsoever.  All actions of a vendor taken pursuant to such delegation of duties will be taken as agent of the Interim Servicer with the same force and effect as though performed by the Interim Servicer.

Section 2.06.  "As Is Where Is" Transaction.

Purchaser hereby acknowledges and agrees that, except as expressly set forth in this Agreement, the Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Mortgage Loans.  Without in any way limiting the foregoing, the Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Mortgage Loans.  Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the Mortgage Loans and all such other matters relating to or affecting the Mortgage Loans as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Mortgage Loans, Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, except as expressly set forth in the Agreement, Purchaser will accept the Mortgage Loans on the Closing Date "AS IS" and "WHERE IS".

13

Section 2.07.    Purchase Price Adjustment.

On the Closing Date, the amount payable by the Purchaser on the Closing Date shall be reduced by an amount equal to the Purchase Price Adjustment, if any.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01.    Sellers Representations and Warranties.

The Sellers represent and warrant to Purchaser as of the date hereof and as of the Closing Date as follows:

(a)    Status, Authority, Authorization.    Except as a result of the commencement of the Bankruptcy Cases, each Seller (i) has been duly incorporated and is validly existing in good standing as a corporation under the laws of its jurisdiction of incorporation, (ii) subject to the rights of ABN as provided in Exhibit E and in the Sale Motion, has the corporate power and authority to execute and deliver, and perform its obligations under, this Agreement, and (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement.

(b)    No Prohibitions or Violations.    Each Seller's execution and delivery of, and performance of its obligations under, this Agreement, are not prohibited by and do not violate (i) such Seller's certificate or articles of incorporation or bylaws, or (ii) any judgment or order entered against such Seller in an action or proceeding to which such Seller is a party by any court or administrative agency.

(c)    No Litigation Pending.    Excepting any action, suit, proceeding or investigation related to the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending or, to the Sellers' knowledge, threatened against Sellers that, if determined adversely to such Seller either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or that Seller's ability to perform its obligations under this Agreement.

(d)    No Consent Required.    Subject to the rights of ABN as provided in Exhibit E and in the Sale Motion, no consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for each Seller's execution, delivery and performance of their obligations under this Agreement, other than the approval of the Bankruptcy Court.

(e)    Right to Transfer.    As to each Mortgage Loan, subject to and upon the approval of the Bankruptcy Court of this Agreement, and subject to the rights of ABN as provided in Exhibit E and in the Sale Motion, the Sellers shall have full right to transfer and sell such Mortgage Loan to Purchaser free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest.

14

Section 3.02.    Interim Servicer Representations and Warranties.

The Interim Servicer represents and warrants to Purchaser as of the date hereof and as of the Closing Date as follows:

(a)    Status, Authority, Authorization; Licensing.    The Interim Servicer (i) has been duly incorporated and is validly existing in good standing as a corporation under the laws of its jurisdiction of incorporation, (ii) has the corporate power and authority to execute and deliver, and perform its obligations under, this Agreement, (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement, (iv) is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it (after taking into account its duties hereunder) or properties owned, or leased or serviced by it requires such qualification (except where there is an applicable statutory exemption applicable to the Servicer), and (v) has all material licenses necessary to carry on its business as now being conducted (after taking into account its duties hereunder) and to perform all of its obligations hereunder and is in material compliance with state laws requiring licensing to the extent necessary to permit the servicing of the Mortgage Loans in accordance with this Agreement.

(b)    No Prohibitions or Violations; Due Execution.    The Interim Servicer's execution and delivery of, and performance of its obligations under, this Agreement, are not prohibited by and do not violate  (i) the Interim Servicer's certificate of incorporation or bylaws or (ii) any judgment or order entered against the Interim Servicer in an action or proceeding to which the Interim Servicer is a party by any court or administrative agency, and (iii) shall not constitute a breach of any mortgage, indenture, contract or other agreement to which the Interim Servicer is a party or by which the Interim Servicer may be bound.    When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Interim Servicer enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

(c)    No Litigation Pending.    Excepting those matters identified on Exhibit C, there is no action, suit, proceeding or investigation pending or, to the Interim Servicer's knowledge, threatened against the Interim Servicer that, if determined adversely to the Interim Servicer either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or the Interim Servicer's ability to perform its obligations under this Agreement.

(d)    No Consent Required.    No consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for the Interim Servicer's execution, delivery and performance of their obligations under this Agreement, other than the approval of the Bankruptcy Court.

(e)    Ordinary Course of Business.    The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Interim Servicer.

15

(f)    Compliance with MERS.  The Interim Servicer is a member of MERS in good standing, and will remain a member of MERS in good standing for as long as any Mortgage Loans are registered with MERS.

(g)    Ability to Service.  The Interim Servicer has the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans. The Interim Servicer is in good standing to enforce and service mortgage loans in the jurisdiction wherein the Mortgaged Properties are located.

Section 3.03.    Purchaser Representations and Warranties.

Purchaser represents and warrants to the Sellers as of the date hereof and as of the Closing Date as follows:

(a)    Status, Authority, Authorization.  Purchaser (i) has been duly incorporated or formed and is validly existing in good standing under the laws of its jurisdiction of incorporation or formation, (ii) has the power and authority to execute and deliver, and perform its obligations under, this Agreement, and (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement.

(b)    No Prohibitions or Violations.  Purchaser's execution and delivery of, and performance of its obligations under, this Agreement, are not prohibited by and do not violate (i) Purchaser's certificate or articles of incorporation or bylaws, certificate of formation, limited liability company agreement, or other organic documents, as applicable, or (ii) any judgment or order entered against Purchaser in an action or proceeding to which Purchaser is a party by any court or administrative agency.

(c)    No Litigation Pending.  There is no action, suit, proceeding or investigation pending or, to the best of Purchaser's knowledge, threatened against Purchaser that, if determined adversely to Purchaser either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or Purchaser's ability to perform its obligations under this Agreement.

(d)    No Consent Required.  No consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for the Purchaser's execution, delivery and performance of its obligations under this Agreement.

(e)    Funding.  Purchaser has all funds in cash necessary to consummate the Sale.

## ARTICLE IV

## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS DURING THE INTERIM SERVICING PERIOD

Section 4.01.    Interim Servicer to Act as Servicer.

The Mortgage Loans are being sold by the Sellers to the Purchaser on a servicing released basis.  During the Interim Servicing Period, the Interim Servicer, as an independent

16

contractor, shall service and administer the Mortgage Loans on behalf of the Purchaser on an actual/actual basis and the Interim Servicer shall have full power and authority to do any and all things in connection with such servicing and administration that the Interim Servicer may deem necessary or desirable, consistent with the terms of this Agreement and with Accepted Practices in consideration of payment of the Servicing Fee; provided, however, that the servicing activities of the Interim Servicer hereunder shall be restricted to such minimal servicing and collection activities as are necessary for preserving and administering the Mortgage Loans on a temporary basis, it being agreed and understood that the servicing of the Mortgage Loans is intended to be transferred to the Purchaser or the Purchaser's designee on or before the Servicing Transfer Date. The Interim Servicer will advise Purchaser from time to time of such servicing actions, including, without limitation, filing of notices of default, that the Interim Servicer believes should be taken with respect to the Mortgage Loans and will take such actions to the extent authorized to do so by the Purchaser. In the event that servicing of the Mortgage Loans is not transferred to the Purchaser or the Purchaser's designee on or before the forty-fifth (45th) calendar day following the Closing Date, the Interim Servicer shall have no further duties, obligations or responsibilities for servicing the Mortgage Loans, unless the Interim Servicer and the Purchaser have entered into a mutually agreeable servicing agreement to govern the servicing of the Mortgage Loans thereafter.

Section 4.02.  Collection of Mortgage Loan Payments.

Continuously from the Closing Date until the Servicing Transfer Date, in accordance with this Agreement and Accepted Practices, the Interim Servicer shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall ascertain and estimate all other charges that will become due and payable with respect to the Mortgage Loan and the Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable. The Interim Servicer shall remit to the Purchaser on or before the fifth (5th) Business Day following the end of each month during the Interim Servicing Period any and all amounts received on account of the Mortgage Loans during the Interim Servicing Period, less the Servicing Fee, including, without limitation, payments of principal and interest and insurance proceeds, such remittance to be by wire transfer in the case of cash received and by overnight delivery service with respect to checks and other instruments. Such remittance shall be accompanied by a report in form and detail reasonably satisfactory to Purchaser setting forth the source and application of all amounts received. As compensation for its services hereunder, the Interim Servicer shall be entitled to retain all Servicing Fees for the Mortgage Loans serviced hereunder. For the avoidance of doubt, if the amounts received on account of the Mortgage Loans after the Cut-off Date are insufficient to pay the Servicing Fee to the Interim Servicer, all such amounts received by the Interim Servicer shall be kept by the Interim Servicer as partial satisfaction of the Servicing Fee, and the Purchaser shall pay the balance of the Servicing Fee to the Interim Servicer.

Section 4.03.  Disbursement of Mortgage Loan Proceeds.

Continuously from the date hereof until the Servicing Transfer Date, in accordance with this Agreement and Accepted Practices, the Interim Servicer shall proceed diligently to disburse all escrow amounts due for disbursement, if applicable, under each of the Mortgage Loans when

17

the same shall have been requested or are otherwise due for disbursement under the terms of such Mortgage Loans.

## ARTICLE V

## TRANSFER OF SERVICING

Section 5.01.   <u>Assumption of Responsibilities at Transfer Date</u>.

On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to, and the Interim Servicer will cease all servicing responsibilities (except as expressly set forth herein) related to, the Mortgage Loans. On or prior to the Servicing Transfer Date (or in the case of (c), (d) and (e) below, within three (3) Business Days from and after the Servicing Transfer Date or by such other date as may be specified in this Agreement or as may be otherwise agreed), the Interim Servicer will take such steps in accordance with Accepted Practices as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the Mortgage Loans to the Purchaser, or its designee, including but not limited to the following:

(a)   <u>Notice to the Mortgagors</u>.   At least fifteen (15) calendar days prior to the Servicing Transfer Date, the Interim Servicer shall mail to each Mortgagor a letter advising the Mortgagor of the transfer of the servicing of the related Mortgage Loan to the Purchaser, or its designee. The Interim Servicer shall provide the Purchaser with copies of all such related notices no later than thirty (30) calendar days from and after the Servicing Transfer Date.

(b)   <u>Notice to Insurance Companies</u>. The Interim Servicer shall transmit to the applicable insurance companies and/or their agents, notification of the transfer of the servicing of the Mortgage Loans to the Purchaser, or its designee, and instructions to deliver all insurance statements to the Purchaser, or its designee, from and after the Servicing Transfer Date.  The Interim Servicer shall provide the Purchaser with copies of all such notifications no later than fifteen (15) calendar days from and after the Servicing Transfer Date.

(c)   <u>Delivery of Servicing Records</u>.   The Interim Servicer shall forward to the Purchaser, or its designee, all servicing records and the Servicing Files in the Interim Servicer's possession relating to each Mortgage Loan, and shall make any such records available to the Purchaser, or its designee, during normal business hours.

(d)   <u>Escrow Deposits and Interest Reserves</u>.   Any funds held by the Interim Servicer belonging to Mortgagors to be disbursed in accordance with the corresponding Mortgage Loan Documents and remaining on deposit as of the Servicing Transfer Date shall be turned over to Purchaser.   In addition, there exist with respect to certain Mortgage Loans as-yet unfunded interest reserves designated for the making of monthly interest payments in accordance with the corresponding Mortgage Loan Documents.   Any such funds remaining on deposit as of the Servicing Transfer Date shall be turned over to Purchaser.

(e)   <u>Payments Received and Disbursements Made Prior to Servicing Transfer Date</u>. Prior to the Servicing Transfer Date, all payments received and disbursements made by the

18

Interim Servicer on each Mortgage Loan shall be properly applied by the Interim Servicer to or against the account of the particular Mortgagor.

(f)     Payments Received and Disbursements Made After the Servicing Transfer Date. The amount of any Monthly Payments for the Mortgage Loans received by Interim Servicer after the Servicing Transfer Date shall be forwarded to the Purchaser by wire transfer or overnight mail within two (2) Business Days of receipt. The Interim Servicer shall notify the Purchaser of the particulars of the payment, which notification requirement shall be satisfied if the Interim Servicer forwards with its payment sufficient information to permit appropriate processing of the payment to the Purchaser. The Interim Servicer shall have no obligation to disburse funds with respect to any Mortgage Loan on or after the Servicing Transfer Date.

(g)     Misapplied Payments.    Misapplied payments (including without limitation payments returned for insufficient funds) on Mortgage Loans shall be processed as follows: (i) all parties shall cooperate in correcting misapplication errors; (ii) the party receiving notice of a misapplied payment occurring prior to the Servicing Transfer Date and discovered after the Servicing Transfer Date shall immediately notify the other party; (iii) if a misapplied payment occurred prior to the Servicing Transfer Date cannot be identified and said misapplied payment has resulted in a shortage in a custodial account or escrow account, the appropriate Seller and the Interim Servicer shall be liable for the amount of such shortage; the appropriate Seller and/or the Interim Servicer shall reimburse the Purchaser for the amount of such shortage within thirty (30) calendar days after the receipt of written demand thereof from the Purchaser; (iv) if a misapplied payment that occurred prior to the Servicing Transfer Date has created an improper Purchase Price or Purchase Price Adjustment as the result of an inaccurate outstanding principal balance, the party with notice of such misapplied payment shall promptly inform the other party and a wire transfer or check shall be issued to the party shorted by the improper payment application within ten (10) Business Days after notice thereof by the other party; and (v) any wire transfer or check issued under the provisions of this paragraph shall be accompanied by a statement indicating the corresponding Seller and/or the Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments or by facsimile.

(h)     Reconciliation.  The Interim Servicer shall, on or before the Servicing Transfer Date, reconcile principal balances and make any monetary adjustments for the Mortgage Loans as agreed to by Sellers and Purchaser. Any such monetary adjustments will be transferred among, the Interim Servicer, the Sellers, and the Purchaser as appropriate.

(i)     IRS Forms.  The Interim Servicer shall file all IRS forms each is required to file in relation to the servicing and/or ownership of the Mortgage Loans on or before the Servicing Transfer Date.

(j)     Insurance Policies.  For thirty (30) calendar days after the Servicing Transfer Date, the Interim Servicer shall deliver such insurance policies or renewals and invoices as it may receive with respect to the Mortgage Loans to Purchaser within five (5) Business Days of its receipt of same, and thereafter the Interim Servicer shall exercise commercially reasonable efforts to deliver such insurance policies or renewals and invoices as it may receive with respect to the Mortgage Loans to Purchaser within a reasonable time of its receipt of same.

19

(k)     Transfer of Servicing. On the Servicing Transfer Date, the Interim Servicer shall transfer servicing of the related Mortgage Loans to the Purchaser or its designee pursuant to the terms of this Agreement and the procedures reasonably agreed to by the Interim Servicer, the Sellers, the Purchaser and the Purchaser's designee, if any.

(l)     Reimbursement for Servicing Advances. Following the Servicing Transfer Date, the Interim Servicer shall be reimbursed by the Purchaser for any unreimbursed and properly made Servicing Advances made or incurred (including, without limitation, professional fees that have been incurred for services rendered but not yet billed for) after the Cut-off Date with respect to any related Mortgage Loan; provided that the Purchaser shall not be liable for any such Servicing Advances to the extent the Interim Servicer's invoice (and detail of such Servicing Advances) is received by the Purchaser more than sixty (60) calendar days following the Servicing Transfer Date. Such reimbursement shall be paid by the Purchaser or its designee to the Interim Servicer following the delivery to the Purchaser of invoice(s), in form and substance in accordance with Accepted Practices, including, but not limited to, reasonable detail of the Servicing Advances or other evidence of such amounts. For the avoidance of doubt, Purchaser shall not be required to make any reimbursements or any other type of payment whatsoever in respect of Servicing Advances that were made or incurred on or prior to the Cut-off Date. The Sellers are responsible for reimbursing the Interim Servicer for any unreimbursed Servicing Advances made or incurred (including, without limitation, professional fees that have been incurred for services rendered but not yet billed for) prior to or on the Cut-off Date with respect to any related Mortgage Loan. Such reimbursement shall be paid by the Sellers to the Interim Servicer following the delivery to the Sellers of invoice(s), in form and substance in accordance with Accepted Practices, including, but not limited to, reasonable detail of the Servicing Advances or other evidence of such amounts. The Interim Servicer is not obligated to make any Servicing Advances, and shall make Servicing Advances only to the extent it reasonably believes that it will be promptly reimbursed for such Servicing Advances. Any Servicing Advances made by the Interim Servicer shall be restricted to such minimal Servicing Advances as are necessary for preserving and administering the Mortgage Loans on a temporary basis, it being agreed and understood that the servicing of the Mortgage Loans is intended to be transferred to the Purchaser or the Purchaser's designee on or before the Servicing Transfer Date. This paragraph shall survive the termination of this Agreement.

## ARTICLE VI

## SELLERS TO COOPERATE

Section 6.01.   Provision of Information; Right to Examine Sellers Records.

During the term of this Agreement, the Sellers shall furnish to the Purchaser such periodic, special, or other reports or information as the Purchaser may reasonably request, and copies or originals of any documents contained in the Servicing File for each Mortgage Loan provided for herein. All periodic, special or other reports or information not provided for in this Agreement as shall be necessary, reasonable, or appropriate with respect to the Purchaser or any regulatory agency will be provided at the Purchaser's expense after delivery to Purchaser of invoices with reasonable detail or other evidence of such amounts. All such reports, documents or information shall be provided by and in accordance with all reasonable instructions and

20

directions that the Purchaser may give. In addition, during the term of this Agreement, the appropriate Seller shall provide to the OCC and to comparable regulatory authorities supervising the Purchaser or any of Purchaser's assigns (including beneficial owners of securities issued in Securitization Transactions backed by the Mortgage Loans) and the examiners and supervisory agents of the OCC and such other authorities, access to the documentation required by applicable regulations of the OCC and other authorities with respect to the Mortgage Loans. Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices designated by the Sellers.

Each Seller shall execute and deliver all such instruments and take all such action as the Purchaser may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

## ARTICLE VII

## MISCELLANEOUS PROVISIONS

Section 7.01. <u>No Recourse</u>. The Purchaser agrees that the obligations of the Sellers and the Interim Servicer to the Purchaser under this Agreement are non-recourse obligations of the Sellers and the Interim Servicer and, except to the extent set forth in this Article VII, the Purchaser shall have no recourse to the Sellers or to the Interim Servicer for any obligations of the Sellers or the Interim Servicer under this Agreement.

Section 7.02. <u>Amendment</u>.

This Agreement may be amended from time to time by written agreement signed by the Sellers, the Interim Servicer and the Purchaser.

Section 7.03. <u>Survival</u>.

The respective representations and warranties of the Parties contained herein and in any other agreement, certificate, instrument or other document associated therewith or herewith shall not survive and shall expire upon the closing on the Closing Date, except for the representations and warranties of the Interim Servicer in Section 3.02, which shall expire on the Servicing Transfer Date.

Section 7.04. <u>Governing Law</u>.

THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK) AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 7.05.  <u>Venue and Retention of Jurisdiction</u>.

(a)    WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, (I) THE BANKRUPTCY COURT SHALL RETAIN EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND TO DECIDE ANY CLAIMS OR DISPUTES THAT MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT, ANY BREACH OR DEFAULT HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND (II) ANY AND ALL PROCEEDINGS RELATED TO THE FOREGOING SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO AND SUBMIT TO THE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT AND SHALL RECEIVE NOTICES AT SUCH LOCATIONS AS INDICATED IN SECTION 7.06 HEREOF; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY CASES HAVE CLOSED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE SITTING IN NEW CASTLE COUNTY OR THE STATE COURTS OF THE STATE OF DELAWARE SITTING IN NEW CASTLE COUNTY AND ANY APPELLATE COURT FROM ANY COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE.  THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.  EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    EACH OF THE PARTIES HERETO HEREBY CONSENTS TO PROCESS BEING SERVED BY ANY PARTY OF THIS AGREEMENT IN ANY SUIT, ACTION OR PROCEEDING BY DELIVERY OF A COPY THEREOF IN ACCORDANCE WITH THE PROVISIONS OF SECTION 7.06 HEREOF.

(c)    EACH OF THE SELLERS, THE INTERIM SERVICER AND THE PURCHASER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OR ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE SELLERS OR THE PURCHASER.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PURCHASER TO ENTER INTO THIS AGREEMENT.

22

Section 7.06.  Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or delivered by overnight courier as follows:

(a)     if to the Sellers:

    c/o American Home Mortgage Corp.
    538 Broadhollow Road
    Melville, New York 11747
    Attention: Damian Voulo
    Phone: (631) 663-3273
    Fax: (206) 339-2781

or such other address as may hereafter be furnished to the Purchaser and the Interim Servicer in writing by the Sellers in accordance with this Section 7.06;

(b)     if to the Interim Servicer:

    American Home Mortgage Servicing Inc.
    4600 Regent Blvd, Suite 200
    Irving, TX 75063
    Attention: Robert J. Love
    Phone: (214) 260-6804
    Fax: (877) 718-7805

or such other address as may hereafter be furnished to the Purchaser and the Sellers in writing by the Interim Servicer in accordance with this Section 7.06;

(c)     if to the Purchaser:

    Vantium Capital Markets, L.P.
    c/o Vantium Management, L.P.
    9 W. 57th Street, 37th Floor
    New York, NY 10019
    Attention: Mike Nocco
    Phone: (212) 822-0631
    Fax: (917) 591-2920

    with a copy to:

    Acqura Loan Services, a Vantium Capital Inc. Company
    6500 International Parkway, Suite 1500
    Plano, Texas 75093
    Attention: Ron Bendalin
    Telephone: (972) 715-1019
    Email: Ron@vantiumcapital.com

23

or such other address as may hereafter be furnished to the Sellers and the Interim Servicer in writing by the Purchaser in accordance with this Section 7.06.

Section 7.07.  Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 7.08.  Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto and the services of the Sellers and the Interim Servicer shall be rendered as an independent contractor and not as agent for the Purchaser.

Section 7.09.  Successors and Assigns.

This Agreement shall bind and inure to the benefit of and be enforceable by the Sellers, Interim Servicer and the Purchaser and the respective permitted successors and assigns of the Sellers, the Interim Servicer and the Purchaser.  After the Closing Date, this Agreement shall not be assigned, pledged or hypothecated by any of the Purchaser, the Sellers, or the Interim Servicer to a third party without the prior written consent of the Purchaser, the Sellers, or the Interim Servicer, as applicable, which consent may be withheld by the Purchaser in its sole discretion.

Section 7.10.  Further Agreements.

The Purchaser, the Sellers, and the Interim Servicer each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 7.11.  Confidential Information.

(a)     The Purchaser, the Sellers, and the Interim Servicer hereby acknowledge that certain information including, without limitation, the Mortgage Loans, is confidential, sensitive, or proprietary in nature.  Any of the Purchaser, the Sellers, or the Interim Servicer may also designate information disclosed in connection with the transaction contemplated by this Agreement as "Confidential Information" by written notice to the other party at the time of initial disclosure of such information.  Each of the Purchaser, the Sellers, and the Interim Servicer agrees that it shall use such Confidential Information solely for the purpose of fulfilling the terms and conditions of this Agreement and shall disclose such Confidential Information only to its affiliates and its affiliates' directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), controlling persons (collectively, its "Representatives") to the extent reasonably necessary or expedient for the performance of its obligations under this Agreement.  Such Representatives shall use commercially reasonable safeguards to maintain the confidentiality of such Confidential

24

Information and to prevent its disclosure to any person not authorized to receive such information.

(b)     The term "Confidential Information" shall mean this Agreement and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever that: (a) a party hereto ("Discloser") discloses, in writing, to the other party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement, and that (b) relates to: (i) a party hereto or its customers, or (ii) third-party vendors or licensors who have made confidential or proprietary information available to a party hereto.   Confidential Information shall include Customer Information (as defined below).

(c)     The Sellers and the Interim Servicer acknowledge that the Purchaser has a responsibility to its customers to keep information about its customers and their accounts ("Customer Information") strictly confidential.  In addition to the other requirements set forth in this Section 7.11 regarding Confidential Information, Customer Information shall also be subject to the additional restrictions set forth in this Subsection.  The Sellers and the Interim Servicer shall not disclose or use Customer Information other than to carry out the purposes for which such Customer Information has been disclosed to the Sellers or the Interim Servicer.  The Sellers and the Interim Servicer shall not disclose any Customer Information other than on a "need to know" basis and then only to: (a) affiliates of the Purchaser; (b) its and its affiliates' Representatives; (c) affiliates of the Sellers and the Interim Servicer provided that such affiliates shall be restricted in use and redisclosure of the Customer Information to the same extent as the Sellers or the Interim Servicer; (d) to subcontractors provided that such subcontractors shall have entered into a confidentiality agreement no less restrictive than the terms hereof; (e) to independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section; or (f) pursuant to the exceptions set forth in 15 U.S.C. § 6802(e) and accompanying regulations that disclosures are made in the ordinary course of business.  In addition, each party further agrees that any Customer Information transmitted electronically by either party must be encrypted.  The restrictions set forth herein shall apply during the term and after the termination of this Agreement.

(d)     Each of the Purchaser, the Sellers and the Interim Servicer, as the Recipient, hereby agrees on behalf of itself and its employees, officers, affiliates and subcontractors that it will not disclose Confidential Information to any person for any reason whatsoever, other than on a "need to know basis" and then only to: (a) its employees and officers; (b) subcontractors and other third parties specifically permitted under this Agreement, provided that all such persons agree to the provisions of this Agreement applicable to such persons or are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section 7.11; (c) independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section 7.11; and (d) as required by law or regulation, including in connection with the Bankruptcy Cases, or as otherwise permitted by this Agreement, either during the term of this Agreement or after the termination or expiration of this Agreement. Prior to any disclosure of Confidential Information as required by law or regulation, the party making such disclosure (except as may be prohibited by law or regulations) shall use its

25

commercially reasonable efforts to: (i) notify the other party of any actual or threatened legal compulsion of such disclosure, and any actual or asserted legal obligation of disclosure promptly upon learning thereof, and (ii) cooperate with the other party's (and at the other party's sole expense) reasonable, lawful efforts to resist, limit or delay disclosure.

(e)    Upon the termination or expiration of this Agreement, the Recipient shall (except as may be required to be maintained by law or regulation) as promptly as practicable destroy or return, in its sole discretion, all Confidential Information, including Customer Information, in the possession of the Recipient or in the possession of any third party over which Recipient has or may exercise control to the extent such Confidential Information is not required for legal and compliance, audit or record keeping purposes, including compliance with any bona fide records retention policy; provided that Customer Information that is also Customer Information of the Recipient (independent of the transactions contemplated by this Agreement) shall not be required to be returned or destroyed.

(f)    With the exception of the obligations related to Customer Information, the obligations of confidentiality in this Section 7.11 shall not apply to any information that any of the Purchaser, the Sellers, or the Interim Servicer rightfully has in its possession when disclosed to it by the other party, information that any of the Purchaser, the Sellers or the Interim Servicer independently develops, information that is or becomes known to the public other than by breach of this Section 7.11, or information rightfully received by any of the Purchaser, the Sellers or the Interim Servicer from a third party without the obligation of confidentiality.

(g)    None of the Purchaser, the Sellers, nor the Interim Servicer shall issue any media releases, public announcements and public disclosures relating to this Agreement or use the name or logo of the other party, including, without limitation, for or in connection with any promotional or marketing material, or customer lists; provided, however, that this restriction shall not apply to any disclosure required in connection with the Bankruptcy Cases or by legal, accounting or regulatory requirements beyond the reasonable control of such party.

(h)    Notwithstanding anything set forth to the contrary in this Agreement, subject to Applicable Law, the provisions of Section 7.11 (other than Section 7.11(g)) shall expire and be of no further force and effect on the Closing Date.

Section 7.12.    Information Security and Privacy.

The Sellers and the Interim Servicer acknowledge that the Purchaser is required to comply with the information security standards required by the Gramm-Leach-Bliley Act (15 U.S.C. 6801, 6805(b)(1)), as amended, and the regulations issued thereunder (12 C.F.R. Part 40) (collectively, the "GLB Act") and with other statutory and regulatory requirements (collectively, "Privacy Laws") as well as its internal information security program for information protection. If applicable, the Sellers and the Interim Servicer shall make commercially reasonable efforts to assist the Purchaser to so comply and to conform to its own policies for information protection with applicable Privacy Laws, as amended from time to time. At the Purchaser's request, the Sellers and the Interim Servicer shall make commercially reasonable modifications to their information security program or to the procedures and practices thereunder to conform to the Purchaser's security requirements as they exist from time to time.

26

(a)    Within ten (10) calendar days of the Purchaser's written request, the Sellers and the Interim Servicer shall deliver to the Purchaser's information protection department a copy of its written information security program. The program shall be designed to:

(i)    Ensure the security, integrity and confidentiality of Confidential Information;

(ii)    Protect against any anticipated threats or hazards to the security or integrity of such Confidential Information;

(iii)    Protect against unauthorized access to or use of such Confidential Information that could result in substantial harm or inconvenience to the person that is the subject of such information; and

(iv)    Ensure the proper disposal of such Confidential Information.

The Interim Servicer confirms that it has complied with and is in compliance with all applicable Privacy Laws.

Section 7.13.    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 7.14.    Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 7.15.    General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

27

(d)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 7.16.   Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

*{Signature Page Follows}*

IN WITNESS WHEREOF, the Sellers, the Purchaser, and the Interim Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**VANTIUM CAPITAL MARKETS, L.P.**
Purchaser

**AMERICAN HOME MORTGAGE CORP.**
Seller

**By: VANTIUM MANAGEMENT, L.P., its Manager**

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

**AMERICAN HOME MORTGAGE SERVICING, INC.**
Interim Servicer

**AMERICAN HOME MORTGAGE ACCEPTANCE, INC.**
Seller

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

## EXHIBIT A

### CONTENTS OF MORTGAGE FILES

1.  The original Mortgage Loan Note endorsed "Pay to the order of _____, without recourse" and signed in the name of the Seller by an authorized officer (provided that, in the event that the Mortgage Loan was acquired by the Seller in a merger, the signature must be substantially in the following form: "[Seller], successor by merger to [name of predecessor]"; and in the event that the Mortgage Loan was acquired or originated by the Seller while doing business under another name, the signature must be substantially in the following form: "[Seller], formerly known as [previous name]"); or a lost note affidavit, in the form attached to this Exhibit A, with a copy of the original Mortgage Loan Note attached thereto.

2.  The original Mortgage, with evidence of recording thereon, or, if unavailable, documentation reflecting the tender of such original Mortgage for recording that may include (i) in the case of a delay caused by the public recording office, an Officer's Certificate stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Purchaser or the Purchaser's designee (as Purchaser shall direct) upon receipt thereof by the Seller; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded Mortgage.

3.  The original of any document sent for recordation in connection with all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, or, if unavailable, documentation reflecting the tender of such original document for recording that may include (i) in the case of a delay caused by the public recording office, an Officer's Certificate stating that such document has been dispatched to the appropriate public recording office for recordation and that the original recorded document or a copy of such document certified by such public recording office to be a true and complete copy of the original recorded document will be promptly delivered to the Purchaser or Purchaser's designee (as Purchaser shall direct) upon receipt thereof by the Seller; or (ii) in the case of a document where a public recording office retains the original recorded document or in the case where a document is lost after recordation in a public recording office, a copy of such document certified by such public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded document.

4.      The original of any Assignment of Mortgage to MERS or in blank for each Mortgage Loan (other than MOM Mortgage Loans), originals or certified true copies thereof sent for recordation with evidence of recording thereon, or, if unavailable, documentation reflecting the tender of such original document for recording that may include (i) in the case of a delay caused by the public recording office, an Officer's Certificate stating that such document has been dispatched to the appropriate public recording office for recordation and that the original recorded document or a copy of such document certified by such public recording office to be a true and complete copy of the original recorded document will be promptly delivered to the Purchaser or Purchaser's designee (as Purchaser shall direct) upon receipt thereof by the Seller; or (ii) in the case of a document where a public recording office retains the original recorded document or in the case where a document is lost after recordation in a public recording office, a copy of such document certified by such public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded document. With respect to each Mortgage Loan (including MOM Mortgage Loans) the Seller shall take all actions as are reasonably necessary to cause the Purchaser or its designee to be shown as the owner of the related Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS at the sale cost and expense of the Purchaser.

5.      The original of any document sent for recordation in connection with all intervening assignments of the Mortgage, if any, with evidence of recording thereon, or, if unavailable, documentation reflecting the tender of such original document for recording that may include (i) in the case of a delay caused by the public recording office, an Officer's Certificate stating that such document has been dispatched to the appropriate public recording office for recordation and that the original recorded document or a copy of such document certified by such public recording office to be a true and complete copy of the original recorded document will be promptly delivered to the Purchaser or Purchaser's designee (as Purchaser shall direct) upon receipt thereof by the Seller; or (ii) in the case of a document where a public recording office retains the original recorded document or in the case where a document is lost after recordation in a public recording office, a copy of such document certified by such public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded document.

6.      The original lender's or mortgagee's policy of title insurance or, if such policy has not been issued, the preliminary report or irrevocable binder or commitment to issue the same.

7.      Any security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

8.      For each Mortgage Loan that is secured by a residential long-term lease, if any, a copy of the lease with evidence of recording indicated thereon, or, if the lease is

in the process of being recorded, a photocopy of the lease, certified by an officer of the respective prior owner of such Mortgage Loan or by the applicable title insurance company, closing/settlement/escrow agent or company or closing attorney to be a true and correct copy of the lease transmitted for recordation.

9.      All other documents held by Sellers with respect to each Mortgage Loan as part of the mortgage loan file.

10.     Payment history for any Mortgage Loan that has been closed for more than ninety (90) calendar days.

11.     Fully executed power of attorney, if applicable.

FORM OF LOST NOTE AFFIDAVIT

# AFFIDAVIT OF LOST NOTE

STATE OF NEW YORK

COUNTY OF SUFFOLK

      I, Eileen Wanerka, an Assistant Vice President of American Home Mortgage Corp., personally appeared before me, _____, a Notary Public in and for the County of Suffolk, in the State of New York, and made the following oath before me in this County:

1.      _____ originated a loan evidenced by a certain Note dated _____ executed by _____ (the "Borrower(s)") in the amount of $_____ and payable to _____.

2.      The Note secures a Mortgage dated _____ from the (Borrower(s)) to _____.

3.      The original Note has been lost and after diligent search has not been found or recovered by American Home Mortgage Corp. A copy of the Note is attached as Exhibit A.

4.      American Home Mortgage Corp. represents and warrants that it has not previously hypothecated, transferred, sold, pledged or assigned the Note.

Dated: _____

American Home Mortgage Corp.


_____
By: Eileen Wanerka
Its: Assistant Vice President


Sworn to before me this
_____ **day of** _____, **2009**


_____
Notary Public

My Commission Expires: _____

EXHIBIT B

FORM OF MEMORANDUM OF SALE

CLOSING DATE:  May ___, 2009

This Memorandum of Sale (this "Memorandum"), dated as of the Closing Date referred to above, confirms the sale by American Home Mortgage Corp., a New York corporation, and American Home Mortgage Acceptance, Inc., a Maryland corporation (collectively, the "Sellers") to Vantium Capital Markets, L.P., a Cayman Islands limited partnership (the "Purchaser"), and the purchase by the Purchaser from the Sellers, of the first lien, adjustable and fixed rate residential mortgage loans on a servicing released basis described on the Mortgage Loan Schedule attached hereto as Schedule I (the "Mortgage Loans"), pursuant to the terms of the Mortgage Loan Sale and Interim Servicing Agreement (the "Agreement"), dated as of March ___, 2009, by and among the Purchaser, the Sellers, and the Interim Servicer.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Sellers do hereby bargain, sell, convey, assign and transfer to Purchaser without recourse, except as provided in the Agreement, and on a servicing released basis, all right, title and interest of the Sellers in and to each of the Mortgage Loans, together with all documents maintained as part of the related Mortgage Files and Servicing Files, all payments of principal (except for principal received and retained by a Seller resulting in a Purchase Price Adjustment) received on the Mortgage Loans after the Cut-off Date, all payments of interest received on the Mortgage Loans after the Closing Date, all other unscheduled collections collected in respect of the Mortgage Loans after the Cut-off Date, and all proceeds of the foregoing, subject, however, to the rights of the Sellers under the Agreement.

The Sellers hereby acknowledge receipt of the Purchase Price with respect to the Mortgage Loans.

The Sellers have delivered to the Purchaser or its designee on the date hereof the Mortgage Loan Documents with respect to each Mortgage Loan that are in Sellers' possession.

The Sellers hereby acknowledge their duties and obligations under the Agreement with respect to the Mortgage Loans.

Capitalized terms that are used herein but are not defined herein shall have the respective meanings set forth in the Agreement.

IN WITNESS WHEREOF, the parties hereto, by the hands of their duly authorize officers, execute this Memorandum of Sale as of the Closing Date referred to above.

**AMERICAN        HOME        MORTGAGE**
**ACCEPTANCE, INC.**
as Seller

By: _____

Name: _____

Title: _____


**AMERICAN HOME MORTGAGE CORP.**
as Seller

By: _____

Name: _____

Title: _____


**VANTIUM CAPITAL MARKETS, L.P.**
Purchaser

**By: VANTIUM MANAGEMENT, L.P., its**
**Manager**

By: _____

Name: _____

Title: _____

<u>SCHEDULE I to EXHIBIT B – FORM OF MEMORANDUM OF SALE</u>

**[to be completed in substantially the form of the tape or other electronic record media provided by the Sellers to potential bidders in connection with the sale of Mortgage Loans contemplated by the Agreement to which this page is attached – completed schedule will include identification of any applicable warehouse lenders]**

EXHIBIT C

## LITIGATION SCHEDULE OF THE INTERIM SERVICER

NONE

## EXHIBIT D

### PURCHASE PRICE PERCENTAGE

| Mortgage Loan Number | Non-Delinquent Mortgage Loan | Delinquent Mortgage Loan |
|---|---|---|
| 106768 | 41.11% | 41.11% |
| 724980 | 8.26% | 8.26% |
| 1143902 | 28.60% | 28.60% |
| 1332178 | 53.23% | 53.23% |
| 1398185 | 19.17% | 19.17% |
| 1407699 | 35.55% | 35.55% |
| 1431361 | 22.11% | 22.11% |
| 1503507 | 18.95% | 18.95% |
| 1535325 | 11.15% | 11.15% |
| 1555301 | 0.70% | 0.70% |
| 1610181 | 25.18% | 25.18% |
| 1659110 | 28.56% | 28.56% |
| 1725182 | 30.00% | 30.00% |
| 1748075 | 36.97% | 36.97% |
| 4579629 | 33.23% | 33.23% |
| 5126633 | 52.70% | 52.70% |
| 1151862 | 47.60% | 11.50% |
| 3473395 | 38.20% | 7.50% |
| 4384119 | 50.50% | 41.00% |

# EXHIBIT E

## ABN CONSENT

CONSENT OF ABN AMRO BANK N.V. (the "ABN Consent")

1.        Sellers and ABN AMRO Bank N.V. ("ABN") are parties to a Master Repurchase

Agreement, dated as of February 28, 2007 (the "Master Repurchase Agreement") in respect of

the loans numbered 1 through 14 on attached Exhibit 1 (each an "ABN Mortgage Loan," and

collectively "ABN Mortgage Loans 1-14"). ABN Mortgage Loans 1 through 7 are REO

property, meaning that title to the property that is the collateral for the mortgage loan has

previously been transferred from the mortgage loan borrower to Sellers or the Interim Servicer.

ABN Mortgage Loans 8 through 14 are not REO property. Each ABN Mortgage Loan currently

is being serviced by Interim Servicer with the consent of ABN.

2.        ABN Mortgage Loans 1-14 are also the subject of the following stipulations and

orders entered in the Bankruptcy Cases and approved by the Bankruptcy Court: (a) Stipulation

Between Certain Debtors and ABN AMRO Bank N.V.; Order Thereon, approved by Bankruptcy

Court order on August 22, 2007 [D.I. 284]; (b) Stipulation Between Certain Debtors and ABN

AMRO Bank N.V. Regarding Marketing and Sale of Certain Construction Loans and Servicing

Rights; and Order Thereon, approved by Bankruptcy Court orders entered on October 4, 2007

[D.I. 1175 and 1176]; (c) Second Stipulation Between Certain Debtors and ABN AMRO Bank

N.V. Regarding Post-Petition Advances and Sale of Construction Loan Portfolio; Order Thereon,

approved by Bankruptcy Court order entered on December 3, 2007 [D.I. 2355]; (d) Third

Stipulation Between Certain Debtors and ABN AMRO Bank, N.V. Regarding: (1) Post-Petition

Advances; (2) Servicing Payments; and (3) Mortgage Loan Refinancings, approved by

Bankruptcy Court order on February 28, 2008 [D.I. 3115]; (e) Fourth Stipulation Between

Certain Debtors and ABN AMRO Bank, N.V. Amending and Supplementing the Third

Stipulation Regarding: (1) Post-Petition Advances; (2) Servicing Payments; and (3) Mortgage

Loan Refinancings, approved by Bankruptcy Court order on June 9, 2008 [D.I. 4484] ((a) through (e) collectively, the "Bankruptcy Court Orders").

3.     The Bankruptcy Court Orders provide, in relevant part, that the Sellers and ABN agreed to extend the deadline for conveying certain mortgage loans, of which the ABN Mortgage Loans 1-14 were a part, from Sellers to ABN.  Sellers and ABN hereby agree that Sellers have not conveyed ABN Mortgage Loans 1-14 to ABN, but they remain subject to ABN's rights under the Master Repurchase Agreement and the Bankruptcy Court Orders.

4.     ABN acknowledges that Sellers seek to sell ABN Mortgage Loans 1-14 pursuant to the Sale Procedures attached as Exhibit 2 (the "Sale Procedures").  Except as provided in paragraph 5 below, ABN, by its signature below, hereby releases to the Successful Bidder,[1] or in the event the Successful Bidder fails to close as provided in the Sale Procedures, to Second Best Bidder, all of its right, title and interest in and to each of ABN Mortgage Loans 1-14, including ABN's rights in and to each of ABN Mortgage Loans 1-14 under the Master Repurchase Agreement and under the Bankruptcy Court Orders, subject to the occurrence or performance as the case may be of conditions (a) and (b) for ABN Mortgage Loans 1-14:

(a)  entry of an order of the Bankruptcy Court approving the transaction that is the subject of the sale agreement ("Sale Agreement") that incorporates this ABN Consent, and the closing of such sale; and

(b)  the amounts received for all ABN Mortgage Loans transferred to the Successful Bidder, or the Second Best Bidder, as the case may be, is equal to or exceeds the aggregate sum of the amounts bid for each such ABN Mortgage Loan by Vantium

---

[1] All terms not otherwise defined herein are to be given the meanings ascribed to them in the Sale Procedures.

2

Capital Markets, L.P. ("Vantium") as stalking horse bidder, as each such amount is indicated on Exhibit 1 hereto.

5.     ABN Mortgage Loans 2, 3, 5, and 7 are currently the subject of pending sales to third parties. In the REO Property Sale Agreement, Debtors have reserved the right to remove any REO Property from the sale process that becomes subject to a pending sale. ABN likewise reserves the right to withdraw from the sale process any such ABN Mortgage Loan that is subject to a pending sale at any time prior to (A) one business day before the date of the Auction, as such date may be continued by the Debtors pursuant to the Sale Procedures, or (B) if there is no Auction for the REO Property Asset Pool, the commencement of the Sale Hearing.

6.     The inclusion of this ABN Consent into the Sale Agreement constitutes the agreement of the parties to such Sale Agreement (Sellers, Vantium and Interim Servicer) to each of the terms and conditions of this ABN Consent, and their further agreement that no terms of the Sale Agreement apply to or are binding in any way on ABN other than the terms of this ABN Consent; provided, however, nothing in this paragraph shall limit any provision in the sale order issued by the Bankruptcy Court approving the Sale as long as such provisions are materially consistent with the terms of this Consent.

*{Signature Page Follows}*

3

IN WITNESS WHEREOF, ABN and the Sellers have caused their names to be signed hereto by their respective officers thereunto duly authorized as of March ___, 2009.

**ABN AMRO BANK, N.V.**

By: _____
    David W. Stack
Name: __Senior Vice President__

Title: _____

By: _____
    NEIL J. BIVONA
Name: __SENIOR VICE PRESIDENT__

Title: _____


**AMERICAN HOME MORTGAGE**
**ACCEPTANCE, INC.**
Seller

By: _____

Name: _____

Title: _____


**AMERICAN HOME MORTGAGE CORP.**
Seller

By: _____

Name: _____

Title: _____

4

IN WITNESS WHEREOF, ABN and the Sellers have caused their names to be signed hereto by their respective officers thereunto duly authorized as of March ____, 2009.

**ABN AMRO BANK, N.V.**

By: _____

Name: ___David W. Stack___

Title: _____

By: _____

Name: ___NEIL J. BIVONA___

Title: _____

**AMERICAN HOME MORTGAGE ACCEPTANCE, INC.**
Seller

By: _____

Name: ___Damian Voulo___

Title: ___SVP___

**AMERICAN HOME MORTGAGE CORP.**
Seller

By: _____

Name: ___Damian Voulo___

Title: ___SVP___

4

Exhibit 1

| ABN Mortgage Loan | Loan Number | Address of Property | Vantium Bid |
|---|---|---|---|
| 1 | 1184819 | 1354 Pennsylvania Avenue SE, Washington, DC 20003 | $10 |
| 2 | 1267885 | 2301 Killdeer Street, New Orleans, LA 70122 | $217,397 |
| 3 | 1395860 | 1932 West Iron Horse Boulevard, Bluffdale, UT 84065 | $159,969 |
| 4 | 1419394 | Wilshire Road, Munger MI 48747 | $27,012 |
| 5 | 1522817 | 151 North 3375 West, Layton, UT 84040 | $165,131 |
| 6 | 1692736 | 329 Iron Horse Court, Grand Junction, CO 81503 | $49,656 |
| 7 | 1773856 | 14451 South Long Ridge Drive, Herriman, UT 84065 | $188,891 |
| 8 | 1725182 | Kinsman & Farmer Roads, Seneca, IL 61360 | $115,871 |
| 9 | 1610181 | 48 Quashnet Way, East Falmouth, MA 02536 | $120,857 |
| 10 | 1555301 | 107 East Valley Road, Smethport, PA 16749 | $560 |
| 11 | 1535325 | 156 Gage School House Road, Cherry Valley, NY 13320 | $14,852 |
| 12 | 1503507 | SW 178th Street, Ocala, FL 34473 | $41,880 |
| 13 | 1431361 | 123 North Greenfield Road, Porter Cors, NY 12859 | $40,527 |
| 14 | 1398185 | SW 170th Loop, Ocala, FL 34473 | $41,906 |

## Exhibit 2

Sale Procedure

(OMITTED)