## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x

In re:                                                  : Chapter 11

                                            :

AMERICAN HOME MORTGAGE HOLDINGS, INC., : Case No. 07-11047 (CSS)
a Delaware corporation, et al.,[1]                      :

                                            : Jointly Administered

                            Debtors.                :

                                            : **Hearing Date: June 5, 2009 at 10:00 a.m.**
                                            : **Objection Deadline: May 26, 2009 at 4:00 p.m.**

-------------------------------------------------------------- x

## MOTION OF AMERICAN HOME MORTGAGE CORP. FOR AN ORDER, PURSUANT TO SECTIONS 105, 363, 365, AND 1146(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE SALE OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (II) APPROVING THE TERMS OF THE PURCHASE AGREEMENT; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF AND TRANSFER OF THE DEBTORS' INTERESTS IN CERTAIN REAL PROPERTY LEASES; (IV) AUTHORIZING THE EXEMPTION OF THE SALE FROM STAMP AND SIMILAR TAXES; AND (V) GRANTING RELATED RELIEF

American Home Mortgage Corp. ("AHM Corp." or the "Beneficiary"), one of the

above-captioned, post-confirmation Debtors (collectively, the "Debtors"), by and through its

undersigned attorneys, hereby submits this motion (the "Motion") for entry of an order, pursuant

to sections 105(a), 363, 365 and 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101

et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the private sale of certain assets

free and clear of liens, claims, encumbrances and other interests (the "Sale"); (ii) approving the

terms of the purchase and sale agreement annexed hereto as Exhibit A (the "Purchase

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The mailing address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

DB02:7968452.4                                                                                    066585.1001

Agreement"); (iii) authorizing the assumption, assignment and transfer of certain nonresidential

real property leases (collectively, the "Leases"), as more specifically identified on Exhibit B

annexed hereto; (iv) authorizing the exemption of the Sale from stamp and similar taxes; and (v)

granting related relief.  In support of the Motion, AHM Corp. and the other Debtors respectfully

represent as follows:

## JURISDICTION

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief requested herein are sections 105(a), 363, 365 and 1146(a) of the Bankruptcy Code, along

with Bankruptcy Rules 2002, 6004, 6006 and 9014.

## GENERAL BACKGROUND

2.       On August 6, 2007 (the "Petition Date"), the Debtors each filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have

continued in possession of their properties and have continued to operate their businesses as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       An official committee of unsecured creditors (the "Committee") was

appointed on August 14, 2007, and an official committee of borrowers (the "Borrowers

Committee") was appointed on October 21, 2008.  No trustee or examiner has been appointed.

4.       The Debtors filed an Amended Chapter 11 Plan of Liquidation (as

amended, supplemented and/or modified, the "Plan") with the Court on November 25, 2008.

The Court entered an order confirming the Plan on February 23, 2009 [D.I. 7042].

DB02:7968452.4

066585.1001

## THE MARKETING AND SALE PROCESS

5.       In connection with the Debtors' efforts to maximize the value of their

assets, the Debtors retained CB Richard Ellis, Inc. ("CBRE") as their real estate broker to market

the real property located at 950 North Elmhurst Road/150 West Rand Road, Mount Prospect,

Illinois (the "Real Property"). CBRE's retention by the Debtors was approved by entry of an

Order dated March 11, 2008 [D.I. 3223] and subsequently extended by Order appearing at

Docket No. 6659.

6.       Since being retained over a year ago, CBRE has been actively marketing

the Real Property for sale. Specifically, CBRE completed approximately twenty blast email

marketing campaigns beginning on or about May 1, 2008 to an exclusive mailing list compiled

by CBRE's Private Client Group to solicit interest in the Real Property. The blast email

campaigns reached a total of approximately 101,400 parties. In addition to the blast email

campaigns, CBRE erected a sign on the Real Property, made numerous telephone calls,

cooperated with other brokers and gave tours of the Real Property. CBRE also distributed an

offering memorandum as part of its blast email campaigns.

7.       As a result of those efforts, in late July, 2008, the Debtors entered into a

letter of intent with an interested party for the sale of the Real Property and for the assignment of

the Leases. However, despite the Debtors' best efforts to finalize a purchase agreement with that

party, the Debtors reached an impasse over certain terms and conditions of the agreement. As a

result, the Debtors determined not to proceed with the proposal.

8.       The Debtors, with the assistance of CBRE, continued marketing the Real

Property and the Leases. As a result of the continued marketing efforts, the Debtors received an

offer from The Equitable Funds LLC (the "Purchaser") for the Real Property and for the

assignment of the Leases through a private sale.  Since receiving that offer, the Debtors and the

Purchaser engaged in active negotiations concerning the terms and conditions of the Sale.  On

April 13, 2009, the Debtors sent a letter of direction to North Star Trust Company, as successor-

trustee to Park National Bank and Trust Company of Chicago, as legal owner of the Real

Property (the "Legal Owner"), to execute the Purchase Agreement.[2]  On April 17, 2009, AHM

Corp., the Legal Owner and the Purchaser executed the Purchase Agreement.

9.      For the reasons explained below and throughout this Motion, the Debtors

decision to proceed with the Sale without conducting a formal auction process is a sound

exercise of the Debtors' business judgment.  Simply, proceeding by private sale and without

conducting a formal auction is not only a requirement of the Purchaser's offer, but it also

significantly reduces the transaction costs associated with the Sale.  Thus, proceeding by private

sale will maximize the value realized from the Sale by the Debtors' estates for the benefit of all

stakeholders.

## SUMMARY OF THE PURCHASE AGREEMENT[3]

10.      Following good faith and arm's length negotiations, the Debtors and the

Purchaser entered into the Purchase Agreement in the form annexed hereto as Exhibit A.  A

summary of certain terms of the Purchase Agreement are listed herein:[4]

- Property.  The Property to be sold pursuant to the terms of the Purchase Agreement to the Purchaser includes (a)the Real Property; (b)   all easements, if any, benefiting the Real Property or the improvements located thereon; (c) all rights and appurtenances pertaining to the Real Property, including any right, title and interest of the Sellers in and to adjacent streets, alleys or

---

[2]      The Real Property is held pursuant to a Trust Agreement dated as of December 20, 1993 with AHM Corp. as the named beneficiary.

[3]      The summary of the Purchase Agreement is qualified in its entirety by the Purchase Agreement.  If there are any inconsistencies between the summary contained herein and the Purchase Agreement, the Purchase Agreement shall control.

[4]      Capitalized terms not defined in the following summary of the Purchase Agreement or anywhere else in the Motion shall have the definition ascribed to them in the Purchase Agreement.

rights-of-way pertaining to the Real Property; (d) the Improvements; (e) the Beneficiary's interest in the Leases, and any leases entered into after the Effective Date with the consent of the Purchaser; (f) the Tangible Personal Property, but specifically excluding the items listed on Exhibit C to the Purchaser Agreement; and (g) all Permits, expressly excepting and excluding any and all such Permits used in connection with or related to the Sellers' business or operations in any manner whatsoever, and (ii) right, title and interest of the Sellers in and to the Plans covering the Property, expressly excepting and excluding any and all such Plans used in connection with or related to the Sellers' business or operations in any manner whatsoever

- <u>Purchase Price</u>. One Million Three Hundred Fifteen Thousand and 00/100 Dollars ($1,315,000.00).

- <u>Cure Claims</u>. Except as otherwise set forth in the Purchase Agreement, the Sellers have agreed satisfy, on or before the Closing Date, the Cure Claims under the Leases.

- <u>Assumed Liabilities</u>. At Closing, the Purchaser shall assume all obligations of the Sellers under the Leases that are assigned to, and assumed by, the Purchaser on the Closing Date accruing or arising from and after the Closing Date.

- <u>Third Party Offers.</u>  The Sellers have agreed not to accept any Third Party Offer unless the purchase price contained in the Third Party Offer exceeds the Purchase Price by at least ten percent (10%).  In the event that the Sellers accept the Third Party Offer and closing on the Property actually occurs in accordance with the terms of the Third Party Offer, the Beneficiary agrees to pay to the Purchaser a break up fee equal to Fifty Thousand and 00/100 Dollars ($50,000.00) from the proceeds actually received by the Beneficiary in accordance with the terms of the Third Party Offer (the "<u>Break Up Fee</u>") and immediately return the Deposit to the Purchaser.  The Purchaser shall also be entitled to payment of the Break Up Fee, as an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code, in the event the Closing does not occur; <u>provided, however,</u> if the Closing does not occur as a result of the Purchaser's breach of the Purchase Agreement, the Break Up Fee shall not be paid to the Purchaser.

- <u>AS IS, WHERE IS</u>.  Except as expressly set forth in the Purchase Agreement, the Purchaser is purchasing the Property on an "AS IS, WHERE IS" basis.

## RELIEF REQUESTED

11.    By this Motion, AHM Corp. and the other Debtors seek entry of an order, pursuant to sections 105(a), 363(b), 365 and 1146(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, (i) authorizing the Sale; (ii) approving the terms of the Purchase Agreement; (iii) authorizing the assumption and assignment and transfer of the Leases; (iv) authorizing the exemption of the Sale from stamp and similar taxes; and (v) granting related relief.

A.    *The Entry Into the Purchase Agreement is Within the Sound Business Judgment of AHM Corp. and the Transactions Provided Therein Should be Approved*

12.    Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In pertinent part, Bankruptcy Rule 6004 states that, "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1).  With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that,

> . . . the notice of a proposed use, sale or lease of property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections. The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

Fed. R. Bankr. P. 2002(c)(1).

13.    To approve the use, sale, or lease of property outside the ordinary course of business, this Court must find "some articulated business justification" for the proposed action. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 145-47 (3d Cir. 1986)

(implicitly adopting the "articulated business justification" and good faith tests of <u>Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1070 (2d Cir. 1983)); <u>see</u> <u>also</u> <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in <u>Abbotts Dairies</u>); <u>Titusville Country Club v. PennBank (In re Titusville Country Club)</u>, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); <u>In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.</u>, 77 B.R. 15, 19 (Bankr. E.D. Pa. 1987).

       B.     *Legal Standard for Approval of Private Sale*

       14.    Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. See <u>Lionel</u>, 722 F.2d at 1071 (setting forth the "sound business purpose" test); <u>Abbotts Dairies</u>, 788 F.2d at 145-57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); <u>Delaware & Hudson Ry.</u>, 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

       15.    This fundamental analysis does not change if the proposed sale is private, rather than public. See, e.g., <u>In re Ancor Exploration Co.</u>, 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b).").

The bankruptcy court "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); accord, In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). Here, the Sale to the Purchaser, pursuant to the terms of the Purchase Agreement, meets these requirements and should be approved.

     i.     Proceeding by Private Sale Reflects an Exercise of the Debtors' Business Judgment

16.     There is more than ample business justification to sell the Property through a private sale rather than conducting a public sale. The Debtors submit that an order granting the relief requested herein is a matter within the discretion of the Court and would be consistent with the provisions of the Bankruptcy Code. See 11 U.S.C. § 105(a). As discussed above, the Debtors, through CBRE, have been marketing the Property for a significant period of time. However, the real estate market is plagued with a surplus of property and lacks willing buyers. As a result, and despite CBRE's efforts, only a limited number of parties have expressed interest in purchasing the Property. As a result of the foregoing and the fact that the consideration provided by the Purchaser is fair and reasonable, the Debtors' estates and creditors benefit from the approval of the Sale without the added costs associated with a public auction, at which the Debtors would not be guaranteed the commitment of the Purchaser to purchase the Property.

     ii.     The Purchase Price is Fair and Reasonable

17.     After analyzing the Purchaser's offer and negotiating for better terms and conditions, the Debtors have concluded that the Sale will maximize the value of the Debtors' estates. As explained above, the Debtors marketed the Property in an appropriate and cost effective manner given the circumstances of these cases and the condition of the real estate

DB02:7968452.4                                                                                                    066585.1001

market. In light of the marketing efforts, nature of the assets and circumstances of these cases, the Debtors believe that the Sale provides fair and reasonable value for the Property.

      iii.    <u>The Sale Was Proposed in Good Faith</u>

    18.    The Sale has been proposed in good faith as the Purchase Agreement is the product of good faith, arm's length negotiations between AHM Corp., on the one hand, and the Purchaser, on the other, and was negotiated with the active involvement of the Debtors' management and professional advisors. The Debtors believe that sale of the Property to the Purchaser, pursuant to the terms and conditions of the Purchase Agreement, is not the product of collusion or bad faith. No evidence exists to suggest that the Purchase Agreement is anything but the product of arm's length negotiations between AHM Corp., the Purchaser and their respective professional advisors. The Purchaser does not share common ownership with any of the Debtors, and is independently controlled and operated, and is not otherwise affiliated with the Debtors or their officers and directors.

      iv.    <u>Adequate and Reasonable Notice of the Sale Will Be Provided</u>

    19.    The Debtors will provide adequate notice of the Motion, as required by the applicable procedural rules. <u>See</u> Fed. R. Bankr. P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); <u>see also</u> <u>Delaware & Hudson Ry.</u>, 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

    20.    To summarize, in the Debtors' informed business judgment there is very little, if anything, to be gained by conducting a formal auction for the Property because the delay, uncertainty and added administrative expenses attendant to the auction process would be

unfavorable to the Debtors, their estates and creditors. For these reasons, the Court should not force the Debtors to conduct a public sale or to establish bidding procedures, but instead should approve the Sale as a private sale of the Property to the Purchaser.

## III.    The Sale Should Be Approved Under 11 U.S.C. §§ 363(m) and 363(f)

### A.    The Sale is Proposed in Good Faith Within the Meaning of 11 U.S.C. §363(m)

21.    Here, the Sale is being proposed in good faith. There is no evidence of fraud or collusion. To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the hearing, the Purchase Agreement is the culmination of a solicitation and negotiation process. All negotiations have been conducted on an arm's length, good faith basis. Under the circumstances, the Purchaser should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. See generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.), No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y.) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also generally In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978))).

### B.    The Sale Should be Free and Clear of Liens, Claims, and Interests (Except as Set Forth Herein)

22.    In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim,

11

or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property

is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of

a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a

legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. §

363(f); see In re Elliot, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved

provided the requirements of at least one subsection are met).

        23.      Considering that any objections to this Motion must be resolved by

consent of the objecting party or by the Court, the Debtors expect that they can satisfy at least the

second and fifth subsections of section 363(f) of the Bankruptcy Code.  Furthermore, courts have

held that they have the equitable power to authorize sales free and clear of interests that are not

specifically covered by section 363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL

1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); Volvo White Truck Corp. v. Chambersburg

Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

Accordingly, the Debtors request that the Sale pursuant to the Purchase Agreement be approved

"free and clear," with any liens, claims, encumbrances, and interests to attach to proceeds of the

Sale.

**IV.     Assumption and Assignment of the Leases Should Be Approved Under Section 365
        of the Bankruptcy Code**

        24.      Section 365(a) of the Code provides, in pertinent part, that a trustee,

subject to the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor.  11 U.S.C. § 365(a).  Courts have uniformly deferred to the business judgment of a

debtor to determine whether the assumption of an unexpired lease would be beneficial to the

estate and is therefore appropriate under section 365(a) of the Code.  See Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir 1993); In re

Taylor, 913 F.2d 102 (3d Cir. 1990).  "More exacting scrutiny would slow the administration of

the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for

private control of administration of the estate, and threaten the court's ability to control a case

impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

The Bankruptcy Code further authorizes the debtor-in-possession to assign an assumed

executory contract or unexpired lease to a third party, provided that any default under such

contract or lease is cured and adequate assurance of future performance is provided.  See

11 U.S.C. § 365(f).

  25. The meaning of "adequate assurance of future performance" depends on

the facts and circumstances of each case, but should be given "practical, pragmatic construction."

See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr.

D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate

assurance of future performance present when the prospective assignee of a lease from the

debtors has the financial resources and has expressed a willingness to devote sufficient funding

to the business in order to give it a strong likelihood of succeeding; "chief determinant of

adequate assurance of future performance is whether rent will be paid").

  26. The Debtors believe that the assumption and assignment of the Leases is

an exercise of their sound business judgment.  The Debtors have carefully considered the

economic terms of the Leases and have determined that they hold no material economic value to

the Debtors or their estates given that the Debtors no longer have business operations and are

liquidating their assets in order to maximize distributions to the claimants under the Plan.  As the

    

assignment of the Leases is an important aspect of the Sale, by assuming and assigning the

Leases and selling the other Property, the Debtors will realize sale proceeds in the amount of

$1,315,000.00, eliminate their obligations, if any, to perform under the Leases, and avoid the

accrual of any administrative obligations or potential liability under the Leases, thereby

providing a material benefit to these estates. Moreover, the assumption and assignment of the

Leases, as opposed to rejection, will also allow the Debtors and their estates to avoid a rejection

damages claim.

27.     The non-Debtor parties to the Leases will be served with this Motion and

will have an opportunity to object to the assumption and assignment of the Leases and the

proposed cure amounts. The proposed cure amounts for the Leases are identified on Exhibit B

annexed hereto (the "Cure Amounts"). Subject to and in accordance with the Purchase

Agreement, the Sellers are responsible for satisfying the Cure Amounts upon the closing of the

Sale. The Debtors submit that the Purchaser will demonstrate adequate assurance of future

performance under the Leases at or before the hearing on the Sale.

28.     For the reasons stated above, the assumption and assignment of the Leases

is in the best interests of the Debtors' estates and should be authorized by this Court.

## V.    Authorizing the Exemption of the Sale from Stamp and Similar Taxes is Appropriate

29.     Under section 1146(a) of the Bankruptcy Code, the "transfer. . . or the

making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this

title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a).

In Florida Department of Revenue v. Piccadilly Cafeterias, Inc., the Supreme Court concluded

that section 1146(a) of the Bankruptcy Code is to be interpreted as setting forth a simple, bright-

line rule: "'If a debtor is able to develop a Chapter 11 reorganization and obtain confirmation,

14

then the debtor is to be afforded relief from certain taxation to facilitate the implementation of the reorganization plan.'" 128 S. Ct. 2326 (U.S. 2008) (quoting <u>NVR Homes, Inc. v. Clerks of the Circuit Courts (In re NVR, L.P.)</u>, 189 F.3d 442, 458 (4th Cir. Va. 1999). Here, the Debtors, without question, clearly satisfy this bright-line rule. This Court has confirmed the Plan, which contemplates the liquidation of all of the Debtors' assets and the distribution of the proceeds realized to claimants as provided in the Plan. The Sale is being proposed and will close post-confirmation with this Court's approval. Therefore, the Sale is precisely the type of transfer for which section 1146(a) of the Bankruptcy Code applies. Accordingly, the Sale should be approved free and clear of stamp and similar taxes.

## VI.    Relief from the Ten-Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

30.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Order approving the Sale be effective immediately upon its entry by providing that the ten (10) day stay under Bankruptcy Rules 6004(h) and 6006(d) are waived.

31.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) are to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, at least one leading commentator suggests that the ten (10) day stay period should be eliminated to allow a sale or

15

other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6004.10 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

32.    Since a prompt closing of the Sale is of critical importance to the Debtors' efforts to maximize the value of their estates and to minimize costs, the Debtors request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

33.    Notice of this Motion will be provided to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) the non-Debtor parties to the Leases; (iv) the known parties that assert a lien in the Property; (v) counsel for the Purchaser; and (vi) all parties entitled to notice under Del. Bankr. L.R. 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

DB02:7968452.4

066585.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the proposed order, substantially in the form attached hereto as Exhibit C, (i) authorizing the Sale; (ii) approving the terms of the Purchase Agreement; (iii) authorizing the assumption and assignment of and transfer of the Leases; (iv) authorizing the exemption of the Sale from stamp and similar taxes; and (v) granting such other and further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
       April 30, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel for Debtors and Debtors in Possession*

17

066585.1001

## EXHIBIT A

**Purchase Agreement**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made effective this 17th day of April, 2009 (the "**Effective Date**"), by and among **NORTH STAR TRUST COMPANY**, an Illinois corporation, as successor-trustee to **PARK NATIONAL BANK AND TRUST COMPANY OF CHICAGO**, under Trust Agreement dated December 20, 1993 (known as Trust Number 10129) ("**Legal Owner**"), and **AMERICAN HOME MORTGAGE CORP.** ("**Beneficiary**"), a New York Corporation, and **THE EQUITABLE FUNDS LLC** ("**Purchaser**"), a Delaware limited liability company, or its permitted assignee. Legal Owner and Beneficiary are sometimes hereinafter referred to collectively as the "**Sellers**".

## RECITALS

WHEREAS, Legal Owner is the legal owner in fee simple of that certain piece and parcel of land situate and lying in the Village of Mount Prospect, Cook County, State of Illinois, commonly known as 950 North Elmhurst Road and 150 West Rand Road, having a tax parcel number of 03-27-307-024-0000, and more particularly described in **Exhibit A** attached hereto and made a part hereof (the "**Real Property**"); and

WHEREAS, Beneficiary is the beneficiary under that that certain Trust Agreement dated December 20, 1993 (known as Trust Number 10129), as amended and assigned (collectively, the "**Trust Agreement**"); and

WHEREAS, Sellers desire to sell the Property and Purchaser desires to purchase the Property, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated by reference herein, and the mutual promises herein contained and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged by each party hereto, the parties agree as follows:

1    Property. Subject to the terms, covenants and conditions contained in this Agreement, Sellers do hereby bargain and sell unto Purchaser and Purchaser does hereby purchase from Sellers all of Sellers' right, title and interest in and to the following described property (hereinafter collectively referred to as the "**Property**"):

      (a)    the Real Property;

      (b)    all easements, if any, benefiting the Real Property or the improvements located thereon;

      (c)    all rights and appurtenances pertaining to the Real Property, including any right, title and interest of Sellers in and to adjacent streets, alleys or rights-of-way pertaining to the Real Property;

(d)     all of the structures, parking areas, landscaping, buildings and improvements, if any, situated on the Real Property (collectively, the "**Improvements**");

(e)     Beneficiary's interest as landlord in and to all leases, occupancy and rental agreements of space on or in the Real Property and Improvements, including those related to the tenancies listed on **Exhibit B** attached hereto and made a part hereof, and any leases entered into after the Effective Date with the consent of Purchaser, which consent may be granted or not granted by Purchaser in it's sole discretion; provided that, notwithstanding the foregoing, Purchaser shall not unreasonably withhold, condition or delay its consent to any lease entered into after the Effective Date if such lease can be terminated by the lessor of such lease on no more than sixty (60) days notice (referred to individually as a "**Lease**" and collectively as the "Leases"), and tenant security deposits for which Seller has liability to tenants under the Leases;

(f)     all appliances, fixtures, equipment, machinery, furniture, carpet, drapes and other personal property owned by Beneficiary and currently located on or about the Real Property and Improvements, excluding only those items listed on **Exhibit C**, attached hereto and made a part hereof, together with all additions thereto between the Effective Date and the Closing Date (the "**Tangible Personal Property**"); and

(g)     reserved

(h)     all (i) certificates, permits, licenses, authorizations and approvals in any way belonging or relating to the Property or the Tangible Personal Property or the ownership, operation or occupancy thereof (the "**Permits**"), expressly excepting and excluding any and all such Permits used in connection with or related to the Sellers' business or operations in any manner whatsoever, and (ii) right, title and interest of Sellers in and to all drawings, plans, specifications, guarantees and warranties (the "**Plans**") covering the Property, expressly excepting and excluding any and all such Plans used in connection with or related to the Sellers' business or operations in any manner whatsoever (the Permits and Plans are hereinafter collectively referred to as the "**Intangible Property**").

2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Property shall not include (i) those items expressly excluded pursuant to the provisions of Section 1 above; (ii) all cash and cash equivalents other than pro-rated rent and common area charges under any Lease, if any, for periods subsequent to Closing; (iii) any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business; (iv) all claims, cross claims, and causes of action of Seller, including, without limitation, all claims and causes of action arising under Sections 542-553 of the United States Bankruptcy Code; (v) subject to Section 13 of this Agreement, all insurance policies and other rights to indemnification of Seller by any third party; (vi) all insurance, utility and tax deposits or refunds owing to Seller; (vii) Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof; (viii) any Lease which is not assigned to, or assumed by, Purchaser at the Closing; and (ix) any other asset, tangible or intangible, which is not acquired by Purchaser at the Closing (collectively, the "**Excluded**

Assets").

3 <u>Purchase Price and Payment.</u>  The purchase price (the "**Purchase Price**") for the Property shall be One Million Three Hundred Fifteen Thousand and 00/100 Dollars ($1,315,000.00).  The Purchase Price shall be payable by Purchaser to Beneficiary as follows:

(a) <u>Initial Deposit.</u>  Upon the execution and delivery of this Agreement by both Sellers and Purchaser, an initial deposit of Fifty Thousand and 00/100 Dollars ($50,000.00) (the "**Initial Deposit**") shall be remitted by Purchaser to Chicago Title Insurance Company attn: Robert J Karsa, as escrow agent ("**Escrow Agent**"), to be held by Escrow Agent in escrow in a federally insured sole order (until such time as the later to occur of the Study Period (as hereinafter defined) having ended and Bankruptcy Court Approval (as hereinafter defined) having been obtained, at which time the escrow shall become joint order) non-interest bearing escrow account pursuant to the escrow instructions (the "**Escrow Instructions**") contained in **Exhibit J**, attached hereto and made a part hereof.

(b) In the event Purchaser does not terminate this Agreement prior to the expiration of the Study Period (as defined in Section 6(b) hereof) in accordance with the terms of this Agreement, then, within one (1) business day of the expiration of the Study Period, an additional deposit of Fifty Thousand and 00/100 Dollars ($50,000.00) (the "**Additional Deposit**") shall be remitted by Purchaser to Escrow Agent, to be held by Escrow Agent in escrow in a federally insured joint order interest bearing escrow account pursuant to the Escrow Instructions.

(c) Purchaser simultaneously with the execution of this Agreement shall provide Escrow Agent with Purchaser's Federal Tax Identification number for use by Escrow Agent in establishing the escrow account and any interest thereon shall be reported as income by Purchaser on its tax returns. The Initial Deposit and the Additional Deposit (herein referred to collectively as the "**Deposit**") shall be applied toward the Purchase Price at Closing or distributed as otherwise provided in this Agreement.  In the event Purchaser does not terminate this Agreement prior to the expiration of the Study Period in accordance with the terms of this Agreement, the Deposit shall be and become non-refundable to Purchaser, except in the event that (i) settlement under this Agreement does not occur due to Sellers' uncured default under this Agreement or (ii) this Agreement is terminated in accordance with Sections 6(c), 9(a), 13(b) or 13(c) of this Agreement. Notwithstanding anything contained in this Agreement to the contrary, in the event that settlement under this Agreement does not occur for any reason whatsoever, other than Sellers' uncured default under this Agreement, and this Agreement is not terminated in accordance with Sections 6(c), 9(a), 13(b) or 13(c) of this Agreement, then Escrow Agent shall pay the Deposit and all interest earned thereon to Beneficiary within one (1) business day of receipt by Escrow Agent of written notice from Beneficiary that settlement under this Agreement has not occurred and this Agreement has not been terminated, as aforesaid, without the need for any further action or authorization from Purchaser.

(d) <u>Remainder of Purchase Price.</u>  The remainder of the Purchase Price, less the Deposit and subject to any adjustments contained in this Agreement, shall be payable in cash, certified check, title company check or wire transfer at the time of Closing.

   4  Cure Claims, Assumption and Assignment, Adequate Assurance and Assumed Liabilities.

    (a) Cure Claims. With respect to each of the Leases assigned to Purchaser on the Closing Date, Sellers shall satisfy (or, with respect to any liability or obligation that cannot be rendered non-contingent and liquidated prior to the Closing Date, make effective provision reasonably satisfactory to Purchaser and the Bankruptcy Court for satisfaction from funds of Seller), on or before the Closing Date, all liabilities or obligations thereunder (i) accruing or arising prior to or on the Closing Date or (ii) arising from or relating to any act, event or occurrence on or prior to the Closing Date (including, without limitation, liability or obligation for breach, misfeasance, or under any other theory relating to Seller's conduct, performance or non-performance), including, without limitation, all amounts owing thereunder which are required to be paid pursuant to 11 U.S.C. § 365 in order to assume and assign the Leases to Purchaser, and to maintain any and all options thereunder to remain in force and effect (collectively, **"Cure Claims"**). The Leases shall be assigned to Purchaser, pursuant to the Bankruptcy Court Approval (as defined in Section 6(c) hereof), free and clear of all Cure Claims. Notwithstanding the foregoing, Sellers shall not be required to satisfy Cure Claims to the extent Cure Claims exceed $50,000 (the **"Maximum Cure Amount"**). In the event aggregate Cure Claims exceed the Maximum Cure Amount, (i) Purchaser may elect to pay any Cure Claims in excess of the Maximum Cure Amount, without reduction of the Purchase Price, in which case, Purchaser shall consummate the purchase of the Property in accordance with the terms of this Agreement; or (ii) if Purchaser does not elect to pay any Cure Claims in excess of the Maximum Cure Amount, Seller shall have the option, in its sole subjective and absolute discretion, to elect to pay the amount in excess of the Maximum Cure Amount, in which case, Purchaser shall consummate the purchase of the Property in accordance with the terms of this Agreement, or to terminate this Agreement. In the event the Seller terminates this Agreement in accordance with the terms of this Section 4, neither party hereto shall have any further obligations or liabilities hereunder to the other, except to the extent they survive hereunder by their own terms, and this Agreement shall become null and void and of no further force and effect, either at law or in equity.

    (b) Assumption and Assignment of Leases/Adequate Assurance of Future Performance. The assumption and assignment of the Leases pursuant to 11 U.S.C. § 365 are subject to the occurrence of the Closing and subject to Purchaser's ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Leases. If reasonably requested by Sellers to demonstrate the aforesaid adequate assurance of future performance, Purchaser shall provide financial information reasonably available to Purchaser that is required to demonstrate Purchaser's ability to assume, or to take an assignment of, the Leases. If reasonably requested by Sellers to demonstrate the aforesaid adequate assurance of future performance, Purchaser further agrees to appear before the Bankruptcy Court to provide testimonial evidence as to adequate assurance of future performance.

    (c) Assumed Liabilities. At Closing, Purchaser shall assume all obligations of the Sellers under the Leases that are assigned to, and assumed by, Purchaser on the Closing Date accruing or arising from and after the Closing Date. Purchaser shall not assume any liability or

obligation for Cure Claims.

     5    <u>Delivery of Certain Materials to Purchaser</u>.  Within five (5) days of the Effective Date, Beneficiary shall deliver to Purchaser the following (collectively, the "**Information Documents**"):

     (a)    Copies of the Title Commitment, together with a copy of each of the exceptions listed thereon, Survey and Phase I Assessment (as defined in Sections 7(a), 7(a) and 9 hereof, respectively); and

     (b)    Copies of all Leases and, including all amendments and modifications thereof.

     6    <u>Inspections; Study Period; Bankruptcy Court Approval Contingency</u>.

     (a)    <u>Inspections</u>.  Purchaser, its agents, servants, employees, engineers, invitees and/or designees, at their risk and expense, shall have the full right from and after the Effective Date: (i) to enter upon the Property at any reasonable time, and from time to time, for purposes of conducting studies, structural tests, termite inspections, investigations and the like (expressly excluding any and all environmental tests, studies, assessments or audits) with respect to the Property, any component thereof or any system contained therein and (ii) to review all of Beneficiary's books and records relating to Beneficiary's ownership, operation and maintenance of the Property.  Purchaser, its agents, servants, employees, engineers, invitees and/or designees may interview current occupants provided that Purchaser makes its best efforts to do so in a discrete manner.  If Purchaser enters the Property, Purchaser shall: (i) keep the Property free and clear of any and all liens or claims resulting therefrom; (ii) defend, indemnify and hold harmless each of the Sellers against and from any claim or liability imposed or sought to be imposed upon any one or more of the Sellers as a result of actions by Purchaser, its employees, agents, architects, engineers, contractors, subcontractors or any other Person under Purchaser's control or acting at the direction of Purchaser; (iii) agree not to damage or harm the Property; (iv) use its best efforts not to unreasonably interfere with the use and enjoyment of the Property by the tenants during such entry; and (v) immediately after such entry, restore the Property to substantially the same condition as existed prior to such entry.  This subsection shall survive the termination of this Agreement and the Closing and shall not be merged or extinguished by any settlement, closing, payment of the Purchase Price or by execution and delivery of any deed.

     (b)    <u>Study Period</u>.  For a period commencing on the date Purchaser receives the Information Documents (such date being hereinafter referred to as the "**Study Period Commencement Date**") and ending thirty (30) calendar days from the Study Period Commencement Date (such thirty (30) calendar day period being herein referred to as the "**Study Period**"), Purchaser shall have the right to terminate this Agreement by written notice to Beneficiary sent prior to the expiration of the Study Period, in its sole and absolute discretion, for any reason or no reason whatsoever.  In the event that Purchaser shall terminate this Agreement pursuant to the provisions of this subsection, the Deposit shall be promptly returned to Purchaser by Escrow Agent and no party hereto shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this

Agreement shall be and become null and void and of no further force and effect, either at law or in equity. The failure of Purchaser to send Beneficiary written notice of termination in accordance with the terms of this subsection prior to the expiration of the Study Period shall constitute a waiver by Purchaser of this contingency and Purchaser's right to terminate this Agreement in accordance with this subsection.

(c)    Bankruptcy Court Approval Contingency. Purchaser acknowledges that Beneficiary has filed for protection under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Court Protection**"). Purchaser's and Sellers' respective obligations to close the transactions contemplated by this Agreement at the Closing shall be subject to, and conditioned upon, the approval of this Agreement (the "**Bankruptcy Court Approval**") by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). On or before the date which is ten (10) days after the Study Period Commencement Date, Beneficiary shall file a private sale motion with the Bankruptcy Court seeking approval of this Agreement (as the Agreement may be modified in the reasonable discretion of Beneficiary) pursuant to 11 U.S.C. §§ 105, 363 and 365, and diligently pursue approval of such motion. If Beneficiary, after diligent efforts, is unable to obtain the Bankruptcy Court Approval on or before the date which is thirty-five (35) calendar days after the expiration of the Study Period (the "**Bankruptcy Court Approval Outside Date**"), then either Purchaser or Beneficiary may terminate this Agreement by written notice to the other parties hereto sent on or before the date which is five (5) calendar days after the Bankruptcy Court Approval Outside Date. In the event that either Purchaser or Beneficiary shall terminate this Agreement pursuant to the provisions of this subsection, the Deposit shall be promptly returned to Purchaser by Escrow Agent and no party hereto shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity.

(d)    Third Party Offers. Sellers agree not to accept an offer for the purchase of the Property from any other Person (as defined in Section 23(m) hereof) (the "**Third Party Offer**") unless the purchase price contained in the Third Party Offer exceeds the Purchase Price by at least ten percent (10%). In the event that Sellers accept the Third Party Offer and closing on the Property actually occurs in accordance with the terms of the Third Party Offer, Beneficiary agrees to pay to Purchaser a break up fee equal to Fifty Thousand and 00/100 Dollars ($50,000.00) from the proceeds actually received by Beneficiary in accordance with the terms of the Third Party Offer (the "**Break Up Fee**") and immediately return the Deposit to Purchaser. Purchaser shall also be entitled to payment of the Break Up Fee, as an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code, in the event the Closing does not occur; provided, however, if the Closing does not occur as a result of Purchaser's breach of this Agreement, the Break Up Fee shall not be paid to Purchaser. Upon payment to Purchaser of the Break Up Fee, no party hereto shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity. In the event that Sellers receives unsolicited further offers or a bid process is conducted, Purchaser shall have the right to make competing offers or tender bids and, in such event, Purchaser shall have the right to "credit bid" the Break Up Fee against such offers or bids; provided that, no such solicitation or bid process nor any competing offers or bids tendered by Purchaser or any other Person shall in anyway

release Purchaser from, or alter, modify, amend or otherwise change, Purchaser's duties, obligations and liabilities under this Agreement unless and until a Third Party Offer is accepted by Sellers and closing actually occurs in accordance with the terms of such Third Party Offer.

7     Title; Title Insurance; Survey.

(a)     Beneficiary shall seek a commitment (the "**Title Commitment**") from Chicago Title Insurance Company (the "Title Company") for an owner's title insurance policy on the Real Property in the amount of the Purchase Price, which owner's policy shall issue using the most recent Standard ALTA Policy form and at regular rates (the "Title Policy"). Beneficiary shall provide the Title Commitment, together with copies of the exceptions listed thereon, and a copy of the Plat of Survey for the Real Property dated August 25, 2008, and prepared by James M. Ellman Ltd. (Order No. 080825) (the "Survey") to Purchaser. Prior to the end of the Study Period, Sellers shall cause the Title Company to cause the Title Commitment to be supplemented or revised so as to contain a commitment by the Title Company to issue the Required Endorsements (as hereinafter defined), all such Required Endorsements to be issued at Purchaser's sole cost and expense. As used herein, the term "**Required Endorsements**" shall mean the following endorsements to the Title Commitment (to the extent they are available for issuance in Illinois) each of which shall be issued at Purchaser's sole cost and expense and in form and substance acceptable to Purchaser in its reasonable discretion: (i) an extended coverage endorsement over all general or pre-printed exceptions, (ii) an owner's comprehensive endorsement, (iii) a zoning endorsement (ALTA No. 3.1 (long form) covering, in addition to the usual matters therein, parking and loading docks and stands), (iv) a contiguity endorsement, (v) a survey endorsement, (vi) an access endorsement, (vii) a tax parcel endorsement, (viii) a creditors' rights endorsement, (ix) a utility facilities endorsement, (x) and such other endorsements as may be requested in writing by Purchaser prior to the expiration of the Study Period.

(b)     If the Title Commitment shows exceptions to title that Purchaser objects to (individually a "**Title Objection**" and collectively the "**Title Objections**") or if the Survey shows encroachments to the Real Property that Purchaser objects to or that the Improvements are not located within the boundary of the Real Property (individually a "**Survey Objection**" and collectively the "**Survey Objections**", any Survey Objection or Title Objection being referred to herein as an "**Unpermitted Exception**"), then Purchaser shall give Beneficiary written notice of any and all Unpermitted Exceptions (the "**Title/Survey Objection Notice**"), which Title/Survey Objection Notice shall contain a detailed description of all such Title Unpermitted Exceptions, on or before the date which is five (5) calendar days from receipt by Purchaser of the Title Commitment, together with copies of the exceptions listed thereon, and the Survey (the "**Title Review Date**"); provided, however, that all liens or encumbrances against the Property of a definite or ascertainable amount which may be removed by the payment of money including, without limitation, any mortgages, deeds of trust, or other debt security, attachment, judgment, liens for delinquent real estate taxes and mechanics' or materialmen's liens (collective, "**Monetary Liens**"), shall automatically, and without any requirement for Purchaser to provide notice thereof to Beneficiary, be deemed Unpermitted Exceptions and Sellers hereby covenant to remove all such Monetary Liens from title to the Property, or cause the Title Company to insure over such Monetary Liens on the Title Policy in a manner acceptable to Purchaser, prior to or at

Closing. Unless Beneficiary gives Purchaser written notice within five (5) calendar days from receipt of the Title/Survey Objection Notice (the "**Seller Response Period**") that Beneficiary will cure the Unpermitted Exceptions at or prior to Closing, Sellers shall not be obligated to cure, or liable for any such Unpermitted Exceptions. Any and all liens, encumbrances, restrictions, covenants, easements and other title matters contained in the Title Commitment or appearing on the Survey, including but not limited to, any and all Unpermitted Exceptions, that Beneficiary does not agree in writing to cure in accordance with the terms of this subsection shall be deemed to be and are herein referred to as the "**Permitted Exceptions**" (provided however, that, in any event, Sellers shall remain obligated to cause any Monetary Liens to be removed from title or insured over by the Title Company on the Title Policy in a manner acceptable to Purchaser prior to or at Closing).

(c)     At Closing, Legal Owner shall duly execute and deliver to Purchaser or Purchaser's permitted assignee the Deed (as defined in Section 14(a) hereof) for the Real Property. Title to the Property, as thereby conveyed to Purchaser, shall be good and merchantable, free and clear of all liens and encumbrances except for the Permitted Exceptions, Leases.

(d)     If Beneficiary fails to deliver the Title Commitment, together with copies of the exceptions listed thereon, and the Survey on or before the date which is forty-five (45) days after the Effective Date (the "**Title Commitment and Survey Delivery Date**"), then Purchaser's sole remedy shall be to terminate this Agreement, in which event the Deposit shall be promptly returned to Purchaser and no party shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity. The failure of Purchaser to send Beneficiary written notice of termination on or before the date which is three (3) calendar days after the Title Commitment and Survey Delivery Date shall constitute a waiver by Purchaser of its right to terminate this Agreement in accordance with the terms of this Subsection.

(e)     If required by the Title Company in order to issue the Title Policy, Sellers shall arrange to have the Survey updated to a date acceptable to the Title Company.

8     Disclaimers and Limitations. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, PURCHASER EXPRESSLY UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THE CONVEYANCE OF THE PROPERTY SHALL BE MADE BY SELLER TO PURCHASER ON AN "AS IS, WHERE IS" BASIS AND WITH ALL FAULTS, AND PURCHASER ACKNOWLEDGES THAT PURCHASER HAS AGREED TO BUY THE PROPERTY IN ITS PRESENT CONDITION AND THAT PURCHASER IS RELYING SOLELY ON ITS OWN EXAMINATION AND INSPECTIONS OF THE PROPERTY AND NOT ON ANY STATEMENTS OR REPRESENTATIONS MADE BY SELLERS OR ANY OF THEIR RESPECTIVE AGENTS OR REPRESENTATIVES. ADDITIONALLY, PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS OTHERWISE PROVIDED IN SECTION 10 (F) THROUGH (H) OF THIS AGREEMENT, SELLERS HAVE NOT AND DO NOT MAKE ANY WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION,

HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY OR ANY PORTION THEREOF, OR WITH RESPECT TO THE ECONOMICAL, FUNCTIONAL, ENVIRONMENTAL OR PHYSICAL CONDITION, OR ANY OTHER ASPECT, OF THE PROPERTY. EXCEPT AS OTHERWISE PROVIDED IN SECTION 10 (F) THROUGH (H) OF THIS AGREEMENT, EACH OF THE SELLERS HEREBY SPECIFICALLY DISCLAIM ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING: (i) THE NATURE AND CONDITION OF THE PROPERTY OR ANY PART THEREOF, INCLUDING, BUT NOT LIMITED TO, ITS WATER, SOIL, OR GEOLOGY OR THE SUITABILITY THEREOF FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT THEREON, OR ANY IMPROVEMENTS PURCHASER MAY ELECT TO CONSTRUCT THEREON, OR ANY INCOME TO BE DERIVED THEREFROM, OR ANY EXPENSES TO BE INCURRED WITH RESPECT THERETO, OR ANY OBLIGATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE SAME; (ii) THE PRESENCE OR ABSENCE OF ASBESTOS OR ANY HAZARDOUS SUBSTANCES (AS HEREINAFTER DEFINED) IN, AT, ON UNDER, ABOVE OR RELATED TO THE PROPERTY OR IN, AT, ON UNDER, ABOVE OR RELATED TO ANY PROPERTY ADJACENT TO OR ABUTTING THE PROPERTY; (iii) THE MANNER OF CONSTRUCTION OR CONDITION OR STATE OF REPAIR OR LACK OF REPAIR OF ALL OR ANY PORTION OF THE PROPERTY; (iv) THE COMPLIANCE OF THE PROPERTY OR THE OPERATION OF THE PROPERTY OR ANY PORTION THEREOF WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY; AND (v) THE NATURE OR EXTENT OF ANY EASEMENT, RESTRICTIVE COVENANT, RIGHT-OF-WAY, LEASE, SERVICE CONTRACT, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHER SIMILAR MATTER PERTAINING TO THE PROPERTY, OR ANY PORTION THEREOF. PURCHASER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES ANY AND ALL OBJECTIONS TO OR CLAIMS WITH RESPECT TO ANY AND ALL PHYSICAL CHARACTERISTICS AND ALL PAST OR EXISTING CONDITIONS OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY HAZARDOUS SUBSTANCES IN, AT, ON, UNDER, ABOVE OR RELATED TO THE PROPERTY. PURCHASER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, HEREBY RELEASES AND WAIVES ANY AND ALL CLAIMS, SUITS, ACTIONS, CAUSES OF ACTION, LIABILITIES, LOSSES, DAMAGES, RIGHTS OF CONTRIBUTION OR INDEMNIFICATION AND ALL COSTS AND EXPENSES IN CONNECTION THEREWITH, AGAINST ANY ONE OR MORE OF THE SELLERS AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES AND STOCKHOLDERS, WHICH PURCHASER HAS, MAY OR COULD HAVE, NOW OR HEREAFTER, AGAINST ANY ONE OR MORE OF THEM ARISING FROM OR IN CONNECTION WITH THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL CHARACTERISTICS AND CONDITIONS EXISTING IN, AT, ON UNDER, ABOVE OR RELATED TO THE PROPERTY (INCLUDING, WITHOUT LIMITATION, HAZARDOUS SUBSTANCES, AND THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES) AS AFORESAID, NOW OR HEREAFTER ARISING, WHETHER AT COMMON LAW OR BY FEDERAL, STATE, COUNTY OR MUNICIPAL LAW OR ORDINANCE, INCLUDING, WITHOUT LIMITATION, ANY

ENVIRONMENTAL LAWS (AS HEREINAFTER DEFINED), OR BY LAW OR IN EQUITY. **"HAZARDOUS SUBSTANCES"** ARE SUBSTANCES DEFINED AS A **"HAZARDOUS SUBSTANCE"** OR **"TOXIC SUBSTANCE"** IN ANY ONE OR MORE OF THE ENVIRONMENTAL LAWS.    THE **"ENVIRONMENTAL LAWS"** ARE THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, AS AMENDED, 42 U.S.C. 9601-9630; THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT, 42 U.S.C. 9601-9630; THE RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. 6901-6992; AND THE CLEAN AIR ACT, 42 U.S.C. 7401-7508; AS ANY OF THOSE STATUTES MAY BE AMENDED FROM TIME TO TIME; AND ANY OTHER APPLICABLE LAW OR REGULATION RELATING TO POLLUTION OR PROTECTION OF HUMAN HEALTH OR THE ENVIRONMENT, INCLUDING, BUT NOT LIMITED TO, ANY LAW OR REGULATION THAT REQUIRES OR RELATES TO: (I) ADVISING APPROPRIATE AUTHORITIES, EMPLOYEES, AND/OR THE PUBLIC OF INTENDED OR ACTUAL RELEASES OF POLLUTANTS OR HAZARDOUS SUBSTANCES OR MATERIALS, VIOLATIONS OF DISCHARGE LIMITS, OR OTHER PROHIBITIONS AND OF THE COMMENCEMENTS OF ACTIVITIES, SUCH AS RESOURCE EXTRACTION OR CONSTRUCTION, THAT COULD HAVE SIGNIFICANT IMPACT ON THE ENVIRONMENT; (II) PREVENTING OR REDUCING TO ACCEPTABLE LEVELS THE RELEASE OF POLLUTANTS OR HAZARDOUS SUBSTANCES OR MATERIALS INTO THE ENVIRONMENT; (III) REDUCING THE QUANTITIES, PREVENTING THE RELEASE, OR MINIMIZING THE HAZARDOUS CHARACTERISTICS OF WASTES THAT ARE GENERATED; (IV) ASSURING THAT PRODUCTS ARE DESIGNED, FORMULATED, PACKAGED, AND USED SO THAT THEY DO NOT PRESENT UNREASONABLE RISKS TO HUMAN HEALTH OR THE ENVIRONMENT WHEN USED OR DISPOSED OF; (V) PROTECTING RESOURCES, SPECIES, OR ECOLOGICAL AMENITIES; (VI) REDUCING TO ACCEPTABLE LEVELS THE RISKS INHERENT IN THE TRANSPORTATION OF HAZARDOUS SUBSTANCES, POLLUTANTS, OIL, OR OTHER POTENTIALLY HARMFUL SUBSTANCES; (VII) CLEANING UP POLLUTANTS THAT HAVE BEEN RELEASED, PREVENTING THE THREAT OF RELEASE, OR PAYING THE COSTS OF SUCH CLEAN-UP OR PREVENTION; OR (VIII) MAKING RESPONSIBLE PARTIES PAY PRIVATE PARTIES, OR GROUPS OF THEM, FOR DAMAGES DONE TO THEIR HEALTH OR THE ENVIRONMENT.

      9    <u>Phase I Environmental Site Assessment</u>. Beneficiary shall deliver to Purchaser a copy of the AAI Phase I Environmental Site Assessment for the Property dated December 29, 2008, and prepared by Carlson Environmental, Inc. (the **"Phase I Assessment"**).

      (a)    If Beneficiary fails to deliver the Phase I Assessment on or before the date which is five (5) days after the Effective Date (the **"Phase I Delivery Date"**), then Purchaser's sole remedy shall be to terminate this Agreement, in which event the Deposit shall be promptly returned to Purchaser and no party shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity. The failure of Purchaser to send Beneficiary written notice of termination on or before the

date which is three (3) calendar days after the Phase I Delivery Date shall constitute a waiver by Purchaser of its right to terminate this Agreement in accordance with the terms of this Section.

(b)  Except as provided in Section 9(c) of this Agreement, nothing contained herein shall authorize or permit the Purchaser to undertake or perform any environmental investigations, studies, audits or tests without the prior written approval of Beneficiary, which approval may be granted or not granted in Beneficiary's sole subjective and absolute discretions. Nothing contained in this Agreement or the Phase I Assessment shall obligate or require any one or more of the Sellers to perform any other environmental tests, inspections, evaluations, or audits. Except to the extent expressly authorized under this Section, Beneficiary shall retain sole and exclusive responsibility for and control over any and all testing, analysis, reporting and any other activities required under any Environmental Laws relating to any other inspections or audits or any condition revealed or disclosed in the Phase I Assessment or as otherwise deemed suitable or desirable by Beneficiary.  The parties obligations to maintain the Phase I Assessment in confidence are governed by Section 21 of this Agreement, captioned "Confidentiality".  In the event the Phase I Assessment discloses the presence on or under the Property of any Hazardous Substances in such quantities, levels, scope or degree for which remediation action is required under any applicable Environmental Laws (collectively, the "**Conditions**"), then, until Closing, Beneficiary shall retain sole and exclusive responsibility for and control over any and all testing, analysis, reporting and any other remediation activities required under the Environmental Laws relating to any and all such Conditions or as otherwise deemed suitable or desirable by Beneficiary prior to Closing; provided, however, that the parties expressly acknowledge and agree that Legal Owner, Beneficiary and Purchaser shall not be liable or responsible for any remediation action relating to the Conditions, including, but not limited to, the identification, reporting, removal, disposal or other affirmative action.

(c)  Purchaser's Addition Phase I.  During the Study Period, Purchaser, or its authorized representatives and agents, may, upon forty-eight (48) hours prior written notice to Beneficiary, at Purchaser's sole cost and risk, inspect and examine the environmental condition of the Property in a manner consistent with a Phase I environmental assessment or audit (the "**Purchaser's Phase I Audit**").  Notwithstanding anything contained herein to the contrary, nothing contained herein shall authorize or permit Purchaser to undertake or perform any invasive or intrusive environmental investigations, without the prior written consent and approval of Beneficiary which consent may be granted or withheld by Beneficiary for any reason or no reason whatsoever, in Beneficiary's sole subjective and absolute discretion.  The purpose of the Purchaser's Phase I Audit shall be to ascertain the absence of any environmental problems or impairments of the Property that would materially inhibit, restrict or otherwise impede the use of the Property as presently zoned.  Purchaser shall promptly deliver to Seller, at no cost to Purchaser, a copy of any Purchaser's Phase I Audit obtained with respect to the Property, together with copies of all surveys, engineering tests, inspections or other materials or documents generated by or for Purchaser in connection with the forgoing investigations, inspections and examinations conducted by Purchaser and its authorized representatives and agents (the "**Purchaser's Materials**").  Nothing contained in this Agreement or the Purchaser's Phase I Audit shall obligate or require any one or more of the Sellers to perform any other environmental tests, inspections, evaluations, or audits.  Except to the extent expressly authorized under this Section, Beneficiary shall retain sole and exclusive responsibility for and

control over any and all testing, analysis, reporting and any other activities required under any Environmental Laws relating to any other inspections or audits or any condition revealed or disclosed in the Purchaser's Phase I Audit or as otherwise deemed suitable or desirable by Beneficiary. The parties obligations to maintain the Purchaser's Phase I Audit in confidence are governed by Section 21 of this Agreement, captioned "Confidentiality". In the event the Purchaser's Phase I Audit discloses any Conditions, then, until Closing, Beneficiary shall retain sole and exclusive responsibility for and control over any and all testing, analysis, reporting and any other remediation activities required under the Environmental Laws relating to any and all such Conditions or as otherwise deemed suitable or desirable by Beneficiary prior to Closing; provided, however, that the parties expressly acknowledge and agree that Legal Owner, Beneficiary and Purchaser shall not be liable or responsible for any remediation action relating to the Conditions, including, but not limited to, the identification, reporting, removal, disposal or other affirmative action. In addition, Purchaser hereby agrees to indemnify and hold Sellers and their respective members, directors, officers, shareholders, subsidiaries, parent companies, affiliates, agents, servants, and employees harmless from, all claims for damage to person or property (including loss or interruption of business) resulting or arising from or out of the acts or omissions of Purchaser and its agents, servants, contractors and employees in connection with any of the activities contemplated hereunder. In case of any action or proceeding brought against Sellers or their respective members, directors, officers, shareholders, subsidiaries, parent companies, affiliates, agents, servants, and employees, by reason of any such claim, upon notice from Beneficiary, Purchaser covenants to defend such action or proceeding at its own expense by counsel of Beneficiary's own selection or counsel otherwise reasonably satisfactory to Beneficiary or shall pay Beneficiary's costs of defense, including reasonable attorney's fees. In addition, if Purchaser or any of its authorized representatives and agents enters the Property, Purchaser shall: (i) keep the Property free and clear of any and all liens or claims resulting therefrom; (ii) agree not to damage or harm the Property; (iii) use its best efforts not to unreasonably interfere with the use and enjoyment of the Property by the tenants during such entry; and (iv) immediately after such entry, restore the Property to substantially the same condition as existed prior to such entry. This Section 9(c) shall survive the termination of this Agreement and the Closing and shall not be merged or extinguished by any settlement, closing, payment of the Purchase Price or by execution and delivery of any deed.

      10     <u>Covenants, Representations and Warranties of Seller</u>. Sellers hereby represent and warrant that:

      (a)     Legal Owner has title to the Property.

      (b)     Sellers have full power, have received all necessary approvals, corporate or otherwise, expressly excepting the Bankruptcy Court Approval, and are duly authorized to enter into and perform this Agreement. Sellers have duly and validly executed this Agreement and, assuming execution and delivery of this Agreement by Purchaser and receipt of the Bankruptcy Court Approval, this Agreement is a legal, valid and binding obligation of Sellers enforceable against them in accordance with its terms.

      (c)     Section 1445 of the Internal Revenue Code provides that a purchaser of a U.S. real property interest must withhold tax if Legal Owner is a foreign person. In connection

therewith, Legal Owner warrants that withholding of tax is not required upon disposition of the U.S. real property interest being sold pursuant to this Agreement, and agrees to hold Purchaser harmless from any liability under Section 1445 or any interest or penalties imposed in connection therewith.

(d)     To the best of Seller's knowledge, all real estate management, maintenance, security and service contracts, to the extent such agreements are contracts (collectively, "**Service Contracts**") related to the Property are oral and shall be cancelled at or prior to the Closing and Beneficiary shall not enter into any new Service Contracts with respect to the Property which are not terminable on or before Closing.

(e)     Other than as set forth on **Exhibit B** attached hereto, to the best of Seller's knowledge, there are not now, and will not be at Closing, any leases, tenancies, licenses, concessions, franchises, options or rights of occupancy with respect to the Property or any portion thereof.  Beneficiary is the lessor under the Leases.  To the best of Seller's knowledge, the Leases are in full force and effect and have not been amended, modified, supplemented or restated except as set forth on **Exhibit B**.  To the best of Seller's knowledge, Beneficiary is not currently, and at Closing will not be, in default under any of the Leases.  To the best of Seller's knowledge, no tenant under any of the Leases is currently in default.

(f)     To the best of Seller's knowledge, Sellers have received no written notice of any condemnation proceeding threatened or contemplated by any governmental authority.

(g)     To the best of Seller's knowledge, Sellers are not in violation of any recorded restriction, condition or agreement affecting all or any portion of the Property, and, to the best of Seller's knowledge, no other party to any recorded restriction, condition or agreement affecting all or any portion of the Property is in violation thereof.

(h)     To the best of Seller's knowledge, Sellers have not received written notice of any violation of any zoning, building, health, safety, disability, environmental, pollution control, fire or other law, ordinance, directive or regulation with respect to the Property or any portion thereof.

As used in this Agreement, the phrase "to the best of Sellers' knowledge" or any variation thereof means the sole and actual knowledge, without independent investigation, of Kevin Nystrom, Chief Restructuring Officer.

11     <u>Covenants, Representations and Warranties of Purchaser</u>.  Purchaser hereby represents and warrants that:

(a)     Purchaser has full power, has received all necessary approvals, corporate or otherwise, expressly excepting the Bankruptcy Court Approval, and is duly authorized to enter into and perform this Agreement.  Purchaser has duly and validly executed this Agreement and, assuming execution and delivery of this Agreement by Seller and receipt of the Bankruptcy Court Approval, this Agreement is a legal, valid and binding obligation of Purchaser enforceable against it in accordance with its terms.

12    <u>Maintenance and Operation of Property Until Closing</u>.  Beneficiary agrees that, from the Effective Date to the date of Closing, it will, at its sole cost and expense: (i) operate the Property only in the ordinary and usual manner, (ii) keep the Property in as good of a condition and repair as exists as of the Effective Date, reasonable wear and tear and damages due to casualty excepted, (iii) not terminate, amend, modify, supplement or restate any Lease, (iv) not enter into (a) any new equipment leases, maintenance or building service, management, leasing, operating, reciprocal easement or other agreements relating to the ownership, maintenance or operation of the Property nor (b) any new leases, tenancies, licenses, concessions, franchises, options or rights of occupancy with respect to the Property or any portion thereof, or (v) maintain insurance on the Property in the amounts currently maintained by Beneficiary.

13    <u>Possession; Risk of Loss; Insurance, Condemnation</u>.

(a)    Possession of the Property shall be given to Purchaser as of the date of Closing, subject to the Permitted Exceptions, and Leases.

(b)    The Property is to be held at the risk of Beneficiary until legal title has passed.  If, prior to the time legal title has passed, all or a material part of the Property is destroyed or damaged by any casualty (unless caused by the intentional acts or gross negligence of Purchaser or its agents), Purchaser shall have the option of (i) completing the purchase, in which event all of the insurance proceeds, if any, paid to Beneficiary shall be credited on account of the Purchase Price for the benefit of Purchaser, and, to the extent not theretofore paid to Beneficiary, shall be payable to Purchaser (and Beneficiary shall assign all claims therefore to Purchaser and execute such documents as may be requested from time to enable Purchaser to receive sole payment of any such proceeds), or (ii) terminating this Agreement by sending written notice of such termination to Beneficiary on or before the date which is three (3) calendar days after Purchaser receives notice of any such casualty, in which event the Deposit shall be promptly returned to Purchaser by Escrow Agent and no party hereto shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity.  If, prior to Closing, less than a material part of the Property is destroyed or damaged by any casualty, Beneficiary, in the event of such damage by casualty, shall fully restore the Property to the condition existing prior to such occurrence and shall be entitled to any insurance proceeds and Closing shall be extended for such reasonable period of time as is necessary to allow Beneficiary to fully restore the Property as aforesaid. For purposes hereof, a material part of the Property shall be deemed to have been destroyed or damaged if the cost to repair or replace the same is in excess of twenty percent (20%) of the Purchase Price.  The failure of Purchaser to send Beneficiary written notice of termination in accordance with the terms of this subsection prior to the expiration of the aforesaid three (3) calendar day period shall constitute a waiver by Purchaser of this contingency and Purchaser's right to terminate this Agreement in accordance with this subsection.

(c)    If, prior to the time legal title has passed, all or any part of the Property is or becomes the subject of condemnation proceedings, Purchaser shall have the option of (i) completing the purchase, in which event all of the condemnation proceeds, if any, paid to Beneficiary shall be credited on account of the Purchase Price for the benefit of Purchaser, and, to

the extent not theretofore paid to Beneficiary, shall be payable to Purchaser (and Beneficiary shall assign all claims therefore to Purchaser and execute such documents as may be requested from time to enable Purchaser to receive sole payment of any such proceeds), or (ii) terminating this Agreement by sending written notice of such termination to Beneficiary on or before the date which is three (3) calendar days after Purchaser receives notice of any such condemnation proceedings, in which event the Deposit shall be promptly returned to Purchaser by Escrow Agent and no party hereto shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity. The failure of Purchaser to send Beneficiary written notice of termination in accordance with the terms of this subsection prior to the expiration of the aforesaid three (3) calendar day period shall constitute a waiver by Purchaser of this contingency and Purchaser's right to terminate this Agreement in accordance with this subsection.

14    Sellers' Deliveries and Conditions Precedent to Purchaser's Obligations. The following documents shall be executed, if required, and delivered to Purchaser by Legal Owner or Beneficiary, as applicable, the delivery and execution of which shall be a condition to Purchaser's obligation to consummate the purchase of the Property.

(a)    Deed. Legal Owner shall execute and deliver a special warranty deed for the Real Property in the form of **Exhibit E**, attached hereto and made a part hereof (the "**Deed**").

(b)    Bill of Sale. Beneficiary shall execute and deliver a bill of sale for the Tangible Personal Property in the form of **Exhibit F**, attached hereto and made a part hereof (the "**Bill of Sale**").

(c)    Assignment and Assumption of Leases and Security Deposits. Beneficiary shall execute and deliver an assignment and assumption of the Leases in the form of **Exhibit G**, attached hereto and made a part hereof (the "**Lease Assignment**"), together with (i) the originals of the Leases (or, if such originals do not exist, copies of such Leases); (ii) all tenant security deposits for which Beneficiary has liability to tenants under the Leases; and (iii) a letter in the form of **Exhibit H**, attached hereto and made a part hereof (the "**Tenant Letter**"), advising all of the tenants and occupants in the Property of the sale of the Property to Purchaser.

(d)    reserved

(e)    Intangible Property Bill of Sale and Assignment and Assumption. Beneficiary shall execute and deliver a bill of sale and assignment and assumption of the Intangible Property in the form of **Exhibit K**, attached hereto and made a part hereof (the "**Intangible Property Bill of Sale and Assignment and Assumption**").

(f)    Sellers' duly executed closing statement.

(g)    To the extent in Beneficiary's possession, originals, or to the extent originals are not available, copies of the Intangible Property (which are in the possession of Sellers) or any part thereof which have not previously been delivered to Purchaser.

(h)    A certificate that Legal Owner is not a "foreign person" for the purposes of Section 1445 of the Internal Revenue Code of 1986, as amended, in a form complying with federal tax law.

(i)    All applicable state, county and municipal transfer declarations, and any other required governmental certificates, required to consummate the transaction contemplated hereby.

(j)    Keys.  Beneficiary shall deliver keys and security codes to the locks on any and all doors on the Property.

(k)    Additional Documents.  Sellers shall execute, if required, and deliver, such additional and customary documents as may be reasonably necessary to consummate the transaction contemplated by this Agreement and reasonably requested by the title company issuing the Title Policy to consummate the transactions described herein and to cause the title company to issue and deliver the Title Policy subject only to the Permitted Exceptions, Leases, and such other exceptions to which Purchaser consents in writing.

(l)    Title Policy.  Sellers shall cause the Title Company to issue the Title Policy to Purchaser, which Title Policy shall (i) insure Purchaser as having fee simple title to the Property, (ii) have an effective date which is the later to occur of (a) the Closing Date or (b) the date of recording of the Deed, (iii) be in a policy amount equal to the Purchaser Price, (iv) be subject to only the Permitted Exceptions, and (v) contain the Required Endorsements.

15    Purchaser's Deliveries and Conditions Precedent to Sellers' Obligations.  Purchaser shall execute, if applicable, and deliver to Beneficiary at the Closing all of the following, the delivery and execution of which shall be a condition to Seller's obligation to consummate the sale of the Property.

(a)    Purchase Price.  The Purchase Price.

(b)    Assignment and Assumption of Leases and Security Deposits.  The Purchaser's executed counterpart of the Lease Assignment.

(c)    reserved

(d)    Intangible Property Bill of Sale and Assignment and Assumption.  Purchaser's executed counterpart of the Intangible Property Bill of Sale and Assignment and Assumption.

(e)    Purchaser's duly executed closing statement.

(f)    All applicable state, county and municipal transfer declarations, and any other required governmental certificates.

(g)    Additional Documents.  Such additional and customary documents as may

be reasonably necessary to consummate the transaction contemplated by this Agreement and reasonably requested by Beneficiary or Beneficiary's attorney, or the title company issuing the Title Policy to consummate the transactions described herein and to cause the title company to issue and deliver the Title Policy subject only to the Permitted Exceptions, Leases, and such other exceptions to which Purchaser consents in writing.

16    Default.

(a)    Default by Purchaser.    In the event that all conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Agreement have been satisfied or waived and Purchaser is not entitled to terminate this Agreement under any provisions hereof, then in the event of default by Purchaser under this Agreement, Sellers' sole remedy shall be for Beneficiary to give Escrow Agent and Purchaser written notice of Purchaser's default, in which event Escrow Agent shall deliver the Deposit to Beneficiary as liquidated damages for Purchaser's default hereunder. It is expressly agreed that damages would be difficult or impossible to measure, and the parties have agreed that the Deposit is a fair estimation of the damages. The parties have further agreed that this is the sole and only remedy of Sellers against Purchaser in the event of Purchaser's default, and Sellers shall have no other remedy against Purchaser whatsoever, including any right to specific performance, injunction or damages beyond the forfeiture of the Deposit as liquidated damages. Upon delivery of the Deposit to Beneficiary, no party hereto shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity.

(b)    Default by Sellers.    In the event that all conditions precedent to Sellers' obligation to consummate the transactions contemplated by this Agreement have been satisfied or waived and neither of the Sellers are not entitled to terminate this Agreement under any provisions hereof, then in the event of default by any one or more of the Sellers under this Agreement, then Purchaser's sole and exclusive remedy shall be to either (a) terminate this Agreement upon written notice of such Seller's default to Beneficiary and Escrow Agent, in which case Escrow Agent shall deliver the Deposit to Purchaser or (b) sue for specific performance. Upon delivery of the Deposit to Purchaser, no party hereto shall have any further obligations or liabilities hereunder to any other party hereto, except to the extent they survive hereunder by their own terms, and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity.

(c)    Notice.    No party shall be deemed to be in default hereunder, unless and until, it shall have been sent notice of such default by the other party, and shall have failed to cure the default within five (5) calendar days of the date of such notice.

(d)    Limitation of Damages.    Notwithstanding anything to the contrary in this Agreement, under no circumstances shall any party hereto be entitled to receive or recover any damages (including consequential, special or punitive damages) as a result of any other party's uncured default hereunder expressly excepting the forfeiture of the Deposit as liquidated damages as contemplated by Section 16(a) above or the return of the Deposit or the right of Purchaser to seek specific performance as contemplated by Section 16(b) above.

17     <u>Closing</u>.  Closing shall occur on or before the date which is the <u>later</u> of: (a) eleven (11) calendar days after the date that the Bankruptcy Court Approval is obtained in accordance with Section 6(c) of this Agreement or (b) thirty (30) calendar days after the end of the Study Period (such action, the "**Closing**"), on a date and at a time mutually agreed upon by Purchaser and Beneficiary.  The transactions described herein shall be closed by mail through an escrow with the Title Company on the basis of a "New York-style" closing.  Seller shall provide any so-called "gap" undertaking required by the Title Company necessary for such "New York-style" closing to occur.

18     <u>Adjustments, Prorations and Closing Costs</u>.

(a)     Any taxes (other than real estate taxes), general or special, and all other public or governmental charges or assessments against the Property which are, or may be, payable on an annual basis (including Metropolitan District, Sanitary Commission or other benefit charges, assessments, liens or encumbrances for sewer, water, drainage or other public improvements, completed or commenced, on or prior to the date hereof, or subsequent thereto), shall be adjusted and apportioned as of the date of Closing and are to be assumed and paid thereafter by Purchaser, said adjustment apportionment to be on the basis of the fiscal year for which assessed, whether or not such assessments had been levied as of the date of Closing.  Real estate taxes not yet due and payable shall be prorated on the basis of one hundred ten (110%) percent of the amount of the most recently ascertainable tax bills for the Property, and there shall be no reproration.

(b)     All rental income from the Property shall be adjusted and apportioned as of the date of Closing and shall be the sole and exclusive property of Purchaser thereafter.  In the event that Purchaser collects any rent attributable to any period prior to Closing, Purchaser shall immediately pay that amount to Beneficiary, less any out of pocket expenses incurred by Purchaser in the collection of the foregoing amounts.  In the event that Beneficiary collects any rents attributable to any period after Closing, Beneficiary shall immediately pay that amount to Purchaser.  Purchaser agrees to use reasonable efforts to collect those amounts on Beneficiary's behalf provided that Purchaser shall not be required to file suit in order to collect such amounts.

(c)     All other charges, if any, and fees including real estate taxes and common area maintenance charges customarily pro-rated and adjusted in similar transactions shall be pro-rated at Closing and thereafter assumed by Purchaser.  In the event that accurate prorations and other adjustments cannot be made at Closing because current bills or statements are not obtainable, the parties shall pro-rate on the best available information, subject to adjustment upon receipt of the final bill or statement.

(d)     The parties shall equally divide all state and county transfer taxes.

(e)     Purchaser shall pay the entire cost of the premium for the Title Policy and all endorsements to the Title Policy and all municipal transfer taxes of the City of Mt. Prospect, Illinois.

(f)     The parties shall equally divide all costs and fees of Escrow Agent and the cost of recording the Deed.

(g)    Each party shall be responsible for the fees of its respective legal counsel.

The provisions of this Section shall survive termination of this Agreement or the Closing and shall not be merged or extinguished by any settlement, closing, payment of the Purchase Price or by execution and delivery of any deed.

19    Agency. Legal Owner, Beneficiary and Purchaser each warrant and represent to the other that it has not used the services of any real estate broker, agent or finder in connection with this Agreement, except Beneficiary acknowledges that it is responsible for and shall pay a fee to CB Richard Ellis in accordance with its agreement with CB Richard Ellis in connection with the sale of the Property. In reliance of these warranties and representations, each party agrees to indemnify and hold the other harmless against any claim by any real estate broker, agent or finder for a commission or fee arising by reason of the indemnifying party's breach of its representation and warranty. The provisions of this Section shall survive termination of this Agreement or the Closing and shall not be merged or extinguished by any settlement, closing, payment of the Purchase Price or by execution and delivery of any deed.

20    Exclusivity. From the date of this Agreement until the entry of the Sale Order (unless terminated earlier pursuant to the terms of this Agreement), neither the Legal Owner, the Beneficiary nor any of their respective officers, directors, employees, affiliates, or broker shall solicit the sale of the Property. Notwithstanding the foregoing, the Legal Owner, the Beneficiary and any of their respective officers, directors, employees, affiliates, or broker shall be permitted to (i) serve a copy of the motion to approve the Agreement in accordance with Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (ii) respond to any unsolicited offers for the sale of the Property, including, but not limited to, providing such parties with a copy of the due diligence materials provided to Purchaser, the Agreement, and the motion to approve this Agreement.

21    Notices. Any notice or demand under this Agreement shall be in writing and sent by (a) hand delivery, (b) registered or certified mail, return receipt requested, postage prepaid, (c) recognized overnight courier service such as Federal Express, or (d) legible facsimile (followed by hard copy sent concurrently with such facsimile in accordance with the preceding subsections (a), (b), or (c)) as follows:

|  |  |
|---|---|
| If to Sellers: | Zolfo Cooper<br>1166 Avenue of the Americas, 24th Floor,<br>New York, NY 10036<br>Attn: Scott Martinez<br>Facsimile No. 212-948-4226 |
| With a copy to: | John C. Kuffel, Esquire<br>Young Conaway Stargatt & Taylor, LLP<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Facsimile No. 302-576-3478 |

David Berliner
BDO Consulting
135 West 50th Street
New York, New York 10020
Wilmington, Delaware 19801
Facsimile No. 212-515-2599

Mark S. Indelicato, Esquire
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022
Facsimile No. 212-478-7400

If to Beneficiary:          Zolfo Cooper
                            1166 Avenue of the Americas, 24th Floor,
                            New York, NY 10036
                            Attn: Scott Martinez
                            Facsimile No. 212-948-4226

With a copy to:             John C. Kuffel, Esquire
                            Young Conaway Stargatt & Taylor, LLP
                            The Brandywine Building
                            1000 West Street, 17th Floor
                            Wilmington, Delaware 19801
                            Facsimile No. 302-576-3478

                            David Berliner
                            BDO Consulting
                            135 West 50th Street
                            New York, New York 10020
                            Wilmington, Delaware 19801
                            Facsimile No. 212-515-2599

                            Mark S. Indelicato, Esquire
                            Hahn & Hessen LLP
                            488 Madison Avenue
                            New York, NY 10022
                            Facsimile No. 212-478-7400

If to Purchaser:      The Equitable Funds LLC
350 West Hubbard Street, Suite 222
Chicago, IL 60654
Attn: Jonathan Berger
Facsimile No. 312-822-9122

With a copy to:      Sean W. Bezark, Esquire
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, Illinois 60601
Facsimile: (312) 456-8400

If to Escrow Agent:      Chicago Title Insurance Company
171 N. Clark Street, 3rd Floor
Chicago, IL 60601
Attn: Robert J Karsa
Facsimile No. 312-223-5888

Notice given by hand delivery shall be effective upon receipt (or refusal by the intended recipient to accept delivery). Notice given by registered or certified mail, return receipt requested, postage prepaid, or recognized overnight courier service such as Federal Express, shall be effective upon the date of deposit. Notice given by facsimile shall be effective upon the sending of such facsimile (subject to the requirement that hard copy be sent concurrently in accordance with this Section). Either party by notice to the other in accordance with the above, may designate a substitute address for such notice or demand and thereafter such substitute address shall be used for the giving of notice or demand.

      22    Confidentiality. Any and all information (whether written, oral, electronic or in any other medium) provided to or obtained by Purchaser through or from any one or more of the Sellers or any of their respective subsidiaries, affiliates, officers, directors, employees, contractors, agents, representatives or attorneys (for purposes of this Section only collectively the "**Sellers**") with respect to the Property shall be strictly confidential. Subject to all applicable laws, Purchaser covenants and agrees to keep all such information obtained or derived from its investigations, discussions, negotiations, meetings or other communications with Sellers strictly confidential and agrees that all such information shall be used solely by Purchaser, its agents, officers, directors, partners, consultants, engineers, representatives, lenders, prospective partners and lenders, employees, advisors, attorneys and accountants ("**authorized parties**") to the extent reasonably necessary to analyze and evaluate the feasibility and desirability of the purchase of the Property. Purchaser shall have the right to share information obtained during the Study Period and thereafter pursuant to and in accordance with the provisions of this Agreement with authorized parties for purposes of the evaluation of the transaction contemplated by this Agreement, provided such authorized parties agree to keep the information in confidence in accordance with this Section. Purchaser shall be permitted to copy, transcribe or otherwise duplicate any information (whether oral or written) regarding the Property or any part thereof, including leases, data, reports, books, records, interpretations or forecasts, or summaries,

analyses or excerpts thereof during the Study Period. Purchaser shall exercise reasonable care to prevent disclosure of any such information to any third party except authorized parties, and shall limit dissemination of such information to its employees and individuals employed by authorized parties, whose duties justify the need to know such information, and then only if there is a clear understanding by such individuals of their obligation to maintain the confidential status of such information and to restrict its use solely to the purposes set forth above. No other right or license to use proprietary or confidential information is granted to Purchaser or any authorized parties under this Agreement. Purchaser agrees to cease and desist from any and all objectionable use of such information immediately upon receipt of notice from Sellers and to indemnify and hold Sellers harmless from and against any and all liability, loss, cost and expenses, claims, suits, including reasonable attorney's fees, arising out of any material and substantive breach of this covenant of confidentiality. Notwithstanding the foregoing, information provided by Sellers shall not be deemed confidential to the extent that the information (i) contains any information previously known by Purchaser prior to the receipt of Sellers' information, (ii) contains information that is publicly available, (iii) contains information that is available to Purchaser from another source or is created by Purchaser without reliance on Sellers' information, or (iv) is required by law to be disclosed. In the event the Closing does not take place for any reason whatsoever, Purchaser shall, within three (3) calendar days of the termination of this Agreement, return to Beneficiary all instruments and materials delivered pursuant hereto and any and all copies thereof made by Purchaser, shall not use any of the information provided to it for any other purpose whatsoever, shall destroy any instruments, materials and information provided to Purchaser in electronic format, and shall certify under penalties of perjury to Seller and Beneficiary in writing that all such instruments, materials and information have been returned and/or destroyed as aforesaid. The provisions of this Section shall survive termination of this Agreement or the Closing and shall not be merged or extinguished by any settlement, closing, payment of the Purchase Price or by execution and delivery of any deed.

23   Miscellaneous.

(a)   This Agreement shall inure to the benefit of and be binding upon Sellers and Purchaser and their respective successors and assigns. Neither party hereto shall have the right to assign this Agreement to any Person, without the prior written consent of the other party hereto, which consent may be granted or not granted by such other party in such other party's sole subjective and absolute discretion; provided, however, Purchaser may assign all of its interest under this Agreement to an affiliate of Purchaser or an entity controlled by Purchaser without the consent of Sellers; provided, however, that no such assignment shall release Purchaser of or from any of its obligations, duties or liabilities contained in this Agreement, Purchaser remaining and being, at all times, primarily liable and obligated for any and all such obligations, duties, and liabilities.

(b)   This Agreement contains the final and entire agreement between the parties hereto and supersedes all prior oral representations, negotiations and agreements, including the letter of interest dated November 20, 2008, from Purchaser to Beneficiary, and neither the parties, nor their agents, shall be bound by any terms, conditions and representations not herein written. This Agreement may not be modified or changed orally, but only by agreement in writing signed by the party against whom enforcement of any such change is sought.

(c)     The interpretation, construction and performance of this Agreement shall be governed by Illinois law, the Property described in this Agreement being located in Illinois.

(d)     The titles of the sections and paragraphs are inserted as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the intent of any provision thereof.

(e)     This Agreement is the result of the combined draftsmanship and/or review of Sellers and Purchaser and/or their respective agents, accordingly, there shall be no presumption or interpretation of this Agreement based on its having been drafted by one or the other.

(f)     Each party shall reasonably cooperate with the other in connection with the satisfaction of any condition or obligation which must be satisfied by Closing pursuant to the terms of this Agreement, and in connection therewith each party agrees to execute any document contemplated by the terms of this Agreement, which may be reasonably requested by the other party.

(g)     This Agreement may be executed in one or more counterparts by facsimile signatures and/or original signatures. The signatures of the parties who sign different counterparts of this Agreement or any of the instruments executed to effectuate the purposes of this Agreement shall have the same effect as if those parties had signed the same counterparts of this Agreement or of any such instrument.

(h)     Time shall be of the essence of each and every provision of this Agreement.

(i)     Unless otherwise expressly stated in this Agreement, no party hereto shall be deemed to have waived the exercise of any right which it holds hereunder unless such waiver is made expressly and in writing (and no delay or omission by any party hereto in exercising any such right shall be deemed a waiver of its future exercise). No such waiver made as to any instance involving the exercise of any such right shall be deemed a waiver as to any other such instance, or any other such right.

(j)     No determination by any court, governmental or administrative entity or otherwise that any provision of this Agreement or any amendment hereof is invalid or unenforceable in any instance shall affect the validity or enforceability of (i) any other such provision or (ii) such provision in any circumstance not controlled by such determination. Each such provision shall be valid and enforceable to the fullest extent allowed by, and shall be construed wherever possible as being consistent with, applicable law.

(k)     The words "including", "include" or "includes" or words of similar import shall not, unless otherwise provided, be construed as words of limitation and shall be construed as words or phrases of illustration and not terms of limitation.

(l)     If any action is required to be performed, or if any notice, consent or other communication is given, on a day that is a Saturday or Sunday or a legal federal holiday, such performance shall be deemed to be required, and such notice, consent or other communication

shall be deemed to be given, on the first business day following such Saturday, Sunday or legal holiday.  Unless otherwise specified herein, all references herein to a **"day"** or **"days"** shall refer to calendar days and not business days.  The term **"business day"** means any day which is not a Saturday, Sunday, federal holiday or legal holiday in the States of Delaware or Illinois.

(m)    **"Person"** means any person, corporation, limited liability company, partnership, association, trust or other legal entity or any combination thereof.

(n)    Nothing in the provisions of this Agreement shall be deemed in any way to create between the parties hereto any relationship of partnership, joint venture or association, and the parties hereto hereby disclaim the existence of any such relationship.

(o)    To the extent in Beneficiary's possession and without incurring any additional costs or expense, Beneficiary will endeavor to deliver to Purchaser copies of all third party engineering or inspection reports concerning the Property, including environmental reports, copies of Permits and Plans, and copies of all tax bills covering the Property for the past three years (collectively, the **"Beneficiary's Deliverables"**); provided that, (1) failure of Beneficiary to deliver any one or more of the Beneficiary's Deliverables shall not be, or deemed to be, a default under this Agreement, (2) no dates, deadlines, timeframes or periods contained herein, including, but not limited to, the Study Period and the Closing Date, shall be extended, modified, changed or otherwise altered in an manner whatsoever as a result of Beneficiary's failure to deliver any one or more of the Beneficiary's Deliverables, and (3) Purchaser shall not have the right to sue for specific performance in connection with the delivery by Beneficiary of the Beneficiary's Deliverables.


End of text – signature page follows

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the day and year below shown.

Trustee's Exoneration Rider Attached Hereto And Made A Part Hereof

LEGAL OWNER:

NORTH STAR TRUST COMPANY, an Illinois corporation, as successor-trustee to PARK NATIONAL BANK AND TRUST COMPANY OF CHICAGO, under Trust Agreement dated December 20, 1993 (known as Trust Number 10129)

Attest: _Silvia Medina_
Trust Officer

By: _Jacquelin Eh_ (SEAL)
Name: Jacqueline Cana
Title: Vice-President
Date: 4-17-09

BENEFICIARY:

AMERICAN HOME MORTGAGE CORP.

By: _Bret W Fernandes_ (SEAL)
Name: Bret W Fernandes
Title: Director of Restructuring
Date: April 14, 2009

PURCHASER:

THE EQUITABLE FUNDS LLC

By: (SEAL)
Name: JONATHAN BERGER
Title: MANAGER
Date: April 13 2009

**Exhibit A**

Real Property Description

**Parcel 1:**

Lot 1 in Rand-Elmhurst subdivision, being a subdivision of part of the East ½ of the Southwest ¼ of Section 27, Township 42 North, range 11, East of the third principal meridian in the Village of Mt. Prospect, according to the plat thereof recorded December 18, 1968, as document 20707569, in Cook County, Illinois.

**Parcel 2:**

Easement for driveway purposes, ingress and egress and underground utilities for the benefit of Parcel 1 aforesaid, as created by the Deed from F. C. Brehm, as Trustee under Trust Agreement dated October 1, 1958 and known as Trust Number 580 to the Firestone Tire and Rubber Company, a corporation of Ohio, dated November 16, 1964 and recorded January 18, 1965, as document no. 19358929 over

The Southwest 10 feet as measured perpendicular to the Southwest line (except the Southeast 45 feet thereof) the Northwest 25 feet of the Southeast 45 feet as measured perpendicular to the Southeast line, and the West 25 feet of the East 45 feet lying West of the West line of Elmhurst Road (except the aforedescribed Southeast 45 feet thereof) of the following described tract of land: that part of the East ½ of the Southwest ¼ of Section 27, Township 42 North, range 11 East of the third principal meridian, described as follows: commencing at the intersection of the center line of Rand Road with the East line of said East ½ of the Southwest ¼ of Section 27, said point of intersection being 198.97 feet North of the South line of said Section 27: thence Northwesterly along the said center line of Rand Road, 439.93 feet; thence Northeasterly on a straight line that if extended would intersect the East line of the East ½ of the Southwest ¼ of said Section 27 at a distance of 439.93 feet North of the intersection of the said East line with the center line of Rand Road, for a distance of 170.23 feet to the point of beginning; thence Northwesterly at right angles to the last described course, a distance of 189.03 feet: thence Northeasterly at right angles to the last described course, a distance of 249.60 feet to the point on the aforesaid East line of the East ½ of the Southwest ¼ of Section 27: thence Southward along the said East line a distance of 205.00 feet to the point being 439.93 feet North of the intersection of the said East line with the center line of Rand Road: thence Southwesterly, a distance of 170.27 feet to the point of Beginning (excepting therefrom that part thereof heretofore dedicated for public highways), in Cook County, Illinois.

**Exhibit B**

Leases

1.      Office Lease dated August ___, 2007, by and between American Home Mortgage Corp., as landlord, and T.M.P. Investments, as tenant, as amended by that certain First Amendment to Office Lease dated July 31, 2008.

2.      Lease Agreement dated November 30, 2004, by and between American Home Mortgage Corp., as landlord, and Greg Hahaj Personal Training Center, Inc., as tenant.

3.      Lease Agreement dated November 30, 2004, by and between American Home Mortgage Corp., as landlord, and The Darkside Tanning Studio, Ltd., as tenant.

4.      Verbal month to month lease agreement with John Anda (Farmers Insurance Agency) for approximately 990 square feet.

## **Exhibit C**

Excluded Tangible Personal Property

Any and all appliances, fixtures, equipment, machinery, furniture, carpet, drapes and other personal property owned by any one or more of the tenants under any of the Leases

**Exhibit D**

reserved

**Exhibit E**

Form Deed

**SPECIAL WARRANTY DEED**
**Statutory (Illinois)**
**(Corporation to Individual)**

CAUTION: Consult a lawyer before using or acting under this form. *Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.*

**Above Space for Recorder's use only**

THIS AGREEMENT, made this _____ day of _____, 20_____, between

_____, a corporation created and existing under and by virtue of the laws of

the State of _____ and duly authorized to transact business in the State of _____, a

party of the first part, and _____

_____ (Name and Address of Grantee), party of the

second part, WITNESSETH, that the party of the first part, for and in consideration of

_____ Dollars and _____ in hand paid by

the party of the second part, the receipt whereof is hereby acknowledged, and pursuant to authority of the

Board of _____ of said corporation, by these presents does REMISE,

RELEASE, ALIEN and CONVEY unto the party of the second part, and to _____ heirs and assigns,

FOREVER, all the following described real estate, situated in the County of _____ and State of

Illinois known and described as follows, to wit:

   Together with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever, of the party of the first part, either in law or equity, of, in and to the above described premises, with the hereditaments and appurtenances: TO HAVE AND TO HOLD the said premises as above

described, with the appurtenances, unto the party of the second part, _____ heirs and assigns forever.

And the party of the first part, for itself, and its successors, does covenant, promise and agree, to and with the party of the second part, _____ heirs and assigns, that it has not done or suffered to be done, anything whereby the said premises hereby granted are, or may be, in any manner encumbered or charged, except as herein recited; and that the said premises, against all persons lawfully claiming, or to claim the same, by, through or under it, it WILL WARRANT AND DEFEND, subject to:

Permanent Real Estate Number(s): _____

Address(es) of real estate; _____

In Witness Whereof, said party of the first part has caused its corporate seal to be hereto affixed, and

has caused its name to be signed to these presents by its _____ President, and attested by its

_____ Secretary, this _____ day of _____, 20 _____.

|  |  |
|---|---|
| IMPRESS CORPORATE SEAL HERE | _____ (Name of Corporation) |
|  | _____ President |
|  | _____ Secretary |

State of Illinois, County of _____ ss. I, the undersigned, a Notary Public, in

and for the County and State aforesaid, DO HEREBY CERTIFY, that

IMPRESS NOTARIAL SEAL HERE   _____ personally known to me to be the

_____ president of the corporation, and _____

e to be the _____ Secretary of said corporation, and personally

known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared

before me this day in person and severally acknowledged that as such _____ President

_____ and Secretary, they signed and delivered the said instrument and caused the

corporate seal of said corporation to be affixed thereto, pursuant to authority given by the Board of

_____ of said corporation, as their free and voluntary act, and as the free and

voluntary act and deed of said corporation, for the uses and purposes therein set forth.

Given under my hand and official seal, this _____ day of

_____ 20 __ Commission expires _____ 20 __

_____

NOTARY PUBLIC

THIS INSTRUMENT PREPARED BY:

_____
(Name)

_____
(Address)

_____
(City, State and Zip)

DB02:7723312.8                         31                         066585.1001

MAIL TO:

_____

(Name)

_____

(Address)

_____

(City, State and Zip)

OR RECORDER'S OFFICE BOX NO. _____


SEND SUBSEQUENT TAX BILLS TO:

_____

(Name)

_____

(Address)

_____

(City, State and Zip)

**Exhibit F**

Bill of Sale

This Bill of Sale is made effective the _____ day of _____, 2009, by _____ ("**Seller**"), in favor of **THE EQUITABLE FUNDS LLC** ("**Purchaser**"), a Delaware limited liability company.

**WHEREAS,** Seller and Purchaser are parties to that certain Purchase and Sale Agreement dated _____, 2009 (the "**Purchase Agreement**"); and

**WHEREAS,** pursuant to the Purchase Agreement, Seller has agreed to grant, bargain, sell, assign, transfer, deliver and convey unto Purchaser all of Seller's right, title and interest in and to all of the Tangible Personal Property (as defined in the Purchase Agreement).

**NOW THEREFORE,** Seller hereby grants, bargains, sells, assigns, transfers, deliver and conveys to Purchaser all of Seller's right, title and interest in and to all of the Tangible Personal Property.

**TO HAVE AND TO HOLD** the same unto Purchaser, its successors and assigns, forever.

**IN WITNESS WHEREOF,** Seller intending to be legally bound hereby, has caused this Bill of Sale to be duly executed under seal the day and year first above written.

_____

By:_____
Name: _____
Title: _____

33

**Exhibit G**

Lease Assignment

## ASSIGNMENT AND ASSUMPTION OF LEASES

This Assignment and Assumption of Lease (this "**Assignment**") is made and entered into effective the _____ day of _____, 2009 (the "**Effective Date**"), by and between **AMERICAN HOME MORTGAGE CORP.** ("Assignor"), a New York Corporation, and **THE EQUITABLE FUNDS LLC** ("Assignee"), a Delaware limited liability company.

### RECITALS

WHEREAS, Assignor is the landlord under those certain leases related to the tenancies listed on **Exhibit A** attached hereto and made a part hereof (referred to individually as a "**Lease**" and collectively as the "**Leases**"); and

WHEREAS, copies of each Lease is attached hereto as **Exhibit B**; and

WHEREAS, Assignor desires to assign all of its rights, title, obligation and interest as landlord under the Leases to Assignee, and Assignee desires to accept such assignment and assume the Leases upon the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated by reference herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Assignor and Assignee agree as follows:

1.    As of the Effective Date, Assignor hereby assigns unto Assignee all of its rights, title, obligation and interest in and to and arising out of each Lease, including (i) all of Assignor's rights to the rents payable under the Leases for the period from and after the Effective Date, if any and (ii) all of Assignor's rights to the security deposits previously paid to Assignor pursuant to the Leases, if any, to the extent any such security deposits are in Assignor's possession or have not otherwise been used by Assignor in accordance with any such Lease.

2.    Assignee accepts the assignment of each Lease and Assignee hereby assumes and agrees to perform all agreements and obligations of Assignor under each Lease arising on and after the Effective Date.

3.    This Assignment may be modified only by an agreement in writing signed by the parties hereto. This Assignment shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns. This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois. This

Assignment may be executed in one or more counterparts by facsimile signatures and/or original signatures. The signatures of the parties who sign different counterparts of this Assignment or any of the instruments executed to effectuate the purposes of this Assignment shall have the same effect as if those parties had signed the same counterparts of this Assignment or of any such instrument.

IN WITNESS WHEREOF, the parties have caused this Assignment to be executed under seal the day and year first above written.

ASSIGNOR:

**AMERICAN HOME MORTGAGE CORP.**

By:_____
Name: _____
Title: _____
Date: _____

ASSIGNEE:

**THE EQUITABLE FUNDS LLC**

By:_____
Name: _____
Title: _____
Date: _____

DB02:7723312.8                                                                              066585.1001

**Exhibit A to Assignment and Assumption of Leases**

List of Leases

1.  Office Lease dated August ___, 2007, by and between American Home Mortgage Corp., as landlord, and T.M.P. Investments, as tenant, as amended by that certain First Amendment to Office Lease dated July 31, 2008.

2.  Lease Agreement dated November 30, 2004, by and between American Home Mortgage Corp., as landlord, and Greg Hahaj Personal Training Center, Inc., as tenant.

3.  Lease Agreement dated November 30, 2004, by and between American Home Mortgage Corp., as landlord, and The Darkside Tanning Studio, Ltd., as tenant.

4.  Verbal month to month lease agreement with John Anda (Farmers Insurance Agency) for approximately 990 square feet.

DB02:7723312.8                                                          066585.1001

**Exhibit B to Assignment and Assumption of Leases**

Copies of Leases Attached

066585.1001

**Exhibit H**

Tenant Letter

**[insert Purchaser's address]**

**[insert closing date]**

Dear_____:

As the former owner and the new owner of the property located in the Village of Mount Prospect, Cook County, State of Illinois, commonly known as 950 North Elmhurst Road and 150 West Rand Road (the "Property"), we are jointly pleased to inform you that as of [insert closing date], the Property has been acquired by **THE EQUITABLE FUNDS LLC.**

This change of ownership will not, however, affect your existing lease, which has been assigned to the new owner without any changes. The address for the new owner, **THE EQUITABLE FUNDS LLC,** will be _____.

In connection with this transfer of ownership, please be advised that your security deposit, if any, has been transferred and delivered as of [insert closing date] to the new owner, **THE EQUITABLE FUNDS LLC.** From now on, the new owner, **THE EQUITABLE FUNDS LLC** (and not the former owner) will be responsible for your security deposit.

Effective immediately, any rental payments now due and all future rental payments should be made to **THE EQUITABLE FUNDS LLC** at the foregoing address.

You should direct any inquiries you may have regarding rental payments or any other matters related to your lease or building operations, to the new owner, **THE EQUITABLE FUNDS LLC,** at the above address.

Sincerely,

New Owner:                                      Former Owner:

**THE EQUITABLE FUNDS LLC**          **AMERICAN HOME MORTGAGE CORP.**

By:_____     By: _____

_____._____         _____._____

**Exhibit I**
Reserved

066585.1001

**Exhibit J**

Earnest Money Escrow Instructions

## EARNEST MONEY ESCROW INSTRUCTIONS

These Earnest Money Escrow Instructions (these "**Instructions**") are entered into as of this _____ day of _____, 2009, by and among **AMERICAN HOME MORTGAGE CORP.** ("**Beneficiary**"), a New York Corporation, **PARK NATIONAL BANK AND TRUST COMPANY OF CHICAGO**, under Trust Agreement dated December 20, 1993 (known as Trust Number 10129) ("**Legal Owner**"), **THE EQUITABLE FUNDS LLC,** a Delaware limited liability company ("**Purchaser**"), and **CHICAGO TITLE INSURANCE COMPANY** ("**Escrowee**").    Beneficiary and Legal Owners are sometimes collectively referred to as "**Sellers**".

**WHEREAS,** Purchaser and Sellers entered into an Purchase and Sale Agreement, dated _____, 2009 (the "**Agreement**"), for the purchase and sale of the Property (as defined in the Agreement); and

**WHEREAS,** the parties desire to enter into escrow instructions with Escrowee pursuant to which Purchaser shall deposit earnest money, as required under the Agreement (the "**Escrow**").

**NOW THEREFORE,** in consideration of the mutual covenants contained in these Instructions, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Deposit</u>.

1.1      <u>Earnest Money</u>.   Pursuant to the terms and provisions of the Agreement, Purchaser has deposited (or shall deposit) with Escrowee earnest money in the sum of Fifty Thousand and No/100 Dollars ($50,000.00) to be increased to One Hundred Thousand and No/100 Dollars ($100,000.00) [the "Earnest Money"].

1.2      <u>Investment of Earnest Money</u>.   Escrowee shall deposit the Earnest Money in a segregated non-interest bearing account.

2.      <u>Application of Earnest Money at Closing and Upon Termination of Agreement</u>.

2.1      <u>At Closing</u>.   At Closing (as defined in the Agreement), the Earnest Money shall be delivered by Escrowee to Beneficiary and credited against the payment of the Purchase Price, whereupon the Escrow shall terminate.

2.2      <u>Upon Termination of the Agreement</u>.   Except as otherwise provided in **Section 3** below, in the event of any termination of the Agreement, the Earnest Money shall be distributed by Escrowee only pursuant to the sole written direction of Purchaser unless both of

066585.1001

the following have occurred: (i) the Study Period (as defined in the Agreement) has ended and (ii) Bankruptcy Court Approval (as defined in the Agreement) has been obtained in which case the Earnest Money shall be distributed by Escrowee only pursuant to the joint written direction of Purchaser and Beneficiary..

3.    Default.

3.1    Purchaser's Default.    Subject to Section 2(c) of the Agreement, in the event that Purchaser breaches or defaults under the obligations imposed on it under the Agreement, and Beneficiary desires to obtain the Earnest Money from Escrowee (pursuant to the terms of the Agreement), Beneficiary shall be required to present to Escrowee: Beneficiary's affidavit of default (the "Default Affidavit"), executed under penalty of perjury by an authorized representative of Beneficiary, certifying to Purchaser and Escrowee that Purchaser is in default under the Agreement and, therefore, Beneficiary is entitled to the Earnest Money proceeds. Upon receipt of the Default Affidavit from Beneficiary, Escrowee shall (i) deliver a copy of the Default Affidavit to Purchaser, in the manner as provided in **Section 5** below and (ii) if, within five (5) business days after the date on which the Default Affidavit is deemed to be delivered to Purchaser (pursuant to **Section 5** below), Escrowee has not received from Purchaser a notice ("Objection Notice") objecting to Escrowee's compliance with the Default Affidavit, Escrowee shall deliver the Earnest Money, together with all interest earned thereon, to Beneficiary. Notwithstanding anything contained in these Instructions or the Agreement to the contrary, in the event that settlement under the Agreement does not occur for any reason whatsoever, other than Beneficiary's uncured default under this Agreement, and the Agreement is not terminated in accordance with Sections 6(c), 9(a), 13(b) or 13(c) of the Agreement, then Escrow Agent shall pay the Deposit and all interest earned thereon to Beneficiary within one (1) business day of receipt by Escrow Agent of written notice from Beneficiary that settlement under the Agreement has not occurred and the Agreement has not been terminated, as aforesaid, without the need for any further action or authorization from Purchaser and Purchaser shall have no right to, and hereby waives all right to, object to any such payment by Escrow Agent to Beneficiary.

3.2    Sellers' Default.    In the event that any one or more of the Sellers breach or default under the obligations imposed on it under the Agreement, and Purchaser desires the return of the Earnest Money from Escrowee (pursuant to the terms of the Agreement), Purchaser shall be required to present to Escrowee: its own Default Affidavit executed under penalty of perjury by an authorized representative of Purchaser certifying to Sellers and Escrowee that Sellers are in default under the Agreement and, therefore, Purchaser is entitled to return of the Earnest Money proceeds. Upon receipt of the Default Affidavit from Purchaser, Escrowee shall (i) deliver a copy of the Default Affidavit to Beneficiary as provided in **Section 5** below, and (ii) if, within five (5) business days after the date on which the Default Affidavit is deemed to be delivered to Beneficiary (pursuant to **Section 5** below), Escrowee has not received from Beneficiary an Objection Notice, objecting to Escrowee's compliance with the Default Affidavit, Escrowee shall deliver the Earnest Money, together with all interest earned thereon, to Purchaser.

4.    Objection Notices.    If Escrowee receives an Objection Notice from Beneficiary or Purchaser within the time period set forth in **Section 3** above, then Escrowee shall refuse to comply with the Default Affidavit then in question ("**Objectionable Default Affidavit**") until Escrowee receives (a) joint written instructions executed by both Purchaser and Beneficiary, or (b) a final non-

appealable order with respect to the disposition of the Earnest Money from a federal or state court of competent jurisdiction ("**Court Order**"), in either of which events Escrowee shall then disburse the Earnest Money and all interest earned thereon, in accordance with such direction or Court Order, as the case may be. Notwithstanding the immediately preceding sentence, if the party that delivers the Objection Notice does not (i) commence litigation with respect to the Earnest Money by filing a complaint or action for a declaratory judgment in an appropriate court of competent jurisdiction ("**Litigation**"), and (ii) provide notice and a file-stamped copy of such complaint or action for declaratory judgment to Escrowee and the other party to these Instructions within thirty (30) days after delivery of the then-applicable Objection Notice, then Escrowee shall disburse the Earnest Money in accordance with the Objectionable Default Affidavit.

     5.    <u>Notices.</u>   Any notice or demand under this Agreement shall be in writing and sent by (a) hand delivery, (b) registered or certified mail, return receipt requested, postage prepaid, (c) recognized overnight courier service such as Federal Express, or (d) legible facsimile (followed by hard copy sent concurrently with such facsimile in accordance with the preceding subsections (a), (b), or (c)) as follows:

|  |  |
|---|---|
| If to Seller: | Zolfo Cooper<br>1166 Avenue of the Americas, 24th Floor,<br>New York, NY 10036<br>Attn: Scott Martinez<br>Facsimile No. 212-948-4226 |
| With a copy to: | John C. Kuffel, Esquire<br>Young Conaway Stargatt & Taylor, LLP<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Facsimile No. 302-576-3478 |
|  | David Berliner<br>BDO Consulting<br>135 West 50th Street<br>New York, New York 10020<br>Wilmington, Delaware 19801<br>Facsimile No. 212-515-2599 |
|  | Mark S. Indelicato, Esquire<br>Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, NY 10022<br>Facsimile No. 212-478-7400 |
| If to Beneficiary: | Zolfo Cooper<br>1166 Avenue of the Americas, 24th Floor,<br>New York, NY 10036<br>Attn: Scott Martinez |

Facsimile No. 212-948-4226

With a copy to:    John C. Kuffel, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Facsimile No. 302-576-3478

David Berliner
BDO Consulting
135 West 50th Street
New York, New York 10020
Wilmington, Delaware 19801
Facsimile No. 212-515-2599

Mark S. Indelicato, Esquire
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022
Facsimile No. 212-478-7400

If to Purchaser:    The Equitable Funds LLC
350 West Hubbard Street, Suite 222
Chicago, IL 60654
Attn: Jonathan Berger
Facsimile No. 312-822-9122

With a copy to:    Sean W. Bezark, Esquire
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, Illinois 60601
Facsimile: (312) 456-8400

If to Escrow Agent:    Chicago Title Insurance Company
171 N. Clark Street, 3rd Floor
Chicago, IL 60601
Attn: Robert J Karsa
Facsimile No. 312-223-5888

    Notice given by hand delivery shall be effective upon receipt (or refusal by the intended recipient to accept delivery). Notice given by registered or certified mail, return receipt requested, postage prepaid, or recognized overnight courier service such as Federal Express, shall be effective upon the date of deposit. Notice given by facsimile shall be effective upon the sending of such facsimile (subject to the requirement that hard copy be sent concurrently in

accordance with this Section). Either party by notice to the other in accordance with the above, may designate a substitute address for such notice or demand and thereafter such substitute address shall be used for the giving of notice or demand.

6.     <u>Escrowee Obligations.</u>   The parties agree that, except as otherwise expressly provided in **Section 4**, the actions of, and the relationship between, Purchaser and Sellers shall be governed by the terms of the Agreement. In all events and under all circumstances (except as otherwise expressly provided in **Section 4**), the ultimate rights and obligations of Sellers and Purchaser shall be strictly governed and controlled by the terms and provisions of the Agreement, rather than these Instructions. In the event of any conflict between the terms and provisions of the Agreement and these Instructions, the terms and provisions of the Agreement shall control in all events and circumstances except as otherwise expressly provided in **Section 4**. Notwithstanding the existence of the Agreement or any references herein to the Agreement, the parties agree that Escrowee (but not Sellers and Purchaser) shall be governed solely by the terms and provisions of these Instructions. The parties furthermore agree that, except as otherwise specifically provided in **Section 4** above, Escrowee is hereby expressly authorized to regard, comply with, and obey any and all orders, judgments or decrees entered or issued by any court, and, in case Escrowee obeys and complies with any such order, judgment or decree of any court, it shall not be liable to either of the parties hereto or to any other person, firm or corporation by reason of such compliance.

7.     Litigation.   In the event of litigation between the parties with respect to these Instructions, the performance of their respective obligations hereunder, or the effect of a termination under the Agreement or these Instructions, the losing party shall pay all costs and expenses incurred by the prevailing party in connection with such litigation, including, but not limited to, court costs and reasonable fees of counsel selected by the prevailing party. Notwithstanding any provision of the Agreement or these Instructions to the contrary, the obligations of the parties under this **Section 7** shall survive a termination of either or both of the Agreement and these Instructions.

8.     <u>Time of the Essence</u>. Time is of the essence of these Instructions. If any date herein set forth for the performance of any obligations by Sellers, Escrowee or Purchaser or for the delivery of any instrument or notice as herein provided should be on a Saturday, Sunday or legal holiday, the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or legal holiday.

DB02:7723312.8

066585.1001

Trustee's Exoneration Rider Attached Hereto And Made A Part Hereof

9.    _Counterparts._  These Instructions may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument.

**SELLERS:**

**NORTH STAR TRUST COMPANY**, an Illinois corporation, as successor-trustee to **PARK NATIONAL BANK AND TRUST COMPANY OF CHICAGO**, under Trust Agreement dated December 20, 1993 (known as Trust Number 10129)

By: _____
Name: _____Jacqueline Esna_____
Its: _____Vice-President_____

**Attest** _Selena Medina_
Trust Officer

**AMERICAN HOME MORTGAGE CORP.**

By: _____Bret W Fernandes_____
Name: ___Bret W Fernandes_____
Its: ___Director of Restructuring____

**PURCHASER:**

**THE EQUITABLE FUNDS LLC**

By: _____
Name: ____Jonathan Berger_____
Its: _____Manager_____

**ACCEPTED BY ESCROWEE:**

**CHICAGO TITLE INSURANCE COMPANY**

By: _____
Name: _____
Its: _____

45

DB02:7723312.0                                  066505.1001

EXHIBIT K

**INTANGIBLE PROPERTY BILL OF SALE AND ASSIGNMENT AND ASSUMPTION**

THIS ASSIGNMENT AND ASSUMPTION OF INTANGIBLE PROPERTY (*"Assignment"*) is made as of this _____ day of _____, 2009, by and between AMERICAN HOME MORTGAGE CORP., a New York Corporation (*"Assignor"*), and THE EQUITABLE FUNDS LLC, a Delaware limited liability company (*"Assignee"*).

WHEREAS, NORTH STAR TRUST COMPANY, an Illinois corporation, as successor-trustee to PARK NATIONAL BANK AND TRUST COMPANY OF CHICAGO, under Trust Agreement dated December 20, 1993 (known as Trust Number 10129) ("**Legal Owner**"), Assignor and Assignee have entered into that certain Purchase and Sale Agreement dated as of _____, 2009 (the *"Purchase Agreement"*). All terms used but not defined in this Assignment shall have the meanings ascribed to them in the Purchase Agreement.

WHEREAS, pursuant to the Purchase Agreement, Legal Owner is conveying to Assignee that certain real property located at 950 North Elmhurst Road and 150 West Rand Road, in the Village of Mount Prospect, Cook County, Illinois and more particularly described in the Purchase Agreement (the *"Real Property"*).

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to transfer, convey and assign to Assignee its rights in and to the Intangible Property.

NOW, THEREFORE, in consideration of the foregoing premises, the promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.    ASSIGNMENT AND ASSUMPTION INTANGIBLE PROPERTY

A.    Assignment and Assumption.    Assignor has granted, bargained, sold, conveyed, assigned, transferred, and set over, and by these presents does hereby grant, bargain, sell, convey, assign, transfer and set over, to Assignee, all of Assignor's rights, if any, in and to the Intangible Property, arising from and after the date hereof.  Assignee agrees to assume, and does hereby assume, all of the obligations of Assignor under the Intangible Property, arising from and after the date hereof.

2.    BINDING ON SUCCESSORS AND ASSIGNS

A.    Assignor.    All the covenants and agreements of Assignor herein contained shall apply to and bind Assignor and Assignor's executors, agents, administrators, representatives, heirs, invitees, successors and assigns.

B.    Assignee.    All the covenants and agreements of Assignee herein contained shall apply to and bind Assignee and Assignee's executors, agents, administrators, personal representatives, heirs, invitees, successors and assigns.

46

C.    <u>Use of Term</u>. The term "Assignee" as used in this Assignment shall mean and include Assignee's successors and assigns.

3.    MISCELLANEOUS

A.    <u>Counterparts</u>. This Assignment may be executed in one (1) or more counterparts, all of which together shall constitute a single agreement and each of which shall be an original for all purposes.

B.    <u>Governing Law</u>. This Assignment shall be governed by, interpreted under and construed and enforced in accordance with the laws of the state in which the Real Property is located.

[remainder of this page intentionally left blank; signature blocks contained on next page]

DB02:7723312.8    066585.1001

IN WITNESS WHEREOF, this Assignment has been executed by Assignee and Assignor as of the date first above written.

ASSIGNOR:

**AMERICAN HOME MORTGAGE CORP.**

By:_____

Name:_____

Title:_____

Date:_____

ASSIGNEE:

**THE EQUITABLE FUNDS LLC**

By:_____

Name:_____

Title:_____

Date:_____

DB02:7723312.8                                                          066585.1001

# EXHIBIT B

## Leases to be Assumed, Assigned and Transferred

DB02:7968452.4

066585.1001

| Counterparty | Counterparty Address | Type of Contract | Proposed Cure (in dollars) |
|---|---|---|---|
| T.M.P. Investments | 950 N. Elmhurst Road, Mt. Prospect, IL 60056 | Nonresidential Real Property Lease Agreement | 0.00 |
| Greg Hahaj Personal Training Center, Inc. | 150 W. Rand Road, Mt. Prospect, IL 60056 | Nonresidential Real Property Lease Agreement | 0.00 |
| The Darkside Tanning Studio, Ltd. | 150 W. Rand Road, Mt. Prospect, IL 60056 | Nonresidential Real Property Lease Agreement | 0.00 |
| John Anda (Farmers Insurance Group) | 950 N. Elmhurst Road, Mt. Prospect, IL 60056 | Nonresidential Real Property Lease Agreement | 0.00 |