1              IN THE UNITED STATES BANKRUPTCY COURT

2                  FOR THE DISTRICT OF DELAWARE

3   IN RE:                        :
                                  : Chapter 11
4   AMERICAN HOME MORTGAGE,       :
    HOLDINGS, INC., a Delaware    :
5   Corporation, et al.,          :
                                  : Case No. 07-11047(CSS)
6        Debtors.                 :
    . . . . . . . . . . . . . . . .

7
                          Wilmington, Delaware
8                         May 15, 2009
                          2:56 p.m.
9
                       TRANSCRIPT OF HEARING
10        BEFORE THE HONORABLE CHRISTOPHER J. SONTCHI
                 UNITED STATES BANKRUPTCY JUDGE
11
    APPEARANCES:
12
    For the Debtors:            Sean Beach, Esquire
13                              Nathan Grow, Esquire
                                Curtis Crowther, Esquire
14                              Margaret W. Greecher, Esquire
                                Young Conaway Stargatt & Taylor, LLP
15
    For The Bancorp, Inc:       Lawrence J. Kotler, Esquire
16                              Duane Morris, LLP

17  For American Home Bank:     Ken Dorsney, Esquire
                                Messana Rosner & Stern, LLP
18
    For the Creditors':         David W. Carickhoff, Esquire
19  Committee                   Blank Rome, LLP

20                              Mark T. Power, Esquire
                                Hahn & Hessen, LLP
21
    For Bank of America:        Gabriel MacConaill, Esquire
22                              Potter Anderson & Corroon, LLP

23  For Rucker:                 Charles J. Brown, III, Esquire
                                Archer & Greiner, PC
24
    For Jackson/Dobben:         Jeff Barnes, Esquire
25

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

2

1  VIA TELEPHONE:

2  For Bank of America:       Ana M. Alfonso, Esquire
                             Kaye Scholer, LLP
3
   For Allen & Overy:         Pamela Chepiga, Esquire
4                            Allen & Overy, LLP

5  For American Home Bank:    John A. Pintarelli, Esquire
                             Morrison & Foerster, LLP
6
   For ABN AMRO Bank N.V.:    Robert J. Moore, Esquire
7                            Fred Neufeld, Esquire
                             Milbank Tweed Hadley & McCloy, LLP
8
   For Paula Rush:            Paula Rush
9                            Paula Rush - In Pro Per

10 Court Recorder:            Leslie Murin

11 Transcription Service:     Perfect Pages Transcription, Inc.
                             18 Tuckerton Road
12                           Shamong, NJ 08088
                             www.perfecttranscripts.com
13                           (609) 654-8880

14 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.

15

16

17

18

19

20

21

22

23

24

25

3

1                                    INDEX

2
                                    Re-    Re-   Further
3                         Direct Cross Direct Cross Redirect

4    Witnesses For Debtors:

5      John Nelligan
       (proffered)
6      (By Mr. Beach)          9

7      Damien Pasternack
       (proffered)
8      (By Mr. Beach)          25

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Call to order of the Court.)

2                THE CLERK:  All rise.

3                THE COURT:  Please be seated.

4                MR. BEACH:  Good afternoon, Your Honor.  May it

5     please the Court, Sean Beach from Young, Conaway, Stargatt &

6     Taylor on behalf of the Debtors.  Your Honor, the -- we do

7     have a full agenda today.  The first 19 items on the agenda

8     are -- have been adjourned, so at least we've knocked out 19

9     for you.  Unfortunately, we've got about another 19 left.

10    There's some of those things I don't think will take very

11    long.  We have two sales, and then there are a couple

12    contested stay relief matters.  We have resolved certain

13    matters, and have notified your chambers.  I hope you've

14    gotten those messages.

15         Your Honor, the first item to deal with today is item 20

16    on the agenda which is the Debtors' --

17                THE COURT:  Hey.  Hey.  Hello.  Get out of here with

18    that phone.  Is that an attorney?

19                MR. BEACH:  I don't know.

20                THE COURT:  That's outrageous.

21                MR. BEACH:  I didn't see him, Your Honor.  Your

22    Honor, the -- as I said, the first Motion up today is the sale

23    of 10,000 shares of common stock of American Home Bank owned

24    by American Home Mortgage Holdings, which is all of the stock

25    of the bank.  All the outstanding shares of common stock of

5

1    the bank.  American Home Bank was established in 2006 when

2    American Home Mortgage Holdings purchased Flower Bank, FSB,

3    which is a one-branch Federal Savings Bank founded in 1987,

4    and regulated by the FDIC and the OTS.  Your Honor, the bank

5    holds mortgages, consumer loans, securities, cash deposits,

6    and as of April 30th, 2009 the bank had approximately 94

7    million in total assets and 18 million in total deposits.

8    Milestone Capital Advisors has been -- or, I'm sorry,

9    Milestone Advisors has been marketing this asset, as Your

10   Honor is well aware, since 2007, October 2007 to be specific,

11   and we're pleased to say we do now have a binding agreement

12   before Your Honor.

13        We did provide all of the potential purchasers and all

14   other interested parties with notice of the Motion.  We didn't

15   ultimately get any bids, which were due on May 8th.  We did

16   have one party that -- since the sale procedures were

17   approved, we had one party an NDA, or one additional party I

18   should say, and do due diligence.  They were provided full

19   access and ultimately notified us on May 8th that they were not

20   able to get their financing in order, and other approvals to

21   submit a bid on that day.  Your Honor, we gave them contact

22   information for counsel, and have not heard anything from them

23   since May 8th.  As such, Your Honor, the auction that was

24   scheduled for May 12th was canceled.

25        If I may, Your Honor, what I'd like to do is hand up a

6

1   few items.  One is a bid summary for the bid that we have

2   before -- or the bid that we have before you today with The

3   Bancorp as well as a revised Form of Sale Order, which

4   reflects the resolution that we have with one of the two

5   Objectors.  There were two objections.  The second objection

6   we just -- I think just hit the docket.  It's a letter from an

7   individual who appears to own stock in one of the American

8   Home entities.  It's not American Home Mortgage -- it's not

9   the stock that we're selling today.  I think there was some

10   confusion, so I believe that that objection is moot.  We tried

11   to reach out to that party and were not able to reach them.

12   So I'd like to hand that bid summary to you as well as a Form

13   of Order that reflects the changes in the resolution with the

14   Objector.  May I --

15         THE COURT:  Please do.

16         MR. BEACH:  -- approach, Your Honor?

17         THE COURT:  Yes, sir.  When you say -- you're

18   talking about Mr. Doyle's letter?

19         MR. BEACH:  Yes.

20         THE COURT:  Jermaine Doyle?

21         MR. BEACH:  Yes, Your Honor.

22         THE COURT:  Okay.  I have that and I've reviewed it.

23     (Counsel approaches.)

24         THE COURT:  Thank you.

25         MR. BEACH:  Your Honor, if I may ask you to turn to

7

1    the bid summary sheet that I've --

2         THE COURT:  Yes.

3         MR. BEACH:  -- handed up.  This -- the first page of

4    this summary gives you a very general view of what the

5    purchase price would look like if the closing were to happen

6    as of April 30th, because it reflects the book value and other

7    information as of April 30th.  Obviously, that's subject to

8    change prior to closing, but we wanted to give you our best

9    estimate as of the most current information.  So it shows an

10   aggregate balance sheet adjustments of $6,591,483, the total

11   April 30th book value of $49 million and change, less another

12   adjustment for a data processing contract of $900,000 leaving

13   the purchase price for Bancorp of $41,000,600 and change, if,

14   again, the deal closed on April 30th.  The Debtors have planned

15   in some additional adjustments based on estimated costs, and

16   potential book value adjustments through the closing date of

17   approximately $1.2 million, bringing the estimated net

18   proceeds to the estate of $40,000,400.

19        THE COURT:  All right.

20        MR. BEACH:  Your Honor, the next page, if you go

21   down to the middle part of the page, it details some of those

22   purchase price adjustments or the balance sheet purchase price

23   adjustments, 2.3 million increase based on the allowance for

24   loan losses; $750,000 based on the value of the Federal Home

25   Loan Bank stock; $900,000 based on the data processing

8

1    contract deduction; $105,000 based on the Community

2    Redevelopment Act Investment Fund; $768,000 for an adjustment

3    related to the carrying value of the subsidiary over the bank

4    Umbrella Services Corp.  And then there's a note that the

5    mark-to-mark value of the securities portfolio, which is

6    required to be sold prior to the closing, is also another

7    factor that could impact the ultimate price depending on how

8    much we get for those securities.

9        And then, finally, Your Honor, the adjustment to the

10    deferred tax asset, the Debtors will get a $250 credit, but

11    not the full balance sheet value of that asset.

12            THE COURT:  Okay.

13            MR. BEACH:  Your Honor, The Bancorp has completed

14    its due diligence.  There are no financing contingencies to

15    this deal.  Another advantage to this deal is that they do

16    intend to keep the exiting employees, and those employees will

17    be eligible for permanent employment in either the current

18    location or another location, and the -- and finally, the last

19    thing I want to note is that the bid is -- or that the closing

20    is contingent on certain regulatory approvals, which the

21    parties have been engaged in, and we hope will go smooth, and

22    we expect that they will go smooth, but stranger things have

23    happened in this case.

24        Your Honor, unless you have any questions, -- unless you

25    have any questions, we have Mr. John Nelligan as our witness

1  here today with Milestone Advisors, and he's available in the

2  courtroom.  What I would propose to do is proffer his

3  testimony as the matter's uncontested.

4          THE COURT:  Any objection to the use of a proffer?

5      (No verbal response.)

6          THE COURT:  All right.  You may proceed by proffer.

7          MR. BEACH:  Thank you, Your Honor.  Mr. Nelligan is

8  a principal with Milestone Advisors, the Debtors' investment

9  bankers.  Prior to founding Milestone, Mr. Nelligan was a

10  senior vice-president in the financial services group of

11  Friedman, Billings, Ramsey & Company focused exclusively on

12  M&A and management led buy-out transactions.  Prior to joining

13  FBR, Mr. Nelligan was an associate at HUBB Financial, a

14  privately held investment bank, focused primarily on private

15  equity investments and M&A transactions within the financial

16  services sector.  Mr. Nelligan received the Bachelor of

17  Science from the University of Vermont with a concentration in

18  finance.

19      Mr. Nelligan has reviewed and is familiar with the

20  current bank Sale Motion, the Sale Procedures Order, the sale

21  procedures, and the Stock Purchase Agreement currently before

22  the Court.  Mr. Nelligan would testify as to all of the facts

23  regarding the background and marketing descriptions as set

24  forth in paragraphs eight and nine of the Motion, and the

25  summary description of the Stock Purchase Agreement as set

1    forth in paragraphs ten and eleven of the Motion.

2         Mr. Nelligan understands, from counsel, that the elements

3    the Court will consider in connection with the Motion to Sale

4    the Bank Stock are that there is a sound business purpose,

5    adequate notice has been provided to Interested Parties, the

6    Debtors have obtained fair and reasonable price, and the sale

7    was negotiated in good faith.  In connection with the sound

8    business purpose, Mr. Nelligan would -- understands that the

9    primary purpose of these Chapter 11 cases is to enable the

10   Debtors to liquidate assets in order to maximize value of the

11   estates for all stakeholders.

12        Milestone was retained by the Debtors to assist in

13   maximizing the value of the bank's stock, which is one of the

14   Debtors' primary remaining assets.  Mr. Nelligan has

15   participated in numerous liquidation and sales models, board

16   calls and strategic meetings with the Debtor and Committee

17   principals and professionals to determine the best way to

18   maximize the value of the bank stock, including a review of a

19   straight liquidation of the bank assets and the dissolution.

20   Based on these considerations, Mr. Nelligan believes that the

21   best way to maximize value and return to Creditors is the sale

22   of the bank stock, and would testify that as such, a sound

23   business purpose justifies the sale.

24        In connection with notice to Interested Parties, he would

25   testify that these marketing efforts undertaken provided

11

1  Parties-in-Interest with significant notice of potential sale

2  of the stock as well as sufficient opportunity to bid.  Again,

3  he would testify as to all of the marketing descriptions set

4  forth in the Motion.  Mr. Nelligan would further testify that

5  the Debtors complied with the terms of approved sale

6  procedures.  In this regard, after approval of the sale

7  procedures, Milestone worked with other professionals to cause

8  notice of the sale and related deadlines to be served upon

9  each of the potential purchasers initially contacted by

10 Milestone, and allowed parties, until May 8th, 2009, to submit

11 a bid for the stock.  Only one additional party signed the

12 non-disclosure agreement and conducted diligence since that

13 time.  Mr. Nelligan would testify that such party was provided

14 access to due diligence information, and company

15 representatives had notified the Debtors that it completed --

16 that they had completed its due diligence prior to the

17 expiration of the bid deadline.  He would also testify that

18 the party notified the Debtors on May 8th, 2009 that it would

19 not be submitting a bid as a result of not receiving adequate

20 internal approvals, and the inability to procure the financing

21 in the time frame allotted.  The Debtors have received no

22 further communications from such party since May 8th.

23      Since the Debtors did not receive a qualified bid, the

24 auction scheduled for May 12th was canceled and The Bancorp was

25 declared the successful bidder under the terms of the Stock

12

1   Purchase Agreement.  Mr. Nelligan would testify that for the

2   foregoing reasons established that potential purchasers had

3   sufficient notice of the sale, of and an opportunity to bid on

4   the bank stock.

5       In connection with the requirement for a fair and

6   reasonable price, Mr. Nelligan would testify that after

7   multiple rounds of intense negotiations with potential

8   purchasers as well as numerous meetings and discussions with

9   certain regulatory authorities, the Debtors identified The

10  Bancorp as the stalking-horse bidder for the shares.  The

11  Debtors estimate that the net proceeds from the sale will be

12  approximately $40,400,000 based on the April 30th, 2009 book

13  value.  He would testify that there are no financing

14  contingencies required; however, closing is contingent on the

15  necessary regulatory approvals.  The termination date is

16  September 30th, 2009.  The purchaser has -- or shall be

17  entitled to three 30-day extensions by paying a non-refundable

18  extension payment of $1 million for each extension.  The

19  purchase price will be adjusted at closing to provide a 50

20  percent credit for any purchase price or any extension

21  payment.

22      The Stock Purchase Agreement may be terminated and

23  transactions contemplated thereon -- therein abandoned at any

24  time prior to closing for, among other reasons, the Sale

25  Approval Order's not entered by June 16th, 2009; if required

1   approvals from Governmental entities for the transfer of the

2   shares to the purchaser are not obtained by September 30th,

3   2009; if the closing date shall not have occurred before

4   September 30th, 2009; or if a governmental entity issues an

5   order or takes an action permanently preventing the stock

6   purchase transactions.

7       Based on the marketing process, both prior to and under

8   the sale procedures, he would testify that based on his

9   knowledge of the market in general, Mr. Nelligan believes that

10  the purchase price under the Stock Purchase Agreement with

11  Bancorp is fair and reasonable.

12      As to the good faith component, Mr. Nelligan would

13  testify that the sale to Bancorp is proposed in good faith.

14  All parties are separately represented by counsel.

15  Negotiations with respect to the sale of the shares were

16  conducted at arm's length and in good faith.  To his

17  knowledge, The Bancorp is not affiliated with nor owns an

18  interest in, and is not related to, in any way, the Debtors,

19  and is not an insider of the Debtors.  Mr. Nelligan would say

20  that an open and fair marketing and sales process was

21  conducted and the bid submitted by The Bancorp, under the

22  Stock Purchase Agreement, was the highest and best bid for the

23  shares.  He would further testify that he believes Bancorp to

24  be a good-faith purchaser.

25      In connection with the resolution of the objection filed

1    by American Home Bank in Pennsylvania, Mr. Nelligan would

2    testify that when considering all facts and circumstances

3    related to the sale of the -- related to the sale and the

4    American Home Bank trademark action, including litigation

5    costs, the resolution of the objection set forth in the

6    Proposed Form of Order, and the trademark litigation is fair

7    and reasonable in his business judgment.

8        In sum, Mr. Nelligan would testify that the sale of the

9    shares to Bancorp, under the Final Stock Purchase Agreement

10   terms, is in the best interest of the Debtors' estates, is in

11   exercise of the Debtors' sound business judgment, represents

12   the highest and best value to be obtained for the Debtors'

13   estates under the circumstances; it is fair and reasonable,

14   and additional marketing is not likely to yield a better

15   value; and finally, was negotiated at arm's length and in good

16   faith.  And that would conclude Mr. Nelligan's proffer.

17           THE COURT:  Does anyone wish to cross-examine the

18   witness?

19       (No verbal response.)

20           THE COURT:  The Court hears none, and -- any further

21   evidence?

22           MR. BEACH:  No, Your Honor.  I just wanted to walk

23   through the settlement terms that are reflected in the

24   blackline of the Order that I provided to you.

25           THE COURT:  Okay.

1    MR. BEACH:  Your Honor, there was an action filed by

2   American Home Mortgage Corp. and American Home Mortgage

3   Investment Corp. against American Home Bank in Pennsylvania,

4   which is a division of First National Bank of Chester County,

5   and has no affiliation to any of the Debtors or the American

6   Home Bank in Chicago.  The American Home Bank in Pennsylvania

7   sent cease and desist letters to American Home Bank in

8   Chicago, and later the American Home Mortgage Investment Corp.

9   and American Home Mortgage Corp. filed an action against

10  American Home Bank for injunctive and monetary relief.

11  American Home Bank in Pennsylvania filed counterclaims and --

12  for both injunctive and monetary relief against some of the

13  Debtors as well as American Home Bank in Chicago.  That matter

14  has been stayed since the petition date, and no further action

15  was taken on it in connection with this sale.  The American

16  Home Bank in Pennsylvania objected to the sale, wanting to

17  make sure that the litigation wasn't affected in connection

18  with the sales of the shares of the stock.  The parties used

19  that as an opportunity to have discussions about the issues in

20  general, and were able to resolve them as set forth in -- on

21  page 12 of the blackline, paragraphs 13 through 18, Your

22  Honor.  And this resolution sets out the terms resolving both

23  the trademark litigation that's pending in the Southern

24  District of New York as well as the sale objection as premised

25  on the resolution of the sale objection.

16

1      The primary terms are that within ten days of closing --

2  all of this is effective on closing as well -- the Debtors

3  will pay $25,000 out of the proceeds of the sale.  Within 120

4  days after the closing, the Purchaser and the bank will cease

5  and desist using the American Home Bank name, and any new name

6  won't include the words American or home, and the parties to

7  the American Home Bank action will file a stipulation of

8  dismissal of that action in the Southern District of New York

9  with prejudice.

10      There's a trademark pending, American Home Mortgage

11  Investment Corp. agrees to either withdraw it or take no

12  further action until it's abandoned.  The claims that were

13  filed by the American Home Pennsylvania bank will be withdrawn

14  with prejudice upon the closing, and then there are certain

15  mutual releases set forth in paragraph 18, between the parties

16  as it relates to the American Home Bank action and the

17  trademark issues as between the parties.  With that resolution

18  -- Your Honor, what we've submitted to you is essentially a

19  consent or the parties' acknowledging consented to it, and

20  signed, most of them, three signatures on the back of the

21  Order.  And we are asking, in connection with approval of the

22  Bank Sale Order, that this agreement between the parties be

23  approved, again, as it -- in connection with the objection

24  that was filed.

25      THE COURT:  All right.

1    MR. BEACH:  And the only other objection, as Your

2    Honor noted before, was from Mr. Doyle, and I believe, Your

3    Honor, that that should be overruled because it doesn't seem

4    to relate to the actual sale of the shares of the bank stock,

5    which are owned by American Home Mortgage.

6    THE COURT:  Yes, 100 percent of the shares of the

7    bank stock were owned by the Debtors.

8    MR. BEACH:  That's correct, Your Honor.

9    THE COURT:  Well, I expect -- I mean, it's less than

10   clear from the face of the notice what's being sold, so I

11   expect he owns stock in American Mortgage Holdings or some

12   other publicly traded entity.

13   MR. BEACH:  Yeah.  Probably Investment Corp.

14   THE COURT:  Investment.  Thank you.  Well, I'll

15   overrule the objection.  Is there anyone here on behalf of Mr.

16   Doyle on the phone or in person?

17   (No verbal response.)

18   THE COURT:  All right.  Hearing none, I've reviewed

19   his objection and I don't believe it's germane to the issue

20   before the Court and I'll approve the -- I'll overrule that

21   objection.

22   Does anyone wish to be heard in connection with the Sale

23   Order or the settlement?  Mr. Power.

24   MR. POWER:  Your Honor, I'll be very brief.  I know

25   the hour's late.  Mark Power from Hahn & Hessen, counsel to

1  the Committee.  Your Honor, I just want to confirm the

2  Committee has worked closely with the Debtor for the last year

3  and a half of this case.  We've been trying to sell this bank.

4  We've had a lot of walks down the aisle, but this is one that

5  we're happy to say seems to be a good marriage.  We are

6  optimistic that the OTS will approve the business plan, the

7  regulatory plan, so this one appears to be one that will close

8  and consummate.  So the Committee's in full support of the

9  sale.  We also consented to the settlement that's contained in

10  the Order.  I would note for the Court that we think that the

11  securities that are going to be sold actually have increased

12  slightly in value.  The market seems to be a little better now

13  for the mortgage-backed securities, and so we're pushing them

14  to try to sell those as well in the current market, and that

15  will go forward.  So with that, the Committee would ask Your

16  Honor to support the sale.

17          THE COURT:  All right.  Thank you.  Anyone else?

18      (No verbal response.)

19          THE COURT:  All right.  Based on the uncontested

20  record and satisfaction of the standards for sale and for

21  settlement contained in the Order, I'll approve the Motion.

22          MR. BEACH:  Thank you, Your Honor.  And I did leave

23  a clean version with you.

24          MR. KOTLER:  Your Honor, for the record, Larry

25  Kotler of Duane Morris on behalf of The Bancorp.  In light of

1   Your Honor's entry of the Order, I would ask that we be

2   excused.  We have no further business with this Debtor on the

3   rest --

4           THE COURT:  Of course.

5           MR. KOTLER:  -- of the agenda.  Thank you, --

6           THE COURT:  Very good.

7           MR. KOTLER:  -- Your Honor.

8           THE COURT:  Thank you.

9           MR. BEACH:  Now you really need to brace yourself,

10  Your Honor.  We had a loan sale and auction.  Ten bidders

11  showed up.  It was a spirited auction, and the prices that we

12  originally had for both the loans and the REO increased

13  significantly, so we're pleased at that result.  Your Honor, I

14  think it would be useful if I could provide Your Honor with a

15  summary of where the bids shook out -- where the stalking-

16  horse bid -- it shows where the stalking-horse bids were --

17  where we ultimately ended up after the auction by the

18  different pools of assets that we had.

19          THE COURT:  Okay.

20          MR. BEACH:  May I approach?

21          THE COURT:  Yes.

22      (Counsel approaches.)

23      (Pause in proceedings.)

24          THE COURT:  Thank you.

25          MR. BEACH:  Thank you, Your Honor.  I think the

1  easiest thing would be to turn to the bid summary at first.

2  Your Honor, we were selling four pools of assets here, three

3  of them being loan pools, and one of them being a pool of REO

4  assets.  The bid summary shows that -- in connection with the

5  -- well, one other note, with respect to the REO assets and

6  the first-lien assets, as we indicated in the Sales Procedure

7  Hearing, there were certain assets that are either owned or

8  secured or the collateral of ABN AMRO, and there have been a

9  number of stipulations in these bankruptcy cases as to the

10  Debtors' liquidation of those assets.  With these particular

11  assets, there was an agreement that was approved in the sales

12  procedures whereby they would pay essentially a marketing fee

13  to the Debtors of $100,000, and the proceeds of those ABN

14  assets will be distributed to ABN upon closing.  And so the

15  first two line items reflect what proceeds will go to ABN in

16  connection with that agreement.

17      There's one other agreement with -- that we had with ABN

18  that was put on the record at the auction, and that was that

19  in order for us to be able to easily compare bids at the

20  auction, we have an agreement with ABN that the allocation in

21  the initial stalking-horse bid -- there was loan-level pricing

22  for each of those, that that allocation would be the same

23  allocation we would ultimately use with whoever the winning

24  bidder was, because they might have had different loan-level

25  pricing, and we wanted -- it would be difficult to compare one

21

1  bid to another had we not had that agreement so --

2          THE COURT:  All right.

3          MR. BEACH:  -- those proceeds are split that way.

4  Your Honor, I note that you looked at how the pricing shook

5  out.  If you'd like I can walk you through those various --

6          THE COURT:  I --

7          MR. BEACH:  -- items, but we did have four bidders

8  for the REO pool and --

9          THE COURT:  Yes.  I just -- I mean, I know nothing

10 about this business.  I'll never know anything about this

11 business, but you've got 4.91 percent on unpaid principal for

12 second-lien non-performing loans.  Is that -- am I reading

13 that right?

14         MR. BEACH:  I believe that is right.  That's the one

15 that went up from a stalking-horse bid of $7,000 to a hundred

16 and -- almost to $120,000.

17         THE COURT:  Okay.

18         MR. BEACH:  I think the price was half a cent when

19 we started.

20         THE COURT:  Okay.

21         MR. BEACH:  So unless that percentage is wrong,

22 that's right.

23         THE COURT:  No.  I don't have any questions.  I

24 don't think you need to run through it.  I see what happened.

25         MR. BEACH:  Sure.  Thank you, Your Honor.  With

1   that, Your Honor, what I'd like to do next -- unfortunately, I

2   neglected to bring over copies of the blacklines of the eight

3   different Asset Purchase Agreements that are attached to that

4   gigantic Order that I handed up to you.  The -- both the

5   successful -- the successful bidder obviously's on the hook;

6   the second best bidder is on the hook until closing, and those

7   bids are binding, and we're requesting that they be approved

8   in connection with this hearing as well.  So what I wanted to

9   do for Your Honor is I summarized what could be considered

10  material changes to the Asset Purchase Agreement as reflected

11  against the Stalking-Horse Purchase Agreement.  I'd like to

12  just run through those by APA so that they're on the record.

13          THE COURT:  Okay.

14          MR. BEACH:  The first bunch of changes that I'll go

15  through are consistent among all eight APAs so I'll say them

16  one time.  The purchase price, obviously, has been changed in

17  each of the eight Asset Purchase Agreements, and the

18  corresponding changes to the purchase price percentages have

19  been changed in the relevant exhibits.  The purchaser -- a

20  change has been made to say that the purchaser has to pay a

21  deboarding fee to the Interim Servicer at closing.  The

22  sellers must provide the Interim Servicer with a copy of the

23  Memorandum of Sale at closing or a notice of the properties

24  being sold at closing in connection with the REOs.  There's a

25  clarification that the deboarding fees excludes costs and

1  expenses of deboarding.  The as-is where-is disclaimer has

2  been expanded to include the Interim Servicer.  And the

3  schedules include a list of loans being sold as of the auction

4  date, which changed from the initial bids that we received,

5  because some of those were refinanced or sold separately

6  during that period of time.  In connection with the -- and

7  that reflects all the changes to the Vanthiem *(ph)* Agreement

8  in connection with the first-lien sale.  The second best

9  bidder in connection with the first-lien sale was a company

10  called Cadles of Grassy Meadows II, LLC, and the only

11  additional changes in their agreement were that the purchase

12  price shall include accrued interest on the mortgage loans

13  removed from the purchase price -- that was removed from the

14  purchase price definition.  There's a removal of a definition

15  of delinquent mortgage loans, and replaced with defaulted

16  mortgage loans and the relative changes to that defined term.

17  And the governing law changed from Ohio to New York.

18      In connection with the REO property, the prevailing

19  bidder was a company called Mortgage Asset Recovery, and other

20  than the general changes, there were no changes there.  The

21  second best bidder was John Galt Enterprises, and other than

22  the general changes, there are no additional changes to that.

23      The nonperforming seconds, the successful bidder was

24  Cadles of Grassy Meadows II, LLC, and the second best bidder

25  was Ganther *(ph)* Development, LLC.  With respect to the Cadles

24

1    agreement, the only two additional changes were -- what might

2    be considered material changes were the removal of Section

3    4.03.  In the original Stalking-Horse Agreement, there was a

4    representation regarding that the Debtors had stopped HELOC

5    advances and closed off the home equity lines of credit.  That

6    had not occurred and that was removed by all the bidders prior

7    to the auction, including in connection with this Asset

8    Purchase Agreement.  The governing law was changed from Ohio

9    to New York as well.

10       The second best bidder, Ganther Development, LLC, two

11   changes there.  The servicing transfer date was changed to 15

12   days after closing from 45 days after closing, and the HELOC

13   rep was removed.

14       And then finally, with respect to the sale, the

15   performing seconds, the prevailing bidder was Cadles of Grassy

16   Meadows II, LLC, and the -- in the purchase price definition,

17   the sentence the purchase price shall not include accrued

18   interest on the mortgage loans was removed.  There was a

19   change to the delinquent mortgage loan definition.  The HELOC

20   rep was removed, and the governing law was changed from Ohio

21   -- changed to Ohio from New York.  And the second best bidder

22   was NPA Associates, and the only change was the removal of the

23   HELOC rep.

24       With that, Your Honor, unless you have any questions, I

25   would propose to proffer the testimony of Mr. Damien

1   Pasternack *(ph)*, who's available in the courtroom today.

2          THE COURT:  Any objection to using a proffer?

3      (No verbal response.)

4          THE COURT:  You may proceed.

5          MR. BEACH:  Thank you, Your Honor.  Mr. Pasternack

6   is a whole loan trader in the capital markets risk management

7   group of American Home Mortgage, and has been with the company

8   since April of 2006.  In that capacity, Mr. Pasternack sold

9   loans that HM originated to interested third parties,

10  including but not limited to JP Morgan, Bank of America,

11  Lehman Brothers, Countrywide, Wells Fargo, and CitiMortgage.

12  Prior to working at AHM, Mr. Pasternack received his

13  undergraduate degree in finance from Towson University, and an

14  MBA in finance from Hofstra.  Mr. Pasternack is a chartered

15  financial analysis and previously held jobs in accounting and

16  financial services.

17      He would testify that he's familiar with the Loan Sale

18  Motion, the sale procedures, the Sale Procedures Order and the

19  assets being sold, and has been involved in the full marketing

20  process for these assets.  He's familiar with the interest

21  that ABN has in certain of these assets and the agreement that

22  was reached.  And he understands from counsel that the

23  elements that will be considered in connection with the sale

24  are the sound business purpose, that a sound business purpose

25  exists, adequate notice has been provided to interested

1   persons, the Debtors have obtained a fair and reasonable

2   price, and the sale was negotiated in good faith.  He would

3   testify with respect to the sound business purpose that Mr.

4   Pasternack is aware that the Debtors are in the process of

5   liquidated all of their assets in an effort to maximize value

6   and recoveries for all stakeholders.  He believes that the

7   sale of the mortgage loans and REOs under the terms of the

8   Sale Agreement and Second Best Sale Agreements is consistent

9   with this purpose and that it is a sound exercise of the

10  Debtors' business judgment.

11      With respect to notice to interested persons, he would

12  testify that the Debtors have been marketing these mortgage

13  loans and REO properties both before and after the approval of

14  the sale procedures.  He would say that he assisted in causing

15  the notice to all potential interested parties and in

16  accordance with the sales procedures, and testifies that the

17  Debtors complied with the sale and auction procedures.  As a

18  result of these marketing efforts, the Debtors had ten bidders

19  participate in a spirited auction resulting in significant

20  increase in purchase price for each pool of loans and REO.

21  Mr. Pasternack believes that adequate notice has been provided

22  to interested parties, and resulted in a fair process

23  maximizing value to the Creditors.

24      In connection with fair and a reasonable price, he would

25  testify that an auction was conducted on May 13, 2009, and he

1    was in attendance.  All bids were deemed qualified bids under

2    the bid procedures.  The auction lasted numerous rounds during

3    which parties increased their bids.  In addition, the auction

4    resulted in favorable adjustments to the APA so that the

5    auction resulted in more certainty with respect to the value

6    achieved.  When the auction was closed, the successful bidders

7    were selected as the highest and best bid, and the second best

8    bidders were also selected.  The proceeds payable to the

9    estate for the purchase of the assets as compared to the

10   stalking-horse bids increased by nearly $1.5 million.  As a

11   result, Mr. Pasternack is confident that a fair and a

12   reasonable price was received in all asset pools from the

13   successful and second best bidders.

14        In connection with the good faith component, he would

15   testify that none of the successful or second best bidders are

16   affiliated with any of the Debtors; he's not aware of any

17   collusion among the bidders.  In addition, he's not aware of

18   any fraud or attempt to assert any unfair advantage over the

19   other bidders.  The Debtors ran an open and fair auction

20   process, and the successful and second best bidders submitted

21   the highest and best bid, so he believes they are all a good-

22   faith purchasers as he understands that term to be defined.

23        And finally, Mr. Pasternack would testify that the sale

24   of the mortgage loan and REO assets to the successful and

25   second best bidders under the terms of the APA is in the best

28

1    interest in the Debtors' estates, is an exercise of the

2    Debtors sound business judgment, represents the highest and

3    best value to be obtained for the Debtors' estates under the

4    circumstances, is fair and reasonable, and was negotiated at

5    arm's length and in good faith.  And that would conclude Mr.

6    Pasternack's proffer.

7              THE COURT:  Thank you.  Does anyone wish to cross-

8    examine the witness?

9         (No verbal response.)

10             THE COURT:  I hear none.

11         MR. BEACH:  Your Honor, if you could just give me

12   one moment.

13        (Pause in proceedings.)

14         MR. BEACH:  Your Honor, there was one objection, and

15   one reservation of rights filed in connection with loan sales.

16   There was an objection by Manish Kothary and a reservation of

17   rights by James Rucker, who I believe is represented in the

18   courtroom today.  Your Honor, neither of the loans that either

19   of these Borrowers took out are included in the loan sale, so

20   I believe a representation of the record that we're not

21   selling the loans that they would have an interest in should

22   resolve their objections and reservations.

23             THE COURT:  They're the mortgagors and you're not

24   selling their mortgages.

25             MR. BEACH:  Correct, Your Honor.

1          THE COURT:  All right.  Is there anyone on the phone

2     or present for -- I see Mr. Brown's here.

3          MR. BROWN:  Your Honor, I filed both of those and --

4          THE COURT:  Oh.  Okay.

5          MR. BROWN:  -- that is correct.  That takes care of

6     both of them, Your Honor.

7          THE COURT:  All right.  Thank you, Mr. Brown.

8          MR. BROWN:  Thank you.

9          MR. BEACH:  Your Honor, there were only a couple

10    changes made to the Order.  The only substantive change was in

11    paragraph 3, and that is really to make a clarification that's

12    evident from the sale procedures and --

13         THE COURT:  Right.

14         MR. BEACH:  -- other documents that the second best

15    bidder are bound to the Asset Purchase Agreement that they

16    signed until the sale with the successful bidder closes.

17         THE COURT:  Okay.

18         MR. BEACH:  With that, Your Honor, I would ask that

19    you approve the Sale Order, which includes the eight Asset

20    Purchase Agreements, four for the successful bidders, four for

21    the second best bidders for each of the four pools.

22         THE COURT:  This is all one document?

23         MR. BEACH:  Yes, Your Honor.

24         THE COURT:  Okay.  Does anyone wish to be heard?

25    Mr. Power.

1          MR. POWER:  Very briefly, Your Honor.  I'm Mark

2     Power, Hahn & Hessen, (indiscernible) Committee.  We have

3     worked close with the Debtor on this sale.  We were pleased to

4     have -- well, it was stalking horse plus ten bidders.  As you

5     know, we've had auctions with nobody showing up, so this was a

6     good outcome, with the Committee's support to the sale, and

7     I'd ask Your Honor to approve it.

8          THE COURT:  All right.  Thank you.  I'm happy to

9     approve the sale.

10         MR. BEACH:  Thank you, Your Honor.  With that, I'll

11    cede the podium to Ms. Greecher.

12         THE COURT:  All right.

13         MS. GREECHER:  Good afternoon, Your Honor.  Margaret

14    Whiteman Greecher on behalf of the Debtors.  Your Honor, there

15    are several items on the agenda that are still left to go

16    forward.  We'd actually like to move a few of them around.

17    Mr. Barnes is counsel for Ms. Dobben and Mr. & Mrs. Jackson --

18    excuse me.  Dr. & Mrs. Jackson, and he does have a plane to

19    catch, I believe, at 6 o'clock tonight.  Oh.  His

20    arrangements have been changed.  We would ask to accommodate

21    any plans and take theirs first.  There are also two matters

22    that have already been resolved, and we do have Orders to

23    present to the Court for those.  I would suggest taking those

24    first, doing the Dobben and Jackson Stay Relief Motions, and

25    then moving forward with the claims.

31

1          THE COURT:  That's fine.

2          MS. GREECHER:  Your Honor, -- Oops.

3          UNIDENTIFIED SPEAKER:  Sorry.

4          MS. GREECHER:  That's okay.  I do believe -- we're

5   going to go slightly backwards just because I have two Consent

6   Orders to hand up.

7          THE COURT:  Okay.

8          MS. GREECHER:  One is with respect to matter number

9   35 that was the last matter on the agenda.  It's the

10  Consensual Order between the Debtors and Deutsche Bank with

11  respect to their loan files.

12         THE COURT:  Right.

13         MS. GREECHER:  As Your Honor is aware, the Debtors

14  had 1.5 million loan files set in a warehouse in Melville, New

15  York and have been in the process of destroying or returning

16  those documents for quite some time now.  Deutsche Bank had

17  some concerns before picking up their files, the validity of

18  the folders that were included within the truck manifest.

19  There are approximately seven truckloads of loan files that

20  have been requested by Deutsche Bank.  I have a copy of the

21  Order that I think I can hand up and walk through with you.

22         THE COURT:  Yes.  Please.

23      (Counsel approaches.)

24         THE COURT:  Thank you.

25      (Pause in proceedings.)

1        MS. GREECHER:  Pardon me.  The Consent Order

2   provides for a reconciliation process.  The return costs were

3   set forth with respect to the second Disposition Order this

4   Court entered that required folders to be -- excuse me,

5   returned by the retrieval method at 350 per folder.  And that

6   $356,000 number for the Deutsche Bank return cost does reflect

7   that exact amount.  The Debtors have agreed to go through

8   reconciliation process and escrow $100,000 of the return costs

9   pending that escrow -- or excuse me, pending that

10  reconciliation process.  The Debtors will work forward --

11  work with Deutsche Bank with respect to that process, and

12  hopefully will be able to resolve that dispute outside of this

13  Court.  And to the extent they cannot, Deutsche Bank does have

14  the opportunity to file a Motion to Seek Reimbursement of that

15  escrow fund.

16        THE COURT:  Okay.

17        MS. GREECHER:  If Your Honor has no questions with

18  respect to that, I would request that the Court enter that

19  Order.

20        THE COURT:  Does anyone wish to be heard on this

21  matter.

22     (No verbal response.)

23        THE COURT:  No.  All right.  I'll approve of the

24  Order as agreed.

25        MS. GREECHER:  Thank you, Your Honor.  The other

1   Consensual Order to hand up today resolves matter number 26,

2   it's the Motion for Stay Relief with respect to the mortgage

3   of Julia Trister.  Your Honor, this actually dovetails nicely

4   into the Stay Relief Motions that are coming.  As you're aware

5   the Confirmation Order and Plan were -- well, excuse me.  The

6   Plan was recently confirmed by the Confirmation Order, and

7   within that Plan, it did provide certain provisions for

8   Borrower protections.  Of those protections, Borrowers are now

9   allowed to go forward against third parties without any

10  requests for the stay relief, and are allowed to seek

11  necessary redress to halt any foreclosure of their property.

12  Ms. Trister's Motion was essentially two-fold.  One was to

13  allow late filed claims, and the other was to go forward with

14  an action in Connecticut with respect to the adjudication of

15  her claim as well as going forward against the owner and

16  servicer of that mortgage.  The parties have agreed to allow

17  sufficient time for Ms. Trister to file a proof of claim as

18  necessary against the appropriate Debtors, and have also

19  provided that the automatic stay is modified to allow Ms.

20  Trister to prosecute her state court action, essentially on

21  the same terms that the Plan provides, which is that she may

22  go against the Debtors in a nominal capacity and may proceed

23  against third parties to address her recision or monetary

24  damages that she seeks to obtain from non-Debtor third

25  parties.  It does say that any findings of fact or conclusions

34

1    of law or any judgment against the Debtors obtained in a state

2    court action does not prejudice the Debtors' right to bring

3    their claims objection process through here.  I have a Order

4    for you --

5              THE COURT:  Okay.

6              MS. GREECHER:  -- if I may approach.

7              THE COURT:  Yes.  Please.

8         (Counsel approaches.)

9              THE COURT:  Thank you.  Is there anyone here on

10   behalf of Ms. Trister?  Does anyone wish to be heard?

11        (No verbal response.)

12             THE COURT:  Hearing none, I'll approve the Consent

13   Order.

14             MS. GREECHER:  Your Honor, that does bring us to the

15   Motions of Dr. & Mrs. Jackson and Ms. Mona Dobben.  There are

16   two Motions apiece, two of those are with respect to late

17   filed claims.  Mr. Barnes and I have resolved our issues.

18   Basically, the Debtors have just file a reservation of rights

19   with respect to those, and we have an agreed Form of Order

20   from Ms. Dobben.  It does allow her three claims to be deemed

21   timely filed and it does reserve our rights in --

22             THE COURT:  On substance.

23             MS. GREECHER:  -- connection with the --

24             THE COURT:  Right.

25             MS. GREECHER:  With respect to Ms. Jackson -- Dr. &

35

1   Ms. Jackson's stay relief, they had only filed one proof of

2   claim, and it's asserted against one Debtor.  They would like

3   to assert other proofs of claim against other Debtor entities.

4   We are agreeable to doing that but we will need to modify the

5   Order that we have for you today to provide extra time for

6   those claims to be filed --

7            THE COURT:  All right.

8            MS. GREECHER:  -- and will do so under Certification

9   of Counsel.

10            THE COURT:  All right.

11            MS. GREECHER:  I do have an Order ready for Ms.

12   Dobben.

13            THE COURT:  Okay.

14            MS. GREECHER:  Do you need to see it?

15            UNIDENTIFIED SPEAKER:  Is that the one you showed

16   me?

17            MS. GREECHER:  Yes.

18            THE COURT:  Does anyone wish to be heard?  Mr.

19   Barnes, you wish to be heard?

20            MR. BARNES:  Your Honor, as Ms. Greecher accurately

21   represented to the Court, we did work out the language of this

22   on the Jackson Order, which will be submitted, you know, as

23   soon as practicable, and the Dobben Order was acceptable as

24   is.

25            THE COURT:  Okay.  Very good.  Thank you.

1      MR. BARNES:  Thank you.

2      THE COURT:  Anyone else?

3   (No verbal response.)

4      THE COURT:  Hearing none, I've signed the Order for

5  Ms. Dobben, and I'll await the other Order under Certification

6  of Counsel.

7      MS. GREECHER:  Thank you, Your Honor.  The remaining

8  two Motions with respect to Dobben and the Jacksons relate to

9  their stay relief.  I am happy to discuss our objection.  I

10  think everything is on file, and I would cede the podium to

11  Mr. Barnes to make opening remarks if you'd like or if you

12  would like me to address our objection first, that's fine.

13      THE COURT:  However you wish to proceed.

14      MS. GREECHER:  Would you like to --

15      MR. BARNES:  Good.  Your Honor, I think Paula Rush

16  is waiting on the phone on this matter as well.

17      THE COURT:  Okay.

18      MR. BARNES:  I heard her name mentioned when they

19  were calling out people on the phone, and I know she's

20  involved with these two cases and working with me so.

21      THE COURT:  Let me hear from Debtors' counsel first.

22      MR. BARNES:  Sure.

23      THE COURT:  Ms. Rush, are you on the phone?  Just

24  make sure you're there.

25      UNIDENTIFIED SPEAKER:  She was.

1        UNIDENTIFIED SPEAKER:  She was, yeah.

2        THE COURT:  Ms. Rush?

3        MS. RUSH:  Yeah.  I'm on mute.

4        THE COURT:  Oh, good.  Well, thank you.

5        MS. RUSH:  I thought I was on mute.

6        THE COURT:  Yes.  No, you were.  That's excellent.

7   Thank you.  I just wanted to make sure you were on the phone,

8   and now I'm going to hear from Debtors' counsel, then I'll

9   hear from you and Mr. Barnes.

10       MS. GREECHER:  Your Honor, just briefly with respect

11   to Ms. Rush, I do think that she does have a Power of Attorney

12   with Ms. Dobbens.

13       THE COURT:  Okay.

14       MS. GREECHER:  I do not know -- I do not believe

15   that she has any Power of Attorney or other documentation with

16   respect to Ms. Jackson.

17       THE COURT:  Okay.

18       MS. GREECHER:  Your Honor, both Motions essentially,

19   you know, request the same thing, which is to adjudicate the

20   bankruptcy claims in a foreign jurisdiction in connection with

21   state court actions that are recently filed, and have not

22   taken their course.  In fact, I don't believe that the summons

23   have been issued on either one of these actions, so there's

24   quite a bit to do with respect to those actions.  They are not

25   trial ready.  And while it's true that the Debtors have

1    provided stay relief or consented to stay relief before with

2    respect to Borrowers, we believe that the landscape has

3    changed since the Debtors have filed and had their Plan

4    approved, and the Confirmation Order has been entered, which

5    provides Borrowers very specific protections with respect to

6    their adjudication of the claims in bankruptcy court, and

7    provides Borrowers with the ability to seek what they

8    ultimately need to do.  And that is seek a loan modification

9    or recision or go against a -- what I would consider a live

10   party or someone who could provide them with a judgment that

11   is dollar for dollar as the owner and --

12           UNIDENTIFIED SPEAKER:  (Indiscernible).

13           MS. GREECHER:  -- servicer of the loan.  Notably,

14   and I do have a copy of the Confirmation Order or a Plan.

15       (Pause in proceedings.)

16           MS. GREECHER:  Okay.  Your Honor, may I approach?

17           THE COURT:  Yes.

18       (Counsel approaches.)

19           MS. GREECHER:  Your Honor, directing your attention

20   to the Confirmation Order, paragraphs 51 through -- well,

21   excuse me.  Paragraph 50 through what I believe is 53.  Your

22   Honor appointed the Borrowers' Committee with respect to this,

23   and as a result, the Creditors' Committee, the Debtors, the

24   Borrowers' Committee as well as other constituencies had

25   extensive negotiations with respect to this Plan, which

1    essentially resulted in providing an entire article with

2    respect to the Borrower issues.  Specifically, and I did

3    direct your attention to the Confirmation Order, which

4    essentially mimics the Plan documents -- or excuse me, the

5    Plan language in Article 17, but I do believe that there are

6    certain modifications that Your Honor interlineated with

7    respect to paragraph 15 -- or 51.

8           THE COURT:  Right.

9           MS. GREECHER:  Specifically, any mortgage loans that

10   remain subject -- any mortgage loans do remain subject to all

11   claims and defenses that would otherwise have been maintained

12   in a sale outside of bankruptcy.  That's consistent with

13   Section 363(o) of the Bankruptcy Code.  The Borrowers also --

14   the bar dates with respect to Borrowers do not affect the

15   Borrowers' right to assert defenses to payment, non-monetary

16   remedies or setoff or recoupment rights against a Borrower

17   claim.  And nothing in the Plan affects the Borrowers' ability

18   to proceed against non-Debtors third parties or to file a

19   510(c) Subordination Motion.

20       Additionally, the Debtors are required to review and

21   consider any loan modification requests received for loans in

22   which they are still the owner, and to the extent that they

23   are not, they're to otherwise forward the request to any known

24   appropriate party.

25           THE COURT:  All right.

1    MS. GREECHER:  Specifically, with respect to the

2 stay relief, it does allow the Borrowers to proceed against

3 the Debtors in any action solely to commence and prosecute an

4 action as necessary to halt or for the purposes of halting the

5 foreclosure.  It proceeds -- allows the Borrowers to commence

6 any action by naming the Debtors nominally, so that they can

7 go forward against third parties and seek the relief that they

8 need with respect to their loans.  It does provide that the

9 Debtors are compelled to handle any third-party discovery

10 requests that are provided by the Borrowers, and believe

11 that's consistent with the Bankruptcy Code and the automatic

12 stay.

13    And then finally, Your Honor, it does provide for what I

14 would consider a trapdoor or a catch-all provision, which does

15 allow Borrowers to come to this Court and request a stay

16 relief so that they can adjudicate their claims in the

17 Bankruptcy Court.  Our position is that is, in fact, a

18 trapdoor.

19    Obviously, during negotiations and during the

20 confirmation, the parties are not able to imagine every

21 scenario that the Borrowers may have, and accordingly, may

22 need to adjudicate the claims in a different venue.  We don't

23 believe that this is the situation today.  We believe that the

24 protections that are provided by the Plan are adequate for

25 these Borrowers as well as the protections with respect to

41

1    claims reconciliation process.  Specifically, the Borrowers

2    are permitted to appear telephonically to reduce any costs

3    that they have, and more notably, the Debtors are required to

4    provide a reasonable offer to the Debtors -- or excuse me, to

5    the Borrowers prior to going forward with any claim objection

6    that they may have.  As a result, with respect to the cause

7    factors, the Debtors don't believe that the Borrowers have any

8    prejudice with respect to proceeding with adjudication of

9    their claims within this Bankruptcy Court.

10        In contrast, however, we believe that the Debtors have

11   significant prejudice with respect to having claims

12   adjudicated outside of this jurisdiction, specifically, and by

13   example here, we do have three Borrower requests for stay

14   relief today.  One is in New York, one is in Connecticut and

15   the other is in California.  The Debtors do not have insurance

16   proceeds for these and are not able to seek insurance proceeds

17   to defend the costs of these litigations.  The litigation

18   matters, we believe, as we set forth in our papers, do not

19   have substantial merit with respect to the Debtors, and as a

20   result the Borrowers will be forced -- excuse me, the Debtors

21   -- Debtors and Borrowers to me just goes so hand in hand.  The

22   Debtors would be prejudiced by -- essentially having to go

23   forward on admin claim defense costs for matters that will,

24   given the distributions in this case, exceed any distribution

25   that they would have in the claims process.  We believe that

42

1  the process for claims reconciliation here provides a narrow

2  avenue in which to liquidate these claims and to address any

3  objections that we would have, thereby reducing the cost for

4  the Debtors and reducing the prejudice that the Debtors have

5  with respect to those.

6          THE COURT:  All right.

7          MS. GREECHER:  I would --

8          THE COURT:  All right.  Well, let me hear from the

9  Movants.

10          UNIDENTIFIED SPEAKER:  Your Honor, (indiscernible).

11          THE COURT:  Oh, I'm sorry.  Let me hear from Mr.

12  Power first.  I apologize.

13          MR. POWER:  That's all right, and it probably makes

14  more sense for me to go.

15          THE COURT:  Yes, of course.

16          MR. POWER:  On the Committee -- Mark Power from Hahn

17  & Hessen, counsel for the Committee.  The Committee filed

18  joinders with (indiscernible) -- joinders with the Debtors'

19  position and in opposition to the Motion.  I'm not going to --

20  definitely I'm not going to repeat Debtors' counsel, though we

21  do agree with it and we adopt it.  There are a couple of

22  things I would like to point out to the Court in addition.  As

23  Your Honor is aware, there's going to be a change of guard in

24  the case.   The -- as soon as the Plan can go effective and

25  we're -- as you can see, based on today's hearing, we're

43

1  moving forward towards that date, and we're getting closer and

2  closer.  The liquidating Trustee will be appointed, and will

3  basically take over the liquidation process.

4      This case is a very thin case.  It's not a large

5  distribution, this case.  It's single digits for virtually all

6  Creditors right now absent some major changes.  When the

7  liquidating Trustee is appointed, Mr. Sass *(ph)* will basically

8  then have to come up with a procedure to resolve, hopefully,

9  these claims, and there's a lot of these claims in this

10 estate.

11     It seems to me that one of the things Your Honor should

12 consider about when to grant stay relief is to let that

13 process that Your Honor basically approved in the confirmation

14 of the Plan work itself through, which is you have a change of

15 the guard, we'll see where the estate is coming, and what the

16 distribution does really look like so people can know what

17 they're fighting about as opposed to whether it's a claim or

18 actual dollars, and then give the Trustee -- liquidating

19 Trustee an opportunity to try to see if he can resolve these

20 in a streamline manner.

21     If Your Honor starts granting stay relief all over the

22 country, it's going to create, one, extremely administrative

23 burden to this estate, which doesn't have significant

24 resources, but two, disrupt that process and make it very

25 difficult, we think, to resolve this in a much more efficient

44

1    way.  So we would advocate that Your Honor consider that,

2    particularly the timing right now and where we are in the

3    case.

4              THE COURT:  All right.  Thank you, Mr. Power.

5              MR. POWERS:  Thank you.

6              THE COURT:  Movants.

7              MR. BARNES:  Good afternoon, Your Honor.  Jeff

8    Barnes for Mona Dobben and Dr. David & Elisabeth Jackson.

9    Judge, all the arguments that were raised in the response to

10   the Stay Relief Motions apparently have been addressed by this

11   Court, and on at least several prior occasions, including the

12   Laura Biel *(ph)* claim, the AARP claim or the request for the

13   relief from stay.  For example, in the Laura Biel hearing, the

14   Court asked the question, what prejudice is there for you to

15   having to defend a lawsuit in Virginia as opposed to fighting

16   a proof of claim in Delaware.  And the argument about the

17   Motion to Dismiss essentially that was raised in the response

18   as well.  The Court, well, you can't have that -- can't you

19   have that argument in Virginia in front of a federal judge

20   there on a 12(b)(6) or a 12(c) or, you know, a Motion to

21   Restate the Cause of Action.  I mean, ultimately, you're all

22   entitled to the Complaint -- all you're entitled to in the

23   Complaint is notice pleading, etcetera.

24        So the same arguments as to prejudice have been raised

25   before and rejected.  The same arguments as to, essentially,

45

1    alleging a Motion to Dismiss an action pending in a foreign

2    jurisdiction inside this court have been addressed by the

3    Court, and rejected in the context of granting stay relief.

4    And what I'm trying to understand and what I tried to work out

5    with Ms. Greecher before we came up here today is what was the

6    real nature of the objection other than proceeding against the

7    Debtor entities as nominal Defendants.  The problem with that

8    is if that's what their primary objection is, not withstanding

9    these other objections that have previously been raised and

10   dealt with, is we don't know, at this point, how deep the

11   Debtor entity in this -- the Debtor's affiliated entity in

12   this case, that being American Brokers Conduit was involved in

13   this thing, and there is a conspiracy claim pending in the

14   action that's been filed in New York, which, as Ms. Greecher

15   accurately stated, has not been done -- has not taken any

16   activity as far as issuance of summons or services.  It was

17   simply filed by a date certain because of statue of limitation

18   issues under TILA.  But again, as Your Honor recognized in

19   this other case, how do you decide, at this point, whether the

20   Debtor entity was part of a conspiracy?  You don't.  We don't

21   know yet.  So limiting us to proceeding against the Debtor-

22   related entity in a nominal capacity is a preemptive

23   hamstringing of us in that litigation, as far as the Jackson

24   litigation.

25        Now, as far as the Dobben litigation, I've not been

46

1    retained to prosecute that action.  Apparently that was,

2    according to the papers I've read, a 300-page Complaint that

3    was filed in California.  It was dismissed without prejudice

4    on some procedural grounds, and I do not know yet whether it's

5    been re-filed.  Again, I've not been retained to prosecute

6    that action.  But as far as the Jackson action, I have been.

7    We have local counsel.  It is pending.  There was a status

8    conference on that case about a week ago, and the District

9    Judge in New York wanted to know, you know, when we're going

10   to do something, and frankly, we told him, we have to wait

11   until May 15th, to see if stay relief is granted.

12        So in the grand scheme of things and based upon the

13   history of this case with the other Borrower victims who have

14   moved for stay relief, and not being -- having preconditions

15   imposed on their right to proceed outside of this court in

16   other actions, I don't understand why, all of the sudden, for

17   these specific Borrower victims, the rules have all of a

18   sudden changed.  We're just asking to be treated the same way

19   the other Borrower victims were treated beforehand, Laura

20   Biel, AARP and there are several others in here whose names

21   escape me.  The Valenzuelas *(ph)*, etcetera.  They were all

22   granted a stay relief without preconditions to insert all

23   their claims against the Debtor entities without simply having

24   them sued as nominal defendants.  We would just like to be

25   treated the same way.  We believe that to all of a sudden

47

1    impose these new conditions simply because these claims are

2    being filed now result in disparate treatment of these

3    Borrower victims, which is not warranted under the totality of

4    the circumstances.

5              THE COURT:  Mr. Barnes, I'm very sorry.

6              MR. BARNES:  Sure.

7         (Pause in proceedings.)

8              THE COURT:  I'm sorry.  Well, isn't the answer that

9    was then and this is now, and the primary difference being we

10   now have a current firm plan of reorganization in place; we're

11   moving down towards a liquidation situation; and there is a

12   system in place for moving through and liquidating these

13   claims in the ordinary course, and Ms. Biel and Ms. Rush, if I

14   remember correctly, and the others were making an argument in

15   late '07 and early '08, Judge, you know, we don't know where

16   this case is headed.  And the matters were continued several

17   times, and finally, it was to the point where, yes, I did

18   allow stay relief because the case had not been -- I know

19   everyone's working hard, I'm not being pejorative, but the

20   case had not progressed to the confirmation stage at that

21   point.  But we're beyond that now.  We're, hopefully, at the

22   claims reconciliation process in this case, and that's exactly

23   -- I mean, this is what the Bankruptcy Code -- one of the

24   prime purposes of the Bankruptcy Code, gathering assets,

25   gather the liabilities, all in one place, all in one system,

1   figure it out, disburse it, it's more efficient, etcetera.  So

2   I think we are in a different -- I think the facts are

3   different, the timing is different.  In many -- and so let me

4   ask you this:  What is it that you need -- let me see if I can

5   put it in English.  Why is it that you need the Debtors as a

6   more active defendant, if you will, in your cause of action as

7   opposed to a nominal defendant with your claims process

8   reserved here in Delaware?  What is it that you're losing?

9         MR. BARNES:  Well, I'm anticipating, Your Honor,

10   based upon the -- other of these cases I do around the

11   country, there's going to be cross-claims between the

12   brokerage entity, which was Carteret, which is also in

13   bankruptcy, which is another issue, and the broker themselves,

14   and possibly the trust, and the Debtor entity, which is the

15   American Brokers Conduit, which need to be fleshed out, and

16   those rights and liabilities need to be adjudicated in the

17   federal action, which, as I understand it, can't be done if

18   the Debtor entity is solely in a nominal capacity.

19         THE COURT:  Well, that's true.  I mean, it would be

20   true that if anyone who has a cross-claim against the Debtor,

21   they need to come here to assert that cross-claim.

22         MR. BARNES:  But we don't know --

23         THE COURT:  They can't just assert that claim in New

24   York.

25         MR. BARNES:  Of course not, but we don't know that

1   they're going to do that or not at this point.

2            THE COURT:   Well, it's too late, frankly.

3            MR. BARNES:   Well, --

4            THE COURT:   If they haven't filed yet, they're out

5   of luck.

6            MR. BARNES:   That's their problem.   I --

7            THE COURT:   Yes.   I understand.

8            MR. BARNES:   -- assumed that but --

9            THE COURT:   I understand.

10           MR. BARNES:   -- I'm just trying to do the best I

11  can, in this limited circumstance, without the benefit of a

12  crystal ball --

13           THE COURT:   I understand, sir.

14           MR. BARNES:   -- and with the facts I have to work

15  with.

16           THE COURT:   Very good.   I understand.   Ms. Rush, do

17  you have anything you want to say?

18           THE COURT:   Well, you seem --

19           MS. RUSH:   He wants to allow for protection for the

20  Borrowers to continue to try to assert, you know, their

21  claims, and I didn't read that the way that, I guess, it's

22  being now presented today, and you know, maybe it's semantics,

23  maybe it's misunderstanding or not clear, but I thought it was

24  clear that Borrowers would be able to come to the Court and

25  continue to seek relief from stay to adjudicate.   I mean, I

1   don't know -- I think the claims process itself, you know,

2   could be a good thing but I do have concerns about the

3   liquidating Trustee and the parties that are going to be

4   liquidating the claims and whether that's going to be a fair

5   process or not.  That's all I have to add.

6          THE COURT:  All right.  Ms. Rush, I did miss the

7   very beginning of your comments, so I want to make sure you

8   have an opportunity to -- you were talking, I think, at the

9   beginning, I did catch it, about your understanding versus the

10  Debtors' understanding of what the Plan provisions regarding

11  Borrowers mean.

12         MS. RUSH:  Right.  And the Committee, when we were

13  negotiating for the provisions for the Borrowers, and the way

14  that I read the language as it was written in the Plan, that

15  it says, specifically, the Borrowers would still have the

16  right to come in and ask the Court for relief from stay.  I

17  didn't think there was any language in there that had a time

18  frame that said after such and such date, you're no longer

19  going to be allowed to do that.  I did not see that there was

20  a cut-off date that was put into the Plan.  I understand what

21  you're saying about the late hour, and everybody wants to get

22  everything wrapped up, but these loans live on.  And people

23  have waited, and the Jacksons and the Dobbens have tried

24  desperately to work out their issues behind the scenes with

25  the Debtor for quite some time going back over a year.  It's

1   unfortunate that they thought that they would be able to work

2   it out.  It didn't work out.  They weren't, you know,

3   resolved, and now they have to do something else.  It's not

4   their choice that they waited until this hour.  So --

5         THE COURT:  Well, I'm not being critical of them --

6   of anyone waiting.  My point is simply that the scheme has

7   changed by the passage of time, not that anyone has done

8   anything inappropriate in waiting or attempting to negotiate.

9   I would never discourage anyone from negotiating.

10         MS. RUSH:  Right.  And that's really the only reason

11   why this has gone to this late hour, is because they did both

12   -- Dobben's Relief from Stay Motion got lost in the Clerk's

13   Office since August, and, you know, the Jacksons have been

14   actively and -- you know, they had a lawyer, before Mr.

15   Barnes, that was trying to negotiate for them directly with

16   the Debtor.  They tried to negotiate directly with Ms.

17   Greecher.  It's really not -- I guess I feel it's not fair to

18   ask them -- to tell them that it's too late when they have

19   actually actively been trying to do the right thing and work

20   it out with the Debtor without having to go to this step.  So

21   --

22         THE COURT:  All right.

23         MS. RUSH:  -- that's pretty much all I have to add.

24         THE COURT:  Thank you, Ms. Rush.

25         MS. RUSH:  Thank you.

52

1       THE COURT:  Mr. Barnes.

2       MR. BARNES:  Yes.  Just one more thing, Your Honor.

3  I've read through -- I was handed a copy again by Ms.

4  Greecher.  I've read through, a couple times, this findings of

5  fact, conclusions of law in Order, confirming the Amended

6  Chapter 11 Plan of Liquidation to the Debtors dated February

7  18, 2009, specifically, page 39 paragraph 51 sub I.  And I,

8  again, unless I'm missing something, I don't see where the

9  Plan and the Order confirming the Plan changes the right of

10  the Borrowers to pursue their remedies against the Debtor

11  entities in forms outside of this Court to the extent where

12  they are solely restricted to naming them as nominal

13  defendants, which is another reason why I took issue with Ms.

14  Greecher's assertion of their lack of objection to asserting

15  any claims in a foreign venue against the Debtor entities as

16  long as they were named solely as nominal defendants.  I

17  didn't see anything in this Order that would restrict or

18  otherwise limit the Borrowers to proceeding in that -- against

19  the Debtor entities in that capacity.

20       THE COURT:  Romanette ii, isn't it?

21       MR. BARNES:  I'm sorry.

22       THE COURT:  It's romanette -- I'm looking at Ms.

23  Greecher.  It's romanette ii that has the nominal language.

24  Right?

25       MS. GREECHER:  Your Honor, if I may.  I actually

1  think it's twofold.  With respect to continuation of the

2  existing injunctions and stay, you know, with respect to the

3  automatic stay and the injunctions put in place with the Plan,

4  they're paragraph seven and eight, and they obviously go

5  toward all the Creditor constituents not -- including the

6  Borrowers.  Specifically, Section 51, romanette ii, as you

7  mentioned, does provide the Borrowers' ability without stay

8  relief to proceed, and it is the third line, first word,

9  nominally for the purpose of obtaining relief against a non-

10  Debtor party.

11           THE COURT:  All right.

12           MR. BARNES:  That -- as Ms. Greecher said, that

13  would be outside of a request for stay relief.

14           THE COURT:  You don't have to request stay relief to

15  institute an action against the Debtor in its nominal capacity

16  in order --

17           MR. BARNES:  Right.

18           THE COURT:  -- to be able to continue actions

19  against, hopefully, deeper pockets.

20           MR. BARNES:  Right.  That's why were --

21           THE COURT:  And perhaps --

22           MR. BARNES:  -- requesting state -- right.

23           THE COURT:  Right.  Such as brokers, etcetera.

24           MR. BARNES:  Correct.

25           THE COURT:  And I understand that that's -- the

54

1    Debtor has no objection to the naming of the Debtor as a

2    nominal defendant in New York.

3            MR. BARNES:  Right.

4            THE COURT:  But you want to -- you want further

5    relief.  You want relief to be able to assert and prosecute

6    actual claims against the Debtor in state court in New York or

7    federal court --

8            MR. BARNES:  Federal court.

9            THE COURT:  Federal court.  You said TILA, so

10   federal court in New York.  And the response to that is no

11   way, that's not what we agreed to.  The stay is still in

12   place, you still need stay relief to do that, and Judge, don't

13   let them do that because it's grossly inefficient; it's going

14   to cost all this time, effort, money, and there is already, in

15   place, a claims resolution process that will deal with that

16   directly, which is to the extent you have claims against the

17   Debtor, and your clients filed proofs of claim, which they

18   will have done, those claims can be asserted, liquidated and

19   paid through the bankruptcy process.

20           MR. BARNES:  But on a balancing of hardships, since

21   that's one of the things we're talking about here, any -- as

22   Mr. Brady (ph) previously conceded, any judgment from a state

23   or a foreign jurisdiction, I think the example used in a prior

24   hearing was a state court judgment, would simply result in

25   amendment of the claim, which they can object to anyway.  And

1  Your Honor's already addressed the prejudice of defending in a

2  foreign jurisdiction.  Virginia's farther away from here than

3  New York is.  I mean, three of the Defendants, the named

4  Defendants in that action, are in New York.  They're all in

5  the Wall Street area already.  And I would assume the Debtors'

6  counsel arguing in New York is not going to be a severe

7  prejudice.  On the other hand, if our clients are basically

8  constricted to litigating their claim against the non-Debtor

9  Defendants solely in a -- or the Debtor Defendant solely in a

10 nominal capacity, one of the scenarios I can see coming is

11 that the other Defendants, they say, oh, it's all their fault.

12         THE COURT:  Yes.  You're afraid you're going to get

13 whipsawed.

14         MR. BARNES:  There you go.  Thank you.

15         THE COURT:  Well, I -- thank you, Mr. Barnes.  Ms.

16 Greecher, anything further?

17         MS. GREECHER:  Your Honor, I think that -- there's a

18 couple things I wanted to address in terms of the differences

19 here in time frame, I think Ms. Rush was right, that these

20 loans live on.  And they have lived on and they've lived on to

21 find new homes, pardon the reference, with subsequent owners

22 and subsequent servicers.  And in fact, those are the right

23 people that the Borrowers need to go against in these matters.

24 And seeking relief to present something against the Debtors is

25 an inefficient way to handle those actions.  While we

1    understand that going forward against the Debtors nominally

2    does address the procedural burden that Borrowers may have

3    with respect to matters or causes of action, such as TILA,

4    where they're seeking assignee liability or relief under the

5    TILA claims, they can do so.  The idea is that the Borrowers

6    can bring whatever claims that they would like against the

7    Debtors in a nominal capacity.  (Audio interference.)  I sound

8    like Kermit.  In a nominal capacity and they can proceed with

9    any findings of fact that they --

10              UNIDENTIFIED SPEAKER:  Excuse me.  Parties on court

11   call, please mute your phone immediately.  Thank you.

12              THE COURT:  I'm sorry.

13              MS. GREECHER:  That's okay.

14              THE COURT:  Been one of those days.

15              MS. GREECHER:  Your Honor, I think the Borrowers are

16   free to assert any allegations that they wish with respect to

17   the Debtors in connection with those, and to present the

18   evidence that they have with respect to not just the Debtors

19   but of the third parties.  The issue here is that we just

20   don't want any judgments or findings of fact that result from

21   that court action to be brought here as a preclusive effect to

22   the claims reconciliation process.

23        There are a couple of items.  One, I would just say that

24   these claims will need to go through the reconciliation

25   process.  There are classification issues that the Debtors

1    have with these claims, and they, you know, will be subject to

2    claims objections with respect to that.  It would be, I

3    believe, more convenient for the Debtor, and the Borrowers

4    alike, to hopefully resolve these claims within the claims

5    reconciliation process, not just by priority classification

6    but also in validity and amount.

7            THE COURT:  All right.  Yes, Mr. Barnes.

8            MR. BARNES:  I'm sorry.  Just one final thing.

9            THE COURT:  All right.

10           MR. BARNES:  One of the issues that we have to

11   address in this, Judge, and one of the things we need to get

12   to proceed forward is a response to TILA Section 1641(f)(2),

13   to provide the identity of who the current owner and servicer

14   of the mortgage is, which we've never gotten from them here.

15   And if we can't proceed affirmatively against them in the

16   context of at least discovery to find this out, the entire

17   claim is hamstrung.

18           THE COURT:  All right.  (Indiscernible.)  I know

19   we've been through this.

20           UNIDENTIFIED SPEAKER:  Your Honor, we have.

21           MS. GREECHER:  Your Honor, we have.  And actually, I

22   would state that the Borrowers, in this case, actually have

23   identified, in both of their Complaints, the Jackson and the

24   Dobben Complaint, which I understand he has not been retained

25   in and was filed on a pro se basis, they have identified the

1  trusts in which these were securitized.  So I think that the

2  Borrowers have that information.  With respect to the TILA

3  requests under -- and I apologize, I think it's 1640 --

4       UNIDENTIFIED SPEAKER:  Well, it's 1641(f)(2).

5       MS. GREECHER:  -- 41(f)(2), that's a servicer

6  responsibility for those RESPA requests and, you know, we've

7  provided the information we have.  Ms. Jackson and, I believe,

8  Ms. Dobben both have their completed loan files from the

9  Debtor, and I believe that that's written in their Complaints

10  as well.

11       THE COURT:  Okay.  I'm going to deny the Motions.  I

12  -- I am cognizant of the danger of whipsaw, for lack of better

13  word, that the Claimants may be being put in.  But I'm not

14  sure, even were I to provide stay relief, I could do much

15  about that given that the -- any claims against the Debtor,

16  cross-claims, etcetera, by the other parties, the pointed

17  fingers, etcetera, would probably be as difficult to

18  reconcile, given the Debtors' financial situation and the lack

19  of employees, etcetera, with or without stay relief.  And

20  there's a real cost, significant cost, to requiring the

21  Debtors to continue to defend these actions in New York and

22  California and Virginia, and even in Camden or in Philly or

23  Chester.  It doesn't have to be that far away.  Or even down

24  in Dover.  I mean, there's all sorts of issues.  There's a

25  reason -- and I feel like a broken record today.  I think I've

1   said it five or six times, but this claims process is really

2   one of the primary aims of the Bankruptcy Code, which is to

3   bring everybody into one place, one clearinghouse to do this

4   efficiently.  If this were a personal injury action, for

5   instance, often stay relief is granted to allow prosecution of

6   a Debtor in a personal injury action, but solely for purposes

7   of going against insurance proceeds, solely for purposes, as

8   here, of basically naming a nominal defendant to allow the

9   action to go forward against the parties who really have the

10   ability to provide real economic relief to the Claimants.  The

11   Debtors don't.  And the more they spend on having to defend

12   these actions, the less they'll have to spend to provide the

13   relief that their Claimants deserve.  People who have allowed

14   claims against this -- the Debtor should get paid as much as

15   the value of the assets, reasonably, can pay them.  The best

16   place to do that is Bankruptcy Court through the claims

17   resolution process, not in federal court in New York, having

18   to do a full-blown defense of a TILA action or any other

19   action.  Certainly, nominal defendant, under the terms of the

20   Borrowers' carve-out, if you will, in the Plan and

21   Confirmation Order is appropriate.  That's why it's there, to

22   make sure that the Borrowers actually have the ability to get

23   a remedy against the people who can hopefully pay them

24   something, but I'm not going to allow it to go any further, so

25   I'll deny both Motions.

1      And Ms. Greecher, do you have Orders?  Or you can submit

2  them under certification.

3           MS. GREECHER:  I'll submit a Proposed Form --

4           THE COURT:  Thank you.

5           MS. GREECHER:  -- of Order under certification as

6  well as the Motion -- or excuse me.  The Order with respect to

7  Ms. Jackson's late filed claims and those being allowed.

8           THE COURT:  Okay.  Thank you.

9           MS. GREECHER:  Your Honor, I believe that concludes

10  the matters I have for today and leaves claim objection or --

11  so I'm going to cede the podium to Mr. Grow.

12           THE COURT:  Grow.

13           MR. BARNES:  Thank you, Your Honor.

14           THE COURT:  Your welcome, Mr. Barnes.

15           MR. GROW:  Good afternoon, Your Honor.  Nathan Grow

16  of Young, Conaway, Stargatt & Taylor on behalf of the Debtors.

17  A few items related to claim objections to run through today.

18  First of all, item number 24 on the agenda is the Debtors' 15th

19  Omnibus Objection to claims, which was heard a while ago.  We

20  have several claims that were adjourned out of that.  We had

21  scheduled a couple of those to go forward today.  One is the

22  objection with regard to a claim filed by Shervonne Powell.

23  The objection's on the basis of insufficient documentation.

24  We received some additional documentation and a plea for

25  additional time recently, and we've agreed to adjourn with

61

1   respect to that one.

2          THE COURT:  Okay.

3          MR. GROW:  The other claim out of the 15th that I'd

4   like to talk about is the claim of Joshua Kappelman, claim

5   number 2420.  This was also an objection by the Debtors on the

6   basis that insufficient documentation was provided.  Dating

7   back a while, we came to an agreement with Mr. Kappelman to

8   expunge 2420 on the condition that the Debtors allow other

9   claims.  We have dealt with the other claims, but we neglected

10  to get an order entered expunging 2420.  Mr. Kappelman is in

11  agreement with this disposition of the claim.  I have a copy

12  of an Order here and would request that Your Honor enter it.

13         THE COURT:  Okay.

14         MR. GROW:  I'll hold on to it for just a second and

15  hand it up to you with some --

16         THE COURT:  Okay.

17         MR. GROW:  -- other ones maybe though.

18         THE COURT:  That's fine.  That's fine.

19         MR. GROW:  Okay.  Moving on to item 25 on the

20  agenda, this is the Debtors' 17th objection to claims, omnibus

21  objection claims.  We scheduled the claim of Matthew Liang as

22  going forward today.  Debtors object to this claim on the

23  basis that insufficient documentation was provided.  He

24  responded submitting a HELOC statement.  He has -- had a home

25  equity line of credit with American Home Mortgage.  He

1   submitted his statement which shows that he owes -- well, it

2   shows a balance under his home equity line of credit.  The

3   amount of his claim was the total credit limit of his HELOC.

4   We have exchanged a number of phone calls and e-mails with Mr.

5   Liang asking if he has any additional documentation to submit

6   in support of his claim, and we let him know that we were

7   going forward today, and we have received no additional

8   documentation.  I don't think Mr. Liang is represented or on

9   the phone, but we would request that his claim be expunged.

10        THE COURT:  Is there anyone on the phone on behalf

11   of Mr. Liang?  Anyone present?

12      (No verbal response.)

13        THE COURT:  Hearing and seeing none, I'll sustain

14   the claim objection.

15        MR. GROW:  Okay.  And I will hand up an Order on

16   that one as well.  The other one -- what -- we've also

17   scheduled the 29th omnibus objection to go forward today with

18   respect to the claim of James Rucker.  If we can take things

19   out of order, I think we have some quicker things that we can

20   get through and come back to that one or would you rather --

21   we could deal with this one now.  We'll save that one until

22   the end if that's okay, Your Honor.

23        THE COURT:  Okay.

24        MR. GROW:  Moving on to the 31st omnibus objection to

25   claims, the Debtors objected to a claim filed by Michael

63

1    Surowiec, claim number 6635.  Mr. Surowiec is a former

2    employee of American Home Mortgage.  He submitted a claim for

3    38,750 priority for an unpaid bonus and for reimbursement of

4    expenses incurred in moving, and attached a copy of his

5    employment contract and claims that these amounts are owing

6    under that contract.  We've discussed this with Mr. Surowiec.

7    I don't believe that there is a dispute regarding his bonus.

8    His contract is very clear in that it says that he needed to

9    be employed on the scheduled payment date for this bonus in

10   order to receive it, and Mr. Surowiec was fired on August 3rd,

11   2007.  The scheduled payment date occurred after that.  With

12   regard to the moving expenses, this is where the dispute lies.

13   Although Mr. Surowiec is I don't believe on the phone or here

14   to argue this, the Debtors agree he is owed the moving

15   expenses that he alleges in his contract, $14.970.21, but he

16   alleges them as a priority claim and the Debtors believe that

17   it is a general unsecured claim.  There's no provision of the

18   Bankruptcy Code that provides for priority for the

19   reimbursement of moving expenses.  Section 507(a)(4)(A) of the

20   Code --

21          THE COURT:  All right.  Is there anyone here on his

22   behalf?

23      (No verbal response.)

24          THE COURT:  Moving expenses are not priority claims.

25   Objection sustained.

1        MR. GROW:  Okay.  Thank you, Your Honor.  So those

2    are our three one-offs.  Maybe -- could I approach and hand up

3    Orders --

4        THE COURT:  Yes, you may.

5        MR. GROW:  -- regarding those three.

6    (Counsel approaches.)

7        THE COURT:  Thank you.

8        MR. GROW:  Okay, Your Honor.  Item number 31 on the

9    agenda is a Relief from Stay Motion filed by Bayview.  It was

10   listed on the agenda as going forward; however, we had --

11   after submitting the agenda, we had discussions with their

12   counsel and agreed to adjourn it.  We notified your chambers,

13   I believe yesterday, so that one is adjourned.

14       Item number 32 on the agenda we will hold onto and

15   address at the same time that we address the objection to Mr.

16   Rucker's claim.  Item number 32 is a Motion by Mr. Rucker

17   regarding his recoupment rights.  So moving on now to -- well,

18   I guess jumping back.  Item number 22 on the agenda is the

19   Debtors' 32nd omnibus non-substantive objection claims.  This

20   -- there were no responses filed with respect to the 32nd

21   objection.

22       THE COURT:  All right.  Are there any changes?

23       MR. GROW:  No changes.

24       THE COURT:  All right.  I reviewed it.  I don't have

25   any issue.  I'll sign it.

65

1          MR. GROW:  Okay.  I have an Order here that I can

2    hand up.

3          THE COURT:  Okay.

4          MR. GROW:  And then the last item is the 33rd omnibus

5    substantive objection claims.  We received a few responses to

6    this one that I can run through quickly.  And if it's helpful,

7    I can hand up an Order and a blackline showing changes that

8    were made.

9          THE COURT:  Okay.

10          MR. GROW:  May I approach?

11          THE COURT:  Is the Exhibit U?

12     (Counsel approaches.)

13          THE COURT:  Thank you.

14          MR. GROW:  Okay, Your Honor.  In the Revised Form of

15    Order I handed up, it states that the 33rd objection is

16    adjourned with respect to the claims filed by W2007 Seattle

17    Office Bellefried, Eileen Lavan and the State of Hawaii, and

18    the objection is withdrawn in part by the Debtors, without

19    prejudice, with respect to the claims of Loraine Calvo, Mason

20    McDuffie and Mason McDuffie Mortgage Corporation.  That leaves

21    us three responses to address quickly, one that has been

22    consensually resolved, two that have not been consensually

23    resolved; however, I don't believe anybody is here to argue

24    about them.

25          So referring to, I believe, Exhibit U to the agenda

66

1   filed, item number 1 is a claim filed by Caren Goodman.

2        THE COURT:  Right.

3        MR. GROW:  Ms. Goodman is a borrower of AHM.  She

4   filed claim number 10195, which the Debtors objected to on the

5   basis that she submitted insufficient documentation.  Her

6   claim is for $6,958.89 secured for tax and insurance charges

7   related to the loan.  The Debtors disagree with the amounts

8   owed, but are willing to allow the claim in that amount to

9   avoid a fight over an insubstantial amount of money, provided

10  that the Court will --

11       THE COURT:  Reclassify as unsecured.

12       MR. GROW:  -- reclassify as unsecured.  Exactly.

13  Ms. Goodman's position is that her claim is secured by the

14  property, that she received a loan for the property.  The loan

15  is secured by the property.  Her claim is not secured by the

16  property.  We explained this to her but could not come to an

17  agreement about it so we would ask that the Court --

18       THE COURT:  Is there anyone here on behalf of Ms.

19  Goodman.

20      (No verbal response.)

21       THE COURT:  All right.  Claim objection sustained.

22  It's an unsecured claim.

23       MR. GROW:  Okay.  Thank you.  We adjusted the Order

24  accordingly so that it listed as reclassified rather than

25  expunged.

1          THE COURT:  All right.

2          MR. GROW:  Item number 2 in Exhibit U on the agenda

3    is a claim filed by Jess Meatte.  I'm not sure I know how to

4    pronounce that but --

5          THE COURT:  I see it.

6          MR. GROW:  -- we came to a consensual resolution

7    regarding this one to expunge it.  Just in brief, it was a

8    claim for severance, which it was clear in Mr. Meatte's

9    employment contract, that he was not entitled to a severance.

10   He agrees with this, and we ask that the claim be expunged.

11         The last one to address, item number 3 on Exhibit U, is a

12   claim filed by Wayne McGill.  He is also a borrower of AHM,

13   had a home equity line of credit.  Debtors objected on the

14   basis that he had not submitted sufficient documentation to

15   support his claim.  In response, he filed a HELOC statement

16   showing that he owes approximately $77,000 under his home

17   equity line of credit.  Also on a form attached, he stated

18   that, quote, line of credit, home market value upside down.

19   We contacted Mr. McGill to get some clarity and to see if he,

20   indeed, had any sort of claim against American Home Mortgage.

21   After speaking with him, he could not further explain any

22   basis for a claim.  Given notice of the hearing and, along

23   with all these other Claimants, instructions how to

24   participate telephonically, I don't believe he's on the phone

25   or otherwise represented here, and we would ask that his claim

1   be expunged as proposed in the objection.

2          THE COURT:  Is there anyone here on his behalf?

3      (No verbal response.)

4          THE COURT:   The claim's expunged.

5          MR. GROW:  Thank you, Your Honor.  That's all for

6   me.

7          THE COURT:  These are all with --

8          MR. GROW:  Now I think we can move on to --

9          THE COURT:  All my rulings are reflected already in

10  the Order?

11         MR. GROW:  That's correct.

12         THE COURT:  You're a confident young man.  I like

13  that.  I'll sign the Order.

14         MR. GROW:  Then I will hand over the podium to Mr.

15  Crowther.

16         THE COURT:  I'm sorry, Mr. Grow.  We have to take a

17  little break.  It will be short but we'll take a short recess.

18     (Recess from 4:29 p.m. to 4:38 p.m.)

19         MR. CROWLER:  Good afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MR. CROWLER:  Curtis Crowler from Young, Conaway,

22  Stargatt & Taylor on behalf of the Debtors.  The last two

23  matters involve Mr. James Rucker, a borrower for American Home

24  Mortgage.  There are two separate matters.  One is a claim

25  objection the Debtors had filed to his claim, essentially

1  saying there was no liability set forth in the claim because

2  we couldn't determine what it was.  And two, Mr. Rucker has

3  also filed a Motion to Preserve a Recoupment or Setoff Right

4  that he may have to amounts that may be due under that note

5  relative to his claim.  We had this matter scheduled for an

6  evidentiary hearing.  We had contacted chambers because Mr.

7  Rucker was coming in from California, but at the same time, we

8  were able to work out some arrangements to sort of streamline

9  this process, and make it much more focused and easier, not

10  only for the parties but for the Court as well.  The claim is

11  -- as filed, was approximately three and a half inches thick,

12  with a lot of documents, so we would have been here for a

13  while for an evidentiary hearing.

14      We have agreed to, one, essentially adjourn the matter

15  for the time being.  We are going to enter a preliminary

16  stipulation that we would ask to submit under Certification of

17  Counsel.  It does a couple of things:  One, it adds Mrs.

18  Rucker to the claim since she is a co-Borrower under the note,

19  but she did not sign the claim.  Counsel informs me that he

20  has the authority to represent Mrs. Rucker, and we will add

21  her by stipulation so that all parties are before the Court.

22      Two, the (indiscernible) claim is filed by Mr. Rucker,

23  which was a pro se claim.  He has asserted secured and

24  priority status.  The security, we all agree, is as to any

25  amounts owed under the note and not to any other property of

1    the Debtors.  So to the extent that any reserves will be

2    required for a secured claim, it does not apply since it

3    simply reduces the amount owed under the note.  He doesn't

4    have the lien against any other property of the Debtor.  That

5    will also be accomplished in the stipulation.

6        Third, there is no priority status for the claim,

7    therefore, not requiring a reserve for a priority claim as

8    well; however, the Debtor will agree and will put in the

9    stipulation that Mr. Rucker's and Mrs. Rucker's recoupment

10   rights as to any amounts under the note to the extent they

11   have any damaged claim for any alleged breach does, in fact,

12   remain.  So that all of that is protected, preserved, and we

13   would essentially moot the second Motion, and basically focus

14   things here.

15       We've also agreed that in order to make sure that Mr.

16   Rucker or Mrs. Rucker does not have to come back to Delaware,

17   that we will agree to do a deposition to the extent testimony

18   is required.  Since we know that Your Honor does not allow

19   witnesses to appear by phone, we would do that in advance, if

20   it's actually required.  We are hopeful that we are able to

21   work it all out, and never have to come back here again, but

22   if we are unable to, we would ask the Court for a hearing,

23   that -- which will be an evidentiary hearing, but it would be

24   much more narrowly focused and much more streamlined than now.

25           THE COURT:  Make sure you ask for a special hearing,

1  not just a -- normally that's not a problem, but as the

2  calendar's gotten busier, it's harder to fit evidentiary

3  hearings in during omnibus hearings so --

4          MR. GROW:  Certainly, Your Honor.

5          THE COURT:  I do allow -- not by telephone, but I do

6  allow by video so if that's -- that's always available to

7  people if they wish, but if the parties agree on deposition,

8  that's fine with me.

9          MR. GROW:  Thank you for the accommodation, Your

10  Honor.

11          THE COURT:  Your welcome.  Mr. Brown.

12          MR. BROWN:  Thank you, Your Honor.  Mr. Crowler's

13  set forth basically what we had agreed to, and I'm grateful

14  for that.  I think it would have been a fairly long hearing,

15  and I think there's an awful lot of facts that we can

16  stipulate to beforehand, if we have to go forward.  And, quite

17  frankly, what I'm hopeful for, from the discussion that we had

18  beforehand, that we can discuss a loan modification, and move

19  forward under those terms.  I think that would actually

20  provide some benefit to the Debtors' estate; it would allow

21  the Rucker family to keep their house; it would pay off some

22  of -- a significant number of unpaid subcontractors there, so

23  I've got my fingers crossed that we'll be able to accomplish

24  that and not even be back before Your Honor, except for

25  approving some kind of stipulation approving that loan

72

1    modification.

2          THE COURT:  All right.  I'm always hopeful that the

3    parties can reach a consensual basis, and much to the benefit

4    of the Court and this jurisdiction, that's almost always the

5    case so I wish you all the best in connection with that.  I'll

6    await a stipulation under Certification of Counsel.

7          MR. CROWLER:  Thank you, Your Honor.

8          THE COURT:  Very good.

9          MR. GROW:  Thank you, Your Honor.

10         THE COURT:  Yes.  Anything further on that matter?

11      (No verbal response.)

12         THE COURT:  All right.  Thank you.

13         MR. GROW:  No, Your Honor.

14         THE COURT:  Anything further in American Home?

15         UNIDENTIFIED SPEAKER:  No, Your Honor.

16         THE COURT:  All right.  Thank you.  Hearing

17    adjourned.

18      (Court adjourned at 4:43 p.m.)

19                        CERTIFICATE

20         I certify that the foregoing is a correct transcript

21    from the electronic sound recording of the proceedings in the

22    above-entitled matter.

23

24    /s/April J. Foga                    May 25, 2009
      April J. Foga, CET, CCR, CRCR

25

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880