UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        ) Case No. 07-11047(CSS)
                              ) Chapter 11
AMERICAN HOME MORTGAGE        )
HOLDINGS, INC., a Delaware    ) Courtroom No. 6
Corporation, _et al.,_        ) 824 Market Street
                              ) Wilmington, Delaware 19801
                              )
          Debtors.            )
                              ) May 19, 2009
                              ) 10:41 A.M.

TRANSCRIPT OF CALYON LITIGATION
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Young Conaway Stargatt & Taylor, LLP
                          By:  JOHN DORSEY, ESQ.
                               CURTIS CROWTHER, ESQ.
                               MICHELE SHERRETTA BUDICAK, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, Delaware 19899-0391

For Bank of America:      Potter Anderson & Corroon, LLP
                          By: GABRIEL R. MacCONAILL, ESQ.
                          Hercules Plaza, P.O. Box 951
                          1313 N. Market Street
                          Wilmington, Delaware 19899-0951

ECRO:                     LESLIE MURIN

TRANSCRIPTION SERVICE:    TRANSCRIPTS PLUS, INC.
                          435 Riverview Circle
                          New Hope, Pennsylvania 18938
                          Telephone:  215-862-1115
                          Facsimile: 215-862-6639
                          e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

Appearances:
(Continued)

For Calyon New York          Womble Carlyle Sandridge & Rice, PLLC
Branch:                      By:  MICHAEL BUSENKELL, ESQ.
                             222 Delaware Avenue, Suite 1501
                             Wilmington, Delaware 19801

                             Hunton & Williams
                             By:  JASON W. HARBOUR, ESQ.
                                  BENJAMIN C. ACKERLY, ESQ.
                                  TOM RICE, ESQ.
                             Riverfront Plaza, East Tower
                             951 East Byrd Street
                             Richmond, Virginia 23219-4074

TELEPHONIC APPEARANCES:

For Official Committee       Hahn & Hessen LLP
of Unsecured Creditors:      By:  JEFFREY ZAWADZKI, ESQ.
                             488 Madison Avenue
                             New York, New York 10022

3

INDEX

| | Page |
|---|---|
| OPENING STATEMENT: | |
| On behalf of the Debtors, by Mr. Dorsey | 4 |
| On behalf of Calyon, by Mr. Ackerly | 11 |

| WITNESS FOR THE DEBTORS: | Direct | Cross | Redirect | Recross | Voir Dire |
|---|---|---|---|---|---|
| DR. RONNIE J. CLAYTON | | | | | |
| By Mr. Crowther | 19/30 | | | | |
| By Mr. Harbour | | 38 | | | 27 |

| WITNESS FOR THE CALYON: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JOHN-CHARLES VanESSCHE | | | | |
| By Mr. Ackerly | 76 | | 169 | |
| By Mr. Dorsey | | 135 | | |

| DEBTORS' EXHIBITS: | Marked | Received |
|---|---|---|
| D-1  Analysis prepared by Compass Analytical | 53 | 56 |
| D-2  Comparison | 56 | 56 |
| D-3  Comparison | 56 | 56 |
| D-4  Comparison | 56 | 56 |
| D-5  Document | 52 | 52 |
| D-6  9/5/07 Internal Memorandum | 57 | 58 |
| D-7  Document | 52 | 52 |
| D-8  Document | 52 | 52 |
| D-9  Document | 52 | 52 |
| D-10 Document | 52 | 52 |
| D-11 Internal Memorandum (10/31/08) | 58 | 60 |
| D-12 Internal Memorandum (2/3/09) | 58 | 60 |
| D-13 Post August 2008 objection | 60 | 61 |
| D-14 Compass Valuation Report | 61 | 61 |
| D-15 Document | 52 | 52 |
| D-16 Document | 52 | 52 |
| D-17 Document | 52 | 52 |
| D-18 Document | 52 | 52 |
| D-19 E-mail from Mr. VanEssche | 61 | 61 |
| D-20 Document | 52 | 52 |
| D-21 Document | 52 | 52 |
| D-22 Letter from Federal Reserve Bank | 62 | 64 |

4

INDEX

<u>DEBTORS' EXHIBITS</u>:                                    <u>Marked</u>  <u>Received</u>

D-23 Letter from Mr. VanEssche's                 65       65
D-24 Document                                    65       65
D-25 Document                                    52       52
D-26 Document                                    52       52
D-27 Document                                    52       52
D-28 Deposition designations                     49       70


<u>CALYON'S EXHIBITS</u>:                                     <u>Marked</u>  <u>Received</u>

C-1 Affidavit of Michael Strauss                 74      74/136
C-2  Stipulation of Facts and Exhibits          136       136
Stipulation of facts and exhibits thereto       124       127
C-3  Loan tapes                                  90       136
C-4  Loan tapes                                  90       136
C-5  Loan tapes                                  90       136
C-13 Letter, 8/1                                135       136
C-14 Letter, 8/27                               135       136
B    Deutsche Bank report                       127
C    Deutsche Bank summary report               133
D    Deutsche Bank report                       134
K    Proof of claim                             115
L    Proof of claim                             115
M    Proof of claim                             115
N    Proof of claim                             115
P    Listing of funds                           116

1          THE COURT:  Please be seated.  Good morning, Mr.

2  Dorsey.

3          MR. DORSEY:  Good morning, Your Honor.  John Dorsey,

4  Young Conaway Stargatt & Taylor on behalf of the debtors.

5          We are here today, Your Honor, on the debtors'

6  objection to Calyon's proof of claim.  And the issue before the

7  Court is really a rather simple one.  I thought I would just

8  take a few minutes to outline how we think this hearing is

9  going to go and what the evidence is going to be.

10          THE COURT:  Please do.

11          MR. DORSEY:  The issue is what is the amount, if any,

12  of Calyon's damage claim under Section 562 of the Bankruptcy

13  Code.  And Section 562 is very straightforward, Your Honor.  It

14  says, "In the context of a repo agreement, damages are measured

15  as of the earlier date of liquidation, termination or

16  acceleration of the repo."  The parties have agreed to a number

17  of stipulated facts and a binder with that stipulation and the

18  documents behind that stipulation should be on the bench up

19  there for you.  One of those facts that the parties have

20  stipulated to is that at a minimum Calyon accelerated the repo

21  agreement as of August 1, 2007, five days before the debtors'

22  filed for bankruptcy protection.  Now Calyon will argue that

23  the appropriate valuation, the only appropriate valuation is

24  the sale value, but the evidence is going to show that, that is

25  not correct.  What the evidence will show is that on August 1,

6

1  2007 by at least two different methodologies, the mortgage

2  loans were valued at or above par which would mean that Calyon

3  has no damages whatsoever.

4        First, Calyon, itself, hired a company by the name of

5  Compass Analytics to provide them with an analysis or the value

6  of the loan as of July 30th, 2007, just two days before they

7  accelerated.  That was done on a mark-to-market basis which

8  showed a value of a 101 cents on the dollar above par.

9  Calyon's own trial expert who determined the value on a fair

10 market value basis found that on August 1st, the value was 99.8

11 cents, assuming certain things like whether there was an issue

12 about the ownership of the loans the saleability of the loans,

13 which I'll discuss in a moment.

14        Third, the debtors' trial expert, Professor Clayton,

15 will opine that the loans were valued at or near par on a

16 discounted cash flow basis on or about August 1, 2007.

17        That, in a nutshell, Your Honor, is the debtors' case

18 in chief which not only rebuts the prima facie assumption that

19 proof of claim is correct, but also establishes that they

20 actually have no damages whatsoever.

21        Under 562, Calyon then has the burden to show that

22 there were no commercially reasonable determinants of value on

23 August 1, 2007.  And I think its important to note, Your Honor,

24 that 562 refers to determinants plural, not singular.  Calyon's

25 evidence in that regard will be to say that they could not have

7

1  sold the loans on August 1st and, therefore, there was no
2  commercially reasonable determinants of value.  That argument
3  presumes that liquidation of the loans is the only way to
4  determine value.  And as I stated previously, that presumption
5  is simply incorrect.

6       Calyon's argument is based upon several purported
7  facts:  One, that Deutsche Bank who, as the Trustee for this
8  repo agreement, didn't have all of the loan files.

9       Two, that MERS, and I assume Your Honor is very
10  familiar with MERS at this point having dealt with this case
11  for some time now, listed AHM as the owner of the loans.

12       Three, because the debtors' contested whether the
13  repo was a true repo, there was a cloud on the title and it
14  could not have been sold on August 1st.

15       Four, because we were -- because the debtors were
16  alleging contesting servicing rights, the ownership of the
17  servicing rights, no one would have bought the loans on August
18  1st.

19       And, five, because the debtors were -- allegedly not
20  turning over P&I on August 1st and other funds collected under
21  the underlying mortgage assets, that no one would have bought
22  the loans on that date.

23       The evidence, however, will show that Calyon's
24  position is flawed.

25       One, there's no evidence that Calyon even attempted

1  to sell the loans on August 1st, 2007.

2            Two, despite what Calyon says now, the documents sent

3  to Deutsche Bank are precisely the documents that were supposed

4  to be sent under the terms of the repo agreement that they

5  signed.

6            Three, of course, MERS and, again, under the repo

7  this is the way it works, would have listed AHM as the owner.

8  This was a repo.  These were supposed to be moving loans on and

9  off this line, securitizing them as they went along.  AHM could

10 not have accomplished that if they were not listed as the owner

11 of the loans.  And if Calyon really wanted to sell the loans on

12 August 1st, they could have simply executed the assignment and

13 had the loans transferred to their name and they would have

14 been able to sell them if that's what they really wanted to

15 know.

16           Clearly, Calyon knew when it entered into this repo

17 agreement what these requirements were, and they very

18 vigorously fought in this Court to prove that this was a true

19 repo.  That -- and they have to take the burdens that go along

20 with the benefits of being a repo.

21           The fourth issue, Your Honor, is that AHM did not

22 contest the ownership or the true -- or whether it was as true

23 repo until after the bankruptcy filed, after August 6th, 2007.

24 So that's a red herring, Your Honor.  There was no assertion by

25 the debtors on August 1st that these loans belonged to them or

9

1  this was not a true repo.

2        Five, money didn't stop flowing to Calyon until after

3  the bankruptcy filing.  Again another red herring.

4        And most importantly, Your Honor, the evidence is

5  going to show that Calyon never intended, from August of 2007

6  until today, to sell the loans.  Rather it's strategy has been

7  from the very beginning to collect -- to hold the loans, to

8  collect the payments, and wait for market conditions to

9  improve.

10        Indeed, the evidence will show that Calyon continues

11  to collect 10 to $12 million every month on the underlying

12  mortgage assets and that it has collected over $275 million

13  since August of 2007.

14        Section 562 says what it says very clearly, Your

15  Honor.  It doesn't require value to be determined on a

16  liquidation basis.  Indeed, it contemplates that a damage claim

17  could be determined at the time of either the liquidation of

18  the loans, the sale of them, or a termination or an

19  acceleration.  Clearly, 562, by its own terms, contemplates

20  more than one commercially reasonable determinant of value

21  because it uses the plural form of determinants.

22        Moreover, the evidence will show that the repo itself

23  contemplated upon an event of default either a sale of the

24  loans -- these are what the -- Calyon could have done in the

25  event of a default or acceleration.  It could have sold the

1  loans under the repo without giving any notice whatsoever to

2  the debtors.  It could have kept the loans and offset the value

3  of those loans to the debtor.  Obviously they could hold them,

4  not sell them.  Or, three, setting off against other amounts

5  that the debtors' may have had in Calyon accounts, which they

6  actually did.  They swept about $26 million from an AHM

7  account.

8         But regardless, Your Honor, Section 562 clearly says

9  that Calyon's damage claim was fixed as of August 1, 2007.

10         With the benefit of hindsight, Calyon now wants to

11  say well we couldn't have sold them on August 1st.  But the

12  evidence simply doesn't support that.

13         The evidence does -- excuse me.  Even if the Court

14  finds there were no commercially reasonable determinants of

15  value on August 1, which I believe you will, the parties have

16  agreed to limit the other dates that the Court could use to

17  determine when the next available date was for a commercially

18  reasonable determination of value.  That was simply because it

19  would have been impossible, Your Honor, we would have -- both

20  sides would have been coming in wondering what date is the

21  other side going to be using to argue to the Court.  The

22  debtors have taken the position that if it's not August 1st,

23  which we think it should be, that it would either be September

24  30th, 2007, which was right before the date when the debtors

25  were able to sell the Broadhollow loans and/or January 30th,

1  2008, which is a date after the Court had entered its ruling as

2  to whether or not this was a true repo under Phase I of the

3  original trial.

4        But basically, Your Honor, we believe the evidence is

5  going to show, and Your Honor will have no difficulty in

6  finding, that Calyon's damage claim was fixed on August 1st,

7  2007, that the value of the loans was par or above par, and

8  that they have no damages whatsoever.

9        Thank you.

10       THE COURT:  Thank you.  Mr. Ackerly, good morning.

11       MR. ACKERLY:  Good morning, Your Honor.  Ben Ackerly

12  here on behalf of Calyon New York Branch.  I have with me Jason

13  Harbour and Michael Busenkell as co-counsel with me.

14       I agree with Mr. Dorsey, Your Honor, that this is a

15  fairly simple case.  It is, though, like the first litigation

16  we had before you, I believe a case of first impression with

17  respect to the interpretation of Section 562 of the Bankruptcy

18  Code.

19       The Court will recall from the adversary proceeding

20  that we tried in this Court that Calyon New York Branch is the

21  administrative agent under a repurchase agreement.  And as that

22  administrative agent, it filed four proofs of claim against the

23  debtor parties to the repurchase agreement for the repurchase

24  price under the repurchase agreement.

25       And as Mr. Dorsey has said, the debtors objected to

1 those proofs of claim based on Section 562(a) of the Bankruptcy

2 Code because, as Mr. Dorsey says, we did accelerate, and we

3 accelerated on August 1st, 2007.  And they say that because we

4 accelerated on August 1st, 2007 that that is the date upon

5 which our damages must be measured.

6 　　　　Our case, on the other hand, Your Honor, is based

7 upon 562(b).  And 562(b) provides that if there's not a

8 commercially reasonable determinant of value as of August 1st,

9 then the Court should set the damage date at the first

10 commercially reasonable determinant after August 1st, 2007.

11 　　　　And we say that there was no commercially reasonable

12 determinant on August 1st, 2007 for several reasons, all of

13 which are undisputed:

14 　　　　The first -- first basically is that the president of

15 the debtor filed an affidavit with this Court in support of the

16 first day pleadings in which he essentially said -- he did say

17 that the market was dysfunctional, and that the market had been

18 dysfunctional for at least two weeks prior to his affidavit

19 which was dated August 6th, 2007.

20 　　　　Debtors' counsel, as part of it's opening statement

21 on the first day hearing, essentially made the same

22 representation to the Court, that the market was dysfunctional.

23 　　　　So, we have what the legislative history refers to as

24 an event which would suggest that August 1st was not the

25 commercially reasonable determinant date because the debtor is

1  admitting that the market was dysfunctional on that date.

2          In addition, Your Honor, we have some very

3  fundamental undisputed facts in this case:

4          On August 1st, 2007, the debtors claimed that they

5  owned the mortgages.  Now, Mr. Dorsey just said that's not

6  true.  But the stipulation which we've entered into with the

7  debtor, in paragraph 46 says, "As of August 1st, 2007 the

8  counterparty defendants asserted they were the legal owners of

9  the mortgage loans, the proceeds, and the MSRs."

10          So, on August 1st, there was a legitimate dispute as

11  to who owned these mortgages.  And as the Court knows, we spent

12  some time in this Court between August and January litigating

13  that issue until this Court resolved the ownership issue in

14  January of 2008.

15          Secondly, on August 1st and thereafter, Calyon was

16  not receiving the proceeds from the collection of the

17  mortgages, the principal and interest payments.  They did not

18  start receiving the principal and interest payments until the

19  Court approved a stipulation entered into between the debtors

20  and Calyon in late January 2008 in which the debtors finally

21  agreed to turn over the proceeds to Calyon.  This was after the

22  Court had ruled that Calyon owned the mortgages.  And at that

23  hearing, the Court made the statement to debtors' counsel, "How

24  can you expect anybody to buy the mortgages if they're not

25  getting the proceeds of the mortgages."  And the debtors'

14

1  counsel really did not have a good answer to that.

2         But suffice it to say, a stipulation was approved at

3  the end of January of 2008 under which the debtor agreed to

4  begin turning over money as it was collected -- turn over all

5  the money that it had collected since the petition date and

6  turn over as it collected money thereafter.

7         In addition, the debtor agreed to cooperate with

8  Calyon in remediating the files, cleaning up the files so they

9  could be sold.  And that's the third undisputed reason, Your

10 Honor, as to why these mortgages could not be sold on August

11 1st.

12        We did not have complete files.  We did not have

13 history of ownership.  We did not have notes.  We did not have

14 mortgages.  The files were basically in a mess.  And the

15 evidence will be that you can't sell a portfolio of mortgages

16 unless the buyer of the portfolio mortgages knows what it's

17 getting.  And in this case, no buyer would have known what it

18 was getting under this portfolio as of August 1st, 2007.

19        Finally, Your Honor, the evidence will be that in

20 connection with the sale of mortgages under a portfolio like

21 this, buyers require the sellers to make reps and warranties

22 with respect to ownership and with respect to the condition of

23 the mortgage files.  Neither of those reps and warranties could

24 be made.

25        Now, as Mr. Dorsey said, we have picked three other

1  dates.  The next date is September 30th, 2007.  The evidence

2  will be that nothing had changed with respect to ownership,

3  proceeds, servicing, the condition of the files, or anything

4  between August 1st and September 30th.  So, there was no

5  material change as far as there being a commercially reasonable

6  determinant of value.

7          The next date is January 30th, 2008.  And at that

8  point in time some things had changed because the Court had

9  ruled on the ownership issue, and we had entered into a

10  stipulation with respect to the payover of proceeds.  But we

11  still did not have complete files.  We continued to work to

12  remediate the files and we didn't -- we were not able,

13  therefore, to make reps and warranties with respect to the sale

14  of the mortgages.  And it's our evidence that it was not until

15  August 15th of 2008 that there was a commercially reasonable

16  determinant of value.  Because at that point in time, Your

17  Honor, the files had been substantially remediated so that reps

18  and warranties could be made.  All the issues concerning

19  proceeds had been cleared up.  And the servicing issue had --

20  the servicing issue, which was part of Phase II of the

21  adversary proceeding had been resolved.  And so the mortgages

22  could have been sold on that date.  And it's that date, that we

23  contend is the first commercially reasonable determinant.

24          As I said, Your Honor, there are, as far as we can

25  tell, no reported decisions on 562 and how it is to be

1  interpreted.   The legislative history is somewhat brief.

2  Colliers is somewhat brief on the subject as well.

3          But there is a fundamental difference between how we

4  view this case and how we view the statute, and how the debtor

5  views the statute.   Because the debtor said in its opening

6  statement that there's nothing in 562 that suggests that the

7  test has to be what the property could be sold for.   Their

8  argument will be that the test simply is what was the property

9  worth, not what it could be sold for.   And we suggest that,

10 that is wrong.

11          That Congress used the words "commercially

12 reasonable."   Commercially is derivated from commerce.

13 Commerce is derivated from buying and selling.   And we think it

14 is very clear that 562 -- it contemplates the sale.   What could

15 they could have sold the mortgages for on that date?   Not what

16 the mortgages were worth on some abstract basis without any

17 awareness of what's going on around in the marketplace, but

18 what, in fact, could they be sold for.   And we think as the

19 Court is aware, this case arose under a repurchase agreement

20 Safe Harbor.   And the purposes of the safe harbors were to make

21 these assets liquid and to let people be able to liquidate the

22 assets as quickly as possible without interference by the

23 automatic stay and other things.

24          So, we think that the clear test here is not what

25 they were worth on an abstract basis but what this particular

1  portfolio of mortgages could be sold for in the market on the

2  various dates in question.  And that, I think, in a nutshell,

3  Your Honor, is the nub of the dispute between the parties, an

4  interpretation of what, in fact, the statute is intended to do.

5        I have two witnesses, Your Honor, that we will offer

6  in support of our position.

7        THE COURT:  Okay.  Thank you, Mr. Ackerly.

8        I assume no other parties are participating in this

9  litigation.  I know Bank of America is here, but to monitor.

10              (No audible response heard)

11        THE COURT:  I'm getting nods, okay.  I assume the

12  parties have agreed on an order, it looks like the debtors are

13  going first.

14        MR. DORSEY:  Yes, Your Honor, we do believe we have

15  the initial burden to overcome the presumption of -- because of

16  proof of claim, but then the burden will shift to Calyon.

17        THE COURT:  All right, so you're going to put on your

18  entire case.  They'll put on their case.  And then you reserve

19  the right for rebuttal, I assume.

20        MR. DORSEY:  That's correct, Your Honor.

21        THE COURT:  Okay, very good.  Mr. Crowther?  Mr.

22  Ackerly, yes, sir?

23        MR. ACKERLY:  Your Honor, the -- Calyon does have the

24  burden of proof with respect to 562(b) of showing that August

25  1st is not the commercially reasonable determinant on that

1  issue.   I guess -- we contemplated going first, but if they

2  want to go first, that's fine.

3           THE COURT:  Well, you can work it out or I can make a

4  decision.

5           MR. DORSEY:  Well, I think just as a practical

6  matter, Your Honor, the proof of claim is, in and of itself,

7  prima facie evidence of the validity of that claim, and the

8  debtors have the initial burden of proving that the proof of

9  claim is not correct.

10          THE COURT:  All right, I agree.  I think that makes

11 the most sense on how to proceed.

12          Mr. Crowther?

13          MR. CROWTHER:  Your Honor, Curtis Crowther on behalf

14 of the debtors.

15          Debtors call Dr. Ronnie Clayton to the stand.

16          THE COURT:  Very good.

17          CLERK:  Please raise your right hand --

18          THE COURT:  I'm sorry, sir, please remain standing.

19 Thank you.

20          CLERK:  Please raise your right hand.

21          RONNIE JOE CLAYTON, DEBTORS' WITNESS, SWORN

22          CLERK:  Please state and spell your name for the

23 record.

24          THE WITNESS:  Ronnie J. Clayton, R-O-N-N-I-E, J-O-E,

25 Joe, Clayton, C-L-A-Y-T-O-N.

1          THE COURT:  Please -- good morning, sir.  Could you

2   please make the mike a little closer if you don't mind?  Make

3   sure we pick you up.  Thank you very much.

4          THE WITNESS:  Okay.

5                       DIRECT EXAMINATION

6   BY MR. CROWTHER:

7   Q    Good morning, Dr. Clayton.  Can you tell us where you're

8   currently employed?

9   A    Yes, sir.  I am a Glenn Huie Eminent Scholar Chair Holder

10  at Jacksonville State University in Jacksonville, Alabama.

11  Q    Are you a college professor?

12  A    Yes, sir, I am.

13  Q    And what is your subject?

14  A    I teach finance, financial valuation.

15  Q    Do you have any college degrees, sir?

16  A    Yes, sir, I do.  I have an undergraduate degree from the

17  University of Alabama that was awarded in 1976.  My degree is

18  in business administration with a major in finance.

19          I have a master of arts degree also from the

20  University of Alabama.  It was awarded in 1978 with a major in

21  finance.

22          And then I have a Ph.D. that was earned and awarded

23  in 1982 from the University of Georgia.  There, my major field

24  of study was finance and my minor fields included real estate,

25  economics, and econometrics.

1 Q    How long have you been teaching finance?

2 A    My first experience in the classroom was in the fall

3 semester of 1976 at the University of Alabama.

4 Q    Now, you indicated earlier that you had a minor field in

5 real estate and economics.  Can you tell us a little bit about

6 your exposure to real estate and finance?

7 A    Yes.  One, I worked with mortgage information, mortgages,

8 and the savings loan -- in the savings loan industry since

9 1983.

10          (Interruption by announcement over intercom)

11          THE COURT:  I apologize.  We will be interrupted

12 several times probably over the next half hour to make the same

13 announcement over and over again.  Do the best you can to adapt

14 to it.  My apologies.

15          MR. CROWTHER:  Does that become part of the record,

16 Your Honor?

17          THE COURT:  Actually, it will.  Yeah.

18 BY MR. CROWTHER:

19 Q    Sorry for the interruption, Dr. Clayton.  We were talking

20 about your involvement with real estate and finance.

21 A    Yes.  I actually began my involvement with real estate

22 actually as a master's student.  I served as a research

23 assistant to one of the professors in real estate and did some

24 market analysis for them in and around Tuscaloosa, Alabama.

25          Then, as I stated before, a minor field in real

1 estate and my Ph.D.

2         And then in 1983, I was asked to join the Federal

3 Home Loan Bank Board's Office of Policy and Economic Research

4 for a year as a visiting scholar.  There, I was a securities

5 expert, a valuation expert, and dealt with mortgages, mortgage

6 securities, assets of savings associations.  We, of course, got

7 to deal with the problems that occurred and those kind of

8 things.

9         One of the primary tasks that I had for that year was

10 to develop a model of mortgage cash flows that we could use to

11 help value savings and loan association assets.  One of the

12 things that the Federal Home Loan Bank Board promised the

13 savings and loans in return for some information on the

14 maturity or duration of their portfolios was to provide them

15 with a mechanism to estimate cash flows.  I developed a model

16 to do that using market interest rates and mortgage securities

17 that were traded in the market at that time to model what the

18 market interest rates were telling us about the cash flow and

19 the pre-payment cash flow primarily on the mortgages.

20         Then in the 1990's, I've worked with attorneys in

21 Florida.  I was employed in Florida at the time, worked with

22 attorneys in Florida to analyze the riskiness associated with

23 collateralized mortgage obligations, particular collateralized

24 -- hard to say -- collateralized mortgage obligations that were

25 purchased by certain investors, and we needed to determine if

1  this was an appropriate investment for these investors and
2  worked with that.

3          Just prior to that -- I need to back up just a little
4  bit.  Just prior to that -- and I was employed at the
5  University of Tennessee.  It seems like I can't stay in one
6  place for more than maybe a few years, but I think I've settled
7  down now.  But I was employed at the University of Tennessee.
8  And when I arrived in Tennessee, the -- very shortly before
9  that time, the FDIC had closed one of the major banks in East
10 Tennessee in the Knoxville area.  That bank had a relationship
11 with a number of savings associations in that area, and what
12 would happen is when the FDIC was planning to examine the bank,
13 the president of the bank would somehow know, and he would move
14 his mortgage loans that were -- had any issues associated with
15 them to a group of savings and loan association that he was
16 also affiliated with.   And then when the examination was over,
17 the mortgage loans would be moved back.

18          Well, in February of 1983, he moved -- I think it was
19 approximately a $100 million, maybe a $120 million of mortgage
20 loans to these saving associations.  And on Valentine's Day of
21 1983, the bank was closed by the FDIC, placed into
22 receivership.  And so there was no place for those mortgage
23 loans to go.

24          The savings associations then ultimately failed
25 because they had assets that they probably didn't need to have.

1  They were closed by the FSLIC about a year later.  And at that

2  point in time, they were placed into receivership and an

3  organization, Drake Realty, was responsible for providing the

4  information to be able to liquidate those assets, those

5  mortgage assets.  They contacted me and asked me if I would

6  help them to determine the status of the assets, what the cash

7  flows would be, what the relevant interest rates would be on

8  those so they could provide that information to potential

9  borrowers.  So, we provided that.

10         And then also during that time frame, I was asked by

11  attorneys for Franklins Savings and Loan out of Kansas --

12  Kansas City, Missouri, I guess, but out of that area, out of

13  the Midwest to examine the cash flows on their mortgage

14  portfolio.  A large portion of that was mortgage securities.

15  It was approximately a $20 billion portfolio and they felt that

16  they were receiving the cash flows from that portfolio too

17  quickly.  Primarily they thought that as interest were

18  declining, that Freddie Mac, who was servicing or was

19  responsible for a number of those mortgage loans, was

20  estimating the prepayment rate at too high a level and passing

21  that additional money on to the investor, Franklin Savings and

22  Loan.

23         And the problem there is, of course, if you get your

24  money too quickly and interest rates are going down you have to

25  reinvest it at the new rate.  And so what they were finding is

1  they were losing some money on their reinvestment.  So, we had

2  to analyze the cash flows and what was appropriate and what the

3  appropriate investment rates were.  And the ultimate outcome of

4  that was we found that Freddie Mac was deciding on that

5  prepayment rate by simply sitting around in a conference room

6  and did not use any kind of modeling to determine what the

7  prepayment cash flows were, and they were paying too quickly.

8  And the Savings and Loan thought they were entitled to the

9  difference between the interest rates that they would earn on

10  those cash flows and zero.  I did point out to them that if,

11  when they did receive the cash flows, they would then reinvest

12  that at a minimum at a treasury rate, and that they were

13  entitled to the difference.  And they settled for something

14  between what they were asking for and that difference, so that

15  involvement in the mortgage markets.

16       And as we said, then in the 90's I have continued to

17  work -- 90's and 2000's have continued to work in mortgages and

18  worked with the CMO's.  There were -- I think it was about

19  three -- two or three cases that I was involved with.  There's

20  pretty much the same CMO where investors had bought real estate

21  assets, CMO's that they were told that were similar to treasury

22  securities.  But what they did buy was the CMO's that were

23  support securities and they are very different from treasury

24  securities, and much more risky than treasury securities.  They

25  can actually be a very short-term security or a very long-term

Clayton - Direct                                    25

1 security, depending upon what happens in the mortgage market

2 and in interest rates.

3         And then recently, I've worked with an attorney out

4 of Mississippi to assess the appropriateness of some banks'

5 activities and -- and the -- actually in the sub-prime market.

6 They were marking mortgage loans through an individual who

7 admitted to money laundering, and a variety of other things,

8 and the banks knew what was going on.  So, we needed to assess

9 what their culpability was in those mortgage activities.

10 Q    Those tasks you described, were you engaged as an expert

11 witness?

12 A    Yes, I was.

13 Q    Have you ever testified as an expert witness before?

14 A    Yes, I have.  I testified in a bank valuation case in the

15 State of Mississippi in, I believe, 1986.

16         I testified before the -- an arbitration panel of the

17 National Association of Securities Dealers on the CMO issues.

18         And fortunately most of the rest of the things that

19 I've done have settled before I got there.

20         (Interruption by announcement over intercom)

21         THE COURT:  All right, again my apologies.

22 Apparently the Klingons were about to attack.

23                         (Laughter)

24         THE COURT:  We will be interrupted one more time when

25 they tell us that the test is over, but you can --

1          MR. CROWTHER:  I doubt that interruption will be

2  nearly as long.

3          THE COURT:  I hope not, Mr. Hehn -- or, Mr. Crowther,

4  sorry.

5  BY MR. CROWTHER:

6  Q    Dr. Clayton, have you ever purchased articles relating to

7  mortgages or real estate?

8  A    I have.  I've published articles dealing with mortgage

9  interest rates and the relationship of those mortgage interest

10 rates to other interest rates in the market so that we can

11 determine, you know, what that relationship would be.

12          I've published articles that deal with performance of

13 savings associations and those kinds of things.  Those are

14 listed on my resumé.

15 Q    You had mentioned the phrase "analyzing cash flows" many

16 times in your testimony.  What do you mean by that?

17 A    Well, we have -- first you have to determine what the cash

18 flows are.  The cash flows from an asset are generated from the

19 perimeters associated with that asset.  For instance since

20 we're dealing with mortgages today, mortgage cash flows are

21 determined by the interest rate that is charged on those

22 mortgages, the principal repayment of the mortgages, the manner

23 in which that's conducted.  And the, of course, there's

24 additional payments that come through prepayment of the

25 instrument itself.

1    So, we determine what those are.  And then you

2  analyze potentially the pattern of the cash flows, but

3  specifically the value of the cash flows to determine what

4  they're worth.  And the value of any asset is the present value

5  of the cash flows that that asset will generate.

6         MR. CROWTHER:  Your Honor, the debtors ask that the

7  Court rule that Dr. Clayton is an expert in the area of

8  finance, including the valuation of assets that generate cash

9  flows.

10        THE COURT:  Any objection or request for voir dire?

11        MR. HARBOUR:  Request for voir dire, Your Honor.

12        THE COURT:  All right, very good.  Good morning, Mr.

13 Harbour.

14        MR. HARBOUR:  Good morning, Your Honor.  For the

15 record Jason Harbour, Hunton & Williams on behalf of Calyon New

16 York Branch as administrative agent.

17                        VOIR DIRE

18 BY MR. HARBOUR:

19 Q    Good morning, Dr. Clayton.

20 A    Good morning.

21 Q    Have you ever valued a pool of mortgage loans before you

22 were requested to do so by American Home?

23 A    Not this -- a pool specifically, no.  Just individual

24 mortgages.

25 Q    Are you generally involved with the sale of pools of

1 mortgage loans?

2 A    No, sir, I'm not.

3 Q    Have you ever been directly involved with the sale or

4 purchase of mortgage loans?

5 A    No, sir.

6 Q    Did you look at any comparable sales to come up with your

7 valuation conclusions?

8 A    Not since I believe that the value of the mortgages, or

9 the present value of the cash flows, that's what I need to use

10 to, the discounted cash flow is what I need to use to determine

11 the value.

12 Q    So, you didn't --

13 A    I did not, no.

14 Q    Did you talk with anyone in the mortgage market regarding

15 your conclusions?

16 A    No, sir.

17         MR. CROWTHER:  Your Honor, the debtors will object.

18 This is actually cross examination, not voir dire as to his

19 qualifications.

20         MR. HARBOUR:  Your Honor --

21         THE COURT:  Mr. Harbour?

22         MR. HARBOUR:  My objection is that Mr. -- Dr.

23 Clayton, excuse me, is not qualified to testify as an expert

24 here because he's just testifying about a cash flow analysis.

25 And what we're here to talk about is whether there's a

1  commercially reasonable determinant.  And as Mr. Ackerly set

2  forth, it's our position that to be relevant to that, it has to

3  be a market value.

4          THE COURT:  Well --

5          MR. HARBOUR:  So what he's talking about simply isn't

6  relevant.

7          THE COURT:  Well, relevance is an issue -- relevance,

8  reliability, and fit, that's what I look at in connection with

9  the -- in evaluating the actual testimony, not qualifying the

10 expert.  Qualifying the expert has to do with whether he has

11 sufficient experience, education in order to testify on the

12 issues relevant to the Court that would be -- assist the trier

13 of fact.

14         So, I think you have gone -- I think these questions

15 about, you know, did you do a pool, did you do -- not did you

16 do a pool.  Have you ever done a pool versus -- obviously that

17 goes to his expertise.  But issues as to who he consulted in

18 connection with the actual valuation, I agree.  I think that's

19 not voir dire and whether he's an expert; that is cross

20 examination on the weight or admissibility of his report,

21 assuming he's an expert.

22         MR. HARBOUR:  Okay.  With that, Your Honor, I'll sit

23 down and I will wait for cross examination.

24         THE COURT:  Very good.  Any redirect on the

25 qualification?

1          MR. CROWTHER:  No, Your Honor.

2          THE COURT:  All right.  The Court will -- I find that

3   Dr. Taylor [sic] is an expert on the, in the area of finance

4   and --

5          MR. CROWTHER:  Specifically the valuations of assets

6   that generate cash flows.

7          THE COURT:  I find that as well.

8                  DIRECT EXAMINATION CONTINUED

9   BY MR. CROWTHER:

10  Q    Why would one value an asset based upon its cash flows?

11  A    Because cash flows are what are received by the investors,

12  the people who will ultimately own those assets.  Cash flows

13  come in and to -- to -- that's the only relevant value to any

14  asset is the value of the cash flows that you can receive.

15          If you're going to hold the assets, particularly in a

16  portfolio, that adds to the relevance of that cash flow.

17  Q    If there's also a market for the sale of those assets

18  should the market correlate with the discounted cash flow

19  valuation that you performed?

20  A    Unless there is something very, very strange going on in

21  the market, the market value of the assets and the discounted

22  cash flow value of the assets will be very, very similar

23  because you incorporating into this process the impact of

24  things that are going -- that are in the market because they're

25  incorporated into the required yield on these cash flows.

1          So, when you find their discounted present value,

2   you've incorporated those things as well.

3   Q    If there is a disconnect or a divergence between those two

4   numbers, would you have an explanation for that?

5   A    Many times, there's distress in the market.  I mean

6   there's things that are going on that would say to me that I

7   don't want to sell an asset right now.  You know, one -- and if

8   that's happening, you -- if you -- unless you are absolutely in

9   a position where you have to sell the asset, you want to hold

10  it in your portfolio and receive the value over time, and then

11  the value is the discounted present value.

12  Q    Did you perform the discounted cash flow valuation of the

13  Calyon Portfolio of mortgages in this case?

14  A    Yes, I did.

15  Q    Were you provided with sufficient data to enable you to

16  conduct a discounted cash flow valuation in conformity with

17  professional requirements?

18  A    Yes, sir, I was.

19  Q    Was there any data that you needed that you were not

20  provided in order to do that discounted cash flow valuation?

21  A    Yes, I did have to obtain one source of information.  I

22  did go to the mortgage market, actually through the Federal

23  Home Loan Mortgage Corporation's Primary Mortgage Market

24  Survey, to determine what was happening with the required yield

25  on mortgages in general and the markets at the point in time

1 | that we were valuing these instruments.  So, I did look at how

2 | the markets had changed, reflected through the interest rates

3 | that people were charging on mortgages, and then use that

4 | information to assist me in valuing the cash flows.

5 | Q    Other than the market interest rates that you used to do

6 | that analysis, was there any information that you wished you

7 | had that you did not in order to do your valuation?

8 | A    No, sir.

9 | Q    Was your analysis done in conformity with finance

10 | principles for the valuation of cash flow assets?

11 | A    Yes, it was.  It's, you know, for -- forever we've been

12 | teaching and encouraging people to value assets using a

13 | discounted cash flow approach.  I walk into a class the first

14 | day and start my students off on a discounted cash flow

15 | approach.  They go out into the world and they use a discounted

16 | cash flow approach to valuation.  Firms use a discounted cash

17 | flow approach.  So, it's well understood, and well utilized,

18 | and very much an acceptable way to value.

19 | Q    Did you do a discounted cash flow valuation for each of

20 | the mortgages that's part of the pool?

21 | A    Yes, I did.  There was approximately 5,600 mortgages

22 | originally, just slightly over that.  And so what I did was to

23 | adjust the interest rates on those -- the required rates --

24 | actually used as a required rate of return, but -- when you

25 | first start with a mortgage, you -- you -- the interest rate

1  that's charged on that mortgage, or the yield that is available

2  on that mortgage depending upon how it's structured, is the

3  discount rate.  And if you find the -- use the discount rate to

4  discount the cash flows, it should discount back to the

5  principal value or the book value of the mortgage.

6          There could be some adjustments in that, or some

7  changes, depending upon things that you might put into the

8  process.  But given what we had, that was what we would start

9  with is to find the value.

10         And then we would adjust each one of those interest

11 rates.  Each one of them had a different interest rate, or

12 potentially a different interest rate.  A lot of them were the

13 same, but they potentially had different interest rates.  And

14 we could adjust those interest rates by what was happening in

15 the mortgage markets themselves as evidenced through the

16 primary mortgage market survey that Freddie Mac conducts.

17         And I applied that to each individual interest rate

18 and then applied that -- the adjusted rates to discounted cash

19 flows on each individual mortgage that was in the database, and

20 then you summed them up to get -- to determine the total value.

21 Q    The methodology that you employed to do that, is that

22 generally accepted in the area of finance to do a discounted

23 cash flow valuation?

24 A    Yes, sir, it is.

25 Q    Did you deviate in any way from the accepted methodology

Clayton - Direct                              34

1  to conduct a discounted cash flow valuation of a cash flowing

2  asset?

3  A    No, sir, I did not.

4         MR. CROWTHER:  Your Honor, may I approach the easel?

5         THE COURT:  Yes, but you're going to have to move it.

6         MR. CROWTHER:  It's actually more for the Court, Your

7  Honor, than for -- would you like it in a different spot?

8         THE COURT:  Well, I can't see it.  It's up to you.

9                      (Pause)

10        THE COURT:  Why don't you try over there?  I'm sorry,

11 I apologize but --

12        MR. CROWTHER:  That's fine.

13        THE COURT:  -- I can't see passed the computer.  No,

14 that's too far.  Just block out Mr. Dorsey, I don't need to see

15 him.

16                     (Laughter)

17        THE COURT:  That's good.  That's good.  Mr. Ackerly,

18 are you all right there?

19        MR. ACKERLY:  That's fine.

20        THE COURT:  That's a better view.  Thank you.

21 BY MR. CROWTHER:

22 Q    Dr. Clayton, do you recognize what's been placed up on the

23 easel?

24 A    It's a little larger than what I provided originally, but

25 it is the -- a table that I included in my report -- Table 1,

1 portfolio value, yes, sir.

2 Q    Does this table represent the valuation of the mortgage

3 portfolio that you conducted on a discounted cash flow basis?

4 A    Yes, sir, it does for the four different dates that I was

5 asked to examine.

6 Q    Now, there's also a differential between panel A and panel

7 B.  Can you tell what that is?

8 A    Yes the -- panel A is a valuation of the mortgages with

9 servicing retained with the mortgages.  In other words, the

10 mortgage -- if the mortgage is sold, the servicing goes with

11 it.  Has one value.  When you go the bottom panel its servicing

12 released, though the -- the holder of the mortgages would not

13 retain the servicing.  That typically is 12½ basis points and

14 we adjusted for that 12½ basis point differential in cash flow.

15 And so that, therefore, is 12½ basis point you don't receive if

16 servicing is released.  And so, therefore, the present value --

17 the discounted present value is less.

18 Q    You have a line that says D-E-L, and there's multiple

19 spots.  What does D-E-L stand for?

20 A    That's delinquencies.  I had broke that out in a way that

21 was convenient to present.  We had delinquencies that are less

22 than or equal to 60 days.  Delinquencies that are greater than

23 60 days.  And then we have the final possibility of bankruptcy,

24 foreclosure, or real estate owned, and I broke those out as

25 well.

1  Q    Did you utilize the actual delinquency information from

2  the mortgage data?

3  A    I did.  And then we would then take the present value of

4  those, as interest rates fluctuated, you would adjust those.

5  Q    How did you determine the recovery at 50% under the line

6  item for that?

7  A    When a mortgage becomes delinquent, at that point, you

8  know, we know we got -- we have an issue.  And you may recover

9  everything from a delinquency, or you may recover nothing.

10 And, you know, it depends upon the efforts that you put forth,

11 and a variety of other things.

12        But if you take the average of zero recovery and a

13 100% recovery, if -- you know, assuming in that case, the

14 property was probably sold to recover -- for enough to recover

15 everything, then the average between those two numbers is 50%.

16 And so I -- that's what I utilized.  And the primary reason

17 that I did that is I did a search and could not find models

18 that I thought -- I couldn't -- really couldn't find any models

19 that would tell me how to -- how to apply that recovery.  So,

20 if I took the average of the highest you could have and the

21 lowest you could have, you had to come up with some number, and

22 so I thought that was as good a number as we could have.

23 Q    Did you utilize any separate pools of cash that may have

24 been available in doing your discounted cash flow?

25 A    No, sir, I did not.

Clayton - Direct                                37

1  Q    Dr. Clayton, what did you determine the value on a

2  discounted cash flow basis of the Calyon mortgage portfolio on

3  a servicing retained basis on August 1st of 2007?

4  A    It was $1,162,817,745.15.

5  Q    What did you determine the discounted cash flow value of

6  the mortgage portfolio from Calyon on a servicing released

7  basis on August 1st of 2007?

8  A    That date it was 1,148,200,000 -- 148 million -- I'm sorry

9  -- 282,523.34.

10 Q    Dr. Clayton, what did you determine the discounted cash

11 flow value of the Calyon mortgage portfolio on a servicing

12 retained basis on September 30th, 2007?

13 A    It was 1,157,685,463 and 38 cents.

14 Q    Dr. Clayton, what did you determine the discounted cash

15 flow value of the Calyon mortgage portfolio was on a servicing

16 release basis on September 30th of 2007?

17 A    $1,143,215,030.36.

18 Q    Dr. Clayton, what did you determine the discounted cash

19 flow value of the Calyon mortgage portfolio was on a servicing

20 retained basis on January 30th, 2008?

21 A    1,166,844,307.81.

22 Q    Dr. Clayton, what did you determine the discounted cash

23 flow value was of the Calyon portfolio on a servicing release

24 basis on January 30th of 2008?

25 A    $1,152,258,753.96.

1  Q    Dr. Clayton, what did you determine the discounted cash

2  flow value was of the Calyon mortgage portfolio on a servicing

3  retained basis on August 15th of 2008?

4  A    It was 1,081,223,000 --

5            (Interruption by announcement over intercom)

6  A    Okay.  The value on August the 15th, 2008 servicing

7  retained $1,081,223,048.68.

8  Q    And, Dr. Clayton, what did you determine the discounted

9  cash flow value was of the Calyon mortgage portfolio on August

10  15th, 2008 on a servicing released basis?

11  A    $1,067,901,484.79.

12  Q    Dr. Clayton, the conclusions on value that you've given do

13  you believe that represents the value of the mortgage portfolio

14  on those dates?

15  A    Yes, sir, it is on a discounted cash flow basis.

16            MR. CROWTHER:  No further questions, Your Honor.

17            THE COURT:  Okay.  Mr. Harbour?

18            MR. HARBOUR:  Thank you, Your Honor.  For the record,

19  again, Jason Harbour.

20                    CROSS EXAMINATION

21  BY MR. HARBOUR

22  Q    And good morning again, Dr. Clayton.

23  A    Good morning again.

24  Q    I'm not sure which question I left off, and I only asked

25  about four so I might just go back through them real quickly.

1  A     That will be fine.

2  Q     Have you ever -- you've never valued a pool of mortgage

3  loans before this engagement?

4  A     No, sir.

5  Q     And you're not generally involved with the sale of pools

6  of mortgage loans?

7  A     No, sir.

8  Q     You've never been involved -- directly involved with a

9  sale or purchase of a pool of mortgage loans?

10  A     No, sir.

11  Q     You didn't look at any comparable sales to perform your

12  valuations?

13  A     No, sir, because I was interested in a discounted cash

14  flow.

15  Q     You didn't speak with anyone in the market regarding your

16  conclusions?

17  A     No, sir.

18  Q     Your conclusions don't take into account comparable sales?

19  A     No, they do not.

20  Q     If comparable sales showed lower valuations, that would

21  not affect your valuation conclusions would it?

22  A     No, it would not.

23  Q     In fact, if the market for the types of loans in Calyon

24  portfolio became dysfunctional such that there was really no

25  trading going on, or trading was only going on at 10 cents on

1  the dollar, very, very low levels, your conclusions would not

2  change, would they?

3  A    No, they wouldn't because I would -- I'm assuming that

4  these are held for the cash flow, not for the distress sale in

5  the market.

6  Q    Your conclusions about the value in August and September

7  of 2007. they did not assume that there was a dispute about

8  ownership, do they?

9  A    No, they do not.

10 Q    If you did assume there was a dispute about ownership,

11 would it affect your conclusions?

12 A    No, I'm valuing the cash flows.  The cash flows occur no

13 matter -- whether there's a dispute over the ownership.  That's

14 -- the ownership dispute is left for you to work out.  So, I'm

15 valuing the cash flows, that value would -- the cash flows will

16 occur.  If they're going to occur, they're going to occur

17 anyway, so that's what I need to value.

18 Q    So, just to be clear.  Your valuations wouldn't change if

19 there was an ownership dispute?

20 A    No.

21 Q    Did you assume for your August and September valuations

22 that the owner was not receiving principal and interest

23 payments?

24 A    Again, I'm evaluating the cash flows.  Where those cash

25 flows are held once they occur is not relevant.  So, no.

1  Q    And if you did assume it, it wouldn't change your

2  conclusions?

3  A    Not my conclusions, no, sir.

4  Q    If the owner -- did you assume for your August, September,

5  and January conclusions that the owner did not have complete

6  and accurate information regarding the payments of principal

7  and interest that were being made on the loans?

8  A    I did not make those assumptions, no.

9  Q    If you made those assumptions, would it change your

10  conclusions?

11  A    No, sir, it would not.

12  Q    Did you assume that the owner did not have complete and

13  accurate information about the mortgage files?

14  A    No, sir.

15  Q    If you assumed that, would it change your conclusions?

16  A    No, it wouldn't.  These -- the cash flows are still the

17  cash flows.

18  Q    Again -- and this is August, September, and January

19  conclusions.  Did you assume the owner would be unable to make

20  normal representations and warranties in connection with the

21  sale?

22  A    No, I did not.

23  Q    And if you assumed that the owner would be unable to do

24  so, would that affect your conclusions?

25  A    No, sir.

Clayton - Cross                              42

1  Q    Did you assume for your August, September, and January

2  conclusions that there was a dispute over who owned the

3  servicing rights?

4  A    No, I did not.  I was just asked to value them servicing

5  retained, servicing released.

6  Q    So, if you did assume there was a dispute other than

7  servicing retained, servicing released, it wouldn't affect your

8  conclusions?

9  A    That's the only difference.

10 Q    When you were performing your analysis did you make any

11 adjustments to the valuations of the mortgage loans based on

12 whether certain mortgage loans were agency eligible?

13 A    No, sir, that is incorporated in the yield requirements.

14 So, that's what's already -- those characteristics are already

15 incorporated into the parameters of the -- that generate the

16 cash flows.

17 Q    When you say, "they're already incorporated," do you mean

18 that the originator of the mortgage loan took that into account

19 when they set the interest rate?

20 A    That would be my assumption.  If there is additional

21 risks, they would put those into that rate.

22 Q    But your analysis doesn't include any additional --

23 A    It doesn't --

24 Q    -- change?

25 A    No, sir.

1  Q    Did you make any additional adjustments other than the

2  interest rate that was already on the loan for second lien

3  mortgages as compared to first lien mortgages in your valuation

4  calculation?

5  A    Once again, the lenders should incorporate additional

6  return for second liens.  And so that's already in -- in what

7  generates the cash flows and how you discount it.

8  Q    Did you incorporate anything other than looking at

9  potentially different interest rates for different credit

10 scores for the various mortgage loans in your calculation?

11 A    I did not have the credit scores.  I was not asked to look

12 at them.

13 Q    Did you incorporate anything into your analysis, other

14 than looking at the original interest rates, of course, for

15 different loans to value ratios in coming up with your

16 calculations?

17 A    Once again, those kinds of things would be originally

18 incorporated into the required yields on those mortgages.  So,

19 its already there.

20 Q    You assume?

21 A    It's already there.  I don't make that assumption.  It's

22 there.

23 Q    Well, if the mortgage originator was doing their job if

24 they were wrong about delinquency rates and other things like

25 that, then the information would not be correct, would it?

1 A     The mortgage markets that determine those interest rates

2 should be correct.  So there's no reason to make any

3 adjustments is what I'm saying.

4 Q     The --

5 A     It's already in what they've done.

6 Q     If they did their job right?

7 A     I --

8 Q     If they didn't -- let's assume for a moment, Dr. Clayton,

9 that they didn't do their job right and delinquency rates

10 became 20% higher than they assumed on their mortgage loans,

11 would your conclusions be affected by that?

12 A     Because it would -- it does incorporate delinquencies,

13 yes.  But the individuals participating in these markets have a

14 certain set of information as of August, 2007 and prior to that

15 when they originated the loans.  So, you know I can't

16 incorporate into this valuation things that they could not have

17 known, things that I could not have known in 2007.  I -- you

18 know, we're -- looking at the value of these mortgage loans as

19 of August 2007, we have to incorporate the things that were

20 known at that time.  I have to work in a known world, things

21 that I know.  And I can't -- there is -- there's no way you can

22 have an accurate assumption of what the delinquency rate might

23 be five years from now.

24 Q     You say you use the actual delinquency rates to come up

25 with your conclusions, correct?

1  A    I used what was presented in the portfolio, yes.

2  Q    Other than looking at those actual delinquency rates, did

3  you assume that there was any -- going to be any other future

4  delinquency in coming up with your conclusions?

5  A    To the extent that the, you know -- the delinquencies show

6  what is currently happening.  Again, incorporated in the

7  required yields on those mortgages would be an expectation of

8  delinquencies, so I don't need to do that.  It's already in the

9  required yield.

10 Q    But if that expectation of delinquency was wrong, that

11 wouldn't come up in your analysis because you're using the

12 original expectation of delinquency, correct?

13 A    And I can't know that -- that that, you know -- at August

14 of 2007, you know, there was no way I could know what the

15 delinquency rate's going to be five years from now.  I can't

16 incorporate it.  So, I have to use the best information that I

17 know.

18 Q    But you didn't take into account. say in August, the

19 rising delinquency rates on these pools, you just used the

20 actual delinquency rates?

21 A    I used the actual delinquency rates, yes.

22 Q    Not the increase?

23 A    Well, it --

24 Q    You didn't use anything to factor that in?

25 A    When you go from one point to the other, and it does

1 increase, you do incorporate that, as well, and that's in

2 there.

3 Q    Right, but you didn't extrapolate into that future.

4 A    No, I didn't.

5 Q    Okay.  You testified that servicing was worth 12.5 basis

6 points.  Where do you -- where does your knowledge for that

7 come from?

8 A    From working with mortgages and mortgage loans at the

9 Federal Home Loan Bank Board.  It's been approximately 12½

10 basis points for a long, long time.  And many of these loans, I

11 believe, if I'm recalling correctly, reference 12½ basis

12 points, as well.

13 Q    The loans themselves reference something about it?

14 A    Yes.

15              MR. HARBOUR:  Could I have a moment, Your Honor.

16                          (Pause)

17 BY MR. HARBOUR:

18 Q    Dr. Clayton, you testified on direct that your conclusions

19 would reflect the market price for these assets unless

20 something very strange was going on, correct?

21 A    Unless you were in a distressed, very distressed

22 environment and then you would hold the mortgages.

23 Q    Would you consider what's been going on since August of

24 2007 with respect to the value of mortgage loans to be

25 something strange going on?

1  A    Starting some time after August of 2007, the markets were

2  still going, from my -- from what I know and what I read and

3  kept up with, the markets were still moving along quite well in

4  August of 2007, and even into the -- into September of 2007.

5  We've had some changes in the market since that time because

6  people have been selling assets as a -- a distressed basis.

7  And when you sell something at a distressed basis, you may have

8  to take -- if you want to sell it right now, okay, in a

9  distressed market, you may have to take a discount.  But you

10 still value the cash flows.  You value the mortgages exactly

11 the same way, and then you assess what the discount would be.

12 But if you're holding -- and my valuation was not to value

13 based upon stress.  It was to value based upon the cash flows

14 that can generated, and what those would be worth to a

15 portfolio.

16 Q    Not what it could be sold for at a given point in time?

17 A    We've already established that, yes.

18 Q    Did your evaluation -- did you model cash flows for the

19 payment option ARM loans that are part of the portfolio?

20 A    The -- based upon the yield information that was provided

21 in the portfolio, yes.

22 Q    Did those payment option ARMS have balloon payments?

23 A    Some of them did and -- and --

24 Q    And that -- was that calculated?

25 A    That was -- it would be incorporated into the analysis.

Clayton - Cross                              48

1          MR. HARBOUR:  Can I have another moment, Your Honor,

2    I'm sorry.

3          THE COURT:  Yes, of course.

4    BY MR. HARBOUR:

5    Q    Dr. Clayton, if the markets were considered dysfunctional

6    on August 1st by American Home Mortgage, would that change your

7    value calculations?

8    A    No, I'm valuing the cash flows.  The value of the cash

9    flows is the value of the cash flows.  The -- you know,

10   somebody's going to hold that portfolio.  And it -- if you

11   can't -- unless you are forced into a distressed sale, then you

12   adjust based upon what you perceive to be there.  But whenever

13   you -- if you're not forced into a sale, then the value is the

14   value that will occur.  And the value we should be looking at

15   is the value that will occur based upon the discounted cash

16   flow, not that I've got to sell it right now.  You know,

17   because there's a lot of assets.  If I have to sell them right

18   now I got to sell them at a discount.  But I'm not going to

19   choose to do that because it's not in my best interest.  And so

20   we're going to hold that in the portfolio, and it has a value

21   based upon that portfolio value.  And that's what I determined.

22   Q    Right.  So, just to be clear, again, if there was a

23   dysfunctional market for the mortgage loans at some point in

24   time, that does not affect your conclusion?

25   A    The value is the present value of the cash flows -- the

1 discounted present value of the cash flows, which is what I

2 have there.  So it does not affect my conclusions.

3          THE COURT:  I think we plowed this field, Mr.

4 Harbour.

5          MR. HARBOUR:  Agreed.  Agreed, Your Honor.  Thank you

6 for your patience.

7          Thank you, Dr. Clayton.

8          MR. CLAYTON:  Thank you.

9          THE COURT:  Redirect, Mr. Crowther?  You're over

10 there somewhere.

11          MR. CROWTHER:  Your Honor, the debtor has no further

12 questions.

13          THE COURT:  All right.  Sir, you may step down.

14                          (Pause)

15          THE COURT:  Mr. Dorsey?

16          MR. DORSEY:  Your Honor, John Dorsey for the record

17 on behalf of the debtors.  At this time, Your Honor, the

18 debtors would move into evidence the deposition designations of

19 Mr. VanEssche who was the Calyon 30(b)(6) witness, which is

20 exhibit 28 in the debtors' binder.

21          And along with that would be exhibits 1 through 25,

22 which are all documents that were referred to and used during

23 Mr. VanEssche's deposition and are a part of the designations

24 that we have made.

25          And in addition, we would ask to move into evidence

1  exhibits 26 and 27, which are valuations performed by Calyon's

2  trial expert for July -- or excuse me -- August 1st, 2007 and

3  September 30, 2007.

4           THE COURT:  Any objection?

5           MR. HARBOUR:  Yes, Your Honor.

6           THE COURT:  All right.

7                     (Pause)

8           MR. HARBOUR:  To clarify something, Your Honor, I'm

9  sorry.

10          Mr. Dorsey, you asked to move into evidence exhibits

11  1 through 25 to the J.C. VanEssche deposition transcript,

12  correct?

13          MR. DORSEY:  Right.

14          MR. HARBOUR:  Not your exhibits 1 through 25?

15          MR. DORSEY:  No, our exhibits 1 through 25.

16          MR. HARBOUR:  Your exhibits 1 through 25, not --

17          MR. DORSEY:  Correct.

18          MR. HARBOUR:  I want to know whether I need to go

19  through your exhibits or -- his -- yours okay.

20          Your Honor, we agreed with the debtors on a procedure

21  with respect to deposition designations.  We sent them an

22  objection that's a written objection to a number of those

23  points.  We can submit that to the Court with respect to the

24  deposition designation and I would think that would cover that

25  issue.

1          With respect to the individual exhibits, we have

2   objections to a number of them.  And it almost may be

3   worthwhile -- we have objections to 1, 2, 3, 4, 6, 14, 19, 22,

4   23, 24, --

5          THE COURT:  Whoa, slow down.  1, 2, 3, 4, 6, 14 --

6          MR. HARBOUR:  I'm sorry, Your Honor, 19, 22, 23, and

7   24 on hearsay grounds.  We also have objections to 11, 12, 13

8   and part -- 13 on the grounds that they're irrelevant because

9   they are all from after August 15th, 2008 which is -- there's

10  no dispute that there was a commercially reasonable determinant

11  as of August 15th.  So anything after that is irrelevant.

12         THE COURT:  11, 12, 13 irrelevancy or relevancy is

13  your objection.

14         MR. HARBOUR:  Relevancy, Your Honor.

15         THE COURT:  All right.

16         MR. HARBOUR:  And if you like, I can go through them

17  in groups.  I was just laying out the --

18         THE COURT:  No, no I understand.  Any objection to

19  25, 26 and 27.  I understand there's a written, in effect, a

20  written objection to 28.  And have the debtors replied to that,

21  Mr. Crowther?

22         MR. CROWTHER:  The debtors have not designated any

23  additional testimony.  We've only relied upon the original

24  designation.  They filed the objection.

25         The reason they're not filed with the Court, Your

1  Honor, is there's confidentiality agreements with respect to

2  the deposition testimony.  So, we would respond to any

3  evidentiary objections as they raise them.

4          THE COURT:  To the deposition designation.  All

5  right, we'll probably have to go through that then.  All right,

6  any objections to 25, 26, and 27?

7          MR. HARBOUR:  No, Your Honor.

8          THE COURT:  Okay.  All right.  Exhibits -- Debtors'

9  exhibits 5, 7, 8, 9, 10, 15, 16, 17, 18, 20, 21, 25, 26, and 27

10 are admitted without objection.  And let's see let me make a

11 little note to that effect.

12          THE COURT:  Mr. Harbour, I leave it to you whether

13 you want to go item by item.  That probably makes the most

14 sense, I think.  Otherwise, I'll get confused which is very

15 easy.

16          MR. HARBOUR:  Thank you, Your Honor.

17          Number 1, Debtors' Exhibit Number 1 is an analysis

18 prepared by Compass Analytics.  Compass Analytics is not here

19 to be cross examined.  It's hearsay.

20          THE COURT:  Who is Compass Analytics?

21          MR. HARBOUR:  They are -- or at least at the time, I

22 think they still are, a mortgage valuation firm.

23          THE COURT:  Mr. Dorsey.

24          MR. DORSEY:  Is it okay if I remain seated, Your

25 Honor?

1          THE COURT:  Yes, it is.

2          MR. DORSEY:  Exhibit 1, Your Honor, is an exhibit

3    that was prepared on behalf of Calyon by Compass.  It was

4    relied upon by Calyon in determining the value of these

5    mortgage loans.  It is, therefore, a statement against interest

6    because Calyon did, in fact, rely upon this valuation.  And, in

7    fact, if you look at exhibit -- just skipping ahead, Exhibit

8    Number 2, Your Honor, is a comparison of several of the Compass

9    Analytic valuations, as well as a valuation by Deutsche Bank

10   with -- which was actually prepared by Calyon.

11          So, it's clear, Your Honor, that Calyon was relying

12   upon these valuations.  And, therefore, they should be

13   admitted.

14          THE COURT:  Response?

15          MR. HARBOUR:  Your Honor, there's no evidence before

16   you that Calyon relied on these.  The fact that Calyon ordered

17   it and put it in a spreadsheet doesn't indicate that Calyon

18   relied on it.

19          MR. DORSEY:  I think if you look at --

20          MR. HARBOUR:  They may have had it --

21          THE COURT:  But were they employed by you when they

22   made this statement?

23          MR. HARBOUR:  I think there was probably a contract

24   between the parties, Your Honor.

25          MR. DORSEY:  It was an expert retained by Calyon to

1  provide valuation of the loan.

2          THE COURT:  Isn't this the statement of a party in

3  either an individual or representative capacity?

4          MR. HARBOUR:  Your Honor, I don't believe that

5  they're a party.  They were a counter-party to a contract that

6  performed a service.

7          THE COURT:  But aren't they a party, *i.e.,* in a

8  representative capacity?  Your agent?  Or that, that -- all

9  right, never, no --

10          MR. HARBOUR:  Well, we don't have the agreement in

11  front of us to determine whether there was -- they were our

12  agent.

13          THE COURT:  All right, I apologize.  That's the wrong

14  section.  801(d)(2)(D), "A statement by the party's agent

15  concerning a matter within the scope of the agency made during

16  the existence of the relationship."

17          MR. HARBOUR:  My response would be the same, Your

18  Honor.  It's not clear that they were Calyon's agent.  They

19  performed services, but I don't know that, that equates to them

20  being Calyon's agent.

21          Also, the debtors have subpoenaed Calyon -- or

22  Compass, rather, for documents in this matter.  They could have

23  subpoenaed to have them here today.  They chose not to do so.

24          MR. DORSEY:  They were acting as an agent for Calyon,

25  Your Honor.  And Mr. VanEssche testified in his deposition that

1   they did retain Compass, that they were acting on their behalf

2   in order to value the mortgage loans and that they did, in

3   fact, rely upon these valuations to determine what they thought

4   the value of the loans were.

5          THE COURT:  Well, is reliance relevant?

6          MR. DORSEY:  Well, it would be a statement against

7   interest.  If they've adopted this statement as their own, then

8   it's a statement against interest of Calyon.

9          THE COURT:  Mr. Harbour?

10         MR. HARBOUR:  I don't recall that testimony from the

11  transcript, Your Honor, the deposition transcript.

12         THE COURT:  Mr. Dorsey --

13         MR. HARBOUR:   I mean there's no dispute, Your Honor.

14  I'm not disputing that they were, you know, engaged by Calyon.

15  The question is it's not clear that they were an agent or a

16  counter -- just a counter-party who performed the service.

17         MR. DORSEY:  I think that's all I need to show, Your

18  Honor.  If they were engaged by Calyon to perform a service,

19  they performed that service --

20         THE COURT:  I agree.  I find that they're an agent

21  for purposes of 801.  Just so the records clear let me make

22  sure I get the right -- various -- I find that the document is

23  admissible as a statement which is not hearsay under

24  801(d)(2)(D), which is a statement by the party's agent

25  concerning the matter within the scope of the agency or

1 employment named during the existence of the relationship.

2 They're not an agent; they're a servant, which I think would be

3 more -- which is also covered there which is more in the nature

4 of a straight contractual employment relationship as opposed to

5 an agency relationship where they would have the power to, in

6 effect, bind the debtor.  So, they're either an agent or a

7 servant.  Either way, it's not hearsay and it's admissible.

8            So I'll overrule the objection and exhibit 1 will be

9 admitted.

10            MR. HARBOUR:  Thank you, Your Honor, that may

11 expedite the rest of this process.

12            THE COURT:  All right.

13            MR. HARBOUR:  The objection has been made, but it's

14 the same objection for number 2, and number 3, and number 4.

15            THE COURT:  All right, I'll overrule objection 2, 3,

16 and 4, and they are admitted on the same basis as exhibit 1.

17            MR. DORSEY:  All right.  Just for the record, Your

18 Honor, I would also point out exhibit 2, according to Mr.

19 VanEssche was actually prepared by Calyon.  It's not a Compass

20 document.

21            THE COURT:  Okay.

22            MR. HARBOUR:  Similarly, Your Honor, Number 6 the

23 objection was hearsay and was based upon the fact that the

24 report contained some information about the Compass valuations.

25 So, presumably Your Honor's ruling would apply the same to

1  that.  I mean, the -- we'd object, but --

2         THE COURT:  It does and the objection is overruled

3  and the document is admitted.

4         MR. DORSEY:  Just to be clear, Your Honor, we may

5  have a disconnect on what Exhibit Number 6 is.

6         MR. HARBOUR:  The September 5th, 2007 memorandum,

7  merely because the client --

8         THE COURT:  It's an internal memorandum or --

9         MR. HARBOUR:  It's an internal memorandum, Your

10 Honor, but --

11        THE COURT:  But it contains --

12        MR. HARBOUR:  Hearsay within hearsay.

13        THE COURT:  Hearsay within hearsay.

14        MR. HARBOUR:  Well, within a not hearsay document, I

15 guess.

16        MR. DORSEY:  I just wanted to make sure we have the -

17 - we didn't mess up the exhibits of which was which, Your

18 Honor.

19        THE COURT:  All right.

20        MR. HARBOUR:   I think we're good.

21        THE COURT:  So --

22        MR. HARBOUR:  September 5th, 2007 --

23        THE COURT:  -- the objection was not to the entirety

24 of exhibit 6, but to the portions referencing the Compass

25 materials?

1          MR. HARBOUR:  Yes, Your Honor.

2          THE COURT:  Okay, well that objection is overruled.

3          MR. HARBOUR:  Thank you.

4          THE COURT:  And the document is admitted.  Thank you

5   for the clarification.

6          MR. HARBOUR:  Documents 11 and 12, Your Honor, are

7   internal memorandum prepared on October 31st, 2008 and 12

8   states February 3, 2008, but it's actually February 3rd, 2009,

9   that date is just a typo.  So, these are both internal

10  memorandum prepared after August 15th, 2008 and our objection

11  is relevance.

12         THE COURT:  Mr. Dorsey?

13         MR. DORSEY:  It goes to state of mind, Your Honor.

14  Our entire contention here is that Calyon never had any

15  intention of selling these mortgage loans.  As Dr. Clayton just

16  testified to, when you have a distressed market, it's to hold

17  and wait to collect the cash flows until the market improves.

18         THE COURT:  So your position would be this is further

19  evidence that reaching back as far as August 1, 2007 that, in

20  effect, sale price is irrelevant because all they intended to

21  do was hold and collect the cash flows?

22         MR. DORSEY:  Until such time as the market improved,

23  Your Honor.  I think that's what the testimony would be of Mr.

24  VanEssche.

25         THE COURT:  Mr. Harbour?

1          MR. HARBOUR:  And our response is that, that's

2    completely irrelevant because the statute says commercially

3    reasonable determinant of value.  And the whole purpose of the

4    statute is to establish the liquidity of value at which assets

5    could be sold so that at that point, the burden rests on the

6    counter-party to the safe harbored contract not the debtor.  At

7    that point when there's a commercially reasonable determinant,

8    it's their choice to sell or not.  If they sell and it goes

9    badly, it's on them.  They don't have an extra claim against

10   the debtor for that.

11          If they sell and it goes well, they get the benefit

12   of it.  That's how 562 is set up.

13          So what happens after the D date, the date of

14   determination is completely irrelevant.  Whether Calyon

15   intended to sell or not, frankly, is completely irrelevant.

16   What's relevant is could they have in a commercially reasonable

17   manner.

18          THE COURT:  Well, I think you're -- frankly, I think

19   you're making your ultimate legal argument about what evidence

20   I should apply and what evidence I shouldn't apply.  I can't

21   really get there until I've heard the entirety of the trial.

22   Assuming you're right even if it's admitted for purposes of --

23   in effect, the admission would be subject to making a ruling as

24   to what the Court has to weigh in making its ultimate

25   determination.

1        So, I'm going to admit the testimony -- or, excuse

2   me.  I'm going to admit the exhibits and overrule the

3   objection.  But I'm not -- ultimately, at this point, I'm not

4   making a ruling as to what the legal test is.

5        MR. HARBOUR:  Thank you.

6        THE COURT:  And I'll reserve that for a later time

7   and reserve your rights.

8        MR. HARBOUR:  Thank you, Your Honor.

9        THE COURT:  All right.  So, subject to that proviso

10  exhibits 11 and 12 the objection is overruled.  The documents

11  are admitted.

12       MR. HARBOUR:  Objection -- 13, the objection was a

13  post August, 2008 objection to the last page of it.  And

14  presumably Your Honor's ruling will apply to that as well.

15       THE COURT:  Mr. Dorsey, the same basis?

16       MR. DORSEY:  Same basis, Your Honor.

17       THE COURT:  All right the objection is overruled.

18  The document is admitted.

19       MR. HARBOUR:  14, Your Honor, was an objection based

20  on -- although it's a statement by Calyon, there are statements

21  about the Compass valuation in there.  So, our objection was

22  based on hearsay grounds and the exhibit itself was a Compass

23  valuation report which we objected to on hearsay grounds and

24  you've ruled on.

25       THE COURT:  All right, I'll overrule the objection

1 and admit on the basis of the previous rulings.

2          MR. DORSEY:  Just for the record, Your Honor, I would

3 also point out this is actually an e-mail from Mr. VanEssche

4 whose testimony we are introducing through this deposition.  So

5 it's not really hearsay.  And it also further supports our

6 contention that Calyon was, in fact, relying upon the Compass

7 valuations at the time.

8          THE COURT:  All right, I think Mr. Harbour's point

9 was while the e-mail may be admissible certain elements of the

10 contents were not and that's what I'm overruling.

11          MR. DORSEY:  Thank you, Your Honor.

12          MR. HARBOUR:  Thank you, Your Honor.

13          THE COURT:  I think we're up to 19.

14          MR. HARBOUR:  Yes, we are.  And this is the same

15 objection as the prior objection.  It's an e-mail from Mr.

16 VanEssche but parts of it, we objected to on hearsay grounds.

17          THE COURT:  All right, overruled.

18          MR. HARBOUR:  The next one, Your Honor, is 22.  This

19 is a letter from the Federal Reserve Bank of New York and is

20 hearsay.

21          THE COURT:  Mr. Dorsey?

22          MR. DORSEY:  And, Your Honor, it goes to state of

23 mind.  Exhibit Number 23 is Mr. VanEssche's response to this

24 letter from the Federal Reserve -- or, excuse me.  This is the

25 response to Mr. VanEssche's -- let me back up for a moment,

1   Your Honor, to give you some context here.  At one point during

2   -- in May of 2008, the Federal Reserve through the Shared

3   National Credit review came in and looked at this portfolio and

4   made a ruling on how the portfolio should be classified, 100%

5   doubtful.  Calyon objected to that, took an appeal.  Mr.

6   VanEssche wrote the letter to the Federal Reserve explaining

7   the basis for their objection to the classification.  And,

8   therefore, the letter merely puts into context the subject

9   matter of the SNC review and Mr. VanEssche's response to the

10  100% doubtful rating.

11          THE COURT:  And what's the specific -- but why is the

12  context -- I mean what's the argument under the 800 series --

13          MR. DORSEY:  I'm not --

14          THE COURT:  -- to why it's not hearsay?

15          MR. DORSEY:  I'm not introducing it for the truth of

16  the matter asserted, Your Honor, only to show Mr. VanEssche's

17  state of mind when he responded to the appeal that was taken

18  from the SNC review.

19          THE COURT:  And state of mind is relevant why?

20          MR. DORSEY:  Because it shows their view of the value

21  of the portfolio and the composition of the portfolio.

22          THE COURT:  Mr. Harbour?

23          MR. HARBOUR:  I think his state of mind, to the

24  extent its relevant, and we submit to Your Honor that it's not

25  relevant whatsoever, would be demonstrated to the Court if, at

1  all, by a writing or a statement by Mr. VanEssche or Calyon.

2  And -- I mean Exhibit 23, I believe, is from Calyon.  So, if

3  they want to submit something on those points, that would be

4  the appropriate way to do it.  Not a document that, in and of

5  itself, is hearsay.

6         And just for the record, Your Honor, it also contains

7  a discussion of the Compass valuation.  So, we'd also object on

8  hearsay within hearsay grounds to that, but you've already

9  ruled on that issue.

10        THE COURT:  Why is it not a record report statement

11 or data compilation of public offices or agencies setting forth

12 matters observed pursuant to duty and post by law as to which

13 matters there was a duty to report, which is an exception to

14 hearsay under 803(8)?

15        MR. HARBOUR:  Good question, Your Honor.  Just give

16 me a second.

17        THE COURT:  That's all right.

18                   (Pause)

19        MR. HARBOUR:  Your Honor, I don't have a good

20 response to that.

21        THE COURT:  All right.  I'm going to overrule the

22 objection and admit the document on that basis.  And the

23 contents are admitted related to Compass statements for the

24 reasons previously provided.

25        MR. HARBOUR:  Thank you, Your Honor.  And I apologize

1  for this but what was the rule you cited for that?  I wasn't

2  taking diligent notes.

3        THE COURT:  I think 803(8), but let me look again.

4  My evidence professor would be shocked, which means I'm

5  probably wrong but that's for the Appellate Court.  Rule

6  803(8).

7        MR. HARBOUR:  Thank you, Your Honor.

8        THE COURT:  And those -- the following are not

9  excluded by the hearsay rule even though declarant is available

10 as a witness.

11       All right.  So, that leaves us, I believe, with 22,

12 23, and 24.

13       MR. HARBOUR:  Right, well --

14       THE COURT:  Oh, I'm sorry --

15       MR. HARBOUR:  That was 22, right.

16       THE COURT:  That was 22?

17       MR. HARBOUR:  Yes, Your Honor.

18       THE COURT:  All right.

19       MR. HARBOUR:  23, our objection to hearsay grounds

20 are based on the fact that there are statements in here

21 regarding the Compass valuation and regarding the SNC letter

22 that you previously admitted.  So --

23       THE COURT:  All right.

24       MR. HARBOUR:  -- those are both --

25       THE COURT:  Based on the previous rulings, I'll

1  overrule the objection and admit exhibit 23.

2          MR. HARBOUR:  And number 24, Your Honor, it attaches,

3  again, exhibit 22 so our objection is along the same grounds.

4          THE COURT:  All right, overruled.  So, documents --

5  just so the record's clear, exhibits 1 through 27 are admitted

6  into evidence for the reasons set forth on the record.

7          How do we want to proceed with the deposition

8  designations?  Submit that in writing or?

9          MR. CROWTHER:  May we have a moment, Your Honor?

10          THE COURT:  Yes, of course.

11                         (Pause)

12          MR. CROWTHER:  Your Honor, Curtis Crowther for the

13  record.

14          What we've agreed to do if it's okay with the Court

15  is with respect to number 28, the deposition designations,

16  Calyon will raise the objection to the specific designated

17  portion and the debtors will respond so, Your Honor, can make a

18  ruling as to that portion of the transcript.

19          THE COURT:  Okay.

20          MR. CROWTHER:  In addition, we've also agreed as to

21  Calyon's counter designations that in order to make it easier

22  for the Court, Calyon is going to take our 28 and highlight in

23  addition their counter designations for the Court, so it's in

24  one spot.

25          THE COURT:  That would be very helpful.  Thank you.

1        MR. HARBOUR:  That's correct, Your Honor.

2        THE COURT:  And just before we get into this, what's

3  the next item up for bid after we take care of the deposition

4  designations?

5        MR. DORSEY:  After we get through, Your Honor, I

6  believe the debtors will rest their case in chief and turn it

7  over to Calyon for their burden on the --

8        THE COURT:  Okay.  We'll break, that's when we'll

9  break for lunch then.  And we have -- I had to squeeze, I

10 apologize.  I know I gave you the whole two days, but I have to

11 squeeze something in at 1.  So when we break for lunch, we'll

12 come back at 2 o'clock.

13       MR. HARBOUR:  Thank you, Your Honor.

14       THE COURT:  Hopefully -- hopefully we'll be all

15 right.

16       MR. HARBOUR:  Thank you, Your Honor.

17       THE COURT:  Very good.

18       MR. HARBOUR:  Our initial objection, Your Honor, is

19 just simply to the fact that Mr. VanEssche is here in court and

20 it seems almost more expedious for everyone involved for him

21 just to be asked questions here in front of, Your Honor, as

22 opposed to going through the deposition designation.

23       THE COURT:  Mr. Dorsey?

24       MR. DORSEY:  Rule 32, Your Honor, says that a

25 deposition of a party opponent can be used by the other party

1 for any purpose at trial if the person is an officer, director

2 or managing agent or 30(b)(6) opponent.  I believe Mr.

3 VanEssche is an officer, and he certainly was a 30(b)(6)

4 designee which means that we can use this transcript for any

5 purpose at the hearing.

6          THE COURT:  Mr. Harbour?

7          MR. HARBOUR:  Your Honor, I don't dispute what the

8 Federal Rule says.  It just seems quicker and easier to do it

9 this way.

10          THE COURT:  Oh, if that were only the test.

11 Objection overruled.

12          MR. HARBOUR:  Thank you, Your Honor.

13          We also object to -- it was a general objection

14 regarding the deposition based on the fact that much of the --

15 or some of the discussion anyway was after August 15th, 2008.

16 And we also have -- that's the first specific objection as

17 well, Your Honor.  And I can identify those sections.

18          THE COURT:  Well, let's go through specific

19 objections.

20          MR. HARBOUR:  Thank you, Your Honor.

21          The first -- there are portions of deposition

22 transcript, page 7, line 20 through 15, line 4 which are post

23 August 15th, 2008.  And do you want to respond to each one or

24 do you want me to just identify all of them since it's really

25 the same objection?

1            MR. CROWTHER:  Whatever the Court prefers.

2            THE COURT:  All right, the entirety of the deposition

3  designation --

4            MR. HARBOUR:  Well --

5            THE COURT:  -- objections go to that issue?

6            MR. HARBOUR:  No.

7            THE COURT:  Okay.

8            MR. HARBOUR:  No, there are --

9            THE COURT:  Well, let's do it by category, that's

10  probably the easiest.  So, why don't you identify those

11  designations that you have an issue with in connection with --

12  they involved activities that occurred post August 15th, 2008

13  or --

14            MR. HARBOUR:  Yes, Your Honor.

15            THE COURT:  Okay.

16            MR. HARBOUR:  Yes.  The first was page 7, line 20

17  through page 15, line 4.

18            The next is page 15 line 9 through page 19, line 2.

19            The next is page 19, line 20 through page 21, line 8.

20            Next is page 24, line 2 through line 14.

21            Next, page 26, line 10 through page 28, line 17.

22            The next is page 47, line 6 through page 48, line 2.

23            The next is page 51, line 11 through 19.

24            Then page 64, line 9 through page 66, line 13.

25            Then page 66, line 17 through 67, line 2.

1      Page 82, line 19 through 84 -- page 84, line 14.

2          THE COURT:  I'm sorry, I missed that?

3          MR. HARBOUR:  I'm sorry.  82 -- page 82, line 19

4  through page 84, line 14.

5          THE COURT:  Thank you.

6          MR. HARBOUR:  The next is page 179, line 8 through

7  page 180, line 10.

8          The next is page 188, line 2 through 14.

9          And the last in this series, Your Honor, is page 189,

10 line 11 through 20.  And, again, these are all objections based

11 on the fact that these passages contain references to events or

12 other things after August 15th, 2008.

13         THE COURT:  All right, Mr. Crowther -- or I'm sorry,

14 Mr. Dorsey.

15         MR. DORSEY:  Our response is the same, Your Honor.

16 That this goes to the state of mind of Calyon, what their plan

17 was from the beginning of this case in August of 2007 to hold

18 this portfolio until -- so they could collect the cash flows

19 and wait until the market improved before trying to sell it on

20 the market.  And they still hold it.  They haven't sold it yet.

21 It all goes -- it's all relevant to their state of mind and

22 what they intended to do.

23         THE COURT:  I'll exclude Mr. Dorsey's statement that

24 they haven't sold it yet and I'll wait for evidence to that

25 effect.

1          I'll overrule the objection and admit the deposition

2    designations identified.  Again, fully reserving the right to

3    argue that, that's not the test for the Court making its

4    determination under the law.  But if it is, I do find it

5    relevant.  Objection overruled.

6          MR. HARBOUR:  Thank you, Your Honor.  The next nine

7    are based on hearsay.

8          THE COURT:  All right.

9          MR. HARBOUR:  I'll identify them first and then we

10   may need to take a quick look at each and confirm the --

11         THE COURT:  Okay.

12         MR. HARBOUR:  -- basis for it.

13         The first is page 109, line 3 through page 111, line

14   2.

15         Next is page 111, line 24 through page 113, line 19.

16         Then page 117, line 2 through page 121, line 20.

17         Then line -- or page, rather, 123, line 12 through

18   18.

19         Then page 124, line 2 through 25.

20         Next, page 127, line 13 through 128, line 23.

21         Next, page 129, line 6 through 132, line 16.

22         Then line 133 -- or page 133, lines 14 through 17.

23         And finally in this series, Your Honor, page 133,

24   line 24 through page 135, line 2.

25         THE COURT:  All right.  Let's take it in order, is

1  that all right?

2           MR. HARBOUR:  Sounds great, Your Honor.

3           THE COURT:  Okay.  109, line 3 through 111, line 2.

4           MR. HARBOUR:  Yes.  And the basis for this is is that

5  this contains discussions of the Compass valuation.

6           THE COURT:  All right.  Overruled on the previous

7  grounds in that it's not hearsay because it's a statement of

8  either an agent or an employee/servant.

9           MR. HARBOUR:  Thank you, Your Honor.

10          THE COURT:  I don't mean employee.  I'm sorry. A

11 statement of either an agent or a servant.

12          MR. HARBOUR:  Thank you, Your Honor.

13          111, 24 through 113, 19 is based on the same grounds.

14 It's reference to Compass.

15          THE COURT:  All right, overruled.

16          MR. HARBOUR:  117, 2 through 121, 20.  There is

17 discussion in here of a report done by Collateral Risk

18 Solutions which we objected to as hearsay.  And so Your Honor

19 knows Collateral Risk Solutions was -- they entered into a

20 contract with Calyon to perform certain tasks regarding the

21 mortgage loans.

22          THE COURT:  Mr. Dorsey?

23          MR. DORSEY:  The same response, Your Honor, as with

24 Compass.  They were retained by Calyon.  They're either an

25 agent or servant.

1            THE COURT:  I agree; overruled.

2            MR. HARBOUR:  123, three, 12 through 18 is again

3 Compass.

4            THE COURT:  Overruled.

5            MR. HARBOUR:  124, 2 through 25, is again discussions

6 with Compass.

7            THE COURT:  Overruled.

8            MR. HARBOUR:  127, 13 through 128, 23, Compass again.

9            THE COURT:  Overruled.

10            MR. HARBOUR:  129, 6 through 132, 16.  It again deals

11 with the Compass valuation, Your Honor.

12            THE COURT:  Overruled.

13            MR. HARBOUR:  133, 4 through 17, Compass again.

14            THE COURT:  Overruled.

15            MR. HARBOUR:  133, 24 through 135, 2, Compass.

16            THE COURT:  Overruled.

17            MR. HARBOUR:  That's it for our specific objections,

18 Your Honor.  Those were the two grounds.

19            We do have counter designations.  As Mr. Crowther

20 said, we will highlight this copy I have in my hand.

21                  (Microphone vibration)

22            MR. HARBOUR:  Sorry.

23            THE COURT:  That's all right.

24            MR. HARBOUR:  And I may submit it with the objections

25 just so that you have the written identification of the counter

1 designations.  You've ruled on the objection though.  Is that

2 okay?

3          THE COURT:  Mr. Crowther.

4          MR. CROWTHER:   There will be no objection to that.

5          THE COURT:  All right, very good.  Mr. Dorsey, you

6 rest?

7          MR. DORSEY:  We do, Your Honor.

8          THE COURT:  All right.  We're going to take a recess

9 for lunch and for me to hear my other matter.  We'll reconvene

10 at 2 o'clock.  I do believe, unfortunately that there are some

11 objections, it's a sale motion.  I do understand that there are

12 at least a couple unresolved objections.  I'll move through it

13 as quickly as prudent, preserving the due process of all

14 litigants.  We will try to reconvene at 2.  I can go as late as

15 the parties need me to go.  I understand you may have people,

16 of course, from out of town, although we have a continuation of

17 this trial tomorrow.  All right, so I leave it to the parties.

18          We're in recess until 2 o'clock.  If you could -- you

19 can leave your items, but if you could clear the tables that

20 will be very helpful.

21          All right?  Thank you very much.

22          MR. HARBOUR:  Thank you, Your Honor.

23          MR. DORSEY:  Thank you, Your Honor.

24            (Recess 12:32 P.M./Reconvene 2:12 P.M.)

25          THE COURT:  Please be seated.  Mr. Ackerly, you may

1  proceed.  Good afternoon.

2           MR. ACKERLY:  Good afternoon.  Ben Ackerly again on

3  behalf of Calyon New York Branch.

4           Your Honor, as part of our case, and as a preliminary

5  matter, I would ask the Court if you have up on your desk a

6  black notebook that's entitled "Calyon Exhibits."  And it's

7  probably labeled 1 and 2, and 6 through 21.

8           THE COURT:  Yes, I do have those.

9           MR. ACKERLY:  Okay.  In that book, exhibit 1 is a

10  declaration of Michael Strauss in support of the debtors'

11  Chapter 11 petitions and first day relief.

12           We'd like to have that introduced as an exhibit.

13  It's a certified copy of Mr. Strauss's affidavit.

14           THE COURT:  Mr. Dorsey?

15           MR. DORSEY:  No objection, Your Honor.

16           THE COURT:  Admitted without objection.

17           MR. ACKERLY:  Okay.  At Tab 2 in that book, Your

18  Honor, is the transcript of the proceedings from August 7th,

19  2007, the first day hearings.  I would ask the Court with

20  respect to this transcript to take judicial notice of Mr.

21  Patton's (phonetic) statement on page 7, beginning at line 10

22  in which Mr. Patton stated, "In recent weeks, the home mortgage

23  market place reached a point of dysfunctionality that made it

24  almost impossible for us to even sell to third parties our home

25  mortgages at any reasonable price.  So, our ability to move our

1  assets, or to otherwise liquidate our assets functionally

2  ground to a halt."  If the Court would take judicial notice of

3  that.

4          THE COURT:  Mr. Dorsey?

5          MR. DORSEY:  I have no objection to the Court taking

6  judicial notice.  I don't know that Mr. Patton would be

7  qualified to a witness on behalf of the defendant -- on behalf

8  of the debtors.  He was merely making an opening statement to

9  the first day hearings.

10          But I have no objection to the Court taking judicial

11  notice.

12          THE COURT:  All right.  the Court will take judicial

13  notice of the sentence and the fact that Mr. Patton said it.

14          MR. ACKERLY:  I'd like to call Mr. VanEssche.

15          THE COURT:  All right.  Mr. VanEssche, please take

16  the stand.  Please remain standing.

17          CLERK:  Raise your right hand.

18       JOHN-CHARLES VanESSCHE, CALYON'S WITNESS, SWORN

19          CLERK:  You may be seated.

20          THE COURT:  Sir, can you please state your name and

21  spell your last name for the record?

22          MR. VanESSCHE:  My name is John-Charles VanEssche,

23  that's John hyphen Charles.  And the last name is spelled small

24  v-a-n- and then another word E-s-s-c-h-e.

25          THE COURT:   Thank you, sir.

1            DIRECT EXAMINATION

2  BY MR. ACKERLY:

3  Q    Mr. VanEssche, where are you employed?

4  A    I'm employed by Calyon.

5  Q    All right.  And what is your position at Calyon?

6  A    I'm a managing director at the bank.

7  Q    In what area do you --

8  A    I'm in the workout department, the distressed asset

9  department.  We handle all of the problem situations in the

10 bank.

11 Q    And how long have you been in that role at the bank?

12 A    Approximately 10 years and two months.

13 Q    Okay.  Just describe generally to the Court what your

14 duties and responsibilities are in the workout area?

15 A    As I said before, we handle the distressed and workout

16 situations at the bank, either loans or investments that have

17 gone bad.  When that happens, the group I'm in is charged with

18 managing those assets to maximize recoveries and/or minimize

19 losses.  So, we effectively run or manage the deal in terms of

20 internal management, you know, with respect to our senior

21 management.  And also in relation to, you know, the debtors

22 dealing with counsel, dealing with advisors and specialists.

23 Q    Did your responsibility include the repurchase agreement

24 with American Home Mortgage Company and --

25 A    Yes.

1  Q    -- its affiliates?

2  A    Yes, that was assigned to me back in the summer of 2007.

3            MR. ACKERLY:  Your Honor, if we can hand the witness

4  a set of the -- the stipulated exhibits, as well as the --

5            THE COURT:  You may.  And you can put those off to

6  the side if you need the room.

7            THE WITNESS:  Yeah.  Which one do you want me to open

8  up first?

9            MR. ACKERLY:  In the white book to Tab A.

10           THE WITNESS:  Yes, I'm there.

11 BY MR. ACKERLY:

12 Q    Is this the repurchase agreement that you referred to

13 between Calyon and other banks and the debtors?

14 A    Yes.

15 Q    Okay.  Was Calyon the agent back under this repurchase

16 agreement?

17 A    Yes, it was and still is.

18 Q    Okay.  And what are your duties and -- what were and what

19 are your duties and responsibilities as the agent bank under

20 this repurchase agreement?

21 A    Well as agent bank, I manage the deal for the group of

22 banks at large.  So, I'm the point person for all matters

23 concerning this transaction.  I'm the one who deals with the

24 debtor where there needs to be interaction with the debtor and

25 the case here, this particular situation where there's

1  litigation.  I'm the one that's involved in running that with

2  the attorneys, such as yourself.  I basically run this

3  transaction, manage it for the group at large.

4  Q    Okay.  Are you familiar with the Calyon, what I would call

5  loan portfolio, the mortgage portfolio under this repurchase

6  agreement?

7  A    Yes, I am.

8  Q    Okay, would you generally describe the portfolio to the

9  Court?

10 A    The portfolio originally was a portfolio of approximately

11 5,700 loans with an original unpaid principal balance of about

12 -- just under $1.2 billion.  The mortgages were located in all

13 50 states of the United States of America.  And it was

14 principally comprised of ARM loans, adjustable rate mortgages,

15 as well as pay option ARMS --

16 Q    Okay.

17 A    -- and a small portion of Government conforming loans, and

18 then a small portion of second lien loans.

19 Q    Explain to the Court what pay option ARM?

20 A    A pay option ARM loans are essentially mortgages where the

21 mortgagee has the option of choosing which payment they want to

22 make.  And it can be a minimum payment based on some number or

23 interest rate that's based in the contract or it's the actual

24 minimum payment based on the term of the mortgage.  Or they

25 can, in some cases, actually not make a payment at all.

1  Q    Okay.

2  A    It all depends on exactly what the terms of that pay

3  option ARM are.

4  Q    Okay.  Has Calyon engaged advisors both with respect to

5  valuation and disposition of these mortgages?

6  A    Yes, we have.

7  Q    Who have you retained over the course -- since July of

8  2007?

9  A    With respect to valuation, we have hired -- we hired

10  sometime ago Compass Analytics.  For the case here in court

11  today, we hired MIAC.  With respect to disposition, we have

12  hired JPM Securities as a disposition advisor.

13  Q    Okay.  Have you also hired outside firms to help you

14  remediate the mortgages, get the mortgage file cleaned up?

15  A    Yes, we have.  We have hired -- in the past we hired Bohan

16  Group which is a mortgage file remediation firm.  We hired some

17  other vendor, too, to assist that general exercise of

18  determining whether, you know, the mortgage files that we have

19  for the mortgages were in order.  That would include like CRS,

20  Digital Risk.

21  Q    Okay.  Mr. VanEssche, are you familiar with what steps

22  needed to be taken beginning in August 1st, 2007 to sell these

23  mortgage loans?

24  A    Yes.  When I got involved with the repo here, one of the

25  first things that we started to do was essentially try and

1 first -- to ascertain what the portfolio was about.  How many

2 loans were actually in it.  What the UPB was for each of those

3 loans and what those terms were.

4          We are also involved with trying to obtain from

5 American Home copies of the mortgage files.  And on that front,

6 we did obtain approximately 3,000, 3,500 files in the month of

7 August, out of the 5,700 loans that we later on determined were

8 in the portfolio.

9          We were also involved in terms of trying to figure

10 out what the cash proceeds of the portfolio were exactly and

11 where they were, which we determined before the bankruptcy to

12 be at Deutsche Bank.  And ultimately also -- because all of

13 this was sort of happening at the same time, there's also the

14 situation with respect to the ownership of the loans that we

15 were trying to establish.

16 Q    Okay.  Were you also trying to get control of the

17 servicing?

18 A    Yes, we were also trying to get control of the servicing

19 at that time.  We were fearful that American Home Mortgage

20 Servicing, because of the bankruptcy filing might shut its

21 doors.  And as a result of that, we would have essentially a

22 defunct servicer and, therefore, nobody really managing the

23 collections of our loans and whatnot.  So, we were nervous

24 about that situation and we took steps to try and remediate it.

25 Q    Why are these steps that you just identified important?

1  A    Well they're all important:  A) to establish ultimately

2  your ability to realize, you know, recover on these mortgages.

3  And also to essentially ascertain what it is in due course

4  you're going to sell to recover.

5          So, I mean you need to know what you have, what the

6  condition of your assets are.  And then eventually you want to

7  be able to sell them.  And all those steps are necessary to

8  achieve that end.

9  Q    Okay.  What steps have you taken since August 1st, 2007 to

10  try to clear up the issues concerning the mortgage file or the

11  mortgages?

12  A    Well, I guess the first step we took after the first day

13  hearings was we initiated litigation against American Home to

14  establish ownership of the mortgages themselves.  That was the

15  first thing we did because there was a dispute as to whether we

16  owned them or American Home owned them.  They were taking the

17  position that they owned them and that this was only a secured

18  financing.  There was a trial in this Court to that effect.

19  And ultimately, it was resolved with a settlement that was

20  entered into at the beginning of last summer which took effect

21  -- became final and on appeal pursuant to the Court order on

22  August 15th --

23          THE COURT:  It became final when?

24          THE WITNESS:  Pardon me?

25          THE COURT:  It became final when?

1              THE WITNESS:  August 15th of 2008.

2              MR. ACKERLY:  Okay.

3   BY MR. ACKERLY:

4   Q    Did you also try to get control of the proceeds of the

5   mortgages?

6   A    Well, initially we did try to get control of the proceeds,

7   but then the company filed for bankruptcy.  And then pursuant

8   to a court order, they were required to deposit the proceeds

9   from the mortgages into a segregated account at JPMorgan Chase

10  Bank, which was done during the pendency, I guess, of the

11  litigation.  We weren't able to get control of that cash.  It

12  was only after the phase I trial was over and Judge Sontchi

13  issued his decision and order.  And then another motion or two

14  occurred that we finally got control of that cash in early

15  2008.

16  Q    When did you begin working with American Home Mortgage in

17  order to remediate the file, to get the complete records and

18  clean up to the extent that there were deficiencies?

19  A    That effort sort of happened concurrently or

20  simultaneously with when they started to turn over the funds.

21  Q    Funds or files?

22  A    No, the funds.  At the same time that they started to turn

23  over the funds that were being collected on the mortgages, they

24  started to cooperate with us on account of the files.

25  Q    Okay.

1  A     And that also occurred in January of 2008 where they

2  commenced turning over the rest of the mortgage files that we

3  did not have.  And then worked with us to remediate those

4  mortgage files over the next approximate 60 to 75 days.

5  Q     Okay.  Following January of 2008?

6  A     Correct.

7  Q     Okay.  Did the files contain exceptions?

8  A     Yes, the files, as I mentioned before, we received an

9  initial batch of files back in August of 2007.  In the fall of

10 2007, we retained a firm, Bohan Group that I referred to

11 before, and they did a sampling of the files at that point, a

12 few hundred, maybe 300 or 400 just to see in what condition the

13 files were.  And not surprisingly, the files were not in great

14 shape.  It was a combination of the fact that the loans had

15 just been made, as well as the fact that American Home had

16 filed for bankruptcy.  And so the people that otherwise would

17 have been there to put the files together were not there

18 anymore.

19         So, based on that, it was decided that when we could

20 -- and that would be sometime in the future -- when we could,

21 we would essentially do a review of every single loan file that

22 was in the portfolio so that we could determine exactly what

23 the situation was.  We got the remainder of the files from

24 American Home in January or February of 2008.  And then with

25 Bohan, we started the process of going through the files and

1 working with people at American Home to address the exceptions.

2 And so they would run through a number of files, determine what

3 the exceptions were in those files, give that exception list to

4 American Home who had a team of people working out in Melville

5 on the matter.  And then American Home would try and provide us

6 with the documentation or the explanations to address those

7 exceptions.

8           THE COURT:  What do you mean by an exception?

9           THE WITNESS:  There are a variety of exceptions.  You

10 have exceptions that are purely documentary.  For example, a

11 missing truth in lending document.  That's pretty

12 straightforward and objective.

13           Then you have exceptions that would be more

14 subjective that are more addressing, for example the

15 underwriting standard of the loan.  For example, a mortgage

16 might fall into a certain product category which said that the

17 debt to income shouldn't exceed maybe 40%.  Yet the mortgage of

18 that product type was made and the debt to income was say 50%.

19 We'd ask for an explanation as to why they had approved the

20 loan outside of their guidelines.  There'd be extenuating

21 circumstances.  Maybe the borrower had a lot of cash on hand or

22 just something else like that.  And that would explain why this

23 mortgage was, in fact, made.

24           So, if you had exceptions of a documentary nature, of

25 an underwriting nature, you know.

1 BY MR. ACKERLY:

2 Q    Could an exception be a missing mortgage note?

3 A    Yes, that would be a documentary exception.

4 Q    And could an exception -- could an exception be no

5 evidence of recordation of the mortgage?

6 A    That might be one, too.

7 Q    Okay.  So, these exceptions were important to get

8 resolved?

9 A    Yes.

10       MR. DORSEY:  I'm going to object to that, Your Honor,

11 on grounds of foundation.  I don't know that this witness has

12 established a foundation to know what those two leading

13 questions about what exceptions would be actually existed and

14 whether or not they were relevant to the value of these loans

15 in Calyon's eyes.

16       THE COURT:  Which question are you objecting to, all

17 three?

18       MR. DORSEY:  There were two leading questions about

19 whether mortgage notes would be an exception and whether the

20 mortgage itself would be an exception.

21       THE COURT:  Right.

22       MR. DORSEY:  He said yes.  And then he was asked a

23 question are those the kind of mortgage exceptions that would

24 affect the value of the mortgages.  The witness said yes.  But

25 he hasn't established he actually knew that those existed.  He

1  hasn't set a foundation for how he knows it.

2              THE COURT:  Mr. Ackerly.

3              MR. ACKERLY:  Your Honor, I think it's clear from his

4  prior testimony.  He's been involved with these mortgages

5  since, you know, the inception of when they went in default.

6  He's familiar.  He's previously testified about what steps

7  needed to be taken to get these mortgages in a position so that

8  you can sell them.  One of the steps that had to be was the

9  remediation and cleaning up of the files.  So, I think he's

10 laid a foundation that he understood that in order to sell the

11 mortgages, you needed to be able to show to a buyer who's going

12 to do due diligence that you had the proper files.

13             THE COURT:  Well, I'm not sure we've gone there.  I

14 mean he's gone through what he's did.  I don't recall any

15 testimony as to it being necessarily -- I don't recall him

16 testifying that it was required in order to be able to sell the

17 mortgages.  Maybe we're headed there, but I don't remember

18 going quite that far on the foundation.  So, I will sustain the

19 objection --

20             MR. DORSEY:  I would also point out --

21             THE COURT:  -- without prejudice to you to raise it

22 again, and once you have obviously laid a foundation -- that's

23 my memory of the record.

24             MR. ACKERLY:  Okay.

25             MR. DORSEY:  One other point, Your Honor, is I think

1 the witness testified at the beginning that he didn't become --

2 this portfolio was not assigned to him until December of 2007,

3 well after August.

4           MR. ACKERLY:  That was not the testimony.

5           THE WITNESS:  No, no.

6           THE COURT:  I believe he said summer of 2007, Mr.

7 Dorsey.

8           MR. DORSEY:  Summer.  I'm sorry.

9           THE COURT:  Am I correct, Mr. Ackerly?

10          THE WITNESS:  Yes.

11          THE COURT:  Yeah.

12 BY MR. ACKERLY:

13 Q    We'll come back -- Mr. VanEssche, let's step back a moment

14 to August 1st, 2007.  You were involved with this loan at that

15 time, correct?

16 A    Yes, I was.

17 Q    Okay.  Would you look at exhibit E in the white book?

18                     (Pause)

19 Q    That should be a letter dated August 1st, 2007 from

20 Calyon, the re being notice of event of default of sellers, do

21 you see that?

22 A    Yes, I do.

23 Q    Okay.  What is that letter?

24 A    That letter was a letter addressed to American Home, the

25 American Home entities involved in the repurchase agreement,

1  essentially notifying them that we were declaring an event of

2  default under the repurchase agreement.

3  Q    Okay.  And if you will look at exhibit F.  What is that?

4  A    That was a notice of default to the servicer, American

5  Home Mortgage Servicing, in particular --

6  Q    Okay.

7  A    -- notifying them of an event of default as well.

8  Q    Briefly, what were the facts that led up to Calyon sending

9  these default notices?

10 A    Well, the week before August 1st what happened was in the

11 days leading up to that Friday which was, I believe, July 27th,

12 there was a lot of market rumor that things weren't going well

13 at American Home.  And then that Friday evening, and the entire

14 weekend, there were a series of emergency conference calls

15 amongst bankers on the repurchase agreement, but as well as on

16 other transactions that Calyon was involved with that were

17 related to American Home Mortgage.  And those calls continued

18 into next week.  And essentially, you know, it became apparent

19 to everybody that American Home was in trouble.  And that's

20 what led to this issuance of this letter.

21       There was also a press release by the company at the

22 time declaring that they would not be paying dividends on

23 preferred stock.  You know, there were articles on Yahoo

24 Finance and things like that just generally indicating that the

25 situation at American Home was not well.

1    We were trying to communicate with people at American

2 Home, having a very tough time getting people to return phone

3 calls.  So, a lot of things added up to us being concerned.

4 Q    As of August 1st, 2007, who was servicing the portfolio of

5 mortgages?

6 A    It was American Home Mortgage Servicing, their servicing

7 ARM.

8 Q    And what were there responsibilities as servicer?

9 A    Their responsibilities were essentially to manage the

10 mortgage loans once they had been made, *i.e.,* collect the

11 monthly payments from the borrowers, arrange for payoffs if

12 somebody wanted to pay off.  If they were escrowing for real

13 estate taxes, do all that work with respect to escrowing and

14 paying real estate taxes on time; handling, you know, mortgage

15 insurance to the extent mortgage insurance needed to be paid.

16 If and when a borrower became delinquent, they would handle

17 that process, too, including up to having, perhaps, to initiate

18 foreclosure proceedings.

19    So, essentially managing the portfolio on behalf of

20 the investor or owner of that portfolio which, in this case,

21 for us, you know, was this particular facility.

22 Q    Okay.  If you -- you've got a big black notebook there on

23 the floor.  If you will look at exhibits 3, 4, and 5.

24 A    Is it the larger one of the two?

25 Q    What are these?

1  A    These are copies of loan tapes on the portfolio.  They

2  essentially summarize pertinent data on the mortgages that are

3  in the portfolio.

4  Q    Okay.  Was this loan data prepared by American Home

5  Mortgage?

6  A    The first two were prepared by American Home Mortgage,

7  exhibit 3 and 4.  Exhibit 5 was predominately prepared by

8  American Home Mortgage, but my analyst updated certain fields

9  of information.

10  Q    Are exhibits 3, 4, and 5 the information you made

11  available to your expert to assist him in valuing the

12  mortgages?

13  A    Yes, amongst other things.

14        MR. DORSEY:  Just clarity, Your Honor, I don't know

15  if the expert he's referring to is a trial expert or the

16  Compass expert.

17        THE COURT:  Yeah, I -- I would --

18        MR. ACKERLY:  Excuse me. I'm sorry.  The trial

19  expert.

20        THE COURT:  Who is that?

21        MR. ACKERLY:  We haven't -- it's Robert Branthover.

22  He's in the court.

23        THE COURT:  Okay.

24        MR. ACKERLY:  We haven't identified Compass as an

25  expert.

1  BY MR. ACKERLY:

2  Q    Prior to August 1st, 2007, had American Home Mortgage been

3  remitting payments to Calyon?

4  A    They were remitting payments to a account at Deutsche Bank

5  which was for the benefit of Calyon, yes.

6  Q    All right.  These were the principal and interest

7  collections on the mortgages?

8  A    Correct.

9  Q    When was the last payment that Calyon received on account

10 of these mortgages prior to the petition date?

11 A    It was the payment received sometime in July of 2007.

12 Q    Okay.

13          THE COURT:  I'm sorry, you said there were payments

14 made to Deutsche Bank on behalf of Calyon.  Payments from whom?

15          THE WITNESS:  From the portfolio, from the servicing.

16 They would collect the payments on account of the mortgages and

17 then regularly they would sweep those funds into the collection

18 account at Deutsche Bank.

19          THE COURT:  So, it's coming from AHM SI, the

20 servicing ARM?

21          THE WITNESS:  The servicing, yes, from servicing --

22          THE COURT:  Into the Deutsche Bank?

23          MR. VANESSCHE:  Correct.  And then the Deutsche Bank

24 funds, money's fungible obviously, but the Deutsche Bank funds

25 would, you know, extensively be used then to pay the interest

1  on the loans of the commercial paper program that existed

2  prior.

3           THE COURT:  Understood.

4  BY MR. ACKERLY:

5  Q    The payment transfer, did it actually -- when you got paid

6  principal and interest. did it actually come from American Home

7  or did it come from Deutsche Bank?  How did it mechanically

8  work?

9  A    Mechanically, it usually came -- it came from American

10  Home Mortgage.

11  Q    Okay.  All right.  When was the last mortgage purchased

12  under this repurchase agreement?

13  A    July 27th of 2007.

14  Q    Okay.  If you would look at the white notebook to your

15  left, the white on your left.  Look at exhibit G.  This is a

16  letter dated August 6th, 2007.

17  A    Yes.

18  Q    Would you explain to the Court the purpose of this letter?

19  A    The purpose of this letter was essentially to tell

20  American Home that we wanted, we had told them we wanted them

21  to transfer their servicing of a portion of the portfolio to

22  JPMorgan and essentially this letter was addressed to them with

23  respect to loans that we had designated as remaining at

24  American Home Mortgage Servicing.  And we were essentially

25  telling them that we were continuing through a certain date

1  which somewhere here in the letter that we wanted them to

2  continue servicing those pay option ARMS.

3  Q    Look at exhibit H.

4  A    Yes, I'm there.

5  Q    Explain this letter briefly.

6  A    It's the same type of letter. Essentially in this case,

7  we're extending that term to August 22nd.

8  Q    And look at exhibit I.

9  A    I is a similar letter, just with a new date extending the

10 servicing of a portion of the portfolio to August 29th of 2007.

11 Q    Okay, go back to the small black notebook for a moment.

12 Okay.  Look at exhibit 14.  Was this the final letter on the

13 pay option ARMS?

14 A    Yes, it was.

15 Q    Okay.  Look back at exhibit 13 in the same book.  Exhibit

16 13 is an August 1st letter to Deutsche Bank and American Home

17 Mortgage Servicing dated August 1st, see that?

18 A    Yes.

19 Q    Okay.  What was the purpose of this letter?

20 A    Well, that was the first letter in that series of letters

21 that we spoke about and -- where we're designating JPMorgan

22 Chase and then continuing with American Home Mortgage

23 Servicing.  And then ultimately the last letter designated the

24 portion of the portfolio that we have asked American Home

25 Mortgage Servicing to continue to service.  We were designating

1 Cenlar as the servicer.

2 Q    Okay.  Now, prior to the Chapter 11 petition date on

3 August 6th, 2007, did Calyon receive any positive response from

4 American Home Mortgage with respect to the notices of default

5 and the notices concerning servicing that you've just

6 identified?

7 A    No.

8 Q    Okay.  Commencing on August 1st, 2007 was Calyon receiving

9 any of the funds, collections, or other proceeds on the

10 mortgages?

11 A    Directly, no.

12 Q    Okay.  And, again, commencing on August 1st, 2007 did

13 Calyon have complete and accurate copies of the mortgage files?

14 A    No, not on August 1st.

15 Q    I think the Court has indicated earlier that it

16 understands what MERS is but do you understand what MERS is,

17 MERS?

18 A    MERS is a electronic registry system used to determine the

19 ownership of mortgages throughout the country.  It's to avoid

20 the paper physical assignment/reassignment of mortgages.  And

21 given the fact that up until mid 2007, mortgages were trading

22 more and more as part of security pools and then being sliced

23 and diced and some securities being canceled, and then those

24 mortgages being put into other securities.  The purpose of MERS

25 was to be able to track the ownership of the individual

1  mortgages, you know, in a more simplified and easier manner.

2  Q    Okay.  Who was listed as the owner of these mortgages on

3  MERS as of August 1st --

4  A    American --

5  Q    -- 2007?

6  A    American Home Mortgage.

7  Q    Okay.  And who was responsible for reporting ownership

8  information to MERS?

9  A    It's the originator.  So, in this case, it would have been

10 American Home Mortgage.

11 Q    Okay.  When I mention making representations and

12 warranties, do you know what I am referring to?

13 A    Yes.

14 Q    Okay would you explain to the Court what you understand

15 representations and warranties to be in connection with selling

16 mortgage loans?

17 A    Well, there are really two different sorts of reps and

18 warranties.  One, I would say is more a representation, and

19 that would pertain to the ownership of the loans.  Representing

20 that you own the loans, that you have clear title.  That's one

21 set of reps and warranties.  And that's predominately, you

22 know, used for the sale.

23        The other rep and warranty that you're referring to

24 has to do with the warranty that pertains to the recourse that

25 a buyer of a loan has to the seller in the event -- usually in

1 the event of a default on the mortgage.  And essentially when

2 the seller sells a mortgage to a buyer, they represent that the

3 mortgage is in such a shape, has been underwritten to such

4 standard, that the documentation is all there and appropriate

5 and meets, you know, whatever the guidelines for documentation

6 should be.  The seller makes that warranty that everything is

7 in order.  And essentially if, down the road, there's a

8 problem, the buyer will often attempt to put back the loan to

9 the seller based on the fact that the representations and

10 warranties pertaining to the mortgage in the mortgage file were

11 incorrect.

12 Q    Okay.  As of August 1st, 2007 could Calyon make

13 representations and warranties as you have described to any

14 seller?

15 A    No.

16 Q    And why not?

17 A    Because we had no idea as to what the conditions of the

18 files were.  I mean if we had made reps and warranties, we

19 would have done so in a blind manner without knowing at all

20 what our potential exposure was.

21 Q    Okay.  Could Calyon had sold the mortgages on August 1st,

22 2007 for a reasonable price?

23 A    No.

24 Q    Why not?

25 A    Well, first of all, we didn't exactly know even what the

1  portfolio was.  Okay?  There was a dispute already as to

2  ownership.  We, you know -- we weren't getting the cash

3  proceeds directly.  And you also had the issue with respect to

4  servicing, and this is American Home Mortgage Servicing.  It

5  was unclear what their situation was, if they'd be around.

6          So, I'd say that all those elements put together made

7  it extremely difficult, if not impossible, for us to sell these

8  loans at anything close to a reasonable price, assuming there

9  was a market there in the first place.

10 Q    You said you were not getting the cash proceeds directly.

11 Were you getting them indirectly?

12 A    Well, they were being deposited into the Deutsche Bank

13 trust account, but against -- that we swept that one point.

14 But subsequent to that, nothing was coming to us.

15 Q    Okay.  I mean -- just to clarify, subsequent to the

16 petition date, what happened to -- if you know, with respect to

17 the proceeds of these mortgages?

18 A    Subsequent to the petition date and subsequent to the

19 first day hearings, American Home Mortgage set up a segregated

20 account at JPMorgan Chase Bank pursuant to the order of the

21 Court here.  And the proceeds from the mortgages in our

22 portfolio were being deposited into that segregated account.

23 Q    Okay.  And when did you first receive those proceeds?

24 A    We finally received those first proceeds in January of

25 2008.

1  Q    Okay.  As of September 30th, 2007, had anything changed

2  with respect to this mortgage portfolio such that you could

3  give the reps and warranties?

4  A    No.  The only thing -- not really.  The only thing that

5  changed was that we had received a portion of the mortgage

6  files, some of the mortgage files as I mentioned before and --

7  but not all of them.  And ascertained already that the

8  situation with mortgage files was not a good one; that they

9  were incomplete, at best.

10        With respect to the other aspects, you know,

11 everything was more or less the same other than the fact that

12 we had instituted suit on account of the ownership of the

13 mortgages.

14 Q    Okay.  Could Calyon have sold the mortgage portfolio on

15 September 30th, 2007?

16 A    In my opinion, no.

17 Q    During the period of time between August 1st, 2007 and

18 September 30th, 2007, were you in discussions with

19 representatives of the debtors concerning the disposition of

20 the mortgages?

21 A    Between what dates?

22 Q    August 1st, 2007 and September 30th, 2007.

23 A    Not really.  We weren't talking about disposing of the

24 mortgages, some strategy to depose of the mortgages.  No, we --

25 not exact, you know, mechanics of strategies as to help us sell

1 mortgages, no.

2 Q    Did you have any general discussions with American Home

3 Mortgages or any of their representatives about whether it was

4 advisable to dispose of the mortgages?

5 A    In general, I think the discussions were of a nature that

6 the market wasn't good and that it probably wasn't a good time

7 to sell.  Discussions like that, yes, were had.

8 Q    Who were those discussions with?

9 A    That would have been Kevin Nystrom.

10 Q    And who is Kevin Nystrom?

11 A    Kevin Nystrom works for Kroll Zolfo Cooper and he was, at

12 the time, the number two person running American Home, you

13 know, at Kroll Zolfo Cooper.

14 Q    Okay.

15       MR. ACKERLY:  If the Court could take judicial notice

16 of an order entered September 4th, 2007 in which the Court

17 approved an agreement between the debtors and Kroll Zolfo

18 Cooper and -- Kroll Zolfo Cooper, Steven Cooper and Kevin

19 Nystrom.  And in that order, it was provided that the Steven

20 Cooper was the chief restructuring officer for the debtor and

21 that Kevin Nystrom was their director of restructuring.

22       THE COURT:  Any objection?

23       MR. DORSEY:  The document wasn't included in their

24 exhibit list, Your Honor.  I haven't seen it, so I'd like to

25 see if before I --

1            MR. ACKERLY:  It's an order.

2            THE COURT:  You're asking me to take judicial notice

3    for the purposes of establishing those two gentlemen hold those

4    positions?

5            MR. ACKERLY:  Well, that they spoke for the debtor.

6    I mean they were employed by the debtor, approved by the Court,

7    and --

8            THE COURT:  That their employment by the debtor in

9    those positions --

10           MR. ACKERLY:  Yes.

11           THE COURT:  -- was approved.

12           MR. DORSEY:  Well, it wasn't included on their

13   exhibit list, Your Honor, but if they --

14           MR. ACKERLY:  I'm not offering it as an exhibit, Your

15   Honor.  I'm just asking the Court to take judicial notice of

16   it.

17           MR. DORSEY:  I think the Court can take judicial

18   notice of the order, but I don't know that that establishes for

19   a fact that those two --

20           THE COURT:  Judicial notice doesn't mean admission of

21   evidence.  Is there any dispute that -- what are their names

22   again?

23           MR. ACKERLY:  Their names are Steven Cooper and Kevin

24   Nystrom.

25           THE COURT:  And their positions?  Respective

1  positions?

2            MR. ACKERLY:  I don't --

3            THE COURT:  Their respective positions with the

4  debtor.  You identified a title.

5            MR. ACKERLY:  Oh their -- Mr. Cooper was chief

6  restructuring officer, or CRO.  And Mr. Nystrom was director of

7  restructuring, or DR.

8            THE COURT:  Is there any dispute that these gentlemen

9  were retained in that fashion?

10            MR. DORSEY:  No, Your Honor.

11            THE COURT:  All right.  We'll stipulate that Mr.

12  Nystrom and Mr. Cooper were retained by the debtor pursuant to

13  the terms of an order in the positions identified on the

14  record.

15            MR. ACKERLY:  Okay.

16  BY MR. ACKERLY:

17  Q    Did the -- did the debtors, through either Mr. Nystrom or

18  Mr. Cooper, request a meeting with Calyon?

19  A    Yes, through Mr. Nystrom.

20  Q    Okay.  And when did that meeting take place?

21  A    In early October.

22  Q    Okay.

23            THE COURT:  2007?

24            THE WITNESS:  Yes, 2007.

25  BY MR. ACKERLY:

1    Q    And was one of the items discussed at that meeting the

2    disposition of the mortgages?

3    A    Yes.

4    Q    Okay.  And what was discussed with respect to the

5    disposition of the mortgages?

6    A    The general nature of the conversation was that the

7    mortgage market was not a good market at the time, and that

8    selling immediately would not be advisable.  And that we would

9    be all better off if we decided to wait out a little bit

10   before, you know, disposing of the mortgages.

11           We also talked about how to go about selling the

12   mortgages, whether we would do it under a certain scheme or two

13   that they were proposing, and that was essentially it.

14   Q    Okay.  And was there any discussion about remediating the

15   files?

16   A    Yes.  There was also discussion about the fact that the

17   files needed to be remediated, yes.

18   Q    And did you agree to the proposal that was made with

19   respect to disposing of the mortgages?

20   A    The schemes that they had proposed were not acceptable to

21   us, no.  We did not accept them.

22   Q    Okay.  Was there any condition concerning a deficiency

23   claim?

24   A    There was a -- one of the -- there were a number of sort

25   of fees associated with getting rid of the mortgages through

1  the schemes proposed by Mr. Cooper and Mr. Nystrom.  And as

2  part of the package of consideration, one of the things that

3  was thrown in there was that we would waive our deficiency

4  judgment for whatever shortfall there might be upon selling the

5  mortgages.

6  Q    And did Calyon agree to that?

7  A    No, we did not.

8  Q    Okay.

9         MR. ACKERLY:   If I may have just a moment.

10        THE COURT:  Sure.

11                        (Pause)

12 BY MR. ACKERLY:

13 Q    You previously testified that there were concerns

14 expressed about the timing and remediation, whether this is the

15 best time to sell the mortgages, do you recall that?

16 A    Yes.

17 Q    Were those comments coming from the debtors'

18 representatives or from Calyon?

19 A    From both sides.  We had just gone through an extensive

20 exercise, both sides had been working on this more or less

21 together with respect to the Broadhollow and Melville portfolio

22 sales.  That was very, very consuming and very extensive.  And

23 so everybody had gained a fair amount of experience from that

24 process.  So, we were both in agreement, at least on that

25 aspect, with respect to the remediation of the mortgage files.

1  Q    Okay.  Now, moving forward to January 30th, 2008, had

2  anything changed with respect to the mortgage portfolio at that

3  time?  And if so, what?

4  A    With respect to the portfolio itself or with respect to

5  the situation?

6  Q    Well, with respect to the portfolio and the situation

7  surrounding the portfolio.

8  A    Well, I guess the portfolio what had happened by then is

9  that a number of the loans had been paid down.  So, the

10 portfolio had come down in number of loans and in size.  We

11 only really figured that out about two months later, to be

12 honest with you.

13       The other thing that has more to do with our

14 advances.  And at the end of January by then, we had received

15 the money that had been accumulated up to a certain amount in

16 the JPMorgan segregated account.  The debtors finally, after we

17 had filed the motion here in court to have that turned over to

18 us, they stipulated to turn over those funds, and we received

19 them, as I indicated before.

20 Q    And did they begin making those payments monthly, as

21 provided in the stipulation?

22 A    Pursuant to the stipulation, they also agreed to begin

23 remitting the monthly proceeds of the portfolio on a regular

24 monthly basis, yes, going forward.

25 Q    And how about as of January 30th, the status of the

1 records?

2 A    The records of the portfolio -- what happened is that at

3 the time American Home Mortgage agreed to start turning over

4 all the necessary information for us to essentially reconcile

5 the portfolio.  And they had started to turn over that

6 information to us by January 30th.  I can't recall if we had

7 everything we needed.  Probably not because of the entire

8 reconciliation of the portfolio, as well as the cash due to us

9 took approximately 60 days to do.  I hired an external firm,

10 forensic accountants to do that, Capstone Advisory.  And it

11 took them approximately 60 days to do that working with Kroll

12 Zolfo Cooper to make sure that basically everything tied out.

13 Q    In January of 2008, had this Court entered an order with

14 respect to ownership of the mortgages?

15 A    In January of 2008, this Court had decided and issued an

16 order with respect to the Phase I part of the trial.  And they

17 essentially -- the Court did order that we were the owners of

18 the loans.

19 Q    Okay.

20                    (Pause)

21          MR. ACKERLY:  I would just ask the Court with respect

22 to that order to take judicial notice it specifically provided

23 that it was interlocutory because there was another phase of

24 the adversary proceeding which had not been resolved in the

25 first phase.

1             THE COURT:  I don't -- is that what I did, Mr.

2    Dorsey?  That was a year and a half ago.

3             MR. DORSEY:  I don't recall, Your Honor.

4             THE COURT:  I don't either.

5             THE WITNESS:  I do.

6             THE COURT:  Well, why don't you --

7             MR. DORSEY:  I wasn't here for that one.

8             THE COURT:  Why don't you testify to what I did?

9                       (Laughter)

10            THE COURT:  You tell me.

11            THE WITNESS:  You issued -- I hope I get this

12   straight.  You issued a decision and order in January of 2008

13   following a trial that we had in November indicating that

14   Calyon was, indeed, the owner of the mortgages.

15            However, in your decision you indicated and found

16   that the servicing rights to those mortgages belonged to the

17   debtor, to American Home Mortgage.  So that was essentially the

18   result of your decision and order at the time.

19            THE COURT:  I do recall that part.  I guess -- and

20   maybe, Mr. Ackerly, you're pointing me to the fact that I made

21   an interlocutory -- that the order I entered was specifically

22   interlocutory?

23            MR. ACKERLY:  It said -- I mean we -- I think we've

24   got a copy of it.  We can certainly find a copy of it.  But it

25   specifically said that the order was interlocutory because

1  neither side wanted to pursue an appeal of that order until we

2  had resolved Phase II.  And the issue in Phase II primarily

3  went to whether or not the August 1st termination of servicing

4  effectively terminated the servicing before bankruptcy so that

5  it was not property of the estate on the petition date.  So,

6  and that -- and that issue, Your Honor, --

7          THE COURT:  Ultimately settled.

8          MR. ACKERLY:  -- was ultimately settled.  And that

9  was the Court's order of August 5th, 2008 which ultimately

10  settled it and resolved all issues that were pending in the

11  adversary proceeding.

12          THE COURT:  Right. that part I remember.  Okay.  I

13  think that's correct for whatever it's worth.

14          MR. ACKERLY:  Okay.

15          THE COURT:  Yes.

16          MR. ACKERLY:  If the Court would like to see an order

17  -- a copy, I can --

18          THE COURT:  You have it?  Let me --

19          MR. HARBOUR:  It's not a copy -- it's not a copy of

20  the order, Your Honor.  But in our stipulation of facts, there

21  is an agreement that it was not a final order.

22          THE COURT:  All right, there we go.

23  BY MR. ACKERLY:

24  Q    Okay.  Mr. VanEssche, could Calyon have sold the mortgage

25  loans on January 30th, 2008 for a reasonable price?

1  A    No.

2  Q    And why not?

3  A    Well at the time, while certain aspects of the problems

4  that I cited before were beginning to be addressed, they had

5  not been fully addressed.  So, with respect to the portfolio,

6  we had just begun to receive the information describing what

7  the universe of the loans that was in our portfolio, what that

8  was, what the UPB's were.  We were just beginning to get the

9  information that showed the historical payments that had been

10 made since August through the end of December.  And so all that

11 was being worked on.

12          And as I mentioned before, that whole reconciliation

13 of what the portfolio was about, as well as reconciling to the

14 cash, took approximately 60 days to do.

15          So, at January 30th, we definitely did not have a

16 clear picture of exactly what the portfolio was.

17          With respect to the ownership, Judge Sontchi's

18 decision did indicate that we were the owners of the loans, but

19 there was still a dispute with respect to Phase II.  And so it

20 wasn't a final and non-appealable order, and the situation

21 could have been appealed down the road.  So, with respect to

22 representing that we had clear and unequivocal title to the

23 loans, I don't think we could have made that.

24          The servicing aspect, which affected value to some

25 extent, still had not been resolved.  That was going to be

1  resolved as part of Phase II.

2          The cash portion of the problems I indicated before,

3  that one effectively had been resolved because the debtor did

4  agree to commence turning over the proceeds.  But it wasn't

5  until the end of March that we sort of had a forensic

6  accounting, ascertaining exactly what, you know, everything was

7  and if we had gotten everything we were supposed to.

8  Q    Okay.  What is Calyon's contention as to the earliest date

9  on which this mortgage portfolio could have been sold for a

10 reasonable value?

11 A    That would be when the order issued by the Court on our

12 settlement of last summer became final and non-appealable.  So,

13 that would have been August 15th of 2008.

14 Q    Okay.  As of August 15, 2008, had you substantially

15 completed the remediation of the files?

16 A    Substantially, not completely.  The file remediation -- I

17 need to bring you back to the spring, late winter/spring of

18 2008.  While we were doing the forensic accounting of the

19 portfolio, we were doing the remediation of the mortgage files

20 with Bohan Group, as well as with people from American Home

21 Mortgage that had been called back.  That exercise with the

22 company ended mid-April approximately.  There was still a

23 number of issues that remained, not as significant as before,

24 but still that needed to be tied down.  That exercise was then,

25 sort of, re-kick-started later on in the year when American

1  Home had some other people address approximately six or 700

2  exceptions that we still had.  And we were able to correct a

3  few of those back in, I think, it was like late September or

4  October.

5          But by August, it would be fair to say that we had

6  remediated most of the mortgage file problems, but not all.

7  Q    Okay.  At any time between August 1st, 2007 and August

8  15th, 2008, did Calyon prepare any estimates as to the value of

9  the portfolio?

10 A    What was the latter date?

11 Q    August 15th, 2008.  Between August 1st, 2007 and August

12 15th, 2008 did Calyon prepare any estimates as to the value of

13 the portfolio?

14 A    Internal estimates done by Calyon?

15 Q    Yes.

16 A    Yes, we did.

17 Q    Okay, when?

18 A    That was done late July, early August.

19 Q    What year?

20 A    Of 2008.

21 Q    And did you do that?

22 A    I did that personally, yes.

23 Q    Okay.  And what was the purpose of that valuation?

24 A    The purpose of the valuation was to try and ascribe -- now

25 that we had about a year's worth of portfolio history, we

1  wanted to try and ascribe a value to the portfolio that we

2  thought could be realized over time.  And that was the purpose

3  of that exercise, to do that.  And concurrently to establish

4  what we thought might be our potential for losses on the

5  portfolio.  And by definition, then establish a reserve to

6  cover that loss.

7  Q    Okay.  Just briefly, how mechanically did you do this

8  valuation?

9  A    It's a pretty basic model, to be honest with you.  We

10  essentially segregated the portfolio into first and second

11  liens, and then divided each of those buckets into sort of sub-

12  buckets where, you know, the various delinquency levels of the

13  portfolio were broken out.  And then we ascribed a recovery

14  rate to each of those buckets, depending on their first or

15  second lien status, and also depending on whether they were

16  current or delinquent.  And if delinquent, how delinquent they

17  were.

18  Q    Okay.  And did the value that you ascribed to the

19  portfolio have anything to do with what you thought you could

20  sell the mortgages for?

21  A    No.

22  Q    And why not?

23  A    Two different things.  I mean, we knew that the market at

24  the time was still in nonexistent or, at best, in very bad

25  shape.  And, therefore -- for a majority of the portfolio.

1  And, therefore, you know, just two different animals.

2  Q     Okay.  Did Calyon retain Compass Financial, I believe, to

3  do any evaluations of the portfolio?

4  A     Yes, we did.

5  Q     And when did you first retain Compass?

6  A     They were first asked to do valuations right around the

7  time that the company filed for bankruptcy, in the summer of

8  '07.  And we also asked them to do a valuation as of the end of

9  2007, as of 12/31/07.

10 Q     Why did Calyon employ Compass?

11 A     It was to try and get a notion as to what the value of the

12 portfolio might be in the market.  It was just to get a feel.

13 Q     Okay.  Were they given any specific instructions in July

14 when you initially hired them with respect to what they were to

15 do?

16 A     No, we just asked them, give us, you know, a desktop

17 valuation of the portfolio.  And they came back and provided us

18 with a desktop valuation of the portfolio.

19 Q     Does their July valuation tell you what you could sell the

20 portfolio for?

21 A     I don't think so, no.

22 Q     Did their July valuation take into consideration any of

23 the issues that you've described, like ownership and receipt of

24 proceeds and remediation, anything like that?

25 A     No.

1  Q    Okay.  And you said they were employed again in December?

2  A    Yes.

3  Q    And were they given any specific instructions in December?

4  A    The only instructions we gave them in December was to take

5  into account and value the recourse aspect of providing reps

6  and warranties on the condition of the files or the mortgages.

7  Q    Can you be a little bit more specific on that?

8  A    Well, as I was explaining before when loans are sold

9  between a buyer and a seller, usually the seller stands behind,

10 you know, the quality, so to speak, of the mortgage that he is

11 selling that conforms with the underwriting guidelines that it

12 has the necessary documentation to evidence, you know, the fact

13 that the loan was made and that it's, you know, that the

14 mortgage was recorded, et cetera.

15         And, so the -- what we told them was that we -- we

16 were willing to backstop those reps and warranties in a sale.

17 And, therefore, we said if we were to do that, if we were

18 willing to do that, I should say, what would be the impact on

19 value if we backstopped those reps and warranties.

20 Q    And what was the impact on value if you backstopped?

21 A    Approximately 10 cents on the dollar.

22 Q    So, if you gave reps and warranties, the value went up by

23 10 cents on the dollar?

24 A    Yes, that's what Compass told us.

25 Q    Okay.  The valuation that Compass did in December of 2007,

1 did it take into consideration the condition of the portfolio,

2 ownership, proceeds, and those sorts of things?

3 A    No, it did not.

4 Q    Okay.  So did it assume that the portfolio was pristine,

5 basically?

6 A    Yes.

7 Q    As of December 30th, 2007 what reps and warranties could

8 you not give?   Do you understand?

9 A    Well, again it goes to what I said before.  We could have

10 given reps and warranties except we would have been blind as to

11 what our exposure was.  So, effectively if you're blind you're

12 not going to give reps and warranties at all because you don't

13 know what you might have to backstop and what the recourse to

14 you might be.  So, at that point in time, we were in no shape

15 to provide reps and warranties because at the time at the end

16 of December, we had only received a portion of the mortgage

17 files from the debtors.  A sampling had shown that there were

18 numerous exceptions and, you know, the exercise to remediate

19 them, as well as get all the rest of the files, you know, that

20 occurred several months later.

21 Q    Okay.  Between the period August 1st, 2007, and until

22 August 15th, 2008, did Calyon make any effort to sell the

23 mortgages in the portfolio?

24 A    What was the latter date, excuse me?

25 Q    August 15th, 2008.

VanEssche - Direct                    115

1  A    Okay.  No, we did not make a concerted effort to sell the

2  mortgages.

3  Q    And why not?

4  A    Because of the problems that I described before.

5  Q    Okay.  In the white notebook, if you would get the white

6  notebook.  If you would look at Tab K.

7  A    Yes, I'm there.

8  Q    Okay.  What is this?

9  A    It's a copy of a proof of claim that we filed against one

10 of the debtors in the Chapter 11 proceedings.

11 Q    And is that your signature on it?

12 A    Yes it is.

13 Q    And look at L, M, and N.

14 A    Those are our copies of all four proofs of claim that we

15 filed against the four debtors against which we had recourse in

16 the bankruptcy.

17 Q    If you would look at exhibit P.  What is exhibit P?

18 A    Exhibit P is essentially a listing of the funds that were

19 sent to Calyon.  And these funds were proceeds from the

20 mortgage portfolio.  And I guess it shows for each month how

21 much was sent to us.

22 Q    These are payments that you received on account of the

23 repurchase agreement after you filed your proof of claim?

24 A    Yes.

25 Q    Okay.

1          MR. ACKERLY:  Your Honor, I would point out that the

2     stipulation of facts specifically paragraphs 41, 47, 53, and 58

3     each specify the principal balance due -- shown the on proof of

4     claim less payments as of that date.  So, that you have --

5          THE COURT:  Specifies the unpaid principal balance on

6     each of the four dates at issue?

7          MR. ACKERLY:  Yes.  And if you'll, you should have

8     the stipulation in the front of the white notebook.

9          THE COURT:  Um-hum.  What paragraph?

10         MR. ACKERLY:  Look at paragraph 41.

11         THE COURT:  All right.

12         MR. ACKERLY:  Okay.  It shows the repurchase price.

13    That repurchase price is consistent because that's the

14    repurchase price as of the petition date.  But if you look

15    over, you'll see that there's no change in the amount of the

16    claim between August 1st and September 30th because there had

17    been no payments.  But if you look over to paragraph 53 --

18         THE COURT:  Oh, I see, yes.

19         MR. ACKERLY:  You'll see in paragraph 53 that there

20    has been a payment of 72,900 -- $72 million and that comports

21    with what is shown on exhibit P.

22         THE COURT:  I got you.

23         MR. ACKERLY:  And then in paragraph 58 is the same

24    information but a reduced amount as of the August 15th date.

25         THE COURT:  Okay.

1           MR. ACKERLY:  If I may have just a minute, Your

2   Honor.

3           THE COURT:  Yes.

4                        (Pause)

5           MR. ACKERLY:  Your Honor, could we perhaps have just

6   a five minute, just have a five minute recess?

7           THE COURT:  Okay, you're still going through direct,

8   though?

9           MR. ACKERLY:  Yes.

10          THE COURT:  Oh, all right.  That's -- yes, a short

11  recess is fine.  It's about that time.

12          Mr. VanEssche, you're still under oath.  So during

13  the break you may not discuss the substance of your testimony

14  with counsel.  All right?

15          THE WITNESS:  Should I just stay seated here then

16  or --

17          THE COURT:  You can stretch your legs, do as you

18  wish, you know.  What I'm giving you is a free ride.  You don't

19  need to talk to your lawyer.

20          THE WITNESS:  All right.

21          THE COURT:  That's a good thing.  He can't bill you

22  for it then.  All right.

23          THE WITNESS:  I'll remind him of that.

24          THE COURT:  Or double bill you.  Hearing in recess.

25               (Recess 3:20 P.M./Reconvene 3:32 P.M.)

1          THE COURT:  Please be seated.

2          MR. ACKERLY:  Thank you, Your Honor.

3   BY MR. ACKERLY:

4   Q    Mr. VanEssche, was Calyon involved in the Broadhollow

5   mortgage sale?

6   A    Yes.

7   Q    Did you have an interest in those mortgages?

8   A    We did.

9   Q    And that was separate and apart from the repurchase

10  agreement?

11  A    It was.

12  Q    Okay.  To your knowledge did those files have to be

13  remediated before the sale could take place?

14  A    Yes.

15         MR. DORSEY:  Objection; lack of foundation.

16         MR. ACKERLY:  He just testified, Your Honor, he was

17  involved in it.

18         MR. DORSEY:  Involved is nothing, Your Honor.  I

19  don't know what involved means.  He has to explain what his

20  involvement was to show that he has knowledge --

21         MR. ACKERLY:  Okay.  What was --

22         MR. DORSEY:  -- that the files had to be remediated.

23  BY MR. ACKERLY:

24  Q    What was your involvement in the sale?

25  A    As I explained initially, I was charged with managing

1  several exposures that we had related to American Home

2  Mortgage.  The Broadhollow, Melville Commercial Paper Program

3  was one of them.  We were a -- one of several banks that

4  provided market value swaps for the Commercial Paper Program

5  issued by Broadhollow/Melville and, you know, to explain market

6  value swaps were essentially guarantees.  So. that the

7  commercial paper holders if and when there was a problem with

8  the Broadhollow and Melville vehicles, and the mortgages were

9  insufficient to pay them off, the market value swap providers,

10 *i.e.*, the banks would guarantee that they would get paid off

11 and essentially make payment.  So, I was involved in that

12 matter as well.  And, in fact, I would say that at -- in the

13 initial phases of the bankruptcy, the Broadhollow and Melville

14 matter was probably the one to which I was, you know, giving

15 most of my attention.

16 Q   Do you know what had to be done in connection with that

17 sale with respect to the mortgage portfolio?

18 A   Well it was similar to what we ultimately did with our

19 portfolio.  It was an issue of establishing exactly what the

20 universe of loans was, which loans they were, and putting

21 together, you know, data on the loan portfolio for potential

22 buyers.  And then one of the other important aspects of it was

23 to do a mortgage file review such as we did with the repo with

24 Bohan Group in the case of Broadhollow and Melville.  We did

25 with another firm that does the same thing called MDMC.  And in

1 that case, because there were not going to be any reps and

2 warranties with respect to the condition of the mortgages and

3 the mortgage files, what the mortgage value swap banks wanted

4 to do was minimize the discount that the buyers would ascribe

5 to the loans because of the lack of recourse on the reps and

6 warranties.

7 Q    Okay.  Did the Broadhollow and Melville mortgages have to

8 be -- had to be sold within a certain period of time?

9 A    Yes.

10 Q    And what was that?

11 A    It was about 30 days from a certain date.  I can't exactly

12 remember what that date was, but essentially within 30 days,

13 the portfolio needed to be sold at auction.

14 Q    Okay.  And did the debtors request an extension of that

15 time?

16 A    Yes, they did.

17 Q    And why?

18 A    Because we were -- well we were the -- the debtors along

19 with the market value swap banks and MDMC were rushing to get

20 all the files in as best of condition as possible.  We were

21 essentially under a very, you know, short time constraint and

22 we just didn't have enough time to do the job that needed to be

23 done to sell the portfolio into an optimal shape.

24        So, the Court was asked to give an extension of the

25 auction date.  And we received, I believe, it was a two week

1  extension, you know, to hold the auction.

2  Q    All right.  Now, you previously testified with respect to

3  the Calyon portfolio of the remediation that you did there, and

4  you testified that part of the reason for remediation was to

5  resolve exceptions with the documents?

6  A    Yes.

7  Q    Okay.  What are some of the important exceptions?

8  A    Well it falls into a variety of categories.  You have

9  underwriting exceptions which, as I explained before, could

10 range from documentary to adherence to product guidelines.  So,

11 just to give an example of both, you might -- a certain product

12 would call for a verification of income.  And so you'd want to

13 have copies of either tax returns or W-2 forms in the file to

14 show that when underwriting of the loan the income was, indeed,

15 verified.  If that was lacking, you would have, you know, an

16 underwriting exception.

17       With respect to documentation, you'd -- you could

18 also have, for example, you know, an improperly filled out

19 application or an application that wasn't signed, okay.  Then,

20 you would have a documentation, a legal documentation or a

21 compliance documentation issue.  You know, a compliance

22 documentation issue would have to do more with consumer loss,

23 for example, a truth in lending disclosure statement if that

24 wasn't obtained or if it were improperly completed, you know,

25 sort of misrepresenting what the fees were.  These are issues

1  that can come back and cause an exception.

2        The other situation would be, for example, if you

3  failed to actually have a promissory note or a copy of the

4  mortgage agreement, that could pose as a problem too because

5  you've got nothing to establish what the rate is, what the term

6  is until you get that copy.

7  Q    Okay.

8  A    So, those are some of the examples.

9  Q    Okay.  And remediating these exceptions related to your

10  ability to give reps and warranties when you sold them?

11  A    With the repo, yes.  Ultimately remediating them would

12  relate to that.  In the Broadhollow and Melville case, the goal

13  was to essentially address as many exceptions as possible so

14  that the lack of reps and warranties and, *i.e.*, the lack of

15  recourse back to somebody, that price affect would be

16  minimized.

17  Q    Okay.  Now, I think I forgot to ask you these two

18  questions, but could Calyon make reps and warranties with

19  respect to the Calyon portfolio on January 30th, 2008?

20  A    No, I think I answered that question, but if I didn't.  I

21  would say, no.  At that point, we would be flying, more or

22  less, blind.  So, we would not be in a shape to do that.

23  Q    Could you make the reps and warranties with respect to the

24  Calyon portfolio as of August 15th, 2008?

25  A    We would have been in shape to do so, yes.

1  Q    Okay.  Talking about your own valuation which you

2  testified to, and I believe you testified it related to the

3  reserve amount?

4  A    Yes.  Ultimately it was to determine the reserve on our

5  exposure, correct.

6  Q    Okay.  Does the reserve amount that Calyon shows on its

7  books have any relationship to what Calyon thinks it could sell

8  the mortgages for?

9  A    No.

10 Q    Okay.  And one last question.  Going back to the October

11 meeting that you had with Mr. Cooper and Mr. Nystrom, remember?

12 A    Yes.

13 Q    Okay.  Did Mr. Cooper or Mr. Nystrom indicate to you that

14 they wanted to wait on holding -- selling the mortgages, that

15 it was not a good time to sell the mortgages?

16 A    As I recall, the general theme of the discussion was that

17 the market was in very bad shape and that waiting to sell the

18 portfolio was, you know, appropriate.

19 Q    Was this their theme or your theme?

20 A    It was both of our themes.

21        MR. ACKERLY:  Okay.  Your Honor, just at the

22 conclusion, I would like the Court to enter into evidence the

23 stipulation of facts.

24        THE COURT:  Any objection?

25        MR. DORSEY:   No, Your Honor.  I would add the

1 stipulation facts and the exhibits attached thereto.

2          THE COURT:  The stipulation of facts and exhibits

3 thereto, admitted without objection.

4          MR. ACKERLY:  Hold on one second.

5                         (Pause)

6          MR. ACKERLY:  Your Honor, with the exception of

7 exhibits B, C, and D, which are documents from Deutsche Bank.

8          MR. DORSEY:  Your Honor, this was a stipulation of

9 facts.  The parties agreed that the stipulation and the

10 exhibits were admissible at this hearing.  I can't believe I'm

11 hearing an objection now on something that was stipulated to

12 prior to the hearing.

13          MR. ACKERLY:  Your Honor, if the Court will look at

14 paragraph 59 of the stipulation, it's a stipulation as to the

15 authenticity of the documents.  But I think it's clear that

16 when you stipulate as to authenticity, you're not waiving your

17 objections as to hearsay or relevance.

18          THE COURT:  I don't see that.

19          MR. ACKERLY:  I'm not saying that's said, that's what

20 the evidentiary law is.  Paragraph 59 says, "The authenticity

21 of the documents produced by Calyon and received by the debtors

22 is admitted."

23          THE COURT:  Um-hum.

24          MR. ACKERLY:  Admitting authenticity is not waiving

25 objections to relevance and hearsay.  It's just that --

1              THE COURT:  But that's not what it says.  That may be

2  what you're saying the law is, but that's not what the

3  paragraph says.

4              MR. ACKERLY:  Okay.  Well, let me --

5              THE COURT:  It says, "The authenticity produced and

6  received is admitted.  However, the admission of authenticity

7  should not be construed as a factual admission regarding

8  contents."  It doesn't say anything about admissibility.

9              MR. DORSEY:  I'd also point the Court to paragraph

10  number 6, which is the paragraph that refers to these exhibits

11  B and C, which says that 6 and 8 refer to B and C.

12             THE COURT:  Well, B is incorporated by reference and

13  C is incorporated by reference.

14             MR. DORSEY:  Correct.

15             THE COURT:  Are those the only ones?

16             MR. DORSEY:  If they're incorporated by reference

17  into the stipulation of facts, Your Honor, they're admitted.

18  They've agreed they're admissible.

19             THE COURT:  Well, B and C, and D are a little

20  different.  B and C are incorporated.  D specifically provides

21  that Calyon does not agree that the information is accurate and

22  that the information shall not be deemed admitted based on the

23  stipulation.

24             MR. DORSEY:  The accuracy should not be admitted.

25             THE COURT:  Well, I'm going to allow the admission of

1  B and C.  I think clearly under the terms of the stipulation,

2  it was the parties' intent that they be stipulated to and

3  admitted.  I don't believe that the reservation in paragraph 59

4  addresses the issue of admissibility.

5          Obviously, you can cross examine whoever you like on

6  the contents as to their weight, as you've certainly preserved

7  your right to address that.

8          D is a little trickier.

9          MR. ACKERLY:  Your honor, it looks to me like, if I'm

10 reading the stipulation correctly, that not only does B, but

11 also C and D have the same reservation with respect to that

12 they're -- as to whether they are accurate and shall not be

13 deemed -- that they shall be -- not be deemed admitted based on

14 the stipulation of facts.

15         THE COURT:  Yeah, but you incorporated them by

16 reference.  You didn't do that with D, as far as I can.

17         MR. DORSEY:  It does incorporate by reference, Your

18 Honor.

19         THE COURT:  Where?

20         MR. DORSEY:  Paragraph 10.  The borrowing base

21 valuation --

22         THE COURT:  Oh, it does, it does.  I'm sorry.  B, C,

23 and D are admitted.  B, C, and D are admitted.  Objection

24 overruled.  So, the stipulation of facts and its exhibits are

25 admitted either without objection or over the objection of

1  Calyon as set forth on the record.

2              MR. ACKERLY:  Okay.

3  BY MR. ACKERLY:

4  Q     Then, Mr. VanEssche, would you open the stipulation book,

5  the white notebook please, and look at exhibit B.

6  A     Yes.

7  Q     What is this?

8  A     This was a report that was provided by Deutsche Bank on

9  the daily basis.  It was, in fact, generated -- had its origin

10 by American Home.  They were provided to Deutsche Bank, who

11 would then provide us with data.  And this ostensibly would

12 show what was supposed to be in our portfolio of loans in the

13 repo.

14 Q     Is this exhibit B accurate?

15 A     We subsequently found out that these reports contained

16 numerous errors and were not --

17             MR. DORSEY:  Objection, Your Honor, who is "we?"  I

18 don't know if this witness has the foundation --

19 Q     Who is we?

20             MR. DORSEY:  -- to say that he knows for a fact --

21             THE COURT:  Let's be more specific.

22             THE WITNESS:  Okay when we -- when we -- when I

23 retained Capstone to assist in the forensic accounting of the

24 portfolio, we had the Deutsche Bank reports, and we also had

25 the loan tapes.  And in discussing the matters with the

1  company, we were essentially told to --

2            MR. DORSEY:  Objection; hearsay, Your Honor.

3            THE WITNESS:  Okay.

4            MR. DORSEY:  He's trying to get into evidence what

5  Capstone told him about the accuracy of this document.

6            THE COURT:  When you mean "we," you mean you and

7  Capstone.  And you and Capstone were speaking to the company.

8  The debtors, and the debtors told you personally.  Were you

9  present?

10            THE WITNESS:  I was on -- in some of the

11  conversations.  I principally -- I hired Capstone to do the

12  work for me.  I was involved in a number of the conversations.

13  I can't point to the fact that I was in a conversation on this

14  day or that day.

15            THE COURT:  Who was -- who were Capstone and/or you

16  speaking to?

17            THE WITNESS:  We were speaking to a person who was

18  working for Kroll Zolfo Cooper and his name escapes me right

19  now.  I know he went to work for a hedge fund sometime after we

20  finished our forensic accounting exercise, but I just can't

21  remember his name right now.

22            THE COURT:  Mr. Dorsey?

23            MR. DORSEY:  I think it's clearly hearsay, Your

24  Honor.  And it's hearsay within hearsay.  He's trying to get in

25  what someone at Capstone told him about someone that he can't

1  even identify at the debtors told Capstone about the accuracy

2  of this exhibit.

3          THE COURT:  Mr. Ackerly?

4          MR. ACKERLY:  Your Honor, I would admit a slight bit

5  of frustration.  The Court has admitted everything that -- all

6  the documents that have been produced by Capstone that Capstone

7  has done on the theory that they were their agent and,

8  therefore, it comes in.  There's no hearsay objection to that.

9          MR. DORSEY:  That's not accurate, Your Honor.

10         MR. ACKERLY:  Well, I think -- I think --

11         MR. DORSEY:  What's been admitted is from Compass,

12 not from Capstone.

13         MR. ACKERLY:  I'm sorry.

14         MR. DORSEY:  There's not a single document admitted

15 from Capstone.

16         MR. ACKERLY:  I'm sorry, I stand corrected.  It was

17 Compass.  But it was admitted on the theory that they were

18 acting as their agent in doing it at the direction, which is

19 the same as Capstone.  Capstone was employed by the debtor --

20 excuse me, by Calyon to do remediation of the files and were

21 checking information that had been furnished to --

22         THE COURT:  I agree about that.  I don't think -- I

23 think that what Capstone told whoever as an agent or servant of

24 the debtors is not hearsay for the same reasons that I

25 previously made virtually identical rulings in connection with

1  Compass.

2        However, that's step one.  The next step is that

3  someone at the debtor is speaking to Capstone and Capstone is

4  talking to the witness, and that's hearsay.  And someone at

5  Capstone is speaking -- let me get it right.  Someone at Zolfo

6  is speaking directly to this witness, and I've already ruled

7  that's not hearsay.  And there's a problem sort of sifting out

8  who shot John and exactly when in connection with.

9        MR. ACKERLY:  Maybe the Court misspoke but just to

10 clear it.  Capstone and Compass were not employed by the

11 debtor.  They were employed by Calyon.

12        THE COURT:  I apologize.

13        MR. ACKERLY:  And -- and the Court --

14        THE COURT:  What I meant -- let me clarify.

15 Previously I ruled that statements by Compass were not hearsay

16 because Compass was the agent or servant of Calyon.  And, thus,

17 the statements were subject -- in effect statements against

18 interest and not hearsay.

19        The debtor was speaking to Capstone -- excuse me,

20 Zolfo.  Let me get this right.  Zolfo Cooper was speaking to

21 Capstone and to the witness.  Zolfo Cooper was a servant or

22 agent of the debtor.

23        So, the statements of Zolfo to this witness and to

24 Capstone are not hearsay because they are, for the same reasons

25 in connection with the Compass ruling, a statement against

1  interest by the debtor, so that, that's clear.  But that

2  doesn't deal with the hearsay problem of what Zolfo told

3  Capstone and then Capstone told this witness.  What Capstone

4  told this witness is hearsay.

5          MR. ACKERLY:  Okay.

6          THE COURT:  What Zolfo told this witness is not.

7          MR. ACKERLY:  Okay.

8          THE COURT:  But the witness can't separate it out.

9  So --

10          MR. ACKERLY:  Okay. Let me --

11          THE COURT:  -- that's the problem.

12          MR. DORSEY:  Well, I think there's -- Your Honor, to

13  clarify, the witness hasn't even identified who at Zolfo

14  supposedly made these comments, which creates a problem in and

15  of itself.  The agency or servant theory for overruling an

16  objection on hearsay depends on the proponent of who wants to

17  get that evidence in.  It's the statement against interest by a

18  party opponent.  They want to use their own agents and

19  servant's testimony -- or comments to them in an affirmative

20  way.  And that's not what the rule allows.

21          THE COURT:  No, they want -- well, they want to use

22  Capstone -- it appears to me that they want to use Capstone's

23  spin or interpretation.  We haven't gotten there yet, but this

24  is I think where they're headed.  Capstone's spin is,

25  unfortunately, now a pejorative word, but Capstone's

1  interpretation of the facts told purportedly by Zolfo to

2  Capstone and to this witness that, in effect, you know, the

3  accounting wasn't done correctly.  I'm assuming that's where we

4  are headed.  So, I think we're covered on that piece.

5           Now, your point is the interpretation.  And, of

6  course, that's the hearsay problem because the gentleman who

7  made or lady who made the interpretation is not present, not

8  available for cross examination, and not identifiable by name,

9  although I'm somewhat sympathetic as I am awful with names.

10 But with some broad particularity, has been identified as

11 someone who they were speaking to.  Which backs us to the same

12 problem we have --

13           MR. ACKERLY:  Understand.

14           THE COURT:  -- which is the hearsay problem.

15           MR. ACKERLY:  All right.  Let me try this from a

16 little bit different direction.

17           THE COURT:  Yeah, because I think that is hearsay and

18 I'm not sure how we're going to get around that.

19           MR. ACKERLY:  I understand.

20           THE COURT:  So, at least for present purpose, I'll

21 sustain the objection.

22           MR. ACKERLY:  Okay.

23 BY MR. ACKERLY:

24 Q    Mr. VanEssche, we're still looking at exhibit B of the --

25 A    Yes.

1  Q    -- of the stipulation.  Did you rely on this document at

2  all in determining whether to sell the mortgages?

3  A    No.

4  Q    Did you rely on this document in any way in respect with

5  the remediation of the mortgages?

6  A    No.

7  Q    Did you rely on this document for any purpose?

8  A    No, we did not.

9  Q    Okay.  Now look at exhibit C, what is that?

10  A    That was a summary report that Deutsche Bank would provide

11  on a daily basis or, in fact, sometimes several times a day to

12  Calyon as agent to indicate what was coming into the repo in

13  terms of mortgages on an aggregate balance, or what the

14  aggregate balance of the mortgages were.  So, that the advance,

15  the funding by Calyon and the other banks through their

16  commercial paper program could be determined.

17  Q    Okay.  Did you rely on this document in any way with

18  respect to determining what the value of your collateral was

19  for sale purposes?

20  A    No, we did not rely --

21  Q    Did you rely on it in any respect as far as remediation

22  was concerned?

23  A    No.

24  Q    Did you rely on it for any purpose?

25  A    The only thing is that it was a piece of information when

VanEssche - Direct                              134

1  we did the forensic accounting exercise that we had just to

2  sort of, you know, rely on in a general sense.  But this was

3  not the document that was really relied on when we did any of

4  the forensic accounting.

5  Q    Okay.  And look at exhibit D.  What is this?

6  A    It's another one of several reports that was provided to

7  us from Deutsche Bank but, again as I explained, ultimately

8  this information and data was really originated by American

9  Home.  And that was provided, as well, on a daily basis when

10  there were advances made under the repo.

11 Q    Okay.  Did you rely on this document in any respect when

12 determining value as far as selling your mortgage loans?

13 A    No.

14 Q    Okay.  Did you rely on it for any reason?

15 A    No, not really.

16 Q    Okay.

17                         (Pause)

18        MR. ACKERLY:  Your Honor, I'm back -- we got the

19 stipulation into evidence and all the exhibits to the

20 stipulation I believe --

21        THE COURT:  Right.

22        MR. ACKERLY:  -- into evidence.  I would just -- I

23 would just like to -- with respect to the exhibits that have

24 been identified by Mr. VanEssche, I would like to have

25 introduced into evidence be exhibit 2.

1    THE COURT:  All right, we already admitted exhibit 1,

2 correct?

3    MR. ACKERLY:  Correct.

4    THE COURT:  And I took judicial notice of a couple

5 lines from exhibit 2.  So you'd like all of 2 admitted?

6    MR. ACKERLY:  Yes.  And exhibits 11 -- no, excuse me

7 not 11.  Hold on one second, just --

8                    (Pause)

9    MR. ACKERLY:  I think the ones I missed, Your Honor,

10 were exhibits 3, 4, and 5 in the big book, which were the repo

11 loan tapes.  And exhibits 13 and 14, which were an August 1st

12 letter on change of servicer, and an August 27th letter on

13 servicing.

14    THE COURT:  1, 2, 3, 4, 5, 13, and 14.

15    MR. ACKERLY:  Yes, sir.

16    THE COURT:  Okay, any objection?

17    MR. DORSEY:  No objection.

18    THE COURT:  All right, they're admitted without

19 objection.

20    MR. ACKERLY:  No further questions.

21    THE COURT:  All right.  Cross.

22                    CROSS EXAMINATION

23 BY MR. DORSEY:

24 Q    Good afternoon, Mr. VanEssche.

25 A    Hello, Mr. Dorsey.

1          MR. DORSEY:   John Dorsey, Your Honor, for the record

2    on behalf of the debtors.

3    BY MR. DORSEY:

4    Q    I'd like to go back to the August 1st date.   You testified

5    that subsequent to the debtors' bankruptcy filing, funds

6    started moving into an escrow account as opposed to flowing

7    from AHM servicing into the Deutsche Bank trust account,

8    correct?

9    A    Yes.

10   Q    So, as of August 1st, those funds were, in fact, flowing

11   into that account, correct?

12   A    It's possible.

13   Q    And, in fact, you said the last time was in July that

14   funds came in, but they only came in once a month, right?

15   A    No, I don't believe that they -- they came in batched

16   towards a particular time of the month, but they didn't

17   necessarily come in only one time in the month.

18   Q    And you testified that on August 1st, you did not have

19   complete loan files, do you recall that testimony?

20   A    Yes.

21   Q    But under the terms of the repo agreement, Calyon was not

22   supposed to get loan files, were they?

23   A    I don't know how to answer that question.   I mean we

24   didn't have the loan files.

25   Q    Well, if we look at the repurchase agreement which is

1  exhibit A to the stipulation of facts that you have in front of

2  you.  And if you'd turn to page 57, please.  And you testified

3  you were familiar with the repo agreement, correct?

4  A    Yes.

5  Q    And Article 3 on page 57 deals with the mortgage assets

6  which includes the loan files that you've been referring to,

7  correct?

8  A    Not -- no it's not the same thing as those delivered to

9  the custodian.

10 Q    Right.  And under the terms of the repo, the custodian

11 would receive the original mortgage note, a copy of the

12 mortgage until the final mortgage had been filed and recorded

13 wherever the home was located that was being purchased, and

14 then that would be sent to the custodian as well, correct?

15 A    It's approximately correct.  In the case of American Home,

16 I went out and visited the custodian.  And the custodian was

17 only required to have a copy of the note or a copy of the

18 mortgage.

19 Q    And that's under the terms of the repo, correct?

20 A    That I don't know if it was under the terms of the repo.

21 I went out there and asked them what do you have.  They showed

22 me a sampling of the files and basically the files were very

23 skimpy.

24 Q    And that was after August 1st, right?

25 A    Yes, it was.

1 Q    And you also testified that because of the lack of

2 accurate loan files, Calyon would not have been able to sell

3 these mortgages on August 1st if they had chose to do so, but,

4 in fact, where you have mortgages that are performing the fact

5 that there's delinquencies in the mortgage files really doesn't

6 affect the sale price, does it?

7 A    It affects the sale price to the extent you can't provide

8 reps and warranties, yes.

9 Q    And, in fact, Calyon at one point indicated that they'd be

10 willing to backstop the reps and warrants, didn't they?

11 A    Subsequently, yes we did, after August 1st.

12 Q    But as of August 1st, you didn't know there were any

13 problems with reps and warranties, correct?

14 A    As of August 1st, we knew that we had to basically be in a

15 position to provide reps and warranties.  And we knew that in

16 order to ascertain the risks or the exposure with providing

17 those reps and warranties, we needed to understand what the

18 mortgage file situation was.

19 Q    And as of August 1st, however, the answer to my question

20 is, no, you did not know there was a problem with the reps and

21 warranties as of August 1st, correct?

22 A    We didn't know what the situation was.

23 Q    And you testified that MERS had identified AHM as the

24 owner of these mortgage loans, correct?

25 A    Yes.

1 Q    And that's required, isn't it, in order for this repo to

2 be able to work?  Isn't that how this works that loans would be

3 constantly moving on and off?

4 A    It would be constantly be moving in and out, correct.

5 Q    And in order to do that MERS would have to list AHM as the

6 owner, correct?

7 A    Yes.

8 Q    And it would be a simple matter of just having Calyon's

9 assign -- have MERS assign the ownership over to Calyon in

10 order to correct that situation?

11 A    Well, it's the originator that needs to do that.  So, in

12 this situation if we had instructed MERS to assign it over to

13 us, they wouldn't have done so.

14 Q    And is that --

15 A    It has to come from American Home Mortgage.

16 Q    And, in fact, weren't blank assignments sent to MERS in

17 connection with the repo?

18 A    That I don't know.

19 Q    And let's take a look at the Deutsche Bank documents that

20 you looked at just a moment ago.  These were documents that you

21 testified were provided to Calyon on a daily or sometimes more

22 than once a day, correct?

23 A    The listing of the loans -- it's more the summary that was

24 provided on a, it's possible, you know, multi times a day.  The

25 actual file that contained the listing of the loans was usually

VanEssche - Cross                                        140

1  provided at the end of the day.

2  Q     And these documents show by the name of the person who's

3  the mortgagor all of the loans in the portfolio, correct?

4  A     Right.  Well, it contains some of the information on the

5  mortgages, but not all the information.

6  Q     And you've testified that Calyon did not rely upon these

7  documents from Deutsche Bank for any purpose whatsoever,

8  correct?

9  A     No.  What happened is we asked American Home to provide us

10  with the loan tape which contains a lot more information and

11  much more complete information, and that's what we relied on.

12  Some of the information on the loan tape is contained in these

13  reports that you're referring to, but the loan tape is much

14  more complete.

15  Q     But Calyon did, in fact, rely on these documents in order

16  to determine what the borrowing base was under this portfolio,

17  correct?

18  A     When the repo was acting normally and all that, it was the

19  basis for making advances, yes.

20  Q     Up until August 1st, the repo was acting normally, wasn't

21  it?

22  A     Up until late July, yeah.

23  Q     And, in fact, this was a $1.5 billion facility?

24  A     Yes, it was.

25  Q     And Calyon would have made sure that Deutsche Bank was

1 providing information in order that they could make sure that

2 the borrowing base was correct so that they were --

3 A    We were --

4 Q    -- loaning the correct amount of money?

5 A    We were doing that, yes.

6 Q    Now, the amount of the original claim filed by Calyon and

7 the proofs of claim that you looked at earlier was

8 approximately $1.2 billion, correct?

9 A    Yes.

10 Q    And when I took your deposition, you indicated that it was

11 now somewhere around $908,000,000 that was outstanding on the

12 facility, is that correct?

13 A    Yes.

14 Q    And that's because there's been a reduction based on

15 payments received on the performance of the portfolio and

16 payoffs for people who have refinanced their loans?

17 A    It's been a combination of payoffs of, you know, regular

18 monthly payments of principal and interest of homes that we've

19 foreclosed on and sold, short sales, you know.  A combination

20 of ways to realize on the underlying assets.

21 Q    And in your mind, the difference between the claim and the

22 deficiency claim that you're seeking today in this hearing is

23 the amount owed on the repo versus the amount of a shortfall

24 after realization of all those things you just talked about?

25 A    Correct.

VanEssche - Cross                    142

1  Q     And you -- and you believe that it will take years to know

2  what's going to be realized on this portfolio, correct?

3  A     It will take several years, yes.

4  Q     And since August of 2007, Calyon has collected

5  approximately $275,000,000, correct?

6  A     Yes.

7  Q     And it continues to collect between ten and $12,000,000?

8          MR. ACKERLY:  Your Honor, we would object to

9  relevance of this line of questioning because what we collected

10 after August 15th, 2008 is irrelevant.  If the Court is going

11 to apply Section 562, we believe it should be applied.  It's

12 somewhat -- it's somewhat like when you have margin call on

13 your stocks, the stockbrokers is going to liquidate your claim

14 -- your stocks immediately and take the risks -- and not take a

15 risk of them going up or down, you have to hold them.  And the

16 purpose of Section 562 is to value the mortgages as of a

17 specific date, whether you sell them or not.  They're going to

18 get valued as of that date.  Or if that's not a commercially

19 reasonable determinant, at another commercially reasonable

20 determinant.

21         So, what happens with respect to payments that are

22 received after August 15th, 2007 are irrelevant because Calyon,

23 under the statute, is taking the risk of the market going up or

24 down.

25         So, this whole line of questioning with respect to

1   any payments that were received after August 15th, 2008 is not

2   relevant.

3        MR. DORSEY:  It is absolutely relevant, Your Honor.

4   It goes to the very heart of the issue under 562.  They're

5   saying you have to accept our interpretation of 562, that is

6   the sale value on a given date that determines the value as

7   opposed to our position which is that it's a discounted cash

8   flow.  If you're going to hold these things, it's a discounted

9   cash flow analysis.

10       Under their theory, Your Honor, someone could, on

11  August 1st as an example, they could have gone out and sold the

12  loans for 10 cents on the dollar, which is what their expert

13  would say.  You could sell these loans for 10 cents on August

14  1st, 2007, but we're going to hold them, and we're going to

15  collect.  And at the end of the year, we're going to collect

16  the $275,000,000, but our deficiency claim against you,

17  debtors, is in excess of a billion dollars because even though

18  we only now $908,000,000 under the repo.  Which shows the

19  absurdity of the position that they're taking, Your Honor.

20       So, what they've collected and what they continue to

21  collect is absolutely relevant to the issue before the Court

22  today.

23       THE COURT:  I agree.  At least for purposes of the

24  fact that I haven't made up my mind yet as to whose legal

25  theory holds.  And Mr. Dorsey is certainly allowed to solicit

VanEssche - Cross                                144

1  testimony in connection with what's relevant to supporting his

2  argument, just like you are entitled to solicit testimony as to

3  what is relevant to support of your argument.  I haven't made

4  my determination yet.  That's what the trial is for.  So, I'll

5  overrule the objection and allow the line of questioning.

6          MR. DORSEY:  Thank you, Your Honor.

7  BY MR. DORSEY:

8  Q    Mr. VanEssche, it's also true, is it not, that Calyon has

9  not --

10 A    Do you want me to answer your question.

11 Q    Oh, I'm sorry, I thought we had an answer.

12          THE COURT:  I don't remember one.

13 BY MR. DORSEY:

14 Q    I believe my question was Calyon continues to collect

15 between ten and $12,000,000 per month on the portfolio?

16 A    It depends.  But we're also experiencing losses.  So, I

17 mean there are both sides to the equation.  And that's about

18 two to three million a month right now of losses that we're

19 experiencing.

20 Q    Of losses.

21 A    Okay?

22 Q    We'll get to that in a moment.  Calyon hasn't tried to

23 determine how long it would have to hold this portfolio to

24 break even, is that correct?

25 A    By just collecting cash?

VanEssche - Cross                                    145

1  Q     Yeah.

2  A     No, we have not determined that.  And, in fact, I don't

3  think that if we attempted to do that, that we would break

4  even.

5  Q     And you don't think anyone actually could do that

6  analysis?  Determine how long it would take to break even,

7  correct?

8  A     You could -- you could project and do an estimation.  I

9  don't know that the analysis would be correct, but you could

10 always try and guestimate that, sure.

11 Q     And Calyon hasn't done a discounted cash flow analysis --

12 A     No.

13 Q     -- has it?

14 A     No, we have not done a discounted cash flow of all --

15 Q     And instead, Calyon has done what you testified to which

16 is what you refer to as a recovery rate analysis?

17 A     Yes, correct.

18 Q     And you're familiar, are you not, sir, with SFAS,

19 Accounting Standard 114?

20 A     Yes, I am.

21 Q     And that is a valuation methodology that banks are

22 ostensibly supposed to use when pertinent for measuring the

23 value of their assets?

24 A     Yes.

25 Q     And SFAS 114 is a discounted cash flow type of analysis,

VanEssche - Cross                                      146

1  is that correct?

2  A    That is correct.

3  Q    And it says that to value them, you should project the

4  future cash flows from the assets --

5            THE COURT:  Try that again, Mr. Dorsey.  It was a

6  little too fast for me.

7            MR. DORSEY:  I'm sorry, Your Honor.

8  BY MR. DORSEY:

9  Q    And that discounted cash flow analysis is to project the

10 future cash flows from the asset, and then present value of

11 those cash flows?

12 A    That is correct.

13 Q    And that would determine the value of that asset?

14 A    Yes.

15 Q    Okay.  And the reason Calyon hasn't done a discounted cash

16 flow analysis is because it would require drilling down into

17 the loan level detail on each loan, is that right?

18 A    Well, in part.  Also, we feel that, you know, doing a DCF

19 on what are approximately 30-year assets requires a heavy dose

20 of assumptions, which can easily be proven to be incorrect with

21 the passage of time.  So, that's why we don't utilize, you

22 know, a DCF of this type of asset.

23 Q    That's not what you told me in your deposition, is it,

24 sir?

25 A    I gave you the first part of what you just said as an

1 explanation.  I'm giving you an additional explanation right

2 now.

3 Q    Okay.  But you didn't give me that explanation in your

4 deposition?

5 A    I did not, no.

6 Q    Okay.  And what Calyon did was what you did.  You

7 testified --

8 A    Yes.

9 Q    -- you did this yourself.  Was to take a mark-to-model

10 analysis of securitized mortgage pools and overlay that on this

11 portfolio as opposed to doing a ground up analysis, correct?

12 A    Correct.

13 Q    And a mark-to-model analysis is just a best guestimate as

14 what one thinks they would realize on the portfolio on any

15 given day?

16 A    Well, it's not a best -- maybe those were the words I

17 used.  It's an estimate as to what the recovery would be on a

18 portfolio of the loans, yes.

19 Q    Okay.

20 A    So what I did, I think as I testified in the deposition,

21 is I took the results of what those securities -- DCF's are,

22 and overlayed that on the portfolio.

23 Q    And isn't it true, sir, that Calyon actually confirmed

24 with its external auditors that a discounted cash flow analysis

25 would be the proper way to value this asset?

VanEssche - Cross                    148

1  A    No, I don't recall saying that.

2  Q    Do you have a binder up in front of you with exhibits, the

3  debtors' exhibits?

4          THE COURT:  I don't think he does.

5          MR. DORSEY:  May I approach, Your Honor?

6          THE COURT:  Yes.

7          MR. ACKERLY:  Could you hold up just a second.

8          MR. DORSEY:  Exhibit 24 is what I want him to look

9  at.

10 BY MR. DORSEY:

11 Q    Do you have exhibit 24 opened in front of you, sir?

12 A    Yes.

13 Q    And this is an e-mail -- the top e-mail is from you to

14 Bernard Unger (phonetic) at Calyon, correct?

15 A    Yes.

16 Q    And beneath that is an e-mail from a Dominique Gailon

17 (phonetic) who is an employee of Calyon, correct?

18 A    Yes, she's a chief risk officer.

19 Q    And this has to do with the SNC review which we're going

20 to talk about in a little bit later, but this was after the Fed

21 had upheld its original ruling on the SNC review, correct?

22 A    Yes.

23 Q    And if you look at the second to last paragraph in Ms.

24 Gailon's e-mail, she says, "This morning I met with our

25 auditors and mentioned to them this appeal we placed.  However,

1  at that time, I did not have the letter decision in hand.  I

2  indicated to them that we were comfortable with the level of

3  reserves made and they acknowledged that under accounting rule

4  the justification of a reserve is based on the present value of

5  future cash flows."

6          MR. ACKERLY:   Objection, hearsay.  It's hearsay.

7          MR. DORSEY:  As an employee of the company, Your

8  Honor, it's a statement against interest.

9          MR. ACKERLY:  It's hearsay within hearsay.  She's

10 reporting what the external auditor said.

11         THE COURT:  Overruled.

12         MR. DORSEY:  She's saying she confirmed with them,

13 Your Honor.

14         THE COURT:  Overruled.

15 BY MR. DORSEY:

16 Q    That's what Ms. Gailon said in this e-mail.

17 A    I think you're reading a little bit too much into that

18 statement.

19 Q    Well, is that what she said in this e-mail, sir?

20 A    No, no, I'm just saying I think you're reading a little

21 bit too much into it that's all.

22 Q    But that's --

23 A    She's basically saying that she had a conversation with

24 the auditors and they're essentially saying that the

25 justification for a reserve is the PV of cash flow.  It's not

1  the only justification, okay.

2  Q    But it is a --

3  A    And I testified to that in the deposition, too, that it's

4  not the only basis upon which you establish a reserve.

5  Q    But a discounted cash flow basis, according to Ms. Gailon,

6  is something that she confirmed that they could do with the

7  auditors, correct?

8  A    That's what it says.

9  Q    You prepared a series of memos to your superiors over the

10 course -- from beginning about August 17th through February of

11 this year, August 17th of '07, I should say, through February

12 of '09, is that correct?

13 A    Um-hum.

14 Q    And if -- is that a yes?

15 A    Yes.

16 Q    And if you look at the exhibit binder in front of you

17 those would be exhibits 5 through 12 in that binder, correct?

18 A    Yes.

19 Q    Now, the current estimate according to the calculation

20 that you did as of February 2009 -- and we should point out

21 Exhibit Number 12, although it's dated February of 2008, it

22 really should be February 2009, correct?

23 A    That's correct.

24 Q    And the estimate that you came up with on the recovery

25 under the portfolio as of February 2009 was 70%, correct?

1          MR. ACKERLY:  Just for the record, we want to

2  preserve our objection for the admission of that on lack of

3  relevancy as stated after August 15th, 208.

4          THE COURT:  You can have a standing objection to

5  that.  It's overruled.  I'm sorry what was the question?

6  BY MR. DORSEY:

7  Q    That as of February 2009, according to your analysis, Mr.

8  VanEssche, the rate of recovery on this portfolio is in the 70%

9  range?

10  A    Yes 70.4.

11  Q    Now, let's turn to --

12          THE COURT:  Where is that?

13          THE WITNESS:  It's in the upper table, Judge, on page

14  3.

15          THE COURT:  Oh.  Oh, okay, thank you.

16          THE WITNESS:  Do you see at the bottom right,

17  realization rate, 70.4%.

18          THE COURT:  Thank you, sir, yes.

19  BY MR. DORSEY:

20  Q    Now, let's take a look at -- or talk a little bit about

21  the SNC review that was done.  Calyon has reporting

22  requirements to both the Federal Reserve and the New York State

23  Banking Department, correct?

24  A    Yes.

25  Q    And on May -- in May of 2008, Calyon was subjected to a

VanEssche - Cross                                152

1  Shared National Credit Review, or SNC review of this portfolio,

2  correct?

3  A    Correct.

4  Q    And the SNC review found that the entire portfolio would

5  have to be rated at 100% doubtful, right?

6  A    Correct.

7  Q    And Calyon was concerned because they believed that that

8  meant that they would be required to set a 50% reserve,

9  correct?

10  A    Yes.

11  Q    And Calyon took issue with that rating and appealed it,

12  correct?

13  A    Yes, we did.

14  Q    And you wrote to the SNC stating the basis for your

15  disagreement, did you not?

16  A    Yes.

17  Q    And --

18  A    And I wrote the letter I believe it was signed by

19  Dominique Gailon, our Chief Risk Officer, but I was --

20  A    Well --

21  Q    I was the one who wrote the letter.

22  Q    If we turn to exhibit 23 in that binder you have in front

23  of you, this is the -- I'm sorry, I'll wait until you have it

24  open.

25                      (Pause)

1  Q    Do you have exhibit 23?

2  A    Yes, I do.

3  Q    This is the original disagreement with --

4  A    The original disagreement, you're correct, yes.

5  Q    And you wrote this and sent this to the SNC for --

6  A    Yes, I gave it to the examiners that were there, yes.

7  Q    Okay.  And in your response you indicated that the

8  portfolio is considered to be one of higher quality mortgages,

9  correct?

10  A    If I said that down there, I -- I'm sure I did, yes.

11  Q    And Calyon took issue -- I'm sorry.  The next -- hold on a

12  second.  I'm losing track of my space, I need to check things

13  off here.

14        You also indicated in your response that there was a

15  cushion of excess mortgage assets over advances of

16  approximately $90 million, correct?

17  A    Yes.

18  Q    And that meant that the amount that had been advanced on

19  the portfolio was $90 million less than what the value of the

20  underlying mortgages was, correct?

21  A    Yes.

22  Q    And you also indicated in this letter that while

23  delinquency the rate was approximately $75 million, or 6% of

24  the outstanding UPB on the portfolio, losses would be nowhere

25  near close to that amount, correct?

1  A    Well, no where near the implied level of losses by the

2  doubtful rating if you ascribed to 50% loss on the advance,

3  which would essentially imply that the portfolio loss rate

4  would have been something on the order of 60%, which is what

5  was the point I was trying to make.

6  Q    And you also pointed out that 9% of the mortgages, or 525

7  loans, had paid off, is that right?

8  A    If it's in there -- I'm trying to see which page you're

9  on.  I -- if I said that, I said that, yeah.

10 Q    And you also --

11 A    All this is factual.

12 Q    Okay.  You also said that since August of 2007 through May

13 of -- the date of this letter, which is May 5th, 2008, that you

14 had actually suffered losses on only four loans, correct?

15 A    Yes, but when I wrote that, I will say that we eventually

16 determined that was incorrect.  But at the time I wrote that, I

17 believe it was only four loans.

18 Q    Have you contacted the Federal Reserve to let them know

19 that your response was inaccurate?

20 A    They're with us right now, but no I did not contact them

21 to tell them that the response was inaccurate, no.

22 Q    You also took issue with the SNC's referral to the

23 location of the loans in California and Florida as a basis for

24 finding a doubtful rating, correct?

25 A    Um-hum.

VanEssche - Cross                                    155

1  Q    Is that a yes?

2  A    If I said that, yes.

3  Q    Okay.

4  A    I'm trying to look for the paragraph.

5  Q    And you, in fact, pointed out to them that a performing

6  mortgage is a good asset regardless of its location?

7  A    Yes I did say that.

8  Q    You also pointed out that the servicing rights that had

9  been raised by the SNC as a problem was a small issue, correct?

10  A    I don't know if I said small issue.  I think they were

11  trying to saying that was negating the point they were trying

12  to make.

13           MR. ACKERLY:  What provision of the letter are you

14  referring to?

15           MR. DORSEY:  If you look at the last bullet point on

16  page 2.

17                          (Pause)

18  BY MR. DORSEY:

19  Q    You stated, "However, it should be noted that the

20  difference in selling price caused by the servicing rights

21  issued, whether they are retained, *i.e.*, owned by AHM or

22  released, *i.e.*, owned by the bank purchasers, is 300 basis to

23  400 basis points at the most."

24  A    Yeah.  What I was addressing there, and the other points

25  we're addressing, too, was the point, based on our belief that

1  the doubtful classification implied a 50% loss on our loan.

2  Hence, as I mentioned before, a 60% loss on the portfolio,

3  *i.e.,* that we'd only collect 40 cents on the dollar in total on

4  this portfolio.  What I was trying to point out, because they

5  list a, you know, a number of reasons why the credit is being

6  classified doubtful, that being one of them, I was trying to

7  essentially put things in perspective.

8  Q    And you went on in that same paragraph to say, "As

9  explained to the examiners purchasing the servicing rights is

10 an option available and would cost only around a 100 basis

11 points, thus, negating to a great extent this issue."

12 A    Yeah.

13 Q    Correct?

14 A    Yes.

15 Q    Okay.  You also pointed out that if the mortgages are

16 performing, and I think this is important because I think it

17 contradicts your prior testimony.  You also pointed out, "If

18 the mortgages are performing deficiencies in the mortgage files

19 do not impact sale value," correct?

20 A    That's true.

21 Q    Because buyers rarely review files prior to purchase

22 anyway, isn't that what you said?

23 A    Well --

24        MR. ACKERLY:  Where's that statement?

25        MR. DORSEY:  If you look at the middle of the next

1 bullet point.

2 A    Yeah, it doesn't impact sale value, but it affects your

3 rep and warranty recourse value -- I mean your rep and warranty

4 recourse.  So, ultimately you might have to buy back the loans.

5 I was just trying to explain to them what the affect of lacks

6 in reps and warranties has.

7 Q    Well, you were trying to explain that the fact that there

8 were deficiencies in the files was not really an issue --

9 A    They were --

10 Q    -- it didn't affect sale value at all, that's what you

11 said in your letter.

12 A    No.  What I'm -- what I  was trying to say was that if

13 there are file deficiencies and you stand behind with reps and

14 warranties, it's not going to affect the value of your

15 mortgage.  What impacts the value for the seller is the fact

16 that if down the road that loan is put back they then have to

17 buy back the mortgage.  It's the contingent exposure that you

18 have with the reps and warranties.  And if you don't provide

19 that contingent exposure to the buyer, you are going to suffer

20 a price.

21 Q    And you went on in this letter, in your parenthetical

22 there in that same sentence you said, "In fact throughout the

23 industry, file problems are prevalent."

24 A    Yeah, as long as you provide the reps and warranties, it's

25 not going to have an impact on value.

1  Q    And, in fact, if you go back to the first page of this

2  letter you made a reference to the Compass valuation that was

3  done in December of 2007, correct?  Where they found that it

4  was 73 cents on the dollars was the value of the mortgages on a

5  sale value at that point?

6  A    Yes.

7  Q    And you pointed out to them that if you included reps and

8  warranties that that would jump up to 83 cents, right?

9  A    Correct.

10 Q    And you also took issue with a comment by the SNC that

11 there was no desire to liquidate the portfolio under current

12 market conditions, correct?

13 A    That is correct.  Because if we had, we would have

14 suffered a big loss.

15 Q    And this is true, you said, "Only because it makes more

16 sense to sell when liquidity in the market recovers which will

17 result in higher prices," correct?

18 A    I can't disagree with that.

19 Q    And in the meantime the portfolio collections of P&I,

20 that's principal and interest, correct?

21 A    Yes.

22 Q    -- and full payoffs continue, thus, reducing exposure?

23 A    Yes.

24 Q    And the strategy being employed by holding is to maximize

25 value, correct?

1 A    That is correct, and it still is.

2 Q    Indeed, that's been the strategy of Calyon from the very

3 beginning wasn't it --

4 A    Well --

5 Q    -- in August of 2007?

6 A    Well, the strategy of Calyon has been to maximize the

7 recovery of this portfolio.  If that implies holding, it means

8 we're going to hold for awhile.

9        We're also looking to sell some of the loans as we

10 speak, as I mentioned to you during our deposition.  So, when

11 opportunities arise where we can dispose of loans, we are

12 taking advantage of those and we're doing that right now for a

13 pool of approximately $175 million worth of loans.

14 Q    But on August 1st of 2007, Calyon had already come to that

15 conclusion, didn't it?  That it was better to hold the loans

16 and see what happens in the market?

17 A    Probably, yeah.

18 Q    In fact, you wrote to your superiors in one of the -- in

19 the August 17th memo saying that there was no time pressure to

20 realize on this portfolio, correct?

21 A    Well, not as long as you're collecting principal and

22 interest.

23 Q    And the final point that you made to the SNC in your

24 response to the audit was that while the credit is treated as

25 nonperforming for accounting purposes, in cash terms the

1  transaction is actually performing well, *i.e.,* the interest

2  component on the monthly P&I payments from the mortgage

3  portfolio more than covers the contractual interest on the

4  repo, correct?

5  A    (No audible response heard)

6        THE COURT:  Can you answer --

7  Q    Is that a yes?

8  A    Yeah, I guess.  Yes.  If I wrote that, I wrote that, yes.

9        MR. ACKERLY:  Would you confirm you wrote it?

10        THE WITNESS:  If you could point out exactly which

11  section because he's been jumping around the memo.

12  Q    If you go to page --

13  A    Which page is that?

14  Q    Page 3, your last -- second to the last paragraph on page

15  3.  "A final point to be made is that while the credit is

16  treated as non-performing for accounting purposes, in cash

17  terms the transaction is actually performing well" --

18  A    Yes.

19  Q    "*I.E.,* the interest component of the monthly P&I payments

20  from the mortgage portfolio more than covers contractual

21  interest on the repo."

22  A    Yeah, at the time that's what was happening, yes.

23  Q    And you went on to say, "As such loss coverage is

24  increasing as time passes through the accumulation of interest

25  applied to principal," correct?

1  A    That is correct.  But that's reversing now because we're

2  experiencing a fair amount of losses.

3  Q    But that was true as of August 1st, 2007, wasn't it?

4  A    Well, August 1st, 2007 I couldn't have opined on this at

5  that point in time, I was just getting involved.  And so we had

6  no experience with respect to the portfolio.

7  Q    Well, this letter was written in May of 2008.  So, one

8  could presume if it was performing that way in May of 2008, it

9  was performing that way in August of 2007, correct?

10  A    Well, I think that's a little bit of a stretch because the

11  portfolio in 2007 had just been constituted, remember?  I mean

12  the last advance under the repo was on July 27th.  The

13  portfolio only got baked or cast into stone on August -- right

14  there after around August 1st.  It would have been impossible

15  for me to opine on a portfolio that's only been in existence

16  for three or four days as to what, you know, the nature of

17  those payments could do or not do.

18  Q    Let's switch gears for a moment.

19  A    Sure.

20  Q    You make reference in the letter you wrote to the SNC

21  about the Compass valuations for July, August and December of

22  2007, correct?

23  A    Which paragraph is that?

24  Q    If you go back to the beginning of the letter.

25  A    Page 1?

1  Q    Page 1, at the bottom.

2  A    Okay.

3  Q    You make reference to the 73 cents, which would be 83

4  cents if Calyon backstopped the --

5  A    The reps and warranties --

6  Q    -- reps and warrants for December of '07.

7  A    Right.

8  Q    And then you also say, "Indeed, the very same firm valued

9  the portfolio in July 27, '07 at 104%," correct?

10  A    Correct.

11  Q    That wasn't actually --

12         THE COURT:  Where -- I'm sorry, Mr. Dorsey, where are

13  we?

14         THE WITNESS:  Page 1.

15         MR. DORSEY:  The bottom of page 1, Your Honor.

16         THE COURT:  What exhibit?

17         MR. DORSEY:  The -- exhibit 23, Your Honor.

18         THE COURT:  Oh, I was on -- I don't know, I went to

19  11 for some reason. I apologize.  Page 1.  I'm sorry, can you

20  ask the question again?

21         MR. DORSEY:  Yes.  I asked him about the -- whether

22  the December of 2007 valuation done by Compass is referred to

23  in this letter to the SNC.  And he indicated that --

24         THE COURT:  That it was.

25         MR. DORSEY:  It was.

1           THE COURT:  Okay.

2           MR. DORSEY:  And also that the -- he made reference

3  to the same firm making a valuation on July 27th, '07 and

4  valuing the mortgage portfolio at a rate of a 104%.

5  BY MR. DORSEY:

6  Q    Now, if we turn to Exhibit Number 4 for a moment --

7  A    I thought --

8  Q    -- in the debtors' exhibit book.

9  A    I thought you were going to ask me a question.

10 Q    I think you answered the question.  I was just getting the

11 Court back up to speed.

12 A    All right.

13          THE COURT:  Thank you.

14 BY MR. DORSEY:

15 Q    Exhibit 4, you have that in front of you, sir?

16 A    I'm getting to it.  Yes.

17 Q    And this was the July 27, '07 valuation report prepared by

18 Compass, correct?

19 A    Yes.

20 Q    And Compass -- it says, "Compass's MTM," that means mark-

21 to-market?

22 A    Mark-to-market, yeah.

23 Q    Shows a weighted price of a 101.33%, correct?

24 A    Yes.

25 Q    Versus an unweighted AHM original market price of 101.95,

1 right?

2 A    (No audible response heard)

3 Q    Is that correct, sir?

4 A    Oh, yes.

5 Q    And if we turn to exhibit number 26 for a moment.  This

6 was the pricing summary prepared by your trial expert, is that

7 correct?

8 A    Yes.

9 Q    And if you go to the second page of that analysis under

10 "Grand Total," the last paragraph -- or the last column it

11 says, "Market Price," last row, "Grand Total."  And he valued

12 it at 99.5379, correct?

13 A    Correct.

14 Q    And if you go to the next exhibit 27, your trial expert

15 valued it as of September 30, '07, second page of that exhibit

16 at 99.0195, correct?

17 A    Yes.

18 Q    And if we turn to Exhibit Number 2 for a moment.  This is

19 a document that was prepared by Calyon comparing the Compass

20 valuations with the Deutsche Bank valuations that we looked at

21 earlier, correct?

22 A    Yes.

23 Q    And under this analysis the Compass portfolio showed

24 different prices under column 7/30/07 for each of the various

25 types of mortgage loans, correct?

1  A    Yes.

2  Q    And it does the same for August 20th, 2007, correct?

3  A    Yes.

4  Q    And the next block under Deutsche, that's the Deutsche

5  Bank analysis which shows the portfolio advance rates, is that

6  correct?

7  A    Right.

8  Q    And then at the bottom, Calyon calculated that the AHM

9  mark-to-market as of 7/30/07 was 102.27, correct?

10  A    Correct.  They would price the loans as they were put into

11  the repo.  And then there would be an advance rate, so that's

12  what that describes was the weighted average mark-to-market of

13  the entire portfolio.

14  Q    Now, in your direct testimony, you made reference to some

15  conversations you had with folks at Kroll Zolfo Cooper about --

16  on or about early October of '07 where AHM made an offer to

17  liquidate the portfolio, correct?  Do you recall that

18  testimony?

19  A    Yes.

20  Q    And, in fact, Calyon didn't want to allow AHM to liquidate

21  the portfolio because they thought the amount that had been

22  obtained by AHM in the Broadhollow sale was too low, right?

23  A    Correct.

24  Q    And the amount received in Broadhollow was in the 88 to 89

25  cent range?

1  A     It depends from which pool of mortgages you're talking

2  about.  The high 80's, yes.

3  Q     On a blended basis it was --

4  A     Something like that.

5  Q     -- the high 80's?

6  A     Yeah.

7  Q     And in October of 2007, Calyon really had no idea what the

8  loans were worth, did they?

9  A     Our portfolio was very different from the Broadhollow

10 portfolio.  So, I mean it's comparing apples and oranges.  I

11 mean that was a government conforming pool principally.  We had

12 pay option ARMS.  It was, you know, a very different pool of

13 mortgages.

14 Q     And Calyon though internally was making a guesstimate of

15 the value at somewhere at 20 to 30 cents below par in October

16 of '07?

17 A     In October of '07?

18 Q     Yes.

19 A     I don't think we were doing that internally, excuse me.

20 Q     Let's take a look at your deposition transcript, exhibit

21 28 in the debtors' binder is a copy of your deposition.  And

22 beginning on page 104, line number 9, I ask you the question:

23 "Q     Did anyone internally at Calyon discuss what they thought

24 the portfolio could sell for in October of 2007."

25 A     Yes.

1  Q    Answer:

2  "A   In terms of an in-depth analysis as to what we could sell

3  it for?"

4  "Q   In-depth or otherwise."

5  "A   In generalities, yes.  We were talking about what the

6  value could be.  But it was just sort of, you know, a pie in

7  the sky type of talk.  We really had no -- we had no basis."

8  "Q   What were the values that were being talked about?"

9  "A   I think nobody really knew.  We were just shooting numbers

10 in the dark.  I can't remember exactly but they were saying it

11 was X before.  It was probably 20, 15, 25 points lower today.

12 People were just all over the place, all over the map."

13 "Q   Do you recall as you sit here today any numbers

14 specifically that were being discussed?"

15 "A   Nothing in the nature, sir, that would say we agreed or

16 finalized or coalesced around the numbers, say X or Y, no.  It

17 was really a wide range, just throwing things up in the air."

18 "Q   What was the range?"

19 "A   I would say the range was definitely a discount of 20, 30,

20 40 cents below par; probably more at that time.  We were

21 probably thinking 20 or 30 cents below par was our notion.  But

22 again, as I said before, there was no market.  So, there was

23 kind of like a presumption that well there's no market, but

24 probably at that level, somebody would come in and buy."

25          I think that's supposed to be b-u-y.

1  "A   -- because we are so low but we just didn't know."

2  "Q   Is that why Calyon made the decision early on that it was

3  better holding the portfolio for awhile to see if the market

4  improved?"

5  "A   Well, no that wasn't the main reason.  The main reason for

6  not selling had a little bit to do with that, but I think it

7  had to do with a number of other factors, as well."

8            Correct?

9  A   Yes.

10  Q   And you went on to describe the other factors being those

11  ownership issues, and the MERS issue, and so forth, correct?

12  A   Right.  I just want to make a point.  I mean I think you

13  asked before.  The question was that we were valuing it at a

14  certain level.  I just, you know, want to make the point we

15  weren't valuating it.  We were talking about values and we

16  never valued the portfolio for purposes of reserves or

17  reporting internally at those numbers that, you know, that are

18  in the deposition.  So, that's what I was responding to when

19  you asked me your question.

20  Q   You also testified in your deposition, did you not, that

21  if you could have sold them in October for at or near par, you

22  would have?

23  A   Yes.

24  Q   But you couldn't, right?

25  A   No.

1  Q    And you would not have sold them if they were -- if you

2  were going to get 20 or 30 cents below par, correct?

3  A    At the time, we just thought that would be a stupid thing

4  to do.

5         MR. DORSEY:   No further questions, Your Honor.

6         THE COURT:  Redirect.

7                    REDIRECT EXAMINATION

8  BY MR. ACKERLY:

9  Q    Look in the white notebook.

10 A    Yes.  Which tab?

11 Q    The white notebook.  The stipulation at the beginning of

12 it.  The first -- the first thing is the stipulation of facts,

13 do you see that?

14 A    Yes.

15 Q    Turn to paragraph 58 on page 10.

16 A    I'm there.

17 Q    Okay.  The million -- excuse me -- the $1,143,000,000

18 number, that was the repurchase price as of the petition date,

19 is that correct?

20 A    Yes, that's what that sentence says.

21 Q    Okay.  Now in response to a question from Mr. Dorsey, I

22 think you stated that your position is that Calyon's claim is

23 the shortfall from the repurchase price based on realization.

24 A    Yes.

25 Q    Is that correct?

1  A    Yes.

2  Q    Okay.  If you look at page, excuse me, paragraph 58.  What

3  does it show is the outstanding amount on your claim as of

4  August 15th?

5  A    994 million --

6  Q    Okay.

7  A    -- and change.  And that's before, you know, attorney's

8  fees, costs and expenses, etc.

9  Q    Right.  Now, would you allowable claim in this case be

10  that number less what you can sell the mortgages for on

11  whatever date the Court determines would be the sales price?

12        MR. DORSEY:  Objection; calls for legal conclusion,

13  Your Honor.

14        MR. ACKERLY:  Just calls for --

15        MR. DORSEY:  That's what the Court has to decide.

16        MR. ACKERLY:  It doesn't call --

17        THE COURT:  He can give his understanding.

18        MR. ACKERLY:  What's that?

19        THE COURT:  He can give his understanding.

20        MR. ACKERLY:  Thank you.

21  A    Yes, that -- my understanding is that that would be my

22  allowed claim.  If we were to sell the mortgages as of a

23  certain date, basically you would sell the mortgages whatever

24  the UPB is that's not included in that paragraph, you would

25  have a recovery amount.  You would deduct that recovery amount

1   from the amount of our claim and whatever the shortfall was or

2   the difference would be the amount of the deficiency claim.

3   Q    Thank you.  Look at exhibit 24 in the black book.  This is

4   the debtors' exhibits.

5   A    The one given to me by Mr. Dorsey?

6   Q    Yes.

7   A    Okay.

8   Q    It's the --your e-mail dated July 25th, 2008.

9   A    Yes.

10  Q    Okay.  You say, "FYI: the examiners."  Do you see that?

11  A    Yes.

12  Q    Are you referring to the Federal Reserve examiners or the

13  bank examiners?

14  A    The banking examiners.

15  Q    Who?

16  A    The banking examiners of the Shared National Credit --

17  Q    Okay.

18  A    -- you know, Commission exercise.

19  Q    Okay.  Turn to exhibit 12 in that book, page 3.  The

20  realization rate 70.4%, do you see that?

21  A    Yes.

22  Q    Is it your testimony you could sell the mortgages for that

23  price?

24  A    No.

25  Q    And why not?

1  A    Because it's a different animal.  I mean this basically --

2  this, you know, as I explained before this recovery model does

3  assume a whole period until market conditions improve.  And

4  between a combination of recovering on the mortgages while we

5  wait and then selling eventually when liquidity reappears in

6  the market, or where the market has stabilized essentially

7  would result in us ultimately realizing something around 70.4%.

8  Q    You testified in response to some questions from Mr.

9  Dorsey about marketing -- current marketing of the collateral,

10  the mortgages.

11  A    Um-hum.

12  Q    What are you doing to market right now?

13  A    Right now?  Well, what we've done is we hired -- a few

14  months, we hired JPMorgan Securities as a disposition advisor.

15  There are very few players now in the industry that are

16  actually selling, or trading, or actively involved still in

17  trying to move mortgage assets for third parties.  They're one

18  of the few, so we hired them.

19       And we are sort of going after the low hanging fruit

20  first.  Right now, we're working on trying to sell

21  approximately $175 million of loans to Fannie Mae and Freddie

22  Mac.  And we're hopeful that the price would come at or near

23  par.  And we're waiting for a response from them on that front.

24  They keep on coming back to us with more requests for

25  information every so often.

1          The portfolio has been with them, I'd say now, for at

2    least eight weeks, if not longer.  Thus far, they haven't said

3    no to anything which JPMorgan keeps on telling us is a good

4    sign.  As long as they don't say no, there's still a potential

5    that they will, in fact, buy some of the mortgages.  But we're

6    still in the wait and see mode.

7    Q    Look at, if you will, at exhibit 2 in Mr. Dorsey's book.

8    A    Yes.

9    Q    Okay.  Does the amount shown as the weighted price by

10   Compass for either July 30th or August 20th represent what you

11   could sell the mortgages for?

12   A    I don't think it does, no.

13   Q    Okay.  And is there anything on the Deutsche Bank summary

14   that you -- that indicates what you think you could sell the

15   mortgages for?

16   A    No.

17   Q    Okay.

18   A    All the numbers there are essentially valuations ascribed

19   to the mortgage pool by, you know, the various entities that

20   are in the headers there.

21   Q    Okay.

22   A    And just to clarify, the Deutsche Bank valuation

23   ultimately is an amount that was provided to them by American

24   Home.

25   Q    Okay.

1          MR. ACKERLY:   If I may have just a minute.

2          THE COURT:  Um-hum.

3                        (Pause)

4  BY MR. ACKERLY:

5  Q    Mr. VanEssche, did the 20 or 30% guesstimates of value

6  that you gave at your deposition in October --

7  A    Yeah.

8  Q    -- 2007, did that reflect all of the issues with respect

9  to mortgages, like ownership and proceeds and remediation and

10 all that?

11 A    No, it did not.

12 Q    Okay.

13         MR. ACKERLY:  I don't have anything further.

14         THE COURT:  All right.  You may step down, sir.  He's

15 going to be our last witness for the day, I believe unless you

16 would like one more.

17         MR. ACKERLY:  It's up to the Court.  We've got one

18 more witness, and I don't know whether they will call witnesses

19 but --

20         THE COURT:  Well, who do you have?

21         MR. ACKERLY:  An expert.

22         THE COURT:  Yeah.  And how long do you anticipate?

23         MR. ACKERLY:  I would -- I would guess at least an

24 hour.

25         THE COURT:  All right.  I'd like -- I know I said I'd

1 go as late as you wanted, but that's when I was assuming that

2 we weren't going to get as lucky as we did with our previous

3 matter and --

4          MR. ACKERLY:  Well, we're going to be here tomorrow.

5          THE COURT:  Yeah, I'd like to continue til tomorrow.

6 We can reconvene -- we're scheduled for 10, but -- which is

7 fine.  But if you'd like, we can start earlier.  Nine, 9:30?

8 Whatever everybody wants.

9          MR. ACKERLY:  We're fine with 9 or 9:30.

10          THE COURT:  Mr. Dorsey, do you have a preference?

11          MR. DORSEY:  That's fine with me, Your Honor.

12          THE COURT:  Well, why don't we --

13          MR. DORSEY:  Whatever is convenient for the Court.

14          THE COURT:  Yeah, let's -- to make sure we, you know,

15 we give everybody enough time, let's start at 9 --

16          MR. ACKERLY:  Nine.

17          THE COURT:  -- tomorrow.  So, you can leave your

18 things if you wish.  And unless there's anything further, we're

19 in recess until tomorrow at 9 A.M.

20          Thank you very much.  Have a pleasant evening.

21       (Whereupon, at 4:53 P.M. the hearing was adjourned.)

22

23

24

25

176

1                              CERTIFICATE

2

3        I certify that the foregoing is a correct transcript from

4   the electronic sound recording of the proceedings in the

5   above-entitled matter.

6

7

8    /s/  Karen Hartmann     AAERT CET**D0475   Date:  May 27, 2009

9   TRANSCRIPTS PLUS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25