UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 07-11047(CSS) |
| | ) | Chapter 11 |
| AMERICAN HOME MORTGAGE | ) | |
| HOLDINGS, INC., a Delaware | ) | Courtroom No. 6 |
| Corporation, et al., | ) | 824 Market Street |
| | ) | Wilmington, Delaware 19801 |
| | ) | |
| Debtors. | ) | |
| | ) | May 20, 2009 |
| | ) | 9:07 A.M. |

TRANSCRIPT OF HEARING CONTINUED FROM MAY 19, 2009
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Young Conaway Stargatt & Taylor, LLP
                            By:  JOHN DORSEY, ESQ.
                                 CURTIS CROWTHER, ESQ.
                                 MICHELE SHERRETTA BUDICAK, ESQ.
                            The Brandywine Building
                            1000 West Street, 17th Floor
                            Wilmington, Delaware 19899-0391

For Bank of America:        Potter Anderson & Corroon, LLP
                            By: GABRIEL R. MacCONAILL, ESQ.
                            Hercules Plaza, P.O. Box 951
                            1313 N. Market Street
                            Wilmington, Delaware 19899-0951

ECRO:                       LESLIE MURIN


TRANSCRIPTION SERVICE:      TRANSCRIPTS PLUS, INC.
                            435 Riverview Circle
                            New Hope, Pennsylvania 18938
                            Telephone:  215-862-1115
                            Facsimile: 215-862-6639
                            e-mail CourtTranscripts@aol.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

APPEARANCES:
(Continued)


For Calyon New York          Womble Carlyle Sandridge & Rice, PLLC
Branch:                      By:  MICHAEL BUSENKELL, ESQ.
                             222 Delaware Avenue, Suite 1501
                             Wilmington, Delaware 19801

                             Hunton & Williams
                             By:  JASON W. HARBOUR, ESQ.
                                  BENJAMIN C. ACKERLY, ESQ.
                                  TOM RICE, ESQ.
                             Riverfront Plaza, East Tower
                             951 East Byrd Street
                             Richmond, Virginia 23219-4074

TELEPHONIC APPEARANCES:

For Official Committee       Hahn & Hessen LLP
of Unsecured Creditors:      By:  JEFFREY ZAWADZKI, ESQ.
                             488 Madison Avenue
                             New York, New York 10022

INDEX

| WITNESSES FOR THE CALYON: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ROBERT BRANTHOVER | | | | |
| By Mr. Ackerly | 5 | | 47 | |
| By Mr. Dorsey | | 39 | | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| C-6 | Expert report | 18 | 30 |
| C-6A | Handwritten supplement to report | 30 | 30 |
| C-7 | Mr. Branthover's Resumé | 5 | 30 |
| C-8 | Backup of the valuation, 1/31/08 | 31 | 38 |
| C-9 | Backup of the valuation, 8/15/08 | 31 | 38 |
| C-10 | Backup of the valuation, 8/15/08 | 32 | 38 |
| D-26 | MIAC's first cut | 36 | |
| D-27 | MIAC's first cut | 36 | |

Branthover - Direct                                          4

1          THE COURT:  Good morning.  Mr. Ackerly?

2          MR. ACKERLY:  Good morning, Your Honor.  Ben Ackerly.

3          THE COURT:  Are we getting an echo?  It's fixed.

4    Okay.

5          MR. ACKERLY:  We would like to call Robert

6    Branthover.

7          THE COURT:  Okay.

8           ROBERT BRANTHOVER, CALYON'S WITNESS, SWORN

9          CLERK:  Please state and spell your name for the

10   record.

11         THE WITNESS:  Robert R. Branthover, B-R-A-N-T-H-O-V-

12   E-R.

13                       DIRECT EXAMINATION

14   BY MR. ACKERLY:

15   Q    Mr. Branthover, for the record, would you state your

16   residence address, please?

17   A    88 Sherbrook Drive, Berkeley Heights, New Jersey.

18   Q    And where are you currently employed?

19   A    Mortgage Industry Advisory Corporation.

20   Q    Is that referred to as MIAC?

21   A    Correct.

22   Q    Okay.  What is your MIAC?

23   A    I'm a Senior Vice President in charge of the Secondary

24   Solutions Group.

25   Q    Okay.  Have you been retained by Calyon in this case to

1  testify as an expert?

2  A    I have.

3  Q    Okay.  And on what subjects have you been engaged to

4  testify?

5  A    The market value of mortgage collateral.

6  Q    And is that on specific dates?

7  A    It has been.

8  Q    Okay.  What do you mean by "market value of the mortgage

9  collateral?"

10  A    To try to assess a fair value where these loans could be

11  sold into the marketplace.

12  Q    Okay.  If you would look at Exhibit 7 in the black

13  notebook that has on its label Calyon Exhibits.

14  A    Got it.

15  Q    It should be your resumé?

16  A    No, this is loan files.  Maybe it's this one.  What tab?

17  Q    Exhibit 7.

18  A    7, sorry.  Correct.

19  Q    What is this?

20  A    My resumé.

21  Q    Is it up to date and current?

22  A    It is.

23  Q    Would you describe for the Court the aspects of your

24  experience and background that you have relied on for

25  formulating an opinion as to the value of these mortgage --this

1  mortgage portfolio?

2  A    Certainly.  As my resumé indicates, I've been in the

3  financial services industry for almost 20 years.  The last 10

4  years particularly have been almost exclusively involved with

5  the mortgage industry, and valuing mortgage product, both from

6  a -- pricing from an origination, hedging from a distribution

7  perspective, and selling that collateral under the secondary

8  market.  Predominantly in newly originated product, but also a

9  seasoned product, as well.

10 Q    What do you mean by "secondary market?"

11 A    Secondary market represents the market where -- the

12 primary market is a customer comes and gets a mortgage.  That

13 loan is then sold into the secondary market.

14 Q    Okay.  If Calyon were selling the mortgage portfolio,

15 would it be selling it into the secondary market?

16 A    It would be.

17 Q    Okay.  Would you describe your education background?

18 A    Sure.  I have a B.S. in finance from the University of

19 Maryland.

20 Q    Go through your job experience as it relates to the

21 mortgage industry.

22 A    Sure.  I started with Chase in 1989 in a treasury

23 capacity, which involved management of the overall bank's

24 balance sheet of both assets and liabilities.  Some of those

25 assets were mortgages, a lot of them were other liabilities.

Branthover - Direct                                7

1  So, I was first involved with the Chase mortgage division back

2  in the early '90's.

3  Q    Okay.

4  A    And was involved with the valuation hedging of servicing

5  starting in 1991.

6  Q    Okay.  And moving forward?

7  A    I joined the mortgage company in late 1997 as an analyst

8  in part of the team to value and calculating the servicing

9  asset -- the value of the servicing asset and how that would be

10 hedged.  All of these are mortgage assets.  It also included an

11 investment portfolio at the time, as well, or mortgage assets.

12 Q    Are these residential mortgage assets?

13 A    Residential mortgage assets, that's correct.

14 Q    Okay.  And keep -- did you go with Chase Finance at one

15 point?

16 A    Yeah, I joined Chase Home Finance in late '97.  In '99, I

17 moved into the secondary marketing area where I was -- became

18 the jumbo trader.  Jumbo trader means I'm responsible for

19 basically pricing and hedging all of the nonconforming mortgage

20 product that the bank originated.

21 Q    What are nonconforming mortgage products?

22 A    Loans that were outside of the GSE's or Fannie, Freddie,

23 Ginnie Mae's loan limit size.  So, larger loans.  Currently

24 above $417,000.

25 Q    Okay.  And where did you go from Chase Home Finance?

Branthover - Direct                                    8

1  A    I joined Lehman Brothers.

2  Q    Doing what?

3  A    I was a fixed income salesperson.  I represent -- I

4  covered originators in banks.  A large portion of that business

5  was to buy and sell mortgage product from them.

6  Q    Okay.  And you're currently at MIAC.  How long have you

7  been at MIAC?

8  A    Almost five years.

9  Q    And what is your position at MIAC?

10 A    Again, Senior V.P., Head of Secondary Marketing, the

11 Secondary Solutions Group.  We do basically four things:  We

12 have software that we write that allows institutions to manage

13 their mortgage portfolios and to value that mortgage

14 collateral.

15      We do hedge advisory services where we allow -- where

16 we work with mortgage companies to allow them to price, hedge,

17 and sell their mortgages into the secondary market. We do a lot

18 of consulting work, as well, in that front.

19      And fourth, we -- and probably our second business

20 line is really doing valuation work.  Over the years, we've

21 done generally in excess of 100 -- $100 billion a month of

22 valuation of mortgage product.  Both newly originated and

23 seasoned product.

24 Q    Okay.  Approximately on an annual basis, how many

25 mortgages have you market valued during 2007/2008?

1  A    Multiple of trillions of dollars.

2  Q    All right.  I don't know whether you said this.  Do you

3  also do general consulting?

4  A    We do general consulting.

5  Q    Okay.  Consulting in what?

6  A    All -- everything's mortgage related.  From the

7  origination, sale, hedging, dealing with season portfolios, how

8  to sell them, what the market value of those portfolios are.

9  Q    Okay.

10  A    How to make your operation more efficient, you name it.

11  Q    Do you typically advise financial institutions with

12  respect to the value of their residential mortgage portfolio?

13  A    Absolutely.

14  Q    Is that a regular part of your job?

15  A    Almost daily.

16  Q    Okay.  Give some examples of the institutions that you

17  provide this advice to.

18  A    Nine of the 12 home loan banks' system, they provide

19  collateral to us that we value that's in the trillions of

20  dollars.  We work with Wells Fargo, Bank of America, other

21  institutions that have portfolios that need to be sold.  We've

22  worked with a couple hundred other institutions.  Our client

23  base from a software and advisory perspective is Chase

24      Manhattan Bank, Citibank, Wells Fargo, on down.  Nine of

25  the  top 10 originators are clients of ours in one capacity or

1  another.

2  Q    Do you give market value advice with respect to both

3  originated and seasoned portfolios?

4  A    We do.

5  Q    And explain to the Court the difference between an

6  originated and a seasoned portfolio.

7  A    A newly originated portfolio -- or newly originated pool

8  loans generally can be sold under the secondary market based

9  upon known market metrics.  This is where the securities are

10 trading, so the actual value is relatively known every day.

11 It's very easy to mark them to market especially now because

12 the market is  -- it's all conventional, all governments, the

13 nonconforming product is not being originated to the size it

14 had been previously.  So, it's a relatively transparent market

15 to come with a mark to market on that type of product.

16           Seasoned product, in the best of times, can be

17 difficult to sell because it hasn't -- generally it will always

18 have some hair on it, it's a few years old.  You have certain

19 buyers that will have interest in seasoned product, and some

20 people just stay away from it altogether.  You know, with the

21 securitization market kind of having imploded over the last few

22 years, they're not being sold as securities anymore, they're

23 being sold as whole loans.  The process to buy and sell a pool

24 of whole loans is a multi month period of, you know, time to do

25 such a transaction right now.  And basically since the summer

Branthover - Direct                               11

1   of '07, there's still a lot of collateral that has been left

2   over from that time period that has not been able to find a

3   home.  And the values of those have fallen precipitously as the

4   credit performance also has fallen.  So, there's lots of issues

5   around that that we have spent a significant amount of time

6   working with clients on both distribution, how to sell that,

7   and how to deal with it on an ongoing basis.

8   Q    Okay.  Would you explain the process that you use when you

9   value a mortgage loan portfolio?

10  A    Sure.  There's numerous approaches one can take to value a

11  portfolio.  And, again, for a newly originated portfolio, it's

12  relatively straightforward.

13       For an originator who is going to be selling loans

14  into a securitization takeout from Fannie, Freddy, or Ginnie

15  Mae, there's active screens that we see where the secureds are

16  being valued every day.  So, we know what the base value of the

17  security is.

18       The issue for those type of loans is what value are

19  you going to apply for the value of service.  So, when you add

20  those two numbers up, you get the value of the loan basically.

21  That changes every day with the markets, it's relatively

22  straight forward to come up with those calculations.

23       Seasoned loans is a whole other different beast.

24  There's been lots of talk about a discounted cash flow

25  methodology.  We subscribe to a discounted cash flow

1  methodology.  MIAC is one of the first companies that to

2  actively, you know, provide a model that's being used by these

3  largest mortgage companies, a couple hundred institutions to

4  calculate discounted cash flow values.  But no one ever talked

5  about what discount rate to use.  A discount cash flow doesn't

6  automatically mean you're going to get a price at par.

7          So, when we look at a pool, we'll generally look at

8  -- you know, obviously it depends on what the engagement is.

9  If it's a current portfolio of newly originated product,

10 relatively straight forward exercise.

11         If it's a -- if we're going back in time to look at

12 what is sold at a different time period, we'd go back and look

13 at what pricing was available at that time frame.

14         But you also have to look at what's occurred.  It's

15 kind of hard to block out what we know occurred over the last

16 two years and not to -- when you come up with a value.  But I

17 think the metrics are there.

18         So, we can run a discounted cash flow.  We tend to do

19 this in a couple of different ways.  We like to triangulate the

20 problem.  First we get the collateral, we'll load it up into

21 our systems and we'll run it against various pricing sources

22 that we know existed at a particular time.  We'll also run

23 discounted cash flows and also subscribe to what discount rates

24 would apply for that loan with those kind of credit attributes.

25 And they're very broad.  You can't look at a pool of loans and

1  even break them into four, five different categories and come

2  up with one or two different discount rates to a value a pool

3  of loans.  Discount rates, you know, from a DCF perspective, a

4  lot depends on the credit attributions, a lot depends on the

5  LTV, the leverage involved with those lines, a lot depends on

6  the product type involved.

7          So, we're going to use a discount rate for a high LTV

8  second loan that's dramatically different than a discount rate

9  for a newly originated conventional loan.  And we need to be

10  able to do that.  And what gives us that ability to do that is

11  our position in the industry allows us to see trades that are

12  being put out to bid, where they're getting traded, if they're

13  being traded at all, and then we can actually solve for the

14  discount rate, based upon all these other assumptions that need

15  to be put forth in these valuations.

16          You know, when you're valuing a pool of loans, you've

17  got -- what do you have to worry about?  Delinquencies.  Are

18  those delinquencies going to turn into a 30-day, 60-day, 90-

19  day, is that going to go R-E-O.  What are the prepayment risks?

20  Are these loans high -- you know, have a high note rate, rates

21  have fallen obviously over the last few years.  Would that

22  allow those loans to refinance?  You know, if you're buying the

23  loans at 70 cents on the dollar, a refinance is a great thing

24  because you get all your money back.

25          So, we need to factor in lots of issues that have not

1  been discussed in this courtroom previously.  And our tools are

2  designed to do all those things.  We can lay out every cash

3  flow that exists in the mortgage space to come up with a fair

4  value.  And we can basically ascribe values to these different

5  assumptions and how much those impact the value.

6          So, by having witness and been part of live trades,

7  we can actually see, okay, if this pool loan, we marked it at

8  one methodology at 70, but it traded at 55, we can very quickly

9  ascertain what kind of discount assumptions were applied, what

10 kind of lost foreclosure assumptions put aside -- would be

11 applied to that, and perturb those to try to come up with, you

12 know, a matrix that would give us the ability to value

13 additional collateral down the road.

14 Q    Have you been involved in developing proprietary software

15 from MIAC that values mortgage portfolios?

16 A    Yeah, I'm -- you know, as a senior member of the team, you

17 know, our ideas and creativity try to be built into the

18 application, yes.

19 Q    Okay.

20 A    Yeah.

21 Q    Prior to American Home Mortgage filing Chapter 11

22 bankruptcy, did you do some work for them?

23 A    We did.  We -- as part of the Broadhollow facility, we

24 provided a -- I believe a weekly mark to market on that for

25 many years.

1  Q    Okay.

2  A    And that represented new originated product in a liquid

3  marketplace.

4  Q    Okay.  Other than this engagement for Calyon, do you

5  presently do any other work for Calyon?

6  A    No.

7  Q    MIAC?

8  A    No.

9  Q    Have you previously testified in this Court in this case

10  as an expert witness?

11  A    In this case?

12  Q    In the American Home Mortgage case.

13  A    I have, again, with Bank of America a year ago.

14  Q    Okay.  You testified on behalf of Bank of America?

15  A    Correct.

16  Q    Okay.  And what was the general subject of your testimony?

17  A    Valuation of collateral.

18  Q    Mortgage collateral?

19  A    Mortgage collateral, yes.  The Broadhollow facility.

20  Q    Okay.

21          MR. ACKERLY:  Your Honor, Calyon would offer Mr.

22  Branthover as an expert witness on the subject of mortgage

23  evaluation.

24          THE COURT:  Any objection or request for a voir dire?

25          MR. DORSEY:  No objection, Your Honor.

1                THE COURT:  All right.  The Court admits the

2    gentleman as an expert on the subject of mortgage valuation.

3    Mr. Branthover, is that correct?

4                THE WITNESS:  Branthover.

5    BY MR. ACKERLY:

6    Q    Mr. Branthover, in doing your evaluation of the Calyon

7    portfolio, what information do you look at?

8    A    We were provided with tapes of mortgage loans that

9    provided the description of the collateral in question.  What

10   kind of loan it was, what was the note rate, what was the term,

11   what was the structure, was it an arm, did it have resets, what

12   were the cap four structures.  All in necessary -- traditional

13   necessary information needed to both value the collateral, run

14   a cash flow, bucket it into various types, what have you.

15   Q    Look at -- you have a big notebook.  Look at Exhibits 3,

16   4, and 5.

17   A    And this appears to be the collateral in the paper form

18   that we received in electronic form.

19   Q    Okay.  And --

20   A    I don't have all the numbers memorized, though.

21   Q    Okay.  Looking at Exhibit -- Exhibits 3, 4, and 5, are

22   these for different time periods?

23   A    They were.

24   Q    And do you recall what time periods?

25   A    Yeah, we had done one -- was it August 1st of '07?

Branthover - Direct                              17

1  September and August 31st of '07, September 30th of '07, and

2  forward.

3  Q    Okay.  You relied on these exhibits in connection with the

4  preparation of your evaluation?

5  A    We did.  We did.  That's the basis of the valuation.

6  Q    What also do you look at in determining the market value

7  -- did you look at in determining the market value of the

8  Calyon portfolio?

9  A    Current delinquency rates and, you know, obviously that's

10 a trend that has to be addressed.  The different product

11 groupings, the geographic distribution of the portfolio, you

12 know, those are the major categories.

13 Q    Okay.  Did you look at any market data?

14 A    Of course.

15 Q    Okay.  In connection with your valuation, did you make any

16 assumptions as to the condition of the portfolio?

17 A    Every mortgage valuation requires you to make some

18 assumptions.  So, yes, we did.  We made assumptions about --

19 not so much the collateral characteristics, but how this

20 collateral would perform going forward particularly.  With the

21 tapes, we see that there has been a decrease in credit quality,

22 so we have to assume some assumptions about how that's going to

23 fold -- you know, unfold in the future.  And we made modest

24 assumptions about delinquencies continuing to grow into the

25 future.

1  Q    Okay.  In the small black notebook that you were looking

2  at in your resumé,, would you look at Exhibit 6 in that

3  notebook?  This is Plaintiff's Exhibit 6.

4  A    I'm there.

5  Q    And what is this?

6  A    This is my expert report.

7  Q    Okay.  And did you prepare this report?

8  A    I did.

9  Q    All right.  And did you prepare this report based upon the

10 method that you have just described for purposes of determining

11 market value of the portfolio?

12 A    I did.

13 Q    Okay.  Now, if you will turn to Page 9 of the report.

14 A    Tab 9, uh-huh.  Tab 9 or Exhibit 9?

15 Q    No, Page 9 of Exhibit 6.

16 A    Oh, sorry about that.  I'm there.

17 Q    Okay.  And this is headed at the top "Conclusions and

18 reasons for conclusions?"

19 A    Correct.

20 Q    Okay.  And the first date is August 1st, 2007?

21 A    Correct.

22 Q    Is this the first date that you were asked too do a

23 valuation?

24 It is.

25 Q    Okay.  And would you explain to the Court how you arrived

1  at this valuation and what it is?

2  A    Sure.  We had taken the collateral, we had run it a couple

3  different ways to come up with what we expected to be

4  potentially future cash flows to come up to -- to subscribe a

5  value.  But, you know, the mortgage world is no so clear cut

6  that you can just take a portfolio and sell it immediately.

7  There are lots of issues that need to be -- we have to have our

8  ducks in a row to sell a pool of loans in a whole loan market.

9  And we've listed six of them here that were, you know, having

10 serious deficiencies with this pool.  Also the market at that

11 time was coming unglued and the market was demanding more and

12 more information, and as credit problems were starting to

13 unfold.  So, the fact that, you know, you have the title who

14 owned the loans in question, the MERS identification, the

15 proceeds of the loans being unknown, incomplete document, no

16 reps and warranties, and generally a poor market.  You know,

17 and for the size of this portfolio, it would have been a very

18 difficult transaction to have concluded at that time.

19 Q    Okay.  And what was your conclusion as to the market value

20 of this portfolio as of August 1st, 2007?

21 A    Per my opinion, I found the value to be extremely low, it

22 would be almost very difficult to sell, if at all, and ascribed

23 a value of about 10 cents on the dollar.

24 Q    And why would it be difficult to sell, if at all?

25         THE COURT:  When you say 10 cents on the dollar, do

Branthover - Direct                                    20

1  you mean 10 percent of unpaid principal balance?

2            THE WITNESS:  Correct, yes.

3  A    Well, when you buy something, you want to know who's going

4  to receive the cash flows.  It was uncertain who actually owned

5  the collateral.  If you could actually -- if it was actually

6  legally sellable.  You know, the last time I bought a car, the

7  guy had a title for me.  Without a title, I'm not really sure I

8  want to own it.

9  Q    Just as a bit of background, what is the size of this

10 portfolio in terms of the number of mortgages approximately?

11 A    A little less than 6,000.

12 Q    Okay.  Have you ever, in your experience in the mortgage

13 business, seen a sale of a portfolio of mortgages take place

14 where the ownership of the mortgages was in dispute?

15 A    No, I have not personally.

16 Q    Okay.  Are you aware of any?

17 A    I am not, no.

18 Q    Have you ever seen a sale of a portfolio of mortgages take

19 place where the ownership of servicing was in dispute?

20 A    No.

21 Q    Have you ever seen a sale of a portfolio of mortgages take

22 place where the ownership of the proceeds of the mortgages was

23 in dispute?

24 A    No.

25 Q    Have you ever seen a sale of a portfolio of mortgages take

1  place where the owner listed MERS was not the person doing the

2  selling?

3  A    No.

4  Q    Okay.  In a typical sale of a mortgage portfolio, does the

5  seller make certain representations and warranties with respect

6  to the mortgage portfolio?

7  A    In the whole loan market for seasoned product, it is

8  typical for them to provide them, but not -- it doesn't happen

9  all the time.

10 Q    Okay.

11 A    But if they don't, they tended also to be ongoing

12 concerns, you know.  So, not getting reps and warranties from a

13 company that's rumored to be going into bankruptcy would be --

14 I think not the wisest move.

15 Q    Okay.  You were in the courtroom yesterday when Mr.

16 VanEssche testified that Calyon could not give reps and

17 warranties with respect to this mortgage portfolio on August

18 1st, do you remember hearing that testimony?

19 A    I did.

20 Q    And how would that affect the ability of Calyon to sell

21 the mortgages on August 1st?

22 A    Again, if you provide reps and warranties, you're on the

23 hook for any loans that get pushed back to you in case they

24 find out that there isn't a note, or there is documentation

25 issues, or there's fraud.  That's a huge exposure to take on.

Branthover - Direct                                     22

1   A    Okay.

2   Q    And I can see why most people would not -- would avoid

3   doing so.

4   A    Is the financial viability of the originator of the

5   mortgages important at all in connection with the sale of the

6   mortgages in the secondary market?

7   A    I believe it is.

8   Q    And why?

9   A    Obviously if an institution is winding down or going into

10  bankruptcy, the ability to keep track of documents that are

11  required to actually close the trade is going to become very

12  difficult, among other things.  Obviously if there's a problem,

13  and if you have no reps and warranties, and you are now

14  assuming all those reps and warranties, you have no recourse --

15  potentially no recourse back to them.

16  Q    Okay.  Mr. Branthover, are taking into consideration the

17  facts and circumstances that are listed in Paragraphs 1 through

18  6 on Page 9 of your opinion that existed with respect to the

19  Calyon portfolio, could Calyon have sold the mortgage portfolio

20  on August 1st, 2007 for a reasonable price?

21  A    I don't believe so, no.

22  Q    Okay.  Now, if you'll -- if, staying in your opinion, but

23  turning to Page 13, okay, focusing on the first full paragraph

24  where it begins "Trade Date, September 30th, 2007."

25  A    Um-hum.

1  Q    And was this the second date that you were asked to

2  provide a valuation, market evaluation?

3  A    Correct.

4  Q    Okay.  And did you prepare this valuation the same way you

5  prepared the valuation with respect to August 1st?

6  A    We did.

7  Q    Okay.  And the assumptions that you made with respect to

8  the facts and circumstances of the portfolio, are they set

9  forth in Paragraphs 1 through 5 on Page 13?

10 A    They are.

11 Q    Okay.  And what is -- what is your opinion value of this

12 mortgage portfolio as of September 30th, 2007?

13 A    Again, I think it will be a very difficult transaction to

14 take place.  And having another month -- another month had

15 passed, the delinquencies had increased by another two percent.

16 So, clearly there were some very alarming trends that were

17 starting to unfold in this portfolio, and my value, again, was

18 similar to the previous evaluation that 10 cents on the dollar.

19 Q    Did -- in connection with this valuation of September

20 30th, 2007, did you have a loan tape for September 30th, 2007?

21 A    I believe so.

22 Q    Okay.  Go back --

23 A    Well, I know we received -- actually I think we only

24 received three of the tapes out of the four.  So, I believe we

25 might have used this one twice.

1 Q     Okay.

2 A     I can't recall exactly which one we did.

3 Q     Okay.  Can you look at Exhibit 3 -- 3, 4, and 5 and

4 determine if you had a tape for September 30th?

5 A     I don't -- you know, unfortunately, they don't have the

6 actual date of the collateral on this printout, it was in the

7 file name.  So, there was three Excel files that were provided,

8 AHM, you know, 7/30/01, AH-1 9/30, you know -- or -- '07.  So,

9 I don't think -- I don't believe within this file there is an

10 identifier that says these are all from this particular date.

11 Q     If you did not have a loan tape for September 30th, but

12 relied on a loan tape for July 27th, 2007, how would that have

13 affected your value on September 30th?

14 A     Probably would have made my value a little high because --

15 Q     Why is that?

16 A     Because of what we found out -- you know, we found out

17 that the delinquencies continued to increase over that time

18 frame.

19 Q     Okay.

20 A     So, more loans were non-accrual.

21 Q     Okay.  Mr. Branthover, we're taking into consideration the

22 facts and circumstances that existed with respect to the Calyon

23 portfolio on September 30th.  Could Calyon have sold its

24 portfolio on September 30th, 2007 for a reasonable price?

25 A     I don't believe so.

1  Q    Okay.  If you would turn in your report to Page 16?

2  Focusing on the paragraph that begins "Trade Date, January

3  30th, 2008."

4  A    Um-hum.

5  Q    Are you with me?

6  A    I am.

7  Q    Okay.  Was January 30th, 2008 the third date that you were

8  asked to value this mortgage portfolio?

9  A    I was.

10  Q    Okay.  And had anything changed with respect to the

11  portfolio as of January 30th, 2008?

12  A    Absolutely.  Some of the legal issues had started to be

13  corrected.  So, we actually -- as we identify in Section 1, the

14  title situation had improved where a large chunk of the files

15  had been forwarded to Calyon, but not all of them.  And there

16  were still lots of discrepancies and issues associated with

17  those files.

18  Q    Okay.  In getting your valuation to the exceptions that

19  you're referring to, the issues are identified in Paragraphs 1

20  through 4 on Page 16?

21  A    Absolutely.

22  Q    And 5 on Page 17?

23  A    Correct.

24  Q    Okay.

25  A    Still no reps and warranties.  The servicing issue was

1  still in dispute.  Some information had been flowing, but it

2  appears still to be pretty insufficient.

3  Q    What did you determine to be the market value for the

4  Calyon mortgage portfolio on January 30th, 2008?

5  A    Approximately 30 cents on the dollar.

6  Q    Okay.  And the $338 million number that you referenced,

7  that's 30 percent of the outstanding -- of the amount due on

8  the --

9  A    That would be unpaid principal balance.

10 Q    Unpaid -- okay.  Could you turn to Page 17?

11 A    Um-hum.

12 Q    The first full paragraph, are you with me there?

13 A    Um-hum.

14 Q    What were you doing in this paragraph with respect to

15 value?

16 A    We were trying to ascertain if we lived in a perfect

17 world, and we had all the collateral, that we had -- we knew

18 everything about these loans, and all of them were accruing,

19 and paying on time, and all the documentation was in place, we

20 felt the value was approximately 78 cents on the dollar.

21 Q    Okay.

22 A    But unfortunately, we don't live in that world.

23 Q    Okay.  And did the 78 cents on the dollar assume that you

24 could be making reps and warranties?

25 A    Absolutely.

1  Q    Okay.  And what is the discount, if you know, if you do

2  not make reps and warranties?

3  A    You know, again, with mortgages, it's very difficult to

4  make assumptions about particular -- typical items like that

5  because of the collateral make up.  I would say it runs between

6  five to 10, maybe a little more than 10 points.

7  Q    Okay.  10 points or 10 percent?

8  A    10 percent.

9  Q    10 percent?

10  A    Yes, same thing.

11  Q    All right.  Taking into consideration the facts and

12  circumstances that existed with respect to the Calyon portfolio

13  on January 30th, 2008, could Calyon have sold the portfolio on

14  that day for a reasonable price?

15  A    I don't believe so.

16  Q    Okay.  Turn to Page 19 of your report.

17  A    Um-hum.

18  Q    And I'm focusing at the bottom of the page on the trade

19  date August 15th, 2008.

20  A    Um-hum.

21  Q    Okay.  Is this the last date that you were asked to give a

22  valuation?

23  A    Yes.

24  Q    All right.  And what was the condition of the portfolio on

25  August 15th, 2008?

1  A    Well, the delinquencies continued to move up, and I think

2  there were approximately nine and a half percent.  So, the

3  credit quality of the portfolio was continuing to deteriorate

4  at an alarming date.  The title and servicing issues had been

5  rectified, I think, in a reasonable fashion.  Calyon was now

6  receiving cash flows from the mortgages, and had the ability to

7  -- or at least felt comfortable enough to make reps and

8  warranties for the potential sale of that collateral.

9  Q    Okay.  Now, in the -- in the small black notebook that's

10 identified -- well, you're in it right now.  Turn to Exhibit 9,

11 Tab 9.

12 A    I'm there.

13 Q    It's entitled, "Pricing Summary by Lien and Program?"

14 A    Correct.

15 Q    And what -- what is this?

16 A    This is a report generated by MIAC analytics that takes

17 all the collateral that was provided to us for the August 15,

18 '08 valuation, groups them by loan program and lien type.  And

19 comes up with a value.

20 Q    Okay.  And looking at Page 3 on the value, under the

21 column on the right, "Market Price."

22 A    Um-hum.

23 Q    And then the grand total is 40 -- 46.9549?

24 A    Correct.

25 Q    Okay.  And looking at your expert report on Page 19, is

Branthover - Direct                                    29

1  the number on Exhibit 9 consistent with the number that you

2  have given on Page 19 of your report?

3  A    No, there's a typo in my report.  It should read 46.95,

4  not 44.14.

5  Q    Okay.  And have you made a correction to that?

6  A    I am.

7  Q    Okay.

8  A    Generally people don't complain about prices going up.

9            MR. ACKERLY:  Your Honor, if I may approach the

10 witness?

11           THE COURT:  Yes.

12 BY MR. ACKERLY:

13 Q    I've handed you a one-page document.  Is that in your

14 handwriting?

15 A    It is.

16 Q    And did you prepare that to make a correction?

17 A    I did.

18 Q    Okay.  So, based on that correction, what is your opinion

19 of the value -- the market value of the Calyon portfolio on

20 August 15th, 2008?

21 A    Well, 46.9549, which has a market value, not including the

22 mortgage servicing asset, of $510,862,841.14.

23 Q    Slow down on that just a minute.

24 A    510,862,841.14.

25 Q    Okay.  That number assumes it's being sold without

Branthover - Direct                                30

1  servicing?

2  A     Without the servicing, that's correct.

3  Q     If it's being sold with servicing?

4  A     We -- given the credit -- the product distribution, the

5  geographic distribution, and all the issues that can affect the

6  value of the MSR, we value the MSR at 47 basis points, for all

7  in price of 47.42, and a dollar price of 515,923,065.04.

8            MR. ACKERLY:  Your Honor, I would ask that Mr.

9  Branthover's report, which is Exhibit 6, his resumé, which is

10 Exhibit 7, and this handwritten supplement to his report be

11 introduced as exhibits for Calyon.  And I would suggest, Your

12 Honor, we could mark the handwritten correction as 6A, if

13 that's all right.

14           THE COURT:  Any objection?

15           MR. DORSEY:  No objection, Your Honor.

16           THE COURT:  All right.  Exhibit 6, and 7, and 6A are

17 admitted without objection.

18           MR. ACKERLY:  Thank you.

19           THE COURT:  May I have a copy of 6A, please?

20              (The Court conferring off the clerk)

21           THE COURT:  Does the witness have a copy?  Just leave

22 it there, that's fine.  The witness's copies will be the

23 Court's copies.

24           Give me just a moment, Mr. Ackerly, please.

25           MR. ACKERLY:  What's that?

Branthover - Direct                              31

1    THE COURT:  Just give me a moment, please.

2                        (Pause)

3    THE COURT:  Okay.

4  BY MR. ACKERLY:

5  Q    Mr. Branthover, focusing on the August 15th, 2008 value,

6  taking into consideration the facts and circumstances that

7  existed on August 15th, 2008 with respect to the Calyon

8  portfolio, could the Calyon portfolio have been sold on that

9  date for a reasonable price?

10 A    "Reasonable" is not for me to decide.  But I think it

11 could have been sold, yes.

12 Q    And is that the price that you've identified as the price

13 based on selling it with the servicing?

14 A    Correct.

15 Q    Okay.  If you would go back in the same book and look at

16 Exhibit 8, 9, and 10, I think we've previously identified 8.

17 A    Um-hum.

18 Q    Okay.  Now, Exhibit 8 is the backup of the valuation on

19 what date?

20 A    Exhibit 8's as of 1/31/08.

21 Q    1/31/2008?

22 A    Correct.

23 Q    Okay.  And Exhibit 9?

24 A    8/15/2008.

25 Q    And Exhibit 10?

1  A    10 is as of 8/15/2008, and those represents loans that had

2  some collateral information that was deficient that allowed our

3  system not to value them.

4  Q    Explain in a little more detail what Exhibit 10 is

5  contains.

6  A    Basically some loans will get kicked.  And in this case,

7  it was about $65 million of loans due to some data deficiency.

8  But in the scheme of things, 65 million out of the pool doesn't

9  have a material impact on the all in value.

10 Q    Going back to your expert report, which is on Exhibit 6,

11 Tab 6, and on Page 17, the top paragraph of that page which you

12 previously testified to with respect to the 78.09 percent

13 value.

14 A    Yes.

15 Q    My question to you is that given the facts and

16 circumstances that existed with the portfolio on January 30th,

17 could that portfolio have been sold for 78.09 percent of value?

18 A    I don't believe so.

19 Q    Mr. Branthover, you previously testified today about the

20 discounted cash flow method for valuing a mortgage loan

21 portfolio, and my question to you is would a discounted cash

22 flow model alone tell you what you could sell the mortgage for

23 on the dates in question here?

24      MR. DORSEY:  Objection, Your Honor.  This is outside

25 the scope of the expert's report.  He testified at the

1  beginning of his testimony that he was retained to give a

2  market value of the collateral for what the collateral could be

3  sold on a specific date.  Nothing to do with discounted cash

4  flow, Your Honor.

5         MR. ACKERLY:  Your Honor, the debtor is taking the

6  position that market value is irrelevant to the Court's

7  determination under Section 562.  If the Court finds that our

8  view of Section 562 is correct and that the market value is

9  relevant, then I'm sure that the debtors will argue that the

10  discounted cash flow still supports their position.  So, I

11  think this witness is certainly capable of addressing testimony

12  that he heard yesterday from their expert who was testifying as

13  to the value of the collateral.

14         MR. DORSEY:  Absolutely not, Your Honor.  We had a

15  stipulated order on how the -- for the pretrial of this case,

16  how the scheduling of this case was going to go.  They had the

17  opportunity after Dr. Clayton produced his report on a

18  discounted cash flow value to identify another witness or

19  identify this witness who is going to provide rebuttal expert

20  testimony under that scheduling order on Dr. Clayton's report.

21  They didn't do so.

22         Now that we're at trial, they want to sandbag me and

23  say, well, we're going to have him testify about something that

24  you didn't have the opportunity to even question him about or

25  get a report about, or have any information about this witness

1 on.  Absolutely, fundamentally prejudicial to the debtors, Your

2 Honor.

3        MR. ACKERLY:  Your Honor, I think that's a way too

4 emotional and irrational response.  This witness is clearly

5 qualified to testify as to value and what impacts value.  And

6 the question I am asking him about is whether a discounted cash

7 flow alone will show you what the market value will -- I don't

8 think I mentioned Professor Clayton at all in my question.

9 It's not directed at that.  This witness has just been

10 qualified as an expert on value.  He's testified previously

11 that discounted cash flow is one of the things that you take

12 into consideration when you're determine a market value.

13        My only question to him is if you -- is it the only

14 thing you take in?  Would -- would it tell you what the market

15 value is?

16        THE COURT:  Mr. Dorsey?

17        MR. DORSEY:  This is obviously directed at Dr.

18 Clayton, Your Honor.  And they had the opportunity to identify

19 this witness as a rebuttal expert when Dr. Clayton produced his

20 report.  They chose not to do so.  They're resting their case

21 on the idea that 562 only allows for a commercially reasonable

22 determinant of value to be what the loans could be sold for on

23 a specific date, not any other kind of valuation.  They're

24 stuck with that.  That's what they chose.  That's a path they

25 went down.  They haven't identified this witness as an expert

1  in this particular area, and they should not be allowed to

2  introduce that evidence.

3          THE COURT:  All right.  I agree.  Objection

4  sustained.  You can talk about his report.

5  BY MR. ACKERLY:

6  Q    Mr. Branthover, between August 1st, 2007 and August 15th,

7  2008, has any portfolio the size of Calyon's portfolio traded

8  in the marketplace?

9  A    In its entirety?

10 Q    Yes.

11 A    I believe so.

12 Q    How many?

13 A    Hard to say.  The market right now is very difficult.

14 Generally we're seeing any pools that are coming to the market

15 with, say, a billion dollars are not -- the whole pool isn't

16 trading.  The push back and the fade on these is dramatic.  So,

17 you're seeing maybe 30 to 40 percent of the collateral being --

18 actually being sold.  I have not seen a billion dollar pool

19 come up or the entire pool sold, no.  The market has --

20 obviously is looking at value in trying to ascertain which

21 loans could be cured, which loans possibly could be refinanced,

22 which loans have, you know, financial opportunities to move the

23 borrower into a more viable product that will keep them

24 accruing.  A lot of loans do not.  And, therefore, people are

25 -- really don't have any use in owning those.

1          MR. ACKERLY:  I think that's it, Your Honor.  Your

2   Honor, I just want to confirm that Exhibits 6, 6A, 7, 8, 9, and

3   10 are admitted.

4          THE COURT:  I don't think we've -- 8, 9, and 10 are

5   not in evidence.

6   BY MR. ACKERLY:

7   Q    Mr. Branthover, you have a black notebook in front of you

8   that's identified on the cover, "Debtors' Exhibits."

9   A    I do.

10  Q    Okay.  Would you look at Exhibits 26 and 27?

11  A    I have done so.

12  Q    And what are these?

13  A    These are our first cut.  Basically when we get the

14  collateral in, we'll run it through.  And we were asked to do a

15  valuation from a historical perspective.  So, we went back in

16  time and resurrected pricing that existed in the marketplace at

17  that time that we believed to have been somewhat accurate, and

18  we valued this collateral.  I would call this a rough cut of

19  the valuation.

20  Q    Okay.

21  A    That, again, factors in that everything's perfect.  That

22  all the loans are accruing.  That all the documentation's in

23  place.  That these loans could be sold into the secondary

24  market and in an active market.  None of those really seem to

25  hold true in this instance.

1  Q    Looking at Page 2 of Exhibit 26, your market price is

2  98.5379.

3  A    I think it's on -- 26?  I think it's -- my eyes are going,

4  it's pretty small.  I think it's 99.5379?

5  Q    Yup.

6  A    Yeah.

7  Q    Okay.  And does that valuation take into consideration the

8  issues that you've identified in your report with respect to

9  the portfolio?

10 A    No.  It represents a blind valuation, making assumptions

11 about the fact that all the loans are performing, that all the

12 documentation is in place.

13 Q    Okay.

14 A    That everything was done to the letter.

15 Q    Okay.

16 A    And, frankly -- excuse me -- you know, it -- I don't put a

17 whole lot of substance into this value.

18 Q    Okay.

19 A    I had -- you know, we had done valuations for American

20 Home about the same time on the Broadhollow facility, and the

21 only time we had any conversations about our values was about

22 this same time where they thought our values were high.  So, I

23 spoke with Bob Johnson about that in great detail on more than

24 one occasion, about collateral that was significantly of higher

25 quality than this particular pool.  So --

Branthover - Direct                                    38

1  Q    What -- excuse me.

2  A    Go ahead.

3  Q    Let's look at Exhibit 27.  The second page of that

4  exhibit, the market price.

5  A    Correct.

6  Q    Is it your testimony with respect to the market price on

7  Exhibit 27 the same as 26?

8  A    It is.  The same methodology's employed.  One month time

9  difference, not much should really change much.

10  Q    And it does not represent the market price to be obtained

11  for the portfolio?

12  A    It does not.

13              (Attorneys conferring off the record)

14              MR. ACKERLY:  Your Honor, my colleagues tell me that

15  Exhibits 8, 9, and 10 that Mr. Branthover identified are not

16  in.  So, we'd ask that they be admitted, to.

17              THE COURT:  Your colleagues are correct.  Any

18  objection to the admission of 8, 9, and 10?

19              MR. DORSEY:  No objection, Your Honor.

20              THE COURT:  They're admitted without objection.

21              MR. ACKERLY:  That concludes my direct examination.

22              THE COURT:  All right.  Thank you.  Cross?

23              MR. DORSEY:  May I have five minutes, Your Honor,

24  before we start cross?

25              THE COURT:  Yes, you may.  We'll take a recess.  Mr.

1  Dorsey, let us know when you're ready to proceed.

2          Mr. Branthover, you're under cross examination.  You

3  may not discuss the substance of your testimony during the

4  break.  You're free to walk around.  It's up to you.

5          THE WITNESS:  I'll just hang.

6              (Recess 9:58 A.M./Reconvene 10:15 A.M.)

7          THE COURT:  Mr. Dorsey?

8          MR. DORSEY:  Thank you, Your Honor.  For the record,

9  John Dorsey, Young Conaway, on behalf of the debtors.

10                     CROSS EXAMINATION

11  BY MR. DORSEY:

12  Q   Mr. Branthover, you testified just now that you have

13  previously testified in this Court about the valuation of the

14  Broadhollow facility, do you recall that?

15  A   Correct.

16  Q   That's not true, is it, sir?

17  A   I was employed by Kaye Scholer to provide an opinion on

18  the collateral in question.  Actually market value never came

19  to light.

20  Q   Wasn't it a fact that you were asked to provide testimony

21  regarding the trends -- the current and future trends in the

22  residential loan market as it related to the Bank of America

23  scratch and dent facility?

24  A   And if that doesn't impact value, I'm not sure what does.

25  Q   It had nothing to do with the Broadhollow facility, did

1 it, sir?

2 A    I'm sorry?

3 Q    It had nothing to do with the Broadhollow facility, did

4 it, sir?

5 A    Um, okay.

6 Q    And it had nothing to do with the value of the loans on a

7 given day, did it, sir?

8 A    I -- I'll take your word for it.

9 Q    You testified that your September 30 valuation takes into

10 account the fact that there were increasing delinquency rates

11 by that date, do you recall that?

12 A    I do.

13 Q    Can you open to your report and read to the Court where it

14 says that in your report?

15 A    I did not include it.

16 Q    Um --

17 A    It was provided in the professional -- in your

18 professional witness, and we ran with those same numbers and we

19 verified --

20 Q    But it's not in your report, is that right, sir --

21 A    Correct.

22 Q    -- as one of the factors that was impacting the price on

23 September 30, 2007?

24 A    It impacted the value, absolutely.

25 Q    Now, my question is, it's not in your report, is it, sir?

Branthover - Cross                          41

1  A    It is not.

2  Q    And you testified regarding the value on August 1st, 2007

3  would be somewhere around 10 cents on the dollar given the

4  issues relating to the title of the loans, the MERS

5  identification issue, proceeds of whole loans not accruing to

6  Calyon, incomplete documentation, Calyon's inability to give

7  representations and warranties regarding the loan, and the poor

8  market for the mortgage assets, correct?

9  A    Correct.

10 Q    And if you take out the first five of those and just look

11 at the poor market for the mortgage assets, it's your opinion

12 that the loans could have sold on August 1st, 2007, still at a

13 substantial discount, somewhere around 50 points, correct?

14 A    At a substantial discount.  Where did you get 50 points?

15 Q    Did you not testify to that in your deposition, sir?

16                         (Pause)

17         THE COURT:  There's a question pending.

18 A    I believe so.

19 Q    And you indicated that it was -- 50 cents would be your

20 guess -- your opinion about what the value would be on August

21 1st, assuming the other factors were not an issue?

22 A    Correct.

23 Q    And you also testified that by September 30th, assuming

24 the other five factors were not an issue and it was only the

25 market condition, that the loans would have sold at a 10 to 20

1  point discount only for the agency eligible loans, do you

2  recall that?

3  A     For the agency eligible.

4  Q     Yes.

5  A     Which represents a very, very small portion of this

6  portfolio.

7  Q     Correct, that's my --

8  A     (Indiscernible - multiple speakers).

9  Q     (Indiscernible - multiple speakers).

10  A     Correct.

11  Q     Now, when you were testifying just a moment ago, you made

12  reference to Exhibit 9 of the Calyon exhibits, which is the --

13  excuse me.  Which one of the exhibits is --

14  A     9?

15  Q     August 15th, 2008 valuation, do you recall that, as of the

16  pricing summary for those loans.

17  A     Correct.

18  Q     And you indicated that at the end of this valuation, the

19  value of the loans was 46.9549 on a blended basis --

20  A     Um-hum.

21  Q     -- correct?

22  A     Correct.

23  Q     And this report is an accurate representation of what the

24  value of the loans were on August 15th, 2008.

25  A     In my opinion, correct.

1  Q    And I assume that you ran the other three dates through

2  the same computer software system that you testified about,

3  didn't you?

4  A    Correct.

5  Q    But the other three reports you've testified are not valid

6  because even though the pricings on those came up much higher,

7  you think they would have sold much lower, correct?  Isn't that

8  what you testified to?

9  A    Well --

10          MR. ACKERLY:  That's not his testimony, Your Honor.

11  A    Well, there's -- there's lots of issues.

12          THE COURT:  Wait a minute.  Hang on.  There's a

13  pending -- what's your objection?

14          MR. ACKERLY:  My -- he's mischaracterizing the

15  witness's testimony.  He didn't testify --

16          THE COURT:  All right.  Mr. Dorsey --

17          MR. DORSEY:  I believe he did testify, Your Honor,

18  but we'll clarify this a little bit.

19  BY MR. DORSEY:

20  Q    You testified regarding the August 1st, 2007 date which

21  came up with a value on a blended rate of 99 plus, correct?

22  A    I -- correct.

23  Q    And you testified that it would not have sold on that date

24  for that amount, correct?

25  A    Not even close.

1 Q    And you testified just now that even assuming the other

2 five factors were not at issue, it wouldn't have sold for more

3 than 50 cents on August 1st, 2007, correct?

4 A    Correct.

5 Q    So, your software program is wrong on August 1st, 2007,

6 but it's correct on August 15th, 2008, right?

7 A    The fun part about doing these exercising is the

8 questioning -- when you value mortgage product, if you're going

9 to assume one methodology to value a product, you're going to

10 come up wrong every time.

11        On Page 6 in my testimony, I talk about a discounted

12 cash flow methodology, how we employ that.  We --

13        MR. DORSEY:  Objection, Your Honor.  He's trying to

14 get in evidence about discounted cash flow with --

15        MR. ACKERLY:  Your Honor, he asked the question.

16        THE COURT:  He can --

17        THE WITNESS:  I'm answering your question.

18        MR. DORSEY:  I didn't ask him about discounted cash

19 flow, Your Honor.  I asked him about the report.

20        THE COURT:  Okay.  He's talking about his report.

21 He's referencing his report.  I said earlier he can testify as

22 to what's in his report.  So, continue your answer.

23        Objection overruled.

24 A    If we could turn to Page 6, about halfway down, "The

25 market value portfolio of mortgages generally based on the

1  expected cash flows that will be received over time versus the

2  current market for similar credit quality, and expect a

3  maturity of similar mortgage assets currently available in the

4  marketplace.  The expected cash flows need to take into

5  consideration the potential for repayments, delinquency, and

6  foreclosure, which will all affect the market value of the

7  portfolio, irrespective of what interest rates do over this

8  time frame."

9  Q    So, we can deny or live in a world where a discounted cash

10  flow is always going to give you a par price, but that's not

11  how the market operates.  Every trade we've been involved with

12  we'll calculate with a discount cash flow, the methodology that

13  was used to come up with that trade price.  So, that gives the

14  discount rates from five single digits to up to 40 or 60

15  percent.  So, you can talk about how a discounted cash flow

16  will only give you a high price, but it doesn't really work

17  that way.

18        MR. DORSEY:  Objection; move to strike, Your Honor.

19  Completely nonresponsive to my question.

20        My question to the witness, Your Honor, was whether

21  the same program that he ran for the August 15th, 2008 number

22  was the same program he used for August 1st, '07.  But on

23  August 15th, it's correct, and on August 1st, '07, it's

24  incorrect, that was my question, Your Honor.  It had nothing to

25  do with cash flow analysis.

1            THE COURT:  Mr. Ackerly?

2            MR. ACKERLY:  Your Honor, Mr. Dorsey questioned --

3  challenged the witness's evaluations on August 15th, 2008

4  versus his valuation on August 1st, 2007, suggesting that the

5  program was wrong and the witness is trying to explain why the

6  program is not wrong.  He opened the door as to a full and

7  complete, and this witness is entitled to give a full and

8  complete explanation of why his valuations are correct.  And

9  that's all he's doing.

10           THE COURT:  All right.  Well, let me put it this way,

11 I'll overrule the objection.  But I can tell you as sitting

12 here as the finder of fact, what that answer had to do with the

13 question went over my head.  I made no connection whatsoever.

14           So, I'll allow the answer to stay in but, in effect,

15 it has no weight because I didn't understand it.

16           MR. DORSEY:  Well, I think I have what I need, Your

17 Honor.  I have no further questions.

18           THE COURT:  All right.  Redirect.

19           MR. ACKERLY:  Just a minute, please.

20                         (Pause)

21                   REDIRECT EXAMINATION

22 BY MR. ACKERLY:

23 Q   Mr. Branthover, Mr. Dorsey in his cross examination

24 suggested that there was something wrong with the program that

25 you used for coming up with your valuations of the portfolio,

1  do you recall that?  Would you explain why there's nothing

2  wrong with your program?

3  A    First off, our models have been validated by nine of the

4  10 largest mortgage companies and third parties to value

5  collateral.  It's not about the software, it's about the

6  assumptions that are used to come up with those assumptions,

7  those values.  But those assumptions have never been discussed

8  here in this courtroom.

9         So, we use different assumptions to come up with

10  different -- changing the assumptions will give you different

11  values.

12  Q    Okay.  Were the assumptions that you used for August 1st,

13  2007 different from the assumptions you used for August 15th,

14  2008?

15  A    They were.

16  Q    And why were they different?

17  A    The initial valuations were simply to go back and look at

18  what was available at the time frame.  I don't think -- by no

19  means are we subscribing that that's where that pool would have

20  sold.  I think they're making way too much out of that.

21  Taking too much out of that, those two valuations.

22         MR. ACKERLY:  All right.  No further questions, Your

23  Honor.

24         THE COURT:  You can step down.  Thank you.

25         Any further evidence, Mr. Ackerly?

1          MR. ACKERLY:  We have no further evidence in response

2     to the objection.

3          THE COURT:  All right.  Thank you.  Any rebuttal

4     evidence?

5          MR. DORSEY:  May I have one moment?

6          THE COURT:  Um-hum.

7          MR. HARBOUR:  A housekeeping matter, Your Honor.

8     Yesterday we talked about Mr. VanEssche's deposition

9     designation and highlighting it for Your Honor.  That's been

10    done.  And also the objection and counter designations --

11    you've ruled on the objections, but the counter designations

12    are identified, as well, in here, if I could hand those up so

13    you have those.

14         THE COURT:  Yes, please.  Thank you.  Should we go

15    through this now or --

16         MR. DORSEY:  We have no objections to the

17    designations -- the counter designations, Your Honor.

18         MR. CROWTHER:  With counsel's representation that he

19    accurately highlighted the provisions that were designated by

20    Calyon, there's no objection to any of the counter

21    designations.

22         MR. HARBOUR:  That's correct, Your Honor.

23         THE COURT:  All right.  So, there's no objection to

24    the counter designations.

25         MR. CROWTHER:  Right.

1          THE COURT:  Okay.  And I've already dealt with the

2     objections to the designations.

3          MR. HARBOUR:  You've dealt with the objections.  I

4     just gave you that so you'd have a list of them in case you

5     wanted a list.

6          THE COURT:  Thank you.  I appreciate that.  So,

7     everything's highlighted in here.

8          MR. HARBOUR:  Yes, Your Honor.

9          THE COURT:  All right.  I'm sorry.  Mr. Dorsey?

10          MR. DORSEY:  No rebuttal, Your Honor.

11          THE COURT:  All right.  That will close the

12     evidentiary record.  Do we want to hear argument?

13          MR. DORSEY:  At the beginning of this hearing, Your

14     Honor, I said that this was really a simple issue.  Section 562

15     clearly says that repo damage claims are to be measured as of

16     the date of liquidation, termination, or acceleration.  There's

17     no doubt Calyon terminated and accelerated the repo on August

18     1st, 2007.

19          Dr. Clayton testified that on August 1st, 2007, on a

20     discounted cash flow basis, the loans were worth $1,148,000,000

21     approximately, not including the cash that Calyon had swept

22     from the debtors' accounts prior to bankruptcy.

23          Dr. Clayton testified that a DCF analysis is always

24     an appropriate way to value an income producing asset, which

25     makes sense.  This Court does it every day.

1        Dr. Clayton also testified that under normal

2  circumstances, the DCF of mortgage loans will closely track the

3  market value of those loans.  The reason is simple: Because

4  that's how people who trade in the market value the loans

5  themselves.  And unless something has gone terribly wrong,

6  which everyone agrees that something has gone wrong with the

7  market.

8        Both Mr. VanEssche -- excuse me.  Mr. VanEssche also

9  testified that DCF, discounted cash flow, was one way to value

10 the loans.  And he even confirmed that Fair Accounting Standard

11 114 provides for a DCF methodology for banks to value their

12 assets.

13       He also confirmed that their external auditors agreed

14 that DCF was an appropriate way to value the loans.

15 Reluctantly, but he did because he had to.

16       Yet Calyon never did a DCF analysis.  Now, the stated

17 reason they didn't do a DCF analysis is because they didn't

18 want to do a ground up analysis.  It took too much time.  Too

19 time consuming.  But Dr. Clayton had no problem in doing a DCF

20 analysis, and doing it from the ground up.  In fact, doing a

21 DCF of every single loan in the portfolio, taking into account

22 all of the factors that related to those loans, including

23 discount rates, including rates of -- decreasing rates of

24 interest.  And he came up with a total value on a discounted

25 cash flow basis for the portfolio.

1          I think it's clear, Your Honor, that the real reason

2    Calyon has never done a discounted cash flow analysis is

3    because they were trying to maximize their claim against the

4    debtors.  So, instead, what they did because they still don't

5    to have to take a huge hit on their books, instead, Mr.

6    VanEssche testified that he used some untested basis for

7    determining the value of the loans by ascribing to some

8    unknown, securitized loan portfolios, the performance of those

9    portfolios, and overlaying it on this portfolio to come up with

10   a method of determining what their expected recovery was going

11   to be.

12          And even using that untested method, it still shows

13   that as late as February of 2009, Calyon expects to recover at

14   least 70 percent for the value of the mortgages.

15          Now, the bottom line is, Your Honor, that on August

16   1st, 2007, there was a commercially reasonable determinant of

17   value.  It's the discounted cash flow value.  Therefore, the

18   Court never has to get to Section 562(b), which is whether --

19   if there is no way to value the loans on a particular day, then

20   you have to look for the next date when it's possible to do --

21   to come up with a commercially reasonable determinant of value.

22   It doesn't matter whether Calyon could have sold the loans on

23   August 1st.  The Statute doesn't say that a damage claim is

24   determined on the date of termination or acceleration, unless

25   the repo counterparty can't sell the loans on that date.  It

52

1  says you have to determine whether there is a commercially

2  reasonable determinant of value.

3        Regardless, Your Honor, the testimony has been very

4  clear.  That Calyon never intended to sell the loans on August

5  1st, 2007, or any other date.  In fact, the only evidence we

6  have is Mr. -- to their wanting to sell the loans is Mr.

7  VanEssche yesterday testifying that they have recently engaged

8  JPM to try to sell some of the agency conforming loans at par,

9  by the way, to Freddie and Fannie Mac -- Freddie Mae and --

10 Fannie Mae and Freddie Mac.

11       And as an aside, I point out, if you look at the

12 report from Mr. Branthover, the value of those loans on August

13 15th, 2007, he ascribes a value of 64 cents to the agency

14 conforming loans, even though Calyon testified they think

15 they're going to get par for them.

16       Now, Calyon's position is that there's only one

17 commercially reasonable determinant of value, what the loans

18 would have sold for on a given day.  That argument flies in the

19 face of the plain language of the Statute, Your Honor.  The

20 entire damage theory of our judicial system that says one

21 cannot obtain a double recovery or be awarded damages when

22 there are, in fact, no damages.  And it flies in the face of

23 just simple common sense.

24       Clearly that's not what Congress intended when it

25 enacted Section 562.  First, the Statute itself refers on its

1  face to commercially reasonable determinants, plural, of value.

2  Thus Congress recognized that there were different ways to

3  value assets, not just one.

4         And, again, as Dr. Clayton testified, it's always

5  reasonable to value an income producing asset on a discounted

6  cash flow basis.  The Fair Accounting Standards, as Mr.

7  VanEssche testified, recognized that. And Calyon itself

8  recognized that with its external auditors. It's simple to show

9  why Calyon's argument is simply absurd, Your Honor.  And I

10  think a way to do this is to look at it as a -- well, let me

11  just say -- let's do it this way.  Say I'm a public company,

12  and I own a billion dollars worth of mortgage.  Forget about

13  repos, forget about 562, I just own a bunch of mortgages, a

14  billion dollars worth of mortgages.

15         On August 1st, 2007, the market collapses.  Would it

16  be commercially reasonable for me to go out in the market and

17  say I could sell my loans for 10 cents on the dollar.  I'm

18  going to go ahead and do that.  I'm going to sell them for 10

19  cents, or I'm going to sell them for 50 cents on the dollar,

20  even though I know on a discounted cash flow basis I'm going to

21  recover much more than that over time.  And if I hold them long

22  enough, not only will I recover my investment, but I'm going to

23  make a profit.

24         By definition, Your Honor, my going out and selling

25  those loans on August 1st, 2007 would be patently commercially

1   unreasonable.  No rational business would do that. Indeed, if I

2   did, I guarantee you that my stockholders would be suing me for

3   breaches of fiduciary duty.

4            And if the market never recovers, and I continue to

5   hold the loans, and reduce the underlying obligation, that's

6   fine because the loans are front loaded with interest.  So,

7   even over time, if the default rate increases on these loans,

8   I'm still going to make a profit over time.  It might take

9   five, six, seven years, but eventually I'll make a profit if I

10  hold them.

11           So, how do I, as a public company, account for the

12  value of those loans on my books and records?  Well, I apply

13  FAS 114.  It says I account for them on a discounted cash flow

14  basis.

15           And, again, it would be patently unreasonable for me

16  to say I'm going to carry them on my books at the market value

17  of 10 cents when the discounted cash flow value is 100 cents

18  par.

19           Then assume that my public company is going to be

20  purchased by somebody.  Say my colleague, Ms. Budicak, decides

21  to buy my company.  And she comes in and says, well, your

22  company is made up of just this pool of mortgage loans.

23  According to the market, they're worth 10 cents on the dollar,

24  I'll pay you 10 cents for your company.

25           And I said, well, no, discounted cash flow is worth

1   much more than that.  If I sold them to Ms. Budicak at 10 cents

2   on the dollar, I guarantee you, again, I'd be getting sued by

3   my shareholders for waste of corporate assets.

4           Clearly where the market value and the DCF values

5   have diverged where there is a disconnect in the market, it

6   would be commercially unreasonable to determine a value of

7   Calyon's portfolio on what they would sell for in the market on

8   a given day.  That's why --

9           THE COURT:  Well --

10          MR. DORSEY:  I'm sorry, Your Honor.

11          THE COURT:  Well, I was going to say that -- you're

12  making a lot of assumptions there.  And I guess I hear where

13  you're going, all other things being equal.  But your

14  hypothetical company may not have the liquidity to hang on.

15  Your hypothetical company -- there could be other advantages or

16  disadvantages associated with liquidating the collateral.  Even

17  at a temporary troth in price in the market.  And the asset --

18  the DCFs may be wrong, you may have confidence that the DCFs

19  that you're basing your argument on are correct, that it's

20  worth 100 -- say it's worth 105 percent because your DCF --

21  your discount rates are too low.

22          And that if you applied a more appropriate discount

23  rate, would actually be worth 70 cents.  And if it turns out

24  your company is -- your bank is about to fail for a lack of

25  liquidity, I don't know if that could ever happen, that you

1  would need to liquidate as many assets as possible, regardless

2  of the fact that you take a loss on the books.  I mean there

3  could be a lot of things that --

4          MR. DORSEY:  There could be, Your Honor.

5          THE COURT:  Your point being, though, if something's

6  worth a dollar and I sell it for 10, it's patently

7  unreasonable.

8          MR. DORSEY:  Absolutely, Your Honor.  And --

9          THE COURT:  For 10 cents, I mean.

10          MR. DORSEY:  And the only evidence before the Court

11  is Dr. Clayton's discounted cash flow value.  Calyon chose not

12  to challenge it.  They chose not to come in and say your

13  discount rate is incorrect.  Your assumptions were incorrect.

14  They did nothing.  They could have.  They had the opportunity

15  to identify a rebuttal expert, and they chose not to.

16          So, the only evidence in front of the Court today is

17  what those loans are worth on a discounted cash flow basis from

18  Dr. Clayton, and they are much higher than what they would have

19  sold for in the market.

20          In fact, we just heard Mr. Branthover testify, when

21  he was asked by Mr. Ackerly that on August 15th, when the loans

22  are worth 46 cents on the dollar, would it have been reasonable

23  to sell the loans on August 15th, 2008?  Mr. Branthover said,

24  well, I'm not going to say it was reasonable, but you could

25  sell them on that date.

1          Even he knew it wasn't reasonable to sell them at

2  that price because the discounted cash flow value is much

3  higher.  And that's why from the very beginning of this case,

4  in August of 2007 -- August 1st, 2007, Calyon determined that

5  they were better off holding this portfolio.  All the evidence

6  shows.

7          I think Mr. VanEssche testified from the very

8  beginning one of the considerations that they had in holding

9  this -- was to hold this portfolio because the market was in

10 disarray and they knew they were better off holding it.  That's

11 why in October of 2007, Calyon refused the debtors' offer to go

12 out and sell these mortgage loans for them.  Because they

13 didn't want to take a 20 or 30 cent haircut.  They knew they

14 were better off holding these loans over a period of time, and

15 that's the decision that they made.  They thought they would do

16 better by holding the loans.  And, indeed, Mr. VanEssche said

17 it would have been dumb for him to sell the loans in October of

18 2007.

19         That's why today, nine months after Calyon says there

20 was a commercially reasonable determinant of value on August

21 15th, 2008, they still haven't sold the loans because it would

22 have been commercially unreasonable to sell them on August 15th

23 at the 46 cents their expert says they were worth on a market

24 basis.

25         All the issues about the state of the loan files,

1  whether Calyon was receiving cash flows or how MERS listed the

2  ownership are completely irrelevant because Calyon never

3  intended to sell on August 1st, 2007 or any date thereafter.

4  The only commercially reasonably determinant of value, given

5  the market situation, which everyone agrees is unprecedented,

6  is the discounted cash flow basis.

7          As Dr. Clayton testified, usually the discounted cash

8  flow basis and the market price run pretty close to each other

9  because that's how they value them on a discounted cash flow.

10 But the -- excuse me.

11         So, what does that mean in terms of what Calyon's

12 actual advantages are?  Well, the evidence is that per the

13 stipulated facts that on August 1st, 2007, the UPB under the

14 loan portfolio was $1,143,840,204.36.

15         Dr. Clayton testified that the discounted cash flow

16 on that date was $1,148,282,523.34.

17         That means Calyon actually owes the debtors

18 $4,442,318.98 plus the $26 million they swept from our account.

19 That's the evidence in front of the Court.

20         The idea that you can -- that the only value to be

21 ascribed to these loans is what they could be sold for is

22 patently ridiculous, Your Honor, given the fact that Calyon

23 still holds them, and they still believe they're going to do

24 better rather than selling it on the market.  Their -- under

25 562, their claim is fixed as of August 1st, 2007.  They cannot

1  avoid that under the Statute.  So, what is the value on August

2  1st, 2007?  What Dr. Clayton ascribed to it.  They not only

3  don't have a damage claim, they actually owe the debtors money.

4          THE COURT:  Why don't I -- assume all that's correct.

5  Why don't I apply Mr. Branthover's August 1st number?

6          MR. DORSEY:  Because it would be patently

7  commercially unreasonable to assume that the value on August

8  1st is only 10 cents.

9          THE COURT:  His valuation is basically a fire sale

10 liquidation value?

11         MR. DORSEY:  Absolutely, Your Honor.  Which would not

12 be --

13         THE COURT:  And that would not be a commercially

14 reasonable determinant of value as of August 1st, 2007?

15         MR. DORSEY:  That's correct, Your Honor.  Nor would

16 it be on August 15th, 2008 because even he wouldn't say it was

17 reasonable to sell them on that date.

18         THE COURT:  Well, yes, but my question's earlier.

19         MR. DORSEY:  I got you.

20         THE COURT:  So, my point there being, assuming I'm

21 agreeing with you in your argument, you still have the issue of

22 I've got two pieces of evidence as of -- the value as of August

23 1, 2007.  I have Mr. -- Dr. Taylor's argument or evidence,

24 which shows it's slightly in the black.  And I have Mr.

25 Branthover's testimony at 10 cents on the dollar. And you're

1 saying to me only one of those is a reasonable determinant of

2 value as of August 1st, 2007.

3          MR. DORSEY:  That is correct, Your Honor.

4          THE COURT:  Now, if they're both reasonable, what do

5 I do?

6          MR. DORSEY:  I don't think they can be both

7 reasonable, Your Honor, given the disparity in the amounts.

8          THE COURT:  Well, but -- I mean valuation is an art

9 and a science.  I mean to say that somebody comes in with a

10 valuation at 100 cents, and somebody comes in a valuation at

11 105, and somebody comes in at 95, those are all reasonable,

12 it's a question of which one carries the burden of proof.

13 Obviously as they start to get further and further apart, you

14 sort of -- one has to be right and one has to be wrong, I

15 suppose.  Or more right than less wrong.

16          MR. DORSEY:  I think that's right, Your Honor.

17 They're so patently different.

18          Now, I should address the issues -- and if you're

19 talking about the 10 cent value.  Mr. Branthover testified that

20 his opinion would be different on August 1st of 2007 if we took

21 out all those other factors about the --

22          THE COURT:  But he didn't quantify it for that date,

23 right?

24          MR. DORSEY:  He did say -- he finally agreed with me

25 that in his deposition, he said that would be a 50 percent --

1           THE COURT:  50 percent, all right.

2           MR. DORSEY:  Now, those other factors, aside from the

3    fact that they are irrelevant to the issue because there was a

4    commercially reasonable determinant of value on August 1st,

5    2007, and Calyon never intended to sell the loans, I think

6    we've also completely discredited all of those issues regarding

7    the value of those loans.  Mr. VanEssche testified how

8    important it was that the loan files were not in order, and

9    that was going to severely affect the value of the loans. But

10   when it came time to talk to the Federal Reserve, he took a

11   completely different position.

12          He testified that -- unknown about the servicing

13   rights.  That's going to be a big issue.  We don't know how

14   that's going to affect the value of the loans.

15          When it came to talking to the Federal Reserve, not a

16   big issue.  You could resolve that by just buying them for 100

17   basis points.  No big deal.

18          He testified that we weren't getting the P&I.  But he

19   admitted on cross examination that on August 1st, they were

20   getting the P&I.  They were getting the payments, it was going

21   to Deutsche Bank.  Hadn't been -- nothing had been done yet, it

22   wasn't until after the bankruptcy filing. All of those issues,

23   Your Honor, have been completely discredited as a basis for

24   saying they couldn't have sold the loans on August 1st, 2007.

25   Even assuming that they wanted to, which they didn't.

1          THE COURT:  What about the MERS point?

2          MR. DORSEY:  MERS point.  Again, he couldn't testify

3  about -- he admitted that is -- it has to be in AHM's name

4  under the repo because that's how the repo works.  They

5  couldn't have been able to move loans off and on the line.  He

6  couldn't testify about whether there were, in fact, blank

7  assignment forms, that have -- simply executed and had MERS

8  change over the value.  And they have the burden of proof on

9  that issue, Your Honor.  They have the burden of proving that

10 they couldn't have sold them on that day, and there's no

11 evidence that they couldn't have simply transferred to MERS by

12 a simple phone call and sending over a sign assign.

13         THE COURT:  Let me -- I'm sorry, Mr. Dorsey.  If one

14 assumes that Calyon had not accelerated or terminated the

15 repurchase agreement on August 1st, and the debtor had remained

16 -- at that point, not a debtor, but -- the ultimately debtor

17 had remained the owner of those loans on August 1, would that

18 change the pricing analysis we've been discussing?  In other

19 words, the value?

20         If American Home had wanted to sell on August 1, was

21 in possession and wanted to sell, the market approaches, et

22 cetera, would have been the same?  The 50 cents on the dollar?

23         MR. DORSEY:  I don't think we have any evidence on

24 that, Your Honor.  I simply don't know because that wasn't an

25 issue.

1          And as a technical matter under the repo, Calyon was

2    always the owner of these loans, not the debtor.

3          THE COURT:  You're correct.  I apologize.  Yes.  All

4    right.

5          Mr. Ackerly?

6          MR. ACKERLY:  Your Honor, thank you.

7          I think about the only issue that perhaps we agree

8    with the debtor on is that this case presents a simple and

9    single issue.  And I think it's -- as I said in my opening

10   statement, I think this case turns on how the Court interprets

11   Section 562 of the Bankruptcy Code.

12         It is, so far as we can tell, unreported.  No

13   reported decisions on it.  And the only guidance we really have

14   is what the legislative history says was the intent of Congress

15   when they passed it, and what Colliers on Bankruptcy says it is

16   intended to do, and I will address that in a second.

17         But we're focusing -- we're focusing essentially on

18   three words:  Commercial, reasonable, determinant.

19         I don't think determinants is particularly --

20   determinants is a derivation of determine.  And so I think what

21   Congress was saying is was there a way in the marketplace to

22   determine what a commercially reasonable price was on a given

23   date.

24         Now, the question I think the Court has to wrestle

25   with is does 562 mean what the mortgages would actually trade

64

1    for on a date, or does it mean the value if you were to hold

2    the mortgages?

3              Stated another way, is 562 -- is what we're looking

4    at, is it related to the marketplace?  Is the value that we're

5    looking at related to the marketplace?  Or is it unaffected by

6    the marketplace?  And I really think that is what the Court has

7    to -- examine the Statute, the legislative history on this, and

8    come to a resolution on it.

9              We respectfully submit, Your Honor, that a clear

10   reading of 562 and its legislative history would lead the Court

11   to the conclusion that the issue is what could the mortgages

12   have been sold for in the market on a particular day?  And that

13   is not what the debtor takes the position it is.

14             They take the position it's a discounted cash flow,

15   which, as their expert testifies, there's no relation to what

16   the mortgages would actually trade for in the marketplace.

17             Now, why do I feel the way I do about the way the

18   Court should interpret the section?  I first look at

19   legislative history.  The legislative history says, and I

20   quote, "In certain unusual circumstances, such as dysfunctional

21   markets or liquidation of very large portfolios, there may be

22   no commercially reasonable determinants of value of liquidating

23   any such agreements or contracts, or for liquidating all such

24   agreements and contracts in a large portfolio in a single day."

25             Now, that legislative history to me, Your Honor, uses

1  words that are synonymous with market.  What it would sell for

2  in the market.  They talk about dysfunctional markets.  They

3  talk about liquidation.  You liquidate something in a

4  marketplace.  They use the word "liquidating."  Again, you

5  liquidate in the marketplace.  They use the word "liquidating"

6  two times in the legislative history.

7          So, -- and they also talk about, you know, flooding

8  the market.

9          So, we submit that the legislative history is

10 somewhat compelling on this.

11          And I would call the Court's attention again to the

12 statement of Michael Strauss, the President of the company in

13 an affidavit filed in this Court on the first day of the

14 petition dated August 6th in which Mr. Strauss -- I think he's

15 the President, CEO of the company -- he's states -- he's the

16 Chief Executive Officer, President of the parent company of the

17 debtors.  He states, and I quote, "The debtors have fallen

18 victim to a confluence of environmental factors that are

19 unprecedented in the company's experience.  The devaluation of

20 the company's mortgage backed securities and mortgage loan

21 holdings was caused by, among other factors, falling real

22 estate prices and a spike in consumer defaults on mortgage

23 obligations.  The downward pressure on the loan and security

24 values accelerated as more and more borrowers were forced to

25 sell securities and loans in an effort to meet margin calls

1  such that for the last two weeks, the markets for these assets

2  have been disrupted to the point of dysfunction.  The

3  disruption in the credit markets in the past few weeks was

4  unprecedented in the company's experience and caused major

5  write downs of its loan and security portfolios."  End of

6  quote.

7         So, Mr. Strauss is acknowledging that the market was

8  dysfunctional in the two weeks before his affidavit which was

9  August 6th.

10        If Your Honor looks at the Collier comment on Section

11 562, it says, and I quote, "If the debtor is a hedge fund that

12 became insolvent as a result of volatile market activity and

13 certain securities, and if a protected counterparty terminates

14 its security contract and/or repurchase agreement involving

15 such securities promptly following the debtors' commencement of

16 a bankruptcy case, the market for securities could be quite

17 disorderly.  In such circumstances, it might not be possible

18 for the protected counterparty to obtain bids for the

19 securities that fairly reflect their market value or a

20 meaningful quote from a generally recognizes market pricing

21 source."  End quote.

22        Again, clearly recognizing that what Section 562 is

23 pointed to is what's going on in the market.  What could you

24 get in the market.  It's not that you have to sell it, it's

25 what you could get for it in the market.

1          THE COURT:  Isn't -- doesn't that prove the opposite?

2    Isn't that saying, look, you know, repurchase agreement, swap

3    agreements, we're talking about certificates of deposits, U.S.

4    treasuries, generally commercial paper.  Mortgages are the

5    exception?

6          And look, those types of -- those type of -- I'm

7    sorry.  Those types of securities are generally priced, valued

8    at what they trade for, especially -- I mean treasuries.  How

9    many -- billion -- probably trillions trade every day.  I don't

10   even know.  But there's a very active market.

11         And isn't the legislative history in Collier saying

12   if that gets skewed, if the market gets skewed, all of a sudden

13   market price doesn't make sense.  So, you have to figure out if

14   there's some other commercially reasonable way to price this

15   asset.  I think in our basic economic system, we all agree in

16   our commercial system that if there is an active, properly

17   functioning market, something is worth what the market says

18   it's worth.  Something's worth what I can sell it for, that

19   somebody will buy for it.

20         But isn't the legislative history -- isn't 562

21   saying, when that's not working, it will be done -- it will be

22   valued when you can come up with a method that makes sense.  A

23   commercially reasonable method that makes sense.

24         On the other side, the debtor is going to say, okay,

25   the market's not working.  So, let's do something else.  And

1  isn't it commercially reasonable to value an asset under a DCF

2  approach?

3          For instance, illiquid assets have value.  A nuclear

4  power plant is about as illiquid as it gets.  Good luck selling

5  one tomorrow at a Bob's Fly-by-Night, Inc., it's just not going

6  to happen.

7          But that has value.  It creates a cash flow that

8  values it.

9          Now, you could value that Dr. Taylor's approach in

10  saying, look, let's just take a -- basically let's just take

11  the assumptions that were in place prior to the market meltdown

12  and apply them and do a DCF and, you know, amazing, you know, I

13  come to par, might be not a appropriate DCF.  There may be

14  issues as to its weight to give it, okay?

15          But that's not to say that using a DCF when, say, a

16  market price is not going to give you an accurate reflection is

17  not a commercially reasonable determinant of value.  Indeed,

18  you could argue it is the only commercially reasonable

19  determinant of value because the market is not working.

20          So, that rather involved hypothetical or ramble by me

21  is meant to point out the fact that isn't what you're arguing

22  Collier says, in effect, support the debtors' argument?

23          MR. ACKERLY:  Not at all.

24          THE COURT:  Okay.

25          MR. ACKERLY:  Not at all.  I think the Court is

1  ignoring -- you have to read Section A of 562 and Section B of

2  562.  A -- and first off -- you know, 562 doesn't deal with

3  nuclear plants.  It deals with -- it deals with certain types

4  of securities that do have markets.

5          THE COURT:  Understood.

6          MR. ACKERLY:  Okay.  And, again, markets suggest what

7  something is going to trade for.  That there's a market for it.

8          And -- so, 562(a) says that "the claim shall be

9  measured."  That's a "shall."  There's no discretion there for

10 the Court.  "The claim shall be measured the earlier of," and

11 then in our case what is applicable is Subparagraph 2, the date

12 of the acceleration, which was August 1st.  Okay?

13         Now, you have to look at B.  Because B says if there

14 are not any commercially reasonable determinants of value on

15 August 1st, then the Court has to value it on the next date in

16 which there is a commercially reasonable determinant. So, a

17 claimant in this situation, such as Calyon, has -- you know,

18 they make a big deal of the fact -- the debtor makes a big deal

19 of the fact that we had no intention of selling it.  It's

20 irrelevant.  It's totally irrelevant.  Because this Statute

21 says that our claim is going to be valued as of the date of

22 acceleration unless there was not a commercially reasonable

23 determinant on that date.  And then you have to look at when

24 was the first commercially reasonable determinant.

25         If you follow your thinking on this, Your Honor,

1  there's always a commercially reasonable determinant because

2  there's always a discounted cash flow number.  And so, you

3  know, it just -- you're turning the Statute on its head when

4  you're saying that you can look at -- if the market's not

5  working, then you take a discounted cash flow because the

6  discounted cash flow is always there because it bears no

7  relationship to the market.

8          And so that's why, you know, we believe we are right.

9  We believe the Court has to come to that conclusion that this

10  thing is market driven and it has nothing to do with an

11  abstract value based on discounted cash flow because that's not

12  what the market's telling us, that's not what the legislative

13  history is addressing, and that's not what Colliers is

14  addressing.

15          So, you know, we just --

16          THE COURT:  I hear.  And I guess in further support

17  of that, you would say, okay, the sine qua non, I mean the

18  whole point of repurchase agreements is liquidity.

19          MR. ACKERLY:  Yes, sir.

20          THE COURT:  To preserve liquidity.  And my question

21  there then would be, okay, we're reserving liquidity.   Are we

22  -- is it that we're preserving the ability of someone like

23  Calyon to make what used to be a warehouse loan to the debtor

24  for purposes of originating mortgages, et cetera?  And I'm not

25  -- I know that's not what it is, but just to kind of put my

1  head around it.

2          And what we're preserving when we're preserving

3  liquidity is the ability for Calyon to, in effect, immediately

4  get its collateral back, or what used to be its collateral.  To

5  immediately be able to take possession of the collateral.  What

6  we're not -- though what we're not worried about, because we

7  can only do so much is the next step.  Not only are we

8  preserving liquidity in that they can get their collateral back

9  right away or in this case they can hang onto what they had --

10  at that point owned.  The next step is, okay, I can liquidate

11  it somewhere else.

12          Why should 562, et cetera, serve to improve the

13  position of someone like Calyon?  The Statute is designed to

14  make sure that Calyon can get its -- what used to be its

15  collateral back immediately and can liquidate it if necessary.

16  That's fixing what the Bankruptcy Code broke, which was they

17  couldn't do that.  The automatic stay would prevent it.

18          But there's nothing that makes -- I don't see why

19  we're using the Bankruptcy Code as an insurance policy to say,

20  you know what, not only can Calyon now get its collateral back

21  right away.  The debtors will, in effect, be an insurer for

22  purposes of when they can liquidate that collateral.  And to

23  the extent they take a loss at some given point, the debtors

24  will pay the damages for that.

25          MR. ACKERLY:  Well, I think, again, Your Honor, the

1 problem --

2          THE COURT:  And my point there is aren't we expanding

3 Calyon's rights under your reading --

4          MR. ACKERLY:  But --

5          THE COURT:  -- as opposed to simply preserving them.

6          MR. ACKERLY:  You are making an assumption that only

7 assumes one fact, and not the other.  You're assuming that the

8 market is always improving.  So, the longer you sit on the

9 mortgage, the more value the mortgage may have.  You're not

10 considering the fact that the mortgage may be losing value.

11          THE COURT:  Um-hum.

12          MR. ACKERLY:  And what -- let's go back to 559

13 because Section 559 is the Safe Harbor.  And Section 559, you

14 know, as the Court addressed in our earlier adversary

15 proceeding, provides that with respect to a repurchase

16 agreement, the automatic stay doesn't apply and that a

17 repurchase party, nondebtor repurchase party can terminate,

18 liquidate, accelerate without worry about the automatic stay.

19 So, yes, intent of Congress in 559 was to preserve the

20 liquidity of these types of documents so that they could be

21 sold by them.

22          The point of 556 is to set a price.  To set an amount

23 of their claim so that you can't bet on the market either way.

24 In other words, if Calyon, as Mr. Dorsey, I think, incorrectly

25 said, that they made the decision to sit on these things

1  forever.  But if they make the decision to sit on them forever,

2  their claim is still going to be valued based on Section 562.

3  And that is when the Court finds was the first commercially

4  reasonable determinant of value.

5        And, you know, if the Court finds as we would ask the

6  Court to find that the first commercially reasonable

7  determinant of value was on August 15th, 2008 when we had the

8  clear title resolved and no appeal on that, and the servicing

9  resolved, and the documents substantially complete, and all of

10 those things.  If the Court accepts that as the commercially

11 reasonable determinant, that's the claim we're stuck with.

12        Suppose the mortgages go down?  Suppose the

13 mortgagors stop paying?  Suppose the government doesn't save us

14 and the economy becomes worst?  Suppose we go into a

15 depression?  We're still stuck with that.

16        So, it could go either way.  And I think -- I mean --

17 I use the example in the opening statement with respect to

18 margin calls where it, you know, if you have a margin account

19 with your stock broker and you can't honor the margin call, the

20 stock broker's going to liquidate your -- liquidate your stock

21 right away.  They're not going to sit and wait for a week

22 hoping it's going to go up.  They're going to do it right away.

23 And so I think that's what 562 is driving at here.  And that's

24 certainly, you know, I think consistent with the legislative

25 history, consistent with the purpose of 559 when you read it

1  with 562.  Certainly what Colliers is saying it's all about

2  market.  What can you get in the market for it?

3              I don't want to take up a lot of time talking about

4  Dr. Clayton's testimony.  Obviously he is a well respected

5  academic, but he is an academic.  And he admitted he had no

6  experience selling mortgage portfolios.  All he does is sit in

7  his office and run a discounted cash flow with no idea of

8  what's going on around him.  And, you know, even when

9  questioned about --

10             THE COURT:  Sounds as bad as a judge.

11             MR. ACKERLY:  And -- what?

12             THE COURT:  I said it sounds as bad as a judge.

13             MR. ACKERLY:  I think the Court recognizes me talking

14  about it for five or 10 minutes that his valuation -- and he

15  admitted it, he was retained to testify about market value.  He

16  was retained to testify about discounted cash flow.

17             And I think we would -- we would say that discounted

18  cash flow is a determinant --

19             THE COURT:  Well --

20             MR. ACKERLY:  It's not a commercially reasonable

21  determinant of what you can sell something for in the

22  marketplace.

23             THE COURT:  Well, if you have a properly functioning

24  market, and you apply the correct DCF -- well, let's put it

25  this way.  If you have a properly functioning market, that is

75

1  the value.  At any given moment, that is the value, the market

2  value.

3          The reason you use a DCF is, for instance, you're

4  trying to figure out what the cash -- you're trying to value an

5  asset that cannot basically be readily valued because of a

6  marketplace.  So, in an ideal world. Properly functioning

7  market, the DCF and the market value would be identical.

8  There'd be no reason to do a DCF because you'd have a market

9  value.

10          MR. ACKERLY:  Well, I think the other fact that we

11  presumably can agree on is that on August 1st, 2007, we did not

12  have a properly functioning market.  I mean the President of

13  the debtor said it was dysfunctional.  And I don't think he

14  read the legislative history when he said that, but that's what

15  he said.  So, I don't think we had a properly functioning

16  marketing.

17          The other issue, Your Honor, that you cannot lose --

18          THE COURT:  Well, but let's -- all right.  So, we

19  don't have a properly functioning market on August 1st.  Take

20  that as an assumption.  At some point, it recovers.  For

21  example, at some point, September 30th, the debtors are able to

22  sell mortgages in the marketplace through the Broadhollow

23  transaction.  So, why not take that date?

24          MR. ACKERLY:  Well, Broadhollow is not comparable to

25  these mortgages.  Different portfolio --

1          THE COURT:  Well, now, but you want me to say

2    commercially reasonable is the first day at which, you know,

3    title's all set, everything's together.  It's a completely non-

4    fire sale, non, you know, liquidation type of situation.   In

5    other words, you want me to individualize -- earlier we were

6    talking about markets and how that matters.

7          Well, the market's recovered, but now you say your

8    asset isn't transferrable at a reasonable price because there

9    are issues with your asset.  That's a different question as to

10   whether the market's functioning.  That's a question of the

11   quality of what you're being able to sell.  And the point of my

12   question to Mr. Dorsey was -- what I was trying to get to at

13   the end is that's neither a here nor there question as to

14   whether it's Calyon, the debtor, or Joe Blow.  That's the

15   quality of the asset.  And certainly there's nothing in the 500

16   series that we're talking about which is designed to protect a

17   party to a repurchase agreement that bought assets under the

18   repurchase agreement, for whatever reason, fraud or just

19   negligence, that were not easily saleable because their quality

20   was terrible.

21         So, why should I care about all those individual

22   issues with regard to the quality of the asset if the real

23   issue is whether the market's functioning or not.  As soon as

24   the market's functioning, you could have sold them.  So, that

25   should be the date.  And the market is functioning by September

1  30th.

2          MR. ACKERLY:  Well, to use an example, Your Honor, I

3  don't think you would accept as evidence in this Court

4  testimony as to the value of my house when the appraiser is

5  using the State Capital Governor's mansion as a comparable.

6  And that's essentially what the debtor is suggesting here,

7  although they didn't put on any evidence of it, that somehow

8  Broadhollow is a comparable.  And the evidence was it is not a

9  comparable.

10          Now, of course, Broadhollow is evidence of a sale in

11  the marketplace.  I don't think anybody would stand up here and

12  say it was a great sale, but it was evidence of a sale.  And

13  it's certainly something that Mr. Branthover takes into

14  consideration when he's doing his value of these particular

15  mortgages.

16          But if the Court ever looked at the Broadhollow sale,

17  you would see that there were scratch and dent items that were

18  sold in Broadhollow that sold for next to nothing.  And most of

19  the Broadhollow portfolio was agency eligible.  You could sell

20  them to the government.

21          So, to -- you know, it's just totally apples and

22  oranges.  It's not a comparable that I think the Court should

23  consider.

24          THE COURT:  Well, but look, I've approved in American

25  Home at least a dozen, if not more, sales of whole loans,

1 different pieces over time, auctions, commercial -- you know,

2 auctions in this.  And I've seen second lien nonperforming

3 loans go for, you know, 750 basis points on UPB, not even one

4 percent.  And I've found, by the way, that that was a

5 reasonable exercise of the debtors' business judgment to do

6 that loan.

7        I mean the reality is the asset quality goes up or

8 down.  And the higher the quality of your asset, the more money

9 you're going to get for it.  But that's got nothing to do with

10 whether or not there's a market in the asset. I'm just -- I'm

11 trying to figure out why the individuality of this particular

12 asset enters into the equation.  What's your argument for why

13 the individuality or the quality of this asset enters into the

14 question of when there's a commercially reasonable

15 determination of the value of that asset.

16        MR. ACKERLY:  And the reason, Your Honor, is 362 says

17 if a repurchase agreement and a repo participant accelerates

18 the contract, and that person's damages are measured by, and

19 then you go to (b), if there's no commercially reasonable

20 determinant of the value of those mortgages, then you go to

21 another date.

22        So, I don't -- I mean I don't --

23        THE COURT:  And that date should be what?  The date

24 when you could actually sell it for what you want to get for

25 it?  Or just sell it period?

1        MR. ACKERLY:  We never said we wanted to get 45 cents

2  on the dollar or 46 cents on the dollar for these.

3        We are saying that August 15, 2008 is the first

4  commercially reasonable determinant of value because we could

5  give reps and warranties in connection with the sale of the

6  portfolio so that they, in fact, could be sold for a reasonable

7  price.  That's what we are saying.

8        THE COURT:  In other words, you've managed to -- it's

9  the first time -- it's like you buy a dilapidated house, and

10 you want to fix it, and you don't want to sell it until it's

11 fixed up.  But there is a market in dilapidated.  Now, it may

12 not be what you want the value to be, but there is a market in

13 dilapidated houses, and there's a market in fixed up houses,

14 and one gets you more than the other, or less than the other.

15 But to say there's no market there, that's not accurate.

16       MR. ACKERLY:  It has to be a commercially reasonable

17 determinant.  I mean our witness testified that you could maybe

18 sell it on August 1st for 10 cents on the dollar.  That

19 represents a market that you could sell is for 10 cents -- sell

20 the portfolio for 10 cents on the dollar, that represents the

21 market.  But is that commercially reasonable?

22       THE COURT:  Well,  there's two questions about that:

23 Whether the market itself is pricing the asset correctly based

24 on whether the market's functioning at all.  Or whether the

25 quality of the asset as of August 1st is poorer than the

1 quality of the asset two years later or a year later.  Why am I

2 protecting you against the quality of the asset as opposed to

3 protecting you against whether the market's functioning?

4 Because the -- there's nothing about quality of asset in that

5 legislative history you were reading to me.  It talks a lot

6 about market dysfunctionality.  It talks about flooding the

7 market.

8          MR. ACKERLY:  And, Your Honor, we have made a huge

9 issue about the quality of our asset.  Because the quality of

10 our asset is directly attributable to the debtor.  They

11 challenged the ownership of our mortgages.  They refused to

12 turn over the proceeds.  They refused to cooperate and make

13 documents available to us.  They refused to help, at least

14 initially, with remediation.

15          We had to go through five months of litigation in

16 this Court.  And we came into this Court on August -- on --

17 excuse me -- January the 17th before you because we were trying

18 to -- after the Court had entered its order on the ownership

19 issue, we were trying to get -- still trying to get the debtor

20 to turnover the mortgages, turnover the proceeds to us.  And

21 they were baulking at turning over the proceeds.  And you were

22 talking about you wanted us to be able to sell the mortgage.

23 And Mr. Tecci (phonetic) stood here and said, "There's nothing

24 to prevent them from selling the mortgages today, Your Honor."

25 And Your Honor said, "Who's going to buy a mortgage if they're

1  not getting proceeds?"

2           So, we would submit, Your Honor, by any definition

3  these things -- there was no commercially reasonable

4  determinant of value until January.  That's the Court's own

5  statement, "Who is going to buy a mortgage portfolio when you

6  don't know if you're going to get the proceeds?"

7           I mean to me -- I mean these issues, the testimony is

8  clear.  It is unrebutted that in order to sell mortgages in a

9  commercially reasonable way, you need to remediate them.  You

10 need to resolve ownership; we set about doing that.  You need

11 to resolve the servicing; we set about doing that.  You need to

12 get a hold of the proceeds, we set about doing that.  You need

13 to get a hold of all the documents so you can remediate; we set

14 about doing that.  Who opposed that?  They opposed it.  And now

15 they're coming in to the Court and the court of equity and

16 suggesting we had an obligation on August 1st to sell.  That

17 you've got to value this collateral as of August 1st when they

18 said we didn't even own it.  It's just a total disconnect for

19 me.  It's a total disconnect for me that -- you know, that the

20 Court could countenance an argument from a debtor that the

21 reason we couldn't market this property was because of their

22 conduct, not ours.  We proceeded promptly in this Court to

23 clean up the file.  And I think we have done that.

24          Our position -- the Court may disagree on August

25 15th, 2008 as a date for selling these because the Court had

1  determined ownership in January.  But our position is that the

2  August date is the better date because we still hadn't fully

3  remediated.  We couldn't give the reps and warranties.  And the

4  Court's order was still appealable.

5         So, it would be questionable as to whether we could

6  give a rep that we even owned the mortgages.  And so I -- it's

7  just -- it's just, to me, it's frustrating to have to deal with

8  an argument that is caused by the debtor, it's just pure and

9  simple.

10         I think Mr. VanEssche, you know, made it clear in his

11  testimony that in his opinion, essentially the owner of this

12  portfolio, you know, that he couldn't -- he couldn't sell it on

13  August 1st, 2007 or September 30th, 2007, or January 30th,

14  2008.  And he couldn't make the reps and warranties on those

15  dates.

16         And so it was his opinion that the first date that he

17  could sell this in a commercially reasonable way for a fair

18  price was in August.  They never rebutted that.  They don't

19  have any testimony about that.

20         I think Mr. Branthover's testimony, I think, Your

21  Honor, is clear.  But what's so telling about -- Mr. Branthover

22  was obviously well qualified and knows the mortgage market.

23  And he knows what's going on in the mortgage market.  And

24  what's so telling about his testimony is he's never seen a

25  portfolio of mortgages ever sold when ownership was in dispute.

1  When servicing was in dispute.  Those sorts are fundamental

2  things.

3          So, how could there be a -- how could there be a

4  commercially reasonable determinant when you didn't have any of

5  those things?  Mr. Dorsey suggested in his examination of Mr.

6  VanEssche yesterday that somehow the debtors had no obligation

7  to cooperate with us.  Your Honor, that runs totally counter to

8  the repurchase agreement.  And I can cite you to paragraph

9  after paragraph in the repurchase agreement when they -- where

10 the debtor, upon a default, has the obligation to turn over the

11 documents, turn over the cash, cooperate with us in

12 remediating; they did none of that.  They did none of that.

13 Why they fought us?  I don't know whether we were the only ones

14 they fought on the issue of ownership or not, but they fought

15 us.  They chose to fought us -- fight us and they should live

16 in the bed they made.  And they made was to fight us.  This

17 might be a totally different case if, on August 1st, they had

18 responded to our demand and said, you're right, we are in

19 default, here are the documents, we'll cooperate with you, and

20 we'll start turning cash over.  It might be a totally different

21 case.  They didn't do that.  They fought with us.

22          So, Your Honor, you know, again, it comes back in my

23 way of thinking to, you know, 562 is market driven, and it is

24 focused on the particular assets in question.  I would hope the

25 Court would agree with that analysis.  The -- I mean what we

1  are essentially saying, Your Honor, is that the deficiency

2  claim that we have in this case -- if the Court looks at

3  Paragraph 58 of the stipulation of facts, that shows that the

4  outstanding balance on August 15th was 994,000,000 and change.

5  We would submit that the deficiency as of that date is that

6  number less the $515,000,000 number that Mr. Branthover

7  testified today.

8          So, contrary to the implication that we're coming

9  into this Court seeking the allowance of a claim in the $9

10  million range, we would submit that our claim should be allowed

11  in the amount that represents the difference between 994 and

12  515, which is something less than $500 million.  And so that's

13  our case.

14          THE COURT:  Okay.  Thank you.  Any reply, Mr. Dorsey?

15          MR. DORSEY:  Yes, Your Honor.  Just a couple of quick

16  points, Your Honor.  I believe the Court has hit the nail

17  directly on the head with your questions to Mr. Ackerly about

18  the legislative history.  The legislative history actually

19  supports the debtors' position because 562 applies to more than

20  just mortgage loans.  It applies to all kinds of assets, and

21  most of them are non-income producing assets.  They're

22  securities, they're commodities, they're all kinds of things.

23  With mortgage loans, they're an income producing asset.  And,

24  therefore, discounted cash flow, as Dr. Clayton testified, is

25  always, always, always a commercially reasonable way to

1  determine the value of that collateral.

2          Now, if you look at the evidence, Your Honor, Calyon

3  has taken the position that the August 15th date is the first

4  date they could sell it for 46 cents on the dollar, and that is

5  the commercially reasonable determinant of value.  Nobody

6  testified to that.

7          Mr. Branthover baulked at the question from Mr.

8  Ackerly about whether that would be reasonable to sell them on

9  August 15th for 46 cents.  He said, "Well, reasonable, that's

10  in the eye of the beholder.  You could have sold them on that

11  date."

12          And there's a reason for that.  Because Mr.

13  Branthover knows that if Calyon holds the loans, which they've

14  done, nine months after August 15th, they still hold the loans,

15  they're still collecting 10 to $12 million every month on these

16  loans, that they're going to make more money in the long term.

17  So, what Calyon wants to say is precisely what Your Honor was

18  talking about.  They want to make us the insurer.  They want to

19  be able to say August 1st -- under their way of looking at 562,

20  they could say on August 1st, 2007, assuming no problems with

21  ownership or servicing or any of those issues, the loans were

22  worth 10 cents.  Pick a number.  But we're not going to sell

23  them on that date because we think it would be unreasonable to

24  sell them on that date.  That, by definition, is commercially

25  unreasonable.

1       August 15th, if they're not willing to sell them on

2  August 15th for 46 cents, that's commercially unreasonable,

3  too.

4       So, the only evidence that we have on what is

5  commercially reasonable is the discounted cash flow value that

6  Dr. Clayton testified about.  If they want to use August 15th

7  as the date when all of the issues regarding the portfolio and

8  the ownership and all those things were cleaned up, that's fine

9  with me, Your Honor, if Your Honor wants to use the discounted

10 cash flow on that date because if we do that calculation --

11      THE COURT:  Which date, August 1 -- August 15, '08?

12      MR. DORSEY:  If we use August 15th as the date when

13 the portfolio was all said and done, and we look at the

14 discounted cash flow value from Dr. Clayton, Calyon owes the

15 debtors 73 and a half million dollars, plus the $26 million

16 they swept from the account.  If they want to use that date,

17 that's fine with me, Your Honor, and we use the discounted cash

18 flow value.

19      THE COURT:  Okay.  Thank you.  Well, this is a

20 fascinating and interesting issue.  And usually when both sides

21 say it's very simple, it's not.

22      What I'd like to propose to further punish the

23 clients who have, I'm sure, paid more than enough in attorneys'

24 fees so far, but what I'd like is both sides to submit proposed

25 findings of fact and conclusions of law, citing to the record.

1  So, after we get the transcript, citing to the record.  I'd

2  like you to submit that in hard copy in Microsoft Word.  I'll

3  take the matter under advisement.  And as soon as I receive

4  those proposed findings, I'll issue a decision as quickly as

5  possible.

6          I'd like the findings to be simultaneous.  And I

7  leave it to the parties to work out a time frame that makes

8  sense.  Obviously you're going to need the transcript, and I

9  know that that's often a -- unfortunately lengthy process to

10 obtain transcripts in this Court.  Please direct your cards and

11 letters to the Administrative Office of the United States

12 Courts in Washington, D.C. on that issue.

13         But I want to make sure you have an opportunity to

14 have that and digest it, and then if -- to submit those

15 findings and conclusions with cites to the record.

16         Is there any objection to proceeding in that manner?

17 Any questions?

18              (No audible response heard)

19         THE COURT:  I have the designations.  I don't need

20 them.  I have the exhibits, I have the stipulations.  So, the

21 only additional material I would need would be the proposed

22 findings.

23         MR. DORSEY:   No argument, Your Honor, just -- no

24 legal argument, just findings of fact?

25         THE COURT:  No.  Conclusions of law, as well, yes.  I

1   will not need additional oral argument unless I let you know.

2   But I think the excellent present of evidence, the argument

3   we've had today, my reading of the materials, I think I'm in a

4   position to understand the legal concepts and the law's

5   application as much as I need to.  But if I need more help,

6   I'll let you know.

7           All right?  And I you just work out a date amongst

8   yourselves and then just let the Court know so I know when to

9   be looking for that, that'd be fine.

10          MR. DORSEY:  We'll submit a stipulated order, Your

11  Honor.

12          THE COURT:  That's probably best.  That'd be fine.

13  All right?  Anything further for today?

14          MR. ACKERLY:  Nothing further.

15          THE COURT:  I thank you for a really outstandingly

16  presented and professionally presented trial by both sides.

17  I'll get you a disposition as soon as I can.  All right?

18  Hearing adjourned.

19          MR. DORSEY:  Thank you, Your Honor.

20      (Whereupon, at 11:26 A.M. the hearing was adjourned.)

21

22

23

24

25

1

2

3

4

5

6                              CERTIFICATE

7

8              I, KAREN HARTMANN, certify that the foregoing is a

9   correct transcript from the electronic sound recording of the

10  proceedings in the above-entitled matter.

11

12

13  _/s/_ _Karen Hartmann_   AAERT CET**D0475 Date:  May 28, 2009

14  TRANSCRIPTS PLUS, INC.

15

16

17

18

19

20

21

22

23

24

25