**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x

In re:

AMERICAN HOME MORTGAGE
HOLDINGS, INC., a Delaware corporation, et al.,[1]

               Debtors.

:   Chapter 11

:   Case No. 07-11047 (CSS)

:   Jointly Administered

:   Re: Docket Nos. 6824 & 6963

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
OF CALYON NEW YORK BRANCH, AS ADMINISTRATIVE
AGENT PURSUANT TO REPURCHASE AGREEMENT**

Upon the Debtors' Objection to Claims of Calyon New York Branch as Administrative Agent Pursuant to Repurchase Agreement [D.I. 6824] (the "Claim Objection"), the Response to the Debtors' Objection to Claims of Calyon New York Branch, as Administrative Agent Pursuant to Repurchase Agreement [D.I. 6963] (the "Response"), the record herein, the evidence and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

## I.     FINDINGS OF FACT

### A.     The Repurchase Agreement

1.     Calyon New York Branch, as Administrative Agent Pursuant to Repurchase Agreement ("Calyon") and Debtors American Home Mortgage Corp. ("AHM"), AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("Servicing"), American Home

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The mailing address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

Mortgage Acceptance, Inc. ("Acceptance"), and American Home Mortgage Investment Corp. ("Investment"; together with AHM, Servicing and Acceptance, the "Debtors") are parties to that certain Repurchase Agreement dated November 21, 2006 (the "Repurchase Agreement"). Stipulation of Facts, ¶ 1.

2.      Pursuant to the Repurchase Agreement, Calyon was requested to purchase and did purchase, from time to time, certain mortgage loans from the Debtors (the "Mortgage Loans"). Stipulation of Facts, ¶ 2.

3.      Deutsche Bank National Trust Company ("Deutsche Bank") was the custodian under the Repurchase Agreement. Stipulation of Facts, ¶ 3.

4.      Deutsche Bank had possession of some documents relating to the Mortgage Loans. Stipulation of Facts, ¶ 4.

5.      The documents relating to the Mortgage Loans in the possession of Deutsche Bank were limited. May 19, 2009 Transcript,[2] 137:10-23 (testimony of Mr. van Essche); April 22, 2009 Deposition Transcript,[3] 75:5-76:15 (designated testimony of Mr. van Essche).

6.      As the custodian under the Repurchase Agreement, Deutsche Bank transmitted daily "Basic Status Reports", "Collateral Agent Daily Reports" and "Borrowing Base Valuation Reports" to Calyon. Stipulation of Facts, ¶¶ 5, 7 and 9.

7.      The "Basic Status Reports", "Collateral Agent Daily Reports" and "Borrowing Base Valuation Reports" Deutsche Bank transmitted to Calyon were simply based

---

[2]      The May 19, 2009 Transcript shall be referred to herein as Transcript I.

[3]      The April 22, 2009 Deposition Transcript shall be referred to herein as the Deposition Transcript.

on information provided by the Debtors.  Deposition Transcript, 75:5-19 (designated testimony of Mr. van Essche).

8.      Pursuant to the Repurchase Agreement, Servicing was initially appointed Servicer of all of the Mortgage Loans.  Stipulation of Facts, ¶ 11.  As Servicer, Servicing was responsible for administering the Mortgage Loans, including, without limitation, collecting monthly mortgage payments of principal and interest, monitoring past-due accounts, and reporting on defaulted loans.  Stipulation of Facts, ¶ 11.

9.      As of August 1, 2007, the Debtors had defaulted on certain obligations under the Repurchase Agreement.  Stipulation of Facts, ¶ 12.

10.     On August 1, 2007, Calyon delivered to the Debtors a Notice of Event of Default of Sellers ("Notice of Sellers' Default").  Stipulation of Facts, ¶ 13.

11.     The Notice of Sellers' Default served as notice to the Debtors of defaults under the Repurchase Agreement and that the Termination Date under the Repurchase Agreement had occurred and accelerated all amounts due under the Repurchase Agreement. Stipulation of Facts, ¶ 14.

12.     On August 1, 2007, Calyon accelerated the Repurchase Agreement. Stipulation of Facts, ¶ 15.

13.     As a result of the acceleration of the Repurchase Agreement, as of August 1, 2007, the Debtors were obligated to pay Calyon the Repurchase Price to repurchase the Mortgage Loans.  Stipulation of Facts, ¶ 16.

B.      The Bankruptcy Case and the Adversary Proceeding

14.     On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. Stipulation of Facts, ¶ 24.

15.     On August 28, 2007, Calyon commenced Adversary Proceeding No. 07-51704 against the Debtors (the "Adversary Proceeding").  Stipulation of Facts, ¶ 25.

16.     In early November 2007, the Court conducted the Phase I Trial in the Adversary Proceeding.  Stipulation of Facts, ¶ 27.

17.     On January 4, 2008, the Court entered the Opinion regarding the Phase I Trial.  Stipulation of Facts, ¶ 32.

18.     On January 15, 2008, the Court entered the Order on Phase I Trial. Stipulation of Facts, ¶ 33.

19.     On January 25, 2008, the Court entered the Stipulation and Order Regarding Mortgage Funds and Mortgage Files (the "January Stipulation").  Stipulation of Facts, ¶ 35.

20.     The January Stipulation required the Debtors to turn over to Calyon all funds, collections or payments of any type in the Debtors' possession received with respect to the Mortgage Loans since the Petition Date (the "Proceeds") except for a $5,000,000 reserve. January Stipulation, ¶¶ 7 and 8.

21.     The January Stipulation also required the Debtors (i) to provide Calyon with copies of the mortgage files related to the Mortgage Loans which Calyon identified as not having been provided to Calyon; and (ii) with respect to mortgage files provided to Calyon in an

incomplete state, to cooperate with Calyon in providing copies of the information necessary to complete the mortgage files.  January Stipulation, ¶ 10.

22.    As of January 30, 2008, the Court's Order on the Phase I Trial holding that the purchasers under the Repurchase Agreement (the "Purchasers") own the Mortgage Loans was not a final order and was subject to appeal.  Stipulation of Facts, ¶ 57.

23.    On August 5, 2008, the Court entered the Order (I) Approving the Stipulation Between the Debtors and Calyon New York Branch, as Administrative Agent, and (II) Authorizing the Transfer of Service Mortgage Servicing Rights Relating Thereto (the "August Order").  Stipulation of Facts, ¶ 40.

24.    The August Order authorized the Debtors to take all actions required by the Stipulation attached to the August Order as Exhibit 1 (the "August Stipulation"), including, without limitation, to transfer all rights and interests of the Debtors in the right to service the Mortgage Assets (as defined in the Repurchase Agreement) (the "MSRs").  August Order, at 2.

25.    The August Order resolved the Phase II Trial of the Adversary Proceeding and resulted in the dismissal of the Adversary Proceeding.  August Stipulation, ¶ 18.

26.    The dismissal of the Adversary Proceeding was without prejudice to the rights of Calyon and the Debtors regarding the Repurchase Agreement Claims (defined below).  August Stipulation, ¶ 18.

27.    As of August 15, 2008, no party in interest filed a Notice of Appeal with respect to the August Order and the August Order became a final, non-appealable order.  Stipulation of Facts, ¶ 60.

C.    **The Repurchase Agreement Claims**

28.    On January 10, 2008, Calyon timely filed Proof of Claim Number 8044 against Servicing (the "Servicing Claim").  Stipulation of Facts, ¶ 28.

29.    On January 10, 2008, Calyon timely filed Proof of Claim Number 8045 against Acceptance (the "Acceptance Claim").  Stipulation of Facts, ¶ 29.

30.    On January 10, 2008, Calyon timely filed Proof of Claim Number 8046 against AHM (the "AHM Claim").  Stipulation of Facts, ¶ 30.

31.    On January 10, 2008, Calyon timely filed Proof of Claim Number 8047 against Investment (the "Investment Claim"; together with the Servicing Claim, the Acceptance Claim and the AHM Claim, the "Repurchase Agreement Claims").  Stipulation of Facts, ¶ 31.

32.    In the Repurchase Agreement Claims, Calyon asserts claims under the Repurchase Agreement and the other Transaction Documents (as defined in the Repurchase Agreement), including, without limitation, (a) claims for the repurchase of the Mortgage Loans at the Repurchase Price (as defined in the Repurchase Agreement), plus interest thereon, as provided in the Repurchase Agreement; and (b) claims for all costs and expenses, including attorneys' fees, other professional services and disbursements, as provided in the Repurchase Agreement.  *See* Stipulation of Facts, Exhibit K, Exhibit L, Exhibit M, Exhibit N.

33.    As of August 1, 2007 and September 30, 2007, the Debtors were obligated to repurchase the Mortgage Loans for a Repurchase Price of $1,143,840,204.36, which amount does not include Calyon's claims asserted in the Repurchase Agreement Claims for all costs and expenses, including attorneys' fees, other professional services and disbursements, as provided in the Repurchase Agreement.  Stipulation of Facts, ¶¶ 41 and 47.

34.     The Repurchase Price under the Repurchase Agreement as of on or about the Petition Date of $1,143,840,204.36, had been reduced by payments of $72,906,907.82 made to Calyon as of January 30, 2008, leaving an outstanding amount of $1,070,933,296.54 as of on or about January 30, 2008, which amount does not include Calyon's claims asserted in the Repurchase Agreement Claims for all costs and expenses, including attorneys' fees, other professional services and disbursements, as provided in the Repurchase Agreement.  Stipulation of Facts, ¶ 53.

35.     The Repurchase Price under the Repurchase Agreement as of on or about the Petition Date of $1,143,840,204.36, had been reduced by payments of $149,423,974.04 made to Calyon as of August 15, 2008, leaving an outstanding amount of $994,416,230.32 as of on or about August 15, 2008, which amount does not include Calyon's claims asserted in the Repurchase Agreement Claims for all costs and expenses, including attorneys' fees, other professional services and disbursements, as provided in the Repurchase Agreement.  Stipulation of Facts, ¶ 58.

**D.     The Mortgage Loans, Proceeds, Information and Servicing**

**i.     The Mortgage Loans**

36.     As of August 1, 2007 and September 30, 2007, the Debtors asserted that they were the legal owners of the Mortgage Loans.  Stipulation of Facts, ¶¶ 46 and 52.

**ii.     Proceeds**

37.     As of August 1, 2007 and September 30, 2007, the Debtors asserted that they were the legal owners of the Proceeds.  Stipulation of Facts, ¶¶ 46 and 52.

38.     As of August 1, 2007 and September 30, 2007, Calyon was not receiving, and the Debtors were not sending to Calyon, nor did they turn over, the Proceeds until after the

entry of the January Stipulation.  Stipulation of Facts, ¶¶ 36, 42 and 48; *see* Transcript I, 94:8-11, 97:15-25 (testimony of Mr. van Essche).

39.    On January 29, 2008, the Debtors provided Calyon with Proceeds in the amount of $72,906,907.82.  Stipulation of Facts, ¶ 37 and Exhibit P.

40.    From January 29, 2008 through August 15, 2008, the Debtors provided Calyon with Proceeds in the aggregate amount of $149,423,974.04.  Stipulation of Facts, ¶ 37 and Exhibit P.

### iii.    **Information**

41.    As of August 1, 2007 and September 30, 2007, Calyon was not receiving, and the Debtors were not sending to Calyon, information concerning the Proceeds received from servicing the Mortgage Loans until after the entry of the January Stipulation.  Stipulation of Facts, ¶¶ 43 and 49.

42.    As of August 1, 2007, September 30, 2007 and January 30, 2008, Calyon did not have complete and accurate copies of the mortgage files related to the Mortgage Loans. Stipulation of Facts, ¶¶  44, 50 and 54; *see* Transcript I, 94:12-14 (testimony of Mr. van Essche).

43.    In January and February of 2008, the Debtors provided Calyon with copies of the mortgage files related to the Mortgage Loans which had not been previously turned over to Calyon.  Transcript I, 83:23-24 (testimony of Mr. van Essche).

44.    The Debtors worked with Calyon to remediate exceptions in the mortgage files for approximately 60 to 75 days after January 2008.  Transcript I, 82:16-83:6 (testimony of Mr. van Essche).

iv.    **MERS**

45.    As of August 1, 2007 and September 30, 2007, MERS reflected the Debtors as the owners of the Mortgage Loans on its electronic mortgage recording system. Stipulation of Facts, ¶¶ 45 and 51; *see* Transcript I, 95:2-6 (testimony of Mr. van Essche).

v.    **Servicing**

46.    As of August 1, 2007, September 30, 2007 and January 30, 2008, the Debtors asserted that they were the legal owners of the MSRs.  Stipulation of Facts, ¶¶ 46, 52 and 55.

E.    **The Market for the Sale of the Mortgage Loans**

47.    The market for the sale of the Mortgage Loans was dysfunctional on August 1, 2007.  Calyon Exhibit 1, ¶ 27 (Michael Strauss, Chairman, Chief Executive Officer and President of American Home Mortgage Investment Corp., stating in First Day Declaration that, as of August 6, 2007, "for the last two weeks the markets for these assets [mortgage-backed securities and mortgage loan holdings] has been disrupted to the point of dysfunction."); Calyon Exhibit 2, at 7:10-15, (counsel to the Debtors stating that, "[i]n recent weeks, the home mortgage marketplace reached a point of dysfunctionality that made it almost impossible for us to even sell to third parties our home mortgages at any reasonable price.  So our ability to move our assets or to otherwise liquidate our assets functionally ground to a halt.").

48.    This Court stated, in its January 4, 2008, opinion that,

> [i]n the weeks prior to the Petition Date, a major disruption in the global credit markets caused a significant write-down of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to Debtors' loans.

*Calyon New York Branch v. American Home Mortgage Corp. (In re American Home Mortgage, Inc.)*, 379 B.R. 503, 510 (Bankr. D. Del. 2008).

49.      The Debtors and Calyon took the position in October 2007 that it was not a good time to sell the Mortgage Loans and that the market was in very bad shape at that time. *See* Transcript I, 123:10-20 (testimony of Mr. van Essche).

**F.**      **Representations and Warranties**

50.      The representations and warranties usually made in connection with selling mortgage loans allow purchasers to put back mortgage loans to sellers under certain circumstances if the representations and warranties are incorrect, and include representations and warranties regarding the ownership of the mortgage loans, the documentation and underwriting of the mortgage loans and generally that everything is in order regarding the mortgage loans. *See* Transcript I, 95:11-96:11 (testimony of Mr. van Essche).

51.      As of August 1, 2007, Calyon was not able to make the representations and warranties usually made in connection with selling mortgage loans.   *See* Transcript I, 96:21-23 (testimony of Mr. van Essche); Calyon Exhibit 6, at 12.

52.      As of September 30, 2007, Calyon was not able to make the representations and warranties usually made in connection with selling mortgage loans.   *See* Transcript I, 98:1-13 (testimony of Mr. van Essche); Calyon Exhibit 6, at 15.

53.      As of January 30, 2008, Calyon was not able to make the representations and warranties usually made in connection with selling mortgage loans.   *See* Transcript I, 122:17-22 (testimony of Mr. van Essche); Calyon Exhibit 6, at 18.

54.    As of August 15, 2008, Calyon was able to make the representations and warranties usually made in connection with selling mortgage loans.  *See* Transcript I, 122:23-25 (testimony of Mr. van Essche).

55.    The value to be obtained in a sale of mortgage loans is reduced by ten percent if the seller is not able to make the usual representations and warranties.  *See* Transcript I, 113:8-24 (testimony of Mr. van Essche); May 20, 2009 Transcript,[4] 27:1-15 (testimony of Calyon's expert).

### G.    The Parties' Experts

56.    The Debtors' expert was qualified as an expert in the area of finance and the valuations of assets that generate cash flows.  *See* Transcript I, 30:2-7.  The Debtors' expert analyzed the value of the Mortgage Loans based upon the cash flows that could be generated, "not what [the Mortgage Loans] could be sold for at a given point in time."  Transcript I, 47:13-17.  The Debtors' expert had never valued a pool of mortgage loans before this case, has never been directly involved with a sale of a pool of mortgage loans, did not look at any comparable sales of mortgage loans in performing his analysis and did not speak with anyone in the mortgage loan market regarding his analysis.  *See* Transcript I, 39:2-19.

57.    Calyon's expert was qualified as an expert on the subject of mortgage valuation.  *See* Transcript II, 16:1-2.  During 2007 and 2008, Calyon's expert on an annual basis valued trillions of dollars worth of mortgage loans.  *See* Transcript II, 8:24-9:1.  Calyon's expert analyzed the value of the Mortgage Loans based on a market valuation.  *See* Transcript II, 18:25-20:2, 22:16-21, 23:11-18, 24:21-25, 26:3-9, 27:11-15, 28:16-30:07; Calyon Exhibit 6, at 9-21. The market valuations of Calyon's expert are based on his extensive experience in the secondary

---

[4]        The May 20, 2009 Transcript shall be referred to herein as Transcript II.

mortgage market, his review or all relevant information for similar products, data tapes regarding the Mortgage Loans and the facts and circumstances on each relevant date. *See* <u>Calyon Exhibit 6</u>, at 6-21.

### H.    The Potential Sale of the Mortgage Loans

#### i.    August 1, 2007

58.    Calyon was not able to sell the Mortgage Loans for a commercially reasonable value as of August 1, 2007 because, *inter alia*, the mortgage market was dysfunctional, Calyon did not have complete and accurate information about the Mortgage Loans, there was a dispute as to the ownership of the Mortgage Loans, Calyon was not receiving the Proceeds, there was a dispute as to the MSRs and Calyon could not make the usual representations and warranties. *See* Transcript II, 22:16-21 (testimony of Calyon's expert); <u>Calyon Exhibit 6</u>, at 9-13; Transcript I, 96:21-97:9 (testimony of Mr. van Essche).

59.    In particular, Calyon's expert has never seen, and is not aware of, a mortgage loan portfolio sale in which (i) the ownership of the mortgage loans was in dispute; (ii) the ownership of the MSRs was in dispute; (iii) the ownership of the Proceeds was in dispute; and (iv) the seller was not listed as the owner by MERS. Transcript II, 20:12-21:3 (testimony of Calyon's expert); <u>Calyon Exhibit 6</u>, at 10-11.

60.    If Calyon had attempted to sell the Mortgage Loans on August 1, 2007, Calyon would not have been able to sell the Mortgage Loans or would have been able to sell the Mortgage Loans for only 10 percent of the value of the unpaid principal balance of the Mortgage Loans. *See* Transcript II, 18:25-20:2 (testimony of Calyon's expert), <u>Calyon Exhibit 6</u>, at 9-13.

#### ii.    September 30, 2007

61.    Calyon was not able to sell the Mortgage Loans for a commercially reasonable value as of September 30, 2007 because, *inter alia*, the mortgage market was

dysfunctional, Calyon did not have complete and accurate information about the Mortgage Loans, there was a dispute as to the ownership of the Mortgage Loans, Calyon was not receiving the Proceeds, there was a dispute as to the MSRs and Calyon could not make the usual representations and warranties. *See* Transcript II, 24:21-25 (testimony of Calyon's expert); Calyon Exhibit 6, at 13-16; Transcript I, 98:14-16 (testimony of Mr. van Essche).

62.    If Calyon had attempted to sell the Mortgage Loans on September 30, 2007, Calyon would not have been able to sell the Mortgage Loans or would have been able to sell the Mortgage Loans for only 10 percent of the value of the unpaid principal balance of the Mortgage Loans. *See* Transcript II, 23:11-18 (testimony of Calyon's expert), Calyon Exhibit 6, at 13-16.

### iii.    **January 30, 2008**

63.    Calyon was not able to sell the Mortgage Loans for a commercially reasonable value as of January 30, 2008 because, *inter alia*, Calyon did not have complete and accurate information about the Mortgage Loans, the Court's order regarding Calyon's ownership of the Mortgage Loans was not a final, non-appealable order, there was a dispute as to the MSRs and Calyon could not make the usual representations and warranties. *See* Transcript II, 27:11-15 (testimony of Calyon's expert); Calyon Exhibit 6, at 16-19; Transcript I, 107:24-109:7 (testimony of Mr. van Essche).

64.    If Calyon had attempted to sell the Mortgage Loans on January 30, 2008, Calyon would have been able to sell the Mortgage Loans for only 30 percent of the value of the

unpaid principal balance of the Mortgage Loans.  *See* Transcript II, 26:3-9 (testimony of Calyon's expert), <u>Calyon Exhibit 6</u>, at 16-19.[5]

### iv.    <u>**August 15, 2008**</u>

65.    The earliest date when Calyon could have sold the Mortgage Loans for a commercially reasonable value was August 15, 2008 because, *inter alia*, the Court's order regarding Calyon's ownership of the Mortgage Loans was a final, non-appealable order, and the remediation of the mortgage files related to the Mortgage Loans was substantially complete.  *See* Transcript I, 109:8-110:6 (testimony of Mr. van Essche).

66.    If Calyon had attempted to sell the Mortgage Loans on August 15, 2008, Calyon would have been able to sell the Mortgage Loans for $510,862,841.14, or 46.95 percent of the value of the unpaid principal balance of the Mortgage Loans without servicing, or for $515,923,065.04, or 47.42 percent of the value of the unpaid principal balance of the Mortgage Loans with servicing.  *See* Transcript II, 28:16-30:7 (testimony of Calyon's expert), <u>Calyon Exhibit 6</u>, at 19-21, <u>Calyon Exhibit 6A</u>; <u>Calyon Exhibit 9</u>.

### v.    <u>**The Record Contains No Other Market Valuations**</u>

67.    The other analyses in the record regarding the Mortgage Loans are not market valuations because

---

[5]    If as of January 30, 2008 there were no issues regarding the ownership of the Mortgage Loans, the information deficiencies regarding the Mortgage Loans or the MSRs, and Calyon could have made representations and warranties, Calyon could have sold the Mortgage Loans for 78 percent of the value of the unpaid principal balance of the Mortgage Loans.  *See* Transcript II, 26:14-25, 32:10-18 (testimony of Calyon's expert); <u>Calyon Exhibit 6</u>, at 17.  However, even if you ignore the issues regarding ownership, as a result of the undisputed information deficiencies such sale price would need to be reduced by at least 10 percent, to 68 percent of the value of the unpaid principal balance based on Calyon's inability to give representations and warranties on January 30, 2008.  *See* Transcript I, 122:17-22 (testimony of Mr. van Essche that on January 30, 2008, "[a]t that point, [Calyon] would be flying more or less blind.  So [Calyon] would not be in a shape to [give representations and warranties].");  Transcript II, 26:14-27:10, 32:10-18 (testimony of Calyon's expert); <u>Calyon Exhibit 6</u>, at 17.

(i)      the Debtors' discounted cash flow analysis does not reflect the

sales price that could be realized in the marketplace for the Mortgage

Loans.  *See* Transcript I, 39:18-42:9, 47:12-47:17 (testimony of the

Debtors' expert);

(ii)      the Compass valuations do not reflect the price that could be

obtained through a sale of the Mortgage Loans.  *See* Transcript I, 112:19-

25, 113:25-114:6, 173:7-12 (testimony of Mr. van Essche regarding

Compass);

(iii)      the Duetsche Bank materials do not indicate the sale price for the

Mortgage Loans.  *See* Transcript I, 173:13-16 (testimony of Mr. van

Essche regarding Deutsche Bank);

(iv)      Calyon's reserve amounts do not have any relationship to the price

Calyon could obtain in a sale of the Mortgage Loans on a given date.  *See*

Transcript I, 123:6-9 (testimony of Mr. van Essche regarding the Calyon'

reserve amounts);

(v)      Calyon's recovery estimates do not have any relationship to the

price Calyon could obtain in a sale of the Mortgage Loans on a given date.

*See* Transcript I, 171:19-172:7, 174:5-11 (testimony of Mr. van Essche

regarding recovery estimates); and

(vi)      the spreadsheet analyses performed by Calyon's expert for August

1, 2007, September 30, 2007 and January 30, 2008 do not take into

account the facts and circumstance in existence on those dates and do not

represent the prices at which the Mortgage Loans could be sold.  *See*

Transcript II, 26:3-9, 36:10-38:12 (testimony of Calyon's expert); <u>Calyon Exhibit 6</u>, at 9-19; <u>Calyon Exhibit 8</u>; <u>Calyon Exhibit 26</u>; <u>Calyon Exhibit 27</u>.

68.     In particular, the Debtors' discounted cash flow analysis does not reflect the sales price that could be realized in the marketplace for the Mortgage Loans because (a) comparable sales with lower values would not affect the analysis; (b) the analysis would not change if the market was dysfunctional; (c) the analysis does not account for the ownership disputes regarding the Mortgage Loans and the Proceeds, Calyon's lack of information regarding the Mortgage Loans or Calyon's inability to give the normal representations and warranties; and (d) the Debtors' expert acknowledged that the analysis did not reflect the sales price that could be realized in the market place for the Mortgage Loans on a given date.  *See* Transcript I, 39:18-41:25, 46:18-47:17 (testimony of Debtors' expert); Transcript II, 56:17-19 (closing statement of Debtors' counsel that what the Mortgage Loans are worth under the Debtors' discounted cash flow analysis "are much higher than what they would have sold for in the market."); <u>Calyon Exhibit 6</u>, at 7 (the report of Calyon's expert states that "[w]ith the recent disruption of the mortgage and general real estate market, the market value derived on seasoned pools of mortgage loans from a cash flow model has been significantly higher then [sic] where these pools of loans have been sold.").

## II.     <u>CONCLUSIONS OF LAW</u>

### A.     <u>Statutory Interpretation of 11 U.S.C. § 562</u>

69.     Bankruptcy Code section 562 sets forth the basis upon which damage claims under repurchase agreements shall be measured.  11 U.S.C. § 562.

70.     Section 562 states as follows:

(a)     If the trustee rejects a swap agreement, securities contract (as defined in section 741), forward contract, commodity contract (as defined in section 761), repurchase agreement or master netting agreement pursuant to section 365(a), or if a forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of –

(1)     the date of such rejection; or

(2)     the date or dates of such liquidation, termination, or acceleration.

(b)     If there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value.

(c)     For the purposes of subsection (b), if damages are not measured as of the date or dates of rejection, liquidation, termination, or acceleration, and the forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant or the trustee objects to the timing of the measurement of damages –

(1)     the trustee, in the case of an objection by a forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant; or

(2)     the forward contract merchant, stock broker, financial institution, securities clearing agency, repo participant, financial

> participant, master netting agreement
> participant, or swap participant, in the case
> of an objection by the trustee,
>
> has the burden of proving that there was not
> commercially reasonable determinants of
> value as of such date or dates.

11 U.S.C. § 562.

71.     Sections 562(a) and (b) provide that damages under the Repurchase Agreement "shall be measured" as of August 1, 2007, the date Calyon accelerated the Repurchase Agreement, or if there are not any commercially reasonable determinants of value on August 1, 2007, then damages "shall be measured" as of the earliest subsequent date or dates on which there is a commercially reasonable determinant.  *See* 11 U.S.C. § 562.

72.     Section 562 does not require that there be a sale to measure damages, such as is provided in Article 9-615(d)(2) of the Uniform Commercial Code.  *See* 11 U.S.C. § 562.  In fact, section 562 contemplates that there may not be a sale, yet mandates that damages be measured as of a particular date, specifically either the date of acceleration, liquidation or termination as if there were a sale or, if there are no commercially reasonable determinants of value on that date, then the first subsequent date or dates on which there is a commercially reasonable determinant of value.  *See id.*

73.     The Bankruptcy Code contains no definition of the term commercially reasonable determinants of value and this appears to be a case of first impression regarding the meaning of the of the term and section 562.

74.     The Supreme Court has repeatedly stated that "[t]he United States Congress says in a statute what it means and means in a statute what it says there."  *Hartford*

*Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *Connecticut*

*Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)).

75.     As the Supreme Court noted in *Hartford Underwriters*, "when a statute's

language is plain, the sole function of the courts, at least where the disposition of the text is not

absurd, is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters*

*Bank, N.A.*, 530 U.S. at 7 (internal quotations omitted).

76.     With respect to determining whether a particular statutory provision is

ambiguous, the Third Circuit has stated that,

> just because a particular provision may be, by itself,
> susceptible to differing constructions does not mean
> that the provision is therefore ambiguous.    The
> plainness or ambiguity of statutory language is
> determined by reference to the language itself, the
> specific context in which that language is used, and
> the broader context of the statute as a whole.
> Statutory context can suggest the natural reading of
> a provision that in isolation might yield contestable
> interpretations.    Specifically, in interpreting the
> Bankruptcy Code, the Supreme Court has been
> reluctant to declare its provisions ambiguous,
> preferring instead to take a broader, contextual
> view, and urging courts to not be guided by a single
> sentence or member of a sentence, but look to the
> provisions of the whole law, and to its object and
> policy.

*Price v. Delaware State Police Fed. Union (In re Price)*, 370 F.3d 362, 369 (3d. Cir. 2004)

(internal quotations omitted).

77.     As this Court has previously indicated,

> [i]f a statute is ambiguous, the Court must use other
> canons    of    statutory    construction,    including
> legislative history where available, to determine the
> purpose of the statute.    Moreover, regardless of
> whether the court's interpretation of the statute's
> purpose is based upon the plain meaning of the text

> or the application of canons of statutory interpretation to determine the meaning of ambiguous text, it is appropriate to identify, if possible, a congressional purpose consistent with the Court's interpretation of the text at issue.

*Calyon New York Branch v. American Home Mortgage*, 379 B.R. at 514-15 *(citing Price, 370 F.3d at 369 and Lamie v. United States Tr.*, 540 U.S. 526, 539 (2004)).

### B.    Commercially Reasonable Determinants of Value

78.    At issue here is what did Congress mean by the phrase "commercially reasonable determinants of value."   "Commercially" is the adverb for "commercial." "Commercial" is defined as "occupied with or engaged in commerce."   *Merriam Webster's Collegiate Dictionary, 10th Ed., 1996.*  "Commerce" is defined as "the exchange or buying and selling of commodities on a large scale."  *Id.*  "Reasonable" is defined in connection with "price" as "moderate, fair."  *Id.*  "Determinant" is defined as "having defined limits."  *Id.*  "Value" is defined as "the monetary worth of something: marketable price."  *Id.*  The plain meaning of these four words and the context in which they are used lead to the natural conclusion that "commercially reasonable determinants of value" means what you could buy or sell the Mortgage Loans for in the marketplace.  Thus, commercially reasonable determinants of value may include the price actually received in a sale, the price available from a generally recognized source, the most recent bid quotation from that source or expert testimony regarding the market price.

79.    Interpreting commercially reasonable determinants of value to mean a reasonable price or quote that could be obtained also gives meaning to sections 562(b) and (c) because, whether as a result of dysfunctional markets or problems with selling the assets at issue,

there may be dates when a reasonable price for the assets that fairly reflect their value cannot be

obtained by attempting to sell the assets at issue, and later dates would need to be used.

       80.    In explaining when to use a different date than the one specified in section

562(a), the legislative history of section 562 indicates that the existence of a "dysfunctional

market" could result in there being no commercially reasonable determinants of value for

liquidating the Mortgage Loans, which would require the use of a different date for determining

damages.  The legislative history states, in part, that,

> [s]ection 910 of the Act adds a new section 562 to the Bankruptcy Code providing that damages under any swap agreement, securities contract, forward contract, commodity contract, repurchase agreement or master netting agreement will be calculated as of the earlier of: (i) the date of rejection of such agreement by a trustee, or (ii) the date or dates of liquidation, termination or acceleration of such contract or agreement.

> Section 562 provides an exception to the rules in (i) and (ii) if there are no commercially reasonable determinants of value as of such date or dates, in which case damages are to be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value. Although it is expected that in most circumstances damages would be measured as of the date or dates of either rejection or liquidation, termination or acceleration, *in certain unusual circumstances, such as dysfunctional markets or liquidation of very large portfolios*, *there may be no commercially reasonable determinants of value of liquidating any such agreements or contracts or for liquidating all such agreements and contracts in a large portfolio on a single day*."

H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 20, 134-35 (2005), *reprinted in* App. Pt. 10(b)

*infra* (emphasis added).

81. The leading treatise on bankruptcy indicates that the existence of a volatile market would require the use of a different date for determining damages under section 562(b), and provides in part that,

> [i]t is possible that, on the measurement date specified by operation of section 562(a), no commercially reasonable determinant of value is available. For example, if the debtor is a hedge fund that became insolvent as a result of *volatile market activity* in certain securities, and if a Protected Counterparty terminates its securities contracts and/or repurchase agreements involving such securities promptly following the debtor's commencement of a Bankruptcy Code case, *the market for securities could be quite disorderly*. In such circumstances, *it might not be possible for the Protected Counterparty to obtain bids for the securities that fairly reflect their value* or a meaningful quote from a generally recognized market pricing source.
>
> If no commercially reasonable determinant of value is available on the date specified by operation of section 562(a), the measurement date is deferred by section 562(b) to the first subsequent date or dates on which there are commercially reasonable determinants of value."

Collier on Bankruptcy, ¶ 562.03 (Alan N. Resnick and Henry J. Sommer eds. 15th ed. rev. 2009) (emphasis added).

82. In addition, section 562.01 of Collier's in reference to the "protected transactions," i.e., those protected by the safe harbor, states that the safe harbor was intended to permit the non-debtor party to exercise contractual remedies under a repurchase agreement without interferences. "Among other things, such termination and exercise of contractual remedies typically entails an acceleration of the outstanding obligations of the parties to the

protected transaction and fixing damages *by reference to the prevailing market prices and values at the time of the termination*." Collier on Bankruptcy, ¶ 562.01 (emphasis added).

83.     This interpretation comports with the liquidity context and purpose of the Bankruptcy Code safe harbor provisions because it results in damages being measured on the first date when the assets at issue could be sold for a reasonable value.  As this Court noted in its January opinion, the repurchase market

> has become the principal means of financing the market for United States government securities and has expanded to include other types of financial investments, such as mortgage-backed securities and mortgage loans.  The common element in all uses of repurchase agreements is liquidity… As a result, since 1982, Congress has enacted a number of amendments to the Bankruptcy Code that work in concert to preserve the liquidity of the repo market by exempting repurchase agreements from significant provisions such as the automatic stay.

*Calyon New York Branch v. American Home Mortgage*, 379 B.R. at 512.

84.     The amendments to the Bankruptcy Code in 1982 and 1995 which provided the safe harbor for repurchase agreements were intended to preserve liquidity in the repurchase agreement market.  As set forth by a leading treatise regarding section 559, the safe harbor provision for repurchase agreements,

> [m]ost repurchase agreements afford a nondefaulting party the right to "close-out" or "liquidate" the agreement upon the other party's default.  Such a close out or liquidation typically entails terminating or cancelling the agreement, *fixing the damages suffered by the nondefaulting party based on market conditions at the time* of the liquidation, and accelerating the required payment

date of the net amount of the remaining obligations and damages.  For example:[6]

(a)  In the case of a reverse repurchase agreement under which a dealer purchased securities from the debtor in the first leg of the transaction, the dealer would generally have the right on the debtor's default to terminate the agreement, *fix as the dealer's damages any excess of the contract repurchase price for the securities over the current market price of the securities (determined through a commercially reasonable sale of the securities, bids for securities obtained in a commercially reasonable manner or a recognized market pricing source)*, and require immediate payment of the damages; and

(b)  In the case of a repurchase agreement under which a dealer sold securities to the debtor in the first leg of the transaction, the dealer would generally have the right on the debtor's default to terminate the agreement, fix as the dealer's damages any excess of the current market price of the securities (determined through the purchase of similar securities in the principal market therefor or a recognized market pricing source) over the contract repurchase price, and require immediate payment of damages.

Collier on Bankruptcy, ¶ 559.04[1] (emphasis added) (internal citations omitted).  Thus, a leading treatise confirms that the liquidity context and purpose of the safe harbor provisions are served by determining damages based on the market price of the assets at issue.

85.    Interpreting commercially reasonable determinants of value to mean a price or quote for the Mortgage Loans that fairly reflect their value is also consistent with the

---

[6]    Example "(a)" from the treatise applies to the Repurchase Agreement because under the Repurchase Agreement Calyon purchased the Mortgage Loans from the Debtors in the first leg of the transaction.

portion of section 559 dealing with any excess amounts received under a repurchase agreement,

which provides,

> in the event that a repo participant…liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, any excess of the ***market prices received on liquidation*** of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, ***at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source***) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to the available rights of setoff.

11 U.S.C. § 559 (emphasis added).

86. Section 559 of the Bankruptcy Code clearly contemplates that any excess following liquidation shall be calculated by subtracting the market price from the repurchase price and all expenses in connection with the liquidation or, if all of the mortgages are not disposed of on the date of liquidation, the amount due the debtor would be the difference between the prices available at the time of liquidation of the repurchase agreement from (i) a generally recognized source or (ii) the most recent closing bid quotations from such source less the stated repurchase price and all expenses in connection with the liquidation. In either event, the relevant prices for determining whether an excess is owed to a debtor are market prices.

87. Further, as a result of measuring damages as of the first date when the assets at issue could be sold for a reasonable value, Congress placed the risks and rewards of retaining the assets after such date completely with the owner of the assets, and after that date the value of the owner's claim against the non-owner will not increase or decrease based on

subsequent market events.  Hence, non-owner debtors are not insurers against future losses or beneficiaries of future gains.

88.    This comports with the liquidity context and purpose of the Bankruptcy Code safe harbor provisions because the non-owner should not retain any risks or rewards after the owner could sell the assets at issue for a reasonable value; instead all such risks and rewards should reside with the owner of the assets.

89.    Moreover, by discussing the liquidation of large portfolios, the legislative history confirms that the appropriate analysis to determine whether commercially reasonable determinants of value exist is not whether a functioning market existed for a certain type of securities on a given date, but that instead the appropriate analysis is whether *the particular securities in a given transaction* could have been sold on a given date for a reasonable value. *See* H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 20, 134-35 (2005).  Otherwise, the legislative history only would have discussed dysfunctional markets in general.

90.    In addition, determining whether commercially reasonable determinants of value exist based on the ability to sell the particular assets at issue for a reasonable value prevents potentially inequitable results that would conflict with the liquidity context and purpose of the Bankruptcy Code safe harbor provisions.

91.    For example, if the owner's ability to sell the particular assets in a given transaction is not considered, a debtor repo participant could challenge the owner's ownership of the assets, as was done here, or otherwise take actions that result in the owner being unable to sell the assets for a reasonable value without accepting the consequences of such actions.

92.    Specifically, failing to determine whether commercially reasonable determinants of value exist based on whether the owner could sell the specific assets at issue for

a reasonable price could lead to the inequitable result of the owner having its assets decrease in value during a time when it was unable to obtain a reasonable price for the assets because of the debtor's conduct, while simultaneously valuing the owner's claim against the debtor based on a higher market price than the owner could have obtained.[7]

93.     Moreover, such a result would be contrary to the liquidity context and purpose of the Bankruptcy Code safe harbor provisions because it would allow a debtor repo participant to prevent the owner of the assets from selling the assets for a reasonable value without the debtor suffering any consequences if the market declines while the owner is unable to sell the assets.  Such a result would turn the Bankruptcy Code safe harbor provisions on their head.

94.     This, however, is precisely the inequitable result the Debtors seek by attempting to value Calyon's damages under the Repurchase Agreement as of August 1, 2007, September 30, 2007 or January 30, 2008, because the Debtors' actions, including, without limitation, the disputes over the ownership of the Mortgage Loans and the Proceeds, and the Debtors' refusal to provide Calyon with the Proceeds or information about the Proceeds or the Mortgage Loans, resulted in Calyon being unable to sell the Mortgage Loans for a commercially reasonable value on those dates.  It would compound the inequity to apply a discounted cash flow value as the Debtors argue because a discounted cash flow value does not take into consideration the Debtors' actions.

95.     Thus, the term commercially reasonable determinants of value means a reasonable price or quote that Calyon could obtain by selling the Mortgage Loans on a particular

---

[7]     The Debtors took the position that the Mortgages were property of the estate and protected by the automatic stay and, hence Calyon was prevented from selling the Mortgage Loans until January 2008, and was prevented from selling the Mortgage Loans at a commercially reasonable price until August 2008.

date, which interpretation is supported by the plain meaning of section 562, the context and purpose of section 562, the legislative history, a leading treatise and equitable considerations.

96.    Therefore, the first date on which commercially reasonable determinants of value existed after August 1, 2007 was August 15, 2008.

### C.    The Debtors' Discounted Cash Flow Argument

97.    The Debtors argue that the discounted cash flow valuation testified to by their expert constitutes a commercially reasonable determinant of value under section 562 and thus at all relevant times[8] there were commercially reasonable determinants of value, and, hence, Calyon has failed to prove that there were no commercially reasonable determinants of value as of August 1, 2007, the date of acceleration.

98.    The Debtors' argument is not consistent with section 562 because a discounted cash flow analysis will ***always*** provide a valuation for an income producing asset,[9] and thus would render Bankruptcy Code sections 562(b) and (c) nullities because there would never be a time when commercially reasonable determinants of value failed to exist if a discounted cash flow valuation constituted a commercially reasonable determinant of value. *See also* Transcript I, 39:20-40:5; 48:22-49:2 (the Debtors' expert admitted that a dysfunctional market would not affect his discounted cash flow valuations).

---

[8]    The parties have stipulated that there are four relevant dates for purposes of calculating commercially reasonable determinants of value.  They are:  August 1, 2007; September 30, 2007; January 31, 2008; and August 15, 2008.

[9]    In addition to mortgage loans, numerous income producing assets are potentially covered by section 562 in connection with repurchase agreements including certificates of deposit, income producing mortgage related securities, income producing interests in mortgage related securities and income producing securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States. *See* 11 U.S.C. § 101(47).

99.    The Debtors' argument also is contrary to the context and purpose of section 562, which relates to the Bankruptcy Code's safe harbor provisions and preserving liquidity.  *See Calyon New York Branch v. American Home Mortgage Corp. (In re American Home Mortgage, Inc.)*, 379 B.R. 503, 512 (Bankr. D. Del. 2008) ("since 1982, Congress has enacted a number of amendments to the Bankruptcy Code that work in concert to preserve the liquidity of the repo market by exempting repurchase agreements from significant provisions such as the automatic stay."); *see also* H.R. Rep. 109-31, pt. 1, at 133 (2005) (providing that Congress "intended that the normal business practice in the event of a default of a party based on bankruptcy or insolvency is to terminate, liquidate and accelerate … repurchase agreements with the bankrupt or insolvent party."); Collier on Bankruptcy, 559.04[1].

100.    The Debtors argue that whether it is 10-cents on the dollar or 50-cents on the dollar, any sale of the Mortgage Loans at those amounts is commercially unreasonable when the Debtors' discounted cash flow valuation shows that over time Calyon will receive substantially all of the Repurchase Price.  Not only is this argument, especially with respect to the 50-cents on the dollar value, contrary to prior holdings of this Court regarding the reasonable exercise of the Debtors' business judgment concerning sales of mortgage loans for as little as one percent or less of their unpaid principal balance, but this argument would nullify the liquidity context and purpose of the safe harbor provisions because to realize a discounted cash flow value, even assuming it is correct, a repo participant must hold the mortgage loans until maturity and not liquidate them.  *See* Transcript II, 77:24-78:6 (statements of the Court).  It also renders meaningless section 562(b) because if a discounted cash flow valuation is a commercially reasonable determinant of value under section 562, then there would never be the situation Congress contemplated when it enacted section 562(b) because discounted cash flow valuations

are not affected by dysfunctional markets or other unusual circumstances.  *See* H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 20, 134-35 (2005).

101.    Further, a discounted cash flow valuation does not constitute a commercially reasonable determinant of value as that term is used in section 562 because a discounted cash flow valuation does not reflect a market price that could be obtained in a sale, and hence applying a discounted cash flow value to the Mortgage Loans would be inconsistent with the liquidity context and purpose of section 562 and the safe harbor provisions.  *See also* Transcript I, 47:12-47:17 (the Debtors' expert admitted that his valuation was based upon the cash flows that can be generated, not what the Mortgage Loans could be sold for at a given point in time).

102.    If a discounted cash flow valuation constituted a commercially reasonable determinant of value, then the discussion of dysfunctional and volatile markets in the legislative history and the treatise would be meaningless because a discounted cash flow valuation does not change based on changes in the market.  *See* Transcript I, 39:20-40:5; 48:22-49:2 (the Debtors' expert admitted that a dysfunctional market would not affect his discounted cash flow valuations).

103.    Moreover, the Debtors' argument that its discounted cash flow valuation is a commercially reasonable determinant requires that value mean something different in section 562 than in section 559.  Section 559 clearly specifies a market price or market value for purposes of determining whether any excess is due the Debtors under section 559.  There is no reasonable explanation why Congress, on the one hand, would have intended that a discounted cash flow valuation be a commercially reasonable determinant of value for purposes of calculating damages owed to Calyon under section 562 and, on the other hand, would have used

a market value standard in section 559 when it was addressing the excess that could be owed to the Debtors. Therefore, it is impossible to reconcile the Debtors' argument that a discounted flow valuation is a commercially reasonable determinant of value under section 562 with the market valuation method specified in section 559.

104.    Thus, the Debtors argument fails because it is contrary to the plain meaning of section 562, the context and purpose of the Bankruptcy Code safe harbor provisions, the legislative history and a leading treatise.

**D.    The Debtors' Excess Argument**

105.    The Debtors argue, based on their discounted cash flow valuations, that not only should Calyon's claims be disallowed, but that Calyon should pay the Debtors the excess of the discounted cash flow valuation over the stated repurchase price. The Debtors' right to the proceeds of the liquidation of the mortgages is limited by section 559. 11 U.S.C. § 559; *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 753 (3d Cir. 1989).

106.    Section 559 provides that excess amounts are owed to the Debtors only if the market price received in a liquidation or, if all of the Mortgage Loans are not sold, the price available from a generally recognized source or most recent bid quotation from such source, exceed the repurchase price. 11 U.S.C. § 559. In this case, there was no "market price received" by Calyon for the Mortgage Loans nor is there any evidence in the record that the market price that could be received for the Mortgage Loans would exceed the Repurchase Price. Instead, the record indicates that the market price for the Mortgage Loans is substantially less than the Repurchase Price for the Mortgage Loans. *See* Stipulation of Facts, ¶¶ 41, 47, 53, 58; <u>Calyon</u>

<u>Exhibit 6</u>, at 6-21; Transcript II, 18:25-20:2, 23:11-18, 26:3-9, 28:16-30:7 (testimony of Calyon's expert).[10]

## III.    <u>CONCLUSION</u>

107.    Pursuant to Bankruptcy Code section 562, Calyon's damages for the Repurchase Price under the Repurchase Agreement are measured as of August 15, 2008, and are calculated by subtracting $515,923,065.04, the commercially reasonable determinant of value Calyon could obtain by selling the Mortgage Loans, from $994,416,230.32, the Repurchase Price under the Repurchase Agreement as of August 15, 2008.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[10]    In fact, in the Claim Objection the Debtors acknowledged that they were not seeking any excess from Calyon through the Claim Objection by expressly reserving "the right to seek turnover of any excess value of the Calyon Loan Portfolio" and indicating that a "[s]eparate notice and a hearing will be scheduled for any such objection or assertion of such further rights."    Claim Objection, ¶ 44.    Furthermore, any such claim would have be asserted in an adversary proceeding pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.    Fed. R. Bankr. P. 7001(1).

108.    Thus, the Claim Objection shall be denied and Calyon's damages claim under each of the Repurchase Agreement Claims is at least $478,493,165.28, and Calyon's Repurchase Agreement Claims each shall be allowed as general unsecured claims in the amount of at least $478,493,165.28.   This amount does not include the portion of the Repurchase Agreement Claims concerning costs and expenses, including attorneys' fees, other professional services and disbursements, as provided in the Repurchase Agreement because such portion of the Repurchase Agreement Claims, if any, was not at issue in this contested matter.

Respectfully submitted,

WOMBLE CARLYLE SANDRIDGE &
RICE, PLLC

_/s/ Michael G. Busenkell_____
Michael G. Busenkell (DE No. 3933)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: 302.252.4324
Facsimile: 302.252.4330

-and-

Benjamin C. Ackerly
Jason W. Harbour (DE No. 4176)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218

*Counsel to Calyon New York Branch*