# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMERICAN HOME MORTGAGE HOLDINGS, INC.,<br>a Delaware corporation, *et al.*,<br><br>                Debtors. | Chapter 11<br><br>Case No. 07-11047 (CSS)<br><br>Jointly Administered<br><br>Re: Dkt. Nos. 6824 and 7489 |

## CERTIFICATION OF COUNSEL REGARDING DEBTORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH DEBTORS' OBJECTIONS TO REPURCHASE DAMAGE CLAIMS FILED BY CALYON NEW YORK BRANCH, AS ADMINISTRATIVE AGENT

In accordance with the Stipulated Order signed by the Court, Debtors hereby submit the attached Proposed Findings of Fact and Conclusions of Law in connection with Debtors' Objections to Repurchase Damage Claims filed by Calyon New York Branch, as Administrative Agent.

Debtors' Proposed Findings of Fact and Conclusions of Law will also be emailed to Chambers in Word® format in accordance with the Court's instructions at the conclusion of trial.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John T. Dorsey (No. 2988)
Curtis J. Crowther (No. 3238)
Michelle S. Budicak (No. 4651)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and
Debtors-in-Possession

Dated: June 26, 2009

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------------- x
In re:                                            :    Chapter 11
                                                  :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,            :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                   :
                                                  :    Jointly Administered
                                                  :
                                                  :    Re: Dkt. No. 6824
         Debtors.                                 :
--------------------------------------------------------------- x
```

## [DEBTORS' PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, having reviewed the record, and after due deliberations, enters the following Findings of Fact and Conclusions of Law with respect to the Objections of the above-captioned debtors and debtors in possession (collectively the "Debtors") to Claim Nos. 8044, 8045, 8046, and 8047 filed by Calyon New York Branch ("Calyon"):

## BACKGROUND

1.      The Debtors and Calyon are parties to a Repurchase Agreement dated November 21, 2006 (the "Repurchase Agreement"). (Stipulation of Facts, ¶ 1 and Ex. A). In accordance with this agreement, Calyon purchased, from time to time, certain mortgage loans. (Stipulation of Facts, ¶ 2). One of the debtors, AHM SV, Inc.[1] ("Servicing") was initially appointed as servicer of all of the mortgage loans. (Stipulation of Facts ¶ 11).

2.      As of August 1, 2007 (the "Acceleration Date"), Calyon served the Debtors with a notice of default and accelerated the Repurchase Agreement. (Stipulation of Facts, ¶¶ 12-15). The acceleration of the Repurchase Agreement caused the Debtors to be obligated to repurchase

---

[1] AHM SV, Inc. was formerly known as American Home Mortgage Servicing, Inc. The corporate name was changed following the sale of the servicing business during the course of this bankruptcy case.

the loans owned by Calyon (the "Loan Portfolio") for a repurchase price of $1,143,840,204.36 (the "Repurchase Price")[2] on August 1, 2007. (Stipulation of Facts, ¶¶ 16, 41).

3.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code.

4.      On August 28, 2007, Calyon commenced an adversary proceeding numbered 07-51704 (CSS) (the "Calyon Adversary") through which it sought a declaratory judgment that the Repurchase Agreement is a "repurchase agreement," as that term is defined in  § 101(47) of the Bankruptcy Code, and not a secured financing arrangement.

5.      On January 4, 2008, the Court issued its opinion on this question and determined that the Repurchase Agreement is a "repurchase agreement" under § 101(47) and that, accordingly, Calyon's rights were not stayed, avoided or otherwise limited with respect to the ownership of the Loan Portfolio.  The Court's order in connection with this opinion was entered on January 15, 2008.

### Calyon's Claims and the Debtors' Objection

6.      On January 10, 2008, Calyon filed Proofs of Claim Numbers 8044, 8045, 8046, and 8047 (the "Repurchase Claims") against certain of the Debtors[3] in the total amount of

---

2  As a defined term throughout these Findings of Fact and Conclusions of Law, "Repurchase Price" shall mean $1,143,840,204.36, or the repurchase price as of August 1, 2007 and September 30, 2007.  By January 30, 2008 the repurchase price had been reduced by payments of $72,906,907.82 received by Calyon on account of the mortgage loans (to reduce the repurchase price to $1,070,933,296.54) and by August 15, 2008, the repurchase price had further been reduced by payments of $149,423,974.04 (to reduce the repurchase price to $994,416,230.32). (Stipulation of Facts, ¶¶ 52, 58).

3  Four identical proofs of claim were filed against four different debtors.  Proof of Claim Number 8044 was filed against Servicing, Proof of Claim Number 8045 was filed against American Home Mortgage Acceptance, Inc., Proof of Claim Number 8046 was filed against American Home Mortgage Corp., and Proof of Claim Number 8047 was filed against American Home Mortgage Investment Corp.  (Stipulation of Facts, ¶¶ 28-31).

$1,154,579,324.68. (Stipulation of Facts ¶¶ 28-31). The amount of Calyon's filed claims exceeded the total Repurchase Price.

7.     On January 9, 2009, Debtors filed their objections to the Repurchase Claims (the "Debtors' Objections"), seeking to either disallow the Repurchase Claims in full, or reduce them to an amount to be determined by this Court, pursuant to Section 562 of the Bankruptcy Code.

8.     As part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress added § 562 of the Bankruptcy Code to address the timing of damage measurement in connection with repurchase agreements. Section 562 states, in pertinent part:

> (a) If the trustee rejects a . . . repurchase agreement, . . ., or if a . . . repo participant . . . liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of –
>
> > (1)    the date of such rejection; or
> >
> > (2)    the date or dates of such liquidation, termination, or acceleration.
>
> (b) If there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value.

11 U.S.C. § 562. The Debtors contend that § 562(a) requires measurement of Calyon's damages, if any, on the Acceleration Date. If the Debtors are correct, Calyon might not have any claim for damages because the value of the mortgages subject to the Repurchase Agreement (the "Loan Portfolio") on that date, depending on the valuation methodology applied by this Court, could exceed the Repurchase Price (thereby leaving no deficiency or damage claim).

9.     On the other hand, Calyon contends that no "commercially reasonable determinants of value" existed on the Acceleration Date because the only appropriate valuation

3

methodology is the market or sale value, and Calyon could not have obtained a commercially reasonable price on the Acceleration Date for the Portfolio because the market was distressed and the Portfolio suffered from a number of alleged deficiencies that would affect its salability. Accordingly, Calyon asserts that subsection (b) of § 562 applies instead of subsection (a). Subsection (b) provides that, in lieu of the Acceleration Date (the first date triggered under § 562(a)), the Court must measure damages "as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value." Calyon contends that the earliest date on which there existed a commercially reasonable determinant of value was August 15, 2008.

10.     In response, the Debtors argue that subsection (b) of § 562 cannot apply because Calyon is unable to prove that no "commercially reasonable determinants of value" existed on the Acceleration Date. The Debtors contend that, on the Acceleration Date, at least two different methodologies reflected commercially reasonable values for the Portfolio – a discounted cash flow analysis as well as market analyses that Calyon obtained outside of the context of this litigation. Because both of these methodologies value the Loan Portfolio on the Acceleration Date at or above the Repurchase Price, the Debtors assert that Calyon has no deficiency claim and therefore no damage claim under Section 562.

11.     The Court held an evidentiary hearing on the Debtors' Objections on May 19 and 20, 2009 ("Objection Hearing").

***Evidence Presented at the Objection Hearing***

12.     At the Objection Hearing, to overcome the presumption of the validity of Calyon's proofs of claim, the Debtors submitted evidence that, contrary to the value asserted in Calyon's claims, when the loans are valued on a discounted cash flow ("DCF") basis, the value

of the Portfolio is at or above the Repurchase Price on any of the stipulated potential Valuation Dates.[4]

13.     The Debtors' expert, Dr. Ronnie Clayton, testified that a DCF analysis of the Loan Portfolio showed that the total value of the loans on any of the four possible Valuation Dates ranged from roughly $1.067 billion to $1.166 billion,[5] depending on the date used and whether the Loan Portfolio was valued on a "servicing retained" or "servicing released" basis. (Tr. 1 at 37:1-38:11).[6] Dr. Clayton further testified as to the appropriateness of a DCF valuation in all market conditions, noting that if there is a market for the assets at issue, the market should correlate closely with the DCF valuation, "[u]nless there is something very, very strange going on in the market." (Tr. 1 at 30:17-25). Where the market is dysfunctional, the DCF analysis is still an appropriate valuation methodology because it values the asset's cash flows, which continue regardless of market conditions. (Tr. 1 at 39:23-40:5).

14.     Calyon, on the theory that Section 562's reference to "commercially reasonable determinants of value" can only mean the Loan Portfolio's liquidation value, presented evidence regarding the dysfunctional nature of the market and the poor quality of the Loan Portfolio,

---

4 Prior to the claim objection hearing, the parties stipulated to limit the number of possible dates to value the Loan Portfolio to four: August 1, 2007 (the Acceleration Date), September 30, 2007 (shortly before the Debtors sold another large loan portfolio called Broadhollow), January 30, 2008 (shortly after the Court entered its ruling regarding the characterization of the Repurchase Agreement), and August 15, 2008 (the first date on which Calyon contends it was able to make representations and warranties regarding the Loan Portfolio) (collectively the "Valuation Dates").

5 How these figures compare to the repurchase price will depend on the Valuation Date that applies. If the Valuation Date used is the Acceleration Date or September 30, 2007, the Repurchase Price as defined above will apply. If either of the later dates are used as the Valuation Date, the repurchase price must be adjusted to reflect additional payments made to reduce the Loan Portfolio. For example, on January 30, 2008, the Repurchase Price had been reduced by payments of $72,906,907.82 (to a repurchase price of $1,070,933,296.54) and by August 15, 2008, the repurchase price had further been reduced by $149,423,974.04 (to a repurchase price of $994,416,230.32). (Stipulation of Facts, ¶¶ 52, 58).

6 Citations to the transcript from the Objection Hearing that was held on May 19, 2009 (Day 1) and May 20, 2009 (Day 2) will be cited as "Tr. [1 or 2] at ____".

which together, Calyon asserted, precluded liquidation on the Acceleration Date. Calyon did so through the testimony of one of Calyon's managing directors, and Calyon's expert witness.

15.    Calyon's first witness, John-Charles van Essche, testified as to the variety of issues that Calyon claimed prevented it from being able to sell the loans on three of the four possible Valuation Dates. [7] First, there was the dispute between Calyon and the Debtors as to who owned the mortgages, which was ultimately resolved by this Court in its decision and order in January of 2008, as discussed above. Second, Calyon asserted that it could not sell the loans because it was not directly receiving the loan proceeds, also until January of 2008, when the parties came to an agreement regarding the payment of proceeds on the underlying mortgage loans directly to Calyon. Third, Calyon claimed that it did not have complete loan files and collateral files. And finally, there was an issue as to whether Calyon or the Debtors owned the servicing rights to the Loan Portfolio. (Tr. 1 at 79:21 – 84:25; 95:14 – 98:16).

16.    Calyon also presented the testimony of its expert witness, Robert Branthover, who, in addition to offering further testimony regarding the impact of the alleged quality and ownership issues surrounding the loans in the Loan Portfolio in connection with a sale, also testified that the market value of the Loan Portfolio on the Acceleration Date was significantly discounted due to market conditions that existed on that date.

17.    The Court has considered all of the evidence presented and finds as follows:

---

7 As discussed further below, the testimony that Calyon offered on this point is conflicting. On one hand Calyon asserted it could not sell the Loan Portfolio on the Acceleration Date because of the various issues relating to the quality of the asset and the identity of the owner. On the other hand, Calyon also asserted that it had no intention of selling the loans at this time due to market conditions, rendering the previous point seemingly irrelevant.

DB02:8270497.6    066585.1001

# ANALYSIS

## I. SECTION 562'S REFERENCE TO "COMMERCIALLY REASONABLE DETERMINANTS OF VALUE" IS NOT LIMITED TO ONLY THE LIQUIDATION VALUE OF AN ASSET.

18.     The first step in ascertaining the damages, if any, of Calyon, is to resolve the question of law regarding the meaning of the phrase "commercially reasonable determinants of value," as that phrase is used in Section 562 of the Code. There is no case law to guide the Court on this issue. Accordingly, the Court relies on the plain language of the statute, the legislative history, including the policy underlying the Bankruptcy Code, and analogous case law for its conclusion that the phrase "commercially reasonable determinants of value" is not limited to only the sale value of the asset in question. The Court further holds that, even where the market is dysfunctional and no reasonable sale price can be obtained, "commercially reasonable determinants of value" may still exist, particularly where the asset to be valued is income-producing and therefore subject to valuation based on other generally accepted valuation methodologies such as the discounted cash flow method.

### A.     Plain Language of Section 562

19.     Well-established principles of statutory construction direct a Court interpreting a statute to look first to the plain meaning of the language chosen by the legislature. Official Comm. of Unsecured Creditors of United Healthcare Sys. v. Medical Staff, Local 1199J, 200 F.3d 170, 176 (3d Cir. 1999) ("As with all questions of statutory interpretation, we begin with the language of the statute itself."); Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). The language of the statute that is at issue here is as follows:

(a) If the trustee rejects a . . . repurchase agreement, . . ., or if a . . . repo participant . . . liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of –

    (1)    the date of such rejection; or

    (2)    the date or dates of such liquidation, termination, or acceleration.

(b) If there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value.

11 U.S.C. § 562. There are several aspects of the plain language of Section 562 that support the interpretation that "commercially reasonable determinants of value" does not just refer to "liquidation value" or the price that one could obtain for an asset if it were actually sold in the market (assuming a market exists).

    20.    The first, and most obvious indication that Calyon's proposed reading of Section 562 is incorrect, is the legislature's decision to use a broad descriptive phrase such as "commercially reasonable determinants of value" instead of simply the words "market value" or "sale price." Had the legislature intended to use the market value or sale price as the sole indicator of value, instead of saying "If there are not any commercially reasonable determinants of value . . ." it simply could have said "If a market or sale value cannot be obtained . . ." or "Where the market or sale value is not commercially reasonable . . ." That the legislature makes no reference to market value or sale value is the first indicator that it did not have this in mind as the sole method of measuring the value of assets.

21.    The second aspect of the statute that supports the Court's interpretation is the legislature's use of the plural form of the word "determinant" in conjunction with the word "value."   Section 562 says "commercially reasonable determinants of value" not "determinant of value." The use of the plural form of this word suggests the legislature's intent that more than one valuation methodology may constitute a "commercially reasonable determinant" of an asset's value. Additionally, the use of the word "value" as opposed to simply "market or sale price" is also indicative of an intent to encompass the possibility of the use of multiple methodologies for determining value, including those that do not rely on the existence of a functional market. While it is true that an asset's value may be that which the market assigns to it, it is also true that an asset may have value even where the market for that asset is dysfunctional or even non-existent.

22.    Taken together, these two aspects of the plain language of Section 562 suggest to the Court that an asset's liquidation value or sale price is not the sole and exclusive determinant of its value. The legislative history relevant to Section 562 further supports this interpretation.

**B.    The Legislative History of Section 562**

23.    Even assuming that the plain language of the statute was ambiguous, the legislative history of Section 562 supports the Court's holding that "commercially reasonable determinants of value" encompasses more than just the market or sale value of an asset on the relevant valuation date.

24.    First, there is the legislature's reference to a dysfunctional market scenario:

> Although it is expected that in most circumstances damages would be measured as of the date or dates of either rejection or liquidation, termination or acceleration, in certain unusual circumstances, such as dysfunctional markets or liquidation of very large portfolios, there may be no commercially reasonable

9

> determinants of value for liquidating any such agreements or
> contracts or for liquidating all such agreements and contracts in a
> large portfolio on a single day.

H.R. Rep. No. 109-31 at 134-35 (2005). Calyon argues that this language, particularly the repeated use of the word "liquidate" supports its view that "commercially reasonable determinants of value" refers only to what the asset would actually trade for in the marketplace. (Tr. 2 at 64:14 – 65:10). The Court disagrees.

25.    Assuming an ambiguity in the statutory language exists, when read in context, the Court views this section of the legislative history to mean simply that where the market is dysfunctional it may be difficult or impossible to assign a market value to an entire asset or asset pool on a single date – either because the nature of the market mandates that the asset be broken up and sold off in multiple pieces on multiple dates (thereby making it impossible to measure damages on a single date) <u>or</u> because the nature of the market at a given time would result in having to sell or liquidate the asset in a commercially unreasonable manner. When the latter scenario is present, as it is in this case, it does not mean that no "commercially reasonable determinants of value" exist *per se*, but rather means that market or sale value may not be a commercially reasonable determinant of the asset's value at that time. Under such circumstances, another determinant may and should be considered, provided that the alternative determinant of value is itself commercially reasonable.

26.    The second portion of the legislative history that supports the Court's interpretation of Section 562 is the statement regarding when dates other than the "rejection or liquidation, termination or acceleration" dates can be used (in other words, when subsection (b) of Section 562 will apply). The legislative history states:

> The party determining damages is given *limited discretion* to
> determine the dates as of which damages are to be measured. Its

10

> actions are circumscribed *unless there are no "commercially reasonable" determinants of value* for it to measure damages on the date or dates of either rejection or liquidation, termination or acceleration.

H.R. Rep. No. 109-31 at 134-35 (2005) (emphasis added). This portion of the legislative history suggests to the Court that the legislature intended subsection (b) of Section 562 to apply in only a minority of cases. That is, subsection (b) is intended to be the exception rather than the rule.

27. In this case, where the asset to be valued is income-producing in nature, the Court finds that application of subsection (b) of Section 562 would be inappropriate because a DCF analysis is available as a commercially reasonable methodology for determining the asset's value.[8] See, e.g. Riverhead v. Saffals Associates, Inc., 145 A.D.2d 423, 424 (N.Y. App. Div. 2d Dep't 1988) ("The actual income generated by the property in question is generally the surest indicator of its value."); In re Megan-Racine Assocs., 202 B.R. 660, 664 (Bankr. N.D.N.Y. 1996) ("[T]here is a definite relationship between the amount of net income a property will earn and its value.").[9]

28. In holding that a DCF analysis is a commercially reasonable methodology for determining the value of an asset where the asset is income-producing the Court does not read subsection (b) out of the statute as Calyon suggests. (Tr. 2 at 69:25 – 70:7). Subsection (b) remains applicable where the asset to be valued is not income-producing, where market value is

---

8 The Court does not mean to suggest that any DCF analysis offered into evidence will automatically constitute a "commercially reasonable determinant of value" as required by Section 562. The weight, if any, that the Court gives to a DCF analysis in a particular case will depend on the facts of that case. The weight that this Court gives to the DCF analysis submitted by the Debtors in this case is discussed below.

9 The Court cites to New York law for authority because the Repurchase Agreement's choice of law provision provides that New York law will apply. (Stipulation of Facts, Exhibit A at ¶ 13.6). The Court's reliance on case law for this proposition is also appropriate because the legislative history of Section 562 indicates that the statute's "references to commercially reasonable are intended to reflect existing state law standards relating to a creditor's actions in determining damages." H.R. Rep. No. 109-31 at 134-35 (2005).

DB02:8270497.6

066585.1001

unreliable due to a dysfunctional market, and there exists no other method for determining the value of the asset in a commercially reasonable manner on the relevant dates.[10]

### C.    Purpose and Intent of Section 562

29.     Finally, the Court rejects Calyon's interpretation of Section 562 because it is inconsistent with the purpose and intent of that section, which is simply to allow a party to a repurchase agreement, like Calyon, to obtain control of its asset immediately and liquidate it if necessary or desired; a course of action that, prior to the 2005 amendments, was prohibited by the automatic stay.

30.     Calyon's position, if accepted, would have the practical effect of taking Section 562 one step further, and making the Debtors an insurer for Calyon, to protect Calyon against losses it might incur in timing the liquidation of its asset – timing that it, exclusively, controls. Section 562 does not go this far.

31.     Calyon's position, if accepted, would also have the effect of potentially providing Calyon with a double recovery, given its continued collection of the principal and interest (and payoffs) on the mortgages in the Loan Portfolio.[11]  If Calyon holds the Loan Portfolio for long enough, at some point the amount of principal and interest it collects will likely exceed the Repurchase Price.  To allow Calyon to collect from the Debtors the full value of the Repurchase

---

10 For example, Section 562 applies to securities contracts or repurchase agreements involving securities.  The securities that are the subject of such an agreement may not be income producing assets and potentially can only be priced by obtaining a market value.  Accordingly, where the market is dysfunctional, no "commercially reasonable determinants of value" may exist, and application of subsection (b) of Section 562 is appropriate.  See 5 Collier on Bankruptcy, at 562-3 – 562-4 (15th ed. 2008).  The same is true of commodity contracts and forward contracts, to which Section 562 would also apply.

11 Since August of 2007, Calyon has collected approximately $275 million in principal and income on the Loan Portfolio.  (Tr. 1 at 142:4 – 6).

Price in addition would unjustly enrich Calyon at the Debtors' (and its creditors') expense. This was not what Section 562 was intended to do.

### D. Conclusions as to the Meaning of Section 562

32.     For all of these reasons, the Court holds that, as a matter of law, Section 562(a)'s reference to "commercially reasonable determinants of value" refers to more than just the liquidation or sale value of an asset. The Court further holds that, in this case, where the asset is income-producing, a DCF analysis constitutes a commercially reasonable methodology to determine the value of the asset. The Court now addresses the evidence presented on the issue of whether "commercially reasonable determinants of value" existed on the Acceleration Date.

## II.     CALYON HAS NOT MET ITS BURDEN OF PROOF AS TO THE NON-EXISTENCE OF "COMMERCIALLY REASONABLE DETERMINANTS OF VALUE" ON THE ACCELERATION DATE.

33.     In support of its proofs of claim, Calyon contends that there were no "commercially reasonable determinants of value" on the Acceleration Date, and that, therefore, the Court must determine the value of the Loan Portfolio on the first date on which a "commercially reasonable determinant of value" did exist. Calyon asserts that this date is August 15, 2008, the first date on which it could make representations and warranties regarding the Loan Portfolio.

34.     Debtors have the initial burden of rebutting the presumption of the validity of Calyon's proofs of claim. To meet this burden, the Debtors submitted evidence that a DCF analysis performed by their expert demonstrated that the Loan Portfolio had a much higher value than that asserted by Calyon in its proofs of claim.[12] As discussed in further detail below, the

---

12 See footnote 5, above, for explanation of how the repurchase price relates to the valuations of the Loan Portfolio.

Court finds this evidence by the Debtors to be sufficient to rebut the prima facie validity of Calyon's claims.

35. The burden then shifts to Calyon to establish that no "commercially reasonable determinants of value" existed on the Acceleration Date.[13] In its attempt to satisfy its burden of proof, Calyon submitted evidence that the Loan Portfolio could not be sold for a reasonable price on the Acceleration Date. For the reasons set forth below, the Court finds that Calyon has not met its burden of proof, and that "commercially reasonable determinants of value" did in fact exist on the Acceleration Date. Specifically, the Court finds that the DCF analysis of the Loan Portfolio submitted by the Debtors constitutes a "commercially reasonable determinant of value" under Section 562(a) in this case.

A. **The Debtors' Evidence**

36. To overcome the presumption that Calyon's proofs of claim are valid, the Debtors presented the expert testimony of Dr. Ronnie Clayton,[14] that the value of the Loan Portfolio on a DCF basis was in excess of the Repurchase Price asserted by Calyon in its proofs of claim. (Tr. 1 at 37-38).

37. Dr. Clayton testified that he performed a DCF analysis for every one of the more than 5,600 mortgages in the Loan Portfolio by first applying an appropriate discount rate, which he determined from his review of the Federal Home Loan Mortgage Corporation's Primary Mortgage Market Survey. He then adjusted the interest rate to reflect what was happening in the mortgage market at the time, and finally applied the adjusted rates to the discounted cash flows

---

13  11 U.S.C. § 562(c)(2).

14  The Court found Dr. Clayton to be qualified to testify as an expert in the area of finance, specifically the valuation of assets that generate cash flows. (Tr. 1 at 30:2 – 7).

on each individual mortgage and totaled them to determine the value of the Loan Portfolio. (Id. at 32:19 – 33:20).

38.    Dr. Clayton performed his analysis with alternative assumptions regarding the servicing rights. He determined what the value would be if the servicing rights were retained with the mortgages and also what the value would be if the servicing was released or separated from the mortgages.[15] (Id. at 35:2 – 18). Dr. Clayton also accounted for the delinquency rate of the Loan Portfolio as of August 1, 2007 and assumed a 50% recovery rate for loans identified as delinquent at that time (Id. at 35:18 – 36:22). He concluded that, on the Acceleration Date, the Loan Portfolio had alternative values on a DCF basis of either $1,162,817,745.15 (servicing retained) or $1,148,282,523.34 (servicing released). (Id. at 37:1-9).

39.    On cross-examination, Calyon attempted to establish that Dr. Clayton's analysis was unreliable because it did not take into consideration any of the factors that Calyon claimed related to the quality of the loans in the Loan Portfolio, such as comparable sales, the dysfunctional market, the ownership dispute, the servicing dispute, or the lack of complete loan files. (Tr. 1 at 39:11 – 49:6). Calyon was unsuccessful, however, as Dr. Clayton pointed out (correctly the Court finds) that the quality of the loans in the Loan Portfolio, while possibly affecting their salability, would not affect their cash flows. (Id.). Moreover, Dr. Clayton testified that one has to look at the Loan Portfolio on the valuation date being used, and not speculate about what may or may not happen in the future. (Id.)

---

15 In its Opinion dated January 4, 2009 and Order entered January 15, 2008, this Court held that the servicing rights remained with the Debtors. Since the status of the servicing rights had not been determined as of the Acceleration Date, Dr. Clayton considered both possible outcomes.

DB02:8270497.6

066585.1001

40.     Calyon did not challenge or dispute the actual methodology employed by Dr. Clayton and the Court finds that this aspect of Dr. Clayton's testimony is uncontested.

41.     Having reviewed Dr. Clayton's testimony, and finding the witness to be credible and the methodology employed to be one that is generally accepted within the relevant field, the Court finds that the Debtors have successfully overcome the presumption of the validity of Calyon's proofs of claim and put forth what the Court considers to be an accurate DCF analysis.[16] The burden then shifts to Calyon to prove the absence of any "commercially reasonable determinants of value" on the Acceleration Date.

### B.     Calyon's Evidence

#### 1.     The Quality of the Loans

42.     Calyon's only fact witness was John-Charles van Essche, a managing director in Calyon's distressed asset department, who testified as to the alleged issues relating to the quality and ownership of the loans that prevented Calyon from selling the Loan Portfolio on the Acceleration Date.  Though Mr. van Essche began with a somewhat plausible explanation as to why the problems with the loans in the Loan Portfolio would prevent a sale, it became clear by the end of his testimony that his explanation was litigation driven, and therefore, not very credible.

43.     Mr. van Essche testified on direct examination that Calyon could not have sold the Loan Portfolio on the Acceleration Date because the dispute regarding the ownership of the loans, the direction of the proceeds, and questions regarding the servicing "made it extremely

---

16 The Court also notes that Calyon itself acknowledged, outside of this litigation in the context of internal correspondence, that a DCF analysis was the appropriate method for valuing the Loan Portfolio pursuant to Financial Accounting Standard 114.  (See Tr. 1 at 147:23 – 150:8; Debtors' Exhibit 24 (in which a Calyon employee

difficult, if not impossible, for [Calyon] to sell these loans at anything close to a reasonable price, assuming there was a market there in the first place." (Tr. 1 at 96:21 – 97:9).

44.     But on cross-examination it became clear that Mr. van Essche's testimony regarding the significance of the problems with the loans in the Loan Portfolio was much different than the position Calyon had taken outside of the context of this litigation.  In correspondence dated May 23, 2008, to the SNC,[17] Calyon made a number of representations regarding the Loan Portfolio that are in direct contradiction with the statements made to this Court.  Calyon stated:

> Write-up [by the SNC] lists "negative" issues with the credit.  The full context of these issues is not explained . . .
>
> . . . Write-up correctly indicates that the issue of servicing rights must be resolved "so that the pool can be sold for a higher price". However, it should be noted that the difference in selling price caused by the servicing rights issue . . . is 300 bps to 400 bps at the most.  As explained to the examiners, purchasing the servicing rights is an option available and would cost only around 100 bps, thus negating to a great extent this issue.
>
> . . . Write-up refers to the deficiencies in the portfolio . . . .  As explained to the examiners, if mortgages are performing, file deficiencies (which in fact are prevalent throughout the industry) do not really impact sale value.
>
> . . . Write-up indicates there is no "desire to liquidate the portfolio under current market conditions that would severely affect the price".  This is true only because it makes more sense to sell when liquidity in the market recovers, which will result in higher prices. In the mean time, portfolio collections of P&I and full payoffs continue, thus reducing exposure.  The strategy being employed by holding is to maximize value.

---

indicates that Calyon's auditors acknowledge that under the applicable accounting rules, the justification of the reserve related to the Loan Portfolio is based on the present value of future cash-flows.).

17 "SNC" stands for Shared National Credit, which, as explained by Mr. van Essche is, in essence, a committee made up of various banking regulatory agencies for the purpose of reviewing syndicated loan transactions and determining certain loan loss reserve ideals.  (See Debtors' Ex. 28 at 194-95).

(Debtors' Exhibit 23).  Mr. van Essche made no attempt to explain the conflict in positions.[18]

Accordingly, the Court finds Mr. van Essche's testimony with regard to the effect that the quality of the Loan Portfolio would have on its salability to lack credibility and gives his testimony on this issue no weight.[19]

45.    Even if the Court were to find Mr. van Essche's testimony on this issue credible, it would have no effect on the Court's conclusion.  The Court finds that the issues regarding the quality of the loans and their ownership are irrelevant to the issue of whether "commercially reasonable determinants of value" existed on the Acceleration Date.  The evidence submitted shows that, from the time of the Acceleration Date, Calyon had no intention of selling the Loan Portfolio due to the dysfunctional state of the market.  (Tr. 1 at 98:17 – 99:7; 102: 4 – 10; 158:24 – 159:22).  Because Calyon's intent was to hold the loans, and not sell them, testimony regarding the variables that might have had an impact on a sale price is not relevant.  Moreover, the entire issue appears to be one contrived solely for purposes of this litigation.  Accordingly, the Court will not consider the alleged "problems" with the loans in its analysis and, even if it were to do so, would give such "problems" minimal weight.

### 2.    *The Market Valuations*

#### a)    *Calyon's Internal Market Analyses*

46.    Mr. van Essche also testified about a number of valuations of the Loan Portfolio that Calyon, or Calyon's retained agents or advisors, had performed on or about the Acceleration

---

18 Additionally, Mr. van Essche admitted that, as of August 1, 2007, the Acceleration Date, Calyon did not "know what the situation was" with respect to being able to provide representations and warranties on the loans.  (Tr. 1 at 138:12 – 22).  It is unclear to the Court how facts and circumstances unknown to Calyon on the Acceleration Date could have affected the salability of the Loan Portfolio on that date.

19 Calyon's expert, Mr. Branthover, also offered testimony regarding the poor quality of the loans and how that would affect their salability.  Because the Court finds that Mr. Branthover is not a credible witness, as discussed below, his testimony on this issue also has no weight.

Date.[20]  First, Mr. van Essche discussed the internal market analyses of the Loan Portfolio that Calyon conducted for the purposes of determining its potential recovery rate on the loans.  (Tr. 1 at 110:11 – 17).  Those analyses projected the recovery rate on the Portfolio to be 92.5% in August of 2007, shortly after the Acceleration Date.  (Debtors' Exhibit 6).

47.     Next, Mr. van Essche discussed the valuations Calyon obtained from a firm called Compass Analytics ("Compass"), which Calyon had retained to provide a market analysis of the Portfolio in late 2007.  (Tr. 1 at 112:10 – 12).  The Compass valuations, done on a market basis, indicate that the Loan Portfolio had a weighted price of $1,203,729,469 on July 27, 2007 (Debtors' Exhibit 4) (Total Unpaid Principal Balance of $1,187,930,000 x 101.33%) and $1,155,143,132 on August 20, 2007 (Debtors' Exhibit 1) (Total Unpaid Principal Balance of $1,187,930,000 x  97.24%).  Each valuation reflects a value in excess of the Repurchase Price.

48.     Though Mr. van Essche testified that he did not believe either Calyon's internal valuations or the Compass valuations accurately reflect what the loans would have actually sold for, the Court finds these valuations to be probative and convincing evidence of the market value of the Loan Portfolio because they were prepared for business purposes outside of the context of this litigation.[21]

---

20 The valuations that Mr. van Essche testified about do not include those performed by Calyon's expert witness, Mr. Branthover, which are discussed below.

21  Mr. van Essche stated as much during his testimony at the Objection Hearing.  (*See* Tr. 1 at 79:4 – 11) ("Q: Has Calyon engaged advisors both with respect to valuation and disposition of these mortgages? … A: With respect to valuation, we have hired – we hired sometime ago Compass Analytics.  For the case here in court today, we hired MIAC.").

### *b) Calyon's Expert's Market Analyses*

49.     Calyon presented Mr. Robert Branthover as its expert witness on the subject of mortgage valuation.[22]  Mr. Branthover testified that the market value of the Loan Portfolio on the Acceleration Date was, at best, 10 cents on the dollar. (Tr. 2 at 19:19 – 20:1).  His stated basis for this conclusion was that the unresolved questions as to ownership of the loans would have made it very difficult to find a buyer, analogizing the situation to the attempted sale of a car without a title.[23]  (Tr. 2 at 19:24 – 20:8).

50.     Mr. Branthover also testified that if asked to assign a value to the Loan Portfolio on the Acceleration Date on the assumption that there were no ownership issues, the value would still be at a substantial discount, somewhere around 50 cents on the dollar. (Tr. 2 at 41:2 – 22). But the actual results of Mr. Branthover's mathematical analysis had a different conclusion.

51.     The results of Mr. Branthover's market valuations were encompassed in printouts from the computer software that he employed, which printouts were referred to as "Pricing Summaries." (*See* Tr. 2 at 28:9 – 19).  The actual Pricing Summary for the Acceleration Date showed that the value of the loans on that date, when setting aside any ownership issues, was $1,122,993,637.07 which is in excess of 99 cents on the dollar; much higher than the 50 cents on the dollar that Mr. Branthover's testimony indicated.  (Debtors' Exhibit 26) (Current Unpaid Principal Balance x 99.5379%).

52.     Mr. Branthover initially testified that the Pricing Summaries that he generated accurately reflected the loans' market value.  (Tr. 2 at 42:11-25).  But on cross-examination,

---

22 The Court admitted Mr. Branthover as a qualified expert on the subject of mortgage valuation. (Tr. 2 at 16:1-3).

23  As discussed above, however, Calyon never had any intention of selling the loans on the Acceleration Date, or any of the other Valuation Dates.  Therefore, his testimony regarding issues that might affect the salability of the loans is essentially irrelevant.

when asked why the Pricing Summary for the Acceleration Date was not used as the basis for his conclusion as to the value of the Loan Portfolio on that date, when he testified that the Pricing Summaries for other Valuation Dates were, Mr. Branthover offered only a nonsensical response that failed to answer the question. (Tr. 2 at 43:20 – 45:25).[24]

53.     Because the Court cannot discern the basis for Mr. Branthover's conclusion that the market value of the loans on the Acceleration Date would only be 50 cents on the dollar, the Court assigns his opinion on this issue no weight.

### D.     Conclusion Regarding Whether Calyon Has Met Its Burden

54.     In sum, on the question of whether Calyon has met its burden of demonstrating that no "commercially reasonable determinants of value" existed on the Acceleration Date, the Court finds that Calyon has not.

55.     First, the Court finds credible the testimony of the Debtors' expert witness, Dr. Clayton, that a DCF analysis of the Loan Portfolio on the Acceleration Date showed the value of the loans on a DCF basis was either $1,162,817,745.15 (servicing included with mortgages) or $1,148,282,523.34 (servicing not included with mortgages). The court finds as a matter of law, that a DCF analysis is a commercially reasonable methodology for determining the value of the loans subject to the Repurchase Agreement in this case.

56.     Second, the Court rejects Calyon's argument that the quality of the loans prevented it from obtaining a commercially reasonable price at market on the Acceleration Date.

---

24 The same can be said of Mr. Branthover's conclusions for the next Valuation Date, September 30, 2007. In his report, Mr. Branthover concludes that the value of the Loan Portfolio on this date is "possibly 10 cents on the dollar." (Calyon's Exhibit 7 at 13). The Pricing Summary on which his conclusions are based, however, value the loans in excess of 99 cents on the dollar. (Debtors' Exhibit 27).

Calyon's position in this litigation is far different than the position it took with the SNC during its review process and, therefore, Calyon's testimony that the ownership and loan quality issues affected the sale price is not credible and appears litigation driven.

57.    Third, the Court finds that Calyon's expert witness was not credible, and, therefore assigns his market analyses no weight.  The Court further finds that the market analyses performed by Calyon's advisor, Compass, outside of the context of this litigation, indicating that the Loan Portfolio had a value of between 97.24% and 101.33% of the Unpaid Principal Balance (a value of either $1,155,143,132 to $1,203,729,469) on or about the Acceleration Date, are probative and convincing evidence of the Portfolio's market value as of that date.[25]

58.    For all of these reasons the Court finds that Calyon has not met its burden of proof that no "commercially reasonable determinants of value" existed on the Acceleration Date, and, accordingly, finds that the value of the Loan Portfolio on the Acceleration Date was $1,148,282,523.34 (the DCF value determined by the Debtors' expert, without servicing rights being included).  The Repurchase Price on the Acceleration Date was $1,143,840,204.36. Because the value of the Loan Portfolio exceeds the amount of Calyon's Claim, Calyon has no deficiency claim and therefore no damage claim under Section 562.

### III.    EVEN IF THE COURT WERE TO FIND THAT THE ONLY "COMMERCIALLY REASONABLE DETERMINANT OF VALUE" IS MARKET OR SALE VALUE, CALYON WOULD STILL HAVE NO CLAIM FOR DAMAGES BECAUSE IT HAS NOT OFFERED INTO EVIDENCE A MARKET VALUE THAT IS "COMMERCIALLY REASONABLE"

59.    Even if the Court were to agree with Calyon that the only "commercially reasonable determinant of value" is market or sale value, Calyon still has not met its burden of

---

[25] Mr. Branthover's actual Pricing Summary for August 1, 2007 also indicated a value that correlates very closely-- $1,122,993.637.07  Debtors' Exhibit 26.

proof that "no commercially reasonable determinants of value" existed until August 15, 2008 because none of the market analyses that Calyon submitted into evidence, including the valuation for August 15, 2008, were "commercially reasonable" as that term is used in Section 562.[26]

60.     The legislative history of Section 562 indicates that "references to commercially reasonable [within Section 562] are intended to reflect existing state law standards relating to a creditor's actions in determining damages." H.R. Rep. No. 109-31 at 134-35 (2005). The state law standard of commercial reasonableness is most often applied in the context of a secured creditor's sale of collateral obtained after default by a debtor. Such creditor sales are typically governed by Section 9-610 of the Uniform Commercial Code, which provides that "every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."[27]

61.     The Court finds two principles of commercial reasonableness, discussed by the drafters of the U.C.C. in the Official Comment to Article 9, to be helpful to this Court's analysis of commercial reasonableness under Section 562 of the Bankruptcy Code. The first deals with the significance of the timing of a sale to the question of whether the sale is reasonable. The relevant U.C.C. comment states that "[i]t may, for example, be prudent not to dispose of some goods when the market has collapsed." U.C.C. § 9-610, cmt. 3. The parties here do not dispute that the secondary mortgage market had collapsed as of the Acceleration Date, and remained dysfunctional thereafter. The Court will therefore consider whether it would have been

---

26 The only evidence of market value that Calyon submitted in support of its case were the valuations prepared by its expert, Mr. Branthover. The market valuations prepared by Calyon's advisor, Compass, were introduced into evidence by the Debtors.

27 The Court has previously held that the Repurchase Agreement is not governed by the U.C.C. Am. Home Mortg. Inv. Corp. v. Lehman Bros. (In re Am. Home Mortg. Holdings, Inc.), 388 B.R. 69, 88 - 92 (Bankr. D. Del. 2008). However, because the state law standard of commercial reasonableness is most frequently

"commercially reasonable" to sell the Loan Portfolio during the Valuation Dates in light of the then-existing state of the market.

62.    The second principle of commercial reasonableness applicable to this case addresses the extent to which the sale price is relevant to the determination of the commercial reasonableness of a sale.  The relevant U.C.C. comment states that while an unusually low market or sale price may not be sufficient by itself to render a sale commercially unreasonable,[28] "a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable."  See U.C.C. § 9-627, cmt. 2.  Given that the market values that Calyon has assigned to the Loan Portfolio on all of the Valuation Dates were significantly below the Repurchase Price, and the anticipated cash flows to be generated from the Loan Portfolio, the Court finds careful scrutiny of the facts and circumstances at the time of the proposed dispositions to be warranted.[29]

<b>A.    The Facts Suggest That, Due to a Collapsed Market, it would not have been "Commercially Reasonable" to Sell the Loan Portfolio on any of the Valuation Dates</b>

63.    It is not disputed that the state of the secondary mortgage market as of the Acceleration Date, and as of each of the Valuation Dates thereafter, was dysfunctional, at best. Calyon was aware of the state of the market and, in fact, based its decision not to even attempt to sell the Portfolio, at least in part, on the fact that it would only be able to obtain a fraction of the

---

referenced in contexts that are governed by the U.C.C., the Court finds the principles applied in such situations to be helpful and persuasive.

28    There are some contexts, however, in which price alone will render a sale unreasonable.  See, e.g., Girard Trust Bank v. Castle Apartments, Inc., 379 A.2d 1144, 1145 (Del. Super. Ct. 1977) discussing the generally applied principle in Delaware that a sale price at a sheriff's sale that is less than 50% of the property's fair market value will cause the sale to be invalidated.

29    The Court recognizes that the U.C.C. comment refers to scrutiny of "all aspects of a disposition," and that there was, in fact, no disposition to analyze in this case.  Scrutiny of the circumstances that existed on the proposed disposition date is sufficient here because, as discussed below, the Court finds that a sale on any of the Valuation Dates would have been commercially unreasonable regardless of how such a sale would have been conducted.

Repurchase Price. (Debtors' Exhibit 28 at 66:5 – 67:2 (testifying that the mortgage market today is "driven by liquidations more than anything else.")). Calyon's witness, Mr. van Essche, testified in no uncertain terms that Calyon believed it would be "stupid" to sell the loans with the market in the dysfunctional state it was in. (Tr. 1 at 168: 20 – 169:4 (testifying that selling the loans for 20 or 30 cents below par "would be a stupid thing to do.")).

64.     In addition to its knowledge that the market was dysfunctional, Calyon also knew that the Loan Portfolio was, and would likely continue to be, profitable from a cash flow perspective. That is, Calyon was collecting significant sums of money from the payments of principal and interest on the loans, as well as loan payoffs, and believed that it would continue to do so into the foreseeable future. (Tr. 1 at 142:4 – 6). Calyon itself also projected the recovery rate on the Loan Portfolio to be 92.5% in August of 2007, indicating that it believed it would likely recover at least 92% of the value of the Loan Portfolio over time. (Tr. 1 at 110:11 – 17; Debtors' Exhibit 6; Debtors' Exhibit 28 at 27 - 28).

65.     Mr. van Essche further testified that Calyon was under no compulsion to sell the loans. (Tr. 1 at 159: 18 – 22) (testifying that there was no time pressure to realize on the portfolio "as long as you're collecting principal and interest"). This is contrasted with previous mortgage sales that Calyon was involved with, such as the Broadhollow Portfolio in September of 2007, which was a compelled sale for which a blended price of roughly 80 cents on the dollar was obtained. (Tr. 1 at 118:24 – 121:1).[30]

66.     The Court finds that consideration of all of these facts and circumstances supports a finding that the sale of the Loan Portfolio by Calyon on any of the Valuation Dates would not

---

[30] Mr. van Essche further testified that Calyon was unhappy with that sale price, believing the price should have been higher, even though it was a compelled sale. (Tr. 1 at 118:24 – 121:1; 165.14 – 166:6; Debtors' Exhibit 27 at 31:7-11).

DB02:8270497.6                    066585.1001

have been "commercially reasonable." The Court bases its finding on this point on the combined facts that: a) the market had collapsed to the point that any sale would have been at a significant discount; b) the loans were income-producing; and c) Calyon was under no compulsion to sell.

**B.    None of the Proposed Market Analyses Submitted by Calyon are "Commercially Reasonable."**

67.    In addition to examining the general facts and circumstances that existed at the time of the Valuation Dates, the Court also examined the individual market analyses submitted by Calyon for each of the Valuation Dates and the testimony associated with each and concludes that the market analyses are not "commercially reasonable."

68.    The market analyses that Calyon submitted into evidence for both August 1, 2007 and September 30, 2007 value the loans at approximately 10 cents on the dollar. (Calyon Exhibit 6 at 9-16). But both of Calyon's witnesses, including Calyon's expert witness who conducted the market analyses, testified that, if Calyon had sold the loans in August or September of 2007, it would not have been able to obtain a reasonable price. (Tr. 1 at 96:21 – 23; 98:14 - 16; Tr. 2 at 22:19 – 21; 24:23 – 25).

69.    The market analysis submitted by Calyon for the Valuation Date of January 30, 2008 valued the loans at range of 30 cents on the dollar to 78 cents on the dollar, depending on whether or not Calyon would give representations and warranties with the loans. (Calyon's Exhibit 6 at 16-19). Calyon's expert witness also testified that, with respect to this Valuation Date, he did not believe Calyon would be able to obtain anything close to the high end of this range, and that less would not have been a reasonable price. (Tr. 2 at 26:3 – 27:15 (testifying that the value of 78 cents of the dollar assumed "we lived in a perfect world" and that taking into consideration the facts and circumstances that existed on January 30, 2008, Calyon could not have sold the Loan Portfolio on that day for a reasonable price) and 32:10 – 18 (testifying he did

not believe the Loan Portfolio could have been sold for 78.09% of the current unpaid principal balance on January 30, 2008)). Calyon's other witness, Mr. van Essche, also testified that he did not believe that Calyon could have sold the loans on January 30, 2008 for a reasonable price. (Tr. 1 at 107:24 – 108:1).

70. The last date in the set of stipulated Valuation Dates is August 15, 2008. This is also the first date on which Calyon contends that a "commercially reasonable determinant of value" existed. But the evidence shows that Calyon did not believe it could have obtained a "commercially reasonable" price on this date either. The market analysis submitted by Calyon for this date valued the loans at between 44.14 and 44.61 cents on the dollar, on either a servicing retained or servicing released basis. (Calyon Exhibit 6 at 19).[31] Mr. Branthover testified that he thought the Loan Portfolio could be sold in the market on August 15, 2008, but would not testify that Calyon could have obtained a reasonable price. Instead, he stated that "'[r]easonable' is not for me to decide." (Tr. 2 at 31:5 – 11). Calyon's fact witness, Mr. van Essche also testified that at that time the market was still "nonexistent or, at best, in very bad shape." (Tr. 1. at 111:23 – 24).

71. There is no testimony on the record that any of the market analyses submitted by Calyon for any of the Valuation Dates would have constituted a "commercially reasonable determinant of value." To the contrary, all of the evidence demonstrates that Calyon itself believed the proposed market prices for the Loan Portfolio were commercially unreasonable. For these reasons, the Court finds that none of the market analyses submitted by Calyon

---

31 Mr. Branthover's expert report values the Loan Portfolio on this date at 44.14 cents on the dollar (exclusive of the servicing assets) and 44.61 cents on the dollar (including the servicing assets). Mr. Branthover testified at the Objection Hearing that these numbers were incorrect and that the actual value of the Loan Portfolio on this date is 46.95 (without servicing) and 47.42 (with servicing). (Tr. 2 at 28:20 – 30:7).

constitute "commercially reasonable determinants of value" and that, accordingly, Calyon has not met its burden under Section 562.

72.     The Court finds that if Calyon were to sell the Loan Portfolio on the market, at the prices that it has offered on each of the stipulated Valuation Dates, that such sale would be commercially unreasonable. This conclusion is bolstered by the following: (a) Calyon has consistently chosen not to sell the Loan Portfolio at such prices even when it could have sold it, (b) Calyon itself has projected recovery rates based on anticipated cash flows that far exceed such market prices, and (c) the uncontroverted evidence is that the market, while existing, was still dysfunctional.

## CONCLUSION

73.     The Court makes the following conclusions based on its review of the evidence submitted:

> (a)   Section 562's reference to "commercially reasonable determinants of value" is not limited to the market or sale value of an asset;

> (b)   A discounted cash flow methodology is a "commercially reasonable determinant of value" for the mortgage portfolio at issue in this case, which is an income-producing asset;

> (c)   The discounted cash flow analysis that was submitted by the Debtors is compelling evidence of the value of the Loan Portfolio; and

> (d)   Calyon failed to meet its burden of proof, even considering the market value of the Loan Portfolio, because the evidence regarding the market value was conflicting and all of the market values submitted by Calyon are commercially unreasonable.

74.     Based on these findings, the Court concludes that the value of the Loan Portfolio as of the Acceleration Date was $1,148,282,523.34. The Repurchase Price on the Acceleration Date was $1,143,840,204.36. Because the value of the Loan Portfolio exceeds the Repurchase Price, Calyon has no deficiency claim and therefore no damages under Section 562.

75.     Accordingly, Debtors' objections to the Repurchase Claims are sustained and the Repurchase Claims will be expunged.

_____
Christopher S. Sontchi,
United States Bankruptcy Judge

DB02:8270497.6

066585.1001