### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | x | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **AMERICAN HOME MORTGAGE** | : | **Case No. 07-11047 (CSS)** |
| **HOLDINGS, INC., a Delaware corporation,** | : | |
| **et al.,**[1] | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | **Related to Docket No. 7986** |
| | : | |
| | x | |

### AMERICAN HOME MORTGAGE SERVICING, INC.'S
### RESPONSE TO CITIMORTGAGE, INC.'S MOTION
### TO COMPEL AHM SERVICING TO RESPOND TO TWO
### REQUESTS FOR THE PRODUCTION OF DOCUMENTS

American Home Mortgage Servicing, Inc. (the "Purchaser"), the purchaser of substantially all of the above captioned debtors' (the "Debtors") assets related to their loan servicing business, by and through its undersigned counsel, hereby submits its response to CitiMortgage, Inc.'s ("CMI") Motion to Compel AHM Servicing to Respond to Two Requests for the Production of Documents (the "Motion to Compel"), as follows:

### PRELIMINARY STATEMENT

1.      Under the clear and unambiguous provisions of the Sale Order (as defined below), the Purchaser must reimburse the Debtors for all amounts owed, if any, with respect to "defaults arising under the Assumed Contracts with respect to acts or omissions occurring during the period from the Initial Closing [November 16, 2007] to the Final Closing [April 11, 2008]." *See*

---

[1]      The above-captioned debtors and debtors in possession in these cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc., a Maryland corporation, formerly known as American Home Mortgage Servicing, Inc. (7267); American Home Mortgage Corp., a New York Corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

Sale Order at ¶ 36. Any such amounts are defined in the Sale Order as "Purchaser's Cure Amounts." See Id. (Hereafter, the period of time between the Initial Closing and the Final Closing shall be referred to as the "Interim Period").

2.     On June 28, 2008, CMI filed a Purchaser's Cure Amount totaling $111,582.85, without (a) alleging any default under its assumed contracts during the Interim Period; or (b) attaching the legal invoices detailing the services performed and the fees incurred for which it seeks payment as a Purchaser's Cure Amount.

3.     Before incurring the significant time and expense associated with responding to CMI's written discovery, the Purchaser asked CMI two simple questions, which CMI will be required to answer before the Court: (1) What default occurred during the Interim Period?; and (2) How do the fees and costs for which CMI seeks repayment relate to such default? CMI did not respond to the Purchaser's questions,[2] so the Purchaser objected to CMI's discovery and served its own request for production.

4.     The reason CMI failed to voluntarily respond to the Purchaser's simple questions was revealed in CMI's recent response to the Purchaser's formal discovery. As suspected, the documents produced this week by CMI make clear that (a) the alleged defaults under the assumed contracts relate to the Debtors' alleged failure to deliver required documents prior to the Initial Closing; and (b) the fees and costs for which CMI seeks reimbursement have nothing to do with the performance under the assumed contracts during the Interim Period, but instead, appear to encompass all of the fees and costs CMI incurred during the Interim Period in participating in the Debtors' bankruptcy cases on matters which have nothing to do with the Purchaser.

---

[2]     While CMI did inform the Purchaser of alleged "document delivery defaults," CMI provided no specifics regarding any such alleged defaults arising from acts or omissions during the Interim Period.

5.     In these circumstances, CMI's discovery seeks information that is irrelevant to any claim that it has asserted and will not lead to the discovery of admissible evidence.

6.     Even assuming, *arguendo*, that CMI could articulate a default under the assumed contracts during the Interim Period, the fees and expenses for which it seeks reimbursement are completely unrelated to any such default, and under CMI's own contracts, it is not entitled to recover such fees and costs from the Purchaser. There is no reason why the Purchaser should bear the time and expense required to respond to CMI's discovery.[3]

## BACKGROUND

7.     On October 30, 2007, the Court entered an order [Docket No. 1711] (the "Sale Order"), approving the sale of the Debtors' mortgage loan servicing business to the Purchaser, pursuant to the terms of an Asset Purchase Agreement dated as of September 25, 2007, as amended (the "APA"). The Sale Order, among other things, authorized the Debtors to assume and assign and/or transfer to the Purchaser certain contracts (collectively, the "Assumed Contracts"), including, among other things, the Veterans Land Board Veterans Housing Assistance Program Application (the "VLB Application") and the HALO 2007-ARI Master Loan Purchase and Sale Agreement (the "HALO Agreement") with CMI (collectively the "CMI Servicing Agreements").

8.     The Sale Order further apportioned the cure amounts related to the Assumed Contracts among the Debtors and the Purchaser such that the Debtors are responsible for all cure amounts (the "Debtors' Cure Amounts") arising from defaults based on acts or omissions occurring prior to the Initial Closing and the Purchaser is responsible for funding cure amounts

---

[3]     To the extent necessary, the Purchaser would ask the Court to treat this reply as a cross-motion for a protective order under Rule 26(c) applicable in this contested matter by Bankruptcy Rule 7026.

arising from defaults based on acts or omissions occurring during the Interim Period. (Sale Order ¶¶ 35, 36).

9.      Under the APA and Sale Order, $10 million of consideration provided by the Purchaser was set aside as a "Cure Escrow" to fund the Debtors' Cure Amounts.

10.     On May 19, 2008, the Debtors filed the Notice of (i) Debtors' Proposed Purchaser's Cure Amounts and (ii) Deadline for Filing Objections to the Proposed Purchaser's Cure Amounts [Docket No. 4084] (the "Purchaser's Cure Notice"), pursuant to which the Debtors notified the counterparties to the Assumed Contracts of the proposed amounts necessary to cure defaults under those contracts arising from acts or omissions that occurred during the Initial Period. Exhibit A to the Purchaser's Cure Notice lists the proposed Purchaser's Cure Amount Due in connection with the CMI Servicing Agreements as $0.

11.     On June 19, 2008, CMI filed an objection to the Debtors' proposed Purchaser's Cure Amounts [Docket No. 4738] (the "CMI Cure Objection"), pursuant to which CMI asserts that the appropriate Purchaser's Cure Amount is $111,582.85 based on attorneys' fees and expenses incurred as a result of the Debtors' alleged default under the CMI Servicing Agreements.[4]

12.     On April 8, 2009, the Purchaser filed a reply to the CMI Cure Objection [Docket No.4248], pointing out that the alleged defaults, upon which its Purchaser's Cure Amount is based, pre-dated the Initial Closing and that CMI had failed to articulate any act or omission occurring during the Interim Period that resulted in any default under the CMI Servicing Agreements.

---

[4]     In separate filings, CMI has asserted Debtors' Cure Amounts for the period prior to the Initial Closing totaling approximately $119,138.15. *See* Docket Nos. 2226 and 2466.

13.     The Purchaser's counsel followed up the reply with a letter dated April 27, 2009 to CMI's counsel, asking that CMI provide the following documents (which the Purchaser's counsel anticipated CMI would rely upon at the upcoming hearing on this dispute):[5]

> A.     All documents which evidence, refer or otherwise relate to any defaults under the Assumed Contracts between the Initial Closing on November 16, 2007 and the Final Closing on April 11, 2008;
>
> B.     Complete copies of any and all contracts, guidelines or agreements which CitiMortgage is relying upon to assert its right to a cure claim for the period between the Initial Closing on November 16, 2007 and the Final Closing on April 11, 2008; and
>
> C.     Complete copies of all documents (including invoices for attorney's fees and costs) which detail the fees, costs and claims which accrued between the Initial Closing on November 16, 2007 and the Final Closing on April 11, 2008.

14.     Instead of providing the documents requested in the letter, CMI instead served the discovery which is the subject of its Motion to Compel.

15.     After receipt of CMI's discovery, counsel had a number of conversations and communications, but with the exception of alleging generic "document delivery defaults," CMI never identified any specific defaults during the Interim Period and never provided the Purchaser with copies of the legal invoices which make up CMI's Purchaser's Cure Amount.

16.     During this period, the Purchaser was completely puzzled by CMI's actions and position. Even assuming, *arguendo*, that the Debtors failed to timely deliver documents to CMI during the Interim Period, it is beyond comprehension that such acts or omissions could lead to CMI incurring attorneys' fees and costs totaling $111,582.85. For this reason, the Purchaser repeated its requests for copies of CMI's legal invoices, convinced that the actual fees and costs incurred as a result of any alleged defaults during the Interim Period would be a fraction of the amount claimed by CMI (and likely much less than the cost of preparing this reply). But, CMI

---

[5]     CMI's Motion to Compel fails to mention counsel's letter, but instead, implies that the Purchaser never requested this information because the Purchaser chose, at that time, to proceed by letter, as opposed to formal discovery. (*See* Motion to Compel at p. 7)

refused to voluntarily turn over the invoices. As a result, on July 30, 2009, the Purchaser served CMI with its own request for production.

17.     Meanwhile, the Purchaser served its response and objection to CMI's discovery.

18.     Subsequent to filing its Motion to Compel, CMI responded to the Purchaser's discovery and, for the first time, produced documents which conclusively establish that (a) the alleged defaults upon which it bases its claim have nothing to do with the Purchaser; and (b) the fees and costs for which it seeks reimbursement from the Purchaser, likewise, have nothing to do with alleged defaults during the Interim Period.

19.     Attached hereto as **Exhibit "A"** is a spreadsheet produced by CMI which lists the alleged document delivery defaults upon which it bases its Purchaser's Cure Amount.[6]  Even accepting the spreadsheet at "face value," all of the alleged defaults reflected on the spreadsheet relate to loans that were funded long before the start of the Initial Period, some dating back to 2003. If the Debtors defaulted in providing a specific document listed on the spreadsheet, the timing of the loan closings set forth on the spreadsheet make clear that any such default pre-dates the Interim Period.

20.     Equally as fatal to CMI's assertion of a Purchaser's Cure Amount is CMI's legal invoices and time detail attached hereto as **Exhibit "B"** and incorporated by reference herein. Again, even assuming, *arguendo*, that there were document delivery defaults during the Interim Period, none of the fees and costs for which CMI asserts a Purchaser's Cure Amount relate to such alleged defaults. Instead, CMI is attempting to charge the Purchaser with all fees and costs incurred during the Interim Period, which includes the time and expenses incurred in monitoring the Debtors' cases, responding to the Debtors' motion to destroy documents, pursuing a Debtors'

---

6       At CMI's request, the Purchaser has redacted the customer names, the loan numbers and the specific property addresses from the attached spreadsheet.

Cure Amount and pursuing a motion for relief from the automatic stay to obtain documents,

which, as conceded in the motion itself, are wholly unrelated to the mortgage servicing business.

## ARGUMENT

**A.    Because No Portion Of CMI's Alleged Purchaser's Cure Amount Relates To A
Default Under The CMI Servicing Agreements In The Interim Period, CMI's
Discovery Seeks Documents That Are Irrelevant And That Will Not Lead To The
Discovery Of Admissible Evidence.**

21.    Ignoring for the moment that CMI has not alleged any default during the Interim

Period that would give rise to a Purchaser's Cure Amount, the two contractual provisions upon

which CMI bases its entitlement to reimbursement of its legal fees and costs both require, as a

matter of common sense, that such fees and costs relate to the specific default at issue. Section

8.06 of the Veteran's Land Board's Guide, which CMI asserts is incorporated in the VLB

Application, provides:

> Participant to Pay Legal Fees. If it is determined in a judicial proceeding
> that Participant has failed to perform under any provision of this Guide,
> and if the Administrator or the Board shall employ attorneys or incur other
> expenses for the enforcement, performance, or observance of the terms of
> the Guide on the part of Participant, then the Administrator or the Board,
> as the case may be, to the extent permitted by Law, shall be reimbursed by
> Participant, on demand, for reasonable attorneys' fees and other out of
> pocket expenses. (emphasis added).

VLB Guide at VIII-2.

22.    Similarly, Subsection 13.01 of the HALO Agreement, on which CMI also relies,

provides:

> [T]he Seller or the Interim Servicer, as applicable, shall indemnify the Initial
> Purchaser and any subsequent Purchaser and hold them harmless against
> any and all claims, losses, damages, penalties, finds, forfeitures, reasonable
> and necessary legal fees and related costs, judgments, and any other costs,
> fees and expenses that the Initial Purchase and any subsequent Purchaser
> may sustain arising out of or based on the failure of the Seller or the Interim
> Servicer, as applicable, to perform its obligations under this Agreement.
> ...(emphasis added).

HALO Agreement at 48-49.

23. The language of the CMI Servicing Agreements is consistent with the law on this issue. "[A]ttorneys' fees are recoverable as part of a cure claim if the contract or lease specifically requires their payment." In re Crown Books Corp., 269 B.R. 12, 15 (Bankr. D. Del. 2001). When a contract creates a right to attorneys' fees upon the other party's default, the fees must relate to the efforts to remedy the default. See, e.g., PG 1044 Madison Assocs., LLC v. Sirene One, LLC, 369 F.Supp. 2d 512, 23–24 (S.D.N.Y. 2005) (reducing the requested attorneys' fees by 50% based on, among other reasons, legal fees relating to matters extraneous to the instant litigation involving a default on the lease); see also Chase Manhattan Bank v. Iridium Africa Corp., 474 F. Supp. 2d 613, 617–18 (D. Del. 2007) (holding that an agreement provided for attorneys' fees relating to efforts to exercise "rights and remedies upon [a] default," and that the plaintiff had pursued its rights in connection with a default, and therefore the plaintiff was entitled to its attorneys' fees).

24. As CMI's legal invoices and time detail attached hereto as Exhibit "B" make clear, however, the fees and costs for which CMI seeks reimbursement have nothing to do with any alleged default in servicing loans during the Interim Period. To the contrary, these fees and costs relate to CMI's continued participation in the Debtors' bankruptcy cases and what appear to be ongoing disputes with the Debtors over matters unrelated to the servicing business purchased by the Purchaser. While CMI very well may be entitled to reimbursement of some or all of these fees and costs as Debtors' Cure Amounts,[7] there is no basis under which it can assert such a claim as a Purchaser's Cure Amount, and accordingly, discovery of the Purchaser

---

[7] CMI's citations to the Cash Management Order for the proposition that it is entitled to reimbursement for monitoring the Debtors' cases (*See* Motion to Compel at pp. 2-3) suggests to the Purchaser that CMI does not understand that the Purchase's cure claim obligations under the Sale Order are limited to amounts incurred as a result of a default during the Interim Period.

designed to probe possible defaults which have nothing to do with these fees and costs is irrelevant and will not lead to the discovery of admissible evidence.

## B.    CMI Cannot Use The Discovery Process To Search For Facts To Support A Default That Is Not Alleged

25.    CMI does not dispute (because it cannot) that its CMI Cure Objection is devoid of any allegation of a default under the CMl Servicing Agreements during the lnterim Period. Nevertheless, CMl argues that it is not limited to discovery of only acts or omissions identified as a default during the Interim Period; rather, CMl contends that it is entitled to take discovery of any matter relevant to the subject matter of this dispute, because its discovery requests "go to the issues that are at the heart of this contested matter." (*See* Motion to Compel at p. 8.)

26.    But, CMl's position is no longer supported by the current version of Rule 26(b)(1). Prior to 2000, Rule 26(b)(1), incorporated into this contested matter under Bankruptcy Rule 7026, provided: "Parties may obtain discovery regarding any matter, not privileged which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party...." (See Mot. Compl. 8 (citing Paciti v. Macy's, 193 F.3d 766, 777 (3d Cir. 1999) (citing Fed. R. Civ. P. 26(b)(1))).

27.    The scope of discovery under Rule 26(b)(1) was narrowed by the 2000 amendments, as can be seen in the following: "Parties may obtain discovery regarding any matter, not privileged, which that is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party...." See Committee Note of 2000 to Rule 26, reprinted in 6 Moore's Federal Practice, § 26App.10 (Matthew Bender 3d ed.) (hereinafter "Moore's Federal Practice"). After the 2000 amendments, a party may obtain discovery of the broader "matter[s] relevant to the subject matter" only upon order of the court. See Bankruptcy Rule 7026(b)(1) ("For good cause,

the court may order discovery of any matter relevant to the subject matter involved in the

action.").

28.     This change in Rule 26(b)(1) from a "relevant to the subject matter" standard to a

"relevant to the claim or defense of any party" standard is a deliberate narrowing of the scope of

discoverable information. As summarized in Professor Moore's treatise:

> The 2000 amendments to Rule 26(b), as restyled in 2007, narrowed
> the scope of party-controlled discovery to matters "relevant to any party's
> claim or defense." Prior to the 2000 amendments, the parties were entitled
> to discovery of any information that was not privileged so long as it was
> relevant to the "subject matter involved in the pending action."
>
> In the past, courts have often focused on the type of action the
> plaintiff has brought or the type of defense the defendant has asserted to
> determine the breadth of discovery that is permitted. For example, it was
> not uncommon for a court to order that a plaintiff could conduct very
> broad discovery in an action based on Section 1983 by simply noting that
> the plaintiff asserted a civil rights claim and that such cases have
> historically been accorded broad and generous discovery.
>
> A court resolving a discovery dispute on the ground of relevance
> must, under the 2000 amendments, focus on the specific claim or defense
> alleged in the pleadings.

Moore's Federal Practice § 26.41[2][a] (emphasis added, citations omitted).

29.     Applying current Rule 26(b)(1) to the present dispute, before CMI is entitled to

discovery related to a default during the Interim Period, it must first make a claim that such a

default exists. In doing so, CMI must segregate those alleged document delivery failures which

pre-date the Initial Closing, and allege only those defaults which actually occurred during the

Interim Period.[8]

30.     Once CMI actually makes a specific claim to a default arising during the Interim

Period, it must then confine its claim to only those fees and costs, if any, that relate to such

---

[8]     In other words, the Debtors' failure to turnover a document prior to the Initial Closing does not become a
post-Initial Closing default because the document remains undelivered during this time. The Purchaser
already paid $10 million into the Cure Escrow to cover such defaults.

defaults as dictated by case law and the express contractual provisions upon which it relies. Proceeding in this fashion is required by Rule 26(b)(1) and dictated by common sense.

31. CMI's discovery is extremely broad and responding to such discovery will be both expensive and time consuming. Before the Purchaser incurs the burden of responding to such discovery, it is not unreasonable or unfair to require CMI to comply with the Sale Order and articulate the specific elements of its Purchaser's Cure Amount, if any.

32. The Purchaser is not trying to be difficult and has no quarrel with CMI's attempt to recover mortgage loan documents to which it is entitled and/or recovering appropriate cure claims. Here, however, the Sale Order narrowly prescribes those cure claims for which the Purchaser has an obligation to reimburse the Debtors. Because CMI has failed to identify a default under the CMI Servicing Agreements during the Interim Period and because all of its fees and costs are unrelated to the performance of the servicing business during the Interim Period, its discovery of the Purchaser is wholly inappropriate and its Motion to Compel should be denied.

WHEREFORE, the Purchaser prays that the Court enter an order denying the Motion to Compel and granting the Purchaser such further relief as is just and proper.

Dated: September 4, 2009

**SAUL EWING LLP**

By: _____
Mark Minuti (No. 2659)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840

*Counsel to American Home Mortgage Servicing, Inc., fka AH Mortgage Acquisition Co., Inc.*