IN THE UNTED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
                                                             :
In re:                                                       :
                                                             :  Chapter 11
AMERICAN HOME MORTGAGE  HOLDINGS                             :
  INC.,  a Delaware Corporation, et al.,                     :  Case No. 07-11047 (CSS)
                                                             :  (Jointly Administered)
                              Debtors.                       :
                                                             :
------------------------------------------------------------ x


------------------------------------------------------------ x
                                                             :
TRIAD GUARANTY INSURANCE CORP.                               :
                                                             :
                              Plaintiff,                     :  Re: Docket No. ___
                                                             :
AMERICAN HOME MORTGAGE INVESTMENT                            :
CORP., AMERICAN HOME MORTGAGE CORP.,                         :
and AHM SV, INC. (f/k/a AMERICAN HOME                        :
MORTGAGE SERVICING, INC.) AND ALL                           :
OTHERS SIMILARLY SITUATED AS OWNERS                          :
OF MORTGAGE LOAN INSURANCE ISSUED BY                         :
TRIAD GUARANTY CORP. TO AMERICAN HOME                       :
MORTGAGE                                                     :
                                                             :
                              Defendants.                    :
------------------------------------------------------------ x
```

The plaintiff Triad Guaranty Insurance Corp. ("Triad"), complaining of the

defendants, seeks a rescission of multiple master mortgage guaranty insurance policies

and declaratory relief, and alleges as follows:

I.    NATURE OF THE ACTION

1.    This is an action for rescission and declaratory relief arising out of the

failure of American Home Mortgage ("AHM") to perform reasonably and in good faith

under multiple master mortgage guaranty insurance policies ("master policies") issued by

Triad under which Triad provided mortgage guaranty insurance on over 29,000 loans made by AHM.

2.      Fundamental to the contractual relationship between AHM and Triad was proper underwriting of the loan applications for insurance purposes.  This process was essential to a determination of whether the loan was qualified for mortgage guaranty insurance in the first instance.

3.      Historically, Triad had conducted its own insurance underwriting for loans such as the ones at issue.  Over time, lenders such as AHM agreed to assume the insurance underwriting obligation under guidelines approved by Triad.  Based on representations regarding its underwriting processes and quality control procedures, Triad developed trust and confidence in AHM to properly underwrite the loans.  Accordingly, Triad delegated the insurance underwriting function to AHM for the loans insured by the master policies.

4.      As Triad now has learned, AHM did not comply with its essential obligations under the master policies.  Instead, AHM failed to follow the insurance underwriting guidelines approved by Triad, resulting in a large percentage of loans that did not qualify for Triad's insurance in the first instance.

5.      AHM's conduct frustrated the reasonable expectations of Triad in entering into the master policies and deprived Triad of the benefit of the bargain with AHM.

6.      Inherent in any contract to provide mortgage guaranty insurance is the covenant that the loans insured would be underwritten pursuant to reasonable standards aimed at determining whether borrowers are qualified and actually have the ability to repay the loans.  Instead of conforming to this implied covenant, AHM was not diligent

- 2 -

in underwriting the over 29,000 loans placed by AHM for coverage under the master policies, and Triad never would have entered into the master policies with AHM if it had known that AHM would not perform its obligations properly.

7.    AHM's failure to perform its obligations has resulted in substantial damage to Triad.    The rescission rate[1] of the AHM loans increased rapidly from traditional levels of less than 5% to almost 70%.    The number of defaulted loans also soared from historical levels of 2% to over 16%.    Triad has incurred enormous losses by virtue of its review of defaulted loans and its return of premiums for loans that did not qualify for insurance.

8.    By this lawsuit, Triad seeks to be excused from its obligation to insure any loans under its master policies with AHM as a result of AHM's material breach of the master policies, as well as the implied covenant of good faith and fair dealing, and Triad therefore seeks court approval of rescission of the master policies.

II.  PARTIES

9.    Triad is an insurance company organized and existing under the laws of the State of Illinois, with its principal place of business in Winston-Salem, North Carolina.

10.    American Home Mortgage Investment Corp. ("AHMIC") is a Maryland corporation with its principal place of business in New York and is a debtor in possession in this Chapter 11 action.

---

[1] The rate of rescission for defaulted loans is referred to as the "rescission rate."

11.    American Home Mortgage Corp. ("AHMC") is a Maryland corporation with its principal place of business in New York and is a debtor in possession in this Chapter 11 action.

12.    AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHMSI") is a Maryland corporation with its principal place of business in New York and is a debtor in possession in this Chapter 11 action.  AHMIC, AHMC and AHMSI are sometimes collectively referred to as "AHM."

### III.  JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§157, 1334 and 2201 and venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

### IV.  FACTS

14.    Triad was a residential mortgage insurer which offered private residential mortgage guaranty insurance that protected lenders against the risk of borrower default.

15.    In issuing mortgage guaranty insurance, Triad agreed, in exchange for an insurance premium, to cover a portion of a lender's risk of loss from a loan default. Under the typical mortgage insurance policy, the mortgage insurer pays an agreed percentage of the lender's loss which occurs when the borrower defaults on the loan, and following a foreclosure and a sale, the loan has still not been paid in full.  Because the risk of loss from the borrower's default is directly related to the borrower's qualifications to borrow the money from the lender, Triad depends upon accurate underwriting of the loan before the insurance is placed.  By express agreement of the parties, this essential underwriting function was delegated by Triad to AHM, as explained below.

- 4 -

16.    AHM was an independent mortgage lender in the business of providing home mortgage products and services.

17.    Upon information and belief, AHM's primary business was originating, selling and servicing residential mortgage loans.

18.    AHM would often seek to purchase mortgage guaranty insurance to make its loans more attractive to buyers and investors, and to obtain a higher sales price for AHM.

19.    AHM sought mortgage guaranty insurance from Triad.  Triad agreed to write such insurance for AHM with the express understanding that AHM would assume the obligation of underwriting AHM's loans for insurance purposes pursuant to agreed underwriting guidelines.

20.    Triad insured AHM's loans pursuant to two types of policies:  flow and bulk.

A. FLOW LOANS

21.    Flow loans are individually underwritten loans.  AHM did not purchase separate insurance policies for each flow loan.  Rather, AHM purchased master insurance policies applicable to flow loans, and Triad issued a commitment/certificate with respect to each insured loan.  A listing of these master policies is attached as Exhibit A.  Triad's master policies for flow loans were issued to AHM from November, 2004 through March, 2006.

22.    AHM and Triad agreed that flow loans would be insured as part of a "delegated" program.  Under the delegated program, AHM was responsible for

underwriting the mortgage insurance for each loan to be insured by Triad. Simply, the underwriting was "delegated" to AHM.

23. Under the "delegated" program, AHM submitted underwriting guidelines to Triad for prior approval. Once Triad approved those guidelines, AHM was obligated to follow those guidelines if AHM wanted mortgage loan insurance on an individual loan from Triad. If an individual loan did not meet the underwriting guidelines, AHM could seek a variance from Triad. If a loan did not meet the guidelines, and no variance was approved by Triad, the loan was not eligible to be insured by Triad.

24. Under the delegated program, once AHM determined a flow loan met the approved underwriting guidelines or a variance was approved by Triad, AHM would underwrite the insurance for that loan. AHM would determine pursuant to approved guidelines the amount of insurance and premium. AHM then submitted a transmittal form to Triad that contained certain basic information about the loan. In response to the transmittal form, and in reliance on the representations by AHM that it had followed the approved underwriting guidelines in making the loan, Triad issued a separate commitment/certificate for each such loan.

25. Triad was unable, and AHM was aware that Triad was unable, to review AHM's compliance with the approved underwriting guidelines at the time the commitment/certificate was issued. The underwriting process between AHM and Triad for a delegated program precluded Triad from reviewing the underwriting of an individual loan prior to the issuance of a commitment/certificate. Triad would review an individual loan's underwriting in one of two circumstances: (a) a quality review audit; or (b) when AHM advised of a potential for a claim, as where a loan had gone into default.

26.     Each of the AHM policies for flow loans provides that only certain loans

are eligible for coverage.  They state, in part:

> Coverage under this Policy shall extend only to Loans eligible for
> coverage under the Manual and as to which the Insured has
> satisfied all of the existing underwriting procedures set forth in the
> Manual.

27.     Exclusion G in the AHM policies for flow loans provides:

> The Company shall not be liable for, and the Policy shall not apply
> to, extend to, or cover the following:

> G.  Non-Eligible Loans – Any Loan not eligible for coverage under
> the Manual or as to which the Insured failed to satisfy all of the
> underwriting procedures in the Manual, or any Loan as to which
> the Insured fails to submit a copy of its Loan file to the Company
> within thirty (30) days after the Company's request.

28.     Page 5 of the Delegated Underwriting Manual states:

> All loans originated under a American Home Mortgage approved
> for delegated program must meet the requirements and guidelines
> of that program.

29.     In addition to the independent bases stated above, other exclusions in the

policies for flow loans may apply to a claim.

30.     Following notice of a loan default, Triad would review the loan and

determine if it was eligible for coverage under the master policies for flow loans.  Prior to

the review, Triad would not be aware of facts which would have demonstrated that a loan

was not eligible for coverage.

## B.  BULK LOANS

31.     Bulk loans are groups of loans packaged together.  Triad is informed and

believes that the bulk loans were sold by AHM to other entities; that some of those

entities would then issue and sell securities backed by the group of loans, with ownership

of the loans remaining with the entity; and that the owners of the securities did not own any individual loan.

32.    AHM purchased a single master insurance policy which applied to all loans in a particular bulk transaction and Triad issued a commitment/certificate with respect to each insured loan.  A listing of the master insurance policies applicable to particular "bulk" transactions is attached as Exhibit B.  Triad's master policies for bulk loans were issued to AHM from March, 2006 through March, 2007.

33.    For bulk loans, the master policies provide that the insurance is issued "in reliance upon the Insured's representation and statements made in any application for coverage under this Policy, and in any documents and writings, including any electronic media related thereto."

34.    As with flow loans, AHM would submit limited information to Triad regarding the loans in a bulk transaction.  Any individual loan in the bulk transaction was eligible to be insured only if it met the approved underwriting guidelines.  Triad was unable, and AHM was aware that Triad was unable, to review AHM's compliance with the approved underwriting guidelines at the time the commitment/certificate was issued. The underwriting process between Triad and AHM precluded Triad from reviewing the underwriting of an individual loan prior to the issuance of the commitment/certificate. As with flow loans, Triad would review an individual loan's underwriting only during a quality review audit or when a default was presented.

35.    There is a written agreement which is part of each master policy issued for bulk loans.  The March 23, 2006 letter to Alan Horn for Deal # AHM (QRS) MTA 2006-

1, attached as Exhibit C, is as an example of such an agreement. The following are some
of the relevant portions of the agreement:

    (a)    Paragraph 8(c) in "Loss Eligibility Criteria" states:

> The information with respect to each Loan on the Final Data File is true,
> correct, accurate, and complete in all respects.

    (b)    Paragraph 10 states:

> Triad acknowledges the representations of AHM as the Insured that the
> loans insured under the Primary Coverage were made and underwritten by
> the originator of the loan in accordance with the underwriting
> requirements contained in the originator's eligibility criteria
> ("Underwriting Requirements"). AHM acknowledges and agrees that
> Triad shall be entitled to rely upon AHM to determine individual loan
> acceptability based on the Eligibility Criteria set forth above and such
> Underwriting Requirements of the originators. AHM represents and
> warrants to Triad that each loan to be insured under the Primary Coverage
> meets the loan Eligibility Criteria set forth in Section 8 above and in all
> material respects meets such Underwriting Requirements.

    (c)    Paragraph 12 states:

> AHM acknowledges and agrees that (a) the mortgage loan information
> contained on the preliminary file provided to Triad prior to issuance of
> Primary Coverage as confirmed in the final file delivered to Triad is
> material to Triad's decision as to whether to issue such Primary Coverage
> and (b) Triad is relying on such information in issuing such Primary
> Coverage. AHM acknowledges and agrees that all mortgage loan
> information relevant to Triad's insurance decision and contained on the
> preliminary and final files provided by AHM is materially true, correct
> and accurate.

36.    In addition to the independent bases stated above, other exclusions in the
policies for bulk loans may apply to a claim.

## V. LOANS INSURED

37.    Triad repeats and incorporates by reference each of the allegations in
paragraphs 1 through 36.

38.    AHM placed over 29,000 loans for coverage under the flow and bulk master policies.

## VI. FAILURE OF PURPOSE

39.    Triad repeats and incorporates by reference each of the allegations in paragraphs 1 through 38.

40.    Pursuant to the master policies, AHM acknowledged that Triad was relying on AHM to follow the approved underwriting guidelines in issuing the mortgage insurance.

41.    In submitting loans to Triad for mortgage insurance coverage, AHM represented that each loan complied with the approved underwriting guidelines.

42.    Implied in the master policies is the covenant that AHM will also underwrite each loan insured in a reasonable and prudent manner designed to make sure the borrower has the ability to repay the loan.

43.    Triad delegated to AHM the responsibility and obligation to deliver for mortgage guaranty insurance coverage only those loans that had been prudently underwritten and in which the borrower had a reasonable prospect for repayment.

44.    It was entirely reasonable for Triad to expect AHM to underwrite in a reasonable and prudent manner and follow the approved underwriting guidelines with respect to the loans which it submitted for mortgage insurance coverage, and AHM understood that Triad was relying upon AHM to perform its obligation properly.

45.    The parties intended to enter into the master policies for mutual benefit. AHM's purpose was to have mortgage insurance on the mortgage loans it underwrote and to add value to the loans. Triad's purpose was to provide a much needed service to its

insureds – mortgage insurance – and to earn income through premiums collected in excess of claims and expenses.

46.    Loans that were written in violation of the approved underwriting guidelines were not eligible for insurance under the master policies in the first instance. Upon discovery of such violations, Triad's practice has been to rescind the applicable coverage and return all premiums collected for such coverage.

47.    Before the master policies were issued to AHM, Triad had rescinded coverage for less than 5% of defaulted loans. Both parties were aware of these rescission rates before the flow and bulk contracts were made.

48.    After the master policies were issued, Triad began finding a dramatic and unexpected increase in underwriting violations in its review of defaulted AHM loans. As a result, the rate of rescissions for defaulted loans increased rapidly from less than 5% of the insured loans to almost 70%. Over the life of the contracts shown in Exhibit A and B, Triad is rescinding coverage and returning premiums for over 60% of defaulted loans due to violations of approved underwriting guidelines.

49.    The number of defaulted loans has also soared from historical levels of 2% to over 16% of the AHM portfolio. This was caused at least in part by the fact that loans were made to borrowers who did not qualify for Triad's insurance in the first instance. As a result, Triad is incurring unprecedented and unanticipated costs in reviewing defaulted loans to determine whether or not the loans were in compliance with the agreement of the parties.

50.    Because of the extensive number of underwriting violations, the essential purpose of the master policies has been defeated. Triad has been returning the premiums collected on rescinded coverage, and its income stream has been severely affected.

51.    Triad relied upon AHM to properly underwrite the mortgage insurance on its behalf and to submit only qualified loans to Triad for coverage. AHM's failure to do so constitutes a breach of contract that substantially and fundamentally defeats the object of the parties in entering into the master policies, excuses Triad from further performance, and constitutes grounds for rescission of the master policies.

52.    By its actions, AHM has also breached the implied covenant of good faith and fair dealing that accompanied AHM's undertaking of the insurance underwriting obligation.

53.    As a proximate result of the matters alleged herein, Triad has had to cease writing new business and has been placed under the supervision of the Illinois Director of Insurance.

54.    Triad has performed all obligations under the master policies, or such performance has been excused or waived.

55.    Triad has attempted to reach a resolution with AHM, but without success as of the date of this filing.

VIII.  CLASS ALLEGATIONS

56.    Triad repeats and incorporates by reference each of the allegations in paragraphs 1 through 55.

57.    Under the policies identified in Exhibit A and Exhibit B:

If a Loan or a majority participation in a Loan is sold, assigned, or transferred by the Insured, coverage under the Certificate will

- 12 -

continue with respect to the Loan, and the new owner or majority
loan participant shall be considered the Insured(s) hereunder from
the date notice thereof is given to the Company, if the new owner
or majority loan participant is an institutional investor approved by
the Company in advance, or otherwise from the date the new
owner or loan participant is approved in writing by the Company,
provided that, in either case, the Loan continues to be serviced by a
Servicer approved by the Company....

58.     Triad brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure against the following class:

The owners of individual loans insured by the master policies identified on
Exhibits A and B.

59.     Numerosity.  Triad is informed and believes AHM has sold an unknown

number of the over 29,000 loans it insured through the master policies.  In most cases,

Triad was not informed of the identity of the purchasers of the loans.   Triad is informed

and believes the purchasers themselves may have sold the loans to other parties.  Triad

does not know the identity of those purchasers.

60.     The number of owners of loans is too numerous, potentially numbering in

the hundreds, and geographically dispersed across the globe, such that joinder of all

owners is impracticable.

61.     The identities of the owners of loans are or should be known to AHM.

62.     Commonality.  Questions of law and fact relating to the application and

rescission of the master policies are common to the class and predominate over any

questions affecting only individual members of the class.  Insurance for an individual

loan is subject to application and validity of the master policies identified on Exhibits A

and B.  Triad's claims do not involve issues of fact or law relating to each and every

individual loan. Triad's claims are directed to the master policies negotiated solely with AHM, and under which AHM is the named insured.

63.    Typicality. AHM's defenses are typical of the defenses of the class. Any defense involves the acts, omissions and representations of AHM. Any defense available to a member of the class is available to AHM.

64.    Adequacy of Representation. AHM will fairly and adequately protect the interests of the defendant class. Triad is informed and believes that AHM maintains ownership of many individual loans. Further, Triad is informed and believes that under the agreements by which AHM sold flow and bulk loans, the purchasers had the ability to return ownership of the loans to AHM, and that numerous purchasers have in fact returned ownership of loans to AHM. Accordingly, AHM has fair and adequate incentive to be involved in the decision whether the master policies identified on Exhibits A and B are to be rescinded or remain operative.

65.    Predominance and Superiority.    This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impractical. The prosecution of separate actions against the individual members of the class in this court and courts throughout the country would cause a multiplicity of lawsuits, burdening the court system, while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties, this class action presents far

fewer management difficulties, while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

FIRST CLAIM FOR RELIEF (RESCISSION)

66.     Triad repeats and incorporates by reference each of the allegations in paragraphs 1-65.

67.     The master policies were based on the premise that the loans delivered for coverage would be underwritten pursuant to the approved underwriting guidelines, thorough quality assurance, and quality control procedures.

68.     AHM has breached the contracts with Triad in numerous substantial and material ways, including, without limitation, failing to follow approved underwriting guidelines, and in representing that loans were made pursuant to the approved underwriting guidelines.  The large number of rescissions of coverage for individual loans was not contemplated by the parties when the master policies were entered into and constitute breaches going to the root of the insurance contracts between AHM and Triad.

69.     The covenant of good faith and fair dealing between AHM and Triad is implied in the master policies, as it is in every contract under controlling law.

70.     Pursuant to the implied covenant of good faith and fair dealing, AHM was prohibited from doing anything that could injure the right of Triad to receive the benefit of the master policies or evade Triad's reasonable expectations under the master policies.

71.     AHM breached the implied covenant of good faith and fair dealing because it failed to follow reasonable and prudent underwriting practices; it failed to follow the approved underwriting guidelines; and it caused Triad to issue insurance coverage on a group of loans that was almost entirely underwritten in an improper and

imprudent manner. AHM's breach of the implied covenant of good faith and fair dealing constitutes a material breach of the master policies that excuses Triad's contractual obligation to insure any of the loans delivered to Triad for coverage under the master policies.

72.     Triad has suffered, and will continue to suffer, substantial harm and injury under the master policies if they are not rescinded in that, as a result of AHM's conduct, Triad will be forced to review coverage for thousands of mortgage loans that were not underwritten properly and, thus, carry a far higher rate of rescission than Triad would have accepted for the premiums charged.

73.     Furthermore, Triad has incurred enormous, unanticipated additional expenses, which are substantially greater than the parties bargained for, such as costs associated with reviewing and investigating the subject loans.

74.     The breaches described herein are so substantial and fundamental as to defeat the purpose of the parties in making the insurance contracts.

75.     Due to the substantial and material breaches of contract, Triad seeks rescission of each of the master policies issued to AHM, as listed on Exhibits A and B. Triad is prepared to tender into Court the premiums paid with respect to the master policies issued to AHM, net of claims paid by Triad.

76.     AHM's substantial and material breach of contract also excuses further performance by Triad under the master policies.  Claim payments will soon exceed premiums received under the master policies.  In order to avoid further irreparable harm by paying claims under the master policies but being unable to recover them once the

master policies are rescinded, henceforth, Triad will make all claim payments into an escrow account pending final resolution of this matter.

77.    Based on the foregoing allegations, Triad respectfully requests that the court find that AHM committed substantial and material breaches of each of the master policies, and that the court order that the master policies be declared rescinded, *ab initio*.

SECOND CLAIM FOR RELIEF (DECLARATORY RELIEF)

78.    Triad repeats and incorporates by reference each of the allegations in paragraphs 1-76.

79.    An actual and justiciable controversy exists between Triad and defendants. Triad contends AHM's substantial and material breaches of contract entitle Triad to rescind the master policies and invalidate the certificates on individual loans issued pursuant to the master policies.

80.    Triad seeks a declaration that the master policies shown on Exhibits A and B are rescinded and that Triad has no further obligation to perform under those contracts.

WHEREFORE, plaintiff Triad Guaranty Insurance Corp. prays for relief as follows:

1.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing AHM as defendant class representative and its counsel as class counsel, and that appropriate notice be provided to the class pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure.

2.    That the court order rescission of the insurance policies identified on Exhibits A and B.

3.    That the court declare that plaintiff has no obligations under any of the policies identified on Exhibits A and B.

4.    That all costs of this action, including reasonable attorneys fees, be taxed to the defendants; and

5.    That the court grant such other and further relief as it deems just and proper.

Dated: September 4, 2009

WOMBLE CARLYLE SANDRIDGE & RICE
*A Professional Limited Liability Company*


__/s/ Kevin J. Mangan_____
Kevin J. Mangan (#3810)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
(302) 252-4361

Richard T. Rice, Esq.
Womble, Carlyle, Sandridge & Rice
One West Fourth Street
Winston-Salem, North Carolina 27101

Garth Gersten, Esq.
Womble Carlyle Sandridge & Rice, PLLC
2530 Meridian Parkway, Suite 400
Research Triangle Park, North Carolina 27713

*Counsel for Triad Guaranty Insurance Corp.*