**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- :

In re:                                                          :    Chapter 11
                                                                :
AMERICAN HOME MORTGAGE HOLDINGS,                                :    Case No. 07-11047 (CSS)
INC.,                                                           :
a Delaware corporation, <u>et</u> <u>al.</u>,                   :    Jointly Administered
                                                                :
                                                                :    **Re: Dkt. No. 6824**
         Debtors.                                               :
---------------------------------------------------------------- :

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

The Court, having reviewed the record, and after due deliberation, enters the

following Findings of Fact and Conclusions of Law with respect to the objections of the

above-captioned debtors and debtors in possession (collectively the "<u>Debtors</u>") to Claim

Nos. 8044, 8045, 8046, and 8047 filed by Calyon New York Branch ("<u>Calyon</u>").[1]

<u>**STATEMENT OF FACTS**</u>

**I.    Background**

The Debtors and Calyon are parties to a Repurchase Agreement dated November

21, 2006 (the "<u>Repurchase Agreement</u>").[2]  In accordance with this agreement, Calyon

purchased, from time to time, certain mortgage loans.[3]  One of the debtors, AHM SV,

Inc.[4] was initially appointed as servicer of all of the mortgage loans.[5]

---

[1] To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

[2] Stipulation of Facts, ¶ 1 and Ex. A.

[3] *Id.* at ¶ 2.

[4] AHM SV, Inc. was formerly known as American Home Mortgage Servicing, Inc.  The corporate name was changed following the sale of the servicing business during the course of this bankruptcy case.

[5] Stipulation of Facts, ¶ 11.

As of August 1, 2007 (the "<u>Acceleration Date</u>"), Calyon served the Debtors with a notice of default and accelerated the Repurchase Agreement.[6]  The acceleration of the Repurchase Agreement caused the Debtors to be obligated to repurchase the loans owned by Calyon (the "<u>Loan Portfolio</u>") for a repurchase price of $1,143,840,204.36 (the "<u>Repurchase Price</u>")[7] on August 1, 2007.[8]

On August 6, 2007, each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code.

On August 28, 2007, Calyon commenced an adversary proceeding through which it sought a declaratory judgment that the Repurchase Agreement is a "repurchase agreement," as that term is defined in  § 101(47) of the Bankruptcy Code, and not a secured financing arrangement.

On January 4, 2008, the Court issued its opinion on this question and determine that the Repurchase Agreement is a "repurchase agreement" under § 101(47) and that, accordingly, Calyon's rights were not stayed, avoided or otherwise limited with respect to the ownership of the Loan Portfolio.[9]  The Court's order in connection with this opinion was entered on January 15, 2008.

---

[6] *Id.* at ¶¶ 12-15.

[7] As a defined term throughout these Findings of Fact and Conclusions of Law, "Repurchase Price" shall mean $1,143,840,204.36, or the repurchase price as of August 1, 2007 and September 30, 2007.  By January 30, 2008 the repurchase price had been reduced by payments of $72,906,907.82 received by Calyon on account of the mortgage loans (to reduce the repurchase price to $1,070,933,296.54) and by August 15, 2008, the repurchase price had further been reduced by payments of $149,423,974.04 (to reduce the repurchase price to $994,416,230.32).  *Id.* at ¶¶ 52, 58.

[8] *Id.* at ¶¶ 16, 41.

[9] *Calyon New York Branch v. American Home Mortgage Corp., et al. (In re American Home Mortgage Corp.)*, 379 B.R. 503 (Bankr. D. Del. 2008).

## II.    Calyon's Claims and the Debtors' Objection

On January 10, 2008, Calyon filed Proofs of Claim Numbers 8044, 8045, 8046, and 8047 (the "Repurchase Claims") against certain of the Debtors[10] in the total amount of $1,154,579,324.68.[11]   The amount of Calyon's filed claims exceeds the total Repurchase Price.

On January 9, 2009, the Debtors filed their objections to the Repurchase Claims (the "Debtors' Objections"), seeking to either disallow the Repurchase Claims in full, or reduce them to an amount to be determined by this Court, pursuant to Section 562 of the Bankruptcy Code.

Section 562 of the Bankruptcy Code addresses the timing for the measurement of damages in connection with repurchase agreements.  It states, in pertinent part:

> (a)    If the trustee rejects a . . . repurchase agreement, . . ., or if a . . . repo participant . . . liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of –
>
> (1)    the date of such rejection; or
>
> (2)    the date or dates of such liquidation, termination, or acceleration.
>
> (b)    If there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or

---

[10] Four identical proofs of claim were filed against four different debtors.  Proof of Claim Number 8044 was filed against Servicing, Proof of Claim Number 8045 was filed against American Home Mortgage Acceptance, Inc., Proof of Claim Number 8046 was filed against American Home Mortgage Corp., and Proof of Claim Number 8047 was filed against American Home Mortgage Investment Corp.  (Stipulation of Facts at ¶¶ 28-31).

[11] *Id.*  at ¶¶ 28-31.

> dates on which there are commercially reasonable
> determinants of value.[12]

The Debtors contend that § 562(a) requires measurement of Calyon's damages, if any, on the Acceleration Date.  If the Debtors are correct, Calyon might not have any claim for damages because the value of the mortgages subject to the Repurchase Agreement, i.e., the Loan Portfolio, on that date, depending on the valuation methodology, could exceed the Repurchase Price (thereby leaving no deficiency or damage claim).

On the other hand, Calyon contends that no "commercially reasonable determinants of value" existed on the Acceleration Date because the only appropriate valuation methodology is the market or sale value, and Calyon could not have obtained a commercially reasonable price on the Acceleration Date for the Loan Portfolio because the market was distressed and the Loan Portfolio suffered from a number of deficiencies that would affect its salability.  Accordingly, Calyon asserts that section 562(b) is applicable.  Section 562(b) provides that, in lieu of the Acceleration Date (the first date triggered under § 562(a)), the Court must measure damages "as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  Calyon contends that the earliest date on which there existed a commercially reasonable determinant of value was August 15, 2008.

In response, the Debtors argue that section 562(b) does not apply because Calyon is unable to prove that no "commercially reasonable determinants of value" existed on the Acceleration Date.  The Debtors contend that, on the Acceleration Date, at

---

[12] 11 U.S.C. § 562.

least two different methodologies reflected commercially reasonable values for the Loan Portfolio – a discounted cash flow analysis as well as market analyses that Calyon obtained outside of the context of this litigation. Because both of these methodologies value the Loan Portfolio on the Acceleration Date at or above the Repurchase Price, the Debtors assert that Calyon has no deficiency claim and, therefore, no damage claim under Section 562.

The Court held an evidentiary hearing on the Debtors' Objections on May 19 and 20, 2009 ("Objection Hearing").

### III.    Evidence Presented at the Objection Hearing

At the Objection Hearing, to overcome the presumption of the validity of Calyon's proofs of claim, the Debtors submitted evidence that, when the loans are valued on a discounted cash flow ("DCF") basis, the value of the Loan Portfolio is at or above the Repurchase Price on any of the stipulated potential Valuation Dates.[13]

The Debtors' expert, Dr. Ronnie Clayton, testified that a DCF analysis of the Loan Portfolio showed that the total value of the loans on any of the four possible Valuation Dates ranged from roughly $1.067 billion to $1.166 billion,[14] depending on the date used

---

[13] Prior to the claim objection hearing, the parties stipulated to limit the number of possible dates to value the Loan Portfolio to four:  August 1, 2007 (the Acceleration Date), September 30, 2007 (shortly before the Debtors sold another large loan portfolio called Broadhollow), January 30, 2008 (shortly after the Court entered its ruling regarding the characterization of the Repurchase Agreement), and August 15, 2008 (the first date on which Calyon contends it was able to make representations and warranties regarding the Loan Portfolio) (collectively the "Valuation Dates").

[14] How these figures compare to the repurchase price will depend on the Valuation Date that applies.  If the Valuation Date used is the Acceleration Date or September 30, 2007, the Repurchase Price as defined above will apply.  If either of the later dates is used as the Valuation Date, the repurchase price must be adjusted to reflect additional payments made to reduce the Loan Portfolio.  For example, on January 30, 2008, the Repurchase Price had been reduced by payments of $72,906,907.82 (to a repurchase price of

and whether the Loan Portfolio was valued on a "servicing retained" or "servicing released" basis.[15]   Dr. Clayton further testified as to the appropriateness of a DCF valuation in all market conditions, noting that if there is a market for the assets at issue, the market should correlate closely with the DCF valuation, "[u]nless there is something very, very strange going on in the market."[16]   Finally, Dr. Clayton testified that where the market is dysfunctional, the DCF analysis is still an appropriate valuation methodology because it values the asset's cash flows, which continue regardless of market conditions.[17]

Calyon presented evidence regarding the dysfunctional nature of the market and the poor quality of the Loan Portfolio, which together, Calyon asserts, precluded a sale on the Acceleration Date.  Calyon did so through the testimony of one of Calyon's managing directors, and Calyon's expert witness.

Calyon's first witness, John-Charles van Essche, testified as to the variety of issues that prevented Calyon from being able to sell the loans on three of the four possible Valuation Dates.  First, there was a dispute between Calyon and the Debtors as to who owned the mortgages, which was ultimately resolved by this Court in its decision and order in January of 2008.  Second, Calyon could not sell the loans because it was not directly receiving the loan proceeds, also until January of 2008, when the

---

$1,070,933,296.54) and by August 15, 2008, the repurchase price had further been reduced by $149,423,974.04 (to a repurchase price of $994,416,230.32).  (Stipulation of Facts, ¶¶ 52, 58).

[15] Tr. 1 at 37:1-38:11.  Citations to the transcript from the Objection Hearing that was held on May 19, 2009 (Day 1) and May 20, 2009 (Day 2) will be cited as "Tr. [1 or 2] at ____".

[16] *Id.* at 30:17-25.

[17] *Id.* at 39:23-40:5.

parties came to an agreement regarding the payment of proceeds on the underlying mortgage loans directly to Calyon.  Third, Calyon did not have complete loan files and collateral files.  And finally, there was an issue as to whether Calyon or the Debtors owned the servicing rights to the Loan Portfolio.[18]

Calyon also presented the testimony of its expert witness, Robert Branthover, who, in addition to offering further testimony regarding the impact of the quality and ownership issues surrounding the loans in the Loan Portfolio in connection with a sale, testified that the market value of the Loan Portfolio on the Acceleration Date was significantly discounted due to market conditions that existed on that date.

## ANALYSIS

I.    **Section 562's Reference To "Commercially Reasonable Determinants Of Value" Is Not Limited To Only The Sale Or Market Value Of An Asset.**

A.    **Statutory Interpretation**

"[C]ontemporary Supreme Court jurisprudence establishes that the purpose of statutory interpretation is to determine congressional intent."[19]  To that end, the starting point is to examine the plain meaning of the text of the statute.[20]  As the Supreme Court observed in *Hartford Underwriters Ins. Co. v. Union Planters Bank*, "when a statute's language is plain, the sole function of the courts, at least where the disposition by the

---

[18] *Id*. at 79:21 – 84:25; 95:14 – 98:16.

[19] Hon. Thomas F. Waldron and Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 AM. BANKR. L.J.195, 211 (2007).

[20] *Id*. at 229 ("Statutory analysis . . . must start with the text at issue to determine if its meaning can be understood from the text."). *See also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.").

text is not absurd, is to enforce it according to its terms."[21]    Additionally, the Supreme

Court has repeatedly stated that "[t]he United States Congress says in a statute what it

means and means in a statute what it says there."[22]

Notwithstanding the foregoing, applying the plain meaning of the statute is the

default entrance – not the mandatory exit.[23]  If the statute is ambiguous, the Court must

use other canons of statutory construction, including legislative history where available,

to determine the purpose of the statute.[24]  Moreover, regardless of whether the Court's

interpretation of the statute's purpose is based upon the plain meaning of the text or the

application of canons of statutory interpretation to determine the meaning of

ambiguous text, it is appropriate to identify, if possible, a congressional purpose

consistent with the Court's interpretation of the text at issue.[25]

---

[21] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000).  *See also United States v. Ron Pair Enters.*, 489 U.S. 235, 240 (1989); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.").

[22] *Hartford Underwriters Ins. Co.*, 530 U.S. at 6 (quoting *Connecticut Nat. Bank,* 503 U.S. at 254).

[23] Waldron and Berman, *supra* note 19, at 232.

[24] *See Price v. Delaware State Police Fed. Union (In re Price)*, 370 F.3d 362, 369 (3d Cir. 2004) ("Thus, ambiguity does not arise merely because a particular provision can, in isolation, be read in several ways or because a Code provision contains an obvious scrivener's error.  Nor does it arise if the ostensible plain meaning renders another provision of the Code superfluous.  Rather, a provision is ambiguous when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive. In such situations of unclarity, 'where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived,' including pre-Code practice, policy, and legislative history.") (internal citations omitted).

[25] *Lamie v. U.S. Trustee*, 540 U.S. 526, 539 (2004) ("Though we find it unnecessary to rely on the legislative history behind the 1994 enactment of § 330(a)(1), we find it instructive that the history creates more confusion than clarity about the congressional intent. History and policy considerations lend support both to petitioner's interpretation and to the holding we reach based on the plain language of the statute.").

**B.     The Meaning Of The Phrase "Commercially Reasonable Determinants Of Value" As Used In Section 562 Of The Code.**

The threshold issue before the Court is the meaning of the phrase "commercially reasonable determinants of value," as used in Section 562 of the Code.

**(1)     The Parties' Arguments**

Calyon argues that the plain meaning of "commercially reasonable determinants of value" and the context in which it is used lead to the natural conclusion that the phrase means what one could buy or sell the asset for in the marketplace.  Calyon goes on to argue that, the only relevant "determinants" are those that provide evidence of the asset's *market price*, such as the price actually received in a sale, the price available from a generally recognized source, the most recent bid quotation from that source, or expert testimony regarding the market price.

The Debtors argue that Calyon's definition is too narrow.  Had Congress wished to limit the inquiry to the market or sale price of an asset it would have used more limited language rather than using the broad phrase "commercially reasonable determinants of value."  Moreover, Section 562 says "*determinants* of value" not "*determinant* of value."  The use of the plural form suggests that more than one valuation methodology may constitute a "commercially reasonable determinant" of an asset's value.  Similarly, the use of the word "value" as opposed to "market value" or "sale value" indicates that the statute allows for the possible use of multiple methodologies to determine value, including those that do not rely on the existence of a functional market.

>    **(2)    The Phrase "Commercially Reasonable Determinants Of Value"**
>    **Is Ambiguous.**

The transaction at issue here was a repurchase agreement relating to mortgage

loans or interests in mortgage loans.  Section 101(47) of the Code defines the type of

assets that may be considered as a repurchase agreement under the Code.

These assets are:

>    (i) certificates of deposit;
>
>    (ii) mortgage related securities;
>
>    (iii) mortgage loans;
>
>    (iv) interests in mortgage related securities or
>    mortgage loans;
>
>    (v) eligible bankers' acceptances;
>
>    (vi) qualified foreign government securities; and
>
>    (vii) securities that are direct obligations of, or that
>    are fully guaranteed by, the United States or any
>    agency of the United States.[26]

Markets exist for most, if not all, of these assets.  Moreover, section 559 of the

Code acknowledges such in providing:

>    In the event that a repo participant or financial participant
>    liquidates one or more repurchase agreements with a debtor
>    and under the terms of one or more such agreements has
>    agreed to deliver assets subject to repurchase agreements to
>    the debtor, *any excess of the market prices received on liquidation*
>    *of such assets (or if any such assets are not disposed of on the date*
>    *of liquidation of such repurchase agreements, at the prices available*
>    *at the time of liquidation of such repurchase agreements from a*
>    *generally recognized source or the most recent closing bid*
>    *quotation from such a source) over the sum of the stated*
>    *repurchase prices* and all expenses in connection with the
>    liquidation of such repurchase agreements shall be deemed

---

[26] 11 U.S.C. § 101(47)(a)(1)(i).

property of the estate, subject to the available rights of setoff.[27]

Thus, section 559 provides that, upon termination of a repurchase agreement, whether a debtor is entitled to a return of excess funds is to be determined by either selling the assets or checking the market price of those assets.[28]

Section 562 of the Code, in turn, establishes the timing for determining the damages. More specifically, it provides that "damages shall be measured as of the earlier of-- (1) the date of such rejection; or (2) the date or dates of such liquidation, termination, or acceleration."[29] Thus, under sections 562 and 559, it appears that the amount of any claim is measured by either selling the asset or consulting the market price on the date of rejection, liquidation, termination or acceleration (as applicable).

So far so good. But, if the market is currently disrupted or dysfunctional it may not fairly reflect the potential sale price of an asset. Again, section 562 contemplates as much by providing that "[i]f there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."

This is the nub of the question. Section 559 of the Code appears to limit the damage calculation to either selling the assets or checking the market price of those

---

[27] 11 U.S.C. § 559 (emphasis added).

[28] Note that section 559 says nothing about Calyon's position in this case, i.e., the repurchase price exceeded the market price, thus, giving rise to a deficiency claim against the Debtors.

[29] 11 U.S.C. § 562(a).

assets but it only addresses the situation where the market price exceeds the repurchase

price, not vice versa.   Moreover, section 562 appears to contradict section 559 by

referencing whether there are "any commercially reasonable determinants of value."

This implies that damages may be measured by some other method.

As a result of this conflict, the Court finds the phrase "commercially reasonable

determinants of value" as used in section 562 of the Code to be ambiguous.

### (3)    The Legislative History.

The legislative history of section 562 is extremely sparse.[30]   The only relevant

portion of the history discusses the instances in which a reliance on the current market

price of an asset may not fairly reflect its value.   More specifically, there is an

acknowledgment that the size of the portfolio or a dysfunctional market would make

reliance upon the market price on a specific day unreasonable.

> Although it is expected that in most circumstances damages
> would be measured as of the date or dates of either rejection
> or liquidation, termination or acceleration, in certain unusual
> circumstances, such as dysfunctional markets or liquidation
> of very large portfolios, there may be no commercially
> reasonable determinants of value for liquidating any such
> agreements or contracts or for liquidating all such
> agreements and contracts in a large portfolio on a single
> day.[31]

Thus, where the market is dysfunctional it may be difficult or impossible to use a

market price to assign value to an entire asset or asset pool on a single date[32] – either

---

[30] Although Calyon quotes extensively from *Colliers*, there is no relevant legislative history relating to section 559 of the Code.

[31] H.R. Rep. No. 109-31 at 134-35 (2005).

[32] What financial professionals refer to as "price discovery."

because the nature of the market mandates that the asset be broken up and sold off in multiple pieces on multiple dates (thereby making it impossible to measure damages on a single date) or because the nature of the market at a given time would result in having to sell or liquidate the asset in a commercially unreasonable manner.

### (4)    The Purpose and Intent of Section 562

The common element in all uses of repurchase agreements is liquidity. "Without that characteristic, the repurchase agreement would not serve the function that it now does."[33]    Congress has enacted a number of amendments to the Code that work in concert to preserve the liquidity of the repurchase market by exempting repurchase agreements from significant provisions of the Code such as the automatic stay.    In addition, in 2005, Congress expanded the definition of "repurchase agreement" to include the transfer of "mortgage related securities (as defined in section 3 of the Securities Exchange Act of 1934), mortgage loans, [and] interests in mortgage related securities or mortgage loans."[34]

Thus, the primary purpose of the Code provisions relating to repurchase agreements is to preserve the liquidity in the relevant assets, including mortgage loans and interests in mortgage loans.    Section 562 serves to align the risks and rewards associated with an investment in those assets.    By fixing damages as of the date the repurchase agreement is terminated, accelerated, etc. the Code attempts to prevent a

---

[33] *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 7463 (3d Cir. 1989). (quoting *Bankruptcy Law and Repurchase Agreements: Hearings on S. 445 Before the Subcomm. on Monopolies and Commercial Law of the Senate Comm. on the Judiciary*, 98th Cong., 1st Sess. 306 (1983) (Statement of Peter Sternlight, Executive Vice President, Federal Reserve Bank of New York)).

moral hazard.  If damages were measured at some future date, the repo participant could hold the asset at little or no risk.  If the price of the asset were to rise, the repo participant would capture that increase up to the full amount owed under the agreement.  If the price were to fall, however, the repo participant's losses would be covered because its deficiency claim would rise accordingly.  Even if such a claim were not to be paid at 100%, there would certainly be instances where the discounted claim is sufficiently large to motivate the repo participant to shift the risk to the debtor.  In effect, this would make the debtor an insurer of the repo participant's investment even though the debtor has no control over the management of the asset – thus, the moral hazard.

> **(5)    Conclusions As To The Meaning Of The Phrase "Commercially Reasonable Determinants Of Value," As Used In Section 562 Of The Code**

And, so, we return to the issue before the Court: the meaning of the phrase "commercially reasonable determinants of value," as used in Section 562 of the Code.

The Court has found that the statute is ambiguous as to whether (i) the damage calculation is limited to either selling the assets or checking the market price of those assets; or (ii) damages may be measured by some other commercially reasonable method.  In addition, while the legislative history discusses the circumstances where the market price may not be a commercially reasonable determinant of the asset's value at a specific time, it is silent as to what alternative methods, if any, may be used to determine the asset's value.  Finally, the purpose of section 562, which is to align the

---

[34] 11 U.S.C. § 101(47).

risks and rewards related to the asset, supports the argument that there is a strong

preference for measuring damages on the acceleration date.  But, it provides no insight

into what methods may be used to determine the asset's value at that time.

In short, the Court appears to be on its own.  In such an instance, it is helpful to

return to first principles.  What is the value of an asset?  The standard definition is that

the value of an asset is its material or monetary worth, i.e., "the amount of money,

goods, etc., for which a thing can be exchanged or traded."[35]  Of course, the easiest and

most accurate way to determine the amount of money for which an asset can be

exchanged is to do just that – exchange the asset for money or, put more plainly, sell it.

When one does not wish to sell the asset or simply cannot it becomes more difficult to

determine the asset's value.  Nonetheless, in determining an asset's value the ultimate

goal remains the same - to determine as accurately as possible what the sale price

would be.

The most obvious method for estimating an asset's potential sale price is to

consult the current market price for that asset.  Of course, not all assets can be readily

bought and sold in a market.  For example, while there is a ready market for trading in

bushels of wheat there is no such market for wheat farms such that one could consult a

market price to determine value.  Even when there is a market it may not fairly estimate

the potential sale price of an asset if the market is inefficient, disrupted or

dysfunctional.

---

[35] II THE SHORTER OXFORD ENGLISH DICTIONARY 3495 (6th ed. 2007). *See also* BLACK'S LAW DICTIONARY 1586 (8th ed. 2004) ("The monetary worth or price of something; the amount of goods services or money that something will command in an exchange.").

Financial professionals have established a variety of methodologies to determine the value of assets that are not readily valued by reference to a market.  These include, among others, the DCF analysis, the comparable company analysis and the comparable transaction analysis.  No matter which methodology is used the purpose remains the same - to determine as accurately as possible what the sale price would be, i.e., price discovery.

Calyon argues that "commercially reasonable determinants of value" means evidence as to what one could buy or sell the asset for in the marketplace.  The Court agrees.  The purpose of any valuation method is to make that determination.  But, Calyon goes on to argue that the only relevant "determinants" are those that provide evidence of the asset's actual market price, such as the price actually received in a sale, the price available from a generally recognized source, the most recent bid quotation from that source or expert testimony regarding the market price.  In other words, if the asset cannot be sold in a commercially reasonable manner or the market price does not fairly reflect the asset's value, the only choice is to wait for a reasonable sale opportunity or for the market to right itself.

Calyon's argument has some support from section 559, which provides that in determining whether a debtor is entitled to a return of excess funds the amount is to be determined by either selling the assets or checking the market price of those assets (but not vice versa).  Interestingly, however, Calyon's argument is somewhat inconsistent from section 559 as Calyon suggests that a commercially reasonable determinant of

value could be expert testimony regarding the market price.  There is no reference to expert testimony in section 559.

In any event, the Court agrees with the Debtor's argument that Calyon's position is too narrow.  Every valuation methodology has as its goal the determination of value, which, by definition, means the sale price of the asset.  There is nothing in section 562 that would imply a limitation on any methodology used to determine value, provided it is commercially reasonable.  Indeed, the use of the word *determinants* suggests just the opposite – that *any* commercially reasonable valuation may be used.

Moreover, the wait for the asset to become saleable and/or the market to right itself may be lengthy.  Indeed, Calyon argues that in this case it took at least a year – from August 1, 2007 through August 15, 2008.  This creates exactly the moral hazard that section 562 was designed to prevent.  In such an instance, the repo participant can sit back and monitor market conditions while being protected, at least in part, from market losses by its potential deficiency claim against the debtor.

Thus, the Court finds that the phrase "commercially reasonable determinants of value," as used in Section 562 of the Code means that any commercially reasonable valuation methodology may be used as evidence of the damages under a repurchase agreement after its rejection, liquidation, termination or acceleration.  In the event that such a methodology is a commercially reasonable determinant of value, it only makes sense that the commercially reasonable methodology serves not only to fix the timing of

the damages calculation but also the amount of damages.[36]    Whether a specific

valuation methodology is commercially reasonable and correctly applied is a mixed

question of fact and law to which the Court now turns.

## II.    Calyon Has Not Met Its Burden Of Proof As To The Non-Existence Of "Commercially Reasonable Determinants Of Value" On The Acceleration Date.

In support of its proofs of claim, Calyon contends that there were no

"commercially reasonable determinants of value" on the Acceleration Date, and that,

therefore, the Court must determine the value of the Loan Portfolio on the first date on

which a "commercially reasonable determinant of value" did exist.  Calyon asserts that

this date is August 15, 2008, the first date on which it could make representations and

warranties regarding the Loan Portfolio.

Debtors have the initial burden of rebutting the presumption of the validity of

Calyon's proofs of claim.  To meet this burden, the Debtors submitted evidence that a

DCF analysis performed by their expert demonstrates that the Loan Portfolio had a

much higher value than that asserted by Calyon in its proofs of claim.  As discussed in

further detail below, the Court finds this evidence by the Debtors to be sufficient to

rebut the prima facie validity of Calyon's claims.

The burden then shifts to Calyon to establish that no "commercially reasonable

determinants of value" existed on the Acceleration Date.[37]    Calyon established that the

Loan Portfolio could not be sold for a reasonable price on the Acceleration Date.

---

[36] *Hartford Underwriters Ins. Co.*, 530 U.S. at 7 ("when a statute's language is plain, the sole function of the courts, *at least where the disposition by the text is not absurd*, is to enforce it according to its terms. ") (emphasis added).

Nonetheless, Calyon has not met its burden of proof because "commercially reasonable determinants of value" did exist on the Acceleration Date. Specifically, the Court finds that Calyon failed to rebut that the DCF analysis submitted by the Debtors' expert constitutes a commercially reasonable determinant of value of the Loan Portfolio.

### A.    Valuation Of Mortgages

As discussed above, the goal of valuation is to discover the sale price of an asset. When a sale would be unreasonable or cannot be performed one turns to the market price,  However, if a market price is unavailable or the market is disrupted or dysfunctional one must use a different method to discover the value of the asset. In determining which methodologies may be appropriate it is helpful, once again, to return to first principles.

> The value of a bond is the present value of the promised cash flows on the bond, discounted at an interest rate that reflects the default risk in these cash flows. Since the cash flows on a straight bond are fixed at issue, the value of a bond is inversely related to the interest rate that investors demand for that bond. The interest rate charged on a bond is determined by both the general levels of interest rates and to the default premium specific to the entity issuing the bond . . . The general level of interest rates incorporates expected inflation and a measure of real return, and reflects the term structure, with bonds of different maturities carrying different interest rates. The default premiums vary across time, depending in large part on the health of the economy and investors' risk preferences. Bonds often have special features embedded in them that have to be factored into the value.
>
> * * *

---

[37]  11 U.S.C. § 562(c)(2).

> There are two features that set bonds apart from equity investments. First, the promised cash flows on the bond . . . are usually set at issue and do not change during the life of the bond. Even when they do change . . . the changes are usually linked to changes in interest rates. Second, bonds usually have fixed lifetimes, unlike stocks, because most bonds specify a maturity date. As a consequence, the present value of a straight bond with fixed coupons and specified maturity is determined entirely by changes in the discount rate, which incorporates both the general level of interest rates and the specific default risk of the bond being valued.[38]

Mortgages are very similar to bonds in that both are debt instruments. Indeed, one could substitute "mortgage" for "bond" in the above quotation to have an excellent description of the nature of a mortgage. In the case of mortgages, one of the special features embedded in them that affects pricing is the borrowers right to pre-payment, "which affects cash flows and, therefore the value, of all mortgage-backed securities."[39] In addition, borrower defaults tend to be front-loaded and may be particularly sensitive to the state of the economy.

Valuing mortgages in this instance is just like valuing any asset that does not have a liquid market. When a market existed for the mortgages, then the market price could (and should) be used to determine value. When no market exists (or is functioning so poorly that price discovery is no longer occurring), another method of valuation must be used. Since the value of a mortgage "is the present value of the promised cash flows on the [mortgage], discounted at an interest rate that reflects the

---

[38] ASWATH DAMODARAN, INVESTMENT VALUATION: TOOLS AND TECHNIQUES FOR DETERMINING THE VALUE OF ANY ASSET 887-88 (2nd ed. 2001).

[39] *Id.* at 915.

default risk in these cash flows"   use of a DCF analysis, provided it is performed properly, to value the Loan Portfolio is appropriate and, indeed, is the best choice in this case.

### B.    The Debtors' Evidence

The Debtors' expert did just that.  To overcome the presumption that Calyon's proofs of claim are valid, the Debtors presented the expert testimony of Dr. Ronnie Clayton[40] that the value of the Loan Portfolio on a DCF basis was in excess of the Repurchase Price asserted by Calyon in its proofs of claim.[41]

Dr. Clayton testified that he performed a DCF analysis for every one of the more than 5,600 mortgages in the Loan Portfolio by first applying an appropriate discount rate, which he determined from his review of the Federal Home Loan Mortgage Corporation's Primary Mortgage Market Survey.  He then adjusted the interest rate to reflect what was happening in the mortgage market at the time, and finally applied the adjusted rates to the discounted cash flows on each individual mortgage and totaled them to determine the value of the Loan Portfolio.[42]

Dr. Clayton performed his analysis with alternative assumptions regarding the servicing rights.  He determined what the value would be if the servicing rights were retained with the mortgages and also what the value would be if the servicing was

---

[40] The Court found Dr. Clayton to be qualified to testify as an expert in the area of finance, specifically the valuation of assets that generate cash flows.  (Tr. 1 at 30:2 – 7).

[41] *Id*. at 37-38.

[42] *Id*. at 32:19 – 33:20.

released or separated from the mortgages.[43]   Dr. Clayton also accounted for the delinquency rate of the Loan Portfolio as of August 1, 2007 and assumed a 50% recovery rate for loans identified as delinquent at that time.[44]   He concluded that, on the Acceleration Date, the Loan Portfolio had alternative values on a DCF basis of either $1,162,817,745.15 (servicing retained) or $1,148,282,523.34 (servicing released).[45]

On cross-examination, Calyon attempted to establish that Dr. Clayton's analysis was unreliable because it did not take into consideration any of the factors that Calyon claimed related to the quality of the loans in the Loan Portfolio, such as comparable sales, the dysfunctional market, the ownership dispute, the servicing dispute, or the lack of complete loan files.[46]   Calyon was unsuccessful, however, as Dr. Clayton pointed out that the quality of the loans in the Loan Portfolio, while possibly affecting their salability, would not affect their cash flows other than by possibly increasing delinquency rates, which Dr. Clayton accounted for in his opinion by applying 50% discount on the delinquent loans.[47]   Moreover, Dr. Clayton testified that one has to look at the Loan Portfolio on the valuation date being used, and not speculate about what may or may not happen in the future.[48]

Calyon did not challenge or dispute the actual methodology employed by Dr. Clayton and the Court finds that this aspect of Dr. Clayton's testimony is uncontested.

---

[43] *Id*. at 35:2 – 18.

[44] *Id*. at 35:18 – 36:22.

[45] *Id*. at 37:1-9.

[46] *Id*. at 39:11 – 49:6.

[47] *Id*. at 35:18 – 36:22.

This is highly significant since the discount rate applied by Dr. Clayton reflected, in part, the state of the mortgage market in the Acceleration Date.[48]

Having reviewed Dr. Clayton's testimony, and finding the witness to be credible and the methodology employed to be one that is generally accepted within the relevant field, the Court finds that the Debtors have successfully overcome the presumption of the validity of Calyon's proofs of claim and put forth what the Court considers to be an accurate DCF analysis, establishing that the damages are to be calculated as of the Acceleration Date and that the value of the Loan Portfolio exceed the Repurchase Amount on that date.[50]  The burden then shifts to Calyon to prove the absence of any "commercially reasonable determinants of value" on the Acceleration Date.

---

[48] *Id.*

[49]  Calyon argued that the use of a DCF analysis is inappropriate because it will ***always*** provide a valuation for an income producing asset and, thus, would render Bankruptcy Code sections 562(b) and (c) nullities because there would never be a time when commercially reasonable determinants of value failed to exist.  Calyon's argument ignores two important points.  First, there is a fundamental difference in using a DCF to value a debt instrument and an equity interest.  DAMODARAN at 888.  For example, the absence of a fixed maturity date for equity makes the application of a DCF to equity more difficult and perhaps inappropriate.  Certain securities, including those issued by or guaranteed by the United States and other governments, are included in the definition of repurchase agreement.  11 U.S.C. § 101(47).  The definition of securities in section 101(49) of the Code includes equity instruments such as stock.  Thus, it is quite possible that a DCF analysis would not be a commercially reasonable determinant of value for at least some repurchase agreements.  Second, a DCF analysis requires a calculation of the risk of repayment.  If risk cannot be accurately gauged for some reason, say lack of reliable information, a DCF may not be commercially reasonable even for a debt instrument.  Third, the fact that a properly conducted DCF analysis will almost certainly be an appropriate method to value a mortgage or other debt instrument arises from the very nature of the debt, not from a nefarious plan to rewrite the Code.  "The value [of a mortgage] is the present value of the promised cash flows . . . discounted at an interest rate that reflects the default risk in these cash flows." *Id.*

[50] The Court also notes that Calyon itself acknowledged, outside of this litigation in the context of internal correspondence, that a DCF analysis was the appropriate method for valuing the Loan Portfolio pursuant to Financial Accounting Standard 114.  (See Tr. 1 at 147:23 – 150:8; Debtors' Exhibit 24 (in which a Calyon employee indicates that Calyon's auditors acknowledge that under the applicable accounting rules, the justification of the reserve related to the Loan Portfolio is based on the present value of future cash-flows.).

B.      **Calyon's Evidence**

(1)      **The Quality of the Loans**

Calyon's first witness was John-Charles van Essche, a managing director in Calyon's distressed asset department, who testified as to the issues relating to the quality and ownership of the loans that prevented Calyon from selling the Loan Portfolio on the Acceleration Date.  Though Mr. van Essche began with a somewhat plausible explanation as to why the problems with the loans in the Loan Portfolio would prevent a sale, it became clear by the end of his testimony that his explanation was litigation driven, and therefore, not very credible.

Mr. van Essche testified on direct examination that Calyon could not have sold the Loan Portfolio on the Acceleration Date because the dispute regarding the ownership of the loans, the direction of the proceeds, and questions regarding the servicing "made it extremely difficult, if not impossible, for [Calyon] to sell these loans at anything close to a reasonable price, assuming there was a market there in the first place."[51]

But on cross-examination it became clear that Mr. van Essche's testimony regarding the significance of the problems with the loans in the Loan Portfolio was much different than the position Calyon had taken outside of the context of this litigation.  In correspondence dated May 23, 2008, to the SNC,[52] Calyon made a number

---

[51] Tr. 1 at 96:21 – 97:9

[52] "SNC" stands for Shared National Credit, which, as explained by Mr. van Essche is, in essence, a committee made up of various banking regulatory agencies for the purpose of reviewing syndicated loan transactions and determining certain loan loss reserve ideals.  (See Debtors' Ex. 28 at 194-95).

of representations regarding the Loan Portfolio that are in direct contradiction with the

statements made to this Court.  Calyon stated:

> Write-up [by the SNC] lists "negative" issues with the credit.
> The full context of these issues is not explained . . .
>
> . . . Write-up correctly indicates that the issue of servicing
> rights must be resolved "so that the pool can be sold for a
> higher price".   However, it should be noted that the
> difference in selling price caused by the servicing rights
> issue . . . is 300 bps to 400 bps at the most.  As explained to
> the examiners, purchasing the servicing rights is an option
> available and would cost only around 100 bps, thus negating
> to a great extent this issue.
>
> . . . Write-up refers to the deficiencies in the portfolio . . . . As
> explained to the examiners, if mortgages are performing, file
> deficiencies (which in fact are prevalent throughout the
> industry) do not really impact sale value.
>
> . . . Write-up indicates there is no "desire to liquidate the
> portfolio under current market conditions that would
> severely affect the price".  This is true only because it makes
> more sense to sell when liquidity in the market recovers,
> which will result in higher prices.   In the mean time,
> portfolio collections of P&I and full payoffs continue, thus
> reducing exposure.  The strategy being employed by holding
> is to maximize value.[53]

Even if the Court were to find Mr. van Essche's testimony on this issue credible,

it would have no effect on the Court's conclusion.   The Court finds that the issues

regarding the quality of the loans and their ownership are irrelevant to the issue of

whether "commercially reasonable determinants of value" existed on the Acceleration

Date.   The evidence submitted shows that, from the time of the Acceleration Date,

Calyon had no intention of selling the Loan Portfolio due to the dysfunctional state of

---

[53] Debtors' Exhibit 23.

the market.[54]   Because Calyon's intent was to hold the loans, and not sell them,

testimony regarding the variables that might have had an impact on a sale price is not

relevant.   Moreover, the entire issue appears to be one contrived solely for purposes of

this litigation.   Accordingly, the Court will not consider the problems with the loans in

its analysis and, even if it were to do so, would give such problems minimal weight.

**(2)     The Market Valuations**

**(a)     Calyon's Internal Market Analyses**

Mr. van Essche also testified about a number of valuations of the Loan Portfolio

that Calyon, or Calyon's retained agents or advisors, had performed on or about the

Acceleration Date.[55]  First, Mr. van Essche discussed the internal market analyses of the

Loan Portfolio that Calyon conducted for the purposes of determining its potential

recovery rate on the loans.[56]   Those analyses projected the recovery rate on the Loan

Portfolio to be 92.5% in August of 2007, shortly after the Acceleration Date.[57]

Next, Mr. van Essche discussed the valuations Calyon obtained from a firm

called Compass Analytics ("Compass"), which Calyon had retained to provide a *market

analysis* of the Loan Portfolio in late 2007.[58]   The Compass valuations, *done on a market

basis*, indicate that the Loan Portfolio had a weighted price of $1,203,729,469 on July 27,

---

[54] Tr. 1 at 98:17 – 99:7; 102: 4 – 10; 158:24 – 159:22.

[55] The valuations that Mr. van Essche testified about do not include those performed by Calyon's expert witness, Mr. Branthover, which are discussed below.

[56] Tr. 1 at 110:11 – 17.

[57] Debtors' Exhibit 6.

[58] Tr. 1 at 112:10 – 12.

26

2007[59] and $1,155,143,132 on August 20, 2007.[60]  Each valuation reflects a value in excess of the Repurchase Price.

Mr. van Essche testified that he did not believe either Calyon's internal valuations or the Compass valuations accurately reflect the price for which the loans would have actually been sold.  The Court agrees.  It is not disputed that the secondary mortgage market was dysfunctional in August, 2007.  These market valuations were based on outdated assumptions and data.  Thus, they are not probative of the sale value of the mortgages.

### (b)  Calyon's Expert's Market Analyses

Calyon presented Mr. Robert Branthover as its expert witness on the subject of mortgage valuation.[61]  Mr. Branthover testified that the market value of the Loan Portfolio on the Acceleration Date was, at best, 10 cents on the dollar.[62]  His stated basis for this conclusion was that the unresolved questions as to ownership of the loans would have made it very difficult to find a buyer, analogizing the situation to the attempted sale of a car without a title.[63]  The Court has already held, however, that issues regarding the ownership of the loans are irrelevant.

Mr. Branthover also testified that if asked to assign a value to the Loan Portfolio on the Acceleration Date on the assumption that there was no ownership issue, the

---

[59] Debtors' Exhibit 4 (Total Unpaid Principal Balance of $1,187,930,000 x 101.33%).

[60] Debtors' Exhibit 1 (Total Unpaid Principal Balance of $1,187,930,000 x  97.24%).

[61] The Court admitted Mr. Branthover as a qualified expert on the subject of mortgage valuation.  (Tr. 2 at 16:1-3).

[62] *Id*. at  19:19 – 20:1.

[63] *Id*. at 19:24 – 20:8.

value would still be at a substantial discount, somewhere around 50 cents on the dollar.[64]  Assuming he is correct (which is probable), his analysis is irrelevant because the Debtors' proffered DCF was a commercially reasonable determinant of value on the Acceleration Date.  Thus, the entirety of Mr. Branthover's testimony and, indeed, all of the evidence submitted by Calyon is irrelevant.[65]

### C.    Conclusion Regarding Whether Calyon Has Met Its Burden

In sum, on the question of whether Calyon has met its burden of demonstrating that no "commercially reasonable determinants of value" existed on the Acceleration Date, the Court finds that Calyon has not.

First, the Court finds credible the testimony of the Debtors' expert witness, Dr. Clayton, that a DCF analysis of the Loan Portfolio on the Acceleration Date showed the value of the loans on a DCF basis was either $1,162,817,745.15 (servicing included with mortgages) or $1,148,282,523.34 (servicing not included with mortgages).  The Court finds that Dr. Clayton's DCF analysis is a commercially reasonable methodology for determining the value of the Loan Portfolio.

Second, the Court finds Calyon's argument that the quality of the Loan Portfolio prevented it from obtaining a commercially reasonable price at market on the Acceleration Date irrelevant.  Moreover, Calyon's position in this litigation is far different than the position it took with the SNC during its review process and,

---

[64] *Id*. at 41:2 – 22

[65] The Debtors argued for various reasons that Calyon's evidence was not probative.  As the Court finds the evidence is irrelevant it need not address the Debtors' arguments on this point.

therefore, Calyon's testimony that the ownership and loan quality issues affected the sale price is not credible and appears litigation driven.

Third, the Court finds the testimony of Calyon's expert witness to be irrelevant. The Court further finds that Calyon's internal valuation analysis and the market analyses performed by Calyon's advisor, Compass, do not fairly reflect the Loan Portfolio's market value as of that date because the market was dysfunctional.

For all of these reasons the Court finds that Calyon has not met its burden of proving that no "commercially reasonable determinants of value" existed on the Acceleration Date, and, accordingly, finds that the value of the Loan Portfolio on the Acceleration Date was $1,148,282,523.34 (the DCF value determined by the Debtors' expert, without servicing rights being included). The Repurchase Price on the Acceleration Date was $1,143,840,204.36. Because the value of the Loan Portfolio exceeds the amount of Calyon's Claim, Calyon has no deficiency claim and therefore no damage claim under Section 562.

## CONCLUSION

The Court makes the following conclusions based on its review of the evidence submitted:

a)    Section 562's reference to "commercially reasonable determinants of value" is not limited to the market or sale value of an asset;

b)    A discounted cash flow methodology is a "commercially reasonable determinant of value" for the mortgage portfolio at issue in this case, which is an income-producing asset;

c)    The discounted cash flow analysis that was submitted by the Debtors is compelling evidence of the value of the Loan Portfolio; and

d)      Calyon failed to meet its burden of proof, even considering the market value of the Loan Portfolio, because they failed to rebut that the DCF analysis was a "commercially reasonable determinant of value.".

Based on these findings, the Court concludes that the value of the Loan Portfolio as of the Acceleration Date was $1,148,282,523.34.    The Repurchase Price on the Acceleration Date was $1,143,840,204.36.    Because the value of the Loan Portfolio exceeds the Repurchase Price, Calyon has no deficiency claim and therefore no damages under Section 562.

Accordingly, the Debtors' objections to the Repurchase Claims are sustained and the Repurchase Claims will be expunged.  An Order will be issued.

_____
Christopher S. Sontchi,
United States Bankruptcy Judge

Dated: September 8, 2009