# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, INC.,       **Chapter 11**
A Delaware Corporation, <u>et al.</u>,

                                             **Case No. 07-11047 (CSS)**

        Debtors.                             **Jointly Administered**

-------------------------------------------------------------------x

## <u>CREDITOR JOHN MONAGHAN'S RESPONSE TO DEBTORS' FORTY-SECOND OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS PURSUANT TO SECTION 502(b) OF THE BANKRUPTCY RULES 3003 AND 3007, AND LOCAL RULE 3007-1:</u>

COMES now Creditor, John Monaghan ("Monaghan") by and through his undersigned

counsel and files this response to the above titled Objection and states the following as to why

the Court should enter an Order overruling the untimely Objection to Modify the disputed Claim

attached to Debtors' Objection and identified as <u>Exhibit B</u>:

## <u>FACTUAL ALLEGATIONS</u>

1. On October 30, 2007, this Court entered an order (the "Bar Date Order") establishing

    January 11, 2008  at 4:00 p.m. (ET) (the "Bar Date") as the final date and time for filing

    proofs of claim against the Debtors' estates on account of claims arising, or deemed to

    have arisen pursuant to section 501(d) of the Bankruptcy Code, prior to the Petition Date

    and approving the form and manner of notice of the Bar Date.

2. Monaghan filed his original proof of claim on November 1, 2007 in the amount of

    $400,948.00; of which $10,950 is priority unsecured for unpaid wages due under the

    employment contract and in violation of Florida Statute 448.07 & Article 6 of New York

Consolidated Laws; and the balance equates collectively to: $45,000 for an unpaid bonus

and $344,998 in back pay and future pay for wrongful termination in violation of the

Americans with Disability Act (ADA), Chapter 760 of Florida Statutes and Article 15,

Human Rights Law of the Executive Law of New York;  Florida Statute 448.07 & Article

6 of New York Consolidated Laws as to unpaid wages; and for related claims of breach

of contract and negligent misrepresentation.

3.  Monaghan was terminated by Debtor as of February 1, 2007.  Monaghan was employed

with DEBTOR as VP, Repurchase Transaction Manager since October 9, 2006.

4.  Monaghan and Debtor memorized an employment contract on September 21, 2006,

("contract"). See **Attached Exhibit A** [Employment Agreement].

5.  Prior to entering into the contract, Monaghan and Debtor participated in multi-phased

negotiations pertaining to the terms of Monaghan's potential employment with Debtor.

6.  Prior to the final phase of negotiations and prior to memorializing the contract, Debtor

induced Monaghan to continue further negotiations for  employment with Debtor by

offering and/or representing , among other things, the following :

    a.  Assurances that Monaghan could reasonable rely of Debtor representation that

       it would pay Monaghan a bonus commensurate with the bonus Monaghan

       would have to forgo if he terminated his employment with a blue chip firm,

       Morgan Stanley, and began employment with Debtor, a second tier firm.

    b.  Debtor was fully aware at the time of preliminary negotiations with

       Monaghan that Monaghan had earned a bonus from Morgan Stanley but the

       bonus was not to be paid by Morgan Stanley until after the date Monaghan

       would begin employment with Debtor.

    c.  Prior to the final stages of negotiations, Monaghan expressed great concern about foregoing the Morgan Stanley bonus. Debtor gave Monaghan assurances that they were trying to lure him away from Morgan Stanley and that Debtor would do whatever was necessary to hire him. During all stages of negotiations Debtor repeatedly stated to Monaghan "we will do whatever it takes to hire you."

    d.  After Debtor became aware that Monaghan might walk away from negotiations, Debtor promised Monaghan if he continued the negotiations that he would become a senior VP at Debtor which Monaghan had not achieved at Morgan Stanley. Additionally, as an incentive to continue negotiations, Debtor assured Monaghan that he would have independent discretion and judgment.

7.  Monaghan reasonably relied on Debtor assertions, promises and representations and was induced to continue negotiations for employment with Debtor and was induced to leave his job with Morgan Stanley.

8.  Monaghan relied of Debtor assertions, promises and representation to his detriment because during his employment with Debtor, Monaghan was not paid the $45,000.00 bonus promised by Debtor; Monaghan was unable to exercise independent judgment and discretion as promised; Monaghan was not promoted, instead Monaghan's title was changed to a lower ranked title after his start date with Debtor.

9.  Prior to being terminated by Debtor, Monaghan became ill. After Debtor became aware that Monaghan was ill, Debtor insisted that Monaghan provide his medical records.

3

10. Monaghan complied with Debtor's demand for his medical records and within days of receiving Monaghan's medical records Monaghan was fired by Debtor.

11. Monaghan was fired even though Debtor received a release from Monaghan's doctor stating that Monaghan was able to return to work.

12. Monaghan complied with all terms of the employment agreement.

13. Debtor did not comply with the following, among others, terms of the contract:

   a. Section 3(b) pertaining to Monaghan's time, efforts, and skills during periods of illness. Monaghan was not allowed a reasonable time off for illness.

   b. Section 5(a), Monaghan was not paid for his final days of employment ending February 1, 2007. This time period of unpaid wages is approximately one month's wages.

   c. Section 5(b), Monaghan did not receive his earned bonus in the amount of $45,000.00.

   d. Debtor unlawfully terminated Monaghan because of his disability and/or perceived disability.

14. Monaghan was subjected to a discriminatory discharge based on his disability and/or perceived disability.

15. Monaghan's immediate supervisor, Mr. Pace requested and received his medical records. **See Attached Exhibit B** (Letter of January 8, 2007 from Debtor to Monaghan). On January 22, 2007 and within days of Mr. Pace receiving Monaghan's medical records, he was informed that he would be terminated as a result of his medical condition.

16. Debtor maintained its position to terminate Monaghan's employment even though it was aware that he was able to perform the essential functions of my job. **See attached Exhibit C** (termination letter dated January 22, 2007).

4

17. On June 21, 2007, Monaghan filed a Charge of Discrimination with Equal Employment
Opportunity Commission ("EEOC"), New York District office detailing the factual and
legal basis for his unlawful and wrongful termination by Debtor. **See attached Exhibit D**
(Charge of Discrimination).

18. On August 8, 2007, Monaghan brought an action against Debtor in the US Middle
District Court of Florida all stemming from his underlying claim of discrimination,
Tampa Division under Florida Statute 448.07 for unpaid wages Statute 448.08 for
attorney fees and cost; Article 6 of the Labor Law for New York State Consolidated
Laws for unpaid wages, attorney fees and cost; Negligent Misrepresentation and Breach
of Contract under New York Laws and attorney fees and cost. The district court action
was stayed.

19. Even though, only the district court matter could be lawfully stayed, Debtor refused to
cooperate with the EEOC in its investigation of Monaghan's charge of discrimination,
claiming that the matter was stayed.  Debtor took this unlawful position even though the
EEOC repeatedly advised Debtor that the EEOC had a right to proceed with its
investigation. **See Composite Exhibit E** ( EEOC letter to Debtor of September 6, 2007
and Debtor's Letter to EEOC of October 23, 2007).

20. On November 5, 2007, the EEOC issued a Determination in favor of Monaghan and
found that he established a prima facie case of employment discrimination under the ADA
and that there is reasonable cause to believe that Monaghan was subjected to disparate
treatment based on his disability and/or perceived disability. The EEOC attempted to
eliminate Debtor's unlawful practices by informal methods of conciliation, however Debtor
declined to participate. **See Composite Exhibit F** (EEOC Determination & Notice of Right
to Sue).

5

## Unpaid wages claim for $10,950.00

Debtor contends that Monaghan was terminated as of January 22, 2007. However, Monaghan was actually terminated as of February 1, 2007 because under the terms of the employment agreement his termination was not effective until four weeks following his discharge date. Moreover, Debtor's letter of January 22, 207 plainly states that Monaghan is terminated as of February 1, 2007 Therefore Debtors' Objection to modify the claim and reduce same from $10,950.00 to $2,884.62 should be overruled.

## $45,000 Bonus and balance of claim

Debtor contends that Monaghan is not entitled to his unpaid and earned bonus payment and/or damages for breach of the employment agreement because Debtor had a right to terminate Monaghan' employment at anytime and for any reason. Debtor also claims that Monaghan is not entitled to the unpaid and earned bonus payment because Monaghan was discharged prior to the scheduled bonus payment date in March of 2007 and that payment was conditioned on Monaghan being employed by Debtor on the payment date.

Debtor's objection to this portion of the claim should be overruled as Debtor's termination of Monaghan's employment agreement was unlawful and for a discriminatory purpose: because Monaghan was disabled and/or perceived as disabled by Debtor. Moreover, in violation of 11 USC 362 (b)(4), Debtor refused to participate in the EEOC investigation of Monaghan's wrongful termination, claiming that the automatic stay provision applied and that it was not required to subject itself to the Government's prosecutorial and investigative process. It necessarily follows that the EEOC issued a Determination finding a prima facie case of employment discrimination under the ADA and that there is reasonable cause to believe that

6

Monaghan was subjected to disparate treatment based on his disability and/or perceived disability. The EEOC attempted to eliminate Debtor's unlawful practices by informal methods of conciliation; however Debtor refused to participate.

**WHEREFORE,** Claimant, Monaghan respectfully request Stay relief to liquidate the amount of this claim in the US Middle District of Florida, Tampa Division, alternatively if the Court is not inclined to grant the relief of Stay, then Claimant request an evidentiary hearing for approximately 2 days in duration.

Dated October 5, 2009

Sonia C. Lawson
Bar No. 0186678
Sonia C. Lawson, P.A.
100 N. Tampa Str., Ste. 2435
Tampa, Florida 33602
(813) 221-8383
(813) 944-3055 Fax
soniaclawson@aol.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via Fax and hand delivery to Michael S. Neiburg of Young Conaway Staragatt & Taylor, LLP, The Brandywine Building 1000 West Street, 17th Floor Wilmington, Delaware 19801, fax 302-571-1253

Sonia C. Lawson

7

# EMPLOYMENT AGREEMENT

This Employment Agreement, dated as of _September 21_, 2006 (this "Agreement"), is by and between American Home Mortgage Corp., a New York corporation having a place of business at 538 Broadhollow Road, Melville, NY 11747 (the "Company"), and John G. Monaghan, currently residing at 707 SW 4th Avenue, Fort Lauderdale, FL 33315 (the "Executive").

Whereas the Company wishes to assure itself of the services of the Executive, and the Executive desires to be employed by the Company, upon the terms and conditions hereinafter set forth.

The Company and the Executive hereby agree as follows:

1. **Employment.** The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company during the term set forth in Section 2 and on the other terms and conditions of this Agreement.

2. **Term.** The term of this Agreement shall commence on October 9, 2006 (the "Commencement Date"), and shall continue until the Executive resigns or is discharged, in which case the Agreement shall terminate four weeks following the resignation or discharge date.

3. **Position, Duties and Responsibilities, Rights.**

(a)    During the term of this Agreement, the Executive shall serve as and hold the office and title of Vice President, Repurchase Transaction Manager. The Executive shall have all of the powers and duties usually incident to the office described above, and shall at all times comply with all policies of the Company relating to the Executive's employment.

(b)    During the term of this Agreement, the Executive agrees to devote substantially all the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker or arbitrator; provided, however, that the performance of the Executive's duties or responsibilities in any of such capacities does not materially interfere with the regular performance of the Executive's duties and responsibilities hereunder

4. **Place of Performance.**  In connection with the Executive's employment by the Company, the Executive's place of performance shall be in Melville, New York, and the Executive shall not be required to be absent from such location on travel status or otherwise for

EXHIBIT A

NOV-23-2002  12:25

P.03

more than a reasonable time each year as necessary or appropriate for the performance of the Executive's duties hereunder.

　　　　5. Compensation

　　　　(a)　　　During the term of this Agreement, the Company shall pay the Executive, and the Executive agrees to accept a base salary at the rate of not less than $150,000.00 per year (the annual base salary as increased from time to time during the term of this Agreement being hereinafter referred to as the "Base Salary"). The Base Salary shall be paid in installments no less frequently than monthly. Any increase in Base Salary or other compensation shall not limit or reduce any other obligation of the Company hereunder, and once established at an increased specified rate, the Executive's Base Salary hereunder shall not thereafter be reduced.

　　　　(b)　　　In relation to the period of the Executive's employment from the Commencement Date through December 31, 2006, the Executive shall be eligible to receive a bonus of $45,000.00 (the "2006 Bonus"), which will be payable in March 2007. The Executive will not earn or be entitled to receive the 2006 Bonus if the Executive is no longer an employee of the Company as of the scheduled bonus payment date.

　　　　(c)　　　Commencing in 2007, the Executive shall be eligible to receive a quarterly performance bonus (the "Quarterly Performance Bonus"), the targeted amount of which will be $18,750.00 (the "Target Amount"), but the amount awarded, if any, may be less or greater than the Target Amount in accordance with the following matrix (the "Matrix"):

### Whole Loan Sale Performance Matrix

| On-Time Percentage | | | | |
|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 |
| 0 | 25% | 40% | 55% | 70% |
| 0 | 50% | 65% | 80% | 95% |
| 0 | 60% | 75% | 90% | 105% |
| 0 | 65% | 80% | 95% | 110% |
| 0 | 70% | 85% | 100% | 115% |
| 0 | 75% | 90% | 110% | 120% |

To determine the actual amount of the Quarterly Performance Bonus, the Target shall be multiplied by the percentage establish in the Matrix, when comparing the Pull-Through Percentage and the On-Time Percentage. The Pull-Through Percentage and the On-Time Percentage shall be determined in the Company's sole discretion in accordance with the methodologies, policies, and procedures of the Company in effect from time to time. The Quarterly Performance Bonus for a given calendar quarter will be paid when such bonuses are generally paid by the Company in the succeeding quarter. The Executive will not earn or be entitled to receive a Quarterly Performance Bonus if the Executive is no longer an employee of the Company as of the scheduled bonus payment date.

2

P. 11
OCT-05-2009 15:15

NOV-23-2002 12:27

P.04

(d)    During the term of this Agreement, the Executive shall be entitled to fringe benefits, in each case at least equal to and on the same terms and conditions as those attached to the Executive's office on the date hereof, as the same may be improved from time to time during the term of this Agreement.

(e)    During the term of this Agreement, the Executive shall be entitled to reimbursement, upon proper accounting, of all reasonable expenses and disbursements incurred by the Executive in the course of the Executive's duties.

6.    Relocation and Related Travel Expenses.

(a)    The Executive shall permanently relocate from the Executive's present residence to the Melville, New York area within 60 days of the Commencement Date (the "Relocation Obligation"). Provided the Executive complies with the Relocation Obligation, the Executive shall be eligible to receive relocation benefits in accordance with the Employee Relocation Program attached hereto as Exhibit A.

(b)    In addition to those benefits available to the Executive pursuant to Exhibit A, the Company will cover: (i) the reasonable temporary housing expenses incurred for a period not to exceed 60 days, while the Executive transitions to permanent housing (such temporary housing shall be arranged and managed by the Company); and (ii) the reasonable travel expenses associated with round-trip travel between the Melville, New York area and the Executive's current residence every alternate weekend, for a period not to exceed 60 days, while the Executive transitions to permanent housing. If the Executive's employment with the Company terminates prior to, or within twelve (12) months of, the Commencement Date, due to the Executive's voluntary resignation, the Executive must immediately repay to the Company any amounts paid by the Company pursuant to this section 6(b).

7.    Employment At Will.    Employment hereunder shall be at all times "at will". The Company may discharge the Executive and terminate this Agreement at any time and for any reason, and the Executive may terminate the Executive's employment with the Company for any reason. If the Executive terminates the Executive's employment with the Company, the Executive shall provide the Company with notice of such termination pursuant to section 13 herein.

8.    Confidential and Proprietary Information; Company Property    For the purpose of this section, Confidential Information shall mean all information and intellectual property owned by and proprietary to the Company, including but not limited to marketing programs such as Homebuyers Marketing and Marketing Portal, loan applications, loan files, loan file documents, accounts, customer or client information, contracts or agreements, data, records, appraisals, financial information, software, customer lists, prospective customer leads or lists, product information, strategic business plans, trade secrets, manuals, business methodology and processes, and cost and pricing policies. All Confidential Information disclosed or provided to the Executive by the Company, or developed or created by the Executive during the term of the Executive's employment with the Company, is, shall become, and shall at all times remain, the sole and exclusive property of the Company. The Executive agrees not to disclose the

3

NOV-23-2002   12:28                                                     P.05

Confidential Information to any other party, except to the extent that such disclosure is reasonably necessary in order for the Executive to perform the Executive's responsibilities as an executive of the Company. The Executive also agrees that the Executive will not use the Confidential Information for any purpose other than to fulfill the Executive's responsibilities as an executive of the Company.

The Executive acknowledges, understands, and agrees that the Confidential Information is of substantial value to the Company and that, in the event of the use or disclosure of such Confidential Information in breach of this Agreement, the resulting damages will be difficult, if not impossible, to determine and that money damages will be inadequate. Therefore, without prejudice to the rights and remedies otherwise available to the Company, and in addition to such rights and remedies, the Company shall be entitled to equitable relief by way of injunction if the Executive breaches or threatens to breach any of the provisions of this Agreement relating to the Executive's use or disclosure of any of the Confidential Information.

The Executive further acknowledges that the Company may provide the Executive with access to or use of equipment or other property owned or leased by the Company ("Company Property"). The Executive agrees to abide by all agreements and policies relating to the use of Company Property, as may be in effect or modified from time to time at the sole discretion of the Company. The Executive further agrees to promptly return in good working condition all Company Property in the Executive's possession upon termination of the Executive's employment with the Company for any reason, and shall be liable in damages, including but not limited to replacement cost, for any financial loss to the Company if Company Property is not returned in such manner.

The Executive agrees that this section shall survive the termination of this Agreement, and that all of the obligations of the Executive set forth in this section shall remain in full force and effect after this Agreement is terminated. The Executive further agrees that, upon termination of this Agreement, the Executive will return to the General Counsel all Confidential Information (including all copies of Confidential Information) which is then in, or which later comes into, the Executive's possession or custody.

9. Non-Solicitation; Non-Disparagement  The Executive agrees that during the term of the Executive's employment with the Company, and for a period of one (1) year after termination of the Executive's employment with the Company, whether such termination is voluntary or involuntary, with or without cause, the Executive shall not, directly or indirectly: (a) attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting, contacting, or communicating with any customers and/or potential customers of the Company which have been derived from leads and/or lists developed and provided to the Executive by the Company; (b) influence or advise any other person to employ or solicit for employment anyone who is an employee of the Company; (c) influence or advise any person who is an employee of the Company, to leave the employment of the Company; and (d) employ any person who is an employee of the Company. The Executive agrees that during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, attempt to divert any of the business of the Company, or any business which the Company has a reasonable expectation of obtaining, by soliciting,

4

NOV-23-2002  12:29    P.06

contacting, or communicating with any customers or business referral sources, including but not limited to realtors, builders and affinity organizations, joint venture partners, borrowers and loan applicants, obtained by, or whose contact information is stored in the records of, the Company. The Executive expressly agrees that this section is fair and reasonable and that Executive is being adequately compensated for agreeing to the terms of this section.

The Company and the Executive agree that neither will disparage the other, and that their representatives will not disparage either party hereto.

The Executive's obligations as set forth in this section shall survive the termination of this Agreement.

10. Non-Compete. The Executive agrees that, during the term of the Executive's employment with the Company, the Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm corporation or other business enterprise which is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company. The Executive expressly agrees that this section is fair and reasonable and that the Executive is being adequately compensated for agreeing to the terms of this section.

11. Entire Agreement; Amendment.

(a)    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties, their predecessors and affiliates.

(b)    Any amendment of this Agreement shall not be binding unless in writing and signed by both (i) the Company's General Counsel and (ii) the Executive.

12. Enforceability. If any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

13. Notices. All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery, registered or certified mail, return receipt requested or overnight courier, if to the Executive at 707 SW 4th Avenue, Fort Lauderdale, FL 33315, and, if to the Company, to it at its principal executive offices at 538 Broadhollow Road, Melville, NY 11747, Attention: Human Resources Director, with a copy to the Company's General Counsel, and shall be deemed given when sent. Either party may by like notice to the other party change the address at which it is to receive notices hereunder.

14. Counterparts. This Agreement can be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original,

5

NOV-23-2002 12:30                                                            P.07

and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

15. <u>Facsimile Signatures.</u> A facsimile copy of either party's signature shall be deemed as legally binding as the original signature.

16. <u>Governing Law.</u> THIS AGREEMENT SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

American Home Mortgage Corp.

By: _____
Name: Alan B. Horn
Title: Executive Vice President and General Counsel

_____
The Executive

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
Social Security Number

6

P.15

OCT-05-2009

## EXHIBIT A

### American Home Mortgage
### Employee Relocation Program

The following represents the Company's Employee Relocation Program (the "Program"), which shall be made available to the Executive if the Executive relocates to the Melville, New York area within 60 days of the Commencement Date. The Executive will be eligible for expense reimbursement based on the criteria specified below:

If the Executive relocates and purchases a primary residence in the Melville, New York area, the Company will cover reasonable real estate broker's commissions up to a maximum of the lesser of 6% or $30,000.00.

The Company will also reimburse the Executive for customary and reasonable closing costs associated with the sale of the Executive's home in Fort Lauderdale, Florida, with attorneys' fees not to exceed $400. To qualify for such reimbursement, the Executive must work through a relocation vendor designated by the Company.

The Executive will be eligible for the Company's employee discount on the Executive's home mortgage which is a no fee/points/reduced interest rate mortgage. All fees will be reimbursed to the Executive, except that the Executive shall be responsible for customary third party fees.

The Company will secure for the Executive the services of a moving vendor through the Company's relocation service resource. The Company will cover the reasonable cost of such move, up to a maximum of $20,000.00.

It is understood that if, within twelve (12) months of the Executive's relocation to the Melville, New York area, the Executive voluntarily resigns the Executive's employment, the Executive must immediately repay to the Company any amounts paid by the Company under this Program.


ACKNOWLEDGED AND ACCEPTED:


John G. Monaghan

Date   9/21/2006

 **American Home Mortgage**

January 8, 2007

John M. Monaghan
707 SW 4th Avenue
Fort Lauderdale, FL 33315

Dear John:

On January 8, 2007 American Home Mortgage (AHM) was notified of your need to take medical leave due to a health condition that makes you unable to perform the essential functions of your job. AHM was notified that your leave began on January 2, 2007 and the duration of the leave is undetermined at this time. AHM designated your leave which began on January 2, 2007 as a personal medical leave as you do not qualify under the federal Family Medical Leave Act of 1993 (FMLA) or state FMLA for a job protected leave.

In order for us to review your request for Personal Leave, the enclosed forms (explained below) must be completed and returned to my attention at the address below:

- <u>Leave of Absence Application</u>: It is required that this form be completed and returned within 7 calendar days of receipt. Therefore this is due no later than 5 pm Eastern Standard on <u>January 15, 2007.</u>

- <u>Certification of Physician or Practitioner</u>: Please have the attending physician complete this form within 7 calendar days of receipt. Please return this certification directly to me by 5 pm Eastern Standard on January 15, 2007. If your certification is not received promptly, approval of your leave may be delayed.

Please note, if a leave is approved, AHM will designate your leave as a Personal Leave as <u>you do not qualify under the federal Family Medical Leave Act of 1993 (FMLA) for a job guarantee.</u>

AHM will make every effort to hold your position up to a maximum of 30 calendar days but the business needs will determine the actual amount of time that your position will be held. During your leave you are required to be in contact with your manager and myself on a weekly basis, to update us on the status of your leave/disability.

It is required that available paid sick/personal or vacation time (if sick/personal is not available) be used for the 5 day waiting period before your state disability claim becomes effective as well as for any time off from work in which you are not receiving compensation from the carrier. If there is no sick/personal or vacation time available, the waiting period prior to your disability claim becoming effective, will be unpaid.

If your leave is due to your own medical condition, you may be eligible for Short-Term Disability (STD) benefits. Please call Matrix at 1-866-533-3438 to report your STD claim and provide necessary information regarding the claim to the Matrix representative. Enclosed is an Authorization to Release Information Form that you would need sign and give a copy of this to your doctor to authorize them to release of medical information pertaining to your claim to First Reliance Standard.

538 Broadhollow Road, Melville, NY 11747

*Exhibit B*

If approved for disability the benefits payment will begin on the 8th calendar day.   The review of your claim for voluntary disability benefits is made by First Reliance and is independent of AHM.

In accordance with AHM policy, while on leave of absence you continue to be responsible for your portion of benefit premiums.  Your benefits will continue at the employee rate as long as you make the employee contribution by the 1st of each month and will continue through the earlier of the end of the month in which the above 30 day period is met, or the end of the month in which employment is terminated.  Your total monthly premiums are $230.00.  Please make your check payable to "American Home Mortgage" and mail to the address below.

Please feel free to contact me if you have any questions or if you are in need of further information.

Sincerely,

Monika Luthra
Sr. Benefits Administrator
American Home Mortgage
538 Broadhollow Rd
Melville, NY 11747
Phone 631-622-2826
Fax 866-540-7696

Enclosures (4)
Leave Application
Certification of Healthcare Provider
First Reliance Authorization to Release Information Form
Return to Work Certification Form

Cc: Kathleen A. Lebeuf
      Karen Copper

538 Broadhollow Road, Melville, NY 11747

 **American Home Mortgage**

January 22, 2007

John Monaghan
707 SW 4th Street
Port Lauderdale, FL 33315

Dear John,

On January 8, 2007 American Home Mortgage (AHM) was notified of your need to take medical leave due to a health condition that makes you unable to perform the essential functions of your job. AHM was notified that you were requesting a leave of absence, but the duration of the leave was not known at the time.

AHM designated your leave, which began on January 8, 2007 as a personal medical leave as you do not qualify under the federal Family Medical Leave Act of 1993 (FMLA) or state FMLA for a job protected leave. Additionally, it was explained to you that as a non-FMLA leave, AHM would make every effort to hold your position up to the maximum of 30 calendar days. However, the needs of the business determine the actual amount of time a position is held for non-FMLA leaves.

John, please be advised that due to business needs the Company has decided to terminate your position. Effective February 1, 2007, we are separating your employment with American Home Mortgage.

Medical, dental, vision and prescription coverage will expire on February 28, 2007, and ancillary benefits (Supplemental Life Insurance) will expire on February 1, 2007. Information regarding your rights under COBRA will be sent to you separately from AHM's COBRA Administrator, ADP, who can be reached directly at (877) 274-4274. The Highmark Life Insurance Company of New York can be reached at (800) 328-5433 if you are interested in converting your life insurance to an individual policy.

We appreciate your service to the company and certainly wish you well in the future. You can reach me at the below number with any questions.

Sincerely,

Monika Luthra
Sr. Benefits Administrator
American Home Mortgage
538 Broadhollow Rd
Melville, NY 11747
Phone # 631-622-2826
Fax # 866-540-7696

Cc: Kathleen Lebeuf
    Karen Cooper
    Don Pace

*Exhibit C*

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy act statement before completing this form.

Florida Commission on Human Relations and EEOC
*State or local Agency, if any*
New York State Division of Human Rights

| AGENCY | CHARGE NUMBER |
|---|---|
| [ ] FEPA<br>[x] EEOC | |

**NAME** (Indicate Mr., Ms., Mrs.)
Mr. John Monaghan

**STREET ADDRESS**
707 SW 4th AVE

**CITY, STATE AND ZIP CODE**
Ft. Lauderdale, FL 33315

**HOME TELEPHONE** (Include Area Code)
954-895-0691

**DATE OF BIRTH**
July 21, 1964

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

**NAME**
American Home Mortgage Corp

**NUMBER OF EMPLOYEES, MEMBERS**
over 1000

**TELEPHONE** (Include Area Code):
516-396-7700

**STREET ADDRESS**
538 Broadhollow Rd.
Suite 1

**CITY, STATE AND ZIP CODE**
Melville, NY

**COUNTY**
Suffolk

**CAUSE OF DISCRIMINATION BASED ON** (Check appropriate box (es))

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN

[ ] RETALIATION  [ ] AGE  [x] DISABILITY  [ ] OTHER Pregnancy Act

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST (ADEA/EPA)    LATEST (ALL)

January 8, 2007

[x] CONTINUING ACTION

**THE PARTICULARS ARE** (If additional space is needed, attach extra sheet(s))

**PERSONAL HARM:**
I was terminated by the Respondent as of February 1, 2007. I had been employed with Respondent as VP, Repurchase Transaction Manager since October 9, 2006. I was subjected to a discriminatory discharge based on my disability and/or perceived disability.

**RESPONDENT'S REASON FOR ADVERSE ACTION:**
Don Pace, my immediate supervisor requested and received my medical records. On January 22, 2007 and within days of Mr. Pace receiving my medical records, I was informed that I would be terminated as a result of my medical condition. Respondent maintained its position to terminate my employment even though it was aware that I was able to perform the essential functions of my job. See attached Exhibit A (termination letter dated January 22, 2007).

**DISCRIMINATION STATEMENT:** I believe that I have been discriminated against due to my disability and/or perceived disability in violation of Chapter 760 of the Florida Statutes, The Americans with Disabilities Act, and Article 15, Human Rights Law of the Executive Law of New York.
SEE ATTACHED EXHIBIT A

[x] I want this charge filed with Florida Commission on Human Relations, the EEOC and New York State Division of Human Rights and any other applicable State or local Agency. I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date 6/20/2007  Charging Party: *signature*

State of Florida
City of Tampa to wit:

MARGIE VELEZ
MY COMMISSION # DD313915
EXPIRES: July 02, 2008
FL Notary Discount Assoc. Co.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

/x/ *signature*  6/20/2007
SIGNATURE OF COMPLAINANT   DATE

Sworn to and subscribed before the undersigned notary public in and for said jurisdiction this 20th day of June, 2006.

My commission expires: July 2, 2008

*signature*
Notary Public

Exhibit D



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### New York District Office

33 Whitchall Street, 5th Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622
General FAX (212) 336-3625

Roxanne Zygmund
Investigator
Phone (212) 336-3764
Fax (212) 336-3790

September 6, 2007

Wendy J. Mellk, Esq.
JACKSON LEWIS, LLP
58 South Service Road, Suite 410
Melville, NY 11747

Re:  Monaghan v. American Home Mortgage
     EEOC Charge No.: 511-2007-02477

Dear Ms. Mellk:

I understand that you have asserted that §362 (a) of the United States Bankruptcy Code operates as a stay in regard to an EEOC investigation. However, as you are surely aware, §(b)(4) states "the filing of a petition under section 301, 302 or 303 of this Title does not operate as a stay......of the commencement of continuation of an action or proceeding by a governmental unit's police or regulatory power."  We are a governmental enforcement agency. More to the point, courts have consistently held that EEOC's investigations, subpoenas, and lawsuits are not stayed by the filing of a bankruptcy petition because they qualify under the §(b)(4) exemption.  See, e.g., EEOC v. McLean Trucking Co., 834 F.2nd 1011 (3rd Cir. 1989); EEOC v. Hall's Motor Transit Co., 789 F.2nd 1011; EEOC v. Rath Packing Co., 787 F 2d 318 (8th Cir. 1986).

Accordingly, by **Friday, September 21, 2007,** please provide your response to Charging Party's allegations.  Thank you for your anticipated cooperation regarding this matter.

Cordially,

Roxanne Zygmund
Investigator

*Composite
Exhibit E*

# jackson lewis

Attorneys at Law

Representing Management Exclusively in Workplace Law and Related Litigation

| Jackson Lewis LLP | ATLANTA, GA | LOS ANGELES, CA | PROVIDENCE, RI |
|---|---|---|---|
| 58 South Service Road | BOSTON, MA | MIAMI, FL | RALEIGH-DURHAM, NC |
| Suite 410 | CHICAGO, IL | MINNEAPOLIS, MN | RICHMOND, VA |
| Melville, New York 11747 | CLEVELAND, OH | MORRISTOWN, NJ | SACRAMENTO, CA |
| | DALLAS, TX | NEW YORK, NY | SAN FRANCISCO, CA |
| Tel 631 247-0404 | DENVER, CO | ORANGE COUNTY, CA | SEATTLE, WA |
| Fax 631 247-0417 | GREENVILLE, SC | ORLANDO, FL | STAMFORD, CT |
| www.jacksonlewis.com | HARTFORD, CT | PITTSBURGH, PA | WASHINGTON, DC REGION |
| | HOUSTON, TX | PORTLAND, OR | WHITE PLAINS, NY |
| | LONG ISLAND, NY | | |

October 23, 2007

VIA FACSIMILE (212) 336-3625
& FIRST-CLASS MAIL

Ms. Roxanne Zygmund
EEOC Investigator
Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004

Re:    Simone Nicole-New v. Homegate Settlement Services
        EEOC Charge No.: 520-2007-03038
        Monaghan v. American Home Mortgage
        EEOC Charge No.: 511-2007-02477

Dear Ms. Zygmund:

As we discussed, I am writing to follow up on our correspondence of August 10, 2007 and August 13, 2007. As detailed in those letters (attached hereto as Exhibit A), and as we have discussed, American Home Mortgage declared bankruptcy in or around August 2007. At this time, it is my understanding that the Company has ceased day-to-day operations and its affairs are being handled by bankruptcy counsel. I have attached hereto a copy of American Home Mortgage's bankruptcy petition. Accordingly, we are unable to respond on the Company's behalf.

Respectfully submitted,

JACKSON LEWIS LLP

Wendy J. Mellk

WJM:dc
Enclosures

I:\Clients\A\22060_MSW\113845\Correspondence\Ltr to R Zygmund re bankruptcy.doc



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## New York District Office

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820
District Office: (212) 336-3630
General FAX: (212) 336-3625

EEOC CHARGE NO: 511-2007-02477

John Monaghan                                    Charging Party
707 SW 4th Avenue
Ft. Lauderdale, FL 33315

American Home Mortgage Corporation               Respondent
538 Broadhollow Road, Suite 1
Melville, NY 11747

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue on behalf of the Commission the following determination on the merits of the subject charge filed under Title I of the Americans with Disabilities Act of 1990, as amended (ADA).

Respondent is an employer within the meaning of the ADA and all other requirements for coverage have been met.

The Charging Party alleged that he was discriminated against when he was terminated from his position as Vice President, Repurchase Transaction Manager on February 1, 2007 because of his disability and/or perceived disability. Charging Party alleged that his immediate supervisor requested and received his medical records on January 22, 2007 and within days of receipt and reviewing the medical records; he was informed he would be terminated as a result of his medical condition.

Charging Party alleged Respondent maintained its position to terminate him even though Respondent was aware that he was able to perform the essential functions of his job.

The Charging Party has established a prima facie case of employment discrimination under the ADA.

Composite
Exhibit F

The Commission has repeatedly sought a response and documents pertaining to the Charging Party's allegations. On July 17, 2007, the Commission requested from the Respondent a response and documents to be submitted in defense of this charge. Response was due by August 10, 2007. On September 6, 2007, Respondent was also made aware that we were prepared to move forward with our investigation and that, if a full response was not received by September 21, 2007, we would conclude that any information and evidence being withheld would support the allegations in this case, and accordingly, make a determination to that effect. The EEOC again provided Respondent another opportunity to respond and was given a final extension up until October 31, 2007.

Inasmuch as Respondent has been afforded every opportunity to respond to the charge of discrimination and has failed to do so, The Commission at this time determines that said silence is an admission of the allegations made and exercises its discretion to draw an adverse inference with respect to such.

Accordingly, Respondent is found to have engaged in employment discrimination in violation of the ADA.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. The confidentiality provisions of Section 107 of the ADA and Commission Regulations apply to information obtained during conciliation.

Disclosure of information obtained by the Commission during the conciliation process will be made in accordance with the statute, and Section 1601.26 of the Commission's procedural regulations.

If the respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission. A Commission representative will contact each party in the near future to begin conciliation.

ON BEHALF OF THE COMMISSION:

*November 5, 2007*
DATE

SPENCER H. LEWIS, JR.
NEW YORK DISTRICT DIRECTOR



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## New York District Office

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820
District Office: (212) 336-3630
General FAX: (212) 336-3625

John Monaghan
707 SW 4ᵗʰ Avenue
Ft. Lauderdale, FL 33315

Re:    EEOC Charge No. 511-2007-02477
       John Monaghan v. American Home Mortgage Corporation

Dear Mr. Monaghan:

On November 5, 2007, the Commission determined that there is reasonable cause to believe that you were subjected to disparate treatment based on your disability and/or perceived disability. The Commission also invited Respondent to pursue a resolution of the charge through conciliation. Based on information provided by Respondent, the Commission has determined that any further efforts to conciliate this charge as required by statute will be unsuccessful. Therefore, no further efforts to conciliate the charge will be made.

The Commission has also determined that it will not bring a lawsuit against the above named Respondent. The issuance of the enclosed Notice of Right to Sue under Title I of the American with Disabilities Act of 1990, (ADA), as amended concludes the processing of your charge by the Commission. If you decide to sue, you must file a lawsuit in Federal District Court within 90 days of receipt of this letter and Notice of Right to Sue.

On Behalf of the Commission:

Spencer H. Lewis, Jr.
District Director

November 21, 2007
Date